No. 25-2271

# UNITED STATES COURT OF APPEALS

# FOR THE THIRD CIRCUIT

————————————

ROBIN CORNISH AND CARLEEN HASTINGS,

*Plaintiffs-Appellants,*

v.

NATIONAL FOOTBALL LEAGUE AND NFL PROPERTIES LLC,

*Defendants-Appellees,*

————————————

On Appeal from the United States District Court
for the Eastern District of Pennsylvania, No. 2:12-md-02323 (Brody, A.)

————————————

**APPENDIX VOLUME III (pp. 1903-3129)**

————————————

DAVID J. CAMPBELL

THOMPSON & HORTON LLP

8300 N. MOPAC EXPRESSWAY, SUITE 220

AUSTIN, TEXAS 78759

(512) 615-2350

October 8, 2025

# TABLE OF CONTENTS

## VOLUME III

Exhibit 26: A Player's Concussion, a Family's Ordeal, Dkt. No. 6201-7, Oct. 6, 2014 ........................................................................1903

Exhibit 27: For Retirees, Decision on Concussion Settlement Will Not Be a Simple One, Dkt. No. 6201-7, Oct. 6, 2014 ............1908

Exhibit 28: Players wrong on key factor in NFL concussion settlement, Dkt. No. 6201-7, Oct. 6, 2014 ......................................1913

Exhibit 29: the Pro Football Concussion Report, Dkt. No. 6201-7, Oct. 6, 2014 ..................................................................................1916

Exhibit 30: Seaus to opt out of concussion deal, Dkt. No. 6201-7, Oct. 6, 2014 ..................................................................................1919

Exhibit 31: New Concussion Settlement a Win-Win, Dkt. No. 6201-8, Oct. 6, 2014 ........................................................................1923

Exhibit 32: NFL reaches concussion settlement, Dkt. No. 6201-8, Oct. 6, 2014 ..................................................................................1927

Exhibit 33: Cutting Them Short, Dkt. No. 6201-8, Oct. 6, 2014 ....1931

Exhibit 34: Brain impairment begins younger, Dkt. No. 6201-8, Oct. 6, 2014 ..................................................................................1941

Exhibit 35: NFL: Nearly Three in 10 Ex-Players Will Develop Debilitating Brain Conditions, Dkt. No. 6201-8, Oct. 6, 2014 .......1945

Exhibit 36: NFL: 3 in 10 ex-players face Alzheimer's, dementia, Dkt. No. 6201-8, Oct. 6, 2014 ........................................................1948

Exhibit 37: NFL: 3 in 10 Ex-Players Will Face Alzheimer's, Dementia, or Other Neurological Problems, Dkt. No. 6201-9, Oct. 6, 2014 ..................................................................................1952

Exhibit 38: Data: 28 Percent of NFL Player's will suffer Alzheimer's or dementia, Dkt. No. 6201-9, Oct. 6, 2014 ..............1955

Exhibit 39: NFL: 3 in 10 ex-players face Alzheimer', dementia, Dkt. No. 6201-9, Oct. 6, 2014 ........................................................1960

i

Exhibit 40: NFL: 3 in 10 ex-players face Alzheimer', dementia, Dkt. No. 6201-9, Oct. 6, 2014 .........................................................1963

Exhibit 41: NFL takes aim at $25 billion, but at what price?, Dkt. No. 6201-9, Oct. 6, 2014 .................................................................1966

Exhibit 42: Report: NFL paid Roger Goodell $35.1 million last year, Dkt. No. 6201-9, Oct. 6, 2014 ................................................1971

Exhibit 43: NFL: The League that Runs TV, Dkt. No. 6201-9, Oct. 6, 2014 ...................................................................................1974

Exhibit 44: Goodell sets revenue goal of $25B by 2027 for NFL, Dkt. No. 6201-9, Oct. 6, 2014 .........................................................1978

Exhibit 45: Former players: Devil is in the details with NFL concussion settlement, Dkt. No. 6201-10, Oct. 6, 2014 ................1981

Exhibit 46: Deal in Concussion Suit Gives NFL a Big Victory, Dkt. No. 6201-10, Oct. 6, 2014 .......................................................1985

Exhibit 47: Reaction to the concussion deal, Dkt. No. 6201-10, Oct. 6, 2014 ...................................................................................1989

Exhibit 48: Dorsey Levens rips settlement of concussion lawsuit against NFL, Dkt. No. 6201-10, Oct. 6, 2014 ................................1994

Exhibit 49: Seau family says "no" to NFL settlement, Dkt. No. 6201-10, Oct. 6, 2014 ....................................................................1998

Exhibit 50: Hall of Famer Joe DeLamielleure will object to NFL concussion deal, Dkt. No. 6201-10, Oct. 6, 2014 ...........................2001

Exhibit 51: Electroencephalographic Changes in Professional Boxers, Dkt. No. 6201-10, Oct. 6, 2014 .........................................2005

Exhibit 52: Punch Drunk, Dkt. No. 6201-11, Oct. 6, 2014.............2010

Exhibit 53: Chronic Traumatic Encephalopathy in Athletes: Progressive Tauopathy After Repetitive Head Injury, Dkt. No. 6201-11, Oct. 6, 2014 ....................................................................2016

Exhibit 54: Chronic Traumatic Encephalopathy in the National Football League, Dkt. No. 6201-11, Oct. 6, 2014...........................2044

Exhibit 55: Association between Recurrent Concussion and Late-Life Cognitive Impairment in Retired Professional Football Players, Dkt. No. 6201-11, Oct. 6, 2014 ........................... 2048

Exhibit 56: Chronic Traumatic Encephalopathy in a National Football League Player, Dkt. No. 6201-11, Oct. 6, 2014 ............... 2057

Exhibit 57: Chronic Traumatic Encephalopathy in a National Football League Player: Part II, Dkt. No. 6201-11, Oct. 6, 2014 ... 2065

Exhibit 58: NFL Concussion Fast Facts, Dkt. No. 6201-11, Oct. 6, 2014 ....................................................................................... 2074

Exhibit 59: Concussion in professional football, Dkt. No. 6201-11, Oct. 6, 2014 ............................................................................. 2078

Exhibit 60: The case Against the NFL, Dkt. No. 6201-12, Oct. 6, 2014 ....................................................................................... 2089

Exhibit 61: NFL outlines for players steps taken to address concussions, Dkt. No. 6201-12, Oct. 6, 2014 ................................. 2094

Exhibit 62: American Journal of Epidemiology, Racial/Ethnic Disparities in Mortality by Stroke Subtype in the United States, 1995-1998, Dkt. No. 6201-12, Oct. 6, 2014 ................................... 2098

Exhibit 63: The Financial Cost of Dementia, Dkt. No. 6201-12, Oct. 6, 2014 ................................................................................... 2106

Exhibit 64:  NFL Player George Halas Profile, Dkt. No. 6201-12, Oct. 6, 2014 ............................................................................. 2109

Exhibit 65: How (and Why) Athletes Go Broke, Dkt. No. 6201-12, Oct. 6, 2014 ............................................................................. 2111

Exhibit 66: Former  NFL Players: Disabilities, Benefits, and Related Issues, Dkt. No. 6201-12, Oct. 6, 2014 .............................. 2122

Exhibit 67: 'Permanently disabled,' Harrison fighting for benefits NFL took away, Dkt. No. 6201-13, Oct. 6, 2014 ............. 2270

Exhibit 68: Still plenty of skeptics after NFL reaches new deal with players to settle concussion-related lawsuit, Dkt. No. 6201-13, Oct. 6, 2014 ........................................................................... 2277

Exhibit 69: Lawyers fight over settlement details, Dkt. No. 6201-13, Oct. 6, 2014.....................................................................2280

Exhibit 70: Show Us Some Math, Dkt. No. 6201-13, Oct. 6, 2014 ........................................................................................2284

Exhibit 71: How to Diagnose a Battered Brain Before It's Too Late, Dkt. No. 6201-13, Oct. 6, 2014...............................................2290

Exhibit 72: Long-Term Consequences: Effects on Normal Development Profile After Concussion, Dkt. No. 6201-14, Oct. 6, 2014 ........................................................................................2294

Exhibit 73: The Violent Life and Sudden Death of Junior Seau, Dkt. No. 6201-14, Oct. 6, 2014.......................................................2313

Exhibit 74: Dave Duerson: The Ferocious Life and Tragic Death of a Super Bowl Star, Dkt. No. 6201-14, Oct. 6, 2014 ...................2320

Exhibit 75: Are Head Injuries the Bridge Between the NFL Playing Field and Domestic Violence?, Dkt. No. 6201-14, Oct. 6, 2014 ........................................................................................2328

Exhibit 76: Will NFL & NFLPA Admit Concussion Link to Domestic Violence?, Dkt. No. 6201-14, Oct. 6, 2014 ....................2332

Exhibit 77: Profile of Self-Reported Problems with Executive Functioning in College and Professional Football Players, Dkt. No. 6201-15, Oct. 6, 2014 ..............................................................2337

Exhibit 78: Can Science See Inside An NFL Player's Skull Before It's Too Late?, Dkt. No. 6201-15, Oct. 6, 2014...................2344

Exhibit 79: Imaging of Tau Pathology in a Tauopathy Mouse Model and in Alzheimer Patients Compared to Normal Controls, Dkt. No. 6201-15, Oct. 6, 2014........................................................2351

Exhibit 80: Alzheimer's diagnosis may gain from PET imaging of tau proteins, Dkt. No. 6201-15, Oct. 6, 2014...............................2367

Exhibit 81: Time for tau, Dkt. No. 6201-15, Oct. 6, 2014..............2370

Exhibit 82: McGrath: Illinois Eye Institute project claims to identify CTE in the living, Dkt. No. 6201-15, Oct. 6, 2014 ...........2373

Declaration of Robert A. Stern, Ph.D., Dkt. No. 6201-16, Oct. 6, 2014 .................................................................................................2376

Declaration of Sean Morey, Dkt. No. 6201-17, Oct. 6, 2014....................2437

Declaration of Steven F. Molo, Dkt. No. 6201-18, Oct. 6, 2014 ..............2441

Declaration of Martin V. Totaro, Dkt. No. 6201-19, Oct. 6, 2014 ............2444

Declaration of Thomas J. Wiegand, Dkt. No. 6201-20, Oct. 6, 2014 .......2447

Declaration of Kaitlin R. O'Donnell, Dkt. No. 6201-21, Oct. 6, 2014 .....2450

Declaration of William T. Hangley, Dkt. No. 6201-22, Oct. 6, 2014........2453

Declaration of Michele D. Hangley, Dkt. No. 6201-23, Oct. 6, 2014.......2456

Declaration of Linda S. Mullenix, Dkt. No. 6201-24, Oct. 6, 2014..........2459

Fairness Hearing/Amended Transcript before the Honorable Anita B. Brody, Dkt. No. 6463, Dec. 11, 2014 ...................................................................2462

NFL Parties' Reply Memorandum of Law in Further Support of Final Approval of Class Action Settlement Agreement and in Response to Objections, Dkt. No. 6466, Dec. 12, 2014 ................................................2714

Supplemental Declaration of Douglas M. Burns, Dkt. No. 6466-1, Dec. 12, 2014 .................................................................................................2738

Exhibit 1: Memorandum and Order, Dkt. No. 6466-2, Dec. 12, 2014 ......................................................................................................2739

Order, Dkt. No. 6479, Feb. 2, 2015 ....................................................................2755

Class Counsel and the NFL Parties' Joint Submission in Response to the February 2, 2015 Order of the Court, Dkt. No. 6481, Feb. 13, 2015........2758

Exhibit A: Class Action Settlement Agreement (As Amended), Dkt. No. 6481-1, Feb. 13, 2015........................................................2769

Exhibit B: Class Action Settlement Agreement (As Amended), Dkt. No. 6481-2, Feb. 13, 2015........................................................2931

Supplemental Objection to Settlement, Dkt. No. 6484, Feb. 27, 2015 ...............3040

Statement Regarding 28 U.S.C. § 1715, Dkt. No. 6501, Apr. 7, 2015 ................3043

Exhibit 1: NFL Parties' Notice to Alabama Attorney General regarding Proposed Settlement, dated July 3, 2014, Dkt. No. 6501-1, Apr. 7, 2014.......................................................................3048

Exhibit 2: Recipients of Notifications and Supplemental Notifications Pursuant to 28 U.S.C. § 1715, Dkt. No. 6501-2, Apr. 7, 2015 ......................................................................3053

Exhibit 3: NFL Parties' Supplemental Notice to Alabama Attorney General regarding Preliminary Approval of Proposed Settlement, dated July 16, 2014, Dkt. No. 6501-3, Apr. 7, 2015 ....3058

Armstrong Objectors' Supplemental Objection to the Amended Class Action Settlement, Dkt. No. 6503, Apr. 13, 2015 ..................................................3063

Amended Final Order and Judgment, Dkt. No. 6534, May 8, 2015....................3068

Registration Form, Robin Cornish, Claim Doc. No. 95857,  July 25, 2017 .......3076

Notice of Attorney Representation, Robin Cornish, Claim Doc. No. 98468, July 27, 2017....................................................................................3082

Small Estate Affidavit and Order, Claim Doc. No. 101296, July 31, 2017.........3084

Registration Form, Robin Cornish, Claim Doc. No.  101303, July 31, 2017 .....3091

Certificate of Death, Carleen Hastings, Claim Doc. No. 102588, Aug. 1, 2017 ...................................................................................................3097

Certificate of Death, Carleen Hastings, Claim Doc. No. 102592, Aug. 1, 2017 ...................................................................................................3099

Registration Form, Carleen Hastings, Claim Doc. No.  102593, Aug. 1, 2017 ..3101

Notice of Attorney Representation, Carleen Hastings, Claim Doc. No. 102645, Aug. 1, 2017................................................................................3107

Notice of Registration Determination, Robin Cornish, Claim Doc. No. 118831, Aug. 24, 2017.............................................................................3109

Notice of Incomplete Registration, Carleen Hastings, Claim Doc. No. 121847, Aug. 30, 2017 .............................................................................3117

Final Deadline to Submit Representative Claimant Approval Documents, Carleen Hastings, Claim Doc. No. 142340, Nov. 10, 2017.......................3121

Petition for Appointment of Representative Claimant, Carleen Hastings, Claim Doc. No. 142712, Nov. 10, 2017 ....................................................3123

Proposed Representative Claimant Declaration, Carleen Hastings, Claim Doc. No. 142713, Nov. 10, 2017......................................................................3125

Certificate of Death, Carleen Hastings, Claim Doc. No. 142714, Nov. 10, 2017 .................................................................................................................3128

# EXHIBIT 26

# The New York Times

September 15, 2012

# A Player's Concussion, a Family's Ordeal

**By JUDY BATTISTA**

FORT WORTH — Mitch White watched football last Sunday, a framed New Orleans Saints jersey mounted on a wall over his shoulder at his home. White watches football differently from most people. He likes to analyze the offensive line, fitting for a tackle out of Oregon State who was a sixth-round draft pick of the Saints in 2001. And on most days, around the hour the early games reach halftime, White needs to lie down for a nap.

The Saints jersey has its spot, but there were other stops with other teams, too, so many that White sometimes is confused about what order the teams came in and who the coach was. Everywhere it was the same, though. White never played in a regular-season game, always stopped by a freakish injury, a newly signed player, or even one extended battle with the staph infection known as MRSA. After that, White asked the Tampa Bay Buccaneers to allocate him to N.F.L. Europe, now defunct, hoping it would help him get back into shape. White was a journeyman backup and practice squad player, on perhaps the most anonymous rung in the N.F.L. player hierarchy, trying to hang on to his career.

Now, seven years and one crushing hit later, he is one of the more than 3,000 former N.F.L. players who are suing the league over concussions. At 34, White is unable to work and is sometimes so debilitated by migraines that he cannot care for his two young daughters. He takes as many as eight medications at a time to ease his headaches, to smooth his erratic moods, to soothe his sleeplessness. He spends much of his time exploring treatments to find relief that rarely lasts longer than a few days: Botox injections, massage, sensory deprivation.

White and perhaps just a few hundred plaintiffs like him did not enjoy much of the glory or the riches that playing on Sundays usually bring. But they suffered the damage that they believe is the N.F.L.'s calling card, too.

In White's case, it was one hit at an N.F.L. Europe training camp in March 2005, when a blitzing middle linebacker crashed into the right side of White's head as White was pulling from his right tackle position. That sent him tumbling to the grass, knocking him out for a few moments and altering him so ineffably that his mother said, "When he first came home, it was like my son was gone."

To see White now is to get a glimpse of the challenges of living with the effects of a head injury.

**-1904-**

He looks healthy, back down to his high school weight of 245 pounds, down from his high N.F.L. weight of 335. He and his family live in a comfortable house with a big portrait of their daughters on a mantle, in a well-maintained subdivision. This was a good day, his wife, Jennifer, said, meaning he got some sleep and had restrained himself from physical activity enough — a workout at the gym can set him back for three days. The headache, while there from the moment he woke up, was at least tolerable until midafternoon.

But after 90 minutes of talking, White's energy waned. His speech became more deliberate. Sitting on his sofa, he shaded his eyes from the overhead lights in his living room. He gets lost if he drives more than a few miles from home.

The Whites were recently out to dinner with friends, and after two hours, White said he could not talk or think normally. When they have plans, White said, he will load up on medication and try to get through it. Or they will simply cancel. He used to be really funny, he has told his wife. He misses that, she said.

"I try to act normal," White said. "I just want to be normal."

White did not start playing football until he was 16 as a high school sophomore, and he does not remember sustaining any concussions in high school or college. The hit that injured him, White said, was not even the hardest one he had ever taken, although he thought his helmet was not inflated properly.

"I tried to stand up, and fell over — I did that like twice," White said, sitting in his living room, which is usually kept cool and dark because heat and light can make his headaches worse. "A lot of people have told me — I don't remember like two or three days after that — I guess I walked up to the huddle, I thought I was in the huddle, but I was three feet behind the huddle.

"All I remember is I went back in. I just remember being in my stance and trying to lift my head up, and it was excruciating."

White's odyssey through postconcussion life winds through doctors and hotel rooms, starting first in Tampa, Fla., when he was given Tylenol and Advil for his relentless headache, but still told to go to meetings and watch practice the next day. The nadir came during three months in Birmingham, Ala., where players with longer-term injuries were sent. One doctor told him he had a mild concussion and should be ready to go in another week or so. But he could not sleep. He was made to run at one point, and ended up vomiting. He spent most of his time alone, in a dark hotel room.

"I wasn't thinking clearly at all," White said. "I was severely depressed. I had suicidal thoughts,

**-1905-**

big time. It just kept popping in my head. I was thinking of hanging myself with shoe string, or every time I was in a car, I had an urge to jump out of the car on the freeway.

"I knew that was wrong. I couldn't control it."

A neurologist finally told White that the concussion he had was more moderate to severe. Later, a doctor in Pittsburgh was irate that White had been isolated in Birmingham. He told White to go home, to be around family members who could be supportive.

His mother called that time "a disaster." She and Mitch fought, and he had mood swings. "It was like he had a void in his eyes, there was no emotion," his mother, Donna Stacy, said.

Finally, doctors told White he would never play football again. He was stunned.

"I was waiting to get better," he said. "It's just the mentality; you just want to be in there, you feel like you're letting your friends down. I just thought it was like a knee injury. Rehab and get better and go. It was extreme depression."

White worked briefly with his brother in a food delivery service. But working a full day made his headaches worse and led him to take more migraine medicine than he was supposed to. He had to cancel meetings and lie on his office floor when the migraines struck. After about six months, he stopped altogether.

"It drives me crazy just sitting around," White said. "We are meant to work."

White was able to live off savings for about a year, and now he receives about $8,000 a month in payments from the N.F.L. and players union funds. His closest friends understand why White stays at home. But the mothers who take their children over to play with his daughters sometimes may wonder why he is in bed, he said.

White met his wife after he was injured, and everything about their lives together is clouded by his health. Jennifer White works the overnight shift as a registered nurse two days a week, so she is home to help care for their children. When she is not there, he calls his mother or mother-in-law for help.

Jennifer White is due to give birth to a son this year, and she doubts her husband will be able to care for three children. Stacy lives about 20 minutes away, but she is considering moving closer.

Some people have asked why they are having another child, given the situation, and Jennifer White replies: "We're not going to not have children. We're trying not to let it take over."

Jennifer White would like to quit working when their son is born, but they count on her job for medical insurance. One of Mitch White's doctors, Gary Tunell of Texas Neurology, hopes that eventually, White will not have to take so much medicine, but Tunell cannot guarantee that White's symptoms will get substantially better.

"That this has gone on seven years makes you more doubtful," Tunell said. "I think they will be diminishing in severity over time. I've tried to get Mitch to carry on normal activities. He needs to do some form of progressive exercise, and try to work through these headaches. Because right now, they are controlling his life."

The Whites have not given up hope that some new treatment might work. But the awful possibilities loom, every day.

"What he fears is early-onset Alzheimer's," she said. They do not expect much money from the lawsuit, although White is convinced that the league concealed for years its knowledge of the potential risks for players. They hope that improved education about concussions will prevent someone else from going through what White has.

Last month, the N.F.L. filed a motion to have the lawsuits dismissed, arguing that they should be resolved under the terms of the collective bargaining agreement and not by the courts.

"The N.F.L. has long made player safety a priority and continues to do so," the league said in a statement. "Any allegation that the N.F.L. intentionally sought to mislead players has no merit."

As for White, he said he would let his son play football. "I don't hate the N.F.L.," he said. "I love the sport. I in no way want to damage the league. I just thought I'd get better eventually. I had no idea this could be for the rest of your life. That this will affect you, your family, your wife.

"I expected to be hurt. I knew there was a possibility I could be paralyzed. Did I know I could get brain injury and be like this? No. I couldn't fathom that happening."

# EXHIBIT 27

The New York Times | http://nyti.ms/1udgSF4

PRO FOOTBALL | ANALYSIS NYT NOW

# For Retirees, Decision on Concussion Settlement Will Not Be a Simple One

N.F.L. Concussion Settlement Divides Former Players

By KEN BELSON    JULY 22, 2014

Class-action settlements are often messy. When enough aggrieved people are thrown together, it is natural that some of them will be unhappy with a deal that is a result of a negotiation between parties trying to avoid a long, expensive trial with an uncertain outcome.

The proposed settlement in the case brought by more than 4,500 retired N.F.L. players who claim the league hid from them the dangers of concussions is similar. Asking 10 retired players what they think of the settlement might elicit 10 opinions.

In the coming weeks, though, the 20,000 retired players and their beneficiaries will have to make a final decision to accept the proposed deal, which includes an unlimited number of cash awards for a small set of severe neurological conditions; to opt out and perhaps sue the league for more; or to object and possibly appeal the settlement.

To make informed choices, retired players will have to pore over the settlement, consult their lawyers and doctors and consider their own health and financial needs. They will also have to weigh a host of arguments for and against accepting the plan.

Jeff Nixon, who played for the Buffalo Bills from 1979 to 1982, is among those who view the settlement as the best of several bad options. Going to trial, he said, was no slam dunk because the players would have to clear

several significant legal hurdles, most notably the league's argument that the collective bargaining agreement governed player injuries.

"The lawyers fought as hard as they could and got as much as they could from the settlement," said Nixon, who writes a blog about the settlement. "To continue litigation was pretty risky."

The settlement, he said, will get money into the hands of the former players who are in the worst shape, such as those with Parkinson's disease or Alzheimer's disease, and will act as an insurance policy for players whose health might deteriorate.

"We didn't get everything we wanted, but we got the N.F.L. to say, 'We'll give you guys money if you have symptoms,' " he said. "The bottom line is if you've got impairments and symptoms, you'll get paid."

There are many retired players, though, who say the settlement is irreparably flawed, and seven of them took the unusual step Monday of asking a federal appeals court to intervene to correct what they see as deficiencies.

Sean Morey, Alan Faneca and five other former players argued that most retirees would never see any money because many of their ailments would not be covered by the settlement. "The class, as certified, is doomed," they wrote in their filing.

They noted that players who had been found to have chronic traumatic encephalopathy, or C.T.E., a degenerative brain disease closely related with Alzheimer's disease, and who had died before the settlement was finalized, could receive up to $4 million. Anyone with a diagnosis of C.T.E. after the settlement was finalized could not receive an award.

Christopher Seeger, one of the lead lawyers for the plaintiffs in the class action, said the objectors had misread the settlement. The families of dead players who were found to have C.T.E. might receive awards because the players could no longer receive a diagnosis. C.T.E. was not included for living players because the settlement would cover those symptoms if they were to develop.

"Going forward, any retired player who is sick with a qualifying

condition will get compensated, as C.T.E. cannot be currently diagnosed in living people," he said. "Whether you have C.T.E. or not, or whether or not you can prove you have C.T.E., if you have symptoms of a qualifying condition, you will be compensated."

Susan Owens, whose husband, R. C. Owens, played for the San Francisco 49ers, the Baltimore Colts and the Giants and died two years ago from Alzheimer's disease, raised another potential inconsistency. Under the settlement, younger retired players would receive larger awards than older players on the presumption that head trauma from playing football, and not old age, had contributed to their severe neurological conditions.

But Owens pointed to research by the Mayo Clinic and others who found that people with early-onset Alzheimer's often get the disease because it runs in their families. Other research, though, has shown that moderate or severe brain trauma may raise the risk of developing Alzheimer's disease.

Owens said her husband might have had Alzheimer's disease years before he received a diagnosis because he did not want to admit he was losing his memory. If he had received a diagnosis earlier, he might have been eligible for more money.

"My husband would never admit to anything," said Owens, who has said she might file an objection. "He was an expert at not letting people know how he was."

Retired players will also have to consider Article XI of the settlement, which essentially says that state and federal governments have the right to recover expenses associated with treatment for a player's illness. If a player were eligible for a $500,000 award and Medicare had paid $200,000 to treat his condition, the player would receive only $300,000.

The problem for players is figuring out how much the government has spent. A liens administrator will be appointed to determine those amounts, but players may not get answers until after the settlement has been completed. That means they may not know what they could receive until it is too late, said Michael Kaplen, a lawyer who represents clients with traumatic brain injuries.

http://www.nytimes.com/2014/07/23/sports/football/nfl-concussion-settlement-divides-former-players.html?_r=1                                  3/4

"Unless they know what the numbers are, then how can they decide whether to opt out?" he asked.

Seeger, the plaintiffs' lawyer, said that in other settlements he had worked on, he negotiated a fixed deduction that was drastically lower than the amount that the recipients owed. The government, he said, prefers the certainty of receiving small amounts from every recipient rather than spending years trying to claw back money from many people.

"The government likes these deals because rather than chasing these people individually, they can receive a fixed amount for each disease," he said.

Seeger said he was actively negotiating deductions now.

A version of this article appears in print on July 23, 2014, on page B13 of the New York edition with the headline: For Retirees, Decision on Concussion Settlement Will Not Be a Simple One.

© 2014 The New York Times Company

# EXHIBIT 28

- Videos
- Photos
- Scores
- Menu

- nfl
- mlb
- nba
- nhl
- ncaaf
- ncaab
- nascar
- soccer
- fantasy
- linemakers

- *Facebook*
- *Twitter*
- *Google+*
- *Search*

Search Sporting News

Search

# Players wrong on key factor in NFL concussion settlement



- David Steele @david_c_steele
  Email RSS
- July 14, 2014 11:07am EDT

- facebook
- twitter
- googleplus
- tumblr
- pinterest
- Email

The attorneys representing the players in the NFL concussion lawsuit are now at work getting the word out to all the retired players affected by the revised settlement. That includes the ones who are getting misinformation or inaccurate information – including those publicly claiming that they can't get money from the settlement despite having CTE.

"CTE is not a relevant marker for anything in this settlement. It's the symptoms— if you have all the symptoms that are related to CTE, or the diseases that are related, like dementia and Alzheimer's and ALS, then that determines it," said Christopher Seeger, the co-lead counsel for the more than 5,000 players in the settlement.



Frank Wychek (AP Photo)

"If a player thinks he has any symptoms of it, that's the very reason to stay in the deal,'' he added. "Proving that it's actually CTE is not necessary."

Several players and observers have challenged the settlement, in court by seven retired players and in published interviews by Hall of Famer Tony Dorsett and others. The settlement was revised on June 25 to uncap the amount available to them, and U.S. District Court Judge Anita Brody gave preliminary approval last Monday.

The challenges center on language that implied that those suffering from the degenerative brain disease chronic traumatic encephalopathy (CTE) would not be eligible for a payment if they filed after the date of the revised settlement, and that they wouldn't get anything at all because the disease still can't be definitely diagnosed before death.

That, Seeger said, is a fact about the settlement that "they just get wrong."

Players will be part of the payment pool just for showing the commonly-recognizable signs of CTE, without having to prove they have a disease that is still subject to medical research, widespread theory about the cause, and potential challenges by the NFL and its experts.

"If you get sick, period, you still get paid,'' he said. "We're telling everybody to go get tested. You'll be in the system. You're protected (by the settlement).''

Seeger, co-counsel Sol Weiss and the legal team specifically fought to make sure CTE was not used to determine eligibility, he said, because they didn't want anyone to challenge players to have to prove they have it—and that it was specifically related to concussions, and then only to ones suffered as an NFL player. It was a hurdle the lawyers did not want to subject players to.

"We're taking that argument out of the equation,'' Seeger said, adding, "You don't have to prove the causation. If you get sick from these symptoms or illnesses, we're going to assume that it was caused by concussions.''

The land mine the players have to avoid, he said, was putting too much on the current testing being done to diagnose CTE in living patients—such as the program at UCLA in which Dorsett, among others, was diagnosed with symptoms last fall. Besides the obvious worries about the health implications, it now has left the notion that the test is definitive when it's still just preliminary research that likely would not withstand a legal challenge.

In addition, retired tight end Frank Wycheck told The Tennessean that he was sure that "I am not eligible to receive a dime" despite his symptoms.

Without referring specifically to any player or his objections, Seeger said that was not true. The class action covers roughly 19,000 retired players, he said, and if they played and are suffering (or believe they will suffer) from the effects of concussions, they are covered.

The challenge, he said, is convincing players not to opt out of the settlement and trying to go it alone in court—and possibly lose a chance at payments or benefits forever. Seeger worries that players might end up "listening to a guy who's been listening to television ads and wants to gather plaintiffs to file a case and make some money off of it.

"If there ever was an opportunity to opt out,'' he said, "this is not the case to do it.''

- facebook
- twitter
- googleplus
- tumblr
- pinterest
- Email

# EXHIBIT 29

# THE PRO FOOTBALL CONCUSSION REPORT

October 01, 2014

[Search site…] [Go]

- Home
- On TV & Video
- Science & Medical
- Document Archive
- Contact

## A Fan's Look at Head Injuries and the Concussion Crisis in Football

### The NFL CTE Question



Tony Dorsett may be the current face of the NFL Settlement CTE question (AP)

07.22.14

Plaintiffs attorneys for the former NFL football players are trying to clear up the question of CTE in regard to the proposed concussion settlement. A recent Sporting News piece addressed the controversial issue with the former players Co-lead Counsel, Chris Seeger.

> "Seeger, co-counsel Sol Weiss and the legal team specifically fought to make sure CTE was not used to determine eligibility, he said, because they didn't want anyone to challenge players to have to prove they have it—and that it was specifically related to concussions, and then only to ones suffered as an NFL player. It was a hurdle the lawyers did not want to subject players to."

**-1917-**

According to the Sporting News piece, the rationale seems to be that:

1. It is still too early to diagnose CTE in living people. The work that is currently being done toward this goal is preliminary and may not have withstood a legal challenge.

2. Diagnosis of CTE is not necessary because suffering from the symptoms of CTE may make a player eligible for compensation.

> *If you get sick, period, you still get paid. We're telling everybody to go get tested. You'll be in the system. You're protected (by the settlement).*
> ~ Co-lead Class Counsel Chris Seeger

3. Players won't have to prove that CTE came from playing in the NFL. Although this of course is one of the main advantages of the settlement, former players do not have to show causation of their injuries, they also don't have to show it in order to be compensated for the other illnesses (ALS, Parkinson's, Alzheimer's and Dementia) which are listed on the grid.

> *If a player thinks he has any symptoms of it, that's the very reason to stay in the deal. Proving that it's actually CTE is not necessary.*

So moving forward, it will be critical to see if the symptoms of CTE manifest themselves in the diagnoses that the NFL settlement compensates.

In June, concussion plaintiffs lawyers Mike McGlamry and Bruce Hagen hosted a session at Emory University's Alzheimer's Disease Research Center that focused on the diseases and testing that is associated with the settlement.



Plaintiffs lawyers host a medical information session at Emory University

The 1 1/2 hour video has a lot of information about the medical issues including the diagnosis of Level 1.5 and Level 2.0 dementia. Without specific diagnoses of ALS, Alzheimer's or Parkinson's, the 1.5 and 2.0 levels of dementia may be looked at as a sort of catch-all or predecessor to the more specific named illnesses.

- 
- 
- 

Return to Home

# EXHIBIT 30



# Seaus to opt out of concussion deal

**MARK FAINARU-WADA AND STEVE FAINARU via <u>ESPN</u>**

—

Relatives of former linebacker Junior Seau, whose suicide in 2012 put the NFL's concussion crisis on the national agenda, will reject a proposed settlement between the league and thousands of former players, a lawyer representing the family told "Outside the Lines" on Tuesday.

The decision to opt out means the Seaus will proceed with a wrongful death lawsuit they filed in January 2013. That suit alleges that the NFL concealed the dangers of football-related head trauma over a period of several years. After his death, Seau was diagnosed with chronic traumatic encephalopathy, or CTE, a neurodegenerative disease that has been found in dozens of deceased NFL players.

The announcement, coming on the eve of the 2014 season, is a serious blow to the NFL's efforts to put the concussion issue to rest. It raises the specter of continuing litigation that would pit the NFL against the family of one of its most popular players. Seau, a certain Hall of Famer, played 20 years in the NFL.

"The family want to know why this settlement seems designed for expediency for the NFL and to ensure that information doesn't come out," said Seau lawyer Steven Strauss, a partner in the firm Cooley LLP. "And the Seau family wants the truth to come out. Since this litigation started, there hasn't been one document produced, there hasn't been one deposition taken. It seems very clearly designed to nip this in the bud and not have the truth come out, and that's not acceptable to the Seau family, and it's not acceptable to Junior's legacy."

The settlement received preliminary approval from a federal judge in July. The deal calls for payments to former players who qualify under a complicated system that measures the level of neurocognitive impairment related to diseases such as ALS (Lou Gehrig's disease) and CTE. An initial $765 million deal was resubmitted after the judge raised questions about whether it provided enough money for the potentially large number of players who qualified. The total payout is now unlimited.

Strauss said the Seaus concluded that the deal does not address several concerns, including adequate compensation for the descendants of the former players. Seau's lawyers filed a previous motion objecting to the first proposed settlement, and Strauss said the revised deal did nothing to address those issues.

Strauss said Seau's family, including his four children, is "not suing for his pain and suffering. They're suing for their own. This settlement doesn't address that."

Under the proposed settlement, relatives of some players found to have CTE qualify for compensation up to $4 million.

Chris Seeger, an attorney who negotiated the settlement on behalf of the players, noted that those who opt out not only forfeit compensation and medical treatment provided by the deal but also face significant legal hurdles.

**-1920-**

"If Mr. Strauss believes the $4 million his client is eligible for under the settlement is insufficient, he can choose to permanently forfeit these benefits and face all the significant risks associated with continued litigation," Seeger, a partner at Seeger Weiss LLP, said in a statement. "We would advise any class member against opting out of this agreement, considering the tremendous guaranteed benefits it provides."

An NFL spokesman did not respond to inquiries.

Seeger and other supporters of the settlement have argued that the deal was necessary in part because the case against the NFL is difficult to prove. The players, they noted, will have to show that the brain damage was caused by their years in the NFL even though the players participated in youth, high school and college football. They also will have to prove that the NFL suppressed the link between football and brain damage from players and fans even though that connection was discovered relatively recently.

Strauss repeated concerns that have been voiced by other attorneys, who argued that the negotiations that resulted in the deal lacked transparency. Many believe that the case never should have been treated as a class action because the players and their families have such disparate issues and injuries.

Strauss said he hoped other players might follow the Seau family's lead and opt out of the deal to force the two sides to negotiate a better deal.

"Ideally, our opt-out may cause others to consider that, and, in the ideal world, would cause the league and the plaintiffs [lead attorneys] to perhaps re-examine the settlement so they come up with something that addresses the claims of all those in the [lawsuit] and not just the few," Strauss said.

It is unclear how many other players, if any, have signaled their intent to oppose the deal. Strauss said the Seau family will formally notify an administrator of its intent to opt out before an Oct. 14 deadline. Players also have until that deadline to formally object to the deal. A large number of opt-outs could become a factor in the judge's decision to give final approval.

It's also not clear how -- and when -- Seau's case would be allowed to proceed back in California Superior Court in San Diego. It first needs to be remanded back to that court by Judge Anita Brody, who is overseeing the mass case, which conceivably could be held up for years in appeals.

"That's another problem; our case could be held hostage by the settlement," Strauss said. "We're opting out, but also want to proceed, want to be able to get on with the case."

Seau, who was 43, shot himself in the chest with a .357 Magnum revolver following years in which his family and friends noticed marked changes in his behavior. Previously a responsible and loving father, Seau lost control of his finances, gambled excessively and became disconnected from his relatives, including his children.

Shortly after his death, the NFL intervened in an unseemly battle among neuroscientists who wanted to study his brain. Members of the NFL's concussion committee helped direct the brain to the National Institutes of Health, where five separate neuroscientists found signs of the destructive neurofibrillary tangles that cause CTE.

Seau's case might pose a larger threat to the NFL than any other player suing the league. In addition to his name recognition and popularity, his medical record and clinical history are well-documented. In addition, his career coincided with an era in which the NFL's own research arm, created by former commissioner Paul Tagliabue, denied repeatedly in scientific articles and public statements that NFL players are susceptible to brain damage.

That committee, led by Tagliabue's personal physician, Elliot Pellman, who was also the New York Jets' team doctor, attacked neuroscientists who presented evidence suggesting that, in fact, the repeated head trauma related to football had led to significant brain damage in an alarming number of former players, including Hall of Fame Pittsburgh Steelers center Mike Webster and Chicago Bears defensive back Dave Duerson.

Duerson's relatives also sued the NFL. They have not yet indicated whether they intend to opt out of the deal.

Duerson's lawyers also have complained about the unwillingness of the NFL and lead counsel for the players to share information about how the settlement was reached and how the grid designating payoffs for various cognitive issues was crafted. In response to motions by entities such as ESPN, Bloomberg and several players, the league and the lead counsel for the plaintiffs signaled this week that they will produce the documents if the judge orders them to do so.

"We'd like all the info, we can't determine how the grid was even determined," Strauss said. "How did they come up with the grid amounts? We'd like to know the foundational basis that was presented to ... the court for approval. There has been a real sound of secrecy around these settlement discussions and the whole process."

Copyright © 2014 ABC News Internet Ventures

# EXHIBIT 31


PRINT



# New Concussion Settlement a Win-Win

June 26, 2014 by Andy DeGory

A new proposed settlement in the NFL concussion litigation should alleviate many worries when it comes to compensation for players affected by brain injuries. The revised agreement removes the cap on the NFL's obligations to the monetary award fund, and guarantees that any retired player who develops a qualifying neurocognitive condition will receive compensation. Ultimately, it looks like a win-win for the NFL and the players.

In a Wednesday conference call, Chris Seeger, co-lead counsel for the retired NFL players, said the plaintiffs' counsel team had been confident that the $765 million initially agreed upon last August would have been enough to cover the 65-year lifespan of the fund. They were supported by actuarial estimates from both parties. However, concerns over the fund's long-term future arose from both the court and the players.

"We heard concerns from players who needed to trust that the money would be there in, say, 40 years," Seeger said.

U.S. District Judge Anita B. Brody denied the motion for preliminary approval for the settlement in January. After six months of work under the supervision of Brody and the court's special master, Perry Golkin, the agreement was reached to uncap the fund and fully guarantee that retired players would receive the necessary benefits during the 65-year plan.

In regards to the actuarial estimates that led to the initial $765 million agreement, Seeger stated that those are now irrelevant due to the removal of the fund's cap.

"There is no scenario where a player won't get paid," said Seeger. "The biggest news of this is that in 15 or 25 years, you are still guaranteed to be compensated."

According to Seeger, aside from tightening some details the agreement between the players and the league remains largely unchanged. The standard will remain the same for players seeking benefits; severe

Case 2:12-md-02323-AB Document 6534-31 Filed 04/06/15 Page 31 of 1235
Case 2:23-md-02323-AB Document 6534-31 Filed 04/06/15 Page 2 of 3



The compensation of Kevin Turner, a class representative in the suit who suffers from ALS, will not change. (Charles Dharapak/AP)

cognitive impairment will need to be proven to receive benefits. If, during a baseline assessment, mild cognitive issues are identified, players will be eligible for follow-up treatment as part of the program.

The monetary grid and scale to determine a player's compensation will remain unchanged as well. Seeger said that the plaintiffs never thought of trying to change the grid or its pay values during the revision of the settlement.

One change of note is that the NFL's ability to appeal claims is now unlimited, whereas they were limited to 10 appeals a year in the July agreement. Some argue that this could give the league a loophole to minimize claims.

Kevin Turner, a former Eagles and Patriots fullback, now suffers from ALS. A class representative in the lawsuit, his compensation ceiling of $5 million will not change with the new agreement. Turner's statement:

"The compensation provided in this settlement will lift a heavy burden off of the men who are suffering," Turner said in a statement. "I am also personally comforted by the knowledge that this settlement is guaranteed to be there for any retired player who needs it. This settlement is another important step for ensuring that future generations of football players do not suffer the way that many in my generation have."

Case 2:25-cv-07023-1 Document 20-2 Page 32 of 32 Page ID #page-2029

It appears as though both sides got it right on the second iteration. The uncapping of the fund ensures the effectiveness of the compensation program. It alleviates concern over the long-term viability of the initial $765-million agreement, and expedites the process for players who are in need right now.

> **There is no scenario where a player won't get paid,"
> said Seeger. "In 15 or 25 years, you are still
> guaranteed to be compensated.**

Judge Brody and Special Master Golkin deserve credit for working through the initial settlement and ultimately ensuring that the appropriate compensation was allocated. Brody's decision to reject the first settlement looks like it was the right move.

During the conference call, Seeger used the phrase "100% guarantee" multiple times when addressing players' ability to receive benefits. The NFL and the retired players have to be pleased on two fronts: Once the settlement is approved, the compensation program will come into effect soon and start providing benefits to players in need; and recent retirees who could be affected in the future now know that the coverage will be there.



☺

# EXHIBIT 32

# NFL reaches concussion settlement

**Gary Mihoces, USA TODAY Sports**   *7:08 p.m. EDT August 29, 2013*



*(Photo: Evan Habeeb, USA TODAY Sports)*

The NFL and more than 4,500 former players want to resolve concussion-related lawsuits with a $765 million settlement that would fund medical exams, concussion-related compensation and medical research, a federal judge said Thursday.

**MORE:** The judge's order (http://i.usatoday.net/sports/nfl/2013-08-29-NFL-Concussion-Litigation-Settlement.pdf)

**Q&A:** What this means (http://www.usatoday.com/story/sports/nfl/2013/08/29/nfl-concussion-lawsuit-settlement-judge-layn-phillips/2727589/)

The plaintiffs include at least 10 members of the Pro Football Hall of Fame, including former Dallas Cowboys running back Tony Dorsett. They also include Super Bowl-winning quarterback Jim McMahon and the family of Pro Bowl linebacker Junior Seau, who committed suicide last year.

**BELL:** Right time for settlement (http://www.usatoday.com/story/sports/nfl/columnist/bell/2013/08/29/nfl-bell-concussion-lawsuit/2729447/)

**HEADS UP:** Can game be made safer for kids? (http://www.usatoday.com/story/sports/nfl/2013/08/27/heads-up-youth-football-nfl-roger-goodell/2711317/)

Senior U.S. District Judge Anita Brody in Philadelphia announced the proposed settlement Thursday after months of court-ordered mediation. She still must approve it at a later date.

Former NFL fullback Kevin Turner, who suffers from ALS, also known as Lou Gehrig's Disease, spoke in a halting voice during a teleconference Thursday as he welcomed the settlement.

"It's been a struggle to get to this point, but today … I am very proud that the NFL has decided to stand up for all the former players who are suffering from brain injuries," said Turner, 44, who played with the Philadelphia Eagles and New England Patriots and was a plaintiff in the suits.

"You know it's easy to forget just how many men have played in the NFL throughout the years. That's why today is so important for those who are hurting. This will bring help for them."

He added: "The compensation provided in this settlement will lift the huge burden off the men who are suffering right now, both them and their and families. It will give them the peace of mind to have the best quality of life they are able to have. They'll no longer have to make decisions regarding their health based on what they can afford."

Although some might see the settlement as low, the case was complicated and not a slam-dunk for the ex-players. Meanwhile, the NFL was battling a public relations nightmare of appearing to be a bully for even fighting the case.

Players attorney Christopher Seeger acknowledged there would have been risks in litigation. The lawsuits might have been dismissed.



USA TODAY Sports' Jarrett Bell analyzes the $765 million settlement.

"This is the only program where everybody get justice. … Everybody wins," Seeger said.

He said all retired players, not just those who sued, will be eligible for a brain assessment program, and those found to have a certain level of impairment will receive a medical benefit card that be used for further testing and treatment.

Seeger said players who develop problems such as ALS, Alzheimer's or severe dementia will receive a benefit, in some cases as high as $5 million. He also said the families of players who committed suicide will be eligible for "a seven-figure payout."

Seeger said former players will not have to prove their brain conditions are linked to NFL concussions.

"You don't have to prove that your neurological problem is related to a concussion. You don't have to prove in the settlement that you sustained a concussion in the NFL," Seeger said. "You just need to be a former retired player and you're in the program."

Many former players with neurological conditions believe their problems stem from on-field concussions. The lawsuits accused the league of hiding known risks of concussions for decades to return players to games and protect its image.

The NFL has denied any wrongdoing and has insisted that safety has always been a top priority.

**A BETTER HELMET:** Or just wishful thinking? (http://m.usatoday.com/article/sports/2601063)

**DATA:** Concussions keep players out longer (http://www.usatoday.com/story/sports/nfl/2013/07/31/concussions-keeping-nfl-players-off-the-field-longer/2604023/)

The settlement likely means the NFL won't have to disclose internal files about what it knew and when, about concussion-linked brain problems. Lawyers had been eager to learn, for instance, about the workings of the league's Mild Traumatic Brain Injury Committee, which was led for more than a decade by a rheumatologist.

In court arguments in April, NFL lawyer Paul Clement asked Brody to dismiss the lawsuits and send them to arbitration under terms of the players' contract. He said that individual teams bear the chief responsibility for health and safety under the collective bargaining agreement, along with the players' union and the players themselves.

One players lawyer, David Frederick, accused the league of concealing studies linking concussions to neurological problems for decades. But Seeger took the money over a peek into the NFL's files through discovery.

"It's always my preference not to continue to drag the litigation into a settlement process. It's not productive," Seeger said. "We made some pretty serious allegations in our complaint. But when we got into a point where we were looking to settle the case, I put that aside and only had one goal in negotiating and that was achieving the right result for players."

He said the primary goal was "substantial payouts" for severely injured players and testing and care for the others.

"I know many people would have been interested in seeing everything in the NFL's files, but at this point because we achieved the result we achieved and the NFL stepped up and settled the case, it's not a big concern for me. We got what we wanted."

**MORE:** Former QB Rypien applauds settlement (http://www.usatoday.com/story/sports/nhl/2013/08/29/former-washington-redskins-quarterback-mark-rypien-nfl-concussion-settlement/2728781/)

Brody had initially planned to rule in July, but then delayed her ruling and ordered the two sides to meet to decide which plaintiffs, if any, had the right to sue. She also issued a gag order, so it has been unclear in recent weeks whether any progress was being made.

The lawyers were due to report back to her Tuesday, but Brody instead announced in court files Thursday that the case had settled.

In recent years, a string of former NFL players and other concussed athletes have been diagnosed after their deaths with chronic traumatic encephalopathy, or CTE. Those ex-players included Seau and lead plaintiff Ray Easterling, who filed the first suit in Philadelphia in August 2011 but later committed suicide.

About one-third of the league's 12,000 former players have joined the litigation since 2011. They include a few hundred "gap" players, who played during years when there was no labor contract in place, and were therefore considered likely to win the right to sue.

In their suits, the former players allege that for decades the NFL knowingly failed to protect players from concussions. The suits allege long-term effects such as depression, dementia and suicide, such as the 2012 death of Seau and the 2011 suicide of former Chicago Bears great Dave Duerson.

More than 200 suits filed across the country against the NFL by ex-players were consolidated in Philadelphia. Brody had been expected to rule July 22 on an NFL motion to dismiss the suits. The league argued that because the players were covered by collective bargaining agreements, the matter should be settled by arbitration.

Brody ordered the mediation after what she described as an "exploratory" telephone conference with the attorneys for both sides.

"I order parties, through their lead counsel, to engage in mediation to determine if consensual resolution is possible," she wrote.

Brody appointed Layn Phillips, a retired federal judge, as mediator. Brody ordered Phillips to report to her by Sept. 3 on the results of the mediation and said she would not rule on the NFL's motion to dismiss until then.

The two sides responded with brief statements saying they would comply with the order and make no further comment.

*Contributing: The Associated Press*

**PHOTOS: Concussions and the NFL**



**CONCUSSIONS AND THE NFL**

**RELATED VIDEO**



**Is the 'Patriot Way' still working?**

# EXHIBIT 33



# SPORTS ON EARTH

## PATRICK HRUBY

July 18, 2014

# CUTTING THEM SHORT



Former NFL linebacker Junior Seau was diagnosed with CTE posthumously. In one study, 33 of 34 football players tested positive for the disease. (Getty Images)

Dave Pear was still alive. Potentially, this was a problem. It was the day after a federal judge had granted preliminary approval of a proposed settlement of a class action brain damage lawsuit brought by retired players against the National Football League, and Pear was on the phone with me, trying to make sense of the deal. What kind of illness and injury did it cover? How much money could suffering retirees expect? Why did the agreement make all sorts of seemingly arbitrary, non-medical distinctions, like one between different degrees of dementia?

Pear didn't know. He said his lawyer didn't know, either. A 61-year-old former Pro Bowl defensive tackle now afflicted by a variety of football-induced maladies -- vertigo, memory loss, constant physical pain following multiple neck, back and hip surgeries -- Pear already had spent years fighting to receive benefits from the NFL's much-maligned disability system, a treacherous legal and medical thicket that many retirees insist has been designed to cut costs by denying claims. He hoped the proposed settlement was different. That it would help everyone in need, every broken family and battered brain. Including his own.

"Is it a good deal?" Pear said. "It only covers certain people at certain times. Based on what I've read, you won't get compensation for CTE [chronic traumatic encephalopathy] until after you're dead."

Not exactly, I told him. To receive cash awards for CTE, a neurodegenerative disease that currently only can be diagnosed posthumously, former players must have died by a specific cutoff date.

"Well, what's the date?" Pear said.

Yesterday, I said.

Silence.

"That's horrible," Pear said. "That stinks. Unbelievable."

Believe it: According to the terms of the proposed settlement, NFL retirees may receive awards of up to $4 million for "Death with CTE," but only if they've died between Jan. 1, 2006 and July 7, 2014. Anyone who died earlier is shut out. As is anyone reading this. Forever. Never mind that CTE -- a condition found in contact sports athletes, military personnel exposed to explosive blasts and others subjected to repetitive concussive and subconcussive head trauma, marked by widespread, irreversible accumulation of destructive tau protein in the brain -- is at the heart of the lawsuits against the league. That it's the disease of Junior Seau and Dave Duerson, Andre Waters and Justin Strzelczyk. That it's the *deus ex machina* of "League of Denial," a malady that the NFL's handpicked, under-qualified, since-discredited concussion doctors insisted neither existed nor could be linked to football, all while the neuropathologist who first discovered CTE's telltale tau tangles in Hall of Fame center Mike Webster's brain, Bennet Omalu, considered calling it *footballer's dementia*.

Never mind, too, that the proposed settlement does not assign similar cutoff dates to former players diagnosed with amyotrophic lateral sclerosis (Lou Gehrig's disease), Alzheimer's or Parkinson's -- even though a 2013 National Institute for Occupational Safety and Health study of nearly 3,500 NFL retirees who played at least five seasons between 1959 and 1988 recorded just 17 combined cases of the aforementioned diseases, while 33 of the 34 deceased NFL players in a 2010 study were diagnosed with CTE. This left neuropathologist Ann McKee to wonder whether "every single football player doesn't have" it.

"[The cutoff] is one of those things that when you say it out loud, it just sounds ridiculous," says Alan Faneca, a former NFL lineman and one of seven retirees who have filed an objection to the proposed settlement. "It sounds crazy. To have such a small window -- the guys like Mike Webster who helped build and create the game having passed away before and their kids and families don't get anything, and the current guys who luckily enough lived past Fourth of July weekend not getting anything either? It doesn't make sense. It's a line drawn in the sand, entirely not on the right place."

A lawyer who requested anonymity because of his ongoing work on football brain damage litigation is more blunt. Picture the settlement's upcoming fairness hearing, he says, currently scheduled for November in which Judge Anita Brody must listen to objections and concerns

**-1933-**

10/1/2014

Case 2:12-md-02323-AB Document 6201 Page: 40 Filed: Filed Date Filed: 10/08/2015
How the NFL's concussion settlement cuts coverage. | SportsonEarth.com : Patrick Hruby Article

before giving the deal final approval. Now picture Omalu or McKee standing in a federal courtroom in Philadelphia, holding aloft two jars.

In Jar No. 1: The brain of an NFL retiree who died before July 7.

In Jar No. 2: The brain of a retiree who died afterward.

"Just imagine [them saying], 'both show significant signs of brain damage, yet only this one is entitled to $4 million,'" the lawyer says. "'Preposterous, your honor.'"

* * *

Preposterous? Not at all. More like a simple misunderstanding. At least according to Chris Seeger, the co-lead attorney for the players on the proposed settlement. Two nights after I spoke with Pear, Seeger was a guest on CBS Sports radio. He wanted to, in his words, "straighten this out." (Full disclosure: Seeger specifically wanted to straighten *me* out -- the previous evening, I had been a guest on the same show, and had criticized both the death with CTE cutoff date and other aspects of the settlement).

"You know, frankly, we didn't care if you have CTE or not," Seeger said.

The settlement, Seeger explained, wasn't set up to help NFL retirees with CTE. It was set up to help retirees who are sick. Sick enough to show symptoms of neurodegenerative disease. The deal awards cash payments to former players who receive a "qualifying diagnosis" of ALS, Parkinson's, Alzheimer's or dementia. The first two conditions can be definitively diagnosed in the living. CTE cannot. Instead, a definitive diagnoses requires an autopsy, same as Alzheimer's and some types of dementia. A neuropathologist must cut a patient's brain into thin slices, stain them with chemical markers and examine the results under a microscope.

Rather than pay the families and estates of deceased ex-players who have been diagnosed with CTE, the settlement seeks to dispense money to retirees while they are still alive. How? In order to be eligible for a payout, former players must enroll in a Baseline Assessment Program, a neuropsychological testing program that screens for signs of cognitive impairment. If a retiree with CTE has enough impairment to qualify for dementia or Alzheimer's -- both of which have some symptoms which overlap with those of CTE -- he'll get his award in the here and now. Which means he won't need a death with CTE payout. Hence the cutoff date.

That's the logic, at least.

"I think people got really hung up on CTE, but, you know, this is all about symptoms," Seeger said on the radio. "If you're sick, and your activities of daily living are being interfered with, you can't function, you're going to get paid whether or not you have CTE."

This sounds reasonable. Unless you've read the scientific literature written by researchers who study CTE. Or have talked to family members of men who have succumbed to the disease. In which case, it sounds like a sneaky evasion. And also completely ludicrous. Despite Seeger's reassurances, the settlement not only figures to stiff-arm every current NFL retiree unfortunate enough to have CTE and die after July 7, but also many of those same retirees who have to *live* with the disease in the meantime. The very same symptomatic ex-players struggling with daily life who Seeger insists are covered by the deal.

Consider Lew Carpenter.

Carpenter was a football lifer. He played on the Green Bay Packers under Vince Lombardi. Coached in the NFL for 31 years. When he died from pulmonary fibrosis four years ago at age 78, Boston University researchers studying CTE called his daughter Lisa's house. They had an unusual request. They wanted to examine Lew's brain. His family had never heard of the disease. They said *yes* anyway, knowing Lew would have wanted to help other players. Lew's other daughter, Rebecca, wasn't sure what to expect. Dad had taken plenty of hits as running back, receiver and defensive back, but never had been diagnosed with a concussion. Well into his 50s, he had remained mentally sharp -- sharp enough to serve as an assistant coach for eight different NFL teams, as well as sideline stints with the World League of American Football's Frankfurt Galaxy and Southwest Texas State University. Only in his final years did Lew seem obviously impaired: he had trouble finding the right words, remaining organized, remembering why he was going to the doctor.

Rebecca was at her home in Los Angeles when the call came from Boston. *Your father had CTE. An advanced case. No signs of Alzheimer's or any other neurodegenerative diseases.* She was sick to her stomach. Didn't believe it. Didn't know a thing about CTE, either. Thought it might

**-1934-**

be bullshit, a made-up disease, hyped by opportunistic lawyers and overeager scientists. Football was the greatest thing in her father's life, a sport that had lifted him out of childhood poverty, given him everything ... and *this* was what it had done to him? No. Just no. Even when Rebecca read the pathology report a few months later, she remained in denial. Until she saw the images of her father's brain, dotted with dark splotches of stained tau. "It was really shocking how much damage there was," she says. "On a scale of one to four, he was a four. Then I looked at the symptoms and was like, 'oh my god, that was a symptom. That was a symptom.'"

Suddenly, some of her father's inexplicable past behavior started to make sense. Like his mood swings. Like when someone would let the family's dogs into the house, and Dad would start screaming, totally spooked, as if someone had planted a live IED in the living room. *Goddamnit, who let the dogs in!* "He would call up and say, 'how is such and such,' and I would say, 'Dad, that was last year!' Rebecca says. "I would get mad and frustrated and think he doesn't care, he's not listening. But he had brain damage. And we didn't know. He was really high functioning in a lot of ways, but still had a lot of brain damage that impaired his ability to be in relationships and hold down jobs. You can look drunk, like under the influence of drugs. People don't know. It comes and goes. It's intermittent. It's crazy. It's like a frog in a pot of cold water and you slowly turn up the heat, and by the time they are boiling to death they don't even notice the change."

Rebecca talked to her mom, Ann, who first met Lew when she was 15.

*Mom, when did it start to go south?*

*It was really in his 40s.*

Among CTE case studies, Lew's story is hardly unique. Mood and behavioral problems often come first, followed by cognitive impairment. Duerson followed that path, his marriage ending, his business empire imploding, his dreams of becoming mayor of Chicago dashed, all before he began having blurred vision and headaches, memory loss and problems spelling common words. In 2011, he shot himself in the heart with a revolver, asking that his brain be donated to CTE researchers. Prior to committing suicide in 2012, Seau likely would not have been diagnosed with dementia or Alzheimer's. He was functional. Still there. Nevertheless, something had shifted, gone awry: He was womanizing, drinking heavily, gambling too much, acting impulsively, making bad financial decisions, hiding depression, forgetting things, having trouble sleeping.

Last year, Boston University CTE researcher Robert Stern and other scientists published a study of 36 adult males who had the disease. All were athletes. Twenty-nine played football. None suffered from any other neurodegenerative or motor neuron disease. Three were asymptomatic when they died. The rest were not. They fell into two clinically distinct groups, labeled "cognitive" and "behavior/mood." Each group was consistent with earlier case reports of CTE in boxers.

The first group consisted of 11 men. As patients, they suffered first from cognitive impairment -- memory problems, executive dysfunction. They tended to live longer, and their symptoms tended to show up later in life, typically in their late 50s. By contrast, the 22 men were in second group generally died younger, and their symptoms appeared earlier. Moreover, the symptoms themselves were totally different: Emotional explosiveness, impulsive behavior, outbursts of violence, depression and hopelessness.

When Duerson was 45 years old, he inexplicably threw his wife, Alicia, against a wall during an argument. She later told *Men's Journal* that he had never been violent before, and that his behavior came from "the changes" -- a new hair-trigger temper, sudden downshifts in mood and a lack of impulse control.

Back to the settlement. *If you get sick*, Seeger says, *you get paid. This is all about symptoms.* Is it? Is it about Duerson's "changes?" The following symptoms are associated with both brain damage and CTE: Sensitivity to noise, visual impairment, chronic pain, chronic headaches, numbness, burning, tingling, incessant ringing in the ears, attention disorders, trouble sleeping, aggression, agitation, impulsivity, suicidal thoughts and difficulty regulating, expressing and controlling complex emotions. None of these are covered by the settlement. Remember the Baseline Assessment Program? It screens for "sick." It defines "symptoms." It is the first tollbooth on the road to cash awards. As previously mentioned, it consists of neuropsychological tests used to detect cognitive impairment. Not mood and behavioral issues.

In other words, the proposed deal has been designed as if only the first group from the Stern CTE study matters. Meanwhile, members of group two -- the Duerson and Seau cohort, and quite possibly the bigger cohort -- will be ignored, not paid a dime, at least until they live and suffer long enough, like Carpenter, to join the first group in measurable cognitive decline. And even that isn't guaranteed: In one study of CTE, a quarter of the individuals diagnosed with Stage III of the disease -- CTE runs on a scale, with IV being the most advanced stage --

**-1935-**

were not considered cognitively impaired.

In the Stern study, only 10 of the 33 symptomatic subjects were ever diagnosed with dementia.

"I once happened to run into a social worker who helps rehabilitate former gang members," says Carpenter, who is working on a film about her father, *My Dad's Brain*, and has spent the last two years crisscrossing the country interviewing former football players and scientists to better understand how blunt force head trauma and neurodegenerative diseases can affect personality and behavior. "It turns out one of their first intake questions is, 'have you ever had a blow to a head?' They understand that a guy with that may need special intervention if they can help him at all, because that can have a major impact on your ability to regulate emotion and anger. Only that isn't covered by the settlement at all. That leaves me scratching my head."

"Stern says there are two types of CTE," says Gordon Johnson, a Wisconsin-based brain injury lawyer and advocate. "In this settlement, I don't know how you get compensated for the second type without having already killed yourself."

More head-scratching: Many scientists believe that there will be a way to detect CTE in the living within the next decade. This isn't blind faith in the march of progress, like expecting warp drives and flying cars. It's a pragmatic assumption, rooted in current research. Scientists in Chicago are experimenting with a screening test that measures vision, eye movement and optic nerve irregularities. Stern's team in Boston is currently conducting a comprehensive study of 100 NFL retirees, hoping to identify CTE biomarkers. Other researchers are developing and refining scanning technology to see tau deposits in the brain; just this week, scientists from Massachusetts General Hospital attending the Alzheimer's Association International Conference in Copenhagen announced a new type of brain imaging that can show tau tangles in living people for the first time.

Inexplicably, the settlement barely takes future scientific advances into account. While the deal covers the next 65 years, it specifically prohibits the NFL and the players' top lawyers from meeting more than once every 10 years to discuss possible changes to both the agreement's qualifying diagnoses and the protocols for making them, with actual modifications needing approval from both sides. (Translation: If the NFL doesn't want to accept a new method of detecting CTE, it doesn't have to). More significantly, any and all changes will not affect the bottom line. From Section 6.4 of the settlement, "Modification of Qualifying Diagnoses":

*In no event will modifications be made to the Monetary Award levels in the Monetary Award Grid, except for inflation adjustment(s)*

"CTE isn't just being written out here, it's being written out for three generations," Gordon says. "How stupid is this settlement going to look in 10 years if a brain scan can prove CTE, and we have 1,000 players with this disease, and they can't get an award, and there's nothing you can do in this agreement to change if they *should* get an award?"

\* \* \*

The lawyer was incredulous. His clients were confused. He couldn't go on the record -- he represents a group of NFL retirees within the class action suit, and is still figuring how what to advise them in terms of objecting to the deal or opting out altogether -- but asked me to call, anyway.

He wanted to vent.

The lawyer had seen a set of brain scans. Three former players. One in his 30s, one in his 40s, one in his 70s. All still alive. The scans were experimental, provided by a scientist researching neurodegenerative disease. *You can see it,* the lawyer said. *You can see the CTE.*

"Why aren't these players entitled to that diagnostic advantage today -- or in the future?" he said. "Nothing in the settlement provides for that. This started out as a CTE case. It is a CTE case. You have 33 of 34 autopsies confirming CTE. And on top of that, if someone dies today and an autopsy is performed and CTE is found, their family gets nothing? That's not representing these players well. It's ridiculous."

In his interview with *The Sporting News,* Seeger said that he and co-counsel Sol Weiss specifically fought to make sure CTE was not used to determine eligibility for cash awards because: 1) they didn't want anyone to challenge players to have to prove they have it; 2) they didn't want players to have to prove that the disease was specifically related to concussions. This makes little sense. Medical experts can see CTE in the dead. They will be able to see it in the living. How much more proof is necessary? As for the link between football-induced brain damage and neurodegenerative disease, there is no definitive proof that the former causes the latter. Not yet. However, there is a growing

body of suggestive, supportive evidence. And given that evidence, no honest scientist would argue that getting hit in the head over and over is anything but bad for one's brain.

In the case of CTE, the tau deposit patterns that identify the disease -- and distinguish it from, say, Alzheimer's -- have been found only in people who have endured repeated head hits or at least one battlefield blast injury. No brain insult? No CTE, according to McKee and other neuropathologists. On the other hand, while medical experts suspect that the other neurodegenerative diseases compensated by the settlement -- ALS, Parkinson's, Alzheimer's and dementia - may be triggered and/or accelerated by years of bashing helmets with opposing middle linebackers, those same illnesses also occur in people who haven't experienced brain trauma. The link to football is less clear.

By Seeger and Weiss' own logic, then, the settlement's award structure ought to prioritize CTE over other ailments. So what gives? Why are symptomatic former players being left high and dry? Why has the deal become the equivalent of an asbestos lawsuit settlement that severely restricts future mesothelioma claims?

The answers may lie in basic math.

When Seeger and the NFL first asked Judge Brody for preliminary settlement approval in January, the deal's award fund was capped at $675 million, an amount that player and league attorneys both claimed was enough to cover 65 years' worth of potential claims from an estimated pool of 20,000 retirees. Brody disagreed, denying their motion. The NFL and Seeger resubmitted the settlement in June, this time "uncapping" the fund -- but still confidently claiming in court documents that total payments by the league over the agreement's lifetime would not exceed the original amount.

During his interview with CBS Sports radio, Seeger was asked by show host and former NFL linebacker Brian Jones how he arrived at $675 million. Seeger said that he hired "the best economists and actuaries in the country, guys that do this kind of work." They looked at the rates of the neurodegenerative diseases covered by the settlement within the general population, compared those rates to every published study of the same diseases in NFL players, factored in football career length, and came up with an amount that Seeger was "extremely comfortable with."

"Sitting here right now, I'm still comfortable that those numbers are good," Seeger said.

"What percentage of the players," Jones said, "by your estimation, are going to receive compensation as a result of this settlement?"

"It could be as high as 3,000, 4,000, maybe 5,000 players at the end of the day, over the lifecycle of this agreement, will get cash compensation," Seeger said.

Headline: *National Football League expects as many as 25 percent of its former players to develop devastating, diagnosable neurodegenerative diseases.* Not the greatest endorsement for the sport. Putting that aside, however, let's do some arithmetic. Seeger estimates that between 3,000 and 5,000 former players will be compensated. By silent assent, the NFL concurs. Both parties insist that $675 million is sufficient to pay those retirees off under the terms of the settlement. Perform long division, and that means the average expected award is between $135,000 and $225,000.

That's a far cry from the settlement's maximum $5 million award for ALS. From its $3.5 million max for Alzheimer's and Parkinson's. From its $1.5-3 million max for dementia. Moreover, it isn't even close to the roughly $10 million in total lifetime costs -- including lost productivity and medical and custodial care -- that University of Toronto neurosurgeon Charles Tator estimates for each and every case of repetitive traumatic brain injury.

Oh, and also, it's as much as 833 times smaller than a separate $112.5 million that the NFL is required to pay Seeger, Weiss and four other attorneys within 60 days of the settlement receiving final judicial approval.

How do you get the NFL to sign off on a deal that theoretically exposes the league to uncapped, *unlimited* future financial liability? Easy. You make sure that said liability is, in fact, quite limited. Under the terms of the settlement:

• All cash awards are subject to reductions based on a grid that accounts for career length and retiree age at the time of receiving a qualifying diagnosis. Former players with fewer than five credited years of NFL experience will see their awards reduced, some by more than half. The same holds true for retirees over 45 -- the older players are when diagnosed, the less money they'll receive.

**-1937-**

• Any retiree who has suffered a single non-football related traumatic brain injury or stroke will have their award reduced by 75 percent, never mind that 1) there is no scientific reason to presume that a single non-football brain injury accounts for three-quarters of a player's afflictions; 2) NFL team doctors increased former players' risk of stroke (and likely, their risk of brain injury) by administering the painkilling drug Toradol.

• Retirees do not receive credited seasons for playing in NFL Europe, even though time spent on "practice, developmental, or taxi squad[s]," *is* credited, and the laws of physics and biology with regards to collisions and concussions still apply on the other side of the Atlantic Ocean.

• The settlement's diagnostic program and claims process is rife with potential pitfalls that could make it difficult for a completely healthy person to receive an award, never mind a brain-damaged former player with cognitive or emotional challenges. Example No. 1: Retirees who fail to register with the settlement within 180 days of a supplemental notice being distributed are totally ineligible for benefits, as are players over age 43 who fail to get a Baseline Assessment Program exam within two years. Meanwhile, some of the ex-players who most need help are indigent. Example No. 2: The NFL is allowed to make unlimited appeals of player claims, and players must pay a $1,000 fee to contest them. Example No. 3: BAP program neuropsychologists cannot make qualifying diagnoses of Alzheimer's, Parkinson's or ALS; instead, retirees must visit a settlement-approved doctor and pay for both their medical testing and related travel expenses themselves.

### RELATED ARTICLES

#### THE DEVIL IS IN THE DETAILS

Federal judge Anita Brody granted preliminary approval to the revised, "uncapped" brain damage lawsuit settlement... More»

#### THE NCAA RUTZ-O-METER

The ongoing federal antitrust trial pitting former UCLA basketball player Ed O'Bannon against the NCAA is a... More»

#### A SECOND ATTEMPT

The National Football League and lead lawyers for more than 4,500 former players suing the league over concussions... More»

#### EPISODE 41: SHAUN POWELL

More»

#### FREEDOM FOR ALL

The NCAA actually said that amateurism is "uniquely American," which is laughable to the point that it's nearly... More»

Similarly, the settlement's restrictions on CTE seems designed to cut the NFL's costs. The grid reduces the size of individual death with CTE payouts, while the cutoff date limits the total number. In disallowing future award changes regardless of medical advances -- in essence, the potential creation of a "Life with CTE" qualifying diagnosis -- the settlement shrinks the eligible player pool even further, same as pretending NFL Europe hits to the head don't count. By exclusively focusing on cognitive impairment, the same BAP program that is supposed to assist CTE sufferers by giving them a general dementia diagnosis actually *forecloses* on retirees who are suffering from mood, behavioral and other non-cognitive symptoms like chronic migraines -- all while saving the league money by ensuring that living ex-players with CTE who *do* manage to qualify for a dementia award are more likely to be older, and therefore subject to a greater payout reduction according to the aforementioned offset grid.

Think back to that NIOSH study. Almost 3,500 NFL retirees. Just 17 cases of Parkinson's, Alzheimer's and ALS over a 29-year-span. By contrast, neuropathologists have been looking in earnest for CTE in the brains of former football players for less than a decade -- and since they've started, they've mostly found it. If you were a league lawyer or negotiator working on the settlement, which of those diseases would you most try to write out of a deal?

"[The settlement] is a money grab," Faneca says. "A money grab by lawyers trying to get paid and get out. And by the NFL trying to keep this is as small as possible. Of course the league would agree to an unlimited number, because the window is still so small in terms of neurological disorders they agree to cover compared to the broad stroke of things."

Eleanor Perfetto has a related problem with the settlement. Her husband, Ralph Wenzel, played in the NFL. After a slow, painful,

**-1938-**

emotionally agonizing physical and mental decline, Ralph died in 2012 at the age of 69. He was posthumously diagnosed with Alzheimer's and CTE -- but originally diagnosed with early dementia in 1999.

During his first visit with a neurologist, Ralph was asked when he first began to have trouble remembering things. He told the story of a 1994 high school football practice, where he bean to teach his linemen a new blocking technique.

*Hey, coach, you taught us that yesterday.*

Ralph was dubious. He asked his players to explain the technique in question. They did so perfectly, precisely the way he planned to teach it. Because he *had* taught it. Only he didn't recall doing so. That same year, the NFL formed its Mild Traumatic Brain Injury Committee -- a group that spent more than a decade producing junk science, denying and downplaying links between football and brain damage, between concussions and long-term neurological harm. A group whose discredited work and dangerous medical recommendations are at the core of the lawsuits that have produced the proposed settlement.

"With many of the older [NFL retirees], the date of their formal diagnoses is probably many years after they became sick," says Perfetto, a University of Maryland professor specializing in health policy and epidemiology, and a plaintiff in the lawsuits against the league. "So like Ralph, maybe they had symptoms for five or 10 years before a formal diagnosis. And one of the reasons they didn't realize they needed to get checked out, or did get checked out but doctors couldn't figure out what was wrong with them, was all of the efforts the NFL made to smokescreen that this problem didn't exist. Which is exactly what plaintiffs are suing for."

Back to the settlement's award grid. Perfetto says her attorney told her that her husband is due a $1.4 million payout for his postmortem diagnosis of CTE, based on his official dementia diagnosis at age 56. Had he instead been diagnosed in 1994, his award would have been closer to $3 million. Or consider a widow Perfetto knows, a woman in her 80s. She cared for her sick husband, a former NFL player, for more than 30 years. Behavior problems began in his early 50s. Cognitive impairment emerged in his 60s. Confused doctors misdiagnosed him with bipolar disorder and other illnesses, and only diagnosed him with dementia when he was nearing 70.

The man died in his early 80s. Researchers found CTE in his brain. Thanks to the grid and her husband's late age of formal dementia diagnosis, the widow is due to receive $600,000 -- millions less than the league would be required to pay out had the man's mood and behavioral symptoms counted toward a qualifying diagnosis, and a scenario that figures to be repeated if the current settlement proposal receives final approval.

"This is the one thing that bothers me a lot," Perfetto says. "The NFL has actually managed to reward themselves for their deceit."

* * *

Tony Dorsett had no idea. For that matter, neither did Brad Townsend. It was late afternoon on the day that Brody had granted the settlement preliminary approval, and Townsend, a reporter with the *Dallas Morning News*, had called the Hall of Fame running back for his reaction.

"It was the right decision," Dorsett told Townsend.

Now 60, Dorsett is a plaintiff in the brain-damage lawsuits. He also is struggling. Last year, he was diagnosed by doctors at the University of California, Los Angeles as having signs of CTE. Townsend had talked to Dorsett over the phone last August, and again in November. His ability to hold a steady train of thought seemed to have deteriorated. Nevertheless, he told Townsend that he didn't know the size of the award that he might receive from the settlement, and that perhaps it didn't much matter.

"My brain is priceless," Dorsett said. "There isn't enough money that they can give me to make me want to look the other way."

When I saw Townsend's subsequent article, I sent him an email. Did Dorsett realize that the only way for him to receive a CTE award from the settlement was to have dropped dead the previous night?

Townsend wrote back. He said he would give Dorsett another call. The next day, he sent me a follow-up note:

*... I spoke to Dorsett. He said he frequently communicates with his attorney and this is the first he's heard of a CTE loophole ... He said he was*

**-1939-**

*"going to get all over this" and call his attorney ...*

Dorsett wasn't alone in missing the settlement's death with CTE award cutoff date. An Associated Press story on Brody's preliminary approval didn't make note of it. Neither did a piece in the *Minneapolis Star-Tribune*. The first page of a proposed long form settlement notice that will be sent to NFL retirees doesn't mention it specifically -- instead vaguely stating that the deal will provide "monetary awards" for "certain cases of CTE" that are "diagnosed after death" -- while a YouTube video supporting the settlement aimed at former players and produced by plaintiff's lawyers doesn't mention it at all.



In a way, Faneca says, he can understand not knowing. Not *wanting* to know. Ignoring the fine print. Even though the objection to the settlement filed by him and six other former NFL players in late June takes issue with many aspects of the settlement, including the cutoff date.

"[Neurological problems] are definitely not something you like to think about, especially for you own family or families of your friends and people you know," he says. "You first instinct is denial. You think, 'it's not going to happen to me.' It's not a fun conversation with your wife.

"But the likelihood, as we now know it, is that there is a more than strong chance that I'm going to know somebody who is going to be going through these issues in some form or fashion. Guys will be needing help, and we need to broaden the scope of the settlement, open it up and get more guys covered."

And how do you do that?

"Right now, there's tons of guys who have no idea what is going on," Faneca says. "I have guys contacting me, asking to be informed. The settlement is a little daunting to comprehend, the ins and outs and all the exclusions. Who wants to read that stuff? But sometimes you have to suck it up and start handling it."

**8 Comments**    Sports on Earth                        Login

Sort by Best                                     Share   Favorite

Join the discussion...

Ira Pellman Goodell · 2 months ago

# EXHIBIT 34

 **ESPN.com:** NFL            [Print without images]      

Friday, September 12, 2014
# Brain impairment begins younger

By Steve Fainaru and Mark Fainaru-Wada
ESPN.com

NFL players are likely to suffer chronic brain injury at a "significantly higher" rate than the general population and also show neurocognitive impairment at a much younger age, according to documents filed on behalf of the league in federal court Friday.

Former players between 50 and 59 years old develop Alzheimer's disease and dementia at rates 14 to 23 times higher than the general population of the same age range, according to the documents. The rates for players between 60-64 are as much as 35 times the rate of the general population, the documents reported.

The figures, compiled by actuarials hired by the NFL, appeared to be the first public admission by the league that retired players incur brain damage more frequently than the general public. The report did not specify why the rates for retired players are significantly higher.

The NFL's report, along with one filed by the plaintiffs, was prepared for U.S. District Judge Anita B. Brody, who is presiding over the lawsuit in Philadelphia that accuses the NFL of hiding information that linked concussions to brain injuries. Brody sought the documents as evidence that a settlement the two sides reached in the case is sound.

"These results validate that our assumptions are reasonable and conservative because when compared to prevalence rates among the general population, they are significantly higher," wrote The Segal Group in the documents prepared for and presented by the NFL. "Moreover, as anticipated, the model determines that players will first be diagnosed with qualifying diagnoses at a younger age than the general population, which is consistent with plaintiffs' allegations."

Nearly three in 10 former NFL players will develop at least moderate neurocognitive problems and qualify for payments under the proposed concussion settlement, according to documents filed by the league and the players.

The Segal Group estimates that 3,488 former players will make nearly 6,700 claims for payments related to brain injuries caused by playing football, according to the documents. Of those 3,488 claims, 94 percent would be for Alzheimer's, Parkinson's disease or moderate dementia, but the NFL's documents show that many, if not the majority of, players will be ineligible for compensation before reaching age 80.

The settlement has come under intense criticism from several lawyers involved in the case, although it remains unclear whether that opposition could derail it. For months, many of those attorneys have been requesting the underlying actuarial data that negotiators relied upon to close the deal.

After reviewing the documents, one prominent lawyer who represents several former players said the data refuted the claims of lead negotiators that the settlement provides adequate compensation for players with chronic brain damage.

**-1942-**

Case: 12-2070132 Document: 20 Page: 49 Date Filed: 10/08/2025

"They're going around saying what a great settlement it is, when the average Parkinson's player gets $320,000; that's utter nonsense," said the lawyer, who asked not to be identified for fear of upsetting Brody. "The average Alzheimer's guy gets $340,000. That's just utter nonsense."

The players' actuary estimated that former players were at twice the risk for Alzheimer's, Parkinson's, Lou Gehrig's disease and dementia as the general population between the ages of 20-60 years old. After that, they estimated the ex-players' risk would be closer to normal.



The NFL's actuary reported significantly higher rates of Alzheimer's and dementia for all age groups. Players younger than 50 were at least eight times more likely to develop those diseases, for example.

In 2009, the NFL funded a University of Michigan study that showed that former players between 30-49 were 19 times more likely to have Alzheimer's and other mental

Roger Goodell and the NFL agreed this summer to pay out more than the $675 million for player awards agreed to in the concussion settlement.

disorders than men of the same age. But the league disavowed the study, saying that it did not specifically study dementia and was based on unreliable phone surveys.

The documents released Friday have been sought for months by attorneys and media to understand how negotiators arrived at the settlement. The two sides announced in August 2013 that the NFL would pay $765 million -- $675 million designated to retired players with neurological impairment.

One actuary who reviewed both reports for ESPN said he was struck by how similar the findings were.

"It is common to have experts employed by each side wind up with substantially different conclusions," said Scott Witt, owner of Witt Actuarials and a frequent expert in damage calculations. "In this case, I was struck that both experts' reports are fairly harmonious."

Numerous retired players and attorneys have questioned whether the money was sufficient to cover the growing number of players with confirmed brain damage. At the time the proposed settlement was first announced, Christopher Seeger, a lead co-counsel who negotiated the deal for the players, promised that "analysis from economists, actuaries and medical experts" would prove that the settlement will cover "all eligible retired players."

But Seeger and the NFL refused to produce the information. Some attorneys speculated that the NFL was withholding the data because it contained potentially damaging information: the league's own estimates of how many players are likely to suffer brain damage.

That information goes to the heart of questions about the long-term health effects of tackle football. Despite mounting evidence about the link between football and brain damage, scientists have not yet established the prevalence of diseases such as chronic traumatic encephalopathy, or CTE, which has been discovered in dozens of NFL players following their deaths.

In January, Brody refused to provide preliminary approval for the deal. She ordered negotiators to turn over all documentation used to support the settlement, including the analysis by actuaries and economists, noting her concerns that not all qualifying players would be paid.

The plan would pay up to $5 million for players with amyotrophic lateral sclerosis, also known as Lou Gehrig's disease; $4 million for deaths involving CTE; $3.5 million for Alzheimer's disease; and $3

**-1943-**

Case 2:12-md-02323-AB Document 6201-6 Page 50 Filed 10/08/2014 Page 29

million for moderate dementia and other neurocognitive problems.

However, only men younger than 45 who spent at least five years in the league would get those maximum payouts. The awards are reduced, on a sliding scale, if they played fewer years or were diagnosed at a more advanced age.

The players' data therefore predicts the average payouts, in today's dollars, to be $2.1 million for ALS, $1.4 million for a death involving CTE, and $190,000 for Alzheimer's disease or moderate dementia. The average ex-player being diagnosed with moderate dementia is expected to be 77 with four years in the NFL.

About 28 percent of all retired players are expected to be diagnosed with a neurocognitive injury that is eligible for compensation under the plan. But only 60 percent of them are expected to seek awards, based on prior class-action litigation.

---

**-1944-**

# EXHIBIT 35

Dow Jones Reprints: This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers, use the Order Reprints tool at the bottom of any article or visit www.djreprints.com

• See a sample reprint in PDF format.        • Order a reprint of this article now

NFL

# NFL: Nearly Three in 10 Ex-Players Will Develop Debilitating Brain Conditions

*League Makes Disclosure As Part of Proposed Settlement of Concussion Suits*

Associated Press

Sept. 12, 2014 9:32 p.m. ET

PHILADELPHIA—The NFL estimates that nearly three in 10 former players will develop debilitating brain conditions, and that they will be stricken earlier and at least twice as often as the general population.

The disclosure Friday comes in separate actuarial data the league and players' lawyers released as part of their proposed $765 million settlement of thousands of concussion lawsuits.

Both the league and lead players' lawyers expect about 6,000 of the 19,400 retired players, or 28%, to develop Alzheimer's disease or at least moderate dementia. Dozens more will be diagnosed with Lou Gehrig's or Parkinson's disease during their lives, according to the data.

The reports were prepared for Senior U.S. District Judge Anita B. Brody, who is presiding over the class-action lawsuit in Philadelphia that accuses the NFL of hiding information that linked concussions to brain injuries.

The NFL report said the ex-players' diagnosis rates would be "materially higher than those expected in the general population" and would come at "notably younger ages."

The proposed settlement includes $675 million for player awards, $75 million for baseline assessments, $10 million for research and $5 million for public notice. It wouldn't cover current players.

Both sides have insisted that $675 million would be enough to cover awards for 21,000 former players, given fund earnings estimated at 4.5 % annually. Ms. Brody initially had concerns the money might run out, while critics complained the NFL's offering is a pittance given its $10 billion in annual revenues.

The NFL, in its report, said its estimates were "reasonable and conservative," and erred on the side of "overstating the number of players who will develop (illnesses)" to ensure the fund would be sufficient.

The league agreed this summer to remove the cap on its contributions, saying it would pay out more than $675 million if needed, and pay more over time if needed. Ms. Brody then granted preliminary approval of the plan and scheduled a fairness hearing on the proposed settlement for Nov. 19, when critics can challenge it.

**-1946-**

"This report paints a startling picture of how prevalent neurocognitive diseases are among retired NFL players," lead player lawyers Christopher Seeger and Sol Weiss said in a statement.

Lawyers for some players have complained that the negotiations have been cloaked in secrecy, leaving them unsure of whether their clients should participate or opt out.

With an Oct. 14 deadline looming, "we still lack 'an informed understanding of the dynamics of the settlement discussions and negotiations.' Indeed, we have zippo understanding," lawyer Thomas A. Demetrio, who represents the family of Dave Duerson, wrote in a motion Thursday. Mr. Duerson, the popular Chicago Bears safety, committed suicide in 2011.

The family of former linebacker Junior Seau, who also committed suicide, has announced plans to opt out. He and Mr. Duerson are among about 60 former players diagnosed after their deaths with the brain decay known as chronic traumatic encephalopathy. Known as CTE, it can only be diagnosed after death.

Friday's release of the actuarial data was designed to address some of the complaints.

Critics also lament that the settlement plan offers no awards to anyone diagnosed with CTE in the future, and that the Alzheimer's and dementia awards are cut by 75 % for players who also suffered strokes.

The plan would pay up to $5 million for players with amyotrophic lateral sclerosis, also known as Lou Gehrig's disease; $4 million for deaths involving CTE; $3.5 million for Alzheimer's disease; and $3 million for moderate dementia and other neurocognitive problems.

However, only men under 45 who spent at least five years in the league would get those maximum payouts. The awards are reduced, on a sliding scale, if they played fewer years or were diagnosed later in life.

The players' data therefore predicts the average payouts, in today's dollars, to be $2.1 million for ALS, $1.4 million for a death involving CTE, and $190,000 for Alzheimer's disease or moderate dementia. The average ex-player being diagnosed with moderate dementia is expected to be 77 with four years in the NFL.

Only 60% of those eligible for awards are expected to enter the program, based on prior class-action litigation. The payouts would top $900 million, adjusted for inflation.

The 21,000 class members also include the estates of 1,700 deceased players.

—Copyright 2014 Associated Press

Copyright 2014 Dow Jones & Company, Inc. All Rights Reserved
This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law.
For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit
www.djreprints.com

**-1947-**

# EXHIBIT 36

10/1/2014

Case 2:12-md-02323-AB Document 6201-6 Page 55 Filed: 10/08/2025 29



Friday, September 19, 2014                                        Member Login:  Sign In  |  Register

66° **John Bolaris' Forecast »**
Philadelphia, PA

**philly●com**

*Search*

*The Inquirer*
**DAILY NEWS**

🏠 | News | **Sports** | Entertainment | Business | Opinion | Food | Lifestyle | Health | More

EAGLES  PHILLIES  FLYERS  SIXERS  UNION  COLLEGE  HIGH SCHOOL  OTHER SPORTS  VIDEO  FORUMS  ODDS  TICKETS  SHOP

AdChoices ▷ 

Close Ad ✕

# NFL: 3 in 10 ex-players face Alzheimer's, dementia

Share | Tweet | | Reddit | Email



*Tight end John Carlson #89 of the Seattle Seahawks is carted off the field after an apparent head injury in the first quarter against the Chicago Bears in the 2011 NFC divisional playoff game at Soldier Field on January 16, 2011 in Chicago, Illinois. (Photo by Jonathan Daniel/Getty Images)*

**MARYCLAIRE DALE,** *The Associated Press*
POSTED: Friday, September 12, 2014, 3:50 PM

PHILADELPHIA (AP) - The NFL estimates that nearly three in 10 former players will develop debilitating brain conditions, and that they will be stricken earlier and at least twice as often as the general population.

The disclosure Friday comes in separate actuarial data the league and players' lawyers released as part of their proposed $765 million settlement of thousands of concussion

**Advertise Here**

*Latest Videos:*



**The Ceilings for Penn State & Temple**

**Kern: Ceiling for Penn State & Temple**

  

*Most Viewed Sports Stories:*

 **Cooper admits he's pressing**

 **Analyst doubts Birds are Top 10**

**Howard the key to Phils' future**

lawsuits.

Both the league and lead players' lawyers expect about 6,000 of the 19,400 retired players, or 28 percent, to develop Alzheimer's disease or at least moderate dementia. Dozens more will be diagnosed with Lou Gehrig's or Parkinson's disease during their lives, according to the data.

The reports were prepared for Senior U.S. District Judge Anita B. Brody, who is presiding over the class-action lawsuit in Philadelphia that accuses the NFL of hiding information that linked concussions to brain injuries.

The NFL report said the ex-players' diagnosis rates would be "materially higher than those expected in the general population" and would come at "notably younger ages."

The proposed settlement includes $675 million for player awards, $75 million for baseline assessments, $10 million for research and $5 million for public notice. It wouldn't cover current players.

Both sides have insisted that $675 million would be enough to cover awards for 21,000 former players, given fund earnings estimated at 4.5 percent annually. Brody initially had concerns the money might run out, while critics complained the NFL's offering is a pittance given its $10 billion in annual revenues.

The NFL, in its report, said its estimates were "reasonable and conservative," and erred on the side of "overstating the number of players who will develop (illnesses)" to ensure the fund would be sufficient.

The league agreed this summer to remove the cap on its contributions, saying it would pay out more than $675 million if needed, and pay more over time if needed. Brody then granted preliminary approval of the plan and scheduled a fairness hearing on the proposed settlement for Nov. 19, when critics can challenge it.

"This report paints a startling picture of how prevalent neurocognitive diseases are among retired NFL players," lead player lawyers Christopher Seeger and Sol Weiss said in a statement.

Lawyers for some players have complained that the negotiations have been cloaked in secrecy, leaving them unsure of whether their clients should participate or opt out.

With an Oct. 14 deadline looming, "we still lack 'an informed understanding of the dynamics of the settlement discussions and negotiations.' Indeed, we have zippo understanding," lawyer Thomas A. Demetrio, who represents the family of Dave Duerson, wrote in a motion Thursday. Duerson, the popular Chicago Bears safety, committed suicide in 2011.

The family of former linebacker Junior Seau, who also committed suicide, has announced plans to opt out. He and





Flyers want more from Couturier



Kendrick struggles in Phils' loss



*Also on Philly.com:*

NEWS:



Schuylkill boardwalk opens soon

BUSINESS:



10 electric and hybrid cars that get 40 MPG or more

HEALTH:



Does Philly have a doctor shortage?

FOOD:



First Street Steaks: Cheesesteaks under the El

ENTERTAINMENT:



Choreographer sues Cher, alleges racial discrimination

CARS:



Watch: World's first 3D printed electric car

*Stay Connected*

*Travel Deals*

$140 & up -- Downtown D.C. Hotel Sale thru Fall, 20% Off

See all travel deals »

-1950-

Duerson are among about 60 former players diagnosed after their deaths with the brain decay known as chronic traumatic encephalopathy. Known as CTE, it can only be diagnosed after death.

Friday's release of the actuarial data was designed to address some of the complaints.

Critics also lament that the settlement plan offers no awards to anyone diagnosed with CTE in the future, and that the Alzheimer's and dementia awards are cut by 75 percent for players who also suffered strokes.

The plan would pay up to $5 million for players with amyotrophic lateral sclerosis, also known as Lou Gehrig's disease; $4 million for deaths involving CTE; $3.5 million for Alzheimer's disease; and $3 million for moderate dementia and other neurocognitive problems.

However, only men under 45 who spent at least five years in the league would get those maximum payouts. The awards are reduced, on a sliding scale, if they played fewer years or were diagnosed later in life.

The players' data therefore predicts the average payouts, in today's dollars, to be $2.1 million for ALS, $1.4 million for a death involving CTE, and $190,000 for Alzheimer's disease or moderate dementia. The average ex-player being diagnosed with moderate dementia is expected to be 77 with four years in the NFL.

Only 60 percent of those eligible for awards are expected to enter the program, based on prior class-action litigation. The payouts would top $900 million, adjusted for inflation.

The 21,000 class members also include the estates of 1,700 deceased players.

**MARYCLAIRE DALE**
*The Associated Press*

| Share | Tweet | | Reddit | Email |

**Share this story with friends who would like it.**
We recommend which of your friends would enjoy this story.

?

Promoted Links by Taboola

Get the latest Sports Wrap Up newsletter delivered to your email. Sign up now!

Enter email address to sign up

Already a philly.com member? ○ Yes ○ No

# EXHIBIT 37

True Colors (/news/true-colors/) | Random (/news/random/) | Popular (/news/popular/) | Create Account

October 3, 2014

(http://www.huffingtonpost.com/sports)

Edition: U.S. ▾        Like    46k              Follow          Newsletters          Huffington Post Search

**FRONT PAGE**              **POLITICS**                **BUSINESS**              **ENTERTA**
**(HTTP://WWW.HUFFINGTONPOST.COM) (HTTP://WWW.HUFFINGTONPOST.COM/POLITICS/) (HTTP://WWW.HUFFINGTONPOST.COM/BUSINESS/) (HTTP://WWW.HUFFINGTONPOS**

Sports (http://www.huffingtonpost.com/sports)        •  World Cup (http://data.huffingtonpost.com/2014/world-cup/)

•  Donald Sterling (http://www.huffingtonpost.com/news/donald-sterling/)  •  NBA Playoffs (http://www.huffingtonpost.com/news/nba-playoffs/)

•  NHL Playoffs (http://www.huffingtonpost.com/news/nhl-playoffs/)  •  MLB (http://www.huffingtonpost.com/news/mlb/)  •  NFL (http://www.huffingtonpost.com/news/nfl/)

•  Soccer (http://www.huffingtonpost.com/news/soccer/)  •  Highlights (http://www.huffingtonpost.com/news/sports-highlights/)  •  Fails (http://www.huffingtonpost.com/news/sports-fails/)

•  Athletes On Twitter (http://www.huffingtonpost.com/news/athletes-on-twitter/)  •  Sports Crime (http://www.huffingtonpost.com/news/sports-crime/)

•  The Schultz Report (http://www.huffingtonpost.com/news/the-schultz-report/)        Sochi Olympics  (http://data.huffingtonpost.com/winter-olympics-sochi-2014)

# NFL: Nearly 3 In 10 Ex-Players Will Face Alzheimer's, Dementia Or Other Neurological Problems

AP  | By MARYCLAIRE DALE

Posted: 09/12/2014 3:15 pm EDT  |  Updated: 09/12/2014 4:59 pm EDT



(javascript:void(0))

PHILADELPHIA (AP) — The NFL estimates that nearly three in 10 former players will develop debilitating brain conditions, and that they will be stricken earlier and at least twice as often as the general population.

The disclosure Friday comes in separate actuarial data the league and players' lawyers released as part of their proposed $765 million settlement of thousands of concussion lawsuits.

Both the league and lead players' lawyers expect about 6,000 of the 19,400 retired players, or 28 percent, to develop Alzheimer's disease or at least moderate dementia. Dozens more will be diagnosed with Lou Gehrig's or Parkinson's disease during their lives, according to the data.

The reports were prepared for Senior U.S. District Judge Anita B. Brody, who is presiding over the class-action lawsuit in Philadelphia that accuses the NFL of hiding information that linked concussions to brain injuries.

The NFL has projected that 28 percent of former players will develop "at least moderate neurocognitive problems at statistically younger ages" than those expected in the general population" and would come at "notably younger ages."

The proposed settlement includes $675 million for player awards, $75 million for baseline assessments, $10 million for research and $5 million for public notice. It wouldn't cover current players.

Both sides have insisted that $675 million would be enough to cover awards for 21,000 former players, given fund earnings estimated at 4.5 percent annually. Brody initially had concerns the money might run out, while critics complained the NFL's offering is a pittance given its $10 billion in annual revenues.

The NFL, in its report, said its estimates were "reasonable and conservative," and erred on the side of "overstating the number of players who will develop (illnesses)" to ensure the fund would be sufficient.

The league agreed this summer to remove the cap on its contributions, saying it would pay out more than $675 million if needed, and pay more over time if needed. Brody then granted preliminary approval of the plan and scheduled a fairness hearing on the proposed settlement for Nov. 19, when critics can challenge it.

"This report paints a startling picture of how prevalent neurocognitive diseases are among retired NFL players," lead player lawyers Christopher Seeger and Sol Weiss said in a statement.

Lawyers for some players have complained that the negotiations have been cloaked in secrecy, leaving them unsure of whether their clients should participate or opt out.

With an Oct. 14 deadline looming, "we still lack 'an informed understanding of the dynamics of the settlement discussions and negotiations.' Indeed, we have zippo understanding," lawyer Thomas A. Demetrio, who represents the family of Dave Duerson, wrote in a motion Thursday. Duerson, the popular Chicago Bears safety, committed suicide in 2011.

The family of former linebacker Junior Seau, who also committed suicide, has announced plans to opt out. He and Duerson are among about 60 former players diagnosed after their deaths with the brain decay known as chronic traumatic encephalopathy. Known as CTE, it can only be diagnosed after death.

Friday's release of the actuarial data was designed to address some of the complaints.

Critics also lament that the settlement plan offers no awards to anyone diagnosed with CTE in the future, and that the Alzheimer's and dementia awards are cut by 75 percent for players who also suffered strokes.

The plan would pay up to $5 million for players with amyotrophic lateral sclerosis, also known as Lou Gehrig's disease; $4 million for deaths involving CTE; $3.5 million for Alzheimer's disease; and $3 million for moderate dementia and other neurocognitive problems.

However, only men under 45 who spent at least five years in the league would get those maximum payouts. The awards are reduced, on a sliding scale, if they played fewer years or were diagnosed later in life.

The players' data therefore predicts the average payouts, in today's dollars, to be $2.1 million for ALS, $1.4 million for a death involving CTE, and $190,000 for Alzheimer's disease or moderate dementia. The average ex-player being diagnosed with moderate dementia is expected to be 77 with four years in the NFL.

Only 60 percent of those eligible for awards are expected to enter the program, based on prior class-action litigation. The payouts would top $900 million, adjusted for inflation.

The 21,000 class members also include the estates of 1,700 deceased players.

MORE: NFL Concussions , NFL , Nfl Players Alzheimer's , Nfl Players Dementia , NFL Brain Injuries , Dementia Nfl , Nfl Concussions Lawsuit , Alzheimer's Nfl

Suggest a correction

# EXHIBIT 38

# NFL

(http://www.foxsports.com/nfl)

HOME (HTTP://WWW.FOXSPORTS.COM/NFL#COLUMNA)    NEWS (HTTP://WWW.FOXSPORTS.COM/N

# Data: 28 percent of NFL players will suffer Alzheimer's or dementia

**AP**

SEP 12, 2014 1:58P ET

f   🐦   +

PHILADELPHIA (AP) -- The NFL estimates that nearly three in 10 former players will develop debilitating brain conditions, and that they will be stricken earlier and at least twice as often as the general population.

The disclosure Friday comes in separate actuarial data the league and players' lawyers released as part of their proposed $765 million settlement of thousands of concussion lawsuits.

Both the league and lead players' lawyers expect about 6,000 of the 19,400 retired players, or 28 percent, to develop Alzheimer's disease or at least moderate dementia. Dozens more will be diagnosed with Lou Gehrig's or Parkinson's disease during their lives, according to the data.

The reports were prepared for Senior U.S. District Judge Anita B. Brody, who is presiding over the class-action lawsuit in Philadelphia that accuses the NFL of hiding information that linked concussions to brain injuries.

The NFL report said the ex-players' diagnosis rates would be "materially higher than those expected in the general population" and would come at "notably younger ages."

The proposed settlement includes $675 million for player awards, $75 million for baseline assessments, $10 million for research and $5 million for public notice. It wouldn't cover current players.

Both sides have insisted that $675 million would be enough to cover awards for 21,000 former players, given fund earnings estimated at 4.5 percent annually.

Brody initially had concerns the money might run out, while critics complained the NFL's offering is a pittance given its $10 billion in annual revenues.

The NFL, in its report, said its estimates were "reasonable and conservative," and erred on the side of "overstating the number of players who will develop (illnesses)" to ensure the fund would be sufficient.

The league agreed this summer to remove the cap on its contributions, saying it would pay out more than $675 million if needed, and pay more over time if needed. Brody then granted preliminary approval of the plan and scheduled a fairness hearing on the proposed settlement for Nov. 19, when critics can challenge it.

"This report paints a startling picture of how prevalent neurocognitive diseases are among retired NFL players," lead player lawyers Christopher Seeger and Sol Weiss said in a statement.

Lawyers for some players have complained that the negotiations have been cloaked in secrecy, leaving them unsure of whether their clients should participate or opt out.

With an Oct. 14 deadline looming, "we still lack `an informed understanding of the dynamics of the settlement discussions and negotiations.' Indeed, we have zippo understanding," lawyer Thomas A. Demetrio, who represents the family of Dave Duerson, wrote in a motion Thursday. Duerson, the popular Chicago Bears (/nfl/team/chicago-bears) safety, committed suicide in 2011.



The family of former linebacker Junior Seau (/nfl/player/junior-seau/70621), who also committed suicide, has announced plans to opt out. He and Duerson are among about 60 former players diagnosed after their deaths with the brain decay known as chronic traumatic encephalopathy. Known as CTE, it can only be

Friday's release of the actuarial data was designed to address some of the complaints.

Critics also lament that the settlement plan offers no awards to anyone diagnosed with CTE in the future, and that the Alzheimer's and dementia awards are cut by 75 percent for players who also suffered strokes.

The plan would pay up to $5 million for players with amyotrophic lateral sclerosis, also known as Lou Gehrig's disease; $4 million for deaths involving CTE; $3.5 million for Alzheimer's disease; and $3 million for moderate dementia and other neurocognitive problems.

However, only men under 45 who spent at least five years in the league would get those maximum payouts. The awards are reduced, on a sliding scale, if they played fewer years or were diagnosed later in life.

The players' data therefore predicts the average payouts, in today's dollars, to be $2.1 million for ALS, $1.4 million for a death involving CTE, and $190,000 for Alzheimer's disease or moderate dementia. The average ex-player being diagnosed with moderate dementia is expected to be 77 with four years in the NFL.

Only 60 percent of those eligible for awards are expected to enter the program, based on prior class-action litigation. The payouts would top $900 million, adjusted for inflation.

The 21,000 class members also include the estates of 1,700 deceased players.

nfl (http://www.foxsports.com/tag/nfl)

     

/popup?template=colorbox&taboola_utm_source=foxsports&taboola_utm_medium=bytaboola&taboola_utm_content=ab_thumbs-2r_bigger-titles:article bottom:)

'popup?template=colorbox&taboola_utm_source=foxsports&taboola_utm_medium=bytaboola&taboola_utm_content=ab_thumbs-2r_bigger-titles:article bottom:)

YOU MIGHT ALSO LIKE

# EXHIBIT 39

AUTO ACCIDENT INJURY CARE

Oxon Hill Maryland Very Personal & Thorough Care.

# SportsDayDFW

Powered by *The Dallas Morning News*

COWBOYS    MAVERICKS    STARS    RANGERS    COLLEGES    HIGH SCHOOLS    MORE

## NFL: 3 in 10 ex-players face Alzheimer's, dementia

32        6        0        g+ Share   1        1    AA ▲ ▼

Associated Press
Published: 12 September 2014 01:05 PM
Updated: 12 September 2014 09:55 PM

PHILADELPHIA — The NFL estimates that nearly three in 10 former players will develop debilitating brain conditions, and that they will be stricken earlier and at least twice as often as the general population.

The disclosure Friday comes in actuarial data the league and players' lawyers released as part of their proposed $765 million settlement of thousands of concussion lawsuits.

Both the league and lead players' lawyers expect about 6,000 of the 19,400 retired players, or 28 percent, to develop Alzheimer's disease or at least moderate dementia. Dozens more will be diagnosed with Lou Gehrig's or Parkinson's disease during their lives, according to the data.

The reports were prepared for Senior U.S. District Judge Anita B. Brody, who is presiding over the class-action lawsuit in Philadelphia that accuses the NFL of hiding information that linked concussions to brain injuries.

The NFL report said the ex-players' diagnosis rates would be "materially higher than those expected in the general population" and would come at "notably younger ages."

The proposed settlement includes $675 million for player awards, $75 million for baseline assessments, $10 million for research and $5 million for public notice. It wouldn't cover current players.

Both sides have insisted that $675 million would be enough to cover awards for 21,000 former players, given fund earnings estimated at 4.5 percent annually. Brody initially had concerns the money might run out, while critics complained the NFL's offering is a pittance given its $10 billion in annual revenues.

The NFL, in its report, said its estimates were "reasonable and conservative," and erred on the side of "overstating the number of players who will develop (illnesses)" to ensure the fund would be sufficient.

The league agreed this summer to remove the cap on its contributions, saying it would pay out more than $675 million if needed, and pay more over time if needed. Brody then granted preliminary approval of the plan and scheduled a fairness hearing on the proposed settlement for Nov. 19, when critics can challenge it.

"This report paints a startling picture of how prevalent neurocognitive diseases are among retired NFL players," lead player lawyers Christopher Seeger and Sol Weiss said in a statement.

Lawyers for some players have complained that the negotiations have been cloaked in secrecy, leaving them unsure of whether their clients should participate or opt out.

With an Oct. 14 deadline looming, "we still lack 'an informed understanding of the dynamics of the settlement discussions and negotiations.' Indeed, we have zippo understanding," lawyer Thomas A. Demetrio, who represents the family of Dave Duerson, wrote in a motion Thursday. Duerson, the popular Chicago Bears safety, committed suicide in 2011.

The family of former linebacker Junior Seau, who also committed suicide, has announced plans to opt out. He and Duerson are

-1961-

among about 60 former players diagnosed after their deaths with the brain decay known as chronic traumatic encephalopathy. Known as CTE, it can only be diagnosed after death.

Friday's release of the actuarial data was designed to address some of the complaints.

Critics also lament that the settlement plan offers no awards to anyone diagnosed with CTE in the future, and that the Alzheimer's and dementia awards are cut by 75 percent for players who also suffered strokes.

The plan would pay up to $5 million for players with amyotrophic lateral sclerosis, also known as Lou Gehrig's disease; $4 million for deaths involving CTE; $3.5 million for Alzheimer's disease; and $3 million for moderate dementia and other neurocognitive problems.

However, only men under 45 who spent at least five years in the league would get those maximum payouts. The awards are reduced, on a sliding scale, if they played fewer years or were diagnosed later in life.

The players' data therefore predicts the average payouts, in today's dollars, to be $2.1 million for ALS, $1.4 million for a death involving CTE, and $190,000 for Alzheimer's disease or moderate dementia. The average ex-player being diagnosed with moderate dementia is expected to be 77 with four years in the NFL.

Only 60 percent of those eligible for awards are expected to enter the program, based on prior class-action litigation. The payouts would top $900 million, adjusted for inflation.

The 21,000 class members also include the estates of 1,700 deceased players.

Did you see something wrong in this story, or something missing? Let us know.

---

## From Around the Web









€35m Man United & Chelsea target finally gets his wish; deal agreed
(GiveMeSport)

Yasiel Puig soaks FOX reporter Julie Stewart-Binks
(Fox Sports)

Marshawn Lynch Blooper Reel
(Vita Coco YouTube)

Manziel Trick Play Proves Browns Don't Know the NFL Rulebook
(The Cheat Sheet)

Recommended by

### More From the Web

Derek Jeter finishes in style; Hannah Davis is Fox-y Fox Sports

Stunning AV systems installed at University of Oregon Commercial Integrator

Watson hits back after Mickleson criticism GiveMeSport

### More From *Dallasnews.com*

Texas quotable: Petty, high powered Baylor offense will be tough to stop; suspended players might return College Sports Blog

Could Texas bring back Nelson Cruz in offseason? Other possible moves, including managerial search Sports

Cowlishaw: What are Morris Claiborne's problems? A bit of everything Sports

Recommended by

## Comments

To post a comment, log into your chosen social network and then add your comment below. Your comments are subject to our Terms of Service and the privacy policy and terms of service of your social network. If you do not want to comment with a social network, please consider writing a letter to the editor.

| Write a comment |

**1 Comment**      Sort   Subscribe   RSS

**Delli Mathews**      18 days ago
Less than the general population.

Reply Share      0    0

http://www.dallasnews.com/sports/dallas-cowboys/headlines/20140912-players-lawyers-data-estimates-3-in-10-nfl-retirees-face-cognitive-woes.ece    2/5

# EXHIBIT 40


# StarTribune

# NFL: 3 in 10 ex-players face Alzheimer's, dementia

Article by: MARYCLAIRE DALE
Associated Press
September 12, 2014 - 3:55 PM



The family of former NFL linebacker Junior Seau, who committed suicide, has announced plans to opt out of a proposed NFL concussion settlement.

file, Star Tribune

PHILADELPHIA — The NFL estimates that nearly three in 10 former players will develop debilitating brain conditions, and that they will be stricken earlier and at least twice as often as the general population.

The disclosure Friday comes in separate actuarial data the league and players' lawyers released as part of their proposed $765 million settlement of thousands of concussion lawsuits.

Both the league and lead players' lawyers expect about 6,000 of the 19,400 retired players, or 28 percent, to develop Alzheimer's disease or at least moderate dementia. Dozens more will be diagnosed with Lou Gehrig's or Parkinson's disease during their lives, according to the data.

The reports were prepared for Senior U.S. District Judge Anita B. Brody, who is presiding over the class-action lawsuit in Philadelphia that accuses the NFL of hiding information that linked concussions to brain injuries.

The NFL report said the ex-players' diagnosis rates would be "materially higher than those expected in the general population" and would come at "notably younger ages."

The proposed settlement includes $675 million for player awards, $75 million for baseline assessments, $10 million for research and $5 million for public notice. It wouldn't cover current players.

Both sides have insisted that $675 million would be enough to cover awards for 21,000 former players, given fund earnings estimated at 4.5 percent annually. Brody initially had concerns the money might run out, while critics complained the NFL's offering is a pittance given its $10 billion in annual revenues.

The NFL, in its report, said its estimates were "reasonable and conservative," and erred on the side of "overstating the number of players who will develop (illnesses)" to ensure the fund would be sufficient.

The league agreed this summer to remove the cap on its contributions, saying it would pay out more than $675 million if needed, and pay more over time if needed. Brody then granted preliminary approval of the plan and scheduled a fairness hearing on the proposed settlement for Nov. 19, when critics can challenge it.

"This report paints a startling picture of how prevalent neurocognitive diseases are among retired NFL players," lead player lawyers Christopher Seeger and Sol Weiss said in a statement.

Lawyers for some players have complained that the negotiations have been cloaked in secrecy, leaving them unsure of whether their clients should participate or opt out.

With an Oct. 14 deadline looming, "we still lack 'an informed understanding of the dynamics of the settlement discussions and negotiations.' Indeed, we have zippo understanding," lawyer Thomas A. Demetrio, who represents the family of Dave Duerson, wrote in a motion Thursday. Duerson, the popular Chicago Bears safety, committed suicide in 2011.

The family of former linebacker Junior Seau, who also committed suicide, has announced plans to opt out. He and Duerson are among about 60 former players diagnosed after their deaths with the brain decay known as chronic traumatic

Case 2:12-md-02323-AB Document 6201-6 Page 71 Filed 10/08/2025

encephalopathy. Known as CTE, it can only be diagnosed after death.

Friday's release of the actuarial data was designed to address some of the complaints.

Critics also lament that the settlement plan offers no awards to anyone diagnosed with CTE in the future, and that the Alzheimer's and dementia awards are cut by 75 percent for players who also suffered strokes.

The plan would pay up to $5 million for players with amyotrophic lateral sclerosis, also known as Lou Gehrig's disease; $4 million for deaths involving CTE; $3.5 million for Alzheimer's disease; and $3 million for moderate dementia and other neurocognitive problems.

However, only men under 45 who spent at least five years in the league would get those maximum payouts. The awards are reduced, on a sliding scale, if they played fewer years or were diagnosed later in life.

The players' data therefore predicts the average payouts, in today's dollars, to be $2.1 million for ALS, $1.4 million for a death involving CTE, and $190,000 for Alzheimer's disease or moderate dementia. The average ex-player being diagnosed with moderate dementia is expected to be 77 with four years in the NFL.

Only 60 percent of those eligible for awards are expected to enter the program, based on prior class-action litigation. The payouts would top $900 million, adjusted for inflation.

The 21,000 class members also include the estates of 1,700 deceased players.

© 2014 Star Tribune

**-1965-**

# EXHIBIT 41

# NFL takes aim at $25 billion, but at what price?

 Brent Schrotenboer, USA TODAY Sports    *1:42 p.m. EST February 5, 2014*

*For the NFL to reach its revenue goal by 2027, fans, broadcasters and sponsors will have to pay more and more*



(Photo: Kirby Lee, USA TODAY Sports)

NEW YORK (Jan. 31) — Sunday's Super Bowl at MetLife Stadium in East Rutherford, N.J., might be the most popular and expensive television program in U.S. history – about 110 million viewers watching a football game that commands nearly $4 million for a 30-second commercial.

Tickets at the 50-yard line cost about $10,000. A 20-ounce cup of Bud Light will cost $14.

"Nothing is really sacred anymore," said John Vrooman, a sports economics professor at Vanderbilt University.

**TICKETS:** Market picking up steam late (http://ftw.usatoday.com/2014/01/super-bowl-ticket-prices/)

**MANNING:** Throws 'ducks' and proud of it (http://www.usatoday.com/story/sports/nfl/broncos/2014/01/30/peyton-manning-super-bowl-48-denver-richard-sherman/5051231/)

It won't stop there. The National Football League hopes to achieve $25 billion in annual revenue by 2027, up from about $10 billion now. Several analysts told USA TODAY Sports that the NFL can get there, but it will be an expensive journey. More palatial stadiums. Expanded playoffs. More exposure in more places, including smartphones, games in London and more Thursday night games sold to the highest-bidding network.

NFL Commissioner Roger Goodell gave the magic number at a meeting of NFL team owners in 2010: a goal of tripling league revenue in 17 years. If it happens, the NFL would have more income than the gross domestic products of dozens of small countries and would be in the same financial district currently occupied by gigantic global brands such as McDonald's, Nike and Goodyear Tire, each of which recently took in about $21 to $28 billion annually.

Who will pay the price? Fans, sponsors and broadcasters. The NFL remains the most popular sports league in America, and it commands a premium. If the average NFL fan thinks the cost of attending games is already too high, how about paying ever-higher prices to watch games on ESPN and the NFL Network? Cable and satellite TV providers pay ESPN an average of $6.04 per subscription per month, more than double from 10 years ago and dwarfing the likes of CNN (63 cents) and TBS (72 cents), according to SNL Kagan, a market research firm.

**COLUMN:** John Elway's risky double down looking Super (http://www.usatoday.com/story/sports/nfl/super/2014/01/30/super-bowl-denver-broncos-elway-trading-tebow/5064267/)

**FIRING BACK:** Colin Kaepernick pans Richard Sherman (http://ftw.usatoday.com/2014/01/richard-sherman-colin-kaepernick/)

"The standard (cable television) package that households receive is skyrocketing in cost at a point in the U.S. economy when we have increasingly lopsided distribution of income," sports economist Andrew Zimbalist told USA TODAY Sports. "Those two things have to collide."

**The future**

The NFL declined to release financial data, but an estimate of its revenue can be pieced together through various sources by economists and market researchers. That $10 billion pie is roughly sliced four ways, according to Navigate Research, a Chicago-based firm that specializes in the evaluation of sports and entertainment marketing investments.

- About $5 billion from media and television rights to broadcast games.
- About $1-2 billion in sponsorships, such as its long-running deal with PepsiCo, worth about $90 million to $100 million per year.
- About $2 billion related to attendance and ticket sales.
- About $1 billion in merchandise and licensing.

Growing to $25 billion annually will require compound annual growth of about 7 percent, around $1 billion per year.

CBS, Fox, NBC and ESPN provide the NFL with a total of about $5 billion to $6 billion annually from contracts that run through 2021-22. By 2027, Navigate Research predicts such media rights revenues could reach $17 billion.

That ambitious projection assumes that live NFL games will continue to be a golden goose for networks and their advertisers for one major reason: NFL games are one of the few remaining programs that huge audiences want to watch live instead of recording to watch later – fast-forwarding through the commercials that companies pay millions to air.

"We are firm believers that there is nothing more valuable in the world of TV than the NFL – nothing," said Michael Nathanson, a media analyst at MoffettNathanson, a stock research firm that specializes in the media and telecommunications industries. "Their ability to get to $25 billion is kind of predicated on the staying power of the product. I think they're going to ask for whatever they need to from their broadcast partners, their cable partners."

**UNFAIR?** Seahawks player questions marijuana suspension (http://www.usatoday.com/story/sports/nfl/super/2014/01/29/seattle-seahawks-super-bowl-brandon-browner-limbo/5036123/)

**STILL WAITING:** Will Manning's backup ever start for Denver? (http://www.usatoday.com/story/sports/nfl/broncos/2014/01/30/brock-osweiler-backup-super-bowl-peyton-manning-denver-russell-wilson/5068165/)

Vrooman, the Vanderbilt economist, says the NFL can get there primarily because it's a monopoly – the richest sports league on the planet with a business plan built largely through the Sports Broadcasting Act of 1961, which allows sports leagues to pool their television rights for sale to the highest bidder, protecting them from antitrust laws.

"The monopoly rule is to gouge half as many fans more than twice as much on everything," he said. He also predicts the league will become "increasingly more exclusive with the same general formula of fewer fans having access at higher prices to generate more certain media, venue and gate revenues."

The NFL disputes that, noting its commitment to broadcast some games on free over-the-air TV networks, which helps it reach bigger audiences. Even games on ESPN, for example, are available on free TV in local markets. But the league is not shy about its appetite for growth.

"We measure our business very simply: Is consumption going up, and is the economic pie growing?" said Brian Rolapp, the chief operating officer of NFL media.

Rolapp was involved in recent NFL deals with Verizon, Twitter, Microsoft and the television networks. He currently is involved in shopping a Thursday Night Football TV package and working on a new deal with DirecTV. He called the $25 billion goal an aspiration.

"In order to get to a number that lofty, it requires a lot of different things," Rolapp told USA TODAY Sports. "It requires, clearly, hard work. It requires different thinking. We are relatively strong in our business. We're strong as a league, but what we always say around here is complacency is our enemy."

**PHOTOS: ONE MEMORABLE SHOT FROM EVERY SUPER BOWL**

**The formula**

[ ] [ ] [ ] [ ] FULLSCREEN

For better or worse, the road to $25 billion probably requires some variation of the following, analysts told USA TODAY Sports.

ONE GREAT PHOTO FROM EVERY
SUPER BOWL IN HISTORY

**More new and upgraded stadiums.** This year's Super Bowl is in chilly New Jersey, a reward for the Jets and Giants building the swanky MetLife Stadium, which opened in 2010. Yet it has been 11 years since the Super Bowl was in 70-degree San Diego, where the Chargers still play in outdated Qualcomm Stadium.

To keep revenue growing, the NFL needs stadiums that are big moneymakers, such as AT&T Stadium, home of the Dallas Cowboys, where suites cost up to $500,000 per year and fans pay more than $80 for seats in the upper deck end zone. Levi's Stadium, the new $1.3 billion home of the San Francisco 49ers, opens later this year and will host the Super Bowl in 2016. Later that year, the Minnesota Vikings will open their new stadium.

The risk for the NFL is that it might price out everyday, jersey-wearing fans, who might decide they'd rather watch games on high-definition TV anyway. Attendance accounts for only about about 25 percent of NFL revenue, and at times there have been signs of sagging demand. Three of the NFL's four first-round playoff games this year struggled to sell out. Will fans keep going to games if the price keeps rising and the view is better on TV?

"That is a big concern," Rolapp said. "It will always be an important part of the revenue …We still believe it's still the best place to experience NFL football. I think it will be for some time, but we have to keep innovating so it remains that."

**More weeknight games, anyone?** The NFL has been shopping a Thursday night package to TV networks and could announce a buyer soon with possible simulcasting on the NFL Network, the league's cable outlet. NFL games once were mass-delivered for television consumption on Sunday afternoons and Monday night.

NBC, for example, pays about $1 billion per year for its package of Sunday night games and playoff games.

**More televised content.** If there's demand, create more supply. That's why the league is considering expanding the playoffs, creating another product to sell to networks eager to capture big live audiences. The NFL also is turning the offseason into a moneymaker by televising the NFL Combine in February and the NFL Draft in the spring, which has expanded from one day to three days, including two nights in prime time.

**New markets.** The NFL has been priming London as a market, with two sold-out games there last year and three games on tap in 2013. Meanwhile, Los Angeles hasn't had an NFL team since 1994. Moving existing teams from weak markets into bigger vacant markets might give team owners a better way to increase their shared revenue as opposed to adding more franchises to the 32-team league.

Conversely, Los Angeles has value to the NFL as a bargaining chip – the unstated threat of moving into that big, empty market can help existing franchises wring out taxpayer dollars for stadium upgrades and new construction.

Get ready for NFL teams to make "renewed threats of franchise relocation to leverage public money for private stadiums in the second venue revolution, just like the first (round of stadium upgrades) over the last two decades," Vrooman said. "Monopoly power over TV rights and franchise location is what provides the real engine for the economic growth of the most powerful sports league in the world."

**VIDEO — SUPER BOWL QBs: PROFESSOR VS. APPRENTICE**



Tom Pelissero, Rod Mackey, and Paul Silvi shine a magnifying glass at the QB match-up for the big game. Its old school vs new school Sunday at MetLife Stadium.

**Phones, Internet and new media.** More consumers get their news and information from their smartphones – a trend the NFL recognized with its recent $250 million annual deal with Verizon to stream games onto phone screens. The NFL also recently made deals with Twitter and Microsoft's Xbox, giving it new revenue streams in growing interactive and social media.

With more viewers consuming video content online instead of on cable, cable companies and cable channels could see subscription revenue plummet. Those channels – including ESPN and the NFL Network – can try to recoup that revenue through online content, but it might not be as lucrative.

"The established content suppliers – NFL, ESPN – are uneasy and so going very slowly," said Roger Noll, emeritus economics professor at Stanford. "They see the potential for a huge payoff, but also for a huge bursting of the bubble, and want to keep control until they know where things are likely to go."

**Television.** The NFL's TV rights contracts soon will be worth about $7 billion per year combined, with most of them starting this year and lasting through 2022. What happens in 2023?

"It's a new day after that," Rolapp said. "We'll just have to see. A lot of things we do digitally along the way are a great experiment for us to see what the world will look like. We will be prepared one way or the other to be able to shift to where the consumer is."

To get to $25 billion, the NFL probably needs about $15-17 billion from networks.

If networks pay it, those costs likely will be passed down to the consumer. ESPN likely would ask for higher rates from advertisers and higher subscriber fees from cable distributors, and even viewers who don't like football would pay more because cable channels are not offered a la carte.

"Everything else 10 years from now will be worth less relative to what the NFL is going to be worth," said Nathanson, the stock analyst. "No other sport has that kind of national draw to it."

As long as the NFL can bring big live audiences, it'll be hard for the likes of ESPN to avoid paying up, but the growing risk is viewers who could decide to cancel their cable subscriptions and use other devices to watch what they want.

The NFL said it is committed to staying on free television, not just cable, where it has its own network and can reap cable subscription revenue in addition to advertising revenue.

"It would have been very easy years ago to migrate our games to cable," Rolapp said. "In fact, we could have gotten more money in the short term, it could be argued, if we would have done that. But we really are committed to a reach model and free television."

### VIDEO: JERSEY HISTORY ON THE SEAHAWKS' SIDE



The daily report for Jan. 30, 2014, from Jill Savage at the Super Bowl.

### Staying power

Much of this, of course, assumes that the NFL can continue to bring those live audiences well into the next decade.

Another risk to the league's long-term popularity is the concussion crisis. Amid lawsuits from former players, the league has vowed to make the game safer. This could mean changes in equipment and more rules that restrict bone-jarring hits.

"To the extent the NFL tries to pass new rules to reduce the force of hitting or the kind of hits you can make, I think it hurts the game," Zimbalist said. "And there signs that parents no longer want their children playing this game. I don't mean to predict doom for the NFL. I don't think there is doom, but the notion that they're going to get to $25 billion seems to be excessively optimistic. I would not bet on that figure."

Rolapp, the Harvard-educated NFL executive, says the league maintains a "healthy paranoia" about all perceived risks, including pushing too much product onto fans. In the meantime, the NFL plans to stick to a simple formula.

"We're really in the business of aggregating America around events and around our game," Rolapp said. "There are fewer and fewer places that can do that. If you can aggregate audiences, you are going to be more and more valuable."

*Follow Brent Schrotenboer on Twitter @Schrotenboer (http://twitter.com/schrotenboer). E-mail: bschrotenb@usatoday.com*

# EXHIBIT 42

Case 2:15-cv-07130 Document 20-2 Page 78 Filed 10/08/2025
Case 2:15-cv-07130 Document 20-2 Page 78 Filed 10/08/2025

# CBSSPORTS.com

Sign In | Register   Help   Shop   TV   Radio   Mobile

NFL   MLB   NBA   NHL   NCAA FB   NCAA BB   GOLF   WORLD CUP   HIGH SCHOOL   VIDEO   MORE    FANTASY

NFL Home   Draft   Scores   Standings   Schedules   Stats   Teams   Players   Transactions   Rumors   Picks   Odds

Play the ultimate baseball simulation with the CBSSports.com Franchise Baseball game.

AdChoices 

# Report: NFL paid Roger Goodell $35.1 million last year

By Ryan **Wilson** | CBSSports.com
February 14, 2014 3:25 pm ET

Like 233   Tweet 33   g+1 1   • Shar



**Roger Goodell had a good 2013.** (USATSI)

Two years ago, when NFL commissioner Roger Goodell was thought to make only $20 million, Falcons wide receiver Roddy White sent this tweet:



Got some bad news for you, Roddy. Goodell more than doubled his pay over the next 12 months.

**NEVER MISS A MOCK DRAFT**

Sign up to our newsletter and find out who your team could be picking

Login or Register to Sign Up

## NFL VIDEO

July 3, 2014
**Arbitrator classifies Jimmy Graham as a tight end** (2:45)



1 July 3, 2014
**Ben Utecht on concussions and life after football** (4:47)



2 July 1, 2014
**Top 100 players: Is Patrick Peterson better than Richard Sherman?** (2:54)



3 July 1, 2014
**Top 100 players: Who's the better DT -- Ndamukong Suh or Gerald McCoy?** (3:33)





daniel kaplan
@dkaplanSBJ

Follow

BREAKING NEWS: NFL paid commissioner Roger Goodell $35.1 mln, plus $9.1 mln of deferred pay in year-ended March 31, '13, for $44.2 mln total

2:56 PM - 14 Feb 2014

266 RETWEETS    46 FAVORITES

To be clear: That's $35.1 million -- plus another $9.1 million in deferred payments -- for the year that ended March 31, 2013.

So how do we come across this information every year? Turns out, the multibillion-dollar money-making machine that is the NFL is, in the eyes of the government, a nonprofit organization. Thanks to an exemption written into the tax code, the league is exempt from federal corporate taxes.

(If you're so inclined, US Senator Tom Coburn (R-Okla.) explained the particulars in Wastebook 2012.)

The downside -- if you want to call it that -- to being classifed as a nonprofit: this Tax exemption also makes Goodell's salary publicly available, circumstances no doubt eased by the fact that he made nearly $3 million a month.

in a letter obtained by Daniel Kaplan of the Sports Business Journal, NFL owners Arthur Blank, Robert Kraft and Jerry Richardson wrote to their fellow owners that "Goodell's compensation reflects our pay-for-performance philosophy and is appropriate given the fact that the NFL under his consistently strong leadership continues to grow."

Kaplan notes that the three owners comprise the league's compensation committee, adding that Goodell's salary almost certainly makes him the highest-paid sports executive.

Topics: Roddy White, Ryan Wilson, NFL



Like 233    Tweet 33    g+1 1

• Share

## LATEST

**World Cup** | 9:00 am
2014 FIFA World Cup: Keys to the quarterfinal matches

**NFL** | 8:41 am
Vincent Jackson writes a book for kids of military parents

**NCAA Basketball** | 8:41 am
Hirings and firings: 2014 college basketball coaching changes

**NCAA Basketball** | 8:40 am
Grambling fires coach Joseph Price

**NBA** | 2:06 am
Free-agency grades for Wednesday, July 2: Lowry returns to Toronto

**Fantasy Football** | 1:10 am
2014 Fantasy Outlooks: Philadelphia Eagles

**MLB** | 1:04 am
Former Athletics lefty Mark Mulder live-tweets 'Moneyball'

**NBA** | 12:36 am
Report: Patty Mills agrees to three-year deal to remain with Spurs

**MLB** | 12:22 am
MLB rumors, injuries and news roundup for July 2

**NBA** | 12:13 am
Report: Bulls are at least moving towards amnestying Carlos Boozer



## MOST POPULAR

**1** Warren Sapp stiffs waitress for 'horrible' service; waitress responds

**2** Despite setbacks, World Cup shows Klinsmann has US on winning track

**3** Nets agree to deal with Lionel Hollins as next coach

**4** Ex-NFL GM Charley Casserly: Russell Wilson not a top-12 QB

**5** Arbitrator rules Jimmy Graham is a tight end

# EXHIBIT 43

Dow Jones Reprints: This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers, use the Order Reprints tool at the bottom of any article or visit www.djreprints.com

• See a sample reprint in PDF format.　• Order a reprint of this article now

NFL

# NFL: The League That Runs TV

*Owners Reach $27.9 Billion Deal With Fox, CBS and NBC*

By MATTHEW FUTTERMAN, SAM SCHECHNER and SUZANNE VRANICA

December 15, 2011



NBC scored in the ratings Sunday as the Giants played the Cowboys. *Getty Images*

National Football League owners voted to approve $27.9 billion of TV deals with Fox, CBS and NBC on Wednesday, confirming pro football as the driving force in an industry facing fundamental change.

As expected, the networks will pay 63% more on average to air NFL games from 2014 to 2022. Fox will pay an average of about $1.1 billion for the National Football Conference package, which includes many of the league's biggest markets, say people familiar with the talks. CBS will pay about $1 billion a year over the life of the deal for the American Football Conference package, which will include a handful of NFC games. And NBC will pay $950 million a year for nine years for the Sunday night prime-time package.

The networks' willingness to fork over such enormous sums reflects the reality of television today. Audiences are fragmenting among hundreds of channels and alternative viewing options, such as the Internet. Football remains one of the few programs that still draws tens of millions of viewers who watch



Vernon Davis of the San Francisco 49ers. *Getty Images*

live. That gives the networks much-needed leverage with both advertisers and cable operators, especially since the networks gained the right to stream the games on computers and tablets.

Overall annual broadcast revenue for the NFL will jump from an annual average of $1.9 billion in the 2007-2013 period to nearly $3.1 billion for 2014-22. Including deals with ESPN and satellite broadcaster DirecTV, the NFL will collect about $6 billion a year in total TV revenue beginning in 2014, a figure that will likely increase the following year after the DirecTV deal expires. NBC is a unit of Comcast Corp.'s majority-owned NBC Universal, while Fox is a unit of News Corp., which also owns The Wall Street Journal. CBS is a unit of CBS Corp., and ESPN is a unit of Walt Disney Co.

For many of the networks, the NFL is a break-even investment at best—but one they feel they have to make. NFL rights will account for roughly a quarter of the total programming spending by the four networks, including ESPN, by 2015, up from just over 20% in 2008, according to projections from SNL Kagan.

While TV advertising has generally grown slowly in recent years, advertising on NFL games has soared. Ad rates for NFL games rose 27% to $347,800 for a 30-second spot last season, compared with the 2007 season, according to WPP's Kantar Media. The cost of a similar nonsports prime-time ad, by contrast, fell 14% last year from 2007. And the total amount advertisers spent on NFL advertising last season, about $3.3 billion, is up over 20% since the 2007-2008 football season, according to Kantar. Overall TV advertising on U.S. broadcast and cable networks grew just 3.5% between 2007 and 2010 to $44.3 billion.

The NFL reached a $27.9 billion deal with Fox, CBS and NBC for the rights to broadcast games from 2014 to 2022, Matthew Futterman reports on Markets Hub. Photo: REUTERS.

**More NFL News**

League Owners Signs Off on Jaguars Sale

Earlier: NFL Near Major Media Deals

Experts don't see NFL ad demand slowing anytime soon. "It won't break until the consumer breaks with lack of interest and ratings fall," says Tony Ponturo, a sports marketing consultant and former media and sports marketing czar for Anheuser-Busch.

Mark Lazarus, the chairman of NBC Sports, says NFL football is simply too popular not to have. "We think it's one of, if not the, premier television property," he says. "It has value to us for reaching consumers, for diversifying our affiliates and giving our advertising sales team a mix."

So far this fall, NFL games have averaged 17.8 million viewers at any given minute, more than almost all regularly scheduled programs, according to Nielsen data. Importantly, many of those viewers are young men, who are hard for advertisers to reach through other programs. And the fact that most consumers watch NFL games live is important at a time when many viewers record shows and then skip the commercials when they watch them later.

The NFL "is almost a necessity for broadcast and cable networks in terms of maintaining the health of their business overall," says Kris Magel, director of national broadcast at Initiative, a media-buyingunit of

Interpublic Group of Cos.

At the same time, though, at least in some cases the NFL is eating up advertising dollars that would have ended up elsewhere on television. "For us it comes out of other TV budgets," says Steve Shannon, vice president of marketing for Hyundai Motor America. "Big important media properties are more valuable than ever."

Still another reason for networks to pay up for the NFL: The popularity of NFL games gives them a big weapon in disputes over subscription fees with cable, satellite and telecommunications companies that sell TV service. Big broadcast networks like Fox and CBS have increasingly sought those fees to supplement ad revenue, and CBS, for instance, has said it expects to bring in more than $250 million a year in subscription fees by the end of 2012.

"The subscription component is really important going forward, because that's how they're going to get more money out of cable companies," says Deana Myers, a senior analyst at SNL Kagan.

But sports fees are helping to drive up cable rates, raising concerns among media executives that consumers will soon balk at the increasing cost of television.

**Write to** Matthew Futterman at matthew.futterman@wsj.com, Sam Schechner at sam.schechner@wsj.com and Suzanne Vranica at suzanne.vranica@wsj.com

Copyright 2014 Dow Jones & Company, Inc. All Rights Reserved
This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law.
For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit
www.djreprints.com

# EXHIBIT 44

Case 1:32-27129-Rawmont 20-2 Page 26 Filed Date Filed 10/28/029



SBJ/20100405/This Week's News

# Goodell sets revenue goal of $25B by 2027 for NFL

By Daniel Kaplan, Staff Writer

Published April 5, 2010

NFL Commissioner Roger Goodell wants the league to reach $25 billion in revenue by 2027, an amount that would mean adding nearly $1 billion in new revenue on average each year until then.

Goodell presented the futuristic figure late last month to owners at their annual league meeting in Orlando. While the number is designed to serve more as an ambitious goal than a true financial projection, it underscores the degree to which the NFL, under the nearly four-year tenure of Goodell, has sought to dramatically expand its business, whether in technology or overseas.

"It has happened in a lot of well-run businesses," New York Jets owner Woody Johnson said of the kind of revenue growth suggested by Goodell. "If we expend our capital, expand our stadiums, keep renovating and keep all of our capital equipment up to the highest standards, invest in technology, [invest] in the business, it could be done — or more."

Tripling revenue in a roughly 17-year time frame is something the NFL has already accomplished, though off a much smaller base. Precise comparable revenue figures could not be obtained, but growth can be seen in part by looking at the salary cap, which is based on a percentage of revenue. The cap in 1994 was $34.6 million. After several blockbuster national TV contracts and a surge in NFL popularity, league revenue last year hit $8.5 billion, lifting the cap to $128 million, a more than threefold increase from 1994.

"It is certainly an aggressive number," Dallas Cowboys Chief Operating Officer Stephen Jones said of the $25 billion figure, "but it is certainly one we would like to get to."

Tripling revenue over the next 17 years, however, could prove tougher than doing so from the mid-1990s until now. Fox Sports broke the bank in 1994 to become an NFL broadcaster in order to establish the channel's credibility, and DirecTV was added with its first out-of-home package. Only a few teams are currently in need of new stadiums whereas in the early mid-1990s, the NFL's stadium boom had just begun. In addition, the U.S. sponsorship and advertising markets are more fully developed and committed to sports financially than they were in the 1990s, when sports as a business wasn't the size of industry it is today.

There would have to be similar events — and on larger scales — in the future for a comparable growth rate. Areas that hold potential include Internet, cell phone, satellite and international, as well as the NFL Network.

**-1979-**

10/1/2014　　Goodell Sets Revenue Goal Of $25B By 2027 For NFL - This Week's News - SportsBusiness Daily Global

"If you take the number of fans in the [United] States, 181 million, there is clearly massive upside internationally," said Mark Waller, the NFL's chief marketing officer, who is pushing for more foreign games. "We should be measuring our fan growth globally as we do in the U.S., and a key driver will be more games."

Another area is technology. The league just signed a four-year, $720 million sponsorship/media deal with Verizon that will see both games and the league's RedZone channel streamed to cell phones. Neither streaming to mobile nor RedZone were options just a few years ago, Johnson noted, saying that the revenue Goodell foresees could come from categories that do not exist today.



AP IMAGES

Roger Goodell's goal would mean an average revenue increase of $1 billion a year.

In addition, reaching a new labor deal is critical to the desired increase in revenue. The NFL and NFL Players Association are battling over the looming expiration of the collective-bargaining agreement next March, and a prolonged labor stoppage could damage the league. Also, the owners say the game will not grow without an economic deal that allows them to invest with a reasonable rate of return.

The union has responded that it is willing to provide the owners financial credits where the league can prove the money is being used to grow the sport, but to do this the NFL must provide audited financial reports, something Goodell and the owners have said no to so far.

**Related Topics:**
This Week's News

Return to top

# EXHIBIT 45

NFL

# Former players: Devil is in the details with NFL concussion settlement

Print



BY DON BANKS

Posted:
**Thu Aug. 29, 2013**

Updated:
**Mon Jun. 16, 2014**



*"The guys who need it now won, but the rest of us have lost the ability to take the bully behind the shed," Former NFLPA president Kevin Mawae said.*

Don't try telling former NFL players union president **Kevin Mawae** that Thursday's concussion litigation settlement was an even-handed resolution to the most contentious and significant issue facing the sport as the NFL's 2013 regular season looms.

Mawae, a retired 16-year NFL veteran and two-term NFLPA president, said only the ex-players in the most dire need of financial and medical assistance truly won a victory with **Thursday's announcement of a $765 million mediated settlement.**

"I think the league won big on this, because the players settled for a pittance," Mawae told SI.com, on the phone from his home near Baton Rouge, La. "It's a relative drop in the bucket. I'm not going to say the players caved, because it would do an injustice to the older men who really need the help now, but at some point in time, the collective body of players, retired and active, have got to be willing to go all the way to the wall with this issue.

"They didn't this time. The league won this hands down. I know as soon as you print that there's going to be a bunch of former players pissed off at me for saying that, but it's true. The league won."

**KING: The NFL's nuclear-winter scenario has vanished**

Mawae, the former **Seahawks'**, **Jets'** and **Titans'** center, did not add his name to

the list of roughly 4,500 ex-NFL players who sued the league over the effects of brain injuries they contend were incurred on the field, saying he knew football posed inherent risks all along, but they were worth the rewards.

But the settlement is a setback for players in the long run, Mawae said, because it keeps the NFL from having to release information in court about what it knew in regards to the connection between brain injuries and football, and when it knew it. And that opportunity lost represents a discovery process that can't have a dollar value placed upon it.

"Everybody had been asking me what was going to happen with the lawsuit, and I've said all along they're going to settle it," said Mawae, who retired after the 2009 season.

"Because in the end, settling it for however much money is a whole lot better for
the league than giving up everything they have as far as information and potentially
harming the shield for good. There's too much potential for information that could
have done damage to the NFL, and it's better to just pay it off with $765 million,
plus court costs."

**Peter King: The owners win in concussion settlement**
The MMQB's Peter King call the NFL owners the winners in the concussion lawsuit,

The NFL's class of elderly retired players understandably cannot be blamed for not
being able to afford to take the long view in regards to the concussion litigation
settlement. The different agendas between that group of ex-players, and those of
Mawae's era, made Thursday's development capable of being seen from vastly
different perspectives.

"If it helps the neediest men, in the most dire situations, then, yes, it's a good day,"
Mawae said. "But it depends on how long it takes for them to get that money. If
those guys who are destitute, or have no insurance, or have struggles with
dementia, if they can get this help immediately, that's a positive. Especially the
older players who helped lay the foundation of this game. We owe them that."

But today's players, and those recently retired, lost out, Mawae said.

"The guys who need it now won, but the rest of us have lost the ability to take the
bully behind the shed," he said. "From my standpoint, I'd rather take the bully
behind the shed and beat the crap out of him, and let him know he can't bully us

around. But now, essentially what we've done is taken a little bit of our milk money
back and gotten the promise that he won't touch us again.

"But there's no ability to go and finish off the fight. The league, at the end of the
day, was willing to spend $765 million, plus another $200 million in legal fees, and
that's like spending the Jacksonville Jaguars in order to not have to divulge
information you had that the players could have used to finish the fight. It's like
taking it 99 yards, but not getting that last yard."

**McCANN: Here's what happens next in the concussion lawsuit settlement**

Several ex-NFL players SI.com spoke to acknowledged that the devil is in the
details in a deal as complicated as the concussion litigation settlement, and said
they are still waiting to see if the agreement can be executed swiftly and fairly. One
of those was ex-Bucs defensive lineman Chidi Ahanotu, 42, a 12-year NFL
veteran who signed his name to the concussion litigation and recruited ex-Tampa
Bay teammates Hardy Nickerson, Eric Curry and Mike McGruder to do the same.

"It's decent money, but the key part of this will be the people who determine who
qualifies and who's eligible," said Ahanotu, who played for five teams between
1993-2004, spending nine seasons in Tampa Bay. "If it's like the NFL's disability
benefit program, this isn't a win for the players. That panel denies most requests.
We have access to the benefits, but that doesn't mean you get them.

"That's why the jury is still out on this. I want to say we won, but you can't do that
until you see how this money can be accessed and by whom. The fact that this
money is here is great, but [how the money is distributed] is the most important

-1983-

part of the process. That's everything."

Ahanotu said he has suffered from memory loss and a lack of mental clarity since his playing career ended, and worries that his long NFL career will lead to future cognitive issues. He was not surprised by Thursday's settlement, but thought the negotiation process would take longer.

"I was expecting them to settle, because it's just a PR nightmare for the NFL," he said. "Now that the season is close to starting, the league doesn't want this issue looming over everything. But I thought it'd take longer than this."

Reached as he was about to go on Fox Sports1 to talk about the concussion litigation settlement, former Saints linebacker Scott Fujita, now an NFL analyst on that network, was trying to quickly digest the news and impact of the agreement.

"It looks good on paper, and the press release sounds fantastic, all that kind of stuff," said Fujita, who did not join the lawsuit. "But we're all trying to figure out the details and what they mean. That will tell the story."

Cowboys quarterbacks coach Wade Wilson, himself a former NFL quarterback of 17 seasons, called the settlement a potential "win-win for both sides," in that it hopefully allows for closure for the league and its players on this issue.

"Any time you can get care to the ex-players who are really needing it, that's a phenomenal thing," said Wilson, who did not join the lawsuit and said he didn't even know any former teammates who had. "I really do think it's a good day for the NFL, because any time there's litigation out there and you get it resolved, it's a plus. Hopefully now we can start to put it behind us and move on to football and the games."

# EXHIBIT 46

Dow Jones Reprints: This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers, use the Order Reprints tool at the bottom of any article or visit www.djreprints.com

• See a sample reprint in PDF format.  • Order a reprint of this article now

NFL

# Deal in Concussion Suit Gives NFL a Big Victory

By MATTHEW FUTTERMAN and KEVIN CLARK

Updated Aug. 29, 2013 11:22 p.m. ET

After years of damaging publicity, the National Football League reached a surprise settlement with a group of 4,500 former players who sued it over concussion-related issues.

The settlement represents a major victory for the NFL. Just a week before the 2013 season, the league has largely removed an issue that has dogged it for years and led some to suggest the sport should be banned.

The agreement, reached at 2 a.m. Thursday Eastern time after nine weeks of intense mediation, came far earlier than most expected. It calls for the NFL to pay $765 million, mostly for medical benefits and injury compensation for the retired players, in addition to funding medical research and covering legal expenses.



The National Football League and 4,500 former players suing the league over concussion-related issues reached an agreement on a settlement. WSJ's Kevin Clark and NFL Hall of Fame quarterback and SmallBizClub.com Founder and CEO Fran Tarkenton discuss. Photo: AP.

The settlement includes all retired NFL players who present medical evidence of severe cognitive impairment, not just those who joined the suit.

The NFL admitted no wrongdoing or liability in the agreement, which must be approved by Anita Brody, the federal judge in Philadelphia overseeing the case. She is likely to approve the agreement, said a person familiar with the matter.

The plaintiffs don't have to approve the settlement, but anyone can opt out, a league spokesman said.

Layn Phillips, a former U.S. District judge who mediated the settlement, said in a statement that it would "provide relief and support where it is needed at a time when it is most needed," while avoiding a long legal process.

"This settlement is a very important step for ensuring that future generations of football players do not suffer the same way that many in my generation have," said Kevin Turner, an NFL running back in the 1990s and a lead

Former Chicago Bears quarterback Jim McMahon in 1987. (AP Photo/Doug Jennings) *Associated Press*

**Related Articles**

A Look at the Prominent Plaintiffs

plaintiff who suffers from amyotrophic lateral sclerosis, a motor neuron disease known as Lou Gehrig's disease.

The settlement will cost each of the NFL's 32 franchises $24 million over 20 years, or roughly $1.2 million a year. Projected league revenues this season are $10 billion, and the NFL finalized a series of media-rights deals last year that guarantee more than $40 billion through 2022.

The agreement doesn't prevent future players from making claims or suing the NFL for injuries incurred while playing. But because all current players are party to the current collective-bargaining agreement between the NFL's owners and the league's players' union, those claims would be handled through the arbitration process outlined in the labor deal.

NFL Executive Vice President Jeffrey Pash, who spearheaded the case for the league, called the deal "an important step that builds on the significant changes we've made in recent years to make the game safer, and we will continue our work to better the long-term health and well-being of NFL players."

The lead plaintiffs' attorney, Christopher Seeger, said the settlement is an opportunity for the most severely affected players to get medical coverage quickly and covers retired NFL players for the next 60 years. Former players who suffer from ALS, Parkinson's disease, Alzheimer's disease, dementia and other neurological conditions will receive "substantial benefits," some as high as $5 million, he said.

Mr. Seeger said the deal will "get help quickly to the men who suffered neurological injuries. It will do so faster and at far less cost, both financially and emotionally, than could have ever been accomplished by continuing to litigate."

Legal experts familiar with the case say the plaintiffs' attorneys didn't believe they had enough firepower to win in court. NFL lawyers were prepared to probe each plaintiff about his athletic history to try to convince the court the NFL couldn't be held liable for injuries that could have come from youth, high-school or college football—or substance abuse.

John Goldman, a litigator with Herrick, Feinstein LLP, who was following the case, said the plaintiffs had "tough legal hurdles," given the inability of players to prove what caused their injuries.

Current executives at the NFL Players Association issued a terse statement: "All of the plaintiffs involved are part of our player community, and we look forward to learning more about the settlement."

Kevin Mawae, a former president of the NFLPA who wasn't a plaintiff, said the settlement was far too small. "Basically, for the cost of their least valuable team, the NFL was able to remove a huge monkey off their back," Mr. Mawae said. "But even worse than the money, it's that they don't have to admit guilt and the players will never be able to know the information that the league knew about this issue."

**Big Settlements**

**NFL** (2013): The professional football league and a class of former players agreed to settle a concussions-related lawsuit for $765 million. The NFL generated $9.5 billion in revenue in 2012.

**Goldman Sachs** (2010): The bank paid $550 million to settle its civil litigation with the Securities and

He said, "At end of the day it's a very small price to pay considering the negative outcome that could have happened to the NFL if the players had taken this to court."

The settlement calls for $75 million of the NFL payment to go to baseline medical exams for ex-players, $675 million to go toward compensation and $10 million to go to

-1987-

Exchange Commission, which charged that Goldman profited off the housing market's collapse by selling clients mortgage securities. The firm reported $34.1 billion in revenue last year.

**Countrywide** (2011): Bank of America settled for $335 million a discriminatory mortgage-lending suit filed by the Justice Department against its Countrywide unit. BofA reported $84.2 billion in revenue last year.

**Dow Corning** (1998): The company agreed to settle a lawsuit related to its silicone-breast implants for $3.2 billion. Its revenues in 2012 were $6.1 billion.

**Tobacco** (1998): The four largest cigarette makers in the U.S. settled state claims for $206 billion to be paid over 25 years.

research and education.

The cost of notifying members of the class won't exceed $4 million. Legal fee payment will be determined by the district court. The NFL will pay 50% of the settlement over the next three years, then the balance over the next 17 years.

If the initial funds are exhausted, the NFL will have to contribute a maximum of $37.5 million to supplement the fund, bringing the total to just over $800 million, not including legal fees, which are expected to be as much as $100 million, according to a person familiar with the matter.

Players in the suits include Pro Football Hall of Famers Chris Doleman and Bruce Smith and recent stars such as former Jacksonville Jaguars running back Fred Taylor.

Families of players with chronic traumatic encephalopathy who have been posthumously diagnosed, including those who committed suicide as did former NFL linebacker Junior Seau, also will be eligible for millions of dollars in compensation, Mr. Seeger said.

Former Minnesota Vikings quarterback Fran Tarkenton said the deal is a good one for the players, simply because most older players have little money. "They are just broke, they've got dementia, they've got ALS, all types of brain damage and what this does, it puts the money into these people to let them live their live with some type of dignity."

Helmet maker Riddell, a party in many of the lawsuits, wasn't a part of the settlement, Mr. Seeger said. A Riddell spokesman declined to comment.

—Ben Cohen contributed to this article.

**Write to** Matthew Futterman at matthew.futterman@wsj.com and Kevin Clark at kevin.clark@wsj.com

Copyright 2014 Dow Jones & Company, Inc. All Rights Reserved
This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law.
For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit
www.djreprints.com

# EXHIBIT 47

 **ESPN.com:** NFL

[Print without images]



**Thursday, August 29, 2013**

# Reaction to the concussion deal

ESPN.com news services

---

*Reaction to Thursday's order from Senior U.S. District Judge Anita Brody outlining a proposed $765 million settlement between the NFL and more than 4,500 former players who want to resolve concussion-related lawsuits:*

---

"From the outset of this litigation, I have expressed my belief that the interests of all parties would be best served by a negotiated resolution of this case. The settlement holds the prospect of avoiding lengthy, expensive and uncertain litigation, and of enhancing the game of football." -- Brody

---

"It's a great day. My preference was when players were done playing, we'd have some kind of aftercare. It's a great thing for both sides of football that guys can get aftercare now. That's the most important thing." -- former NFL quarterback [Mark Rypien] to USA Today Sports

---

"It's frustrating. Frustrating. And to have a 10-year-old daughter who says to her mother, 'Daddy can't do this because Daddy won't remember how to do it,' it's not a good feeling. I'm glad to see there's been ... acknowledgment that football has had something to do with a lot of the issues us players are going through right now." -- former [Dallas Cowboys] running back Tony Dorsett

---

"Concussions are part of the game. I know a lot of the old players need a lot of help, and it's quite a settlement, from what I understand. ... I think people have hid behind this too long. It's time it's out in the open. It's out in the open now so we'll see what happens." -- former [Chicago Bears] coach and ESPN analyst Mike Ditka

---

"I'm not a part of it, but it seems fair. There have been a lot of guys that have suffered. Take Sam Huff, I saw him carried off the field on a stretcher twice in one game. I'm glad they're addressing it. I hope the players are satisfied and they're taken care of." -- former NFL quarterback Sonny Jurgensen

---

"They (the NFL) put a big settlement number out there, but guess what? They say you have to qualify, how easy will they make that? Then you get 50 percent in the first three years and the rest of it you have to wait for over a period of 17 years? Some of the guys who need to be compensated will be dead by then. A guy who has alzheimer's now. ... how relevant is that number to them? Who cares?" -- former NFL running back [Leroy Hoard]

---

"From what the first offer was to where it is now, I think it's a fair deal. The thing that I'm happy about is they are going to take of some of these guys that are really affected by this. They will do the baseline testing and get these guys the help that they need, more so than the money." -- Hall of Fame quarterback

**-1990-**

Warren Moon

---

"I'm surprised, I'm surprised it ended. I'm surprised they settled. There's a lot of older guys, guys older than me that are ailing right now, suffering so I can understand that you can say 'OK, I'll take the short term gain.' But it doesn't fix the problem. The thing that gets me is I still wanna know what is the NFL not telling us? I have been trying to figure it out. I have gone through this, gone through my first training camp and I remember getting my helmets and pads the first time and I've never had anyone tell me about concussions or anything like that so I want to know what the NFL is not telling us. But I'm happy for the guys that are part of the settlement." -- former Rams defensive tackle D'Marco Farr.

---

"I hope this settlement is the NFL saying, 'We're taking concussions seriously. We're going to keep working on it.' The worst case scenario for me is the NFL saying, 'We paid you money. Now go away.' ... "It felt like for the longest time we were making stuff up, that we were after money. I would give $200 million for my dad to be back here and be alive. There's no price on the hell you go through with this." -- Garrett Webster, son of former Steelers center Mike Webster, who died in 2002 from brain disease.

---

"At the surface it looks like a good deal. But in the long run i don't think it is. That's usually how it works when it comes to players and ownership. ... I'm pretty sure (the lawsuit) changed things. There's a certain protocols and fine systems and safety precautions that are being taken back on the field because of them trying to get ahead of lawsuits and stuff like that that come up later. I think that's affected how the game's being officiated and rule changes and stuff." -- Texans left guard Wade Smith



Kevin Mawae
@KevinMawae
Follow

NFL concussion lawsuit net outcome? Big loss for the players now and the future!  Estimated NFL revenue by 2025 = $27 BILLION

2:34 PM - 29 Aug 2013

114 RETWEETS  11 FAVORITES



Chris Kluwe
@ChrisWarcraft
Follow

Glad to see the older guys are getting taken care of with the concussion settlement. It'll never be enough, but it's a start.

12:49 PM - 29 Aug 2013

24 RETWEETS  24 FAVORITES

**-1991-**

"I am able to live my life the same way I was, but now -- chances are, I am 44 now, I won't make it to 50 or 60 -- I have money now to put back for my children to go to college and for a little something to be there financially. ... The compensation provided in this settlement will lift a huge burden off the men who are suffering right now, for both them and their families, of course. It will give them the peace of mind to have the best quality of life they can have. No longer have to make decisions regarding their health based on what they can afford, but based on what is the best treatment for them." -- former NFL running back Kevin Turner, who has Lou Gehrig's disease.



The settlement includes much-needed medical care and monitoring of former players, as well as a commitment to research funding. -- The Boston University Center for the Study of Traumatic Encephalopathy, which has been examining brains of deceased NFL players to try to determine what sort of connection exists between football and brain disease.

The NFL is far and away the most popular spectator sport in this country, so it has a symbolic power to lead the way on this issue. Now they are free to help raise awareness and fund prevention and treatment that will save millions from an injury that affects what it means to be human. -- agent Leigh Steinberg in op-ed on Forbes.com.



"I'm shocked that it is settled. I'm used to the NFL taking a hard-line approach as they have throughout the years with strikes and everything else. I'm curious how they came up with the figure and I've got a lot

**-1992-**

of questions, but I am happy that it's done. Any time the NFL acknowledges they are ready to settle something, it shows they knew they had some sort of negligence." -- former offensive lineman Lomas Brown, a seven-time Pro Bowler who had sued the league



*Information from ESPN's Kelly Naqi, ESPN.com's Nicholas Wagoner, Scott Wagner and The Associated Press was used in this report.*

# EXHIBIT 48





SportsDay

# Dorsey Levens rips settlement of concussion lawsuit against NFL

Sept. 18, 2013

One of the segments that aired Tuesday night on HBO's "Real Sports with **Bryant Gumbel**" dealt with the issue of the $765 million settlement of the NFL concussion lawsuit.

Former Green Bay Packers running back **Dorsey Levens** was interviewed at length about his reaction to the settlement.

The correspondent on the story, **Jon Frankel**, also interviewed **Christopher Seeger**, the lead attorney for the plaintiffs, and **Kevin Turner**,a former NFL player who suffers from ALS, known as Lou Gehrig's disease.

Both Levens and Turner were among the more than 4,500 plaintiffs in the lawsuit. Levens said he was upset about the decision to settle. He wanted the case to go to trial.

"This is a great victory for them," Levens said. "I didn't understand how they got off so lightly."

Levens, who played for Green Bay from 1994-2001, was asked what his expectations were for the lawsuit.

"It was about getting guys help," Levens said. "You know, and when a guy calls me and says, 'I've called the NFL five times. I can't get a response. My head hurts all the time. And if I can't get help, I'm going to take care of it.' I couldn't sleep. What do you say to a guy like that? I'm going to do my best to help you out."

Levens wanted a trial that could have cost the NFL billions and forced the league to reveal that it knew all along players were at risk.

"I wanted to know what they knew and when they knew it," Levens said.

Seeger defended the amount of the settlement.

"I think we got every nickel we could get," Seeger said. "I know the NFL has lots of nickels. But we got every nickel that we could get."

Seeger said the players' case was not without its weaknesses

"I'm not making the argument for the NFL, but as the lawyer for the players, I have to recognize one thing about this case," Seeger said. "Many of the players, you know, who play two or three years in the

**-1995-**

NFL, four years in the NFL, spent more time playing football outside the NFL."

Frankel asked Turner if he thought "the NFL got away cheap."

Said Turner: "If you call three quarters of a billion cheap, certainly. And to them, maybe it is. Maybe they're behind closed doors, laughing their (expletive) off. But so far the people that I've seen that are complaining, I don't think any of those people are symptomatic right now. The people that have dementia, ALS are happy with it. You know, because they need it now."

Levens said he was happy for those like Turner who are able to get help from the suit but said he worried about future cases.

Levens was asked if he thought he had any traumatic brain injury symptoms.

"I do," Levens said. "The sleeplessness, the blurred vision, the ringing in the ears. You know, some irritability. It's there."

Levens said his nightmare is that he could suffer the same fate as Turner and that there was nothing he could do to safeguard himself from what might happen.

"It's too late," Levens said. "If there was any damage, it's already done. Now you just got to wait and see. Now you play the waiting game, which is terrifying in itself because the first time you forget where your keys are, you know, you kind of lose — it's just like — it's happening. You know, any little thing that happens, you start to question it."

Levens said the lawsuit's conclusion is not really an ending.

"This issue's not going away," Levens said. "Just because the lawsuit is over, this concussion issue is not going away. It's just the tip of the iceberg."

## Fixing the blame

ESPN.com asked its readers: "Which is more to blame for the bizarre ending to the Wisconsin-Arizona State game?"

Out of the nearly 19,900 responses, 70% answered "the officials" and 30% said the "Wisconsin offense."

In the state-by-state breakdown, no state's majority of voters thought the Wisconsin offense was more to blame.

In Wisconsin it was 85% officials and 15% Wisconsin offense.

In Arizona, it was 53% officials and 47% Wisconsin offense.

## Pitcher's pitch goes awry

New York Mets pitcher **Matt Harvey**, interviewed Wednesday on "The **DanPatrick** Show," took product endorsement to a particularly irritating level.

Instead of talking about his elbow injury, he kept plugging Qualcomm. Harvey later apologized for his annoying patter on the show.

**-1996-**

Harvey has decided to rehab instead of undergoing surgery on his arm.

During the discussion with Patrick about that issue, Harvey said: "I strongly believe that that's going to work and pay off but today, I'm here talking about Qualcomm and hoping I can help them out as much as possible."

Harvey then went on and on about Qualcomm, until Patrick mercifully ended the segment.

Said Patrick: "Man, that's a bummer. That's the first time we had him on....That was bad. That was bad. And I wasted people's time there."

*Call SportsDay at (414) 223-5531 or send email to* [bwolfley@journalsentinel.com](mailto:bwolfley@journalsentinel.com)

**Find this article at:**
http://www.jsonline.com/sports/dorsey-levens-rips-settlement-of-concussion-lawsuit-against-nfl-b99101255z1-224335851.html

☐ Check the box to include the list of links referenced in the article.

# EXHIBIT 49

# Seau family says 'no' to NFL settlement

## Lawyer says deal doesn't cover heirs or ensure public airing of concussion issues

By Greg Moran (/staff/greg-moran/)    10:06 a.m.    Sept. 3, 2014    Updated    6:19 p.m.



Linebacker Junior Seau at a press conference Friday March 14, 2003 at Seau's restaurant in Mission Valley. — *John Gastaldo*

The family of San Diego Chargers great Junior Seau won't be part of a proposed settlement between the National Football League and thousands of former players who sued over health problems attributed to repeated concussions.

The decision to withdraw from the settlement means the Seau family will pursue its own wrongful death lawsuit against the league, said Steven Strauss, attorney for the family.

It also may imperil the proposed settlement, to which a federal judge gave preliminary approval in June. Seau is perhaps the most prominent name involved in the litigation, as his suicide in 2012 rocked the league and its fans and heightened attention on the growing concussion crisis.

Strauss said the proposed deal does not address the wrongful death claims the family has sued under and will not provide compensation for relatives of former players, such as Seau's four children. Under the terms of the pending deal, the family would get $4 million.

"The settlement provides medical benefits and compensation for certain players, for past damages," Strauss said. "It doesn't include compensation to heirs or successors."

Strauss said the family also wants more information about the concussion and head trauma issue to come out.

"They want to know what happened to their dad," he said. "This settlement isn't designed for that. Not one deposition has been taken. Not one document has been produced."

The decision by the family could start a domino effect, as other players and families may decide to follow suit. That could break up the entire deal.

Anyone opting out of the deal has until Oct. 14 to notify the federal judge overseeing the case in Pennsylvania. A hearing that would finalize the settlement is set for Nov. 19.

Christopher Seeger, a New York attorney who was the chief negotiator for the settlement on behalf of the players, said in a statement that other players should not follow Seau and risk giving up the "tremendous guaranteed benefits" they would get.

"If Mr. Strauss believes the $4 million his client is eligible for under the settlement is insufficient, he can choose to permanently forfeit these benefits and face all the significant risks associated with continued litigation," he said.

The NFL did not respond to a request for comment.

Also on Wednesday, several family players threatened to object to a settlement on hundreds filed in Philadelphia, saying the potential payouts called for in the suit under a complex formula weren't enough, among other criticisms. By objecting, the former players remain in the suit but tell the judge what they don't like. It's different from opting out, which removes a party from the case.

More than 4,500 players are involved in the suit, alleging a variety of wrongdoing by the league that includes claims of fraud for how it handled concussions and other brain injuries. An original settlement deal in 2013 provided for $675 million in compensation for all players who claimed some kind of brain injury as well as funds for testing and research. Lawyers for the players would also get $112 million.

The deal was roundly criticized, and U.S. District Judge Anita Brody questioned if the compensation fund was large enough. In July, after the league agreed to remove the cap on damage claims, a revised settlement agreement was given preliminary approval by the judge.

While there is no longer a cap, the settlement contains a grid that details how much a player would get based on age and diagnosed ailment. For example, someone under 45 diagnosed with Lou Gehrig's disease would get $5 million.

Seau played 20 years in a Hall of Fame career, but while in the game and after retiring in 2010, he suffered from insomnia, depression, anxiety, alcohol abuse, mood swings and emotional detachment. He shot himself once in the chest on May 2, 2012, at his Oceanside home.

After his death an evaluation of his brain by the National Institutes of Health concluded he had evidence of chronic traumatic encephalopathy, or CTE, a degenerative brain disease, likely the result of repetitive head trauma as a linebacker.

Shaun Martin, a law professor at the University of San Diego School of Law, said it's rare to see enough people opting out of a settlement in a class-action lawsuit so as to scuttle the settlement. Seau's move was not surprising.

"You would rather not have someone as high profile as Junior Seau opt out," he said. "But anyone who really thought about it knew he would. He has uniquely powerful claims, about the NFL causing his suicide. Even more bluntly, it's not in the ballpark of what the estate of Junior Seau would take to settle the case."

The family lawsuit was filed in San Diego Superior Court in January 2013, alleging among other things the league concealed the dangers of concussions and head trauma from players for years.

The league has consistently denied such allegations.

It's unclear what will now happen to the suit, said Strauss, a partner at the law firm Cooley LLP. He said he wanted the Seau case sent back to San Diego to proceed. But it is also possible that Brody, the Pennsylvania judge, could hold on to this case, and any other "opt -out" cases, until the larger settlement is finalized.

That could take several years, if any party to the settlement decides to appeal to the federal courts.

© Copyright 2014 The San Diego Union-Tribune, LLC. An MLIM LLC Company. All rights reserved.

# EXHIBIT 50

# Hall of Famer Joe DeLamielleure will object to NFL concussion deal



Pro Football Hall of Famer Joe DeLamielleure doesn't believe the NFL has the best interest of its former players at heart. (Mark Duncan / Associated Press)

**By NATHAN FENNO**

SEPTEMBER 4, 2014, 3:50 PM

oe DeLamielleure, the Pro Football Hall of Fame offensive lineman, plans to object to the proposed NFL concussion settlement.

"I'm going to tell everyone I know to object," said DeLamielleure, who played for the Buffalo Bills and Cleveland Browns from 1973 to 1985, in a recent interview with The Times.

The information packet mailed to each retired player that includes a 24-page summary of the proposed settlement didn't assuage DeLamielleure's concerns. Neither did an August meeting, in Canton, Ohio, before the Pro Football Hall of Fame inductions, with attorneys who negotiated the settlement.

A longtime critic of the NFL and NFL Players Assn., DeLamielleure doesn't believe many of the

-2002-

estimated 20,000 retired players will receive monetary awards from the proposed settlement. He is also frustrated by a variety of other issues in the settlement that were granted preliminary approval by a federal judge in July, including retired players' having to pay $1,000 to appeal an awards decision. The money would be refunded if they win.

Retired players have until Oct. 14 to object or opt out of the settlement. If enough retired players object, DeLamielleure believes they can unravel the settlement.

"It's going to take 4,000 to 5,000 guys to object or opt out," he said. "But I bet there's not even 4,000 or 5,000 guys who know this is going on."

On Wednesday, an attorney for the family of the late San Diego Chargers linebacker Junior Seau announced they would bypass a potential $4-million award and opt out of the settlement to continue wrongful-death litigation against the NFL on their own.

Others are waiting to make a decision on their participation until they know the outcome of next week's hearing in the U.S. Court of Appeals for the Third Circuit in Philadelphia, where seven retired players asked the court to intervene in the proposed settlement.

"Any objection threatens to delay approval of this settlement and endanger its guaranteed benefits for retired players who are in desperate need," plaintiffs' co-counsel Christopher Seeger said in a statement. "We look forward to finalizing this agreement so that former NFL players can soon begin taking advantage of its benefits."

A fairness hearing is scheduled for Nov. 19 in Philadelphia in front of U.S. District Judge Anita Brody.

**Follow me on Twitter: @nathan fenno.**

Copyright © 2014, Los Angeles Times

---

http://www.latimes.com/sports/sportsnow/la-sp-sn-nfl-concussion-deal-joe-delamielleure-20140904-story.html

# EXHIBIT 51

ensued about 17 hours after the ingestion of the poison, important quantities of the poison were found in the stomach. Brandl and Tappeiner [10] and Gadaskina and Shtessel [11] presented data on the excretion of fluoride through the gastrointestinal tract, and Charnot [12] described fluoride excretion in the bile. Thus it is possible that gastroenterohematic circulation of fluorine compounds exists. Because of these data and the high toxicity of fluoroacetate repeated gastric lavages seem to be advisable.

The total quantity of fluoroacetate recovered from the organs and body fluids tested was 465 mg. Since the patient weighed approximately 140 lb. (63.5 kg.), disregarding the fluoroacetate present in organs from which no sample was available for toxicological study, he ingested a minimum of 6 mg. per kilogram of fluoroacetate.

The therapy used in this case was essentially symptomatic: barbiturates to decrease convulsions, intracardial procaine hydrochloride to inhibit ventricular fibrillation, atropine sulfate to decrease bronchial mucus secretion, and plasma transfusion and oxygen to offset vasomotor and respiratory failure. Experimental studies have suggested the use of certain specific antidotes.[6] Of these

monacetin was directed for the treatment of this case; however, it arrived too late to be employed.

SUMMARY

1. A case history of fluoroacetate poisoning has been described together with postmortem examination and chemical analysis of the fluoroacetate content of organs and body fluids.

2. It appears that there is no important difference between postmortem findings of sodium fluoroacetate and sodium fluoride poisoning. The additional biochemical effects of sodium fluoroacetate thus seem to have no pathological manifestation of diagnostic significance.

3. Because of indications of gastrointestinal excretion and reabsorption of fluorine compounds, repeated gastric lavages seem to be advisable.

4. Other therapeutic aspects are briefly discussed.

1921 Walnut St. (Dr. Harrisson).

10. Brandl, J., and Tappeiner, H.: Über die Ablagerung der Fluorverbindungen im Organismus nach Fütterung mit Fluornatrium, Ztschr. f. Biol. München u. Leipz. 10: 518, 1891-1892.
11. Gadaskina, I. P., and Shtessel, T. A.: Resorption, Distribution and Elimination of Fluorine After Experimental Poisoning with Sodium Fluoride, J. Physiol. U.S.S.R. 19: 1245, 1935.
12. Charnot, A.: Influence de quelque composés minéraux sur les effets toxiques du fluorure de calcium, Bull. Acad. de méd., Paris 120: 224 (Oct. 18) 1938.

---

# ELECTROENCEPHALOGRAPHIC CHANGES IN PROFESSIONAL BOXERS

*Ewald W. Busse, M.D.*

*and*

*Albert J. Silverman, M.D., Denver*

Since the days of the Roman gladiators, men have fought each other and other persons have watched. The sport of boxing, as it exists today, is largely the product of psychological forces that have not changed in essence for 2,000 years. It is the feeling of many persons that in spite of periodic criticism and the efforts to ban prize fighting, the sport will persist. Since it appears unlikely that athletic contests requiring physical contact will ever cease, the physician should attempt to safeguard the physical and mental health of the participants.

Much has been accomplished to protect the athlete in such sports as football and ice hockey, but protective measures for the amateur and professional pugilist have not kept pace. Jokl [1] in his monograph (1941), which is concerned with the medical aspects of boxing, recognized and deplored this situation, and he collected a wide va-

riety of case material that was representative of possible sequelae due to boxing injuries. Raevuori-Nallinmaa [2] in a recent publication states his belief that the usual cause of death related to boxing is intracranial hemorrhage. Tragic and sobering though they be, deaths of this kind are relatively rare. More important, and certainly much commoner, are the mild psychic changes observed in a high percentage of boxers. These changes are due to brain damage, which is also responsible for the less frequently seen, so-called "punch-drunk" person, who is in fact in a state of traumatic dementia and reveals severe psychic and neurological abnormalities.

The syndrome of boxing encephalopathy is probably due to multiple concussion hemorrhages as well as to contusion and laceration of the brain. The "knockouts" and "technical or near knockouts" (representing states of commotio cerebri) are usually the result of a trauma that alters brain function. If the trauma is severe or is mild but repeated at intervals that do not permit the brain to return to normal functioning, permanent damage may result.

Many investigators have reported on the value of the electroencephalogram in the detection of brain injuries. Dow, Ulett, and Raff,[3] in doing electroencephalograms of persons immediately after injury, reported that a

Professor of Psychiatry (Dr. Busse), and Resident in Psychiatry and Electroencephalography (Dr. Silverman).
Mr. W. Asmus, Executive Director, and Mr. E. Bohn, Chairman of the State Athletic Commission of Colorado, assisted in the preparation of this study.
From the Electroencephalograph Laboratory of the Colorado Psychopathic Hospital and the Division of Psychosomatic Medicine, University of Colorado Medical Center.

1. Jokl, E.: The Medical Aspect of Boxing, Pretoria, S. Africa, J. L. Van Schaik, Ltd., 1941.
2. Raevuori-Nallinmaa, S.: Brain Injuries Attributable to Boxing, Acta psychiat. et neurol., supp. 60, p. 51, 1951.

Downloaded From: http://jama.jamanetwork.com/ by Anya Havriliak on 10/03/2014

mild cerebral trauma produced electroencephalographic changes that decreased in abnormality within a few minutes. If amnesia was associated with the trauma, but the patient was clear-minded when his record was taken, there was only a slight increase in the percentage of abnormal records. If consciousness was at all impaired at the time of the electroencephalogram, there were invariable, accompanying electroencephalographic changes. Abnormal findings recorded immediately after head trauma may become normal, however, for Dow and associates found that a larger number of records were abnormal when taken less than a half hour after injury. This points to some mechanism in concussion other than such factors as petechia, contusion, and emboli, each of which would take several days to disappear. Williams [4] found invariable electroencephalographic changes accompanying altered consciousness as a result of head injury and stated that concussion is the result of widespread disorganization of cerebral function. Strauss [5] found diffuse slowing in patients with clouded consciousness but noted a more selective slowing in frontal areas of patients showing facetiousness. Ward and Clark [6] indicated that concussion or localized blows to the cortex resulted in changes in the electroencephalogram identical to those produced by rapid rises in intracranial pressure. Jokl [1] supported this by his contention that at the moment of the blow to the head there was a sharp rise of intracranial pressure.

In their experimental studies Zimmerman and Putnam [7] reported that minimum cell changes could occur without electroencephalographic changes but found that when the trauma was severe enough to cause "incompletely reversible cell changes" there was a direct relationship between severity of cell changes and severity of electroencephalographic abnormalities. They also reported a reduction in voltages that was directly proportional to the amount of force applied. Heppanstall and Hill [8] stated that focal findings were generally significant of symptomatic rather than idiopathic disorders and that there was a greater chance of permanent electroencephalographic changes in persons who sustained head injuries when they were under the age of 20. Kaufman and Walker [9] reported that in about two-thirds of their patients convulsive disorders developed after acute and severe head injuries. Abnormal electroencephalograms were seen in 90% of those patients in whom seizures developed and in more than 75% of those without seizures. Focal abnormalities were noted in over 80% of the epileptics and in over 65% of the nonepileptics. Greenblatt [10] reporting on post-traumatic patients with convulsions, fainting spells, psychoses, or other personality disorders, found that 68% had disturbed electroencephalograms. Regarding minor head injuries, Harris and co-workers [11] stated that abnormal waves may be found in hyperventilation only and that a good prognosis can be made from serial electroencephalograms in which the tracings become more normal. Other investigators, in discussing electroencephalographic changes following head injury, reported different findings. Amplitude asymmetries [12] and bursts of six to eight per second activity [13] were noted by some, while others [14] reported decreases in voltage and increases or decreases in frequency.

Thus, it is evident that the electroencephalogram has no specific pattern in head injury and that any abnormality may be seen, depending on whether there is a temporary physiological disturbance or actual organic damage. The site of injury also has some bearing on electroencephalographic findings.

### METHOD AND PROCEDURE

In order to help prevent serious injuries or death, the state athletic commission of Colorado, acting on the recommendation of one of the authors of this article (E. W. B.), unanimously passed a regulation requiring periodic electroencephalographic examinations on all professional boxers performing in Colorado. Although several states recommend the examination in specific cases, the authors do not know of any other state in which such electroencephalograms are compulsory. The regulations as set up by the state athletic commission were as follows: 1. A professional boxer must have an electroencephalogram at least once a year. 2. In the case of a "knockout," an electroencephalogram must be done within two weeks of the injury. 3. Frequent, repeated examinations could be done in the case of a boxer with suspicious recording.

Our purpose in this article is to record the results obtained from the first year's electroencephalograms as an initial report and to attempt to evaluate the worth of the electroencephalogram in safeguarding the health of those who participate in boxing. A Grass eight-channel electroencephalograph was used. So-called active lead placements were left and right frontals, motors, occipitals, and anterior and posterior temporals. Reference electrodes included the ears and vertex leads. Additional leads were used in specific cases as indicated. Records were classified according to the method described by Gibbs, Gibbs, and Lennox.[15] Activation with hyperventilation was performed routinely. Monopolar and bipolar tracings were done in each case, and a natural sleep record was obtained whenever possible.

3. Dow, R. S.; Ulett, G., and Raff, J.: Electroencephalograph Studies Immediately Following Head Injury, Am. J. Psychiat. **101**: 174 (Sept.) 1944.

4. Williams, D.: Electro-Encephalogram in Acute Head Injuries, J. Neurol. & Psychiat. **4**: 107 (April) 1941.

5. Strauss, H.: Clinical and Electroencephalographic Studies: Correlation of Mental, Electroencephalographic and Anatomic Changes in Cases with Organic Brain Disease, Am. J. Psychiat. **101**: 42 (July) 1944.

6. Ward, J. W., and Clark, S. L.: The Electroencephalogram in Experimental Concussion and Related Conditions, J. Neurophysiol. **11**: 59 (March) 1948.

7. Zimmerman, F. T., and Putnam, T. J.: Relationship Between Electroencephalographic and Histologic Changes Following Application of Graded Force to the Cortex, Arch. Neurol. & Psychiat. **57**: 521 (May) 1947.

8. Heppanstall, M. E., and Hill, D.: Electroencephalography in Chronic Post-Traumatic Syndromes, Lancet **1**: 261 (Feb. 27) 1943.

9. Kaufman, I. C., and Walker, A. E.: Electroencephalogram After Head Injury, J. Nerv. & Ment. Dis. **109**: 383 (May) 1949.

10. Greenblatt, M.: The EEG in Late Post-Traumatic Cases, Am. J. Psychiat. **100**: 378 (Nov.) 1943.

11. Harris, H. I.; Wittson, C. L., and Hunt, W. A.: Value of Electroencephalogram in Prognosis of Minor Head Injuries: Preliminary Report, War Med. **4**: 374 (Oct.) 1943.

12. Laufer, M. W., and Perkins, R. F.: Study of Electroencephalographic Findings in 209 Cases Admitted as Head Injuries to Army Neurological-Neuro-Surgical Center, J. Nerv. & Ment. Dis. **104**: 583 (Dec.) 1946.

13. Marmor, J., and Savitsky, N.: Electro-Encephalography in Cases of Head Injury, J. Nerv. & Ment. Dis. **95**: 285 (March) 1942.

14. Gotze, W.: Bioelectrische Nachuntersuchungen an Hirnverletzen, Zentralbl. f. Neurochir. **7**: 67, 1942.

15. Gibbs, F. A.; Gibbs, E. L., and Lennox, W. G.: Electroencephalographic Classification of Epileptic Patients and Control Subjects, Arch. Neurol. & Psychiat. **50**: 111 (Aug.) 1943.

Downloaded From: http://jama.jamanetwork.com/ by Anya Havriliak on 10/03/2014

## RESULTS

Thirty electroencephalograms as outlined above were done on 24 boxers. Their age distribution (divided arbitrarily into four groups) was as follows:

| No. of Men | Age Group, Yr. |
|---|---|
| 3 | 18-20 |
| 12 | 21-23 |
| 5 | 24-26 |
| 4 | 27-29 |

Of the electroencephalograms done on these men, 4 showed severe disturbance, 5 were moderately dysrhythmic, and 15 were within normal limits; thus, the total number of records showing disturbance amounted to 37.5% of the series. This is well above the 10 to 15% reported by Gibbs, Gibbs, and Lennox [15] and others in control groups, whose findings are in accord with those in our own control series. [16] These figures have statistical significance in that there are only three chances in a hundred that they are due to coincidence.



Fig. 1.—Incidence of abnormal electroencephalograms in boxers by age groups.

*Type of Abnormality Seen.*—There were four records showing severe disturbance. Three of these showed a temporal slow-wave focus, and one revealed diffuse slowing and paroxysms. Five records showing moderate disturbance were noted. Three of these were diffusely slow, and two were indicative of temporal slow-wave foci. Thus, in totaling the severely and moderately disturbed records, five were found to be focal and four showed diffuse findings. (In addition, paroxysms were seen in one each of the focal and diffuse records.) One record showing diffuse disturbance was found in each of the four age groups, while all the focal disturbances were present in the two youngest age groups. It was also noted that, although abnormalities were found in each age group, records showing disturbance seemed to be more frequent in the youngest men; but because of the few cases involved, this could not be statistically corroborated (fig. 1). In order to evaluate the report of decreased voltages in post-traumatic cases, [14] our records were also reviewed with this in mind, and six were found in which voltages were generally decreased. This was

not significantly more than the 20% of low-voltage records expected in normal persons.

When we attempted to correlate history of knockouts with electroencephalogram disturbance, the following facts were noted: Ten of the 24 fighters had been knocked out in their ring careers at least once. Four of the 10 had dysrhythmic records, three being severely



Fig. 2.—Comparative electroencephalographic findings of boxers with and without a history of knockout.

abnormal and one only moderately so. In the remaining 14 fighters, none of whom had ever been knocked out, one record showing severe disturbance and four showing moderate abnormalities were found. Because the number of records under study was not large enough, these findings are not statistically significant. It is noteworthy, however, that although there was an equal number of records showing disturbance in both groups, the men who had been rendered unconscious had electroencephalograms showing the severer disturbances. These findings were consistent with those of other investigators previously mentioned (fig. 2).

An attempt was also made to determine if length of ring career could be correlated with electroencephalographic disturbances, but no correlation was found. Elec-



Fig. 3.—Initial electroencephalogram of professional boxer in case reported. Note the slow-wave focus in the left anterior temporal area.

troencephalograms showing severe disturbances were seen in boxers who had been in from 2 to 50 fights, moderate dysrhythmias in men who had had from 1 to 15 fights, and normal records in men who had participated in from 1 to 106 fights. This lack of correlation is commented on below.

16. In our control series of 329 patients, whose ages ranged from 18 to 54 years, it was noted that 36 (10.94%) showed moderate disturbances and 10 (3.04%) severe dysrhythmias, so that the total of records showing disturbance was 13.98%.

Downloaded From: http://jama.jamanetwork.com/ by Anya Havriliak on 10/03/2014

### REPORT OF A CASE

The patient, a professional boxer, aged 21, was first seen by us in November, 1950. He had had three professional fights prior to his first electroencephalogram. In July, 1950, he was knocked out, but the following month he won his next fight by a technical knockout in the first round. Three days before a scheduled fight in November, 1950, the patient had his first electroencephalogram, which revealed a left temporal slow-wave focus.



Fig. 4.—Repeat electroencephalographic examination of boxer in case reported. By comparison with figure 3, the focal disturbance now appears to consist of higher amplitude and slower waves.

The fight was cancelled. A repeat electroencephalogram revealed more extensive temporal focal findings. (The patient, incidentally, showed no abnormal neurological or psychological signs or symptoms at any time.) He was temporarily suspended from boxing, but continued to train. A third electroencephalogram in January, 1951, revealed the persistence of the focus and the addition of paroxysms. This suggested that he had received additional brain injury during the period of training, from which he could not legally be prohibited. It was now believed that this man had suffered some degree of irreversible damage, and he was permanently suspended from boxing on Jan. 16, 1951, for his own good. It was felt that in this case the electroencephalogram had picked up intracranial damage before it had become clinically apparent and that late neurological disability or even death had possibly been averted by this decision (fig. 3, 4, and 5).



Fig. 5.—Final electroencephalographic examination of boxer in case reported. Note the persistence of the left anterior temporal slow-wave focus and its occasional reflection in the right temporal area. Note also the brief paroxysm of slow waves occurring in the frontal area.

### COMMENT

Even in this small group of professional boxers used as a pilot study, it was at once apparent that their series of electroencephalograms were more frequently abnormal than those seen in control studies. It was noted that as many disturbed records were seen in the group who had not been knocked out as in their more unfortunate colleagues. In spite of this there was some indication that those who had definitely been knocked out showed severer background material was actually available to us; for example, the number of times a man had been hit severely enough to cause him to be dazed without actual loss of consciousness, the number of amateur fights, and the extent and severity of training were not known. Thus, because of lack of such information, the correlation between number of professional fights and the electroencephalogram reading had no apparent meaning.

Concerning the abnormalities seen, diffuse records were found in every age group, while focal records were confined to the younger men. Thus, abnormal findings appeared more frequently in the younger age groups because of this very preponderance of focal records in them. These findings support the well-known fact that focal disturbances are good evidence of actual brain damage. There were relatively fewer records showing disturbance in the older men in our study. One can speculate that these men, for the most part, had been fighting for years and, having escaped brain damage in their first fights, were more experienced and better able to avoid injury in the ring. In addition, attention should be directed to the established fact that there are individual differences regarding susceptibility to trauma, so that in any group of boxers exposed to injury over a period of time it is likely that the more susceptible men are soon damaged permanently and retire from the ring, leaving their less susceptible fellows to carry on. An interesting clinical observation made during this study was that the men who showed focal temporal electroencephalographic abnormalities appeared to be, generally speaking, much more aggressive while fighting; and it is our feeling that this aggressiveness, together with the hint of impaired judgment as noted, may be associated in some way with the temporal lobe foci seen in these men. We feel that case material provided by boxers will provide much information about minor repeated head injuries, and future, better controlled, more extensive studies on larger groups may bring much interesting knowledge to light.

### SUMMARY AND CONCLUSION

Compulsory electroencephalographic examinations were made on 24 professional boxers with the cooperation of the state athletic commission of Colorado. A statistically significant, increased incidence of dysrhythmic electroencephalograms was found in nine boxers (37.5%) in our series. There was some indication that men who had been knocked out showed severer electroencephalographic disturbances than those who had not been knocked out. Focal disturbances were more frequent in the younger men than in the older men, who also, generally speaking, had fewer electroencephalographic disturbances. A case of a boxer is presented who was finally suspended from boxing largely on the basis of progressive encephalographic abnormalities. From the above findings it is concluded that periodic, compulsory electroencephalographic examinations contribute to the protection of boxers and should be a required part of routine examinations.

4200 E. Ninth Ave. (Dr. Busse).

Downloaded From: http://jama.jamanetwork.com/ by Anya Havriliak on 10/03/2014

# EXHIBIT 52

# PUNCH DRUNK *

### HARRISON S. MARTLAND, M.D.

NEWARK, N. J.

For some time fight fans and promoters have recognized a peculiar condition occurring among prize fighters which, in ring parlance, they speak of as "punch drunk." Fighters in whom the early symptoms are well recognized are said by the fans to be "cuckoo," "goofy," "cutting paper dolls," or "slug nutty."

Punch drunk most often affects fighters of the slugging type, who are usually poor boxers and who take considerable head punishment, seeking only to land a knockout blow. It is also common in second rate fighters used for training purposes, who may be knocked down several times a day. Frequently it takes a fighter from one to two hours to recover from a severe blow to the head or jaw. In some cases consciousness may be lost for a considerable period of time.

The early symptoms of punch drunk usually appear in the extremities. There may be only an occasional and very slight flopping of one foot or leg in walking, noticeable only at intervals; or a slight unsteadiness in gait or uncertainty in equilibrium. These may not seriously interfere with fighting. In fact, many who have only these early symptoms fight extremely well, and the slight staggering may be noticed only as they walk to their corners.

In some cases periods of slight mental confusion may occur as well as distinct slowing of muscular action. The early symptoms of punch drunk are well known to fight fans, and the gallery gods often shout "Cuckoo" at a fighter. I know of one fight that was stopped by the referee because he thought one of the fighters intoxicated.

Many cases remain mild in nature and do not progress beyond this point. In others a very distinct dragging of the leg may develop and with this there is a general slowing down in muscular movements, a peculiar mental attitude characterized by hesitancy in speech, tremors of the hands and nodding movements of the head, necessitating withdrawal from the ring.

Later on, in severe cases, there may develop a peculiar tilting of the head, a marked dragging of one or both legs, a staggering, propulsive gait with the facial characteristics of the parkinsonian syndrome, or a backward swaying of the body, tremors, vertigo and deafness. Finally, marked mental deterioration may set in necessitating commitment to an asylum.

Of course the symptoms produced by the late manifestations of epidemic encephalitis, by the juvenile and presenile types of paralysis agitans, by syphilis, brain tumors and other forms of cerebral injury may so closely resemble those of the condition punch drunk as to be differentiated only with extreme difficulty or not at all. Nevertheless, the occurrence of the symptoms in almost 50 per cent of fighters who develop this condition in mild or severe form, if they keep at the game long enough, seems to be good evidence that some special brain injury due to their occupation exists.

As far as I know this condition has practically not been described in medical literature. I am of the opinion that in punch drunk there is a very definite brain injury due to single or repeated blows on the head or jaw which cause multiple concussion hemorrhages in the deeper portions of the cerebrum. Such hemorrhages are very apt to occur in or near the corpora striata, in the corona radiata but almost never in the cerebral cortex or below the tentorium cerebelli. These hemorrhages are later replaced by a gliosis or a degenerative progressive lesion in the areas involved. Therefore, in late stages the symptoms often mimic those seen in diseases characterized by the parkinsonian syndrome. I realize that this theory, while alluring, is quite insusceptible of proof at the present time, but I am so convinced from my former studies on post-traumatic encephalitis that this is the logical deduction that I feel it my duty to report this condition.

## MULTIPLE CONCUSSION HEMORRHAGES

As this theory of punch drunk assumes that the basic lesion is due to traumatic multiple hemorrhages, it will be necessary to discuss briefly this type of brain injury.

In 1924 Cassasa [1] reported five autopsies showing what he called multiple traumatic cerebral hemorrhages. In all these cases there was a history of head injury. Three patients were momentarily unconscious at the time of injury. After a lucid interval varying from three to twenty-four hours there developed a period of marked irritability with increase of deep reflexes, which was followed by unconsciousness. At autopsy, sections of the brain showed multiple usually punctate hemorrhages scattered over various parts of the parenchyma of the brain. Lacerations of the scalp, fractures of the skull, cortical lacerations or hemorrhages except for occasional slight pia-arachnoid hemorrhages were not found. Microscopic examination showed these punctate hemorrhages to be located around the blood vessels in the perivascular spaces of Virchow-Robin. When large, they broke through into the surrounding parenchyma and often became confluent. Cassaca considered this type of traumatic cerebral hemorrhage as relatively rare, for he had found only these five cases during a period of ten years' work with Dr. Otto Schultze, former coroner's physician, and Dr. Charles Norris, chief medical examiner of New York City.

Cassasa's explanation of the mechanism of concussion depends on the existence of the so-called perivascular and perineuronal spaces and the identification of a network of fine fibrils connecting the external wall of the blood vessel with the surrounding brain tissues across the spaces of Virchow-Robin.

Cassasa says:

Sudden overfilling of the perivascular lymph space with cerebrospinal fluid conceivably could produce laceration of a vessel by the tearing of its wall in the neighborhood of such a fibrillar attachment. Otherwise, without such an attachment, the laceration of a vessel surrounded by fluid could not be produced by any pressure exerted through that fluid which would only tend to compress the vessel but not lacerate it. Such an increase of cerebrospinal fluid in one perivascular space could be caused by the cerebrospinal fluid from the surface of the brain being driven into it by pressure exerted by the change of shape of the skull—the result of a blow or fall. This change of shape under an area of violence is in the direction of flattening and diminution of space for the cerebrospinal fluid in that area. This fluid must find its way out of that area through the various sulci of the brain and in connection therewith such fluid as cannot find its way

---

* Read before the New York Pathological Society, at the New York Academy of Medicine, New York, May 10, 1928.
* From the pathologic department of the City Hospital, and the office of the chief medical examiner of Essex County, N. J.

1. Cassasa, C. B.: Multiple Traumatic Cerebral Hemorrhages, Proc. New York Path. Soc. **24:** 101 (Jan.-May) 1924.

Downloaded From: http://jama.jamanetwork.com/ by Anya Havriliak on 10/03/2014

through these channels must find a way into the perivascular lymph spaces in the reverse direction of the normal flow of the cerebrospinal fluid in these channels.

The modus operandi of Cassasa's theory may be roughly illustrated in figure 1.

The existence of perivascular spaces is still questioned. Some observers think they are artefacts, and others assert that they exist only under pathologic conditions. The consensus, however, supports the original conception of His (1865) that there exists a system of richly intercommunicating spaces in the nerve tissues and around the blood vessels. The work of Weed in this connection is well known.

In 1927, Osnato and Giliberti[2] studied 100 clinical cases of concussion of the brain with or without fracture of the skull and one of Cassasa's cases from a histologic standpoint. They concluded that:

Anatomic and clinical investigations seem to show definitely that our conception of concussion of the brain must be modified. It is no longer possible to say that "concussion is an essentially transient state which does not comprise any evidence of structural cerebral injury." Not only is there actual cerebral injury in cases of concussion but in a few instances



Fig. 1.—Schematic diagram of normal perivascular and perineuronal spaces on the left, and the probable mechanism of production of concussion and multiple concussion hemorrhages on the right.

complete resolution does not occur, and there is a strong likelihood that secondary degenerative changes develop. When this happens, we have a condition which, clinically at least, resembles some of the reactions seen in encephalitis. We feel, therefore, that the postconcussion neuroses should properly be called cases of traumatic encephalitis.

In 1927, Martland and Beling[3] reported their experience with consecutive cases of traumatic cerebral hemorrhage over a definite period of two years. During this period, 309 consecutive autopsies were analyzed of people dying as the result of cerebral injuries (exclusive of gunshot wounds of the head), occurring in a community of about 800,000 people and representing practically all the deaths due to cranial injury during that period. The number was sufficiently large to give a pretty good idea of the incidence of the various types of traumatic intracranial hemorrhages.

Extradural hemorrhage was found in twenty-five cases, or 8.2 per cent; cortical laceration and hemor-

rhage in 254 cases, or 82 per cent, while hemorrhages similar to those described by Cassasa and unassociated with fracture of the skull or other gross surface injuries occurred in nine cases, or 2.9 per cent. Unclassified subdural and pia-arachnoid hemorrhages and multiple, streaky, deep hemorrhages associated with cortical injuries were present in twenty-one cases, or 6.9 per cent.

Cortical laceration and hemorrhage characterized by laceration of the vessels of the leptomeninges with hemorrhage in the pia-arachnoid and cortex of the brain constituted by far the most frequent and important traumatic lesion within the cranial cavity. It was usually associated with a fracture of the vault, often running into the base of the skull.

The object of this paper was to call attention to the frequency of the type of hemorrhage described by Cassasa and to its great importance in relation to the various sequelae that often follow head injuries.

When the skull was fractured this type of hemorrhage did not occur, since the splitting of the skull at the time of the violence seemed to prevent the increased intracranial pressure with consequent displacement of cerebrospinal fluid. The frequency with which these hemorrhages occurred in or near the corpora striata was first noted, as well as their rarity in the cerebral cortex or below the tentorium cerebelli.

The location of these hemorrhages naturally must depend on the laws of hydrostatics as applied to the cranial cavity, about which there is still much to learn. Their frequency in or near the basal ganglions is probably explained by a displacement of spinal fluid from the cisterna interpeduncularis, by the effects of contrecoup, into the perivascular spaces running along the vessels supplying these parts. When the corona radiata is involved the fluid is probably displaced from the subarachnoid spaces over the outer surface of the brain by the direct or contrecoup effects of the violence.

The infrequency of these hemorrhages in the brain stem and cerebellum is due to the protective influence of the tense and firm tentorium cerebelli which takes the force and protects the underlying structures, and to the fact that in most cranial injuries the force is applied to the vault or sides of the skull.

While this type of traumatic hemorrhage was apparently recognized by those performing medicolegal autopsies, its significance from a clinical standpoint had not been appreciated.

The possibility of fat embolism causing some of these hemorrhages was first recognized by Cornwall,[4] who had examined one of Cassasa's cases and found evidence of such emboli in the brain. Fat embolism presents the only serious argument against the mechanical theory of Cassasa. It can be demonstrated at autopsy after nearly all fractures of the long bones, and also has been seen after operations on obese subjects, especially such as radical amputation of the breast and herniotomy for umbilical hernia. Bissell[5] believes that it may explain certain deaths following these operations formerly attributed to surgical shock. The increased

2. Osnato, Michael; and Giliberti, Vincent: Postconcussion Neurosis —Traumatic Encephalitis, Arch. Neurol. & Psychiat. **18**: 181-211 (Aug.) 1927.

3. Martland, H. S., and Beling, C. C.: Traumatic Cerebral Hemorrhage, read before the American Neurological Association in May, 1927, at Atlantic City, N. J.

4. Cornwall, L. H.: Personal communication to the author.

5. Bissell, W. W.: Pulmonary Fat Embolism: A Frequent Cause of Postoperative Surgical Shock, Surg. Gynec. Obst. **25**: 8-22 (July) 1917.

Downloaded From: http://jama.jamanetwork.com/ by Anya Havriliak on 10/03/2014

viscosity of the venous blood causes a rise in the venous pressure and a fall in arterial pressure similar to that seen in shock.

It is generally agreed, however, that fat embolism rarely causes serious symptoms or results fatally. Most of the fat reaches the lungs and is held there. As Shinkai[6] has shown, this is due to the high viscosity of the fat, to the tortuosity and distensibility of the capillaries of the lungs, to the low blood pressure in the pulmonary artery, and to the fact that the pulmonary circulation constitutes the first filter for fat which enters the venous circulation. At autopsy, oil droplets may be seen with the naked eye in the blood from the right heart, large veins and lungs, provided proper autopsy technic is used.

In some cases a considerable amount may reach the systemic circulation and cause petechiae in the skin and pleura and microscopic evidence of fat in the brain, spleen and kidneys. Systemic emboli are more likely to occur if the foramen ovale is patent and in such cases multiple, punctate hemorrhages have been seen throughout the white matter in enormous numbers after a simple fracture of the femur. In six of the nine cases reported by Martland and Beling the injuries were limited entirely to the head, and fat emboli were eliminated.

The mechanical theory of Cassasa best explains most of these hemorrhages, although fat embolism might occasionally produce similar lesions. The ringlike distribution of these hemorrhages about the vessels is not characteristic of trauma alone. A similar location is seen in fat embolism, arsenical encephalitis and hemorrhagic forms of influenza encephalitis. In epidemic encephalitis the ringlike perivascular arrangement of the inflammatory cellular, defense reaction is similar in its anatomic location.

It is conceivable that the milder forms of concussion may be attributed to distention of the perineuronal spaces causing hydraulic shock to the neurons without the occurrence of actual hemorrhages.

I believe that such hemorrhages form the foundation of a replacement gliosis which explains the occurrence of post-traumatic symptoms in many cases of head injury in which recovery occurs. It forms the best possible explanation of the large and important groups of postconcussion neuroses and psychoses and the so-called post-traumatic encephalitis.

Even at the present time there is a strong tendency among some writers to demarcate concussion from contusion both clinically and anatomically. This is based usually on the assumption that concussion is unaccompanied by demonstrable morphologic alterations. Miller[7] has recently stated that concussion is the result of disturbed equilibrium of the cortical cells especially. After producing unconsciousness in animals by repeated blows on the head and administering trypan blue intravenously, his failure to produce any staining of the brain was attributed to the absence of brain injury. Mention is not made of microscopic examinations of the brain in any of these animals, and the mechanism of the production of the unconscious state in animals by repeated blows on the head must be vastly different from that of a single blow applied to the human cranium.

### FATAL CASE ILLUSTRATING MULTIPLE CONCUSSION HEMORRHAGES

The following case, taken from the series reported by Martland and Beling, is abstracted here as an illustration.

CASE 1.—*History.*—A man, aged 76, while going upstairs, stumbled and struck his head. He became unconscious. He did not vomit. On admission to the hospital he was in coma. The pupils were small and unequal. There was a laceration over the left eyebrow with brush abrasions on the left side of the face. The upper and lower eyelids of the left eye showed ecchymosis, the ocular conjunctiva being free from hemorrhage. He died thirty hours after admission to the hospital with pulmonary edema, having never regained consciousness.

*Autopsy.*—There was a small amount of hemorrhage in the left temporal muscle and overlying scalp, and laceration of the outer part of the left eyebrow. The skull was not fractured. There was marked edema of the brain, with dilatation of the lateral ventricles. There was no laceration or hemor-



Fig. 2.—Brain in case 1: Multiple punctate concussion hemorrhages may be seen situated chiefly in the corona radiata of both frontal lobes and in the corpora striata. Other brain injury is absent.

rhage of the surface of the brain. In the corona radiata of both frontal lobes were multiple, punctate hemorrhages. There were innumerable small hemorrhages less than a pinhead in size in the white matter of the brain over the roofs of both lateral ventricles. There were a few similar areas in both corpora striata and over the ependyma of the third ventricle and in the posterior horns of the lateral ventricles.

### PUNCH DRUNK AND ITS RELATION TO POST-TRAUMATIC ENCEPHALITIS

Unfortunately there is no previous record of any statistics compiled by competent medical authorities as to either the existence or the nonexistence or incidence of the condition known as punch drunk. There are no previous medical reports to my knowledge of its symptomatology, progress or end-results. We are placed in the position of accepting a series of objective symptoms described to us by laymen. There is undoubted proof that for years fighters, fight pro-

6. Shinkai, T.: Experimental Fat Embolism, Beitr. z. path. Anat. u. z. allg. Path. **78**: 109 (Aug.) 1927.
7. Miller, G. G.: Cerebral Concussion, Arch. Surg. **14**: 891 (Jan.) 1927.

Downloaded From: http://jama.jamanetwork.com/ by Anya Havriliak on 10/03/2014

Jour. A. M. A.
Oct. 13, 1928

moters and the sporting world have recognized and talked about this condition. One sporting writer of note has recently stated that punch drunk was greatly exaggerated and that he had consulted eminent neurologists who had assured him that such a condition did not exist. I have found that the opinion of shrewd laymen, many of whom are making a living by observing the physical fitness, actions and characteristics of the professional fighter, is perhaps more substantial than the opinion of medical experts.

A fight promoter whose ability to judge the physical condition of fighters is unquestionable has given me the names of twenty-three fighters whom he considers punch drunk. Many of these men are scattered over the country and I have been unable to ascertain their exact condition at the present time, especially those who are in asylums. I have examined five of these men and they present the clinical pictures as described.

As an illustration I will report one case of advanced parkinsonian syndrome due to punch drunk:

CASE 2.—*History.*—N. E., aged 38, born in the United States, started to fight in 1906 when 16 years of age. He stopped fighting in 1913, when 23 years of age, because of a tremor in his left hand and an unsteadiness on his legs. During his period of fighting he was a professional featherweight and soon became a top notcher. He had fought such men as Charlie Griffin, Jack Britton, K. O. Brown, Tommy O'Toole, Harry Stone, Kid Burns, Kid Tuts, Johnny Baker, Teddy Maloney and Tommy Lang. He had been knocked out twice;



Fig. 3.—Low power photomicrograph of a section through the corpora striatum in case 1: Innumerable "ring hemorrhages" may be noted with their perivascular distribution.

once when 22 years of age he was out for an hour. He was never sick and seldom drank. On account of symptoms of tremor and unsteadiness, he was often wrongly accused of being intoxicated. Since 1913 his condition has slowly progressed until he now resembles a well marked case of paralysis agitans.

*Examination.*—The patient is a well nourished and apparently healthy man. His gait is staggering and propulsive, his facial expression masklike. There is marked stammering and hesitancy in speech. He has a fine tremor in his hands and tongue. The pupils are equal and react to light. The knee kicks are slightly exaggerated. Clonus and Babinski phenomenon are absent. The sensations are normal. The intelligence is normal. He has been under treatment in many clinics for paralysis agitans and told that his fighting did not have anything to do with his present condition. The blood Wassermann reactions have been repeatedly negative. Complete serologic examination of the spinal fluid was entirely negative.

From a neurologic aspect this case is one of paralysis agitans. It either is traumatic in origin or is a primary, essential form of paralysis agitans of the juvenile type. Epidemic encephalitis is eliminated in this case, since the first symptoms appeared in 1913, three years before epidemic encephalitis was first recorded in France at Bar le Duc, four years before it appeared in Vienna, and six years before cases were making their appearance in America.

## CONCLUSIONS

1. Very definite anatomic-pathologic proof exists that following a cranial injury death may occur in which the autopsy discloses no other lesions than multiple punctate hemorrhages in the deeper structures of

*List of Fighters Known by One Promoter to be "Punch Drunk"*

| No. | Initials | Class | Has Fought | Present Condition |
|---|---|---|---|---|
| 1 | B. N. | LHW | Joe Gans | Parkinsonian syndrome |
| 2 | J. D. | HW | Weinert, Fulton | Drags leg; bad shape |
| 3 | J. T. | LW | Leonard, Kansas, Dundee, Tendler | Drags leg; talks slow |
| 4 | B. B. | LW | Walker, Tendler | Punch drunk |
| 5 | W. J. | LW | Dundee, Leonard | Punch drunk |
| 6 | F. J. | HW | Willard, Weinert | Punch drunk |
| 7 | A. W. | LW | ............... | Asylum |
| 8 | B. M. | HW | Moran, Tunney | Asylum |
| 9 | J. G. | HW | Sharkey, Jeffries, Fitzsimmons, Johnson | Asylum |
| 10 | C. S. | MW | ............... | Asylum |
| 11 | J. C. | .... | ............... | Drags leg; talks slow; thinks slow |
| 12 | J. R. | .... | ............... | Punch drunk |
| 13 | M. D. | .... | ............... | Punch drunk; almost blind |
| 14 | C. C. | .... | ............... | Punch drunk |
| 15 | T. S. | .... | ............... | Punch drunk |
| 16 | J. S. | .... | ............... | Punch drunk |
| 17 | R. S. | .... | ............... | Punch drunk |
| 18 | S. M. | .... | ............... | Punch drunk |
| 19 | P. J. G. | .... | ............... | Punch drunk |
| 20 | T. T. | .... | ............... | Punch drunk |
| 21 | B. M. | .... | ............... | Punch drunk |
| 22 | J. H. | .... | ............... | Punch drunk |
| 23 | D. P. | .... | ............... | Punch drunk |

the brain. This type of hemorrhage does not occur when the skull is fractured. There is often not even a laceration of the scalp. Cortical laceration and hemorrhage is absent or there may be only a slight amount of thin pia-arachnoid bleeding. While this type of cranial injury was known to a few performing medicolegal autopsies, it has never attracted sufficient clinical attention. We are indebted to Cassasa for first describing it and to Osnato and Giliberti for first calling attention to its clinical importance.

2. The mechanical theory advanced by Cassasa offers the best explanation of the production of these hemorrhages. Fat embolism may produce similar hemorrhages in the brain which grossly and microscopically are so alike as to be practically indistinguishable. In such cases the anatomic proof of extensive fat embolism must be sought in the other viscera.

3. In a series of 309 consecutive cases of cranial injury coming to autopsy, Martland and Beling found this type of hemorrhage in nine cases, or 2.9 per cent. In six of these cases fat embolism was eliminated as the cause of the hemorrhages, and was not proved in the three remaining cases. They first called attention to the frequency of these hemorrhages in the basal nuclei, especially in and near the corpora striata, and to their rarity in the cortex of the cerebrum and below the tentorium cerebelli. They called them "concussion hemorrhages" because a purely mechanical theory seemed best to explain their production. They spoke of them as "ring hemorrhages" because on microscopic examination they appeared as small rings surrounding the vessel and filling the perivascular space of Virchow-Robin.

Downloaded From: http://jama.jamanetwork.com/ by Anya Havriliak on 10/03/2014

4. It is possible that, in cases of cerebral concussion ending in recovery and mild in nature, the symptoms may be attributed to hydraulic shock to the neurons by distention of the perineuronal spaces. Actual hemorrhages may not occur or may be only few in number.

5. It is easily conceivable also that, after many cranial injuries unassociated with fracture of the skull, the so-called concussion hemorrhages may be fewer and not in such vital places as in the fatal cases. Recovery, therefore, takes place. If this is true there is a purely morphologic lesion as the basis of many cases of post-concussion neuroses and psychoses. A replacement gliosis or even a progressive degenerative lesion may be the late manifestations of these former hemorrhages. It is not surprising, then, that some of these cases will mimic the juvenile and presenile forms of paralysis agitans or the late manifestations of epidemic encephalitis. Especially is this so when the frequent location of the hemorrhages in the corpora striata is recalled.

While the establishment of these facts is of enormous importance to the courts and to labor compensation boards in placing many cases of cranial injuries on a firm pathologic basis, it also will have its disadvantages. A very great field is opened for the so-called expert testimony, in which malingerers and those suffering from various forms of psychoses and neuroses may claim undue compensation. The correct diagnosis during life will always be extremely difficult, as the condition can only be proved by autopsy.

6. The condition of punch drunk has been described. While most of the evidence supporting the existence of this condition is based at this time on the observations of fight fans, promoters and sporting writers, the fact that nearly one half of the fighters who have stayed in the game long enough develop this condition, either in a mild form or a severe and progressive form which often necessitates commitment to an asylum, warrants this report. The condition can no longer be ignored by the medical profession or the public. It is the duty of our profession to establish the existence or non-existence of punch drunk by preparing accurate statistical data as to its incidence, careful neurologic examinations of fighters thought to be punch drunk, and careful histologic examinations of the brains of those who have died with symptoms simulating the parkinsonian syndrome. The late manifestations of punch drunk will be seen chiefly in the neurologic clinics and asylums, and such material will practically fall to the neuropathologist connected with such institutions.

Punch drunk bears the same relation to multiple concussion hemorrhages as do many of the postconcussion neuroses and psychoses that follow blows or falls on the head.

From the studies of Cassasa, Osnato and Giliberti, and Martland and Beling, it would seem that the older theories of cerebral concussion will have to be discarded. We now have the possibility of a definite type of brain injury explaining the various phases and late manifestations following many cases of cranial injuries.

The following extracts from a copyrighted story which appeared in the New York *Daily News*, Aug. 3, 1928, are of special interest in connection with the foregoing. In discussing his retirement from the prize ring, Gene Tunney said, in connection with his training for the second Dempsey fight: "I went into a clinch with my head down, something I never do. I plunged forward, and my partner's head came up and butted me over the left eye, cutting and dazing me badly. Then . . . he stepped back and swung his right against my jaw with every bit of his power. It landed flush and stiffened me where I stood. . . . That is the last thing I remembered for two days. They tell me that I finished out the round, knocking the man out." Tunney further stated that it was forty-eight hours before he knew who he was, and not until the seventh round of the Dempsey fight was he entirely normal. In concluding, he said: "From that incident was born my desire to quit the ring forever, the first opportunity that presented itself. . . . But most of all I wanted to leave the game that had threatened my sanity before I met with an accident in a real fight with six ounce gloves that would permanently hurt my brain."

---

## *Clinical Notes, Suggestions and New Instruments*

PATENT DUCTUS ARTERIOSUS IN A WOMAN IN HER SIXTY-SIXTH YEAR

PAUL D. WHITE, M.D., BOSTON

Patent ductus arteriosus is not rare and its uncomplicated presence has always been believed to be compatible with an active and long life, but recorded instances of old people with the proved condition are very rare. In Dr. Maude Abbott's[1] most recent series of 850 cases of congenital cardiac defects, uncomplicated patent ductus arteriosus is noted as having been found in eighty-four. The range of age was from 2 weeks to 66 years, though it seems fairly certain that the condition may occur even at a much older age than 66.

In 5,000 consecutive autopsies at the Massachusetts General Hospital, patency of the ductus arteriosus was found ninety-six times but in only seven patients over 1 year old; the ages of these seven were 1¼, 2, 3, 7, 44, 50 and 55 years, respectively.

The present case is reported not only because of the age of the patient, 65 years 9 months, which is almost equal to that of the oldest patient in Dr. Abbott's series,[2] but also because the diagnosis was correctly made two years before death. In the older patient (Josefson's case) cited by Dr. Abbott the clinical diagnosis of mitral stenosis was incorrect.

REPORT OF CASE

An unmarried woman, aged 64, was seen in consultation because of circulatory trouble which involved both the heart and the cerebral vessels. She had always been delicate in health from birth but she had not been a blue baby. Unable to play as vigorously as other children because of fatigue, she had lived a quiet life even in her youth. She had, however, never had any serious illness.

The family history was not important, except that her father had suffered from tuberculosis of the hip and one brother had died of tuberculous meningitis.

It was at the age of 40 that she first was told of any heart trouble, but what it was she did not know. Six months before coming to me for examination she had had a transient left hemiplegia lasting from ten to twelve days and clearing up completely except for a residual increased weakness. Since this hemiplegia she had been in bed off and on.

Her chief complaint at the time of examination was weakness. There were dyspnea, palpitation and precordial oppression at times on excitement but no asthma or clear angina pectoris. There had not been any edema and only rare cough, without sputum. Otherwise there were no symptoms.

On physical examination the patient appeared small and frail, with flushed cheeks and slight cyanosis of the mucous membranes. The mental condition was clear. There was no clubbing or cyanosis of the fingers, and no paralysis was evident. The lungs were clear and the abdomen was normal. The liver and spleen were not felt. There was no ascites or edema of the

1. Abbott, Maude, in Blumer's Bedside Diagnosis, Philadelphia, W. B. Saunders Company, 1928.
2. Josefson, A.: Offenstehender Ductus Botalli nebst Atherom in den Asten der Arteria pulmonalis, Nord. med. Ark. New Series 7, number 10, 1897, p. 1.

Downloaded From: http://jama.jamanetwork.com/ by Anya Havriliak on 10/03/2014

# EXHIBIT 53

Chronic Traumatic Encephalopathy in Athletes: Progressive Tauopathy After Repetitive Head Injury
McKee, Ann C...
Journal of Neuropathology and Experimental Neurology; Jul 2009; 68, 7; ProQuest Central
pg. 709

J Neuropathol Exp Neurol
Copyright © 2009 by the American Association of Neuropathologists, Inc.

Vol. 68, No. 7
July 2009
pp. 709–735

REVIEW ARTICLE

# Chronic Traumatic Encephalopathy in Athletes: Progressive Tauopathy After Repetitive Head Injury

Ann C. McKee, MD, Robert C. Cantu, MD, Christopher J. Nowinski, AB, E. Tessa Hedley-Whyte, MD, Brandon E. Gavett, PhD, Andrew E. Budson, MD, Veronica E. Santini, MD, Hyo-Soon Lee, MD, Caroline A. Kubilus, and Robert A. Stern, PhD

**Abstract**

Since the 1920s, it has been known that the repetitive brain trauma associated with boxing may produce a progressive neurological deterioration, originally termed *dementia pugilistica*, and more recently, *chronic traumatic encephalopathy* (CTE). We review 48 cases of neuropathologically verified CTE recorded in the literature and document the detailed findings of CTE in 3 professional athletes, 1 football player and 2 boxers. Clinically, CTE is associated with memory disturbances, behavioral and personality changes, parkinsonism, and speech and gait abnormalities. Neuropathologically, CTE is characterized by atrophy of the cerebral hemispheres, medial temporal lobe, thalamus, mammillary bodies, and brainstem, with ventricular dilatation and a fenestrated cavum septum pellucidum. Microscopically, there are extensive tau-immunoreactive neurofibrillary tangles, astrocytic tangles, and spindle-shaped and threadlike neurites throughout the brain. The neurofibrillary degeneration of CTE is distinguished from other tauopathies by preferential involvement of the superficial cortical layers, irregular patchy distribution in the frontal and temporal cortices, propensity for sulcal depths, prominent perivascular, periventricular, and subpial distribution, and marked accumulation of tau-immunoreactive astrocytes. Deposition of β-amyloid, most commonly as diffuse plaques, occurs in fewer than half the cases. Chronic traumatic encephalopathy is a neuropathologically distinct slowly progressive tauopathy with a clear environmental etiology.

**Key Words**: Athletes, Concussion, Dementia, Encephalopathy, Neurodegeneration, Tau protein, Traumatic brain injury.

From the Departments of Neurology (ACM, BEG, AEB, VES, H-SL, CAK, RAS) and Pathology (ACM), Center for the Study of Traumatic Encephalopathy (ACM, RCC, CJN, RAS), Boston University School ofMedicine, Boston; Geriatric Research Education Clinical Center, Bedford Veterans Administration Medical Center, Bedford (ACM, AEB); Sports Legacy Institute, Waltham (RCC, CJN); Department of Neurosurgery, Boston University School of Medicine, Boston (RCC); Department of Neurosurgery, Emerson Hospital, Concord (RCC); and CS Kubik Laboratory for Neuropathology, Department of Pathology, Massachusetts General Hospital, Harvard Medical School, Boston (ETH-W), Massachusetts.

Send correspondence and reprint requests to: Ann C. McKee, MD, Bedford Veterans Administration Medical Center, 200 Springs Rd 182-B, Bedford, MA 01730; E-mail: amckee@bu.edu

This work was supported by the Boston University Alzheimer's Disease Center NIA P30 AG13846, supplement 0572063345-5, National Operating Committee on Standards for Athletic Equipment (NOCSAE), and by the Department of Veterans' Affairs.

## INTRODUCTION

During recent years, there has been increasing attention focused on the neurological sequelae of sports-related traumatic brain injury (TBI), particularly concussion. Concussion is a frequent occurrence in contact sports: 1.6 to 3.8 million sports-related concussions occur annually in the United States (1–3). Most sports-related head injury is minor, and although most athletes who have a concussion recover within a few days or weeks, a small number of individuals develop long-lasting or progressive symptoms. This is especially true in cases of repetitive concussion or mild TBI, in which at least 17% of individuals develop chronic traumatic encephalopathy (CTE) (4). The precise incidence of CTE after repetitive head injury is unknown, however, and it is likely much higher. It is also unclear what severity or recurrence of head injury is required to initiate CTE; no well-designed prospective studies have addressed these important public health issues (5–10).

Repetitive closed head injury occurs in a wide variety of contact sports, including football, boxing, wrestling, rugby, hockey, lacrosse, soccer, and skiing. Furthermore, in collision sports, such as football and boxing, players may experience thousands of subconcussive hits during the course of a single season (11, 12). Although the long-term neurological and neuropathologic sequelae associated with repetitive brain injury are best known in boxing, pathologically verified CTE has been reported in professional football players, a professional wrestler, and a soccer player, as well as in epileptics, head bangers, and domestic abuse victims (13–21). Other sports associated with a postconcussive syndrome include hockey, rugby, karate, horse riding, and parachuting (22–25), although the list is almost certainly more inclusive. Furthermore, additional large groups of individuals prone to repetitive head trauma, such as military veterans, may be at risk for CTE.

In this review, we present a summary of the 48 cases of neuropathologically verified CTE in the literature. We also report the clinical and immunocytochemical findings of CTE in 3 retired professional athletes, that is, 1 football player and 2 boxers, ranging in age from 45 to 80 years. Although the cases previously reported in the literature detailed some of the characteristic gross and histological features of CTE, the spectrum of unique regionally specific immunocytochemical abnormalities of phosphorylated tau

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

*McKee et al*                                    *J Neuropathol Exp Neurol* • Volume 68, Number 7, July 2009

that occur in this disorder has not been previously described. We demonstrate that although CTE shares many features of other neurodegenerative disorders, including Alzheimer disease (AD), progressive supranuclear palsy (PSP), postencephalitic parkinsonism, and the amyotrophic lateral sclerosis/Parkinson-dementia complex of Guam (ALS/PDC), CTE is a neuropathologically distinct progressive tauopathy with a clear environmental etiology.

## CLINICAL AND DEMOGRAPHIC FEATURES OF CTE

The concept of CTE was first introduced by Martland (26) in 1928, who introduced the term *punch-drunk* to a symptom complex that seemed to be the result of repeated sublethal blows to the head. This syndrome, long recognized in professional boxers, was termed *dementia pugilistica* by Millspaugh (27) and the *psychopathic deterioration of pugilists* by Courville (28). The symptoms of CTE are insidious, first manifested by deteriorations in attention, concentration, and memory, as well as disorientation and confusion, and occasionally accompanied by dizziness and headaches. With progressive deterioration, additional symptoms, such as lack of insight, poor judgment, and overt dementia, become manifest. Severe cases are accompanied by a progressive slowing of muscular movements, a staggered propulsive gait, masked facies, impeded speech, tremors, vertigo, and deafness (27). Corsellis et al (29) described 3 stages of clinical deterioration as follows. The first stage is characterized by affective disturbances and psychotic symptoms. Social instability, erratic behavior, memory loss, and initial symptoms of Parkinson disease appear during the second stage. The third stage consists of general cognitive dysfunction progressing to dementia and is often accompanied by full-blown parkinsonism, as well as speech and gait abnormalities. Other symptoms include dysarthria, dysphagia, and ocular abnormalities, such as ptosis (29). The severity of the disorder seems to correlate with the length of time engaged in the sport and the number of traumatic injuries, although whether a single TBI can trigger the onset of CTE remains a matter of speculation.

Of the 51 neuropathologically confirmed cases of CTE, 46 (90%) occurred in athletes. The athletes included 39 boxers (85%) who fought as amateurs and as professionals for varying lengths of time (range, 4–25 years; mean, 14.4 years), 5 football players (11%) whose playing time ranged between 14 and 23 years (mean, 18.4 years; SD, 3.9), 1 professional wrestler, and 1 soccer player. The athletes began their respective sports at young ages, that is, between 11 and 19 years (mean, 15.4 years; SD, 2.2) (Tables 1 and 2). The first symptoms of CTE were noticed at ages ranging from 25 to 76 years (mean, 42.8 years; SD, 12.7). One third were symptomatic at the time of their retirement from the sport, and half were symptomatic within 4 years of stopping play. Common presenting symptoms included memory loss, irritability, outbursts of aggressive or violent behavior, confusion, speech abnormalities, cognitive decline, gait abnormalities, unsteadiness, headaches, slurred speech, and parkinsonism. In 14 cases (30%), there was a prominent

mood disturbance, usually depression (28%); 1 boxer was described as having a "euphoric dementia" (31); another boxer was described as manic-depressive (35); and a football player was considered "bipolar" (40). In most of the reported cases, the disease slowly progressed for several decades (range, 2–46 years; mean, 18.6 years; SD, 12.6), with increasing abnormalities in behavior and personality, memory loss, cognitive decline, and visuospatial difficulties. Movement abnormalities were eventually found in 41.2% subjects consisting of parkinsonism; staggered, slowed, or shuffled gait; slowed, slurred, or dysarthric speech; ataxia; ocular abnormalities; and dysphagia. As Critchley (42) noted in 1957, "once established, it not only does not permit reversibility, but ordinarily advances steadily, even though the boxer has retired from the ring."

### CTE in Football Players

Five football players, including our Case A, had neuropathologically verified CTE at autopsy. All died suddenly in middle age (age at death, 36–50 years; mean, 44.0 years; SD, 5.0) and were younger at the time of death compared with boxers with CTE (age at death, 23–91 years; mean, 60.0 years; SD, 15.2). The duration of symptomatic illness was also shorter in the football players (range, 3–10 years; mean, 6.0 years; SD, 2.9) compared with the boxers (range, 5–46 years; mean, 20.6 years; SD, 12.3). All 5 football players played similar positions: 3 were offensive linemen, one was a defensive lineman, and the other was a linebacker. In the football players, the most common symptoms were mood disorder (mainly depression), memory loss, paranoia, and poor insight or judgment (each found in 80%), outbursts of anger or aggression, irritability, and apathy (each found in 60%), confusion, reduced concentration, agitation, or hyperreligiosity (each found in 40%). Furthermore, 4 of the 5 experienced tragic deaths, that is, 2 from suicide (16, 17), one during a high-speed police chase (40), and another from an accidental gunshot while cleaning his gun (Case A). Case A exemplifies these clinical features.

### Case A

A 45-year-old right-handed white man died unexpectedly as a result of an accidental gunshot wound to the chest while he was cleaning a gun. He was a retired professional football player who played football in high school, 3 years of college, and 10 years in the National Football League as a linebacker. According to his wife, he was concussed 3 times during his college football years and at least 8 times during his National Football League career; however, only 1 concussion was medically confirmed. He was never formally diagnosed as having postconcussive syndrome and never sought medical attention for residual cognitive or behavioral difficulties. There was no history of ever losing consciousness for more than a few seconds, and he never required being carried off the field or hospitalization.

At age 40 years, his family began to notice minor impairments in his short-term memory, attention, concentration, organization, planning, problem solving, judgment, and ability to juggle more than one task at a time. His spatial abilities were mildly impaired, and his language was unaffected.

710

© 2009 American Association of Neuropathologists, Inc.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

**TABLE 1.** Demographic Information

| Case No. | Reference | Sex | Sport/Activity | Age Sport Begun, years | Years of Play | Age at Onset Symptoms, years | Interval Between Retirement and Symptoms, years | Interval Between Symptom Onset and Death, years | Age at Death, years | ApoE Genotype |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 30 | M | Boxing | 17 | 11 | 38 | 10 | 13 | 51 | |
| 2 | 31 | M | Boxing | 15 | 14 | 36 | 6 | 12 | 48 | |
| 3 | 32 | M | Boxing | 14 | 10 | 46 | 10 | 7 | 53 | |
| 4 | 32 | M | Boxing | 18 | 6 | 48 | 24 | 10 | 58 | |
| 5 | 28 | M | Boxing | | 4 | | | | 49 | |
| 6 | 33 | M | Boxing | | | | | | | |
| 7 | 33 | M | Boxing | | | | | | | |
| 8 | 34 | M | Boxing | 16 | 7 | 25 | 1 | 33 | 58 | |
| 9 | 35 | M | Boxing | 12 | 12 | 30 | 6 | | | |
| 10 | 35 | M | Boxing | 15 | 20 | 36 | 0 | 10 | 46 | |
| 11 | 35 | M | Boxing | 19 | 12 | 31 | 0 | 15 | 46 | |
| 12 | 35 | M | Boxing | 16 | 16 | 40 | 8 | 5 | 45 | |
| 13 | 35 | M | Boxing | 15 | 13 | 28 | 0 | 16 | 44 | |
| 14 | 35 | M | Boxing | 12 | 12 | | 4 | | 28 | |
| 15 | 29 | M | Boxing | 11 | 14 | 25 | 0 | 38 | 63 | |
| 16 | 29 | M | Boxing | | 20 | 50 | 20 | 27 | 77 | |
| 17 | 29 | M | Boxing | 16 | 14 | 30 | 0 | 33 | 63 | |
| 18 | 29 | M | Boxing | 15 | 25 | 35 | 0 | 34 | 69 | |
| 19 | 29 | M | Boxing | 18 | 18 | 36 | 0 | 25 | 61 | |
| 20 | 29 | M | Boxing | 13 | 25 | 37 | 0 | 46 | 83 | |
| 21 | 29 | M | Boxing | 16 | 20 | 54 | 18 | 8 | 62 | |
| 22 | 29 | M | Boxing | 17 | 23 | 60 | 20 | 11 | 71 | |
| 23 | 29 | M | Boxing | | >10 | 31 | 0 | 41 | 72 | |
| 24 | 29 | M | Boxing | | | 40 | | 27 | 67 | |
| 25 | 29 | M | Boxing | | | 48 | | 19 | 67 | |
| 26 | 29 | M | Boxing | 14 | 16 | 43 | 4 | 14 | 57 | |
| 27 | 29 | M | Boxing | 18 | 10 | | | | 61 | |
| 28 | 29 | M | Boxing | | | | | | 91 | |
| 29 | 29 | M | Boxing | | | | | | 58 | |
| 30 | 18 | F | Physical abuse | | | | | | 76 | |
| 31 | 14 | F | Autistic head banging | | | | | | 24 | |
| 32 | 36 | M | Boxing | | >25 | | | | 63 | |
| 33 | 36 | M | Boxing | | >25 | | | | 69 | |
| 34 | 19 | M | Circus clown | | 15 | | | | 33 | |
| 35 | 15 | M | Boxing | | >11 | 61 | 37 | 10 | 71 | |
| 36 | 13, 37 | M | Boxing | 11 | 12 | | | | 23 | ε3/ε4 |
| 37 | 13 | M | Boxing | 16 | 5 | | 0 | | 28 | |
| 38 | 13 | M | Head banging | | | | | | 28 | |
| 39 | 13 | M | Epilepsy | | | | | | 27 | |
| 40 | 13 | M | Soccer | | | | | | 23 | ε3/ε3 |
| 41 | 38 | M | Boxing | | 10 | 64 | | | 67 | ε3/ε4 |
| 42 | 39 | M | Boxing | | | 76 | | | 78 | |
| 43 | 17 | M | Football | 16 | 22 | | | | 50 | ε3/ε3 |
| 44 | 16 | M | Football | 18 | 14 | 35 | 2 | 10 | 45 | ε3/ε3 |
| 45 | 21 | M | Football | 15 | 23 | 38 | 0 | 6 | 44 | ε3/ε4 |
| 46 | 20 | M | Wrestling | 18 | 22 | 38 | 0 | 2 | 40 | ε3/ε3 |
| 47 | 40 | M | Football | 16 | 17 | 36 | 3 | 3 | 36 | |
| 48 | 41 | M | Boxing | 16 | 17 | 58 | | 13 | 61 | ε3/ε4 |
| 49 | Case A | M | Football | 16 | 16 | 40 | 9 | 5 | 45 | ε4/ε4 |
| 50 | Case B | M | Boxing | 17 | 5 | 63 | 33 | 17 | 80 | ε3/ε4 |
| 51 | Case C | M | Boxing | 11 | 22 | 58 | 25 | 15 | 73 | ε3/ε3 |

F, female; M, male.

© 2009 American Association of Neuropathologists, Inc.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

McKee et al

J Neuropathol Exp Neurol • Volume 68, Number 7, July 2009

**TABLE 2.** Clinical Manifestations

| Case No. | Initial Symptoms | I. Personality/Behavior Change | Dysphoria | Irritability | Confusion | Agitation | Paranoia |
|---|---|---|---|---|---|---|---|
| 1 | Memory, speech | x | | | | x | |
| 2 | Euphoria, dementia | x | x | | | | |
| 3 | | x | | x | | | x |
| 4 | Memory, confusion | x | x | x | x | | |
| 5 | Memory, confusion | x | | | x | | |
| 6 | | | | | | | |
| 7 | | | | | | | |
| 8 | Cognitive decline, hemiparesis | x | x | x | x | | x |
| 9 | Manic-depressive psychosis | x | x | | | | |
| 10 | Headaches | x | x | | x | | x |
| 11 | Headaches | x | x | | x | | |
| 12 | Slurred speech, gait change | x | x | | x | | |
| 13 | Punchy, unsteady | | | | | | |
| 14 | | | | | | | |
| 15 | Violent outbursts | x | | x | | | |
| 16 | Staggered gait, slowed speech | x | | x | x | | |
| 17 | Confusion, falls | x | | x | x | x | x |
| 18 | Unsteadiness | | | | | | |
| 19 | Irritability, memory loss, aggression | x | | x | | | |
| 20 | Gait, speech | x | | | | | x |
| 21 | Dysphoria, violence | x | | | x | | |
| 22 | Ataxia, falls, weakness | | | | x | | |
| 23 | Tremor, slurred speech | x | | | | | |
| 24 | Memory loss | | | | x | x | x |
| 25 | Confusion | x | | | x | | |
| 26 | Speech, delirium | x | | | x | | x |
| 27 | None | | | | | | |
| 28 | Aggression | x | | | | | |
| 29 | None | | | | | | |
| 30 | | | | | | | |
| 31 | | | | | | | |
| 32 | | x | x | | | | |
| 33 | | x | x | | | | |
| 34 | | x | | | | | |
| 35 | | | | | | | |
| 36 | | | | | | | |
| 37 | Paranoid schizophrenia | | | | | | |
| 38 | | | | | | | |
| 39 | | | | | | | |
| 40 | | | | | | | |
| 41 | Cognitive decline, ALS-like syndrome | x | | x | x | x | x |
| 42 | Cognitive decline, parkinsonism | | | | | | |
| 43 | Memory, dysphoria | x | x | | | | |
| 44 | Depression, erratic | x | x | x | | x | x |
| 45 | Headaches, poor decisions | x | x | | | | x |
| 46 | Depression, violent | x | x | | | | |
| 47 | Bipolar disorder | x | x | x | x | x | x |
| 48 | Memory loss | x | | | | | |
| A* | Memory, confusion | x | x | x | x | | x |
| B* | Disorientation, confusion | x | | x | x | x | x |
| C* | Memory | x | x | x | x | x | x |

*New Cases A, B, and C of this series.
x, clinical feature was noted as present; blank, clinical feature was not mentioned.
ALS, amyotrophic lateral sclerosis.

© 2009 American Association of Neuropathologists, Inc.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

-2020-

**TABLE 2.** (Continued)

| Reduced Concentration | Aggression/ Violence | Poor Insight/ Judgment | Apathy | Hypersexuality | II. Somatic Symptoms | Headache | Dizziness | Insomnia |
|---|---|---|---|---|---|---|---|---|
| | X | X | | | | | | |
| X | X | | | | X | X | | |
| X | X | | | | X | X | | X |
| | X | | | | | | | |
| | X | | | | | | | |
| | X | | | | | | | |
| | X | | | | | | | |
| | X | | | X | X | X | | |
| | X | | | | | | | |
| | X | | | | | | | |
| | X | | | | | | | |
| | X | | | | | | | |
| | X | | | | | | | |
| | X | X | | | | | | |
| | X | | | | | | | |
| X | X | X | | | | | | |
| | | X | | | | | | |
| X | X | X | | | | | | |
| | | X | X | | X | X | | |
| | X | | | | | | | |
| X | X | X | X | | | | | |
| X | X | X | | | | | | |
| X | X | X | | | | | | |
| X | X | X | X | | X | | X | |

© 2009 American Association of Neuropathologists, Inc.

713

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

**TABLE 2.** (Continued)

| Case No. | Deafness | Epilepsy | III. Cognitive Changes | Memory Loss | Dementia | Visuospatial Abnormalities | IV. Movement Abnormalities | Parkinsonism | Decreased Facial Movement |
|---|---|---|---|---|---|---|---|---|---|
| 1 | | | x | x | x | | x | x | |
| 2 | | x | x | x | x | | x | x | |
| 3 | | | x | x | | | x | | |
| 4 | | | x | x | x | | | | |
| 5 | | | x | | | | | | |
| 6 | | | | | | | | | |
| 7 | | | | | | | | | |
| 8 | | x | x | x | x | | x | x | x |
| 9 | | | | | | | | | |
| 10 | | | | | | | | | |
| 11 | | | x | x | | | x | x | |
| 12 | | | x | x | | | | | |
| 13 | | | x | | | | | | |
| 14 | | | | | | | x | x | |
| 15 | | | x | x | | | x | x | |
| 16 | | | x | x | x | | x | | |
| 17 | | | x | x | | | | x | x |
| 18 | | | x | x | x | | x | x | |
| 19 | | | x | x | | | | | |
| 20 | | | x | x | | | x | x | |
| 21 | | | x | x | x | | x | | |
| 22 | | | x | | | | x | x | |
| 23 | | | x | x | x | | x | x | x |
| 24 | | | x | x | x | | | | |
| 25 | | | x | x | x | | | | |
| 26 | | | x | x | x | | x | x | |
| 27 | | | | | | | | | |
| 28 | | | | | | | | | |
| 29 | | | | | | | | | |
| 30 | | | | | | | | | |
| 31 | | | | | | | | | |
| 32 | | | x | x | | | x | x | x |
| 33 | | | x | x | | | x | x | x |
| 34 | | | x | x | x | | | | |
| 35 | | | x | x | x | | | | |
| 36 | | | | | | | | | |
| 37 | | | | | | | | | |
| 38 | | | | | | | | | |
| 39 | | | | | | | | | |
| 40 | | | | | | | | | |
| 41 | | | x | x | x | | x | x | x |
| 42 | | | x | x | x | | x | x | |
| 43 | | | x | x | x | | x | x | |
| 44 | | | | | | | | | |
| 45 | | | x | x | | | | | |
| 46 | | | x | x | | | | | |
| 47 | | | x | x | x | | | | |
| 48 | | | x | x | | x | | | |
| A* | | | x | x | | x | | | |
| B* | | | x | x | x | x | x | | |
| C* | | | x | x | x | x | x | x | x |

© 2009 American Association of Neuropathologists, Inc.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

J Neuropathol Exp Neurol • Volume 68, Number 7, July 2009

*Chronic Traumatic Encephalopathy in Athletes*

**TABLE 2.** (Continued)

| Slowed Movements | Tremor | Rigidity | Falls | Ocular Abnormalities | Ptosis | Reduced Upgaze | Gait Problems | Staggered |
|---|---|---|---|---|---|---|---|---|
| x | | | | | | | | |
| | x | | | x | | x | x | |
| | | | | | | | x | |
| | | | x | | | | | |
| x | | | | | | | | |
| | | | | x | | | x | |
| | | | | | | | x | |
| | | | | | | | x | x |
| | | | | | | | x | x |
| | | | | x | x | | | |
| | x | | x | | | | x | x |
| | x | x | x | | | | x | x |
| x | | | | | | | x | |
| | | | | | | | x | x |
| | | | x | | | | x | |
| | x | | x | | | | x | |
| | x | x | x | | | | x | |
| x | | | | | | | | |
| | x | | | | | | x | |
| | x | | | | | | x | |
| | | | | | | | x | |
| | | | | | | | x | |
| | | | x | | | | x | x |
| | x | | | x | | x | x | |

© 2009 American Association of Neuropathologists, Inc.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

*McKee et al*                                        *J Neuropathol Exp Neurol • Volume 68, Number 7, July 2009*

**TABLE 2.** (Continued)

| Case No. | Slowed | Shuffled | Ataxia | Reduced Coordination | Speech Changes | Slowed | Slurred | Dysarthria | Dysphagia | Spasticity |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | | x | x | | | | |
| 2 | | | x | | | | | | | x |
| 3 | | | x | | | | | | | x |
| 4 | | | | | | | | | | |
| 5 | | | | | | | | | | |
| 6 | | | | | x | | | | | |
| 7 | | x | | | | | | x | | x |
| 8 | | | | | | | | | | |
| 9 | | | x | | x | | x | x | | |
| 10 | | | | | x | | x | | | |
| 11 | | | | x | x | x | | | | |
| 12 | | | | x | x | | | | | |
| 13 | | | | | | | | | | |
| 14 | | | x | | x | | | | | |
| 15 | | | x | | x | x | x | | | |
| 16 | | | x | | x | x | x | x | x | x |
| 17 | | x | x | | x | | x | x | | x |
| 18 | | | | | | | | | | |
| 19 | x | x | x | | x | | x | x | | |
| 20 | | | x | | | | | | | |
| 21 | | | x | | x | | | | | |
| 22 | | | x | | | | x | x | | |
| 23 | | | | | | | | | | |
| 24 | | | | | | | | | | |
| 25 | | | | | x | x | x | | | |
| 26 | | | | | | | | | | |
| 27 | | | | | | | | | | |
| 28 | | | | | | | | | | |
| 29 | | | | | | | | | | |
| 30 | | | | | | | | | | |
| 31 | | | | | x | | | x | | |
| 32 | | | | | x | | | x | | |
| 33 | | | x | | | | | | | |
| 34 | | | | | | | | | | |
| 35 | | | | | | | | | | |
| 36 | | | | | | | | | | |
| 37 | | | | | | | | | | |
| 38 | | | | | | | | | | |
| 39 | | | | | | | | | | |
| 40 | | | | | x | | | | | x |
| 41 | | | | | | | | | | |
| 42 | | | | | | | | | | |
| 43 | | | | | | | | | | |
| 44 | | | | | | | | | | |
| 45 | | | | | | | | | | |
| 46 | | | | | | | | | | |
| 47 | | | | | | | | | | |
| 48 | | | | | | | | | | |
| A* | | | | | | | | | | |
| B* | | | | | x | | x | | | |
| C* | x | x | | | x | | x | | | |

© 2009 American Association of Neuropathologists, Inc.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

Case 2:12-cv-02323-DAB Document 1 Filed 07/08/2015 Page 113

He repeatedly asked the same questions over and over, he did not recall why he went to the store unless he had a list, and he would ask to rent a movie that he had already seen. These symptoms gradually increased and became pronounced by the end of his life 5 years later. Using a modification of the Family Version of the Cognitive Difficulties Scale (43, 44), he had a moderate amount of cognitive difficulties. On a modified AD8 informant interview for dementia, he received a total score of 4, which indicated "cognitive impairment is likely to be present" (45). By contrast, the Functional Activities Questionnaire (46), an informant-based measure of instrumental activities of daily living, did not indicate significant functional dependence despite his difficulty in assembling tax records, shopping alone, and understanding television (total Functional Activities Questionnaire score, 3). Moreover, he continued to perform his job as a hunting and fishing guide in a satisfactory manner.

Toward the end of his life, he tended to become angry and verbally aggressive over insignificant issues and was more emotionally labile. He also began to consume more alcohol but did not show other signs or symptoms of depression. He had no significant psychiatric history, and he had never taken performance-enhancing or illicit drugs. His family history was negative for dementia and psychiatric illness.

## CTE in Boxers

Boxing is the most frequent sport associated with CTE, and disease duration is the longest in boxers, with case reports of individuals living for 33, 34, 38, 41, and 46 years with smoldering, yet symptomatic, disease (29). Boxers with long-standing CTE are frequently demented (46%) and may be misdiagnosed clinically as AD (47), as occurred in Cases 2 and 3.

## Case B

An 80-year-old African American/American Indian man was first noted to have difficulty remembering things in his mid-20s. He began boxing when he was 17 years old, quickly rose to professional ranks, and fought professionally for 5 years until he retired at age 22 years. He had a mild head injury in his early teenaged years while moving farm equipment, although he did not lose consciousness or experience any permanent disability. By his mid-30s, he had brief occasional episodes of confusion and a tendency to fall. His wife attributed his occasional forgetfulness, falls, and confusion to being mildly "punch-drunk." His symptoms remained more or less stable during the following 4 decades except for an increased tendency to become disoriented when traveling to unfamiliar places. By age 70 years, he got lost driving on familiar roads; he became increasingly confused and disoriented and did not recognize his daughter. By age 78 years, he was paranoid, his memory loss had increased, his gait was unsteady, his speech slowed, and he frequently fell. He was easily agitated and required multiple hospitalizations for aggressive behaviors. He died at age 80 years of complications of septic shock.

He had a period of alcohol abuse as a young adult but was abstinent for the last 40 years of his life. He smoked cigarettes for 20 years. He was employed as a roofer for most

of his life and was in excellent physical condition, running miles and doing daily calisthenics. He had no history of depression or anxiety and was generally pleasant and even-tempered. His family history was positive for a paternal grandfather with a history of cognitive decline and a brother with AD. Cerebral computerized axial tomography performed 2 and 3 years before death revealed progressive cerebral and cerebellar atrophy and mild ventricular enlargement.

## Case C

A 73-year-old white man began boxing at the age of 11 years and fought as an amateur boxer for 9 years and as a professional boxer for 13 years. He fought a total of 48 professional bouts, accumulating 2 world championships before retiring at the age of 33 years. In his late 50s, he became forgetful with mood swings and restlessness. He changed from his normally happy easy-going self to become apathetic, socially withdrawn, paranoid, irritable, and sometimes violently agitated. During the next 2 years, he began to confuse close relatives and developed increasing anxiety, aggression, and agitation; on occasion, he was verbally abusive toward his wife and tried to strike her. He required neuroleptics for control of his behavior. The following year, he had episodes of dizziness, which was suspected to be vertigo, and resulted in a hospital admission. Neurological examination found him to be disoriented, inattentive, with very poor immediate and remote memory, and impaired visuospatial skills. Neuropsychological testing showed deficits in all cognitive domains, including executive functioning, attention, language, visuospatial abilities, and profound deficits in learning and memory. Computed tomographic scan and magnetic resonance imaging (MRI) showed generalized cortical atrophy, enlargement of the cerebral ventricles, cavum septum pellucidum, and a right globus pallidus lacuna. An electroencephalogram, an MR angiogram, and a carotid ultrasound were normal. He smoked and drank alcohol occasionally until his early 50s. A first cousin developed dementia in her early 50s, and 3 uncles and 1 aunt (of 11 children) were demented.

During the following 2 years, he continued to decline in all cognitive domains. He frequently fell and developed a tremor of his left hand. Repeat neuropsychological testing at age 67 years revealed further global deficits, again with prominent impairments in memory. By age 70 years, he had severe swallowing difficulties, diminished upgaze, masked facies, garbled speech, and a slow shuffling gait. Mini-Mental Status Examination several months before death was 7 out of 30. He died at the age of 73 years of complications of pneumonia.

## CTE in Other Sports and Activities

Other sports associated with neuropathologically verified CTE are professional wrestling (20) and soccer (13). The first known case of CTE in a professional wrestler involved a 40-year-old white man who began professional wrestling at age 18 years and wrestled for the next 22 years (20). He was known for his rough aggressive style and had experienced numerous concussions and a cervical fracture during his career. At age 36 years, he began to experience problems in

-2025-
Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

*McKee et al*                                                   *J Neuropathol Exp Neurol* • Volume 68, Number 7, July 2009

**TABLE 3.** Gross Pathological Features: Atrophy

| Case No. | Brain Weight, g | Thickened Leptomeninges | Atherosclerosis | Arteriolosclerosis | Cerebral Atrophy | Frontal Lobe | Parietal Lobe | Temporal Lobe | Occipital Lobe |
|---|---|---|---|---|---|---|---|---|---|
| 1 | | ++ | 0 | ++ | + | | | | |
| 2 | | | | | + | | | | |
| 3 | (Biopsy) | | | | | | | | |
| 4 | | | | | | +++ | | | |
| 5 | 1,120 | + | 0 | | | + | + | | |
| 6 | | | | | | | | | |
| 7 | | | | | | | | | |
| 8 | 1,180 | | | | + | | | | |
| 9 | | + | ++ | ++ | + | + | | | |
| 10 | | + | ++ | ++ | | | | | |
| 11 | | + | + | | | | | | |
| 12 | | + | + | | | | | | |
| 13 | | + | + | | | | | | |
| 14 | | + | | | | | | | |
| 15 | 1,310 | ++ | + | | | | | | |
| 16 | 960 | | + | ++ | +++ | +++ | | +++ | |
| 17 | 1,260 | | | | | | | | |
| 18 | 1,205 | + | | | + | + | | | |
| 19 | 1,095 | + | | | | ++ | | ++ | |
| 20 | 1,300 | + | | | | 0 | 0 | 0 | 0 |
| 21 | 1,090 | + | | | | | | | |
| 22 | 1,040 | | | | | +++ | | +++ | |
| 23 | 1,435 | | | | | | | | |
| 24 | 1,095 | | | | | | | | |
| 25 | 1,030 | | | | | | | | |
| 26 | | | | | | | | | |
| 27 | 950 | | | | | + | | | |
| 28 | 1,395 | | | | | | | | |
| 29 | | | | | | | | | |
| 30 | | | | | | + | | | |
| 31 | | | | | | | | | |
| 32 | | | | | | + | | | |
| 33 | | | | | | | | | |
| 34 | 1,833 | | 0 | | | | | | |
| 35 | | | | | | + | + | + | |
| 36 | | | | | | | | | |
| 37 | | | | | | | | | |
| 38 | | | | | | | | | |
| 39 | (Lobectomy) | | | | | | | | |
| 40 | | | | | | | | | |
| 41 | | | | | | + | | + | |
| 42 | | | | | | | | + | |
| 43 | 1,565 | | | | | 0 | 0 | 0 | 0 |
| 44 | | | | | | | | | |
| 45 | 1,535 | | | | | 0 | 0 | 0 | 0 |
| 46 | 1,510 | | | | | 0 | 0 | 0 | 0 |
| 47 | | | | | | | | | |
| 48 | | | | | | ++ | | ++ | |
| A* | (Fragments) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| B* | 1,360 | 0 | 0 | ++ | + | + | + | + | 0 |
| C* | 1,220 | + | + | + | ++ | ++ | ++ | ++ | + |

*New Cases A, B, and C of this series.
0, feature not present; +, mild; ++, moderate; +++, severe; blank, feature was not mentioned.

© *2009 American Association of Neuropathologists, Inc.*

-2026-

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

J Neuropathol Exp Neurol • Volume 68, Number 7, July 2009    *Chronic Traumatic Encephalopathy in Athletes*

**TABLE 3.** *(Continued)*

| Hippocampus | Entorhinal Cortex | Amygdala | Mammillary Bodies | Thalamus/ Hypothalamus | Brainstem | Cerebellum | Olfactory Bulb | Corpus Callosum |
|---|---|---|---|---|---|---|---|---|
|  |  |  | + | + | + |  |  |  |
|  |  |  | + | + | + | + |  | + |
|  |  |  | + | + | + | + |  |  |
|  |  |  |  | + | + | + | + | + |
|  |  |  |  |  |  | + |  | + |
|  |  |  |  | + |  | + | + | + |
|  |  |  |  |  | + |  |  |  |
|  |  |  |  |  | + |  |  |  |
|  |  |  |  | + | + |  |  |  |
|  |  |  |  |  |  |  |  | + |
|  |  |  | + |  |  |  |  | + |
|  |  |  |  |  |  |  | + |  |
|  |  |  |  | + |  | +++ |  | ++ |
| 0 | 0 | 0 |  |  |  |  |  |  |
| +++ | +++ | +++ | ++ | + | 0 | 0 | 0 | + |
| +++ | +++ | +++ | ++ | ++ | 0 | 0 | + | + |

© 2009 American Association of Neuropathologists, Inc.                    719

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

*McKee et al*  *J Neuropathol Exp Neurol • Volume 68, Number 7, July 2009*

his marriage, with periods of depression and lapses of memory. During his 40th year, he had episodes of violent behavior; he ultimately killed his wife and son and committed suicide. He was believed to have used anabolic steroids and prescription narcotics. His medical history included a motor vehicle accident at age 6 years requiring 3 days of hospitalization for mild TBI without known neurological sequelae.

Geddes and colleagues (13) reported finding mild changes of CTE in a 23-year-old amateur soccer player who regularly "headed" the ball while playing and had a history of a single severe head injury. Williams and Tannenberg (19) reported the findings of CTE in a 33-year-old achondroplastic dwarf, with a long history of alcohol abuse, who worked for 15 years as a clown in a circus. He had been knocked unconscious "a dozen times" and participated in dwarf-throwing events.

## PATHOLOGICAL FEATURES OF CTE

### Gross Pathology

In their comprehensive description of the pathology, Corsellis and colleagues (29) summarized the most common gross neuropathologic findings including 1) a reduction in brain weight, 2) enlargement of the lateral and third ventricles, 3) thinning of the corpus callosum, 4) cavum septum pellucidum with fenestrations, and 5) scarring and neuronal loss of the cerebellar tonsils. The reduction in brain weight is generally mild (mean, 1261 g; range, 950–1,833 g) and associated with atrophy of the frontal lobe (36%), temporal lobe (31%), parietal lobe (22%), and less frequently, occipital lobe (3%) (Tables 3–6). With increasing severity of the disease, atrophy of the hippocampus, entorhinal cortex, and amygdala may become marked. The lateral ventricles (53%) and III ventricles (29%) are frequently dilated; rarely, there is dilation of the IV ventricle (4%). Cavum septum pellucidum is often present (69%), usually with fenestrations (49%). Other common gross features include pallor of the substantia nigra and locus caeruleus, atrophy of the olfactory bulbs, thalamus, mammillary bodies, brainstem, and cerebellum, and thinning of the corpus callosum. Many of these gross pathological features were found in our Cases B and C.

### Case B

The brain weighed 1,360 g. There was a mild yellow-brown discoloration in the leptomeninges over the temporal poles. There was mild atrophy of the frontal, parietal, and temporal lobes, most pronounced in the temporal pole. The floor of the hypothalamus was thinned and translucent, and the mammillary bodies were atrophic. The medial thalamus was atrophic and concave. The frontal, temporal, and occipital horns of the lateral and third ventricles were enlarged, with a 0.5-cm cavum septum pellucidum. The corpus callosum was thinned in its midportion. The anterior hippocampus, amygdala, and entorhinal cortex were severely atrophic. By contrast, the posterior hippocampus was only mildly atrophic. The substantia nigra and locus caeruleus were markedly pale.

### Case C

The brain weighed 1,220 g. There was moderate atrophy of the frontal, parietal, and temporal lobes, most pronounced in the temporal pole. The floor of the hypothalamus was markedly thinned, and the mammillary bodies were atrophic. The corpus callosum was thinned, most prominently in its anterior portion. There was a large cavum septum pellucidum (0.8 cm) with fenestrations. The frontal and temporal horns of the lateral ventricles and the third ventricle were moderately enlarged. The entorhinal cortex, hippocampus, and amygdala were markedly atrophic throughout their entire extent. The medial thalamus was atrophic and concave. The perivascular spaces of the temporal and frontal white matter were prominent. A 1.0-cm lacuna was present in the internal segment of the right globus pallidus. There was severe pallor of the substantia nigra and locus caeruleus, with discoloration and atrophy of the frontopontine fibers in the cerebral peduncle.

See the appendix for methods of analysis for Cases A to C.

### Microscopic Pathology

#### Neuronal Loss

A few reports in the literature (Cases 3, 4, 10, 12, 14, 29; Table 5) described neuronal loss and gliosis in the hippocampus, substantia nigra, and cerebral cortex without appreciable neurofibrillary pathology. Neuronal loss and gliosis most commonly accompany neurofibrillary degeneration, however, and are pronounced in the hippocampus, particularly the CA1 and subiculum, the entorhinal cortex, and amygdala. If the disease is advanced, neuronal loss is also found in the subcallosal and insular cortex and to a lesser degree in the frontal and temporal cortex. Other areas of neuronal loss and gliosis include the mammillary bodies, medial thalamus, substantia nigra, locus caeruleus, and nucleus accumbens. In Cases B and C, the cerebral cortex showed mild neuronal loss in the insular and septal cortices and moderate neuronal loss in the entorhinal cortex, amygdala, medial thalamus, mammillary bodies, substantia nigra pars compacta and pars reticulata, and to a lesser extent, locus caeruleus. In Case B, CA1 of the hippocampus showed moderate loss of neurons, and in Case C, CA1 and the subiculum of the hippocampus showed severe neuronal loss and gliosis.

#### Tau Deposition

Neurofibrillary tangles (NFTs), astrocytic tangles, and dotlike and spindle-shaped neuropil neurites (NNs) are common in the dorsolateral frontal, subcallosal, insular, temporal, dorsolateral parietal, and inferior occipital cortices. The tau-immunoreactive neurofibrillary pathology is characteristically irregular in distribution with multifocal patches of dense NFTs in the superficial cortical layers, often in a perivascular arrangement. This superficial distribution of neocortical NFTs was originally described by Hof and colleagues (47), who noted that the NFTs in CTE were preferentially distributed in layer II and the upper third of layer III in neocortical areas and generally more dense than in AD.

Geddes and colleagues (13, 37) drew attention to the perivascular distribution of NFTs in their description of the

720

© 2009 American Association of Neuropathologists, Inc.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

Case 2:12-cv-02705-DMC Document 20-2 Page 135 Date Filed: 08/22/2012

**TABLE 4.** Gross Pathological Features: Other

| Case No. | II Ventricle Enlarged | III Ventricle Enlarged | IV Ventricle Enlarged | Cavum Septum | Fenestrations | SN Pallor | LC Pallor |
|---|---|---|---|---|---|---|---|
| 1 | + | + | | | | | |
| 2 | + | | | + | | | |
| 3 | | | | | | | |
| 4 | +++ | | | | | | |
| 5 | + | + | | | | | |
| 6 | | | | + | | | |
| 7 | | | | + | | | |
| 8 | | | | + | | +++ | |
| 9 | + | | | + | + | | |
| 10 | + | | | + | + | | |
| 11 | + | | | + | | | + |
| 12 | + | | | + | | | |
| 13 | + | | | + | + | | |
| 14 | + | | | + | | | |
| 15 | ++ | ++ | | +++ | + | ++ | |
| 16 | +++ | +++ | +++ | +++ | + | ++ | |
| 17 | ++ | ++ | | ++ | + | +++ | |
| 18 | ++ | ++ | | + | + | +++ | |
| 19 | ++ | ++ | + | +++ | + | + | |
| 20 | ++ | ++ | | ++ | + | +++ | |
| 21 | ++ | ++ | | ++ | + | | |
| 22 | ++ | ++ | + | ++ | + | | |
| 23 | ++ | | | ++ | + | +++ | |
| 24 | +++ | +++ | | +++ | + | | |
| 25 | ++ | | | +++ | + | | |
| 26 | + | | | + | | | |
| 27 | ++ | ++ | | ++ | + | | |
| 28 | ++ | ++ | | ++ | | | |
| 29 | | | | + | + | | |
| 30 | | | | +++ | + | | |
| 31 | | | | +++ | | | |
| 32 | | | | + | + | | |
| 33 | | | | | | | |
| 34 | +++ | +++ | | | + | | |
| 35 | | | | | + | | |
| 36 | | | | 0 | 0 | 0 | |
| 37 | | | | 0 | 0 | 0 | |
| 38 | | | | 0 | 0 | 0 | |
| 39 | | | | | | | |
| 40 | | | | 0 | 0 | 0 | |
| 41 | | | | + | | ++ | ++ |
| 42 | | | | + | | | |
| 43 | | | | | | + | |
| 44 | | | | | | | |
| 45 | | | | + | | | |
| 46 | | | | | | | |
| 47 | | | | | | | |
| 48 | ++ | | | + | + | | |
| A* | | + | | | | 0 | 0 |
| B* | + | + | | + | + | +++ | +++ |
| C* | ++ | ++ | | ++ | + | +++ | +++ |

*New Cases A, B, and C of this series.
0, feature not present; +, mild; ++, moderate; +++, severe; blank, feature was not mentioned.
LC, locus caeruleus; SN, substantia nigra.

© 2009 American Association of Neuropathologists, Inc.

721

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

McKee et al

J Neuropathol Exp Neurol • Volume 68, Number 7, July 2009

**TABLE 5.** Microscopic Pathological Features: Neuronal Loss

| Case No. | Frontal Cortex | Parietal Cortex | Temporal Cortex | Occipital Cortex | Hippocampus | Entorhinal Cortex | Amygdala | Cerebellum |
|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | | |
| 2 | | | | | | | | |
| 3 | +++ | +++ | +++ | | | | | |
| 4 | +++ | +++ | +++ | | | | | |
| 5 | | | | | | | | |
| 6 | | | | | | | | |
| 7 | | | | | | | | |
| 8 | | | | | | | | |
| 9 | | | | | | | | |
| 10 | | | | | | | | |
| 11 | | | | | | | | |
| 12 | | | | | | | | |
| 13 | | | | | | | | |
| 14 | | | | | | | | |
| 15 | + | | | | | | | |
| 16 | +++ | +++ | +++ | | | | | |
| 17 | | | | | | | | |
| 18 | | | | | | | | |
| 19 | | | | | | | | |
| 20 | + | + | + | + | | | | |
| 21 | | | | | | | | |
| 22 | + | + | + | + | | | | |
| 23 | + | + | + | + | | | | |
| 24 | | | | | | | | |
| 25 | | | | | | | | |
| 26 | +++ | +++ | +++ | +++ | | | | |
| 27 | | | | | | | | |
| 28 | | | | | | | | |
| 29 | | | | | | | | |
| 30 | | | | | | | | |
| 31 | | | | | | | | |
| 32 | | | | | | | | |
| 33 | | | | | | | | |
| 34 | | | | | | | | |
| 35 | | | | | | | | |
| 36 | | | | | | | | |
| 37 | | | | | | | | |
| 38 | | | | | | | | |
| 39 | | | | | | | | |
| 40 | | | | | | | | |
| 41 | | | | | | | | |
| 42 | | | | | | | | |
| 43 | | | | | | | | |
| 44 | | | | | | | | |
| 45 | | | | | | | | |
| 46 | | | | | | | | |
| 47 | | | | | | | | |
| 48 | ++ | ++ | ++ | ++ | ++ | | | |
| A* | 0 | 0 | 0 | 0 | + | + | + | |
| B* | + | + | + | + | ++ | ++ | ++ | |
| C* | ++ | ++ | ++ | ++ | +++ | +++ | +++ | |

*New Cases A, B, and C of this series.
0, feature not present; +, mild; ++, moderate; +++, severe; blank, feature was not mentioned.

© 2009 American Association of Neuropathologists, Inc.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

Case 2:12-cv-02123-DAB Document 20-2 6 Page 137 Filed Date Filed: 10/08/2025 79

**TABLE 6.** Microscopic Pathological Features: Other

| Case No. | Frontal | Parietal | Temporal | Occipital | Thalamus | Hypothalamus | Septal Nuclei | Globus Pallidus | Caudate/Putamen | Nucleus Basalis of Meynert | Mammillary Bodies |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | NFT | | | | | | | | |
| 1 | + | + | + | + | | | | | | | |
| 2 | + | + | + | | + | + | | | | | |
| 3 | | | | | | | | | | | |
| 4 | | | | | | | | | | | |
| 5 | + | + | + | | | | | | | | |
| 6 | + | + | + | | | | | | | | |
| 7 | + | + | + | | | | | | | | |
| 8 | + | | + | + | | | | | | | |
| 9 | | | | | | | | | | | |
| 10 | | | | | | | | | | | |
| 11 | + | + | + | | | | | | | | |
| 12 | | | | | | | | | | | |
| 13 | + | + | + | | | | | | | | |
| 14 | | | | | | | | | | | |
| 15 | + | | | | | | | | | | |
| 16 | +++ | +++ | +++ | | | | | | | | |
| 17 | + | + | + | | | | | | | | |
| 18 | +++ | | +++ | | | | | | | | |
| 19 | +++ | +++ | +++ | +++ | | | | | | | |
| 20 | + | + | + | | | | | | | | |
| 21 | + | + | + | + | | | | | | | |
| 22 | ++ | ++ | ++ | ++ | | | | | | | |
| 23 | ++ | ++ | ++ | ++ | | | | | | | |
| 24 | | | + | | | | | | | | |
| 25 | | | + | | | | | | | | |
| 26 | +++ | +++ | +++ | +++ | | | | | | | |
| 27 | | | | | | | | | | | |
| 28 | + | + | + | + | | | | | | | |
| 29 | | | | | | | | | | | |
| 30 | ++ | + | + | | | | | | | | |
| 31 | | ++ | | | | | | | | | |
| 32 | + | | + | | | | | | | + | |
| 33 | | | + | | | | | | | | |
| 34 | | | + | | | | | | | | |
| 35 | | | | | | | | | | | |
| 36 | | | + | | | | | | | | |
| 37 | | | + | | | | | | | | |
| 38 | | | + | | | | | | | | |
| 39 | | | + | | | | | | | | |
| 40 | | | + | | | | | | | | |
| 41 | ++ | | + | | | | | ++ | ++ | | |
| 42 | + | | + | | | | | | | | |
| 43 | + | + | + | | | | | | | | |
| 44 | + | | + | | | | | | | | |
| 45 | +++ | | +++ | ++ | + | | | | + | | ++ |
| 46 | + | + | + | | | | | + | + | | |
| 47 | | | | | | | | | | | |
| 48 | ++ | ++ | ++ | 0 | | | | | | | |
| A* | +++ | ++ | +++ | ++ | + | +++ | +++ | 0 | + | +++ | +++ |
| B* | +++ | +++ | +++ | ++ | ++ | +++ | +++ | + | ++ | +++ | +++ |
| C* | +++ | +++ | +++ | ++ | +++ | +++ | +++ | + | ++ | +++ | +++ |

*New Cases A, B, and C of this series.
0, feature not present; +, mild; ++, moderate; +++, severe; blank, feature was not mentioned.
Aβ, β-amyloid; LC, locus caeruleus; NFT, neurofibrillary tangles; SN, substantia nigra; SP, senile plaques.

-2031-

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

*McKee et al*                                              *J Neuropathol Exp Neurol* • Volume 68, Number 7, July 2009

**TABLE 6.** (Continued)

| Case No. | Hippocampus | Entorhinal Cortex | Amygdala | Periventricular Gray | Midbrain Tegmentum | SN | LC | Basis Pontis | Medulla | Inferior Olive | Red Nucleus | Cranial Nerves 3, 4 Nuclei |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | +++ | | | | | | | | | | | |
| 2 | +++ | | | | | +++ | | | | | | |
| 3 | | | | | | | | | | | | |
| 4 | | | | | | | | | | | | |
| 5 | | | | | | | | | | | | |
| 6 | | | | | | | | | | | | |
| 7 | | | | | | | | | | | | |
| 8 | +++ | +++ | +++ | +++ | +++ | +++ | +++ | | | | | |
| 9 | | | | | | | | | | | | |
| 10 | | | | | | | | | | | | |
| 11 | | | | | | | | | | | | |
| 12 | | | | | | | | | | | | |
| 13 | | | | | | | | | | | | |
| 14 | | | | | | | | | | | | |
| 15 | | | | | | | | | | | | |
| 16 | | | | | | | | | | | | |
| 17 | | | | | | | | | | | | |
| 18 | | | | | | | | | | | | |
| 19 | | | | | | | | | | | | |
| 20 | | | | | | | | | | | | |
| 21 | | | | | | | | | | | | |
| 22 | | | | | | | | | | | | |
| 23 | | | | | | | | | | | | |
| 24 | | | | | | | | | | | | |
| 25 | | | | | | | | | | | | |
| 26 | | | | | | | | | | | | |
| 27 | | | | | | | | | | | | |
| 28 | | | | | | | | | | | | |
| 29 | | | | | | | | | | | | |
| 30 | + | | | | | + | | | | | | |
| 31 | | | | | | | | | | | | |
| 32 | | | | | | + | + | | | | | |
| 33 | | | | | | + | | | | | | |
| 34 | + | | | | | | | | | | | |
| 35 | + | | | + | | + | | | | | | + |
| 36 | 0 | | | | | | | | | | | |
| 37 | 0 | | | | | | | | | | | |
| 38 | 0 | | | | | | | | | | | |
| 39 | 0 | | | | | | | | | | | |
| 40 | 0 | | | | | | | | | | | |
| 41 | +++ | | | | | | | | | | | |
| 42 | +++ | | | | | | | | | | | |
| 43 | 0 | | | | | | | | | | | |
| 44 | ++ | ++ | | | | + | + | + | + | | | |
| 45 | ++ | ++ | ++ | + | + | ++ | ++ | +++ | ++ | | | |
| 46 | | | | | | + | + | | | | | |
| 47 | | | | | | | | | | | | |
| 48 | +++ | | | | | + | + | | | | | |
| A* | ++ | +++ | ++ | + | + | ++ | | | | | | |
| B* | +++ | +++ | +++ | ++ | ++ | +++ | +++ | + | + | + | + | + |
| C* | +++ | +++ | +++ | ++ | ++ | +++ | +++ | ++ | ++ | ++ | ++ | ++ |

© 2009 American Association of Neuropathologists, Inc.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

J Neuropathol Exp Neurol • Volume 68, Number 7, July 2009    *Chronic Traumatic Encephalopathy in Athletes*

**TABLE 6.** (Continued)

| | NFT | | | | Aβ | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Cranial Nerve 12 Nucleus | Spinal Cord | Cerebellar Dentate | Olfactory Bulb | Diffuse Plaques | Neuritic Plaques | Congophilic Angiopathy | NFT Only | NFT + SP | SP Only | No NFT/No SP |
| | | | | +++ | ++ | ++ | | +++ | | |
| | | | | | | | +++ | | | |
| | | | | | | | | | | + |
| | | | | | | | | | | + |
| | | | | | | | + | | | |
| | | | | | | | + | | | |
| | | | | | | | + | | | |
| | | | | | | | + | | | |
| | | | | + | + | | | | + | |
| | | | | 0 | 0 | | | | | |
| | | | | 0 | 0 | | | | | + |
| | | | | 0 | 0 | | + | | | |
| | | | | 0 | 0 | | | | | + |
| | | | | 0 | 0 | | + | | | |
| | | | | + | | | | + | | |
| | | | | + | | | | + | | |
| | | | | + | | | | + | | |
| | | | | + | | | | + | | |
| | | | | + | | | | + | | |
| | | | | + | + | | | + | | |
| | | | | + | + | | | + | | |
| | | | | + | | | | + | | |
| | | | | + | | | | + | | |
| | | | | + | | | | + | | |
| | | | | + | | | | + | | |
| | | | | + | | | | + | | |
| | | | | ++ | ++ | | | + | | |
| | | | | + | + | | | + | | |
| | | | | | | | | | | + |
| | | | | + | + | | | + | | |
| | | | | +++ | ++ | | | + | | |
| | | | | 0 | 0 | 0 | | | | |
| | | | | 0 | 0 | 0 | | | | |
| | | | | + | + | + | | + | | |
| | | | | ++ | ++ | ++ | | + | | |
| | | | | | | | + | | | |
| | | | | | | | + | | | |
| | | | | | | | + | | | |
| | | | | | | | + | | | |
| | | | | | | | + | | | |
| | +++ | | | + | + | | | + | | |
| | | | | | | | + | | | |
| | | | | + | | | | + | | |
| | | ++++ | | + | + | | | + | | |
| | | | | | | | + | | | |
| | | 0 | ++ | 0 | 0 | 0 | + | | | |
| o | ++ | + | +++ | ++ | + | o | | + | | |
| +++ | ++ | ++ | +++ | 0 | 0 | 0 | + | | | |

© 2009 American Association of Neuropathologists, Inc.  725

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

neuropathologic alterations in the brain and frontal lobectomy specimens of 5 young men, ranging in age from 23 to 28 years. The 5 cases included 2 boxers, a soccer player, a person described as "mentally subnormal" with a long history of head banging, and a patient with epilepsy who frequently hit his head during seizures. Microscopically, all the brains showed argyrophilic tau-positive neocortical NFTs, strikingly arranged in groups around small intracortical blood vessels, associated with neuropil threads and granular tau-positive neurons. There were also NFTs along the basal surfaces of the brain, usually at the depths of sulci. The hippocampi of the 4 autopsy cases were normal.

In CTE, tau-immunoreactive protoplasmic astrocytes are interspersed throughout the superficial cortical layers appearing as plaquelike accumulations composed of primarily globular neurites. The corpus callosum and subcortical white matter of the cortex show NNs and fibrillar astrocytic tangles. The U-fibers are prominently involved. Subcortical white matter structures such as the extreme and external capsule, anterior and posterior commissures, thalamic fasciculus, and fornix also show NNs and astrocytic tangles.

Dense NFTs, ghost tangles, and astrocytic tangles are found in the olfactory bulbs, hippocampus, entorhinal cortex, and amygdala, often in greater density than is found in AD. Abundant NFTs and astrocytic tangles are also found in the thalamus, hypothalamus, mammillary bodies, nucleus basalis of Meynert, medial geniculate, substantia nigra (pars compacta more than the pars reticulata), locus caeruleus, superior colliculus, periaqueductal gray, medial lemniscus, oculomotor nucleus, trochlear nucleus, ventral tegmental area, dorsal and median raphe, trigeminal motor nucleus, pontine nuclei, hypoglossal nucleus, dorsal motor nucleus of the vagus, inferior olives, and reticular formation. The nucleus accumbens is usually moderately affected; the globus pallidus, caudate, and putamen are less involved. In the brainstem and spinal cord, midline white matter tracts show dense astrocytic tangles especially around small capillaries. Fibrillar astrocytic tangles are also common in the subpial and periventricular zones. Neurons in the spinal cord gray matter contain NFTs, and astrocytic tangles are frequent in the ventral gray matter. This unique pattern of tau-immunoreactive pathology was found in all 3 of our cases, with increasing severity from Case A to Case C.

## Case A

Neurofibrillary tangles immunopositive for tau epitopes (Appendix) were prominent in the inferior frontal, superior frontal, subcallosal, insular, temporal, and inferior parieto-temporal cortices (Fig. 1). Primary visual cortex showed no NFTs; anterior and posterior cingulate cortex showed only scant NFTs. Neurofibrillary tangles occurred in irregular patches, often greatest at the sulcal depths (Fig. 2). Tau-positive fibrillar astrocytes ("astrocytic tangles") were prominent in foci, especially in subpial regions and around small blood vessels (Figs. 2, 3). Neurofibrillary tangles were especially numerous in cortical laminae II and III, where a prominent perivascular distribution of neuronal NFTs and fibrillar astrocytic tangles was evident (Fig. 3). Although some neuronal NFTs showed multiple tau-positive perisomatic processes, most neuronal NFTs were morphologically similar to those found in AD. In the cortex, there were many tau-positive astrocytes bearing a corona of tau-positive processes. These tau-positive protoplasmic astrocytes were similar in appearance to the astrocytic plaques of corticobasal degeneration, except that the perikaryon was often tau positive (Fig. 3).

Neuropil neurites and astrocytic tangles were abundant in the frontal and temporal white matter (Fig. 3). Neuropil neurites were often dotlike and spindle-shaped, in addition to thread-like forms similar to those found in AD. The hippocampus, entorhinal, and transentorhinal cortex contained dense NFTs, ghost tangles, and NNs, including many ghost tangles in CA1 and subiculum; NFTs were denser in the anterior hippocampus compared with the posterior hippocampus. The amygdala showed dense tau immunoreactivity, including NFTs, astrocytic tangles, and NNs (Fig. 4). Neurofibrillary tangles were most frequent in the lateral nuclear group of the amygdala.

The nucleus basalis of Meynert, hypothalamic nuclei, septal nuclei, fornix, and lateral mammillary bodies showed dense NFTs and astrocytic tangles. Neurofibrillary tangles and astrocytic tangles were also found in the olfactory bulb, thalamus, caudate, and putamen. The globus pallidus and



**FIGURE 1.** Case A. Whole-mount 50-μm coronal sections immunostained for tau with monoclonal antibody AT8 and counterstained with cresyl violet showing irregular patchy deposition of phosphorylated tau protein in frontal, subcallosal, insular, temporal, and parietal cortices and the medial temporal lobe.

© 2009 American Association of Neuropathologists, Inc.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

J Neuropathol Exp Neurol • Volume 68, Number 7, July 2009      *Chronic Traumatic Encephalopathy in Athletes*



**FIGURE 2. (A–C)** Whole-mount 50-μm coronal sections of superior frontal cortex from Case A **(A)**, Case B **(B)**, and Case C **(C)** immunostained for tau with monoclonal antibody CP-13 showing extensive immunoreactivity that is greatest at sulcal depths (asterisks) and is associated with contraction of the cortical ribbon. **(D–F)** Microscopically, there are dense tau-immunoreactive neurofibrillary tangles (NFTs) and neuropil neurites throughout the cortex, Case A **(D)**, Case B **(E)**, and Case C **(F)**. There are focal nests of NFTs and astrocytic tangles around small blood vessels **(E,** arrow) and plaquelike clusters of tau-immunoreactive astrocytic processes distributed throughout the cortical layers **(F,** arrows).

subthalamic nucleus were relatively spared. The lateral substantia nigra pars compacta showed mild neuronal loss, extraneuronal pigment deposition, and moderate numbers of NFTs and NNs. The pars reticulata was unremarkable. The cerebellar peduncle showed mild perivascular hemosiderin deposition. Neurofibrillary tangles were numerous in the dorsal and median raphe nuclei. The internal, external, and extreme capsules, fornix, and mammillothalamic tract showed moderate NNs, although in general, the white matter was less affected than adjacent gray matter.

## Case B

There were abundant tau-positive NFTs, glial tangles, and dotlike and spindle-shaped NNs in the superficial layers of cerebral cortex (I–III) (Fig. 3). Cortical tau pathology was most prominent in patchy areas of the superior frontal and temporal lobes, especially the medial temporal lobe, often in a vasocentric pattern. The olfactory bulb, hippocampus, entorhinal cortex, and amygdala showed extremely dense NFTs with many ghost tangles (Figs. 4–6). Tau-positive glia and NNs were also found in the subcortical white matter and corpus callosum. The olfactory bulb, thalamus, hypothalamus, nucleus basalis, striatum, globus pallidus, substantia nigra, raphe, periventricular gray, locus caeruleus, oculomotor nucleus, red nucleus, pontine base, tegmentum, reticular nuclei, inferior olives, and dentate nucleus showed dense NFTs and glial tangles. Spindle-shaped NNs and tau-positive glia were pronounced in the midline white matter tracts of the brainstem.

## Case C

Microscopic examination showed dense accumulations of tau-immunoreactive NFTs, astrocytic tangles, and NNs in irregular patches of the dorsolateral frontal, insular, sub-callosal, inferior frontal, superior parietal, and posterior temporo-occipital cortices, and most severely in the medial temporal lobe. The hippocampus, entorhinal cortex, and amygdala contained extremely dense NFTs with ghost tangles and severe neuronal loss (Figs. 4, 6). Tau-positive glia and NNs were also found in the subcortical white matter, particularly in the subcortical U fibers. The olfactory bulb, thalamus, hypothalamus, nucleus basalis, striatum, globus pallidus, substantia nigra, raphe, periventricular gray, locus caeruleus, oculomotor nucleus, red nucleus, pontine base, pontine tegmentum, hypoglossal nuclei, reticular nuclei, inferior olives, midline tracts of the medulla, and dentate nucleus contained dense NFTs and astrocytic tangles (Figs. 5, 7). Subcortical white matter tracts including the anterior and posterior commissure, thalamic fasciculus, and external and extreme capsule also showed astrocytic tangles and NNs.

The abnormal tau proteins that are found in the glial and neuronal tangles in CTE are indistinguishable from NFTs in AD and are composed of all 6 brain tau isoforms (39). Neuropathologically, CTE resembles several other neurodegenerative diseases characterized by accumulations of hyperphosphorylated tau protein in neurons or glial cells, including ALS/PDC of Guam, postencephalitic parkinsonism, PSP, corticobasal degeneration, and frontotemporal

© 2009 American Association of Neuropathologists, Inc.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.



**FIGURE 3.** Whole-mount 50-μm sections from Cases A and B immunostained with anti-tau monoclonal antibody AT8. **(A)** Case B. There is a prominent perivascular collection of neurofibrillary tangles (NFTs) and astrocytic tangles evident in the superficial cortical layers with lesser involvement of the deep laminae. Prominent neuropil neurites (NNs) are found in the subcortical U-fibers (arrow). Original magnification: 150×. **(B)** Case A. There is a preferential distribution of NFTs in Layer II and NNs extending into the subcortical white matter even in mildly affected cortex. Original magnification: 150×. **(C)** Case A. Focal subpial collections of astrocytic tangles and NFTs are characteristic of chronic traumatic encephalopathy (CTE). Original magnification: 150×. **(D)** Case A. The shape of most NFTs and NNs in CTE is similar to those found in Alzheimer disease. Original magnification: 150×. Some NFTs have multiple perisomatic processes **(E)**, and spindle-shaped and dotlike neurites are found in addition to threadlike forms. **(E)** Case A. Original magnification: 350×. **(F)** Case A. Astrocytic tangles are interspersed with NFTs in the cortex (arrows). Original magnification: 350×. **(G)** Case A. Tau-immunoreactive astrocytes are common in periventricular regions. Original magnification: 150×. **(H, I)** Case A. Tau-immunoreactive astrocytes take various forms; some appear to be protoplasmic astrocytes with short rounded processes **(H)** double immunostained section with AT8 (brown) and anti-glial fibrillary acidic protein (red). **(H)** Original magnification: 350×. **(I)** Original magnification: 945×. **(J)** Case B. Dotlike or spindle-shaped neurites predominate in the white matter, although there are also some threadlike forms. Original magnification: 150×.

dementia with parkinsonism linked to chromosome 17 (FTDP-17) (36, 48–50). Similar to ALS/PDC of Guam, neurofibrillary tau pathology in CTE is found in the medial temporal lobe structures, cerebral cortex, and spinal cord, with only a subset of cases showing evidence of diffuse plaques (51). Similar to ALS/PDC and PSP, CTE preferentially involves the superficial cortical layers and involves the accumulation of tau-immunoreactive astrocytes (36). However, CTE differs from ALS/PDC of Guam and PSP in that the cortical involvement is irregular and patchy, greatest at sulcal depths, and distributed in a prominent perivascular, periventricular, and subpial pattern. Furthermore, there is a unique regional involvement of subcortical and brainstem structures in CTE (Tables 5, 6).

## β-Amyloid Deposition

β-Amyloid (Aβ) deposition is an inconstant feature in CTE. Fourteen of the 15 brains originally described by Corsellis et al (29) and 6 additional boxers were reexamined by Roberts and colleagues (18) using Aβ immunocytochemistry with formic acid pretreatment; 19 of the 20 cases showed widespread diffuse Aβ deposits. Similarly, Tokuda and colleagues (52) found abundant diffuse Aβ deposits in 8 cases of CTE and cerebrovascular Aβ deposits in 3 cases. In

728  \qquad  © 2009 American Association of Neuropathologists, Inc.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

*J Neuropathol Exp Neurol* • Volume 68, Number 7, July 2009 *Chronic Traumatic Encephalopathy in Athletes*



**FIGURE 4. (A–C)** Whole-mount 50-μm-thick coronal sections immunostained for tau (AT8) from Case A **(A)**, Case B **(B)**, and Case C **(C)** counterstained with cresyl violet showing extremely dense deposition of tau protein in the amygdala with increasing severity from left to right. **(D–F)** Microscopically, there is a moderate density of neurofibrillary tangles and astrocytic tangles in Case A **(D)**, the density is increased in Case B **(E)**, and extremely marked in Case C **(F)**. Original magnification: 350×.

our series, only Case B showed moderate numbers of diffuse Aβ plaques in the frontal, parietal, and temporal cortices, and sparse neuritic plaques; there was no vascular amyloid. Of the 51 neuropathologically verified cases of CTE, diffuse plaques were found in 24 (47%), neuritic plaques in 13 (27%), and amyloid angiopathy in 3 (6%). There was also 1 report of a fatal cerebral hemorrhage from amyloid angiopathy associated with CTE (15).

## White Matter Changes and Other Abnormalities

Tau-positive fibrillar astrocytic tangles are found in the white matter, but the major abnormality is that of dotlike or spindle-shaped tau-positive neurites. The shape of the tau-immunoreactive neurites is distinct from the predominantly threadlike forms found in AD and suggests an axonal origin. Tokuda and colleagues (52) characterized the NNs in CTE as shorter and less prominent than the neuropil threads found in AD and not spatially related to senile plaques. Generally, tau abnormalities in the white matter are not as severe as in adjacent gray matter. Other abnormalities frequently found in the cerebral and cerebellar white matter include small arterioles with thickened fibrohyalinized walls with perivascular hemosiderin-laden macrophages, widened perivascular spaces, and white matter rarefaction. In our Cases A to C,



**FIGURE 5.** Whole-mount 50-μm coronal sections of Case B **(A)** and Case C **(B)** immunostained for tau (AT8) and counterstained with cresyl violet. There is extremely dense deposition of tau protein in the hippocampus and medial temporal lobe structures. There is also prominent tau deposition in the medial thalamus.

© *2009 American Association of Neuropathologists, Inc.*

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

*McKee et al*          *J Neuropathol Exp Neurol • Volume 68, Number 7, July 2009*



**FIGURE 6.** Tau-immunoreactive (AT8) neurofibrillary tangles (NFT), astrocytic tangles, and neuropil neurites are found in many subcortical nuclei including the substantia nigra (**[A]** Case C. Original magnification: 350×) and nucleus basalis of Meynert (**[B]** Case C. Original magnification: 350×). The NFTs are also abundant in the olfactory bulb (**[C]** Case B. Bielschowsky silver method. Original magnification: 150×) and thalamus (Case A. Original magnification: 350×. The AT8 immunostain counterstained with cresyl violet).

mild to moderate myelin and axonal losses were found in the corpus callosum and subcortical white matter of the frontal and temporal lobes and cerebellum, with mild perivascular hemosiderin deposition.

### α-Synuclein Staining

Extensive accumulation of α-synuclein has been found in axons after acute TBI (53), but α-synuclein immunostaining was not a feature of any of the 51 cases of CTE, including our 3 cases.

### CLINICOPATHOLOGIC CONSIDERATIONS

The distribution of the tau abnormalities in CTE suggests distinctive core pathology within the amygdalo-hippocampal-septo-hypothalamic-mesencephalic continuum,

that is, the Papez circuit (54, 55). The early involvement of these anatomical regions, sometimes referred to as *emotional* or *visceral* brain, may underlie many of the early behavioral symptoms, including the tendency toward emotional lability, aggression, and violent outbursts. The early involvement of the hippocampus, entorhinal cortex, and medial thalamus may explain episodic memory disturbance as a frequent presenting symptom (56). Neurofibrillary degeneration of the frontal cortex and underlying white matter most likely contributes to the dysexecutive symptoms. Although less common and generally less severe, neurofibrillary degeneration in the dorsolateral parietal, posterior temporal, and occipital cortices likely accounts for the visuospatial difficulties. The parkinsonian features found in 41.1% of cases are likely caused by degeneration of the substantia nigra pars compacta. The gait



**FIGURE 7.** Whole-mount tau (AT8)-immunostained 50-μm coronal sections of the brainstem from Case C showing severe involvement of the locus caeruleus, pontine tegmentum, pontine base, midline medulla, and hypoglossal nuclei.

730

© *2009 American Association of Neuropathologists, Inc.*

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

disorder, variously described as staggered, slowed, shuffled, or frankly ataxic, may result from a combination of cortical and subcortical frontal damage, degeneration of cerebellar tracts in the brainstem, direct cerebellar injury, as well as parkinsonism from substantia nigra pathology. Similarly, speech abnormalities, most often described as slowed and slurred, likely reflect multiregional degeneration. Symptoms of dysarthria, dysphagia, and ocular abnormalities probably result from degeneration of brainstem nuclei, for example, the hypoglossal and oculomotor nuclei.

## POSSIBLE MECHANISMS OF CEREBRAL INJURY

Acceleration and deceleration forces are thought to be important events in concussion, particularly rotational acceleration and deceleration (57–59). Sagittal (front-to-back) injuries result in relatively good recovery, whereas lateral (side-to-side) injuries produce the most injury, with injury directed related to the severity of the generating force (58). Conceivably, a concussive impact imparts a fluid wave in the lateral ventricles that produces a shearing force on the septum pellucidum; this may explain the development of an enlarged cavum septum pellucidum and, if severe or repeated, fenestrations.

The patchy irregular location of the cortical NFTs and astrocytic tangles suggests that the distribution is related to direct mechanical injury from blows to the side or top of the head, given their multifocal dorsolateral frontal and parietal, inferior frontal and occipital, and lateral temporal distribution. The possibility that ischemia may contribute to the development of the tau pathology is suggested by the concentration of tau-immunoreactive pathology at the depths of sulci. Damage to the blood-brain barrier and release of local neurotoxins might explain some of the tendency toward perivascular nests of tau-immunoreactive NFT, tau-positive glia, and NNs (13). Buee et al (60) studied the microvasculature of several cases of dementia pugilistica and found decreased microvascular density and tortuosity, with a strong correlation between the laminar distribution of NFTs and pathological microvasculature. Buee and colleagues (60) suggested that the shear forces of repetitive head trauma might lead to vascular damage followed by perivascular NFT and NN formation. Further supporting a possible vascular connection to the pathological changes in CTE, Bouras et al (61) reported that, upon laser microprobe mass analysis, NFTs and nuclei of NFT-free neurons in CTE contained substantially higher amounts of iron and aluminum than NFTs in AD.

### Acute TBI

#### Axonal Injury

Acute concussion produces diffuse axonal injury (62). The "diffuse degeneration of the cerebral white matter" was first described by Strich (63) as the shearing or mechanical tearing of axons at the time of injury. It is now appreciated that axons are not sheared at the time of injury, except in the most severe instances of diffuse axonal injury, but instead undergo a series of changes that may result in a secondary axotomy within 24 hours (64). The axolemma is one of the initial sites of injury; the increased permeability, uncontrolled

influx of Ca++, swelling of mitochondria, disruption of microtubules, and alterations in axonal transport that follow produce axonal swelling and secondary axotomy (64–66). Rapid axonal swelling, perisomatic axotomy, and Wallerian degeneration may also occur without changes in axolemmal permeability, suggesting that trauma may have diverse effects on axons. McKenzie et al (67) showed that 80% of patients who died of acute head injury showed immunocytochemical evidence of axonal injury within 2 hours of injury; after 3 hours of injury, axonal bulbs were identified, and as the survival time increased, the amount of axonal damage and axonal bulb formation increased. Axonal injury was found most frequently in the brainstem, followed by the internal capsule, thalamus, corpus callosum, and parasagittal white matter (67). Axonal damage may continue for weeks after the acute TBI (68).

### Deposition of Abnormal Proteins

In individuals undergoing surgical brain tissue resection for acute TBI, tau-immunoreactive dystrophic axons were found in the white matter, and diffuse tau immunoreactivity was found in some neuronal cell bodies, dendrites, and glial cells within 2 to 3 hours postinjury (67). Studies of acute TBI in experimental animal models and postmortem human brain also demonstrate that Aβ deposition and amyloid precursor protein processing, production, and accumulation are increased after injury (69–78). Increased amyloid precursor protein production in experimental TBI has also been associated with heightened neuronal loss in the hippocampus (73, 79). In acute TBI, diffuse cortical Aβ plaques have been found in 30% to 38% of cases as early as 2 hours after injury (73, 76, 80). In addition, individuals with cortical Aβ plaques showed increased levels of soluble Aβ$_{42}$, and half were apolipoprotein E (ApoE) ε4 allele carriers (81). In acute TBI, Aβ deposition is widely distributed throughout the neocortex without apparent association with the injury sites (82). The predominant form of Aβ in acute TBI is Aβ$_{42}$, whereas the Aβ$_{40}$ form predominates in serum and cerebrospinal fluid, a situation similar to that in AD (83). A recent report also showed that interstitial soluble Aβ concentrations in the brain seem to directly correlate with neurological outcome after TBI (84).

## NEURONAL DEATH IN ACUTE TBI AND RELATIONSHIP TO CTE

There are multiple reasons for neuronal loss in acute traumatic injury including neuronal death from direct physical damage, necrosis from the immediate release of excitatory transmitters such as glutamate, and diffuse delayed cell death involving both necrotic and apoptotic death cascades (85, 86). Other contributing factors include focal ischemia, breakdown of the blood-brain barrier, inflammation, and the release of cytokines. Experimental lateral percussive injury in the rat produces apoptotic and necrotic neuronal death that progresses for up to 1 year after injury, with degeneration of the cortex, hippocampi, thalami, and septum, ventriculomegaly, and impaired memory performance (62, 85, 87–89). The thalamic degeneration typically follows the cortical degeneration by weeks, suggesting that a secondary process

© 2009 American Association of Neuropathologists, Inc.

731

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

such as deafferentation may play a role in the thalamic neuronal death. Neuronal loss in the hippocampus and thalamus has also been reported after blunt head injury in humans using stereological techniques (90, 91). One of the key features of CTE is that the disease continues to progress decades after the activity that produced traumatic injury has stopped. It is most likely that multiple pathological cascades continue to exert their effects throughout the individual's lifetime once they are triggered by repetitive trauma; the longer the survival after the initial events and the more severe the original injuries, the greater the severity of the neurodegeneration. It is clear that neuronal loss, cerebral atrophy, and ventricular enlargement all increase with longer survival and greater exposure to repetitive trauma.

## DIAGNOSIS OF CTE

Presently, there are no available biomarkers for the diagnosis of CTE. Although significant decreases in cerebrospinal fluid ApoE and Aβ concentrations have been reported that correlated with severity of the injury after TBI, there have been no similar studies in CTE (92). Nonetheless, advances in neuroimaging offer the promise of detecting subtle changes in axonal integrity in acute TBI and CTE. Standard T1- or T2-weighted structural MRI is helpful for quantitating pathology in acute TBI, but diffusion tensor MRI (DTI) is a more sensitive method to assess axonal integrity in vivo (93, 94). In chronic moderate-to-severe TBI, abnormalities on DTI have been reported in the absence of observable lesions on standard structural MRI (83). More severe white matter abnormalities on DTI have been associated with greater cognitive deficits by neuropsychological testing (94, 95), and increases in whole-brain apparent diffusion coefficient and decreases in fractional anisotropy using DTI have been found in boxers compared with controls (96, 97).

## GENETIC RISK AND THE ROLE OF APOE4

Apolipoprotein E genotyping has been reported in 10 cases of CTE, including our most recent cases. Five (50%) of the 10 cases of CTE carried at least 1 ApoE ε4 allele, and 1 was homozygous for ApoE ε4 (our Case A). The percentage of ApoE ε4 carriers in the general population is 15%; this suggests that the inheritance of an ApoE ε4 allele might be a risk factor for the development of CTE.

In acute TBI, there is accumulating evidence that the deleterious effects of head trauma are more severe in ApoE ε4–positive individuals (98–100). Acute TBI induces Aβ deposition in 30% of people (75, 76), and a significant proportion of these individuals are heterozygous for ApoE ε4 (101, 102). Apolipoprotein E4 transgenic mice experience greater mortality from TBI than ApoE ε3 mice (102). Furthermore, transgenic mice that express ApoE ε4 and overexpress amyloid precursor protein show greater Aβ deposition after experimental TBI (103).

## GUIDELINES FOR PREVENTION AND TREATMENT

Clearly, the easiest way to decrease the incidence of CTE is to decrease the number of concussions or mild TBIs.

In athletes, this is accomplished by limiting exposure to trauma, for example, by penalizing intentional hits to the head (as is happening in football and hockey) and adhering to strict "return to play" guidelines. Proper care and management of mild TBI in general and particularly in sports will also reduce CTE. No reliable or specific measures of neurological dysfunction after concussion currently exist, and most recommendations are centered on the resolution of acute symptoms such as headache, confusion, sensitivity to light, and so on (104). Asymptomatic individuals have been shown, however, to have persistent decreases in P300 amplitudes in response to an auditory stimulus at least 5 weeks after a concussion, thereby casting doubt on the validity of the absence of symptoms as a guidepost (105, 106). Neuropsychological tests have also helped provide estimates of the appropriate time for athletes to return to practice and play. Studies using event-related potentials, transcranial magnetic stimulation, balance testing, multitask effects on gait stability, positron emission tomography, and DTI MRI have all shown abnormalities in concussed athletes or nonathletes with TBI lasting for 2 to 4 weeks (105, 107–109). These studies indicate that safe return to play guidelines might require at least 4 to 6 weeks to facilitate more complete recovery and to protect from reinjury, as a second concussion occurs much more frequently in the immediate period after a concussion (106, 110). In addition, experimental evidence in animals suggests that there is expansion of brain injury and inhibition of functional recovery if the animal is subjected to overactivity within the first week (111).

## CONCLUSIONS

Chronic traumatic encephalopathy is a progressive neurodegeneration clinically associated with memory disturbances, behavioral and personality changes, parkinsonism, and speech and gait abnormalities. Pathologically, CTE is characterized by cerebral and medial temporal lobe atrophy, ventriculomegaly, enlarged cavum septum pellucidum, and extensive tau-immunoreactive pathology throughout the neocortex, medial temporal lobe, diencephalon, brainstem, and spinal cord. There is overwhelming evidence that the condition is the result of repeated sublethal brain trauma that often occurs well before the development of clinical manifestations. Repetitive closed head injury occurs in a wide variety of contact sports as well as a result of accidents or in the setting of military service. Pathologically, CTE shares some features of AD, notably tau-immunoreactive NFTs, NNs, and in approximately 40% of cases, diffuse senile plaques. Furthermore, the Aβ and NFTs found in CTE are immunocytochemically identical to those found in AD, suggesting a possible common pathogenesis. Multiple epidemiological studies have shown that head injury is a risk factor for AD, and there have been several case reports citing an association between a single head injury and the development of subsequent AD (112, 113). Just as acquired vascular injury may interact additively or synergistically with AD, traumatic injury may interact additively with AD to produce a mixed pathology with greater clinical impact or synergistically by promoting pathological cascades that result in either AD or CTE. In athletes, by instituting and following proper

732

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

*J Neuropathol Exp Neurol* • Volume 68, Number 7, July 2009

*Chronic Traumatic Encephalopathy in Athletes*

guidelines for return to play after a concussion or mild TBI, it is possible that the frequency of sports-related CTE could be dramatically reduced or, perhaps, entirely prevented.

## ACKNOWLEDGMENTS

*The authors thank Rafael Romero, MD, for his review of the clinical features of Case C.*

## REFERENCES

1. Thurman DJ, Branche CM, Sniezek JE. The epidemiology of sports-related traumatic brain injuries in the United States: Recent developments. J Head Trauma Rehabil 1998;13:1–8
2. Langlois JA, Rutland-Brown W, Wald MM. The epidemiology and impact of traumatic brain injury: A brief overview. J Head Trauma Rehabil 2006;21:375–78
3. Nowinski C. *Head Games: Football's Concussion Crisis From the NFL to Youth Leagues.* East Bridgewater, MA: Drummond Publishing Group; 2006
4. Roberts GW, Allsop D, Bruton C. The occult aftermath of boxing. J Neurol Neurosurg Psychiatry 1990;53:373–78
5. Webbe FM, Barth JT. Short-term and long-term outcome of athletic closed head injuries. Clin Sports Med 2003;22:577–92
6. Macciocchi SN, Barth JT, Alves W, et al. Neuropsychological functioning and recovery after mild head injury in collegiate athletes. Neurosurgery 1996;39:510–14
7. Collins MW, Lovell MR, Iverson GL, et al. Cumulative effects of concussion in high school athletes. Neurosurgery 2002;51:1175–79; [discussion 80–81]
8. Gaetz M, Goodman D, Weinberg H. Electrophysiological evidence for the cumulative effects of concussion. Brain Inj 2000;14:1077–88
9. Gaetz M, Weinberg H. Electrophysiological indices of persistent post-concussion symptoms. Brain Inj 2000;14:815–32
10. Bailes JE, Cantu RC. Head injury in athletes. Neurosurgery 2001;48: 26–45
11. Beckwith JG, Chu JJ, Greenwald RM. Validation of a noninvasive system for measuring head acceleration for use during boxing competition. J Appl Biomech 2007;23:238–44
12. Greenwald RM, Gwin JT, Chu JJ, et al. Head impact severity measures for evaluating mild traumatic brain injury risk exposure. Neurosurgery 2008;62:789–98
13. Geddes JF, Vowles GH, Nicoll JA, et al. Neuronal cytoskeletal changes are an early consequence of repetitive head injury. Acta Neuropathol 1999;98:171–78
14. Hof PR, Knabe R, Bovier P, et al. Neuropathological observations in a case of autism presenting with self-injury behavior. Acta Neuropathol 1991;82:321–26
15. Jordan BD, Kanik AB, Horwich MS, et al. Apolipoprotein E epsilon 4 and fatal cerebral amyloid angiopathy associated with dementia pugilistica. Ann Neurol 1995;38:698–99
16. Omalu BI, DeKosky ST, Hamilton RL, et al. Chronic traumatic encephalopathy in a national football league player: Part II. Neurosurgery 2006;59:1086–92
17. Omalu BI, DeKosky ST, Minster RL, et al. Chronic traumatic encephalopathy in a National Football League player. Neurosurgery 2005;57: 128–34
18. Roberts GW, Whitwell HL, Acland PR, et al. Dementia in a punch-drunk wife. Lancet 1990;335:918–19
19. Williams DJ, Tannenberg AE. Dementia pugilistica in an alcoholic achondroplastic dwarf. Pathology 1996;28:102–4
20. Cajigal S. Brain damage may have contributed to former wrestler's violent demise. Neurology Today 2007;7:1, 16
21. Schwarz A. Expert ties ex-player's suicide to brain damage [*New York Times* Web site]. January 18, 2007. Available at: http://www.nytimes.com/2007/01/18/sports/football/18waters.html. Accessed January 26, 2008.
22. Aotsuka A, Kojima S, Furumoto H, et al. [Punch drunk syndrome due to repeated karate kicks and punches]. Rinsho Shinkeigaku 1990;30: 1243–46
23. Matser JT, Kessels AG, Jordan BD, et al. Chronic traumatic brain injury in professional soccer players. Neurology 1998;51:791–6
24. McCrory P, Turner M, Murray J. A punch drunk jockey? Br J Sports Med 2004;38:e3
25. Tysvaer AT, Storli OV, Bachen NI. Soccer injuries to the brain. A neurologic and electroencephalographic study of former players. Acta Neurol Scand 1989;80:151–56
26. Martland HS. Punch drunk. JAMA 1928;91:1103–7
27. Millspaugh JA. Dementia pugilistica. US Naval Med Bull 1937;35: 297–303
28. Courville CB. Punch drunk. Its pathogenesis and pathology on the basis of a verified case. Bull Los Angel Neuro Soc 1962;27:160–68
29. Corsellis JA, Bruton CJ, Freeman-Browne D. The aftermath of boxing. Psychol Med 1973;3:270–303
30. Brandenburg W, Hallervorden J. [Dementia pugilistica with anatomical findings.]. Virchows Arch 1954;325:680–709
31. Grahmann H, Ule G. [Diagnosis of chronic cerebral symptoms in boxers (dementia pugilistica & traumatic encephalopathy of boxers)]. Psychiatr Neurol (Basel) 1957;134:261–83
32. Neubuerger KT, Sinton DW, Denst J. Cerebral atrophy associated with boxing. AMA Arch Neurol Psychiatry 1959;81:403–8
33. Mawdsley C, Ferguson FR. Neurological disease in boxers. Lancet 1963;2:799–801
34. Constantinidis J, Tissot R. [Generalized Alzheimer's neurofibrillary lesions without senile plaques (Presentation of one anatomo-clinical case)]. Schweiz Arch Neurol Neurochir Psychiatr 1967;100:117–30
35. Payne EE. Brains of boxers. Neurochirurgia (Stuttg) 1968;11:173–88
36. Hof PR, Delacourte A, Bouras C. Distribution of cortical neurofibrillary tangles in progressive supranuclear palsy: A quantitative analysis of six cases. Acta Neuropathol 1992;84:45–51
37. Geddes JF, Vowles GH, Robinson SF, et al. Neurofibrillary tangles, but not Alzheimer-type pathology, in a young boxer. Neuropathol Appl Neurobiol 1996;22:12–16
38. Newell KL, Drachman DA. Case records of the Massachusetts General Hospital. Weekly clinicopathological exercises. Case 12-1999. A 67-year-old man with three years of dementia. N Engl J Med 1999; 340:1269–77
39. Schmidt ML, Zhukareva V, Newell KL, et al. Tau isoform profile and phosphorylation state in dementia pugilistica recapitulate Alzheimer's disease. Acta Neuropathol 2001;101:518–24
40. Schwarz A. Lineman, dead at 36, exposes brain injuries [*New York Times* Web site]. June 15, 2007. Available at: http://www.nytimes.com/2007/06/15/sports/football/15brain.html. Accessed March 11, 2009
41. Areza-Fegyveres R, Rosemberg S, Castro RM, et al. Dementia pugilistica with clinical features of Alzheimer's disease. Arq Neuropsiquiatr 2007;65(3B):830–33
42. Critchley M. Medical aspects of boxing, particularly from a neurological standpoint. Br Med J 1957;1:357–62
43. McNair DM, Kahn RJ. Self-assessment of cognitive deficits. In: Crook T, Ferris S, Bartus R, eds. *Assessment in Geriatric Psychopharmacology.* New Canaan, CT: Mark Powley, 1984
44. Spitznagel MB, Tremont G. Cognitive reserve and anosognosia in questionable and mild dementia. Arch Clin Neuropsychol 2005;20:505–15
45. Galvin JE, Roe CM, Powlishta KK, et al. The AD8: A brief informant interview to detect dementia. Neurology 2005;65:559–64
46. Pfeffer RI, Kurosaki TT, Harrah CH Jr, et al. Measurement of functional activities in older adults in the community. J Gerontol 1982;37: 323–29
47. Hof PR, Bouras C, Buee L, et al. Differential distribution of neurofibrillary tangles in the cerebral cortex of dementia pugilistica and Alzheimer's disease cases. Acta Neuropathol 1992;85:23–30
48. Feany MB, Mattiace LA, Dickson DW. Neuropathologic overlap of progressive supranuclear palsy, Pick's disease and corticobasal degeneration. J Neuropathol Exp Neurol 1996;55:53–67
49. Litvan I, Hauw JJ, Bartko JJ, et al. Validity and reliability of the preliminary NINDS neuropathologic criteria for progressive supranuclear palsy and related disorders. J Neuropathol Exp Neurol 1996;55:97–105
50. Perl DP, Hof PR, Purohit DP, et al. Hippocampal and entorhinal cortex neurofibrillary tangle formation in Guamanian Chamorros free of overt neurologic dysfunction. J Neuropathol Exp Neurol 2003;62:381–88
51. Hirano A. Amyotrophic lateral sclerosis and parkinsonism-dementia complex on Guam: Immunohistochemical studies. Keio J Med 1992; 41:6–9
52. Tokuda T, Ikeda S, Yanagisawa N, et al. Re-examination of ex-boxers' brains using immunohistochemistry with antibodies to amyloid beta-protein and tau protein. Acta Neuropathol 1991;82:280–85
53. Uryu K, Chen XH, Martinez D, et al. Multiple proteins implicated in

© 2009 American Association of Neuropathologists, Inc.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

Case 1:25-cv-02712-DLB Document 20-2 6 Page 148 Filed Date Filed: 08/30/25

neurodegenerative diseases accumulate in axons after brain trauma in humans. Exp Neurol 2007;208:185–92

54. Eggers AE. Redrawing Papez' circuit: A theory about how acute stress becomes chronic and causes disease. Med Hypotheses 2007;69:852–57

55. Papez JW. A proposed mechanism of emotion. 1937. J Neuropsychiatry Clin Neurosci 1995;7:103–12

56. Bird CM, Burgess N. The hippocampus and memory: Insights from spatial processing. Nat Rev Neurosci 2008;9:182–94

57. Gaetz M. The neurophysiology of brain injury. Clin Neurophysiol 2004;115:4–18

58. Holbourn AHS. Mechanics of head injury. Lancet 1943;2:438–41

59. Ommaya AK, Gennarelli TA. Cerebral concussion and traumatic unconsciousness. Correlation of experimental and clinical observations of blunt head injuries. Brain 1974;97:633–54

60. Buee L, Hof PR, Bouras C, et al. Pathological alterations of the cerebral microvasculature in Alzheimer's disease and related dementing disorders. Acta Neuropathol 1994;87:469–80

61. Bouras C, Giannakopoulos P, Good PF, et al. A laser microprobe mass analysis of brain aluminum and iron in dementia pugilistica: Comparison with Alzheimer's disease. Eur Neurol 1997;38:53–58

62. Graham DI, McIntosh TK, Maxwell WL, et al. Recent advances in neurotrauma. J Neuropathol Exp Neurol 2000;59:641–51

63. Strich SJ. Diffuse degeneration of the cerebral white matter in severe dementia following head injury. J Neurol Neurosurg Psychiatry 1956; 19:163–85

64. Maxwell WL, McCreath BJ, Graham DI, et al. Cytochemical evidence for redistribution of membrane pump calcium-ATPase and ecto-Ca-AT-Pase activity, and calcium influx in myelinated nerve fibres of the optic nerve after stretch injury. J Neurocytol 1995;24:925–42

65. Giza CC, Hovda DA. The neurometabolic cascade of concussion. J Athl Train 2001;36:228–35

66. Hovda DA, Lee SM, Smith ML, et al. The neurochemical and metabolic cascade following brain injury: Moving from animal models to man. J Neurotrauma 1995;12:903–6

67. McKenzie KJ, McLellan DR, Gentleman SM, et al. Is beta-APP a marker of axonal damage in short-surviving head injury? Acta Neuropathol 1996;92:608–13

68. Blumbergs PC, Scott G, Manavis J, et al. Staining of amyloid precursor protein to study axonal damage in mild head injury. Lancet 1994;344: 1055–56

69. Gentleman SM, Nash MJ, Sweeting CJ, et al. Beta-amyloid precursor protein (beta APP) as a marker for axonal injury after head injury. Neurosci Lett 1993;160:139–44

70. Graham DI, Gentleman SM, Lynch A, et al. Distribution of beta-amyloid protein in the brain following severe head injury. Neuropathol Appl Neurobiol 1995;21:27–34

71. Masumura M, Hata R, Uramoto H, et al. Altered expression of amyloid precursors proteins after traumatic brain injury in rats: In situ hybridization and immunohistochemical study. J Neurotrauma 2000;17:123–34

72. McKenzie JE, Gentleman SM, Roberts GW, et al. Increased numbers of beta APP-immunoreactive neurones in the entorhinal cortex after head injury. Neuroreport 1994;6:161–64

73. Murakami N, Yamaki T, Iwamoto Y, et al. Experimental brain injury induces expression of amyloid precursor protein, which may be related to neuronal loss in the hippocampus. J Neurotrauma 1998;15:993–1003

74. Pierce JE, Trojanowski JQ, Graham DI, et al. Immunohistochemical characterization of alterations in the distribution of amyloid precursor proteins and beta-amyloid peptide after experimental brain injury in the rat. J Neurosci 1996;16:1083–90

75. Roberts GW, Gentleman SM, Lynch A, et al. βA4 amyloid protein deposition in brain after head trauma. Lancet 1991;338:1422–23

76. Roberts GW, Gentleman SM, Lynch A, et al. Beta amyloid protein deposition in the brain after severe head injury: Implications for the pathogenesis of Alzheimer's disease. J Neurol Neurosurg Psychiatry 1994;57:419–25

77. Smith DH, Chen XH, Nonaka M, et al. Accumulation of amyloid beta and tau and the formation of neurofilament inclusions following diffuse brain injury in the pig. J Neuropathol Exp Neurol 1999;58:982–92

78. Uryu K, Laurer H, McIntosh T, et al. Repetitive mild brain trauma accelerates Abeta deposition, lipid peroxidation, and cognitive impairment in a transgenic mouse model of Alzheimer amyloidosis. J Neurosci 2002;22:446–54

79. Smith DH, Nakamura M, McIntosh TK, et al. Brain trauma induces massive amyloid plaque neuron death linked to a surge in beta-amyloid levels in mice overexpressing mutant amyloid precursor protein. Am J Pathol 1998;153:1005–10

80. Ikonomovic MD, Uryu K, Abrahamson EE, et al. Alzheimer's pathology in human temporal cortex surgically excised after severe brain injury. Exp Neurol 2004;190:192–203

81. DeKosky ST, Abrahamson EE, Ciallella JR, et al. Association of increased cortical soluble abeta42 levels with diffuse plaques after severe brain injury in humans. Arch Neurol 2007;64:541–44

82. Graham DI, Gentleman SM, Nicoll JA, et al. Altered beta-APP metabolism after head injury and its relationship to the aetiology of Alzheimer's disease. Acta Neurochir Suppl 1996;66:96–102

83. Gentleman SM, Greenberg BD, Savage MJ, et al. A beta 42 is the predominant form of amyloid beta-protein in the brains of short-term survivors of head injury. Neuroreport 1997;8:1519–22

84. Brody DL, Magnoni S, Schwetye KE, et al. Amyloid-beta dynamics correlate with neurological status in the injured human brain. Science 2008;321:1221–24

85. Geddes DM, LaPlaca MC, Cargill RS 2nd. Susceptibility of hippocampal neurons to mechanically induced injury. Exp Neurol 2003;184: 420–27

86. Colicos MA, Dixon CE, Dash PK. Delayed, selective neuronal death following experimental cortical impact injury in rats: Possible role in memory deficits. Brain Res 1996;739:111–19

87. Bramlett HM, Kraydieh S, Green EJ, et al. Temporal and regional patterns of axonal damage following traumatic brain injury: A beta-amyloid precursor protein immunocytochemical study in rats. J Neuropathol Exp Neurol 1997;56:1132–41

88. Dixon CE, Kochanek PM, Yan HQ, et al. One-year study of spatial memory performance, brain morphology, and cholinergic markers after moderate controlled cortical impact in rats. J Neurotrauma 1999;16: 109–22

89. Smith DH, Chen XH, Pierce JE, et al. Progressive atrophy and neuron death for one year following brain trauma in the rat. J Neurotrauma 1997;14:715–27

90. Maxwell WL, Domleo A, McColl G, et al. Post-acute alterations in the axonal cytoskeleton after traumatic axonal injury. J Neurotrauma 2003; 20:151–68

91. Maxwell WL, MacKinnon MA, Smith DH, et al. Thalamic nuclei after human blunt head injury. J Neuropathol Exp Neurol 2006;65: 478–88

92. Kay AD, Day SP, Kerr M, et al. Remodeling of cerebrospinal fluid lipoprotein particles after human traumatic brain injury. J Neurotrauma 2003;20:717–23

93. Hughes DG, Jackson A, Mason DL, et al. Abnormalities on magnetic resonance imaging seen acutely following mild traumatic brain injury: Correlation with neuropsychological tests and delayed recovery. Neuroradiology 2004;46:550–58

94. Kraus MF, Susmaras T, Caughlin BP, et al. White matter integrity and cognition in chronic traumatic brain injury: A diffusion tensor imaging study. Brain 2007;130:2508–19

95. Salmond CH, Menon DK, Chatfield DA, et al. Diffusion tensor imaging in chronic head injury survivors: Correlations with learning and memory indices. Neuroimage 2006;29:117–24

96. Chappell MH, Ulug AM, Zhang L, et al. Distribution of microstructural damage in the brains of professional boxers: A diffusion MRI study. J Magn Reson Imaging 2006;24:537–42

97. Zhang L, Ravdin LD, Relkin N, et al. Increased diffusion in the brain of professional boxers: A preclinical sign of traumatic brain injury? AJNR Am J Neuroradiol 2003;24:52–57

98. Ariza M, Pueyo R, Matarín Mdel M, et al. Influence of APOE polymorphism on cognitive and behavioural outcome in moderate and severe traumatic brain injury. J Neurol Neurosurg Psychiatry 2006;77: 1191–93

99. Chiang MF, Chang JG, Hu CJ. Association between apolipoprotein E genotype and outcome of traumatic brain injury. Acta Neurochir (Wien) 2003;145:649–53

100. Friedman G, Froom P, Sazbon L, et al. Apolipoprotein E-epsilon4 genotype predicts a poor outcome in survivors of traumatic brain injury. Neurology 1999;52:244–48

© 2009 American Association of Neuropathologists, Inc.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

*J Neuropathol Exp Neurol* • Volume 68, Number 7, July 2009

Chronic Traumatic Encephalopathy in Athletes

101. Nicoll JA, Roberts GW, Graham DI. Apolipoprotein E epsilon 4 allele is associated with deposition of amyloid beta-protein following head injury. Nat Med 1995;1:135–37

102. Nicoll JA, Roberts GW, Graham DI. Amyloid beta-protein, APOE genotype and head injury. Ann N Y Acad Sci 1996;777:271–5

103. Hartman RE, Laurer H, Longhi L, et al. Apolipoprotein E4 influences amyloid deposition but not cell loss after traumatic brain injury in a mouse model of Alzheimer's disease. J Neurosci 2002;22:10083–87

104. Cantu RC. Recurrent athletic head injury: Risks and when to retire. Clin Sports Med 2003;22:593–603

105. Gosselin N, Theriault M, Leclerc S, et al. Neurophysiological anomalies in symptomatic and asymptomatic concussed athletes. Neurosurgery 2006;58:1151–61; [discussion 1151–61]

106. Mayers L. Return-to-play criteria after athletic concussion: A need for revision. Arch Neurol 2008;65:1158–61

107. Arfanakis K, Haughton VM, Carew JD, et al. Diffusion tensor MR imaging in diffuse axonal injury. AJNR Am J Neuroradiol 2002;23:794–802

108. Bergsneider M, Hovda DA, Lee SM, et al. Dissociation of cerebral glucose metabolism and level of consciousness during the period of metabolic depression following human traumatic brain injury. J Neurotrauma 2000;17:389–401

109. De Beaumont L, Brisson B, Lassonde M, et al. Long-term electrophysiological changes in athletes with a history of multiple concussions. Brain Inj 2007;21:631–44

110. Guskiewicz KM, McCrea M, Marshall SW, et al. Cumulative effects associated with recurrent concussion in collegiate football players: The NCAA Concussion Study. JAMA 2003;290:2549–55

111. Kozlowski DA, James DC, Schallert T. Use-dependent exaggeration of neuronal injury after unilateral sensorimotor cortex lesions. J Neurosci 1996;16:4776–86

112. Corsellis JA, Brierley JB. Observations on the pathology of insidious dementia following head injury. J Ment Sci 1959;105:714–20

113. Rudelli R, Strom JO, Welch PT, et al. Posttraumatic premature Alzheimer's disease. Neuropathologic findings and pathogenetic considerations. Arch Neurol 1982;39:570–75

114. Klein RL, Lin WL, Dickson DW, et al. Rapid neurofibrillary tangle formation after localized gene transfer of mutated tau. Am J Pathol 2004;164:347–53

115. Weaver CL, Espinoza M, Kress Y, et al. Conformational change as one of the earliest alterations of tau in Alzheimer's disease. Neurobiol Aging 2000;21:719–27

116. Su JH, Cummings BJ, Cotman CW. Early phosphorylation of tau in Alzheimer's disease occurs at Ser-202 and is preferentially located within neurites. Neuroreport 1994;5:2358–62

117. Lewis J, McGowan E, Rockwood J, et al. Neurofibrillary tangles, amyotrophy and progressive motor disturbance in mice expressing mutant (P301L) tau protein. Nat Genet 2000;25:402–5

118. Lewis J, Dickson DW, Lin WL, et al. Enhanced neurofibrillary degeneration in transgenic mice expressing mutant tau and APP. Science 2001;293:1487–91

## APPENDIX

## Methods for Analysis of Cases A to C

The following anatomical regions were microscopically evaluated in paraffin sections in Cases A to C: olfactory bulb, midbrain at level of red nucleus, right motor cortex, right inferior parietal cortex (Brodmann Area [BA] 39, 40), right anterior cingulate (BA 24), right superior frontal (BA 8, 9), left inferior frontal cortex (BA 10, 11, 12), left lateral frontal (BA 45, 46), caudate, putamen, and accumbens (CAP), anterior temporal (BA 38), superior temporal (BA 20, 21, 22), middle temporal (BA 38), inferior temporal cortex, amygdala, entorhinal cortex (BA 28), globus pallidus, insula, substantia innominata, right hippocampal formation at the level of the lateral geniculate, hippocampus, thalamus with mammillary body, thalamus, posterior cingulate (BA 23, 31), calcarine cortex (BA 17,18), superior parietal cortex (BA 7B), cerebellar vermis, cerebellum with dentate nucleus, parastriate cortex (BA 19) pons, medulla, and spinal cord.

The sections were stained with Luxol fast blue and hematoxylin and eosin, Bielschowsky silver impregnation, and by immunohistochemistry with antibodies to phosphoserine 202 and phosphothreonine 205 of PHF-tau (mouse monoclonal AT8; Pierce Endogen, Rockford IL; 1:2000), $\alpha$-synuclein (rabbit polyclonal; Chemicon, Temecula, CA; 1:15,000), A$\beta$ (mouse monoclonal; Dako North America Inc, Carpinteria, CA; 1:2000) (after formic acid pretreatment), and A$\beta$ 42 (rabbit polyclonal; Invitrogen [Biosource], Carpinteria, CA; 1:2000). In addition, multiple large coronal fragments were cut at 50 $\mu$m on a sledge microtome and stained as free-floating sections using a mouse monoclonal antibody directed against phosphoserine 202 of tau (CP-13; courtesy of Peter Davies; 1:200); this is considered to be the initial site of tau phosphorylation in NFT formation (114–118). Other monoclonal antibodies used for immunostaining were AT8, phosphoserine 396, and phosphoserine 404 of hyperphosphorylated tau (PHF-1; courtesy of Peter Davies; 1:1000) (114–118), glial fibrillary acidic protein (Chemicon; 1:2000), and HLA-DR-Class II major histocompatibility complex (LN3; Zymed, San Francisco, CA; 1:2000); some of these sections were counterstained with cresyl violet.

© 2009 American Association of Neuropathologists, Inc.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

# EXHIBIT 54

# CHRONIC TRAUMATIC ENCEPHALOPATHY IN THE NATIONAL FOOTBALL LEAGUE

Robert C. Cantu, M.D.

Department of Surgery,
Emerson Hospital,
Concord, Massachusetts, and
Neurological Sports Injury Center,
Brigham and Women's Hospital,
Boston, Massachusetts

*Neurosurgery 61:223–225*　　DOI: 10.1227/01.NEU.0000255514.73967.90　　www.neurosurgery-online.com

**W**hen Andre Waters, a hard hitting National Football League (NFL) safety from 1984 to 1995, made the front page of the *New York Times* on Thursday, January 18, 2007, he became the third NFL player known to have died as a result of chronic traumatic encephalopathy (CTE) attributed to the multiple concussions he experienced while playing in the NFL. Preceding the 44-year-old Andre were Mike Webster, age 50, the Hall of Fame Pittsburgh Steelers center who died homeless, and Terry Long, age 42, who, like Waters, took his own life (6, 7).

All three of these athletes were known as iron men, hard hitters who never came out of the game, continuing to play through countless injuries, including concussions. All of these athletes, as well as Ted Johnson, whose front-page story was widely circulated February 2, 2007 in the *New York Times* and *Boston Globe*, shared symptoms of sharply deteriorated cognitive function, especially recent memory loss and psychiatric symptoms such as paranoia, panic attacks, and major depression after multiple concussions experienced in the NFL.

The brains of all these deceased athletes were examined by Bennett Omalu, M.D., a forensic pathologist at the University of Pittsburgh, and shared common features of CTE including neurofibrillary tangles, neutrophil threads, and cell dropout. He likened Waters' brain to that of an "octogenarian Alzheimer's patient."

## ARE THE FINDINGS OF CTE IN THE BRAINS OF WEBSTER, LONG, AND WATERS A SURPRISE?

Certainly the Waters finding was no surprise to Julian Bailes, M.D., medical director, and Kevin Guskiewicz, Ph.D., the Director of the Study of Retired Athletes at the University of North Carolina at Chapel Hill. Their study of retired NFL players published in this journal found that those who had sus-tained three or more concussions were three times more likely to experience "significant memory problems" and five times more likely to develop earlier onset of Alzheimer's disease (3). A study published this year by the same authors found a similar relationship between three or more concussions and clinical depression (4).

The NFL's own publications in this journal on concussion state that they had seen no cases of CTE in the NFL (8–10). That finding is not a surprise as the NFL study included only active players in their 20s and 30s over a short 6-year window from 1996 to 2001. Other significant limitations of the NFL studies include the following:

1) History of concussion: previous concussions either in the NFL in the years before the study began or during their playing careers in high school, college, or other levels of football were not included.
2) The population of NFL players changes from year to year: new players enter the league, older players leave the league, and we do not know the number of players who constituted the 1996 population who are still in the league in subsequent years.
3) There was difficulty collecting data on loss of consciousness; the initial data collection sheet did not ask for data regarding loss of consciousness.
4) This was a multisite study with numerous different examiners; there was no uniform method of evaluation of concussion in this study.
5) Return to play data were collected on players with initial and repeat concussion: there are many other factors that go into the decision of whether or not the player should return to play, including the importance of the player to the team; the importance of the upcoming game to the team; and pressure from owners, players, and their families, coaches, agents, and media may certainly influence the final decision on when the player returns to play.

6) The results apply to mainly NFL-level players: extrapolation to younger players has not been demonstrated.

Should we be surprised that CTE has been reported in former NFL football players? I would echo Dr. Bailes and say "absolutely not," but for additional reasons. Before I enumerate, let us first go back to the definition of CTE.

CTE, or dementia pugilistica, was first described by Harrison S. Martland in his landmark *Journal of the American Medical Association* article published in 1928 (5) as being characteristic of boxers "who take considerable head punishment seeking only to land a knockout blow." It was also "common in second rate fighters used for training purposes." The early symptoms he described were a "slight mental confusion, a general slowing in muscular movement, hesitancy in speech, and tremors of the hands." Later, marked truncal ataxia, Parkinsonian syndrome, and marked mental deterioration may set in, "necessitating commitment to an asylum" (5, p 1103).

Although Martland first described the clinical syndrome of CTE and Roberts (11) echoed the dangers of chronic brain damages in boxers in 1969, it was Corsellis et al. who first identified the neuropathology of this syndrome in the brains of 15 deceased boxers, eight of whom were either world or national champions (1).

*Table 1* summarizes his findings of the four main components of this entity, areas of the brain damaged, and resultant signs and symptoms. It is critical to understand that although Corsellis pointed out four different areas of the brain and the resultant signs and symptoms, he did not state that all four areas needed to be involved for the diagnosis to be made. In fact, only eight out of 15 brains studied had all four areas of pathology present (2).

It was Corsellis who also reported CTE not only in boxers but other sports with a high risk of head injury, including those in which head injury occurred in declining frequency; among these were jockeys (especially steeplechasers), professional wrestlers, parachutists, and even a case of battered wife syndrome. With this history, it is no surprise to have cases from NFL football.

## TABLE 1. Four main components of chronic brain damage in dementia pugilistica

| Area damaged | Clinical symptoms/signs |
|---|---|
| Septum pellucidum, adjacent periventricular grey matter, frontal and temporal lobes | Altered affect (euphoria, emotional ability) and memory |
| Degeneration of the substantia nigra | Parkinson's syndrome of tremor, rigidity, and brachykinesia |
| Cerebellar scarring and nerve cell loss | Slurred speech, loss of balance and coordination |
| Diffuse neuronal loss | Loss of intellect, Alzheimer's syndrome |

## SO WHAT ARE THE QUESTIONS TO BE ANSWERED?

The most pressing question to be answered concerns the prevalence of the problem. The Waters case came to light only because of Chris Nowinski, a former All-Ivy defensive tackle at Harvard and World Wrestling Entertainment professional wrestler who, after being forced to retire because of repeated concussions and postconcussion syndrome, researched and wrote a book on the subject of athletic concussions. Hearing of Waters' suicide and suspecting CTE, Nowinski convinced the Waters family to send a portion of Waters' brain to Dr. Omalu for neuropathological examination.

Since the Ted Johnson publicity in which this former New England Patriots star middle linebacker said, "I don't want anyone to end up like me," I have personally examined and spoken with a number of retired NFL players with postconcussion/CTE symptoms. Only an immediate prospective study will determine the true incidence of this problem. Although this study could be funded by the NFL charities, the NFL should refrain from introducing potential bias with regard to the team of neurosurgeons, neurologists, neuropsychiatrists, and neuropathologists with athletic head injury expertise chosen to carry out the study.

I also commend the fact that the brains of Webster, Long, and Waters have now been examined by other neuropathologists who concur with Omalu's findings. Obtaining second opinions on such a high profile issue is just common sense.

Finally, it is clear that not all players with long concussion histories have met premature and horrific ends to their lives. However, as the list of NFL players retired as a result of postconcussion symptoms (e.g., Harry Carson, Al Toon, Merrill Hodge, Troy Aikman, Steve Young, Ted Johnson, Wayne Chrebet) grows and as the number of documented CTE cases increases, I believe the time for independent study of the problem as well as NFL recognition that there is a problem is now. Recognizing that soldiers were having problems with blast-related closed head injury, I have been a part of a team convened by the Department of Defense to write management algorithms and protocols in the past year. I believe the NFL would be prudent to assemble such an independent impeccably qualified "dream team" to tackle their problem with concussion and resultant CTE head on. Just as the National Association for Stock Car Auto Racing recently faced a problem, solved it, and became even more popular, I believe the NFL will lift this dark cloud if they confront the problem directly and honestly.

## REFERENCES

1. Corsellis JA, Bruton CJ, Freeman-Browne D: The aftermath of boxing. **Psychol Med** 3:270–303, 1973.
2. Corsellis JA: Brain damage in sport. **Lancet** 1:401–402, 1976.
3. Guskiewicz KM, Marshall SW, Bailes J, McCrea M, Cantu RC, Randolph C, Jordan BD: Association between recurrent concussion and late-life cognitive impairment in retired professional football players. **Neurosurgery** 57:719–726, 2005.

4. Guskiewicz KM, Marshall SW, Bailes J, McCrea M, Harding HP, Matthews A, Mihalik JR, Cantu RC: Recurrent Concussion and Risk of Depression in Retired Professional Football Players. **Med Sci Sports Exerc** 39:903–909, 2007.

5. Martland HS: Punch drunk. **JAMA** 91:1103–1107, 1928.

6. Omalu BI, DeKosky ST, Minster RL, Kamboh MI, Hamilton RI, Wecht CH: Chronic traumatic encephalopathy in a National Football League player. **Neurosurgery** 57:128–134, 2005.

7. Omalu BI, DeKosky ST, Hamilton RL, Minster RL, Kamboh MI, Shakir AM, Wecht CH: Chronic traumatic encephalopathy in a national football league player: Part II. **Neurosurgery** 59:1086–1092, 2006.

8. Pellman EJ, Viano DC, Casson IR, Arfken C, Powell J: Concussion in professional football: Injuries involving 7 or more days out—Part 5. **Neurosurgery** 55:1100–1119, 2004.

9. Pellman EJ, Lovell MR, Viano DC, Casson IR, Tucker AM: Concussion in professional football: Neuropsychological testing—Part 6. **Neurosurgery** 55:1290–1303, 2004.

10. Pellman EJ, Lovell MR, Viano DC, Casson IR: Concussion in professional football: Recovery of NFL and high school athletes assessed by computerized neuropsychological testing—Part 12. **Neurosurgery** 58:263–274, 2006.

11. Roberts AH: *Brain Damage in Boxers*. London, Pitman Medical & Scientific Publishing, 1969, pp 61–99.



*Harlequin by Picasso, 1901. Oil on canvas. Courtesy of The Metropolitan Museum of Art, New York.*

# EXHIBIT 55

CLINICAL STUDIES

**Kevin M. Guskiewicz, Ph.D., A.T.C.**

Departments of Exercise and Sport Science
and Orthopedics,
University of North Carolina
at Chapel Hill,
Chapel Hill, North Carolina,

**Stephen W. Marshall, Ph.D.**

Departments of Epidemiology and Orthopedics,
University of North Carolina
at Chapel Hill,
Chapel Hill, North Carolina,

**Julian Bailes, M.D.**

Department of Neurosurgery,
West Virginia University
School of Medicine,
Morgantown, West Virginia

**Michael McCrea, Ph.D.**

Neuroscience Center,
Waukesha Memorial Hospital,
Waukesha, Wisconsin, and
Department of Neurology,
Medical College of Wisconsin,
Milwaukee, Wisconsin

**Robert C. Cantu, M.D.**

Neurosurgery Service,
Emerson Hospital,
Concord, Massachusetts, and
Neurological Sports Injury Center,
Brigham and Women's Hospital,
Boston, Massachusetts

**Christopher Randolph, Ph.D.**

Chicago Neurological Institute,
Chicago, Illinois, and
Department of Neurology,
Loyola University Medical School,
Maywood, Illinois,

**Barry D. Jordan, M.D., M.P.H.**

Memory Evaluation and Treatment Service,
Burke Rehabilitation Hospital,
White Plains, New York

**Reprint requests:**
Kevin M. Guskiewicz, Ph.D.,
A.T.C.,
Sports Medicine
Research Laboratory,
Department of Exercise
and Sport Science,
211 Fetzer CB #8700,
University of North Carolina
at Chapel Hill,
Chapel Hill, NC 27599-8700.
Email: gus@email.unc.edu

**Received,** November 5, 2004.
**Accepted,** May 3, 2005.

# Association between Recurrent Concussion and Late-Life Cognitive Impairment in Retired Professional Football Players

**OBJECTIVE:** Cerebral concussion is common in collision sports such as football, yet the chronic neurological effects of recurrent concussion are not well understood. The purpose of our study was to investigate the association between previous head injury and the likelihood of developing mild cognitive impairment (MCI) and Alzheimer's disease in a unique group of retired professional football players with previous head injury exposure.

**METHODS:** A general health questionnaire was completed by 2552 retired professional football players with an average age of 53.8 (±13.4) years and an average professional football playing career of 6.6 (± 3.6) years. A second questionnaire focusing on memory and issues related to MCI was then completed by a subset of 758 retired professional football players (≥50 yr of age). Results on MCI were then cross-tabulated with results from the original health questionnaire for this subset of older retirees.

**RESULTS:** Of the former players, 61% sustained at least one concussion during their professional football career, and 24% sustained three or more concussions. Statistical analysis of the data identified an association between recurrent concussion and clinically diagnosed MCI ($\chi^2$ = 7.82, $df$ = 2, $P$ = 0.02) and self-reported significant memory impairments ($\chi^2$ = 19.75, $df$ = 2, $P$ = 0.001). Retired players with three or more reported concussions had a fivefold prevalence of MCI diagnosis and a threefold prevalence of reported significant memory problems compared with retirees without a history of concussion. Although there was not an association between recurrent concussion and Alzheimer's disease, we observed an earlier onset of Alzheimer's disease in the retirees than in the general American male population

**CONCLUSION:** Our findings suggest that the onset of dementia-related syndromes may be initiated by repetitive cerebral concussions in professional football players.

**KEY WORDS:** Alzheimer, Concussion, Mild cognitive impairment, Retired professional football players

*Neurosurgery* 57:719-726, 2005    DOI: 10.1227/01.NEU.0000175725.75780.DD    www.neurosurgery-online.com

Traumatic brain injury (TBI) is an important public health concern, as each year more than 1.2 million Americans suffer head injury (26). More than 50,000 head-related injuries result in a fatality each year in the United States, whereas the overwhelming majority of head injuries are classified as mild traumatic brain injuries that can result in significant cognitive, emotional, and functional disabilities (26). TBI has been identified as a potential risk factor for the occurrence (or early expression) of neurodegenerative dementing disorders, including Alzheimer's disease (AD) disease and Parkinson's syndrome, and other psychiatric disorders such as clinical depression (8, 13, 21, 25, 28, 31, 35–37, 40). Still, other research findings have not shown this association between TBI and dementia (1, 3, 6, 7, 17, 19, 33, 42). Guo et al. (9) suggested that the severity of head injury is related to the magnitude of AD risk, and that the risk of AD associated with head injury involving loss of consciousness was approximately double that associated with head injury without loss of consciousness. However, they reported that even head injury without loss of conscious-

Copyright © Congress of Neurological Surgeons. Unauthorized reproduction of this article is prohibited.

GUSKIEWICZ ET AL.

ness significantly increased the risk of AD relative to no head injury (9).

Mild cognitive impairment (MCI) is a recently established diagnostic classification typically applied to older individuals who exhibit some evidence of cognitive decline (usually in the domain of memory) and perform below expected levels on formal neurocognitive testing, but who have not exhibited a sufficient degree of impairment and/or functional decline to meet diagnostic criteria for dementia (30). MCI is often conceptualized as a transitional state between the cognitive changes of normal aging and dementia, with most recent studies estimating that 10 to 20% of MCI patients convert to a more advanced stage labeled as "dementia" each year, compared with healthy controls who convert at a rate of 1 to 2% per year (5, 22, 39). The majority of patients with MCI who convert to dementia are subsequently diagnosed with probable AD, although a significant percentage is diagnosed with vascular dementia (23). The identification of risk factors for the onset of MCI, and for the conversion of MCI to dementia, is an important step in developing strategies for the prevention and early treatment of these disorders, especially with the emergence of various dementia treatment agents thought to provide the greatest therapeutic yield earliest in the disease process. Although head trauma has been linked to irreversible cognitive deficits (24, 29, 30), its role in causing eventual MCI or AD is less clear. Mayeux et al. (20) reported a 10-fold increase in the risk of developing AD among those individuals who tested positive for the ApoE e4 gene and had a history of TBI, compared with only a two-fold increase in risk with the ApoE e4 gene alone. Other authors have described a genetic vulnerability and redistribution of neurofilaments after TBI resulting from rotational acceleration of the head in the nonathletic population (12, 27).

The relatively high rate of concussive brain injuries in contact sports affords a unique opportunity for exploring both the immediate and long-term consequences of concussion. More than 300,000 sport-related concussions, many of which are recurrent injuries, occur annually in the United States (38). Unfortunately, the long-term effects of these concussions remain largely unclear. Organized sports, however, provides for a unique laboratory for studying the influence of recurrent mild TBI on dementia-related syndromes such as MCI and AD. The sports literature has connected ApoE e4 with chronic TBI in boxers (16), and other studies have shown that the repeated head trauma experienced by boxers can lead to the development of dementia pugilistica—punch drunk syndrome (32). This literature has also carefully defined the neuropathology of dementia pugilistica as involving numerous neurofibrillary tangles in the absence of plaques, in contrast to the profusion of tangles and plaques seen in AD. Lower cognitive performance has also been found in older football players with the ApoE e4 gene, suggesting that there may be an association between these dementia syndromes and either recurrent TBI or recurrent subconcussive contacts to the head (18). The purpose of our study was to investigate the association between previous head injury and the likelihood of developing MCI and/or AD in a unique group of individuals, namely retired professional football players, who have previous head injury exposure.

## PATIENTS AND METHODS

A diverse group of retired professional football players were studied, including recent retirees and those who played professional football before World War II. All participants played a minimum of two seasons of professional football. We studied this group using two self-report questionnaires: a general health survey and a follow-up instrument specifically targeting cognitive decline. It was explained at the beginning of the survey that participants would not be identified and that research records would be kept confidential. By completing and submitting the survey, participants were acknowledging that they agreed to take part in this research study.

### General Health Questionnaire

The general health questionnaire was first sent to all living members of the National Football League Retired Player's Association (n = 3683) through the Center for the Study of Retired Athletes. The questionnaire asked a variety of questions about musculoskeletal, cardiovascular, and neurological conditions that the retired player experienced during and after his football career. It included questions about the number of concussions sustained during their professional football career (concussion history) and the prevalence of diagnosed medical conditions such as depression, Parkinson's disease, AD, and schizophrenia. Previous concussion was based on the player's retrospective recall of injury events and was defined on the questionnaire as an injury resulting from a blow to the head that caused an alteration in mental status and one or more of the following symptoms: headache, nausea, vomiting, dizziness/balance problems, fatigue, trouble sleeping, drowsiness, sensitivity to light or noise, blurred vision, difficulty remembering, and difficulty concentrating. Additionally, the questionnaire included the SF-36 Measurement Model for Functional Assessment of Health and Well-Being, which addresses how well the retired athlete functions with activities of daily living (41). From the SF-36, we calculated a physical health composite score, which includes scores of physical functioning, role physical, bodily pain, and general health, as well as a mental health component score, which includes scores of vitality, social functioning, role emotional, and mental health. These scores were compared with age- and gender-specific population-based norms established by previous researchers (41).

We initially mailed the general health questionnaire in May 2001, followed by remailings to nonrespondents in August 2001 and February 2002. We then began telephoning nonrespondents at different times of the day and completed the questionnaire over the telephone. We then conducted a reliability check of the general health questionnaire by readministering the instrument to 25 of the original respondents 18 to

Copyright © Congress of Neurological Surgeons. Unauthorized reproduction of this article is prohibited.

24 months later to establish a high level of agreement between selected responses.

## Mild Cognitive Impairment Instrument

Approximately 4 months later, a second questionnaire focusing on memory and issues related to MCI was sent to a subset of 1754 retirees. The subset comprised all respondents from the original health questionnaire who were aged 50 years or older. The same instrument was also sent to an informant (spouse or close relative) to collect data on any cognitive problems exhibited by the retiree that were not reported on the retiree's instrument. Results from the MCI questionnaire were then cross-tabulated with results from the original general health questionnaire. MCI was defined according to the following, outlined in the American Academy of Neurology Practice Parameter (30): memory complaint corroborated by a family member; objective memory impairment as determined by neurocognitive testing; intact activities of daily living; and does not meet accepted diagnostic criteria for probable AD or other forms of dementia.

### Statistical Analysis

$X^2$ tests of association were used to compare proportions in tables; Fisher's exact test was used when 80% of expected cell counts were less than five. Analysis of variance models were used to determine differences among the groups on selected variables. The groups were stratified by concussion history (none, one, two, and three or more). Because of the sample size, some analyses required us to collapse respondents with one and two previous concussions into a single group (one to two previous concussions). We used the Cochran-Armitage trend test to assess linear trends in the proportion of retirees reporting memory impairments and problems across strata of concussion history. Level of significance for all analyses was set a priori at $P < 0.05$. Estimates of the prevalence of AD in the general population of American men, stratified by age, were provided by researchers at the Johns Hopkins University (2).

## RESULTS

### General Health Questionnaire

Of the original 3683 general health surveys sent to retired players, 2552 (69.3%) were completed. The age of the respondents averaged 53.8 ($\pm$13.4) years, with an average professional football playing career of 6.6 ($\pm$3.6) years. Respondents reported having played organized football (junior high school, high school, college, armed service, and professional) for an average of 15.1 ($\pm$ 4.3) years. When considering the prevalence of previous concussions, 1513 (60.8%) of the retired players reported having sustained at least one concussion during their professional playing career, and 597 (24%) reported sustaining three or more concussions. Of those retired players who had sustained a concussion during their professional career, more than half reported experiencing loss of consciousness (n = 817,

54.0%) or memory loss (n = 787, 52.0%) from at least one of their concussive episodes. We asked the retired athletes for their subjective assessment of the long-term consequences of their injuries. Of the retirees who sustained at least one concussion, 266 (17.6%) reported that they perceived the injury to have had a permanent effect on their thinking and memory skills as they have gotten older.

Only 33 (1.3%) retired players reported being diagnosed by a physician as having AD; 15 were undergoing medical treatment for the disease. We observed a higher prevalence of AD in the study population relative to the general American male population (*Fig. 1*). The overall age-adjusted prevalence ratio for AD was 1.37 (95% confidence interval 0.98–1.56), which indicates that the football retirees have higher prevalence than other American men of the same age. The AD prevalence in the football retirees was particularly increased in the younger age groups ($\leq$70 yr), which suggests that this group may have an earlier onset of AD than the general American male population. The average age of the retired players with AD was 71.7 ($\pm$ 7.62) years (range, 52–83 yr). There was, however, no association between number of concussions sustained as a professional player (none, one, two, and three or more) and a diagnosis of AD (Fisher's exact test, $P = 0.24$).

Mental Component Scale (MCS) scores on the SF-36 were similar between the NFL retirees and population-based normative values for all age groups ( $P > 0.05$) (*Fig. 2*); however, retired players with a history of concussion, especially recurrent concussion, scored lower (worse) on the MCS than those without a history of recurrent concussion (F [3,2146] = 19.29, $P = 0.001$). The lowest MCS scores were observed in those with the most reported concussions (*Table 1*). The group who experienced three or more concussions also scored significantly worse than the normative group on the age-matched MCS (50.31 versus 52.42).

### Mild Cognitive Impairment Instrument

Results of the follow-up MCI and memory questionnaires were analyzed based on responses from 758 retired players (average age, 62.4 yr) and 641 retired players' spouses or close relatives. Our findings revealed 22 cases of physician-diagnosed MCI and 77 cases of retirees who have significant




**FIGURE 1.** *Alzheimer's disease prevalence ratios for the American male population and National Football League (NFL) retirees. Error bars indicate 95% confidence intervals.*

Copyright © Congress of Neurological Surgeons. Unauthorized reproduction of this article is prohibited.



**FIGURE 2.** *MCS scores for the NFL retirees and population norms by age. "Total" is age-standardized; error bars indicate 95% confidence intervals.*



**FIGURE 3.** *Percentage of retired players aged 50 years or older with a diagnosis of MCI and memory problems (self-reported and reported by a spouse or close relative) by concussion history (none, one, two, and three or more).* Error bars indicate 95% confidence intervals. $P < 0.007$.

**TABLE 1. Mental Component Scale score by concussion history in retired National Football League players aged 50 years or older[a]**

| No. of previous concussions | Mean MCS score and 95% CI | Standard deviation |
|---|---|---|
| 0 (n = 814) | 54.35 (53.77, 54.94) | (8.50) |
| 1 (n = 429) | 52.63 (51.73, 53.52) | (9.47) |
| 2 (n = 374) | 52.97 (52.03, 53.91) | (9.22) |
| 3+ (n = 533) | 50.31 (49.35, 51.27) | (11.26) |

[a] MCS, mental component scale; CI, confidence interval. $P < 0.001$; $\beta$ -1.51 (0.26).

memory impairment as determined by their spouse or close relative. Further analyses of these data identified an association between recurrent concussion and clinically diagnosed MCI ($\chi^2 = 7.82$, df = 2, $P = 0.02$); self-reported significant memory impairments ($\chi^2 = 19.75$, df = 2, $P = 0.001$); and spouse/relative-reported significant memory impairments ($\chi^2 = 6.05$, df = 2, $P = 0.04$). Retired players with three or more reported concussions had a fivefold prevalence of being diagnosed with MCI and a threefold prevalence of reported significant memory problems compared with those players without a history of concussion (*Fig. 3*). There was no association between MCI and other systemic factors such as coronary heart disease, hypertension, diabetes, or osteoarthritis. Although we found an association between diagnosis of MCI and stroke, this association does not detract from the association between MCI and concussion history. Only three (13.6%) of the 22 MCI cases involved stroke, and we do not know which diagnosis came first.

## DISCUSSION

These data suggest that a history of concussion, particularly recurrent concussion, may be a risk factor for the expression of late-life memory impairment, MCI, and AD. Although the clinical samples studied are relatively small, retired professional football players were found to have a progressive decline in mental health functioning and a higher rate of memory problems and cognitive decline associated with a history of concussion. Retired players with a history of three or more concussions were at highest risk of being diagnosed by a physician as having MCI and of having significant memory problems based on their own account and the observations of their spouse or caregiver.

Data from a small sample of retired athletes medically diagnosed with probable AD also suggests a trend toward earlier disease onset and higher disease prevalence in younger cohorts relative to the general population (*Fig. 1*). Despite the earlier onset of AD, we failed to find an association between previous concussion and lifetime onset of AD. The cumulative effect of sub-concussive and concussive contacts to the head sustained by professional football players may promote an earlier expression of AD; however, the factor of age eventually overwhelms this factor and prevents it from becoming an independent predictor of lifetime onset of AD. Thus, the lines in *Figure 1* representing the two groups (American male population and retired NFL players) eventually converge.

The number of individuals in the United States with AD was estimated at 2.32 million in 1997, and it is projected that the prevalence will nearly quadruple in the next 50 years, by which time 1 in 45 Americans will be afflicted with the disease (2). As a result, AD is sure to place a large burden on the country's health care system in the decades ahead. For this reason, identification of factors associated with precursor conditions to AD are of interest. The pathology is characterized by cerebral atrophy most severe in frontal, temporal, and parietal lobes resulting in a dramatic reduction of brain weight (normal, 1500–1800 g; AD, 850–1250 g). Microscopic findings include senile plaques, neurofibrillary tangles, and granulovascular degeneration. Biomechanically, there is a 50 to 90% reduction in choline acetyltransferase (5, 15, 17, 23, 36, 37, 39). Clinically, AD presents with a progressive decline in cortical functions principally affecting memory, language, and executive functioning, followed by increasing neurobehavioral and

Copyright © Congress of Neurological Surgeons. Unauthorized reproduction of this article is prohibited.

Case 2:15-cv-02315-DGC Document 20-2 Page 159 Date Filed: 10/08/2015
Case 1:12-cv-00232-XXX Document 20-2 Filed 10/08/2015 Page 1 of 25

Recurrent Concussion and Late-Life Cognitive Impairment

neuropsychiatric deficits in more advanced stages of the disease (2, 5, 6).

The study of MCI and AD is challenging because of the difficulties in diagnosing the conditions. Both conditions can be evaluated using several measures, but they cannot be diagnosed solely on neuropsychological assessment. Petersen et al. (29, 30) state that the usefulness of any neuropsychological battery for identifying cases of MCI depends on its composition, size, and supporting data. The battery should include measures of new learning, delayed recall, attention, and executive function. Neuroimaging is also considered a powerful tool for the differential diagnosis of cognitive impairment and tracking change (30). Hippocampal atrophy has been identified in amnestic MCI relative to cognitively intact controls, and it is believed that volumetric measurement of this atrophy can predict the rate of conversion from MCI to AD (15).

The human ApoE gene encodes a cholesterol carrier lipoprotein (apolipoprotein E) that is made in the liver and brain and is important in the transport of lipids in the brain. There are three allelic forms (ApoE e2, e3, e4) that give rise to six possible genotype combinations. ApoE plays an important role in the response of the brain to injury. After accelerator forces are imparted to the brain, there is an accumulation of beta amyloid and tau proteins within hours of injury within the neuronal body (12). Possession of the e2 allele is now believed to be underrepresented in AD and may be protective (22). On the other hand, possession of ApoE e4 increases the risk of AD, shifts onset to an earlier age, increases the accumulation of amyloid beta protein in AD and TBI, and decreases recovery after TBI (6, 7, 12, 19, 20).

The sports literature also suggests that possessing the ApoE e4 allele results in greater cognitive impairment after mild repetitive head injury. Older professional football players with the ApoE e4 allele score lower on cognitive tests than players without the allele or less experienced players of any genotype (18). The study clearly suggests that the cognitive status of athletes with repeated head trauma is influenced by age, inherited factors such as ApoE e4, and cumulative exposure to head contact.

Jordan et al. (16) came to similar conclusions in their study of boxers. The boxers with higher exposure (defined by number of bouts) had significantly higher chronic brain injury scores than those with low exposure. Boxers with low exposure had low chronic brain injury scores irrespective of ApoE e4 allele genotype, whereas those with high exposure and the ApoE e4 allele had higher chronic brain injury scores than boxers with high exposure and no ApoE e4 allele. Possession of the ApoE e4 allele was associated with an increased severity of neurological deficits in the high-exposure boxers.

To our knowledge, our study is unique in evaluating the risk of recurrent mild TBI in the development of later-life memory disorders and MCI. These data describe a significant association between recurrent concussion and MCI, as well as with self-reported memory impairments confirmed by a spouse or close relative. Retired professional football players with three or more concussions were twice as likely to be

diagnosed with MCI as those with one or two previous concussions, and five times more likely than those with no previous concussions. This trend continued with respect to self-reported significant memory problems. These findings suggest that the clinical features of dementia-related syndromes, such as reductions in synaptic density, loss of neurons, and granulovacuolar degeneration, may be initiated by repetitive cerebral concussions. Other recent peer-reviewed studies of recurrent concussion have identified an acute cumulative effect of concussion as measured by increased symptomatology or slowed recovery on symptom checklists and neuropsychological tests after subsequent injuries in high school and collegiate athletes (4, 10, 11, 14). These acute or short-term consequences of recurrent concussion should be of great interest to the sports medicine community, especially given that they parallel our findings of more chronic consequences after years of playing football.

Our study is influenced by the limitations of any retrospective self-report study. The study is limited by the uncertainty of how well the retired players recalled the concussions sustained during their careers and the accuracy of reporting memory problems and diagnosis of MCI. Recent literature has reported selective preservation of older information in subjects with AD-related dementia, which suggests that recollection of events involving previous injuries is not unlikely in these retired athletes (34). The purpose of the spouse or close relative questionnaire was to confirm the retired players' memory status and any physician-diagnosed MCI. For cases in which there was disagreement in the responses of the retiree and the spouse or relative, phone calls and medical records were used to confirm the diagnosis. When the difference in responses could not be reconciled, the case was eliminated from the analyses. Another limitation of our study is that we do not currently know the ApoE allele form of these retired players, which might help to better understand some of these relationships.

## CONCLUSIONS

Despite the limitations, these data suggest some very interesting findings—that a history of recurrent concussions, and probably sub-concussive contacts to the head, may be risk factors for the expression of late-life memory impairment, MCI, and AD. Our findings demonstrate a dose-response relationship between concussion and an increased lifetime burden; however, prospective longitudinal cohort studies are necessary to determine causality. Future prospective studies should implement genetic testing, more rigorous diagnostic criteria, historical documentation, and extensive serial evaluations (e.g., neuropsychological testing, functional neuroimaging) to clarify the direct or mitigating effects of concussion on lifetime risk of dementia or other neurological disorders.

## REFERENCES

1. Broe GA, Henderson AS, Creasey H, McCusker E, Korten AE, Jorm AF, Longley W, Anthony JC: A case-control study of Alzheimer's disease in Australia. **Neurology** 40:1698–1707, 1990.

-2053-

Copyright © Congress of Neurological Surgeons. Unauthorized reproduction of this article is prohibited.

GUSKIEWICZ ET AL.

2. Brookmeyer R, Gray S, Kawas C: Projections of Alzheimer's Disease in the United States and the public health impact of delaying disease onset. **Am J Public Health** 88:1337–1342, 1998.

3. Chandra V, Kokmen E, Schoenberg BS, Beard CM: Head trauma with loss of consciousness as risk factor for Alzheimer's disease. **Neurology** 39:1576–1578, 1989.

4. Collins MW, Lovell MR, Iverson G, Cantu RC, Maroon J, Field M: Cumulative effects of concussion in high school athletes. **Neurosurgery** 51:1175–1181, 2002.

5. Daly E, Zaitchik D, Copeland M, Schmahmann J, Gunther J, Albert M: Predicting conversion to Alzheimer disease using standardized clinical information. **Arch Neurol** 57:675–680, 2000.

6. Ferini-Strambi L, Smirne S, Garancini P, Franceshi M: Clinical and epidemiological aspects of Alzheimer's disease with presenile onset: A case-control study. **Neuroepidemiology** 9:39–49, 1990.

7. Fratiglioni L, Ahlbom A, Viitanen M, Winblad B: Risk factors for late-onset Alzheimer's disease: A population-based, case-control study. **Ann Neurol** 33:258–266, 1993.

8. Graves AB, White E, Koepsell TD, Reifler BV, van Belle G, Larson EB, Raskind M: The association between head trauma and Alzheimer's disease. **Am J Epidemiol** 131:491–501, 1990.

9. Guo Z, Cupples LA, Kurz A, Auerbach SH, Volicer L, Chui H, Green RC, Sadovnick AD, Duara R, DeCarli C, Johnson K, Go RC, Growdon JH, Haines JL, Kukull WA, Farrer LA: Head injury and the risk of AD in the MIRAGE study. **Neurology** 54:1316–1323, 2000.

10. Guskiewicz K, McCrea M, Marshall WM, Cantu RC, Randolph C, Barr W, Onate JA, Kelly JP: Cumulative effects associated with recurrent concussion in collegiate football players: The NCAA Concussion Study. **JAMA** 290:2549–2555, 2003.

11. Guskiewicz K, Weaver N, Padua D, Garrett W: Epidemiology of concussion in collegiate and high school football players. **Am J Sports Med** 28:643–650, 2000.

12. Hamberger A, Huang YL, Zhu H, Bao F, Ding M, Blennow K, Olsson A, Hansson HA, Viano D, Haglid KG: Redistribution of neurofilaments and accumulation of beta-amyloid protein after brain injury by rotational acceleration of the head. **J Neurotrauma** 20:169–178, 2003.

13. Holsinger T, Steffens DC, Phillips C, Helms MJ, Havlik RJ, Breitner JC, Guralnik JM, Plassman BL: Head injury in early adulthood and the lifetime risk of depression. **Arch Gen Psychiatry** 59:17–22, 2002.

14. Iverson GL, Gaetz M, Lovell MR, Collins MW: Cumulative effects of concussion in amateur athletes. **Brain Injury** 18:433–443, 2004.

15. Jack CR Jr, Peterson RC, Xu YC, O'Brien PC, Smith GE, Ivnik RJ, Boeve BF, Waring SC, Tangalos EG, Kokman E: Prediction of AD with MRI-based hippocampal volume in mild cognitive impairment. **Neurology** 52:1397–1403, 1999.

16. Jordan BD, Relkin NR, Ravdin LD, Jacobs AR, Bennett A, Gandy S: Apolipoprotein E epsilon4 associated with chronic traumatic brain injury in boxing. **J Am Med Soc** 278:136–140, 1997.

17. Katzman R, Aronson M, Fuld P, Kawas C, Brown T, Morgenstern H, Frishman W, Gidez L, Eder H, Ooi WL: Development of dementing illnesses in an 80-year-old volunteer cohort. **Ann Neurol** 25:317–324, 1989.

18. Kutner KC, Erlanger DM, Tsai J, Jordan B, Relkin NR: Lower cognitive performance of older football players possessing apolipoprotein E epsilon4. **Neurosurgery** 47:651–658, 2000.

19. Launer LJ, Andersen K, Dewey ME, Letenneur L, Ott A, Amaducci LA, Brayne C, Copeland JR, Dartigues JF, Kragh-Sorensen P, Lobo A, Martinez-Lage JM, Stijnen T, Hofman A: Rates and risk factors for dementia and Alzheimer's disease: Results from EURODEM pooled analyses. EURODEM Incidence Research Group and Work Groups. European Studies of Dementia. **Neurology** 52:78–84, 1999.

20. Mayeux R, Ottman R, Maestre G, Ngai C, Tang MX, Ginsberg H, Chun M, Tycko B, Shelanski M: Synergistic effects of traumatic head injury and apolipoprotein-epsilon 4 in patients with Alzheimer's disease. **Neurology** 45:555–557, 1995.

21. Mayeux R, Ottman R, Tang MX, Noboa-Bauza L, Marder K, Gurland B, Stern Y: Genetic susceptibility and head injury as risk factors for Alzheimer's disease among community-dwelling elderly persons and their first-degree relatives. **Ann Neurol** 33:494–501, 1993.

22. Meyer J, Xu G, Thornby J, Chowdhury M, Quach M: Longitudinal analysis of abnormal domains comprising mild cognitive impairment (MCI) during aging. **J Neurol Sci** 201:19–25, 2002.

23. Meyer J, Xu G, Thornby J, Chowdhury MH, Quach M: Is MCI prodromal for vascular dementia like Alzheimer's disease? **Stroke** 33:1981–1985, 2002.

24. Morris JC, Storandt M, Miller JP, McKeel DW, Price JL, Rubin EH, Berg L: Mild cognitive impairment represents early-stage Alzheimer's disease. **Arch Neurol** 58:397–405, 2001.

25. Mortimer JA, French LR, Hutton JT, Schuman LM: Head injury as risk factor for Alzheimer's disease. **Neurology** 35:264–267, 1985.

26. National Center for Injury Prevention and Control: Traumatic brain injury. <http://www.cdc.gov/ncipc/dacrrdp/tbi/htm>. Accessed May 15, 2005.

27. Nathoo N, Chetty R, van Dellen JR, Barnett GH: Genetic vulnerability following traumatic brain injury: The role of apolipoprotein E. **Mol Pathol** 56:132–136, 2003.

28. O'Meara ES, Kukull WA, Sheppard L, Bowen JD, McCormick WC, Teri L, Pfanschmidt M, Thompson JD, Schellenberg GD, Larson EB: Head injury and risk of Alzheimer's disease by apolipoprotein E genotype. **Am J Epidemiol** 146:373–384, 1997.

29. Petersen RC, Doody R, Kurz A, Mohs RC, Morris JC, Rabins PV, Ritchie K, Rossor M, Thal L, Winblad B: Current concepts in mild cognitive impairment. **Arch Neurol** 58:1985–1992, 2001.

30. Petersen RC, Stevens JC, Ganguli M, Tangalos EG, Cummings JL, DeKosky ST: Practice parameter: Early detection of dementia—MCI (an evidence-based review). Report of the Quality Standards Subcommittee of the American Academy of Neurology. **Neurology** 56:1133–1142, 2001.

31. Rasmusson DX, Brandt J, Martin DB, Folstein MF: Head injury as a risk factor in Alzheimer's disease. **Brain Injury** 9:213–219, 1995.

32. Roberts GW, Allsop D, Bruton C: The occult aftermath of boxing. **J Neurol Neurosurg Psychiatry** 53: 373–383, 1990.

33. Ryan DH: A Scottish record linkage study of risk factors in medical history and dementia outcome in hospital patients. **Dementia** 5:339–347, 1994.

34. Sadek JR, Johnson SA, White DA, Salmon DP, Taylor KI, Delapena JH, Paulsen JS, Heaton RK, Grant I: Retrograde amnesia in dementia: Comparison of HIV-associated dementia, Alzheimer's disease, and Huntington's disease. **Neuropsychology** 2004; Oct; 18(4): 692–699.

35. Schofield PW, Tang M, Marder K, Bell K, Dooneief G, Chun M, Sano M, Stern Y, Mayeux R: Alzheimer's disease after remote head injury: An incidence study. **J Neurol Neurosurg Psychiatry** 62:119–124, 1997.

36. Shalat SL, Seltzer B, Pidcock C, Baker EL Jr: Risk factors for Alzheimer's disease: A case-control study. **Neurology** 37:1630–1633, 1987.

37. The Canadian Study of Health and Aging: Risk factors for Alzheimer's disease in Canada. **Neurology** 44:2073–2080, 1994.

38. Thurman D, Branche C, Sniezek JE: The epidemiology of sports-related traumatic brain injuries in the United States: Recent developments. **J Head Trauma Rehabil** 13:1–8, 1998.

39. Tierney MC, Szalai JP, Snow WG, Fisher RH, Nores A, Nadon G, Dunn E, St George-Hyslop PH: Prediction of probable Alzheimer's disease in memory-impaired patients: A prospective longitudinal study. **Neurology** 46:661–665, 1996.

40. van Duijn CM, Tanja TA, Haaxma R, Schulte W, Saan RJ, Lameris AJ, Antonides-Hendriks G, Hofman A: Head trauma and the risk of Alzheimer's disease. **Am J Epidemiol** 135:775–782, 1992.

41. Ware JE Jr, Gandek B, Kosinski M, Aaronson NK, Apolone G, Brazier J, Bullinger M, Kaasa S, Leplege A, Prieto L, Sullivan M, Thunedborg K: The equivalence of SF-36 summary health scores estimated using standard and country-specific algorithms in 10 countries: results from the IQOLA Project: International Quality of Life Assessment. **J Clin Epidemiol** 51:1167–1170, 1998.

42. Williams DB, Annegers JF, Kokmen E, O'Brien PC, Kurland LT: Brain injury and neurologic sequelae: A cohort study of dementia, parkinsonism, and amyotrophic lateral sclerosis. **Neurology** 41:1554–1557, 1991.

## Acknowledgments

We thank Ron Brookmeyer, Ph.D., of the Johns Hopkins University, for providing data on the projected prevalence of Alzheimer's disease in the general American population.

Copyright © Congress of Neurological Surgeons. Unauthorized reproduction of this article is prohibited.

## COMMENTS

The significance of repeated concussions is a question of great interest to all athletes, from players in grade schools to professionals. Anecdotes suggest that repetitive concussions may have a detrimental effect, but more rigorous analyses of this question have been less conclusive. In this report, Dr. Guskiewicz et al. surveyed retired professional football players, first by asking them to complete a general health questionnaire and subsequently by sending them a second questionnaire focusing on memory problems and cognitive impairment. Their data suggest that recurrent concussions seem to be related to mild cognitive impairment diagnosed by a physician and to be related to self-reported memory problems. These associations seemed to be stronger in patients with three or more reported concussions. Alzheimer's disease may have occurred at an earlier age in former National Football League players than in the population as a whole, but the number of patients with this diagnosis was quite small.

Like all retrospective studies that rely upon self-reported medical histories and health problems, this one is subject to bias in the accuracy with which problems were recalled and reported. Nevertheless, these results are of considerable interest. The authors make appropriate recommendations for further prospective studies to include such factors as genetic testing, standardized diagnostic criteria, and more extensive evaluation of players with concussion, perhaps including neuropsychological testing and functional neuroimaging.

**Alex B. Valadka**
*Houston, Texas*

The safety of contact sports and likelihood of neurologic impairment occurring after retiring from the sport are of obvious concern to athletes and to parents deciding on which sports they should allow their kids to participate in. Studies such as this have the potential to provide important information in this regard. Unfortunately, this particular study is confounded by a critical design flaw of relying on retired athletes to accurately recall events from decades earlier and relating those events to their current memory problems. The study would have been much stronger had the authors corroborated the frequency and severity of concussions sustained with independent sources.

**Donald Marion**
*Boston, Massachusetts*

Thank you for the opportunity to comment on this excellent and extremely important study. The authors have used the tremendous resource of a database of the National Football League Retired Players Association, which contains 3683 individuals who played football at a high level for an average of 15 years (minimum six yrs of professional-level football). Using carefully constructed retrospective questionnaires, they have shown a strong association between three or more concussions sustained during a players' professional football career and mild cognitive impairment.

Although this evidence was the most compelling, they also showed an earlier onset and increased incidence of Alzheimer's disease in this group of professional football players who received concussions frequently than in the general age-matched male population in the United States.

This study has important and far-reaching implications. To my knowledge, this is one of few studies to show a positive association between repetitive concussion and long-term cognitive impairment and Alzheimer's disease (1–4). Therefore, this study documents the

dangers of contact sports, such as professional football. As professional football evolves, the speed of the plays appears to be increasing, the prowess, strength, and size of the athletes is measurably increasing, and, therefore, the potential for concussions, especially higher-impact energy concussions, is increasing. It is important to know whether the incidence of multiple concussions per player each year is increasing over time, and this invaluable cohort provides such details by including players with a history as far back as pre-World War II.

What are the implications for the future of the game? Possibly, rules could be tightened to limit the types of dangerous plays, but, in the "heat of the game," this may be unlikely. Helmet design has evolved tremendously in recent years (3), and, clearly, studies with kinematic accelerometers of the type used in crash-test dummies by the auto industry should be performed and correlated with the "action replays," which are such an exciting facet of modern televised football. In this way, it may be possible to modify the game in ways that are compatible with increased safety without decreasing the spectator appeal of the game. New types of energy-absorbing foam and plastic are becoming available for football helmets.

However, as with professional boxing, athletes who undertake high-impact sports need to be fully and demonstrably informed of the risks that they undertake in pursuit of their vocation. This important study will provide a basis upon which players' associations and teams can formulate decisions.

Do the implications of these data go further? Many have called for apolipoprotein E genotyping of professional boxers to reduce the risk of precipitating Alzheimer's disease in apolipoprotein E e4 homozygous boxers. Should the same apply to professional football players, ice hockey players, and rugby players?

The authors have demonstrated that they have access to an enormous "data mine" to test the role of long-term physical fitness upon the development of delayed degenerative joint disease, low back disorders, and cardiovascular mortality. Do the cumulative effects of strains, sprains, and fractures, which are the inevitable consequence of professional football, outweigh the beneficial effect of many years of peak physical fitness upon the musculoskeletal system?

**M.R. Ross Bullock**
*Richmond, Virginia*

1. Mortimer JA, French LR, Hutton JT, Schuman LM: Head injury as risk factor for Alzheimer's disease. **Neurology** 35:264–267, 1985.
2. Roberts GW, Allsop D, Bruton C: The occult aftermath of boxing. **J Neurol Neurosurg Psychiatry** 53:373–378, 1990.
3. Guskiewicz K, McCrea M, Marshall WM, Cantu RC, Randolph C, Barr W, Onate JA, Kelly JP: Cumulative effects associated with recurrent concussion in collegiate football players. The NCAA Concussion Study. **JAMA** 290:2549–2555, 2003.
4. Jordan BD, Relkin NR, Ravdin LD, Jacobs AR, Bennett A, Gandy S: Apolipoprotein E epsilon4 associated with chronic traumatic brain injury in boxing. **J Am Med Soc** 278:136–140, 1997.

Dr. Guskiewicz et al. have assessed by questionnaire a large number of retired professional football players to assess the incidence of concussions and more serious head injuries sustained during their playing careers and to determine whether such injuries influenced the subsequent development of Alzheimer's disease or mild cognitive impairment. Their results indicated that football players with repetitive concussion injuries (three or more) have a fivefold prevalence of mild cognitive impairment and a threefold increase in self-reported

-2055-

Copyright © Congress of Neurological Surgeons. Unauthorized reproduction of this article is prohibited.

memory problems. The authors also suggest a 'soft' association between concussion and Alzheimer's disease.

This is an interesting paper that poses an intriguing hypothesis regarding the consequences of recurrent concussion, not only to create short-term problems, but also to accelerate the decline of cognitive function in later years. While tantalizing, the findings are soft. This data is derived from a questionnaire administered to a group that may have substantial bias, especially considering the recent reports and concerns expressed by physicians and the media. How did the authors pare down the original 2552 respondents to 758 whose memory questionnaires were analyzed? Figure one suggests an earlier onset of Alzheimer's disease in respondents aged less than 69 years, but the trend corrects by the age of 75. If the hypothesis is correct, why shouldn't this early separation persist or widen over time?

As usual, the data in sports medicine is difficult to control. Despite its shortcomings, it is reasonable that this paper should be published, not on the basis of its science, but on its conjecture and the need for neurosurgeons to be more aware of the current information in this area.

**Arthur L. Day**
*Boston, Massachusetts*

This latest manuscript on the relationship between cognitive impairment and recurrent concussion focuses on players from the National Football League. As in previous studies, there is an association between the frequency of recurrent concussion, the development of mild cognitive impairment, and the suggestion that Alzheimer's disease develops earlier in such patients. This trend is potentially of interest, but a larger sample is necessary.

One concern with the manuscript is the lack of controls in other sports where aggressive behavior is common but concussion is relatively rare, such as in wrestling. There may be genetic linkage to aggressive behavior and cognitive impairment later in life, which is separate from concussion. Perhaps the link is unlikely, but such controls in future studies would help support the hypothesis. Clearly, this is an area of continuing interest and the authors work is important.

**Lawrence F. Marshall**
*San Diego, California*

Unfortunately, this manuscript reflects the low priority our society places on the prevention of head injuries and the major sequelae. It attempts to address the significant concern that repeated head injury leads to brain damage. Injury prevention programs, such as ThinkFirst, confront the lack of accurate studies on the potential damage of head trauma such as those sustained by both amateur and professional athletes.

The present study does not dispel uncertainties regarding the relationship between repeated concussions and subsequent onset of brain disorders, most importantly Alzheimer's disease. The study suffers from lack of professionally obtained prospective data. The glaring deficiency of this study is its reliance on questionnaires from patients and relatives that were obtained retrospectively. Society must provide the author with the necessary funds and incentive to do the study correctly based on professionally obtained prospective data. Regrettably, the questions raised by the authors are of great importance to society and remain unanswered.

**Charles H. Tator**
*Toronto, Ontario, Canada*

This is an extremely valuable contribution. Most concussion studies focus on the days and weeks following the injury with the implicit assumption that recovery to preinjury levels is the end of the issue. The present paper provides strong suggestion that some residua of a concussion may not become manifest until decades after the injury. The study also provides a strong rationale for future studies focusing on the effects of concussion on cognitive reserves, rather than simply on performance in the immediate aftermath of injury. Moreover, because the present study demonstrates a dose-response relation between concussion and future cognitive disorder, it highlights the importance of reducing lifetime burden of concussion in athletes.

The authors are to be commended for clearly stating the limitations of their retrospective self-report experimental design. However, the 'gold-standard' methodology would require a multi-decade prospective study. While I think the present findings support the need for a prospective inception-cohort study on this question, this should not overshadow the importance of the present findings and the importance of additional follow-up studies exploring the pathophysiological underpinnings of the present findings.

**Joseph Bleiberg**
*Neuropsychologist*
*Washington, D.C.*

This is an important paper on the relationship between cerebral concussion and subsequent cognitive impairment in retired professional football players. Its major flaw, as the authors acknowledge, is that the history of previous concussion was based on the players' 'retrospective recall of injury events.' Nonetheless, their data strongly suggests there is a cumulative deleterious effect of repeated concussion on later cognitive function. It further emphasizes the need to enhance protective measures that minimize concussion in contact sports and to carefully follow players by documenting the number and severity of concussive events throughout their careers. Finally, given the increasing data concerning the long-term risk of greater cognitive impairment for concussed individuals carrying the apolipoprotein E e4 allele, genetic screening and counseling of individuals about to embark on a potentially long career of contact sports should be considered.

**Daniel F. Kelly**
*Los Angeles, California*



Copyright © Congress of Neurological Surgeons. Unauthorized reproduction of this article is prohibited.

# EXHIBIT 56

SPECIAL REPORT

# Chronic Traumatic Encephalopathy in a National Football League Player

**Bennet I. Omalu, M.D., M.P.H.**

Departments of Pathology
and Epidemiology,
University of Pittsburgh,
Pittsburgh, Pennsylvania

**Steven T. DeKosky, M.D.**

Departments of Human Genetics
and Neurology,
University of Pittsburgh,
Pittsburgh, Pennsylvania

**Ryan L. Minster, M.S.I.S.**

Department of Human Genetics,
University of Pittsburgh,
Pittsburgh, Pennsylvania

**M. Ilyas Kamboh, Ph.D.**

Department of Human Genetics,
University of Pittsburgh,
Pittsburgh, Pennsylvania

**Ronald L. Hamilton, M.D.**

Department of Pathology,
University of Pittsburgh,
Pittsburgh, Pennsylvania

**Cyril H. Wecht, M.D., J.D.**

Departments of Pathology and
Epidemiology,
University of Pittsburgh,
Pittsburgh, Pennsylvania

**Reprint requests:**
Bennet I. Omalu, M.D., M.P.H.,
Departments of Pathology
and Epidemiology,
University of Pittsburgh,
7520 Penn Bridge Court,
Pittsburgh, PA 15221.
Email: bennet.omalu@verizon.net

**Received,** August 30, 2004.
**Accepted,** February 10, 2005.

**OBJECTIVE:** We present the results of the autopsy of a retired professional football player that revealed neuropathological changes consistent with long-term repetitive concussive brain injury. This case draws attention to the need for further studies in the cohort of retired National Football League players to elucidate the neuropathological sequelae of repeated mild traumatic brain injury in professional football.

**METHODS:** The patient's premortem medical history included symptoms of cognitive impairment, a mood disorder, and parkinsonian symptoms. There was no family history of Alzheimer's disease or any other head trauma outside football. A complete autopsy with a comprehensive neuropathological examination was performed on the retired National Football League player approximately 12 years after retirement. He died suddenly as a result of coronary atherosclerotic disease. Studies included determination of apolipoprotein E genotype.

**RESULTS:** Autopsy confirmed the presence of coronary atherosclerotic disease with dilated cardiomyopathy. The brain demonstrated no cortical atrophy, cortical contusion, hemorrhage, or infarcts. The substantia nigra revealed mild pallor with mild dropout of pigmented neurons. There was mild neuronal dropout in the frontal, parietal, and temporal neocortex. Chronic traumatic encephalopathy was evident with many diffuse amyloid plaques as well as sparse neurofibrillary tangles and $\tau$-positive neuritic threads in neocortical areas. There were no neurofibrillary tangles or neuropil threads in the hippocampus or entorhinal cortex. Lewy bodies were absent. The apolipoprotein E genotype was E3/E3.

**CONCLUSION:** This case highlights potential long-term neurodegenerative outcomes in retired professional National Football League players subjected to repeated mild traumatic brain injury. The prevalence and pathoetiological mechanisms of these possible adverse long-term outcomes and their relation to duration of years of playing football have not been sufficiently studied. We recommend comprehensive clinical and forensic approaches to understand and further elucidate this emergent professional sport hazard.

**KEY WORDS:** Chronic traumatic encephalopathy, National Football League, Retired professional football players

*Neurosurgery* 57:128-134, 2005   DOI: 10.1227/01.NEU.0000163407.92769.ED   www.neurosurgery-online.com

Several professional players of the National Football League (NFL) have retired prematurely because of postconcussion syndrome (29), a possible outcome of repeated concussion of the brain. The NFL Committee on Mild Traumatic Brain Injury, which was formed in 1994 to study this trend, has replaced the terminology *postconcussion syndrome* with *mild traumatic brain injury* (MTBI). MTBI is defined as a "traumatically induced alteration in brain function that is manifested by a) alteration of awareness or

consciousness, including but not limited to loss of consciousness, sensation of being dazed or stunned, sensation of woosiness or fogginess, seizure, or amnesic period; and b) signs and symptoms commonly associated with postconcussion syndrome, including persistent headaches, vertigo, lightheadedness, loss of balance, unsteadiness, syncope, near-syncope, cognitive dysfunction, memory disturbance, hearing loss, tinnitus, blurred vision, diplopia, visual loss, personality change, drowsiness, lethargy, fatigue, and inability to

Copyright © Congress of Neurological Surgeons. Unauthorized reproduction of this article is prohibited.

perform usual daily activities" (29). In 1995, the committee recommended that the NFL should fund independent scientific research to understand the causes of MTBI and elucidate ways of preventing MTBI. Despite this recommendation, which was made many years ago, the possible long-term cognitive and neurodegenerative sequelae of professional football as well as the underlying histological changes and pathobiological cascades associated with and likely induced by the trauma of professional football are little understood. This is especially true for the neuropathological changes, because no cases have come to autopsy.

We herein report the first documented case of long-term neurodegenerative changes in a retired professional NFL player consistent with chronic traumatic encephalopathy (CTE). This case draws attention to a disease that remains inadequately studied in the cohort of professional football players, with unknown true prevalence rates. Although clinical assessments can determine encephalopathy and dementia, and new neuroimaging methods may aid in the detection of amyloid plaques (23), autopsy examination is required to confirm the neuropathological basis of these changes. Autopsies aimed at diagnosing long-term central nervous system (CNS) sequelae of repeated brain concussions in NFL players are virtually nonexistent. Our case represents an extremely rare scenario whereby a complete autopsy was performed on a retired NFL player with a comprehensive neuropathological examination, which revealed changes consistent with CTE.

# CASE REPORT

## Premortem History

Our patient was a 50-year-old professional football player who died approximately 12 years after retirement from the NFL. He began playing football in high school and played for 3 years in college, where he was a team's most valuable player and a multiyear starter as a lineman in a Division I college. Drafted into the NFL at the age of 22 years, he played in 245 games in the NFL during 17 seasons. For 10 of those years, he played 177 consecutive games, principally as an offensive linesman. He was in the starting lineup in 150 consecutive games and played in 19 playoff games (15). After his retirement, he presented with a medical history that included atrial fibrillation and coronary atherosclerotic disease, which were treated with intraluminal stenting. Telephone interviews of surviving family members revealed a neuropsychiatric history that resembled a dysthymic disorder according to the criteria of the *Diagnostic and Statistical Manual of Mental Disorders*, 4th edition (2). Other medical history included a deficit in memory and judgment as well as parkinsonian symptoms. He died suddenly from clinically documented myocardial infarction. There was no known history of brain trauma outside professional football.

## Autopsy Findings

### General

External examination revealed the body of an adult Caucasian man who weighed 244 lb and measured 69 inches (body mass index, 36 kg/m$^2$ [Class II obesity]). There was no external evidence of recent trauma. The pericardium revealed diffuse fibrocalcific and adhesive pericardioepicarditis. The cardiovascular system revealed dilated cardiomyopathy with severe cardiomegaly (855 g), severe bilateral atrioventricular dilation; biventricular hypertrophy; and patchy subendocardial, endocardial, and valvular fibrosis. There was evidence of cardiogenic shock with centrilobular hepatocellular coagulative necrosis. There was chronic sinusoidal hepatic congestion with trabecular atrophy. There was severe atherosclerosis of the proximal and distal right coronary artery and the left anterior descending coronary artery, with approximately 95% multifocal intraluminal occlusion. The proximal left circumflex coronary artery revealed moderate atherosclerosis with 50 to 75% focal intraluminal occlusion. A metal intraluminal surgical stent was identified in the proximal right coronary artery. The myocardium revealed moderate interstitial and perivascular fibrosis. The respiratory system revealed moderate acute pulmonary edema and congestion with patchy, acute, and terminal bronchopneumonia.

### Gross CNS Findings

The dura mater and dural sinuses appeared unremarkable. The formalin-fixed whole brain weighed 1565 g, whereas the cerebellum and brainstem weighed 220 g. The leptomeninges were unremarkable. There was no cerebral atrophy. There were no cortical contusions, infarcts, or hemorrhages. There was moderate cerebral edema but no evidence of uncal or cerebellar tonsillar herniation. The cerebral blood vessels and circle of Willis revealed focal mild eccentric atherosclerosis of the left vertebral artery without aneurysms or other anomalies. The cranial nerves were normal.

Coronal sections of the cerebral hemispheres revealed no significant gross pathological changes of the cortex, white matter, or deep gray structures. The ventricles were not enlarged, and there was no atrophy of the hippocampi or the corpus callosum. The amygdala and piriform cortex demonstrated no atrophy. The mamillary bodies and hypothalamus appeared unremarkable.

The midbrain, pons, and medulla oblongata were grossly unremarkable, except for the pigmentation of the substantia nigra, which was attenuated for age, but the locus ceruleus appeared adequately pigmented. There were no infarcts in the cerebellum. There was mild atrophy of the anterior superior vermis. The dentate nucleus appeared normal. The pituitary gland and spinal cord were unremarkable.

### CNS Histomorphology

Primary hematoxylin and eosin stains were performed on all tissue sections. After they were reviewed, a panel of spe-

Copyright © Congress of Neurological Surgeons. Unauthorized reproduction of this article is prohibited.

cialized histochemical and immunohistochemical stains was applied. These specialized stains included β-amyloid protein (Beta-A4; Dako, Carpinteria, CA), neurofilament (Dako), α-synuclein (Zymed Laboratories, South San Francisco, CA), and τ-protein (Dako) immunostains as well as Bielschowsky's silver impregnation histochemical stains.

The frontal, parietal, and temporal neocortex revealed normal laminar and columnar organization, with mild neuronal dropout and astrogliosis. The penetrating parenchymal vessels revealed patchy perivascular hemosiderin-laden macrophages in the Virchow-Robin spaces. There was moderate cerebral edema. The centrum semiovale revealed no white matter rarefaction or perivascular pallor but demonstrated focal mural mineralization of deep penetrating blood vessels. There was no periventricular leukomalacia, and the subependymal white matter was nongliotic. The basal ganglia and subcortical white matter tracts were unremarkable. There was mild to moderate neuronal dropout of the nigral pars compacta and pars reticularis, accompanied by mild extraneuronal pigment and astrogliosis. There were no Lewy bodies. There was no mineralization of pallidal vessel walls. The hippocampus revealed mild neuronal dropout of the pyramidal neurons of Sommer's sector (CA-1) without selective neuronal necrosis. There were no Hirano bodies and no granulovacuolar neuronal degeneration. The subiculum, entorhinal cortex, and alveus were unremarkable, as were the amygdala and basal nucleus of Meynert. There were no lesions in the remaining brainstem structures. The cerebellar cortex revealed mild neuronal dropout and Bergmann astrogliosis of the Purkinje cell layer. This was accentuated in the superior anterior vermis, which also revealed mild atrophy of the internal granule cell layer. The cerebellar white matter and dentate nucleus were unremarkable. The adenohypophysis and neurohypophysis were normal. The cervical, thoracic, and lumbar segments of the spinal medulla were normal and demonstrated no signs of anterior horn cell dropout or degenerative changes.

### Specialized Stains

The battery of immunohistochemical stains revealed frequent diffuse extracellular amyloid plaques (*Fig. 1A*), sparse τ-positive neuritic threads (*Fig. 1B*), and sparse intraneuronal band-shaped and flame-shaped neurofibrillary tangles (NFTs) (*Fig. 1C*) in the frontal, temporal, parietal, occipital, and cingulate cortex and the insula. Cortical Lewy bodies were absent. Many neocortical perikarya revealed diffuse cytoplasmic immunopositivity for neurofilament protein. The hippocampal formation was spared of these pathological changes; the dentate gyrus, cornu ammonis, and subiculum demonstrated no diffuse amyloid plaques (*Fig. 1D*), NFTs, neuritic threads, or Lewy bodies. The subcortical nuclei and brainstem, including the substantia nigra, contained no diffuse amyloid plaques, NFTs, neuritic threads, or Lewy bodies. There was no histological evidence of cerebral amyloid angiopathy.



**FIGURE 1.** *A, β-amyloid immunostain of the neocortex (original magnification, ×200) showing frequent diffuse amyloid plaques. B, τ immunostain of the neocortex (original magnification, ×200) showing sparse NFTs and many τ-positive neuritic threads. C, τ immunostain (original magnification, ×400) showing an NFT in a neocortical neuron with extending τ-positive dendritic processes. D, β-amyloid immunostain (original magnification, ×100) of the Sommer's sector (CA-1 region of the hippocampus) showing no diffuse amyloid plaques.*

### Apolipoprotein E (ε) Genotyping

Genomic deoxyribonucleic acid (DNA) was extracted from 25-mg formaldehyde-fixed brain tissue with the QIAamp DNA Mini Kit (Qiagen, Valencia, CA) using the protocol for isolation of genomic DNA from formaldehyde-fixed tissues. Representative whole-genome amplification of the extracted DNA was accomplished using the GenomiPhi DNA Amplification Kit (Amersham Biosciences, Piscataway, NJ). Restriction fragment length polymorphism analysis was completed using previously published protocols (20). The genotype of the sample was determined to be E3/E3 (*Fig. 2*).

## DISCUSSION

Although head injury (repeated mild concussive brain injury or a single episode of severe diffuse brain injury) may increase the risk of sporadic Alzheimer's disease (AD), (14, 25) importantly, this case did not meet criteria for AD but met criteria for CTE. Cortical amyloid plaques and NFTs were unaccompanied by tangles in the entorhinal cortex or hippocampus, which is the usual starting point for neuropathological changes of sporadic AD. The first neuropathological report on the long-term effects of contact sport (boxing) was written by Brandenburg and Hallervorden (8) in 1954, in a 51-year-old retired boxer who manifested delayed posttraumatic dementia with AD pathological changes. In 1973,

Copyright © Congress of Neurological Surgeons. Unauthorized reproduction of this article is prohibited.



**FIGURE 2.** *Polyacrylamide gel electrophoresis showing DNA from decedent's brain under ultraviolet light. Lanes 1 and 2 contain duplicate samples of the DNA extracted from the brain sample amplified as described in the text and digested with HhaI to reveal the restriction fragment length polymorphism. Lane 3 is a sample known to be E2/E4 prepared in parallel with the samples from Lanes 1 and 2. Lane 4 is a negative template control. Lane 5 contains a 50- to 2000 base-pair (bp) ladder.*

Corsellis et al. (8) described the neurohistological substrate of CTE in the brains of 15 retired professional and amateur boxers. These reports and other subsequent reports (12–14, 34–36, 39, 41) have described characteristic neuropathological findings for CTE, especially in boxers, which comprise: 1) sparse to many τ-positive NFTs in the neocortex concentrated around penetrating parenchymal vessels, 2) neocortical τ-immunopositive neurites in the neuropil (neuropil threads), and 3) neocortical diffuse amyloid plaques with or without neuritic plaques. Neocortical changes seem to spare the hippocampus. The NFT distribution is notably different from that observed in normal aging and AD, in which there is early involvement of the entorhinal cortex and hippocampus with later involvement of the neocortex in advanced stages. Other reported delayed gross neuropathological changes in the brains of retired boxers have included cerebral atrophy, cerebral amyloid angiopathy, communicating hydrocephalus, fenestrations of the septum pellucidum, cavum septi pellucidi, cerebellar cortical atrophy, and degeneration of the substantia nigra (8, 10, 12, 34, 38, 39, 41). After an extensive search of the medical literature, we could not identify any study on the neuropathological substrate of delayed neurodegeneration in professional football players.

The pathological mechanisms for these delayed posttraumatic changes are thought to be biochemical cascades that are induced by cumulative effects of repeated low-grade concussive brain injury, especially changes like hyperphosphorylation of neuronal microtubule-associated protein and aberrant metabolism of amyloid precursor protein (13, 34, 38, 39). It has been suggested that repeated axonal injury, vascular injury, and ischemia trigger a cascade of molecular events involving derangement of neuronal cytoskeletal metabolism and accumulation of abnormal cytoskeletal proteins; increased expression of amyloid precursor protein; and a subsequent increase in the β-amyloid fragment, which is deposited in amyloid plaques.

The sport of American football has a high probability of impact to the head and concussion of the brain. There are up to 300,000 cases per year of MTBI or brain concussion in contact sports in the United States (29–32). There are approximately 0.41 concussions per NFL game of American football: 67.7% of concussions involve impact by another player's helmet, 20.9% involve impact by other body regions (e.g., a knee), and 11.4% involve impact on the ground (29, 31, 32, 40). It has been reported that 9.3% of the concussions involved loss of consciousness and 2.4% of the concussions resulted in hospitalization. Most (92%) of the players who sustain a concussion return to practice in less than 7 days; fewer (69%) of the players who experience loss of consciousness return to practice in less than 7 days. The relative risk of brain concussion in NFL players is associated with player position. Although every player position is at risk of brain concussion, quarterbacks, wide receivers, tight ends, and defensive backs have the highest relative risks (1.62, 1.23, 0.94, and 0.93 concussions per 100 games, respectively) (30–32). The most frequent position played by the patient was an offensive lineman. In a 17-year career as an offensive lineman, he sustained numerous episodes of mild traumatic and/or concussive brain injury, which is supported by the histological evidence of remote hemorrhages into the Virchow-Robin spaces of penetrating parenchymal vessels, with multiple perivascular hemosiderin-laden macrophages. These histological findings indicate microvascular injury that may be sustained from repetitive concussive brain injury.

Concussions in professional football are related to translational acceleration-deceleration, with considerable head impact velocity and velocity changes. The injury potential of these transferring inertial forces is ameliorated by the use of protective helmets. Since 1978, there has been a remarkable reduction in fatal head injuries (51%), concussions (35%), and cranial fractures (65%) in youth football, after the voluntary adoption of set standards for protective helmet manufacturers by the National Operating Committee on Standards for Athletic Equipment (29, 31, 32). The NFL has aggressively pursued the prevention of traumatic brain injury during play by the modification of play and rules of play as well as the introduction of improved standardized helmets, which have generated a marked reduction in the incidence of fatal and nonfatal head injuries (6). Although the technology and safety of football helmets have advanced in the past decades, this player's career spanned earlier decades in which helmets were not as protective as the ones in use today.

The acute sequelae of brain injury in professional football players have been elucidated and ameliorated, although there is less information about the chronic long-term sequelae of brain injury in retired football players. A variety of delayed clinical outcomes have been studied by radiological and neuropsychiatric testing, although without neuropathological evaluation. Such studies have suggested long-term impaired cognitive functioning (memory, planning, and visuoperceptual processing), electroencephalographic abnormalities, and cerebral atrophy in professional boxers, soccer players, football players, ice hockey players, karate players, lacrosse players, and rugby players (1, 3, 5, 7, 11, 22, 24, 33, 39, 42, 43). Possible symptoms of CTE may include recurrent headaches,

Copyright © Congress of Neurological Surgeons. Unauthorized reproduction of this article is prohibited.

irritability, dizziness, lack of concentration, impaired memory, and mental slowing; mood disorders, explosive behavior, morbid jealousy, and pathological intoxication and paranoia; tremor, dysarthria, and parkinsonian movement disorders (9, 18, 19, 26, 37). Postmortem telephone interviews of close family members of the patient in this case indicated a long-standing mood disorder that resembled a dysthymic disorder according to the criteria of the *Diagnostic and Statistical Manual of Mental Disorders*, 4th edition (2).

### Apolipoprotein E (ε) and CTE

We analyzed the apolipoprotein E (APOE) genotype of the patient in this case, because genotypic variation of APOE predisposes to or mitigates the development of AD and posttraumatic AD-like pathological changes (4, 16). The possession of the APOE4 allele by professional football players and boxers has been associated with chronic neurological deficits, lower scores in overall cognitive performance, and lower scores in cognitive domains (17, 21). The three APOE isoforms differ by only one or two amino acids but confer a three- to ninefold increase in the risk for developing these diseases (APOE4 > APOE3 > APOE2). Individuals who inherit one or two copies of APOE4 have an earlier age of onset for late-onset and sporadic AD and increased long-term sequelae of brain trauma (4). The presence of the APOE4 allele does not confer absolute predisposition to CTE and/or other sporadic or posttraumatic AD pathological changes, and absence of the APOE4 allele does not confer absolute protection from these diseases (4). Geddes et al. (12) reported the E3/E3 APOE genotype in two patients with repetitive head injury in contact sports who demonstrated neuronal cytoskeletal changes and CTE. The authors concluded that CTE can occur in the absence of APOE4 (12, 13). Our finding of the E3/E3 APOE genotype in our patient appears similar to the findings in the cases reported by Geddes et al. (12, 13).

## CONCLUSION

This case study by itself cannot confirm a causal link between professional football and CTE. However, it indicates the need for comprehensive cognitive and autopsy-based research on long-term postneurotraumatic sequelae of professional American football. Empirical, cognitive, and postmortem data on CTE are currently unavailable in the population cohort of professional NFL players. Our report therefore constitutes a forensic epidemiological sentinel case that draws attention to a possibly more prevalent yet unrecognized disease because of the rarity of CNS-targeted autopsies in the cohort of retired NFL players.

## REFERENCES

1. Abreau FTD, Schuyler BA, Hutchison HT: Neuropsychological assessment of soccer players. **Neuropsychology** 4:175–181, 1990.
2. American Psychiatric Association, American Psychiatric Association Task Force on DSM-IV: *Diagnostic and Statistical Manual of Mental Disorders: DSM-IV-TR*. Washington, DC, American Psychiatric Association, 2000.
3. Aotsuka A, Kojima S, Furumoto H, Hattori T, Hirayama K: Punch drunk syndrome due to repeated karate kicks and punches [in Japanese]. **Rinsho Shinkeigaku** 30:1243–1246, 1990.
4. Bales KR, Dodart JC, DeMattos RB, Holtzman DM, Paul SM: Apolipoprotein E, amyloid, and Alzheimer disease. **Mol Interv** 2:363–375; 339, 2002.
5. Barth JT, Macciocchi SN, Giordani B, Rimel R, Jane JA, Boll TJ: Neuropsychological sequelae of minor head injury. **Neurosurgery** 13:529–533, 1983.
6. Cantu RC, Mueller FO: Brain injury-related fatalities in American football, 1945–1999. **Neurosurgery** 52:846–852, 2003.
7. Collins MW, Grindel SH, Lovell MR, Dede DE, Moser DJ, Phalin BR, Nogle S, Wasik M, Cordry D, Daugherty KM, Sears SF, Nicolette G, Indelicato P, McKeag DB: Relationship between concussion and neuropsychological performance in college football players. **JAMA** 282:964–970, 1999.
8. Corsellis JA, Bruton CJ, Freeman-Browne D: The aftermath of boxing. **Psychol Med** 3:270–303, 1973.
9. Dikmen SS, Bombardier CH, Machamer JE, Fann JR, Temkin NR: Natural history of depression in traumatic brain injury. **Arch Phys Med Rehabil** 85:1457–1464, 2004.
10. Editorial: Brain damage in sport. **Lancet** 1:401–402, 1976.
11. Erlanger DM, Kutner KC, Barth JT, Barnes R: Neuropsychology of sports-related head injury: Dementia Pugilistica to Post Concussion Syndrome. **Clin Neuropsychol** 13:193–209, 1999.
12. Geddes JF, Vowles GH, Nicoll JA, Revesz T: Neuronal cytoskeletal changes are an early consequence of repetitive head injury. **Acta Neuropathol (Berl)** 98:171–178, 1999.
13. Geddes JF, Vowles GH, Robinson SF, Sutcliffe JC: Neurofibrillary tangles, but not Alzheimer-type pathology, in a young boxer. **Neuropathol Appl Neurobiol** 22:12–16, 1996.
14. Gentleman SM, Graham DI, Roberts GW: Molecular pathology of trauma: Altered βAPP metabolism and the etiology of Alzheimer's disease, in Kogure K, Hossmann K-A, Siesjö BK (eds): *Progress in Brain Research*. New York, Elsevier, 1993, pp 237–246.
15. http://www.footballresearch.com/articles. February 20, 2004.
16. Jin ZQ, Fan YS, Ding J, Chen M, Fan W, Zhang GJ, Zhang RB, Yu SJ, Zhang YS, Ji WF, Zhang JG: Association of apolipoprotein E 4 polymorphism with cerebral infarction in Chinese Han population. **Acta Pharmacol Sin** 25:352–356, 2004.
17. Jordan BD, Relkin NR, Ravdin LD, Jacobs AR, Bennett A, Gandy S: Apolipoprotein E ε4 associated with chronic traumatic brain injury in boxing. **JAMA** 278:136–140, 1997.
18. Jorge R, Robinson RG: Mood disorders following traumatic brain injury. **Int Rev Psychiatry** 15:317–327, 2003.
19. Jorge RE, Robinson RG, Moser D, Tateno A, Crespo-Facorro B, Arndt S: Major depression following traumatic brain injury. **Arch Gen Psychiatry** 61:42–50, 2004.
20. Kamboh MI, Aston CE, Hamman RF: The relationship of APOE polymorphism and cholesterol levels in normoglycemic and diabetic subjects in a biethnic population from the San Luis Valley, Colorado. **Atherosclerosis** 112:145–159, 1995.
21. Kutner KC, Erlanger DM, Tsai J, Jordan B, Relkin NR: Lower cognitive performance of older football players possessing apolipoprotein E ε4. **Neurosurgery** 47:651–658, 2000.
22. Maddocks D, Saling M: Neuropsychological deficits following concussion. **Brain Inj** 10:99–103, 1996.
23. Mathis CA, Wang Y, Klunk WE: Imaging β-amyloid plaques and neurofibrillary tangles in the aging human brain. **Curr Pharm Des** 10:1469–1492, 2004.
24. Matser JT, Kessels AG, Jordan BD, Lezak MD, Troost J: Chronic traumatic brain injury in professional soccer players. **Neurology** 51:791–796, 1998.
25. McKenzie JE, Gentleman SM, Roberts GW, Graham DI, Royston MC: Increased numbers of βAPP-immunoreactive neurones in the entorhinal cortex after head injury. **Neuroreport** 6:161–164, 1994.
26. Mendez MF: The neuropsychiatric aspects of boxing. **Int J Psychiatry Med** 25:249–262, 1995.
27. Millar K, Nicoll JA, Thornhill S, Murray GD, Teasdale GM: Long term neuropsychological outcome after head injury: Relation to APOE genotype. **J Neurol Neurosurg Psychiatry** 74:1047–1052, 2003.
28. Nicoll JA, Roberts GW, Graham DI: Apolipoprotein E ε4 allele is associated with deposition of amyloid β-protein following head injury. **Nat Med** 1:135–137, 1995.
29. Pellman EJ: Background on the National Football League's research on concussion in professional football. **Neurosurgery** 53:797–798, 2003.

Copyright © Congress of Neurological Surgeons. Unauthorized reproduction of this article is prohibited.

30. Pellman EJ, Powell JW, Viano DC, Casson IR, Tucker AM, Feuer H, Lovell M, Waeckerle JF, Robertson DW: Concussion in professional football: Epidemiological features of game injuries and review of the literature—Part 3. **Neurosurgery** 54:81–96, 2004.

31. Pellman EJ, Viano DC, Tucker AM, Casson IR: Concussion in professional football: Location and direction of helmet impacts—Part 2. **Neurosurgery** 53:1328–1340, 2003.

32. Pellman EJ, Viano DC, Tucker AM, Casson IR, Waeckerle JF: Concussion in professional football: Reconstruction of game impacts and injuries. **Neurosurgery** 53:799–812, 2003.

33. Porter MD: A 9-year controlled prospective neuropsychologic assessment of amateur boxing. **Clin J Sport Med** 13:339–352, 2003.

34. Roberts GW: Immunocytochemistry of neurofibrillary tangles in dementia pugilistica and Alzheimer's disease: Evidence for common genesis. **Lancet** 2:1456–1458, 1988.

35. Roberts GW, Allsop D, Bruton C: The occult aftermath of boxing. **J Neurol Neurosurg Psychiatry** 53:373–378, 1990.

36. Roberts GW, Whitwell HL, Acland PR, Bruton CJ: Dementia in a punch-drunk wife. **Lancet** 335:918–919, 1990.

37. Ryan LM, Warden DL: Post concussion syndrome. **Int Rev Psychiatry** 15:310–316, 2003.

38. Smith DH, Chen XH, Nonaka M, Trojanowski JQ, Lee VM, Saatman KE, Leoni MJ, Xu BN, Wolf JA, Meaney DF: Accumulation of amyloid $\beta$ and $\tau$ and the formation of neurofilament inclusions following diffuse brain injury in the pig. **J Neuropathol Exp Neurol** 58:982–992, 1999.

39. Sortland O, Tysvaer AT: Brain damage in former association football players: An evaluation by cerebral computed tomography. **Neuroradiology** 31:44–48, 1989.

40. Tagliabue P: Tackling concussions in sports. **Neurosurgery** 53:796, 2003.

41. Tokuda T, Ikeda S, Yanagisawa N, Ihara Y, Glenner GG: Re-examination of ex-boxers' brains using immunohistochemistry with antibodies to amyloid $\beta$ protein and $\tau$ protein. **Acta Neuropathol (Berl)** 82:280–285, 1991.

42. Tysvaer AT, Storli OV: Soccer injuries to the brain: A neurologic and electroencephalographic study of active football players. **Am J Sports Med** 17:573–578, 1989.

43. Tysvaer AT, Storli OV, Bachen NI: Soccer injuries to the brain: A neurologic and electroencephalographic study of former players. **Acta Neurol Scand** 80:151–156, 1989.

## COMMENTS

This is the first publication of chronic traumatic encephalopathy (CTE) in a retired National Football League (NFL) player. It should come as no surprise, though, as a number of NFL players have had to retire from sequelae of multiple mild traumatic brain injuries. It is also consistent with the findings of Kevin Guskiewicz, Julian Bailes, and others at The Center for the Study of Retired Athletes at the University of North Carolina. These researchers found retired NFL players with three or more concussions had a fivefold prevalence toward mild cognitive impairment and a threefold prevalence toward significant memory problems compared with retirees with no history of concussion. Hopefully, in the years ahead, the center will be able to study these retirees so a better idea of the incidence of CTE in former NFL players becomes known, as well as how many years of participation may lead to this risk. I fully support the conclusions of Omalu et al.

**Robert C. Cantu**
*Concord, Massachusetts*

In this case report of CTE in a retired NFL player, the authors provide an in-depth description of the deceased player's neuropathological findings. The authors assert that the individual's premortem cognitive decline, depression, parkinsonism symptoms, and neuropathological findings were a manifestation of traumatic encephalopathy resulting from his many years of professional football. Although this is an interesting hypothesis and it is

likely he sustained several mild traumatic brain injuries over the course of his NFL career, this assertion appears to be somewhat presumptuous because they are only reporting associated findings in a single individual. It is notable that no mention is made of any concussions, mild or otherwise, in his premortem history, and that he played predominantly as an offensive lineman which is one of the player positions associated with the lowest frequency of concussion in the NFL. Additionally, this individual's apolipoprotein E genotype was not E4 which has been more strongly associated with the development of Alzheimer's disease. Ideally, the causal link suggested here between a career in professional football and CTE would result from postmortem assessments of a group of similar individuals from the NFL compared with another group of otherwise well-matched individuals whose careers did not involve repetitive contact sports. I encourage the authors to continue their investigations.

**Daniel F. Kelly**
*Los Angeles, California*

The authors provide a detailed analysis of the central nervous system histopathology in an offensive lineman who played for 17 seasons in the NFL and died from a myocardial infarction 12 years after retirement. The autopsy findings were consistent with CTE. This article complements the series of articles by Pellman et al. that have previously appeared in this journal regarding the neuropsychological abnormalities suffered by NFL players, and provides an important anatomic underpinning for those abnormalities. Unfortunately, Omalu et al. did not provide specific information about the neuropsychological deficits experienced by this athlete, other than to state that he met criteria for dysthymic disorder, had deficits in memory and judgment, and had parkinsonian symptoms. It is unlikely that detailed neuropsychological testing was routinely performed during his career, so such data was probably not available. The increasing use of detailed pre- and post-traumatic neuropsychological testing by the NFL and amateur football groups should provide an invaluable database of information that will allow for clinical-anatomic correlations not previously possible. Together with information obtained from functional magnetic resonance imaging studies, this data will significantly advance our understanding of the cellular and physiologic mechanisms of traumatic brain injury.

**Donald W. Marion**
*Boston, Massachusetts*

This article raises some interesting questions. However, in this case report, the scientific validity of the putative association between suspected repetitive mild traumatic brain injury in professional football players and histological findings consistent with chronic neurodegenerative processes is, at the very least, questionable. This report highlights the potential value of a prospectively administered database that might include athletes' medical histories and, when available, postmortem findings and results of cognitive testing. More abundant and more rigorously collected data of this type might enable us to provide better answers to the questions posed here.

**Alex B. Valadka**
*Houston, Texas*

Omalu et al. have added to our knowledge of neuropathological correlates of sports-related head injury. They provide a detailed postmortem analysis of a retired player who spent 17 years in the NFL. It is clear that we are just beginning to understand the myriad of biomechanical, physiological, neurogenetic, and neurocognitive sequelae of this condition. By providing the first reported case of autopsy-confirmed traumatic encephalopathy in a professional football player, these authors provide an initial

Copyright © Congress of Neurological Surgeons. Unauthorized reproduction of this article is prohibited.

OMALU ET AL.

window to structural changes of this condition. It is noted that the authors indicate that the player's encephalopathy occurred as a result of long-term repetitive concussive brain injury. However, they did not indicate the frequency of concussive events or the numbers of years over which concussive events occurred. Because concussive events were not recorded systematically at the time of this player's career, we cannot be sure that his encephalopathy was caused by either repetitive or long-term events.

**Kenneth C. Kutner**
*Neuropsychologist*
*Hackensack, New Jersey*

Omalu et al. have reported a sentinel case of a 50-year-old retired NFL player with 17 years experience as a professional football player. It provides a glimpse, for the first time, into the gross and microscopic pathological changes of this relatively young brain, which had extensive exposure to repetitive head impacts in football. These findings, which are not consistent with Alzheimer's disease or aging, but rather CTE, have been observed previously in autopsy material of retired boxers. These consist predominantly of markers of neuronal and axonal injury to the neocortex with relative sparing of the hippocampus, as well as hemorrhagic markers in the Virchow Robin spaces.

Despite attempts to enact rule changes and to improve helmet design, naturally there are still regular episodes of traumatic brain injury in contact sports such as football. Irrespective of design modifications in the football helmet, there still exists the regular occurrence of rapid acceleration-deceleration mechanisms of brain injury which are difficult to ameliorate or eliminate. In addition, recent reports have suggested that the true incidence of concussion in football, recognized or subclinical in nature, is higher than previously believed. Although earlier research has shown that contact athletes may later develop mental and cognitive impairment, this case report documents cerebral histopathological abnormalities and adds to our knowledge as we further study the long-term consequences of repetitive traumatic brain injury.

**Julian E. Bailes**
*Morgantown, West Virginia*

This article raises controversial questions concerning the potential risk of CTE in retired NFL players. The authors provide detailed and compelling neuropathological evidence supporting the presence of CTE in this particular case, but there is no documentation of concussion history during the athlete's sports career. As the authors openly note, this is a single case report and does not establish an empirically substantiated causal relation between participation in professional football and the development of CTE, even if previous concussion history had been recorded in this case. Clearly, further investigation with multiple subjects and a controlled experimental design is needed.

By reporting their case, the authors lay a solid groundwork for pursuing further neuropathology studies in professional football players. Based on the potential association between CTE and boxing, it is certainly conceivable that there is a link between the activities inherent in professional football and CTE. However, the rate at which a typical player sustains head injuries and the severity of those injuries are important factors that may differentially affect the likelihood of developing CTE. Thus, it will be important to note not only the length of career and the number of athlete exposures, but to also include reliable concussion history data in future studies. Empirical studies that include this information would portray a more complete picture of the risks of professional football, contribute knowledge of the possible etiologic factors of CTE, and convey precautionary measures, if needed, to minimize its occurrence.

The postmortem finding of CTE in a retired football player raises

the possibility that some of the cognitive, emotional, and neurological symptoms observed in retired NFL athletes may be manifestations of disease processes other than Alzheimer's disease, which has been more extensively documented in recent literature. The relation of CTE, Alzheimer's disease, and the Apolipoprotein E genotype in retired athletes is also fuel for future research. Although this article raises more questions than it answers, it provides a foundation indicating that these questions are important and worth pursuing.

**Joseph Bleiberg**
*Neuropsychologist*
*Washington, District of Columbia*

This article represents the first documented case of long-term neurodegenerative changes in a retired professional NFL player. The case report describes the comprehensive autopsy and laboratory findings of a retired professional football player showing neuropathological changes consistent with long-term repetitive concussive brain injury. The report states that the deceased athlete "sustained numerous episodes of mild traumatic and concussive brain injury . . ." during his 17-year career as an offensive lineman. Although the report does not indicate an approximate number of suspected concussions, we are left to assume that it was well above the average of two concussions reported to the Center for the Study of Retired Athletes by retired NFL players with an average of 6.5 years in the league (1). Given that the deceased athlete played approximately three times longer than the retired NFL players in that study, we might predict that he experienced at least six concussions, and probably many more subconcussive impacts to the head during his professional football career.

The authors indicate that the deceased player demonstrated longstanding mood disorders that resembled a dysthymic disorder. This report parallels findings from the Center for the Study of Retired Athletes which suggest there is an association between recurrent concussions sustained during the professional playing years, and the likelihood of being diagnosed with clinical depression (1). As the authors state, the case study by itself cannot confirm a causal link between professional football and chronic neurodegenerative diseases such as CTE, however, it indicates the need for a more comprehensive study of both active and retired professional football players.

Furthermore, this case report calls to team physicians and athletic trainers for improved injury surveillance of concussions and other brain related traumas so future studies may be able to better understand the relationship between these injuries and the neurodegenerative changes described. For years there has been speculation of an increased risk for late life cognitive impairment in athletes with a history of multiple concussions. While this well written case report provides a good starting point for answering these important questions, future prospective studies implementing genetic testing, more rigorous diagnostic criteria, historical documentation, and extensive serial evaluations (e.g., neuropsychological testing and functional neuroimaging) will be necessary to clarify the direct or mitigating effects of head trauma on lifetime risk of such neurological disorders. The authors should be commended for providing the medical community with a very interesting paper that will make significant contributions to the literature on the topic of sport-related concussion and neurodegenerative disease, and will likely serve as an impetus for future study in this area.

**Kevin M. Guskiewicz**
*Chapel Hill, North Carolina*

---

1. http://www.csra.unc.edu/statistics.htm. Accessed June 13, 2005.

**-2064-**

Copyright © Congress of Neurological Surgeons. Unauthorized reproduction of this article is prohibited.

# EXHIBIT 57

# Chronic Traumatic Encephalopathy in a National Football League Player: Part II

**Bennet I. Omalu, M.D., M.P.H.**

Departments of Pathology
and Epidemiology,
University of Pittsburgh,
Pittsburgh, Pennsylvania

**Steven T. DeKosky, M.D.**

Departments of Human Genetics
and Neurology,
University of Pittsburgh,
Pittsburgh, Pennsylvania

**Ronald L. Hamilton, M.D.**

Department of Pathology,
University of Pittsburgh,
Pittsburgh, Pennsylvania

**Ryan L. Minster, M.S.I.S.**

Department of Human Genetics,
University of Pittsburgh,
Pittsburgh, Pennsylvania

**M. Ilyas Kamboh, Ph.D.**

Department of Human Genetics,
University of Pittsburgh,
Pittsburgh, Pennsylvania

**Abdulrezak M. Shakir, M.D.**

Department of Pathology,
University of Pittsburgh,
Pittsburgh, Pennsylvania

**Cyril H. Wecht, M.D., J.D.**

Departments of Pathology
and Epidemiology,
University of Pittsburgh,
Pittsburgh, Pennsylvania

**Reprint requests:**
Bennet I. Omalu, M.D., M.P.H.,
7520 Penn Bridge Court,
Pittsburgh, PA 15221.
Email: bennet.omalu@verizon.net

**Received,** January 4, 2006.
**Accepted,** June 30, 2006.

**OBJECTIVE:** We present the second reported case of autopsy-confirmed chronic traumatic encephalopathy in a retired professional football player, with neuropathological features that differ from those of the first reported case. These differing pathological features underscore the need for further empirical elucidation of the pathoetiology and pathological cascades of long-term neurodegenerative sequelae of professional football.

**METHODS:** A psychological autopsy was performed with the next-of-kin and wife. Medical and hospital records were reviewed. A complete autopsy was accompanied by a comprehensive forensic neuropathological examination. Restriction fragment length polymorphism analysis was performed to determine apolipoprotein-E genotype.

**RESULTS:** Pertinent premortem history included a 14-year span of play in organized football starting from the age of 18 years. The subject was diagnosed with severe major depressive disorder without psychotic features after retirement, attempted suicide multiple times and finally committed suicide 12 years after retirement by ingestion of ethylene glycol. Autopsy revealed cardiomegaly, mild to moderate coronary artery disease, and evidence of acute ethylene glycol overdose. The brain showed no atrophy, a cavum septi pellucidi was present, and the substantia nigra showed mild pallor. The hippocampus and cerebellum were not atrophic. Amyloid plaques, cerebral amyloid angiopathy, and Lewy bodies were completely absent. Sparse to frequent τ-positive neurofibrillary tangles and neuropil threads were present in all regions of the brain. Tufted and thorn astrocytes, as well as astrocytic plaques, were absent. The apolipoprotein-E genotype was E3/E4.

**CONCLUSION:** Our first and second cases both had long careers without multiple recorded concussions. Both manifested Major Depressive Disorder after retirement. Amyloid plaques were present in the first case and completely absent in the second case. Both cases exhibited neurofibrillary tangles, neuropil threads, and coronary atherosclerotic disease. Apolipoprotein-E4 genotypes were different. Reasons for the contrasting features in these two cases are not clear. Further studies are needed to identify and define the neuropathological cascades of chronic traumatic encephalopathy in football players, which may form the basis for prophylaxis and therapeutics.

**KEY WORDS:** Chronic traumatic encephalopathy, National Football League, Professional football players

*Neurosurgery 59:1086–1093, 2006*    DOI: 10.1227/01.NEU.0000245601.69451.27    www.neurosurgery-online.com

I n 2005, we reported the first autopsy-confirmed case of chronic traumatic encephalopathy (CTE) in a National Football League (NFL) player (5, 27). The brain in that report showed diffuse amyloid plaques, neuropil threads (NT) and neurofibrillary tangles (NFT) in the neocortex. There were no diffuse amyloid plaques, NTs, or NFTs in the entorhinal cortex or hippocampus. We now report the second autopsy-confirmed case of CTE in another NFL player with neuropathological findings that are somewhat distinct from the initial reported case. In contrast to the first case, the brain in this second case revealed topographically distributed sparse to frequent NFT and NT in the neocortex, hippocampus,

subcortical ganglia, and brainstem. There were no diffuse amyloid plaques. Whereas the apolipoprotein-E (APOE) genotype of our first case was E3/E3, the APOE genotype of this second case was E3/E4.

Chronic neurodegenerative changes have been causally associated with contact sports, including boxing, soccer, and American football (7, 13–15, 39, 40, 43, 45, 53). Autopsies aimed at diagnosing CTE are virtually non-existent in active or retired NFL players. This has precluded definitive elucidation of pathological cascades of chronic neurodegenerative sequelae of professional football by direct tissue analyses. Since the 1995 recommendation of the NFL Committee on Mild Traumatic Brain Injury (MTBI) for the NFL to fund research into MTBI, significant progress has been made in understanding and ameliorating or preventing acute MTBI (28–37, 50–52). However, we currently know little regarding the chronic neurodegenerative outcomes of long-term play in professional football. The differing pathological findings in our two cases, especially the absence of amyloid plaques in the second case, underscore the urgent need for further information and possibly a prospective, longitudinal study of former professional football players. Such a study, combining neurological, neuropsychiatric, neuroimaging, and post-mortem neuropathological facets and findings, might form the basis for possible prophylaxis and therapeutics.

### Premortem History

A psychological autopsy of this 45-year-old African-American man was performed with his next-of-kin and wife. He had married twice and had no children. At the time of his death, he lived alone and was separated from his second wife. He enlisted in the United States Armed Forces in 1977 after high school and served for 2 years. He began playing football at the age of 18 years, while in the military, and played as an offensive tackle for 2 years. He entered college after military service and moved on to a college football scholarship, during which time he played as a starting offensive line tackle for 4 years (1980–1984). In 1984, he was drafted by the NFL as a right guard and played for 8 consecutive years (1984–1992). He sustained several musculoskeletal and cartilage injuries while playing professional football, which necessitated multiple knee, elbow, and shoulder surgeries. He had indicated to his second wife that he sustained repeated mild concussions of his head on numerous occasions during his football career.

During his childhood and during his amateur and professional football career, his wife and family did not observe any obvious psychosocial or behavioral abnormality. However, within several years of his retirement from the NFL, his wife reported that he became increasingly quiet and that he was afraid and fearful, with paranoid tendencies. On some occasions, he would sweat profusely in public settings and become agitated when approached by other people. At other times, he was noted to exhibit a reassured, confident, and approachable demeanor. In private, he sometimes became extremely reclusive and distanced himself from all personal interactions with family and friends, often locking himself in the house for 1 to 2 days. He would later seek companionship from family and friends as if nothing had happened. He manifested unpredictable fluctuations in mood and personality.

Before his retirement, the decedent had started a sole proprietorship business in 1988. He began working as a sales manager for another business entity in 1992. In 1994, he formed a second wholesale produce corporation. In 1994, he diversified his business and expanded into food processing and manufacturing and created yet another new corporation. His business activities and decisions were regarded as extraordinarily risky, ambitious, and rather irrational. In business dealings, he also exhibited sudden and unexpected fluctuations in mood and personality. At some times, he appeared hard working, ambitious, and highly driven, but at others, he exhibited sudden bouts of agitation and irritability with no clear instigator. He would lose his ability to focus and concentrate and would become highly emotional, which led to failure of his business operations. In 2000, he further expanded his food service business and formed another sole proprietorship entity.

He was described by the next-of-kin as having "extreme highs and lows." He became progressively incapable of mentally handling very complex rational thoughts in matters of daily living and business. He became increasingly impulsive and paranoid. His erratic behavior continued to worsen; he exhibited disinhibition, began having financial problems, and could not sustain his businesses.

He began outpatient psychotherapy in 1992 after his first suicide attempt in 1991 by ingestion of rat poison and cold medications, after suspension from the NFL for violating the NFL's steroid policy. He was diagnosed with adjustment disorder with depressed mood after this first suicide attempt. He made several subsequent suicide attempts by ingestion of prescription drugs and antifreeze. He verbalized thoughts of suicide and attempted suicide again in 2003, shortly after he was investigated for a fire that destroyed his business. In 2005, he was indicted for arson and wrongful business transactions for apparently setting fire to his factory plant. His behavior became increasingly characterized by constant thoughts of suicide, and he was admitted for psychiatric treatment three times. A few weeks after his last discharge from the hospital, he was found lying on a couch with altered mental status; he died at a local hospital several hours later. Laboratory analyses of his blood and urine samples performed before his death revealed metabolic acidosis with increased blood lactic acid, negative base excess, high anion gap, high serum osmolality, hypocalcemia, and positive urine oxalate crystals.

There was no contributory family history relative to significant medical problems or severe depression/suicide attempts. There was a documented single episode of a rollover of a sport utility vehicle which he was driving when he swerved to avoid hitting a deer. He experienced a brief loss of consciousness at the scene, but recovered completely. There was at least one clinically documented severe concussive brain injury during play of football in 1987, which necessitated removal from play for at least 1 week. He was hospitalized for one night and complained of lightheadedness, unsteadiness in gait, and difficulty

concentrating. These symptoms were present for at least several days. Medical records from a local psychiatric hospital, where the decedent received follow-up psychiatric treatment, revealed a primary psychiatric diagnosis of major depressive disorder, which was severe and without psychotic features. Other significant medical history included thyroidectomy (2 mo before death) for hyperthyroidism (Grave's disease).

### Relevant Findings on General Autopsy

A complete autopsy was performed at the Allegheny County Coroner's Office. External examination revealed a well-developed, well-nourished African-American man who weighed 275 pounds and measured 72 inches and seemed consistent with the stated age of 45 years. There was no evidence of recent blunt force, penetrating force, or projectile trauma. Internal examination revealed a heart weight of 580 g. The heart showed patchy myofibrillary hypertrophy with focal infiltration of the subendocardium by neutrophils. The coronary arteries showed mild to moderate eccentric, segmental atherosclerosis with 40 to 60% multifocal luminal occlusion. The lungs showed moderate acute pulmonary edema and congestion. The right and left kidneys appeared grossly unremarkable; however, numerous intratubular oxalate crystals were found in histology sections of the kidneys. Postmortem toxicological analyses of blood and urine revealed the presence of ethylene glycol in the urine, with a level of 460 mg/dl. There was no ethylene glycol detected in the blood (ethylene glycol has a short half-life, of 2.5–4.5 h).

### Neuropathological Findings

The dura mater revealed no hemorrhages, xanthochromia, or subdural membranes. The brain weighed 1535 g in the fresh state. The cerebral and cerebellar hemispheres appeared symmetrical and revealed no anomalous gyral-sulcal convolutions, atrophy, contusions, infarcts, or hemorrhages. There was global edema and congestive swelling. The leptomeninges appeared normal, as did the vessels of the circle of Willis and the basilar and vertebral arteries. The cranial nerves were normal.

The neocortical gray ribbon was intact and the gray-white matter demarcation distinct. The centrum semiovale and the periventricular white matter revealed diffuse edema and congestion without hemorrhages, infarcts, or demyelination. The ventricles contained no abnormal fluid, were symmetrically compressed, and showed normal ependymal lining. A cavum septi pellucidi was present, compressed, and measured 0.9 × 0.1 cm at the coronal level of the nucleus accumbens. The septum pellucidum showed no fenestrations. The choroid plexuses were congested. The lamina terminalis and superior and inferior medullary vela were intact. The corpus callosum was not atrophic and was without hemorrhage or demyelination. The caudate nucleus, putamen, globus pallidus, thalamus, and subthalamic nucleus were normal, without lacunar infarcts or hemorrhages. The substantia nigra showed mild pallor. The internal capsule, basal nucleus of Meynert, amygdala, and piriform cortex were intact and without atrophy. The hippocam-

pus and parahippocampal gyrus revealed no anomalies or gross atrophy. The mamillary bodies and hypothalamus were normal. The midbrain, pons, and medulla oblongata revealed no hemorrhages, infarcts, or demyelination. The pituitary gland was normal.

Sections from 23 brain areas were submitted for histological tissue processing and analysis, including the middle frontal gyrus, cingulate gyrus, anterior corpus callosum, caudate nucleus, insula cortex, putamen and globus pallidus, hippocampus at the level of the lateral geniculate body, thalamus, midbrain at the level of the red nucleus and the substantia nigra, pons at the level of the locus ceruleus, medulla at the level of the inferior olivary nucleus, cerebellum with dentate nucleus, basal nucleus of Meynert, amygdala, inferior parietal lobule, superior and middle temporal gyri, occipital lobe-calcarine cortex, superior cerebellar vermis, splenium of corpus callosum, mamillary body and hypothalamus, pituitary gland, and dura mater. The following histochemical and immunohistochemical stains were performed on each section of the brain: hematoxylin and eosin, β-A4 amyloid immunostain, τ protein immunostain, neurofilament immunostain, α-synuclein immunostain, ubiquitin immunostain, amyloid precursor protein immunostain, and Bielschowsky silver impregnation stain. The section of the dura mater was stained only with hematoxylin and eosin.

Microscopic examination revealed sparse to moderate infiltration of the leptomeninges by neutrophils, accompanied by acute congestion of the leptomeningeal vessels, consistent with ethylene glycol-induced chemical leptomeningitis (16). There was mild neocortical neuronal dropout in the frontal, parietal, and temporal lobes, with residual normal laminar and columnar organization. Swollen, achromasic, or ballooned neurons were absent. There was mild extracellular edema of the cortical gray and white matter. Very focal and sparse perivascular oxalate microcrystals were noted. The centrum semiovale and the corpus callosum revealed no demyelination, pallor, or axonal spheroids. The ependymal lining showed intermittent denudations with focal infiltration of the occipital horn by neutrophils. There was patchy subependymal gliosis. The globus pallidus showed mild neuronal dropout. The internal, external, and extreme capsules and claustrum revealed no demyelination or degeneration.

The Sommer's sector, presubiculum and subiculum revealed cytoplasmic eosinophilia of many pyramidal neurons without neuronal dropout. The basal nucleus of Meynert and the amygdala revealed no neuronal dropout. The substantia nigra revealed mild neuronal dropout accompanied by mild extraneuronal pigment. The locus ceruleus also revealed mild neuronal dropout. The medulla oblongata revealed mild neuronal dropout and astrogliosis of the dorsal inferior olivary nucleus. There was mild neuronal dropout of the Purkinje neurons, without acute eosinophilic degeneration, as well as mild Bergmann astrogliosis. There was mild neuronal dropout of the internal granule cell layer and the dentate nucleus, which revealed mild fibrillary astrogliosis. The adenohypophysis revealed focal interstitial fibrosis with very focal sparse infiltration by



**FIGURE 1.** *Photomicrograph (×100) of a section of the frontal neocortex immunostained for τ protein, showing frequent NFTs and NTs.*



**FIGURE 2.** *Photomicrograph (×100) of a section of the locus ceruleus immunostained for τ protein, showing frequent NFTs and NTs.*

lymphocytes. The neurohypophysis was unremarkable. The dura mater was congested and revealed no inflammation or remote hemorrhage.

### Immunohistochemical Findings

Diffuse or neuritic amyloid plaques and cerebral amyloid angiopathy were absent in all regions of the brain examined. τ-positive band- and flame-shaped small and large globose perikaryal NFT were topographically observed in several regions (*Figs. 1* and *2*). The NFTs were also accompanied by τ-positive NTs. Large globose NFTs were found only in the midbrain, pons, basal nucleus of Meynert, substantia nigra, mammillary bodies, and hypothalamus. *Table 1* shows the dis-

**TABLE 1. Summary of topographic distribution and density of neurofibrillary tangles and neuropil threads**[a]

| Region of the brain | Density of NFTs | Density of NTs |
|---|---|---|
| Frontal lobe, left | +++ | ++ |
| Cingulate gyrus, corpus callosum, and caudate nucleus, left | | |
| *Cingulate cortex* | + | + |
| *Caudate nucleus* | +* | +* |
| Insular cortex, putamen and globus pallidus, left | | |
| *Insular cortex* | ++* | ++* |
| *Putamen* | +* | +* |
| *Globus pallidus* | 0 | 0 |
| Hippocampus, left | | |
| *CA-1, CA-2, CA-3* | + | + |
| *Subiculum, presubiculum* | + | + |
| *Entorhinal cortex* | +++ | +++ |
| Thalamus, left | + | + |
| Midbrain, level of red nucleus | | |
| *Superior colliculi/oculomotor nucleus* | + | + |
| *Substantia nigra* | ++* | ++* |
| Pons, level of locus ceruleus | | |
| *Locus ceruleus* | +++ | +++ |
| *Other pontine tegmental nuclei* | + | + |
| Medulla | + | + |
| Cerebellum | 0 | 0 |
| Basal nucleus of Meynert | + | + |
| Amygdala | ++ | + |
| Inferior parietal lobule, left | ++ | + |
| Superior and middle temporal gyri, left | +++ | ++ |
| Occipital lobe, calcarine cortex, left | 0 | 0 |
| Superior cerebellar vermis | 0 | 0 |
| Splenium of corpus callosum | | |
| *Posterior cingulate cortex* | + | +* |
| *Corpus callosum* | n/a | 0 |
| Hippocampus, right | | |
| *Cornu ammonis (CA1–3)* | ++ | ++ |
| *Subiculum* | + | + |
| *Entorhinal cortex* | ++ | ++ |
| Mamillary body and hypothalamus, left | ++ | ++ |
| Substantia nigra, cut left side | ++ | ++ |
| Rostral pons/caudal midbrain | | |
| *Locus ceruleus* | +++ | +++ |
| *Other tegmental nuclei* | + | + |
| Mid/caudal pons | | |
| *Locus ceruleus* | +++ | +++ |
| *Other tegmental nuclei* | + | + |

[a] NFTs, neurofibrillary tangles; NTs, neuropil threads; +, sparse density; ++, moderate density; +++, frequent density; ++*, sparse-to-moderate density; +*, very sparse; n/a, not applicable.

tribution and density of NFTs and NTs in the regions of the brain examined. The determination of the density of NFTs and NTs was adapted from the density distribution of neuritic plaques by the Consortium to Establish a Registry for Alzheimer's Disease, which is used for the neuropathological diagnosis of Alzheimer's disease (9, 12, 23). One or two astrocytes in the subcortical white matter showed focal cytoplasmic fibrillary τ immunoreactivity. τ-positive tufted astrocytes, thorn astrocytes, and astrocytic plaques were absent in all regions of the brain examined. Lewy bodies, Lewy-related neurites, α-synuclein-positive glial inclusions, and neuronal or glial ubiquitin-positive inclusions were absent in all regions of the brain examined.

Acute toxic axonal injury and cerebral edema caused by acute ethylene glycol intoxication was evinced by multifocal axonal white matter immunoreactivity for amyloid precursor protein in the subcortical white matter and brainstem (15, 25).

## APOE Genotyping

Genomic deoxyribonucleic acid (DNA) was extracted from whole blood using the QIAamp DNA Blood Mini Kit (Qiagen, Valencia, CA). Restriction fragment length polymorphism analysis with Hha I (New England Biolabs, Beverly, MA) was completed using previously published protocols (20, 27). The genotype of the sample was determined to be E3/E4 (*Fig. 3*).

## DISCUSSION

Major depression, dementia-related syndromes, and neuropsychological and sensory motor deficits have been reported in professional and amateur contact sport players, including NFL players (6, 8, 10, 17–19, 21, 22, 38, 46–49). The neuropathological findings responsible for these neuropsychiatric deficits have not been clearly defined because of the rarity of autopsies in retired NFL players.

Our case represents a retired professional player (who played a total of 14 yr of organized football) who had developed a progressive major depressive disorder after retirement from football, accompanied by repeated suicide attempts and a completed suicide by ingestion of ethylene glycol. Autopsy confirmed the presence of abnormal metabolism and widespread neuronal and neuropil accumulation of a cytoskeletal protein to form NFTs and



FIGURE 3. *Polyacrylamide gel electrophoresis showing DNA stained with ethidium bromide visualized with ultraviolet light. Lanes 1 and 2 contain duplicate samples of the DNA extracted from the brain sample amplified as described in the text and digested with Hha to reveal the restriction fragment length polymorphism. Lane 3 is a sample known to be E2/E4 prepared in parallel with the samples from Lanes 1 and 2. Lane 4 is a negative template control. Lane 5 contains a 50 to 2000 basepair ladder.*

NTs. The major components of NFTs and NTs are hyperphosphorylated paired helical filaments of the microtubule-binding protein, τ (16).

Abnormal metabolism and accumulation of neuronal cytoskeleton and membrane proteins have been suggested to be pathoetiological components of delayed neurological sequelae of single or repeated MTBI sustained in contact sports (2, 13, 14, 41, 42). The morphophenotype of our case, i.e., the presence of NFTs without amyloid plaques, supports previous findings of Geddes et al. (13, 14) who found only NFTs in the brains of five young adults who had experienced mild chronic head injuries. Geddes et al. (13, 14) had hypothesized that repetitive head injury in young adults may be initially associated with neocortical NFT formation in the absence of β-amyloid.

The APOE genotypes of our two reported cases were different (E3/E3 and E3/E4). We currently do not have any explanation for this difference. However, it confirms what is already known regarding APOE genotype (3, 11, 24, 25, 44). Individuals who inherit one or two copies of APOE4 may exhibit a three- to

TABLE 2. Common and contrasting features of two reported cases of chronic traumatic encephalopathy in two retired National Football League players[a]

| Characteristics | Patient 1 | Patient 2 |
|---|---|---|
| Age at death | 50 years | 45 years |
| Approximate age when decedent was drafted into the NFL | 22 years | 25 years |
| Duration of professional play in the NFL | 17 years | 8 years |
| Approximate duration of play of football in high school, college, and/ or in the military | 5 years | 6 years |
| Interval between retirement from the NFL and death | 12 years | 12 years |
| History and diagnosis of major depressive disorder after retirement from the NFL | Present | Present |
| Gross atrophy of the brain and hydrocephalus ex vacuo | Absent | Absent |
| Fenestrations of the septum pellucidum | Absent | Absent |
| Cavum septi pellucidi | Absent | Present |
| Presence of diffuse amyloid plaques | Present | Absent |
| Presence of NFTs and NTs | Present | Present |
| APOE genotype | E3/E3 | E3/E4 |
| Postmortem diagnosis of coronary atherosclerotic disease | Present | Present |
| Premortem history of steroid use | Present | Present |

[a] NFL, National Football League; NFTs, neurofibrillary tangles; NTs, neuropil threads; APOE, apolipoprotein-E.

ninefold increase in developing chronic posttraumatic neurodegeneration. However, the presence of the APOE4 allele does not confer absolute predisposition to CTE, and absence of APOE4 does not confer absolute protection from CTE.

Table 2 illustrates the common and contrasting features of our two reported cases of CTE in two NFL players. Both had long careers without multiple recorded concussions. Reasons for contrasting features in the two cases are not clear. There was a history of steroid use during play in the NFL in both cases. This observation may suggest that there is an unconfirmed possibility that steroid use may play a role in the pathoetiology of CTE. However, we cannot allude to this role of steroid use at this time. Further studies are needed to identify and define the pathoetiological factors and neuropathological cascades of CTE in retired football players.

The neuropsychiatric presentation and clinical course of CTE in football players and other contact-sport players including boxers (dementia pugilistica) may exhibit a spectrum of neuropsychiatric and neuropathological cascades. However, definitive characteristics of CTE in contact sports and American football should be determined by long-term, longitudinal, multi-institutional, and multidisciplinary studies, which will comprise genetic analysis and scheduled intermittent neuropsychiatric testing and follow-up, accompanied by neuroradiological monitoring of a specified cohort of professional contact-sport players, such as the players in the NFL Hall of Fame. Autopsies and comprehensive postmortem neuropathological examinations should be performed on all participants in these studies for brain tissue analysis and clinicopathological correlations.

## REFERENCES

1. Abreau F, Templer DI, Schuyler BA, Bradley A, Hutchison HT: Neuropsychological assessment of soccer players. **Neuropsychology** 4:175–181, 1990.
2. Allsop D, Haga S, Bruton C, Ishii T, Roberts GW: Neurofibrillary tangles in some cases of dementia pugilistica share antigens with amyloid beta-protein of Alzheimer's disease. **Am J Pathol** 136:255–260, 1990.
3. Bales KR, Dodart JC, DeMattos RB, Holtzman DM, Paul SM: Apolipoprotein E, amyloid, and Alzheimer disease. **Mol Interv** 2:363–375, 339, 2002.
4. Barth JT, Macciocchi SN, Giordani B, Rimel R, Jane JA, Boll TJ: Neuropsychological sequelae of minor head injury. **Neurosurgery** 13:529–533, 1983.
5. Casson IR, Pellman EJ, VianoDC: Chronic traumatic encephalopathy in a National Football League Player. **Neurosurgery** 58:E1003, 2006 (comment).
6. Collins MW, Grindel SH, Lovell MR, Dede DE, Moser DJ, Phalin BR, Nogle S, Wasik M, Cordry D, Daugherty KM, Sears SF, Nicolette G, Indelicato P, McKeag DB: Relationship between concussion and neuropsychological performance in college football players. **JAMA** 282:964–970, 1999.
7. Corsellis JA, Bruton CJ, Freeman-Browne D: The aftermath of boxing. **Psychol Med** 3:270–303, 1973.
8. Drew RH, Templer DI, Schuyler BA, Newell TG, Cannon WG: Neuropsychological deficits in active licensed professional boxers. **J Clin Psychol** 42:520–525, 1986.
9. Ellison D, Love S, Chimelli L, Harding BM, Rowe J, Vinters HV: Neuropathology: A Reference Text of CNS Pathology. Edinburgh and New York, Mosby, 2004, ed 2.
10. Erlanger DM, Kutner KC, Barth JT, Barnes R: Neuropsychology of sports-related head injury: Dementia pugilistica to post concussion syndrome. **Clin Neuropsychol** 13:193–209, 1999.
11. Friedman G, Froom P, Sazbon L, Grinblatt I, Shochina M, Tsenter J, Babaey S, Yehuda B, Groswasser Z: Apolipoprotein E-epsilon4 genotype predicts a poor outcome in survivors of traumatic brain injury. **Neurology** 52:244–248, 1999.
12. Gearing M, Mirra SS, Hedreen JC, Sumi SM, Hansen LA, Heyman A: The Consortium to Establish a Registry for Alzheimer's Disease (CERAD). Part X. Neuropathology confirmation of the clinical diagnosis of Alzheimer's disease. **Neurology** 45:461–466, 1995.
13. Geddes JF, Vowles GH, Nicoll JA, Revesz T: Neuronal cytoskeletal changes are an early consequence of repetitive head injury. **Acta Neuropathol (Berl)** 98:171–178, 1999.
14. Geddes JF, Vowles GH, Robinson SF, Sutcliffe JC: Neurofibrillary tangles, but not Alzheimer-type pathology, in a young boxer. **Neuropathol Appl Neurobiol** 22:12–16, 1996.
15. Gentleman SM, Graham DI, Roberts GW: Molecular pathology of trauma: Altered βAPP metabolism and the aetiology of Alzheimer's Disease, in Kogure K, Hossmann KA, Siesjö BK (eds): Neurobiology of Ischemic Brain Damage (Progress in Brain Research). Amsterdam, Elsevier, 1993, pp 237–246.
16. Greenfield JG, Graham DI, Lantos PL: Greenfield's Neuropathology. London, Arnold, 2002 vol 1, pp 823–898; vol 2, pp 195–272.
17. Guskiewicz KM, Marshall SW, Bailes J, McCrea M, Cantu RC, Randolph C, Jordan BD: Association between recurrent concussion and late-life cognitive impairment in retired professional football players. **Neurosurgery** 57:719–726, 2005.
18. Jorge R, Robinson RG: Mood disorders following traumatic brain injury. **Int Rev Psychiatry** 15:317–327, 2003.
19. Jorge RE, Robinson RG, Moser D, Tateno A, Crespo-Facorro B, Arndt S: Major depression following traumatic brain injury. **Arch Gen Psychiatry** 61:42–50, 2004.
20. Kamboh MI, Aston CE, Hamman RF: The relationship of APOE polymorphism and cholesterol levels in normoglycemic and diabetic subjects in a biethnic population from the San Luis Valley, Colorado. **Atherosclerosis** 112:145–159, 1995.
21. Maddocks D, Saling M: Neuropsychological deficits following concussion. **Brain Inj** 10:99–103, 1996.
22. Matser JT, Kessels AG, Jordan BD, Lezak MD, Troost J: Chronic traumatic brain injury in professional soccer players. **Neurology** 51:791–796, 1998.
23. Mirra SS, Heyman A, McKeel D, Sumi SM, Crain BJ, Brownlee LM, Vogel FS, Hughes JP, van Belle G, Berg L: The Consortium to Establish a Registry for Alzheimer's Disease (CERAD). Part II. Standardization of the neuropathologic assessment of Alzheimer's disease. **Neurology** 41:479–486, 1991.
24. Nathoo N, Chetry R, van Dellen JR, Connolly C, Naidoo R: Apolipoprotein E polymorphism and outcome after closed traumatic brain injury: Influence of ethnic and regional differences. **J Neurosurg** 98:302–306, 2003.
25. Nathoo N, Chetty R, van Dellen JR, Barnett GH: Genetic vulnerability following traumatic brain injury: The role of apolipoprotein E. **Mol Pathol** 56:132–136, 2003.
26. Omalu BI: Diagnosis of traumatic diffuse axonal injury. **Am J Forensic Med Pathol** 25:270, 2004.
27. Omalu BI, DeKosky ST, Minster RL, Kamboh MI, Hamilton RL, Wecht CH: Chronic traumatic encephalopathy in a National Football League player. **Neurosurgery** 57:128–134, 2005.
28. Pellman EJ: Background on the National Football League's research on concussion in professional football. **Neurosurgery** 53:797–798, 2003.
29. Pellman EJ, Lovell MR, Viano DC, Casson IR: Concussion in professional football: Recovery of NFL and high school athletes assessed by computerized neuropsychological testing—Part 12. **Neurosurgery** 58:263–274, 2006.
30. Pellman EJ, Lovell MR, Viano DC, Casson IR, Tucker AM: Concussion in professional football: Neuropsychological testing—Part 6. **Neurosurgery** 55:1290–1303, 2004.
31. Pellman EJ, Powell JW, Viano DC, Casson IR, Tucker AM, Feuer H, Lovell M, Waeckerle JF, Robertson DW: Concussion in professional football: Epidemiological features of game injuries and review of the literature—Part 3. **Neurosurgery** 54:81–94, 2004.
32. Pellman EJ, Viano DC, Casson IR, Arfken C, Feuer H: Concussion in professional football: Players returning to the same game—Part 7. **Neurosurgery** 56:79–90, 2005.

-2071-

33. Pellman EJ, Viano DC, Casson IR, Arfken C, Powell J: Concussion in professional football: Injuries involving 7 or more days out—Part 5. **Neurosurgery** 55:1100–1119, 2004.

34. Pellman EJ, Viano DC, Casson IR, Tucker AM, Waeckerle JF, Powell JW, Feuer H: Concussion in professional football: Repeat injuries—Part 4. **Neurosurgery** 55:860–873, 2004.

35. Pellman EJ, Viano DC, Tucker AM, Casson IR; Committee on Mild Traumatic Brain Injury, National Football League: Concussion in professional football: Location and direction of helmet impacts—Part 2. **Neurosurgery** 53:1328–1340, 2003.

36. Pellman EJ, Viano DC, Tucker AM, Casson IR, Waeckerle JF: Concussion in professional football: Reconstruction of game impacts and injuries. **Neurosurgery** 53:799–812, 2003.

37. Pellman EJ, Viano DC, Withnall C, Shewchenko N, Bir CA, Halstead PD: Concussion in professional football: Helmet testing to assess impact performance—Part 11. **Neurosurgery** 58:78–96, 2006.

38. Porter MD: A 9-year controlled prospective neuropsychologic assessment of amateur boxing. **Clin J Sport Med** 13:339–352, 2003.

39. Roberts GW: Immunocytochemistry of neurofibrillary tangles in dementia pugilistica and Alzheimer's disease: Evidence for common genesis. **Lancet** 2:1456–1458, 1988.

40. Roberts GW, Allsop D, Bruton C: The occult aftermath of boxing. **J Neurol Neurosurg Psychiatry** 53:373–378, 1990.

41. Smith C, Graham DI, Murray LS, Nicoll JA: τ immunohistochemistry in acute brain injury. **Neuropathol Appl Neurobiol** 29:496–502, 2003.

42. Smith DH, Chen XH, Nonaka M, Trojanowski JQ, Lee VM, Saatman KE, Leoni MJ, Xu BN, Wolf JA, Meaney DF: Accumulation of amyloid β and τ and the formation of neurofilament inclusions following diffuse brain injury in the pig. **J Neuropathol Exp Neurol** 58:982–992, 1999.

43. Sortland O, Tysvaer AT: Brain damage in former association football players. An evaluation by cerebral computed tomography. **Neuroradiology** 31:44–48, 1989.

44. Teasdale GM, Nicoll JA, Murray G, Fiddes M: Association of apolipoprotein E polymorphism with outcome after head injury. **Lancet** 350:1069–1071, 1997.

45. Tokuda T, Ikeda S, Yanagisawa N, Ihara Y, Glenner GG: Re-examination of ex-boxers' brains using immunohistochemistry with antibodies to amyloid β-protein and τ protein. **Acta Neuropathol (Berl)** 82:280–285, 1991.

46. Tysvaer AT, Lochen EA: Soccer injuries to the brain. A neuropsychologic study of former soccer players. **Am J Sports Med** 19:56–60, 1991.

47. Tysvaer AT, Sortland O, Storli OV, Lochen EA: Head and neck injuries among Norwegian soccer players: A neurological, electroencephalographic, radiologic and neuropsychological evaluation [in Norwegian]. **Tidsskr Nor Laegeforen** 112:1268–1271, 1992.

48. Tysvaer AT, Storli OV: Soccer injuries to the brain. A neurologic and electroencephalographic study of active football players. **Am J Sports Med** 17:573–578, 1989.

49. Tysvaer AT, Storli OV, Bachen NI: Soccer injuries to the brain. A neurologic and electroencephalographic study of former players. **Acta Neurol Scand** 80:151–156, 1989.

50. Viano DC, Casson IR, Pellman EJ, Bir CA, Zhang L, Sherman DC, Boitano MA: Concussion in professional football: Comparison with boxing head impacts—Part 10. **Neurosurgery** 57:1154–1172, 2005.

51. Viano DC, Casson IR, Pellman EJ, Zhang L, King AI, Yang KH: Concussion in professional football: Brain responses by finite element analysis—Part 9. **Neurosurgery** 57:891–916, 2005.

52. Viano DC, Pellman EJ: Concussion in professional football: Biomechanics of the striking player—Part 8. **Neurosurgery** 56:266–280, 2005.

53. Zhang L, Ravdin LD, Relkin N, Zimmerman RD, Jordan B, Lathan WE, Ulug AM: Increased diffusion in the brain of professional boxers: A preclinical sign of traumatic brain injury? **AJNR Am J Neuroradiol** 24:52–57, 2003.

## COMMENTS

This is an interesting study linking the chronic head trauma in professional football players with chronic traumatic encephalopathy. There is a temporal association of the symptoms with the patient's football career. Also, it does not prove that head injury from playing football was the sole cause of this patient's disease; the association is intriguing and is important to report.

**Kenneth Aldape**
*Houston, Texas*

The authors have had the opportunity to perform neuropathological studies on the brains of two National Football League (NFL) players with significant neuropathological differences in terms of the genotype, the presence (and absence) of amyloid plaques, and history. They concluded that a specific cohort of football players, such as those elected to the NFL Hall of Fame, should have autopsies and comprehensive postmortem neuropathological examinations regardless of premorbid conditions. The purpose would be to determine whether or not chronic neurodegenerative changes can be causally related to football participation.

From a scientific perspective, the goal certainly seems laudable. This case, however, exemplifies the difficulty in such a study. In their premortem history, the authors state that, "within several years of his retirement from the NFL, his [present] wife reported that he became increasingly quiet, he was noted to be afraid and fearful with paranoid tendencies." They also report that he became extremely reclusive and distanced himself from all personal interactions with family and friends. Because the authors did not speak with his first wife, or obtain history from the players, trainers, and others with whom he associated in an intensely competitive environment for more than 8 years, the statement that abnormal behavior began "within several years of his retirement from the NFL" could certainly be challenged.

Indeed, after an automobile accident after his third year in the NFL, the authors state that medical records from a local psychiatric hospital indicated that he had the diagnosis of "a major depressive disorder, severe, without psychotic features." In 1990, 2 years before his retirement, he was suspended by the NFL for steroid abuse. The duration for which he used steroids is unrecorded or unknown.

In 1991, 1 year before his retirement, he attempted suicide by the ingestion of rat poison and cold medications, and, as the authors state, there were several other subsequent suicide attempts by ingestion of prescription drugs and antifreeze. After another suicide attempt in 2003 and the conviction for arson in 2005, he subsequently died from ingestion of ethylene glycol.

With such a multifactorial and incomplete history, I think it is extremely speculative to suggest that his psychosocial behavior and neuropathological findings are attributable to football-induced traumatic encephalopathy, especially because he demonstrated no residual evidence of a post concussion syndrome after his one documented cerebral concussion, after which he returned to full football participation for several years. Nevertheless, although more than daunting, to perform postmortem neuropathological examinations on all NFL Hall of Fame inductees would be of interest.

**Joseph C. Maroon**
*Pittsburgh, Pennsylvania*

Omalu et al. report the second case of a relatively young, retired NFL player whose autopsy showed widespread changes, which they speculate may have been related to episodes of mild traumatic brain injury (MTBI) during his many years of contact sport participation. Pathological brain findings included widespread accumulation of Ù-positive neurofibrillary tangles and neuropil threads, a cavum septum pellucidum, but no hippocampal or cerebellar atrophy. This athlete's medical history, having participated in organized football for

14 years, had numerous episodes of behavorial abnormalities, along with a progressive major depressive disorder, multiple suicide attempts, and a completed suicide. However, there is no information concerning whether or not there were documented occurrences of clinical concussion related to football or if there were instances of MTBI at other stages of his life.

This report follows upon the authors' initial study of a similarly aged, football experienced, and psychologically disturbed retired NFL player whose autopsy findings showed both similar and contrasting features. Differences in this second case, although unclear if pertinent, were absence of amyloid plaques, an E3/E4 genotype, and diffuse topographic distribution of sparse to frequent neurofibrillary tangles and neuropil threads in not only the neocortex, but also the hippocampus, subcortical ganglia, and brainstem.

We now appreciate that, after sports concussion, a transient hypermetabolic state, axonal injury, a lower threshold for recurrence, and cumulative effects may occur (2, 6, 8). The old standard of a negative neurological examination and computed tomographic study to exclude central nervous system damage is no longer valid. Newer evaluations, focusing on white matter injury, hold promise to detect the presence of injury (1). Also, as McKeag has recently pointed out, there has been a previous tendency to overgeneralize in our approach to athletic MTBI and in studying its effects, as a wide range of variability in the type and expression of injury to the human brain is to be expected (7). Our previous study of former NFL players suggested that there was a correlation between the exposure to athletic MTBI and mild cognitive impairment seen in the later years after retirement (5).

Following on their initial case report, this autopsy study is of interest and further raises the question of the possibility of chronic or cumulative effects of multiple, subclinical concussions resulting in neurodegenerative changes in the form of accumulation of neuronal cytoskeleton and membrane proteins. Notwithstanding the absence of documentation of multiple clinical concussive episodes, this case nonetheless stimulates the discussion of whether or not, in a small number of players, such football exposure can cause a widespread neurodegenerative process with ultimate clinical manifestations.

It is uncertain whether or not these two case reports, unprecedented for such athletes, represent random findings or if there is a posttraumatic state which is akin to, but dissimilar enough not to satisfy all the classic neuropathological findings of, dementia pugilistica (3, 4). It remains an important, but unanswered question, which will have to be addressed by future necropsy and longitudinal population studies of athletes' exposure to known MTBI and subclinical concussions and their subsequent clinical and neurocognitive outcomes in the years after retirement.

**Julian E. Bailes**
*Morgantown, West Virginia*

1. Bazarian JJ, Blyth B, Cimpello L: Bench to bedside: Evidence for brain injury after concussion—Looking beyond the computed tomography scan. **Acad Emerg Med** 13:199–214, 2006.
2. Collins MW, Lovell MR, Iverson GL, Cantu RC, Maroon JC, Field M: Cumulative effects of concussion in high school athletes. **Neurosurgery** 51:1175–1181, 2002.
3. Corsellis JA, Bruton CJ, Freeman-Browne D: The aftermath of boxing. **Psychol Med** 3:270–303, 1973.
4. Geddes JF, Vowles GH, Robinson SF, Sutcliffe JC: Neurofibrillary tangles, but not Alzheimer-type pathology in a young boxer. **Neuropathol Appl Neurobiol** 22:12–16, 1996.
5. Guskiewicz KM, Marshall SW, Bailes J, McCrea M, Cantu RC, Randolph C, Jordan BD: Association between recurrent concussion and late-life cognitive impairment in retired professional football players. **Neurosurgery** 57:719–726, 2005.
6. Hovda DA, Prins M, Becker DP, Lee S, Bergsneider M, Martin N: Neurobiology of concussion, in Bailes JE, Lovell MR, Maroon JC (eds): *Sports-related Concussion.* St Louis, Quality Medical Publishing, 1999, pp 12–51.
7. McKeag DB: Understanding sports-related concussion: Coming into focus but still fuzzy. **JAMA** 290:2604–2605, 2003.
8. Smith DH, Meaney DF: Axonal damage in traumatic brain injury. **Neuroscientist** 6:483–495, 2000.

This article adds to the increasing literature regarding cognitive deficits associated with low-grade repetitive head injury. Although, as a case report, no definitive statements can be made, it is important to have such cases presented and discussed. Although it is not possible to exclude a coincidental association of a psychiatric disorder in a professional NFL player, the degenerative pathology described would certainly be more in keeping with a traumatic etiology. Clearly, cases such as this provide an opportunity for more detailed studies looking at potential mechanisms underlying cognitive decline in chronic repetitive head injury, such as neuroinflammatory mechanisms. The genetic information relating to apolipoprotein E is of limited interest as a number of one (or two, when the previous report is included) is not informative.

**Colin Smith**
**Neuropathologist**
*Edinburgh, Scotland*

The authors present a case of autopsy-confirmed chronic traumatic encephalopathy in a retired professional football player with a history of neuropathological features. He had a 14-year history of involvement in organized football without multiple recorded concussions. After retirement, he was diagnosed with severe major depressive disorder and committed suicide 12 years after retirement. The contribution of anticoagulant rodenticide and ethylene glycol ingestion to his demise is unclear. The patient underwent an autopsy with restriction fragment length polymorphism analysis performed to determine apolipoprotein E genotype. His apolipoprotein E genotype was E3/E4, which would suggest, though not with certainty, a three- to ninefold increase in developing chronic posttraumatic neurodegeneration. Neurofibrillary tangles and neuropil threads were noted on evaluation of the cerebrum.

The authors compare and contrast this case with a previous case report. The relationship of the onset of his depressive disorder after his history of participation in football is purely temporal. This is a difficult relationship, given a potential history of antisocial behavior before his retirement. It becomes additionally more complex given a history of steroid use.

This report will hopefully bear subsequent studies, as the authors appropriately suggest, which will require long-term, longitudinal, multi-institutional and multi-disciplinary evaluation of genetic disposition, neuropsychiatric history, neuroradiological findings, clinical follow-up, and comprehensive postmortem neuropathological examinations.

**Min Park**
**Andy Nguyen**
**Michael L. Levy**
*San Diego, California*

# EXHIBIT 58

http://www.cnn.com/2013/08/30/us/nfl-concussions-fast-facts/

# NFL Concussions Fast Facts

*By CNN Library*
*updated 1:29 PM EDT, Mon July 21, 2014*

CNN.com

**(CNN)** -- Here's some background information about concussions in the NFL. Reports show an increasing number of retired NFL players who have suffered concussions developed memory and cognitive issues such as dementia, Alzheimer's, depression and chronic traumatic encephalopathy (CTE).

A concussion is a type of traumatic brain injury caused by a blow to the head.

## Facts:

Most concussions occur without losing consciousness.

Chronic traumatic encephalopathy (CTE) is a degenerative disease of the brain and is associated with repeated head traumas like concussions.

Among the plaintiffs in concussion-related lawsuits: Art Monk, Tony Dorsett, Jim McMahon, Jamal Anderson and Ray Easterling.

## Common Symptoms of Concussions: (The NFL Player Concussion Pamphlet)

Imbalance
Headache
Confusion
Memory loss
Loss of consciousness
Vision change
Hearing change
Mood change
Fatigue
Malaise

## Statistics: (NFL)

**2012 -** 261 diagnosed concussions during preseason and regular-season practices and games combined.

**2013 -** 228 diagnosed concussions during preseason and regular-season practices and games combined.

## Timeline:

**1994 -** NFL Commissioner Paul Tagliabue creates the Mild Traumatic Brain Injury Committee. Dr. Elliot Pellman is named chairman despite not having experience with brain injuries.

**2002 -** Dr. Bennet Omalu, a forensic pathologist and co-founder of the Brain Injury Research Institute, identifies chronic traumatic encephalopathy (CTE) in the brain of former Pittsburgh Steelers' center Mike Webster, 50, who committed suicide. Omalu is the first to identify CTE in American football players.

**January 2005 -** The NFL's Mild Traumatic Brain Injury Committee finds that returning to play after sustaining a concussion "does not involve significant risk of a second injury either in the same game or during the season."

**2005 and 2006 -** Dr. Omalu identifies chronic traumatic encephalopathy (CTE) in the brains of former Pittsburgh Steelers players Terry Long, 45, and Andre Waters, 44. Both had committed suicide.

2075

http://www.cnn.com/2013/08/30/us/nfl-concussions-fast-facts/

**February 2007 -** Dr. Elliot Pellman steps down as chairman of the Mild Traumatic Brain Injury Committee but remains on the committee.

**June 2007 -** The NFL holds a medical conference on concussions.

**August 14, 2007 -** The NFL formalizes new concussion guidelines which include a telephone hotline to report when a player is being forced to play contrary to medical advice.

**October 28, 2009 -** Part I of the House Judiciary Committee hearing on Legal Issues Relating to Football Head Injuries. NFL Commissioner Roger Goodell defends the League's policy regarding concussions.

**January 4, 2010 -** Part II of the House Judiciary Committee hearing on Legal Issues Relating to Football Head Injuries. Dr. Ira Casson, one of the co-chairs of the Mild Traumatic Brain Injury Committee, denies a link between repeat head impacts and long-term brain damage.

**March 2010 -** The NFL's Mild Traumatic Brain Injury Committee is renamed the Head, Neck and Spine Committee. Two new co-chairs are selected, and Dr. Elliot Pellman is no longer a member of the panel.

**October 20, 2010 -** NFL Commissioner Goodell issues a memo to all 32 teams that warns of possible suspensions for offenders that violate the "playing rules that unreasonably put the safety of another player in jeopardy have no place in the game, and that is especially true in the case of hits to the head and neck."

**February 17, 2011 -** Former Chicago Bears defensive back Dave Duerson, 50, commits suicide with a gunshot wound to the chest rather than his head so his brain can be researched for chronic traumatic encephalopathy (CTE). Boston University researchers find CTE in Duerson's brain, the same disease found in other deceased NFL players.

**April 19, 2012 -** Former Atlanta Falcons safety Ray Easterling, 62, commits suicide. An autopsy finds signs of chronic traumatic encephalopathy (CTE). Easterling had been a plaintiff in a class action lawsuit against the NFL over concussion-related injuries filed in August 2011.

**May 2, 2012 -** Former NFL linebacker Junior Seau, 43, is found dead with a gunshot wound to the chest, classified as a suicide. Friends and family members say the suicide was brought on by multiple concussions, but an initial autopsy report finds no apparent brain damage. Portions of Seau's brain have been sent to the National Institutes of Health for further study.

**June 7, 2012 -** A unified lawsuit combining more than 80 concussion-related lawsuits on behalf of more than 2,000 National Football League players is filed in federal court in Philadelphia. The players accuse the NFL of negligence and failing to notify players of the link between concussions and brain injuries, in Multi-district Litigation Case No. 2323.

**August 30, 2012 -** The NFL files a motion to dismiss the concussion-related lawsuits filed by former players.

**September 5, 2012 -** The Foundation for the National Institutes of Health announces that the NFL has committed to donating $30 million to support research on medical conditions prominent in athletes.

**January 10, 2013 -** The National Institutes of Health releases the results of their analysis of Junior Seau's brain tissue confirming that Seau did suffer from chronic traumatic encephalopathy (CTE).

-2076-

**January 23, 2013 -** Junior Seau's family files a wrongful death lawsuit against the NFL, claiming that Seau's suicide was the result of a brain disease caused by violent hits he endured while playing the game.

**August 29, 2013 -** The NFL and ex-players reach a deal in the class action lawsuit that calls for the NFL to pay $765 million to fund medical exams, concussion-related compensation, medical research for retired NFL players and their families, and litigation expenses, according to a court document filed in U.S. District Court in Philadelphia. The agreement still needs to be approved by the judge assigned to the case, which has grown to include more than 4,500 plaintiffs.

**December 13, 2013 -** The body of former NFL linebacker Jovan Belcher is exhumed in order to perform tests on his brain, a lawyer for the player's family tells the Kansas City Star. On December 1, 2012, Belcher, 25, shot his longtime girlfriend to death and then killed himself.

**December 2013 -** Ryan Freel is the first Major League Baseball player to be diagnosed with chronic traumatic encephalopathy (CTE), according to researchers at the Boston University School of Medicine. Freel committed suicide in December 2012 at the age of 36.

**January 14, 2014 -** A federal judge declines to approve a proposed $760 million settlement of claims arising from concussions suffered by NFL players, saying she didn't think it was enough money.

**May 28, 2014 -** Former Miami Dolphins quarterback Dan Marino, and 14 other former NFL players, sues the NFL over concussions. The lawsuit claims the NFL knew for years of the link between concussions and long-term health problems.

**June 3, 2014 -** It is reported that Dan Marino has withdrawn his name from the concussion lawsuit.

**July 17, 2014 -** Former NFL players Christian Ballard and Gregory Westbrooks file suit against the NFL Players Association, alleging the union withheld information about head injuries.

---

*© 2014 Cable News Network. Turner Broadcasting System, Inc. All Rights Reserved.*

EXHIBIT 59

Neurosurg Focus 21 (4):E12, 2006

# Concussion in professional football

## Summary of the research conducted by the National Football League's Committee on Mild Traumatic Brain Injury

Elliot J. Pellman, M.D., and David C. Viano, Dr. Med., Ph.D.

*Mild Traumatic Brain Injury Committee, National Football League, New York, New York;
ProHEALTH Care Associates, Lake Success, New York;
and ProBiomechanics, Bloomfield Hills, Michigan*

✓In 1994 the National Football League (NFL) initiated a comprehensive clinical and biomechanical research study of mild traumatic brain injury (TBI), a study that is ongoing. Data on mild TBIs sustained between 1996 and 2001 were collected and submitted by NFL team physicians and athletic trainers, and these data were analyzed by the NFL's Committee on Mild Traumatic Brain Injury. At the same time, analysis of game videos was performed for on-field mild TBIs to quantify the biomechanics involved and to develop means to improve the understanding of these injuries so that manufacturers could systematically improve and update their head protective equipment. The findings and analysis of the Committee have been presented in a series of articles in *Neurosurgery*.

KEY WORDS • traumatic brain injury • sports-related concussion • neuropsychological assessment

I N 1992 Al Toon, who was a wide receiver for the New York Jets, was the first NFL player known to have retired because of postconcussion syndrome.[2] The year after Mr. Toon's retirement, another player, Merrill Hoge of the Chicago Bears, retired because of the same problem. Commissioner Paul Tagliabue, team physicians, and many others raised questions: was this a new problem or a misdiagnosed or unrecognized one? Was this a statistical anomaly or the beginning of an epidemic?

It was decided that a rigorous, scientific approach was necessary to gather the data to answer these questions for this high-profile professional sports league. In 1994, Commissioner Tagliabue approved the creation of the NFL's Committee on Mild Traumatic Brain Injury.[12] The Committee was composed of experts inside and outside the NFL. It was decided by the Committee that protection against injury as well as collection and analysis of injury data would be critical to the success of their mission. For the study, a reportable mild TBI was defined as a traumatically induced alteration in brain function manifested by an alteration of awareness and consciousness, including but not limited to an LOC, a "ding," a sensation of being dazed or stunned, a sensation of "wooziness" or "fogginess," a seizure or amnesic period, and by symptoms commonly associated with postconcussion syndrome, including persistent headaches, vertigo, lightheadedness, loss of balance, unsteadiness,

syncope, near-syncope, cognitive dysfunction, memory disturbances, hearing loss, tinnitus, blurred vision, diplopia, visual loss, personality change, drowsiness, lethargy, fatigue, and inability to perform usual daily activities.[10] The research summarized here was developed, supervised, and completed in response to the stated goals of the NFL's Committee on Mild Traumatic Brain Injury.

## Protection Against Mild TBI

### I: Helmet Standards

Next to impact avoidance, football helmets are the most important factor in protecting a player from mild TBI. In 1973, the NOCSAE established standards for the impact performance of football helmets.[9] The NOCSAE standard limited the SI, which is based on resultant head acceleration. All new football helmets available for use in high school and college football were then certified to the NOCSAE standard, and the wearing of such helmets was made mandatory for college players in 1978 and for high school players in 1980.

The certified helmets cut the SI score by half compared with the headgear worn before the establishment of the standard. By 1980, significant reductions in injuries were observed after the voluntary adoption of the standards by helmet manufacturers. The injury reduction was believed to be the result of the helmet design changes, which targeted serious brain injuries such as brain contusion. Despite the improvement of helmet design for the prevention of serious brain injury, little was known regarding the effectiveness of football helmets in protecting against mild TBI at the time of the initial research conducted by

---

*Abbreviations used in this paper:* CI = confidence interval; ImPACT = Immediate Postconcussion Assessment and Cognitive Testing; LOC = loss of consciousness; mph = miles per hour; NFL = National Football League; NOCSAE = National Operating Committee on Standards for Athletic Equipment; SI = severity index; TBI = traumatic brain injury.

E. J. Pellman and D. C. Viano

the NFL's Committee on Mild Traumatic Brain Injury. Therefore, the Committee planned a series of research projects aimed at defining the biomechanics of concussive impacts in professional football.

After consideration of various alternatives, the effort focused on analyses of game videos of plays that had resulted in concussions. Experts in biomechanics proposed that, with multiple views of the impact and line markings on the field, the direction and speed of concussive impacts could be determined. Cinematographic analysis methods were developed to determine the actual speed at which players were moving before colliding (Fig. 1). This would allow laboratory reconstructions (reenactments) of the game impacts by using instrumented test dummies to simulate the helmeted players. The reenactments closely matched the situations on the field.

Reconstruction of the game impacts involved two Hybrid III anthropometric test devices. Two high-speed videos recorded head kinematics in the reconstruction. The cameras were positioned identically to the views from the game video to allow one-to-one comparison (Fig. 2). With the aid of transducers placed in the head of the dummy, the translational and rotational accelerations of the head could be determined in concussive and noninjurious impacts. Matching the available on-field injury video to clinically confirmed mild TBI made determination of an appropriate "event" possible and verifiable. All mild TBI events in the players were examined, confirmed, and recorded by NFL team physicians.

When a mild TBI occurred on the field, it was evaluated by a physician and athletic trainer, who completed forms describing the impact and the injury. Mild TBIs were also reported to a biomechanical engineering group contracted to analyze and reconstruct game impacts. Television network tapes of games were obtained from the NFL and analyzed.

The most striking observation in this study is that concussion in professional football involves a mean impact velocity of 9.3 m/second (20.8 mph) and a head velocity change of 7.2 m/second (16.1 mph). These are exceptionally high velocities and accelerations and long durations. Automotive crashes typically involve impact durations of less than 6 msec for head impacts with vehicle rails, pillars, and structures. The NFL established new information on tolerances in the 15-msec range; there had been a virtual absence of scientific data on human tolerance. The NFL reconstruction data also supported a value of 70 to 75 G for concussion in padded impacts, which is at the high end of earlier tolerance ranges but is consistent with the Wayne State University concussion tolerance curve. Most important, the initial study demonstrated the strong correlation of concussion with translational acceleration, which should therefore be the primary measure for assessment of the performance of helmet protection systems.[10]

One conclusion of the initial biomechanical study was that the current NOCSAE SI and the more widely accepted Head Injury Criterion are adequate performance measures for helmet standards and that the added complexity of measuring rotational acceleration may not be needed





FIG. 1. Still photographs from films showing game action and mathematical calculations of the vector of impacts. The impact velocity of game hits was determined by analysis of two camera views of the collision. *Upper:* The photos show the impact sequence from two views. *Lower:* Graph showing the camera locations and the perspective of the two video images of the game impact. The two perspectives are mathematically merged as vectors that change with each time-step of the video. (Reprinted in modified form with permission from Pellman EJ, Viano DC, Tucker AM, Casson IR, Waeckerle JF: Concussion in professional football: reconstruction of game impacts and injuries. **Neurosurgery 53:** 799–814, 2003.)

2

Concussion in professional football



Fig. 2. Comparison of the laboratory reconstruction *(upper)* and still photos of the game impact *(lower)* from a case of concussion sustained in an NFL game. Refinements in the test setup were done until the helmet kinematics matched the game impact sequence. (Reprinted in modified form with permission from Pellman EJ, Viano DC, Tucker AM, Casson IR, Waeckerle JF: Concussion in professional football: reconstruction of game impacts and injuries. **Neurosurgery 53:** 799–814, 2003.)

for an improved or supplemental NOCSAE helmet standard. The results of this study provided a basis for new helmet evaluation methods, new helmet designs, and the prevention of concussions in football.

*II: Biomechanical Testing*

It was recognized by the Committee that a greater understanding of the location and direction of helmet impacts was needed to give manufacturers the ability to develop newer, improved mild TBI–resistant helmets. Therefore, NFL game videos were further analyzed for the typical locations of severe helmet impacts in professional football. The magnitude and direction of force causing concussion were determined by the use of selected cases that were reconstructed in laboratory tests.

A request was made to have a biomechanical testing contractor reconstruct the impact in 31 cases by using at least two clear video reviews of the collision. Laboratory



*Fig. 3. Upper:* Photographs of dummy heads showing location of initial helmet contacts for the struck players. Both concussive and nonconcussive impacts and falls to the ground are shown. *Lower:* The impact location for the striking players involved no concussions. The impact locations are all shown on the right side of the helmet, although the game impacts occurred on both sides. H-G = helmet-to-ground impact; H-H = helmet-to-helmet impact; MTBI = mild TBI. (Reprinted with permission from Viano DC, Pellman EJ: Concussion in professional football: biomechanics of the striking player—part 8. **Neurosurgery 56:** 266–280, 2005.)

tests would then be set up to reenact the game impacts with crash dummies and to measure head responses. The reconstruction emphasized helmet-to-helmet and helmet-to-ground impacts, because the video of other impacts was more obscured from clear view. Helmet contact of the struck player was categorized by the impact quadrant and head level for helmet contacts.

The study demonstrated the importance of face-mask injuries at an oblique angle, with the majority of contacts occurring below the head's center of gravity.[9] Another important aspect was that it described the quadrants on the helmet for which future NOCSAE standards may establish performance requirements (Fig. 3). By defining relevant quadrants, greater performance may be ensured over a segment of the helmet in which risks of concussion are higher in professional football, particularly low on the side and back and oblique to the face mask.

The laboratory reconstruction of game impacts provided the Committee with data identifying the location and direction of helmet impacts associated with concussion in NFL players. It also provided unique biomechanical data on head responses associated with concussion. The response data also allowed the determination of injury risk functions for concussion.

Using the Logist function, the probability of concussion p(x) was related to various biomechanical parameters (x) measured in the reenactment tests by using the following formula: $p(x) = [1 + exp(\alpha - \beta x)]^{-1}$ where $\alpha$ and $\beta$ are parameters fit to the NFL data. The parameters determined for NFL concussion were as follows: $\alpha = 2.677$ and $\beta = 0.0111$ for the Head Injury Criterion; $\alpha = 4.678$ and $\beta = 0.0573$ for translational acceleration; and $\alpha = 5.231$ and $\beta = 0.000915$ for rotational acceleration.[10]

*III: Head-Down Tackling*

For decades head-down tackling (or so-called spearing) has been a concern because it can result in catastrophic neck injuries in the striking player. The epidemiological and cinematographic analyses of neck injuries have shown that axial loading with flexion or extension causes the majority of cervical fracture–dislocations. This evidence has resulted in rules changes in high school, college, and professional football banning deliberate spearing

E. J. Pellman and D. C. Viano

and the use of the top of the helmet as an initial point of contact in a tackle. It was observed that players who suffered concussions were sometimes struck by players who were using head-down tackling techniques. The Committee decided to study the biomechanics of this form of injury both in the striking player ("nonconcussed") and the player who was struck ("concussed").

Once again, game film and video were collected from the NFL and correlated with clinical mild TBI data supplied by each club's team physicians. Laboratory reconstruction was performed using Hybrid III male dummies. In the dummy representing the striking player, a six-axis neck transducer was installed between the head and the top of the neck.

In helmet-to-helmet impacts, the striking player lowers the head, neck, and torso to deliver maximum force to the struck player, whose head and neck resist the impact.[15] This is the typical situation when the struck player does not see the tackle and does not prepare for the collision. The key to the concussive blow is the head-down position, which involves a 67% greater mass of the striking player by engaging his torso in the collision. Neck forces couple torso mass into the collision, which contributes to the higher effective mass of the striking player.

The prevention of concussion in the struck player provides another reason, besides preventing neck injuries in the striking one, to enforce rules against head-down tackling or spearing in football. Another means to lower concussion severity may be to reduce the stiffness of the top-crown portion of the helmet and to lower the mass of the helmet, although these changes may be less effective than enforcement of antispearing rules.

### IV: Boxing

Because boxing entails considerable risk of closed head trauma, comparisons are often made between this sport and football regarding mechanisms of injury. The risk of concussion is considerably greater in professional boxing compared with professional football. The clinical picture of more severe brain injury is different in football and boxing. Boxers are much more likely to suffer subdural hematomas and deaths from brain injury than are professional football players. A better understanding of the biomechanics of head responses and mechanisms of brain injury would continue to lay the foundation for better protective headgear for sports.

Eleven Olympic boxers were included in this study.[13] These athletes were instructed to strike an instrumented Hybrid III head with their gloved fist two times with four different punches (to the forehead and jaw and with a hook and an uppercut). The height and weight of each boxer were measured and anthropometric data for the dominant hand were collected to allow the effective hand–arm mass to be calculated. Instrumentation was placed in the boxer's clenched hand as well as in the Hybrid III head. A camera recorded the event at a lens speed of 4500 images per second. The punch and head inertial forces were measured.

There were three significant differences noted between the biomechanical forces exerted on the head and brain by boxing punches and the football helmet impacts in the NFL. The boxer's punches resulted in lower translational

accelerations in the struck head compared with the football impacts (Fig. 4). The boxer's punch applied a higher moment to the struck head than did the football impacts. This resulted in a higher rotational acceleration in the head that was struck than did the football impacts. Boxers sustain a brain injury by two mechanisms: translational and rotational accelerations of the brain, with a preponderance of the rotational component. Professional football players, on the other hand, sustain mild TBI mostly by translational forces because the shell of the helmet allows the players to slide relative to one another, limiting high rotational accelerations. These differences were further studied using finite element analysis of brain responses.[14] The localized strains in the brain and different biomechanical inputs help explain the clinical differences between head injuries in boxing and professional football.

Finite element modeling also showed that strains develop late, after the primary impact force, and focus on their response at the midbrain. This study shows a complicated interaction of the head kinematics, detailed geometrical and material properties of the brain, and the role of brain movement and deformation within the skull (Fig. 5).

### V: Impact Velocity

In our earlier studies, we found that concussions in NFL players occur at an impact velocity of $9.3 \pm 1.9$ m/second ($20.8 \pm 4.2$ mph) oblique on the face mask, side, and back of the helmet. There is a need for new testing methods to evaluate helmet performance in protecting against impacts causing concussion.

The NOCSAE certifies the helmets used by professional football players. The impact tests provide confidence that protective helmets are effective in reducing life-threatening head injuries. Data collected from the accelerometers used in the NOCSAE head drop test are used to assess the shock-attenuating properties of the helmet based on the head SI, in which the risk of serious head injury is



FIG. 4. Scatterplot showing individual data points for translational and rotational acceleration (Accel) of the Hybrid III head for NFL game impacts and four different Olympic boxing punches. (Reprinted with permission from Viano DC, Casson IR, Pellman EJ, Bir CA, Zhang L, Sherman DC, et al: Concussion in professional football: comparison with boxing head impacts—Part 10. **Neurosurgery 57:** 1154–1172, 2005.)

Concussion in professional football



| Rotation | 0 | 11° | 24° |
| Displacement | 0 | 42 mm | 115 mm |
| Time | 0 | 15 ms | 25 ms |

Fig. 5. Anatomical models showing the deformation pattern of the finite element brain from a frontal and superior view of the hemispheres at 0, 15, and 25 msec for one of the NFL concussion cases. The sequence shows the head kinematics and brain deformations. (Reprinted in modified form with permission from Viano DC, Casson IR, Pellman EJ, Zhang L, King AI, Yang KH: Concussion in professional football: brain responses by finite element analysis—part 9. **Neurosurgery 57:** 891–916, 2005.)

determined from the SI. This standard does not address helmet performance in reducing the risk of concussion.

It was believed by the members of the committee that the previous NFL mild TBI research findings would allow a recommendation to be made for a new methodology for testing helmets to reduce the risk of concussions.[11] The initial approach involved pendulum impactors that were used to simulate 7.4 and 9.3 m/second impacts causing concussion in NFL players. A helmet was placed on an instrumented Hybrid III head that was supported on the neck, which was fixed to a sliding table for frontal and lateral impacts. The testing evolved to a linear pneumatic impactor, which gives better control and a broader speed range for helmet testing. The NOCSAE has prepared a draft supplemental helmet standard for the 7.4- and 9.3-m/second impacts evaluated using the new impactor. The proposed NOCSAE standard is the first to address helmet performance in reducing the risk of concussion.

### VI: Performance of the Newer Helmets

The new understanding of the biomechanics of concussion in NFL players has enabled football helmet manufacturers to make design changes, for the first time, specifically to reduce the risk of mild TBI. The NFL testing techniques addressing concussion were shared previously with the helmet manufacturers and NOCSAE. The Adams USA Pro Elite, Riddell Revolution, and Schutt Sport Air Varsity Commander and DNA helmets are examples of headgear designed using the new information. Using the new mild TBI testing methodology, the Committee believed it would be useful to test the performance of newer helmets in reconstructed game impacts to compare them with a more standard VSR-4 football helmet.

The aim of this most recent study[16] was to investigate the performance of newer football helmets under conditions causing concussion in NFL players. Ten cases of NFL

game concussions were selected for reenactment testing with newer helmets to investigate the equipment's effectiveness in reducing the risk of concussion. The range of impact speed was between 7.4 and 11.2 m/second for eight cases of helmet-to-helmet impacts. This was within one standard deviation of the average condition for concussion in the NFL. The two head-to-ground impact cases averaged 7.2 m/second. For each case of helmet-to-helmet impact, the striking and struck dummies were oriented to match the original laboratory reconstructions of NFL players' concussions. Verification tests ensured that the 10 reconstructed impacts from NFL games were set up similarly to the original testing. Identification on all helmets was obscured, and random tests were conducted.

Testing revealed that newer football helmets reduce concussion risks in collisions that were representative of NFL player experiences. Depending on the biomechanical response, the reductions are in the range of a 10 to 20% lower risk of concussion. The newer headgear reduces concussion risk by using thicker and more energy-absorbing padding on the side and back of the helmets and around the ears. This demonstrates an encouraging trend with the newer headgear; and we expect additional progress. The tests should help NOCSAE in its effort to finalize new helmet standards for preventing concussions.

### Injury Collection and Data Analysis

#### I: Prevalence of Mild TBI

Mild TBI is a major public health problem in the US, with an estimated annual incidence of 160 to 375 cases per 100,000 persons per year. Officials at the Centers for Disease Control and Prevention have estimated that the number of mild TBIs has reached 300,000 cases per year in all sports. In an attempt to better understand mild TBI in the NFL, the Committee supervised prospective collection of data on this condition in NFL players from 1996 to 2001.

All data were collected using standardized forms, and the information was assessed in a blinded fashion. In all, 787 game-related cases (1913 games) were reported, and all players were examined by team physicians, with information reported on player position, type of helmet, symptoms, medical actions, and playing days lost.[5] All patients were evaluated by physicians immediately after the injury and underwent follow-up physician evaluations until they returned to play. Forms were completed by the physicians, which increased the medical validity and reliability of the information collected. Because the Committee did not mandate case management for mild TBI, the patients' medical course reflects the true natural history of mild TBIs among professional football players during this 6-year period.

Mild TBIs are relatively common injuries sustained by professional football players. The data indicate that quarterbacks, wide receivers, defensive backs, and special-team players on kicking units are more likely to sustain these injuries than are offensive and defensive linemen (Table 1). The clinical information helped validate the biomechanical data on professional football–related mild TBIs derived from the earlier studies.

The most common initial symptoms for players who sustained concussions were headaches, dizziness, memory

E. J. Pellman and D. C. Viano

TABLE 1

*Incidence of mild traumatic brain injury according to player position in National Football League games*

| Position | No. of Cases | Incidence(%) | No. of Game Positions | Risk per 100 game-positions[a] |
|---|---|---|---|---|
| **High Risk** | | | | |
| Offensive | | | | |
| Quarterback | 62 | 7.9% | 3,826 | 1.62(1.22, 2.02) |
| Wide Receiver | 94 | 11.9% | 7,652 | 1.23(0.98, 1.48) |
| Tight End | 36 | 4.6% | 3,826 | 0.94(0.63, 1.25) |
| Running Back | 69 | 8.8% | 7,652 | 0.90(0.69, 1.11) |
| Defensive | | | | |
| Secondary | 143 | 18.2% | 15,304 | 0.93(0.78, 1.08) |
| **Moderate Risk** | | | | |
| Offensive | | | | |
| Offensive Line | 56 | 7.1% | 19,130 | 0.29(0.21, 0.37) |
| Defensive | | | | |
| Linebacker | 52 | 6.6% | 11,478 | 0.45(0.33, 0.57) |
| Defensive Line | 67 | 8.5% | 15,304 | 0.44(0.34, 0.54) |
| Special Team | | | | |
| Return Ball Carrier | 22 | 2.8% | 3,826 | 0.58(0.34, 0.82) |
| Kick Unit | 131 | 16.6% | 38,260 | 0.34(0.28, 0.40) |
| **Low Risk** | | | | |
| Special Team | | | | |
| Punter | 7 | 0.9% | 3,826 | 0.18(0.05, 0.31) |
| Return Unit | 33 | 4.2% | 38,260 | 0.09(0.06, 0.12) |
| Kicker, FGA | 1 | 0.1% | 3,826 | 0.03(−0.02, 0.08) |
| Kicker, PAT | 1 | 0.1% | 3,826 | 0.03(−0.02, 0.08) |
| Holder | 1 | 0.1% | 3,826 | 0.03(−0.02, 0.08) |
| Unknown/Undesignated | 12 | 1.5% | | |
| Total | 787 | 100% | | 8.08 |

[a]Risk per 100 game-positions is the number of concussions divided by the number of times the position was played during the observed period of 3,826 games, multiplied by 100. Values in parentheses are 95% confidence intervals. FGA = field goal attempt; PAT = point after touchdown. Risk strata are approximate, because there is some overlap of confidence intervals.

(Table reproduced with permission from Pellman EJ, Powell JW, Viano DC, Casson IR, Tucker AM, Feuer H, et al: Concussion in professional football: epidemiological features of game injuries and review of the literature—part 3. **Neurosurgery 54:**81–96, 2004.)

problems, cognitive problems, and somatic complaints. Headaches were observed in 55% (95% CI 51.5–58.5%) of NFL players who suffered concussions.[5] For the great majority of these players, mild TBIs did not cause prolonged disability or prolonged absence from play. In the NFL, 56.5% of players with concussions returned to play on the day of the injury and 97.1% returned to play by Day 9 after the injury. Only 2.9% of the players missed more than 9 days before returning to play. This indicates that most mild TBIs sustained in the NFL are self-limiting and that players recover fully and spontaneously in a short time. Because a significant percentage of players returned to play in the same game and the overwhelming majority of players with concussions were kept out of football-related activities for less than 1 week, it can be concluded that mild TBIs in professional football are not serious injuries.

Only 9.3% (95% CI 7–11.6%) of the NFL players experienced an LOC as a result of severe concussive head impacts (58 of 623 reported cases of mild TBI). It is important for all physicians who care for athletes with head injuries to know that most of the concussions they treat are not associated with LOC, and that when this symptom occurs it is for a relatively short duration.

## II: Repeated Mild TBI

Despite the findings and conclusions in the preliminary clinical study, questions remained concerning NFL players who suffered repeated mild TBIs. Physicians have been concerned for many years about the possible deleterious effects of multiple concussions on the brains of athletes.[8] In this study, data on 887 concussions sustained in practices and games involving 650 players from all 30 NFL teams between 1996 and 2001 were prospectively collected and analyzed. A total of 160 players experienced repeated injury, with 51 suffering three or more concussions during the study period. The median time between injuries was 374.5 days, with only six concussions occurring within 2 weeks of the initial injury. Repeated concussions were more prevalent in the secondary, the kick unit on special teams, and in wide receivers.

There have been reports in which researchers have concluded that there may be an increased risk of repeated concussive injuries, and there may be a slower recovery of neurological function after repeated concussions in those who have a history of previous ones. The results of this study in professional football players do not support that conclusion. Although approximately one half of players returned to play during the same game or practice session, and approximately 90% returned within 1 week, recurrent injury caused by an increased vulnerability in the immediate postconcussion period does not seem to be a factor in professional football players.

No cases of "second-impact syndrome" were detected during the 6-year period of this NFL study. There were no deaths, prolonged comas, or evidence of diffuse cerebral

# Concussion in professional football

edema in any player. Furthermore, there have been no case reports of second-impact syndrome in the history of the NFL. It is possible that this syndrome does not truly exist in this population of athletes. Many of the mild TBI guidelines have established exclusion periods based at least partially on the belief that someone who experiences a symptomatic mild TBI is at risk for the development of second-impact syndrome. The absence of the syndrome in this patient population supports the suggestion that such arbitrary return-to-play guidelines may be too conservative for professional football.

Another often-expressed concern underlying the development of mild TBI guidelines is the occurrence of chronic brain damage as a result of multiple head injuries. A recent letter to the editor in *Neurosurgery* addressed the case of an NFL player who was alleged to have died of complications of chronic traumatic encephalopathy, underscoring this concern.[1] Chronic traumatic encephalopathy in boxers is a well-accepted and documented clinical and pathological syndrome. The clinical features include a combination of cerebellar, extrapyramidal, and pyramidal dysfunction, along with cognitive and personality changes. In the NFL study, none of these features was identified in any player, including those with repeated injury. There were no signs of chronic traumatic encephalopathy in this group of active, contemporary football players.

In players with four or more concussions there was a greater chance of personality change and fatigue, but the number did not reach statistical significance. The incidence of LOC at the time of mild TBI was no different with successive concussions. Overall, however, the signs and symptoms reported in the NFL study were very similar in players with single and multiple mild TBIs. There was no evidence of increased severity of injury in multiple compared with single mild TBI cases.

## III: Postconcussion Syndrome

In the data analysis there were a small number of athletes in whom persistent postconcussion symptoms developed, and these individuals were unable to return to play for an extended period. Often the postconcussion symptoms were seen 1 or more weeks after the injury. The postconcussion syndrome follows head injury that is usually mild, and consists of any combination of the symptoms and signs that occur after mild TBI. The Committee decided to analyze the data obtained in players in whom postconcussion syndrome was diagnosed.[7]

When does cerebral concussion end and postconcussion syndrome begin? Very few data are available on the evolution of head injury to postconcussion syndrome in athletes. The purpose of this part of the study was to compare the small group of NFL players who did not return for more than 7 days after a mild TBI with the majority of NFL players who do return within 7 days. The 7-day dividing line between the groups does not reflect an arbitrary distinction. Because NFL teams play games once a week, the players in this study cohort all missed at least one game. The NFL teams play only 16 games per season. Therefore, missing one game involves a significant loss of playing time. The study cohort all had significant functional impairment caused by mild TBI.

There were 72 cases with more than 7 days away from

play among the 887 cases of mild TBI analyzed between 1996 and 2001. Of these injuries, 38 were single concussions experienced in the study period, eight were the first of repeated concussions, 16 were the second, seven were the third concussion, and so on in the study period. The median duration between the first injury and 7 or more days away from play was 364 days, and the median duration between the last injury and 7 or more days away was 329 days, which is statistically significant.

For the whole sample, there were 650 players who experienced 887 concussions during the study period, and the position they were playing was recorded in this analysis. Individually, the position groups most often associated with loss of 7 or more days are the defensive secondary (23.6%), kick unit (19.4 %), quarterbacks (12.5%), and wide receivers (12.5%). The fraction of players in a position with 7 or more days away compared with all in that group was highest for the quarterback (14.8%), the return unit on special teams (11.8%), and the secondary (10.8%), followed by the kick unit (10.4%) on special teams. Quarterbacks had the highest odds ratio of 7 or more days away from play with concussion, whereas running backs had the lowest relative risk.

The majority of players with concussions (88.9%) are rested, with 7 or more days out, compared with 90.7% with fewer than 7 days out. Overall, the data show a conservative treatment of concussion. There was no statistical difference in players' treatment in comparisons between the two groups.

Between the initial examination and the first follow-up review, most of the signs and symptoms started to decrease, except for increases in the general category of memory problems, fatigue, irritability, and sleep problems. By the fourth follow-up examination (median 4.7 days), all memory and cognitive problems had cleared. Nevertheless, some players still reported headaches, dizziness, and photophobia. Somatic complaints continued in some players, including personality change and fatigue. By the seventh examination (median 13 days) only headaches remained to clear.

The data analysis allowed the development of profiles for two groups of NFL players with concussions. The first group is the small minority of players who ultimately do not return to play for 7 or more days postinjury. They are more likely to experience LOC as a result of the head injury, and they are more likely to be hospitalized on the day of the injury. At the time of the initial evaluation, these players have a significantly increased number of the signs and symptoms of mild TBI. On initial examination, they are very likely to have retrograde amnesia, difficulties with immediate recall, and overall difficulties with cognition and general memory.

The results of this study and the previous ones prompted the Committee to perform a critical analysis of the widely promoted guidelines for the evaluation and management of concussion in sport. This 6-year study indicates that no NFL player experienced second-impact syndrome, chronic cumulative injury, or chronic traumatic encephalopathy from repeated injuries. These are a few of the expressed rationales for developing management guidelines. The proponents of these guidelines recommend grading the severity of concussion by a limited number of criteria, such as presence or absence of LOC, post-

traumatic amnesia at time of injury, confusion, and mental status changes soon after injury. The guidelines then make clinical management recommendations on the basis of the grade of concussion diagnosed using these criteria.

Analysis of the NFL data reveals that there are other prognostic factors of equal importance that are not included in the grading systems. These include photophobia, fatigue, and increased absolute numbers of signs and symptoms. Furthermore, the grading systems do not take into account factors such as the position played by the injured athlete and the type of play during which the injury occurred. In the NFL study we found that the presence of signs and symptoms such as fatigue, sleep disturbance, irritability, and/or cognitive or memory impairments on examination the day after the injury also has significant prognostic usefulness. None of the grading systems incorporate results from examinations performed other than on the day of the injury. Although the grading systems use some important prognostic findings, they are limited in their scope and fail to incorporate a number of other factors that have been demonstrated to be predictors of delayed recovery.

The NFL studies also support the contention that grading concussions immediately after injury is prone to error. A number of players with signs and symptoms suggesting a poor prognosis in fact recovered very quickly and returned to play on the day or within a few days of injury. Conversely, there were two players with minimal signs or symptoms, suggesting a good prognosis, who were ultimately kept out of play for 7 or more days after mild TBI. None of the prognostic factors or combinations of factors was 100% accurate in predicting recovery.

It followed from this analysis that the current attempts to link prospective grading of concussion symptoms to arbitrary, rigid management decisions are not consistent with scientific data. We believe that if one insists on grading concussion severity, the best way is retrospectively, on the basis of how long it actually takes the player to become asymptomatic, with normal results on neurological examination. It is the recommendation of the NFL's Committee on Mild Traumatic Brain Injury that team physicians treat their players on a case-by-case basis, using their best clinical judgment and basing their decisions on the most relevant, objective medical data obtained.

*IV: Neuropsychological Testing in Evaluating Mild TBI*

The development and use of neuropsychological testing in the NFL has been rapid, and it has contributed to the implementation of this testing in other professional sports organizations, including ice hockey, automobile racing, and Australian Rules football. When used in concert with other medical information, neuropsychological test data contribute quantitative information regarding neurocognitive processes, such as attentional, memory, and cognitive processing speed. Neuropsychological testing can provide objective information regarding the recovery process and allows comparisons of the athlete's performance against normative data and the individual's preinjury level of performance.

The NFL's neuropsychological testing program was established as a clinical research program with the goal of investigating the use of such testing to assist team physi-

cians in the return-to-play decision. Athletes in the NFL who underwent neuropsychological testing between 1996 and 2001 and who participated in the study were included.[4] Preseason normative data were collected in 655 NFL athletes. The overall sample of injured players who underwent testing consisted of 143 athletes. This sample represented 22% of the 650 NFL athletes who experienced 887 concussions during the study period. Because participation in the study was voluntary, not all athletes with mild TBI completed neuropsychological testing.

This study supports previous research that has shown that on-field signs of cognitive impairment, such as amnesia, are useful in determining the severity of brain injury.[4] Players identified as having cognitive and memory disturbances are likely to show neuropsychological impairments on follow-up testing. Athletes with no clinically recognized cognitive and memory impairments on physician examination did not, as a group, have more subtle changes in cognitive processes that were missed during the sideline clinical examination. This suggests that the on-field evaluation by team physicians is effective with regard to the identification of cognitive and memory impairments immediately after an injury.

On review of the data, the fact that there were no overall significant differences in test results between a group of injured NFL athletes who had previously undergone baseline neuropsychological testing suggests that NFL athletes with mild TBIs recover quickly after injury (Fig. 6). In contrast to previous studies in which cognitive difficulties lasting 1 week or more were suggested, NFL athletes demonstrated generally intact performance within several days relative to baseline performance levels.

The issue of the potential cumulative effects of sports-related mild TBI has been a particularly controversial one, and many studies have offered different views on the significance of multiple injuries. In this study we did not find a pattern of worse neuropsychological test scores in a group of professional athletes who received close follow-up care for 6 years. We also did not find worse neuropsychological performance in NFL athletes who were held back from play for 7 or more days compared with a group who returned within 1 week. It is noteworthy that in this group that was kept from play for 7 or more days, the results of neuropsychological tests and medical evaluation of cognitive and memory function were normal within several days of the injury. The results of this study indicate no evidence of worsening injury or chronic cumulative effects of multiple mild TBIs in NFL players.

On the basis of this study, the NFL's Committee on Mild Traumatic Brain Injury makes the following recommendations regarding the proper role of neuropsychological testing in the NFL. Neuropsychological testing is a tool that can assist the physician in evaluating and managing mild TBI. It definitely should not be used in isolation and cannot replace and should not be used to replace the clinical judgment of the treating physician in the diagnosis and management of mild TBI. The main value of neuropsychological testing in this setting is its ability to confirm and corroborate the results of clinical and mental status evaluation.

*V: The ImPACT Program*

Concussion in professional football



FIG. 6. Bar graph showing the mean and standard deviation in Brief Visuospatial Memory Test-Revised (BVMT-R) (Total) neuropsychological test scores for NFL baselines, players with memory problems, more than three concussions, and out 7 or more days from play. Also shown are data (first two bars) from a sample of high school and college players at Penn State University. (Reprinted with permission from Pellman EJ, Lovell MR, Viano DC, Casson IR, Tucker AM: Concussion in professional football: neuropsychological testing—part 6. **Neurosurgery 55:** 1290–1305, 2004.)

Despite the initial findings, based on neuropsychological testing, that NFL players had a rapid return to baseline after a mild TBI, the Committee was aware that this was in contrast to several studies that found more long-lasting neuropsychological decrements in high school athletes. Members of the committee decided to perform an additional study, in which professional and younger athletes were compared using the same protocol and identical neurocognitive test battery.[3]

The ImPACT program is a computerized neuropsychological testing instrument used by some within the NFL neuropsychology program. The ImPACT program (version 2.0) consists of six neuropsychological tests designed to target different aspects of cognitive functioning, including attention, memory, processing speed, and reaction time. The results of ImPACT testing on NFL and high school players were compared.

In this study,[3] we found no significant neurocognitive deficits in the NFL sample within the 1st week postinjury, suggesting that NFL athletes with mild TBIs recover relatively quickly after injury. In contrast, we found residual difficulties in reaction time and memory in the high school sample but not in professional players. This raises the question of differential response to mild TBI in professional and high school athletes.

*VI: Return to Play*

There were concerns based on the results of the earlier studies of mild TBI that perhaps some players were being

returned to play too soon after injury, thus resulting in more prolonged postconcussion syndrome and perhaps creating the risk of more severe brain injury. The committee therefore decided to do a data analysis on NFL players who returned to play on the same day as their mild TBI.[6]

In the NFL players studied between 1996 and 2001, there were 135 (15.2%) who returned to play immediately after mild TBI and 304 (34.3%) who rested and returned to the same game after concussion. There were few differences in the player position or team activity related to the injury or action taken. However, players who suffered concussions and returned to the same game had fewer initial signs and symptoms than those who were removed from play.

Widely used concussion management guidelines state that athletes can return to play on the day of the injury if they become asymptomatic and if results of examinations performed within 15 minutes of their injury are normal. In the NFL database, 41% of players returned to the same game either immediately or after resting more than 15 minutes. Of those who returned immediately, 17.9% were out more than 15 minutes, and 51.7% of those who rested and returned were out for more than 15 minutes. The data showed no increased risk of repeated mild TBI, prolonged postconcussion syndrome, delayed return to play (≥ 7 days out), second-impact syndrome, or catastrophic intracranial event. The NFL experience thus supports the suggestion that players who become asymptomatic and have normal results on examinations performed at any time after injury, while the game is still in progress, have

E. J. Pellman and D. C. Viano

been and can continue to be safely returned to play on that day. The data also support the proposition that players who experienced LOC had no increased risk of repeated mild TBI or prolonged postconcussion syndrome compared with other players.

The results of this study indicate that many NFL players can be safely allowed to return to play on the day of the injury after sustaining a mild TBI. These players had to be asymptomatic, with normal results on clinical and neurological examinations, and be cleared by a knowledgeable team physician. There were no adverse effects, and the results once again are in sharp contrast to the recommendations in published guidelines and the standard of practice of most college and high school football team physicians. This data analysis was performed on information obtained in adult professional football players, and these findings are not meant to be carried over to any other patient population, including high school and college football players.

## Conclusions

The NFL study was conducted to increase the scientific information available to physicians and sports professionals based on prospective clinical information and contemporary, "real-time" biomechanical data. The NFL's Committee on Mild Traumatic Brain Injury is currently supervising work on an animal model of mild TBI, mouthpieces, and studies of retired players that we hope will continue to add information and shed light on the complicated clinical syndrome of mild TBI in athletes.

## References

1. Casson IR, Pellman EJ, Viano DC: Chronic traumatic encephalopathy in a National Football League player. **Neurosurgery 58:** E1003, 2006 (Letter)
2. Pellman EJ: Background on the National Football League's research on concussion in professional football. **Neurosurgery 53:**797–798, 2003
3. Pellman EJ, Lovell MR, Viano DC, Casson IR: Concussion in professional football: recovery of NFL and high school athletes assessed by computerized neuropsychological testing—part 12. **Neurosurgery 58:**263–274, 2006
4. Pellman EJ, Lovell MR, Viano DC, Casson IR, Tucker AM: Concussion in professional football: neuropsychological test-
ing—part 6. **Neurosurgery 55:**1290–1305, 2004
5. Pellman EJ, Powell JW, Viano DC, Casson IR, Tucker AM, Feuer H, et al: Concussion in professional football: epidemiological features of game injuries and review of the literature—part 3. **Neurosurgery 54:**81–96, 2004
6. Pellman EJ, Viano DC, Casson IR, Arfken C, Feuer H: Concussion in professional football: players returning to the same game—part 7. **Neurosurgery 56:**79–92, 2005
7. Pellman EJ, Viano DC, Casson IR, Arfken C, Powell J: Concussion in professional football: injuries involving 7 or more days out—part 5. **Neurosurgery 55:**1100–1119, 2004
8. Pellman EJ, Viano DC, Casson IR, Tucker AM, Waeckerle JF, Powell JW, et al: Concussion in professional football: repeat injuries—part 4. **Neurosurgery 55:**860–876, 2004
9. Pellman EJ, Viano DC, Tucker AM, Casson IR: Concussion in professional football: location and direction of helmet impacts—part 2. **Neurosurgery 53:**1328–1341, 2003
10. Pellman EJ, Viano DC, Tucker AM, Casson IR, Waeckerle JF: Concussion in professional football: reconstruction of game impacts and injuries. **Neurosurgery 53:**799–814, 2003
11. Pellman EJ, Viano DC, Withnall C, Shewchenko N, Bir CA, Halstead PD: Concussion in professional football: helmet testing to assess impact performance—part 11. **Neurosurgery 58:** 78–96, 2006
12. Tagliabue P: Tackling concussions in sports. **Neurosurgery 53:** 796, 2003 (Editorial)
13. Viano DC, Casson IR, Pellman EJ, Bir CA, Zhang L, Sherman DC, et al: Concussion in professional football: comparison with boxing head impacts—part 10. **Neurosurgery 57:**1154–1172, 2005
14. Viano DC, Casson IR, Pellman EJ, Zhang L, King AI, Yang KH: Concussion in professional football: brain responses by finite element analysis—part 9. **Neurosurgery 57:**891–916, 2005
15. Viano DC, Pellman EJ: Concussion in professional football: biomechanics of the striking player—part 8. **Neurosurgery 56:**266–280, 2005
16. Viano DC, Pellman EJ, Withnall C, Shewchenko N: Concussion in professional football: performance of newer helmets in reconstructed game impacts—Part 13. **Neurosurgery 59:**591–606, 2006

Manuscript received June 22, 2006.
Accepted in final form October 2, 2006.
*Address reprint requests to:* David C. Viano, Dr. Med., Ph.D, ProBiomechanics, 265 Warrington Road, Bloomfield Hills, Michigan 48304. email: dviano@comcast.net.

# EXHIBIT 60




THE BEST SPORTS STORIES OF THE
DAY IN A FREE EMAIL.

Email Address

TRENDING    Seinfeld On Jeter Finale    Michigan Football Woes    Jameis Winston's Hometown    LeBron's Summer Diet    Chuck Bednarik    Mario Chalmers/LeBron

# The Case Against The NFL

Wednesday, February 29, 2012 12:58 pm    |    Written by: Patrick Hruby

        Like  80

An attorney by training and a member of Congress by trade, Linda Sanchez knows verbal dissembling — read: pure, unadulterated bull excrement — when she hears it, Case in point? During a 2009 Capitol Hill hearing on brain trauma in the National Football League that included commissioner Roger Goodell, the Democratic representative from California introduced a 2007 video clip from HBO's "Real Sports" featuring neurologist Ira Casson, then the co-chair of the league's panel on head injuries.

**Interviewer:** Is there any evidence, as far as you're concerned, that links multiple head injuries among pro football players with depression?

**Casson:** No.

**Interviewer:** With dementia?

**Casson:** No.

**Interviewer:** With early onset of Alzheimer's?

**Casson:** No.

**Interviewer:** Is there any evidence as of today that links multiple head injuries with any long-term problem like that?

**Casson:** In NFL players?

**Interviewer:** Yeah.

**Casson:** No.



"[The NFL's] actions smacked of them knowing it was a very serious problem," Sanchez says. "And them trying to deny it and cover it up with very vague-sounding and un-alarming information, because, let's face it, there's a heck of a lot of money at stake. If they could deny and delay anybody putting this together, then they could avoid being held liable for these former players suffering these very severe aftereffects.

"It reminded me of the tobacco industry, who knew for years and years that smoking wasn't good for you but kept denying it."

*No. No. No.* No more. Last week, the family of Dave Duerson — the former Chicago Bears safety who committed suicide by shooting himself in the heart, the better to preserve his brain for scientific study — filed suit against the NFL, contending that the league's mismanagement of Duerson's on-field concussions resulted in his brain damage and ultimate death. Hundreds of other former players have filed similar suits since last summer, seeking recompense for football-induced headaches and memory loss, depression and dementia, emotional turmoil and cognitive decline. Each complaint alleges essentially the same thing: The NFL knew there was a problem. Knew that concussions can and do produce serious, long-term harm. Knew this and did nothing — failed to adequately warn players about the risk, failed to protect them with proper care and treatment, failed to help when they later became ill, once-robust men laid irrevocably low by the ticking time bombs exploding inside their heads. Worse still, the league knew and pretended otherwise, plausibly denying and implausibly lying and actively covering up, hiding behind phony prudence and junk science, slow-walking the issue into the dank corner of a dark closet, raking in billions all the while, just like Big Tobacco before them.

The NFL
says otherwise. Firmly and consistently, the league claims it handled concussions the best it could given the medical information available at the time; moreover, it intends to fight the lawsuits, four of which have been consolidated in a Philadelphia federal court. Chances are, the league will prevail. It has money. It has lawyers. It has the kind of lawyers that money buys. The NFL can afford to make the battle long, costly and technical; according to sports law expert Michael McCann, it can make a strong defensive case in terms of strict legal culpability. But never mind that. Even if the league wins in court — even if it escapes a potentially damning future discovery process unscathed — it already has lost. Lost whatever remains of its carefully burnished cultural sheen, its implicit, NFL Films-fueled claim to be something greater than big-budget human cockfighting, a red-blooded, all-American enterprise that can kick off the Super Bowl with a pious recitation of the Declaration of Independence while maintaining a straight face. Because the NFL doesn't just have a legal duty to the helmet-smashing men who make its profits possible. It has a moral duty, too. And on that front, the league has failed.

Failed miserably, in fact.



AP PHOTO

Start with the science. Medical research dating back to the 1920s indicates that suffering multiple blows to the head that are not allowed to properly heal can result in degenerative and irreversible cognitive impairment – known in boxing as "punch drunkenness." Yet despite presiding over a violent contact sport in which both concussions and sub-concussive head hits are *de rigueur* – and that's just during practice -- the NFL did not formally begin to investigate the issue until 1994, when the league formed its Committee on Mild Traumatic Brain Injury. Heading the group? Former New York Jets team doctor Elliot Pellman. Not a neurologist. A rheumatologist. A man who claimed in his biographical material that he had a medical degree from the State University of New York at Stony Brook, when in fact he reportedly attended medical school in Guadalajara, Mexico. A man who shared the following moment with concussed Jets receiver Wayne Chrebet during a 2003 game against the New York Giants, later detailed by ESPN writer Peter Keating in a chilling magazine article:

*"There's going to be some controversy about you going back to play." Elliot Pellman looks Wayne Chrebet in the eye in the fourth quarter of a tight game ... A knee to the back of the head knocked Chrebet stone-cold unconscious a quarter earlier, and now the Jets' team doctor is putting the wideout through a series of mental tests. Pellman knows Chrebet has suffered a concussion, but the player is performing adequately on standard memory exercises.*

*"This is very important for you," the portly physician tells the local hero, as was later reported in the New York Daily News. "This is very important for your career." Then he asks, "Are you okay?"*

*When Chrebet replies, "I'm fine," Pellman sends him back in.*

Appearing on HBO's "Inside the NFL" that same year, Pellman flatly dismissed a study linking multiple concussions with depression among former players. Months later, Pellman and his colleagues produced a paper stating that there was "no evidence" that concussions produced "permanent or cumulative" damage; in 2006, they published a summary of their work to date, declaring "mild traumatic brain injuries" – read: concussions – "in professional football are not serious injuries."

Read that again: concussions do not qualify as a serious injuries. Are these the kind of doctors you want looking after your son?



GETTY IMAGES

Unsurprisingly, independent medical scientists found serious fault with the committee's methodology and conclusions. So did Sanchez. One reason? Pellman and company drew many of their conclusions from voluntary surveys that had been mailed out to a small number of retired players. "A lot of these players who are suffering, they have dementia or are living on the street," Sanchez says. "They don't have the wherewithal to full out a survey. They don't have an address. So the results were very skewed, showing there wasn't a problem. That made me sick to my stomach."

Likewise, independent research contradicted the NFL committee, demonstrating that multiple concussions significantly increased players' risk of cognitive disease and impairment. For example, a 2005 study of over 2,550 former players found that individuals who had suffered three or more concussions during their pro careers were five times more likely than retirees without a history of concussions to be diagnosed with a loss of brain function affecting memory, thinking, language, judgment and behavior.

How did the NFL respond? Think Phillip Morris. Committee member Mark Lovell attacked the above study, claiming that the league wanted to "apply scientific rigor to this issue to make sure that we're really getting at the underlying cause of what's happening ... you cannot tell that from a survey." (Right. Because surveys aren't credible, unless paid for by the league). Time and again, committee members denied a link between concussions and cognitive decline. They asked for more time to study the issue. They claimed that independent scientists were drawing premature conclusions. In 2007, some of those same independent scientists gave face-to-face presentations to committee members; afterward, the NFL released a statement that in part read:

ThePostGame brings you the most interesting sports stories on the web.

**FOLLOW US ON FACEBOOK AND TWITTER TO READ THEM FIRST!**

Like  145k    Follow @Post_Game

Current research with professional athletes has **not shown that having more than one or two concussions leads to permanent problems** ... It is important to understand that there is no magic number for how many concussions is too many.

The worst example of the league's see-no-evil approach came when forensic pathologist Dr. Bennet Omalu dissected the brain tissue of dead NFL players such as Pittsburgh Steelers Hall of Fame center Mike Webster. Omalu published an article in the academic journal Neurosurgery concluding that football-related head trauma caused the players to suffer the mind-destroying disease chronic traumatic encephalopathy (CTE). Pellman and two other committee members didn't just blow Omalu off – they wrote a letter to the journal attempting to discredit his research. According to a scathing 2009 GQ magazine article, the NFL repeatedly dismissed Omalu before sending an independent expert to examine his work in 2008. The expert, neuropathologist Peter Davies, initially was skeptical – that is, until he saw Omalu's slides, which contained the brain tissue of once-mad, now-deceased football players. "The credit must go to Bennet Omalu," Davies told the magazine. "Because he first reported this and nobody believed him, nobody in the field, and I'm included in that. I did not think there was anything there. But when I looked at the stuff, he was absolutely right. I was wrong to be skeptical."

The NFL's response? According to the magazine, the league declined to make Davies' report public and never spoke to Omalu again. One year earlier, however, it did give active players a pamphlet asserting that the link between concussions and long-term brain damage remained an open question – a position the NFL finally disavowed in 2010, in the wake of its public shaming before Congress and concurrent with new members of a reconstituted concussion committee publicly blasting their predecessors' work as "unacceptable."

Speaking of said predecessors: Also in 2010, Casson finally appeared before Congress in person at a follow-up hearing in Detroit. Having resigned his position on the NFL concussion committee – probably not a coincidence, given that former players disparagingly referred to him as "Dr. No" – he nevertheless doubled-down on his public assertion that there wasn't enough "valid, reliable or objective" scientific evidence to link repeated football head trauma and long-term brain damage. Sanchez was incredulous. When she asked Casson if the link between getting hit in the head and brain damage was

**-2091-**

a generally accepted medical principle, the doctor refused to answer directly, but did note that he wasn't "saying that concussions are good for you."



"That was the strongest thing I could get him to say," Sanchez says. "And he was employed by the NFL to study this. I can't put into words how shocking that was."

By denying the obvious -- that concussions are, in fact, profoundly not good for you — the league may have reduced its legal culpability in the current wave of lawsuits. As a leading brain scientist told ESPN's Keating, "They're basically trying to prepare a defense for when one of these players sues ... they are trying to say that what's done in the NFL is OK because in their studies, it doesn't look like bad things are happening from concussions." But the NFL also did its players a grave, unforgivable disservice. Remember Chrebet? After suffering multiple concussions over the course of his football career, he retired in 2005; two years later, he was still suffering from headaches and lethargy. Or take Dave Pear. A former Pro Bowl defensive tackle and Super Bowl winner with the Oakland Raiders, the 58-year-old Washington state resident still remembers how concussions in pro football were handled in the 1970s. "If you even talked about them, you were less than a man," he says. "You got knocked out, they held out four fingers. You'd say two. They would say, 'Close enough, get back out there.' There just wasn't a whole lot of concern about our heath."

Since 2004, Pear has been unable to work, instead collecting federal disability payments. The reason? It isn't his creaky spine, even though that has been operated on. It isn't his ruined hips, both of which have been replaced. It's his damaged brain. Eight years ago, a clinical psychologist concluded that Pear had "significant memory impairment as the result of repeated head injuries" and possibly was displaying "signs of early onset dementia." Today, he suffers from vertigo, chronic headaches and short-term memory lapses. Even during the day, he has a hard time staying awake. "I try to keep my mind active," he says. "I read a lot. But with head injuries, it doesn't get better. You just try to maintain some level so you can function. The reality is, it's your wife and your children that pay the biggest price."



The potential price worries Nate Jackson. A Denver Broncos tight end from 2003 to 2008 — the same time period as the NFL's most adamant concussion stonewalling -- Jackson always measured football in terms of its rewards. Money. Women. Status. Pride. A irresistible grab for ephemeral glory, no matter now badly his body ached. "As a player, you don't keep your best interests in mind," he says. "There's always something more powerful pulling you back on the field. When everybody tells you that this athletic talent you have is very, very important, well, what are you without it? How do you step outside of that and think rationally?"

While catching a pass during a 2008 game, Jackson was hit in the head by Cleveland linebacker Willie McGinest. The shoulder-to-helmet blow knocked Jackson out. Almost certainly concussed, he was never diagnosed with a brain injury. Nor was he tested for one. He didn't think to ask. Didn't want to know. "The [team doctors] knew I was [expletive] up," Jackson says. "They saw the hit. The trainer was telling me not to move my neck. But I intentionally made as little of a deal as I could about it. I didn't want to go sit in a training room. This was before concussions were a big deal. They weren't stressed to us. No specific meetings about it. No points of emphasis from the coaches."

Jackson spent the next three days in bed. Now out of football and writing a book about his experience, he wonders if the blow — or countless others like it — will come back to haunt him. "As a tight end, every day I had to smack my head into another dude's head, over and over again," he says. "I don't know if it's my imagination, but I feel like I can literally feel my brain getting kicked in when I read about concussions. It's a scary thought to consider where I might be in 20 years."

During this year's Super Bowl, the NFL aired a 60-second commercial about player safety, a slick spot in which the evolution of the game and its rules unfolded over the course of a single kick return, one era morphing into the next. Leather helmets became plastic. Players acquired facemasks. At the end of the spot, Baltimore Ravens linebacker Ray Lewis intoned, "Here's to making the next century safer and more exciting. Forever forward. Forever football." Maybe so. But missing from the ad was the league's brain trauma dissembling morphing into acceptance. Casson's no becoming a yes. In the here and now, the NFL touts its born-again concussion religion. A public crackdown on helmet-to-helmet hits. Universal return-to-play guidelines for players who have been concussed. Big, bright, liability-limiting posters, right there on locker room walls, stating that concussions can lead to devastating long-term cognitive damage. The league even donates money to medical researchers dissecting ex-players' brains, the same kind of research it once pooh-poohed.



All of that is good. But none of it is enough. Not when Cleveland quarterback Colt McCoy is concussed from a brutal, helmet-to-chinstrap hit in a game last December — and then sent back onto the field in the same game, potentially risking his life, because no one on the Browns medical staff noticed. Not when the league reportedly wanted to insert a concussion liability waiver into new player contracts, starting with this year's draft. (A league spokesman denied the report). And not when hundreds, maybe thousands, of brain-damaged former players need so much help, financial and otherwise, assistance they shouldn't have to go to a courtroom to secure.

**MORE HRUBY TUESDAY.**

- **Brain Trauma And The Future Of Youth Football >>**
- **Let's Make Super Monday A National Holiday >>**
- **Time To Strike Against The NCAA**

"The NFL doesn't walk away from this issue looking like a standup league," Sanchez says. "They just don't. They're moving in the right direction, but the fact remains that here are guys who are really, seriously messed up, health-wise, continuing to struggle and the league continues to ignore that. They have to go back to the guys that didn't make millions of dollars when they played. They have got to make it right by them."

Pear concurs. He says he made just over $600,000 in his pro football career. He says he has spent all of it and more on medical bills. A plaintiff in one of the concussion lawsuits, he isn't looking to make a quick buck. He's simply trying to survive. "I'm going to have medical bills the rest of my life from playing football," he says. "I want to be compensated for what the NFL has put myself and my family through. I want to see all my football brothers compensated. I want to see the NFL be to be honest about the sport. It's hazardous to your health."

**-2092-**

>>
• **Occupy The Marlins**
>>

A few years ago, Pear's phone rang. Goodell was on the line. He wanted to talk. Pear says he had been getting a bureaucratic runaround from league and players association disability services, that he needed help and had gotten nowhere. He also runs a blog that acts as a kind of clearinghouse and group therapy session of for retired players, many of them disaffected and struggling, some of them now concussion plaintiffs as well. The commissioner wanted to know what the problems were, and how he could help. "I made him listen to my grievance for 25 minutes," Pear recalls. "He kept trying to get off the line, getting more and more exasperated. Finally, he said, 'Who do you think I am, God?'"

Pear pauses.

"I said, 'No, Roger, you're the commissioner of the National Football League. It's your duty to protect the integrity of the game. You need to clean up this mess."

**Popular Stories On ThePostGame:**
– **What Should Jeremy Do? Plenty Of Options For Cashing In On Linsanity**
– **Justin Verlander Pitches 'Fastball Flakes' Cereal To Benefit Veterans**
– **NFL Combine: Fastest 40-Yard Dashes**
– **Jeremy Lin: His Impact On Changing The Perception Of The Asian American Male**

# EXHIBIT 61



PRINT THIS PAGE

Find this article at:
http://www.nfl.com/news/story/09000d5d8017cc67/article/nfl-outlines-for-players-steps-taken-to-address-concussions

# NFL outlines for players steps taken to address concussions

National Football League
Published: Aug. 14, 2007 at 07:08 p.m.  Updated: July 26, 2012 at 08:55 p.m.

The National Football League has outlined for NFL players, coaches, and staff members the recent steps that have been taken to address the management of concussions in the NFL.

"We want to make sure all NFL players, coaches and staff members are fully informed and take advantage of the most up-to-date information and resources as we continue to study the long-term impact of concussions," Commissioner Roger Goodell said. "Because of the unique and complex nature of the brain, our goal is to continue to have concussions managed conservatively by outstanding medical personnel in a way that clearly emphasizes player safety over competitive concerns."

**The recent steps were outlined in a memo that will be sent to all NFL players and team personnel with other information. They include the following:**

· The NFL held a medical conference in June on the subject of concussions. It was attended by team physicians and athletic trainers from every NFL team and by active players and medical representatives of the NFL Players Association. The conference reviewed the current medical and scientific research and included presentations by doctors and scientists from within and outside the NFL.

· An informational pamphlet on concussions for NFL players and their families has been prepared (below). It describes the symptoms of concussions, what NFL players should look for in themselves or a teammate if they suspect a possible concussion, and what NFL families should know about concussions.

· The establishment of a hotline to report information on a confidential basis about an NFL player being forced to practice or play against medical advice. The hotline underscores the league's priority on player safety over competitive concerns.

**The NFL and NFLPA medical advisors prepared a summary of key factors in deciding when NFL players can safely return to the same game or practice. These factors have been identified in medical studies and are used by NFL team medical staffs. They emphasize that concussions in the NFL should continue to be managed conservatively and include the following specific points:**

**1.** The player should be completely asymptomatic and have normal neurological test results, including mental status testing at rest and after physical exertion, before returning to play.

**2.** Symptoms to be taken into account include confusion, problems with immediate recall, disorientation to time, place and person, anterograde and retrograde amnesia, fatigue, and blurred vision.

**3.** If an NFL player sustains a loss of consciousness, as determined by the team medical staff, he should not return to the same game or practice.

**4.** NFL team physicians and athletic trainers will continue to exercise their medical judgment and expertise in treating concussions, including considering any history of concussions in a player.

· Neuropsychological testing has been expanded for all NFL players. NFL players who have been removed from a game due to a concussion will be re-tested during the season as part of the medical staff's treatment of the player and to assist in determining when players can return to practice and play. Each club will select the neuropsychological testing provider of its choice.

· Player safety rules relating to the use of the helmet will continue to be closely enforced. This will include strict enforcement of the requirement that chin straps on helmets be completely and properly buckled so that the helmet provides the maximum protection.

· The NFL will continue to research and study all elements of concussions with a particular focus on long-term effects.

**BELOW IS AN EXCERPT FROM THE NFL PLAYER CONCUSSION PAMPHLET:**

What is a Concussion? It's More Than a "Ding."

Concussions are caused by a hard hit to the head. The hit is typically from another player's helmet, shoulder pad or knee or from a fall to the ground. The effects usually last a short time, but it's important that they are treated properly and promptly by you, your team doctors and your athletic trainers.

You shouldn't decide if it is just a "ding." Instead, you should report any symptom from the list below to your medical staff. This will help determine whether or not you have had a concussion.

"Ding" is not a medical term. It doesn't describe specific symptoms and won't help your medical staff. Try to describe your symptoms from the following list.

How do I know if I have had a concussion?

These are some of the symptoms you may experience immediately or within a few days of having a concussion. Every concussion is different, players may react differently and not all players will experience the same symptoms.

**The most common symptoms are:**

· **Imbalance:** You may feel a change in your sense of balance, feel dizzy, or unsteady on your feet.

· **Headache:** This is the most common symptom with concussion. It may be mild to severe in intensity and you may feel like there is pressure in your head. This may be accompanied by nausea and vomiting.

· **Confusion:** You may be confused about where you are, about a play, the score or game situation. You may not remember the play you are running.

· **Memory loss:** You may lose memory about things that happened BEFORE or AFTER you were hit. You may not remember what happened during the play or the quarter before your collision. Or you can't remember what happened on the field or on the sidelines after your hit. You may ask the same questions over and over again.

· **Loss of consciousness:** You may black out or get knocked out, even for a second or two.

· **Vision change:** You may become sensitive to light, have blurred vision, double vision or feel like lights seem brighter. Some athletes also report "seeing stars" or other objects following a hard hit.

· **Hearing change:** You may feel a change in your hearing so sounds suddenly seem very loud, or you may hear a high pitch tone in your ears.

· **Mood change:** You may have a sudden change in your mood or a teammate may notice a change in your mood following a collision. For example, you might suddenly start to laugh or cry for no reason. You may not know this is happening but teammates, coaches, or the medical staff may see it. After a game, you may feel more irritable, anxious, or cranky than usual.

· **Fatigue:** You may feel more exhausted than usual after a game when you had a hard hit to the head. Some athletes report that they need to sleep many more hours after a concussion.

· **Malaise:** You may just "not feel right" but can't point to a specific problem.

Not every hard hit to the head leads to a concussion and whether or not you have a concussion can only be determined by your team doctors and athletic trainers. If the team medical staff does not know that you are injured, it can't help you!

You may not always recognize your symptoms. But your teammates, coaches or family members may see a difference in you that you don't. If someone sees a change in you, take it seriously and report it to your team medical staff.

What should you report to your team medical staff?

Don't try to make a diagnosis yourself. A concussion needs to be diagnosed by your team medical staff. If you have had a

**-2096-**

hard hit to the head and have symptoms, you should immediately report your symptoms to your team doctors and athletic trainers, who will conduct a thorough evaluation on the sideline.

On occasions, symptoms from concussion will be more obvious or noticeable hours after the impact. Symptoms should be reported to your medical staff regardless of when you become aware of them.

If you see any symptoms in a teammate, tell your team doctors or athletic trainers because your teammate may not always realize he has had a concussion.

When should I return to play following a concussion?

After a concussion, all return-to-play decisions should be made by your team medical staff. These decisions should never be made by players or coaches. You should be free of symptoms before you return to play.

If you have had a concussion and feel you are being pressured to return too quickly, or think that is happening to a teammate, you can call (the hotline number) to make a confidential report.

Am I at risk for further injury if I have had a concussion?

Current research with professional athletes has shown that you should not be at greater risk of further injury once you receive proper medical care for a concussion and are free of symptoms.

If I have had more than one concussion, am I at increased risk for another injury?

Current research with professional athletes has not shown that having more than one or two concussions leads to permanent problems if each injury is managed properly. It is important to understand that there is no magic number for how many concussions is too many.

Research is currently underway to determine if there are any long-term effects of concussion in NFL athletes.

What is the treatment for a concussion?

The treatment for concussion usually consists of rest. Medication may sometimes be prescribed by your team doctors for symptoms such as headaches and dizziness. If your team doctor prescribes medication, be sure to follow his directions and those provided with the prescription.

It is important that you avoid drinking alcohol. Also, if you intend to use over-the-counter medication, vitamins or supplements, tell your team doctors. They may want you to stop taking them.

You should avoid caffeine and make sure that you do not become dehydrated.

# EXHIBIT 62

American Journal of Epidemiology
Copyright © 2001 by the Johns Hopkins University Bloomberg School of Public Health
All rights reserved

Vol. 154, No. 11
Printed in U.S.A.

# Racial/Ethnic Disparities in Mortality by Stroke Subtype in the United States, 1995–1998

Carma Ayala,[1,2] Kurt J. Greenlund,[2] Janet B. Croft,[2] Nora L. Keenan,[2] Ralph S. Donehoo,[3] Wayne H. Giles,[2] Steven J. Kittner,[4] and James S. Marks[5]

Healthy People 2010 objectives for improving health include a goal to eliminate racial disparities in stroke mortality. Age-specific death rates by stroke subtype are not well documented among racial/ethnic minority populations in the United States. This report examines mortality rates by race/ethnicity for three stroke subtypes during 1995–1998. National Vital Statistics' death certificate data were used to calculate death rates for ischemic stroke ($n = 507,256$), intracerebral hemorrhage ($n = 97,709$), and subarachnoid hemorrhage ($n = 27,334$) among Hispanics, Blacks, American Indians/Alaska Natives, Asians/Pacific Islanders, and Whites by age and sex. Comparisons with Whites as the referent were made using age-standardized risk ratios and age-specific risk ratios. Age-standardized mortality rates for the three stroke subtypes were higher among Blacks than Whites. Death rates from intracerebral hemorrhage were also higher among Asians/Pacific Islanders than Whites. All minority populations had higher death rates from subarachnoid hemorrhage than did Whites. Among adults aged 25–44 years, Blacks and American Indians/Alaska Natives had higher risk ratios than did Whites for all three stroke subtypes. Increased public health attention is needed to reduce incidence and mortality for stroke, the third leading cause of death. Particular attention should be given to increasing awareness of stroke symptoms among young minority groups. *Am J Epidemiol* 2001;154:1057–63.

Asian Americans; Blacks; cerebral hemorrhage; cerebrovascular accident; Hispanic Americans; Indians, North American; mortality; subarachnoid hemorrhage

Although stroke is the third leading cause of death in the United States (1) and its overall mortality rates are well documented, few studies have addressed racial/ethnic differences in stroke mortality (2–4). In 1997, all racial/ethnic minority populations aged 35–64 years experienced higher

Received for publication March 23, 2001, and accepted for publication August 20, 2001.

Abbreviations: CI, confidence interval; ICD-9, *International Classification of Diseases*, Ninth Revision.

[1] Epidemic Intelligence Service, Division of Applied Public Health Training, Epidemiology Program Office, Centers for Disease Control and Prevention, Atlanta, GA.

[2] Cardiovascular Health Branch, Division of Adult and Community Health, National Center for Chronic Disease Prevention and Health Promotion, Centers for Disease Control and Prevention, Atlanta, GA.

[3] Community Health and Program Services Branch, Division of Adult and Community Health, National Center for Chronic Disease Prevention and Health Promotion, Centers for Disease Control and Prevention, Atlanta, GA.

[4] Department of Neurology and the Department of Epidemiology and Preventive Medicine, University of Maryland at Baltimore, MD, and the Geriatrics Research, Education, and Clinical Center, Baltimore Department of Veterans Affairs Medical Center, Baltimore, MD.

[5] Office of the Director, National Center for Chronic Disease Prevention and Health Promotion, Centers for Disease Control and Prevention, Atlanta, GA.

Correspondence to Dr. Carma Ayala, Cardiovascular Health Branch, National Center for Chronic Disease Prevention and Health Promotion, Mailstop K-47, Centers for Disease Control and Prevention, 4770 Buford Hwy NE, Atlanta, GA 30341-3717 (e-mail: cia1@cdc.gov).

mortality rates for stroke than did the White population (5). Currently, more than 25 percent of the US population is composed of racial/ethnic minority populations and, by 2050, that percentage should nearly double (6). Thus, there is an increasing need to understand racial/ethnic differences in stroke mortality so that appropriate public health interventions might be developed to eliminate disparities.

In addition, racial/ethnic stroke mortality differentials may exist according to the type of stroke. Ischemic stroke accounts for 70–80 percent of all strokes, but cerebral and subarachnoid hemorrhagic stroke have higher risks of fatality (7). Examining the patterns of stroke subtypes among racial/ethnic populations could help target prevention efforts. In this report, we present national, racial/ethnic, age-standardized, and age-specific mortality rates and risk ratios for stroke subtypes among the major racial/ethnic groups: non-Hispanic American Indians/Alaska Natives, non-Hispanic Asians/Pacific Islanders, non-Hispanic Blacks, non-Hispanic Whites, and Hispanics.

## MATERIALS AND METHODS

National Vital Statistics' data for death certificates were used to determine death rates and risk ratios for stroke mortality among persons who were ≥25 years during 1995–1998. In addition to medical examiners and coroners, practicing physicians report the cause of death on the certificates. The death certificates are processed in state vital

Downloaded from http://aje.oxfordjournals.org/ by guest on October 3, 2014

Downloaded from http://aje.oxfordjournals.org/ by guest on October 3, 2014

statistics offices and then sent to the National Center for Health Statistics at the Centers for Disease Control and Prevention for entry into a national detailed mortality database file (1). Death rates exclude nonresidents. For this study, observed stroke deaths were those for which the underlying cause of death was classified according to the *International Classification of Diseases*, Ninth Revision (ICD-9), codes 430–438 as listed on death certificates. Stroke subtypes were defined as subarachnoid hemorrhage (code 430), intracerebral hemorrhage (codes 431–432), and ischemic stroke (codes 433–434 or 436–438). Deaths attributed to transient ischemic attack (code 435) were excluded, but these events accounted for <1 percent of stroke deaths. There were no deaths listed as ICD-9 code 432 (other or unspecified intracerebral hemorrhage) during this time period. Demographic information, such as age, race, and ethnicity, is reported on death certificates by funeral directors on the basis of observation or information with which they are provided, usually by family members. Since 1992, information on both race and Hispanic origin has been requested on death certificates.

Death rates and risk ratios were calculated for groups defined by race/ethnicity, sex, and age (25–44, 45–64, and ≥65 years). Mortality rates (per 100,000 population) for the 4-year period 1995–1998 were calculated as the number of deaths divided by the population of interest. Population data (denominators for death rates) were postcensal estimates from the US Bureau of the Census. Age-standardized death rates were calculated by the direct method using the year 2000 standard US population (8). To estimate the overall excess risk for stroke death among racial/ethnic minority populations, we calculated risk ratios and 95 percent confidence intervals by dividing the rate for each racial/ethnic group by the rate for the White population (9). To estimate the excess risk in age groups, the risk ratios and 95 percent confidence intervals were calculated by dividing the mortality rates in each age group by the corresponding White mortality rates (10). Risk ratios of ≥1.0 indicate higher death rates or excess risk for the minority population than for Whites, while ratios of <1.0 indicate a lower rate or risk. Risk ratios are not presented for a category with ≤20 deaths because of potential instability of the estimate. Because the number of deaths in a given year was quite small in some subgroups, data were combined for 1995–1998 to create more robust estimates.

## RESULTS

In 1995–1998, there were 507,256 deaths from ischemic stroke, 97,709 from intracerebral hemorrhage, and 27,334 from subarachnoid hemorrhage among adults aged ≥25 years. Ischemic strokes accounted for 80 percent of deaths from these stroke subtypes (82 percent among non-Hispanic Whites, 75 percent among non-Hispanic Blacks, 74 percent among non-Hispanic American Indians/Alaska Natives, 62 percent among non-Hispanic Asians/Pacific Islanders, and 67 percent among Hispanics). For ischemic stroke, the age-standardized death rate among Blacks (95.8 per 100,000) was 1.30 (95 percent confidence interval (CI): 1.29, 1.31) times or 30 percent higher than the rate for Whites (73.7 per 100,000), while American Indian/Alaska Native, Asian/Pacific Islander, and Hispanic adults had lower death rates than Whites (table 1). For intracerebral hemorrhage, death rates for Blacks and Asians/Pacific Islanders were 1.70 (95 percent CI: 1.67, 1.74) and 1.52 (95 percent CI: 1.47, 1.58) times, respectively, as high as those of Whites. All minority populations had higher rates for subarachnoid hemorrhage than did Whites. Similar racial/ethnic differences were observed among both men and women (figure 1). Black men and women had the highest death rates for all three stroke subtypes, while Asian/Pacific Islander men and women also had high rates for both intracerebral and subarachnoid hemorrhagic stroke.

Eighty-nine percent of ischemic stroke deaths were attributed to acute, ill-defined, cerebrovascular disease (ICD-9 code 436), other and ill-defined cerebrovascular disease (ICD-9 codes 437–437.9), and late effects cerebrovascular disease (ICD-9 code 438) (figure 2). Only 5 percent of ischemic stroke deaths were classified as other (code 437.8) or unspecified (code 437.9). There were no appreciable differences among the racial/ethnic groups in the percentage distribution of these ICD-9 ischemic stroke classifications. When the analysis was repeated excluding these codes, there was essentially no change in the risk ratios.

As expected, the death rates for all three stroke subtypes increased with age among all racial/ethnic populations (table 2). For all three stroke subtypes, Blacks and American

**TABLE 1. Age-standardized death rates (per 100,000 population) from stroke subtypes and risk ratios\* and 95% confidence intervals comparing rates in racial/ethnic populations with those in White populations among adults aged 25 years or older, United States, 1995–1998**

|  | Ischemic | | | | Intracerebral hemorrhage | | | | Subarachnoid hemorrhage | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | No. of deaths | Rate | RR† | 95% CI† | No. of deaths | Rate | RR | 95% CI | No. of deaths | Rate | RR | 95% CI |
| Non-Hispanic |  |  |  |  |  |  |  |  |  |  |  |  |
| White | 430,749 | 73.7 |  |  | 75,363 | 13.2 |  |  | 20,564 | 3.8 |  |  |
| Black | 54,555 | 95.8 | 1.30 | 1.29, 1.31 | 14,028 | 22.5 | 1.70 | 1.67, 1.74 | 3,779 | 5.7 | 1.50 | 1.45, 1.55 |
| American Indian/Alaska Native | 1,435 | 48.6 | 0.66 | 0.63, 0.69 | 344 | 10.4 | 0.79 | 0.71, 0.88 | 161 | 4.4 | 1.16 | 0.99, 1.35 |
| Asian/Pacific Islander | 6,599 | 45.8 | 0.62 | 0.61, 0.64 | 3,173 | 20.1 | 1.52 | 1.47, 1.58 | 893 | 5.2 | 1.37 | 1.28, 1.46 |
| Hispanic | 13,918 | 39.7 | 0.54 | 0.53, 0.55 | 4,801 | 12.0 | 0.91 | 0.88, 0.94 | 1,937 | 4.2 | 1.11 | 1.05, 1.16 |

\* Risk ratio compares the rate for a racial/ethnic minority population with the rate for the White population.
† RR, risk ratio; CI, confidence interval.



Downloaded from http://aje.oxfordjournals.org/ by guest on October 3, 2014

**FIGURE 1.** Age-standardized death rates (per 100,000 population) for stroke subtype among adults aged 25 years or older, by race/ethnicity and sex, United States, 1995–1998. Death rates per 100,000, age adjusted to the 2000 total US standard population. *International Classification of Diseases*, Ninth Revision, codes for subarachnoid hemorrhage (code 430), intracerebral hemorrhage (codes 431–432), and ischemic hemorrhage (codes 433, 434, 436–438). Transient cerebral ischemia (code 435) was excluded. Categories for race and Hispanic origin (racial/ethnic populations) are mutually exclusive: NH, non-Hispanic; AIAN, American Indian/Alaska Native; API, Asian/Pacific Islander.

Indians/Alaska Natives at younger ages had higher rates of death than did Whites at similar ages; however, the risk of death was similar or lower at older ages. For example, the age-specific rate of intracerebral hemorrhagic deaths among Blacks was 5.20 (95 percent CI: 4.91, 5.51) times greater at ages 25–44 years, 3.94 (95 percent CI: 3.82, 4.07) times greater at ages 45–64 years, but similar (risk ratio = 1.04, 95 percent CI: 1.01, 1.07) at ages ≥65 years compared with the death rate in the corresponding age group of Whites. For intracerebral hemorrhage, the risk of death was higher at younger ages among Hispanics compared with Whites and higher at all age groups for Asians/Pacific Islanders than Whites. For subarachnoid hemorrhage, Asians/Pacific Islanders had a lower risk of mortality at younger ages but a

greater risk at older ages compared with corresponding Whites. The age-specific racial/ethnic differential in each minority population was similar for men and women (data not shown). Both Black men and Black women in the youngest age group, 25–44 years, had substantially higher death rates for all stroke subtypes than corresponding White men and White women.

## DISCUSSION

The Healthy People 2010 objectives include a goal to eliminate racial disparities in stroke mortality (11). Death rates for stroke declined by 70 percent overall from 1950 to 1996, but the rate of decline varied by race/ethnicity and

Downloaded from http://aje.oxfordjournals.org/ by guest on October 3, 2014



**FIGURE 2.**  Percentage of ischemic stroke deaths in adults aged 25 years or older by *International Classification of Diseases*, Ninth Revision (ICD-9), codes for ischemic stroke (codes 433–434.9, 436–438) and race/ethnicity, United States, 1995–1998. Categories for race and Hispanic origin (racial/ethnic populations) are mutually exclusive: NH, non-Hispanic; AIAN, American Indian/Alaska Native; API, Asian/Pacific Islander.

**TABLE 2.**  Age-specific death rates (per 100,000 population) from stroke subtypes and risk ratios* and 95% confidence intervals comparing death rates in racial/ethnic populations with death rates in the White population, adults aged 25 years or older, United States, 1995–1998

| Ethnicity, race, and age group (years) | Ischemic | | | Intracerebral hemorrhage | | | Subarachnoid hemorrhage | | |
|---|---|---|---|---|---|---|---|---|---|
| | Rate | RR† | 95% CI† | Rate | RR | 95% CI | Rate | RR | 95% CI |
| Non-Hispanic | | | | | | | | | |
| White | | | | | | | | | |
| 25–44 | 0.8 | | | 1.0 | | | 1.3 | | |
| 45–64 | 11.3 | | | 6.9 | | | 4.3 | | |
| ≥65 | 355.1 | | | 53.0 | | | 8.7 | | |
| Black | | | | | | | | | |
| 25–44 | 2.8 | 3.50 | 3.25, 3.77 | 5.2 | 5.20 | 4.91, 5.51 | 2.9 | 2.23 | 2.09, 2.38 |
| 45–64 | 38.3 | 3.39 | 3.30, 3.48 | 27.2 | 3.94 | 3.82, 4.07 | 7.1 | 1.65 | 1.56, 1.74 |
| ≥65 | 416.3 | 1.17 | 1.16, 1.18 | 55.1 | 1.04 | 1.01, 1.07 | 9.6 | 1.10 | 1.04, 1.18 |
| American Indian/Alaska Native | | | | | | | | | |
| 25–44 | 1.4 | 1.85 | 1.25, 2.44 | 1.6 | 1.60 | 1.17, 2.20 | 1.8 | 1.38 | 1.02, 1.87 |
| 45–64 | 16.7 | 1.48 | 1.29,1.69 | 9.6 | 1.39 | 1.17, 1.66 | 5.3 | 1.23 | 0.97, 1.56 |
| ≥65 | 216.1 | 0.61 | 0.57, 0.64 | 32.8 | 0.62 | 0.56, 0.69 | 8.8 | 1.01 | 0.76, 1.34 |
| Asian/Pacific Islander | | | | | | | | | |
| 25–44 | 0.6 | 0.75 | 0.59, 2.95 | 1.4 | 1.40 | 1.21, 1.63 | 1.0 | 0.77 | 0.60, 0.99 |
| 45–64 | 10.1 | 0.89 | 0.83, 0.96 | 13.2 | 1.91 | 1.79, 2.04 | 4.6 | 1.07 | 0.93, 1.23 |
| ≥65 | 215.0 | 0.61 | 0.59, 0.62 | 76.1 | 1.44 | 1.39, 1.50 | 16.1 | 1.85 | 1.65, 2.07 |
| Hispanic | | | | | | | | | |
| 25–44 | 0.8 | 1.00 | 0.88, 1.13 | 1.5 | 1.50 | 1.37, 1.64 | 1.3 | 1.00 | 0.91, 1.10 |
| 45–64 | 10.9 | 0.96 | 0.92, 1.01 | 10.4 | 1.51 | 1.43, 1.59 | 5.3 | 1.23 | 1.15, 1.32 |
| ≥65 | 182.0 | 0.51 | 0.50, 0.52 | 39.4 | 0.74 | 0.71, 0.77 | 9.1 | 1.05 | 0.96, 1.14 |

* Risk ratio is calculated by dividing the age-specific death rates in each racial/ethnic minority group by the corresponding death rates of the Whites.

† RR, risk ratio; CI, confidence interval.

*Am J Epidemiol*   Vol. 154, No. 11, 2001

halted in the early 1990s before declining again in 1995 (12). Even if death rates continue to fall, however, the aging of the population could mean that the absolute number of deaths will increase. This report and an earlier one (5) suggest an excess risk of dying from stroke at younger ages for minority groups compared with Whites.

Consistent with previous findings (7, 13–19), Black adults were more likely than their White peers to die from ischemic, intracerebral, and subarachnoid hemorrhagic stroke in 1995–1998. Previous reports suggest that racial/ethnic disparities in stroke subtype mortality may be driven by differences in incidence with more new cases occurring among Blacks and Hispanics (7, 20, 21). Community studies in the past 20 years have observed higher incidences of all three stroke subtypes among Black adults (14, 15, 17). Differences in death rates for stroke subtype between minority populations and Whites may reflect socioeconomic status, greater severity of disease and poor survival at younger ages, and variations in risk factors such as obesity, uncontrolled high blood pressure, inactivity, poor nutrition, diabetes, and cigarette smoking (2, 3, 16, 19, 22, 23). Other factors that influence death rates include the lack of access to medical care, which may include lack of health insurance, differential access to or acceptance of invasive procedures, transportation difficulties, and lack of knowledge about early warning signs of stroke (3, 16, 19–26). Deaths from stroke can be delayed or reduced by preventing and controlling these risk factors and by removing barriers to early and effective treatment. Additional targeting of these efforts in minority populations may be needed.

In the present report, we observed that a greater risk of deaths from all stroke subtypes relative to Whites was concentrated below age 65 years for both Blacks and American Indians/Alaska Natives. This pattern of a greater risk of stroke deaths at younger ages was also observed for Hispanics and Asians/Pacific Islanders for death from intracerebral hemorrhage. These racial/ethnic differences among younger adults may in part be explained by racial/ethnic differences in risk factors, especially among younger adults. The Behavioral Risk Factor Surveillance System reported for 1996–1998 that young racial/ethnic minority groups throughout the United States had a higher prevalence of smoking, obesity, and diabetes than did young Whites (24–26), which could lead to our finding of greater racial gaps among Blacks and American Indians/Alaska Natives, aged 25–44 years. A 1993 study in Cincinnati, Ohio, suggested that excess risk of subarachnoid hemorrhage in Blacks could be attributable to their more prevalent risk factors such as hypertension, smoking, alcohol abuse, and unrecognized genetic/environmental factors (15, 17). Furthermore, an earlier onset of obesity, diabetes mellitus, and hypertension in these populations (24–26) may contribute to earlier cerebrovascular vessel damage. In terms of reducing the number of people at risk for the development of intracerebral hemorrhage and ischemic stroke, these findings highlight the importance of both primary and secondary prevention for eliminating racial disparities in the development and management of hypertension, diabetes mellitus, and obesity.

Both intracerebral hemorrhage and subarachnoid hemorrhage account for over half of early age stroke deaths in population-based studies of stroke mortality (13–15). Hemorrhagic strokes are more lethal than ischemic strokes. For example, Medicare patients hospitalized for hemorrhagic stroke were five times more likely to die than those hospitalized with ischemic stroke even after adjustment for age, sex, race, hypertension, diabetes, coronary heart disease, heart failure, atrial fibrillation, stroke types, and length of hospital stay (27). In a national study of Medicare beneficiaries, the racial gap between Blacks and Whites widened from 1990 to 1995 for mortality from hemorrhagic stroke, while the gap for ischemic stroke narrowed (16). Ongoing research on other risk factors is assessing the impact of oral contraceptives, alcohol consumption, antiphospholipid antibodies, increased homocysteine, inflammation, and infection on stroke (28, 29). Eventually, these factors may be found important in explaining disparities in stroke incidence.

The aging of the US population in general suggests that the actual numbers of stroke cases could increase. Minority groups could further experience an increasing burden of stroke. The Bureau of Census estimates that Hispanic and Asian/Pacific Islander populations aged 25 years or older will increase almost 400 percent each from 1995 to 2050, while the American Indian/Alaska Native adult population will increase to 142 percent (6). The Black population is estimated to increase 116 percent by 2050, whereas the White adult population will have the smallest increases (6). Thus, public health programs for the prevention of stroke should place more focus among racial/ethnic minority populations to further reduce overall stroke mortality.

Few studies have examined stroke deaths in American Indians/Alaska Natives and in Asians/Pacific Islanders because their population sizes are small. American Indians/Alaska Natives have a greater prevalence of smoking and obesity, which may result in a higher prevalence of hypertension and diabetes mellitus (24), both of which are stroke risk factors. In our study, American Indian/Alaska Native, Asian/Pacific Islander, and Hispanic groups had a higher mortality at younger ages for some stroke subtypes compared with Whites. Underreporting of American Indian/Alaska Native, Asian/Pacific Islander, and Hispanic origin on death certificates and census population counts can lead to underestimates of the risk of stroke deaths in these groups (6, 30, 31). A report from the National Center for Health Statistics suggests that racial/ethnic reporting biases due to miscoding on death certificates and undercoverage in the census could result in death rates being underreported by as much as 21 percent for American Indians/Alaska Natives, 11 percent for Asians/Pacific Islanders, and 2 percent for Hispanics, as well as slightly overreporting for Blacks (5 percent) (30). Hence, we may have underestimated the racial disparity gaps for American Indians/Alaska Natives, Asians/Pacific Islanders, and Hispanics and may have overestimated the gap for Blacks. There is little reported information about age misclassification on death certificates and in the census. Despite these potential limitations, our results emphasize the need to direct prevention efforts to the most vulnerable groups at risk of stroke mortality, especially among the younger aged minority populations.

Downloaded from http://aje.oxfordjournals.org/ by guest on October 3, 2014

**1062** Ayala et al.

Another potential limitation of this study is the accuracy of reporting cause of death using the ICD-9 codes. Historically, during the 1970s and 1980s, the classification of stroke subtypes was not considered very accurate (32). Since the advent of widespread use of computerized tomography, a death certificate diagnosis of intracranial hemorrhage versus nonhemorrhagic stroke appears to be sufficiently accurate for use in epidemiologic studies (33). Nonetheless, our findings suggest that there was no racial/ethnic difference in ICD-9-defined classifications within the stroke subtypes.

Since the 1960s, it is evident that considerable geographic variations in stroke incidence and stroke mortality exist with the highest rates observed in the stroke belt of the southeastern United States (34, 35). The patterns of age-specific excess risk of overall stroke death in the stroke belt differed between Black and White men and women (36). It is beyond the scope of the current paper to examine geographic variations for stroke subtypes between racial/ethnic groups.

Our results suggest the need for greater public health attention to the nation's third leading cause of death and highlight the need for reducing racial/ethnic disparities in stroke mortality, particularly at younger ages. Educating the public about the signs and symptoms of a stroke may be key to preventing premature stroke death among young adults who perceive stroke as a disease of the elderly. Further epidemiologic studies may help to reveal risk factor clustering that operates more specifically for stroke subtypes in those at highest risk in these populations. Targeted research and evaluation among these high-risk populations may also help to identify specific differences between and within subpopulations related to lower socioeconomic or educational levels or to adverse environmental factors.

Downloaded from http://aje.oxfordjournals.org/ by guest on October 3, 2014

## REFERENCES

1. Murphy SL. Deaths: final data for 1998. Natl Vital Stat Rep 2000;48:1–105.
2. Howard G, Anderson R, Sorlie P, et al. Ethnic differences in stroke mortality between non-Hispanic whites, Hispanic whites, and blacks. The National Longitudinal Mortality Study. Stroke 1994;24:2120–5.
3. Gillum RF. Epidemiology of stroke in Hispanic Americans. Stroke 1995;26:1707–12.
4. Wein TH, Smith MA, Morgenstern LB. Race/ethnicity and location of stroke mortality: implications for population-based studies. Stroke 1999;30:1501–5.
5. Age-specific excess deaths associated with stroke among racial/ethnic minority populations—United States, 1997. MMWR Morb Mortal Wkly Rep 2000;49:94–7.
6. US Bureau of the Census. Population projections of the United States by age, sex, race, and Hispanic origin: 1995–2050. In: Current Population Reports Series P25-1130. Washington, DC: US Bureau of the Census, May 2000.
7. Broderick JP, Brott T, Tomsick T, et al. Intracerebral hemorrhage is more than twice as common as subarachnoid hemorrhage. J Neurosurg 1993;78:188–91.
8. Anderson RN, Rosenberg HM. Age standardization of death rates: implementation of the year 2000 standard. Natl Vital Stat Rep 1998;47:1–20.
9. Cates W, Williamson GD. Descriptive epidemiology: analyzing and interpreting surveillance data. In: Teutsch SM, Churchill RE, eds. Principles and practice of public health sur-

veillance. New York, NY: Oxford University Press, 1994: 96–135.
10. Heckler M. Mortality and morbidity indicators. In: Report of the Secretary's Task Force on Black & Minority Health. Washington, DC: US Department of Health and Human Services, 1985:63–85.
11. Healthy People 2010. Conference ed. Vol 1 and 2. Washington, DC: US Department of Health and Human Services, 2000.
12. Decline in deaths from heart disease and stroke—United States, 1990–1999. MMWR Morb Mortal Wkly Rep 1999;48: 649–56.
13. Otten MW Jr, Teutsch SM, Williamson DF, et al. The effect of known risk factors on the excess mortality of black adults in the United States. JAMA 1990;263:845–50.
14. Broderick JP, Phillips SJ, Whisnant JP, et al. Incidence rates of stroke in the eighties: the end of the decline in stroke? Stroke 1989;20:577–82.
15. Broderick JP, Brott T, Tomsick T, et al. The risk of subarachnoid and intracerebral hemorrhage in blacks as compared with whites. N Engl J Med 1992;326:733–6.
16. Giles WH, Croft JB, Casper ML, et al. Stroke incidence, comorbid conditions, health care utilization, and poststroke mortality in black and white Medicare beneficiaries: national patterns and trends. In: Gillum RF, Gorelick PB, Cooper ES, eds. Stroke in blacks: a guide to management and prevention. New York, NY: Karger, 1999:106–17.
17. Broderick J, Brott T, Kothari R, et al. The Greater Cincinnati/Northern Kentucky Stroke Study: preliminary first-ever and total incidence rates of stroke among blacks. Stroke 1998;29:415–21.
18. Caplan LR. Cerebral ischemia and infarction in blacks. In: Gillum RF, Gorelick PB, Cooper ES, eds. Stroke in blacks. New York, NY: Karger, 1999:7–18.
19. Gillum RF. Stroke mortality in blacks: disturbing trends. Stroke 1999;30:1711–15.
20. Sacco RL, Hauser WA, Mohr JP, et al. One-year outcome after cerebral infarction in Whites, Blacks, and Hispanics. Stroke 1991;22:305–11.
21. Sacco RL. Risk factors and outcomes for ischemic stroke. Neurology 1993;45(suppl):S10–14.
22. Mayberry RM, Mili F, Vaid IGM, et al. Racial and ethnic differences in access to medical care: a synthesis of the literature. Washington, DC: Morehouse Medical Treatment Effectiveness Center (MMEDTEC), Morehouse School of Medicine, 1999.
23. National Center for Chronic Disease Prevention and Health Promotion. Chronic diseases and their risk factors: the nation's leading causes of death. Atlanta, GA: Centers for Disease Control and Prevention, 1999.
24. Bolen JC, Rhodes L, Powell-Griner EE, et al. State-specific prevalences of selected health behaviors, by race and ethnicity—Behavioral Risk Factor Surveillance System. MMWR CDC Surveill Summ 2000;49(SS-2):1–60.
25. Hahn RA, Heath GW, Chang MH. Cardiovascular disease risk factors and preventive practices among adults—United States, 1994: a behavioral risk factor atlas. Behavioral Risk Factor Surveillance System State Coordinators. MMWR CDC Surveill Summ 1998;47(SS-5):35–69.
26. Holtzman D, Powell-Griner E, Bolen JC, et al. State- and sex-specific prevalence of selected characteristics—Behavioral Risk Factor Surveillance System, 1996 and 1997. MMWR CDC Surveill Summ 2000;49(SS-6):1–39.
27. May DS, Kittner SJ. Use of Medicare claims data to estimate national trends in stroke incidence, 1985–1991. Stroke 1994; 25:2343–7.
28. Tegos TJ, Kalodiki E, Daskalopoulou SS, et al. Stroke: epidemiology, clinical picture, and risk factors—part I of III. Angiology 2000;51:793–808.
29. Elkind MS, Sacco RL. Stroke risk factors and stroke prevention. Semin Neurol 1998;18:429–40.
30. Rosenberg HM, Maurer JD, Sorlie PD, et al. Quality of death rates by race and Hispanic origin: a summary of current research, 1999. Vital Health Stat 2 1999;(128):1–13.
31. Final report: methodology for adjusting IHS mortality data for

*Am J Epidemiol* Vol. 154, No. 11, 2001

inconsistent classification of race-ethnicity of American Indians and Alaska Natives between state death certificates and IHS patient registrations records. Washington, DC: US Department of Health and Human Services, 1996.

32. Leibson CL, Naessens JM, Brown RD, et al. Accuracy of hospital discharge abstracts for identifying stroke. Stroke 1994;25: 2348–55.

33. Iso H, Jacobs DR, Goldman L. Accuracy of death certificate diagnosis of intracranial hemorrhage and nonhemorrhagic stroke: the Minnesota Heart Survey. Am J Epidemiol 1990;

132:993–8.

34. Howard G. Why do we have a stroke belt in the southeastern United States? A review of unlikely and uninvestigated potential causes. Am J Med Sci 1999;317:160–7.

35. Casper ML, Wing S, Anda RF, et al. The shifting stroke belt. Changes in the geographic pattern of stroke mortality in the United States, 1962–1988. Stroke 1995;26:755–60.

36. Howard G, Evans GW, Pearce K, et al. Is the stroke belt disappearing? An analysis of racial, temporal, and age effects. Stroke 1995;26:1153–8.

Downloaded from http://aje.oxfordjournals.org/ by guest on October 3, 2014

# EXHIBIT 63

10/2/2014

# Psychology Today



**"How do we know if an action is morally right or wrong?"**

Gregg Henriques

Home | Find a Therapist | Topic Streams | Get Help | Magazine | Tests | Psych Basics | Experts

## Demystifying Psychiatry

A resource for patients and families

by Charles Zorumski, M.D., and Eugene Rubin, M.D., Ph.D.

### The Financial Cost of Dementia

Most of the costs of treating Alzheimer's disease are not covered by Medicare.

Published on October 10, 2013 by Eugene Rubin, M.D., Ph.D. in Demystifying Psychiatry

**Eugene Rubin, M.D., Ph.D.,** is Professor and Vice-Chair for Education in the Department of Psychiatry at Washington University in St. Louis - School of Medicine. more...

Subscribe to Demystifying Psychiatry
Subscribe via RSS

  

4 Like · 3 · 0 · Tweet · 8+1 · Share ·  email

Many of us know the emotional toll that Alzheimer's disease and other dementing illnesses have on patients and families, but how much do we know about the financial burden? A recent report in the New England Journal of Medicine examined the cost of taking care of persons with dementias. Not only are the costs dramatic, but the nature of these costs and who pays the price are sobering.

In 2010 dollars, the cost associated with dementia treatment and care is estimated to be between $42,000 and $56,000 per person per year. Because about 15% of persons 70 and older have dementia, the total cost in the US is an astounding $157 billion to $215 billion per year. Of this total, Medicare covers only about $11 billion.

Why so expensive? Over 75% of the cost per individual involves either nursing home or home care costs. Overall, nursing home care accounts for about 25% of the total cost. About 50% of the cost involves home care. This number is derived from either the actual cost of paying for formal home-based care or the cost of lost wages for family members or friends to provide care for a demented person still living at home. We suspect that many are personally aware of the financial and emotional costs of providing care to a parent or grandparent. Dementia care is one side of the "sandwich" of the so-called "sandwich generation."

**Find a Therapist**

Search for a mental health professional near you.

City or Zip

Medicare-related costs make up about $2,700 of the approximately $50,000 annual cost. Why so low? Medicare-covered costs involve direct medical services. Hospital and physician bills resulting from dementia are a relatively small percent of the total cost of taking care of persons with dementia. Therefore, although Medicare and/or other medical insurance cover the majority of hospital and doctor charges, these bills make up only 5-6% of the total costs.

Most nursing home bills are not covered by Medicare or other third party medical insurance policies. If a person requires long term nursing home care, the costs (about $80,000 per year) are paid from personal funds unless a person had purchased a very specific type of insurance called long-term care insurance. Once personal savings are fully depleted (i.e., all of a person's savings are gone), Medicaid helps pay nursing home costs. However, it may be difficult to find a Medicaid-subsidized bed in a high quality nursing home.

**Find Local:**

Acupuncturists
Chiropractors
Massage Therapists
Dentists
and more!

City or Zip

So, what can we do about this? The good news is that a lot of progress is being made in understanding the pathophysiology and natural history of dementias. It is now known that pathological changes in the brain associated with Alzheimer's dementia start at least 15 years prior to the onset of noticeable symptoms. Thus, the possibility of delaying the onset of clinical Alzheimer's disease is a reasonable goal. Tests are becoming

**Demystifying Psychiatry**
Recent Posts

 Depressed preschoolers are at risk for depression, anxiety, and ADHD when older.

 Medical information to consider as the use of marijuana increases.

Case 1:25-cr-00123-JMB Document 20-2 Page 2 Filed Date Filed 10/08/2025 81

available that should allow us to determine who is likely to develop this illness years down the road. With the ability to detect individuals at high risk, research clinicians are already studying medications that might prevent the abnormal brain processes that cause disease progression. The bad news is that therapeutic efforts to date have not been highly successful, and research funding is not keeping up with the potential for clinically significant advances. We would argue that investments in preventing Alzheimer's disease and other dementias should be a very high national priority. We would further argue that there are staggering costs associated with other neuropsychiatric illnesses, including substance abuse, schizophrenia, and depression. In fact, combined costs of these illnesses are perhaps double the costs associated with Alzheimer's disease, yet these are even more underfunded areas of research. Naturally, as academic physicians, we may be biased. What do you think?

This post was written by Eugene Rubin MD, PhD and Charles Zorumski MD

Have a comment? Start the discussion here!

 8 tips to fight fall allergies

 Dating with diabetes

Subscribe to Psychology Today now and get a free issue!

 An antidepressant decreases biochemical changes related to Alzheimer disease.

 Several factors are leading to a rapid transformation of American psychiatry.

 Does a week of intensive cognitive therapy work?

**More of Demystifying Psychiatry blog**

## Most Popular

Most Read | Most Emailed

 1 Internet Trolls Are Narcissists, Psychopaths, and Sadists
by Jennifer Golbeck, Ph.D.

 2 How Boring Are You?
by Marty Nemko, Ph.D.

 3 How Distorted Thinking Increases Stress and Anxiety
by Toni Bernhard, J.D.

 4 How to Tell a Sociopath from a Psychopath
by Scott A. Bonn, Ph.D.

 5 6 Signs of Narcissism You May Not Know About
by Leon F. Seltzer, Ph.D.

Case 1:25-cv-02323-DEB Document 62 Page 215 Filed 10/08/2025 Page 215

# EXHIBIT 64


Sign In | Register

Search NFL.com    SEARCH

WATCH NFL NETWORK NOW: NFL GAMEDAY HIGHLIGHTS 10:30 PM ET

| MIN | 10 | CHI | 24 | HOU | 17 | BUF | 17 | BAL | 13 | PIT | 31 | TB | 31 | ATL | 20 | STL | 28 | CLE | 29 | ARI | 20 | NYJ | 0 | KC | 17 | CIN | 0 | SEA |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| GB | 42 | CAR | 31 | DAL | 20 | DET | 17 | IND | 20 | JAX | 9 | NO | 37 | NYG | 30 | PHI | 34 | TEN | 28 | DEN | 41 | SD | 31 | SF | 22 | NE | 34 | WAS |
| FINAL | | FINAL | | FINAL OT | | FINAL | | FINAL OT | | FINAL | | FINAL OT | | FINAL | | FINAL | | FINAL | | FINAL | | FINAL | | FINAL | | Q3 05:56 | | MON 8:30 |


AN UNPRECEDENTED LOOK INSIDE THE LIFE OF AN NFL SCOUT
FINDING GIANTS
TUESDAYS 9PM ET



## George Halas

Height: 6-0   Weight: 182   Deceased
Born: 2/2/1895 Chicago , IL
College: Illinois
Experience: 10 Seasons
Hall of Fame Induction: 1963

| REC | YDS | AVG | TDS |
|---|---|---|---|
| 0 | 0 | 0.0 | 8 |

f Like    + Share

Profile | Career Stats | Game Logs

### CAREER STATS    MORE

| Season | Team | Receiving | | | | | | Rushing | | | | | Fumbles | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | G | GS | Rec | Yds | Avg | Lng | TD | Att | Yds | Avg | Lng | TD | FUM | Lost |
| 1929 | Chicago Bears | 0 | -- | 0 | 0 | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| 1928 | Chicago Bears | 4 | -- | 0 | 0 | -- | -- | 1 | -- | -- | -- | -- | -- | -- | -- |
| 1927 | Chicago Bears | 10 | -- | 0 | 0 | -- | -- | 1 | -- | -- | -- | -- | -- | -- | -- |
| 1926 | Chicago Bears | 15 | -- | 0 | 0 | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| 1925 | Chicago Bears | 17 | -- | 0 | 0 | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| 1924 | Chicago Bears | 11 | -- | 0 | 0 | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| 1923 | Chicago Bears | 13 | -- | 0 | 0 | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| 1922 | Chicago Bears | 12 | -- | 0 | 0 | -- | -- | 1 | 0 | -- | -- | -- | 1 | 0 | -- | -- |
| 1921 | Chicago Staleys | 11 | -- | 0 | 0 | -- | -- | 3 | -- | -- | -- | -- | -- | -- | -- |
| 1920 | Decatur Staleys | 12 | -- | 0 | 0 | -- | -- | 2 | -- | -- | -- | -- | -- | -- | -- |
| | TOTAL | 0 | 0 | 0.0 | 0 | 8 | 0 | 0 | 0.0 | 0 | 1 | 0 | 0 |

BIG PLAY HIGHLIGHTS    PRESENTED BY


Forte 56-yard catch and run    01:00
Published: Oct. 5, 2014 at 02:23 p.m.
Chicago Bears running back Matt Forte catches a short pass from quarterback Jay Cutler and gains 56 yards.


Briggs intercepts Newton    00:38
Published: Oct. 5, 2014 at 02:16 p.m.
Carolina Panthers quarterback Cam Newton has his pass intercepted by Chicago Bears linebacker Lance Briggs.


Jeffery 25-yard touchdown reception    00:51
Published: Oct. 5, 2014 at 02:07 p.m.
Chicago Bears quarterback Jay Cutler throws a short pass to wide receiver Alshon Jeffery who scores a 25-yard touchdown.


Cutler runs in for a 10-yard touchdown    00:53
Published: Oct. 5, 2014 at 01:54 p.m.
Chicago Bears quarterback Jay Cutler scrambles for a 10-yard touchdown, scoring his first rush touchdown of the season.

Watch more video >

Sponsored Links

#1 Worst carb EVER (avoid!)
This health food causes fat gain, wild energy & blood sugar swings
FixYourBloodSugar.com

Visa® Black Card™
Luxury Without Limits Only With the Stainless Steel Visa® Black Card™.
www.blackcard.com

5-Second flat belly quiz
Also discover 1 EASY trick to do twice daily that FIGHTS belly fat
fatsthatfight.com


Buy a link here

**-2110-**

# EXHIBIT 65

THE VAULT

# How (and Why) Athletes Go Broke

Recession or no recession, many NFL, NBA and Major League Baseball players have a penchant for losing most or all of their money. It doesn't matter how much they make. And the ways they blow it are strikingly similar

Print



BY PABLO S. TORRE

Originally Posted:
March 23, 2009

What the hell happened here? Seven floors above the iced-over Dallas North Tollway, Raghib (Rocket) Ismail is revisiting the question. It's December, and Ismail is sitting in the boardroom of Chapwood Investments, a wealth management firm, his white Notre Dame snow hat pulled down to his furrowed brow.

In 1991 Ismail, a junior wide receiver for the Fighting Irish, was the presumptive No. 1 pick in the NFL draft. Instead he signed with the CFL's Toronto Argonauts for a guaranteed $18.2 million over four years, then the richest contract in football history. But today, at a private session on financial planning attended by eight other current or onetime pro athletes, Ismail, 39, indulges in a luxury he didn't enjoy as a young VIP: hindsight.

"I once had a meeting with J.P. Morgan," he tells the group, "and it was literally like listening to Charlie Brown's teacher." The men surrounding Ismail at the conference table include Angels outfielder Torii Hunter, Cowboys wideout Isaiah Stanback and six former pros: NFL cornerback Ray Mickens and fullback Jerald Sowell (both of whom retired in 2006), major league outfielder Ben Grieve and NBA guard Erick Strickland ('05), and linebackers Winfred Tubbs ('00) and Eugene Lockhart ('92). Ismail ('02) cackles ruefully. "I was so busy focusing on football that the first year was suddenly over," he says. "I'd started with this $4 million base salary, but then I looked at my bank statement, and I just went, What the. . . ?"

Before Ismail can elaborate on his bewilderment--over the complexity of that statement and the amount of money he had already lost--eight heads are nodding, eight faces smiling in sympathy. Hunter chimes in, "Once you get into the financial stuff, and it sounds like Japanese, guys are just like, 'I ain't going back.' They're lost."

At the front of the room Ed Butowsky also does a bobblehead nod. Stout, besuited and silver-haired, Butowsky, 47, is a managing partner at Chapwood and a former senior vice president at Morgan Stanley. His bailiwick as a money manager has long been billionaires, hundred-millionaires and CEOs--a club that, the Steinbrenners' pen be damned, still doesn't include many athletes. But one afternoon six years ago Butowsky was chatting with Tubbs, his neighbor in the Dallas suburb of Plano, and the onetime Pro Bowl player casually described how money spills through athletes' fingers. Tubbs explained how and when they begin earning income (often in school, through illicit payments from agents); how their pro salaries are invested (blindly); and when the millions evaporate (before they know it).

"The details were mind-boggling," recalls Butowsky, who would later hire Tubbs to work in business development at Chapwood. "I couldn't believe what I was hearing."

**-2112-**

What happens to many athletes and their money is indeed hard to believe. In this month alone Saints alltime leading rusher Deuce McAllister filed for bankruptcy protection for the Jackson, Miss., car dealership he owns; Panthers receiver Muhsin Muhammad put his mansion in Charlotte up for sale on eBay a month after news broke that his entertainment company was being sued by Wachovia Bank for overdue credit-card payments; and penniless former NFL running back Travis Henry was jailed for nonpayment of child support.

In a less public way, other athletes from the nation's three biggest and most profitable leagues--the NBA, NFL and Major League Baseball--are suffering from a financial pandemic. Although salaries have risen steadily during the last three decades, reports from a host of sources (athletes, players' associations, agents and financial advisers) indicate that:

• By the time they have been retired for two years, 78% of former NFL players have gone bankrupt or are under financial stress because of joblessness or divorce.

• Within five years of retirement, an estimated 60% of former NBA players are broke.

• Numerous retired MLB players have been similarly ruined, and the current economic crisis is taking a toll on some active players as well. Last month 10 current and former big leaguers--including outfielders Johnny Damon of the Yankees and Jacoby Ellsbury of the Red Sox and pitchers Mike Pelfrey of the Mets and Scott Eyre of the Phillies-- discovered that at least some of their money is tied up in the $8 billion fraud allegedly perpetrated by Texas financier Robert Allen Stanford. Pelfrey told the New York Post that 99% of his fortune is frozen; Eyre admitted last month that he was broke, and the team quickly agreed to advance a portion of his $2 million salary.

The Wall Street meltdown is only the latest threat to athletes' financial health. "Athletes have a different set of challenges from, say, entertainers," says money manager Michael Seymour, the founder of Philadelphia-based UNI Private Wealth Strategies. "There's a far shorter peak earnings period [in sports] than in any other profession, and in many cases they lack the time and desire to understand and monitor their investments."

In 2005 Butowsky began inviting sports figures--some well off, some not--to what he calls his financial "boot camps," elementary sessions that go from defining a bond to explaining a diversified portfolio as the equivalent of a balanced meal. There is no charge for the sessions or pressure to sign up with Chapwood, according to Butowsky, who calls this service his "mitzvah to sports." The financial adviser, who helps counsel Thunder forward Kevin Durant pro bono, hopes merely that the sessions will reflect well upon Chapwood. Such goodwill is easy to earn: The bar for radically improving the financial habits of pro athletes, Butowsky acknowledges, is low enough for a toddler to trip over.

"Oh, I've seen it all," says veteran agent Bill Duffy, whose clients include Suns guard Steve Nash and Nuggets forward Carmelo Anthony. "A pro athlete's money is supposed to outlive his career. Most players never get that."

Why? Where do they go wrong?

I.

The Lure of The Tangible

Over the years Rocket Ismail's portfolio has contained a passel of dubious inventions

and risky investments. After mentioning that he once poured money into a religious movie, the gregarious father of four goes uncharacteristically mum about the details. "I don't really want to go over that agony," he says, smiling thinly.

Ismail played two years in Canada and 10 in the NFL, estimating that he earned $18 million to $20 million in salary alone. He made an abortive NFL comeback attempt in 2006, never getting beyond workouts with the Redskins, and then navigated the reality-TV circuit (Pros vs. Joes, Ty Murray's Celebrity Bull Riding Challenge). Today he does a Cowboys postgame show on Fox Sports Net. As cautionary tales go, Ismail's could've been worse: He has his Notre Dame degree, and he never filed for bankruptcy, had legal trouble or got divorced. Yet he lost several million dollars, he admits, through "total ignorance."

It began in the winter of 1991 when he sank $300,000 into the Rock N' Roll Café, a theme restaurant in New England designed to ride the wave of the Hard Rock Cafe and Planet Hollywood franchises. One of his advisers pitched the idea as "fail-proof, with no downsides," Ismail recalls. He never recouped his money and has no idea what became of the restaurant.

Lesson learned? If only. After that Ismail squandered a fortune funding not only that inspirational movie but also the music label COZ Records ("The guy was a real good talker," says Rocket); a cosmetics procedure whereby oxygen was absorbed into the skin ("We were not prepared for the sharks in the beauty industry"); a plan to create nationwide phone-card dispensers ("When I was in college, phone cards were a big deal"); and, recently, three shops dubbed It's in the Name, where tourists could buy framed calligraphy of names or proverbs of their choice ("The main store opened up in New Orleans, but doggone Hurricane Katrina came two months later"). The shops no longer exist.

You might say Ismail had a run of terrible luck, but the odds were never close to being in his favor. Industry experts estimate that only one in 30 of the highest-caliber private investment deals works out as advertised. "Chronic overallocation into real estate and bad private equity is the Number 1 problem [for athletes] in terms of a financial meltdown," Butowsky says. "And I've never seen more people come to me about raising money for those kinds of deals than athletes."

For the risk-averse investor, an adviser such as Butowsky would suggest allocating 5% to private equity, 7%-12% to real estate, 50%-65% to a mix of public securities (stocks, mutual funds and the like) and the rest to alternatives such as gold and hedge funds. Yet with athletes, who are often uninterested in either conservative spending or the stock market, those percentages are frequently flipped. Securities are invisible, after all, and if you don't study them, they're unintelligible. Not to mention boring. Inventions, nightclubs, car dealerships and T-shirt companies have an advantage: the thrill of tangibility.

Many players, consequently, are financial prey. "Disreputable people see athletes' money as very easy to get to," says Steven Baker, an agent who represents 20 NFL players. In May 2007 former quarterbacks Drew Bledsoe and Rick Mirer and five other NFL retirees invested at least $100,000 apiece in a now-defunct start-up called Pay By Touch--which touted "biometric authentication" technology that would help replace credit cards with fingerprints--even as the company was wracked by lawsuits and internal dissent. (The players later sued the financial-services firm UBS, which had encouraged its clients to invest in Pay By Touch, for allegedly withholding information about the company founder's criminal history and drug use.)

About five years ago, Hunter says, he invested almost $70,000 in an invention: an

**-2114-**

inflatable raft that would sit under furniture. The pitch was that when high-rainfall areas were flooded, consumers could pump up the device, allowing a sofa to float and remain dry. "The guy I invested with came back and wanted me to put in more, about $500,000," Hunter says. "Then I met [Butowsky], who just said, Hell no! I wound up never seeing that guy--or any of my money--again."

Hunter, who in November 2007 signed a five-year, $90 million contract, has been able to absorb the loss. But innumerable other athletes have not been so lucky. Former (and perhaps future) NFL quarterback Michael Vick filed for Chapter 11 bankruptcy last July and recently put his mansion in suburban Atlanta on the market. That's partly because he is unable to repay about $6 million in bank loans that he put toward a car-rental franchise in Indiana, real estate in Canada and a wine shop in Georgia. "It's always so predictable," Butowsky says. "Everyone wants to be the next Magic Johnson."

But Johnson is the rare, luminous exception of tangibility gone right. In 1994 he started a chain of inner-city movie theaters and diligently built a business empire. Today Magic Johnson Enterprises includes partnerships with Starbucks, 24 Hour Fitness, Aetna and Best Buy, and its capital management division has invested over a billion dollars in urban communities.

The rule, unfortunately, is a mogul manqué like McAllister. According to a civil suit filed on Feb. 20 by Nissan, the running back owes the car company more than $6.6 million plus almost $300,000 in interest on his car dealership. Or Muhammad, whose Cleveland music company, Baylo Entertainment, is being sued by Wachovia for allegedly failing to pay back $24,603.24 on a Visa Business Rewards credit card. Muhammad's 8,200-square-foot lakeside estate, which boasts a custom spa and the "largest residential aquarium in the Southeast," can now be had on eBay for $1.95 million, $800,000 less than he initially asked for.

"Without question, this recession is increasing the velocity of what's taking place with athletes," Butowsky says. "They're suffering tremendously." Retired NBA forward Vin Baker's seafood restaurant in Old Saybrook, Conn., was foreclosed on in February 2008 due to nearly $900,000 in unpaid loans. (It has since reopened with help from an anonymous investor.) And former major league infielder Junior Spivey's portfolio of real estate has lately assumed the form of a sinkhole. "I'm taking a huge hit," says Spivey, who has been buying homes to sell and rent since 2001. (He won't say how many properties he owns.) "It's very tough, especially for someone like me who's not playing."

Then there are the unnamed athletes and team personnel who pawned 400 title rings to the online reseller championship-rings.net over the past three months, a spike of about 33% from the same period last year. (A 2008 Giants Super Bowl ring was among them.) "It's mostly younger players who've been selling," says Tim Robins, the site's owner. "It's the economy. Selling these items is always embarrassing, a last resort."

II.

Misplaced Trust

Salary aside, the closest analogue to a pro athlete is not a white-collar executive. It's a lottery winner--who's often in his early twenties. "With athletes, there's an extraordinary metamorphosis of financial challenge," says agent Leigh Steinberg, who has represented the NFL's No. 1 pick a record eight times. "Coming off college scholarships, they probably haven't even learned the basics of budgeting or keeping

**-2115-**

receipts." Which then triggers two fatal mistakes: hiring the wrong people as advisers, and trusting them far too much.

"That's the killer," Magic Johnson says. Johnson started out by admitting he knew nothing about business and seeking counsel from the power brokers who sat courtside at the old L.A. Forum, men such as Hollywood agent Michael Ovitz and Sony Pictures CEO Peter Guber. Now, Johnson says, he gets calls from star players "every day"--Alex Rodriguez, Shaquille O'Neal, Dwyane Wade, Plaxico Burress--and cuts them short if they propose relying on friends and family. "It won't even be a conversation," says Johnson. "They hire these people not because of expertise but because they're friends. Well, they'll fail."

Says Hunter, "They'll say, 'I got this guy, a cousin who's an accountant.' But he's usually an accountant in the 'hood. You hire him, you're doing him a favor."

Strickland realized that all too late. In 2001, when a "friend of a close friend" of the nine-year NBA vet proposed a real-estate deal in Georgia, Strickland turned to his business manager: his dad, Matthew, a retired lieutenant colonel in the Air Force. The paperwork on the plot of land, which was on sale for $1.8 million but supposedly had been appraised at as much as $3 million, appeared legitimate, and Strickland bought it. "I trusted my father to help look it over for me because I was hooping and didn't have time," Erick says. "He checked it out. But he didn't go that extra length."

The land wasn't worth anything close to what Strickland was told. "I had to take that hit," he says. "I wish my dad hadn't been put in that position. He just didn't have the knowledge." As for his close friend? Strickland says the man secretly got a cut of the deal, and the conflict caused a permanent "falling out" between them.

Relatives are not the only ones foolishly trusted with athletes' money. One up-and-coming guard in the NBA allows his entire fortune to be managed by his former AAU coach, who has the player's power of attorney. In a meeting with Butowsky in December, the guard's dad admitted that he has no idea who the son's accountant is and said he wanted a financial "intervention."

The NBA player's ignorance of his own affairs is not unique. According to Bob Young, the managing director of Apex Wealth Management in Doylestown, Pa., "You'll say to a player, 'How are you doing?' A lot of the time they'll respond, 'I have no idea.' All the bills are paid by someone else, and none of the statements go to [the athlete]."

In fact, according to the NFL Players Association, at least 78 players lost a total of more than $42 million between 1999 and 2002 because they trusted money to financial advisers with questionable backgrounds. In this rogues' gallery Robert Allen Stanford looks almost presidential--and shows that even when athletes trust financiers of high repute, things can go disastrously wrong. The dubious advisers included Luigi DiFonzo--a former felon who claimed he was an Italian count and defrauded players such as Hall of Fame running back Eric Dickerson before committing suicide in August 2000--and disgraced agent William (Tank) Black, who built a pyramid scheme that took a total of about $15 million from at least a dozen players, including Patriots running back Fred Taylor.

Just last May, Atlanta hedge fund manager Kirk Wright was convicted on 47 counts of fraud and money laundering in a scheme involving more than $150 million. His client list included at least eight NFL players; former safeties Blaine Bishop (who lost $4 million, according to court documents) and Steve Atwater (who lost $2.7 million) had recruited former Broncos stars Terrell Davis and Rod Smith to Wright's firm, unwittingly making them victims too. Soon after his conviction Wright committed

**-2116-**

suicide in prison.

In October, Atwater himself received an investment pitch from a fellow athlete. Former quarterback Jeff Blake sent 102 other retired players an e-mail on behalf of Triton Financial, an investment firm in Austin, whose "athlete services" department Blake directs along with three other ex-QBs: Chris Weinke and the brothers Detmer, Ty and Koy. In the e-mail, a copy of which was obtained by SI, Blake claimed without caveat that "Triton is averaging 32% annualized return on its investments within the past five years."

Triton is an official partner of the Heisman Trophy Trust and the sponsor of the Triton Financial Classic, a PGA senior tour event. Its CEO, Kurt Barton, told SI that the firm manages "about $300 million" in assets, and he claimed that Triton registered with the SEC (as is required by law of investment adviser firms with at least $25 million in assets under management) "roughly six months ago, around October." But the Texas State Securities Board and Triton chief compliance officer David Tuckfield said that the company has not, in fact, done so. "Right now, we're only registered with Texas," Tuckfield said. "But we're passing the [assets] threshold, and we're confident that we'll need to file this year."

Says Paul Cohen, a real estate investor who owns properties in Austin, "In this economy, especially in real estate, anything you bought in the last two years is deeply underwater. I guess what [Triton is] saying could happen. But then again, I could target the moon with my rifle and shoot, but I ain't gonna hit it." (Barton did not dispute the e-mail's 32% figure, but he and Tuckfield admitted to SI that Blake should not have sent it out. Barton also conceded that Triton was "not supposed to publish specific numbers about past performance" without significant disclaimers, including a disclosure of what the company had invested in.)

On a much smaller scale, Torii Hunter and Astros pitcher LaTroy Hawkins recall the story of a former major leaguer from the Dominican Republic whose adviser took care of all his financial matters. One day the player's mail came to the clubhouse and Hunter playfully asked to see it. "It turns out he was paying this guy $5,000 a month on insurance for two cars in the Dominican Republic," Hunter says. "I got three cars, and I only pay $250 a month. He'd been with and trusted this guy [for almost 18 years]!"

Advisers warn that such overcharging is the most common form of financial bloodletting for athletes. "It's basically large-scale shoplifting," Butowsky says. "Athletes don't know industry standards, so virtually every one of them is being robbed." Brokers will encourage them to buy bonds with longer maturities because the commissions on them are often larger. Or they'll overcharge on portfolios--2% or 3% instead of the customary 1%.

A few years ago, Butowsky recalls, he met with a former high-round NFL pick whose adviser, also a former player, said that he couldn't reveal how much he was charging to manage the athlete's tax-exempt municipal bonds "because of the Patriot Act." According to Butowsky, he was taking $146,000 every year.

III.

Family Matters

In 1996, when Panthers owner Jerry Richardson--a former NFL flanker turned businessman--addressed his players, one of them asked, What's the most dangerous thing that could happen to us financially? "Without blinking an eye," Ismail recalls, "Mr. Richardson said, 'Divorce.' "

**-2117-**

Players today would not disagree. In a survey reported by the financial-services firm Rothstein Kass in December, more than 80% of the 178 athletes polled--each with a minimum net worth of $5 million and two thirds under the age of 30--said they were "concerned about being involved in unjust lawsuits and/or divorce proceedings." By common estimates among athletes and agents, the divorce rate for pro athletes ranges from 60% to 80%.

In divorce proceedings, of course, husbands routinely lose half of their net worth. But for athletes there is an aggravating factor: when the divorce happens. Most splits occur in retirement, when the player's peak earnings period is long over and making a comparable living is virtually impossible. Such timing is no accident. "There's this huge lifestyle change," says former NBA center Mark West, a licensed stockbroker who is now the Suns' vice president of player programs. "You and your wife are suddenly always at home, bugging each other. Before, you'd always say, 'I gotta go to practice.' Now you don't have to practice. You have to finish conversations."

Which often involve an incendiary subject: infidelity. "A friend of mine is a football player, and I asked him why he cheated on his wife," says Anita Hawkins, LaTroy's wife of 11 years. "He just said, 'I love her dearly, but I feel like I got married too early and didn't get to do what I wanted to do when I was young.' "

Given all the pressures on a pro athlete's marriage, one safety valve might be the prenuptial agreement--something "very strongly" recommended by agent David Falk, who surged to prominence representing Michael Jordan (who did not have one). "The percentage of prenups amongst athletes is appreciably lower compared with nonathletes at the same economic level," says celebrity divorce lawyer Raoul Felder, who has represented the ex-wives of Patrick Ewing, Jason Kidd and Mike Tyson.

In 1994, when NBA center Dikembe Mutombo was engaged to Michelle Roberts, a med student, Roberts refused to sign a premarital contract the day before the wedding. Five hundred guests--including a large party from Mutombo's native Democratic Republic of Congo--had begun flying in to Washington. "[Roberts] never signed," Falk says, "and Mutombo never married the girl." Calling off the nuptials reportedly cost him $250,000.

It's no coincidence that the woman a pro athlete often chooses to marry--and often at a young age--is his hometown sweetheart. For that reason he can't envision a ruinous divorce. "That was how you could tell if she really liked you, if she knew you before you made it," says West. But when a player does make it? "The question [for the athlete] becomes, When you get off the farm and see Paris, so to speak, can you really go back to the farm?"

Children almost always complicate the issue. How to limit paternity obligations is a challenge for pro athletes. Former NBA forward Shawn Kemp (who has at least seven children by six women) and, more recently, Travis Henry (nine by nine) have seen their fortunes sapped by monthly child-support payments in the tens of thousands of dollars. Last month Henry, who reportedly earned almost $11 million over seven years in the NFL, tried and failed to temporarily reduce one of his nine child-support payments by arguing that he could no longer afford the $3,000 every month. Two weeks later he was jailed for falling $16,600 behind in payments for his child in Frostproof, Fla.

An aversion to family planning goes hand in hand with neglect of other forms of financial foresight, which can affect what happens to athletes' fortunes even after they die. Hall of Fame linebacker Derrick Thomas, who died at 33 following a January 2000 car crash, had ignored the urging of his financial adviser to make a will, and his

entire estate was left for the court to divide, touching off a legal battle among the five mothers of his seven children. (Of the estimated $30 million Thomas had earned in the NFL, he had only $1.16 million in valued assets at the time of his death.)

"Derrick didn't care about meeting with his planner, and we tried to set him up to do it 10 times," says Steinberg, who was his agent. "The sad truth is that there was a certain group of athletes who actually believed that if they ever sat down to write their wills, they were going to die."

IV.

Great Expectations

The thorniest question for a pro athlete, however, isn't how he handles himself and those closest to him. It's "how you handle the new people suddenly emerging in your life," says Richard Lapchick, director of the University of Central Florida's DeVos Sport Business Management program. "They'll be expecting help or money or jobs. Often players don't know how to say no."

It's all part of that ossified notion of how a pro athlete should live and provide for those around him. If he isn't consuming conspicuously, then he hasn't made it. "When I was a young buck," says Hawkins, "I was trying to spend all my money. Now I try to preach to young guys in the clubhouse who are like that. I've got all this stuff from 10 years ago--jewelry, rims--that I think, Why the f--- did I even buy this?"

Two years ago Rockets forward Ron Artest had a similar change of heart. He dismissed six friends who were involved with his record label and doing odd jobs for him while they lived in a house he was leasing for $30,000 a year. This entourage's "level of helpfulness," said Artest's publicist, Heidi Buech, "was 50 percent." (The house they occupied had also been broken into while Artest was abroad.)

As soon as an athlete goes pro, people in search of handouts tend to stretch the definitions of family and friends. When Hunter went to his hometown of Pine Bluff, Ark., for his grandmother's funeral last August, he found Old St. James Baptist Church packed, the line of cars outside stretching for blocks. "But my grandma didn't know anybody," Hunter says. "She just lived at home." When he stepped outside the church, people "came running, all dressed up, chasing after me," Hunter says. "They were throwing CDs, projects, letters. . . . They were yelling, My sister's brother went to school with you!"

A different but equally potent pressure operates in the workplace--the clubhouse, the locker room and the team plane. "For rookies, it's like an unspoken initiation," says Strickland. "You're trying to get in good with the veterans, so you go beyond your means. You drive the nice car, splurge on a house."

The veterans don't mind giving explicit instructions. "I got ripped my first three years in the NFL, every day," says Tubbs. "I got on planes with a cassette player, and [a teammate] would tell me, 'They make CD players. You're in the NFL now.' "

Perhaps the upper limit on spending was set by the famously profligate Shaquille O'Neal, who--according to a document obtained by the Palm Beach Post during O'Neal's canceled divorce filing in January 2008--spends a total of $875,015 each month, including $26,500 for child care, $24,300 for gas and $17,220 for clothing. But O'Neal, who also has been known to fund charities anonymously and cover medical bills for complete strangers, has the wherewithal to remain solvent.

**-2119-**

Imitators have been less fortunate. When former NBA guard Kenny Anderson filed for bankruptcy in October 2005, he detailed how the estimated $60 million he earned in the league had dwindled to nothing. He bought eight cars and rang up monthly expenses of $41,000, including outlays for child support, his mother's mortgage and his own five-bedroom house in Beverly Hills, Calif.--not to mention $10,000 in what he dubbed "hanging-out money." He also regularly handed out $3,000 to $5,000 to friends and relatives. (Along with Ismail, he enlisted as both a Slamball coach and a Pros vs. Joes participant last year.) Former big league slugger Jack Clark filed for bankruptcy in July 1992 while still playing, listing debts of $6.7 million and ownership of 18 cars--17 of which still had outstanding payments.

Financial advisers have come to call it "the problem of the $20,000 Rolex." If a 22-year-old spends $20,000 on a watch or on a big night out at a nightclub, that money is either depreciating or gone. "But if they invested in a five percent, Triple A insured, tax-free municipal bond for a period of 30 years," money manager Seymour says, "that $20,000 would be worth $86,000 at that tax-free rate of return. And needless to say, they buy more than one $20,000 Rolex."

Four years ago future NBA Hall of Famer Scottie Pippen unsuccessfully sued his former law firm for allegedly losing $27 million of his money through poor investments. (He had earned about $110 million in salary alone over a 17-year career.) In February 2007--around the same time as Pippen's failed NBA comeback attempt--the Missouri Court of Appeals upheld a ruling that the player owed U.S. Bank more than $5 million in principal, interest and attorneys' fees from a dispute regarding a Grumman Gulfstream II corporate jet that he'd purchased in 2001.

In an era in which banks are lambasted for using taxpayers' money to fly their executives on luxury private planes, it's a smart bet for players not to use their own cash to do the same. "In this economy, especially, the goal shouldn't be living that kind of lifestyle or trying to get richer," says West. "It needs to be about trying to maintain the wealth."

Sometimes, though, a jock just can't shake the temptation to try to hit the jackpot. Butowsky believes that "there's something in an athlete's mentality" that drives him to swing for the fences financially--usually at his own peril. "The solution to the problem is, without a doubt, education," the adviser says. "Change won't happen until grown men start wanting to learn."

Old habits die hard. Despite all his dreadful experiences, and lessons absorbed the hard way, not even Ismail is done yet. This time around, the project in which he's invested $250,000 is a special mouth guard--available online for $79.95--that's designed to help the body "physiologically perform at the highest level," he says. The science behind it involves relieving pressure on the temporomandibular joint and holding the jaw in an "optimal" position. (Ismail made the investment before he began consulting with Butowsky.)

It might sound familiar, Rocket admits, but there's at least one distinction between this and his previous six ventures: He didn't embark on it so blindly. He actually used the mouth guard during his playing career. He says he's close friends with the guy who designed it. ("He's my boy.") And, perhaps most important, Ismail saw the plan develop from the ground up.

Hours after Butowsky's boot camp in Dallas is over, Rocket calmly lays out his rationale: "You know that statistic we heard about how one in 30 private equity investments works?" He smiles broadly. "Well, Lord willing, this is going to be my one."

Somewhere heads are nodding.

http://sportsillustrated.cnn.com/vault/2009/03/23/105789480/how-and-why-athletes-go-broke 10/10

# EXHIBIT 66



**Cornell University ILR School**
**DigitalCommons@ILR**

Federal Publications                                    Key Workplace Documents

4-8-2008

# Former NFL Players: Disabilities, Benefits, and Related Issues

L. Elaine Halchin

*Congressional Research Service; Government and Finance Division*

Follow this and additional works at: http://digitalcommons.ilr.cornell.edu/key_workplace

 Part of the Human Resources Management Commons

This Article is brought to you for free and open access by the Key Workplace Documents at DigitalCommons@ILR. It has been accepted for inclusion in Federal Publications by an authorized administrator of DigitalCommons@ILR. For more information, please contact jdd10@cornell.edu.

# Former NFL Players: Disabilities, Benefits, and Related Issues

**Abstract**

[Excerpt] Professional football is a very popular sport, and the physical nature of the game of football is part of its appeal, but, at the same time, playing the game can exact a physical and mental toll on players. Violent collisions, as well as other aspects of the sport, can and do cause injuries. Each week during the season, the National Football League (NFL) releases an injury report that lists, for each team, players who are injured, the type or location of the injury (for example, "concussion," "knee," or "ribs"), and the players' status for the upcoming game. During the 2007 season, aside from weeks one and eight, at least 10% of NFL players were identified each week as being injured. Players' injuries and current health conditions (for example, excess weight and sleep apnea) might have long-term consequences for their health, meaning that today's injury might become a chronic health problem or disability during retirement from the NFL. The issue has received considerable attention from Congress, including hearings in both chambers. Through collective bargaining agreement (CBA) negotiations and other discussions, the NFL and the NFL Players Association (NFLPA) have established a number of benefits, including retirement benefits (that is, a pension), severance pay, total and permanent disability benefits, and an annuity program. Some benefits are available to all players, while other benefits are available only to players who played in the NFL during certain years. Additionally, some benefits have eligibility requirements. Funds for benefits that are included in the CBA come from the portion of the league's total revenues that is allocated to the players. Apparently, the NFL and the NFLPA determine how to fund other benefits. The NFL and the NFLPA have taken steps to promote the health and safety of players. The league has established several committees, such as the Mild Traumatic Brain Injury (MTBI) Committee, and, through NFL Charities, awards grants for medical and scientific research related to health and safety issues. The NFLPA has a medical advisor and a performance consultant, and there is an NFL-NFLPA joint committee on player safety. The subject of injuries, disabilities, and benefits is a complex one, and there are a variety of issues surrounding this subject. For example, it has been argued that the way compensation is structured within the NFL might induce an individual to play while injured instead of seeking medical treatment. The oldest retired players might make up a subset with exceptional financial and medical needs, because they (1) might not have been protected as well as current players are; (2) might have received medical care that, while the best available at the time, was not as effective as the care available today; and (3) are not eligible for all of the benefits available to current players. Another issue involves MTBI research and whether multiple concussions might have long-term effects. The NFLPA proposed three legislative options in 2007. Other possibilities include establishing one or more ombudsman offices or taking steps to mitigate the economic risk of injuries and disabilities. This report will be updated as events warrant.

**Keywords**

professional football, National Football League, NFL, injury, disability, retirement, public policy, Congress, NFL Players Association, NFLPA

**Disciplines**

Business | Human Resources Management

**Comments**

Halchin, L. E. (2008). *Former NFL players: Disabilities, benefits, and related issues* (RL34439). Washington, DC: Congressional Research Service. http://digitalcommons.ilr.cornell.edu/key_workplace/525/

This article is available at DigitalCommons@ILR: http://digitalcommons.ilr.cornell.edu/key_workplace/525

# CRS Report for Congress

## Former NFL Players: Disabilities, Benefits, and Related Issues

April 8, 2008

L. Elaine Halchin
Analyst in American National Government
Government and Finance Division


Congressional
Research
Service

Prepared for Members and
Committees of Congress

# Former NFL Players: Disabilities, Benefits, and Related Issues

## Summary

Professional football is a very popular sport, and the physical nature of the game of football is part of its appeal, but, at the same time, playing the game can exact a physical and mental toll on players. Violent collisions, as well as other aspects of the sport, can and do cause injuries. Each week during the season, the National Football League (NFL) releases an injury report that lists, for each team, players who are injured, the type or location of the injury (for example, "concussion," "knee," or "ribs"), and the players' status for the upcoming game. During the 2007 season, aside from weeks one and eight, at least 10% of NFL players were identified each week as being injured. Players' injuries and current health conditions (for example, excess weight and sleep apnea) might have long-term consequences for their health, meaning that today's injury might become a chronic health problem or disability during retirement from the NFL. The issue has received considerable attention from Congress, including hearings in both chambers.

Through collective bargaining agreement (CBA) negotiations and other discussions, the NFL and the NFL Players Association (NFLPA) have established a number of benefits, including retirement benefits (that is, a pension), severance pay, total and permanent disability benefits, and an annuity program. Some benefits are available to all players, while other benefits are available only to players who played in the NFL during certain years. Additionally, some benefits have eligibility requirements. Funds for benefits that are included in the CBA come from the portion of the league's total revenues that is allocated to the players. Apparently, the NFL and the NFLPA determine how to fund other benefits.

The NFL and the NFLPA have taken steps to promote the health and safety of players. The league has established several committees, such as the Mild Traumatic Brain Injury (MTBI) Committee, and, through NFL Charities, awards grants for medical and scientific research related to health and safety issues. The NFLPA has a medical advisor and a performance consultant, and there is an NFL-NFLPA joint committee on player safety.

The subject of injuries, disabilities, and benefits is a complex one, and there are a variety of issues surrounding this subject. For example, it has been argued that the way compensation is structured within the NFL might induce an individual to play while injured instead of seeking medical treatment. The oldest retired players might make up a subset with exceptional financial and medical needs, because they (1) might not have been protected as well as current players are; (2) might have received medical care that, while the best available at the time, was not as effective as the care available today; and (3) are not eligible for all of the benefits available to current players. Another issue involves MTBI research and whether multiple concussions might have long-term effects. The NFLPA proposed three legislative options in 2007. Other possibilities include establishing one or more ombudsman offices or taking steps to mitigate the economic risk of injuries and disabilities. This report will be updated as events warrant.

# Contents

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

The Game of Football and the Health of Players . . . . . . . . . . . . . . . . . . . . . . 4
    Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    The Nature of the Game of Football . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    Health Problems . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

NFL and NFLPA Benefit Programs and Plans . . . . . . . . . . . . . . . . . . . . . 18
    History of Benefits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
    How Benefits Are Funded . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
    Benefits for Former Players . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
    NFLPA Retired Players Department . . . . . . . . . . . . . . . . . . . . . . . . . . 40
    Players Assistance Trust (PAT) Fund . . . . . . . . . . . . . . . . . . . . . . . . . 41
    The Alliance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Other Efforts to Aid Former Players . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
    Selected Organizations and Websites . . . . . . . . . . . . . . . . . . . . . . . . . 48
    Active Players' Efforts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

NFL and NFLPA Health and Safety Initiatives . . . . . . . . . . . . . . . . . . . . . 50
    NFL Injury and Safety Panel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
    NFL Cardiovascular Health Committee . . . . . . . . . . . . . . . . . . . . . . . . 51
    NFL Medical Research Grants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52
    NFL Mild Traumatic Brain Injury Committee . . . . . . . . . . . . . . . . . . . . 53
    NFL and NFLPA Education Efforts for Players . . . . . . . . . . . . . . . . . . . 54
    NFLPA Medical Consultant and Performance Consultant . . . . . . . . . . . . 55
    NFL and NFLPA Joint Committee on Player Safety and Welfare . . . . . . . 56

Discussion of Selected Issues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58
    Injuries and Financial Considerations . . . . . . . . . . . . . . . . . . . . . . . . . 58
    Selected Challenges for Some Retired Players . . . . . . . . . . . . . . . . . . . 74
    Total and Permanent (T&P) Disability Benefit . . . . . . . . . . . . . . . . . . . 76
    Is There a Subset of Former Players with Exceptional Needs? . . . . . . . . . 86
    What Is Known about Injuries and Possible Long-Term Consequences? . . 92
        Studies on Possible Long-Term Effects of MTBI . . . . . . . . . . . . . . . 92
        Susceptibility to an Additional MTBI . . . . . . . . . . . . . . . . . . . . . . 97
        Chronic Traumatic Encephalopathy (CTE) . . . . . . . . . . . . . . . . . . . 98
        NFL's Approach to MTBI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104
    Funding for the Retirement Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . 110
    What Is the Extent of the NFLPA's Capacity? . . . . . . . . . . . . . . . . . . . 112
    Medical Care for Active Players . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113
        Access to Medical Records . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113
        Arrangements for Medical Care and Treatment . . . . . . . . . . . . . . . 114
    Workers' Compensation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118

Possible Courses of Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119
    NFLPA's Suggestions for Legislative Action . . . . . . . . . . . . . . . . . . . 119

Establish Federal Standards for Workers' Compensation . . . . . . . . . 120
Permit Unions to Manage Their Benefit Plans . . . . . . . . . . . . . . . . . 120
Eliminate the Requirement for the Disability Initial Claims
    Committee (DICC) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121
Other Suggestions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122
    Mitigation of Economic Risk . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122
    Independent Studies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 123
    Data: Collection, Quality, and Access . . . . . . . . . . . . . . . . . . . . . . . 124
    Establish an Ombudsman Office . . . . . . . . . . . . . . . . . . . . . . . . . . . 126

Concluding Observations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126

Appendix A. Glossary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

Appendix B. NFL and NFLPA Studies Concerning Players' Health . . . . . . . . 134
    Planned or Ongoing Studies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 136

Appendix C. Members of the Mild Traumatic Brain Injury Committee and
    Retired Player Study Investigators . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 138
    MTBI Committee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 138
    Retired Player Study Investigators . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 139

Appendix D. Acronyms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 141

## List of Tables

Table 1. The NFL's Major Television Rights Contracts, 2006-2013 . . . . . . . . . 1
Table 2. Number of Players Listed on the NFL's Injury Report, 2007 Season . . . 7
Table 3. NFL Players' Injuries by Type of Injury, 1997-1999 . . . . . . . . . . . . . . . 9
Table 4. Selected NFL-NFLPA Benefits as of October 2007 . . . . . . . . . . . . . . . 30
Table 5. Players Assistance Trust Fund Grants, by Grant Type, 1991-2007 . . . . 43
Table 6. Players Assistance Trust Fund Grants, by Year, 1991-2007 . . . . . . . . . 43
Table 7. NFL Charities' Grants for Research Related to Players' Health,
    2003-2007 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53
Table 8. Signing Bonuses Among NFL Players, 1993-1997 . . . . . . . . . . . . . . . 64
Table 9. Signing Bonuses Among NFL Players, 1998-2002 . . . . . . . . . . . . . . . 66
Table 10. Signing Bonuses Among NFL Players, 2003-2007 . . . . . . . . . . . . . . . 68
Table 11. Range of Percentage of Total Players Who Received a Signing
    Bonus, by Signing Bonus Amount . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70
Table 12. Total and Permanent Disability Payments by Category . . . . . . . . . . . 78
Table 13. Selected Criteria for Football Degenerative and Inactive
    Categories . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80
Table 14. Effect of 15-Year Threshold on Eligibility for
    "Football Degenerative" Benefits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81
Table 15. Number of Players Who Are Receiving or Have Received T&P
    Benefits, as of October 23, 2007 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83
Table 16. Benefits Available to Players . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89
Table 17. Recipients of NFL Charities Grants for MTBI and Related Research,
    2003-2007 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

# Former NFL Players: Disabilities, Benefits, and Related Issues

## Introduction[1]

Professional football, notably the National Football League (NFL), is the favorite sport of many in the United States.[2]  Recognized by some as "America's most popular spectator sport," the NFL's "popularity has never been greater: in the past 20 years, football has sharply widened its lead over baseball as America's favorite professional sport, according to a Harris Poll in December [2005].  Fans choose football over baseball, basketball and auto racing combined...."[3]  The popularity of the sport also is reflected in the league's major television rights deals, which are summarized in **Table 1**.

### Table 1. The NFL's Major Television Rights Contracts, 2006-2013

| Network or Cable Channel | Years Covered by the Contract | Total Rights Fee | Average Annual Value |
|---|---|---|---|
| CBS and Fox | 2006-2011 | $8.0 billion | $1.3 billion |
| NBC | 2006-2011 | $3.6 billion | $600 million |
| ESPN[a] | 2006-2013 | $8.8 billion | $1.1 billion |
| Total | | $20.4 billion | $3.0 billion |

**Source:** *Sports Business Resource Guide & Fact Book, 2006* (Charlotte, NC: Street and Smith's Sports Group, 2005), p. E-120.

a. A comparable television rights deal between Major League Baseball and ESPN, for the period 2006-2013, has a total rights fee of $2.37 billion and an average annual value of $296 million. (*Sports Business Resource Guide and Fact Book, 2006*, 2005, p. E-120.)

Throughout the documents that govern retirement and disability benefits, "active" players are distinguished from inactive, or retired, players.  In this context, "active" players generally are those under contract to a club or between teams; the

---

[1] This report was prepared at the request of the House Committee on the Judiciary.

[2] A list of acronyms used in this report may be found at **Appendix D**.

[3] Hoover's, Inc., "National Football League," Dec. 11, 2007, available at [http://www.lexisnexis.com/]; and Steven Levingston, "NFL Plays Smash-Mouth Ball When It Comes to Branding," *Washington Post*, Feb. 5, 2006, p. A7.

term roughly corresponds to the bargaining unit under the CBA. The term "active player" also can arise in distinguishing among categories of players who are employed by teams. For example each team is permitted a maximum of 53 players on its roster for a game. This limited roster comprises an Active list, not exceeding 45, and an Inactive list. However, "active players," as used generally in this report extends beyond roster players those players employed while in other categories, injured reserve, for example.

Active and future players are represented by the NFL Players Association (NFLPA), which is the sole and exclusive bargaining representative for players.[4] The average length of an NFL career is three and one-half seasons, and the average salary (which may include other types of compensation; see below for additional information) is $1.1 million.[5] Including both vested (i.e., having earned a sufficient number of "credited seasons" to qualify for retirement benefits) and nonvested players, the number of retired (or former) players is approximately 13,000. Vested players number approximately 7,900.[6] Although, under the collective bargaining agreement (CBA), the NFLPA does not represent former players, it does negotiate with the NFL for benefits for retired players.[7]

Playing professional football can, for some individuals, exact a significant physical, and, in some cases, mental, toll. Yet, the excitement of big hits is part of the attraction of the sport. In 2003, ESPN introduced a segment, "Jacked Up," that featured the five biggest hits from the weekend's games, except for plays that

---

[4] National Football League and NFL Players Association, *NFL Collective Bargaining Agreement, 2006-2012*, Mar. 8, 2006, p. 3. The term "future players" refers to individuals who had been previously employed by an NFL team and who are seeking employment with an NFL team; all rookie players, once they have been selected in the current year's draft; and all undrafted rookie players, once they begin negotiations with an NFL team. (Ibid.)

[5] NFL Players Association, "FAQs: NFL Hopefuls FAQ," available at [http://www.nflpa.org/Faqs/NFL_HopefulsFaq.aspx] as of Jan. 14, 2008, on file with the author. The NFL Players Association established a new website in Mar. 2008, replacing the original url [http://www.nflpa.org], with this url: [http://www.nflplayers.com]. (NFL Players Association, "Ready, Set, Click! NFLPA to Launch New Website This Month," Mar. 6, 2008, available at [http://www.nflplayers.com/user/content.aspx?fmid=178&lmid=443&pid=310&type=n].) Following this change, some of the NFLPA documents obtained from the previous website apparently are no longer readily accessible at the new website. Citations for these documents include the date the author accessed and printed the relevant document. However, some of these documents are pdf documents, which means that the dates they were accessed via the previous NFLPA website do not appear on the document. The citations for this particular group of documents notes the month and year they were downloaded. Regarding documents obtained from the previous website that are accessible at the new website, the current url is provided.

[6] Letter from Eugene Upshaw, Executive Director, NFL Players Association, to Reps. John Conyers, Jr., Lamar S. Smith, Linda T. Sanchez, and Christopher B. Cannon, Nov. 5, 2007, p. 8.

[7] A Supreme Court ruling stated that "the ordinary meaning of 'employee' does not include retired workers...." (*Allied Chemical & Alkali Workers of America, Local Union No. 1 v. Pittsburgh Plate Glass Co., Chemical Division*, 404 U.S. 157 (1971), at 392.)

resulted in an injury or a penalty.[8]  Television news broadcasts often carry video replays of especially hard collisions.  Some players achieve renown as "big hitters."

Despite the popularity of the physical nature of the game, it is balanced by concern for the players.  One sports journalist has written of the game's violence, "Players live for it, fans love it, media celebrate it — and all bemoan its devastating consequences.  The brutal collision of bodies is football's lifeblood, and the NFL's biggest concern."[9]

For the purposes of this report, distinctions are made between injuries, disabilities classified as such under the Bert Bell/Pete Rozelle NFL Player Retirement Plan ("retirement plan"), disabilities generally, and chronic health problems.  An injury is damage that occurs to an individual's body, in this case a professional football player, such as an abrasion, or a sprained ankle, torn muscle, or concussion.  A retirement plan disability is a medical condition that qualifies as a disability under the NFL and NFLPA retirement plan.  (See below for additional information about the different types of disabilities for which benefits are provided under the retirement plan.)  The term "disability" also may be interpreted more broadly to include any inability or incapacity.  Thus, a retired player who is incapable of performing one or more particular activities or functions, but does not receive any retirement plan disability benefits, also may be considered to be disabled.[10]  The phrase "chronic health problems" refers to conditions or illnesses that interfere with the activities of daily living, but do not rise to the level of rendering a player unable or incapable of performing an activity or function.  For example, as reported by the *Los Angeles Times* in 2000, Joe Montana, former quarterback for the San Francisco 49ers, "does not qualify for disability payments ... [and appears] to be living a healthy, active post-career life, [but he] suffers from an aching knee that makes [playing] golf painful, a numb foot that makes walking awkward and occasional blurred vision from too many hits to the head."[11]

Although the focus of this report is on former players, and their health problems and benefits, the report also covers certain issues involving active players.  The health of retired players derives in part from the injuries and medical conditions (such as excessive weight, if not obesity) that they may have experienced during their playing days.  Accordingly, some of the conditions, terms, or policies under which active players perform might have some bearing on their current and long-term health.  The issue of former players and their health and benefits has received considerable attention from Congress, including hearings in both chambers.

---

[8] Tim Layden, "The Big Hit," *Sports Illustrated*, July 30, 2007, p. 58.

[9] Ibid., p. 53.

[10] For example, a former player who is disabled but does not receive any disability benefits might not have applied for benefits; might not be eligible for disability benefits; might have applied and have his application pending; or might have applied, but had his application denied.

[11] Steve Springer, "After Care: Medical Benefits; Disability Payments Ease Pain; Unlike in Years Past, Former Players Who Are Totally and Permanently Disabled Receive Monetary Compensation," *Los Angeles Times*, Jan. 25, 2000, p. D8.

The next section describes the physical nature of the game of football, injuries, and health problems and is followed by a section on benefit programs and plans available to former players.  After an overview of other organizations' efforts to aid former players, this report examines the NFL's and the NFL Players Association's health and safety initiatives, examines selected issues, and discusses possible courses of action.

# The Game of Football and the Health of Players

## Introduction

Comprehensive data about the health of former players apparently are not collected and maintained, either by the NFLPA or the NFL, or by a third party.  The NFLPA is not aware of "any source of general data on the current health" of the 7,900 former players who are vested.[12]  Individual teams may have some information, but, apparently, the Retirement Plan Office does not.[13]

Neither the players association nor the league collects data on number or percentage of players who retire because of an injury or injuries.[14]  The NFLPA notes:

> [Players] may leave the game for several reasons.  Statistics about why NFL players retire can be misleading.  Most careers are not affected by a muscle or bone problem that causes a person to be one-half of a second slower in the 40-yard dash.  In the NFL, that half-second could cost a player his job.  The vast majority of players who leave the NFL, including those who leave because of injury, are in most respects quite healthy and capable of other employment.[15]

Although the last statement in this passage may be accurate, confirmation is difficult due to the dearth of evidence, and possibly some of the individuals who are "quite healthy" upon leaving the NFL might develop football-related disabilities later in life.

The NFL offers several possible reasons individuals retire from professional football: "Players retire for many reasons: because they do not make the team, because they wish to start their second career, because they lose the desire to play, or because they wish to spend more time with their families."[16]  Nevertheless, the NFL has some information on this subject which suggests that, for the period 1994-2004, at least 181 players retired for health reasons.  This figure is 4% of the "4,362 players who earned a Credited Season" during the same period and who "appear to

---

[12] Letter from Upshaw to Reps. Conyers, Smith, Sanchez, and Cannon, p. 8.

[13] Ibid., p. 7.  The Retirement Plan Office is responsible for administering the retirement plan which is part of the collective bargaining agreement.

[14] Ibid., p. 13;  Letter from Roger Goodell, Commissioner, National Football League, to Reps. John Conyers, Jr., and Lamar S. Smith, Nov. 2, 2007, p. 9.

[15] Ibid.

[16] Ibid.

have retired."[17]  The NFL was able to identify these 181 players because they received additional compensation after they "did not pass their pre-season physical[s] due to [injuries] sustained during the prior season and thus were unable to play."  Not included in this count are players who decided to retire because of their injuries and thus did not submit to a pre-season physical.

Without comprehensive, complete, detailed, and accurate data, including the number and extent of all disabilities and chronic health problems, it is difficult to know the health status, or employment or financial status, of all former players, and not just those who already receive, in particular, disability benefits.[18] As suggested above, some former players may have chronic health problems or may suffer from disabilities, as broadly construed, but do not receive any disability benefits from the retirement plan.  The absence of information about this group of retirees makes it difficult to determine whether any of them do not receive sufficient assistance, and also might hamper efforts to determine the effects or consequences of football-related disabilities.

Despite the lack of data on the health of former players, however, descriptive information can provide some insight into the nature of professional football and football injuries, which, for some former players, might have long-term health consequences.

## The Nature of the Game of Football

Physical contact is integral to the game of professional football.  For some, though, the phrase "physical contact" is an inadequate description.  Notably, Mike Ditka, a former player and coach in the NFL, stated, during a congressional hearing, that  "[i]t is not a contact sport, it's a collision sport."[19]

Timothy Gay, a professor of physics at the University of Nebraska and author of *Football Physics: The Science of the Game*, asks,

> What is the force of that hit?  Well, you're talking about classical physics, which puts us in the province of Isaac Newton: Force equals mass times acceleration. What you come up with in this case is that each man exerts about 1,500 pounds of force, or three quarters of a ton, on the other.  Which is why they call football a contact sport.[20]

---

[17] Letter from Goodell to Reps. Conyers and Smith, p. 9.

[18]  In some cases, an individual's health status and financial status may be related.

[19] U.S. Congress, Senate Committee on Commerce, Science and Transportation, "Oversight of the NFL Retirement System," statement of Mike Ditka, unpublished hearing, 110th Cong., 1st sess., Sept. 18, 2007, p. 99.

[20] Layden, "The Big Hit," pp. 55-56.  See also Timothy Gay, *Football Physics, The Science of the Game* (Emmaus, PA: Rodale Inc., 2004), pp. 35-36; and Gene Wojiechowski and Chris Dufresne, "Life Expectancy Low, Some Say: Football Career Is Taking Its Toll on NFL's Players," *Los Angeles Times*, June 26, 1988, available at [http://www.lexisnexis.com/].

At Virginia Polytechnic Institute and State University (Virginia Tech), a mechanical engineering professor put impact recorders in football players' helmets in 2003. The devices recorded 3,300 hits to the heads of players in 10 games and 25 practices. He also found that "[a] typical skull absorbed 50 wallops measured at 40 times the force of gravity...."[21] Players collide during training camp, practice, pre-season, regular season and post-season games.[22] Some players tear muscles and ligaments, break bones, and lose consciousness.[23]

Each week during the season, the NFL releases an injury report that lists, for each team, players who are injured, the type or location of the injury (for example, "concussion," "knee," or "ribs"), and the injured player's status for the upcoming game (for example, "out," "questionable," or "probable").[24] **Table 2** includes data for each week in the 2007 season. The data in this table may not provide an accurate count of the number of injuries sustained by NFL players for the following reasons: (1) only one type of injury or injury location was listed on the report, but some players listed may have had more than one injury; (2) a player may not have reported his injury or injuries to his team's medical staff, and, hence, his name did not appear on the report; (3) a player may have reported his injury or injuries to the medical staff, but the type or severity of the injury or injuries did not preclude him from playing; and (4) a player whose injury status kept him from playing in games for more than one week could be listed on the injury report each week. More accurate injury data are submitted to the NFL's Injury Surveillance System (see below for additional information) by each team's medical staff.

---

[21] Carl Prine, "Extra Pounds Cause Trouble Later in Life," *Pittsburgh Tribune-Review*, Jan. 9, 2005, available at [http://www.pittsburghlive.com/x/pittsburghtrib/news/specialreports/specialnfl/s_291051.html].

[22] Carl Prine, "Bloody Sundays," *Pittsburgh Tribune-Review*, Jan. 9, 2005, available at [http://www.pittsburghlive.com/x/pittsburghtrib/news/specialreports/specialnfl/s_291033.html].

[23] Peter Carlson, "For the NFL's Retirees: Know Pain, No Gain," *Washington Post*, Aug. 21, 2007, p. C7; and Paul Gutierrez, "NFL Injuries; Pain Game," *Los Angeles Times*, Jan. 25, 2000, available at [http://www.lexisnexis.com/].

[24] According to a news article, "The [NFL's] injury lists have roots in two mandates: State workers' compensation laws and federal reporting requirements force teams to record injuries. Because a paper trail is needed to substantiate a potential on-the-job disability or safety issue, broken bones, joint tears, ruptured muscles, head wounds and other ailments are written down. NFL bylaws also require teams disclose to their opponents their players' pre-game injury status so coaches can prepare strategies." (Prine, "Bloody Sundays.") Regarding an injured player's status, Prine reported that "even a player marked 'probable' for Sunday's game has a 'serious' injury, much as a bad fall or a degenerative bone condition would be considered serious on a workers' compensation filing. 'As a fan, maybe you don't think it's serious because the player is playing, but [the injury] can still be serious,' said Dr. Derek Jones, one of the nation's foremost orthopedic surgeons at the Ochnser Clinic in New Orleans." (Ibid.)

### Table 2. Number of Players Listed on the NFL's Injury Report, 2007 Season

| Week During the Season | Number of Players[a] | Percentage of Players[b] |
|---|---|---|
| 1 | 132 | 8% |
| 2 | 167 | 10% |
| 3 | 202 | 12% |
| 4 | 208 | 12% |
| 5 | 207 | 12% |
| 6 | 179 | 11% |
| 7 | 190 | 11% |
| 8 | 159 | 9% |
| 9 | 188 | 11% |
| 10 | 185 | 11% |
| 11 | 195 | 11% |
| 12 | 181 | 11% |
| 13 | 198 | 12% |
| 14 | 211 | 12% |
| 15 | 207 | 12% |
| 16 | 203 | 12% |
| 17 | 216 | 13% |

**Source:** National Football League, "Injuries," available at [http://www.nfl.com/injuries].

a.  These figures do not include any player who was listed on a team's injury report, but for whom the entry in the "Injury" column was "Appendicitis," "Coach's Decision," "Migraine," "Personal," "Personal Decision," "Personal Reason," "Team decision," or "Illness."
b. Percentages have been rounded.

Aside from weeks one and eight, at least 10% of NFL players are identified each week as being injured.  The relatively small variation in the percentage of players identified as being injured each week throughout a 17-game season — 10% to13% — suggests, despite questions about the accuracy of the data, that a fairly consistent number of players are injured throughout the season.

A journalist for the *Pittsburgh Tribune-Review* conducted an analysis of four years of data culled from the NFL's weekly injury reports, interviewed 200 current and former players, coaches, and managers about injuries, and reviewed medical literature.  A summary of his findings is as follows:

In the 2000 through the 2003 seasons, NFL players racked up 6,558 injuries. More than half the athletes are hurt annually, with the number spiking at 68% in 2003-04, according to the NFL's weekly injury reports.

Defenders are injured more than their foes on the offense. A defensive back alone is 30 percent more likely to get hurt than a quarterback, even though a passer touches the ball on every possession. Two out of three cornerbacks and safeties suffer injuries in the NFL annually, and half of those will suffer a second, unrelated injury before the Super Bowl.

Quarterbacks, tight ends, wide receivers, safeties and cornerbacks routinely suffer high rates of brain concussions and spine injuries that could trigger paralysis, dementia, depression and other ailments later in life. During typical four-year careers, one of every 10 NFL receivers experiences a concussion. On average, seven pro football players a week face potentially life-altering head, spine or neck trauma.[25]

Additionally, the news article noted that, during the four-year period studied, 1,205 players had knee injuries; 652 sustained head, spine, or neck trauma; 683 injured their hamstring and groin muscles; and 928 broke or sprained their ankles.[26] Reportedly, the "2003 NFL injury rate was nearly eight times higher than that of any other commercial sports league, according to the U.S. Department of Labor — and that includes the National Hockey League, the National Basketball Association, and professional auto racing."[27]

Another newspaper, the *Los Angeles Times*, also used the NFL's weekly injury reports to compile data for several seasons, 1997-1999. In 1997, 335 players were sidelined for 937 games; in 1998, 398 players sat out 1,340 games; and, in 1999, 364 players did not play in 1,061 games.[28] **Table 3** shows the types of injuries sustained by NFL players for these three years. The data in this table are not comparable to the data provided in **Table 2**. A key difference between the two datasets is that the *Los Angeles Times* researcher who compiled the data found in **Table 3** tracked individual players.[29] Nevertheless, some of the same caveats that apply to **Table 2** also might apply to **Table 3**. That is, the data in **Table 3** may not provide an accurate count of the number of injuries sustained by NFL players for the following reasons: (1) only one type of injury or injury location was listed on the report, but some players listed may have had more than one injury; (2) a player may not have reported his injury or

---

[25] Prine, "Bloody Sundays."

[26] Ibid.

[27] Ibid.

[28] Gutierrez, "NFL Injuries; Pain Game."

[29] Specifically, he "tracked every player who suffered an injury during the 1997, '98, and '99 seasons. Those players who were sidelined for a game or more because of injury were logged, as were the number of games they were sidelined and the types of injuries. Players who were injured in the previous season or in the exhibition season and missed games the next season ... were not counted." (Houston Mitchell, "NFL Injuries; Injury Report; Methodology," *Los Angeles Times*, Jan. 25, 2000, available at [http://www.lexisnexis.com/].)

injuries to his team's medical staff and hence his name did not appear on the report; (3) a player may have reported his injury or injuries to the medical's staff, but the type or severity of the injury or injuries did not preclude him from playing.

### Table 3. NFL Players' Injuries by Type of Injury, 1997-1999

| Type of Injury or Illness | 1997[a] | 1998[a] | 1999[a] |
|---|---|---|---|
| **Abdomen** | 2<br>1% | 6<br>1% | 1<br><1% |
| Abrasions | 0 | 0 | 1<br><1% |
| Achilles tendon | 3<br>1% | 3<br>1% | 5<br>1% |
| Ankle | 50<br>14% | 54<br>13% | 52<br>14% |
| Arm | 5<br>1% | 5<br>1% | 4<br>1% |
| Back | 12<br>3% | 23<br>5% | 9<br>2% |
| Biceps | 0 | 4<br>1% | 1<br><1% |
| Blood clot | 0 | 0 | 1<br><1% |
| Buttocks | 1<br><1% | 0 | 0 |
| Calf | 4<br>1% | 10<br>2% | 7<br>2% |
| Chest | 0 | 5<br>1% | 2<br>1% |
| Concussion | 5<br>1% | 5<br>1% | 11<br>3% |
| Elbow | 7<br>2% | 4<br>1% | 5<br>1% |
| Ear | 1<br><1% | 0 | 0 |
| Eye | 3<br>1% | 2<br><1% | 0 |
| Face laceration | 0 | 0 | 1<br><1% |

CRS-10

| Type of Injury or Illness | 1997[a] | 1998[a] | 1999[a] |
|---|---|---|---|
| Finger | 1<br><1% | 4<br>1% | 1<br><1% |
| Foot | 8<br>2% | 23<br>5% | 19<br>5% |
| Groin | 12<br>3% | 14<br>3% | 10<br>3% |
| Hamstring | 29<br>8% | 35<br>8% | 30<br>8% |
| Hand | 12<br>3% | 9<br>2% | 2<br>1% |
| Head | 3<br>1% | 2<br><1% | 1<br><1% |
| Heel | 1<br><1% | 0 | 0 |
| Hernia | 1<br><1% | 0 | 1<br><1% |
| Hip | 6<br>2% | 2<br><1% | 4<br>1% |
| Jaw | 2<br>1% | 2<br><1% | 1<br><1% |
| Kidney | 0 | 1<br><1% | 0 |
| Knee | 104<br>30% | 131<br>31% | 122<br>33% |
| Leg | 14<br>4% | 7<br>2% | 7<br>2% |
| Liver | 0 | 0 | 1<br><1% |
| Neck | 11<br>3% | 13<br>3% | 14<br>4% |
| Nose | 1<br><1% | 0 | 0 |
| Pelvis | 1<br><1% | 0 | 0 |
| Quadriceps | 3<br>1% | 2<br><1% | 7<br>2% |

CRS-11

| Type of Injury or Illness | 1997[a] | 1998[a] | 1999[a] |
|---|---|---|---|
| Ribs | 6<br>2% | 4<br>1% | 4<br>1% |
| Shin | 0 | 1<br><1% | 0 |
| Shoulder | 22<br>6% | 35<br>8% | 31<br>8% |
| Thigh | 3<br>1% | 1<br><1% | 0 |
| Throat | 0 | 0 | 1<br><1% |
| Thumb | 5<br>1% | 4<br>1% | 4<br>1% |
| Toe | 5<br>1% | 3<br>1% | 6<br>2% |
| Triceps | 1<br><1% | 2<br><1% | 1<br><1% |
| Wrist | 3<br>1% | 3<br>1% | 0 |
| Total | 347 | 419 | 367 |

**Source:** Houston Mitchell, "NFL Injuries; Injury Report; Methodology," *Los Angeles Times*, Jan. 25, 2000, available at [http://www.lexisnexis.com/].

a. Percentages have been rounded.

According to **Table 3**, players sustained 43 different types of injuries. Four types of injuries accounted for 50% of the injuries in each year: knee, ankle, hamstring, and shoulder. The breakdown for each of these injuries, by year, is as follows:

- Knee: 30%, 31%, and 33%
- Ankle: 14%, 13%, and 14%
- Hamstring: 8% each year
- Shoulder: 6%, 8%, and 8%

Given the focus on mild traumatic brain injury (MTBI, or concussions) in 2007, and the related anecdotal evidence on the frequency of concussions, it is notable that only 21 concussions were recorded for this three-year period (1997-1999). Concussions accounted for 1% of injuries in 1997 and in 1998, and 3% in 1999.

For some players, the injuries they sustain playing in the NFL might lead to disabilities later in life. David Meggyesy, a former player and the director of NFLPA's San Francisco office, reportedly referred to post-NFL injuries as "'the

elephant in the room that no one wants to say is in the room....  Everybody walks away with an injury....  You just don't see that being done to the human body and not think there are going to be consequences later in life.'"[30]  Echoing Meggyesy's comments, a former president of the NFLPA, Trace Armstrong, offered his observations of other former players: "You go to our retired players' conventions ... and some of these guys don't look so good.  Young men, onetime great athletes, but they don't move around so well."

## Health Problems

Although accurate, complete, comprehensive, and detailed data about former and active players are necessary to construct a comprehensive picture of their health, the following information is useful for  illustrating some of  the health problems football players might experience, whether as active players or as retirees.

An obvious feature of most football players is their size.  From 1985 through 2005, the average weight of a player in the NFL grew by 10% to an average of 248 pounds.  At the heaviest position, offensive tackle, the average weight of players has increased from 281 pounds in the mid-1980s to 318 pounds in 2005.[31]  As of 2005, 552 players weighed 300 pounds or more, which is 33% of all active players, and 82 other players weighed between 295 and 299 pounds.[32]

Not only are football players large, but some of them also may be classified as obese.  Joyce B. Harp and Lindsay Hecht calculated the body mass index (BMI) of NFL players active during the 2003-2004 season and reported these findings:[33]

- 97% of the players had a BMI of 25 or greater.
- 56% had a BMI of 30 or greater.  This was 32 percentage points higher than the percentage of 20- to 39-year-old men who had comparable BMIs in the 1999-2002 National Health and Nutrition Examination Survey (NHANES).[34]
- 26% of the players had a BMI of 35 or greater.

---

[30] David Steele, "Adding Insult to Injury," *San Francisco Chronicle*, Sept. 1, 2002, available at [http://sfgate.com].

[31] Thomas Hargrove, "Heavy NFL Players Twice as Likely to Die Before 50," *Espn.com*, Jan. 31, 2006, available at [http://sports.espn.go.com/nfl/news/story?id=2313476].

[32] Mark Maske and Leonard Shapiro, "NFL Is Soul Searching After Herrion's Death," *Washington Post*, Aug. 25, 2005, p. E8.

[33] For this study, "body mass index (BMI) was calculated for each of the players as weight in kilograms divided by height in meters squared, as was mean BMI for each team and position across all 32 teams and a frequency distribution of BMI for all players." (Joyce B. Harp and Lindsay Hecht, "Obesity in the National Football League," *Journal of the American Medical Association*, vol. 293, no. 9, Mar. 2, 2005, p. 1061.)

[34] Information about the National Health and Nutrition Examination Survey is available at [http://www.cdc.gov/nchs/nhanes.htm].

- 3% of the players had a BMI of 40 or greater. This percentage was similar to the percentage (3.7%) of 20- to 39-year-old men who had comparable BMIs in the 1999-2002 NHANES.
- Cornerbacks and defensive backs had the lowest mean BMI (26.8).
- Guards had the highest mean BMI (38.2).[35]

In this study, "body mass index was classified according to the National Institutes of Health guideline: normal weight (BMI 18.5-24.9), overweight (25-29.9), obese class 1 (30-34.9), obese class 2 (35-39.9), and obese class 3 ($\geq$40)."[36] These data show that slightly more than half of the players were obese, with 26% having a BMI that "qualifie[s] as class 2 obesity."[37] The authors concluded their article with the following comment:

> Although measurements of body composition are needed to determine the source of the increased weight, it is unlikely that the high BMI in this group, particularly in the class 2 obesity range, is due to a healthy increase in muscle mass alone. The high number of large players was not unexpected given the pressures of professional athletes to increase their mass. However, it may not be without health consequences. A recent study described increased sleep-disordered breathing in professional football players, particularly those with a high BMI; linemen, who had the highest BMIs, also had higher blood pressures than did other players. The high prevalence of obesity in this group warrants further investigation to determine the short- and long-term health consequences of excessive weight in professional as well as amateur athletes.[38]

Dr. Elliott Pellman, former medical advisor/liaison to the NFL Commissioner, reportedly critiqued the Harp and Hecht article by saying: "'[The BMI] is okay if you're an actuary for life insurance.... But medically, we don't define obesity that way. It's not designed for people that large. The study the [NFL] commissioner ordered will do a lot more than take heights and weights off the Internet. The data must be gathered in a scientific way.'"[39]

---

[35] Harp and Hecht, "Obesity in the National Football League," pp. 1061-1062.

[36] Ibid., p. 1061.

[37] Ibid., p. 1062.

[38] Ibid., p. 1062.

[39] Maske and Shapiro, "NFL Is Soul Searching After Herrion's Death," p. E8. It is unclear whether the subject of obesity will be part of the NFL's study on cardiovascular health, or it will be the subject of a separate study. See **Appendix B** for a list of planned or ongoing studies. Elliot Pellman was medical advisor/liaison to the NFL Commissioner for the period 2001-2006. (Elliot J. Pellman, "Curriculum Vitae," provided by the House Committee on the Judiciary to the author on Nov. 6, 2007, p. 3.) Dr. Pellman served as the Chairman of the NFL Committee on Mild Traumatic Brain Injury (MTBI) from 1994 through 2007. His residencies and fellowship were in the fields of internal medicine and rheumatology. He continues to serve on the MTBI Committee, and he also serves on the Alliance for NFL Retired Football Players (member, 2007-present), the NFL's Foot and Ankle Committee (advisor, 2005-present) and Cardiovascular Health Committee (advisor, 2004-present), the NFL-NFLPA Joint Committee on Player Safety (member, 2001-present), the NFL's Injury and Safety Panel (advisor, 1995-present). Previously, he served as a member of the National

(continued...)

CRS-14

Reportedly, some NFL linemen have a provision in their contracts saying they agree to maintain their size.[40]   In Article XXIV, Section 7(c) of the CBA, which addresses financial incentives in players' contracts, examples of incentives that are considered "within the sole control of the player" include "weight bonuses."[41] "Weight bonuses" is open to interpretation.  For example, a player may be required to not exceed a certain weight or not to fall below a certain weight.  Reportedly, Gene Upshaw, executive director of the NFLPA, said, in 2002, that the players association and the league had been discussing "how to deal with weight-loss demands by coaches.  Is science involved?  What factors do height and weight play?  How long does it take the player to lose it?"[42]   It is unclear, though, whether this reference to weight loss is related to the possibility of a weight contract clause.

Obesity itself, plus simply being overweight, can lead to other health problems, both indirectly and directly.  Players who have retired from the NFL may have difficulty decreasing their weight and staying in shape, particularly if they suffer from other health problems that preclude or limit their physical activity.[43]   Kevin Guskiewicz, research director of the Center for the Study of Retired Athletes (CSRA), University of North Carolina at Chapel Hill, as quoted in the *New York Times*, adds pain to the equation and describes a possible chain of events for former players: "What happens is that the retired athlete can't exercise because of the injuries he's sustained and the pain he is in, and that leads to higher weight, depression, bad eating habits, high blood pressure and so on."[44]

Sleep apnea and cardiovascular disease (CVD) are examples of two health problems associated with excess weight.  A 2003 study by SleepTech Consulting Group found that 34% of offensive linemen suffered from sleep apnea.[45]   As reported by the *New York Times*, an associate team physician with the New York Giants, Dr. Allan Levy, describes what some NFL players might experience:

> The problem with sleep apnea is in the neck.  A 17 ½-inch neck is usually where the problem begins.  When they sleep, the muscles relax in the body.  Now the

---

[39] (...continued)
Football League Physicians Society's executive committee, from 1994 through 2003. (Ibid., pp. 1-5.)

[40] Prine, "Extra Pounds Cause Trouble Later in Life."

[41] National Football League and NFL Players Association, *NFL Collective Bargaining Agreement, 2006-2012*, p. 109.

[42] Thomas George, "Care by Team Doctors Raises Conflict Issue," July 28, 2002, available at [http://query.nytimes.com/gst/fullpage.html?res=990DEFDE173BF93BA15754C0A9649C8B63].

[43] Ibid.

[44] Harvey Araton, "Stealth Killer Puts Doctor on Mission with N.F.L.," *New York Times*, May 8, 2007, available at [http://query.nytimes.com/gst/fullpage.html?res=9C02EED71631F93BA35756C0A9619C8B63&n=Top/News/Sports/Columns/Harvey%20Araton].  Information about the Center for the Study of Retired Athletes may be found at [http://www.csra.unc.edu/index.htm].

[45] Prine, "Extra Pounds Cause Trouble Later in Life."

weight of their neck clasps down on their airway. They stop breathing. They momentarily wake up, then the cycle starts over again, and they never get into deep sleep. They develop heart disease and hypertension. Sleep apnea is a killer. One of the kids that played for us, we did a sleep study on [him], [he] had 440 awakenings during the night.[46]

Dr. Arthur Roberts, a cardiac surgeon who played in the NFL for three years, summarized the cardiovascular risk for professional football players. His summary, which was included in a *Washington Post* news article, follows:

> The real problem is what's happening inside these men to their cardiovascular risk factors. The combination of large body size is associated with increased risk factors for diabetes and hypertension, which lead to so many other problems. Doctors have learned over the last 30 years that so many bad outcomes are related to cardiovascular problems that might have been avoided .... Cardiac arrest in the locker room is tragic but, thank God, a rare event .... But many of the risk factors that are in these players' bodies are not apparent now but will be apparent later in life. We have to shift the pendulum and evaluate and educate the younger players, make it a total process. With retired players we're finding high cholesterol and high blood pressure. We already know sleep apnea is associated with heart arrhythmia and hypertension. You have a lot of risk factors building in players. We have to make them aware and start educating them on how to take care of themselves to avoid problems later on. We have the technology to do it. We have a support system of doctors and hospitals involved in this study willing to do it. It's now a matter of getting players to buy into it.[47]

Roberts was referring to a study of past and present players involving, among other things, the consequences of excess weight for cardiovascular health.[48] In contrast, a study designed to assess whether there is a link between playing professional football and reduced risk later in life for CVD, osteoporosis, and higher muscle mass reached an encouraging conclusion:

> In this small [16 former NFL players] sample of older men, former successful professional athletes who remained physically active in middle age have a favorable body composition and reduced risk factors for CVD and osteoporosis compared with health age-and BMI-matched older men.[49]

The findings of this study do not necessarily contradict Kevin Guskiewicz's comment above. This study included former players "who remained physically active in

---

[46] Clifton Brown, "Ex-Players Dealing With Not-So-Glamorous Health Issues," *New York Times*, Feb. 1, 2007, available at [http://query.nytimes.com/gst/fullpage.html?res= 9D0CEFDB153FF932A35751C0A9619C8B63&n=Top/Reference/Times%20Topics/ People/B/Brown,%20Clifton].

[47] Maske and Shapiro, "NFL Is Soul Searching After Herrion's Death," p. E8.

[48] Ibid.

[49] Nicole A. Lynch, Alice S. Ryan, Joyce Evans, Leslie I. Katzel, and Andrew P. Goldberg, "Older Elite Football Players Have Reduced Cardiac and Osteoporosis Risk Factors," *Medicine & Science in Sports & Exercise*, 2007, p. 1124.

CRS-16

middle age," while Guskiewicz was referring to retired players who are unable to exercise because of injuries sustained during their NFL careers.

Responding to a request from the NFLPA, the National Institute for Occupational and Safety and Health (NIOSH) conducted a mortality study in the early 1990s of the rate and causes of death of NFL players.[50]   The study found the following:

- Former offensive and defensive linemen "had a 50% greater risk of cardiovascular disease than the general population."[51]

- Linemen "had a 3.7 times greater risk of cardiovascular disease" than players in other positions.[52]

Possibly lending credence to questions about the size of players, the authors noted that "[i]t is not possible from this analysis to determine specifically what it is about the linemen, besides BMI, that contributes to this increased risk."[53]

As described above, players sustain hits to the head, which may or may not result in a mild traumatic brain injury (MTBI) or concussion.  Reportedly, league data show that approximately 100 players a year sustain concussions.[54]   (For more information on MTBI, see below, in the "Discussion of Selected Issues" section.)

A study that focused on the long-term effect of concussions, however, also reported information about other health problems experienced by former players. The researchers found, by questioning 2,488 former NFL players, that 22% had knee surgery and 10% had back or disc surgery after their careers ended.[55]   In response, the NFL's medical advisor/liaison reportedly said that there is little credible research on whether playing football leads to serious medical problems later in life.[56]

---

[50] A January 2006 news article reported that Dr. Sherry Baron, co-author of the 1994 study, was planning to repeat her study of mortality rates within the NFL. (Thomas Hargrove, "Compared to Baseball, Football Players Die Younger," *Espn.com*, Jan. 31, 2006, available at [http://sports.espn.go.com/nfl/news/story?id=2313520].) The status of the planned study is not known.

[51] Letter from Sherry Baron, M.D., M.P.H., and Robert Rinsky, U.S. Department of Health and Human Services, National Institute for Occupational Safety and Health, to Frank Woschitz, National Football League Players Association, Jan. 10, 1994, p. 4.  This letter is popularly known as the "NFL mortality study."

[52] Ibid., p. 4.

[53] Ibid., p. 4.

[54] Peter Keating, "Doctor Yes," *ESPN.com*, Oct. 28, 2006, available at [http://sports.espn.go.com/espn/print?id=2636795 &type=story].

[55] Ellen E. Schultz, "A Hobbled Star Battles the NFL," *Wall Street Journal*, Dec. 3, 2005, p. A2.

[56] Ibid., pp. A2-A3.

A study of depression and pain experienced by former NFL players also surveyed them about the most common problems they experience in retirement. The results, "in descending order of frequency as quite or very common" were: "difficulty with pain (48%), loss of fitness and lack of exercise (29%), weight gain (28%), trouble sleeping (28%), difficulty with aging (27%), and trouble with transition to life after professional football (27%)."[57] Regarding the thrust of the study, the study's authors wrote:

> Although pain and depression are commonly comorbid in the general population ..., the frequency with which retired professional football players report difficulty with pain seems to put them at additional risk of both developing depression and experiencing associated difficulties with retirement. The high level of psychosocial dysfunction and significant barriers to receiving help put a small but important subgroup of all retired NFL players at significant risk of adverse life events and disability, almost certainly including an increased risk of suicide.... Retired professional football players experience depressive symptoms at a rate that is similar to that found in the general population, presumably with a corresponding rate of clinical depression. They bear an additional burden of substantial chronic pain. Depressive symptoms and pain interact to result in a strong correlation with self-report perceptions of the risk of sleeping problems, difficulty with aging, loss of fitness and lack of exercise, financial problems, and concerns about their use of prescription and recreational drugs and alcohol.[58]

What, if any, relationship exists between playing professional football and mortality is unclear. The 1994 NIOSH study mentioned above found that professional football players had "a 46% lower overall mortality rate than the general United States male population with a similar age and race distribution."[59] A review of data on the mortality of those who played football, and those who played baseball, a sport with less physical contact. Deceased players from both sports born before 1955"were about equally likely to suffer an early death."[60] However, differences between these two groups of athletes did appear for players born after 1955.

- At least 130 of the 8,961 football players and 31 of the 4,382 baseball players born after 1955 are known to have died. That is, 1 in every 69 football players and 1 in every 154 baseball players born after 1955 have died.

- The most common cause of death for baseball players was accidents; only one-third died of medical causes. Over half (52%) of the deceased football players "succumbed to conditions such as coronary

---

[57] Thomas L. Schwenk, Daniel W. Gorenflo, Richard R. Dopp, and Eric Hipple, "Depression and Pain in Retired Professional Football Players," *Medicine & Science in Sports and Exercise*, 2007, pp. 600-601.

[58] Ibid., pp. 603-604.

[59] Letter from Baron and Rinsky to Woschitz, p. 4.

[60] Thomas Hargrove, "Compared to Baseball, Football Players Die Younger."

disease, stroke and cancer — diseases known to be more common among obese people."[61]

- "The deceased baseball players averaged 192 pounds during their athletic careers while the dead football players averaged 238 pounds. Football players who died of medical causes averaged 248 pounds."[62]

Complete, detailed, comprehensive, and accurate data are needed to construct a profile of the health of active players and former players. Furthermore, this type of initiative potentially could facilitate efforts to determine what links exist, if any, between injuries sustained as an active player and chronic health problems and disabilities (as broadly construed) experienced as a retired player.

# NFL and NFLPA Benefit Programs and Plans

## History of Benefits

Both the league and the players association are involved in the funding and provision of benefits to former players as well as active players. Most of the benefits for former players are administered by joint boards "to which the NFLPA and the NFL each appoint three voting members. The day-to-day administration of these jointly-trusteed benefits occurs at the 'Plan Office' in Baltimore ...." That is, neither the NFLPA nor the NFL administers certain benefits, such as the benefits included in the retirement plan, although the NFL is the sole administrator for severance pay and post-career health insurance.[63]

Although the name and composition of the league has changed over the years, the league was formed in 1920, and adopted its current name in 1922.[64] The NFL Players Association was founded a number of years later, in 1956.

The following history of selected events shows the evolution of benefits for NFL players. Events that are not directly related to the establishment or enhancement of benefits are included to provide context or background information. Such events may include strikes, lockouts, and lawsuits, which are included for the period 1987-1993, when several events and decisions culminated in significant changes in benefits. However, since this is not a history of labor relations between the league and the players association, the chronology does not necessarily include all of the labor-management issues or milestones.

---

[61] Ibid.

[62] Ibid.

[63] Ibid., p. 29.

[64] The NFL as it exists today was created through a merger in 1966 with another league, the American Football League, which was formed in 1959.

- 1958. Team owners created "a benefit plan that included hospitalization, [and] medical and life insurance with a plan for retirement benefits at age 65."[65]

- 1960s. "Players pushed through pension coverage [for] a group of 110 players who were in the league in 1959, when benefits were introduced. Life insurance and health coverage benefits were improved and, for the first time, two player reps [representatives] were designated to sit on the Retirement Board."[66]

- 1962. The NFLPA obtained the first pension agreement, known as the Bert Bell NFL Player Retirement Plan. The plan does not include players who left the game before 1959 (known as the "pre-59ers").[67]

- 1966. The Commissioner of the NFL announced that the NFL and American Football League (AFL) will merge into one league.

- 1968. The NFLPA, which represented players on only 16 of the 26 teams (the AFL Players Association represented players on the remaining 10 teams), "proposed new pension demands ...." A lockout is followed by a brief strike, and eventually the parties agreed to what was the first CBA, which was effective from July 15, 1968, through February 1, 1970.[68] Negotiations resulted in "a minimum salary of $12,000, better pay for exhibitions, and a doubling of the annual pension-fund contribution to $3 million."[69] The NFLPA demands included a retirement age of 45; but, the retirement age in the CBA was set at age 65.[70]

- 1970. The AFL Players Association and the NFL Players Association merged and retained the latter's name. The NFLPA was

---

[65] NFL Players Association, "About Us: NFLPA History," n.d., available at [http://www.nflpa.org/AboutUs/NFLPA_History.aspx] as of Oct. 2, 2007, on file with the author.

[66] Ibid.

[67] NFL Players Association, "History of Retirement and T&P Benefits for NFL Players," n.d., available at [http://nflpa.org/pdfs/NewsAndEvents/History_of_the_NFLPA%E2%80%99s_Retired_ Player_Benefits.pdf], downloaded Sept. 2007, on file with the author.

[68] NFL Players Association, "About Us: NFLPA History"; *The Business of Football 2001* (Carmel, CA: Paul Kagan Associates, Inc., 2001), p. 392.

[69] Stephen Fox, *Big Leagues, Professional Baseball, Football, and Basketball in National Memory* (Lincoln, NE: University of Nebraska Press, 1994), p. 425.

[70] *The Business of Football 2001*, p. 393.

certified as a union.[71] The American Football League (AFL) and the NFL merged and retained the latter's name. "The Players Negotiating Committee and the NFL Players Association announced a four-year agreement guaranteeing approximately $4,535,000 annually to player pension and insurance benefits.... The owners also agreed to contribute $250,000 annually to improve or implement items such as disability payments, widows' benefits, maternity benefits, and dental benefits."[72] Players also were given the "right to meaningful representation on the Retirement Board, and the right to impartial arbitration of injury grievances."[73] Total and permanent (T&P) disability benefits and line-of-duty (LOD) disability benefits were established.[74] The pension plan was revised and set up in its present structure. Monthly pension is based on the number of years an individual plays football, not on the amount of his salary.[75]

- 1973. A nonprofit organization, NFL Charities, was created "to support education and charitable activities and to supply economic support to persons formerly associated with professional football who were no longer able to support themselves."[76]

- 1974-1976. NFL and NFLPA played three seasons without a CBA.[77]

- 1977. The NFL Management Council and the NFLPA ratified a CBA which continued "the pension plan — including years 1974, 1975, and 1976 — with contributions totaling more than $55 million.... The agreement ... reduced pension vesting to four years ... [and] improved insurance, medical, and dental benefits."[78] Specifically, Group Insurance was established.[79] Players were permitted to get a lump sum "early payment benefit" from their pension; the lump sum equaled 25% of their pension.[80]

---

[71] NFL Players Association, "About Us: NFLPA History."

[72] National Football League, "History, 1961-1970," n.d., available at [http://www.nfl.com/history/chronology/1961-1970].

[73] NFL Players Association, "About Us: NFLPA History."

[74] Letter from Upshaw to Reps. Conyers, Smith, Sanchez, and Cannon, p. 4.

[75] NFL Players Association, "History of Retirement and T&P Benefits for NFL Players."

[76] National Football League, "History, 1971-1980," n.d., available at [http://www.nfl.com/history/chronology/1971-1980].

[77] *The Business of Football 2001*, p. 394.

[78] National Football League, "History, 1971-1980."

[79] Letter from Upshaw to Reps. Conyers, Smith, Sanchez, and Cannon, p. 4.

[80] NFL Players Association, "History of Retirement and T&P Benefits for NFL Players."

- 1982. The strike-shortened season resumed after the CBA was ratified on November 21-22. The CBA included, among other things, increases in players' medical, insurance, and retirement benefits; and a severance pay system.[81] Players also gained rights related to their medical care: the right to a second opinion, the "right to select a surgeon for injury-related operations, and the right to inspect their club medical records."[82]

- 1987. The 1982 CBA expired. The 1987 season included a strike, the use of replacement players, the NFLPA filing an antitrust lawsuit against the NFL and then filing charges with the National Labor Relations Board (NLRB), alleging unfair labor practices.[83] A "special payment program was adopted to benefit nearly 1,000 former NFL players who participated in the League before the current Bert Bell NFL Pension Plan was created and made retroactive to the 1959 season. Players covered by the new program spent at least five years in the League and played all of part of their career prior to 1959. Each vested player would receive $60 per month for each year of service in the League for life."[84] Players continued to play through the 1993 season without a new CBA.

- 1987 and 1988. The owners agreed to allow benefit credits to accrue at the then-rate of $150 per Credited Season.[85]

- 1989. A court ruling in the NFLPA's antitrust lawsuit suggested that "players had to choose between being a union and using their right to strike under labor laws, or relinquishing their union rights and [pursuing] their antitrust rights as individuals in court." Players ratified a decision for the NFLPA to decertify as a union, which freed the players to pursue their antitrust rights.[86] Team owners refused to allow continued accruals of benefit credits. Instead, owners created their own plan, called the "Pete Rozelle NFL Player Retirement Plan." The Rozelle plan was similar to the Bell plan, "except that it [Rozelle plan] was run totally by the owners and had

---

[81] National Football League, "History, 1981-1990," n.d., available at [http://www.nfl.com/history/chronology/1981-1990]; Peter King, "The Surreal Strike of 1987," *Sports Illustrated*, Oct. 15, 2007, p. 22; NFL Players Association, "About Us: NFLPA History"; Stephen Fox, *Big Leagues, Professional Baseball, Football, and Basketball in National Memory* (Lincoln, NE: University of Nebraska Press, 1994), p. 426; Letter from Upshaw to Reps. Conyers, Smith, Sanchez, and Cannon, p. 4.

[82] NFL Players Association, "About Us: NFLPA History."

[83] Ibid.; *The Business of Football 2001*, p. 395.

[84] National Football League, "History, 1981-1990."

[85] NFL Players Association, "History of Retirement and T&P Benefits for NFL Players," p. 4.

[86] NFL Players Association, "About Us: NFLPA History."

Case 1:25-cv-22723-DPG Document 20-2 Filed 10/06/2025 Page 256 of 1235 Case 1:25-cv-22723-DPG Document 62 Filed 10/06/2025 Page 256 of 1235

CRS-22

no player trustees."[87]  By comparison,  the union had the right to appoint three of the Bert Bell Plan's six voting trustees.  The owners refused "to make further contributions [to the Bell Plan], and the trustees appointed by the union ... sued the trustees appointed by the owners."[88]

- 1990.  The NFLPA was re-formed as a professional association.  Its goal was to "pursue litigation on behalf of individual players...."[89] The change in status of the NFLPA "caused a rapid domino effect in court cases."  For example, the NLRB awarded back pay to 1,400 players prevented from playing for one week after they ended their strike in 1987; a case filed in 1990 "resulted in a jury awarding damages to players; and the 1989 *Brown v. NFL* case awarded $30 million to practice squad players...."[90]

- 1992.  "The NFL agreed to provide a minimum of $2.5 million in financial support to the NFL Alumni Association and assistance to NFL  Alumni-related  programs.  The  agreement  included contributions from NFL Charities to the Pre-59ers and Dire Need Programs for former players."[91]

- 1993.  The NFL and the players association signed a seven-year CBA, "which guarantee[d] more than $1 billion in pension, health, and post-career  benefits  for  current  and  retired  players...."[92] Specifically, the agreement provided for free agency; gave players a  guaranteed  percentage  of  the  gross  revenues;  retroactively increased pre-59ers' pensions by 30% and all other players' pensions by 40%; added pre-59ers to the Bert Bell Pension Plan (which added 906 players to the plan); decreased the vesting requirement to three credited seasons; and established the Retiree Medical benefit, Second Career Savings Plan, and Total and Permanent (T&P) Disability benefits.[93]  Additionally, "WWII years were included for

---

[87] NFL Players Association, "History of Retirement and T&P Benefits for NFL Players," p. 4.

[88] Ibid.

[89] NFL Players Association, "About Us: NFLPA History."

[90] *The Business of Football 2001*, p. 396.

[91] National Football League, "History, 1991-2000," available at [http://www.nfl.com/ history/chronology/1991-2000].

[92] Ibid.

[93] NFL Players Association, "About Us: NFLPA History"; NFL Players Association, "Recent Pensions & Disability Improvements Timeline," n.d., available at [http://www.nflpa.org/pdfs/NewsAndEvents/Timeline_of_NFLPA_Pension_and_ Disability_Improvements.pdf], downloaded Sept. 2007, on file with the author; NFL Players Association, "History of Retirement and T&P Benefits for NFL Players," p. 5; and Letter
(continued...)

pension eligibility, increasing [the number of] credited seasons for 159 players," and "Korean War and Vietnam years were included for pension credits, adding 182 players."[94] A single plan counsel (Groom Law Group) and a single plan actuary (Aon Corporation) were selected. The CBA "based future contributions strictly on negotiated actuarial factors."[95] The Pete Rozelle Plan and its assets merged with the Bert Bell Plan, and the NFLPA becomes a certified union again.[96]

- 1998. The 1993 CBA was extended through at least 2003. The extension established an annuity plan; provided for salary guarantees for certain players; increased minimum salaries, increased the lowest benefit credit from $80 to $100; increased the T&P disability benefit; and changed the pension eligibility requirement from five to four credited seasons.[97]

- 2002. The CBA was extended again. The extension allowed injured reserve seasons prior to 1970 to be counted toward pension eligibility and raised the lowest benefit credits from $100 to $200.[98]

- 2006. The CB0A was extended and became effective until the last day of the 2012 league year. The extension raised the lowest benefit credit from $200 to $250 (for individuals who played during the period 1920-1982); tripled widows' and surviving children's benefits; created the Plan 88 program; and increased the monthly pension amount by 10% for individuals who played from 1983-2006.[99]

- 2007. The following benefits and programs were announced or established: Health Reimbursement Account Plan, Cardiovascular

---

[93] (...continued)
from Upshaw to Reps. Conyers, Smith, Sanchez, and Cannon, pp. 4-5.

[94] NFL Players Association, "Recent Pensions & Disability Improvements Timeline."

[95] NFL Players Association, "History of Retirement and T&P Benefits for NFL Players," p. 5.

[96] NFL Players Association, "History of Retirement and T&P Benefits for NFL Players," p. 5.

[97] NFL Players Association, "About Us: NFLPA History"; NFL Players Association, "History of Retirement and T&P Benefits for NFL Players," p. 6; Letter from Upshaw to Reps. Conyers, Smith, Sanchez, and Cannon, p. 5; and NFL Players Association, "Recent Pensions & Disability Improvements Timeline."

[98] Ibid.; NFL Players Association, "History of Retirement and T&P Benefits for NFL Players," p. 6.

[99] NFL Players Association, "Recent Pensions & Disability Improvements Timeline"; NFL Players Association, "History of Retirement and T&P Benefits for NFL Players," p. 6.

Health Program, NFL Player Joint Replacement Benefit Plan, and assisted living arrangements.[100]

- 2008. The following changes and programs were announced or established: expanded health screening that focuses on cardiovascular health, obesity, and prostate cancer; discounted rates and special services at three national assisted living providers; and a prescription drug card that will allow former players to purchase prescription medications at a discount.[101] Additionally, the NFL and NFLPA announced changes that have been, or will be, made to T&P and LOD disability benefits. These changes are noted in **Table 4.**

## How Benefits Are Funded

Funds for benefits that are included in the CBA come from the portion of the league's total revenues that is allocated to the players. A summary of the definition of "total revenues" (TR) is as follows:

> [T]he aggregate revenues received or to be received on an accrual basis ... by the NFL and all NFL Teams ... from all sources, whether known or unknown, derived from, relating to or arising out of the performance of players in NFL football games, with only the specific exceptions set forth below [in Article XXIV, Section 1(a)(ii) of the CBA].... Total Revenues shall include, without limitation: ... gate receipts ... the sale, license or other conveyance of the right to broadcast or exhibit NFL preseason, regular season and playoff games on radio and television ... revenues derived from concessions, parking, local advertising, signage, magazine advertising, local sponsorship agreements, stadium clubs, luxury box income ... Internet operations... and sales of programs and novelties...."[102]

Under the current CBA, the portion of total revenues that goes to players (that is, the "player costs percentage"[103]) each year is as follows:

---

[100] Letter from Upshaw to Reps. Conyers, Smith, Sanchez, and Cannon, p. 5; National Football League, "NFL & NFL Players Association Create New Joint Replacement Benefit Plan," news release, Dec. 10, 2007; and "14 Leading Medical Institutions Selected to Assist Retired Players Needing Joint Replacement Surgery," news release, Dec. 10, 2007. Few details are available about some of these initiatives, which means that eligibility criteria, the application process (if any), and the extent of benefits are unknown.

[101] National Football League and NFL Players Association, "NFL and NFL Players Association Expand Disability Benefits Program for Retired Players," Feb. 29, 2008, available at [http://www.nflplayers.com/user/content.aspx?fmid=178&lmid=443&pid=422&type=n], p. 3. Detailed information about these initiatives is provided later in this report.

[102] National Football League and NFL Players Association, *NFL Collective Bargaining Agreement, 2006-2012*, pp. 82-83.

[103] Player costs include "the total Salaries and Benefits attributable to a League Year for all NFL Teams under all of the rules set forth in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary), but not including loans, loan guarantees,

(continued...)

- 2006: 57%
- 2007: 57%
- 2008: 57.5%
- 2009: 57.5%
- 2010: 58%
- 2011: 58%[104]

The amount of money equivalent to the player costs percentage in a given year is allocated between active players' salaries and benefits for both active players and retired players. The following description of how a team's salary cap is determined shows the relationship between salaries and benefits: in 2008, the amount of a team's salary cap will be "57.5% of Projected Total Revenues, less League-wide projected benefits, divided by the number of Teams playing in the NFL during such year...."[105] The following definition of "benefits" lists the different benefits for active players and former players that are funded in the manner described above:

> Benefits "mean the aggregate for a League Year of all sums paid ... by the NFL and all NFL Teams for, to, or on behalf of present or former NFL players, but only for: (i) pensions funding, including the Bert Bell/Pete Rozelle NFL Player Retirement Plan ... and the Second Career Savings Plan ...; (ii) Group insurance programs, including life, medical, and dental coverage ... and the Second Career Savings Plan; (iii) Injury protection ...; (iv) Workers' compensation, payroll, unemployment compensation, social security taxes, and contributions to the fund described in Article LIV, Section 4 below [Worker's Compensation Offset Provisions]; (v) Pre-season per diem amounts ... and regular season meal allowances ...; (vi) Expenses for travel, board and lodging for a player participating in an off-season workout program ...; (vii) Payments or reimbursements made to players participating in a Club's Rookie Orientation Program ...; (viii) Moving and travel expenses ...; (ix) Postseason pay ...; and salary paid to practice squad players ...; (x) Player medical costs ...; (xi) Severance pay ...; (xii) The Player Annuity Program ...; (xiii) The Minimum Salary Benefit ...; (xiv) The Performance Based Pool ...; (xv) The Tuition Assistance Plan ...; (xvi) The NFL Players Health Reimbursement Account ...; (xvii) The "88 Benefit" ...; (xviii) The NFL Player Benefits Committee...."[106]

The portion of the "League-wide projected benefits" needed "to fund the Retirement Plan is calculated actuarially, in accordance with federal law."[107] The

---

[103] (...continued)
unpaid grievances attributions, and unearned incentives." (National Football League and NFL Players Association, *NFL Collective Bargaining Agreement, 2006-2012*, p. 7.)

[104] NFL Players Association, "NFLPA Term Sheet - Basic Economic Terms," Mar. 7, 2006, available at [http://www.nflpa.org/pdfs/CBA/2006_CBA_Extension_Term_Sheet.pdf], downloaded Sept. 2007, on file with the author.

[105] National Football League and NFL Players Association, *NFL Collective Bargaining Agreement, 2006-2012*, p. 96.

[106] Ibid., pp. 93-94.

[107] Letter from Upshaw to Reps. Conyers, Smith, Sanchez, and Cannon, p. 29.

CRS-26

same is also true for the Health Reimbursement Account Plan.[108]  (The retirement plan and the Health Reimbursement Account Plan are described below.)  According to the NFL and the NFLPA, the actuarial assumptions, or factors, that are used are negotiated during the collective bargaining process and are "acceptable to the plan's Enrolled Actuary."[109]  The following excerpt from the CBA describes the process:

> For the 1993 Plan Year and continuing for each Plan Year[110] thereafter that begins prior to the expiration of the Final League Year,[111] a contribution will be made to the Retirement Plan on behalf of each NFL Club as actuarially determined to be necessary to fund the benefits provided in this Article [of the CBA], based on the actuarial assumptions and methods contained in Appendix J [of the CBA].  No provision of this Agreement will eliminate or reduce the obligation to provide the benefits described in this Article, or eliminate or reduce the obligations of the NFL Clubs to fund retirement benefits.  Contributions will be used exclusively to provide retirement benefits and to pay expenses.[112]

Similar language is found in the Bert Bell/Pete Rozelle NFL Player Retirement Plan:

> For each Plan Year that begins prior to the expiration of the Final League Year, a contribution to the Trust [the trust agreement for the Retirement Plan] will be made by the Employers, as actuarially determined to be necessary to fund the benefits provided in this Plan based on the actuarial assumptions and methods contained in Appendix A [of the Retirement Plan].[113]

Funding for benefits other than the retirement plan and the Health Reimbursement Account apparently is not calculated using actuarial methods and assumptions.  The NFLPA has stated that "[t]he contribution necessary to fund other benefit plans is more simply calculated as the total of the benefits provided plus all costs of administration.  For the new 88 Plan, the consultants estimated an initial

---

[108] Ibid.

[109]  Letter from Goodell to Reps. Conyers and Smith, p. 10; NFL Players Association, "History of Retirement and T&P Benefits for NFL Players," p. 5.  In 1993, a single plan counsel, Groom Law Group, and a single plan actuary, Aon Corporation, were selected for the retirement plan. (NFL Players Association, "History of Retirement and T&P Benefits for NFL Players," p. 5.)

[110] "'Plan Year' means a 12-month period from April 1 to March 31.  A Plan Year is identified by the calendar year in which it begins." (*Bert Bell/Pete Rozelle NFL Player Retirement Plan*, Apr. 1, 2001, p. 6.)

[111] Final League Year is "the League Year which is scheduled prior to its commencement to be the final League Year of the Collective Bargaining Agreement." A "League Year" is "the period from February 20 of one year through and including February 19 of the following year, or such other one year period to which the NFLPA and the [NFL's] Management Council may agree." (*Bert Bell/Pete Rozelle NFL Player Retirement Plan*, pp. 4 and 6.)

[112] National Football League and NFL Players Association, *NFL Collective Bargaining Agreement: 2006-2012*, p. 203.

[113]  *Bert Bell/Pete Rozelle NFL Player Retirement Plan*, p. 10.

contribution of $1.88 million, all to benefit retired players."[114]  The method or methods used to determine how much money to allocate to this and other benefits is unknown.

Data provided by the NFL and the NFLPA show that possibly $919.6 million was spent on benefits for retired players in 2006 and 2007.  However, the ways in which the data are presented by the two organizations leave room for interpretation. The NFLPA states that "active players gave up approximately" the following amounts (which total $181.6 million) during the period April 2006 through March 2007 for benefits for former players:[115]

- $96.5 million for retirement benefits for retired players;
- $31 million for medical benefits for retired players ($18 million for health reimbursement accounts, $2 million for the 88 Plan, and $11 million for "five years post-retirement fully paid health care");
- $20 million for disability benefits for retired players; and
- $34.1 million to fund workers' compensation coverage.[116]

In fall 2007, the NFLPA also noted that 38% of vested former players were receiving monthly benefits at that time.[117]

According to the NFL, "... clubs contributed approximately $388 million" in 2006 to fund the Supplemental Disability Plan, Second Career Savings Plan, Annuity Program, Group Insurance Plan, Health Reimbursement Account Plan, 88 Plan, Severance Plan, and Tuition Reimbursement (which is not included in this report).[118] The NFL estimated that the costs of these benefits in 2007 would be $350 million.

Although the NFLPA regularly describes the amount of funds provided for retirees' benefits in terms of how the "[b]enefit costs reduce the revenue available for active players under the" CBA, it appears that this description refers to the process described above for the allocation of funds for benefits.[119]  Regarding the NFL's statement that the teams contribute funds for benefits, it seems plausible that this statement, too, refers to the allocation process described above.

The differences in the information provided by the NFL and NFLPA make it difficult to determine exactly how much money was spent for each benefit in 2006

---

[114] Letter from Upshaw to Reps. Conyers, Smith, Sanchez, and Cannon, p. 29.

[115] The NFLPA describes the amount of funds provided for retirees' benefits in terms of how the "[b]enefit costs reduce the revenue available for active players under the" CBA. (NFL Players Association, "NFLPA White Paper" n.d., available at [http://www.nflpa.org/ whitepaper/], downloaded Sept. 2007, on file with the author, p. 4.)  This description appears to refer to the allocation process described above in this report.

[116] Letter from Upshaw to Reps. Conyers, Smith, Sanchez, and Cannon, pp. 29-30.

[117] Ibid., p. 9.

[118] The NFL will have contributed a total of $2.2 billion for these benefits during the period 1998-2007. (Letter from Goodell to Reps. Conyers and Smith, p. 12.)

[119] NFL Players Association, "NFLPA White Paper," p. 4.

or 2007. The NFLPA provided information that covers both years, while the NFL provided an amount for each year. Additionally, the NFLPA provided a breakdown by type of benefit (that is, retirement benefits, medical benefits, and disability funds) and amount, while the NFL provided an aggregate amount for eight different benefits, each of which is listed by the name of the benefit.

## Benefits for Former Players

**Table 4** provides a summary of the benefits available to former players; eligibility requirements vary by benefit. This overview includes selected features for each type of benefit. For detailed information about a particular benefit, it is best to consult the appropriate document, such as the CBA. Workers' compensation is included because, although states administer workers' compensation programs, the NFLPA and the NFL provide funding for workers' compensation for their players.

The following is a list of the benefits included in **Table 4**. Shortened names are used in the table because this format makes it easier to identify the description or purpose of the benefit. Each benefit is identified by its complete name, as well as a shortened version. For example, the NFL Players Health Reimbursement Account appears as "Health Reimbursement Account" in the table. An asterisk identifies a benefit that is included in the CBA.

- 88 Benefit (or Plan)*

- Cardiovascular Health (CVH) Program

- Bert Bell/Pete Rozelle NFL Player Retirement Plan — Death Benefits ("death benefits")*

- Bert Bell/Pete Rozelle NFL Player Retirement Plan — Line-of-Duty Disability ("line-of-duty disability" or "LOD disability")*

- Bert Bell/Pete Rozelle NFL Player Retirement Plan — Retirement Benefits ("retirement benefits" or "pension")*

- Bert Bell/Pete Rozelle NFL Player Retirement Plan — Total and Permanent Disability Benefits ("total and permanent disability benefits" or "T&P benefits")*
- NFL Player Annuity Program ("annuity program")*

- NFL Player Joint Replacement Benefit Plan ("joint replacement benefit plan")

- NFL Player Second Career Savings Plan ("second career savings plan")*

- NFL Player Supplemental Disability Plan ("supplemental disability plan" or "supplemental disability benefits")*

CRS-29

- NFL Players Health Reimbursement Account ("health reimbursement account")*

- Retiree Medical* (This benefit is part of Group Insurance, which is how the benefit is listed in the CBA.  The remainder of the Group Insurance benefit is available to only active players.)

- Severance Pay*

- Workers' Compensation

CRS-30

## Table 4.  Selected NFL-NFLPA Benefits as of October 2007

| Name of Benefit or Program and Year Established | Players from These Years May Participate | Summary of Eligibility Criteria[a] | Selected Features[b,c] |
|---|---|---|---|
| 88 Plan[d,e]<br>February 1, 2007 | All years | Vested player who is suffering from dementia. | — Plan will reimburse, or pay for, certain costs related to dementia.<br>— A maximum of $88,000 may be paid annually for expenses for care provided by a third party (for example, institutional custodial care or home custodial care provided by an unrelated third party).  The maximum amount of this benefit is $50,000 annually for care that is not provided by a third party (for example, a relative provides care at home). |
| Annuity Program[d]<br>April 1, 1998 | 1998-present | Minimum of four credited seasons. | — This is a deferred compensation program.<br>— An allocation of $65,000 will be made for each eligible player who earns a credited season in an annuity year and who has a total of four or more credited seasons as of the end of such annuity year. |
| Cardiovascular Health (CVH) Program<br>July 25, 2007 | All years | Apparently, this program is open to all players. | — Provides cardiovascular screening and education. |
| Death Benefits[d]<br>September 19, 1962 | All years | Vested inactive or active player. | — Provides financial assistance to widow and/or surviving minor children of a former or active player.<br>— Monthly benefit equal to $3,600 or 50% of the player's benefits, whichever is greater.  For first 48 months after player's death, the amount of the benefit cannot be less than $6,000/month for a player who was an active player after 1976 plan year, or $9,000/month for a |

CRS-31

| Name of Benefit or Program and Year Established | Players from These Years May Participate | Summary of Eligibility Criteria[a] | Selected Features[b,c] |
|---|---|---|---|
| | | | player who was an active player after the 1981 plan year.<br>— For a widow, benefit ends with her death or remarriage.  For children, benefit ends upon reaching the age of 19 (or 23, if in college).  Termination based on age does not apply if child is mentally or physically incapacitated. |
| Health Reimbursement Account (HRA)[d]<br>March 1, 2007 | 2004-present | At least eight credited seasons for a player whose last credited season was 2004 or 2005.  At least three credited seasons for a player who earned a credited season in 2006 or any later year. | — An annual contribution is made to a player's account in the amount of $25,000 or $50,000, depending upon the terms of the CBA.  Total contributions shall not exceed $300,000.<br>— Player may receive reimbursement for medical care expenses only during periods of time when he is not covered by the Group Insurance in the CBA or the Extended Post-Career Medical and Dental Insurance in the CBA. |
| Joint Replacement Benefit Plan<br>2007[f] | All years | Unknown. | — Assists retired players who need joint replacement surgery.<br>— Plan provides financial assistance to all eligible former players to cover the cost of surgery.<br>— Additional financial assistance is available from the NFL Player Care Foundation. |
| Line of duty (LOD) disability benefit[d]<br>April 1, 1970 | All years | Any player who incurs a substantial disablement (but is not totally and permanently disabled) arising out of NFL football activities, as | — Amount of monthly benefit will equal the sum of the player's benefit credits (see Retirement Benefits) or $1,000, whichever is greater.<br>— Payments continue for duration of substantial disablement, but no longer than 7 ½ years. |

CRS-32

| Name of Benefit or Program and Year Established | Players from These Years May Participate | Summary of Eligibility Criteria[a] | Selected Features[b,c] |
|---|---|---|---|
| | | determined by the Retirement Board or the Disability Initial Claims Committee (DICC), that is a significant factor in causing his retirement from football.  Player does not have to be vested. | — If both an LOD benefit and a T&P benefit are payable, only the larger of the two benefits will be paid.<br>— Application for LOD benefit must be submitted within 48 months after player ceases to be an active player.[g] |
| Retiree Medical[d,h]<br>May 6, 1993 | 1993-present | Vested. | — Active players receive group insurance benefits: life insurance, and medical and dental benefits.  The same medical and dental benefits are provided to former players for a set amount of time, as described below.<br>— Players released or who otherwise severed employment after the first regular season game in the 2002 season, but before the first regular season game in 2005 season, continue to receive medical and dental benefits for 48 months.<br>— Players released after the first regular season game in the 2005 season and prior to the expiration or termination of the 2006-2012 CBA will receive medical and dental benefits for the following 60-month period. |
| Retirement Benefits[d,i]<br>September 19, 1962 | All years | Vested player. | — A player earns a benefit credit for each credited season, and a vested player's monthly pension is the sum of his benefit credits for each of his credited seasons.  Under the 2006-2012 CBA, the benefit credits are as follow:[j] |

CRS-33

| Name of Benefit or Program and Year Established | Players from These Years May Participate | Summary of Eligibility Criteria[a] | Selected Features[b,c] |
|---|---|---|---|
| | | | **Credited Season ----------- Benefit Credit**<br><br>Before 1982 ---------------- $250<br>1982-1992 ------------------ $255<br>1993-1994 ------------------ $265<br>1995-1996 ------------------ $315<br>1997 ------------------------- $365<br>1998-present[k] -------------- $470<br><br>— Any vested inactive player may choose to receive his benefits at the normal retirement age, which is 55 under the retirement plan, or later (that is, deferred retirement).  A vested inactive player with at least one credited season prior to 1993 plan year may elect for early retirement (which begins at age 45).  Benefits will be adjusted accordingly for a player who chooses deferred retirement or early retirement.  Benefits will be increased for deferred retirement, and decreased for early retirement.<br> — A vested player who leaves the NFL on or after March 1, 1977, has at least one credited season prior to the 1993 plan year, and is no longer an employee may elect to receive an early payment benefit in the form of a lump sum, a life-only pension, or a qualified joint and survivor annuity.  If a player receives an early payment benefit, his monthly pension will be based upon 75% of the sum of his benefit credits.<br> — A player who chooses an early payment benefit after March 31, |

CRS-34

| Name of Benefit or Program and Year Established | Players from These Years May Participate | Summary of Eligibility Criteria[a] | Selected Features[b,c] |
|---|---|---|---|
| | | | 1982, will have any subsequent payments for certain benefits (for example, total and permanent disability benefits, line-of-duty disability benefits) reduced by 25%. |
| Second Career Savings Plan[d]<br>July 1, 1993 | 1993-present | A first-year player may contribute to the plan. A player must have at least two credited seasons, at least one of which is for Plan Year 2006 or later, in order to receive a club contribution. | — Matching contributions shall be two dollars for each dollar provided by a player.  The maximum matching contributions, which vary by plan year under the CBA, are as follow: $20,000 for each year, 2006-2008; $22,000 for 2009; $24,000 for 2010, and $26,000 for 2011.<br>— Beginning at age 45, a player may withdraw money from his account. |
| Severance Pay[d]<br>November 16, 1982 | 1982-present | Minimum of two credited seasons.  At least one of the seasons must have occurred during the period 1993-2011. Player's written request for severance pay must indicate that he intends to permanently sever employment as an active player. | — A player's severance pay will equal the sum of the following: $5,000 per credited season for each season during the period 1989-1992; $10,000 per credited season for each season during the period 1993-1999;  $12,500 per credited season for each season during the period 2000-2008; and $15,000 per credited season for each season during the period 2009-2011.<br>— Severance pay is paid in a single lump sum.  Payment date varies depending upon when the individual was last involved in a league playing activity and when he submits an application. |
| Supplemental Disability Plan[d,l]<br>July 1, 1993 | 1993-present | Former players who receive T&P disability benefits in the "active football," "active | — Supplemental disability plan benefits are automatically paid to each eligible player.<br>— Effective April 1, 2000, the monthly and annual supplemental |

CRS-35

| Name of Benefit or Program and Year Established | Players from These Years May Participate | Summary of Eligibility Criteria[a] | Selected Features[b,c] |
|---|---|---|---|
| | | nonfootball," and "football degenerative" categories. | disability plan benefit for each category is as follows: "active football," $14,670 monthly and $176,040 annually; "active nonfootball," $7,167 monthly and $86,004 annually; and "football degenerative," $5,167 monthly and $62,004 annually.[m] <br> — Players who receive T&P "inactive" category benefits do not receive any benefits under this plan.[m] |
| Total and Permanent Disability Benefit[d,h,n] April 1, 1970 | All years, except for an inactive player who does not have a credited season after 1958. | Active player (he does not have to be vested) or vested inactive player who is totally and permanently disabled, as determined by the Retirement Board or the DICC. | — The amount of a player's benefit will be equal to the sum of his benefit credits, excluding benefit credits for credited seasons prior to 1958.  The benefit amount may be increased as follows for each benefit category: <br> (a) Active football: monthly benefit will be not be less than $4,000 if the disability or disabilities arise out of NFL football activities, arise while the player is an active player, and cause the player to be totally and permanently disabled "shortly after" the disability or disabilities first arise.[o] <br> (b) Active nonfootball: monthly benefit will not be less than $4,000 if the disability or disabilities do not result from NFL football activities, but do arise while the player is an active player, and cause the player to be totally and permanently disabled "shortly after" the disabilities first arise.[o] <br> (c) Football degenerative: monthly benefit will not be less than $4,000 if the disability or disabilities arise out of NFL football activities and result in T&P disability before 15 years after the end of the player's last credited season. |

Case: 25-2271   Document: 20-2   Page: 269   Date Filed: 10/08/2025

CRS-36

| Name of Benefit or Program and Year Established | Players from These Years May Participate | Summary of Eligibility Criteria[a] | Selected Features[b,c] |
|---|---|---|---|
| | | | (d) Inactive: The monthly benefit will not be less than $1,500 ($1,750 for applications received on or after April 1, 2007)[p] if the T&P disability or disabilities arise from other than NFL football activities while the player is a vested inactive player, or the disability or disabilities arise out of NFL football activities and result in total and permanent disability 15 or more years after the end of the player's last credited season, whichever is later. |
| | | | (e) Dependent child: monthly benefit will increase $100 per each child who is a dependent.[q] |
| | | | — Effective for payments made on and after November 1, 1998, a player may receive a T&P payment for a disability resulting from a psychological/psychiatric disorder.  This provision applies only to the "active nonfootball" and "inactive" categories, and special rules that pertain to disabilities resulting from other than a football injury. |
| | | | — A T&P disability that is a result of a psychological/psychiatric disorder may be awarded under the provisions for "active football" and "football degenerative"disabilities (and under special rules that pertain to disabilities resulting from a football injury incurred while an active player) if the requirements for such a disability are met and the disorder "(1) is caused by or relates to a head injury (or injuries) sustained by a Player arising out of League football activities (e.g., repetitive concussions); (2) is caused by or relates to the use of a substance prescribed by a licensed physician for an injury (or injuries) or illness sustained by a Player arising out of League football activities; or (3) is |

CRS-37

| Name of Benefit or Program and Year Established | Players from These Years May Participate | Summary of Eligibility Criteria[a] | Selected Features[b,c] |
|---|---|---|---|
| | | | caused by an injury (or injuries) or illness that qualified the Player for total and permanent disability benefits under Section 5.1(a) [active football]."[f] <br> — T&P benefit is payable for life or until cessation of total and permanent disability. |
| Workers' Compensation[s] | All years | Apparently, all players are eligible.  However, workers' compensation is regulated and administered by state governments, which also means that eligibility requirements and other details vary from state to state. | — NFLPA has made arrangements for all players to be covered by workers' compensation, which is available to employees who have been injured or disabled on the job. <br> — Workers' compensation may include disability pay or wage loss benefits, a lump sum benefit to compensate for permanent loss of function, and/or payment or reimbursement for medical expenses. |

**Sources:** National Football League and NFL Players Association, *NFL Collective Bargaining Agreement: 2006-2012*, Mar. 8, 2006; NFL Players Association, "Line of Duty Disability," Mar. 12, 2008, available at [http://www.nflplayers.com/user/content.aspx?fmid=178&lmid=443&pid=367&type=n]; NFL Players Association, "NFLPA and NFL Announced New Retirement Benefit Initiatives," news release, July 25, 2007; *Bert Bell/Pete Rozelle NFL Player Retirement Plan*, Apr. 1, 2001; *NFL Player Supplemental Disability Plan*, Apr. 1, 2001; Letter from Eugene Upshaw, Executive Director, NFL Players Association, to Reps. John Conyers, Jr., Lamar S. Smith, Linda T. Sanchez, and Christopher B. Cannon, Nov. 5, 2007, p. 1; NFL Players Association, "CBA: Workers' Compensation Benefits," available at [http://www.nflpa.org/CBA/Workers_Comp.aspx] as of Nov. 15, 2007, on file with the author; National Football League, "NFL & NFL Players Association Create New Joint Replacement Benefit Plan"; and National Football League "14 Leading Medical Institutions Selected to Assist Retired Players Needing Joint Replacement Surgery," news release, Dec. 10, 2007; and Gregory P. Guyton, "A Brief History of Workers' Compensation," *Iowa Orthopaedic Journal*, 1999, available at [http://www.pubmedcentral.nih.gov/articlerender.fcgi?artid=1888620].

CRS-38

**Note:** See the glossary in **Appendix A** for the definition of terms, such as "credited season," "plan year," and "vested player."

a. Since this is only a summary, additional criteria or conditions may apply.

b. The actual amount that a particular individual receives is determined by a number of factors, including, for example, the years in which he played and whether the amount of a particular benefit is altered by a succeeding CBA.  Also, the receipt of a certain benefit may affect the amount of another benefit an individual receives.  For example, receipt of an 88 Plan benefit may result in a decrease in Total and Permanent disability benefits as follows: "The maximum benefit payable for any month shall be reduced, but not below zero, by the amount of any total and permanent disability benefits paid by the Bert Bell/Pete Rozelle NFL Player Retirement Plan and the NFL Player Supplemental Disability Plan.  However, the maximum benefit payable for any month shall not be reduced by those total and permanent disability benefits paid to players who are receiving the Inactive total and permanent disability benefit described in Section 5.1(d) of the Bert Bell/Pete Rozelle NFL Player Retirement Plan." (National Football League and NFL Players Association, *NFL Collective Bargaining Agreement: 2006-2012*, Mar. 8, 2006, pp. 215-216.)

c. The amount, eligibility criteria, and other details of a particular Retirement Plan benefit may change over the years as new CBAs are negotiated and the Retirement Plan is changed accordingly.  The details of other (non-retirement plan) benefits may be changed, too, by the NFL and the NFL Players Association.

d. This benefit plan or program is  included in the CBA.

e. The 88 Plan was so named to honor John Mackey, a former Baltimore Colts tight end and member of the Hall of Fame who wore number 88.  (NFL Players Association, "NFLPA White Paper," n.d.,  available at [http://www.nflpa.org/whitepaper/], p.23.), downloaded Sept. 2007, on file with the author.

f. The NFL announced in Dec. 2007 the establishment of the Joint Replacement Benefit Plan, but it appears that implementation will occur at some later date.

g. As announced on Feb. 29, 2008, the NFL and the NFLPA modified the deadline for applying for LOD benefits.  A player will have 48 months or the number of credited seasons he has earned within which to apply.  For example, a player who has six credited seasons will have six years, instead of four years, within which he must apply.  The deadline will equal the number of credited seasons a player has, which means, for example, that a player with six credited seasons will have six years

h. Retiree Medical is part of the Group Insurance benefit in the CBA, where it is identified as "Extended Post-Career Medical and Dental Benefits."  It is unclear whether Retiree Medical covers injuries sustained as a player.  The remainder of the Group Insurance benefit is available to only active players. (National Football League and NFL Players Association, *NFL Collective Bargaining Agreement, 2006-2012*, pp. 218-219.)

i. A former player who is receiving T&P disability benefits when he reaches the normal retirement age of 55 will have his disability benefits converted to a retirement benefit (pension).  The amount of the benefit will not change.  (*Bert Bell/Pete Rozelle NFL Player Retirement Plan, Summary Plan Description*, Apr. 2005, p. 18.)

j. For example, "[a]n Active Player for three or more games of the 1996 through 1999 seasons [would receive] Benefits Credits [in the amount of] $1,465 ($285 + $330 + $425 +$425 = $1,465).  The player will, therefore, receive $1,465 per month when he begins to receive his pension benefit at age 55."  (NFL Players Association, "Rules and Regulations: Player Benefits," n.d., available at [http://www.nflpa.org/RulesAndRegs/PlayerBenefits.aspx] as of Aug. 21, 2007, on file with the author.)

k. Specifically, the benefit credit of $425 is for each credited season from 1998 "through the Plan Year that begins prior to the expiration of the Final League Year." (*Bert Bell/Pete Rozelle NFL Player Retirement Plan*, p. 11.)

l. Per the NFLPA, the Supplemental Disability Plan was created because, pursuant to federal statute(s), there is a cap on the amount of disability benefits a plan may pay, such as the retirement plan for former players.  (Letter from Upshaw to Reps. Conyers, Smith, Sanchez, and Cannon, p. 19.)

m.  See "Total and Permanent Disability Benefit" in the table for information about the four categories of T&P benefits.

CRS-39

n.  In Feb. 2008, the NFL and the NFLPA announced the following changes to the T&P disability benefit: "Players who took their NFL pension early, and are therefore ineligible to apply for and receive disability benefits, will be offered a new one-time opportunity to apply for total and permanent disability benefits. These players may establish their disability through either a medical examination or by a total and permanent disability determination from Social Security. The opportunity to apply for benefits will begin on April 1, 2008. Applications will be accepted through July 31, 2008. Players who have received a total and permanent disability determination from Social Security will not need to separately establish disability under the NFL plan. Players who were denied benefits under the NFL plan but have subsequently been found [to be] disabled by [the] Social Security [Administration] may have their NFL cases reconsidered. The other good news for retired NFL players is that NFL disability awards are not offset by the amount of any award paid by Social Security." (National Football League and NFL Players Association, "NFL and NFL Players Association Expand Disability Benefits Program for Retired Players," Feb. 29, 2008, available at [http://www.nflplayers.com/user/content.aspx?fmid=178&lmid=443&pid=422& type=n], p. 1.)

o.  "A Player who becomes totally and permanently disabled no later than six months after a disability(ies) first arises will be conclusively deemed to have become totally and permanently disabled 'shortly after' the disability(ies) first arises, as that phrase is used in subsections (a) and (b) above [descriptions of benefits for players who experience active football and active nonfootball disabilities], and Player who becomes totally and permanently disabled more than 12 months after a disability(ies) first arises will be conclusively deemed not to have become totally and permanently disabled 'shortly after' the disability(ies) first arises as that phrase is used in subsections (a) and (b) above. In cases falling within this six-to twelve-month period, the Retirement Board or the Disability Initial Claims Committee will have the right and duty to determine whether the 'shortly after' standard is satisfied." (*Bert Bell/Pete Rozelle NFL Player Retirement Plan*, p. 20.)

p.  The NFL and the NFLPA announced on Feb. 29, 2008, that "the minimum benefit post-career" for "non-football 'total and permanent' disability" had doubled from "$20,000 to $40,000 per year for retired players who become disabled unrelated to football." (National Football League and NFL Players Association, "NFL and NFL Players Association Expand Disability Benefits Program for Retired Players," p. 1.)

q.  A child is considered to be a dependent only until reaching the age of 19; if he or she is in college, age 23 is the threshold. (*Bert Bell/Pete Rozelle NFL Player Retirement Plan*, p. 4.)

r.  *Bert Bell/Pete Rozelle NFL Player Retirement Plan*, p. 21.

s.  The year that this benefit was established is unknown.

## NFLPA Retired Players Department

The Retired Players Department, established in 1984,

acts to meet players' needs with the right services; continuously communicates and involves players of all ages to create an exclusive fraternity; works collaboratively with other NFLPA departments and Players Inc.[120] to give outstanding value to its members; provides leadership, administration, coordination and implementation to serve the needs of retired players and retired player chapters.[121]

The department's objectives are

- "To establish more local chapters [of retired players]";

- "To increase the future pensions and benefits for all players";

- "To establish a formal line of communication between active and retired players";

- "To build a network of retired players for business contacts and second careers";

- "To help build the image of the game and promote it to the benefit of players; and"

- "To raise funds for the Players Assistance Trust (PAT)."[122]

Accomplishments of the Retired Players Department include

- "[Assisting players] in gaining pension and disability benefit increases";

---

[120] "In September 2000, NFL PLAYERS and the NFL entered into a historic partnership to provide player group licensing rights to NFL sponsors. With this deal, NFL sponsors are given the right to utilize players as part of their sponsorship agreements.... Activities include marketing, licensing, special events, corporate sponsorship, media and content development, publishing, website (NFLPLAYERS.COM) and other promotional programs. PLAYERS INC is a fully integrated marketing company for active and retired NFL players. These activities generate guaranteed royalties to PLAYERS INC and the players, in addition to providing financial support to the NFLPA. The organization is committed to meeting the needs of all NFL players in the National Football League by creating player marketing opportunities, increasing brand awareness and developing valuable business partnerships." (NFL Players Association, "Sponsors/Licensees," available at [http://www.nflplayers.com/user/template.aspx?fmid=182&lmid=243&pid=0&type=l].) (Capitalization is in the original.)

[121] NFL Players Association, "Retired Players Department: FAQs," n.d., available at [http://www.nflpa.org/Faqs/Faqs.aspx?printer_friendly=yes] as of Nov. 2, 2007, on file with the author, p. 1.

[122] Letter from Upshaw to Reps. Conyers, Smith, Sanchez, and Cannon, p. 27.

- "[Administering] the PAT Fund, resulting in over $5 million in payments on behalf of former players in need";

- "[Assisting] in networking between former players and potential employers";

- "Helping former players take advantage of workers compensation benefits under state law; and"

- "Providing the services of medical professionals in various areas including orthopedic and cardiovascular."[123]

Any player who had signed a contract with a team is eligible to join a chapter, and there are 33 chapters of former players across the country.[124] Chapter presidents attend an annual chapter officers meeting and the Retired Players Convention. An election is held at the latter for the Retired Players Steering Committee, which is "the only elected national body representing retired players...."[125]

## Players Assistance Trust (PAT) Fund

The players association created the Professional Athletes Foundation (PAF), a 501(c)(3) organization under the Internal Revenue Code, in 1987.[126] The foundation's mission is to "provide vocational, educational, recreational and athletic opportunities for people of all races, religions and nationalities, male and female, wherever they may live, including but not limited to needy, former, amateur and professional athletes and young people who might not have the fullest opportunity to develop their vocational and educational capabilities."[127]

In 1992, the foundation established the Player Assistance Trust (PAT) to "provide financial assistance to former professional and amateur players and their families...."[128] Specifically, the PAT is to provide

> short-term financial assistance to former players who find themselves in a financial crisis. A primary goal of the fund is to assist players who are faced with financial problems created by catastrophic illness.... The funds cannot be used for long-term financial support. Grants are not available for supplemental

---

[123] Ibid.

[124] Ibid., p. 26.

[125] NFL Players Association, "Retired Players Department: FAQs," p. 1.

[126] This organization is a tax-exempt organization under the Internal Revenue Code. For more information, see U.S. Dept. of the Treasury, Internal Revenue Service, "Exemption Requirements," available at [http://www.irs.gov/charities/charitable/article/0,,id= 96099,00.html].

[127] NFL Players Association, "Retired Players Department: FAQs," pp. 4-5.

[128] Ibid., p. 5.

income to pension benefits.  Grants are not available as loans for business transactions.[129]

The maximum grant amounts available are $10,000 for educational purposes and $20,000 for financial or medical assistance; not every applicant, however, receives the maximum amount.[130]

Donations from the players association, the NFL, and individuals, and a percentage of the fines levied against active players provide funding for the PAT. Since 2000 and through fall 2007,  the amount of money from fines contributed to the PAT was $2,814,692.[131]  The NFL has contributed the following amounts, which total $6,350,000:

- 1997: $350,000
- 1998: $350,000
- 1999: $350,000
- 2000: $700,000
- 2001: $700,000
- 2002: $700,000
- 2003: $700,000
- 2004: $1,000,000
- 2005: $1,250,000
- 2006: $1,250,000[132]

Data about grants awarded during the period 1991-2007 are provided in the following two tables.  **Table 5** shows how many grants were awarded, by type (for example, education, financial, and medical).  **Table 6** shows how many grants were awarded each year.  A total of 860 grants have been awarded since the inception of the PAT, and, according to other information provided by the NFLPA, grants have been awarded to 662 different players and widows of players.[133]

---

[129]  NFL Players Association, "Players Assistance Trust Fund Grant Guidelines," n.d., available at [http://www.nflpa.org/pdfs/Charitywork/PAT_Application_2007.pdf], downloaded Sept. 2007, on file with the author, p. 1.

[130]  Ibid., p. 2.

[131]  Letter from Goodell to Reps. Conyers and Smith, p. 12.

[132] Ibid.

[133]  Letter from Upshaw to Reps. Conyers, Smith, Sanchez, and Cannon, p. 28.

## Table 5. Players Assistance Trust Fund Grants,
## by Grant Type, 1991-2007

| Type of Grant | Number and Percentage of Grants[a] | Amount and Percentage of Money[a] |
|---|---|---|
| Education | 92<br>11% | $398,393.22<br>7% |
| Education/Financial | 11<br>1% | $72,597.66<br>1% |
| Financial | 585<br>68% | $3,861,965.46<br>70% |
| Medical | 119<br>14% | $698,313.49<br>13% |
| Medical/Financial | 52<br>6% | $473,941.67<br>9% |
| Unknown | 1<br><1% | $3,315.00<br><1% |
| Total | 860 | $5,508,526.50 |

**Source:** Data provided by the NFL Players Association; calculations performed by the author.

**Note:** The data for 2007 may be incomplete as the data were provided before the end of 2007.

a. Percentages have been rounded.

Significant percentages of the number of PAT grants (88%) and the amount of money (92%) have been awarded for financial or medical purposes, or for a combination of the two.  Only 12% of the grants, and 8% of the money, were awarded for education and education/financial purposes.  The largest average grant, $6,855.29, was for medical and medical/financial purposes.  The average amount of a financial grant was $6,601.65.  The average amount of an education and education/financial grant was $4,572.73.  Overall, the average amount of a grant was $6,405.26.

## Table 6. Players Assistance Trust Fund Grants,
## by Year, 1991-2007

| Year | Number and Percentage of Grants[a] | Amount and Percentage of Grants[a,b] | Average Amount of Grant[b] |
|---|---|---|---|
| 1991 | 2<br><1% | $4,836<br><1% | $2,418 |
| 1992 | 19<br>2% | $92,120<br>2% | $4,848 |

CRS-44

| Year | Number and Percentage of Grants[a] | Amount and Percentage of Grants[a,b] | Average Amount of Grant[b] |
|------|------|------|------|
| 1993 | 33 4% | $134,937 2% | $4,089 |
| 1994 | 25 3% | $122,609 2% | $4,904 |
| 1995 | 37 4% | $190,019 3% | $5,136 |
| 1996 | 48 6% | $354,419 6% | $7,384 |
| 1997 | 51 6% | $341,975 6% | $6,705 |
| 1998 | 46 5% | $275,267 5% | $5,984 |
| 1999 | 46 5% | $387,044 7% | $8,414 |
| 2000 | 17 2% | $91,668 2% | $5,392 |
| 2001 | 35 4% | $210,493 4% | $6,014 |
| 2002 | 32 4% | $205,505 4% | $6,422 |
| 2003 | 45 5% | $281,239 5% | $6,250 |
| 2004 | 56 7% | $360,824 7% | $6,443 |
| 2005 | 130 15% | $867,392 16% | $6,672 |
| 2006 | 143 17% | $834,881 15% | $5,839 |
| 2007[c] | 95 11% | $753,300 14% | $7,929 |
| Total | 860 | $5,508,528 | $6,405 |

**Source:** Letter from Eugene Upshaw, Executive Director, NFL Players Association, to Reps. John Conyers, Jr., Lamar S. Smith, Linda T. Sanchez, and Christopher B. Cannon, Nov. 5, 2007, exhibit C; calculations performed by the author.

a. Percentages have been rounded.
b. Dollar amounts have been rounded to the nearest dollar.
c. The data for 2007 may be incomplete as the data were provided before the end of 2007.

Despite the possibility that the data for 2007 may be incomplete (for the reason stated above), over 40% of the grants were awarded during the years 2005-2007; 368 grants, 43% of the total, were awarded during this period. Accordingly, the percentage of grants awarded in each of these years is in double digits. For the previous 14 years, the percentage of grants awarded each year ranged from less than 1% to 7%. Consistent with these results, 45% ($2,455,573) of the total amount of the grants was awarded during the period 2005-2007. The reasons for the relatively consistent percentage of grants for each year from 1991 through 2004, and the noticeable increase in 2005 followed by similarly high percentages in 2006 and 2007 are unknown. More former players needed assistance during these three years, but it is unclear whether the rise in the number of grants is related to, for example, the type and amount of benefits the players received from NFL/NFLPA-funded benefits and whether these benefits met their needs; wider dissemination of information about the PAT (if indeed information was disseminated more widely than had been done previously); or changes, if any, that were made to the PAT applications process.

Regarding the average amount of a grant, there has been a general upward trend. Aside from the initial year, when only two grants were awarded and the average grant amount was $2,418, the average amount has increased from $4,848 in 1992 to $7,929 in 2007. However, the highest average amount, $8,414, was in 1999, and the average amount in 2006 was $5,839.

The NFL has noted that individual clubs also fund efforts involving former players; usually, these efforts are directed toward players who were members of a particular club.[134]

## The Alliance

In May 2007, four organizations — the NFL, the NFLPA, the NFL Alumni Association, and the Pro Football Hall of Fame — came together to form the "Alliance," which "is aimed at addressing the medical concerns and needs of retired players, including joint replacements, cardiovascular health programs and assisted living arrangements."[135] In December 2007, the NFL announced the establishment of the NFL Player Care Foundation, which is "governed by representatives of members of the Alliance," and which apparently will administer the $17 million that has been donated to date.[136] In February 2008, the NFL and the NFLPA announced that four former players — Andre Collins, Willie Lanier, Randy Minniear, and Ozzie Newsome — had been appointed to the board of the directors for the NFL Player Care Foundation, and that these board members would select additional members.[137]

---

[134] Letter from Goodell to Reps. Conyers and Smith, p. 12.

[135] Ibid.; National Football League, "NFL Clubs Commit $10 Million in Additional Funding to Retired Players for Medical Assistance."

[136] National Football League, "NFL & NFL Players Association Create New Joint Replacement Benefit Plan."

[137] National Football League and NFL Players Association, "NFL and NFL Players Association Expand Disability Benefits Program for Retired Players," p. 3.

The foundation will coordinate and provide funds to the programs established by the Alliance.[138]

When the league and the players association announced, in July 2007, the formation of this group, they also announced that the Alliance had received $7 million.[139]  NFL team owners approved a donation of an additional $10 million in October 2007.[140]  Fines paid by active players to the NFL for on-field infractions, and contributions from the NFLPA, other members of the Alliance, and "other interested retired player groups" will supplement the $17 million.[141]

As part of this initiative, the NFL and the players association created the NFL Player Joint Replacement Plan in fall 2007.  Fourteen medical centers have been selected to provide these services:

> [The medical centers will] assist eligible retired players in need of joint replacement surgery....  The medical facilities, carefully chosen for their expertise, high-quality service and reputation, will make available specialized, coordinated care to players covered by this new program.  The program provides a common application process to assist them gain access to the institutions.  The plan also will provide financial assistance to all players, regardless of their financial situation, to cover the cost of the operations.  For players not covered by insurance and who cannot pay for the procedure, additional financial assistance will be available from the newly created NFL Player Care Foundation.  Players eligible for assistance from the NFL Player Care Foundation will not be responsible for the cost of either the joint replacement surgery or post-operative rehabilitation.[142]

As reported in *The New York Times*, only retired players who are vested are eligible for this benefit.[143]

The following 14 institutions will provide joint replacement surgery: St. Vincent's Birmingham/Andrews Sports Medicine & Orthopaedic Center (Birmingham, AL), Broward General Medical Center (Ft. Lauderdale, FL), Centinela Freeman Regional Medical Center (Marina del Rey, CA), Cleveland Clinic Foundation (Cleveland, OH), Lenox Hill Hospital (New York, NY), MedStar Health — Georgetown University Hospital and Union Memorial Hospital (Washington,

---

[138] Information provided electronically by the NFL Players Association to the author on Mar. 3, 2008.

[139] NFL Players Association, "NFLPA and NFL Announce New Retirement Benefit Initiatives."

[140] National Football League, "NFL Approves Additional $10 Million for Retired Players," news release, Oct. 24, 2007, available at [http://search.nfl.com/search/?query=recent&sort=date&page=5].

[141] National Football League, "NFL Approves Additional $10 Million for Retired Players."

[142] National Football League, "NFL & NFL Players Association Create New Joint Replacement Benefit Plan," news release, Dec. 10, 2007.

[143] Frank Listky, "Rehab Plan Announced for N.F.L.'s Ex-Players," *New York Times*, Dec. 11, 2007, available at [http://www.nytimes.com/2007/12/11/sports/football/11joints.html].

DC, and Baltimore, MD, respectively), Methodist Hospital, (Houston, TX), Mount Sinai Medical Center (New York, NY), Northwestern Memorial Hospital (Chicago, IL), OASIS MSO, Inc. (San Diego, CA), St. Joseph's Hospital-Atlanta (Atlanta, GA), Texas Orthopedic Hospital (Houston, TX), and University of Pittsburgh Medical Center (Pittsburgh, PA).[144] Houston, New York, the Washington, DC, metropolitan area, and the state of California have two facilities each that are on the list. The remaining six institutions are in Alabama, Florida, Georgia, Ohio, Illinois, and Pennsylvania. Without information about the location of former players, it is unknown how many retired players reside in or near these 10 cities or metropolitan areas.

Post-surgery rehabilitation and physical therapy will be provided to eligible former players by HCR Manor Care, which has 280 skilled nursing and rehabilitation centers and 85 outpatient rehabilitation therapy clinics across the country.[145]

The Alliance has also developed the following programs:

**Health screening —** Two doctors, funded by the NFL Player Care Foundation, are working with medical centers throughout the country to make it easier for players to get cardiovascular screening without cost. Players found to need cardiovascular care will receive affordable medical, nutritional and other treatment. Obesity screening and education also is provided.

**Prostate cancer screening —** In conjunction with the American Urological Association, the Alliance will establish a comprehensive program of prostate cancer screening, care and education.

**Assisted living arrangements —** Negotiated discounted rates and special services are made available to former players at three leading national assisted living providers — Brookdale Senior Living, Inc.; Belmont Village L.P., and Silverado Senior Living, Inc.

**Prescription drug card —** The NFL and NFLPA are providing retired players with a prescription drug card that permits them to purchase prescription medications at a substantial discount. This new benefit is provided at no cost to former players.[146]

---

[144] Ibid.

[145] Ibid. Information about HCR Manor Care is available at [http://www.hcr-manorcare.com].

[146] National Football League and NFL Players Association, "NFL and NFL Players Association Expands Disability Benefits Program for Retired Players," p. 3. (Boldface included in original.)

# Other Efforts to Aid Former Players

## Selected Organizations and Websites

Several former players and other individuals have established organizations or websites with the goal of aiding retired players. Examples of these organizations and websites include the following:

- Dignity After Football Inc. This organization is "committed to giving a voice to past heroes of the NFL and to finally restoring dignity to the lives of thousands of disabled and under-pensioned former players."[147]

- Fourth & Goal. Bruce Laird, a former NFL player, founded this organization to assist retired players.[148]

- Gridiron Greats. "The Gridiron Greats Assistance Fund is a non-stock, non-profit corporation that has been established to provide financial assistance and coordination of social services to retired players who are in dire need due to a variety of reasons including inadequate disability and/or pensions."[149]

- Hall of Fame Enshrinee Assistance Fund. One of the objectives of this organization "is to help its own by offering support to former pros experiencing financial or medical hardship."[150]

- Hall of Fame Players Association. One of the association's six purposes is to "assist Hall [of Fame] members who have financial difficulties."[151] Established in 2001, the Hall of Fame Players Association (HOFPA) Charitable Foundation "will contribute to local and national charities, create a relief fund for members who are in need and support awards and scholarship efforts in selected regional areas."[152]

---

[147] Dignity After Football Inc., "Mission," n.d., available at [http://www.dignityafterfootball.org].

[148] Greg Johnson, "More NFL Players Donating Game Checks to Charity," *Los Angeles Times*, Dec. 12, 2007, available at [http://www.latimes.com/sports/football/nfl/la-sp-nfl12dec12,1,1897270. story?coll=la-headlines-sports-nfl].

[149] Gridiron Greats, "About the Gridiron Greats Fund," available at [http://www.gridirongreats.org/aboutthefund.html].

[150] NFL Alumni, "Mission Statement," available at [http://www.nflalumni.org/].

[151] Hall of Fame Players Association, "About Us," available at [http://www.hofplayers.com/index.asp?PageAction=Custom&ID=15].

[152] Hall of Fame Players Association, "Charities," available at [http://www.hofplayers.com/index.asp?PageAction=Custom&ID=140].

- The John Mackey Fund, Inc.  The fund was established "to raise public awareness and fund research to find a cure for Frontotemporal Dementias."[153]

- NFL Alumni Association's Dire Need Fund.  This is a joint effort of the NFL and NFL alumni to provide "assistance to former NFL players and coaching staff members experiencing financial or medical hardship."[154]

- Ralph Wenzel Trust.  The trust was established initially to receive donations to help cover expenses for the care of Wenzel, who suffers from Alzheimer's-type dementia.  Wenzel now participates in an NFL program [155] that pays for a portion of his care, so the website continues as a tribute to Wenzel and as a means of collecting information about problems faced by former football players.[156]

- Retired Professional Football Players for Justice.  This website was created "to inform former football players, fans and supporters of the actions being taken by retired players to collect what they fairly deserve, but that has not been distributed by the organizations that claim to be acting in the players' best interest."[157]

## Active Players' Efforts

In fall 2007, a lineman for the Kansas City Chiefs, Kyle Turley, announced that he would donate his paycheck from his team's game on December 23 to help retired players who are in need.  Reportedly, Turley talked to approximately 20 players who said they will donate to Gridiron Greats, and he sent a letter to other players in late November on the subject of donations.[158]  Turley is quoted, in a *New York Times* article, as saying:  "Are we going to wait until guys die?  Are we going to wait until guys commit suicide before we make a difference and change this thing?" [He added:] "If this system doesn't get fixed, no matter how much money you make ... you are a serious surgery away from being broke."[159]  At least 12 other active players also have contributed funds to Gridiron Greats, and Turley's goal is to raise $8

---

[153] The John Mackey Fund, Inc., available at [http://johnmackeyfund.org/].

[154] NFL Alumni, "NFL Alumni Dire Need Charitable Trust," available at [http://www.nflalumni.org/dire_need.html].

[155] This statement may be a reference to the 88 Plan.

[156] Ralph Wenzel Trust, available at [http://www.ralphwenzeltrust.org].

[157] Retired Professional Football Players for Justice, "About Us," available at [http://www.playersforjustice.org/aboutus.html].

[158] "N.F.L. Players Plan to Donate to Retirees," *New York Times*, Nov. 27, 2007, available at [http://www.nytimes.com/aponline/sports/AP-FBN-NFL-Disability.html?ex= 1353906000&en=8264ea3f9c77d661&ei=5088&partner=rssnyt&emc=rss].

[159] Ibid.

million, according to another news article.[160]  Additionally, it has been reported that former tennis player John McEnroe, former NBA player Charles Barkley, and sports broadcaster Bob Costas have indicated that they will donate money to Gridiron Greats.[161]

# NFL and NFLPA Health and Safety Initiatives

As noted in the introduction to this report, a former player's disabilities (as interpreted broadly) or chronic health problems might, in some cases, have their origins in what occurred, or did not occur, while the individual was an active player in the NFL.  A potentially significant factor for active players is the NFL's and the NFLPA's efforts to safeguard their health, safety, and general welfare.  Such efforts may include, at a minimum: (1) keeping players informed of, and actively soliciting their suggestions and ideas on, health and safety issues and initiatives; (2) helping players prepare for the rigors of playing professional football; (3) identifying and mitigating all possible conditions and factors that could affect a player's health and safety; and (4) upon being made aware of a potentially unsafe or unhealthful condition, practice, piece of equipment, or rule or guideline, for example — which, in any case, could involve an act committed or omitted — acting in a timely fashion to remedy the situation.  Some health or safety problems, such as excessive weight, concussions, and injuries to joints, might have  significant, long-term implications for players.  Thus, a comprehensive approach to the health and safety of players might also include research that examines the possible long-term effects or consequences of the different types of injuries sustained by players.[162]

The material in this next section describes the league's and the players association's health and safety initiatives.

## NFL Injury and Safety Panel

The NFL Injury and Safety Panel was founded in 1993.  The panel

- "developed and manages an injury surveillance system that reports the types and severity of injuries that players experience each year. These reports are used by team medical staffs to assist in injury prevention and treatment, and by the Competition Committee to

---

[160] Pat Borzi, "Fund for N.F.L. Retirees in Need of Help Is Gaining Support," *New York Times*, Dec. 12, 2007, available at [http://www.nytimes.com/2007/12/12/sports/football/12veterans.html]; Greg Johnson, "More Players Donating Game Checks to Charity," *Los Angeles Times*, Dec. 12, 2007, available at [http://www.latimes.com/sports/football/nfl/la-sp-nfl12dec12,1,1897270.story?coll=la-headlines-sports-nfl&ctrack=1&cset=true].

[161] Ibid.

[162] As noted below, the NFL is planning to request or sponsor a study on the long-term effects of concussions.

assist in the development of playing rules that promote safety. Rules and enforcement are reviewed annually..."; and the panel[163]

- "evaluates proposals and makes recommendations regarding grants to support research."[164]

The NFL has had the injury surveillance system since 1980, and team physicians and athletic trainers use it "to record data on injured players and circumstances surrounding injuries."[165]  The league produces two reports each year — one approximately midway through the regular season and the other after the Super Bowl — that are detailed medical analyses of the data submitted to, and maintained in, the injury surveillance system.  The NFL provides a copy of each report to the NFLPA.[166]

The panel's Subcommittee on Foot and Ankle Injuries, which was founded in 2005, "collects and analyzes injury data on foot and ankle injuries, works with shoe manufacturers to encourage the development of more protective equipment, and educates team equipment managers and medical staffs on these matters.  The subcommittee has commissioned studies by Boise State University and Michigan State University analyzing how shoe and turf factors related to these injuries."[167]

The NFL does not know how many players decided to retire because of injuries they sustained while playing football.  However, the league estimates that 181 players who retired during the period 1993-2004 may have done so because of such injuries.[168]

## NFL Cardiovascular Health Committee

The Cardiovascular Health Committee, which was established in 2004, consists of team physicians, athletic trainers, and experts in "cardiology and cardiovascular

---

[163]  Letter from Goodell to Reps. Conyers and Smith, p. 8.

[164] Ibid.

[165] Elliot J. Pellman, et al., "Concussion in Professional Football: Epidemiological Features of Game Injuries and Review of the Literature," *Neurosurgery*, vol. 54, no. 1, Jan. 2004, p. 82.

[166] Personnel affiliated with the NFL have used data from the injury surveillance system for articles on NFL players and health issues.  For example, see the preceding footnote.  Additionally, data from the surveillance system were used in this article: Bryan T. Kelly, et al., "Shoulder Injuries to Quarterbacks in the National Football League," *American Journal of Sports Medicine*, vol. 32, no. 2, 2004, pp. 328-331.

[167] Ibid., p. 9.

[168] Ibid.  The basis for the league's "assessment" is that 181 players received additional compensation that is available or provided to players who do not "pass their pre-season physical due to an injury sustained during the prior season and thus [are] unable to play." (Letter from Goodell to Reps. Conyers and Smith, p. 9.)

medicine, endocrinology and obesity, sleep medicine and cardiovascular disease epidemiology."[169]  The committee's objectives are to investigate

> the prevalence of cardiovascular risk factors in NFL players, including hypertension, diabetes, sleep apnea and obesity; [assess] how those risk factors relate to different body types and positions on the field; and [evaluate] the effect of cardiovascular risks on various aspects of an NFL player's life, such as aerobic training, nutrition, family history and demographics.[170]

This committee also oversees the CVH program, which involves screening and education, for retired players.[171]

## NFL Medical Research Grants

Through NFL Charities, a nonprofit organization that was established in 1973, the NFL awards charitable grants for sports-related medical research.[172]  Nonprofit educational and research institutions may apply for these grants, the focus of which must be "sports injury prevention, injury treatment, [or] other related research that affects the health and performance of athletes."[173]  Within the category of sports-related medical research grants, there are four subcategories: education, medical, MTBI, and scientific research.  The following list shows what types of research or activities have been funded by each grant subcategory:

- Education grants are used to fund the National Athletic Trainers' Association Non-Medical Research and Scholarship Fund, the annual meeting of the NFL Physicians Society, and the Professional Football Athletic Trainers Society Foundation's Ethnic Minority Scholarship Program.

- Medical grants are used to pay the manager of the NFL's injury surveillance system and to pay for studies on concussions and cardiovascular disease.

- MTBI grants have paid for studies involving concussions and related subjects.

---

[169] Ibid., pp. 6-7.  The former commissioner of the NFL selected the co-chairmen who, in turn, selected the other members of the committee. (Ibid., p. 7.)

[170] Ibid.

[171] Ibid.

[172] National Football League, NFL Charities, "NFL Charities Grant Guidelines," available at [http://www.nflpa.org/pdfs/CharityWork/2006NFLCHARITIESGRANTGUIDELINES.pdf], downloaded Sept. 2007, on file with the author.

[173] National Football League, "NFL Charities, Medical Research Grants," available at [http://www.jointheteam.com/programs/program.asp?p=39&c=6].

- Scientific research grants have funded studies on, for example, arthritis, heat illness, orthopedic injuries and treatments, and cardiac disease.[174]

**Table 7** shows the amount of money awarded for grants in each of the four subcategories.

### Table 7.  NFL Charities' Grants for Research Related to Players' Health, 2003-2007

| Year | Total Amount of Grants by Subcategory | | | |
|------|-----------|---------|---------|---------------------|
|      | **Education** | **Medical** | **MTBI** | **Scientific Research** |
| 2003 | $65,000 | $70,935 | $200,000 | $5,126,666 |
| 2004 | $92,000 | $70,935 | $180,000 | $862,825 |
| 2005 | $92,000 | $263,715 | $200,000 | $1,182,900 |
| 2006 | $92,000 | $502,385 | $345,900 | $1,154,875 |
| 2007 | $112,000 | $1,184,030 | $100,000 | $1,230,073 |
| Total | $453,000 | $2,092,000 | $1,025,900 | $5,126,666 |

**Source:**  Letter from Roger Goodell, Commissioner, National Football League, to Reps. John Conyers, Jr., and Lamar S. Smith, Nov. 2, 2007, attachment 8.

The percentage of total funds awarded for grants, by subcategory and in descending order, is: scientific research, 59%; medical, 24%; mild traumatic brain injury, 12%; and education, 5%.  Although the percentage of funds for MTBI grants might seem relatively small, some medical grants have been awarded for research into concussions, and the league's MTBI Committee has conducted numerous studies (see below and **Appendix B**).

## NFL Mild Traumatic Brain Injury Committee

The Committee on Mild Traumatic Brain Injury was established in 1994, by then-Commissioner Paul Tagliabue.  After addressing the definition of "concussion," undertaking an effort to collect data, and reviewing available safety equipment, the committee recommended to the commissioner that

the NFL should independently fund scientific research that would enable scientists to better understand the cause(s) of MTBI; that this research should be

---

[174]  Letter from Goodell to Reps. Conyers and Smith, attachment 8.

funded to independent scientific researchers; and that the NFL Mild Traumatic
Brain Injury Committee should be charged with oversight of the project.[175]

To date, the committee has published 14 studies, all in the journal *Neurosurgery*, and
has contributed to "the development of a clearer understanding of the nature of
concussions in football, how they are caused, and the types of impacts that are more
likely to result in concussions."[176] The National Operating Committee on Standards
for Athletic Equipment (NOCSAE), which, among other things, develops standards
for and tests football helmets, and helmet manufacturers have received the
committee's research.[177]

A list of members of the committee, and their professional affiliations, is found
in **Appendix C**.

## NFL and NFLPA Education Efforts for Players

Although the NFL has noted that "education regarding injuries and related
matters is principally done by team medical staffs,"[178] the league has provided some
information to players. In addition to the information on concussions disseminated
by the league (see below), the NFL and the players association have prepared and
distributed information on their substance of abuse policy and program, and their
policy on anabolic steroids and related substances.[179] Materials on heat and hydration
that were developed by the NFL Physicians Society have been shared with team
medical staffs.[180]

For its part, the NFLPA has stated that it "does not conduct any formalized
educational program for players concerning injuries, their treatment, or rehabilitation.

---

[175] Elliot J. Pellman, "Background on the National Football League's Research on
Concussion in Professional Football," *Neurosurgery*, vol. 53, no. 4, Oct. 2003, pp. 797-798.

[176] Letter from Goodell to Reps. Conyers and Smith, p. 5.

[177] Ibid., pp. 5-6. Additional information about the National Operating Committee on
Standards for Athletic Equipment (NOCSAE) is available at [http://www.nocsae.org/].

[178] Letter from Goodell to Reps. Conyers and Smith, p. 13.

[179] The following substances are considered substances of abuse under the NFL-NFLPA
policy: alcohol (under certain circumstances), cocaine, marijuana, amphetamine and its
analogues, opiates, phencyclidine (PCP), and methylenedioxymethamphetamine (MDMA)
and its analogues. (National Football League and NFL Players Association, *National
Football League Policy and Program for Substances of Abuse*, 2007, available at
[http://www.nflplayers.com/images/pdfs/RulesAndRegs/Drug_Policy_2007.pdf], pp. 6, 20.)
The categories of prohibited substances included in the latter policy are anabolic agents
(steroids), masking agents, and certain stimulants. (National Football League and NFL
Players Association, *National Football League Policy on Anabolic Steroids and Related
Substances 2007*, 2007, available at [http://www.nflplayers.com/images/pdfs/
RulesAndRegs/BannedSubstances.pdf], pp. 13-16.) See CRS Report RL32894, *Anti-Doping
Policies: The Olympics and Selected Professional Sports*, by L. Elaine Halchin, for
additional information about the NFL's steroids policy and doping in general.

[180] Letter from Goodell to Reps. Conyers and Smith, p. 13.

Under the standard NFL Player Contract form, Club medical staff has full discretion on the treatment of injuries, subject to the player's right to a second opinion and the right to choose his own surgeon should surgery become necessary."[181] The players association provides free legal representation for grievances having to do with injuries; includes information on injury grievances and related topics in the Player Planner; maintains a list of physicians whom players may consult when seeking second opinions; and, though union representatives, brings issues related to injuries to the attention of the Joint Committee on Player Safety and Welfare.[182]

## NFLPA Medical Consultant and Performance Consultant

The NFLPA's medical consultant (or advisor) "participates in various studies conducted by the NFL and helps monitor compliance with a set of medical guidelines the NFL clubs have been advised to follow regarding acclimatization, emergency medical care, heat prostration, and other medical issues."[183] It is unclear whether this individual is responsible for monitoring each team's compliance with the NFL's medical guidelines. In any case, the method used for monitoring, how often it occurs, and whether the medical consultant has a staff to aid him or her are unclear.

The extent of the medical consultant's responsibilities raises the following questions. Does the medical advisor personally monitor the teams, perhaps visiting each team on a regular basis; reviewing the team's policies, protocols, and other materials; reviewing a sample of players' medical records to see how players were treated; and talking with medical staff as well as players? Or do teams use a "self-report" model for compliance, whereby team staff members submit a verbal or written report to the medical advisor that indicates to what extent the team complies with medical guidelines?

The performance consultant attends NFLPA's annual meeting and "advises player reps [representatives] on a variety of health-related issues, including conditioning, rehabilitation of injuries, use of nutritional supplements, and proper equipment."[184]

---

[181] Letter from Upshaw to Reps. Conyers, Smith, Sanchez, and Cannon, pp. 30-31.

[182] Ibid., p. 31. The Player Planner is an appointment book that the NFLPA provides to players and that includes information about, for example, benefits, the NFLPA, and the NFL season.

[183] Ibid., p. 11. Dr. Thom A. Mayer, CEO and president of BestPractices and chairman, Dept. of Emergency Medicine, Inova Fairfax Hospital, is the NFLPA's medical consultant. (Ibid.)

[184] National Football League and NFL Players Association, *NFL Collective Bargaining Agreement, 2006-2012*, p. 11. The players association's performance consultant is Mark Verstegen, founder and chairman, Athletes' Performance, a personal training company.

# NFL and NFLPA Joint Committee on Player Safety and Welfare

The following excerpt from the CBA describes the committee's composition, responsibilities, and authority:

> A Joint Committee on Player Safety and Welfare (hereinafter the "Joint/ Committee") will be established for the purpose of discussing the player safety and welfare aspects of playing equipment, playing surfaces, stadium facilities, playing rules, player-coach relationships and any other relevant subjects. The Joint Committee will consist of six members: three Club representatives (plus advisors) and three NFLPA representatives (plus advisors). The Joint Committee will hold two regular meetings each year on dates and at sites selected by the Committee. Special meetings may be held at any time and place mutually agreeable to the Committee. The Joint Committee will not have the power to commit or bind either the NFLPA or the [NFL] Management Council on any issue. The Joint Committee may discuss and examine any subject related to player safety and welfare it desires, and any member of the Committee may present for discussion any such subject. Any Committee recommendation will be made only to the NFLPA, the Management Council, the Commissioner, or any appropriate committee of the NFL; such recommendation will be given serious and thorough consideration.[185]

Pursuant to the 2006-2012 CBA, an additional task was assigned to the committee, which is as follows: "The NFLPA and the [NFL] Management Council agree that a task for the Joint Committee to undertake promptly upon the execution of this Agreement is a review of all current materials on the player safety aspects of player equipment, playing surfaces, including artificial turf and other safety matters."[186]

The NFLPA has the right to initiate an investigation "before the Joint Committee if the NFLPA believes that the medical care of a team is not adequately taking care of player safety."[187] Two or more neutral physicians will investigate the issue raised by the NFLPA, write a report, and submit recommendations to the joint committee within 60 days of being selected.[188] If the NFLPA disagrees with the outcome of this process, it is unclear what recourse, if any, the players association has.

Although the joint committee has the authority to discuss virtually any subject related to the safety and welfare of players, it does not appear to have the authority necessary to implement any proposals or remedies it might develop. That is, the committee may make recommendations to the NFLPA, the Management Council, the Commissioner, or an NFL committee, but it does "not have the power to commit or

---

[185] National Football League and NFL Players Association, *NFL Collective Bargaining Agreement, 2006-2012*, p. 38.

[186] Ibid.

[187] Ibid., p. 39.

[188] Ibid.

bind either" the players association or the Management Council on any issue.[189]  This limitation on its authority may exist because any changes the committee proposes possibly would have to be negotiated pursuant to the collective bargaining process.  On the other hand, this limitation might hamper the ability of the NFL and the NFLPA to enact in a timely manner any rule or policy changes necessary to protect the health and safety of the players.  Moreover, whereas it appears that the joint committee focuses exclusively on player safety and health, when a recommendation made by the committee is forwarded to one or more of the other parties, it is unclear what other factors, interests, or considerations might be raised by these other parties when discussing the committee's recommendation.

The joint committee also has a role to play if the NFLPA believes that any proposed playing rule changes, which are issued following the NFL's annual meeting, would adversely affect player safety.  The process is as follows:

> If the NFLPA believes that the adoption of a playing rule change would adversely affect player safety, then within seven days of receiving such notice the NFLPA may call a meeting of the Joint Committee [on Player Safety and Welfare] to be held within one week to discuss such proposed rule change.  Within five days after such meeting, if the NFLPA continues to believe that the adoption of a playing rule change would adversely affect player safety, the NFLPA may request an advisory decision by one of the arbitrators designated in Article IX [of the CBA].  A hearing before such arbitrator must be held within seven days of the Joint Committee meeting and the arbitrator must render his decision within one week of the hearing.  No such playing rule change will be made by the Clubs until after the arbitrator's advisory decision unless the arbitrator has not rendered his decision within one week of the hearing.  The arbitrator's decision will be advisory only, not final and binding.  Except as so limited, nothing in this section will impair or limit in any way the right of the Clubs to make any playing rule change whatsoever.[190]

While the joint committee's role in this type of situation is relatively minor, the description of the process for addressing rule changes that might adversely affect player safety shows that, ultimately, neither the joint committee, the players association, nor the arbitrator has any capability to modify or rescind a potentially problematic proposed rule change.  It is not known how many rule changes, if any, were enacted despite the objections of the NFLPA.  Conversely, considering the following excerpt from the CBA, it appears that the NFLPA is not included in the process for proposing new rules and thus cannot propose any rules directed at improving player safety, let alone participate in discussions of rules proposed by the NFL and/or teams: "Immediately following the NFL annual meeting, the NFLPA will be given notice of all proposed playing rule changes, either tentatively adopted by the Clubs or put over for further consideration at a later league meeting."[191]

---

[189] Ibid., p. 38.

[190] Ibid., pp. 38-39.

[191] Ibid., p. 38.

# Discussion of Selected Issues

## Injuries and Financial Considerations

Anecdotal accounts suggest that a player might be concerned that, if he is unable to play because of an injury, his compensation, or his position on the team, might be jeopardized. Faced with one or more possible financial disincentives, a player might choose, then, to conceal an injury and continue to play, thus risking further injury. Moreover, by delaying or not seeking treatment — or even by downplaying the severity of his injury — a player may not receive appropriate, effective medical treatment. The lack of medical treatment, or even just the lack of timely medical care, could have long-term health consequences. Even if a player considers this possibility, the immediate financial incentives of continuing to play might outweigh concerns about possible long-term consequences, particularly since those consequences might not be well known and might be unlikely to occur.

A player does have a financial incentive to report an injury, but this incentive is relatively small. Failure to promptly report an injury to a club physician trainer may result in a fine of up to $1,500.[192] The financial penalty for failing to report an injury promptly might be less important to a player than the perception, if not the reality, of potential adverse financial consequences related to his willingness to play while injured. If an individual continues to play with an injury, an action that can be facilitated by the use of pain medications, it is possible that he risks aggravating the original injury, or that other parts of his body may be forced to compensate for the injured body part. A possible long-term consequence is that, since the injury is not part of the player's medical records, he might not have documentation he will need as a former player to be eligible for retirement plan disability benefits.

Anecdotal information, in the form of statements by players that have been reported in news articles, suggests that the perception exists among at least some players that, in some cases or situations, a player who reports an injury might be jeopardizing his career.[193] Bob Brudzinski, who was a linebacker for the then-Los Angeles Rams and Miami Dolphins, was quoted as saying

> I can't say the owners and coaches didn't care. They wanted to see how tough you are. Anybody can play not injured. They wanted to see if you can play injured. There were a lot of injections and stuff like that. And the other thing is, you didn't want to sit out a game, because there's always somebody behind you who can take your spot. I never thought about concussions, never thought about blowing my knee out. The one thing I wish is that I could remember more. We used our head too much, in the wrong way.[194]

Another player, Jim Kelly, former quarterback for the Buffalo Bills, reportedly said

---

[192] Ibid., p. 19.

[193] Dustin Dow, "Much Pain, No Gain?" *Cincinnati Enquirer*, July 1, 2007, available at [http://www.factiva.com/].

[194] Brown, "Ex-Players Dealing With Not-So-Glamorous Health Issues."

The game is played with pain....  If you can't play in pain you should be playing golf, like I'm doing now.  I think that's the mentality of players.  There's a lot at stake.  Big contracts, the pressure of losing your job — a lot of things force some guys to do things that maybe they shouldn't do.  I know I played in a lot of games that I should not have been playing in, but I did.[195]

Referring to the use of painkillers in order to keep playing, an unnamed offensive lineman was quoted in a news article as saying: "When you have 300-pound guys smashing into one another, what do people expect?  People just see Sundays, and we hit each other every day....  Ultimately, players take them to stay on the field. Basically you're in a very competitive sport that is cutthroat. There is little tolerance for someone who's not playing."[196]  A former linebacker for the San Francisco 49ers, Dan Bunz, reportedly said, "The coaches dangled that carrot — if you're not ready to play, you're going to get cut [....] They just wanted you back on the field.  They don't care about you, they just care about the game."[197]

The following comments by a former linebacker for the Cleveland Browns, Randy Gardner, suggest that performance incentives (which are discussed below) might contribute to the problem of playing injured: "'You have guys who have a lot of incentives based upon playing time, you know?  How many catches, maybe, how many tackles — whatever is written into contracts....  And if you don't meet that, you lose out on a lot of money.  Guys understand that.  They push themselves through the injuries, you know, in order to play and pretty much just to keep their jobs." [198]

Comments by the former director of football operations for the Pittsburgh Steelers, are consistent with the concerns expressed by players.  As quoted in a *Washington Post* article, Tom Donahoe said: "'Durability becomes a significant factor because there is so much money involved....  If a guy misses five or six games a year, you'll think about whether you want to sign him.  And I don't know about all coaches, but many would rather have a guy with less talent who is more dependable than a more talented guy who you don't know when he'll show up.'"[199]

---

[195] Mike Freeman, "Painkillers, and Addiction, Are Prevalent in N.F.L.," *New York Times,* Apr. 13, 1997, available at [http://query.nytimes.com/gst/fullpage.html?res= 950CE7DD1F3CF930A25757C0A961958260].

[196] Ibid.  The player who made this comment was not identified in the article.

[197] Ron Kroichick, "Glory Has Its Price: The 1981 49ers, Dan Bunz: Pain, Personal Welfare No Match for Pressure to Play On," *San Francisco Chronicle*, Jan. 21, 2007, available at [http://www.sfgate.com/cgi-bin/article.cgi?f=/c/a/2007/01/21/SPG0ANLFN11.DTL].

[198] Carl Prine, "Finances Worsen Woes, Critics Say" *Pittsburgh Tribune-Review*, Jan. 9, 2005, available at [http://www.pittsburghlive.com/x/pittsburghtrib/news/specialreports/ specialnfl/s_291052.html], p. 4.

[199] Dave Sell, "Football's Pain-Taking Process; Playing Hurt Can Be a Complicated Decision," *Washington Post*, Dec. 8, 1996, p. D1.

Some observers might attribute the players' comments and concerns to the lack of "guaranteed contracts" in the NFL.[200]  There is no definition of a "guaranteed contract," but the term is taken to mean that a player who has a guaranteed contract will continue to receive some or all of his compensation even if he is, for example, injured and thus unable to play.  The following excerpts from the NFL Player Contract, which permit a team to terminate a player's contract for reasons having to do with, among other things, the player's physical condition and performance, may contribute, at least in part, to the notion that players in the NFL do not have so-called guaranteed contracts:

> 8. PHYSICAL CONDITION.  Player represents to Club that he is and will maintain himself in excellent physical condition.  Player will undergo a complete physical examination by the Club physician upon Club request, during which physical examination Player agrees to make full and complete disclosure of any physical or mental condition known to him which might impair his performance under this contract and to respond fully and in good faith when questioned by the Club physician about such condition.  *If Player fails to establish or maintain his excellent physical condition* to the satisfaction of the Club physician, or make the required full and complete disclosure and good faith responses to the Club physician, *then Club may terminate this contract.*

> 9. INJURY.  Unless this contract specifically provides otherwise, if Player is injured in the performance of his services under this contract and promptly reports such injury to the Club physician or trainer, then Player will receive such medical and hospital care during the term of this contract as the Club physician may deem necessary, and *will continue to receive his yearly salary for so long, during the season of injury only and for no subsequent period covered by this contract, as Player is physically unable to perform the services required of him* by this contract because of such injury.  If Player's injury in the performance of his services under this contract results in his death, the unpaid balance of his yearly salary for the season of injury will be paid to his stated beneficiary, or in the absence of a stated beneficiary, to his estate.

> 11. SKILL, PERFORMANCE AND CONDUCT.  Player understands that he is competing with other players for a position on Club's roster within the applicable player limits.  *If at any time, in the sole judgment of Club, Player's skill or performance has been unsatisfactory* as compared with that of other players competing for positions on Club's roster, or if Player has engaged in personal conduct reasonably judged by club to adversely affect or reflect on Club, *then Club may terminate this contract.*  In addition, during the period any salary cap is legally in effect, this contract may be terminated if, in Club's opinion, Player is anticipated to make less of a contribution to Club's ability to compete on the playing field than another player or players whom Club intends to sign or attempts to sign, or another player or players who is or are already on Club's roster, and for whom Club needs room [under the salary cap].[201]

As discussed below, a player may have a "skill guarantee" or an "injury guarantee" written into his contract that protects some or all of his compensation in the event his

---

[200] E.M. Swift, "One Big Headache," *Sports Illustrated*, Feb. 12, 2007, p. 23.

[201] National Football League and NFL Players Association, *NFL Collective Bargaining Agreement, 2006-2012*, pp. 252-253. (Italics added to aid in identifying significant text.)

skills decline or he sustains an injury that keeps him from playing, respectively.

The idea of a "guaranteed contract" is, perhaps, an overly broad concept for the NFL, given the different ways in which player compensation may be structured. Generally, the composition and amount of total compensation, and whether all or a portion of the compensation is guaranteed, varies from player contract to player contract. (Generally, a player has an agent who negotiates the terms of his contract with the team. However, a player may negotiate his own contract.) A player's total compensation from the NFL may include, for example, salary, one or more bonuses, and one or more incentives.[202] Incentives are also known as performance bonuses; however, not all bonuses are incentives. One of the better-known bonuses an NFL player may have included in his contract is a signing bonus, which means he will receive a bonus for signing his contract with the team. Some incentives are tied to a team's performance, such as "points scored by offense," "points allowed by defense," and "[number of] sacks allowed."[203] Examples of individual incentives include number of interceptions made, passer rating, and total number of receptions.[204] A portion of a player's compensation might be guaranteed, depending upon what was negotiated with the team, but how much is guaranteed, for what reason or reasons, and for which year or years of the contract varies from player to player.

It is difficult to know, then, how much of each player's compensation from the league is guaranteed and how much is not guaranteed. Without this information, and, in particular, data that show how many players, if any, have none, or only a negligible portion, of their NFL compensation guaranteed, it is difficult to know whether, and how many, players could be at risk of adverse financial consequences if they are unable to play because of injuries.[205]

---

[202] Section 8 of Article XXXVIII of the CBA describes the different types of compensation a player might be entitled to in addition to his salary: "A player will be entitled to receive a signing or reporting bonus, additional salary payments, incentive bonuses and such other provisions as may be negotiated between his Club (with the assistance of the [NFL] Management Council) and the player or his NFLPA-certified agent." (National Football League and NFL Players Association, *NFL Collective Bargaining Agreement, 2006-2012*, p. 180.)

[203] Ibid., p. 111.

[204] Ibid., p. 112. The incentives that are included in a player's contract might serve as an inducement to continue playing with an injury instead of seeking treatment, which might put the player at risk for not meeting the goal(s) in one or more of his incentive clauses. A team physician for the Pittsburgh Steelers, Jim Bradley, reportedly has suggested that "players will beg doctors to get them back into a game so they can make the three catches needed to trigger hundreds of thousands of dollars in incentive clauses in their contracts.... During games, he has signaled trainers to hide an injured player's helmet to prevent a return to the field." (Dan Vergano, "NFL Doctors, Players Face Off Over Painful Choices," *USA Today*, Jan. 31, 2004, available at [http://www.usatoday.com/news/health/2002-01-31-football-medicine.htm].)

[205] In the absence of comprehensive data, the long-term financial consequences for players who sustain an injury or injuries, and, as a result, are unable to play, are unknown. The

(continued...)

Apparently, however, during the 2007 season, approximately 94% of NFL players had only a portion, if any, of their compensation guaranteed. The NFLPA has noted that, if "the term 'guaranteed' is defined as an individually negotiated clause in a player's contract that assures that he will receive all or most of his salary for the term of the contract, even if he is unable to play due to injury or declining skills, only about 6 per cent of all NFL player contracts are 'guaranteed'."[206] This percentage equates to approximately 102 players for the 2007 season.[207] Looking further back, "from the 1982 through 1992 seasons only *eleven* players had *any* of their base salary guaranteed...." and "[t]he average number of players with guaranteed base salary from 1995 through 2002 [was] 40 per season...."[208]

The NFLPA has noted, nevertheless, that signing bonuses are preferable to salary guarantees, and has suggested, generally, that such bonuses equate to guaranteed compensation. Specifically, the players association has stated that "a signing bonus is far more preferable to a salary guarantee" for these reasons: the money is given to the player "up front" (that is, "before he renders his services to the club"); if the club wants some or all of the signing bonus returned (for example, if the player fails to perform), the team "must legally prove its entitlement to a return of any of that money"; and the player can invest the money as soon as he receives it (unlike a salary, which is paid periodically).[209] The NFLPA adds,

> It should therefore be clear that signing bonuses, representing a more secure form of compensation than the typical 'guaranteed contracts' in professional baseball and basketball, more than qualify as 'guaranteed' compensation under any definition of that term. In 2006, approximately 52% of all compensation paid to players in the NFL was paid in the form of signing or similar bonuses or

---

[205] (...continued)
actual consequences may differ from players' perceptions, although an analysis performed by the *Pittsburgh Tribune-Review* suggests that a connection might exist between sustaining an injury and having one's salary decreased. The *Tribune-Review*, which analyzed salary and bonus data for 109 individuals who played for the Steelers during the period 1999-2003, found that every game an injured player missed led to "nearly $73,000 [on average] in wage concessions the next season." (Prine, "Bloody Sundays."*)*

[206] NFL Players Association, "Guaranteed Contracts in Professional Team Sports: How Does the NFL Compare?" NFLPA issue paper, n.d., p. 3.

[207] The percentage was calculated using 1,696 as the total number of players (each of the 32 teams has a roster of 53 players).

[208] NFL Players Association, "A New Look at Guaranteed Contracts in the NFL," n.d., available at [http://www.nflpa.org/PDFs/Shared/Guaranteed_Contracts.pdf], downloaded Sept. 2007, on file with the author. (Italics in original.)

[209] NFL Players Association, "Guaranteed Contracts in Professional Team Sports: How Does the NFL Compare?" p. 4. In this statement, "the term 'signing bonus' includes bonuses which are either labeled as such or are payable 'up front' or with a similar degree of certainty, such as first year roster bonuses, reporting bonuses, or option bonuses." (Ibid., p. 4.)

guaranteed salary.  In a very real sense, it can therefore be said that at least 52% of all compensation in the NFL is, in fact, 'guaranteed' to players.[210]

Although, league-wide, 52% of all compensation in 2006 was virtually "guaranteed," this does not mean that 52% of each player's compensation was "guaranteed."

Variations among players' contracts, specifically signing bonuses, provide a better indication of each player's financial status, and, as the NFLPA has suggested, could indicate what portion of a player's contract is "guaranteed."  The NFLPA acknowledges that it "knows better than anyone that not all players can negotiate large signing bonuses or otherwise lucrative contracts."[211]  The size of a player's signing bonus might have some bearing on whether and how vulnerable a player might be to internal or external factors inducing him to play when he is injured, recognizing that an individual's decision to play when injured could be the result of a combination of many different factors or considerations.

Signing bonus data are presented in **Tables 8** (1993-1997), **9** (1998-2002), and **10** (2003-2007).  Each table shows, for each range of signing bonus amounts, information regarding two groups of players: (1) players who received signing bonuses; and (2) all players, including those who did not receive signing bonuses.

---

[210]  Ibid.  See the preceding footnote for a description of what the NFLPA includes in the term "signing bonus" in this context.

[211]  Ibid.

CRS-64

**Table 8. Signing Bonuses Among NFL Players, 1993-1997**

| | 1993 | | 1994 | | 1995 | | 1996 | | 1997 | |
|---|---|---|---|---|---|---|---|---|---|---|
| Total Signing Bonus[a] | $183,413,792 | | $272,809,813 | | $460,308,221 | | $563,184,962 | | $523,047,173 | |
| Average Signing Bonus | $308,258 | | $271,723 | | $364,745 | | $480,533 | | $436,965 | |
| Total # of Signing Bonuses[b] | 595 (40.0%) | | 1,003 (67.6%) | | 1,262 (79.4%) | | 1,172 (73.7%) | | 1,197 (75.3%) | |
| Total # of NFL Players[c] | 1,484 | | 1,484 | | 1,590[d] | | 1,590 | | 1,590 | |
| | **% of Players w/ Bonus** | **% of Total Players[e]** | **% of Players w/ Bonus** | **% of Total Players[e]** | **% of Players w/ Bonus** | **% of Total Players[e]** | **% of Players w/ Bonus** | **% of Total Players[e]** | **% of Players w/ Bonus** | **% of Total Players[e]** |
| $1-$250,000 | 73.3 | 29.4 | 75.5 | 51.0 | 73.5 | 58.4 | 70.7 | 52.1 | 71.3 | 53.6 |
| $250,001-$500,000 | 12.4 | 5.0 | 10.1 | 6.8 | 9.4 | 7.5 | 9.0 | 6.6 | 8.9 | 6.7 |
| $500,001-$750,000 | 4.2 | 1.7 | 3.8 | 2.6 | 5.1 | 4.0 | 4.0 | 3.0 | 5.2 | 3.9 |
| $750,001-$1,000,000 | 2.0 | 0.8 | 3.7 | 2.5 | 2.7 | 2.1 | 3.2 | 2.4 | 3.8 | 2.8 |
| $1,000,001-$1,250,000 | 2.4 | 0.9 | 1.2 | 0.8 | 1.5 | 1.2 | 1.6 | 1.2 | 1.0 | 0.8 |
| $1,250,001-$1,500,000 | 1.8 | 0.7 | 1.5 | 1.0 | 1.5 | 1.2 | 1.6 | 1.2 | 2.1 | 1.6 |
| $1,500,001-$1,750,000 | 1.0 | 0.4 | 0.5 | 0.3 | 0.7 | 0.6 | 0.6 | 0.4 | 0.7 | 0.5 |
| $1,750,001-$2,000,000 | 0.5 | 0.2 | 1.2 | 0.8 | 1.1 | 0.8 | 2.0 | 1.4 | 1.6 | 1.2 |
| $2,000,001-$3,000,000[e] | 1.0 | 0.4 | 1.6 | 1.1 | 2.6 | 2.1 | 3.8 | 2.8 | 2.7 | 2.0 |
| $3,000,001-$4,000,000 | 0.5 | 0.2 | 0.5 | 0.3 | 1.0 | 0.8 | 1.0 | 0.8 | 1.2 | 0.9 |
| $4,000,001-$5,000,000 | 0.4 | 0.1 | 0.4 | 0.3 | 0.4 | 0.3 | 1.1 | 0.8 | 0.7 | 0.5 |

CRS-65

|  | 1993 | | 1994 | | 1995 | | 1996 | | 1997 | |
|---|---|---|---|---|---|---|---|---|---|---|
| $5,000,001-$6,000,000 | 0.1 | 0.06 | 0.1 | 0.06 | 0.2 | 0.2 | 0.7 | 0.5 | 0.5 | 0.4 |
| $6,000,001-$7,000,000 | 0 | 0 | 0 | 0 | 0.2 | 0.2 | 0.5 | 0.4 | 0.2 | 0.1 |
| $7,000,001-$8,000,000 | 0 | 0 | 0 | 0 | 0.1 | 0.01 | 0 | 0 | 0.2 | 0.1 |
| $8,000,001-$9,000,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| $9,000,001-$10,000,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.1 | 0.06 |
| $10,000,001 + | 0 | 0 | 0 | 0 | 0.2 | 0.2 | 0.1 | 0.06 | 0.2 | 0.1 |

**Source:** Information provided by the NFL Players Association to the author on Jan. 8, 2008; as described in table note e, some calculations performed by the author.

a. The term "signing bonus" "includes bonuses which are either labeled as such or are payable 'up front' or with a similar degree of certainty, such as first year roster bonuses, reporting bonuses, or option bonuses." (NFL Players Association, "Guaranteed Contracts in Professional Team Sports: How Does the NFL Compare?" NFLPA Issue Paper, n.d.,  p. 4. Information provided by telephone by the NFL Players Association to the author on Jan. 15, 2008.)  Although some signing bonuses may be multiyear, each signing bonus in this table is included only in the year in which it was negotiated and agreed to.
b. Each percentage in this row is the percentage of the total number of players who received a signing bonus.
c. The total number of players was calculated by multiplying the number of teams by the number of players each team is permitted to have on its regular season and post-season roster, which is 53.
d. Two expansion teams were added to the league in 1995: the Carolina Panthers and the Jacksonville Jaguars.

e. The percentage of total players was calculated in this manner: the figure in the column "% of Players w/Bonus" was multiplied by the "Total # of Signing Bonuses."  The result of this calculation was rounded and then divided by the "Total # of NFL Players."  For example, for the year 1993, .733 (% of Players w/Bonus) was multiplied times 595 ("Total # of Signing Bonuses").   The result was 436.135, which was rounded to 436.  Dividing 436 by 1,484 ("Total # of NFL Players") resulted in .2938, or 29.4%.

CRS-66

## Table 9. Signing Bonuses Among NFL Players, 1998-2002

| | 1998 | | 1999 | | 2000 | | 2001 | | 2002 | |
|---|---|---|---|---|---|---|---|---|---|---|
| Total Signing Bonus[a] | $831,580,214 | | $953,514,150 | | $1,052,590,699 | | $973,098,236 | | $857,847,526 | |
| Average Signing Bonus | $710,145 | | $767,107 | | $788,457 | | $784,124 | | $689,588 | |
| Total # of Signing Bonuses[b] | 1,171 (73.6%) | | 1,243 (75.7%) | | 1,335 (81.3%) | | 1,241 (75.5%) | | 1,244 (73.3%) | |
| Total # of NFL Players[c] | 1,590 | | 1,643[d] | | 1,643 | | 1,643 | | 1,696[e] | |
| | % of Players w/ Bonus | % of Total Players[e] | % of Players w/ Bonus | % of Total Players[e] | % of Players w/ Bonus | % of Total Players[e] | % of Players w/ Bonus | % of Total Players[e] | % of Players w/ Bonus | % of Total Players[e] |
| $1-$250,000 | 66.6 | 49.1 | 63.0 | 47.7 | 62.5 | 50.8 | 62.9 | 47.5 | 67.8 | 49.7 |
| $250,001-$500,000 | 8.3 | 6.1 | 8.9 | 6.8 | 9.4 | 7.6 | 9.2 | 6.9 | 8.4 | 6.1 |
| $500,001-$750,000 | 4.7 | 3.5 | 3.7 | 2.8 | 3.1 | 2.5 | 4.4 | 3.3 | 3.2 | 2.4 |
| $750,001-$1,000,000 | 3.2 | 2.3 | 4.2 | 3.2 | 4.0 | 3.2 | 2.6 | 1.9 | 2.6 | 1.9 |
| $1,000,001-$1,250,000 | 1.6 | 1.2 | 1.9 | 1.5 | 2.2 | 1.8 | 1.8 | 1.3 | 1.8 | 1.3 |
| $1,250,001-$1,500,000 | 1.6 | 1.2 | 2.5 | 1.9 | 2.6 | 2.1 | 3.0 | 2.3 | 2.4 | 1.8 |
| $1,500,001-$1,750,000 | 0.9 | 0.7 | 2.3 | 1.8 | 2.0 | 1.6 | 1.0 | 0.7 | 1.4 | 1.0 |
| $1,750,001-$2,000,000 | 1.5 | 1.1 | 2.3 | 1.8 | 2.0 | 1.6 | 2.0 | 1.5 | 1.6 | 1.2 |
| $2,000,001-$3,000,000 | 3.7 | 2.7 | 3.7 | 2.8 | 4.6 | 3.7 | 5.3 | 4.0 | 3.9 | 2.9 |
| $3,000,001-$4,000,000 | 4.0 | 3.0 | 2.7 | 2.1 | 2.5 | 2.0 | 3.3 | 2.5 | 2.7 | 2.7 |
| $4,000,001-$5,000,000 | 1.2 | 0.9 | 2.3 | 1.8 | 2.1 | 1.7 | 1.3 | 1.0 | 1.3 | 0.9 |

Case: 25-2271   Document: 20-2   Page: 300   Date Filed: 10/08/2025

CRS-67

| | 1998 | | 1999 | | 2000 | | 2001 | | 2002 | |
|---|---|---|---|---|---|---|---|---|---|---|
| $5,000,001-$6,000,000 | 0.9 | 0.7 | 0.6 | 0.4 | 0.7 | 0.5 | 1.0 | 0.7 | 1.1 | 0.8 |
| $6,000,001-$7,000,000 | 0.3 | 0.3 | 0.6 | 0.4 | 0.7 | 0.5 | 0.4 | 0.3 | 1.0 | 0.7 |
| $7,000,001-$8,000,000 | 0.8 | 0.6 | 0.4 | 0.3 | 0.5 | 0.4 | 0.5 | 0.4 | 0.1 | 0.06 |
| $8,000,001-$9,000,000 | 0.2 | 0.1 | 0.3 | 0.2 | 0.2 | 0.2 | 0.5 | 0.4 | 0.1 | 0.06 |
| $9,000,001-$10,000,000 | 0.2 | 0.1 | 0.2 | 0.1 | 0.3 | 0.2 | 0.2 | 0.1 | 0.4 | 0.3 |
| $10,000,001 + | 0.4 | 0.3 | 0.5 | 0.4 | 0.5 | 0.4 | 0.5 | 0.4 | 0.4 | 0.3 |

**Source:** Information provided by the NFL Players Association to the author on Jan. 8, 2008; as described in table note f, some calculations performed by the author.

a. The term "signing bonus" "includes bonuses which are either labeled as such or are payable 'up front' or with a similar degree of certainty, such as first year roster bonuses, reporting bonuses, or option bonuses." (NFL Players Association, "Guaranteed Contracts in Professional Team Sports: How Does the NFL Compare?" NFLPA Issue Paper, n.d., p. 4. Information provided by telephone by the NFL Players Association to the author on Jan. 15, 2008.) Although some signing bonuses may be multiyear, each signing bonus in this table is included only in the year in which it was negotiated and agreed to.
b. Each percentage in this row is the percentage of the total number of players who received a signing bonus.
c. The total number of players was calculated by multiplying the number of teams by the number of players each team is permitted to have on its regular season and post-season roster, which is 53.
d. One team was added to the league in 1999 with the re-activation of the Cleveland Browns franchise. (The original Cleveland team was moved, by its owner, to Baltimore in 1995, and became the Baltimore Ravens.)
e. One expansion team was added to the league in 2002, the Houston Texans.
f. The percentage of total players was calculated in this manner: the figure in the column "% of Players w/Bonus" was multiplied by the "Total # of Signing Bonuses." The result of this calculation was rounded and then divided by the "Total # of NFL Players." For example, for the year 1998, .666 ("% of Players w/Bonus") was multiplied times 1,171 ("Total # of Signing Bonuses"). The result was 779.886, which was rounded to 780. Dividing 780 by 1,590 ("Total # of NFL Players") resulted in .4906, or 49.1%.

CRS-68

**Table 10. Signing Bonuses Among NFL Players, 2003-2007**

| | 2003 | | 2004 | | 2005 | | 2006 | | 2007 | |
|---|---|---|---|---|---|---|---|---|---|---|
| Total Signing Bonus[a] | $833,446,205 | | $989,681,552 | | $775,180,194 | | $908,253,709 | | $898,656,147 | |
| Average Signing Bonus | $701,554 | | $882,069 | | $746,083 | | $889,759 | | $889,759 | |
| Total # of Signing Bonuses[b] | 1,188 (70.0%) | | 1,122 (66.2%) | | 1,039 (61.3%) | | 1,069 (63.0%) | | 1,010 (59.6%) | |
| Total # of NFL Players[c] | 1,696 | | 1,696 | | 1,696 | | 1,696 | | 1,696 | |
| | % of Players w/ Bonus | % of Total Players[d] | % of Players w/ Bonus | % of Total Players[d] | % of Players w/ Bonus | % of Total Players[d] | % of Players w/ Bonus | % of Total Players[d] | % of Players w/ Bonus | % of Total Players[d] |
| $1-$250,000 | 65.1 | 45.6 | 61.6 | 41.0 | 65.0 | 40.0 | 62.3 | 39.3 | 64.6 | 38.4 |
| $250,001-$500,000 | 9.7 | 6.8 | 9.2 | 6.1 | 9.3 | 5.7 | 9.4 | 5.9 | 9.5 | 5.7 |
| $500,001-$750,000 | 4.0 | 2.8 | 5.0 | 3.3 | 3.8 | 2.3 | 4.3 | 2.7 | 3.8 | 2.2 |
| $750,001-$1,000,000 | 3.1 | 2.2 | 2.9 | 1.9 | 4.2 | 2.6 | 3.4 | 2.1 | 4.0 | 2.4 |
| $1,000,001-$1,250,000 | 1.8 | 1.2 | 2.3 | 1.5 | 1.6 | 1.0 | 1.9 | 1.2 | 1.6 | 0.9 |
| $1,250,001-$1,500,000 | 2.8 | 1.9 | 2.6 | 1.7 | 2.6 | 1.6 | 2.2 | 1.4 | 2.2 | 1.3 |
| $1,500,001-$1,750,000 | 1.6 | 1.1 | 1.2 | 0.8 | 1.1 | 0.6 | 1.3 | 0.8 | 0.6 | 0.4 |
| $1,750,001-$2,000,000 | 2.2 | 1.5 | 2.1 | 1.4 | 2.3 | 1.4 | 2.6 | 1.7 | 1.8 | 1.1 |
| $2,000,001-$3,000,000 | 3.8 | 2.6 | 4.7 | 3.1 | 2.9 | 1.8 | 4.1 | 2.6 | 3.8 | 2.2 |
| $3,000,001-$4,000,000 | 1.6 | 1.1 | 2.6 | 1.7 | 2.1 | 1.3 | 2.5 | 1.6 | 1.9 | 1.1 |
| $4,000,001-$5,000,000 | 1.4 | 1.0 | 1.8 | 1.2 | 1.5 | 0.9 | 2.3 | 1.5 | 1.5 | 0.9 |

CRS-69

| | 2003 | | 2004 | | 2005 | | 2006 | | 2007 | |
|---|---|---|---|---|---|---|---|---|---|---|
| $5,000,001-$6,000,000 | 0.9 | 0.6 | 1.0 | 0.6 | 1.1 | 0.6 | 1.0 | 0.6 | 1.3 | 0.8 |
| $6,000,001-$7,000,000 | 0.4 | 0.3 | 0.8 | 0.5 | 1.2 | 0.7 | 0.8 | 0.5 | 0.7 | 0.4 |
| $7,000,001-$8,000,000 | 0.4 | 0.3 | 0.7 | 0.5 | 0.1 | 0.05 | 0.7 | 0.4 | 0.6 | 0.4 |
| $8,000,001-$9,000,000 | 0.2 | 0.1 | 0.6 | 0.4 | 0.5 | 0.3 | 0.3 | 0.2 | 0.2 | 0.1 |
| $9,000,001-$10,000,000 | 0.5 | 0.4 | 0.2 | 0.1 | 0.2 | 0.1 | 0.2 | 0.1 | 0.7 | 0.4 |
| $10,000,001 + | 0.5 | 0.4 | 0.7 | 0.5 | 0.5 | 0.3 | 0.8 | 0.5 | 1.5 | 0.9 |

**Source:** Information provided by the NFL Players Association to the author on Jan. 8, 2008;  as described in table note d, some calculations performed by the author.

a. The term "signing bonus" ""includes bonuses which are either labeled as such or are payable 'up front' or with a similar degree of certainty, such as first year roster bonuses, reporting bonuses, or option bonuses." (NFL Players Association, "Guaranteed Contracts in Professional Team Sports: How Does the NFL Compare?" NFLPA Issue Paper, n.d.,  p. 4. Information provided by telephone by the NFL Players Association to the author on Jan. 15, 2008.)  Although some signing bonuses may be multiyear, each signing bonus in this table is included only in the year in which it was negotiated and agreed to.
b. The percentage in this row is the percentage of the total number of players who received a signing bonus.
c. The total number of players was calculated by multiplying the number of teams by the number of players each team is permitted to have on its regular season and post-season roster, which is 53.
d. The percentage of total players was calculated in this manner: the figure in the column "% of Players w/Bonus" was multiplied by the "Total # of Signing Bonuses."  The result of this calculation was rounded and then divided by the "Total # of NFL Players."  For example, for the year 2003, .651 ("% of Players w/Bonus") was multiplied times 1,188 ("Total # of Signing Bonuses").   The result was 773.338, which was rounded to 773.  Dividing 773 by 1,696 ("Total # of NFL Players") resulted in .4558, or 45.6%.

The percentage of total players who received a signing bonus each year varied from a low of 40.0% in 1993 to a high of 81.3% in 2000. The largest change between consecutive years was a 27.6 percentage point increase from 1993 (40.0%) to 1994 (67.6%), which might be related to the approval of a new CBA in 1993. For the period 1995-2003, the percentage was at or above 70.0%. However, after reaching 81.3% in 2000, the percentages have declined each year so that, in 2007, 59.6% of total players received a signing bonus, which is a decrease of 21.7 percentage points since 2000. The signing bonus category, the range, and the difference between the lowest and highest percentages are in **Table 11**.

### Table 11.  Range of Percentage of Total Players Who Received a Signing Bonus, by Signing Bonus Amount

| Amount of Signing Bonus | Range of Percentage of Total Players for the Years 1993-2007 | Difference in Percentage Points Between Lowest and Highest Percentage |
|---|---|---|
| $1-$250,000 | 29.4%-58.4% | 29.0 |
| $250,000-$500,000 | 5.0%-7.6% | 2.6 |
| $500,001-$750,000 | 1.7%-4.0% | 2.3 |
| $750,001-$1,000,000 | 0.8%-3.2% | 2.4 |
| $1,00,001-$1,250,000 | 0.8%-1.8% | 1.0 |
| $1,250,001-$1,500,000 | 0.7%-2.3% | 1.6 |
| $1,500,001-$1,750,000 | 0.3%-1.8% | 1.5 |
| $1,750,001-$2,000,000 | 0.2%-1.8% | 1.6 |
| $2,000,001-$3,000,000 | 0.4%-4.0% | 3.6 |
| $3,000,001-$4,000,000 | 0%-3.0% | 3.0 |
| $4,000,001-$5,000,000 | 0.1%-1.8% | 1.7 |
| $5,000,001-$6,000,000 | 0.06%-0.8% | 0.74 |
| $6,000,001-$7,000,000 | 0%-0.7% | 0.7 |
| $7,000,001-$8,000,000 | 0%-0.6% | 0.6 |
| $8,000,001-$9,000,000 | 0%-0.4% | 0.4 |
| $9,000,001-$10,000,000 | 0%-0.4% | 0.4 |
| $10,000,001+ | 0%-0.9% | 0.9 |

**Sources:** Tables 8-10.

The largest percentage of players who received a signing bonus each year received a bonus valued at $250,000 or less. The percentage of total players who received an amount in this category ranged from 29.4%, in 1993, to 58.4%, in 1995. Except for 1997 and 2000, the percentage steadily declined from 1995 through 2007. The percentage dropped by 20.0 percentage points over this period. Consequently,

CRS-71

in 2007, the percentage (38.4%) is only 9.0 percentage points higher than the 1993 figure (29.4%). The percentages of total players who received other signing bonus amounts experienced much smaller changes over the 15-year period. Thus, **Table 11** shows that the overall decrease in the percentage of players who received signing bonuses was due primarily to the steady decline in the percentage of players who receive signing bonuses valued at $250,000 or less.

The nature of the game of football, and, in particular, the risk of injury and how that risk is apportioned between players and teams appears to have some bearing on how compensation is structured. News accounts regarding three players who had sustained injuries — Wayne Chrebet, Matt Birk, and Dan Morgan — and how their respective teams responded to their situations illustrates how risk is allocated between the team and the player. A description of how then-New York Jet Wayne Chrebet's contract was re-structured shows the complexity of one player's contract, and illustrates how a team can protect itself financially. Of particular concern to the team, apparently, was the number of concussions that Chrebet already had sustained; reportedly, he had had at least six concussions by the time he retired several months after the end of the 2005 season.[212] The article on Chrebet's "concussion clause" stated the following:

> Chrebet, signed through 2008, agreed to a $1.3 million pay cut that lowers his base salary this season [2004] to $1.5 million, according to NFL Players Association documents. The pay cut isn't a surprise, considering Chrebet probably will lose his starting job, but the new contract does include an injury-related wrinkle. The Jets got Chrebet to sign a 'split' contract, a complicated deal that would save them from having to pay his entire $1.5 million salary if he's placed on injured reserve with a concussion. Ordinarily, a player receives his full salary on injured reserve. Clearly, the Jets are concerned that another concussion would end Chrebet's season — and quite likely his career. The 'split' salary, as negotiated by both parties, is $500,000. It means that, if Chrebet were to land on injured reserve, his salary would drop to $500,000 from $1.5 million. Pro-rated over the course of a season, the difference is about $60,000 per week. The contract states that only a concussion, and no other injury, can trigger the 'split' salary. To sweeten the deal for Chrebet, the Jets guaranteed $500,000 of the $1.5 million salary. He receives that amount no matter what, even if he's not on the opening-day roster.[213]

In 2005, Matt Birk, a center for the Minnesota Vikings, considered how much risk he wanted to take in continuing to play while injured, as recounted in a news article.[214] Although he had had three hernia operations and was experiencing chronic

---

[212] William C. Rhoden, "A Jet Who Led with His Head, and His Heart," *New York Times*, Sept. 24, 2007, available at [http://www.nytimes.com/glogin?URI=http://www.nytimes.com/2007/09/24/sports/football/24rhoden.html&OQ=_rQ3D1&OP=1744e5c7Q2FlOkAl6_YRx__r7l7Q51Q51.lQ51Q27l7blRW_xrRlQ7E__rAyccl7bxQ5D_6kztQ5DrBc].

[213] Rich Cimini, "Jets Give Chrebet Concussion Clause," *New York Daily News*, Mar. 31, 2004, available at [http://www.nydailynews.com/archives/sports/2004/03/31/2004-03-31_jets_give_chrebet_concussion.html].

[214] Joseph Nocera, "The Union That Can't Throw Straight," *New York Times*, Sept. 17,
(continued...)

CRS-72

pain, Birk played in most games during the 2004-2005 season. At the beginning of the 2005-2006 season, he asked the team to guarantee his salary for the 2006-2007 season. He offered to play injured — he had a hip injury — during the 2005-2006 season in exchange for guaranteed salary the following season. Reportedly, Birk explained his reasoning as follows:

> Playing with pain is part of the game.... But I felt that I had risked my career by playing injured last year [2004], and probably shortened it. And I wasn't willing to do it again unless the team was going to assume some of the risk." So he asked the Vikings to guarantee the $3.94 million his contract called for him to get next year [2006]. The Vikings declined. On Tuesday, Mr. Birk went under the knife. He's done for the season.[215]

Another player who, reportedly, had his contract restructured because of his team's concern about his history of concussions is Dan Morgan. *The New York Times* article described his situation as follows:

> ... teams are wary of players with a history of concussions. An example is Carolina Panthers linebacker Dan Morgan — who has sustained at least five concussions but was cleared to continue playing — and faced being cut had he not agreed to restructure his $2 million roster bonus into payments of $125,000 for each game he played. Beyond acknowledging the team's concerns about subsequent concussions, the contract gave Mr. Morgan financial incentive not to reveal any concussion for treatment. Mr. Morgan has missed most of this season [2007] with a torn Achilles' tendon, and has declined interview requests by The New York Times. Regarding the restructuring of his contract, Mr. Morgan told The Herald of Rock Hill, S.C., "I didn't have a problem with that, because that's just them protecting themselves."[216]

Without data, it is impossible to know how many players have faced situations similar to Chrebet's, Birk's, or Morgan's; have obtained one or more guarantees in their contracts; or have been unsuccessful in obtaining any type of guarantees.

Andrew Zimbalist, an economics professor at Smith College who has written extensively on sports economics, summarized the situation in the NFL: "'The lack of guaranteed contracts is a natural outcome of football players getting hurt'."[217] In a similar vein, the NFL Players Association offered this explanation for "no-cut" contracts (that is, contracts that do not include any guarantees):

> There's no argument that no-cut contracts in the NFL have been a rarity. For a lot of reasons. Mainly, owners just said "No." That's the way "Things had always been" and traditionally owners held virtually all of the leverage in contract negotiations. That meant that players, who rarely — if ever — had a

---

[214] (...continued)
2005, p. C1.

[215] Ibid.

[216] Alan Schwarz, "For Jets, Silence on Concussions Signals Unease," *New York Times*, Dec. 22, 2007, p. A20.

[217] Nocera, "The Union That Can't Throw Straight."

viable alternative if they wanted to have a pro football career, were forced to sign a series of one year non-guaranteed contracts. The NFL was "unique," owners argued, because injury rates to players (who, ironically took all the risks) were so high that there was no desire to have [to] keep on paying players no longer in the league.[218]

If injury risk were re-allocated and the compensation structure were altered accordingly, players might be less likely to play with injuries, which would benefit them immediately, and might also positively affect their long-term health. On the other hand, NFL teams might be adversely affected if they were required to bear more of the risk related to injuries than they do presently. A team cannot pay its players more than the NFL-established salary cap each year.[219] The existence of a salary cap means that a team would be unable to hire and pay additional players to play in place of injured players while it continues to pay the salaries of the injured players. A related problem is that a team may be unwilling or unable financially to pay the salaries of more than 53 players (a team can have only 53 players on its regular season and postseason rosters). The NFLPA describes this dilemma for teams as follows:

> In the NFL, the salary cap rules require that any salary paid in a given year must count against the cap for that year even if the player is no longer playing. If a team has a large number of guaranteed contracts, a rash of injuries to players covered by those contracts could cause severe cap problems for the team and diminish its ability to compete with healthy players on the field.[220]

A journalist for *The New York Times* explains further how "guaranteed contracts" could adversely affect a team's ability to maintain a competitive team:

> ... there are seasons when dozens of players on one roster will miss at least some games because of injury. If football teams had to pay every player whose abilities were diminished as a result of injury, or had to continue paying a player who had suffered a career-ending injury, there is no way they'd be able to stay

---

[218] NFL Players Association, "A New Look at Guaranteed Contracts in the NFL." A related issue is the length of contracts: "Fans often read about multiyear deals, but NFL compensation packages are really a series of one-year contracts. Because of career-ending injuries, players increasingly rely on signing bonuses struck at the beginning of the contract and performance incentives after they take the field. Signing bonuses now constitute half of a player's take-home pay, according to the National Football League Player's Association." (Prine, "Bloody Sundays.") Reportedly, the rationale offered by an employee of the NFL for one-year contracts is as follows: "The NFL is a competitive sports league .... We put the world's best athletes on the field, so it's a competitive business by its very nature. Let's say a team gave someone a long-term contract. What's the player's incentive to compete? You must have an incentive to get out there and compete at the highest level, or you won't have the competitive excellence that we have in the NFL." (Ibid.)

[219] The "salary cap" is the "absolute maximum amount of Salary that each Club may pay or be obligated to pay" its players each year. (National Football League and the NFL Players Association, *NFL Collective Bargaining Agreement, 2006-2012*, p. 7.)

[220] NFL Players Association, "Guaranteed Contracts in Professional Team Sports: How Does the NFL Compare?" p. 3.

within the [salary] cap. There would be too much "dead money" going to players who weren't playing.[221]

Combining the salary cap with so-called guaranteed contracts possibly could undermine a team's ability to field a competitive team, which, in turn, might affect the team's revenues.

There may be a particular group of players who are especially vulnerable to choosing to play while injured, because of the way risk is allocated between the team and the players. Framed as a question, are the players who are less likely to have guarantees (or to have large guarantees) included in their contracts also the players who are more likely to be cut from the team? For some positions on a team, there are two, three, or possibly four individuals who can play a particular position. After the starter (the player who, generally, is the best at that position), the other players are listed on the depth chart, in descending order, so that the individual who is number four on the depth chart is possibly the least experienced, or least skilled, player at that position. Players who are number three or number four on the depth chart for their respective positions might feel pressured to play when injured in the hope of moving up the depth chart, or not being cut from the team following the end of the season.[222] Since these players, generally, are the least skilled or least experienced on the team, it seems possible that they are less likely than players who are ahead of them on the depth chart to have guarantees written into in their contracts. Tiki Barber, upon retiring from the New York Giants, reportedly acknowledged that this might be a problem: "Barber was quick to point out that he didn't start to ponder such things [the fact that he was no longer able to recover as quickly after games as he had in the past] until after he was an established star. He said a player trying to make a team, seize a role and earn a payday almost certainly isn't thinking about his long-term health."[223]

## Selected Challenges for Some Retired Players

Clearly, some former players are very successful after their careers have ended. Among the most well-known, by virtue of their success as players and their post-NFL careers as sports broadcasters, are, for example, Terry Bradshaw, Boomer Esiason, Howie Long, Dan Marino, and Phil Simms.[224] Other former players may, for a variety of reasons, experience very different circumstances, as described here:

---

[221] Nocera, "The Union That Can't Throw Straight," p. C1.

[222] Here is another description of what might occur: "NFL depth charts are malleable. Job security is minimal. A player goes down in a practice or a game and is quickly replaced within the next-man-up framework. Many coaches systematically ensure that injured players are out of view of the rest of the team, rehabilitating out of sight and, hopefully, out of mind." (Paul Kuharsky, "Players Sacrifice Health for Game," *Tennessean.com*, Dec. 13, 2007, available at [http://ashlandcitytimes.com/apps/pbcs.dll/article?AID=/20071213/SPORTS01/ 712130408/1001/NEWS].)

[223] Ibid.

[224] CBS, "CBS Sports Team," available at [http://sportsline.com/cbssports/team]; Fox Sports, "2007 NFL Schedule on Fox," available at [http://msn.foxsports.com/nfl/story/6671136].

While ex-NFL players can always seek employment in other professional football leagues, such as the Canadian Football League or the Arena Football League, salaries for players in those leagues usually pale in comparison to NFL salaries. Thus, for most NFL players, when their NFL career ends, so too does their professional football career. So instead of continuing a professional football career, many ex-NFL players gravitate toward positions in coaching, scouting, finance, sales or real estate, all of which can offer a good wage by most standards, but typically not by NFL standards. Other ex-NFL players lack the education, skills, or life experience to obtain continuous employment outside of football. In short, life in the NFL may be good, but it's usually very short, and the vast majority of ex-NFL players are headed for lives more akin to those of their fans than their star teammates.[225]

For some retired players, then, finding gainful employment might be relatively difficult. The lack of gainful or continuous employment could be particularly problematic for a retiree who has chronic health problems or one or more disabilities. In addition to financial remuneration, having a job, generally, provides access to health insurance or some other type of health care plan or program. If a retired player is employed by a company that does not provide medical benefits, however, it may be difficult and costly for him to obtain his own health insurance, depending upon the injuries he sustained as a player. As reported by a journalist, Joe Montana, former quarterback of the San Francisco 49ers, needed health insurance upon retiring from the NFL. The lowest estimate he received was $106,000 per year, because he was considered to be in a high-risk group.[226] Kansas City Chiefs' guard Kyle Turley reportedly has posed the following question: "How am I going to go to an insurance company and say, 'I'm overweight and have all kinds of injuries and now I've got to pay for insurance for the rest of my life'?"[227] According to another news article, Miki Yaras-Davis, director of the NFLPA's benefits department, suggested that "most players never make enough over their careers to afford out-of-pocket costs for long-term conditions, and very few insurance carriers will treat gridiron [football] ailments...."[228]

Another aspect of the financial-medical relationship is that an individual who has one or more chronic health problems or disabilities (as interpreted broadly), might not be able to get or keep a job. The lack of steady employment might decrease the probability that an individual has the resources necessary to obtain health care.

---

[225] Michael McCann, "NFL Retirement System Not As Bad, or Good, As Argued, *SI.com*, Sept. 18, 2007, available at [http://sportsillustrated.cnn.com/2007/writers/michael_mccann/09/18/hearings/index.html].

[226] Charles Chandler, "Ex-Players Say NFL Neglects Retirees; Hall of Famers: League, Union Leader Fall Short in Providing Benefits," *Charlotte Observer*, June 4, 2007, available at [http://www.factiva.com/].

[227] Les Carpenter, "Split on NFL Union's Effectiveness Lingers," *Washington Post*, Jan. 28, 2008, p. E5.

[228] Prine, "Finances Worsen Woes, Critics Say."

A former player's size — that is, the combination of his height and weight — might lead to difficulties in finding nursing home care. Eleanor Perfetto, the wife of former San Diego Charger Ralph Wenzel, had trouble finding a facility that would take her husband. Wenzel suffers from Alzheimer's-type dementia, and " victims of Alzheimer's-type diseases occasionally become violent, and former football players of his size (6 feet 2 and 215 pounds) are difficult for staff members to subdue. 'These facilities are used to older people who are fairly decrepit — who have strokes or blindness or use a walker, that sort of thing,' Dr. Perfetto said."[229]  While the 88 Plan will help former players with dementia and their families pay for their care, Dr. Perfetto's comments suggest that cost may be only part of the challenge in obtaining appropriate health care for players with certain types of diseases.

## Total and Permanent (T&P) Disability Benefit

While former players may be concerned about several of the different benefits available to them, the T&P disability benefit seems to be particularly contentious. At congressional hearings in 2007 and in news articles, several former players recounted their experiences in attempting to obtain T&P benefits. The following account about Dave Pear, a former player for the Oakland Raiders and Tampa Bay Buccaneers, appeared in the *Washington Post Magazine*:

> Since football, he has undergone seven spinal surgeries, including a 1984 operation to fuse a disk in his neck. He had his most recent spinal surgery last April [2007], when doctors fused two herniated disks in his back. Not unexpectedly, the four screws holding the disks together have left Pear with postoperative discomfort, and at this moment he is experiencing a new throbbing in his right hip. His doctors have said that at some point he'll need two new hips.... At 54, he shuffles like an ailing 80 year-old man. He suffers from chronic fatigue that leaves him falling asleep without warning on most mornings and afternoons....

> Off and on for the past quarter-century, [Pear] has been unsuccessfully pressing the NFL for disability benefits that he believes have been unjustly denied him by the league's retirement board. His monthly NFL pension is $606, but he estimates that he often spends about $1,000 alone out-of-pocket on medication.... In 1995, he believed his working days were running out. He applied for the league's total and permanent disability benefit with the retirement board. The doctor commissioned by the board to assess his condition portrayed Pear as a man whose physical ailments left him able to do little. Presented with evidence that included reports on Pear's acute fatigue, the doctor said that Pear would require a job that granted him "frequent rest breaks." He would also need, the doctor added, to be limited to sedentary work. Pear should not stand for lengthy periods, should not bend and could not be expected to lift anything more than 15 pounds, the doctor wrote.... The six-man board ... rejected his claim. Three years later, eager to put his hands on cash wherever he could find it, Pear filed for his early retirement pension from the league at the minimum age of 45 and started collecting $484 a month initially. The small benefit came to Pear's

---

[229] Alan Schwarz, "Wives United by Husbands' Post-N.F.L. Trauma," *New York Times*, Mar. 14, 2007, p. C15.

savings account at a severe cost: In accepting it, he sacrificed any claim to a disability payment forever, according to the rules of the retirement board plan.[230]

The following is the NFLPA's account of Pear's efforts to obtain disability benefits:

> Mr. Pear played professional football in the NFL from 1975-1980.... Mr. Pear applied for LOD benefits in 1983. At that time, the Retirement Board was required to determine that the player's injury caused him to leave football before it could grant LOD benefits. After evaluating the report of the neutral physician who examined Mr. Pear, the three player trustees [on the Retirement Board] wanted to award Mr. Pear the LOD benefits, but the three management trustees refused to do so. As a result of this deadlock, the Board sent the issue to an arbitrator, who ultimately ruled that the injury did not cause Mr. Pear to leave football.... Mr. Pear applied for T&P benefits in 1995. The [Retirement] Plan doctor who examined Mr. Pear determined that he could work. The [Retirement] Board therefore concluded that Mr. Pear did not qualify for T&P disability benefits.[231]

When the T&P disability benefit was established, only two categories of benefits, "active football" and "active nonfootball," were included. The "football degenerative" and "inactive categories" were added in 1993. An individual does not have to be vested to receive "active football" or "active nonfootball" T&P benefits, but he must be vested to receive "football degenerative" and "inactive benefits."[232] The four benefit categories, including the amount of monthly payment, are as follow:

- Active football. The monthly benefit will not be less than $4,000 if the disability or disabilities arise out of NFL football activities, or arise while the player is an active player, and otherwise cause the player to be totally and permanently disabled "shortly after" the disability or disabilities first arise.[233]

- Active nonfootball. The monthly benefit will not be less than $4,000 if the disability or disabilities do not result from NFL football activities, but do arise while the player is an active player, and cause the player to be totally and permanently disabled "shortly after" the disabilities first arise.

- Football degenerative. The monthly benefit will not be less than $4,000 if the disability or disabilities arise out of NFL football activities and result in T&P disability before 15 years after the end of the player's last credited season.

---

[230] Michael Leahy, "The Pain Game," *Washington Post Magazine*, Feb. 3, 2008, pp. 10, 23.

[231] NFL Players Association, "NFLPA White Paper," pp. 14-15. As a result of the collective bargaining process for the 1993 CBA, the requirement for the LOD disability benefit that a player's injury must have forced him to retire was eliminated from the retirement plan. (Ibid., p. 15.)

[232] Letter from Upshaw to Reps. Conyers, Smith, Sanchez, and Cannon, p. 5.

[233] See **Table 4**, note o. for an explanation of "shortly after."

- Inactive. The monthly benefit will not be less than $1,500 ($1,750 for applications received on or after April 1, 2007) if the T&P disability arises from other than NFL football activities while the player is a vested inactive player, or the disability or disabilities arise(s) out of NFL football activities and result(s) in total and permanent disability 15 or more years after the end of the player's last credited season, whichever is later.[234]

Individuals who receive active T&P benefits in the "active football," "active nonfootball," or "football degenerative" categories automatically qualify for NFL Player Supplemental Disability Plan benefits.[235] **Table 12** shows the amounts of payments for each category of T&P benefit. The NFL and the NFLPA announced on February 29, 2008, that "the minimum benefit post-career" for "non-football 'total and permanent' disability" had doubled from "$20,000 to $40,000 per year for retired players who become disabled unrelated to football," which, apparently, is a reference to "inactive" benefits.[236] However, because details involving this change are not available yet, **Table 12** does not incorporate this change.

### Table 12. Total and Permanent Disability Payments by Category

| Category | T&P Disability Benefit Amount | Supplemental Disability Plan Benefit Amount | Total |
|---|---|---|---|
| **Active Football** | | | |
| Monthly | $4,000 | $14,670 | $18,670 |
| Annually | $48,000 | $176,040 | $224,040 |
| **Active Nonfootball** | | | |
| Monthly | $4,000 | $7,167 | $11,167 |
| Annually | $48,000 | $86,004 | $134,004 |
| **Football Degenerative** | | | |
| Monthly | $4,000 | $5,167 | $9,167 |
| Annually | $48,000 | $62,004 | $110,004 |

[234] *Bert Bell/Pete Rozelle NFL Player Retirement Plan*, p. 20.

[235] *Bert Bell/Pete Rozelle NFL Player Retirement Plan, Summary Plan Description*, Apr. 2005, p. 15.

[236] National Football League and NFL Players Association, "NFL and NFL Players Association Expand Disability Benefits Program for Retired Players," p. 1.

| Category | T&P Disability Benefit Amount | Supplemental Disability Plan Benefit Amount | Total |
|---|---|---|---|
| **Inactive** | | | |
| Monthly | $1,500[a] | 0 | $1,500 |
| | $1,750[b] | 0 | $1,750 |
| Annually | $18,000[a] | 0 | $18,000 |
| | $21,000[b] | 0 | $21,000 |

**Sources:** National Football League and NFL Players Association, *NFL Collective Bargaining Agreement, 2006-2012*, Mar. 8, 2006; *Bert Bell/Pete Rozelle NFL Player Retirement Plan*, Apr. 1, 2001.

a. This amount is for players who applied for T&P benefits prior to Apr. 1, 2007.
b. This amount is for players who applied on or apply after Apr. 1, 2007 for T&P benefits.

An active player who sustains an injury that results in a T&P disability receives the largest annual payment, $224,040. Comparing the latter three categories with this category ("active football") shows that the "active nonfootball" total annual amount equates to 60% of the "active football" benefit total annual amount; "football degenerative" equates to 49%; and "inactive" equates to 8% ($18,000) and 9% ($21,000). The size of the payment for the "inactive" category, when compared to the size of the payments for the other three categories, and the threshold for distinguishing between a "degenerative football" disability and an "inactive" disability (which is discussed below), might contribute to the contentious nature of disagreements between retirees, on the one hand, and the NFL, the NFL Players Association, and the Plan Office, on the other hand.

As **Table 12** shows, the benefit amount decreases if the disability is not related to football, and whether a disability is related to football is determined by the amount of time that has passed since retirement from the NFL. In the following explanation of how T&P benefits are structured, the NFLPA essentially confirms that this is the methodology for determining the size of benefit for each category:

> The criteria for all of these T&P benefits [the four categories] were forged in collective bargaining. Which category applies in a specific case generally depends on (1) the cause of the disability and (2) the length of time between a player's NFL career and his inability to work. In the view of the NFLPA, it is appropriate for the benefit to be greater where NFL football was the cause and it is appropriate that the payment amount may depend in part on the length of time between the player's NFL career and his inability to work.[237]

This explanation raises a few questions. For example, does scholarly literature indicate that total and permanent disabilities caused by injuries peculiar to playing professional football manifest themselves within a certain time frame? Specifically, is the time frame selected by the NFL and the NFLPA — 15 years — supported by

---

[237] Letter from Upshaw to Reps. Conyers, Smith, Sanchez, and Cannon, p. 18.

scholarly literature?  Additionally, do some types of disabilities appear later than others?

The threshold (that is, time frame) for determining whether a player's disability can be classified as "football degenerative" instead of "inactive" was changed in 2006  for applications received on or after September 1, 2006.  **Table 13** shows the relevant language prior to the 2006 amendment — which still applies to applications received prior to September 1, 2006 — and the current (post-amendment) language, which applies to applications received on or after September 1, 2006.  The key difference between the two versions, as shown below, is that the time threshold, which is used to determine whether a player who is otherwise eligible for T&P benefits receives the "football degenerative" benefit, has changed.

## Table 13. Selected Criteria for Football Degenerative and Inactive Categories

| Retirement PlanVerison | Football Degenerative | Inactive |
|---|---|---|
| Prior to 2006 Amendment[a] | "(c)The monthly benefit will not be less than $4,000 if the disability or disabilities arise out of NFL football activities and results in T&P disability before age 45 or 12 years after the end of the player's last credited season, whichever is later." | "(d) Inactive: monthly benefit will not be less than $1,500 if the T&P disability arises from other than NFL football activities while the player is a vested inactive player, or the disability or disabilities arises out of NFL football activities and results in total and permanent disability after age 45 or 12 years after the end of the player's last credited season, whichever is later." |
| 2006 Amendment[b] | "(c) Football degenerative: monthly benefit will not be less than $4,000 if the disability or disabilities arise out of NFL football activities and results in T&P disability before 15 years after the end of the player's last credited season." | "(d) Inactive: monthly benefit will not be less than $1,500 [or $1,750 for individuals who applied on or after April 1, 2007] if the T&P disability arises from other than NFL football activities while the player is a vested inactive player, or the disability or disabilities arises out of NFL football activities and results in total and permanent disability 15 or more years after the end of the player's last credited |

| Retirement PlanVerison | Football Degenerative | Inactive |
|---|---|---|
|  |  | season, whichever is later." |

**Sources:** *Bert Bell/Pete Rozelle NFL Player Retirement Plan*, Apr. 1, 2001; "Bert Bell/Pete Rozelle NFL Player Retirement Plan, Amendment," amendment to Sec. 5.1(c), signed Sept. 12, 2006; "Bert Bell/Pete Rozelle NFL Player Retirement Plan, Amendment," amendment to Sec. 5.1(d), signed Oct. 4, 2006.

a. The language in this row applies to applications received prior to Sept. 1, 2006.
b. The language in this row applies to applications received on or after Sept. 1, 2006.

**Table 14** shows how the change in the threshold will affect players, depending upon the age at which they retire, who file for T&P disability benefits on or after September 1, 2006.

### Table 14. Effect of 15-Year Threshold on Eligibility for "Football Degenerative" Benefits

| Age at Which Player Retires | Latest Age at Which Player Can Receive "Football Degenerative" Benefits | |
|---|---|---|
|  | Prior to 2006 Amendment | 2006 Amendment |
| 23[a] | 45 | 38 |
| 25 | 45 | 40 |
| 30 | 45 | 45 |
| 35 | 47 | 50 |
| 40 | 52 | 55 |
| 45 | 57 | 60 |
| 50 | 62 | 65 |

**Sources:** Table developed by the author using the following information: *Bert Bell/Pete Rozelle NFL Player Retirement Plan*, Apr. 1, 2001; "Bert Bell/Pete Rozelle NFL Player Retirement Plan, Amendment," amendment to Sec. 5.1(c), signed Sept. 12, 2006; "Bert Bell/Pete Rozelle NFL Player Retirement Plan, Amendment," amendment to Sec. 5.1(d), signed Oct. 4, 2006.

a. This is most likely the youngest age at which a player could retire and be vested. A player must have three credited seasons to be vested, and it is assumed that no one younger than 20 enters the NFL. Pursuant to the CBA, an individual shall not be eligible for the draft "until three regular NFL seasons have begun and ended following either his graduation from high school or graduation of the class with which he entered high school, whichever is earlier. For example, if a player graduated from high school in December 2006, he would not otherwise be eligible for selection, until the 2010 Draft." (National Football League and NFL Players Association, *NFL Collective Bargaining Agreement*, 2006-2012, Mar. 8, 2006, p. 46.)

CRS-82

This table shows that the change in criteria will affect differently players younger than age 30 and players older than age 30 at the time of retirement. For players who are younger than 30 when they retire, their disabilities, if any, will need to surface at a younger age than under the previous criteria for them to be eligible for the "football degenerative" benefit. Players who retire at age 31 or older will have an additional three years, compared to the previous criteria, in which their disabilities may surface for them to be eligible for the "football degenerative" category. The implications of this change in criteria for players who retire before they reach age 30 are unknown. As noted above, the length of an average career is 3½ seasons, so a significant number of players might retire before age 30. Accordingly, players who have relatively short careers probably sustain fewer injuries than their peers who play for 10 or 15 years.

Applications for disability benefits are initially considered by the Disability Initial Claims Committee (DICC). Subsequently, an applicant may have an application reconsidered by the Retirement Board. (29 CFR §2560.503-1(h)(3)(ii) and (4) require a disability plan to have a mechanism for an applicant to appeal an adverse benefit determination, and stipulate that neither the individual who made the adverse determination, nor anyone subordinate to this individual, can hear the appeal.) On its review, the Board is not bound by the evidence presented to the DICC or its findings, but rather has broad discretion as to what it may take into account, including evidence not previously presented. Decisions of the Board may be appealed to federal courts.

Overall, from July 1, 1993, through June 26, 2007, 1,052 individuals applied for LOD or T&P disability benefits: 428 applications were approved; 576 were denied; and 48 are pending. The approval rate, which does not include the cases that are pending, is 42%.[238] The following series of statements shows the status of applications at each step of the process.

- 1,052 applications submitted for disability benefits.
  - 358 (34%) applications approved.
  - 675 (64%) applications denied.
  - 19 (2%) applications are pending.
- 223 (33% of 675) applications denied at the initial stage were appealed.
  - 69 (31%) approved on appeal.
  - 132 (60%) denied on appeal.
  - 22 (10%) appeals are pending.
- 32 (24% of 132) applicants whose appeals were denied filed a lawsuit.
  - 1 (3%) lawsuit resulted in a reversal of the Retirement Board's decision.

---

[238] Letter from Upshaw to Reps. Conyers, Smith, Sanchez, and Cannon, pp. 9-10.

- 24 (75%) lawsuits resulted in the Retirement Board's decisions being upheld.

- 7 (22%) lawsuits are pending.[239]

This tally shows that of the cases it decided, the DICC's approval rate was a little over 34%. The Retirement Board's approval rate of the cases it reviewed following DICC consideration was similar, at 31%. The opportunity for Retirement Board review resulted in a greater overall approval rate of about 42% of applications filed. On the other hand, were the Retirement Board alone to have considered applications, it is not certain that the overall approval rate would have been lower than 42%, or if the approval rate might be equal to or even exceeding the 42% rate.

The reasons applications are denied, which are not publicly available, might shed some light on why applicants decide not to appeal, or otherwise challenge, adverse decisions. Some applicants may have missed a deadline, not been able to provide satisfactory documentation to the Disability Initial Claims Committee (DICC), or applied for T&P benefits while already receiving a retirement plan pension (a player who is receiving a pension is not eligible for disability benefits). Information on the reasons for denial possibly could be useful in identifying processes, policies, or guidelines that could be improved. Information on the reasons for denial, particularly if made available to former players (if not to the public as well), could provide some transparency and possibly facilitate accountability.

**Table 15** shows how many former players receive, or have received, T&P benefits as of a single day. The latter group includes players who, upon reaching age 55, had their T&P benefits automatically converted to pension payments, with no reduction in the amount of money they receive. The data in **Table 15** are current as of a single day, October 23, 2007.

### Table 15. Number of Players Who Are Receiving or Have Received T&P Benefits, as of October 23, 2007

| T&P Disability Category | Number and Percentage of Players Receiving T&P Benefits as of October 23, 2007[a] | Number and Percentage of Players Who Are Age 55 or Older and Who Previously Received T&P Benefits[b] | Total |
|---|---|---|---|
| Active Football | 6 (4%) | 2 (3%) | 8 (4%) |
| Active Nonfootball | 9 (6%) | 3 (4%) | 12 (5%) |
| Football Degenerative | 91 (60%) | 21 (30%) | 112 (50%) |

---

[239] Ibid.

| T&P Disability Category | Number and Percentage of Players Receiving T&P Benefits as of October 23, 2007[a] | Number and Percentage of Players Who Are Age 55 or Older and Who Previously Received T&P Benefits[b] | Total |
|---|---|---|---|
| Inactive | 48 (31%) | 44 (63%) | 92 (41%) |
| Total | 154 | 70 | 224 |

**Source:** Letter from Eugene Upshaw, Executive Director, NFL Players Association, to Reps. John Conyers, Jr., Lamar S. Smith, Linda T. Sanchez, and Christopher B. Cannon, Nov. 5, 2007, pp. 6-7.

a. This column includes former players who are age 54 or younger.
b. Disability benefits are converted to retirement benefits at age 55. The amount of the benefit does not change when the conversion occurs.

According to **Table 15**, eight players receive the highest payment available ($224,040). Moving on to "active nonfootball," 12 former players receive payments that equate to 60% of the highest payment; 112 players in the "football degenerative" category receive payments that are 49% of the highest amount; and 92 players in "inactive" category receive 8% or 9% of the highest amount. Comparing the total number of players who are younger than age 55 with the total number of players who are age 55 or older shows that more than twice as many players receiving T&P benefits are under age 55. **Table 15** also shows that the percentages of players receiving "active football" and "active nonfootball" benefits are similar. A significant difference between the two age groups is evident in the percentages of players who receive "football degenerative" and "inactive" benefits: 60% of the players younger than 55 receive "football degenerative" benefits while only 30% of players older than 55 receive the same type of benefit. The percentages are reversed for "inactive benefits." It is not clear why this difference exists. It may be due, for example, to changes in the benefit plan over the years. As noted above, the benefit plan initially included only two types of T&P benefits.

A comparison between active players and former players shows that only 9% (active football and active nonfootball) of the T&P disabilities occurred when an individual was in the NFL. Conversely, the data suggest that most T&P disabilities — 91% — surface after players have retired and been out of the NFL more than six months.

The league and the players association have taken steps designed to improve the disability application process. In December 2007, the NFL announced that the organizations had agreed on a series of improvements involving disability benefits, including providing prescription drug cards to retired players that will permit them to buy prescription medications at a discount.[240] The changes are as follow:

---

[240] National Football League, "Improvements Made to Disability Plan Procedures," news release, Dec. 12, 2007.

1. Medical Director — The plan will retain a medical director to consult with the two-person initial claims committee and, as needed, with the retirement board to assist in resolving claims. It is expected that this will reduce the number of initial denials at the claims committee level, expediting both initial approvals and the processing of appeals. In addition, the medical director can help ensure that standards are consistently applied, that reports are prepared in a timely basis, and otherwise monitor the performance of neutral physicians.

2. Physician Panels — The plan will establish a series of physician "panels" or "teams," consisting of doctors with experience in orthopedic and other practices. These teams will be located in areas where there is the largest concentration of retired players, including in Arizona, California, Florida and Texas, as well as in other major metropolitan areas. This change will reduce the trips required of people needing to be examined by doctors in different specialties.

3. Claims Specialist — The plan will provide a specialist to receive calls from applicants via a toll-free number. This specialist will assist in preparing applications and advise applicants on the information that is required. The completed application will be sent to the applicant for review, verification and signature. The 45-day review period will begin once the signed application is returned. This service will make it more likely that applications are completed correctly the first time and thus reduce the processing time.

4. Expedited Email Appeals — The retirement board will, whenever possible, decide appeals via email ballots. This will allow for faster decisions on many appeals and will avoid requiring applicants to wait for the next scheduled meeting of the retirement board.

5. Extending Review Period — The plan will reduce the number and frequency of continuation reviews for those applicants receiving total and permanent disability benefits by extending the current three-year maximum to at least five years. Any three trustees may require a continuation review more frequently, although not more frequently than annually, if they decide there is reason to do so.[241]

Furthermore, the NFL and the NFLPA have agreed that any eligible former player who is receiving Social Security disability benefits will be granted disability benefits automatically and will not have to be examined by a retirement plan doctor.[242] Other changes to T&P disability benefits may be found in **Table 4**.

Conducting a program evaluation of the T&P disability benefit plan, which would include an examination of the outcomes and unintended consequences, if any, of these changes, could aid in establishing and maintaining an efficient, effective, and responsive disability plan and application process. Sharing the results of the study with all interested parties, including, for example, the NFL, NFLPA, former players, and active players, could promote transparency and accountability.

---

[241] Ibid.

[242] NFL Players Association, "NFLPA White Paper," n.d., pp. 5-6.

## Is There a Subset of Former Players with Exceptional Needs?

For a variety of reasons, it seems possible that a former player's financial and medical needs might be related to his age. While the usual effects of the aging process can affect a retiree's health and employment situation, there may be additional factors that could affect older retirees. Over the years, improvements and advances have taken place in these areas: playing rules,[243] equipment, and playing surfaces; medical knowledge, procedures, and technologies; and benefits. Therefore, it seems likely that individuals who played 20, 30, and 40 years ago might not have been protected as well as current players; might have received medical care that, while the best available at the time, was not as effective or successful as the care available today; and are not eligible for all of the benefits available to current players. Thus, older players might be a subset with, for the reasons stated here, exceptional financial and medical needs, and their needs exceed the benefits available to them.

Playing rules, protective equipment, and playing surfaces have evolved over the years. For example, until it was prohibited in 1977, a player could use the "head slap" (that is, slap another player on the side of his helmet) to disorient another player.[244] As for protective equipment, the helmet, which, in addition to shoulder pads, is the only piece of protective equipment players are required to wear, has evolved from wool stocking caps (1800s) and leather (1920s) to fiber shell (1934) and plastic (1943-present).[245] Additionally, it was not until the early 1970s that the first safety requirements for football helmets were instituted.[246] Regarding the

---

[243] Over the years, the NFL has forbade a number of techniques used by players against one another that were deemed dangerous, such as "clothes lining," "spearing," and "cut blocking." See National Football League, "Summary of Penalties," available at [http://www.nfl.com/rulebook/penaltysummaries].

[244] U.S. Congress, House Committee on the Judiciary, Subcommittee on Commercial and Administrative Law, "The National Football League's System for Compensating Retired Players: An Uneven Playing Field? statement of Cy Smith, unpublished hearing, 110th Cong., 1st sess., June 26, 2007, p. 4.

[245] Alan Schwarz, "Far From Grandpa's Leather, Helmet Absorbs Shock a New Way," *New York Times*, Oct. 27, 2007, p. A10.

[246] Ibid. The organization that developed the test standards for football helmets, the National Operating Committee on Standards for Athletic Equipment (NOCSAE), was formed in 1969. NOCSAE comprises "representatives from a number of groups which have an interest in athletic equipment. These include manufacturers, reconditioners, athletic trainers, coaches, equipment managers, sports medicine and consumer organizations." (National Operating Committee on Standards for Athletic Equipment, "About NOCSAE," available at [http://www.nocsae.org/about/index.html].) Improvements in helmet technology continue. A new helmet, the Xenith X1, has been developed that "features 18 black, thermoplastic shock absorbers filled with air that ... can accept a wide range of forces and still moderate the sudden jarring of the head that causes concussion. Moreover, laboratory tests have shown that the disks can withstand hundreds of impacts without any notable degradation in performance, a longtime drawback of helmets' traditional foam. Dr. Robert Cantu of Brigham and Women's Hospital in Boston, one of the nation's leading experts in concussion management, reportedly called it 'the greatest advance in helmet design in at
(continued...)

playing surface in NFL stadiums, the type or types of artificial turf used in the past were found to contribute to players' injuries. A 1974 study commissioned by the NFL reportedly found that "natural grass was safer to play on than the artificial surfaces then being produced for football."[247] A 1985 *Sports Illustrated* article reported that "[t]he NFLPA found that the average turf injury took longer to heal, that the number of players placed on injured reserve increased by a third and that the number of missed games doubled when the injuries occurred on turf."[248]

It seems likely, because of ongoing medical research and advances in medical care, procedures, and technologies, that players today receive better medical care than individuals received in the past. The following excerpt from an article summarizes some of the advances that have occurred since the early 1980s:

> Arthroscopy. Doctors can now repair knees, shoulders and other joints without making huge incisions. Instead, they use tiny tools snaked via tubes under the skin to perform surgery. In the early 1980s, reconstructing a knee ligament could require a two-foot long incision and a two-hour procedure. Now it may only take a few half-inch ones and only 40 minutes to complete.

> Imaging. Players might get daily X-rays to assess the progress of a broken bone. Steelers linebacker Earl Holmes was hurt in the second quarter of one playoff game; doctors had magnetic resonance imaging pictures of his knee by the third quarter.

> Year-round training. Players now get nutrition, sports psychology and strength-training advice designed specifically around their injuries and train year-round to prevent them.[249]

In the following excerpt from a news article, a fullback for the Tennessee Titans plans to rely on improvements the field of medicine for treating his injuries, and notes a difference between his father's experience and his experience with knee surgery:

---

[246] (...continued)
least 30 years'." (Schwarz, "Far From Grandpa's Leather, Helmet Absorbs Shock a New Way," p. A1.)

[247] John Underwood, "Just an Awful Toll," *Sports Illustrated*, Aug. 12, 1985, available at [http://www.lexisnexis.com/], p. 48.

[248] Ibid. As of 2007, 19 NFL stadiums had grass playing fields, and the remainder had artificial turf, though it seems likely that, because of improvements over the years, the artificial turf installed in stadiums in the 21st century is better than the products that were installed 20 and 30 years ago. (Stadiums of the NFL, "Comparisons," available at [http://www.stadiumsofnfl.com/ comparisons.htm].) According to this source, among the stadiums that have artificial turf, 11 have had FieldTurf installed, and one stadium has a SportExe product. Information about these companies and their products is available at [http://www.fieldturf.com/index.cfm] and [http://www.sportexe.com/], respectively. These companies' websites include descriptions of how their products are designed and constructed.

[249] Vergano, "NFL Doctors, Players Face Off Over Painful Choices."

Case 1:25-cv-02723-AS Document 20-2 62 Page 322 of 1235 Date Filed 08/20/25 181

... Casey Cramer said he's thought about the effects of poundings, but he's placing a large degree of faith in medical advances. He remembers how arduous it was for his dad, a former player, to recover from knee surgery 30 years ago. He also remembers being able to walk within hours of his own knee operation. "I feel like the science is getting a lot better," Cramer said. "Surgeries, medicines, and all of those things have improved over the years. I've said jokingly that I'm banking on science to fix my body afterwards, [but] I feel like 20 or 30 years from now, science will be a lot better."[250]

Former players who did not have the benefit of the rules, protective equipment, and medical procedures and technologies that are available to today's players also have fewer benefits available to them. As shown in **Table 16**, individuals who played in the NFL prior to 1982 have eight benefits available to them; current players have 14 benefits. While this comparison shows that the number of benefits has increased over the years, it also shows how many and which benefits are not, or were not, available to some former players. For the reasons described above, however, older retirees might have the greatest medical and financial needs.

The NFL and the NFLPA announced, on February 29, 2008, that five additional benefits had been, or would be, established for former players: a joint replacement surgery and rehabilitation program, a screening program for cardiovascular health and obesity, a prostate cancer screening program, discounted rates for assisted living facilities managed by three companies, and a prescription drug card.[251] Additional information regarding these benefits is provided above, but because, for example, eligibility criteria, implementation dates, and other details have not been publicized yet, these benefits are not included in **Table 16**.

At least a few benefits were made retroactive when established or at some later date, which means that a benefit is available to all players, regardless of which year or years they played in the NFL. The 88 Plan is an example of a benefit that is retroactive, and, in 1993, the players known as "pre-59ers" were added to the Bert Bell Pension Plan. The nature of some benefits, however, seems to have precluded making them retroactive. Examples include the Second Career Savings Plan and severance pay.

---

[250] Ibid.

[251] National Football League and NFL Players Association, "NFL and NFL Players Association Expand Disability Benefits Program for Retired Players," Feb. 29, 2008, pp. 2-3.

## Table 16. Benefits Available to Players

| If an Individual Played in the NFL During the Following Period: | The Benefits Available to Him Are:[a] |
|---|---|
| Not later than 1981 | 88 Plan<br>Cardiovascular Health Program<br>Death Benefits<br>Line of Duty Disability<br>NFL Player Joint Replacement Benefit Plan<br>Retirement Benefits<br>Total and Permanent Disability Benefits<br>Workers' Compensation |
| 1982-1992 | 88 Plan<br>Cardiovascular Health Program<br>Death Benefits<br>Line of Duty Disability<br>NFL Player Joint Replacement Benefit Plan<br>Retirement Benefits<br>Severance Pay[b]<br>Total and Permanent Disability Benefits<br>Workers' Compensation |
| 1993-1997 | 88 Plan<br>Cardiovascular Health Program<br>Death Benefits<br>Line of Duty Disability<br>NFL Player Joint Replacement Benefit Plan<br>Retiree Medical[b]<br>Retirement Benefits<br>Second Career Savings Plan[b]<br>Severance Pay<br>Supplemental Disability Plan[b]<br>Total and Permanent Disability Benefits<br>Workers' Compensation |
| 1998-2003 | 88 Plan<br>Annuity Program[b]<br>Cardiovascular Health Program<br>Death Benefits<br>Line of Duty Disability<br>NFL Player Joint Replacement Benefit Plan<br>Retiree Medical<br>Retirement Benefits<br>Second Career Savings Plan<br>Severance Pay<br>Supplemental Disability Plan<br>Total and Permanent Disability Benefits<br>Workers' Compensation |
| 2004-Present | 88 Plan<br>Annuity Program<br>Cardiovascular Health Program[b] |

| If an Individual Played in the NFL During the Following Period: | The Benefits Available to Him Are:[a] |
|---|---|
| | Death Benefits<br>Health Reimbursement Account Plan[b]<br>Line of Duty Disability<br>NFL Player Joint Replacement Benefit Plan[b]<br>Retiree Medical<br>Retirement Benefits<br>Second Career Savings Plan<br>Severance Pay<br>Supplemental Disability Plan<br>Total and Permanent Disability Benefits<br>Workers' Compensation |

**Source:** Letter from Eugene Upshaw, Executive Director, NFL Players Association, to Reps. John Conyers, Jr., Lamar S. Smith, Linda T. Sanchez, and Christopher B. Cannon, Nov. 5, 2007, p. 20.

a. A player has to meet the eligibility criteria to receive a benefit.
b. The benefit was established during this time period. If the benefit is retroactive, it appears in the list for previous time period(s).

In some cases, it is possible that an individual made one or more decisions that, ultimately, resulted in adverse consequences. For example, players are, or have been, able to choose when and how they receive certain benefit payments, but the consequences of some choices can negatively affect the individual's financial status. Examples of such choices are the following:

- Prior to the 1993 CBA, a player could choose to begin receiving his pension at age 45, which is 10 years earlier than the NFL's normal retirement age of 55. By electing to begin his pension 10 years early, the "age-55 benefit is actuarially reduced by more than 50% in this situation, since [the former player] will receive [his] pension for ten more years." This option is no longer available, except to former players who played in at least one season prior to 1993. Despite being warned about the consequences of opting for an early pension, players continue to do so.[252]

- Some former players chose a "Social Security Adjustment" form of benefit, "in which the majority of their retirement benefit is paid prior to age 62, with only a token benefit starting at age 62." Electing this option decreases a player's retirement benefits when he

---

[252] NFL Players Association, "NFLPA White Paper," pp. 22-23. As noted above, players who took their NFL pension early "will be offered a new one-time opportunity" in 2008 to apply for T&P disability benefits. (National Football League and NFL Players Association, "NFL and NFL Players Association, "NFL and NFL Players Association Expand Disability Benefits Program for Retired Players," p. 1.)

reaches age 62.[253]  "For example, instead of receiving $271 a month for life beginning at age 45, a player could use this ... option to receive about $384 a month from age 45 up to age 72, and only $50 a month thereafter."[254]

- Beginning with the 1977 CBA, a player was able to choose a lump sum "early payment benefit" (EPB), which was equal to 25% of his pension, one year after retiring from the NFL.  As a result, all pension payments he would have received later were reduced by 25%.[255]

The 1993 CBA eliminated all three of these options for players who entered the NFL in 1993 or later.  According to the plan counsel for the retirement plan, under federal law, these options remain available to players who earned a credited season before 1993.[256]

In congressional testimony, the plan counsel showed, through the following account of an unnamed former player's circumstances, how a series of decisions can adversely affect an individual's finances:

> [He] complains that his retirement benefit is too small, but doesn't mention that he 1) chose to retire at age 45 with a 45% actuarial reduction, 2) elected the social security option providing the lion's share of his pension up front, 3) knew that he would only receive a token pension when he became 62, and 4) was ordered by a divorce court to share his pension with his ex-wife.[257]

As reported by a journalist, Leroy Kelly, a former running back for the Cleveland Browns, requested that his pension begin at age 45.  Consequently, his $800 monthly payment decreased to $112 when he began drawing Social Security payments.[258]  Another former player, Joe DeLamielleure, also chose to take his pension early.  Faced with a family financial crisis, the former guard for the Cleveland Browns and Buffalo Bills opted for an early pension, which resulted in a monthly payment of $992; if he had waited until he reached age 55 (normal retirement age for players), he would have received $2,200 per month.[259]  These examples show that a player's

---

[253] Ibid., p. 23.

[254] U.S. Congress, House Committee on the Judiciary, Subcommittee on Commercial and Administrative Law, "The National Football League's System for Compensating Retired Players: An Uneven Playing Field?" statement of Douglas W. Ell, unpublished hearing, 110th Cong., 1st sess., June 26, 2007, p. 6.

[255] Ibid.

[256] Ibid., p. 8.

[257] Ibid., p. 18.

[258] Charles Chandler, "Ex-Players Say NFL Neglects Retirees; Hall of Famers: League, Union Leader Fall Short in Providing Benefits," *Charlotte Observer*, June 4, 2007.

[259] Ibid.

decisions and personal circumstances (for example, getting a divorce) also might affect the level of benefits that he receives.

## What Is Known about Injuries and Possible Long-Term Consequences?

Considering the frequency and extent of football injuries, the potential risk of certain medical conditions (such as excessive weight, cardiovascular disease, and sleep apnea), and the possibility that injuries and medical conditions might have long-term consequences, how much is known about these subjects? Specifically, what do the NFL and the NFLPA know; what are their sources of information; and how do they use the information? The league and the players association have conducted or sponsored, separately as well as jointly, studies and articles on subjects related to players' health, and the NFL has several studies planned or in progress.[260] However, as demonstrated by the following examination of MTBI research, contradictions among the findings of different studies contribute to the challenge of understanding injuries, medical conditions, and their possible long-term consequences.

The following four subsections present scholarly research on the long-term effects of concussions, susceptibility to additional MTBI, and chronic traumatic encephalopathy (CTE). It is beyond the scope of this report to assess the merits and drawbacks of scholarly articles in the field of neurology. Excerpts from articles and peer reviews of articles are included to show the findings and the nature or extent of disagreement among authors. Some disagreements may flow from methodological differences, such as the type of survey instrument used (for example, telephone, mail, or personal interview) or the method used to select study participants.

Several of the articles included here were written by members of the NFL's MTBI Committee. The other articles were written by professionals in the field of neurology or related fields who are not affiliated with the NFL or the NFLPA. Members of the MTBI Committee have published 14 articles in the journal *Neurosurgery*.[261] Within each heading, articles are presented in the order in which they were published. In *Neurosurgery*, peer reviewers' comments on particular articles are published following the articles, and excerpts from each peer reviewer's comments are included with the applicable article.

**Studies on Possible Long-Term Effects of MTBI.** Although members of the MTBI Committee did not publish an article focused exclusively on the long-term effects of concussions, they did address the issue in an article on neuropsychological testing. In the sixth article of the 14-article series, committee members suggested that multiple MTBIs would not permanently affect an individual. Pellman, et al., wrote the following:

---

[260] A list of these studies and articles is found in **Appendix B**.

[261] These articles are included in **Appendix B**.

The strong correlation between the results of clinical and neuropsychological evaluations also provides supportive evidence for the position that there is no evidence in this study of widespread permanent or cumulative effects of single or multiple MTBIs in professional football players.  In other words, the results of this present study support the authors' previous work, which indicated that there was no evidence of worsening injury or chronic cumulative effects of multiple MTBIs in NFL players.[262]

NFL players did not demonstrate evidence of neurocognitive decline after multiple (three or more) MTBIs or in those players out 7+ days [from the date of the concussion].  The data show that MTBI in this population is characterized by a rapid return of neuropsoychological function in the days after injury.[263]

A theme among peer reviewers' comments was that the finding — the evidence does not support a link between single or multiple MTBIs and long-term effects — was questionable.  The following are excerpts from peer reviewers' comments:

In addition, I do not believe that this study, with correlation between clinical and neuropsychological evaluation, proves that there are no widespread permanent or cumulative effects of single or multiple MTBI in NFL players.  I think that it is premature to conclude that there are no long-term consequences of MTBI in football while players are still active, for many reasons.[264]
... these results should be interpreted with caution.  Further follow-up of players sustaining MTBI is needed to better determine the cumulative effect of multiple concussions.[265]

The authors possess a remarkable data set.  My strongest impression after reading the article was that the data set was so important that it deserved additional analysis and that a good place to start would be to remove the outliers and see the results.[266]

It is specifically recommended that the statement that there are no widespread permanent or cumulative effects of single or multiple MTBIs in professional football players be softened somewhat.[267]

---

[262] Elliot J. Pellman, et al., "Concussion in Professional Football: Neuropsychological Testing — Part 6," *Neurosurgery*, vol. 55, no. 6, Dec. 2004, p. 1299.

[263] Ibid., p. 1290.  As quoted in a news article in the *Wall Street Journal*, Dr. Pellman said that he has studied players who had multiple concussions and that "'they had all returned to normal.  Does that mean there may or may not be problems 10 to 15 years from now?  I don't know, but the early objective data say no.' Dr. Pellman says the NFL hasn't studied former players' health because they are no longer employees and are geographically scattered." (Ellen E. Schultz, "A Hobbled Star Battles the NFL," p. A2.)

[264] Elliot J. Pellman, et al., "Concussion in Professional Football: Neuropsychological Testing — Part 6," see comments by Julian E. Bailes, p. 1304.

[265] Ibid., see comments by Daniel F. Kelly, p. 1304.

[266] Ibid., see comments by Joseph Bleiberg, p. 1304.

[267] Ibid., see comments by Joseph C. Maroon, p. 1305.

Given the methods and statistical design used, it is difficult to understand how they can comment that 'The strong correlation between the results of clinical and neuropsychological evaluations also provides supportive evidence for the position that there is no evidence in this study of widespread permanent or cumulative effects of single or multiple MTBIs in professional football players.' They only studied the acute neuropsychological effects of single and repeat concussion, and the data presented tell us nothing about potential 'permanent' or long-term complications.  The authors cannot assume that there could not be chronic effects, especially since they have only looked at a brief window of time.[268]

A study carried out by physicians who are not affiliated with the NFL and led by the research director of the Center for the Study of Retired Athletes (CSRA), Kevin M. Guskiewicz, focused specifically on the long-term effects of concussions in former NFL players.  As the following excerpt shows, Gukiewicz, et al., reached a different conclusion than did Pellman, et al., regarding  possible long-term consequences of MTBIs.

These data describe a significant association between recurrent concussion and MCI, as well as with self-reported memory impairments confirmed by a spouse or close relative.  Retired professional football players with three or more concussions were twice as likely to be diagnosed with MCI as those with one or two previous concussions, and five times more likely than those with no previous concussions.  This trend continued with respect to self-reported significant memory problems.  These findings suggest that the clinical features of dementia-related syndromes ... may be initiated by repetitive cerebral concussions.[269]

Another result of the survey conducted by Guskiewicz, et al., involved the prevalence of concussions among retired NFL players.  Among former players who participated in the study, 60.8% reported having had at least one concussion during their NFL careers, and 24% reported sustaining three or more concussions.[270]

Peer reviewers' comments on Guskiewicz, et al., noted, among other points, that relying on self-reported information might affect the accuracy of the data collected.  Several peer reviewers also commented on the value and possible implications of the study.

Like all retrospective studies that rely upon self-reported medical histories and health problems, this one is subject to bias in the accuracy with which problems were recalled and reported.  Nevertheless, these results are of considerable interest.  The authors make appropriate recommendations for further prospective studies....[271]

---

[268] Ibid., see comments by Kevin M. Guskiewicz, p. 1305.

[269] Kevin M. Guskiewicz, et al., "Association Between Recurrent Concussion and Late-Life Cognitive Impairment in Retired Professional Football Players," *Neurosurgery*, vol. 57, no. 4, Oct. 2005, p. 723.

[270] Ibid., p. 721.

[271] Ibid., see comments by Alex B. Valadka, p. 725.

CRS-95

Studies such as this have the potential to provide important information [regarding the possibility of neurologic impairment surfacing after a player has retired]. Unfortunately, this particular study is confounded by a critical design flaw of relying on retired athletes to accurately recall events from decades earlier and relating those events to their current memory problems.[272]

This study has important and far-reaching implications. To my knowledge, this is one of few studies to show a positive association between repetitive concussion and long-term cognitive impairment and Alzheimer's disease.[273]

This is an interesting paper that poses an intriguing hypothesis regarding the consequences of recurrent concussion, not only to create short-term problems, but also to accelerate the decline of cognitive function in later years. While tantalizing, the findings are soft. The data are derived from a questionnaire administered to a group that may have substantial bias, especially considering the recent reports and concerns expressed by physicians and the media.[274]

This is an extremely valuable contribution. Most concussion studies focus on the days and weeks following the injury with the implicit assumption that recovery to preinjury levels is the end of the issue. The present paper provides strong suggestion that some residua of a concussion may not become manifest until decades after the injury.... The authors are to be commended for clearly stating the limitations of their retrospective self-report experimental design. However, the "gold-standard" methodology would require a multi-decade prospective study.[275]

This is an important paper on the relationship between cerebral concussion and subsequent cognitive impairment in retired professional football players. Its major flaw, as the authors acknowledge, is that the history of previous concussion was based on the players' "retrospective recall of injury events." Nonetheless, their data strongly suggests there is a cumulative deleterious effect of repeated concussion on later cognitive function.[276]

The present study does not dispel uncertainties regarding the relationship between repeated concussions and subsequent onset of brain disorders, most importantly Alzheimer's disease.... Society must provide the author with the necessary funds and incentive to do the study correctly based on professionally obtained prospective data.[277]

A second article by Guskiewicz, et al., examined another possible long-term consequence of concussions, specifically a possible connection between MTBIs and depression in former NFL players. The authors wrote,

---

[272] Ibid., see comments by Donald Marion, p. 725.

[273] Ibid., see comments by M.R. Ross Bullock, p. 725.

[274] Ibid., see comments by Arthur L. Day, p. 726.

[275] Ibid., see comments by Joseph Bleiberg.

[276] Ibid., see comments by Daniel F. Kelly, p. 726.

[277] Ibid., see comments by Charles H. Tator, p. 726.

The findings from our study of retired professional football players support the notion that lifetime prevalence of depression and feelings commonly associated with a depressed state increases as a function of previous head injury exposure.... Our observed threefold prevalence ratio for retired players with three or more concussions is daunting, given that depression is typically characterized by sadness, loss of interest in activities, decreased energy, and loss of confidence and self-esteem. These findings call into question how effectively retired professional football players with a history of three or more concussions are able to meet the mental and physical demands of life after playing professional football. Furthermore, our findings suggest that a single concussion does not provide the risk for subsequent depression, and they provide an extension to the findings on the cumulative risk of repeat concussion demonstrated in collegiate football players. In combination, these suggest that football players with three or more concussions are at a threefold risk for sustaining future concussions, with a subsequent threefold risk of being diagnosed with clinical depression compared with those with limited or no prior history.[278]

Guskiewicz, et al., then explain the impact that depression may have on an individual, noting that "[d]epression can affect one's ability to function in multiple realms, including interpersonal relationships, productivity at work, and self-care. In older adults, depression is associated with significantly higher health care costs and significant risk of functional decline. [279]

Additional findings reported by Guskiewicz, et al., in this article suggest that certain players, because of a combination of injuries and circumstances, may experience a range of problems during retirement. The following excerpt describes these circumstances and problems:

Our findings also suggest that, in general, retired professional football players who have a history of concussion and depressive episodes report greater physical limitations that interfere with their ability to perform daily physical activities compared with those without depression. The SF-36 [Short Form 36] results for mental and physical functioning reveal that those with a history of depression are more likely to be restricted by muscle and joint pain, feel helpless, have difficulty sleeping, and, in general feel as though their health is declining.[280] Individuals with a history of depression also reported more alcohol-related problems and were more likely to be separated or divorced."[281]

The journal in which this article appeared did not publish any peer review comments on this article.

---

[278] Kevin M. Guskiewicz, et al., "Recurrent Concussion and Risk of Depression in Retired Professional Football Players," *Medicine and Science in Sports and Exercise*, June 2007, p. 906.

[279] Ibid., pp. 907-908.

[280] The title of the SF-36 is "Short Form 36 Measurement Model for Functional Assessment of Health and Well-Being," and it "assesses health status and estimates how well a retired athlete functions with activities of daily living." (Kevin M. Guskiewicz, et al., "Recurrent Concussion and Risk of Depression in Retired Professional Football Players," p. 904.)

[281] Ibid., p. 906.

CRS-97

**Susceptibility to an Additional MTBI.** A study of 2,905 football players, which was also led by Kevin Guskiewicz, explored the possibility that a player who has suffered one or more concussions is more likely to sustain an additional concussion than an individual who has not had any concussions. In a published article, Guskiewicz, et al., reported that a player who has sustained a concussion, and, in particular, a player who has sustained three or more concussions, has a greater probability of having another concussion than a player who has not had three concussions. The authors wrote,

> Players reporting a history of 3 or more previous concussions were 3.0 ... times more likely to have an incident concussion than players with no concussion history.... Our study suggests that players with a history of previous concussions are more likely to have future concussive injuries than those with no history; 1 in 15 players with a concussion may have additional concussions in the same playing season; and previous concussions may be associated with slower recovery of neurological function.... These results illustrate that a history of previous concussions may be associated with an increased risk of future concussive injuries and that these previous concussion may be associated with slower recovery of neurological function following subsequent concussions. Within a given season, there may be a 7- to 10-day window of increased susceptibility for recurrent concussive injury, but this finding should be further studied in a larger sample of athletes with recurrent in-season concussions.[282]

This article was not published in *Neurosurgery*; hence, there are no comments by peer reviewers.

In an article on return-to-play considerations, which are used to determine when it is acceptable, from a medical perspective, for a player who has sustained a concussion to return to practice or to a game, Pellman, et al., suggest that a player who has sustained an MTBI does not have a greater risk of sustaining another concussion than a player who has no history of concussions.

> Players who are concussed and return to the same game have fewer initial signs and symptoms than those removed from play. Return to play does not involve a significant risk of a second injury either in the same game or during the season. The current decision-making of NFL team physicians seems appropriate for return to the game after a concussion, when the player has become asymptomatic and does not have memory or cognitive problems.[283]

> The NFL experience thus suggests that players who become asymptomatic with normal examinations at any time after injury, while the game is still in progress, have been and can continue to be safely returned to play on that day. This indicates that the '15-minutes rule' in the current guidelines may be too conservative for the NFL. Many of the currently accepted guidelines also indicate that any player who experiences loss of consciousness with MTBI

---

[282] Kevin M. Guskiewicz, et al., "Cumulative Effects Associated with Recurrent Concussion in Collegiate Football Players," *Journal of the American Medical Association*, vol. 290, no. 19, Nov. 19, 2003, pp. 2549 and 2554.

[283] Elliot J. Pellman, et al., "Concussion in Professional Football: Players Returning to the Same Game — Part 7," *Neurosurgery*, vol. 56, no. 1, Jan. 2005, p. 79.

should not be allowed to return to play that day....  Although the numbers were small, there were a few players in this study who had recorded loss of consciousness as a result of MTBI and later returned to play in the same game.  There was no evidence of any adverse effect of this action.  These data suggest that these players were at no increased risk of repeat MTBI or prolonged postconcussion syndrome compared with other players.[284]

The peer reviewers' comments on Pellman, et al., are as follows:

A study of this magnitude has some inherent limitations, as the authors acknowledge.  However, this is an interesting analysis that demonstrates that, at least in the acute phase and during their active playing years, these athletes seem to perform well with a risk for intracranial hemorrhage or a later high incidence of recurrent concussion or postconcussion symptoms.[285]

The conclusions cited in this article are supported by the data presented....  Multiple studies in the past several years have indicated that the  incidence of concussion cited by the athlete questioned after the season is over is many times higher, four to seven times, than that currently reported by the team medical personnel.  That most athletes do play through most minor concussions is supported by these studies.[286]

The present study evaluated the safety of returning concussed professional football players to the same game immediately or after a period of rest....  As would be predicted, players who returned to the same game have significantly lower incidences of cognitive and memory problems than players removed from play or hospitalized .... This article essentially confirms that the practice by team physicians and trainers in the NFL of not allowing symptomatic or neurologically abnormal athletes to return to play in the same game is a safe practice.[287]

Return-to-play decisions regarding athletes who sustain concussion can be difficult for the sports medicine team.  Pellman et al., in Part 7, describe signs, symptoms, and management of NFL players who sustained concussions and returned to the same game during the 6-year period.  The authors of this study conclude that the results of this NFL study differ from previous articles and did not reveal the same return-to-play concerns.[288]

**Chronic Traumatic Encephalopathy (CTE).**  Chronic traumatic encephalopathy which is also known as dementia pugilistica and is a long-term problem associated with traumatic brain injury, "primarily affects career boxers. The most common symptoms of the condition are dementia and parksonism [apparently, a reference to Parkinson's Disease] caused by repetitive blows to the head over a long

---

[284] Ibid., p. 88.

[285] Ibid., see comments by Julian E. Bailes, p. 90.

[286] Ibid., see comments by Robert C. Cantu, p. 91.

[287] Ibid., see comments by Joseph C. Maroon, p. 91.

[288] Ibid., see comments by Russ Romano, p. 91.

period of time. Symptoms begin anywhere between 6 and 40 years after the start of a boxing career, with an average onset of about 16 years."[289]

In 2002, Dr. Bennet I. Omalu, a neuropathologist and a forensic pathologist with the Office of the Medical Examiner, Allegheny County, PA, performed the autopsy of Mike Webster, a former player for the Pittsburgh Steelers, and found signs of CTE in Webster's brain.[290] Writing in an article that was published in *Neurosurgery* in July 2005, Omalu, et al. described what was found during the autopsy and suggested that additional research was warranted:

> ... the results of the autopsy of a retired professional football player ... revealed neuropathological changes consistent with long-term repetitive concussive brain injury.[291] This case draws attention to the need for further studies in the cohort of retired National Football League players to elucidate the neuropathological sequelae of repeated mild traumatic brain injury in professional football.... Autopsy confirmed the presence of coronary atherosclerotic disease with dilated cardiomyopathy.... Chronic traumatic encephalopathy was evident.... This case highlights potential long-term neurodegenerative outcomes in retired professional

---

[289] National Institutes of Health, National Institute of Neurological Disorders and Stroke, "Traumatic Brain Injury: Hope Through Research," available at [http://www.ninds.nih.gov/disorders/tbi/detail_tbi.htm].

[290] Dr. Omalu studied the brains of four former NFL players after they died : Terry Long, Justin Strzelczyk, Andre Waters, and Mike Webster. Dr. Omalu "found [the brains of the four players] to have had a condition similar to that generally found only in boxers with dementia or people in their 80s.... a condition evidenced by neurofibrillary tangles in the brain's cortex, which can cause memory loss, depression and eventually Alzheimer's disease-like dementia." (Alan Schwarz, "Lineman, Dead at 36, Shed Light on Brain Injuries," *New York Times*, Jun 15, 2007, p. C14.) Terry Long, a former lineman for the Pittsburgh Steelers, committed suicide, in Jan. 2006, at age 45 ("Ex-Steeler Long Drank Antifreeze to Commit Suicide," *Espn.com*, Jan. 26, 2006, available at [http://sports.espn.go.com/espn/print?id=2307003&type=story].) Justin Strzelczyk, who also had played for the Steelers, as an offensive lineman, was killed, at age 36, in a car crash. (Schwarz, "Lineman, Dead at 36, Shed Light on Brain Injuries," p. C18.) Following his retirement from the NFL, Strzelczyk "spiraled downward ... enduring a divorce and dabbling with steroid-like substance, and soon before his death complained of depression and hearing voices from what he called 'the evil ones.' He was experiencing an apparent breakdown the morning of Sept. 30, 2004, when, during a 40-mile high-speed police chase in central New York, his pickup truck collided with a tractor-trailer and exploded, killing him instantly." (Ibid.) Andre Waters, a former defensive back for the Philadelphia Eagles, committed suicide at age 44 in Nov. 2006. (Ibid.) Mike Webster died at age 50, in Sept. 2002, of heart failure. (Greg Garber, "A Tormented Soul," *Espn.com*, Jan. 24, 2005, available at [http://sports.espn.go.com/nfl/news/story?id=1972285].)

[291] Although a diagnosis of CTE is complicated, the following rudimentary description of the process and effect may be useful: "When slides were made of the [brain] matter [from Mike Webster], then magnified 200 times, the telltale red flecks of abnormal protein appeared. The proteins appear when the brain is hit, [Dr. Bennet] Omalu said, but disappear as the healthy brain cells devour them, leading to recovery. Yet when the brain suffers too many blows, the brain cells can't keep up with the protein and eventually give up and die, leaving just the red flecks." (Les Carpenter, "'Brain Chaser' Tackles Effects of NFL Hits," *Washington Post*, Apr. 25, 2007, p. E4.)

National Football League players subjected to repeated mild traumatic brain injury. The prevalence and pathoetiological mechanisms of these possible adverse long-term outcomes and their relation to duration of years of playing football have not been sufficiently studied. We recommend comprehensive clinical and forensic approaches to understand and further elucidate this emergent professional sports hazard.[292]

Although Omalu, et al., indicate that CTE was evident in Webster's brain, they also note that further studies are needed. It appears that this was the first article to examine the possibility that professional football players could sustain damage sufficient to cause CTE.

In response to this article, several members of the MTBI Committee submitted a letter in May 2006 to *Neurosurgery* critiquing Omalu, et al., and suggesting that their article be retracted or revised. An excerpt from Casson, et al., follows:

[We] disagree with the assertion that Omalu et al.'s ... recent article actually reports a case of 'chronic traumatic encephalopathy in a National Football League (NFL) player.' We base our opinion on two serious flaws in Omalu et al.'s article, namely a serious misinterpretation of their neuropathological findings in relation to the tetrad characteristics of chronic traumatic encephalopathy and a failure to provide an adequate clinical history.... We have demonstrated that Omalu et al.'s ... case does not meet the clinical or neuropathological criteria of chronic traumatic encephalopathy. We, therefore, urge the authors to retract their paper or sufficiently revise it and its title after more detailed investigation of this case.[293]

Omalu, et al., replied to the Casson, et al., letter and others in the field of neurology also commented on the article and the Casson et al. letter. In their reply, Omalu, et al., explained why they would not withdraw their article and concluded by encouraging the NFL to study the long-term consequences of MTBI. In concluding their letter, Omalu, et al., wrote,

In fact, our case is important primarily because it indicates that there may be brain damage in NFL players that is currently under-reported, because of a lack of long-term clinical follow-up focused on evaluating such a condition. We suggest that the NFL begin examining the long-term effects of brain injury in its former players. We would be happy to collaborate with the Mild Traumatic Brain Injury Committee and the NFL in developing and implementing an optimal research program that will address these newly emerging issues.[294]

---

[292] Bennet I. Omalu, et al., "Chronic Traumatic Encephalopathy in a National Football League Player," *Neurosurgery*, vol. 57, no. 1, July 2005, p. 128.

[293] Ira R. Casson, Elliot J. Pellman, and David C. Viano, "Chronic Traumatic Encephalopathy in a National Football League Player," correspondence, *Neurosurgery*, vol. 58, no. 5, May 2006, p. E1003.

[294] Bennet I. Omalu, et al., "Chronic Traumatic Encephalopathy in a National Football League Player," correspondence, *Neurosurgery*, vol. 58, no. 5, May 2006, p. E1003.

CRS-101

The following excerpts from others' letters are provided to show the range of comments offered by others who addressed Omalu, et al.'s, July 2005 article and Casson, et al.'s, May 2006 correspondence. Although one correspondent supported retraction of the Omalu, et al., article; others note the article's limitations but suggest that it has value.

... I agree that retraction or a major revision by the authors is warranted.[295]

They [Casson, et al.] do not dispute his [Omalu, et al.] findings, they simply dispute the name Omalu et al. have given to those findings.... In summary, I see the Casson et al. letter as raising several valid points regarding the intrinsic limitations of the case material used in Omalu et al.'s study. However, because these limitations were noted by Omalu et al. in the published version, I do not see the point of publishing a letter reiterating them.[296]

[Casson, et al.,] should be thanked for compiling this detailed historical review of our understanding of the neuropathology of chronic brain injury.... Omalu et al.'s report may serve to stimulate interest in the area of neurodegenerative histological findings in athletes. However, the bar has clearly been raised. Future studies will need to use standardized or widely accepted histological criteria in addition to firm and accurate medical histories.[297]

Casson et al., conveniently omitted the obvious contribution of this [Omalu, et al.] study. Namely, this is a seminal study in the field.... Casson et al.'s letter seems to have exceeded protocol for scientifically providing an additional opinion for a published story. Specifically, they took an extreme stand in actually urging the authors to retract the article.... Articles should be considered for retraction if they contain fabricated data, contamination of data, or allegation of misconduct. It is my opinion that there is no justification for retracting this article.[298]

As members of the Mild Traumatic Brain Injury Committee of the NFL, and clinician-scientists that are clearly devoted to the investigation of sports-related concussion, Drs. Casson, Pellman, and Viano should welcome the contribution from Omalu et al. and consider the findings of that report highly relevant to their own research, rather than recommending retraction of the article. The need to obtain more details regarding premorbid neuropsychological deficits and specific episodes of concussion is clearly recognized and stated by Omalu et al. ... in their

---

[295] Daniel F. Kelly, "Chronic Traumatic Encephalopathy in a National Football League Player," correspondence, *Neurosurgery*, vol. 58, no. 5, May 2006, p. E1003.

[296] Joseph Bleiberg, "Chronic Traumatic Encephalopathy in a National Football League Player," correspondence, *Neurosurgery*, vol. 58, no. 5, May 2006, p. E1003.

[297] Alex B. Valadka, "Chronic Traumatic Encephalopathy in a National Football League Player," correspondence, *Neurosurgery*, vol. 58, no. 5, May 2006, p. E1003.

[298] Kenneth C. Kutner, "Chronic Traumatic Encephalopathy in a National Football League Player," correspondence, *Neurosurgery*, vol. 58, no. 5, May 2006, p. E1003.

paper, but the histopathological findings are clearly described and consistent with a previous history of brain injury.[299]

In November 2006, Omalu, et al., presented the results of an examination of the brain of another retired NFL player. The autopsy confirmed that this individual had CTE, but it also discovered "neuropathological features that differ from those of the first reported case."[300] The reasons for the differences were not clear, and, again, Omalu called for further studies "to identify and define the neuropathological cascades of chronic traumatic encephalopathy in football players, which may form the basis for prophylaxis and therapeutics."[301] Excerpts from peer reviewers' comments are as follow:

> This is an interesting study linking the chronic head trauma in professional football players with chronic traumatic encephalopathy. There is a temporal association of the symptoms with the patient's football career. Also, it does not prove that head injury from playing football was the sole cause of this patient's disease; the association is intriguing and is important to report.[302]

> With such multifactorial and incomplete history, I think it is extremely speculative to suggest that his [former player] psychosocial behavior and neuropathological findings are attributable to football-induced traumatic encephalopathy, especially because he demonstrated no residual evidence of a post concussion syndrome after his one documented cerebral concussion, after which he returned to full football participation for several years. Nevertheless, although more than daunting, to perform postmortem neuropathological examinations on all NFL Hall of Fame inductees would be of interest.[303]

> Following on their initial case report, this autopsy study is of interest and further raises the question of the possibility of chronic or cumulative effects of multiple, subclinical concussions resulting in neurodegenerative changes.... Notwithstanding the absence of documentation of multiple clinical concussive episodes, this case nonetheless stimulates the discussion of whether or not, in a small number of players, such football exposure can cause a widespread neurodegenerative process with ultimate clinical manifestations.[304]

> This article adds to the increasing literature regarding cognitive deficits associated with low-grade repetitive head injury. Although, as a case report, no

---

[299] Donald W. Marion, "Chronic Traumatic Encephalopathy in a National Football League Player," correspondence, *Neurosurgery*, vol. 58, no. 5, May 2006, p. E1003.

[300] Bennet I. Omalu, et al., "Chronic Traumatic Encephalopathy in a National Football League Player: Part II," *Neurosurgery*, vol. 59, no. 5, Nov. 2006, p. 1086.

[301] Ibid.

[302] Ibid., see comments by Kenneth Aldape, p. 1092.

[303] Ibid., see comments by Joseph C. Maroon, p. 1092.

[304] Ibid., see comments by Julian E. Bailes, p. 1093.

Case 1:25-cv-02273-AS   Document 20-2   Filed 10/06/25   Page 337 of 1235   Case 1:25-cv-02273-AS   Document 20-2   Filed 10/06/25   Page 337 of 1235

CRS-103

definitive statements can be made, it is important to have such cases presented and discussed.[305]

The authors compare and contrast this case with a previous case report. The relationship of the onset of his depressive disorder after his history of participation in football is purely temporal. This is a difficult relationship, given a potential history of antisocial behavior before his retirement. It becomes additionally more complex given a history of steroid use.[306]

In the August 2007 issue of *Neurosurgery*, Robert C. Cantu offered his comments on the CTE issue.[307]  Excerpts from his comments follow:

The NFL's own publications in this journal [*Neurosurgery*] on concussions state that they had seen no cases of CTE in the NFL....  That finding is not a surprise as the NFL study included only active players in their 20s and 30s during a short 6-year window from 1996 to 2001.

It was Corsellis who also reported CTE not only in boxers but other sports with a high risk of head injury, including those in which head injury occurred in declining frequency; among these were jockeys (especially steeplechasers), professional wrestlers, parachutists, and even a case of battered wife syndrome. With this history, it is no surprise to have cases from NFL football.[308]

---

[305] Ibid., see comments by Colin Smith, p. 1093.

[306] Ibid., see comments by Min Park, Andy Nguyen, and Michael L. Levy, p. 1093.

[307]  A critique by Cantu of the NFL's research on MTBI might provide some insight into why other, though not all, professionals in the field of neurology raise questions about the articles published by the MTBI Committee. Cantu wrote: "Other significant limitations of the NFL studies include the following: 1) History of concussion: previous concussions either in the NFL in the years before the study began or during their playing careers in high school, college, or other levels of football were not included.  2) The population of NFL players changes from year to year: new players enter the league, older players leave the league, and we do not know the number of players who constituted the 1996 population who are still in the league in subsequent years.  3) There was difficulty collecting data on loss of consciousness; the initial data collection sheet did not ask for data regarding loss of consciousness. 4) This was a multisite study with numerous different examiners; there was no uniform method of evaluation of concussion in this study.  5) Return to play data were collected on players with initial and repeat concussions: there are many other factors that go into the decision of whether or not the player should return to play, including the importance of the player to the team; the importance of the upcoming game to the team; and pressure from owners, players, and their families, coaches, agents, and media may certainly influence the final decision on when the player returns to play.  6) The results apply to mainly NFL-level players: extrapolation to younger players has not been demonstrated." (Robert C. Cantu, "Chronic Traumatic Encephalopathy in the National Football League," *Neurosurgery*, vol. 61, no. 2, Aug. 2007, pp. 223-224.)  Also see text at footnote 329.

[308] Ibid., p. 224.  "Corsellis" in this quotation refers to one or both of these articles: J.A. Corsellis, C.J. Bruton CJ, and D. Freeman-Browne, "The Aftermath of Boxing," *Psychological Medicine*, vol 3, 1973, pp. 270-303; and J.A. Corsellis, "Brain Damage in Sport," *Lancet*, 1, 1976, pp. 401-402.

Case 1:25-cv-02723-DLC   Document 20-2   Page: 338   Date Filed: 08/04/2025
Case 1:25-cv-02723-DLC   Document 20-2   Filed 06/04/25   Page 338 of 1181

CRS-104

... I have personally examined and spoken with a number of retired NFL players with postconcussion/CTE symptoms. Only an immediate prospective study will determine the true incidence of this problem. Although this study could be funded by the NFL charities, the NFL should refrain from introducing potential bias with regard to the team of neurosurgeons, neurologists, neuropsychiatrists, and neuropathologists with athletic head injury expertise chosen to carry out the study.[309]

Finally, it is clear that not all players with long concussion histories have met premature and horrific ends to their lives. However, as the list of NFL players retired as a result of post-concussion symptoms (e.g., Harry Carson, Al Toon, Merril Hoge, Troy Aikman, Steve Young, Ted Johnson, Wayne Chrebet) grows and as the number of documented CTE cases increases, I believe the time for independent study of the problem as well as NFL recognition that there is a problem is now.[310]

**NFL's Approach to MTBI.** It is unclear whether the NFL has, or has had, a league-wide policy on MTBI that teams — including medical staff, coaches, and players — are required to follow. A news article from fall 2006 stated: "The NFL allows each team to manage concussions as it sees fit. When a player is injured, the team doctor, sometimes with input from trainers and specialists, decides when he can return to the field."[311] In 2007, following league meetings in March and May, the NFL undertook several initiatives involving the management of MTBI, which are as follow:[312]

- Held a medical and scientific conference (known popularly as the "concussion summit") on concussions in June. Physicians and head trainers from every team, and active players and NFLPA medical representatives attended. Doctors and scientists from the NFL and from outside the league gave presentations.

- Prepared a pamphlet for players and their families that, among other things, describes the symptoms of a concussion.

- Established a hotline to be used for reporting confidentially when a player is being forced to practice or play despite medical advice that says he should not play.

- Worked with the NFLPA's medical advisors, prepared a summary of key factors to be used by team doctors and athletic trainers in

---

[309] Ibid.

[310] Ibid.

[311] Keating, "Doctor Yes."

[312] "Goodell Orders Teams to Concussion Meeting," *NFL News*, May 2, 2007, available at [http://www.nfl.com/news/story/10162742]; Letter from Roger Goodell, Commissioner, National Football League, to Chief Executives, Club Presidents, General Managers, Head Coaches, Team Physicians, and Head Athletic Trainers, "Materials re Management of Concussions," memorandum, Aug. 10, 2007, p. 1.

CRS-105

determining when it is safe for a player to practice, or to return to the same game in which the concussion occurred.

- Expanded the use of neuropsychological testing so that, before the beginning of the 2007 season, all NFL players underwent testing.

- Directed that players removed from a game due to a concussion be re-tested.

- Continued to enforce safety rules involving the use and proper wearing of helmets. And,

- Continued to research concussions with "a particular focus on long-term effects" and expanded the membership of its MTBI Committee.[313]

The concussion summit included presentations by members of the MTBI Committee and presentations by at least two neurologists who either have written articles that conflict with articles published by MTBI Committee members or have critiqued the committee's research.

The establishment of a hotline has the potential to aid a player who is pressured to play after sustaining a concussion or who observes that a teammate is being pressured to play. It is appropriate to expect a player to take responsibility for his health, and team personnel may use the hotline, too. However, considering the financial incentives (as discussed above) that might convince someone to play with a concussion, some may inquire why owners, coaches, medical staff, and other team personnel are not prohibited from implicitly or explicitly pressuring a player to practice, or to play in a game, when it is not medically advisable to do so. As quoted in a news article, a former tight end for the New Orleans Saints, Ernie Conwell, addresses this problem and offers a cautionary note that "stiffer guidelines" might have an unintended effect:

> There's already kind of a counterculture in the N.F.L. of self-treating, of not letting trainers and doctors know when something's wrong with you .... My biggest concern [about stiffer guidelines on how to deal with players who may have suffered concussions] is that we'll push players away .... Guys will say 'Hey man, be careful, you don't want to say anything about getting dinged because they might rip you out of the game, or you might be labeled as a guy with a soft head.[314]

---

[313] Letter from Roger Goodell, Commissioner, National Football League, and Eugene Upshaw, Executive Director, NFL Players Association, to NFL players, Aug. 2007, pp. 1-2; National Football League, "NFL Outlines for Players Steps Taken to Address Concussions," news release, Aug. 14, 2007, pp. 1-2.

[314] Alan Schwarz, "Player Silence on Concussions May Block N.F.L. Guidelines," *New York Times*, June 20, 2007, available at [http://www.nytimes.com/2007/06/20/sports/football/20concussions.html].

CRS-106

The case of former New York Jets wide receiver Wayne Chrebet, as reported by the *New York Times*, shows how he viewed the decision to play, after having had six concussions diagnosed during his 11-year NFL career.

"If they took it [the decision to play] out of my hands, there was nothing I could do about it," Chrebet said. "I'd have to do what they said." On the other hand, if he were not permitted to come back, there might not have been a Wayne Chrebet with the Jets. He was an undersized receiver from Hofstra, an obscure college by N.F.L. standards, who felt he did not have the luxury to miss a game. "Especially players who were in my situation, you can't afford to take a play off," he said. Chrebet cited the story of Wally Pipp, who was replaced in the Yankees' starting lineup by Lou Gehrig and never regained his spot. In the N.F.L., nonguaranteed contracts add to the normal competitiveness and insecurity. "You take one play off, and somebody takes your spot," Chrebet said. "They make a play, [and] it [your career] could be over.[315]

The last item in the list of NFL initiatives above mentions additional MTBI research that is planned or ongoing; a list of these studies is in **Appendix B**. Additionally, NFL Charities has awarded, during 2003-2007, grants for research involving, among other things, concussions, MTBI, and related topics. **Table 17** includes a list of these grants.

### Table 17. Recipients of NFL Charities Grants for MTBI and Related Research, 2003-2007

| Institution | Amounts and Years of Grants[b] | Description of Research or Title of Study |
|---|---|---|
| Biokinetics and Associates, Ltd.[a] | — $189,914 2005 | — "MTBI Advanced Concussion Research Study" |
| | — $175,900 2006 | — "Concussion studies" |
| | — $105,000 2006 | — "MTBI Advanced Concussion Research Study" |
| | — $111,413 2007 | — "MTBI Advanced Concussion Research Study" |
| Institute for Injury Research[c] | — $155,000 2005 | — "Concussion-Comparing Injuries in the NFL Animal Model with those from an Established Head Injury Model by Marmarou." |
| | — $75,000 2007 | — "Concussions-Studying Protein Deposits in the Brain After Concussions" |
| Mark R. Lovell | — $7,500 2007 | "NFL Pilot Study Neuropsychological Testing" |

---

[315] Rhoden, "A Jet Who Led With His Head, and His Heart."

CRS-107

| Institution | Amounts and Years of Grants[b] | Description of Research or Title of Study |
|---|---|---|
| University of Maryland-Baltimore | — $59,000<br>2003 | "Assessment of brain blood flow following concussion." |
| Wayne State University Sports Lab[d] | — $200,000<br>2003 | — "Concussion studies" |
| | — $180,000<br>2004 | — "Concussion studies" |
| | — $45,000<br>2005 | — "Mouth guards-Development of a Mandible and Teeth for the Hybrid III Dummy Head to Test the Influence of Mouth guards on Risk of Concussions" |
| | — $170,000<br>2006 | — "Helmet and Mouth Guard-Concussion Studies" |
| | — $25,000<br>2007 | — "Mouth guard and Helmet Testing" |
| | — $352,887<br>2007 | — "Helmet Impact Study" |

Source: Letter from Roger Goodell, Commissioner, National Football League, to Reps. John Conyers, Jr., and Lamar S. Smith, Nov. 2, 2007, attachment 8.

a. Biokinetics and Associates, Ltd., is a Canadian firm that, according to its mission statement, "provides engineered solutions to human impact protection for sports, transportation and defence/law enforcement applications." (Biokinetics, "Mission," available at [http://www.biokinetics. com/profile_index.html].)

b. Amounts have been rounded to the nearest dollar.

c. David Viano, who is co-chair of the MTBI Committee, is the president of the Institute for Injury Prevention. (David C. Viano, "Résumé," provided by the House Committee on the Judiciary to the author on Nov. 6, 2007, p. 5.)

d. Apparently, the full name of this organization is Sports Injury Biomechanics Lab. David Viano, who is co-chair of the MTBI Committee, is the director of the Sports Injury Biomechanics Lab. (Wayne State University, "Sports Injury Biomechanics Lab," available at [http://ttb.eng.wayne.edu/]; Viano, "Résumé," p. 1.)

As reported by *ESPN.com*, the NFL has taken, or plans to take, some additional steps regarding its MTBI Committee. Reportedly, the commissioner has told the MTBI Committee "to involve new researchers in its work," and a member of the committee said: "We're going to reach out to other people, to all the experts in MTBI, and try to have an open, meaningful scientific dialogue."[316] Thom Mayer, the NFLPA's medical advisor, reportedly said: "We [apparently, this is a reference to the NFLPA] expect to have a seat at the table for virtually anything that occurs from

---

[316] Peter Keating, "NFL Retools Approach to Concussion Research," *ESPN.com*, Apr. 20, 2007, available at [http://sports.espn.go.com/nfl/news/story?id=2844041].

this point forward."[317]  Additionally, the MTBI committee reportedly has subjected its research findings "to a new round of statistical analysis...." and has asked team doctors and consultants to provide "hundreds of neuropsychological tests conducted on NFL players" that apparently had not been included in studies on the effects of concussions.[318]

The "NFL Player Concussion Pamphlet" identifies and describes the most common symptoms of concussions and also addresses, in question and answer format, a number of concussion-related subjects.  Two of these questions and the NFL's responses are as follow:

> Am I at risk for further injury if I have had a concussion?  Current research with professional athletes has shown that you should not be at greater risk of further injury once you receive proper medical care for a concussion and are free of symptoms.

> If I have had more than one concussion, am I at increased risk for another injury? Current research with profession athletes has not shown that having more than one or two concussions leads to permanent problems if each injury is managed properly.  It is important to understand that there is no magic number for how many concussions is too many.  Research is currently underway to determine if there are any long-term effects of concussion in NFL athletes.[319]

These responses apparently rely exclusively on the MTBI Committee's studies, for no mention is made of other research that addresses the possible long-term consequences of sustaining one or more concussions (this research is presented above).  The following comments by researcher Kevin Guskiewicz and Greg Aiello, senior vice president of media relations for the NFL, as reported in the *New York Times*, capture the different perspectives:

> [Kevin Guskiewicz] noted that "The first half of their statement is false....  And the second part, if they're managed properly?  What does that mean?  They're just trying to raise ambiguity when the science is becoming more and more clear."  Greg Aiello, NFL spokesman, responded in a statement: "We certainly respect the work that Dr. Guskiewicz and others have done on this subject and look forward to continuing to work with him.  Our medical advisers, including neurosurgeons and neurologists, do not fully share his view of the science.  We are conducting research on long-term effects of concussions that we hope will clarify this important issue."[320]

---

[317] Ibid.

[318] Ibid.

[319] National Football League, "NFL Player Concussion Pamphlet," n.d.  (Considering the context in which a reproduction of pamphlet material was received, the pamphlet most likely was produced in 2007.)

[320] Schwarz, "For Jets, Silence on Concussions Signals Unease," p. A20.

Another development in 2007 was that the MTBI Committee reaffirmed the following summary of return-to-play considerations for players who sustain concussions:

> Team physicians and athletic trainers should continue to exercise their clinical judgment and expertise in the treatment of each player who sustains a concussion and to avail themselves of additional expert consultation when clinically indicated. We encourage team physicians and athletic trainers to continue to take a conservative approach to treating concussion.

> Team physicians and athletic trainers should continue to take the time to obtain a thorough history, including inquiring specifically about the common symptoms of concussion, and to conduct a thorough neurological examination, including mental status testing at rest and post-exertional testing, before making return to play decisions in a game or practice.

> The essential criteria for consideration of return to play remain unchanged. The player should be completely asymptomatic and have a normal neurologic examination, including mental status testing at rest and post-exertional testing, before being considered for return to play.

> Team physicians and athletic trainers should continue to take into account certain symptoms and signs that have been associated with a delayed recovery when making return to play decisions. These include confusion, problems with immediate recall, disorientation to time, place and person, anterograde and retrograde amnesia, fatigue, blurred vision and presence of three or more signs and symptoms of concussion.

> If the team medical staff determines a player was unconscious, the player should not be returned to the same game or practice.

> Team physicians and athletic trainers should continue to consider the player's history of concussion, including number and time between incidents, type and severity of blow, and time to recover.

> Team physicians and athletic trainers should continue to educate players about concussion and to emphasize the need for players to be forthright about physical and neurological complaints associated with concussion.[321]

The third item from the bottom, which advises that a player who was unconscious should not be returned to the same game or practice, appears to conflict with an article written by members of the MTBI Committee. The relevant portion of the 2005 *Neurosurgery* article is as follows:

> Many of the currently accepted guidelines also indicate that any player who experiences loss of consciousness with MTBI should not be allowed to return to play that day .... Although the numbers were small, there were a few players in this study who had recorded loss of consciousness as a result of MTBI and later returned to play in the same game. There was no evidence of any adverse effect

---

[321] Letter from Roger Goodell, Commissioner, National Football League, and Eugene Upshaw, Executive Director, NFL Players Association, to NFL players, Aug. 2007, p. 5.

of this action. These data suggest that these players were at no increased risk of repeat MTBI or prolonged postconcussion syndrome compared with other players.[322]

Without additional information, the reason for the discrepancy between the league's return-to-play guidelines and the committee's article is unknown. The league's general counsel reportedly stated that the NFL was "'erring on the side of player safety ... it may be that a player will be held out of a game when it is not medically required or indicated by the data. Certainly it's a less-risky approach in terms of player safety.... It reflects an effort to avoid this debate going forward.'"[323]

In the same *Neurosurgery* article, Pellman, et al., also discuss various factors that may play a role in deciding when a player may return to the game or practice. They cite the player's medical condition as the most important factor, but then appear to acknowledge that other considerations also may influence the return-to-play decision. Pellman, et al., wrote:

> Although the medical condition of the player certainly is the most important factor in determining return-to-play decisions by team physicians, there are many other factors that go into the decision of when the player should return to play. The importance of the player to the team; the importance of the game to the team; and pressure from owners, players and their families, coaches, agents, and media certainly may influence the decision of when the player returns to play. The authors believe, however, that the medical factors regarding the patient's recovery are and should be the overriding factors that guide the team physicians' decisions-making on return to play.[324]

## Funding for the Retirement Plan

Maintaining full funds for the retirement plan is a priority of the NFL and the NFLPA, and is made possible by the use of actuarial assumptions (or factors) and methods, and by ensuring that benefits are awarded only to eligible individuals. Under the CBA, the amount of money needed to fund certain benefits, including the retirement plan, is determined using "negotiated actuarial factors."[325] The factors (or assumptions) are "determined by collective bargaining" and are "acceptable to the plan's Enrolled Actuary."[326] At a congressional hearing in 2007, the plan counsel

---

[322] Elliot J. Pellman, et al., "Concussion in Professional Football: Players Returning to the Same Game — Part 7," p. 88.

[323] Alan Schwarz, "New Advice by N.F.L. in Handling Concussions," *New York Times*, Aug. 21, 2007, available at [http://www.nytimes.com/2007/08/21/sports/football/21concussions.html].

[324] Elliot J. Pellman, et al., "Concussion in Professional Football: Players Returning to the Same Game — Part 7," p. 89.

[325] NFL Players Association, "History of Retirement and T&P Benefits for NFL Players," p. 5. In 1993, a single plan counsel, Groom Law Group, and a single plan actuary, Aon Corporation, were selected for the retirement plan. (Ibid.)

[326] NFL Players Association, "History of Retirement and T&P Benefits for NFL Players,"
(continued...)

stated: "Because of the repeated increases in benefits and thus liabilities, the Retirement Plan is somewhat under funded from an actuarial point of view. Both the Players Association and the NFL view pension funding as a priority, and full funding may occur in the next few years, at least until the next negotiated benefit increase."[327]

The use of actuarial assumptions and methods is necessary to ensure that a benefit plan has sufficient funds to meet its obligations — that is, to pay benefits to eligible individuals. Accordingly, it is necessary "that only those persons who qualify for the benefits receive them."[328] According to an article that appeared in the *Washington Post Magazine*, and which quoted the executive director of the NFLPA, Gene Upshaw, the players association is committed to ensuring that funds are available for eligible players. An excerpt from the article follows:

> [Gene Upshaw] fears that, if disability payments "go to any borderline cases out there," the floodgates will open, and there "might be thousands" of claims from NFL reitrees who will "say they hurt somewhere on their bodies.... Heck, a lot of guys have little things." He says that the league couldn't endure such a press of claims. "We couldn't afford that," he says. "And the [active] players wouldn't go for it.... The players right now give up $82,000 a year [on average] to fund all the things we're doing with disability [payments] and pensions.... We can't pay for everything for all the [retirees] asking for it. We want to protect money for the retired players who really need and deserve it."[329]

Appendix J of the CBA contains the actuarial assumptions and actuarial cost method used to determine how much money is needed to fund the benefits provided by the retirement plan.[330] Calculations that use these assumptions and cost method determine how much money is needed to fund the retirement plan. Some of the actuarial assumptions in Appendix J are based on established tables, such as the 1980 Railroad Retirement Board rates, which is used for the "Remarriage and mortality rates for widow's benefit" factor; and *The RP-2000 Table*, which is used for "Mortality rates" and "Disability mortality before age sixty-five."[331] The "Football

---

[326] (...continued)
p. 5; Letter from Goodell to Reps. Conyers and Smith, p. 10.

[327] U.S. Congress, House Committee on the Judiciary, Subcommittee on Commercial and Administrative Law, "The National Football League's System for Compensating Retired Players: An Uneven Playing Field?" statement of Douglas W. Ell, Plan Counsel for Bert Bell/Pete Rozelle NFL Player Retirement Plan, unpublished hearing, 110th Cong., 1st sess., June 26, 2007, p. 10.

[328] U.S. Congress, House Committee on the Judiciary, Subcommittee on Commercial and Administrative Law, The National Football League's System for Compensating Retired Players: An Uneven Playing Field?" statement of Dennis Curran, Senior Vice President, National Football League, unpublished hearing, 110th Cong., 1st sess., June 26, 2007, p. 4.

[329] Leahy, "The Pain Game," p. 22.

[330] National Football League and NFL Players Association, *NFL Collective Bargaining Agreement, 2006-2012*, p. 203.

[331] National Football League and NFL Players Association, *NFL Collective Bargaining Agreement, 2006-2012*, pp. 282-283. The 1980 Railroad Retirement Board rates are
(continued...)

related disability rates" factor apparently is not based on a table. Instead, the disability rates are the following: "As of April 1, 2007, the rates are "[.10%] per year for active players and [.08%] per year for inactive players until age forty-five, after which it becomes zero. Active players are assumed to become inactive after one year or age thirty, whichever comes later."[332] The method and information used for determining these rates is unclear. The NFLPA has noted that "the amount to fund the Retirement Plan is calculated actuarially, in accordance with federal law."[333] Is it possible that retired (that is, inactive) players' needs for medical care exceed the amount of funds for disability benefits that are calculated using this disability rate?

## What Is the Extent of the NFLPA's Capacity?

The extent of the NFLPA's authority and capabilities regarding health and safety issues, and its position on such issues are, at times, unclear. For example, the NFL has a number of committees that deal with injuries, safety, and health. Apparently, the NFLPA does not have any similar committees or entities, although, along with the NFL, it is part of the joint committee on player safety and welfare.[334] The NFLPA has a medical advisor; but, apparently, this is not a full-time position, for the current advisor is CEO and president of BestPractices and chairman of the Department of Emergency Medicine, Inova Fairfax Hospital.[335] Additionally, it is unclear what resources, including staff, are available to the medical advisor.

The NFLPA apparently is not included in discussions about proposed rule changes that may affect the health and safety of players. Furthermore, the description of the process for addressing rule changes that might adversely affect player safety shows that, ultimately, neither the joint committee, the players association, nor the

---

[331] (...continued)
available at U.S. Railroad Retirement Board, "Financial, Actuarial and Statistical," [http://www.rrb.gov/mep/fin_act_stat.asp]. The other document ,*The RP-2000 Mortality Tables*, is available at [http://www.soa.org/files/pdf/rp00_mortalitytables.pdf].

[332] National Football League and NFL Players Association, *NFL Collective Bargaining Agreement, 2006-2012*, p. 282.

[333] Letter from Upshaw to Reps. Conyers, Smith, Sanchez, and Cannon, p. 29.

[334] In the absence of evidence of the committee's accomplishments, certain features of the committee suggest that its influence might be limited. The committee holds only two regular meetings per year, although special meetings may be convened, and the committee does not have the power "to commit or bind" the NFLPA or the NFL on any issues. (National Football League and NFL Players Association, *NFL Collective Bargaining Agreement, 2006-2012*, Mar. 8, 2006, p. 38.) The names of the NFLPA's 13 departments are: Benefits Department, Communications Department, Executive Department, Finance and Asset Management Department, Financial Programs and Advisor Administration Department, Information Systems, Legal Department, Membership Services, NFL PLAYERS Department, NFLPA Retired Players Department, Player Development, Regional Directors, and Salary Cap and Agent Administration. (NFL Players Association, "Departments," n.d., available at [http://www.nflplayers.com/user/template.aspx?fmid=181&l mid=238&pid=0&type=l].)

[335] Letter from Upshaw to Reps. Conyers, Smith, Sanchez, and Cannon, p. 11.

arbitrator (if one is involved) has authority to modify or rescind a potentially problematic proposed rule change. (The issue of rule changes is discussed above.)

The subject of MTBI research and guidelines, in particular, raises several questions regarding whether the players association has sufficient capacity and authority to participate effectively in matters involving safety and health issues. For example, while members of the MTBI Committee have been involved in an ongoing dialogue with other professionals in the field of neurology (as documented above), it appears that the NFLPA has not commented publicly on any of the issues, such as the possible long-term effects of concussions and the possibility that multiple mild traumatic brain injuries could result in CTE. The NFLPA has "supported and/or participated in several studies concerning the physical effects of playing professional football."[336] Those studies include "[s]tudies conducted by the Center for the Study of Retired Professional Athletes at the University of North Carolina at Chapel Hill, including the 'Recurrent Concussion and Risk of Depression in Retired Professional Football Players' study done by Dr. Kevin M. Guskiewicz and others in 2006."[337]

A joint NFL-NFLPA letter on concussions and concussion management noted that the NFLPA's medical advisor had attended the June 2007 "concussion summit" and that he "will remain closely involved" in ongoing projects involving MTBI research.[338] The extent of the authority of the NFLPA medical advisor regarding the committee's decisions, actions, and recommendations is unclear, as are his possible courses of action, if any, should he disagree with the decisions of the committee. Additionally, the NFLPA's involvement in the MTBI's development of the concussion management guidelines and, specifically, the return-to-play guidelines is unclear.

## Medical Care for Active Players

**Access to Medical Records.** Under the CBA, a player may examine his medical records and athletic trainers' records only twice per year: "once during the pre-season and [once] after the regular season."[339] Additionally, he may obtain a copy of the records during the off-season.[340] The rationale for not permitting a player to see his records during the pre-season and regular season is unclear. While obtaining records after the season is useful for the player who wants to, among other

---

[336] Ibid., p. 12.

[337] Ibid., pp. 12-13.

[338] Letter from Goodell and Upshaw to NFL players, pp. 1-2.

[339] National Football League and NFL Players Association, *NFL Collective Bargaining Agreement, 2006-2012*, p. 199. Having access to one's medical records, albeit only twice per year, apparently is an improvement. As quoted in the *New York Times* in 2002, Gene Upshaw noted the following changes to players' medical care: "'Before 1986-87, guys could not select the doctor for their surgery, they could not get second opinions and they could not even see a copy of their medical records.... All of that is in place now." (Thomas George, "Care by Team Doctors Raises Conflict Issue.")

[340] National Football League and NFL Players Association, *NFL Collective Bargaining Agreement, 2006-2012*, p. 199.

things, maintain his own medical history, timely access to the records might be useful to a player who has been injured and is receiving, or has received, medical treatment. Furthermore, a player might be more likely to recognize inaccurate, incomplete, or erroneous information if he is permitted to examine his records during the season, rather than having to wait until the conclusion of the season. Team medical staff, however, may not have time during the season to provide access to, or copies of, medical records, because they are fulfilling their primary responsibility, which is to diagnose and treat injured players. The access issue also raises the question of whether a player is permitted to have corrections added to his health records.

In a reminder to players to review their medical records following the season, the NFLPA touched on several issues related to the importance of knowing what is in medical records created and maintained by the team. The NFLPA stated the following:

> With injuries being such a critical factor in determining the quality and longevity of an NFL player's career, it is important for players to become knowledgeable about the injuries they sustain and to learn what their club medical staff thinks about those injuries....

> According to Tim English, NFLPA Staff Counsel who regularly represents injured NFL players in Injury Grievance arbitrations, "players who review their club's medical records for the first time while preparing their arbitrations are often surprised to read what has been written about their injuries by the club doctors and trainers. The level of detail in the records far exceeds what is told to them by the club." Invariably, those players regret not having taken the time to review their records previously.

> Many times, the additional information contained in the club's records may assist a player in planning or altering his off-season treatment and training activity. All too often during the season a player who sustains an injury is only focused on getting back out on the field, and not on the extent of his injury and the best course of action to take for long-term health. The off-season is therefore the time to re-evaluate those injuries, and a review of the club medical and trainers' records is the place to start.[341]

**Arrangements for Medical Care and Treatment.** Article XLIV of the CBA governs the players' right to medical care and treatment. As the employer, a team provides medical care for its players, which includes team physicians and athletic trainers. Under the CBA, a team's medical staff must include a board-certified orthopedic surgeon; the team is responsible for the cost of medical services that its physicians provide; and all full-time head trainers and assistant trainers must be certified by the National Athletic Trainers Association.[342]

---

[341] NFL Players Association, "News and Events: Off-Season and Medical Records, Off-Season Is the Time for Players to Review Their Medical Records," available at [http://www.nflpa.org/newsandevents/021908.aspx] as of Feb. 21, 2008, on file with the author.

[342] National Football League and NFL Players Association, *NFL Collective Bargaining*
(continued...)

Article XLIV includes several additional safeguards for players, including the following:

> If a Club physician advises a coach or other Club representative of a player's physical condition which adversely affects the player's performance or health, the physician will also advise the player. If such condition could be significantly aggravated by continued performance, the physician will advise the player of such fact in writing before the player is again allowed to perform on-field activity.[343]

While the requirement to provide written notification to a player is an important safeguard, it is unclear whether this step would be feasible in some situations. For example, is it possible to provide written notification to players during a game?

A player may seek a second opinion, and he may have his team pay for the costs associated with doing so as long as he follows this provision in the CBA:

> A player will have the opportunity to obtain a second medical opinion. As a condition of the responsibility of the Club for the costs of medical services rendered by the physician furnishing the second opinion, the player must (a) consult with the Club physician in advance concerning the other physician; and (b) the Club physician must be furnished promptly with a report concerning the diagnosis, examination and course of treatment recommended by the other physician.[344]

At least one former team doctor has suggested, however, that some players may believe the team prefers that they not seek a second option. As quoted in a news article, Dr. Robert Huizenga, a team doctor for the Oakland Raiders and past president of the National Football League Team Physicians Society, "said he always suspected that the Raiders he treated believed it would be held against them if they sought a second opinion. 'Some of them were afraid to even admit to being injured at all,' Dr. Huizenga said...."[345] Although it is not known whether any team has discouraged a player from seeking a second opinion, the expense involved and the possibility that a non-team doctor's diagnosis and recommendation for treatment might conflict with, or be more costly than, the team doctor's diagnosis and recommendation might have some bearing on a team's perspective on second opinions. It is unclear whether the team would be required to pay for any non-surgical treatment recommended by a non-team physician. Under the CBA, a team will pay for a player's surgery regardless of who — team doctor or non-team doctor — performs the surgery:

---

[342] (...continued)
*Agreement, 2006-2012*, p. 197.

[343] Ibid.

[344] Ibid.

[345] Bill Pennington, "Sports Medicine; Sports Turnaround: The Team Doctors Now Pay the Team," *New York Times*, May 18, 2004, available at [http://query.nytimes.com/gst/fullpage.html?sec=health&res=9501E6D8153FF93BA25756C0A9629C8B63].

> A player will have the right to choose the surgeon who will perform surgery provided that: (a) the player will consult unless impossible (e.g., emergency surgery) with the Club physician as to his recommendation as to the need for, the timing of and who should perform the surgery; and (b) the player will give due consideration to the Club physician's recommendations. Any such surgery will be at Club expense; provided, however, that the Club, the Club physician, trainers and any other representative of the Club will not be responsible for or incur any liability (other than the cost of the surgery) for or relating to the adequacy or competency of such surgery or other related medical services rendered in connection with such surgery.[346]

The condition that requires a player to "give due consideration" to the team physician's recommendations might be open to interpretation. Specifically, this phrase might concern how much discretion a player has, or how much discretion he thinks he has, to select his own surgeon, which could differ from the team's view on how much discretion a player has.

Another issue regarding the medical care provided to players is the potential for a conflict of interest. Some would argue that a team physician, as an employee of the team, might find it challenging to balance the interests of his patients — players — with the interests of the coaches, if not the team owners. The following excerpt from a news article describes the issue: "There is a complex tapestry occurring in players' medical treatments. Coaches often want players rushed back onto the field to win games. Players themselves often push to get back quickly. But when some injured players balk, coaches and teammates might consider them loafers and pressure them to return. Coaches pressure doctors for medical releases for players to play. And trainers are often caught in the middle, receiving pressure from coaches and even from owners to influence doctors' decisions."[347] A former assistant team physician with the Carolina Panthers, Dr. Walter Beaver, indicated, though, that in his experience, "'[y]ou had total authority to take care of the players the way you felt they should be taken care of.... They (team officials) would never question it.'"[348] A team physician for the Pittsburgh Steelers, Jim Bradley, also has asserted that his team's head coach did not intervene in medical decisions. Reportedly, Bradley said: "'If I tell Bill (Cowher, the [former] Steelers coach) a guy can't go, he never gives me any problem.... It's my call.'"[349] A related issue is the possibility that the premier players on a team receive better medical treatment than other players. During a malpractice suit against a former team doctor, it was "revealed that players believe, in some cases, that star players are treated differently medically than lesser players."[350] Reportedly, the executive director of the NFLPA stated: "'We never

---

[346] Ibid.

[347] Thomas George, "Care by Team Doctors Raises Conflict Issue."

[348] Charles Chandler, "Consent at Heart of Lawsuit Facing Panthers, Doctor; Four Ex-Panthers Say Surgeries Went Further Than They Expected," *Charlotte Observer*, p. 1A.

[349] Vergano, "NFL Doctors, Players Face Off Over Painful Choices."

[350] Thomas George, "Care by Team Doctors Raises Conflict Issue." The player, Jeff Novak, an offensive lineman for the Jacksonville Jaguars, filed a lawsuit against Stephen Lucie, (continued...)

know if it's the patient-doctor relationship or the doctor-owner relationship' that matters in a team's medical decisions.'"[351]  In 2002, it was reported that the NFLPA and the league were "seeking a uniform standard for the relationships between team doctors and players and to make them more doctor-patient relationships.  The league wants players treated effectively and fairly but also wants to protect its teams from expensive liability awards."[352]  The status of this effort is unclear.

A related issue is the nature of the business arrangement between a team and its medical staff.  As described in the following excerpt, some doctors (or their medical practices) pay a team for the privilege of serving as team doctor(s).

> In an upside-down scenario spawned by an increasingly competitive health-care market, hospitals and medical practices — eager for any promotional advantage — have begun bidding to pay pro teams as much as $1.5 million annually for the right to treat their high-salaried players.  In addition to the revenue, sports franchises get the services of the provider's physicians without charge or at severely discounted rates.  In return, the medical groups and the hospitals are granted the exclusive right to market themselves as the teams' official hospital, H.M.O. or orthopedic group....  Despite concerns among many doctors and the players' unions over the ethics of putting health care out to bid, about half the teams in the four major North American professional sports are now tied contractually to a medical institution.... [353]

> Criticism  is generally not directed at the quality of medical care dispensed, because it is difficult, if not impossible, to ascertain how these marketing arrangements directly affect player treatment.  Almost everyone agrees that the pool of sophisticated sports medicine practitioners is so deep that the level of care is likely to be excellent.  But the manner in which the doctors and the hospitals are selected and the potential for conflicts of interest bother many people in sports....[354]

---

[350] (...continued)
who had been a Jacksonville team doctor, and won a $5.35 million malpractice award.  A news article summarized Novak's story as follows: "[Novak] injured his right knee in training camp on July 28, 1998. Lucie drained blood and fluid from the knee on Aug. 3 in a training room at Alltel Stadium.  Two days later, Novak returned to practice, but by Sept. 10 had staph and E-coli infections in the knee and had bleeding episodes.  Two operations followed.  Novak ... played in only three more games that season, and was not offered a new contract and retired.  Lucie testified that he 'had a patient who was in a lot of pain who was having trouble walking around and wanted relief; the best way to provide relief was to remove this pressure and drain the hematoma.'  Doctors testifying for Novak said that he should have rested after the surgery, that it was performed in an unsterile environment, that maybe Novak should not have had the surgery at all but should have allowed the knee to rest and heal." (Ibid.)

[351] Vergano, "NFL Doctors, Players Face Off Over Painful Choices."

[352] Thomas George, "Care by Team Doctors Raises Conflict Issue."

[353] Pennington, "Sports Medicine; Sports Turnaround: The Team Doctors Now Pay the Team," *New York Times*.

[354] Ibid.

CRS-118

Although the medical care provided may not suffer as a result of the business relationship between a team and its team doctor or doctors, concern persists about the appearance of a conflict of interest. Reportedly, Dr. Andrew Bishop, the Atlanta Falcons' team doctor for 11 years, said: "'It compromises you as a physician.... The perception is that if this individual was so eager to do this he's willing to pay to do it, then he's going to do whatever management wants to keep the job he paid for.'"[355] Dr. James Bradley, president of the N.F.L. Physicians Society, counters this notion, reportedly saying: "'If you are an N.F.L. team doctor and don't have the best interests of the players in mind ... you are a fool.'"[356] Reportedly, a spokesman for the NFLPA, Carl Francis, said: "'We're always concerned about the relationships between teams and physicians.... But we're willing to give the teams the benefit of the doubt. You would hope that a corporate relationship wouldn't prevent a team from doing the proper research before hiring a medical staff.'"[357] A final comment on the topic comes from a player, Troy Vincent, then president of the NFL Players Association. Vincent was quoted in a news article as saying: "'Our medical care is the only part of our game that isn't regulated.... There are uniform rules on everything else, including how to wear your uniform socks. Shouldn't there be some rules about who gets to treat the players when they're injured? That's when we are most vulnerable, and we should know that the doctor who comes out on that field to help us is the best around, chosen because he is the best, and not for any other reason.'"[358]

## Workers' Compensation

The NFLPA and the NFL have taken steps to ensure that workers' compensation, which is administered by states, is available to NFL players. The players association has taken steps to ensure that all players are covered by workers' compensation, and "has established a panel of qualified lawyers to help players file and pursue their claims."[359] Similar to other benefits, funding for workers' compensation comes from the portion of the league's total revenues that is allocated to the players. A player may receive both disability benefits and workers' compensation, and the players association and the league have agreed that the disability benefits will not be reduced.[360] The NFLPA has written that it "strongly advises each player to preserve his rights under Workers' Compensation for life-time medical care for his football injuries."[361]

---

[355] Ibid.

[356] Ibid.

[357] Mike Bianchi, "Doctors, Teams, Players Work in Strange Ways," *Orlando Sentinel*, Sept. 17, 2003, p. D1.

[358] Pennington, "Sports Medicine; Sports Turnaround: The Team Doctors Now Pay the Team."

[359] Letter from Upshaw to Reps. Conyers, Smith, Sanchez, and Cannon, p. 4; NFL Players Association, "NFLPA White Paper," p. 21.

[360] Ibid.

[361] Ibid.

Since workers' compensation is administered by states, benefits, requirements, and filing procedures may vary by team location. As the NFLPA has noted, "every state has a time limit within which to file a claim, which could be as short as one (1) year from the date of injury."[362] Despite the efforts of the NFLPA to publicize workers' compensation benefits, some players might not explore this option until, for example, they retire or one or more disabilities arise, when it might be too late for them to apply. A successful application for workers' compensation benefits might limit a player's options for recourse concerning his team (including the team's medical staff), which might serve as a deterrent to some players. Generally, an individual who files for and receives workers' compensation may not be permitted to file a lawsuit against his employer.[363] Reportedly, the trial of a former team doctor who was sued by a player "showed that workmen's compensation laws and the league's current collective bargaining agreement protect some doctors and teams from litigation unless ... they are independent contractors."[364]

# Possible Courses of Action

The subject of injuries, chronic health problems, disabilities (interpreted broadly), and benefits for former players is a complex one, and involves a variety issues, some of which are discussed in this report. Accordingly, developing possible courses of action is a challenging undertaking, particularly given the interrelationships among different facets and issues.

The next section examines three proposals offered by the NFLPA, while the following section explores other possible options.

## NFLPA's Suggestions for Legislative Action

At a hearing in September 2007, the executive director of the players association proposed three legislative options.[365] The NFLPA did not discuss how it developed these proposals, including whether the suggestions were based on any data or documentation.

---

[362] NFL Players Association, "CBA: Workers' Compensation Benefits."

[363] Cornell University Law School, Legal Information Institute, "Workers Compensation," n.d., available at [http://www.law.cornell.edu/wex/index.php/Workerscompensation]; Gregory P. Guyton, "A Brief History of Workers' Compensation," *Iowa Orthopaedic Journal*, 1999, available at [http://www.pubmedcentral.nih.gov/articlerender.fcgi? artid=1888620], pp. 108-109; California Department of Industrial Relations, "Division of Workers' Compensation - Employer Information," n.d., available at [http://www.dir.ca.gov/dwc/Employer.htm].

[364] Thomas George, "Care by Team Doctors Raises Conflict Issue."

[365] U.S. Congress, Senate Committee on Commerce, Science, and Transportation, "Oversight of the NFL Retirement System," statement of Eugene Upshaw, Executive Director, NFL Players Association, unpublished hearing, 110th Cong., 1st sess., Sept. 18, 2007, p. 3.

**Establish Federal Standards for Workers' Compensation.** The NFLPA suggested that the federal government develop federal standards for workers' compensation, which currently is administered by states. The players association argues that the current system "causes the vast majority of hurt workers, not just NFL players, to settle for a lump sum, and give up their rights to lifetime medical care for their injuries on the job."[366] Without additional, detailed information about states' workers' compensation systems or programs, including data about the disposition of workers' compensation applications, the extent of the problem raised by the NFLPA is unknown. This suggestion might be interpreted as applying to all employers and employees, and not just the NFL and professional football players, yet it would be helpful to have an explicit declaration of the scope of the suggestion. In any case, whether the suggestion is for the NFL only or for all employers, the implications of such a change could be far-reaching. Another consideration is whether, since states, historically, have been responsible for administering workers' compensation, this is an area in which the federal government would want to intervene. In sum, additional, detailed information is needed in order to assess this proposal.

**Permit Unions to Manage Their Benefit Plans.** The NFLPA suggested that the Taft-Hartley Act (29 U.S.C. §§141-197) should be changed to allow the players association, if not all unions, to manage their own "plans." It appears that the NFLPA is referring to 29 U.S.C. §186(c)(5)(B), which requires that a plan subject to the act be administered by a board of trustees, and that the union and the employer be represented equally on the board. As with the first proposal, it is unclear whether the NFLPA is suggesting this change for only the NFL-NFLPA retirement plan, or for all negotiated retirement plans. If the NFLPA is proposing that the suggested change to the Taft-Hartley Act apply to all negotiated plans, it is unclear how other unions and employers might respond to the NFLPA's suggestion.

The rationale offered by the NFLPA for amending the Taft-Hartley Act is as follows: "since the NFLPA has been criticized when applications are denied (even though a majority vote of the six trustees is necessary for a decision), and since current players are funding the system, it makes sense for the players to be the ones making the disability decisions."[367] The players association has also said that "allow[ing] the trustees appointed by the NFLPA to have the sole responsibility to decide applications for disability benefits ... [would] avoid deadlocks and expedite payments."[368]

Changing the composition of the Retirement Board might not significantly affect the application approval rate, which means that criticism of the NFLPA might not lessen. As the NFLPA executive director noted in his comments regarding this proposal, "the negotiated contribution by employers is fixed and plan actions cannot impose extra liability."[369] Thus, the NFLPA does not assert that changing the

---

[366] Ibid., p. 3.

[367] Ibid., p. 3.

[368] Letter from Upshaw to Reps. Conyers, Smith, Sanchez, and Cannon, p. 14.

[369] U.S. Congress, Senate Committee on Commerce, Science, and Transportation,

(continued...)

composition of the board would result in an increase in overall payments. Furthermore, as mentioned above, the plan counsel testified that the retirement plan is underfunded actuarially. However, one of the suggestions presented below, regarding the Sports Broadcasting Act of 1961, includes a mechanism that, if enacted, might yield additional funds for benefits.

While it might be important symbolically for the board to consist solely of NFLPA representatives, the substantive significance of the second element of the NFLPA's rationale for this proposal — players fund the retirement plan — is not readily apparent. Furthermore, under the proposed arrangement, the NFLPA alone most likely would bear the brunt of criticism about the disability application process, whereas currently both the league and the players association might be viewed as sharing responsibility for the Retirement Board's decisions.

In his testimony, the NFLPA's executive director mentioned "six trustees," which suggests that he was referring to the Retirement Board (the DICC has only two members) when he proposed that the NFLPA choose all of the individuals who make disability application decisions. Giving the NFLPA sole responsibility for the decisions of the Retirement Board would, according to the players association, end deadlocked votes which, in turn, would aid in expediting payments to applicants. Currently, resolving tie votes involves sending the applicant to a medical advisory physician or using arbitration (the arbitration is among the board members; the applicant "is not a party to the arbitration").[370] Thus, if there are no deadlocks, the application process would end with the board's decision.

**Eliminate the Requirement for the Disability Initial Claims Committee (DICC).** In his 2007 testimony, the NFLPA's executive director asked Congress to eliminate the requirement to have "an extra level of decision-making in disability decisions." The executive director appeared to be referring to 29 CFR §2560.503-1(h)(3)(ii) and (4), which require a disability plan to have a mechanism for an applicant to appeal an adverse benefit determination, and stipulate that neither the individual who made the adverse determination, nor anyone subordinate to this individual, can hear the appeal. No rationale accompanied the NFLPA's suggestion, although it seems likely that this step would decrease the amount of time needed to process applications.

On the one hand, eliminating a level of review might reduce the cost and duration of the application process as a whole. On the other hand, as the plan counsel, Douglas W. Ell, testified in 2007, "... one man's 'red tape' is another man's due process."[371] The application process, as summarized by Ell, is as follows:

---

[369] (...continued)
"Oversight of the NFL Retirement System," statement of Eugene Upshaw, p. 3.

[370] U.S. Congress, House Committee on the Judiciary, Subcommittee on Commercial and Administrative Law, *The National Football League's System for Compensating Retired Players: An Uneven Playing Field?* statement of Douglas W. Ell, p. 15.

[371] Ibid., p. 16.

A player seeking disability benefits begins by completing a written application and sending it to the [Retirement] Plan's administration office in Baltimore. The Plan office has a toll-free number that players call to ask questions and get forms, and also has a website for downloading forms. The player is then sent to a nearby physician approved by the Retirement Board for an examination. These physicians are called neutral physicians and they provide a written report.

Disability claims are decided at the first level by a separate committee, the Disability Initial Claims Committee. Since 2002 the Department of Labor has required the existence of this separate committee. If a player is dissatisfied in any way with the decision of the Committee, he has the right to appeal to the full Retirement Board. Players who appeal are sent to a different second Neutral Physician, as required by federal law. If a player is dissatisfied in any way with the decision of the Retirement Board, he has the right to file suit in federal court.[372]

Eliminating one level of review — specifically, the DICC — might affect the overall approval rate, which is 42%. Currently, the DICC performs the initial review, and its approval rate is 34%. As discussed above, the second level of review (the Retirement Board) in the current configuration appears to contribute to a higher overall approval rate. If the DICC were eliminated, would the overall approval rate decrease from 42%, stay the same, or increase?

## Other Suggestions

**Mitigation of Economic Risk.** The health of active and former players might have implications for the NFL, the NFLPA, and society as a whole. Relatively healthy individuals and former players who, through their employment, earn sufficient wages to support themselves and their families are less likely to need government benefits and NFL/NFLPA-provided benefits than individuals who are unemployed, underemployed, or suffer from chronic health problems and/or disabilities. Dave Pear is an example of a former player who relies on government benefits and NFL/NFLPA benefits. A former defensive lineman for the Oakland Raiders and the Tampa Bay Buccaneers, Pear receives a $606 monthly pension payment from the retirement plan and $2,000 per month in Social Security disability benefits.[373] Medicare has paid most of the costs of his surgeries.[374]

Since the injuries and medical conditions an active player sustains most likely will have some bearing on his health in retirement, mitigation begins with active players. (The NFL and NFLPA policies on steroids and substances of abuse are examples of efforts to mitigate risk.[375]) To aid in mitigating the economic risk

---

[372] Ibid., pp. 14-15.

[373] Leahy, "The Pain Game," p. 10.

[374] Ibid.

[375] National Football League and NFL Players Association, *National Football League Policy on Anabolic Steroids and Related Substances 2007*; National Football League and NFL Players Association, *National Football League Policy and Program for Substances of*
(continued...)

associated with the health and safety of players, two options are available. A neutral party could conduct a single review, or multiple reviews, of the conditions, terms, policies, and procedures involving player health and safety. Within the federal government, the National Institute for Occupational Safety and Health and the Institute of Medicine (IOM) of the National Academies are examples of two entities that, with appropriate funding, might be able to undertake this initiative.[376] Another option for facilitating the mitigation of risk would be to have the Occupational Safety and Health Administration (OSHA) review the working conditions of NFL players, set and enforce standards, and provide education.[377]

**Independent Studies.** While the NFLPA has not conducted its own research or written its own articles on medical subjects and related subjects, the NFL has awarded grants for research, and members of the MTBI Committee, and perhaps other NFL committees as well, have written articles on medical subjects.[378] (See **Appendix B** for a list of studies and articles that each entity has sponsored or published. The recipients of NFL Charities grants for MTBI and related research are

---

[375] (...continued)
*Abuse*. Substances of abuse include, for example, marijuana and cocaine. The policy also covers the abuse of prescription drugs, over-the-counter medications, and alcohol. (Ibid., p. 1.)

[376] NIOSH, which is located within the Dept. of Health and Human Services, Centers for Disease Control, "is the federal agency responsible for conducting research and making recommendations for the prevention of work-related injury and illness. (Dept. of Health and Human Services, Center for Disease Control, National Institution for Occupational Safety and Health, "About NIOSH," available at [http://www.cdc.gov/niosh/about.html].) IOM "provides unbiased, evidence-based, and authoritative information and advice concerning health and science policy to policy-makers, professionals, leaders in every sector of society, and the public at large." (Institute of Medicine, "About," available at [http://www.iom.edu/CMS/AboutIOM.aspx].)

[377] OSHA, which is part of the Dept. of Labor, "aims to ensure employee safety and health in the United States by working with employers and employees to create better working environments." (Dept. of Labor, Occupational Safety and Health Administration, "OSHA Facts — August 2007," available at [http://www.osha.gov/as/opa/oshafacts.html].)

[378] Although the NFL has referred to the MTBI Committee as "the NFL's independent committee on mild-traumatic brain injury," and has noted that the "MTBI Committee will continue to operate as an independent group," it is unclear what is meant by "independent" in these statements. (National Football League, "NFL Outlines Standards for Concussion Management," news release, May 22, 2007, p. 1.) The degree of independence might depend upon, for example, the terms and conditions governing members' service on the committee; whether committee members are compensated in any way for their service; and whether any other committee, office, or individual in or affiliated with the NFL conducts a pre-publication review of articles produced by committee members. At the conclusion of at least one of the articles published by members of the MTBI Committee is a statement that disavows any conflict of interest. The text of the statement is as follows: "None of the Committee members have a financial or business relationship posing a conflict of interest to the research conducted on concussion in professional football. Funding for this research was provided by the National Football League and NFL Charities. The Charities is funded by the NFL Players' Association and League." (Pellman, et al., "Concussion in Professional Football: Players Returning To the Same Game — Part 7," p. 90.)

shown in **Table 17**.) Selecting individuals and organizations that are not affiliated, either directly or indirectly, with the NFL to conduct research on subjects and issues related to player health might provide a fresh perspective while helping to alter the perception, if not the reality, that, as some observers allege, the NFL uses its own research "to justify league practices."[379] The National Institute of Occupational Safety and Health (NIOSH) and the Center for the Study of Retired Athletes (CSRA), University of North Carolina at Chapel Hill, are two organizations that are independent of the NFL and the NFLPA and may have the capability to conduct studies of active and former NFL players.[380] In the early 1990s, the NFLPA asked NIOSH to conduct a mortality study to "investigate the rate and causes of death of National Football League Players."[381] Additionally, as noted above, Dr. Bennet I. Omalu and his co-authors offered to "collaborate with the Mild Traumatic Brain Injury Committee and the NFL in developing and implementing an optimal research program that will address these newly emerging issues."[382]

**Data: Collection, Quality, and Access.** The collection, analysis, and reporting of certain data might serve a number of purposes, such as providing additional, or more complete, information to active players about injuries and possible long-term consequences, and helping the NFL, the NFLPA, and the retirement plan office to identify and remedy possible problems associated with the administration of benefits. Possible options include providing injury surveillance system reports to active players, which could aid them in understanding, for example, the scope and frequency of injuries, which positions are at risk for certain injuries, and why certain protective equipment or safety procedures are necessary for players' safety. Provision of the data (in addition to the two reports that are produced each season) to the NFLPA would make it possible for the players association to conduct its own analysis of injuries.

Suggestions for new data collection efforts include conducting exit interviews with players who are retiring, carrying out a survey of former players, and establishing and maintaining a database on the disposition of applications for disability benefits. Exit interviews might provide information useful to the league, the players association, and the players themselves. An exit interview could cover a range of topics including, for example, reason(s) for retirement, feedback on the nature and quality of health care received as a player, a discussion of health and safety issues (including the player's narrative of injuries sustained), and retirement

---

[379] Peter Keating, "See No Evil? The NFL Won't Face Concussion Facts," *ESPN.com*, Jan. 19, 2007, available at [http://sports.espn.go.com/nfl/columns/story?id=2736505].

[380] Information about NIOSH and CSRA is available at [http://www.cdc.gov/niosh/] and [http://www.csra.unc.edu/], respectively.

[381] Letter from Baron and Rinsky to Woschitz, p. 1.

[382] Omalu, et al., "Chronic Traumatic Encephalopathy in a National Football League Player," May 2006, p. E1003. According to a 2000 news article, the NFLPA had tried to get the NFL to join the players association in asking the Centers for Disease Control to conduct a "comprehensive injury study," but the NFL was not interested. The NFL apparently responded that no such offer had been made by the players association. (Gutierrez, "NFL Injuries; Pain Game.")

plans.[383]  One or more surveys of former players could be used to gather information about their health and employment status, and could aid in determining how well existing benefits meet active and retired players' needs.  Benefit program evaluation efforts also might be enhanced by a survey of retired players.  Considering that the disposition of applications for disability benefits is a sensitive issue,[384] detailed, information that shows how many applications were denied, and why, at each step of the LOD application process and at each step of the T&P application process might be useful in explaining how the application process works and why applications were denied.

Ensuring that the information gleaned from the initiatives described above is provided to, at a minimum, active players, former players, the NFL, and the NFLPA could yield several advantages.  Active and former players would be better informed about a number of subjects and issues related to health, safety, and benefits; the NFL, the NFLPA, and the retirement plan office would receive feedback about benefits and the administration of benefits; and NFL and NFLPA personnel who deal with health and safety issues would receive potentially significant information about the medical treatment of players, and the health of two groups of former players — those who have just concluded their NFL careers and those who have been retired for a number of years.  Additionally, an overarching benefit could be enhanced accountability and transparency as all of the stakeholders would have access to the same information.  The actual benefits of such initiatives, and the validity and reliability of the data collected, would depend upon a number of factors, such as the way in which

---

[383]  An exit physical examination might be useful, too, to both the player and the team.  The player would have complete documentation of his health, including neurological health, upon the conclusion of his NFL career, and the information could be submitted to the NFL's injury surveillance system, which then might aid in tracking the long-term effects of injuries, if any.  NFL teams are responsible for the cost of medical services provided by team physicians. Having team physicians conduct exit physical examinations might increase the cost of such services to the team.  A player might be hesitant to submit to an exit examination if the results could possibly affect his ability to purchase health insurance at a reasonable price after the health insurance provided by the NFL and NFLPA expired.  Additionally, although an active or former player may request a copy of his medical records and trainer's records during the off-season, perhaps a copy of both sets of records could be provided automatically to a player upon his retirement. (National Football League and NFL Players Association, *NFL Collective Bargaining Agreement, 2006-2012*, p. 199.)  Under Article XLIV, "Players' Right to Medical Care and Treatment," of the CBA, each player is required to undergo a standard minimum pre-season physical examination.  The protocol for standard minimum pre-season physical examination, which includes the following, might serve as a model for an exit examination: general medical examination, orthopedic examination, flexibility, EKG, stress test (at physician's discretion), blood test, urinalysis, vision test, hearing test, dental examination, chest x-ray (at appropriate intervals), and x-ray of all previously injured areas.  (Ibid., pp. 197, 279-281.)

[384] U.S. Congress, House Committee on the Judiciary, Subcommittee on Commercial and Administrative Law, *The National Football League's System for Compensating Retired Players: An Uneven Playing Field?* statement of Douglas W. Ell; letter from Douglas W. Ell, to Rep. Linda Sanchez, Chair, Subcommittee on Commercial and Administrative Law, July 3, 2007; and U.S. Congress, Senate Committee on Commerce, Science, and Transportation, *Oversight of the NFL Retirement System*, unpublished transcript, 110th Cong., 1st sess., Sept. 18, 2007.

information was collected, how respondents were selected, and how survey questions were worded.

**Establish an Ombudsman Office.**    Although the NFLPA does not represent former players, the organization has a Retired Players Department, which "acts to meet players' needs with the right services; continuously communicates and involves players of all ages to create an exclusive fraternity; works collaboratively with other NFLPA departments and Players Inc to give outstanding value to its members; provides leadership, administration, coordination and implementation to serve the needs of retired players and retired player chapters."[385] Active players are represented by the players association, and they select the members of the NFLPA's Board of Player Representatives.    (Members of each team elect a player representative and an alternate player representative.  Both serve on the Board of Player Representatives.[386])

Additional options for involving current and former players in issues of interest to them and for identifying and addressing problems include expanding the membership of each committee involved in health and safety issues and establishing one or more ombudsmen.  Opening up committee membership to active players would promote participation by the individuals who have a direct stake in the work of the committees.  Furthermore, players might bring a fresh perspective and innovative ideas to the work of each committee.  Expanding committee membership in this way might not be feasible, however.  Player-members might find it difficult to attend meetings that are held during the season, and their contributions might be limited during discussions that require specialized knowledge.  Establishing an ombudsman office in one or more of the following organizations — the NFL, NFLPA, and retirement plan office — would provide an outlet for active and/or former players. In addition to responding to complaints and requests for assistance, an ombudsman office could function akin to an auditor or a government inspector general, identifying and examining issues and problems.  Planning for the establishment of an ombudsman office would probably have to address, at a minimum, funding, organizational independence, and the culture of the organization in which it is to be located.

# Concluding Observations

Professional football is an immensely popular sport in the United States, yet it exacts a physical toll on the men who play the game.  Injuries and health problems sustained by active players run the gamut from sprained knees and ankles to concussions and broken bones, and injuries might have long-term consequences for a player's health.  It has been suggested by several studies, for example, that mild traumatic brain injuries might lead to depression or Alzheimer's-like disease.  The NFL and the NFLPA, through collective bargaining and other discussions, have

---

[385]  NFL Players Association, "Retired Players Department: FAQs," p. 1.

[386] NFL Players Association, "FAQs," n.d., available at [http://www.nflplayers.com/user/template.aspx?fmid=181&lmid=237&pid=0&type=c#a1].

created a variety of benefits for retired and active players, including benefits for individuals who are totally and permanently disabled. Additionally, the league has established several committees that deal with health and safety issues, and the players association has its own medical advisor. Organizations not affiliated with the NFL or the players association also have taken steps to provide assistance to former players.

The subject of players' injuries, disabilities, and benefits is a complex one, and, accordingly, there are a host of issues surrounding this subject. Although the number and type of benefits have grown over the years, older retirees, particularly those who played prior to 1982, have fewer benefits available to them than their successors have. Yet, this subset of former players might have the greatest financial and medical needs. MTBI research has been a somewhat controversial issue, because some experts have published articles whose findings do not agree with those of the NFL's MTBI Committee. These issues, and the others discussed above, suggest that there may not be any simple or easy answers to the health problems experienced by active and former players, or to the questions raised about the sufficiency of benefits for retirees in particular. The players association has suggested three legislative options, and it might be possible, for example, to mitigate the risk of playing professional football and to gather data that could be used to educate players, improve the administration of existing benefits programs, and determine the extent of former players' needs.

# Appendix A. Glossary

**Active Player** — "A Player who is obligated to perform football playing services under a contract with an Employer; provided, however, that for purposes of Section 5.1 only, Active Player will also include a Player who is no longer obligated to perform football playing services under a contract with an Employer, but is between the period beginning when his last such contract expired or was terminated for any reason, and ending on the later of (a) the July 15 following the beginning of the period, or (b) the first day of preseason training camp."[387]

**Affiliate** — "means, with respect to a particular Employer, (a) any corporation, other than the Employer, which is a member of a controlled group of corporations (within the meaning of [Internal Revenue] Code [of 1986, as amended] section 414(b) of which such Employer is a member, (b) any trade or business, other than the Employer, which together with such Employer are under common control (within the meaning of [Internal Revenue] Code section 414(c)), (c) any employer, other than the Employer, which is a member of an affiliated service group (within the meaning of [Internal Revenue] Code section 414(m)) of which such Employer is a member, and (d) any other entity required to be aggregated with the Employer under section 414(o) of the [Internal Revenue] Code."[388]

**Annuity Year** — The 12-month period beginning April 1 and ending March 31 of the following year.[389]

**Arising out of League football activities** — This means "a disablement arising out of any League pre-season, regular-season, or post-season game, or any combination thereof, or out of League football activity supervised by an Employer, including all required or directed activities. [This phrase] does not include, without limitation, any disablement resulting from other employment, or athletic activity for recreational purposes, nor does it include a disablement that would not qualify for benefits but for an injury (or injuries) or illness that arises out of other than League football activities."[390]

**Benefit credit** — "means the credit in Section 4.1 [of the Retirement Plan] for the corresponding Credited Season."[391]

**Credited season** — "[A] Plan Year in which a Player: (a) is an Active Player (including an injured Player who otherwise satisfies the definition of 'Active Player') on the date of three or more Games, not including Game dates when he was on the Future List; (b) after April 1, 1970, is injured in the course and scope of his

---

[387] *Bert Bell/Pete Rozelle NFL Player Retirement Plan*, p. 2.

[388] Ibid.

[389] Information provided telephonically by Benjamin L. Zelenko , Esq., to the author on Dec. 10, 2007.

[390] *Bert Bell/Pete Rozelle NFL Player Retirement Plan*, p. 26.

[391] Ibid., pp. 2-3.

employment for an Employer and by reason of such injury receives payment equivalent to his salary for three or more Games or for a number of Games which, when added to the number of Games in such Plan Year for which he otherwise has credit, totals three or more; (c) after reporting to at least one official pre-season training camp or official practice session during such Plan Year, (1) dies, (2) becomes totally and permanently disabled under Section 5.1(a) [active football] or Section 5.1(b) [active nonfootball], or (3) incurs a disability that subsequently qualifies for a benefit under Section 6.1 [line-of-duty disability]; (d) is absent from employment by an Employer while serving in the Armed Forces of the United States, provided such Player returns as an Active Player, after first being eligible for discharge from military service, by the later of (i) 90 days or any longer period prescribed by applicable law, or (ii) the opening of the official pre-season training camp; (e) effective June 1, 2003, was absent from employment by an Employer while serving in the Armed Forces of the United States during the periods set forth in the table below [the periods cover World War II, the Korean War, and the Vietnam War] if (1) during the one year period ending on the date he entered the Armed Forces, such Player either played professional football for an Employer or signed a contract (or a similar document) stipulating his intent to play professional football for an Employer, and (2) such Player was alive on the date set forth in the table below for the corresponding period ... provided that Credited Seasons under this Section 1.10(e) [definition of "credited season"] will be granted only if and to the extent necessary for such Player to become a Vested Player; or (f) effective April 1, 2001, has a season with at least eight games on the practice squad in a Plan Year (either before or after April 1, 2001) in which he did not otherwise earn a Credited Season, provided that he is otherwise vested and earns a Credited Seasons in 2001 or later. A player may earn a maximum of one Credited Season under this Section 1.10(f) regardless of the number of seasons in which he has at least eight games."[392]

**Disability Initial Claims Committee (DICC)** — This committee, which has two members (one is appointed by the NFLPA, the other by the NFL Management Council), is "responsible for deciding all initial claims for any and all disability benefits under [the Retirement] Plan. The Disability Initial Claims Committee also will make initial decisions under Sections 5.3 [total and permanent disability] and 6.3 [line-of-duty disability] as to whether Players currently receiving disability benefits should continue to receive those benefits. At the request of a member of the Disability Initial Claims Committee, the Disability Initial Claims Committee will reconsider any decision it has made. When making the decisions described in this [section], the Disability Initial Claims Committee will have full and absolute discretion, authority and power to interpret the Plan and the Trust."[393]

**Employee** — "[A]n individual who (a) is employed by an Employer as an Active Player, or (b) is employed by an Employer or an Affiliate in a capacity other than as

---

[392] Ibid., pp. 3-4.

[393] Ibid., pp. 31-32.

an Active Player (provided that such employment immediately precedes or immediately follows, without interruption, employment as an Active Player)."[394]

**Employer** — "A member club of the League."[395]

**Final League Year** — is "the League Year which is scheduled prior to its commencement to be the final League Year of the Collective Bargaining Agreement."[396]

**Inactive vested player** — See "vested inactive player."

**League Year** — is "the period from February 20 of one year through and including February 19 of the following year, or such other one year period to which the NFLPA and the [NFL's] Management Council may agree."[397]

**Life only pension** — "Equal monthly pension payments payable during the Player's lifetime only."[398]

**Line of Duty Disability** — "Any player who incurs a 'substantial disablement' (as defined in Section 6.4(a) and (b) [of the *Bert Bell/Pete Rozelle NFL Player Retirement Plan*]) 'arising out of League football activities' (as defined in Section 6.4(c) [of the *Bert Bell/Pete Rozelle NFL Player Retirement Plan*]) will receive a monthly line-of-duty disability benefit ....[399]"

**Normal retirement date** — "[T]he first day of the calendar month coincident with or next following a Player's 55th birthday."[400]

**Plan Year** — "[A] 12-month period from April 1 to March 31. A Plan Year is identified by the calendar year in which it begins."[401]

**Player** — "Any person who is or was employed under a contract by an Employer to play football in the League and who is or was (a) on the Active List or the Inactive List (as such lists are or have been defined in the Constitution and By-Laws of the League) of an Employer; (b) on an Employer's roster without being on the Active List by reason of injuries sustained in the Chicago Tribune All-Star Game; (c) injured in the course and scope of his employment for an Employer and by reason of such

---

[394] Ibid., p. 4.

[395] Ibid.

[396] Ibid.

[397] Ibid., p. 6.

[398] Ibid., p. 13.

[399] Ibid., p. 25.

[400] Ibid., p. 6.

[401] Ibid.

injury paid under such contract for all or part of the Plan Year in which the injury occurs or occurred; (d) on the Move List, or, for the purposes of the benefits provided by Articles 5, 6 and 7, on the Future List of an Employer after April 1, 1970 (as such lists have been defined in the Constitution and By-Laws of the League); or (e) on the Reserve/Physically Unable to Perform or the Reserve/NFI-EL Lists of an Employer (as such lists have been defined in the Constitution and By-Laws of the League)."[402]

**Pre-59ers** — The first pension plan, the Bert Bell NFL Player Retirement Plan, was established in 1962, but it was retrospective to only 1959. Players who left football before 1959 — the pre-59ers — were not covered by this plan.[403]

**Projected total revenues** — "[T]he amount of Benefits projected in accordance with the rules set forth in Article XXIV [of the CBA] (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary."[404]

**Qualified joint and survivor annuity** — "[A] monthly annuity for the life of the Player with a monthly survivor annuity for the life of the Spouse equal to 50% of the amount of the monthly annuity payable during the life of the Player, which benefit will be the Actuarial Equivalent of the life only pension form of benefit ...."[405]

**Retired player** — same as former or inactive player. NFL and NFLPA documents define "active player" and the implication is that an individual who does not fall into the active category is inactive.

**Retirement Board** — "The Retirement Board will be the 'named fiduciary' of the [Retirement] Plan within the meaning of section 402(a)(2) of ERISA [Employee Retirement Income Security Act], and will be responsible for implementing and administering the Plan, subject to the terms of the Plan and Trust. The Retirement Board will have full and absolute discretion, authority, and power to interpret, control, implement, and manage the Plan and the Trust."[406]

**Salary cap** — "[T]he absolute maximum amount of Salary that each Club may pay or be obligated to pay or provide to players or Player Affiliates, or may pay or be obligated to pay to third parties at the request of and for the benefit of Players or Player Affiliates, at any time during a particular League Year, in accordance with the rules set forth in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary), if applicable."[407]

---

[402] Ibid.

[403] NFL Players Association, "History of Retirement and T&P Benefits for NFL Players," p. 1.

[404] National Football League and NFL Players Association, *NFL Collective Bargaining Agreement, 2006-2012*, p. 7.

[405] *Bert Bell/Pete Rozelle NFL Player Retirement Plan*, p. 13.

[406] Ibid., pp. 29-30.

[407] National Football League and NFL Players Association, *NFL Collective Bargaining*
(continued...)

**Substantial disablement** — "(a) For applications received on or after May 1, 2002, a 'substantial disablement' is a 'permanent' disability that: (1) Results in a 50% or greater loss of speech or sight; or (2) Results in a 55% or greater loss of hearing; or (3) Is the primary or contributory cause of the surgical removal or major functional impairment of a vital bodily organ or part of the central nervous system; or (4) For orthopedic impairments, using the American Medical Association *Guides to the Evaluation of Permanent Impairment* (Fifth Edition, Chicago IL) ('AMA Guides'), is (a) a 38% or greater loss of use of the entire lower extremity; (b) a 23% or greater loss of use of the entire upper extremity; (c) an impairment to the cervical or thoracic spine that results in a 25% or greater whole body impairment; (d) an impairment to the lumbar spine that results in a 20% or greater whole body impairment; or (e) any combination of lower extremity, upper extremity, and spine impairments that results in a 25% or greater whole body impairment. In accordance with the AMA Guides, up to three percentage points may be added for excess pain in each category above ((a) through (e)). The range of motion test will not be used to evaluate spine impairments. (b) A disability will be deemed to be 'permanent' if it has persisted or is expected to persist for at least 12 months from the date of its occurrence and if the Player is not an Active Player."[408]

**Totally and permanently disabled**[409] — "An Active Player or a Vested Inactive Player, other than a Player who has reached his Normal Retirement Date [age 55] or begun receiving his monthly pension under Article 4 [Retirement Benefits], will be deemed to be totally and permanently disabled if the Retirement Board or the Disability Initial Claims Committee finds that he has become totally disabled to the extent that he is substantially prevented from or substantially unable to engage in any occupation or employment for remuneration or profit, but expressly excluding any disability suffered while in the military service of any country. A Player will not be considered to be able to engage in any occupation or employment for remuneration or profit within the meaning of this Section 5.2[410] merely because such person is employed by the League or an Employer, manages personal or family investments, is employed by or associated with a charitable organization, or is employed out of benevolence."[411]

**Vested player** — A player who: "(a) earns five Credited Seasons; (b) earns four Credited Seasons, including a Credited Season after the 1973 Plan Year; (c) earns three Credited Seasons, including a Credited Season after the 1992 Plan Year; (d)

---

[407] (...continued)
*Agreement, 2006-2012*, p. 7.

[408] *Bert Bell/Pete Rozelle NFL Player Retirement Plan*, p. 26.

[409] A definition of "permanent disability" may be found in Article 6, "Line-of-Duty Disability," of the *Bert Bell/Pete Rozelle NFL Player Retirement Plan*: "A disability will be deemed 'permanent' if it has persisted or is expected to persist for at least 12 months from the date of its occurrence and if the Player is not an Active Player." (Ibid., p. 26.) It is unclear whether this definition also applies to the determination of total and permanent disabilities made by the Retirement Board and the Disability Initial Claims Committee.

[410] This definition is the text of Section 5.2.

[411] *Bert Bell/Pete Rozelle NFL Player Retirement Plan*, p. 21.

after the 1975 Plan Year, is an Employee on his Normal Retirement Date; (e) after receiving total and permanent disability benefits under Article 5 [of the retirement plan], is found to no longer qualify for total and permanent disability; (f) is an Employee after the 1975 Plan year and has at least 10 Years of Service (only for the purpose of applying Article 4 [of the retirement plan] or Section 7.3 [of the retirement plan] and not for any other purpose); (g) is an Employee after the 1988 Plan Year and has at least four Years of Service, at least one of which occurred after the 1988 Plan Year and is a Plan Year in which the Employee did not earn a Credited Season (only for the purpose of applying Article 4 [of the retirement plan] or Section 7.3 [of the retirement plan] and not for any other purpose); (h) is an Employee after the 1992 Plan year and has at least three Years of Service, at least one of which occurred after the 1992 Plan Year and is a Plan Year in which the Employee did not earn a Credited Season (only for the purpose of applying Article 4 [of the retirement plan] or Section 7.3 [of the retirement plan] and not for any other purpose); or (i) (1) earned at least four (4) Credited Seasons, the last of which is earned prior to the 1974 Plan Year, and (2) is alive on June 1, 1998 (only for the purpose of applying Article 4 [of the retirement plan] or Section 7.3 [of the retirement plan] and not for any other purpose).[412]

**Vested inactive player** — "A Vested Player who is not an Active Player."

---

[412] Ibid., p. 7.

# Appendix B. NFL and NFLPA Studies Concerning Players' Health

The following information was provided by the NFL and the NFLPA, except for the first item in the list. The study sponsor, participant, or author (for example, the MTBI Committee) is identified following the citation.

Letter from Sherry Baron, M.D., M.P.H., and Robert Rinsky, U.S. Department of Health and Human Services, National Institute for Occupational Safety and Health, to Frank Woschitz, National Football League Players Association, Jan. 10, 1994.[413] (NFLPA)

Ira R. Casson, Elliot J. Pellman, and David C. Viano, "Chronic Traumatic Encephalopathy in a National Football League Player," *Neurosurgery*, Nov. 2006, pp. 1182-1184. (MTBI Committee)

Kevin M. Guskiewicz, et al., "Recurrent Concussion and Risk of Depression in Retired Professional Football Players," 2006. (NFLPA)[414]

Elliot J. Pellman, "Background on the National Football League's Research on Concussion in Professional Football," *Neurosurgery*, Oct. 2003, pp. 797-798.(MTBI Committee)

Elliot J. Pellman, et al., "Concussion in Professional Football: Reconstruction of Game Impacts and Injuries," *Neurosurgery*, Oct. 2003, pp. 799-814. (MTBI Committee)

Elliot J. Pellman, et al., "Concussion in Professional Football: Location and Direction of Helmet Impacts — Part 2," *Neurosurgery*, Dec. 2003, pp. 1328-1341. (MTBI Committee)

Elliot J. Pellman, et al., "Concussion in Professional Football: Epidemiological Features of Game Injuries and Review of the Literature — Part 3," *Neurosurgery*, Jan. 2004, pp. 81-96. (MTBI Committee)

Elliot J. Pellman, et al., "Concussion in Professional Football: Repeat Injuries — Part 4," *Neurosurgery*, Oct. 2004, pp. 860-876. (MTBI Committee)

---

[413] This study was published as correspondence, and the letter notes that the mortality study was conducted at the request of the NFL Players Association. This document is popularly known as the "NFL mortality study."

[414] Guskiewicz, et al., did not publish an article in 2006. The information from the NFLPA appears to be a reference to this article: Kevin M. Guskiewicz, et al., "Recurrent Concussion and Risk of Depression in Retired Professional Football Players," *Medicine and Science in Sports and Exercise*, June 2007, pp. 903-909.

CRS-135

Elliot J. Pellman, et al., "Concussion in Professional Football: Injuries Involving 7 or More Days Out — Part 5," *Neurosurgery*, Nov. 2004, pp. 1100-1119. (MTBI Committee)

Elliot J. Pellman, et al., "Concussion in Professional Football: Neuropsychological Testing — Part 6," *Neurosurgery*, Dec. 2004, pp. 1290-1305. (MTBI Committee)

Elliot J. Pellman, et al., "Concussion in Professional Football: Players Returning to the Same Game — Part 7," *Neurosurgery*, Jan. 2005, pp. 79-92. (MTBI Committee)

Elliot J. Pellman, et al., "Concussion in Professional Football: Helmet Testing to Assess Impact Performance — Part 11," *Neurosurgery*, Jan. 2006, pp. 78-96. (MTBI Committee)

Elliot J. Pellman, et al., "Concussion in Professional Football: Recovery of NFL and High School Athletes Assessed by Computerized Neuropsychological Testing — Part 12," *Neurosurgery*, Feb. 2006, pp. 263-274. (MTBI Committee)

Elliot J. Pellman and David C. Viano, "Concussion in Professional Football," *Neurosurgical Focus*, Oct. 2006, pp. 1-10. (MTBI Committee)

Beverly Pitts, "After the Battle: Report on Lives of Former Players," May 1994. (NFLPA)

Beverly Pitts, "A Study of Players Who Left Professional Football in the 90's," June 2002. (NFLPA)

Mark Popovich and Beverly Pitts, "Life After Football: A Survey of Former Players" May 1989. (NFLPA)

Mark Popovich and Beverly Pitts, "Aftermath of an NFL Career: Injuries." (NFLPA) May 1990

Mark Popovich and Beverly Pitts, "Lifestyle After Football," Spring 1994. (NFLPA)

Mark Popovich and Beverly Pitts, "Life After Football: Careers and Opportunities," Sept. 1996. (NFLPA)

Arthur Roberts, "Determinants of Cardiovascular and Respiratory Risk in Elite Professional Football Players," 2004. (NFLPA)

Thomas Schwenk, et al., "Depression and Pain in Retired Professional Football Players," n.d. (NFLPA)

Paul Tagliabue, "Tackling Concussions in Sports," *Neurosurgery*, Oct. 2003, p. 796. (NFL)

CRS-136

David C. Viano, "Report on ProCap Helmet Tests at Biokinetics," Jan. 17, 2002. (MTBI Committee)[415]

David C. Viano and Elliot J. Pellman, "Concussion in Professional Football: Biomechanics of the Striking Player — Part 8," *Neurosurgery*, Feb. 2005, pp. 266-280. (MTBI Committee)

David C. Viano, et al., "Concussion in Professional Football: Brain Responses by Finite Element Analysis: Part 9," *Neurosurgery*, Nov. 2005, pp. 891-916. (MTBI Committee)

David C. Viano, et al., "Concussion in Professional Football: Comparison with Boxing Head Impacts," *Neurosurgery*, Dec. 2005, pp. 1154-1172. (MTBI Committee)

David C. Viano, et al., "Concussion in Professional Football: Performance of Newer Helmets in Reconstructed Game Impacts — Part 13," *Neurosurgery*, Sept. 2006, pp. 591-606. (MTBI Committee)

David C. Viano, Ira R. Casson, and Elliot J. Pellman, "Concussion in Professional Football: Biomechanics of the Struck Player — Part 14," *Neurosurgery*, Aug. 2007, pp. 313-328. (MTBI Committee)

## Planned or Ongoing Studies

In 2007, the NFL stated that studies are in progress or planned for the following subjects (the organization(s) conducting the study or studies are also listed):

- Protective effects of mouthguards, by Biokinetics and Associates, Ltd.[416]

- Biomechanical [research], Wayne State University and the University of Göteborg (Sweden).

- Long-term effects of concussions.  The organization(s) conducting this study were not identified, although it was noted that "[d]ifferent phases of the study are being managed by different researchers."[417]

---

[415] This article was not published.

[416] Biokinetics and Associates, Ltd., is a Canadian firm that, according to its mission statement, "provides engineered solutions to human impact protection for sports, transportation and defence/law enforcement appplications."  (Biokinetics, "Mission," available at [http://www.biokinetics. com/profile_index.html].)

[417] In a *New York Times* article dated May 31, 2007, it was reported that the Commissioner of the NFL had said that the MTBI Committee "had just begun its own study 'to determine if there are any long-term effects of concussions on retired N.F.L. players.'  Dr. Casson, the committee's co-chair, said that players who retired from 1986 through 1996 would be (continued...)

CRS-137

- Cardiovascular health of active players, NFL's Cardiovascular Health Committee.[418]

---

[417] (...continued)
randomly approached to undergo 'a comprehensive neurological examination, and a comprehensive neurologic history, including a detailed concussion history,' using player recollection cross-referenced with old team injury reports. He said that the study would take two to three years to be completed and another year to be published." (Alan Schwarz, "Study of Ex-N.F.L. Players Ties Concussion to Depression Risk," *New York Times*, May 31, 2007, p. C18.)  It is possible that this excerpt refers to the same study that the NFL mentioned in its letter to the House Committee on the Judiciary, which is the source for the studies included in this list.  Team injury reports may not include all of the concussions that a player experienced, for reasons discussed above regarding financial incentives that may cause a player not to report an injury.

[418] Letter from Goodell to Reps. Conyers and Smith, pp. 3-4.

# Appendix C.  Members of the Mild Traumatic Brain Injury Committee and Retired Player Study Investigators

The following information is current as of October 30, 2007.  The position or role that each individual has or fills on the committee is listed first in each entry, following the individual's name and academic degree(s) or certification.  Eight committee members are employed by NFL teams; the team is included in the list of each individual's professional affiliations.[419]

## MTBI Committee

David Viano, M.D., Ph.D. — Co-chair and biomedical engineer; Biomedical Engineer, ProBiomechanics LLC; Adjunct Professor of Engineering, Wayne State University.

Ira Casson, M.D. — Co-chair and neurologist; Assistant Professor of Neurology, Albert Einstein School of Medicine and Long Island Jewish Medical Center.

Ronnie Barnes, ATC — Head athletic trainer, New York Giants.[420]

Rick Burkholder, ATC — Head athletic trainer, Philadelphia Eagles.

Henry Feuer, M.D. — Neurosurgeon; Neurosurgeon, Indiana University Medical Center and Indianapolis Neurosurgical Group; Indianapolis Colts.

Mark Lovell, Ph.D. — Neuropsychologist; Director, University of Pittsburgh Medical Center (UPMC) Sports  Concussion Program; Associate Professor of Neurological Surgery, University of Pittsburgh.[421]

---

[419] Unless noted otherwise, the sources of information in this appendix are National Football League, "NFL Outlines Standards for Concussion Management," n.d., pp. 4-5;  National Football League, "NFL Subcommittee on Mild Traumatic Brain Injury Membership and Affiliations As of October 30, 2007," n.d.

[420] ATC is the acronym for "certified athletic trainer." (National Athletic Trainers Association, "The Facts about Certified Athletic Trainers and the National Athletic Trainers Association," available at [http://www.nata.org/consumer/docs/Factsaboutathletictrainers.pdf].)

[421] Mark Lovell also is the Chairman and Software Developer, ImPACT Applications, Inc., which sells neurocognitive testing software to NFL teams.  (ImPACT Applications, "Developers/Clinical," available at [http://www.impacttest.com/contact.php#anc1]; ImPACT Applications, Inc., "Professional Teams," available at [http://www.impacttest.com/currentusers.php?type=proteam].)  For additional information on ImPACT, see Peter Keating, "NFL's Concussion Expert Also Sells Equipment to League," *ESPN.com*, Aug. 10, 2007, available at [http://sports.espn.go.com/nfl/news/story?id=2967678].

CRS-139

Joseph Maroon, M.D. — Neurosurgeon; Neurosurgeon, UPMC; Clinical Professor and Vice Chairman, Department of Neurological Surgery, University of Pittsburgh School of Medicine; Pittsburgh Steelers.[422]

Joel Morgenlander, M.D. — Neurologist; Professor of Neurology, Duke University Medical Center.

Thomas Naidich, M.D. — Neuroradiologist; Professor and Chief of Neuroradiology, Mount Sinai School of Medicine.

Elliot Pellman, M.D. — NFL Medical Liaison; Member, NFL Injury and Safety Panel, NFL Subcommittee on Cardiovascular Health, and NFL Foot and Ankle Subcommittee; Medical Director, ProHEALTH Care Associates; Associate Clinical Professor of Medicine and Orthopedics, Mount Sinai School of Medicine; New York Jets.

John Powell, Ph.D., ATC — Epidemiologist; NFL Consultant, Injury Studies, Med Sports Systems; Associate Professor, Departments of Kinesiology and Physical Medicine and Rehabilitation, Michigan State University.

Doug Robertson, M.D. — Sports medicine; Indianapolis Colts.

Andrew Tucker, M.D. — Sports medicine; Co-Chairman, NFL Subcommittee on Cardiovascular Health; Member, NFL Injury and Safety Panel; Chief of Sports Medicine, Union Memorial Hospital; Baltimore Ravens.

Joe Waeckerle, M.D. — Emergency medicine; Editor Emeritus, *Annals of Emergency Medicine*; Clinical Professor of Medicine, University of Missouri School of Medicine; Kansas City Chiefs.

## Retired Player Study Investigators

The professional affiliations of investigators who are also members of the MTBI Committee may be found above.

Ira Casson, M.D. — Member of MTBI Committee.

---

[422] Information about Joseph Maroon's employment with the Pittsburgh Steelers came from University of Pittsburgh Medical Center, "Joseph C. Maroon, M.D.," available at [http://www.upmc.com/Communications/MediaRelations/UPMCExperts/ByName/M/MaroonJosephC.htm]. Joseph Maroon also is the Chief Medical Officer, ImPACT Applications, Inc., which sells neurocognitive testing software to NFL teams. (ImPACT Applications, "Developers/Clinical," available at [http://www.impacttest.com/contact.php#anc1]; ImPACT Applications, Inc., "Professional Teams," available at [http://www.impacttest.com/currentusers.php?type=proteam].) For additional information on ImPACT, see Peter Keating, "NFL's Concussion Expert Also Sells Equipment to League," *ESPN.com*, Aug. 10, 2007, available at [http://sports.espn.go.com/nfl/news/story?id=2967678].

CRS-140

Kathleen Finzel, M.D. — Chief of Radiology, ProHEALTH Care Associates. [no entry in parentheses for her indicating her role on the committee]

Mark Haacke, Ph.D. — Biomedical engineering; Professor of Biomedical Engineering, Wayne State University; Director of the MRI Institute for Biomedical Research.

Brian Hainline, M.D. — Neurologist; Associate Clinical Professor, New York University School of Medicine; Chief of Neurology, ProHEALTH Care Associates.

Victor Haughton, M.D. — Neuroradiologist; Professor and Chief of Neuroradiology, University of Wisconsin-Madison.

Danielle LeStrange, R.N. — Study coordinator.[423]

Mark Lovell, Ph.D. — Member of MTBI Committee.

Joseph Maroon, M.D. — Member of MTBI Committee.

Joe Morgenlander, M.D. — Member of MTBI Committee.

Thomas Naidich, M.D. — Member of MTBI Committee.

Elliot Pellman, M.D. — Member of MTBI Committee.

Chi-Sing Zee, M.D. — Neuroradiologist; Professor of Radiology and Director of Neuroradiology, Keck School of Medicine, University of Southern California.

David Viano, M.D., Ph.D. — Member of MTBI Committee.

---

[423] No information was provided about Danielle LeStrange's professional affiliations in the NFL's May 22, 2007, news release.

# Appendix D. Acronyms

**CBA** — collective bargaining agreement.

**CTE** — chronic traumatic encephalopathy.

**DICC** — Disability Initial Claims Committee.

**LOD** — line-of-duty.

**MTBI** — mild traumatic brain injury.

**NFL** — National Football League.

**NFLMC** — National Football League Management Council.

**NFLPA** — NFL Players Association.

**T&P** — total and permanent.

# EXHIBIT 67

NFL

# 'Permanently disabled', Harrison fighting for benefits NFL took away

Print



BY MICHAEL ROSENBERG

Posted:
Wed Jan. 29, 2014

Updated:
Tue Jun. 10, 2014



*Dwight Harrison played 10 years in the NFL and now suffers from dementia, but he has been repeatedly denied benefits from the NFL that he feels he deserves.*

Dwight Harrison played in the NFL for 10 years. Recently, he was terrified of a phone call.

"I was up all night," he told me, "scared to death. At times, I can't even speak. I'm afraid to talk to you."

I am not in the habit of scaring people to death. But Harrison worried he would say the wrong thing. He worried I wouldn't believe him, which is understandable. His story is so absurd, so unfair, that it sounds like a sick joke. But it is not a joke. It is Harrison's life. And here is what happened:

Harrison requested higher disability pay from his NFL retirement plan.

The plan's trustees said no ... and took away *his entire pension.*

**MICHAEL McCANN: Judge rejects $765 million NFL concussion settlement**

Then they charged him for legal fees.

Now Harrison lives alone in Beaumont, Texas, in what he calls "a little FEMA house," because a hurricane wiped out his other one. He is 65. He is on Medicaid now. He is still fighting for the money, and the acknowledgment that he deserves it. But it is not a fair fight. After too many hits to the head, his brain flickers on and off.

"My situation ... sometimes it's bright, sometimes it's dim, and sometimes the light don't come on at all," said Harrison, who in his 10-year career from 1971 to '80 played for the **Oakland Raiders**, **Buffalo Bills**, Baltimore Colts and **Denver Broncos**. "I can't sometimes keep my thoughts. Forgive me, please."

-2271-

The night before our first talk a few months ago, Harrison's light went on, and he wanted to take advantage of it. He grabbed a recorder that he keeps on a small table next to his old standard-definition television and spoke his thoughts. The next day, a few minutes after he mustered the courage to answer my call, he placed his recorder next to the phone and pushed PLAY.

*****

We will let the trustees of the Bert Bell/Pete Rozelle NFL Player Retirement Plan begin this story. The year was 1993.

There are six trustees on the board at any given time: Three that represent owners, and three that ostensibly represent players. Former players have long grumbled that the board is more interested in protecting owners and the union than helping former players.

Former Bears star Dave Duerson was appointed by the union but publicly doubted that former players were suffering because of football hits. Duerson later committed suicide and was found to have chronic traumatic encephalopathy (CTE), a brain disease commonly linked to concussions. His tragic story seems to epitomize the NFL's concussion problem: Denial for too long, until it was too late.

But in 1993, the trustees examined Harrison's medical records and determined he was "totally and permanently disabled."

We repeat: The *trustees* said Harrison was "totally and permanently disabled."

They awarded him a $1,729 monthly disability benefit. They also determined that Harrison had been disabled since Jan. 1, 1984, and awarded him a lump sum of $184,756 in retroactive benefits.

Still, Harrison felt he deserved more. He had good reasons to believe that. The retirement plan featured four tiers of "total and permanent disability" benefits, depending mostly on how a player was disabled. The trustees put him on the lowest tier. They determined that, while Harrison clearly had serious medical problems, they did not result from playing in the NFL. He disagreed, and his wife sent a letter to the board asking them to reconsider.

In 1994, the trustees again acknowledged Harrison's "total and permanent disability," at age 45 ... but they would not give him more money. Instead, they informed him that his "disorder has its origin in an incident that occurred while you were playing college football, not League football." They also said that his depression was "of recent origin".

Yes, the trustees tied Harrison's health problems to his life before *and* after his NFL career ... but said he was not damaged *during* his career.

**SI VAULT: Wives and girlfriends often bear the burden of caring for suffering former NFL players**

How did they reach this conclusion? In part, they used Harrison's honesty against him. He had told at least one doctor he was traumatized seeing a teammate suffer a broken neck and paralysis his senior year at Texas A&I (now Texas A&M-Kingsville). That allowed the trustees to trace his problems to his college career, instead of his NFL career.

And of course, it's reasonable to assume that his memory loss, depression and diminished cognitive function got worse after he retired. That enabled the trustees to say his depression was "of recent origin".

Still, there was no debate about his disabilities. Two doctors had confirmed them -- and one of them was appointed by the retirement plan, not by Harrison. The only dispute was what caused him to be disabled.

Harrison appealed. And this is when his case and his savings began to disintegrate.

The trustees argued that he failed to appear for a psychiatrist's examination, failed to respond to requests for counsel, then failed to appear for another examination. The trustees alleged that when a process server approached Harrison, Harrison drove away quickly, did not stop and kept shaking his head, trying to lose the process server.

They said he did not provide financial information. They said he participated in activities that "include socializing with college football teammates at a team reunion, direct participation in real estate transactions and other business activities." They claim he was trying to run a rodeo out of his backyard. They say witnesses described him as a "businessman" who was "interested in anything to make money." They said he missed appointments with their doctors. He also missed two court hearings.

They denied his appeal and suspended his benefits.

Then they filed a counterclaim to recoup everything they had paid him.

In 1994, the trustees again acknowledged Harrison's "total and permanent disability," at age 45 ... but they would not give him more money. Instead, they informed him that his "disorder has its origin in an incident that occurred while you were playing college football, not League football."

The trustees could have denied his request for more money and kept him on the lowest tier. Instead, they basically called him a crook. In 1996, three years after their chosen doctor wrote a withering report detailing Harrison's maladies, the trustees determined that Harrison was "not now totally and permanently disabled."

That makes it sound like Harrison suddenly got healthy, or had been faking it the whole time. Harrison says now that he never received the notices that the trustees sent him. He says communication broke down when his court-appointed attorney left the case. Harrison, who never graduated from college, represented himself in court.

Why would a man ask for increase in disability pay, then hide from the people who can give it to him? The trustees and their lawyers did not seem to consider that a man with serious mental and physical ailments might miss a few appointments.

The trustees argued that Harrison was "unjustly enriched" by $236,626 -- every last dollar they had paid him. Because Harrison failed to show up in court, the trustees won a default judgment against him. Harrison was ordered to return all his disability payments, along with $99,112.50 in legal fees.

The total default judgment against Harrison (including interest) was $352,252.06.

-2273-

Harrison's average annual NFL salary: $49,750.

It got worse. Harrison also had a pension, which is separate from disability pay. The trustees determined that his pension was worth $130,528, and they successfully offset that against the money he suddenly owed them. So they took his pension.

Harrison sued to get his money back. He had another court-appointed attorney, who resigned. Harrison represented himself again. He knew what was happening was wrong, but he did not understand the legal arguments against it. He was not capable of arguing that his pension should have been exempt from any judgments against him, according to the Employee Retirement Income Security Act of 1974. He just attached a copy of his original complaint and stated his case.

A magistrate judge said his motion "simply relies on his pleadings, and therefore is insufficient."

In 2003, the NFL started giving Harrison retirement benefits again. But that was apparently an accident. In 2007, they cut him off again.

Then, in 2011, when the NFL and the Players Association signed a new collective bargaining agreement, they created a $620 million Legacy Fund for players who retired before 1993. The NFL proudly announced that every player who retired before 1993 would receive at least $600 per month, "regardless of the form of benefit". It doesn't matter if the player is disabled or healthy, wealthy or poor.

Harrison received a form letter from NFL commissioner Roger Goodell saying he was entitled to Legacy Fund payments. By the league's calculation, a player with Harrison's experience should have received $1,144 per month from the Legacy Fund. But in 2012 the trustees voted to offset Harrison's Legacy money against the default judgment. So there went his Legacy Fund benefit.

"I had a little faith in the legal system," Harrison said, "and it just crapped on me."

Harrison's current lawyer, Jeffrey Dahl, argues that the trustees had no legal right to touch Harrison's pension, and he is fighting to have it restored. But attorneys for the retirement plan wrote in a court filing last summer that Harrison has "unquestionably already received more than his fair share of benefits." They also wrote: "Harrison's first lawsuit against the Plan nearly 20 years ago exposed him as a fraud."

A fraud?

Dwight Harrison?

"I'm not a doctor," Harrison says. "If you're going to accuse anybody of fraud, charge them, not me."

Yes, the doctors. Harrison gave me access to his medical records but asked me not to quote them directly out of respect for his privacy. They tell a thorough and heartbreaking version of the horror story you have heard about other retired NFL players: post-concussion syndrome, memory loss and ... well, one thing Harrison still has left is pride. He asked me not to go into detail. But I can say this: The records are extremely detailed, and they are painful to read.

The trustees have decided that when several doctors diagnose a man with mental

problems, including memory loss, and that man misses a few appointments, he is a "fraud" who doesn't deserve any benefits or his pension. And if that man has dementia now, he should apply for benefits elsewhere.

Six doctors have reached the same conclusion about Harrison, independent of each other. The first was in 1993. The most recent was in 2008. And in some cases, the doctor was a neutral psychologist chosen with the approval of the trustees.

Also, in 2008, the Social Security Administration confirmed their findings and said his condition was "due to head injury."

It's a pretty convincing case ... unless you really, really don't want to be convinced.

*****

So what is the NFL's response to all this? Well, Mike Miller, the Director of NFL Player Benefits, did not return several calls. The three current league-appointed trustees (executives Ted Phillips of the Bears, Dick Cass of the Ravens, and Katie Blackburn of the Bengals) referred me to the Groom Law Group, counsel to the plan.

Doug Ell, an attorney with Groom, repeated via email his contention that the plan "has been subjected to both fraud and frivolous litigation by Mr. Harrison."

I asked Ell about the six doctors who have examined Harrison, including at least one who was appointed by the league. Did Harrison dupe them?

Ell's response: "I do not know what doctor reports you refer to, when they were written, or what they say."

I sent Ell a 45-page file of medical records -- which, of course, has been in the record of the case. I asked again if he thinks Harrison duped the doctors.

In his response, Ell did not answer that question or even acknowledge the medical records. Instead, he wrote that Harrison lost benefits because he did not take a medical exam.

"Mr. Harrison was explicitly and repeatedly warned of it, and a federal judge even ordered him to attend, and he refused to do so," Ell wrote.

Ell also wrote: "There is a very generous benefit plan for former NFL Players who have dementia. It is called the '88 Plan. You might encourage Mr. Harrison to seek those benefits."

Why would Ell suggest that Harrison apply for the '88 plan, when his firm has argued in court filings, for many years, that Harrison does not have dementia?

Ell's response: "I do not know whether Mr. Harrison currently has dementia. If he does, there are generous benefits. I do not understand why he would not seek those benefits if he does have dementia."

Dahl, Harrison's lawyer, is skeptical about getting '88 Plan benefits, because the trustees have declared he is no longer a participant in the NFL retirement plan.

To sum up: The trustees have decided that when several doctors diagnose a man with mental problems, including memory loss, and that man misses a few appointments, he is a "fraud" who doesn't deserve any benefits or his pension. And if that man has dementia now, he should apply for benefits elsewhere. After all, the trustees are tired of his "frivolous" actions.

The trustees convinced courts they were right, but Harrison was severely under-lawyered. They have taken a few anecdotes about Harrison trying to conduct business, meeting with college teammates and failing to show up for doctor's exams and court appointments, and used them to punish him for two decades.

*****

How do you measure what is left of a broken man?

Harrison's memories are scattered like leaves on a windy day. He recalls watching game film as a player and not remembering that he played in the game. Sometimes he does not even remember all of his injuries.

Harrison was 44 when this fight began. He is 65 now. His battle for benefits has lasted twice as long as his NFL career. He could have lived a more comfortable life, with better medical care, if the NFL had not cut off the payments he deserved.

For Harrison, the pain cuts deeper than the money he lost. The trustees have essentially told him that his life did not happen the way he says it happened.

"They've got it in there that I am a fraudulent person," he says, and is there a worse charge than that?

"Why?" Harrison asked me. "Why in the world are they treating us so bad? You are dealing with some evil people."

He knows that his only hope is through the legal system. But he is worried about showing up in court and hearing the trustees and their lawyers call him a fraud.

"I don't know if I could take it," he says. "You ruined my life."

I didn't realize it when I called, but this story will remove another piece of Dwight Harrison. The stress of defending himself overwhelmed him.

"I'm not going to give another interview," he said. "It was just too much."

**-2276-**

Case: 25-2170 Document: 20-2 Page: 383 Filed: 10/08/2025

# EXHIBIT 68

NEW YORK   NEWS   POLITICS   SPORTS   ENTERTAINMENT   OPINION   LIVING   AUTOS

JETER | BASEBALL | FOOTBALL | BASKETBALL | HOCKEY | COLLEGE | HIGH SCHOOL | SOCCER | I-TEAM | MORE SPORTS | BLOGS

# Still plenty of skeptics after NFL reaches new deal with players to settle concussion-related lawsuit



BY MICHAEL OKEEFFE

Hopefully the settlement will provide medical care, support and hope to thousands of guys who have suffered because of injuries incurred playing America's most brutal sport at its highest level.

NEW YORK DAILY NEWS  /  Saturday, June 28, 2014, 11:40 AM

A A A

20   84   8+1    ❤    SHARE THIS URL

nydn.us/UUkuMj



COREY SIPKIN/NEW YORK DAILY NEWS

The NFL and commissioner Roger Goodell don't need to admit concussion coverup as part of a new settlement reached last week with thousands of players.

**RELATED STORIES**



Jim McMahon blasts NFL for not providing 'appropriate care'



Dan Marino withdrawing from NFL concussion lawsuit



Brent Boyd has earned the right to be cynical: When the NFL's disability board denied his concussion claim in 2001, he says, they told him his blinding headaches, depression and lethargy had nothing to do with the injuries he suffered during his seven years as an offensive lineman for the Minnesota Vikings.

Back then, the NFL was still denying that brain injuries caused long-term health problem, and Boyd and other former players complained that the disability program jointly run by the league and its union was designed to stonewall players.

"Delay, deny and hope they die," is how former Cleveland Browns cornerback Bernie Parrish puts it.

So when the NFL and lawyers for the 4,500 former NFL retirees who filed a lawsuit that accused the league of covering up the long-term consequences of traumatic brain injuries submitted a proposed settlement that lifted the cap on concussion-related damages last week, Boyd was skeptical. Will the administrators of this plan also look for ways to deny legitimate claims? Will this deal only benefit the most desperate and leave everybody else hanging?

NFL VIDEO

RALPH VACCHIANO THE BLUE SCREEN 

July 1, 1:05PM    BY EBENEZER SAMUEL
Stevie Brown expects to be training camp full go

June 25, 2:11PM    BY EBENEZER SAMUEL
With Will Hill gone, Demps could step in as third safety

June 19, 11:51PM    BY EBENEZER SAMUEL
 Former NY Giants CB Aaron Ross signs with Baltimore Ravens

VIEW FULL BLOG

MANISH MEHTA THE JETS STREAM 



John Madden: NFL announcer gets locker room painkiller shot

Eight ex-players sue NFL over painkiller abuse

"My fear is that they won't give us any real remedies until we are too sick to know it or we are dead," Boyd says.

This new settlement, the result of six months of negotiations after U.S District Court Judge Anita Brody rejected a deal that capped the NFL's responsibility at $765 million in January, is hardly perfect. It won't compensate Boyd for income he lost because he's been unable to work for so many years. It won't make whole players who have lost marriages, families and careers because of the physical and emotional pain caused by their brain injuries. It won't bring back men like Junior Seau and others who committed suicide because they could not endure any more suffering.

But it certainly can't be any worse than the cruelty dished out for years by the NFL's disability board, and, hopefully, it will provide medical care, support and hope to thousands of guys who have suffered because of injuries incurred playing America's most brutal sport at its highest level.

"At the end of the day, you can't make the settling defendant do everything you want," says Christopher Seeger, one of the lead attorneys for the players.

Michael Kaplen, a New York attorney who specializes in brain injury issues and teaches at George Washington University Law School, criticizes the proposal because the NFL is not required to acknowledge that it covered up the long-term consequences of concussions for so many years. He says the deal won't help retirees at the low end of the dementia scale who nevertheless have experienced behavioral and emotional problems as a result of brain injuries.

"A mild brain injury is only mild if it is someone else's brain," Kaplen says. "The silent majority of players who have cognitive, emotional, and behavioral impairments because of their reliance on the fraudulent conduct by the NFL will remain uncompensated under this settlement."

Seeger acknowledges that players with comparatively mild symptoms may not qualify for compensation. But they will be eligible for baseline testing, and if their conditions become more severe, they will get paid. "We had to make sure the sickest players were taken care of," he says.

Seeger understands Boyd's fears about stonewalling panels that seem to delight in denying help to suffering people. But he says this proposal, if approved by Brody and the players, will be different. The lawyers will put together a team of independent doctors and administrators that will review claims and make payments. The league will be able to appeal what it believes are fraudulent claims, but this time it won't be running the show.

"I want the NFL to pay for concussion-related injuries and put something new in place for these players, and we did that," he says.

Unfortunately, Roger Goodell will never stand at the 50-yard line at MetLife Stadium and apologize to the players and families who suffered while the NFL and its medical hit men denied the damages of concussions.

But Seeger bristles when people blast the deal because the NFL did not have to acknowledge any wrongdoing. The $9 billion a year league spoke volumes last week, he says, when it agreed to remove the cap on concussion payments.

"Does anybody," Seeger asks, "think they didn't admit liability with that kind of payment?"

PROMOTED STORIES

---

June 26, 10:43AM                    BY SETH WALDER



Mike Goodson absent at court hearing

June 22, 10:47PM                    BY SETH WALDER

Rex Ryan seen at World Cup match

June 19, 12:25PM                    BY SETH WALDER

Mike Pettine: Patriots may have had Jets defensive playbook

VIEW FULL BLOG

# EXHIBIT 69

Case: 12-2701 Document 20-2 Page: 387 Date Filed: 10/08/2015

 **ESPN.com:** OTL      [Print without images] 

Friday, January 24, 2014

# Lawyers fight over settlement details

By Steve Fainaru and Mark Fainaru-Wada
ESPN.com

One week after a federal judge refused to grant preliminary approval of the NFL concussion settlement, the lead negotiator for the players is engaged in an increasingly bitter campaign to beat back opposition to the $765 million deal.

In conversations and private meetings, Chris Seeger, one of the settlement's main architects, has clashed with his own clients and with attorneys for other players, lobbying for the agreement while lashing out at critics and the media, according to details provided to "Outside the Lines."

Legal experts said the growing fissures among former players and lawyers could undermine the settlement after Judge Anita B. Brody's surprise ruling, which requested more information amid concerns there is not enough money to cover all qualifying players.

To get the settlement approved, proponents will have to convince Brody not only that it provides enough money but also that thousands of former players have enough in common to be legally considered a "class." Several attorneys involved in the case have argued that they don't.

"That's an argument the judge will have to take very seriously," said William Hubbard, a civil litigation expert at the University of Chicago Law School. "Some very famous cases have gone up in flames because of exactly that issue."

In private conversations, several former players have expressed their dissatisfaction to Seeger, their attorney, about the deal; one said he believed that the concussion suit has been "hijacked" by lawyers and that he's expecting a "high number of opt-outs and objections" among Seeger's clients as the settlement moves forward.

On Tuesday, during a meeting of about 60 lawyers at a Manhattan hotel, Seeger was challenged for several minutes by Tom Demetrio, who represents the family of former Chicago Bears defensive back Dave Duerson. One lawyer present described the tense scene as "almost a cross-examination." Seeger angered other lawyers in the informational meeting when he repeatedly deflected questions by citing a "gag order" that he said prevented him from sharing information. The lawyers said they were unaware of any such order.

On Thursday, two days after confronting Seeger, Demetrio filed a motion requesting that Brody direct Seeger and co-lead counsel Sol Weiss to "supply all Plaintiffs' attorneys of record with all of the data utilized by them in reaching the proposed settlement agreement."

Lawyers for former San Diego Chargers great Junior Seau launched their own attack less than 24 hours later, objecting to other aspects of the settlement and citing "serious deficiencies." In a motion filed Friday morning, the lawyers zeroed in on a provision that prevents a player who rejects the deal from pursuing a lawsuit against the

**-2281-**

NFL until the settlement is fully resolved -- possibly delaying cases for years. Seau's lawyers argued that the settlement limits wrongful death claims, suggesting that Seau's children could not collect for the "wrong the NFL did to them."

The challenges are potentially ominous for Seeger and other proponents of the deal, signaling that the families of two prominent players -- Duerson and Seau, both of whom committed suicide by shooting themselves in the chest and were later diagnosed with brain damage -- are considering opting out of the deal.

"This extraordinary settlement could not have been achieved without the contributions of our fellow attorneys, who have been skillful and steadfast advocates for the retired NFL players they represent," Seeger and Weiss said in a statement Friday. "We organized Tuesday's meeting to provide an open forum to discuss the details of the settlement and for lawyers to learn more about how this agreement benefits their clients. There were many productive exchanges, and we are confident that attendees left better equipped to help retired players take advantage of this settlement once it is approved. The retired player community has provided overwhelming support for this agreement, and we look forward to finalizing it soon so they can begin taking advantage of its benefits."

When Brody denied preliminary approval Jan. 14, she ordered negotiators to turn over all data used to come up with a dollar amount for the settlement. The NFL and the players conducted separate analyses, sources familiar with the negotiations said, potentially resulting in different projections on the key question of how many NFL players are likely to get different forms of brain damage.

At the New York meeting, Seeger assured the attorneys in the room that the data existed and that it would reflect that the settlement is sufficient. However, when pressed for details, Seeger referenced the gag order and said his "hands were tied" by Brody. He also surprised many in attendance by announcing that it would be another 30 to 60 days before negotiators are able to refile their motion for preliminary approval -- further delaying a settlement that was announced on the eve of the NFL season.

"New York was a complete and utter waste of time," said one lawyer who attended the meeting. "Nothing, nothing at this informational meeting resembled information. It was a dog and pony show without any dog and without any pony."

Seeger did not respond to an interview request. This week, in an interview with Sports Illustrated writer Peter King, he said he was unconcerned about Brody's ruling and suggested that one reason he pushed the settlement was because he did not think the players had a good case against the NFL.

"I've already settled cases, much bigger than this one," said Seeger, who was co-lead counsel in the class action lawsuit over the pain medication Vioxx, which resulted in a $4.85 billion settlement. "I've had a good career. My legacy case wasn't going to be a case that didn't work. It wasn't going to be a case that I wasn't totally proud of. Because I know that most of the people involved in this, including the judge, are going to be thought of more for the NFL case than anything else that they will do in their career. That's silly if you ask me, but it's reality."

The players' executive committee -- a select group of lawyers that oversees the negotiations -- already had begun to splinter even before Brody rejected the motion for preliminary approval. Of the six attorneys originally named to the committee, two -- Tom Girardi and Michael Hausfeld -- were kept out of the discussions, according to sources close to the negotiations.

Seeger said he removed Girardi, a Los Angeles-based attorney who has become one of the settlement's main critics, from the negotiating committee because he believed he was leaking information to the media, according to people familiar with the conversations.

Girardi, who says he represents 1,200 former players, complained to "Outside the Lines" last week that he had

no input despite his role on the negotiating committee. Seeger has confirmed that in private conversations, the sources said.

Hausfeld was kept out of the negotiations because of his controversial role in a separate case involving proceeds from the NFL's licensing agreements, according to sources close to the case. He remains unpopular among some players but also played a leading role in the concussion suit before he was marginalized.

Like Girardi, Hausfeld has expressed strong reservations about the terms of the settlement.

Seeger and Weiss have clashed with other lawyers on the case. John Giddens, a Jackson, Miss., attorney who represents 240 former players, said he tried to raise questions about the settlement -- including an apparent disparity that awards players without legal representation more money -- on a conference call this month but was shouted down by Weiss.

"In Mississippi, you say your dog's name over and over and they were talking to me like a dog: 'John, John, John, what did we tell you, John?'" Giddens said. "Maybe it's just that these guys are from Philadelphia. I'm so glad we had him on speakerphone, because I was with [attorney] Philip Thomas and another lawyer and we were just looking at each other in disbelief. Here we are on the same side and he's just going off on us."

Shortly after the call, Giddens and Thomas filed a motion on behalf of 177 former players opposing preliminary approval -- the first formal objection to the deal.

When he arrived at the meeting in New York, "I thought there'd be plastic on the floor and walls, like in 'Goodfellas,'" Giddens said. "These guys, you don't want to piss them off. They're pretty scary dudes. They're used to getting their way. We decided to go against the grain. To hell with pissing them off. We weren't going out like that. We just did what was best for our clients, let the chips fall where they may."

How much the acrimony will affect the suit is unclear. Several lawyers involved in the case said they're waiting for additional information before deciding whether to recommend to their clients to take the deal or opt out.

Asked whether he supported the settlement, one attorney, underscoring his skepticism, said: "I think the settlement is a terrific thing as long as they keep the opt-out provision. This is gonna have a longer shelf life than people think."

---

# EXHIBIT 70

   

# SPORTS ON EARTH

 ## PATRICK HRUBY

January 20, 2014

# SHOW US SOME MATH



NFL commissioner Roger Goodell has defended the league's concussion settlement, but judge Anita B. Brody denied preliminary approval of the plan last week. (AP)

Imagine this: You're in the market for a used car. You go to a dealership, find something promising, sit down with a salesperson. Wary of purchasing a lemon, you ask for a comprehensive vehicle history report.



*Sorry. Not now. You can have it when we close the sale. But trust me, the car runs great!*

Er, OK. So, have you at least seen the document yourself?

*Nope. The head of the sales department won't share it with me. In fact, I'm not even sure it exists. But trust me, the car runs great!*

Sounds sketchy, right? Guess what: All of the above basically describes the proposed settlement of the consolidated National Football League concussion lawsuits. The car is the $765 million deal, intended to compensate brain-damaged former football players. The dealership salespeople are the top negotiators for both the NFL and the players. And starring in the role of buyer?

The federal judge presiding over the case. The more than 4,500 retired players suing the league. Oh, and many -- seemingly most -- of the attorneys representing those players.

Like I said: things are sketchy.

Last week, judge Anita Brody refused to grant preliminary approval of the settlement, which allocates $675 million to compensate retired players suffering from neurological diseases and another $75 million for brain damage diagnosis. Why the red light? To give a go-ahead, Brody has to conclude that the deal is fair, reasonable and adequate -- that the settlement is large enough to cover approximately 20,000 former players over a 65-year span, at least by its own terms.

Right now, she simply doesn't have enough evidence to make that judgment.

On paper, the settlement promises to pay as much as $5 million to NFL retirees with conditions like Parkinson's and amyotrophic lateral sclerosis (ALS). Former players with chronic traumatic brain injuries that fail to rise to the level of degenerative disease -- think memory lapses, explosive anger, debilitating migraine headaches -- will receive far less. (Read: nothing or close to it). In a motion for approval and supporting documents submitted to Brody, top negotiators for both the NFL and the players claim that the math behind the deal checks out. That medical experts, actuaries and economists have produced "thorough analyses" predicting: (a) how many former football players are brain damaged; (b) what the extent of that damage will be; (c) how much that damage will cost under the terms of the settlement.

The problem? The NFL and players' lawyers didn't provide their analyses to Brody -- essentially asking her to start the vehicle-buying process without giving her a history report. *But trust me, the car runs great!* In her rejection of the settlement, Brody noted as much:

*… even if only 10 percent of Retired NFL Football Players eventually receive a Qualifying Diagnosis, it is difficult to see how the Monetary Award Fund would have the funds available over its lifespan to pay all claimants at these significant award levels ….*

*… Plaintiffs allege that their economists conducted analyses to ensure that there would be sufficient funding to provide benefits to all eligible Class Members given the size of the Settlement Class and projected incidence rates, and Plaintiffs' counsel "believe" that the aggregate sum is sufficient to compensate all Retired NFL Football Players who may receive Qualifying Diagnoses. Unfortunately, no such analyses were provided to me in support of the Plaintiffs' Motion …*

Believe it or not, things get sketchier. Shortly after Brody's rejection, attorney Thomas Demetrio - who represents the family of Dave Duerson, a former Chicago Bears defensive back who committed suicide and was later found to have the neurodegenerative disease chronic traumatic encephalopathy (CTE) - told ESPN's Outside the Lines that the players' lead co-counsels, Chris Seeger and Sol Weiss, have operated in a "cloak of secrecy" and that he hasn't seen any analyses, either. "Maybe they don't exist," he said. "Maybe they don't substantiate the $765 million figure." Meanwhile, attorney Thomas Girardi -- who represents 1,200 former players and was one of the first lawyers to file a concussion suit against the NFL -- told Outside the Lines that he was analyzing the settlement "right now" to see which of his clients would be better off opting out, a number he predicted would be "substantial."

I contacted Demetrio last Thursday. He said the "majority" of the players' lawyers haven't seen any of the settlement's supporting analyses. Two other player attorneys who requested anonymity told me the same thing. One of those attorneys sits on the players' executive committee, a small group of lawyers overseeing negotiations. He said Girardi was "right on." He also said that he didn't think that *anyone* on the executive committee had seen the analyses -- and even more significantly, nobody saw them before the initial agreement with the NFL was reached last fall, either.

**-2286-**

Also last week, I emailed every player lawyer listed on the preliminary approval motion except Seeger and Weiss. I asked five questions, starting with this: *Did you actually see, read and evaluate the analyses before submitting the motion for preliminary approval?* Most didn't answer. Those that did declined to go on the record. Not one said they had seen the analyses.

"In decades of practice," the executive committee attorney told me, "I've never seen a deal done with such cloak."

This matters greatly. For two reasons. First, the documents submitted to Brody claim that the settlement is fair, reasonable and adequate. Specifically, they state:

*... after hard-fought negotiations, the Settling Parties arrived at* **an aggregate sum that proposed Co-Lead Class Counsel, Class Counsel and Subclass Counsel believe is sufficient to compensate (bold added)** *all Retired NFL Football Players who may be diagnosed with Qualifying Diagnoses and their Representative and Derivative Claimants.*

If most of the above counsels -- that is, top players' lawyers -- haven't seen the math behind the settlement, then how can they believe it's sufficient? Moreover, why would that make a case in court? Isn't that a bit unethical? Doesn't that pretty much mean they're bulls----ing Brody?

Is bulls----ing a federal judge ever a good idea?

Next point: Similar to Brody, the 4,500-plus former players -- and/or families of deceased retirees -- suing the NFL have a decision to make. Is the settlement fair? Will it take care of their needs? Is the money enough? Or should they opt out of the agreement, and continue to fight the league in court for a bigger, better deal?

In order to answer those questions, they need to see settlement's supporting numbers. So do their attorneys. *All* of their attorneys, and not just the ones who negotiated the proposed agreement with the NFL. To continue the used car analogy: if you hired someone to help you find and buy a vehicle, wouldn't you both want to see the history report?

"Because I have not seen the analyses, I don't have a clue as to whether or not they will help me evaluate the fairness of any proposed settlement," Demetrio said. "Will they help me decide if any of my clients should opt out? I don't have a clue."

"Without the numbers, you can't provide your clients accurate information and advice," said another players' lawyer who asked to remain anonymous. "All I can do is look at my 500 people and say, 'my numbers [of players with neurodegenerative diseases] are way above 10 percent. So how the hell is this going to work?'"

Believe it or not, things get sketchier still. According to a document submitted to Brody by former federal judge and settlement mediator Layn Phillips, the players' top attorneys planned on presenting a summary of their experts' analysis -- but not until the final settlement hearing, scheduled to take place *after* the player opt-out period.

In used car terms, that's like being handed a vehicle history report as you drive off the lot.

"Unconscionable," said the executive committee attorney.

"You're the lawyers who asked a judge to approve the settlement, and you didn't attach the documents, and now lawyers who are on your own executive committee don't have those numbers, either?" said Dionne Koller, a University of Baltimore law professor. "Plus you're litigating a case of this much importance and this much public awareness? This thing will be torpedoed if they don't come up with the numbers. And by holding them back, they've created a question: do they even have them?

"Is it unethical? There's a fine line between stupid and unethical. As a legal strategy, I'm scratching my head."

Me, too. How could this happen? Four theories:

**1. Hubris:** According to the executive committee attorney, both Seeger and Weiss and the lead negotiators for the NFL -- league legal mastermind Jeff Pash and outside counsel Brad Karp -- may have believed they could push the settlement through federal court with little resistance. "My clue," the attorney said, "is that there was a high degree of arrogance."

Assuming that's true, the NFL and the players' top lawyers have miscalculated. While a truly fair, reasonable and adequate settlement is in everyone's interest -- our overloaded judicial system; brain-damaged former players who need medical care and financial help; an image-conscious league that would like to avoid the public relations water-boarding that would accompany prolonged litigation, damaging discovery and the *drip-drip-drip* of news stories pointing out that football can be very bad for the human brain -- a lemon of a deal would be the opposite.

Hurting players would be left to suffer. The NFL would appear even more sociopathic, capping its legal liability without fully addressing the damage left in its industrial wake. Meanwhile, Brody would look like a duty-shirking, rubber-stamping stooge, something no judge aspires to.

As such, it's hardly surprising that Brody wants to see the numbers. The lead negotiators should have known better.

**2. The NFL has something to hide:** Any complex analysis supporting the adequacy of the settlement ultimately has to answer two simple questions -- what percentage of retired professional football players will end up with neurodegenerative diseases resulting in cash awards, and what percentage will end up with brain damage that doesn't rise to that level but still may qualify for some form of medical monitoring and/or limited assistance by the terms of the settlement? Ten and 30 percent? Five and 20? Whatever the number, it isn't good for the league: *Together We Make Football, and also 2,000 cases of early-onset dementia.*

"What if the data is worse than the public knows, a higher percentage of serious trauma and injury?" said Warren Zola, a Boston College sports law professor. "That could be something that one side does not want released because of an overwhelming negative response."

Speaking of data: We're talking about projections. Risk models. Future figures based on imperfect assumptions, given that football-induced brain damage isn't well-understood and that no one -- not the NFL; not the players' union; not the Centers for Disease Control -- has ever bothered to conduct a rigorous clinical census of the retired player population. Moreover, we're talking about financial projections as well -- how much money the settlement fund will actually pay out to injured retirees based on their diagnoses, age, number of years played in the league and factors that reduce awards or disqualify players altogether. (Diagnosed with depression? No money for you.) What if the settlement's math only adds up because the qualifying diagnostic process deliberately has been engineered to limit or deny the vast majority of claims -- a familiar, all-too-common phenomenon when it comes to health benefits and workers' compensation for former NFL players?

If that's part of what's going on, the league's lawyers may not be the only ones with something to hide.

**3. The players' lawyers are covering their tails:** Let's get a little more conspiratorial. Could it be that all or most of the top players' lawyers saw the settlement's math and knew it was somehow shaky. In the interest of expediency and a nice guaranteed payday -- thanks to a settlement-mandated, NFL-funded $112 million legal fee fund -- they nevertheless decided to roll the dice and see if Brody would fall for an okey-doke.

Now that the judge has called their bluff -- in embarrassing public fashion, no less -- they're covering up. Claiming they've been kept in the dark. Throwing Seeger and Weiss under the bus. And why would they do that?

"To reassure their clients," Zola said.

Consider: Girardi told Outside the Lines that the settlement might not make financial sense for many of the former players he represents *after* Brody rejected the deal. Not before. If the numbers don't work, why did he wait so long to either (a) run them; (b) speak up?

**4. The players' lawyers are fighting for more money:** Follow me down the rabbit hole. The NFL wants the concussion lawsuits resolved as soon as possible -- otherwise, why settle in the first place? Seeger and Weiss know this. They know the league doesn't want any football brain damage statistics made public. They also know that the Super Bowl is coming up.

Timing is everything. Perhaps creating negative headlines and casting doubt on the agreement is part of their overarching strategy -- a way to pressure the league into throwing a few more coins into the cup, the better to seal the deal, shut up squabbling lawyers and make the whole thing go away.

"Maybe you don't attach the numbers knowing full well that judge Brody won't accept it," Koller said. "Now this clouds the Super Bowl,

Case 2:12-md-02323-AB Document 6201-6 Page 395 Filed Date Filed 10/08/2024

continues to drag on, and it becomes 'let's get to a billion and call it a day.'"

Maybe. Or maybe there's another reason the settlement's main lawyers haven't shown their work. Whatever the case, Brody is right. No more. Phillips, the mediator, says the numbers are sound. Let's see 'em. The court needs to know. Player attorneys need to know. Players themselves need to know -- not just the players suing the league, but *all* retired players, since the settlement covers them, too. Even the public should get a look. After all, we're the ones trying to figure out if our children should play football; if the settlement is inadequate, we'll be the ones picking up ex-player medical bills through Medicare and higher insurance premiums. We deserve to know the costs. We deserve to know the risks. This is a large private settlement with larger public ramifications. It should never be comparable to a sketchy used car deal.

If anything, said sketchiness is a loud and clear signal that the entire deal merits additional scrutiny. Skepticism, too. Negotiations between the NFL and the top player lawyers should be re-examined, both by Brody and a third-party representing the interests of former players who haven't filed suit. Every actuarial assumption should be examined; every medical and economic data point picked apart by independent experts; every part of the agreement subject to a basic question: does this serve the interests of a small group of highly skilled lawyers? Or does it serve the interests of brain-damaged men and their suffering families, people who need appropriate care and recompense? After all, the NFL concussion settlement doesn't cover a 2002 Honda Civic with a funky smell and a flickering CHECK ENGINE light. It covers human lives. *Caveat emptor.* Show the math.

http://www.sportsonearth.com/article/66858180/the-nfls-concussion-deal-may-not-cover-all-former-players-with-cte#!7iui2

# EXHIBIT 71

Case 2:12-cv-02703-DWA Document 20-2 Filed 10/08/2015 Page 397 of 1235




- SUBSCRIBE
- RENEW
- GIVE A GIFT
- DIGITAL EDITION

Print | Close

# How to Diagnose a Battered Brain Before It's Too Late

*By Neal Emery*

*High-impact activities like football are known to cause creeping brain damage that can't easily be detected until after death. But promising research may give rise to new methods of diagnosing chronic traumatic encephalopathy.*



REUTERS/Jeff Haynes

In 1996, the brain of an alcoholic dwarf circus clown perplexed scientists with a disease normally limited to boxers. Over 15 years of being shot from a cannon at a circus, the clown developed *dementia pugilistica*, or as its 1928 discoverer Harrison Martland called it, "punch drunk." Less than ten years after the publication of a study on that cannon-rattled brain, an autopsy diagnosed deceased NFL Hall of Famer Mike Webster with the same condition, but now called chronic traumatic encephalopathy (CTE). An upswell in public interest and research following this death brought to light the danger that brain injuries present for athletes in all contact sports. A string of suicides and bizarre deaths by professional athletes, primarily football and hockey players, catalyzed a movement of more than 100 athletes to donate their brains for scientific study.

Junior Seau is the most recent athlete to donate his brain. The day after Junior Seau's suicide last

week, the co-directors of the Boston University Center for the Study of Traumatic Encephalopathy published a paper, titled "Chronic traumatic encephalopathy: neurodegeneration following repetitive concussive and subconcussive brain trauma," in the medical journal *Brain Imaging and Behavior*. Even though Corsellis first identified the signs of CTE in the brains of boxers in 1973, significant gaps remain in our knowledge of this disease.

Repeated blows to the head -- from football tackles, blasts from a circus cannon or some other trauma -- put the brain at risk for CTE. Although typically associated with concussions or serious head injuries, brains of football players with CTE but without any concussive history demonstrate that repeated, less severe "subconcussive" injuries provide sufficient trigger for this disease. While individual trauma may produce short-term symptoms, the effects of CTE manifest years after the injuries as the disease progresses and the brain breaks down. Yet many athletes with recurrent head injuries evade CTE; it appears repeated head trauma are necessary, but not sufficient, to trigger CTE. Researchers believe that the nature of the head trauma -- and the severity, frequency, and age of the recipient -- may play a role in whether or not CTE develops. But, for now, why the disease overtakes some and spares others remains a mystery.

MORE ON SPORTS INJURY



**Can America Quit Football?**



**Junior Seau Is Dead**



**The NFL's Punishment of the Saints Is Harsh and Hypocritical**



**How to Fix Sports' Concussion Crisis**

The answer hides somewhere amidst tangled neurons and wasted brain tissue. During autopsy, scientists diagnose CTE through the pattern of brain decay and the buildup of tau protein. Normally, the tau protein stabilizes the brain cell skeleton. In both CTE and Alzheimer's, two distinct diseases, enzymes cause the protein to release from the skeleton and cluster in cells to form neurofibrillary tangles (NFTs). Researchers remain uncertain about the tangles' exact effect on the brain, says Dr. Brandon Gavett, a neuropsychologist at the University of Colorado-Colorado Springs. Unlike Alzheimer's, which is characterized by the even spread of NFTs, in CTE, NFTs cluster around blood vessels and dead tissue. According to Gavett, some researchers hypothesize that damage to blood vessels during head trauma may cause the brain to wither and form NFTs but thus far no mechanism of disease has been proven.

Brain damage associated with CTE triggers crippling psychological effects. Because the disease can only be diagnosed by autopsy, the changes in behavior and mood must be pieced together by interviews with family members after the afflicted person's death. Family members report that their loved ones exhibited problems with learning, remembering new information, and organization. Judgement and impulse control also frequently gave way to aggressive behavior and problems with addiction. Additionally, those affected by CTE frequently became depressed, agitated, and -- in what ultimately takes the lives of many with CTE -- suicidal. On top of these emotional changes, difficulty with balance,

**-2292-**

Case: 12-2704 Document: 003 Page: 399 Date Filed: 10/08/2014

gait, and speech similar to Parkinson's disease often accompany CTE.

Despite the wealth of symptoms identified, these psychological factors need to be integrated with genetic susceptibility, chemical analysis of blood and cerebrospinal fluid, and brain imaging in order to accurately diagnose CTE in living patients. Possible chemical markers and genetic predispositions for CTE have been identified from research on Alzheimer's disease, and pilot studies show promise for diagnostic MRI and MRS scans as brain imaging technology improves. Late last year, Boston University CSTE began a study of NFL players and non-contact athletes to begin integrating these parts and develop methods to diagnose CTE before death. Some knowledge needed for such a diagnosis still evades researchers, but scientific advancement creeps closer to this goal every day.

Over the last 7 years, the exponential eruption of public interest and outrage around chronic traumatic encephalopathy has dwarfed the incremental advancements in research. Tremendous holes remain in what we know about how and why CTE develops in battered brains. These questions should not serve as grounds for the public health hazard's dismissal, but should instead prompt caution with a still unfamiliar threat.

This article available online at:

http://www.theatlantic.com/health/archive/2012/05/how-to-diagnose-a-battered-brain-before-its-too-late/256877/

Copyright © 2014 by The Atlantic Monthly Group. All Rights Reserved.

# EXHIBIT 72

Case 1:25-cv-02023-ABJ   Document 20-2   Filed 10/06/25   Page 401 of 1235

# Long-Term Consequences: Effects on Normal Development Profile After Concussion

Daniel H. Daneshvar, MA[a],*, David O. Riley, SB[a],
Christopher J. Nowinski, AB[a,b], Ann C. McKee, MD[c],
Robert A. Stern, PhD[a], Robert C. Cantu, MD[a,b,d,e,f]

**KEYWORDS**

- Concussion • Development
- Chronic traumatic encephalopathy
- Postconcussion syndrome • Youth

In the United States, approximately 1.7 million people sustain a traumatic brain injury (TBI) annually; these injuries account for 1.365 million emergency room visits and 275,000 hospitalizations each year.[1] The majority of these TBIs are minor, with 75% of these injuries classified as mild TBIs (mTBI) or concussions.[2] These numbers

This work was supported by the Boston University Alzheimer's Disease Center NIA P30 AG13846, supplement 0572063345-5, the National Operating Committee on Standards for Athletic Equipment, the National Collegiate Athletic Association, the National Federation of State High School Associations, the American Football Coaches Association, and the Sports Legacy Institute.

The authors have nothing to disclose.

[a] Department of Neurology, Center for the Study of Traumatic Encephalopathy (CSTE), Boston University School of Medicine (BUSM), 72 East Concord Street, B7800, Boston 02118, MA, USA
[b] Sports Legacy Institute, PO Box 181225, Waltham, MA, USA
[c] Department of Neurology, Center for the Study of Traumatic Encephalopathy (CSTE), Bedford VA Hospital, Boston University School of Medicine (BUSM), 200 Springs Road, 182-B, Boston, MA 01730, USA
[d] Department of Neurosurgery, Neurologic Sports Injury Center, Brigham and Women's Hospital, 5 Francis Street, Boston, MA, USA
[e] Department of Surgery, Emerson Hospital,131 Old Road to Nine Acre Corner, Concord, MA, USA
[f] Department of Neurosurgery, Center for the Study of Traumatic Encephalopathy (CSTE), Boston University School of Medicine (BUSM), John Cuming Building, Suite 820, 131 ORNAC, Concord, MA 01742, USA
* Corresponding author.
E-mail address: ddanesh@bu.edu

Phys Med Rehabil Clin N Am 22 (2011) 683–700
doi:10.1016/j.pmr.2011.08.009
1047-9651/11/$ – see front matter © 2011 Elsevier Inc. All rights reserved.

may, however, vastly underestimate the total incidence of concussion, as many individuals suffering from mild or moderate TBI do not seek medical advice, especially in the 81% to 92% of cases when the concussion is not accompanied by loss of consciousness.[1,3–5] Beyond the burden of the injury itself, these TBIs have significant direct and indirect economic consequences, estimated at more than $60 billion annually in the United States alone.[6]

A concussion is a brain injury caused by a force transmitted to the head from a direct or indirect contact with the head, face, neck, or elsewhere, which results either in a collision between the brain and skull or in a strain on the neural tissue and vasculature.[7,8] This impact or strain is believed to cause the symptoms of concussion through a cascade characterized by abrupt neuronal depolarization, release of excitatory neurotransmitters, ionic shifts, altered glucose metabolism and cerebral blood flow, and impaired axonal function.[8] Although these injuries are known to cause short-term deficits, the long-term effects of this neuropathologic cascade are less defined.[9–14]

Clinically the acute signs and symptoms of a concussion are similar in children and adults, and can include physical signs (eg, loss of consciousness, amnesia), behavioral changes (eg, irritability), cognitive impairment (eg, slowed reaction times), sleep disturbances (eg, drowsiness), somatic symptoms (eg, headaches), cognitive symptoms (eg, feeling "in a fog"), and/or emotional symptoms (eg, emotional lability).[15] These deficits are observed in the absence of structural brain damage in diagnostic magnetic resonance imaging (MRI).[16,17] While the vast majority of these symptoms resolve spontaneously, many others may linger.[9] In addition, no two concussions have the same presentation or identical outcomes.[18]

The specific mechanism underlying neural tissue damage, however, appears to be different in the adult versus the developing brain.[19,20] While severe TBI has been shown to have both serious and long-term consequences on personality, mood, and cognition, the precise effect of concussions on development has yet to be fully elucidated.[21–27] Furthermore, immature neural tissue differs from mature tissue in response to injury, in terms of both plasticity and altered developmental trajectory.[28] The structure of the brain, in relation to the skull and its musculature, is also dissimilar in adults and children, leading to different biomechanics and thus different injury profiles.[29,30] As a result, different presentations and outcomes would be expected in response to a concussion experienced in youth as compared with one experienced as an adult.

## LONG-TERM EFFECTS OF POSTCONCUSSION SYNDROME

The symptoms of a concussion may take some time to resolve, resulting in significant long-term burden. When the symptoms of concussion persist as a variety of cognitive, somatic, and behavioral changes, these lingering deficits comprise postconcussion syndrome (PCS).[17,31–33] PCS is defined by the *International Classification of Diseases, 10th Revision* (ICD-10) as the occurrence within 1 month of injury of at least 3 of the 8 symptom categories listed in **Box 1**.[34] The *Diagnostic and Statistical Manual of Mental Disorders* (Fourth Edition, Text Revised) (DSM-IV-R) requires the presence of symptoms in at least 3 of 6 categories for at least 3 months after injury in addition to evidence of neuropsychological dysfunction, as outlined in **Box 2**.[35] Whether PCS is experienced following an mTBI seems to be dependent on a combination of factors, including premorbid vulnerability, postinjury psychological adjustment, and postinjury changes in brain function.[36] While most of these symptoms typically resolve within a few days or weeks following mTBI or other head injury, some individuals suffer from PCS for months or longer and, although studies remain conflicting, it is believed

Case: 25-2270 Document 20-2 Page: 403 Date Filed: 10/08/2023

---

**Box 1**

**Characteristics of postconcussion syndrome according to the ICD-10**

History of head trauma with loss of consciousness precedes symptom onset by maximum of 4 weeks

*Three or more symptom categories:*

- Headache, dizziness, malaise, fatigue, noise intolerance
- Irritability, depression, anxiety, emotional lability
- Subjective concentration, memory, or intellectual difficulties without neuropsychological evidence of marked impairment
- Insomnia
- Reduced alcohol intolerance

Preoccupation with above symptoms and fear of brain damage with hypochondriacal concern and adoption of sick role

*Data From* World Health Organization. The ICD-10 classification of mental and behavioral disorders: diagnostic criteria for research. Geneva (Switzerland): World Health Organization; 1993.

---

that as many as 15% of people with a history of mTBI still suffer from deficits 1 year after injury.[17,37,38]

Adults with PCS often initially present with physical symptoms such as dizziness and headache in the first weeks following injury, with psychosocial symptoms such as depression and irritability first appearing up to a month later.[39] These findings mimic those of rodent models, which have reported both impaired learning and

---

**Box 2**

**Characteristics of postconcussion syndrome according to the DSM-IV-R**

A history of head trauma that has caused significant cerebral concussion (eg, with loss of consciousness, posttraumatic amnesia, or seizures)

Neuropsychological evidence of difficulty in attention or memory

*Three or more symptoms that last at least 3 months and have an onset shortly after head trauma or represent substantial worsening of previous symptoms:*

- Fatigue
- Disordered sleep
- Headache
- Dizziness
- Irritability or aggression with little or no provocation
- Anxiety, depression, or affect lability
- Changes in personality
- Apathy or lack of spontaneity

The symptoms result in significant impairment in daily functioning that reflects a decline from previous level

*Data from* American Psychiatric Association. Diagnostic and statistical manual of mental disorders. 4th edition. Washington, DC: American Psychiatric Association; 1994.

---

depressive-like behavior in mice following mTBI, perhaps mediated by apoptotic cell death.[40–42] In addition, single and repeated concussions in adults have been shown to be correlated with cognitive deficits months following the injury.[43] Executive functioning impairment also appears to persist, with adults who had experienced an mTBI 6 months prior found to have significantly decreased information processing speed.[44] At 1 year after injury, the most common symptoms appear to be a combination of the physical, the psychosocial, and the cognitive, with reports of headaches, dizziness, disturbances of senses, light and noise sensitivity, and various psychiatric symptoms, including depression, anxiety, coping issues, and psychosocial disability.[45,46] In addition, studies have suggested that women are more likely to develop PCS, in terms of both more symptoms reported and a longer duration of impairment.[47]

Some adults continue to show motor deficits, functional deficits, and persistent depressive symptoms more than 1 year after injury.[48–50] The data here are conflicting, however, with other studies indicating that neuropsychological deficits appear to resolve by 1 year after injury. These latter studies tend to include all individuals who had been exposed to any mTBI rather than just those who experienced PCS symptoms; as a result, the sample is overly dilute and the resulting lack of association is not surprising.[51–54]

Of interest, several studies have looked at how beliefs regarding expected outcome in response to brain injury might influence an individual's risk of developing PCS. One study found that individuals who had suffered an mTBI and who indicated that they believed their symptoms would have serious negative consequences on their lives were significantly more likely to experience PCS at 3 months following the injury. In fact, these beliefs regarding the perceived severity at the time of injury were more predictive of PCS symptoms at 3 months than were the total number of PCS symptoms reported immediately following the injury.[45] Another study evaluating attitudes surrounding injury recovery found that self-ratings of PCS symptoms were positively related to emotion-focused coping strategies and negatively related to problem-focused coping in adults who had experienced an mTBI.[55] These findings suggest that one's attitudes can influence the extent to which a concussion has long-term, persistent effects.

Although PCS is considered to be fully recoverable with proper treatment, suffering from PCS-related symptoms for an extended time may delay an individual's return to work, adversely affect one's quality of life, and result in additional social and economic costs.[17,31,45] The deficits caused by these symptoms may also have an indirect long-term effect by exacerbating a preexisting depression or impairing the ability to adequately cope with stress.[56–58] In addition, there is some evidence that concussions result in chronic motor and neuropsychological changes over 3 decades following injury[59]; however, these findings may be attributable to an early-stage neurodegenerative disease associated with concussion, as discussed later.

Although studies and diagnostic criteria of PCS initially reported dissimilar symptoms for adult and pediatric populations, it is now acknowledged that children and young adults report a PCS that is similar to adults and may suffer from the same behavioral, emotional, and somatic difficulties following mTBI.[36,60] Many of these initial studies of youth concussions focused on athletes, as they tend to be at increased risk of experiencing concussions.[5] Although college football athletes report a higher incidence of concussion than high school athletes, it has been reported that high school athletes take longer to recover, based on neuropsychological testing.[61] This finding of increased youth susceptibility to PCS has been extended to other sports and activities, and is perhaps explained by the fact that the frontal lobes do

not fully develop until late adolescence.[43] Rodent models have also suggested that the immature brain is more susceptible than the adult brain to apoptosis following mTBI.[62,63] In fact, one prospective cohort study found that age at the time of injury and extent of extracranial injury were the two strongest independent predictors of functional outcome at 6 months after injury.[64] Even in young adults well enough to enroll and continue in college, there is evidence that PCS symptoms may last for years, and that there may be gender differences in PCS resolution, with women reporting more lingering mood and anxiety symptoms.[65]

Children differ significantly from adults and adolescents not only in size but also biomechanically, pathophysiologically, neurobehaviorally, and developmentally.[28] Because the developing brain is more plastic than the mature brain, younger age at the time of injury was originally thought to have a beneficial effect on recovery and expected outcome.[66] However, current literature indicates that this is not the case; the developing brain appears, in fact, to be more vulnerable to diffuse brain injury. Traumatic injury to the immature brain results in a prolonged period of pathogenesis in both cortical and subcortical structures, leading to progressive neurodegeneration, hyperactivity, and sustained cognitive impairments.[67,68]

Although early studies showed either a small or no effect of head injuries on the developing brain, many of these studies had flawed designs; less than half of the 56 studies reviewed by Satz and colleagues[69,70] from 1970 through 1998 met even 4 of the 6 following recommendations for methodologically sound studies: (1) the inclusion of control groups (either with no injury or with other body injury); (2) the use of a longitudinal design with follow-up assessment post injury; (3) a clear definition of mild injury, without the inclusion of children with more severe injuries; (4) the inclusion of at least 20 children with mTBI; (5) the use of standardized tests to measure outcomes; and (6) controls for preinjury risk factors.

The most methodologically sound studies have found that children report worse cognitive symptoms more than 1 year after concussion than adults. These deficits are first reported months after the original injury and affect the child's school work or abilities to function at home.[71] Children aged 6 to 12 years with mTBI have impaired executive functioning and attention 1 year after injury compared with noninjured controls.[72] An mTBI may also cause linguistic changes that adversely affect Verbal IQ and expressive language. Of note, although these deficiencies improved by 6 months after injury, no additional improvement was observed between 6 and 24 months.[73] In such cases where symptoms persist, PCS may adversely affect a child's conduct and personality, and can lead to extended school absence and limitations on athletic play. In fact, one study reported that children who showed more PCS symptoms displayed worse overall adjustment in comparison with children with fewer PCS symptoms.[36] It has also been suggested that individuals with higher cognitive ability have better outcomes following head injury, because they may be able to recruit alternative and additional neural substrates to compensate for tissue damage.[71,74,75]

Although animal models have elucidated the general pathophysiology responsible for acute concussive symptoms, the underlying cause of sustained PCS remains a matter of debate. However, several pathologic mechanisms have been proposed. Some make the pathophysiologic case that a contributing factor for sustained PCS is the microstructural damage of the brain from head injury. Given that the acute injury causes the aforementioned pathophysiologic cascade, it is not unlikely that some of the resulting microstructural damage can persist in some cases and result in the persisting symptoms of PCS sometimes observed.[31] However, as already mentioned for mTBI in adults, the correlation between increased risk of sustained PCS in children

Case: 25-2270   Document 62   Page: 406   Date Filed: 10/08/2025

with negative coping strategies or beliefs about their mTBI symptoms indicates that there may also be a psychopathologic cause to this long-term PCS.[45,55]

This matter is further complicated by various methodologic shortcomings in mTBI and PCS research.[76] These limitations may include retrospective, cross-sectional designs, a lack of appropriate control groups, and a failure to separate different degrees of PCS.[36,39] In addition, studies rely heavily on the self-report of postconcussive symptoms by patients; this has a history of being unreliable, and studies show that a patient's self-report may be the result of simple malingering, an involvement in litigation, or recall biases such as the "good old days" bias, the idea that individuals who sustain an injury often underestimate problems preinjury.[17,77] Finally, whereas PCS is an acknowledged condition, there is a disagreement between ICD-10 and DSM-IV diagnostic criteria; this disagreement emphasizes the confusion over the underlying cause of long-term PCS. Whereas the ICD-10 criteria classifies PCS as symptoms without neuropsychological impairment and focuses instead on premorbid conditions and postinjury psychological adjustment, the DSM-IV criteria do require this neuropsychological impairment and seem to assume that PCS and related symptoms are at least partially caused by an underlying brain trauma.[78] The variability in diagnostic criteria, and the assumptions about PCS that this variation implies, result in different incidence estimates and limited diagnostic agreement when dealing with PCS patients.[79]

The enduring effects of PCS appear to be a combination of the biologic, the physiologic, the psychological, and the social. For both the pediatric and adult population, future research that incorporates genetics, advanced neuroimaging, refined cognitive and postconcussive symptom measures, and social environment research can help to achieve an integrated "biopsychosocial" model that may aid in the management of long-term PCS.[78] This, along with effective education and rehabilitation of patients, will work to reduce the incidence and burden of long-term PCS in TBI patients.

## EFFECTS ON BEHAVIOR

Having sustained a previous concussion may alter a child's long-term developmental trajectory years after the symptoms of PCS subside. Studies of PCS typically only follow children for up to 1 year after injury, potentially before the full effects of the injury have manifested themselves. As a result, these studies are unable to measure the extent of the long-term detrimental effects of an mTBI on the developing brain. To properly evaluate the long-term consequences of youth concussion, studies must examine cognitively mature individuals who previously experienced a concussion in their youth.[80]

Because the prefrontal cortex is one of the last brain structures to mature, it is not surprising that parents report attention deficits, hyperactivity, or conduct disorder following a head injury to their child.[60] In addition, it has been shown that the number of long-term neurobehavioral symptoms in children is related to the severity of the initial mTBI as well as the child's neuropsychological functioning, academic performance, emotional adjustment, and adaptive functioning.[36,81]

The majority of previous studies examining the effects of brain injuries on development years after the injury have focused on more severe injuries.[82–85] However, these studies of moderate and severe TBI suggest a specific window of time during which the brain may be more vulnerable to injury; TBI experienced in middle childhood and later appears to be less detrimental than injuries sustained earlier.[86–91]

One cohort study of 490 children who experienced an mTBI before age 14 years, and who had no prior history of psychiatric illness, found that these children were

significantly more likely to have psychiatric issues in the 3 years following injury than were uninjured controls. The children most commonly presented with attentional problems in the first year following injury. However, there was no difference observed in children who had already had a prior history of psychiatric illness in the year preceding the injury.[92]

These studies are complicated by the fact that the children more likely to experience concussions were also more likely to have undiagnosed psychiatric issues. To circumvent this issue, some studies have used detailed retrospective questionnaires to assess preinjury psychiatric status. One prospective longitudinal study found that children who experienced an mTBI requiring hospitalization before age 10 years displayed increased hyperactivity/inattention and conduct disorder between the ages of 10 and 13 compared with children who had not experienced an mTBI, as rated both by their mothers and their teachers.[89] This cohort has been followed through age 16, and these issues have been shown to persist.[93] However, these children did not display any deficits in intelligence or academic skills. In addition, children whose injuries did not require hospitalization showed no differences from control children without a history of mTBI. Although there were differences observed in hyperactivity/inattention and conduct disorder based on age at the time of injury (those injured between 0 and 5 years old and those injured between 5 and 10 years old), these differences were not statistically significant.[89] A later study confirmed these findings and also reported that children injured in preschool had progressively worsening parent and teacher ratings of hyperactivity/inattention and conduct disorder when followed longitudinally from age 7 to 13 years.[80] Another study of 45 adults, with an average age at injury of 8.9 years (standard deviation of 3.3), found that those who experienced posttraumatic amnesia for at least 30 minutes had statistically significant decreases in measures of attention and memory more than 2 decades later.[94] These attentional findings are not surprising, as the prefrontal cortex does not fully develop until late adolescence. In addition, these deficits were not observed in individuals injured as adults.[95]

The effects of mTBI on children do not always end with the resolution of PCS, but may have long-term effects on cognitive processing, mood, and behavior. These delayed behavioral impairments suggest the need for continued monitoring and intervention in children, even years after initial concussion.

## WHEN TO RETIRE AFTER A CONCUSSION

Following a concussion, the absolute contraindications to return to a contact/collision practice or competition sport include:

1. Abnormal neurologic assessment
2. Symptomatic of postconcussion signs/symptoms at rest or exertion
3. If done, neuropsychological battery not baseline or above
4. If done, head computed tomography or MRI shows a lesion placing the athlete at increased risk of head injury (edema, hemorrhage, hydrocephalus, cavum septum pellucidum, arachnoid cyst).

The relative contraindications to return to collision practice or competition include:

1. Postconcussion symptoms that last many months and not days
2. Mild or indirect blows (whiplash) that produce significant and lengthy postconcussion symptoms.

Thus there are absolute and relative indicators for retirement. Neither are based on a particular number of concussions, but rather on the athlete's response, including

Case: 25-2170    Document: 62    Page: 408    Date Filed: 10/08/2025

duration of symptoms and ease of being concussed. Keeping in mind the increased vulnerability of the developing brain, it is suggested that one might be even more conservative in the under-18 age group as compared with adults.[96]

## DEGENERATIVE DISEASE

Brain trauma has long been thought to play a role in initiating or accelerating the molecular cascade involved in several degenerative diseases, including Alzheimer disease (AD), Parkinson disease (PD), and amyotrophic lateral sclerosis (ALS).[97–99] In addition, repetitive concussive and subconcussive brain trauma has been implicated as the primary risk factor for developing the progressive neurodegenerative disease chronic traumatic encephalopathy (CTE), as well as the motor neuron disease variant chronic traumatic encephalomyelopathy (CTE-M).[100,101]

### Alzheimer Disease

Several epidemiologic studies have found a relationship between head trauma and AD in later life.[102–108] However, all of these studies based their analyses on a clinical diagnosis of possible or probable AD. Without neuropathologic confirmation of disease, it is possible that other neurodegenerative diseases, such as CTE, were in fact partially or fully responsible for the observed clinical dementia.[109] However, one retrospective study found that individuals with a history of TBI had a higher than expected prevalence of AD pathology observed at autopsy.[110] This result could in part be explained by the fact that β-amyloid precursor protein (APP) is shown to temporarily accumulate in response to acute TBI in genetically susceptible mice; the cleavage of APP results in the β-amyloid (Aβ) characteristic of AD.[111,112] More research is certainly needed, both to elucidate the relationship between AD and mTBI, and to disambiguate potential cases of CTE from clinically diagnosed cases of probable and possible AD.

### Parkinson Disease

TBI has also been implicated as a risk factor for PD.[98,113] Although the nature of the relationship is poorly understood, animal models suggest that TBI results in α-synuclein deposition, a protein shown to be the primary building block of the Lewy bodies in PD.[112,114,115] However, neither animal models nor human studies have conclusively shown a relationship between concussions and the development of PD.

### Chronic Traumatic Encephalopathy

CTE is a progressive neurodegenerative tauopathy caused by repeated concussive and subconcussive impacts. Because repeated impacts are thought to be necessary to initiate the disease process, CTE is typically found in those at high risk for experiencing repetitive head trauma, including athletes, those with exposure to injury due to military service or occupation, and individuals who exhibit seizures and/or head-banging behavior.[100,109] In fact, CTE was initially named dementia pugilistica because of its association with the repetitive head trauma experienced by boxers in the ring.

However, head trauma alone is not sufficient to initiate the neuropathologic cascade of CTE. There are many potential risk factors that likely play a role in determining which individuals develop CTE and which individuals do not, given similar head trauma histories. There is some evidence that the ApoE E4 allele may be associated with CTE development.[100,101] In addition, the relationship between the development of CTE and the number or severity of head injuries is not yet clear, as some athletes diagnosed with CTE had no reported concussion history despite a history of repetitive subconcussive head trauma.[100,101] In addition, the age at which an individual begins

experiencing head injury and the time interval between concussions may play a role in the development of CTE.

Although the disease process likely starts at the time of injury, the initial signs of CTE do not typically manifest until decades later. Therefore, the time course for the presentation of CTE symptoms distinguish it from the cumulative effects of multiple injuries or a form of prolonged PCS. CTE can only be diagnosed post mortem at this time, and as such the precise clinical presentation and the cascade of events preceding it are not yet known.[116] In addition, because the diagnosis of CTE relies on postmortem tissue analysis, the precise epidemiology of CTE is not yet known. Although the majority of professional and collegiate athletes examined for CTE have in fact been found to have had the disease, this represents a biased sample in that families who suspect their loved ones may be impaired are more likely to agree to brain donation for research purposes.

However, CTE is believed to be characterized clinically by a progressive decline of memory and executive functioning; mood and behavioral disturbances that include depression, apathy, impulsivity, anger, irritability, suicidal behavior, and aggressiveness; gait changes that resemble Parkinsonism; and, eventually, progression to dementia. Once this disease process is initiated, the neurodegeneration typically progresses slowly, with a mean survival duration of 18 years following the onset of symptoms.[100,117–119]

CTE is characterized neuropathologically by a distinctive pattern of extensive tau-immunoreactive inclusions scattered throughout the cerebral cortex in a patchy, superficial distribution, with focal epicenters at the depths of sulci and around the cerebral vasculature; extensive tau-immunoreactive inclusions in limbic and paralimbic regions as well as brainstem nuclei; and a relative absence of Aβ deposits. On gross examination, CTE is characterized by generalized atrophy and enlarged ventricles, specific atrophy of the frontal and medial temporal lobes, degenerations of white matter fiber bundles, cavum septum pellucidum often with fenestrations, thinning of the hypothalamic floor, and shrinkage of the mammillary bodies.[100]

Although CTE may have similarities with AD, they are two quite distinct diseases. Clinically, CTE typically presents with age of onset in the 40s and 50s as opposed to onset after age 65 years in sporadic AD. In addition, the clinical progression of disease is much slower, often lasting decades, and is characterized by a subtle deterioration in personality and behavior.[100] Neuropathologically both diseases share tau immunoreactivity, but the widespread distribution of neurofibrillary and glial tangles in the frontal, insular, and temporal cortices, white matter, diencephalon, brainstem, and spinal cord is considerably more extensive in CTE than in AD. Furthermore, the pattern of the neurofibrillary abnormalities is entirely distinct from AD or any other tauopathy, especially when considering the absence of the neuritic Aβ deposits characteristic of AD.[100,120] However, additional research is needed to better understand the mechanism underlying these changes.

### Motor Neuron Disease

Although genetic mutations have been identified that cause ALS, 90% to 95% of ALS cases are sporadic.[121,122] Many risk factors have been identified as possibly contributing to these sporadic cases, but trauma specifically has been implicated as a risk factor that may initiate the molecular cascades resulting in ALS.[99,123] In one case-control study, researchers found that injuries that had occurred in the previous 10 years had the strongest association with diagnosis of ALS.[99] Another case-control study also found that the risk of ALS increased when the last head injury occurred closer to the time of diagnosis.[124] However, other studies have disputed this

Case: 12-2270  Document: 62  Page: 410  Date Filed: 10/08/2013
Case: 12-2270  Document: 62  Page: 411  Date Filed: 10/08/2013

association.[125] On the whole, these findings suggest that head injury may play a role in triggering the onset of motor neuron disease.

Motor neurons in sporadic ALS are often found with TDP-43–immunoreactive inclusion bodies that appear either as rounded hyaline inclusions or as skein-like inclusions; as a result, TDP-43 has been implicated in the pathogenesis of motor neuron disease.[126,127] Widespread TDP-43–positive inclusions have also been found in the vast majority of cases of CTE, and are typically found in the brainstem, basal ganglia, diencephalon, medial temporal lobe, frontal, temporal, and insular cortices, and subcortical white matter. A subset of individuals with CTE also develops a progressive motor neuron disease characterized by profound weakness, atrophy, spasticity, and fasciculations. In these individuals, both tau neurofibrillary pathology and extensive TDP-43–immunoreactive inclusions and neurites were found in the motor cortex of the brain and in the spinal cord in a distribution not characteristic of sporadic ALS.[101] Although these initial findings merit further investigation, the co-occurrence of widespread TDP-43 and tau proteinopathies in CTE suggests that repetitive head injury might be associated with the deposition of two abnormally phosphorylated, misfolded proteins, and that in some individuals the TDP-43 proteinopathy is associated with the development of a motor neuron disease.

## IMPLICATIONS ON ATHLETIC PARTICIPATION

As a result of these potential long-term consequences, both the incidence and the severity of youth concussion must be reduced. There are several approaches worth evaluating toward this end.

One potential solution involves the development and introduction of better equipment (eg, helmets and mouth guards) that are specifically designed to attenuate the forces associated with concussions. However, although helmets have been shown to decrease the incidence of facial injury as well as moderate and severe TBI, and mouth guards help protect against dental and orofacial injury, there has been no evidence to date that the newest equipment reduces the incidence of concussions or severity of concussion symptoms.[5]

In addition, when new equipment requirements are introduced into a sport, athletes' behavior often changes, resulting in a riskier style of play reflecting their increased feeling of protection.[128] In some cases, this has been associated with a paradoxic increase in concussion incidence within an activity.[129]

A potentially more fruitful approach would be to limit an athlete's exposure to the impacts that might result in concussion. This goal could be accomplished through several means, such as decreasing the number of contact practices an athlete participates in each week; practice alone is responsible for up to 1500 impacts of 10 g or more for some football players.[130] Ivy League colleges have taken the lead and recently began implementing this policy, and it is hoped that others will follow suit. In addition, sport-specific rule changes might help reduce the frequency of unnecessary and dangerous collisions, thereby decreasing the burden of athletic concussion.

In most instances, when concussions are properly treated they are not believed to be associated with any long-term sequelae. Ensuring that individuals receive proper medical care, and are given adequate physical and mental rest during recovery, should ensure that these injuries fully heal. Adopting uniform return-to-play guidelines, such as those already discussed here, would help ensure athletes are not permitted to play too soon.

Along these lines, proper education of athletes, coaches, medical professionals, and the general public is necessary to identify and properly treat concussions. There

are many organizations, such as the Centers for Disease Control and Prevention, the Brain Injury Association, and the Sports Legacy Institute, working to improve concussion awareness and educational outreach.

## SUMMARY

While most concussions fully resolve within weeks of the injury, for some these concussions can have serious, long-term effects. Concussed individuals can sometimes experience prolonged PCS, lasting for months or even years, which can result in significant physical, emotional, and cognitive stress. In addition, in children and young adults, months of PCS can adversely affect one's developmental trajectory by keeping students out of class and straining personal relationships. In adults, suffering from PCS for an extended period of time may delay one's ability to return to work, resulting in an additional financial and social burden on the concussed individual.

Once the symptoms of concussion subside, in some cases a prior concussion may also have a lasting effect on behavior. These issues are more common in children, as those who have been concussed are more likely to have symptoms of mood or conduct disorders reported by parents and teachers years after injury. Although these findings may in part be due to undiagnosed mood or conduct disorders in children, which resulted in an original injury, the fact that the prefrontal cortex has not fully developed in these injured children provides an additional explanation of aberrant behavior.

In addition, concussions and subconcussive impacts have been shown to increase the risk of developing degenerative disease, sometimes even decades after the injury. There is a good deal of epidemiologic evidence linking a history of head injury with the development of AD, supported by evidence from animal models in response to acute head injury, but additional work is necessary to separate clinically diagnosed AD from other dementias. TBI has also been linked to PD through transient increases in $\alpha$-synuclein resulting in an increase in the formation of Lewy bodies. However, the strongest evidence for a direct link between repetitive concussive and subconcussive injury and neurodegenerative disease later in life comes from the study of CTE. Originally found in boxers, CTE has been diagnosed in a wide variety of individuals, all of whom had been exposed to repetitive head injury, be it through participation in athletics, military service, occupational hazards, or some other cause. While the tau diagnostic of CTE may begin to aggregate and form inclusions as early as in the second decade, the first clinical signs of CTE are not typically observed until one's 30s or 40s. CTE presents with cognitive deficits, depression, and behavioral disinhibition, and eventually progresses to full-blown dementia.

Although concussions were once considered relatively benign, mounting evidence indicates that concussions can have long-term consequences, sometimes for years or even decades after the injury. Improved understanding of the risks associated with concussions, and their potentially debilitating consequences, highlights the need for better diagnosis, treatment, and prevention.

## REFERENCES

1. Faul M, Xu L, Wald MM, et al. Traumatic brain injury in the United States: emergency department visits, hospitalizations and deaths 2002–2006. Washington, DC: US Department of Health and Human Services; 2010.
2. CDC. Report to Congress on mild traumatic brain injury in the United States: steps to prevent a serious public health problem. Atlanta (GA): National Center for Injury Prevention and Control; 2003.

3. Langlois JA, Rutland-Brown W, Wald MM. The epidemiology and impact of traumatic brain injury: a brief overview. J Head Trauma Rehabil 2006;21(5):375–8.

4. CDC. Nonfatal traumatic brain injuries from sports and recreation activities—United States, 2001–2005. Atlanta (GA): Centers for Disease Control and Prevention; 2007.

5. Daneshvar DH, Nowinski CJ, McKee AC, et al. The epidemiology of sport-related concussion. Clin Sports Med 2011;30(1):1–17, vii.

6. Finkelstein E, Corso P, Miller T. The incidence and economic burden of injuries in the United States. New York: Oxford University Press; 2006.

7. Concussion (mild traumatic brain injury) and the team physician: a consensus statement. Med Sci Sports Exerc 2006;38(2):395–9.

8. Barkhoudarian G, Hovda DA, Giza CC. The molecular pathophysiology of concussive brain injury. Clin Sports Med 2011;30(1):33–48, vii–iii.

9. Cantu RC, Herring SA, Putukian M. Concussion. N Engl J Med 2007;356(17):1787 [author reply: 1789].

10. Covassin T, Stearne D, Elbin R. Concussion history and postconcussion neurocognitive performance and symptoms in collegiate athletes. J Athl Train 2008;43(2):119–24.

11. Belanger HG, Vanderploeg RD. The neuropsychological impact of sports-related concussion: a meta-analysis. J Int Neuropsychol Soc 2005;11(4):345–57.

12. McCrea M, Guskiewicz KM, Marshall SW, et al. Acute effects and recovery time following concussion in collegiate football players: the NCAA Concussion Study. JAMA 2003;290(19):2556–63.

13. Bailes JE, Cantu RC. Head injury in athletes. Neurosurgery 2001;48(1):26–45 [discussion: 45–6].

14. Nolin P. Executive memory dysfunctions following mild traumatic brain injury. J Head Trauma Rehabil 2006;21(1):68–75.

15. McCrory P, Meeuwisse W, Johnston K, et al. Consensus statement on concussion in sport—the 3rd International Conference on concussion in sport, held in Zurich, November 2008. J Clin Neurosci 2009;16(6):755–63.

16. Davis GA, Iverson GL, Guskiewicz KM, et al. Contributions of neuroimaging, balance testing, electrophysiology and blood markers to the assessment of sport-related concussion. Br J Sports Med 2009;43(Suppl 1):i36–45.

17. Hall RC, Chapman MJ. Definition, diagnosis, and forensic implications of post-concussional syndrome. Psychosomatics 2005;46(3):195–202.

18. Cantu RC. Return to play guidelines after a head injury. Clin Sports Med 1998;17(1):45–60.

19. Teasdale GM, Murray GD, Nicoll JA. The association between APOE epsilon4, age and outcome after head injury: a prospective cohort study. Brain 2005;128(Pt 11):2556–61.

20. Shah SA, Prough DS, Garcia JM, et al. Molecular correlates of age-specific responses to traumatic brain injury in mice. Exp Gerontol 2006;41(11):1201–5.

21. Cantu RC, Guskiewicz K, Register-Mihalik JK. A retrospective clinical analysis of moderate to severe athletic concussions. PM R 2010;2(12):1088–93.

22. Levin HS, Song J, Ewing-Cobbs L, et al. Word fluency in relation to severity of closed head injury, associated frontal brain lesions, and age at injury in children. Neuropsychologia 2001;39(2):122–31.

23. Temkin NR, Corrigan JD, Dikmen SS, et al. Social functioning after traumatic brain injury. J Head Trauma Rehabil 2009;24(6):460–7.

24. Bombardier CH, Fann JR, Temkin NR, et al. Rates of major depressive disorder and clinical outcomes following traumatic brain injury. JAMA 2010;303(19):1938–45.

25. Taylor HG, Swartwout MD, Yeates KO, et al. Traumatic brain injury in young children: postacute effects on cognitive and school readiness skills. J Int Neuropsychol Soc 2008;14(5):734–45.

26. Gerrard-Morris A, Taylor HG, Yeates KO, et al. Cognitive development after traumatic brain injury in young children. J Int Neuropsychol Soc 2010;16(1):157–68.

27. Anderson V, Catroppa C, Morse S, et al. Recovery of intellectual ability following traumatic brain injury in childhood: impact of injury severity and age at injury. Pediatr Neurosurg 2000;32(6):282–90.

28. Kirkwood MW, Yeates KO, Wilson PE. Pediatric sport-related concussion: a review of the clinical management of an oft-neglected population. Pediatrics 2006;117(4):1359–71.

29. Prins ML, Hovda DA. Developing experimental models to address traumatic brain injury in children. J Neurotrauma 2003;20(2):123–37.

30. Cantu RC, Mueller FO. The prevention of catastrophic head and spine injuries in high school and college sports. Br J Sports Med 2009;43(13):981–6.

31. Sterr A, Herron KA, Hayward C, et al. Are mild head injuries as mild as we think? Neurobehavioral concomitants of chronic post-concussion syndrome. BMC Neurol 2006;6:7.

32. Gosselin N, Tellier M. Patients with traumatic brain injury are at high risk of developing chronic sleep-wake disturbances. J Neurol Neurosurg Psychiatry 2010;81(12):1297.

33. Sojka P, Stalnacke BM, Bjornstig U, et al. One-year follow-up of patients with mild traumatic brain injury: occurrence of post-traumatic stress-related symptoms at follow-up and serum levels of cortisol, S-100B and neuron-specific enolase in acute phase. Brain Inj 2006;20(6):613–20.

34. WHO. The ICD-10 classification of mental and behavioural disorders: diagnostic criteria for research. Geneva (Switzerland): WHO; 1993.

35. APA. Diagnostic and statistical manual of mental disorders. 4th edition. Washington, DC: APA; 1994.

36. Yeates KO, Luria J, Bartkowski H, et al. Postconcussive symptoms in children with mild closed head injuries. J Head Trauma Rehabil 1999;14(4):337–50.

37. Carroll LJ, Cassidy JD, Peloso PM, et al. Prognosis for mild traumatic brain injury: results of the WHO Collaborating Centre Task Force on Mild Traumatic Brain Injury. J Rehabil Med 2004;(Suppl 43):84–105.

38. Rees PM. Contemporary issues in mild traumatic brain injury. Arch Phys Med Rehabil 2003;84(12):1885–94.

39. Yang CC, Tu YK, Hua MS, et al. The association between the postconcussion symptoms and clinical outcomes for patients with mild traumatic brain injury. J Trauma 2007;62(3):657–63.

40. Milman A, Rosenberg A, Weizman R, et al. Mild traumatic brain injury induces persistent cognitive deficits and behavioral disturbances in mice. J Neurotrauma 2005;22(9):1003–10.

41. Tashlykov V, Katz Y, Volkov A, et al. Minimal traumatic brain injury induces apoptotic cell death in mice. J Mol Neurosci 2009;37(1):16–24.

42. Tweedie D, Milman A, Holloway HW, et al. Apoptotic and behavioral sequelae of mild brain trauma in mice. J Neurosci Res 2007;85(4):805–15.

43. Wall SE, Williams WH, Cartwright-Hatton S, et al. Neuropsychological dysfunction following repeat concussions in jockeys. J Neurol Neurosurg Psychiatry 2006;77(4):518–20.

44. Johansson B, Berglund P, Ronnback L. Mental fatigue and impaired information processing after mild and moderate traumatic brain injury. Brain Inj 2009; 23(13–14):1027–40.

Case: 25-2270   Document: 62   Page: 414   Date Filed: 01/08/2025

45. Whittaker R, Kemp S, House A. Illness perceptions and outcome in mild head injury: a longitudinal study. J Neurol Neurosurg Psychiatry 2007;78(6):644–6.

46. Panayiotou A, Jackson M, Crowe SF. A meta-analytic review of the emotional symptoms associated with mild traumatic brain injury. J Clin Exp Neuropsychol 2010;32(5):463–73.

47. Farace E, Alves WM. Do women fare worse: a metaanalysis of gender differences in traumatic brain injury outcome. J Neurosurg 2000;93(4):539–45.

48. Pagulayan KF, Hoffman JM, Temkin NR, et al. Functional limitations and depression after traumatic brain injury: examination of the temporal relationship. Arch Phys Med Rehabil 2008;89(10):1887–92.

49. Bell KR, Hoffman JM, Temkin NR, et al. The effect of telephone counselling on reducing post-traumatic symptoms after mild traumatic brain injury: a randomised trial. J Neurol Neurosurg Psychiatry 2008;79(11):1275–81.

50. Heitger MH, Jones RD, Dalrymple-Alford JC, et al. Motor deficits and recovery during the first year following mild closed head injury. Brain Inj 2006;20(8):807–24.

51. Dikmen SS, Corrigan JD, Levin HS, et al. Cognitive outcome following traumatic brain injury. J Head Trauma Rehabil 2009;24(6):430–8.

52. Straume-Naesheim TM, Andersen TE, Dvorak J, et al. Effects of heading exposure and previous concussions on neuropsychological performance among Norwegian elite footballers. Br J Sports Med 2005;39(Suppl 1):i70–7.

53. Broglio SP, Ferrara MS, Piland SG, et al. Concussion history is not a predictor of computerised neurocognitive performance. Br J Sports Med 2006;40(9):802–5 [discussion: 802–5].

54. Collie A, McCrory P, Makdissi M. Does history of concussion affect current cognitive status? Br J Sports Med 2006;40(6):550–1.

55. Woodrome SE, Yeates KO, Taylor HG, et al. Coping strategies as a predictor of post-concussive symptoms in children with mild traumatic brain injury versus mild orthopedic injury. J Int Neuropsychol Soc 2011;17(2):1–10.

56. Killam C, Cautin RL, Santucci AC. Assessing the enduring residual neuropsychological effects of head trauma in college athletes who participate in contact sports. Arch Clin Neuropsychol 2005;20(5):599–611.

57. Sawchyn JM, Brulot MM, Strauss E. Note on the use of the Postconcussion Syndrome Checklist. Arch Clin Neuropsychol 2000;15(1):1–8.

58. Machulda MM, Bergquist TF, Ito V, et al. Relationship between stress, coping, and postconcussion symptoms in a healthy adult population. Arch Clin Neuropsychol 1998;13(5):415–24.

59. De Beaumont L, Theoret H, Mongeon D, et al. Brain function decline in healthy retired athletes who sustained their last sports concussion in early adulthood. Brain 2009;132(Pt 3):695–708.

60. Mittenberg W, Wittner MS, Miller LJ. Postconcussion syndrome occurs in children. Neuropsychology 1997;11(3):447–52.

61. Field M, Collins MW, Lovell MR, et al. Does age play a role in recovery from sports-related concussion? A comparison of high school and collegiate athletes. J Pediatr 2003;142(5):546–53.

62. Bayly PV, Dikranian KT, Black EE, et al. Spatiotemporal evolution of apoptotic neurodegeneration following traumatic injury to the developing rat brain. Brain Res 2006;1107(1):70–81.

63. Bittigau P, Sifringer M, Pohl D, et al. Apoptotic neurodegeneration following trauma is markedly enhanced in the immature brain. Ann Neurol 1999;45(6):724–35.

64. Jacobs B, Beems T, Stulemeijer M, et al. Outcome prediction in mild traumatic brain injury: age and clinical variables are stronger predictors than CT abnormalities. J Neurotrauma 2010;27(4):655–68.

65. Santa Maria MP, Pinkston JB, Miller SR, et al. Stability of postconcussion symptomatology differs between high and low responders and by gender but not by mild head injury status. Arch Clin Neuropsychol 2001;16(2):133–40.

66. Schneider GE. Is it really better to have your brain lesion early? A revision of the "Kennard principle". Neuropsychologia 1979;17(6):557–83.

67. Pullela R, Raber J, Pfankuch T, et al. Traumatic injury to the immature brain results in progressive neuronal loss, hyperactivity and delayed cognitive impairments. Dev Neurosci 2006;28(4–5):396–409.

68. Huh JW, Widing AG, Raghupathi R. Midline brain injury in the immature rat induces sustained cognitive deficits, bihemispheric axonal injury and neurodegeneration. Exp Neurol 2008;213(1):84–92.

69. Satz P, Zaucha K, McCleary C, et al. Mild head injury in children and adolescents: a review of studies (1970–1995). Psychol Bull 1997;122(2):107–31.

70. Satz P. Mild head injury in children and adolescents. Curr Dir Psychol Sci 2001; 10:106–9.

71. Fay TB, Yeates KO, Taylor HG, et al. Cognitive reserve as a moderator of postconcussive symptoms in children with complicated and uncomplicated mild traumatic brain injury. J Int Neuropsychol Soc 2010;16(1):94–105.

72. Catale C, Marique P, Closset A, et al. Attentional and executive functioning following mild traumatic brain injury in children using the Test for Attentional Performance (TAP) battery. J Clin Exp Neuropsychol 2009;31(3):331–8.

73. Ewing-Cobbs L, Fletcher JM, Levin HS, et al. Longitudinal neuropsychological outcome in infants and preschoolers with traumatic brain injury. J Int Neuropsychol Soc 1997;3(6):581–91.

74. Dawson KS, Batchelor J, Meares S, et al. Applicability of neural reserve theory in mild traumatic brain injury. Brain Inj 2007;21(9):943–9.

75. Stern Y. What is cognitive reserve? Theory and research application of the reserve concept. J Int Neuropsychol Soc 2002;8(3):448–60.

76. Dikmen SS, Levin HS. Methodological issues in the study of mild head injury. J Head Trauma Rehabil 1993;8(3):30–7.

77. Iverson GL, Lange RT, Brooks BL, et al. "Good old days" bias following mild traumatic brain injury. Clin Neuropsychol 2010;24(1):17–37.

78. Yeates KO, Taylor HG. Neurobehavioural outcomes of mild head injury in children and adolescents. Pediatr Rehabil 2005;8(1):5–16.

79. Yeates KO. Mild traumatic brain injury and postconcussive symptoms in children and adolescents. J Int Neuropsychol Soc 2010;16(6):953–60.

80. McKinlay A, Grace RC, Horwood LJ, et al. Long-term behavioural outcomes of pre-school mild traumatic brain injury. Child Care Health Dev 2010;36(1): 22–30.

81. Yeates KO, Taylor HG, Rusin J, et al. Longitudinal trajectories of postconcussive symptoms in children with mild traumatic brain injuries and their relationship to acute clinical status. Pediatrics 2009;123(3):735–43.

82. Timonen M, Miettunen J, Hakko H, et al. The association of preceding traumatic brain injury with mental disorders, alcoholism and criminality: the Northern Finland 1966 Birth Cohort Study. Psychiatry Res 2002;113(3):217–26.

83. Roncadin C, Guger S, Archibald J, et al. Working memory after mild, moderate, or severe childhood closed head injury. Dev Neuropsychol 2004; 25(1–2):21–36.

84. Ewing-Cobbs L, Barnes M, Fletcher JM, et al. Modeling of longitudinal academic achievement scores after pediatric traumatic brain injury. Dev Neuropsychol 2004;25(1–2):107–33.

85. Anderson SW, Damasio H, Tranel D, et al. Long-term sequelae of prefrontal cortex damage acquired in early childhood. Dev Neuropsychol 2000;18(3):281–96.

86. Jacobs R, Harvey AS, Anderson V. Executive function following focal frontal lobe lesions: impact of timing of lesion on outcome. Cortex 2007;43(6):792–805.

87. Catroppa C, Anderson VA, Morse SA, et al. Children's attentional skills 5 years post-TBI. J Pediatr Psychol 2007;32(3):354–69.

88. Anderson V, Catroppa C. Recovery of executive skills following paediatric traumatic brain injury (TBI): a 2 year follow-up. Brain Inj 2005;19(6):459–70.

89. McKinlay A, Dalrymple-Alford JC, Horwood LJ, et al. Long term psychosocial outcomes after mild head injury in early childhood. J Neurol Neurosurg Psychiatry 2002;73(3):281–8.

90. Anderson V, Catroppa C, Morse S, et al. Functional plasticity or vulnerability after early brain injury? Pediatrics 2005;116(6):1374–82.

91. Bonnier C, Marique P, Van Hout A, et al. Neurodevelopmental outcome after severe traumatic brain injury in very young children: role for subcortical lesions. J Child Neurol 2007;22(5):519–29.

92. Massagli TL, Fann JR, Burington BE, et al. Psychiatric illness after mild traumatic brain injury in children. Arch Phys Med Rehabil 2004;85(9):1428–34.

93. McKinlay A, Grace R, Horwood J, et al. Adolescent psychiatric symptoms following preschool childhood mild traumatic brain injury: evidence from a birth cohort. J Head Trauma Rehabil 2009;24(3):221–7.

94. Hessen E, Nestvold K, Sundet K. Neuropsychological function in a group of patients 25 years after sustaining minor head injuries as children and adolescents. Scand J Psychol 2006;47(4):245–51.

95. Hessen E, Nestvold K, Anderson V. Neuropsychological function 23 years after mild traumatic brain injury: a comparison of outcome after paediatric and adult head injuries. Brain Inj 2007;21(9):963–79.

96. Cantu RC. Recurrent athletic head injury: risks and when to retire. Clin Sports Med 2003;22(3):593–603, x.

97. Mortimer JA, van Duijn CM, Chandra V, et al. Head trauma as a risk factor for Alzheimer's disease: a collaborative re-analysis of case-control studies. EURODEM Risk Factors Research Group. Int J Epidemiol 1991;20(Suppl 2):S28–35.

98. Goldman SM, Tanner CM, Oakes D, et al. Head injury and Parkinson's disease risk in twins. Ann Neurol 2006;60(1):65–72.

99. Chen H, Richard M, Sandler DP, et al. Head injury and amyotrophic lateral sclerosis. Am J Epidemiol 2007;166(7):810–6.

100. McKee AC, Cantu RC, Nowinski CJ, et al. Chronic traumatic encephalopathy in athletes: progressive tauopathy after repetitive head injury. J Neuropathol Exp Neurol 2009;68(7):709–35.

101. McKee AC, Gavett BE, Stern RA, et al. TDP-43 proteinopathy and motor neuron disease in chronic traumatic encephalopathy. J Neuropathol Exp Neurol 2010;69(9):918–29.

102. Fleminger S, Oliver DL, Lovestone S, et al. Head injury as a risk factor for Alzheimer's disease: the evidence 10 years on; a partial replication. J Neurol Neurosurg Psychiatry 2003;74(7):857–62.

103. Mortimer JA, French LR, Hutton JT, et al. Head injury as a risk factor for Alzheimer's disease. Neurology 1985;35(2):264–7.

104. O'Meara ES, Kukull WA, Sheppard L, et al. Head injury and risk of Alzheimer's disease by apolipoprotein E genotype. Am J Epidemiol 1997; 146(5):373–84.

105. Mehta KM, Ott A, Kalmijn S, et al. Head trauma and risk of dementia and Alzheimer's disease: The Rotterdam Study. Neurology 1999;53(9):1959–62.

106. Katzman R, Galasko DR, Saitoh T, et al. Apolipoprotein-epsilon4 and head trauma: synergistic or additive risks? Neurology 1996;46(3):889–91.

107. Mayeux R, Ottman R, Maestre G, et al. Synergistic effects of traumatic head injury and apolipoprotein-epsilon 4 in patients with Alzheimer's disease. Neurology 1995;45(3 Pt 1):555–7.

108. Plassman BL, Havlik RJ, Steffens DC, et al. Documented head injury in early adulthood and risk of Alzheimer's disease and other dementias. Neurology 2000;55(8):1158–66.

109. Gavett BE, Stern RA, Cantu RC, et al. Mild traumatic brain injury: a risk factor for neurodegeneration. Alzheimers Res Ther 2010;2(3):18.

110. Jellinger KA, Paulus W, Wrocklage C, et al. Traumatic brain injury as a risk factor for Alzheimer disease. Comparison of two retrospective autopsy cohorts with evaluation of ApoE genotype. BMC Neurol 2001;1:3.

111. Corrigan F, Pham CL, Vink R, et al. The neuroprotective domains of the amyloid precursor protein, in traumatic brain injury, are located in the two growth factor domains. Brain Res 2011;1378:137–43.

112. Smith DH, Uryu K, Saatman KE, et al. Protein accumulation in traumatic brain injury. Neuromolecular Med 2003;4(1–2):59–72.

113. Bower JH, Maraganore DM, Peterson BJ, et al. Head trauma preceding PD: a case-control study. Neurology 2003;60(10):1610–5.

114. Uryu K, Giasson BI, Longhi L, et al. Age-dependent synuclein pathology following traumatic brain injury in mice. Exp Neurol 2003;184(1):214–24.

115. Newell KL, Boyer P, Gomez-Tortosa E, et al. Alpha-synuclein immunoreactivity is present in axonal swellings in neuroaxonal dystrophy and acute traumatic brain injury. J Neuropathol Exp Neurol 1999;58(12):1263–8.

116. Gavett BE, Stern RA, McKee AC. Chronic traumatic encephalopathy: a potential late effect of sport-related concussive and subconcussive head trauma. Clin Sports Med 2011;30(1):179–88, xi.

117. Belanger HG, Spiegel E, Vanderploeg RD. Neuropsychological performance following a history of multiple self-reported concussions: a meta-analysis. J Int Neuropsychol Soc 2010;16(2):262–7.

118. Omalu BI, Bailes J, Hammers JL, et al. Chronic traumatic encephalopathy, suicides and parasuicides in professional American athletes: the role of the forensic pathologist. Am J Forensic Med Pathol 2010;31(2):130–2.

119. Guskiewicz KM, Marshall SW, Bailes J, et al. Recurrent concussion and risk of depression in retired professional football players. Med Sci Sports Exerc 2007;39(6):903–9.

120. Braak H, Braak E. Neuropathological staging of Alzheimer-related changes. Acta Neuropathol 1991;82(4):239–59.

121. Bruijn LI, Miller TM, Cleveland DW. Unraveling the mechanisms involved in motor neuron degeneration in ALS. Annu Rev Neurosci 2004;27:723–49.

122. Mulder DW, Kurland LT, Offord KP, et al. Familial adult motor neuron disease: amyotrophic lateral sclerosis. Neurology 1986;36(4):511–7.

123. Schmidt S, Kwee LC, Allen KD, et al. Association of ALS with head injury, cigarette smoking and APOE genotypes. J Neurol Sci 2010;291(1–2): 22–9.

Case: 25-2702 Document: 60 Page: 418 Date Filed: 10/08/2025

124. Binazzi A, Belli S, Uccelli R, et al. An exploratory case-control study on spinal and bulbar forms of amyotrophic lateral sclerosis in the province of Rome. Amyotroph Lateral Scler 2009;10(5-6):361–9.

125. Armon C. Sports and trauma in amyotrophic lateral sclerosis revisited. J Neurol Sci 2007;262(1–2):45–53.

126. Dickson DW. Neuropathology of non-Alzheimer degenerative disorders. Int J Clin Exp Pathol 2009;3(1):1–23.

127. Geser F, Martinez-Lage M, Kwong LK, et al. Amyotrophic lateral sclerosis, frontotemporal dementia and beyond: the TDP-43 diseases. J Neurol 2009;256(8): 1205–14.

128. Hagel B, Meeuwisse W. Risk compensation: a "side effect" of sport injury prevention? Clin J Sport Med 2004;14:193–6.

129. Dick R, Romani WA, Agel J, et al. Descriptive epidemiology of collegiate men's lacrosse injuries: National Collegiate Athletic Association Injury Surveillance System, 1988-1989 through 2003-2004. J Athl Train 2007;42(2):255–61.

130. Crisco JJ, Fiore R, Beckwith JG, et al. Frequency and location of head impact exposures in individual collegiate football players. J Athl Train 2010;45(6): 549–59.

# EXHIBIT 73



LOOK SHARP    LIVE SMART

Sports

# The Violent Life and Sudden Death of Junior Seau

When the legendary NFL linebacker retired for good in 2010, he seemed set for life: supremely wealthy, beloved across the league, a hero in his hometown of San Diego. Two years later, he was dead. On a lonely morning in a big empty house, Seau shot himself through the chest. It's no longer a secret how much damage pro football can do to the men who play it, but never before had we witnessed it destroy a genuine superstar—not until Junior Seau. in this GQ special report, Seau's friends and former teammates try to make sense of how a life so filled with triumph could go so wrong so fast

BY NATHANIEL PENN

September 2013



The average NFL career lasts 3.5 years. Junior Seau, one of the greatest linebackers in the history of the NFL, played for twenty—and San Diego, where he starred most of those years for the Chargers, was his city as much as New York is Derek Jeter's. Seau invested in San Diego both as a businessman and as the head of a foundation serving at-risk kids. But after retiring as a very wealthy man in 2010—he earned more than $50 million over the course of his long career—he began to behave uncharacteristically.

He withdrew from family and friends. He made terrible business decisions. He abused pills. He drank. He gambled away terrifying sums. It was evident to those who knew him well that he was struggling, but no one foresaw his suicide on the morning of May 2, 2012.

Eight months after his death, the scientists who examined his brain announced they had found evidence of CTE (chronic traumatic encephalopathy), a dire neurological disease linked to concussions, which has been a factor in the deaths of many other NFL players. It's impossible to pinpoint the degree to which CTE drove Seau's rapid decline; the disease has been connected to depression, insomnia, emotional withdrawal, and compulsive behavior—all of which afflicted him. But there's one thing everybody close to Seau agrees on: In his final years, Junior was no longer the Junior they had known and loved.



● ● ●

## 1. The Man Who Loved to Hit

**Natrone Means** *(San Diego Chargers running back, ex-teammate):* God Almighty, he was fast. He was strong, man. He was hands-down the best football player I ever played with.

*Seau was a star linebacker for twenty seasons, primarily with the San Diego Chargers, where he was legendary for his seeming indestructibility.*

**Aaron Taylor** *(Chargers guard, ex-teammate, friend):* Any time you play a sport that requires an ambulance to be on-site, it's inherently a fucking dangerous game, right? "Getting your bell rung" was the euphemism, and I think we all took pride in it. If you didn't light somebody up or get lit up in a collision, there was a sense that we weren't doing our jobs.

**Warren Moon** *(NFL Hall of Fame quarterback, friend):* You have two guys running full speed into each other and butting heads. And that's during *practice*. You don't do anything like that in a game.



**Jay Michael Auwae** *(friend):* I once asked Junior what the biggest hit was that he could recall. He said, "Buddy, it wasn't in a game. It was in practice. Natrone Means was talking trash; I was talking trash. I said, 'Bring it on!' " Junior said Natrone hit him so hard, and he hit Natrone so hard, that they both were knocked out.

**Means:** I don't recall this. Maybe it was such a big collision that it's gone from my memory. But I can remember countless times I've seen Junior just smash guys out there. Fights would break out all the time. You want to make a name for yourself. And if you have a name, you want to prove why you have the name.

**Taylor:** I personally watched him take multiple injections, because he was in front of me in line for them. The 'Caine sisters: Marcaine, lidocaine. Toradol and steroidals to calm down inflammation. I can't say for certain what it was he took, but I would imagine they're not going to give him anything different than what we would've gotten for similar injuries. It was what you did.

**Means:** I remember him playing in the AFC Championship game [in 1995] with the pinched nerve, man. I mean, sixteen tackles. With a pinched nerve. God Almighty. Never coming out of the game.

**Mark Walczak** *(Chargers tight end, ex-teammate, friend):* I couldn't believe the number of surgeries he had. There were like 15 or 16.

*Seau at USC with the Chargers.*

**Means:** It was the "smelling salts and get back in there" generation.

**Taylor:** You cannot show vulnerability in the locker room. It's despised. Who wants to be a bitch?

**Moon:** One thing I read that was peculiar to me—he had just been diagnosed with a concussion. That tells me he

wasn't reporting what was wrong with him. For a guy that played linebacker for twenty years, somewhere in there he would've had a concussion.

• • •

## 2. "What Do You Do with Your Day Now?"

*As early as the mid-1990s, when Seau was in his twenties, he was privately complaining of headaches and bouts of dizziness. He also developed insomnia and began to pull away from his wife (they would divorce in 2002) and children. But there were no signs of that man when Seau announced his retirement on August 14, 2006. Instead he struck a more hopeful note: "I'm not retiring," he said. "I am graduating." Just four days later, he changed his mind and signed with the New England Patriots, where for the next four seasons he chased after an elusive Super Bowl ring. In January 2010, a few days before his forty-first birthday, he retired for good. "I'm going to surf," he said.*

*With his ever present ukulele, Seau was a fixture on the streets and beaches of Oceanside, his suburban San Diego hometown. But soon he began drinking heavily to cope with his insomnia, while also taking Ambien, a sleeping medication prescribed to him by the controversial former Chargers team physician David Chao (who has since, in an unrelated case, been found liable for malpractice). A downward spiral was taking shape: Seau's worsening health affected his business acumen—and when he made bad financial decisions, he would try to gamble his way out of them.*





*Seau moments after the Patriots' crushing last-minute loss to the Giants in the Super Bowl in 2008.*

**Taylor:** [In 2003] Junior reached out to me. I had retired, and he was thinking of retirement. We had our history together of partying pretty heavily, but he had also watched my transformation. I've been sober eleven years, but [before that] I crashed and burned. So we went for sushi up in Encinitas and talked about the struggles of transition. I was telling him how my first feeling was relief that I didn't have to put my body through that anymore, but very quickly sadness set in. I didn't know what to do. I didn't have schedules; like, I was a blank slate. I had an infinite number of choices, and it was overwhelming and daunting. He expressed some fears of letting go and what's next: "What's it been like? What do you do with your day now? Is it hard?"

**Means:** If you were to write a script on how to exit the game, Junior's would be an ideal story. The only thing missing was the ring. Coming from the San Diego area, you go up to USC, you come back, and you play for the Chargers. It's almost storybook.

**Taylor:** The amount of adrenaline and endorphins that is released into our bodies when we run out of a tunnel or make a great play—there's nothing that can replace that [after we retire]. But it doesn't mean that we don't try—and that's where we get into trouble.

**Dale Yahnke** (*Seau's financial adviser*): My goal was to make sure that when he retired, he could work as he wanted to, not because he had to. I think we were there. I didn't like seeing him doing things that were destructive. I knew that what he was doing in Vegas was going to end only one way, and I thought it would be humiliating for him. I tried to talk him out of it. He didn't listen. It clearly was accelerating toward the end.

**DID FOOTBALL KILL JUNIOR SEAU?**

When a schizophrenic commits suicide, we understand it's his

-2316-

**Auwae:** We landed in Vegas one time and immediately, within hours, he won 800-something thousand dollars, okay? So he comes back up to the room. I said, "Let's go home, surf, chill, pay some bills." But after dinner a whale-watcher [a casino handler charged with roping in big-money gamblers] comes up to the room. I'm saying, "June, enough already." And he goes, "No, bro. One more time. I'm gonna clip 'em." Not even two hours later, he comes back up and hits the table with a glass and starts cussing. I was like, "Please don't tell me—" He had lost it all. He's lying on his bed looking at the ceiling, and I go, "Buddy, you gotta stop this, man." He goes, "We got this. We'll get 'em tomorrow." The next morning the whale-watchers show up. June got another half-million dollars, and he goes back down and loses the whole thing.

**Taylor:** He felt an inordinate amount of financial pressure for a lot of different reasons. He had had some money taken by John Gillette [a San Diego financial adviser who was convicted of stealing millions from his clients]. He had gotten divorced.

**Moon:** [Seau's The Restaurant, a local institution] wasn't doing as well, because another sports-bar chain had moved in to the same complex, and they were starting to take a lot of his business.

**Walczak:** He tried to open [another] restaurant in Temecula, which failed. I know that he put his personal guarantee on the restaurant and was continuing to pay the lease when the business was no longer there. Without a doubt his decision-making was impaired.

**Auwae:** He lost, what, $1 million trying to do [a chain of] Ruby Tuesdays.

**Taylor:** He shared with me that there were a lot of demands on him: from friends, family, the community. And it was overwhelming—the calls he would get to help pay $5,000 for a prom dress or a party or, or, or...

**Yahnke:** I'll just put it this way—he was very generous. I can't comment on the other side. I have opinions on it, but I can't comment on it.

**Taylor:** He was a guy from the hood who had made it. He was an icon, and I think because of that, he had a hard time saying no.

disease that really killed him. But did CTE kill Junior Seau? In the brief period of his life after he retired from pro football, he battled alcoholism, insomnia, prescription-drug abuse, depression, and a gambling addiction. Individually, each has been linked to CTE, but in combination the cause-and-effect relationships are impossibly tangled.

As Seau's friend Aaron Taylor observes, "It's a murky pot of gumbo." Russell Lonser, the former chief of surgical neurology at the National Institutes of Health, oversaw the investigation into Seau's brain that confirmed the presence of CTE. But unfortunately that's about all the study told us. "We are just in the infancy of studying CTE," Lonser told *GQ*. "We don't know if it's progressive or reversible. We don't know the incidence or prevalence or the treatment modalities. Did Junior Seau commit suicide because of CTE? Absolutely no one can answer that."—N.P.

**Yahnke:** What he needed was for someone to say, "This is destructive behavior, and you need to stop doing it." I tried; didn't work. [The former head of Seau's foundation tried; didn't work. So I don't know what it would've taken. He has great kids. I would've liked to see him spend more time with them. I think he was conflicted about it. He spent a lot of time at bars and things like that. His foundation helped a lot of kids around San Diego, but why he didn't spend more time with his own kids, who he loved, I don't know. I think deep down, Junior was lonely. He had a lot of what he would call buddies, but I don't think there was anybody that he could truly open up his soul to.

**Taylor:** Guys keep things to themselves. They suck it up. It allows us to be good football players, but it slices our throats on the back end, because we use the same tools in this new arena that allowed us to be successful during our careers. The alcohol was a numbing-out of all the things that troubled him: He had financial demands, he had familial issues, he had marriage issues. I know he had deep, deep guilt about how he was not showing up as a father toward the end.

● ● ●

### 3. From Ali to Urkel

*Throughout his career, Seau was the gentlest of men off the field, but after his retirement he sometimes became aggressive and even violent with those close to him. At approximately 12:20 a.m. on October 18, 2010, he was arrested on suspicion of domestic violence after an incident with a girlfriend. Within hours of posting bail, he was involved in a bizarre accident on a coastal road in Carlsbad, California. The story made national headlines.*

**Walczak:** He was up all night with the police. Finally they got it sorted out, and he was driving south, and he told me he fell asleep and drove off the cliff. At that time, I had no reason not to believe him. I wish I'd gone and looked at the site where it happened, because it wasn't an accident. I've been there lots of times, and it just doesn't work. It would be a ninety-degree turn. You'd have to crank the wheel so hard, you'd have to time it just so.

**Taylor:** He was a beaten-down man. His confidence was gone. He seemed worn-out. It was hard for him to articulate coherent thoughts. There was a degradation of the dude that I remember playing with. I played with Muhammad Ali, and I had lunch with a guy that showed up with the machismo of Urkel. He looked like a crackhead walking in off the street. He said, "I need help. I don't know what to do. I'm an addict of a lot of things. Tell me what to do, man."

**Walczak:** Ambien is a crazy, hallucinogenic, mind-altering, addictive, terrible drug. I think part of his struggles were with that [drug] altering his ability to make sense or judgments. He didn't take it as prescribed; he'd take three over the course of the night.

**Jamie Paulin** *(Nashville songwriter, friend):* We'd talk about [a job in] sportscasting, where he'd be like, "Oh yeah, I'm going to get on that," and then the next day there would be no thought of it. It was, like, too much to think about.



*Seau, post-retirement, in a harbinger of tragedy to come, Seau drove his car off a beachside cliff but somehow survived the crash.*

**Auwae:** He would forget the phone on the back of the [car's] hood and drive two miles and not know where the phone is. Ukuleles, leaving them in different places. Missing appointments—like [his daughter] Sydney's volleyball game.

**Taylor:** We went to a meeting of a twelve-step program. He introduced himself as an addict and shared where he was at. I knew how much courage it took, because I know how hard it was for me, and I was a nobody as a player. *Everybody* in San Diego knew what happened with his car. I was very encouraged. But pretty quickly after that, he went dark.

**Auwae:** We went to a bar in Carlsbad [in late April 2012]. This fan comes up to him: "Mr. Seau, you mind if—" And he's like, *"Get the fuck out of here, man."* Dude, that's not Junior. This is so not him. I go, "What's wrong with you?" He just said, "I'm tired of it, man."

• • •

## 4. A Bullet to the Chest

*In late April 2012, Walczak spent the week of his fiftieth birthday with Seau. The men spent that week hopping around local restaurants and bars, always returning to Seau's house across the street from the Pacific Ocean. Throughout, Seau regularly requested that they play music together—in particular a song that Paulin had written called "Who I Ain't."*



*The extended Seau family carries Junior's coffin at his funeral in Oceanside, California.*

**Walczak:** I've suffered many, many concussions, and at certain times I can't remember anything. He cracked on me: "Buddy, do you got Sometimer's or Alzheimer's?" We had cocktails and relaxed near the ocean. He seemed to be really right. We talked about Dave Duerson [the former Chicago Bears All-Pro safety who had shot himself; later he was discovered to have been suffering from CTE], because it came up on ESPN. I asked him: "How do you feel? Do you have symptoms of anything?" He said, "I feel great."

**Auwae:** Everybody talked about the suicide note; it wasn't a suicide note, it was the lyrics of a song.

**Paulin:** "Who I Ain't" was written ten years ago by me and Justin Lantz. It's about a guy who has made a lot of mistakes but then finds peace and redemption. Junior was here [in Nashville] that April, and he said, "Oh, you gotta send me a copy of that." We told him the chords and wrote down the lyrics for him.

**Walczak:** During the course of that week, we probably sang the song together fifty times, getting it right. When he found a song that he liked, man, he'd play it over and over. It goes, *Cuz I've broke the hearts of angels, cursed my fellow man / Turned from the Bible with a bottle in my hand /* only hope for forgiveness, when the good Lord calls my

*name / Is that he knows who I am and who I ain't.* Maybe he knew that he was going to end it. Maybe this was his way of being at peace with it and sharing his peace.

**Paulin:** I never thought he felt he was carrying any unfixable mistakes. Apparently he felt he was.

*On Tuesday, May 1, Seau sent a group text to family members: "I LOVE YOU." He spent that evening watching a Lakers game on TV with a girlfriend. The following morning, she discovered his body. Among the mysteries of that day: The SIM card from Seau's cell phone was never found. Auwae has speculated that Seau received a collections call from a Las Vegas casino, which may have contributed to his suicide. In any event, Seau's gambling debts were forgiven following his death.*

**Walczak:** He didn't tell me he owned a gun. I do know this: He had probably never, ever fired a gun in his life before.

**Mark Malamatos** *(investigator for county medical examiner's office; from his report):* At approximately 0915 hours, [Seau's girlfriend] left her gym and attempted to telephone [Seau] four or five times. When he did not answer, she decided to drive by the gym where he worked out. She then went back to the house, and when she entered through the garage, she had a feeling that it was unusually quiet. When she walked up the steps to the living room/kitchen area, she saw [Seau's] dog, and knew it was unusual for him to be in there. She then walked down the hallway to the master bedroom and did not see [Seau] in bed. She noticed that one of the spare bedroom doors was shut, which again she thought was very unusual. As she walked into the spare bedroom, she saw the decedent lying on the bed.



*Seau's mother after her son's suicide.*

**Auwae:** What's weird about the whole thing is he didn't even kill himself in his room. He went to a spare room. He sat in bed, grabbed the gun, pressed it hard against his chest, and blew a hollow-point round right through himself.

**Walczak:** It was completely uncharacteristic of a guy who was the constant competitor, the most generous person in the world, the biggest lover of people. It's just strange that his life would end in a way that symbolized uncaring and selfishness and thoughtlessness. He somehow lost his mind.

• • •

## 5. The Life and Afterlife of Junior Seau

*In April 2013, the Seau family joined more than 4,400 former players in a mass of lawsuits charging that the NFL and the helmet manufacturer Riddell had misrepresented or suppressed data about the risks associated with concussions. Of the players involved in wrongful-death lawsuits, Junior Seau is one of the youngest. "We know this lawsuit will not bring back Junior," the Seau family said in a statement published by the Associated Press. "But it will send a message that the NFL needs to care for its former players, acknowledge its decades of deception on the issue of head injuries and player safety, and make the game safer for future generations."*

**Taylor:** Junior was different. Junior was special. There's legendary stories of him playing with broken forearms and compound fractures. I don't know if I ever saw him for any reason leave a game. Junior fought through so much pain. There would be times that he wouldn't practice because he couldn't walk, but magically he would show up on Sunday.

**Means:** I remember when I left San Diego in 1996 and went to Jacksonville. I was thinking, "I guess every NFL team has a Junior Seau linebacker." I'm out there that first day of practice, I'm looking around, I'm like, "Okay, where's the Junior Seau at?" You see a lot of guys who look the part, but I'm like, "Naw, that's not the one.... No, that's not the guy...." That's when it really hit me: "Oh shit. Okay, now I get it."

**Auwae:** Once he told me about his first gym workout as a rookie. He was nervous about making the team. His dad wanted to buy the house he lives in now, but Junior didn't even have a bank account. At the gym, the most feared guy on the team starts flinging up the weights, and he's struggling. Junior grabbed the same weights and pressed them like nothing. He could feel everybody looking at him, impressed with him. Afterward he went to the phone and called his mom. He goes, "Mom, tell Dad to go buy the house. We're gonna be here for a while."

# EXHIBIT 74

# MEN'S JOURNAL

## Dave Duerson: The Ferocious Life and Tragic Death of a Super Bowl Star

By Paul Solotaroff   May 2011

For years ex-Bear Dave Duerson had a hand in turning down scores of disability claims of retired players – though he likely suffered from brain injuries himself. In February, 2011, he shot himself in the heart. Was it because he couldn't bear to admit his betrayal?

*Editor's Note: On May 2, 2011, doctors at the Center for Study of Traumatic Encephalopathy at the Boston University School of Medicine announced that Dave Duerson was suffering from a "moderately advanced" case of chronic traumatic encephalopathy (CTE) – a disease linked to repeated blows to the head whose symptoms can include memory loss, depression and dementia – when he committed suicide three months earlier. 17 months later, after four years of research, Duerson's CTE was confirmed in the scientific journal 'Brain.' In February 2011, Paul Solotaroff and Rick Telander covered Duerson's once-charmed life and sad end.*

Dave Duerson set the scene with a hangman's care before climbing into bed with the revolver. The former Pro Bowl safety for the Super Bowl–champion 1985 Chicago Bears drew the curtains of his beachfront Florida condo, laid a shrine of framed medals and an American flag to his father, a World War II vet, and pulled the top sheet up over his naked body, a kindness to whoever found him later. On the dining room table were notes and a typed letter that were alternately intimate and official, telling his former wife where his assets were and whom to get in touch with to settle affairs. He detailed his motives for ending his life, citing the rupture of his family and the collapse of his finances, a five-year cliff dive from multimillionaire to a man who couldn't pay his condo fees. Mostly, though, he talked about a raft of ailments that pained and depressed him past all tolerance: starburst headaches and blurred vision, maddening craters in his short-term memory, and his helplessness getting around the towns he knew. Once a man so acute he aced his finals at Notre Dame with little study time, he found himself now having to dash down memos about what he was doing and when. Names, simple words, what he'd eaten for dinner – it was all washing out in one long wave.

No one had to tell him what those symptoms implied or what lay in store if he stuck around. Once a savage hitter on the best defense the game has ever seen, Duerson filled the punch list for chronic traumatic encephalopathy (CTE), the neuron-killing condition so rampant these days among middle-aged veterans of the National Football League. Andre Waters and Terry Long, both dead by their own hands; John Mackey and Ralph Wenzel, hopelessly brain-broke in their 50s. It was a bad way to die and a worse way to live, warehoused for decades in a fog, unable, finally, to know your own kids when they came to see you at the home.

Among the personal effects Duerson arranged that night in February was the master clue to the act he'd soon commit, Exhibit A in a life turned sideways: his 1987 NFL Man of the Year trophy. It was a testimonial to a former colossus, a player whose brilliance on the football field was a taste of much grander things to come. Future meat-processing magnate and potential congressman, or successor to

-2321-

Gene Upshaw as director of the NFL Players Association – that Dave Duerson was all forward motion, the rarest amalgam of outsize smarts and inborn ambition. This version, though – the one slumped in bed with the .38 Special to his chest – this one had run into walls, head lowered, and he, not the walls, had buckled first.

Still, when someone turns a gun on himself, there are bound to be messy questions. Why, given the spate of concussions in the NFL season just past, would Duerson elect to keep silent about his suspected ailment at precisely the moment he should have spoken? Why would a man who knew as much about brain woes as anyone who's ever played the game, having served for six years and read thousands of case files as a trustee on the NFL's pension board, not have sought treatment and financial compensation from the very committee he sat on? And why, bizarrely, did he deny those very benefits to the men who needed them most, brain-dimmed veterans living in pain and squalor and seeking relief from the league?

Perhaps to stanch these questions, Duerson dispatched a blitz of texts in the last couple of hours of his life, some of them making an emphatic plea: Get my brain to the NFL's brain bank in Boston. The meaning of the texts seems plain enough: I'm sick and my mind's failing from all the helmet-to-helmet collisions in 11 brutal seasons in the NFL. Please see to it that my cortex is studied by doctors seeking treatments for brain trauma – and inquire no further about my reasons. It was a grandiose gesture, killing himself at 50 so that current and future players might be spared this horror, and was italicized by a second theatrical stroke: He shot himself through the heart, not the head, to preserve his brain for science.

But the dramatics of the act didn't sanctify him or absolve him of blame for the part he'd played in the suffering of other ex-players. If anything, Duerson's death has become a referendum on his, and his sport's, brutality, a prism through which to finally take a look at the cost of all those hits.
If you're the kind of fan who keeps a mental lineup of ex-players headed for bad endings, Dave Duerson was the last name to make your list. Virtually from birth he'd been a special case, a gold-star guy who didn't bull through problems so much as soar above them. The youngest of four children born to Julia and Arthur Duerson Jr. in working-class Muncie, Indiana, he was as exceptional off the field as he was on it. A big, powerful kid with a nose for the ball and the long-stride speed to get there first, he dominated boys two and three years older in football from the time he hit sixth grade. (He excelled at baseball and basketball, as well.) Even then, though, his dreams were broader than jock stardom. Among friends he talked brashly about owning his own factories and running for the Senate someday. Duerson made the National Honor Society in high school, learned the trumpet and tuba by the age of 15, and toured overseas in an ambassador's band while earning 10 varsity letters.

With his pick of football factories like Texas and USC, Duerson chose South Bend for its glorious campus and network of corporate contacts. "From when I met him in seventh grade, he was positioning himself for a career after football," says Dave Adams, Duerson's teammate at Northside High and his roommate at Notre Dame. He interned at a law firm, then for Indiana Senator Richard Lugar.

"Sports were the springboard," says his ex-wife Alicia, who met him at a bowl game his freshman year. "He made so many plans for such a young age and had the brains to pull it all off. He had a photographic memory, which used to make me mad, because he'd barely study and get A's, where I'd be up a week of nights and be happy to get a B." A four-year starter at Notre Dame and a team captain, Duerson was as proud of his degree in economics as of making All-American, which he did twice.

Duerson was nothing if not complicated. He had, besides ambition and swagger to burn, a deep well of kindness and soul. You could see it in the way he honored Muncie, returning each summer to run a camp for poor kids in memory of a high school friend who'd drowned, and you could hear it later from the teens he sent to college after making it big with the Bears. "Everything he did was a teaching tool," says Michael Gorin, a family friend and retired teacher from Muncie whose son Brandon attended Duerson's

camp and went on to play nine years in the NFL. "He had the Super Bowl rings but kept harping on academics. My son says they talk about him at Harvard."

Harvard would come later, after Duerson got done playing and commuted to Cambridge for an executive program at the business school. Long before that, though, he got a brawler's education when he showed up at Bears training camp as a third-round pick. He should have gone higher in the '83 draft, but his talk about law school and political aspirations probably set him back a round or two. Buddy Ryan, the great, brutish coordinator of Chicago's 46 defense, loathed rookies, especially rookies with more on their mind than earholing Packers. "He knew I'd gone to Notre Dame and asked if I was one of those doctors or lawyers," Duerson said in an interview he gave last year for a book about Americans turning 50. "I said, 'Yes, sir.' He said, 'Well, you won't be here long, because I don't like smart niggers'" – a comment Ryan has denied making.

Dan Hampton, a Hall of Fame lineman on that absurdly dominant Bears defense, offers a different take. "Buddy didn't care if you were black, white, or green: He wanted smashmouth, and Duerson wouldn't nail guys. In practice, Buddy'd yell, 'That shit ain't cuttin' it! You dive on the ground again, I'm firing you!'"

Duerson submitted to doing it Ryan's way and became a ferocious hitter. He mostly covered kicks his first two seasons and backed up Pro Bowl safety Todd Bell. Then, in '85, Bell held out for more money, and Ryan had no choice but to start Duerson. "I played through that whole season with [Buddy] telling me that he was rooting for me to screw up," Duerson said in a 2005 interview. "So I became an All-Pro myself." On that banzai unit, which jammed the line with 10 men, Duerson came screaming off the edge on blitzes. In 1986, his second season as a starter, he had seven sacks, a record for defensive backs that stood till 2005. He made the Pro Bowl four years running, a breakout star on a squad of loud assassins. Tellingly, it was Duerson who, with linebacker Otis Wilson, developed the unit's calling card. After an especially vicious shot, they'd stand over their victim, barking and baying like junkyard dogs.

Of course, football has a way of evening things up between predators and prey. In his 11-year run with the Bears, Giants (where he won another Super Bowl, in 1990), and Cardinals, Duerson suffered multiple minor concussions, though he was never knocked out cold. Emerging after games in a pair of dark glasses and wincing against the dusk, he'd complain of nausea and ringing headaches, says his ex-wife Alicia. "Dave would get concussed on the first or second series and play the whole way through, or get a dinger in the second half and be back at practice Wednesday morning," she says. "Dave had one speed, and that was full-out."

In the years to come, he'd have cause to rethink that, at least when it came to his kids. His middle son, Tregg, now a bank analyst in Chicago, was a highly regarded prep-school running back who'd go on to play defensive back at Notre Dame. One game in high school, Tregg was dazed from a tackle and wobbled off the field. Watching from the stands, Duerson ran down to the sideline and snatched Tregg's helmet so he couldn't return; at halftime he whisked him off to the hospital to be checked out. Tregg had a concussion. "Just to be on the safe side," says Alicia, "Dave wouldn't let him play for three games."
As his playing days dwindled, Duerson weighed his options, beginning with politics. "Both the Republican and Democratic parties in Chicago tabbed him to run for office," says Harold Rice, one of Duerson's oldest friends and the man who accompanied Alicia and Tregg to Florida after Duerson's death. "Dave wanted to be a difference maker, but realized pretty quick that it wasn't worth the scrutiny."

Rice, who owned a McDonald's, urged him to enter his business instead. Duerson opened a franchise in Louisville, Kentucky, his first year out of football, then got an attractive offer from a McDonald's supplier: There was an ownership opportunity in a meat-processing plant an hour outside Chicago. Duerson bought a controlling stake and, with his contacts and charm, promptly doubled the plant's

-2323-

revenue to more than $60 million a year. He bought himself a huge house in Highland Park, just up the road from Michael Jordan's place, engraved his jersey number, NFL 22, on the driveway pillars, and spent a bundle on exotic cars, including a midnight-blue Mercedes SL 600 with the vanity plate DD22. By then he'd had four kids with Alicia, had local sports talk shows on both radio and television, and was jetting off to Cambridge, Massachusetts, for months at a time for the executive program there. "Dave loved it at Harvard, getting to network with CEOs and bounce ideas off presidents of foreign companies," says Alicia. "When he took us to Europe, it was first class all the way: stretch limos, four-star dining, and -- his big dream – flying in the Concorde."

But friction eventually sparked between Duerson and his partner at the plant, who resented his comings and goings. In 2002, Duerson sold his interest to open his own processing plant nearby. It was the first big mistake in a life of shrewd decisions, and caught Duerson flat-footed, stunned by failure.

From the beginning, Duerson Foods had disaster written all over it. He shelled out millions to gut and double the factory's floor space, then borrowed heavily to buy state-of-the-art freezers from a company in the Netherlands. They were impressive to look at but so unsound that he had to postpone opening by six months. He fell behind on his schedule to supply Burger King and Olive Garden, and soon he was leveraged to the hilt. At his swank offices in Lincolnshire, Illinois, employees, some of them relatives, saw a change. His niece, Yvette Fuse, would call Rice in a panic to say that "Dave was berating people, acting mean." Duerson borrowed more, using his house as collateral, and sued the freezer maker. He won a $34 million judgment, but the company filed for bankruptcy and never paid him a dime. By 2006, creditors were raining down lawsuits, and Duerson, broke and heartsick, shut the plant. He'd lost his mother to a heart attack and his house to the finance company, and his father was ailing with Alzheimer's (he died in 2009). "The pressure on him was phenomenal," said Rice. "It would've taken Superman not to break."

As it turned out, Duerson had broken, if briefly. In February 2005, he and Alicia drove to South Bend for a meeting of Notre Dame's board of trustees, of which he was a member. During a small-hours argument at their hotel, he threw her out the door of their room into the hallway wall. Alicia suffered cuts to her head and went to the ER with dizziness and pain. Duerson was charged with several misdemeanor counts and later pleaded guilty to domestic battery. In an interview, he called that night "a three-second snap," but it was played up big in the Chicago papers and forced his resignation from Notre Dame's board of trustees. Alicia, looking back now through the prism of his death, sees a clear demarcation in his conduct. The old Dave, she says, "would never do that; he never showed violence toward me. It was the changes," she says of his new hair-trigger temper, sudden downshifts in mood, and lack of impulse control – all signs of brain trauma.

His missteps, meanwhile, were beginning to throw shade on his fine reputation in the game – a reputation he'd carefully nursed since the day he entered the league. As a rookie in Chicago, Duerson had been chosen by his teammates to be the Bears' union representative. He was the son of a strong labor man at General Motors and "wanted to make things better for the guys," says Alicia.

For more than 60 years, the owners had run roughshod over the players, shackling stars to teams and imposing whatever terms they liked in collective negotiations. Duerson deftly held the Bears together through the bitter 1987 strike and beyond, and became a key adviser to, and close friend of, Gene Upshaw, the union's chief executive. "The two of them traveled together, even during the season, to talk to players about their rights," says Alicia. "Dave believed in the cause with all his heart and set himself to learning about labor laws so he could explain it clearly to the guys."

In 1992 and 1993, the players finally turned the tables in a pair of historic trials in federal court. Duerson was a featured plaintiff in one, and his tour de force performance on the witness stand helped fray the owners' resolve to keep on fighting. "He was so knowledgeable on the facts and spoke them so

beautifully that you could really feel the tide start to turn," says ESPN.com legal analyst Lester Munson, who covered the trial for Sports Illustrated.

The owners grudgingly cut a deal, awarding free agency and a broad slate of rights to players. Among the key gains was the creation of a board to hear the disability claims not only of active players but of retirees whose injuries prevented them from holding a job. The board was composed of six trustees (three each of management and union members, the latter being appointed by Upshaw), and the disability money, many hundreds of millions of dollars, was funded almost entirely by owners.

Right from its inception, though, an odd thing happened: In case after case before the board, former players were denied assistance or put through a maze of second opinions and paperwork. Men with bent spines and diced joints were told they could still hold a paying job and so were ineligible for aid. Then there were the veterans coming forward in their 40s and 50s with the brain scans of aging boxers who also had their claims voted down by the board. "They made it real clear that they'd fight me to the death, like they did with Mike Webster," says Brent Boyd, a Vikings guard in the '80s who suffers from clinical depression related to brain trauma. (Webster, the Hall of Fame center of the Steelers, was profoundly impaired by CTE and lived out of his truck at times before he died at 50.) "They were supposed to push for us, but were in the owners' pockets. You had to live in a wheelchair to collect."

In 2006, a particularly fraught time in the struggles between veterans and the players union, Upshaw decided to name his old friend Duerson to the pension board. This seemed a peculiar choice at best: Duerson had been out of the sport for a decade, was tarnished by the recent incident in South Bend, and ran a company that was coming apart. Any doubts about Duerson – and Upshaw's critics had plenty – were quickly ratified by his demeanor. The man who'd been so eloquent in federal court under the grilling of NFL lawyers was barging around town like a pit bull on crank, attacking former players at every turn. At a congressional hearing in 2007 to investigate the ex-players' charges, Duerson started a shoving match with Sam Huff and Bernie Parrish, two former greats speaking out for injured vets. He maligned Brent Boyd to a Senate committee, questioning whether his documented brain woes were actually caused by football. He took to talk radio to disparage Mike Ditka, saying his old coach, who'd raised money for vets, had never cared about his players' health. The worst of it, though, was his sliming of Brian DeMarco, a crippled veteran with several crushed vertebrae who'd gone public about his rejection by the union. Duerson tore into him on a call-in radio show, deriding him as a liar and an insurance fraud, then appeared on a Chicago TV program to ambush DeMarco in person.

His mad-dog behavior was very much in line with the way he voted on claims. Says Cy Smith, the lawyer who won a landmark lawsuit on behalf of Mike Webster's estate: "I get dozens of these files coming across my desk – stark, sad cases of guys really banged up – and the vast majority of these judgments are 6–0 against the players. That's a gross breach of practice by the board and a clear pattern of bias against paying." That Duerson was siding with management – and, apparently, Upshaw – is no surprise to his critics. Says Huff, the New York Giants Hall of Fame linebacker: "Dave wanted Gene's job when he finally stepped down, and was saying and doing whatever Gene wanted, or whatever he thought he wanted." Indeed, Duerson told people he'd been handpicked by Upshaw to succeed him as union chief, a position that paid nearly $7 million a year and was essentially a lifetime appointment. When Upshaw died in 2008, Duerson didn't get the post (attorney DeMaurice Smith did), though he retained his seat on the board.

Whatever Duerson's motives for voting against veterans, they ran counter to a life spent helping others. At Duerson Foods, he'd paid the healthcare premiums for his factory-floor workers and footed the college tuition for kids from inner-city Chicago. That doesn't assuage the retired players he turned down, whose rancor isn't softened by his death. "He caused more suffering personally than all the other board members combined," says Boyd. Adds John Hogan, a lawyer who assists former players with their disability

-2325-

claims: "He really could've changed the story for vets, and done it from the inside without saying mea culpa. He didn't have to indict the system. All he had to do was say, publicly, 'I'm sick, and I need help like these other guys.' "

The last years of his life, duerson knew he was in decline. He'd gotten divorced from Alicia in 2009 and fled to Florida in glum retreat, dropping out of sight for months on end. (He'd bought the condo, in the twin-tower Ocean One, in Sunny Isles Beach, as a winter house in 2000, but hadn't much used it until he moved in.) On his trips to Chicago to see his kids, he'd complain to Alicia about persistent headaches and frightening spells of blurred vision. "He thought at first he was getting old, but seemed more concerned as time went on," she says. His memory was shot, he wasn't sleeping much, and he had to ask her directions to get around Chicago – a town he'd known cold for 25 years. "He could hide the changes from friends and such, but he couldn't hide them from me. He'd say, 'Remember the time we did such and such?' as if to prove he wasn't fading, but he was."

He was a step above flat broke and trying to hide that, too. He hocked his wedding ring and Rolex watch, unloaded a newer Mercedes and his beloved Harley, and borrowed heavily against the equity in his apartment, though he'd put the place in trust for his four children. Even so, he couldn't make his child-support payments or keep up with his condo fees, and the stress and shame compounded his symptoms and began, it seemed, to derange him.

Says Ron Ben-David, who took over as building manager at the Ocean One towers in 2008: "I called Dave down and asked him politely why he hadn't paid his dues in almost a year. He told me someone had broken into his closet and stolen three paintings he'd bought in Cuba, and unless we reimbursed him the $7,000, he wasn't going to pay the arrears." But Duerson hadn't phoned the cops about his loss or filed an insurance claim, and ultimately paid his back-maintenance fees via wire transfer. A year later, his checks stopped coming again, and again Ben-David called him down. "He said, 'Well, someone stole my paintings. Aren't you going to reimburse me?' And this time they were worth $30,000."

"He was definitely getting worse. I could hear it over the phone," says Alicia. "He was trying to reinvent who he was at 50, and that's hard even when you're thinking straight." Duerson talked a lot about having "irons in the fire" – some deals in the works with Costco and the USDA – but nothing ever seemed to pan out. When he filed for bankruptcy in Florida last year, he showed annual expenditures of $74,000, an income of less than $34,000, and a consulting business whose only assets were the furniture and equipment in his study. His one frail hope, a Hail Mary, was to get hired as a coach in the NFL. Last fall he phoned Steve Zucker, his former agent, and asked him to make some calls on his behalf. At the time, he had several ex-teammates running teams – Jeff Fisher, then with the Titans, Mike Singletary, then with the 49ers, and Leslie Frazier, who'd taken over in Minnesota – all three also proud alumni of that great Bears defense of the '80s. "His plan was to get a position-coach thing or a job in someone's front office," says Zucker, once a Chicago superagent who is now in his 70s and mostly retired. "I talked to him all the time and had no idea. He sounded so positive on the phone."

With the exception of Alicia and a couple of his old cronies, Duerson told no one how grim things had gotten or how badly his symptoms had unhinged him. He holed up in Florida, where he avoided his neighbors. Beyond the occasional visit from one of his kids, the only break in the deepening gloom was a last-chance love affair. He'd met Antoinette Sykes in May 2010 at a business conference in Las Vegas, where he gave a talk to aspiring entrepreneurs about growing and selling a million-dollar company. By summer, he and Sykes, who owns her own PR and marketing firm in Washington, D.C., were speaking or texting 10 times a day and flying to each other's homes for weeklong stays. In the fall, he proudly showed her off to building manager Ben-David, calling her his "angel" and fiancée. They were scheduled to be married in April 2011, when his daughter, who would be on spring recess, could attend.

-2326-

10/1/2014
Case 1:15-cv-07232-KBF Document 62-2 Filed 08/30/15 Page 7 of 7
Men's Journal Magazine - Men's Style, Travel, Fitness and Gear

"What we shared was so sacred and joyful," Sykes said over the phone from D.C. "I knew he had headaches and – and a lump on his skull that he was worried about, but what I'm reading in the papers now about his brain, it's thrown me for such a loop. Maybe he wanted to shield me, but he seemed so excited about spending the rest of our lives together. On our last night, Valentine's, he joked that I owed him 29 more because we'd committed to 30 years of wedded bliss. And then I flew home to pack my things to move down there…" She breaks off, convulsing.

On February 17, Sykes woke up in Washington to a text from Duerson. It began, "My dear Angel, I love you so much and I'm sorry for my past, but I think this knot on my head is the real deal." Sykes called him, heard nothing back, and became frantic as the morning passed. Sometime after two that afternoon, she called Ben-David and asked him to knock on Duerson's door. When no one answered, she faxed him her permission to use a spare key. "I got the door open, but there was a chair wedged against it. That's when I called 911," he says. Paramedics and cops arrived and pushed their way in. "I heard them in the bedroom, yelling 'Sir! Sir! Is everything all right?' Then they asked me to leave," says Ben-David. Duerson was found shortly after 3 pm. He had shot himself about 12 hours earlier. Apart from the large patch of blood beneath him, the place was immaculate, said Miami-Dade police officers. Veteran detectives, they said they'd never seen a suicide planned and executed so meticulously.

In the months after his death, Duerson has become a wedge for practically anyone with a connection to the sport. The media has mostly lined up with 'Time' magazine, which called him "football's first martyr." Ex-players have sourly mocked his sanctification, denying him any credit for calling attention to CTE in death when he could have worked for justice while alive. Even his Bears teammates are badly split: Some are saddened and shocked by his death, while others deem him selfish and arrogant – "political to the end," groused a former lineman. The dissonance was put best by his son Tregg, now 25. "I just wish he'd played baseball," he told the New York Times five days after Duerson died. But, he added, sobbing, that his father "was looking for an answer and was hoping to be part of an answer."

At some point, it's hoped, Duerson's motives will matter less than the long-haul impact of his passing. A tremor has gone through the league, deep and wide; players are talking openly about football and brain cells and fretting over their own neural health. "Is it something that I think about? Yeah, absolutely," Baltimore Ravens center Matt Birk told the Times. He's one of more than a hundred current and former players who've signed over their brains for postmortem study at Boston University. You'd expect forward thinking from a Harvard grad like Birk, rated the sixth-smartest man in sports by Sporting News last year. But the message is getting across to less cerebral types, too. Jim McMahon, the ex-passer and party monster who loved to celebrate touchdowns with ringing head butts, is battling serious memory problems and has also agreed to send his brain to Boston. "What the fuck do I need it for when I'm dead?" he says. That gesture, if not the sentiment, will be part of the answer to the questions Duerson lived and died to raise.

# EXHIBIT 75

Case 2:15-20702-DAB Doct 30-2 5 *Page 435iled Date 7.14 FID 08280543

Blogs » Dave Zirin » Are Head Injuries the Bridge Between the NFL Playing Field and Domestic Violence?



# Dave Zirin

Follow @EdgeofSports    38.5K followers          RSS Feed

*Where sports and politics collide.*

# Are Head Injuries the Bridge Between the NFL Playing Field and Domestic Violence?

*Dave Zirin* on September 21, 2014 - 7:13 PM ET

Share    Tweet    g+1



*NFL Commissioner Roger Goodell (AP Photo/Seth Wenig)*

There is an unspoken question lurking behind the NFL domestic violence cover-up saga that has emerged over the last month. It is whether the brutality of the game, particularly head injuries, plays a role in the prevalence of players committing acts of violence against women. The NFL has a vested interest in not having this discussion. On head injuries, as the title of the award-winning book said so clearly, it remains "a league of denial." If, in the name of public relations, the owners won't have a discussion about the connection between their sport and horrific post-concussive syndromes like ALS and early-onset dementia, are they really going to talk about links between head injuries and domestic violence? The sports media are largely in denial about this topic as well, as there was not one question in Roger Goodell's instantly infamous Friday press conference about whether the league would investigate whether brain injuries could be the bridge between the violence at work and the violence at home.

Yet many domestic violence advocates are also—understandably—not thrilled with this line of discussion. Partner abuse occurs in all walks of life, all professions and among all income groups, and post-concussive syndromes are almost always not a part of those stories. Additionally, to blame it on concussions seems to be excusing domestic violence and denying the fact that NFL players have agency and choice before becoming abusers. This resistance is very understandable. But attempting to explore and explain the shockingly high rates of domestic violence in the NFL is not the same as excusing it.

So is there a connection? As my friend Ruth, who is a DV counselor, says, "When it comes to

-2329-

domestic violence, it is extremely difficult to generalize across the board, in the NFL or otherwise." In other words, every case is distinct, reflecting the interpersonal relationships of the parties involved. But there are factors that appear to show themselves in the football cases with alarming regularity. Some of these factors are high rates of stress, a culture of entitlement for sports stars that predates their life in the NFL, and an inability to turn off the violence of the game once the pads are off. This is when we see the most toxic part of the sport's hyper-masculinist culture poison the relationships between the men who play the game —as well as the men who own teams—and the women in their lives. But among many players, this question of the role of head injuries still lingers in the background.

Dan Diamond over at *Forbes* is one of the few journalists I have seen explore these links in detail. In one piece, he cites a "disturbing new report" that shows "3 in 10 NFL players suffer from at least moderate brain disease." Diamond then details many examples of former players who were found in their autopsies to have the repetitive post-concussive syndromes known as CTE, and were also arrested at some point or another for domestic violence. He writes:

> The key issue is whether suffering *repeated head trauma* lowers a person's self-control. And while many pro football players haven't been diagnosed with concussions in the NFL, nearly all of them have been playing football since they were young and suffered repetitive, frequent blows that can add up over time. And researchers know that those concussions can change a person. Even a pillar of the community.

This connects anecdotally with much of my own research. Over the last two months, I have spoken with three different women whose husbands are or were NFL players. All three are domestic violence survivors. In one case, the marriage was mended and endures to this day. In one case, it ended in divorce. In one case it ended with the suicide of the player in question. Yet that is where the differences ended. The similarities were stunning. In all three cases, the violence was precipitated either by migraine headaches or self-medicating—drugs or alcohol —to manage migraines. In all three cases, the survivors spoke about their NFL husbands becoming disoriented or light-sensitive, easily frustrated and quick to anger in ways that did not exist earlier in the relationship. In all three cases, they spoke about bizarre looks on their husbands' faces when they committed the abuse, from a chillingly peaceful calm to quizzical smiles. Whatever the look, they spoke of being in the presence of someone they "did not recognize."

**Please support our journalism. Get a digital subscription for just $9.50!**

I also spoke with Matt Chaney, a former college football player and author of the book *Spiral of Denial: Muscle Doping in American Football* , about whether he believed there was a causal link between concussions and domestic violence. He e-mailed me back the following. "I can't speak as medical authority on any link but as a journalist and academic who's read and filed tens of thousand documents on football hazards from violence to drugs, and one who's interviewed a thousand people, along with being a former college player who has knowledge of countless athletes and their relationships, I believe football brain injuries lead many players to violence they wouldn't otherwise have committed, ranging from domestic cases to random acts.… I think brain injuries, after studying the topic as we all have in recent years, now explains much about the perplexing cases of violence and other irrational behavior among football players I've known. And while I thought I abhorred street fighting, before college football, I found myself nearly involved with or nearly instigating such trouble on more than one occasion while I was in full-contact activity, fall and spring practices, banging my head. If I didn't have headache after a college contact session, I didn't think I'd done anything."

This question, of course, has profound implications well beyond the sport. It is about the choice families make whether to let their children play tackle football. It is about the health and safety of women in relationships with NFL players, and whether recognizing warning signs of CTE can create opportunities for intervention before abuse takes place. It is about the degree

Case 2:12-md-02323-AB Document 6201-6 Filed 10/08/2014 Page 437 of 1235

to which the league's very violence bears some complicity in their abuse. This is a difficult question, one Roger Goodell is loathe to discuss. That is exactly why we need to keep asking it.

# EXHIBIT 76

Sign In

# THE LEGAL EXAMINER

10  06  2014  **Headline:** HBO Real Sports to Examine Link Between NFL Concussions and Domestic Violence  2 weeks ago



[Search]

## Kansas City, Missouri

Home › Missouri › Kansas City





Brett Emison

Attorney • (866) 735-1102 Ext 461

### Will NFL & NFLPA Admit Concussion Link to Domestic Violence?

**Posted by Brett Emison**
**September 16, 2014 8:32 AM**

5 comments

[Tweet]  Recommend ⟨ 84 ⟩  [8+1]  [Share]

SUBSCRIBE TO THE LEGAL EXAMINER

Keep up with the latest updates using your favorite RSS reader



click here for
**LIVE CHAT**
ONLINE NOW

The Legal Examiner Kansas City is brought to you by Langdon & Emison

**Langdon & Emison**
**(800) 397-4910**
www.langdonemison.com

911 Main St
P.O. Box 220
Lexington, Missouri 64067
[Show Map]

1828 Swift Ave
Suite 333
North Kansas City, Missouri 64116
[Show Map]

55 W. Monroe
Suite 3700
Chicago, Illinois 60606
[Show Map]

110 East Lockwood
St. Louis, Missouri 63119
[Show Map]



By now, most of America has seen (or at least heard about) the horrific video show NFL running back Ray Rice knocking out his fiancee in an elevator and then dragging her out into a casino hotel. You've also heard about problems with NFL running back Adrian Peterson or defensive end Greg Hardy or defensive end Ray McDonald. Most of America has also heard about the issue of concussions plaguing current and former NFL players. Most - if not all - of the media have been treating these issues as separate "crises" for the NFL and NFLPA. But science and medicine suggest we should be looking at these issues as symptoms of the same problem.

Medical science has told us for years that brain injury is linked to violent acts. In 2013, the Toronto Sun reported that athletes who experienced repeated head injuries have an increased risk of becoming angry and violent. 73% of the young men studied were described as "explosive"; 64% were described as "out of control"; and 68% were described as physically violent.

An 8-year study published by the University of Michigan School of Public Health in the journal *Pediatrics* "does support some of the sports research that's been going on with concussions." Researchers noted that long-term effects of head trauma can include changes in cognition, language, emotion, irritability, impulsiveness, and violence.

> "Head injuries range along a continuum from athletic concussions to traumatic brain injury suffered in war or a result of an accident. This study looks at head injuries from a broad perspective and confirms previous findings about the connection between violence and head injuries."
>
> - Lead author, Sarah Stoddard, Ph.D, via PsychCentral



LANGDON
& EMISON
ATTORNEYS AT LAW



View firm profile

The study found that violent effects could be seen quickly following a head injury.

Researchers studied the timing between a head injury and violent behavior and found that an injury reported in year seven of the study predicted violent behavior in year eight.

"We found that the link between a head injury and later violence was stronger when a head injury was more recent, even after controlling for other factors including previous violent behavior," Stoddard said.

- Rick Hauert, Ph. D. at PsychCentral

According to the group, synapse, people suffering head trauma may develop behaviors leading to domestic violence.

We all tend to let our hair down with family, as opposed to strangers or acquaintances. Of course, after a brain injury a person's interpretation of letting hair down may be well beyond what most would consider acceptable, particularly if their self-awareness has been affected. They may justify their violence by saying that others provoked them, not realizing that the brain injury has increased their sensitivity to stress and decreased their ability to handle it.

The frontal lobe is often damaged in brain injury. This area of the brain is involved in reasoning, problem solving and controlling our more basic instincts such as anger. An individual who has sustained a brain injury has often lost these skills and therefore may have trouble controlling anger and violent outbursts. In many cases brain injured individuals often lose some of the social judgment capabilities and are not effectively able to reason out the appropriateness of either their own behavior or the behavior they expect from others.

- synapse, Domestic Violence and Brain Injury

 A 2005 study noted that aggressive behavior after a concussion or other traumatic brain injury includes explosive behavior that can be set off by minimal provocation and occur without warning. A number of studies have found frontal and prefrontal injuries or other abnormalities in people prone to impulsive aggression and violence. The frontal lobe and prefrontal network generally control impulse and behavioral reactions to provocation. Uninjured people are able to control negative feelings voluntarily and can process restraint-producing cues from their environment, including facial and vocal signs of anger or fear. However, when frontal and prefrontal areas of the brain are injured, victims are less able to control their emotions and impulses. They are also more prone anger, aggression, and violence.

> For More Information About
> NFLPA Concussion Lawsuits
> Click Here

Why have we not seen any discussion of the link between concussions and other head trauma and domestic violence in the NFL? Just last Friday, the NFL dumped piles of data showing the severe risk its players are at for traumatic brain injury. According to the NFL data, nearly 30% of players will suffer brain injury significant enough to result in moderate-to-severe dementia. Twice the rate of the regular population at age 71.

**Personal Injury Lawyers Serving:** Langdon & Emison tries cases across the country from offices in St. Louis and near Kansas City. Greater Kansas City areas include Kansas City, Independence, Lee's Summit, Blue Springs, Raytown, Gladstone, Liberty, Grandview, Belton, Sedalia, Warrensburg, Marshall, Raymore, Excelsior Springs.

**Archives**

Select Month ▼

**Categories**

Automobile Accidents
Defective & Dangerous Products
FDA & Prescription Drugs
Head & Brain Injuries
Mass Transit (Airline, Cruise Ship, Train, Bus)
Medical Devices & Implants
Medical Malpractice
Miscellaneous
Nursing Home & Elder Abuse
Property Owner's Liability (Slip & Fall)
Spinal Cord Injuries
Toxic Substances
Tractor-Trailer Accidents
Uncategorized
Workplace Discrimination
Workplace Injuries
Wrongful Death



Greg Hardy - found guilty of domestic violence in July 2014 - suffered a concussion during the 2010 NFL season. The other players in the news have not had a concussion documented on an injury report, but each of them is likely to have suffered numerous head traumas in their grinding NFL careers. Ray Rice even bragged that new NFL rules prohibiting running backs from using the crown of their helmet to contact defenders outside the tackle box would not change his running style.

> "I don't like it," Rice told the Ravens' official web site. "I'm just telling you right now, there's not going to be a guy that's going to be able to get a free lick on me and think it's all right. I will defend my case, and I will defend myself as a runner."
>
> ***
>
> Rice and others contend that it's impossible for a back to protect himself without dipping his head and making contact.
>
> "If I'm in the open field and you're coming at me and I'm coming at you, and I lower my shoulder and I get flagged, I'll appeal it," Rice said. You're going to protect yourself as a runner. Not one running back, you ask anyone in the league, not one is going to change their game."
>
> - Kareem Copeland, NFL.com

It just makes sense that when the NFL generates a higher-than-normal level of brain injury, it generates a higher-than-normal level of domestic violence.



Since 2000, there have been 83 domestic violence arrests of NFL players, making this by far the

NFL's worst category with a relative arrest rate of 55.4%. As Benjamin Morris at FiveThirtyEight, points out, this is "extremely high relative to expectations."

> That 55.4 percent is more than four times worse than the league's arrest rate for all offenses (13 percent), and domestic violence accounts for 48 percent of arrests for violent crimes among NFL players, compared to our estimated 21 percent nationally.
>
> Moreover, relative to the income level (top 1 percent) and poverty rate (0 percent) of NFL players, the domestic violence arrest rate is downright extraordinary.
>
> – Benjamin Morris at FiveThirtyEight

No one is defending the actions of these players off the field. I'm certainly not doing that here. A brain injury can never be an excuse for domestic violence. But why hasn't the league and why hasn't the Players Association made the link between the level of brain injury and the level of domestic violence when the science is so strong and so straightforward.

The NFL and the NFLPA have a concussion and brain injury problem. The league and the Players Association have a domestic violence problem. But the science suggests they are not separate problems at all.

When the NFL has already acknowledged significant brain injury resulting in dementia in almost 30% of its players, why isn't the league and – more importantly – why isn't the NFLPA doing something more to protect these players and their families?

**Read More:**

- Domestic Violence and Brain Injury [synopse]
- Breaking the Silence: Violence as a Cause and a Consequence of Traumatic Brain Injury [Jean Langlois at Brain Injury Professional magazine via brainline.org]
- Ray Rice: New helmet rule won't change my game [Kareem Copeland at NFL.com]
- The Rate of Domestic Violence Arrests Among NFL Players [Benjamin Morris at FiveThirtyEight]
- Violence and Aggression – The Dana Guide [Antonio Damasio at The Dana Foundation]
- Study: 30% of Former NFL Players Will Develop Dementia
- NFL Star Suffering Memory Loss After Concussion Injuries
- More Players Join Concussion Lawsuits Against NFLPA

© Copyright 2014 Brett A. Emison

Follow @BrettEmison on Twitter.

**Tags:** Adrian Peterson, Aggression, Alzheimer's, Alzheimer's Disease, Brain Injury, Class Action, Concussion, CTE, Dementia, Domestic Violence, Greg Hardy, Head Trauma, Lawsuit, Litigation, NFL, NFLPA, Parkinson's, Parkinson's Disease, Players Association, Ray McDonald, Ray Rice, Settlement, TBI, Violence

**-2336-**

# EXHIBIT 77

JOURNAL OF NEUROTRAUMA 30:1299–1304 (July 15, 2013)
© Mary Ann Liebert, Inc.
DOI: 10.1089/neu.2012.2690

**Short Communications**

# Profile of Self-Reported Problems with Executive Functioning in College and Professional Football Players

Daniel R. Seichepine,[1,2] Julie M. Stamm,[2] Daniel H. Daneshvar,[2] David O. Riley,[2] Christine M. Baugh,[2] Brandon E. Gavett,[3] Yorghos Tripodis,[4] Brett Martin,[5] Christine Chaisson,[5] Ann C. McKee, M.D.,[1,2,6–8] Robert C. Cantu,[2,9,10] Christopher J. Nowinski,[2] and Robert A. Stern[1,2,7,10]

## Abstract

Repetitive mild traumatic brain injury (mTBI), such as that experienced by contact-sport athletes, has been associated with the development of chronic traumatic encephalopathy (CTE). Executive dysfunction is believed to be among the earliest symptoms of CTE, with these symptoms presenting in the fourth or fifth decade of life. The present study used a well-validated self-report measure to study executive functioning in football players, compared to healthy adults. Sixty-four college and professional football players were administered the Behavior Rating Inventory of Executive Function, adult version (BRIEF-A) to evaluate nine areas of executive functioning. Scores on the BRIEF-A were compared to published age-corrected normative scores for healthy adults Relative to healthy adults, the football players indicated significantly more problems overall and on seven of the nine clinical scales, including Inhibit, Shift, Emotional Control, Initiate, Working Memory, Plan/Organize, and Task Monitor. These symptoms were greater in athletes 40 and older, relative to younger players. In sum, football players reported more-frequent problems with executive functioning and these symptoms may develop or worsen in the fifth decade of life. The findings are in accord with a growing body of evidence that participation in football is associated with the development of cognitive changes and dementia as observed in CTE.

**Key words:** chronic traumatic encephalopathy; executive function; football; traumatic brain injury

## Introduction

**T**RAUMATIC BRAIN INJURY (TBI) is a significant public health problem. It is estimated that approximately 1.7 million TBIs occur in the United States annually, resulting in emergency department visits, hospitalization, or death, with direct and indirect costs totaling approximately $76.5 billion a year.[1–3] Moderate to severe TBI (sTBI) is associated with a wide range of long-term cognitive deficits.[4] Though early research focused on the effects of moderate to sTBI, attention has increasingly turned to the long-term consequences of repetitive mild TBI (mTBI), such as that experienced by contact-sport athletes. It has been estimated that 1.6–3.8 million sport-related mTBIs occur annually,[5,6] with the greatest number occurring in football.[7,8] With over 60 million youth and adolescents participating in organized sports each year, a number that increased by 16 million from 1997 to 2008, sport-related TBI is an important and growing public health concern.[9,10]

The recent deaths of several high-profile athletes have resulted in significant public and scientific interest in the long-term effects of mTBI and chronic traumatic encephalopathy (CTE), a progressive neurodegenerative disease linked to repetitive brain trauma. Helmet sensor data indicate that football players can experience more than 1000 hits to the head over the course of a season.[11] This repetitive exposure has been associated with the development of CTE and changes in cognition, mood, and behavior that begin in the fourth to fifth decade of life and eventually progress to dementia.[12–17] Epidemiological studies indicate that professional football players are at least four times more likely to receive a diagnosis of memory impairment or dementia and have at least a three times greater risk of dying from a neurodegenerative disease, compared to the general population.[17,18] To date, all cases of neuropathologically confirmed CTE have had a history of repetitive brain trauma; therefore, repetitive brain trauma appears necessary for the development of the disease.[15,19] However, brain trauma alone is insufficient to lead to

---

[1]Boston University Alzheimer's Disease Center and [2]Center for the Study of Traumatic Encephalopathy, Boston University School of Medicine, Boston University, Boston, Massachusetts.
[3]Department of Psychology, University of Colorado at Colorado Springs, Colorado Springs, Colorado.
[4]Department of Biostatistics and [5]Data Coordinating Center, Boston University School of Public Health, Boston University, Boston, Massachusetts.
[6]Neurology Service, Veterans Affairs Boston Healthcare System, Jamaica Plain, Massachusetts.
Departments of [7]Neurology and [8]Pathology, Boston University School of Medicine, Boston, Massachusetts.
[9]Department of Neurosurgery, Emerson Hospital, Concord, Massachusetts.
[10]Department of Neurosurgery, Boston University School of Medicine, Boston University, Boston, Massachusetts.

neurodegeneration in all individuals (i.e., not everyone with repetitive TBI gets CTE).[15]

To date, relatively few studies have examined cognitive functioning in football players during life. Amen and colleagues found that active and retired football players scored in the bottom 50th percentile on three indices (attention/mental control, memory, and reasoning) of a computerized assessment of neuropsychological status.[20] Former university hockey and football players who sustained concussions have been found to perform worse on measures of memory and attention/executive function decades after their last concussion.[21] These studies indicate that executive functioning is impaired in former contact-sport athletes many years after the athlete's last exposure to brain trauma.

The long-term effects of repetitive brain trauma on cognition have yet to be examined using a standardized self-report measure of executive function. The Behavior Rating Inventory of Executive Function, adult version (BRIEF-A) was chosen for this study because of its use in clinical neuropsychological assessments and well-established normative data. Additionally, reports indicate that the BRIEF-A is sensitive to early executive deficits, before they might typically present on objective measures of cognitive function.[22] The aim of this study was to examine executive function in current and retired college and professional football players, a group at high risk of exposure to repetitive mTBI, using the BRIEF-A. We hypothesized that these football players would report more-frequent problems with executive functioning than healthy, same-age control participants. Because CTE symptoms typically present in the fourth or fifth decade of life, we hypothesized that football players over 40 years of age would report more-frequent problems than younger athletes.

## Methods

This project was part of an ongoing longitudinal study examining cognitive function in current and former athletes. Inclusion criteria include being at least 18 years old and having a history of participation in organized sports at any level of competition. Recruitment methods include the following: (1) inclusion of the study on the Center's website and the website of the Sports Legacy Institute; (2) lectures and presentation at a variety of events for athletes at all levels of play; and (3) word of mouth. All participants are self-referred. This larger project (the Longitudinal Examination to Gather Evidence of Neurodegenerative Disease; LEGEND), requires completion of yearly telephone interviews and online questionnaires. Participants are sent an e-mail link to complete the online questionnaires, which include self-report measures of cognition, mood, and performance on activities of daily living. Demographic characteristics, athletic experience, and concussion history, as well as participant and family medical and psychiatric history, are also obtained. Subsequent to completion of the online questionnaires, participants are contacted by phone to complete the telephone interview. The present study included all college and professional football players in the LEGEND study at the time of data analysis.

### Participants

Participants included 64 male current and retired football players, ranging from 25 to 81 years of age (mean, 47.0; standard deviation, 13.6). All LEGEND participants with a history of participation in college or professional football were selected for analysis. The football players were grouped by highest level achieved and age greater than or equal to 40. Demographic and athletic characteristics of the groups are listed in Table 1. All participants provided informed consent for the protocol approved by the Boston University Medical Center Institutional Review Board (Boston, MA).

### Measures and procedures

Participants completed an online version of the BRIEF-A, a 75-item self-report measure of executive functioning in everyday activities over the past 30 days. Participants were instructed to answer the following question for each statement: ''During the past month, how often has each of the following behaviors been a problem?'' Responses use a three-point scale, scored as follows: never = 1; sometimes = 2; and often = 3. Higher scores indicate worse executive function. These responses yield an overall composite score (Global Executive Composite; GEC), two index scores [Behavioral Regulation Index (BRI) and Metacognition Index (MI)], and the following nine clinical scales: Inhibit; Shift; Emotional Control; Self-Monitor; Initiate; Working Memory; Plan/Organize; Task Monitor; and Organization of Materials. Each clinical scale includes 6–10 items. The BRI index is composed of the Inhibit, Shift, Emotional Control, and Self-Monitor

TABLE 1. DEMOGRAPHIC CHARACTERISTICS

| Characteristic | AP (n = 64) | CF (n = 35) | PF (n = 29) | <40 (n = 22) | ≥40 (n = 42) |
|---|---|---|---|---|---|
| Mean age, years (SD) | 47.0 (13.6) | 45.9 (14.1) | 48.3 (13.0) | 33.0 (3.9)† | 54.3 (10.8) |
| Age range | 25–81 | 25–78 | 27–81 | 25–39 | 41–81 |
| Education (terminal degree) | | | | | |
| High school/GED, % | 1.6 | 0 | 3.4 | 0 | 2.4 |
| Associates/certification, % | 1.6 | 2.9 | 0 | 4.5 | 0 |
| Bachelor's degree, % | 65.6 | 57.1 | 75.9 | 68.2 | 64.3 |
| Master's or doctoral degree, % | 31.3 | 40 | 20.7 | 27.3 | 33.3 |
| Athletic history | | | | | |
| Total years of football (SD) | 13.0 (5.1) | 9.5 (2.7) | 17.2 (3.9)* | 11.8 (4.3) | 13.6 (5.4) |
| Years played in college (SD) | 3.7 (1.0) | 3.3 (1.3) | 4.2 (.51)* | 3.7 (1.1) | 3.9 (0.85) |
| Years played professionally (SD) | 3.0 (4.1) | N/A | 6.4 (3.6) | 2.2 (3.8) | 3.6 (4.2) |
| Professional: college | N/A | N/A | N/A | 8:14 | 21:21 |
| Number of concussions (SD) | 350.8 (2516.0) | 24.9 (23.8) | 758.1 (3771.7) | 22.8 (223.2) | 526.7 (3117.8) |

<40 indicates players 39 years of age and younger, whereas ≥40 indicates players 40 or more years of age.
*Significant differences between CF and PF (alpha = 0.05).
†Significant differences between <40 and ≥40 ( p < 0.05).
AP, all players; CF, college players; PF, professional players; SD, standard deviation; GED, General Educational Development.

subscales, and the MI index is composed of the Initiate, Working Memory, Plan/Organize, Task Monitor, and Organization of Materials subscales.

Concussion history was obtained during a phone interview. Participants were provided the following definition of concussion:

"Some people have the misconception that concussions only happen when you black out after a hit to the head or when the symptoms last for a while. But, in reality, a concussion has occurred anytime you have had a blow to the head that caused you to have symptoms for any amount of time. These include: blurred or double vision, seeing stars, sensitivity to light or noise, headache, dizziness or balance problems, nausea, vomiting, trouble sleeping, fatigue, confusion, difficulty remembering, difficulty concentrating, or loss of consciousness. Whenever anyone gets a ding or their bell rung, that too is a concussion"

Based on this definition, participants were asked to state approximately how many total concussions they have had during their life.

### Statistical analysis

Scores on the BRIEF-A were converted to age-appropriate T scores based on published normative data, which include 1050 participants selected to proportionally represent the U.S. population in regard to sex, race/ethnicity, education, and geographic region.[23] Elite football players may differ from this normative population in several ways, including exposure to repetitive brain trauma, physical stature (height and weight), educational attainment (generally higher), health (alcohol use, heart disease, arthritis, chronic pain, orthopedic issues, number of surgeries, depression, dementia, and use of medications), and health-related behaviors (increased alcohol use, decreased smoking, and illicit drug use).[24] For comparison of mean scores with normative data, one-sample $t$-tests were performed. For between-group comparisons, $t$-tests for two independent samples were performed. When indicated by Levene's test for equality of variances, degrees of freedom were adjusted to account for unequal variances. Because there were cases with zero counts in some cells, rates of clinically elevated scores (i.e., percent of individuals with a T score $\geq 65$) were compared to additional normative data using Fisher's exact test. For the overall composite score (GEC) and index scores (BRI and MI), an alpha level of 0.05 was adopted. To control for type I errors, analyses of the nine clinical scales were conservatively adjusted for multiple comparisons using Bonferroni's correction (0.05/9 = 0.006). Analyses of the individual clinical scales were performed when significant group effects were observed on the overall composite score or one of the two index scores.

### Results

#### Comparison between college and professional football players

Effects of competition level (i.e., professional vs. college) on the overall composite score and the two index scores were examined by independent sample $t$-tests. Scores on the GEC were similar between groups ($t(44.2) = 2.0$; $p = 0.06$). Professional and college football players indicated similar functioning on the BRI index ($t(49.3) = 1.9$; $p = 0.06$), but the professional athletes reported more-frequent executive functioning problems on the MI index ($t(42.7) = 2.4$; $p < 0.05$). Analyses of clinical scales revealed similar ratings between groups at each of the nine scales (all $p$ values > 0.006). Given the similarity between groups, data from college and professional football players were combined for subsequent analyses.

#### Comparison between football players and normative data for healthy adults

Effects of participation in football were examined by one-sample $t$-tests comparing age-adjusted T scores with the known population mean of 50. Significant group differences were observed on GEC ($t(63) = 5.4$; $p < 0.05$), MI ($t(63) = 5.3$; $p < 0.05$), and BRI ($t(63) = 5.2$; $p < 0.05$). Analyses of the clinical scales indicated significant group effects on seven of the nine scales: Inhibit ($t(63) = 5.8$; $p < 0.006$); Shift ($t(63) = 4.4$; $p < 0.006$); Emotional Control ($t(63) = 4.9$; $p < 0.006$); Initiate ($t(63) = 4.6$; $p < 0.006$); Working Memory ($t(63) = 6.6$; $p < 0.006$); Plan/Organize ($t(63) = 3.9$; $p < 0.006$); and Task Monitor ($t(63) = 4.8$; $p < 0.006$). Differences between groups on Organization of Materials reached the corrected alpha level of 0.006, but was not below this threshold ($t(63) = 2.8$; $p = 0.006$), and groups were similar on Self-Monitor ($t(63) = 1.4$; $p = 0.16$). Across all scales, the football players indicated worse functioning than the normative sample.

Rates of clinically elevated scores (i.e., T scores $\geq 65$) between groups were examined by Fisher's exact test. Significant group differences emerged on GEC ($x^2(1, n = 90) = 9.1$; $p < 0.05$), MI ($x^2(1, n = 90) = 13.3$; $p < 0.05$), and BRI ($x^2(1, n = 90) = 8.5$; $p = 0.05$). Analyses of the clinical scales indicated significant group effects on five of the nine scales: Inhibit ($x^2(1, n = 90) = 8.5$; $p < 0.006$); Shift ($x^2(1, n = 90) = 7.9$; $p < 0.006$); Initiate ($x^2(1, n = 90) = 9.1$; $p < 0.006$); Working Memory ($x^2(1, n = 90) = 13.3$; $p < 0.006$); and Plan/Organize ($x^2(1, n = 90) = 11.1$, $p < 0.006$). The rate of clinically elevated scores was similar between groups on the remaining four scales: Emotional Control ($x^2(1, n = 90) = 5.9$; $p = 0.02$); Self-Monitor ($x^2(1, n = 90) = 5.6$; $p = 0.02$); Task Monitor ($x^2(1, n = 90) = 4.5$; $p = 0.05$); and Organization of Materials ($x^2(1, n = 90) = 2.0$; $p = 0.27$). Across all scales, the football players had higher rates of clinically elevated scores than the normative sample.

#### Comparison between younger and older football players

Effects of age group (i.e., < 40 vs. $\geq 40$ years) on the overall composite score and the two index scores were examined by independent sample $t$-tests. Older athletes indicated more-frequent problems overall ($t(62) = 2.7$; $p < 0.05$), on the BRI ($t(56.0) = 3.3$; $p = 0.05$); and on the MI indices ($t(62) = 2.1$; $p < 0.05$), when compared to younger athletes. Analyses of clinical scales revealed group differences on two of the nine scales. Older football players indicated experiencing more problems on the Emotional Control ($t(62) = 2.9$; $p < 0.006$) and Initiate ($t(55.8) = 3.2$; $p < 0.006$) clinical scales. Scores on the remaining scales were similar between groups, including Inhibit ($t(57.7) = 1.8$; $p = 0.08$), Shift ($t(62) = 2.5$; $p = 0.01$), Self-Monitor ($t(62) = 2.7$; $p = 0.01$), Working Memory ($t(62) = 1.4$; $p = 0.16$), Plan/Organize ($t(62) = 1.9$; $p = 0.07$), Task Monitor ($t(62) = 2.5$; $p = 0.02$), and Organization of Materials ($t(62) = 1.5$; $p = 0.14$; see Table 3).

#### Correlations between BRIEF-A and athletic history

Correlations between BRIEF-A scores, self-reported concussions, and years playing football were determined by Pearson's correlation coefficients for all participants, separately for level of play and age groups. The number of self-reported concussions was log-transformed because of the non-normal distribution of these data. Overall, 56 of the 64 participants (87.5%) reported experiencing 55 or fewer concussions. For the remaining 8 participants, 6 reported experiencing between 100 and 140 concussions, 1

Table 2. Comparison of Age-Adjusted T Scores between Football Players (College and Higher) and Normative Data for Healthy Adults on the BRIEF-A

| | Football players[a] | | Football[a] vs. healthy adults[b] | | |
| --- | --- | --- | --- | --- | --- |
| | Mean (SD) | Percent of T scores ≥65 | T-score p value | Cohen's d | T scores ≥65 p value |
| Index scores | | | | | |
| BRI | 58.2 (12.8) | 26.6 | 0.000* | 0.81 | 0.004* |
| MI | 59.4 (14.2) | 37.5 | 0.000* | 0.91 | 0.000* |
| GEC | 58.9 (13.2) | 28.1 | 0.000* | 0.87 | 0.002* |
| Clinical scales | | | | | |
| Inhibit | 58.4 (11.5) | 26.6 | 0.000* | 0.85 | 0.004* |
| Shift | 56.3 (11.4) | 25.0 | 0.000* | 0.63 | 0.005* |
| Emotional Control | 58.0 (13.0) | 26.6 | 0.000* | 0.79 | 0.015 |
| Self-Monitor | 52.3 (13.0) | 18.8 | 0.159 | 0.23 | 0.018 |
| Initiate | 58.1 (14.1) | 28.1 | 0.000* | 0.79 | 0.002* |
| Working Memory | 62.4 (15.0) | 37.5 | 0.000* | 1.20 | 0.000* |
| Plan/Organize | 56.9 (14.1) | 32.8 | 0.000* | 0.67 | 0.001* |
| Task Monitor | 57.6 (12.6) | 28.1 | 0.000* | 0.75 | 0.035 |
| Organization of Material | 54.3 (11.9) | 14.1 | 0.006 | 0.43 | 0.162 |

Scores from football players were compared to age-adjusted normative data published in the BRIEF-A manual.
[a]$n = 64$.
[b]$n = 1050$.
*Significant group differences (index scores, alpha < 0.05; clinical scales, alpha < 0.006).
BRI, Behavioral Regulation Index; MI, Metacognition Index; GEC, Global Executive Composite; SD, standard deviation.

reported experiencing approximately 350 concussions, and 1 reported experiencing approximately 20,000 concussions. These analyses were performed to determine if total years of play and/or number of concussions contributed to the between-group findings. In the overall sample, total number of years played correlated with Working Memory ($r = 0.29$; $p < 0.05$), and number of self-reported concussions correlated with Emotional Control ($r = 0.26$; $p < 0.05$) and Initiate ($r = 0.32$; $p < 0.05$). In the younger than 40 group,

Table 3. Comparison Between Age-Adjusted T Scores on BRIEF-A between Players Younger and Older Than 40 Years

| | Football players less than 40 years of age (n = 22) | Football players 40 and older (n = 42) | p value |
| --- | --- | --- | --- |
| Index scores[a] | | | |
| BRI* | 52.0 (9.4) | 61.5 (13.2) | 0.002 |
| MI* | 54.5 (13.9) | 62.0 (13.8) | 0.043 |
| GEC* | 53.1 (10.7) | 62.0 (13.5) | 0.010 |
| Clinical scales[b] | | | |
| Inhibit | 55.3 (8.5) | 60.1 (12.5) | 0.075 |
| Shift | 51.5 (9.9) | 58.8 (11.4) | 0.014 |
| Emotional Control* | 51.9 (9.9) | 61.2 (13.4) | 0.005 |
| Self-Monitor | 46.5 (10.1) | 55.4 (13.4) | 0.008 |
| Initiate* | 51.4 (10.5) | 61.6 (14.6) | 0.002 |
| Working Memory | 58.7 (12.0) | 64.3 (16.2) | 0.158 |
| Plan/Organize | 52.4 (11.8) | 59.2 (14.7) | 0.067 |
| Task Monitor | 52.4 (10.9) | 60.4 (12.7) | 0.015 |
| Organization of Material | 51.2 (10.3) | 55.9 (12.5) | 0.138 |

All means and standard deviations are reported.
[a]Alpha level = 0.05.
[b]Alpha level was adjusted to 0.006.
*Statistically significant.
BRI, Behavioral Regulation Index; MI, Metacognition Index; GEC, Global Executive Composite.

number of self-reported concussions correlated with Inhibit ($r = 0.54$; $p < 0.05$). In the older than 40 group, total number of years played correlated with Working Memory ($r = 0.37$; $p < 0.05$). No other correlations were significant.

## Discussion

In this study, we examined a self-report measure of executive function in current and retired college and professional football players, a group with high exposure to repetitive brain trauma. Overall, we found that football players reported more-frequent problems with executive function in everyday activities, when compared to published normative data for healthy individuals of the same age and representative of the U.S. population in regard to sex, race/ethnicity, education, and geographic region. Scores were elevated overall, as well as on specific indices of the ability to control behavior and emotional responses and the ability to methodically solve problems through planning, organization, and sustaining effort. Despite higher scores overall, considerable variability was observed across participants, indicating that not all elite football players experience executive dysfunction.

It should be highlighted that the football players reported a normal frequency of problems on monitoring the effects of their behavior on others. Taken together, this profile suggests that football players may be aware of any effects they may have on others, but are unable to change their behavior because of weaknesses in thinking flexibly and inhibition. It is plausible that this may contribute to depression observed in former athletes with CTE.[15] It should be emphasized that executive dysfunction has several etiologies, and not all football players with these symptoms will develop CTE.

Consistent with our hypothesis, football players 40 years of age and older reported more frequent problems with the ability to control behavior and emotional responses, even after the data were corrected for age. This finding provides additional evidence to suggest that problems with executive function in football players develop or worsen after 40 years of age. Alternatively, differences between age groups could be a cohort effect, reflecting changes in professional

football over the decades (e.g., development of new protective equipment or differences in individuals that choose to participate). Longitudinal studies are needed to better understand this finding.

Although we believe this study has several strengths, there are also a number of important limitations that require discussion. Scores on the BRIEF-A were compared to normative data, which is not an ideal comparison group for elite athletes. Future studies would benefit from having a comparison group of elite non-contact-sport athletes. If results were similar, the findings would further suggest that this executive dysfunction results from repeated mTBI. Because of recent publicity surrounding CTE and the self-referral in our study, it may be that only symptomatic individuals who were concerned about their cognitive functioning volunteered. If this were the case, however, we would have expected to observe very few scores in the normal range. In contrast, nearly one third (31.3%) of the participants had overall scores at or below the expected value for their age (i.e., T score of 50), and for the majority of participants (71.8%), the overall score was below the clinically meaningful threshold (i.e., T score of 65). Because of the inclusion of current and recently retired players, it is possible that some of the executive function problems reported stem from residual postconcussive syndrome. In this case, we would have expected to find higher scores in the younger players. In contrast, we observed higher scores in football players older than 40. Given the retrospective nature of this study, it is impossible to determine whether these findings stem from the effects of participation in football or whether individuals with these characteristics seek out this sport initially. Future prospective studies examining change in executive function over time are needed. Although the BRIEF-A has good convergent validity with other questionnaires, future studies will benefit from also using objective measures of executive functioning in addition to self-report measures. Finally, we did not exclude individuals with a history of repeated brain trauma from participation in other contact sports or non-sport-related TBIs, which may have also affected the results.

In summary, our results indicate that college and professional football players experience more problems with executive functions in everyday activities than would be expected for their age, and these symptoms appear to develop or worsen in the fifth decade of life. Future longitudinal studies are needed to confirm these initial results. The findings are in accord with a growing body of evidence that participation in football may be associated with the development of cognitive changes and dementia observed in individuals with CTE.

## Acknowledgments

This work was supported by the Boston University Alzheimer's Disease Center (NIA P30 AG13846, supplement 0572063345-5), the National Institutes of Health (R01NS078337), a grant from the National Operating Committee on Standards for Athletic Equipment, the Sports Legacy Institute, the Center for the Integration of Medicine and Innovative Technology, and an unrestricted gift from the National Football League. A portion of this research was presented at the 2012 Military Health System Research Symposium, in Fort Lauderdale, FL, August 13–16, 2012.

The authors thank all the individuals who participated in this study. Brian Stamm and Andrew Brennan provided expert technical support.

## Author Disclosure Statement

No competing financial interests exist.

## References

1. Faul, M Z.L., Wald, M.M., and Coronado, V.G. (2010). Traumatic brain injury in the United States: emergency department visits, hospitalizations, and deaths. Centers for Disease Control and Prevention, National Center for Injury Prevention and Control: Atlanta, GA.
2. Control C.f.i.P.a. (2003). Report to Congress on mild traumatic brain injury in the United States: steps to prevent a serous public health problem. Centers for Disease Control and Prevention: Atlanta, GA.
3. Finkelstein, E., Corso, P., and Miller, T. (2006). The Incidence and Economic Burden of Injuries in the United States. Oxford University Press: New York.
4. Dikmen, S.S., Corrigan, J.D., Levin, H.S., Machamer, J., Stiers, W., and Weisskopf, M.G. (2009). Cognitive outcome following traumatic brain injury. J. Head Trauma Rehabil. 24, 430–438.
5. Langlois, J.A., Rutland-Brown, W., and Wald, M.M. (2006). The epidemiology and impact of traumatic brain injury: a brief overview. J. Head Trauma Rehabil. 21, 375–378.
6. Daneshvar, D.H., Nowinski, C.J., McKee, A.C., and Cantu, R.C. (2011). The epidemiology of sport-related concussion. Clin Sports Med. 30, 1–17, vii.
7. Hootman, J.M., Dick, R., and Agel, J. (2007). Epidemiology of collegiate injuries for 15 sports: summary and recommendations for injury prevention initiatives. J. Athl. Train. 42,311–9.
8. Gessel, L.M., Fields, S.K., Collins, C.L., Dick, R.W., and Comstock, R.D. (2007). Concussions among United States high school and collegiate athletes. J. Athl. Train. 42, 495–503.
9. Promotion N.C.f.C.D.P.H. (2006). Behavioral risk factor surveillance system: exercise: Centers for Disease Control and Prevention: Atlanta, GA.
10. National Council of Youth Sports. (2008) Report on Trends and Participation in Organized Youth Sports. National Council of Youth Sports: Stuart, FL.
11. Gysland, S.M., Mihalik, J.P., Register-Mihalik, J.K., Trulock, S.C., Shields, E.W., and Guskiewicz, K.M. (2012). The relationship between subconcussive impacts and concussion history on clinical measures of neurologic function in collegiate football players. Ann. Biomed. Eng. 40, 14–22.
12. Omalu, B.I., DeKosky, S.T., Hamilton, R.L., Minster, R.L., Kamboh, M.I., Shakir, A.M., and Wecht C.H. (2006). Chronic traumatic encephalopathy in a national football league player: part II. Neurosurgery 59, 1086–1092; discussion, 1092–1093.
13. Omalu, B.I., DeKosky, S.T., Minster, R.L., Kamboh, M.I., Hamilton, R.L., and Wecht, C.H. (2005). Chronic traumatic encephalopathy in a National Football League player. Neurosurgery 57, 128–134; discussion, 134.
14. Omalu, B.I., Hamilton, R.L., Kamboh, M.I., DeKosky, S.T., and Bailes, J. (2010). Chronic traumatic encephalopathy (CTE) in a National Football League Player: case report and emerging medicolegal practice questions. J. Forensic Nurs. 6, 40–46.
15. McKee, A.C., Cantu, R.C., Nowinski, C.J., Hedley-Whyte, E.T., Gavett, B.E., Budson, A.E., Santini, V.E., Lee, H.S., Kubilus, C.A., and Stern, R.A. (2009). Chronic traumatic encephalopathy in athletes: progressive tauopathy after repetitive head injury. J. Neuropathol. Exp. Neurol. 68, 709–735.
16. McKee, A.C., Gavett, B.E., Stern, R.A., Nowinski, C.J., Cantu, R.C., Kowall, N.W., Perl, D.P., Hedley-Whyte, E.T., Price, B., Sullivan, C., Morin, P., Lee, H.S., Kubilus, C.A., Daneshvar, D.H., Wulff, M., and Budson, A.E. (2010). TDP-43 proteinopathy and motor neuron disease in chronic traumatic encephalopathy. J. Neuropathol. Exp. Neurol. 69, 918–929.
17. Guskiewicz, K.M., Marshall, S.W., Bailes, J., McCrea, M., Cantu, R.C., Randolph, C., and Jordan, B.D. (2005). Association between recurrent concussion and late-life cognitive impairment in retired professional football players. Neurosurgery 57, 719–726; discussion, 726.
18. Lehman, E.J., Hein, M.J., Baron, S.L., and Gersic, C.M. (2012). Neurodegenerative causes of death among retired National Football League players. Neurology 12, 1970–1974.
19. McKee, A.C., Stern, R.A., Nowinski, C.J., Stein, T.D., Alvarez, V.E., Daneshvar, D.H., Lee, H.S., Wojtowicz, S.M., Hall, G., Baugh, C.M., Riley, D.O., Kubilus, C.A., Cormier, K.A., Jacobs, M.A., Martin, B.R., Abraham, C.R., Ikezu, T., Reichard, R.R., Wolozin, B.L.,

Budson, A.E., Goldstein, L.E., Kowall, N.W., and Cantu, R.C. (2013). The spectrum of disease in chronic traumatic encephalopathy. Brain Jan 29. doi: 10.1093/brain/aws307.

20. Amen, D.G., Newberg, A., Thatcher, R., Jin, Y., Wu, J., Keator, D., and Willeumier, K. (2011). Impact of playing American professional football on long-term brain function. J. Neuropsychiatry Clin. Neurosci. 23, 98–106.

21. De Beaumont, L., Theoret, H., Mongeon, D., Messier, J., Leclerc, S., Tremblay, S., Ellemberg, D., and Lassonde, M. (2009). Brain function decline in healthy retired athletes who sustained their last sports concussion in early adulthood. Brain 132, 695–708.

22. Rabin, L.A., Roth, R.M., Isquith, P.K., Wishart, H.A., Nutter-Upham, K.E., Pare, N., Flashman, L.A., and Saykin, A.J. (2006). Self- and informant reports of executive function on the BRIEF-A in MCI and older adults with cognitive complaints. Arch. Clin. Neuropsychol. 21, 721–732.

23. Roth, R.M., Isquith, P.K., and Gioia, G.A. (2005). *BRIEF-A: Behavior Rating Inventory of Executive Function—Adult Version: Professional Manual*. Psychological Assessment Resources: Lutz, FL.

24. Weir, D.R., Jackson, J.S., and Sonnega, A. (2009). National football league player care foundation. Study of retired NFL players. Institute for Social Research, University of Michigan, 1–37.

Address correspondence to:
*Robert A. Stern, PhD*
*Center for the Study of Traumatic Encephalopathy*
*Boston University*
*72 East Concord Street, Suite B7800*
*Boston, MA 02118*

*E-mail:* bobstern@bu.edu

# EXHIBIT 78





### REGRESSING (/)



REGRESSING

(/)

Search

# Can Science See Inside An NFL Player's Skull Before It's Too Late? (http://regressing.deadspin.com/5920006/can-science-see-inside-an-nfl-players-skull-before-its-too-late)



(http://kylenw.kinja.com)

Kyle Wagner (http://kylenw.kinja.com)

Filed to: BAD BRAINS (/TAG/BAD-BRAINS)   6/21/12 9:00am (http://regressing.deadspin.com/5920006/can-science-see-inside-an-nfl-players-skull-b

66,140   🔥   2   ★   ▼

EXPAND



Chronic traumatic encephalopathy, or CTE, is a diagnosis for dead people. Last month, Junior Seau was found in his home in Oceanside, Calif., with a fatal self-inflicted gunshot wound to the chest. A familiar sequence unfolded: His brain was requested by both the Brain Injury Research Institute and Boston University's Center for the Study of Traumatic Encephalopathy—the two main brain banks chasing damage in former football players. If the family consents, the brain will be sliced open and put under a microscope.

Given Seau's profession and the nature of his demise, the expectation is that the tissues will show a buildup of a protein called tau, creating tangles like the ones found in victims of Alzheimer's disease. But so what? It's one more brain, to go with the 60-plus brains of former players who have already demonstrated postmortem signs of CTE.

The question, after a decade of brain-slicing autopsies, is when any of this will help players before they're dead. Doctors can't just crack open living patients' skulls and lop off slices of their brains to stick under a microscope.

But new research at UCLA is using a cutting-edge biomarker that can attach itself to tau protein tangles so that they show up on PET scans of living subjects. Dr. Gary Small is currently running a pilot study on retired NFL players, imaging their brains in place. If he is successful, his work would reorient the science of head injuries around saving lives instead of merely contextualizing deaths.

"I've always sort of thought of tau imaging as the holy grail on the issue of chronic brain damage, especially CTE," said Dr. Julian Bailes, one of the founders of the Brain Injury Research Institute (BIRI).

**-2345-**

The grail isn't in handsets but the market that patients would pay to among the most promising of them is the hundreds of research projects seeking to make CTE something other than an after-the-fact conclusion. Tools to see CTE in living players, tests and techniques honed on other forms of brain damage that may be able to track the disease's progress—science is trying to get inside the skull, before it's too late.

## At The Frontier Of Head-Injury Science

In 2009, the NFL, under heavy fire from the House Judiciary Committee, acknowledged for the first time the long-term consequences of concussions. Since then, the league's ideas about how to protect the living have focused on improving the equipment (better helmets and thighpads) and conspicuously fining defensive players for especially gruesome-looking hits. Non-NFL-affiliated studies have tended to coalesce around those issues. We've measured the force of collisions in mouthguards and pads, and we know the effect of those anti-concussion helmets, too.

But taken as a whole, the efforts to quell or at least understand CTE have been, to this point, a mix of the cynical, the haphazard, and the fatalistic. There is real value in gathering data about the force of impacts, but the context has often been backward-looking, substantiating science that's no longer really in question. The brain donation and autopsy, for instance, is now more of a mourning rite than a marshalling of fresh evidence.

The NFL has been too busy cosseting itself against any potential legal liability and seeking out second opinions to ask the only question left: What now? The frontiers of CTE research—living patient diagnosis, prevention, risk assessment, *cures*—have been largely left unexplored.

(The NFL did announce a promising study (http://www.nytimes.com/2011/10/04/sports/football/nfl-plans-more-scientific-study-of-concussions.html) late last year, but there have been few details since about when and how it might launch. And it's now been essentially outflanked by a new joint study (http://espn.go.com/blog/ncfnation/post/_/id/62166/b1g-ivy-doing-vital-work-on-concussions) between the Big Ten and the Ivy League that will get underway this year.)

It's not as if the league hasn't had time to do real homework. It's been 10 years since Dr. Bennet Omalu first cut into Mike Webster's brain and discovered CTE, and seven years since Omalu's work appeared in the July 2005 issue of *Neuroscience*, where it was shouted down by the NFL.

Dozens of dead men's brains later, the disbelievers have mostly come around. At its core, CTE is a neurodegenerative brain disease, not much different from Alzheimer's, Parkinson's, or early-onset dementia. It breaks part of your brain, and that affects how you behave and function. But unlike other cases of cognitive decline, we believe we know the root cause: repeated blunt head trauma.



The research could have a profound effect on the NFL and possibly the NCAA. Being able to track the buildup of tau (pictured) is the key to any future serious player safety regime.

While we don't have a cure for CTE's closest analogs, having that starting point makes a big difference. If we can see how the disease unfolds, we have a chance of stopping it. Thus: Gary Small's UCLA research into scanning living subjects. It's funded by BIRI, which was founded by Omalu, Bailes, and Robert Fitzsimmons.

At the center of the study is a patented radioactive biomarker that Small co-invented for diagnosing Alzheimer's disease. The marker attaches itself to both tau protein tangles and amyloid plaques, the two elements necessary to diagnose Alzheimer's. There are other markers that attach to plaques, but this specific marker, $[^{18}F]FDDNP$, is the only one known to lock onto tau. In the absolute simplest terms, this is the only known substance in the world that can make CTE show up on a scan in living patients.

PET imaging tech is half a century old, and though FDDNP is relatively new, it's still been around for years. So it's strange to think about the marker being on the cutting edge of a fairly recently discovered brain disease. If the marker can find and pinpoint CTE, why hadn't anyone tried it before now? And for that matter, why isn't it already in use?

More than finding answers, science is about asking the right questions. For something like FDDNP to be tested on NFL players, the thought not only has to occur to someone, but that someone then has to get together some grants or other funding, and some applicable test subjects.

The case of something like PET imaging is doubly difficult because it isn't just a matter of injecting radioactive material into your patients and using a giant Geiger counter to see where it lands. Radiation exposure is tracked closely, and a person can receive only a limited number of scans per year, Small said, though he adds that "the only potential side effects people get from scans is a bruise where the IV goes in, or a backache from lying in the scanner."

Small, whose background is in geriatric psychology and Alzheimer's disease, came to CTE research when the chancellor of West Virginia University introduced him to Bailes, who was at WVU at the time. Small's initial study has been funded by BIRI, and Bailes helped refer retired players to Small to try out the scan.

The study is still a pilot program, and there's work to be done before it can be translated into something we can use to diagnose developing cases of CTE—mainly stemming from the fact that FDDNP locks onto not just tau, but the amyloid plaques as well. Still, a biomarker would be perhaps the most important development in the field since Omalu looked at a slide of Webster's brain and saw tau's telltale brown and red splotches (http://www.gq.com/sports/profiles/200909/nfl-players-brain-dementia-study-memory-concussions). Small couldn't share the specific results of his studies because they haven't been published yet, but he was confident. "We think this is going to be a very helpful way to better understand and identify people who are at risk," he said.

"We've autopsied more players than anyone—more than 30 now—and while the science is intriguing, we can only make the diagnosis after death," Bailes said. Small's work, he added, "gives us hope we'll be able to diagnose and identify risk in living patients."

If the scans are effective, they could have a profound effect on the NFL and possibly the NCAA. Being able to track the buildup of tau is the key to any future serious player safety regime. This would likely require regular PET scans—yearly, maybe, or twice a season. An extreme case of CTE—like Webster's—would have a better chance of being caught, especially in the latter stages of a player's career, when his protein levels would be higher.



*PET scan, similar to Small's work with CTE, of brain amyloid and tau in adults with Down syndrome.*

But even with reliable scans, the risk factors and the rate of tau accumulation would differ from player to player. So Small's group has been looking at ways to refine the risk assessment available to players. "We're looking at genetic factors, a player's position, other behaviors that worsen brain health like smoking or drinking," he said. He's also keeping an eye out for other signs or markers that could be used to identify tau. If, for example, a specific change in a patient's blood were to occur when there's a buildup of tau, maybe a blood test could offer an affordable and less-invasive alternative to the PET scan.

Cheaper alternatives are a crucial point, too. Right now, each scan costs about $5,000. The price could drop as more companies and groups license FDDNP from UCLA for research. But the scans still probably won't get into the range where the average high school or Division III college could afford to have their players tested multiple times a year.

## Knowing When To Stop

In Las Vegas, Dr. Charles Bernick is attacking the same problem from a different angle. Instead of looking for CTE itself, Bernick wants to know how the disease spreads and changes its victim over time. He's wrapping up the first year of an ongoing study tracking the cognitive health of over 100 boxers and MMA fighters, some of whom enlisted at the urging of a family member or spouse who'd started to notice changes in behavior. The goal of the study is to pinpoint when, exactly, a fighter should hang up the gloves.

The Professional Fighters Brain Health Study at the Cleveland Clinic's Lou Ruvo Center for Brain Health pulls from the center's experience with similar diseases, like Parkinson's, to develop a working *modus operandi* for attacking CTE as a traditional brain disease. (The difference, of course, is that those other diseases are a constant deterioration of brain function, while CTE is caused by intermittent brain trauma.) The study uses a combination of MRI scans and computerized cognitive tests—exercises ranging from simple memory tests to questions about what the

fighters did or felt or considered. It's hard now the subjects brains might change or degrade as their careers advance. If it can map the trajectory of CTE, we can not only extrapolate how much is too much, but use that information to begin working on cures or preventative measures—not just for boxing and MMA, but for all sports and occupations that pose a risk of CTE.

Bernick hasn't been in contact with the NFL. "It wouldn't be a bad idea in the field for all the oars to be rowing in the same direction," he said. "So if the NFL and hockey and the military were collecting core information, we'd learn a lot faster."

So far, Bernick's team has mapped out a regimen to test fighters at regular intervals for any signs of cognitive decline. The process, which involves computer-based cognitive tests, speech analysis, and thorough MRI scans, closely resembles the tests administered to Alzheimer's and EOD patients.

The MRI in particular is noteworthy. Like PET scans, it's an old technology that can be augmented by asking new and better questions. Specifically, Bernick is trying to hunt down CTE by measuring, comparatively, the size of certain parts of the brain over time, looking for swelling or scar tissue; comparing the brain's conductivity in a resting state to when it's active; and examining blood-vessel buildup, which happens around tau protein.

It's not as easy as just tossing a marker into the brain and firing up a PET scan, but it could be far more scalable outside of the lab.

There are some compromises, though, in the interest of making the test less time-consuming for fighters and other athletes. Unlike Alzheimer's diagnostics, for example, family and friends aren't brought in for cross-referencing on the cognitive tests, and there isn't a genetic analysis of close and distant relatives.

"There's way more that we need to do," Bernick said, "But we had to make it practical. The whole testing takes about two hours to do. It has to be tools you can use anywhere, and it's probably not realistic to expect everyone to go in for a two-hour neuropsych test, but maybe a 20-minute computerized test will do."

The preliminary findings have been suggestive. The fighters were split into three groups: those who had fought for fewer than six years, those who had fought for between six and 12 years, and those who had fought for more than 12 years. They showed a marked decline in cognitive ability from group to group. At six years, there was some drop-off; at 12 years, there was a much larger drop-off.

The six-year groupings were arbitrary, and the data will be shuffled some to try and get a more accurate line of demarcation. Year 2 also introduces retired fighters to the study, so new controls for age will have to be enacted, and more frequent check-ins would obviously be ideal. But for now, it's a starting point. Year over year, the data could be used to pick out different influences: genetic traits that might make humans resistant to CTE, various fighting styles, safe and dangerous layoff periods between fights.

And, of course, there will be post-mortem data. The clinic has made arrangements to supply many of the fighters' brains to one of the large brain banks involved in CTE research.

The important thing to remember about this research—all medical research, really—is that it's not looking to nail down a universal imperative. The surgeon general doesn't tell you the maximum number of cigarettes you're allowed to smoke, or the maximum poundage of cheeseburgers you should eat. So there will not be, say, a scientifically validated eight-year limit on fighting or contact sports. Instead, Bernick is hoping to build a tool for evaluating whether individual fighters should be allowed to continue fighting.

"If you're 38 years old and go to the [Nevada Athletic Commission] to be relicensed, what do they have to go on?" he said. "Maybe the last few fights' performance. But if there was information available to them, they would use it."

Bernick said his group has considered using information from the UCLA PET scans but is holding off because the marker isn't specific to tau itself, and there's still a chance that a tau-only agent will be found.

For their part, the fighters say that they're going to take the results seriously. "If they know that they're sustaining damage to their brain, they would stop," Bernick said. "Maybe a 22-year-old wouldn't say that, but it kind of evolves as you mature. I'm not sure totally people would ignore it. There are regulatory agencies who should be looking at this too. Hypothetically, if you fought eight years, you're required now to get an MRI scan once a year, or a computerized cognitive scan twice a year. If it's more severe, maybe you'd have to stop."

**Padding The Inside Of The Skull**

Brain injuries in football happen because of a phenomenon that Bailes, though an ex-jock himself, calls "brain slosh." "That's where the brain is free to move around inside the skull, regardless of helmets or external protection, because it floats inside a bath of fluid called Cerebral Spinal Fluid (CSF)," he explained. "Despite the fact that sports and the military looks at brain protection from the outside, we think you have to look at it from the inside."

In fact, Bailes is working on an absurdly simple accessory that could protect brains from being injured in the first place.



*A rendering of the "internal jugular vein compression device." Courtesy* Neurosurgery*.*

Think of it this way: In a collision, the brain is basically driving without a seatbelt or an airbag. While better helmets and the banning of helmet-to-helmet detonations might help keep your skull intact, they would do nothing to stop the brain from smashing into the windshield in even minor collisions. So how do you stop the brain from taking a beating on every routine block, tackle, and other impact—the real killers?

Bailes's answer to this brain slosh amounts to stuffing the whole car full of packing peanuts. His newest research takes groups of rats and puts a small, circular device around their necks, compressing their internal jugular veins. That increases the volume of blood in the skull, which creates added pressure on the brain, locking it in place. In theory, that should keep the brain's movement inside the skull more in line with the skull's own movement, allowing all the new space-age helmets to do their jobs.

So far, Bailes's team has seen a 30 percent increase in cranial pressure, and, after concussing the rats and examining the resulting computer models, an 80 percent drop in the precursors to amyloid protein. "This was only a proof-of-concept pilot study, and it hasn't been proven in humans, but we think the theory is sound," he said. "If it moves forward, we're going to expand to a broader group of patients, and we hope to do that sooner rather than later."

If the research can be replicated and no unforeseen safety concerns pop up—neither of which is guaranteed in research like this—there are already people and players volunteering as test subjects. Why wouldn't there be? If a simple necklace could reduce the accumulation of brain injury, and there is virtually no downside to wearing it, isn't that worth whatever minor discomfort it causes and a few hours a year of testing?

## Who Will Pay For The Future?

But for all the practical upside of these projects, it's hard to make ends meet. I asked Bernick where he hopes his project tracking fighters' brains will be in five or 10 years. He replied: "I mean, before anything else, we hope to still be here in five or 10 years. The major goal is to keep the thing going."

The fighter brain-health study costs about $250,000 a year, but that number's misleading, because so much of what goes into the study—tests, scans, and most crucially, man-hours—is donated by the Cleveland Clinic and its staff. "Without that much help, it would probably cost twice as much," Bernick said.

The NFL's latest collective bargaining agreement sets aside $100 million to put toward research, much of which is expected to go to brain injury. But so far, only $1 million has been distributed—to Boston University's CSTE. This issue of funding—in Las Vegas, in tau protein imaging, in all of the studies that haven't or won't get off the ground—is more difficult than it seems.

The Nevada Athletic Commission is deeply interested, and supportive, of the Cleveland study, as are big time fight promoters like Bob Arum's Top Rank and Oscar De La Hoya's Golden Boy. "Everybody at the gyms around here have been very great about this," Bernick said. But despite financial uncertainty, the study hasn't taken money from any of them. An interesting dilemma is where you get your funding, and conflicts of

interest," he explained. "Being someone who has requested funding, but if you get it any time down the road," he said, "and there's a conflict of interest, there can be a view of a conflict of interest." That's also why he hasn't reached into the NFL's $100 million pockets yet either, though he absolutely would if it came down to a decision to accept funding or discontinue the study.

For Small's research into the tau protein biomarker, it's partially a matter of getting the word out. Because FDDNP is owned by UCLA, it can be licensed to any pharmaceutical company that wants to use it for studies. (Siemens licensed the marker for non-CTE research for a few years, but ultimately abandoned it.) "That would help drive the cost down, especially for the scans, but we'd still need further grants," Small said. The group has applied for an NIH grant, and submitted several studies and ideas, but it hasn't found any additional funding. Would he consider turning to the NFL and its $100 million slush fund? "Absolutely," he said, "if there are no strings attached. I understand the financial pressure the NFL is facing, but I'd hope that they want what's best for the players."

What does it mean for the viability of brain-injury research if even tau biomarking—the holy grail—has trouble finding backers? The logical place to stage a project like that would be one of those huge, überprofitable biomedical conglomerates. That's not happening. For competitive reasons, the companies won't talk about business strategies and future plans on the record, but the implication is unmistakable: There is no money in it. Not yet, anyway.

As with the search for a tau protein biomarker, there just isn't the widespread need for continued research in CTE the way there is for other forms of brain deterioration. A representative at one company who asked to not be named explained that, while recent talk about pulling the military into the ongoing brain-injury discussion could go a long way toward making the financials work, it still wouldn't be enough. Despite all the attention it's gotten, a health crisis affecting wealthy young celebrities in America's most popular sport is still only a niche concern.

"It's not like cancer, where your constituency is everyone, or even Alzheimer's, where there are millions," he said. "We just don't get hit in the head very often."

*Kyle Wagner is a writer for Gizmodo (http://Gizmodo.com). Top image by Jim Cooke.*

# EXHIBIT 79



Neuron

Article

# Imaging of Tau Pathology in a Tauopathy Mouse Model and in Alzheimer Patients Compared to Normal Controls

Masahiro Maruyama,[1,10] Hitoshi Shimada,[1,10] Tetsuya Suhara,[1] Hitoshi Shinotoh,[1] Bin Ji,[1] Jun Maeda,[1] Ming-Rong Zhang,[1] John Q. Trojanowski,[2] Virginia M.-Y. Lee,[2] Maiko Ono,[1] Kazuto Masamoto,[1] Harumasa Takano,[1] Naruhiko Sahara,[3,5,6] Nobuhisa Iwata,[4] Nobuyuki Okamura,[7] Shozo Furumoto,[7] Yukitsuka Kudo,[8] Qing Chang,[9] Takaomi C. Saido,[4] Akihiko Takashima,[3] Jada Lewis,[5,6] Ming-Kuei Jang,[9] Ichio Aoki,[1] Hiroshi Ito,[1] and Makoto Higuchi[1,*]

[1]Molecular Imaging Center, National Institute of Radiological Sciences, 4-9-1 Anagawa, Inage-ku, Chiba, Chiba 263-8555, Japan
[2]Center for Neurodegenerative Disease Research, University of Pennsylvania Perelman School of Medicine, Third Floor HUP-Maloney, 36th and Spruce Streets, Philadelphia, PA 19104, USA
[3]Laboratory for Alzheimer's Disease
[4]Laboratory for Proteolytic Neuroscience
RIKEN Brain Science Institute, 2-1 Hirosawa, Wako, Saitama 351-0198, Japan
[5]Center for Translational Research in Neurodegenerative Disease
[6]Department of Neuroscience
University of Florida, 1275 Center Drive, Gainesville, FL 32610, USA
[7]Department of Pharmacology, Tohoku University Graduate School of Medicine, 2-1 Seiryo-machi, Aoba-ku, Sendai, Miyagi 980-8575, Japan
[8]Clinical Research, Innovation and Education Center, Tohoku University Hospital, 1-1 Seiryo-machi, Aoba-ku, Sendai, Miyagi 980-8574, Japan
[9]Institute for Applied Cancer Science, MD Anderson Cancer Center, 1901 East Road, Houston, TX 77054, USA
[10]These authors contributed equally to this work
*Correspondence: mhiguchi@nirs.go.jp
http://dx.doi.org/10.1016/j.neuron.2013.07.037

## SUMMARY

Accumulation of intracellular tau fibrils has been the focus of research on the mechanisms of neurodegeneration in Alzheimer's disease (AD) and related tauopathies. Here, we have developed a class of tau ligands, phenyl/pyridinyl-butadienyl-benzothiazoles/benzothiazoliums (PBBs), for visualizing diverse tau inclusions in brains of living patients with AD or non-AD tauopathies and animal models of these disorders. In vivo optical and positron emission tomographic (PET) imaging of a transgenic mouse model demonstrated sensitive detection of tau inclusions by PBBs. A pyridinated PBB, [11C]PBB3, was next applied in a clinical PET study, and its robust signal in the AD hippocampus wherein tau pathology is enriched contrasted strikingly with that of a senile plaque radioligand, [11C]Pittsburgh Compound-B ([11C]PIB). [11C]PBB3-PET data were also consistent with the spreading of tau pathology with AD progression. Furthermore, increased [11C]PBB3 signals were found in a corticobasal syndrome patient negative for [11C]PIB-PET.

## INTRODUCTION

Hallmark pathologies of Alzheimer's disease (AD) are extracellular senile plaques consisting of aggregated amyloid β peptide (Aβ) and intraneuronal neurofibrillary tangles (NFTs) composed of pathological tau fibrils, while similar tau lesions in neurons and glia are also characteristic of other neurodegenerative disorders, such as progressive supranuclear palsy (PSP) and corticobasal degeneration (CBD), that are collectively referred to as tauopathies (Ballatore et al., 2007). The discovery of *tau* gene mutations in a familial form of tauopathy, known as frontotemporal dementia and parkinsonism linked to chromosome 17 (FTDP-17), and subsequent studies of transgenic (Tg) mice expressing human tau with or without these mutations, clearly implicate pathological tau in mechanisms of neurodegeneration in AD and related tauopathies (Ballatore et al., 2007). Thus, there is an urgent need for tau imaging techniques to complement Aβ amyloid imaging methods that now are widely used.

In vivo imaging modalities, as exemplified by positron emission tomography (PET) (Klunk et al., 2004; Small et al., 2006; Kudo et al., 2007; Maeda et al., 2007), optical scanning (Bacskai et al., 2003; Hintersteiner et al., 2005), and magnetic resonance imaging (MRI) (Higuchi et al., 2005), have enabled visualization of Aβ deposits in humans with AD and/or AD mouse models, and there has been a growing expectation that low-molecular-weight ligands for β-pleated sheet structures will also serve as molecular probes for tau amyloids. Although the majority of plaque-imaging agents used for clinical PET studies do not bind to tau lesions (Klunk et al., 2003), at least one radiolabeled β sheet ligand, [18F]FDDNP, enables PET imaging of AD NFTs (Small et al., 2006). However, a relatively low contrast of in vitro autoradiographic and in vivo PET signals for [18F]FDDNP putatively reflecting tau lesions does not allow a simple visual inspection of images for the assessment of tau pathologies in living subjects





(Small et al., 2006; Thompson et al., 2009). Thus, better tau radioligands with higher affinity for tau fibrils and/or less nonspecific binding to tissues are urgently needed to complement high-contrast senile plaque imaging agents, including widely studied [$^{11}$C]Pittsburgh Compound-B ([$^{11}$C]PIB) (Klunk et al., 2004) and United States Food and Drug Administration-approved [$^{18}$F]florbetapir (Yang et al., 2012). In addition, [$^{18}$F]FDDNP and several other candidate tau probes do not bind to tau inclusions in non-AD tauopathy brains without plaque deposition (Okamura et al., 2005) and therefore can be clinically characterized only in AD patients with comingled Aβ and tau amyloids. Hence, compounds that detect diverse tau aggregates, including tau inclusions in non-AD neurodegenerative diseases and tau Tg models, could be used to interrogate in vivo interactions between exogenous ligands and tau pathologies.

Here, we found that the lipophilicity of β sheet ligands is associated with their selectivity for tau versus Aβ fibrils and that the core dimensions of these chemicals are major determinants of their reactivity with a broad spectrum of tau aggregates in diverse tauopathies and mouse models of tau pathology. Building on these observations, we developed a series of fluorescent compounds capable of detecting diverse tau lesions using optical and PET imaging in living Tg mouse models of tauopathies. Finally, we identified a radiotracer that produced the highest contrast for tau inclusions in animal PET and used it in exploratory in vivo imaging studies of AD patients, providing clear demonstration of signal intensification in tau-rich regions, in sharp distinction to [$^{11}$C]PIB-PET data reflecting plaque deposition.

## RESULTS

### Identification of PBBs as Ligands for Diverse Tau Inclusions in Human Tauopathies

We screened an array of fluorescent chemicals capable of binding to β sheet conformations (see the Compounds subsection in the Experimental Procedures). Fluorescence labeling with these compounds were examined in sections of AD brains bearing Aβ and tau amyloids (Figures 1A and 2A) and non-AD tauopathy brains characterized by tau inclusions and few or no Aβ plaques (Figure 2). Amyloid PET tracers currently used for human PET studies, PIB (Klunk et al., 2004), and BF-227 (Kudo et al., 2007), tightly bound to senile plaques, while they only weakly reacted with AD NFTs (Figures 1A; Figure S1 available online). PET probes reported to selectively label tau aggregates, BF-158 (Okamura et al., 2005) and THK523 (Fodero-Tavoletti et al., 2011), detected AD NFTs (Figures 2A and S1) but microscopically detectable fluorescence signals produced by FDDNP, which are presumed to bind to both Aβ and tau fibrils (Small et al., 2006), were consistent with dense cores of classic plaques and distinct from tau lesions (Figures 2A and S1). None of the above-mentioned PET ligands were reactive with tau inclusions in non-AD tauopathies, such as Pick bodies in Pick's disease (Figures 2A and S1) and neuronal and glial fibrillary lesions in PSP and CBD (data not shown). By contrast, these pathologies were intensely labeled with a widely used amyloid dye, thioflavin-S, and a derivative of another classic amyloid dye Congo red, (E,E)-1-fluoro-2,5-bis(3-hydroxycarbonyl-4-

hydroxy)styrylbenzene (FSB) (Higuchi et al., 2005; Maeda et al., 2007) (Figures 1, 2A, and S1), although these chemicals may not undergo efficient transfer through the blood-brain barrier (Zhuang et al., 2001). Because compounds possessing a π-electron-conjugated backbone longer than 13Å exhibited affinities for pathological inclusions in a broad range of tauopathies, we examined binding of additional chemicals with a variety of structural dimensions to tau aggregates and found that affinity for non-AD tau inclusions could be attributed to a core structure with a specific extent ranging from 13 to 19 Å (Figure S1). Based on this view and the known fact that chemicals with a flat and slender backbone could pass through and attach to channel-like accesses in β-pleated sheets (Krebs et al., 2005), we developed a class of compounds, phenyl/pyridinyl-butadienyl-benzothiazoles/benzothiazoliums (PBBs), by stretching the core structure of a prototypical fluorescent amyloid dye, thioflavin-T, with two C = C double bond inserts between aniline (or aminopyridine) and benzothiazole (or benzothiazolium) groups (Figure 1B).

All PBB compounds intensely labeled NFTs, neuropil threads, and plaque neurites in AD brains (Figure 1C). Interestingly, the affinity of these PBBs for Aβ plaques lacking dense cores was positively correlated with their lipophilicity (Figure 1C), and thereby three potential probes with relatively low logP (log of the octanol/water partition coefficient) values, including PBB3, 2-[4-(4-methylaminophenyl)-1,3-butadienyl]-benzothiazol-5,6-diol (PBB4) and PBB5 (structurally identical to Styryl 7, CAS registry number 114720-33-1), appeared suitable for visualizing tau pathologies in living organisms with reasonable selectivity. High-affinity of PBBs for tau lesions was further demonstrated by fluorometric analyses using Aβ and tau filaments assembled in a test tube (Table S1; experimental procedures are given in the Supplemental Experimental Procedures), but the most and least lipophilic PBB members displayed similar selectivity for in vitro tau versus Aβ pathologies, implying a methodological limitation in screening chemicals for tau-selective ligands based on binding to synthetic peptides and recombinant proteins. PBBs and FSB were also shown to label tau inclusions in non-AD tauopathies, such as Pick's disease (Figures 2A and S1), PSP, and CBD (Figure 2B), all of which were immunodetected by an antibody specific for phosphorylated tau proteins (AT8).

### In Vitro and Ex Vivo Fluorescence Imaging of Tau Lesions in Tau Tg Mice by PBBs

To obtain in vivo evidence of direct interaction between PBBs and tau lesions, we employed Tg mice expressing a single human four-repeat tau isoform with the P301S FTDP-17 mutation (PS19 line, see Figure S2 for neuropathological features of this Tg strain) (Yoshiyama et al., 2007). Similar to the findings in non-AD tauopathy brains, NFT-like inclusions in the brain stem and spinal cord of PS19 mice were clearly recognized by PBBs (Figures 3A and S1). We then performed ex vivo fluorescence labeling of tau lesions in PS19 mice with intravenously administered PBBs. Brains and spinal cords were removed 60 min after tracer injection, and fluorescence microscopy revealed an intense accumulation of these compounds in fibrillary tau inclusions abundantly seen throughout the sections by

Case 2:15-cr-00232-JAD   Document 20-2   Page 546   Filed 10/08/2021
Case 1:22-cr-00123-JAD   Document 20-2   Page 546   Filed 10/08/2021   Page 539

Neuron

Imaging of Tau Pathology in Model Mice and Humans



**Figure 1. Design and Characterization of PBB Compounds as Potential Imaging Agents for Tauopathies**

(A) Confocal fluorescence images of frontal cortex sections from an AD patient. Following fluorescence labeling (pseudocolors are converted to green) with PIB (top row) and FSB (middle row), the samples were immunostained with an antibody against AβN3(pE) (red in the right column). PIB intensely labeled Aβ plaques (white arrowheads) but did not clearly label NFTs (arrows). By contrast, NFTs and neuropil threads were intensely labeled by FSB, whereas the staining of diffuse plaques was negligible. A section was also doubly immunolabeled (bottom row) with AT8 (green) and anti-AβN3(pE) antibodies (red in the right panel), to demonstrate the abundance of tau and Aβ amyloids in this area. Yellow arrowheads indicate tau-positive dystrophic neurites associated with senile plaques.

(B) Structures of PBBs. Neutral benzothiazoles (PBB1-4) are newly synthesized chemicals, and a charged benzothiazolium, PBB5, is identical to a commercially available near-infrared laser dye.

(C) Confocal fluorescence images of PBBs (pseudocolors are converted to green) and AβN3(pE) (red in the right column) staining in sections adjacent to those displayed in (A). The intensity of plaque staining (arrowheads) relative to that of NFTs (arrows) was positively associated with the lipophilicity of PBBs. As compared with PBB1 (top row) staining, labeling of diffuse plaques with PBB3 (middle row) was substantially attenuated. PBB5 was nearly unreactive with diffuse plaques (bottom row), and subsequent double immunofluorescence staining of the same section (bottom row in C) illustrated good agreement of PBB5 labeling with the distribution of AT8-positive NFTs.

Scale bar, 50 μm (A and C). See also Figure S1 and Table S1.

| Compound | $R_1$ | $R_2$ | $R_3$ | $R_4$ | X | Y | ClogP |
|---|---|---|---|---|---|---|---|
| PBB1 | $CH_3$ | - | H | H | C(H) | N | 5.44 |
| PBB2 | H | - | H | OH | C(H) | N | 3.57 |
| PBB3 | H | - | H | OH | N | N | 3.30 |
| PBB4 | H | - | OH | OH | C(H) | N | 2.97 |
| PBB5 | $CH_3$ | $CH_3CH_2$ | H | H | C(H) | $N^+$ | 2.32 |

staining with thioflavin-S, FSB, and AT8 (Figure 3B). On the other hand, no overt in vitro (Figure 3A) or ex vivo (data not shown) fluorescence of these ligands was noted in the corresponding regions of non-Tg wild-type (WT) mice. Consistent with these observations, two-photon laser scanning fluorescence microscopy of ex vivo samples demonstrated somatic and neuritic staining of a subset of tangle-bearing neurons with intravenously injected 2-[4-(4-methylaminophenyl)-1,3-butadienyl]-benzothia-

zol-6-ol (PBB2) and PBB4 in unsliced spinal cord blocks from PS19 mice (Figure 3B).

**In Vivo Macroscopic and Mesoscopic Optical Detection of Fibrillar Tau Pathologies in a Mouse Model Using PBB5**

We next characterized PBBs with the use of in vivo fluorescence imaging modalities, which permitted a quick assessment of





**Figure 2. Binding of Tau Ligands to Tau Lesions in AD and Non-AD Tauopathy Brains**

(A) Double fluorescence staining of AD NFTs and Pick bodies (PBs) in Pick's disease with PBBs, other tau ligands, and anti-phospho-tau antibody (AT8). FSB and PBBs sensitively captured AD NFTs and PBs. AD NFTs were labeled with THK523. Meanwhile, PBs were not visualized by these compounds. NFTs and PBs were barely recognizable by using FDDNP.

(B) Double fluorescence staining of neuronal tau inclusions (arrows) in PSP and CBD and putative astrocytic plaques (arrowheads) in CBD. A substantial portion of tau fibrils in neurons were captured by PBB3 and PBB5, but a much smaller subset of phosphorylated tau aggregates in astrocytic plaques were labeled with these compounds.

Scale bar, 20 μm (A and B). See also Figures S2 and S3.

candidate chemicals without the need for radiolabeling. Because PBB5 is fluorescent, with peak excitation and emission wavelengths in a near-infrared range (Table S1), this compound is applicable to in vivo optical imaging of tau deposits in laboratory animals. To examine this possibility, fluorescence images were obtained from living mice over a time course following intravenous PBB5 injections using a small animal-dedicated system permitting the intravital observation of fluorescence signals at magnifications varying between macroscopic and microscopic levels. Tail vein administration of PBB5 in PS19 mice revealed strong fluorescence relative to non-Tg WT mice in the central nervous system (CNS) above the slit between the base of the skull and first vertebra, through the skin and connective tissues overlaying the cisterna magna (Figures S3A–S3D), suggesting a concentration of this tracer in the PS19 spinal cord. In line with this in vivo observation, the hindbrain and spinal cord of PS19 mice, which were dissected out at 2 hr after the injection of PBB5, exhibited increased retention of this compound compared to non-Tg WT mice (Figures S3E–S3G).

In vivo optical imaging of tau Tg mice was subsequently performed using a device equipped with a pulsed diode laser and a photomultiplier tube to detect deep signals through the skull. Elevated levels of fluorescence intensity were found in homogenized brain stem samples collected from PS19 mice at 20 hr after the intravenous tracer administration (Figure S4A), indicating a long-lasting in vivo binding of PBB5 to tau fibrils. To support

the ex vivo evidence, fluorescence intensity was noninvasively analyzed in living PS19 and non-Tg WT mice treated with PBB5. The mice, with their heads shaved in advance, were pre-scanned, and autofluorescence signals were detected at a relatively high level in an area corresponding to the frontal forebrain. Using these baseline signals as landmarks, regions of interest (ROIs) were defined in the frontal cortex, brain stem, and spinal cord (Figure 4A). The near-infrared fluorescence was notably increased immediately after the intravenous injection of PBB5 (Figure S4C), and the fluorescence in the brain stem and spinal cord ROIs of PS19 mice much exceeded that in WT mice at 30 min (Figure 4B). Fluorescence intensity in the frontal cortex ROI, normalized on the basis of integration time and laser power, was lower in PS19 mice than in WT mice over 120 min after tracer injection (Figure S4B), which may reflect impaired CNS delivery of the tracer in Tg mice due to degenerative changes (see Figures S4C–S4L for details), and thereafter this became almost equivalent between the two genotypes (Figure S4B). Meanwhile, persistent retention of the signals in the brain stem and spinal cord ROIs of PS19 mice was observed beyond 240 min (Figures 4B and S4B). A more quantitative index comparable among different mice was determined by calculating the target-to-frontal-cortex ratio of fluorescence intensity and was shown to increase over time particularly in PS19 mice (Figures 4C and 4D). This ratio was significantly greater in PS19 mice than in WT mice at 240 min (Figure 4E), beyond which the difference

Neuron 79, 1094–1108, September 18, 2013 ©2013 Elsevier Inc.    1097





**Figure 3. In Vitro and Ex Vivo Labeling of NFTs in PS19 Mice with PBB Compounds**
(A) Double fluorescence staining of intraneuronal tau aggregates in postmortem brain stem slices of a 12-month-old PS19 mouse with PBB, other amyloid ligands, and anti-phospho-tau antibody (AT8).
(B) Binding of intravenously administered PBBs (0.1 mg/kg PBB5 and 1 mg/kg PBB1 and PBB3) to NFTs in PS19 mice at 10–12 months of age. The tissues were sampled at 60 min after tracer administration. The brain stem (top row) and spinal cord (second and third rows from the top) sections abundantly contained neurons showing strong fluorescence (left), and subsequent staining with FSB or AT8 (right) indicated that these cells were laden with tau amyloid fibrils (right). Putative intraneuronal tau inclusions in unsectioned spinal cords (arrowheads in the bottom row) removed from PS19 mice at 60 min after intravenous injection of PBB2 and PBB4 were also clearly visible by using a two-photon (2P) fluorescence microscopic system. Arrow in the bottom row indicates a cluster of auto-fluorescence signals from blood cells.
Scale bars, 25 μm (A), 30 μm (top to third rows in B), and 20 μm (bottom row in B).

between the two lines of mice became nearly constant (Figures 4C and 4D). The intensity ratio of the spinal cord ROI to the frontal cortex in PS19 mice at 240 min was also significantly correlated with the abundance of NFTs stained with FSB (Figure 4F), but such correlations were not statistically significant in the brain stem (Figure 4F), implying limitations of the intensitometry in some brain regions below the cerebellum and fourth ventricle.

### Intravital Imaging of Individual Tau Inclusions by PBB3 and Two-Photon Laser Scanning Fluorescence Microscopy

Two-photon excitation microscopy, which enables optical sectioning, potentially up to 1 mm deep, in living tissues, could be utilized to visually demonstrate transfer of a fluorescent probe from the plasma compartment into the cytoplasm of CNS neurons and binding of the probe to intraneuronal tau inclusions. We therefore captured fluorescence signals from intravenously administered PBB3 by in vivo two-photon laser scanning microscopic imaging of the spinal cord of laminectomized PS19 mice. Within 3 s of PBB3 injection, green fluorescence signals emerged in blood vessels and labeled with red with intraperitoneal treatment using sulforhodamine 101 and subsequently diffused from the vasculatures to the spinal cord parenchyma

over the next few minutes (Figures 5A–5F). These diffuse signals declined thereafter due to the clearance of PBB3 from the tissue, whereas intense labeling of putative tau inclusions with green fluorescence appeared in a subpopulation of large cells morphologically identified as neurons at 3–5 min after PBB3 injection (Figures 5G and 5H). These intracellular PBB3 fluorescent signals were not found in the spinal cord of WT mice (Figure 5I). As the BBB of the brain and spinal cord are presumed to be identical, the two-photon microscopic data obtained here provide compelling evidence that PBB3 rapidly transits the BBB and neuronal plasma membranes, where it binds to intraneuronal tau inclusions. Accumulation of injected PBB3 in AT8-positive, NFT-like lesions of Tg mice was postmortemly confirmed by ex vivo microscopy (Figures 5J and 5K).

### Autoradiographic and PET Imaging of Tau Lesions in PS19 Mice by Radiolabeled PBBs

We investigated the kinetic properties of PBBs by high-performance liquid chromatography (HPLC) analyses of plasma and brain samples collected from non-Tg WT mice treated with these ligands. Following intravenous administration, PBB5 was rapidly converted into a major metabolite, which at 5 min was found at high levels in both plasma and brain extracts. Subsequent liquid

Neuron
Imaging of Tau Pathology in Model Mice and Humans





**Figure 4. Noninvasive Near-Infrared Imaging of Tau Pathology in Living Tau Tg Mice Using Pulsed Laser Optics and PBB5**

(A) Baseline autofluorescence signals (middle) are overlaid on the visible background image of a shaven non-Tg WT mouse head (left). Ellipsoidal ROIs are defined above the frontal cortex (FC), brain stem (BS), and cervical spinal cord (SC) guided by a relatively intense emission from the FC region (right).

(B) Fluorescence intensity maps in 12-month-old WT (top) and PS19 (Tg; bottom) mice before and at 30 and 240 min after the intravenous administration of PBB5 (0.1 mg/kg). The intensity maps (A and B) are normalized by the FC ROI value at 30 min after tracer injection. Long-lasting retention of the tracer was noted in the BS and SC ROIs of the Tg mouse.

(C and D) Target-to-FC ratios of fluorescence intensity in the BS (C) and SC (D) ROIs over the image acquisition time in the WT (open circles; n = 7) and PS19 (closed circles; n = 7) mice. There were significant main effects of time, region, and genotype in two-way, repeated-measures ANOVA (time, $F_{(1, 132)} = 17.6$, p < 0.001; region, $F_{(1, 12)} = 29.9$, p < 0.001; genotype, $F_{(1, 12)} = 23.6$, p < 0.001).

(E) Target-to-FC ratios in the BS and SC ROIs of the WT (open columns) and tau Tg (closed columns) mice at 240 min after tracer injection. *p < 0.05; **p < 0.01; two-way repeated-measures ANOVA with Bonferroni's post hoc analysis.

(F) Scatterplots of target-to-FC ratios at 240 min versus the number of FSB-positive NFTs per unit area of postmortem 20 μm tissue slices in BS (blue symbols) and SC (red symbols) ROIs of tau Tg mice. Solid lines represent regressions; p values were determined by t test. Vertical bars in the graphs represent SEs.

See also Figures S3 and S4.

chromatography-mass spectrometry (LC-MS) assays suggested that the major metabolite was likely a reduced, electrically neutralized derivative of PBB5 (Figures S5A and S5B). Besides transventricular uptake of unmetabolized PBB5 as implied above, this uncharged form incapable of emitting near-infrared light could readily penetrate the BBB, as well as cell membranes, and thereafter could be reoxidized into its original form, thereby enabling it to bind to tau fibrils, particularly at sites exposed to oxidative stress in pathological conditions. In addition, PBB4 was promptly converted to metabolites capable of entering the brain. Finally, studies of PBB2 and PBB3 showed that they exhibited reasonable biostability and sufficient entry into and clearance from the brain. Indeed, HPLC assays demonstrated that fractions of unmetabolized PBB2 and PBB3 in mouse plasma were 23.5% and 16.3%, respectively, at 3 min after intravenous administration and were 4.6% and 2.8%, respectively, at 30 min. There were also no metabolites of PBB2 and PBB3 detectable in the mouse brain at 3 and 30 min.

We then radiolabeled PBB2 and PBB3 with [11]C to conduct autoradiographic and PET assays using PS19 mice. In vitro autoradiography using frozen tissue sections showed binding of these radioligands to the brain stem of PS19 mice and neocortex of AD patients (Figure 6A). As expected from their lipophilicities,

[11]C]PBB3 yielded high-contrast signals with less nonspecific labeling of myelin-rich white matter than did [11]C]PBB2, and the accumulation of [11]C]PBB3 in pathological regions was nearly completely abolished by the addition of nonradioactive compounds. Similarly, ex vivo autoradiographic studies demonstrated that intravenously administered [11]C]PBB3 selectively labeled the brain stem and spinal cord of PS19 mice harboring neuronal tau inclusions, whereas tau-associated [11]C]PBB2 radiosignals were less overt because of a considerable level of nonspecific background (Figure 6B; Figures S6C–S6F). Finally, in vivo visualization of tau lesions in PS19 mouse brains was enabled by a microPET system using these two tracers (Figures 6C, S6A, and S6B). Following intravenous injection, [11]C]PBB3 rapidly crossed the BBB and unbound and nonspecifically bound tracers were promptly washed out from the brain with a half-life of ∼10 min (left panel in Figure 6E). The retention of [11]C]PBB3 signals in the brain stem of 12-month-old PS19 mice lasted over the imaging time (90 min), producing a pronounced difference from that in age-matched non-Tg WT mice (left panel in Figure 6E). By selecting the striatum as a reference region lacking tau deposits, the target-to-reference ratio was estimated for the brain stem, with the value in PS19 mice peaking at around 70 min, contrasting with its continuous decrease over





**Figure 5. Real-Time Two-Photon Laser Scanning Images of PBB3 Diffusing from Vessels, Binding to Intraneuronal Tau Inclusions, and Clearing from Spinal Cord**

(A–H) A maximum projection of fluorescence in a 3D volume of the spinal cord of a living PS19 mouse at 12 months of age before (A) and at various time points after (B–H) intravenous administration of PBB3 (1 mg/kg). Blood vessels were labeled with sulforhodamine 101 (red) intraperitoneally injected at 15 min before PBB3 administration. Green fluorescence indicates a rapid transfer of PBB3 from the plasma to tissue parenchyma (B–E) and subsequent washout from the tissue (F). Background PBB3 signals were further attenuated beyond 300 s, whereas somatodendritic labeling by this compound was observed in a subset of neurons (arrowheads in G and H).

(I) Fluorescence image of WT spinal cord at 300 s after PBB3 injection demonstrates no overt retention of the tracer in the tissue.

(J and K) Ex vivo microscopy for a brain stem section of the same Tg mouse. Tissues were obtained at 60 min after PBB3 injection. Signals of intravenously administered PBB3 (J) overlapped with AT8 immunoreactivity (K).

Scale bars, 50 μm (A–F), 25 μm (G–I), and 25 μm (J and K).

of [¹¹C]methoxy-PBB5 ([¹¹C]mPBB5; Figure S5C). PET images demonstrated complex pharmacokinetics of [¹¹C]mPBB5 (Figures S5D and S5E), and the difference in the specific radioligand binding between Tg and WT mice was small relative to the [¹¹C]PBB3-PET data (Figure S5F). After taking all of these findings into consideration, [¹¹C]PBB3 was selected as the most suitable ligand for in vivo PET imaging of tau pathology in tau Tg mice and human subjects.

60 min in WT mice (right panel in Figure 6E). The mean ratio at 45–90 min was increased by 40% in 12-month-old PS19 mice as compared with age-matched WT mice (p < 0.01 by t test). The agreement between localizations of PET signals and tau inclusions in PS19 mice was proven by postmortem FSB staining of brain sections from scanned mice (Figure 6D). Significantly, the mean target-to-reference ratio in the brain stem quantified by PET correlated closely with the number of FSB-positive inclusions per brain section in the same region of the postmortem sample (p < 0.001 by t test; data not shown). [¹¹C]PBB2 exhibited slower clearance from the brain and higher nonspecific retention in myelin-rich regions than [¹¹C]PBB3 (Figure S6G), resulting in insufficient contrast of tau-bound tracers in the brain stem of PS19 mice and a small difference in the target-to-reference ratio of radioactivities between PS19 and WT mice (8% at 45–90 min; p < 0.05 by t test; Figure S6H) relative to those achieved with [¹¹C]PBB3.

As radiolabeling at the dimethylamino group in PBB5 with ¹¹C was unsuccessful, ¹¹C-methylation of a hydroxyl derivative of this compound was performed, leading to the production

Notably, the hippocampus of many PS19 mice was devoid of overt [¹¹C]PBB3 retention (Figure 6C), although a pronounced hippocampal atrophy was noted in these animals. This finding is in agreement with the well-known neuropathological features of PS19 mice in the hippocampus, because the accumulation of AT8-positive phosphorylated tau inclusions results in the degeneration of the affected hippocampal neurons prior to or immediately after NFT formation, followed by the clearance of their preNFTs or NFTs that are externalized into the interstitial CNS compartment (Figure S2). To explore the feasibility of our imaging agents in studies with other tauopathy model mice, we also performed fluorescence labeling with PBBs for brain sections generated from rTg4510 mice (Santacruz et al., 2005; the Supplemental Experimental Procedures). As reported elsewhere (Santacruz et al., 2005), these mice developed numerous thioflavin-S-positive neuronal tau inclusions in the neocortex and hippocampus, and reactivity of these lesions with PBBs was demonstrated by in vitro and ex vivo fluorescence imaging (Figure S7).

-2358-

Neuron

Imaging of Tau Pathology in Model Mice and Humans





**Figure 6. PET and Autoradiographic Detection of Tau Pathologies in PS19 Mice Using [$^{11}$C]PBB2 and [$^{11}$C]PBB3**

(A) In vitro autoradiograms of PS19 and non-Tg WT hindbrains (coronal sections) and AD frontal cortex. Fibrillar aggregates in the mouse brain stem and AD gray matter produced intense radiolabeling with both tracers, but nonspecific background signals were also observed at a considerably high level with the use of [$^{11}$C]PBB2. Binding of [$^{11}$C]PBB3 was profoundly abolished by the addition of nonradioactive PBB3 (10 μM).

(B) Autoradiographic labeling with intravenously injected [$^{11}$C]PBB2 and [$^{11}$C]PBB3 in PS19 (Tg) and WT mice. The brains were removed at 45 min after injection and were cut into sagittal slices. The autoradiographic section of PS19 brain was also stained with FSB. Arrows indicate the brain stem containing numerous tau inclusions displayed at intermediate and high magnifications.

(C) Sagittal and coronal PET images generated by averaging dynamic scan data at 60–90 min after intravenous administration of [$^{11}$C]PBB3. The images are overlaid on the MRI template (images of the template alone are presented at the bottom). Arrows and asterisks indicate the brain stem and striatum, respectively, and arrowhead denotes intense radiolabeling in the medial brain stem of the PS19 mouse.

(D) FSB staining of PS19 mouse brain shown in (C). Sagittal (left) and coronal (middle) images and a high-power view of fibrillar inclusions (right) are displayed. Corresponding to high-level retention of [$^{11}$C]PBB3 in PET scans, abundant FSB-positive lesions were found in the medial brain stem (arrow and arrowhead).

(E) Time-radioactivity curves (left) in the striatum (ST) and brain stem (BS) and BS-to-ST ratio of radioactivity (right) over the imaging time in PS19 (Tg; red symbols) and WT (black symbols) mice (n = 5 each). Vertical bars in the graphs denote SEs.

Scale bars, 1 cm (A and B, top, middle, and bottom left panels); 1 cm (C and D, left and middle panels); 100 μm (B, bottom middle panel); and 100 μm (B, bottom right panel and D, right panel). See also Figures S5, S6, and S7.

## Detection of Tau Pathologies in Living Brains of AD Patients by Comparative PET Imaging with [$^{11}$C]PBB3 and [$^{11}$C]PIB

In order to compare the bindings of [$^{11}$C]PBB3 and [$^{11}$C]PIB to tau-rich regions in the human brain, in vitro autoradiography was carried out with sections of AD and control hippocampus. A notable difference in labeling between these two radioligands

was observed in the CA1 sector and subiculum of the AD hippocampus, where fibrillar tau aggregates predominantly localized to NFTs and neuropil threads (Figure 7A).

We subsequently conducted an exploratory clinical PET study for patients with probable AD (n = 3) and age-matched cognitively normal control (NC) subjects (n = 3). All AD patients exhibited a marked increase in the retention of [$^{11}$C]PIB in


Case: 12-2270 Document 20-2 Page: 466 Filed: 01/08/2013



**Figure 7. Accumulation of [$^{11}$C]PBB3 in the Hippocampal Formation of AD Patients Revealed by In Vitro Autoradiography and In Vivo PET**

(A) Autoradiographic labeling of adjacent brain sections from an AD patient with 10 nM of [$^{11}$C]PBB3 (left) and [$^{11}$C]PIB (middle). The slices contain the hippocampus (Hi), parahippocampal gyrus (PH), fusiform gyrus (FF), and white matter (asterisks). Total binding (top) of [$^{11}$C]PBB3 and [$^{11}$C]PIB was markedly abolished (bottom) by addition of nonradioactive PBB5 (100 μM) and thioflavin-S (10 μM), respectively, except for the nonspecific (NS) labeling of white matter with [$^{11}$C]PIB. The hippocampal CA1 sector and subiculum displayed intense [$^{11}$C]PBB3 signals without noticeable binding of [$^{11}$C]PIB, and binding of [$^{11}$C]PBB3 in cortical areas flanking the collateral sulcus (identified by a red dot) and hippocampal CA2 sector (arrows) was also abundant relative to that of [$^{11}$C]PIB. FSB staining of amyloid fibrils in the sections used for autoradiography indicated the predominance of NFTs and diffuse plaques in the hippocampal subiculum (Sub) and fusiform gyrus (FF), respectively, supporting the strong reactivity of [$^{11}$C]PBB3 with AD NFTs.

(B) MRI (left) and PET imaging with [$^{11}$C]PBB3 (middle) and [$^{11}$C]PIB (right) performed in the same AD (top) and normal control (NC; bottom) subjects. Coronal images containing the hippocampal formation (arrowheads) are displayed. [$^{11}$C]PBB3- and [$^{11}$C]PIB-PET images were generated by estimating SUVRs at 30–70 min and 50–70 min after radiotracer injection, respectively, and were superimposed on individual MRI data. In the hippocampal formation, prominently increased retention of [$^{11}$C]PBB3 in the AD patient was in sharp contrast to the modest or negligible changes in [$^{11}$C]PIB binding as compared with NC. Scale ranges for SUVRs were 0.75–1.50 ([$^{11}$C]PBB3) and 0.75–3.00 ([$^{11}$C]PIB).

See also Figure S9.

plaque-rich areas, and all NC were negative for this PET assay. These subjects then received a [$^{11}$C]PBB3-PET scan, and the [$^{11}$C]PIB and [$^{11}$C]PBB3 images were compared in the same individuals. Intravenously injected [$^{11}$C]PBB3 was delivered to the brain tissue despite its relatively rapid metabolism in humans

(Figures 9A and 9B). Unlike [$^{11}$C]PIB, [$^{11}$C]PBB3 showed minimal nonspecific binding to white matter and other anatomical structures with high myelin content, although it accumulated in dural venous sinuses in control and AD brains (Figures 7B, 8, and 9B). Time courses of regional radioactivity (Figures 9C and 9D; Figures S8A and S8B) and the standardized uptake value ratio (SUVR) to the cerebellum (Figures S8C and S8D) demonstrated accumulation of [$^{11}$C]PBB3 in several brain regions of AD patients as compared to controls (definition of these VOIs is indicated in Figure S8E). In agreement with autoradiographic findings, binding of [$^{11}$C]PBB3 to the medial temporal region, including the hippocampus, contrasted strikingly with the low-level retention of [$^{11}$C]PIB in this area (Figure 7B). There was a slight increase in the retention of [$^{11}$C]PBB3 primarily in the medial temporal region of a control subject with a loss of several points in Mini-Mental State Examination (MMSE) (subject 3 in Figure 8), appearing similar to the tau pathology at Braak stage III/IV or earlier (Braak and Braak, 1991), distinct from the lack of enhanced [$^{11}$C]PIB signals. Indeed, mild increase of medial temporal SUVR (Figure 9E) contrasted with unremarkable change in lateral temporal and frontal SUVRs in this subject (Figures 9G and 9H). Signals of [$^{11}$C]PBB3 were also intense mainly in the limbic region of a subject with early AD (subject 4 in Figure 8), but profound and moderate increases of SUVRs were also observed in the lateral temporal and frontal cortices, respectively, of this case (Figures 9G and 9H), resembling the localization of tau deposits at Braak stage V/VI (Braak and Braak, 1991). With the further cognitive decline as scored by MMSE (subjects 5 and 6 in Figure 8), additional increase in the retention of [$^{11}$C]PBB3 was found in the medial temporal region, precuneus, and frontal cortex (Figures 9E, 9F, and 9H). Meanwhile, a substantial decline of [$^{11}$C]PBB3 binding was noted in the lateral temporal cortex of subject 6 (Figures 8 and 9G). The SUVRs in the medial temporal region, precuneus, and frontal cortex were consequently well correlated with the decline of MMSE scores (Figures 9E, 9F, and 9H). In distinction with [$^{11}$C]PBB3-PET data, there was no overt association between the binding of [$^{11}$C]PIB and disease severity in AD patients (Figure 8), consistent with previous observations. These data support the potential utility of [$^{11}$C]PBB3 for clarifying correlations between the distribution of tau deposition and the symptomatic progression of AD.

As in vitro fluorescence staining indicated that PBB3 was reactive with not only tau lesions but also several types of senile plaques, particularly dense core plaques, density of binding sites, and affinity of [$^{11}$C]PBB3 for these sites were quantified by autoradiographic binding assays with hippocampal and neocortical sections of AD brains enriched with NFTs and senile plaques, respectively. These analyses demonstrated that specific radioligand binding sites were primarily constituted by high-affinity, low-capacity binding components in NFT-rich regions and low-affinity, high-capacity binding components in plaque-rich regions (Figures S9A and S9B). A subsequent simulation for radioligand binding in an area containing these two types of binding sites at a ratio of 1:1 indicated that the selectivity of [$^{11}$C]PBB3 for NFTs versus plaques may be inversely associated with concentration of free radioligands (Figure S9C). In a range of free concentration in the brain achievable

Neuron

Imaging of Tau Pathology in Model Mice and Humans





**Figure 8. Orthogonal [¹¹C]PBB3-PET Images in All Human Subjects Examined in the Present Exploratory Clinical Study**

Data are displayed as parametric maps for SUVR. The [¹¹C]PBB3 binding to the hippocampal formation (arrowheads) was increased consistently in AD patients in contrast to minimum radiotracer retention in normal control (NC) subjects with MMSE scores of 29–30 points (subjects 1 and 2). Another NC subject with an MMSE score of 27 points (subject 3) was negative for [¹¹C]PIB-PET but exhibited slight accumulation of radiotracer signals primarily around the hippocampus, resembling fibrillar tau deposition at Braak stage III/IV or earlier. Sagittal slices around the midline illustrate that radioligand signals were the most intense in the limbic system but began to expand to the neocortex in a patient with the mildest AD (subject 4), in agreement with the tau pathology at Braak stage V/VI, and was further intensified in most neocortical areas, corresponding to Braak stage VI, apparently as a function of the disease severity assessed by MMSE (subjects 5 and 6). The AD patient with the lowest MMSE score (subject 6) displayed a less profound increase of [¹¹C]PBB3 retention in the lateral temporal and parietal cortices than did the other two AD cases, and this is attributable to marked cortical atrophy in this individual and/or toxic loss of tau-bearing neurons in these brain areas at an advanced pathological stage. In contrast to the spatial profiles of [¹¹C]PBB3 binding, the distribution of [¹¹C]PIB signals appeared unchanged among AD subjects. See also Figure S9.




**Figure 9. Pharmacokinetic Profiles of [¹¹C]PBB3 Administered to Humans and PET Images of a Patient Clinically Diagnosed as Having Corticobasal Syndrome**

(A) Time course of unmetabolized [¹¹C]PBB3 fraction in plasma following intravenous radiotracer injection. The plot was generated by averaging data from six individuals.

(B) Time-radioactivity curves in different brain regions of cognitively normal control subjects over 70 min after intravenous injection of [¹¹C]PBB3. Data were generated by averaging values in two individuals and are presented as standard uptake values (SUVs).

(C and D) Comparisons of time-radioactivity curves in the medial temporal region (C) and precuneus (D) of normal controls (black symbols and lines; n = 3) and AD patients (red symbols and lines; n = 3).

(E–H) Scatterplots illustrating correlation of SUVRs with MMSE scores in the medial temporal region (E), precuneus (F), and lateral temporal (G) and frontal (H) cortices. Numbers beside symbols denote subject ID as indicated in Figure 8. Coefficients of determination ($r^2$) and p values by t test are displayed in graphs.

(I) [¹¹C]PBB3- and [¹¹C]PIB-PET images in a subject with clinical diagnosis of corticobasal syndrome. Images were generated as in Figures 7 and 8. Accumulation of [¹¹C]PBB3 was noticeable in the basal ganglia (red arrowheads) with right-side dominance and an area containing the thalamus and midbrain (yellow arrowhead).

Vertical bars in the graphs represent SEs. See also Figures S8 and S9.

gray matter of AD patients, by conducting autoradiography and FSB histochemistry for the same sections. Radiolabeling associated with dense cored plaques accounted for less than 1% and 3% of total gray matter signals in the temporal cortex and precuneus, respectively (Figures S9D–S9H). Moreover, fluorescence labeling of adjacent sections with PBB3 demonstrated that approximately 2% and 5% of total gray matter fluorescence signals were attributable to PBB3 bound to dense core plaques in the temporal cortex and precuneus, respectively. Hence, dense cored plaques were conceived to be rather minor sources of binding sites for [¹¹C]PBB3.

at a pseudoequilibrium state in human PET imaging (<0.2 nM), [¹¹C]PBB3 is presumed to preferentially bind to tau lesions relative to in vitro autoradiographic (~1 nM) and fluorescence (>100 nM) labeling.

We also estimated contribution of [¹¹C]PBB3 bound to dense core plaques to total radiosignals in the neocortical

Finally, PET scans with [¹¹C]PBB3 and [¹¹C]PIB were conducted for a subject clinically diagnosed as having corticobasal syndrome. Retention of [¹¹C]PIB stayed at a control level, but notable accumulation of [¹¹C]PBB3 was observed in the neocortex and subcortical structures (Figure 9I), providing evidence for in vivo detection of tau lesions in plaque-negative

-2362-



tauopathies. Interestingly, right-side dominant [$^{11}$C]PBB3-PET signals in the basal ganglia were consistent with laterality of atrophy in this area (Figure S8F). These findings may also be associated with a right-side dominant decrease in cerebral blood flow and left-side dominant motor signs in this patient.

## DISCUSSION

Here, we report our efforts to develop BBB-penetrant ligands that are capable of binding to and visualizing intracellular tau aggregates in AD and non-AD tauopathies. These compounds may accordingly be useful for the differential diagnosis of neurological conditions in elderly subjects on the basis of the distribution of tau lesions, thereby opening up novel avenues for research in elucidating mechanisms of tau-mediated neurodegeneration, as well as tau-focused biomarkers and therapies.

Despite numerous efforts to develop imaging ligands to visualize tau pathologies in the brains of patients with AD and related tauopathies, the urgent need for these tau biomarkers remains largely unmet. To address this significant challenge, we also took advantage of a multimodal imaging system, which facilitates a quick and label-free validation of candidate compounds in terms of their transfer to the brain and retention in tau-rich regions. In addition, subcellular-resolution imaging optics exemplified by two-photon laser scanning microscopy provided proof of the rapid transfer of intravenously administered potential tau pathology imaging agents from plasma to the CNS extracellular matrix and subsequently to the cytoplasm of neurons, where they can bind to intracellular tau inclusions. Based on these encouraging preliminary data using radiolabeled compounds, a subset of these compounds was radiolabeled for use in PET imaging of Tg mice that model tau pathology, and a radioligand that yielded the best visualization of tau lesions in these Tg mice was selected for further testing in human AD patients and NC subjects as well as patients with probable CBD. This stepwise strategy enabled us to identify and advance the most promising PET probe for the visualization and quantitative assessment of tau pathology in the CNS of living human subjects. Interestingly, another research group has recently reported development of $^{18}$F-labeled PET ligands for tau lesions mostly through assessments of binding to brain tissues, but not recombinant tau assemblies (Zhang et al., 2012; Chien et al., 2013), as in the present approach. These radioligands have been implied to produce considerably high contrasts for tau pathologies in living AD brains, and relatively long radioactive half-life of $^{18}$F would enable delivery of radioligands from a radiosynthesis sites to multiple PET facilities. [$^{11}$C]PBB3 has distinct advantages over these compounds, as exemplified by affinity for diverse tau lesions, including Tg mouse tau aggregates, applicability to multimodal imaging, and induction of smaller radioactive exposure than $^{18}$F-labeled ligands.

In the present work, we clinically validated the performance of [$^{11}$C]PBB3 as a tau imaging agent by comparing the distribution of [$^{11}$C]PBB3 with that of [$^{11}$C]PIB in AD brains. Tau deposits in patients with moderate or severe AD are thought to be distributed extensively in the neocortical and limbic regions (classified as Braak stage V/VI) (Braak and Braak, 1991), thereby resembling localization of senile plaques, except for the predominance

of tau aggregates in the hippocampal formation. This rationalizes the use of radioactivity in the medial temporal area as an index to validate an imaging probe for tau pathology versus Aβ deposits in AD patients from prodromal to advanced stages. Furthermore, our preliminary data suggest that [$^{11}$C]PBB3 may be capable of capturing the temporospatial spreading of neurofibrillary tau pathologies from the limbic system (Braak stage III/IV or earlier) to neocortical areas (Braak stage V/VI) with the progression of AD (Figure 8). A considerable subset of tau lesions at Braak stage I/II is composed of phosphorylated tau deposits barely reactive with thioflavin-S (i.e., pretangles), and NFTs are relatively low in number and are confined to the transentorhinal cortex (Braak and Braak, 1991; Braak et al., 2011). Therefore, detection of these early tau pathologies would be more difficult. Our next-stage clinical study with expanded sample size and wider range of MMSE scores is currently ongoing to pursue tau accumulation in normal controls and subjects with mild cognitive impairments and AD at diverse stages and will bring more compelling insights into the significance of tau PET imaging in early diagnosis and prediction of AD. In addition, alterations of [$^{11}$C]PBB3 retention were indicated in the transition from mild to moderate AD. Loss of PET signals in the lateral temporal cortex of a patient with moderate AD (subject 6 in Figure 8) might not result from atrophy of this region, as the hippocampus of the same subject exhibited strong [$^{11}$C]PBB3 binding despite marked atrophy. Possible explanations for this change include formation of extracellular NFTs and their envelopment by astrocytes in the degenerating neocortex, profoundly modifying accessibility of these NFTs to exogenous molecules (Schmidt et al., 1988). This notion would need to be examined by combined autoradiogarphic and immunohistochemical assays of different brain regions.

Being able to visualize tau deposits with [$^{11}$C]PBB3 in non-AD tauopathies, such as PSP, CBD, and related disorders, is also of major importance, as suggested in the present PET data the support detectability of tau deposition in living CBD brains. As compared with NFTs and neuropil threads in AD, abundant tau deposits are largely confined to specific neuroanatomical locations of the CNS in tau-positive, plaque-negative illnesses, as exemplified by PSP and CBD (Dickson et al., 2011), but the homogenous and low-level background signals of [$^{11}$C]PBB3 in brain parenchyma indicate the possibility of detecting tau lesions in these disorders. Following such in vivo assessments, a postmortem neuropathological evaluation of scanned subjects would be required as a reference standard for PET assays of non-AD tau pathologies.

[$^{11}$C]PIB-positive plaque formation nearly plateaus prior to the progression of brain atrophy in AD (Engler et al., 2006), but tau abnormalities may bridge the chasm between Aβ fibrillogenesis and neuronal death. Consistent with this notion, our PET/MRI data indicate that the deposition of tau inclusions as visualized by the intense [$^{11}$C]PBB3 labeling but lacking overt [$^{11}$C]PIB binding is closely associated with a local volume reduction in the hippocampal formation. Indeed, our pilot clinical PET study demonstrated that localized accumulation of [$^{11}$C]PBB3 in the medial temporal region of AD patients was accompanied by marked hippocampal atrophy (Figure 7B). Notably, [$^{11}$C]PBB3-PET signals were substantially increased, notwithstanding the atrophy-related partial volume effects on PET images, and this

Case: 1:25-cr-00232 Document 20-2 Page 547 Filed Date Filed: 10/08/2025

observation may support the contribution of tau fibrils to toxic neuronal death in AD. However, these data do not immediately imply neurotoxicities of [$^{11}$C]PBB3-reactive tau fibrils, in light of MRI-detectable neurodegeneration uncoupled with [$^{11}$C]PBB3 retention in the hippocampus of PS19 mice. In the hippocampal formation of AD patients, neurons bearing NFTs that resemble those in the PS19 hippocampus may drive neurodegeneration similar to that observed in either the PS19 hippocampus or brain stem, and this issue could be addressed in future studies using [$^{11}$C]PBB3-PET and MRI in diverse mouse models, including PS19 and rTg4510 mice, and human subjects.

Our analyses of multiple β sheet ligands illustrated electrochemical and/or conformational diversities of β-pleated sheets among amyloid aggregates, producing a selectivity of these compounds for a certain spectrum of fibrillar pathologies (Figures 1 and S1). Lipophilicities of the β sheet ligands could determine their reactivity with noncored plaques, as noted among the PBBs studied here (Figure 1), although the molecular properties underlying this variation are yet to be elucidated. Meanwhile, we noted that all β sheet ligands tested in the present study were reactive with dense core plaques regardless of their lipophilicities. This may affect in vivo PET signals, particularly in AD brain areas with abundant cored plaques, such as the precuneus. However, our combined autoradiographic and histochemical assessments indicated that [$^{11}$C]PBB3 bound to dense core plaques accounts for less than 10% of total specific radioligand binding in these areas, and this percentage in fact includes binding to tau fibrils in plaque neurites in addition to Aβ amyloid core. A second possibility to account for the diversity of ligand reactivity to tau lesions may arise from the packing distance between two juxtaposed β sheets in tau filaments and is discussed in the Supplemental Discussion.

Notably, selectivity of [$^{11}$C]PBB3 for tau versus aggregates may depend on free radioligand concentration in the brain. Our autoradiographic binding assays suggested that affinity of [$^{11}$C]PBB3 for NFTs is 40- to 50-fold higher than senile plaques, but binding components on tau fibrils may be more readily saturated by this radioligand than those on Aβ fibrils. [$^{11}$C]PBB3-PET data in humans indicated that uptake of this radioligand into the brain is less than one-third of [$^{11}$C]PIB uptake and that free radioligand concentration in the brain at a pseudoequilibrium state is approximately 0.2 nM or lower. In this range of concentration, [$^{11}$C]PBB3 could preferentially interact with high-affinity binding components formed by tau assemblies. An excessive amount of radioligand in the brain would result in saturation of radioligand binding to tau lesions and increased binding to low-affinity, high-capacity binding components in Aβ plaques, and such overload of free radioligand is more likely in regions with less abundant tau pathologies. This could be even more critical in capturing early tau pathologies that originate in the hippocampal formation and may require technical improvements and methodological refinements, including high-resolution imaging, correction for motions of subjects during scans, and robust definition of VOIs on the atrophic hippocampus.

Although nonspecific [$^{11}$C]PBB3-PET signals in control human subjects were generally low, radioligand retention in dural venous sinuses was noticeable in all scanned individuals.

Possible mechanisms that underlie this property are discussed in the Supplemental Discussion.

The present work has also implied the potential utility of multimodal imaging systems for translational development of therapeutic agents that counteract tau fibrillogenesis. Optical imaging with a near-infrared fluorescent probe, such as PBB5, could provide the least invasive technique to assess tau accumulation in living mouse models. As demonstrated by our in vitro and ex vivo fluorescence labeling, all PBBs share a similarity in terms of their reactivity with tau aggregates. Hence, PBB5 optics may be applicable to early screening of therapeutic agents that suppress tau deposition, and the data on abundance of tau lesions obtained by this approach may be translatable to advanced stages of assessments using [$^{11}$C]PBB3-PET in animal models and humans. By contrast, pharmacokinetic properties of PBB5 (Figure S5) were found to be distinct from those of electrically neutral PBBs, including PBB2 and PBB3. These considerations would be of importance in developing and using fluorescent ligands applicable to optical and PET imaging.

To conclude, our class of multimodal imaging agents offers the possibility of visual investigations of fibrillary tau pathologies at subcellular, cellular, and regional levels. These assay systems are potentially powerful tools for the longitudinal evaluation of anti-tau treatments (Marx, 2007), as a single probe may facilitate a seamless, bidirectional translation between preclinical and clinical insights. PET tracers would also serve a more immediate therapeutic purpose by enabling the assessment of the effects of anti-Aβ and anti-tau therapies on tau pathologies in living AD patients.

## EXPERIMENTAL PROCEDURES

### Compounds and Reagents

PBB1 (Wako Pure Chemical Industries), PBB2 (ABX), PBB3 (Nard Institute), PBB4 (ABX), mPBB5 (Nard Institute), desmethyl precursor of [$^{11}$C]PBB2 (2-[4-(4-aminophenyl)buta-1,3-dienyl]benzothiazol-6-ol; Nard Institute), desmethyl precursor of [$^{11}$C]PBB3 protected with a assay group (5-[4-(6-tert-butyl-dimethylsilyloxy-benzothiazol-2-yl)buta-1,3-dienyl]pyridine-2-amine; Nard Institute), desmethyl precursor of [$^{11}$C]mPBB5 (2-[4-(4-dimethylaminophenyl)buta-1,3-dienyl]-3-ethyl-6-hydroxybenzothiazol-3-ium; Nard Institute), and 2-[8-(4-dimethylaminophenyl)octa-1,3,5,7-tetraenyl]-3-ethylbenzothiazol-3-ium (DM-POTEB; Nard Institute) were custom synthesized. Information on other chemicals is provided in the Supplemental Experimental Procedures. ClogP for each compound was calculated using ACD Chemsketch logP software (Advanced Chemistry Development).

### Animal Models

Tg mice heterozygous for human T34 (4-repeat tau isoform with 1 N-terminal insert) with FTDP-17 P301S mutation driven by mouse prion protein promoter, also referred to as PS19 mice (Yoshiyama et al., 2007), were bred and kept on a C57BL/6 background. All mice studied here were maintained and handled in accordance with the National Research Council's Guide for the Care and Use of Laboratory Animals and our institutional guidelines. Protocols for the present animal experiments were approved by the Animal Ethics Committees of the National Institute of Radiological Sciences.

### Postmortem Brain Tissues

Procedures for preparation of human and mouse brain sections are given in the Supplemental Experimental Procedures.

### In Vitro and Ex Vivo Fluorescence Microscopy

Six micrometer paraffin sections generated from patient brains and 20 μm frozen sections of mouse brains were stained with 10$^{-3}$% β sheet ligands

-2364-



dissolved in 50% ethanol for 1 hr at room temperature. Images of the fluorescence signals from these compounds were captured by nonlaser (BZ-9000; Keyence Japan) and confocal laser scanning (FV-1000; Olympus) microscopes. In the confocal imaging, excitation/emission wavelengths (nm) were optimized for each compound as follows: 405/420-520 (PBB3, FSB, PIB, BF-227, BF-158, FDDNP, thioflavin-S), 488/520-580 (PBB2, PBB4), 515/530-630 (PBB1, curcumin), and 635/645-720 (PBB5, BF-189, DM-POTEB). Subsequently, the tested samples and adjacent sections probed serially with each ligand were autoclaved for antigen retrieval, immunostained with the anti-tau monoclonal antibody AT8 that is specific for tau phosphorylated at Ser 202 and Thr 205 (Endogen), as well as a polyclonal antibody against AβN3(pE), and inspected using the microscopes noted above. For ex vivo imaging, PS19 and non-Tg WT at 10–12 months of age were anesthetized with 1.5% (v/v) isoflurane and were given 1 mg/kg PBB1-4, 0.1 mg/kg PBB5, or 10 mg/kg FSB by syringe via tail vein. The animals were killed by decapitation at 60 min after tracer administration. Brain and spinal cord were harvested and cut into 10-μm-thick sections on a cryostat (HM560). The sections were imaged using microscopes as in the in vitro assays and were labeled with either FSB or AT8, followed by microscopic re-examination.

**Ex Vivo and In Vivo Multiphoton Imaging**
Experimental procedures are given in the Supplemental Experimental Procedures.

**In Vivo and Ex Vivo Pulsed Laser Scanning Imaging**
Noninvasive scans of isoflurane-anesthetized non-Tg WT and tau Tg mice at 12 months of age were performed using a small animal-dedicated optical imager (eXplore Optix; ART). Scan protocols are given in the Supplemental Experimental Procedures.

**Radiosynthesis of [¹¹C]PBB2**
Experimental procedures are given in the Supplemental Experimental Procedures.

**Radiosynthesis of [¹¹C]PBB3**
[¹¹C]Methyl iodide was produced and transferred into 300 μl of dimethyl sulphoxide (DMSO) containing 1.5–2 mg of tert-butyldimethylsilyl desmethyl precursor and 10 mg of potassium hydroxide at room temperature. The reaction mixture was heated to 125°C and maintained for 5 min. After cooling the reaction vessel, 5 mg of tetra-n-butylammonium fluoride hydrate in 600 μl of water was added to the mixture to delete the protecting group, and then 500 μl of HPLC solvent was added to the reaction vessel. The radioactive mixture was transferred into a reservoir for HPLC purification (CAPCELL PAK C₁₈ column, 10 × 250 mm; acetonitrile/50 mM ammonium formate = 4/6, 6 ml/min). The fraction corresponding to [¹¹C]PBB3 was collected in a flask containing 100 μl of 25% ascorbic acid solution and 75 μl of Tween 80 in 300 μl of ethanol and was evaporated to dryness under a vacuum. The residue was dissolved in 10 ml of saline (pH 7.4) to obtain [¹¹C]PBB3 (970–1,990 GBq at the end of synthesis [EOS]) as an injectable solution. The final formulated product was radiochemically pure (≥95%) as detected by analytic HPLC (CAPCELL PAK C₁₈ column, 4.6 × 250 mm; acetonitrile/50 mM ammonium formate = 4/6, 2 ml/min). The specific activity of [¹¹C]PBB3 at EOS was 37–121 GBq/μmol, and [¹¹C]PBB3 maintained its radioactive purity exceeding 90% over 3 hr after formulation.

**Radiosynthesis of [¹¹C]mPBB5**
Experimental procedures are given as Supplemental Experimental Procedures.

**Radiosynthesis of [¹¹C]PIB**
Radiolabeling of PIB was performed as described elsewhere (Maeda et al., 2011). The specific activity of [¹¹C]PIB at EOS was 50–110 GBq/μmol.

**In Vitro and Ex Vivo Autoradiography**
Experimental procedures are given in the Supplemental Experimental Procedures.

**In Vivo PET Imaging of Mice**
PET scans were performed using a microPET Focus 220 animal scanner (Siemens Medical Solutions) immediately after intravenous injection of [¹¹C]PBB2 (28.3 ± 10.3 MBq), [¹¹C]PBB3 (29.7 ± 9.3 MBq), or [¹¹C]mPBB5 (32.8 ± 5.9 MBq). Detailed procedures are provided in the Supplemental Experimental Procedures.

**In Vivo PET Imaging of Humans**
Three cognitively normal control subjects (64, 72, and 75 years of age; mean age, 70.3 years) and three AD patients (64, 75 and 77 years of age; mean age, 72 years) were recruited to the present work (Figure 8). Additional information on these subjects is given in the Supplemental Experimental Procedures. The current clinical study was approved by the Ethics and Radiation Safety Committees of the National Institute of Radiological Sciences. Written informed consent was obtained from the subjects or their family members. PET assays were conducted with a Siemens ECAT HR+ scanner (CTI PET Systems). Detailed PET scan protocols are provided in the Supplemental Experimental Procedures. A fraction of radioactivity corresponding to unmetabolized [¹¹C]PBB3 in plasma at 3, 10, 20, 30, and 60 min was determined by HPLC (Waters mBondapak C₁₈ column, 7.8 × 300 mm; acetonitrile/ammonium formate mobile phase with gradient elution = 40/60, 52/48, 80/20, 80/20, 40/60, and 40/60 at 0, 6, 7, 8, 9, and 15 min, respectively; flow rate, 6 ml/min) as described elsewhere (Suzuki et al., 1999). The radiotracer injection and following scans and plasma assays were conducted in a dimly lit condition to avoid photoracemization of the chemicals.

Individual MRI data were coregistered to the PET images using PMOD software (PMOD Technologies). Volumes of interest (VOIs) were drawn on coregistered MR images and were transferred to the PET images. Procedures of image analyses are provided in the Supplemental Experimental Procedures.

We additionally carried out PET scans of a patient who was clinically diagnosed as having corticobasal syndrome, as described in the Supplemental Experimental Procedures.

**SUPPLEMENTAL INFORMATION**

Supplemental Information includes Supplemental Experimental Procedures, nine figures, and one table and can be found with this article online at http://dx.doi.org/10.1016/j.neuron.2013.07.037.

**ACKNOWLEDGMENTS**

The authors thank Mr. T. Minamihisamatsu and Mr. Y. Matsuba for technical assistance, the staff of the Molecular Probe Group, National Institute of Radiological Sciences, for support with radiosynthesis, Dr. Y. Yoshiyama at National Hospital Organization Chiba-East Hospital for his support on clinical PET studies, and Dr. T. Iwatsubo at the University of Tokyo and Dr. H. Inoue at Kyoto University for their critical discussions. This work was supported in part by grants from the National Institute on Aging of the National Institutes of Health (AG10124 and AG17586) (to J.Q.T. and V. M.-Y.L.), Grants-in-Aid for Japan Advanced Molecular Imaging Program, Young Scientists (21791158) (to M.M.), Scientific Research B (23390235) (to M.H.), Core Research for Evolutional Science and Technology (to T.S.), Scientific Research on Innovative Areas ("Brain Environment") (23111009) (to M.H.) from the Ministry of Education, Culture, Sports, Science and Technology, Japan, Thomas H. Maren Junior Investigator Fund from College of Medicine, University of Florida (to N.S.), and research fund of Belfer Neurodegeneration Consortium (to Q.C. and M.-K.J.). M.M., H. Shimada, T.S., M.-R.Z., and M.H. are named as inventors on a patent application 0749006WO1, claiming subject matter related to the results described in this paper.

Accepted: July 12, 2013
Published: September 18, 2013

**REFERENCES**

Bacskai, B.J., Hickey, G.A., Skoch, J., Kajdasz, S.T., Wang, Y., Huang, G.F., Mathis, C.A., Klunk, W.E., and Hyman, B.T. (2003). Four-dimensional

Case: 1:25-cv-02132 Document 20-2 Page 547 Filed Date: Page 472 of 2025-9

multiphoton imaging of brain entry, amyloid binding, and clearance of an amyloid-β ligand in transgenic mice. Proc. Natl. Acad. Sci. USA 100, 12462–12467.

Ballatore, C., Lee, V.M.Y., and Trojanowski, J.Q. (2007). Tau-mediated neurodegeneration in Alzheimer's disease and related disorders. Nat. Rev. Neurosci. 8, 663–672.

Braak, H., and Braak, E. (1991). Neuropathological staging of Alzheimer-related changes. Acta Neuropathol. 82, 239–259.

Braak, H., Thal, D.R., Ghebremedhin, E., and Del Tredici, K. (2011). Stages of the pathologic process in Alzheimer disease: age categories from 1 to 100 years. J. Neuropathol. Exp. Neurol. 70, 960–969.

Chien, D.T., Bahri, S., Szardenings, A.K., Walsh, J.C., Mu, F., Su, M.Y., Shankle, W.R., Elizarov, A., and Kolb, H.C. (2013). Early clinical PET imaging results with the novel PHF-tau radioligand [F-18]-T807. J. Alzheimers Dis. 34, 457–468.

Dickson, D.W., Kouri, N., Murray, M.E., and Josephs, K.A. (2011). Neuropathology of frontotemporal lobar degeneration-tau (FTLD-tau). J. Mol. Neurosci. 45, 384–389.

Engler, H., Forsberg, A., Almkvist, O., Blomquist, G., Larsson, E., Savitcheva, I., Wall, A., Ringheim, A., Långström, B., and Nordberg, A. (2006). Two-year follow-up of amyloid deposition in patients with Alzheimer's disease. Brain 129, 2856–2866.

Fodero-Tavoletti, M.T., Okamura, N., Furumoto, S., Mulligan, R.S., Connor, A.R., McLean, C.A., Cao, D., Rigopoulos, A., Cartwright, G.A., O'Keefe, G., et al. (2011). 18F-THK523: a novel in vivo tau imaging ligand for Alzheimer's disease. Brain 134, 1089–1100.

Higuchi, M., Iwata, N., Matsuba, Y., Sato, K., Sasamoto, K., and Saido, T.C. (2005). 19F and 1H MRI detection of amyloid β plaques in vivo. Nat. Neurosci. 8, 527–533.

Hintersteiner, M., Enz, A., Frey, P., Jaton, A.L., Kinzy, W., Kneuer, R., Neumann, U., Rudin, M., Staufenbiel, M., Stoeckli, M., et al. (2005). In vivo detection of amyloid-β deposits by near-infrared imaging using an oxazine-derivative probe. Nat. Biotechnol. 23, 577–583.

Klunk, W.E., Wang, Y., Huang, G.F., Debnath, M.L., Holt, D.P., Shao, L., Hamilton, R.L., Ikonomovic, M.D., DeKosky, S.T., and Mathis, C.A. (2003). The binding of 2-(4'-methylaminophenyl)benzothiazole to postmortem brain homogenates is dominated by the amyloid component. J. Neurosci. 23, 2086–2092.

Klunk, W.E., Engler, H., Nordberg, A., Wang, Y., Blomquist, G., Holt, D.P., Bergström, M., Savitcheva, I., Huang, G.F., Estrada, S., et al. (2004). Imaging brain amyloid in Alzheimer's disease with Pittsburgh Compound-B. Ann. Neurol. 55, 306–319.

Krebs, M.R.H., Bromley, E.H., and Donald, A.M. (2005). The binding of thioflavin-T to amyloid fibrils: localisation and implications. J. Struct. Biol. 149, 30–37.

Kudo, Y., Okamura, N., Furumoto, S., Tashiro, M., Furukawa, K., Maruyama, M., Itoh, M., Iwata, R., Yanai, K., and Arai, H. (2007). 2-(2-[2-Dimethylaminothiazol-5-yl]ethenyl)-6-(2-[fluoro]ethoxy)benzoxazole: a novel PET agent for in vivo detection of dense amyloid plaques in Alzheimer's disease patients. J. Nucl. Med. 48, 553–561.

Maeda, J., Ji, B., Irie, T., Tomiyama, T., Maruyama, M., Okauchi, T., Staufenbiel, M., Iwata, N., Ono, M., Saido, T.C., et al. (2007). Longitudinal, quantitative assessment of amyloid, neuroinflammation, and anti-amyloid treatment in a living mouse model of Alzheimer's disease enabled by positron emission tomography. J. Neurosci. 27, 10957–10968.

Maeda, J., Zhang, M.R., Okauchi, T., Ji, B., Ono, M., Hattori, S., Kumata, K., Iwata, N., Saido, T.C., Trojanowski, J.Q., et al. (2011). In vivo positron emission tomographic imaging of glial responses to amyloid-beta and tau pathologies in mouse models of Alzheimer's disease and related disorders. J. Neurosci. 31, 4720–4730.

Marx, J. (2007). Alzheimer's disease. A new take on tau. Science 316, 1416–1417.

Okamura, N., Suemoto, T., Furumoto, S., Suzuki, M., Shimadzu, H., Akatsu, H., Yamamoto, T., Fujiwara, H., Nemoto, M., Maruyama, M., et al. (2005). Quinoline and benzimidazole derivatives: candidate probes for in vivo imaging of tau pathology in Alzheimer's disease. J. Neurosci. 25, 10857–10862.

Santacruz, K., Lewis, J., Spires, T., Paulson, J., Kotilinek, L., Ingelsson, M., Guimaraes, A., DeTure, M., Ramsden, M., McGowan, E., et al. (2005). Tau suppression in a neurodegenerative mouse model improves memory function. Science 309, 476–481.

Schmidt, M.L., Gur, R.E., Gur, R.C., and Trojanowski, J.Q. (1988). Intraneuronal and extracellular neurofibrillary tangles exhibit mutually exclusive cytoskeletal antigens. Ann. Neurol. 23, 184–189.

Small, G.W., Kepe, V., Ercoli, L.M., Siddarth, P., Bookheimer, S.Y., Miller, K.J., Lavretsky, H., Burggren, A.C., Cole, G.M., Vinters, H.V., et al. (2006). PET of brain amyloid and tau in mild cognitive impairment. N. Engl. J. Med. 355, 2652–2663.

Suzuki, K., Takei, M., and Kida, T. (1999). Development of an analyzing system for the sensitive measurement of radioactive metabolites on the PET study. J. Labelled Compd. Radiopharm. 42, S658–S660.

Thompson, P.W., Ye, L., Morgenstern, J.L., Sue, L., Beach, T.G., Judd, D.J., Shipley, N.J., Libri, V., and Lockhart, A. (2009). Interaction of the amyloid imaging tracer FDDNP with hallmark Alzheimer's disease pathologies. J. Neurochem. 109, 623–630.

Yang, L., Rieves, D., and Ganley, C. (2012). Brain amyloid imaging—FDA approval of florbetapir F18 injection. N. Engl. J. Med. 367, 885–887.

Yoshiyama, Y., Higuchi, M., Zhang, B., Huang, S.M., Iwata, N., Saido, T.C., Maeda, J., Suhara, T., Trojanowski, J.Q., and Lee, V.M.Y. (2007). Synapse loss and microglial activation precede tangles in a P301S tauopathy mouse model. Neuron 53, 337–351.

Zhang, W., Arteaga, J., Cashion, D.K., Chen, G., Gangadharmath, U., Gomez, L.F., Kasi, D., Lam, C., Liang, Q., Liu, C., et al. (2012). A highly selective and specific PET tracer for imaging of tau pathologies. J. Alzheimers Dis. 31, 601–612.

Zhuang, Z.P., Kung, M.P., Hou, C., Skovronsky, D.M., Gur, T.L., Plössl, K., Trojanowski, J.Q., Lee, V.M.Y., and Kung, H.F. (2001). Radioiodinated styrylbenzenes and thioflavins as probes for amyloid aggregates. J. Med. Chem. 44, 1905–1914.

# EXHIBIT 80

# FierceDiagnostics

Published on FierceDiagnostics (http://www.fiercediagnostics.com)

# Alzheimer's diagnosis may gain from PET imaging of tau proteins

September 20, 2013 | By Mark Hollmer

An international group of researchers from Japan and the U.S. say they've developed a way to use PET imaging to diagnose Alzheimer's in a living person and then track the disease's advance. The key: an imaging agent drawn to the buildup of tau protein in the brain.

*Forbes*, the *BBC* and other news outlets picked up on this major advance, which, if supported by future research, could improve how patients are both diagnosed and treated for Alzheimer's. The journal *Neuron* carries the full study and its findings.

Right now, the only way to definitively diagnose Alzheimer's is through an autopsy. A number of companies are advancing imaging agents that would help, in theory, to diagnose the disease in living patients. Navidea ($NAVB) is underway with a Phase III trial of an imaging agent that can detect beta-amyloid deposits in the brain--the compound can be a telltale sign of Alzheimer's. GE Healthcare also has an investigative imaging agent that tracks beta-amyloid, and it has done well in Phase III. Both trigger vivid images through PET scans.

As *Forbes* explains, this new study differed because it relied on a fluorescent material drawn to tau protein, thought to be another sign of Alzheimer's or budding dementia. The substance crossed the blood brain barrier and worked in both mice and several human patients. And as the *BBC* notes, those tags, combined with positron emission tomography, helped build a three-dimensional image of tau buildup in the brain that clinicians haven't had before.

These are early results, of course. But if further research can duplicate these findings, then doctors get a new way to potentially track and diagnose the disease. The advance could also give researchers a tool to test Alzheimer's drugs by tracking how the tau protein buildup responds to a given treatment through detailed PET scans. What's more, detailed imaging could lead to earlier diagnosis and treatment, which doctors believe may be the best way to slow Alzheimer's advance.

- here's the *Forbes* story
- check out the *BBC*'s take
- here's the journal abstract

**Related Articles:**
Navidea keys up Alzheimer's Dx agent for Phase III
GE touts promising PhIII for Alzheimer's imaging agent
GE Healthcare joins Australian government on Alzheimer's Dx study

-2368-

Case 1:25-cv-02732-ABA Document 20-2 Filed 10/08/25 Page 475 of 1235
Case 1:25-cv-02732-ABA Document 20-2 Filed 10/08/25 Page 475 of 1235

**Source URL:** http://www.fiercediagnostics.com/story/alzheimers-diagnosis-may-gain-pet-imaging-tau-proteins/2013-09-20

# EXHIBIT 81

Brain 2014: 137; 1570–1578 | 1570



# BRAIN
A JOURNAL OF NEUROLOGY

## SCIENTIFIC COMMENTARIES
# Time for tau

Downloaded from http://brain.oxfordjournals.org/ at New York University on June 28, 2014

It is almost exactly 10 years since the first report of a PET ligand that specifically bound to a pathological protein in the brain was published (Klunk et al., 2004). This tracer, [11]C-Pittsburgh compound B (PIB), detected fibrillar aggregated forms of amyloid-β, the major constituent of the Alzheimer's disease plaque and, according to many, the initiating event in Alzheimer's disease pathogenesis. This report was soon followed by several amyloid imaging tracers that were radiolabelled with the longer half-life positron-emitting nuclide [18]F, opening the door to commercial manufacture and clinical application. Several of these tracers are now approved by worldwide regulatory agencies including the US Food and Drug Administration and the European Medicines Agency, although reimbursement for clinical use remains problematic. In this issue of Brain, Okamura and colleagues report the first human PET studies with a new tracer for tau, [18]F-THK5105, and reveal that retention of this tracer correlates with dementia severity and brain atrophy in Alzheimer's disease (Okamura et al., 2014).

Because it is difficult to develop, test and validate a new PET imaging agent, it may have seemed overly optimistic 10 years ago to conclude that a new era in human brain imaging had begun, but it had. The latest developments are a series of PET tracers that bind to the microtubule-associated protein tau that is aggregated as neurofibrillary tangles in Alzheimer's disease. Tau-related diseases also include the group of tauopathies often referred to as frontotemporal lobar degenerations, and the highly publicized chronic traumatic encephalopathy. Tau would seem to be a difficult target for PET imaging: it may be intracellular thus requiring tracer passage across both the blood–brain barrier and cell membranes; it is found in the brain at lower concentrations than amyloid-β; and it is characterized by different isoforms reflecting alternative splicing with either three (3R) or four (4R) repeated microtubule binding domains. The first PET tau imaging agent to be reported, [18]F-FDDNP, was not specific for tau and showed relatively low uptake. However, in the past few years, three research groups have investigated separate molecular structures resulting in three series of compounds that are promising tau-binding PET tracers. One of these, [11]C-PBB3 (Maruyama et al., 2013), has shown in vitro binding to tau in the form of neurofibrillary tangles, neuropil threads and plaque neurites in Alzheimer's disease brain tissue, and also in vitro binding to tau inclusions in tissue from patients with Pick's disease (a 3R tauopathy), or progressive supranuclear palsy and corticobasal degeneration (4R tauopathies). PET studies showed hippocampal uptake in

cognitively normal older people, and extensive cortical binding in patients with Alzheimer's disease that appeared largely consistent with the pathological staging proposed by Braak and Braak (1991). Another series of compounds includes the [18]F-labelled T807 and T808 (Chien et al., 2013, 2014); these compounds both demonstrate tau binding to Alzheimer's disease brain tissue without labelling amyloid-β. They show good in vivo brain penetration in humans and patterns of retention on PET scans that again are consistent with Braak staging.

The third group of [18]F-labelled compounds comprises the 'THK' series developed at Tohoku University. The first of this series, [18]F-THK523, was reported by Fodero-Tavoletti et al. (2011), and although tissue studies indicated good selectivity for tau over amyloid-β, subsequent human PET experiments showed low cortical binding compared to binding in white matter, making signal detection difficult. Okamura and colleagues now report the first human PET studies of the related compound [18]F-THK5105 (Okamura et al., 2014). They studied eight patients with Alzheimer's disease and eight older control subjects with [18]F-THK5105 and [11]C-PIB. [18]F-THK5105 data acquired over 2 h showed that tracer activity in the cerebellar cortex washed out similarly in patients and control subjects, whereas tracer retention occurred in the temporal lobe in patients with Alzheimer's disease. By 90 min post-injection, ratios in cortex to cerebellum averaged 1.32 in the inferior temporal lobe of patients (the neocortical region with highest retention) compared with 1.09 in control subjects. Although other cortical regions generally showed higher retention in patients than controls, the highest brain signal was seen in pons, and this was similar in both patients and control subjects. Other subcortical brain regions showing high uptake included putamen and white matter, which did not differ between patients and control subjects. In controls, tracer retention in medial temporal regions was higher than in neocortex, suggesting the presence of medial temporal lobe neurofibrillary tangles, a common finding in ageing. [11]C-PIB uptake revealed a very different pattern, with highest uptake in precuneus and frontal cortex; uptake of the two tracers was not statistically correlated. In addition, associations were found between [18]F-THK5105 retention and both cognitive and magnetic resonance volumetric measures that were not seen with [11]C-PIB.

These data are very supportive of the use of [18]F-THK5105 in the study of Alzheimer's disease, with a number of important potential applications. Okamura et al. (2014) note that

© The Author (2014). Published by Oxford University Press on behalf of the Guarantors of Brain. All rights reserved.
For Permissions, please email: journals.permissions@oup.com

[18]F-THK5105 retention in the inferior temporal cortex showed no overlap between patients and control subjects, suggesting that tau imaging could be diagnostically useful, although the samples are still quite small. Reports that the related compound THK523 did not bind to tau deposited in the tauopathies of corticobasal degeneration, progressive supranuclear palsy, and Pick's disease (Fodero-Tavoletti et al., 2014) may be good news if we are looking for a disease-specific biomarker, but bad news if we are looking for a biomarker to image frontotemporal lobar degeneration syndromes. The findings that brain [18]F-THK5105 paralleled both clinical measures of severity and magnetic resonance measures of atrophy, though preliminary, are consistent with observations that post-mortem measures of neurofibrillary tangle pathology are among the best correlates of disease severity in patients with Alzheimer's disease and suggest that tau imaging could be a staging method that might also be useful in detecting response to a therapeutic agent. Recent attempts to develop PET amyloid imaging as surrogate markers of treatment efficacy have been disappointing in failing to show either a strong relationship with dementia severity or prediction of clinical therapeutic response (Salloway et al., 2014). Because tau pathology correlates with symptoms, tau imaging could be a potential surrogate outcome for any therapy that has clinical benefit and would certainly be a useful biomarker in a trial of a therapeutic agent targeted to tau itself, an especially important goal in relation to frontotemporal lobar degeneration.

In addition to potential applications to clinical trials, tau imaging will be of major benefit for understanding the pathological progression of Alzheimer's disease and differentiating it from normal ageing. Current models of Alzheimer's disease are problematic in many respects, one of which is the difficulty in defining the relative importance of neurodegeneration as opposed to amyloid-β deposition. Although early models of biomarker change in Alzheimer's disease posited that amyloid-β was an initiating event, evidence of neurodegeneration in the absence of amyloid-β has resulted in a pathological framework that admits the possibility of independent and early tauopathy in Alzheimer's disease (Jack et al., 2013). The suggestion that all of the tau imaging agents are retained in the medial temporal lobes of older control subjects offers the promise that the relationship between medial temporal tau and neocortical amyloid-β can be disentangled, as well as the relationships between both of these proteins and brain atrophy, hypometabolism and cognition.

We now have at least three distinct ligands for human tau imaging. PET imaging of neurodegenerative diseases is rapidly evolving and there will undoubtedly be new tau imaging agents on the way, along with additional agents for other proteins such as α-synuclein. In fact, Okamura et al. (2014) note that they have developed another related compound, [18]F-THK5117, which has more favourable pharmacokinetic and binding properties. There are no data for comparison of the THK series compounds with [18]F-T807 and [11]C-PBB3, although the [11]C label of PBB3 will limit its use to institutions with PET radiochemistry programs unless an [18]F label can be developed. Which of these compounds is 'best' is a complex determination that will have to be defined by the

intended use and additional data that accrue in this rapidly developing field. No PET ligand is perfect, and these tau ligands are likely to differ by specificity (do they bind to different forms of tau and to non-tau targets?), sensitivity (how much tau signal can be detected compared to non-specific background binding?), pharmacokinetics (is brain penetration high and steady state achieved early enough to yield good images?) and other factors. The implications for understanding Alzheimer's disease and developing effective treatments are important, and as we learn more about the behaviour of different ligands we may open up new avenues to the study of non-Alzheimer's disease tauopathies and chronic traumatic encephalopathy. The pace of scientific discovery is accelerating and the end result will be more tools and more information that should result in more effective treatments.

William Jagust
University of California Berkeley, USA

Correspondence to: William Jagust
E-mail: jagust@berkeley.edu

Advance Access publication April 15, 2014
doi:10.1093/brain/awu093

# References

Braak H, Braak E. Neuropathological staging of Alzheimer-related changes. Acta Neuropathol 1991; 82: 239–59.

Chien DT, Bahri S, Szardenings AK, Walsh JC, Mu F, Su MY, et al. Early clinical PET imaging results with the novel PHF-tau radioligand [F-18]-T807. J Alzheimers Dis 2013; 34: 457–68.

Chien DT, Szardenings AK, Bahri S, Walsh JC, Mu F, Xia C, et al. Early clinical PET imaging results with the novel PHF-tau radioligand [F18]-T808. J Alzheimers Dis 2014; 38: 171–84.

Fodero-Tavoletti MT, Furumoto S, Taylor L, McLean CA, Mulligan RS, Birchall I, et al. Assessing THK523 selectivity for tau deposits in Alzheimer's disease and non Alzheimer's disease tauopathies. Alzheimers Res Ther 2014; 6: 11.

Fodero-Tavoletti MT, Okamura N, Furumoto S, Mulligan RS, Connor AR, McLean CA, et al. 18F-THK523: a novel in vivo tau imaging ligand for Alzheimer's disease. Brain 2011; 134 (Pt 4): 1089–100.

Jack CR Jr, Knopman DS, Jagust WJ, Petersen RC, Weiner MW, Aisen PS, et al. Tracking pathophysiological processes in Alzheimer's disease: an updated hypothetical model of dynamic biomarkers. Lancet Neurol 2013; 12: 207–16.

Klunk WE, Engler H, Nordberg A, Wang Y, Blomqvist G, Holt DP, et al. Imaging brain amyloid in Alzheimer's disease with Pittsburgh Compound-B. Ann Neurol 2004; 55: 306–19.

Maruyama M, Shimada H, Suhara T, Shinotoh H, Ji B, Maeda J, et al. Imaging of tau pathology in a tauopathy mouse model and in Alzheimer patients compared to normal controls. Neuron 2013; 79: 1094–108.

Okamura N, Furumoto S, Fodero-Tavoletti M, Mulligan RS, Harada R, Yates P, et al. Noninvasive assessment of Alzheimer's disease neurofibrillary pathology using 18F-THK-5101 PET. Brain 2014in press.

Salloway S, Sperling R, Fox NC, Blennow K, Klunk W, Raskind M, et al. Two phase 3 trials of bapineuzumab in mild-to-moderate Alzheimer's disease. N Engl J Med 2014; 370: 322–33.

Downloaded from http://brain.oxfordjournals.org/ at New York University on June 28, 2014

# EXHIBIT 82



# McGRATH: Illinois Eye Institute project aims to identify CTE in the living

Like 125    Tweet 20    Share 0    8+1 0      41

BY DAN MCGRATH For Sun-Times Media June 14, 2014 4:35PM

Updated: June 14, 2014 4:39PM

David Diaz knows he probably should have told someone about the double vision he experienced near the end of his world-class boxing career, but the disclosure would have cost him the thing that defined him and enabled him to provide for his family.

Fighters fight, and Diaz — a U.S. Olympian at 20 in 1996 and a crowd-pleasing world lightweight champion 10 years later — was a fighter's fighter.

''It was worst when I looked at somebody straight-on,'' he recalled. ''In the ring, you're always moving your head, so I could adapt.''

Diaz spent two years and four fights trying to regain the title he lost to Manny Pacquiao in a brutal ninth-round stoppage that showed ''PacMan'' at the peak of his relentless powers and left Diaz looking as though he had been in a knife fight. He decided he'd had enough and retired in 2011, after a sneaky right hand from Philadelphia prospect Hank Lundy sliced open his right eyebrow and drew a river of blood from the worst cut of his 41-bout pro career.

''I didn't see it coming,'' Diaz said.

A boxer who can't see punches coming had best seek a new line of work. Diaz also wanted to be a husband to his wife, Tonya, and a father to their boys, David, Elias and Silas.

A consultation with Dr. Robert Steinmetz led to corrective treatment for Diaz's double vision. Steinmetz, a Chicago optometrist and former college baseball player whose wife, Nicole, was a Golden Gloves boxing champion, also persuaded Diaz to participate in a research project the Illinois Eye Institute is conducting to examine whether irregularities in the vision, movements and retina/optic nerve structure in the eyes of contact-sport participants might be a marker for the tau protein that causes chronic traumatic encephalopathy (CTE) in concussed athletes.

CTE, brought on by multiple concussions, accelerates deterioration of the brain and has been cited as a factor in the deaths of several high-profile former football players, including Pittsburgh Steelers great Mike Webster and former Bears safety Dave Duerson.

''One thing that's known about CTE is it's related to the number of times you get hit in the head,'' said Dr. Leonard Messner, who is directing the project as executive director of the institute. ''A concussion is a metabolic change within the brain, more of a biomechanical injury than structural. Eighty to 85 percent of them go unreported.''

With that in mind, Messner is working with the Chicago Concussion Coalition to standardize screening procedures so concussed athletes are identified more readily and removed from harm's way. They're part of a National Hit Count Initiative designed to track how often athletes are exposed to potentially damaging collisions. And they have persuaded the Illinois High School Association to ban full-contact football drills during the offseason.

''The biggest risk factor in sustaining a concussion is having had one previously,'' Messner said, ''and 'return to play' guidelines are purely speculative.''

The Illinois project is affiliated with the Sports Legacy Institute, the Boston University-based group that has pioneered CTE research through the work of neurosurgeons Ann McKee and Robert Cantu and the tireless awareness-raising of *Head Games* author Chris Nowinski, a college football star/professional wrestler/concussion victim.

On Wednesday at the Union League Club, the Sports Legacy Institute will honor former Bears quarterback Jim McMahon for his courage in coming forward as a possible CTE case. McMahon has acknowledged experiencing memory loss, severe headaches, blurred vision and other symptoms of post-concussion syndrome.

To date, the only method of identifying CTE is through post-mortem examination of the brains of suspected victims. Researchers are

**-2374-**

working to detect its presence in the living, before the deterioration of the brain begins.

Dr. Messner's group has tested more than 30 former football players, boxers and hockey players.

''It's a macho thing with boxers to say they've never been knocked out, so they'll tell us they've never had a concussion,'' Dr. Steinmetz said. ''But you don't have to be knocked out to have a concussion.''

Diaz knows.

''I've had multiple,'' he said.

And though his eye-test results were in the ''normal'' range, he limits his boxing activity to working with a youth group in Cicero.

''I hold the mitts for them, teach them footwork,'' he said. ''They all want to spar, but I won't get in the ring with them. If I did, I might be tempted, start thinking, 'I can still do this.' But I won't. Not many of us walk away clean. I want to be there for my kids.''

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br>MDL No. 2323 |
| Kevin Turner and Shawn Wooden, *on behalf of themselves and others similarly situated*,<br><br>    Plaintiffs,<br><br>        v.<br><br>National Football League and NFL Properties, LLC, successor-in-interest to NFL Properties, Inc.,<br><br>    Defendants. | Civil Action No. 2:14-cv-00029-AB |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**DECLARATION OF ROBERT A. STERN, PH.D.**

Robert A. Stern, Ph.D., affirms under penalty of perjury the truth of the following facts:

1.      I am a Professor of Neurology, Neurosurgery, and Anatomy & Neurobiology at Boston University School of Medicine.  My complete *curriculum vitae* is attached at Tab A, and I highlight here some of my experience, research, and qualifications relevant to the opinions expressed below.

2.      I am a licensed Clinical Psychologist (Massachusetts License number 7238), with a specialty in Clinical Neuropsychology. I have been licensed as a Clinical Psychologist since 1990 and have been a Registrant of the National Register of Health Service Providers in Psychology since 1992.  During that time, I was Director of the Memory and Cognitive Assessment Program at Rhode Island Hospital.

3.      Prior to that, I had been Assistant Professor of Psychiatry at the University of North Carolina (UNC) School of Medicine at Chapel Hill, North Carolina, where I had been on the faculty since 1990.  During that time, I was Director of the Neurobehavioral Assessment Laboratory as well as the Associate Director of the federally-funded Mental Health Clinical Research Center.

4.    I received my Ph.D. in Clinical Psychology from the University of Rhode Island (dissertation titled, "Mood Disorders following Stroke"), completed my pre-doctoral internship training in Clinical Neuropsychology at the Boston Veterans Administration Medical Center, and completed my post-doctoral fellowship research and clinical training in both Neuropsychology and Psychoneuroendocrinology at UNC School of Medicine.

5.    I am a Fellow of both the American Neuropsychiatric Association and the National Academy of Neuropsychology. I sit on the editorial boards of several leading medical and scientific journals, and on the grant review committees of several international, national (e.g., National Institutes of Health, NIH), and foundation funding agencies. I am a member of the medical and scientific advisory boards of the MA/NH Chapter of the Alzheimer's Association, the National Grave's Disease Foundation, and Sports Legacy Institute, and am also a member of the Mackey White Traumatic Brain Injury Committee of the National Football League Players Association.

6.    Throughout my 25 year career, I have taught medical students and young physicians (neurology residents, psychiatry residents, and geriatrics fellows) through courses and required training seminars in the areas of neurobehavioral mental status examination, brain-behavior relationships, assessment of dementia, the diagnosis and treatment of Alzheimer's disease and related disorders, chronic traumatic encephalopathy (CTE), and similar areas of their formal training.

7.    I have been a lecturer in, and a course director of, several continuing medical education (CME) courses for physicians, both locally and nationally.

8.    I have been an invited lecturer (and keynote lecturer) for numerous national and international medical and scientific meetings, speaking primarily in the area of Alzheimer's disease, CTE, and issues pertaining to the evaluation and assessment of the cognitive, mood, and behavioral aspects of neurodegenerative disease.

9.    I have also been the mentor for numerous undergraduate students, graduate students (Ph.D. students, master's degree students, medical students, M.D./Ph.D. students), and post-doctoral fellows, and have been the primary mentor of many masters theses and Ph.D. dissertations.

10.     One of my areas of specialization and expertise includes the assessment and evaluation of neurocognitive functioning.  I have published extensively in this area and have also been the primary author of several widely used, standardized neuropsychological tests, including the 33 tests of memory, language, attention, executive functioning, and spatial skills that make up the *Neuropsychological Assessment Battery* (NAB).

11.     I have directed predoctoral and postdoctoral training programs in Clinical Neuropsychology, and have served as the mentor for numerous trainees learning to become neuropsychologists.

12.     I have given invited lectures at the New York Academy of Sciences and for the Coalition Against Major Diseases in Washington, DC, providing guidance and education to members of the Federal Drug Administration, senior thought leaders in the pharmaceutical industry, and fellow scientists about neurocognitive assessment issues for Alzheimer's disease clinical trials.

13.     As a clinical neuropsychologist with a specialty in the evaluation and diagnosis of neurodegenerative diseases, I conduct clinical examinations of patients referred to me by neurologists, geriatricians, psychiatrists, primary care physicians, and others, for diagnostic impressions and treatment recommendations.

14.     My clinical neuroscience research focuses on the risk factors for, and the diagnosis and treatment of, neurodegenerative diseases and other causes of cognitive, mood, and behavior change in aging.  Currently, I am the Clinical Core Director of the Boston University (BU) Alzheimer's Disease Center (ADC), one of 27 research centers across the country funded by the National Institute on Aging (NIA) of the National Institutes of Health (NIH).  In this capacity, I oversee all clinical research (i.e., research conducted on living humans) pertaining to Alzheimer's disease, including studies aimed at the early diagnosis of Alzheimer's disease, genetics, and clinical trials of new medicines to prevent or treat Alzheimer's disease.

15.     As part of my role as Clinical Core Director of the BU ADC, I oversee a weekly multidisciplinary diagnostic consensus conference involving neurologists, neuropsychologists, psychiatrists, geriatricians, and others, at which we review the histories, medical tests (including neuroimaging), clinical evaluations, and neuropsychological test performance of research participants and determine the specific

diagnosis (e.g., Alzheimer's disease dementia, Frontotemporal Dementia, Vascular Dementia, Mild Cognitive Impairment, Chronic Traumatic Encephalopathy) of each individual.

16.      My other area of currently NIH-funded research includes the cognitive effects of chemotherapy in older breast cancer patients; my co-principal investigators on this grant are from the Georgetown Lombardi Comprehensive Cancer Center and the Memorial Sloan Kettering Cancer Center.

17.      Since 2008, my primary area of research has been the long-term consequences of repetitive brain trauma in athletes (see listing of publications below).  I was a co-founder of the BU Center for the Study of Traumatic Encephalopathy (CSTE, now "CTE Center") and I serve as the leader of clinical research for the CTE Center.  I have received R01 grant funding from NIH (the first grant ever funded by NIH for the study of CTE) to develop biomarkers for the *in vivo* (i.e., during life) detection and diagnosis of CTE.

18.      This project, called the Diagnosis and Evaluation of Traumatic Encephalopathy using Clinical Tests (DETECT) study, involves the examination of 100 former professional football players (selected based on positions played, their overall exposure to repetitive brain trauma using data from helmet sensors, and existing clinical symptoms) and 50 same-age non-contact sport elite athletes.  All research participants (approximately 100 to date) undergo extensive brain scans, lumbar punctures (to measure proteins in cerebrospinal fluid), electrophysiological studies, blood tests (e.g., for genetic studies and other state-of-the-art biomarkers), and in-depth neurological, neuropsychological, and psychiatric evaluations.  For this project, I oversee a talented multidisciplinary group of investigators with specialties in neurology, psychiatry, neuroimaging, radiology, genetics, and biostatistics.

19.      In addition, I have recently received Department of Defense funding (with my co-principal investigator, Dr. Martha Shenton from Harvard Medical School) to examine a new Positron Emission Tomography (PET) ligand (T807) that is specific to the abnormal forms of tau protein found in CTE.

20.      Relatedly, I am principal investigator of a new study funded by Avid Radiopharmaceuticals to examine that same PET ligand (and another PET ligand for the amyloid protein found in AD) in participants in the DETECT study.  I view these two studies of the T807 PET test as the most important investigations in the field of CTE research.

21.     I am also the principal investigator of a telephone- and web-based longitudinal study (Longitudinal Evaluation to Gather Evidence of Neurodegenerative Disease; LEGEND) of over 600 adult former and current athletes across all sports and levels of play (including collegiate) to assess risk factors (including brain trauma exposure, genetics, and lifestyle) and clinical course of CTE and other short-term and long-term consequences of repetitive brain trauma.

22.     I have conducted over 100 in-depth retrospective clinical interviews with the next-of-kin of the deceased athletes (and others) in Dr. Ann McKee's VA-BU-SLI brain bank. For these cases, I also reviewed all of the available medical records. I currently am a co-investigator of Dr. McKee's NIH-funded U01 project aimed at defining the neuropathology of CTE. For that study, I am a member of the multidisciplinary group of clinicians and scientists who review the clinical history of every new case in the brain bank in order to determine the clinical diagnosis prior to being provided with the neuropathological diagnosis for the case.

23.     Based on these experiences, I am confident that I have the same or more experience than any other scientist or clinician in the world examining the clinical history and presentation of athletes (including former NFL players) with post-mortem diagnosed CTE, through detailed interviews and discussions with the decedents' family members, friends, significant others, and physicians.

24.     Based on the data gathered through these interviews and medical records, I have published (as first or second author) the largest case series of the clinical presentation of neuropathologically-confirmed CTE (Stern et al., 2013; McKee, Stern, et al., 2013).

25.     I am the senior author of an important new journal article (Montenigro et al., 2014) that describes the first clinical diagnostic criteria for CTE and Traumatic Encephalopathy Syndrome (TES), based, in part, on the information gathered from the post-mortem family interviews of over 75 neuropathologically confirmed cases of CTE, and on an extensive review of the world's literature on CTE and "dementia pugilistica."

26.     Our group of researchers at BU has been playing a central role nationally and internationally in the area of CTE and the long-term consequences of repetitive brain trauma, including concussions and subconcussive blows. I was the co-director of the first ever national scientific meeting on CTE and have been an invited speaker at numerous national and international conferences, including the first two workshops held

by NIH on this topic. I have published extensively in this area of research including several empirical papers in high impact peer-reviewed scientific journals. I am the invited editor of a special series on CTE and traumatic brain injury (TBI) for the journal, *Alzheimer's Research and Therapy*. I recently testified about this issue before the US Senate Special Committee on Aging.

27.     My experience has included extensive clinical- and research-based interviews with former professional football players and their relatives regarding the mid to late life changes in cognition, behavior, mood and daily functioning observed in these persons.

28.     My statements and views included in this declaration are mine alone and do not reflect those of Boston University or any of the departments and centers with which I am involved. Specifically, they do not reflect the views of the Boston University Alzheimer's Disease Center, the Boston University CTE Center, or the Boston University Center for the Study of Traumatic Encephalopathy; nor do they reflect any of the faculty, staff, or administration associated with any of these organizations.

29.     I have not received any financial payments for preparing this Declaration from any source, including any attorney or plaintiff in this case. Furthermore, I am not retained by, nor receive any payments from plaintiff attorneys in this case for the purpose of this case.

## I.     CLASS MEMBERS WHO SUFFER FROM MANY OF THE MOST DISTURBING AND DISABLING SYMPTOMS OF CTE WOULD NOT BE COMPENSATED UNDER THE SETTLEMENT

30.     I have reviewed the Class Action Settlement Agreement as of June 25, 2014, together with its exhibits (the "Settlement"), filed in the above captioned proceeding. I have paid particular attention to Articles III through IX, and Exhibits 1, 2, and 3, of the Settlement, relating to testing and compensation of the class of retired NFL football players and their families.

31.     The primary clinical features of CTE include impaired cognition, mood, and behavior (e.g., Stern et al., 2013). However, the Baseline Neuropsychological Test Battery set forth in Exhibit 2 of the Settlement (the "Test Battery") is focused primarily on the assessment of cognitive impairment, and excludes problems in mood and behavior in the algorithm used to define Neurocognitive Impairment Levels 1, 1.5, or 2.

32.     The behavioral and mood disorders associated with head impacts in former professional football players are just as important, just as serious, and just as amenable to detection and diagnosis, as cognitive disorders.  Individuals with neuropathologically confirmed CTE have had significant problems with mood and behavior and not just problems with cognition.  In the study from my research team (Stern et al., 2013) published in the journal, Neurology,  22 of 33 deceased former athletes with neuropathologically confirmed CTE (and no other abnormal brain findings) were reported to have behavior or mood problems as their initial difficulties, prior to any cognitive impairment.  Only 10 of 33 were ever diagnosed with dementia at any time prior to death.  These numbers are provided not as an estimate of expected future diagnoses or as an estimate of the prevalence of dementia amongst all individuals with CTE.  Rather, they are presented to underscore the findings from our group and from all other descriptions of CTE that dementia and cognitive impairment are not the only life-altering problems experienced by individuals with CTE.

33.     Individuals with impairments in mood and behavior, but without significant cognitive impairment can still experience devastating changes in their lives.  Based on my review of the medical and scientific literature and on my interviews of living research participants, informal discussions with former players and/or their family members, and formal interviews with family members of deceased former players with neuropathologically confirmed CTE, it is my scientific opinion that many former NFL players have significant changes in mood and behavior (e.g., depression, hopelessness, impulsivity, explosiveness, rage, aggression), resulting, in part, from their repetitive head impacts in the NFL, that have, in turn, led to significant financial, personal, and medical changes, including, but not limited to:  the inability to maintain employment, homelessness, social isolation, domestic abuse, divorce, substance abuse, excessive gambling, poor financial decision-making, and death from accidental drug overdose or suicide.

34.     The significant changes in mood and behavior relatively early in life can lead to significant distress for the individual with CTE as well as their family, friends, and other loved ones.  I have learned about the tremendous pain and suffering the family members experienced while their loved one's life was destroyed by the progressive destruction of the brain. I have interviewed the adult children of former professional and college football and rugby players whose fathers had dramatic changes in personality, the development of

aggressive and out-of-control behavior, and suicidal thoughts. And, I have spoken with the parents of young athletes in their 20's and 30's who impulsively took their own lives.

35.     Several well-known former NFL players who were diagnosed neuropathologically with CTE following death did not have dementia and would not have been found impaired under the proposed Baseline Assessment Program of the Settlement (the "BAP").  For example, based on publicly available information, Junior Seau (diagnosed with CTE by a group of independent neuropathologists coordinated by the NIH), and Dave Duerson (diagnosed with CTE by Dr. McKee at BU), both died from suicide reportedly after years of significant changes in mood and behavior, including depression, hopelessness, aggression, and poor impulse control.  Based on public reports of their functioning by their family members and friends, it is unlikely that their cognitive skills were impaired to the degree of meeting the criteria for Level 1.5 or Level 2 Neurocognitive Impairment.  Rather, their primary symptoms involved mood and behavioral disturbance, neither of which is compensable in the Settlement.  Notwithstanding important limitations and criticisms of the test battery and criteria described below, Level 1.5 and Level 2 Neurocognitive Impairment do not include any impairment in mood or behavior.  Thus if either of these individuals died on July 8, 2014 or later, their families would not receive any compensation under the Settlement.

36.     CTE is a unique neurodegenerative disease.  It is not Alzheimer's disease (AD), Parkinson's disease, or ALS.  All of these diseases are diagnosed through careful neuropathological examination of brain tissue following death.

37.     AD cannot accurately be diagnosed during life, although there have been tremendous strides over the past decade in developing specific, objective biological markers (biomarkers) that improve the predictive accuracy of the diagnosis during life.  These biomarkers are now used routinely in research studies and are beginning to be used in clinical settings.

38.     CTE also cannot accurately be diagnosed during life, although there are methods being developed at this time by my research team and by others that are meant to improve our ability to do so and to distinguish CTE from AD and other brain diseases and conditions.  Based on the scientific and medical literature, my own first-hand knowledge of the current state of the scientific field, and on my own research, I am

confident that within the next five to ten years there will be highly accurate, clinically accepted, and FDA-approved methods to diagnose CTE during life. Based on my involvement in, and understanding of, current ongoing research, it is my scientific opinion that the understanding of neurodegenerative conditions and the capabilities of diagnostic tests will advance rapidly over the next 65 years.

39. Dementia is not an illness or disease. Dementia is a clinical syndrome diagnosed when there are cognitive symptoms that interfere with the ability to function at work or at usual activities, and the patient exhibits a decline from previous levels of functioning that is not explained by delirium or major psychiatric disorder (McKhann et al., 2011; National Institute on Aging and the Alzheimer's Association workgroup).

40. There are several neurodegenerative diseases that can lead to dementia. AD, CTE, and Parkinson's all are neurodegenerative diseases that can lead to dementia. These diseases begin many years or decades prior to any symptoms. When enough brain tissue is destroyed by the disease, symptoms begin to develop. When the symptoms begin, they would not be considered "dementia." When there are cognitive impairments, but not to the degree of interfering with daily functioning, the clinical syndrome of Mild Cognitive Impairment (MCI) may be diagnosed; MCI is not a disease, it is merely a clinical syndrome. It is only when these diseases progress further and the symptoms become bad enough to interfere with the ability to function independently that the individual would be diagnosed with dementia. That is, AD, CTE, and Parkinson's disease each are independent brain diseases that eventually can lead to dementia, later in the course of the disease.

41. The only symptoms related to CTE that are compensable (other than those that overlap with Alzheimer's disease, ALS or Parkinson's) are cognitive difficulties, and only cognitive difficulties that are severe enough that the Class Member would have significant impairments in critical aspects of daily living and independence. Several key symptoms of CTE that are identified in the scientific and medical literature and in my clinical and research experience are not compensable.

42. Class members who clearly have dementia but whose doctors have determined, by appropriate and currently approved medical tests, that they likely have CTE and not Alzheimer's disease as the cause of the dementia would receive substantially less compensation than Class members whose doctors do not order the

tests to assist in the diagnosis.  At this time, there are two U.S. Food and Drug Administration (FDA)-approved PET scan tests for patients being evaluated for Alzheimer's disease and dementia: Amyvid (Florbetapir F 18 injection) and Vizamyl (flutemetamol F 18 injection).  The following is from an FDA Press Release dated October 25, 2013: "'Many Americans are evaluated every year to determine the cause of diminishing neurologic functions, such as memory and judgment, that raise the possibility of Alzheimer's disease,' said Shaw Chen, M.D., deputy director of the Office of Drug Evaluation IV in the FDA's Center for Drug Evaluation and Research. 'Imaging drugs like Vizamyl provide physicians with important tools to help evaluate patients for AD and dementia…A negative Vizamyl scan means that there is little or no beta amyloid accumulation in the brain and the cause of the dementia is probably not due to AD.'"

As an exemplar, I will compare two hypothetical cases, both age 62 with the same number of qualifying seasons in the NFL. They both have had a progressive history of cognitive, behavioral, and mood symptoms and are now having difficulties carrying out daily activities.  They receive the exact same test scores on the Neuropsychological Test Battery and meet the criteria for Neurocognitive Impairment 1.5.  They are examined by two different neurologists. Both neurologists conduct neurological evaluations, order the blood tests, and order the same MRI scans.  The findings of all these tests come back similarly negative.  Both cases are diagnosed by their neurologists as having "dementia."  However, Case A's neurologist diagnoses him with Alzheimer's disease.  Case B's neurologist decides to order a Florbetapir (Amyvid) PET scan.  That specific FDA-approved test is labeled by the FDA to be used to help rule out Alzheimer's disease in cases when the differential diagnosis may be questionable.  That is, if the test is found to be negative (indicating little or no abnormal beta amyloid protein build up in the brain), the patient unlikely has Alzheimer's disease as the cause of their dementia. For Case B, because the neurologist knew that CTE was a possible cause for dementia in an individual with a history of repetitive brain trauma, the neurologist felt that the Florbetapir PET scan would be helpful in clarifying the diagnosis.  The result of the scan came back negative, resulting in the neurologist determining that the patient does not have Alzheimer's disease.  Case A, with a diagnosis of Alzheimer's disease as the cause of dementia, would be eligible for compensation of $950,000 according to the Settlement's Monetary Award Grid.  Case B, with a diagnosis of Probable CTE as the cause of dementia (the neurologist

could not give a diagnosis of Alzheimer's based on the negative Florbetapir scan), would not be covered for anything other than Neurocognitive Impairment Level 1.5 and would be eligible for compensation of $290,000. That is, two individuals with identical histories and clinical presentations would receive strikingly disparate compensation solely because of the decision of one of the neurologists to use a very appropriate, FDA-approved test to make a more accurate diagnosis (i.e., not Alzheimer's disease). The former NFL player who received that accurate diagnosis would receive $660,000 <u>less</u> than the former NFL player with the imprecise/incomplete diagnosis.

## II. THE BASELINE NEUROPSYCHOLOGICAL TEST BATTERY IS INAPPROPRIATE FOR THE EVALUATION OF THE CLASS MEMBERS FOR WHOM IT IS MEANT TO BE USED

43. The Test Battery, set forth in Exhibit 2 of the Settlement, is not appropriate for evaluating whether retired professional football players have neurodegenerative diseases such as CTE or Alzheimer's disease. Rather, it is appropriate only for the evaluation of a younger traumatic brain injury patient. The specific tests selected, and the length of the battery would not be consistent with that given by the large majority of neuropsychologists who specialize in neurodegenerative disease and who evaluate patients for Mild Cognitive Impairment and Alzheimer's disease dementia.

44. Based on information provided by the test publishers and by my extensive clinical experience with dementia patients, it is estimated that the Test Battery in the Settlement would take approximately five hours without any break. For patients with the level of severity required for compensation (i.e., Level 1.5 or 2 Neurocognitive Impairment), this length of testing would be excessive, would result in refusals to complete the evaluation, and would result in inaccurate results.

45. The Test Battery includes two measures of "Mental Health" even though the results of those tests are not included anywhere in the criteria for impairment. In addition, based on the scientific and medical literature and on my clinical and research experience, the two tests are not appropriate for the detection and diagnosis of the specific types of behavioral and mood disorders linked to a history of head impacts in former professional football players. One of these two tests, the Mini International Neuropsychiatric Interview (M.I.N.I.), is not sufficient to evaluate specific areas of impairments, such as impulsivity, rage, and aggression.

Further, its inclusion in the battery is unnecessary because the results are not used in any way to determine compensable diagnosis. The second of these tests, the MMPI-2RF, is inappropriate for patients with dementia. Even if the results were to be used for any reason, they would likely be inaccurate or incomplete in that the test requires the patient to complete 338 yes-no questions about psychological state and personality; such a task would not be possible by the majority of patients with the severity of dementia included in the compensable diagnoses. As described above, it is my opinion that there must be an appropriate evaluation of mood and behavioral impairment as part of the BAP evaluation, and in the proposed Settlement none exists and there is no inclusion of any mood or behavioral impairment in the definitions of compensable diagnoses.

46. The Test Battery includes extensive testing for performance validity in order to assure that the Class Member's test data represent a valid reflection of the former player's optimal level of functioning, even though patients with moderate dementia have been found to perform poorly (i.e., false positives) on effort testing. Although it is appropriate to consider suboptimal effort in any neuropsychological evaluation for possible compensation, it should be noted that the only compensable findings of the evaluation are Level 1.5 and 2 Neurocognitive Impairment. These represent mild to moderate stages of dementia and require significant impairment on numerous tests in the battery. There have been several studies that indicate that recommended cut-off scores on at least one of the effort tests included in the battery (Test of Memory Malingering) are not appropriate for use in patients with dementia due to an excessive number of false positives (e.g., Bortnick et al., 2013; Teichner & Wagner, 2004). That is, because patients with dementia are so impaired cognitively, they may perform poorly on the effort test due to their actual cognitive impairment rather than poor effort or malingering. It is my scientific opinion, based on the medical and scientific literature and on my own clinical and research experience, that reliance on the effort measures included in the Neuropsychological Test Battery would unfairly deprive at least some otherwise eligible persons with measurable cognitive deficits of compensation.

III. **THE HIGH THRESHOLD FOR COMPENSATION BASED ON LEVEL OF COGNITIVE IMPAIRMENT DEFINED BY THE SPECIFIC TEST FINDINGS AND ALGORITHM DETAILED IN EXHIBIT 2 OF THE SETTLEMENT WOULD DEPRIVE PERSONS WITH DOCUMENTED COGNITIVE DEFICITS OF COMPENSATION.**

47. To be eligible for compensation under Neurocognitive Impairment Level 1.5 or 2.0, the Class Member would have to be so severely impaired in several areas of cognitive functioning that they would require assistance in many activities of daily living (in Level 1.5) or be almost fully dependent on another person for most activities of daily living, such as bathing and toileting (for Level 2.0). Specifically, the definitions of Level 1.5 Neurocognitive Impairment and Level 2 Neurocognitive impairment require that the Class Member exhibits functional impairment consistent with the criteria set forth in the National Alzheimer's Coordinating Center's (NACC) Clinical Dementia Rating (CDR) scale. For Level 1.5 Neurocognitive Impairment, the Class Member must meet criteria for CDR Category 1.0 in the areas of Community Affairs, Home & Hobbies, and Personal Care. For Level 2 Neurocognitive Impairment, the Class Member must meet criteria for CDR Category 2.0 in the areas of Community Affairs, Home & Hobbies, and Personal Care. According to the CDR, Category 1.0 would require the individual to be unable to function independently at a job, shopping, and volunteer and social groups; to have mild but definite impairment in functioning independently at home, with more difficult chores abandoned, and more complicated hobbies and interests abandoned; and would need prompting for personal care functions, such as dressing, toileting, and bathing. CDR Category 2.0 would require the individual to have no pretense of independent functioning outside home; would only have simple chores preserved; would have very restricted interests; and would require assistance in dressing, hygiene, and keeping of personal effects (Morris, 1993; NACC, https://www.alz.washington.edu/NONMEMBER/UDS/DOCS/VER2/ivpguide.pdf).

48. The algorithm used in the Settlement to translate test performance into compensable Neurocognitive Impairment categories is not one that is used in any known or published set of criteria for the determination of dementia, and utilizes a threshold of impairment that would exclude many Class Members with dementia. To clarify the specific content of Exhibit 2 of the Settlement and understand the algorithm used, it is important to understand the statistical terminology used in the criteria. Neuropsychological tests are developed to result in test scores that are roughly distributed as a normal ("bell-shaped") curve. The tests are typically standardized on a large group of healthy individuals who do not have any known neurological disorder or other possible cause of cognitive impairment. That "normative group" is made up of individuals across

different age and educational levels, as well as gender and sometimes ethnic, racial, and geographical groups. The results of the normative group's performance on the test are used to create standardized scores, such that when the test is administered to a patient (or in this case a former NFL player), that person's raw score (e.g., the number correct or the time to completion) is compared to the scores from the appropriate reference group from the normative sample. The raw score is then transformed to a standardized score that is then used to interpret the level of performance.

49. A T score is one of the types of standardized scores used to determine the level of performance on the test by the patient. A T score has a mean of 50 (i.e., the average score of the reference normative group is 50) and a standard deviation of 10. A standard deviation is a measure of the distribution of scores in the normative group, such that approximately 68% of the normative group scored within one standard deviation of the mean. That translates into 68% of the healthy normative group having T scores between 40 and 60. Another way to interpret this is that a T score of 40 would be equivalent to approximately the 16th percentile, i.e., only 16 percent of the "normal" healthy population would be expected to score below that level. A T score of 30 (i.e., two standard deviations below the mean) would indicate that only 2.3 percent of the healthy population would be expected to score below that level.

50. As described in Exhibit 2 of the Settlement, the "basic principle for defining impairment on testing is that there must be a pattern of performance that is approximately … 1.7-1.8 standard deviations (for Level 1.5 Impairment) or 2 standard deviations (for Level 2 Impairment) below the person's expected level of premorbid functioning." (Settlement, Exhibit 2, p. 5). Using the tables provided in Exhibit 2 of the Settlement, a Class Member with Average Estimated Intellectual Functioning, for example, would be required to perform worse than 97 percent of same age peers in the published normative reference group on two or more (of six) Learning and Memory tests AND two or more (of four) Executive Function tests, in order to qualify for benefits under the Settlement. As seen in several studies comparing cognitively healthy elderly controls with patients diagnosed with moderate dementia, and often even with severe dementia, it is not common for dementia patients to score consistently more than two standard deviations below healthy controls (e.g., Caccappolo-Van Vliet et al., 2003; de Jager et al., 2003). However, the criteria used in the Settlement would require that the

Class Member's test performance be even more impaired than what is often seen in well-diagnosed cases of moderate stage dementia.

51.    The algorithm used to translate test performance into compensable Neurocognitive Impairment categories is arbitrary, nonstandard, and not supported by any scientific literature.  There are three different tables in Exhibit 2 of the Settlement used to determine the specific levels of test performance required to meet the categories of Neurocognitive Impairment based on three different levels of "Estimated Intellectual Functioning."  That is, the specific number of impaired tests per cognitive domain (e.g., 3 or more versus 2 or more) and the specific level of impairment (e.g., T Score below 35 versus below 37) is different based on whether a Class Member is determined to have Below Average, Average, or Above Average Estimated Intellectual Functioning.  Although it is common practice in neuropsychological assessment to compare an individual's performance to expected premorbid levels for that individual, it is uncommon to create distinct criteria tables for levels of impairment based on a single estimate of premorbid functioning to be used across large groups of individuals.  And, most importantly, for an algorithm to be used for any decision-making purpose (e.g., determination of large sums of compensation), it must be shown to be valid and reliable in the specific population for which it is being used, a process that requires extensive research.  There is no mention in the description of this algorithm that it has undergone any research to determine its appropriateness for this use.

52.    As defined in Exhibit 2 of the Settlement, Estimated Premorbid Intellectual Ability is determined by the Test of Premorbid Functioning (TOPF), which "provides three models for predicting premorbid functioning: (a) demographics only, (b) TOPF only, and (c) combined demographics and TOPF prediction equations" (Settlement Exhibit 2, p. 4).

53.    Based on the TOPF, Class Members would be categorized into one of the following three categories of Estimated Intellectual Functioning: (1) Below Average (estimated IQ below 90); (2) Average (estimated IQ between 90 and 109); and (3) Above Average (estimated IQ above 110).  A Class Member who, based solely on the TOPF predictions of premorbid functioning, is in the Below Average category would have to perform more poorly on more tests than a Class Member who is in the Average or Above Average categories. As an additional exemplar, I will compare two hypothetical cases who receive the exact same test scores on the

Neuropsychological Test Battery with the exception of TOPF scores. Based on the TOPF, the first case would be classified as having Below Average Estimated Intellectual Functioning, whereas the second case would be classified as having Above Average Estimated Intellectual Functioning. The age of both cases is the same, as is the number of qualifying seasons in the NFL. In both cases, the two worse areas of performance are in Learning and Memory and Executive Function. Both cases had two Learning and Memory tests with T scores of 34 and one Learning and Memory test with a T score of 36; all other Learning and Memory tests had better scores (i.e., T scores above 37). Both cases also had two Executive Function tests with T scores of 35 and one Executive Function test with a T score of 36; all other Executive Function tests had better scores (i.e., T scores above 40). Therefore, with the exact same performance on the exact same tests (other than the TOPF word pronunciation test), the first case would not qualify for any compensable diagnosis, whereas the second case would qualify for financial compensation with a diagnosis of Level 1.5 Neurocognitive Impairment.

**References Cited**

Bortnik KE, Horner MD, Bachman DL. (2013). Performance on Standard Indexes of Effort among Patients with Dementia. Applied Neuropsychology- Adult. Mar 28. [Epub ahead of print]

Caccappolo-Van Vliet, E., Manly, J., Tang, M.X., et al. (2003).The neuropsychological profiles of mild Alzheimer's disease and questionable dementia as compared to age-related cognitive decline. Journal of the International Neuropsychological Society, 9, 720–732.

De Jager, C. A., Hogervorst, E., Combrinck, M., & Budge, M.M. (2003).Sensitivity and specificity of neuropsychological tests for mild cognitive impairment, vascular cognitive impairment and Alzheimer's disease. Psychological Medicine, 33, 1039–1050

McKee, A., Stern, R., Nowinski, C., Stein, T., Alvarez, V., Daneshvar, D., Lee, H., Wojtowicz, S., Hall, G., Baugh, B., Riley, D., Kubilis, C., Cormier, K., Jacobs, M., Martin, B., Abraham, C., Ikezu, T., Reichard, R., Wolozin, B., Budson, A., Goldstein, G., Kowall, N., & Cantu, R. (2013). The spectrum of disease in chronic traumatic encephalopathy. Brain, 136, 43-64.

McKhann GM, Knopman DS, Chertkow H, et al. (2011).The diagnosis of dementia due to Alzheimer's disease: Recommendations from the National Institute on Aging-Alzheimer's Association workgroups on diagnostic guidelines for Alzheimer's disease. Alzheimer's and Dementia, 7, 263-269.

Montenigro, P.H., Baugh, C.M., Daneshvar, D.H., Mez, J., Budson, A.E., Au, R., Katz, D., Cantu, R.C., & Stern, R.A. (2014).  Clinical subtypes of chronic traumatic encephalopathy: Literature review and proposed research diagnostic criteria for Traumatic Encephalopathy Syndrome. Alzheimer's Research and Therapy, 6, 68.

Morris, J.C. (1993). The Clinical Dementia Rating (CDR): Current vision and scoring rules Neurology, 43:2412-2414

Stern, R.A., Daneshvar, D.H., Baugh, C.M., Seichepine, D.R., Montenigro, P.H., Riley, D.O., Fritts, N.G., Stamm, J.M., Robbins, C.A., McHale, L., Simkin, I., Stein, T.D., Alvarez, V., Goldstein, L.E., Budson, A.E., Kowall, N.W., Nowinski, C.J., Cantu, R.C., & McKee, A.C. (2013). Clinical presentation of Chronic Traumatic Encephalopathy. Neurology, 81, 1122-1129.

Teichner, G.L., &Wagner, M.T. (2004).The Test of Memory Malingering (TOMM): normative data from cognitively intact, cognitively impaired, and elderly patients with dementia. Archives of Clinical Neuropsychology, 19, 455-464.

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury that the foregoing is true and correct:

_____
Robert A. Stern, Ph.D.

Date:  October 6, 2014

# Curriculum Vitae
## Robert A. Stern, PhD

Alzheimer's Disease Center and CTE Center
Boston University School of Medicine
72 East Concord St., B7380
Boston, MA 02118-2526
Telephone: (617) 638-5678
Fax: (617) 638-5679
Email: bobstern@bu.edu
Web Sites: www.bu.edu/cte
www.bu.edu/alzresearch
October 2014

**ACADEMIC TRAINING:**

| | |
|---|---|
| 1980 B.A. | Wesleyan University, Middletown, CT |
| 1984 M.A. | University of Rhode Island, Kingston, RI, Psychology |
| 1988 Ph.D. | University of Rhode Island, Kingston, RI, Clinical Psychology (Clinical Neuropsychology Specialization); |
| 1986-1987 | Pre-Doctoral Internship in Clinical Neuropsychology; Mentor Edith Kaplan, Ph.D.; Department of Veterans Affairs Medical Center, Boston, MA |

**POSTDOCTORAL TRAINING:**

| | |
|---|---|
| 1988-1990 | Fellow in Neuropsychology and Psychoneuroendocrinology; Mentor Arthur J. Prange, Jr., MD; University of North Carolina School of Medicine, Chapel Hill, NC |

**ACADEMIC APPOINTMENTS:**

| | |
|---|---|
| 1988-1990 | Clinical Instructor of Psychiatry, University of North Carolina School of Medicine |
| 1990-1993 | Assistant Professor of Psychiatry, University of North Carolina School of Medicine |
| 1991-1993 | Clinical Assistant Professor of Speech and Hearing Sciences, University of North Carolina School of Medicine |
| 1991 - 1993 | Research Scientist, Brain and Development Research Center University of North Carolina School of Medicine |
| 1993-1996 | Assistant Professor of Psychiatry and Human Behavior, Brown Medical School |
| 1993-1996 | Assistant Professor of Clinical Neurosciences (Neurology), Brown Medical School |
| 1994-2004 | Adjunct Assistant Professor, Behavioral Neuroscience Program, Division of Graduate Medical Sciences, Boston University School of Medicine |
| 1996-2003 | Associate Professor of Psychiatry and Human Behavior, Brown Medical School |
| 1996-2003 | Associate Professor of Clinical Neurosciences (Neurology), Brown Medical School |
| 1997-2004 | Graduate Faculty Member, University of Rhode Island |
| 2002-2003 | Faculty Member, Brain Science Program, Brown University |
| 2005-Present | Faculty Member, Behavioral Neuroscience Program, Division of Graduate Medical Sciences, Boston University School of Medicine |
| 2005-2011 | Associate Professor of Neurology, Boston University School of Medicine |
| 2011-Present | Professor of Neurology and Neurosurgery, Boston University School of Medicine |
| 2014-Present | Professor of Neurology, Neurosurgery, and Anatomy and Neurobiology, Boston University School of Medicine |

## HOSPITAL APPOINTMENTS:

| | |
|---|---|
| 1986-1988 | Assistant in Neuropsychology, McLean Hospital, Belmont, MA |
| 1990-1993 | Clinical Neuropsychologist; Director, Adult Neuropsychology Laboratory; UNC Hospitals, Chapel Hill, NC |
| 1993-2003 | Clinical Neuropsychologist, Women's and Infants Hospital, Providence, RI |
| 1993-2003 | Clinical Neuropsychologist, Rhode Island Hospital, Providence, RI |
| 1994-1995 | Supervising Neuropsychologist, Slater Hospital, Cranston, RI |
| 1994-2003 | Director, Memory and Cognitive Assessment Program, Rhode Island Hospital, Providence, RI |
| 1997-2003 | Director, Neuropsychology Program; Rhode Island Hospital, Providence, RI |
| 2004-Present | Clinical Neuropsychologist, Boston Medical Center (Boston University Neurology Associates), Boston, MA |
| 2014-Present | Core Faculty Member, Boston Medical Center Injury Prevention Center |

## HONORS:

| | |
|---|---|
| 1980 | Honors in Psychology, Wesleyan University, Middletown, CT |
| 1980 | Heidman Prize (for Community Service), Wesleyan University, Middletown, CT |
| 1984 | Psi Chi National Honor Society in Psychology |
| 1988 | Phi Kappa Phi National Honor Society |
| 1997 | Master of Arts *ad eundem*, Brown University, Providence, RI |
| 1997 | Independent Investigator Award, National Alliance for Research on Schizophrenia & Depression (NARSAD) |
| 1999 | Outstanding Teaching Award in Psychology, Brown University School of Medicine, Providence, RI |
| 2001 | Fellow, American Neuropsychiatric Association |
| 2001 | Fellow, National Academy of Neuropsychology |
| 2008 | National Research Award, Alzheimer's Association MA/NH Chapter |

## LICENSES AND CERTIFICATION:

| | |
|---|---|
| 1990-1994 | Licensed Psychologist, North Carolina License # 1560 |
| 1993-2008 | Licensed Psychologist, Rhode Island # 491 |
| 1992-Present | Registrant, National Register of Health Service Providers in Psychology |
| 1997-Present | Licensed Psychologist HSP, Massachusetts # 7238 |

## DEPARTMENTAL AND UNIVERSITY COMMITTEES:

| | |
|---|---|
| 1994-1995 | Leadership Committee, Department of Psychiatry, Rhode Island Hospital |
| 1994-1996 | Committee for the Protection of the Rights of Human Subjects (IRB), Rhode Island Hospital |
| 1994-1997 | Research Committee, Department of Psychiatry and Human Behavior, Brown Medical School, RI |
| 1995-1996 | IRB Executive Committee Member, Rhode Island Hospital |
| 1995-2003 | Brown University Geriatric Neuropsychiatry Research and Treatment Program, Brown Medical School, RI |
| 1998-2000 | Continuing Medical Education Subcommittee, Department of Psychiatry, Rhode Island Hospital |
| 1999-2002 | Library Committee, Lifespan (Rhode Island Hospital and Miriam Hospital) |
| 2001-2002 | Training Committee, Brown University Clinical Psychology Training Consortium, Brown Medical School, RI |
| 2004-Present | Executive Committee, Alzheimer's Disease Center, Boston University School of Medicine |

| 2006-2012 | Executive Committee, Alzheimer's Disease Advisory (Philanthropic) Board, Boston University School of Medicine |
| 2012-present | Faculty Appointment and Promotions Committee, Boston University School of Medicine |

## TEACHING EXPERIENCE AND RESPONSIBILITIES:

| 1990-1993 | Member, Clinical Psychology Training Program, UNC School of Medicine |
| 1990-1993 | Regular Lecturer for Internship Seminar Series, UNC School of Medicine |
| 1990-1993 | Mentor and Supervisor, Neuropsychology Clinical Post-doctoral Fellows and Pre-doctoral Interns, Dept. of Psychiatry, UNC School of Medicine |
| 1990-1993 | Mentor for Psychiatry Research Fellows, Research Fellowship Training Program, UNC School of Medicine |
| 1990-1993 | Member, Training Faculty Institutional National Research Service Award Fellowship Training Program; Brain and Development Research Center, UNC School of Medicine |
| 1990-1993 | Co-director, Neuropsychiatry Seminar Series, UNC School of Medicine |
| 1990-1993 | Regular lecturer, Consult/Liaison Seminar Series, UNC Psychiatry Residency Training Program, UNC School of Medicine |
| 1990-1993 | Co-director, "Brain-Behavior Relationships", 3rd year medical school course; UNC School of Medicine |
| 1990-1993 | Regular Lecturer, 1st year Neurobiology Course, UNC School of Medicine |
| 1990-1993 | Regular Lecturer, "Adult Language Disorders" Course, Division of Speech and Hearing Sciences; UNC School of Medicine |
| 1990-1993 | Regular Lecturer, Graduate Neuropsychology Course, UNC |
| 1990-1993 | Regular Lecturer, Undergraduate Neuropsychology Seminar, UNC |
| 1993 | Non-faculty member of Ph.D. Dissertation Committees; Suffolk University, North Carolina State University, University of Alabama, University of New South Wales, Australia |
| 1993-2003 | Member, Neuropsychology Training Faculty; mentored clinical and research neuropsychology fellows and interns; Brown University |
| 1993-2003 | Supervised research placements for neuropsychology pre-doctoral interns; Brown University |
| 1993-2003 | Regular lecturer for Neuropsychology Seminar Series, Brown Medical School |
| 1993-2003 | Regular lecturer for Neuropsychology Rounds, Brown Medical School |
| 1993-2003 | Training Faculty, Neuropsychiatry/Behavioral Neurology Fellowship, Depts. Of Psychiatry & Human Behavior and, Department of Clinical Neurosciences, Brown Medical School |
| 1993-2003 | Regular lectures for Post-doctoral Fellow Lecture Series; Clinical Psychology Training Consortium, Brown Medical School |
| 1993-2003 | Lecturer for Psychiatry Residency Training Program for PGY 1, 2, 3 and 4 Lecture Series, Brown Medical School |
| 1993-2003 | Lecturer for First Year Medical Students Medical Interviewing Seminar, Brown Medical School |
| 1993-2003 | Mentor for Undergraduate Independent Study Courses, Departments of Neuroscience, Psychology, and others, Brown University |
| 1993-2004 | Supervised Practicum Training Site for Clinical Psychology Graduate Students, Undergraduate Psychology Internship Placement; URI |
| 1994-Present | Annual lecturer for Basic Neurosciences Course, Behavioral Neurosciences Program, BUSM |
| 1999-2007 | Clinical Practicum Supervisor; Suffolk University Clinical Psychology Program |
| 2001–2002 | Coordinator, Internship Training Program Neuropsychology Track, Brown University Clinical Psychology Training Consortium |

| 2001-2002 | Training Committee Member; Brown University Clinical Psychology Training Consortium |
| 2003 | Core Faculty Member, Brown University T32 Dementia Research Training Program |
| 2004-Present | Annual lecturer for Human Neuropsychology Seminar, Behavioral Neurosciences Program, BUSM |
| 2004-Present | Lecturer for Neurology Residency Training Program Lecture Series |
| 2005-2007 | Advisor (for 40 graduate students), BUSM Graduate Medical Sciences Masters Program |
| 2005-Present | Director, Post-Doctoral Neuropsychology Training Program, Alzheimer's Disease Center, BUSM |
| 2005-Present | Director and Lecturer for Neuropsychology and Dementia Seminar Series, Geriatric Medicine, Dentistry & Psychiatry Fellowship Program |
| 2005-Present | Consulting Neuropsychologist and Research Mentor, APA Accredited Internship and Fellowship Clinical Neuropsychology Training Program; Bedford (MA) Veterans Affairs Medical Center |
| 2006-2008 | Course Co-Director, Neuropsychological Assessment, Behavioral Neurosciences Program, BUSM |
| 2007-2008 | Lecturer for Biology of Disease (Neurology) Course, BUSM Preclinical Medical School Course |
| 2010-Present | CME Annual Course Co-Director, Brain Trauma and the Athlete, BUSM |
| 2011-Present | Core Faculty Member, Alzheimer's Disease Translational Research Training Program (National Institute on Aging T32), BUSM |
| 2012-Present | CME Course Co-Director, Chronic Traumatic Encephalopathy, co-sponsored by BUSM and the Cleveland Clinic Lou Ruvo Center for Brain Health; Las Vegas, September 30-October 1, 2012 |

**MAJOR MENTORING ACTIVITIES:**

Undergraduate Honors Theses Supervised

1991 Wendy Cox, "Effects of Physostigmine on Mood and Sustained Attention," Psychology Department, University of North Carolina

1992 Boykin Robinson, "Self-Report of Emotional and Cognitive Complaints in Individuals with Graves' Disease: A Survey Study," Psychology Department, University of North Carolina

1996 Mara Lowenstein, "Neuropsychological Functioning in Alzheimer's Disease and Vascular Dementia: A Qualitative Assessment of the Rey-Osterrieth Complex Figure," Psychology Department, Brown University

1997 Yamini Subramanian, "The Thyroid Axis and Seizure Threshold: Examining a Mechanism of Thyroid Hormone Augmentation of ECT," Neuroscience Department, Brown University

2002 Anna Podolanczuk, "Thyroid Hormone Levels in Post-Mortem Alzheimer's and Control Brains," Neuroscience Department, Brown University

Master's Theses Supervised

1998 Jennifer Latham, "The Visual Analog Mood Scales for Adolescents : A Preliminary Examination of Reliability and Validity," Psychology Department, University of Rhode Island

2000 Jessica Somerville, "A Comparison of Administration Procedures for the Rey-Osterrieth Complex Figure: Flow-Charts Vs. Pen-Switching," Psychology Department, University of Rhode Island

2000 Susan L. Legendre, "The Influence of Cognitive Reserve on Memory After Electroconvulsive Therapy," Psychology Department, University of Rhode Island

2005 Veronica Santini, "Thyroid-Neurobehavioral Relationships in the Elderly," Division of Graduate Medical Sciences, Boston University School of Medicine

2006  Daniel Daneshvar, "Association between Smoking, APOE, and Risk for Mild Cognitive
      Impairment and Alzheimer's Disease," Division of Graduate Medical Sciences, Boston
      University School of Medicine

2006  Laura Ridgely, "The Public Health Risk of Unsafe Elderly Drivers and Drivers with Dementia:
      Current Problems and Steps to be Taken," Division of Graduate Medical Sciences, Boston
      University School of Medicine

2007  David Essaff, "Executive Dysfunction in Early Alzheimer's Disease (AD) and Mild Cognitive
      Impairment: A Potential Cognitive Marker for Preclinical AD," Division of Graduate Medical
      Sciences, Boston University School of Medicine

2007  Meghan Lembeck, "Racial Disparities and Mild Cognitive Impairment Diagnosis: The Effects of
      Literacy Correction on Neuropsychological Test Scores," Division of Graduate Medical
      Sciences, Boston University School of Medicine

2008  Jessica A. Riggs, "Current Approaches to Alzheimer's Disease Treatment: A Focus on Passive
      Immunotherapy," Division of Graduate Medical Sciences, Boston University School of Medicine

2009  Vlada Doktor, "Clinical utility of Self and Informant's Complaint in Mild Cognitive Impairment
      and the Rate of Progression to Alzheimer's Disease," Division of Graduate Medical Sciences,
      Boston University School of Medicine

2011  John Picano, "Defining Concussions: A Literary and Empirical Analysis of Sports-Related
      Concussion."

2013  Alexandra Bourlas, "The Effects of Level and Duration of Play on Cognition, Mood and
      Behavior Among Former Football Players."


Doctoral Dissertations Supervised

1991  Susan L. Silva, "The Effects of Physostigmine on Cognition, Mood, and Behavior," Department
      of Psychology, North Carolina State University

1993  Mark L. Prohaska, "Thyroid, Lithium, and Cognition: The Use of Thyroid Hormone
      Augmentation in the Reduction of Cognitive Side Effects Associated with Lithium
      Maintenance," Psychology Department, University of Alabama

1999  Debbie J. Javorsky, "A Validation Study of the Boston Qualitative Scoring System (BQSS) for
      the Rey-Osterrieth Complex Figure," Psychology Department, University of Rhode Island

2003  Susan L. Legendre, "The Influence of Cognitive Reserve on Neuropsychological Functioning
      After Coronary-Artery Bypass Grafting (CABG)," Psychology Department, University of Rhode
      Island

2004  Jessica Somerville Ruffolo, "Visuoconstructional Impairment: What Are We Assessing and How
      Are We Assessing It?," Psychology Department, University of Rhode Island

2014  Stacy Anderson, "Episodic Memory and Executive Function in Familial Longevity" (Second
      Reader), Behavioral Neurosciences Program, Boston University School of Medicine.


Current PhD and MD/PhD Students

      Julie Stamm (Mentor for NIH F31 Grant 1F31NS081957; 2013-Present; PhD candidate, Dept of
      Anatomy and Neurobiology)

      Philip Montenigro (MD/PhD candidate, Dept. of Anatomy and Neurobiology)

      Daniel Corps (visiting PhD student from Melbourne, Australia)

CV: Robert A. Stern, Ph.D.          -          Page 6

Post-Doctoral Fellows Trained

| | |
|---|---|
| 1991-1993 | Susan Silva, Ph.D., now Research Associate Professor at Duke University |
| 1992-1993 | Mareah Steketee, Ph.D., now Adjunct Associate Professor at UNC-Chapel Hill |
| 1993-1995 | Mark Prohaska, Ph.D., now Director, Neuropsychology Clinic, Alabama |
| 1994-1996 | James Arruda, Ph.D., now Associate Professor at University of West Florida |
| 1994-1996 | Garrie Thompson, Ph.D., now Clinical Neuropsychologist, Florida |
| 1996-1998 | Geoffrey Tremont, Ph.D., now Associate Professor at Brown University |
| 1998-2000 | Holly Westervelt, Ph.D., now Clinical Assistant Professor at Brown University |
| 1998-2000 | Debbie Javorsky, Ph.D., now Clinical Neuropsychologist, New Hampshire |
| 2000-2001 | Michael Ropacki, Ph.D., now Medical Director, Global Medical Affairs, Janssen Alzheimer Immunotherapy |
| 2000-2002 | Caitlin Macaulay, Ph.D., now Clinical Neuropsychologist at Lahey Clinic, Massachusetts |
| 2001-2004 | Jennifer Duncan Davis, Ph.D., now Assistant Professor at Brown University |
| 2002-2003 | Richard Temple, Ph.D., now Vice President of Clinical Operations at Core Health Care |
| 2003-2004 | Laura Brown, Ph.D., now Clinical Neuropsychologist, Rhode Island |
| 2003-2004 | Mary Beth Spitznagel, Ph.D., now Assistant Professor at Kent State University |
| 2004-2005 | Angela Jefferson, Ph.D., now Associate Professor at Vanderbilt University |
| 2005-2007 | Lee Ashendorf, Ph.D., now Clinical Neuropsychologist at Bedford VAMC |
| 2007-2009 | Brandon Gavett, Ph.D., now Assistant Professor at Univ. of Colorado, Colorado Springs |
| 2010-2011 | Katherine Gifford, Ph.D., now Fellow at Vanderbilt University |
| 2012-2013 | Daniel Seichepine, Ph.D. |
| 2012-2014 | Elizabeth Vassey, Ph.D. |
| 2013-Present | Todd Solomon, Ph.D. |

## MAJOR ADMINISTRATIVE RESPONSIBILITIES:

| | |
|---|---|
| 1991-1993 | Director, Neurobehavioral Assessment Core, NIMH-funded Mental Health Clinical Research Center, UNC School of Medicine |
| 1992-1993 | Acting Director, Data Management/Biostatistics Core, NIMH-funded Mental Health Clinical Research Center, UNC School of Medicine |
| 1992-1993 | Associate Center Director, NIMH-funded Mental Health Clinical Research Center, UNC School of Medicine |
| 1995-1996 | Vice Chair, Committee for the Protection of the Rights of Human Subjects (IRB), Rhode Island Hospital |
| 2001-2002 | Coordinator of Neuropsychology Track, Internship Training Program, Brown Clinical Psychology Training Consortium, Brown Medical School |
| 2004-Present | Director of Neuropsychology, Alzheimer's Disease Clinical and Research Program, Boston University School of Medicine (BUSM) |
| 2004-2008 | Associate Director, Alzheimer's Disease Center (NIA-Funded) Clinical Core, BUSM |
| 2004-2006 | Associate Director, Alzheimer's Disease Clinical and Research Program, BUSM |
| 2006-2010 | Co-Director, Alzheimer's Disease Clinical and Research Program, BUMC |
| 2008-2012 | Co-Director, Center for the Study of Traumatic Encephalopathy, BUSM |
| 2009-2010 | Acting Director, Alzheimer's Disease Clinical and Research Program, BUMC |
| 2009 | Acting Director, Alzheimer's Disease Center (NIA-Funded) Clinical Core, BUSM |
| 2010-Present | Director, Alzheimer's Disease Center (NIA-Funded) Clinical Core, BUSM |
| 2011-2012 | Director, Alzheimer's Disease Clinical and Research Program, BUMC |
| 2011-2012 | Co-Chair, Global Advisory Committee, INternational Registry Of Alzheimer's Disease patientS (INROADS), Janssen Alzheimer Immunotherapy |
| 2011-Present | Site Director (BU) and Steering Committee Member, Alzheimer's Disease Cooperative Study (NIA-Funded) |
| 2014-Present | Director of Clinical Research, CTE Center, BUSM |

## OTHER PROFESSIONAL ACTIVITIES:

### PROFESSIONAL SOCIETIES: MEMBERSHIPS, OFFICES, AND COMMITTEE ASSIGNMENTS

International Neuropsychological Society (Member, 1987-Present)
    Member, Scientific Program Committee, 1997-1999
    Meeting Development Coordinator, 1999-2001

American Psychological Association Division 40, Clinical Neuropsychology (Member, 1988-Present)
    Member, Scientific Advisory Committee, 1995-1997

American Psychological Association Division 12, Clinical Psychology (Member, 1988-Present)

National Academy of Neuropsychology (Member, 1990-Present)
    Fellow, Appointed 2001

American Neuropsychiatric Association (Member, 1995-Present)
    Fellow, Appointed 2001
    Member, Scientific Program Committee, 1995-1999
    Co-Director, Annual Meetings, 1997-1999
    Member, Awards Committee, 2006-Present

Massachusetts Neuropsychological Society (Member, 2007-Present)

International Society to Advance Alzheimer Research and Treatment (Member, 2008-Present)

**EDITORIAL BOARDS:**

| | |
|---|---|
| 1998-Present | Associate Editor, *Journal of Neuropsychiatry and Clinical Neurosciences* |
| 2001-2003 | Consulting Editor, *Assessment* |
| 2008-Present | Editorial Board Member, *Archives of Clinical Neuropsychology* |
| 2010-Present | Review Editor, *Frontiers in Neurotrauma* |
| 2011-Present | Review Editor, *Frontiers in Sports Neurology* |
| 2012-Present | Series Editor, Traumatic Brain Injury Series, *Alzheimer's Research and Therapy* |

**JOURNAL REVIEWER**

Alzheimer's Disease and Associated Disorders
Archives of Neurology
Brain and Cognition
Cognitive and Behavioral Neurology
Injury Epidemiology
International Journal of Geriatric Psychiatry
International Review of Psychiatry
Journal of Clinical and Experimental Neuropsychology
Journal of the International Neuropsychological Society
Journal of the Neurological Sciences
Journal of Nutrition, Health and Aging
Neurology
Neurology: Clinical Practice
Neurology Psychiatry & Brain Research
Neuropsychology
Neuroscience & Biobehavioral Reviews
PLOS ONE
The Clinical Neuropsychologist

## MAJOR COMMITTEE ASSIGNMENTS:

### Federal Government

| | |
|---|---|
| 1998 - 1999 | Independent Neuropsychological Review Committee V.A. Cooperative Study #029, "Evaluation of a Computer-Assisted Neuropsychological Screening Battery", Department of Veterans Affairs |
| 2012 – Present | Member, Advisory Board, DoD ADNI (Effects of traumatic brain injury and post traumatic stress disorder on Alzheimer's disease in Veterans using ADNI; PI: MW Weiner) |

### Private/Foundation

| | |
|---|---|
| 1993-Present | Member, Medical Advisory Board, National Graves' Disease Foundation |
| 2007-Present | Member, Medical Advisory Board, Sports Legacy Institute |
| 2007-Present | Member, Medical & Scientific Advisory Committee, Massachusetts/New Hampshire Chapter, Alzheimer's Association |
| 2010-Present | Member, Mackey-White Traumatic Brain Injury Committee, National Football League Players Association; Co-Chair of Subcommittee on Former Player Research |

### Study Sections

*National Institutes of Health*

| | |
|---|---|
| 1993 | Ad hoc Reviewer, Mental Health AIDS and Immunology Review Committee: Psychobiological, Biological, and Neuroscience Subcommittee |
| 1995 | Ad hoc Reviewer, Mental Health Small Business Research Review |
| 1995-1996 | Reviewers Reserve (NRR; Study Sections) Member |
| 1996-1998 | Mental Health Small Business Research Review Committee Member |
| 1999 | Ad hoc Reviewer, Small Business Research Review Committee |
| 2000 | Ad hoc Reviewer, Special Emphasis Panel – ZMH1-CRB-B01 |
| 2013 | Ad hoc Reviewer, Special Emphasis Panel - ZRG1 BBBP-D02 |

*Other National Review Committees*

| | |
|---|---|
| 1998-Present | Initial Review Board of the Medical and Scientific Advisory Council, Alzheimer's Association |
| 2013 | Reviewer, US Army Medical Research and Materiel Command (USAMRMC) |

*International*

| | |
|---|---|
| 2013 | External Advisor, Wellcome Trust Strategic Award Committee (SAC) |

## CONSULTANT ACTIVITIES:

| | |
|---|---|
| 1991-1992 | Cato Research, Ltd. (Clinical Trials Design and Implementation) Durham, NC |
| 1995-2003 | "HIV: Neuropsychiatric and Psychoimmune Relationships" (Dwight Evans, PI; R01 Grant), Department of Psychiatry, University of Pennsylvania |
| 2004-2006 | "A Telephone Intervention for Dementia Caregivers" (Geoffrey Tremont, PI; R21 Grant), Rhode Island Hospital/Brown Medical School |
| 2004-2006 | "A Longitudinal Study of Hazardous Drivers with Dementia" (Brian Ott, PI; R01 Grant), Memorial Hospital of Rhode Island/Brown Medical School |
| 2007-2009 | Outcome Science (for Forest Laboratories), Cambridge, MA |
| 2009 | Elan Pharmaceuticals, San Francisco, CA |
| 2011 | Neuronix, Yokneam, Israel |
| 2012 | Lilly (*Expert Advisor*), Indianapolis, IN |
| 2011-2012 | Janssen Alzheimer Immunotherapy, San Francisco, CA |
| 2013-Present | Athena Diagnostics (Quest), Worcester, MA |

**CURRENT OTHER SUPPORT:**

| | |
|---|---|
| 2014-2015 | 2R56NS078337-04, **PI: Stern**, Chronic Traumatic Encephalopathy: Clinical Presentation and Biomarkers (competing continuation), Total Costs: $785,813. |
| 2014-2018 | ADCS-Toyama Chemical Partnership; **Site PI: Stern**, A Phase 2 multi-center, randomized, double blind, placebo-controlled, parallel group study to evaluate the efficacy and safety of T-817MA in patients with mild to moderate Alzheimer's Disease (US202), Total Costs: $473,346. |
| 2014-2015 | Avid Radiopharmaceuticals; **PI: Stern**, 18F-AV-1451 and Florbetapir F 18 PET Imaging in Subjects with Repetitive Brain Trauma at High Risk for Chronic Traumatic Encephalopathy, Total Costs: $243,263. |
| 2014-2015 | R56NS089607, mPI: Au/McClean/Grafman **(Stern Co-Investigator)**, Precursors and Prognosis of Traumatic Brain Injury in Young to Middle Aged Adults, Total Costs: $634,227 |
| 2014-2016 | Avid Radiopharmaceuticals; **Site PI: Stern**, 18F-AV-1451-A05: An open label, multicenter study, evaluating the safety and imaging characteristics of 18F-AV-1451 in cognitively healthy volunteers, subjects with Mild Cognitive Impairment, and subjects with Alzheimer's disease, Total Costs: $395,222. |
| 2014-2019 | Alzheimer's Disease Cooperative Study (ADCS), **Site PI: Stern**, Anti-Amyloid Treatment in Asymptomatic Alzheimer's Disease (A4 Study), Total Costs: $464,479. |
| 2014-2019 | Eli Lilly, **Site PI: Stern**, Effect of Passive Immunization on the Progression of Mild Alzheimer's Disease: Solanezumab (LY2062430) Versus Placebo, Total Costs: $395,270 |
| 2014-2016 | Amarantus Holdings, Inc., **PI: Stern**, Amarantus LymPro Cell Cycle Dysfunction Blood Biomarker for AD and CTE, Total Costs: 54,600 |
| 2013-2016 | DoD W81XWH-13-2-0064; Traumatic Brain Injury Research Award; **Co-PI: Stern** (Co-PI: M. Shenton), Tau Imaging of Chronic Traumatic Encephalopathy, Total Costs: $992,727 |
| 2013-2015 | Eisai, Inc., **Site PI: Stern**, A Placebo-controlled, double-blind, parallel-group, Baysian Adaptive Randomization Design and Dose Regimen-finding study to evaluate safety, tolerability and efficacy of BAN2401 in subjects with early Alzheimer's disease, Total Costs: $391,342. |
| 2013-2017 | U01-NS086659; PI: McKee **(Stern, Co-Investigator)**, CTE and Posttraumatic Neurodegeneration: Neuropathology and Ex Vivo Imaging, Total Costs: $6,000,000 |
| 2011-2015 | R01NS078337-01A1, **PI: Stern**, Chronic Traumatic Encephalopathy: Clinical Presentation and Biomarkers, Total Costs: $ 2,035,330. |
| 2011-2016 | P30-AG13846, PI: N. Kowall; **Clinical Core Director: Stern**; Boston University Alzheimer's Disease Core Center; Total Costs: $5,986,877. |
| 2010-2015 | D01 HP08796, PI: S. Chao; **Neuropsychology Director: R.A. Stern**; Geriatric Medicine, Dentistry and Psychiatry Fellowship at Boston University; Total Direct Costs: $1,044,630 |
| 2009-2015 | R01CA129769, **PI: Stern** (mPI: Mandelblatt, Ahles), Older Breast Cancer Patients: Risk for Cognitive Decline, Total Costs: $ 3,186,605 |

## PAST OTHER SUPPORT

2008-2014 R01MH080295, PI: Stern (MPI: R. Joffe), Subclinical Hypothyroidism: Mood, Cognition and the Effect of L-Thyroxine Treatment, Total Costs: $ 2,229,240

2009-2013 Medivation, Inc. Protocol No. DIM18EXT, Site PI: R.A. Stern, Concert Plus: An Open-Label Extension of the Concert Protocol (DIM18) Evaluating Dimebon (Latrepirdine) in Patients with Alzheimer's Disease, Total Direct Costs: $30,768

2009-2013 Wyeth/Pfizer Pharmaceuticals, Site PI: R.A. Stern, A Phase 3, Multicenter, Randomized, Double-Blind, Placebo-Controlled, Parallel Group, Efficacy and Safety Trial of Bapineuzumab (AAB-001, ELN115727) in Patients with Mild to Moderate Alzheimer's Disease who are Apolipoprotein E 4 Carriers (Protocol 3133K1-3001-US), Total Direct Costs: $265,380

2008-2012 Elan Pharmaceuticals (now Janssen Alzheimer's Immunotherapy), Site PI: R.A. Stern, A Phase 3, Multicenter, Randomized, Double-Blind, Placebo-Controlled, Parallel Group, Efficacy and Safety Trial of Bapineuzumab (AAB-001, ELN115727) in Patients with Mild to Moderate Alzheimer's Disease who are Apolipoprotein E 4 Non-Carriers (Protocol ELN115727-301) and Carriers (Protocol ELN115727-302), Total Direct Costs: $500,000

2007-2012 U01 AG10483, ADCS Contract (CFDA #93.866), Site PI: R.A. Stern, Multi-Center Trial to Evaluate Home-Based Assessment Methods for Alzheimer 's Disease Prevention Research in People Over 75 Years Old, Total Direct Costs: $117,750

2009-2011 5U01AG015477-07 ARRA. PI: J. Breitner; Site Director: R.A. Stern, Prevention of Alzheimer's Disease and Cognitive Decline, Total Direct Costs (Boston Site): $145,432

2009-2011 National Operating Committee on Standards for Athletic Equipment Investigator Initiated Grant, PI: A.C. McKee & R.A. Stern, Neuropathological and Clinical Consequences of Repetitive Concussion in Athletes; Total Direct Costs: $249,992

2008-2011 IIRG-08-89720 (Alzheimer's Association), PI: R.A. Stern, Assessment of Driving Safety in Aging, MCI and Dementia, Total Direct Costs: $240,000

2008-2011 Alzheimer's Association Subcontract, PI: G. Feke; Site PI: R.A. Stern, Objective Biomarkers for Alzheimer's Disease in the Retina, Total Costs: $81,000 Subcontract

2009-2010 P30-AG13846 Supplement to P30 Center Grant, PI: R.A. Stern & A.C. McKee (N. Kowell, P30 PI); Development of Pathology Diagnostic Criteria for Chronic Traumatic Encephalopathy, Total Direct Costs: $83,287

2008-2009 P30-AG13846 Supplement to P30 Center Grant, PI: R.A. Stern & A.C. McKee (N. Kowell, P30 PI); Neuropathologic Examination of Traumatic Encephalopathy in Athletes with Histories of Repetitive Concussion, Total Direct Costs: $100,000

2004-2009 U01 AG023755, PI: T. Perls, Exceptional Survival and Longevity in New England, Total Direct Costs: $2,073,781

2006-2009 R01 HG/AG02213, PI: R.C. Green, Risk Evaluation and Education for Alzheimer's Disease (REVEAL III), Total Direct Costs: $1,992,415

2000-2007 U01 AG15477, PI: J. Breitner, The ADAPT Study: Alzheimer's Disease Anti-inflammatory Prevention Trial, Total Direct Costs to Boston Site: $561,246

2004-2006 Massachusetts Institute of Technology AgeLab and The Hartford, PI: R.A. Stern; Driving and Dementia Total Direct Costs: $162,082

2004-2005 Boston University Alzheimer's Disease Core Center Pilot Project Grant, PI: R.A. Stern Triiodothyronine Treatment of Alzheimer's Dementia, Total Direct Costs: $29,989

| 2001-2004 | R21MH062561, PI: G. Tremont, A Telephone Intervention for Dementia Caregivers, Total Direct Costs: $375,000 |
|---|---|
| 2001-2005 | 5R01AG016335, PI: B. Ott, A Longitudinal Study of Hazardous Drivers with Dementia, $103,008, Subcontract |
| 1998-2004 | 5R01NS037840, PI: Ivan Miller. Title: Efficacy of a Family Telephone Intervention for Stroke, Total Direct Costs: $1,516,615 |
| 2000-2003 | Eisai, Inc. and Pfizer, Inc Investigator Initiated Grant, PI: R.A. Stern; Title: Clinical Trial of Donepezil Hydrochloride (Aricept) in Diminishing the Cognitive Impairment Associated with Electroconvulsive Therapy; Total Direct Costs: $108,854 |
| 1999-2003 | Alzheimer's Association Individual Research Grant; PI: R.A. Stern; Title: A Double-Blind Study of Donepezil with and without Thyroid Hormone in the Treatment of Alzheimer's Dementia Total Direct Costs; $163,626 |
| 2000-2002 | R44 MH58501, PI: T. White. Project PI: R.A. Stern; Title: A Modular Neuropsychological Test Battery (Subcontract with Psychological Assessment Resources, Inc) Total Direct Costs: $272,487, Subcontract (Project Total Direct: $1,305,245) |
| 1999-2000 | Psychological Assessment Resources, Inc. Contract; PI: R.A. Stern; Title: Development of a Modular Neuropsychological Test Battery; Total Direct Costs: $48,084 |
| 1999-2004 | Thyroid Research Advisory Council (TRAC) Individual Grant; PI: Geoffrey Tremont; Title: Cerebral Perfusion and Neuropsychological Functioning in Thyrotoxic Graves' Disease Patients; Total Direct Costs: $55,139 |
| 1997-2000 | National Alliance for Research on Schizophrenia and Depression Independent Investigator Award; PI: R.A. Stern; Title: Thyroxine Treatment of the Neurocognitive Side Effects of Lithium; Total Direct Costs: $92,592 |
| 1998 | R43 MH58501-01; PI: T. White; A Modular Neuropsychological Test Battery (subcontract) Total Direct Costs: $23,463, Subcontract |
| 1997-1998 | Research Fellowship Training Grant, Brown University Department of Psychiatry and Human Behavior; PI: Geoffrey Tremont and R.A. Stern; Psychiatric and Neuropsychologic Consequences of Graves' Disease; Total Direct Costs: $15,888 |
| 1996-1997 | Contract, Milkhaus Laboratory; PI: R.A. Stern; An Open-Label Treatment of 2CVV in the Amelioration of Neuropsychological and Psychiatric Symptoms Associated with Chronic Fatigue Syndrome (CFS); Total Direct Costs: $10,000 |
| 1995-1996 | Contract, Milkhaus Laboratory; PI: R. A. Stern; 2CVV in the Amelioration of Neuropsychological and Psychiatric Symptoms in Outpatients with Chronic Fatigue Syndrome: A Phase 1/2, Double-Blind, Placebo-Controlled Study; Total Direct Costs: $9575 |
| 1994-1995 | Research Fellowship Training Grant (PI: James Arruda, Ph.D., Fellow); Title: Neurobehavioral Functioning in Women Infected with HIV-1; Total Direct Costs: $17,500 |
| 1992-1997 | 5R01MH048578-05; PI: R.A. Stern; Combined Thyroid Hormone and Electroconvulsive Therapy; Total Direct Costs: $471,021 |
| 1992-1994 | 5R01MH043231-02; PI: J.J.Haggerty; Co-PI: R.A. Stern; Neuropsychiatric Aspects of Marginal Hypothyroidism; Total Direct Costs: $174,413 |
| 1992-1997 | 5P50MH033127; PI: A.J. Prange, Jr.; Neurobehavioral Assessment Core Director: R.A. Stern; Psychoendocrinology: Children and Adults, Total Direct Costs: $4,641,038 total project; $256,624 subproject [core] *role in project ended 7/93 due to leaving UNC* |

| 1992-1993 | UNC University Research Council Pilot Project Award Grant; PI: R. A. Stern; Influence of L-triiodothyronine (T3) on Memory following Repeated Electroconvulsive Shock (ECS) in Rats; Total Direct Costs: $3000 |
|---|---|
| 1992-1993 | The Psychological Corporation Contract; PI: R.A. Stern;  Validation of the Microcog Computerized Neuropsychological Screening Test in HIV-Infected Gay Men; Total Direct Costs: $3600 |
| 1991-1992 | UNC Medical Faculty Research Pilot Project Award Grant; PI: R.A. Stern; Physostigmine as a Psychodiagnostic Tool: The Effects of Physostigmine on Cognition, Mood, and Behavior in Normal Volunteers; Total Direct Costs: $3000 |
| 1990-1992 | The Foundation of Hope for Research and Treatment of Mental Illness Pilot Project Award; PI: R.A. Stern; Neuropsychological Correlates of Pregnancy and the Early Puerperium; Total Direct Costs: $16,000 |
| 1990-1992 | The North Carolina Foundation for Mental Health Research, Inc. Pilot Project Award; PI: R.A. Stern; Physostigmine as a Psychodiagnostic Tool: The Effects of Physostigmine on Cognition, Mood and Behavior; Total Direct Costs: $1200 |
| 1989-1991 | The Foundation of Hope for Research and Treatment of Mental Illness Pilot Project Award; PI: R.A. Stern; Neuropsychological Correlates of Alterations in Thyroid State; Total Direct Costs: $26,317 |
| 1989-1994 | R01MH044618; PI: D. Evans; HIV: Neuropsychiatric and Psychoimmune Relationships; Total Direct Costs: $1,293,290 (subcontract) |

## CONGRESSIONAL TESTIMONY

| June 25, 2014 | Special Committee on Aging, United States Senate Hearing on "State of Play: Brain Injuries and Diseases of Aging" |
|---|---|

## INVITED LECTURES AND PRESENTATIONS
*(Does not include frequent invited community lay lectures, including lectures for the MA/NH Chapter of the Alzheimer's Association)*

| May 16, 1989 | *Mood Disorders and Cerebrovascular Disease.*  Department of Psychiatry, Rhode Island Hospital, Brown University School of Medicine, Providence, RI,. |
|---|---|
| Dec. 8, 1989 | *Mood Disorders following Stroke.*  Continuing Education Course,  Greensboro (NC) Area Health Education Center, |
| January 4, 1990 | *Assessment and Diagnosis of Post-Stroke Mood Disorders.*  Continuing Education Course, Westboro (MA) State Hospital |
| March 3, 1990 | *How to Design a Clinical Trial.*  Third annual meeting of the Southern Association for Research in Psychiatry. Chapel Hill, NC. |
| May 25, 1990 | *Assessment and Diagnosis of Post-Stroke Mood Disorders.*  Whittiker Rehabilitation Center, Bowman-Gray Medical Center, Winston-Salem, NC |
| Aug 17, 31 1990 | *Neurobehavioral Syndromes: Assessment and Diagnosis.*  Continuing Education Workshop, Mountain Area Health Education Center, Asheville, NC |
| September 22, 1990 | *Theories and Models of Human Cognition: Learning and Memory.*  Advanced Workshops in Traumatic Brain Injury Rehabilitation, Peace Rehabilitation Center, Greenville, SC. |

October 19, 1990      *Neurobehavioral Syndromes*.  Continuing Education Course, Broughton Hospital, Morganton, NC

December 11, 1990     *Neuropsychology of Aging*.  Continuing Education Workshop, Mountain Area Health Education Center, Asheville, NC

Feb 24-Mar 1, 1991    *States of Mind*.  Series of lectures on brain-behavior relationships to selected educators during week-long seminar/retreat, The North Carolina Center for the Advancement of Teaching, Cullowhee, NC

March 1, 1991         *How to Design a Clinical Trial*.  Psychiatry Grand Rounds, Bowman-Gray School of Medicine, Winston-Salem, NC

March 14, 1991        *Mood Disorders Following Stroke*.  Psychiatry Grand Rounds, University of North Carolina School of Medicine, Chapel Hill, NC

July 26, 1991         *Normal and Pathological Aging: Neurocognitive Functioning*.  Continuing Education Course, Broughton Hospital, Morganton, NC

September 12, 1991    *Neurobehavioral Functioning in a Non-Confounded Cohort of Asymptomatic HIV Seropositive Gay Men*.  National Institute of Mental Health (NIMH) sponsored meeting, Neurobehavioral Findings in AIDS Research, Washington, DC

April 2, 1992.        *Neuropsychiatric Disorders: Post-Stroke Depression and AIDS-Related Neurobehavioral Impairment*.  Annual meeting of the North Carolina Speech and Hearing Association, Wilmington, NC,

September 18, 1992    *Neurobehavioral Syndromes*. Continuing Education Course, Johnston County (NC) Mental Health Center.

October 13, 1993      *Neurobehavioral Aspects of HIV Infection: Children and Adults*.  Child Psychiatry Grand Rounds, Brown University School of Medicine, Providence, RI

December 14, 1993     *New Directions in Psychoneuroimmunology: Neuropsychiatric Correlates of HIV Infection*.  Boston Behavioral Immunology Study Group, Boston, MA

March 3, 1994         *Neuropsychiatric Aspects of Thyroid Disorders*. Endocrinology Grand Rounds, Rhode Island Hospital, Providence, RI

March 23, 1994        *Post-Stroke Mood Disorders*. Neurology Grand Rounds, Brown University School of Medicine, Providence, RI

April 29, 1994        *Behavioral Abnormalities in Dementia*. Gerontology '94: Brain and Behavior, a conference sponsored by the Rhode Island Department of Elderly Affairs, Cranston, RI

June 3, 1994          *Differential Diagnosis of Psychiatric Disorders in Neurologic Patients: Assessment of Mood*. Applications of Neuropsychological Expertise to Clinical Practice in Psychology. Boston Department of Veterans Affairs Medical Center and Tufts New England Medical Center, Boston, MA

November 15, 1994     *Brain-Behavior Relationships: Appropriate Use and Benefits of Neuropsychological Evaluation*.  Grand Rounds. Department of Medicine, Rhode Island Hospital, Providence, RI

November 17, 1994     *Neuropsychiatric Aspects of HIV and AIDS*.  General Internal Medicine Research Seminar. Rhode Island Hospital, Providence, RI.

March 5, 1996         *Thyroid Disorders and Psychiatry*.  Grand Rounds, St. Luke's Hospital, New Bedford, MA

March 26, 1996        *Neurobehavioral Aspects of Thyroid Disorders*. Lecture Series, Department of Endocrinology, University of Virginia School of Medicine, Charlottesville, VA

| April 10, 1996 | *Neuropsychiatric Aspects of Thyroid Disorders*. Psychiatry Lecture Series, Rhode Island Hospital, Providence, RI |
| April 19, 1996 | *Neurobehavioral Aspects of Graves' Disease*.  Keynote Address, Third Annual Meeting of the New England Thyroid Club, Westborough, MA |
| May 7, 1996 | *Neuropsychological Evaluation of Executive Functioning*. "Neuropsychiatry for Clinicians" section of the *Psychiatry Update* session of the 149th Annual Meeting of the American Psychiatric Association, New York |
| June 19, 1997 | *Assessment of Mood State and Depression in Neurodegenerative Disease*.  Geriatric Case Conference and Journal Club. Butler Hospital |
| November 2, 1997 | *The Thyroid Axis in Mood Disorders: Thoughts About Therapy* (Discussant). The 14th Annual George C. Ham Symposium (A Festschrift Celebrating the Career of Arthur J. Prange, Jr.). Chapel Hill, NC |
| December 19, 1997 | *Neuropsychiatric Manifestations of HIV Infection*.  Psychiatry Grand Rounds. Department of Veterans Affairs Medical Center.  Providence, RI |
| May 5, 1998 | *Quantifying the Qualitative Features of Rey-Osterrieth Complex Figure Performance: The Boston Qualitative Scoring System (BQSS)*.  Continuing Education Lecture.  Massachusetts Neuropsychological Society, Boston, MA |
| November 8, 1998 | *Assessment of Mood State and Depression in Aphasia*.  Aphasia: Assessment, Treatment, and Emotional Issues Symposium.  19th Annual Neurorehabilitation Conference on Traumatic Brain Injury and Stroke.  (Sponsored by the Healthsouth Braintree Rehabilitation Hospital.) Cambridge, MA |
| April 27, 1999 | *Assessment of Mood and Depression in Neurologic Disease*.  Spring Lecture Series. Department of Communicative Disorders, University of Rhode Island, Kingston, RI |
| June 16, 1999 | *The Use of Thyroid Hormone to Diminish the Cognitive Side Effects of Psychiatric Treatment*. Psychiatry Grand Rounds, McMaster University Medical Center, Hamilton, Ontario, Canada |
| Nov. 13, 1999 | *Cognitive Rehabilitation: A Neuropsychological Perspective*.  "Frontiers of Hope;" Annual National Meeting for Patients, Families, and Health Care Professionals; Brain Tumor Society, Providence, RI |
| March 1, 2000 | *Neurobehavioral Functioning in Thyroid Disease*.  Neurology Grand Rounds, Brown University School of Medicine, Rhode Island Hospital, Providence, RI |
| June 14, 2000 | *Surviving a Brain Tumor: Understanding Changes in Thinking and Memory*.  Featured speaker for an international educational teleconference for brain tumor survivors and family members, co-sponsored by the Brain Tumor Society, the American Brain Tumor Association, the National Brain Tumor Foundation, and Cancer Care, Inc. |
| December 14, 2000 | *The Use of Thyroid Hormone to Diminish the Cognitive Side Effects of ECT and Lithium*. Geriatric Psychiatry Case Conference and Journal Club (CME activity), Butler Hospital, Providence, RI |
| April 29, 2002 | *The Thyroid-Brain Connection: Neuropsychological and Behavioral Aspects of Thyroid Disorders*.  Keynote Speaker, Psi Chi Induction Ceremony, Providence College, Providence, RI |
| September 21, 2002 | *The Invisible Disability: Living with the Cognitive and Behavioral Changes from a Brain Tumor*. "Living Beyond a Brain Tumor 2002: A brain tumor symposium for patients, families, and healthcare professionals. Brain Tumor Society, Quincy, MA |

| December 5, 2002 | *Neuropsychology of Thyroid Disease*. Behavioral Neuroscience Seminar Series. Brigham and Women's Hospital, Harvard Medical School, Boston, MA |
| --- | --- |
| June 16, 2003 | *The Role of Thyroid Functioning in the Aging Brain and Dementia*. Seminar Series, Alzheimer's Disease Center, Boston University School of Medicine, Boston, MA |
| December 12, 2003 | *The Neuropsychological Assessment Battery (NAB).* Continuing Education Workshop, Colorado Neuropsychological Society, Denver, CO |
| January 23, 2004 | *The Neuropsychological Assessment Battery (NAB).* Continuing Education Workshop, Georgia Psychological Association, Emerald Pointe, GA,. |
| January 24, 2004 | *The Neuropsychological Assessment Battery (NAB): Development and Psychometric Properties.* Continuing Education Workshop, 1st Professional Neuropsychology Weekend Conference, Coalition of Clinical Practitioners in Neuropsychology, Las Vegas, NV |
| January 24, 2004 | *The Neuropsychological Assessment Battery (NAB): Administration, Scoring, and Interpretation.* Continuing Education Workshop, 1st Professional Neuropsychology Weekend Conference, Coalition of Clinical Practitioners in Neuropsychology, Las Vegas, NV |
| April 1, 2004 | *The Utility of the Neuropsychological Assessment Battery (NAB) in the Evaluation of Adult Neurodevelopment Disabilities.* Continuing Education Workshop, Annual Conference of Contemporary Applications of Psychological Testing, Harvard Medical School, Boston, MA |
| October 8, 2004 | *The Neuropsychological Assessment Battery (NAB).* Workshop presented at the annual meeting of the International Test Commission, Williamsburg, VA |
| December 8, 2004 | *The Role of Thyroid Functioning in the Aging Brain and Dementia*. Psychiatry Grand Rounds, Edith Norse Veterans Administration Medical Center, Bedford, MA |
| February 5, 2005 | *Neurobehavioral Functioning in Thyroid Disorders*. Continuing Education Seminar presented at the 32nd Annual Conference of the International Neuropsychological Society, Las Vegas, NV |
| March 15, 2005 | *Thyroid-Brain Relationships in Aging and Dementia*. Neurology Grand Rounds, Boston University School of Medicine, Boston, MA |
| March 22, 2005 | *Cognitive & Memory Changes in Aging & Dementia*. Mini-Med School, Boston University School of Medicine, Boston, MA |
| May 12, 2005 | *Alzheimer's Disease Research in 2005: Where are we and Where are we Going?* Keynote Address, 5th Annual Boston Alzheimer's Partnership Legislative Breakfast. Dorchester, MA |
| June 7, 2005 | *Alzheimer's Disease Research in 2005.* Keynote Address, "Alzheimer's Disease: Finding New Pathways," Berkshire Area Health Education Center Conference, Hancock, MA. |
| May 3, 2006 | *Research Update.* Alzheimer's Association annual "Map Through the Maze," Marlboro, MA |
| June 4, 2006 | *Advances in Alzheimer's Disease: Diagnosis and Care of Women.* 14th Annual Congress on Women's Health, Hilton Head, SC |
| January 16, 2007 | *New Discoveries and Directions in Alzheimer's Disease Research and Care*. A Briefing for the Bipartisan Congressional Task Force on Alzheimer's Disease. The Rayburn House Office Building, Washington, DC, |

| | |
|---|---|
| May 2, 2007 | *Research Update.* Alzheimer's Association annual "Map Through the Maze," Marlboro, MA |
| June 29, 2007 | *Driving and Dementia.* Social Work Practice with Older Adults: A Continuing Education and Certificate Training Opportunity, Boston College Graduate School of Social Work, Boston, MA |
| February 28, 2008 | *Medical Advances in Research and Treatment*, Keynote Address for the Dementia/Alzheimer's Disease Training Session, Massachusetts Assisted Living Facilities Association (MassALFA), Waltham, MA. |
| May 14, 2008 | *Driving and Dementia: Balancing Personal Independence and Public Safety.* Alzheimer's Association annual "Map Through the Maze," Marlboro, MA |
| June 27, 2008 | *Elderly Drivers: A Difficult Balance of Personal Independence & Public Safety.* Women's Health and Older Adult Conference, Nurse Practitioner Associates Continuing Eduction (NPACE), Falmouth, MA |
| March 6, 2009 | *Chronic Traumatic Encephalopathy: Progressive Tauopathy following Repetitive Concussion in Athletes*, Pediatric Neurology Grand Rounds, Boston University School of Medicine |
| May 13, 2009 | *Research Update.* Alzheimer's Association annual "Map Through the Maze," Marlboro, MA |
| October 2, 2009 | *Chronic Traumatic Encephalopathy and the Athlete.* Concussion and the Athlete CME Conference, Foxboro, MA |
| October 7, 2009 | *Alzheimer's Disease Research Update.* Massachusetts Councils on Aging Annual Conference, Sturbridge, MA |
| November 12, 2009 | *Recognizing, Diagnosing, and Treating Alzheimer's Disease.* Pri-Med East CME Conference, Boston, MA |
| November 13, 2009 | *Alzheimer's Disease Research Update 2009: Where are we Now and Where are we Going?* Keynote Address at the 12th Annual Alzheimer's Awareness Conference, Alzheimer's Services of Cape Cod and the Islands, Mashpee, MA |
| March 17, 2010 | *Chronic Traumatic Encephalopathy.* Briefing to the Congressional Brain Injury Task Force, Washington, DC |
| June 23, 2010 | *Chronic Traumatic Encephalopathy and Repetitive Brain Trauma in Athletes*, Institute of Medicine Committee on Nutrition, Trauma and the Brain, Washington, DC |
| October 1, 2010 | *Long-Term Effects of Repetitive Concussive and Subconcussive Brain Trauma: Chronic Traumatic Encephalopathy (CTE).* 2010 Head Trauma and the Athlete CME Conference, Waltham, MA |
| October 28, 2010 | *The Role of Thyroid Functioning in the Aging Brain.* Psychiatry Grand Rounds, Edith Norse Veterans Administration Medical Center, Bedford, MA |
| November 6, 2010 | *Head Games: Chronic Traumatic Encephalopathy Following Repetitive Brain Trauma in Athletes.* Keynote Address at the 31st Annual Braintree Neurorehabilitation Conference, Cambridge, MA |
| November 18, 2010 | *Alzheimer's Disease 2010: A Time for Hope*, Keynote Address for the Dementia/Alzheimer's Disease Training Session, Massachusetts Assisted Living Facilities Association (MassALFA), Hopkinton, MA. |

| February 2, 2011 | *Chronic Traumatic Encephalopathy: Long-term Consequences of Repetitive Brain Trauma*. Continuing Education Course at the 39th Annual Meeting of the International Neuropsychological Society, Boston, MA. |
| --- | --- |
| March 19, 2011 | *Chronic Traumatic Encephalopathy*, Keynote Speaker, **"**New Frontiers in Traumatic Brain Injury: Update 2011 Essential Information for the Clinical Neurologist," sponsored by the Massachusetts Neurologic Association and the Massachusetts Medical Society, Boston, MA. |
| March 25, 2011 | *Head Games: Chronic Traumatic Encephalopathy and the Long-Term Impact of Repetitive Brain Trauma in Athletes*, Luncheon Keynote Address, American Neuropsychiatric Association, Denver, CO |
| April 28, 2011 | *Sports Concussions: The Hidden Risks*, Invited Speaker for Brain Trauma Symposium, The Neuroscience Institute at the University of Tennessee Health Science Center, Memphis, TN. |
| April 29, 2011 | *Head Games: Chronic Traumatic Encephalopathy and the Long-Term Consequences of Repetitive Brain Trauma in Athletes.* Neurology Grand Rounds, University of Tennessee Health Sciences Center. |
| May 11, 2011 | *Driving and Dementia: A Difficult Balance of Personal Independence and Public Safety*. Alzheimer's Association annual "Map Through the Maze," Marlboro, MA. |
| August 5, 2011 | *Chronic Traumatic Encephalopathy: The Synergy of Science and Journalism in Creating Culture Change.* Invited Lecture at the Annual Meeting of the American Psychological Association, Washington, DC. |
| September 24, 2011 | *Head Games: Chronic Traumatic Encephalopathy and the Long-Term Consequences of Repetitive Brain Trauma in Athletes*. Keynote Speaker for the Baptist Hospital Annual Brain Injury Symposium, Coconut Grove, FL. |
| October 19, 2011 | *Head Games: Chronic Traumatic Encephalopathy and the Long Term Effects of Repetitive Brain Trauma in Athletes*. Grand Rounds Speaker, Beth Israel Deaconess Medical Center-Needham, Needham, MA |
| October 20, 2011 | Panelist, "Alzheimer's Forum," WBUR (NPR), Boston, MA |
| November 5, 2011 | *Alzheimer's disease: Research Updates on Diagnosis, Treatment and Prevention*. Keynote Speaker, Alzheimer's Association, Chicopee, MA |
| January 19, 2012 | *Chronic Traumatic Encephalopathy*. Invited Lecture, Boston Society of Neurology and Psychiatry, Boston, MA |
| March 5, 2012 | *Head Games: Chronic Traumatic Encephalopathy and the Long-Term Consequences of Repetitive Brain Trauma in Athletes*. Invited Speaker, Boston Surgical Society, Boston, MA |
| March 28, 2012 | Moderator, Annual Alzheimer's Association (MA/NH Chapter) Research Day, Lexington, MA |
| April 11, 2012 | *Alzheimer's Disease 2012: A Reason for Hope*. Keynote Speaker, Annual Research Program, Alzheimer's Association, Worcester, MA |
| April 17, 2012 | *Head Games: Chronic Traumatic Encephalopathy and the Long-Term Consequences of Repetitive Brain Trauma in Athletes*. Grand Rounds Speaker, Good Samaritans Medical Center, Brockton, MA |

| April 26, 2012 | *Head Games: Chronic Traumatic Encephalopathy and the Long-Term Consequences of Repetitive Brain Trauma in Athletes*. Invited Speaker, CME Series, Vista Health System, Waukegan, IL |
| --- | --- |
| April 28, 2012 | *Alzheimer's Disease: Research Updates on Diagnosis, Treatment and Prevention*. Keynote Speaker, Alzheimer's Partnership, Andover, MA |
| May 16, 2012 | *Driving and Dementia: A Difficult Balance of Personal Independence and Public Safety*. Alzheimer's Association annual "Map Through the Maze," Marlboro, MA. |
| May 24, 2012 | *Chronic Traumatic Encephalopathy: Long-Term Effects of Repetitive Brain Trauma in Athletes and the Military*. Invited Speaker, Alzheimer's Disease: Update and Research, Treatment, and Care, Annual Conference sponsored by the Shiley-Marcos Alzheimer's Disease Research Center, University of California, San Diego, San Diego, CA |
| June 13, 2012 | *Head Games: Long-term Consequences of Repetitive Brain Trauma*. Keynote Speaker, Traumatic Brain Injury Conference, Sunnybrook Hospital, Toronto, Canada |
| June 15, 2012 | *Head Games: Chronic Traumatic Encephalopathy and the Long-Term Consequences of Repetitive Brain Trauma in Athletes*. Keynote Speaker, "Effects of Multiple ABI—Preventing Further Injury" Conference, Brain Injury Association, London, Ontario, Canada |
| August 3, 2012 | *Chronic Traumatic Encephalopathy*. Plenary Speaker, Annual Meeting of the American Psychological Association, Orlando, FL |
| October 1, 2012 | *Clinical Presentation of CTE : Combining Clinical and Biomarker Data for Accurate Diagnosis*. Invited Speaker (and Conference Co-Chair), Inaugural Chronic Traumatic Encephalopathy (CTE) Conference, Jointly Sponsored by Boston University and the Lou Ruvo Center for Brain Health, Las Vegas, NV |
| October 13, 2012 | *Differentiating chronic traumatic encephalopathy from Alzheimer's disease and other neurodegenerative conditions*. Invited Speaker, Fred Kavli Public Symposium, Society for Neuroscience, New Orleans, LA |
| October 26, 2012 | *Chronic Traumatic Encephalopathy: Clinical Presentation*. Invited Speaker (and Conference Co-Chair), 2012 Brain Trauma and the Athlete Conference, CME Conference Sponsored by Boston University School of Medicine, Waltham, MA |
| October 29, 2012 | *Understanding the Continuum of MCI due to AD & Dementia due to AD*. Invited Speaker, Aging or Alzheimer's Disease? How to Detect and Treat Memory Loss in the Primary Care Setting, CME Conference by Boston University Alzheimer's Disease Center, Waltham, MA. |
| November 10, 2012 | *Alzheimer's Disease 2012: Reasons for Hope*. Keynote Speaker, NH Alzheimer's Association Conference: Care to Cure, Concord, NH. |
| December 1, 2012. | *Head Games: Chronic Traumatic Encephalopathy and the Long-Term Consequences of Repetitive Brain Trauma in Athletes*. Invited Speaker, 59th Annual Meeting of the Massachusetts Chapter of the American College of Surgeons, Boston, MA |
| December 5, 2012 | *Clinical Presentation of CTE*: Invited Speaker, 1st NIH Workshop on the Neuropathology of Chronic Traumatic Encephalopathy, Bethesda, MD. |
| December 11, 2012 | *Head Games: Chronic Traumatic Encephalopathy and the Long-Term Consequences of Repetitive Brain Trauma in Athletes*. Invited Speaker, Clinical Neurosciences Grand Rounds, Boston University School of Medicine, Boston, MA |
| March 6, 2013 | *Clinical Presentation of Chronic Traumatic Encephalopathy*, Invited Speaker, 3rd Traumatic Brain Injury Conference, Arlington, VA |

| March 17, 2013 | *Efforts toward earlier Alzheimer's Treatment*, Invited Panelist, Health Journalism 2013 (American Health Care Journalists), Boston, MA |
|---|---|
| April 17, 2013 | *Head Games: Chronic Traumatic Encephalopathy and the Long Term Consequences of Repetitive Brain Trauma in Athletes*. Invited Webinar Speaker, Rose® Webinar Series. |
| May 4, 2013 | *CTE and Late Life Issues*, Invited Speaker, International Sports Concussion Symposium, Minneapolis, MN |
| May 10, 2013 | BU A Leader in Sports-Related Head Injury: Long Term Consequences, Invited Speaker, Medical Grand Rounds, Boston University School of Medicine, Boston, MA |
| May 13, 2013 | *Clinical Presentation and Diagnosis of Chronic Traumatic Encephalopathy*, Invited Speaker, World Brain Mapping Conference, Baltimore, MD |
| May 31, 2013 | *Chronic Traumatic Encephalopathy*, Invited Speaker, "Dementia: A Comprehensive Update" Continuing Medical Education Course, Harvard Medical School, Boston, MA. |
| June 3, 2013 | *The Future of Contact Sports: Concussions May Be the Tip of the Iceberg*. Invited Panelist and Speaker, The German Center for Research and Innovation and Ludwig-Maximilians-Universität München, New York, NY |
| June 10, 2013 | *Clinical efficacy – how do we observe a potential treatment effect?* Invited Speaker, Workshop: Prevention of Alzheimer's Disease – What will it take? (New York Academy of Sciences), New York, NY |
| June 20, 2013 | *CTE: Point/Counterpoint Presentation*, Invited Speaker, 11th Annual American Academy of Clinical Neuropsychology Conference, Chicago, IL |
| October 24, 2013 | *Concussion and Action Points* Symposium, The Association of Ringside Physicians 2013 Annual Medical Seminar, Las Vegas, NV |
| November 12, 2013 | *Unmet Needs in Neurodegeneration: Focus on Endpoints*, Keynote Speaker, 2nd Annual Meeting of the Coalition Against Major Diseases, Bethesda, MD |
| November 12, 2013 | *Chronic Traumatic Encephalopathy: Public Health Consequences of Repetitive Brain Trauma in Sports*, Keynote Speaker, 2nd Annual Research Day, Boston University School of Public Health, Boston, MA |
| December 5, 2013 | *Head Games: Chronic Traumatic Encephalopathy and the Long-Term Consequences of Repetitive Brain Trauma in Athletes,* Grand Rounds, Department of Neurology, Medical University of South Carolina, Charleston, SC |
| January 17, 2014 | *Brain Games: Chronic Traumatic Encephalopathy and the Long-Term Consequences of Repetitive Brain Trauma*, Distinguished Lecturer for Grand Rounds, Department of Physical Medicine and Rehabilitation, Harvard Medical School, Spaulding Rehabilitation Hospital, Boston, MA |
| January 29, 2014 | *Clinical Presentation and Diagnosis of Chronic Traumatic Encephalopathy: What We Think We Know and What We Need to Know Next*, Invited Lecture, C4CT Summit, United Nations, New York, NY |
| January 30, 2014 | *Brain Games: Chronic Traumatic Encephalopathy and the Long-Term Consequences of Repetitive Brain Trauma*, Visiting Speaker, Mayo Clinic, Scottsdale, AZ |
| March 19-23, 2014 | *Chronic Traumatic Encephalopathy*, Invited Symposium Organizer and Speaker, 10th World Congress on Brain Injury, San Francisco, CA |

| March 28, 2014 | *Head Games: Chronic Traumatic Encephalopathy and the Long-Term Consequences of Repetitive Brain Trauma in Athletes*, Invited Speaker, Grand Rounds, Department of Medicine, Tufts Medical School, Boston, MA |
| April 16-17, 2014 | *Chronic Traumatic Encephalopathy Clinical Presentation and Biomarkers: What We Know and What We Do Not Know*, Invited Speaker, 4rd Traumatic Brain Injury Conference, Washington, DC |
| May 2, 2014 | *Chronic Traumatic Encephalopathy: What We Think We Know and What We Need to Know*, Plenary Speaker, 8th Annual National Summit on Sports Concussion, Los Angeles, CA |
| May 13, 2014 | *Brain Games: Chronic Traumatic Encephalopathy and the Long Term Consequences of Repetitive Concussive and Subconcussive Brain Trauma in Athletes*. Keynote Speaker, NYC MedTech Program, New York, NY |
| May 30, 2014 | *Chronic Traumatic Encephalopathy*, Invited Speaker, "Dementia: A Comprehensive Update" Continuing Medical Education Course, Harvard Medical School, Boston, MA. |
| June 30, 2014 | *Overview of recent/current research in clinical endpoint development*, "Pre-Dementia Clinical Outcome Assessment Tool (pCOA) Stage 2 Meeting, Coalition Against Major Diseases, Bethesda, MD |
| July 31, 2014 | *Brain Trauma Leading to Alzheimer's Disease and Chronic Traumatic Encephalopathy: What We Know and What We Need to Know*, Invited Lecture, C4CT Summit, United Nations, New York, NY |
| November 12, 2014 | *Brain Games: What We Now Know and What We Must Know Next about Chronic Traumatic Encephalopathy*, Opening Keynote Address, 2014 Annual Conference of the National Academy of Neuropsychology, Puerto Rico. |

## MEDIA EXPERIENCE AND APPEARANCES:

| Media Training: | Fleishman-Hillard International Communications, New York, February 2009 |
| Print Media: | Interviewed and quoted in national and international newspapers and news magazines, including the New York Times, Washington Post, Boston Globe, LA Times, Time Magazine, USA Today, and others. |
| Broadcast Media: | Interviews on ABC World News Tonight, CBS Evening News, NBC Nightly News, Good Morning America, Nightline, CNN, Fox News, National Public Radio, ESPN, CTV's Canada AM, ABC Radio Australia, ABC TV Australia, and numerous local affiliate radio and television news interviews. |
| Documentaries: | Appeared in Feature Length Film Documentary, "I Remember Better When I Paint" (2009), French Connection Films and the Hilgos Foundation. |
| | Appeared in Feature Length Film Documentary, "Head Games" (2012), Variance Films, Directed by Steven James. |
| | Appeared in Feature Length Television Documentary, "League of Denial" (2013), *Frontline*, Public Broadcasting System (PBS), Directed by Michael Kirk. |

## ORIGINAL, PEER REVIEWED ARTICLES:

*(Past and present students, fellows, and other trainees italicized)*

1. Elder, J.P., & **Stern, R.A.** (1986). The ABC's of adolescent smoking prevention: An environment and skills model. Health Education Quarterly, 13, 181-191.

2. Elder, J.P., **Stern, R.A.**, Anderson, M., Hovell, M.F., Molgaard, C.A., & Seidman, R. (1987). Contingency-based strategies for the prevention of alcohol, drugs, and tobacco use: Missing or unwanted components of adolescent health promotion? Education and Treatment of Children, 10, 30-47.

3. **Stern, R.A.**, Prochaska, J.O., Velicer, W.F., & Elder, J.P. (1987). Stages of adolescent smoking acquisition: Measurement and sample profiles. Addictive Behaviors, 12, 319-329.

4. Elder, J.P., de Moor, C., Young, R.L., Wildey, M.B., Molgaard, C.A., Golbeck, A.L., Sallis, J.F., & **Stern, R.A.** (1990). Stages of adolescent tobacco-use acquisition. Addictive Behaviors, 15, 449-454.

5. Simmons, R.B., **Stern, R.A.**, Teekhassaenee, C., & Kenyon, K.R. (1990). Elevated intraocular pressure following penetrating keratoplasty. Transactions of the American Ophthalmological Society, 87, 79-93.

6. Simmons, R.B., Shields, M.B., Blasini, M., Wilkerson, M., & **Stern, R.A.** (1991). A clinical evaluation of transscleral Neodymium:YAG cyclophotocoagulation with a contact lens. American Journal of Ophthalmology, 112, 671-677.

7. **Stern, R.A.**, & Bachman, D.L. (1991). Depressive symptoms following stroke. American Journal of Psychiatry, 148, 351-356.

8. **Stern, R.A.**, Nevels, C.T., Shelhorse, M.E., *Prohaska, M.L.*, Mason, G.A., & Prange, A.J., Jr. (1991). Antidepressant and memory effects of combined thyroid hormone treatment and electroconvulsive therapy: Preliminary findings. Biological Psychiatry, 30, 623-627.

9. Keenan, P., **Stern, R.A.**, Janowsky, D.S., & Pedersen, C.A. (1992). Psychological aspects of premenstrual syndrome I: Cognition and memory. Psychoneuroendocrinology, 17, 179-187.

10. **Stern, R.A.**, *Singer, N.G., Silva, S.G.*, Rogers, H.J., Perkins, D.O., Hall, C.D., van der Horst, C.M., & Evans, D.L. (1992). Neurobehavioral functioning in a nonconfounded group of asymptomatic HIV seropositive homosexual men. American Journal of Psychiatry, 149, 1099-1102.

11. **Stern, R.A.**, van der Horst, C.M., Hooper, S.R., Bloodgood, K.M., & High, K.A. (1992). Zidovudine overdose in an asymptomatic HIV seropositive patient with hemophilia. Psychosomatics, 33, 454-457.

12. Girdler, S.S., Pedersen, C.A., **Stern, R.A.**, & Light, K.C. (1993). The menstrual cycle and premenstrual syndrome: Modifiers of cardiovascular reactivity in women. Health Psychology, 12, 180-192.

13. Haggerty, J.J. Jr., **Stern, R.A.**, Mason, G.A., Beckwith, J., *Morey, C.E.*, & Prange, A.J. Jr. (1993). Subclinical hypothyroidism: A modifiable risk factor for depression. American Journal of Psychiatry, 150, 508-510.

14. Pedersen, C.A., **Stern, R.A.**, *Pate, J.*, Senger, M.A., Bowes, W.A., & Mason, G.A. (1993). Thyroid and adrenal measures during late pregnancy and the puerperium in women who have been major depressed or who become dysphoric postpartum. Journal of Affective Disorders, 29, 201-211.

15. Robertson, K.R., **Stern, R.A.**, Hall, C.D., Perkins, D.O., Wilkins, J.W., *Gortner, D.T.*, Donovan, M.K., Messenheimer, J.A., Whaley, R., & Evans, D.L. (1993). Vitamin $B_{12}$ deficiency and nervous system disease in HIV infection. Archives of Neurology, 50, 807-811.

16. **Stern, R.A.**, *Steketee, M.S.*, Durr, A., Prange, A.J. Jr., & Golden, R.N. (1993). Combined use of thyroid hormone and ECT. Convulsive Therapy, 9, 285-292.

17.   Perkins, D.O., **Stern, R.A.**, Golden, R.N., Murphy, C., *Naftalowitz, D.*, & Evans, D.L. (1994). Mood disorders in HIV infection: Prevalence and risk factors in a non-epicenter of the AIDS epidemic. American Journal of Psychiatry, 151, 233-236.

18.   **Stern, R.A.** (1994). Neuropsychiatric and psychoneuroimmune aspects of HIV infection and AIDS. Advances, 10 (4), 28-31.

19.   **Stern, R.A.**, *Singer, E.A., Duke, L.M., Singer, N.G., Morey, C.E., Daughtrey, E.W.,* & Kaplan, E. (1994). The Boston Qualitative Scoring System for the Rey-Osterrieth Complex Figure: Description and interrater reliability. The Clinical Neuropsychologist, 8, 309-322.

20.   Echelman, D.A., **Stern, R.A.**, Shields, S.R., Simmons, R.B., & Shields, M.B. (1995). Variability of contact transscleral neodymium:YAG cyclophotocoagulation. Investigative Ophthalmology & Visual Science, 36, 497-502.

21.   Evans, D.L., Leserman, J., Perkins, D.O., **Stern, R.A.**, Murphy, C., Tamul, K., Liao, D., van der Horst, C.M., Hall, C.D., Folds, J.D., Golden, R.N., & Petitto, J.M. (1995). Stress associated reductions of cytotoxic T lymphocytes and natural killer cells in asymptomatic human immunodeficiency virus infection. American Journal of Psychiatry, 152, 543-550.

22.   Perkins, D.O., Leserman, J., **Stern, R.A.**, *Baum, S.F.*, Liao, D., Golden, R.N., & Evans, D.L. (1995). Somatic symptoms and HIV-1 infection: Relationship to depressive symptoms and indicators of HIV disease. American Journal of Psychiatry, 152, 1776-1781.

23.   *Prohaska, M.L.*, **Stern, R.A.**, *Steketee, M.C.*, & Prange, A.J. Jr. (1995). Lithium, thyroid hormones, and neuropsychological functioning: A review and hypothesis. Depression, 2, 241-251.

24.   **Stern, R.A.**, *Whealin, J.M.*, Mason, G.A., Noonan, L.R., *Silva, S.G., Arruda, J.E.*, & Prange, A.J. Jr. (1995). Influence of L-triiodothyronine on memory following repeated electroconvulsive shock in rats: Implications for human electroconvulsive therapy. Biological Psychiatry, 37, 198-201.

25.   *Arruda, J.E.*, **Stern, R.A.**, & *Legendre, S.A.* (1996). Assessment of mood state in patients undergoing electroconvulsive therapy: The utility of Visual Analogue Mood Scales developed for cognitively-impaired patients. Convulsive Therapy, 12, 207-212.

26.   *Arruda, J.E.*, Weiler, M.D., Valentino, D.S., Willis, W.G., Rossi, J.S., **Stern, R.A.**, Gold, S.G., & Costa, L. (1996). A guide for applying principal components analysis and confirmatory factor analysis to quantitative electroencephalogram data. International Journal of Psychophysiology, 23, 63-81.

27.   *Cahn, D.A.*., Marcotte, A.C., **Stern, R.A.**, *Arruda, J.E.*, Akshoomoff, N.A., & *Leshko, I.C.* (1996). The Boston Qualitative Scoring System for the Rey-Osterrieth Complex Figure: A study of children with Attention Deficit Hyperactivity Disorder. The Clinical Neuropsychologist, 10, 397-406.

28.   *Prohaska, M.L.* **Stern, R.A.**, Nevels, C.T., Mason, G.A., & Prange, A.J. Jr. (1996). The relationship between thyroid status and neuropsychological performance in psychiatric outpatients maintained on lithium. Neuropsychiatry, Neuropsychology, and Behavioral Neurology, 9, 30-34.

29.   **Stern, R.A.**, *Robinson, B., Thorner, A.R., Arruda, J.E., Prohaska, M.L.,* & Prange, A.J. Jr. (1996). A survey study of neuropsychiatric complaints in patients with Graves' disease. Journal of Neuropsychiatry and Clinical Neurosciences, 8, 181-185.

30.   **Stern, R.A.**, *Silva, S.G., Chaisson, N.*, & Evans, D.L. (1996). Influence of cognitive reserve on neuropsychological functioning in asymptomatic Human Immunodeficiency Virus-1 infection. Archives of Neurology, 53, 148-153.

31.   **Stern, R.A.** (1996). Assessment of mood states in neurodegenerative disease: Methodological and diagnostic recommendations. Seminars in Clinical Neuropsychiatry, 1, 315-324.

32.   *Costa, L., Arruda, J.E.,* **Stern, R.A.,** *Somerville, J.A.,* & Valentino, D. (1997). Asymptomatic HIV infected women: A preliminary study of quantitative EEG activity and performance on a continuous performance test. Perceptual and Motor Skills, 85, 1395-1408.

33. Evans, D.L., Leserman, J., Perkins, D.O., **Stern, R.A.**, Murphy, C., Zheng, B., Gettes, D., Longmate, J.A., Silva, S.G., van de Horst, C.M., Hall, C.D., Folds, J.D., Golden, R.N., & Petitto, J.M. (1997). Severe life stress as a predictor of early disease progression in HIV infection. American Journal of Psychiatry, 154, 630-634.

34. Nyenhuis, D.L., **Stern, R.A.**, Yamamoto, C., Luchetta, T., & *Arruda, J.E.* (1997). Standardization and validation of the Visual Analog Mood Scales. The Clinical Neuropsychologist, 11, 407-415.

35. **Stern, R.A.**, *Arruda, J.E.*, Hooper, C.R., Wolfner, G.D., & *Morey, C.E.* (1997). Visual Analogue Mood Scales to measure internal mood state in neurologically impaired patients: Description and initial validity evidence. Aphasiology, 11, 59-71.

36. **Stern, R.A.**, *Arruda, J.E., Somerville, J.A.*, Cohen, R.A., Boland, R.J., Stein, M.I., & Martin, E.M. (1998). Neurobehavioral functioning in asymptomatic HIV-1 infected women. Journal of the International Neuropsychological Society, 4, 172-178.

37. *Arruda, J.E.,* **Stern, R.A.**, & *Somerville, J.A.* (1999). Measurement of mood states in stroke patients: Validation of the Visual Analog Mood Scales. Archives of Physical Medicine and Rehabilitation, 80, 676-680.

38. **Stern, R.A.** (1999). Assessment of mood state in aphasia. Seminars in Speech and Language, 20, 33-50.

39. Freeman, R.Q., Giovannetti, T., Lamar, M., Cloud, B.S., **Stern, R.A.**, Kaplan, E., & Libon, D.J. (2000). Visuoconstructional problems in dementia: Contribution of executive systems functions. Neuropsychology, 14, 415-426.

40. Petitto, J.M., Leserman, J., Perkins, D., **Stern, R.A.**, Gettes, D., Folds, J.D., Golden, R.N., & Evans, D.L. (2000). High versus low basal cortisol secretion in asymptomatic, medication-free HIV infected men: Differential effects of severe life stress on parameters of immune status. Behavioral Medicine, 25, 143-151.

41. Schreiber, H.E., *Javorsky, D.J.*, Robinson, J., & **Stern, R.A.** (2000). Rey-Osterrieth Complex Figure Performance in Adults with Attention Deficit Hyperactivity Disorder: A Validation Study of the Boston Qualitative Scoring System. The Clinical Neuropsychologist, 14, 509-520.

42. *Somerville, J.A.*, Tremont, G., & **Stern, R.A.** (2000). The Boston Qualitative Scoring System (BQSS) as a measure of executive functioning in Rey-Osterrieth Complex Figure performance. Journal of Clinical and Experimental Neuropsychology, 22, 613-621.

43. Tremont, G., *Halpert, S., Javorsky, D.J.*, & **Stern, R.A.** (2000). Differential impact of executive dysfunction on verbal list learning and story recall. The Clinical Neuropsychologist, 14, 295-302.

44. Tremont, G., & **Stern, R.A.** (2000). Minimizing the cognitive effects of lithium therapy and electroconvulsive therapy using thyroid hormone. International Journal of Neuropsychopharmacology, 3, 175-186.

45. *Ruffolo, J.A., Javorsky, D.J.*, Tremont, G., *Westervelt, H.J.*, & **Stern, R.A.** (2001). A comparison of administration procedures for the Rey-Osterrieth Complex Figure: Flowcharts vs. pen switching. Psychological Assessment, 13, 299-305.

46. Paul, R.H., Cohen, R.A., & **Stern, R.A.** (2002). Neurocognitive manifestations of Human Immunodeficiency Virus. CNS Spectrums, 7, 860-866.

47. Tremont, G., Westervelt, H.J., Javorsky, D., *Podolanczuk, A.*, & **Stern, R.A.** (2002). Referring physicians' perceptions of the neuropsychological evaluation: How are we doing? The Clinical Neuropsychologist, 16, 551-554.

48. *Bishop, C.L., Temple, R.O.*, Tremont, G., Westervelt, H.J., & **Stern, R.A.** (2003). Utility of the inpatient neuropsychological evaluation in an acute medical hospital. The Clinical Neuropsychologist, 17, 468-473.

49. Cahn-Weiner, D.A., Williams, K., Grace, J., Tremont, G., Westervelt, H., & **Stern, R.A.** (2003). Discrimination of dementia with lewy bodies from Alzheimer disease and Parkinson disease using the clock drawing test. Cognitive and Behavioral Neurology, 16, 85-92.

50.     *Davis, J.D.*, **Stern, R.A.**, & Flashman, L. (2003). Cognitive and neuropsychiatric aspects of subclinical hypothyroidism: Significance in the elderly. Current Psychiatry Reports, 5, 384-390.

51.     *Legendre*, S.A., **Stern, R.A.**, Solomon, D.A., Furman, M.J., & *Smith, K.E.* (2003). The influence of cognitive reserve on memory following electroconvulsive therapy. Journal of Neuropsychiatry and Clinical Neurosciences, 15, 333-339.

52.     Tremont, G., **Stern, R.A.**, Westervelt, H., *Bishop, C.L.* & *Davis, J.D.* (2003). Neurobehavioral functioning in thyroid disorders. Medicine and Health Rhode Island, 86, 318-322.

53.     Westervelt, H.J., **Stern, R.A.**, & Tremont, G. (2003). Odor identification deficits in diffuse lewy body disease. Cognitive and Behavioral Neurology, 16, 93-99.

54.     *Temple, R.O.* **Stern, R.A.**, *Latham, J., Ruffolo, J.S.*, Arruda, J.E. & Tremont, G. (2004). Assessment of Mood State in Dementia by Use of the Visual Analog Mood Scales (VAMS). American Journal of Geriatric Psychiatry, 12. 527-530.

55.     **Stern, R.A.,** *Davis, J.D., Rogers, B.L., Smith, K.M.*, Harrington, C.J., Ott, B.R., Jackson, I.M.D., & Prange, A.J. Jr. (2004). Preliminary study of the relationship between thyroid status and cognitive and neuropsychiatric functioning in euthyroid patients with Alzheimer's dementia. Cognitive and Behavioral Neurology, 17, 219-223.

56.     *Brown, L.B.,* **Stern, R.A.**, Cahn-Weiner, D.A., *Rogers, B.,* Davis, M.A., Lannon, M.C., Maxwell, C., Souza, T., White, T., & Ott, B.R. (2005). Driving Scenes test of the Neuropsychological Assessment Battery (NAB) and on-road driving performance in aging and very mild dementia. Archives of Clinical Neuropsychology, 20, 209-215.

57.     Jefferson, A.L., *Wong, S., Bolen, E.*, Ozonoff, A., Green, R.C., & **Stern, R.A.** (2006). Cognitive correlates of HVOT performance differ between patients with mild cognitive impairment and normal controls. Archives of Clinical Neuropsychology, 21, 405-412.

58.     Westervelt, H.J., Brown, L.B, Tremont, G., Javorsky, D.J., & **Stern, R.A.** (2006). Patient and family perceptions of the neuropsychological evaluation: How Are We Doing? The Clinical Neuropsychologist, 20, 1385-4046

59.     Bhalla, R.K., Papandonatos, G.D., **Stern, R.A.**, & Ott, B.R. (2007). Alzheimer's disease patients' anxiety prior to and following a standardized on-road driving test. Alzheimer's and Dementia, 3, 33-39.

60.     Jefferson, A.L., *Wong, S., Gracer, T.S.* Ozonoff, A., Green, R.C., & **Stern, R.A.** (2007). Geriatric performance on an abbreviated version of the Boston Naming Test. Applied Neuropsychology, 14, 215-223.

61.     *Ropacki, S.A.L.,* Bert, A.A., Ropacki, M.T., Rogers, B.L., & **Stern, R.A.** (2007). The influence of cognitive reserve on neuropsychological functioning after coronary artery bypass grafting (CABG). Archives of Clinical Neuropsychology,.22, 73-85.

62.     *Ashendorf A.* Jefferson AL, O'Connor MK, Chaisson C, Green RC, & **Stern, RA**. (2008). Trail Making Test errors in normal aging, mild cognitive impairment, and dementia. Archives of Clinical Neuropsychology, 23, 129-137.

63.     *Davis, J.D., Podolanczuk, A.,* Donahue, J.E., Stopa, E., Hennessey, J.V., Luo, L.G., Lim, Y-P., & **Stern, R.A.** (2008). Thyroid hormone levels in the prefrontal cortex of post-mortem brains of Alzheimer's disease patients. Current Aging Science, 1, 175-181.

64.     *Hubbard EJ, Santini, V, Blankevoort CG, Volkers, KM, Barrup, MS, Byerly L,* Chaisson C, Jefferson AL, Kaplan, E, Green, RC, **Stern RA**. (2008). Clock Drawing Performance in Cognitively Normal Elderly. Archives of Clinical Neuropsychology, 23, 295-327.

65.     Posternak, M.A., Novak, S.P., **Stern, R.A.**, Hennessey, J.V., Joffe, R., Prange, A.J. Jr, & Zimmerman, M. (2008). A pilot effectiveness study: placebo-controlled trial of adjunctive L-triiodothyronine (T3) used to accelerate and potentiate the antidepressant response. The International Journal of Neuropsychopharmacology, 11, 15-25.

66. **Stern, R.A.**, D'Ambrosio, L.A., Mohyde, M., *Carruth, A.*, Tracton-Bishop, B., *Hunter, J.D., Daneshvar, D.H.*, & Coughlin, J.F. (2008). At the Crossroads: Development and evaluation of a dementia caregiver group intervention to assist in driving cessation. Gerontology and Geriatrics Education, 29, 363-382.

67. *Ashendorf, L.*, Jefferson, A.L., Green, R.C., & **Stern, R.A.** (2009). Test-retest stability on the WRAT-3 Reading subtest in geriatric cognitive evaluations. Journal of Clinical and Experimental Neuropsychology, 31, 605-610. **DOI:** 10.1080/13803390802375557

68. *Chung, W.W.*, Chen, C.A., Cupples, L.A., Roberts, J.S., Hiraki, S.C., Nair, A.K., Green, R.C., & **Stern, R.A.** (2009). A new scale measuring psychological impact of genetic susceptibility testing for Alzheimer's disease. Alzheimer's Disease and Associated Disorders, 23, 50-56.

69. D'Ambrosio, L.A., Coughlin, J.F., Mohyde, M., *Carruth, A., Hunter, J.D.*, & **Stern, R.A**. (2009). Caregiver communications and the transition from driver to passenger among people with dementia. Geriatric Rehabilitation, 25, 34–43.

70. *Gavett, B.E., Poon, S.J.,* Ozonoff, A., Jefferson, A.L., Nair, A.K., Green, R.C., and **Stern, R.A.** (2009). Diagnostic utility of a list learning test in Alzheimer's disease and mild cognitive impairment. Journal of the International Neuropsychological Society, 15, 121-129.

71. McKee, A.C., Cantu, R.C., *Nowinski, C.J.,* Hedley-Whyte, E.T., Lee, H.S., Kubilus, C.A., *Gavett, B.E.*, Romero, R., Budson, A.E., Ryu, H., *Santini, V.E.,* & **Stern, R.A.** (2009). Chronic Traumatic Encephalopathy in athletes: Progressive tauopathy following repetitive concussion. Journal of Neuropathology and Experimental Neurology, 68, 709-735.

72. *Eggermont, L.H., Gavett, B.E., Volkers, K.M., Blankevoort, C.G.,* Scherder, E.J., Jefferson, A.L., Steinberg, E., Nair, A., Green, R.C., & **Stern, R.A.** (2010). Lower extremity function in normal cognitive aging, mild cognitive impairment, and Alzheimer's disease. Archives of Physical Medicine and Rehabilitation, 91, 584-588.

73. Gavett BE, Ozonoff A, *Doktor V,* Palmisano J, Nair AK, Green RC, Jefferson AL, **Stern RA.** (2010). Predicting cognitive decline and conversion to Alzheimer's disease in older adults using the NAB List Learning test. Journal of the International Neuropsychological Society, 16, 651-660.

74. Gavett, B.E., **Stern, R.A**., Cantu, R.C., *Nowinski, C.J.,* & McKee, A.C. (2010). Mild traumatic brain injury: A risk factor for neurodegeneration. Alzheimer's Research and Therapy, 2, 18-21.

75. McKee, A.C., Gavett, B.E., **Stern, R.A.,** *Nowinski, C.J.,* Cantu, R.C., Kowall, N.W., Perl, D., Hedley-Whyte, E.T., Price, B., Sullivan, C., Morin, P., Lee, H.S., Kubilus, C.A., *Daneshvar, D., Wulff, M.,* & Budson, A.E. (2010). TDP-43 proteinopathy and motor neuron disease in chronic traumatic encephalopathy. Journal of Neuropathology and Experimental Neurology. 69, 918-929.

76. Nair, A., *Gavett, B.E., Damman, M., Dekker, W.,* Green, R.C., Mandel, A., Auerbach, S., Steinberg, E., *Hubbard, E.,* and **Stern, R.A**. (2010). Clock Drawing Test ratings by practicing dementia specialists: Inter-rater reliability and diagnostic accuracy. Journal of Neuropsychiatry and Clinical Neurosciences. 22, 85-92.

77. *Daneshvar, D.H., Baugh, C.M., Nowinski, C.J.*, McKee, A.C., **Stern, R.A.,** & Cantu, R.C. (2011). Helmets and mouth guards: The role of personal equipment in preventing sport-related concussions. Clinics in Sports Medicine, 30, 145-163.

78. *Daneshvar, D.H., Riley, D.O., Nowinski, C.J.,* McKee, A.C., **Stern, R.A.**, & Cantu, R.C. (2011). Long-term consequences: Effects on normal development after concussion. Physical Medicine and Rehabilitation Clinics of North America, 22, 683–700.

79. *Gavett, B.E.,* Cantu, R.C., Shenton, M., Lin, A., *Nowinski, C.J.,* McKee, A.C., & **Stern, R.A.** (2011). Clinical appraisal of chronic traumatic encephalopathy: Current perspectives and future directions. Current Opinion in Neurology, 24, 525–531.

80. Gavett, B.E., **Stern, R.A.**, & McKee, A.C. (2011). Chronic Traumatic Encephalopathy: A potential late effect of sport-related concussive and subconcussive head trauma. Clinics in Sports Medicine, 30, 179-188.

81.     Naj, A.C., Jun, G., Beecham, G.W., Wang, L.S., Vardarajan, B.N., Buros, J., Gallins, P.J., Buxbaum, J.D., Jarvik, G.P., Crane, P.K., Larson, E.B., Bird, T.D., Boeve, B.F., Graff-Radford, N.R., De Jager, P.L., Evans, D., Schneider, J.A., Carrasquillo, M.M., Ertekin-Taner, N., Younkin, S.G., Cruchaga, C., Kauwe, J.S.K., Nowotny, P., Kramer, P., Hardy, J., Huentelman, M.J., Myers, A.J., Barmada, M.M., Demirci, F.Y., Baldwin, C.T., Green, R.C., Rogaeva, E., St. George-Hyslop, P., Arnold, S.E., Barber, R., Beach, T., Bigio, E.H., Bowen, J.D., Boxer, A., Burke, J.R., Cairns, N.J., Carlson, C.S., Carney, R.M., Carroll, S.L., Chui, H.C., Clark, D.G., Corneveaux, J., Cotman, C.W., Cumming, J.L., DeCarli, C., DeKosky, S.T., Diaz-Arrastia, R., Dick, M., Dickson, D.W., Eillis, W.G., Faber, K.M., Fallon, K.B., Farlow, M.R., Ferris, S., Frosch, M.P., Galasko, D.R., Ganguli, M., Gearing, M., Geschwind, D.H., Ghetti, B., Gilbert, J.R., Gilman, S., Giordani, B., Glass, J.D., Growdon, J.H., Hamilton, R.L., Harrell, L.E., Head, E., Honig, L.S., Hulette, C.M., Hyman B.T., Jicha, G.A., Jin, L.W., Johnson, N., Karlawish, J., Karydas, A., Kaye, J.A., Kim, R., Koo, E.H., Kowall, N.W., Lah, J.J., Levey, A.I., Lieberman, A.P., Lopez, O.L., Mack, W.J., Marson, D.C., Martiniuk, F., Mash, D.C., Masliah, E., McCormick, W.C., McCurry, S.M., McDavid, A.N., McKee, A.C., Mesulam, M., Miller, B.L., Miller, C.A., Miller, J.W., Parisi, J.E., Perl, D.P., Peskind, E., Petersen, R.C., Poon, W.W., Quinn, J.F., Rajbhandary, R.A., Raskind, M., Resiberg, B., Ringman, J.M., Roberson, E.D., Rosenberg, R.N., Sano, M., Schneider, L.S., Seeley, W., Shelanski, M.L., Slifer, M.A., Smith, C.D., Sonnen, H.V., Spina, S., **Stern, R.A.,** Tanzi, R.E., Trojanowski, J.Q., Troncoso, J.C., Van Deerlin, V.M., Vinters, H.V., Vonsattel, J.P., Weintraub, S., Welsh-Bohmer, K.A., Williamson, J., Woltjer, R.L., Cantwell, L.B., Dombrowski, B.A., Beekly, D., Lunetta, K.L, Martin, E.R, Kamboh, M.I., Saykin, A.J., Reiman, E.M., Bennett, D.A., Morris, J.C., Montine, T.J., Goate, A.M., Blacker, D., Tsuang, D.W., Hakonarson, H., Kukull, W.A., Foroud, T.M., Haines, J.L., Mayeux, R., Pericak-Vance, M.A., Farrer, L.A., & Schellenberg, G.D. (2011). Common variants in *MS4A4/MS4A6E*, *CD2AP*, *CD33*, and *EPHA1* are associated with late-onset Alzheimer's disease. <u>Nature Genetics,</u> 43, 436–441

82.     Ready, R.E., Carvalho, J.O., Green, R.C., Gavett, B.E., & **Stern, R.A.** (2011). The structure and validity of self-reported affect in mild cognitive impairment and mild Alzheimer's disease. <u>International Psychogeriatrics,</u> 23, 887-898.

83.     **Stern, R.A.**, *Riley, D.A., Daneshvar, D.H.*, *Nowinski, C.J.*, Cantu, R.C. & McKee, A.C. (2011). Long-term consequences of repetitive brain trauma: Chronic traumatic encephalopathy. <u>Physical Medicine and Rehabilitation,</u> 3, S460-S467.

84.     *Baugh, C.M., Stamm, J.M., Riley, D.O.,* Gavett, B.G., Shenton, M.E., Lin, A.L., Cantu, R.C., McKee, A.C., & **Stern, R.A.** (2012). Chronic Traumatic Encephalopathy: Neurodegeneration following repetitive concussive and subconcussive brain trauma. <u>Brain Imaging and Behavior,</u> 6, 244-254.

85.     Gavett, B.E., *Lou, K.R., Daneshvar, D.H.,* Green, R.C., Jefferson, A.L., & **Stern, R.A.** (2012). Diagnostic accuracy statistics for seven Neuropsychological Assessment Battery (NAB) Test variables in the diagnosis of Alzheimer's disease. <u>Applied Neuropsychology,</u> 19, 108-115.

86.     Gavett, B.E., & **Stern, R.A.** (2012). Dementia has a categorical, not dimensional, latent structure. <u>Psychology and Aging,</u> 27, 791–797.

87.     Goldstein, L.E., Fisher, A.M., Tagge, C.A., Zhang, X.-L., Velisek, L., Sullivan, J. A. Upreti, C., Kracht, J. M., Ericsson, M., Wojnarowicz, M.W., Goletiani, C.J., Maglakelidze, G.M., Casey, N., Moncaster, J.A., Minaeva, O., Moir, R.D., *Nowinski, C.J.*, Stern, R.A., Cantu, R.C., Geiling, J., Blusztajn, J.K., Wolozin, B.L., Ikezu, T., Stein, T.D., Budson, A.E., Kowall, N.W., Chargin, D. Sharon, A., Saman, S., Hall, G.F., Moss, W.C., Cleveland, R.O., Tanzi, R.E., Stanton, P.K., & McKee, A.C. (2012). Chronic Traumatic Encephalopathy in Blast-Exposed Military Veterans and a Blast Neurotrauma Mouse Model. <u>Science Translational Medicine,</u> 4, 1946-6234.

88.     Niewoehner, P.M., Henderson, R.R., Dalchow, J., Beardsley, T.L., **Stern, R.A.**, & Carr, D.B. (2012). Predicting road test performance in adults with cognitive or visual impairment referred to a VA driving clinic. <u>Journal of the American Geriatrics Society,</u> 60, 2070-2074

89. Shenton ME, Hamoda HM, Schneiderman JS, Bouix S, Pasternak O, Rathi Y, Vu MA, Purohit MP, Helmer K, Koerte I, Lin AP, Westin CF, Kikinis R, Kubicki M, **Stern RA**, & Zafonte R. (2012). A review of magnetic resonance imaging and diffusion tensor imaging findings in mild traumatic brain injury. Brain Imaging and Behavior, 6, 137–192.

90. Holton P, Ryten M, Nalls M, …**Stern RA**, … Wright CB, & Younkin SG (2013). Initial assessment of the pathogenic mechanisms of the recently identified Alzheimer risk Loci. Annals of Human Genetics, 77, 85-105.

91. Joffe, R.T., Pearce, E.N., Hennessey, J.V., Ryan, J.J., & **Stern, R.A.** (2013). Subclinical hypothyroidism, mood, and cognition in the elderly: A review. International Journal of Geriatric Psychiatry. 28, 111-118.

92. Mandelblatt, J.S., Hurria, A., McDonald, B.C., Saykin, A.J., **Stern, R.A.**, VanMeter, J.W., McGuckin, M., Traina, T., Denduluri, N., Turner, S., Howard, D., Jacobsen, P.B., Ahles, T., for the Thinking and Living With Cancer Study (2013). Cognitive effects of cancer and its treatments at the intersection of aging: What do we know; what do we need to know? Seminars in Oncology, 40, 709-725.

93. McKee, A., **Stern, R.**, *Nowinski, C.,* Stein, T., Alvarez, V., *Daneshvar, D.*, Lee, H., Wojtowicz, S., Hall, G., *Baugh, B., Riley, D.*, Kubilis, C., Cormier, K., Jacobs, M., Martin, B., Abraham, C., Ikezu, T., Reichard, R., Wolozin, B., Budson, A., Goldstein, G., Kowall, N., & Cantu, R. (2013). The spectrum of disease in chronic traumatic encephalopathy. Brain. 136, 43-64.

94. Mez, J., **Stern, R.A.**, & McKee, A.C. (2013). Chronic traumatic encephalopathy: Where are we and where are we going? Current Neurology and Neuroscience Reports. 13, 407.

95. *Seichepine, D.R., Stamm, J.M., Daneshvar, D.H., Riley, D.O., Baugh, C.M.,* Gavett, B.E., Tripodis, Y., Martin, B., Chaisson, C., McKee, A.C., Cantu, R.C., *Nowinski, C.J.,* & **Stern, R.A.** (2013). Profile of self-reported problems with executive functioning in college and professional football players. Journal of Neurotrauma. 30, 1299-1304.

96. **Stern, R.A.**, *Daneshvar, D.H., Baugh, C.M., Seichepine, D.R., Montenigro, P.H., Riley, D.O., Fritts, N.G., Stamm, J.M., Robbins, C.A.,* McHale, L., Simkin, I., Stein, T.D., Alvarez, V., Goldstein, L.E., Budson, A.E., Kowall, N.W., *Nowinski, C.J.,* Cantu, R.C., & McKee, A.C. (2013). Clinical presentation of Chronic Traumatic Encephalopathy. Neurology, 81, 1122-1129.

97. *Baugh, C.M., Robbins, C.A,* McKee, A.C. & **Stern, R.A**. *(2014).* Current understanding of Chronic Traumatic Encephalopathy. Current Treatment Options in Neurology. Sep;16(9):306. doi: 10.1007/s11940-014-0306-5.

98. Mandelblatt, J.S., **Stern, R.A.,** Luta, G., McGuckin, M., Clapp, J.D., Hurria, A., Jacobsen, P.J., Faul, L.A., Isaacs, C., Denduluri, N., Gavett, B., Traina, T.A., Johnson, P., Silliman, R.A., Turner, R.S., Howard, D., VanMeter, J.W., Saykin, A., & Ahles, T. (2014). Cognitive impairments in older breast cancer patients prior to systemic therapy: Is there an interaction between cancer and comorbidity? Journal of Clinical Oncology. 32, 1909-18.

99. *Montenigro, P.H., Baugh, C.M., Daneshvar, D.H.*, Mez, J., Budson, A.E., Au, R., Katz, D., Cantu, R.C., & **Stern, R.A.** (2014). Clinical subtypes of chronic traumatic encephalopathy: Literature review and proposed research diagnostic criteria for Traumatic Encephalopathy Syndrome. Alzheimer's Research and Therapy, 6, 68.

100. *Robbins, C.A., Daneshvar, D.H., Picano, J.D.,* Gavett, B.E., *Baugh, C.M., Riley, D.O., Nowinski, C.J.,* McKee, A.C., Cantu, R.C., & **Stern, R.A**. (2014). Self-reported concussion history: Impact of providing a definition of concussion. Open Access Journal of Sports Medicine. 5, 99-103

101.   Qiu, W.Q., Au, R., Zhu, H., Wallack, M., Liebson, E., Li, H., Rosenzweig, J., Mwamburi, M., & **Stern, R.A**. (2014). Positive association between plasma amylin and cognition in a homebound elderly population. <u>Journal of Alzheimer's Disease</u>. Jun 4. [Epub ahead of print] PMID:24898659

102.   Zhu, H., Wang, X., Wallack, M., Li, H., Carreras, I., Dedeoglu, A., Hur, J.Y., Zheng, H., Li, H., Find, R., Mwamburi, M., Sun, X., Kowall, N., **Stern, R.A**. & Qiu, W.Q. (2014). Intraperitoneal injection of the pancreatic peptide amylin potently reduces behavioral impairment and brain amyloid pathology in murine models of Alzheimer's disease. <u>Molecular Psychiatry</u>, Mar 11. doi: 10.1038/mp.2014.17. [Epub ahead of print] PMID: 24614496

103.   *Baugh, C.M., Kiernan, P.T.,* Kroshus, E., *Daneshvar, D.H., Montenigro, P.H.,* McKee, A.C., & **Stern, R.A**. (in press). Frequency of head impact related outcomes by position in NCAA Division I collegiate football players. <u>Journal of Neurotrauma</u>.

104.   *Baugh, C.M., Kroshus, E., Daneshvar, D.H.,* & **Stern, R.A**. (in press). Perceived coach support and concussion symptom-reporting: differences between freshmen and non-freshmen college football players. <u>Journal of Law Medicine and Ethics</u>.

105.   Lin, A.P., Ramadan, S., **Stern, R.A.,** Box, H.C., *Nowinski, C.J.,* Ross, B.D., & Mountford, C.E. (in press). Changes in the neurochemistry of athletes with repetitive brain trauma: Preliminary results using 2D correlated spectroscopy. <u>Alzheimer's Research and Therapy.</u>

106.   *Riley, D.O., Robbins, C.A.,* Cantu, R.C., & **Stern, R.A**. (in press). Chronic traumatic encephalopathy: Contributions from the Boston University Centre for the Study of Traumatic Encephalopathy. <u>Brain Injury</u>.

107.   Qiu, W.Q., Lai, A., Mon, T., Mwamburi, D.M., Taylor, W., Rosenzweig, J., Kowall, N., **Stern, R.A.,** Zhu, H., & Steffens, D.C. (in press). Angiotensin Converting Enzyme Inhibitors and Alzheimer's disease in the Presence of Apolipoprotein E4 Allele. <u>American Journal of Geriatric Psychiatry</u>.

108.   Qiu, W.Q, Mwamburi, M., Besser, L.M., Zhu, H., Li, H., Wallack, M., Phillips, L., Qiao, L., Budson, A., **Stern, R.A.,** & Kowall, N. (in press). Angiotensin Converting Enzyme inhibitors and the reduced risk of Alzheimer's disease in the absence of Apoliprotein E4 allele. <u>Journal of Alzheimer's Disease</u>.

109.   Koerte, I.K., Lin, A.P., Muehlmann, M., Merugumala, S., Liao, H., Starr, T., Kaufmann, D., Mayinger, M., Steffinger, D., Fisch, B., Karch, S., Heinen, F., Ertl-Wagner, B., Reiser, M., **Stern, R.A**., Zafonte, R., & Shenton, M.E. (under review). Altered neurochemistry in former professional soccer players without a history of concussion. <u>Cerebral Cortex</u>.

110.   Stamm, J.M., Bourlas, A.P., Baugh, C.M., Fritts, N.G., Daneshvar, D.H., Martin, B.M., McClean, M.D., Tripodis, Y., & **Stern, R.A**. (under review). Age of first exposure to football and later-life cognitive impairment in former NFL players. <u>Neurology</u>.

## RESEARCH PUBLICATIONS WITHOUT NAMED AUTHORSHIP

1.   Aisen, P.S., Schneider, L.S., Sano, M., Diaz-Arrastia, R., van Dyck, C.H., Weiner, M.F., Bottiglieri, T., Jin, S., Stokes, K.T., Thomas, R.G., Thal, L.J. & **Alzheimer Disease Cooperative Study** (2008). High-dose B vitamin supplementation and cognitive decline in Alzheimer disease: a randomized controlled trial. Journal of the American Medical Association, 300, 1774-1783.

2.   **ADAPT Research Group**, Martin, B.K., Szekely, C., Brandt, J., Piantadosi, S., Breitner, J.C., Craft, S., Evans, D., Green, R., Mullan, M. (2009). Cognitive function over time in the Alzheimer's Disease Anti-inflammatory Prevention Trial (ADAPT): results of a randomized, controlled trial of naproxen and celecoxib. Archives of Neurology, 65, 896-905.

3.   Jun G, Naj AC, Beecham GW, …**Alzheimer's Disease Genetics Consortium,…** Pericak-Vance MA, & Schellenberg GD (2010). Meta-Analysis confirms *CR1*, *CLU*, and *PICALM* as Alzheimer's disease risk loci and reveals interactions with *APOE* genotypes. Archives of Neurology, 67, 1473-1484.

4.   Jun G, Vardarajan BN, Buros J, …**Alzheimer's Disease Genetics Consortium**, … Schellenberg GD, & Farrer LA. (2012). Comprehensive search for Alzheimer disease susceptibility loci in the APOE region. Archives of Neurology, 69, 1270-9.

5.   Whitcomb, D., LaRusch, J., Krasinskas, A.M., …**Alzheimer's Disease Genetics Consortium**, … Yadav, D., & Devlin, B. (2012). Common genetic variants in the CLDN2 and PRSS1-PRSS2 loci alter risk for alcohol-related and sporadic pancreatitis. Nature Genetics, 44, 1349–1354.

6.   Zou, F., Chai, H.S., Younkin, C.S., …**Alzheimer's Disease Genetics Consortium**, …Younkin, S.G.,  & Nilüfer Ertekin-Taner, N.  (2012). Brain expression genome-wide association study (eGWAS) identifies human disease-associated variants. PloS Genetics, 8(6): e1002707.

7.   **Alzheimer's Disease Anti-inflammatory Prevention Trial Research Group**. (2013). Results of a follow-up study to the randomized Alzheimer's Disease Anti-inflammatory Prevention Trial (ADAPT). Alzheimer's & Dementia, 9, 714-23. PMID: 23562431

8.   Cruchaga, C., Kauwe, J.S.K., Harari, O., …**Alzheimer Disease Genetic Consortium** & Goate, A.M. (2013). GWAS of cerebrospinal fluid tau levels identifies risk variants for Alzheimer's disease. Neuron, 78, 256–268.

9.   Holton, P., Ryten, M., Nalls, M., … **Alzheimer's Disease Genetics Consortium**, … Hardy, J., & Guerreiro, R. (2013). Initial assessment of the pathogenic mechanisms of the recently identified Alzheimer risk Loci. Annals of Human Genetics, 77, 85-105.

10.  Miyashita, A., Koike, A., Jun, G., … **The Alzheimer's Disease Genetics Consortium**, … Farrer, L.A., and Kuwanzo, R. (2013). SORL1 is genetically associated with late-onset Alzheimer's disease in Japanese, Koreans and Caucasians. PLoS One, 8(4):e58618.

11.  Reitz, C., Jun, G., Naj, A., …& **Alzheimer Disease Genetics Consortium.** (2013)**.** Variants in the ATP-binding cassette transporter (ABCA7), apolipoprotein E ε4, and the risk of late-onset Alzheimer disease in African Americans. JAMA, 309(14), 1483-92.

12.    Reitz, C., Mayeux, R., & **Alzheimer's Disease Genetics Consortium.** (2013). TREM2 and neurodegenerative disease. New England Journal of Medicine, 369, 1564-5.

13.    Lambert, J.C., Ibrahim-Verbaas, C.A., Harold, D., …**Alzheimer's Disease Genetic Consortium**,… Schellenberg, G.D., & Amouyel, P. (2013). Meta-analysis of 74,046 individuals identifies 11 new susceptibility loci for Alzheimer's disease. Nature Genetics, 45,1452-1458.

14.    Sano, M. Egelko, S., Donohue, M., Ferris, S., Kaye, J., Hayes, T.L., Mundt, J.C. Sun, C., Paparello, S., Aisen, P.S., and the **Alzheimer Disease Cooperative Study Investigators** (2013). Developing dementia prevention trials: Baseline report of the Home-Based Assessment Study. Alzheimer Disease and Associated Disorders, 27, 356–362

15.    Allen, M., Zou, F., Chai, H.S., …**Alzheimer's Disease Genetics Consortium**, …Younkin, S.G, & Ertekin-Taner, N. (in press). Novel late-onset Alzheimer's disease loci variants associate with brain gene expression. Neurology.

16.    **Alzheimer's Disease Anti-inflammatory Prevention Trial Research Group**. (in press). Follow-up evaluation of cognitive function in the randomized Alzheimer's Disease Anti-inflammatory Prevention Trial (ADAPT) and its Follow-up Study (ADAPT-FS). Alzheimer's & Dementia.

17.    Escott-Price, V., Bellenguez, C., Wang, L… **Alzheimer's Disease Genetics Consortium** .. & Williams, J.  (in press). Gene-wide analysis detects two new susceptibility genes for Alzheimer's disease. PLOS ONE.

18.    Jun, G., Vardarajan, B.N., Buros, J., …**The Alzheimer's Disease Genetics Consortium**, … Schellenberg, G.D., & Farrer, L.A. (in press). A comprehensive search for Alzheimer disease susceptibility loci in the APOE region. Archives of Neurology.

19.    Miyashita, A., Koike, A., Jun, G., … **The Alzheimer's Disease Genetics Consortium**, …(in press). SORL1 is genetically associated with late-onset Alzheimer's disease in Japanese, Koreans and Caucasians. GWAS.

20.    Reitz, C., Tosto, G., Vardarajan, B.N., … & **Alzheimer's Disease Genetics Consortium**. (under review).  Independent and epistatic effects of variants in VPS10 sortilin receptors on Alzheimer's disease risk and processing of the amyloid precursor protein (APP).  Annals of Neurology.

## CASE REPORTS, REVIEWS, CHAPTERS, EDITORIALS AND OTHER PUBLICATIONS

**Proceedings of Meetings & Invited Papers**

*(Past and present students, fellows, and other trainees italicized)*

1.  Raymond, P.F., **Stern, R.A.**, Authelet, A.M., & Penny, D. (1987). A comparison of California Verbal Learning Test performance among patients with multiple sclerosis, vascular lesions, and normal controls. Journal of Clinical and Experimental Neuropsychology, 9, 49.

2.  **Stern, R.A.** (1988). Mood disorders following stroke. Doctoral Dissertation, University of Rhode Island, Kingston. Abstracted in Dissertation Abstracts International.

3.  Raymond, P.A., Authelet, A.M., **Stern, R.A.**, & Penny, D. (1989). Patterns of memory dysfunction in multiple sclerosis. Journal of Clinical and Experimental Neuropsychology, 11, 49.

4.  **Stern, R.A.**, & Bachman, D.L. (1989). Dysphoric mood and vegetative disturbance following stroke: Patterns of lesion localization. Journal of Clinical and Experimental Neuropsychology, 11, 97-98.

5.  Keenan, P., **Stern, R.A.**, Janowsky, D.S., & Pedersen, C.A. (1990). Verbal learning and affective state in premenstrual syndrome. Journal of Clinical and Experimental Neuropsychology, 12, 76-77.

6.  Keenan, P., **Stern, R.A.**, Janowsky, D.S., & Pedersen, C.A. (1990). Cognitive functioning across the menstrual cycle in women with and without premenstrual syndrome. Journal of Clinical and Experimental Neuropsychology, 12, 76.

7.  **Stern, R.A.**, Bachman, D.L., Valentino, D.A., & Raymond, P.M. (1990). Aphasia and mood disorders. Journal of Clinical and Experimental Neuropsychology, 12, 32.

8.  **Stern, R.A.**, Hooper, C.R., & *Morey, C.E.* (1990). Development of visual analogue scales to measure mood in aphasia. The Clinical Neuropsychologist, 4, 300.

9.  **Stern, R.A.**, *Morey, C.E.*, Perry, J.R., McCartney, W.H., Mason, G.A., & Prange, A.J. Jr. (1990). Neuropsychological and psychiatric correlates of hyperthyroidism: Preliminary findings. NeuroEndocrinology Letters, 12, 273.

10. **Stern, R.A.**, Nevels, C.T., Shelhorse, M.E., *Prohaska, M.L.*, Mason, G.A., & Prange, A.J. Jr. (1990). Triiodothyronine potentiation of electroconvulsive therapy: Preliminary findings. NeuroEndocrinology Letters, 12, 362.

11. Girdler, S.S., Pedersen, C.A., **Stern, R.A.**, & Light, K.C. (1991). Menstrual cycle and premenstrual syndrome: Modifiers of cardiovascular reactivity in women. Psychophysiology (Suppl.), 28, S25.

12. Haggerty, J.J. Jr., **Stern, R.A.**, Beckwith, J., *Morey, C.E.*, Mason, G., & Prange, A.J. Jr. (1991). A controlled evaluation of psychiatric and neuropsychological function in subclinical hypothyroidism. Biological Psychiatry, 29, 153A.

13. **Stern, R.A.**, & Bachman, D.L. (1991). Depressive Symptom nach cerebrovaskularem insult [Depressive symptoms following stroke]. Exacta Psychiatrica, 5, 15.

14. **Stern, R.A.**, & Bachman, D.L. (1991). Depressive symptoms following stroke. Digest of Neurology and Psychiatry, Series, 59, 125.

15. **Stern, R.A.**, & Bachman, D.L. (1991). Depressive symptoms following stroke. Focus on Depression, 2, 93-94.

16.    **Stern, R.A.**, & Bachman, D.L. (1991). Depressive symptoms following stroke. Psychiatry Digest, 8, 22-23.

17.    **Stern, R.A.**, Davidson, E.J., *Singer, N.G.*, Perkins, D.O., *Silva, S.G.*, & Evans, D.L. (1991). The role of vitamin B12 deficiency in the early neurobehavioral impairments seen in asymptomatic HIV seropositive gay men. Biological Psychiatry, 29, 155A-156A.

18.    **Stern, R.A.**, Nevels, C.T., Shelhorse, M.E., *Prohaska, M.L.*, & Prange, A.J. Jr. (1991). The effects of combined electroconvulsive therapy and thyroid hormone treatment on verbal memory and depressive symptomatology: Preliminary report. Journal of Clinical and Experimental Neuropsychology, 13, 31.

19.    **Stern, R.A.**, Rosenbaum, J., White, R.F., & *Morey, C.E.* (1991). Clinical validation of a visual analogue dysphoria scale for neurologic patients. Journal of Clinical and Experimental Neuropsychology, 13, 106.

20.    **Stern, R.A.**, *Singer, N.G., Morey, C.E., Silva, S.G.*, Wilkins, J.W., & Kaplan, E. (1991). A qualitative scoring system for the Rey-Osterrieth Complex Figure. Journal of Clinical and Experimental Neuropsychology, 13, 89.

21.    **Stern, R.A.**, *Singer, N.G., Silva, S.G.*, Rogers, H.J., Perkins, D.O., Hall, C.D., van der Horst, C.M., & Evans, D.L. (1991). Motor dysfunction in early asymptomatic HIV infection. Society for Neuroscience Abstracts, 17, 487.13.

22.    Evans, D.L., Petitto, J., Leserman, J., Perkins, D.O., **Stern, R.A.**, Folds, J. Ozer, H., Golden, R.N., (1992). Stress, depression and natural killer cells: Potential clinical relevance. Clinical Neuropharmacology, 15, 656A-657A.

23.    Haggerty, J.J., **Stern, R.A.**, Mason, G.A., Marquardt, M., & Prange, A.J. Jr. (1992). Subclinical hypothyroidism: recognition, significance, management. Clinical Neuropharmacology, 15, 386A.

24.    Pedersen, C.A., **Stern, R.A.**, *Pate, J.*, & Mason, G.A. (1992). Depression history and changes in the adrenal and thyroid axes during the puerperium. Biological Psychiatry, 31, 126A.

25.    *Silva, S.G.*, **Stern, R.A.**, Golden, R.N., Davidson, E.J., & Janowsky, D.S. (1992). The effects of physostigmine on behavioral inhibition, cognition, and mood in healthy males. Biological Psychiatry, 31, 111A-112A.

26.    *Silva, S.G.*, **Stern, R.A.**, Golden, R.N., Davidson, E.J., Mason, G.A., & Janowsky, D.S. (1992). Physostigmine effects on neuropsychological performance and mood in healthy males. The Clinical Neuropsychologist, 6, 346.

27.    **Stern, R.A.**, *Duke, L.M., Pate, J.D., Silva, S.G.*, Bowes, W.A., & Pedersen, C.A. (1992). Neuropsychological correlates of pregnancy and the early postpartum period. The Clinical Neuropsychologist, 6, 349.

28.    **Stern, R.A.**, Nevels, C.T., Shelhorse, M.E., *Prohaska, M.L.*, Mason, G.A., & Prange, A.J. Jr. (1992). The use of T3 to enhance the effects of ECT. Clinical Neuropharmacology, 15, 387A-388A.

29.    **Stern, R.A.**, *Silva, S.G., Gortner, D.T., Daughtrey, E.W.*, Perkins, D.O., Leserman, J., Hall, C.D., & Evans, D.L. (1992). Neurobehavioral functioning as a predictor of immunosuppression in asymptomatic HIV seropositive gay men. Biological Psychiatry, 31, 238A.

30.    Forman, L.M., *Silva, S.G.*, & **Stern, R.A.**, & *Pate, J.* (1993). Bromocriptine augmentation of neuroleptic treatment in schizophrenia. Journal of Neuropsychiatry and Clinical Neurosciences, 5, 453.

31.   Pedersen, C.A., Evans, D.L., Ozer, H., Folds, J., *Pate, J.*, Senger, M.A., & **Stern, R.A.** (1993). Natural killer cell activity is decreased in postpartum dysphoria. Biological Psychiatry, 33, 85A.

32.   *Silva, S.G.*, **Stern, R.A.**, *Daughtrey, E.W.*, Perkins, D.O., Leserman, J., & Evans, D.L. (1993). Disrupted mood and information processing speed interactions in asymptomatic HIV-1 seropositive gay men. Journal of Neuropsychiatry and Clinical Neurosciences, 5, 450-451.

33.   *Silva, S.G.*, **Stern, R.A.**, *Steketee, M.C., Daughtrey, E.W., Chaisson, N.*, & Evans, D.L. (1993). Twelve-month decline in general intellectual ability in asymptomatic HIV-1 seropositive gay men with early neurobehavioral impairments. Clinical Neuropathology, 12, S34.

34.   *Steketee, M.C.*, **Stern, R.A.**, *Silva, S.G., Daughtrey, E.W., Chaisson, N.*, & Evans, D.L. (1993). Factor and cluster analyses of neuropsychological performance in a sample of asymptomatic HIV-seropositive gay men. Clinical Neuropathology, 12, S34.

35.   **Stern, R.A.** *Silva, S.G., Daughtrey, E.W., Gortner, D.T.*, Mason, G.A., & Evans, D.L. (1993). Endocrine correlates of neuropsychological functioning in asymptomatic HIV-1 seropositive gay men. Journal of Clinical and Experimental Neuropsychology, 15, 96.

36.   **Stern, R.A.**, *Silva, S.G., Gortner, D.T., Daughtrey, E.W., Bostancic, F.*, & Evans, D.L. (1993). Neuropsychological functioning in asymptomatic HIV-1 seropositive gay men: A principal components analysis. Journal of Clinical and Experimental Neuropsychology, 15, 96-97.

37.   *Prohaska, M.L.*, **Stern, R.A.**, & Prange, A.J. Jr. (1994).   The role of thyroid status in the neuropsychological side effects of lithium. Journal of Neuropsychiatry and Clinical Neurosciences, 6, 323.

38.   *Silva, S.G.,* **Stern, R.A.**, *Chaisson, N., Baum, S.F.*, Perkins, D.O., Golden, R.N., & Evans, D.L. (1994). Apathy and neurobehavioral functioning in asymptomatic HIV-seropositive gay men. Journal of Neuropsychiatry and Clinical Neurosciences, 6, 311.

39.   *Silva, S.G.*, **Stern, R.A.**, *Chaisson, N., Baum, S.F., Singer, E.*, Golden, R.N., & Evans, D.L. (1994). Stable manual dexterity disturbance in asymptomatic HIV-1 seropositive gay men: A twelve-month follow-up. Biological Psychiatry, 35, 638A.

40.   *Silva, S.G.*, **Stern, R.A.**, Hall, M.J., & Janowsky, D.S. (1994). Physostigmine: Dissociation of mood and psychomotor effects in healthy males. Biological Psychiatry, 35, 666A

41.   **Stern, R.A.**, & Bachman, D.L. (1994). Discrepancy between self-report and observer rating of mood in stroke patients: Implications for the differential diagnosis of post-stroke depression. Journal of Neuropsychiatry and Clinical Neurosciences, 6, 319.

42.   **Stern, R.A.**, *Singer, E.A, Duke, L.M., Silva, S.G.*, Bowes, W., *Leshko, I.C.,* & Pedersen, C. (1994). Neuropsychiatric functioning in women taking oral contraceptives: A preliminary study.   Journal of Neuropsychiatry and Clinical Neurosciences, 6, 323.

43    *Arruda, J.E.*, Valentino, D., **Stern, R.A.**, & Costa, L. (1995). Confirmatory factor analysis of quantified electroencephalogram measured during a continuous performance test. Journal of the International Neuropsychological Society, 1, 126.

44.   *Prohaska, M.L.*, **Stern, R.A.**, Mason, G.A., Nevels, C.T., & Prange, A.J. Jr. (1995). Thyroid hormone and lithium-related neuropsychological deficits: A preliminary test of the Lithium-Thyroid Interactive Hypothesis. Journal of the International Neuropsychological Society, 1, 134.

45.   *Silva, S.G.,* **Stern, R.A.**, *Chaisson, N., Singer, E.A., Baum, S.F.*, Golden, R.N., & Evans, D.L. (1995). The effects of cognitive reserve on neurobehavioral functioning in asymptomatic HIV-seropositive gay men. Journal of the International Neuropsychological Society, 1, 162.

46.    Silva, S.G., **Stern, R.A.**, Chaisson, N., Singer, E.A., Gaver, V., Watson, J.B., Golden, R.N., & Evans, D.L. (1995). Evidence of mild visuoconstructive impairments in HIV infection using the Boston Qualitative Scoring System for the Rey-Osterrieth Complex Figure. Journal of the International Neuropsychological Society, 1, 138.

47.    Silva, S.G., **Stern, R.A.**, Durr, A.L., Hall, M.J., Davis, S.S., & Haggerty, J.J. Jr. (1995). Neuropsychiatric functioning in subclinical hypothyroidism. Journal of Neuropsychiatry and Clinical Neurosciences, 7, 408.

48.    **Stern, R.A.** (1995). Neuropsychological functioning in hyperthyroidism. The Clinical Neuropsychologist, 9, 296.

49.    **Stern, R.A.**, Singer, E.A., Duke, L.M., Singer, N.G., Morey, C.E., Daughtrey, E.W., & Kaplan, E. (1995). The Boston Qualitative Scoring System for the Rey-Osterrieth Complex Figure: Description and inter-rater reliability. Journal of the International Neuropsychological Society, 1, 357.

50.    Suhr, J.A., **Stern, R.A.**, Leshko, I.C., Singer, E.A., Franco, A., Lee, B., Pacheco, G.M., & Kaplan, E. (1995). The Boston Qualitative Scoring System for the Rey-Osterrieth Complex Figure: Preliminary validity findings. Journal of the International Neuropsychological Society, 1, 125.

51.    Whealin, J.M, **Stern, R.A.**, Mason, G.A., Noonan, L.R., Overstreet, D.H., Silva, S.G., & Prange, A.J. Jr. (1995). Influence of L-triiodothyronine on memory functioning following repeated electroconvulsive shock in rats: Implications for human electroconvulsive therapy. Journal of the International Neuropsychological Society, 1, 382.

52.    Arruda, J.E., **Stern, R.A.**, Hooper, C.R., Wolfner, G., Somerville, J., & Bishop, D. (1996). Visual Analogue mood scales to measure internal mood state in aphasic patients: Description and initial validity evidence with normal and neurologically impaired subjects. Archives of Clinical Neuropsychology, 11, 364.

53.    Cahn, D.A.., Marcotte, A.C., **Stern, R.A.**, Arruda, J.E., Akshoomoff, N.A., & Leshko, I.C. (1996). Qualitative features of visuoconstructional performance in children with Attention Deficit Hyperactivity Disorder. Archives of Clinical Neuropsychology, 11, 374-375.

54.    Nyenhuis, D.L., **Stern, R.A.**, Yamamoto, C., Terrien, A., Parmentier, A., Luchetta, T, & Arruda, J.E. (1996). A standardization, further validation and principal component analysis of the Visual Analogue Mood Scales. Journal of the International Neuropsychological Society, 2, 4.

55.    Silva, S.G., Jackson, E., Chaisson, N., **Stern, R.A.**, Golden, R.N., Petitto, J., & Evans, D.L. (1996). DHEA-S and decline in HIV-1 associated cognitive/motor functioning. Biological Psychiatry, 39, 663.

56.    Silva, S.G., **Stern, R.A.**, Chaisson, N., Singer, E.A., Baum, S.F., Golden, R.N., & Evans, D.L. (1996). Influence of cognitive reserve on neuropsychological functioning in asymptomatic HIV-seropositive gay men. Journal of Neuro-AIDS, 2, 178.

57.    **Stern, R.A.**, Arruda, J.E., & Legendre, S.A. (1996). Assessment of mood state in patients undergoing electroconvulsive therapy: The utility of Visual Analog Mood Scales designed for cognitively-impaired patients. Convulsive Therapy, 12, 74-75.

58.    Arruda, J.E., **Stern, R.A.**, Somerville, J.A., & Bishop, D.S. (1997). Description and initial reliability and validity evidence for the Visual Analogue Mood Scales in a neurologically-impaired patient population. Journal of Neuropsychiatry and Clinical Neurosciences, 9, 152.

59.    Arruda, J.E., **Stern, R.A.**, Somerville, J.A., Cohen, R., Stein, M.I., & Martin, E.M. (1997). Neurobehavioral functioning in asymptomatic HIV-1 infected women: Preliminary findings. Journal of the International Neuropsychological Society, 3, 14.

60.   *Arruda, J.E.*, Valentino, D.A., Weiler, M.D., & **Stern, R.A.** (1997). A further validation of a right hemisphere vigilance system as measured by factor analyzed quantitative electroencephalogram. Journal of Neuropsychiatry and Clinical Neurosciences, 9, 699-700.

61.   Silva, S.G., Jackson, E.D., **Stern, R.A.**, Leserman, J., Perkins, D.O., Golden, R.N., & Evans, D.L. (1997). Depressed mood and neurocognitive functioning in HIV-1 infection: Relationship to cognitive reserve. Journal of Neuropsychiatry and Clinical Neurosciences, 9, 167.

62.   *Singer Harris, N.*, **Stern, R.A.**, Marcotte, A.C., Stern, C., Huntzinger, R.M., *Somerville, J.A.*, Holler, K.A., Beetar, J.T., & Wilson, J.M. (1997). Assessment of mood states in children referred for neuropsychological evaluation: The Visual Analog Mood Scales-Children's Version. Journal of Neuropsychiatry and Clinical Neurosciences, 9, 667. (*Based on this abstract, Naomi Singer Harris was the recipient of an American Neuropsychiatric Association Young Investigator Award.*)

63.   **Stern, R.A.**, *Arruda, J.E., Somerville, J.A.*, Cohen, R.A., & Boland, R.J. (1997). Neuropsychiatric functioning in asymptomatic HIV-1 infected women. Journal of Neuropsychiatry and Clinical Neurosciences, 9, 147-148.

64.   **Stern, R.A.**, *Robinson, B., Thorner, A.R., Arruda, J.E.*, Prohaska, M.L., & Prange, A.J. Jr. (1997, February). A survey study of neuropsychiatric complaints in patients with Graves' disease. Psychiatry Digest, 1, 20-22.

65.   *Thompson, G.B., Arruda, J.E., Javorsky, D.J., Dahlen, K., Somerville, J.A.*, Guilmette, T.J., & **Stern, R.A.** (1997). The effects of coaching on the detection of malingering using the Abbreviated Hiscock Forced-Choice Procedure. Archives of Clinical Neuropsychology, 12, 414-415.

66.   *Tremont, G.*, **Stern, R.A.**, Abuelo, D.N., Geffroy, G.A.E., Walsh, A.J., & Salloway, S.P. (1997). Early-onset Alzheimer's dementia in a mentally-retarded adult associated with novel Presenilin-1 mutations. Journal of Neuropsychiatry and Clinical Neurosciences, 9, 697.

67.   Freeman, R.Q., Carew, T.G., Lamar, M., Cloud, B.S., Resh, R., **Stern, R.**, & Libon, D.J. (1998). Visuoconstructional impairment in dementia. Archives of Clinical Neuropsychology, 13, 40-41.

68.   *Thompson, G.B., Arruda, J.E., Tremont, G., Javorsky, D.J., Somerville, J.A.*, & **Stern, R.A.** (1998). Detection of malingering with the Boston Qualitative Scoring System for the Rey-Osterrieth Complex Figure. Archives of Clinical Neuropsychology, 13, 98-99.

69.   *Harris, N.S.*, Bernstein, J.H., Waber, D.P., & **R.A. Stern** (1999). Comparison of two qualitative scoring systems for the Rey-Osterrieth Complex Figure: The DSS and BQSS. Journal of the International Neuropsychological Society, 5, 120.

70.   *Javorsky, D.* & **Stern, R.A.** (1999). Validity of the Boston Qualitative Scoring System (BQSS) for the Rey-Osterrieth Complex Figure in discriminating between Alzheimer's and vascular dementia. Journal of the International Neuropsychological Society, 5, 120.

71.   *Latham, J.A.*, Tremont, G., *Somerville, J.A.*, Arruda, J.E., & **Stern, R.A.** (1999). Assessing internal mood state in dementia: Validation of the Visual Analog Mood Scales. Journal of Neuropsychiatry and Clinical Neurosciences, 11, 148.

72.   Silva, S.G., Jackson, E.D., Lanning, K.M., Leserman, J., Perkins, D.O., **Stern, R.A.**, Golden, R.N., & Evans, D.L. (1999). Cognitive reserve and HIV-1 disease progression: The differential effects of neurologic versus psychosocial factors. Journal of Neuropsychiatry and Clinical Neurosciences, 11, 162-163.

73.   *Somerville, J.A., Tremont, G.*, & **Stern, R.A.** (1999). The Boston Qualitative Scoring System (BQSS) for the Rey-Osterrieth Complex Figure as a Measure of Executive Functioning: A Convergent Validity Study. Journal of the International Neuropsychological Society 5, 118.

74. *Javorsky, D.*, Rosenbaum, J., & **Stern, R.A.** (1999). Utility of the Boston Qualitative Scoring System (BQSS) for the Rey-Osterrieth Complex Figure in the evaluation of traumatic brain injury. Archives of Clinical Neuropsychology, 14, 789-790.

75. Tremont, G., *Somerville, J.A.*, & **Stern, R.A.** (1999). Neuropsychological performance in Graves' hyperthyroidism: Evidence for executive dysfunction. Archives of Clinical Neuropsychology, 14, 652-653.

76. *Halpert, S.*, Tremont, G., *Javorsky, D.*, & **Stern, R.A.** (2000). Differential impact of executive dysfunction on the California Verbal Learning Test and Logical Memory. Journal of the International Neuropsychological Society 6, 138.

77. *Javorsky, D.*, Silva, S.G., & **Stern, R.A.** (2000). Utility of the Boston Qualitative Scoring System (BQSS) in evaluating the Rey-Osterrieth performance of asymptomatic HIV seropositive men. Journal of the International Neuropsychological Society, 6, 232.

78. Racenstein, J.M., Martin, E.M., Reed, R., Carson, V., Harris, T.E., Pitrak, D., Arruda, J.E., *Somerville, J.A.*, & **Stern, R.A.** (2000). Gender differences in spatial working memory in HIV positive individuals. Journal of the International Neuropsychological Society, 6, 135.

79. *Somerville, J.A., Javorsky, D,* Tremont, G., *Westervelt, H.*, & **Stern, R.A.** (2000). Flow-charts vs. pen-switching: A comparison of administration procedures for the Rey-Osterrieth Complex Figure. Journal of the International Neuropsychological Society, 6, 144.

80. **Stern, R.A.**, *Legendre, S., Thorner, A.*, Solomon, D., Tremont, G., *Arruda, J.A.,* Furman, M., *Somerville, J.A.*, & Prange, A.J. Jr. (2000). Exogenous thyroid hormone diminishes the amnestic side effects of electroconvulsive therapy. Journal of the International Neuropsychological Society, 6, 235.

81. **Stern, R.A.** & White, T. (2000). Survey of neuropsychological assessment practices. Journal of the International Neuropsychological Society, 6, 137.

82. Tremont, G., *Somerville, J.A., Pettibon, W.H., Javorsky, D.J.,* & **Stern, R.A.** (2000). A Quick Scoring Guide for the Boston Qualitative Scoring System for the Rey-Osterrieth Complex Figure. Journal of the International Neuropsychological Society, 6, 144.

83. Tremont, G., *Somerville, J.A., Smith, K.E.,* Hennessey, J.V., Noto, R.V., Jackson, I.M.D., & **Stern, R.A.** (2000). Cerebral hypoperfusion and neuropsychological deficits in patients with Graves' hyperthyroidism. Archives of Clinical Neuropsychology, 15, 665-666.

84. *Westervelt, H., Somerville, J.A.,* Tremont, G., & **Stern, R.A.** (2000). The impact of organizational strategy on recall of the Rey-Osterrieth Complex Figure. Archives of Clinical Neuropsychology 15, 684.

85. *Legendre, S.A., Ropacki, M.T., Sourathathone, C.M.,* Tremont, G., & **Stern, R.A.** (2001). Comparison of the Hopkins Verbal Learning Test and Randt Short Stories in assessing memory after ECT. Archives of Clinical Neuropsychology, 16, 798.

86. *Legendre, S.A.*, **Stern, R.A.**, Solomon, D.A., Furman, M.J., & *Smith, K.E.* (2001). The influence of cognitive reserve on memory following electroconvulsive therapy. Journal of Neuropsychiatry and Clinical Neurosciences, 13, 133. (*Based on this abstract, Susan Legendre was the recipient of an American Neuropsychiatric Association Young Investigator Award.*)

87. *Somerville, J.A.*, & **Stern, R.A.** (2001). Effects of length of delay on Rey-Osterrieth Complex Figure Recall. Journal of the International Neuropsychological Society 7, 132.

88.     *Sourathathone, C.M., Legendre, S., Ropacki, M.,* Westervelt, H., Tremont, G., & **Stern, R.A.** (2001). Relationship between verbal fluency measures and the Boston Naming Test (BNT). Archives of Clinical Neuropsychology, 16, 807-808.

89.     *Sourathathone, C.M., Westervelt, H.J.,* **Stern, R.A.,** & Tremont, G. (2001). Qualitative analysis of errors on the Paced Auditory Serial Addition Task (PASAT). Journal of Neuropsychiatry and Clinical Neurosciences, 13, 135.

90.     Tremont, G., Westervelt, H., *Podolanczuk, A.,* Javorsky, D., & **Stern, R.A.** (2001). Referring physician's perceptions of the neuropsychological evaluation: How are we doing? Archives of Clinical Neuropsychology, 16, 808.

91.     *Westervelt, H.*, Tremont, G., *Somerville, J., Padolanczuk, A.*, & **Stern, R.A.** (2001). Why are some amnestic patients oriented? Journal of the International Neuropsychological Society, 7, 133-134.

92.     *Rilling, L.M.*, Tremont, G., *Podolanczuk, A.*, & **Stern, R.A.** (2002). The validity and classification accuracy of the Wisconsin Card Sorting Test-64. Journal of the International Neuropsychological Society, 8, 154.

93.     *Williams, K.,* Cahn-Weiner, D.A., Grace, J., Tremont, G., Westervelt, H., & **Stern, R.A.** (2002). Quantitative and qualitative features of clock drawing performance in Alzheimer's disease, Parkinson's disease, and Dementia with Lew Bodies. Archives of Clinical Neuropsychology, 17, 737.

94.     *Bishop, C.,* **Stern, R.,** & Javorsky, D. (2003). Nine-year longitudinal case study of progressive dementia pugilistica. Journal of the International Neuropsychological Society, 9, 165.

95.     *Bishop, C.L.*, Westervelt, H.J., & **Stern, R.A.** (2003). Severe, refractory depression and the development of a buccofacial movement disorder in a patient with vascular dementia secondary to polycythemia vera: A case study. Journal of Neuropsychiatry and Clinical Neurosciences, 15, 268.

96.     *Davis, J.D.* & **Stern, R.A.** (2003). A case of apparent progressive cognitive decline in an older woman with multiple treated endocrinopathies: Importance of considering endocrine status in diagnosing dementia. Journal of Neuropsychiatry and Clinical Neurosciences, 15, 268.

97.     *Podolanczuk, A., Davis, J.D.*, Stopa, E., Hennessey, J.V., Luo, L., Lim, Y., & **Stern, R.A.** (2003). Thyroid hormone concentrations in prefrontal cortex of post mortem brains of Alzheimer's disease patients and controls. Journal of Neuropsychiatry and Clinical Neurosciences, 15, 272.

98.     **Stern, R.,** *Bender, A.,* Furman, M., *Smith, K., Rogers, B.,* Browning, R., Raufi, N., & Solomon, D. (2003). The use of Aricept (Donepezil) in electroconvulsive therapy (ECT). Journal of the International Neuropsychological Society, 9, 327-328.

99.     **Stern, R.A.,** *Davis, J.D., Rogers, B.L., Smith, K.M.,* Harrington, C.J., Ott, B.R., Prange, A.J. Jr. (2003). A double-blind study of thyroxine in the treatment of Alzheimer's dementia. Journal of Neuropsychiatry and Clinical Neurosciences, 15, 272.

100.    **Stern, R.,** Helm-Estabrooks, N., *Ruffolo, J.,* Leitten, C., & White, T. (2003). The NAB Narrative Writing Test: Description and interrater reliability. Journal of the International Neuropsychological Society, 9, 242.

101.    **Stern, R.,** *Ruffolo, J., Van Meter, A.,* Leitten, C., & White, T. (2003). The NAB Figure Drawing Test: Description and interrater reliability. Journal of the International Neuropsychological Society, 9, 242.

102.    **Stern, R.,** *Van Meter, A., Lang, K.,* Westervelt, H., Leitten, C., Hethcox, A., & White, T. (2003). The NAB Judgment Test: Description and interrater reliability. Journal of the International Neuropsychological Society, 9, 241.

103. Tremont, G., *Ruffolo, J., Bender, A., Podolanczuk, A.,* Hennessey, J., Noto, R., & **Stern, R.** (2003). Association between brain SPECT and neuropsychological functioning in Graves' disease. <u>Journal of the International Neuropsychological Society</u>, 9, 299.

104. Westervelt, H.J., **Stern, R.**, & Tremont, G. (2003). Odor identification deficits in Diffuse Lewy Body disease. <u>Journal of the International Neuropsychological Society</u>, 9,164.

105. *Bishop, C.L., Temple, R.O.,* Tremont, G., Westervelt, H.J., & **Stern, R.A.** (2003). Utility of inpatient neuropsychological consultation in an acute medical hospital. <u>Archives of Clinical Neuropsychology</u>, 18, 793.

106. **Stern, R.A.**, & White, T. (2003). The Neuropsychological Assessment Battery (NAB): Development and psychometric properties. <u>Archives of Clinical Neuropsychology</u>, 18, 805.

107. *Legendre, S.A.*, **Stern, R.A.**, Bert, A.A., & *Rogers, B.L.* (2003). The influence of cognitive reserve on neuropsychological functioning after CABG. <u>Archives of Clinical Neuropsychology</u>, 18, 726. (*Based on this abstract, Susan Legendre was the recipient of a Student Poster Award from the National Academy of Neuropsychology.*)

108. *Temple, R.O.,* & **Stern, R.A.** (2003). Marchiafava-Bignami disease: A case report. <u>Archives of Clinical Neuropsychology</u> 18, 732-733.

109. Tremont, G., Westervelt, H.J., *Davis, J.D., Macaulay, C.* & **Stern, R.A.** (2003). Effect of the neuropsychological evaluation on self-report of cognitive difficulties in early dementia. <u>Archives of Clinical Neuropsychology</u>, 18, 703-704.

110. *Brown, L.B.*, **Stern, R.A.**, Cahn-Weiner, D.A., *Rogers, B.*, Davis, M.A., Lannon, M.C., Maxwell, C., Souza, T., White, T., & Ott, B.R. (2004). Ecological validity of the Neuropsychological Assessment Battery (NAB) Driving Scenes test. <u>Journal of Neuropsychiatry and Clinical Neurosciences</u>, 16, 232-233.

111. Ledbetter, M.F., Davis, M.A., White, T., & **Stern, R.A.** (2004). Reliability of the Neuropsychological Assessment Battery (NAB). <u>Journal of the International Neuropsychological Society</u>, 10(S1), 106.

112. Ledbetter, M.F., White, T., & **Stern, R.A.** (2004). Validity evidence based on the internal structure of the Neuropsychological Assessment Battery (NAB). <u>Journal of the International Neuropsychological Society</u>, 10 (S1), 106.

113. *Macaulay, C.*, **Stern, R.A.**, & White, T. (2004). Validity evidence for the Neuropsychological Assessment Battery (NAB): How does the NAB compare to existing tests?. <u>Journal of the International Neuropsychological Society</u>, 10(S1), 106.

114. *Spitznagel, M.B.*, Tremont, G., Westervelt, H.J. & **Stern, R.A.** (2004). Does cognitive reserve play a role in anosognosia in dementia? <u>Journal of the International Neuropsychological Society</u>, 10(S1), 10.

115. **Stern, R.A.** & White, T. (2004). Introduction to the Neuropsychological Assessment Battery (NAB). <u>Journal of the International Neuropsychological Society</u>, 10(S1), 105.

116. **Stern, R.A.**, White, T., & Ledbetter, M.F. (2004). Validity evidence for the Neuropsychological Assessment Battery (NAB): Sensitivity, specificity, and clinical profiles. <u>Journal of the International Neuropsychological Society</u>, 10(S1), 106-107.

117. White, T., Davis, M.A., & **Stern, R.A.** (2004). Standardization and norming of the Neuropsychological Assessment Battery (NAB). <u>Journal of the International Neuropsychological Society</u>, 10(S1), 106.

118.  Westervelt, H J, Tremont G, *Spitznagel MB,* Howard JM, & **Stern RA.** (2005). Differential Odor Identification Performance in Dementia Subtypes. <u>Journal of the International Neuropsychological Society</u>, <u>11(S1)</u>, 107.

119.  Westervelt, H.J., *Brown, L.B.,* Tremont, G., & **Stern, R.A.** (2005). Patient and family perceptions of the neuropsychological evaluation: How are we doing? <u>Archives of Clinical Neuropsychology</u>, <u>20</u>, 895.

120.  Jefferson, A.L., *Wong, S., Bolen, E.,* Ozonoff, A., Levenson, S., Green, R.C., & **Stern, R.A.** (2006). Cognitive predictors of Hooper Visual Organization Test (HVOT) performance differ between patients with mild cognitive impairment (MCI) and geriatric normal controls (NC). <u>Journal of the International Neuropsychological Society</u>, <u>12(S1)</u>, 115.

121.  Jefferson, A.L., *Wong, S., Gracer, T.S.,* Ozonoff, A., Levenson, S., Green, R.C., & **Stern, R.A.** (2006). Geriatric performance on the 30-item even version of the Boston Naming Test (BNT): A comparison of normal controls (NC), mild cognitive impairment (MCI), and Alzheimer's disease (AD). <u>Journal of the International Neuropsychological Society</u>, <u>12(S1)</u>, 26.

122.  *Santini, V.*, **Stern, R.A.**, & Green, R.C. (2006). Relationship between thyroid status and neuropsychological performance in healthy elderly euthyroid controls. <u>Journal of the International Neuropsychological Society</u>, <u>12(S1)</u>, 144.

123.  *Ashendorf, L.*, Jefferson, A.L., Green, R.C., & **Stern, R.A.** (2007). Test-retest consistency of the WRAT-3 Reading Subtest among older adults. <u>Journal of the International Neuropsychological Society</u>, <u>13(S1)</u>, 80.

124.  *Ashendorf, L.,* Jefferson, A.L., Green, R.C., & **Stern, R.A.** (2007). Grooved Pegboard Test Performance Among Cognitively Normal Elders and Individuals with MCI. <u>Journal of the International Neuropsychological Society</u>, <u>13(S1)</u>, 105.

125.  *Ashendorf, L.,* O'Connor, M.K., Green, R.C., Jefferson, A.L., & **Stern, R.A.** 2007). Utility of Trail Making Test errors in MCI and AD. <u>Journal of the International Neuropsychological Society</u>, <u>13(S1)</u>, 80.

126.  *Ashendorf, L.,* O'Connor, M.K., Green, R.C., Jefferson, A.L., & **Stern, R.A.** (2007). Older adult normative data for Trail Making Test errors. <u>Journal of the International Neuropsychological Society</u>, <u>13(S1)</u>, 31.

127.  *Gavett, B.E., Barrup, M., Gonzalez, B.,* Nair, A.K., Green, R.C., Jefferson, A.L., & **Stern, R.A**. (2008). Rates of Impaired Episodic Memory on a Modified Logical Memory Test Compared to the CERAD Word Recall Test. <u>Archives of Clinical Neuropsychology</u>, <u>23</u>, 713.

128.  McKee, A., **Stern, R.A.**, *Gavett, B.*, & Cantu, R. (2008). The distinct pattern of tau degeneration in dementia pugilistica. <u>Federation of American Societies for Experimental Biology Journal</u>, <u>22</u>,173.11.

129.  *Gavett, B.E.,* **Stern, R. A.**, Nowinski, C. J., Cantu, R. C., & McKee, A. C. (2009). Clinical and Neuropathological Findings in Chronic Traumatic Encephalopathy: A Case Series. <u>Archives of Clinical Neuropsychology</u>, <u>24</u>, 525.

130.  *Lou, K. R., Gavett, B. E.,* Jefferson, A. L., Nair, A. K., Green R.C., & **Stern, R. A.** (2009). Sensitivity and specificity of select Neuropsychological Assessment Battery (NAB) subtests in the diagnosis of Alzheimer's disease. <u>Archives of Clinical Neuropsychology</u>, <u>24</u>, 439-440.

131.  *Pimontel, M., Gavett, B. E.,* Jefferson, A. L., Nair, A. K., Green, R. C., & **Stern, R. A.** (2009). Cognitive assessment of older adults using WAIS-R Digit Symbol: Normative data concerns. <u>Archives of Clinical Neuropsychology</u>, <u>24</u>, 439.

132.    Gavett BE, Kowall NK, Qiu W, Green RC, Jefferson AL, **Stern RA.** (2010, October). Lack of equivalence between the Mini-Mental State Examination (MMSE) and the Clinical Dementia Rating (CDR) in very mild to moderate stage dementia. <u>Archives of Clinical Neuropsychology.</u>

133.    Lin A.P., Ramadan, S., Box, H., Stanwell, P. & **Stern, R.A.** Neurochemical Changes in Athletes with Chronic Traumatic Encephalopathy.  Paper presented at the Annual Meeting of the Radiological Society of North America; December 1, 2010; Chicago, IL

134.    *Feke, G.T., Hyman, B.T., **Stern, R.A.,** & Pasquale, L.R. (2011).* Retinal Blood Flow and Nerve Fiber Layer Thickness in Patients with Mild Cognitive Impairment or Probable Alzheimer's Disease. Poster presented at the Annual Meeting of the Association for Research in Vision and Ophthalmology (ARVO), May 1-5, 2011, Fort Lauderdale, FL.

## Textbook Chapters

1.  Evans, D.L., **Stern, R.A.**, Golden, R.N., Haggerty, J.J. Jr., Perkins, D., Simon, J.S., & Nemeroff, C.D. (1990). Neuroendocrine and peptide challenge tests in primary and secondary depression. In C.B. Nemeroff (Ed.) Neuropeptides and Psychiatric Disorders. Washington, D.C.: American Psychiatric Association Press, pp. 279-298.

2.  Perkins, D.O., **Stern, R.A.**, Golden, R.N., Miller, H.L., & Evans, D.L. (1991). Use of neuroendocrine tests in the psychiatric assessment of the medically ill patient. In J.A. McCubbin, P.G. Kaufmann, and C.B. Nemeroff (Eds). Stress, Neuropeptides, and Systemic Disease. New York: Academic Press, pp. 199-217.

3.  Prange, A.J. Jr., & **Stern, R.A.** (1995). Pharmacologic use of thyroid hormones in psychiatry. In H.I. Kaplan & B.J. Sadock (Eds.). Comprehensive Textbook of Psychiatry/VI. Baltimore: Williams and Wilkins, pp. 2083-2088.

4.  **Stern, R.A.**, Perkins, D.O., & Evans, D.L. (1995). Neuropsychiatric aspects of HIV-1 infection and AIDS. In F.E. Bloom & D.J. Kupfer (Eds.). Psychopharmacology: The Fourth Generation of Progress. New York: Raven Press, pp. 1545-1558. URL: http://www.acnp.org/citations/GN401000149.

5.  **Stern, R.A.**, & Prange, A.J. Jr. (1995). Neuropsychiatric aspects of endocrine disorders. In H.I. Kaplan & B.J. Sadock (Eds.). Comprehensive Textbook of Psychiatry/VI. Baltimore: Williams and Wilkins, pp. 241-251.

6.  **Stern, R.A.**, & *Prohaska, M.L.* (1996). Neuropsychological evaluation of executive functioning. In L.J. Dickstein, M.B. Riba, & J.M. Oldham (Eds.). American Psychiatric Press Review of Psychiatry, Vol. 15. Washington, D.C.: American Psychiatric Press, pp. 243-266.

7.  Connors, C.K., Epstein, J., **Stern, R.A.**, March, J., Sparrow, E., & *Javorsky, D.J.* (2003). Subtyping Attention-Deficit/Hyperactivity Disorder (ADHD): Use of the ROCF. In J. Knight & E. Kaplan (Eds.). The Handbook of Rey-Osterrieth Complex Figure Usage: Clinical and Research Applications. Lutz, Florida: Psychological Assessment Resources, pp. 411-431.

8.  Libon, D.J., Freeman, R.Q., Giovannetti, T., Lamar, M., Cloud, B.S., **Stern, R.A.**, & Kaplan, E. (2003). The ROCF and visuoconstructional impairment in cortical and subcortical dementia. In J. Knight & E. Kaplan (Eds.). The Handbook of Rey-Osterrieth Complex Figure Usage: Clinical and Research Applications. Lutz, Florida: Psychological Assessment Resources, pp. 583-596.

9.  Boyle, P., *Ropacki, S.A.L.*, & **Stern, R.A.** (2007). Electroconvulsive therapy and coronary artery bypass grafting surgery: Pseudoexperimental paradigms for studying cognitive reserve. In Y. Stern (Ed.). Cognitive Reserve: Theory and Applications. New York: Taylor and Francis, pp. 117-130.

10. Iverson, G.L., Brooks, B.L., White, T., & **Stern, R.A.** (2007). Neuropsychological Assessment Battery (NAB): Introduction and advanced interpretation. In: A.M. Horton (Ed.). The Neuropsychology Handbook (3rd Ed.). New York: Springer, pp. 279-343.

11. **Stern, R.A.** *Daneshvar, D. & Poon, S.* (2010). Visual Analogue Mood Scales. In S. Brumfitt (Ed.). Psychological Well-Being in the Person with Acquired Communication Problems. New York: John Wiley & Sons, pp. 116-136.

12. **Stern, R.A.**, *Anderson, S. & Gavett, B.* (2011). Frontal Systems and Executive Functioning. In A. Budson & N. Kowall (Eds.). The Handbook of Alzheimer's Disease and Other Dementias. New York: Wiley-Blackwell.

13. Stamm, J. & **Stern, R.A.** (in preparation). Chronic Traumatic Encephalopathy. In B.L. Miller & J.L. Cummings (Eds.). The Human Frontal Lobes, 3rd Edition. New York: The Guilford Press.

14.  Koerte, I.K., Lin, A., Muehlmann, M., Rauchmann, B., Cooper, K., Mayinger, M., **Stern, R.A.**, & Shenton, M.E. (in press). Post-Traumatic Cognitive Disorders.  In S. Kanekar (Ed.) <u>Imaging Of Neurodegenerative Disorders</u>, New York: Thieme Publishers.

## Letters and Other Publications

1.  Haggerty, J.J. Jr., **Stern, R.A.**, Mason, G., & Prange, A.J. Jr. (1994). In reply to: The prevalence of goiter in psychiatric outpatients suffering from affective disorder [letter]. <u>American Journal of Psychiatry</u>, <u>151</u>, 454.

2.  Tremont, G., & **Stern, R.A.** (2001). Minimizing the cognitive effects of lithium therapy and electroconvulsive therapy using thyroid hormone. .<u>Biologine Psichiatrija ir Psichofarmakologija</u> (Lithuanian journal; "Biological Psychiatry and Psychopharmacology"), <u>3</u>, 5-11.

3.  **Stern, R.A.**, Gavett, B.E., *Baugh, C.,* Nowinski, C.J., Cantu, R.C., & McKee, A.C. (2011). Recurrent Sports-Related Traumatic Brain Injury and Tauopathy. In <u>Nutrition and Traumatic Brain Injury: Improving Acute and Subacute Health Outcomes in Military Personnel</u>, edited by J. Erdman, M. Oria, and L. Pillsbury. Washington, DC: The National Academies Press. pp. 305-310.

**Published Tests, Instruments, and Manuals:**

1.      **Stern, R.A.** (1997). <u>Visual Analog Mood Scales</u>, Psychological Assessment Resources (PAR), Odessa, FL.

2.      **Stern, R.A.**, *Javorsky, D.J., Singer, E.A., Singer, N.G., Duke, L.M., Somerville, J.A.*, Thompson, J.A., & Kaplan, E. (1999). <u>Boston Qualitative Scoring System (BQSS) for the Rey-Osterrieth Complex Figure</u>, Psychological Assessment Resources (PAR), Odessa, FL.

3.      **Stern, R.A.** & White, T. (2003). <u>Neuropsychological Assessment Battery (NAB)</u>, Psychological Assessment Resources (PAR), Lutz, FL.
              In addition to the entire battery, the following individual tests and modules are available from the publisher:
                    NAB Screening Module
                    NAB Attention Module
                    NAB Language Module
                    NAB Memory Module
                    NAB Spatial Module
                    NAB Executive Functions Module
                    NAB Auditory Comprehension Test
                    NAB Categories Test
                    NAB Design Construction Test
                    NAB Digits Forward/Digits Backward Test
                    NAB Mazes Test
                    NAB Naming Test
                    NAB Numbers and Letters Test
                    NAB Orientation Test
                    NAB Visual Discrimination Test
                    NAB Writing Test

4.      **Stern, R.A.** & White, T. (2003). <u>NAB Administration, Scoring, and Interpretation Manual</u>, Psychological Assessment Resources (PAR), Lutz, FL.

5.      White, T. & **Stern, R.A.** (2003). <u>NAB Psychometric and Technical Manual</u>, Psychological Assessment Resources (PAR), Lutz, FL.

6.      White, T. & **Stern, R.A.** (2003). <u>NAB Demographically Corrected Norms Manual</u>, Psychological Assessment Resources (PAR), Lutz, FL.

7.      White, T. & **Stern, R.A.** (2003). <u>NAB U.S. Census-Matched Norms Manual</u>, Psychological Assessment Resources (PAR), Lutz, FL.

8.      Mohyde, M., Tracton-Bishop, B., Coughlin, J. D'Ambrosio, L., & **Stern, R.A** (2007). <u>At the Crossroads: The Support Group Kit on Alzheimer's Disease, Dementia & Driving</u>.  The Hartford, Hartford, CT.
              The kit was developed collaboratively by BU School of Medicine, MIT AgeLab, The Hartford Financial Services Group the three organizations, based on materials developed for a research study (**PI R. Stern**) of dementia caregivers and driving.  Other major contributors include from the MIT AgeLab. The support group kit was the recipient of a *Today's Caregiver* Magazine's "2011 Caregiver Friendly" Award.

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br>MDL No. 2323 |
| Kevin Turner and Shawn Wooden, *on behalf of themselves and others similarly situated*,<br><br>     Plaintiffs,<br><br>     v.<br><br>National Football League and NFL Properties, LLC, successor-in-interest to NFL Properties, Inc.,<br><br>     Defendants. | Civil Action No. 2:14-cv-00029-AB |
| THIS DOCUMENT RELATES TO:<br>ALL ACTIONS | |

**DECLARATION OF SEAN MOREY**

Pursuant to 28 U.S.C. § 1746, Sean Morey declares as follows:

1.    I have ten credited seasons playing in the NFL, as a wide receiver and as a member of the special teams.

2.    I began my NFL career in 1999 with the New England Patriots. I played for the Philadelphia Eagles in 2002, and throughout the 2003 NFL season. I played for the three seasons with the Pittsburgh Steelers in 2004, 2005 & 2006. I played the final three seasons of my NFL career with the Arizona Cardinals from 2007 until 2009. I retired in 2010.

3.    I am also a veteran of NFL Europe. In 2000, the Patriots allocated me to the Barcelona Dragons where I played wide receiver and on special teams. I returned to the Dragons

1

for the 2001 season, allocated again by the New England Patriots to play defensive back and special teams. I was then allocated to the Barcelona Dragons by the Philadelphia Eagles in 2003, where I played my third and final season in NFL Europe.

4. During training camp for and throughout the three seasons that I played in NFL Europe, I suffered repeated head trauma.

5. The NFL Europe season lasted ten games with one additional championship game. Additionally, all teams would have live scrimmages during training camp in Florida, which lasted approximately two weeks before traveling to Europe for the season. In addition, some NFL Europe teams held "full contact" practices during the week throughout the season.

6. NFL Europe games were largely the same as NFL games played here in the United States. The field dimensions, duration of game, and principal rules were largely the same as those in the NFL. Unlike the NFL, however, NFL Europe restricted overload blitzes; as defenses were restricted in the number of rushers to a particular side. The rule sought to simplify protection schemes and protect quarterbacks. Otherwise, the rules governing contact were largely the same as those in the NFL.

7. The NFL Europe season did not overlap with the NFL season. Thus, some players played a full season in NFL Europe, went directly into NFL Training Camps, and played an entire season in the NFL in a single year. In 2003, for example, I played 33 games total: 10 games with the Dragons in NFL Europe and 23 games with the Eagles in the NFL (4 preseason games, 16 regular season games, and 3 playoff games).

8. NFL Europe was not equipped to provide the level of medical care necessary for injured football players. I found it difficult to communicate with the foreign doctors, who often did not speak English, and the athletic trainers were ill-equipped and often inexperienced. NFL

-2438-

Europe did not have a neurological expert on the sideline and did not implement any concussion protocol.

9.   I am aware that, from time to time, players playing in NFL Europe were flown to Health South in Birmingham, Alabama for medical care as a result of those players not being able to receive appropriate care in Europe, as well as for rehabilitation.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: October 6, 2014

Sean Morey

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br>MDL No. 2323 |
| Kevin Turner and Shawn Wooden, *on behalf of themselves and others similarly situated*,<br><br>      Plaintiffs,<br><br>              v.<br><br>National Football League and NFL Properties, LLC, successor-in-interest to NFL Properties, Inc.,<br><br>      Defendants. | Civil Action No. 2:14-cv-00029-AB |
| THIS DOCUMENT RELATES TO:<br>ALL ACTIONS | |

## DECLARATION OF STEVEN F. MOLO

Pursuant to 28 U.S.C. § 1746, Steven F. Molo declares as follows:

1.     I am a partner at MoloLamken LLP.

2.     Sean Morey has retained MoloLamken LLP in connection with the above-captioned matter, and I represent Mr. Morey in this matter.

3.     Alan Faneca has retained MoloLamken LLP in connection with the above-captioned matter, and I represent Mr. Faneca in this matter.

4.     Ben Hamilton has retained MoloLamken LLP in connection with the above-captioned matter, and I represent Mr. Hamilton in this matter.

1

5.      Sean Considine has retained MoloLamken LLP in connection with the above-captioned matter, and I represent Mr. Considine in this matter.

6.      Robert Royal has retained MoloLamken LLP in connection with the above-captioned matter, and I represent Mr. Royal in this matter.

7.      Roderick "Rock" Cartwright has retained MoloLamken LLP in connection with the above-captioned matter, and I represent Mr. Cartwright in this matter.

8.      Jeff Rohrer has retained MoloLamken LLP in connection with the above-captioned matter, and I represent Mr. Rohrer in this matter.

2

I declare under penalty of perjury that the foregoing is true and correct.

Signed this _3rd_ day of October, 2014.

Steven F. Molo

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br>MDL No. 2323 |
| Kevin Turner and Shawn Wooden, *on behalf of themselves and others similarly situated*,<br><br>    Plaintiffs,<br><br>        v.<br><br>National Football League and NFL Properties, LLC, successor-in-interest to NFL Properties, Inc.,<br><br>    Defendants. | Civil Action No. 2:14-cv-00029-AB |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**DECLARATION OF MARTIN V. TOTARO**

Pursuant to 28 U.S.C. § 1746, Martin V. Totaro declares as follows:

1.    I am a partner at MoloLamken LLP.

2.    Sean Morey has retained MoloLamken LLP in connection with the above-captioned matter, and I represent Mr. Morey in this matter.

3.    Alan Faneca has retained MoloLamken LLP in connection with the above-captioned matter, and I represent Mr. Faneca in this matter.

4.    Ben Hamilton has retained MoloLamken LLP in connection with the above-captioned matter, and I represent Mr. Hamilton in this matter.

5.     Sean Considine has retained MoloLamken LLP in connection with the above-captioned matter, and I represent Mr. Considine in this matter.

6.     Robert Royal has retained MoloLamken LLP in connection with the above-captioned matter, and I represent Mr. Royal in this matter.

7.     Roderick "Rock" Cartwright has retained MoloLamken LLP in connection with the above-captioned matter, and I represent Mr. Cartwright in this matter.

8.     Jeff Rohrer has retained MoloLamken LLP in connection with the above-captioned matter, and I represent Mr. Rohrer in this matter.

Signed this __6th__ day of October, 2014.

_____

Martin V. Totaro

Case: 25-2271     Document: 20-2     Page: 552     Date Filed: 10/08/2025

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br>MDL No. 2323 |
| Kevin Turner and Shawn Wooden, *on behalf of themselves and others similarly situated*,<br><br>    Plaintiffs,<br><br>    v.<br><br>National Football League and NFL Properties, LLC, successor-in-interest to NFL Properties, Inc.,<br><br>    Defendants. | Civil Action No. 2:14-cv-00029-AB |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

## DECLARATION OF THOMAS J. WIEGAND

Pursuant to 28 U.S.C. § 1746, Thomas J. Wiegand declares as follows:

1.    I am a partner at MoloLamken LLP.

2.    Sean Morey has retained MoloLamken LLP in connection with the above-captioned matter, and I represent Mr. Morey in this matter.

3.    Alan Faneca has retained MoloLamken LLP in connection with the above-captioned matter, and I represent Mr. Faneca in this matter.

4.    Ben Hamilton has retained MoloLamken LLP in connection with the above-captioned matter, and I represent Mr. Hamilton in this matter.

1

5.    Sean Considine has retained MoloLamken LLP in connection with the above-captioned matter, and I represent Mr. Considine in this matter.

6.    Robert Royal has retained MoloLamken LLP in connection with the above-captioned matter, and I represent Mr. Royal in this matter.

7.    Roderick "Rock" Cartwright has retained MoloLamken LLP in connection with the above-captioned matter, and I represent Mr. Cartwright in this matter.

8.    Jeff Rohrer has retained MoloLamken LLP in connection with the above-captioned matter, and I represent Mr. Rohrer in this matter.

I declare under penalty of perjury that the foregoing is true and correct.

Signed this ___3rd___ day of October, 2014.

Thomas J. Wiegand

Case: 25-2271     Document: 20-2     Page: 555     Date Filed: 10/08/2025

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br>MDL No. 2323 |
| Kevin Turner and Shawn Wooden, *on behalf of themselves and others similarly situated*,<br><br>     Plaintiffs,<br><br>     v.<br><br>National Football League and NFL Properties, LLC, successor-in-interest to NFL Properties, Inc.,<br><br>     Defendants. | Civil Action No. 2:14-cv-00029-AB |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

## DECLARATION OF KAITLIN R. O'DONNELL

Pursuant to 28 U.S.C. § 1746, Kaitlin R. O'Donnell declares as follows:

1.    I am an associate at MoloLamken LLP.

2.    Sean Morey has retained MoloLamken LLP in connection with the above-captioned matter, and I represent Mr. Morey in this matter.

3.    Alan Faneca has retained MoloLamken LLP in connection with the above-captioned matter, and I represent Mr. Faneca in this matter.

4.    Ben Hamilton has retained MoloLamken LLP in connection with the above-captioned matter, and I represent Mr. Hamilton in this matter.

1

5.      Sean Considine has retained MoloLamken LLP in connection with the above-captioned matter, and I represent Mr. Considine in this matter.

6.      Robert Royal has retained MoloLamken LLP in connection with the above-captioned matter, and I represent Mr. Royal in this matter.

7.      Roderick "Rock" Cartwright has retained MoloLamken LLP in connection with the above-captioned matter, and I represent Mr. Cartwright in this matter.

8.      Jeff Rohrer has retained MoloLamken LLP in connection with the above-captioned matter, and I represent Mr. Rohrer in this matter.

I declare under penalty of perjury that the foregoing is true and correct.


Signed this 6th day of October, 2014.


Kaitlin R. O'Donnell

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br>MDL No. 2323 |
| Kevin Turner and Shawn Wooden, *on behalf of themselves and others similarly situated*,<br><br>    Plaintiffs,<br><br>    v.<br><br>National Football League and NFL Properties, LLC, successor-in-interest to NFL Properties, Inc.,<br><br>    Defendants. | Civil Action No. 2:14-cv-00029-AB |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

## DECLARATION OF WILLIAM T. HANGLEY

Pursuant to 28 U.S.C. § 1746, William T. Hangley declares as follows:

1.    I am a partner at Hangley Aronchick Segal Pudlin & Schiller LLP.

2.    I have been retained to represent Sean Morey in connection with the above-captioned matter, and I do represent Mr. Morey in this matter.

3.    I have been retained to represent Alan Faneca in connection with the above-captioned matter, and I do represent Mr. Faneca in this matter.

4.    I have been retained to represent Ben Hamilton in connection with the above-captioned matter, and I do represent Mr. Hamilton in this matter.

1

5.      I have been retained to represent Sean Considine in connection with the above-captioned matter, and I do represent Mr. Considine in this matter.

6.      I have been retained to represent Robert Royal in connection with the above-captioned matter, and I do represent Mr. Royal in this matter.

7.      I have been retained to represent Roderick "Rock" Cartwright in connection with the above-captioned matter, and I do represent Mr. Cartwright in this matter.

8.      I have been retained to represent Jeff Rohrer in connection with the above-captioned matter, and I do represent Mr. Rohrer in this matter.

I declare under penalty of perjury that the foregoing is true and correct.

Signed this ___3rd___ day of October, 2014.

_____
William T. Hangley

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br>MDL No. 2323 |
| Kevin Turner and Shawn Wooden, *on behalf of themselves and others similarly situated*,<br><br>    Plaintiffs,<br><br>        v.<br><br>National Football League and NFL Properties, LLC, successor-in-interest to NFL Properties, Inc.,<br><br>    Defendants. | Civil Action No. 2:14-cv-00029-AB |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**DECLARATION OF MICHELE D. HANGLEY**

Pursuant to 28 U.S.C. § 1746, Michele D. Hangley declares as follows:

1.    I am a partner at Hangley Aronchick Segal Pudlin & Schiller LLP.

2.    I have been retained to represent Sean Morey in connection with the above-captioned matter, and I do represent Mr. Morey in this matter.

3.    I have been retained to represent Alan Faneca in connection with the above-captioned matter, and I do represent Mr. Faneca in this matter.

4.    I have been retained to represent Ben Hamilton in connection with the above-captioned matter, and I do represent Mr. Hamilton in this matter.

1

5.    I have been retained to represent Sean Considine in connection with the above-captioned matter, and I do represent Mr. Considine in this matter.

6.    I have been retained to represent Robert Royal in connection with the above-captioned matter, and I do represent Mr. Royal in this matter.

7.    I have been retained to represent Roderick "Rock" Cartwright in connection with the above-captioned matter, and I do represent Mr. Cartwright in this matter.

8.    I have been retained to represent Jeff Rohrer in connection with the above-captioned matter, and I do represent Mr. Rohrer in this matter.

I declare under penalty of perjury that the foregoing is true and correct.

Signed this _3rd_ day of October, 2014.

Michele D. Hangley

Case: 25-2271     Document: 20-2     Page: 564     Date Filed: 10/08/2025

### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br>MDL No. 2323 |
| Kevin Turner and Shawn Wooden, *on behalf of themselves and others similarly situated*,<br><br>            Plaintiffs,<br><br>            v.<br><br>National Football League and NFL Properties, LLC, successor-in-interest to NFL Properties, Inc.,<br><br>            Defendants. | Civil Action No. 2:14-cv-00029-AB |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

## DECLARATION OF LINDA S. MULLENIX

Pursuant to 28 U.S.C. § 1746, Linda S. Mullenix declares as follows:

1.    I am a licensed attorney.

2.    I have been retained to represent Sean Morey in connection with the above-captioned matter, and I do represent Mr. Morey in this matter.

3.    I have been retained to represent Alan Faneca in connection with the above-captioned matter, and I do represent Mr. Faneca in this matter.

4.    I have been retained to represent Ben Hamilton in connection with the above-captioned matter, and I do represent Mr. Hamilton in this matter.

5.      I have been retained to represent Sean Considine in connection with the above-captioned matter, and I do represent Mr. Considine in this matter.

6.      I have been retained to represent Robert Royal in connection with the above-captioned matter, and I do represent Mr. Royal in this matter.

7.      I have been retained to represent Roderick "Rock" Cartwright in connection with the above-captioned matter, and I do represent Mr. Cartwright in this matter.

8.      I have been retained to represent Jeff Rohrer in connection with the above-captioned matter, and I do represent Mr. Rohrer in this matter.

I declare under penalty of perjury that the foregoing is true and correct.

Signed this _3rd_ day of October, 2014.

                                        _Linda S. Mullenix_

                                        Linda S. Mullenix

```
                                                          Page 1
 1                  UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF PENNSYLVANIA
 2

 3   IN RE NATIONAL FOOTBALL      )  No. 2:12-md-02323-AB
     LEAGUE PLAYERS' CONCUSSION   )
 4   INJURY LITIGATION            )  MDL No. 2323
     _____  )
 5                                )  Philadelphia, PA
     THIS DOCUMENT RELATES TO     )  November 19, 2014
 6                                )  9:58 a.m.-3:20 p.m.
     All Actions                  )
 7   _____  )

 8             FAIRNESS HEARING/AMENDED TRANSCRIPT
               BEFORE THE HONORABLE ANITA B. BRODY
 9

10   APPEARANCES:

11   CHRISTOPHER SEEGER, ESQ.
     BRAD S. KARP, ESQ.
12   STEVEN MOLO, ESQ.
     MARTIN TOTARO, ESQ.
13   THOMAS WIEGAND, ESQ.
     THOMAS DEMETRIO, ESQ.
14   WILLIAM GIBBS, ESQ.
     JOHN PENTZ, ESQ.
15   LANCE LUBEL, ESQ.
     MICHAEL ROSENTHAL, ESQ.
16   PARAG SHAH, ESQ.
     GLENN MANOCHI, ESQ.
17   EUGENE MOORE
     MARY HAWKINS
18   ELEANOR PERFETTO
     BENJAMIN J. UTECHT
19   REBECCA CARPENTER
     BRUCE BIRENBOIM, ESQ.
20   DAVID BUCHANAN, ESQ.

21   ESR OPERATOR:          Katie Furphy

22

23        Veritext National Court Reporting Company
                    Mid-Atlantic Region
24        1801 Market Street - Suite 1800
                   Philadelphia, PA 19103
25                  1-888-777-6690
```

Page 2

1                              I N D E X

2    ARGUMENT                                        PAGE

3    Mr. Seeger                                        7
     Mr. Karp                                         47
4    Mr. Molo                                         68
     Mr. Totaro                                      105
5    Mr. Wiegand                                     115
     Mr. Demetrio                                    120
6    Mr. Gibbs                                       125
     Mr. Pentz                                       128
7    Mr. Lubel                                       135
     Mr. Rosenthal                                   146
8    Mr. Shan                                        150
     Mr. Manochi                                     153
9    Mr. Moore                                       158
     Ms. Hawkins                                     163
10   Ms. Perfetto                                    170
     Mr. Utecht                                      174
11   Ms. Carpenter                                   179
     Mr. Birenboim                                   187
12   Mr. Seeger                                      194
     Mr. Karp                                        200
13   Mr. Buchanan                                    208

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

```
 1                P R O C E E D I N G S

 2        (Call to Court)

 3               THE CLERK:  Now in session.  The

 4    Honorable Anita B. Brody presiding.  Good morning,

 5    Your Honor.

 6               THE COURT:  Good morning.

 7        (A chorus of good morning)

 8               THE COURT:  Won't you be seated.

 9               We're here in the case of NFL Players

10    Concussion Litigation, multi-district litigation

11    number 12-23-23.

12               And there are a few things that I want

13    to take care of before we -- before we begin.  I want

14    to introduce Mr. Perry Golkin.  Why don't you stand,

15    Mr. Golkin, who is my special master for financial

16    matters, and he has been just invaluable, and I want

17    to publicly thank you, Perry, you're been wonderful.

18               And if I decide to approve this

19    settlement and grant the motion I want to introduce

20    two people that I have designated for -- thank you --

21    two people that I have -- will be designating for

22    special master's implementation of the agreement.

23               And first, Dean Wendell Prichett, why

24    don't you stand -- Dean Pritchett who is the -- are

25    you the interim dean, isn't that correct, at the
```

Page 4

```
 1    University of Pennsylvania Law School, and he's a
 2    professor of law.  Thank you.
 3                    And also Jo-Ann Verrier who will cover
 4    the administrative matters.  Jo -- full disclosure.
 5    Jo-Ann was a law clerk of mine 30 years ago and she is
 6    now vice dean of -- for administration at the
 7    University of Pennsylvania law School.  Thank you.
 8                    And Judge Strawbridge who is my
 9    magistrate judge.  And any time the agreement says
10    that it will be -- the Court will adjudicate the
11    matter it may be me or it may be Judge Strawbridge.
12    Thank you, David, I appreciate that.
13                    Okay.  Let's begin.  Mr. Seeger.
14                    MR. SEEGER:  Yes, Your Honor.
15                    Your Honor, if you don't mind I'm going
16    use this podium for a few minutes and then switch over
17    to this one.
18                    THE COURT:  Oh, wow.  Okay.  I'm glad I
19    have four of those podiums.
20                    MR. SEEGER:  I don't want to mess up --
21    I don't want to mess up the technology here.
22                    THE COURT:  All right.  Okay.
23                    MR. SEEGER:  Good morning, Your Honor.
24                    THE COURT:  Good morning, Mr. Seeger.
25                    MR. SEEGER:  Thank you for this
```

Page 5

 1    opportunity.

 2                    I'd like to start by just introducing

 3    if you don't mind, Your Honor, a few people that are

 4    in the courtroom.

 5                    THE COURT:  Oh, certainly.

 6                    MR. SEEGER:  Chea (ph) Smith is with

 7    us.  She's the wife of Steve Smith, retired NFL

 8    player, who's too sick to be here today, he's

 9    suffering from ALS.

10                    THE COURT:  Okay.

11                    MR. SEEGER:  Also with us is our class

12    representative --

13                    THE COURT:  You know I think that the

14    -- if you use the microphone everybody can hear a

15    little -- yeah, that's better.

16                    MR. SEEGER:  I'll do that.

17                    THE COURT:  Yeah.

18                    MR. SEEGER:  Thank you, Mrs. Smith.

19                    Also with us is Shawn Wooden, who's our

20    subclass representative, retired NFL player as well,

21    for Subclass I.

22                    Our subclass representative, Kevin

23    Turner, for Subclass II could not make it.  His

24    condition has deteriorated to the point where he is

25    now on a breathing -- he needs assistance with his

Page 6

1    breathing and he's got a feeding tube, so his medical

2    professionals didn't think it would be appropriate for

3    him to travel, but he did want to be here and he

4    wanted me to mention that.

5                    THE COURT:  Okay.

6                    MR. SEEGER:  So thank you, Your Honor.

7                    Also with me is our counsel I should

8    note.  Co-lead counsel, Saul Weiss is here, Your

9    Honor.

10                   MR. WEISS:  Good morning, Your Honor.

11                   THE COURT:  Good morning.

12                   MR. SEEGER:  Also some members of the

13   negotiating team in the PEC, Gene Locks (ph) is here.

14                   THE COURT:  Hi.

15                   MR. SEEGER:  Steve Marks (ph).  And

16   subclass counsel Arnold Levin (ph) and Diane Nest

17   (ph).

18                   MR. MARKS:  Good morning, Your Honor.

19                   THE COURT:  Good morning.

20                   MR. SEEGER:  And, Judge, before I start

21   I would like to just spend a moment to thank Your

22   Honor for everything you've done in this case.  The

23   way you've handled it, the way you've managed it, and

24   at times the parties, as you know, this was a tough

25   fought litigation as well as a negotiation, and we

Page 7

1    needed a kick in the pants at times and we got that

2    from Your Honor, and I want to thank you.

3                THE COURT:  I never -- I never withhold

4    that.

5        (Laughter)

6                MR. SEEGER:  And at times when it got

7    difficult we came to Your Honor and we asked for help.

8    And one of the things we asked you for is to appoint

9    Judge Lane Phillips to help us out, and you did that,

10   Your Honor, and he helped us get at least to the first

11   point that we got to.

12               And at that point Your Honor had some

13   questions about the deal and you needed those

14   responded to and studies, and you appointed Special

15   Master Golkin.  And I want to thank Special Master

16   Golkin as well for the work he did in this case and

17   Your Honor for appointing him.

18               Judge, we're here today seeking final

19   approval of this landmark and historic settlement.  I

20   say landmark because this settlement uses state of the

21   art diagnostic tools and tests that will assist in the

22   diagnosis, treatment, and prevention of diseases

23   associated with mild traumatic brain injury,

24   concussions, and sub-concussive hits.

25               There are numerous studies that

Page 8

1    indicate the importance of early detection and

2    treatment and prevention in staving off some of the

3    serious conditions from a degenerative brain disease

4    like -- that are dealt with in this litigation, not to

5    mention the fact that the information that'll be

6    generated through our baseline assessment program will

7    be very important for science and scientists and

8    doctors who study this disease and try to come up with

9    answers to some of the things we don't -- answers that

10   we don't have today.

11            I also refer to this settlement as

12   historic because 5,000 brave NFL players put their

13   name and reputations on the line and took on the NFL

14   in what everyone understood would be a long and hard

15   fought battle.  Those men, their wives, and their

16   families made this happen.  They achieved something

17   that no one two years ago thought was possible could

18   be achieved, something that no one before was able to

19   achieve.  They want an outstanding results for all NFL

20   retired NFL players whether they are vested union

21   members or not.

22            The settlement I'm about to discuss

23   gets immediate help to retired NFL players like Kevin

24   Turner suffering from a debilitating disease like ALS,

25   it helps those with Alzheimer, dementia, and

Page 9

1   Parkinson's.  No retired NFL player needs to prove he

2   sustained a concussion or prove causation in this

3   settlement.  He only need be a retired NFL player.

4            All retired NFL players will have the

5   ability to get tested by a competent medical

6   professional located where they live.

7            Before I go into the details about the

8   benefits provided in the settlement I'd like to set

9   the stage for the settlement discussions.

10           This groundbreaking resolution is the

11  result of many months of intense, hard fought, arms

12  length negotiations.  I have extensive experience in

13  trying individual cases, mass cases, class cases

14  involving personal injuries.  I've personally

15  negotiated over $8 billion in settlements for victims

16  suffering from personal injuries in pharmaceutical

17  cases and all kinds of different cases.

18           In a case like this it's class

19  counsel's duty to negotiate -- to consider the class

20  as a whole when negotiating a global resolution and to

21  achieve the best results under the circumstances in

22  the particular case.

23           Although we were prepared to litigate

24  each and every one of these cases to trial, and in

25  fact we were in the middle of litigating preemption

Page 10

1  when we settled this case, that issue alone could have

2  dismissed thousands of cases in this litigation.

3            Co-lead counsel decided that the class

4  as a whole be best served by a global resolution if

5  one could be achieved on the right terms.

6            At the urging of Your Honor the parties

7  began a series of meetings to explore settlement.

8  Coming into these negotiations we were prepared to

9  make demands on all categories of injuries.  In our

10  complaint we allege that concussions and sub-

11  concussive hits result in Alzheimer, ALS, dementia,

12  Parkinson's, anger, mood swings, depression, sleep

13  loss, we had a whole number of injuries.

14            In the end, based upon the back and

15  forth of these hard fought negotiations, the

16  scientific considerations, and the legal issues

17  foreseeable in the case, the parties agreed to the

18  settlement terms we now present to this Court today

19  for approval.

20            The question for Your Honor today is

21  not whether the settlement is perfect, but whether

22  it's fair, reasonable, and adequate, and under the

23  circumstances of this case and the controlling Third

24  Circuit law this settlement is entitled to a

25  presumption of fairness.

Page 11

```
 1                    So, Judge, now I'd like to go through
 2    the settlement and some of the issues in the case for
 3    class certification.
 4                    Your Honor, I just want to -- do you
 5    see my PowerPoint up on your screen?
 6                    THE CLERK:  He has to touch the feed.
 7                    MR. SEEGER:  What's that?
 8                    THE CLERK:  He has to tap your feed.
 9                    MR. SEEGER:  Tap the feed.  Whatever
10    that means.
11                    THE COURT:  Do you want to help him?
12         (Pause)
13                    MR. SEEGER:  All right.
14                    THE COURT:  I don't have it, Jim.
15    Thank you.  All right, I can see it now.
16                    MR. SEEGER:  All right.
17                    THE COURT:  There's no problem now.
18    Can everybody see it?
19                    MR. SEEGER:  And you know what, Your
20    Honor, maybe -- I also have a hard copy if you want to
21    follow along that way.
22                    THE COURT:  Perfect.
23                    MR. SEEGER:  So I'll hand you two.  One
24    for Jack as well.
25                    THE COURT:  Okay, that's fine.
```

Page 12

 1              MR. SEEGER:  Okay.

 2              THE COURT:  And I don't -- can

 3   everybody see -- can you see it, Ms. --

 4         UNIDENTIFIED SPEAKER:  (Indiscernible -

 5   10:08:26).

 6              THE COURT:  Okay.  That's fine.  Okay.

 7              MR. SEEGER:  Your Honor, there are

 8   three components to the settlement.  There's a

 9   baseline assessment program, monetary award fund, and

10   an educational fund.

11              Let's talk about the baseline

12   assessment.  I'll try to get through some of this

13   quickly because I know I have a limited amount of

14   time.

15              It's a -- there is $75 million

16   committed to the baseline assessment program.  It

17   includes neurological examinations and comprehensive

18   neuropsychological tests for all NFL players that want

19   to avail themselves of it.  We're hopping all of them

20   do.

21              The BAP (ph) administrator will select

22   an independent group of medical professionals who will

23   handle these tests, and all you need to be able to go

24   through the baseline assessment program is a half a

25   season -- a half eligible season in the settlement,

Page 13

1    and if the players are age 43 or older they have two

2    years to be tested, and if they're younger than 43

3    they have up to 10 years to be tested.

4              And again, I mentioned that we don't

5    have to spend a lot of time on this, the importance --

6    it is throughout the medical literature the importance

7    of diagnosing these diseases early, getting the

8    treatment, and prevention.  This is a very important

9    part of the program, Your Honor.

10             So what could be diagnosed through the

11   BAP testing program?  The levels of neurocognitive

12   disease that we've identified.  Level 2, which is

13   moderate dementia.  Level 1.5, which is what we call

14   early or mild dementia, Your Honor.

15             THE COURT:  Is that the same?  Because

16   sometimes it's called earlier and sometimes it's

17   called mild.

18             MR. SEEGER:  It's referred to both in

19   the literature, Your Honor.  And I think for the

20   purpose --

21             THE COURT:  And so that --

22             MR. SEEGER:  Yes.

23             THE COURT:  Do you agree with that?

24             MR. KARP:  We do, Your Honor.

25             THE COURT:  Okay.  All right.

Page 14

```
1              MR. SEEGER:  Thank you for pointing
2    that out, Your Honor.
3              And then we provide supplemental
4    benefits.  So if somebody doesn't rise to the level of
5    a qualifying condition, Your Honor, but they're
6    diagnosed with impairment not rising to the level of
7    qualifying condition we will get them that important
8    additional testing medical treatment and
9    pharmaceutical care, if necessary.
10             The monetary award fund critically and
11   very important to this is uncapped.  Every qualifying
12   diagnosis over the 65-year life of this settlement
13   will be paid.  That is guaranteed now by the NFL.  The
14   qualifying diagnoses are ALS, Parkinson's, Alzheimer,
15   Level 2, which is moderate dementia, Level 1.5, which
16   is earlier mild dementia, and that's with CTE for
17   players who passed away prior to July 7th, 2014 and
18   has a pathological finding of CTE on the brain.
19             Again, the highlights, no player need
20   establish causation as they would have to do if this
21   were being -- this were a case tried before a jury.
22             And the diagnoses are all going to be
23   made by qualified professionals, and the diagnosis
24   will be set at the date that the diagnosis is made by
25   a medical professional for the purposes of
```

Page 15

 1    compensation.

 2                    There are adjustments in the payment

 3    scheme that deal with the number of years played in

 4    the NFL, the age of the player at the time of

 5    diagnosis, and I'll talk about those later in my

 6    presentation, and there are adjustments for players

 7    who suffered a stroke prior to certain conditions and

 8    brain trauma not related to football play.

 9                    And here's just a -- how the seasons

10    breakdown, the number of seasons needed to qualify for

11    a full award.

12                    Now, importantly in a player is

13    diagnosed with Level 1.5 dementia let's say, Your

14    Honor, which is early to mild, and they progress into

15    Level 2, they will get a supplemental benefit.  We

16    will look at it again and they will be paid additional

17    money that correlates with where they are on the grid

18    for Level 2 dementia.  If they advance into Alzheimer

19    they could be -- they could be eligible for an

20    additional compensation there.  That's very important.

21    They can reapply to the program throughout their life.

22                    And one thing that we all encountered,

23    those of us who talk to players all the time as we

24    have throughout, is they may have a diagnosis which is

25    just short of a qualifying diagnosis.  Well they're

Page 16

1    not out of the program, they can keep coming back if

2    these are degenerative diseases, and we don't wish

3    these on anybody, but God forbid a player digresses

4    and he gets sicker he can reapply for these awards,

5    and that can happen throughout his lifetime.

6              Statutory lien is a very important

7    aspect of this settlement are being dealt with by

8    plaintiffs' counsel, by class counsel.  We're taking

9    the power and the size of this fund and we're going to

10   negotiate lien reductions for the players far beyond

11   anything an individual lawyer could do or the player

12   could do for themselves.  These lien reductions will

13   be substantial, and it won't affect their eligibility

14   if they're getting Medicare or Medicaid.  Their future

15   eligibility is preserved.

16             And finally in terms of additional

17   features is that we will allow modifications to the

18   settlement to incorporate new diagnostic tools, and

19   the parties are going to continually, even though the

20   agreement says every ten years, we're going to work

21   together all the time to keep an eye on this, and we

22   will in good faith make sure that if they're necessary

23   and needed they will be implemented.

24             THE COURT:  So if it's good faith your

25   representation; is that correct?

Page 17

```
 1                    MR. KARP:  It is, Your Honor.

 2                    THE COURT:  All right.  That means that

 3      there is -- there can be judicial oversight of that.

 4                    MR. SEEGER:  Yes, Your Honor.

 5                    THE COURT:  Do you agree with that,

 6      Mr. Karp?

 7                    MR. KARP:  We do.  It's laid out in the

 8      agreement.  Yes.

 9                    THE COURT:  Okay.  Thank you.

10                    MR. SEEGER:  Thank you, Your Honor.

11                    And finally the education fund, which

12      in terms of the dollar amount is a small aspect of

13      this, but it's important, because it's going to be

14      used to educate retired players regarding benefits

15      that are available to them that they may not be aware

16      of.  We've had numerous discussions with players who

17      would qualify for benefits that are provided now by

18      the NFL that don't know they're there for whatever

19      reason, and we're going to make sure that they know

20      whatever benefits they are.  Counseling, whatever it

21      is.

22                    And we're going to try to establish

23      programs and work with programs to make football safer

24      so that players learn how to hit in a safer way to

25      avoid some of these injuries.
```

Page 18

```
 1                    Also the agreement there are numerous
 2    CBA benefits that have been collectively bargained
 3    for.  I just mentioned them.
 4                    What we learned while we were
 5    negotiating is that in the 2011 collective bargaining
 6    agreement there's a neurocog program -- a
 7    neurocognitive impairment program that had a waiver in
 8    it.  The waiver said you either go into the benefits
 9    program or you go into the tort system, but you
10    couldn't do both.  The NFL in the context of this
11    settlement has agreed to waive that.  So now players
12    can avail themselves of the settlement and they can
13    avail themselves of the benefits.  There's going to be
14    no problem there with that.
15                    THE COURT:  That's correct, is it not?
16                    MR. KARP:  It is, Your Honor, and I'll
17    be addressing that in my remarks shortly.
18                    THE COURT:  Okay.
19                    MR. SEEGER:  We don't touch workers'
20    compensation claims, they can still file them, or
21    other claims.  If a player thinks that they should
22    bring a case against their high school or their -- or
23    college they can do that.  There's no release of those
24    claims.
25                    I'd like to talk for a minute now about
```

Page 19

 1    class notice.  I've never been involved in a case

 2    where the notice was as extensive, as well written as

 3    in this case, and there is evidence -- there is

 4    evidence of the effect of this good notice, which I'm

 5    going to get to, but let me first mention that we

 6    directly mailed over 33,000 notices -- actual notice

 7    to retired players and their families.

 8                    We had it on television programs, we

 9    published notice, we had short forms of the notice

10    that said -- even though it didn't lay out in that

11    one-page short form the entire deal, it told them

12    where to go to find out, and that's important.

13                    We had a website.  That's important

14    because we -- I'm going to show you in the next slide,

15    but I want to spend a moment on this, I want to talk

16    about media, but on the next slide I'm going to show

17    you what the impact of that notice was.  We can do

18    that here.

19                    This case was extensively covered in

20    the media from the time we filed the case.  Every

21    aspect of it, every change in the settlement, when

22    Your Honor denied preliminary approval stories were

23    run, they were repeated hundreds of times, every

24    aspect of the settlement was discussed and criticized

25    by the press, and some aspects I believe unfairly, but

Page 20

```
 1   it was out there, you know, everybody was talking
 2   about it.
 3                In addition to that the objectors had
 4   their own websites.  Mr. Molo had a website with his
 5   objectors putting in my view misinformation out there
 6   about the settlement.  But they did it and that's what
 7   it is.  It didn't really have much of an impact, but
 8   I'll come back to the point about why it's important.
 9                As a result of this notice we had
10   66,000 visits to our website in a class of over
11   20,000.  That's amazing.  That means family members
12   for those who probably couldn't -- are checking the
13   website and getting information.
14                We had more than 4,500 calls to our
15   call center.  Twenty-three hundred callers spoke with
16   a live operator.
17                Over 5,000 players preregistered
18   themselves for benefits, and the registration program
19   is not yet open, but they've asked to be included and
20   gave their identifying information.
21                And as a result of that we have less
22   than one percent of the class has opted out.  And I'll
23   tell you something interesting about that.  That
24   number is going down.  Because if you -- if we -- you
25   look at the reports filed by BrownGreer players are
```

Page 21

1    coming back and saying I made a mistake, I want to

2    come back in.  I hope that continues.  They can come

3    back in.  But the number was up over 200 and now it's

4    down as of today to 199.  So players are coming back.

5                    Now why is that important?  Because I'm

6    not aware of a case that had so much information.

7    There was extensive press coverage as I said, and in

8    addition to that websites like Mr. Molo where they

9    spoofed off our name where the name of our website was

10    "Concussion Settlements," he's created a website

11    called "Concussion Settlement Facts."

12                    MR. MOLO:  Judge --

13                    MR. SEEGER:  I'm presenting Mr. Molo.

14                    THE COURT:  You can respond.

15                    MR. SEEGER:  You've spoken, this is my

16    time.

17                    THE COURT:  You can respond.

18                    MR. MOLO:  No, because this is not

19    correct.  Thank you.

20                    MR. SEEGER:  I get to speak for the

21    class.

22                    Judge, I'm not upset with Mr. Molo

23    about it.  It's important -- it's an important fact

24    for the record.

25                    THE COURT:  Well despite the fact that

Page 22

1    you're not happy about it I appointed Mr. Molo to

2    represent the defendants.

3                   MR. SEEGER:  No, I wasn't happy about

4    it.

5                   MR. MOLO:  Thank you.

6                   MR. SEEGER:  I'm not even happy he's

7    here.

8         (Laughter)

9                   MR. SEEGER:  But now I get a chance to

10   talk to Your Honor, and I get to speak for the over

11   20,000 players who said yes for the settlement.

12                  The one -- the less than one percent

13   who have opted out has gone down, but the only point I

14   want to include on, and I'm going to move off it, is

15   the fact that I'm not aware, except in one other case

16   we found from the district of New Jersey, where

17   objectors launched a campaign against our notice

18   campaign and we still have this result.  That's my

19   only point.  And less than one percent objecting.

20                  Your Honor, I'm going go through some

21   of the Rule 23 factors pretty quickly because we don't

22   really have a disagreement, even the objectors don't

23   dispute that there's numerosity in this case, we have

24   over 20,000 retired players.

25                  The common questions there's no real

Page 23

 1   dispute.  What are they?  The -- some of the questions

 2   that are common to this class are the nature and

 3   extent of the duty of the NFL to the retired players,

 4   whether the duty was breached, whether the NFL knew

 5   and suppressed information, whether these concussive

 6   and sub-concussive hits increased the risk of the

 7   Alzheimer, ALS, Parkinson's, dementia, and

 8   neurocognitive impairment, whether the NFL's

 9   affirmative defenses are preemption workers' comp

10   would have barred discovery.  Those are the common

11   questions, no real dispute on that.

12               Typicality is met in this case, because

13   the conduct that we allege arises -- it's the same

14   conduct throughout the class.  The class

15   representatives, Shawn Wooden, played nine seasons in

16   the NLF, he experienced concussive and sub-concussive

17   hits, he suffers from neurological symptoms, although

18   they're not a qualifying diagnosis, and he has

19   headaches, sleep problems, mood swings, concentration

20   loss, all the things that we had in our complaint.  He

21   has not been diagnosed with a qualifying injury.

22               Kevin Turner who is our Subclass II

23   representative played eight seasons in the NFL for the

24   Patriots and the Eagles.  He experienced numerous

25   concussive and sub-concussive hits and he was

Page 24

1    diagnosed with ALS, which is a qualifying condition in

2    2010.

3              So the conduct arises from the same

4    conduct.  Shawn Wooden, Kevin Turner, retired NFL

5    players whose claims arise from the same conduct as

6    the two subclasses.

7              Predominance.  Again, these questions

8    predominate over individual issues.  No real dispute

9    here, not many objectors have even raised this as a

10   concern.

11             Superiority we know under Anchem (ph) is

12   really not an issue because the whole idea here is to

13   avoid a trial.  So the issue of manageability is a

14   non-issue here.

15             Adequacy we do have some push back from

16   some of the objectors, and I'll spend a minute or two

17   talking about it.  Adequacy is a two-prong inquiry.

18   It looks at the qualifications of counsel and it looks

19   to whether there's a conflict between the subclass

20   representatives and their interests and the interest

21   of the class.

22             Co-lead counsel -- my qualifications

23   are in my affidavit, Your Honor.  When you look at my

24   qualifications, Saul Weiss' qualifications, Gene

25   Locks, Steve Marks, Arnold Levin, Diane Nest, these

Page 25

 1  are attorneys who do this every day.  This is not our
 2  first case like it is for some of the objectors'
 3  counsel.  We do -- we handle personal jury cases.
 4  This is what we do.  And we do it time in and time and
 5  again, and our qualifications are pretty well laid
 6  out.  We have tried numerous bell weather cases.  I
 7  myself have tried numerous bell weather cases in MDLs
 8  and in front of many judges in state and federal
 9  court, which are representative trials.
10           We have litigated preemption issues,
11  Daubert issues, dispositive challenges involving
12  complex injury claims.
13           We've negotiated the resolutions -- if
14  you add my co-counsel in the number will go up to many
15  billions of dollars in settlements that have been
16  handled.  Arnold Levin was co-lead counsel in the Diet
17  Drugs litigation.  A multi-billion settlement right
18  here in the Eastern District.  We have handled --
19           THE COURT:  Someone is having trouble.
20  Yeah, maybe they want some water?
21           MR. SEEGER:  Oh.
22           THE COURT:  We don't give much around
23  here, but we do -- we do give water.
24           MR. SEEGER:  I've got an extra bottle
25  right here.  I have a cold so you won't want mine.

```
 1                    The lien --
 2                    THE COURT:  Thank you.
 3                    MR. SEEGER:  -- resolution program that
 4    we are presenting to Your Honor as part of this deal,
 5    this is -- we've done this in numbers of cases.  In
 6    fact I believe it might have been -- I was co-lead
 7    counsel in a case in front of Jack Weinstein involving
 8    a drug called Zyprexa where it was one of the first
 9    cases where we rolled out the lien resolution program
10    on a mass-wide basis throughout -- make sure she's
11    okay?  You all right?  And it was very, very
12    successful there.  It was very successful in Vioxin
13    and many other cases where it's been done.
14                    So we've got the -- we've got the two
15    separate subclasses.  Subclass I, who Mr. Wooden
16    represents, are players who've been injured, have
17    played in the NFL, suffered concussions but not yet
18    have a qualifying diagnosis.  Kevin Turner, Subclass
19    II representative has had concussions, played in the
20    NFL, represents players with a qualifying diagnosis.
21                    And why this works and why there are no
22    conflicts, Your Honor, is for the reason in this
23    slide.  The motivation of Subclass I was to insure
24    that without -- that players without a qualifying
25    injury today would have the money later to compensate
```

Page 27

1    injuries that would come down the road in the future.

2              Subclass II was motivated to bargain

3    for the best deal that they could presently get, and

4    because the monetary award fund is an inflation

5    adjusted and uncapped any possibility of a conflict

6    between those two classes is eliminated.

7              And we have language from prudential

8    where it says:

9              "Where both named plaintiffs and other

10   class members would need to prove the same allegations

11   in order to succeed on any of the claims the proposed

12   class satisfies the adequacy of representation

13   requirement of 23(a)."

14             Now what are some of objectors'

15   adequacy complaints?  Well they say we should have had

16   numerous subclasses.  When you figure out all the

17   subclasses that all the objectors together say we

18   should have had, when you layer on top of that public

19   citizen we would have had the problem that we were

20   warned against in the Cendant litigation, which is a

21   balkanization of this class action to the point where

22   every little interest would be represented and you

23   would never be able to put a settlement together with

24   the NFL or any defendant.  It would -- the settlement

25   would implode on itself.  That was the problem.

Page 28

```
 1                    The interests are represented by the
 2   class by these two subclass represents, the classes
 3   work perfectly, they involve all NFL players diagnosed
 4   and not diagnosed today, it is uncapped and inflation
 5   adjusted.  There is no conflict.
 6                    As our expert, Professor Calanoff (ph)
 7   says, too many subclasses is just inherently
 8   unmanageable.
 9                    So what do they say?  The settlement
10   should provide what they're specifically saying,
11   because this really isn't about adequacy, it's about
12   where you draw the line.  We want more money, we
13   should have gotten more money, we should have defined
14   the qualifying diagnoses differently, we should employ
15   different award reductions, they don't like the way we
16   did that, and they don't -- they generally just don't
17   like the way we did it, so they want to do it their
18   way.  But these aren't objections to adequacy, they're
19   objections to where the lines were drawn.
20                    As you can see from Judge Phillips'
21   quote from his affidavit, "The compromise was reached
22   after many months of vigorous arms length negotiations
23   supervised by a court-appointed mediator."  In that
24   case it was Judge Phillips, and in the settlement
25   after you denied preliminary approval, Your Honor, it
```

Page 29

1   was Special Master Golkin.

2              The class representatives' interest are

3   closely aligned with those of the class members such

4   that fair and adequate representation can be insured

5   and sufficient unity exists for the settlement class

6   certification purposes.

7              There are no Anchem issues as has been

8   asserted.  There are no futures issue.  The entire

9   class played in the NFL is discernible and was exposed

10  to head impacts.  The monetary award fund is uncapped.

11  Awards are inflation adjusted and there's no cash flow

12  maximum.  After final approval the NFL is bound, they

13  can't walk from the deal.  And the two subclasses and

14  separate representation afforded structural protection

15  beyond those afforded by the deal itself, Your Honor.

16             So, I'd spoke earlier about the strong

17  presumption in the Third Circuit in favor of voluntary

18  settlement agreements.  This presumption is especially

19  strong in class actions.  That's from the Sullivan

20  case.  And there's an overriding public interest in

21  settling class action litigation.

22             In order for Your Honor to assess the

23  fairness of this Girsh versus Jepson says to Your

24  Honor there are nine factors that have to be

25  satisfied, and I will quickly go through those.

Page 30

1                    The first one is the complexity and the

2      duration of the litigation.  Well the complexity --

3      just think about what the discovery would have been

4      like in this case in any kind of a case involving

5      neurocognitive problems.  Let's take, you know,

6      depression, for example.

7                    I have handled suicide cases, I've

8      handled depression cases, I know what discovery looks

9      like in those cases.  I've personally handled those.

10     They ask for everything.  They ask for educational

11     records that go back to the time you were

12     kindergarten.  They want the educational records of

13     your parents, because part of the neurocognitive

14     profile is it's a loss of intelligence so they want to

15     -- they want to get those records.  When you're

16     talking about depression they want to know what kind

17     of drugs you take.  Are they legal or are they

18     illegal?  Do you drink alcohol?  What is your -- what

19     is your sexual orientation is important.  I've had

20     that come up in depression cases.  Do you -- are you

21     involved in extramarital affairs?  Do you have

22     financial problems?

23                    You could just imagine I could go on

24     and on what the list would be of what the NFL would

25     want in a case that was going to trial involving the

Page 31

1    claim of anger or depression or some of those other

2    things.

3                The NFL would attack plaintiffs'

4    experts on Daubert.  You've seen their affidavits,

5    Your Honor, that's a glimpse of what the case is going

6    to look like for opt outs who will want to go to

7    trial.  That's what they'll be dealing with.

8                Prior to trial the NFL would challenge

9    many of the legal issues.  We were fighting

10   preemption.  Your Honor noted herself the risk

11   involved in that.  But, you know, when -- and I have a

12   slide where I want to talk about preemption.  The NFL

13   has one preemption cases in other parts of the

14   country.  It's not like, you know, we just said, hey,

15   there's risk, I'm talking about now co-lead counsel's

16   assessment of the risk on that, which is important.

17   It doesn't relate to anything that happened in this

18   court.  I was able to look at what the law was and

19   look at what the risk was in other courts, and I'll

20   talk about that.

21                And it would be a -- it would have been

22   an expensive, scorched earth litigation, we know that

23   because parties who have litigated with the NFL know

24   that they're in it typically for the long haul and

25   what that means.

Page 32

1                    The reaction of the class to the

2    settlement, I speak about it in the notice.  We had

3    extensive notice, we had extensive media coverage,

4    including misinformation campaigns, and then unrelated

5    to what Mr. Molo is doing, we had players themselves

6    -- this is a cohesive community.  I mean these guys

7    are like the marines, they talk to each other, there

8    is a -- there is a brotherhood here.  If you go on any

9    chat room or blog site there are many of them

10   discussing the settlement all long.  And they talk to

11   each other, they have email lists for each other.  I

12   mean we're talking about like household names.  When

13   you mention the name of an NFL player all these other

14   plays know who they are, they're friends with them.

15   So they're very cohesive and they were talking to each

16   other, and they decided to overwhelmingly accept this

17   deal.

18                    So the class reaction has been

19   extremely positive, and in the Third Circuit really

20   argues in favor of approval just on that point alone.

21                    The stage of the proceedings we were

22   in, I mean Your Honor knows this, we were in the

23   process of litigating a threshold issue on preemption.

24   We had very important legal issues besides the

25   preemption issue.  The NFL, and they've said this in

Page 33

1    their papers, intended to bring a motion to hold the

2    NFL as a co-employer with the teams.  If that would

3    have happened all of the players would have been

4    relegated to a workers' comp claim.  And as I said,

5    they would have challenged the science at every level.

6              And at the end of the day this was a

7    science-driven case.  Everything that the plaintiffs'

8    lawyers needed to know about the science was in the

9    medical literature.  We've read it -- we read it all,

10   we studied it all, we know everything that the experts

11   that are proposed by the objectors have had to say, we

12   know everything they've published, we know everything

13   our experts have said, we know -- we knew everything

14   that was out there, and at the end of the day it was a

15   science-driven case.

16             People can talk about discovery, you

17   can talk about fraud, you can talk about these issues,

18   but you don't get to jump over causation and go right

19   to those issues.  As you know, Your Honor, we would

20   have to prove all of those elements to get the case to

21   the jury.

22             The parties and Judge Phillips, says,

23   this is a comment from his affidavit:

24             "The parties consulted with and relied

25   on their respective independent medical experts in the

Page 34

1    fields of neurology, neuropsychological, and other

2    relevant specialties in order to understand the

3    science regarding the diseases associated with

4    concussive head trauma and their pathologies to

5    evaluate the strength of plaintiffs' claims."

6              The risks of establishing liability,

7    risk of establishing damages, factors four and five

8    under Girsh.  Well, I've been through these and I

9    don't think I need to spend too much more time on

10   them.

11             Statute of limitations would have been

12   a big part.  Our settlement allows a player who played

13   in the '80s if he gets sick today to come in and get

14   compensated.  You know, I'm not going predict whether

15   that claim would be dismissed on a statute of

16   limitations, but we could all as attorneys and judges,

17   we can all look at that and see that there are issues

18   there whether that case would be time barred or not.

19   It isn't time barred in this settlement.

20             Assumption of risk would have been a

21   big factor by the NFL.

22             Now, I want to talk a little bit about

23   the preemption issue, because it gets pooh-poohed from

24   time to time, but it was a big issue, Your Honor, and

25   if you remember we brought in one of the country's

Page 35

1    best authorities on preemption, David Fredericks, to

2    come in here and argue to Your Honor.  The NFL brought

3    in an expert.  We extensively briefed it.  I mean the

4    briefs went on for pages and pages and pages.  Your

5    Honor unfortunately had to read all that because we

6    settled right before you were about to rule.  But

7    here's a case involving a player, Stringer, where the

8    Court found preemption and dismissed the case.  That

9    was a factor going into this.

10                   THE COURT:  Is that the California

11   case?

12                   MR. SEEGER:  This was Corey Stringer.

13   The Corey Stringer case.  I'm not exactly sure what

14   court.

15                   MR. KARP:  I believe it's Minnesota.

16                   THE COURT:  Minnesota.  Okay.

17                   MR. SEEGER:  Thank you.

18                   THE COURT:  Thank you.

19                   MR. SEEGER:  Maxwell versus the NFL.

20   Here we have a quote from the opinion that says, "The

21   Court finds that plaintiff's second cause of action

22   for negligence against the NFL is preempted."

23                   And although this next one I'm showing

24   I'm not asserting for the fact -- I'm not saying the

25   case has been dismissed at any means, Mr. Duerson (ph)

Page 36

1   is in the class, but here is a case from the Northern

2   District of Illinois where the judge in a different

3   context commented:

4                    "That even if the NFL's duties -- I'm

5   sorry -- NFL's duty arises apart from the CBAs

6   therefore the necessity of interpreting the CBAs" --

7   the collective bargaining agreements -- "to determine

8   the standard of care still leads to preemption."

9                    This is what the players were up

10  against, Your Honor.

11                   And we would have had to establish, as

12  I've commented both general causation, that is due

13  concussions caused these diseases, and then we would

14  have had to prove specific causation.  So the player

15  would have had to prove that there was a documented

16  concussion, that his problems occurred in the NFL as

17  opposed to college, high school, or pop warner, and

18  that the specific disease we were complaining of in

19  that case was directly related to the concussions.

20                   Girsh factor six, the risks of

21  maintaining a class action.

22                   Well, Your Honor, the one big piece of

23  this case that gets put aside in the context of a

24  settlement, because the idea is to avoid a trial, is

25  the issue of manageability.  That issue in the context

Page 37

1   of a settlement is put aside.  But in the context of a

2   litigation between us and the NFL the NFL would have

3   fought manageability very tough and it could have been

4   a big issue there.  It could have prevented class

5   certification.  And then even if Your Honor granted

6   the class for us, as we believe we would have asked

7   you to and think you should have, the NFL had the

8   right to go up to the Third Circuit, as Mr. Molo did

9   when he took us up on the 23(f) appeal, the NFL could

10  have done that.

11              The seventh factor, the ability of the

12  defendants to withstand a greater judgment.  Your

13  Honor, I don't have to spend a lot of time on this

14  because Your Honor has written on this.  This is a

15  case that you handled, Your Honor.  I'm going to say

16  it wrong, I think it's Jakesian (ph).  I guess, you

17  know, the only thing -- the only question I raise

18  here --

19              THE COURT:  You're insisting I be

20  consistent, is that what you're -- are you insisting

21  that I be consistent?

22              MR. SEEGER:  Yes, we would like you to

23  be, Your Honor.

24      (Laughter)

25              MR. SEEGER:  I'm quoting back your

Page 38

 1    case.  Which is something actually by way of passing

 2    I'll note that Mr. Molo waited until the day before

 3    our brief was due to actually brief this factor.  And

 4    guess what he -- he put a lot of information about how

 5    much money the NFL has, all their contracts, guess

 6    what he didn't put in that supplemental brief?  Your

 7    case.  I can't figure that out.  Maybe he can explain

 8    that when he stands up.

 9                    And Your Honor said and that courts in

10    this district regularly find that, you know, the issue

11    is really neutral on the ability to pay.  It really is

12    a factor when you have a defendant who might not be

13    able to pay.  That's not the case here, Your Honor.

14                    The range of reasonableness of the

15    settlement in light of the best recovery.  Well, I

16    mentioned earlier I, co-lead counsel, class counsel,

17    the PEC, and we draw upon that experience, have

18    negotiated many of these settlements.

19                    I will tell you that the values

20    achieved in this settlement are on the high end of

21    what anybody could find that's out there in the

22    context of a class or even a mass aggregate

23    settlement.  These are very rich values.  In many

24    cases with the younger players that go into millions

25    of dollars, and with the older players they don't go

Page 39

1    into millions of dollars.  And I'll discuss why -- why

2    that adjustment was made, but they're still very

3    significant values that I would challenge anybody to

4    say anything about in the context of a deal like this.

5    They are on the high end.

6                    I handled the PPA litigation in front

7    of Judge Barbara Rothstein who ultimately -- who

8    approved that -- that was a class case -- who approved

9    that.  This settlement had better values.  That

10   involved injuries relating to stroke, and she

11   ultimately became the head of the Federal Judicial

12   Center.  In Diet Drugs, Arnold Levin handled that

13   case.  Those are substantial values.  I would say this

14   settlement has richer values than that one does.  And

15   in Vioxx, a case that I handled that settled for

16   almost $5 billion.  I could tell you that on a

17   generalized basis the values here are higher.

18                    And I said in my declaration that we

19   strived to obtain the best overall deal we could for

20   plaintiffs taking into consideration the projected

21   incidents of plaintiffs' injuries, the value of the

22   claims, the risk of the litigation, including the

23   pending motions at the time on preemption.

24                    And Judge Phillips says:

25                    "In particular it's my considered

Page 40

1    judgment that plaintiffs would be unlikely to have

2    obtained more money and benefits without going through

3    years of discovery and trial where they would face

4    substantial risk of loss due to their inability to

5    prove negligence or fraud on the part of the NFL

6    parties or judgments below what they will receive in

7    this proposed litigation -- this proposed settlement."

8                So, I want to deal now with some of the

9    objectors' concerns, because they don't really impact

10   at all the fairness of this case.  It's really line

11   drawing that they could have done it better or should

12   have gotten more, should have tweaked this that way.

13               So they say the settlement doesn't

14   compensate CTE in living persons.  That is one of the

15   biggest misinformation points that some of objectors'

16   counsel has put out there.

17               This settlement does not compensate

18   CTE, it compensates the injuries and the diseases, the

19   most significant ones that we were able to agree upon.

20   The injuries and diseases associated with CTE.  So

21   let's make that clear right off the bat.

22               CTE is not diagnosable in living

23   people.  Their experts agree with that.  There is for

24   way to detect CTE in a living person today.  And the

25   settlement -- the settlement compensates the most

Page 41

1    serious neurocognitive and neuromuscular injuries

2    associated with TBI, and that is ALS, Alzheimer,

3    Parkinson's, and dementia, which had been reported in

4    patients determined to have CTE.  Those are from our

5    declarations of our experts Dr. Fisher and Dr. Deza

6    (ph).

7                   Through the pathological diagnosis of

8    -- though the pathological diagnosis of CTE is not

9    compensated as an injury perspectively, the most

10   serious cognitive impairments developed in living

11   retired players that have been associated with the

12   literature we see here are compensated.  The most

13   serious diseases are compensated.

14                   It says, "The settlement doesn't

15   compensate" -- and these are all the things they say

16   that could have been compensated in their opinion.

17   Epilepsy, multiple sclerosis, deafness, dizzy spells,

18   vision problems, headaches, depression, mood swings,

19   substance abuse.

20                   The plaintiffs -- we demanded going

21   into this settlement we wanted compensation on all of

22   those things, they're alleged in our complaint, but as

23   I said early when we started, that when you get into a

24   tough negotiation with a party like the NFL and things

25   have to be factored in.  The science of the case, the

Page 42

1    risks of litigating, all those things come to play.

2    At the end of the day we wound up with an excellent

3    settlement that tests young players or even older

4    players to find out if they have any of these

5    problems, if they do and they have a qualifying

6    diagnosis they get compensated, and if they don't

7    they're going to find out right away what their

8    condition is.  And if they ever progress down the road

9    the fund will be there for them.

10              Now one of the problems that we have,

11   and maybe the objectors can address this when they

12   stand up, is that these things that they said need to

13   be included, depression, these are things that occur

14   in the general population and are reported independent

15   of concussions.

16              If you go a search on Goggle right now

17   for the amount of money the pharmaceutical industry

18   makes selling antidepression drugs you will find out

19   that tens of millions of people take them and they

20   make tens of billions of dollars selling they will,

21   and those people don't play in the NFL.

22              I'm not pooh-poohing or diminishing

23   depression, I believed it was associated with

24   concussions, but you have to take the science as it

25   exists at the time you're negotiating, and even

Page 43

1  plaintiffs' experts can't conclusively say that

2  depression is associated with it -- I mean objectors.

3              It's reasonable for settling parties to

4  make choices and compromises.  If a class member with

5  one of the excluded conditions was upset he had the

6  opportunity to opt out, and that's something that did

7  not occur in a big way in this case.  There are under

8  200 opt outs in a class of over 20 something

9  thousands.

10             So the objectors say monetary award

11 offsets are unfair and they have complaints concerning

12 the reductions for fewer than five years in the NFL

13 play, reductions based on age, reductions based on

14 stroke or severe brain trauma before a qualifying

15 diagnosis.  And each and every one of those reductions

16 had a reason in logic, science, and fact.

17             The reductions as Tom Vasquez (ph), our

18 expert says -- our economist:

19             "Reduction is based on years -- on

20 years played accounts for reduced exposure to the NFL

21 impact relative to a player's earlier years of play

22 versus college, high school, and grade school.

23             Reductions based on age at diagnosis

24 reflects relative grade or joint casualty for

25 background risks with increasing age."

Page 44

```
 1                    What we found in the medical literature
 2    is that when you get over the age of 60, when you're
 3    70 years old you're -- the chance of developing
 4    dementia just by the aging process and other things
 5    that go on in the body, was much higher than the risk
 6    of you developing that -- and I say you in the generic
 7    way -- or a player developing that because it related
 8    to concussions or NFL play, which would have occurred
 9    20, 30 years prior.
10                    Reductions for stroke and severe TBI
11    parallel medical references showing increased risk for
12    such events and greater difficulty establishing
13    liability at a trial with such facts.  Each of these
14    points though --
15                    THE COURT:  What's TBI?
16                    MR. SEEGER:  Traumatic brain injury.
17                    THE COURT:  Okay.  Thank you.
18                    MR. SEEGER:  Each of these points I
19    want to make clear though was the subject of fierce
20    and protracted negotiations.  We fought on every
21    single one of them, and there were times they walked
22    out of the room, and there were times we walked out of
23    the room, and we were screaming at each other on the
24    phone in the early morning hours while objectors --
25    many of the objectors' counsel didn't even have a
```

Page 45

1    horse in the race.  Some of them don't even have

2    clients that filed a case.  They were not involved.

3    They didn't offer their services to us then.  We only

4    found out about them once the settlement came up.

5                    Professor Calanoff says:

6                    "Objectors' complaints reduced to one

7    of how the settle's lines were drawn.  If drawn

8    differently or more favorably toward objectors another

9    class member would have a concern as to the place

10   where that line fell."

11                   You're not going to make anybody happy

12   in a line drawing battle.

13                   So what we got, as I started out

14   saying, was something that maybe isn't perfect, but it

15   is really good and it is clearly fair.

16                   And that is the end of my presentation.

17   And I actually think I came up a little bit early on

18   time, Your Honor.

19                   THE COURT:  Okay.

20                   MR. SEEGER:  So I will hand off now to

21   Mr. Karp.

22                   THE COURT:  One second.  Let me -- let

23   me speak with counsel at side bar, please.

24                   MR. SEEGER:  Sure.

25                   THE COURT:  For one moment.  No, I'm

Page 46

1    going to speak to -- Mr. Molo, I just want to speak to

2    counsel who were up here.  I'll speak to you later.

3    This is -- this has to do with --

4         (Sidebar)

5              THE COURT:  (Indiscernible - 10:44:11).

6    All right.  Please come forward.

7              MR. SEEGER:  Do you want us to remain

8    up here?

9              THE COURT:  Yes.  Please come up.

10   Yeah.  (Indiscernible - 10:44:32).  Listen, the

11   question -- and I want you to be prepared, the

12   question I -- Mr. Molo, hello.

13             MR. MOLO:  Hello, Judge.  Thank you for

14   having me.

15             THE COURT:  Right.  Because if they

16   finish early I'm going start with you.

17             MR. MOLO:  Whatever -- however you want

18   to handle it.  However you want to do it.  Can we take

19   a break at 11:00 (indiscernible - 10:44:54) to be able

20   to complete my presentation at noon time

21   (indiscernible - 10:44:57).

22             THE COURT:  Yes.  Okay.  Well then you

23   should be able to go to 1 o'clock.

24             MR. MOLO:  Yeah.  Yes.

25             THE COURT:  I mean I don't think a half

Page 47

1    hour should be -- we're at 11:00, and it would take

2    five minutes for a break, it's 12:00, and we'll have

3    -- we'll put your particular presentation on.

4                    MR. MOLO:  Okay.  Okay.

5                    THE COURT:  All right.  (Indiscernible

6    - 10:45:16) come back.

7                    MR. MOLO:  Sure.

8                    THE COURT:  Is that okay?

9                    MR. MOLO:  Yes.

10                    UNIDENTIFIED SPEAKER:  Thank you, Your

11    Honor.

12                    THE COURT:  All right.  Okay.

13        (Sidebar concluded)

14                    THE COURT:  Just a little bit of

15    tidying up about when we're going to again and when

16    we're going end.

17                    Okay.  Mr. Karp, are you next?

18                    MR. KARP:  I am, Your Honor.

19                    THE COURT:  All right.

20                    MR. KARP:  Okay.  Good morning, Your

21    Honor.

22                    THE COURT:  Good morning.

23                    MR. KARP:  I'm Brad Karp, counsel for

24    the National Football League and for NFL Properties.

25    With me at counsel table are my partner, Bruce

Page 48

1    Birenboim.

2                    MR. BIRENBOIM:  Good morning, Your

3    Honor.

4                    MR. KARP:  NFL senior counsel Anastasia

5    Danias, Bob Heim from the Dechert firm.

6                    MR. HEIM:  Your Honor.

7                    MR. KARP:  And I would also like to

8    introduce my stellar team at Paul, Weiss.  We have my

9    partner, Lynn Bayard.

10                   MS. BAYARD:  Good morning, Your Honor.

11                   MR. KARP:  Brian Stekloff.

12                   MR. STEKLOFF:  Good morning, Your

13   Honor.

14                   MR. KARP:  Doug Burns.

15                   MR. BURNS:  Good morning, Your Honor.

16                   MR. KARP:  Ralia Polechronis.

17                   MS. POLECHRONIS:  Good morning.

18                   MR. KARP:  And we're also pleased to

19   have with us today Sheila Burnbalm (ph).

20                   MS. BURNBALM:  Thank you.

21                   MR. KARP:  Uh-huh.  I will try to keep

22   my opening remarks brief, Your Honor, and I'll try not

23   to repeat each of the points raised by Mr. Seeger.

24                   THE COURT:  Okay.  Thank you.

25                   MR. KARP:  Although I will repeat the

Page 49

1   point raised at the outset by Mr. Seeger that the NFL

2   believes too that this is an historic settlement.

3                    The proposed settlement provides

4   substantial and monetary compensation, indeed

5   unprecedented monetary compensation up to $5 million

6   per player for retired NFL players who develop

7   significant neurocognitive and neuromuscular

8   impairments associated with specific diseases and

9   specific conditions.

10                   The proposed settlement provides the

11  substantial monetary awards without requiring any

12  showing whatsoever of causation.  In other words,

13  there is no requirement that players prove that

14  playing in the NFL caused their impairments.

15                   The settlement program runs for 65

16  years, a period of time sufficient to cover each of

17  the 22,000 plus retired players.

18                   The monetary awards are inflation

19  protected.

20                   The NFL has guaranteed payment of full

21  compensation to every eligible retired player over the

22  life of the settlement, and the NFL's ultimate

23  liability is uncapped.

24                   In addition to these uncapped,

25  inflation protected, substantial monetary awards the

Page 50

 1   proposed settlement also includes a comprehensive

 2   program of baseline neurocognitive testing.  This

 3   program to be funded entirely by the NFL provides

 4   therapy, treatment, and medicine to NFL players who

 5   show early signs of neurocognitive decline, and it

 6   will help NFL retired players and their families

 7   understand the player's current level of cognitive

 8   functioning.

 9              I want to emphasize, Your Honor, that

10   these monetary compensation awards and these

11   supplemental benefits are on top of the NFL's existing

12   health benefits and disability programs, programs that

13   have been collectively bargained and that will remain

14   in full force and full effect.

15              As part of this settlement the NFL has

16   agreed not to seek offsets and not to seek reductions

17   for payments made to NFL players under these programs.

18              And finally, as Mr. Seeger noted, the

19   proposed settlement establishes an education fund

20   which will be funded by the NFL and overseen by this

21   Court.  That fund will support safety and injury

22   protection programs at all levels of football and will

23   educate retired NFL players about the NFL's existing

24   medical and disability benefit programs.

25              The NFL is proud of this settlement.

Page 51

1                    THE COURT:  One second before you go on

2     about the education fund you know there has been a

3     good deal of criticism sipray (ph), and I've been

4     criticized for allowing certain sipray conditions.

5     Would you consider this sipray?

6                    MR. KARP:  No, this is an independent

7     part of the settlement that is funded separately and

8     distinct from the BAP program and from the monetary

9     award program, and under the Third Circuit's decision

10    in Baby Products it is not a sipray issue, and we

11    discuss that in our brief pages 139 to 141.

12                    Again, Your Honor, the NFL is proud of

13    this settlement.

14                    In entering into it the league put

15    aside its very strong legal and factual defenses and

16    we agreed not to litigate.  Instead, as Your Honor is

17    aware, we focused on negotiating a settlement that

18    would provide substantial compensation and other

19    critical benefits to retired players and years and

20    years and years sooner than would have been possible

21    in a litigated context.

22                    And it's important to keep in mind --

23    and this has been missing from the public debate --

24    that the NFL had a fundamental choice to make in this

25    matter.  The league could have fought these claims,

Page 52

1    successfully fought these claims in my view for many,

2    many years.  But as Your Honor observed in your

3    July 14th preliminary approval decision, and as

4    Mr. Seeger stressed in his opening remarks, the league

5    has several powerful -- indeed the league had several

6    dispositive legal and factual defenses to the claims

7    asserted by plaintiffs.  The objectors entirely ignore

8    this reality and this context in their extensive

9    papers.

10                  I don't want to belabor this point, but

11    I would like to provide some context here.

12                  This settlement cannot be viewed in a

13    vacuum as the objectors and as many in the media have

14    attempted.

15                  The NFL, as you heard a few moment ago,

16    has a significant pending motion before this Court

17    that these cases should be dismissed at the very

18    outset because the underlying claims asserted by the

19    plaintiffs are governed by the players' collective

20    bargaining agreements with the NFL and therefore are

21    preempted by federal labor law.

22                  As Mr. Seeger noted while this Court

23    has not yet decided the NFL's preemption motion,

24    numerous courts around the country have and they have

25    agreed with the NFL's position.

Page 53

1           This single threshold issue posing

2    enormous risks to retired players, risks that have

3    been entirely ignored by the objectors in their

4    papers.  And the challenge is that plaintiffs would

5    face in this litigation, as Your Honor is aware and as

6    Your Honor wrote, extend far, far beyond preemption.

7           For example, even if some of these

8    cases survived a preemption ruling plaintiffs would

9    still face numerous substantial legal and factual

10   hurdles that would likely result in the dismissal of

11   their claims, if not at the outset of litigation, most

12   certainly before trial.

13          These defenses include statutes of

14   limitation, assumption of risk, causation, the lack of

15   any factual support for plaintiffs' claim of

16   concealment, and on and on and on.  These defenses are

17   outlined in some detail in our brief asking this Court

18   to grand final approval.  The objectors entirely

19   ignore the existence of all of these defenses and the

20   huge risks they pose for plaintiffs.

21          The proposed settlement agreed to by

22   the NFL eliminates not only the very significant risks

23   of defeat for the retired players, but also the huge

24   cost to all retired players of years and years of

25   contested litigation.

Page 54

1                    To put this in perspective consider if

2    you will the reality of how this would play out in the

3    absence of a settlement.  Absent a settlement

4    currently symptomatic retirees, if their claims

5    somehow were to survive preemption, would be required

6    to spend many years and many, many millions of dollars

7    in legal fees litigating highly uncertain claims that

8    likely in our view would leave them empty handed in

9    the end.

10                    And absent a settlement currently

11    asymptomatic retirees, if their claims were to somehow

12    survive preemption, would face an uncertain future

13    knowing that if they ever developed a significant

14    neurocognitive or significant neuromuscular impairment

15    they would then, and only then, need to embark on a

16    protracted and expensive litigation with the odds

17    stacked decidedly against any recovery.

18                    The proposed settlement before Your

19    Honor entirely eliminates all of these very

20    substantial risks.  It provides all retired players,

21    whether symptomatic or asymptomatic, with the peace of

22    mind that substantial monetary compensation and other

23    substantial benefits will be available if and when

24    they are needed without any risk and without any

25    uncertainty.

Page 55

1                    What has been lost in the fog of the

2       objections is that the league chose to do the right

3       thing here.  It agreed to put aside its substantial

4       factual and legal defenses to work with plaintiffs

5       under the supervision of this Court, the mediator, and

6       the court-appointed Special Master Perry Golkin, to

7       negotiate the consensual resolution that provides

8       substantial monetary compensation and substantial

9       other benefits to retired NFL players and to their

10      families.

11                   The settlement provides this

12      compensation and these benefits to those who are most

13      deserving and most in need of immediate help, and

14      critically it provides this compensation and these

15      benefits many, many years sooner than would have been

16      possible through a protracted and bitterly contested

17      litigation.

18                   The product of this year-long effort is

19      the proposed settlement pending before Your Honor.

20                   For all the reasons set forth in our

21      extensive papers and supported by our medical and

22      expert declarations we submit that the proposed

23      settlement is fair, reasonable, and adequate under

24      well-settled law in this circuit.

25                   First the settlement is fair,

Page 56

1   reasonable, and adequate in absolute terms for the

2   reasons I've outlined, but just as important and

3   conspicuously absent from the broad public debate and

4   from the lengthy papers submitted by the objectors,

5   this settlement is manifestly fair, reasonable, and

6   adequate when one evaluates it in context.

7             In other words, how would the retired

8   players fair if they actually were to litigate these

9   cases?  What relief would the retired players likely

10  secure five years or ten years from now if they

11  litigated these claims against the National Football

12  League?

13            Fair, reasonable, and adequate as

14  compared to the alternatives.  That is the appropriate

15  inquiry.  That analysis is entirely missing from the

16  public debate and from the objectors' papers.

17            I submit, Your Honor, that the proposed

18  settlement is measurably superior for the retired

19  players than the likely outcome of a protracted and

20  expensive litigation.

21            And of course as Mr. Seeger pointed

22  out, and as Your Honor knows only too well, any

23  retired player in the settlement class who believes

24  differently was free to opt out of the settlement and

25  free to pursue a litigation against the National

Page 57

1    Football League.

2                    At the end of the day this Court need

3    not accept my word and this Court need not accept Mr.

4    Seeger's word that the settlement is fair, reasonable,

5    and adequate.  We urge the Court to consider the

6    overwhelmingly positive reaction from the 22,000 plus

7    retired players in the settlement class.  They have

8    spoken clearly, they have spoken loudly, and they have

9    spoken unambiguously.

10                   Under Third Circuit law, as Your Honor

11   knows, the reaction of directly affected class members

12   is persuasive evidence of a settlement's fairness,

13   reasonableness, and adequacy, and that is especially

14   true in this case.

15                   And why do I say that?  It is not

16   overstatement or hyperbole, Your Honor, to suggest

17   that the proposed settlement in this case has been

18   scrutinized and dissected more closely, more

19   relentlessly, and more publicly than any class

20   settlement in history.

21                   The debate over its terms has been

22   widespread, it has been intense, and it has been

23   uniquely public.

24                   The media presence here today is

25   emblematic of the unprecedented level of public

Page 58

1    scrutiny that this settlement has attracted.  And I'm

2    not only referring to scrutiny by the media, numerous

3    experienced and well-funded attorneys have vehemently

4    and publicly criticized the deal and campaigned

5    relentlessly to try to persuade class members to opt

6    out of the settlement class even creating websites to

7    do so.

8              Several of them are here today in this

9    courtroom, Your Honor, and they have been supported in

10   this effort by powerful voices in the media who have

11   wanted for their own purposes to see this settlement

12   fail.

13             But notwithstanding this unprecedented

14   level of scrutiny and these concerted efforts to

15   induce opt outs, more than 99 percent of the 22,000

16   plus class members have endorsed this settlement and

17   have decided to remain in the class.  More than 99

18   percent of the class members support this settlement.

19             Why have the retired players supported

20   this settlement so overwhelmingly?  There's several

21   reasons.

22             First, they recognize that the

23   settlement provides very substantial monetary and very

24   substantial other benefits.

25             Second, they recognize that the

Page 59

1    settlement provides these monetary payments and other

2    benefits promptly, consistently, and fairly.

3                And third, and perhaps most important,

4    they recognize that this settlement will spare

5    thousands of retirees and their families the severe

6    financial and emotional cost, not to mention the very

7    substantial risk of defeat, associated with years and

8    years of litigation.

9                Nor we submit, Your Honor, should this

10   overwhelming showing of support be the least bit

11   surprising.

12               This settlement has been carefully

13   structured by the parties under the supervision of

14   this Court, the mediator, and the court-appointed

15   special master to be as fair as possible.  Thus the

16   baseline assessment program provides class members

17   with a comprehensive program of neurocognitive testing

18   and related medical benefits funded by the NFL.

19               The monetary payments as noted up to

20   $5 million per player will be made to retired players

21   who present medical evidence of qualifying diagnoses

22   without requiring these players to make any showing

23   whatsoever of causation.  These diagnoses will be made

24   by qualified independent doctors working with the

25   settlement administrator appointed by this Court.

Page 60

```
 1              The offsets contained in the settlement
 2   for age of diagnosis and for years played are
 3   appropriate proxies for both causation and exposure
 4   and are fully supported by established medical
 5   science.
 6              The awards are inflation protected.
 7              The agreement provides for adequate
 8   security of future payments, and the NFL's ultimate
 9   liability in this settlement is uncapped.  A point
10   that we appreciate was very important to Your Honor.
11              This overwhelming nearly unanimous show
12   of support by the class members themselves powerfully
13   underscores the fairness, reasonableness, and adequacy
14   of the proposed settlement.
15              You'll here next from the objectors,
16   Your Honor, and I would like to note that the
17   objections before this Court are entirely typical of
18   objections seen in settlements of this type.
19              The objections are directed primarily
20   at attempting to increase for select categories or
21   groupings of retired players the already generous
22   awards provided by the settlement.
23              The objections, in our view, and as
24   laid out in our briefs, are entirely without merits.
25              And of course once again, Your Honor,
```

Page 61

1    any retired player in the class who believed that the

2    awards should have been greater or the categories of

3    compensable conditions broader, or the procedural

4    protections more lax, or the applicable offsets more

5    modest, any player in the class was free to opt out of

6    the settlement and to pursue his own litigation

7    against the NFL.

8                    There is certainly a have their cake

9    and eat it too aroma to these objections.

10                   We'll respond to the specific

11   objections later this afternoon, but I'd like to spend

12   just a moment, if I may, Your Honor, addressing the

13   headline objection that the settlement does not cover

14   CTE.

15                   That objection, as Your Honor know

16   doubt is aware, has received a great deal of public

17   attention, but that objection and the reporting of

18   that objection reflects a fundamental, if not a

19   deliberate, misunderstanding of this settlement, how

20   it works, and its scope.

21                   As is crystal clear from its terms, and

22   Mr. Seeger made this point in his opening remarks,

23   this settlement compensates retired players who were

24   diagnosed with severe neurocognitive and neuromuscular

25   impairments.

Page 62

```
 1                    As such, this settlement expressly does
 2    compensate the significant neurocognitive and
 3    neuromuscular impairments that allegedly are
 4    associated with CTE, such as memory loss, such as loss
 5    of executive function, such as attention difficulties,
 6    such as loss of spatial and reasoning skills.
 7                    The objectors' suggestion that this
 8    settlement does not cover CTE is not only not true,
 9    but we submit that it is a deliberate effort to
10    mislead this Court and to mislead class members, an
11    effort that I might add has failed spectacularly since
12    99 percent plus of the class members did not fall for
13    it and now support the settlement.
14                    The other CTE-related objection that
15    the settlement does not compensate mood disorder and
16    depression allegedly associated with CTE, likewise
17    reflects a fundamental misunderstanding of this
18    settlement and of settlement negotiations more
19    generally.
20                    Mood disorders and depression are not
21    compensated under this settlement for a very simple
22    reason.  These conditions are widely distributed
23    across the general population and have more proven
24    causes that have nothing in the world to do with
25    football and with CTE.
```

Page 63

1              The fact that this settlement draws

2    lines on compensable conditions at various levels of

3    severity is entirely reasonable, entirely fair, and

4    frankly entirely predictable.

5              Every settlement of this type on

6    record, every single one does exactly the same thing,

7    and courts in this circuit, and for that matter courts

8    in every circuit in this nation, have found such line

9    drawing to be an appropriate and inevitable product of

10   arms length negotiations between experienced

11   plaintiffs' counsel and experienced defense counsel.

12             And, Your Honor, I would add again,

13   that any retired players who believed that mood

14   disorders or depression should be a compensable

15   condition was free to opt out of this litigation and

16   pursue those claims in a litigation against the NFL.

17             The fact again that more than 99

18   percent of the retired players chose to support this

19   settlement, perhaps the most publicly covered

20   settlement in history, speaks volumes about what they

21   and about what objectors' counsel really think about

22   the legal bona fides and the value of these claims.

23             Let me touch upon very briefly, if I

24   may, Your Honor, the objectors' other complaints.

25             For example, the reductions and offsets

Page 64

1    contained in the settlement for age of diagnosis and

2    seasons played.  They are entirely appropriate proxies

3    for causation and for exposure and are fully supported

4    by established medical and scientific science --

5    evidence.

6                    Everyone in the medical and scientific

7    community, and in that regard I do mean everyone,

8    agrees that neurocognitive and neuromuscular decline

9    increases as one ages for reasons entirely dependent

10   of playing football.  And it makes good sense to use

11   the amount of time played in the National Football

12   League as a proxy for alleged exposure to repetitive

13   concussive and sub-concussive events, which happens to

14   be the common allegation in all of these cases.

15                   Finally the objection that the proposed

16   settlement imposes unfair administrative burdens on

17   retired players is particularly difficult to

18   understand.  Again, Your Honor, we urge you to

19   consider the reality here.

20                   This settlement requires retired

21   players to do no more than to secure a diagnosis of an

22   eligible compensable condition from a rooster of

23   qualified independent doctors and to submit that

24   diagnosis with supporting documentation to the court-

25   appointed claims administrator.  That's it.  That's

Page 65

1    all they're required to do.  A retired player seeking

2    millions of dollars of monetary benefits can hardly be

3    heard to object to that process.  And the NFL, which

4    has agreed to pay these substantial monetary awards

5    without any cap on its total liability, is surely

6    entitled to a claims process that is fair and that is

7    structured to be untainted by fraud and unaffected by

8    abuse.

9                   I fully appreciate Your Honor that the

10   objectors and some of the retired players would like

11   this settlement to be even richer, even more generous

12   than it is, that is true as Your Honor who's

13   experienced well knows in every settlement on record.

14                  And I appreciate that the retired

15   players and some of the objectors would like the

16   settlement to cover every physical and every

17   psychological condition under the sun, and I

18   appreciate that some retired players and some in media

19   have decided to blame professional football for a

20   broad, broad catalog of evils and frustrations.

21                  Perhaps all of this is understandable,

22   perhaps it's not, but in the end however we ought not

23   lose sight of the fact that this Court is being asked

24   to evaluate a particular settlement, one that was

25   negotiated at arms length by the parties, one that was

Page 66

1    later revised to take into account specific concerns

2    raised by this Court and by Mr. Golkin.

3                  No one in good faith can deny that the

4    settlement pending before this Court provides

5    substantial benefits and substantial other relief to

6    retired NFL players or that it provides retired

7    players with an outcome far, far superior to what they

8    likely would achieve through a protracted and costly

9    litigation against the NFL.  More than 99 percent of

10   the class members have already publicly acknowledged

11   as much.

12                 Viewed as it must be through the prism

13   of this circuit's precedent we submit this settlement

14   undeniably is fair, that it undeniably is reasonable,

15   that it undeniably is adequate, and we urge its final

16   approval.

17                 But before I sit down, Your Honor, I

18   would like to thank this Court for its extraordinary

19   efforts superintending this very complicated MDL

20   litigation and for closely supervising this settlement

21   progress, and for allowing the parties to enlist

22   retired Federal District Judge Lane Phillips as

23   mediator and for involving Special Master Perry Golkin

24   in these settlement efforts.

25                 As you heard from Mr. Seeger and as you

Page 67

1   yours know only too well, negotiating this settlement

2   was an extraordinarily challenging, complicated, and

3   daunting undertaking.  This historic agreement would

4   not have been possible without the commitment,

5   dedication, patience, and judgment provided by Your

6   Honor throughout this process.

7                    I thank you very much, Judge Brody.

8                    THE COURT:  All right.  Thank you.

9   Okay.  What we have decided to do is to take a ten-

10  minute recess, and then Mr. Molo, you will begin.

11                   MR. MOLO:  Yes, Your Honor.

12                   THE COURT:  Okay?  And then we'll have

13  lunch when the judge gets hungry?  No, when you

14  finish.

15       (Laughter)

16                   THE COURT:  Okay.  Court is recessed

17  until 25 after 11:00.

18       (Recessed at 11:12 a.m.; reconvened at 11:22

19  a.m.)

20                   THE CLERK:  Be seated, everyone.

21                   THE COURT:  My goodness I've been a

22  judge for 33 years and I never had to use a gavel.

23       (Laughter)

24                   THE COURT:  Okay.  You don't have to

25  stand.  Once a day is enough.  Thanks.

Page 68

```
 1                    We'll wait a second, just wait until

 2      everybody comes back in.  There are a lot of people in

 3      the courtroom.

 4          (Pause)

 5                    THE COURT:  Steven Molo; is that

 6      correct?

 7                    MR. MOLO:  That's correct, Judge.

 8                    THE COURT:  Okay.  You may begin.

 9                    MR. MOLO:  Good morning, Your Honor.

10                    THE COURT:  Good morning.

11                    MR. MOLO:  Thank you for --

12                    THE COURT:  It's still morning.  Wow.

13                    MR. MOLO:  It's still morning.  Thank

14      you --

15                    THE COURT:  Okay.

16                    MR. MOLO:  -- for giving me the

17      opportunity to address the Court and for the other

18      objectors to address the Court as well.

19                    Since Mr. Karp got to introduce his

20      team I can't go back to New York without introducing

21      mine.

22                    THE COURT:  Okay.

23                    MR. MOLO:  So in addition to

24      Mr. Weigand and Mr. Totaro, who are over there to my

25      right, I have the skilled, abled Philadelphia,
```

Page 69

1    Mr. Hangley with me at counsel table, and then seated

2    with me are Kaitlin O'Donnell, Eric Nitz, and Ray

3    Hashem from my office.

4                  THE COURT:  Okay.  Thank you.

5                  MR. MOLO:  And Mr. Moore who is one of

6    the original objectors in the case and he happens to

7    be here as well.

8                  Your Honor, I think -- I just want to

9    be absolutely clear up front, we want a settlement.

10   There's no question we want a settlement.  I agree

11   with much of what was said by Mr. Karp and Mr. Seeger;

12   however, we want a settlement that is fair, adequate,

13   and reasonable.  And the settlement that before the

14   Court today is not that.

15                 I think it's important to understand

16   the settlement is a compromise, yes, but a compromise

17   of what?  What were the nature of these very claims

18   here that are being put to rest as a result of this

19   settlement?

20                 The allegations were fraud.  Fraud of

21   the most serious kind.  Not out of someone's -- the

22   plaintiffs weren't defrauded out of their money,

23   that's not what they alleged, they were alleging that

24   they were defrauded out of their health with all the

25   consequences that has not just to them but to their

Page 70

1    families, to their girlfriends, to their wives, to all

2    those around them.

3                    And yes, the plaintiffs face

4    significant obstacles and the settlement allows them

5    to avoid those risks, but the NFL avoids pretty

6    significant risks here too in this settlement.  They

7    avoid the risk of having to pay billions of dollars in

8    damages, not just compensatory damages, but possibly

9    punitive damages.

10                   They avoid the risk of having to go

11   through discovery.  There's been no discovery in this

12   case.  It's extraordinary that a settlement of this

13   nature would be reached without any discovery, and

14   there's been no disclosure by class counsel of any

15   informal discovery.

16                   So the NFL avoids, if the allegations

17   that class counsel have put forth are to be true,

18   producing evidence that they in fact sponsor junk

19   science, that they affirmatively lied to their

20   players, all in the name of corporate profit.

21                   The choice, contrary to what Mr. Karp

22   says, isn't just opt out if you don't like the

23   settlement, the choice is to have a settlement that is

24   legally sufficient or to opt out.  And this Court is

25   well aware and has very carefully undertaken its duty

Page 71

1    to be the safeguard of that class.

2                    I'm going to address three primary

3    issues.  I'm not going to address every issue that

4    Mr. Seeger raised, I'm not going address every issue

5    Mr. Karp raised.  As Your Honor is well aware other

6    counsel will be speaking.  I'm going to address the

7    issue that you directed me to first and foremost,

8    which is CTE, and how the release of the CTE claims,

9    while compensating only a small percentage of the CTE

10   cases in this case, renders the settlement in and of

11   itself unfair.

12                   Secondly, I'm going to address

13   conflicts within the class, specifically with respect

14   to the treatment of CTE, and also with respect to the

15   treatment of players who played in the NFL Europe.

16                   And third, I'm going to address the

17   deficient notice in this case.

18                   Those issues all raise issues not just

19   of questions of the Federal Rules of Civil Procedure

20   but of constitutional magnitude.

21                   Mr. Totaro is going address the issue

22   of defects and claims process, and Mr. Weigand will

23   address the problems with testing.

24                   I think it's very helpful to start with

25   the legal framework on the issues that I raise,

Page 72

1   because I don't disagree with most of the analysis

2   under the Girsh factors.

3              The first point on the legal factors --

4   if we could pull up the first slide, please, Josh.

5              THE COURT:  Okay.

6              MR. MOLO:  Okay.  The law is clear that

7   denial of final approval is appropriate where a

8   settlement treats similarly situated class members

9   differently or where the settlement releases claims of

10  the parties who receive no compensation in the

11  settlement.  It's Third Circuit law and it comes

12  straight from the manual for complex litigation.

13             Does the release -- is the release

14  justified, are parties in fact being compensated in

15  exchange for giving that release?  And then what does

16  the release say here?

17             The release here -- if you would -- is

18  peculiarly both very broad and very specific.  And I

19  have a stack here if this would be beneficial.

20             THE COURT:  No, I can see it.

21             MR. MOLO:  Okay.

22             THE COURT:  It's okay.  Thank you.

23             MR. MOLO:  It's an unusual release in

24  that it's both broad and specific.  As Your Honor can

25  see it says, "The class members waive and forever

Page 73

1    discharge and hold harmless the released parties from

2    any and all past, present, and future claims," then it

3    talks generally about claims arising out of or

4    relating to brain or cognitive injury, but then

5    specifically -- specifically it says, "Arising out of

6    or relating to CTE."

7              So what is CTE and what is this disease

8    that this release applies to?  Oddly enough we're

9    largely in agreement, the experts they submitted 11

10   affidavits I think it was a week ago, it might be more

11   than that from a host of people, I submitted

12   affidavits from 2 of the most prominent people in this

13   field, Dr. Stern and Dr. Gandy.  Dr. Stern is at the

14   BU Center for CTE at Boston University Medical Center.

15   Dr. Gandy is at Mount Sinai.

16             And I want to add, Judge, both of those

17   doctors submitted those affidavits without any charge

18   because they feel so strongly about the wrongness of

19   this settlement.  And before we're done today I would

20   appreciate it if the Court would require plaintiffs'

21   counsel and class counsel to disclose the financial

22   interests and arrangements between their experts, the

23   monies that was paid to their experts, as well as the

24   arrangements, there was one or two experts that said

25   we weren't paid, but their programs were funded by the

Page 74

1    NFL.

2              What is CTE?  If you look here at the

3    brain it's a hideous, hideous disease.  Up on top is a

4    healthy brain, on the bottom we see a diseased brain

5    with CTE.  Just physically they look different.  It's

6    a progressive degenerative disease in people who have

7    suffered repetitive brain trauma, and that's

8    repetitive brain trauma whether you've received a

9    concussion or whether it's sub-concussive.

10             And again, you see the agreement and

11   the objectors between Dr. Gandy and class counsels'

12   expert (indiscernible – 11:29:20) there was an

13   agreement there between the class counsels' expert and

14   the objectors' expert.

15             How does this CTE actually -- how does

16   a brain come to look like that?  There are actually

17   specific definitive scientific methods for detecting

18   it as we can see on the next slide.

19             If you look to the left, Judge, you'll

20   see these little clusters and dots, and we can't see

21   -- okay.  Okay.  And those little clusters and dots

22   indicate what they call tau tangles.  There is a

23   protein called the tau protein, and when it forms in

24   certain patterns in the brain that is in effect the

25   symptom or a sign of CTE.  That is CTE.  If you look

Page 75

1   to the right a healthy brain doesn't have those tau

2   tangles, to the left CTE does.  And again, there's

3   agreement between the parties to that.

4                Now CTE has some very -- if you can go

5   to the next , please -- interesting things.  In

6   contrast to Alzheimer, Parkinson --

7                THE COURT:  No, no, may I have the --

8   let me have --

9                MR. MOLO:  Sure.

10                THE COURT:  -- what you -- what I --

11                MR. MOLO:  Sure.

12                THE COURT:  -- the first time said I

13   was not interested in seeing.  It's difficult for me

14   to see it.

15                MR. MOLO:  What's interesting about CTE

16   as it relates to this case, and it's interesting

17   because it relates to something that Mr. Karp said and

18   Mr. Seeger did as well, CTE requires repetitive head

19   trauma.  In other words, you can't get CTE without

20   being hit in the head and repeatedly.

21                In contrast Alzheimer, Parkinson's,

22   ALS, and CTE all can be found in the general

23   population.  And when they talk about well we can't

24   compensate mood disorders because -- or depression

25   because depression is found in the general population,

Page 76

 1    Alzheimer, Parkinson's, ALS are all found in the
 2    general population, and unfortunately many of us here
 3    know people who never played football who contracted
 4    those diseases.  And that's why it's been termed --
 5    CTE has been termed in the popular presses the
 6    industrial disease of football.
 7                     Now much has been made of the inability
 8    to diagnose CTE only post-mortem, and that is true
 9    that a definitive -- absolutely definitive diagnosis
10    of CTE only comes on an autopsy of a person's brain
11    and the research on a person's brain where those
12    microscopic slides are formed and then they're able to
13    analyze the tau proteins.
14                     But, Judge, it's true also that there's
15    a great deal of imprecision about the diagnoses of
16    these other forms of neurological disease as well.
17                     Alzheimer while people say so and so,
18    my aunt, my friend has Alzheimer, often it's not such
19    a definitive diagnosis.  In those diagnoses frequently
20    most instances can't be definitively formed until the
21    person has unfortunately died and there's an
22    examination of their brain.
23                     Now, I will say that the science today
24    to diagnose Alzheimer and Parkinson's and ALS in
25    people who are alive is farther advanced than it is in

Page 77

1   CTE, but we are very, very close on CTE.

2                  Within the next five to ten years, as

3   Dr. Stern has stated in his affidavit, there'll be

4   highly accurate, clinically accepted methods to

5   diagnose CTE to a great certainty.  And obviously

6   Dr. Stern says that, but in addition class counsels'

7   own expert says this.  This clinic that they have at

8   UCLA, which is doing these -- this research now, there

9   are players being told that they have CTE.  And I'll

10  come to that in a moment.

11                 So -- and there's an eye clinic in

12  Chicago.  We cite all of this in our papers.

13                 And contrary to what Mr. Karp says

14  about the science, Anchem clearly teaches -- Anchem

15  clearly teaches that you cannot freeze science in

16  place.  A settlement has to account for the

17  development of science, especially when we're talking

18  about a situation like this.

19                 Now one of the class -- the -- that's

20  the science of CTE in an overview.

21                 I want to talk now about how CTE

22  actually manifests itself and the symptoms.  What is

23  CTE to a person that has it?  And it displays itself

24  in four stages, Judge.  Can we go to the first stage?

25                 Stage 1 CTE -- is it possible to get

Page 78

1    that a little bit cleaner on the screen?  Stage 1 CTE,

2    and Judge, this is on page 8 of the overall chart of

3    your -- of your book.  But people at Stage 1 are

4    suffering from short-term memory difficulties,

5    executive dysfunction, loss of attention and

6    concentration, explosivity, and aggression.  And, you

7    know, unfortunately we have seen these reports of

8    domestic abuse and domestic violence to the NFL, and

9    CTE is unquestionably a factor in that.  It does not

10   excuse the behavior, I'm not suggesting for a moment

11   it does, but we would be all ignoring the science and

12   the most important people who are speaking on this

13   issue to say that having CTE and having a violent and

14   explosive and an aggressive personality and behavior

15   are unrelated.

16               In addition to that and what is

17   extraordinary is at its earliest stages, at Stage 1

18   CTE manifests, one of the symptoms is suicidality.

19   Suicidality.

20               And interestingly enough suicidality

21   does not present in Parkinson's, it does not present

22   in Alzheimer, it does not present in ALS, but

23   suicidality presents in CTE and at its very earliest

24   stages.

25               When you move to Stage 2 CTE, and it

Page 79

1    does progress, and if you have CTE you will progress

2    for all four stages if you live long enough -- if you

3    live long enough, and many people don't.

4                    At the second stage, in addition to the

5    things that I mentioned, the short-term memory loss,

6    again the explosivity and aggression, impulsivity and

7    mood swings develop, and again the suicidality is

8    present.

9                    At Stage 3.  At Stage 3 -- Stage 1 had

10   short-term memory loss and difficulty, Stage 2 short-

11   term memory loss.  At Stage 3 we finally see memory

12   loss with mild dementia.  At Stage 3 CTE.  And at

13   Stage 3 --

14                   THE COURT:  How -- this is -- all comes

15   from this McKee (ph) report, is that what this --

16                   MR. MOLO:  This is from the McKee

17   report.

18                   THE COURT:  But how do they -- but what

19   was their evidence of that?

20                   MR. MOLO:  Well they are -- I mean

21   Dr. Stern and -- has put forth an affidavit they have

22   done, BU has put forth the most -- and this is not

23   controverted by the other side.

24                   THE COURT:  But now that you have CTE

25   only after death I don't quite understand how you can

Page 80

1  come to conclusions about Stage 1, Stage 2, and

2  Stage 3.  Are you asking families, is that what you're

3  doing?

4            MR. MOLO:  They have gone back and

5  interviewed -- they have interviewed family members

6  and they have gone through and dealt with this, and

7  this is not just the people at BU, there's people at

8  UCLA and other people around the country that are

9  studying this.

10            THE COURT:  Well right now you cite

11  McKee, but I read that -- I read -- is it a she?  Yes.

12  I read her submissions -- her submissions of

13  scientific papers and it says that the only way they

14  know about this is that they asked family members.

15            MR. MOLO:  Correct.

16            THE COURT:  So family members are

17  making a decision about Stage 1, Stage 2, Stage 3?

18            MR. MOLO:  No, family members are not,

19  Judge.  The family members are providing information

20  to train scientists who do this very thing, and in

21  doing this very thing this is -- the study as to how

22  these symptoms display themselves, and it is only at

23  stage 4 that we see that CTE evolves to severe memory

24  loss with dementia, again, with the explosivity, the

25  aggression, suicidality, and paranoia.

Page 81

```
 1                  I'm telling you that CTE is linked to
 2    playing in the NFL and that CTE is the industrial
 3    disease of the NFL, but I'm not the only person who is
 4    before this Court who's told you that and who believes
 5    that.
 6                  Let's start with where it appears in
 7    the class complaint.  They specifically allege:
 8                  "That for decades the NFL has been
 9    aware of paragraph 89 that multiple blows to the head
10    can lead to long-term brain injury, including, but not
11    limited to, memory loss, dementia, depression, and CTE
12    and related symptoms."
13                  That allegation was made by this cadre
14    of lawyers that Mr. Seeger talked about this morning,
15    these people who had settled billions of dollars of
16    claims, were the world's leading experts in bringing
17    claims on injuries like this, and after their studied
18    view of this case, after their great detailed study
19    and their analysis and their research they put their
20    names to a complaint in which this was the allegation
21    that was made.  And you know what, they were right to
22    do so, because the science supports it.
23                  If you go to the next slide we'll see
24    what BU did.  You know, BU has the leading center on
25    the study of CTE, and in 2013 they published the study
```

Page 82

1    in Brain Journal, which is the leading journal in

2    neurology, and in that study it showed that 34 of 35

3    deceased professional players were diagnosed with CTE,

4    and that slide says deceased professional players

5    because one of them happened to not play in the NFL,

6    he played in the Canadian Football League.

7                 That research was recently updated, not

8    in a paper, but they've announced that research was

9    updated, and the 2014 research shows that 76 of 79

10   deceased NFL players have been diagnosed with CTE

11   post-mortem.

12                So again, the allegation that was made

13   linking CTE to the NFL is supported by the science.

14                Lastly, what has class counsel said

15   throughout this litigation up until just recently?

16   Mr. Seeger on his own website told the world:

17                "that multiple medical studies have

18   found direct correlation between football and

19   concussions and suffering from symptoms of chronic

20   traumatic encephalopathy, also known as CTE.

21                CTE is believed to be the most serious

22   and most harmful disease that results from the NFL on

23   concussions."

24                That was on his website until the day

25   after the argument in the Third Circuit when it raised

Page 83

1    it at the Third Circuit, then it came down.

2               So for all of their experience, for all

3    of their research, for all of their work on the case

4    up until whatever it was, six weeks ago, eight weeks

5    ago, plaintiffs' counsel was telling the world that

6    CTE is believed to be the most serious and harmful

7    disease that results from the NFL and concussions.

8               So what does a player that is living

9    with CTE now after July 7th of 2014 get for having

10   CTE, the most serious and harmful disease?  Gets zero.

11   Gets zero.  Mr. Seeger's declaration at paragraph 37

12   says it, the NFL's brief at paragraph 78 -- at page 78

13   says it.  CTE is not compensated in the living, it is

14   simply not compensated.

15              Now, I've heard about -- we heard a

16   little bit today and we've seen it in the papers that

17   they said, well really it's not CTE, even though we're

18   compensating Parkinson's, ALS, Alzheimer because those

19   are diseases that are more readily, not to 100 percent

20   certainty necessarily, but more readily diagnosable

21   right now ARE people that are living we're going to

22   give them actual cash awards.  But the CTE people are

23   really sort of taken care of any way.  And let's see

24   how that works out.

25              Well the compensation that they're

Page 84

1    referring to, death with CTE before July 7th of 2014,

2    which they valued with a maximum award of $4 million,

3    so they're saying that CTE has a value, as they

4    should, but if you were diagnosed with CTE at Stage 1,

5    Stage 2, Stage 3, or Stage 4 you could get up to a

6    $4 million award for any of those stages.

7              Now this sort of sloppy after the fact

8    argument to sort of apologizing and address the very

9    obvious issue that CTE is not compensated, they say,

10   well really they're compensated with CTE through

11   dementia.  But how would that occur?  Well you could

12   have CTE at Stage 1 or 2 and not have dementia, and in

13   that case you die with it, it could be diagnosed in

14   your brain, just like the people who died before

15   July 7th of 2014 have that same definitive post—mortem

16   diagnosis and they get nothing.  They get nothing.

17   But if you have Stage 3 or 4 and you might —— and you

18   die also by the way just the after fact diagnosis

19   you're not going to get anything even though it's

20   definitive.

21              But the argument that's being made is

22   that the way that CTE victims get somehow compensated

23   through this settlement is that they get to go through

24   the claims process, which we're going to talk about

25   the problems with that in a moment, have that

Page 85

1    uncertainty of the claims process, and then -- and

2    then if after going through the claims process there

3    is a determination -- and I'm not even going to call

4    it a diagnosis -- but a determination of dementia 1.5,

5    because it's not really in the medical literature,

6    something called dementia 1.5, they could get a

7    maximum award of up to 1.5 million.  And similarly if

8    you get a diagnose or a determination of dementia at

9    2.0 you could get up to a $3 million award.

10                   So compensation for dementia simply

11   does not equal compensation for CTE.

12                   Now there was a statement made by

13   Mr. Klonoff, one of the affiants at paragraph 86 where

14   he makes what I consider to be quite a remarkable

15   statement and one that has been muddered around in the

16   press and has come -- been attributed to various

17   people on the plaintiffs' side of this case, is the

18   reason we didn't provide a benefit for CTE in people

19   after July 7th of 2014 is that would somehow

20   incentivize people to commit suicide.

21                   Well if you were really interested in

22   addressing suicidality among players who were the

23   victims of this disease that you class counsel had

24   researched with all of your resources and experience

25   and have alleged in the complaint and proclaimed to

Page 86

1    the world and in website, why didn't you do something,

2    why didn't you build something into the settlement

3    that would deal with the issue of suicide when people

4    were suffering from CTE at Stage 1 or 2, not the

5    mention 3 or 4?

6                    I mean I believe that that statement

7    and that argument is an insult, it's an absolute

8    insult to the memory of the players who have taken

9    their lives and who under the scheme of this

10   settlement would never have been compensated or their

11   families would not be compensated, even though they're

12   suffering from this hideous disease.

13                   Now the CTE sets up in a different way

14   in addition to just that alone the inadequacy and the

15   failure to compensate CTE is enough to find this

16   settlement unfair and inadequate.

17                   Additionally, Judge, there are

18   intraclass conflicts, and again, we're not just

19   talking about leaving out a disease, we're not talking

20   about line drawing, we're talking about the disease

21   that is most central and the one that is only

22   exclusively obtained through contact in the head being

23   left out of the settlement.  There's a release without

24   compensation for those people, but they did provide

25   some compensation, there is some CTE compensation, and

Page 87

1    that CTE compensation is for people who died with CTE

2    before July 7th of 2014.  As I said, the award that

3    those people may get would be up to -- up to

4    $4 million.

5              The issue here is are the class

6    representatives -- the Third Circuit deals with the

7    this issue, which is really under Rule 23(a)(4) about

8    adequacy of representation, intraclass conflicts

9    within Third Circuit law is addressed through the

10   issue of adequacy of representations.

11             The class representatives failed to

12   fairly and adequately represent the interest of the

13   class, and the adequacy requirement here, the lynchpin

14   of the adequacy requirement is the alignment of the

15   interests and the incentives between the

16   representative plaintiffs and the class.  The

17   alignment of the interests and the incentives between

18   the representative interests of the class, the rest of

19   the class.

20             What did the -- what did the class

21   members here allege?  The representative class members

22   do not allege -- and I believe it's paragraph 4 for

23   Mr. Wooden and paragraph 7 for Mr. Turner -- they do

24   not allege they have or at risk of having CTE, they do

25   not allege that they played football in the NFL

Page 88

1    Europe, which is excluded and I'll come to in one

2    second, and they do not allege that they were subject

3    to the TBI, traumatic brain injury, and stroke set

4    offs.  And the rights of people who do have CTE and

5    the rights of the people who have played in the NFL

6    Europe and the rights of the people who have TBI and

7    stroke set offs those rights were bargained away.  And

8    it makes sense, because class counsel -- I mean the

9    class representatives do not allege that they are

10   subject to any of those things.

11              As I said, the intraclass conflict.

12   The CTE issue presents itself as an intraclass

13   conflict as well.  We have the $4 million award for

14   those who die with CTE or died with CTE, Stages 1

15   through 4, any of those stages -- any of those stages,

16   death with a diagnosis of Stages 1 through 4 qualified

17   someone for a payment of up to $4 million, whereas,

18   death with CTE at Stages 1 through 4 on or after

19   July 7th, 2014 results this zero.

20              Let's assume for a moment that you

21   can't diagnose people -- let's assume for a moment

22   that you can't diagnose people with CTE while they're

23   living.  There's no justification for not providing

24   that same CTE benefit with that same diagnosis for

25   people who die after July 7th of 2014.  None.  And

Page 89

 1    none has been offered.  The closest they've come is

 2    this outrageous statement by Klonoff about this was in

 3    concern for people not inducing suicidality or

 4    inducing suicide.

 5                    In addition to the intraclass conflict

 6    there's a conflict with the players who play in the

 7    NFL Europe who receive no compensation or no credit I

 8    should say for the years that are played.

 9                    As Your Honor is aware the settlement

10    is set up with a grid where if you play a certain

11    amount of time you get a certain award.

12                    Now the NFL Europe was a league that

13    was actually operated and owned by the NFL from 1991

14    to 1992 and 1995 to 2007.  All of the people in NFL

15    Europe are included in the class and all of them

16    provide a release.

17                    The NFL Europe had essentially the same

18    rules, there were very, very minor rule differences.

19    They played with the same equipment.  And you know

20    what else?  They played with the same players.  They

21    played with the same players.  Mr. Morey in his

22    affidavit says that he played 1 year 30 games between

23    the --

24                    THE COURT:  Well he's opted out hasn't

25    he?

Page 90

1                    MR. MOLO:  He has opted out.

2                    THE COURT:  Then you can't cite him.

3                    MR. MOLO:  But there are other -- the

4     evidence is of the record that he played 30 games, and

5     Mr. -- there's another affidavit by Mr. Heimburger,

6     who has not opted out.

7                    THE COURT:  Okay.

8                    MR. MOLO:  And players played in both

9     the NFL Europe and they played in the NFL in the

10    United States.  And at one point in the meeting

11    Mr. Seeger was saying, well, maybe they didn't hit as

12    hard in Europe.  I don't -- I don't think that that

13    can seriously be contended.  These are the same

14    players that played in the NFL.  These are NFL

15    players.

16                   They also say, well, you know, the NFL

17    Europe was really a developmental league so that's not

18    really entitled.  Forget about the fact that someone

19    who may go on and play on a Super Bowl team or play on

20    a Super Bowl team that year may go over and play in

21    the NFL Europe, they're saying it's really a

22    developmental league.

23                   Well let's see how they treat those

24    people.  So to be eligible for an award if you played

25    in the NFL, if you played three or more games on an

Page 91

1    active rooster that counted as one eligible season

2    under the award.  And if you've played eight or if you

3    served ought or more games on a developmental squad

4    you were eligible for .5 seasons.

5                    So the fact that the NFL season was 16

6    games or 14 games or 140 games didn't matter because

7    you qualify with 3.  And the NFL Europe game -- season

8    was 10 games.  So a player could play three games very

9    easily in the NFL Europe.  And to the extent that they

10   claim it's a developmental squad there's no

11   justification for dividing out these players from the

12   NFL Europe.  And again, those players from the NFL

13   Europe give the same release as everyone else.

14                   Now again, you don't have to

15   necessarily take my word for it, Mr. Klonoff here who

16   I criticized a moment ago I think is brilliant in this

17   assessment where he says that class counsel -- he

18   discussed this issue of excluding the players from NFL

19   Europe from credit and he says:

20                   "I believe as well that the parties

21   should consider modifications to the settlement

22   agreement to address the NFL Europe issue.

23                   It is my belief that the parties should

24   consider modifications to the settlement to address

25   this issue."

Page 92

1              And that's the Cludoff declaration at

2    paragraph 16 and 93.

3              And we raise other issues concerning

4    the offsets for non-NFL traumatic brain injury in our

5    objection, I'm not going address those, but what I am

6    going talk about next is the question of notice.

7              I've heard about today, this morning

8    this historic settlement that over 20,000 players

9    endorse this agreement.  No such thing.  There's no

10   such endorsement.  There are not players all standing

11   up here saying that we are fully behind this.  And,

12   you know, it's not surprising why that's the case that

13   we have not seen a relatively low number of objectors.

14   By the way, this number of objectors and these

15   percentages of objectors is not all that low.  It's in

16   fact greater than the number of opt outs and objectors

17   in the GM Trucks case in which the Third Circuit

18   reversed due to inadequate representation.  And the

19   issue is whether or not the objections raised fairly

20   questioned the fairness, adequacy, and reasonableness

21   of the settlement.

22              So let's consider what we heard about,

23   all this notice that was given.  The long-form notice,

24   the short-form notice, the website.

25              The website statistics are striking.

Page 93

1    Mr. Seeger cited some terrific numbers that he gave

2    you about how many people visited the website.  But if

3    you go and read the declaration of the person that

4    managed that for him, 78 percent of the 65,000 people

5    who visited the website looked only at the first page,

6    the average viewer looked at the website for a minute

7    or less.  That is in the declaration of Mr. Brown,

8    which is attachment 7.

9                    The -- and what did they see once they

10   got there?  What they saw on the home page of the

11   website was essentially the short-form notice, and the

12   short-form notice was displayed or published in other

13   places as well.

14                   But what did the short-form notice say?

15   It said that players -- if they were looking at what

16   their benefit would be that they would receive as part

17   of this settlement, which would -- I think would be

18   the thing that people would look to -- what are the

19   monetary awards, that middle bullet point, it said:

20                   "Awards for diagnosis of ALS, Lou

21   Gehrig's disease, Alzheimer disease, Parkinson's,

22   dementia, and certain cases of traumatic -- chronic

23   traumatic encephalopathy or CTE, a neuropathological

24   finding, diagnosed after death."

25                   That's what the short-form notice says.

Page 94

1    It doesn't say diagnosed after death if you died

2    before July 7th of 2014.

3               And a player could very reasonably

4    conclude that this notice, as well as the website, if

5    they went and visited the website, said, you know

6    what, this may not be a good deal, it may not be the

7    deal I want, but at least I know I'm safe and my

8    family is safe because I'm going to get a CTE benefit

9    after I die.  And it's a very reasonable conclusion

10   for a player to draw.

11              And then when you go to the long-form

12   notice, which was this slickly magazined packaged up

13   23-page magazine that they published and -- or sent

14   out, that's also false and misleading.

15              When you look to the long-form notice

16   at Section 14, again, what would be the diagnosis that

17   people would look to first and -- what would they look

18   to first and foremost?  What diagnosis qualified for

19   monetary awards?  Of course this happened to be by the

20   way the centerfold.  When you open this up this is on

21   centerfold of -- it's not a centerfold like that, it's

22   a centerfold when you open the pages, and it says that

23   "Monetary awards are available for the diagnosis of

24   ALS, Parkinson's, Alzheimer, Level 1 neurocognitive

25   impairment, early dementia, or death with CTE."  And

Page 95

1   then they take death with CTE, along with those

2   others, and they give it a defined term, they call it

3   a qualifying diagnosis.  And then it says, "A

4   qualifying diagnosis may occur at any time until the

5   end of a 65-year term of the monetary award fund."

6   Well that's certainly not true if in fact death with

7   CTE before July 7th of 2014 is what gets you an award.

8             So again, a player reading the long-

9   form notice would be misled.

10            And I can go through more of these, but

11  if you take it they use the same point again

12  throughout where they talk about qualifying diagnosis.

13  And if you look at that again qualifying diagnosis and

14  death with CTE diagnosed after death, $4 million.

15            Now, yes, there is mention at one point

16  about July 7th of 2014, it's -- they say it's

17  mentioned three times.  Twice it's in defining the

18  class representatives in the subclassing, and there's

19  no mention of you have to get -- you have to die

20  before July 7th of 2014 to get the benefit.  And the

21  one disclosure that is made is distinct from these

22  others and is distinct from the tremendous impression

23  that's created throughout this.

24            So we see that, you know, the long-form

25  notice itself was misleading.

Page 96

1                    And, you know, we cited some cases in

2     our brief that went beyond class certification or in

3     class notice issues that looked to other areas of the

4     law, and I thought it was informative.

5                    You know, if we're going to require

6     accuracy for somebody to make a claim for their, you

7     know, an insurance policy on a class action where the

8     insurance policy was inaccurate or they're making a

9     claim, a consumer fraud claim for some product that's

10    returned, I mean we hold that to a stringer standard

11    than we're going to hold a situation where -- the

12    parties in a situation where the stakes are someone's

13    life and someone's health?  That just is not right.

14                   So the total mix here is completely

15    irrelevant, and they're completely disingenuous,

16    dishonest, misleading statements that are made.

17                   Now the settlement notice became worse

18    by what happened after it went out.  As we said, and

19    I'm not going to go through all of this, but class

20    counsel undertook a very vigorous media campaign.  I

21    thought it was kind of funny to hear Mr. Karp talk

22    about the powerful journalists.  All one has to do is

23    turn on a television set between August and February

24    and the NFL seems to be on virtually every night of

25    the week where people are talking about the NFL.

1    There's no more powerful media agent in the United

2    States than the NFL.

3                    But Mr. Seeger went out and started

4    selling the deal to players, and this was an interview

5    that he gave to Sporting News.  He's telling:

6                    "CTE is not a relevant marker for

7    anything in the settlement, it's the symptoms.  If you

8    have all the symptoms that are related to CTE or the

9    diseases that are related like dementia and Alzheimer

10   and ALS, then that determines it.

11                   If a player thinks he has any symptoms

12   of it that's the reason to stay in the deal."

13                   If a player thinks he has any symptoms

14   of it that's the reason to stay in the deal.  But we

15   know that many of the symptoms of CTE, including some

16   of the most serious symptoms of CTE, not just for the

17   players but for their wives, girlfriends, and those

18   around them, are not in any way compensated under this

19   settlement.

20                   Now you might think, boy, Mr. Molo this

21   is all sort of fanciful thinking and you've threaded

22   together this argument and it all flows very nicely to

23   meet your point, but no player really would do that.

24   Well that's -- that would be wrong if you were to

25   think that or if someone were to argue that, and I can

Page 98

1   show you why.  Because if you look at an objection

2   that was filed by a player by the name of Eric

3   Williams, and it's moving, and I've read these

4   objections and I've read the letters, like the letter

5   from the mother who lost her son to CTE who played

6   football, Mr. Williams' objection set forth to this

7   Court and it's filed says first of all when he's

8   describing his situation says, "Diagnosed with CTE at

9   UCLA subject NFL form."  Diagnosed with CTE.

10              Now maybe technically under the legal

11  definition of a diagnosis or maybe under the issue of

12  -- under the scrutiny of diagnosis to the finest and

13  final degree of medical certainty he didn't have CTE

14  because it only can be diagnosed post-mortem, but he

15  was told, or at least he believes he was told, that he

16  was diagnosed with CTE at UCLA.  Probably by these

17  very people who were affiants for the class counsel.

18              And then what does he say?  He says

19  that, "Players diagnosed with CTE and living today

20  have to kill themselves or die for their family to

21  ever benefit, for their family to ever benefit.  In my

22  case, based upon all my other reports, there's an

23  overwhelming chance my family had a lifetime of

24  medical bills, including long-term care on its

25  horizon.  But the only time the family can get relief

Page 99

1    is after I'm dead."

2                    If he wrote you this letter, that's

3    simply not the case.  I mean, the only time someone

4    would get a benefit for CTE is had they died before

5    July 7th of 2014.

6                    So it's not a question of me getting up

7    here and saying, you know, this notice is inadequate

8    and they left out a word here and a player looking at

9    this would logically -- would logically believe that

10   CTE is covered.  This is evidence that a player does

11   believe it and I'm certain, Judge, that there are

12   many, many more out there like him.

13                   I would like to know whether class

14   counsel, any of them, all of them with all of their

15   experience got on the phone, the minute they read this

16   objection and said, Mr. Williams, we want you to

17   understand you're incorrect.  You're misinformed.

18   Even though we're your fiduciary, we're your guardian

19   and we want you to know that you've been misinformed.

20   Your family doesn't get any benefit.  Maybe we could

21   hear about that this afternoon, that phone call and

22   how it went.

23                   Now, Judge, this was a deal that was

24   negotiated without any discovery.  It contains a clear

25   sailing provision that calls for up to $112 million

Page 100

```
 1    fee award, $112 million fee award without --
 2                THE COURT:  Well, that --
 3                MR. MOLO:  -- any discovery.
 4                THE COURT:  -- that comes after.
 5    That's not --
 6                MR. MOLO:  It does after, Judge, but
 7    it's part of the settlement agreement that you're
 8    going to --
 9                THE COURT:  Well, that --
10                MR. MOLO:  -- prove.
11                THE COURT:  No.  That wasn't what it
12    said.  It said they -- that the NFL would not object
13    --
14                MR. MOLO:  Correct.
15                THE COURT:  -- which is a very
16    different --
17                MR. MOLO:  I agree.
18                THE COURT:  I decide this.
19                MR. MOLO:  I agree.  We agree.  It's
20    what they call in a literature, I guess, a clear,
21    sailing agreement.  The -- part of the settlement
22    agreement says the NFL would not object.  I understand
23    it's still within the Court's discretion to make the
24    award that it's going to make, but up to $112 million
25    to have someone say that, I'll agree to pay you up to
```

Page 101

1    $112 million, subject to the Court's discretion, and

2    not compensate the core disease, the core injury to

3    the class.  It's a -- we've got all this experience.

4    We've negotiated billions of dollars of claims.  Well,

5    how -- you know, they -- what difference does that

6    make.  These are injured people who are going without

7    compensation, and they have a fiduciary duty to them.

8                   I know, too, that by the way they get

9    paid under that agreement within 60 days and the --

10   these class members are left to struggle through the

11   system for however long it takes.  I'll talk about

12   some of the difficulties with that in a moment.

13                  So I understand the decision before the

14   Court today is up or down, either to approve the

15   settlement as fair, adequate and reasonable and fully

16   compliant with Rule 23, including Rule 23(a)(4), or to

17   say, no --

18                  THE COURT:  You don't think I have any

19   discretion to adjust it?

20                  MR. MOLO:  I agree.

21                  THE COURT:  You -- is that -- do you

22   think I don't?

23                  MR. MOLO:  I think -- no.  I think that

24   your decision today is to approve the settlement or to

25   reject the settlement.  But in rejecting the

Page 102

```
 1   settlement --
 2              THE COURT:  Well, I mean, if there's --
 3   if I -- in other words I can't make any adjustments to
 4   that -- to this settlement that I think is are -- they
 5   are reasonable and adequate in order to make it an
 6   agreement --
 7              MR. MOLO:  Correct.
 8              THE COURT:  -- that we can --
 9              MR. MOLO:  But I believe that the Court
10   can exercise extraordinary influence in seeing that
11   the parties do incorporate some things.
12              And what might those be, if I may,
13   because, again, we want to see a settlement.  I want
14   to make no mistake about that.  Just, these would be
15   some things, some things that would go toward just
16   making it at least closer to fair, reasonable and
17   adequate.
18              Simply on the notice issue, notice has
19   to be done in a way where it's clear, consistent, and
20   accurate language.  On the question of the NFL Europe,
21   you've got to give credit for those players.  Those
22   are things that can be done quite simply.
23              With respect to the non-NFL induced
24   traumatic brain injury or stroke and those offsets,
25   those should be reduced to a reasonable number where
```

Page 103

1    there's an evidence-based percentage.  There's no real

2    evidentiary based percentage for those then.

3                    And then for this core issue, Judge, on

4    CTE, what can be done?  Well, the settlement can

5    include compensation for CTE after death of July 7th

6    of 2014.  So taking away the issue of whether or not

7    CTE can be diagnosed in someone that's living, this

8    benefit can be extended to anyone who dies with CTE

9    and has a diagnosis of CTE after they die.  And just

10   like the people who had that benefit if the player

11   died before July 7th of 2014.

12                   Another thing that could be done is to

13   include compensation for CTE while people are living

14   once more reliable scientific tests are done, or at

15   least making an effort to address those issues now

16   while the science catches up knowing what the symptoms

17   are.

18                   And then also to treat all symptoms of

19   CTE, Stages 1 through 4.  As we've seen, assuming that

20   you buy the argument that CTE's really -- the symptoms

21   of CTE are really treated through the dementia,

22   they're not.  There's no question, and you will hear

23   from lawyers today who represent players who did not

24   demonstrate the symptoms of Stages 3 and 4, and those

25   players displayed extraordinary symptoms.  Their lives

Page 104

1    devolved and fell apart.  And in stages -- with Stages

2    1 and 2, and it ultimately resulted, unfortunately,

3    very, very sadly in suicide.  And that happened with

4    several prominent players.

5                    So something must be done for that.

6    And the alternative to that is to go back to what the

7    bargain is and say, well, then, if you're not going to

8    do those things, if you're not going to compensate the

9    core disease, the one that only -- is the only disease

10   that's at issue here that results from playing

11   football and not one that's found in the general

12   population, then eliminate the CTE release.  Don't let

13   the benefit -- the NFL have that benefit.  They're not

14   entitled to it.  They're providing no compensation for

15   it and they say as much.

16                   This is not a fair, adequate and

17   reasonable settlement, Judge, and I can't tell you how

18   much gratitude my clients feel and many other players

19   who have contacted me and feel for allowing me the

20   opportunity to come here and raise these concerns

21   because they have lived through hell, the misery that

22   they have experienced with their families, with their

23   sons and daughters, with their wives and girlfriends.

24   We've seen these domestic abuse issues that have been

25   all over the media.  This is an insidious disease and

Page 105

1   it deserves compensation, and it frankly deserve

2   affirmative action in people doing something to treat

3   it, not cover it up.

4              The motion for final approval should be

5   rejected.  The matter should be remanded.  If the

6   parties want to negotiate, there should be adequate

7   representation for those whose rights were bargained

8   away already in this first settlement.  And then

9   hopefully, hopefully we'll get a settlement when it's

10  fair, adequate and reasonable and, frankly, worthy of

11  these people who have been subjected to a terrible,

12  terrible wrong.

13             Thank you.

14             THE COURT:  Thank you.

15             Okay.  We have some lawyers from your

16  firm who are going to say a few words.

17             MR. MOLO:  Yes.

18             THE COURT:  Okay.  I think that the

19  first person is --

20             MR. MOLO:  Mr. Totaro.

21             THE COURT:  -- Mr. Totaro who has ten

22  minutes.

23             MR. TOTARO:  Thank you, Your Honor.

24             Martin Totaro of Mololamken.  I would

25  like to spend a few minutes discussing the various

Page 106

1    procedural flaws in the various claims provisions that

2    render the settlement unfair.  I will briefly address

3    three categories of flaws.  First --

4                    THE COURT:  Before -- can -- before

5    that, and I just noticed this from my list here, did

6    you -- who objected, who -- one of your clients that

7    didn't opt out?  Mori (ph) -- is it Manny Morey, yeah,

8    Morey opted out.

9                    MR. TOTARO:  Allan Faneca would be one

10   example of someone --

11                   THE COURT:  And this -- that person

12   made an objection?

13                   MR. TOTARO:  I -- yes.  Our objection

14   was filed on behalf --

15                   THE COURT:  Oh, okay.  Your object --

16                   MR. TOTARO:  -- of all seven.

17                   THE COURT:  Okay.  That's fine.

18                   MR. TOTARO:  Some opted out, some

19   didn't.

20                   THE COURT:  Thank you.

21                   MR. TOTARO:  Thank you, Your Honor.

22                   So the first deficiency I wanted to

23   raise was the fact that the settlement is opt-in, not

24   opt-out, second, deficiencies in the baseline

25   assessment program; and, third, deficiencies in how

Page 107

1    players with qualifying diagnoses actually receive

2    awards.  So I would like to start out with a slide

3    that provides an overview of what I'm talking about.

4    I think it's up.

5                 Thank you.

6                 So, Your Honor, this is an opt-in

7    settlement.  A class member does not have an automatic

8    right to receive benefits from the settlement.  The

9    class member must instead opt-in to this settlement by

10   registering with the claims administrator within six

11   months or forever be barred for receiving any

12   compensation regardless of whether the person would

13   otherwise merit compensation.

14                Now the settling parties come back and

15   say, well, precedent doesn't unilaterally bar

16   registration requirements in every case.  But the

17   settling parties cite no case where the courts have

18   allowed this opt-in procedure where the class injuries

19   themselves could cause the injury that allows -- that

20   causes the player to miss the deadline.

21                And more fundamentally, Your Honor, the

22   settling parties provide no reason why you would have

23   an opt-in requirement.  There's simply no need for an

24   opt-in requirement.  If you are a class member and you

25   are entitled to compensation, then you should receive

Page 108

1    compensation.  In other words, everyone who is a class

2    member should automatically be registered.  There

3    should be no opt-in requirement.

4                    Moving to the second issue on the

5    slide, deficiencies in the baseline assessment

6    program.  If we could put up the next slide.

7                    So the settling parties have said over

8    and over that the settlement is uncapped.  That simply

9    is not true.  The baseline assessment program is very

10   much capped at $75 million and that cap moreover, as

11   we point out in our papers, is based on several

12   unrealistic assumptions, including the cost of

13   treating members of the class who have dementia who

14   don't qualify for an award.

15                   Now the settling parties' response here

16   I think is very telling to the way this case has been

17   handled by the settling parties.  They say that their

18   actuaries estimate that the $75 million should be more

19   than enough.  If that is true, Your Honor, then there

20   is no need for a cap.  And if it's not true, then the

21   cap should be lifted because class members with

22   dementia who do not qualify for an award can receive

23   benefits under the settlement.

24                   Now Mr. Seeger said something here

25   today that I think is -- is worth mentioning.  When he

Page 109

1    was discussing participation in the baseline

2    assessment program he said, "We're hoping all of the

3    players participate."  That came as quite a surprise

4    to me.  Class counsel's own expert estimates that only

5    a little over half the players will participate,

6    11,886, and that's on paragraph 23 of the Vasquez

7    declaration.  If Mr. Seeger is actually hoping that

8    all the players will participate and all the players

9    actually do participate, that cap will far fall

10   woefully short.

11           The baseline assessment program also

12   doesn't address mood and behavioral symptoms, so it

13   will add nothing to the many players who are suffering

14   from those symptoms.  As Mr. Molo explained

15   previously, if CTE is to receive compensation, then

16   mood and behavioral symptoms should also be covered

17   under the baseline assessment program.

18           The baseline assessment program's

19   supplemental benefits were supposed to provide

20   meaningful medical and counseling benefits.  A capped

21   time-limited fund simply does not do that.

22           If I could go to the third topic I will

23   speak about, deficiencies in how players with

24   qualifying diagnoses actually receive awards.  The

25   next slide.  Thank you.

Page 110

1                    So even if a class member has opted

2      into the settlement, even if a class member has

3      participated in the baseline assessment program and

4      met that deadline, that class member would still face

5      several hurdles before he can recover on even a valid

6      claim.

7                    A qualifying diagnosis can only come

8      from what's called under the settlement a MAF

9      physician, and that just means a monetary award fund

10     physician.  And that person has to be approved by the

11     NFL, and the player has to pay for the visit and the

12     examination.

13                   Now the settling parties come back and

14     say, well, we actually need our own physicians, these

15     MAF physicians to protect against fraud.  But, Your

16     Honor, that cuts in our favor.  If these physicians

17     are put in place to protect against fraud, then other

18     hurdles faced by class members before recovery are

19     totally unnecessary.  Why would there be a complicated

20     claims package that must be submitted even after

21     you've received a qualifying diagnosis from an NFL-

22     approved doctor.

23                   Why does the NFL get to appeal a

24     decision where its own doctor that it picked decided

25     that a class member deserves an award.  These burdens

1    simply make no sense if, as the NFL and class counsel

2    suggests, their own physicians are already policing

3    against fraud.

4              And it's also going to be very

5    difficult to actually find these physicians and put

6    them into the -- into place.  The country, large parts

7    of the country are facing a nationwide shortage in

8    qualified neurologists.  And there's no guarantee in

9    the settlement that a class member will be within X or

10   Y number of miles of one of these physicians who can

11   actually diagnose them with a qualifying disease.

12             And I would also note that the NFL

13   agrees that a "qualified neurologist" under the

14   settlement may make a qualifying diagnosis for a

15   player before the settlement would get approved.  That

16   should be all that's required for after certification

17   as well.  At a minimum that should be all that's

18   required if there's a player in a rural area, for

19   example, who is not close to a MAF physician.

20             I would also like to note, Your Honor,

21   that even after a player receives a diagnosis from an

22   NFL picked doctor, he still faces many hurdles before

23   actually recovering.  He must submit a claim package

24   within two years of receiving a qualifying diagnosis.

25   And I think most absurdly for me, that player has to

Page 112

1    submit some sort of proof that he actually played in

2    the NFL.  And a player who fails to do so receives an

3    80 percent offset in any award.

4                    Now the settling parties say that,

5    well, the NFL has a duty under the settlement

6    agreement to provide evidence in "good faith" if the

7    player's application is insufficient to demonstrate

8    that the player did play in the NFL.  But with all due

9    candor, Your Honor, we don't want to good faith

10   standard.  We don't want to give the NFL discretion.

11   We want clear, bright-lined rules that allow recovery

12   where recovery is due.

13                   My final point, Your Honor, is that the

14   appeal process is very much asymmetrical.  A class

15   member has to pay a $1,000 award for an appeal to this

16   Court, but the NFL pays nothing.  That's simply a fee-

17   shifting provision.  There's also no hardship

18   provision for any NFL player to appeal if the player

19   has become poor.  And as we note on Footnote 89 of our

20   brief, that's unfortunately a common result after

21   playing in the NFL.

22                   A player also has to satisfy a clear

23   and convincing evidence standard and must do so within

24   five pages, and under settlement Section 9.7 they

25   don't even get to file a reply.  I know there have

Page 113

1    been a lot of pages filed in this case.  Some people

2    might think there's been too many, but five pages to

3    satisfy a clear and convincing evidence standard seems

4    to me to be an unfairly high limit imposed on these

5    players.

6                    Now what did the settling parties

7    respond?  Well, they say that the $1,000 fee is meant

8    to "discourage baseless appeals," but there's no fee

9    limit or limit on the number of appeals that the NFL

10   can take.  And the NFL, moreover, has little incentive

11   not to appeal and prolong the process.  Here again,

12   the only limit on the number of NFL appeals is that

13   they must be in good faith.

14                   But I would also like to note one

15   peculiarity about this settlement.  Section 9.6(b)

16   doesn't even allow the appellant, the player, the

17   class member, to challenge whether the NFL is acting

18   in good faith.  Instead, curiously, that job falls on

19   class counsel, not the actual player whose -- whose

20   been affected.

21                   And so like Mr. Molo, I would like to

22   put up a slide that suggests how this settlement might

23   be a little better.  So you could lift the cap on the

24   BAP, the $75 million cap; that if Mr. Seeger is

25   correct, if all the players participate, it wouldn't

Page 114

1    come close to covering all the benefits that the

2    baseline assessment program is supposed to provide.

3                    Another simple fix would be to extend

4    the baseline assessment program to the full term of

5    the settlement instead of having it ten years with the

6    possible enhancement of five more years at the -- on

7    the outside.

8                    You could also eliminate the

9    unnecessary opt-in requirement hurdle.

10                   You could, Your Honor, make it easier

11   to get a qualifying diagnosis by eliminating the MAF

12   physician requirement, at least where these physicians

13   aren't close to any class member.

14                   And then, finally, you could even up

15   the appeal process to make it symmetrical.

16                   Your Honor, I'm happy to answer any

17   questions you might have, but otherwise that's it.

18                   THE COURT:  Okay.  Thank you.

19                   MR. TOTARO:  Thank you for giving me

20   the opportunity to speak.

21                   THE COURT:  Okay.  Mr. Demetrio.

22                   MR. MOLO:  Actually, Mr. -- Mr.

23   Wiegand, I believe, Judge.

24                   THE COURT:  Oh, it says on the list

25   here that I've sent out --

Page 115

1                    MR. MOLO:  You had -- you turned it

2      around the other way, I think.  You said you wanted to

3      hear from all the Mololamken lawyers' first?

4                        THE COURT:  Well, I thought that --

5                        MR. MOLO:  However -- however you want

6      to proceed.  If you don't mind, his short and Mr.

7      Demetrio's is longer.

8                        THE COURT:  Well, it doesn't make a

9      difference.  I'm going to hear both of them before

10     lunch.  If you want to go --

11                       MR. MOLO:  Go ahead.

12                       THE COURT:  -- Mr., -- I'm not going to

13     -- that's not -- that's irrelevant.  You can go for

14     five minutes.

15                       MR. MOLO:  Thank you, Judge.

16                       THE COURT:  Okay.  Mr. Wiegand.

17                       MR. WIEGAND:  Thank you, Your Honor,

18     and good afternoon.

19                       THE COURT:  Good afternoon.

20                       MR. WIEGAND:  Tom Wiegand of

21     Mololamken.

22                       Your Honor, the problems with the test

23     battery are not limited to the fact that it does not

24     cover CTE or its symptoms.  I am going to address the

25     problem with the testing procedures used in the

Page 116

1  baseline assessment program being arbitrary and not

2  scientifically accepted.

3           Now the categories of dementia that are

4  created in the settlement, Levels 1.0, 1.5 and 2.0,

5  neurocognitive impairment is how they've been titled,

6  are determined through a testing procedure that is set

7  forth in Exhibit 2 to the proposed settlement.

8           I have highlighted on the screen the

9  five areas that are put into the determination of

10  neurocognitive impairment under this proposed test

11  procedure.  You'll see under each of those highlighted

12  areas there are specific subtests.  So for the first

13  one, complex attention, there are six subtests.  The

14  point that the settling parties have made is that

15  these tests are commonly used, known and accepted.

16           Those six subtests, each on its own, is

17  that.  It is known, used and accepted.  When you

18  combine this page of various subtests in these five

19  domains, that is new.  In fact, they combine them in

20  ways that depending on how one tests in different of

21  the subtests that you will be determined either as

22  1.0, 1.5 or 2.0 level dementia.

23           Your Honor, if you were to Google, as I

24  did, Level 1.5 dementia, you will find references to

25  the NFL concussion settlement.  It is nowhere else in

Page 117

1    the scientific or medical literature.

2              THE COURT:  But they do talk about mild

3    dementia.  All the papers that I read that were

4    submitted to me refer to mild dementia.

5              MR. WIEGAND:  The -- and this is not a

6    known or accepted test for mild dementia.  That is --

7    how neurologists and neuropsychologists determine that

8    is not what we are seeing.  So the requirements that

9    are being set forth here, we -- we don't dispute that

10   test batteries can be used, but test batteries only

11   get used and are accepted after years of experience.

12             And so the concern here is that this is

13   a test battery that no one knows about, that there is

14   no experience with.  Our expert, Dr. Stern, has

15   submitted an affidavit as has been referred to.  And

16   Dr. Stern identifies deficiencies with the test

17   battery in quite clear language.  He states, the

18   specific tests selected and the life of the battery

19   would not be consistent with that given by the large

20   majority of neuropsychologists who specialize in

21   neurodegenerative disease.

22             So to your point, Your Honor, people in

23   the field, neuropsychologists, are determining

24   moderate dementia on a daily basis with their

25   patients.  They are not using this test battery to do

Page 118

```
 1    it.  They have never done it.  It has never been
 2    identified.
 3                Dr. Stern also states in paragraph 50
 4    of his declaration that the criteria used in the
 5    settlement could require that the players' test
 6    performance be even more impaired than what is often
 7    seen in well-diagnosed cases of moderate stage
 8    dementia.
 9                Your Honor, that was our concern.  Dr.
10    Stern verified it; that even if you had a moderately
11    impaired patient with dementia, they may not qualify
12    under the test battery.  It is untested and our expert
13    believes that they won't qualify.  That's
14    unacceptable.
15                Your Honor, it gets worse.  The way
16    that a player's intellectual functioning pre-NFL is
17    determined is based on a test that is biased against
18    players from rural areas or worse school programs, and
19    that's because this -- it's called a pre-morbid test.
20    And they try -- the purpose of it is to determine
21    where was this player's intellect prior to playing in
22    the NFL.  So they give a test and they ask for
23    pronunciation of certain words.
24                Well, if you have an accent, rural or
25    cultural accent, if you were from a school system that
```

Page 119

1    didn't expose you, even if you have the same intellect

2    to someone who was in a good school system, if you're

3    in a lesser school system you may not have heard of

4    these words.  You're not going to pronounce them as

5    well.

6                    It is known that that will cause a

7    person to function more poorly.  By making such a

8    rigid pre-morbid test, we are locking in an unfairness

9    that we believe is also inappropriate.  That is also

10   dealt with in Dr. Stern's declaration.

11                   THE COURT:  All right.  You have to

12   wrap up.

13                   MR. WIEGAND:  So, Your Honor, the

14   settling parties have not met their burden to show

15   that the proposed test battery can properly measure

16   even (indiscernible) injury in retired football

17   players.

18                   THE COURT:  Okay.

19                   MR. WIEGAND:  And there are three -- if

20   I could say there are three things --

21                   THE COURT:  Well, just --

22                   MR. WIEGAND:  -- what would improve it.

23                   THE COURT:  -- put them up because I

24   have limited -- you know, Mr. Molo gave me limitations

25   on the times and I think we can all see them --

Page 120

```
 1       (Laughter)
 2               THE COURT:  -- and I'll certainly take
 3   that.
 4               MR. WIEGAND:  Thank you, Your Honor.
 5               THE COURT:  Okay.  Well, I -- in other
 6   words, you -- you told me -- I gave you a tote (sic).
 7               Okay.
 8               MR. WIEGAND:  Thank you, Your Honor.
 9               THE COURT:  Thank you very much.
10               Okay.  Now I think we can hear Mr.
11   Demetrio.
12               You have ten minutes, Mr. Demetrio.
13               MR. DEMETRIO:  Thank you for that ten
14   minutes, Your Honor.
15               THE COURT:  You're welcome.
16               MR. DEMETRIO:  Judge Pausner (ph), a
17   distinguished judge in the Seventh Circuit, rendered
18   an opinion, published an opinion this year in a case
19   called Eubank versus Hella Windows (ph).  And I would
20   just like to quote a couple of lines from that
21   opinion.  I find them apropos:
22               "Class members have no control over
23   class counsel."  This was, by the way, a class action
24   lawsuit that he found to be scandalous.  He found that
25   the approval of the settlement was wrong, and he
```

Page 121

1    stated, "When a judge is being urged by both

2    adversaries to approve the class action settlement

3    that they've negotiated, she's at a disadvantage in

4    evaluating the fairness of the settlement to the

5    class.

6              "Enter the objectors," said Judge

7    Pausner.  "Members of the class who smell a rat can

8    object to the approval of a settlement," and he talks

9    about Rule 23 and the importance of the

10   representatives, class representatives representing

11   the best interest of all the class members.

12             He also states parenthetically that in

13   that case there was a study he cites that states that

14   "in class action lawsuits less than one-tenth of one

15   percent of the class members opt-out."

16             Judge Kazinski (ph), Alex, Ninth

17   Circuit in a case pending right now against Nissan

18   where he filed an objection states that, it's not

19   uncommon at all for people to not object, not opt-out

20   in class action lawsuits.

21             And pursuant to that we have a tsunami

22   of people who have opted-out and who have objected.

23   The fact of the matter is this is arbitrary, it's

24   unfair, and respectfully we hope you do not approve of

25   it as it is.

Page 122

```
 1                    I would like the courtesy of
 2   introducing Tregg Duerson and his mother, Alicia.  May
 3   I do that, Your Honor?
 4                    THE COURT:  I told you that -- I had a
 5   rule.  You can introduce -- they can stand up.
 6                    MR. DEMETRIO:  Introduce them.
 7                    THE COURT:  Okay.  Let them stand.
 8        (Pause)
 9                    THE COURT:  Okay.  Thank you very much.
10                    MR. DEMETRIO:  This is their day in
11   court, the closest thing they're going to get to one,
12   and as I understand it you've ruled that they cannot
13   speak.
14                    THE COURT:  Well, I have ruled that
15   anyone who is represented by counsel, which is an
16   ordinary rule of a court, anyone who is represented by
17   counsel cannot speak.  This is not a criminal case.
18   You have no right of allocution.  That's my ruling.
19                    Go on.
20                    MR. DEMETRIO:  After Tregg's father
21   filed a bullet into his heart and killed himself, his
22   family found notes begging them to have his brain
23   examined by the good folks at Boston University.  This
24   was done.  The findings were third stage CTE and that
25   his death with CTE was representative of what's turned
```

Page 123

1    out to be now 79 others.

2              At the settlement table in this case no

3    class representative was there to advocate for the

4    people who died with CTE.  No one.  No one was

5    advocating that post-July 7th CTE needs to be

6    compensated.  Say what they will, CTE is real. It's

7    with us.  It's not going away and there are over

8    20,000 potential people who are going to suffer from

9    it.

10             As far as I'm concerned the only lawyer

11   in this room who deserves $112 million is Mr. Karp.

12   The NFL by this settlement will never have to say what

13   they knew, when they knew it, and CTE, poof, it's

14   gone.  Now I heard Mr. Karp say, no, CTE's very much a

15   part of this.  Take it out, then.  Take it out of the

16   release.  Let the future Dave Duerson's families be a

17   part of this settlement.  Let them be at the table.

18   They weren't when it was negotiated.

19             The NFL is proud of this settlement.

20   Yeah, no kidding.  I would be, too.  Ninety-nine

21   percent groundswell, everybody's saying this is the

22   greatest settlement ever.  No.  Mr. Molo covered that

23   quite well.  But Mr. Seeger said something that caught

24   my attention.  Early detection is very, very

25   important.  Well, yeah.  That's the whole purpose of

Page 124

1    this lawsuit.  That's the fraud that we're never going

2    to know about.  If the Dave Duerson's of the world

3    knew what the problem might be, yeah, they could have

4    gotten attention earlier.  So, yeah, early detection

5    is important.

6                    And the smoking gun of all smoking

7    guns, this very accomplished, he told us, attorney on

8    his own website while he was negotiating away CTE for

9    all time says, it's the most serious of all illnesses

10   related to NFL concussions.  That is the motherload of

11   a smoking gun.

12                   And then to sound like we're Mother

13   Theresa, we don't want others committing suicide.

14   Yeah.  Okay.  Well, others are.  And under this

15   unfair, arbitrary settlement, they're not going to be

16   compensated.

17                   Chris Seeger publicly told the world,

18   this isn't my case.  This isn't my legacy case.  But

19   he said it's Judge Brody's.  And I submit to you,

20   Judge, what is your legacy going to be if he is

21   correct?  Are you going to just sort of approve this

22   as it is, unfair, as arbitrary as it is, or are you

23   going to let these former players, and I refer you to

24   our objections that we filed with you, Claude and

25   Clara, I ask you to read about Claude and Clara.  They

Page 125

```
 1   don't know they need your vigilance, but we lawyers
 2   know it, and that's what we ask for.
 3                   Thank you, Judge.
 4                   THE COURT:  Thank you.
 5                   Okay.  Mr. Gibbs has five minutes.
 6                   MR. GIBBS:  Good morning, Your Honor.
 7                   THE COURT:  Good morning.
 8                   MR. GIBBS:  And thank you for --
 9                   THE COURT:  Good afternoon.
10                   MR. GIBBS:  Good afternoon.  And thank
11   you for allowing me the opportunity to present our
12   arguments.
13                   Judge, in sum and substance this
14   settlement as currently constructed cannot and will
15   not stand the test of time.  Because of an overbroad
16   release, an over-narrow qualifying diagnoses that will
17   be frozen in time forever, the statement will not
18   fulfill its goal. Instead players and their families
19   will be left out in the cold.
20                   The men who may be suffering from
21   today, or who will suffer from in the future, CTE or
22   other similar neurodegenerative diseases have had
23   their claims forever eviscerated.  Even if the science
24   advances and CTE is the subject of epidemiological
25   studies, families who will lose their loved ones and
```

Page 126

1    discover the CTE or other neurodegenerative processes

2    in their brains will have no recourse or no remedy.

3              This morning we heard that this is a

4    science-driven case and that we were promised the

5    settling parties will "continue to work together to

6    allow modifications." What does this mean pursuant to

7    the terms of the agreement? How will this be

8    accomplished pursuant to the terms of this agreement?

9    How will that be enforced? How does a class member

10   come and trigger judicial oversight? None of that is

11   addressed in this settlement agreement. The only

12   thing that this settlement agreement states as to a

13   development of the qualifying diagnoses is that in

14   Section 6.4(a) on a periodic basis not to exceed once

15   every ten years. Co-lead class counsel and counsel for

16   the NFL will agree to discuss things and will modify

17   it if they come to a written agreement. That's it.

18   That's all the agreement says.

19              Judge, 65 years is a long time. These

20   men and their families will suffer during those 65

21   years. We cannot allow these qualifying diagnoses,

22   these four limited qualifying diagnoses to be the only

23   thing that they can rely upon until the year 2079.

24              On behalf of the Duerson family, the

25   Blue (ph) family, and the other families that

Page 127

1   inevitably will suffer from these horrific diseases

2   brought by repetitive head trauma sustained during an

3   NFL career, we ask that you deny final approval of

4   this settlement.

5            THE COURT:  Thank you.

6            MR. GIBBS:  Thank you.

7            THE COURT:  All right.  I think we're

8   going to break for lunch.  I'm going to take till --

9   let's see.  One moment, please.  Don't stand yet.  Let

10  me just figure this out.

11       (Pause)

12            THE COURT:  We'll come back at -- I'll

13  take 25 of two.  Okay.  That's 55 minutes.  Okay.

14  1:35.  Court is recessed till 1:35.

15       (A chorus of thank you)

16       (Recess taken at 12:38 p.m.; resume at 1:33 p.m.)

17            THE CLERK:  Please remain seated.  This

18  court is now again in session.

19            THE COURT:  Once a day -- once a day

20  standing --

21       (Laughter).

22            THE COURT:  -- in respect for the

23  Court, but not -- not all the time.

24            Okay.  One second.  Well, did you put

25  that back in?  I have -- because I have to know who

Page 128

1    you are.  You are Mr. Pentz, right?

2                    MR. PENTZ:  Yes, Your Honor.

3                    THE COURT:  Good.  Okay.  You have ten

4    minutes.

5                    MR. PENTZ:  My name is John Pentz.  I

6    represent Fred Smerlas, Cleo Miller and eight other

7    former NFL football players, but I will be speaking

8    today in support of an objection made by Ben Utecht

9    who is in the courtroom and who will be speaking later

10   today.  That objection --

11                   THE COURT:  That's not --

12                   MR. PENTZ:  -- has to do --

13                   THE COURT:  We can't do that.  That's -

14   - that is not -- I'm sorry, Mr. Pentz.  That, I think,

15   was made clear.

16                   MR. MOLO:  Yeah.  Judge --

17                   THE COURT:  Is that right, Mr. Molo?

18                   MR. MOLO:  Judge, in the -- Mr. -- I

19   believe Mr. Pentz had told me you're adopting Mr.

20   Utecht's objection and in the interest of organizing

21   people to allow people who wanted to speak and speak,

22   this was done this way.

23                   So I certainly -- it was within --

24   clearly within the spirit of what you were trying to

25   do, Judge, and we mentioned that.  I wouldn't

Page 129

1    (indiscernible).  So --

2                    MR. PENTZ:  Your Honor --

3                    THE COURT:  What --

4                    MR. PENTZ:  -- Mr. Utecht's lawyer is

5    in the courtroom prepared to speak on this if --

6                    MR. MOLO:  Well, Mr. Utecht's going to

7    speak, so --

8                    THE COURT:  Mr. Utecht's going to

9    speak.

10                   MR. MOLO:  Yes.

11                   THE COURT:  I can't have Mr. Utecht's

12   lawyer speak.  Whom do you represent?

13                   MR. PENTZ:  That's why I'm here to

14   speak.  Fred Smerlas, Cleo Miller, Judson Flynn and

15   seven other NFL -- former NFL players.

16                   THE COURT:  So it's not Mr. Utecht,

17   then?

18                   MR. PENTZ:  No.  I never entered an

19   appearance on his behalf.  No.

20                   THE COURT:  Well, what are you going to

21   speak about?

22                   MR. PENTZ:  I'm going to speak in

23   support of Mr. Utecht's objection that there may not

24   be enough money in the settlement fund to play -- to

25   pay claims 30, 40, or 50 years into the future.

Page 130

```
 1                    THE COURT:  All right.  Okay.  Tell me
 2      why you --
 3                    MR. PENTZ:  Okay.  Thank you, Your
 4      Honor.
 5                    THE COURT:  You think it's the demise
 6      of the NFL?  Is that what you're concerned about?
 7                    MR. PENTZ:  Well, that's one of the
 8      possibilities, but there are --
 9         (Laughter)
10                    MR. PENTZ:  -- other ones here.
11                    THE COURT:  Well, give me more
12      realistic ones.
13                    MR. PENTZ:  When you -- when you
14      rejected the original settlement, Your Honor, you
15      stated that:
16                    "I am primarily concerned that not all
17      retired NFL football players who ultimately receive a
18      qualifying diagnosis or their related claimants will
19      be paid.  In various hypothetical scenarios the
20      monetary award fund may lack the necessary funds to
21      pay monetary awards for qualifying diagnoses."
22                    Now even though this current amended
23      settlement is uncapped, it doesn't actually guarantee
24      the payments as that term is understood.
25                    THE COURT:  How would you do that?
```

Page 131

1               MR. PENTZ:  Well, Your Honor, it would

2    be impossible to -- we have a couple of ideas.  One is

3    you could bond it or you could insure it with an

4    insurance company.

5               THE COURT:  And they're better off than

6    the NFL.

7        (Laughter)

8               MR. PENTZ:  Right.

9               THE COURT:  Okay.  I just wanted to

10   know what your --

11              MR. PENTZ:  It would have --

12              THE COURT:  -- assumptions are.

13              MR. PENTZ:  -- to be.  Yeah.

14   Obviously, because in the -- the way the settlement

15   now works there are two funds that -- the monetary

16   awards fund and then something called a statutory

17   trust which is meant to secure that monetary awards

18   fund.

19              In year 11 of the settlement the NFL is

20   required to fund a statutory trust with enough money

21   to pay all claims for the next 55 years.  That is an

22   impossibility.  Nobody can forecast what amount that

23   would be.  The NFL is doing this, is going to

24   determine this amount in its sole discretion.

25              THE COURT:  But I thought that they

Page 132

1    have -- they are -- aren't they responsible for

2    payment for 65 years?

3                    MR. PENTZ:  They are, Your Honor.

4                    THE COURT:  Okay.

5                    MR. PENTZ:  But Mr. Utecht's concern is

6    that if he got an award down the road, say 30 or 40

7    years from now, all he would have at that point would

8    be a breach of contract claim against the NFL if they

9    didn't pay his award.

10                    THE COURT:  Oh, okay.  Okay.  I

11   understand your argument.

12                    MR. PENTZ:  And one of the --

13                    THE COURT:  Good thing I'm not going to

14   be around to decide that.

15        (Laughter)

16                    MR. PENTZ:  Well, I don't think any of

17   us will, Your Honor.

18                    Your Honor, that's part of the problem,

19   seriously, is that -- well, our main concern is Seeger

20   and Weiss because they're responsible for enforcing

21   all of the clauses.

22                    THE COURT:  You don't think that

23   they're going --

24                    MR. SEEGER:  I won't be around.

25                    THE COURT:  -- to be around.  You don't

Page 133

```
 1   think  --
 2               MR. PENTZ:  They won't be around.  Will
 3   their firm be around?  Will an associate in that firm
 4   be available 50 years from now when Mr. Utecht calls
 5   and says, they're not paying my claim?
 6               THE COURT:  Okay.  I hope --
 7               MR. PENTZ:  That's what we're --
 8               THE COURT:  -- I --
 9               MR. PENTZ:  -- worried about.
10               THE COURT:  Okay.  I understand your
11   concern.  I think that you've explained it and I don't
12   think I need any further explanation.  I certainly
13   will -- I'll think about it.  Okay.
14               MR. PENTZ:  Okay, Your Honor.  I
15               THE COURT:  Thank you --
16               MR. PENTZ:  -- have more, but --
17               THE COURT:  -- very much.
18               MR. PENTZ:  -- if that's all you want
19   to hear  --
20               THE COURT:  No.  That's it.  Thank you
21   --
22               MR. PENTZ:  Okay.
23               THE COURT:  -- Mr. Pentz.
24               MR. PENTZ:  Thank you.
25               THE COURT:  Okay.  Mr. Lubel.  Okay.
```

Page 134

```
 1        (Pause)

 2               THE COURT:  Mr. Lubel, you're the one

 3   who asked me to postpone this hearing because you

 4   couldn't get here today or something.

 5               MR. LUBEL:  No, ma'am.  I asked you if

 6   we could continue the hearing because of the mass dump

 7   -- document dump that was done --

 8               THE COURT:  All right.  I --

 9               MR. LUBEL:  -- a week ago.

10               THE COURT:  I -- obviously I denied --

11   I didn't have a chance for anyone to respond to that.

12   But I did look where you were from, and now that you

13   speak two or three words I know it's not New York.

14        (Laughter)

15               MR. LUBEL:  Well, it's funny you say

16   that, Your Honor, because when I showed up this

17   morning downstairs --

18               THE COURT:  Yes.

19               MR. LUBEL:  -- the marshals wanted to

20   make sure I wasn't from Dallas.

21        (Laughter)

22               MR. LUBEL:  And I assure you I'm not.

23               THE COURT:  Okay.  I -- where are you,

24   Beaumont, Texas?

25               MR. LUBEL:  You know, I grew -- I was
```

Page 135

1   actually raised in Beaumont, but I split time between

2   San Antonio where the Alamo is and Houston.

3                  THE COURT:  Okay.  All right.

4                  MR. LUBEL:  So I appreciate your time.

5                  THE COURT:  Okay.  Thank you.

6                  MR. LUBEL:  Judge, I've been asked to

7   address two components or features of this settlement

8   agreement that arbitrarily and unnecessarily will

9   reduce monetary awards if the settlement is approved

10  to various class members.

11                 Number one are the eligible seasons,

12  that's one of the components, and number two is the

13  age for which the qualifying diagnosis is made.  You

14  will find the eligible seasons on page 9, a definition

15  at –– on page 9 of the settlement under (kk).  And

16  then on page 36 you will actually see a chart that I

17  will refer to later that provides how those deductions

18  are applied.

19                 On Point Number 2, the age at the time

20  of the qualifying diagnosis, that is strictly Exhibit

21  3 to the settlement.

22                 Judge, both of these components or

23  features of the settlement are flawed for two reasons.

24  Neither of them is reasonable and, number two, both

25  did not provide for the structural protections that

Page 136

1    Anchem required in the United States Supreme Court

2    decision.  Let me address that one first.

3                    There's two subclass representatives,

4    Mr. Turner and Mr. Wooden (ph).  And when you look at

5    both of their allegations what you will find is that

6    both of them played in the NFL for eight to nine

7    years.  And so if you play in the NFL for more than

8    five -- we'll come back -- it's actually more detailed

9    than that.  But there's a -- an arbitrary cutoff if

10   you will at five.  And for -- after -- below five

11   years you get deducted.  Both of the class

12   representatives played in excess of that, far in

13   excess of that, and so they are not impacted by the

14   deductions that occur under the eligible season

15   section.

16                   Under the age for qualifying diagnosis, they

17   likewise are not adequate representatives because Mr.

18   Turner was diagnosed with his illness, based on his

19   allegations, before he reached 45 years old.  And that

20   arbitrary line that they drew for what -- when the

21   deductions kick in or the reductions and monetary

22   awards is at 45 years old or older.

23                   Now Mr. Wooden, the allegations are

24   that he has not currently been diagnosed with any of

25   the qualifying diagnose -- diseases or disorders.

Page 137

1    However, best I can tell he's 40 or 41 years old and

2    he has time, three or four years, for which he could

3    be diagnosed with a qualifying diagnosis and,

4    therefore, he would not be impacted.

5                    And so for those reasons, Your Honor,

6    we do not believe that either Mr. Wooden or Mr. Turner

7    are adequate representatives of the class or the

8    absentee members because neither of them appear to be

9    impacted when we focus in on these two sections.

10                   THE COURT:  Okay.

11                   MR. LUBEL:  Now I -- I'm sure the Court

12   has heard, I heard it before today and then I heard it

13   again, and that is this settlement does not require

14   any proof of causation.  I heard it again today.  Both

15   Mr. Karp and Mr. Seeger, on behalf of their groups,

16   said it.  However, it wasn't within minutes, maybe 15

17   minutes within both of them saying that they were

18   using causation as justification for both of the

19   components of the settlement for which I'm complaining

20   about or which the objectors are complaining about.

21   And the exact words that I heard were, they service

22   proxies for causation and exposure and they are

23   scientifically based.  Those are the words I heard.

24                   Now I would like to -- if we can pull

25   up Exhibit 3 first.

Page 138

```
 1        (Pause)

 2                    MR. LUBEL:  Well, I could do it on

 3   ELMO.

 4                    THE COURT:  Where's Jim?  Jim?  One

 5   second.

 6        (Pause)

 7                    THE COURT:  What would I do without

 8   you, Jim?  They could do without me, but not without

 9   you.

10        (Pause)

11                    THE COURT:  Is that it?

12                    MR. LUBEL:  Yes, Your Honor.

13                    THE COURT:  Okay.

14                    MR. LUBEL:  That is Exhibit 3 to the

15   settlement.

16                    THE COURT:  Okay.

17                    MR. LUBEL:  It was.  It vanished.

18                    THE COURT:  We'll get it back.  Right

19   now I'm not concerned.

20                    MR. LUBEL:  It's one way to cut down on

21   my argument, Judge.

22        (Laughter)

23                    MR. LUBEL:  That's it.

24                    THE COURT:  That's it?  Oh, okay.

25                    UNIDENTIFIED SPEAKER:  Here you go.
```

Page 139

1    Sorry about that.

2                MR. LUBEL:  No.  Thanks, Jim.

3                Your Honor --

4                THE COURT:  Yes.

5                MR. LUBEL:  -- this is Exhibit 3.

6                THE COURT:  Okay.  I see it.

7                MR. LUBEL:  This is the section dealing

8    with age at the time of qualifying diagnosis.

9                THE COURT:  Okay.  All right.

10               MR. LUBEL:  If you look at the top, on

11   the left-hand column you'll see age group and you'll

12   see under 45 and you'll see what appear to be fairly

13   large settlement numbers starting with ALS at $5

14   million; death with CTE at 4 million and on and on.

15               If -- they claim that this is

16   scientifically based.  So what evidence have they

17   provided, much less what argument, that somebody

18   between 25 and 45 should get exactly the same thing?

19   Is it their claim, is it the NFL's claim that somebody

20   that's diagnosed with any of these disorders, these

21   diseases at 25 years old has the same range of damages

22   as somebody does at 44?

23               Now they're the ones that -- Judge,

24   they have to prove that this is reasonable, that it's

25   rationally based.  That's what Professor Calanoff has

Page 140

1    said.  That's the test.  They provided the Court with

2    no rationalization on how somebody under 45, that that

3    whole age range group of people should be treated

4    exactly the same.

5              By the same token, if you focus in on

6    death with CTE and you look at the -- consider what a

7    44 year old would get.  So a 44 year old diagnosed

8    with CTE before you approve, preliminarily approve the

9    settlement that is, would receive $4 million assuming

10   no other setoffs or offsets.  A 45 year old would

11   receive 3.2 million.

12             Now where's the science behind that,

13   Judge?  Common sense tells you that a one-year change

14   in life expectancy does not justify, much less could

15   it be scientifically justified an $800,000 delta.  If

16   you go and you look even below that, if you're -- if

17   you're 49 and you're diagnosed, death with CTE, you

18   get $3.2 million assuming no other offsets.  If you're

19   50 you get $900,000 less.  That's with a -- again,

20   with a one-year change in life expectancy.  And these

21   people have passed.  They're already dead.  There is -

22   - there can be -- they've offered no scientific basis

23   for this categorization nor the numbers.

24             Your Honor, just another example.  If

25   you look at Alzheimer's, if you're 44 years old and

Page 141

1   you're diagnosed.  You have a qualifying diagnosis of

2   Alzheimer's with -- assuming everything else is the

3   same, you get $3.5 million.  If you're 45, one year

4   difference, you get $1,200,000 less.

5            Now what's that based on?  Do they have

6   evidence that that one-year change in diagnosis date

7   has resulted in a million-two less in medical; that

8   it's somehow altered your life by worthy of $1,200,000

9   change?

10            Judge, there -- there is no rational

11   basis for the numbers.  What I suspect happened, and

12   it's pure speculation, is that when they initially sat

13   down and settled this case for $650 plus million

14   before you rejected it, they tried to back in to how

15   the numbers would play out.  And I'm not here to

16   debate the whole process of trying to back in and

17   fulfill your fiduciary obligations, but I -- but it

18   does offer you an explanation as to how this happens,

19   but it's not a rational explanation, nor is it

20   scientifically based as they told you.

21            I think it's also important to notice,

22   if you look at the -- if we can go to the 60 to 64

23   category, that whole line.  Now Mr. Seeger told you

24   when he stood up that the primary basis for having

25   these deductions or reductions in monetary awards

Page 142

1    based on age were because the science showed that when

2    you got into your 60s -- he either said age 60 or when

3    you entered your 60s -- the risk of being diagnosed

4    with these disorders, Parkinson's, Alzheimer's,

5    dementia-type disorders, they go up.

6                  Well, is that -- look what we see,

7    Judge.  He said it like there's some stark difference

8    at 60 years old or in the decade of your 60s.  Do we

9    see a big difference between 55 and 60?  We actually

10   see bigger differences when we looked at Alzheimer's,

11   Judge -- look at the difference between the 55

12   category under Alzheimer's and the 60.  That's like a

13   $200,000 difference.

14                  Now they're focused in supposedly on this

15   decade of the -- your 60s.  Now when we go back to the

16   first example I used on Alzheimer's, how do they

17   justify a million-two reduction between ages 44 and

18   ages 45 diagnosis?  They can't do it.  There's no

19   doctor that will give them that.  There's no

20   scientific article that will justify it.  They just

21   don't have it.  And so it's their burden to prove to

22   the court that these are reasonable and they're

23   rational, and they're just not.

24                  If we could move to --

25                  THE COURT:  Okay.  Thank you.  Are you

Page 143

1    -- you've got more than the age?

2                    MR. LUBEL:  Not on this category, Your

3    Honor.

4                    THE COURT:  Okay.  But --

5                    MR. LUBEL:  Just --

6                    THE COURT:  -- you know you're almost

7    finished with time, so why don't you -- yes.

8                    MR. SEEGERT:  I might be able to save

9    Mr. Lubel and the Court some time.  If Mr. Lubel would

10   just, for the first time, apparently, read the

11   language at the bottom of that grid which explains

12   everything he just spent 15 minutes discussing.  How

13   about blowing up that paragraph right underneath the

14   numbers?

15                   Thank you, nice and big, nice and big

16   if you can.  And then there's a word, average, in that

17   first sentence.  You want to read that?  I can read

18   it.  It says, "The above monetary award levels are the

19   average based monetary awards for each qualifying

20   diagnosis."  Now this won't make Mr. Lubel stop

21   complaining, but the -- in the grid category he was

22   talking about, 50 to 54 for ALS, there's a $4 million

23   number.  So that's the amount for a 47 year old.  And

24   if you're a little younger it goes up and if you're a

25   little older it goes down.  There are gradations

Page 144

```
 1    within each box.
 2                    THE COURT:  Okay.
 3                    MR. SEEGERT:  There isn't a big jump.
 4                    Thank you, Judge.
 5                    MR. LUBEL:  The jump is not -- the
 6    delta, Judge, has not been proven to be rational or
 7    reliable --
 8                    THE COURT:  But that's not what you
 9    said before.  Okay.  And that will be on them to do.
10                    Okay.  And what's your second -- you
11    have a second --
12                    MR. LUBEL:  If we can go to the
13    eligible seasons.  This one -- so, Judge, if you were
14    to look at page 9 of the settlement there's a
15    definition of eligible seasons.  Let me give you the
16    short version.  Essentially, it is if you're on a
17    active roster of an NFL team for three or more games,
18    you -- you're entitled to an -- you get a season.  If
19    you're on a (indiscernible) practice or developmental
20    squad for eight or more games you get a half a season.
21                    When you look at the number of eligible
22    seasons, under five eligible seasons you start to get
23    deducts.  And if we -- let's just focus on Number 5,
24    which is the two-and-a-half eligible seasons.  The
25    problem they have here, Judge, is that when they
```

Page 145

1   defined eligible seasons they did not include that you

2   had to play or what position you were, whether you

3   were a high impact position:  Were you a cornerback;

4   were you a wide receiver; were you a linebacker; what

5   were you; did you play at all?

6              And so you've got players that in an

7   extreme example fit the definition of being in five

8   eligible seasons and not -- not deducted at all.

9              And so you've got players that in an

10  extreme example fit the definition of being in five

11  eligible seasons and not -- not deducted at all.  No

12  deduction whatsoever that never played.  They were on

13  an active roster for three or more games, for five

14  seasons, they had a qualifying diagnosis, they

15  wouldn't get deducted.  Whereas the quarterback that

16  fell into the definition for two and a half years back

17  in the '70s or '80s where they didn't have these rules

18  that were designed to start protecting the

19  quarterbacks, if that quarterback only played or was

20  on an active roster for two and a half eligible

21  seasons he'd get 50 percent less, and that quarterback

22  could have played 16 games for 2 seasons versus the

23  field goal kicker, second string, that didn't play at

24  all, or the first string that was rarely on the goal.

25  The field goal kicker, whether he played or not, would

Page 146

1    get twice the money as the quarterback that played

2    under their scenario.

3                There's no scientific basis for their

4    eligible seasons, there's no good reason to apply it

5    that way.

6                THE COURT:  Thank you very much.

7                MR. LUBEL:  Thanks, Judge.

8                Okay, Mr. Rosenthal.  Okay.

9                MR. ROSENTHAL:  Thank you, Your Honor.

10   My name is Michael Rosenthal, I represent Andrew

11   Stewart who played in the NFL from 1989 to 1993.

12                He has a qualifying diagnosis of

13   Parkinson's disease, but his objection is the

14   definition of eligible season, because the definition

15   here requires playing in a minimum of three games in a

16   regular season and excludes players like Andrew who

17   were put on injured reserve prior to that third game.

18                Both class counsel and the NFL have

19   submitted elaborate expert valuations of this

20   settlement, but neither use the criteria for eligible

21   season that they now insist are critical to this

22   settlement.

23                Neither class counsel nor the NFL

24   counsel has offered any explanation for why their

25   respective expert reports on the value of the

Page 147

1   settlement failed to use the actual eligible season

2   criteria in their analysis.

3                Instead the NFL expert has based his

4   analysis on credited seasons, that's a concept from

5   the retirement plan where players vest, based on

6   number of credited seasons, they have eligibility for

7   pension based on the number of credited seasons.

8                The NFL's expert said that credited

9   seasons were a proxy -- his words -- a proxy for

10  eligible seasons.  And they use the creditable season

11  data because that was readily available from the NFL.

12  Why didn't they use eligible season data?  I think the

13  answer is because eligible season data is much more

14  difficult to come by, and that data is the data that

15  the players under this agreement would now have to

16  provide.  Otherwise it would have been provided by the

17  NFL for the NFL's analysis.  So it's left up to the

18  class members to dig up this data, establish the

19  number of eligible seasons.

20               But what did they have to do?  They

21  have to submit, and it's their burden to submit by

22  objective evidence -- objective evidence the number of

23  eligible seasons that they have.  There's no

24  definition of objective evidence and it's simply let

25  to the unfettered discretion of the claims

Page 148

1    administrator.  And usually when there's unfettered

2    discretion it means that the decision cannot be

3    overturned unless there's an abuse of discretion.

4    That's a very difficult standard to overcome, and it's

5    an unnecessary burden on the players here, all of whom

6    would be coming into this settlement who were seeking

7    benefits already having a qualifying diagnosis.

8                  Now the NFL has contended in its papers

9    that the line drawing is fair because there's an

10   exception for players whose IR, injured reserve,

11   status was due to a concussion, but that's an illusory

12   benefit.

13                 The NFL had an injury surveillance

14   system in place for a long time and they've had

15   studies of concussions.  From 1995 through 2006 they

16   did a 12-year study of concussions.  And during that

17   period, from 1996 to 2001, for example, only one

18   player lost more than 61 days before returning to

19   play.  There's no evidence that any player went on

20   injured reserve because of or due to a concussion.

21                 So the fact that they're offering that

22   as a protection is really illusory, when in fact we

23   know from the documents that I've submitted as well as

24   public records that the players during training camp

25   are suffering concussions, during pre-seasons are

Page 149

1    suffering concussions, there were 61 at least in this

2    past pre-season.

3                Our solution is that the agreement

4    should include credited seasons as defined by the

5    retirement plan to account for pre-season and training

6    camp time.  There's no dispute that concussive and

7    sub-concussive trauma occurred during those games and

8    during training camp.  And in fact when my client,

9    Andrew, was playing in the '80s and '90s training

10   camps were far more brutal than they are today.

11               Finally, there's no additional

12   financial risk to the NFL if credited season is used

13   instead of eligible season or credited seasons added

14   to the definition of -- credited seasons is made to be

15   the objective evidence necessary to qualify.

16               Under the NFL's own analysis

17   $675 million is more than sufficient to cover the

18   payments to cover class members and they use credited

19   season data.  So using eligible season data by

20   definition will reduce the value to the players.

21               Given that we think that credited

22   season offers the players a better deal and a better

23   chance that the monetary payments will fairly --

24   fairly compensate them for their cognitive injuries

25   and loss of suffering.

Page 150

```
 1                    THE COURT:  Thank you, Mr. Rosenthal.
 2                    MR. ROSENTHAL:  Thank you.
 3                    THE COURT:  All right, Mr. Shah?
 4                    MR. SHAH:  Good afternoon, Your Honor.
 5                    THE COURT:  Good afternoon.
 6                    MR. SHAH:  I'm here on behalf of the
 7       family of Dale Williams.
 8                    Our objection is about whether
 9       Mr. Williams died with ALS, and I'd like to read an
10       excerpt from three documents.
11                    Mr. Williams' death certificate that
12       says "cause of death cardiac arrest as a result of
13       respiratory acidosis as a consequence of ALS."
14                    His obituary published by the New York
15       Times in 1984 that says:
16                    "Dale Williams, a former star offensive
17       guard at Florida State University and with the New
18       Orleans Saints, died Wednesday at age 39 of ALS."
19                    Another obituary published by the
20       Tallahassee Democrat in 1984 that says:
21                    "Earlier this year Williams came in a
22       wheelchair to Live Oak for a last reunion.  The
23       disease that struck down Lou Gehrig hit Williams late
24       last season.
25                    In October he saw a neurologist, but it
```

Page 151

1    was not until last February that his affliction was

2    diagnosed by the Mayo Clinic."

3                    Under this proposed settlement the NFL

4    will not acknowledge that Mr. Williams died with ALS.

5                    The NFL has made a commitment to fully

6    compensate those players who have received the worst

7    cognitive diseases.  They have said based on their

8    compensation grid that ALS is the worst of these

9    diseases.  And in fact they have agreed that athletes

10   who have played at least 5 eligible seasons and are

11   under the age of 45 deserve to be fully compensated

12   because they have this strongest causal link between

13   playing in the NFL and being inflicted with one of

14   these neurocognitive diseases.

15                   Mr. Williams played seven seasons with

16   the New Orleans Saints.  He died at the age of 39, 10

17   years after retiring from the NFL.  This settlement is

18   intended to protect Mr. Williams.

19                   Now, Mr. Williams' family has to prove

20   his diagnosis through certain medical records, and

21   Mr. Williams was diagnosed in 1984 and by the Mayo

22   Clinic.

23                   In November of '84 he was treated at

24   Baptist Memorial Hospital by Dr. Theal (ph), who's a

25   pulmonologist.  Mr. Williams died in November of 1984,

Page 152

1   Dr. Theal died in 2011, and Baptist Memorial Hospital

2   was swept away by Hurricane Katrina.

3              Mr. Williams' family has no way to

4   submit any medical records, but the NFL does say on

5   page 132 to 133 of their response that a death

6   certificate can be considered a medical record.  But

7   here's the thing, the death certificate has to be

8   signed by a neurologist, neurosurgeon, or

9   neurospecialist.  This rigid requirement as to the

10  type of physician that must sign the death certificate

11  leaves Mr. Williams and others in his position without

12  an ability to prove his illness, and in fact the Mayo

13  Clinic states that the most common cause of death with

14  ALS is respiratory failure, which means most patients

15  at the end of their life will see a pulmonologist like

16  Dr. Theal who will sign the death certificate.

17             Now the NFL suggests that this is an

18  anti-fraud measure, but there's nothing unreliable

19  about the contents of a death certificate simply

20  because it was signed by someone other than a

21  neurosurgeon.

22             In fact the American Academy of

23  Neurology in their paper published in 2012 linking

24  degenerative disease -- causes of death among retired

25  NFL players bases their conclusions after reviewing

Page 153

1    death certificates.

2              The Journal of Epidemiology in

3    Community Health in 1992 concluded that death

4    certificates diagnoses of ALS were adequate.

5              Finally in terms of to anti-fraud

6    argument.  As Mr. Rosenthal just said, when they're

7    talking about eligibility they can use objective

8    evidence such as pay stubs, newspaper printouts, but

9    when it comes to proving the illness something as

10   objective as an obituary can't be used.

11             I'm here on behalf of Mr. Williams and

12   his family.  The only fair thing to do is to modify

13   this settlement so that he is protected.

14             THE COURT:  Thank you.  Appreciate

15   that, Mr. Shah.

16             Mr. Manochi?

17             MR. MANOCHI:  Good afternoon, Your

18   Honor.  Thank you for giving us the opportunity this

19   afternoon to speak on behalf of objectors Craig and

20   Dawn Heimburger.

21             Mr. Heimburger I think would be

22   categorized as a journeyman player playing basically

23   between four and five seasons, one of which was in the

24   NFL Europe, and in the years 1999 to 2002.

25             He feels very strongly that the

Page 154

1   settlement agreement should not be approved, and we

2   therefore respectfully request that the Court

3   carefully review each of the objections in

4   Mr. Heimburger's objections submitted with the Court

5   and give it the due consideration that it deserves.

6            The -- I don't want to belabor the

7   point, I think Mr. Molo and Mr. Lubel have raised the

8   point nicely with regard to the Amchem issue, I just

9   simply point out that here Mr. Heimburger in the 2000

10  year played for the NFL Europe, we -- as been pointed

11  out that both Mr. Turner and Mr. Wooden were five-

12  season players in the NFL, there were no issues there

13  with regard to Europe, so we think some consideration

14  should have been given in terms of a subclass of some

15  sort to deal with the issues that are raised by the

16  reductions off of the eligible seasons for various

17  years.  We won't belabor the point, we just simply put

18  it -- leave it at that.

19            The more important aspect of my

20  presentation this afternoon is to discuss the sipray

21  elements of the settlement agreement, it's the

22  $10 million that's been --

23            THE COURT:  Let me ask you something.

24  Would you be happy with this agreement if they just

25  weren't -- they weren't obligated to give any money to

Page 155

```
 1   the education fund?
 2                  MR. MANOCHI:  No, we think --
 3                  THE COURT:  Would that solve the sipray
 4   issue?
 5                  MR. MANOCHI:  No, I don't think it's --
 6                  THE COURT:  And should I strike it?
 7                  MR. MANOCHI:  No, I think it should be
 8   reallocated, and here's the -- here's the reasons,
 9   Your Honor.  The -- we can sit here and debate whether
10   sipray or not, we don't agree with the NFL's version
11   that just because it's -- there's not going to be an
12   unclean running here so it's not sipray.
13                  THE COURT:  Exactly.
14                  MR. MANOCHI:  We -- we kind of -- we
15   suggest that the Court respectfully look at what Judge
16   Roberts in the (indiscernible - 2:08:58) case defined
17   it as and what the Third Circuit defined it as in
18   connection with its review of the matter in the Baby
19   Products case.
20                  Judge Roberts calls sipray the
21   distribution of settlement funds --
22                  THE COURT:  There's no question about
23   the fact I was the -- I was the judge in the Baby
24   Products case so I'm very familiar with that.
25                  MR. MANOCHI:  Okay.  Okay.
```

Page 156

1                    THE COURT:  So it was sipray.

2                    I don't quite understand if I strike

3        the $10 million for education then everybody who

4        complains about sipray should be a lot happier.

5                    MR. MANOCHI:  No, I think my argument,

6        Your Honor, is those monies are better allocated to

7        the -- to going toward other elements of the class,

8        and here's a perfect example, okay?  NFL Europe for

9        instance.  Mr. Heimburger played in Europe for a year,

10       he doesn't get any credit for it.  If we look to

11       Mr. Calanoff, the law professor and plaintiffs'

12       expert, settling class counsels' expert, he says that

13       the NFL Europe amounts should have been included as an

14       eligible season, okay?

15                   So the point simply is being that the

16       monies, even by plaintiffs' own omission -- I mean the

17       whole purpose of the class action settlement is to

18       directly -- to compensate to the members of the class

19       as directly as possible, and Mr. Heimburger is a

20       member of the class.  He's not getting any eligibility

21       for NFL Europe.  Now, Mr. Calanoff seems to suggest

22       that that should be an element that is compensated.

23                   So to the extent that with the sipray

24       element we think the record is uncontroverted as a

25       matter of fact that the members of the class aren't

Page 157

 1    being compensated as directly as possible.  To the
 2    extent that the sipray element goes to that imperfect
 3    third-party element of whatever a distribution is,
 4    that is what our concern is.
 5                    THE COURT:  Well, I understand that.
 6    Thank you.
 7                    MR. MANOCHI:  Okay.  Thank you.
 8                    And one suggestion -- I mean there is
 9    -- there may have been ways other to more closely --
10    to more closely define how it is that those monies are
11    spent.  We don't happen to think that an education
12    fund directly benefits the members of this class,
13    which are defined as retired NFL football players.
14    They don't have to worry about issues of safety, they
15    don't play football anymore.
16                    So we simply suggest that that's
17    another element here which indicates that it's not
18    truly something that should be a part of this
19    settlement.  If the NFL wants to do it independently
20    God bless them.
21                    THE COURT:  Okay.
22                    MR. MANOCHI:  I -- you know, I'm
23    done --
24                    THE COURT:  Would you like me to --
25    okay.  Thank you very much.

Page 158

```
 1                    MR. MANOCHI:  I appreciate your time.
 2    Thank you.
 3                    THE COURT:  You're welcome.
 4                    Okay.  We're going to hear from some of
 5    the individual players.  Mr. Molo, I have covered all
 6    the lawyers; is that correct?
 7                    MR. MOLO:  Everyone, Judge, that is on
 8    the list that I have, yes.
 9                    THE COURT:  Okay, good.
10                    All right, Eugene Moore, is he here?  I
11    don't want -- good afternoon, Mr. Moore.  I don't want
12    to cut anyone off, but you understand that you have
13    five minutes.
14                    MR. MOORE:  Okay.
15                    THE COURT:  Thank you.
16                    MR. MOORE:  As a -- I may be 30 seconds
17    over.  As a player --
18                    THE COURT:  No, no, no, no, no.
19                    MR. MOORE:  Okay.  All right.  Okay.
20                    My name is Eugene Player, I am a former
21    player, and I think it's very important that my
22    perspective as a former player be taken seriously.
23                    And first of all I'd like to say good
24    morning, Your Honor, and thank you for keeping this
25    process on track.  I got it.  I got it.
```

Page 159

1                THE COURT:  Good afternoon.

2                MR. MOORE:  You read my summary.  Okay.

3                The first thing I'd like to say is I

4      was drafted by the 49's, I bounced around for three

5      years, five training camps, four teams.

6                I'd like to preface my objections by

7      saying that I believe that -- and many others that

8      I've spoken to -- that class counsel has utterly, and

9      I -- with all due respect -- failed the players and

10     their spouses.

11               Why do I say that?  Because they had an

12     obligation and responsibility to fight for the

13     players.  By allowing the elimination of CTE and

14     overly broad releases they failed.  It's as though

15     there was some sort of alternative universe being

16     constructed into which all of the figures and

17     computations were entered.

18               The preliminary concussion settlement

19     had its origins as a CTE litigation.  They're gone.

20     There's nowhere to be found in the document.  How does

21     that happen?  It's astonishing, it's more than

22     astonishing.  There's something -- well let's just say

23     it's astonishing and breathtaking.  It's akin to

24     bringing a coal miner's health claim without black

25     lung disease or an asbestos health claim without

Page 160

1   asbestosis.  How could that be that we're here today

2   even expressing our objection to a settlement that

3   does not include CTE is astonishing.

4                 Number two, the NFL preliminary

5   settlement functionally excludes a majority of players

6   whoever strapped on a helmet.  Why do I say that?  And

7   if it doesn't exclude them it places insurmountable

8   hurdles in the way in their road to claiming -- to

9   basically receiving their claim.  And that's been

10  addressed by several people here.  I can't even begin

11  to contemplate a more exclusionary agreement.

12                While contemplating this a couple of

13  weeks ago I realized that one of the underlying

14  structural flaws is the assumption and premise that

15  NFL -- that the amount of contact that an NFL player

16  takes is based primarily on the assumption of game

17  day.  There is something called pre-season, there's

18  something that predates pre-season that's called

19  training camp.

20                In training camp, and I can tell you

21  because I was in enough of them, you hit two times a

22  day, you go through two a days.  You are fighting for

23  a job whether you're a rookie, whether you're coming

24  off of injured reserve, whether you are trying to make

25  the (indiscernible - 2:15:27) again, whether you were

Page 161

1    on the cusp, you were fighting for a position, thus

2    you have a lot of fights during training camp, it's a

3    hyper-competitive, people are at each other, you're

4    doing thing ins training camp that would cause a team

5    to be fined during training camp.  Survey enough

6    players they will agree.

7                    My educated guess is that from the

8    beginning of training camp through to pre-season the

9    amount of impact that you take during those first 6 to

10   8 weeks is at least 50 percent of the total and maybe

11   more, and you start bouncing around, as I did, and it

12   is going to be more, because you don't let an

13   opportunity pass to hit somebody.  And you have the

14   language of the coaches, hit him, lay him out, knock

15   him on the rear, whatever, I mean it's a lot more

16   colorful than that.  So --

17                    THE COURT:  I appreciate your

18   restraint.

19                    MR. MOORE:  Pardon?

20                    THE COURT:  I said I appreciate your

21   restraint.  I'm only teasing.

22       (Laughter)

23                    MR. MOORE:  Okay.  All right.  All

24   right.

25                    And at the end of the process it's a

Page 162

1    part of the process and we all live with it and so

2    forth, only a select few make it to the regular

3    season, not guaranteed.  Contracts aren't guaranteed.

4    A lot of people are surprised when they hear that.  I

5    signed in 1969 for $12,500.  No one is -- and a 12,500

6    salary.

7                    One of the reasons I say that is

8    because if I impute the -- or I did impute the grid,

9    because the structural (indiscernible - 2:17:00) flows

10   down through to the compensation assumptions and

11   calculations in the grid, I get a $5,000 maximum

12   award, and the discounts for -- let's say if I'm 70

13   years old, 71, 72, I've gotten to $40,000 with

14   institutional care now running over $150,000 for a

15   large NFL ex-player, my 27 -- now 27 and 29 year old

16   children -- I'm divorced -- are now left to assume the

17   burden, and we've got to talk about burden and spouses

18   -- and I realize I can't now.

19                    THE COURT:  I have to cut you off.

20                    MR. MOORE:  The only other thing I'd

21   like to --

22                    THE COURT:  I'd like you to finish up.

23                    MR. MOORE:  Judge, may I just --

24                    THE COURT:  Just conclude what you're

25   going to say.

Page 163

```
 1                    MR. MOORE:  Pardon me?
 2                    THE COURT:  Please conclude what you're
 3      going to say.
 4                    MR. MOORE:  Okay.  This is -- Your
 5      Honor, this is the conclusion.
 6                    This is a fairness proposal, a modest
 7      suggestion, that the NFL simply take care of the
 8      treatment expenses for all living players.  The older
 9      ones are going to die sooner, so they can run the
10      numbers, if they really care.
11                    Two, provide a stipend for the spouses
12      and/or caregivers, because they are taking the hit
13      too.
14                    And lastly, if I may, I would like your
15      permission to file a post-hearing memo.
16                    THE COURT:  Okay.
17                    MR. MOORE:  Okay.  Thank you very much.
18                    THE COURT:  Thank you very much.  You
19      have -- nobody has any objection to that?
20                    UNIDENTIFIED SPEAKER:  No, Your Honor.
21                    UNIDENTIFIED SPEAKER:  No, Your Honor.
22                    THE COURT:  Okay.
23              All right, Ms. Hawkins.  Mary Hawkins.
24                    MS. HAWKINS:  Good afternoon, Judge
25      Brody.
```

Page 164

```
 1              THE COURT:  Good afternoon,
 2    Ms. Hawkins.
 3              MS. HAWKINS:  I thank you for the
 4    opportunity to submit by objection to the proposed
 5    settlement.
 6              I am the spouse of Mr. Ross Hawkins,
 7    Sr., who's also known as Rip, R-I-P, who was a second
 8    round draft choice of the original Minnesota Vikings
 9    team and as a middle linebacker, he served as co-
10    captain and defensive captain, and played for five
11    seasons from 1961 to 1965 until he retired to leave
12    the team to complete law school at Emery University,
13    and also to direct his energy toward the care of his
14    wife at that time who was ill and later died.
15              I'm here today as wife and care partner
16    for my husband Rip as his representative.  My husband
17    can no longer consistently participate in his dialogue
18    with the same succinct, robust quality that he may
19    have demonstrated as a player or a co-captain or as he
20    did in his subsequent years as his career as a
21    district attorney.
22              So I'm here to offer a voice that
23    shares my experiences, insights, and our concerns to
24    the proposed settlement, and I am attempting to
25    articulate these in a manner that accurately reflects
```

Page 165

1    his perspective as I have known them in our nearly 30-

2    year relationship.

3              I'm here also as a seasoned healthcare

4    provider who has for more than 40 years mad advocacy

5    my primary goal for those whom I have the privilege to

6    serve across several disciplines from newborn to

7    geriatric, acute care, chronic care, including trauma

8    units, rehabilitation of TBI or traumatic brain

9    injury, neurologic diseases, spinal cord injury,

10   cardiac rehab, pain management, neonatal intensive

11   care, as well as clinical research.

12             I've also had the honor and privilege

13   of accompanying patients and their families as a

14   hospice volunteer serving care partners and families

15   of those in their near end of life decisions.

16             I will say that despite my many years

17   of experience professionally and personally it was not

18   nearly enough to prepare me for the most challenging

19   role that I have assumed over the last five years as

20   my husband progresses in his course of neurocognitive

21   decline.

22             October 2013 he was enrolled in the 88

23   plan.  And I'm making ever effort -- excuse me --

24             THE COURT:  It's okay.

25             MS. HAWKINS:  -- daily to provide care

Page 166

```
 1   that will allow him to maintain the highest quality of

 2   life.

 3                 THE COURT:  Okay.  Would you like --

 4   just direct yourself --

 5                 MS. HAWKINS:  Thank you.

 6                 THE COURT:  -- to the objection that

 7   you have.

 8                 MS. HAWKINS:  Okay.  My objections

 9   include the process of diagnosis.  Primary care

10   physicians were dismissive and often indifferent to my

11   husband's symptoms and needs.  He was diagnosed only

12   one year ago with -- excuse me -- he assumed the

13   rigorous neuropsychological testing and he was

14   diagnosed with post-concussive dementia, and a year

15   later he was reassessed by a neurologist for a

16   diagnosis of dementia with lewy bodies and a very

17   different care plan was recommended.  And our

18   experience illustrates the difficulty of assessment

19   and accurate diagnosis.

20                 Nearly 80 percent of people with lewy

21   body receive a diagnosis for a different cognitive,

22   movement or psychiatric disorder before ultimately

23   learning that they have lewy body, and half of the

24   people saw 3 or more doctors for 10 visits over the

25   course of a year before they were diagnosed, and
```

Page 167

1    diagnosis required more than 2 years from the onset of

2    symptoms for 31 percent of the cases.

3                    Lewy body dementia is the second most

4    common form of degenerative dementia affecting an

5    estimated 1.3 million people in the United States and

6    is most often misdiagnosed as Alzheimer disease, and

7    despite its prevalence there is no designated sub-

8    category for dementia of lewy body diagnosis in the

9    structured settlement as a core feature.

10                   So do former players diagnosed with

11   lewy body dementia fall in the category of

12   Parkinson's?  Because lewy body is considered part of

13   the Parkinson's spectrum, and as its name also implies

14   the dementia is part of its core feature.  So are they

15   in the category of Parkinson's or dementia?  It

16   presents a puzzling conundrum with significant

17   financial consequences.

18                   Research by Bostrum (ph) identified

19   utilization resources are greater with patients of

20   dementia with lewy body and use more than double the

21   amount of resources compared to Alzheimer diseased

22   patients.  They use specially greater resources in

23   accommodation, long-term care, required more

24   outpatient care, informal care, community services,

25   and pharmaceutical care.

Page 168

```
 1                The cost for care for dementia of the
 2    lewy body patients who present with apathy was almost
 3    three times as high as Alzheimer patients with apathy.
 4                And these findings were collected from
 5    the general population and do not even consider the
 6    psychosocial dynamics of former athletes nor the
 7    typical large physical size that presents additional
 8    care management problems.
 9                While the baseline assessment program
10    may offer an infrastructure to direct the assessment
11    intervention process, our personal experience and the
12    data provide -- illustrate the manifold changes --
13    challenges in the assessment process.
14                THE COURT:  Ms. Hawkins, I'm going to
15    have to ask you to --
16                MS. HAWKINS:  Okay.
17                THE COURT:  -- conclude.
18                MS. HAWKINS:  $10 million designated
19    for education is described in some reports as
20    targeting youth football, and those who have been
21    diagnosed with neurocognitive disease and those caring
22    for them it's little consolation for the fund -- that
23    this fund may be allocated for education that allows
24    the NFL to continue to market the game under the veil
25    of enhanced safety.
```

Page 169

```
 1                  What would be more appropriate in terms
 2      of informed choice is education and public service
 3      announcements comparable to those mandated for the
 4      tobacco industry that have graphically depicted the
 5      affects of smoking.
 6                  THE COURT:  Okay.  Thank you.
 7                  MS. HAWKINS:  So in conclusion --
 8                  THE COURT:  Yes.
 9                  MS. HAWKINS:  -- in conclusion in care-
10      related areas there's a troublesome feature.
11                  My final objection that I present today
12      relates to what I believe is the prejudicial nature of
13      the settlement, distribution based on player age.
14                  While age is certainly recognized as a
15      significant factor in the development of
16      neurocognitive disease these older alumni are being
17      penalized for the fact that medical discoveries and
18      the awareness of neurodegenerative diseases related to
19      head trauma did not exist decades ago, even though for
20      many players their unrecognized and untreated symptoms
21      were prevalent.
22                  What did exist was a culture bravado
23      that fosters denial of pain and symptoms and rewarded
24      these men for their stoicism, often with the
25      administration of pharmaceutical agents that
```

Page 170

 1    contributed to their long-term sequela.

 2                    THE COURT:  I have to cut you off.  I

 3    understand your position on that --

 4                    MS. HAWKINS:  All right.

 5                    THE COURT:  -- on age.  And I think

 6    that's -- I'm going have to cut it off.

 7                    MS. HAWKINS:  And there was no early

 8    metric for that.

 9                    THE COURT:  Okay.  Thank you very much.

10                    MS. HAWKINS:  Thank you.

11                    THE COURT:  Thank you, Ms. Hawkins.

12                    Ms. Perfetto?

13                    MS. PERFETTO:  Your Honor, thank you so

14    much for allowing me to be here today, I really

15    appreciate your time.

16                    I want to address a number of things

17    that were talked about today, and I actually sat in

18    the back of the room listening to everything that was

19    said and I threw my original notes away and started

20    all over again.  I will.

21                    THE COURT:  Five minutes.

22                    MS. PERFETTO:  I will.

23                    My objection -- well let me begin with

24    some of the things that were said about the opt outs,

25    so let me tell you why I did not opt out.

Page 171

1              I did not opt out because I wanted to

2    be able to have this opportunity to speak with you

3    today, and if I opted out I would not be able to do

4    that, that's why I did not opt out.  So please be

5    aware of that.

6              My objection -- my main objection is to

7    the age of the player at diagnosis.  As you've already

8    heard discussed today and you saw the grid that was

9    put up on the screen, I heard about scientific

10   evidence, about causality and risk and what that was

11   based on.

12             Your Honor, I'm trained as an

13   epidemiologist, I know about causality and risk.  I

14   also know about something called detection bias.  And

15   detection bias is when you don't find a disease

16   because you're not looking for it, or when you do find

17   more of a disease because you've learned that you need

18   to start looking for it.

19             The most credible example that I can

20   find to you that I -- that brings to mind today is

21   that of Katie Couric talking about her husband having

22   colon cancer.  When she brought that to the public eye

23   many people started to be tested for colon cancer, and

24   lo and behold we found more colon cancer in this

25   country.  Was it because there was a sudden increase

Page 172

1    in colon cancer?  No, it was because we started

2    looking for it.

3                    Well we did not look for diseases like

4    CTE, and what we're looking for in players today, we

5    didn't do that prior to the early 2000s, because we

6    didn't know to look for it.  And one of the reasons we

7    didn't know is exactly the reason why we are here

8    today, it's the reason for this case, because the NFL

9    is accused of hiding that information and putting out

10   false information.

11                   So the detection bias that was

12   perpetuated through that is the reason why many

13   players never got a diagnosis in the first place or

14   they were diagnosed very late or they were

15   misdiagnosed, and now that poor diagnosis that we had

16   in the past, that detection bias that we had in the

17   past is the reason why those players who are older and

18   their families and their widows, like myself, and

19   wives and children will be getting a lower amount of

20   money than if we had known about this information

21   earlier and if it had not been hidden.

22                   I've also heard a lot of presumptions

23   today about why the objectors are objecting, and I can

24   tell you that I've heard from many other wives and

25   widows, there's confusion, they don't know what

Page 173

1  they're being offered, they didn't know what to do,

2  they don't understand what's in the document, and they

3  weren't getting appropriate help in understanding

4  what's in there.

5           When I asked them point-blank do you

6  know how much you're being offered, do you know what

7  the amount is?  They had absolutely no idea, they just

8  say to me, no, but at my age I can't turn it down.  So

9  there's substantial fear.  Confusion multiplied by

10 fear, multiplied by desperation in some circumstances

11 because they have some desperate financial

12 circumstances because of their husband's illness.

13           So, I think when you multiply all of

14 those kinds of things you're looking at unfairness in

15 this settlement when it comes to those older players,

16 and they're put in the position, I feel, of gravelling

17 -- gravelling for more, and that's really what they're

18 being accused of is only being an objector because

19 they want more.

20           I think what they're actually asking

21 for, Your Honor, is fairness in this so that their

22 issues will be considered, and I think that with

23 appropriate looking at the settlement the way that it

24 is that these kinds of things can be remedied and that

25 a good settlement can come out of this.

Page 174

```
 1                    I just respectfully request that you
 2   consider those things, and that if the NFL really
 3   wants to do the right thing it can do the right thing.
 4   It should have done the right thing a long time ago
 5   and there's nothing from stopping it from doing the
 6   right thing now.
 7                    If it takes gravelling I'm here to
 8   gravel for the families of those older players for
 9   fairness.
10                    Thank you.
11                    THE COURT:  Thank you.  Thank you very
12   much.
13                    Mr. Utecht?
14                    MR. UTECHT:  Good afternoon.
15                    THE COURT:  Remember what this means.
16                    MR. UTECHT:  Five minutes.
17                    THE COURT:  That's right.
18                    MR. UTECHT:  I gotcha.
19                    THE COURT:  You got me.
20                    MR. UTECHT:  Thank you so much for
21   this, Your Honor.  I'm a kid from a small town,
22   Rivertown in Minnesota.  If you told me I'd be
23   standing on this platform I would have laughed at you.
24                    THE COURT:  I would say the same thing
25   about myself, so.
```

Page 175

```
 1                    MR. UTECHT:  Okay.
 2          (Laughter)
 3                    THE COURT:  We all feel that way.
 4                    MR. UTECHT:  And also my lawyer was
 5     unable to speak about my objections --
 6                    THE COURT:  Okay.
 7                    MR. UTECHT:  -- because he's giving me
 8     the chance to speak, so I do have my brief if you want
 9     a better understanding of its --
10                    THE COURT:  Well just tell me what your
11     concern is.
12                    MR. UTECHT:  Okay.  Thank you very
13     much.
14                    My background is this.  I played six
15     years in the NFL, I was fortunate enough to win the
16     Super Bowl in 2006 with the Indianapolis Colts, went
17     onto play two years with Cincinnati.  I'm a father of
18     three beautiful girls, I love my wife, and I'm trying
19     to redefine myself now as a man.
20                    If I'm being completely vulnerable with
21     you I'm just going to be honest.  I love -- I love
22     football.  I love the game of football for so many
23     reasons.
24                    One of the most important reasons is
25     memory.  Your Honor, I hope -- I hope I never -- I
```

Page 176

1   hope I never forget the first time I played catch in

2   the backyard with my dad, the third grade.  I hope

3   that I never forget the look on mom's face when I came

4   back as a junior in high school and told her that I

5   had just been offered a full scholarship to the

6   University of Minnesota.  And I hope that I never

7   forget February of 2007 when I stepped on the biggest

8   stage in the world with Super Bowl XXXXI.

9                   Unfortunately in 2009 I regained

10  consciousness in Kentucky -- in training camp with the

11  Cincinnati Bengals facing my fifth documented

12  concussion.  Your Honor, that sent me into an eight-

13  month rehabilitation process before I was cleared --

14  actually cleared to go back to play.

15                  THE COURT:  Let me hear your objection.

16  I want to make sure you get to it because I --

17                  MR. UTECHT:  I'm getting right to it

18  here.

19                  THE COURT:  -- do care and I'm very --

20  I want to know what your objection to the settlement

21  is.

22                  MR. UTECHT:  Thank you very much.  That

23  leads into my objection and my concern, which is this.

24                  According to Section 25 I don't believe

25  that this settlement guarantees that I will able to

Page 177

1    receive an award 65 years down the road.

2              Now when the gentleman tried to offer

3    that objection it was received with laughs, but this

4    is my life.  I'm one of the youngest in this case.

5    I'm 33 years old and I suffer from memory problems at

6    33 years old.  So I'm going to potentially be bringing

7    an award 30, 40 years from now, and the language --

8              THE COURT:  Are you afraid of -- tell

9    me what you're afraid.  You're afraid that there won't

10   be enough money there?

11             MR. UTECHT:  I'm afraid that there

12   won't be enough money there, that the security is not

13   there and it's not available to me because of the

14   issues within the trust.

15             THE COURT:  Well as I understood it,

16   and I'm going to ask the NFL to explain it to me in

17   rebuttal, but my understanding is they are always

18   responsible.  If -- I mean I don't know what better

19   guarantees you can have than having an institution

20   like the NFL, which you do care about --

21             MR. UTECHT:  Well, I care about

22   football.

23             THE COURT:  -- behind their agreement.

24   These -- this security is just additional as I

25   understand it, but I will ask about that.

Page 178

1                MR. UTECHT:  Thank you.

2                THE COURT:  And I expect Mr. --

3    Mr. Karp, you'll address that, won't you?

4                MR. KARP:  I will, Your Honor.

5                THE COURT:  Okay.  That's what I'm --

6    and I have to know about that, because that's

7    something that I was concerned about from the very

8    start, and that's why I'm capless, to make sure that

9    there was a top --

10               MR. UTECHT:  Correct.

11               THE COURT:  -- number that they have to

12   insulate -- that they could insulate themselves with.

13               MR. UTECHT:  Correct.

14               THE COURT:  So that's -- you and I

15   share that concern.

16               MR. UTECHT:  And that's why I brought

17   forth this objection.

18               THE COURT:  Okay.

19               MR. UTECHT:  There are many other

20   objections that I can relate to, but I also understand

21   how the settlement works.

22               I brought this objection forward

23   because the language that we found in that section

24   does not support their being the security that gives

25   me enough comfort to say I feel like this is going to

Page 179

1    be there for me in 65 years or not.

2              THE COURT:  Okay.  I appreciate that.

3    Thank you very much.

4              MR. UTECHT:  Thank you for your time.

5              THE COURT:  That's what I wanted to

6    know.

7              MR. UTECHT:  Okay.

8              THE COURT:  Okay.

9              All right.  Mr. Erickson?

10   Mr. Erickson.  Is there a Mr. Erickson?  Okay.

11             All right.  Ms. Carpenter?  Rebecca

12   Carpenter?

13             I think one more -- Mr. Erickson?  Did

14   you speak with Mr. Erickson?

15             MR. MOLO:  I personally did not.  I'll

16   go -- I'll look in the hall.

17             THE COURT:  No, it's okay.  We'll do it

18   after this -- after Ms. Carpenter.

19             MS. CARPENTER:  Hi.

20             THE COURT:  Hello, Ms. Carpenter.

21             MS. CARPENTER:  I'm sorry, I'm so

22   nervous.

23             THE COURT:  Oh, I understand.

24             MS. CARPENTER:  Thank you.

25             THE COURT:  Just relax.  I am very

Page 180

1    scary.

2        (Laughter)

3                MS. CARPENTER:  Thank you for taking

4    the time to listen to me.

5            My objection concerns primarily I guess the

6    lack of screening medical services, counseling, and

7    family support services for families who are living

8    with symptoms other than significant dementia.  I'm

9    one of those former kids.

10               THE COURT:  And you are -- are you --

11   and you are a child of --

12               MS. CARPENTER:  I am a child, although

13   I don't look like one, but yes.

14               THE COURT:  Are you a child of a former

15   player?

16               MS. CARPENTER:  Yeah, I'll tell you who

17   he is, Your Honor.

18               THE COURT:  Okay.

19               MS. CARPENTER:  My father was Lew

20   Carpenter, he played for ten years in the NFL as a

21   running back, he was a Packer, he played in three

22   world championships.  He was a coach for 30 years in

23   the NFL.  He also coached in NFL Europe.

24               His onset of his symptoms, I would say

25   he fell under the mood disorder category and other

Page 181

1    symptoms, which were very different and significant.

2                    I want to read, because I don't want to

3    miss my points and I'll try to go quickly.

4                    I think that it's real important for

5    people to understand that there's a 20- to 30-year

6    period between the onset of initial symptoms and the

7    onset of full-blown dementia in men like my father.

8                    Long (indiscernible - 2:37:52) dementia

9    diagnosis symptoms can derail both family life and

10   career.

11                   Lew Carpenter was diagnosed his case

12   and there were 17 of the disease we're currently

13   calling CTE, and I'm here in part to put a face on

14   what it means to live with a parent who has a mood

15   disorder due to a brain injury.

16                   I have a second interest in being here

17   and that has to do with my love of children and my

18   desperate desire to make sure that the children of

19   these men become partially the focus of this hearing.

20                   I have a masters in teaching from the

21   University of Southern California, I have a particular

22   passion for working with children coming from high-

23   stress environments and particularly high poverty or

24   violence or children who are confronted with scarcity

25   (indiscernible - 2:38:30) material scarcity, but

Page 182

1  scarcity of mom, scarcity of dad, situations where

2  parents are tremendously overburdened by the demands

3  of daily life.

4              There's a technical term for that, it's

5  called proximal abandonment.  Like Pauline Bosh (ph)

6  she talks about her books on living with people with

7  disease and other chronic disease.  And this can be

8  devastating for a child.

9              In the case of a traumatic brain injury

10  or CTE the proximal abandonment is due to the

11  devastating implications of behaviors relating to the

12  disease.  It's not just the loss of the father, it's

13  often loss of the mother too.

14              The wives are overwhelmed with the

15  demands of caring for their husband's symptoms, mom

16  isn't present, the children are often -- become the

17  caregiver for dad, and in the worse of the situations

18  the kids are in the cross fire of dad's erratic

19  behaviors.

20              I've spent much of the last two years

21  talking and meeting with people who my dad played with

22  and coached trying to understand really how

23  significant this disease was, is, and how pervasive it

24  is, when do people see the onset of symptoms, what are

25  they like?

Page 183

1                  I didn't believe this whole drama that

2       was surrounding it because I just -- I really learned

3       to kind of find out for myself, you know, and I also

4       interviewed a dozen neurologists, neurosurgeons,

5       neuroscientists, (indiscernible - 2:30:51)

6       neuropsychologists, neuropsychologists outside of the

7       (indiscernible - 2:39:55) group because I really

8       wanted to understand this.

9                  And, you know, I would say that

10      (indiscernible - 2:40:00) my question there a thousand

11      Lew Carpenters and I think that's a problem.

12                 My father's symptoms would not be

13      covered under this current settlement.  He's dead now

14      but I really want to make sure that this is --

15                 THE COURT:  How long ago did he pass

16      away?

17                 MS. CARPENTER:  Four years almost

18      exactly.  Yeah.

19                 The moms become exhausted, they're

20      stretching their breaking point trying to hold it

21      together.  Sometimes she's not just the caregiver for

22      the children, she's the primary breadwinner, she's

23      ashamed of what's happening at home, she's socially

24      isolated, she's afraid from the outbursts that are

25      taking place, everybody is walking on egg shells.  The

Page 184

1   children usually blame themselves.  And no matter how

2   many people I talk to the stories are frighteningly

3   familiar.

4               You could do an overlay, you could do a

5   grid.  I think Elanore was right, when you start to

6   look for it you just -- you see it so starkly it's

7   like it's hard to believe you didn't see it so clearly

8   before.

9               And the final thing I want to say is,

10  you know, I think a lot about what is the job

11  (indiscernible - 2:41:00), what is good enough

12  parenting?

13              The job of a parent is to provide a

14  safe and stable environment for children to reach

15  their developmental milestones in a good enough way.

16  To provide safety, structure, three hots in a cot as

17  my dad used to say.  To provide adequate validation,

18  to help kids learn to set goals and provide them with

19  the tools to achieve them, assuming the kids are

20  willing to put in the work.  To teach kids how to be

21  moral and ethical human beings and to help them create

22  an internal map.  This is primary relationships and a

23  person's life will be fulfilling, safe, and

24  worthwhile.  All of this is compromised in a household

25  living with untreated brain injury and CTE.

Page 185

1              My research has shown me there's much

2    we can do to help men and their families navigate this

3    disease through early intervention, ongoing cognitive

4    behavioral therapy, and drug therapies.  These

5    treatments are expensive and lifelong, but they can

6    help these men manage their mood swings, help them to

7    be more present in their lives and their work, and

8    increase their quality of life, including their most

9    intimate relationships.

10             From my perspective the criteria for

11   receiving services related to repetitive brain injury

12   in the case called CTE is not solely about a man's

13   ability to hold down a job.  My father was gainfully

14   employed by the NFL for 40 years.  I was raised in the

15   NFL, I have three sisters, there are only four girls,

16   everybody I grew up with, the guys called themselves

17   my brothers.  We were the daughters, they were the

18   sons.  This is everybody I know.

19             It's really important to make sure that

20   we protect the children.

21             THE COURT:  Thank you very much.  Okay.

22        Jim, would you go outside and just ask if

23   there's a John Erickson?  I don't know -- all right?

24   Or the CE can go out.  Thanks.  You go out and ask if

25   there's a John Erickson.  Just one second.  And do you

Page 186

```
 1   need a moment to organize your thoughts for rebuttal?
 2                   MR. SEEGER:  No, we're -- I'm ready.
 3                   MR. KARP:  We're ready.
 4                   UNIDENTIFIED SPEAKER:  We're ready.
 5                   THE COURT:  Oh, okay.  One second,
 6   let's -- let's -- who's going to go first, have you
 7   decided?
 8                   Mr. Birenboim, you're going to go?
 9                   MR. BIRENBOIM:  Yes, Your Honor.
10                   THE COURT:  Okay.  Just one second.
11   Mr. Birenboim, just one second while -- 'til I make
12   sure that there's no one by that name outside.  I
13   don't want to eliminate someone because -- Marshal,
14   just make sure that -- if you don't mind.  Thanks.
15   Okay.  Thanks so much.
16                   Okay.  All right.  Mr. Birenboim?
17                   MR. BIRENBOIM:  May I proceed, Your
18   Honor?
19                   THE COURT:  Absolutely.
20                   MR. BIRENBOIM:  Good afternoon --
21                   THE COURT:  Just put the microphone
22   down a little bit if you don't mind.  Thanks.
23                   MR. BIRENBOIM:  This okay?
24                   THE COURT:  Yeah.  And I hear better
25   that way.  Yes.
```

Page 187

1           MR. BIRENBOIM:  Good afternoon, Bruce

2    Birenboim from Paul, Weiss for the NFL.

3           I'm going to spend a few minutes on

4    rebuttal addressing some, but not all, of the issues

5    that were raised by the various objectors, and in

6    particular I want to spend a few minutes on a few of

7    Mr. Molo's comments.

8           We heard a lot statements in Mr. Molo's

9    presentation, a lot of -- not a lot of citation to the

10   medical evidence and the science, and I think as we

11   discussed this morning, Your Honor, this is a science-

12   driven settlement.  And rather than the Court hearing

13   my views of Mr. Molo's views, I thought I would just

14   spend a few minutes on the science and why the science

15   supports the reasonableness of the settlement that has

16   been presented to the Court.

17          Mr. Molo basically raised and the other

18   objectors have raised three issues about CTE, that

19   it's not compensated at all, allegedly, that mood and

20   behavior disorders are not compensated, and that the

21   provision for compensation for death with CTE is not a

22   rational exception.  All of those I would submit are

23   very rational in the context of this litigation

24   settlement.

25          As Mr. Karp and Mr. Seeger discussed

Page 188

1    this morning, this is a litigation settlement, so we

2    need to focus on the elements approving the claims in

3    this case and whether they were appropriately

4    compromised.

5                    Causation is clearly a key element of

6    any claim in this case.

7                    And the question then for the Court is

8    whether -- not whether the settlement is perfect or

9    whether every condition is compensated for, but

10   whether the proposed settlement is fair, reasonable,

11   and adequate given the strengths and weaknesses of the

12   claims.

13                   And it's striking that none of the

14   objectors really evaluated the CTE claims in terms of

15   likelihood of success and difficulty of proving CTE.

16                   But we have submitted affidavits from

17   Dr. Yaffey (ph) and Dr. Sneider (ph) which addressed

18   that issue, and they have both opined, they are very

19   experienced doctors and psychologists, have both

20   opined that based on the current state of knowledge,

21   the current state of scientific knowledge it would be

22   extremely difficult to prove that football causes CTE

23   or that CTE causes any particular symptoms.

24                   The research in this area, it is

25   undisputed, is in its infancy.  The National Institute

Page 189

1    of Health has said that, the Institute of Medicine has

2    said that.  There are essentially one or two studies

3    that have studied 200 brains of deceased players and

4    others, and that is really the entirety of the

5    research in this area.  It is new, it is far, far, far

6    behind where we are in Alzheimer and Parkinson's, and

7    all of that.

8                    In the expert opinions to the effect of

9    the difficulty of proving causation with respect to

10   CTE really is unrebutted.  And the -- there have been,

11   Your Honor, no double blind studies, there have been

12   no perspective studies, there have been no cross-

13   sectoral studies, there have been no case control

14   studies.  All there have been have been a couple of

15   case studies.

16                   The sciences is in it infancy, and this

17   is not a trial, Your Honor, where one side or the

18   other is required to prove that CTE is or isn't a

19   cause of this or that.  The question on the table is

20   whether this issue, the issue of causation and CTE,

21   would will hotly contested at trial.

22                   There can be no dispute on this

23   scientific record that those -- that issue would be

24   hotly contested, and therefore the issue is simply

25   whether the line drawing was reasonable in the context

Page 190

```
 1   of the hot dispute there.

 2                So what was the resolution in this

 3   case?  The resolution is that CTE is not per se

 4   covered, but the significant symptoms of CTE are

 5   covered.

 6                And in fact the objectors -- the

 7   objectors' own doctors, Dr. Stern and Dr. McKee who

 8   performed studies with Dr. Stern, they have found that

 9   there are four -- they hypothesize that there are four

10   levels of CTE.  And Levels 3 and 4, which coincide

11   with the decline in neurocognitive behavior in

12   dementia, the McKee study found -- and this is in the

13   Yaffey affidavit at paragraph 83 -- that 89 percent of

14   the patients that were studies by Dr. Yaffey had

15   either Level 3 or Level 4.  And those levels would be

16   covered by this settlement.

17                So as a factual matter it's just not

18   the case that the principal symptoms of CTE are not

19   covered.  They are covered, but the symptoms that are

20   not covered are mood behavior and depression.  And it

21   is also undisputed that mood behavior and depression

22   are prevalent in the general population, there are

23   many, many, many, many other causes.

24                The difficulty of proving causation in

25   that case would be extremely difficult, and I would
```

Page 191

1    just cite the Court Dr. Sneider's affidavit at

2    paragraph 45.  She talks about how for years it was

3    thought that depression was caused by Alzheimer.  It's

4    now proven that it's not caused by Alzheimer.  This is

5    why you can't assume that there's as causal link.

6                    So this settlement draws a line --

7    draws a line at the more significant aspects of CTE,

8    which are covered under the dementia categories, and

9    does not cover mood and behavioral problems.

10                   And lastly on this point, and it's a

11   point that's been ignored by all the objectors, the

12   assumption in the objectors' presentation is that

13   there are players who have a certain set of symptoms

14   today caused by CTE that might not be covered, period,

15   as if time doesn't go on and if as those players who

16   may not be covered for mood issues today as if they

17   will not be covered next week or next month or next

18   year if, as is often the case, these conditions

19   progress.

20                   So all the players who have CTE may

21   progress into Levels 3 and 4 and be covered by this

22   settlement.

23                   The question for the Court in the last

24   analysis is, is the line that was drawn here fair and

25   reasonable given the science?  And we think given the

Page 192

1    causation issues and given the infancy of the research

2    in this area the line was clearly a fair line.

3                    Now let me just address for one second

4    the death with CTE point.

5                    The settlement covers death with CTE

6    prepreliminary approval precisely because obviously by

7    definition players who have deceased prior to

8    preliminary approval cannot get a qualifying diagnosis

9    and be covered.

10                   So the coverage for death with CTE

11   prepreliminary approval was an expansion of the

12   settlement so those players who had CTE and were

13   deceased were covered.  So it expanded coverage for

14   those people and it also demonstrates that their

15   interests were in fact being looked after.

16                   I mean if it were in fact the case, as

17   some of the objectors have alleged, that there was no

18   one at the table looking after the CTE -- players who

19   had CTE then you wouldn't have that provision.  That

20   provision there would you describe to protect pre-

21   deceased CTE death with CTE before preliminary

22   approval.

23                   Let me address for a second the science

24   issue.

25                   Mr. Molo and other objectors have made

Page 193

1    the point that the science of CTE is changing and it

2    may be that in five or ten years we will be able to

3    diagnose CTE pre-death.  Now you can only diagnose it

4    post-death.  That actually doesn't change anything

5    about the settlement, Your Honor, it doesn't affect

6    the settlement, because as the Court knows the purpose

7    of the settlement is to compensate for actual

8    manifested cognitive impairment.  If we could -- if we

9    could determine today that a certain protein

10   associated with CTE was in the brain but there were no

11   cognitive impairments there would be no compensation.

12   That's the entire theory of the case.  It's to

13   compensate players who have cognitive impairments.

14              So if a test were developed tomorrow

15   showing CTE that would not change the outcome

16   whatsoever.  And in this respect Dr. Sneider in

17   paragraph 44 of her affidavit notes that a third of

18   older persons post-death, the pathology shows that

19   they have full Alzheimer in their brains with no pre-

20   death symptoms whatsoever.

21              The purpose of the settlement is not to

22   compensate protein in the brain or not to compensate a

23   particular structure, it's to compensate cognitive

24   impairment.

25              And just as a side note there's nothing

Page 194

1    in Amchem, Your Honor, that requires that an agreement

2    change over time.  The issue in Amchem was whether the

3    interests of the futures, the people in the class who

4    had not yet developed any symptoms, were protected,

5    and in this case we have a subclass that protects

6    those interests.

7                    I have no further comments, Your Honor.

8    I think Mr. Karp has a few comments.

9                    MR. SEEGER:  Thank you, Your Honor.  I

10   just wanted to, you know; in some respects maybe add

11   on to what was just caught into.  You know, Mr. Molo

12   very confidently stood up here and said to Your Honor,

13   we know that suicidality is related to CTE.  And he

14   speaks about CTE like he has confirmation.

15                   So let's just play a little bit of a

16   game for a second, and I know this isn't the game.

17   But let's imagine that we were at a trial, because

18   Mr. Molo and I know he doesn't -- he's never handled a

19   PI case, a personal injury case and has never tried

20   one.  But I just want him to understand what he would

21   be confronted with when puts his own experts on the

22   stand.  He has two experts he continues to talk about,

23   Dr. Stern and Dr. Gandy.

24                   And this is what Dr. Stern said.

25   Dr. Stern is an author.  He's the lead author on this

Page 195

1    study.  He says, "There is no epidemiological cross-

2    sectional prospective studies of CTE that currently

3    exist."  That was Dr. Stern's opinion in 2013.  I

4    don't know if that's in his affidavit.  But I can go

5    back and check.

6                    Dr. Gandy acknowledges however there

7    have no prospective studies in clinical and

8    neuropsychological characterization of CTE is yet to

9    be properly developed.

10                   So, Your Honor, in the context of a

11   Daubert hearing this is some of the things, the

12   writings of the experts that Mr. Molo has put forward,

13   the things that you'd be asked to decide whether a

14   jury could hear that CTE is a disease and causes

15   suicidality and these other things.

16                   THE COURT:  You're saying to me -- am I

17   understanding to say that if the plaintiffs were to

18   try their case, they would be facing a Daubert Hearing

19   where you're challenging whether or not I'd even allow

20   CTE to be in?

21                   MR. SEEGER:  I invited him to -- I was

22   prepared to try that case in front of Your Honor.

23   It's Mr. Molo who comes in here leading Objectors and

24   convincing them and others that we have failed to

25   compensate or do something in the settlement.

Page 196

```
 1                 We failed to compensate CTE, which Mr.
 2    Birenboim has just done a great job explaining why
 3    he's wrong on that.  But I think he needs to
 4    understand that his own experts -- that Mr. Molo did
 5    not point these sections out.  I'm pointing them out
 6    because this is the published literature that his own
 7    experts will put their names on.  This isn't in their
 8    affidavits necessarily, but this is what they say in
 9    their published literature that goes out to the
10    medical community.
11                 Dr. Gandy, "We have little idea,
12    however of the risk of developing CTE following
13    carotid brain injury.  We have little idea of the risk
14    of developing CTE" -- which their full objection --
15    "following a traumatic brain injury, a concussion, for
16    example."
17                 Dr. Stern, 2014, "There are no
18    objective validated in vivo by in large with CTE.
19    Another way of saying we can't determine whether it's
20    in living people.
21                 And finally and maybe most importantly,
22    Dr. Stern in 2011 agrees with this settlement although
23    he doesn't say it in his affidavit.  Maybe Mr. Molo
24    should have paid him.
25                 It says, "the differential diagnosis of
```

Page 197

1    CTE often include that's Alzheimer's and frontal

2    temporal dementia, although a history of remote head

3    trauma may be suggested of CTE, head trauma" -- this

4    is very important, Judge -- "has been implicated as a

5    risk factor for Alzheimer's, Parkinson's disease, ALS,

6    and other neurodegenerative diseases."  That's what we

7    compensated in settlement, Your Honor.

8                I just wanted to spend a moment if I

9    could -- that I was going onto the notices

10   (indiscernible).

11              UNIDENTIFIED SPEAKER:  Sure.

12              MR. SEEGER:  Well, but, just one quick,

13   I mean just the one because I think this may help Mr.

14   Lubel who didn't read the language on the slide that

15   said that those numbers were averages, those payouts.

16              We also in Mr. Vasquez's affidavit for

17   this case, he talks about the reason for the

18   differences that are in the grid with the lower

19   payments after a certain age.  And just by way of

20   example, and I'm not going to spend time on this,

21   Judge, because everybody can go and read the

22   affidavits.

23              After 75 years a person is 302 times

24   more likely to develop dementia after that age.

25   That's a much higher risk factor than anybody has ever

Page 198

1    attributed to concussions or anything else.

2              Finally, just a couple points on the

3    notice because Mr. Molo wanted to use -- and this has

4    nothing to do with Mr. Eric Williams who I respect and

5    I respected every word he said.  But Mr. Molo wanted

6    to use Mr. Williams's objection as a reason for

7    showing why the notice wasn't good.  The only problem

8    Mr. Molo has is that we received Mr. Williams's

9    objection on July 3rd, 2014, two months before the

10   notice went out.  So that's a little bit of a problem.

11             And then with regard to the notice,

12   just a couple of last points.  Again, this -- there's

13   nothing that has been more advertised in the press

14   everywhere than the notice in this case.

15             Mr. Molo was critical of the summary

16   notice.  This is a summary notice.  Mr. Molo is a

17   lawyer.  He understands what this means.  He

18   understands that at the very bottom it tells everybody

19   to go look at the website where to register for

20   benefits and what number to call if you have

21   questions.  It also indicates that there's a

22   settlement agreement.  People can get the settlement

23   agreement.

24             But then he goes on to criticize the

25   long form notice and he says that we only mention the

Page 199

1    fact that in the long form notice that there was death

2    with CTE prior to July of 2014.

3              Well, the problem that he has there

4    besides the legal issue which I'll go into is the

5    summary notice makes it very clear under the section

6    entitled "What are the benefits of the settlement?"

7    That's the section.  Right under there it says

8    monetary awards for diagnosis of death with CTE prior

9    to July 7, 2014.  I think if you're reading the

10   notice, the section if you want to know what your

11   benefits are, you're probably going to go to the

12   section that says, what are the benefits of the

13   settlement?  The notice does that.  And then, finally

14   the last legal --

15             THE COURT:  Say that again.  What are

16   -- refresh my memory on that.

17             MR. SEEGER:  There is Section 5 of the

18   long form notice.  It is entitled, "What are the

19   benefits of the settlement?"

20             THE COURT:  Okay.  Read it slow.

21             MR. SEEGER:  Section 5, What are the

22   benefits of the settlement?  And below that in the

23   second bullet point, the very first sentence,

24   "Monetary awards for diagnosis of death with CTE prior

25   to July 7th, 2014."  It's right there in the notice.

Page 200

```
 1   And there is a legal presumption.  And it's in re:

 2   Domestic Air Antitrust litigation that there's a

 3   presumption that the notices are read in their

 4   entirety, Your Honor.

 5             That's all I have at this point unless

 6   you have any questions of me.

 7             THE COURT:  No.  No, I'm -- I frankly

 8   read we have an MDL -- an MDL website and I -- before

 9   I helped draft this notice, because I thought that was

10   my notice too.

11             MR. SEEGER:  I know that.

12             THE COURT:  I read them and I thought

13   that this one was very specific.  I mean if anyone

14   wants to review them, they ought to review all the

15   others.

16             MR. SEEGER:  Yeah.  It would be helpful

17   to actually read all the sections.  Thank you.

18             THE COURT:  Yeah.  Okay.  Thank you.

19   You have anything further, Mr. Karp?

20             MR.  KARP:  I know -- I know you had a

21   question for me so I'm clearly going to stand up and

22   answer that question.

23             THE COURT:  Okay.

24             MR. KARP:  On the -- just on the notice

25   point, just because there was a lot highfalutin
```

Page 201

```
 1   rhetoric flowing from one of the objectors who

 2   described the long form notice as slick.

 3                  THE COURT:  Wow.  I've never been so

 4   flattered.

 5                  MR. KARP:  Yeah.  All I would say --

 6                  THE COURT:  Because I wrote a lot of

 7   it.

 8                  MR. KARP:  If slick means accurate and

 9   comprehensive, I think thee long form notice was very

10   slick indeed.  You had a couple of questions regarding

11   how the security --

12                  THE COURT:  Oh, yeah.

13                  MR. KARP:  -- work and I know

14   Mr. Utecht spent some time expressing concern would

15   the money --

16                  THE COURT:  Which I appreciated.

17                  MR. KARP:  -- be there, which I

18   appreciated as well.  Maybe it makes sense for me to

19   spend two minutes just to go through the structure of

20   how the security is set up in the settlement.  And in

21   doing so we were aided significantly by Mr. Golkin,

22   the court appointed special master, who found it

23   within his province and Your Honor directed to make

24   sure the economics and financial aspects of this

25   settlement work.  And not that they work for five
```

Page 202

1    years or ten years, or 20 years, but they be

2    structured so as to work for the entire 65-year

3    duration of the settlement.

4              And we spent hours and hours and weeks

5    and in fact probably months with Mr. Golkin going

6    through different formulations and different

7    structures until we and Mr. Seeger had satisfied him

8    that the economic structure of this settlement worked,

9    was sensible, and would protect claimants and class

10   members like Mr. Utecht.

11             The way this structure works is that

12   during the first ten years of the settlement, the NFL

13   is obligated to pay claims as they are approved by the

14   settlement claims administrator.  There has been

15   widespread public criticism of the settlement by the

16   Objectors and certain folks in the media that the

17   settlement is too inexpensive because the NFL

18   allegedly is awash in money, whether it's from

19   broadcast deals, sponsorship arrangements, or other

20   forms of revenue.

21             The criticism is the NFL has so much

22   money at its disposal; it should be paying a lot more

23   in the settlement.   That position advocated by some

24   of the Objectors and the media obviously is

25   inconsistent with the concern that the NFL will not

Page 203

1    have the financial wherewithal during years one

2    through ten to pay claims as they come due.  So that's

3    point number one.

4                    The way that we structured the

5    settlement with Mr. Golkin's assistance is that the

6    NFL is obligated after year ten to set up a statutory

7    trust which is intended to have sufficient funds to

8    pay all remaining expected claim for the remaining 55-

9    year life of the settlement.  And that statutory trust

10   in theory will millions and millions and millions of

11   dollars.  We will have ten-year track record of having

12   seen what claims have been approved by the claims

13   administrator up to that point and we will be able to

14   make reasoned assumptions going forward.

15                   Now, Your Honor adverted to a belt and

16   suspender aspect of the settlement from years 10 to

17   year 65 which is absolutely accurate.  Entirely

18   independent of the statutory trust, the NFL at all

19   times --

20                   THE COURT:  Uh-huh.

21                   MR. KARP:  -- from the moment this

22   settlement becomes effective until 65 years later; the

23   NFL has an independent obligation under the settlement

24   agreement to pay every single claim that is approved

25   by the claims administrator on a timely basis.  And

Page 204

 1    that is an obligation that has tremendous teeth behind

 2    it.

 3              If the NFL fails to pay a claim, or

 4    defaults on a claim, for whatever reason, Your Honor

 5    or whoever succeeds Your Honor in superintending this

 6    settlement will have the ability to nullify the class-

 7    wide release that flows to the NFL.  So every

 8    claimant, every class member who has not received

 9    payment will then be able to return to the tort system

10    and continue the litigation against the league.

11              So the NFL has funds now, will have

12    funds in years 10 through 65 and in the event the NFL

13    ever were to default, the punishment for such a

14    default is draconian, and I hope that satisfies Your

15    Honor and I certainly hope it satisfies Mr. Utecht and

16    those in a position like Mr. Utecht.

17              The only other point I'd like to make

18    -- there was a lot of discussion by the Objectors and

19    the --

20              THE COURT:  That was the solution in

21    the Fen-Fen litigation, I believe.

22              MR. KARP:  It was, Your Honor.  And in

23    factually in other mass tort class action settlements

24    as well.  We've put a lot of discussion by the

25    Objectors and by certain of the players or players'

Page 205

1    representatives that they would like the settlement to

2    be more generous in this regard.

3                    They'd like the claims covered whether

4    physical or psychological to be broader.  That, as

5    noted earlier, is true in every settlement.  We

6    respect the objections.  We listened to the objections

7    with great care.  But there is compromise.  There is

8    laundering.  This is the settlement of a litigated --

9    a case that would be litigated and we have very strong

10   defenses as adverted to.

11                   I'd like to close if I may just by

12   referring very briefly to a couple of statements that

13   Ms. Hawkins and Ms. Perfetto made just a couple of

14   moments ago.  Ms. Hawkins who spoke so eloquently on

15   behalf of her husband, Ross, said, I just wish that

16   testing was in place years earlier.  I wish it were

17   possible to have diagnosed my husband years earlier

18   because there are things that could have been done

19   medically to help assuage some of the conditions and

20   difficulties that he faced and that the family faced

21   as a result.

22                   One of the aspects of this settlement

23   that the NFL is very proud of is the BAP program, the

24   baseline neurocognitive testing program.  The whole

25   purpose behind that program, Your Honor, is to ensure

Page 206

 1    that the 22,000-plus retired NFL players will receive

 2    the moment this settlement becomes effective,

 3    neurocognitive testing.  That they will understand

 4    their neurocognitive impairment level if, in fact,

 5    they're impaired.

 6                    A baseline will be set so that if they

 7    are tested in the future, trajectories and trends will

 8    be able to be noted.  And to the extent they have

 9    early neurocognitive impairment; under the program

10    they will receive treatment.  They will receive

11    therapy.  They will receive medicine.  And I'd like to

12    believe that Mr. Hawkins would have benefited from

13    such a program being in place that Ms. Perfetto's late

14    husband would have benefited from such a program being

15    put in place.  It is an important aspect of this

16    settlement.

17                    And the only other point I'd like to

18    add is Mr. Hawkins is receiving disability benefits

19    under the EDA disability plan provided by the NFL.

20                    One of the issues in our settlement

21    negotiations with Mr. Seeger and the Plaintiffs'

22    Steering Committee was do we allow players to continue

23    to receive those disability and medical benefits or do

24    we somehow structure the settlement in a way that

25    provides an offset or a reduction in any monetary

Page 207

1    compensation awards?

2                    And this was another example, Your

3    Honor, in which the League very much wanted to do the

4    right thing or try to do the right thing on behalf of

5    its retired players.  The League agreed not to seek

6    any offset or reduction, but to allow the players who

7    are receiving monies and other benefits under the

8    League's current disability plans also to receive

9    benefits under this settlement under the monetary

10   award compensation program.

11                   The League really is proud of this

12   settlement.  We appreciate the patience that Your

13   Honor has displayed not just today, but over the past

14   several years in putting up with the parties.  And

15   thank you very much for your attention.

16                   THE COURT:  Thank you.  Okay.  All

17   right.

18                   MR. SEEGER:  Just one very -- one last

19   point.  It will be made in two minutes, Judge, if my

20   partner, Mr. Buchanan, can just address the point that

21   Mr. Wiegand made about the baseline testing.  It will

22   two minutes.

23                   THE COURT:  That's what -- that's what

24   I wrote down.

25                   MR. SEEGER:  It's a two-minute point.

Page 208

```
 1                    THE COURT:  Okay.

 2                    MR. BUCHANAN:  Thank you, Your Honor.

 3                    THE COURT:  Okay.  Let me hear from

 4      you.

 5                    MR. BUCHANAN:  Thank you, Your Honor.

 6                    THE COURT:  One second.  We have some

 7      -- is that computer -- oh, you're going to do the old

 8      fashioned?

 9                    MR. BUCHANAN:  Old fashioned.  Old

10      school.

11                    THE COURT:  Oh. Okay.  What is it, we

12      have to -- Bill, make sure you put on the

13      (indiscernible).  Yeah.  Okay.

14                    MR. BUCHANAN:  Is there a mic here as

15      well?

16                    UNIDENTIFIED SPEAKER:  Yes.

17                    MR. BUCHANAN:  Thank you.  Can you help

18      me focus that?

19                    THE COURT:  No.  Where's?  Okay.

20                    MR. BUCHANAN:  Your Honor, there was an

21      article that was shown and we discussed earlier today.

22      It was the work of Dr. McGee and Stern and others

23      concerning CTE.  And you have the comments obviously

24      of Mr. Seeger and Mr. Birenboim as well as the

25      affidavits.
```

Page 209

```
 1                What I wanted to address in the context

 2    of the BAP is there's an argument that the BAP,

 3    obviously, isn't evaluating some of the core symptoms

 4    that have been reported in connection with CTE.

 5                I did want to highlight something

 6    that's interesting in this article, and I'm sorry for

 7    the page list.  We'll get to the relevant page.  It's

 8    right here and this is a chart where -- actually, can

 9    you zoom out, please, PJ?  Thank you.  Or is that me

10    doing it?

11                PJ: No that's Mr. Jones doing that for

12    you.

13                MR. BUCHANAN:  Oh, thank you, Mr.

14    Jones.  Could you actually pull out a little bit?

15    Okay.  There we go.  It's going to be hard to read,

16    but the highlighted columns and it -- on the left;

17    Stage 1 CTE, Stage 2 CTE, Stage 3 CTE, Stage 4.

18                What I wanted to highlight are these

19    points that I've already highlighted before I got up

20    here, Your Honor; Attention, Executive Function,

21    Memory, Language, and Visual Spatial.  Those are

22    cognitive domains that are evaluated through the BAP

23    and actually inform whether somebody could be a Level

24    1, a Level 1 and a half, or a Level 2 in terms of the

25    neurocognitive impairments.
```

Page 210

```
 1                  It was interesting to follow the -- you

 2     can see, you know, by the plus signs in the columns --

 3                  THE COURT:  Where are you getting this

 4     from?

 5                  MR. BUCHANAN:  Yeah, this is the 2013

 6     publication by Dr. McKee and I think Dr. Stern is also

 7     coauthor.

 8                  THE COURT:  Oh, that's that -- that was

 9     the -- those are Ms. Molo's.  Okay.  That's it.

10                  MR. BUCHANAN:  Yeah, I think it was

11     within his deck and I think he drew data from this

12     where he talked about the staging of CTE.

13                  THE COURT:  Yeah.

14                  MR. BUCHANAN:  There's another column

15     off to the right.  And, Mr. Jones, I don't know if you

16     can zoom in on the dementia column.  And what you see

17     is actually -- that's going to be a little hard.

18                  So up top it says dementia and as you

19     scroll down you see with great frequency, obviously,

20     it greater and later stages of CTE Stage that's been

21     reported is Stage 3 and Stage 4, dementia as being a

22     very common and frequent -- frankly, I think there was

23     only patient perhaps that didn't have a diagnosis of

24     Dementia Phase 3 and 4.

25                  THE COURT:  They actually said that.
```

Page 211

1    They actually said -- I noticed that.  When I read

2    those articles that they did actually mention that in

3    it that except in very rare circumstances everybody

4    had history.  Remember, this was all history as I

5    understood it.

6                    MR. BUCHANAN:  It is.  These are case

7    series, Your Honor.  They're based on really, I think,

8    a sample that would be self-selected or perhaps even

9    argued by the defense as biased.  But nonetheless, the

10   symptoms have been documented in the research.

11                   But what's interesting is the BAP

12   actually is picking up the cognitive domains that have

13   been specifically assessed.

14                   And you saw even in Level 1 --

15   actually, Mr. Jones, could I show it again real quick?

16   Because it's even more common -- well, it's going to

17   be harder for me find the page.  It's even more common

18   at Stage 1 and Stage 2 CTE to see reports of

19   complaints either in a 1-plus sign or a 2-plus sign in

20   those five cognitive domains and some of the other

21   things that have been reported.

22                   So you see, you know, persistent

23   cognitive impairments that have been associated in

24   these familial reports in the literature with what's

25   subsequently diagnosed as CTE.

Page 212

1          Getting specifically to the BAP design, the

2    B-A-P design, we have a lot of acronyms in the

3    courtroom today.  But the design of the BAP, this

4    wasn't designed by lawyers.

5          It was designed, frankly, by scientists who

6    we consulted with as part of our negotiations and

7    trying to get baseline assessments of the players.

8    And we worked with people who designed batteries and

9    do this.  This was not unscientific and I heard that

10   argument today, that this was really just some

11   scattershot approach to testing former players.

12              In fact, 16 of the 22 tests that are in

13   the BAP -- there's 22 tests in the battery we run

14   designed to test those various domains.  And then

15   there's also some supplemental ones that are for

16   screening and for the benefit of players and their

17   families.

18              But 16 of the 22 tests are relied upon,

19   frankly, in the literature cited by the Objectors and

20   by Dr. Stern and his publication in looking at

21   cognitive impairments in MCI, mild cognitive impaired

22   people, and dementia.  The pool is 16.

23              And then the question of the quarter

24   maybe others might be well why, you know, why did you

25   add the other six?  Why did you go beyond that?

Page 213

1              One of the challenges we had as

2   counsel, frankly, in the scientists in trying to

3   design something that could be applied throughout the

4   country for a player base that may be diverse both by

5   age, racially, demographics, education, et cetera is

6   having good normative data.

7              In other words, a player comes in and

8   takes a test, but what do we evaluate that score

9   against?  Do we have population sample that we can

10  compare that to, to evaluate whether the player has

11  truly declined or whether maybe they're just -- have

12  they truly declined where they should have been

13  relative to their pre-morbid or Pre-NFL function?

14              So you want to consider people in that

15  context.  And what the experts did was identify tests

16  that had good normative data samplings so that we

17  could make correct comparisons and appropriate

18  comparisons.

19              And this was done scientifically.  It

20  was done on the basis of empirical data.  It was done

21  and supported by the literature, and it was done,

22  obviously, with one of our experts, Dr. Kelp, who's

23  designed test batteries for the military.  I think he

24  designed a battery that screened 50,000-plus military

25  personnel pre-battle, obviously, in connection with

Page 214

1    them being enlisted.

2                    Dr. Grant Iverson whose work has been

3    published in reference text books that's cited

4    throughout the affidavits.  I'd encourage Your Honor

5    actually to look if you have a question about the

6    scientific backing behind the BAP.

7                    You can look at the declarations that

8    were submitted of Dr. Kelp.  You can also look at the

9    literature cited therein.  And you can also look at

10   Dr. Hamilton, a doctor who was not involved in the

11   creation of the BAP, who evaluated it though from the

12   perspective of a practicing neuropsychologist who also

13   says they are sound scientific methods, empirical

14   principles that underline the BAP.  Thank you.

15                    THE COURT:  Thank you, very much.

16   Okay.  A couple of -- let me see three lawyers at

17   sidebar, please.  Not three, it can be six, seven, I

18   don't care whatever it is.

19        (Sidebar under seal)

20        (Conclusion of requested excerpt at 3:22 p.m.)

21

22

23

24

25

1                C E R T I F I C A T E

2

3

            I do hereby certify that I am a Court
4    approved transcriber and the foregoing
     testimony is a true and correct transcript
5    from the official electronic sound recording
     of the proceedings in teh above entitled
6    matter.

7

8

9

10

11

12   Dated:      _____

13

14        Dawn South
             Dawn South
15

        Approved Transcriber

16

17

18

19

20

21

22

23

24

25

**A**

**AAERT** 215:8
**abandonment**
182:5,10
**ability** 9:5 37:11
38:11 152:12
185:13 204:6
**able** 8:18 12:23
27:23 31:18 38:13
40:19 46:19,23
76:12 143:8 171:2
171:3 176:25
193:2 203:13
204:9 206:8
**abled** 68:25
**absence** 54:3
**absent** 54:3,10 56:3
**absentee** 137:8
**absolute** 56:1 86:7
**absolutely** 69:9
76:9 173:7 186:19
203:17
**absurdly** 111:25
**abuse** 41:19 65:8
78:8 104:24 148:3
**Academy** 152:22
**accent** 118:24,25
**accept** 32:16 57:3,3
**accepted** 77:4
116:2,15,17 117:6
117:11
**accommodation**
167:23
**accompanying**
165:13
**accomplished**
124:7 126:8
**account** 66:1 77:16
149:5
**accounts** 43:20
**accuracy** 96:6
**accurate** 77:4
102:20 166:19
201:8 203:17
215:4
**accurately** 164:25

**accused** 172:9
173:18
**achieve** 8:19 9:21
66:8 184:19
**achieved** 8:16,18
10:5 38:20
**acidosis** 150:13
**acknowledge** 151:4
**acknowledged**
66:10
**acknowledges**
195:6
**acronyms** 212:2
**acting** 113:17
**action** 27:21 29:21
35:21 36:21 96:7
105:2 120:23
121:2,14,20
156:17 204:23
**actions** 1:6 29:19
**active** 91:1 144:17
145:13,20
**actual** 19:6 83:22
113:19 147:1
193:7
**actuaries** 108:18
**acute** 165:7
**add** 25:14 62:11
63:12 73:16
109:13 194:10
206:18 212:25
**added** 149:13
**addition** 20:3 21:8
49:24 68:23 77:6
78:16 79:4 86:14
89:5
**additional** 14:8
15:16,20 16:16
149:11 168:7
177:24
**Additionally** 86:17
**address** 42:11
68:17,18 71:2,3,4
71:6,12,16,21,23
84:8 91:22,24
92:5 103:15 106:2
109:12 115:24

135:7 136:2
170:16 178:3
192:3,23 207:20
209:1
**addressed** 87:9
126:11 160:10
188:17
**addressing** 18:17
61:12 85:22 187:4
**adequacy** 24:15,17
27:12,15 28:11,18
57:13 60:13 87:8
87:10,13,14 92:20
**adequate** 10:22
29:4 55:23 56:1,6
56:13 57:5 60:7
66:15 69:12
101:15 102:5,17
104:16 105:6,10
136:17 137:7
153:4 184:17
188:11
**adequately** 87:12
**adjudicate** 4:10
**adjust** 101:19
**adjusted** 27:5 28:5
29:11
**adjustment** 39:2
**adjustments** 15:2,6
102:3
**administration** 4:6
169:25
**administrative** 4:4
64:16
**administrator**
12:21 59:25 64:25
107:10 148:1
202:14 203:13,25
**adopting** 128:19
**advance** 15:18
**advanced** 76:25
**advances** 125:24
**adversaries** 121:2
**adverted** 203:15
205:10
**advertised** 198:13
**advocacy** 165:4

**advocate** 123:3
**advocated** 202:23
**advocating** 123:5
**affairs** 30:21
**affect** 16:13 193:5
**affiants** 85:13
98:17
**affidavit** 24:23
28:21 33:23 77:3
79:21 89:22 90:5
117:15 190:13
191:1 193:17
195:4 196:23
197:16
**affidavits** 31:4
73:10,12,17
188:16 196:8
197:22 208:25
214:4
**affirmative** 23:9
105:2
**affirmatively** 70:19
**affliction** 151:1
**afforded** 29:14,15
**afraid** 177:8,9,9,11
183:24
**afternoon** 61:11
99:21 115:18,19
125:9,10 150:4,5
153:17,19 154:20
158:11 159:1
163:24 164:1
174:14 186:20
187:1
**age** 13:1 15:4 43:13
43:23,25 44:2
60:2 64:1 135:13
135:19 136:16
139:8,11 140:3
142:1,2 143:1
150:18 151:11,16
169:13,14 170:5
171:7 173:8
197:19,24 213:5
**agent** 97:1
**agents** 169:25
**ages** 64:9 142:17,18

**aggregate** 38:22
**aggression** 78:6
79:6 80:25
**aggressive** 78:14
**aging** 44:4
**ago** 4:5 8:17 52:15
73:10 83:4,5
91:16 134:9
160:13 166:12
169:19 174:4
183:15 205:14
**agree** 13:23 17:5
40:19,23 69:10
100:17,19,19,25
101:20 126:16
155:10 161:6
**agreed** 10:17 18:11
50:16 51:16 52:25
53:21 55:3 65:4
151:9 207:5
**agreement** 3:22 4:9
16:20 17:8 18:1,6
60:7 67:3 73:9
74:10,13 75:3
91:22 92:9 100:7
100:21,22 101:9
102:6 112:6 126:7
126:8,11,12,17,18
135:8 147:15
149:3 154:1,21,24
160:11 177:23
194:1 198:22,23
203:24
**agreements** 29:18
36:7 52:20
**agrees** 64:8 111:13
196:22
**ahead** 115:11
**aided** 201:21
**Air** 200:2
**akin** 159:23
**Alamo** 135:2
**alcohol** 30:18
**Alex** 121:16
**Alicia** 122:2
**aligned** 29:3
**alignment** 87:14,17

**alive** 76:25
**Allan** 106:9
**allegation** 64:14
 81:13,20 82:12
**allegations** 27:10
 69:20 70:16 136:5
 136:19,23
**allege** 10:10 23:13
 81:7 87:21,22,24
 87:25 88:2,9
**alleged** 41:22 64:12
 69:23 85:25
 192:17
**allegedly** 62:3,16
 187:19 202:18
**alleging** 69:23
**allocated** 156:6
 168:23
**allocution** 122:18
**allow** 16:17 112:11
 113:16 126:6,21
 128:21 166:1
 195:19 206:22
 207:6
**allowed** 107:18
**allowing** 51:4
 66:21 104:19
 125:11 159:13
 170:14
**allows** 34:12 70:4
 107:19 168:23
**ALS** 5:9 8:24 10:11
 14:14 23:7 24:1
 41:2 75:22 76:1
 76:24 78:22 83:18
 93:20 94:24 97:10
 139:13 143:22
 150:9,13,18 151:4
 151:8 152:14
 153:4 197:5
**altered** 141:8
**alternative** 104:6
 159:15
**alternatives** 56:14
**alumni** 169:16
**Alzheimer** 8:25
 10:11 14:14 15:18

23:7 41:2 75:6,21
76:1,17,18,24
78:22 83:18 93:21
94:24 97:9 167:6
167:21 168:3
189:6 191:3,4
193:19
**Alzheimer's** 140:25
 141:2 142:4,10,12
 142:16 197:1,5
**amazing** 20:11
**Amchem** 154:8
 194:1,2
**amended** 130:22
**American** 152:22
**amount** 12:13
 17:12 42:17 64:11
 89:11 131:22,24
 143:23 160:15
 161:9 167:21
 172:19 173:7
**amounts** 156:13
**analysis** 56:15 72:1
 81:19 147:2,4,17
 149:16 191:24
**analyze** 76:13
**Anastasia** 48:4
**Anchem** 24:11 29:7
 77:14,14 136:1
**Andrew** 146:10,16
 149:9
**and/or** 163:12
**anger** 10:12 31:1
**Anita** 1:8 3:4
**announced** 82:8
**announcements**
 169:3
**answer** 114:16
 147:13 200:22
**answers** 8:9,9
**antidepression**
 42:18
**Antitrust** 200:2
**anti-fraud** 152:18
 153:5
**Antonio** 135:2
**anybody** 16:3

38:21 39:3 45:11
197:25
**anymore** 157:15
**apart** 36:5 104:1
**apathy** 168:2,3
**apologizing** 84:8
**apparently** 143:10
**appeal** 37:9 110:23
 112:14,15,18
 113:11 114:15
**appeals** 113:8,9,12
**appear** 137:8
 139:12
**appearance** 129:19
**APPEARANCES**
 1:10
**appears** 81:6
**appellant** 113:16
**applicable** 61:4
**application** 112:7
**applied** 135:18
 213:3
**applies** 73:8
**apply** 146:4
**appoint** 7:8
**appointed** 7:14
 22:1 59:25 64:25
 201:22
**appointing** 7:17
**appreciate** 4:12
 60:10 65:9,14,18
 73:20 135:4
 153:14 158:1
 161:17,20 170:15
 179:2 207:12
**appreciated** 201:16
 201:18
**approach** 212:11
**appropriate** 6:2
 56:14 60:3 63:9
 64:2 72:7 169:1
 173:3,23 213:17
**appropriately**
 188:3
**approval** 7:19
 10:19 19:22 28:25
 29:12 32:20 52:3

53:18 66:16 72:7
105:4 120:25
121:8 127:3 192:6
192:8,11,22
**approve** 3:18
 101:14,24 121:2
 121:24 124:21
 140:8,8
**approved** 39:8,8
 110:10,22 111:15
 135:9 154:1
 202:13 203:12,24
**approving** 188:2
**apropos** 120:21
**arbitrarily** 135:8
**arbitrary** 116:1
 121:23 124:15,22
 136:9,20
**area** 111:18 188:24
 189:5 192:2
**areas** 96:3 116:9,12
 118:18 169:10
**argue** 35:2 97:25
**argued** 211:9
**argues** 32:20
**argument** 2:2
 82:25 84:8,21
 86:7 97:22 103:20
 132:11 138:21
 139:17 153:6
 156:5 209:2
 212:10
**arguments** 125:12
**arises** 23:13 24:3
 36:5
**arising** 73:3,5
**arms** 9:11 28:22
 63:10 65:25
**Arnold** 6:16 24:25
 25:16 39:12
**aroma** 61:9
**arrangements**
 73:22,24 202:19
**arrest** 150:12
**art** 7:21
**article** 142:20
 208:21 209:6

**articles** 211:2
**articulate** 164:25
**asbestos** 159:25
**asbestosis** 160:1
**ashamed** 183:23
**aside** 36:23 37:1
 51:15 55:3
**asked** 7:7,8 20:19
 37:6 65:23 80:14
 134:3,5 135:6
 173:5 195:13
**asking** 53:17 80:2
 173:20
**aspect** 16:7 17:12
 19:21,24 154:19
 203:16 206:15
**aspects** 19:25 191:7
 201:24 205:22
**asserted** 29:8 52:7
 52:18
**asserting** 35:24
**assess** 29:22
**assessed** 211:13
**assessment** 8:6
 12:9,12,16,24
 31:16 59:16 91:17
 106:25 108:5,9
 109:2,11,17,18
 110:3 114:2,4
 116:1 166:18
 168:9,10,13
**assessments** 212:7
**assist** 7:21
**assistance** 5:25
 203:5
**associate** 133:3
**associated** 7:23
 34:3 40:20 41:2
 41:11 42:23 43:2
 49:8 59:7 62:4,16
 193:10 211:23
**assuage** 205:19
**assume** 88:20,21
 162:16 191:5
**assumed** 165:19
 166:12
**assuming** 103:19

140:9,18 141:2
  184:19
**assumption** 34:20
  53:14 160:14,16
  191:12
**assumptions**
  108:12 131:12
  162:10 203:14
**assure** 134:22
**astonishing** 159:21
  159:22,23 160:3
**asymmetrical**
  112:14
**asymptomatic**
  54:11,21
**athletes** 151:9
  168:6
**attachment** 93:8
**attack** 31:3
**attempted** 52:14
**attempting** 60:20
  164:24
**attention** 61:17
  62:5 78:5 116:13
  123:24 124:4
  207:15 209:20
**attorney** 124:7
  164:21
**attorneys** 25:1
  34:16 58:3
**attracted** 58:1
**attributed** 85:16
  198:1
**August** 96:23
**aunt** 76:18
**author** 194:25,25
**authorities** 35:1
**automatic** 107:7
**automatically**
  108:2
**autopsy** 76:10
**avail** 12:19 18:12
  18:13
**available** 17:15
  54:23 94:23 133:4
  147:11 177:13
**average** 93:6

143:16,19
**averages** 197:15
**avoid** 17:25 24:13
  36:24 70:5,7,10
**avoids** 70:5,16
**award** 12:9 14:10
  15:11 27:4 28:15
  29:10 43:10 51:9
  84:2,6 85:7,9 87:2
  88:13 89:11 90:24
  91:2 95:5,7 100:1
  100:1,24 108:14
  108:22 110:9,25
  112:3,15 130:20
  132:6,9 143:18
  162:12 177:1,7
  207:10
**awards** 16:4 29:11
  49:11,18,25 50:10
  60:6,22 61:2 65:4
  83:22 93:19,20
  94:19,23 107:2
  109:24 130:21
  131:16,17 135:9
  136:22 141:25
  143:19 199:8,24
  207:1
**aware** 17:15 21:6
  22:15 51:17 53:5
  61:16 70:25 71:5
  81:9 89:9 171:5
**awareness** 169:18
**awash** 202:18
**a.m** 1:6 67:18,19

─────── B ───────

**B** 1:8 3:4
**Baby** 51:10 155:18
  155:23
**back** 10:14 16:1
  20:8 21:1,2,3,4
  24:15 30:11 37:25
  47:6 68:2,20 80:4
  104:6 107:14
  110:13 127:12,25
  136:8 138:18
  141:14,16 142:15

145:16 170:18
  176:4,14 180:21
  195:5
**background** 43:25
  175:14
**backing** 214:6
**backyard** 176:2
**balkanization**
  27:21
**BAP** 12:21 13:11
  51:8 113:24
  205:23 209:2,2,22
  211:11 212:1,3,13
  214:6,11,14
**Baptist** 151:24
  152:1
**bar** 45:23 107:15
**Barbara** 39:7
**bargain** 27:2 104:7
**bargained** 18:2
  50:13 88:7 105:7
**bargaining** 18:5
  36:7 52:20
**barred** 23:10 34:18
  34:19 107:11
**base** 213:4
**based** 10:14 43:13
  43:13,19,23 98:22
  103:2 108:11
  118:17 136:18
  137:23 139:16,25
  141:5,20 142:1
  143:19 147:3,5,7
  151:7 160:16
  169:13 171:11
  188:20 211:7
**baseless** 113:8
**baseline** 8:6 12:9
  12:11,16,24 50:2
  59:16 106:24
  108:5,9 109:1,11
  109:17,18 110:3
  114:2,4 116:1
  168:9 205:24
  206:6 207:21
  212:7
**bases** 152:25

**basically** 153:22
  160:9 187:17
**basis** 26:10 39:17
  117:24 126:14
  140:22 141:11,24
  146:3 203:25
  213:20
**bat** 40:21
**batteries** 117:10,10
  212:8 213:23
**battery** 115:23
  117:13,17,18,25
  118:12 119:15
  212:13 213:24
**battle** 8:15 45:12
**Bayard** 48:9,10
**Beaumont** 134:24
  135:1
**beautiful** 175:18
**began** 10:7
**begging** 122:22
**beginning** 161:8
**behalf** 106:14
  126:24 129:19
  137:15 150:6
  153:11,19 205:15
  207:4
**behavior** 78:10,14
  187:20 190:11,20
  190:21
**behavioral** 109:12
  109:16 185:4
  191:9
**behaviors** 182:11
  182:19
**behold** 171:24
**beings** 184:21
**belabor** 52:10
  154:6,17
**belief** 91:23
**believe** 19:25 26:6
  35:15 37:6 86:6
  87:22 91:20 99:9
  99:11 102:9
  114:23 119:9
  128:19 137:6
  159:7 169:12

176:24 183:1
  184:7 204:21
  206:12
**believed** 42:23 61:1
  63:13 82:21 83:6
**believes** 49:2 56:23
  81:4 98:15 118:13
**bell** 25:6,7
**belt** 203:15
**Ben** 128:8
**beneficial** 72:19
**benefit** 15:15 50:24
  85:18 88:24 93:16
  94:8 95:20 98:21
  98:21 99:4,20
  103:8,10 104:13
  104:13 148:12
  212:16
**benefited** 206:12
  206:14
**benefits** 9:8 14:4
  17:14,17,20 18:2
  18:8,13 20:18
  40:2 50:11,12
  51:19 54:23 55:9
  55:12,15 58:24
  59:2,18 65:2 66:5
  107:8 108:23
  109:19,20 114:1
  148:7 157:12
  198:20 199:6,11
  199:12,19,22
  206:18,23 207:7,9
**Bengals** 176:11
**BENJAMIN** 1:18
**best** 9:21 10:4 27:3
  35:1 38:15 39:19
  121:11 137:1
**better** 5:15 39:9
  40:11 113:23
  131:5 149:22,22
  156:6 175:9
  177:18 186:24
**beyond** 16:10 29:15
  53:6 96:2 212:25
**bias** 171:14,15
  172:11,16

**biased** 118:17
211:9
**big** 34:12,21,24
36:22 37:4 43:7
142:9 143:15,15
144:3
**bigger** 142:10
**biggest** 40:15 176:7
**Bill** 208:12
**billion** 9:15 39:16
**billions** 25:15
42:20 70:7 81:15
101:4
**bills** 98:24
**Birenboim** 1:19
2:11 48:1,2 186:8
186:9,11,16,17,20
186:23 187:1,2
196:2 208:24
**bit** 34:22 45:17
47:14 59:10 78:1
83:16 186:22
194:15 198:10
209:14
**bitterly** 55:16
**black** 159:24
**blame** 65:19 184:1
**bless** 157:20
**blind** 189:11
**blog** 32:9
**blowing** 143:13
**blows** 81:9
**Blue** 126:25
**Bob** 48:5
**bodies** 166:16
**body** 44:5 166:21
166:23 167:3,8,11
167:12,20 168:2
**bona** 63:22
**bond** 131:3
**book** 78:3
**books** 182:6 214:3
**Bosh** 182:5
**Boston** 73:14
122:23
**Bostrum** 167:18
**bottle** 25:24

**bottom** 74:4 143:11
198:18
**bounced** 159:4
**bouncing** 161:11
**bound** 29:12
**Bowl** 90:19,20
175:16 176:8
**box** 144:1
**boy** 97:20
**Brad** 1:11 47:23
**brain** 7:23 8:3
14:18 15:8 43:14
44:16 73:4 74:3,4
74:4,7,8,16,24
75:1 76:10,11,22
81:10 82:1 84:14
88:3 92:4 102:24
122:22 165:8
181:15 182:9
184:25 185:11
193:10,22 196:13
196:15
**brains** 126:2 189:3
193:19
**bravado** 169:22
**brave** 8:12
**breach** 132:8
**breached** 23:4
**breadwinner**
183:22
**break** 46:19 47:2
127:8
**breakdown** 15:10
**breaking** 183:20
**breathing** 5:25 6:1
**breathtaking**
159:23
**Brian** 48:11
**brief** 38:3,3,6 48:22
51:11 53:17 83:12
96:2 112:20 175:8
**briefed** 35:3
**briefly** 63:23 106:2
205:12
**briefs** 35:4 60:24
**bright-lined** 112:11
**brilliant** 91:16

**bring** 18:22 33:1
**bringing** 81:16
159:24 177:6
**brings** 171:20
**broad** 56:3 65:20
65:20 72:18,24
159:14
**broadcast** 202:19
**broader** 61:3 205:4
**Brody** 1:8 3:4 67:7
163:25
**Brody's** 124:19
**brotherhood** 32:8
**brothers** 185:17
**brought** 34:25 35:2
127:2 171:22
178:16,22
**Brown** 93:7
**BrownGreer** 20:25
**Bruce** 1:19 47:25
187:1
**brutal** 149:10
**BU** 73:14 79:22
80:7 81:24,24
**Buchanan** 1:20
2:13 207:20 208:2
208:5,9,14,17,20
209:13 210:5,10
210:14 211:6
**build** 86:2
**bullet** 93:19 122:21
199:23
**burden** 119:14
142:21 147:21
148:5 162:17,17
**burdens** 64:16
110:25
**Burnbalm** 48:19,20
**Burns** 48:14,15
**buy** 103:20
**B-A-P** 212:2

_____
C
_____

**C** 3:1
**cadre** 81:13
**cake** 61:8
**Calanoff** 28:6 45:5

139:25 156:11,21
**calculations** 162:11
**California** 35:10
181:21
**call** 3:2 13:13 20:15
74:22 85:3 95:2
99:21 100:20
198:20
**called** 13:16,17
21:11 26:8 74:23
85:6 110:8 118:19
120:19 131:16
160:17,18 171:14
182:5 185:12,16
**callers** 20:15
**calling** 181:13
**calls** 20:14 99:25
133:4 155:20
**camp** 148:24 149:6
149:8 160:19,20
161:2,4,5,8
176:10
**campaign** 22:17,18
96:20
**campaigned** 58:4
**campaigns** 32:4
**camps** 149:10
159:5
**Canadian** 82:6
**cancer** 171:22,23
171:24 172:1
**candor** 112:9
**cap** 65:5 108:10,20
108:21 109:9
113:23,24
**capless** 178:8
**capped** 108:10
109:20
**captain** 164:10,10
**cardiac** 150:12
165:10
**care** 3:13 14:9 36:8
83:23 98:24
162:14 163:7,10
164:13,15 165:7,7
165:11,14,25
166:9,17 167:23

167:24,24,25
168:1,8 169:9
176:19 177:20,21
205:7 214:18
**career** 127:3
164:20 181:10
**carefully** 59:12
70:25 154:3
**caregiver** 182:17
183:21
**caregivers** 163:12
**caring** 168:21
182:15
**carotid** 196:13
**Carpenter** 1:19
2:11 179:11,12,18
179:19,20,21,24
180:3,12,16,19,20
181:11 183:17
**Carpenters** 183:11
**case** 3:9 6:22 7:16
9:18,22 10:1,17
10:23 11:2 14:21
18:22 19:1,3,19
19:20 21:6 22:15
22:23 23:12 25:2
26:7 28:24 29:20
30:4,4,25 31:5
33:7,15,20 34:18
35:7,8,11,13,25
36:1,19,23 37:15
38:1,7,13 39:8,13
39:15 40:10 41:25
43:7 45:2 57:14
57:17 69:6 70:12
71:10,17 75:16
81:18 83:3 84:13
85:17 92:12,17
98:22 99:3 107:16
107:17 108:16
113:1 120:18
121:13,17 122:17
123:2 124:18,18
126:4 141:13
155:16,19,24
172:8 177:4
181:11 182:9

185:12 188:3,6
189:13,15 190:3
190:18,25 191:18
192:16 193:12
194:5,19,19
195:18,22 197:17
198:14 205:9
211:6
cases 9:13,13,13,17
9:17,24 10:2 25:3
25:6,7 26:5,9,13
30:7,8,9,20 31:13
38:24 52:17 53:8
56:9 64:14 71:10
93:22 96:1 118:7
167:2
cash 29:11 83:22
casualty 43:24
catalog 65:20
catch 176:1
catches 103:16
categories 10:9
60:20 61:2 106:3
116:3 191:8
categorization
140:23
categorized 153:22
category 141:23
142:12 143:2,21
167:8,11,15
180:25
caught 123:23
194:11
causal 151:12
191:5
causality 171:10,13
causation 9:2 14:20
33:18 36:12,14
49:12 53:14 59:23
60:3 64:3 137:14
137:18,22 188:5
189:9,20 190:24
192:1
cause 35:21 107:19
119:6 150:12
152:13 161:4
189:19

caused 36:13 49:14
191:3,4,14
causes 62:24
107:20 152:24
188:22,23 190:23
195:14
CBA 18:2
CBAs 36:5,6
CE 185:24
Cendant 27:20
center 20:15 39:12
73:14,14 81:24
centerfold 94:20,21
94:21,22
central 86:21
CERITFIED 215:8
certain 15:7 51:4
74:24 89:10,11
93:22 99:11
118:23 151:20
191:13 193:9
197:19 202:16
204:25
certainly 5:5 53:12
61:8 95:6 120:2
128:23 133:12
169:14 204:15
certainty 77:5
83:20 98:13
certificate 150:11
152:6,7,10,16,19
certificates 153:1,4
certification 11:3
29:6 37:5 96:2
111:16 215:1
CERTIFY 215:3
CET 215:8
cetera 213:5
challenge 31:8 39:3
53:4 113:17
challenged 33:5
challenges 25:11
168:13 213:1
challenging 67:2
165:18 195:19
championships
180:22

chance 22:9 44:3
98:23 134:11
149:23 175:8
change 19:21
140:13,20 141:6,9
193:4,15 194:2
changes 168:12
changing 193:1
characterization
195:8
charge 73:17
chart 78:2 135:16
209:8
chat 32:9
Chea 5:6
check 195:5
checking 20:12
Chicago 77:12
child 180:11,12,14
182:8
children 162:16
172:19 181:17,18
181:22,24 182:16
183:22 184:1,14
185:20
choice 51:24 70:21
70:23 164:8 169:2
choices 43:4
chorus 3:7 127:15
chose 55:2 63:18
Chris 124:17
CHRISTOPHER
1:11
chronic 82:19
93:22 165:7 182:7
Cincinnati 175:17
176:11
circuit 10:24 29:17
32:19 37:8 55:24
57:10 63:7,8
72:11 82:25 83:1
87:6,9 92:17
120:17 121:17
155:17
circuit's 51:9 66:13
circumstances 9:21
10:23 173:10,12

211:3
citation 187:9
cite 77:12 80:10
90:2 107:17 191:1
cited 93:1 96:1
212:19 214:3,9
cites 121:13
citizen 27:19
Civil 71:19
claim 31:1 33:4
34:15 53:15 91:10
96:6,9,9 110:6
111:23 132:8
133:5 139:15,19
139:19 159:24,25
160:9 188:6 203:8
203:24 204:3,4
claimant 204:8
claimants 130:18
202:9
claiming 160:8
claims 18:20,21,24
24:5 25:12 27:11
34:5 39:22 51:25
52:1,6,18 53:11
54:4,7,11 56:11
63:16,22 64:25
65:6 69:17 71:8
71:22 72:9 73:2,3
81:16,17 84:24
85:1,2 101:4
106:1 107:10
110:20 125:23
129:25 131:21
147:25 188:2,12
188:14 202:13,14
203:2,12,12,25
205:3
Clara 124:25,25
class 5:11 9:13,18
9:19 10:3 11:3
16:8 19:1 20:10
20:22 21:21 23:2
23:14,14 24:21
27:10,12,21 28:2
29:2,3,5,9,19,21
32:1,18 36:1,21

37:4,6 38:16,22
39:8 43:4,8 45:9
56:23 57:7,11,19
58:5,6,16,17,18
59:16 60:12 61:1
61:5 62:10,12
66:10 70:14,17
71:1,13 72:8,25
73:21 74:11,13
77:6,19 81:7
82:14 85:23 87:5
87:11,13,16,18,19
87:20,21 88:8,9
89:15 91:17 95:18
96:2,3,7,19 98:17
99:13 101:3,10
107:7,9,18,24
108:1,13,21 109:4
110:1,2,4,18,25
111:1,9 112:14
113:17,19 114:13
120:22,23,23
121:2,5,7,10,11
121:14,15,20
123:3 126:9,15
135:10 136:11
137:7 146:18,23
147:18 149:18
156:7,12,17,18,20
156:25 157:12
159:8 194:3 202:9
204:6,8,23
classes 27:6 28:2
Claude 124:24,25
clauses 132:21
cleaner 78:1
clear 40:21 44:19
61:21 69:9 72:6
99:24 100:20
102:19 112:11,22
113:3 117:17
128:15 199:5
cleared 176:13,14
clearly 45:15 57:8
77:14,15 128:24
184:7 188:5 192:2
200:21

**Cleo** 128:6 129:14
**clerk** 3:3 4:5 11:6,8
  67:20 127:17
**client** 149:8
**clients** 45:2 104:18
  106:6
**clinic** 77:7,11 151:2
  151:22 152:13
**clinical** 165:11
  195:7
**clinically** 77:4
**close** 77:1 111:19
  114:1,13 205:11
**closely** 29:3 57:18
  66:20 157:9,10
**closer** 102:16
**closest** 89:1 122:11
**Cludoff** 92:1
**clusters** 74:20,21
**coach** 180:22
**coached** 180:23
  182:22
**coaches** 161:14
**coal** 159:24
**coauthor** 210:7
**cognitive** 41:10
  50:7 73:4 149:24
  151:7 166:21
  185:3 193:8,11,13
  193:23 209:22
  211:12,20,23
  212:21,21
**cohesive** 32:6,15
**coincide** 190:10
**cold** 25:25 125:19
**collected** 168:4
**collective** 18:5 36:7
  52:19
**collectively** 18:2
  50:13
**college** 18:23 36:17
  43:22
**colon** 171:22,23,24
  172:1
**colorful** 161:16
**Colts** 175:16
**column** 139:11

210:14,16
**columns** 209:16
  210:2
**combine** 116:18,19
**come** 8:8 20:8 21:2
  21:2 27:1 30:20
  34:13 35:2 42:1
  46:6,9 47:6 74:16
  77:10 80:1 85:16
  88:1 89:1 104:20
  107:14 110:7,13
  114:1 126:10,17
  127:12 136:8
  147:14 173:25
  203:2
**comes** 68:2 72:11
  76:10 79:14 100:4
  153:9 173:15
  195:23 213:7
**comfort** 178:25
**coming** 10:8 16:1
  21:1,4 148:6
  160:23 181:22
**comment** 33:23
**commented** 36:3
  36:12
**comments** 187:7
  194:7,8 208:23
**commit** 85:20
**commitment** 67:4
  151:5
**committed** 12:16
**Committee** 206:22
**committing** 124:13
**common** 22:25
  23:2,10 64:14
  112:20 140:13
  152:13 167:4
  210:22 211:16,17
**commonly** 116:15
**community** 32:6
  64:7 153:3 167:24
  196:10
**comp** 23:9 33:4
**company** 1:23
  131:4
**comparable** 169:3

**compare** 213:10
**compared** 56:14
  167:21
**comparisons**
  213:17,18
**compensable** 61:3
  63:2,14 64:22
**compensate** 26:25
  40:14,17 41:15
  62:2,15 75:24
  86:15 101:2 104:8
  149:24 151:6
  156:18 193:7,13
  193:22,22,23
  195:25 196:1
**compensated** 34:14
  41:9,12,13,16
  42:6 62:21 72:14
  83:13,14 84:9,10
  84:22 86:10,11
  97:18 123:6
  124:16 151:11
  156:22 157:1
  187:19,20 188:9
  197:7
**compensates** 40:18
  40:25 61:23
**compensating** 71:9
  83:18
**compensation** 15:1
  15:20 18:20 41:21
  49:4,5,21 50:10
  51:18 54:22 55:8
  55:12,14 72:10
  83:25 85:10,11
  86:24,25,25 87:1
  89:7 101:7 103:5
  103:13 104:14
  105:1 107:12,13
  107:25 108:1
  109:15 151:8
  162:10 187:21
  193:11 207:1,10
**compensatory** 70:8
**competent** 9:5
**complaining** 36:18
  137:19,20 143:21

**complains** 156:4
**complaint** 10:10
  23:20 41:22 81:7
  81:20 85:25
**complaints** 27:15
  43:11 45:6 63:24
  211:19
**complete** 46:20
  164:12
**completely** 96:14
  96:15 175:20
**complex** 25:12
  72:12 116:13
**complexity** 30:1,2
**compliant** 101:16
**complicated** 66:19
  67:2 110:19
**components** 12:8
  135:7,12,22
  137:19
**comprehensive**
  12:17 50:1 59:17
  201:9
**compromise** 28:21
  69:16,16 205:7
**compromised**
  184:24 188:4
**compromises** 43:4
**computations**
  159:17
**computer** 208:7
**concealment** 53:16
**concentration**
  23:19 78:6
**concept** 147:4
**concern** 24:10 45:9
  89:3 117:12 118:9
  132:5,19 133:11
  157:4 175:11
  176:23 178:15
  201:14 202:25
**concerned** 123:10
  130:6,16 138:19
  178:7
**concerning** 43:11
  92:3 208:23
**concerns** 40:9 66:1

104:20 164:23
  180:5
**concerted** 58:14
**conclude** 94:4
  162:24 163:2
  168:17
**concluded** 47:13
  153:3
**conclusion** 94:9
  163:5 169:7,9
  214:20
**conclusions** 80:1
  152:25
**conclusively** 43:1
**concussion** 1:3 3:10
  9:2 21:10,11
  36:16 74:9 116:25
  148:11,20 159:18
  176:12 196:15
**concussions** 7:24
  10:10 26:17,19
  36:13,19 42:15,24
  44:8 82:19,23
  83:7 124:10
  148:15,16,25
  149:1 198:1
**concussive** 10:11
  23:5,16,25 34:4
  64:13 149:6
**condition** 5:24 14:5
  14:7 24:1 42:8
  63:15 64:22 65:17
  188:9
**conditions** 8:3 15:7
  43:5 49:9 51:4
  61:3 62:22 63:2
  191:18 205:19
**conduct** 23:13,14
  24:3,4,5
**confidently** 194:12
**confirmation**
  194:14
**conflict** 24:19 27:5
  28:5 88:11,13
  89:5,6
**conflicts** 26:22
  71:13 86:18 87:8

confronted 181:24
194:21
confusion 172:25
173:9
connection 155:18
209:4 213:25
consciousness
176:10
consensual 55:7
consequence
150:13
consequences
69:25 167:17
consider 9:19 51:5
54:1 57:5 64:19
85:14 91:21,24
92:22 140:6 168:5
174:2 213:14
consideration
39:20 154:5,13
considerations
10:16
considered 39:25
152:6 167:12
173:22
consistent 37:20,21
102:19 117:19
consistently 59:2
164:17
consolation 168:22
conspicuously 56:3
constitutional
71:20
constructed 125:14
159:16
consulted 33:24
212:6
consumer 96:9
contact 86:22
160:15
contacted 104:19
contained 60:1
64:1
contains 99:24
contemplate
160:11
contemplating

160:12
contended 90:13
148:8
contents 152:19
contested 53:25
55:16 189:21,24
context 18:10 36:3
36:23,25 37:1
38:22 39:4 51:21
52:8,11 56:6
187:23 189:25
195:10 209:1
213:15
continually 16:19
continue 126:5
134:6 168:24
204:10 206:22
continues 21:2
194:22
contract 132:8
contracted 76:3
contracts 38:5
162:3
contrary 70:21
77:13
contrast 75:6,21
contributed 170:1
control 120:22
189:13
controlling 10:23
controverted 79:23
conundrum 167:16
convincing 112:23
113:3 195:24
copy 11:20
cord 165:9
core 101:2,2 103:3
104:9 167:9,14
209:3
Corey 35:12,13
cornerback 145:3
corporate 70:20
correct 3:25 16:25
18:15 21:19 68:6
68:7 80:15 100:14
102:7 113:25
124:21 158:6

178:10,13 213:17
correlates 15:17
correlation 82:18
cost 53:24 59:6
108:12 168:1
costly 66:8
cot 184:16
counsel 6:7,8,16
10:3 16:8,8 24:18
24:22 25:3,16
26:7 38:16,16
40:16 44:25 45:23
46:2 47:23,25
48:4 63:11,11,21
69:1 70:14,17
71:6 73:21,21
82:14 83:5 85:23
88:8 91:17 96:20
98:17 99:14 111:1
113:19 120:23
122:15,17 126:15
126:15 146:18,23
146:24 159:8
213:2
counseling 17:20
109:20 180:6
counsels 74:11,13
77:6 156:12
counsel's 9:19
31:15 109:4
counted 91:1
country 31:14
52:24 80:8 111:6
111:7 171:25
213:4
country's 34:25
couple 120:20
131:2 160:12
189:14 198:2,12
201:10 205:12,13
214:16
Couric 171:21
course 56:21 60:25
94:19 165:20
166:25
court 1:1,23 3:2,6,8
4:10,18,22,24 5:5

5:10,13,17 6:5,11
6:14,19 7:3 10:18
11:11,14,17,22,25
12:2,6 13:15,21
13:23,25 16:24
17:2,5,9 18:15,18
21:14,17,25 25:9
25:19,22 26:2
31:18 35:8,10,14
35:16,18,21 37:19
44:15,17 45:19,22
45:25 46:5,9,15
46:22,25 47:5,8
47:12,14,19,22
48:24 50:21 51:1
52:16,22 53:17
55:5 57:2,3,5
59:14,25 60:17
62:10 64:24 65:23
66:2,4,18 67:8,12
67:16,16,21,24
68:5,8,10,12,15
68:17,18,22 69:4
69:14 70:24 72:5
72:20,22 73:20
75:7,10,12 79:14
79:18,24 80:10,16
81:4 89:24 90:2,7
98:7 100:2,4,9,11
100:15,18 101:14
101:18,21 102:2,8
102:9 105:14,18
105:21 106:4,11
106:15,17,20
112:16 114:18,21
114:24 115:4,8,12
115:16,19 117:2
119:11,18,21,23
120:2,5,9,15
122:4,7,9,11,14
122:16 125:4,7,9
127:5,7,12,14,18
127:19,22,23
128:3,11,13,17
129:3,8,11,16,20
130:1,5,11,25
131:5,9,12,25

132:4,10,13,22,25
133:6,8,10,15,17
133:20,23,25
134:2,8,10,18,23
135:3,5 136:1
137:10,11 138:4,7
138:11,13,16,18
138:24 139:4,6,9
140:1 142:22,25
143:4,6,9 144:2,8
146:6 150:1,3,5
153:14 154:2,4,23
155:3,6,13,15,22
156:1 157:5,21,24
158:3,9,15,18
159:1 161:17,20
162:19,22,24
163:2,16,18,22
164:1 165:24
166:3,6 168:14,17
169:6,8 170:2,5,9
170:11,21 174:11
174:15,17,19,24
175:3,6,10 176:15
176:19 177:8,15
177:23 178:2,5,11
178:14,18 179:2,5
179:8,17,20,23,25
180:10,14,18
183:15 185:21
186:5,10,19,21,24
187:12,16 188:7
191:1,23 193:6
195:16 199:15,20
200:7,12,18,23
201:3,6,12,16,22
203:20 204:20
207:16,23 208:1,3
208:6,11,19 210:3
210:8,13,25
214:15
courtesy 122:1
courtroom 5:4 58:9
68:3 128:9 129:5
212:3
courts 31:19 38:9
52:24 63:7,7

107:17
**Court's** 100:23
101:1
**court-appointed**
28:23 55:6 59:14
**cover** 4:3 49:16
61:13 62:8 65:16
105:3 115:24
149:17,18 191:9
**coverage** 21:7 32:3
192:10,13
**covered** 19:19
63:19 99:10
109:16 123:22
158:5 183:13
190:4,5,16,19,19
190:20 191:8,14
191:16,17,21
192:9,13 205:3
**covering** 114:1
**covers** 192:5
**co-captain** 164:19
**co-counsel** 25:14
**co-employer** 33:2
**co-lead** 6:8 10:3
24:22 25:16 26:6
31:15 38:16
126:15
**Craig** 153:19
**create** 184:21
**created** 21:10
95:23 116:4
**creating** 58:6
**creation** 214:11
**credible** 171:19
**credit** 89:7 91:19
102:21 156:10
**creditable** 147:10
**credited** 147:4,6,7
147:8 149:4,12,13
149:14,18,21
**criminal** 122:17
**criteria** 118:4
146:20 147:2
185:10
**critical** 51:19
146:21 198:15

**critically** 14:10
55:14
**criticism** 51:3
202:15,21
**criticize** 198:24
**criticized** 19:24
51:4 58:4 91:16
**cross** 182:18
189:12 195:1
**crystal** 61:21
**CTE** 14:16,18
40:14,18,20,22,24
41:4,8 61:14 62:4
62:8,16,25 71:8,8
71:9,14 73:6,7,14
74:2,5,15,25,25
75:2,4,15,18,19
75:22 76:5,8,10
77:1,1,5,9,20,21
77:23,25 78:1,9
78:13,18,23,25
79:1,12,24 80:23
81:1,2,11,25 82:3
82:10,13,20,21
83:6,9,10,13,17
83:22 84:1,3,4,9
84:10,12,22 85:11
85:18 86:4,13,15
86:25 87:1,1,24
88:4,12,14,14,18
88:22,24 93:23
94:8,25 95:1,7,14
97:6,8,15,16 98:5
98:8,9,13,16,19
99:4,10 103:4,5,7
103:8,9,13,19,21
104:12 109:15
115:24 122:24,25
123:4,5,6,13
124:8 125:21,24
126:1 139:14
140:6,8,17 159:13
159:19 160:3
172:4 181:13
182:10 184:25
185:12 187:18,21
188:14,15,22,23

189:10,18,20
190:3,4,10,18
191:7,14,20 192:4
192:5,10,12,18,19
192:21,21 193:1,3
193:10,15 194:13
194:14 195:2,8,14
195:20 196:1,12
196:14,18 197:1,3
199:2,8,24 208:23
209:4,17,17,17
210:12,20 211:18
211:25
**CTE's** 103:20
123:14
**CTE-related** 62:14
**cultural** 118:25
**culture** 169:22
**curiously** 113:18
**current** 50:7
130:22 183:13
188:20,21 207:8
**currently** 54:4,10
125:14 136:24
181:12 195:2
**cusp** 161:1
**cut** 138:20 158:12
162:19 170:2,6
**cutoff** 136:9
**cuts** 110:16

**D**

**D** 2:1 3:1
**dad** 176:2 182:1,17
182:21 184:17
**dad's** 182:18
**daily** 117:24 165:25
182:3
**Dale** 150:7,16
**Dallas** 134:20
**damages** 34:7 70:8
70:8,9 139:21
**Danias** 48:5
**data** 147:11,12,13
147:14,14,18
149:19,19 168:12
210:11 213:6,16

213:20
**date** 14:24 141:6
**Daubert** 25:11 31:4
195:11,18
**daughters** 104:23
185:17
**daunting** 67:3
**Dave** 123:16 124:2
**David** 1:20 4:12
35:1
**Dawn** 153:20 215:3
215:7
**day** 25:1 33:6,14
38:2 42:2 57:2
67:25 82:24
122:10 127:19,19
160:17,22
**days** 101:9 148:18
160:22
**dead** 99:1 140:21
183:13
**deadline** 107:20
110:4
**deafness** 41:17
**deal** 7:13 15:3
19:11 26:4 27:3
29:13,15 32:17
39:4,19 40:8 51:3
58:4 61:16 76:15
86:3 94:6,7 97:4
97:12,14 99:23
149:22 154:15
**dealing** 31:7 139:7
**deals** 87:6 202:19
**dealt** 8:4 16:7 80:6
119:10
**dean** 3:23,24,25 4:6
**death** 79:25 84:1
88:16,18 93:24
94:1,25 95:1,6,14
95:14 103:5
122:25 139:14
140:6,17 150:11
150:12 152:5,7,10
152:13,16,19,24
153:1,3 187:21
192:4,5,10,21

193:20 199:1,8,24
**debate** 51:23 56:3
56:16 57:21
141:16 155:9
**debilitating** 8:24
**decade** 142:8,15
**decades** 81:8
169:19
**deceased** 82:3,4,10
189:3 192:7,13,21
**Dechert** 48:5
**decide** 3:18 100:18
132:14 195:13
**decided** 10:3 32:16
52:23 58:17 65:19
67:9 110:24 186:7
**decidedly** 54:17
**decision** 51:9 52:3
80:17 101:13,24
110:24 136:2
148:2
**decisions** 165:15
**deck** 210:11
**declaration** 39:18
83:11 92:1 93:3,7
109:7 118:4
119:10
**declarations** 41:5
55:22 214:7
**decline** 50:5 64:8
165:21 190:11
**declined** 213:11,12
**dedication** 67:5
**deducted** 136:11
145:8,11,15
**deduction** 145:12
**deductions** 135:17
136:14,21 141:25
**deducts** 144:23
**default** 204:13,14
**defaults** 204:4
**defeat** 53:23 59:7
**defects** 71:22
**defendant** 27:24
38:12
**defendants** 22:2
37:12

**defense** 63:11
211:9
**defenses** 23:9 51:15
52:6 53:13,16,19
55:4 205:10
**defensive** 164:10
**deficiencies** 106:24
106:25 108:5
109:23 117:16
**deficiency** 106:22
**deficient** 71:17
**define** 157:10
**defined** 28:13 95:2
145:1 149:4
155:16,17 157:13
**defining** 95:17
**definition** 98:11
135:14 144:15
145:7,10,16
146:14,14 147:24
149:14,20 192:7
**definitive** 74:17
76:9,9,19 84:15
84:20
**definitively** 76:20
**defrauded** 69:22,24
**degenerative** 8:3
16:2 74:6 152:24
167:4
**degree** 98:13
**deliberate** 61:19
62:9
**delta** 140:15 144:6
**demanded** 41:20
**demands** 10:9
182:2,15
**dementia** 8:25
10:11 13:13,14
14:15,16 15:13,18
23:7 41:3 44:4
79:12 80:24 81:11
84:11,12 85:4,6,8
85:10 93:22 94:25
97:9 103:21
108:13,22 116:3
116:22,24 117:3,4
117:6,24 118:8,11

166:14,16 167:3,4
167:8,11,14,15,20
168:1 180:8 181:7
181:8 190:12
191:8 197:2,24
210:16,18,21,24
212:22
**dementia-type**
142:5
**Demetrio** 1:13 2:5
114:21 120:11,12
120:13,16 122:6
122:10,20
**Demetrio's** 115:7
**demise** 130:5
**Democrat** 150:20
**demographics**
213:5
**demonstrate**
103:24 112:7
**demonstrated**
164:19
**demonstrates**
192:14
**denial** 72:7 169:23
**denied** 19:22 28:25
134:10
**deny** 66:3 127:3
**dependent** 64:9
**depending** 116:20
**depicted** 169:4
**depression** 10:12
30:6,8,16,20 31:1
41:18 42:13,23
43:2 62:16,20
63:14 75:24,25
81:11 190:20,21
191:3
**derail** 181:9
**describe** 192:20
**described** 168:19
201:2
**describing** 98:8
**deserve** 105:1
151:11
**deserves** 105:1
110:25 123:11

154:5
**deserving** 55:13
**design** 212:1,2,3
213:3
**designated** 3:20
167:7 168:18
**designating** 3:21
**designed** 145:18
212:4,5,8,14
213:23,24
**desire** 181:18
**desperate** 173:11
181:18
**desperation** 173:10
**despite** 21:25
165:16 167:7
**detail** 53:17
**detailed** 81:18
136:8
**details** 9:7
**detect** 40:24
**detecting** 74:17
**detection** 8:1
123:24 124:4
171:14,15 172:11
172:16
**deteriorated** 5:24
**determination** 85:3
85:4,8 116:9
**determine** 36:7
117:7 118:20
131:24 193:9
196:19
**determined** 41:4
116:6,21 118:17
**determines** 97:10
**determining**
117:23
**devastating** 182:8
182:11
**develop** 49:6 79:7
197:24
**developed** 41:10
54:13 193:14
194:4 195:9
**developing** 44:3,6,7
196:12,14

**development** 77:17
126:13 169:15
**developmental**
90:17,22 91:3,10
144:19 184:15
**devolved** 104:1
**Deza** 41:5
**diagnosable** 40:22
83:20
**diagnose** 76:8,24
77:5 85:8 88:21
88:22 111:11
136:25 193:3,3
**diagnosed** 13:10
14:6 15:13 23:21
24:1 28:3,4 61:24
82:3,10 84:4,13
93:24 94:1 95:14
98:8,9,14,16,19
103:7 136:18,24
137:3 139:20
140:7,17 141:1
142:3 151:2,21
166:11,14,25
167:10 168:21
172:14 181:11
205:17 211:25
**diagnoses** 14:14,22
28:14 59:21,23
76:15,19 107:1
109:24 125:16
126:13,21,22
130:21 153:4
**diagnosing** 13:7
**diagnosis** 7:22
14:12,23,24 15:5
15:24,25 23:18
26:18,20 41:7,8
42:6 43:15,23
60:2 64:1,21,24
76:9,19 84:16,18
85:4 88:16,24
93:20 94:16,18,23
95:3,4,12,13
98:11,12 103:9
110:7,21 111:14
111:21,24 114:11

130:18 135:13,20
136:16 137:3
139:8 141:1,6
142:18 143:20
145:14 146:12
148:7 151:20
166:9,16,19,21
167:1,8 171:7
172:13,15 181:9
192:8 196:25
199:8,24 210:23
**diagnostic** 7:21
16:18
**dialogue** 164:17
**Diane** 6:16 24:25
**die** 84:13,18 88:14
88:25 94:9 95:19
98:20 103:9 163:9
**died** 76:21 84:14
87:1 88:14 94:1
99:4 103:11 123:4
150:9,18 151:4,16
151:25 152:1
164:14
**dies** 103:8
**Diet** 25:16 39:12
**difference** 101:5
115:9 141:4 142:7
142:9,11,13
**differences** 89:18
142:10 197:18
**different** 9:17
28:15 36:2 74:5
86:13 100:16
116:20 166:17,21
181:1 202:6,6
**differential** 196:25
**differently** 28:14
45:8 56:24 72:9
**difficult** 7:7 64:17
75:13 111:5
147:14 148:4
188:22 190:25
**difficulties** 62:5
78:4 101:12
205:20
**difficulty** 44:12

79:10 166:18
188:15 189:9
190:24
**dig** 147:18
**digresses** 16:3
**diminishing** 42:22
**direct** 82:18 164:13
166:4 168:10
**directed** 60:19 71:7
201:23
**directly** 19:6 36:19
57:11 156:18,19
157:1,12
**disability** 50:12,24
206:18,19,23
207:8
**disadvantage** 121:3
**disagree** 72:1
**disagreement**
22:22
**discernible** 29:9
**discharge** 73:1
**disciplines** 165:6
**disclose** 73:21
**disclosure** 4:4
70:14 95:21
**discounts** 162:12
**discourage** 113:8
**discover** 126:1
**discoveries** 169:17
**discovery** 23:10
30:3,8 33:16 40:3
70:11,11,13,15
99:24 100:3
**discretion** 100:23
101:1,19 112:10
131:24 147:25
148:2,3
**discuss** 8:22 39:1
51:11 126:16
154:20
**discussed** 19:24
91:18 171:8
187:11,25 208:21
**discussing** 32:10
105:25 109:1
143:12

**discussion** 204:18
204:24
**discussions** 9:9
17:16
**disease** 8:3,8,24
13:12 36:18 73:7
74:3,6 76:6,16
81:3 82:22 83:7
83:10 85:23 86:12
86:19,20 93:21,21
101:2 104:9,9,25
111:11 117:21
146:13 150:23
152:24 159:25
167:6 168:21
169:16 171:15,17
181:12 182:7,7,12
182:23 185:3
195:14 197:5
**diseased** 74:4
167:21
**diseases** 7:22 13:7
16:2 34:3 36:13
40:18,20 41:13
49:8 76:4 83:19
97:9 125:22 127:1
136:25 139:21
151:7,9,14 165:9
169:18 172:3
197:6
**dishonest** 96:16
**disingenuous** 96:15
**dismissal** 53:10
**dismissed** 10:2
34:15 35:8,25
52:17
**dismissive** 166:10
**disorder** 62:15
166:22 180:25
181:15
**disorders** 62:20
63:14 75:24
136:25 139:20
142:4,5 187:20
**display** 80:22
**displayed** 93:12
103:25 207:13

**displays** 77:23
**disposal** 202:22
**dispositive** 25:11
52:6
**dispute** 22:23 23:1
23:11 24:8 117:9
149:6 189:22
190:1
**dissected** 57:18
**distinct** 51:8 95:21
95:22
**distinguished**
120:17
**distributed** 62:22
**distribution** 155:21
157:3 169:13
**district** 1:1,1 22:16
25:18 36:2 38:10
66:22 164:21
**diverse** 213:4
**dividing** 91:11
**divorced** 162:16
**dizzy** 41:17
**doctor** 110:22,24
111:22 142:19
214:10
**doctors** 8:8 59:24
64:23 73:17
166:24 188:19
190:7
**document** 1:5
134:7 159:20
173:2
**documentation**
64:24
**documented** 36:15
176:11 211:10
**documents** 148:23
150:10
**doing** 32:5 77:8
80:3,21 105:2
131:23 161:4
174:5 201:21
209:10,11
**dollar** 17:12
**dollars** 25:15 38:25
39:1 42:20 54:6

65:2 70:7 81:15
101:4 203:11
**domains** 116:19
209:22 211:12,20
212:14
**domestic** 78:8,8
104:24 200:2
**don't** 132:16
**dots** 74:20,21
**double** 167:20
189:11
**doubt** 61:16
**Doug** 48:14
**downstairs** 134:17
**dozen** 183:4
**Dr** 41:5,5 73:13,13
73:13,15 74:11
77:3,6 79:21
117:14,16 118:3,9
119:10 151:24
152:1,16 188:17
188:17 190:7,7,8
190:14 191:1
193:16 194:23,23
194:24,25 195:3,6
196:11,17,22
208:22 210:6,6
212:20 213:22
214:2,8,10
**draconian** 204:14
**draft** 164:8 200:9
**drafted** 159:4
**drama** 183:1
**draw** 28:12 38:17
94:10
**drawing** 40:11
45:12 63:9 86:20
148:9 189:25
**drawn** 28:19 45:7,7
191:24
**draws** 63:1 191:6,7
**drew** 136:20
210:11
**drink** 30:18
**driven** 187:12
**drug** 26:8 185:4
**drugs** 25:17 30:17

39:12 42:18
**due** 36:12 38:3 40:4
92:18 112:8,12
148:11,20 154:5
159:9 181:15
182:10 203:2
**Duerson** 35:25
122:2 126:24
**Duerson's** 123:16
124:2
**dump** 134:6,7
**duration** 30:2
202:3
**duties** 36:4
**duty** 9:19 23:3,4
36:5 70:25 101:7
112:5
**dynamics** 168:6
**dysfunction** 78:5
**D-408** 215:8

---

**E**

**E** 2:1 3:1,1
**Eagles** 23:24
**earlier** 13:16 14:16
29:16 38:16 43:21
124:4 150:21
172:21 205:5,16
205:17 208:21
**earliest** 78:17,23
**early** 8:1 13:7,14
15:14 41:23 44:24
45:17 46:16 50:5
94:25 123:24
124:4 170:7 172:5
185:3 206:9
**earth** 31:22
**easier** 114:10
**easily** 91:9
**Eastern** 1:1 25:18
**eat** 61:9
**economic** 202:8
**economics** 201:24
**economist** 43:18
**EDA** 206:19
**educate** 17:14
50:23

**educated** 161:7
**education** 17:11
  50:19 51:2 155:1
  156:3 157:11
  168:19,23 169:2
  213:5
**educational** 12:10
  30:10,12
**effect** 19:4 50:14
  74:24 189:8
**effective** 203:22
  206:2
**effort** 55:18 58:10
  62:9,11 103:15
  165:23
**efforts** 58:14 66:19
  66:24
**egg** 183:25
**eight** 23:23 83:4
  91:2 128:6 136:6
  144:20 176:12
**either** 18:8 101:14
  116:21 137:6
  142:2 190:15
  211:19
**elaborate** 146:19
**Elanore** 184:5
**ELEANOR** 1:18
**ELECTRONIC**
  215:8
**element** 156:22,24
  157:2,3,17 188:5
**elements** 33:20
  154:21 156:7
  188:2
**eligibility** 16:13,15
  147:6 153:7
  156:20
**eligible** 12:25 15:19
  49:21 64:22 90:24
  91:1,4 135:11,14
  136:14 144:13,15
  144:21,22,24
  145:1,8,11,20
  146:4,14,20 147:1
  147:10,12,13,19
  147:23 149:13,19

151:10 154:16
  156:14
**eliminate** 104:12
  114:8 186:13
**eliminated** 27:6
**eliminates** 53:22
  54:19
**eliminating** 114:11
**elimination** 159:13
**ELMO** 138:3
**eloquently** 205:14
**email** 32:11
**embark** 54:15
**emblematic** 57:25
**Emery** 164:12
**emotional** 59:6
**emphasize** 50:9
**empirical** 213:20
  214:13
**employ** 28:14
**employed** 185:14
**empty** 54:8
**encephalopathy**
  82:20 93:23
**encountered** 15:22
**encourage** 214:4
**endorse** 92:9
**endorsed** 58:16
**endorsement** 92:10
**energy** 164:13
**enforced** 126:9
**enforcing** 132:20
**enhanced** 168:25
**enhancement** 114:6
**enlist** 66:21
**enlisted** 214:1
**enormous** 53:2
**enrolled** 165:22
**ensure** 205:25
**Enter** 121:6
**entered** 129:18
  142:3 159:17
**entering** 51:14
**entire** 19:11 29:8
  193:12 202:2
**entirely** 50:3 52:7
  53:3,18 54:19

56:15 60:17,24
  63:3,3,4 64:2,9
  203:17
**entirety** 189:4
  200:4
**entitled** 10:24 65:6
  90:18 104:14
  107:25 144:18
  199:6,18
**environment**
  184:14
**environments**
  181:23
**epidemiological**
  125:24 195:1
**epidemiologist**
  171:13
**Epidemiology**
  153:2
**Epilepsy** 41:17
**equal** 85:11
**equipment** 89:19
**Eric** 69:2 98:2
  198:4
**Erickson** 179:9,10
  179:10,13,14
  185:23,25
**erratic** 182:18
**especially** 29:18
  57:13 77:17
**ESQ** 1:11,11,12,12
  1:13,13,14,14,15
  1:15,16,16,19,20
**ESR** 1:21
**essentially** 89:17
  93:11 144:16
  189:2
**establish** 14:20
  17:22 36:11
  147:18
**established** 60:4
  64:4
**establishes** 50:19
**establishing** 34:6,7
  44:12
**estimate** 108:18
**estimated** 167:5

**estimates** 109:4
**et** 213:5
**ethical** 184:21
**Eubank** 120:19
**Eugene** 1:17
  158:10,20
**Europe** 71:15 88:1
  88:6 89:7,12,15
  89:17 90:9,12,17
  90:21 91:7,9,12
  91:13,19,22
  102:20 153:24
  154:10,13 156:8,9
  156:13,21 180:23
**evaluate** 34:5 65:24
  213:8,10
**evaluated** 188:14
  209:22 214:11
**evaluates** 56:6
**evaluating** 121:4
  209:3
**event** 204:12
**events** 44:12 64:13
**everybody** 5:14
  11:18 12:3 20:1
  68:2 156:3 183:25
  185:16,18 197:21
  198:18 211:3
**everybody's** 123:21
**evidence** 19:3,4
  57:12 59:21 64:5
  70:18 79:19 90:4
  99:10 112:6,23
  113:3 139:16
  141:6 147:22,22
  147:24 148:19
  149:15 153:8
  171:10 187:10
**evidence-based**
  103:1
**evidentiary** 103:2
**evils** 65:20
**eviscerated** 125:23
**evolves** 80:23
**exact** 137:21
**exactly** 35:13 63:6
  139:18 140:4

155:13 172:7
  183:18
**examination** 76:22
  110:12
**examinations**
  12:17
**examined** 122:23
**example** 30:6 53:7
  63:25 106:10
  111:19 140:24
  142:16 145:7,10
  148:17 156:8
  171:19 196:16
  197:20 207:2
**exceed** 126:14
**excellent** 42:2
**exception** 148:10
  187:22
**excerpt** 150:10
  214:20
**excess** 136:12,13
**exchange** 72:15
**exclude** 160:7
**excluded** 43:5 88:1
**excludes** 146:16
  160:5
**excluding** 91:18
**exclusionary**
  160:11
**exclusively** 86:22
**excuse** 78:10
  165:23 166:12
**executive** 62:5 78:5
  209:20
**exercise** 102:10
**exhausted** 183:19
**Exhibit** 116:7
  135:20 137:25
  138:14 139:5
**exist** 169:19,22
  195:3
**existence** 53:19
**existing** 50:11,23
**exists** 29:5 42:25
**expanded** 192:13
**expansion** 192:11
**expect** 178:2

**expectancy** 140:14
140:20
**expected** 203:8
**expenses** 163:8
**expensive** 31:22
54:16 56:20 185:5
**experience** 9:12
38:17 83:2 85:24
99:15 101:3
117:11,14 165:17
166:18 168:11
**experienced** 23:16
23:24 58:3 63:10
63:11 65:13
104:22 188:19
**experiences** 164:23
**expert** 28:6 35:3
43:18 55:22 74:12
74:13,14 77:7
109:4 117:14
118:12 146:19,25
147:3,8 156:12,12
189:8
**experts** 31:4 33:10
33:13,25 40:23
41:5 43:1 73:9,22
73:23,24 81:16
194:21,22 195:12
196:4,7 213:15,22
**explain** 38:7 177:16
**explained** 109:14
133:11
**explaining** 196:2
**explains** 143:11
**explanation** 133:12
141:18,19 146:24
**explore** 10:7
**explosive** 78:14
**explosivity** 78:6
79:6 80:24
**expose** 119:1
**exposed** 29:9
**exposure** 43:20
60:3 64:3,12
137:22
**expressing** 160:2
201:14

**expressly** 62:1
**extend** 53:6 114:3
**extended** 103:8
**extensive** 9:12 19:2
21:7 32:3,3 52:8
55:21
**extensively** 19:19
35:3
**extent** 23:3 91:9
156:23 157:2
206:8
**extra** 25:24
**extramarital** 30:21
**extraordinarily**
67:2
**extraordinary**
66:18 70:12 78:17
102:10 103:25
**extreme** 145:7,10
**extremely** 32:19
188:22 190:25
**ex-player** 162:15
**eye** 16:21 77:11
171:22

───────────────

**F**
**face** 40:3 53:5,9
54:12 70:3 110:4
176:3 181:13
**faced** 110:18
205:20,20
**faces** 111:22
**facing** 111:7 176:11
195:18
**fact** 8:5 9:25 21:23
21:25 22:15 26:6
35:24 43:16 63:1
63:17 65:23 70:18
72:14 84:7,18
90:18 91:5 92:16
95:6 106:23
115:23 116:19
121:23 148:21,22
149:8 151:9
152:12,22 155:23
156:25 169:17
190:6 192:15,16

199:1 202:5 206:4
212:12
**factor** 34:21 35:9
36:20 37:11 38:3
38:12 78:9 169:15
197:5,25
**factored** 41:25
**factors** 22:21 29:24
34:7 72:2,3
**facts** 21:11 44:13
**factual** 51:15 52:6
53:9,15 55:4
190:17
**factually** 204:23
**fail** 58:12
**failed** 62:11 87:11
147:1 159:9,14
195:24 196:1
**fails** 112:2 204:3
**failure** 86:15
152:14
**fair** 10:22 29:4
45:15 55:23,25
56:5,8,13 57:4
59:15 63:3 65:6
66:14 69:12
101:15 102:16
104:16 105:10
148:9 153:12
188:10 191:24
192:2
**fairly** 59:2 87:12
92:19 139:12
149:23,24
**fairness** 1:8 10:25
29:23 40:10 57:12
60:13 92:20 121:4
163:6 173:21
174:9
**faith** 16:22,24 66:3
112:6,9 113:13,18
**fall** 62:12 109:9
167:11
**falls** 113:18
**false** 94:14 172:10
**familial** 211:24
**familiar** 155:24

184:3
**families** 8:16 19:7
50:6 55:10 59:5
70:1 80:2 86:11
104:22 123:16
125:18,25 126:20
126:25 165:13,14
172:18 174:8
180:7 185:2
212:17
**family** 20:11 80:5
80:14,16,18,19
94:8 98:20,21,23
98:25 99:20
122:22 126:24,25
150:7 151:19
152:3 153:12
180:7 181:9
205:20
**fanciful** 97:21
**Faneca** 106:9
**far** 16:10 53:6,6
66:7,7 109:9
123:10 136:12
149:10 189:5,5,5
**farther** 76:25
**fashioned** 208:8,9
**father** 122:20
175:17 180:19
181:7 182:12
185:13
**father's** 183:12
**favor** 29:17 32:20
110:16
**favorably** 45:8
**fear** 173:9,10
**feature** 167:9,14
169:10
**features** 16:17
135:7,23
**February** 96:23
151:1 176:7
**federal** 25:8 39:11
52:21 66:22 71:19
**fee** 100:1,1 112:16
113:7,8
**feed** 11:6,8,9

**feeding** 6:1
**feel** 73:18 104:18
104:19 173:16
175:3 178:25
**feels** 153:25
**fees** 54:7
**fell** 45:10 104:1
145:16 180:25
**Fen-Fen** 204:21
**fewer** 43:12
**fides** 63:22
**fiduciary** 99:18
101:7 141:17
**field** 73:13 117:23
145:23,25
**fields** 34:1
**fierce** 44:19
**fifth** 176:11
**fight** 159:12
**fighting** 31:9
160:22 161:1
**fights** 161:2
**figure** 27:16 38:7
127:10
**figures** 159:16
**file** 18:20 112:25
163:15
**filed** 19:20 20:25
45:2 98:2,7
106:14 113:1
121:18 122:21
124:24
**final** 7:18 29:12
53:18 66:15 72:7
98:13 105:4
112:13 127:3
169:11 184:9
**finally** 16:16 17:11
50:18 64:15 79:11
114:14 149:11
153:5 196:21
198:2 199:13
**financial** 3:15
30:22 59:6 73:21
149:12 167:17
173:11 201:24
203:1

**find** 19:12 38:10,21
42:4,7,18 86:15
111:5 116:24
120:21 135:14
136:5 171:15,16
171:20 183:3
211:17
**finding** 14:18 93:24
**findings** 122:24
168:4
**finds** 35:21
**fine** 11:25 12:6
106:17
**fined** 161:5
**finest** 98:12
**finish** 46:16 67:14
162:22
**finished** 143:7
**fire** 182:18
**firm** 48:5 105:16
133:3,3
**first** 3:23 7:10 19:5
25:2 26:8 30:1
55:25 58:22 71:7
72:3,4 75:12
77:24 93:5 94:17
94:18 98:7 105:8
105:19 106:3,22
115:3 116:12
136:2 137:25
142:16 143:10,17
145:24 158:23
159:3 161:9
172:13 176:1
186:6 199:23
202:12
**Fisher** 41:5
**fit** 145:7,10
**five** 34:7 43:12 47:2
56:10 77:2 112:24
113:2 114:6
115:14 116:9,18
125:5 136:8,10,10
144:22 145:7,10
145:13 153:23
154:11 158:13
159:5 164:10

165:19 170:21
174:16 193:2
201:25 211:20
**fix** 114:3
**flattered** 201:4
**flawed** 135:23
**flaws** 106:1,3
160:14
**Florida** 150:17
**flow** 29:11
**flowing** 201:1
**flows** 97:22 162:9
204:7
**Flynn** 129:14
**focus** 137:9 140:5
144:23 181:19
188:2 208:18
**focused** 51:17
142:14
**fog** 55:1
**folks** 122:23 202:16
**follow** 11:21 210:1
**following** 196:12
196:15
**football** 1:3 15:8
17:23 47:24 50:22
56:11 57:1 62:25
64:10,11 65:19
76:3,6 82:6,18
87:25 98:6 104:11
119:16 128:7
130:17 157:13,15
168:20 175:22,22
177:22 188:22
**Footnote** 112:19
**forbid** 16:3
**force** 50:14
**forecast** 131:22
**foremost** 71:7
94:18
**foreseeable** 10:17
**forever** 72:25
107:11 125:17,23
**forget** 90:18 176:1
176:3,7
**FORGOING** 215:3
**form** 19:11 95:9

98:9 167:4 198:25
199:1,18 201:2,9
**formed** 76:12,20
**former** 124:23
128:7 129:15
150:16 158:20,22
167:10 168:6
180:9,14 212:11
**forms** 19:9 74:23
76:16 202:20
**formulations** 202:6
**forth** 10:15 55:20
70:17 79:21,22
98:6 116:7 117:9
162:2 178:17
**fortunate** 175:15
**forward** 46:6
178:22 195:12
203:14
**fosters** 169:23
**fought** 6:25 8:15
9:11 10:15 37:3
44:20 51:25 52:1
**found** 22:16 35:8
44:1 45:4 63:8
75:22,25 76:1
82:18 104:11
120:24,24 122:22
159:20 171:24
178:23 190:8,12
201:22
**four** 4:19 34:7
77:24 79:2 126:22
137:2 153:23
159:5 183:17
185:15 190:9,9
**framework** 71:25
**frankly** 63:4 105:1
105:10 200:7
210:22 212:5,19
213:2
**fraud** 33:17 40:5
65:7 69:20,20
96:9 110:15,17
111:3 124:1
**Fred** 128:6 129:14
**Fredericks** 35:1

**free** 56:24,25 61:5
63:15
**freeze** 77:15
**frequency** 210:19
**frequent** 210:22
**frequently** 76:19
**friend** 76:18
**friends** 32:14
**frighteningly** 184:2
**front** 25:8 26:7
39:6 69:9 195:22
**frontal** 197:1
**frozen** 125:17
**frustrations** 65:20
**fulfill** 125:18
141:17
**fulfilling** 184:23
**full** 4:4 15:11 49:20
50:14,14 114:4
176:5 193:19
196:14
**fully** 60:4 64:3 65:9
92:11 101:15
151:5,11
**full-blown** 181:7
**function** 62:5 119:7
209:20 213:13
**functionally** 160:5
**functioning** 50:8
118:16
**fund** 12:9,10 14:10
16:9 17:11 27:4
29:10 42:9 50:19
50:21 51:2 95:5
109:21 110:9
129:24 130:20
131:16,18,20
155:1 157:12
168:22,23
**fundamental** 51:24
61:18 62:17
**fundamentally**
107:21
**funded** 50:3,20
51:7 59:18 73:25
**funds** 130:20
131:15 155:21

203:7 204:11,12
**funny** 96:21 134:15
**Furphy** 1:21
**further** 133:12
194:7 200:19
**future** 16:14 27:1
54:12 60:8 73:2
123:16 125:21
129:25 206:7
**futures** 29:8 194:3

### G

**G** 3:1
**gainfully** 185:13
**game** 91:7 146:17
160:16 168:24
175:22 194:16,16
**games** 89:22 90:4
90:25 91:3,6,6,6,8
91:8 144:17,20
145:13,22 146:15
149:7
**Gandy** 73:13,15
74:11 194:23
195:6 196:11
**gavel** 67:22
**Gehrig** 150:23
**Gehrig's** 93:21
**Gene** 6:13 24:24
**general** 36:12
42:14 62:23 75:22
75:25 76:2 104:11
168:5 190:22
**generalized** 39:17
**generally** 28:16
62:19 73:3
**generated** 8:6
**generic** 44:6
**generous** 60:21
65:11 205:2
**gentleman** 177:2
**geriatric** 165:7
**getting** 13:7 16:14
20:13 99:6 156:20
172:19 173:3
176:17 210:3
212:1

**Gibbs** 1:14 2:6
125:5,6,8,10
127:6
**girlfriends** 70:1
97:17 104:23
**girls** 175:18 185:15
**Girsh** 29:23 34:8
36:20 72:2
**give** 25:22,23 83:22
91:13 95:2 102:21
112:10 118:22
130:11 142:19
144:15 154:5,25
**given** 92:23 117:19
149:21 154:14
188:11 191:25,25
192:1
**gives** 178:24
**giving** 68:16 72:15
114:19 153:18
175:7
**glad** 4:18
**GLENN** 1:16
**glimpse** 31:5
**global** 9:20 10:4
**GM** 92:17
**go** 9:7 11:1 12:23
18:8,9 19:12
22:20 25:14 29:25
30:11,23 31:6
32:8 33:18 37:8
38:24,25 42:16
44:5 46:23 51:1
68:20 70:10 75:4
77:24 81:23 84:23
90:19,20 93:3
94:11 95:10 96:19
102:15 104:6
109:22 115:10,11
115:13 122:19
138:25 140:16
141:22 142:5,15
144:12 160:22
176:14 179:16
181:3 185:22,24
185:24 186:6,8
191:15 195:4

197:21 198:19
199:4,11 201:19
209:15 212:25
**goal** 125:18 145:23
145:24,25 165:5
**goals** 184:18
**God** 16:3 157:20
**goes** 143:24,25
157:2 196:9
198:24
**Goggle** 42:16
**going** 4:15 14:22
16:9,19,20 17:13
17:19,22 18:13
19:5,14,16 20:24
22:14,20 30:25
31:5 34:14 35:9
37:15 40:2 41:20
42:7 45:11 46:1
46:16 47:15,16
71:2,3,4,6,12,16
71:21 83:21 84:19
84:24 85:2,3 92:5
92:6 94:8 96:5,11
96:19 100:8,24
101:6 104:7,8
105:16 111:4
115:9,12,24 119:4
122:11 123:7,8
124:1,15,20,21,23
127:8,8 129:6,8
129:20,22 131:23
132:13,23 155:11
156:7 158:4
161:12 162:25
163:3,9 168:14
170:6 175:21
177:6,16 178:25
186:6,8 187:3
197:9,20 199:11
200:21 202:5
203:14 208:7
209:15 210:17
211:16
**Golkin** 3:14,15
7:15,16 29:1 55:6
66:2,23 201:21

202:5
**Golkin's** 203:5
**good** 3:4,6,7 4:23
4:24 6:10,11,18
6:19 16:22,24
19:4 45:15 47:20
47:22 48:2,10,12
48:15,17 51:3
64:10 66:3 68:9
68:10 94:6 112:6
112:9 113:13,18
115:18,19 119:2
122:23 125:6,7,9
125:10 128:3
132:13 146:4
150:4,5 153:17
158:9,11,23 159:1
163:24 164:1
173:25 174:14
184:11,15 186:20
187:1 198:7 213:6
213:16
**goodness** 67:21
**Google** 116:23
**gotcha** 174:18
**gotten** 28:13 40:12
124:4 162:13
**governed** 52:19
**gradations** 143:25
**grade** 43:22,24
176:2
**grand** 53:18
**grant** 3:19 214:2
**granted** 37:5
**graphically** 169:4
**gratitude** 104:18
**gravel** 174:8
**gravelling** 173:16
173:17 174:7
**great** 61:16 76:15
77:5 81:18 196:2
205:7 210:19
**greater** 37:12 44:12
61:2 92:16 167:19
167:22 210:20
**greatest** 123:22
**grew** 134:25 185:16

**grid** 15:17 89:10
143:11,21 151:8
162:8,11 171:8
184:5 197:18
**groundbreaking**
9:10
**groundswell**
123:21
**group** 12:22 139:11
140:3 183:7
**groupings** 60:21
**groups** 137:15
**guarantee** 111:8
130:23
**guaranteed** 14:13
49:20 162:3,3
**guarantees** 176:25
177:19
**guard** 150:17
**guardian** 99:18
**guess** 37:16 38:4,5
100:20 161:7
180:5
**gun** 124:6,11
**guns** 124:7
**guys** 32:6 185:16

## H

**half** 12:24,25 46:25
109:5 144:20
145:16,20 166:23
209:24
**hall** 179:16
**Hamilton** 214:10
**hand** 11:23 45:20
**handed** 54:8
**handle** 12:23 25:3
46:18
**handled** 6:23 25:16
25:18 30:7,8,9
37:15 39:6,12,15
108:17 194:18
**Hangley** 69:1
**happen** 8:16 16:5
157:11 159:21
**happened** 31:17
33:3 82:5 94:19

96:18 104:3
141:11
**happening** 183:23
**happens** 64:13 69:6
141:18
**happier** 156:4
**happy** 22:1,3,6
45:11 114:16
154:24
**hard** 8:14 9:11
10:15 11:20 90:12
184:7 209:15
210:17
**harder** 211:17
**hardship** 112:17
**harmful** 82:22 83:6
83:10
**harmless** 73:1
**Hashem** 69:3
**haul** 31:24
**Hawkins** 1:17 2:9
163:23,23,24
164:2,3,6 165:25
166:5,8 168:14,16
168:18 169:7,9
170:4,7,10,11
205:13,14 206:12
206:18
**head** 29:10 34:4
39:11 75:18,20
81:9 86:22 127:2
169:19 197:2,3
**headaches** 23:19
41:18
**headline** 61:13
**health** 50:12 69:24
96:13 153:3
159:24,25 189:1
**healthcare** 165:3
**healthy** 74:4 75:1
**hear** 5:14 96:21
99:21 103:22
115:3,9 120:10
133:19 158:4
162:4 176:15
186:24 195:14
208:3

**heard** 52:15 65:3
66:25 83:15,15
92:7,22 119:3
123:14 126:3
137:12,12,12,14
137:21,23 171:8,9
172:22,24 187:8
212:9
**hearing** 134:3,6
181:19 187:12
195:11,18
**HEARING/AM...**
1:8
**heart** 122:21
**Heim** 48:5,6
**Heimburger** 90:5
153:20,21 154:9
156:9,19
**Heimburger's**
154:4
**hell** 104:21
**Hella** 120:19
**hello** 46:12,13
179:20
**helmet** 160:6
**help** 7:7,9 8:23
11:11 50:6 55:13
173:3 184:18,21
185:2,6,6 197:13
205:19 208:17
**helped** 7:10 200:9
**helpful** 71:24
200:16
**helps** 8:25
**hey** 31:14
**Hi** 6:14 179:19
**hidden** 172:21
**hideous** 74:3,3
86:12
**hiding** 172:9
**high** 18:22 36:17
38:20 39:5 43:22
113:4 145:3 168:3
176:4 181:22,23
**higher** 39:17 44:5
197:25
**highest** 166:1

**highfalutin** 200:25
**highlight** 209:5,18
**highlighted** 116:8
116:11 209:16,19
**highlights** 14:19
**highly** 54:7 77:4
**historic** 7:19 8:12
49:2 67:3 92:8
**history** 57:20 63:20
197:2 211:4,4
**hit** 17:24 75:20
90:11 150:23
160:21 161:13,14
163:12
**hits** 7:24 10:11 23:6
23:17,25
**hold** 33:1 73:1
96:10,11 183:20
185:13
**home** 93:10 183:23
**honest** 175:21
**honor** 3:5 4:14,15
4:23 5:3 6:6,9,10
6:18,22 7:2,7,10
7:12,17 10:6,20
11:4,20 12:7 13:9
13:14,19,24 14:2
14:5 15:14 17:1,4
17:10 18:16 19:22
22:10,20 24:23
26:4,22 28:25
29:15,22,24 31:5
31:10 32:22 33:19
34:24 35:2,5
36:10,22 37:5,13
37:14,15,23 38:9
38:13 45:18 47:11
47:18,21 48:3,6
48:10,13,15,22
50:9 51:12,16
52:2 53:5,6 54:19
55:19 56:17,22
57:10,16 58:9
59:9 60:10,16,25
61:12,15 63:12,24
64:18 65:9,12
66:17 67:6,11

68:9 69:8 71:5
72:24 89:9 105:23
106:21 107:6,21
108:19 110:16
111:20 112:9,13
114:10,16 115:17
115:22 116:23
117:22 118:9,15
119:13 120:4,8,14
122:3 125:6 128:2
129:2 130:4,14
131:1 132:3,17,18
133:14 134:16
137:5 138:12
139:3 140:24
143:3 146:9 150:4
153:18 155:9
156:6 158:24
163:5,20,21
165:12 170:13
171:12 173:21
174:21 175:25
176:12 178:4
180:17 186:9,18
187:11 189:11,17
193:5 194:1,7,9
194:12 195:10,22
197:7 200:4
201:23 203:15
204:4,5,15,22
205:25 207:3,13
208:2,5,20 209:20
211:7 214:4
**Honorable** 1:8 3:4
**hope** 21:2 121:24
133:6 175:25,25
176:1,2,6 204:14
204:15
**hopefully** 105:9,9
**hoping** 109:2,7
**hopping** 12:19
**horizon** 98:25
**horrific** 127:1
**horse** 45:1
**hospice** 165:14
**Hospital** 151:24
152:1

**host** 73:11
**hot** 190:1
**hotly** 189:21,24
**hots** 184:16
**hour** 47:1
**hours** 44:24 202:4
202:4
**household** 32:12
184:24
**Houston** 135:2
**huge** 53:20,23
**human** 184:21
**hundred** 20:15
**hundreds** 19:23
**hungry** 67:13
**hurdle** 114:9
**hurdles** 53:10
110:5,18 111:22
160:8
**Hurricane** 152:2
**husband** 164:16,16
165:20 171:21
205:15,17 206:14
**husband's** 166:11
173:12 182:15
**hyperbole** 57:16
**hyper-competitive**
161:3
**hypothesize** 190:9
**hypothetical**
130:19

## I

**idea** 24:12 36:24
173:7 196:11,13
**ideas** 131:2
**identified** 13:12
118:2 167:18
**identifies** 117:16
**identify** 213:15
**identifying** 20:20
**ignore** 52:7 53:19
**ignored** 53:3
191:11
**ignoring** 78:11
**II** 5:23 23:22 26:19
27:2

**ill** 164:14
**illegal** 30:18
**Illinois** 36:2
**illness** 136:18
152:12 153:9
173:12
**illnesses** 124:9
**illusory** 148:11,22
**illustrate** 168:12
**illustrates** 166:18
**imagine** 30:23
194:17
**immediate** 8:23
55:13
**impact** 19:17 20:7
40:9 43:21 145:3
161:9
**impacted** 136:13
137:4,9
**impacts** 29:10
**impaired** 118:6,11
206:5 212:21
**impairment** 14:6
18:7 23:8 54:14
94:25 116:5,10
193:8,24 206:4,9
**impairments** 41:10
49:8,14 61:25
62:3 193:11,13
209:25 211:23
212:21
**imperfect** 157:2
**implementation**
3:22
**implemented** 16:23
**implicated** 197:4
**implications**
182:11
**implies** 167:13
**implode** 27:25
**importance** 8:1
13:5,6 121:9
**important** 8:7 13:8
14:7,11 15:20
16:6 17:13 19:12
19:13 20:8 21:5
21:23,23 30:19

31:16 32:24 51:22
56:2 59:3 60:10
69:15 78:12
123:25 124:5
141:21 154:19
158:21 175:24
181:4 185:19
197:4 206:15
**importantly** 15:12
196:21
**imposed** 113:4
**imposes** 64:16
**impossibility**
131:22
**impossible** 131:2
**imprecision** 76:15
**impression** 95:22
**improve** 119:22
**impulsivity** 79:6
**impute** 162:8,8
**inability** 40:4 76:7
**inaccurate** 96:8
**inadequacy** 86:14
**inadequate** 86:16
92:18 99:7
**inappropriate**
119:9
**incentive** 113:10
**incentives** 87:15,17
**incentivize** 85:20
**incidents** 39:21
**include** 22:14 53:13
103:5,13 145:1
149:4 160:3 166:9
197:1
**included** 20:19
42:13 89:15
156:13
**includes** 12:17 50:1
**including** 32:4
39:22 81:10 97:15
98:24 101:16
108:12 165:7
185:8
**inconsistent** 202:25
**incorporate** 16:18
102:11

**incorrect** 99:17
**increase** 60:20
171:25 185:8
**increased** 23:6
44:11
**increases** 64:9
**increasing** 43:25
**independent** 12:22
33:25 42:14 51:6
59:24 64:23
203:18,23
**independently**
157:19
**Indianapolis**
175:16
**indicate** 8:1 74:22
**indicates** 157:17
198:21
**indifferent** 166:10
**indiscernible** 12:4
46:5,10,19,21
47:5 74:12 119:16
129:1 144:19
155:16 160:25
162:9 181:8,25
183:5,7,10 184:11
197:10 208:13
**individual** 9:13
16:11 24:8 158:5
**induce** 58:15
**induced** 102:23
**inducing** 89:3,4
**industrial** 76:6
81:2
**industry** 42:17
169:4
**inevitable** 63:9
**inevitably** 127:1
**inexpensive** 202:17
**infancy** 188:25
189:16 192:1
**inflation** 27:4 28:4
29:11 49:18,25
60:6
**inflicted** 151:13
**influence** 102:10
**inform** 209:23

**informal** 70:15
167:24
**information** 8:5
20:13,20 21:6
23:5 38:4 80:19
172:9,10,20
**informative** 96:4
**informed** 169:2
**infrastructure**
168:10
**inherently** 28:7
**initial** 181:6
**initially** 141:12
**injured** 26:16
101:6 146:17
148:10,20 160:24
**injuries** 9:14,16
10:9,13 17:25
27:1 39:10,21
40:18,20 41:1
81:17 107:18
149:24
**injury** 1:4 7:23
23:21 25:12 26:25
41:9 44:16 50:21
73:4 81:10 88:3
92:4 101:2 102:24
107:19 119:16
148:13 165:9,9
181:15 182:9
184:25 185:11
194:19 196:13,15
**inquiry** 24:17
56:15
**ins** 161:4
**insidious** 104:25
**insights** 164:23
**insist** 146:21
**insisting** 37:19,20
**instance** 156:9
**instances** 76:20
**Institute** 188:25
189:1
**institution** 177:19
**institutional**
162:14
**insufficient** 112:7

**insulate** 178:12,12
**insult** 86:7,8
**insurance** 96:7,8
131:4
**insure** 26:23 131:3
**insured** 29:4
**insurmountable**
160:7
**intellect** 118:21
119:1
**intellectual** 118:16
**intelligence** 30:14
**intended** 3:7
151:18 203:7
**intense** 9:11 57:22
**intensive** 165:10
**interest** 24:20
27:22 29:2,20
87:12 121:11
128:20 181:16
**interested** 75:13
85:21
**interesting** 20:23
75:5,15,16 209:6
210:1 211:11
**interestingly** 78:20
**interests** 24:20 28:1
73:22 87:15,17,18
192:15 194:3,6
**interim** 3:25
**internal** 184:22
**interpreting** 36:6
**intervention**
168:11 185:3
**interview** 97:4
**interviewed** 80:5,5
183:4
**intimate** 185:9
**intraclass** 86:18
87:8 88:11,12
89:5
**introduce** 3:14,19
48:8 68:19 122:5
122:6
**introducing** 5:2
68:20 122:2
**invaluable** 3:16

**invited** 195:21
**involve** 28:3
**involved** 19:1 30:21
31:11 39:10 45:2
214:10
**involving** 9:14
25:11 26:7 30:4
30:25 35:7 66:23
**IR** 148:10
**irrelevant** 96:15
115:13
**isolated** 183:24
**issue** 10:1 24:12,13
29:8 32:23,25
34:23,24 36:25,25
37:4 38:10 51:10
53:1 71:3,4,7,21
78:13 84:9 86:3
87:5,7,10 88:12
91:18,22,25 92:19
98:11 102:18
103:3,6 104:10
108:4 154:8 155:4
188:18 189:20,20
189:23,24 192:24
194:2 199:4
**issues** 10:16 11:2
24:8 25:10,11
29:7 31:9 32:24
33:17,19 34:17
71:3,18,18,25
92:3 96:3 103:15
104:24 154:12,15
157:14 173:22
177:14 187:4,18
191:16 192:1
206:20
**Iverson** 214:2

**J**

**J** 1:18
**Jack** 11:24 26:7
**Jakesian** 37:16
**Jepson** 29:23
**Jersey** 22:16
**Jim** 11:14 138:4,4,8
139:2 185:22

**Jo** 4:4
**job** 113:18 160:23
    184:10,13 185:13
    196:2
**John** 1:14 128:5
    185:23,25
**joint** 43:24
**Jones** 209:11,14
    210:15 211:15
**Josh** 72:4
**journal** 82:1,1
    153:2
**journalists** 96:22
**journeyman**
    153:22
**Jo-Ann** 4:3,5
**judge** 4:8,9,11 6:20
    7:9,18 11:1 21:12
    21:22 28:20,24
    33:22 36:2 39:7
    39:24 46:13 66:22
    67:7,13,22 68:7
    73:16 74:19 76:14
    77:24 78:2 80:19
    86:17 99:11,23
    100:6 103:3
    104:17 114:23
    115:15 120:16,17
    121:1,6,16 124:19
    124:20 125:3,13
    126:19 128:16,18
    128:25 135:6,22
    138:21 139:23
    140:13 141:10
    142:7,11 144:4,6
    144:13,25 146:7
    155:15,20,23
    158:7 162:23
    163:24 197:4,21
    207:19
**judges** 25:8 34:16
**judgment** 37:12
    40:1 67:5
**judgments** 40:6
**judicial** 17:3 39:11
    126:10
**Judson** 129:14

**July** 14:17 52:3
    83:9 84:1,15
    85:19 87:2 88:19
    88:25 94:2 95:7
    95:16,20 99:5
    103:5,11 198:9
    199:2,9,25
**jump** 33:18 144:3,5
**junior** 176:4
**junk** 70:18
**jury** 14:21 25:3
    33:21 195:14
**justification** 88:23
    91:11 137:18
**justified** 72:14
    140:15
**justify** 140:14
    142:17,20

**K**

**Kaitlin** 69:2
**Karp** 1:11 2:3,12
    13:24 17:1,6,7
    18:16 35:15 45:21
    47:17,18,20,23,23
    48:4,7,11,14,16
    48:18,21,25 51:6
    68:19 69:11 70:21
    71:5 75:17 77:13
    96:21 123:11,14
    137:15 178:3,4
    186:3 187:25
    194:8 200:19,20
    200:24 201:5,8,13
    201:17 203:21
    204:22
**Katie** 1:21 171:21
**Katrina** 152:2
**Kazinski** 121:16
**keep** 16:1,21 48:21
    51:22
**keeping** 158:24
**Kelp** 213:22 214:8
**Kentucky** 176:10
**Kevin** 5:22 8:23
    23:22 24:4 26:18
**key** 188:5

**kick** 7:1 136:21
**kicker** 145:23,25
**kid** 174:21
**kidding** 123:20
**kids** 180:9 182:18
    184:18,19,20
**kill** 98:20
**killed** 122:21
**kind** 30:4,16 69:21
    96:21 155:14
    183:3
**kindergarten** 30:12
**kinds** 9:17 173:14
    173:24
**kk** 135:15
**Klonoff** 85:13 89:2
    91:15
**knew** 23:4 33:13
    123:13,13 124:3
**knock** 161:14
**know** 5:13 6:24
    11:19 12:13 17:18
    17:19 20:1 24:11
    30:5,8,16 31:11
    31:14,22,23 32:14
    33:8,10,12,12,13
    33:19 34:14 37:17
    38:10 51:2 61:15
    67:1 76:3 78:7
    80:14 81:21,24
    89:19 90:16 92:12
    94:5,7 95:24 96:1
    96:5,7 97:15 99:7
    99:13,19 101:5,8
    112:25 119:24
    124:2 125:1,2
    127:25 131:10
    134:13,25 143:6
    148:23 157:22
    171:13,14 172:6,7
    172:25 173:1,6,6
    176:20 177:18
    178:6 179:6 183:3
    183:9 184:10
    185:18,23 194:10
    194:11,13,16,18
    195:4 199:10

200:11,20,20
    201:13 210:2,15
    211:22 212:24
**knowing** 54:13
    103:16
**knowledge** 188:20
    188:21
**known** 82:20
    116:15,17 117:6
    119:6 164:7 165:1
    172:20
**knows** 32:22 56:22
    57:11 65:13
    117:13 193:6

**L**

**labor** 52:21
**lack** 53:14 130:20
    180:6
**laid** 17:7 25:5
    60:24
**LANCE** 1:15
**landmark** 7:19,20
**Lane** 7:9 66:22
**language** 27:7
    102:20 117:17
    143:11 161:14
    177:7 178:23
    197:14 209:21
**large** 111:6 117:19
    139:13 162:15
    168:7 196:18
**largely** 73:9
**lastly** 82:14 163:14
    191:10
**late** 150:23 172:14
    206:13
**laughed** 174:23
**laughs** 177:3
**Laughter** 7:5 22:8
    37:24 67:15,23
    120:1 127:21
    130:9 131:7
    132:15 134:14,21
    138:22 161:22
    175:2 180:2
**launched** 22:17

**laundering** 205:8
**law** 4:1,2,5,7 10:24
    31:18 52:21 55:24
    57:10 72:6,11
    87:9 96:4 156:11
    164:12
**lawsuit** 120:24
    124:1
**lawsuits** 121:14,20
**lawyer** 16:11
    123:10 129:4,12
    175:4 198:17
**lawyers** 33:8 81:14
    103:23 105:15
    115:3 125:1 158:6
    212:4 214:16
**lax** 61:4
**lay** 19:10 161:14
**layer** 27:18
**lead** 81:10 194:25
**leading** 81:16,24
    82:1 195:23
**leads** 36:8 176:23
**league** 1:3 47:24
    51:14,25 52:4,5
    55:2 56:12 57:1
    64:12 82:6 89:12
    90:17,22 204:10
    207:3,5,11
**League's** 207:8
**learn** 17:24 184:18
**learned** 18:4
    171:17 183:2
**learning** 166:23
**leave** 54:8 154:18
    164:11
**leaves** 152:11
**leaving** 86:19
**left** 74:19 75:2
    86:23 99:8 101:10
    125:19 147:17
    162:16 209:16
**left-hand** 139:11
**legacy** 124:18,20
**legal** 10:16 30:17
    31:9 32:24 51:15
    52:6 53:9 54:7

55:4 63:22 71:25
72:3 98:10 199:4
199:14 200:1
**legally** 70:24
**length** 9:12 28:22
63:10 65:25
**lengthy** 56:4
**lesser** 119:3
**letter** 98:4 99:2
**letters** 98:4
**let's** 4:13 12:11
15:13 30:5 40:21
81:6 83:23 88:20
88:21 90:23 92:22
127:9 144:23
159:22 162:12
186:6,6 194:15,17
**level** 13:12,13 14:4
14:6,15,15 15:13
15:15,18 33:5
50:7 57:25 58:14
94:24 116:22,24
190:15,15 206:4
209:23,24,24
211:14
**levels** 13:11 50:22
63:2 116:4 143:18
190:10,10,15
191:21
**Levin** 6:16 24:25
25:16 39:12
**Lew** 180:19 181:11
183:11
**lewy** 166:16,20,23
167:3,8,11,12,20
168:2
**liability** 34:6 44:13
49:23 60:9 65:5
**lied** 70:19
**lien** 16:6,10,12 26:1
26:9
**life** 14:12 15:21
49:22 96:13
117:18 140:14,20
141:8 152:15
165:15 166:2
177:4 181:9 182:3

184:23 185:8
203:9
**lifelong** 185:5
**lifetime** 16:5 98:23
**lift** 113:23
**lifted** 108:21
**light** 38:15
**likelihood** 188:15
**likewise** 62:16
136:17
**limit** 113:4,9,9,12
**limitation** 53:14
**limitations** 34:11
34:16 119:24
**limited** 12:13 81:11
115:23 119:24
126:22
**line** 8:13 28:12
40:10 45:10,12
63:8 86:20 136:20
141:23 148:9
189:25 191:6,7,24
192:2,2
**linebacker** 145:4
164:9
**lines** 28:19 45:7
63:2 120:20
**link** 151:12 191:5
**linked** 81:1
**linking** 82:13
152:23
**list** 30:24 106:5
114:24 158:8
209:7
**listen** 46:10 180:4
**listened** 205:6
**listening** 170:18
**lists** 32:11
**literature** 13:6,19
33:9 41:12 44:1
85:5 100:20 117:1
196:6,9 211:24
212:19 213:21
214:9
**litigate** 9:23 51:16
56:8
**litigated** 25:10

31:23 51:21 56:11
205:8,9
**litigating** 9:25
32:23 42:1 54:7
**litigation** 1:4 3:10
3:10 6:25 8:4
10:2 25:17 27:20
29:21 30:2 31:22
37:2 39:6,22 40:7
53:5,11,25 54:16
55:17 56:20,25
59:8 61:6 63:15
63:16 66:9,20
72:12 82:15
159:19 187:23
188:1 200:2
204:10,21
**little** 5:15 27:22
34:22 45:17 47:14
74:20,21 78:1
83:16 109:5
113:10,23 143:24
143:25 168:22
186:22 194:15
196:11,13 198:10
209:14 210:17
**live** 9:6 20:16 79:2
79:3 150:22 162:1
181:14
**lived** 104:21
**lives** 86:9 103:25
185:7
**living** 40:14,22,24
41:10 83:8,13,21
88:23 98:19 103:7
103:13 163:8
180:7 182:6
184:25 196:20
**lo** 171:24
**located** 9:6
**locking** 119:8
**Locks** 6:13 24:25
**logic** 43:16
**logically** 99:9,9
**long** 8:14 31:24
32:10 79:2,3 95:8
101:11 126:19

148:14 174:4
181:8 183:15
198:25 199:1,18
201:2,9
**longer** 115:7
164:17
**long-form** 92:23
94:11,15 95:24
**long-term** 81:10
98:24 167:23
170:1
**look** 15:16 20:25
24:23 31:6,18,19
34:17 74:2,5,16
74:19,25 93:18
94:15,17,17 95:13
98:1 134:12 136:4
139:10 140:6,16
140:25 141:22
142:6,11 144:14
144:21 155:15
156:10 172:3,6
176:3 179:16
180:13 184:6
198:19 214:5,7,8
214:9
**looked** 93:5,6 96:3
142:10 192:15
**looking** 93:15 99:8
171:16,18 172:2,4
173:14,23 192:18
212:20
**looks** 24:18,18 30:8
**lose** 65:23 125:25
**loss** 10:13 23:20
30:14 40:4 62:4,4
62:6 78:5 79:5,10
79:11,12 80:24
81:11 149:25
182:12,13
**lost** 55:1 98:5
148:18
**lot** 13:5 37:13 38:4
68:2 113:1 156:4
161:2,15 162:4
172:22 184:10
187:8,9,9 200:25

201:6 202:22
204:18,24 212:2
**Lou** 93:20 150:23
**loudly** 57:8
**love** 175:18,21,21
175:22 181:17
**loved** 125:25
**low** 92:13,15
**lower** 172:19
197:18
**Lubel** 1:15 2:7
133:25 134:2,5,9
134:15,19,22,25
135:4,6 137:11
138:2,12,14,17,20
138:23 139:2,5,7
139:10 143:2,5,9
143:9,20 144:5,12
146:7 154:7
197:14
**lunch** 67:13 115:10
127:8
**lung** 159:25
**lynchpin** 87:13
**Lynn** 48:9

### M

**mad** 165:4
**MAF** 110:8,15
111:19 114:11
**magazine** 94:13
**magazined** 94:12
**magistrate** 4:9
**magnitude** 71:20
**mailed** 19:6
**main** 132:19 171:6
**maintain** 166:1
**maintaining** 36:21
**majority** 117:20
160:5
**making** 80:17 96:8
102:16 103:15
119:7 165:23
**man** 175:19
**manage** 185:6
**manageability**
24:13 36:25 37:3

managed 6:23 93:4
management
  165:10 168:8
mandated 169:3
manifested 193:8
manifestly 56:5
manifests 77:22
  78:18
manifold 168:12
manner 164:25
Manny 106:7
Manochi 1:16 2:8
  153:16,17 155:2,5
  155:7,14,25 156:5
  157:7,22 158:1
manual 72:12
man's 185:12
map 184:22
marines 32:7
marker 97:6
market 1:24 168:24
Marks 6:15,18
  24:25
Marshal 186:13
marshals 134:19
Martin 1:12 105:24
Mary 1:17 163:23
mass 9:13 38:22
  134:6 204:23
mass-wide 26:10
master 3:15 7:15
  7:15 29:1 55:6
  59:15 66:23
  201:22
masters 181:20
master's 3:22
material 181:25
matter 4:11 51:25
  63:7 91:6 105:5
  121:23 155:18
  156:25 184:1
  190:17
matters 3:16 4:4
maximum 29:12
  84:2 85:7 162:11
Maxwell 35:19
Mayo 151:2,21

152:12
ma'am 134:5
McGee 208:22
MCI 212:21
McKee 79:15,16
  80:11 190:7,12
  210:6
MDL 1:4 66:19
  200:8,8
MDLs 25:7
mean 32:6,12,22
  35:3 43:2 46:25
  64:7 79:20 86:6
  88:8 96:10 99:3
  102:2 126:6
  156:16 157:8
  161:15 177:18
  192:16 197:13
  200:13
meaningful 109:20
means 11:10 17:2
  20:11 31:25 35:25
  110:9 148:2
  152:14 174:15
  181:14 198:17
  201:8
meant 113:7
  131:17
measurably 56:18
measure 119:15
  152:18
media 19:16,20
  32:3 52:13 57:24
  58:2,10 65:18
  96:20 97:1 104:25
  202:16,24
mediator 28:23
  55:5 59:14 66:23
Medicaid 16:14
medical 6:1 9:5
  12:22 13:6 14:8
  14:25 33:9,25
  44:1,11 50:24
  55:21 59:18,21
  60:4 64:4,6 73:14
  82:17 85:5 98:13
  98:24 109:20

117:1 141:7
151:20 152:4,6
169:17 180:6
187:10 196:10
206:23
medically 205:19
Medicare 16:14
medicine 50:4
  189:1 206:11
meet 97:23
meeting 90:10
  182:21
meetings 10:7
member 43:4 45:9
  107:7,9,24 108:2
  110:1,2,4,25
  111:9 112:15
  113:17 114:13
  126:9 156:20
  204:8
members 6:12 8:21
  20:11 27:10 29:3
  57:11 58:5,16,18
  59:16 60:12 62:10
  62:12 66:10 72:8
  72:25 80:5,14,16
  80:18,19 87:21,21
  101:10 108:13,21
  110:18 120:22
  121:7,11,15
  135:10 137:8
  147:18 149:18
  156:18,25 157:12
  202:10
memo 163:15
Memorial 151:24
  152:1
memory 62:4 78:4
  79:5,10,11,11
  80:23 81:11 86:8
  175:25 177:5
  199:16 209:21
men 8:15 125:20
  126:20 169:24
  181:7,19 185:2,6
mention 6:4 8:5
  19:5 32:13 59:6

86:5 95:15,19
198:25 211:2
mentioned 13:4
  18:3 38:16 79:5
  95:17 128:25
mentioning 108:25
merit 107:13
merits 60:24
mess 4:20,21
met 23:12 110:4
  119:14
methods 74:17 77:4
  214:13
metric 170:8
mic 208:14
Michael 1:15
  146:10
microphone 5:14
  186:21
microscopic 76:12
middle 9:25 93:19
  164:9
Mid-Atlantic 1:23
mild 7:23 13:14,17
  14:16 15:14 79:12
  117:2,4,6 212:21
miles 111:10
milestones 184:15
military 213:23,24
Miller 128:6
  129:14
million 12:15 49:5
  59:20 84:2,6 85:7
  85:9 87:4 88:13
  88:17 95:14 99:25
  100:1,24 101:1
  108:10,18 113:24
  123:11 139:14,14
  140:9,11,18 141:3
  141:13 143:22
  149:17 154:22
  156:3 167:5
  168:18
millions 38:24 39:1
  42:19 54:6 65:2
  203:10,10,10
million-two 141:7

142:17
mind 4:15 5:3
  51:22 54:22 115:6
  171:20 186:14,22
mine 4:5 25:25
  68:21
miner's 159:24
minimum 111:17
  146:15
Minnesota 35:15
  35:16 164:8
  174:22 176:6
minor 89:18
minute 18:25 24:16
  67:10 93:6 99:15
minutes 4:16 47:2
  105:22,25 115:14
  120:12,14 125:5
  127:13 128:4
  137:16,17 143:12
  158:13 170:21
  174:16 187:3,6,14
  201:19 207:19,22
misdiagnosed
  167:6 172:15
misery 104:21
misinformation
  20:5 32:4 40:15
misinformed 99:17
  99:19
mislead 62:10,10
misleading 94:14
  95:25 96:16
misled 95:9
missing 51:23
  56:15
mistake 21:1
  102:14
misunderstanding
  61:19 62:17
mix 96:14
moderate 13:13
  14:15 117:24
  118:7
moderately 118:10
modest 61:5 163:6
modifications

16:17 91:21,24
126:6
**modify** 126:16
153:12
**Molo** 1:12 2:4 20:4
21:8,12,13,18,22
22:1,5 32:5 37:8
38:2 46:1,12,13
46:17,24 47:4,7,9
67:10,11 68:5,7,9
68:11,13,16,23
69:5 72:6,21,23
75:9,11,15 79:16
79:20 80:4,15,18
90:1,3,8 97:20
100:3,6,10,14,17
100:19 101:20,23
102:7,9 105:17,20
109:14 113:21
114:22 115:1,5,11
115:15 119:24
123:22 128:16,17
128:18 129:6,10
154:7 158:5,7
179:15 187:17
192:25 194:11,18
195:12,23 196:4
196:23 198:3,5,8
198:15,16
**Mololamken**
105:24 115:3,21
**Molo's** 187:7,8,13
210:9
**mom** 182:1,15
**moment** 6:21 19:15
45:25 52:15 61:12
77:10 78:10 84:25
88:20,21 91:16
101:12 127:9
186:1 197:8
203:21 206:2
**moments** 205:14
**moms** 183:19
**mom's** 176:3
**monetary** 12:9
14:10 27:4 29:10
43:10 49:4,5,11

49:18,25 50:10
51:8 54:22 55:8
58:23 59:1,19
65:2,4 93:19
94:19,23 95:5
110:9 130:20,21
131:15,17 135:9
136:21 141:25
143:18,19 149:23
199:8,24 206:25
207:9
**money** 15:17 26:25
28:12,13 38:5
40:2 42:17 69:22
129:24 131:20
146:1 154:25
172:20 177:10,12
201:15 202:18,22
**monies** 73:23 156:6
156:16 157:10
207:7
**month** 176:13
191:17
**months** 9:11 28:22
107:11 198:9
202:5
**mood** 10:12 23:19
41:18 62:15,20
63:13 75:24 79:7
109:12,16 180:25
181:14 185:6
187:19 190:20,21
191:9,16
**Moore** 1:17 2:9
69:5 158:10,11,14
158:16,19 159:2
161:19,23 162:20
162:23 163:1,4,17
**moral** 184:21
**Morey** 89:21 106:7
106:8
**Mori** 106:7
**morning** 3:4,6,7
4:23,24 6:10,11
6:18,19 44:24
47:20,22 48:2,10
48:12,15,17 68:9

68:10,12,13 81:14
92:7 125:6,7
126:3 134:17
158:24 187:11
188:1
**mother** 98:5 122:2
124:12 182:13
**motherload** 124:10
**motion** 3:19 33:1
52:16,23 105:4
**motions** 39:23
**motivated** 27:2
**motivation** 26:23
**Mount** 73:15
**move** 22:14 78:25
142:24
**movement** 166:22
**moving** 98:3 108:4
**muddered** 85:15
**multiple** 41:17 81:9
82:17
**multiplied** 173:9,10
**multiply** 173:13
**multi-billion** 25:17
**multi-district** 3:10

### N

**N** 2:1 3:1
**name** 8:13 21:9,9
32:13 70:20 98:2
128:5 146:10
158:20 167:13
186:12
**named** 27:9
**names** 32:12 81:20
196:7
**nation** 63:8
**National** 1:3,23
47:24 56:11,25
64:11 188:25
**nationwide** 111:7
**nature** 23:2 69:17
70:13 169:12
**navigate** 185:2
**near** 165:15
**nearly** 60:11 165:1
165:18 166:20

**necessarily** 83:20
91:15 196:8
**necessary** 14:9
16:22 130:20
149:15
**necessity** 36:6
**need** 9:3 12:23
14:19 27:10 34:9
42:12 54:15 55:13
57:2,3 107:23
108:20 110:14
125:1 133:12
171:17 186:1
188:2
**needed** 7:1,13
15:10 16:23 33:8
54:24
**needs** 5:25 9:1
123:5 166:11
196:3
**negligence** 35:22
40:5
**negotiate** 9:19
16:10 55:7 105:6
**negotiated** 9:15
25:13 38:18 65:25
99:24 101:4 121:3
123:18
**negotiating** 6:13
9:20 18:5 42:25
51:17 67:1 124:8
**negotiation** 6:25
41:24
**negotiations** 9:12
10:8,15 28:22
44:20 62:18 63:10
206:21 212:6
**neither** 135:24
137:8 146:20,23
**neonatal** 165:10
**nervous** 179:22
**Nest** 6:16 24:25
**neurocog** 18:6
**neurocognitive**
13:11 18:7 23:8
30:5,13 41:1 49:7
50:2,5 54:14

59:17 61:24 62:2
64:8 94:24 116:5
116:10 151:14
165:20 168:21
169:16 190:11
205:24 206:3,4,9
209:25
**neurodegenerative**
117:21 125:22
126:1 169:18
197:6
**neurologic** 165:9
**neurological** 12:17
23:17 76:16
**neurologist** 111:13
150:25 152:8
166:15
**neurologists** 111:8
117:7 183:4
**neurology** 34:1
82:2 152:23
**neuromuscular**
41:1 49:7 54:14
61:24 62:3 64:8
**neuropathological**
93:23
**neuropsychologi...**
12:18 34:1 166:13
195:8
**neuropsychologist**
214:12
**neuropsychologi...**
117:7,20,23 183:6
183:6
**neuroscientists**
183:5
**neurospecialist**
152:9
**neurosurgeon**
152:8,21
**neurosurgeons**
183:4
**neutral** 38:11
**never** 7:3,3 19:1
27:23 67:22 76:3
86:10 118:1,1
123:12 124:1

172:13 175:25
176:1,3,6 194:18
194:19 201:3
**new** 16:18 22:16
68:20 116:19
134:13 150:14,17
151:16 189:5
**newborn** 165:6
**News** 97:5
**newspaper** 153:8
**NFL** 3:9 5:7,20
8:12,13,19,20,23
9:1,3,4 12:18
14:13 15:4 17:18
18:10 23:3,4,23
24:4 26:17,20
27:24 28:3 29:9
29:12 30:24 31:3
31:8,12,23 32:13
32:25 33:2 34:21
35:2,19,22 36:16
37:2,2,7,9 38:5
40:5 41:24 42:21
43:12,20 44:8
47:24 48:4 49:1,6
49:14,20 50:3,4,6
50:15,17,20,23,25
51:12,24 52:15,20
53:22 55:9 59:18
61:7 63:16 65:3
66:6,9 70:5,16
71:15 74:1 78:8
81:2,3,8 82:5,10
82:13,22 83:7
87:25 88:5 89:7
89:12,13,14,17
90:9,9,14,14,16
90:21,25 91:5,7,9
91:12,12,18,22
96:24,25 97:2
98:9 100:12,22
102:20 104:13
110:11,21,23
111:1,12,22 112:2
112:5,8,10,16,18
112:21 113:9,10
113:12,17 116:25

118:22 123:12,19
124:10 126:16
127:3 128:7
129:15,15 130:6
130:17 131:6,19
131:23 132:8
136:6,7 144:17
146:11,18,23
147:3,11,17 148:8
148:13 149:12
151:3,5,13,17
152:4,17,25
153:24 154:10,12
156:8,13,21
157:13,19 160:4
160:15,15 162:15
163:7 168:24
172:8 174:2
175:15 177:16,20
180:20,23,23
185:14,15 187:2
202:12,17,21,25
203:6,18,23 204:3
204:7,11,12
205:23 206:1,19
**NFL's** 23:8 36:4,5
49:22 50:11,23
52:23,25 60:8
83:12 139:19
147:8,17 149:16
155:10
**nice** 143:15,15
**nicely** 97:22 154:8
**night** 96:24
**nine** 23:15 29:24
136:6
**Ninety-nine** 123:20
**Ninth** 121:16
**Nissan** 121:17
**Nitz** 69:2
**NLF** 23:16
**non-issue** 24:14
**non-NFL** 92:4
102:23
**noon** 46:20
**normative** 213:6,16
**Northern** 36:1

**note** 6:8 38:2 60:16
111:12,20 112:19
113:14 193:25
**noted** 31:10 50:18
52:22 59:19 205:5
206:8
**notes** 122:22
170:19 193:17
**notice** 19:1,2,4,6,9
19:9,17 20:9
22:17 32:2,3
71:17 92:6,23,23
92:24 93:11,12,14
93:25 94:4,12,15
95:9,25 96:3,17
99:7 102:18,18
141:21 198:3,7,10
198:11,14,16,16
198:25 199:1,5,10
199:13,18,25
200:9,10,24 201:2
201:9
**noticed** 106:5 211:1
**notices** 19:6 197:9
200:3
**notwithstanding**
58:13
**November** 1:5
151:23,25 215:10
**nullify** 204:6
**number** 3:11 10:13
15:3,10 20:24
21:3 25:14 92:13
92:14,16 102:25
111:10 113:9,12
135:11,12,19,24
143:23 144:21,23
147:6,7,19,22
160:4 170:16
178:11 198:20
203:3
**numbers** 26:5 93:1
139:13 140:23
141:11,15 143:14
163:10 197:15
**numerosity** 22:23
**numerous** 7:25

17:16 18:1 23:24
25:6,7 27:16
52:24 53:9 58:2

**O**

**O** 3:1
**Oak** 150:22
**obituary** 150:14,19
153:10
**object** 65:3 100:12
100:22 106:15
121:8,19
**objected** 106:6
121:22
**objecting** 22:19
172:23
**objection** 61:13,15
61:17,18 62:14
64:15 92:5 98:1,6
99:16 106:12,13
121:18 128:8,10
128:20 129:23
146:13 150:8
160:2 163:19
164:4 166:6
169:11 170:23
171:6,6 176:15,20
176:23 177:3
178:17,22 180:5
196:14 198:6,9
**objections** 28:18,19
55:2 60:17,18,19
60:23 61:9,11
92:19 98:4 124:24
154:3,4 159:6
166:8 175:5
178:20 205:6,6
**objective** 147:22,22
147:24 149:15
153:7,10 196:18
**objector** 173:18
**objectors** 20:3,5
22:17,22 24:9,16
25:2 27:14,17
33:11 40:9,15
42:11 43:2,10
44:24,25 45:6,8

52:7,13 53:3,18
56:4,16 60:15
62:7 63:21,24
65:10,15 68:18
69:6 74:11,14
92:13,14,15,16
121:6 137:20
153:19 172:23
187:5,18 188:14
190:6,7 191:11,12
192:17,25 195:23
201:1 202:16,24
204:18,25 212:19
**obligated** 154:25
202:13 203:6
**obligation** 159:12
203:23 204:1
**obligations** 141:17
**observed** 52:2
**obstacles** 70:4
**obtain** 39:19
**obtained** 40:2
86:22
**obvious** 84:9
**obviously** 77:5
131:14 134:10
192:6 202:24
208:23 209:3
210:19 213:22,25
**occur** 42:13 43:7
84:11 95:4 136:14
**occurred** 36:16
44:8 149:7
**October** 150:25
165:22
**Oddly** 73:8
**odds** 54:16
**offensive** 150:16
**offer** 45:3 141:18
164:22 168:10
177:2
**offered** 89:1 140:22
146:24 173:1,6
176:5
**offering** 148:21
**offers** 149:22
**office** 69:3

**offs** 88:4,7
**offset** 112:3 206:25
  207:6
**offsets** 43:11 50:16
  60:1 61:4 63:25
  92:4 102:24
  140:10,18
**oh** 4:18 5:5 25:21
  106:15 114:24
  132:10 138:24
  179:23 186:5
  201:12 208:7,11
  209:13 210:8
**okay** 4:13,18,22
  5:10 6:5 11:25
  12:1,6,6 13:25
  17:9 18:18 26:11
  35:16 44:17 45:19
  46:22 47:4,4,8,12
  47:17,20 48:24
  67:9,12,16,24
  68:8,15,22 69:4
  72:5,6,21,22
  74:21,21 90:7
  105:15,18 106:15
  106:17 114:18,21
  115:16 119:18
  120:5,7,10 122:7
  122:9 124:14
  125:5 127:13,13
  127:24 128:3
  130:1,3 131:9
  132:4,10,10 133:6
  133:10,13,14,22
  133:25,25 134:23
  135:3,5 137:10
  138:13,16,24
  139:6,9 142:25
  143:4 144:2,9,10
  146:8,8 155:25,25
  156:8,14 157:7,21
  157:25 158:4,9,14
  158:19,19 159:2
  161:23 163:4,16
  163:17,22 165:24
  166:3,8 168:16
  169:6 170:9 175:1

  175:6,12 178:5,18
  179:2,7,8,10,17
  180:18 185:21
  186:5,10,15,16,23
  199:20 200:18,23
  207:16 208:1,3,11
  208:13,19 209:15
  210:9 214:16
**old** 44:3 136:19,22
  137:1 139:21
  140:7,7,10,25
  142:8 143:23
  162:13,15 177:5,6
  208:7,9,9
**older** 13:1 38:25
  42:3 136:22
  143:25 163:8
  169:16 172:17
  173:15 174:8
  193:18
**omission** 156:16
**once** 45:4 60:25
  67:25 93:9 103:14
  126:14 127:19,19
**ones** 40:19 125:25
  130:10,12 139:23
  163:9 212:15
**one-page** 19:11
**one-tenth** 121:14
**one-year** 140:13,20
  141:6
**ongoing** 185:3
**onset** 167:1 180:24
  181:6,7 182:24
**open** 20:19 94:20
  94:22
**opening** 48:22 52:4
  61:22
**operated** 89:13
**operator** 1:21
  20:16
**opined** 188:18,20
**opinion** 35:20
  41:16 120:18,18
  120:21 195:3
**opinions** 189:8
**opportunity** 5:1

  43:6 68:17 104:20
  114:20 125:11
  153:18 161:13
  164:4 171:2
**opposed** 36:17
**opt** 31:6 43:6,8
  56:24 58:5,15
  61:5 63:15 70:22
  70:24 92:16 106:7
  170:24,25 171:1,4
**opted** 20:22 22:13
  89:24 90:1,6
  106:8,18 110:1
  171:3
**opted-out** 121:22
**opt-in** 106:23 107:6
  107:9,18,23,24
  108:3 114:9
**opt-out** 106:24
  121:15,19
**order** 27:11 29:22
  34:2 102:5
**ordinary** 122:16
**organize** 186:1
**organizing** 128:20
**orientation** 30:19
**original** 69:6
  130:14 164:8
  170:19
**origins** 159:19
**Orleans** 150:18
  151:16
**ought** 65:22 91:3
  200:14
**outbursts** 183:24
**outcome** 56:19 66:7
  193:15
**outlined** 53:17 56:2
**outpatient** 167:24
**outrageous** 89:2
**outs** 31:6 43:8
  58:15 92:16
  170:24
**outset** 49:1 52:18
  53:11
**outside** 114:7 183:6
  185:22 186:12

**outstanding** 8:19
**overall** 39:19 78:2
**overbroad** 125:15
**overburdened**
  182:2
**overcome** 148:4
**overlay** 184:4
**overly** 159:14
**overriding** 29:20
**overseen** 50:20
**oversight** 17:3
  126:10
**overstatement**
  57:16
**overturned** 148:3
**overview** 77:20
  107:3
**overwhelmed**
  182:14
**overwhelming**
  59:10 60:11 98:23
**overwhelmingly**
  32:16 57:6 58:20
**over-narrow**
  125:16
**owned** 89:13
**o'clock** 46:23
**O'Donnell** 69:2

---

**P**

**P** 3:1
**PA** 1:5,24
**package** 110:20
  111:23
**packaged** 94:12
**Packer** 180:21
**page** 2:2 78:2 83:12
  93:5,10 116:18
  135:14,15,16
  144:14 152:5
  209:7,7 211:17
**pages** 35:4,4,4
  51:11 94:22
  112:24 113:1,2
**paid** 14:13 15:16
  73:23,25 101:9
  130:19 196:24

**pain** 165:10 169:23
**pants** 7:1
**paper** 82:8 152:23
**papers** 33:1 52:9
  53:4 55:21 56:4
  56:16 77:12 80:13
  83:16 108:11
  117:3 148:8
**PARAG** 1:16
**paragraph** 81:9
  83:11,12 85:13
  87:22,23 92:2
  109:6 118:3
  143:13 190:13
  191:2 193:17
**parallel** 44:11
**paranoia** 80:25
**Pardon** 161:19
  163:1
**parent** 181:14
  184:13
**parenthetically**
  121:12
**parenting** 184:12
**parents** 30:13
  182:2
**Parkinson** 75:6
**Parkinson's** 9:1
  10:12 14:14 23:7
  41:3 75:21 76:1
  76:24 78:21 83:18
  93:21 94:24 142:4
  146:13 167:12,13
  167:15 189:6
  197:5
**part** 13:9 26:4
  30:13 34:12 40:5
  50:15 51:7 93:16
  100:7,21 123:15
  123:17 132:18
  157:18 162:1
  167:12,14 181:13
  212:6
**partially** 181:19
**participate** 109:3,5
  109:8,9 113:25
  164:17

**participated** 110:3
**participation** 109:1
**particular** 9:22
  39:25 47:3 65:24
  181:21 187:6
  188:23 193:23
**particularly** 64:17
  181:23
**parties** 6:24 10:6
  10:17 16:19 31:23
  33:22,24 40:6
  43:3 59:13 65:25
  66:21 72:10,14
  73:1 75:3 91:20
  91:23 96:12
  102:11 105:6
  107:14,17,22
  108:7,15,17
  110:13 112:4
  113:6 116:14
  119:14 126:5
  207:14
**partner** 47:25 48:9
  164:15 207:20
**partners** 165:14
**parts** 31:13 111:6
**party** 41:24
**pass** 161:13 183:15
**passed** 14:17
  140:21
**passing** 38:1
**passion** 181:22
**pathological** 14:18
  41:7,8
**pathologies** 34:4
**pathology** 193:18
**patience** 67:5
  207:12
**patient** 118:11
  210:23
**patients** 41:4
  117:25 152:14
  165:13 167:19,22
  168:2,3 190:14
**Patriots** 23:24
**patterns** 74:24
**Paul** 48:8 187:2

**Pauline** 182:5
**Pause** 11:12 68:4
  122:8 127:11
  134:1 138:1,6,10
**Pausner** 120:16
  121:7
**pay** 38:11,13 65:4
  70:7 100:25
  110:11 112:15
  129:25 130:21
  131:21 132:9
  153:8 202:13
  203:2,8,24 204:3
**paying** 133:5
  202:22
**payment** 15:2
  49:20 88:17 132:2
  204:9
**payments** 50:17
  59:1,19 60:8
  130:24 149:18,23
  197:19
**payouts** 197:15
**pays** 112:16
**peace** 54:21
**PEC** 6:13 38:17
**peculiarity** 113:15
**peculiarly** 72:18
**penalized** 169:17
**pending** 39:23
  52:16 55:19 66:4
  121:17
**Pennsylvania** 1:1
  4:1,7
**pension** 147:7
**Pentz** 1:14 2:6
  128:1,2,5,5,12,14
  128:19 129:2,4,13
  129:18,22 130:3,7
  130:10,13 131:1,8
  131:11,13 132:3,5
  132:12,16 133:2,7
  133:9,14,16,18,22
  133:23,24
**people** 3:20,21 5:3
  33:16 40:23 42:19
  42:21 68:2 73:11

73:12 74:6 76:3
  76:17,25 78:3,12
  79:3 80:7,7,8
  81:15 83:21,22
  84:14 85:17,18,20
  86:3,24 87:1,3
  88:4,5,6,21,22,25
  89:3,14 90:24
  93:2,4,18 94:17
  96:25 98:17 101:6
  103:10,13 105:2
  105:11 113:1
  117:22 121:19,22
  123:4,8 128:21,21
  140:3,21 160:10
  161:3 162:4
  166:20,24 167:5
  171:23 181:5
  182:6,21,24 184:2
  192:14 194:3
  196:20 198:22
  212:8,22 213:14
**percent** 20:22
  22:12,19 58:15,18
  62:12 63:18 66:9
  83:19 93:4 112:3
  121:15 123:21
  145:21 161:10
  166:20 167:2
  190:13
**percentage** 71:9
  103:1,2
**percentages** 92:15
**perfect** 10:21 11:22
  45:14 156:8 188:8
**perfectly** 28:3
**Perfetto** 1:18 2:10
  170:12,13,22
  205:13
**Perfetto's** 206:13
**performance** 118:6
**performed** 190:8
**period** 49:16
  148:17 181:6
  191:14
**periodic** 126:14
**permission** 163:15

**perpetuated**
  172:12
**Perry** 3:14,17 55:6
  66:23
**persistent** 211:22
**person** 40:24 76:21
  77:23 81:3 93:3
  105:19 106:11
  107:12 110:10
  119:7 197:23
**personal** 9:14,16
  25:3 168:11
  194:19
**personality** 78:14
**personally** 9:14
  30:9 165:17
  179:15
**personnel** 213:25
**persons** 40:14
  193:18
**person's** 76:10,11
  184:23
**perspective** 54:1
  158:22 165:1
  185:10 189:12
  214:12
**perspectively** 41:9
**persuade** 58:5
**persuasive** 57:12
**pervasive** 182:23
**ph** 5:6 6:13,15,16
  6:17 12:21 24:11
  28:6 35:25 37:16
  41:6 43:17 48:19
  51:3 79:15 106:7
  120:16,19 121:16
  126:25 136:4
  151:24 167:18
  182:5 188:17,17
**pharmaceutical**
  9:16 14:9 42:17
  167:25 169:25
**Phase** 210:24
**Philadelphia** 1:5,24
  68:25
**Phillips** 7:9 28:20
  28:24 33:22 39:24

66:22
**phone** 44:24 99:15
  99:21
**physical** 65:16
  168:7 205:4
**physically** 74:5
**physician** 110:9,10
  111:19 114:12
  152:10
**physicians** 110:14
  110:15,16 111:2,5
  111:10 114:12
  166:10
**PI** 194:19
**picked** 110:24
  111:22
**picking** 211:12
**piece** 36:22
**PJ** 209:9,11
**place** 45:9 77:16
  110:17 111:6
  148:14 172:13
  183:25 205:16
  206:13,15
**places** 93:13 160:7
**plaintiffs** 16:8 27:9
  31:3 33:7 34:5
  39:20,21 40:1
  41:20 43:1 52:7
  52:19 53:4,8,15
  53:20 55:4 63:11
  69:22 70:3 73:20
  83:5 85:17 87:16
  156:11,16 195:17
  206:21
**plaintiff's** 35:21
**plan** 147:5 149:5
  165:23 166:17
  206:19
**plans** 207:8
**platform** 174:23
**play** 15:8 42:1,21
  43:13,21 44:8
  54:2 82:5 89:6,10
  90:19,19,20 91:8
  112:8 129:24
  136:7 141:15

145:2,5,23 148:19
157:15 175:17
176:14 194:15
**played** 15:3 23:15
23:23 26:17,19
29:9 34:12 43:20
60:2 64:2,11
71:15 76:3 82:6
87:25 88:5 89:8
89:19,20,21,22
90:4,8,9,14,24,25
91:2 98:5 112:1
136:6,12 145:12
145:19,22,25
146:1,11 151:10
151:15 154:10
156:9 164:10
175:14 176:1
180:20,21 182:21
**player** 5:8,20 9:1,3
14:19 15:4,12
16:3,11 18:21
32:13 34:12 35:7
36:14 44:7 49:6
49:21 56:23 59:20
61:1,5 65:1 83:8
91:8 94:3,10 95:8
97:11,13,23 98:2
99:8,10 103:10
107:20 110:11
111:15,18,21,25
112:2,8,18,18,22
113:16,19 148:18
148:19 153:22
158:17,20,21,22
160:15 164:19
169:13 171:7
180:15 213:4,7,10
**players** 1:3 3:9
8:12,20,23 9:4
12:18 13:1 14:17
15:6,23 16:10
17:14,16,24 18:11
19:7 20:17,25
21:4 22:11,24
23:3 24:5 26:16
26:20,24 28:3

32:5 33:3 36:9
38:24,25 41:11
42:3,4 49:6,13,17
50:4,6,17,23
51:19 52:19 53:2
53:23,24 54:20
55:9 56:8,9,19
57:7 58:19 59:20
59:22 60:21 61:23
63:13,18 64:17,21
65:10,15,18 66:6
66:7 70:20 71:15
77:9 82:3,4,10
85:22 86:8 89:6
89:20,21 90:8,14
90:15 91:11,12,18
92:8,10 93:15
97:4,17 98:19
102:21 103:23,25
104:4,18 107:1
109:3,5,8,8,13,23
113:5,25 118:5,18
119:17 124:23
125:18 128:7
129:15 130:17
145:6,9 146:16
147:5,15 148:5,10
148:24 149:20,22
151:6 152:25
154:12 157:13
158:5 159:9,13
160:5 161:6 163:8
167:10 169:20
172:4,13,17
173:15 174:8
189:3 191:13,15
191:20 192:7,12
192:18 193:13
204:25,25 206:1
206:22 207:5,6
212:7,11,16
**player's** 43:21 50:7
112:7 118:16,21
**playing** 49:14
64:10 81:2 104:10
112:21 118:21
146:15 149:9

151:13 153:22
**plays** 32:14
**please** 45:23 46:6,9
72:4 75:5 127:9
127:17 163:2
171:4 209:9
214:17
**pleased** 48:18
**plus** 49:17 57:6
58:16 62:12
141:13 210:2
**podium** 4:16
**podiums** 4:19
**point** 5:24 7:11,12
20:8 22:13,19
27:21 32:20 49:1
52:10 60:9 61:22
72:3 90:10 93:19
95:11,15 97:23
108:11 112:13
116:14 117:22
132:7 135:19
154:7,8,9,17
156:15 183:20
191:10,11 192:4
193:1 196:5
199:23 200:5,25
203:3,13 204:17
206:17 207:19,20
207:25
**pointed** 56:21
154:10
**pointing** 14:1 196:5
**points** 40:15 44:14
44:18 48:23 181:3
198:2,12 209:19
**point-blank** 173:5
**Polechronis** 48:16
48:17
**policing** 111:2
**policy** 96:7,8
**poof** 123:13
**pooh-poohed** 34:23
**pooh-poohing**
42:22
**pool** 212:22
**poor** 112:19 172:15

**poorly** 119:7
**pop** 36:17
**popular** 76:5
**population** 42:14
62:23 75:23,25
76:2 104:12 168:5
190:22 213:9
**pose** 53:20
**posing** 53:1
**position** 52:25
145:2,3 152:11
161:1 170:3
173:16 202:23
204:16
**positive** 32:19 57:6
**possibilities** 130:8
**possibility** 27:5
**possible** 8:17 51:20
55:16 59:15 67:4
77:25 114:6
156:19 157:1
205:17
**possibly** 70:8
**postpone** 134:3
**post-concussive**
166:14
**post-death** 193:4
193:18
**post-hearing**
163:15
**post-July** 123:5
**post-mortem** 76:8
82:11 84:15 98:14
**potential** 123:8
**potentially** 177:6
**poverty** 181:23
**power** 16:9
**powerful** 52:5
58:10 96:22 97:1
**powerfully** 60:12
**PowerPoint** 11:5
**PPA** 39:6
**practice** 144:19
**practicing** 214:12
**pre** 192:20 193:19
**precedent** 66:13
107:15

**precisely** 192:6
**predates** 160:18
**predict** 34:14
**predictable** 63:4
**Predominance** 24:7
**predominate** 24:8
**preempted** 35:22
52:21
**preemption** 9:25
23:9 25:10 31:10
31:12,13 32:23,25
34:23 35:1,8 36:8
39:23 52:23 53:6
53:8 54:5,12
**preface** 159:6
**prejudicial** 169:12
**preliminarily**
140:8
**preliminary** 19:22
28:25 52:3 159:18
160:4 192:8,21
**premise** 160:14
**prepare** 165:18
**prepared** 9:23 10:8
46:11 129:5
195:22
**prepreliminary**
192:6,11
**preregistered**
20:17
**presence** 57:24
**present** 10:18
59:21 73:2 78:21
78:21,22 79:8
125:11 168:2
169:11 182:16
185:7
**presentation** 15:6
45:16 46:20 47:3
154:20 187:9
191:12
**presented** 187:16
**presenting** 21:13
26:4
**presently** 27:3
**presents** 78:23
88:12 167:16

168:7
**preserved** 16:15
**presiding** 3:4
**press** 19:25 21:7
  85:16 198:13
**presses** 76:5
**presumption** 10:25
  29:17,18 200:1,3
**presumptions**
  172:22
**pretty** 22:21 25:5
  70:5
**prevalence** 167:7
**prevalent** 169:21
  190:22
**prevented** 37:4
**prevention** 7:22 8:2
  13:8
**previously** 109:15
**pre-battle** 213:25
**pre-death** 193:3
**pre-morbid** 118:19
  119:8 213:13
**pre-NFL** 118:16
  213:13
**pre-season** 149:2,5
  160:17,18 161:8
**pre-seasons** 148:25
**Prichett** 3:23
**primarily** 60:19
  130:16 160:16
  180:5
**primary** 71:2
  141:24 165:5
  166:9 183:22
  184:22
**principal** 190:18
**principles** 214:14
**printouts** 153:8
**prior** 14:17 15:7
  31:8 44:9 118:21
  146:17 172:5
  192:7 199:2,8,24
**prism** 66:12
**Pritchett** 3:24
**privilege** 165:5,12
**probably** 20:12

98:16 199:11
  202:5
**problem** 11:17
  18:14 27:19,25
  115:25 124:3
  132:18 144:25
  183:11 198:7,10
  199:3
**problems** 23:19
  30:5,22 36:16
  41:18 42:5,10
  71:23 84:25
  115:22 168:8
  177:5 191:9
**procedural** 61:3
  106:1
**procedure** 71:19
  107:18 116:6,11
**procedures** 115:25
**proceed** 115:6
  186:17
**proceedings** 32:21
  215:4
**process** 32:23 44:4
  65:3,6 67:6 71:22
  84:24 85:1,2
  112:14 113:11
  114:15 141:16
  158:25 161:25
  162:1 166:9
  168:11,13 176:13
**processes** 126:1
**proclaimed** 85:25
**producing** 70:18
**product** 55:18 63:9
  96:9
**Products** 51:10
  155:19,24
**professional** 9:6
  14:25 65:19 82:3
  82:4
**professionally**
  165:17
**professionals** 6:2
  12:22 14:23
**professor** 4:2 28:6
  45:5 139:25

156:11
**profile** 30:14
**profit** 70:20
**program** 8:6 12:9
  12:16,24 13:9,11
  15:21 16:1 18:6,7
  18:9 20:18 26:3,9
  49:15 50:2,3 51:8
  51:9 59:16,17
  106:25 108:6,9
  109:2,11,17 110:3
  114:2,4 116:1
  168:9 205:23,24
  205:25 206:9,13
  206:14 207:10
**programs** 17:23,23
  19:8 50:12,12,17
  50:22,24 73:25
  118:18
**program's** 109:18
**progress** 15:14
  42:8 66:21 79:1,1
  191:19,21
**progresses** 165:20
**progressive** 74:6
**projected** 39:20
**prolong** 113:11
**prominent** 73:12
  104:4
**promised** 126:4
**promptly** 59:2
**pronounce** 119:4
**pronunciation**
  118:23
**proof** 112:1 137:14
**properly** 119:15
  195:9
**Properties** 47:24
**proposal** 163:6
**proposed** 27:11
  33:11 40:7,7 49:3
  49:10 50:1,19
  53:21 54:18 55:19
  55:22 56:17 57:17
  60:14 64:15 116:7
  116:10 119:15
  151:3 164:4,24

188:10
**prospective** 195:2,7
**protect** 110:15,17
  151:18 185:20
  192:20 202:9
**protected** 49:19,25
  60:6 153:13 194:4
**protecting** 145:18
**protection** 29:14
  50:22 148:22
**protections** 61:4
  135:25
**protects** 194:5
**protein** 74:23,23
  193:9,22
**proteins** 76:13
**protracted** 44:20
  54:16 55:16 56:19
  66:8
**proud** 50:25 51:12
  123:19 205:23
  207:11
**prove** 9:1,2 27:10
  33:20 36:14,15
  40:5 49:13 100:10
  139:24 142:21
  151:19 152:12
  188:22 189:18
**proven** 62:23 144:6
  191:4
**provide** 14:3 28:10
  51:18 52:11 85:18
  86:24 89:16
  107:22 109:19
  112:6 114:2
  135:25 147:16
  163:11 165:25
  168:12 184:13,16
  184:17,18
**provided** 9:8 17:17
  60:22 67:5 139:17
  140:1 147:16
  206:19
**provider** 165:4
**provides** 49:3,10
  50:3 54:20 55:7
  55:11,14 58:23

59:1,16 60:7 66:4
  66:6 107:3 135:17
  206:25
**providing** 80:19
  88:23 104:14
**province** 201:23
**proving** 153:9
  188:15 189:9
  190:24
**provision** 99:25
  112:17,18 187:21
  192:19,20
**provisions** 106:1
**proxies** 60:3 64:2
  137:22
**proximal** 182:5,10
**proxy** 64:12 147:9
  147:9
**prudential** 27:7
**psychiatric** 166:22
**psychological**
  65:17 205:4
**psychologists**
  188:19
**psychosocial** 168:6
**public** 27:18 29:20
  51:23 56:3,16
  57:23,25 61:16
  148:24 169:2
  171:22 202:15
**publication** 210:6
  212:20
**publicly** 3:17 57:19
  58:4 63:19 66:10
  124:17
**published** 19:9
  33:12 81:25 93:12
  94:13 120:18
  150:14,19 152:23
  196:6,9 214:3
**pull** 72:4 137:24
  209:14
**pulmonologist**
  151:25 152:15
**punishment** 204:13
**punitive** 70:9
**pure** 141:12

**purpose** 13:20
  118:20 123:25
  156:17 193:6,21
  205:25
**purposes** 14:25
  29:6 58:11
**pursuant** 121:21
  126:6,8
**pursue** 56:25 61:6
  63:16
**push** 24:15
**put** 8:12 27:23
  36:23 37:1 38:4,6
  40:16 47:3 51:14
  54:1 55:3 69:18
  70:17 79:21,22
  81:19 108:6
  110:17 111:5
  113:22 116:9
  119:23 127:24
  146:17 154:17
  171:9 173:16
  181:13 184:20
  186:21 195:12
  196:7 204:24
  206:15 208:12
**puts** 194:21
**putting** 20:5 172:9
  207:14
**puzzling** 167:16
**p.m** 1:6 127:16,16
  214:20

**Q**

**qualifications**
  24:18,22,24,24
  25:5
**qualified** 14:23
  59:24 64:23 88:16
  94:18 111:8,13
**qualify** 15:10 17:17
  91:7 108:14,22
  118:11,13 149:15
**qualifying** 14:5,7
  14:11,14 15:25
  23:18,21 24:1
  26:18,20,24 28:14

42:5 43:14 59:21
  95:3,4,12,13
  107:1 109:24
  110:7,21 111:11
  111:14,24 114:11
  125:16 126:13,21
  126:22 130:18,21
  135:13,20 136:16
  136:25 137:3
  139:8 141:1
  143:19 145:14
  146:12 148:7
  192:8
**quality** 164:18
  166:1 185:8
**quarter** 212:23
**quarterback**
  145:15,19,21
  146:1
**quarterbacks**
  145:19
**question** 10:20
  37:17 46:11,12
  69:10 92:6 99:6
  102:20 103:22
  155:22 183:10
  188:7 189:19
  191:23 200:21,22
  212:23 214:5
**questioned** 92:20
**questions** 7:13
  22:25 23:1,11
  24:7 71:19 114:17
  198:21 200:6
  201:10
**quick** 197:12
  211:15
**quickly** 12:13
  22:21 29:25 181:3
**quite** 79:25 85:14
  102:22 109:3
  117:17 123:23
  156:2
**quote** 28:21 35:20
  120:20
**quoting** 37:25

**R**

**R** 3:1
**race** 45:1
**racially** 213:5
**raise** 37:17 71:18
  71:25 92:3 104:20
  106:23
**raised** 24:9 48:23
  49:1 66:2 71:4,5
  82:25 92:19 135:1
  154:7,15 185:14
  187:5,17,18
**Ralia** 48:16
**range** 38:14 139:21
  140:3
**rare** 211:3
**rarely** 145:24
**rat** 121:7
**rational** 141:10,19
  142:23 144:6
  187:22,23
**rationalization**
  140:2
**rationally** 139:25
**Ray** 69:2
**reach** 184:14
**reached** 28:21
  70:13 136:19
**reaction** 32:1,18
  57:6,11
**read** 33:9,9 35:5
  80:11,11,12 93:3
  98:3,4 99:15
  117:3 124:25
  143:10,17,17
  150:9 159:2 181:2
  197:14,21 199:20
  200:3,8,12,17
  209:15 211:1
**readily** 83:19,20
  147:11
**reading** 95:8 199:9
**ready** 186:2,3,4
**real** 22:25 23:11
  24:8 103:1 123:6
  181:4 211:15

**realistic** 130:12
**reality** 52:8 54:2
  64:19
**realize** 162:18
**realized** 160:13
**reallocated** 155:8
**really** 20:7 22:22
  24:12 28:11 32:19
  38:11,11 40:9,10
  45:15 63:21 83:17
  83:23 84:10 85:5
  85:21 87:7 90:17
  90:18,21 97:23
  103:20,21 148:22
  163:10 170:14
  173:17 174:2
  182:22 183:2,7,14
  185:19 188:14
  189:4,10 207:11
  211:7 212:10
**reapply** 15:21 16:4
**rear** 161:15
**reason** 17:19 26:22
  43:16 62:22 85:18
  97:12,14 107:22
  146:4 172:7,8,12
  172:17 197:17
  198:6 204:4
**reasonable** 10:22
  43:3 55:23 56:1,5
  56:13 57:4 63:3
  66:14 69:13 94:9
  101:15 102:5,16
  102:25 104:17
  105:10 135:24
  139:24 142:22
  188:10 189:25
  191:25
**reasonableness**
  38:14 57:13 60:13
  92:20 187:15
**reasonably** 94:3
**reasoned** 203:14
**reasoning** 62:6
**reasons** 55:20 56:2
  58:21 64:9 135:23
  137:5 155:8 162:7

172:6 175:23,24
**reassessed** 166:15
**Rebecca** 1:19
  179:11
**rebuttal** 177:17
  186:1 187:4
**receive** 40:6 72:10
  89:7 93:16 107:1
  107:8,25 108:22
  109:15,24 130:17
  140:9,11 166:21
  177:1 206:1,10,10
  206:11,23 207:8
**received** 61:16 74:8
  110:21 151:6
  177:3 198:8 204:8
**receiver** 145:4
**receives** 111:21
  112:2
**receiving** 107:11
  111:24 160:9
  185:11 206:18
  207:7
**recess** 67:10 127:16
**recessed** 67:16,18
  127:14
**recognize** 58:22,25
  59:4
**recognized** 169:14
**recommended**
  166:17
**reconvened** 67:18
**record** 21:24 63:6
  65:13 90:4 152:6
  156:24 189:23
  203:11 215:4
**records** 30:11,12
  30:15 148:24
  151:20 152:4
**recourse** 126:2
**recover** 110:5
**recovering** 111:23
**recovery** 38:15
  54:17 110:18
  112:11,12
**redefine** 175:19
**reduce** 135:9

149:20
**reduced** 43:20 45:6
  102:25
**reduction** 43:19
  142:17 206:25
  207:6
**reductions** 16:10
  16:12 28:15 43:12
  43:13,13,15,17,23
  44:10 50:16 63:25
  136:21 141:25
  154:16
**refer** 8:11 117:4
  124:23 135:17
**reference** 214:3
**references** 44:11
  116:24
**referred** 13:18
  117:15
**referring** 58:2 84:1
  205:12
**reflects** 43:24 61:18
  62:17 164:25
**refresh** 199:16
**regained** 176:9
**regard** 64:7 154:8
  154:13 198:11
  205:2
**regarding** 17:14
  34:3 201:10
**regardless** 107:12
**Region** 1:23
**register** 198:19
**registered** 108:2
**registering** 107:10
**registration** 20:18
  107:16
**regular** 146:16
  162:2
**regularly** 38:10
**rehab** 165:10
**rehabilitation**
  165:8 176:13
**reject** 101:25
**rejected** 105:5
  130:14 141:14
**rejecting** 101:25

**relate** 31:17 178:20
**related** 15:8 36:19
  44:7 59:18 81:12
  97:8,9 124:10
  130:18 169:10,18
  185:11 194:13
**relates** 1:5 75:16,17
  169:12
**relating** 39:10 73:4
  73:6 182:11
**relationship** 165:2
**relationships**
  184:22 185:9
**relative** 43:21,24
  213:13
**relatively** 92:13
**relax** 179:25
**release** 18:23 71:8
  72:13,13,15,16,17
  72:23 73:8 86:23
  89:16 91:13
  104:12 123:16
  125:16 204:7
**released** 73:1
**releases** 72:9
  159:14
**relegated** 33:4
**relentlessly** 57:19
  58:5
**relevant** 34:2 97:6
  209:7
**reliable** 103:14
  144:7
**relied** 33:24 212:18
**relief** 56:9 66:5
  98:25
**rely** 126:23
**remain** 46:7 50:13
  58:17 127:17
**remaining** 203:8,8
**remanded** 105:5
**remarkable** 85:14
**remarks** 18:17
  48:22 52:4 61:22
**remedied** 173:24
**remedy** 126:2
**remember** 34:25

174:15 211:4
**remote** 197:2
**render** 106:2
**rendered** 120:17
**renders** 71:10
**repeat** 48:23,25
**repeated** 19:23
**repeatedly** 75:20
**repetitive** 64:12
  74:7,8 75:18
  127:2 185:11
**reply** 112:25
**report** 79:15,17
**reported** 41:3
  42:14 209:4
  210:21 211:21
**reporting** 1:23
  61:17
**reports** 20:25 78:7
  98:22 146:25
  168:19 211:18,24
**represent** 22:2
  87:12 103:23
  128:6 129:12
  146:10
**representation**
  16:25 27:12 29:4
  29:14 87:8 92:18
  105:7
**representations**
  87:10
**representative** 5:12
  5:20,22 23:23
  25:9 26:19 87:16
  87:18,21 122:25
  123:3 164:16
**representatives**
  23:15 24:20 29:2
  87:6,11 88:9
  95:18 121:10,10
  136:3,12,17 137:7
  205:1
**represented** 27:22
  28:1 122:15,16
**representing**
  121:10
**represents** 26:16

26:20 28:2
**reputations** 8:13
**request** 154:2
  174:1
**requested** 214:20
**require** 73:20 96:5
  118:5 137:13
**required** 54:5 65:1
  111:16,18 131:20
  136:1 167:1,23
  189:18
**requirement** 27:13
  49:13 87:13,14
  107:23,24 108:3
  114:9,12 152:9
**requirements**
  107:16 117:8
**requires** 64:20
  75:18 146:15
  194:1
**requiring** 49:11
  59:22
**research** 76:11
  77:8 81:19 82:7,8
  82:9 83:3 165:11
  167:18 185:1
  188:24 189:5
  192:1 211:10
**researched** 85:24
**reserve** 146:17
  148:10,20 160:24
**resolution** 9:10,20
  10:4 26:3,9 55:7
  190:2,3
**resolutions** 25:13
**resources** 85:24
  167:19,21,22
**respect** 71:13,14
  102:23 127:22
  159:9 189:9
  193:16 198:4
  205:6
**respected** 198:5
**respectfully** 121:24
  154:2 155:15
  174:1
**respective** 33:25

146:25
**respects** 194:10
**respiratory** 150:13
  152:14
**respond** 21:14,17
  61:10 113:7
  134:11
**responded** 7:14
**response** 108:15
  152:5
**responsibility**
  159:12
**responsible** 132:1
  132:20 177:18
**rest** 69:18 87:18
**restraint** 161:18,21
**result** 9:11 10:11
  20:9,21 22:18
  53:10 69:18
  112:20 150:12
  205:21
**resulted** 104:2
  141:7
**results** 8:19 9:21
  82:22 83:7 88:19
  104:10
**resume** 127:16
**retired** 5:7,20 8:20
  8:23 9:1,3,4 17:14
  19:7 22:24 23:3
  24:4 41:11 49:6
  49:17,21 50:6,23
  51:19 53:2,23,24
  54:20 55:9 56:7,9
  56:18,23 57:7
  58:19 59:20 60:21
  61:1,23 63:13,18
  64:17,20 65:1,10
  65:14,18 66:6,6
  66:22 119:16
  130:17 152:24
  157:13 164:11
  206:1 207:5
**retirees** 54:4,11
  59:5
**retirement** 147:5
  149:5

**retiring** 151:17
**return** 204:9
**returned** 96:10
**returning** 148:18
**reunion** 150:22
**revenue** 202:20
**reversed** 92:18
**review** 154:3
  155:18 200:14,14
**reviewing** 152:25
**revised** 66:1
**rewarded** 169:23
**rhetoric** 201:1
**rich** 38:23
**richer** 39:14 65:11
**right** 4:22 10:5
  11:13,15,16 13:25
  17:2 25:17,25
  26:11 33:18 35:6
  37:8 40:21 42:7
  42:16 46:6,15
  47:5,12,19 55:2
  67:8 68:25 75:1
  80:10 81:21 83:21
  96:13 107:8
  119:11 121:17
  122:18 127:7
  128:1,17 130:1
  131:8 134:8 135:3
  138:18 139:9
  143:13 150:3
  158:10,19 161:23
  161:24 163:23
  170:4 174:3,3,4,6
  174:17 176:17
  179:9,11 184:5
  185:23 186:16
  199:7,25 207:4,4
  207:17 209:8
  210:15
**rights** 88:4,5,6,7
  105:7
**rigid** 119:8 152:9
**rigorous** 166:13
**Rip** 164:7,16
**rise** 14:4
**rising** 14:6

**risk** 23:6 31:10,15
  31:16,19 34:7,20
  39:22 40:4 44:5
  44:11 53:14 54:24
  59:7 70:7,10
  87:24 142:3
  149:12 171:10,13
  196:12,13 197:5
  197:25
**risks** 34:6 36:20
  42:1 43:25 53:2,2
  53:20,22 54:20
  70:5,6
**Rivertown** 174:22
**road** 27:1 42:8
  132:6 160:8 177:1
**Roberts** 155:16,20
**robust** 164:18
**role** 165:19
**rolled** 26:9
**rookie** 160:23
**room** 32:9 44:22,23
  123:11 170:18
**rooster** 64:22 91:1
**Rosenthal** 1:15 2:7
  146:8,9,10 150:1
  150:2 153:6
**Ross** 164:6 205:15
**roster** 144:17
  145:13,20
**Rothstein** 39:7
**round** 164:8
**rule** 22:21 35:6
  87:7 89:18 101:16
  101:16 121:9
  122:5,16
**ruled** 122:12,14
**rules** 71:19 89:18
  112:11 145:17
**ruling** 53:8 122:18
**run** 19:23 163:9
  212:13
**running** 155:12
  162:14 180:21
**runs** 49:15
**rural** 111:18
  118:18,24

**R-I-P** 164:7

────────
**S**
────────
**S** 1:11 3:1
**sadly** 104:3
**safe** 94:7,8 184:14
  184:23
**safeguard** 71:1
**safer** 17:23,24
**safety** 50:21 157:14
  168:25 184:16
**sailing** 99:25
  100:21
**Saints** 150:18
  151:16
**salary** 162:6
**sample** 211:8 213:9
**samplings** 213:16
**San** 135:2
**sat** 141:12 170:17
**satisfied** 29:25
  202:7
**satisfies** 27:12
  204:14,15
**satisfy** 112:22
  113:3
**Saul** 6:8 24:24
**save** 143:8
**saw** 93:10 150:25
  166:24 171:8
  211:14
**saying** 21:1 28:10
  35:24 45:14 84:3
  90:11,21 92:11
  99:7 123:21
  137:17 159:7
  195:16 196:19
**says** 4:9 16:20 27:8
  28:7 29:23 33:22
  35:20 39:24 41:14
  43:18 45:5 70:22
  72:25 73:5 77:6,7
  77:13 80:13 82:4
  83:12,13 89:22
  91:17,19 93:25
  94:22 95:3 98:7,8
  98:18 100:22

114:24 124:9
  126:18 133:5
  143:18 150:12,15
  150:20 156:12
  195:1 196:25
  198:25 199:7,12
  210:18 214:13
**scandalous** 120:24
**scarcity** 181:24,25
  182:1,1
**scary** 180:1
**scattershot** 212:11
**scenario** 146:2
**scenarios** 130:19
**scheme** 15:3 86:9
**scholarship** 176:5
**school** 4:1,7 18:22
  36:17 43:22,22
  118:18,25 119:2,3
  164:12 176:4
  208:10
**science** 8:7 33:5,8
  34:3 41:25 42:24
  43:16 60:5 64:4
  70:19 76:23 77:14
  77:15,17,20 78:11
  81:22 82:13
  103:16 125:23
  140:12 142:1
  187:10,11,14,14
  191:25 192:23
  193:1
**sciences** 189:16
**science-driven** 33:7
  33:15 126:4
**scientific** 10:16
  64:4,6 74:17
  80:13 103:14
  117:1 140:22
  142:20 146:3
  171:9 188:21
  189:23 214:6,13
**scientifically** 116:2
  137:23 139:16
  140:15 141:20
  213:19
**scientists** 8:7 80:20

212:5 213:2
**sclerosis** 41:17
**scope** 61:20
**scorched** 31:22
**score** 213:8
**screaming** 44:23
**screen** 11:5 78:1
  116:8 171:9
**screened** 213:24
**screening** 180:6
  212:16
**scroll** 210:19
**scrutinized** 57:18
**scrutiny** 58:1,2,14
  98:12
**se** 190:3
**seal** 214:19
**search** 42:16
**season** 12:25,25
  91:1,5,7 136:14
  144:18,20 146:14
  146:16,21 147:1
  147:10,12,13
  149:12,13,19,19
  149:22 150:24
  154:12 156:14
  162:3
**seasoned** 165:3
**seasons** 15:9,10
  23:15,23 64:2
  91:4 135:11,14
  144:13,15,22,22
  144:24 145:1,8,11
  145:14,21,22
  146:4 147:4,6,7,9
  147:10,19,23
  149:4,13,14
  151:10,15 153:23
  154:16 164:11
**seated** 3:8 67:20
  69:1 127:17
**second** 35:21 45:22
  51:1 58:25 68:1
  79:4 88:2 106:24
  108:4 127:24
  138:5 144:10,11
  145:23 164:7

167:3 181:16
185:25 186:5,10
186:11 192:3,23
194:16 199:23
208:6
**Secondly** 71:12
**seconds** 158:16
**section** 94:16
112:24 113:15
126:14 136:15
139:7 176:24
178:23 199:5,7,10
199:12,17,21
**sectional** 195:2
**sections** 137:9
196:5 200:17
**sectoral** 189:13
**secure** 56:10 64:21
131:17
**security** 60:8
177:12,24 178:24
201:11,20
**see** 11:5,15,18 12:3
12:3 28:20 34:17
41:12 58:11 72:20
72:25 74:4,10,18
74:20,20 75:14
79:11 80:23 81:23
83:23 90:23 93:9
95:24 102:13
116:11 119:25
127:9 135:16
139:6,11,12,12
142:6,9,10 152:15
182:24 184:6,7
210:2,16,19
211:18,22 214:16
**Seeger** 1:11 2:3,12
4:13,14,20,23,24
4:25 5:6,11,16,18
6:6,12,15,20 7:6
11:7,9,13,16,19
11:23 12:1,7
13:18,22 14:1
17:4,10 18:19
21:13,15,20 22:3
22:6,9 25:21,24

26:3 35:12,17,19
37:22,25 44:16,18
45:20,24 46:7
48:23 49:1 50:18
52:4,22 56:21
61:22 66:25 69:11
71:4 75:18 81:14
82:16 90:11 93:1
97:3 108:24 109:7
113:24 123:23
124:17 132:19,24
137:15 141:23
186:2 187:25
194:9 195:21
197:12 199:17,21
200:11,16 202:7
206:21 207:18,25
208:24
**SEEGERT** 143:8
144:3
**Seeger's** 57:4 83:11
**seeing** 75:13 102:10
117:8
**seek** 50:16,16 207:5
**seeking** 7:18 65:1
148:6
**seen** 31:4 60:18
78:7 83:16 92:13
103:19 104:24
118:7 203:12
**select** 12:21 60:20
162:2
**selected** 117:18
**self-selected** 211:8
**selling** 42:18,20
97:4
**senior** 48:4
**sense** 64:10 88:8
111:1 140:13
201:18
**sensible** 202:9
**sent** 94:13 114:25
176:12
**sentence** 143:17
199:23
**separate** 26:15
29:14

**separately** 51:7
**sequela** 170:1
**series** 10:7 211:7
**serious** 8:3 41:1,10
41:13 69:21 82:21
83:6,10 97:16
124:9
**seriously** 90:13
132:19 158:22
**serve** 165:6
**served** 10:4 91:3
164:9
**service** 137:21
169:2
**services** 45:3
167:24 180:6,7
185:11
**serving** 165:14
**session** 3:3 127:18
**set** 9:8 14:24 55:20
88:3,7 89:10
96:23 98:6 116:6
117:9 184:18
191:13 201:20
203:6 206:6
**setoffs** 140:10
**sets** 86:13
**settled** 10:1 35:6
39:15 81:15
141:13
**settlement** 3:19
7:19,20 8:11,22
9:3,8,9 10:7,18,21
10:24 11:2 12:8
12:25 14:12 16:7
16:18 18:11,12
19:21,24 20:6
21:11 22:11 25:17
27:23,24 28:9,24
29:5,18 32:2,10
34:12,19 36:24
37:1 38:15,20,23
39:9,14 40:7,13
40:17,25,25 41:14
41:21 42:3 45:4
49:2,3,10,15,22
50:1,15,19,25

51:7,13,17 52:12
53:21 54:3,3,10
54:18 55:11,19,23
55:25 56:5,18,23
56:24 57:4,7,17
57:20 58:1,6,11
58:16,18,20,23
59:1,4,12,25 60:1
60:9,14,22 61:6
61:13,19,23 62:1
62:8,13,15,18,18
62:21 63:1,5,19
63:20 64:1,16,20
65:11,13,16,24
66:4,13,20,24
67:1 69:9,10,12
69:13,16,19 70:4
70:6,12,23,23
71:10 72:8,9,11
73:19 77:16 84:23
86:2,10,16,23
89:9 91:21,24
92:8,21 93:17
96:17 97:7,19
100:7,21 101:15
101:24,25 102:1,4
102:13 103:4
104:17 105:8,9
106:2,23 107:7,8
107:9 108:8,23
110:2,8 111:9,14
111:15 112:5,24
113:15,22 114:5
116:4,7,25 118:5
120:25 121:2,4,8
123:2,12,17,19,22
124:15 125:14
126:11,12 127:4
129:24 130:14,23
131:14,19 135:7,9
135:15,21,23
137:13,19 138:15
139:13 140:9
144:14 146:20,22
147:1 148:6 151:3
151:17 153:13
154:1,21 155:21

156:17 157:19
159:18 160:2,5
164:5,24 167:9
169:13 173:15,23
173:25 176:20,25
178:21 183:13
187:12,15,24
188:1,8,10 190:16
191:6,22 192:5,12
193:5,6,7,21
195:25 196:22
197:7 198:22,22
199:6,13,19,22
201:20,25 202:3,8
202:12,14,15,17
202:23 203:5,9,16
203:22,23 204:6
205:1,5,8,22
206:2,16,20,24
207:9,12
**settlements** 9:15
21:10 25:15 38:18
60:18 204:23
**settlement's** 57:12
**settle's** 45:7
**settling** 29:21 43:3
107:14,17,22
108:7,15,17
110:13 112:4
113:6 116:14
119:14 126:5
156:12
**seven** 106:16
129:15 151:15
214:17
**seventh** 37:11
120:17
**severe** 43:14 44:10
59:5 61:24 80:23
**severity** 63:3
**sexual** 30:19
**Shah** 1:16 150:3,4
150:6 153:15
**Shan** 2:8
**share** 178:15
**shares** 164:23
**Shawn** 5:19 23:15

24:4
**Sheila** 48:19
**shells** 183:25
**shifting** 112:17
**short** 15:25 19:9,11
  79:10 109:10
  115:6 144:16
**shortage** 111:7
**shortly** 18:17
**short-form** 92:24
  93:11,12,14,25
**short-term** 78:4
  79:5,10
**show** 19:14,16 50:5
  60:11 98:1 119:14
  211:15
**showed** 82:2
  134:16 142:1
**showing** 35:23
  44:11 49:12 59:10
  59:22 193:15
  198:7
**shown** 185:1
  208:21
**shows** 82:9 193:18
**sic** 120:6
**sick** 5:8 34:13
**sicker** 16:4
**side** 45:23 79:23
  85:17 189:17
  193:25
**sidebar** 46:4 47:13
  214:17,19
**sight** 65:23
**sign** 74:25 152:10
  152:16 211:19,19
**signed** 152:8,20
  162:5
**significant** 39:3
  40:19 49:7 52:16
  53:22 54:13,14
  62:2 70:4,6
  167:16 169:15
  180:8 181:1
  182:23 190:4
  191:7
**significantly**

201:21
**signs** 50:5 210:2
**similar** 125:22
**similarly** 72:8 85:7
**simple** 62:21 114:3
**simply** 83:14 85:10
  99:3 102:18,22
  107:23 108:8
  109:21 111:1
  112:16 147:24
  152:19 154:9,17
  156:15 157:16
  163:7 189:24
**Sinai** 73:15
**single** 44:21 53:1
  63:6 203:24
**sipray** 51:3,4,5,10
  154:20 155:3,10
  155:12,20 156:1,4
  156:23 157:2
**sisters** 185:15
**sit** 66:17 155:9
**site** 32:9
**situated** 72:8
**situation** 77:18
  96:11,12 98:8
**situations** 182:1,17
**six** 36:20 83:4
  107:10 116:13,16
  175:14 212:25
  214:17
**size** 16:9 168:7
**skilled** 68:25
**skills** 62:6
**sleep** 10:12 23:19
**slick** 201:2,8,10
**slickly** 94:12
**slide** 19:14,16
  26:23 31:12 72:4
  74:18 81:23 82:4
  107:2 108:5,6
  109:25 113:22
  197:14
**slides** 76:12
**sloppy** 84:7
**slow** 199:20
**small** 17:12 71:9

174:21
**smell** 121:7
**Smerlas** 128:6
  129:14
**Smith** 5:6,7,18
**smoking** 124:6,6,11
  169:5
**Sneider** 188:17
  193:16
**Sneider's** 191:1
**socially** 183:23
**sole** 131:24
**solely** 185:12
**solution** 149:3
  204:20
**solve** 155:3
**somebody** 14:4
  96:6 139:17,19,22
  140:2 161:13
  209:23
**someone's** 69:21
  96:12,13
**son** 98:5
**sons** 104:23 185:18
**sooner** 51:20 55:15
  163:9
**sorry** 36:5 128:14
  139:1 179:21
  209:6
**sort** 83:23 84:7,8
  97:21 112:1
  124:21 154:15
  159:15
**sound** 124:12
  214:13
**SOURH** 215:3
**SOUTH** 215:7
**Southern** 181:21
**spare** 59:4
**spatial** 62:6 209:21
**speak** 21:20 22:10
  32:2 45:23 46:1,1
  46:2 109:23
  114:20 122:13,17
  128:21,21 129:5,7
  129:9,12,14,21,22
  134:13 153:19

171:2 175:5,8
  179:14
**SPEAKER** 12:4
  47:10 138:25
  163:20,21 186:4
  197:11 208:16
**speaking** 71:6
  78:12 128:7,9
**speaks** 63:20
  194:14
**special** 3:15,22
  7:14,15 29:1 55:6
  59:15 66:23
  201:22
**specialize** 117:20
**specially** 167:22
**specialties** 34:2
**specific** 36:14,18
  49:8,9 61:10 66:1
  72:18,24 74:17
  116:12 117:18
  200:13
**specifically** 28:10
  71:13 73:5,5 81:7
  211:13 212:1
**spectacularly**
  62:11
**spectrum** 167:13
**speculation** 141:12
**spells** 41:17
**spend** 6:21 13:5
  19:15 24:16 34:9
  37:13 54:6 61:11
  105:25 187:3,6,14
  197:8,20 201:19
**spent** 143:12
  157:11 182:20
  201:14 202:4
**spinal** 165:9
**spirit** 128:24
**split** 135:1
**spoke** 20:15 29:16
  205:14
**spoken** 21:15 57:8
  57:8,9 159:8
**sponsor** 70:18
**sponsorship** 202:19

**spoofed** 21:9
**Sporting** 97:5
**spouse** 164:6
**spouses** 159:10
  162:17 163:11
**squad** 91:3,10
  144:20
**Sr** 164:7
**stable** 184:14
**stack** 72:19
**stacked** 54:17
**stage** 9:9 32:21
  77:24,25 78:1,3
  78:17,25 79:4,9,9
  79:9,10,11,12,13
  80:1,1,2,17,17,17
  80:23 84:4,5,5,5
  84:12,17 86:4
  118:7 122:24
  176:8 209:17,17
  209:17,17 210:20
  210:21,21 211:18
  211:18
**stages** 77:24 78:17
  78:24 79:2 84:6
  88:14,15,15,16,18
  103:19,24 104:1,1
  210:20
**staging** 210:12
**stakes** 96:12
**stand** 3:14,24 42:12
  67:25 122:5,7
  125:15 127:9
  194:22 200:21
**standard** 36:8
  96:10 112:10,23
  113:3 148:4
**standing** 92:10
  127:20 174:23
**stands** 38:8
**star** 150:16
**stark** 142:7
**starkly** 184:6
**start** 5:2 6:20 46:16
  71:24 81:6 107:2
  144:22 145:18
  161:11 171:18

178:8 184:5
**started** 41:23 45:13
  97:3 170:19
  171:23 172:1
**starting** 139:13
**state** 7:20 25:8
  150:17 188:20,21
**stated** 77:3 121:1
  130:15
**statement** 85:12,15
  86:6 89:2 125:17
**statements** 96:16
  187:8 205:12
**states** 1:1 90:10
  97:2 117:17 118:3
  121:12,13,18
  126:12 136:1
  152:13 167:5
**statistics** 92:25
**status** 148:11
**statute** 34:11,15
**statutes** 53:13
**statutory** 16:6
  131:16,20 203:6,9
  203:18
**staving** 8:2
**stay** 97:12,14
**Steering** 206:22
**Stekloff** 48:11,12
**stellar** 48:8
**stepped** 176:7
**Stern** 73:13,13 77:3
  77:6 79:21 117:14
  117:16 118:3,10
  190:7,8 194:23,24
  194:25 196:17,22
  208:22 210:6
  212:20
**Stern's** 119:10
  195:3
**Steve** 5:7 6:15
  24:25
**Steven** 1:12 68:5
**Stewart** 146:11
**stipend** 163:11
**stoicism** 169:24
**stood** 141:24

194:12
**stop** 143:20
**stopping** 174:5
**stories** 19:22 184:2
**straight** 72:12
**strapped** 160:6
**Strawbridge** 4:8,11
**Street** 1:24
**strength** 34:5
**strengths** 188:11
**stress** 181:23
**stressed** 52:4
**stretching** 183:20
**strictly** 135:20
**strike** 155:6 156:2
**striking** 92:25
  188:13
**string** 145:23,24
**stringer** 35:7,12,13
  96:10
**strived** 39:19
**stroke** 15:7 39:10
  43:14 44:10 88:3
  88:7 102:24
**strong** 29:16,19
  51:15 205:9
**strongest** 151:12
**strongly** 73:18
  153:25
**struck** 150:23
**structural** 29:14
  135:25 160:14
  162:9
**structure** 184:16
  193:23 201:19
  202:8,11 206:24
**structured** 59:13
  65:7 167:9 202:2
  203:4
**structures** 202:7
**struggle** 101:10
**stubs** 153:8
**studied** 33:10 81:17
  189:3
**studies** 7:14,25
  82:17 125:25
  148:15 189:2,11

189:12,13,14,15
  190:8,14 195:2,7
**study** 8:8 80:21
  81:18,25,25 82:2
  121:13 148:16
  190:12 195:1
**studying** 80:9
**sub** 10:10 167:7
**subclass** 5:20,21,22
  5:23 6:16 23:22
  24:19 26:15,18,23
  27:2 28:2 136:3
  154:14 194:5
**subclasses** 24:6
  26:15 27:16,17
  28:7 29:13
**subclassing** 95:18
**subject** 44:19 88:2
  88:10 98:9 101:1
  125:24
**subjected** 105:11
**submissions** 80:12
  80:12
**submit** 55:22 56:17
  59:9 62:9 64:23
  66:13 111:23
  112:1 124:19
  147:21,21 152:4
  164:4 187:22
**submitted** 56:4
  73:9,11,17 110:20
  117:4,15 146:19
  148:23 154:4
  188:16 214:8
**subsequent** 164:20
**subsequently** 211:25
**substance** 41:19
  125:13
**substantial** 16:13
  39:13 40:4 49:4
  49:11,25 51:18
  53:9 54:20,22,23
  55:3,8,8 58:23,24
  59:7 65:4 66:5,5
  173:9
**subtests** 116:12,13

116:16,18,21
**sub-concussive**
  7:24 23:6,16,25
  64:13 74:9 149:7
**succeed** 27:11
**succeeds** 204:5
**success** 188:15
**successful** 26:12,12
**successfully** 52:1
**succinct** 164:18
**sudden** 171:25
**suffer** 123:8 125:21
  126:20 127:1
  177:5
**suffered** 15:7 26:17
  74:7
**suffering** 5:9 8:24
  9:16 78:4 82:19
  86:4,12 109:13
  125:20 148:25
  149:1,25
**suffers** 23:17
**sufficient** 29:5
  49:16 70:24
  149:17 203:7
**suggest** 57:16
  155:15 156:21
  157:16
**suggested** 197:3
**suggesting** 78:10
**suggestion** 62:7
  157:8 163:7
**suggests** 111:2
  113:22 152:17
**suicidality** 78:18,19
  78:20,23 79:7
  80:25 85:22 89:3
  194:13 195:15
**suicide** 30:7 85:20
  86:3 89:4 104:3
  124:13
**Suite** 1:24
**Sullivan** 29:19
**sum** 125:13
**summary** 159:2
  198:15,16 199:5
**sun** 65:17

**Super** 90:19,20
  175:16 176:8
**superintending**
  66:19 204:5
**superior** 56:18 66:7
**Superiority** 24:11
**supervised** 28:23
**supervising** 66:20
**supervision** 55:5
  59:13
**supplemental** 14:3
  15:15 38:6 50:11
  109:19 212:15
**support** 50:21
  53:15 58:18 59:10
  60:12 62:13 63:18
  128:8 129:23
  178:24 180:7
**supported** 55:21
  58:9,19 60:4 64:3
  82:13 213:21
**supporting** 64:24
**supports** 81:22
  187:15
**supposed** 109:19
  114:2
**supposedly** 142:14
**suppressed** 23:5
**Supreme** 136:1
**sure** 16:22 17:19
  26:10 35:13 45:24
  47:7 75:9,11
  134:20 137:11
  176:16 178:8
  181:18 183:14
  185:19 186:12,14
  197:11 201:24
  208:12
**surely** 65:5
**surprise** 109:3
**surprised** 162:4
**surprising** 59:11
  92:12
**surrounding** 183:2
**surveillance** 148:13
**Survey** 161:5
**survive** 54:5,12

**survived** 53:8
**suspect** 141:11
**suspender** 203:16
**sustained** 9:2 127:2
**swept** 152:2
**swings** 10:12 23:19
  41:18 79:7 185:6
**switch** 4:16
**symmetrical**
  114:15
**symptom** 74:25
**symptomatic** 54:4
  54:21
**symptoms** 23:17
  77:22 78:18 80:22
  81:12 82:19 97:7
  97:8,11,13,15,16
  103:16,18,20,24
  103:25 109:12,14
  109:16 115:24
  166:11 167:2
  169:20,23 180:8
  180:24 181:1,6,9
  182:15,24 183:12
  188:23 190:4,18
  190:19 191:13
  193:20 194:4
  209:3 211:10
**system** 18:9 101:11
  118:25 119:2,3
  148:14 204:9

**T**

**table** 47:25 69:1
  123:2,17 189:19
  192:18
**take** 3:13 30:5,17
  42:19,24 46:18
  47:1 66:1 67:9
  91:15 95:1,11
  113:10 120:2
  123:15,15 127:8
  127:13 161:9
  163:7
**taken** 83:23 86:8
  127:16 158:22
**takes** 101:11

160:16 174:7
  213:8
**talk** 12:11 15:5,23
  18:25 19:15 22:10
  31:12,20 32:7,10
  33:16,17,17 34:22
  75:23 77:21 84:24
  92:6 95:12 96:21
  101:11 117:2
  162:17 184:2
  194:22
**talked** 81:14
  170:17 210:12
**talking** 20:1 24:17
  30:16 31:15 32:12
  32:15 77:17 86:19
  86:19,20 96:25
  107:3 143:22
  153:7 171:21
  182:21
**talks** 73:3 121:8
  182:6 191:2
  197:17
**Tallahassee** 150:20
**tangles** 74:22 75:2
**tap** 11:8,9
**targeting** 168:20
**tau** 74:22,23 75:1
  76:13
**TBI** 41:2 44:10,15
  88:3,6 165:8
**teach** 184:20
**teaches** 77:14,15
**teaching** 181:20
**team** 6:13 48:8
  68:20 90:19,20
  144:17 161:4
  164:9,12
**teams** 33:2 159:5
**teasing** 161:21
**technical** 182:4
**technically** 98:10
**technology** 4:21
**teeth** 204:11
**television** 19:8
  96:23
**tell** 20:23 38:19

39:16 104:17
  130:1 137:1
  160:20 170:25
  172:24 175:10
  177:8 180:16
**telling** 81:1 83:5
  97:5 108:16
**tells** 140:13 198:18
**temporal** 197:2
**ten** 16:20 56:10
  67:9 77:2 105:21
  114:5 120:12,13
  126:15 128:3
  180:20 193:2
  202:1,12 203:2,6
**tens** 42:19,20
**ten-year** 203:11
**term** 79:11 95:2,5
  114:4 130:24
  182:4
**termed** 76:4,5
**terms** 10:5,18
  16:16 17:12 56:1
  57:21 61:21 126:7
  126:8 153:5
  154:14 169:1
  188:14 209:24
**terrible** 105:11,12
**terrific** 93:1
**test** 115:22 116:10
  117:6,10,10,13,16
  117:25 118:5,12
  118:17,19,22
  119:8,15 125:15
  140:1 193:14
  212:14 213:8,23
**tested** 9:5 13:2,3
  171:23 206:7
**testing** 13:11 14:8
  50:2 59:17 71:23
  115:25 116:6
  166:13 205:16,24
  206:3 207:21
  212:11
**tests** 7:21 12:18,23
  42:3 103:14
  116:15,20 117:18

212:12,13,18
  213:15
**Texas** 134:24
**text** 214:3
**thank** 3:17,20 4:2,7
  4:12,25 5:18 6:6
  6:21 7:2,15 11:15
  14:1 17:9,10
  21:19 22:5 26:2
  35:17,18 44:17
  46:13 47:10 48:20
  48:24 66:18 67:7
  67:8 68:11,13
  69:4 72:22 105:13
  105:14,23 106:20
  106:21 107:5
  109:25 114:18,19
  115:15,17 120:4,8
  120:9,13 122:9
  125:3,4,8,10
  127:5,6,15 130:3
  133:15,20,24
  135:5 142:25
  143:15 144:4
  146:6,9 150:1,2
  153:14,18 157:6,7
  157:25 158:2,15
  158:24 163:17,18
  164:3 166:5 169:6
  170:9,10,11,13
  174:10,11,11,20
  175:12 176:22
  178:1 179:3,4,24
  180:3 185:21
  194:9 200:17,18
  207:15,16 208:2,5
  208:17 209:9,13
  214:14,15
**Thanks** 67:25
  139:2 146:7
  185:24 186:14,15
  186:22
**Theal** 151:24 152:1
  152:16
**thee** 201:9
**theory** 193:12
  203:10

**therapies** 185:4
**therapy** 50:4 185:4
  206:11
**Theresa** 124:13
**They'd** 205:3
**thing** 15:22 37:17
  55:3 63:6 80:20
  80:21 92:9 93:18
  103:12 122:11
  126:12,23 132:13
  139:18 152:7
  153:12 159:3
  161:4 162:20
  174:3,3,4,6,24
  184:9 207:4,4
**things** 3:12 7:8 8:9
  23:20 31:2 41:15
  41:22,24 42:1,12
  42:13 44:4 75:5
  79:5 88:10 102:11
  102:15,15,22
  104:8 119:20
  126:16 170:16,24
  173:14,24 174:2
  195:11,13,15
  205:18 211:21
**think** 5:13 6:2
  13:19 30:3 34:9
  37:7,16 45:17
  46:25 63:21 69:8
  69:15 71:24 73:10
  90:12 91:16 93:17
  97:20,25 101:18
  101:22,23,23
  102:4 105:18
  107:4 108:16,25
  111:25 113:2
  115:2 119:25
  120:10 127:7
  128:14 130:5
  132:16,22 133:1
  133:11,12,13
  141:21 147:12
  149:21 153:21
  154:7,13 155:2,5
  155:7 156:5,24
  157:11 158:21

170:5 173:13,20
173:22 179:13
181:4 183:11
184:5,10 187:10
191:25 194:8
196:3 197:13
199:9 201:9 210:6
210:10,11,22
211:7 213:23
**thinking** 97:21
**thinks** 18:21 97:11
97:13
**third** 10:23 29:17
32:19 37:8 51:9
57:10 59:3 71:16
72:11 82:25 83:1
87:6,9 92:17
106:25 109:22
122:24 146:17
155:17 176:2
193:17
**third-party** 157:3
**THOMAS** 1:13,13
**thought** 8:17 96:4
96:21 115:4
131:25 187:13
191:3 200:9,12
**thoughts** 186:1
**thousand** 183:10
**thousands** 10:2
43:9 59:5
**threaded** 97:21
**three** 12:8 71:2
90:25 91:8 95:17
106:3 119:19,20
134:13 137:2
144:17 145:13
146:15 150:10
159:4 168:3
175:18 180:21
184:16 185:15
187:18 214:16,17
**threshold** 32:23
53:1
**threw** 170:19
**tidying** 47:15
**till** 127:8,14

**time** 4:9 12:14 13:5
15:4,23 16:21
19:20 21:16 25:4
25:4 30:11 34:9
34:18,19,24,24
37:13 39:23 42:25
45:18 46:20 49:16
64:11 75:12 89:11
95:4 98:25 99:3
124:9 125:15,17
126:19 127:23
135:1,4,19 137:2
139:8 143:7,9,10
148:14 149:6
158:1 164:14
170:15 174:4
176:1 179:4 180:4
191:15 194:2
197:20 201:14
**timely** 203:25
**times** 6:24 7:1,6
19:23 44:21,22
95:17 119:25
150:15 160:21
168:3 197:23
203:19
**time-limited**
109:21
**titled** 116:5
**tobacco** 169:4
**today** 5:8 7:18 8:10
10:18,20 21:4
26:25 28:4 34:13
40:24 48:19 57:24
58:8 69:14 73:19
76:23 83:16 92:7
98:19 101:14,24
103:23 108:25
125:21 128:8,10
134:4 137:12,14
149:10 160:1
164:15 169:11
170:14,17 171:3,8
171:20 172:4,8,23
191:14,16 193:9
207:13 208:21
212:3,10

**token** 140:5
**told** 19:11 77:9
81:4 82:16 98:15
98:15 120:6 122:4
124:7,17 128:19
141:20,23 174:22
176:4
**Tom** 43:17 115:20
**tomorrow** 193:14
**tools** 7:21 16:18
184:19
**top** 27:18 50:11
74:3 139:10 178:9
210:18
**topic** 109:22
**tort** 18:9 204:9,23
**total** 65:5 96:14
161:10
**totally** 110:19
**Totaro** 1:12 2:4
68:24 71:21
105:20,21,23,24
106:9,13,16,18,21
114:19
**tote** 120:6
**touch** 11:6 18:19
63:23
**tough** 6:24 37:3
41:24
**town** 174:21
**track** 158:25
203:11
**train** 80:20
**trained** 171:12
**training** 148:24
149:5,8,9 159:5
160:19,20 161:2,4
161:5,8 176:10
**trajectories** 206:7
**TRANCRIPT**
215:3
**TRANSCRIBER**
215:8
**TRANSCRIPT** 1:8
**trauma** 15:8 34:4
43:14 74:7,8
75:19 127:2 149:7

165:7 169:19
197:3,3
**traumatic** 7:23
44:16 82:20 88:3
92:4 93:22,23
102:24 165:8
182:9 196:15
**travel** 6:3
**treat** 90:23 103:18
105:2
**treated** 103:21
140:3 151:23
**treating** 108:13
**treatment** 7:22 8:2
13:8 14:8 50:4
71:14,15 163:8
206:10
**treatments** 185:5
**treats** 72:8
**Tregg** 122:2
**Tregg's** 122:20
**tremendous** 95:22
204:1
**tremendously**
182:2
**trends** 206:7
**trial** 9:24 24:13
30:25 31:7,8
36:24 40:3 44:13
53:12 189:17,21
194:17
**trials** 25:9
**tried** 14:21 25:6,7
141:14 177:2
194:19
**trigger** 126:10
**trouble** 25:19
**troublesome**
169:10
**Trucks** 92:17
**true** 57:14 62:8
65:12 70:17 76:8
76:14 95:6 108:9
108:19,20 205:5
215:3
**truly** 157:18 213:11
213:12

**trust** 131:17,20
177:14 203:7,9,18
**try** 8:8 12:12 17:22
48:21,22 58:5
118:20 181:3
195:18,22 207:4
**trying** 9:13 128:24
141:16 160:24
175:18 182:22
183:20 212:7
213:2
**tsunami** 121:21
**tube** 6:1
**turn** 96:23 173:8
**turned** 115:1
122:25
**Turner** 5:23 8:24
23:22 24:4 26:18
87:23 136:4,18
137:6 154:11
**tweaked** 40:12
**Twenty-three**
20:15
**twice** 95:17 146:1
**two** 3:20,21 8:17
11:23 13:1 24:6
24:16 26:14 27:6
28:2 29:13 73:24
111:24 127:13
131:15 134:13
135:7,12,23,24
136:3 137:9
145:16,20 160:4
160:21,22 163:11
175:17 182:20
189:2 194:22
198:9 201:19
207:19,22
**two-and-a-half**
144:24
**two-minute** 207:25
**two-prong** 24:17
**type** 60:18 63:5
152:10
**typical** 60:17 168:7
**Typicality** 23:12
**typically** 31:24

**U**

**UCLA** 77:8 80:8
98:9,16
**Uh-huh** 48:21
203:20
**ultimate** 49:22 60:8
**ultimately** 39:7,11
104:2 130:17
166:22
**unable** 175:5
**unacceptable**
118:14
**unaffected** 65:7
**unambiguously**
57:9
**unanimous** 60:11
**uncapped** 14:11
27:5 28:4 29:10
49:23,24 60:9
108:8 130:23
**uncertain** 54:7,12
**uncertainty** 54:25
85:1
**unclean** 155:12
**uncommon** 121:19
**uncontroverted**
156:24
**undeniably** 66:14
66:14,15
**underline** 214:14
**underlying** 52:18
160:13
**underneath** 143:13
**underscores** 60:13
**understand** 34:2
50:7 64:18 69:15
79:25 99:17
100:22 101:13
122:12 132:11
133:10 156:2
157:5 158:12
170:3 173:2
177:25 178:20
179:23 181:5
182:22 183:8
194:20 196:4

206:3
**understandable**
65:21
**understanding**
173:3 175:9
177:17 195:17
**understands**
198:17,18
**understood** 8:14
130:24 177:15
211:5
**undertaken** 70:25
**undertaking** 67:3
**undertook** 96:20
**undisputed** 188:25
190:21
**unfair** 43:11 64:16
71:11 86:16 106:2
121:24 124:15,22
**unfairly** 19:25
113:4
**unfairness** 119:8
173:14
**unfettered** 147:25
148:1
**unfortunately** 35:5
76:2,21 78:7
104:2 112:20
176:9
**UNIDENTIFIED**
12:4 47:10 138:25
163:20,21 186:4
197:11 208:16
**unilaterally** 107:15
**union** 8:20
**uniquely** 57:23
**United** 1:1 90:10
97:1 136:1 167:5
**units** 165:8
**unity** 29:5
**universe** 159:15
**University** 4:1,7
73:14 122:23
150:17 164:12
176:6 181:21
**unmanageable**
28:8

**unnecessarily**
135:8
**unnecessary**
110:19 114:9
148:5
**unprecedented**
49:5 57:25 58:13
**unquestionably**
78:9
**unrealistic** 108:12
**unrebutted** 189:10
**unrecognized**
169:20
**unrelated** 32:4
78:15
**unreliable** 152:18
**unscientific** 212:9
**untainted** 65:7
**untested** 118:12
**untreated** 169:20
184:25
**unusual** 72:23
**updated** 82:7,9
**upset** 21:22 43:5
**urge** 57:5 64:18
66:15
**urged** 121:1
**urging** 10:6
**use** 4:16 5:14 64:10
67:22 95:11
146:20 147:1,10
147:12 149:18
153:7 167:20,22
198:3,6
**uses** 7:20
**usually** 148:1 184:1
**Utecht** 1:18 2:10
128:8 129:16
133:4 174:13,14
174:16,18,20
175:1,4,7,12
176:17,22 177:11
177:21 178:1,10
178:13,16,19
179:4,7 201:14
202:10 204:15,16
**Utecht's** 128:20

129:4,6,8,11,23
132:5
**utilization** 167:19
**utterly** 159:8

**V**

**vacuum** 52:13
**valid** 110:5
**validated** 196:18
**validation** 184:17
**valuations** 146:19
**value** 39:21 63:22
84:3 146:25
149:20
**valued** 84:2
**values** 38:19,23
39:3,9,13,14,17
**vanished** 138:17
**various** 63:2 85:16
105:25 106:1
116:18 130:19
135:10 154:16
187:5 212:14
**Vasquez** 43:17
109:6
**Vasquez's** 197:16
**vehemently** 58:3
**veil** 168:24
**verified** 118:10
**Veritext** 1:23
**Verrier** 4:3
**version** 144:16
155:10
**versus** 29:23 35:19
43:22 120:19
145:22
**vest** 147:5
**vested** 8:20
**vice** 4:6
**victims** 9:15 84:22
85:23
**view** 20:5 52:1 54:8
60:23 81:18
**viewed** 52:12 66:12
**viewer** 93:6
**views** 187:13,13
**vigilance** 125:1

**vigorous** 28:22
96:20
**Vikings** 164:8
**violence** 78:8
181:24
**violent** 78:13
**Vioxin** 26:12
**Vioxx** 39:15
**virtually** 96:24
**vision** 41:18
**visit** 110:11
**visited** 93:2,5 94:5
**visits** 20:10 166:24
**Visual** 209:21
**vivo** 196:18
**voice** 164:22
**voices** 58:10
**volumes** 63:20
**voluntary** 29:17
**volunteer** 165:14
**vulnerable** 175:20

**W**

**wait** 68:1,1
**waited** 38:2
**waive** 18:11 72:25
**waiver** 18:7,8
**walk** 29:13
**walked** 44:21,22
**walking** 183:25
**want** 3:12,13,16,19
4:20,21 6:3 7:2,15
8:19 11:4,11,20
12:18 19:15,15
21:1 22:14 25:20
25:25 28:12,17
30:12,14,15,16,25
31:6,12 34:22
40:8 44:19 46:1,7
46:11,17,18 50:9
52:10 69:8,9,10
69:12 73:16 77:21
94:7 99:16,19
102:13,13 105:6
112:9,10,11 115:5
115:10 124:13
133:18 143:17

154:6 158:11,11
170:16 173:19
175:8 176:16,20
181:2,2 183:14
184:9 186:13
187:6 194:20
199:10 209:5
213:14
**wanted** 6:4 41:21
58:11 106:22
115:2 128:21
131:9 134:19
171:1 179:5 183:8
194:10 197:8
198:3,5 207:3
209:1,18
**wants** 157:19 174:3
200:14
**warned** 27:20
**warner** 36:17
**wasn't** 22:3 100:11
134:20 137:16
198:7 212:4
**water** 25:20,23
**way** 6:23,23 11:21
17:24 28:15,17,18
38:1 40:12,24
43:7 44:7 80:13
83:23 84:18,22
86:13 92:14 94:20
97:18 101:8
102:19 108:16
115:2 118:15
120:23 128:22
131:14 138:20
146:5 152:3 160:8
173:23 175:3
184:15 186:25
196:19 197:19
202:11 203:4
206:24
**ways** 116:20 157:9
**We'll** 138:18
**weaknesses** 188:11
**weather** 25:6,7
**website** 19:13 20:4
20:10,13 21:9,10

82:16,24 86:1
92:24,25 93:2,5,6
93:11 94:4,5
124:8 198:19
200:8
**websites** 20:4 21:8
58:6
**Wednesday** 150:18
**week** 73:10 96:25
134:9 191:17
**weeks** 83:4,4
160:13 161:10
202:4
**Weigand** 68:24
71:22
**Weinstein** 26:7
**Weiss** 6:8,10 24:24
48:8 132:20 187:2
**welcome** 120:15
158:3
**well-diagnosed**
118:7
**well-funded** 58:3
**well-settled** 55:24
**Wendell** 3:23
**went** 35:4 94:5 96:2
96:18 97:3 99:22
148:19 175:16
198:10
**weren't** 69:22
73:25 123:18
154:25,25 173:3
**we'll** 47:2,3 61:10
67:12 68:1 81:23
105:9 127:12
136:8 179:17
209:7
**we're** 3:9 7:18
12:19 16:8,9,20
17:19,22 32:12
47:1,15,16 48:18
73:8,19 77:17
83:17,21 84:24
86:18,19,20 96:5
96:11 99:18,18
109:2 124:1,12
127:7 133:7 158:4

160:1 172:4
181:12 186:2,3,4
**we've** 13:12 17:16
25:13 26:5,14,14
33:9 83:16 101:3
101:4 103:19
104:24 162:17
204:24
**whatsoever** 49:12
59:23 145:12
193:16,20
**wheelchair** 150:22
**wherewithal** 203:1
**who've** 26:16
**wide** 145:4 204:7
**widely** 62:22
**widespread** 57:22
202:15
**widows** 172:18,25
**Wiegand** 1:13 2:5
114:23 115:16,17
115:20,20 117:5
119:13,19,22
120:4,8 207:21
**wife** 5:7 164:14,15
175:18
**WILLIAM** 1:14
**Williams** 98:3,6
99:16 150:7,9,11
150:16,21,23
151:4,15,18,19,21
151:25 152:3,11
153:11 198:4
**Williams's** 198:6,8
**willing** 184:20
**win** 175:15
**Windows** 120:19
**wish** 16:2 205:15
205:16
**withhold** 7:3
**withstand** 37:12
**wives** 8:15 70:1
97:17 104:23
172:19,24 182:14
**woefully** 109:10
**wonderful** 3:17
**Wooden** 5:19 23:15

24:4 26:15 87:23
136:4,23 137:6
154:11
**word** 57:3,4 91:15
99:8 143:16 198:5
**words** 49:12 56:7
75:19 102:3
105:16 108:1
118:23 119:4
120:6 134:13
137:21,23 147:9
213:7
**work** 7:16 16:20
17:23 28:3 55:4
83:3 126:5 184:20
185:7 201:13,25
201:25 202:2
208:22 214:2
**worked** 202:8
212:8
**workers** 18:19 23:9
33:4
**working** 59:24
181:22
**works** 26:21 61:20
83:24 131:15
178:21 202:11
**world** 62:24 82:16
83:5 86:1 124:2
124:17 176:8
180:22
**world's** 81:16
**worried** 133:9
**worry** 157:14
**worse** 96:17 118:15
118:18 182:17
**worst** 151:6,8
**worth** 108:25
**worthwhile** 184:24
**worthy** 105:10
141:8
**wouldn't** 113:25
128:25 145:15
192:19
**wound** 42:2
**wow** 4:18 68:12
201:3

**wrap** 119:12
**writings** 195:12
**written** 19:2 37:14
126:17
**wrong** 37:16 97:24
105:12 120:25
196:3
**wrongness** 73:18
**wrote** 53:6 99:2
201:6 207:24

**X**

**X** 2:1 111:9
**XXXXI** 176:8

**Y**

**Y** 111:10
**Yaffey** 188:17
190:13,14
**yeah** 5:15,17 25:20
46:10,24 106:7
123:20,25 124:3,4
124:14 128:16
131:13 180:16
183:18 186:24
200:16,18 201:5
201:12 208:13
210:5,10,13
**year** 89:22 90:20
120:18 126:23
131:19 140:7,7,10
141:3 143:23
150:21 154:10
156:9 162:15
165:2 166:12,14
166:25 191:18
203:6,9,17
**years** 4:5 8:17 13:2
13:3 15:3 16:20
40:3 43:12,19,20
43:21 44:3,9
49:16 51:19,20,20
52:2 53:24,24
54:6 55:15 56:10
56:10 59:7,8 60:2
67:22 77:2 89:8
111:24 114:5,6

117:11 126:15,19
126:21 129:25
131:21 132:2,7
133:4 136:7,11,19
136:22 137:1,2
139:21 140:25
142:8 145:16
151:17 153:24
154:17 159:5
162:13 164:20
165:4,16,19 167:1
175:15,17 177:1,5
177:6,7 179:1
180:20,22 182:20
183:17 185:14
191:2 193:2
197:23 202:1,1,1
202:12 203:1,16
203:22 204:12
205:16,17 207:14
**year-long** 55:18
**York** 68:20 134:13
150:14
**young** 42:3
**younger** 13:2 38:24
143:24
**youngest** 177:4
**youth** 168:20

---

**Z**
**zero** 83:10,11 88:19
**zoom** 209:9 210:16
**Zyprexa** 26:8

---

**$**
**$1,000** 112:15
113:7
**$1,200,000** 141:4,8
**$10** 154:22 156:3
168:18
**$112** 99:25 100:1
100:24 101:1
123:11
**$12,500** 162:5
**$150,000** 162:14
**$200,000** 142:13
**$3** 85:9

**$3.2** 140:18
**$3.5** 141:3
**$4** 84:2,6 87:4
88:13,17 95:14
140:9 143:22
**$40,000** 162:13
**$5** 39:16 49:5 59:20
139:13
**$5,000** 162:11
**$650** 141:13
**$675** 149:17
**$75** 12:15 108:10
108:18 113:24
**$8** 9:15
**$800,000** 140:15
**$900,000** 140:19

---

**1**
**1** 46:23 77:25 78:1
78:3,17 79:9 80:1
80:17 84:4,12
86:4 88:14,16,18
89:22 94:24
103:19 104:2
209:17,24,24
211:14,18
**1-plus** 211:19
**1-888-777-6690**
1:25
**1.0** 116:4,22
**1.3** 167:5
**1.5** 13:13 14:15
15:13 85:4,6,7
116:4,22,24
**1:33** 127:16
**1:35** 127:14,14
**10** 13:3 91:8 151:16
166:24 203:16
204:12
**10:08:26** 12:5
**10:44:11** 46:5
**10:44:32** 46:10
**10:44:54** 46:19
**10:44:57** 46:21
**10:45:16** 47:6
**100** 83:19
**105** 2:4

**11** 73:9 131:19
**11,886** 109:6
**11:00** 46:19 47:1
67:17
**11:12** 67:18
**11:22** 67:18
**11:29:20** 74:12
**115** 2:5
**12,500** 162:5
**12-year** 148:16
**12-23-23** 3:11
**12:00** 47:2
**12:38** 127:16
**120** 2:5
**125** 2:6
**128** 2:6
**132** 152:5
**133** 152:5
**135** 2:7
**139** 51:11
**14** 91:6 94:16
**14th** 52:3
**140** 91:6
**141** 51:11
**146** 2:7
**15** 137:16 143:12
**150** 2:8
**153** 2:8
**158** 2:9
**16** 91:5 92:2 145:22
212:12,18,22
**163** 2:9
**17** 181:12
**170** 2:10
**174** 2:10
**179** 2:11
**1800** 1:24
**1801** 1:24
**187** 2:11
**19** 1:5
**19103** 1:24
**194** 2:12
**1961** 164:11
**1965** 164:11
**1969** 162:5
**1984** 150:15,20
151:21,25

**1989** 146:11
**199** 21:4
**1991** 89:13
**1992** 89:14 153:3
**1993** 146:11
**1995** 89:14 148:15
**1996** 148:17
**1999** 153:24

---

**2**
**2** 13:12 14:15 15:15
15:18 73:12 78:25
79:10 80:1,17
84:5,12 86:4
104:2 116:7
135:19 145:22
167:1 209:17,24
211:18
**2-plus** 211:19
**2.0** 85:9 116:4,22
**2:08:58** 155:16
**2:12-md-02323-AB**
1:3
**2:15:27** 160:25
**2:17:00** 162:9
**2:30:51** 183:5
**2:37:52** 181:8
**2:38:30** 181:25
**2:39:55** 183:7
**2:40:00** 183:10
**2:41:00** 184:11
**20** 43:8 44:9 181:5
202:1
**20,000** 20:11 22:11
22:24 92:8 123:8
**200** 2:12 21:3 43:8
189:3
**2000** 154:9
**2000s** 172:5
**2001** 148:17
**2002** 153:24
**2006** 148:15 175:16
**2007** 89:14 176:7
**2009** 176:9
**2010** 24:2
**2011** 18:5 152:1
196:22

**2012** 152:23
**2013** 81:25 165:22
195:3 210:5
**2014** 1:5 14:17 82:9
83:9 84:1,15
85:19 87:2 88:19
88:25 94:2 95:7
95:16,20 99:5
103:6,11 196:17
198:9 199:2,9,25
215:10
**2079** 126:23
**208** 2:13
**22** 212:12,13,18
215:10
**22,000** 49:17 57:6
58:15
**22,000-plus** 206:1
**23** 22:21 101:16
109:6 121:9
**23(a)** 27:13
**23(a)(4)** 87:7
101:16
**23(f)** 37:9
**23-page** 94:13
**2323** 1:4
**25** 67:17 127:13
139:18,21 176:24
**27** 162:15,15
**29** 162:15

---

**3**
**3** 79:9,9,11,12,13
80:2,17 84:5,17
86:5 91:7 103:24
135:21 137:25
138:14 139:5
166:24 190:10,15
191:21 209:17
210:21,24
**3rd** 198:9
**3.2** 140:11
**3:20** 1:6
**3:22** 214:20
**30** 4:5 44:9 89:22
90:4 129:25 132:6
158:16 165:1

177:7 180:22
**30-year** 181:5
**302** 197:23
**31** 167:2
**33** 67:22 177:5,6
**33,000** 19:6
**34** 82:2
**35** 82:2
**36** 135:16
**37** 83:11
**39** 150:18 151:16

---

**4**

**4** 80:23 84:5,17
  86:5 87:22 88:15
  88:16,18 103:19
  103:24 139:14
  190:10,15 191:21
  209:17 210:21,24
**4,500** 20:14
**40** 129:25 132:6
  137:1 165:4 177:7
  185:14
**41** 137:1
**43** 13:1,2
**44** 139:22 140:7,7
  140:25 142:17
  193:17
**45** 136:19,22
  139:12,18 140:2
  140:10 141:3
  142:18 151:11
  191:2
**47** 2:3 143:23
**49** 140:17
**49's** 159:4

---

**5**

**5** 91:4 144:23
  151:10 199:17,21
**5,000** 8:12 20:17
**50** 118:3 129:25
  133:4 140:19
  143:22 145:21
  161:10
**50,000-plus** 213:24
**54** 143:22

**55** 127:13 131:21
  142:9,11 203:8

---

**6**

**6** 161:9
**6.4(a)** 126:14
**60** 44:2 101:9
  141:22 142:2,8,9
  142:12
**60s** 142:2,3,8,15
**61** 148:18 149:1
**64** 141:22
**65** 49:15 126:19,20
  132:2 177:1 179:1
  203:17,22 204:12
**65,000** 93:4
**65-year** 14:12 95:5
  202:2
**66,000** 20:10
**68** 2:4

---

**7**

**7** 2:3 87:23 93:8
  199:9
**7th** 14:17 83:9 84:1
  84:15 85:19 87:2
  88:19,25 94:2
  95:7,16,20 99:5
  103:5,11 123:5
  199:25
**70** 44:3 162:12
**70s** 145:17
**71** 162:13
**72** 162:13
**75** 197:23
**76** 82:9
**78** 83:12,12 93:4
**79** 82:9 123:1

---

**8**

**8** 78:2 161:10
**80** 112:3 166:20
**80s** 34:13 145:17
  149:9
**83** 190:13
**84** 151:23
**86** 85:13

**88** 165:22
**89** 81:9 112:19
  190:13

---

**9**

**9** 135:14,15 144:14
**9.6(b)** 113:15
**9.7** 112:24
**9:58** 1:6
**90s** 149:9
**93** 92:2
**99** 58:15,17 62:12
  63:17 66:9

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| : | |
| IN RE: NATIONAL FOOTBALL LEAGUE: | No. 2:12-md-02323-AB |
| PLAYERS' CONCUSSION          : | |
| INJURY LITIGATION            : | MDL No. 2323 |
| : | |
| Kevin Turner and Shawn Wooden,   : | |
| *on behalf of themselves and*    : | |
| *others similarly situated,*     : | |
|                    Plaintiffs,  : | CIVIL ACTION NO: 14-cv-0029 |
| : | |
|                    v.           : | |
| : | |
| National Football League and    : | **Hon. Anita B. Brody** |
| NFL Properties LLC,             : | |
| successor-in-interest to        : | |
| NFL Properties, Inc.,           : | |
|                    Defendants.  : | |
| : | |
| THIS DOCUMENT RELATES TO:    : | |
| ALL ACTIONS                  : | |
| : | |

**NATIONAL FOOTBALL LEAGUE'S AND NFL PROPERTIES LLC'S**
**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF FINAL**
**APPROVAL OF THE CLASS ACTION SETTLEMENT AGREEMENT**
**AND IN RESPONSE TO OBJECTIONS**

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................................1

ARGUMENT.........................................................................................................4

     A.     Objectors' CTE Arguments Have No Merit .................................5

          1.     CTE Is Included in the Settlement..................................5

          2.     The Settlement Properly Does Not Cover Mood and Behavioral Symptoms for Any Qualifying Diagnosis, Including CTE .............9

          3.     Objectors' Attacks on the NFL Parties' Experts are Meritless......13

     B.     Objectors' Remaining Arguments Largely Repeat Their Original Submissions ................................................................15

CONCLUSION....................................................................................................19

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Girsh* v. *Jepson,*
   521 F.2d 153 (3d Cir. 1975) .......................................................................... 1, 4

*In re Ins. Brokerage Antitrust Litig.,*
   579 F.3d 241 (3d Cir. 2009) ............................................................................ 13

*In re Serzone Prods. Liab. Litig.,*
   231 F.R.D. 221 (S.D. W.Va. 2005) ................................................................. 13

*Smith* v. *Nat'l Football League Players Ass'n,*
   4:14-cv-01559, E.D. Mo. Dec. 2, 2014 ...................................................... 4-5

STATUTES

28 U.S.C. § 2412 ................................................................................................... 14

OTHER AUTHORITIES

3 Fed. Evid. § 6:78 (4th ed.) ................................................................................ 14

98 C.J.S. Witnesses § 86 ...................................................................................... 14

Defendants National Football League ("NFL") and NFL Properties LLC (together with the NFL, the "NFL Parties") respectfully submit this reply memorandum in further support of final approval of the Class Action Settlement Agreement dated June 25, 2014 ("Settlement Agreement" or "Settlement") and preliminarily approved by this Court on July 7, 2014. (*See* Order, July 7, 2014, Doc. No. 6084.)

## PRELIMINARY STATEMENT

The NFL Parties' Final Approval papers demonstrated that this Settlement—guaranteeing generous Monetary Awards and other substantial benefits to every Retired NFL Football Player who receives a diagnosis of debilitating neurocognitive and neuromuscular impairment over the next 65 years—is fair, reasonable and adequate under the settled law of this Circuit, and that no objection to the Settlement has merit. Nothing in Objectors' supplemental briefing refutes that showing.

As the NFL Parties' moving papers established, the Settlement easily satisfies the factors set forth in *Girsh* v. *Jepson*. In their supplemental briefs, no Objector disputes that the complex legal, factual and scientific issues in this case would make continued litigation significantly prolonged and expensive. No Objector contests that over 99% of Settlement Class Members remained in the Settlement—support that continues to grow given the several Opt Outs who have revoked their requests for exclusion following the Fairness Hearing. No Objector refutes the serious risks of litigation faced by Plaintiffs in the absence of settlement, including the likely insurmountable legal obstacles of preemption and causation, or that those risks have grown more—not less—serious with the passage of time. And no Objector debates that the Settlement is well within the range of reasonableness in light of the best possible recovery in litigation, and likely exceeds it.

Rather, in their supplemental briefs, Objectors rehash their misguided complaint that CTE purportedly has been excluded from the Settlement.  As the NFL Parties and Class Counsel showed in their moving papers and at the Fairness Hearing, that is not true.  The Settlement indisputably compensates the manifest neurocognitive deficits allegedly associated with CTE according to the research of Objectors' own experts.  Objectors do not, and cannot, contend otherwise.  Instead, they argue that the criteria used to diagnose those deficits are somehow infirm, notwithstanding that such criteria are scientifically sound and were designed by highly qualified expert consultants retained by the parties.  At bottom, Objectors' CTE grievance is that the Settlement does not compensate the mood and behavioral symptoms that Objectors argue are associated with the purported early stages of CTE.  Leaving aside that Objectors' arguments regarding the alleged mood and behavioral symptoms of CTE are scientifically speculative, the Settlement intentionally does not compensate those symptoms for CTE *or any Qualifying Diagnosis* because they are so common in the general population and derive from multiple causes—a fact that Objectors do not seriously dispute.  The decision to exclude those symptoms from compensation was fair and the result of arm's-length negotiations.

Lacking a persuasive response on the merits of the NFL Parties' CTE arguments, Objectors resort to attacking the experts of the NFL Parties and Class Counsel as biased because they are being paid at standard hourly rates and allegedly have made prior inconsistent statements about the science.   Those claims have no merit.  The NFL Parties' experts are leading practitioners in their respective fields and have offered objective opinions in their declarations, and the allegedly "inconsistent statement" is no

2

such thing. In any event, there is no dispute among the experts—Objectors' and the parties' alike—on the material issue here: the neurocognitive deficits and the Qualifying Diagnoses compensated by the Settlement are associated with CTE and thus Retired NFL Football Players living with CTE who manifest those deficits or Qualifying Diagnoses are *included* in the Settlement.

Finally, none of Objectors' remaining arguments—all of which have been addressed in detail in the NFL Parties' moving papers—has merit. The amount of, and Offsets to, the Monetary Awards are fair and reasonable. The Settlement's claims process is a structured program designed to operate functionally, efficiently, consistent with due process, and without fraud, in order to provide Settlement Class Members with substantial benefits for 65 years. And no Objector rebuts the NFL Parties' argument as to why the Education Fund is not a *cy pres* distribution. As for the argument that the Settlement's security provision is insufficient to ensure that all Monetary Awards will be paid over the Settlement's 65-year term, again Objectors miss the point of the provision. The NFL Parties are providing security in the amount of money that they believe will be necessary given reasonable assumptions about investment returns. This protection is in addition to the contractual obligation of the NFL Parties to pay all valid claims as they come due. Moreover, Settlement Class Members have remedies—both legal and equitable—to redress any hypothetical payment obligation failures of the NFL Parties over the term.

For the reasons below and in the NFL Parties' and Class Counsel's moving papers, the NFL Parties respectfully submit that the Court should grant final approval of the Settlement.

3

## ARGUMENT

The NFL Parties' moving papers established that the Settlement is presumptively fair.[1]  It was the product of hard-fought arm's-length negotiations by experienced counsel well versed in the strengths and weaknesses of Plaintiffs' claims. No Objector contests that over 99% of Settlement Class Members remained in the Settlement—indeed, several Opt Outs have revoked their requests for exclusion following the Fairness Hearing.[2]  (NFL Parties' Mem. in Supp. of Final Approval ("NFL Parties' Mem.") at 45-47, Doc. No. 6422.)

The NFL Parties also showed that the *Girsh* factors confirm that the Settlement is fair, reasonable and adequate.  (*Id*. at 41-74.)  That showing essentially is conceded by Objectors, who do not dispute that continued litigation would be long-lasting, complex, expensive and enormously risky given the likely insurmountable legal obstacles faced by Plaintiffs—including causation, statutes of limitations, assumption of risk and the NFL Parties' preemption argument that could have and likely would have resulted in the outright dismissal of Plaintiffs' claims.[3]  (*See id*. at 42-45, 55-68.)

---

[1]    Unless otherwise defined, the capitalized terms used in this memorandum have the same meaning as those in the Settlement Agreement.

[2]    *See* Fourth Opt Out Report Submitted by the Claims Administrator at 3, Doc. No. 6465 (revocation of Opt Outs by Steve August and George Youngblood).  In addition, Joshua Cribbs, who submitted an Opt Out form, is no longer a Settlement Class Member because he has signed with an NFL Member Club to play football and thus is not a Retired NFL Football Player.  *Id.*

[3]    Indeed, just within the last month another federal district court ruled that negligent misrepresentation claims against the NFL Players Association ("NFLPA") identical to those asserted against the NFL in this MDL are preempted because resolution of the claims substantially depends on interpretation of the NFL Collective Bargaining Agreement player health and safety provisions.  (*See* Suppl. Decl. of Douglas M. Burns ("Suppl. Burns Dec.") Ex. 1, Mem. & Order 1-2, 14, *Smith* v. *Nat'l Football League Players Ass'n*, 4:14-cv-01559 (E.D. Mo. Dec. 2, 2014), Doc. No. 34 ("*Smith*

4

In their supplemental briefs, Objectors instead argue that CTE is excluded from the Settlement. Objectors also repeat several other objections made in their original submissions and fully addressed in the NFL Parties' and Class Counsel's moving papers. None of Objectors' supplemental arguments has merit.

**A.    <u>Objectors' CTE Arguments Have No Merit</u>**

The NFL Parties have repeatedly demonstrated that the Settlement Agreement provides for Monetary Awards for living Retired NFL Football Players with the manifest neurocognitive deficits allegedly associated with CTE, as well as those Retired NFL Football Players who develop them in the future. Objectors' supplemental arguments do not refute this fact.

**1.    CTE Is Included in the Settlement**

In their moving papers and at the Fairness Hearing, the NFL Parties demonstrated that the Settlement compensates the key, manifest deficits of CTE identified in the two main studies conducted to date regarding CTE. (NFL Parties' Mem. at 80-85.) Specifically, those studies claim that former NFL players diagnosed post-mortem with CTE had neurocognitive impairment while living that was consistent with

---

Mem. & Order").) Specifically, the Court found that determining whether the players justifiably relied on the NFLPA's assurances that they would protect players and act in their interests substantially depends on an interpretation of these provisions. (*Id.*) Justifiable reliance is also an element of Plaintiffs' fraud-based claims. (Defs.' Mem. of Law in Supp. of Mot. to Dismiss Am. MAC at 27-30, Doc. No. 3589-1; Defs.' Mem of Law in Supp. of Mot. to Dismiss MACAC at 24-25, Doc. No. 3590-1.) In addition, the *Smith* Court denied the Settlement Class Members' argument that preemption is inapplicable because they are now retired. Instead, "the events occurred while Plaintiffs were current members of the collective bargaining unit" and thus preemption of claims based on those events is a valid finding. (*Smith* Mem. & Order at 12.) This holding also supports the NFL Parties' position in their pending motions to dismiss. (Defs.' Reply Mem. of Law in Further Supp. of Mot. to Dismiss Am. MAC at 22-25, Doc. No. 4252; Defs.' Reply Mem. of Law in Further Supp. of Mot. to Dismiss MACAC at 23-25, Doc. No. 4253.)

5

dementia or co-morbid diseases such as ALS, Parkinson's Disease, Alzheimer's Disease, or frontotemporal dementia. Thus, according to these studies, at least 89% of the former NFL players studied would have been eligible for a Qualifying Diagnosis while living under the Settlement, proving that CTE is, in fact, compensated under the Settlement. (Decl. of Dr. Kristine Yaffe Decl. ("Dr. Yaffe Decl.") ¶¶ 82-84 (citing Ann McKee et al., *The Spectrum of Disease in Chronic Traumatic Encephalopathy*, 136 Brain 43, 59 (2013) ("McKee Study") (reporting that "'CTE plus co-morbid disease' refers to players who were diagnosed with CTE and one of the following: Alzheimer's Disease, Parkinson's Disease, ALS, or frontotemporal dementia.")), Doc. No. 6422-36; Decl. of Dr. Julie Ann Schneider ("Dr. Schneider Decl.") ¶¶ 51-52, Doc. No. 6422-35; Post-Fairness H'g Suppl. Br. of Morey Obj. at 20 n.21, Doc. No. 6455.)[4]

Tellingly, Objectors do not dispute the point. They argue instead that the specific terms in the Settlement Agreement for mild dementia and moderate dementia, that is, Level 1.5 Neurocognitive Impairment and Level 2 Neurocognitive Impairment— and the test and criteria for diagnosing them, that is, the BAP Test Battery and Specific Impairment Criteria contained in Exhibit 2 to the Settlement Agreement—are not recognized within the medical and scientific communities and do not diagnose the allegedly "unique" disease of CTE. Again, Objectors are wrong. (*See* Post-Fairness H'g Suppl. Br. of Morey Obj. at 18-20, 22-23, Doc. No. 6455; Suppl. Decl. of Robert A. Stern ¶¶ 14-16, Doc. No. 6455-1; Decl. of Dr. Wayne Gordon ("Dr. Gordon Decl.") ¶ 9, Doc.

---

[4]     Moreover, the studies do not show that the remaining 11% (three players) were unqualified for compensation under the Settlement, but rather that the information provided in the McKee Study—which was based on the retrospective recollections of family members—was insufficient to draw any conclusions one way or the other. (Dr. Yaffe Decl. ¶ 83.)

6

No. 6455-11.)  Although the descriptive terms used in the Settlement—Level 1.5 and Level 2 Neurocognitive Impairment—are unique to the Settlement, the BAP Test Battery and Specific Impairment Criteria used to determine such "Levels"—far from "fantasy"—were developed in consultation with highly qualified consultants acting on behalf of Class Counsel and the NFL Parties, are consistent with relevant medical and neuropsychological literature, and provide a sound methodology to assess the neurocognitive impairments that the Settlement compensates.  (NFL Parties' Mem. at 118-22; *see*, *e.g.*, Decl. of Dr. John G. Keilp ("Dr. Keilp Decl.") ¶¶ 22, 28-45, Doc. No. 6423-20; Decl. of Dr. Scott Richard Millis ("Dr. Millis Decl.") ¶¶ 16-34, Doc. No. 6422-34; Decl. of Dr. Richard Allen Hamilton ("Dr. Hamilton Decl.") ¶¶ 14-23, Doc. No. 6423-25; Decl. of Dr. Kenneth C. Fischer ("Dr. Fischer Decl.") ¶¶ 8, 9, 14, Doc. No. 6423-17.)  They were not designed to, and do not purport to, diagnose any unique pathology—such as CTE or Alzheimer's Disease.[5]  Rather, these diagnostic tests identify the severe neurocognitive deficits compensated by the Settlement and associated with these and other neurocognitive pathologies.  The Test Battery and Specific Impairment Criteria function as intended:  The test results correlate well with the clinical reality and presentation of the patients.  (Dr. Keilp Decl. ¶ 36.)

Objectors' purported "case study in the unfairness, unreasonableness, and inadequacy of the settlement proposal" in fact illustrates that the Settlement compensates

---

[5]  Objectors' related assertion that clinicians may be able to diagnose CTE in living persons in the next decade, particularly because of the possible development of a biomarker that allows clinicians to identify the presence of tau in an individual's brain, is irrelevant for the same reason.  The Settlement does not compensate individuals because of the presence of a protein in their brains.  Instead, the Settlement provides compensation for a certain severity of neurocognitive impairment irrespective of pathological cause.  This is true for *all* of the Qualifying Diagnoses in the Settlement Agreement, other than pre-Settlement Death with CTE.

7

CTE and that the Test Battery and Specific Impairment Criteria capture the manifest impairments allegedly associated with CTE.  (Resp. of Chesley Obj. to the Mots. for Settlement Approval at 4, Doc. No. 6453.)  According to Objectors, Retired NFL Football Player Jesse Solomon was examined by a neuropsychologist and a neurologist in 2011.  Those practitioners determined that, among other issues, Mr. Solomon had "severe problems with" memory, "poor concentration and focus," and became "easily distracted" (*id*. at 5)—learning, memory and complex attention problems that specifically are tested for under the Test Battery in the Settlement.

Thus, depending on the severity of Mr. Solomon's deficits in learning, memory and complex attention, he likely would have been compensated under the Settlement Agreement for Level 1.5 Neurocognitive Impairment or Level 2 Neurocognitive Impairment in 2011 when he went to the neurologist and neuropsychologist purportedly "exhibiting the signs and symptoms of chronic traumatic encephalopathy (CTE)."  (*Id*.)  Moreover, because the Settlement is not static, even if Mr. Solomon would not have qualified for compensation in 2011, as his condition progressed—a key feature of CTE, according to Objectors and the McKee Study—he would have become eligible for compensation at the point at which his neurocognitive impairment reached the requisite severity, and would continue to be eligible for Supplemental Monetary Awards if and when his condition deteriorated further. Accordingly, Mr. Solomon's case, rather than demonstrating that the Settlement is unreasonable, proves that the Settlement compensates individuals with CTE while living, and that the Test Battery and Specific Impairment Criteria are scientifically valid.

Finally, Objectors' argument that CTE must be its own Qualifying Diagnosis under the Settlement because it is a unique condition allegedly caused by "[r]epetitive brain trauma" ignores a principal benefit of the Settlement—namely that it does not require a Retired NFL Football Player to establish causation to obtain compensation for any Qualifying Diagnosis. (*See, e.g.*, Post-Fairness H'g Suppl. Br. of Morey Obj. at 6, Doc. No. 6455; Suppl. Decl. of Dr. Sam Gandy ("Dr. Gandy Suppl. Decl.") ¶ 14, Doc. No. 6455-2; Dr. Gordon Decl. ¶ 4.) Thus, any causal relationship between football and CTE—an issue of great scientific debate—is irrelevant because the Settlement compensates neurocognitive deficits of a certain severity, regardless of their underlying cause or pathology—whether CTE, Alzheimer's Disease, frontotemporal dementia, Lewy body dementia, or otherwise.[6]

In sum, far from excluding a claimed "unique" pathology purportedly caused by football, the Settlement broadly includes debilitating neurocognitive impairments of any cause, including CTE.

> ## 2. The Settlement Properly Does Not Cover Mood and Behavioral Symptoms for Any Qualifying Diagnosis, Including CTE

At bottom, Objectors' fundamental complaint about CTE is that the alleged mood and behavioral symptoms that Objectors *speculate* are associated with it are

---

[6] The elimination of causation from the analysis of whether a Retired NFL Football Player qualifies for a Monetary Award is a major benefit for Settlement Class Members. Objectors' CTE-related objections—like all of the objections—ignore the context in which this Settlement is being reached and the alternative of vigorously contested litigation. There can be no dispute that causation would be heavily disputed if these cases proceeded to trial and that Plaintiffs would face enormous challenges proving both general causation—whether concussions and repetitive head trauma are capable of causing long-term neurocognitive impairments in the first place—and specific causation—whether a player's specific concussion(s) actually caused his long-term injury and whether the NFL Parties' alleged conduct substantially contributed to that injury. (*See, e.g.*, Dr. Yaffe Decl. ¶¶ 51-53.)

9

not compensated under the Settlement Agreement. Objectors are correct that these symptoms are not covered—not for CTE or for any other Qualifying Diagnosis.

First, the Settlement Agreement treats mood and behavioral symptoms consistently across *all* Qualifying Diagnoses: Mood and behavioral symptoms simply and definitively are not covered under the Settlement Agreement. As the NFL Parties' moving papers showed, the settling parties' decision not to compensate mood and behavioral symptoms—allegedly associated with CTE or otherwise—is for good reason. Mood and behavioral symptoms, such as depression, irritability, and aggressiveness are common in the general population and often have multifactorial causation, meaning that the causes of these symptoms can be attributed to numerous factors wholly unrelated to CTE, head trauma, or NFL Football. (*See* NFL Parties' Mem. at 83-85, Doc. No. 6422; Dr. Schneider Decl. ¶¶ 39, 42; *see also* Dr. Yaffe Decl. ¶ 75; Dr. Hamilton Decl. ¶ 29, 33.) Retired NFL Football Players also may have one of several significant risk factors for depression, including, but not limited to, sleep apnea, higher Body Mass Index, exposure to severe lifestyle changes, or drug or steroid abuse, which have been shown to increase the risk of depression or other behavioral symptoms. (Dr. Yaffe Decl. ¶ 75; Dr. Schneider Decl. ¶ 39.) Moreover, mood and behavioral symptoms experienced by individuals with other Qualifying Diagnoses, such as Alzheimer's Disease, do not result in compensation under the Settlement. And individuals with other Qualifying Diagnoses, such as Alzheimer's Disease, often experience mood and behavioral symptoms like depression. In fact, although the medical and scientific communities have now determined that depression is not part of the clinical profile of Alzheimer's Disease, it was believed to be decades ago. (Dr. Schneider Decl. ¶¶ 39, 42.)

10

Second, Objectors continue to ignore the state of the science regarding CTE. All experts agree that: (i) the specific diagnostic profile of CTE and its causes or even association with football are unknown (*See* Dr. Yaffe Decl. ¶¶ 66-67, 78-79; Dr. Schneider Decl. ¶¶ 24, 27-28; Dr. Hamilton Decl. ¶¶ 26-27, 30-31; Decl. of Dr. Christopher C. Giza ("Dr. Giza Decl.") ¶¶ 18-20, Doc. No. 6423-18; Decl. of Dr. David Allen Hovda ("Dr. Hovda Decl.") ¶ 26, Doc. No. 6423-19; *see also* McKee Study at 61-62; Decl. of Eric R. Nitz, Ex. 12, Robert A. Stern et al., *Clinical Presentation of Chronic Traumatic Encephalopathy*, 81 Neuro. 1122, 1125-27 (2013) ("Stern Clinical Presentation Study"), Doc. No. 6201-4); (ii) there have been no prospective, longitudinal epidemiological studies to determine the incidence and prevalence of CTE in the general population and to analyze whether a causal link exists between head injury and CTE (Dr. Yaffe Decl. ¶¶ 66-67; Dr. Schneider Decl. ¶¶ 25-27; Dr. Fischer Decl. ¶ 11; Dr. Hamilton Decl. ¶ 28; Dr. Giza Decl. ¶ 16; Dr. Hovda Decl. ¶¶ 20-23, 26; Dr. Keilp Decl. ¶ 38; *see also* Stern Clinical Presentation Study at 1127 ("Future research is needed to clarify the clinical presentation of CTE")); and (iii) the *two* studies that Objectors rely upon to support their speculation about mood and behavioral symptoms—the McKee Study and the Stern Clinical Presentation Study—are case reports with numerous inherent limitations including, but not limited to, information bias based on retrospective calls to family members to determine subjects' alleged symptoms. (Dr. Yaffe Decl. ¶ 64; Dr. Schneider Decl. ¶¶ 25-26; Dr. Giza Decl. ¶ 17.) Put simply, there is no scientific basis to claim that mood and behavioral symptoms are part of CTE. (Dr. Yaffe Decl. ¶ 75; Dr. Hamilton Decl. ¶ 31 ("The current state of the science does not allow us to determine the extent to which repetitive neurotrauma uniquely causes or contributes to specific clinical

11

symptoms such as depression, personality changes, or cognitive impairment."); Dr. Schneider Decl. ¶ 29 ("[I]t is premature to consider mood and behavioral symptoms as part of the diagnostic and clinical profile of CTE.").)

None of Objectors' newly-submitted, virtually identical medical declarations from various professors and physicians offers scientific grounds to support Objectors' position to the contrary. Not a single declarant for Objectors cites a prospective, longitudinal study that explains the causes of CTE, the diagnostic or clinical profile of CTE, including whether that diagnostic or clinical profile includes mood or behavioral symptoms, or the prevalence and incidence of CTE in any specific population. Nor could they because no such studies exist. In fact, the two studies relied upon by Objectors openly acknowledge the inherent limitations of the science to date and the inability to draw conclusions from *either* study regarding CTE. *See* Stern Clinical Presentation Study at 1127 ("Results from this study should not be interpreted in terms of population prevalence or generalized to living athletes with CTE . . . [T]here was no comparison group of former athletes without CTE. This may limit the ability to draw conclusions that the clinical presentation described is specifically due to the effects of CTE."); McKee Study at 61 ("[A]n autopsy-based case series is limited by significant ascertainment bias, as families of individuals showing behavioural or cognitive symptoms are much more likely to initiate and participate in a brain donation programme than families of normally functioning individuals. Consequently, no generalizations regarding the incidence and prevalence of CTE in living athletes and veterans can be made.").

12

In sum, even if science reaches the point where mood and behavioral symptoms are identified as part of the diagnostic profile of CTE, the parties' decision to not compensate mood and behavioral symptoms associated with *any* conditions is entirely reasonable. *In re Serzone Prods. Liab. Litig.*, 231 F.R.D. 221, 233 (E.D. Va. 2005) (overruling objection that the settlement failed to compensate additional injuries when the excluded injuries had multiple potential causes); *see also In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 272 (3d Cir. 2009) (disparate treatment "reflect[ing] . . . the extent of the injury that certain class members incurred . . . does not clearly suggest that the class members had antagonistic interests").

### 3.    Objectors' Attacks on the NFL Parties' Experts are Meritless

Recognizing that the Settlement, in fact, includes CTE, Objectors resort to attacking the NFL Parties' experts, arguing that they are biased.  (*See* Post-Fairness H'g Suppl. Br. of Morey Obj. at 8-11, 16-17, Doc. No. 6455.)  Nothing could be further from the truth.  Dr. Kristine Yaffe and Dr. Julie Ann Schneider are leading practitioners in their respective fields.  They practice at elite institutions, have each published hundreds of peer-reviewed articles, and have devoted their careers to treating patients suffering from and conducting research regarding dementia, Alzheimer's Disease, and other neurodegenerative conditions.  Dr. Scott Millis is a leading researcher in the field of traumatic brain injury who has published over 100 peer-reviewed articles relating to neurobehavioral outcome and neuropsychology.  Their credentials are impeccable, and, not surprisingly, are not directly challenged by Objectors.[7]  That they are paid for their

---

[7]    On the one hand, Objectors point to the fact that Drs. Yaffe and Schneider have co-authored numerous academic papers with Drs. Stern and Gandy as evidence that Drs. Stern and Gandy are well-qualified (*see* Post-Fairness H'g Suppl. Br. of Morey Obj. at 8 n.5, Doc. No. 6455), while at the same time seeking to discredit Drs. Yaffe and

13

work is of no consequence.  All of the NFL Parties' experts focus their careers on the treatment of patients, research into medical or scientific issues, or their academic responsibilities.  It is standard for experts to receive hourly compensation for secondary expert work that takes them away from their primary responsibilities.  *See generally* 28 U.S.C. § 2412(d)(2)(A) (defining "fees and other expenses" to include reasonable expert fees "necessary for the preparation of the party's case"); 3 Fed. Evid. § 6:78 (4th ed.) ("[I]t is of course not only permissible, but indeed standard practice, to pay witnesses for aid in preparing the case."); 98 C.J.S. Witnesses § 86 ("[A]n expert witness is entitled to reasonable compensation for court appearances and work in preparation of his or her testimony.").  That is the case here.

Objectors' argument that Dr. Yaffe previously made an allegedly inconsistent statement about CTE has no greater merit.  Objectors quote from an article authored by 15 experts, including Dr. Yaffe, who participated in a meeting hosted by the Alzheimer's Association and the Veterans' Health Research Institute (NCIRE) in May 2012, which "brought together experts from the U.S. military and academic medical centers around the world to discuss current evidence and hypotheses regarding the pathophysiological mechanisms linking [Traumatic Brain Injury, Post-Traumatic Stress Disorder, and Alzheimer's Disease]."  (Suppl. Decl. of Eric R. Nitz ("Suppl. Nitz Decl."), Ex. 14, Michael W. Weiner et al., *Military Risk Factors for Alzheimer's Disease*, 9 Alzheimer's & Dementia 445, 445 (2013), Doc. No. 6455-14.)  Objectors point to statements in the article regarding CTE, including its possible association with head

---

Schneider.  Moreover, the fact that Drs. Yaffe and Schneider acknowledge the "important" work being done by the Boston University team and "praise" their studies as "pioneering" is a testament to their objectivity.  (*Id*. at 8-9.)

14

trauma and that it manifests initially with emotional and behavioral symptoms. Although Objectors spend much time attempting to put prior statements of Drs. Stern and Gandy in context given Mr. Seeger's (fair and accurate) arguments at the Fairness Hearing, they ignore completely the context in which they purport to quote Dr. Yaffe. Had the Morey Objectors described the context of the paper, they would have noted that it was a "*Perspective* article" in which the numerous authors "summarize[d] information presented at [the] meeting" by the many participants in an effort to further "research efforts that are needed or are underway to advance our understanding of the pathophysiological mechanisms that may underlie and link [Traumatic Brain Injury, Post-Traumatic Stress Disorder, and Alzheimer's Disease]." (*See* Suppl. Nitz Decl., Ex. 14 at 446.) Dr. Yaffe did not present the CTE-related information that is summarized in the paper. Simply put, nothing in the article alters any of the opinions offered by Dr. Yaffe in her declaration.

### B.   Objectors' Remaining Arguments Largely Repeat Their Original Submissions

None of Objectors' remaining arguments has merit—and most have been addressed in detail in the NFL Parties' moving papers.[8] The only additional arguments that warrant a response are Objectors' complaints that, notwithstanding the NFL Parties'

---

[8]   The amount of, and Offsets to, the Monetary Awards are fair and reasonable, including where reductions to Awards are proxies for causation and exposure in a Settlement Agreement that does not require Settlement Class Members to prove causation in order to claim Awards. (*See* NFL Parties' Mem. at 95-114.) The Settlement's claims process is a structured program designed to operate functionally, efficiently, consistent with due process, and without fraud, for 65 years, in order to provide Settlement Class Members with substantial benefits; its fair and reasonable nature is highlighted by the various accommodations outlined in the NFL Parties' moving brief and ignored by Objectors. (*See id*. at 123-39.) And no Objector rebuts the NFL Parties' argument as to why the Education Fund is not a *cy pres* distribution. (*See id*. at 142-46.)

15

obligation under the Settlement Agreement to pay all valid Monetary Awards, the Settlement's security provision does not provide fully collateralized security for 65 years and the remedies available to Settlement Class Members to address any theoretical payment obligation failures of the NFL Parties are somehow insufficient.

The NFL Parties' final approval submission sets forth why the NFL's investment grade rating on its Stadium Program Bonds is adequate security that the NFL Parties will meet their payment obligations for the first ten years of the Settlement, particularly in light of the NFL's substantial revenue streams, the lack of any legal requirement to pledge collateral, and the right of the Court to render null and void the Releases and Covenants Not to Sue provided to the Released Parties by Settlement Class Members affected by any failure to meet the payment obligations. (*See* NFL Parties' Mem. at 149-51.) The NFL Parties also explained that their obligation under the Settlement Agreement to pay all valid Monetary Awards mitigates any concern about underfunding the statutory trust. (*Id*. at 150-51.)

Nonetheless, Objectors repeat their initial arguments in supplemental submissions and now seek to impose collateral-guaranteed security terms into the Settlement Agreement in order to obviate the need to avail themselves of legal and equitable remedies to address any (highly unlikely) failure of the NFL Parties to meet their obligations. (*See generally* Suppl. to Utecht Obj., Doc. No. 6437; Final Suppl. to Utecht Obj., Doc. No. 6454; Post-Fairness H'g Suppl. Br. of Morey Obj. at 29, Doc. No. 6455.) These arguments lack merit.

First and foremost, Objectors improperly imply a guarantee into the Statutory Trust provision that does not exist. Objectors argue that the Statutory Trust "is

16

required" to have sufficient funds "so that there is no risk that money will not be available to pay in the event that the NFL does not timely pay." (Final Suppl. to Utecht Obj. at 1-2, Doc. No. 6454.) Not so. As a form of security, the NFL Parties are to fund the Statutory Trust with the amount that *in their reasonable belief* will be sufficient. (*See* NFL Parties' Mem. at 149-51; Settlement Agreement § 25.6(d).) Nothing in the Settlement Agreement requires that the security provision serve as 100% collateralized protection of future risk. Nor does anything in the law suggest this is necessary for the Settlement to be approved as fair, reasonable and adequate. And Objectors cite no support to that effect. Instead, Objectors conclusorily argue they need absolute certainty in the form of fully collateralized security because the NFL could run into financial trouble and even face bankruptcy. (*See* Final Supp. to Utecht Obj. at 2 n.1, Doc. No. 6454; Post-Fairness H'g Suppl. Br. of Morey Obj. at 29, Doc. No. 6455.) But this risk is run by contractual counterparties to all companies, municipalities and other entities, and creditor rights provide a means of potential recovery in such unlikely circumstances. Moreover, it defies logic for Objectors to make this argument while simultaneously contending that the NFL's long-term television agreements provide annual revenue that is "almost ten times the amount the NFL" estimates will be needed to pay Monetary Awards over the 65-year period. (Suppl. to Morey Obj. at 5, Doc. No. 6420.)

Separately, the NFL Parties are contractually obligated to pay all valid Monetary Awards for the 65-year term, and Settlement Class Members can avail themselves of remedies if the NFL Parties do not meet their obligations. Objectors nevertheless argue that there is a "serious anticipated breach of contract" by the NFL Parties and that a breach of contract action against them would somehow inevitably result

17

in a compromised settlement of the claim involving substantial class counsel fees. (Final Suppl. to Utecht Obj. at 2, 7, Doc. No. 6454.) But Objectors do not explain why a breach of contract action is not a fair and reasonable remedy. Nor do they explain how the contractual obligation of a multi-billion dollar business that has been in existence for nearly 100 years, *combined* with a creditor-protected Statutory Trust with the amount expected to be needed to pay all claims, is not reasonable and fair security resulting from arm's-length negotiation.

Objectors also argue that the right of this Court to render null and void the Releases and Covenants Not to Sue is somehow "deceptive" and "does not even pass the good faith test" because it would be difficult for a smaller "class of plaintiffs . . . to prevail against the massive defense that the NFL would mount." (*Id*. at 7 n.3.)[9] This conclusory argument rings hollow especially in light of the fact that this same Objector— and many others—sued the NFL in an individual capacity in the first place. *See* Compl., *Alt* v. *Nat'l Football League, Inc*., 2:12-cv-04180 (E.D. Pa. July 23, 2012), Doc. No. 1.

In sum, the Settlement's security provisions are reasonable and no objection to the contrary has merit.

---

[9] Objectors also attempt to predict this Court's future actions by arguing that it would not rescind the Releases because rescission is an equitable remedy and such equitable relief "cannot be granted in cases where a claim for monetary damages is available," here in the form of a breach of contract claim. (Suppl. to Utecht Obj. at 1-2, Doc. No. 6437.) This argument ignores that the parties agreed to a Settlement Agreement that, as a matter of contract, confirms the Court's ability to provide such equitable relief if the NFL Parties fail to meet their payment obligations and thereafter fail to cure in compliance with an order from this Court. (*See* Settlement Agreement § 25.6(g).)

18

**CONCLUSION**

For the foregoing reasons, the NFL Parties respectfully submit that this Court should grant final approval of the Settlement Agreement and overrule each of the objections.

Dated: December 12, 2014                    Respectfully submitted,

                                            /s/ Brad S. Karp
                                            Brad S. Karp
                                            Theodore V. Wells Jr.
                                            Bruce Birenboim
                                            Lynn B. Bayard
                                            PAUL, WEISS, RIFKIND, WHARTON &
                                                GARRISON LLP
                                            1285 Avenue of the Americas
                                            New York, NY 10019-6064
                                            Main: 212.373.3000
                                            Fax: 212.757.3990
                                            bkarp@paulweiss.com
                                            twells@paulweiss.com
                                            bbirenboim@paulweiss.com
                                            lbayard@paulweiss.com

                                            Beth A. Wilkinson
                                            PAUL, WEISS, RIFKIND, WHARTON &
                                                GARRISON LLP
                                            2001 K Street, NW
                                            Washington, DC 20006-1047
                                            Main: 202.223.7300
                                            Fax: 202.223.7420
                                            bwilkinson@paulweiss.com

                                            and

Robert C. Heim (Pa. Atty. ID 15758)
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104-2808
Main: 215.994.4000
Fax: 215.994.2222
Robert.heim@dechert.com

**Attorneys for National Football League
and NFL Properties LLC**

20

### CERTIFICATE OF SERVICE

It is hereby certified that a true copy of the foregoing document was served electronically via the Court's electronic filing system on the 12th day of December, 2014, upon all counsel of record.


Dated: December 12, 2014                    /s/ Brad S. Karp
                                            Brad S. Karp

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB <br><br> MDL No. 2323 |
| THIS DOCUMENT RELATES TO: <br><br> ALL ACTIONS | **Hon. Anita B. Brody** |

### SUPPLEMENTAL DECLARATION OF DOUGLAS M. BURNS

DOUGLAS M. BURNS declares pursuant to 28 U.S.C. § 1746:

1.     I am an associate at the law firm of Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul, Weiss"), counsel to Defendants National Football League and NFL Properties LLC (collectively, the "NFL Parties") in MDL No. 2323.  I respectfully submit this declaration in support of the National Football League's and NFL Properties LLC's Reply Memorandum of Law in Further Support of Final Approval of the Class Action Settlement Agreement and in Response to Objections.

2.     Attached as Exhibit 1 is a true and correct copy of the Court's Memorandum & Order dated December 2, 2014 in *Smith* v. *National Football League Players' Association*, No. 4:14-cv-01559 (E.D. Mo.), Doc. No. 34.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:     New York, New York
           December 12, 2014

_____
Douglas M. Burns

# EXHIBIT 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| NEIL SMITH et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 4:14CV01559  ERW |
| v. | ) | |
| | ) | |
| NATIONAL FOOTBALL LEAGUE | ) | |
| PLAYERS ASSOCIATION, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM AND ORDER**

This matter comes before the Court on Plaintiffs' "Motion to Remand" [ECF No. 9].

**I. BACKGROUND**

Plaintiffs Neil Smith, Ladell Betts, and Anthony Davis filed a Petition in the 22nd Judicial Circuit of Missouri, St. Louis, on July 17, 2014 [ECF No. 1-1].  They named National Football League Players' Association ("NFLPA"), Raymond Lester Armstrong, III, Troy Vincent (who has since been dismissed as a defendant), and Kevin Mawae as defendants. Plaintiffs' petition asserts claims for fraudulent concealment, fraud, negligent misrepresentation, negligence, negligent hiring (against NFLPA only), negligent retention (against NFLPA only), medical monitoring, and civil conspiracy.  On August 11, 2014, Plaintiffs filed a First Amended Petition, adding Vaughn Booker, Ron Dugans, Sheddrick Gurley, Chad Johnson, Kendyll Pope, Corey Sawyer, Shevin Smith, Tarlos Thomas, Tamarick Vanover, and Keith Williams as Plaintiffs [ECF No. 4].  On September 10, 2014, Defendant NFLPA removed the Petition to this Court pursuant to 28 U.S.C. §§ 1441 and 1446 [ECF No. 1].  On September 11, 2014, Defendant NFLPA moved to consolidate this case with *Ballard et al. v. National Football League Players*

1

*Association*, Case No. 4:14-cv-01267 [ECF No. 5].  On September 18, 2014, Plaintiffs filed a Motion to Remand this case to the 22nd Judicial Circuit of Missouri, pursuant to 28 U.S.C. § 1447(c) [ECF No. 9].  Plaintiffs also filed a Memorandum in Support of Motion to Remand [ECF No. 10].  Defendant NFLPA's Opposition to Motion to Remand was filed on October 16, 2014.  Plaintiffs filed a Reply Memorandum in Support of Motion to Remand on October 23, 2014 [ECF No. 25].

## II. FACTS

"The allegations of the complaint as set forth at the time the petition was removed are controlling."  *Crosby v. Paul Hardeman, Inc.*, 414 F.2d 1, 3 (8th Cir. 1968) (citing *Pullman Co. v. Jenkins*, 305 U.S. 534, 537-38 (1939)).  Plaintiffs are former National Football League ("NFL") players, who had playing careers of various lengths, ranging from 1988 to 2010. During their respective careers, Plaintiffs suffered "multiple repetitive traumatic head impacts and concussions during practices and games."  These injuries were neither acknowledged nor treated while Plaintiffs were players.  "Defendants' wrongful conduct . . . directly caused or contributed to cause" Plaintiffs "to suffer harm, including . . . chronic traumatic encephalopathy ("CTE"), which is "caused by repetitive sub-concussive and/or concussive blows to the head."

Plaintiffs, throughout their careers, paid money to the NFLPA as association dues. Defendants assured Plaintiffs they would protect them, and owed them a fiduciary duty. Defendants state they would act in the players' best interests.  However, the NFLPA did not spend significant funds on research into ways to mitigate or prevent brain trauma.  The NFLPA also failed to certify medical personnel treating players, despite having a duty to do such. Plaintiffs relied on Defendants' assertions to their detriment.

2

Defendants were in a superior position of knowledge, and knew the dangers and risks associated with repetitive head impacts and concussions. Despite this, they knowingly concealed the information from Plaintiffs. Defendants also fraudulently misrepresented there was no link between head impacts and cognitive decline.

## III. STANDARD

A claim may be removed to federal court only if it could have brought in federal court originally. *Peters v. Union Pac. R. R. Co.*, 80 F.3d 257, 260 (8th Cir. 1996). The burden is on the defendant to prove by a preponderance of the evidence the Court has subject-matter jurisdiction. *In re Prempro Prods. Liab. Litig.*, 591 F.3d 613, 619 (8th Cir. 2010). Removal statutes are to be strictly construed against removal and all doubts should be resolved in favor of remand. *Nichols v. Harbor Venture, Inc.*, 284 F.3d 857, 861 (8th Cir. 2002); *In re Bus. Men's Assur. Co. of Am.*, 992 F.2d 181, 183 (8th Cir. 1993).

## IV. DISCUSSION

Defendants removed this matter to this Court for three reasons [ECF No. 1]. First, Defendants argued removal was proper under Sections 8(b) and 9(a) of the National Labor Relations Act ("NLRA") because the claims made by Plaintiffs constitue claims for breach of the duty of fair representation. Second, Defendants claimed removal was proper under Section 301 of the Labor Management Relations Act ("LMRA"), because any additional duties Defendants owed to Plaintiffs would have to arise from the NFL Collective Bargaining Agreement ("CBA"). Finally, Defendants contended removal was proper because the one non-diverse defendant was improperly joined.

Plaintiffs request remand for three reasons. First, they argue Defendants' reliance on the duty of fair representation is improper [ECF No. 10 at 3]. Second, they argue federal-question

3

jurisdiction does not exist under § 301 of LMRA in this case [ECF No. 10 at 9]. Finally, they argue complete diversity is lacking because one of the defendants shares a state of residence with at least one of the Plaintiffs [ECF No. 10 at 12]. For the foregoing reasons, this Court denies Plaintiffs' Motion to Remand.

### A. Duty of Fair Representation

Plaintiffs contend the duty of fair representation does not completely preempt state-law claims; the preemption by the duty is simply ordinary conflict preemption, which can be asserted by Defendants as a defense in state court. They argue the duty of fair representation is a judicially-evolved duty, and only statutory duties can completely preempt a state-law claim. Plaintiffs further state their claims are independent of the duty of fair representation because the NFLPA was not their exclusive bargaining representative. They assert they are former professional football players, and the NFLPA only owes a duty of fair representation to its current members. Plaintiffs also maintain their claims are simply not subsumed within the duty of fair representation. Rather, they state their claims are based on a duty the NFLPA assumed voluntarily and separately from the CBA.

Defendants argue the duty of fair representation does completely preempt state law claims because it is a statutory duty arising from federal law. They also maintain Plaintiffs cannot escape preemption because they are former players. Defendants state Plaintiffs' claims are based on what the NLFPA could have done for Plaintiffs while they were playing, and Plaintiffs are arguing the NFLPA continued to owe them a duty of fair representation after retirement. Defendants also state Plaintiffs' claims are subsumed within the duty of fair representation, because Plaintiffs have not identified a contract where the NFLPA assumed a separate duty to its members outside the CBA.

"Article III of the Constitution gives the federal courts power to hear cases 'arising under' federal statutes." *Merrell Dow Pharm. Inc. v. Thompson*, 478 U.S. 804, 807 (1986) (citing U.S. Const. Art. III, § 2). "The presence or absence of federal-question jurisdiction is governed by the 'well-pleaded complaint rule,' which provides that federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint." *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 392 (1987). The "artful pleading" doctrine allows a court to "scrutinize the complaint in the removed case to determine whether the action, though ostensibly grounded solely on state law, is actually grounded on a claim in which federal law is the exclusive authority." *Federated Dept. Stores, Inc. v. Moitie*, 452 U.S. 394, 408 (1981). Where "the pre-emptive force of a statute is so 'extraordinary'" it completely preempts a state-law claim, the claim is converted into a federal claim. *Caterpillar*, 482 U.S. at 393. However, "a case may not be removed to federal court on the basis of a federal defense, including the defense of preemption, even if the defense is anticipated in the plaintiff's complaint, and even if both parties concede that the federal defense is the only question truly at issue." *Id.*

"The 'well-pleaded complaint rule' is the basic principle marking the boundaries of federal question jurisdiction of federal district courts. *Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 63 (1987). "It is long settled law that a cause of action arises under federal law only when the plaintiff's well-pleaded complaint raises issues of federal law." *Id.* Federal preemption is ordinarily a defense to a state law claim, and federal defenses, since they do not appear on the complaint, do not authorize removal to federal court. *Id.* However, one exception is when federal law "so completely pre-empt[s] a particular area that any civil complaint raising this select group of claims is necessarily federal in character." *Id.* at 63-64.

5

Precedent strongly suggests (and the parties appear to agree) state law claims can only be preempted by federal statute, not by federal common law. *See id.* ("Congress may so completely pre-empt . . . ."); *Caterpillar*, 482 U.S. at 393 ("On occasion, the Court has concluded that the pre-emptive force of a statute is so 'extraordinary' that it 'converts an ordinary state common-law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule.'") (quoting *Metropolitan*, 481 U.S. at 63-64); *Aetna Health Inc. v. Davila*, 542 U.S. 200, 207 (2004) ("'When a federal statute wholly displaces the state-law cause of action through complete pre-emption,' the state claim can be removed.") (quoting *Beneficial Nat. Bank v. Anderson*, 539 U.S. 1, 8 (2003)).

1. Whether Plaintiffs' Claims are Actually Claims of Breach of the Duty of Fair Representation.

Plaintiffs argue their claims are based on a duty the NFLPA assumed separately and voluntarily from its duties to them as their exclusive bargaining agent. A plaintiff cannot avoid removal by failing to plead necessary federal questions. *Rivet v. Regions Bank of La.*, 522 U.S. 470, 475 (1998) (citing *Franchise Tax Bd. of Cal. v. Construction Laborers Vacation Trust for S. Cal.*, 463 U.S. 1, 14 (1983)). "If a court concludes that a plaintiff has 'artfully pleaded' claims in this fashion, it may uphold removal even though no federal question appears on the face of the plaintiff's complaint. The artful pleading doctrine allows removal where federal law completely preempts a plaintiff's state-law claim." *Rivet*, 522 U.S. at 475.

The duty of fair representation is the duty to act as the exclusive bargaining agent in a fair manner. *Int'l Bhd. of Elec. Workers v. Foust*, 442 U.S. 42, 46 (1979). This duty states "[a] union must represent fairly the interests of all bargaining-unit members during the negotiation, administration, and enforcement of collective-bargaining agreements." *Id.* at 47. The duty of fair representation "arises . . . from the grant under § 9(a) of the NLRA . . . of the union's exclusive

6

power to represent all employees in a particular bargaining unit." *Breininger v. Sheet Metal Workers Int'l Ass'n Local Union No. 6*, 493 U.S. 67, 86-87 (1989). "'The undoubted broad authority of the union as exclusive bargaining agent in the negotiation and administration of a collective bargaining contract is accompanied by a responsibility of equal scope, the responsibility and duty of fair representation.'" *Id.* at 88 (quoting *Humphrey v. Moore*, 375 U.S. 335, 342 (1964)). The NFLPA is bound by the duty of fair representation.

"A breach of the duty of fair representation occurs only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." *Vaca v. Sipes*, 386 U.S. 171, 190 (1967). This rule does not apply only to union actions with regards to the collective bargaining agreement. It applies to all union activity. *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 67 (1991). If the NFLPA has acted towards members of the collective bargaining agreement in bad faith, it has breached the duty of fair representation.

The complaint clearly alleges Defendants acted towards Plaintiffs, members of the collective bargaining unit at the time of the conduct, in bad faith, by alleging Defendants undertook fraudulent behavior against Plaintiffs. Any bad faith conduct by the union against a member of the collective bargaining unit is a breach of the duty of fair representation. The complaint does not state a claim on its face for breach of such a duty, but it is clearly present. All claims regarding bad faith by Defendants are claims of breach of the duty of fair representation.[1]

> 2. Whether a Claim for Breach of Duty of Fair Representation Completely Preempts State Law Claims.

Plaintiffs contend a claim for breach of duty of fair representation does not completely preempt state-law claims. Federal jurisdiction exists over cases involving the duty of fair

---

[1] Therefore, the counts of fraudulent concealment, fraud, and civil conspiracy, being claims Defendants acted in bad faith towards members of the union, are breaches of the duty of fair representation. The other claims, however, are for mere negligence, which is not a breach of the duty of fair representation. *Rawson*, 495 U.S. at 372-73.

representation. *Commc'ns Workers of Am. v. Beck*, 487 U.S. 735, 743 (1988) ("[O]ne such remedy over which federal jurisdiction is well settled is the judicially implied duty of fair representation.") (citing *Vaca v. Sipes*, 386 U.S. 171 (1967)). In fact, the duty arises from federal statute. *United Steelworkers of Am., AFL-CIO-CLC v. Rawson*, 495 U.S. 362, 373 (1990) ("The Union's duty of fair representation arises from the National Labor Relations Act itself.") (citing *Breininger*, 493 U.S. 67, 86–87 (1989)); *DelCostello v. Teamsters*, 462 U.S. 151, 164 (1983); *United Parcel Service, Inc. v. Mitchell*, 451 U.S. 56, 66 (1981) (Stewart, J., concurring in judgment). "Because a union enjoys the exclusive right to represent its members in the collective bargaining process, the federal labor laws impose upon the union a duty of fair representation 'akin to the duty owed by other fiduciaries to their beneficiaries.'" *Beavers v. United Paperworkers Int'l Union*, 72 F.3d 97, 100 (8th Cir. 1995).

Although the Eighth Circuit has not addressed this preemption question, other circuit courts appear to agree: where there is a claim for breach of duty of fair representation, it completely preempts state law claims. "A union's rights and duties as the exclusive bargaining agent in carrying out its representational functions is precisely such an area; Congress has 'occupied th(e) field and closed it to state regulation.'" *Condon v. Local 2944, United Steelworkers of America, AFL-CIO, CLC*, 683 F.2d 590, 594-95 (1st Cir. 1982) (citing *Teamsters v. Morton*, 377 U.S. 252, 261 (1964)); *see also BIW Deceived v. Local S6, Indus. Union of Marine and Shipbuilding Workers of America, IAMAW Dist. Lodge 4*, 132 F.3d 824, 830 (1st Cir. 1997); *Thomas v. Nat'l Ass'n of Letter Carriers*, 225 F.3d 1149, 1158 (10th Cir. 2000) ("Where a plaintiff's allegations fall within the scope of the duty of fair representation, federal labor law governs and ordinarily preempts any state-law claims based on those allegations."); *Richardson v. U.S.*, 864 F.2d 1162, 1169-70 (5th Cir. 1989); *Scott v. Graphic*

8

*Commc'ns. Int'l Union, Local 97-B*, 92 Fed. Appx. 896, 904 (3rd Cir. 2004). Therefore, claims for the breach of duty of fair representation are completely preempted.

> 3. Whether the Plaintiffs' Claims are Independent of the Duty of Fair Representation Because They are Former Players.

Plaintiffs argue their claims are independent of the duty of fair representation because they are former players. A union owes no statutory duty of fair representation to former employees and retirees. *See Allied Chem. & Alkali Workers of Am., Local Union No. 1 v. Pittsburgh Plate Glass Co., Chem. Div.*, 404 U.S. 157, 180-82 (1971) (holding retirees are not employees in the bargaining unit). *But see BIW Deceived*, 132 F.3d at 833 ("[A] union owes a duty of fair representation to nonmembers whom it has undertaken constructively to represent.") Therefore, any breaches of the duty of fair representation while a Plaintiff was retired do not provide a claim. *Merk v. Jewel Companies, Inc.*, 848 F.2d 761, 767 (7th Cir. 1988) (finding the union owed no continuing duty of fair representation to former employees). *Cf. Washington v. Service Emps. Int'l. Union, Local 50*, 130 F.3d 825, 826 (8th Cir. 1997) (Finding the argument a "statute of limitations was tolled because of continuing violation" was without merit). However, if the alleged breach occurred while the employee was employed, then there was a duty at the time of the breach. *See Foust*, 442 U.S. at 42 (finding a lack of duty of fair representation at the time of the lawsuit was not reason to dismiss the case). To find otherwise would deprive discharged workers the ability to take their grievance to federal court if the union failed to perform its duties.

Plaintiffs allege Defendants committed acts of fraud against them while they were players.[2] For example, the first allegation of fraudulent behavior states the NFLPA supplied false and misleading information to players in 1994. There are allegations similar conduct took

---

[2] "Defendants knowingly and fraudulent concealed from then-current . . . professional football players . . . the risks of head injuries in games and practices . . . " [ECF No. 4 at ¶ 149].

place throughout the rest of the 1990s and 2000s, and into the present decade. Thus, there is a range from 1994 to at least 2012 where Defendants are alleged to have engaged in bad faith conduct against members of the collective bargaining unit. Every single plaintiff was a "current member" of the NFLPA for at least some time between 1994 and 2012. Therefore, the duty of fair representation applied to Plaintiffs at the time, and the allegations indicate breaches of said duty occurred while Plaintiffs were playing. Their claims are not independent of the duty of fair representation and the duty of fair representation completely preempts their claims.

*B. Section 301 of the LMRA*

Defendants claimed removal was also proper under Section 301 of the LMRA, because any additional duties Defendants owed to Plaintiffs outside of the duty of fair representation would have to arise from the NFL Collective Bargaining Agreement ("CBA"). Section 301 of the LMRA applies to breaches of a collective bargaining agreement ("CBA"). *Williams v. Nat'l Football League*, 582 F.3d 863, 873 (8th Cir. 1998). Federal law governs breaches of a CBA. *Textile Workers Union v. Lincoln Mills,* 353 U.S. 448, 450-51 (1957) ("301(a) . . . authorizes federal courts to fashion a body of federal law for the enforcement of these collective bargaining agreements."). Where § 301 applies, it completely preempts state-law claims. *Williams*, 582 F.3d at 874. "In applying the section 301 preemption doctrine, [a court] begins with the claim itself, and appl[ies] a two-step approach in order to determine if the claim is sufficiently independent to survive section 301 preemption." *Id*. "First, a state-law claim is preempted if it is based on a provision of the CBA, meaning that the CBA provision at issue actually sets forth the right upon which the claim is based." *Id*. "Second, section 301 preemption applies where a state-law claim is dependent upon an analysis of the relevant CBA, meaning that the plaintiff's state-law claim requires interpretation of a provision of the CBA." *Id.* A court may look to the

10

CBA to determine if the claim would be substantially dependent upon it.  *See Osborn v. U.S.*, 918 F.2d 724, 728 (8th Cir. 1990) ("The district court has authority to consider matters outside the pleadings when subject-matter jurisdiction is challenged.").

Plaintiffs assert federal-question jurisdiction does not exist in this case under § 301 of the LMRA.  They contend, as retirees, they are outside of the bargaining unit, therefore, the CBA does not apply to them.  Plaintiffs also argue their claims are not substantially dependent upon or inextricably intertwined with analysis of the CBA.  Plaintiffs claim Defendants failed to show how the CBA provides the source of the duty involved in Plaintiffs' claims.  Rather, Plaintiffs argue the undertakings by Defendants were voluntary assumptions of duty, not arising from the CBA.  Therefore, Plaintiffs state, the claims do not arise under § 301 of the LMRA.

Defendants argue Plaintiffs' status as retirees is not relevant to LMRA preemption.  Defendants contend whether the complaint puts CBA rights or interpretation at issue is what is important to the preemption analysis.  Defendants assert interpretation of the CBA is required in this case, thus, the LMRA completely preempts this matter.

### 1. Relevance of Retiree Status to LMRA Preemption

Plaintiffs argue they are outside of the bargaining unit because they are retirees, and the CBA does not apply to retirees, therefore, their claims are not preempted under § 301.  The Court disagrees.  It is true the collective-bargaining obligation of a union extends only to terms and conditions of employment of the employer's employees.  *Allied*, 404 U.S. at 166.  The meaning of "employees" does not ordinarily include retired workers.  *Id.* at 168.  But this does not preclude retirees from bringing a claim under § 301 of the LMRA.  For example, a union and an employer can choose to bargain over benefits for retirees, and retirees can enforce any benefits

11

they acquire through such bargaining. *Atwater v. Nat'l Football League Players' Ass'n*, 626 F.3d 1170, 1185 (11th Cir. 2010).

The status of the Plaintiffs as retirees can be relevant. Although in *Atwater*, the fact the plaintiffs were retirees was irrelevant, it was because the rights specifically bargained for extended to retirees as well as current players. *Id.* As *Allied* noted, unless the union and retirees agree otherwise, retirees are otherwise not employees, and the union it owes no duty to them. *Allied*, 404 U.S. at 172. Even if the duties of the union are only to current members of the collective bargaining unit, the events occurred while Plaintiffs were current members of the collective bargaining unit, as noted *supra* IV.A.3. Regardless if this court construes the matter to arise under fair representation or § 301, the relevant events occurred at least at some point during each of Plaintiffs' careers.[3] The fact Plaintiffs are now retirees does not preclude preemption of claims based on events which occurred while Plaintiffs were members of the bargaining unit.

### 2. Whether Defendants Failed to Meet Burden of Establishing Preemption

Plaintiffs argue Defendants failed to meet the burden of establishing the claims are preempted by § 301. The party asserting federal preemption of state law bears the burden of persuasion. *Williams v. Nat'l Football League*, 582 F.3d 863, 880 (8th Cir. 2009). Defendants argue the NFL CBA contains a number of provisions applicable to player safety and health. If these provisions expressly place a duty on the NFLPA to keep players informed about health risks arising from participating in the NFL, or if the claims substantially depend on an interpretation of a provision in the CBA, § 301 will preempt the state law claims. To determine if the claims are either based on an express duty of the CBA, or substantively depend on the interpretation of a provision of the CBA, an analysis of the elements of the claims is required.

---

[3] There may be a need to analyze each CBA in effect during the alleged conduct by Defendants, to see if the duties of said CBAs were indeed breached by Defendants' conduct.

*Hanks v. General Motors Co.*, 859 F.2d 67, 69 (8th Cir. 1988) (finding a state tort claim was not preempted as none of its elements required interpretation of the CBA).   If one element of the claim requires interpretation of the CBA, the claim is preempted.  *Id.*[4]  This Court looks to the NFL CBA to see if Plaintiffs' claims would be dependent upon its analysis.  *Osborn*, 918 F.2d at 728.

### i. Negligent Misrepresentation

In Missouri, "[t]he elements of negligent misrepresentation are: (1) the speaker supplied information in the course of his business; (2) because of the speaker's failure to exercise reasonable care, the information was false; (3) the information was intentionally provided by the speaker for the guidance of limited persons in a particular business transaction; (4) the hearer justifiably relied on the information; and (5) due to the hearer's reliance on the information, the hearer suffered a pecuniary loss."  *Renaissance Leasing, LLC v. Vermeer Mfg. Co.*, 322 S.W.3d 112, 134 (Mo. 2010).

The key element is "the hearer justifiably relied on the information".  This element implies the hearer had a valid reason to rely on the information provided.  *Green v. Ariz. Cardinals Football Club LLC*, No. 4:14CV461CDP, 2014 WL 1920468, at *7 (E.D. Mo., May, 14, 2014) (finding where the justification for reliance is based on a common law duty, it does not require interpretation of a CBA).   The first provision Defendants reference is Article 39, "Players' Rights to Medical Care and Treatment."   This Court's attention is drawn to section 1, subsection (d) of that article, "NFLPA Medical Director".   NFL CBA 2011, pg. 171.   The most pertinent language is as follows: "The NFL recognizes that the NFLPA Medical Director has a critical role in advising the NFLPA on health and safety issues."   *Id.*  This language suggests the

---

[4] Finding one claim is preempted would likely establish supplemental jurisdiction, thus, once preemption is found, this Court will not look to other claims.  *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966).

13

NFLPA should be well-informed on matters of health and safety, and should be a reliable source of information.

Section 3 of Article 39, "Accountability and Care Committee", is also worth examining. "The parties agree to establish an Accountability and Care Committee, which will provide advice and guidance regarding the provision of preventive, medical, surgical, and rehabilitative care for players by all clubs during the term of this Agreement. The Committee shall consist of the NFL Commissioner and the NFLPA Executive Director (or their designees)." *Id.* This language confers upon the NFLPA, and the other parties to the agreement, a duty to establish a committee which will advise and guide the provision of health care for players, and the NFLPA is to be a part of it. While it does not explicitly say the NFLPA has a duty to inform its members on the risks and consequences of head injuries, it is arguable players are justified in relying on any information the committee does release, because the committee has a CBA-mandated advisory role on the provision of health care. To determine this, interpretation of the CBA is necessary.

Unlike *Green*, the justification for reliance on the NFLPA's statements does not arise from a common law duty. "Under the common law . . . it is the employer, not a labor union, that owes employees a duty to exercise reasonable care in providing a safe workplace." *Int'l Bhd. of Elec. Workers v. Hechler*, 481 U.S. 851, 859 (1987). The justification may exist, but it will substantially depend on interpretation of the CBA. Therefore, the claim of negligent misrepresentation is preempted by section 301 of the LMRA.

### Summary

Both the duty of fair representation and § 301 of the LMRA completely preempt the claims of this case. Removal was proper, as a federal claim exists.

14

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiffs' "Motion to Remand" [ECF No. 9] is

**DENIED**.

So Ordered on this 2nd day of December, 2014.

_E. Richard Webber_
_____

**E. RICHARD WEBBER**
**SENIOR UNITED STATES DISTRICT JUDGE**

15

**-2754-**

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br><br>MDL No. 2323 |
| THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | **Hon. Anita B. Brody** |

## <u>ORDER</u>

On July 7, 2014, I preliminarily approved the Class Action Settlement Agreement (ECF No. 6084).  Class Plaintiffs have since moved, pursuant to Federal Rule of Civil Procedure 23(e) and Section 20.1 of the Class Action Settlement Agreement, for the entry of Final Order and Judgment (ECF No. 6423).  In consideration of this Motion, I have reviewed the briefs, supporting affidavits, and other materials in support of final approval filed by Class Counsel and the NFL Parties (ECF Nos. 6422, 6423, 6466, 6467), the objections to final approval of the Class Action Settlement filed by various objectors and their counsel and the responsive briefs to the motion for final approval of the Class Action Settlement, and the arguments in support of, and in objection to, the Class Action Settlement at the November 19, 2014 Fairness Hearing (*see* ECF No. 6463) and the post-Hearing submissions.

After reviewing these submissions and arguments, I believe that the following changes would enhance the fairness, reasonableness, and adequacy of the proposed Class Action Settlement Agreement:

- The settlement should provide for some Eligible Seasons credit for play in the World League of American Football, the NFL Europe League, and the NFL Europa League;

- The settlement should assure that all living Retired NFL Football Players who timely register for the Settlement, who are eligible to participate in the Baseline Assessment Program, and who timely seek a BAP baseline assessment examination, will receive the examination regardless of any funding limitations in the agreement;

- The Qualifying Diagnosis of Death with CTE should include Retired NFL Football Players who die between preliminary approval and final approval of the Settlement;

- The settlement should provide a hardship provision with respect to the appeal fee for Settlement Class Members;

- The settlement should allow reasonable accommodation for Settlement Class Members who do not possess medical records in support of a Qualifying Diagnosis due to *force majeure* type events.

**AND NOW,** this __2nd_____ day of ___February_____, 2015, it is **ORDERED** that Class Counsel and the NFL Parties file a joint submission on or before February 13, 2015 that addresses these issues, either through amendments to the Class Action Settlement, or through explanations as to why the parties are unwilling to agree to amendments that address these issues.

s/Anita B. Brody

_____
ANITA B. BRODY, J.
United States District Judge

Copies **VIA ECF** on _____ to:                    Copies **MAILED** on _____ to:

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE: | : | No. 2:12-md-02323-AB |
| PLAYERS' CONCUSSION | : | |
| INJURY LITIGATION | : | MDL No. 2323 |
| | : | |
| | : | |
| Kevin Turner and Shawn Wooden, | : | |
| *on behalf of themselves and* | : | |
| *others similarly situated,* | : | |
| Plaintiffs, | : | CIVIL ACTION NO: 14-cv-0029 |
| | : | |
| v. | : | |
| | : | |
| National Football League and | : | **Hon. Anita B. Brody** |
| NFL Properties LLC, | : | |
| successor-in-interest to | : | |
| NFL Properties, Inc., | : | |
| Defendants. | : | |
| | : | |
| | : | |
| THIS DOCUMENT RELATES TO: | : | |
| ALL ACTIONS | : | |
| | : | |

**CLASS COUNSEL AND THE NFL PARTIES' JOINT SUBMISSION**
**IN RESPONSE TO THE FEBRUARY 2, 2015 ORDER OF THE COURT**

Class Counsel and Defendants National Football League and NFL Properties LLC (collectively, the "Parties") jointly submit this response to the Court's February 2, 2015 order (the "Order").

## INTRODUCTION

The Order directed the Parties to address the following issues related to the proposed Class Action Settlement Agreement dated June 25, 2014 ("Settlement Agreement" or "Settlement"):

- Whether the Settlement should provide for some Eligible Seasons credit for play in the World League of American Football, the NFL Europe League, and the NFL Europa League;

- How the Settlement will assure that all living Retired NFL Football Players who timely register for the Settlement, who are eligible to participate in the Baseline Assessment Program, and who timely seek a BAP baseline assessment examination, will receive the examination regardless of any funding limitations in the Settlement Agreement;

- Whether the Qualifying Diagnosis of Death with CTE should include Retired NFL Football Players who die between preliminary approval and final approval of the Settlement;

- Whether the Settlement should provide a hardship provision with respect to the appeal fee for Settlement Class Members; and

- Whether the Settlement should allow reasonable accommodation for Settlement Class Members who do not possess medical records in support of

a Qualifying Diagnosis due to *force majeure* type events.

(Doc. No. 6479.)

The Parties have met and conferred on these matters and have agreed to amend the Settlement to address each of these issues. The Settlement Agreement, as amended as of February 13, 2015, is attached as Exhibit A, and a redline showing the amendments is attached as Exhibit B. A summary of the amendments follows.

## SETTLEMENT AGREEMENT AMENDMENTS

### NFL Europe

The Settlement Agreement currently provides no credit for time played in certain developmental leagues, such as NFL Europe. The Settlement, as amended, provides one-half of an Eligible Season when a Retired NFL Football Player or deceased Retired NFL Football Player was on a World League of American Football, NFL Europe League, or NFL Europa League (collectively, "NFL Europe") team's active roster on the date of three or more regular season or postseason games or on the active roster on the date of one or more regular or postseason games, and then spent at least two regular or postseason games on the NFL Europe injured reserve list or team inactive list due to a concussion or head injury. (*See* Settlement Agreement, as amended, § 2.1(kk).) Each half of an Eligible Season may be summed together with other earned Eligible Seasons or half Eligible Seasons up to a maximum of one Eligible Season per year (with each year defined to include any spring NFL Europe season and the following fall NFL season). (*Id*. § 6.7(c).)

The above treatment of NFL Europe is fair and reasonable for several reasons. NFL Europe was a developmental league. (Decl. of T. David Gardi ¶ 14

("Gardi Decl."), Doc. No. 6422-33.)  The Settlement, as amended, is uniform in awarding a maximum of one-half of an Eligible Season for developmental participation.  (*See* Settlement Agreement, as amended, § 2.1(kk) (providing one-half of an Eligible Season for participation in at least eight regular or postseason games on an NFL Member Club's developmental roster).)  Moreover, NFL Europe is further distinguished from the NFL because it had a shorter regular season than the NFL—10 games rather than 16—and fewer practices (Gardi Decl. ¶14), further justifying a credit of one-half an Eligible Season.  In addition, NFL Europe players face a particular litigation risk due to workers' compensation exclusivity laws.  (*See* NFL Parties' Mem. of Law in Supp. of Final Approval of the Class Action Settlement Agreement and in Resp. to Objections at 110-11, Doc. No. 6422.)

Second, capping a Retired NFL Football Player's Eligible Seasons at one Eligible Season per year is reasonable.  The Parties negotiated at arm's length and reached a compromise to limit the maximum Eligible Seasons to one, regardless of the number of games in which a Retired NFL Football Player was on an active roster.  This is because an Eligible Season is a proxy for—and not a precise calculation of—exposure to alleged repetitive mild traumatic head impacts, and it establishes the minimum level of exposure needed to receive Eligible Season credit.

**BAP Examination**

The Settlement Agreement currently provides that all Retired NFL Football Players with at least one-half of an Eligible Season who timely register to participate in the Settlement will be entitled to one baseline assessment examination. (Settlement Agreement § 5.1; *see also id*. § 23.1(b) ($75 million BAP Fund provided that

"every qualified Retired NFL Football Player, as set forth in Section 5.1, is entitled to one baseline assessment examination.") Although the Parties are confident that the Settlement Agreement currently provides sufficient funding to pay the cost of these baseline assessment examinations, the Parties have agreed to amend the Settlement Agreement to add the following language to remove any ambiguity: "For the avoidance of any doubt, if the Seventy-Five Million United States dollars (U.S. $75,000,000) is insufficient to cover the costs of one baseline assessment examination for every qualified Retired NFL Football Player electing to receive an examination by the deadline set forth in Section 5.3, the NFL Parties agree to pay the amount of money necessary to provide the examinations in accordance with this Settlement Agreement." (Settlement Agreement, as amended, § 23.1(b); *see also id.* § 23.3(d).)

**Death with CTE**

The Settlement Agreement currently provides for a Death with CTE Qualifying Diagnosis for Retired NFL Football Players who died prior to the date of the Preliminary Approval and Class Certification Order and who had a post-mortem diagnosis of CTE made by a board-certified neuropathologist. (Settlement Agreement, Ex. 1.) The Settlement Agreement, as amended, extends this deadline from the date of preliminary approval to the Final Approval Date, which is defined as the date that the Court enters the Final Order and Judgment. (Settlement Agreement, as amended, §§ 2.1(mm), 6.3(f), Ex. 1.) In addition, consistent with the Parties' intent under the original Settlement Agreement, and recognizing that obtaining such a diagnosis may take several months post-death, the Parties have provided for a grace period of 270 days following

any date of death between preliminary approval and the Final Approval Date to allow Claimants to obtain the necessary diagnosis. (*Id*. § 6.3(f), Ex. 1.)

**Appeal Fee Hardship Provision**

The Settlement Agreement requires a payment of $1,000 for a Settlement Class Member to appeal determinations regarding Monetary Awards and Derivative Claimant Awards. (Settlement Agreement § 9.6(a).) The Settlement, as amended, allows Settlement Class Members to make a hardship request to the Claims Administrator for the appeal fee to be waived for good cause. (Settlement Agreement, as amended, § 9.6(a)(i).) The Claims Administrator will have sole discretion to approve or deny the request based upon a review of the Settlement Class Member's financial information as may be necessary to decide the request. (*Id*.)

**Unavailability of Medical Records Due to *Force Majeure* Type Events**

The Settlement Agreement requires the submission of certain medical records under specified circumstances. (*See* Settlement Agreement § 8.2(a).) The Settlement Agreement, as amended, provides a limited exception to this requirement in the event of the unavailability of the required medical records for Representative Claimants of deceased Retired NFL Football Players because—unlike living Retired NFL Football Players—deceased Retired NFL Football Players cannot return to their diagnosing physician for examination and the creation of replacement medical records.[1] In those cases where a deceased Retired NFL Football Player received a Qualifying Diagnosis in the past but the medical records reflecting the Qualifying Diagnosis are unavailable because of a *force majeure* type event (*e.g.*, flood, fire), the Settlement, as

---

[1]    The eligibility requirements for Representative Claimants of deceased Retired NFL Football Players to receive a Monetary Award remain as set forth in Section 6.2(b).

amended, allows the Representative Claimant to petition the Claims Administrator to accept the Claim Package as valid without the medical records if the Representative Claimant makes a showing of a reasonable effort to obtain the medical records from any available source, states the reasons such records could not be obtained, and presents a certified death certificate referencing the Qualifying Diagnosis made while the Retired NFL Football Player was living.  (Settlement Agreement, as amended, § 8.2(ii).)  If the unavailability of medical records also causes the diagnosing physician to be unable to provide a Diagnosing Physician Certification, the Representative Claimant may petition the Claims Administrator to allow a sworn affidavit from the diagnosing physician attesting to the reasons why the diagnosing physician is unable to provide a Diagnosing Physician Certification without the medical records.  (*Id.*)  The sufficiency of these showings shall be in the sole discretion of the Claims Administrator, subject to the appeal rights set forth in Section 9.5 of the Settlement.  (*Id.*)

*       *       *

In sum, the Settlement, as amended, addresses in full the issues raised by the Court.  The Parties therefore respectfully request that the Court grant final approval of the Settlement, as amended.

Dated:  February 13, 2015

/s/ Christopher A. Seeger
Christopher A. Seeger
SEEGER WEISS LLP
77 Water Street
New York, NY 10005
Main: (212) 584-0700
Fax: (212) 584-0799
cseeger@seegerweiss.com

and

Sol Weiss
ANAPOL SCHWARTZ
1710 Spruce Street
Philadelphia, PA 19103
Main: (215) 735-1130
Fax: (215) 735-2024
sweiss@anapolschwartz.com

**_Co-Lead Class Counsel_**

Respectfully submitted,

/s/ Brad S. Karp
Brad S. Karp
Theodore V. Wells Jr.
Bruce Birenboim
Lynn B. Bayard
PAUL, WEISS, RIFKIND, WHARTON &
    GARRISON LLP
1285 Avenue of the Americas
New York, NY  10019-6064
Main: 212.373.3000
Fax: 212.757.3990
bkarp@paulweiss.com
twells@paulweiss.com
bbirenboim@paulweiss.com
lbayard@paulweiss.com

Beth A. Wilkinson
PAUL, WEISS, RIFKIND, WHARTON &
    GARRISON LLP
2001 K Street, NW
Washington, DC 20006-1047
Main: 202.223.7300
Fax: 202.223.7420
bwilkinson@paulweiss.com

and

Robert C. Heim (Pa. Atty. ID 15758)
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104-2808
Main: 215.994.4000
Fax: 215.994.2222
Robert.heim@dechert.com

**_Attorneys for National Football League and_**
**_NFL Properties LLC_**

*Class Counsel*

Steven C. Marks
PODHURST ORSECK P.A.
City National Bank Building
25 W. Flagler Street, Suite 800
Miami, FL 33130-1780
Main: (305) 358-2800
Fax: (305) 358-2382
smarks@podhurst.com

Gene Locks
LOCKS LAW FIRM
The Curtis Center
Suite 720 East
601 Walnut Street
Philadelphia, PA 19106
Main: 866-562-5752
Fax: (215) 893-3444
glocks@lockslaw.com

*Subclass Counsel*

Arnold Levin
LEVIN FISHBEIN SEDRAN &
BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Main: (215) 592-1500
Fax: (215) 592-4663
alevin@lfsblaw.com

Dianne M. Nast
NAST LAW LLC
1101 Market Street, Suite 2801
Philadelphia, Pennsylvania 19107
Main: (215) 923-9300
Fax: (215) 923-9302
dnast@nastlaw.com

*Counsel for Subclass 1*

*Counsel for Subclass 2*

*Of Counsel*

Thomas V. Girardi
Graham B. LippSmith
GIRARDI KEESE
1126 Wilshire Blvd
Los Angeles, CA 90017
Main: (213) 977-0211
Fax: (213) 481-1554
tgirardi@girardikeese.com
glippsmith@girardikeese.com

Michael D. Hausfeld
Richard S. Lewis
HAUSFELD LLP
1700 K Street, N.W., Suite 650
Washington, D.C. 20006
Main: (202) 540-7200
Fax: (202) 540-7201
mhausfeld@hausfeldllp.com
rlewis@hausfeldllp.com

James R. Dugan, II
THE DUGAN LAW FIRM
One Canal Place, Suite 1000
365 Canal Street
New Orleans, LA 70130
Phone: (504) 648-0180
Fax: (504) 648-0181
jdugan@dugan-lawfirm.com

Anthony Tarricone
KREINDLER & KREINDLER LLP
277 Dartmouth Street
Boston, MA 02116
Main: (617) 424-9100
Fax: (617) 424-9120
atarricone@kreindler.com

Michael L. McGlamry
POPE, MCGLAMRY, KILPATRICK
    MORRISON & NORWOOD, P.C.
3455 Peachtree Road, NE
The Pinnacle, Suite 925
P.O. Box 191625 (31119-1625)
Atlanta, GA 30326-3243
Main: (404) 523-7706
Fax: (404) 524-1648
efile@pmkm.com

David A. Rosen
ROSE, KLEIN & MARIAS LLP
801 South Grand Avenue, 11th Floor
Los Angeles, CA 90017-4645
Main: (213) 626-0571
Fax: (213) 623-7755
d.rosen@rkmlaw.net

Charles S. Zimmerman
ZIMMERMAN REED PLLP
1100 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Main: (612) 341-0400
Fax: (612) 341-0844
charles.zimmerman@zimmreed.com

Derriel McCorvey
THE LAW FIRM OF DERRIEL C.
    MCCORVEY
115 W. Main Street, Suite 14
P.O. Box 2473
Lafayette, LA 70501
Main: (337) 291-2431
derriel@mccorveylaw.com

David S. Casey, Jr.
Fred Schenk
CASEY GERRY SCHENK
    FRANCAVILLA BLATT &
    PENFIELD LLP
110 Laurel Street
San Diego, CA 92101-1486
Main: (619) 238-1811
Fax: (619) 544-9232
dcasey@cglaw.com
fschenk@cglaw.com

## **CERTIFICATE OF SERVICE**

       It is hereby certified that a true copy of the foregoing document and all exhibits were served electronically via the Court's electronic filing system on the 13th day of February, 2015, upon all counsel of record.

Dated: February 13, 2015                /s/ Brad S. Karp_____
                                         Brad S. Karp

# EXHIBIT  A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE: PLAYERS' CONCUSSION INJURY LITIGATION | : : : : | No. 2:12-md-02323-AB<br><br>MDL No. 2323 |
| Kevin Turner and Shawn Wooden, *on behalf of themselves and others similarly situated,* | : : : : | |
| Plaintiffs, | : | CIVIL ACTION NO: 14-cv-0029 |
| v. | : : | |
| National Football League and NFL Properties, LLC, successor-in-interest to NFL Properties, Inc., | : : : : | |
| Defendants. | : | |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | : : : : : | |

## CLASS ACTION SETTLEMENT AGREEMENT

### (AS AMENDED)

Dated:        June 25, 2014

Amended:    February 13, 2015

**TABLE OF CONTENTS**

**Page**

ARTICLE I         Definitions of Settlement Class and Subclasses ................................... 4

ARTICLE II        Definitions ........................................................................... 4

ARTICLE III       Settlement Benefits for Class Members ............................................ 17

ARTICLE IV        Information and Registration Process................................................ 17

ARTICLE V         Baseline Assessment Program......................................................... 20

ARTICLE VI        Monetary Awards for Qualifying Diagnoses...................................... 31

ARTICLE VII       Derivative Claimant Awards ............................................................ 38

ARTICLE VIII      Submission and Review of Claim Packages and Derivative
                  Claim Packages........................................................................... 39

ARTICLE IX        Notice of Claim Determinations, Payments, and Appeals ................. 43

ARTICLE X         Class Action Settlement Administration ........................................... 50

ARTICLE XI        Identification and Satisfaction of Liens.............................................. 59

ARTICLE XII       Education Fund ............................................................................ 64

ARTICLE XIII      Preliminary Approval and Class Certification................................... 64

ARTICLE XIV       Notice, Opt Out, and Objections...................................................... 66

ARTICLE XV        Communications to the Public.......................................................... 69

ARTICLE XVI       Termination................................................................................... 69

ARTICLE XVII      Treatment of Confidential Information ............................................ 71

ARTICLE XVIII     Releases and Covenant Not to Sue .................................................. 72

ARTICLE XIX       Bar Order ..................................................................................... 76

ARTICLE XX        Final Order and Judgment and Dismissal With Prejudice................. 76

ARTICLE XXI       Attorneys' Fees ............................................................................ 77

ARTICLE XXII      Enforceability of Settlement Agreement and Dismissal of
                  Claims ......................................................................................... 78

ARTICLE XXIII   NFL Payment Obligations ................................................................. 79

ARTICLE XXIV   Denial of Wrongdoing, No Admission of Liability ............................ 86

ARTICLE XXV   Representations and Warranties ......................................................... 87

ARTICLE XXVI   Cooperation........................................................................................ 90

ARTICLE XXVII   Continuing Jurisdiction...................................................................... 91

ARTICLE XXVIII Role of Co-Lead Class Counsel, Class Counsel and Subclass
                Counsel.................................................................................................. 91

ARTICLE XXIX   Bargained-For Benefits...................................................................... 92

ARTICLE XXX   Miscellaneous Provisions .................................................................. 92

IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS'
CONCUSSION INJURY LITIGATION, MDL 2323,
CLASS ACTION SETTLEMENT AGREEMENT AS OF JUNE 25, 2014
(as amended as of February 13, 2015)
(subject to Court approval)

## PREAMBLE

This SETTLEMENT AGREEMENT, dated as of June 25, 2014 (the "Settlement Date"), as amended as of February 13, 2015, is made and entered into by and among defendants the National Football League ("NFL") and NFL Properties LLC ("NFL Properties") (collectively, "NFL Parties"), by and through their attorneys, and the Class Representatives and Subclass Representatives, individually and on behalf of the Settlement Class and Subclasses, by and through Class Counsel. This Settlement Agreement is intended by the Parties fully, finally, and forever to resolve, discharge, and settle all Released Claims against the Released Parties, as set forth below, subject to review and approval by the Court.[1]

## RECITALS

A.    On January 31, 2012, a federal multidistrict litigation was established in the United States District Court for the Eastern District of Pennsylvania, In re: National Football League Players' Concussion Injury Litigation, MDL No. 2323. Plaintiffs in MDL No. 2323 filed a Master Administrative Long-Form Complaint and a Master Administrative Class Action Complaint for Medical Monitoring on June 7, 2012. Plaintiffs filed an Amended Master Administrative Long-Form Complaint on July 17, 2012. Additional similar lawsuits are pending in various state and federal courts.

B.    The lawsuits arise from the alleged effects of mild traumatic brain injury allegedly caused by the concussive and sub-concussive impacts experienced by former NFL Football players. Plaintiffs seek to hold the NFL Parties responsible for their alleged injuries under various theories of liability, including that the NFL Parties allegedly breached a duty to NFL Football players to warn and protect them from the long-term health problems associated with concussions and that the NFL Parties allegedly concealed and misrepresented the connection between concussions and long-term chronic brain injury.

C.    On August 30, 2012, the NFL Parties filed motions to dismiss the Master Administrative Class Action Complaint for Medical Monitoring and the Amended Master Administrative Long-Form Complaint on preemption grounds. Plaintiffs filed their oppositions to the motions on October 31, 2012, the NFL Parties filed reply memoranda of law on December 17, 2012, and plaintiffs filed sur-reply memoranda of law on January 28, 2013. Oral argument on the NFL Parties' motions to dismiss on preemption grounds was held on April 9, 2013.

---

[1]    Capitalized terms have the meanings provided in ARTICLE II, unless a section or subsection of this Settlement Agreement provides otherwise.

D.    On July 8, 2013, prior to ruling on the motions to dismiss, the Court ordered the plaintiffs and NFL Parties to engage in mediation to determine if consensual resolution was possible and appointed retired United States District Court Judge Layn Phillips of Irell & Manella LLP as mediator.

E.    Over the course of the following two months, the Parties, by and through their respective counsel, engaged in settlement negotiations under the direction of Judge Phillips.  On August 29, 2013, the Parties signed a settlement term sheet setting forth the material terms of a settlement agreement.  On the same day, the Court issued an order deferring a ruling on the NFL Parties' motions to dismiss and ordering the Parties to submit, as soon as possible, the full documentation relating to the settlement, along with a motion seeking preliminary approval of the settlement and notice plan.  On December 16, 2013, the Court appointed a special master, Perry Golkin ("Special Master Golkin"), to assist the Court in evaluating the financial aspects of the proposed settlement.

F.    On January 6, 2014, Class Counsel moved the Court for an order, among other things, granting preliminary approval of the proposed settlement and conditionally certifying a settlement class and subclasses.  On January 14, 2014, the Court denied that motion without prejudice.

G.    In conjunction with the January 2014 filing of the proposed settlement agreement, and this Settlement Agreement, the Class and Subclass Representatives filed Plaintiffs' Class Action Complaint ("Class Action Complaint") on January 6, 2014.  In the Class Action Complaint, the Class and Subclass Representatives allege claims for equitable, injunctive and declaratory relief pursuant to Federal Rules of Civil Procedure 23(a)(1-4) & (b)(2), or, alternatively, for compensatory damages pursuant to Federal Rule of Civil Procedure 23(b)(3), for negligence, negligent hiring, negligent retention, negligent misrepresentation, fraud, fraudulent concealment, medical monitoring, wrongful death and survival, and loss of consortium, all under state law.

H.    The NFL Parties deny the Class and Subclass Representatives' allegations, and the allegations in Related Lawsuits, and deny any liability to the Class and Subclass Representatives, the Settlement Class, or any Settlement Class Member for any claims, causes of action, costs, expenses, attorneys' fees, or damages of any kind, and would assert a number of substantial legal and factual defenses against plaintiffs' claims if they were litigated to conclusion.

I.    The Class and Subclass Representatives, through their counsel, have engaged in substantial fact gathering to evaluate the merits of their claims and the NFL Parties' defenses.  In addition, the Class and Subclass Representatives have analyzed the legal issues raised by their claims and the NFL Parties' defenses, including, without limitation, the NFL Parties' motions to dismiss the Amended Master Administrative Long-Form Complaint and Master Administrative Class Action Complaint on preemption grounds.

J.      After careful consideration, the Class and Subclass Representatives, and their respective Counsel, have concluded that it is in the best interests of the Class and Subclass Representatives and the Settlement Class and Subclasses to compromise and settle all Released Claims against the Released Parties for consideration reflected in the terms and benefits of this Settlement Agreement. After arm's length negotiations with Counsel for the NFL Parties, including through the efforts of the court-appointed mediator and Special Master Golkin, the Class and Subclass Representatives have considered, among other things: (1) the complexity, expense, and likely duration of the litigation; (2) the stage of the litigation and amount of fact gathering completed; (3) the potential for the NFL Parties to prevail on threshold issues and on the merits; and (4) the range of possible recovery, and have determined that this Settlement Agreement is fair, reasonable, adequate, and in the best interests of the Class and Subclass Representatives and the Settlement Class and Subclasses.

K.      The NFL Parties have concluded, in light of the costs, risks, and burden of litigation, that this Settlement Agreement in this complex putative class action litigation is appropriate. The NFL Parties and Counsel for the NFL Parties agree with the Class and Subclass Representatives and their respective counsel that this Settlement Agreement is a fair, reasonable, and adequate resolution of the Released Claims. The NFL Parties reached this conclusion after considering the factual and legal issues relating to the litigation, the substantial benefits of this Settlement Agreement, the expense that would be necessary to defend claims by Settlement Class Members through trial and any appeals that might be taken, the benefits of disposing of protracted and complex litigation, and the desire of the NFL Parties to conduct their business unhampered by the costs, distraction and risks of continued litigation over Released Claims.

L.      The Parties desire to settle, compromise, and resolve fully all Released Claims.

M.      The Parties desire and intend to seek Court review and approval of the Settlement Agreement, and, upon preliminary approval by the Court, the Parties intend to seek a Final Order and Judgment from the Court dismissing with prejudice the Class Action Complaint and ordering the dismissal with prejudice of Related Lawsuits.

N.      This Settlement Agreement will not be construed as evidence of, or as an admission by, the NFL Parties of any liability or wrongdoing whatsoever or as an admission by the Class or Subclass Representatives, or Settlement Class Members, of any lack of merit in their claims.

NOW, THEREFORE, it is agreed that the foregoing recitals are hereby expressly incorporated into this Settlement Agreement and made a part hereof and further, that in consideration of the agreements, promises, and covenants set forth in this Settlement Agreement, including the Releases and Covenant Not to Sue in ARTICLE XVIII, the entry by the Court of the Final Order and Judgment dismissing the Class Action Complaint with prejudice and approving the terms and conditions of the Settlement Agreement, and for other good and valuable consideration, the receipt and

sufficiency of which are hereby acknowledged, this action shall be settled and compromised under the following terms and conditions:

## ARTICLE I
### Definitions of Settlement Class and Subclasses

Section 1.1    Definition of Settlement Class

(a)    "Settlement Class" means all Retired NFL Football Players, Representative Claimants and Derivative Claimants.

(b)    Excluded from the Settlement Class are any Retired NFL Football Players, Representative Claimants or Derivative Claimants who timely and properly exercise the right to be excluded from the Settlement Class ("Opt Outs").

Section 1.2    Definition of Subclasses

(a)    "Subclass 1" means Retired NFL Football Players who were not diagnosed with a Qualifying Diagnosis prior to the date of the Preliminary Approval and Class Certification Order and their Representative Claimants and Derivative Claimants.

(b)    "Subclass 2" means Retired NFL Football Players who were diagnosed with a Qualifying Diagnosis prior to the date of the Preliminary Approval and Class Certification Order and their Representative Claimants and Derivative Claimants, and the Representative Claimants of deceased Retired NFL Football Players who were diagnosed with a Qualifying Diagnosis prior to death or who died prior to the date of the Preliminary Approval and Class Certification Order and who received a post-mortem diagnosis of CTE.

## ARTICLE II
### Definitions

Section 2.1    Definitions

For the purposes of this Settlement Agreement, the following terms (designated by initial capitalization throughout this Agreement) will have the meanings set forth in this Section.

Unless the context requires otherwise, (i) words expressed in the masculine will include the feminine and neuter gender and vice versa; (ii) the word "will" shall be construed to have the same meaning and effect as the word "shall"; (iii) the word "or" will not be exclusive; (iv) the word "extent" in the phrase "to the extent" will mean the degree to which a subject or other thing extends, and such phrase will not simply mean "if"; (v) references to "day" or "days" in the lower case are to calendar days, but if the last day is a Saturday, Sunday, or legal holiday (as defined in Fed. R. Civ. P. 6(a)(6)), the period will continue to run until the end of the next day that is not a Saturday, Sunday, or legal holiday; (vi) references to this Settlement Agreement will include all

exhibits, schedules, and annexes hereto; (vii) references to any law will include all rules and regulations promulgated thereunder; (viii) the terms "include," "includes," and "including" will be deemed to be followed by "without limitation," whether or not they are in fact followed by such words or words of similar import; and (ix) references to dollars or "$" are to United States dollars.

(a)    "Active List" means the list of all players physically present, eligible and under contract to play for a Member Club on a particular game day within any applicable roster or squad limits set forth in the applicable NFL or American Football League Constitution and Bylaws.

(b)    "Affiliate" means, with respect to any person or entity, any other person or entity that, directly or indirectly, through one or more intermediaries, controls, or is controlled by, or is under common control with, such person or entity, where "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies, whether through the ownership of voting shares, by contract, or otherwise.

(c)    "ALS" means amyotrophic lateral sclerosis, also known as Lou Gehrig's Disease, as defined in Exhibit 1.

(d)    "Alzheimer's Disease" is defined in Exhibit 1.

(e)    "American Football League" means the former professional football league that merged with the NFL.

(f)    "Appeals Form" means that document that Settlement Class Members, the NFL Parties or Co-Lead Class Counsel, as the case may be, will submit when appealing Monetary Award or Derivative Claimant Award determinations by the Claims Administrator, as set forth in Section 9.7.

(g)    "Appeals Advisory Panel" means a panel of physicians, composed of, in any combination, five (5) board-certified neurologists, board-certified neurosurgeons, and/or other board-certified neuro-specialist physicians agreed to and jointly recommended by Co-Lead Class Counsel and Counsel for the NFL Parties, and appointed by the Court, any one of whom is eligible to advise the Court or the Special Master with respect to medical aspects of the Class Action Settlement and to perform the other duties of the Appeals Advisory Panel set forth in this Settlement Agreement.

(h)    "Appeals Advisory Panel Consultants" means three (3) neuropsychologists certified by the American Board of Professional Psychology (ABPP) or the American Board of Clinical Neuropsychology (ABCN), a member board of the American Board of Professional Psychology, in the specialty of Clinical Neuropsychology, agreed to and jointly recommended by Co-Lead Class Counsel and Counsel for the NFL Parties, and appointed by the Court, any one of whom is eligible to advise a member of the Appeals Advisory Panel, the Court, or the Special Master on the neuropsychological testing referenced in Exhibits 1 and 2 to the Settlement Agreement, as pertaining to the Qualifying Diagnoses of Level 1.5 Neurocognitive Impairment and

Level 2 Neurocognitive Impairment, and Level 1 Neurocognitive Impairment if subject to review as set forth in Section 5.13. Appeals Advisory Panel Consultants do not meet the definition of Appeals Advisory Panel members and shall not serve as members of the Appeals Advisory Panel.

(i)      "Baseline Assessment Program" ("BAP") means the program described in ARTICLE V.

(j)      "Baseline Assessment Program Supplemental Benefits" or "BAP Supplemental Benefits" means medical treatment, including, as needed, counseling and pharmaceutical coverage, for Level 1 Neurocognitive Impairment (as set forth in Exhibit 1) within a network of Qualified BAP Providers and Qualified BAP Pharmacy Vendor(s), respectively, established by the BAP Administrator, as set forth in Section 5.11.

(k)      "Baseline Assessment Program Fund Administrator" or "BAP Administrator" means that person(s) or entity, agreed to and jointly recommended by Co-Lead Class Counsel and Counsel for the NFL Parties, and appointed by the Court, to perform the responsibilities assigned to the BAP Administrator under this Settlement Agreement, including, without limitation, as set forth in ARTICLE V.

(l)      "Baseline Assessment Program Fund" or "BAP Fund" means the fund to pay BAP costs and expenses, as set forth in ARTICLE V.

(m)      "Claim Form" means that document to be submitted to the Claims Administrator by a Settlement Class Member who is a Retired NFL Football Player or Representative Claimant claiming a Monetary Award, as set forth in ARTICLE VIII.

(n)      "Claim Package" means the Claim Form and other documentation, as set forth in Section 8.2(a).

(o)      "Claims Administrator" means that person(s) or entity, agreed to and jointly recommended by Co-Lead Class Counsel and Counsel for the NFL Parties, and appointed by the Court, to perform the responsibilities assigned to the Claims Administrator under this Settlement Agreement, including, without limitation, as set forth in Section 10.2.

(p)      "Class Action Complaint" means the complaint captioned Plaintiffs' Class Action Complaint filed on consent in the Court on January 6, 2014.

(q)      "Class Action Settlement" means that settlement set forth in this Settlement Agreement.

(r)      "Class Counsel" means, pending Court appointment, the counsel who are so designated and who are signatories to this Settlement Agreement, namely, Co-Lead Class Counsel, Christopher A. Seeger and Sol Weiss, Subclass Counsel, Arnold Levin and Dianne M. Nast, and Steven C. Marks of Podhurst Orseck,

P.A. and Gene Locks of Locks Law Firm, and, upon appointment, such other counsel as the Court may appoint to represent the Settlement Class.

(s)    "Class Representatives" means Shawn Wooden and Kevin Turner, or such other or different persons as may be appointed by the Court as the representatives of the Settlement Class.

(t)    "CMS" means the Centers for Medicare & Medicaid Services, the agency within the United States Department of Health and Human Services responsible for administration of the Medicare Program and the Medicaid Program.

(u)    "Co-Lead Class Counsel" means, pending Court appointment, the counsel who are so designated and who are signatories to this Settlement Agreement, namely, Christopher A. Seeger of Seeger Weiss LLP and Sol Weiss of Anapol Schwartz, and, upon appointment, such other counsel as the Court may appoint to represent the Settlement Class in a lead role.

(v)    "Collective Bargaining Agreement" means the August 4, 2011 Collective Bargaining Agreement between the NFL Management Council and the NFL Players Association, individually and together with all previous and future NFL Football collective bargaining agreements governing NFL Football players.

(w)    "Counsel for the NFL Parties" means Paul, Weiss, Rifkind, Wharton & Garrison LLP, or any law firm or attorney so designated in writing by the NFL Parties.

(x)    "Court" means the United States District Court for the Eastern District of Pennsylvania, Judge Anita Brody (or any successor judge designated by the United States District Court for the Eastern District of Pennsylvania, or a magistrate judge designated by Judge Brody or such designated successor judge, as set forth in and pursuant to Federal Rule of Civil Procedure 72), presiding in In re: National Football League Players' Concussion Injury Litigation, MDL No. 2323. For the period of time from the Effective Date up to and including the fifth year of the Class Action Settlement, the Parties agree, in accordance with the provisions of 28 U.S.C. § 636(c), to waive their right to proceed before a judge of the United States District Court in connection with issues relating to the administration of this Settlement Agreement where the Court is required or requested to act, and consent to have a United States Magistrate Judge conduct such proceedings.

(y)    "Covenant Not to Sue" means the covenant not to sue set forth in Section 18.4.

(z)    "CTE" means Chronic Traumatic Encephalopathy.

(aa)    "Death with CTE" is defined in Exhibit 1.

(bb)    "Deficiency" means any failure of a Settlement Class Member to provide required information or documentation to the Claims Administrator, as set forth in Section 8.5.

(cc)    "Derivative Claim Form" means that document to be submitted to the Claims Administrator by a Settlement Class Member who is a Derivative Claimant claiming a Derivative Claimant Award, as set forth in ARTICLE VIII.

(dd)    "Derivative Claim Package" means the Derivative Claim Form and other documentation, as set forth in Section 8.2(b).

(ee)    "Derivative Claimants" means spouses, parents, children who are dependents, or any other persons who properly under applicable state law assert the right to sue independently or derivatively by reason of their relationship with a Retired NFL Football Player or deceased Retired NFL Football Player.

(ff)    "Derivative Claimant Award" means the payment of money from the Monetary Award of the subject Retired NFL Football Player to a Settlement Class Member who is a Derivative Claimant, as set forth in ARTICLE VII.

(gg)    "Diagnosing Physician Certification" means that document which a Settlement Class Member who is a Retired NFL Football Player or Representative Claimant must submit either as part of a Claim Package in order to receive a Monetary Award, as set forth in Section 8.2(a), or to receive BAP Supplemental Benefits, as set forth in Section 5.11, the contents of which shall be agreed to by Co-Lead Class Counsel and Counsel for the NFL Parties and that shall include, without limitation: (i) a certification under penalty of perjury by the diagnosing physician that the information provided is true and correct, (ii) the Qualifying Diagnosis being made consistent with the criteria in Exhibit 1 (Injury Definitions) and the date of diagnosis, and (iii) the qualifications of the diagnosing physician, including, without limitation, whether the diagnosing physician is a Qualified MAF Physician.

(hh)    "Education Fund" means a fund to support education programs promoting safety and injury prevention with respect to football players, including safety-related initiatives in youth football, the education of Retired NFL Football Players regarding the NFL CBA Medical and Disability Benefits programs, and other educational initiatives benefitting Retired NFL Football Players, as set forth in ARTICLE XII.

(ii)    "Education Fund Amount" means the amount of Ten Million United States dollars (U.S. $10,000,000), as set forth in Section 23.1(c).

(jj)    "Effective Date" means (i) the day following the expiration of the deadline for appealing the entry by the Court of the Final Order and Judgment approving the Settlement Agreement and certifying the Settlement Class (or for appealing any ruling on a timely motion for reconsideration of such Final Order, whichever is later), if no such appeal is filed; or (ii) if an appeal of the Final Order and Judgment is filed, the date upon which all appellate courts with jurisdiction (including the United States

Supreme Court by petition for certiorari) affirm such Final Order and Judgment, or deny any such appeal or petition for certiorari, such that no future appeal is possible.

(kk)    "Eligible Season" means a season in which a Retired NFL Football Player or deceased Retired NFL Football Player was:  (i) on a Member Club's Active List on the date of three (3) or more regular season or postseason games; or (ii) on a Member Club's Active List on the date of one (1) or more regular or postseason games, and then spent at least two (2) regular or postseason games on a Member Club's injured reserve list or inactive list due to a concussion or head injury.  A "half of an Eligible Season" means a season in which a Retired NFL Football Player or deceased Retired NFL Football Player was:  (i) on a Member Club's practice, developmental, or taxi squad roster for at least eight (8) regular or postseason games; or (ii) on a World League of American Football, NFL Europe League, or NFL Europa League team's active roster on the date of three (3) or more regular season or postseason games or on the active roster on the date of one (1) or more regular or postseason games, and then spent at least two (2) regular or postseason games on the World League of American Football, NFL Europe League, or NFL Europa League injured reserve list or team inactive list due to a concussion or head injury.

(ll)    "Fairness Hearing" means the hearing scheduled by the Court to consider the fairness, reasonableness, and adequacy of this Settlement Agreement under Rule 23(e)(2) of the Federal Rules of Civil Procedure, and to determine whether a Final Order and Judgment should be entered.

(mm)    "Final Approval Date" means the date on which the Court enters the Final Order and Judgment.

(nn)    "Final Order and Judgment" means the final judgment and order entered by the Court, substantially in the form of Exhibit 4, and as set forth in ARTICLE XX.

(oo)    "Funds" means the Settlement Trust Account, the BAP Fund, the Monetary Award Fund, and the Education Fund.

(pp)    "Governmental Payor" means any federal, state, or other governmental body, agency, department, plan, program, or entity that administers, funds, pays, contracts for, or provides medical items, services, and/or prescription drugs, including, but not limited to, the Medicare Program, the Medicaid Program, Tricare, the Department of Veterans Affairs, and the Department of Indian Health Services.

(qq)    "HIPAA" means the administrative simplification provisions of the Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191, 110 Stat. 1936 (1996) (codified as amended in scattered sections of 42 U.S.C.) and the implementing regulations issued by the United States Department of Health and Human Services thereunder, and incorporates by reference the provisions of the Health Information Technology for Economic and Clinical Health Act (Title XIII of

Division A and Title IV of Division B of the American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5 (2009)) pertaining to Protected Health Information.

(rr)    "Level 1 Neurocognitive Impairment" is defined in Exhibit 1.

(ss)    "Level 1.5 Neurocognitive Impairment" is defined in Exhibit 1.

(tt)    "Level 2 Neurocognitive Impairment" is defined in Exhibit 1.

(uu)    "Lien" means any statutory lien of a Government Payor or Medicare Part C or Part D Program sponsor; or any mortgage, lien, pledge, charge, security interest, or legal encumbrance, of any nature whatsoever, held by any person or entity, where there is a legal obligation to withhold payment of a Monetary Award, Supplemental Monetary Award, Derivative Claimant Award, or some portion thereof, to a Settlement Class Member under applicable federal or state law.

(vv)    "Lien Resolution Administrator" means that person(s) or entity, agreed to and jointly recommended by Co-Lead Class Counsel and Counsel for the NFL Parties, and appointed by the Court, to perform the responsibilities assigned to the Lien Resolution Administrator under this Settlement Agreement, including, without limitation, as set forth in ARTICLE XI.

(ww)    "Medicaid Program" means the federal program administered by the states under which certain medical items, services, and/or prescription drugs are furnished to Medicaid beneficiaries under Title XIX of the Social Security Act, 42 U.S.C. § 1396–1, *et seq*.

(xx)    "Medicare Part C or Part D Program" means the program(s) under which Medicare Advantage, Medicare cost, and Medicare health care prepayment plan benefits and Medicare Part D prescription drug plan benefits are administered by private entities that contract with CMS.

(yy)    "Medicare Program" means the Medicare Parts A and B federal program administered by CMS under which certain medical items, services, and/or prescription drugs are furnished to Medicare beneficiaries under Title XVIII of the Social Security Act, 42 U.S.C. § 1395, *et seq*.

(zz)    "Member Club" means any past or present member club of the NFL or any past member club of the American Football League.

(aaa)    "Monetary Award" means the payment of money from the Monetary Award Fund to a Settlement Class Member, other than a Derivative Claimant, as set forth in ARTICLE VI.   The term "Monetary Award" shall also include "Supplemental Monetary Award" with respect to the claims process set forth in this

Settlement Agreement, including, without limitation, relating to submission and approval of claims, calculation and distribution of awards, and appeals.

(bbb)    "Monetary Award Fund" or "MAF" means the sixty-five (65) year fund, as set forth in Section 6.10.

(ccc)    "Monetary Award Grid" means that document attached as Exhibit 3.

(ddd)    "MSP Laws" means the Medicare Secondary Payer Act set forth at 42 U.S.C. § 1395y(b), as amended from time to time, and implementing regulations, and other applicable written CMS guidance.

(eee)    "NFL CBA Medical and Disability Benefits" means any disability or medical benefits available under the Collective Bargaining Agreement, including the benefits available under the Bert Bell/Pete Rozelle NFL Player Retirement Plan; NFL Player Supplemental Disability Plan, including the Neuro-Cognitive Disability Benefit provided for under Article 65 of the Collective Bargaining Agreement; the 88 Plan; Gene Upshaw NFL Player Health Reimbursement Account Plan; Former Player Life Improvement Plan; NFL Player Insurance Plan; and/or the Long Term Care Insurance Plan.

(fff)    "NFL Football" means the sport of professional football as played in the NFL, the American Football League, the World League of American Football, the NFL Europe League, and the NFL Europa League. NFL Football excludes football played by all other past, present or future professional football leagues, including, without limitation, the All-American Football Conference.

(ggg)    "NFL Medical Committees" means the various past and present medical committees, subcommittees and panels that operated or operate at the request and/or direction of the NFL, whether independent or not, including, without limitation, the Injury and Safety Panel, Mild Traumatic Brain Injury Committee, Head Neck and Spine Medical Committee, Foot and Ankle Subcommittee, Cardiovascular Health Subcommittee, and Medical Grants Subcommittee, and all persons, whether employees, agents or independent of the NFL, who at any time were members of or participated on each such panel, committee, or subcommittee.

(hhh)    "Notice of Challenge Determination" means the written notice set forth in Section 4.3(a)(ii)-(iv).

(iii)    "Notice of Deficiency" means that document that the Claims Administrator sends to any Settlement Class Member whose Claim Package or Derivative Claim Package contains a Deficiency, as set forth in Section 8.5.

(jjj)    "Notice of Derivative Claimant Award Determination" means the written notice set forth in Section 9.2(a)-(b).

(kkk)    "Notice of Monetary Award Claim Determination" means the written notice set forth in Section 9.1(b)-(c).

(lll)    "Notice of Registration Determination" means the written notice set forth in Section 4.3.

(mmm)"Offsets" means downward adjustments to Monetary Awards, as set forth in Section 6.7(b).

(nnn)    "Opt Out," when used as a verb, means the process by which any Retired NFL Football Player, Representative Claimant or Derivative Claimant otherwise included in the Settlement Class exercises the right to exclude himself or herself from the Settlement Class in accordance with Fed. R. Civ. P. 23(c)(2).

(ooo)    "Opt Outs," when used as a noun, means those Retired NFL Football Players, Representative Claimants and Derivative Claimants who would otherwise have been included in the Settlement Class and who have timely and properly exercised their rights to Opt Out and therefore, after the Final Approval Date, are not Settlement Class Members.

(ppp)    "Other Party" means every person, entity, or party other than the Released Parties.

(qqq)    "Parkinson's Disease" is defined in Exhibit 1.

(rrr)    "Parties" means the Class Representatives and Subclass Representatives, individually and on behalf of the Settlement Class and Subclasses, and the NFL Parties.

(sss)    "Personal Signature" means the actual signature by the person whose signature is required on the document. Unless otherwise specified in this Settlement Agreement, a document requiring a Personal Signature may be submitted by an actual original "wet ink" signature on hard copy, or a PDF or other electronic image of an actual signature, but cannot be submitted by an electronic signature within the meaning of the Electronic Records and Signatures in Commerce Act, 15 U.S.C. §§7001, *et seq.*, the Uniform Electronic Transactions Act, or their successor acts.

(ttt)    "Preliminary Approval and Class Certification Order" means the order, upon entry by the Court, preliminarily approving the Class Action Settlement and conditionally certifying the Settlement Class and Subclasses.

(uuu)    "Protected Health Information" means individually identifiable health information, as defined in 45 C.F.R. § 160.103.

(vvv)    "Qualified BAP Providers" means neuropsychologists certified by the American Board of Professional Psychology (ABPP) or the American Board of Clinical Neuropsychology (ABCN), a member board of the American Board of Professional Psychology, in the specialty of Clinical Neuropsychology, and board-

certified neurologists, eligible to conduct baseline assessments of Retired NFL Football Players under the BAP, as set forth in Section 5.7(a).

(www) "Qualified MAF Physician" means a board-certified neurologist, board-certified neurosurgeon, or other board-certified neuro-specialist physician, who is part of an approved list of physicians authorized to make Qualifying Diagnoses, as set forth in Section 6.5.

(xxx) "Qualified Pharmacy Vendor(s)" means one or more nationwide mail order pharmacies contracted to provide approved pharmaceutical prescriptions as part of the BAP Supplemental Benefits, as set forth in Section 5.7(b).

(yyy) "Qualifying Diagnosis" or "Qualifying Diagnoses" means Level 1.5 Neurocognitive Impairment, Level 2 Neurocognitive Impairment, Alzheimer's Disease, Parkinson's Disease, ALS, and/or Death with CTE, as set forth in Exhibit 1 (Injury Definitions).

(zzz) "Related Lawsuits" means all past, present and future actions brought by one or more Releasors against one or more Released Parties pending in the Court, other than the Class Action Complaint, or in any other federal court, state court, arbitration, regulatory agency, or other tribunal or forum that arise out of, are based upon or are related to the allegations, transactions, facts, matters, occurrences, representations or omissions involved, set forth, alleged, or referred to in the Class Action Complaint, except that Settlement Class Members' claims for workers' compensation and claims alleging entitlement to NFL CBA Medical and Disability Benefits are not Related Lawsuits.

(aaaa) "Released Claims" means those claims released as set forth in Section 18.1 and Section 18.2.

(bbbb) "Released Parties" for purposes of the Released Claims means (i) the NFL Parties (including all persons, entities, subsidiaries, divisions, and business units composed thereby), together with (ii) each of the Member Clubs, (iii) each of the NFL Parties' and Member Clubs' respective past, present, and future agents, directors, officers, employees, independent contractors, general or limited partners, members, joint venturers, shareholders, attorneys, trustees, insurers (solely in their capacities as liability insurers of those persons or entities referred to in subparagraphs (i) and (ii) above and/or arising out of their relationship as liability insurers to such persons or entities), predecessors, successors, indemnitees, and assigns, and their past, present, and future spouses, heirs, beneficiaries, estates, executors, administrators, and personal representatives, including, without limitation, all past and present physicians who have been employed or retained by any Member Club and members of all past and present NFL Medical Committees; and (iv) any natural, legal, or juridical person or entity acting on behalf of or having liability in respect of the NFL Parties or the Member Clubs, in their respective capacities as such; and, as to (i)-(ii) above, each of their respective Affiliates, including their Affiliates' officers, directors, shareholders, employees, and agents.  For the avoidance of any doubt, Riddell is not a Released Party.

(cccc) "Releases" means the releases set forth in ARTICLE XVIII.

(dddd)        "Releasors" means the releasors set forth in Section 18.1.

(eeee)        "Representative Claimants" means authorized representatives, ordered by a court or other official of competent jurisdiction under applicable state law, of deceased or legally incapacitated or incompetent Retired NFL Football Players.

(ffff)        "Retired NFL Football Players" means all living NFL Football players who, prior to the date of the Preliminary Approval and Class Certification Order, retired, formally or informally, from playing professional football with the NFL or any Member Club, including American Football League, World League of American Football, NFL Europe League and NFL Europa League players, or were formerly on any roster, including preseason, regular season, or postseason, of any such Member Club or league and who no longer are under contract to a Member Club and are not seeking active employment as players with any Member Club, whether signed to a roster or signed to any practice squad, developmental squad, or taxi squad of a Member Club.

(gggg)        "Riddell" means Riddell, Inc.; All American Sports Corporation; Riddell Sports Group, Inc.; Easton-Bell Sports, Inc.; Easton-Bell Sports, LLC; EB Sports Corp.; and RBG Holdings Corp., and each of their respective past, present, and future Affiliates, directors, officers, employees, general or limited partners, members, joint venturers, shareholders, agents, trustees, insurers (solely in their capacities as such), reinsurers (solely in their capacities as such), predecessors, successors, indemnitees, and assigns.

(hhhh)        "Settlement Agreement" means this Settlement Agreement and all accompanying exhibits, including any subsequent amendments thereto and any exhibits to such amendments.

(iiii)        "Settlement Class and Subclasses" is defined in Section 1.1 and Section 1.2.

(jjjj)        "Settlement Class Member" means each Retired NFL Football Player, Representative Claimant and/or Derivative Claimant in the Settlement Class; provided, however, that the term Settlement Class Member as used herein with respect to any right or obligation after the Final Approval Date does not include any Opt Outs.

(kkkk)        "Settlement Class Notice" means that notice, in the form of Exhibit 5, and as set forth in Section 14.1, as agreed to by Co-Lead Class Counsel and Counsel for the NFL Parties, and approved by the Court.

(llll)   "Settlement Class Notice Agent" means that person or entity who will implement the Settlement Class Notice Plan and who will be responsible for the publication and provision of the Settlement Class Notice and Settlement Class Supplemental Notice.

(mmmm)   "Settlement Class Notice Payment" means Four Million United States dollars (U.S. $4,000,000), as set forth in Sections 23.1(d) and 23.3(e), for the costs of Settlement Class Notice, any supplemental notice required, including, without limitation, the Settlement Class Supplemental Notice, and compensation of the Settlement Class Notice Agent and the Claims Administrator to the extent the Claims Administrator performs notice-related duties that have been agreed to by the NFL Parties.

(nnnn)   "Settlement Class Notice Plan" means that document which sets forth the methods, timetable, and responsibilities for providing Settlement Class Notice to Settlement Class Members, as set forth in Section 14.1.

(oooo)   "Settlement Class Supplemental Notice" means that notice, as set forth in Section 14.1(d), as agreed to by Co-Lead Class Counsel and Counsel for the NFL Parties, and approved by the Court.

(pppp)   "Settlement Date" means the date by which Class Counsel and Counsel for the NFL Parties have all signed the Settlement Agreement dated June 25, 2014 on behalf of the Class and Subclass Representatives, Settlement Class and Subclasses, and the NFL Parties, respectively.

(qqqq)   "Settlement Trust" means the trust enacted pursuant to the Settlement Trust Agreement, as set forth in Section 23.5.

(rrrr)   "Settlement Trust Account" means that account created under the Settlement Trust Agreement and held by the Trustee into which the NFL Parties will make payments pursuant to ARTICLE XXIII of this Settlement Agreement.

(ssss)   "Settlement Trust Agreement" means the agreement that will establish the Settlement Trust and will be entered into by Co-Lead Class Counsel, the NFL Parties, and the Trustee, as set forth in Section 23.5(c).

(tttt)   "Signature" means the actual signature by the person whose signature is required on the document, or on behalf of such person by a person authorized by a power of attorney or equivalent document to sign such documents on behalf of such person.  Unless otherwise specified in this Settlement Agreement, a document requiring a Signature may be submitted by: (i) an actual original "wet ink" signature on hard copy; (ii) a PDF or other electronic image of an actual signature; or (iii) an electronic signature within the meaning of the Electronic Records and Signatures in Commerce Act, 15 U.S.C. §§7001, *et seq.*, the Uniform Electronic Transactions Act, or their successor acts.

(uuuu)      "Special Master" means that person appointed by the Court pursuant to Federal Rule of Civil Procedure 53 to oversee the administration of the Settlement Agreement, as set forth in Section 10.1.

(vvvv)      "Stadium Program Bonds" means the NFL's G3 and G4 bonds.

(wwww)      "Stroke" means stroke, as defined by the World Health Organization's International Classification of Diseases, 9th Edition (ICD-9) or the World Health Organization's International Classification of Diseases, 10th Edition (ICD-10), which occurs prior to or after the time the Retired NFL Football Player played NFL Football.  A medically diagnosed Stroke does not include a transient cerebral ischaemic attack and related syndromes, as defined by ICD-10.

(xxxx) "Subclass Counsel" means, pending Court appointment, the counsel who are so designated and who are signatories to this Settlement Agreement, namely Arnold Levin of Levin, Fishbein, Sedran & Berman for Subclass 1, and Dianne M. Nast of NastLaw LLC for Subclass 2, and, upon appointment, such other counsel as the Court may appoint to represent the Settlement Subclasses 1 and 2.

(yyyy)      "Subclass Representatives" means Shawn Wooden and Kevin Turner, or such other or different persons as may be designated by the Court as the representatives of the Settlement Subclasses 1 and 2.

(zzzz)      "Supplemental Monetary Award" means the supplemental payment of monies from the Monetary Award Fund to a Settlement Class Member, as set forth in Section 6.8.

(aaaaa)      "Traumatic Brain Injury" means severe traumatic brain injury unrelated to NFL Football play, that occurs during or after the time the Retired NFL Football Player played NFL Football, consistent with the definitions in the World Health Organization's International Classification of Diseases, 9th Edition (ICD-9), Codes 854.04, 854.05, 854.14 and 854.15, and the World Health Organization's International Classification of Diseases, 10th Edition (ICD-10), Codes S06.9x5 and S06.9x6.

(bbbbb)      "Tricare" means the federal program managed and administered by the United States Department of Defense through the Tricare Management Activity under which certain medical items, services, and/or prescription drugs are furnished to eligible members of the military services, military retirees, and military dependents under 10 U.S.C. § 1071, *et seq.*

(ccccc) "Trustee" means that person or entity approved by the Court as trustee of the Settlement Trust Account and as administrator of the qualified settlement fund for purposes of Treasury Regulation §1.468B-2(k)(3), as set forth in ARTICLE XXIII.

**ARTICLE III**
**Settlement Benefits for Class Members**

Section 3.1    The Class and Subclass Representatives, by and through Class Counsel and Subclass Counsel, and the NFL Parties, by and through Counsel for the NFL Parties, agree that, in consideration of the Releases and Covenant Not to Sue set forth in ARTICLE XVIII, and the dismissal with prejudice of the Class Action Complaint and the Related Lawsuits, and subject to the terms and conditions of this Settlement Agreement, the NFL Parties will, in addition to other obligations set forth in this Settlement Agreement:

(a)    Pay all final Monetary Awards and Derivative Claimant Awards to those Settlement Class Members who qualify for such awards pursuant to the requirements and criteria set forth in this Settlement Agreement;

(b)    Provide qualified Settlement Class Members who are Retired NFL Football Players with the option to participate in the BAP and receive a BAP baseline assessment examination and BAP Supplemental Benefits, if eligible, pursuant to the requirements and criteria set forth in this Settlement Agreement; and

(c)    Establish the Education Fund to support education programs promoting safety and injury prevention with respect to football players, including safety-related initiatives in youth football, the education of Retired NFL Football Players regarding the NFL CBA Medical and Disability Benefits programs, and other educational initiatives benefitting Retired NFL Football Players, as set forth in ARTICLE XII.

**ARTICLE IV**
**Information and Registration Process**

Section 4.1    Information

(a)    Within ten (10) days after the Preliminary Approval and Class Certification Order, Co-Lead Class Counsel will cause to be established and maintained a public website containing information about the Class Action Settlement (the "Settlement Website"), including the Settlement Class Notice and "Frequently Asked Questions." Within ninety (90) days after the Effective Date, Co-Lead Class Counsel will cause the Settlement Website to be transitioned for claims administration purposes. The Settlement Website will be the launching site for secure web-based portals established and maintained by the Claims Administrator, BAP Administrator, and/or Lien Resolution Administrator for use by Settlement Class Members and their designated attorneys throughout the term of the Class Action Settlement. The Claims Administrator will post all necessary information about the Class Action Settlement on the Settlement Website, including, as they become available, information about registration deadlines and methods to participate in the BAP, the Claim Package requirements and Monetary Awards, and the Derivative Claim Package requirements and Derivative Claimant

Awards. All content posted on the Settlement Website will be subject to advance approval by Co-Lead Class Counsel and Counsel for the NFL Parties.

(b)  Within ten (10) days after the Preliminary Approval and Class Certification Order, Co-Lead Class Counsel also will cause to be established and maintained an automated telephone system that uses a toll-free number or numbers to provide information about the Class Action Settlement. Within ninety (90) days after the Effective Date, Co-Lead Class Counsel will cause the automated telephone system to be transitioned for claims administration purposes. Through this system, Settlement Class Members may request and obtain copies of the Settlement Class Notice, Settlement Agreement, Claim Form, Derivative Claim Form, and Appeals Form, and they may speak with operators for further information.

Section 4.2    Registration Methods and Requirements

(a)  The Claims Administrator will establish and administer both online and hard copy registration methods for participation in the Class Action Settlement.

(b)  The registration requirements will include information sufficient to determine if a registrant is a Settlement Class Member, including: (i) name; (ii) address; (iii) date of birth; (iv) Social Security Number (if any); (v) email address (if any), and whether email, the web-based portal on the Settlement Website, or U.S. mail is the preferred method of communication; (vi) identification as a Retired NFL Football Player, Representative Claimant or Derivative Claimant; (vii) dates and nature of NFL Football employment (*e.g.*, Active List, practice squad, developmental squad), and corresponding identification of the employer Member Club(s) or assigned team(s) (for Retired NFL Football Players, or, for the subject Retired NFL Football Player or deceased Retired NFL Football Player in the case of Representative Claimants and Derivative Claimants); and (viii) Signature of the registering purported Settlement Class Member.

(i)  In addition to the registration requirements in this Section 4.2(b), Representative Claimants also will identify the subject deceased or legally incapacitated or incompetent Retired NFL Football Player, including name, last known address, date of birth, and Social Security Number (if any), and will provide a copy of the court order, or other document issued by an official of competent jurisdiction, providing the authority to act on behalf of that deceased or legally incapacitated or incompetent Retired NFL Football Player.

(ii)  In addition to the registration requirements in this Section 4.2(b), Derivative Claimants also will identify the subject Retired NFL Football Player or deceased Retired NFL Football Player and the relationship by which they assert the right under applicable state law to sue independently or derivatively.

(c)  Unless good cause, as set forth in subsection (i), is shown, Settlement Class Members must register on or before 180 days from the date that the

Settlement Class Supplemental Notice is posted on the Settlement Website.  If a Settlement Class Member does not register by that deadline, that Settlement Class Member will be deemed ineligible for the BAP and BAP Supplemental Benefits, Monetary Awards and Derivative Claimant Awards.

(i)     Good cause will include, without limitation, (a) that a Settlement Class Member who is a Representative Claimant had not been ordered by a court or other official of competent jurisdiction to be the authorized representative of the subject deceased or legally incapacitated or incompetent Retired NFL Football Player prior to the registration deadline (and the Representative Claimant seeks to register within 180 days of authorization by the court or other official of competent jurisdiction), or (b) that the subject Retired NFL Football Player timely registered prior to his death or becoming legally incapacitated or incompetent and his Representative Claimant seeks to register for that Retired NFL Football Player; or (c) that the subject Retired NFL Football Player timely registered and the Derivative Claimant seeks to register within thirty (30) days of that Retired NFL Football Player's submission of a Claim Package.

Section 4.3     Registration Review

(a)     Upon receipt of a purported Settlement Class Member's registration, the Claims Administrator will review the information to determine whether the purported Settlement Class Member is a Settlement Class Member under the Settlement Agreement, and whether he or she has timely registered.  In order to determine qualification for the BAP, as set forth in Section 5.1, the Claims Administrator will also determine if a registering Retired NFL Football Player has identified his participation in NFL Football that earns him at least one half of an Eligible Season.  The Claims Administrator will then issue a favorable or adverse Notice of Registration Determination, within forty-five (45) days of receipt of the purported Settlement Class Member's registration, informing the purported Settlement Class Member whether he or she is a Settlement Class Member who has properly registered.  To the extent the volume of registrations warrants, this deadline may be extended by agreement between Co-Lead Class Counsel and Counsel for the NFL Parties.

(i)     Favorable Notices of Registration Determination will include information regarding the sections of the Settlement Website and/or secure web-based portals that provide detailed information regarding the Claim Package and Monetary Awards, the Derivative Claim Package and Derivative Claimant Awards and, for Settlement Class Members who are Retired NFL Football Players, information regarding the BAP.  The Notice of Registration Determination will inform the Settlement Class Member of his or her unique identifying number for future use, including on a Claim Form or Derivative Claimant Form.

(ii)     Adverse Notices of Registration Determination will include information regarding how the purported Settlement Class Member can challenge the determination.  The purported Settlement Class Member may submit a written challenge to the Claims Administrator within sixty (60) days after the date of the Notice of Registration Determination.  The purported Settlement Class Member must present a

sworn statement or other evidence in support of any written challenge. The Claims Administrator will make a determination on the written challenge and issue a Notice of Challenge Determination to the purported Settlement Class Member and the NFL Parties informing them of the decision.

(iii)    The NFL Parties can challenge, for good cause, a favorable Notice of Registration Determination by submitting a written challenge to the Claims Administrator within sixty (60) days after the date of the Notice of Registration Determination. The NFL Parties must present evidence in support of the written challenge. The Claims Administrator will make a determination on the written challenge and issue a Notice of Challenge Determination to the purported Settlement Class Member and the NFL Parties informing them of the decision.

(iv)    Any Notice of Challenge Determination may be appealed by the purported Settlement Class Member or the NFL Parties, provided that the NFL Parties' appeal is limited to challenging the purported Retired NFL Football Player's or subject Retired NFL Football Player's status as a Retired NFL Football Player, in writing to the Court within sixty (60) days after the date of the Notice of Challenge Determination. The parties may present evidence in support of, or in opposition to, the appeal. The Court will be provided access to all documents and information available to the Claims Administrator to aid in determining the appeal. The Court may, in its discretion, refer the appeal to the Special Master. The decision of the Court or the Special Master shall be final and binding.

(v)    If either Co-Lead Class Counsel or Counsel for the NFL Parties believe that the Claims Administrator has issued a Notice of Registration Determination that reflects an improper interpretation of the Settlement Class definition set forth in Section 1.1, such counsel may petition the Court to resolve the issue. The Court may, in its discretion, refer the matter to the Special Master. If the Court or the Special Master determines that the Claims Administrator misinterpreted the Settlement Class definition, the decision of the Court or the Special Master will supersede the prior determination by the Claims Administrator.

## ARTICLE V
## Baseline Assessment Program

Section 5.1    <u>Qualification</u>. All Retired NFL Football Players with at least one half of an Eligible Season, as defined in Section 2.1(kk), who timely registered to participate in the Class Action Settlement, as set forth in ARTICLE IV, will qualify for the BAP and will be entitled to one (1) baseline assessment examination as provided in Section 5.2. For the avoidance of any doubt, an eligible Retired NFL Football Player who submits a claim for a Monetary Award, whether successful or not, may participate in the BAP, except a Retired NFL Football Player who submits a successful claim for a Monetary Award is not eligible to later receive BAP Supplemental Benefits.

Section 5.2    <u>Scope of Program</u>. The BAP will provide the opportunity for each qualified Retired NFL Football Player, as set forth in Section 5.1, to receive a

maximum of one (1) baseline assessment examination, which includes: (a) a standardized neuropsychological examination in accordance with the testing protocol set forth in Exhibit 2 performed by a neuropsychologist certified by the American Board of Professional Psychology (ABPP) or the American Board of Clinical Neuropsychology (ABCN), a member board of the American Board of Professional Psychology, in the specialty of Clinical Neuropsychology, who is a Qualified BAP Provider; and (b) a basic neurological examination performed by a board-certified neurologist who is a Qualified BAP Provider. The diagnosis of Level 1 Neurocognitive Impairment, Level 1.5 Neurocognitive Impairment and Level 2 Neurocognitive Impairment made pursuant to the BAP must be agreed to by both the neuropsychologist and board-certified neurologist serving as Qualified BAP Providers. BAP baseline assessment examinations are intended to establish a physician/patient relationship between the Retired NFL Football Player and his Qualified BAP Providers. Retired NFL Football Players diagnosed during their BAP baseline assessment examinations by Qualified BAP Providers with Level 1 Neurocognitive Impairment will be eligible to receive BAP Supplemental Benefits, as set forth in Section 5.11. For the avoidance of any doubt, a Qualifying Diagnosis of Alzheimer's Disease, Parkinson's Disease, ALS or Death with CTE shall not be made through the BAP baseline assessment examination.

Section 5.3    <u>Deadline for BAP Baseline Assessment Examination</u>. A Retired NFL Football Player electing to receive a BAP baseline assessment examination must take it: (i) within two (2) years of the commencement of the BAP if he is age 43 or older on the Effective Date; or (ii) if he is younger than age 43 on the Effective Date, before his 45th birthday or within ten (10) years of the commencement of the BAP, whichever occurs earlier. For the avoidance of any doubt, there shall be no baseline assessment examinations after the tenth anniversary of the commencement of the BAP.

Section 5.4    <u>Monetary Award Offset</u>. If a Retired NFL Football Player in Subclass 1 chooses not to participate in the BAP and receives a Qualifying Diagnosis on or after the Effective Date, that Retired NFL Football Player will be subject to a Monetary Award Offset (as set forth in Section 6.7(b)(iv)) based on his non-participation in the BAP unless the Qualifying Diagnosis is of ALS or if he receives any Qualifying Diagnosis other than ALS prior to his deadline to receive a BAP baseline assessment examination as set forth in Section 5.3. This Offset does not apply to a Retired NFL Football Player who is in Subclass 2.

Section 5.5    <u>BAP Term</u>. The BAP will commence one hundred and twenty (120) days after the Settlement Class Supplemental Notice is posted on the Settlement Website and will end ten (10) years after it commences, except that the provision of BAP Supplemental Benefits to Retired NFL Football Players diagnosed with Level 1 Neurocognitive Impairment, as set forth in Exhibit 1, may extend beyond the term of the BAP for up to five (5) years as set forth in Section 5.11. Retired NFL Football Players who are qualified, as set forth in Section 5.1, will be entitled to one (1) baseline assessment examination within the applicable time limitations set forth in Section 5.3.

Section 5.6    BAP Administrator

(a)    Appointment and Oversight

(i)    The Motion for Preliminary Approval of the Class Action Settlement filed by Class Counsel  will request that the Court appoint The Garretson Resolution Group, Inc. ("Garretson Group") as BAP Administrator.  Within ten (10) days after the Effective Date, Co-Lead Class Counsel will retain the BAP Administrator appointed by the Court.

(ii)    Co-Lead Class Counsel's retention agreement with the BAP Administrator will provide that the BAP Administrator will perform its responsibilities and take all steps necessary to faithfully implement and administer the BAP-related provisions of the Settlement Agreement, and will require that the BAP Administrator maintain at all times appropriate and sufficient bonding insurance in connection with its performance of its responsibilities under the Settlement Agreement.

(iii)    The Court may, at its sole discretion, request reports or information from the BAP Administrator.  The BAP Administrator will be responsible for reporting and providing information to the Court at such frequency and in such a manner as the Court directs.

(iv)    The Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof) will oversee the BAP Administrator, and may, at his or her sole discretion, request reports or information from the BAP Administrator.

(v)    Beyond the reporting requirements set forth in Section 5.6(a)(iii)-(iv), beginning one month after the Effective Date, the BAP Administrator will issue a regular monthly report to the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof), Co-Lead Class Counsel, and Counsel for the NFL Parties during the first three years of the BAP, and thereafter on a quarterly basis, or as reasonably agreed upon by the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof), Co-Lead Class Counsel and Counsel for the NFL Parties, regarding the status and progress of the BAP.  The monthly (or quarterly) report will include, without limitation, information regarding activity in the BAP, including:  (a) the number and identity of Retired NFL Football Players with pending BAP appointments, (b) the monthly and total number of Retired NFL Football Players who took part in the BAP, and the identity of each Settlement Class Member who took part in the preceding month; (c) the monthly and total monetary amounts paid to Qualified BAP Providers; (d) the monthly and total number of Retired NFL Football Players eligible for BAP Supplemental Benefits, as set forth in Section 5.11, and the identity of each such Retired NFL Football Player; (e) any Retired NFL Football Player complaints regarding specific Qualified BAP Providers; (f) expenses/administrative costs, including a summary accounting of the administrative expenses incurred by the BAP Administrator in the preceding month; and (g) any other information reasonably requested by the Special Master (or the Court after expiration of

the term of the Special Master and any extension(s) thereof), Co-Lead Class Counsel, or Counsel for the NFL Parties.

(vi)    Beginning on the first January after the Effective Date, the BAP Administrator will provide annual financial reports to the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof), Co-Lead Class Counsel and Counsel for the NFL Parties, based on information from the preceding year, regarding:  (a) the number of Retired NFL Football Players who took part in the BAP; (b) the monetary amount paid to Qualified BAP Providers; (c) the number of Retired NFL Football Players eligible for BAP Supplemental Benefits; (d) the expenses/administrative costs incurred by the BAP Administrator; (e) the projected expenses/administrative costs for the remainder of the BAP, including the five-year period for the provision of BAP Supplemental Benefits as set forth in Sections 5.5 and 5.11; (f) the monies remaining in the BAP Fund; and (g) any other information reasonably requested by the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof), Co-Lead Class Counsel, or Counsel for the NFL Parties.

(b)    <u>Compensation and Expenses</u>.  Reasonable compensation of the BAP Administrator, as agreed to by Co-Lead Class Counsel and Counsel for the NFL Parties, and reasonable out-of-pocket costs and expenses directly incurred as a result of the BAP Administrator's responsibilities will be paid out of the BAP Fund.  The BAP Administrator shall submit an annual budget to the Court for review and approval.  Either Co-Lead Class Counsel or Counsel for the NFL Parties may challenge the reasonableness of the BAP Administrator's out-of-pocket costs and expenses, in which case the Court will determine (or may, in its discretion, refer the challenge to the Special Master to determine) the reasonableness of such costs and expenses.  If the Court or Special Master, as applicable, determines that any costs and expenses are unreasonable, the BAP Administrator will not be paid for such costs and expenses or, if such costs and expenses have already been paid, the BAP Administrator will refund that amount to the BAP Fund.

(c)    <u>Liability</u>.  The Parties, Class Counsel, Counsel for the NFL Parties, and the Special Master, and their respective Affiliates, will not be liable for any act, or failure to act, of the BAP Administrator.

(d)    <u>Replacement</u>.  The BAP Administrator may be replaced by joint motion made by Co-Lead Class Counsel and Counsel for the NFL Parties, or for cause by motion of either Co-Lead Class Counsel or Counsel for the NFL Parties, upon order of the Court.  If the BAP Administrator resigns, dies, is replaced, or is otherwise unable to continue employment in this position, Co-Lead Class Counsel and Counsel for the NFL Parties will agree to and jointly recommend a new proposed BAP Administrator for appointment by the Court.

(e)    <u>Conflicts of Interest</u>.  Within ninety (90) days after the Effective Date, Co-Lead Class Counsel, Counsel for the NFL Parties, the Special Master and the BAP Administrator will establish and implement procedures to promptly detect and resolve possible conflicts of interest between the BAP Administrator, including,

without limitation, its executive leadership team and all employees conducting BAP-related work, on the one hand, and Settlement Class Members (and counsel individually representing them, if any), the NFL Parties, Counsel for the NFL Parties, or the Special Master, on the other hand.  Co-Lead Class Counsel, Counsel for the NFL Parties, and the BAP Administrator, subject to approval of the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof) may modify such procedures in the future, if appropriate.  Notwithstanding anything herein to the contrary, Co-Lead Class Counsel, Counsel for the NFL Parties, and the Special Master understand that the BAP Administrator regularly provides settlement administration, lien resolution, and other related services to settling parties and their attorneys, and Co-Lead Class Counsel, Counsel for the NFL Parties, and the Special Master acknowledge and agree that it shall not be a conflict of interest for the BAP Administrator to provide such services to such individuals or to receive compensation for such work.

Section 5.7     Retention and Oversight of Qualified BAP Providers and Qualified BAP Pharmacy Vendor(s)

(a)     Qualified BAP Providers

(i)     Within ninety (90) days after the Effective Date, the BAP Administrator will establish and maintain a network of Qualified BAP Providers to provide baseline assessment examinations to Retired NFL Football Players, and to provide medical treatment to Retired NFL Football Players who receive BAP Supplemental Benefits, as set forth in Section 5.11.  The BAP Administrator's selection of all Qualified BAP Providers will be subject to written approval of Co-Lead Class Counsel and Counsel for the NFL Parties, each of which will have the unconditional right to veto the selection of twenty (20) Qualified BAP Providers, in addition to the unconditional right to veto the selection of any Qualified BAP Provider who has served or is serving as a litigation expert consultant or expert witness for a party or his, her or its counsel in connection with litigation relating to the subject matter of the Class Action Complaint since July 1, 2011.  Thereafter, the BAP Administrator may select additional Qualified BAP Providers during the term of the BAP to the extent necessary to effectuate network coverage, subject to written approval of Co-Lead Class Counsel and Counsel for the NFL Parties.  Co-Lead Class Counsel and Counsel for the NFL Parties each shall accrue five (5) additional unconditional veto rights for every fifty (50) new Qualified BAP Providers selected and approved during the term of the BAP, and shall retain the unconditional right to veto the selection of any Qualified BAP Provider who has served or is serving as a litigation expert consultant or expert witness for a party or his, her or its counsel in connection with litigation relating to the subject matter of the Class Action Complaint since July 1, 2011.

(ii)     The BAP Administrator will select Qualified BAP Providers based on the following criteria:     (a) education, training, licensing, credentialing, board certification, and insurance coverage; (b) ability to provide the specified baseline assessment examinations under the BAP; (c) ability to provide medical services under the BAP Supplemental Benefits; (d) ability to provide all required examinations and services in a timely manner; (e) geographic proximity to Retired NFL

Football Players; and (f) rate structure and payment terms. Under no circumstances will a Qualified BAP Provider be selected or approved who has been convicted of a crime of dishonesty, or who is serving on or after the Final Approval Date as a litigation expert consultant or expert witness for an Opt Out, or his, her or its counsel in connection with litigation relating to the subject matter of the Class Action Complaint. If selected and approved, under no circumstances shall a Qualified BAP Provider continue to serve in that role if convicted of a crime of dishonesty and/or thereafter retained as a litigation expert consultant or expert witness for an Opt Out, or his, her or its counsel in connection with litigation relating to the subject matter of the Class Action Complaint.

(iii)    In order to be eligible for selection, each Qualified BAP Provider must provide the following information to the BAP Administrator: (a) state professional license number; (b) National Provider Identifier; (c) board-certification information, if any; (d) evidence of proper licensing and insurance coverage under applicable state laws; (e) experience, including number of years as a healthcare provider; (f) primary and additional service locations; (g) mailing and billing addresses; (h) tax identification information; (i) ability to provide the specified baseline assessment examinations; (j) capacity for new patients; (k) appointment accessibility; (l) languages spoken; (m) criminal record; (n) the percentage of his/her practice related to litigation expert/consulting engagements, including the relative percentage of such expert/consulting performed for plaintiffs, defendants and court/administrative bodies, and a general description of such engagements, since July 1, 2011; (o) list of all litigation-related engagements as a litigation expert consultant or expert witness arising out of, or relating to, head, brain and/or cognitive injury of athletes; (p) a general description of any past or present salaried, or other professional or consulting relationships with the NFL Parties or Member Clubs; and (q) such other information as the BAP Administrator may reasonably request.

(iv)    The BAP Administrator will enter into a written contract with each Qualified BAP Provider (the "Provider Contract") to provide the specified baseline assessment examinations under the BAP and authorized medical services under the BAP Supplemental Benefits. The Provider Contract will include, among other things, a description of the baseline assessment examinations that will be provided under the BAP; rates, billing, and payment terms; terms relating to licensing, credentials, board certification, and other qualifications; the amount and type of insurance to be maintained by the Qualified BAP Provider; procedures for scheduling, rescheduling, and cancelling BAP appointments; document retention policies and procedures; and fraud policies. The Provider Contract will further provide: (a) that the Qualified BAP Provider will release and hold harmless the Parties, Class Counsel, Counsel for the NFL Parties, Special Master, BAP Administrator, and Claims Administrator from any and all claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, or otherwise, arising from or related to the services provided by that Qualified BAP Provider as part of the BAP; (b) that the Qualified BAP Provider will not seek payment from the Parties, Class Counsel, Counsel for the NFL Parties, Special Master, BAP Administrator, or Claims Administrator for any medical service(s), examination(s), and/or test(s) or any medical

treatment or care that are not part of the specified baseline assessment examinations or authorized for payment under the terms of the BAP Supplemental Benefits, except that the Qualified BAP Provider may seek payment from a Retired NFL Football Player or, where applicable, his or her insurer for any medical service(s), examination(s), and/or test(s) or any medical treatment or care that are not part of the specified baseline assessment examinations or BAP Supplemental Benefits, where the Retired NFL Football Player, or, where applicable, his or her insurer, has agreed in writing to authorize and pay for such medical service(s), examination(s), and/or test(s) or any medical treatment or care; and (c) that the Qualified BAP Provider will retain medical records for Retired NFL Football Players in accordance with Section 5.10.

(1)    The Provider Contract will be drafted by the BAP Administrator, as overseen by the Special Master, and in consultation with and subject to the approval of, Co-Lead Class Counsel and Counsel for the NFL Parties.

(2)    The Provider Contract's fraud policies will contain the following warning against fraudulent conduct:  "As a Qualified BAP Provider you have agreed to provide your services and make your diagnosis in good faith in accordance with best medical practices.  Your diagnoses and billings will be audited on a periodic and random basis subject to the discretion of the BAP Administrator and Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof).  Any finding of fraudulent diagnoses or billings by you will be subject to, without limitation, referral to appropriate regulatory and disciplinary boards and agencies and/or federal authorities, the immediate termination of this contract, and your disqualification from serving as a diagnosing physician in any aspect of the Class Action Settlement."

(v)    The BAP Administrator will audit the credentialing and performance of Qualified BAP Providers on an annual (or, as needed, more frequent) basis.  The criteria and process for the audit will be overseen by the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof) and subject to the approval of Co-Lead Class Counsel and Counsel for the NFL Parties, except Co-Lead Class Counsel or Counsel for the NFL Parties shall maintain the right to order audits of specific Qualified BAP Providers under this subparagraph, on the basis of good cause, at any time during the BAP, including the five-year period for the provision of BAP Supplemental Benefits as set forth in Sections 5.5 and 5.11.  The BAP Administrator may conduct onsite visits at the locations of Qualified BAP Providers on a random or adverse selection basis to confirm their compliance with the Provider Contract described in Section 5.7(a)(iv).

(vi)    All Qualified BAP Providers will bill the BAP Administrator directly for any services rendered pursuant to the terms and conditions of the BAP.  The BAP Administrator will establish procedures to ensure that the BAP Fund is the primary payer for BAP baseline assessment examinations and treatments under the BAP Supplemental Benefits, subject to the coverage limits of the BAP Supplemental Benefits, consistent with the Provider Contract, which will be executed by the BAP Administrator and each participating Qualified BAP Provider.  The BAP Administrator

will establish and administer a system to audit Qualified BAP Providers' procedures for billing and providing BAP baseline assessment examinations and BAP Supplemental Benefits treatments.  This audit system will be designed to detect billing errors that could result in overpayment or the payment of unauthorized medical services.  The BAP Administrator will bring abusive and fraudulent Qualified BAP Provider billings to the attention of the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof), Co-Lead Class Counsel and Counsel for the NFL Parties.

(vii)    The BAP Administrator may terminate the Provider Contract of any Qualified BAP Providers that are not in compliance with its terms, or for other cause.

(b)    Qualified Pharmacy Vendor(s)

(i)    Within ninety (90) days after the Effective Date, the BAP Administrator will contract with one or more Qualified BAP Pharmacy Vendor(s) to provide pharmaceuticals covered by the BAP Supplemental Benefits, as set forth in Section 5.11.  The BAP Administrator's selection of the Qualified BAP Pharmacy Vendor(s) will be subject to written approval of the Special Master, in consultation with Co-Lead Class Counsel and Counsel for the NFL Parties.

(ii)    The BAP Administrator will select Qualified BAP Pharmacy Vendor(s) based on the following criteria:  (a) proper licensing for operation as a mail order pharmacy in all U.S. states and territories; (b) nationwide coverage and ease of administration; and (c) rate structure and payment terms.

(iii)    In order to be eligible for selection, each Qualified BAP Pharmacy Vendor must provide the following information to the BAP Administrator: (a) federal DEA and/or state license numbers, as applicable; (b) evidence of proper licensing under applicable state laws; (c) experience, including number of years as a mail order pharmacy; (d) information about processes required to submit and fulfill mail order prescriptions; (e) average processing and delivery time from submission of a valid prescription; (f) policies related to generic substitution of name-brand pharmaceutical products; (g) mailing and billing addresses; (h) tax identification information; (i) languages spoken; and (j) such other information as the BAP Administrator may reasonably request.

(iv)    The BAP Administrator will enter into a written contract with each Qualified BAP Pharmacy Vendor (the "Pharmacy Contract") to provide the pharmaceuticals covered under the BAP Supplemental Benefits.  The Pharmacy Contract will include, among other things, a description of the pharmaceutical therapies that will be covered under the BAP Supplemental Benefits; rates, billing, and payment terms; terms relating to qualifications; procedures for submitting, filling, and shipping prescriptions; document retention policies and procedures; and fraud policies. The Pharmacy Contract will further provide:  (a) that the Qualified BAP Pharmacy Vendor will release and hold harmless the Parties, Class Counsel, Counsel for the NFL

Parties, Special Master, BAP Administrator, and Claims Administrator from any and all claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, or otherwise, arising from or related to the services provided by that Qualified BAP Pharmacy Vendor as part of the BAP; and (b) that the Qualified BAP Pharmacy Vendor will not seek payment from the Parties, Class Counsel, Counsel for the NFL Parties, Special Master, BAP Administrator, or Claims Administrator for any prescriptions that are authorized for payment under the terms of the BAP Supplemental Benefits.

(v)    The BAP Administrator will audit the performance of Qualified BAP Pharmacy Vendor(s) on an annual (or, as needed, more frequent) basis. The criteria and process for the audit will be overseen by the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof) and subject to the approval of Co-Lead Class Counsel and Counsel for the NFL.

(vi)    All Qualified BAP Pharmacy Vendors will be reimbursed by the BAP Administrator directly for any services rendered pursuant to the terms and conditions of the BAP, subject to the coverage limits of the BAP Supplemental Benefits. The BAP Administrator will establish procedures to ensure that the BAP Fund is the primary payer for covered prescriptions consistent with the Pharmacy Contract, which will be executed by the BAP Administrator and each participating Qualified BAP Provider. The BAP Administrator will establish and administer a system to audit Qualified BAP Pharmacy Vendor(s)' procedures for billing and providing approved BAP Supplemental Benefits prescriptions. This audit system will be designed to detect billing errors that could result in overpayment or the payment of unauthorized prescriptions. The BAP Administrator will bring abusive and fraudulent Qualified BAP Pharmacy Vendor billings to the attention of the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof), Co-Lead Class Counsel and Counsel for the NFL Parties.

(vii)    The BAP Administrator may terminate the Pharmacy Contract of any Qualified BAP Pharmacy Vendor that is not in compliance with its terms, or for other cause.

Section 5.8    Scheduling and Providing Baseline Assessment Examinations.    The Parties will establish, subject to Court approval, processes and procedures governing the scheduling and provision of BAP examinations.

Section 5.9    Other Communications with Retired NFL Football Players

(a)    The BAP Administrator will send an Explanation of Benefits ("EOB") statement to each Retired NFL Football Player following a BAP appointment. The statement will describe the services and medical examinations that were performed during the appointment.

(b)　　　Beginning one (1) year after the Effective Date of the Settlement Agreement, the BAP Administrator will send Retired NFL Football Players who have not received baseline assessments and remain eligible to do so, an annual statement describing the BAP and requesting that they update any contact information that has changed in the preceding year.

(c)　　　If a Retired NFL Football Player is represented by counsel and has provided such notice to the BAP Administrator, the BAP Administrator will copy his counsel of record on any written communications with the Retired NFL Football Player.

Section 5.10　　<u>Use and Retention of Medical Records</u>

(a)　　　All Retired NFL Football Players who participate in the BAP will be encouraged to provide their confidential medical records for use in medical research into cognitive impairment and safety and injury prevention with respect to football players.  The provision of such medical records shall be subject to the reasonable informed consent of the Retired NFL Football Players, and in compliance with applicable law, including a HIPAA-compliant authorization form.  Medical records and information used in medical research will be kept confidential.

(b)　　　The BAP Administrator will retain the medical records of Retired NFL Football Players and other program-defined forms that must be completed by the Qualified BAP Providers.

(c)　　　Qualified BAP Providers who provide BAP baseline assessment examinations will be required to retain all medical records from such visits in compliance with applicable state and federal laws; provided, however, that each Qualified BAP Provider will be required to retain all medical records in the format(s) prescribed by applicable state and federal laws and, notwithstanding any shorter time period permitted under applicable laws, will be required to retain such medical records for not less than ten (10) years after the conclusion of the BAP term.

(d)　　　All Retired NFL Football Player medical records will be treated as confidential, as set forth in Section 17.2.

Section 5.11　　<u>BAP Supplemental Benefits</u>.  Each Retired NFL Football Player diagnosed by Qualified BAP Providers with a Level 1 Neurocognitive Impairment, as defined in Exhibit 1, shall be eligible for BAP Supplemental Benefits related to the Retired NFL Football Player's impairment in the form of medical treatment, counseling and/or examination by Qualified BAP Providers, including, if medically needed and prescribed by a Qualified BAP Provider, pharmaceuticals by Qualified BAP Pharmacy Vendor(s).  BAP Supplemental Benefits shall comprise medical treatments and/or examinations generally accepted by the medical community.  The BAP Supplemental Benefits must be used within the term of the BAP or within five (5) years of diagnosis of Level 1 Neurocognitive Impairment by Qualified BAP Providers, even if the five (5) year period extends beyond the term of the BAP, whichever is later.  The

BAP Administrator, as overseen by the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof), and in consultation with, and subject to the approval of, Co-Lead Class Counsel and Counsel for the NFL Parties, will establish the procedures governing BAP Supplemental Benefits.

Section 5.12   <u>Diagnosing Physician Certifications</u>.   Qualified BAP Providers who diagnose a Level 1 Neurocognitive Impairment, Level 1.5 Neurocognitive Impairment or Level 2 Neurocognitive Impairment, as set forth in Exhibit 1, must support that diagnosis with a Diagnosing Physician Certification and supporting medical records. The Qualified BAP Provider must provide the Diagnosing Physician Certification and copies of the supporting medical records to the Retired NFL Football Player, his counsel (if any), and the BAP Administrator.

Section 5.13   <u>Conflicting Opinions of Qualified BAP Providers</u>.   If there is a lack of agreement, as required by Section 5.2 and Exhibit 1, between the two Qualified BAP Providers regarding whether a Retired NFL Football Player has Level 1 Neurocognitive Impairment, Level 1.5 Neurocognitive Impairment, Level 2 Neurocognitive Impairment, or none, the BAP Administrator may in its discretion:  (a) request that the Qualified BAP Providers confer with each other in an attempt to resolve the conflict; (b) request that a second BAP baseline assessment examination be conducted by different Qualified BAP Providers; or (c) refer the results of the BAP baseline assessment examination and all relevant medical records to a member of the Appeals Advisory Panel for review and decision.  The decision of the member of the Appeals Advisory Panel will determine whether the Retired NFL Football Player has Level 1 Neurocognitive Impairment, Level 1.5 Neurocognitive Impairment, Level 2 Neurocognitive Impairment, or none.  If the member of the Appeals Advisory Panel determines that additional review, analysis and/or testing needs to be conducted prior to a decision, such review, analysis and/or testing will be completed by Qualified BAP Providers as selected by the BAP Administrator.  The decision of the Appeals Advisory Panel member as to whether the Retired NFL Football Player has Level 1 Neurocognitive Impairment, Level 1.5 Neurocognitive Impairment, Level 2 Neurocognitive Impairment, or none, will be final and binding, except a claim for a Monetary Award or Derivative Claimant Award relying on such diagnosis may still be appealed, as set forth in Section 9.5.  The member of the Appeals Advisory Panel must support the decision with a Diagnosing Physician Certification.

Section 5.14   <u>Funding</u>.

(a)   All aspects of the BAP, including, without limitation, its costs and expenses, payment of Qualified BAP Providers, compensation of the BAP Administrator, and BAP Supplemental Benefits, will be paid from the BAP Fund.  Any funds remaining in the BAP Fund at the conclusion of the five-year period for the provision of BAP Supplemental Benefits, as set forth in Sections 5.5 and 5.11, shall be transferred to the Settlement Trust for transfer by the Trustee into the Monetary Award Fund.

(b)     In order to ensure sufficient funds to pay for a baseline assessment examination for each eligible Retired NFL Football Player, as set forth in Section 5.2 and subject to Sections 5.14(a), 23.1(b) and 23.3(d) of this Agreement, the maximum per player BAP Supplemental Benefit payable under this Section, taking into account such factors as the number of Retired NFL Football Players using the BAP and diagnosed with Level 1 Neurocognitive Impairment, shall be determined on the one-year anniversary of the commencement of the BAP by Co-Lead Class Counsel and Counsel for the NFL Parties, in consultation with the BAP Administrator, and with the approval of the Court. The maximum per player benefit will be set at a sufficient level to ensure that there will be sufficient funds, without exceeding the Seventy-Five Million United States Dollars (U.S. $75,000,000) cap on the BAP Fund, to pay for every eligible Retired NFL Football Player to receive one baseline assessment examination. At the conclusion of the term of the BAP, and at such other times as the Court may direct or as may be requested by Co-Lead Class Counsel or Counsel for the NFL Parties, Co-Lead Class Counsel and Counsel for the NFL Parties will review and adjust, if necessary, this maximum benefit, in consultation with the BAP Administrator and with the approval of the Court, to ensure that there are sufficient funds to pay for all baseline assessment examinations without exceeding the Seventy-Five Million United States Dollar (U.S. $75,000,000) cap on the BAP Fund.

## ARTICLE VI
## Monetary Awards for Qualifying Diagnoses

Section 6.1     Eligible Retired NFL Football Players and Representative Claimants will be entitled to Monetary Awards as set forth in this Article.

Section 6.2     Eligibility

(a)     A Settlement Class Member who is a Retired NFL Football Player or Representative Claimant is eligible for a Monetary Award if, and only if:  (i) the Settlement Class Member timely registered to participate in the Class Action Settlement, as set forth in Section 4.2; (ii) the subject Retired NFL Football Player or deceased Retired NFL Football Player was diagnosed with a Qualifying Diagnosis; and (iii) the Settlement Class Member timely submits a Claim Package, subject to the terms and conditions set forth in ARTICLE VIII.

(b)     A Representative Claimant of a deceased Retired NFL Football Player will be eligible for a Monetary Award only if the deceased Retired NFL Football Player died on or after January 1, 2006, or if the Court determines that a wrongful death or survival claim filed by the Representative Claimant would not be barred by the statute of limitations under applicable state law as of:  (i) the date the Representative Claimant filed litigation against the NFL (and, where applicable, NFL Properties) relating to the subject matter of these lawsuits, if such a wrongful death or survival claim was filed prior to the Settlement Date; or (ii) the Settlement Date, where no such suit has previously been filed.

Section 6.3    Qualifying Diagnoses

      (a)    The following, as defined in Exhibit 1, are Qualifying Diagnoses eligible for a Monetary Award:  (a) Level 1.5 Neurocognitive Impairment; (b) Level 2 Neurocognitive Impairment; (c) Alzheimer's Disease; (d) Parkinson's Disease; (e) Death with CTE; and (f) ALS.  All Qualifying Diagnoses must be made by properly credentialed physicians as set forth below for the particular Qualifying Diagnosis, consistent with Exhibit 1 (Injury Definitions).

      (b)    Following the Effective Date, a Qualifying Diagnosis of Level 1.5 Neurocognitive Impairment, Level 2 Neurocognitive Impairment, Alzheimer's Disease, Parkinson's Disease, or ALS shall be made only by Qualified MAF Physicians, except that a Qualifying Diagnosis of Level 1.5 Neurocognitive Impairment or Level 2 Neurocognitive Impairment may also be made by Qualified BAP Providers as set forth in Section 5.2 and consistent with the terms of Exhibit 1 (Injury Definitions).

      (i)    Any licensed neuropsychologist who assists a Qualified MAF Physician in making a Qualifying Diagnosis must be certified by the American Board of Professional Psychology (ABPP) or the American Board of Clinical Neuropsychology (ABCN), a member board of the American Board of Professional Psychology, in the specialty of Clinical Neuropsychology.

      (c)    From the date of the Preliminary Approval and Class Certification Order through the Effective Date, a Qualifying Diagnosis of Level 1.5 Neurocognitive Impairment, Level 2 Neurocognitive Impairment, Alzheimer's Disease, Parkinson's Disease, or ALS  shall be made only by board-certified neurologists, board-certified neurosurgeons, or other board-certified neuro-specialist physicians, except as set forth in Section 6.3(e).

      (d)    Prior to the date of the Preliminary Approval and Class Certification Order, a Qualifying Diagnosis of Level 1.5 Neurocognitive Impairment, Level 2 Neurocognitive Impairment, Alzheimer's Disease, Parkinson's Disease, or ALS shall be made only by board-certified neurologists, board-certified neurosurgeons, or other board-certified neuro-specialist physicians, or otherwise qualified neurologists, neurosurgeons, or other neuro-specialist physicians, except as set forth in Section 6.3(e).

      (e)    For a Retired NFL Football Player deceased prior to the Effective Date, a Qualifying Diagnosis of Level 1.5 Neurocognitive Impairment, Level 2 Neurocognitive Impairment, Alzheimer's Disease, Parkinson's Disease, or ALS, which was rendered while the Retired NFL Football Player was living by a physician not otherwise identified in Sections 6.3 (b)-(d) but who has sufficient qualifications (i) in the field of neurology to make a Qualifying Diagnosis of Level 1.5 Neurocognitive Impairment, Level 2 Neurocognitive Impairment, Alzheimer's Disease, Parkinson's Disease, or ALS, or (ii) in the field of neurocognitive disorders to make a Qualifying Diagnosis of Level 1.5 Neurocognitive Impairment or Level 2 Neurocognitive Impairment, is permitted.

(f)  A Qualifying Diagnosis of Death with CTE shall be made only for Retired NFL Football Players who died prior to the Final Approval Date, through a post-mortem diagnosis made by a board-certified neuropathologist prior to the Final Approval Date, provided that a Retired NFL Football Player who died between July 7, 2014 and the Final Approval Date shall have until 270 days from his date of death to obtain such a post-mortem diagnosis.

Section 6.4    Qualifying Diagnosis Review by Appeals Advisory Panel.

(a)  A member of the Appeals Advisory Panel must review, as set forth in Section 6.4(b), Qualifying Diagnoses made prior to the Effective Date by:

(i)  A board-certified neurologist, board-certified neurosurgeon, or other board-certified neuro-specialist physician, who is not a Qualified MAF Physician, between July 1, 2011 and the Effective Date;

(ii)  A neurologist, neurosurgeon, or other neuro-specialist physician, who is not board-certified but is otherwise qualified; and

(iii)  A physician who is not a Qualified MAF Physician and who is not otherwise identified in Section 6.4(a)(i)-(ii) but who has sufficient qualifications (i) in the field of neurology to make a Qualifying Diagnosis of Level 1.5 Neurocognitive Impairment, Level 2 Neurocognitive Impairment, Alzheimer's Disease, Parkinson's Disease, or ALS, or (ii) in the field of neurocognitive disorders to make a Qualifying Diagnosis of Level 1.5 Neurocognitive Impairment or Level 2 Neurocognitive Impairment.

(b)  If a review of a Qualifying Diagnosis by a member of the Appeals Advisory Panel is required by Section 6.4(a), the contents of the Claim Package relevant to the Qualifying Diagnosis, including the Claim Form, the Diagnosing Physician Certification, medical records supporting and reflecting the Qualifying Diagnosis, and any other related materials concerning the Qualifying Diagnosis, shall be submitted to a member of the Appeals Advisory Panel for review.  The Appeals Advisory Panel member will determine whether the Retired NFL Football Player or deceased Retired NFL Football Player has the Qualifying Diagnosis reported in the Diagnosing Physician Certification, or, where there is no Diagnosing Physician Certification as set forth in Section 8.2(a), reported in the Claim Package submitted by the Representative Claimant.  The Appeals Advisory Panel member shall review the Qualifying Diagnosis based on principles generally consistent with the diagnostic criteria set forth in Exhibit 1 (Injury Definitions), including consideration of, without limitation, the qualifications of the diagnosing physician, the supporting medical records and the year and state of medicine in which the Qualifying Diagnosis was made.  The Appeals Advisory Panel member shall also confirm that the Qualifying Diagnosis was made by an appropriate physician as set forth in Section 6.3.  For the avoidance of any doubt, the review of whether a Qualifying Diagnosis is based on principles generally consistent with the diagnostic criteria set forth in Exhibit 1 (Injury Definitions) does not require identical

diagnostic criteria, including without limitation, the same testing protocols or documentation requirements.

(i)    The review by a member of the Appeals Advisory Panel under this subsection, absent extraordinary circumstances impacting the schedule of such member, shall be completed within forty-five (45) days of the date on which he or she receives a Settlement Class Member's file, except such time limit may be altered to the extent the volume of files warrants, either by agreement between Co-Lead Class Counsel and Counsel for the NFL Parties, subject to approval by the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof), or by application by Co-Lead Class Counsel or Counsel for the NFL Parties to the Court. The Qualifying Diagnoses shall generally be reviewed in the order in which they are received.

Section 6.5    Qualified MAF Physicians

(a)    Within ninety (90) days after the Effective Date, the Claims Administrator will establish and maintain a list of Qualified MAF Physicians eligible to provide Qualifying Diagnoses. Each Qualified MAF Physician shall be approved by Co-Lead Class Counsel and Counsel for the NFL Parties, which approval shall not be unreasonably withheld. To the extent a Retired NFL Football Player is examined by a Qualified MAF Physician, such visit and examination shall be at the Retired NFL Football Player's own expense.

(b)    The Claims Administrator will select Qualified MAF Physicians based on the following criteria:  (a) education, training, licensing, credentialing, board certification, and insurance coverage; (b) ability to provide the specified examinations necessary to make Qualifying Diagnoses; (c) ability to provide all required examinations and services in a timely manner; (d) insurance accessibility; and (e) geographic proximity to Retired NFL Football Players. Under no circumstances will a Qualified MAF Physician be selected or approved who has been convicted of a crime of dishonesty, or who is serving on or after the Final Approval Date as a litigation expert consultant or expert witness for an Opt Out, or his, her or its counsel in connection with litigation relating to the subject matter of the Class Action Complaint. If selected and approved, under no circumstances shall a Qualified MAF Physician continue to serve in that role if convicted of a crime of dishonesty and/or thereafter retained as a litigation expert consultant or expert witness for an Opt Out, or his, her or its counsel in connection with litigation relating to the subject matter of the Class Action Complaint.

(c)    In order to be eligible for selection, each Qualified MAF Physician must provide the following information to the Claims Administrator:  (a) state professional license number; (b) National Provider Identifier; (c) board-certification information; (d) evidence of proper licensing and insurance coverage under applicable state laws; (e) experience, including number of years as a healthcare provider; (f) primary and additional service locations; (g) mailing and billing addresses; (h) tax identification information; (i) ability to provide all required examinations and services in a timely manner; (j) capacity for new patients; (k) appointment accessibility; (l) languages spoken;

-2806-

(m) criminal record; (n) the percentage of his/her practice related to litigation expert/consulting engagements, including the relative percentage of such expert/consulting performed for plaintiffs, defendants, and court/administrative bodies, and a general description of such engagements, since July 1, 2011; (o) list of all litigation-related engagements as a litigation expert consultant or expert witness arising out of, or relating to, head, brain and/or cognitive injury of athletes; (p) a general description of any past or present salaried, or other professional or consulting relationships with the NFL Parties or Member Clubs; and (q) such other information as the Claims Administrator may reasonably request.

Section 6.6    Modification of Qualifying Diagnoses

(a)    Subject to the constraints of Section 6.6(b), following the Effective Date, on a periodic basis not to exceed once every ten (10) years, Co-Lead Class Counsel and Counsel for the NFL Parties agree to discuss in good faith possible prospective modifications to the definitions of Qualifying Diagnoses and/or the protocols for making Qualifying Diagnoses, in light of generally accepted advances in medical science.  No such modifications can be made absent written agreement between Co-Lead Class Counsel and Counsel for the NFL Parties and approval by the Court, and neither Co-Lead Class Counsel nor Counsel for the NFL Parties shall seek modification to the definitions of Qualifying Diagnoses and/or the protocols for making Qualifying Diagnoses other than with the written agreement of the other regarding such modifications.

(b)    Monetary Awards, consistent with the terms of this Settlement Agreement, shall compensate Settlement Class Members only in circumstances where a Retired NFL Football Player manifests actual cognitive impairment and/or actual neuromuscular impairment, or a deceased Retired NFL Football Player manifested actual cognitive impairment and/or actual neuromuscular impairment while living.  For the avoidance of any doubt, the identification of a condition—for example, through a blood test, genetic test, imaging technique, or otherwise—that has not yet resulted in actual cognitive impairment and/or actual neuromuscular impairment experienced by the Retired NFL Football Player does not qualify as a Qualifying Diagnosis.  As such, Co-Lead Class Counsel and Counsel for the NFL Parties have defined the Qualifying Diagnoses to require an actual manifestation of cognitive impairment and/or an actual manifestation of neuromuscular impairment.  Consistent with Section 6.6(a), Co-Lead Class Counsel and Counsel for the NFL Parties will address possible advances in science to effectuate this mutual intent.  For the avoidance of doubt, this subsection does not apply to the Qualifying Diagnosis of Death with CTE.  This subsection also does not alter the Qualifying Diagnoses definitions, as set forth in Exhibit 1.

(c)    In no event will modifications be made to the Monetary Award levels in the Monetary Award Grid, except for inflation adjustment(s) as set forth in Section 6.9.

Section 6.7    Determination of Monetary Awards

(a)    Settlement Class Members who the Claims Administrator determines are entitled to Monetary Awards will be compensated in accordance with the terms of the Monetary Award Grid and all applicable Offsets, as set forth in Exhibit 3 and below, except such compensation will be reduced by one percent (1%) to the extent that any Derivative Claimants submit for, and are entitled to, a Derivative Claimant Award based upon their relationships with the Retired NFL Football Player, as set forth in ARTICLE VII.

(b)    Offsets.  All Monetary Awards will be subject to downward adjustments, including based on a Settlement Class Member's age at the time of the Qualifying Diagnosis (as reflected in the Monetary Award Grid, as set forth in Exhibit 3), and as follows:

(i)    Number of Eligible Seasons:

(1)    4.5 Eligible Seasons:    - 10%

(2)    4 Eligible Seasons:    - 20%

(3)    3.5 Eligible Seasons:    - 30%

(4)    3 Eligible Seasons:    - 40%

(5)    2.5 Eligible Seasons:    - 50%

(6)    2 Eligible Seasons:    - 60%

(7)    1.5 Eligible Seasons:    - 70%

(8)    1 Eligible Season:    - 80%

(9)    0.5 Eligible Seasons:    - 90%

(10)    0 Eligible Seasons:    - 97.5%

(ii)    Medically diagnosed Stroke occurring prior to a Qualifying Diagnosis:  - 75%

(iii)    Medically diagnosed Traumatic Brain Injury occurring prior to a Qualifying Diagnosis:  - 75%

(iv)    Non-participation in the BAP by a Retired NFL Football Player in Subclass 1, except where the Qualifying Diagnosis is of ALS or if he receives any Qualifying Diagnosis prior to his deadline to receive a BAP baseline assessment examination as set forth in Section 5.3:  - 10%

-2808-

(c)     For purposes of calculating the total number of Eligible Seasons earned by a Retired NFL Football Player or deceased Retired NFL Football Player under this Settlement Agreement, each earned Eligible Season and each earned half of an Eligible Season will be summed together to reach a total number of Eligible Seasons (*e.g.*, 3.5 Eligible Seasons), except a Retired NFL Football Player may not receive credit for more than one (1) Eligible Season per year (with each year defined to include any spring World League of American Football, NFL Europe League or NFL Europa League season, and the following fall NFL season).  By way of example only:  (a) a Retired NFL Football Player who was on a NFL Europe League team's active roster on the date of three (3) or more regular season or postseason games during the 2002 spring NFL Europe League season and who was on a Member Club's Active List on the date of three (3) or more regular season or postseason games during the 2002-2003 fall NFL season would receive credit for one (1) Eligible Season for the year; and (b) a Retired NFL Football Player who was on a NFL Europe League team's active roster on the date of three (3) or more regular season or postseason games during the 2002 spring NFL Europe League season and who was on a Member Club's practice squad for at least eight (8) regular season or postseason games during the 2002-2003 fall NFL season would receive credit for one (1) Eligible Season for the year.

(d)     If the Retired NFL Football Player receives a Qualifying Diagnosis prior to a medically diagnosed Stroke or a medically diagnosed Traumatic Brain Injury, then the 75% Offset for medically diagnosed Stroke or medically diagnosed Traumatic Brain Injury will not apply.  If the Retired NFL Football Player receives a Qualifying Diagnosis subsequent to a medically diagnosed Stroke or a medically diagnosed Traumatic Brain Injury, and if the Settlement Class Member demonstrates, by clear and convincing evidence, that the Qualifying Diagnosis was not causally related to the Stroke or the Traumatic Brain Injury, then the 75% Offset will not apply.

(e)     Multiple Offsets will be applied individually and in a serial manner to any Monetary Award.  For example, if the Monetary Award before the application of Offsets is $1,000,000, and two 10% Offsets apply, there will be a 19% aggregate downward adjustment of the award (*i.e.*, application of the first Offset will reduce the award by 10%, or $100,000, to $900,000, and application of the second Offset will reduce the award by an additional 10%, or $90,000, to $810,000).

Section 6.8     <u>Supplemental Monetary Awards</u>.  If, during the term of the Monetary Award Fund, a Retired NFL Football Player who has received a Monetary Award based on a certain Qualifying Diagnosis subsequently is diagnosed with a different Qualifying Diagnosis, the Retired NFL Football Player (or his Representative Claimant, if applicable) may be entitled to a Supplemental Monetary Award.  If the Monetary Award level in the Monetary Award Grid ("Grid Level") for the subsequent Qualifying Diagnosis is greater than the Grid Level  for the earlier Qualifying Diagnosis, the Retired NFL Football Player (or his Representative Claimant, if applicable) will be entitled to a payment that is equal to the Grid Level for the subsequent Qualifying Diagnosis, after application of all applicable Offsets, minus the Grid Level for the earlier Qualifying Diagnosis, after application of all applicable Offsets, but prior to any deductions for the satisfaction of Liens.  In other words, any amounts deducted from the

earlier Monetary Award to satisfy Liens will not be considered in the calculation of the Supplemental Monetary Award, which may also require an amount deducted to satisfy any subsequent Liens. (By way of example only, a Retired NFL Football Player who receives a Monetary Award for Level 1.5 Neurocognitive Impairment that is $1,000,000 after application of all Offsets, which is then reduced by $20,000 to $980,000 to satisfy a Lien, and who later receives a Qualifying Diagnosis for Level 2 Neurocognitive Impairment that would pay $1,200,000 after application of all Offsets, where there are no additional Liens, shall be entitled to a Supplemental Monetary Award of $200,000.)

Section 6.9    Inflation Adjustment.  Monetary Award amounts set forth in Exhibit 3 will be subject to an annual inflation adjustment, beginning one year after the Effective Date, not to exceed two and a half percent (2.5%), the precise amount subject to the sound judgment of the Special Master (or the Court after expiration of the term of the Special Master) based on consideration of the Consumer Price Index for Urban Consumers (CPI-U).

Section 6.10    Monetary Award Fund Term.  The Monetary Award Fund will commence on the Effective Date and will end sixty-five (65) years after the Effective Date.

## ARTICLE VII
## Derivative Claimant Awards

Section 7.1    All Settlement Class Members who are Derivative Claimants seeking Derivative Claimant Awards must do so through the submission of Derivative Claim Packages containing all required proof, as set forth in Section 8.2(b).

Section 7.2    Eligibility.    A Settlement Class Member who is a Derivative Claimant is entitled to a Derivative Claimant Award if, and only if:  (a) the Derivative Claimant timely registered to participate in the Class Action Settlement, as set forth in Section 4.2; (b) the Retired NFL Football Player through whom the relationship is the basis of the claim (or the Representative Claimant of a deceased or legally incapacitated or incompetent Retired NFL Football Player through whom the relationship is the basis of the claim) has received a Monetary Award; (c) the Settlement Class Member timely submits a Derivative Claim Package, subject to the terms and conditions set forth in ARTICLE VIII; and (d) the Claims Administrator determines, based on a review of the records provided in the Derivative Claim Package and applicable state law, that the Derivative Claimant has a relationship with the subject Retired NFL Football Player that properly and legally provides the right under applicable state law to sue independently and derivatively.

Section 7.3    Determination of Derivative Claimant Awards.  Settlement Class Members who the Claims Administrator determines are entitled to Derivative Claimant Awards will be compensated from the Monetary Award of the Retired NFL Football Player through whom the relationship is the basis of the claim (or his Representative Claimant), and from any Supplemental Monetary Award, in the amount of one percent (1%) of that Monetary Award and any Supplemental Monetary Award.  If

there are multiple Derivative Claimants asserting valid claims based on the same subject Retired NFL Football Player, the Claims Administrator will divide and distribute the Derivative Claimant Award among those Derivative Claimants pursuant to the laws of the domicile of the Retired NFL Football Player (or his Representative Claimant, if any).

## ARTICLE VIII
### Submission and Review of Claim Packages
### and Derivative Claim Packages

Section 8.1    All Settlement Class Members applying for Monetary Awards or Derivative Claimant Awards must submit Claim Packages or Derivative Claim Packages to the Claims Administrator.

Section 8.2    Content

(a)    The content of Claim Packages will be agreed to by Co-Lead Class Counsel and Counsel for the NFL Parties, and will include, without limitation:  (i) a Claim Form with the Personal Signature of the Retired NFL Football Player (or Representative Claimant) either on the Claim Form or on an acknowledgement form verifying the contents of the Claim Form; (ii) a Diagnosing Physician Certification; (iii) medical records reflecting the Qualifying Diagnosis; (iv) a HIPAA-compliant authorization form; and (v) records in the possession, custody or control of the Settlement Class Member demonstrating employment and participation in NFL Football.

(i)    Representative Claimants of Retired NFL Football Players who died prior to the Effective Date do not need to include a Diagnosing Physician Certification in the Claim Package if the physician who provided the Qualifying Diagnosis, as set forth in Exhibit 1, also died prior to the Effective Date or was deemed by a court of competent jurisdiction legally incapacitated or incompetent prior to the Effective Date.  Instead, the Representative Claimant must provide evidence of that physician's death, incapacity or incompetence and of the qualifications of the diagnosing physician.  For the avoidance of any doubt, all other content of Claim Packages must be submitted, including medical records reflecting the Qualifying Diagnosis.

(ii)    In cases where a deceased Retired NFL Football Player received a Qualifying Diagnosis but the medical records reflecting the Qualifying Diagnosis are unavailable because of a force majeure type event (*e.g.*, flood, hurricane, fire), the Claims Administrator, upon petition by the Representative Claimant, may determine the Claim Package to be valid without the medical records if the Representative Claimant makes a showing of a reasonable effort to obtain the medical records from any available source and presents a certified death certificate referencing the Qualifying Diagnosis made while the Retired NFL Football Player was living.  For the avoidance of any doubt, the Claims Administrator has the sole discretion to determine the sufficiency of this showing, subject to the appeal rights set forth in Section 9.5.  If the unavailability of medical records also causes the diagnosing physician to be unable to provide a Diagnosing Physician Certification, the Claims Administrator, upon petition by

the Representative Claimant, and in addition to the presentation of a certified death certificate referencing the Qualifying Diagnosis made while the Retired NFL Football Player was living, may instead allow an accompanying sworn affidavit from the diagnosing physician attesting to the reasons why the diagnosing physician is unable to provide a Diagnosing Physician Certification without the medical records.  The Claims Administrator has the sole discretion to determine the sufficiency of this showing, subject to the appeal rights set forth in Section 9.5.

(iii)    In cases where a Retired NFL Football Player has received a Qualifying Diagnosis and the diagnosing physician who provided the Qualifying Diagnosis, as set forth in Exhibit 1, has died or has been deemed by a court of competent jurisdiction legally incapacitated or incompetent prior to the Effective Date, or otherwise prior to completing a Diagnosing Physician Certification, the Retired NFL Football Player (or his Representative Claimant, if applicable) may obtain a Diagnosing Physician Certification from a separate qualified physician for the Qualifying Diagnosis as specified in Exhibit 1 based on an independent examination by the qualified physician and a review of the Retired NFL Football Player's  medical records that formed the basis of the Qualifying Diagnosis by the deceased or legally incapacitated or incompetent physician.  If the same Qualifying Diagnosis is found by both doctors, the date of Qualifying Diagnosis used to calculate Monetary Awards shall be the date of the earlier Qualifying Diagnosis.

(b)    The content of Derivative Claim Packages will be agreed to by Co-Lead Class Counsel and Counsel for the NFL Parties, and will include, without limitation:  (i) a Derivative Claim Form with the Personal Signature of the Derivative Claimant either on the Derivative Claim Form or on an acknowledgement form verifying the contents of the Derivative Claim Form; and (ii) records sufficient to verify the relationship with the subject Retired NFL Football Player or deceased Retired NFL Football Player that properly and legally provides the Derivative Claimant the right under applicable state law to sue independently and derivatively.

(c)    All statements made in Claim Forms, Derivative Claim Forms, any acknowledgement forms, and Diagnosing Physician Certifications will be sworn statements under penalty of perjury.

(d)    Each Settlement Class Member has the obligation to submit to the Claims Administrator all of the documents required in Section 8.2 to receive a Monetary Award or Derivative Claimant Award.

Section 8.3    <u>Submission</u>

(a)    Settlement Class Members must submit Claim Packages and Derivative Claim Packages to the Claims Administrator in accordance with Section 30.15.

(i)    Claim Packages must be submitted to the Claims Administrator no later than two (2) years after the date of the Qualifying Diagnosis or

within two (2) years after the Settlement Class Supplemental Notice is posted on the Settlement Website, whichever is later.  Failure to comply with this two (2) year time limitation will preclude a Monetary Award for that Qualifying Diagnosis, unless the Settlement Class Member can show substantial hardship that extends beyond the Retired NFL Football Player's Qualifying Diagnosis and that precluded the Settlement Class Member from complying with the two (2) year deadline, and submits the Claim Package within four (4) years after the date of the Qualifying Diagnosis or after the Settlement Class Supplemental Notice is posted on the Settlement Website, whichever is later.

(ii)     Derivative Claim Packages must be submitted to the Claims Administrator no later than thirty (30) days after the Retired NFL Football Player through whom the relationship is the basis of the claim (or the Representative Claimant of a deceased or legally incapacitated or incompetent Retired NFL Football Player through whom the relationship is the basis of the claim) receives a Notice of Monetary Award Claim Determination that provides a determination that the Retired NFL Football Player (or his Representative Claimant) is entitled to a Monetary Award.  Failure to comply with this time limitation will preclude a Derivative Claimant Award based on that Monetary Award.

(b)     Each Settlement Class Member will promptly notify the Claims Administrator of any changes or updates to the information the Settlement Class Member has provided in the Claim Package or Derivative Claim Package, including any change in mailing address.

(c)     All information submitted by Settlement Class Members to the Claims Administrator will be recorded in a computerized database that will be maintained and secured in accordance with all applicable federal, state and local laws, regulations and guidelines, including, without limitation, HIPAA.  The Claims Administrator must ensure that information is recorded and used properly, that an orderly system of data management and maintenance is adopted, and that the information is retained under responsible custody.  The Claims Administrator will keep the database in a form that grants access for claims administration use, but otherwise restricts access rights, including to employees of the Claims Administrator who are not working on claims administration for the Class Action Settlement.

(i)     The Claims Administrator and Lien Resolution Administrator, and their respective agents, representatives, and professionals who are administering the Class Action Settlement, will have access to all information submitted by Settlement Class Members to the Claims Administrator and/or Lien Resolution Administrator necessary to perform their responsibilities under the Settlement Agreement.

(ii)     All information submitted by Settlement Class Members to the Claims Administrator will be treated as confidential, as set forth in Section 17.2.

Section 8.4     Preliminary Review

(a)     Within forty-five (45) days of the date on which the Claims Administrator receives a Claim Package or Derivative Claim Package from a Settlement Class Member, the Claims Administrator will determine the sufficiency and completeness of the required contents, as set forth in Section 8.2.  To the extent the volume of claims warrants, this deadline may be extended by agreement between Co-Lead Class Counsel and Counsel for the NFL Parties, subject to approval by the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof).

(b)     The Claims Administrator will reject a claim submitted by a Settlement Class Member, subject to the cure provisions of Section 8.5, if the Claims Administrator has not received all required content.

Section 8.5     Deficiencies and Cure.  For rejected Claim Packages or Derivative Claim Packages, the Claims Administrator will send a Notice of Deficiency to the Settlement Class Member, which Notice will contain a brief explanation of the Deficiency(ies) giving rise to rejection of the Claim Package or Derivative Claim Package, and will, where necessary, request additional information and/or documentation.  The Claims Administrator will make available to the Settlement Class Member through a secure online web interface any document(s) with a Deficiency needing correction or, upon request from the Settlement Class Member, will mail the Settlement Class Member a copy of such document(s).  The Notice of Deficiency will be sent no later than forty-five (45) days from the date of receipt of the Claim Package or Derivative Claim Package by the Claims Administrator.  To the extent the volume of claims warrants, this deadline may be extended by agreement between Co-Lead Class Counsel and Counsel for the NFL Parties, subject to approval by the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof). The Notice of Deficiency will contain a recommendation for how, if possible, the Settlement Class Member can cure the Deficiency, and will provide a reasonable deadline not less than 120 days (from the date the Notice of Deficiency is sent to the Settlement Class Member) for the Settlement Class Member to submit Deficiency cure materials. Within that time period, the Settlement Class Member will have the opportunity to cure all Deficiencies and provide any requested additional information or documentation, except that the failure to submit timely a Claim Package or Derivative Claim Package in accordance with the terms of this Settlement Agreement cannot be cured other than upon a showing of substantial hardship as set forth in Section 8.3(a)(i).  Any Claim Package or Derivative Claim Package that continues to suffer from a Deficiency identified on the Notice of Deficiency following the submission of documentation intended to cure the Deficiency will be denied by the Claims Administrator.

Section 8.6     Verification and Investigation

(a)     Each Settlement Class Member claiming a Monetary Award or Derivative Claimant Award will authorize the Claims Administrator and/or Lien Resolution Administrator, as applicable, consistent with HIPAA and other

applicable privacy laws, to verify facts and details of any aspect of the Claim Package or Derivative Claim Package and/or the existence and amounts, if any, of any Liens. The Claims Administrator or Lien Resolution Administrator, at its sole discretion, may request additional documentation, which each Settlement Class Member agrees to provide in order to claim a Monetary Award or Derivative Claimant Award.

(b)    The Claims Administrator will have the discretion to undertake or cause to be undertaken further verification and investigation, including into the nature and sufficiency of any Claim Package or Derivative Claim Package documentation, including, without limitation, as set forth in Section 10.3.

## ARTICLE IX
## Notice of Claim Determinations, Payments, and Appeals

Section 9.1    <u>Monetary Award Determination</u>.  Based upon its review of the Claim Package, and the results of any investigations of the Settlement Class Member's claim, the Claims Administrator will determine whether a Settlement Class Member qualifies for a Monetary Award and the amount of any such Award.  In order to decide whether a Settlement Class Member is entitled to a Monetary Award, and at what level, the Claims Administrator will determine whether the Retired NFL Football Player or deceased Retired NFL Football Player has a Qualifying Diagnosis according to the Diagnosing Physician Certification, including consideration of, without limitation, the qualifications of the diagnosing physician, or in the case of a deceased Retired NFL Football Player diagnosed by a deceased physician, as set forth in Section 8.2(a)(i), according to the supporting medical records.  If the Claims Administrator determines that there is a Qualifying Diagnosis, it will determine the level of Monetary Award based on the Monetary Award Grid (attached as Exhibit 3) and a review of the Diagnosing Physician Certification for the age at the time of the Qualifying Diagnosis, and will review the Claim Package, including the Claim Form and medical records reflecting the Qualifying Diagnosis, for information relating to all other Offsets, and must apply all applicable Offsets to the Monetary Award.  For the avoidance of any doubt, the Claims Administrator has no discretion to make a Monetary Award determination other than as set forth above.

(a)    <u>Evidence of NFL Employment and Participation</u>.  To the extent that the Claims Administrator determines that the Settlement Class Member has provided in the Claim Package insufficient evidence of the Retired NFL Football Player's NFL employment and participation to substantiate the claimed Eligible Seasons, the Claims Administrator will request that the NFL Parties and Member Clubs provide any employment or participation records of the Retired NFL Football Player in their reasonable possession, custody or control, which the NFL Parties and Member Clubs will provide in good faith.  The Claims Administrator will consider all of the evidence provided to it by the Retired NFL Football Player and the NFL Parties and Member Clubs in determining the appropriate number of Eligible Seasons to apply to the Retired NFL Football Player's claim.  The Claims Administrator shall credit only the Eligible Seasons substantiated by the overall evidence.  To the extent there is no objective evidence regarding an Eligible Season claimed by the Retired NFL Football Player

beyond his sworn statement, the Claims Administrator will take into account the reasons offered by the Retired NFL Football Player for the lack of such objective evidence in arriving at its final decision.

(i)    The assertion of NFL employment and participation in more than one (1) Eligible Season, however, must be substantiated by the Retired NFL Football Player with objective evidence beyond his sworn statement, the sufficiency of which shall be in the Claims Administrator's discretion.  In the event there is no objective evidence of NFL employment and participation in more than one (1) Eligible Season, the Claims Administrator may credit the Retired NFL Football Player with one (1) or fewer Eligible Seasons consistent with Section 9.1(a).

(b)    <u>Timing of Monetary Award Determination</u>.  The Claims Administrator will make such determination and will send a corresponding Notice of Monetary Award Claim Determination to the Settlement Class Member and the NFL Parties no later than sixty (60) days from the later of:  (i) the date when a completed Claim Package that is free from all Deficiencies is received by the Claims Administrator; (ii) the date, if any, when all Deficiencies with a Settlement Class Member's Claim Package have been deemed cured by the Claims Administrator; (iii) the date, if any, on which the additional information or documentation identified in the Notice of Deficiency, if applicable, has been timely provided to the Claims Administrator; (iv) the date of a decision by a member of the Appeals Advisory Panel under Section 8.6(b); or (v) the date on which the Settlement Class Member no longer has the right to cure such Deficiencies or provide additional information or documentation, in accordance with Section 8.5; provided, however, that to the extent the volume of claims warrants, these deadlines may be extended by agreement between Co-Lead Class Counsel and Counsel for the NFL Parties, subject to approval by the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof).

(c)    <u>Notice Content</u>

(i)    Notices of Monetary Award Claim Determination that provide an adverse determination will include a short statement regarding the reasons for the adverse determination and information regarding how the Settlement Class Member can appeal the determination, as set forth in Section 9.7.  An adverse Notice of Monetary Award Claim Determination does not preclude a Settlement Class Member from submitting a Claim Package in the future for a Monetary Award should the Retired NFL Football Player's medical condition change.   The Claims Administrator shall develop reasonable procedures and rules to ensure the right of Settlement Class Members to submit a Claim Package for the same or different Qualifying Diagnoses in the future, while preventing unwarranted repetitive claims that do not disclose materially changed circumstances from prior claims made by the Settlement Class Member.

(ii)    Notices of Monetary Award Claim Determination that provide a determination that the Settlement Class Member is entitled to a Monetary Award will provide:  (a) the net amount of that Monetary Award after application of Offsets; (b) a listing of the Offsets applied to that Monetary Award; (c) the Lien

Resolution Administrator's determination of any amount deducted from the Monetary Award to satisfy identified Liens, as set forth in ARTICLE XI; or the Lien Resolution Administrator's determination of the "holdback" amount to be deducted from the Monetary Award under which identified Liens shall be resolved, as set forth in ARTICLE XI; (d) information regarding how the Settlement Class Member can appeal the Monetary Award determination, as set forth in Section 9.7; and (e) information regarding the timing of payment, as set forth in Section 9.3.

(d)    NFL Parties' and Co-Lead Class Counsel's Review of Claim Packages. If a Notice of Monetary Award Determination provides a determination that the Settlement Class Member is entitled to a Monetary Award, the Claims Administrator will make the Settlement Class Member's Claim Package and the review determinations available to the NFL Parties and Co-Lead Class Counsel.

Section 9.2    Derivative Claimant Award Determination. Based upon its review of the Derivative Claim Package, and the results of any investigations of the Derivative Claimant's claim, the Claims Administrator will determine whether a Derivative Claimant qualifies for a Derivative Claimant Award, as set forth in Section 7.3.

(a)    Timing of Derivative Claimant Award Determination. The Claims Administrator will make such determination and will send a corresponding Notice of Derivative Claimant Award Determination to the Settlement Class Member and the NFL Parties no later than thirty (30) days from the later of: (i) the date when a completed Derivative Claim Package that is free from all Deficiencies is received by the Claims Administrator; (ii) the date when all Deficiencies with a Settlement Class Member's Derivative Claim Package have been determined by the Claims Administrator to be satisfactorily cured; (iii) the date, if any, on which the additional information or documentation identified in the Notice of Deficiency, if applicable, has been timely provided to the Claims Administrator; or (iv) the date on which the Settlement Class Member no longer has the right to cure such Deficiencies or provide additional information or documentation, in accordance with Section 8.5; provided, however, that to the extent the volume of claims warrants, these deadlines may be extended by agreement between Co-Lead Class Counsel and Counsel for the NFL Parties, subject to approval by the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof).

(b)    Notice Content

(i)    Notices of Derivative Claimant Award Determination that provide an adverse determination will include a short statement regarding the reasons for the adverse determination and information regarding how the Settlement Class Member can appeal the determination, as set forth in Section 9.7. An adverse Notice of Derivative Claimant Award Determination does not preclude a Derivative Claimant from submitting a Derivative Claim Package in the future for a Derivative Claimant Award should the Retired NFL Football Player receive a

Supplemental Monetary Award or succeed on an appeal of a previously denied claim for a Monetary Award.

(ii)    Notices of Derivative Claimant Award Determination that provide a determination that the Settlement Class Member is entitled to a Derivative Claimant Award will provide:  (a) the amount of that Derivative Claimant Award; (b) the Lien Resolution Administrator's determination of any amount deducted from the Derivative Claimant Award to satisfy identified Liens, as set forth in ARTICLE XI; or the Lien Resolution Administrator's determination of the "holdback" amount to be deducted from the Derivative Claimant Award under which identified Liens will be resolved, as set forth in ARTICLE XI; (c) information regarding how the Derivative Claimant can appeal the Derivative Claimant Award determination, as set forth in Section 9.7; and (d) information regarding the timing of payment, as set forth in Section 9.4.

(c)    NFL Parties' and Co-Lead Class Counsel's Review of Derivative Claim Packages.  If a Notice of Derivative Claimant Award Determination provides a determination that the Settlement Class Member is entitled to a Derivative Claimant Award, the Claims Administrator will make the Settlement Class Member's Claim Package and the review determinations available to the NFL Parties and Co-Lead Class Counsel.

Section 9.3    Remuneration and Payment of Monetary Awards.

(a)    The Claims Administrator will promptly pay any Monetary Awards to Settlement Class Members who qualify under the terms of the Monetary Award Grid and all applicable Offsets after the Claims Administrator sends a Notice of Monetary Award Claim Determination; provided, however, any such payment will not occur until after the completion of the processes for (i) appealing Monetary Award determinations, as set forth in Section 9.7; (ii) auditing claims and investigating claims for fraud, as set forth in Section 10.3; (iii) identifying and satisfying Liens, as set forth in ARTICLE XI; and (iv) determining if any Derivative Claimants have filed timely, and are entitled to, Derivative Claimant Awards based on their relationship with the subject Retired NFL Football Player.  Such payment shall be made consistent with Section 23.3(b)(iv) of this Settlement Agreement.

(b)    In connection with a Monetary Award issued to a Representative Claimant, the Claims Administrator will abide by all substantive laws of the domicile of such Representative Claimant concerning distribution and will not issue payment until the Claims Administrator has received from the Settlement Class Member proof of such court approvals or other documents necessary to authorize payment.  Where short form procedures exist concerning such distribution that do not require domiciliary court approval or supervision, the Claims Administrator is authorized to adopt those procedures as part of the claims administration process applicable to such Representative Claimant.  The Claims Administrator also is authorized to adopt procedures as are approved by the Court to aid or facilitate in the payment of claims to minor, incapacitated or incompetent Settlement Class Members or their guardians.

(c)    Upon the completion of the Monetary Award Fund term, as set forth in Section 6.10, the Court shall determine the proper disposition of any funds remaining in the Monetary Award Fund consistent with the purpose of this Settlement, including to promote safety and injury prevention with respect to football players and/or the treatment or prevention of traumatic brain injuries.

Section 9.4    Remuneration and Payment of Derivative Claimant Awards

(a)    The Claims Administrator will promptly pay any Derivative Claimant Awards to Settlement Class Members who qualify; provided, however, any such payment will not occur until after expiration or completion of: (i) the time period for Derivative Claimants to file Derivative Claim Packages, as set forth in Section 8.3(a)(ii), has expired; (ii) the process for appealing Derivative Claimant Awards, including appeals by any other Derivative Claimants asserting claims based on the same Retired NFL Football Player, as set forth in Section 9.7; (iii) the process for auditing claims and investigating claims for fraud, set forth in Section 10.3; and (iv) the process for identifying and satisfying Liens, as set forth in ARTICLE XI. Such payment shall be made consistent with Section 23.3(b)(iv) of this Settlement Agreement.

(b)    In paying a Derivative Claimant Award to a minor, the Claims Administrator will abide by all substantive laws of the domicile of such Settlement Class Member concerning distribution and will not issue payment until the Claims Administrator has received from the Settlement Class Member proof of such court approvals or other documents necessary to authorize payment. Where short form procedures exist concerning such distribution that do not require domiciliary court approval or supervision, the Claims Administrator is authorized to adopt those procedures as part of the claims administration process applicable to such Settlement Class Members. The Claims Administrator also is authorized to adopt procedures as are approved by the Court to aid or facilitate in the payment of claims to minor, incapacitated or incompetent Settlement Class Members or their guardians.

Section 9.5    Scope of Appeals.    The Claims Administrator's determination as to whether a Settlement Class Member is entitled to a Monetary Award or Derivative Claimant Award under this Settlement Agreement, and/or the calculation of the Monetary Award or Derivative Claimant Award, is appealable by the Settlement Class Member, Co-Lead Class Counsel, or the NFL Parties based on their respective good faith belief that the determination by the Claims Administrator was incorrect.

Section 9.6    Appellant Fees and Limitations

(a)    Any Settlement Class Member taking an appeal will be charged a fee of One Thousand United States dollars (U.S. $1,000) by the Claims Administrator that must be paid before the appeal may proceed, which fee will be refunded if the Settlement Class Member's appeal is successful. If the appeal is unsuccessful, the fee will be paid to the Settlement Trust for transfer by the Trustee into the Monetary Award Fund.

(i)      Settlement Class Members may make a hardship request to the Claims Administrator and ask that the fee of One Thousand United States dollars (U.S. $1,000) be waived for good cause.  The Claims Administrator will require that the Settlement Class Member provide such financial information as may be necessary to decide the request to waive the fee, which request shall be approved or denied in the Claims Administrator's sole discretion.

(b)      The NFL Parties may appeal Monetary Award or Derivative Claimant Award determinations in good faith.  To the extent that Co-Lead Class Counsel believe that the NFL Parties are submitting vexatious, frivolous or bad faith appeals, Co-Lead Class Counsel may petition the Court for appropriate relief.

Section 9.7      Submissions on Appeals

(a)      The appellant must submit to the Court his or her notice of appeal, using an Appeals Form to be agreed upon by Co-Lead Class Counsel and the NFL Parties and provided by the Claims Administrator, with written copy to the appellee(s) Settlement Class Member or the NFL Parties (as applicable), Co-Lead Class Counsel, and to the Claims Administrator, no later than thirty (30) days after receipt of a Notice of Monetary Award Claim Determination or Notice of Derivative Claimant Award Determination.  Appellants must present evidence in support of their appeal, and any written statements may not exceed five (5) single-spaced pages in length.

(b)      The appellee(s) may submit a written opposition to the appeal no later than thirty (30) days after receipt of the Appeals Form.  This written opposition must not exceed five (5) single-spaced pages in length.  The Court will not deem the lack of an opposition to be an admission regarding the merits of the appeal. The appellant may not submit a reply.

(c)      Co-Lead Class Counsel may submit a written statement in support of or opposition to the appeal no later than fifteen (15) days after receipt of the Appeals Form or an appellee's written opposition.  This written statement must not exceed five (5) single-spaced pages in length.  The Court will not deem the lack of a statement to be an admission regarding the merits of the appeal.  The appellant and appellee(s) may each submit a reply.

Section 9.8      Review and Decision.      The Court will make a determination based upon a showing by the appellant of clear and convincing evidence. The Court may be assisted, in its discretion, by any member of the Appeals Advisory Panel and/or an Appeals Advisory Panel Consultant.  The decision of the Court will be final and binding.

(a)      Appeals Advisory Panel and Appeals Advisory Panel Consultants

(i)      Within ninety (90) days after the Effective Date, Co-Lead Class Counsel and Counsel for the NFL Parties will agree to, and jointly recommend to the Court for appointment, the members of the Appeals Advisory Panel

and the Appeals Advisory Panel Consultants.  Under no circumstances may a member of the Appeals Advisory Panel or an Appeals Advisory Panel Consultant have been convicted of a crime of dishonesty, or serve, on or after the Final Approval Date, as a litigation expert consultant or expert witness in connection with litigation relating to the subject matter of the Class Action Complaint for a party, a Member Club, or an Opt Out, or his, her or its counsel.  If selected and approved, under no circumstances shall an Appeals Advisory Panel member or Appeals Advisory Panel Consultant continue to serve in that role if convicted of a crime of dishonesty and/or thereafter retained as an expert consultant or expert witness in connection with litigation relating to the subject matter of the Class Action Complaint by a party, a Member Club, or an Opt Out, or his, her or its counsel.

(ii)    Co-Lead Class Counsel and Counsel for the NFL Parties will jointly retain the members of the Appeals Advisory Panel and the Appeals Advisory Panel Consultants appointed by the Court.

(iii)    Upon request of the Court or the Special Master, the Appeals Advisory Panel will take all steps necessary to provide sound advice with respect to medical aspects of the Class Action Settlement.

(iv)    The Court will oversee the Appeals Advisory Panel and the Appeals Advisory Panel Consultants, and may, in its discretion, request reports or information from the Appeals Advisory Panel or the Appeals Advisory Panel Consultants.

(v)    Compensation of the Appeals Advisory Panel and Appeals Advisory Panel Consultants, at a reasonable rate for their time agreed to by Co-Lead Class Counsel and Counsel for the NFL Parties, will be paid out of the Monetary Award Fund, except that compensation of an Appeals Advisory Panel member or Appeals Advisory Panel Consultant will be paid out of the BAP fund for reviewing and advising the Court whether a Retired NFL Football player has Level 1 Neurocognitive Impairment, Level 1.5 Neurocognitive Impairment, Level 2 Neurocognitive Impairment, or none, in cases where there are conflicting diagnoses by Qualified BAP Providers.

(vi)    Members of the Appeals Advisory Panel or the Appeals Advisory Panel Consultants may be replaced by joint motion made by Co-Lead Class Counsel and Counsel for the NFL Parties, or for cause by motion of either Co-Lead Class Counsel or Counsel for the NFL Parties, upon order of the Court.  If any member of the Appeals Advisory Panel or an Appeals Advisory Panel Consultant resigns, dies, is replaced, or is otherwise unable to continue in his or her position, Co-Lead Class Counsel and Counsel for the NFL Parties will agree to and jointly recommend a new proposed member for appointment by the Court.

(b)    Conflicts of Interest.  Within ninety (90) days after the Effective Date, Co-Lead Class Counsel, Counsel for the NFL Parties, and the Special Master will establish and implement procedures to promptly detect and resolve possible conflicts of interest between members of the Appeals Advisory Panel or Appeals

Advisory Panel Consultants, on the one hand, and an appellant or appellee(s), on the other hand. Co-Lead Class Counsel and Counsel for the NFL Parties, subject to approval of the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof) may modify such procedures in the future, if appropriate. For the avoidance of any doubt, employment of the Special Master by any Party as an expert in unrelated matters will not constitute a conflict of interest.

(c)    Liability.  The Parties, Class Counsel, Counsel for the NFL Parties, and the Special Master, and their respective Affiliates, will not be liable for any act, or failure to act, of a member of the Appeals Advisory Panel or an Appeals Advisory Panel Consultant.

**ARTICLE X**
**Class Action Settlement Administration**

Section 10.1    Special Master

(a)    Appointment and Oversight

(i)    The Motion for Preliminary Approval of the Class Action Settlement filed by Class Counsel  will request that the Court appoint, in consultation with Co-Lead Class Counsel and Counsel for the NFL Parties, a Special Master pursuant to Federal Rule of Civil Procedure 53.

(ii)    It is the intention of the Parties that the Special Master will perform his or her responsibilities and take all steps necessary to faithfully oversee the implementation and administration of the Settlement Agreement.  The Special Master shall be appointed for a term of five (5) years commencing on the Effective Date.  The term of the Special Master shall be extended, or a new Special Master shall be appointed, for additional five-year terms for the life of the Settlement Agreement, unless the Court determines, in consultation with Co-lead Class Counsel and Counsel for the NFL Parties, that the Special Master's role is no longer necessary.

(iii)    The Special Master will maintain at all times appropriate and sufficient bonding insurance in connection with his or her performance of responsibilities under the Settlement Agreement.  The cost for this insurance will be paid out of the Monetary Award Fund.

(iv)    The Court may, at its sole discretion, request reports or information from the Special Master.  The Special Master will be responsible for reporting and providing information to the Court at such frequency and in such a manner as the Court directs.  The Claims Administrator may assist with such reports if requested by the Special Master.

(v)    Following the five (5) year term of the Special Master, and any extension(s) thereof, oversight of the administration of the Class Action Settlement will revert to the Court.

(b)    Roles and Responsibilities

(i)    The Special Master will, among other responsibilities set forth in this Settlement Agreement:

(1)    Provide reports or information that the Court may, at its sole discretion, request from the Special Master, who will be responsible for reporting and providing information to the Court at such frequency and in such a manner as the Court directs;

(2)    Oversee complaints raised by Co-Lead Class Counsel, Counsel for the NFL Parties, the BAP Administrator, Claims Administrator and/or the Lien Resolution Administrator regarding aspects of the Class Action Settlement;

(3)    Hear appeals of registration determinations, if requested by the Court, as set forth in Section 4.3(a)(iv);

(4)    Oversee the BAP Administrator, Claims Administrator and Lien Resolution Administrator, as set forth in Section 5.6(a)(iv), Section 10.2(a)(iv), and Section 11.1(a)(iv), and receive monthly and annual reports from those Administrators; and

(5)    Oversee fraud detection and prevention procedures, and review and decide the appropriate disposition of potentially fraudulent claims as further specified in Section 10.3(i).

(c)    Compensation and Expenses.  Annual compensation of the Special Master will not exceed Two Hundred Thousand United States dollars (U.S. $200,000).  The annual compensation and reasonable out-of-pocket costs and expenses of the Special Master directly incurred as a result of the performance of his or her responsibilities will be paid out of the Monetary Award Fund.  Either Co-Lead Class Counsel or Counsel for the NFL Parties may challenge the reasonableness of the Special Master's out-of-pocket costs and expenses, in which case the Court will determine the reasonableness of such costs and expenses.  If the Court determines that any costs and expenses are unreasonable, the Special Master will not be paid for such costs and expenses or, if such costs and expenses have already been paid, the Special Master will refund that amount to the Monetary Award Fund.

(d)    Replacement.  The Court, in its discretion, can replace the Special Master for good cause.  If the Special Master resigns, dies, or is otherwise unable to continue employment in this position, Co-Lead Class Counsel and Counsel for the NFL Parties may file a motion for the appointment by the Court of a new Special Master.

(e)    Conflicts of Interest.  Within ninety (90) days after the Effective Date, Co-Lead Class Counsel, Counsel for the NFL Parties, and the Special Master will establish and implement procedures to promptly detect and resolve possible conflicts of interest between the Special Master, on the one hand, and Settlement Class

Members (and counsel individually representing them, if any), Class Counsel,  the NFL Parties, Counsel for the NFL Parties, the BAP Administrator, the Claims Administrator, or the Lien Resolution Administrator, on the other hand.  Co-Lead Class Counsel and Counsel for the NFL Parties, subject to approval of the Court, may modify such procedures in the future, if appropriate.  For the avoidance of any doubt, employment of the Special Master by any Party as an expert in unrelated matters will not constitute a conflict of interest.

Section 10.2    Claims Administrator

(a)    Appointment and Oversight

(i)    The Motion for Preliminary Approval of the Class Action Settlement filed by Class Counsel will request that the Court appoint BrownGreer PLC as Claims Administrator.  Within ten (10) days after the Effective Date, Co-Lead Class Counsel will retain the Claims Administrator appointed by the Court.

(ii)    Co-Lead Class Counsel's retention agreement with the Claims Administrator will provide that the Claims Administrator will perform its responsibilities and take all steps necessary to faithfully implement and administer the Settlement Agreement, and will require that the Claims Administrator maintain at all times appropriate and sufficient bonding insurance in connection with its performance of its responsibilities under the Settlement Agreement.

(iii)    The Court may, at its sole discretion, request reports or information from the Claims Administrator.  The Claims Administrator will be responsible for reporting and providing information to the Court at such frequency and in such a manner as the Court directs.

(iv)    The Special Master, for the duration of his or her term, will oversee the Claims Administrator, and may, at his or her sole discretion, request reports or information from the Claims Administrator.

(v)    Beyond the reporting requirements set forth in Section 10.2(a)(iii)-(iv), beginning one month after the Effective Date, the Claims Administrator will issue a regular monthly report to the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof), Co-Lead Class Counsel, and Counsel for the NFL Parties during the first three years of the Monetary Award Fund, and thereafter on a quarterly basis or as reasonably agreed upon by the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof), Co-Lead Class Counsel and the NFL Parties, regarding the status and progress of claims administration.  The monthly (or quarterly) report will include, without limitation:  (a) the monthly and total number of Settlement Class Members who registered timely, and the biographical information for each Settlement Class Member who registered timely in the preceding month, as set forth in Section 4.2(c); (b) the identity of each Settlement Class Member who submitted a Claim Package or Derivative Claim Package in the preceding month, the review status of such package (*e.g*, under

preliminary review, subject to a Notice of Deficiency, subject to verification and investigation, received a Notice of Claim Determination), and the monthly and total number of Settlement Class Member claims for Monetary Awards and Derivative Claimant Awards; (c) the monthly and total number of Monetary Awards and Derivative Claimant Awards paid; (d) the monthly and total number of each Qualifying Diagnosis for which a Monetary Award has been paid; (e) the monthly and total number of Settlement Class Members for whom appeals are pending regarding Monetary Awards and Derivative Claimant Awards; (f) the monthly identification/breakdown of physicians diagnosing Qualifying Diagnoses and/or law firms representing Settlement Class Members who submitted claims for Monetary Awards and Derivative Claimant Awards; (g) the monthly expenses/administrative costs, including a summary accounting of the administrative expenses incurred by the Claims Administrator; and (h) any other information requested by the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof), Co-Lead Class Counsel, or Counsel for the NFL Parties.

(vi)    Beginning on the first January after the Effective Date, the Claims Administrator will provide annual financial reports to the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof), Co-Lead Class Counsel and Counsel for the NFL Parties, based on information from the preceding year, regarding:  (a) the number of Settlement Class Members, broken down by Qualifying Diagnosis, who received Monetary Awards, and the corresponding number of Settlement Class Members who sought but were found by the Claims Administrator or the Court not to qualify for Monetary Awards; (b) the number of Settlement Class Members who received Derivative Claimant Awards, and the corresponding number of Settlement Class Members who sought but were found by the Claims Administrator or the Court not to qualify for Derivative Claimant Awards;  (c) the monetary amounts paid through Monetary Awards and Derivative Claimant Awards, including the monetary amounts over the term of the Class Action Settlement; (d) the number of Settlement Class Members for whom appeals are pending regarding Monetary Awards and Derivative Claimant Awards; (e) the identification/breakdown of physicians diagnosing Qualifying Diagnoses and/or law firms representing Settlement Class Members who submitted claims for Monetary Awards and Derivative Claimant Awards; (f) expenses/administrative costs, including a summary accounting of the administrative expenses incurred by the Claims Administrator; (g) the projected expenses/administrative costs for the remainder of the Monetary Award Fund term; (h) the monies remaining in the Monetary Award Fund; and (i) any other information requested by the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof), Co-Lead Class Counsel, or Counsel for the NFL Parties.

(vii)    The NFL Parties may elect, at their own expense, to cause an audit to be performed by a certified public accountant of the financial records of the Claims Administrator, and the Claims Administrator shall cooperate in good faith with the audit.  Audits may be conducted at any time during the term of the Monetary Award Fund.  Complete copies of the audit findings report will be provided to the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof), Co-Lead Class Counsel, and Counsel for the NFL Parties.

(b)      <u>Roles and Responsibilities</u>

(i)      The Claims Administrator will, among other responsibilities set forth in this Settlement Agreement:

(1)      Maintain the Settlement Website, as set forth in Section 4.1(a);

(2)      Maintain an automated telephone system to provide information about the Class Action Settlement, as set forth in Section 4.1(b);

(3)      Establish and administer both online and hard copy registration methods, as set forth in Section 4.2(a);

(4)      Review a purported Settlement Class Member's registration and determine its validity, as set forth in Section 4.3;

(5)      Process and review Claim Packages and Derivative Claim Packages, as set forth in ARTICLE VIII;

(6)      Determine whether Settlement Class Members who submit Claim Packages and Derivative Claim Packages are entitled to Monetary Awards or Derivative Claimant Awards, as set forth in ARTICLE VI and ARTICLE VII;

(7)      Audit Claim Packages and Derivative Claim Packages, and establish and implement procedures to detect and prevent fraudulent submissions to, and payments of fraudulent claims from, the Monetary Award Fund, as set forth in Section 10.3; and

(8)      Perform such other tasks reasonably necessary to accomplish the goals contemplated by this Settlement Agreement, as agreed to by Co-Lead Class Counsel and Counsel for the NFL Parties.

(c)      <u>Compensation and Expenses</u>.  Reasonable compensation of the Claims Administrator, as agreed to by Co-Lead Class Counsel and Counsel for the NFL Parties, and reasonable out-of-pocket costs and expenses directly incurred as a result of the Claims Administrator's responsibilities set forth in this Settlement Agreement will be paid out of the Monetary Award Fund.  The Claims Administrator shall submit an annual budget to the Court for review and approval.  Either Co-Lead Class Counsel or Counsel for the NFL Parties may challenge the reasonableness of the Claims Administrator's out-of-pocket costs and expenses, in which case the Court will determine (or may, in its discretion, refer the challenge to the Special Master to determine) the reasonableness of such costs and expenses.  If the Court or Special Master, as applicable, determines that any costs and expenses are unreasonable, the Claims Administrator will not be paid for such costs and expenses or, if such costs and expenses have already been paid, the Claims Administrator will refund that amount to the Monetary Award Fund.

(d)    <u>Liability</u>.  The Parties, Class Counsel, Counsel for the NFL Parties, and the Special Master, and their respective Affiliates, will not be liable for any act, or failure to act, of the Claims Administrator.

(e)    <u>Replacement</u>.  The Claims Administrator may be replaced by joint motion made by Co-Lead Class Counsel and Counsel for the NFL Parties, or for cause by motion of either Co-Lead Class Counsel or Counsel for the NFL Parties, upon order of the Court.  If the Claims Administrator resigns, dies, is replaced, or is otherwise unable to continue employment in this position, Co-Lead Class Counsel and Counsel for the NFL Parties will jointly recommend a new proposed Claims Administrator for appointment by the Court.

(f)    <u>Conflicts of Interest</u>.  Within ninety (90) days after the Effective Date, Co-Lead Class Counsel, Counsel for the NFL Parties, the Special Master and the Claims Administrator will establish and implement procedures to promptly detect and resolve possible conflicts of interest between the Claims Administrator, including, without limitation, its executive leadership team and all employees working on the Class Action Settlement, on the one hand, and Settlement Class Members and their counsel (if any), the NFL Parties, Counsel for the NFL Parties, or the Special Master, on the other hand.  Co-Lead Class Counsel, Counsel for the NFL Parties, and the Claims Administrator, subject to approval of the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof), may modify such procedures in the future, if appropriate.  Notwithstanding anything herein to the contrary, Co-Lead Class Counsel, Counsel for the NFL Parties, and the Special Master understand that the Claims Administrator regularly provides settlement claims administration and other related services to settling parties and their attorneys, and the Special Master, Co-Lead Class Counsel, and Counsel for the NFL Parties acknowledge and agree that it shall not be a conflict of interest for the Claims Administrator to provide such services to such individuals or to receive compensation for such work.

Section 10.3    <u>Audit Rights and Detection and Prevention of Fraud</u>

(a)    Co-Lead Class Counsel and the NFL Parties each will have the absolute right and discretion, at any time, but at their sole expense, in good faith to conduct, or have conducted by an independent auditor, audits to verify Monetary Award and Derivative Claimant Award claims submitted by Settlement Class Members.

(b)    In addition, Co-Lead Class Counsel, Counsel for the NFL Parties, and the Claims Administrator will establish and implement procedures to detect and prevent fraudulent submissions to, and payments of fraudulent claims from, the Monetary Award Fund.  Among other fraud detection and prevention procedures, the Claims Administrator, with the approval of Co-Lead Class Counsel and Counsel for the NFL Parties, will institute the following procedures relating to claim audits:

(i)    A Settlement Class Member whose claim has been selected for audit by the Claims Administrator, Co-Lead Class Counsel or Counsel for the

NFL Parties may be required to submit additional records, including medical records, and information as requested by the auditing party; and

(ii)    A Settlement Class Member who refuses to cooperate with an audit, including by unreasonably failing or refusing to provide the auditing party with all records and information sought within the time frame specified, will have the claim denied by the Claims Administrator, without right to an appeal.

(c)    On a monthly basis, the Claims Administrator will audit ten percent (10%) of the total Claim Packages and Derivative Claim Packages that the Claims Administrator has found to qualify for Monetary Awards or Derivative Claimant Awards during the preceding month.  The Claims Administrator will select such Claim Packages and Derivative Claim Packages for auditing on a random basis or to address a specific concern raised by a Claim Package or Derivative Claim Package, but will audit at least one Claim Package, if any qualify, each month.

(d)    In addition, the Claims Administrator will audit Claim Packages that:  (i) seek a Monetary Award for a given Qualifying Diagnosis when the Retired NFL Football Player took part in the BAP within the prior 365 days and was not diagnosed with that Qualifying Diagnosis during the BAP baseline assessment examination; (ii) seek a Monetary Award for a given Qualifying Diagnosis when the Retired NFL Football Player submitted a different Claim Package within the prior 365 days based upon a diagnosis of that same Qualifying Diagnosis by a different physician, and that Claim Package was found not to qualify for a Monetary Award; and (iii) reflect a Qualifying Diagnosis made through a medical examination conducted at a location other than a standard treatment or diagnosis setting (*e.g.*, hotel rooms).

(e)    Upon selection of a Settlement Class Member's Claim Package for audit, the Claims Administrator will notify Co-Lead Class Counsel, the Settlement Class Member (and his/her individual counsel, if applicable), and Counsel for the NFL Parties of the selection and will require that, within ninety (90) days, or such other time as is necessary and reasonable under the circumstances, the audited Settlement Class Member submit to the Claims Administrator, to the extent not already provided, such information as may be necessary and appropriate to audit the Claim Package, which may include the following records and information:

(i)    All of the Retired NFL Football Player's medical records in the Settlement Class Member's possession, custody, or control that relate to the underlying medical condition that is the basis for the Qualifying Diagnosis claimed by the Settlement Class Member;

(ii)    A list of all health care providers seen by the Retired NFL Football Player in the last five (5) years;

(iii)    The Settlement Class Member's (or subject Retired NFL Football Player's) employment records from Member Clubs or other NFL Football employers, but only to the extent that the Settlement Class Member is authorized under

applicable state law or Collective Bargaining Agreement to request and receive such records from the Member Club or other NFL Football employer;

(iv)     Such other relevant documents or information within the Settlement Class Member's possession, custody, or control as may reasonably be requested by the Claims Administrator under the circumstances, including, if necessary, authorizations to obtain the medical records of the Settlement Class Member (or subject Retired NFL Football Player) created or obtained by any health care providers seen by the Settlement Class Member (or subject Retired NFL Football Player) in the last five (5) years; and

(v)     Where the audit is conducted because of the circumstances set forth in Section 10.3(d), authorizations to obtain the medical records of the Settlement Class Member (or subject Retired NFL Football Player) held by the primary care physician of the Retired NFL Football Player and the medical records of all other physicians or neuropsychologists who have examined the Retired NFL Football Player relating to the Qualifying Diagnosis.

(f)     Upon selection of a Settlement Class Member's Derivative Claim Package for audit, the Claims Administrator will notify Co-Lead Class Counsel, the Settlement Class Member (and his/her individual counsel, if applicable), and Counsel for the NFL Parties of the selection and will require that, within ninety (90) days, or such other time as is necessary and reasonable under the circumstances, the audited Settlement Class Member submit to the Claims Administrator, to the extent not already provided, such information as may be necessary and appropriate to audit the Claim Package, which may include relevant documents or information within the Settlement Class Member's possession, custody, or control as may reasonably be requested by the Claims Administrator under the circumstances.

(g)     When auditing a Settlement Class Member's claim for a Monetary Award or Derivative Claimant Award, the Claims Administrator will review the records and information relating to that claim and determine whether the Claim Form or Derivative Claim Form misrepresents, omits, and/or conceals material facts that affect the claim.

(h)     If, upon completion of an audit, the Claims Administrator determines that there has not been a misrepresentation, omission, or concealment of a material fact made in connection with the claim, the process of issuing a Monetary Award or Derivative Claimant Award, subject to appeal, will proceed.

(i)     If, upon completion of an audit, the Claims Administrator determines that there has been a misrepresentation, omission, or concealment of a material fact made in connection with the claim, the Claims Administrator will notify the Settlement Class Member and will refer the claim to the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof) for review and findings. The Special Master's review and findings shall take into account whether the misrepresentation, omission or concealment was intentional, and may include the

following relief, without limitation:  (a) denial of the claim in the event of fraud; (b) additional audits of claims from the same law firm or physician (if applicable), including those already paid; (c) referral of the attorney or physician (if applicable) to the appropriate disciplinary boards; (d) referral to federal authorities; (e) disqualification of the attorney, physician and/or Settlement Class Member from further participation in the Class Action Settlement; and/or (f) if a law firm is found by the Claims Administrator to have submitted more than one fraudulent submission on behalf of Settlement Class Members, claim submissions by that law firm will no longer be accepted, and attorneys' fees paid to the firm by the Settlement Class Member will be forfeited and paid to the Settlement Trust for transfer by the Trustee into the Monetary Award Fund.

(j)    In addition, if the Claims Administrator at any time makes a finding (based on its own detection processes or from information received from Co-Lead Class Counsel or Counsel for the NFL Parties) of fraud by a Settlement Class Member submitting a claim for a Monetary Award or Derivative Claimant Award, and/or by the physician providing the Qualifying Diagnosis, including, without limitation, misrepresentations, omissions, or concealment of material facts relating to the claim, the Claims Administrator will notify the Settlement Class Member and will make a recommendation to Co-Lead Class Counsel and Counsel for the NFL Parties to refer the claim to the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof) for review and findings that may include, without limitation, those set forth in Section 10.3(i).

(i)    If both Co-Lead Class Counsel and Counsel for the NFL Parties do not agree with the Claims Administrator's recommendation to refer a claim to the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof), they will notify the Claims Administrator, who will continue with the processing of the claim.

Section 10.4    The Claims Administrator, in consultation with Co-Lead Class Counsel and Counsel for the NFL Parties, will also establish system-wide processes to detect and prevent fraud, including, without limitation, claims processing quality training and review and data analytics to spot "red flags" of fraud, including, without limitation, alteration of documents, questionable signatures, duplicative documents submitted on claims, the number of claims from similar addresses or supported by the same physician or office of physicians, data metrics indicating patterns of fraudulent submissions, and such other attributes of claim submissions that create a reasonable suspicion of fraud.

**ARTICLE XI**
**Identification and Satisfaction of Liens**

Section 11.1   Lien Resolution Administrator

(a)      Appointment and Oversight

(i)      The Motion for Preliminary Approval of the Class Action Settlement filed by Class Counsel,  will request that the Court appoint Garretson Group as Lien Resolution Administrator.  Within ten (10) days after the Effective Date, Co-Lead Class Counsel will retain the Lien Resolution Administrator appointed by the Court.

(ii)      Co-Lead Class Counsel's retention agreement with the Lien Resolution Administrator will provide that the Lien Resolution Administrator will perform its responsibilities and take all steps necessary to faithfully implement and administer the Lien-related provisions of the Settlement Agreement, and will require that the Lien Resolution Administrator maintain at all times appropriate and sufficient bonding insurance in connection with its performance of its responsibilities under the Settlement Agreement.

(iii)      The Court may, at its sole discretion, request reports or information from the Lien Resolution Administrator.   The Lien Resolution Administrator will be responsible for reporting and providing information to the Court at such frequency and in such a manner as the Court directs.

(iv)      The Special Master, for the duration of his or her term, will oversee the Lien Resolution Administrator, and may, at his or her sole discretion, request reports or information from the Lien Resolution Administrator.

(b)      Roles and Responsibilities.   The Lien Resolution Administrator will, among other responsibilities set forth in this Settlement Agreement, administer the process for the identification and satisfaction of all applicable Liens, as set forth in Section 11.3.  Each Settlement Class Member (and his or her respective counsel, if applicable) claiming a Monetary Award or Derivative Claimant Award, however, will be solely responsible for the satisfaction and discharge of all Liens.

(c)      Compensation and Expenses.  Reasonable compensation of the Lien Resolution Administrator, as agreed to by Co-Lead Class Counsel and Counsel for the NFL Parties, and reasonable out-of-pocket costs and expenses directly incurred as a result of the Lien Resolution Administrator's responsibilities will be paid out of the Monetary Award Fund, unless otherwise specified herein.   The Lien Resolution Administrator shall submit an annual budget to the Court for review and approval.  Either Co-Lead Class Counsel or Counsel for the NFL Parties may challenge the reasonableness of the Lien Resolution Administrator's out-of-pocket costs and expenses, in which case the Court will determine (or may, in its discretion, refer the challenge to the Special Master to determine) the reasonableness of such costs and expenses.  If the Court or Special Master, as applicable, determines that any costs and expenses are unreasonable,

the Lien Resolution Administrator will not be paid for such costs and expenses or, if such costs and expenses have already been paid, the Lien Resolution Administrator will refund that amount to the Monetary Award Fund.

(d)    Liability.  The Parties, Class Counsel, Counsel for the NFL Parties, and the Special Master, and their respective Affiliates, will not be liable for any act, or failure to act, of the Lien Resolution Administrator.

(e)    Replacement.  The Lien Resolution Administrator may be replaced by joint motion made by Co-Lead Class Counsel and Counsel for the NFL Parties, or for cause by motion of either Co-Lead Class Counsel or Counsel for the NFL Parties, upon order of the Court.  If the Lien Resolution Administrator resigns, dies, is replaced, or is otherwise unable to continue employment in this position, Co-Lead Class Counsel and Counsel for the NFL Parties will agree to and jointly recommend a new proposed Lien Resolution Administrator for appointment by the Court.

Section 11.2    Conflicts of Interest.  Within ninety (90) days after the Effective Date, Co-Lead Class Counsel, Counsel for the NFL Parties, the Special Master and the Lien Resolution Administrator will establish and implement procedures to promptly detect and resolve possible conflicts of interest between the Lien Resolution Administrator, including, without limitation, its executive leadership team and all employees working on the Class Action Settlement, on the one hand, and Settlement Class Members (and counsel individually representing them, if any), the NFL Parties, Counsel for the NFL Parties, or the Special Master, on the other hand.  Co-Lead Class Counsel, Counsel for the NFL Parties, and the Lien Resolution Administrator, subject to approval of the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof), may modify such procedures in the future, if appropriate.  Notwithstanding anything herein to the contrary, Co-Lead Class Counsel, Counsel for the NFL Parties, and the Special Master understand that the Lien Resolution Administrator regularly provides lien resolution and other related services to settling parties and their attorneys, and the Special Master, Co-Lead Class Counsel, and Counsel for the NFL Parties acknowledge and agree that it shall not be a conflict of interest for the Lien Resolution Administrator to provide such services to such individuals or to receive compensation for such work.

Section 11.3    Lien Identification, Satisfaction and Discharge

(a)    Each Settlement Class Member claiming a Monetary Award or Derivative Claimant Award will identify all Liens held or asserted by Governmental Payors or Medicare Part C or Part D Program sponsors with respect to any Monetary Award or Derivative Claimant Award in his or her Claim Form or Derivative Claim Form.

(b)    Each Settlement Class Member (and counsel individually representing him or her, if any) shall cooperate with the Lien Resolution Administrator to identify all Liens held or asserted by Governmental Payors or Medicare Part C or Part D Program sponsors with respect to any Monetary Award or Derivative Claimant Award as

a prerequisite to receiving payment of any Monetary Award or Derivative Claimant Award, including by providing the requested information and authorizations to the Lien Resolution Administrator and/or Claims Administrator in the timeframe specified for so doing.

(c)     Among other things, each Settlement Class Member will authorize the Lien Resolution Administrator to:

(i)     Establish procedures and protocols to identify and resolve Liens held or asserted by Governmental Payors or Medicare Part C or Part D Program sponsors with respect to any Monetary Award or Derivative Claimant Award;

(ii)     Undertake to obtain an agreement in writing and other supporting documentation with CMS promptly following the Effective Date that:

(1)     Establishes a global repayment amount per Qualifying Diagnosis and/or for all or certain Qualifying Diagnoses for Settlement Class Members who are or were beneficiaries of the Medicare Program, or, alternatively, otherwise sets forth a conditional payment resolution process.  Such amounts will be based on the routine costs associated with the medically accepted standard of care for the treatment and management of each Qualifying Diagnosis, as well as actual utilization of treatment by Settlement Class Members related to each Qualifying Diagnosis.  The agreement, in writing, and supporting documentation with CMS will demonstrate reasonable proof of satisfaction of Medicare's Part A and/or Part B fee-for-service recovery claim in connection with Settlement Class Member's (who are or were beneficiaries of the Medicare Program) receipt of any Monetary Award or Derivative Claimant Award and any benefits provided pursuant to this Settlement Agreement.

(2)     Establishes reporting processes recognized by CMS as satisfying the reporting obligations, if any, under the mandatory Medicare reporting requirements of Section 111 of the Medicare, Medicaid and SCHIP Extension Act of 2007, 110 Pub. L. No. 173, 121 Stat. 2492 ("MMSEA") in connection with this Settlement Agreement;

(iii)     Fulfill all state and federal reporting obligations, including those to CMS that are agreed upon with CMS;

(iv)     Satisfy Lien amounts owed to a Governmental Payor or, to the extent identified by the Class Member pursuant to Section 11.3(a), Medicare Part C or Part D Program sponsor for medical items, services, and/or prescription drugs paid on behalf of Settlement Class Members out of any Monetary Award or Derivative Claimant Award to the Settlement Class Member pursuant to this Settlement Agreement; and

(v)     Transmit all information received from any Governmental Payor or Medicare Part C or Part D Program sponsor pursuant to such authorizations (i) to the NFL Parties, Claims Administrator, and/or Special Master solely for purposes of verifying compliance with the MSP Laws or other similar reporting

obligations and for verifying satisfaction and full discharge of all such Liens, or (ii) as otherwise directed by the Court.

(d)      If the Lien Resolution Administrator is able to negotiate a global repayment amount for some or all of the Qualifying Diagnoses for Settlement Class Members who are or were beneficiaries of the Medicare Program with CMS, as set forth in Section 11.3(c)(ii)(1), the Lien Resolution Administrator shall: (i) satisfy such global repayment amount out of any Monetary Award to such Settlement Class Member; and (ii) provide that reasonable compensation of the Lien Resolution Administrator for such efforts, will be paid out of any Monetary Award to such Settlement Class Member.

(e)      If the Lien Resolution Administrator is unable to negotiate a global repayment amount for some or all of the Qualifying Diagnoses for Settlement Class Members who are or were beneficiaries of the Medicare Program with CMS, as set forth in Section 11.3(c)(ii)(1), the Lien Resolution Administrator will put in place a mechanism for resolving these Liens on an individual basis, as agreed to by Co-Lead Class Counsel and Counsel for the NFL Parties.  In addition, the Lien Resolution Administrator will put in place a mechanism for resolving Liens owed to other Governmental Payors or  Medicare Part C or Part D Program sponsors on an individual basis, as agreed to by Co-Lead Class Counsel and Counsel for the NFL Parties.  These mechanisms for resolving such Liens on an individual basis will allow the Lien Resolution Administrator to:  (i) satisfy such Lien amounts owed for medical items, services, and/or prescription drugs paid on behalf of a Settlement Class Member out of any Monetary Award to the Settlement Class Member, subject to the Settlement Class Member's right to object to the fact and/or amount of such Lien amount; and (ii) provide that the Lien Resolution Administrator's reasonable costs and expenses incurred in resolving such Liens, including the reasonable compensation of the Lien Resolution Administrator for such efforts, will be paid out of any Monetary Award to the Settlement Class Member.

(f)      The Parties further understand and agree that the Lien Resolution Administrator's performance of functions described in this Article is not intended to modify the legal and financial rights and obligations of Settlement Class Members, including the duty to pay and/or arrange for reimbursement of each Settlement Class Member's past, current, or future bills or costs, if any, for medical items, services, and/and prescription drugs, and to satisfy and discharge any and all statutory recovery obligations for any Liens.

(g)      Notwithstanding any other provision of this Settlement Agreement relating to timely payment, the Claims Administrator will not pay any Monetary Award to a Settlement Class Member who is or was entitled to benefits under a Governmental Payor program or Medicare Part C or Part D Program prior to: (i) the Lien Resolution Administrator's determination of the final amount needed to satisfy the reimbursement obligation that any Governmental Payor or Medicare Part C or Part D Program sponsor states is due and owing (as reflected in a final demand letter or other formal written communication), and satisfaction and discharge of that reimbursement obligation as evidenced by the Lien Resolution Administrator's receipt of a written

satisfaction and discharge from the applicable Governmental Payor or Medicare Part C or Part D Program sponsor; or (ii) the Lien Resolution Administrator's determination of the "holdback" amount to be deducted from the Monetary Award or Derivative Claimant Award under which such reimbursement obligation will be resolved.

(h)    Notwithstanding any other provision of this Settlement Agreement relating to timely payment, if any person or entity claims any Liens, other than those set forth in Section 11.3(g), with respect to a Settlement Class Member's Monetary Award or Derivative Claimant Award, then the Claims Administrator will not pay any such Monetary Award or Derivative Claimant Award if the Claims Administrator or Lien Resolution Administrator has received notice of that Lien and there is a legal obligation to withhold payment to the Settlement Class Member under applicable federal or state law.   The Claims Administrator will hold such Monetary Award or Derivative Claimant Award in an escrow account until the Settlement Class Member (and counsel individually representing him or her, if any) presents documentary proof, such as a court order or release or notice of satisfaction by the party asserting the Lien, that such Lien has been satisfied and discharged; or until the Lien Resolution Administrator's determination of the "holdback" amount to be deducted from the Monetary Award, Supplemental Monetary Award or Derivative Claimant Award under which such reimbursement obligation will be resolved.

(i)    Settlement Class Members who are or were entitled to benefits under Medicare Part C or Part D Programs may be required by statute or otherwise, when making a claim for and/or receiving compensation pursuant to this Settlement Agreement, to notify the relevant Medicare Part C or Part D Program sponsor or others of the existence of, and that Settlement Class Member's participation in, this Class Action Settlement.  It is the sole responsibility of each Settlement Class Member to determine whether he or she has such a notice obligation, and to perform timely any such notice reporting.

Section 11.4    <u>Indemnification</u>.  Each Settlement Class Member, on his or her own behalf, and on behalf of his or her estate, predecessors, successors, assigns, representatives, heirs, beneficiaries, executors, and administrators, in return for the benefits and consideration provided in this Settlement Agreement, will indemnify and forever hold harmless, and pay all final judgments, damages, costs, expenses, fines, penalties, interest, multipliers, or liabilities, including the costs of defense and attorneys' fees of, the Released Parties against any and all claims by Other Parties arising from, relating to, or resulting from (a) any undisclosed Lien relating to, or resulting from, compensation or benefits received by a Settlement Class Member pursuant to this Class Action Settlement and/or (b) the failure of a Settlement Class Member timely and accurately to report or provide information that is necessary for compliance with the MSP Laws, or for the Lien Resolution Administrator to identify and/or satisfy all Governmental Payors or Medicare Part C or Part D Program sponsors who may hold or assert a reimbursement right.  The amount of indemnification will not exceed the total Monetary Award or Derivative Claimant Award for that Settlement Class Member's claim.  **CLASS AND SUBCLASS REPRESENTATIVES AND SETTLEMENT CLASS MEMBERS ACKNOWLEDGE THAT THIS SECTION COMPLIES**

**WITH ANY REQUIREMENT TO EXPRESSLY STATE THAT LIABILITY FOR SUCH CLAIMS IS INDEMNIFIED AND THAT THIS SECTION IS CONSPICUOUS AND AFFORDS FAIR AND ADEQUATE NOTICE.**

Section 11.5  <u>No Admission</u>.  Any reporting performed by the Lien Resolution Administrator and/or Claims Administrator for the purpose of resolving Liens, if any, related to compensation provided to Settlement Class Members pursuant to this Settlement Agreement does not constitute an admission by any Settlement Class Member or any Released Party of any liability or evidence of liability in any manner.

Section 11.6  The foregoing provisions of this Article are solely for the several benefit of the NFL Parties, the Lien Resolution Administrator, the Special Master, and the Claims Administrator.  No Settlement Class Member (or counsel individually representing them, if any) will have any rights or defenses based upon or arising out of any act or omission of the NFL Parties or any Administrator with respect to this Article.

**ARTICLE XII**
**Education Fund**

Section 12.1  An Education Fund will be established to fund programs promoting safety and injury prevention with respect to football players, including safety-related initiatives in youth football, the education of Retired NFL Football Players regarding the NFL CBA Medical and Disability Benefits programs and other educational initiatives benefitting Retired NFL Football Players.  The Court shall approve these education programs, with input from Co-Lead Class Counsel, Counsel for the NFL Parties and medical experts, as further set forth below.  Co-Lead Class Counsel and Counsel for the NFL Parties will agree to a protocol through which Retired NFL Football Players will actively participate in such initiatives.

Section 12.2  Co-Lead Class Counsel, with input from Counsel for the NFL Parties, and with Court approval, will take all necessary steps to establish the Education Fund and establish procedures and controls to manage and account for the disbursement of funds to the education projects and all other costs associated with the Education Fund.  The costs and expenses to administer the Education Fund will be paid out of the Education Fund Amount.

**ARTICLE XIII**
**Preliminary Approval and Class Certification**

Section 13.1  Promptly after execution, Class Counsel will file the Motion for Preliminary Approval of the Class Action Settlement and the Settlement Agreement as an exhibit thereto.  Simultaneously, the Class and Subclass Representatives will file a Motion for Certification of Rule 23(b)(3) Class and Subclasses for Purposes of Settlement.

Section 13.2  The Parties agree to take all actions reasonably necessary to obtain the Preliminary Approval and Class Certification Order from the Court.

Section 13.3    The Parties agree to jointly request that the Court stay this action and all Related Lawsuits, and enjoin all Settlement Class Members, unless and until they have been excluded from the Settlement Class by action of the Court, or until the Court denies approval of the Class Action Settlement, or until the Settlement Agreement is otherwise terminated, from filing, commencing, prosecuting, intervening in, participating in and/or maintaining, as plaintiffs, claimants, or class members in, any other lawsuit, including, without limitation, a Related Lawsuit, or administrative, regulatory, arbitration, or other proceeding in any jurisdiction (whether state, federal or otherwise), against Released Parties based on, relating to, or arising out of the claims and causes of action, or the facts and circumstances at issue, in the Class Action Complaint, Related Lawsuits and/or the Released Claims, except that claims for workers' compensation and claims alleging entitlement to NFL CBA Medical and Disability Benefits will not be stayed or enjoined.   For the avoidance of any doubt, the Parties are not requesting that the Court stay any actions against Riddell.

(a)    The Parties recognize that there may be further pleadings, discovery responses, documents, testimony, or other matters or materials owed by the Parties to each other pursuant to existing pleading requirements, discovery requests, pretrial rules, procedures, orders, decisions, or otherwise.  As of the Settlement Date, each Party expressly waives any right to receive, inspect, or hear such pleadings, discovery, testimony, or other matters or materials during the pendency of the settlement proceedings contemplated by this Settlement Agreement and subject to further order of the Court.

Section 13.4    The Parties agree that any certification of the Settlement Class and Subclasses will be for settlement purposes only.  The Parties do not waive or concede any position or arguments they have for or against certification of any class for any other purpose in any action or proceeding.  Any class certification order entered in connection with this Settlement Agreement will not constitute an admission by the NFL Parties, or finding or evidence, that the Class and Subclass Representatives' claims, or the claims of any other Settlement Class Member, or the claims of the Settlement Class, are appropriate for class treatment if the claims were contested in this or any other federal, state, arbitral, or foreign forum.  If the Court enters the proposed form of Preliminary Approval and Class Certification Order, the Final Order and Judgment will provide for vacation of the Final Order and Judgment and the Preliminary Approval and Class Certification Order in the event that this Settlement Agreement does not become effective.

Section 13.5    Upon entry of the Preliminary Approval and Class Certification Order, the statutes of limitation applicable to any and all claims or causes of action that have been or could be asserted by or on behalf of any Settlement Class Members related to the subject matter of the Settlement Agreement will be tolled and stayed to the extent not already tolled by the initiation of an action in this litigation or a Related Lawsuit.  The limitations period will not begin to run again for any Settlement Class Member unless and until he or she is deemed to have Opted Out of the Settlement Class, this Settlement Agreement is terminated pursuant to ARTICLE XVI, or a Settlement Class Member's Release and Covenant Not to Sue has been rendered null and

void by the Court as set forth in Section 25.6(g).  In the event the Settlement Agreement is terminated pursuant to ARTICLE XVI, to the extent not otherwise tolled, the limitations period for each Settlement Class Member as to whom the limitations period had not expired as of the date of the Preliminary Approval and Class Certification Order will extend for the longer of thirty (30) days from the last required issuance of notice of termination or the period otherwise remaining before expiration.  Notwithstanding the tolling agreement herein, the Parties recognize that any time already elapsed for any Class or Subclass Representatives or Settlement Class Members on any applicable statutes of limitations will not be reset, and no expired claims will be revived, by virtue of this tolling agreement.  Class and Subclass Representatives and Settlement Class Members do not admit, by entering into this Settlement Agreement, that they have waived any applicable tolling protections available as a matter of law or equity.  Nothing in this Settlement Agreement will constitute an admission in any manner that the statute of limitations has been tolled for anyone outside the Settlement Class, nor does it constitute a waiver of legal positions regarding tolling.

## ARTICLE XIV
## Notice, Opt Out, and Objections

Section 14.1    <u>Notice</u>

(a)    As part of Plaintiffs' Motion for Preliminary Approval of Class Action Settlement, Plaintiffs will submit to the Court a Settlement Class Notice Plan agreed upon by Class Counsel and Counsel for the NFL Parties.

(b)    The Settlement Class Notice Plan, to be implemented by the Settlement Class Notice Agent following the Court's entry of the Preliminary Approval and Class Certification Order, and approval of the Settlement Class Notice (in the form of Exhibit 5), paid for by the NFL Parties' transfer of Four Million United States dollars (U.S. $4,000,000) to Co-Lead Class Counsel, as set forth in Sections 23.1 and 23.3, will be designed to meet the requirements of Fed. R. Civ. P. 23 (c)(2)(B), and will include:  (i) direct notice by first-class mail; (ii) broad notice through the use of paid media including national radio spots, national consumer magazines, television and internet advertising; and (iii) electronic notice through the Settlement Website created under Section 4.1(a) and an automated telephone system created under Section 4.1(b).

(c)    The Parties and the Claims Administrator will maintain a list of the names and addresses of each person to whom the Settlement Class Notice is transmitted in accordance with any order entered by the Court pursuant to ARTICLE XIII.  These names and addresses will be kept strictly confidential and will be used only for purposes of administering this Class Action Settlement, except as otherwise ordered by the Court.

(d)    Within thirty (30) days of the Effective Date, upon Court approval, Co-Lead Class Counsel shall cause the Settlement Class Supplemental Notice to be disseminated to Settlement Class Members by first-class mail and by posting on the Settlement Website created under Section 4.1(a) and through an automated telephone

system created under Section 4.1(b), to advise Settlement Class Members of the previously disclosed deadlines:  (i) to register for participation in the Class Action Settlement, as set forth in Section 4.2; (ii) as to eligible Retired NFL Football Players, to participate in the BAP, as set forth in Section 5.3; and (iii) to submit Claim Packages or Derivative Claim Packages, as set forth in Section 8.3.  The Settlement Class Supplemental Notice shall include the above information, and any other information, as agreed upon by Co-Lead Class Counsel and Counsel for the NFL Parties, and approved by the Court.

Section 14.2   Opt Outs

(a)    The Settlement Class Notice will provide instructions regarding the procedures that must be followed to Opt Out of the Settlement Class pursuant to Fed. R. Civ. P. 23(c)(2)(B)(v).  The Parties agree that, to Opt Out validly from the Settlement Class, a Settlement Class Member must submit a written request to Opt Out stating "I wish to exclude myself from the Settlement Class in *In re: National Football League Players' Concussion Injury Litigation*, No. 2:12-md-02323" (or substantially similar clear and unambiguous language) to the Claims Administrator on or before such date as is ordered by the Court.  That written request also will contain the Settlement Class Member's printed name, address, telephone number, and date of birth and enclose a copy of his or her driver's license or other government issued identification.  A written request to Opt Out may not be signed using any form of electronic signature, but must contain the dated Personal Signature of the Retired NFL Football Player, Representative Claimant, or Derivative Claimant seeking to exclude himself or herself from the Settlement Class.  Attorneys for Settlement Class Members may submit a written request to Opt Out on behalf of a Settlement Class Member, but such request must contain the Personal Signature of the Settlement Class Member.  The Claims Administrator will provide copies of all requests to Opt Out to Class Counsel and Counsel for the NFL Parties within seven (7) days of receipt of each such request.  Valid requests to Opt Out from the Settlement Class will become effective on the Final Approval Date.

(b)    All Settlement Class Members who do not timely and properly Opt Out from the Settlement Class will in all respects be bound by all terms of this Settlement Agreement and the Final Order and Judgment upon the Effective Date, will be entitled to all procedural opportunities and protections described in this Settlement Agreement and provided by the Court, and to all compensation and benefits for which they qualify under its terms, and will be barred permanently and forever from commencing, filing, initiating, prosecuting, asserting, and/or maintaining any and all Released Claims against any Released Parties in any court of law or equity, arbitration tribunal, or administrative or other forum.

(c)    Prior to the Final Approval Date, any Retired NFL Football Player, Representative Claimant, or Derivative Claimant may seek to revoke his or her Opt Out from the Settlement Class and thereby receive the benefits of this Class Action Settlement by submitting a written request to Co-Lead Class Counsel and Counsel for the NFL Parties stating "I wish to revoke my request to be excluded from the Settlement

Class" (or substantially similar clear and unambiguous language), and also containing the Settlement Class Member's printed name, address, phone number, and date of birth. The written request to revoke an Opt Out must contain the Personal Signature of the Settlement Class Member seeking to revoke his or her Opt Out.

Section 14.3    Objections

(a)    Provided a Settlement Class Member has not submitted a written request to Opt Out, as set forth in Section 14.2(a), the Settlement Class Member may present written objections, if any, explaining why he or she believes the Class Action Settlement should not be approved by the Court as fair, reasonable, and adequate. No later than such date as is ordered by the Court, a Settlement Class Member who wishes to object to any aspect of the Class Action Settlement must file with the Court , or as the Court otherwise may direct, a written statement of the objection(s). The written statement of objection(s) must include a detailed statement of the Settlement Class Member's objection(s), as well as the specific reasons, if any, for each such objection, including any evidence and legal authority the Settlement Class Member wishes to bring to the Court's attention. That written statement also will contain the Settlement Class Member's printed name, address, telephone number, and date of birth, written evidence establishing that the objector is a Settlement Class Member, and any other supporting papers, materials, or briefs the Settlement Class Member wishes the Court to consider when reviewing the objection. A written objection may not be signed using any form of electronic signature, but must contain the dated Personal Signature of the Retired NFL Football Player, Representative Claimant, or Derivative Claimant making the objection. The Court shall determine whether any Settlement Class Members who do not follow the procedures will have waived any objections they may have.

(b)    A Settlement Class Member may object on his or her own behalf or through an attorney hired at that Settlement Class Member's own expense, provided the Settlement Class Member has not submitted a written request to Opt Out, as set forth in Section 14.2(a). Attorneys asserting objections on behalf of Settlement Class Members must: (i) file a notice of appearance with the Court by the date set forth in the Preliminary Approval and Class Certification Order, or as the Court otherwise may direct; (ii) file a sworn declaration attesting to his or her representation of each Settlement Class Member on whose behalf the objection is being filed or a copy of the contract (to be filed *in camera*) between that attorney and each such Settlement Class Member; and (iii) comply with the procedures described in this Section.

(c)    A Settlement Class Member (or counsel individually representing him or her, if any) seeking to make an appearance at the Fairness Hearing must file with the Court, by the date set forth in the Preliminary Approval and Class Certification Order, or as the Court otherwise may direct, a written notice of his or her intention to appear at the Fairness Hearing, in accordance with the requirements set forth in the Preliminary Approval and Class Certification Order.

(d)    Any Settlement Class Member who fails to comply with the provisions of this Section 14.3 will waive and forfeit any and all rights he or she may have to object to the Class Action Settlement.

## ARTICLE XV
## Communications to the Public

Section 15.1    The form, content, and timing of any public statement announcing the filing of this Settlement Agreement will be subject to mutual agreement by Class Counsel and Counsel for the NFL Parties.  The Parties and their counsel agree not to make any public statements, including statements to the media, that are inconsistent with the Settlement Agreement.  Any communications to the public or the media made by or on behalf of the Parties and their respective counsel regarding the Class Action Settlement will be made in good faith and will be consistent with the Parties' agreement to take all actions reasonably necessary for preliminary and final approval of this Class Action Settlement.   Any information contained in such communications will be balanced, fair, accurate, and consistent with the content of the Settlement Class Notice.

(a)    Nothing herein is intended or will be interpreted to inhibit or interfere with the ability of Class Counsel or Counsel for the NFL Parties to communicate with the Court, their clients, or Settlement Class Members and/or their counsel.

(b)    Class Counsel acknowledge and agree, and the Preliminary Approval and Class Certification Order will provide, that the NFL Parties have the right to communicate orally and in writing with, and to respond to inquiries from, Settlement Class Members on matters unrelated to the Class Action Settlement in connection with the NFL Parties' normal business.

## ARTICLE XVI
## Termination

Section 16.1    <u>Walk-Away Right of NFL Parties</u>.  Without limiting any other rights under this Settlement Agreement, the NFL Parties will have the absolute and unconditional right, in their sole good faith discretion, to unilaterally terminate and render null and void this Class Action Settlement and Settlement Agreement for any reason whatsoever following notice of Opt Outs and prior to the Fairness Hearing.  The NFL Parties must provide written election to terminate this Settlement Agreement to Class Counsel and the Court prior to the Fairness Hearing.

Section 16.2    <u>Party Termination Rights</u>

(a)    Class Counsel and Counsel for the NFL Parties each have the absolute and unconditional right, in their sole discretion, which discretion will be exercised in good faith, to terminate and render null and void this Class Action Settlement and Settlement Agreement if (i) the Court, or any appellate court(s), rejects, modifies, or denies approval of any portion of this Settlement Agreement that Class

Counsel or Counsel for the NFL Parties reasonably and in good faith determines is material, including, without limitation, the Releases or the definition of the Settlement Class, or (ii) the Court, or any appellate court(s), does not enter or completely affirm, or alters or expands, any portion of the proposed Preliminary Approval and Class Certification Order or the proposed Final Order and Judgment (Exhibit 4) that Class Counsel or Counsel for the NFL Parties reasonably and in good faith believes is material. Such written election to terminate this Settlement Agreement must be made to the Court within thirty (30) days of such Court order.

(b)     Class Counsel may not terminate and render null and void this Class Action Settlement and Settlement Agreement on the basis of the attorneys' fees award ordered, or modified, by the Court or any appellate court(s), as set forth in ARTICLE XXI.

Section 16.3    <u>Post-Termination Actions</u>

(a)     In the event this Settlement Agreement is terminated or becomes null and void, this Settlement Agreement will not be offered into evidence or used in this or in any other action in the Court, or in any other federal court, state court, arbitration, regulatory agency, or other tribunal or forum for any purpose, including, but not limited to, the existence, certification, or maintenance of any purported class.  In addition, in such event, this Settlement Agreement and all negotiations, proceedings, documents prepared and statements made in connection with this Settlement Agreement will be without prejudice to all Parties and will not be admissible into evidence and will not be deemed or construed to be an admission or concession by any of the Parties of any fact, matter, or proposition of law and will not be used in any manner for any purpose, and all Parties will stand in the same position as if this Settlement Agreement had not been negotiated, made, or filed with the Court.

(b)     In the event this Settlement Agreement is terminated or becomes null and void, the Parties will jointly move the Court to vacate the Preliminary Approval and Certification Order and any other orders certifying a Settlement Class provided.

(c)     If this Settlement Agreement is terminated or becomes null and void after notice has been given, the Parties will provide Court-approved notice of termination to the Settlement Class.  If a Party terminates the Settlement Agreement in accordance with Section 16.1 or Section 16.2, that Party will pay the cost of notice of termination.

(d)     In the event this Settlement Agreement is terminated or becomes null and void, any unspent and uncommitted monies in the Funds will revert to the NFL Parties within ten (10) days, and all data provided by the NFL Parties, Class Counsel and/or Settlement Class Members shall be returned or destroyed.

## ARTICLE XVII
## Treatment of Confidential Information

Section 17.1    Confidentiality of Information Relating to the Settlement Agreement.    The Parties will treat all confidential or proprietary information shared hereunder, or in connection herewith, either prior to, on or after the Settlement Date, and any and all prior or subsequent drafts, representations, negotiations, conversations, correspondence, understandings, analyses, proposals, term sheets, and letters, whether oral or written, of any kind or nature, with respect to the subject matter hereof ("Confidential Information") in conformity with strict confidence and will not disclose Confidential Information to any non-Party without the prior written consent of the Party that shared the Confidential Information, except:  (i) as required by applicable law, regulation, or by order or request of a court of competent jurisdiction, regulator, or self-regulatory organization (including subpoena or document request), provided that the Party that shared the Confidential Information is given prompt written notice thereof and, to the extent practicable, an opportunity to seek a protective order or other confidential treatment thereof, provided further that the Party subject to such requirement or request cooperates fully with the Party that shared the Confidential Information in connection therewith, and only such Confidential Information is disclosed as is legally required to be disclosed in the opinion of legal counsel for the disclosing Party; (ii) under legal (including contractual) or ethical obligations of confidentiality, on an as-needed and confidential basis to such Party's present and future accountants, counsel, insurers, or reinsurers; or (iii) with regard to any information that is already publicly known through no fault of such Party or its Affiliates.  This Settlement Agreement, all exhibits hereto, any other documents filed in connection with the Class Action Settlement, and any information disclosed through a public court proceeding shall not be deemed Confidential Information.

Section 17.2    Confidentiality of Retired NFL Football Player Information

(a)    All information relating to a Retired NFL Football Player that is disclosed to or obtained by the Special Master, BAP Administrator, Claims Administrator, Lien Resolution Administrator, designated Qualified BAP Providers, the NFL Parties, an Appeals Advisory Panel member, an Appeals Advisory Panel Consultant, or the Court, may be used only by the Special Master, BAP Administrator, Claims Administrator, Lien Resolution Administrator, designated Qualified BAP Providers, the NFL Parties, an Appeals Advisory Panel member, an Appeals Advisory Panel Consultant, or the Court for the administration of this Class Action Settlement according to the Settlement Agreement terms and conditions.  All such information relating to a Retired NFL Football Player will be treated as Confidential Information hereunder, will be subject to the terms of Section 17.1 hereof, and, where applicable, will be treated as Protected Health Information subject to HIPAA and other applicable privacy laws.

**ARTICLE XVIII**
**Releases and Covenant Not to Sue**

Section 18.1     Releases

        (a)    In consideration of the benefits described and the agreement and covenants contained in this Settlement Agreement, and by operation of the Final Order and Judgment, the Settlement Class, the Class and Subclass Representatives, and each Settlement Class Member, on his or her own behalf and on behalf of his or her respective predecessors, successors, assigns, assignors, representatives, attorneys, agents, trustees, insurers, heirs, next of kin, estates, beneficiaries, executors, administrators, and any natural, legal, or juridical person or entity to the extent he, she, or it is entitled to assert any claim on behalf of any Settlement Class Member (the "Releasors"), hereby waive and release, forever discharge and hold harmless the Released Parties, and each of them, of and from any and all past, present and future claims, counterclaims, actions, rights or causes of action, liabilities, suits, demands, damages, losses, payments, judgments, debts, dues, sums of money, costs and expenses (including, without limitation, attorneys' fees and costs), accounts, reckonings, bills, covenants, contracts, controversies, agreements, obligations, or promises, in law or in equity, contingent or non-contingent, known or unknown, suspected or unsuspected, foreseen or unforeseen, matured or unmatured, accrued or unaccrued, liquidated or unliquidated, whether direct, representative, class or individual in nature, in any forum that the Releasors, and each of them, had, has, or may have in the future arising out of, in any way relating to or in connection with the allegations, transactions, facts, matters, occurrences, representations or omissions involved, set forth, referred to or relating to the Class Action Complaint and/or Related Lawsuits ("Claims"), including, without limitation, Claims:

        (i)    that were, are or could have been asserted in the Class Action Complaint or any other Related Lawsuit; and/or

        (ii)    arising out of, or relating to, head, brain and/or cognitive injury, as well as any injuries arising out of, or relating to, concussions and/or subconcussive events (including, without limitation, prevention, diagnosis and treatment thereof) of whatever cause and its damages (whether short-term, long-term or death), whenever arising, including, without limitation, Claims for personal or bodily injury, including disease, mental or physical pain or suffering, emotional or mental harm, or anguish or loss of enjoyment of life (and exacerbation and/or progression of personal or bodily injury), or wrongful death and/or survival actions as a result of such injury and/or exacerbation and/or progression thereof; and/or

        (iii)    arising out of, or relating to, neurocognitive deficits or impairment, or cognitive disorders, of whatever kind or degree, including, without limitation, mild cognitive impairment, moderate cognitive impairment, dementia, Alzheimer's Disease, Parkinson's Disease, and ALS; and/or

        (iv)    arising out of, or relating to, CTE; and/or

(v)    arising out of, or relating to, loss of support, services, consortium, companionship, society, or affection, or damage to familial relations (including disease, mental or physical pain or suffering, emotional or mental harm, or anguish or loss of enjoyment of life); and/or

(vi)    arising out of, or relating to, increased risk, possibility, or fear of suffering in the future from any head, brain and/or cognitive injury, as well as any injuries arising out of, or relating to, concussions and/or subconcussive events (including, without limitation, prevention, diagnosis and treatment thereof), and including disease, mental or physical pain or suffering, emotional or mental harm, or anguish or loss of enjoyment of life); and/or

(vii)    arising out of, or relating to, medical screening and medical monitoring for undeveloped, unmanifested, and/or undiagnosed head, brain and/or cognitive injury, as well as any injuries arising out of, or relating to, concussions and/or subconcussive events (including, without limitation, prevention, diagnosis and treatment thereof); and/or

(viii)    premised on any purported or alleged breach of any Collective Bargaining Agreement related to the issues in the Class Action Complaint and/or Related Lawsuits, except claims for workers' compensation and claims alleging entitlement to NFL CBA Medical and Disability Benefits.

(b)    In consideration of the benefits described and the agreement and covenants contained in this Settlement Agreement, and by operation of the Final Order and Judgment, the Releasors do hereby release, forever discharge and hold harmless the Released Parties from any and all Claims, including unknown Claims, arising from, relating to, or resulting from the reporting, transmittal of information, or communications between or among the NFL Parties, Counsel for the NFL Parties, the Special Master, Claims Administrator, Lien Resolution Administrator, any Governmental Payor, and/or Medicare Part C or Part D Program sponsor regarding any claim for benefits under this Settlement Agreement, including any consequences in the event that this Settlement Agreement impacts, limits, or precludes any Settlement Class Member's right to benefits under Social Security or from any Governmental Payor or Medicare Part C or Part D Program sponsor.

(c)    In consideration of the benefits described and the agreement and covenants contained in this Settlement Agreement, and by operation of the Final Order and Judgment, the Releasors do hereby release, forever discharge and hold harmless the Released Parties from any and all Claims, including unknown Claims, pursuant to the MSP Laws, or other similar causes of action, arising from, relating to, or resulting from the failure or alleged failure of any of the Released Parties to provide for a primary payment or appropriate reimbursement to a Governmental Payor or Medicare Part C or Part D Program sponsor with a Lien in connection with claims for medical items, services, and/or prescription drugs provided in connection with compensation or benefits claimed or received by a Settlement Class Member pursuant to this Settlement Agreement.

(d)      In consideration of the benefits described and the agreement and covenants contained in this Settlement Agreement, and by operation of the Final Order and Judgment, the Releasors do hereby release, forever discharge and hold harmless the Released Parties, the Special Master, BAP Administrator, Claims Administrator, and their respective officers, directors, and employees from any and all Claims, including unknown Claims, arising from, relating to, or resulting from their participation, if any, in the BAP, including, but not limited to, Claims for negligence, medical malpractice, wrongful or delayed diagnosis, personal injury, bodily injury (including disease, trauma, mental or physical pain or suffering, emotional or mental harm, or anguish or loss of enjoyment of life), or death arising from, relating to, or resulting from such participation.

Section 18.2    Release of Unknown Claims.    In connection with the releases in Section 18.1, the Class and Subclass Representatives, all Settlement Class Members, and the Settlement Class acknowledge that they are aware that they may hereafter discover Claims now unknown or unsuspected, or facts in addition to or different from those which they now know or believe to be true, with respect to actions or matters released herein. Class and Subclass Representatives, all Settlement Class Members, and the Settlement Class explicitly took unknown or unsuspected claims into account in entering into the Settlement Agreement and it is the intention of the Parties fully, finally and forever to settle and release all Claims as provided in Section 18.1 with respect to all such matters.

Section 18.3    Scope of Releases

(a)      Each Party acknowledges that it has been informed of Section 1542 of the Civil Code of the State of California (and similar statutes) by its counsel and that it does hereby expressly waive and relinquish all rights and benefits, if any, which it, he or she has or may have under said section (and similar sections) which reads as follows:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

(b)      The Parties acknowledge that the foregoing waiver of the provisions of Section 1542 of the California Civil Code and all similar provisions of the statutory or common law of any other state, territory, or other jurisdiction was separately bargained for and that the Parties would not have entered into this Settlement Agreement unless it included a broad release of unknown claims relating to the matters released herein.

(c)      The Releasors intend to be legally bound by the Releases.

(d)    The Releases are not intended to prevent the NFL Parties from exercising their rights of contribution, subrogation, or indemnity under any law.

(e)    Nothing in the Releases will preclude any action to enforce the terms of this Settlement Agreement in the Court.

(f)    The Parties represent and warrant that no promise or inducement has been offered or made for the Releases contained in this Article except as set forth in this Settlement Agreement and that the Releases are executed without reliance on any statements or any representations not contained in this Settlement Agreement.

Section 18.4    <u>Covenant Not to Sue</u>.  From and after the Effective Date, for the consideration provided for herein and by operation of the Final Order and Judgment, the Class and Subclass Representatives, each Settlement Class Member, and the Settlement Class, on behalf of the Releasors, and each of them, covenant, promise, and agree that they will not, at any time, continue to prosecute, commence, file, initiate, institute, cause to be instituted, assist in instituting, or permit to be instituted on their, his, her, or its behalf, or on behalf of any other individual or entity, any proceeding:  (a) alleging or asserting any of his or her respective Released Claims against the Released Parties in any federal court, state court, arbitration, regulatory agency, or other tribunal or forum, including, without limitation, the Claims set forth in Section 18.1; or (b) challenging the validity of the Releases.  To the extent any such proceeding exists in any court, tribunal or other forum as of the Effective Date, the Releasors covenant, promise and agree to withdraw, and seek a dismissal with prejudice of, such proceeding forthwith.

Section 18.5    <u>No Release for Insurance Coverage</u>.

(a)    Notwithstanding anything herein to the contrary, this Settlement Agreement is not intended to and does not release any Governmental Payor or Medicare Part C or Part D Program sponsor from its or their obligation to provide any health insurance coverage, major medical insurance coverage, or disability insurance coverage to a Settlement Class Member, or from any claims, demands, rights, or causes of action of any kind that a Settlement Class Member has or hereafter may have with respect to such individuals or entities.

(b)    Notwithstanding anything herein to the contrary, this Settlement Agreement is not intended to and does not effect a release of any rights or obligations that any insurer has under or in relation to any contract or policy of insurance to any named insured, insured, additional insured, or other insured person or entity thereunder, including those persons or entities referred to in Section 2.1(bbbb)(i)-(ii).

Section 18.6    <u>No Release for Claims for Workers' Compensation and NFL CBA Medical and Disability Benefits.</u>   Nothing contained in this Settlement Agreement, including the Release and Covenant Not to Sue provisions in this ARTICLE XVIII, affects the rights of Settlement Class Members to pursue claims for workers' compensation and claims alleging entitlement to NFL CBA Medical and Disability Benefits.  For the avoidance of any doubt, this Settlement Agreement does not alter the

showing that Settlement Class Members must demonstrate to pursue successful claims for workers' compensation and/or successful claims alleging entitlement to NFL CBA Medical and Disability Benefits, nor does it alter the defenses to such claims available to Released Parties except as set forth in ARTICLE XXIX.

## ARTICLE XIX
## Bar Order

Section 19.1    <u>Bar Order</u>.  As a condition to the Settlement, the Parties agree to move the Court for a bar order, as part of the Final Order and Judgment (substantially in the form of Exhibit 4), as set forth in Section 20.1.

Section 19.2    <u>Judgment Reduction</u>.  With respect to any litigation by the Releasors against Riddell, the Releasors further agree that if a verdict in their favor results in a verdict or judgment for contribution or indemnity against the Released Parties, the Releasors will not enforce their right to collect this verdict or judgment to the extent that such enforcement creates liability against the Released Parties.  In such event, the Releasors agree that they will reduce their claim or agree to a judgment reduction or satisfy the verdict or judgment to the extent necessary to eliminate the claim of liability against the Released Parties or any Other Party claiming contribution or indemnity.

## ARTICLE XX
## Final Order and Judgment and Dismissal With Prejudice

Section 20.1    The Parties will jointly seek a Final Order and Judgment from the Court, substantially in the form of Exhibit 4, approval and entry of which shall be a condition of this Settlement Agreement, that:

(a)    Approves the Class Action Settlement in its entirety pursuant to Fed. R. Civ. P. 23(e) as fair, reasonable, and adequate;

(b)    Finds that this Settlement Agreement, with respect to each Subclass, is fair, reasonable, and adequate;

(c)    Confirms the certification of the Settlement Class for settlement purposes only;

(d)    Confirms the appointments of the Class and Subclass Representatives;

(e)    Confirms the appointments of Co-Lead Class Counsel, Class Counsel and Subclass Counsel;

(f)    Finds that the Settlement Class Notice satisfied the requirements set forth in Fed. R. Civ. P. 23(c)(2)(B);

(g)    Permanently bars, enjoins and restrains the Releasors (and each of them) from commencing, filing, initiating, prosecuting, asserting, and/or maintaining any and all Released Claims against any Released Party;

(h)    Dismisses with prejudice the Class Action Complaint, without further costs, including claims for interest, penalties, costs and attorneys' fees, except that the motion for an award of attorneys' fees and reasonable costs, as set forth in in Section 21.1, will be made at an appropriate time to be determined by the Court;

(i)    Orders the dismissal with prejudice, and without further costs, including claims for interest, penalties, costs, and attorneys' fees, of all Related Lawsuits pending in the Court as to the Released Parties, thereby effectuating in part the Releases;

(j)    Orders all Releasors with Related Lawsuits pending in any federal court, state court, arbitration, regulatory agency, or other tribunal or forum, other than the Court, promptly to dismiss with prejudice, and without further costs, including claims for interest, penalties, costs, and attorneys' fees, all such Related Lawsuits as to the Released Parties, thereby effectuating in part the Releases;

(k)    Permanently bars and enjoins the commencement, assertion, and/or prosecution of any claim for contribution and/or indemnity in the Court, in any other federal court, state court, arbitration, regulatory agency, or other tribunal or forum between the Released Parties and all alleged joint tortfeasors, other than Riddell, together with an appropriate judgment reduction provision;

(l)    Confirms the appointment of the Special Master, Garretson Group as the BAP Administrator, BrownGreer as the Claims Administrator, Garretson Group as the Liens Resolution Administrator, and Citibank, N.A. as the Trustee, and confirms that the Court retains continuing jurisdiction over those appointed;

(m)    Confirms that the Court retains continuing jurisdiction over the "qualified settlement funds," as defined under §1.468B-1 of the Treasury Regulations promulgated under Sections 461(h) and 468B of the Internal Revenue Code of 1986, as amended, created under the Settlement Agreement; and

(n)    Expressly incorporates the terms of this Settlement Agreement and provides that the Court retains continuing and exclusive jurisdiction over the Parties, the Settlement Class Members and this Settlement Agreement, to interpret, implement, administer and enforce the Settlement Agreement in accordance with its terms.

## ARTICLE XXI
### Attorneys' Fees

Section 21.1    Award.    Separately and in addition to the NFL Parties' payment of the monies set forth in ARTICLE XXIII and any consideration received by Settlement Class Members under this Settlement, the NFL Parties shall pay class

attorneys' fees and reasonable costs. Class Counsel shall be entitled, at an appropriate time to be determined by the Court, to petition the Court on behalf of all entitled attorneys for an award of class attorneys' fees and reasonable costs. Provided that said petition does not seek an award of class attorneys' fees and reasonable costs exceeding One Hundred and Twelve Million, Five Hundred Thousand United States dollars (U.S. $112,500,000), the NFL Parties agree not to oppose or object to the petition. Ultimately, the award of class attorneys' fees and reasonable costs to be paid by the NFL Parties is subject to the approval of the Court. For the avoidance of any doubt, the NFL Parties' obligation to pay class attorneys' fees and reasonable costs is limited to those attorneys' fees and reasonable costs ordered by the Court as a result of the initial petition by Class Counsel. The NFL Parties shall not be responsible for the payment of any further attorneys' fees and/or costs for the term of this Agreement. After the Effective Date, Co-Lead Class Counsel may petition the Court to set aside up to five percent (5%) of each Monetary Award and Derivative Claimant Award to facilitate the Settlement program and related efforts of Class Counsel. These set-aside monies shall be held in a separate fund overseen by the Court. Any future petition for a set-aside will describe: (i) the proposed amount; (ii) how the money will be used; and (iii) any other relevant information (for example, the assurance that any "set-aside" from a Monetary Award or Derivative Claimant Award for a Settlement Class Member represented by his/her individual counsel will reduce the attorney's fee payable to that counsel by the amount of the "set-aside"). No money will be held back or set aside from any Monetary Award or Derivative Claimant Award without Court approval. The NFL Parties believe that any such proposed set aside application is a matter strictly between and among Settlement Class Members, Class Counsel, and individual counsel for Settlement Class Members. The NFL Parties therefore take no position on the proposed set aside and will take no position on the proposed set aside in the event such an application is made.

Section 21.2    Payment.  No later than sixty (60) days after the Effective Date, the NFL Parties will pay, or cause to be paid, a total of One Hundred and Twelve Million, Five Hundred Thousand United States dollars (U.S. $112,500,000) into the Attorneys' Fees Qualified Settlement Fund, as set forth in Section 23.7, to be held in escrow until such payment shall be made as directed by the Court.

**ARTICLE XXII**
**Enforceability of Settlement Agreement and Dismissal of Claims**

Section 22.1    It is a condition of this Settlement Agreement that the Court approve and enter the Preliminary Approval and Class Certification Order and Final Order and Judgment substantially in the form of Exhibit 4.

Section 22.2    The Parties agree that this Class Action Settlement is not final and enforceable until the Effective Date, except that upon entry of the Preliminary Approval and Class Certification Order, the NFL Parties will be obligated to make the Settlement Class Notice Payment as set forth in Sections 14.1, 23.1 and 23.3.

Section 22.3    From and after the Effective Date, for the consideration provided for herein and by operation of the Final Order and Judgment, the Court will

dismiss with prejudice all Released Claims by any and all Releasors against any and all Released Parties pending in the Court, and any and all Releasors with Related Lawsuits pending in any federal court, state court, arbitration, regulatory agency, or other tribunal or forum, other than the Court, will dismiss with prejudice the Related Lawsuits as to the Released Parties, including any related appeals.

Section 22.4    From and after the Effective Date, for the consideration provided for herein and by operation of the Final Order and Judgment, the Parties agree that each and every Releasor will be permanently barred and enjoined from commencing, filing, initiating, instituting, prosecuting, and/or maintaining any judicial, arbitral, or regulatory action against any Released Party with respect to any and all Released Claims.

Section 22.5    From and after the Effective Date, for the consideration provided for herein and by operation of the Final Order and Judgment, this Settlement Agreement will be the exclusive remedy for any and all Released Claims by or on behalf of any and all Releasors against any and all Released Parties, and no Releasor will recover, directly or indirectly, any sums from any Released Parties for Released Claims other than those received for the Released Claims under the terms of this Settlement Agreement, if any.

Section 22.6    From and after the Effective Date, if any Releasor, in violation of Section 18.4, commences, files, initiates, or institutes any new action or other proceeding for any Released Claims against any Released Parties, or continues to prosecute any pending claims, or challenges the validity of the Releases, in any federal court, state court, arbitration, regulatory agency, or other tribunal or forum, such action or other proceeding will be dismissed with prejudice and at such Releasor's cost; provided, however, before any costs may be assessed, counsel for such Releasor or, if not represented, such Releasor, will be given reasonable notice and an opportunity voluntarily to dismiss such new action or proceeding with prejudice. Furthermore, if the NFL Parties or any other Released Party brings any legal action before the Court to enforce its rights under this Settlement Agreement against a Settlement Class Member and prevails in such action, that Released Party will be entitled to recover any and all related costs and expenses (including attorneys' fees) from any Releasor found to be in violation or breach of his or her obligations under this Article.

**ARTICLE XXIII**
**NFL Payment Obligations**

Section 23.1    <u>Funding Amount</u>.   In consideration of the Releases and Covenant Not to Sue set forth in ARTICLE XVIII, and the dismissal with prejudice of the Class Action Complaint and the Related Lawsuits, and subject to the terms and conditions of this Settlement Agreement, the NFL Parties will pay in accordance with the funding terms set forth herein:

(a)    <u>Monetary Award Fund Amount</u>.   The amount of money sufficient to make all payments set forth in Section 23.3(b) for sixty-five (65) years from the Effective Date.   For the avoidance of any doubt, the NFL Parties shall have no

payment obligations under this Settlement Agreement after the end of the Monetary Award Fund sixty-five (65) year term;

(b)    BAP Fund Amount.    The amount of money, up to a maximum of Seventy-Five Million United States dollars (U.S. $75,000,000), sufficient to make all payments set forth in Section 23.3(d), except that every qualified Retired NFL Football Player, as set forth in Section 5.1, is entitled to one baseline assessment examination. For the avoidance of any doubt, if the Seventy-Five Million United States dollars (U.S. $75,000,000) is insufficient to cover the costs of one baseline assessment examination for every qualified Retired NFL Football Player electing to receive an examination by the deadline set forth in Section 5.3, the NFL Parties agree to pay the amount of money necessary to provide the examinations in accordance with this Settlement Agreement;

(c)    Education Fund Amount.    Ten Million United States dollars (U.S. $10,000,000), which monies will be used exclusively to fund the Education Fund;

(d)    Settlement Class Notice Amount.    Four Million United States dollars (U.S. $4,000,000), to pay for Settlement Class Notice and related expenses; and

(e)    Annual Compensation of the Special Master.    The annual compensation of the Special Master appointed by the Court, whose total annual compensation shall not exceed Two Hundred Thousand United States dollars (U.S. $200,000).

(f)    Notwithstanding any provision of the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119, amended by the Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, 124 Stat. 1029, or any subsequent legislation mandating or subsidizing health insurance coverage, the NFL Parties will pay, or cause to be paid, in full the amounts set forth above in Section 23.1(a)-(e), and will not bill any Governmental Payor or Medicare Part C or Part D Program for any such costs.

Section 23.2    Exclusive Payments.    For the avoidance of any doubt, other than as set forth in Section 21.2, the NFL Parties will have no additional payment obligations in connection with this Settlement Agreement.

Section 23.3    Funding Terms.    The NFL Parties' payment obligations will be funded as follows:

(a)    Education Fund.    No later than thirty (30) days after the Effective Date, the NFL Parties will pay, or cause to be paid, a total of Ten Million United States dollars (U.S. $10,000,000) into the Settlement Trust Account, as set forth in Section 23.5, for transfer by the Trustee into the Education Fund.

(b)      Monetary Award Fund.  The NFL Parties will pay, or cause to be paid six initial monthly installments of Twenty Million United States dollars (U.S. $20,000,000) each, into the Settlement Trust Account for transfer by the Trustee into the Monetary Award Fund, beginning no later than thirty (30) days after the Effective Date. If additional funds are necessary in any given month during this six month period, they shall be requested and paid in accordance with the procedures set forth in section 23.3(b)(i)-(iv).  The Claims Administrator shall provide in writing to the NFL Parties and Co-Lead Class Counsel a monthly report for this initial six month period that includes an accounting of the items set forth in Section 23.3(b)(i)(1)-(5).

(i)      Beginning no later than thirty (30) days after the Effective Date,  on or before the 10th day of each month, the Claims Administrator shall provide in writing to the NFL Parties and Co-Lead Class Counsel a monthly funding request identifying the monetary amount necessary to pay all final and accrued Monetary Awards, Derivative Claimant Awards and the costs and expenses paid out of the Monetary Award Fund, as set forth in Section 23.5(d)(ii), and any additional amount necessary to maintain the Monetary Award Fund targeted reserve, as set forth in Section 23.3(b)(v), after all final and accrued Monetary Awards, Derivative Claimant Awards and costs and expenses are paid.  This monthly funding request shall provide, in addition to the total monetary amount requested, an accounting of:

(1)      The name of each Settlement Class Member with a final and accrued Monetary Awards or Derivative Claimant Award since the last monthly funding request, identification of his/her counsel, identification of the Award as a Monetary Award or Derivative Claimant Award, the Award amount, and identification of any "holdback" amount deducted from the Award as set forth in Sections 9.1(c)(ii) and 9.2(b)(ii), 11.3(g) and 11.3(h);

(2)      The amount of costs and expenses related to the appeals process, as set forth in ARTICLE IX, since the last monthly funding request;

(3)      The amount of costs and expenses of claims administration, as set forth in ARTICLE X, since the last monthly funding request;

(4)      The amount of costs and expenses of the Lien identification and resolution process, as set forth in ARTICLE XI, since the last monthly funding request;

(5)      The amount necessary to maintain the Monetary Award Fund targeted reserve, as set forth in Section 23.3(b)(v), after all final and accrued Monetary Awards, Derivative Claimant Awards, and costs and expenses are paid.

(ii)      Subject to the objection process set forth in Section 23.3(b)(iii), the NFL Parties will pay, or cause to be paid, within thirty (30) days of receipt of the written monthly funding request, a payment of the total amount requested

into the Settlement Trust Account for transfer by the Trustee into the Monetary Award Fund.

(iii)    Within ten (10) days after receipt of the written monthly funding request, the NFL Parties and Co-Lead Class Counsel shall each notify the Claims Administrator in writing of any objection to any aspect of the funding request. If an objection is timely made, the NFL Parties, will pay, or cause to be paid, within thirty (30) days of such written monthly funding request, a payment of the undisputed portion of the total amount requested into the Settlement Trust Account for transfer by the Trustee into the Monetary Award Fund. The NFL Parties, Co-Lead Class Counsel and the Claims Administrator shall use their best efforts to resolve any objections within fifteen (15) days after receipt of the written monthly funding request. If the NFL Parties, Co-Lead Class Counsel and the Claims Administrator are unable to resolve the objection within twenty (20) days after receipt of the written monthly funding request, the objecting party shall present the matter in writing to the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof).

(1)    After an agreement on the resolution of an objection, or a decision by the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof) resolving an objection by requiring the NFL Parties to pay, or cause to be paid, additional amounts beyond the undisputed portion of the monthly funding request, the NFL Parties will pay, or cause to be paid, the additional amounts beyond the undisputed portion of the monthly funding request within the longer of thirty (30) days of receiving the written monthly funding request or ten (10) days after resolution of the objection.

(iv)    Within ten (10) days after transfer of funds into the Monetary Award Fund pursuant to a monthly funding request or decision of the Special Master or Court, as set forth in Section 23.3(b)(iii)(1), the Claims Administrator shall cause payment to be issued on all applicable final and accrued Monetary Awards, Derivative Claimant Awards and costs and expenses paid out of the Monetary Award Fund, as set forth in Section 23.5(d)(ii).

(v)    The Monetary Award Fund shall maintain a targeted reserve, as set forth in Section 23.3(b)(v)(1), beyond the monetary amounts necessary to pay written monthly funding requests, which reserve may be used to pay any costs and expenses that must be satisfied pursuant to a contractual or other legal obligation before receipt of the monthly funding request amount and that are properly paid out of the Monetary Award Fund, as set forth in Section 23.5(d)(ii). The Claims Administrator shall report promptly any such payments from the Monetary Award Fund to the NFL Parties and Co-Lead Class Counsel. Either Co-Lead Class Counsel or Counsel for the NFL Parties may challenge the appropriateness of such payments, in which case the Court will determine (or may, in its discretion, refer the challenge to the Special Master to determine) the appropriateness of such payments. If the Court or Special Master, as applicable, determines that any such payment constituted willful misconduct, the Court or Special Master may, in its discretion, deduct that amount from the compensation of the Claims Administrator.

(1)    The Monetary Award Fund shall maintain a targeted reserve of: (i) Ten Million United States dollars (U.S. $10,000,000) during the first through tenth years of the Monetary Award Fund; (ii) Five Million United States dollars (U.S. $5,000,000) during the eleventh through fiftieth years of the Monetary Award Fund; (iii) One Million United States dollars ($1,000,000) during the fifty-first through sixtieth years of the Monetary Award Fund; and (iv) Two Hundred and Fifty Thousand United States dollars (U.S. $250,000) during the sixty-first through sixty-fifth years of the Monetary Award Fund.

(c)    During the eleventh, fifty-first, and sixty-first years of the Monetary Award Fund, monthly funding requests shall first be satisfied by the money constituting the balance in the Monetary Award Fund until the revised targeted reserve, as set forth in Section 23.3(b)(v)(1), is achieved. For example, in the eleventh year of the Monetary Award Fund, all monthly funding requests shall be paid from the Monetary Award Fund balance until the reserve is reduced to Five Million United States dollars ($5,000,000). The process for the monthly funding request shall otherwise remain as set forth in Section 23.3(b).

(d)    <u>BAP Fund.</u>   No later than thirty (30) days after the Effective Date, the NFL Parties will pay, or cause to be paid, a total of Thirty-Five Million United States dollars (U.S. $35,000,000) into the Settlement Trust Account for transfer by the Trustee into the BAP Fund. If at any point following the Effective Date until the expiration the five-year period for the provision of BAP Supplemental Benefits, as set forth in Sections 5.5 and 5.11, the balance of the BAP Fund falls below Ten Million United States dollars (U.S. $10,000,000), the NFL Parties, upon written notice from the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof), who shall act upon application of the BAP Administrator, will pay, or cause to be paid, within thirty (30) days of such written notice, additional payments into the Settlement Trust Account for transfer by the Trustee into the BAP Fund in order to maintain a balance of no less than Ten Million United States dollars (U.S. $10,000,000), and no more than Eleven Million United States dollars (U.S. $11,000,000). Under no circumstances will the aggregate transfers to the BAP Fund exceed Seventy-Five Million United States dollars (U.S. $75,000,000) in total, except if necessary to provide every qualified Retired NFL Football Player with one baseline assessment examination as provided for in Sections 5.1 and 23.1(b). Any funds remaining in the BAP Fund at the conclusion of the five-year period for the provision of BAP Supplemental Benefits, as set forth in Sections 5.5 and 5.11, shall be transferred to the Settlement Trust for transfer by the Trustee into the Monetary Award Fund.

(e)    <u>Class Notice Costs.</u>   No later than five (5) days after the date of the Preliminary Approval and Class Certification Order, the NFL Parties will pay, or cause to be paid, a total of Four Million United States dollars (U.S. $4,000,000) to Co-Lead Class Counsel for the Settlement Class Notice and related expenses, as set forth in Section 14.1.

(f)    <u>Prepayment Right.</u>  The NFL Parties will have the right (but not the obligation) to prepay, or cause to be prepaid, any of their payment

obligations to the Funds under the Settlement Agreement. In connection with any such prepayment, the NFL Parties will designate in writing the payment obligation that is being prepaid and how such prepayment should affect the NFL Parties' remaining payment obligations (*i.e.*, whether the amount prepaid should be credited against the next payment obligation or to one or more subsequent payment obligations or a combination thereof).

Section 23.4    No Interest or Inflation Adjustment. For the avoidance of any doubt, the payments set forth in Section 23.1 will not be subject to any interest obligation or inflation adjustment.

Section 23.5    Settlement Trust

(a)    Promptly following the Effective Date, Co-Lead Class Counsel and Counsel for the NFL Parties will file a motion seeking the creation of a Settlement Trust under Delaware law and the appointment of the Trustee. Co-Lead Class Counsel and Counsel for the NFL Parties will file a proposed Settlement Trust Agreement with the Court.

(b)    Co-Lead Class Counsel and Counsel for the NFL Parties will jointly recommend Citibank, N.A. as the Trustee, subject to the approval of the Court. The Trustee may be replaced by joint motion made by Co-Lead Class Counsel and Counsel for the NFL Parties, and granted by the Court. If the Trustee resigns, dies, is replaced, or is otherwise unable to continue employment in that position, Co-Lead Class Counsel and Counsel for the NFL Parties will agree to and jointly recommend a new proposed Trustee for appointment by the Court.

(c)    Upon Court approval of the proposed Settlement Trust Agreement, Co-Lead Class Counsel, the NFL Parties, the Trustee and the Special Master, will execute the Settlement Trust Agreement approved by the Court, thereby creating the Settlement Trust. The Settlement Trust will be structured and operated in a manner so that it qualifies as a "qualified settlement fund" under §1.468B-1 of the Treasury Regulations promulgated under Sections 461(h) and 468B of the Internal Revenue Code of 1986, as amended.

(d)    The Settlement Trust will be composed of the Funds. The Trustee will establish the Settlement Trust Account, into which the NFL Parties will make payments as required by this Settlement Agreement. The Trustee will also establish three separate funds (the "Funds"), into which the Trustee will transfer funds at the direction of the Special Master (or the Claims Administrator after expiration of the term of the Special Master and extension(s) thereof) and pursuant to the terms of this Settlement Agreement and on which the Special Master (or the Claims Administrator after expiration of the term of the Special Master and any extension(s) thereof) will have signatory authority. These Funds will constitute a single qualified settlement fund:

(i)    The BAP Fund, which will be used to make payments for the BAP, as set forth in ARTICLE V.

(ii)     The Monetary Award Fund, which will be used to make payments for:  (a) all Monetary Awards and Derivative Claimant Awards, as set forth in ARTICLE VI and ARTICLE VII; (b) certain costs and expenses of the appeals process, as set forth in ARTICLE IX; (c) costs and expenses of claims administration, as set forth in ARTICLE X; and (d) certain costs and expenses of the Lien identification and resolution process, as set forth in ARTICLE XI;

(iii)     The Education Fund, which will be used exclusively to make payments to support education programs and initiatives, as set forth in ARTICLE XII; and

(iv)     The Settlement Trust Account, which will be used solely to transfer funds into the Funds described above in Section 23.5(d)(i)-(iii).

(e)     The Settlement Trust will be managed by the Trustee as provided in the Settlement Trust Agreement, and both the Settlement Trust and Trustee will be subject to the continuing jurisdiction and supervision of the Court.  Each of the Funds will be maintained in separate bank accounts at one or more federally insured depository institutions approved by Co-Lead Class Counsel and Counsel for the NFL Parties.  The Trustee will have the authority to make payments from the Settlement Trust Account into the other Funds at the direction of the Special Master (or the Claims Administrator after expiration of the term of the Special Master and any extension(s) thereof) and to make disbursements from the Funds at the direction of the Special Master (or the Claims Administrator at the direction of Co-Lead Class Counsel and Counsel for the NFL Parties, after expiration of the term of the Special Master and any extension(s) thereof), and consistent with the terms of this Settlement Agreement and the Settlement Trust Agreement.

(f)     The Trustee will be responsible for making any necessary tax filings and payments of taxes, estimated taxes, and associated interest and penalties, if any, by the Settlement Trust and responding to any questions from, or audits regarding such taxes by, the Internal Revenue Service or any state or local tax authority. The Trustee also will be responsible for complying with all tax information reporting and withholding requirements with respect to payments made by the Settlement Trust, as well as paying any associated interest and penalties. Any such taxes, interest, and penalty payments will be paid by the Trustee from the Monetary Award Fund.

Section 23.6   Funds Investment

(a)     To the extent funds are available for investment, amounts deposited in each of the Funds will be invested conservatively in a manner designed to assure timely availability of funds, protection of principal and avoidance of concentration risk.

(b)     Any earnings attributable to the BAP Fund, the Monetary Award Fund, and/or the Education Fund will be retained in the respective Fund.

Section 23.7 <u>Attorneys' Fees Qualified Settlement Fund</u>.  Unless the Court directs otherwise, a separate fund (intended to qualify as a "qualified settlement fund" under §1.468B-1 of the Treasury Regulations promulgated under Sections 461(h) and 468B of the Internal Revenue Code of 1986, as amended) will be established out of which attorneys' fees will be paid pursuant to order of the Court, as set forth in ARTICLE XXI.  This separate qualified settlement fund will be established pursuant to order of the Court, and will operate under Court supervision and control.  This separate qualified settlement fund will be separate from the qualified settlement fund described in Section 23.5(c) and any of the Funds described therein, and will not be administered by the Trustee.  The Court will determine the form and manner of administering this fund, in which the NFL Parties will have no reversionary interest.

Section 23.8 <u>Trustee Satisfaction of Monetary Obligations</u>.  Wherever in this Settlement Agreement the Special Master, BAP Administrator, Claims Administrator, or Lien Resolution Administrator is authorized or directed, as the context may reflect, to pay, disburse, reimburse, hold, waive, or satisfy any monetary obligation provided for or recognized under any of the terms of this Settlement Agreement, the Special Master, BAP Administrator, Claims Administrator, or Lien Resolution Administrator may comply with such authorization or direction by directing the Trustee to, as appropriate, pay, disburse, reimburse, hold, waive, or satisfy any such monetary obligation.

## ARTICLE XXIV
## Denial of Wrongdoing, No Admission of Liability

Section 24.1  This Settlement Agreement, whether or not the Class Action Settlement becomes effective, is for settlement purposes only and is to be construed solely as a reflection of the Parties' desire to facilitate a resolution of the Class Action Complaint and of the Released Claims and Related Lawsuits.  The NFL Parties expressly deny that they, or the other Released Parties, have violated any duty to, breached any obligation to, committed any fraud on, or otherwise engaged in any wrongdoing with respect to, the Class and Subclass Representatives, the Settlement Class, any Settlement Class Member, or any Opt Out, and expressly deny the allegations asserted in the Class Action Complaint and Related Lawsuits, and deny any and all liability related thereto.  Neither this Settlement Agreement nor any actions undertaken by the NFL Parties or the Released Parties in the negotiation, execution, or satisfaction of this Settlement Agreement will constitute, or be construed as, an admission of any liability or wrongdoing, or recognition of the validity of any claim made by the Class and Subclass Representatives, the Settlement Class, any Settlement Class Member, or any Opt Out, in this or any other action or proceeding.

Section 24.2  In no event will the Settlement Agreement, whether or not the Class Action Settlement becomes effective, or any of its provisions, or any negotiations, statements, or court proceedings relating to its provisions, or any actions undertaken in this Settlement Agreement, in any way be construed as, offered as, received as, used as, or deemed to be evidence, admissible or otherwise, of any kind, or used in any other fashion, by the Class and Subclass Representatives, the Settlement

Class, any Settlement Class Member, Class Counsel, or any of the Released Parties in any litigation, action, hearing, or any judicial, arbitral, administrative, regulatory or other proceeding for any purpose, except a proceeding to resolve a dispute arising under, or to enforce, the Settlement Agreement.   Without limiting the foregoing, neither the Settlement Agreement nor any of its provisions, negotiations, statements, or court proceedings relating to its provisions, nor any actions undertaken in this Settlement Agreement, will be construed as, offered as, received as, used as, or deemed to be evidence, admissible or otherwise, or an admission or concession of any liability or wrongdoing whatsoever on the part of any person or entity, including, but not limited to, the Released Parties, or as a waiver by the Released Parties of any applicable defense, or as a waiver by the Class and Subclass Representatives, the Settlement Class, any Settlement Class Member of any claims, causes of action, or remedies.  This Section 24.2 shall not apply to disputes between the NFL Parties and their insurers, as to which the NFL Parties reserve all rights.

## ARTICLE XXV
## Representations and Warranties

Section 25.1   <u>Authority</u>.  Class Counsel represent and warrant as of the date of the Settlement Agreement, as amended, that they have authority to enter into this Settlement Agreement on behalf of the Class and Subclass Representatives.

Section 25.2   <u>Class and Subclass Representatives</u>.  Each of the Class and Subclass Representatives, through a duly authorized representative, represents and warrants that he:  (i) has agreed to serve as a representative of the Settlement Class proposed to be certified herein; (ii) is willing, able, and ready to perform all of the duties and obligations as a representative of the Settlement Class; (iii) is familiar with the pleadings in <u>In re: National Football League Players' Concussion Injury Litigation</u>, MDL 2323, or has had the contents of such pleadings described to him; (iv) is familiar with the terms of this Settlement Agreement, including the exhibits attached to this Settlement Agreement, or has received a description of the Settlement Agreement, including the exhibits attached to this Settlement Agreement, from Class Counsel, and has agreed to its terms; (v) has consulted with, and received legal advice from, Class Counsel about the litigation, this Settlement Agreement (including the advisability of entering into this Settlement Agreement and its Releases and the legal effects of this Settlement Agreements and its Releases), and the obligations of a representative of the Settlement Class; (vi) has authorized Class Counsel to execute this Settlement Agreement on his behalf; and (vii) will remain in and not request exclusion from the Settlement Class and will serve as a representative of the Settlement Class until the terms of this Settlement Agreement are effectuated, this Settlement Agreement is terminated in accordance with its terms, or the Court at any time determines that such Class or Subclass Representative cannot represent the Settlement Class.

Section 25.3   <u>NFL Parties</u>.  The NFL Parties represent and warrant as of the date of the Settlement Agreement, as amended, that:  (i) they have all requisite corporate power and authority to execute, deliver, and perform this Settlement Agreement; (ii) the execution, delivery, and performance by the NFL Parties of this

Settlement Agreement has been duly authorized by all necessary corporate action; (iii) this Settlement Agreement has been duly and validly executed and delivered by the NFL Parties; and (iv) this Settlement Agreement constitutes their legal, valid, and binding obligation.

Section 25.4    NFL Parties' Representation and Warranty Regarding Member Clubs.  The NFL Parties represent and warrant as of the date of the Settlement Agreement, as amended, that the current Member Clubs have duly authorized the execution, delivery, and performance by the NFL Parties of this Settlement Agreement.

Section 25.5    Investigation and Future Events.  The Parties and their counsel represent and warrant that they have each performed an independent investigation of the allegations of fact and law made in connection with the Class Action Complaint in In re: National Football League Players' Concussion Injury Litigation, MDL No. 2323, and may hereafter discover facts in addition to, or different from, those that they now know or believe to be true with respect to the subject matter of this Settlement Agreement.  Nevertheless, the Parties intend to resolve their disputes pursuant to the terms of this Settlement Agreement and thus, in furtherance of their intentions, this Settlement Agreement will remain in full force and effect notwithstanding the discovery of any additional facts or law, or changes in law, and this Settlement Agreement will not be subject to rescission or modification by reason of any change or difference in facts or law.

Section 25.6    Security

(a)    The NFL Parties represent and warrant that the NFL currently maintains, and will continue to maintain, an investment grade rating on its Stadium Program Bonds, as rated by Fitch Ratings.  This investment grade rating shall serve as security that the NFL Parties will meet their payment obligations as set forth in Section 23.3 for the first ten years of the Settlement following the Effective Date.

(b)    If the identity of the rating agency that rates the NFL's Stadium Program Bonds changes during the first ten years of the Settlement from the Effective Date, then an investment grade rating by the new rating agency on the NFL's Stadium Program Bonds will satisfy the NFL Parties' obligations under Section 25.6(a).

(c)    The applicable definition of "investment grade" will be as provided by the rating agency rating the NFL's Stadium Program Bonds.

(d)    No later than the tenth anniversary of the Effective Date (the "Tenth Anniversary Date"), the NFL Parties shall establish, or cause to be established, a special-purpose Delaware statutory trust (the "Statutory Trust"), with an independent trustee, that will be funded and managed as follows:  the NFL Parties shall contribute cash to the Statutory Trust so that as of the Tenth Anniversary Date, it shall contain funds that, in the reasonable belief of the NFL Parties, and after taking into account reasonably expected investment returns over time, will be sufficient to satisfy the NFL Parties' remaining anticipated payment obligations, as set forth in Section

-2860-

23.5(d)(ii), as they come due. In the event that the remaining anticipated payment obligations on the Tenth Anniversary Date materially exceed the NFL Parties' reasonable expectations as of the Effective Date due to participation rates and/or the claims experience during the first ten years of the Settlement, the NFL Parties may apply to the Court to fund the Statutory Trust as follows: seventy percent of the required funds to be contributed by the NFL Parties to the Statutory Trust by the Tenth Anniversary Date and the remaining thirty percent of the required funds to be contributed on a three-year schedule set by the Court so that all required funds are deposited in the Statutory Trust no later than the thirteenth anniversary of the Effective Date. The NFL Parties shall not have the right to pledge or assign the property of the Statutory Trust (including any investment returns earned thereon and remaining in the Statutory Trust, as provided herein) to any third-party, and, as contemplated by §3805(b) of Title 12 of the Delaware Code, no other creditor of any of the NFL Parties shall have any right to obtain possession of, or otherwise exercise legal or equitable remedies with respect to, the property of the Statutory Trust. The documents governing the Statutory Trust will provide that the NFL Parties may direct how the funds in the Statutory Trust are invested from time to time, but the Trustee will be instructed to permit withdrawals of funds from the Statutory Trust only for the limited purposes of: (i) satisfying the NFL Parties' payment obligations under this Settlement Agreement as set forth in Section 23.5(d)(ii); (ii) the NFL Parties' costs and expenses related to the Statutory Trust, including, without limitation, taxes, investment-related expenses and administrative costs; (iii) the return of excess monies in the Statutory Trust to the NFL Parties based on attaining investment returns exceeding the amount necessary to satisfy the NFL Parties' remaining anticipated payment obligations, but only upon Court approval; (iv) the return of excess monies in the Statutory Trust to the NFL Parties based on reductions to the NFL Parties' remaining anticipated payment obligations, but only upon Court approval; or (v) upon the completion of the NFL Parties' payment obligations, as set forth in this Settlement Agreement, but only upon Court approval. To the extent that Court approval is required for the withdrawal of funds from the Statutory Trust, such approval shall be granted unless there has been either a material default on the NFL Parties' payment obligations within the prior thirty (30) days, or upon a showing, by clear and convincing evidence, that the proposed withdrawal would materially impair the Settlement Agreement.

(e)    In the event of a material default by the NFL Parties in satisfying their payment obligations as set forth in this Settlement Agreement, and the NFL Parties' failure to cure any such material default within sixty (60) days of written notification of such default by the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof), Co-Lead Class Counsel shall have the right to petition the Court to make a finding that there has been a material, uncured default in satisfying the NFL Parties' payment obligations and to enter an order directing the NFL Parties to meet their payment obligations. Beginning on the Tenth Anniversary Date, any such petition by Co-Lead Class Counsel may request that the Court direct the NFL Parties to meet their payment obligations with the funds available in the Statutory Trust established by the NFL Parties pursuant to Section 25.6(d).

(f)    The NFL Parties historically have maintained liability insurance policies under which they are seeking coverage and are pursuing their rights to

recover under said policies. It is understood that if the NFL Parties secure funding commitments from one or more insurers under their historical policies, or a court order obligating one or more such insurers to fund in whole or in part certain of the NFL Parties' obligations under this Settlement Agreement, after such insurance funding is deposited into the Statutory Trust, the NFL Parties may seek Court approval to reduce, dollar-for-dollar, the equivalent amount of such funding for anticipated remaining liabilities that otherwise would be required to be deposited in the Statutory Trust by the NFL Parties pursuant to Section 25.6(d). In addition, if the NFL Parties obtain additional insurance policies from one or more insurers with a rating of A or above, to insure in whole or in part certain of their obligations under the Settlement, the NFL Parties may seek Court approval to reduce, dollar-for-dollar, the equivalent amount of funding for anticipated remaining liabilities that otherwise would be required to be deposited in the Statutory Trust by the NFL Parties pursuant to Section 25.6(d). To do so, the NFL Parties must demonstrate to the Court that the Court or the Statutory Trust provided for in Section 25.6(d) will have sufficient control over such insurance policies and their proceeds to ensure that the proceeds are available to meet the NFL Parties' payment obligations, if necessary.

(g) In the event the Court enters an order pursuant to Section 25.6(e) directing the NFL Parties to meet their payment obligations pursuant to Section 23.3 and the NFL Parties fail materially to comply with such Order, as set forth in Section 25.6(e), Co-Lead Class Counsel may request that the Court provide the NFL Parties sixty (60) days to show cause why the Court shall not render null and void the Releases and Covenants Not to Sue provided to Released Parties, as set forth in Section 18.1, by Settlement Class Members who: (i) have received a final, favorable Notice of Registration Determination, as set forth in Section 4.3, and have not received a final and accrued Monetary Award or final and accrued Derivative Claimant Award as of the date of such application; or (ii) who have only received a final and accrued Monetary Award for a Level 1.5 Neurocognitive Impairment or a final and accrued Derivative Claimant Award for a Level 1.5 Neurocognitive Impairment as of the date of such application. For the avoidance of any doubt, all other Releases and Covenants Not to Sue shall remain effective. In the event that a Settlement Class Member's Release and Covenant Not to Sue is rendered null and void, such Settlement Class Member shall not challenge, if applicable, any Released Party's right to offset any final judgment received by the Settlement Class Member as a result of Section 25.6(g)(ii) in the amount of the Monetary Award or Derivative Claimant Award received by the Settlement Class Member. For the avoidance of any doubt, nothing in this subsection 25.6, shall affect any rights or obligations of Settlement Class Members and Released Parties as otherwise provided in, or with respect to, this Settlement Agreement or any breach thereof.

## ARTICLE XXVI
### Cooperation

Section 26.1 The Parties will cooperate, assist, and undertake all reasonable actions to accomplish the steps contemplated by this Settlement Agreement

and to implement the Class Action Settlement on the terms and conditions provided herein.

Section 26.2    The Parties agree to take all actions necessary to obtain final approval of the Class Action Settlement and entry of a Final Order and Judgment, including the terms and provisions described in this Settlement Agreement, and, upon final approval and entry of such order, an order dismissing the Class Action Complaint and Related Lawsuits with prejudice as to the Class and Subclass Representatives, the Settlement Class, and each Settlement Class Member.

Section 26.3    The Parties and their counsel agree to support the final approval and implementation of this Settlement Agreement and defend it against objections, appeal, collateral attack or any efforts to hinder or delay its approval and implementation.    Neither the Parties nor their counsel, directly or indirectly, will encourage any person to object to the Class Action Settlement or assist them in doing so.

## ARTICLE XXVII
### Continuing Jurisdiction

Section 27.1    Pursuant to the Final Order and Judgment, the Court will retain continuing and exclusive jurisdiction over the Parties and their counsel, all Settlement Class Members, the Special Master, BAP Administrator, Claims Administrator, Liens Resolution Administrator, Appeals Advisory Panel, Appeals Advisory Panel Consultants, and Trustee with respect to the terms of the Settlement Agreement.    Any disputes or controversies arising out of, or related to, the interpretation, implementation, administration, and enforcement of this Settlement Agreement will be made by motion to the Court.    In addition, the Parties, including each Settlement Class Member, are hereby deemed to have submitted to the exclusive jurisdiction of this Court for any suit, action, proceeding, or dispute arising out of, or relating to, this Settlement Agreement.    The terms of the Settlement Agreement will be incorporated into the Final Order and Judgment of the Court, which will allow that Final Order and Judgment to serve as an enforceable injunction by the Court for purposes of the Court's continuing jurisdiction related to the Settlement Agreement.

(a)    Notwithstanding any contrary law applicable to the underlying claims, this Settlement Agreement and the Releases hereunder will be interpreted and enforced in accordance with the laws of the State of New York, without regard to conflict of law principles.

## ARTICLE XXVIII
### Role of Co-Lead Class Counsel, Class Counsel and Subclass Counsel

Section 28.1    Co-Lead Class Counsel and Class Counsel acknowledge that, under applicable law, their respective duty is to the entire Settlement Class, to act in the best interest of the Settlement Class as a whole, with respect to promoting, supporting, and effectuating, as fair, adequate, and reasonable, the approval, implementation, and administration of the settlement embodied in the Settlement

Agreement, and that their professional responsibilities as attorneys are to be viewed in this light, under the ongoing supervision and jurisdiction of the Court that appoints them to represent the interests of the Settlement Class.

Section 28.2    Subclass Counsel acknowledge that, under applicable law, their respective duty is to their respective Subclasses, to act in the best interest of the respective Subclass as a whole, with respect to promoting, supporting, and effectuating, as fair, adequate, and reasonable, the approval, implementation, and administration of the settlement embodied in the Settlement Agreement, and that their professional responsibilities as attorneys are to be viewed in this light, under the ongoing supervision and jurisdiction of the Court that appoints them to represent the interests of the respective Subclass.

## ARTICLE XXIX
## Bargained-For Benefits

Section 29.1    Nothing in the Collective Bargaining Agreement will preclude Settlement Class Members from receiving benefits under the Settlement Agreement.  In addition, the fact that a Settlement Class Member has signed, or will sign, a release and covenant not to sue pursuant to Article 65 of the 2011 Collective Bargaining Agreement will not preclude the Settlement Class Member from receiving benefits under the Settlement Agreement, and the NFL Parties agree not to assert any defense or objection to the Settlement Class Member's receipt of benefits under the Settlement Agreement on the ground that he executed a release and covenant not to sue pursuant to Article 65 of the 2011 Collective Bargaining Agreement.

Section 29.2    A Retired NFL Football Player's participation in the Settlement Agreement will not in any way affect his eligibility for bargained-for benefits under the Collective Bargaining Agreement or the terms or conditions under which those benefits are provided, except as set forth in Section 18.1.

## ARTICLE XXX
## Miscellaneous Provisions

Section 30.1    No Assignment of Claims.    Neither the Settlement Class nor any Class or Subclass Representative or Settlement Class Member has assigned, will assign, or will attempt to assign, to any person or entity other than the NFL Parties any rights or claims relating to the subject matter of the Class Action Complaint.  Any such assignment, or attempt to assign, to any person or entity other than the NFL Parties any rights or claims relating to the subject matter of the Class Action Complaint will be void, invalid, and of no force and effect and the Claims Administrator shall not recognize any such action.

Section 30.2    Individual Counsel

(a)    Counsel individually representing a Settlement Class Member shall provide notice of his or her representation to the Claims Administrator within thirty (30) days of the Effective Date or within thirty (30) days of the retention if

Counsel is retained after the Effective Date. Counsel acting on his or her client's behalf may submit all claim forms, proof, correspondence, or other documents to the Special Master, BAP Administrator, Claims Administrator or Lien Resolution Administrator on behalf of that Settlement Class Member; provided, however, that counsel individually representing a Settlement Class Member may not sign on behalf of that Settlement Class Member: (i) an Opt Out request; (ii) a revocation of an Opt Out; (iii) an objection, as set forth in Section 14.3; (iv) a Claim Form, (v) a Derivative Claim Form, or (vi) an Appeals Form.

(b)      Where a Settlement Class Member indicates in writing to the Special Master, BAP Administrator, Claims Administrator or Lien Resolution Administrator that he or she is individually represented by counsel, the Special Master, BAP Administrator, Claims Administrator or Lien Resolution Administrator will copy the counsel individually representing a Settlement Class Member on any written communications with the Settlement Class Member. Any communications, whether written or oral, by the Special Master, BAP Administrator, Claims Administrator or Lien Resolution Administrator with counsel individually representing a Settlement Class Member will be deemed to be a communication directly with such individually represented Settlement Class Member.

Section 30.3    Integration. This Settlement Agreement and its exhibits, attachments, and appendices will constitute the entire agreement and understanding among the Parties and supersedes all prior proposals, negotiations, letters, conversations, agreements, term sheets, and understandings, whether written or oral, relating to the subject matter of this Settlement Agreement, including the Settlement Term Sheet dated August 29, 2013. The Parties acknowledge, stipulate, and agree that no covenant, obligation, condition, representation, warranty, inducement, negotiation, agreement, arrangement, or understanding, whether written or oral, concerning any part or all of the subject matter of this Settlement Agreement has been made or relied on except as expressly set forth in this Settlement Agreement.

Section 30.4    Headings. The headings used in this Settlement Agreement are intended for the convenience of the reader only and will not affect the meaning or interpretation of this Settlement Agreement in any manner. Any inconsistency between the headings used in this Settlement Agreement and the text of the Articles and Sections of this Settlement Agreement will be resolved in favor of the text.

Section 30.5    Incorporation of Exhibits. All of the exhibits attached hereto are hereby incorporated by reference as though fully set forth herein. Notwithstanding the foregoing, any inconsistency between this Settlement Agreement and any attachments, exhibits, or appendices hereto will be resolved in favor of this Settlement Agreement.

Section 30.6    Amendment. This Settlement Agreement will not be subject to any change, modification, amendment, or addition without the express written consent of Class Counsel and Counsel for the NFL Parties, on behalf of all Parties to this Settlement Agreement, and upon Court approval.

Section 30.7 <u>Mutual Preparation</u>. The Parties have negotiated all of the terms and conditions of this Settlement Agreement at arm's length. Neither the Settlement Class Members nor the NFL Parties, nor any one of them, nor any of their counsel will be considered to be the sole drafter of this Settlement Agreement or any of its provisions for the purpose of any statute, case law, or rule of interpretation or construction that would or might cause any provision to be construed against the drafter of this Settlement Agreement. This Settlement Agreement will be deemed to have been mutually prepared by the Parties and will not be construed against any of them by reason of authorship.

Section 30.8 <u>Beneficiaries</u>. This Settlement Agreement will be binding upon the Parties and will inure to the benefit of the Settlement Class Members and the Released Parties. All Released Parties who are not the NFL Parties are intended third-party beneficiaries who are entitled to enforce the terms of the Releases and Covenant Not to Sue set forth in ARTICLE XVIII. No provision in this Settlement Agreement is intended to create any third-party beneficiary to this Settlement Agreement other than the Released Parties. Nothing expressed or implied in this Settlement Agreement is intended to or will be construed to confer upon or give any person or entity other than Class and Subclass Representatives, the Settlement Class Members, Class Counsel, the NFL Parties, the Released Parties, and Counsel for the NFL Parties, any right or remedy under or by reason of this Settlement Agreement.

Section 30.9 <u>Extensions of Time</u>. Co-Lead Class Counsel and Counsel for the NFL Parties may agree in writing, subject to approval of the Court where required, to reasonable extensions of time to implement the provisions of this Settlement Agreement.

Section 30.10 <u>Execution in Counterparts</u>. This Settlement Agreement may be executed in counterparts, and a facsimile signature will be deemed an original signature for purposes of this Settlement Agreement.

Section 30.11 <u>Good Faith Implementation</u>. Co-Lead Class Counsel and Counsel for the NFL Parties will undertake to implement the terms of this Settlement Agreement in good faith. Before filing any motion or petition in the Court raising a dispute arising out of or related to this Settlement Agreement, Co-Lead Class Counsel and Counsel for the NFL Parties will consult with each other in good faith and certify to the Court that they have conferred in good faith.

Section 30.12 <u>Force Majeure</u>. The Parties will be excused from any failure to perform timely any obligation hereunder to the extent such failure is caused by war, acts of public enemies or terrorists, strikes or other labor disturbances, fires, floods, acts of God, or any causes of the like or different kind beyond the reasonable control of the Parties.

Section 30.13 <u>Waiver</u>. The waiver by any Party of any breach of this Settlement Agreement by another Party will not be deemed or construed as a waiver of

any other breach, whether prior, subsequent, or contemporaneous, of this Settlement Agreement.

Section 30.14 <u>Tax Consequences</u>.   No opinion regarding the tax consequences of this Settlement Agreement to any individual Settlement Class Member is being given or will be given by the NFL Parties, Counsel for the NFL Parties, Class and Subclass Representatives, Class Counsel, nor is any representation or warranty in this regard made by virtue of this Settlement Agreement.   Settlement Class Members must consult their own tax advisors regarding the tax consequences of the Settlement Agreement, including any payments provided hereunder and any tax reporting obligations they may have with respect thereto.   Each Settlement Class Member's tax obligations, and the determination thereof, are his or her sole responsibility, and it is understood that the tax consequences may vary depending on the particular circumstances of each individual Settlement Class Member.   The NFL Parties, Counsel for the NFL Parties, Class Counsel will have no liability or responsibility whatsoever for any such tax consequences resulting from payments under this Settlement Agreement. To the extent required by law, the Claims Administrator will report payments made under the Settlement Agreement to the appropriate authorities.

Section 30.15 <u>Issuance of Notices and Submission of Materials</u>.   In any instance in which this Settlement Agreement requires the issuance of any notice regarding registration, a claim or an award, unless specified otherwise in this Settlement Agreement, such notice must be issued by: (a) online submission through any secure web-based portal established by the Claims Administrator for this purpose to the Settlement Class Member or NFL Parties, which shall be accompanied by an email certifying receipt; or (b) U.S. mail (or its foreign equivalent).   In any instance in which this Settlement Agreement requires submission of materials by or on behalf of a Settlement Class Member or the NFL Parties, unless specified otherwise in this Settlement Agreement, such submission must be made by: (a) online submission through any secure web-based portal established by the Claims Administrator for this purpose; or (b) U.S. mail (or its foreign equivalent); or (c) delivery.   Written notice to the Class Representatives or Co-Lead Class Counsel must be given to:   Christopher A. Seeger, Seeger Weiss LLP, 77 Water Street, New York, New York 10005; and Sol Weiss, Anapol Schwartz, 1710 Spruce Street, Philadelphia, PA 19103.   Written notice to the NFL Parties or Counsel for the NFL Parties must be given to: Jeffrey Pash, Executive Vice President and General Counsel, National Football League, 345 Park Avenue, New York, New York 10154; Anastasia Danias, Senior Vice President and Chief Litigation Officer, National Football League, 345 Park Avenue, New York, New York 10154; and Brad S. Karp, Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York 10019, or such other person or persons as shall be designated by the Parties.

Section 30.16 <u>Party Burden</u>.   Unless explicitly provided otherwise, whenever a showing is required to be made in this Settlement Agreement, the party seeking the relief shall bear the burden of substantiation.

Agreed to as of this 13th day of February, 2015.

NATIONAL FOOTBALL LEAGUE, NFL PROPERTIES LLC

By: _____
Jeffrey Pash
NFL Executive Vice President

COUNSEL FOR THE NFL PARTIES

By: _____
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
Brad S. Karp
Theodore V. Wells, Jr.
Bruce Birenboim
Beth A. Wilkinson
Lynn B. Bayard

CO-LEAD CLASS COUNSEL

By: _____
  SEEGER WEISS LLP
  Christopher A. Seeger

By: _____
  ANAPOL SCHWARTZ
  Sol Weiss

CLASS COUNSEL

By: _____
  PODHURST ORSECK, P.A.
  Steven C. Marks

By: _____
  LOCKS LAW FIRM
  Gene Locks

SUBCLASS COUNSEL

By: _____
  LEVIN, FISHBEIN, SEDRAN &
  BERMAN
  Arnold Levin

By: _____
  NASTLAW LLC
  Dianne M. Nast

96

Section 30.16 <u>Party Burden</u>.    Unless explicitly provided otherwise, whenever a showing is required to be made in this Settlement Agreement, the party seeking the relief shall bear the burden of substantiation.

Agreed to as of this 13th day of February, 2015.

NATIONAL FOOTBALL LEAGUE, NFL PROPERTIES LLC

By: _____
    Jeffrey Pash
    NFL Executive Vice President


COUNSEL FOR THE NFL PARTIES

By: _____
    PAUL, WEISS, RIFKIND, WHARTON &
    GARRISON LLP
    Brad S. Karp
    Theodore V. Wells, Jr.
    Bruce Birenboim
    Beth A. Wilkinson
    Lynn B. Bayard


CO-LEAD CLASS COUNSEL

By: _____
    SEEGER WEISS LLP
    Christopher A. Seeger

CLASS COUNSEL

By: _____
    PODHURST ORSECK, P.A.
    Steven C. Marks

SUBCLASS COUNSEL

By: _____
    LEVIN, FISHBEIN, SEDRAN &
    BERMAN
    Arnold Levin

By: _____
    ANAPOL SCHWARTZ
    Sol Weiss

By: _____
    LOCKS LAW FIRM
    Gene Locks

By: _____
    NASTLAW LLC
    Dianne M. Nast

96

Section 30.16 <u>Party Burden</u>.    Unless explicitly provided otherwise, whenever a showing is required to be made in this Settlement Agreement, the party seeking the relief shall bear the burden of substantiation.

Agreed to as of this 13th day of February, 2015.

NATIONAL FOOTBALL LEAGUE, NFL PROPERTIES LLC

By: _____
   Jeffrey Pash
   NFL Executive Vice President


COUNSEL FOR THE NFL PARTIES

By: _____
   PAUL, WEISS, RIFKIND, WHARTON &
   GARRISON LLP
   Brad S. Karp
   Theodore V. Wells, Jr.
   Bruce Birenboim
   Beth A. Wilkinson
   Lynn B. Bayard


CO-LEAD CLASS COUNSEL

By: _____
   SEEGER WEISS LLP
   Christopher A. Seeger

CLASS COUNSEL

By: _____
   PODHURST ORSECK, P.A.
   Steven C. Marks

SUBCLASS COUNSEL

By: _____
   LEVIN, FISHBEIN, SEDRAN &
   BERMAN
   Arnold Levin

By: _____
   ANAPOL SCHWARTZ
   Sol Weiss

By: _____
   LOCKS LAW FIRM
   Gene Locks

By: _____
   NASTLAW LLC
   Dianne M. Nast

96

Section 30.16 <u>Party Burden</u>.    Unless explicitly provided otherwise, whenever a showing is required to be made in this Settlement Agreement, the party seeking the relief shall bear the burden of substantiation.

Agreed to as of this 13th day of February, 2015.

NATIONAL FOOTBALL LEAGUE, NFL PROPERTIES LLC

By: _____
    Jeffrey Pash
    NFL Executive Vice President


COUNSEL FOR THE NFL PARTIES

By: _____
    PAUL, WEISS, RIFKIND, WHARTON &
    GARRISON LLP
    Brad S. Karp
    Theodore V. Wells, Jr.
    Bruce Birenboim
    Beth A. Wilkinson
    Lynn B. Bayard


CO-LEAD CLASS COUNSEL

By: _____        By: _____
    SEEGER WEISS LLP               ANAPOL SCHWARTZ
    Christopher A. Seeger            Sol Weiss

CLASS COUNSEL

By: _____        By: _____
    PODHURST ORSECK, P.A.         LOCKS LAW FIRM
    Steven C. Marks               Gene Locks

SUBCLASS COUNSEL

By: _____        By: _____
    LEVIN, FISHBEIN, SEDRAN &       NASTLAW LLC
    BERMAN                   Dianne M. Nast
    Arnold Levin

Case: 25-2271    Document: 20-2    Page: 978    Date Filed: 10/08/2025

Section 30.16 <u>Party Burden</u>.   Unless explicitly provided otherwise, whenever a showing is required to be made in this Settlement Agreement, the party seeking the relief shall bear the burden of substantiation.

Agreed to as of this 13th day of February, 2015.

NATIONAL FOOTBALL LEAGUE, NFL PROPERTIES LLC

By: _____
    Jeffrey Pash
    NFL Executive Vice President

COUNSEL FOR THE NFL PARTIES

By: _____
    PAUL, WEISS, RIFKIND, WHARTON &
    GARRISON LLP
    Brad S. Karp
    Theodore V. Wells, Jr.
    Bruce Birenboim
    Beth A. Wilkinson
    Lynn B. Bayard

CO-LEAD CLASS COUNSEL

By: _____                    By: _____
    SEEGER WEISS LLP                               ANAPOL SCHWARTZ
    Christopher A. Seeger                          Sol Weiss

CLASS COUNSEL

By: _____                    By: _____
    PODHURST ORSECK, P.A.                          LOCKS LAW FIRM
    Steven C. Marks                                Gene Locks

SUBCLASS COUNSEL

By: _____                    By: _____
    LEVIN, FISHBEIN, SEDRAN &                      NASTLAW LLC
    BERMAN                                         Dianne M. Nast
    Arnold Levin

96

**-2872-**

# EXHIBIT A-1

| **INJURY DEFINITIONS** |
|---|

### DIAGNOSIS FOR BAP SUPPLEMENTAL BENEFITS

#### Level 1 Neurocognitive Impairment

(a)     For Retired NFL Football Players diagnosed through the BAP, a diagnosis of Level 1 Neurocognitive Impairment must meet the criteria set forth in subsections (i)-(iv) below:

(i)     Concern of the Retired NFL Football Player, a knowledgeable informant, or the Qualified BAP Provider that there has been a decline in cognitive function.

(ii)     Evidence of moderate cognitive decline from a previous level of performance, as determined by and in accordance with the standardized neuropsychological testing protocol annexed in Exhibit 2 to the Settlement Agreement, in two or more cognitive domains (complex attention, executive function, learning and memory, language, perceptual-spatial), provided one of the cognitive domains is (a) executive function, (b) learning and memory, or (c) complex attention.

(iii)     The Retired NFL Football Player exhibits functional impairment generally consistent with the criteria set forth in the National Alzheimer's Coordinating Center's Clinical Dementia Rating scale Category 0.5 (Questionable) in the areas of Community Affairs, Home & Hobbies, and Personal Care.

(iv)     The cognitive deficits do not occur exclusively in the context of a delirium, acute substance abuse, or as a result of medication side effects.

(b)     Level 1 Neurocognitive Impairment, for the purposes of this Settlement Agreement, may only be diagnosed by Qualified BAP Providers during a BAP baseline assessment examination, with agreement on the diagnosis by the Qualified BAP Providers.

## QUALIFYING DIAGNOSES FOR MONETARY AWARDS

1.    **Level 1.5 Neurocognitive Impairment**

(a)    For Retired NFL Football Players diagnosed through the BAP, a diagnosis of Level 1.5 Neurocognitive Impairment must meet the criteria set forth in subsections (i)-(iv) below:

(i)    Concern of the Retired NFL Football Player, a knowledgeable informant, or the Qualified BAP Provider that there has been a severe decline in cognitive function.

(ii)    Evidence of a moderate to severe cognitive decline from a previous level of performance, as determined by and in accordance with the standardized neuropsychological testing protocol annexed in Exhibit 2 to the Settlement Agreement, in two or more cognitive domains (complex attention, executive function, learning and memory, language, perceptual-spatial), provided one of the cognitive domains is (a) executive function, (b) learning and memory, or (c) complex attention.

(iii)    The Retired NFL Football Player exhibits functional impairment generally consistent with the criteria set forth in the National Alzheimer's Coordinating Center's Clinical Dementia Rating (CDR) scale Category 1.0 (Mild) in the areas of Community Affairs, Home & Hobbies, and Personal Care.  Such functional impairment shall be corroborated by documentary evidence (*e.g.*, medical records, employment records), the sufficiency of which will be determined by the physician making the Qualifying Diagnosis.  In the event that no documentary evidence of functional impairment exists or is available, then (a) there must be evidence of moderate to severe cognitive decline from a previous level of performance, as determined by and in accordance with the standardized neuropsychological testing protocol annexed in Exhibit 2 to the Settlement Agreement, in the executive function cognitive domain or the learning and memory cognitive domain, and at least one other cognitive domain; and (b) the Retired NFL Football Player's functional impairment, as described above, must be corroborated by a third-party sworn affidavit from a person familiar with the Retired NFL Football Player's condition (other than the player or his family members), the sufficiency of which will be determined by the physician making the Qualifying Diagnosis.

(iv)    The cognitive deficits do not occur exclusively in the context of a delirium, acute substance abuse, or as a result of medication side effects.

(b)    For living Retired NFL Football Players diagnosed outside of the BAP, a diagnosis while living of Level 1.5 Neurocognitive Impairment, *i.e.*, early dementia, based on evaluation and evidence generally consistent with the diagnostic criteria set forth in subsection 1(a)(i)-(iv) above, made by a Qualified MAF Physician or a board-certified or otherwise qualified neurologist, neurosurgeon, or other neuro-specialist physician, as set forth and provided in Sections 6.3(b)-(d) of the Settlement Agreement.

(c)    For Retired NFL Football Players deceased prior to the Effective Date, a diagnosis of Level 1.5 Neurocognitive Impairment, *i.e.*, early dementia, based on evaluation and evidence generally consistent with the diagnostic criteria set forth in subsection 1(a)(i)-(iv)

above, made while the Retired NFL Football Player was living by a board-certified or otherwise qualified neurologist, neurosurgeon, or other neuro-specialist physician, or by a physician with sufficient qualifications in the field of neurology or neurocognitive disorders, as set forth and provided in Sections 6.3(c)-(e) of the Settlement Agreement.

2.    **Level 2 Neurocognitive Impairment**

(a)    For Retired NFL Football Players diagnosed through the BAP, a diagnosis of Level 2 Neurocognitive Impairment must meet the criteria set forth in subsections (i)-(iv) below:

(i)    Concern of the Retired NFL Football Player, a knowledgeable informant, or the Qualified BAP Provider that there has been a severe decline in cognitive function.

(ii)    Evidence of a severe cognitive decline from a previous level of performance, as determined by and in accordance with the standardized neuropsychological testing protocol annexed in Exhibit 2 to the Settlement Agreement, in two or more cognitive domains (complex attention, executive function, learning and memory, language, perceptual-spatial), provided one of the cognitive domains is (a) executive function, (b) learning and memory, or (c) complex attention.

(iii)    The Retired NFL Football Player exhibits functional impairment generally consistent with the criteria set forth in the National Alzheimer's Coordinating Center's Clinical Dementia Rating (CDR) scale Category 2.0 (Moderate) in the areas of Community Affairs, Home & Hobbies, and Personal Care.  Such functional impairment shall be corroborated by documentary evidence (*e.g.*, medical records, employment records), the sufficiency of which will be determined by the physician making the Qualifying Diagnosis.  In the event that no documentary evidence of functional impairment exists or is available, then (a) there must be evidence of severe cognitive decline from a previous level of performance, as determined by and in accordance with the standardized neuropsychological testing protocol annexed in Exhibit 2 to the Settlement Agreement, in the executive function cognitive domain or the learning and memory cognitive domain, and at least one other cognitive domain; and (b) the Retired NFL Football Player's functional impairment, as described above, must be corroborated by a third-party sworn affidavit from a person familiar with the Retired NFL Football Player's condition (other than the player or his family members), the sufficiency of which will be determined by the physician making the Qualifying Diagnosis.

(iv)    The cognitive deficits do not occur exclusively in the context of a delirium, acute substance abuse, or as a result of medication side effects.

(b)    For living Retired NFL Football Players diagnosed outside of the BAP, a diagnosis while living of Level 2 Neurocognitive Impairment, *i.e.*, moderate dementia, based on evaluation and evidence generally consistent with the diagnostic criteria set forth in subsection 2(a)(i)-(iv) above, unless the diagnosing physician can certify in the Diagnosing Physician Certification that certain testing in 2(a)(i)-(iv) is medically unnecessary because the Retired NFL Football Player's dementia is so severe, made by a Qualified MAF Physician or a board-certified

or otherwise qualified neurologist, neurosurgeon, or other neuro-specialist physician, as set forth and provided in Sections 6.3(b)-(d) of the Settlement Agreement.

(c)    For Retired NFL Football Players deceased prior to the Effective Date, a diagnosis of Level 2 Neurocognitive Impairment, *i.e.*, moderate dementia, based on evaluation and evidence generally consistent with the diagnostic criteria set forth in subsection 2(a)(i)-(iv) above, unless the diagnosing physician can certify in the Diagnosing Physician Certification that certain testing in 2(a)(i)-(iv) was medically unnecessary because the Retired NFL Football Player's dementia was so severe, made while the Retired NFL Football Player was living by a board-certified or otherwise qualified neurologist, neurosurgeon, or other neuro-specialist physician, or by a physician with sufficient qualifications in the field of neurology or neurocognitive disorders, as set forth and provided in Sections 6.3(c)-(e) of the Settlement Agreement.

3.    **Alzheimer's Disease**

(a)    For living Retired NFL Football Players, a diagnosis while living of the specific disease of Alzheimer's Disease as defined by the World Health Organization's International Classification of Diseases, 9th Edition (ICD-9), the World Health Organization's International Classification of Diseases, 10th Edition (ICD-10), or a diagnosis of Major Neurocognitive Disorder due to probable Alzheimer's Disease as defined in the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5), made by a Qualified MAF Physician or a board-certified or otherwise qualified neurologist, neurosurgeon, or other neuro-specialist physician, as set forth and provided in Sections 6.3(b)-(d) of the Settlement Agreement.

(b)    For Retired NFL Football Players deceased prior to the Effective Date, a diagnosis of Major Neurocognitive Disorder due to probable Alzheimer's Disease consistent with the definition in *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5), or a diagnosis of Alzheimer's Disease, made while the Retired NFL Football Player was living by a board-certified or otherwise qualified  neurologist, neurosurgeon, or other neuro-specialist physician, or by a physician with sufficient qualifications in the field of neurology to make such a diagnosis, as set forth and provided in Sections 6.3(c)-(e) of the Settlement Agreement.

4.    **Parkinson's Disease**

(a)    For living Retired NFL Football Players, a diagnosis while living of the specific disease of Parkinson's Disease as defined by the World Health Organization's International Classification of Diseases, 9th Edition (ICD-9), the World Health Organization's International Classification of Diseases, 10th Edition (ICD-10), or a diagnosis of Major Neurocognitive Disorder probably due to Parkinson's Disease as defined in the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5), made by a Qualified MAF Physician or a board-certified or otherwise qualified neurologist, neurosurgeon, or other neuro-specialist physician, as set forth and provided in Sections 6.3(b)-(d) of the Settlement Agreement.

(b)    For Retired NFL Football Players deceased prior to the Effective Date, a diagnosis of Parkinson's Disease, made while the Retired NFL Football Player was living by a board-certified or otherwise qualified  neurologist, neurosurgeon, or other neuro-specialist

physician, or by a physician with sufficient qualifications in the field of neurology to make such a diagnosis, as set forth and provided in Sections 6.3(c)-(e) of the Settlement Agreement.

5. **Death with Chronic Traumatic Encephalopathy (CTE)**

For Retired NFL Football Players who died prior to the Final Approval Date, a post-mortem diagnosis of CTE made by a board-certified neuropathologist prior to the Final Approval Date, provided that a Retired NFL Football Player who died between July 7, 2014 and the Final Approval Date shall have until 270 days from his date of death to obtain such a post-mortem diagnosis.

6. **Amyotrophic Lateral Sclerosis (ALS)**

(a)    For living Retired NFL Football Players, a diagnosis while living of the specific disease of Amyotrophic Lateral Sclerosis, also known as Lou Gehrig's Disease ("ALS"), as defined by the World Health Organization's International Classification of Diseases, 9th Edition (ICD-9) or the World Health Organization's International Classification of Diseases, 10th Edition (ICD-10), made by a Qualified MAF Physician or a board-certified or otherwise qualified neurologist, neurosurgeon, or other neuro-specialist physician, as set forth and provided in Sections 6.3(b)-(d) of the Settlement Agreement.

(b)    For Retired NFL Football Players deceased prior to the Effective Date, a diagnosis of ALS, made while the Retired NFL Football Player was living by a board-certified or otherwise qualified   neurologist, neurosurgeon, or other neuro-specialist physician, or by a physician with sufficient qualifications in the field of neurology to make such a diagnosis, as set forth and provided in Sections 6.3(c)-(e) of the Settlement Agreement.

# EXHIBIT A-2

**BASELINE NEUROPSYCHOLOGICAL TEST BATTERY AND SPECIFIC IMPAIRMENT CRITERIA FOR RETIRED NFL FOOTBALL PLAYERS**

**Section 1. Test Battery**

| Estimating Premorbid Intellectual Ability | Learning and Memory (6 scores) |
|---|---|
| ACS Test of Premorbid Functioning (TOPF) | WMS-IV Logical Memory I |
| **Complex Attention/Processing Speed (6 scores)** | WMS-IV Logical Memory II |
| WAIS-IV Digit Span | WMS-IV Verbal Paired Associates I |
| WAIS-IV Arithmetic | WMS-IV Verbal Paired Associates II |
| WAIS-IV Letter Number Sequencing | WMS-IV Visual Reproduction I |
| WAIS-IV Coding | WMS-IV Visual Reproduction II |
| | |
| WAIS-IV Symbol Search | **Language (3 scores)** |
| WAIS-IV Cancellation | Boston Naming Test |
| **Executive Functioning (4 scores)** | Category Fluency (Animal Naming) |
| Verbal Fluency (FAS) | BDAE Complex Ideational Material |
| Trails B | **Spatial-Perceptual (3 scores)** |
| Booklet Category Test | WAIS-IV Block Design |
| WAIS-IV Similarities | WAIS-IV Visual Puzzles |
| **Effort/Performance Validity (8 scores)** | WAIS-IV Matrix Reasoning |
| *ACS Effort Scores* | **Mental Health** |
| ACS-WAIS-IV Reliable Digit Span | MMPI-2RF |
| ACS-WMS-IV Logical Memory Recognition | Mini International Neuropsychiatric Interview |
| ACS-WMS-IV Verbal Paired Associates Recognition | |
| ACS-WMS-IV Visual Reproduction Recognition | |
| ACS-Word Choice | |
| *Additional Effort Tests* | |
| Test of Memory Malingering (TOMM) | |
| Medical Symptom Validity Test (MSVT) | |

**Section 2: Evaluate Performance Validity**

Freestanding, embedded and regression based performance validity metrics will be administered to each Retired NFL Football Player during baseline and, if relevant, subsequent neuropsychological examinations. There will be at least seven performance validity metrics utilized during each assessment. The specific performance validity metrics utilized will not be released to the public in order to maintain the highest standards of assessment validity. The performance validity metrics employed will be rotated at intervals determined by the Appeals Advisory Panel in consultation with Co-Lead Class Counsel and Counsel for the NFL Parties.

Each neuropsychological examiner must complete a checklist of validity criteria as set forth in *Slick et al.* 1999, and revised in 2013 (see below) for every Retired NFL Football Player examined in order to determine whether the Retired NFL Football Player's test data is a valid reflection of his optimal level of neurocognitive functioning.

1.  Suboptimal scores on performance validity embedded indicators or tests. The cutoffs for each test should be established based on empirical findings.

2.  A pattern of neuropsychological test performance that is markedly discrepant from currently accepted models of normal and abnormal central nervous system (CNS) function. The discrepancy must be consistent with an attempt to exaggerate or fabricate neuropsychological dysfunction (e.g., a patient performs in the severely impaired range on verbal attention measures but in the average range on memory testing; a patient misses items on recognition testing that were consistently provided on previous free recall trials, or misses many easy items when significantly harder items from the same test are passed).

3.  Discrepancy between test data and observed behavior. Performance on two or more neuropsychological tests within a domain are discrepant with observed level of cognitive function in a way that suggests exaggeration or fabrication of dysfunction (e.g., a well-educated patient who presents with no significant visual-perceptual deficits or language disturbance in conversational speech performs in the severely impaired range on verbal fluency and confrontation naming tests).

4.  Discrepancy between test data and reliable collateral reports. Performance on two or more neuropsychological tests within a domain are discrepant with day-to-day level of cognitive function described by at least one reliable collateral informant in a way that suggests exaggeration or fabrication of dysfunction (e.g., a patient handles all family finances but is unable to perform simple math problems in testing).

5.  Discrepancy between test data and documented background history. Improbably poor performance on two or more standardized tests of cognitive function within a specific domain (e.g., memory) that is inconsistent with documented neurological or psychiatric history.

6. Self-reported history is discrepant with documented history. Reported history is markedly discrepant with documented medical or psychosocial history and suggests attempts to exaggerate deficits.

7. Self-reported symptoms are discrepant with known patterns of brain functioning. Reported or endorsed symptoms are improbable in number, pattern, or severity; or markedly inconsistent with expectations for the type or severity of documented medical problems.

8. Self-reported symptoms are discrepant with behavioral observations. Reported symptoms are markedly inconsistent with observed behavior (e.g., a patient complains of severe episodic memory deficits yet has little difficulty remembering names, events, or appointments; a patient complains of severe cognitive deficits yet has little difficulty driving independently and arrives on time for an appointment in an unfamiliar area; a patient complains of severely slowed mentation and concentration problems yet easily follows complex conversation).

9. Self-reported symptoms are discrepant with information obtained from collateral informants. Reported symptoms, history, or observed behavior is inconsistent with information obtained from other informants judged to be adequately reliable. The discrepancy must be consistent with an attempt to exaggerate deficits (e.g., a patient reports severe memory impairment and/or behaves as if severely memory-impaired, but his spouse reports that the patient has minimal memory dysfunction at home).

Notwithstanding a practitioner's determination of sufficient effort in accordance with the foregoing factors, a Retired NFL Football Player's failure on two or more effort tests may result in the Retired NFL Football Player's test results being subjected to independent review, or result in a need for supplemental testing of the Retired NFL Football Player.

Note: Additional information relating to the evaluation of effort and performance validity will be provided in a clinician's interpretation guide.

**Section 3. Estimate Premorbid Intellectual Ability**

| Test | Ability |
|------|---------|
| Test of Premorbid Functioning (TOPF) | Reading<br><br>Reading + Demographic Variables |

The Test of Premorbid Functioning (TOPF) provides three models for predicting premorbid functioning: (a) demographics only, (b) TOPF only, and (c) combined demographics and TOPF prediction equations. For each model using demographic data, a simple and complex prediction equation can be selected. In the simple model, only sex, race/ethnicity, and education, are used in predicting premorbid ability. In the complex model, developmental, personal, and more specific demographic data is incorporated into the equations. The clinician should select a model based on the patient's background and his or her current level of reading or language impairment.

Note: It is necessary to estimate premorbid intellectual functioning in order to use the criteria for impairment set out in this document. Estimated premorbid intellectual ability will be assessed and classified as:

➢ Below Average (estimated IQ below 90);

➢ Average (estimated IQ between 90 and 109);

➢ Above Average (estimated IQ above 110).

**Section 4. Neuropsychological Test Score Criteria by Domain of Cognitive Functioning**

There are 5 domains of cognitive functioning. In each domain, there are several tests that contribute 3, 4, or 6 demographically-adjusted test scores for consideration. Test selection in the domains was based on the availability of demographically-adjusted normative data for Caucasians and African Americans. These domains and scores are set out below.

The basic principle for defining impairment on testing is that there must be a pattern of performance that is approximately 1.5 standard deviations (for Level 1 Impairment), 1.7-1.8 standard deviations (for Level 1.5 Impairment) or 2 standard deviations (for Level 2 Impairment) below the person's expected level of premorbid functioning. Therefore, it is necessary to have more than one low test score in each domain. A user manual will be provided to neuropsychologists setting out the cutoff scores, criteria for identifying impairment in each cognitive domain, and statistical and normative data to support the impairment criteria.

| Domain/Test | Ability |
|---|---|
| **Complex Attention/Speed of Processing (6 Scores)** | |
| Digit Span | Attention & Working Memory |
| Arithmetic | Mental Arithmetic |
| Letter Number Sequencing | Attention & Working Memory |
| Coding | Visual-Processing & Clerical Speed |
| Symbol Search | Visual-Scanning & Processing Speed |
| Cancellation | Visual-Scanning Speed |
| **Executive Functioning (4 scores)** | |
| Similarities | Verbal Reasoning |
| Verbal Fluency (FAS) | Phonemic Verbal Fluency |
| Trails B | Complex Sequencing |
| Booklet Category Test | Conceptual Reasoning |
| **Learning and Memory (6 scores)** | |
| Logical Memory I | Immediate Memory for Stories |
| Logical Memory II | Delayed Memory for Stories |
| Verbal Paired Associates I | Learning Word Pairs |
| Verbal Paired Associates II | Delayed Memory for Word Pairs |
| Visual Reproduction I | Immediate Memory for Designs |
| Visual Reproduction II | Delayed Memory for Designs |
| **Language** | |
| Boston Naming Test | Confrontation Naming |
| BDAE Complex Ideational Material | Language Comprehension |
| Category Fluency | Category (Semantic) Fluency |
| **Visual-Perceptual** | |
| Block Design | Spatial Skills & Problem Solving |
| Visual Puzzles | Visual Perceptual Reasoning |
| Matrix Reasoning | Visual Perceptual Reasoning |

**Impairment Criteria: *Below Average* Estimated Intellectual Functioning (A1 – E1)**

| |
|---|
| **A1.  Complex Attention (6 test scores)** |
| 1.  Level 1 Impairment: 3 or more scores below a T score of 35 |
| 2.  Level 1.5 Impairment: 4 or more scores below a T score of 35; or meet for Level 1 and 2 scores below a T score of 30 |
| 3.  Level 2 Impairment: 3 or more scores below a T score of 30 |
| **B1.  Executive Function (4 test scores)** |
| 1.  Level 1 Impairment: 2 or more scores below a T score of 35 |
| 2.  Level 1.5 Impairment: 3 or more scores below a T score of 35; or meet for Level 1 and 1 score below a T score of 30 |
| 3.  Level 2 Impairment: 2 or more scores below a T score of 30 |
| **C1.  Learning and Memory (6 test scores)** |
| 1.  Level 1 Impairment: 3 or more scores below a T score of 35 |
| 2.  Level 1.5 Impairment: 4 or more scores below a T score of 35; or meet for Level 1 and 2 scores below a T score of 30 |
| 3.  Level 2 Impairment: 3 or more scores below a T score of 30 |
| **D1.  Language (3 test scores)** |
| 1.  Level 1 Impairment: 3 or more scores below a T score of 37 |
| 2.  Level 1.5 Impairment: meet for Level 1 and 2 scores below a T score of 35 |
| 3.  Level 2 Impairment: 3 or more scores below a T score of 35 |
| **E1.  Visual-Perceptual (3 test scores)** |
| 1.  Level 1 Impairment: 3 or more scores below a T score of 37 |
| 2.  Level 1.5 Impairment: meet for Level 1 and 2 scores below a T score of 35 |
| 3.  Level 2 Impairment: 3 or more scores below a T score of 35 |

**Impairment Criteria:** *Average* **Estimated Intellectual Functioning (A2 – E2)**

| |
|---|
| **A2.  Complex Attention (6 test scores)** |
| 1.  Level 1 Impairment: 2 or more scores below a T score of 35 |
| 2.  Level 1.5 Impairment: 3 or more scores below a T score of 35; or meet for Level 1 and 1 score below a T score of 30 |
| 3.  Level 2 Impairment: 2 or more scores below a T score of 30 |
| **B2.  Executive Function (4 test scores)** |
| 1.  Level 1 Impairment: 2 or more scores below a T score of 35 |
| 2.  Level 1.5 Impairment: 3 or more scores below a T score of 35; or meet for Level 1 and 1 score below a T score of 30 |
| 3.  Level 2 Impairment: 2 or more scores below a T score of 30 |
| **C2.  Learning and Memory (6 test scores)** |
| 1.  Level 1 Impairment: 3 or more scores below a T score of 35 |
| 2.  Level 1.5 Impairment: 4 or more scores below a T score of 35; or meet for Level 1 and 1 score below a T score of 30 |
| 3.  Level 2 Impairment: 2 or more scores below a T score of 30 |
| **D2.  Language (3 test scores)** |
| 1.  Level 1 Impairment: 2 or more scores below a T score of 37 |
| 2.  Level 1.5 Impairment: 3 or more scores below a T score of 37; or meet for Level 1 and 1 score below a T score of 35 |
| 3.  Level 2 Impairment: 2 or more scores below a T score of 35 |
| **E2.  Visual-Perceptual (3 test scores)** |
| 1.  Level 1 Impairment: 2 or more scores below a T score of 37 |
| 2.  Level 1.5 Impairment: 3 or more scores below a T score of 37; or meet for Level 1 and 1 score below a T score of 35 |
| 3.  Level 2 Impairment: 2 or more scores below a T score of 35 |

**Impairment Criteria:** *Above Average* **Estimated Intellectual Functioning (A3 – E3)**

| |
|---|
| **A3. Complex Attention (6 test scores)** |
| 1.  Level 1 Impairment: 2 or more scores below a T score of 35 |
| 2.  Level 1.5 Impairment: meet for Level 1 and 3 or more scores below a T score of 37 |
| 3.  Level 2 Impairment: 3 or more scores below a T score of 35 |
| **B3. Executive Function (4 test scores)** |
| 1.  Level 1 Impairment: 2 or more scores below a T score of 37 |
| 2.  Level 1.5 Impairment: meet for Level 1 and 3 or more scores below a T score of 37; or meet for Level 1 and 1 score below a T score of 30 |
| 3.  Level 2 Impairment: 2 or more scores below a T score of 30 |
| **C3. Learning and Memory (6 test scores)** |
| 1.  Level 1 Impairment: 2 or more scores below a T score of 35 |
| 2.  Level 1.5 Impairment: meet for Level 1 and 3 or more scores below a T score of 37 |
| 3.  Level 2 Impairment: 3 or more scores below a T score of 35 |
| **D3. Language (3 test scores)** |
| 1.  Level 1 Impairment: 2 or more scores below a T score of 40 |
| 2.  Level 1.5 Impairment: 3 scores below at T score of 40; or meet for Level 1 and 1 score below a T score of 37 |
| 3.  Level 2 Impairment: 2 or more scores below a T score of 37 |
| **E3. Visual-Perceptual (3 test scores)** |
| 1.  Level 1 Impairment: 2 or more scores below a T score of 40 |
| 2.  Level 1.5 Impairment: 3 scores below at T score of 40; or meet for Level 1 and 1 score below a T score of 37 |
| 3.  Level 2 Impairment: 2 or more scores below a T score of 37 |

**Section 5: Mental Health Assessment**

| Test | Symptoms/Functioning | Assessment |
|------|---------------------|------------|
| MMPI-2RF | Mental Health Assessment | Evaluation of Validity Scales and Configurations; T-Scores for Symptom Domains |
| Mini International Neuropsychiatric Interview (M.I.N.I. Version 5.0.0) | Semi-structured Psychiatric Interview | Scale Criteria for Various Psychiatric Diagnoses |

# EXHIBIT A-3

| | | MONETARY AWARD GRID | | | |
| --- | --- | --- | --- | --- | --- |
| | | (BY AGE AT TIME OF QUALIFYING DIAGNOSIS) | | | |

| Age Group | ALS | Death w/CTE | Parkinson's | Alzheimer's | Level 2 | Level 1.5 |
| --- | --- | --- | --- | --- | --- | --- |
| Under 45 | $5,000,000 | $4,000,000 | $3,500,000 | $3,500,000 | $3,000,000 | $1,500,000 |
| 45-49 | $4,500,000 | $3,200,000 | $2,470,000 | $2,300,000 | $1,900,000 | $950,000 |
| 50-54 | $4,000,000 | $2,300,000 | $1,900,000 | $1,600,000 | $1,200,000 | $600,000 |
| 55-59 | $3,500,000 | $1,400,000 | $1,300,000 | $1,150,000 | $950,000 | $475,000 |
| 60-64 | $3,000,000 | $1,200,000 | $1,000,000 | $950,000 | $580,000 | $290,000 |
| 65-69 | $2,500,000 | $980,000 | $760,000 | $620,000 | $380,000 | $190,000 |
| 70-74 | $1,750,000 | $600,000 | $475,000 | $380,000 | $210,000 | $105,000 |
| 75-79 | $1,000,000 | $160,000 | $145,000 | $130,000 | $80,000 | $40,000 |
| 80+ | $300,000 | $50,000 | $50,000 | $50,000 | $50,000 | $25,000 |

The above Monetary Award levels are the average base Monetary Awards for each of the Qualifying Diagnoses for particular age groups, except for the "Under 45" and "80+" rows, which list the maximum and minimum base Monetary Awards, respectively, for those age groups. A Settlement Class Member's actual base Monetary Award for ages 45-79 may be higher or lower than the average base Monetary Award listed for the Retired NFL Football Player's age group, depending on the Retired NFL Football Player's actual age at the time of Qualifying Diagnosis.

Base Monetary Awards are subject to: (a) upward adjustment for inflation, as provided in Section 6.7 of the Settlement Agreement; and (b) downward adjustment based on Offsets (Number of Eligible Seasons, medically diagnosed Stroke occurring prior to a Qualifying Diagnosis, medically diagnosed Traumatic Brain Injury occurring prior to a Qualifying Diagnosis, and non-participation in the BAP by a Retired NFL Football Player in Subclass 1, under the circumstances described in detail in the Settlement Agreement), as provided in Section 6.5(b) of the Settlement Agreement.

# EXHIBIT  A-4

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br><br>MDL No. 2323 |
| Kevin Turner and Shawn Wooden, *on behalf of themselves and others similarly situated,*<br>Plaintiffs,<br><br>v.<br><br>National Football League and NFL Properties, LLC, successor-in-interest to NFL Properties, Inc.,<br>Defendants. | Civ. Action No.: 14-cv-00029-AB |
| THIS DOCUMENT RELATES TO: ALL ACTIONS |  |

**[PROPOSED] FINAL ORDER AND JUDGMENT**

On January 6, 2014, Plaintiffs in the above-referenced action ("Action") filed a Class Action Complaint and on June 25, 2014 a Settlement Agreement was entered into by and among defendants the National Football League ("NFL") and NFL Properties LLC ("NFL Properties") (collectively, "NFL Parties"), by and through their attorneys, and the Class Representatives and Subclass Representatives, individually and on behalf of the Settlement Class and Subclasses, by and through Co-Lead Class Counsel, Class Counsel and Subclass Counsel.

On [DATE], the Court entered a Preliminary Approval and Conditional Class Certification Order ("Preliminary Order") that, among other things: (i) preliminarily approved

the Settlement Agreement; (ii) for purposes of the Settlement Agreement only, conditionally certified the Settlement Class and Subclasses; (iii) appointed Co-Lead Class Counsel, Class Counsel, and Subclass Counsel; (iv) approved the form and method of notice of the Settlement Agreement to the Settlement Class and Subclasses and directed that appropriate notice of the Settlement Agreement be disseminated; (v) scheduled a Fairness Hearing for final approval of the Settlement Agreement; and (vi) stayed this matter and all Related Lawsuits in this Court and enjoined proposed Settlement Class Members from pursuing Related Lawsuits.

In its Preliminary Order, pursuant to Fed. R. Civ. P. 23(b)(3), the Court defined and certified the Settlement Class as follows:

(i)    All living NFL Football Players who, prior to the date of the Preliminary Approval and Class Certification Order, retired, formally or informally, from playing professional football with the NFL or any Member Club, including American Football League, World League of American Football, NFL Europe League and NFL Europa League players, or were formerly on any roster, including preseason, regular season, or postseason, of any such Member Club or league and who no longer are under contract to a Member Club and are not seeking active employment as players with any Member Club, whether signed to a roster or signed to any practice squad, developmental squad, or taxi squad of a Member Club ("Retired NFL Football Players"); and

(ii)    Authorized representatives, ordered by a court or other official of competent jurisdiction under applicable state law, of deceased or legally incapacitated or incompetent Retired NFL Football Players ("Representative Claimants"); and

(iii)    Spouses, parents, children who are dependents, or any other persons who properly under applicable state law assert the right to sue independently or derivatively by reason of their relationship with a Retired NFL Football Player or deceased Retired NFL Football Player ("Derivative Claimants").

In its Preliminary Order, pursuant to Fed. R. Civ. P. 23(b)(3), the Court defined and certified the Subclasses as follows:

(i)    "Subclass 1" means Retired NFL Football Players who were not diagnosed with a Qualifying Diagnosis prior to the date of the Preliminary Approval and Class Certification Order and their Representative Claimants and Derivative Claimants.

(ii)    "Subclass 2" means Retired NFL Football Players who were diagnosed with a Qualifying Diagnosis prior to the date of the Preliminary Approval and Class Certification Order and their Representative Claimants and Derivative Claimants, and the Representative Claimants of deceased Retired NFL Football Players who were diagnosed with a Qualifying Diagnosis prior to death or who died prior to the date of the Preliminary Approval and Class Certification Order and who received a post-mortem diagnosis of CTE.

Notice was provided to Settlement Class Members pursuant to the Settlement Class Notice Plan approved in the Preliminary Order.  (*See* Settlement Class Notice Plan attached to the Declaration of Katherine Kinsella, Class Notice Agent.)  Counsel for the NFL Parties and Class Counsel worked together with the Settlement Class Notice Agent to fashion a Settlement Class Notice Plan that was tailored to the specific claims and Settlement Class Members of this case.  Settlement Class Notice was disseminated to all known Settlement Class Members by U.S. first-class mail by [INSERT DATE].  In addition, a Summary Notice was published in accordance with the Settlement Class Notice Plan and Co-Lead Class Counsel caused to be established an automated telephone system that uses a toll-free number to respond to questions from Settlement Class Members.  Co-Lead Class Counsel also caused to be established and maintained a public website that provided information about the proposed Class Action Settlement, including the Settlement Agreement, frequently asked questions, the Preliminary Order, and relevant dates for objecting to the Class Action Settlement, opting out of the Settlement Class, and the date and place of the Fairness Hearing.  The website allowed Settlement Class Members to identify themselves so that Settlement Class Notice could be mailed to them.  Class Counsel have established that the Settlement Class Notice Plan was implemented.

[    ] Settlement Class Members have chosen to be excluded from the Settlement Class by timely filing written requests for exclusion ("Opt Outs").  The Opt Outs are listed at the end of this Order in Exhibit [  ].

[    ] Settlement Class Members submitted objections to the Class Action Settlement under the process set by the Preliminary Order.

On [DATE], at [TIME], the Court held the Fairness Hearing to consider whether the Class Action Settlement was fair, reasonable, adequate, and in the best interests of the Settlement Class and Subclasses.  At the Fairness Hearing, [NAMES] appeared on behalf of the Class Representatives, Subclass Representatives and Settlement Class Members, and [NAMES] appeared on behalf of the NFL Parties.  Additionally, the following individuals also appeared at the Fairness Hearing having timely submitted a Notice of Intention to Appear.  [INSERT LIST]

The Court, having heard arguments of counsel for the Parties and of the persons who appeared at the Fairness Hearing [REFERENCE OBJECTIONS, if any], having reviewed all materials submitted, having considered all of the files, records, and proceedings in this Action, and being otherwise fully advised,

**HEREBY ORDERS THAT:**

1.    <u>Jurisdiction.</u>  This Court retains continuing and exclusive jurisdiction over the Action, Parties and their counsel, all Settlement Class Members, the Special Master, BAP Administrator, Claims Administrator, Lien Resolution Administrator,  Appeals Advisory Panel, Appeals Advisory Panel Consultants, Trustee and Settlement Agreement, including its enforcement and interpretation, and all other matters relating to it.  This Court also retains continuing jurisdiction over the "qualified settlement funds," as defined under § 1.468B-1 of the

Treasury Regulations promulgated under Sections 461(h) and 468B of the Internal Revenue Code of 1986 as amended, created under the Settlement Agreement.

2.    <u>Incorporation of Settlement Documents.</u>    This Order and Judgment incorporates and makes a part hereof: (a) the Settlement Agreement and exhibits filed with the Court on June 25, 2014, including definitions of the terms used therein and (b) the Settlement Class Notice Plan and the Summary Notice, both of which were filed with the Court on June 25, 2014.  Unless otherwise defined in this Final Order and Judgment, the capitalized terms herein shall have the same meaning as they have in the *In re: National Football League Players' Concussion Injury Litigation*, MDL 2323, Class Action Settlement Agreement dated June 25, 2014.

3.    <u>Confirmation of Settlement Class.</u>    The provisions of the Preliminary Order that conditionally certified the Settlement Class and Subclasses should be, and hereby are, confirmed in all respects as a final class certification order under Fed. R. Civ. P. 23 for the purposes of implementing the Settlement Agreement.  As set forth in the Preliminary Order, the Court finds that, for purposes of effectuating the Settlement Agreement: (a) the Settlement Class Members are so numerous that their joinder is impracticable; (b) there are questions of law and fact common to the Class and Subclasses; (c) the claims of the Class Representatives and Subclass Representatives are typical of the Settlement Class Members and the respective Subclass Members; (d) the Class Representatives and Subclass Representatives and Co-Lead Class Counsel, Class Counsel and Subclass Counsel have fairly and adequately represented and protected the interests of all Settlement Class Members; and (e) the questions of law or fact common to the Class and Subclasses predominate over any questions affecting only individual

Settlement Class Members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

4.    <u>Settlement Notice.</u>  The Court finds that pursuant to Federal Rule of Civil Procedure 23(c)(2)(B) the dissemination of the Settlement Class Notice and the publication of the Summary Notice: (i) were implemented in accordance with the Preliminary Order; (ii) constituted the best notice practicable under the circumstances; (iii) constituted notice that was reasonably calculated, under the circumstances, to apprise Settlement Class Members (a) of the effect of the Settlement Agreement (including the Releases provided for therein), (b) that the NFL Parties agreed not to object to a petition for class attorneys' fees and reasonable incurred costs up to $112.5 million, and that at a later date, to be determined by the Court, Class Counsel may petition the Court for an award of attorneys' fees and reasonable incurred costs, and Settlement Class Members may comment on or object to the petition, (c) of their right to opt out or object to any aspect of the Settlement Agreement, (d) of their right to revoke an Opt Out prior to the Final Approval Date, and (e) of their right to appear at the Fairness Hearing; (iv) constituted due, adequate, and sufficient notice to all persons or entities entitled to receive notice of the proposed Settlement Agreement; and (v) satisfied the requirements of Rule 23 of the Federal Rules of Civil Procedure, the United States Constitution (including the Due Process Clause) and other applicable laws and rules.  The Notice given by the NFL Parties to state and federal officials pursuant to 28 U.S.C. § 1715 fully satisfied the requirements of that statute.

5.    <u>Confirmation of Appointment of Class and Subclass Representatives.</u>  As set forth in the Preliminary Order, the Court confirms the appointment of Shawn Wooden and Kevin Turner as Class Representatives and Shawn Wooden as Subclass 1 Representative and Kevin Turner as Subclass 2 Representative.

6.    Confirmation of Appointments of Co-Lead Class Counsel, Class Counsel and Subclass Counsel. Pursuant to Fed. R. Civ. P. 23(g), the Court confirms the appointment of Christopher A. Seeger, Sol Weiss, Steven C. Marks, Gene Locks, Arnold Levin and Dianne M. Nast as Class Counsel. In addition, the appointment of Christopher A. Seeger and Sol Weiss as Co-Lead Class Counsel is confirmed, and the appointments of Arnold Levin and Dianne M. Nast as Subclass Counsel for Subclasses 1 and 2, respectively, are confirmed. Co-Lead Class Counsel, Class Counsel and Subclass Counsel are familiar with the claims in this case and have done work investigating the claims. They have consulted with other counsel in the case and have experience in handling class actions and other complex litigation. They have knowledge of the applicable laws and the resources to commit to the representation of Settlement Class Members and the Settlement Class and Subclasses.

7.    Approval of Class Action Settlement. Pursuant to, and in accordance with, Rule 23 of the Federal Rules of Civil Procedure, this Court hereby fully and finally approves the Settlement Agreement in its entirety (including, without limitation, the NFL Parties' payment obligations, as set forth in Article XXIII of the Settlement Agreement, the Releases provided for therein, and the dismissal with prejudice of claims against the NFL Parties) and finds that the Settlement Agreement is fair, reasonable and adequate. The Court also finds that the Settlement Agreement is fair, reasonable and adequate, and in the best interests of, the Class and Subclass Representatives and all Settlement Class Members, including, without limitation, the members of the Subclasses.

The Parties are ordered to implement, perform and consummate each of the obligations set forth in the Settlement Agreement in accordance with its terms and

provisions. All objections to the Settlement Agreement are found to be without merit and are overruled.

8. <u>Dismissal of Class Action Complaint.</u> The Class Action Complaint is hereby dismissed with prejudice, without further costs, including claims for interest, penalties, costs and attorneys' fees, except that Class Counsel's motion for an award of class attorneys' fees and reasonable incurred costs, as contemplated by the Parties in Section 21.1 of the Settlement Agreement, will be made at an appropriate time to be determined by the Court.

9. <u>Dismissal of Released Claims.</u> As set forth in Article XVIII of the Settlement Agreement, the Settlement Class, the Class and Subclass Representatives and each Settlement Class Member, on his or her own behalf and on behalf of his or her respective predecessors, successors, assigns, assignors, representatives, attorneys, agents, trustees, insurers, heirs, next of kin, estates, beneficiaries, executors, administrators, and any natural, legal, or juridical person or entity to the extent he, she, or it is entitled to assert any claim on behalf of any Settlement Class Member (the "Releasors"), have waived and released, forever discharged and held harmless the Released Parties, and each of them:

> a. Of and from any and all past, present and future claims, counterclaims, actions, rights or causes of action, liabilities, suits, demands, damages, losses, payments, judgments, debts, dues, sums of money, costs and expenses (including, without limitation, attorneys' fees and costs), accounts, reckonings, bills, covenants, contracts, controversies, agreements, obligations, or promises, in law or in equity, contingent or non-contingent, known or unknown, suspected or unsuspected, foreseen or unforeseen, matured or unmatured, accrued or unaccrued, liquidated or unliquidated, whether direct, representative, class or individual in nature, in any forum that the Releasors, and each of them, had, has, or may have in the future arising out of, in any way relating to or in connection with the allegations, transactions, facts, matters, occurrences, representations or omissions involved, set forth, referred to or relating to the Class Action Complaint and/or Related Lawsuits

("Claims"), including, without limitation, the Claims identified in Section 18.1(a)(i)-(viii) of the Settlement Agreement.

b.  Of and from any and all Claims, including unknown Claims, arising from, relating to, or resulting from the reporting, transmittal of information, or communications between or among the NFL Parties, Counsel for the NFL Parties, the Special Master, Claims Administrator, Lien Resolution Administrator, any Governmental Payor and/or Medicare Part C or Part D Program sponsor, regarding any claim for benefits under this Settlement Agreement, including any consequences in the event that this Settlement Agreement impacts, limits, or precludes any Settlement Class Member's right to benefits under Social Security or from any Governmental Payor or Medicare Part C or Part D Program sponsor.

c.  Of and from any and all Claims, including unknown Claims, pursuant to the MSP Laws, or other similar causes of action, arising from, relating to, or resulting from the failure or alleged failure of any of the Released Parties to provide for a primary payment or appropriate reimbursement to a Governmental Payor or Medicare Part C or Part D Program sponsor with a Lien in connection with claims for medical items, services, and/or prescription drugs provided in connection with compensation or benefits claimed or received by a Settlement Class Member pursuant to this Settlement Agreement.

d.  And the Special Master, BAP Administrator, Claims Administrator, and their respective officers, directors, and employees, of and from any and all Claims, including unknown Claims, arising from, relating to, or resulting from their participation, if any, in the BAP, including, but not limited to, Claims for negligence, medical malpractice, wrongful or delayed diagnosis, personal injury, bodily injury (including disease, trauma, mental or physical pain or suffering, emotional or mental harm, or anguish or loss of enjoyment of life), or death arising from, relating to, or resulting from such participation.

Accordingly, the Court hereby orders the dismissal with prejudice of all Released Claims by the Releasors against the Released Parties pending in the Court and without further costs, including claims for interest, penalties, costs and attorneys' fees. All Releasors with Released Claims pending in any other federal court, state court, arbitration, regulatory agency, or

other tribunal or forum, other than the Court, against the Released Parties are ordered to promptly dismiss with prejudice all such Released Claims, and without further costs, including claims for interest, penalties, costs, and attorneys' fees. This Settlement Agreement will be the exclusive remedy for any and all Released Claims by or on behalf of any and all Releasors against any of the Released Parties, and no Releasor shall recover, directly or indirectly, any sums from any Released Parties for Released Claims other than those received for Released Claims under the terms of the Settlement Agreement, if any. However, nothing contained in the Settlement Agreement, including the Release and Covenant Not to Sue provisions in Article XVIII, affects the rights of Settlement Class Members to pursue claims for workers' compensation and claims alleging entitlement to NFL CBA Medical and Disability Benefits. Nor does the Settlement Agreement alter the showing that Settlement Class Members must demonstrate to pursue successful claims for workers' compensation and/or successful claims alleging entitlement to NFL CBA Medical and Disability Benefits, nor does it alter the defenses to such claims available to Released Parties except as set forth in ARTICLE XXIX.

10.    <u>Dismissal of Related Lawsuits.</u>  All Related Lawsuits pending in the Court are hereby dismissed with prejudice, without further costs, including claims for interest, penalties, costs and attorneys' fees. All Releasors with Related Lawsuits pending in any other federal court, state court, arbitration, regulatory agency, or other tribunal or forum, other than the Court, are ordered to promptly dismiss with prejudice such Related Lawsuits, and without further costs, including claims for interest, penalties, costs, and attorneys' fees.

11.    <u>Covenant Not to Sue.</u>  Consistent with Section 18.4 of the Settlement Agreement, the Class and Subclass Representatives, each Settlement Class Member, and the Settlement Class, on behalf of the Releasors, and each of them, are hereby barred, enjoined and

restrained from, at any time, continuing to prosecute, commencing, filing, initiating, instituting, causing to be instituted, assisting in instituting, or permitting to be instituted on their, his, her, or its behalf, or on behalf of any other individual or entity, any proceeding:  (i) alleging or asserting any of his or her respective Released Claims against the Released Parties in any federal court, state court, arbitration, regulatory agency, or other tribunal or forum, including, without limitation, the Claims set forth in Article XVIII of the Settlement Agreement; or (ii) challenging the validity of the Releases.  To the extent any such proceeding exists in any court, tribunal or other forum as of the Effective Date, the Releasors are ordered to withdraw and seek dismissal with prejudice of such proceeding forthwith.

        12.    Complete Bar Order and Judgment Reduction.  It is ordered that any person or entity, other than Riddell (as defined in the Settlement Agreement), that becomes liable to any Releasor, or to any other alleged tortfeasor, co-tortfeasor, co-conspirator or co-obligor, by reason of judgment or settlement, for any claims that are or could have been asserted in this Action or in any Related Lawsuit, or that arise out of or relate to any claims that are or could have been asserted in this Action or in any Related Lawsuit, or that arise out of or relate to any facts in connection with this Action or any Related Lawsuit (collectively, the "Barred Defendants"), are hereby permanently BARRED, ENJOINED and RESTRAINED from commencing, prosecuting, or asserting any claim for contribution or indemnity (whether styled as a claim for contribution, indemnity or otherwise) against the Released Parties that seeks to recover from the Released Parties any part of any judgment entered against the Barred Defendants and/or any settlement reached with any of the Barred Defendants, in connection with any claims that are or could have been asserted against the Barred Defendants in this Action or in any Related Lawsuit or that arise out of or relate to any claims that are or could have been

asserted in this Action or in any Related Lawsuit, or that arise out of or relate to any facts in connection with this Action or any Related Lawsuit, whether arising under state, federal, or foreign law as claims, cross-claims, counterclaims, or third-party claims, whether asserted in this Action, in any Related Lawsuit, in any federal or state court, or in any other court, arbitration proceeding, administrative agency, or other forum in the United States or elsewhere.

It is further ordered that the Released Parties are hereby permanently BARRED, ENJOINED AND RESTRAINED from commencing, prosecuting, or asserting any claim for contribution or indemnity (whether styled as a claim for contribution, indemnity or otherwise) against any of the Barred Defendants that seeks to recover any part of the NFL Parties' payment obligations as set forth in Article XXIII of the Settlement Agreement, whether arising under state, federal, or foreign law as claims, cross-claims, counterclaims, or third-party claims, whether asserted in this Action, in any Related Lawsuit, in any federal or state court, or in any other court, arbitration proceeding, administrative agency, or other forum in the United States or elsewhere.

It is further ordered that any judgment or award obtained by the Releasors against any such Barred Defendant shall be reduced by the amount or percentage, if any, necessary under applicable law to relieve the Released Parties of all liability to such Barred Defendants on claims barred pursuant to this Paragraph 12. Such judgment reduction, partial or complete release, settlement credit, relief, or setoff, if any, shall be in an amount or percentage sufficient under applicable law to compensate such Barred Defendants for the loss of any such barred claims pursuant to this Paragraph 12 against the Released Parties.

13.    No Release for Insurance Coverage. Notwithstanding anything to the contrary in this Final Order and Judgment, this Final Order and Judgment and the Settlement

Agreement are not intended to and do not effect a release of any rights or obligations that any insurer has under or in relation to any contract or policy of insurance to any named insured, insured, additional insured, or other insured person or entity thereunder, including those persons or entities referred to in Section 2.1(bbbb)(i)-(ii) of the Settlement Agreement.

14.    <u>Riddell.</u>    As set forth in the Settlement Agreement, it is hereby ordered that, with respect to any litigation by the Releasors against Riddell, if a verdict in a Releasor's favor results in verdict or judgment for contribution or indemnity against any of the Released Parties, the Releasors shall not enforce their right to collect this verdict or judgment to the extent that such enforcement creates liability against such Released Parties.   In such event, the Releasors shall reduce their claim or agree to a judgment reduction or satisfy the verdict or judgment to the extent necessary to eliminate the claim of liability against the Released Parties or any Other Party claiming contribution or indemnity.

15.    <u>Confirmation of Administrative Appointments.</u>   As set forth in the Preliminary Order, the Court confirms the appointment of The Garretson Resolution Group, Inc. as the BAP Administrator, BrownGreer PLC as the Claims Administrator, The Garretson Resolution Group, Inc. as the Liens Resolution Administrator and Citibank, N.A. as the Trustee, and confirms that the Court retains continuing jurisdiction over those appointed.   Pursuant to Federal Rule of Civil Procedure 53 and the inherent authority of the Court, the Court appoints _____ as Special Master to perform the duties of the Special Master as set forth in the Settlement Agreement for a five-year term.

16.    <u>No Admission.</u>    This Final Order and Judgment, the Settlement Agreement, and the documents relating thereto, and any actions taken by the NFL Parties or the Released Parties in the negotiation, execution, or satisfaction of the Settlement Agreement: (a)

do not and shall not, in any event, constitute, or be construed as, an admission of any liability or wrongdoing, or recognition of the validity of any claim made by the Class and Subclass Representatives, the Settlement Class, or any Settlement Class Member in this or any other action or proceeding; and (b) shall not, in any way, be construed as, offered as, received as, used as, or deemed to be evidence, admissible or otherwise, of any kind, or used in any other fashion, by the Class and Subclass Representatives, the Settlement Class, any Settlement Class Member, Class Counsel, or any of the Released Parties in any litigation, action, hearing, or any judicial, arbitral, administrative, regulatory or other proceeding for any purpose, except a proceeding to resolve a dispute arising under, or to enforce, the Settlement Agreement.  Without limiting the foregoing, neither the Settlement Agreement nor any of its provisions, negotiations, statements, or court proceedings relating to its provisions, nor any actions undertaken in this Settlement Agreement, will be construed as, offered as, received as, used as, or deemed to be evidence, admissible or otherwise, or admission or concession of any liability or wrongdoing whatsoever on the part of any person or entity, including, but not limited to, the Released Parties, or as a waiver by the Released Parties of any applicable defense, or as a waiver by the Class and Subclass Representatives, the Settlement Class, or any Settlement Class Member, of any claims, causes of action, or remedies.  This Paragraph shall not apply to disputes between the NFL Parties and their insurers, as to which the NFL Parties reserve all rights.

    17. <u>Modification of the Settlement Agreement.</u>  Without further approval from the Court, and without the express written consent of Class Counsel and Counsel for the NFL Parties, on behalf of all Parties, the Settlement Agreement will not be subject to any change, modification, amendment, or addition.

18. <u>Binding Effect.</u> The terms of the Settlement Agreement and of this Final Order and Judgment shall be forever binding on the Parties (regardless of whether or not any individual Settlement Class Member receives payment of a Monetary Award or Derivative Claimant Award or participates in a BAP baseline assessment examination), as well as their respective heirs, executors, administrators, predecessors, successors, affiliates and assigns. The Opt Outs listed in Exhibit [    ] hereto are excluded from the Settlement Class pursuant to request and are not bound by the terms of the Settlement Agreement or this Final Order and Judgment.

19. <u>Termination.</u> If the Settlement Agreement is terminated as provided in Article XVI of the Settlement Agreement, then this Final Order and Judgment (and any orders of the Court relating to the Settlement Agreement) shall be null and void and be of no further force or effect, except as otherwise provided by the Settlement Agreement, and any unspent and uncommitted monies in the Funds will revert to, and shall be paid to, the NFL Parties within ten (10) days.

20. <u>Entry of Final Judgment.</u> There is no just reason to delay the entry of this Final Order and Judgment as a final judgment in this Action. Accordingly, the Clerk of Court is hereby directed, in accordance with this Final Order and Judgment and pursuant to Fed. R. Civ. P. 54, to: (i) enter final judgment dismissing with prejudice this Action and any Related Lawsuits in this Court in which Released Parties (or any of them) are the only defendants, and (ii) enter final judgment dismissing with prejudice all Released Claims asserted against Released Parties

(or any of them) in any other Related Lawsuits in this Court in which there are named defendants other than Released Parties.

SO ORDERED this _____ day of _____, 2014.


_____
Anita B. Brody
United States District Court Judge

# EXHIBIT A-5

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

# NFL Concussion Settlement

### All Valid Claims of Retired NFL Football Players to be Paid in Full for 65 Years

### Monetary Awards, Baseline Medical Exams and Other Benefits Provided

*A federal court authorized this Notice. This is not a solicitation from a lawyer.*

- The National Football League ("NFL") and NFL Properties LLC (collectively, "NFL Parties") have agreed to a Settlement of a class action lawsuit seeking medical monitoring and compensation for brain injuries allegedly caused by head impacts experienced in NFL football. The NFL Parties deny that they did anything wrong.

- The Settlement Class includes all retired players of the NFL, the American Football League ("AFL") that merged with the NFL, the World League of American Football, NFL Europe League, and NFL Europa League, as well as immediate family members of retired players and legal representatives of incapacitated, incompetent or deceased retired players.

- The Settlement will provide eligible retired players with:

  - Baseline neuropsychological and neurological exams to determine if retired players are: a) currently suffering from any neurocognitive impairment, including impairment serious enough for compensation, and b) eligible for additional testing and/or treatment ($75 million);

  - Monetary awards for diagnoses of ALS (Lou Gehrig's disease), Parkinson's Disease, Alzheimer's Disease, early and moderate Dementia and certain cases of chronic traumatic encephalopathy (CTE) (a neuropathological finding) diagnosed after death. The maximum monetary awards range from $1.5 million to $5 million depending on the diagnosis. There is no cap on the amount of funds available to pay these Monetary Awards and all valid claims will be paid in full for 65 years; and

  - Education programs promoting safety and injury prevention with respect to football players, including safety-related initiatives in youth football, the education of retired players regarding the NFL's medical and disability programs and other educational programs and initiatives ($10 million).

- Individuals who represent incapacitated, incompetent or deceased retired players, or family members who meet certain criteria may also file claims for monetary awards (*see* Question 6).

- To get money, proof that injuries were caused by playing NFL football is not required.

- **Settlement Class Members will need to register to get benefits. Settlement Class Members may sign up at the website for additional information about the Settlement and updates on the registration process.**

- Your legal rights are affected even if you do nothing. Please read this Notice carefully.

| YOUR LEGAL RIGHTS AND OPTIONS IN THIS SETTLEMENT | |
|---|---|
| **STAY IN THE SETTLEMENT CLASS** | You do not need to do anything to be included in the Settlement Class. However, once the Court approves the Settlement, you will be bound by the terms and releases contained in the Settlement. There will be later notice to explain when and how to register for Settlement benefits (*see* Question 26). |
| **ASK TO BE EXCLUDED** | You will get no benefits. This is the only option that allows you to participate in any other lawsuit against the NFL Parties about the claims in this case (*see* Question 30). |

QUESTIONS? CALL 1-800-000-0000 OR VISIT WWW.NFLCONCUSSIONSETTLEMENT.COM

Exhibit 5                                                                 Page 1

-2909-

| **OBJECT** | Write to the Court if you do not like the Settlement (*see* Question 35). |
|---|---|

- These rights and options—**and the deadlines to exercise them**—are explained in this Notice.

- The Court in charge of this case still has to decide whether to approve the Settlement.

- **This Notice is only a summary of the Settlement Agreement and your rights.  You are encouraged to carefully review the complete Settlement Agreement at www.NFLConcussionSettlement.com.**

| What This Notice Contains |
| --- |

## CHAPTER 1: INTRODUCTION

**BASIC INFORMATION**………………………………………………………………………….**Page 5**
1.    Why is this Notice being provided?
2.    What is the litigation about?
3.    What is a class action?
4.    Why is there a Settlement?
5.    What are the benefits of the Settlement?

**WHO IS PART OF THE SETTLEMENT?** …………………………………………………….**Page 7**
6.    Who is included in the Settlement Class?
7.    What players are not included in the Settlement Class?
8.    What if I am not sure whether I am included in the Settlement Class?
9.    What are the different levels of neurocognitive impairment?
10.   Must a retired player be vested under the NFL Retirement Plan to receive Settlement benefits?

## CHAPTER 2: SETTLEMENT BENEFITS

**THE BASELINE ASSESSMENT PROGRAM**………………………………………………....**Page 9**
11.   What is the Baseline Assessment Program ("BAP")?
12.   Why should a retired player get a BAP baseline examination?
13.   How does a retired player schedule a baseline assessment examination and where will it be done?

**MONETARY AWARDS**…………………………………………………………….……... **Page 10**
14.   What diagnoses qualify for monetary awards?
15.   Do I need to prove that playing professional football caused the retired player's Qualifying Diagnosis?
16.   How much money will I receive?
17.   How does the age of the retired player at the time of first diagnosis affect a monetary award?
18.   How does the number of seasons a retired player played affect a monetary award?
19.   How do prior strokes or brain injuries of a retired player affect a monetary award?
20.   How is a retired player's monetary award affected if he does not participate in the BAP program?
21.   Can I receive a monetary award even though the retired player is dead?
22.   Will this Settlement affect a retired player's participation in NFL or NFLPA related benefits programs?
23.   Will this Settlement prevent retired players from bringing workers' compensation claims?

**EDUCATION FUND**…………………………………………………………………………**Page 14**
24.   What types of education programs are supported by the Settlement?

## CHAPTER 3: YOUR RIGHTS

**REMAINING IN THE SETTLEMENT**……………………………………………………….**Page 15**
25.   What am I giving up to stay in the Settlement Class?

QUESTIONS? CALL **1-800-000-0000** OR VISIT WWW.NFLCONCUSSIONSETTLEMENT.COM

Exhibit 5                                                                                                    Page 3

**-2911-**

**HOW TO GET BENEFITS**………………………………………………………………...**Page 15**
26.    How do I get Settlement benefits?
27.    Is there a time limit for Retired NFL Football Players and Representative Claimants to file claims
       for monetary awards?
28.    Can I re-apply for compensation if my claim is denied?
29.    Can I appeal the determination of my monetary award claim?

**EXCLUDING YOURSELF FROM THE SETTLEMENT**……………………………………**Page 16**
30.    How do I get out of the Settlement?
31.    If I do not exclude myself, can I sue the NFL Parties for the same thing later?
32.    If I exclude myself, can I still get benefits from this Settlement?

**THE LAWYERS REPRESENTING YOU**……………………………………………………**Page 17**
33.    Do I have a lawyer in the case?
34.    How will the lawyers be paid?

**OBJECTING TO THE SETTLEMENT**………………………………………………………**Page 18**
35.    How do I tell the Court if I do not like the Settlement?
36.    What is the difference between objecting to the Settlement and excluding myself?

**THE COURT'S FAIRNESS HEARING**……………………………………………………**Page 19**
37.    When and where will the Court hold a Fairness Hearing concerning the Settlement?
38.    Do I have to attend the hearing?
39.    May I speak at the hearing?

**GETTING MORE INFORMATION**…………………………………………………………**Page 19**
40.    How do I get more information?

# CHAPTER 1: INTRODUCTION

## BASIC INFORMATION

| **1. Why is this Notice being provided?** |
|---|

The Court in charge of this case authorized this Notice because you have a right to know about the proposed Settlement of this lawsuit and about all of your options before the Court decides whether to give final approval to the Settlement. This Notice summarizes the Settlement and explains your legal rights and options.

Judge Anita B. Brody of the United States District Court for the Eastern District of Pennsylvania is overseeing this case. The case is known as *In re: National Football League Players' Concussion Injury Litigation,* No. 2:12-md-02323. The people who sued are called the "Plaintiffs." The National Football League and NFL Properties LLC are called the "NFL Defendants."

The Settlement may affect your rights if you are: (a) a retired player of the NFL, AFL, World League of American Football, NFL Europe League, or NFL Europa League, (b) an authorized representative of a deceased or legally incapacitated or incompetent retired player of those leagues, or (c) an individual with a close legal relationship with a retired player of those leagues, such as a spouse, parent or child.

| **2. What is the litigation about?** |
|---|

The Plaintiffs claim that retired players experienced head trauma during their NFL football playing careers that resulted in brain injuries, which have caused or may cause them long-term neurological problems. The Plaintiffs accuse the NFL Parties of being aware of the evidence and the risks associated with repetitive traumatic brain injuries but failing to warn and protect the players against the long-term risks, and ignoring and concealing this information from the players. The NFL Parties deny the claims in the litigation.

| **3. What is a class action?** |
|---|

In a class action, one or more people, the named plaintiffs (who are also called proposed "class representatives") sue on behalf of themselves and other people with similar claims. All of these people together are the proposed "class" or "class members." When a class action is settled, one court resolves the issues for all class members (in the settlement context, "settlement class members"), except for those who exclude themselves from the settlement. In this case, the proposed class representatives are Kevin Turner and Shawn Wooden. Excluding yourself means that you will not receive any benefits from the Settlement. The process for excluding yourself is described in Question 30 of this Notice.

| **4. Why is there a Settlement?** |
|---|

After extensive settlement negotiations mediated by retired United States District Court Judge Layn Phillips, and further settlement negotiations under the supervision of the Court-appointed Special Master, Perry Golkin, the Plaintiffs and the NFL Parties agreed to the Settlement.

A settlement is an agreement between a plaintiff and a defendant to resolve a lawsuit. Settlements conclude litigation without the court or a jury ruling in favor of the plaintiff or the defendant. A settlement allows the parties to avoid the cost and risk of a trial, as well as the delays of litigation.

If the Court approves this Settlement, the claims of all persons affected (*see* Question 6) and the litigation between these persons and the NFL Parties are over. The persons affected by the Settlement are eligible for the benefits summarized in this Notice and the NFL Parties will no longer be legally responsible to defend against the claims made in this litigation.

The Court has not and will not decide in favor of the retired players or the other persons affected by the Settlement or the NFL Parties, and by reviewing this Settlement the Court is not making and will not make any findings that any law was broken or that the NFL Parties did anything wrong.

The proposed Class Representatives and their lawyers ("Co-Lead Class Counsel," "Class Counsel," and "Subclass Counsel," *see* Question 33) believe that the proposed Settlement is best for everyone who is affected. The factors that Co-Lead Class Counsel, Class Counsel, and Subclass Counsel considered included the uncertainty and delay associated with continued litigation, a trial and appeals, and the uncertainty of particular legal issues that are yet to be determined by the Court. Co-Lead Class Counsel, Class Counsel and Subclass Counsel balanced these and other substantial risks in determining that the Settlement is fair, reasonable and adequate in light of all circumstances and in the best interests of the Settlement Class Members.

The Settlement Agreement is available at www.NFLConcussionSettlement.com. The Settlement Agreement is also on file with the Clerk of the Court for the Eastern District of Pennsylvania (*see* Question 35 for the address). You can also get this information by calling 1-800-000-0000.

| 5. What are the benefits of the Settlement? |
| --- |

Under the Settlement, the NFL Parties will pay to fund:

- Baseline neuropsychological and neurological examinations for eligible retired players, and additional medical testing, counseling and/or treatment if they are diagnosed with moderate cognitive impairment during the baseline examinations (up to $75 million, "Baseline Assessment Program") (*see* Questions 11-13);

- Monetary awards for diagnoses of ALS, Parkinson's Disease, Alzheimer's Disease, Level 2 Neurocognitive Impairment (*i.e.*, moderate Dementia), Level 1.5 Neurocognitive Impairment (*i.e.*, early Dementia) and Death with CTE prior to [Date of Preliminary Approval Order] (*see* Questions 14-21); **All valid claims under the Settlement, without limitation, will be paid in full throughout the 65-year life of the Settlement (the "Monetary Award Fund")**; and

- Education programs promoting safety and injury prevention with respect to football players, including safety-related initiatives in youth football, the education of retired players regarding the NFL's medical and disability programs and other educational programs and initiatives ($10 million) (*see* Question 24).

In addition, the NFL Parties will pay the cost of notifying the Settlement Class. Administrative costs and expenses will be paid out of the Monetary Award Fund. The Baseline Assessment Program costs and expenses will be paid out of the Baseline Assessment Program Fund.

The details of the Settlement benefits are in the Settlement Agreement, which is available at www.NFLConcussionSettlement.com. The Settlement Agreement is also on file with the Clerk of the Court for the Eastern District of Pennsylvania (*see* Question 35 for the address). You can also get this information by calling 1-800-000-0000.

**Note:** The Baseline Assessment Program and Monetary Award Fund are completely independent of the NFL Parties and any benefit programs that have been created between the NFL and the NFL Players Association. The NFL Parties are not involved in determining the validity of claims.

## WHO IS PART OF THE SETTLEMENT?

You need to decide whether you are included in the Settlement.

| 6.  Who is included in the Settlement Class? |
|---|

This Settlement Class includes three types of people:

Retired NFL Football Players:  Prior to [Date of Preliminary Approval Order], all living NFL Football players who (1) have retired, formally or informally, from playing professional football with the NFL or any Member Club, including AFL, World League of American Football, NFL Europe League, and NFL Europa League players, or (2) were formerly on any roster, including preseason, regular season, or postseason, of any such Member Club or league and no longer are under contract to a Member Club and are not seeking active employment as a player with any Member Club, whether signed to a roster or signed to any practice squad, developmental squad, or taxi squad of a Member Club.

Representative Claimants:  An authorized representative, ordered by a court or other official of competent jurisdiction under applicable state law, of a deceased or legally incapacitated or incompetent Retired NFL Football Player.

Derivative Claimants:  A spouse, parent, dependent child, or any other person who properly under applicable state law asserts the right to sue independently or derivatively by reason of his or her relationship with a living or deceased Retired NFL Football Player.  (For example, a spouse asserting the right to sue due to the injury of a husband who is a Retired NFL Football Player.)

The Settlement recognizes two separate groups ("Subclasses") of Settlement Class Members based on the Retired NFL Football Player's injury status as of [Date of Preliminary Approval Order]:

- Subclass 1 includes: Retired NFL Football Players who were not diagnosed with ALS, Parkinson's Disease, Alzheimer's Disease, Level 2 Neurocognitive Impairment (*i.e.*, moderate Dementia), Level 1.5 Neurocognitive Impairment (*i.e.*, early Dementia) or Death with CTE prior to [Date of Preliminary Approval Order], and their Representative Claimants and Derivative Claimants.

- Subclass 2 includes:

  - Retired NFL Football Players who were diagnosed with ALS, Parkinson's Disease, Alzheimer's Disease, Level 2 Neurocognitive Impairment (*i.e.*, moderate Dementia), or Level 1.5 Neurocognitive Impairment (*i.e.*, early Dementia) prior to [Date of Preliminary Approval Order], and their Representative Claimants and Derivative Claimants; and

o Representative Claimants of deceased Retired NFL Football Players who were diagnosed with ALS, Parkinson's Disease, Alzheimer's Disease, Level 2 Neurocognitive Impairment (*i.e.*, moderate Dementia), or Level 1.5 Neurocognitive Impairment (*i.e.*, early Dementia) prior to death or who died prior to [Date of Preliminary Approval Order] and received a diagnosis of Death with CTE.

## 7. What players are not included in the Settlement Class?

The Settlement Class does not include: (a) current NFL players, and (b) people who tried out for NFL or AFL Member Clubs, or World League of American Football, NFL Europe League or NFL Europa League teams, but did not make it onto preseason, regular season or postseason rosters, or practice squads, developmental squads or taxi squads.

## 8. What if I am not sure whether I am included in the Settlement Class?

If you are not sure whether you are included in the Settlement Class, you may call **1-800-000-0000** with questions or visit www.NFLConcussionSettlement.com. You may also write with questions to NFL Concussion Settlement, P.O. Box 0000, City, ST 00000. You may also consult with your own attorney.

## 9. What are the different levels of neurocognitive impairment?

In addition to ALS, Parkinson's Disease, and Alzheimer's Disease, various levels of neurocognitive impairment are covered by this Settlement. More details can be found in the Injury Definitions, which are available at www.NFLConcussionSettlement.com or by calling **1-800-000-0000**.

The level of Neurocognitive Impairment will be established in part with evidence of decline in performance in at least two areas subject to clinical evaluative testing (complex attention, executive function, learning and memory, language, or perceptual-spatial), provided one of the areas is executive function, learning and memory, or complex attention, and related functional impairment as follows:

| LEVEL OF NEUROCOGNITIVE IMPAIRMENT | TYPE OF IMPAIRMENT | DEGREE OF DECLINE |
|---|---|---|
| Level 1 | Moderate cognitive impairment | Moderate cognitive decline |
| Level 1.5 | Early Dementia | Moderate to severe cognitive decline |
| Level 2 | Moderate Dementia | Severe cognitive decline |

If neurocognitive impairment is temporary and only occurs with delirium, or as a result of substance abuse or medicinal side effects, it is not covered by the Settlement.

## 10. Must a retired player be vested under the NFL Retirement Plan to receive Settlement benefits?

No. A retired player can be a Settlement Class Member regardless of whether he is vested due to credited seasons or total and permanent disability under the Bert Bell/Pete Rozelle NFL Player Retirement Plan.

**QUESTIONS? CALL 1-800-000-0000 OR VISIT WWW.NFLCONCUSSIONSETTLEMENT.COM**

Exhibit 5                                                                                    Page 8

-2916-

# CHAPTER 2:  SETTLEMENT BENEFITS

## THE BASELINE ASSESSMENT PROGRAM

| **11.  What is the Baseline Assessment Program ("BAP")?** |
| --- |

All living retired players who have earned at least one-half of an Eligible Season (*see* Question 18), who do not exclude themselves from the Settlement (*see* Question 30), and who timely register to participate in the Settlement (*see* Question 26) may participate in the Baseline Assessment Program ("BAP").

The BAP will provide baseline neuropsychological and neurological assessment examinations to determine whether retired players are currently suffering from cognitive impairment.  Retired players will have from two to ten years, depending on their age as of the date the Settlement is finally approved and any appeals are fully resolved ("Final Settlement Approval"), to have a baseline examination conducted through a nationwide network of qualified and independent medical providers.

- Retired players 43 or older as of the date the Settlement goes into effect will need to have a baseline examination within two years of the start of the BAP.

- Retired players under the age of 43 as of the date the Settlement goes into effect will need to have a baseline examination within 10 years of the start of the BAP, or before they turn 45, whichever comes sooner.

Retired players who are diagnosed with Level 1 Neurocognitive Impairment (*i.e.*, moderate cognitive impairment) are eligible to receive further medical testing and/or treatment (including counseling and pharmaceuticals) for that condition during the ten-year term of the BAP or within five years from diagnosis, whichever is later.

Retired players who participate in the BAP will be encouraged to provide their confidential medical records for use in research into cognitive impairment and safety and injury prevention with respect to football players.

Although all retired players are encouraged to take advantage of the BAP and receive a baseline examination, they do not need to participate in the BAP to receive a monetary award, but any award to the retired player may be reduced by 10% if  the retired player does not participate in the BAP, as explained in more detail in Question 20.

| **12.  Why should a retired player get a BAP baseline examination?** |
| --- |

Getting a BAP baseline examination will be beneficial.  It will determine whether the retired player has any cognitive impairment.  If he is diagnosed with Level 1 Neurocognitive Impairment (*i.e.*, moderate cognitive impairment), he will be eligible to receive further medical testing and/or treatment for that condition.  In addition, regardless of any cognitive impairment today, the results of the BAP baseline examination can be used as a comparison to measure any subsequent deterioration of  cognitive condition over the course of his life.  Participants also will be examined by at least two experts during the BAP baseline examinations, a neuropsychologist and a neurologist, and the retired player and/or his family members will have the opportunity to ask questions relating to any cognitive impairment during those examinations.

**QUESTIONS?  CALL 1-800-000-0000 OR VISIT WWW.NFLCONCUSSIONSETTLEMENT.COM**

Exhibit 5                                                                                                           Page 9

Participation in the BAP does not prevent the retired player from filing a claim for a monetary award. For the next 65 years, retired players will be eligible for compensation paid from the Monetary Award Fund if the player develops a Qualifying Diagnosis (*see* Question 14). Participation in the BAP also will help ensure that, to the extent the retired player receives a Qualifying Diagnosis in the future, he will receive the maximum monetary award to which he is entitled (*see* Question 20).

| | |
|---|---|
| **13.** | **How does a retired player schedule a baseline assessment examination and where will it be done?** |

Retired players need to register for Settlement benefits before they can get a baseline assessment examination. Registration for benefits will not be available until after Final Settlement Approval. **However, a retired player may provide his name and contact information now at www.NFLConcussionSettlement.com or by calling 1-800-000-0000. This ensures that the retired player will receive additional notice about the registration process and deadlines when it becomes available.**

The BAP Administrator will send notice to those retired players determined during registration to be eligible for the BAP, explaining how to arrange for an initial baseline assessment examination. The BAP will use a nationwide network of qualified and independent medical providers who will provide both the initial baseline assessment as well as any further testing and/or treatment. The BAP Administrator, which will be appointed by the Court, will establish the network of medical providers.

## MONETARY AWARDS

| **14.** | **What diagnoses qualify for monetary awards?** |
|---|---|

Monetary awards are available for the diagnosis of ALS, Parkinson's Disease, Alzheimer's Disease, Level 2 Neurocognitive Impairment (*i.e.*, moderate Dementia), Level 1.5 Neurocognitive Impairment (*i.e.*, early Dementia), or Death with CTE (the "Qualifying Diagnoses"). A Qualifying Diagnosis may occur at any time until the end of the 65-year term of the Monetary Award Fund.

If a retired player receives a monetary award based on a Qualifying Diagnosis, and later is diagnosed with a different Qualifying Diagnosis that entitles him to a larger monetary award than his previous award, he will be eligible for an increase in compensation. This would also apply to Derivative Claimants.

Qualifying Diagnoses must be made by approved qualified specialists. If and when Final Settlement Approval is obtained, the Claims Administrator will create and maintain a list of specialists who may make an authorized Qualifying Diagnoses if no such diagnosis has already been made by a qualified specialist before the Settlement is effective.

| **15.** | **Do I need to prove that playing professional football caused the retired player's Qualifying Diagnosis?** |
|---|---|

No. You do not need to prove that a retired player's Qualifying Diagnosis was caused by playing professional football or that he experienced head injuries in the NFL, AFL, World League of American Football, NFL Europe League, or NFL Europa League in order to receive a monetary award. The fact that a retired player receives a Qualifying Diagnosis is sufficient to be eligible for a monetary award.

You also do not need to exclude the possibility that the Qualifying Diagnosis was caused or contributed to by amateur football or other professional football league injuries or by various risk factors linked to the Qualifying Diagnosis.

| **16. How much money will I receive?** |

The amount of money you will receive depends on the retired player's:
- Specific Qualifying Diagnosis,
- Age at the time of diagnosis (*see* Question 17),
- Number of seasons played or practiced in the NFL or the AFL (*see* Question 18),
- Diagnosis of a prior stroke or traumatic brain injury (*see* Question 19), and
- Participation in a baseline assessment exam (*see* Question 20).

The amount of money you will receive also depends on whether:
- There are any legally enforceable liens on the award,
- Any retainer agreement with an attorney, and
- The Court makes any further assessments (*see* Question 34).

Certain costs and expenses related to resolving any liens for Settlement Class Members will be paid out of such Settlement Class Members' Monetary Awards or Derivative Claimant Awards.

The table below lists the maximum amount of money available for each Qualifying Diagnosis before any adjustments are made.

| QUALIFYING DIAGNOSIS | MAXIMUM AWARD AVAILABLE |
|---|---|
| Amyotrophic lateral sclerosis (ALS) | $5 million |
| Death with CTE (diagnosed after death) | $4 million |
| Parkinson's Disease | $3.5 million |
| Alzheimer's Disease | $3.5 million |
| Level 2 Neurocognitive Impairment (*i.e.*, moderate Dementia) | $3 million |
| Level 1.5 Neurocognitive Impairment (*i.e.*, early Dementia) | $1.5 million |

Monetary awards may be increased up to 2.5% per year during the 65-year Monetary Award Fund term for inflation.

To receive the maximum amount outlined in the table, a retired player must have played for at least five Eligible Seasons (*see* Question 18) and have been diagnosed when younger than 45 years old.

Derivative Claimants are eligible to be compensated from the monetary award of the retired player with whom they have a close relationship in an amount of 1% of that award. If there are multiple Derivative Claimants for the same retired player, the 1% award will be divided among the Derivative Claimants according to the law where the retired player (or his Representative Claimant, if any) resides.

**17. How does the age of the retired player at the time of first diagnosis affect a monetary award?**

Awards are reduced for retired players who were 45 or older when diagnosed. The younger a retired player is at the time of diagnosis, the greater the award he will receive. Setting aside the other downward adjustments to monetary awards, the table below provides:

- The average award for people diagnosed between the ages of 45-79; and
- The amount of the award for those under age 45 and over 79.

The actual amount will be determined based on each retired player's actual age at the time of diagnosis and on other potential adjustments.

| AGE AT DIAGNOSIS | ALS | DEATH W/CTE | PARKINSON'S | ALZHEIMER'S | LEVEL 2 | LEVEL 1.5 |
|---|---|---|---|---|---|---|
| Under 45 | $5,000,000 | $4,000,000 | $3,500,000 | $3,500,000 | $3,000,000 | $1,500,000 |
| 45 - 49 | $4,500,000 | $3,200,000 | $2,470,000 | $2,300,000 | $1,900,000 | $950,000 |
| 50 - 54 | $4,000,000 | $2,300,000 | $1,900,000 | $1,600,000 | $1,200,000 | $600,000 |
| 55 - 59 | $3,500,000 | $1,400,000 | $1,300,000 | $1,150,000 | $950,000 | $475,000 |
| 60 - 64 | $3,000,000 | $1,200,000 | $1,000,000 | $950,000 | $580,000 | $290,000 |
| 65 - 69 | $2,500,000 | $980,000 | $760,000 | $620,000 | $380,000 | $190,000 |
| 70 - 74 | $1,750,000 | $600,000 | $475,000 | $380,000 | $210,000 | $105,000 |
| 75 - 79 | $1,000,000 | $160,000 | $145,000 | $130,000 | $80,000 | $40,000 |
| 80+ | $300,000 | $50,000 | $50,000 | $50,000 | $50,000 | $25,000 |

**Note:** The age of the retired player at diagnosis (not the age when applying for a monetary award) is used to determine the monetary amount awarded.

**18. How does the number of seasons a retired player played affect a monetary award?**

Awards are reduced for retired players who played less than five "Eligible Seasons." The Settlement uses the term "Eligible Season" to count the seasons in which a retired player played or practiced in the NFL or AFL. A retired player earns an Eligible Season for:

- Each season where he was on an NFL or AFL Member Club's "Active List" for either three or more regular season or postseason games, or

- Where he was on an Active List for one or more regular or postseason games and then spent two regular or postseason games on an injured reserve list or inactive list due to a concussion or head injury.

- A retired player also earns one-half of an Eligible Season for each season where he was on an NFL or AFL Member Club's practice, developmental, or taxi squad for at least eight games, but did not otherwise earn an Eligible Season.

**QUESTIONS? CALL 1-800-000-0000 OR VISIT WWW.NFLCONCUSSIONSETTLEMENT.COM**

Exhibit 5                                                                                          Page 12

-2920-

The "Active List" means the list of all players physically present, eligible and under contract to play for an NFL or AFL Member Club on a particular game day within any applicable roster or squad limits in the applicable NFL or AFL Constitution and Bylaws.

Time spent playing or practicing in the World League of American Football, NFL Europe League, and NFL Europa League does <u>not</u> count towards an Eligible Season.

The table below lists the reductions to a retired player's (or his Representative Claimant's) monetary award if the retired player has less than five Eligible Seasons. To determine the total number of Eligible Seasons credited to a retired player, add together all of the earned Eligible Seasons and half Eligible Seasons. For example, if a retired player earned two Eligible Seasons and three half Eligible Seasons, he will be credited with 3.5 Eligible Seasons.

| NUMBER OF ELIGIBLE SEASONS | PERCENTAGE OF REDUCTION |
|---|---|
| 4.5 | 10% |
| 4 | 20% |
| 3.5 | 30% |
| 3 | 40% |
| 2.5 | 50% |
| 2 | 60% |
| 1.5 | 70% |
| 1 | 80% |
| .5 | 90% |
| 0 | 97.5% |

**19. How do prior strokes or traumatic brain injuries of a retired player affect a monetary award?**

It depends. A retired player's monetary award (or his Representative Claimant monetary award) will be reduced by 75% if he experienced: (1) a medically diagnosed stroke that occurred before or after the time the retired player played NFL football, but before he received a Qualifying Diagnosis; or (2) a severe traumatic brain injury unrelated to NFL football that occurred during or after the time the retired player played NFL football, but before he received a Qualifying Diagnosis.

The award will not be reduced if the retired player (or his Representative Claimant) can show by clear and convincing evidence that the stroke or traumatic brain injury is not related to the Qualifying Diagnosis.

**20. How is a retired player's monetary award affected if he does not participate in the BAP program?**

It depends on when the retired player receives his Qualifying Diagnosis and the nature of the diagnosis. There is a 10% reduction to the monetary award if the retired player does not participate in the BAP and:

- Did not receive a Qualifying Diagnosis prior to [Date of Preliminary Approval Order], and

- Receives a Qualifying Diagnosis (other than ALS) after his deadline to receive a BAP baseline assessment examination.

### 21.  Can I receive a monetary award even though the retired player is dead?

Yes.  Representative Claimants for deceased retired players with a Qualifying Diagnoses will be eligible to receive monetary awards.  If the deceased retired player died before January 1, 2006, however, the Representative Claimant will only receive a monetary award if the Court determines that a wrongful death or survival claim is allowed under applicable state law.

Derivative Claimants also will be eligible for a total award of 1% of the monetary award that the Representative Claimant for the deceased retired player receives (*see* Question 16).

Representative and Derivative Claimants will also need to register for Settlement benefits (*see* Question 26).

### 22.  Will this Settlement affect a retired player's participation in NFL or NFLPA-related benefits programs?

No.  The Settlement benefits are completely independent of any benefits programs that have been created by or between the NFL and the NFL Players Association.  This includes the 88 Plan (Article 58 of the 2011 Collective Bargaining Agreement) and the Neuro-Cognitive Disability Benefit (Article 65 of the 2011 Collective Bargaining Agreement).

**Note:**  The Settlement ensures that a retired player who has signed, or will sign, a release as part of his Neuro-Cognitive Disability Benefit application, will not be denied Settlement benefits.

### 23.  Will this Settlement prevent retired players from bringing workers' compensation claims?

No.  Claims for workers' compensation will not be released by this Settlement.

## EDUCATION FUND

### 24.  What type of education programs are supported by the Settlement?

The Settlement will provide $10 million in funding to support education programs promoting safety and injury prevention with respect to football players, including safety-related initiatives in youth football, the education of retired players regarding the NFL's medical and disability programs and other educational programs and initiatives.

Retired players will be able to actively participate in such initiatives if they desire.

# CHAPTER 3:  YOUR RIGHTS

## REMAINING IN THE SETTLEMENT

| 25.  What am I giving up to stay in the Settlement Class? |
| --- |

Unless you exclude yourself from the Settlement, you cannot sue the NFL Parties, the Member Clubs, or related individuals and entities, or be part of any other lawsuit against the NFL Parties about the issues in this case.  This means you give up your right to continue to litigate any claims related to this Settlement, or file new claims, in any court or in any proceeding at any time.  **However, the Settlement does not release any claims for workers' compensation (*see* Question 23) or claims alleging entitlement to NFL medical and disability benefits available under the Collective Bargaining Agreement**.

Please note that certain Plaintiffs also sued the football helmet manufacturer Riddell and certain related entities (specifically, Riddell, Inc., Riddell Sports Group Inc., All American Sports Corporation, Easton-Bell Sports, Inc., EB Sports Corp., Easton-Bell Sports, LLC, and RBG Holdings Corp.).  **They are not parties to this Settlement and claims against them are not released by this Settlement**.

Article XVIII of the Settlement Agreement contains the complete text and details of what Settlement Class Members give up unless they exclude themselves from the Settlement, so please read it carefully.  The Settlement Agreement is available at www.NFLConcussionSettlement.com.  The Settlement Agreement is also on file with the Clerk of the Court for the Eastern District of Pennsylvania  (*see* Question 35 for the address).  You can also get this information by calling 1-800-000-0000.  If you have any questions you can talk to the law firms listed in Question 33 for free or you can talk to your own lawyer if you have questions about what this means.

## HOW TO GET BENEFITS

| 26.  How do I get Settlement benefits? |
| --- |

To get benefits, you will need to register.  This is true for all Settlement Class Members, including Representative and Derivative Claimants.  Registration for benefits will not begin until after Final Settlement Approval (*see* Question 37).  If and when that occurs, further notice will be provided about the registration process and deadlines.  **However, you may provide your name and contact information now at www.NFLConcussionSettlement.com or by calling 1-800-000-0000.  This ensures that you will receive additional notice about the registration process and deadlines when that becomes available.**  To receive any Settlement benefits, you must register on or before 180 days from the date that further notice about the registration process and deadlines is posted on www.NFLConcussionSettlement.com.  Information about the registration deadline will also be available by calling **1-800-000-0000.**

| 27.  Is there a time limit for Retired NFL Football Players and Representative Claimants to file claims for monetary awards? |
| --- |

Yes.  Retired NFL Football Players and Representative Claimants for retired players who are diagnosed by the date of Final Settlement Approval must submit claims for monetary awards within two years of the date that further notice about the registration process and deadlines is posted on

QUESTIONS?  CALL **1-800-000-0000** OR VISIT **WWW.NFLCONCUSSIONSETTLEMENT.COM**

Exhibit 5                                                                                                          Page 15

www.NFLConcussionSettlement.com. Retired NFL Football Players and Representative Claimants for retired players who are diagnosed after the date of Final Settlement Approval have two years from the date of diagnosis to file claims. This deadline may be extended to within four years of the Qualifying Diagnosis or the date that further notice about the registration process and deadlines is posted on www.NFLConcussionSettlement.com, whichever is later, if the Retired NFL Football Player or Representative Claimant can show substantial hardship beyond the Qualifying Diagnosis. Derivative Claimants must submit claims no later than 30 days after the Retired NFL Football Player through whom the close relationship is the basis for the claim (or the Representative Claimant of that retired player) receives a notice that he is entitled to a monetary award. All claims must be submitted by the end of the 65-year term of the Monetary Award Fund.

**28. Can I re-apply for compensation if my claim is denied?**

Yes. A Settlement Class Member who submits a claim for a monetary award that is denied can re-apply in the future should the Retired NFL Football Player's medical condition change.

**29. Can I appeal the determination of my monetary award claim?**

Yes. The Settlement establishes a process for a Settlement Class Member to appeal the denial of a monetary award claim or the amount of the monetary award.

## EXCLUDING YOURSELF FROM THE SETTLEMENT

If you do not want to receive benefits from this Settlement, and you want to retain the right to sue the NFL Parties about the legal issues in this case, then you must take steps to remove yourself from the Settlement. You may do this by asking to be excluded – sometimes referred to as "opting out" of – the Settlement Class.

**30. How do I get out of the Settlement?**

To exclude yourself from the Settlement, you must mail a letter or other written document to the Claims Administrator. Your request must include:

- Your name, address, telephone number, and date of birth;

- A copy of your driver's license or other government issued identification;

- A statement that "I wish to exclude myself from the Settlement Class in *In re: National Football League Players' Concussion Injury Litigation,* No. 2:12-md-02323" (or substantially similar clear and unambiguous language); and

- Your signature by hand (not any form of electronic signature), and the date on which you signed it (even if represented by an attorney).

You must mail your exclusion request, postmarked no later than **Month 00, 0000** [Date ordered by the Court], to:

NFL Concussion Settlement
P.O. Box 0000,
City, ST 00000

**QUESTIONS? CALL 1-800-000-0000 OR VISIT WWW.NFLCONCUSSIONSETTLEMENT.COM**

Exhibit 5                                                                                                    Page 16

| **31.  If I do not exclude myself, can I sue the NFL Parties for the same thing later?** |
|---|

No.  Unless you exclude yourself, you give up the right to sue the NFL Parties for all of the claims that this Settlement resolves.  If you want to maintain your own lawsuit relating to the claims released by the Settlement, then you must exclude yourself by **Month 00, 0000.**

| **32.  If I exclude myself, can I still get benefits from this Settlement?** |
|---|

No.  **If you exclude yourself from the settlement you will not get any Settlement benefits**.  You will not be eligible to receive a monetary award or participate in the Baseline Assessment Program.

## THE LAWYERS REPRESENTING YOU

| **33.  Do I have a lawyer in the case?** |
|---|

The Court has appointed a number of lawyers to represent all Settlement Class Members as "Co-Lead Class Counsel," "Class Counsel" and "Subclass Counsel" (*see* Question 6).  They are listed at the end of this Notice with their contact information.

You will not be charged for contacting these lawyers.  If you are represented by an attorney, you may contact your attorney to discuss the proposed Settlement.  You do not have to hire your own attorney.  However, if you want to be represented by your own lawyer, you may hire one at your own expense.

| **34.  How will the lawyers be paid?** |
|---|

At a later date to be determined by the Court, Co-Lead Class Counsel, Class Counsel and Subclass Counsel will ask the Court for an award of attorneys' fees and reasonable costs.  The NFL Parties have agreed not to oppose or object to the request for attorneys' fees and reasonable incurred costs if the request does not exceed $112.5 million.  These fees and incurred costs will be paid separately by the NFL Parties and not from the Baseline Assessment Program Fund, Education Fund, or Monetary Award Fund.  Settlement Class Members will have an opportunity to comment on and/or object to this request at an appropriate time.  Ultimately, the award of attorneys' fees and reasonable costs to be paid by the NFL Parties is subject to the approval of the Court.

After Final Settlement Approval, Co-Lead Class Counsel may ask the Court to set aside up to five percent of each Monetary Award and Derivative Claimant Award to facilitate the Settlement program and related efforts of Co-Lead Class Counsel, Class Counsel and Subclass Counsel.  If approved, this money would be held in a separate fund overseen by the Court.  Any future request for a set-aside will describe:  (1) the proposed amount; (2) how the money will be used; and (3) any other relevant information.  This "set-aside" would come out of the claimant's attorney's fee if represented by individual counsel or, if not represented, out of the Monetary Award or Derivative Claimant Award itself.  No money will be held back or set aside from any award without a Court order.  The set-aside is a matter between Class Counsel and individual counsel for Settlement Class Members.  The NFL Parties do not take a position on the proposal.

## OBJECTING TO THE SETTLEMENT

You may tell the Court that you do not agree with the Settlement or some part of it.

---

**35.  How do I tell the Court if I do not like the Settlement?**

---

If you do not exclude yourself from the Settlement Class, you may object to the Settlement if you do not like some part of it.  The Court will consider your views.  To object to the Settlement, you or your attorney must submit your written objection to the Court.  The objection must include the following:

- The name of the case and multi-district litigation, *In re: National Football League Players' Concussion Injury Litigation,* No. 2:12-md-02323;

- Your name, address, telephone number, and date of birth;

- The name of the Retired NFL Football Player through which you are a Representative Claimant or Derivative Claimant (if you are not a retired player);

- Written evidence establishing that you are a Settlement Class Member;

- A detailed statement of your objections, and the specific reasons for each such objection, including any facts or law you wish to bring to the Court's attention;

- Any other supporting papers, materials or briefs that you want the Court to consider in support of your objection; and

- Your signature by hand (not any form of electronic signature), and the date on which you signed it (even if represented by an attorney).

The requirements to object to the Settlement are described in detail in the Settlement Agreement in section 14.3.

You must file your objection with the Court no later than **Month 00, 0000 [date ordered by the Court]**:

| COURT |
|---|
| Clerk of the District Court/NFL Concussion Settlement |
| United States District Court for the Eastern District of Pennsylvania |
| James A. Byrne U.S. Courthouse, |
| 601 Market Street, |
| Philadelphia, PA 19106-1797 |

---

**36.  What is the difference between objecting to the Settlement and excluding myself?**

---

Objecting is simply telling the Court that you do not like something about the Settlement or want it to say something different.  You can object only if you do not exclude yourself from the Settlement Class. Excluding yourself is telling the Court that you do not want to be part of the Settlement Class and you do

**QUESTIONS?  CALL 1-800-000-0000 OR VISIT WWW.NFLCONCUSSIONSETTLEMENT.COM**

Exhibit 5                                                                                            Page 18

not want to receive any Settlement benefits.  If you exclude yourself, you have no basis to object because the case no longer affects you.

## THE COURT'S FAIRNESS HEARING

The Court will hold a hearing to decide whether to approve the Settlement.  You may attend and you may ask to speak, but you do not have to.  The Court will determine if you are allowed to speak if you request to do so (*see* Question 39).

| **37.  When and where will the Court hold a Fairness Hearing concerning the Settlement?** |
| --- |

The Court will hold the Fairness Hearing at XX:00 x.m. on **Month 00, 0000**, at the United States District Court for the Eastern District of Pennsylvania, located at the James A. Byrne U.S. Courthouse, 601 Market Street, Philadelphia, PA 19106-1797.  The hearing may be moved to a different date or time without additional notice, so it is a good idea to check www.NFLConcussionSettlement.com or call **1-800-000-0000**.  At this hearing, the Court will hear evidence about whether the Settlement is fair, reasonable, and adequate.  If there are objections, the Court will consider them and may elect to listen to people who have asked to speak at the hearing.  After the hearing, the Court will decide whether to approve the Settlement.  We do not know how long these decisions will take.

The Court will consider the request for attorneys' fees and reasonable costs by Co-Lead Class Counsel, Class Counsel and Subclass Counsel (*see* Question 34) after the Fairness Hearing, which will be set at a later date by the Court.

| **38.  Do I have to attend the hearing?** |
| --- |

No.  Co-Lead Class Counsel, Class Counsel and Subclass Counsel will answer questions the Court may have.  But you are welcome to attend at your own expense.  If you timely file an objection, you do not have to come to Court to talk about it.  As long as you filed your written objection on time, the Court will consider it.  You may also have your own lawyer attend at your expense, but it is not necessary.

| **39.  May I speak at the hearing?** |
| --- |

You may ask the Court for permission to speak at the Fairness Hearing.  The Court will determine whether to grant you permission to speak.  To make such a request, you must file a written notice stating that it is your wish to speak at the *In re: National Football League Players' Concussion Injury Litigation*, No. 2:12-md-02323 Fairness Hearing.  Be sure to include your name, address, telephone number, and your signature.  Your request to speak must be filed with the Court no later than **Month 00, 0000** at the address in Question 35.

## GETTING MORE INFORMATION

| **40.  How do I get more information?** |
| --- |

This Notice summarizes the proposed Settlement.  More details are in the Settlement Agreement.  You can get a copy of the Settlement Agreement at www.NFLConcussionSettlement.com.  The Settlement Agreement is also on file with the Clerk of the Court for the Eastern District of Pennsylvania (*see* Question

35 for the address).  You also may write with questions to NFL Concussion Settlement, P.O. Box 0000, City, ST 00000 or call **1-800-000-0000**.

**PLEASE DO NOT WRITE OR TELEPHONE THE COURT OR THE NFL PARTIES FOR INFORMATION ABOUT THE SETTLEMENT OR THIS LAWSUIT.**

| IMPORTANT DATES AND CONTACT INFORMATION | |
|---|---|
| **Exclusion "Opt Out" Deadline** | Month 00, 2014 |
| **Objection Deadline** | Month 00, 2014 |
| **Deadline to Request to Speak at the Fairness Hearing** | Month 00, 2014 |
| **Fairness Hearing** | Month 00, 2014 |
| **Start of Registration Period** | The start of the registration process and related deadlines will be announced on www.NFLConcussionSettlement.com following Final Settlement Approval |
| **Registration Deadline** | 180 days after registration begins |
| **Submit a Claim** | • Retired NFL Football Players and Representative Claimants for retired players who are diagnosed by the date of Final Settlement Approval must submit claims for monetary awards within two years of the announcement of the registration process.<br>• Retired NFL Football Players and Representative Claimants for retired players who are diagnosed after the date of Final Settlement Approval have two years from the date of diagnosis to file claims. |
| **Settlement Administrator** | NFL Concussion Settlement<br>P.O. Box 0000<br>City, ST 00000<br>Tel: 1-800-000-0000 |
| **Court** | Clerk of the District Court/NFL Concussion Settlement<br>United States District Court for the Eastern District of Pennsylvania<br>James A. Byrne U.S. Courthouse,<br>601 Market Street,<br>Philadelphia, PA 19106-1797 |
| **Class Counsel** | Christopher A. Seeger<br>Co-Lead Class Counsel<br>SEEGER WEISS LLP<br>77 Water Street<br>New York, NY 10005 | Sol Weiss<br>Co-Lead Class Counsel<br>ANAPOL SCHWARTZ<br>1710 Spruce Street<br>Philadelphia, PA 19103 |
| | Steven C. Marks<br>Class Counsel<br>PODHURST ORSECK P.A.<br>City National Bank Building<br>25 W. Flagler Street, Suite 800<br>Miami, FL 33130-1780 | Gene Locks<br>Class Counsel<br>LOCKS LAW FIRM<br>The Curtis Center, Suite 720 East<br>601 Walnut Street<br>Philadelphia, PA 19106 |
| | Arnold Levin<br>Counsel - Subclass 1<br>LEVIN FISHBEIN SEDRAN & BERMAN<br>510 Walnut Street, Suite 500<br>Philadelphia, PA 19106 | Dianne M. Nast, Counsel –<br>Counsel - Subclass 2<br>NAST LAW LLC<br>1101 Market Street, Suite 2801<br>Philadelphia, Pennsylvania 19107 |

**QUESTIONS? CALL 1-800-000-0000 OR VISIT WWW.NFLCONCUSSIONSETTLEMENT.COM**

Exhibit 5                                                                                   Page 21

**Reminder:** Provide your name and contact information now at www.NFLConcussionSettlement.com or by calling 1-800-000-0000.   This ensures that you will receive additional notice about the registration process and deadlines when it becomes available.

# EXHIBIT B

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | : : : | No. 2:12-md-02323-AB |
| | : | MDL No. 2323 |

Kevin Turner and Shawn Wooden,
*on behalf of themselves and*
*others similarly situated,*

                    Plaintiffs, :      CIVIL ACTION NO: 14-cv-0029

              v.

National Football League and
NFL Properties, LLC,
successor-in-interest to
NFL Properties, Inc.,

                   Defendants. :

THIS DOCUMENT RELATES TO:
ALL ACTIONS

**CLASS ACTION SETTLEMENT AGREEMENT ~~AS OF JUNE~~**

**(AS AMENDED)**

**Dated:**       **June** 25, 2014

**Amended:**   **February 13, 2015**

# TABLE OF CONTENTS

**Page**

ARTICLE I          Definitions of Settlement Class and Subclasses.................................4

ARTICLE II         Definitions.................................................................................4

ARTICLE III        Settlement Benefits for Class Members..........................~~16~~**17**

ARTICLE IV         Information and Registration Process..............................17

ARTICLE V          Baseline Assessment Program.........................................20

ARTICLE VI         Monetary Awards for Qualifying Diagnoses....................31

ARTICLE VII        Derivative Claimant Awards...........................................38

ARTICLE VIII       Submission and Review of Claim Packages and Derivative
                   Claim Packages................................................~~38~~**39**

ARTICLE IX         Notice of Claim Determinations, Payments, and Appeals.........~~42~~**43**

ARTICLE X          Class Action Settlement Administration........................~~49~~**50**

ARTICLE XI         Identification and Satisfaction of Liens.........................58

ARTICLE XII        Education Fund................................................~~63~~**64**

ARTICLE XIII       Preliminary Approval and Class Certification...............~~63~~**64**

ARTICLE XIV        Notice, Opt Out, and Objections..............................~~65~~**66**

ARTICLE XV         Communications to the Public................................~~68~~**69**

ARTICLE XVI        Termination...........................................~~68~~**69**

ARTICLE XVII       Treatment of Confidential Information..........................70

ARTICLE XVIII      Releases and Covenant Not to Sue...............................71

ARTICLE XIX        Bar Order.................................................................75

ARTICLE XX         Final Order and Judgment and Dismissal With Prejudice.......~~75~~**76**

ARTICLE XXI        Attorneys' Fees.............................................~~76~~**77**

ARTICLE XXII       Enforceability of Settlement Agreement and Dismissal of
                   Claims.................................................~~77~~**78**

ARTICLE XXIII  NFL Payment Obligations .................................................... 78**79**

ARTICLE XXIV  Denial of Wrongdoing, No Admission of Liability ................. 85**86**

ARTICLE XXV   Representations and Warranties ........................................... 86**87**

ARTICLE XXVI  Cooperation ........................................................................ 89**90**

ARTICLE XXVII  Continuing Jurisdiction ....................................................... 90**91**

ARTICLE XXVIII Role of Co-Lead Class Counsel, Class Counsel and Subclass
                        Counsel .................................................................... 90**91**

ARTICLE XXIX  Bargained-For Benefits ....................................................... 91**92**

ARTICLE XXX   Miscellaneous Provisions .................................................... 91**92**

IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS'
CONCUSSION INJURY LITIGATION, MDL 2323,
CLASS ACTION SETTLEMENT AGREEMENT AS OF JUNE 25, 2014
(as amended as of February 13, 2015)
(subject to Court approval)

## PREAMBLE

This SETTLEMENT AGREEMENT, dated as of June 25, 2014 (the "Settlement Date"), as amended as of February 13, 2015, is made and entered into by and among defendants the National Football League ("NFL") and NFL Properties LLC ("NFL Properties") (collectively, "NFL Parties"), by and through their attorneys, and the Class Representatives and Subclass Representatives, individually and on behalf of the Settlement Class and Subclasses, by and through Class Counsel. This Settlement Agreement is intended by the Parties fully, finally, and forever to resolve, discharge, and settle all Released Claims against the Released Parties, as set forth below, subject to review and approval by the Court.[1]

## RECITALS

A.    On January 31, 2012, a federal multidistrict litigation was established in the United States District Court for the Eastern District of Pennsylvania, In re: National Football League Players' Concussion Injury Litigation, MDL No. 2323. Plaintiffs in MDL No. 2323 filed a Master Administrative Long-Form Complaint and a Master Administrative Class Action Complaint for Medical Monitoring on June 7, 2012. Plaintiffs filed an Amended Master Administrative Long-Form Complaint on July 17, 2012. Additional similar lawsuits are pending in various state and federal courts.

B.    The lawsuits arise from the alleged effects of mild traumatic brain injury allegedly caused by the concussive and sub-concussive impacts experienced by former NFL Football players. Plaintiffs seek to hold the NFL Parties responsible for their alleged injuries under various theories of liability, including that the NFL Parties allegedly breached a duty to NFL Football players to warn and protect them from the long-term health problems associated with concussions and that the NFL Parties allegedly concealed and misrepresented the connection between concussions and long-term chronic brain injury.

C.    On August 30, 2012, the NFL Parties filed motions to dismiss the Master Administrative Class Action Complaint for Medical Monitoring and the Amended Master Administrative Long-Form Complaint on preemption grounds. Plaintiffs filed their oppositions to the motions on October 31, 2012, the NFL Parties filed reply memoranda of law on December 17, 2012, and plaintiffs filed sur-reply

---

[1]    Capitalized terms have the meanings provided in ARTICLE II, unless a section or subsection of this Settlement Agreement provides otherwise.

memoranda of law on January 28, 2013.  Oral argument on the NFL Parties' motions to dismiss on preemption grounds was held on April 9, 2013.

       D.      On July 8, 2013, prior to ruling on the motions to dismiss, the Court ordered the plaintiffs and NFL Parties to engage in mediation to determine if consensual resolution was possible and appointed retired United States District Court Judge Layn Phillips of Irell & Manella LLP as mediator.

       E.      Over the course of the following two months, the Parties, by and through their respective counsel, engaged in settlement negotiations under the direction of Judge Phillips.  On August 29, 2013, the Parties signed a settlement term sheet setting forth the material terms of a settlement agreement.  On the same day, the Court issued an order deferring a ruling on the NFL Parties' motions to dismiss and ordering the Parties to submit, as soon as possible, the full documentation relating to the settlement, along with a motion seeking preliminary approval of the settlement and notice plan.  On December 16, 2013, the Court appointed a special master, Perry Golkin ("Special Master Golkin"), to assist the Court in evaluating the financial aspects of the proposed settlement.

       F.      On January 6, 2014, Class Counsel moved the Court for an order, among other things, granting preliminary approval of the proposed settlement and conditionally certifying a settlement class and subclasses.  On January 14, 2014, the Court denied that motion without prejudice.

       G.      In conjunction with the January 2014 filing of the proposed settlement agreement, and this Settlement Agreement, the Class and Subclass Representatives filed Plaintiffs' Class Action Complaint ("Class Action Complaint") on January 6, 2014.  In the Class Action Complaint, the Class and Subclass Representatives allege claims for equitable, injunctive and declaratory relief pursuant to Federal Rules of Civil Procedure 23(a)(1-4) & (b)(2), or, alternatively, for compensatory damages pursuant to Federal Rule of Civil Procedure 23(b)(3), for negligence, negligent hiring, negligent retention, negligent misrepresentation, fraud, fraudulent concealment, medical monitoring, wrongful death and survival, and loss of consortium, all under state law.

       H.      The NFL Parties deny the Class and Subclass Representatives' allegations, and the allegations in Related Lawsuits, and deny any liability to the Class and Subclass Representatives, the Settlement Class, or any Settlement Class Member for any claims, causes of action, costs, expenses, attorneys' fees, or damages of any kind, and would assert a number of substantial legal and factual defenses against plaintiffs' claims if they were litigated to conclusion.

       I.      The Class and Subclass Representatives, through their counsel, have engaged in substantial fact gathering to evaluate the merits of their claims and the NFL Parties' defenses.  In addition, the Class and Subclass Representatives have analyzed the legal issues raised by their claims and the NFL Parties' defenses, including, without limitation, the NFL Parties' motions to dismiss the Amended Master

Administrative Long-Form Complaint and Master Administrative Class Action Complaint on preemption grounds.

       J.    After careful consideration, the Class and Subclass Representatives, and their respective Counsel, have concluded that it is in the best interests of the Class and Subclass Representatives and the Settlement Class and Subclasses to compromise and settle all Released Claims against the Released Parties for consideration reflected in the terms and benefits of this Settlement Agreement. After arm's length negotiations with Counsel for the NFL Parties, including through the efforts of the court-appointed mediator and Special Master Golkin, the Class and Subclass Representatives have considered, among other things:  (1) the complexity, expense, and likely duration of the litigation; (2) the stage of the litigation and amount of fact gathering completed; (3) the potential for the NFL Parties to prevail on threshold issues and on the merits; and (4) the range of possible recovery, and have determined that this Settlement Agreement is fair, reasonable, adequate, and in the best interests of the Class and Subclass Representatives and the Settlement Class and Subclasses.

       K.    The NFL Parties have concluded, in light of the costs, risks, and burden of litigation, that this Settlement Agreement in this complex putative class action litigation is appropriate.  The NFL Parties and Counsel for the NFL Parties agree with the Class and Subclass Representatives and their respective counsel that this Settlement Agreement is a fair, reasonable, and adequate resolution of the Released Claims.  The NFL Parties reached this conclusion after considering the factual and legal issues relating to the litigation, the substantial benefits of this Settlement Agreement, the expense that would be necessary to defend claims by Settlement Class Members through trial and any appeals that might be taken, the benefits of disposing of protracted and complex litigation, and the desire of the NFL Parties to conduct their business unhampered by the costs, distraction and risks of continued litigation over Released Claims.

       L.    The Parties desire to settle, compromise, and resolve fully all Released Claims.

       M.    The Parties desire and intend to seek Court review and approval of the Settlement Agreement, and, upon preliminary approval by the Court, the Parties intend to seek a Final Order and Judgment from the Court dismissing with prejudice the Class Action Complaint and ordering the dismissal with prejudice of Related Lawsuits.

       N.    This Settlement Agreement will not be construed as evidence of, or as an admission by, the NFL Parties of any liability or wrongdoing whatsoever or as an admission by the Class or Subclass Representatives, or Settlement Class Members, of any lack of merit in their claims.

       NOW, THEREFORE, it is agreed that the foregoing recitals are hereby expressly incorporated into this Settlement Agreement and made a part hereof and

further, that in consideration of the agreements, promises, and covenants set forth in this Settlement Agreement, including the Releases and Covenant Not to Sue in ARTICLE XVIII, the entry by the Court of the Final Order and Judgment dismissing the Class Action Complaint with prejudice and approving the terms and conditions of the Settlement Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, this action shall be settled and compromised under the following terms and conditions:

## ARTICLE I
## Definitions of Settlement Class and Subclasses

Section 1.1    Definition of Settlement Class

(a)    "Settlement Class" means all Retired NFL Football Players, Representative Claimants and Derivative Claimants.

(b)    Excluded from the Settlement Class are any Retired NFL Football Players, Representative Claimants or Derivative Claimants who timely and properly exercise the right to be excluded from the Settlement Class ("Opt Outs").

Section 1.2    Definition of Subclasses

(a)    "Subclass 1" means Retired NFL Football Players who were not diagnosed with a Qualifying Diagnosis prior to the date of the Preliminary Approval and Class Certification Order and their Representative Claimants and Derivative Claimants.

(b)    "Subclass 2" means Retired NFL Football Players who were diagnosed with a Qualifying Diagnosis prior to the date of the Preliminary Approval and Class Certification Order and their Representative Claimants and Derivative Claimants, and the Representative Claimants of deceased Retired NFL Football Players who were diagnosed with a Qualifying Diagnosis prior to death or who died prior to the date of the Preliminary Approval and Class Certification Order and who received a post-mortem diagnosis of CTE.

## ARTICLE II
## Definitions

Section 2.1    Definitions

For the purposes of this Settlement Agreement, the following terms (designated by initial capitalization throughout this Agreement) will have the meanings set forth in this Section.

Unless the context requires otherwise, (i) words expressed in the masculine will include the feminine and neuter gender and vice versa; (ii) the word "will" shall be construed to have the same meaning and effect as the word "shall"; (iii) the word "or" will not be exclusive; (iv) the word "extent" in the phrase "to the

4

extent" will mean the degree to which a subject or other thing extends, and such phrase will not simply mean "if"; (v) references to "day" or "days" in the lower case are to calendar days, but if the last day is a Saturday, Sunday, or legal holiday (as defined in Fed. R. Civ. P. 6(a)(6)), the period will continue to run until the end of the next day that is not a Saturday, Sunday, or legal holiday; (vi) references to this Settlement Agreement will include all exhibits, schedules, and annexes hereto; (vii) references to any law will include all rules and regulations promulgated thereunder; (viii) the terms "include," "includes," and "including" will be deemed to be followed by "without limitation," whether or not they are in fact followed by such words or words of similar import; and (ix) references to dollars or "$" are to United States dollars.

(a)    "Active List" means the list of all players physically present, eligible and under contract to play for a Member Club on a particular game day within any applicable roster or squad limits set forth in the applicable NFL or American Football League Constitution and Bylaws.

(b)    "Affiliate" means, with respect to any person or entity, any other person or entity that, directly or indirectly, through one or more intermediaries, controls, or is controlled by, or is under common control with, such person or entity, where "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies, whether through the ownership of voting shares, by contract, or otherwise.

(c)    "ALS" means amyotrophic lateral sclerosis, also known as Lou Gehrig's Disease, as defined in Exhibit 1.

(d)    "Alzheimer's Disease" is defined in Exhibit 1.

(e)    "American Football League" means the former professional football league that merged with the NFL.

(f)    "Appeals Form" means that document that Settlement Class Members, the NFL Parties or Co-Lead Class Counsel, as the case may be, will submit when appealing Monetary Award or Derivative Claimant Award determinations by the Claims Administrator, as set forth in Section 9.7.

(g)    "Appeals Advisory Panel" means a panel of physicians, composed of, in any combination, five (5) board-certified neurologists, board-certified neurosurgeons, and/or other board-certified neuro-specialist physicians agreed to and jointly recommended by Co-Lead Class Counsel and Counsel for the NFL Parties, and appointed by the Court, any one of whom is eligible to advise the Court or the Special Master with respect to medical aspects of the Class Action Settlement and to perform the other duties of the Appeals Advisory Panel set forth in this Settlement Agreement.

(h)    "Appeals Advisory Panel Consultants" means three (3) neuropsychologists certified by the American Board of Professional Psychology (ABPP) or the American Board of Clinical Neuropsychology (ABCN), a member board

5

of the American Board of Professional Psychology, in the specialty of Clinical Neuropsychology, agreed to and jointly recommended by Co-Lead Class Counsel and Counsel for the NFL Parties, and appointed by the Court, any one of whom is eligible to advise a member of the Appeals Advisory Panel, the Court, or the Special Master on the neuropsychological testing referenced in Exhibits 1 and 2 to the Settlement Agreement, as pertaining to the Qualifying Diagnoses of Level 1.5 Neurocognitive Impairment and Level 2 Neurocognitive Impairment, and Level 1 Neurocognitive Impairment if subject to review as set forth in Section 5.13. Appeals Advisory Panel Consultants do not meet the definition of Appeals Advisory Panel members and shall not serve as members of the Appeals Advisory Panel.

(i) "Baseline Assessment Program" ("BAP") means the program described in ARTICLE V.

(j) "Baseline Assessment Program Supplemental Benefits" or "BAP Supplemental Benefits" means medical treatment, including, as needed, counseling and pharmaceutical coverage, for Level 1 Neurocognitive Impairment (as set forth in Exhibit 1) within a network of Qualified BAP Providers and Qualified BAP Pharmacy Vendor(s), respectively, established by the BAP Administrator, as set forth in Section 5.11.

(k) "Baseline Assessment Program Fund Administrator" or "BAP Administrator" means that person(s) or entity, agreed to and jointly recommended by Co-Lead Class Counsel and Counsel for the NFL Parties, and appointed by the Court, to perform the responsibilities assigned to the BAP Administrator under this Settlement Agreement, including, without limitation, as set forth in ARTICLE V.

(l) "Baseline Assessment Program Fund" or "BAP Fund" means the fund to pay BAP costs and expenses, as set forth in ARTICLE V.

(m) "Claim Form" means that document to be submitted to the Claims Administrator by a Settlement Class Member who is a Retired NFL Football Player or Representative Claimant claiming a Monetary Award, as set forth in ARTICLE VIII.

(n) "Claim Package" means the Claim Form and other documentation, as set forth in Section 8.2(a).

(o) "Claims Administrator" means that person(s) or entity, agreed to and jointly recommended by Co-Lead Class Counsel and Counsel for the NFL Parties, and appointed by the Court, to perform the responsibilities assigned to the Claims Administrator under this Settlement Agreement, including, without limitation, as set forth in Section 10.2.

(p) "Class Action Complaint" means the complaint captioned Plaintiffs' Class Action Complaint filed on consent in the Court on January 6, 2014.

(q)    "Class Action Settlement" means that settlement set forth in this Settlement Agreement.

(r)    "Class Counsel" means, pending Court appointment, the counsel who are so designated and who are signatories to this Settlement Agreement, namely, Co-Lead Class Counsel, Christopher A. Seeger and Sol Weiss, Subclass Counsel, Arnold Levin and Dianne M. Nast, and Steven C. Marks of Podhurst Orseck, P.A. and Gene Locks of Locks Law Firm, and, upon appointment, such other counsel as the Court may appoint to represent the Settlement Class.

(s)    "Class Representatives" means Shawn Wooden and Kevin Turner, or such other or different persons as may be appointed by the Court as the representatives of the Settlement Class.

(t)    "CMS" means the Centers for Medicare & Medicaid Services, the agency within the United States Department of Health and Human Services responsible for administration of the Medicare Program and the Medicaid Program.

(u)    "Co-Lead Class Counsel" means, pending Court appointment, the counsel who are so designated and who are signatories to this Settlement Agreement, namely, Christopher A. Seeger of Seeger Weiss LLP and Sol Weiss of Anapol Schwartz, and, upon appointment, such other counsel as the Court may appoint to represent the Settlement Class in a lead role.

(v)    "Collective Bargaining Agreement" means the August 4, 2011 Collective Bargaining Agreement between the NFL Management Council and the NFL Players Association, individually and together with all previous and future NFL Football collective bargaining agreements governing NFL Football players.

(w)    "Counsel for the NFL Parties" means Paul, Weiss, Rifkind, Wharton & Garrison LLP, or any law firm or attorney so designated in writing by the NFL Parties.

(x)    "Court" means the United States District Court for the Eastern District of Pennsylvania, Judge Anita Brody (or any successor judge designated by the United States District Court for the Eastern District of Pennsylvania, or a magistrate judge designated by Judge Brody or such designated successor judge, as set forth in and pursuant to Federal Rule of Civil Procedure 72), presiding in In re: National Football League Players' Concussion Injury Litigation, MDL No. 2323. For the period of time from the Effective Date up to and including the fifth year of the Class Action Settlement, the Parties agree, in accordance with the provisions of 28 U.S.C. § 636(c), to waive their right to proceed before a judge of the United States District Court in connection with issues relating to the administration of this Settlement Agreement where the Court is required or requested to act, and consent to have a United States Magistrate Judge conduct such proceedings.

7

(y)    "Covenant Not to Sue" means the covenant not to sue set forth in Section 18.4.

(z)    "CTE" means Chronic Traumatic Encephalopathy.

(aa)    "Death with CTE" is defined in Exhibit 1.

(bb)    "Deficiency" means any failure of a Settlement Class Member to provide required information or documentation to the Claims Administrator, as set forth in Section 8.5.

(cc)    "Derivative Claim Form" means that document to be submitted to the Claims Administrator by a Settlement Class Member who is a Derivative Claimant claiming a Derivative Claimant Award, as set forth in ARTICLE VIII.

(dd)    "Derivative Claim Package" means the Derivative Claim Form and other documentation, as set forth in Section 8.2(b).

(ee)    "Derivative Claimants" means spouses, parents, children who are dependents, or any other persons who properly under applicable state law assert the right to sue independently or derivatively by reason of their relationship with a Retired NFL Football Player or deceased Retired NFL Football Player.

(ff)    "Derivative Claimant Award" means the payment of money from the Monetary Award of the subject Retired NFL Football Player to a Settlement Class Member who is a Derivative Claimant, as set forth in ARTICLE VII.

(gg)    "Diagnosing Physician Certification" means that document which a Settlement Class Member who is a Retired NFL Football Player or Representative Claimant must submit either as part of a Claim Package in order to receive a Monetary Award, as set forth in Section 8.2(a), or to receive BAP Supplemental Benefits, as set forth in Section 5.11, the contents of which shall be agreed to by Co-Lead Class Counsel and Counsel for the NFL Parties and that shall include, without limitation: (i) a certification under penalty of perjury by the diagnosing physician that the information provided is true and correct, (ii) the Qualifying Diagnosis being made consistent with the criteria in Exhibit 1 (Injury Definitions) and the date of diagnosis, and (iii) the qualifications of the diagnosing physician, including, without limitation, whether the diagnosing physician is a Qualified MAF Physician.

(hh)    "Education Fund" means a fund to support education programs promoting safety and injury prevention with respect to football players, including safety-related initiatives in youth football, the education of Retired NFL Football Players regarding the NFL CBA Medical and Disability Benefits programs, and other educational initiatives benefitting Retired NFL Football Players, as set forth in ARTICLE XII.

(ii)    "Education Fund Amount" means the amount of Ten Million United States dollars (U.S. $10,000,000), as set forth in Section 23.1(c).

(jj)    "Effective Date" means (i) the day following the expiration of the deadline for appealing the entry by the Court of the Final Order and Judgment approving the Settlement Agreement and certifying the Settlement Class (or for appealing any ruling on a timely motion for reconsideration of such Final Order, whichever is later), if no such appeal is filed; or (ii) if an appeal of the Final Order and Judgment is filed, the date upon which all appellate courts with jurisdiction (including the United States Supreme Court by petition for certiorari) affirm such Final Order and Judgment, or deny any such appeal or petition for certiorari, such that no future appeal is possible.

(kk)    "Eligible Season" means a season in which a Retired NFL Football Player or deceased Retired NFL Football Player was:  (i) on a Member Club's Active List on the date of three (3) or more regular season or postseason games; or (ii) on a Member Club's Active List on the date of one (1) or more regular or postseason games, and then spent at least two (2) regular or postseason games on a Member Club's injured reserve list or inactive list due to a concussion or head injury.  A "half of an Eligible Season" means a season in which a Retired NFL Football Player or deceased Retired NFL Football Player was**:    (i)** on a Member Club's practice, developmental, or taxi squad roster for at least eight (8) regular or postseason games**.;** **or (ii) on a World League of American Football, NFL Europe League, or NFL Europa League team's active roster on the date of three (3) or more regular season or postseason games or on the active roster on the date of one (1) or more regular or postseason games, and then spent at least two (2) regular or postseason games on the World League of American Football, NFL Europe League, or NFL Europa League injured reserve list or team inactive list due to a concussion or head injury.**

(ll)    "Fairness Hearing" means the hearing scheduled by the Court to consider the fairness, reasonableness, and adequacy of this Settlement Agreement under Rule 23(e)(2) of the Federal Rules of Civil Procedure, and to determine whether a Final Order and Judgment should be entered.

(mm)    "Final Approval Date" means the date on which the Court enters the Final Order and Judgment.

(nn)    "Final Order and Judgment" means the final judgment and order entered by the Court, substantially in the form of Exhibit 4, and as set forth in ARTICLE XX.

(oo)    "Funds" means the Settlement Trust Account, the BAP Fund, the Monetary Award Fund, and the Education Fund.

(pp)    "Governmental Payor" means any federal, state, or other governmental body, agency, department, plan, program, or entity that administers,

funds, pays, contracts for, or provides medical items, services, and/or prescription drugs, including, but not limited to, the Medicare Program, the Medicaid Program, Tricare, the Department of Veterans Affairs, and the Department of Indian Health Services.

(qq)    "HIPAA" means the administrative simplification provisions of the Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191, 110 Stat. 1936 (1996) (codified as amended in scattered sections of 42 U.S.C.) and the implementing regulations issued by the United States Department of Health and Human Services thereunder, and incorporates by reference the provisions of the Health Information Technology for Economic and Clinical Health Act (Title XIII of Division A and Title IV of Division B of the American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5 (2009)) pertaining to Protected Health Information.

(rr)    "Level 1 Neurocognitive Impairment" is defined in Exhibit 1.

(ss)    "Level 1.5 Neurocognitive Impairment" is defined in Exhibit 1.

(tt)    "Level 2 Neurocognitive Impairment" is defined in Exhibit 1.

(uu)    "Lien" means any statutory lien of a Government Payor or Medicare Part C or Part D Program sponsor; or any mortgage, lien, pledge, charge, security interest, or legal encumbrance, of any nature whatsoever, held by any person or entity, where there is a legal obligation to withhold payment of a Monetary Award, Supplemental Monetary Award, Derivative Claimant Award, or some portion thereof, to a Settlement Class Member under applicable federal or state law.

(vv)    "Lien Resolution Administrator" means that person(s) or entity, agreed to and jointly recommended by Co-Lead Class Counsel and Counsel for the NFL Parties, and appointed by the Court, to perform the responsibilities assigned to the Lien Resolution Administrator under this Settlement Agreement, including, without limitation, as set forth in ARTICLE XI.

(ww)    "Medicaid Program" means the federal program administered by the states under which certain medical items, services, and/or prescription drugs are furnished to Medicaid beneficiaries under Title XIX of the Social Security Act, 42 U.S.C. § 1396–1, *et seq.*

(xx)    "Medicare Part C or Part D Program" means the program(s) under which Medicare Advantage, Medicare cost, and Medicare health care prepayment plan benefits and Medicare Part D prescription drug plan benefits are administered by private entities that contract with CMS.

(yy)    "Medicare Program" means the Medicare Parts A and B federal program administered by CMS under which certain medical items, services,

10

and/or prescription drugs are furnished to Medicare beneficiaries under Title XVIII of the Social Security Act, 42 U.S.C. § 1395, *et seq.*

(zz)    "Member Club" means any past or present member club of the NFL or any past member club of the American Football League.

(aaa)    "Monetary Award" means the payment of money from the Monetary Award Fund to a Settlement Class Member, other than a Derivative Claimant, as set forth in ARTICLE VI.  The term "Monetary Award" shall also include "Supplemental Monetary Award" with respect to the claims process set forth in this Settlement Agreement, including, without limitation, relating to submission and approval of claims, calculation and distribution of awards, and appeals.

(bbb)    "Monetary Award Fund" or "MAF" means the sixty-five (65) year fund, as set forth in Section 6.10.

(ccc)    "Monetary Award Grid" means that document attached as Exhibit 3.

(ddd)    "MSP Laws" means the Medicare Secondary Payer Act set forth at 42 U.S.C. § 1395y(b), as amended from time to time, and implementing regulations, and other applicable written CMS guidance.

(eee)    "NFL CBA Medical and Disability Benefits" means any disability or medical benefits available under the Collective Bargaining Agreement, including the benefits available under the Bert Bell/Pete Rozelle NFL Player Retirement Plan; NFL Player Supplemental Disability Plan, including the Neuro-Cognitive Disability Benefit provided for under Article 65 of the Collective Bargaining Agreement; the 88 Plan; Gene Upshaw NFL Player Health Reimbursement Account Plan; Former Player Life Improvement Plan; NFL Player Insurance Plan; and/or the Long Term Care Insurance Plan.

(fff)    "NFL Football" means the sport of professional football as played in the NFL, the American Football League, the World League of American Football, the NFL Europe League, and the NFL Europa League.  NFL Football excludes football played by all other past, present or future professional football leagues, including, without limitation, the All-American Football Conference.

(ggg)    "NFL Medical Committees" means the various past and present medical committees, subcommittees and panels that operated or operate at the request and/or direction of the NFL, whether independent or not, including, without limitation, the Injury and Safety Panel, Mild Traumatic Brain Injury Committee, Head Neck and Spine Medical Committee, Foot and Ankle Subcommittee, Cardiovascular Health Subcommittee, and Medical Grants Subcommittee, and all persons, whether employees, agents or independent of the NFL, who at any time were members of or participated on each such panel, committee, or subcommittee.

11

(hhh)    "Notice of Challenge Determination" means the written notice set forth in Section 4.3(a)(ii)-(iv).

(iii)    "Notice of Deficiency" means that document that the Claims Administrator sends to any Settlement Class Member whose Claim Package or Derivative Claim Package contains a Deficiency, as set forth in Section 8.5.

(jjj)    "Notice of Derivative Claimant Award Determination" means the written notice set forth in Section 9.2(a)-(b).

(kkk)    "Notice of Monetary Award Claim Determination" means the written notice set forth in Section 9.1(b)-(c).

(lll)    "Notice of Registration Determination" means the written notice set forth in Section 4.3.

(mmm)    "Offsets" means downward adjustments to Monetary Awards, as set forth in Section 6.7(b).

(nnn)    "Opt Out," when used as a verb, means the process by which any Retired NFL Football Player, Representative Claimant or Derivative Claimant otherwise included in the Settlement Class exercises the right to exclude himself or herself from the Settlement Class in accordance with Fed. R. Civ. P. 23(c)(2).

(ooo)    "Opt Outs," when used as a noun, means those Retired NFL Football Players, Representative Claimants and Derivative Claimants who would otherwise have been included in the Settlement Class and who have timely and properly exercised their rights to Opt Out and therefore, after the Final Approval Date, are not Settlement Class Members.

(ppp)    "Other Party" means every person, entity, or party other than the Released Parties.

(qqq)    "Parkinson's Disease" is defined in Exhibit 1.

(rrr)    "Parties" means the Class Representatives and Subclass Representatives, individually and on behalf of the Settlement Class and Subclasses, and the NFL Parties.

(sss)    "Personal Signature" means the actual signature by the person whose signature is required on the document.  Unless otherwise specified in this Settlement Agreement, a document requiring a Personal Signature may be submitted by an actual original "wet ink" signature on hard copy, or a PDF or other electronic image of an actual signature, but cannot be submitted by an electronic signature within the meaning of the Electronic Records and Signatures in Commerce Act, 15 U.S.C. §§7001, *et seq.*, the Uniform Electronic Transactions Act, or their successor acts.

(ttt)    "Preliminary Approval and Class Certification Order" means the order, upon entry by the Court, preliminarily approving the Class Action Settlement and conditionally certifying the Settlement Class and Subclasses.

(uuu)    "Protected Health Information" means individually identifiable health information, as defined in 45 C.F.R. § 160.103.

(vvv)    "Qualified BAP Providers" means neuropsychologists certified by the American Board of Professional Psychology (ABPP) or the American Board of Clinical Neuropsychology (ABCN), a member board of the American Board of Professional Psychology, in the specialty of Clinical Neuropsychology, and board-certified neurologists, eligible to conduct baseline assessments of Retired NFL Football Players under the BAP, as set forth in Section 5.7(a).

(www) "Qualified MAF Physician" means a board-certified neurologist, board-certified neurosurgeon, or other board-certified neuro-specialist physician, who is part of an approved list of physicians authorized to make Qualifying Diagnoses, as set forth in Section 6.5.

(xxx)    "Qualified Pharmacy Vendor(s)" means one or more nationwide mail order pharmacies contracted to provide approved pharmaceutical prescriptions as part of the BAP Supplemental Benefits, as set forth in Section 5.7(b).

(yyy)    "Qualifying Diagnosis" or "Qualifying Diagnoses" means Level 1.5 Neurocognitive Impairment, Level 2 Neurocognitive Impairment, Alzheimer's Disease, Parkinson's Disease, ALS, and/or Death with CTE, as set forth in Exhibit 1 (Injury Definitions).

(zzz)    "Related Lawsuits" means all past, present and future actions brought by one or more Releasors against one or more Released Parties pending in the Court, other than the Class Action Complaint, or in any other federal court, state court, arbitration, regulatory agency, or other tribunal or forum that arise out of, are based upon or are related to the allegations, transactions, facts, matters, occurrences, representations or omissions involved, set forth, alleged, or referred to in the Class Action Complaint, except that Settlement Class Members' claims for workers' compensation and claims alleging entitlement to NFL CBA Medical and Disability Benefits are not Related Lawsuits.

(aaaa)    "Released Claims" means those claims released as set forth in Section 18.1 and Section 18.2.

(bbbb)    "Released Parties" for purposes of the Released Claims means (i) the NFL Parties (including all persons, entities, subsidiaries, divisions, and business units composed thereby), together with (ii) each of the Member Clubs, (iii) each of the NFL Parties' and Member Clubs' respective past, present, and future agents, directors, officers, employees, independent contractors, general or limited partners, members, joint venturers, shareholders, attorneys, trustees, insurers (solely in their capacities as liability insurers of those persons or entities referred to in

13

subparagraphs (i) and (ii) above and/or arising out of their relationship as liability insurers to such persons or entities), predecessors, successors, indemnitees, and assigns, and their past, present, and future spouses, heirs, beneficiaries, estates, executors, administrators, and personal representatives, including, without limitation, all past and present physicians who have been employed or retained by any Member Club and members of all past and present NFL Medical Committees; and (iv) any natural, legal, or juridical person or entity acting on behalf of or having liability in respect of the NFL Parties or the Member Clubs, in their respective capacities as such; and, as to (i)-(ii) above, each of their respective Affiliates, including their Affiliates' officers, directors, shareholders, employees, and agents.   For the avoidance of any doubt, Riddell is not a Released Party.

(cccc)   "Releases" means the releases set forth in ARTICLE XVIII.

(dddd)      "Releasors" means the releasors set forth in Section 18.1.

(eeee)      "Representative Claimants" means authorized representatives, ordered by a court or other official of competent jurisdiction under applicable state law, of deceased or legally incapacitated or incompetent Retired NFL Football Players.

(ffff)      "Retired NFL Football Players" means all living NFL Football players who, prior to the date of the Preliminary Approval and Class Certification Order, retired, formally or informally, from playing professional football with the NFL or any Member Club, including American Football League, World League of American Football, NFL Europe League and NFL Europa League players, or were formerly on any roster, including preseason, regular season, or postseason, of any such Member Club or league and who no longer are under contract to a Member Club and are not seeking active employment as players with any Member Club, whether signed to a roster or signed to any practice squad, developmental squad, or taxi squad of a Member Club.

(gggg)      "Riddell" means Riddell, Inc.; All American Sports Corporation; Riddell Sports Group, Inc.; Easton-Bell Sports, Inc.; Easton-Bell Sports, LLC; EB Sports Corp.; and RBG Holdings Corp., and each of their respective past, present, and future Affiliates, directors, officers, employees, general or limited partners, members, joint venturers, shareholders, agents, trustees, insurers (solely in their capacities as such), reinsurers (solely in their capacities as such), predecessors, successors, indemnitees, and assigns.

(hhhh)      "Settlement Agreement" means this Settlement Agreement and all accompanying exhibits, including any subsequent amendments thereto and any exhibits to such amendments.

(iiii)        "Settlement Class and Subclasses" is defined in Section 1.1 and Section 1.2.

(jjjj)        "Settlement Class Member" means each Retired NFL Football Player, Representative Claimant and/or Derivative Claimant in the Settlement Class; provided, however, that the term Settlement Class Member as used herein with respect to any right or obligation after the Final Approval Date does not include any Opt Outs.

(kkkk)        "Settlement Class Notice" means that notice, in the form of Exhibit 5, and as set forth in Section 14.1, as agreed to by Co-Lead Class Counsel and Counsel for the NFL Parties, and approved by the Court.

(llll)        "Settlement Class Notice Agent" means that person or entity who will implement the Settlement Class Notice Plan and who will be responsible for the publication and provision of the Settlement Class Notice and Settlement Class Supplemental Notice.

(mmmm)        "Settlement Class Notice Payment" means Four Million United States dollars (U.S. $4,000,000), as set forth in Sections 23.1(d) and 23.3(e), for the costs of Settlement Class Notice, any supplemental notice required, including, without limitation, the Settlement Class Supplemental Notice, and compensation of the Settlement Class Notice Agent and the Claims Administrator to the extent the Claims Administrator performs notice-related duties that have been agreed to by the NFL Parties.

(nnnn)        "Settlement Class Notice Plan" means that document which sets forth the methods, timetable, and responsibilities for providing Settlement Class Notice to Settlement Class Members, as set forth in Section 14.1.

(oooo)        "Settlement Class Supplemental Notice" means that notice, as set forth in Section 14.1(d), as agreed to by Co-Lead Class Counsel and Counsel for the NFL Parties, and approved by the Court.

(pppp)        "Settlement Date" means the date by which Class Counsel and Counsel for the NFL Parties have all signed ~~this~~**the** Settlement Agreement **dated June 25, 2014** on behalf of the Class and Subclass Representatives, Settlement Class and Subclasses, and the NFL Parties, respectively.

(qqqq)        "Settlement Trust" means the trust enacted pursuant to the Settlement Trust Agreement, as set forth in Section 23.5.

(rrrr)        "Settlement Trust Account" means that account created under the Settlement Trust Agreement and held by the Trustee into which the NFL Parties will make payments pursuant to ARTICLE XXIII of this Settlement Agreement.

15

(ssss)        "Settlement Trust Agreement" means the agreement that will establish the Settlement Trust and will be entered into by Co-Lead Class Counsel, the NFL Parties, and the Trustee, as set forth in Section 23.5(c).

(tttt)        "Signature" means the actual signature by the person whose signature is required on the document, or on behalf of such person by a person authorized by a power of attorney or equivalent document to sign such documents on behalf of such person.  Unless otherwise specified in this Settlement Agreement, a document requiring a Signature may be submitted by: (i) an actual original "wet ink" signature on hard copy; (ii) a PDF or other electronic image of an actual signature; or (iii) an electronic signature within the meaning of the Electronic Records and Signatures in Commerce Act, 15 U.S.C. §§7001, *et seq.*, the Uniform Electronic Transactions Act, or their successor acts.

(uuuu)        "Special Master" means that person appointed by the Court pursuant to Federal Rule of Civil Procedure 53 to oversee the administration of the Settlement Agreement, as set forth in Section 10.1.

(vvvv)        "Stadium Program Bonds" means the NFL's G3 and G4 bonds.

(wwww)        "Stroke" means stroke, as defined by the World Health Organization's International Classification of Diseases, 9th Edition (ICD-9) or the World Health Organization's International Classification of Diseases, 10th Edition (ICD-10), which occurs prior to or after the time the Retired NFL Football Player played NFL Football.  A medically diagnosed Stroke does not include a transient cerebral ischaemic attack and related syndromes, as defined by ICD-10.

(xxxx) "Subclass Counsel" means, pending Court appointment, the counsel who are so designated and who are signatories to this Settlement Agreement, namely Arnold Levin of Levin, Fishbein, Sedran & Berman for Subclass 1, and Dianne M. Nast of NastLaw LLC for Subclass 2, and, upon appointment, such other counsel as the Court may appoint to represent the Settlement Subclasses 1 and 2.

(yyyy)        "Subclass Representatives" means Shawn Wooden and Kevin Turner, or such other or different persons as may be designated by the Court as the representatives of the Settlement Subclasses 1 and 2.

(zzzz)        "Supplemental Monetary Award" means the supplemental payment of monies from the Monetary Award Fund to a Settlement Class Member, as set forth in Section 6.8.

(aaaaa)        "Traumatic Brain Injury" means severe traumatic brain injury unrelated to NFL Football play, that occurs during or after the time the Retired NFL Football Player played NFL Football, consistent with the definitions in the World Health Organization's International Classification of Diseases, 9th Edition (ICD-9), Codes 854.04, 854.05, 854.14 and 854.15, and the World Health Organization's

16

International Classification of Diseases, 10th Edition (ICD-10), Codes S06.9x5 and S06.9x6.

(bbbbb)    "Tricare" means the federal program managed and administered by the United States Department of Defense through the Tricare Management Activity under which certain medical items, services, and/or prescription drugs are furnished to eligible members of the military services, military retirees, and military dependents under 10 U.S.C. § 1071, *et seq.*

(ccccc) "Trustee" means that person or entity approved by the Court as trustee of the Settlement Trust Account and as administrator of the qualified settlement fund for purposes of Treasury Regulation §1.468B-2(k)(3), as set forth in ARTICLE XXIII.

## ARTICLE III
### Settlement Benefits for Class Members

Section 3.1    The Class and Subclass Representatives, by and through Class Counsel and Subclass Counsel, and the NFL Parties, by and through Counsel for the NFL Parties, agree that, in consideration of the Releases and Covenant Not to Sue set forth in ARTICLE XVIII, and the dismissal with prejudice of the Class Action Complaint and the Related Lawsuits, and subject to the terms and conditions of this Settlement Agreement, the NFL Parties will, in addition to other obligations set forth in this Settlement Agreement:

(a)    Pay all final Monetary Awards and Derivative Claimant Awards to those Settlement Class Members who qualify for such awards pursuant to the requirements and criteria set forth in this Settlement Agreement;

(b)    Provide qualified Settlement Class Members who are Retired NFL Football Players with the option to participate in the BAP and receive a BAP baseline assessment examination and BAP Supplemental Benefits, if eligible, pursuant to the requirements and criteria set forth in this Settlement Agreement; and

(c)    Establish the Education Fund to support education programs promoting safety and injury prevention with respect to football players, including safety-related initiatives in youth football, the education of Retired NFL Football Players regarding the NFL CBA Medical and Disability Benefits programs, and other educational initiatives benefitting Retired NFL Football Players, as set forth in ARTICLE XII.

## ARTICLE IV
### Information and Registration Process

Section 4.1    Information

(a)    Within ten (10) days after the Preliminary Approval and Class Certification Order, Co-Lead Class Counsel will cause to be established and

17

-2951-

maintained a public website containing information about the Class Action Settlement (the "Settlement Website"), including the Settlement Class Notice and "Frequently Asked Questions." Within ninety (90) days after the Effective Date, Co-Lead Class Counsel will cause the Settlement Website to be transitioned for claims administration purposes. The Settlement Website will be the launching site for secure web-based portals established and maintained by the Claims Administrator, BAP Administrator, and/or Lien Resolution Administrator for use by Settlement Class Members and their designated attorneys throughout the term of the Class Action Settlement. The Claims Administrator will post all necessary information about the Class Action Settlement on the Settlement Website, including, as they become available, information about registration deadlines and methods to participate in the BAP, the Claim Package requirements and Monetary Awards, and the Derivative Claim Package requirements and Derivative Claimant Awards. All content posted on the Settlement Website will be subject to advance approval by Co-Lead Class Counsel and Counsel for the NFL Parties.

(b)    Within ten (10) days after the Preliminary Approval and Class Certification Order, Co-Lead Class Counsel also will cause to be established and maintained an automated telephone system that uses a toll-free number or numbers to provide information about the Class Action Settlement. Within ninety (90) days after the Effective Date, Co-Lead Class Counsel will cause the automated telephone system to be transitioned for claims administration purposes. Through this system, Settlement Class Members may request and obtain copies of the Settlement Class Notice, Settlement Agreement, Claim Form, Derivative Claim Form, and Appeals Form, and they may speak with operators for further information.

Section 4.2    <u>Registration Methods and Requirements</u>

(a)    The Claims Administrator will establish and administer both online and hard copy registration methods for participation in the Class Action Settlement.

(b)    The registration requirements will include information sufficient to determine if a registrant is a Settlement Class Member, including: (i) name; (ii) address; (iii) date of birth; (iv) Social Security Number (if any); (v) email address (if any), and whether email, the web-based portal on the Settlement Website, or U.S. mail is the preferred method of communication; (vi) identification as a Retired NFL Football Player, Representative Claimant or Derivative Claimant; (vii) dates and nature of NFL Football employment (*e.g.*, Active List, practice squad, developmental squad), and corresponding identification of the employer Member Club(s) or assigned team(s) (for Retired NFL Football Players, or, for the subject Retired NFL Football Player or deceased Retired NFL Football Player in the case of Representative Claimants and Derivative Claimants); and (viii) Signature of the registering purported Settlement Class Member.

(i)    In addition to the registration requirements in this Section 4.2(b), Representative Claimants also will identify the subject deceased or

legally incapacitated or incompetent Retired NFL Football Player, including name, last known address, date of birth, and Social Security Number (if any), and will provide a copy of the court order, or other document issued by an official of competent jurisdiction, providing the authority to act on behalf of that deceased or legally incapacitated or incompetent Retired NFL Football Player.

(ii)    In addition to the registration requirements in this Section 4.2(b), Derivative Claimants also will identify the subject Retired NFL Football Player or deceased Retired NFL Football Player and the relationship by which they assert the right under applicable state law to sue independently or derivatively.

(c)    Unless good cause, as set forth in subsection (i), is shown, Settlement Class Members must register on or before 180 days from the date that the Settlement Class Supplemental Notice is posted on the Settlement Website. If a Settlement Class Member does not register by that deadline, that Settlement Class Member will be deemed ineligible for the BAP and BAP Supplemental Benefits, Monetary Awards and Derivative Claimant Awards.

(i)    Good cause will include, without limitation, (a) that a Settlement Class Member who is a Representative Claimant had not been ordered by a court or other official of competent jurisdiction to be the authorized representative of the subject deceased or legally incapacitated or incompetent Retired NFL Football Player prior to the registration deadline (and the Representative Claimant seeks to register within 180 days of authorization by the court or other official of competent jurisdiction), or (b) that the subject Retired NFL Football Player timely registered prior to his death or becoming legally incapacitated or incompetent and his Representative Claimant seeks to register for that Retired NFL Football Player; or (c) that the subject Retired NFL Football Player timely registered and the Derivative Claimant seeks to register within thirty (30) days of that Retired NFL Football Player's submission of a Claim Package.

Section 4.3    Registration Review

(a)    Upon receipt of a purported Settlement Class Member's registration, the Claims Administrator will review the information to determine whether the purported Settlement Class Member is a Settlement Class Member under the Settlement Agreement, and whether he or she has timely registered. In order to determine qualification for the BAP, as set forth in Section 5.1, the Claims Administrator will also determine if a registering Retired NFL Football Player has identified his participation in NFL Football that earns him at least one half of an Eligible Season. The Claims Administrator will then issue a favorable or adverse Notice of Registration Determination, within forty-five (45) days of receipt of the purported Settlement Class Member's registration, informing the purported Settlement Class Member whether he or she is a Settlement Class Member who has properly registered. To the extent the volume of registrations warrants, this deadline may be

19

extended by agreement between Co-Lead Class Counsel and Counsel for the NFL Parties.

(i)      Favorable Notices of Registration Determination will include information regarding the sections of the Settlement Website and/or secure web-based portals that provide detailed information regarding the Claim Package and Monetary Awards, the Derivative Claim Package and Derivative Claimant Awards and, for Settlement Class Members who are Retired NFL Football Players, information regarding the BAP.   The Notice of Registration Determination will inform the Settlement Class Member of his or her unique identifying number for future use, including on a Claim Form or Derivative Claimant Form.

(ii)     Adverse Notices of Registration Determination will include information regarding how the purported Settlement Class Member can challenge the determination.  The purported Settlement Class Member may submit a written challenge to the Claims Administrator within sixty (60) days after the date of the Notice of Registration Determination.  The purported Settlement Class Member must present a sworn statement or other evidence in support of any written challenge. The Claims Administrator will make a determination on the written challenge and issue a Notice of Challenge Determination to the purported Settlement Class Member and the NFL Parties informing them of the decision.

(iii)    The NFL Parties can challenge, for good cause, a favorable Notice of Registration Determination by submitting a written challenge to the Claims Administrator within sixty (60) days after the date of the Notice of Registration Determination.   The NFL Parties must present evidence in support of the written challenge.   The Claims Administrator will make a determination on the written challenge and issue a Notice of Challenge Determination to the purported Settlement Class Member and the NFL Parties informing them of the decision.

(iv)     Any Notice of Challenge Determination may be appealed by the purported Settlement Class Member or the NFL Parties, provided that the NFL Parties' appeal is limited to challenging the purported Retired NFL Football Player's or subject Retired NFL Football Player's status as a Retired NFL Football Player, in writing to the Court within sixty (60) days after the date of the Notice of Challenge Determination.   The parties may present evidence in support of, or in opposition to, the appeal.  The Court will be provided access to all documents and information available to the Claims Administrator to aid in determining the appeal. The Court may, in its discretion, refer the appeal to the Special Master.  The decision of the Court or the Special Master shall be final and binding.

(v)      If either Co-Lead Class Counsel or Counsel for the NFL Parties believe that the Claims Administrator has issued a Notice of Registration Determination that reflects an improper interpretation of the Settlement Class definition set forth in Section 1.1, such counsel may petition the Court to resolve the issue.   The Court may, in its discretion, refer the matter to the Special Master.  If the Court or the Special Master determines that the Claims Administrator misinterpreted the Settlement

20

Class definition, the decision of the Court or the Special Master will supersede the prior determination by the Claims Administrator.

**ARTICLE V**
**Baseline Assessment Program**

Section 5.1 <u>Qualification</u>. All Retired NFL Football Players with at least one half of an Eligible Season, as defined in Section 2.1(kk), who timely registered to participate in the Class Action Settlement, as set forth in ARTICLE IV, will qualify for the BAP and will be entitled to one (1) baseline assessment examination as provided in Section 5.2. For the avoidance of any doubt, an eligible Retired NFL Football Player who submits a claim for a Monetary Award, whether successful or not, may participate in the BAP, except a Retired NFL Football Player who submits a successful claim for a Monetary Award is not eligible to later receive BAP Supplemental Benefits.

Section 5.2 <u>Scope of Program</u>. The BAP will provide the opportunity for each qualified Retired NFL Football Player, as set forth in Section 5.1, to receive a maximum of one (1) baseline assessment examination, which includes: (a) a standardized neuropsychological examination in accordance with the testing protocol set forth in Exhibit 2 performed by a neuropsychologist certified by the American Board of Professional Psychology (ABPP) or the American Board of Clinical Neuropsychology (ABCN), a member board of the American Board of Professional Psychology, in the specialty of Clinical Neuropsychology, who is a Qualified BAP Provider; and (b) a basic neurological examination performed by a board-certified neurologist who is a Qualified BAP Provider. The diagnosis of Level 1 Neurocognitive Impairment, Level 1.5 Neurocognitive Impairment and Level 2 Neurocognitive Impairment made pursuant to the BAP must be agreed to by both the neuropsychologist and board-certified neurologist serving as Qualified BAP Providers. BAP baseline assessment examinations are intended to establish a physician/patient relationship between the Retired NFL Football Player and his Qualified BAP Providers. Retired NFL Football Players diagnosed during their BAP baseline assessment examinations by Qualified BAP Providers with Level 1 Neurocognitive Impairment will be eligible to receive BAP Supplemental Benefits, as set forth in Section 5.11. For the avoidance of any doubt, a Qualifying Diagnosis of Alzheimer's Disease, Parkinson's Disease, ALS or Death with CTE shall not be made through the BAP baseline assessment examination.

Section 5.3 <u>Deadline for BAP Baseline Assessment Examination</u>. A Retired NFL Football Player electing to receive a BAP baseline assessment examination must take it: (i) within two (2) years of the commencement of the BAP if he is age 43 or older on the Effective Date; or (ii) if he is younger than age 43 on the Effective Date, before his 45th birthday or within ten (10) years of the commencement of the BAP, whichever occurs earlier. For the avoidance of any doubt, there shall be no baseline assessment examinations after the tenth anniversary of the commencement of the BAP.

21

Section 5.4    <u>Monetary Award Offset</u>.  If a Retired NFL Football Player in Subclass 1 chooses not to participate in the BAP and receives a Qualifying Diagnosis on or after the Effective Date, that Retired NFL Football Player will be subject to a Monetary Award Offset (as set forth in Section 6.7(b)(iv)) based on his non-participation in the BAP unless the Qualifying Diagnosis is of ALS or if he receives any Qualifying Diagnosis other than ALS prior to his deadline to receive a BAP baseline assessment examination as set forth in Section 5.3.  This Offset does not apply to a Retired NFL Football Player who is in Subclass 2.

Section 5.5    <u>BAP Term</u>.  The BAP will commence one hundred and twenty (120) days after the Settlement Class Supplemental Notice is posted on the Settlement Website and will end ten (10) years after it commences, except that the provision of BAP Supplemental Benefits to Retired NFL Football Players diagnosed with Level 1 Neurocognitive Impairment, as set forth in Exhibit 1, may extend beyond the term of the BAP for up to five (5) years as set forth in Section 5.11.  Retired NFL Football Players who are qualified, as set forth in Section 5.1, will be entitled to one (1) baseline assessment examination within the applicable time limitations set forth in Section 5.3.

Section 5.6    <u>BAP Administrator</u>

(a)    <u>Appointment and Oversight</u>

(i)    The Motion for Preliminary Approval of the Class Action Settlement filed by Class Counsel  will request that the Court appoint The Garretson Resolution Group, Inc. ("Garretson Group") as BAP Administrator.  Within ten (10) days after the Effective Date, Co-Lead Class Counsel will retain the BAP Administrator appointed by the Court.

(ii)    Co-Lead Class Counsel's retention agreement with the BAP Administrator will provide that the BAP Administrator will perform its responsibilities and take all steps necessary to faithfully implement and administer the BAP-related provisions of the Settlement Agreement, and will require that the BAP Administrator maintain at all times appropriate and sufficient bonding insurance in connection with its performance of its responsibilities under the Settlement Agreement.

(iii)    The Court may, at its sole discretion, request reports or information from the BAP Administrator.  The BAP Administrator will be responsible for reporting and providing information to the Court at such frequency and in such a manner as the Court directs.

(iv)    The Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof) will oversee the BAP Administrator, and may, at his or her sole discretion, request reports or information from the BAP Administrator.

(v)    Beyond the reporting requirements set forth in Section 5.6(a)(iii)-(iv), beginning one month after the Effective Date, the BAP

22

Administrator will issue a regular monthly report to the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof), Co-Lead Class Counsel, and Counsel for the NFL Parties during the first three years of the BAP, and thereafter on a quarterly basis, or as reasonably agreed upon by the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof), Co-Lead Class Counsel and Counsel for the NFL Parties, regarding the status and progress of the BAP.  The monthly (or quarterly) report will include, without limitation, information regarding activity in the BAP, including:  (a) the number and identity of Retired NFL Football Players with pending BAP appointments, (b) the monthly and total number of Retired NFL Football Players who took part in the BAP, and the identity of each Settlement Class Member who took part in the preceding month; (c) the monthly and total monetary amounts paid to Qualified BAP Providers; (d) the monthly and total number of Retired NFL Football Players eligible for BAP Supplemental Benefits, as set forth in Section 5.11, and the identity of each such Retired NFL Football Player; (e) any Retired NFL Football Player complaints regarding specific Qualified BAP Providers; (f) expenses/administrative costs, including a summary accounting of the administrative expenses incurred by the BAP Administrator in the preceding month; and (g) any other information reasonably requested by the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof), Co-Lead Class Counsel, or Counsel for the NFL Parties.

(vi)    Beginning on the first January after the Effective Date, the BAP Administrator will provide annual financial reports to the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof), Co-Lead Class Counsel and Counsel for the NFL Parties, based on information from the preceding year, regarding:  (a) the number of Retired NFL Football Players who took part in the BAP; (b) the monetary amount paid to Qualified BAP Providers; (c) the number of Retired NFL Football Players eligible for BAP Supplemental Benefits; (d) the expenses/administrative costs incurred by the BAP Administrator; (e) the projected expenses/administrative costs for the remainder of the BAP, including the five-year period for the provision of BAP Supplemental Benefits as set forth in Sections 5.5 and 5.11; (f) the monies remaining in the BAP Fund; and (g) any other information reasonably requested by the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof), Co-Lead Class Counsel, or Counsel for the NFL Parties.

(b)    <u>Compensation and Expenses</u>.  Reasonable compensation of the BAP Administrator, as agreed to by Co-Lead Class Counsel and Counsel for the NFL Parties, and reasonable out-of-pocket costs and expenses directly incurred as a result of the BAP Administrator's responsibilities will be paid out of the BAP Fund.  The BAP Administrator shall submit an annual budget to the Court for review and approval.  Either Co-Lead Class Counsel or Counsel for the NFL Parties may challenge the reasonableness of the BAP Administrator's out-of-pocket costs and expenses, in which case the Court will determine (or may, in its discretion, refer the challenge to the Special Master to determine) the reasonableness of such costs and expenses.  If the Court or Special Master, as applicable, determines that any costs and expenses are

23

unreasonable, the BAP Administrator will not be paid for such costs and expenses or, if such costs and expenses have already been paid, the BAP Administrator will refund that amount to the BAP Fund.

(c)    Liability.    The Parties, Class Counsel, Counsel for the NFL Parties, and the Special Master, and their respective Affiliates, will not be liable for any act, or failure to act, of the BAP Administrator.

(d)    Replacement.    The BAP Administrator may be replaced by joint motion made by Co-Lead Class Counsel and Counsel for the NFL Parties, or for cause by motion of either Co-Lead Class Counsel or Counsel for the NFL Parties, upon order of the Court.  If the BAP Administrator resigns, dies, is replaced, or is otherwise unable to continue employment in this position, Co-Lead Class Counsel and Counsel for the NFL Parties will agree to and jointly recommend a new proposed BAP Administrator for appointment by the Court.

(e)    Conflicts of Interest.    Within ninety (90) days after the Effective Date, Co-Lead Class Counsel, Counsel for the NFL Parties, the Special Master and the BAP Administrator will establish and implement procedures to promptly detect and resolve possible conflicts of interest between the BAP Administrator, including, without limitation, its executive leadership team and all employees conducting BAP-related work, on the one hand, and Settlement Class Members (and counsel individually representing them, if any), the NFL Parties, Counsel for the NFL Parties, or the Special Master, on the other hand.  Co-Lead Class Counsel, Counsel for the NFL Parties, and the BAP Administrator, subject to approval of the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof) may modify such procedures in the future, if appropriate. Notwithstanding anything herein to the contrary, Co-Lead Class Counsel, Counsel for the NFL Parties, and the Special Master understand that the BAP Administrator regularly provides settlement administration, lien resolution, and other related services to settling parties and their attorneys, and Co-Lead Class Counsel, Counsel for the NFL Parties, and the Special Master acknowledge and agree that it shall not be a conflict of interest for the BAP Administrator to provide such services to such individuals or to receive compensation for such work.

Section 5.7    Retention and Oversight of Qualified BAP Providers and Qualified BAP Pharmacy Vendor(s)

(a)    Qualified BAP Providers

(i)    Within ninety (90) days after the Effective Date, the BAP Administrator will establish and maintain a network of Qualified BAP Providers to provide baseline assessment examinations to Retired NFL Football Players, and to provide medical treatment to Retired NFL Football Players who receive BAP Supplemental Benefits, as set forth in Section 5.11.  The BAP Administrator's selection of all Qualified BAP Providers will be subject to written approval of Co-Lead Class Counsel and Counsel for the NFL Parties, each of which will have the

unconditional right to veto the selection of twenty (20) Qualified BAP Providers, in addition to the unconditional right to veto the selection of any Qualified BAP Provider who has served or is serving as a litigation expert consultant or expert witness for a party or his, her or its counsel in connection with litigation relating to the subject matter of the Class Action Complaint since July 1, 2011.   Thereafter, the BAP Administrator may select additional Qualified BAP Providers during the term of the BAP to the extent necessary to effectuate network coverage, subject to written approval of Co-Lead Class Counsel and Counsel for the NFL Parties.   Co-Lead Class Counsel and Counsel for the NFL Parties each shall accrue five (5) additional unconditional veto rights for every fifty (50) new Qualified BAP Providers selected and approved during the term of the BAP, and shall retain the unconditional right to veto the selection of any Qualified BAP Provider who has served or is serving as a litigation expert consultant or expert witness for a party or his, her or its counsel in connection with litigation relating to the subject matter of the Class Action Complaint since July 1, 2011.

    (ii)  The BAP Administrator will select Qualified BAP Providers based on the following criteria:   (a) education, training, licensing, credentialing, board certification, and insurance coverage; (b) ability to provide the specified baseline assessment examinations under the BAP; (c) ability to provide medical services under the BAP Supplemental Benefits; (d) ability to provide all required examinations and services in a timely manner; (e) geographic proximity to Retired NFL Football Players; and (f) rate structure and payment terms.   Under no circumstances will a Qualified BAP Provider be selected or approved who has been convicted of a crime of dishonesty, or who is serving on or after the Final Approval Date as a litigation expert consultant or expert witness for an Opt Out, or his, her or its counsel in connection with litigation relating to the subject matter of the Class Action Complaint.   If selected and approved, under no circumstances shall a Qualified BAP Provider continue to serve in that role if convicted of a crime of dishonesty and/or thereafter retained as a litigation expert consultant or expert witness for an Opt Out, or his, her or its counsel in connection with litigation relating to the subject matter of the Class Action Complaint.

    (iii)  In order to be eligible for selection, each Qualified BAP Provider must provide the following information to the BAP Administrator:  (a) state professional license number; (b) National Provider Identifier; (c) board-certification information, if any; (d) evidence of proper licensing and insurance coverage under applicable state laws; (e) experience, including number of years as a healthcare provider; (f) primary and additional service locations; (g) mailing and billing addresses; (h) tax identification information; (i) ability to provide the specified baseline assessment examinations; (j) capacity for new patients; (k) appointment accessibility; (l) languages spoken; (m) criminal record; (n) the percentage of his/her practice related to litigation expert/consulting engagements, including the relative percentage of such expert/consulting performed for plaintiffs, defendants and court/administrative bodies, and a general description of such engagements, since July 1, 2011; (o) list of all litigation-related engagements as a litigation expert consultant or expert witness arising out of, or relating to, head, brain and/or cognitive injury of athletes; (p) a general

25

description of any past or present salaried, or other professional or consulting relationships with the NFL Parties or Member Clubs; and (q) such other information as the BAP Administrator may reasonably request.

(iv)    The BAP Administrator will enter into a written contract with each Qualified BAP Provider (the "Provider Contract") to provide the specified baseline assessment examinations under the BAP and authorized medical services under the BAP Supplemental Benefits. The Provider Contract will include, among other things, a description of the baseline assessment examinations that will be provided under the BAP; rates, billing, and payment terms; terms relating to licensing, credentials, board certification, and other qualifications; the amount and type of insurance to be maintained by the Qualified BAP Provider; procedures for scheduling, rescheduling, and cancelling BAP appointments; document retention policies and procedures; and fraud policies. The Provider Contract will further provide:  (a) that the Qualified BAP Provider will release and hold harmless the Parties, Class Counsel, Counsel for the NFL Parties, Special Master, BAP Administrator, and Claims Administrator from any and all claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, or otherwise, arising from or related to the services provided by that Qualified BAP Provider as part of the BAP; (b) that the Qualified BAP Provider will not seek payment from the Parties, Class Counsel, Counsel for the NFL Parties, Special Master, BAP Administrator, or Claims Administrator for any medical service(s), examination(s), and/or test(s) or any medical treatment or care that are not part of the specified baseline assessment examinations or authorized for payment under the terms of the BAP Supplemental Benefits, except that the Qualified BAP Provider may seek payment from a Retired NFL Football Player or, where applicable, his or her insurer for any medical service(s), examination(s), and/or test(s) or any medical treatment or care that are not part of the specified baseline assessment examinations or BAP Supplemental Benefits, where the Retired NFL Football Player, or, where applicable, his or her insurer, has agreed in writing to authorize and pay for such medical service(s), examination(s), and/or test(s) or any medical treatment or care; and (c) that the Qualified BAP Provider will retain medical records for Retired NFL Football Players in accordance with Section 5.10.

(1)    The Provider Contract will be drafted by the BAP Administrator, as overseen by the Special Master, and in consultation with and subject to the approval of, Co-Lead Class Counsel and Counsel for the NFL Parties.

(2)    The Provider Contract's fraud policies will contain the following warning against fraudulent conduct:  "As a Qualified BAP Provider you have agreed to provide your services and make your diagnosis in good faith in accordance with best medical practices.  Your diagnoses and billings will be audited on a periodic and random basis subject to the discretion of the BAP Administrator and Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof).  Any finding of fraudulent diagnoses or billings by you will be subject to, without limitation, referral to appropriate regulatory

and disciplinary boards and agencies and/or federal authorities, the immediate termination of this contract, and your disqualification from serving as a diagnosing physician in any aspect of the Class Action Settlement."

(v)     The BAP Administrator will audit the credentialing and performance of Qualified BAP Providers on an annual (or, as needed, more frequent) basis. The criteria and process for the audit will be overseen by the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof) and subject to the approval of Co-Lead Class Counsel and Counsel for the NFL Parties, except Co-Lead Class Counsel or Counsel for the NFL Parties shall maintain the right to order audits of specific Qualified BAP Providers under this subparagraph, on the basis of good cause, at any time during the BAP, including the five-year period for the provision of BAP Supplemental Benefits as set forth in Sections 5.5 and 5.11. The BAP Administrator may conduct onsite visits at the locations of Qualified BAP Providers on a random or adverse selection basis to confirm their compliance with the Provider Contract described in Section 5.7(a)(iv).

(vi)     All Qualified BAP Providers will bill the BAP Administrator directly for any services rendered pursuant to the terms and conditions of the BAP. The BAP Administrator will establish procedures to ensure that the BAP Fund is the primary payer for BAP baseline assessment examinations and treatments under the BAP Supplemental Benefits, subject to the coverage limits of the BAP Supplemental Benefits, consistent with the Provider Contract, which will be executed by the BAP Administrator and each participating Qualified BAP Provider. The BAP Administrator will establish and administer a system to audit Qualified BAP Providers' procedures for billing and providing BAP baseline assessment examinations and BAP Supplemental Benefits treatments. This audit system will be designed to detect billing errors that could result in overpayment or the payment of unauthorized medical services. The BAP Administrator will bring abusive and fraudulent Qualified BAP Provider billings to the attention of the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof), Co-Lead Class Counsel and Counsel for the NFL Parties.

(vii)     The BAP Administrator may terminate the Provider Contract of any Qualified BAP Providers that are not in compliance with its terms, or for other cause.

(b)     Qualified Pharmacy Vendor(s)

(i)     Within ninety (90) days after the Effective Date, the BAP Administrator will contract with one or more Qualified BAP Pharmacy Vendor(s) to provide pharmaceuticals covered by the BAP Supplemental Benefits, as set forth in Section 5.11. The BAP Administrator's selection of the Qualified BAP Pharmacy Vendor(s) will be subject to written approval of the Special Master, in consultation with Co-Lead Class Counsel and Counsel for the NFL Parties.

27

(ii)     The BAP Administrator will select Qualified BAP Pharmacy Vendor(s) based on the following criteria:  (a) proper licensing for operation as a mail order pharmacy in all U.S. states and territories; (b) nationwide coverage and ease of administration; and (c) rate structure and payment terms.

(iii)     In order to be eligible for selection, each Qualified BAP Pharmacy Vendor must provide the following information to the BAP Administrator:  (a) federal DEA and/or state license numbers, as applicable; (b) evidence of proper licensing under applicable state laws; (c) experience, including number of years as a mail order pharmacy; (d) information about processes required to submit and fulfill mail order prescriptions; (e) average processing and delivery time from submission of a valid prescription; (f) policies related to generic substitution of name-brand pharmaceutical products; (g) mailing and billing addresses; (h) tax identification information; (i) languages spoken; and (j) such other information as the BAP Administrator may reasonably request.

(iv)     The BAP Administrator will enter into a written contract with each Qualified BAP Pharmacy Vendor (the "Pharmacy Contract") to provide the pharmaceuticals covered under the BAP Supplemental Benefits.  The Pharmacy Contract will include, among other things, a description of the pharmaceutical therapies that will be covered under the BAP Supplemental Benefits; rates, billing, and payment terms; terms relating to qualifications; procedures for submitting, filling, and shipping prescriptions; document retention policies and procedures; and fraud policies.  The Pharmacy Contract will further provide:  (a) that the Qualified BAP Pharmacy Vendor will release and hold harmless the Parties, Class Counsel, Counsel for the NFL Parties, Special Master, BAP Administrator, and Claims Administrator from any and all claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, or otherwise, arising from or related to the services provided by that Qualified BAP Pharmacy Vendor as part of the BAP; and (b) that the Qualified BAP Pharmacy Vendor will not seek payment from the Parties, Class Counsel, Counsel for the NFL Parties, Special Master, BAP Administrator, or Claims Administrator for any prescriptions that are authorized for payment under the terms of the BAP Supplemental Benefits.

(v)     The BAP Administrator will audit the performance of Qualified BAP Pharmacy Vendor(s) on an annual (or, as needed, more frequent) basis.  The criteria and process for the audit will be overseen by the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof) and subject to the approval of Co-Lead Class Counsel and Counsel for the NFL.

(vi)     All Qualified BAP Pharmacy Vendors will be reimbursed by the BAP Administrator directly for any services rendered pursuant to the terms and conditions of the BAP, subject to the coverage limits of the BAP Supplemental Benefits.  The BAP Administrator will establish procedures to ensure that the BAP Fund is the primary payer for covered prescriptions consistent with the

Pharmacy Contract, which will be executed by the BAP Administrator and each participating Qualified BAP Provider.  The BAP Administrator will establish and administer a system to audit Qualified BAP Pharmacy Vendor(s)' procedures for billing and providing approved BAP Supplemental Benefits prescriptions.  This audit system will be designed to detect billing errors that could result in overpayment or the payment of unauthorized prescriptions.  The BAP Administrator will bring abusive and fraudulent Qualified BAP Pharmacy Vendor billings to the attention of the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof), Co-Lead Class Counsel and Counsel for the NFL Parties.

(vii)    The BAP Administrator may terminate the Pharmacy Contract of any Qualified BAP Pharmacy Vendor that is not in compliance with its terms, or for other cause.

Section 5.8    Scheduling and Providing Baseline Assessment Examinations.  The Parties will establish, subject to Court approval, processes and procedures governing the scheduling and provision of BAP examinations.

Section 5.9    Other Communications with Retired NFL Football Players

(a)    The BAP Administrator will send an Explanation of Benefits ("EOB") statement to each Retired NFL Football Player following a BAP appointment.  The statement will describe the services and medical examinations that were performed during the appointment.

(b)    Beginning one (1) year after the Effective Date of the Settlement Agreement, the BAP Administrator will send Retired NFL Football Players who have not received baseline assessments and remain eligible to do so, an annual statement describing the BAP and requesting that they update any contact information that has changed in the preceding year.

(c)    If a Retired NFL Football Player is represented by counsel and has provided such notice to the BAP Administrator, the BAP Administrator will copy his counsel of record on any written communications with the Retired NFL Football Player.

Section 5.10    Use and Retention of Medical Records

(a)    All Retired NFL Football Players who participate in the BAP will be encouraged to provide their confidential medical records for use in medical research into cognitive impairment and safety and injury prevention with respect to football players.  The provision of such medical records shall be subject to the reasonable informed consent of the Retired NFL Football Players, and in compliance with applicable law, including a HIPAA-compliant authorization form.  Medical records and information used in medical research will be kept confidential.

29

(b)    The BAP Administrator will retain the medical records of Retired NFL Football Players and other program-defined forms that must be completed by the Qualified BAP Providers.

(c)    Qualified BAP Providers who provide BAP baseline assessment examinations will be required to retain all medical records from such visits in compliance with applicable state and federal laws; provided, however, that each Qualified BAP Provider will be required to retain all medical records in the format(s) prescribed by applicable state and federal laws and, notwithstanding any shorter time period permitted under applicable laws, will be required to retain such medical records for not less than ten (10) years after the conclusion of the BAP term.

(d)    All Retired NFL Football Player medical records will be treated as confidential, as set forth in Section 17.2.

Section 5.11    <u>BAP Supplemental Benefits</u>.  Each Retired NFL Football Player diagnosed by Qualified BAP Providers with a Level 1 Neurocognitive Impairment, as defined in Exhibit 1, shall be eligible for BAP Supplemental Benefits related to the Retired NFL Football Player's impairment in the form of medical treatment, counseling and/or examination by Qualified BAP Providers, including, if medically needed and prescribed by a Qualified BAP Provider, pharmaceuticals by Qualified BAP Pharmacy Vendor(s).  BAP Supplemental Benefits shall comprise medical treatments and/or examinations generally accepted by the medical community. The BAP Supplemental Benefits must be used within the term of the BAP or within five (5) years of diagnosis of Level 1 Neurocognitive Impairment by Qualified BAP Providers, even if the five (5) year period extends beyond the term of the BAP, whichever is later.  The BAP Administrator, as overseen by the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof), and in consultation with, and subject to the approval of, Co-Lead Class Counsel and Counsel for the NFL Parties, will establish the procedures governing BAP Supplemental Benefits.

Section 5.12    <u>Diagnosing Physician Certifications</u>.    Qualified BAP Providers who diagnose a Level 1 Neurocognitive Impairment, Level 1.5 Neurocognitive Impairment or Level 2 Neurocognitive Impairment, as set forth in Exhibit 1, must support that diagnosis with a Diagnosing Physician Certification and supporting medical records.  The Qualified BAP Provider must provide the Diagnosing Physician Certification and copies of the supporting medical records to the Retired NFL Football Player, his counsel (if any), and the BAP Administrator.

Section 5.13    <u>Conflicting Opinions of Qualified BAP Providers</u>.    If there is a lack of agreement, as required by Section 5.2 and Exhibit 1, between the two Qualified BAP Providers regarding whether a Retired NFL Football Player has Level 1 Neurocognitive Impairment, Level 1.5 Neurocognitive Impairment, Level 2 Neurocognitive Impairment, or none, the BAP Administrator may in its discretion:  (a) request that the Qualified BAP Providers confer with each other in an attempt to resolve the conflict; (b) request that a second BAP baseline assessment examination be

conducted by different Qualified BAP Providers; or (c) refer the results of the BAP baseline assessment examination and all relevant medical records to a member of the Appeals Advisory Panel for review and decision. The decision of the member of the Appeals Advisory Panel will determine whether the Retired NFL Football Player has Level 1 Neurocognitive Impairment, Level 1.5 Neurocognitive Impairment, Level 2 Neurocognitive Impairment, or none. If the member of the Appeals Advisory Panel determines that additional review, analysis and/or testing needs to be conducted prior to a decision, such review, analysis and/or testing will be completed by Qualified BAP Providers as selected by the BAP Administrator. The decision of the Appeals Advisory Panel member as to whether the Retired NFL Football Player has Level 1 Neurocognitive Impairment, Level 1.5 Neurocognitive Impairment, Level 2 Neurocognitive Impairment, or none, will be final and binding, except a claim for a Monetary Award or Derivative Claimant Award relying on such diagnosis may still be appealed, as set forth in Section 9.5. The member of the Appeals Advisory Panel must support the decision with a Diagnosing Physician Certification.

Section 5.14    Funding.

(a)    All aspects of the BAP, including, without limitation, its costs and expenses, payment of Qualified BAP Providers, compensation of the BAP Administrator, and BAP Supplemental Benefits, will be paid from the BAP Fund. Any funds remaining in the BAP Fund at the conclusion of the five-year period for the provision of BAP Supplemental Benefits, as set forth in Sections 5.5 and 5.11, shall be transferred to the Settlement Trust for transfer by the Trustee into the Monetary Award Fund.

(b)    In order to ensure sufficient funds to pay for a baseline assessment examination for each eligible Retired NFL Football Player, as set forth in Section 5.2 and subject to Sections 5.14(a), 23.1(b) and 23.3(d) of this Agreement, the maximum per player BAP Supplemental Benefit payable under this Section, taking into account such factors as the number of Retired NFL Football Players using the BAP and diagnosed with Level 1 Neurocognitive Impairment, shall be determined on the one-year anniversary of the commencement of the BAP by Co-Lead Class Counsel and Counsel for the NFL Parties, in consultation with the BAP Administrator, and with the approval of the Court. The maximum per player benefit will be set at a sufficient level to ensure that there will be sufficient funds, without exceeding the Seventy-Five Million United States Dollars (U.S. $75,000,000) cap on the BAP Fund, to pay for every eligible Retired NFL Football Player to receive one baseline assessment examination. At the conclusion of the term of the BAP, and at such other times as the Court may direct or as may be requested by Co-Lead Class Counsel or Counsel for the NFL Parties, Co-Lead Class Counsel and Counsel for the NFL Parties will review and adjust, if necessary, this maximum benefit, in consultation with the BAP Administrator and with the approval of the Court, to ensure that there are sufficient funds to pay for all baseline assessment examinations without exceeding the Seventy-Five Million United States Dollar (U.S. $75,000,000) cap on the BAP Fund.

31

**ARTICLE VI**
**Monetary Awards for Qualifying Diagnoses**

Section 6.1    Eligible Retired NFL Football Players and Representative Claimants will be entitled to Monetary Awards as set forth in this Article.

Section 6.2    Eligibility

(a)    A Settlement Class Member who is a Retired NFL Football Player or Representative Claimant is eligible for a Monetary Award if, and only if:  (i) the Settlement Class Member timely registered to participate in the Class Action Settlement, as set forth in Section 4.2; (ii) the subject Retired NFL Football Player or deceased Retired NFL Football Player was diagnosed with a Qualifying Diagnosis; and (iii) the Settlement Class Member timely submits a Claim Package, subject to the terms and conditions set forth in ARTICLE VIII.

(b)    A Representative Claimant of a deceased Retired NFL Football Player will be eligible for a Monetary Award only if the deceased Retired NFL Football Player died on or after January 1, 2006, or if the Court determines that a wrongful death or survival claim filed by the Representative Claimant would not be barred by the statute of limitations under applicable state law as of:  (i) the date the Representative Claimant filed litigation against the NFL (and, where applicable, NFL Properties) relating to the subject matter of these lawsuits, if such a wrongful death or survival claim was filed prior to the Settlement Date; or (ii) the Settlement Date, where no such suit has previously been filed.

Section 6.3    Qualifying Diagnoses

(a)    The following, as defined in Exhibit 1, are Qualifying Diagnoses eligible for a Monetary Award:  (a) Level 1.5 Neurocognitive Impairment; (b) Level 2 Neurocognitive Impairment; (c) Alzheimer's Disease; (d) Parkinson's Disease; (e) Death with CTE; and (f) ALS.  All Qualifying Diagnoses must be made by properly credentialed physicians as set forth below for the particular Qualifying Diagnosis, consistent with Exhibit 1 (Injury Definitions).

(b)    Following the Effective Date, a Qualifying Diagnosis of Level 1.5 Neurocognitive Impairment, Level 2 Neurocognitive Impairment, Alzheimer's Disease, Parkinson's Disease, or ALS shall be made only by Qualified MAF Physicians, except that a Qualifying Diagnosis of Level 1.5 Neurocognitive Impairment or Level 2 Neurocognitive Impairment may also be made by Qualified BAP Providers as set forth in Section 5.2 and consistent with the terms of Exhibit 1 (Injury Definitions).

(i)    Any licensed neuropsychologist who assists a Qualified MAF Physician in making a Qualifying Diagnosis must be certified by the American Board of Professional Psychology (ABPP) or the American Board of Clinical

32

Neuropsychology (ABCN), a member board of the American Board of Professional Psychology, in the specialty of Clinical Neuropsychology.

        (c)     From the date of the Preliminary Approval and Class Certification Order through the Effective Date, a Qualifying Diagnosis of Level 1.5 Neurocognitive Impairment, Level 2 Neurocognitive Impairment, Alzheimer's Disease, Parkinson's Disease, or ALS  shall be made only by board-certified neurologists, board-certified neurosurgeons, or other board-certified neuro-specialist physicians, except as set forth in Section 6.3(e).

        (d)     Prior to the date of the Preliminary Approval and Class Certification Order, a Qualifying Diagnosis of Level 1.5 Neurocognitive Impairment, Level 2 Neurocognitive Impairment, Alzheimer's Disease, Parkinson's Disease, or ALS shall be made only by board-certified neurologists, board-certified neurosurgeons, or other board-certified neuro-specialist physicians, or otherwise qualified neurologists, neurosurgeons, or other neuro-specialist physicians, except as set forth in Section 6.3(e).

        (e)     For a Retired NFL Football Player deceased prior to the Effective Date, a Qualifying Diagnosis of Level 1.5 Neurocognitive Impairment, Level 2 Neurocognitive Impairment, Alzheimer's Disease, Parkinson's Disease, or ALS, which was rendered while the Retired NFL Football Player was living by a physician not otherwise identified in Sections 6.3 (b)-(d) but who has sufficient qualifications (i) in the field of neurology to make a Qualifying Diagnosis of Level 1.5 Neurocognitive Impairment, Level 2 Neurocognitive Impairment, Alzheimer's Disease, Parkinson's Disease, or ALS, or (ii) in the field of neurocognitive disorders to make a Qualifying Diagnosis of Level 1.5 Neurocognitive Impairment or Level 2 Neurocognitive Impairment, is permitted.

        (f)     A Qualifying Diagnosis of Death with CTE shall be made only for Retired NFL Football Players who died prior to the ~~date of the Preliminary~~**Final** Approval ~~and Class Certification Order~~**Date**, through a post-mortem diagnosis **made** by a board-certified neuropathologist ~~of CTE~~**prior to the Final Approval Date, provided that a Retired NFL Football Player who died between July 7, 2014 and the Final Approval Date shall have until 270 days from his date of death to obtain such a post-mortem diagnosis**.

        Section 6.4     <u>Qualifying Diagnosis Review by Appeals Advisory Panel.</u>

        (a)     A member of the Appeals Advisory Panel must review, as set forth in Section 6.4(b), Qualifying Diagnoses made prior to the Effective Date by:

        (i)     A board-certified neurologist, board-certified neurosurgeon, or other board-certified neuro-specialist physician, who is not a Qualified MAF Physician, between July 1, 2011 and the Effective Date;

33

**-2967-**

(ii)    A neurologist, neurosurgeon, or other neuro-specialist physician, who is not board-certified but is otherwise qualified; and

(iii)    A physician who is not a Qualified MAF Physician and who is not otherwise identified in Section 6.4(a)(i)-(ii) but who has sufficient qualifications (i) in the field of neurology to make a Qualifying Diagnosis of Level 1.5 Neurocognitive Impairment, Level 2 Neurocognitive Impairment, Alzheimer's Disease, Parkinson's Disease, or ALS, or (ii) in the field of neurocognitive disorders to make a Qualifying Diagnosis of Level 1.5 Neurocognitive Impairment or Level 2 Neurocognitive Impairment.

(b)    If a review of a Qualifying Diagnosis by a member of the Appeals Advisory Panel is required by Section 6.4(a), the contents of the Claim Package relevant to the Qualifying Diagnosis, including the Claim Form, the Diagnosing Physician Certification, medical records supporting and reflecting the Qualifying Diagnosis, and any other related materials concerning the Qualifying Diagnosis, shall be submitted to a member of the Appeals Advisory Panel for review. The Appeals Advisory Panel member will determine whether the Retired NFL Football Player or deceased Retired NFL Football Player has the Qualifying Diagnosis reported in the Diagnosing Physician Certification, or, where there is no Diagnosing Physician Certification as set forth in Section 8.2(a)(i), reported in the Claim Package submitted by the Representative Claimant. The Appeals Advisory Panel member shall review the Qualifying Diagnosis based on principles generally consistent with the diagnostic criteria set forth in Exhibit 1 (Injury Definitions), including consideration of, without limitation, the qualifications of the diagnosing physician, the supporting medical records and the year and state of medicine in which the Qualifying Diagnosis was made. The Appeals Advisory Panel member also shall confirm that the Qualifying Diagnosis was made by an appropriate physician as set forth in Section 6.3. For the avoidance of any doubt, the review of whether a Qualifying Diagnosis is based on principles generally consistent with the diagnostic criteria set forth in Exhibit 1 (Injury Definitions) does not require identical diagnostic criteria, including without limitation, the same testing protocols or documentation requirements.

(i)    The review by a member of the Appeals Advisory Panel under this subsection, absent extraordinary circumstances impacting the schedule of such member, shall be completed within forty-five (45) days of the date on which he or she receives a Settlement Class Member's file, except such time limit may be altered to the extent the volume of files warrants, either by agreement between Co-Lead Class Counsel and Counsel for the NFL Parties, subject to approval by the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof), or by application by Co-Lead Class Counsel or Counsel for the NFL Parties to the Court. The Qualifying Diagnoses shall generally be reviewed in the order in which they are received.

Section 6.5    Qualified MAF Physicians

34

(a)    Within ninety (90) days after the Effective Date, the Claims Administrator will establish and maintain a list of Qualified MAF Physicians eligible to provide Qualifying Diagnoses.  Each Qualified MAF Physician shall be approved by Co-Lead Class Counsel and Counsel for the NFL Parties, which approval shall not be unreasonably withheld.  To the extent a Retired NFL Football Player is examined by a Qualified MAF Physician, such visit and examination shall be at the Retired NFL Football Player's own expense.

(b)    The Claims Administrator will select Qualified MAF Physicians based on the following criteria:  (a) education, training, licensing, credentialing, board certification, and insurance coverage; (b) ability to provide the specified examinations necessary to make Qualifying Diagnoses; (c) ability to provide all required examinations and services in a timely manner; (d) insurance accessibility; and (e) geographic proximity to Retired NFL Football Players.  Under no circumstances will a Qualified MAF Physician be selected or approved who has been convicted of a crime of dishonesty, or who is serving on or after the Final Approval Date as a litigation expert consultant or expert witness for an Opt Out, or his, her or its counsel in connection with litigation relating to the subject matter of the Class Action Complaint.  If selected and approved, under no circumstances shall a Qualified MAF Physician continue to serve in that role if convicted of a crime of dishonesty and/or thereafter retained as a litigation expert consultant or expert witness for an Opt Out, or his, her or its counsel in connection with litigation relating to the subject matter of the Class Action Complaint.

(c)    In order to be eligible for selection, each Qualified MAF Physician must provide the following information to the Claims Administrator:  (a) state professional license number; (b) National Provider Identifier; (c) board-certification information; (d) evidence of proper licensing and insurance coverage under applicable state laws; (e) experience, including number of years as a healthcare provider; (f) primary and additional service locations; (g) mailing and billing addresses; (h) tax identification information; (i) ability to provide all required examinations and services in a timely manner; (j) capacity for new patients; (k) appointment accessibility; (l) languages spoken; (m) criminal record; (n) the percentage of his/her practice related to litigation expert/consulting engagements, including the relative percentage of such expert/consulting performed for plaintiffs, defendants, and court/administrative bodies, and a general description of such engagements, since July 1, 2011; (o) list of all litigation-related engagements as a litigation expert consultant or expert witness arising out of, or relating to, head, brain and/or cognitive injury of athletes; (p) a general description of any past or present salaried, or other professional or consulting relationships with the NFL Parties or Member Clubs; and (q) such other information as the Claims Administrator may reasonably request.

Section 6.6    Modification of Qualifying Diagnoses

(a)    Subject to the constraints of Section 6.6(b), following the Effective Date, on a periodic basis not to exceed once every ten (10) years, Co-Lead Class Counsel and Counsel for the NFL Parties agree to discuss in good faith possible

35

prospective modifications to the definitions of Qualifying Diagnoses and/or the protocols for making Qualifying Diagnoses, in light of generally accepted advances in medical science. No such modifications can be made absent written agreement between Co-Lead Class Counsel and Counsel for the NFL Parties and approval by the Court, and neither Co-Lead Class Counsel nor Counsel for the NFL Parties shall seek modification to the definitions of Qualifying Diagnoses and/or the protocols for making Qualifying Diagnoses other than with the written agreement of the other regarding such modifications.

(b)    Monetary Awards, consistent with the terms of this Settlement Agreement, shall compensate Settlement Class Members only in circumstances where a Retired NFL Football Player manifests actual cognitive impairment and/or actual neuromuscular impairment, or a deceased Retired NFL Football Player manifested actual cognitive impairment and/or actual neuromuscular impairment while living. For the avoidance of any doubt, the identification of a condition—for example, through a blood test, genetic test, imaging technique, or otherwise—that has not yet resulted in actual cognitive impairment and/or actual neuromuscular impairment experienced by the Retired NFL Football Player does not qualify as a Qualifying Diagnosis. As such, Co-Lead Class Counsel and Counsel for the NFL Parties have defined the Qualifying Diagnoses to require an actual manifestation of cognitive impairment and/or an actual manifestation of neuromuscular impairment. Consistent with Section 6.6(a), Co-Lead Class Counsel and Counsel for the NFL Parties will address possible advances in science to effectuate this mutual intent. For the avoidance of doubt, this subsection does not apply to the Qualifying Diagnosis of Death with CTE. This subsection also does not alter the Qualifying Diagnoses definitions, as set forth in Exhibit 1.

(c)    In no event will modifications be made to the Monetary Award levels in the Monetary Award Grid, except for inflation adjustment(s) as set forth in Section 6.9.

Section 6.7    Determination of Monetary Awards

(a)    Settlement Class Members who the Claims Administrator determines are entitled to Monetary Awards will be compensated in accordance with the terms of the Monetary Award Grid and all applicable Offsets, as set forth in Exhibit 3 and below, except such compensation will be reduced by one percent (1%) to the extent that any Derivative Claimants submit for, and are entitled to, a Derivative Claimant Award based upon their relationships with the Retired NFL Football Player, as set forth in ARTICLE VII.

(b)    Offsets.    All Monetary Awards will be subject to downward adjustments, including based on a Settlement Class Member's age at the time of the Qualifying Diagnosis (as reflected in the Monetary Award Grid, as set forth in Exhibit 3), and as follows:

(i)    <u>Number of Eligible Seasons</u>:

(1)    4.5 Eligible Seasons:    - 10%

(2)    4 Eligible Seasons:    - 20%

(3)    3.5 Eligible Seasons:    - 30%

(4)    3 Eligible Seasons:    - 40%

(5)    2.5 Eligible Seasons:    - 50%

(6)    2 Eligible Seasons:    - 60%

(7)    1.5 Eligible Seasons:    - 70%

(8)    1 Eligible Season:    - 80%

(9)    0.5 Eligible Seasons:    - 90%

(10)    0 Eligible Seasons:    - 97.5%

(ii)    <u>Medically diagnosed Stroke occurring prior to a Qualifying Diagnosis</u>:  - 75%

(iii)    <u>Medically diagnosed Traumatic Brain Injury occurring prior to a Qualifying Diagnosis</u>:  - 75%

(iv)    <u>Non-participation in the BAP by a Retired NFL Football Player in Subclass 1, except where the Qualifying Diagnosis is of ALS or if he receives any Qualifying Diagnosis prior to his deadline to receive a BAP baseline assessment examination as set forth in Section 5.3</u>:  - 10%

(c)    For purposes of calculating the total number of Eligible Seasons earned by a Retired NFL Football Player or deceased Retired NFL Football Player under this Settlement Agreement, each **earned** Eligible Season and each **earned** half of an Eligible Season ~~for which the subject Retired NFL Football Player did not otherwise earn an Eligible Season,~~ will be summed together to reach a total number of Eligible Seasons (*e.g.*, 3.5 Eligible Seasons)~~,~~**, except a Retired NFL Football Player may not receive credit for more than one (1) Eligible Season per year (with each year defined to include any spring World League of American Football, NFL Europe League or NFL Europa League season, and the following fall NFL season).  By way of example only: (a) a Retired NFL Football Player who was on a NFL Europe League team's active roster on the date of three (3) or more regular season or postseason games during the 2002 spring NFL Europe League season and who was on a Member Club's Active List on the date of three (3) or more regular season or postseason games during the 2002-2003 fall NFL season would receive credit for one (1) Eligible Season for the year; and (b) a Retired**

37

**NFL Football Player who was on a NFL Europe League team's active roster on the date of three (3) or more regular season or postseason games during the 2002 spring NFL Europe League season and who was on a Member Club's practice squad for at least eight (8) regular season or postseason games during the 2002-2003 fall NFL season would receive credit for one (1) Eligible Season for the year.**

~~(i)      For the avoidance of any doubt, seasons in the World League of American Football, the NFL Europe League, or the NFL Europa League are specifically excluded from the calculation of an Eligible Season.~~

(d)      If the Retired NFL Football Player receives a Qualifying Diagnosis prior to a medically diagnosed Stroke or a medically diagnosed Traumatic Brain Injury, then the 75% Offset for medically diagnosed Stroke or medically diagnosed Traumatic Brain Injury will not apply.  If the Retired NFL Football Player receives a Qualifying Diagnosis subsequent to a medically diagnosed Stroke or a medically diagnosed Traumatic Brain Injury, and if the Settlement Class Member demonstrates, by clear and convincing evidence, that the Qualifying Diagnosis was not causally related to the Stroke or the Traumatic Brain Injury, then the 75% Offset will not apply.

(e)      Multiple Offsets will be applied individually and in a serial manner to any Monetary Award.  For example, if the Monetary Award before the application of Offsets is $1,000,000, and two 10% Offsets apply, there will be a 19% aggregate downward adjustment of the award (*i.e.*, application of the first Offset will reduce the award by 10%, or $100,000, to $900,000, and application of the second Offset will reduce the award by an additional 10%, or $90,000, to $810,000).

Section 6.8      Supplemental Monetary Awards.  If, during the term of the Monetary Award Fund, a Retired NFL Football Player who has received a Monetary Award based on a certain Qualifying Diagnosis subsequently is diagnosed with a different Qualifying Diagnosis, the Retired NFL Football Player (or his Representative Claimant, if applicable) may be entitled to a Supplemental Monetary Award.  If the Monetary Award level in the Monetary Award Grid ("Grid Level") for the subsequent Qualifying Diagnosis is greater than the Grid Level  for the earlier Qualifying Diagnosis, the Retired NFL Football Player (or his Representative Claimant, if applicable) will be entitled to a payment that is equal to the Grid Level for the subsequent Qualifying Diagnosis, after application of all applicable Offsets, minus the Grid Level for the earlier Qualifying Diagnosis, after application of all applicable Offsets, but prior to any deductions for the satisfaction of Liens.  In other words, any amounts deducted from the earlier Monetary Award to satisfy Liens will not be considered in the calculation of the Supplemental Monetary Award, which may also require an amount deducted to satisfy any subsequent Liens.  (By way of example only, a Retired NFL Football Player who receives a Monetary Award for Level 1.5 Neurocognitive Impairment that is $1,000,000 after application of all Offsets, which is then reduced by $20,000 to $980,000 to satisfy a Lien, and who later receives a Qualifying Diagnosis for Level 2 Neurocognitive Impairment that would pay

38

$1,200,000 after application of all Offsets, where there are no additional Liens, shall be entitled to a Supplemental Monetary Award of $200,000.)

Section 6.9    Inflation Adjustment.  Monetary Award amounts set forth in Exhibit 3 will be subject to an annual inflation adjustment, beginning one year after the Effective Date, not to exceed two and a half percent (2.5%), the precise amount subject to the sound judgment of the Special Master (or the Court after expiration of the term of the Special Master) based on consideration of the Consumer Price Index for Urban Consumers (CPI-U).

Section 6.10    Monetary Award Fund Term.  The Monetary Award Fund will commence on the Effective Date and will end sixty-five (65) years after the Effective Date.

## ARTICLE VII
## Derivative Claimant Awards

Section 7.1    All Settlement Class Members who are Derivative Claimants seeking Derivative Claimant Awards must do so through the submission of Derivative Claim Packages containing all required proof, as set forth in Section 8.2(b).

Section 7.2    Eligibility.    A Settlement Class Member who is a Derivative Claimant is entitled to a Derivative Claimant Award if, and only if:  (a) the Derivative Claimant timely registered to participate in the Class Action Settlement, as set forth in Section 4.2; (b) the Retired NFL Football Player through whom the relationship is the basis of the claim (or the Representative Claimant of a deceased or legally incapacitated or incompetent Retired NFL Football Player through whom the relationship is the basis of the claim) has received a Monetary Award; (c) the Settlement Class Member timely submits a Derivative Claim Package, subject to the terms and conditions set forth in ARTICLE VIII; and (d) the Claims Administrator determines, based on a review of the records provided in the Derivative Claim Package and applicable state law, that the Derivative Claimant has a relationship with the subject Retired NFL Football Player that properly and legally provides the right under applicable state law to sue independently and derivatively.

Section 7.3    Determination of Derivative Claimant Awards. Settlement Class Members who the Claims Administrator determines are entitled to Derivative Claimant Awards will be compensated from the Monetary Award of the Retired NFL Football Player through whom the relationship is the basis of the claim (or his Representative Claimant), and from any Supplemental Monetary Award, in the amount of one percent (1%) of that Monetary Award and any Supplemental Monetary Award.  If there are multiple Derivative Claimants asserting valid claims based on the same subject Retired NFL Football Player, the Claims Administrator will divide and distribute the Derivative Claimant Award among those Derivative Claimants pursuant to the laws of the domicile of the Retired NFL Football Player (or his Representative Claimant, if any).

### ARTICLE VIII
### Submission and Review of Claim Packages
### and Derivative Claim Packages

Section 8.1    All Settlement Class Members applying for Monetary Awards or Derivative Claimant Awards must submit Claim Packages or Derivative Claim Packages to the Claims Administrator.

Section 8.2    <u>Content</u>

(a)    The content of Claim Packages will be agreed to by Co-Lead Class Counsel and Counsel for the NFL Parties, and will include, without limitation:  (i) a Claim Form with the Personal Signature of the Retired NFL Football Player (or Representative Claimant) either on the Claim Form or on an acknowledgement form verifying the contents of the Claim Form; (ii) a Diagnosing Physician Certification; (iii) medical records reflecting the Qualifying Diagnosis; (iv) a HIPAA-compliant authorization form; and (v) records in the possession, custody or control of the Settlement Class Member demonstrating employment and participation in NFL Football.

(i)    Representative Claimants of Retired NFL Football Players who died prior to the Effective Date do not need to include a Diagnosing Physician Certification in the Claim Package if the physician who provided the Qualifying Diagnosis, as set forth in Exhibit 1, also died prior to the Effective Date or was deemed by a court of competent jurisdiction legally incapacitated or incompetent prior to the Effective Date.  Instead, the Representative Claimant must provide evidence of that physician's death, incapacity or incompetence and of the qualifications of the diagnosing physician.  For the avoidance of any doubt, all other content of Claim Packages must be submitted, including medical records reflecting the Qualifying Diagnosis.

(ii)    **In cases where a deceased Retired NFL Football Player received a Qualifying Diagnosis but the medical records reflecting the Qualifying Diagnosis are unavailable because of a force majeure type event (*e.g.*, flood, hurricane, fire), the Claims Administrator, upon petition by the Representative Claimant, may determine the Claim Package to be valid without the medical records if the Representative Claimant makes a showing of a reasonable effort to obtain the medical records from any available source and presents a certified death certificate referencing the Qualifying Diagnosis made while the Retired NFL Football Player was living.  For the avoidance of any doubt, the Claims Administrator has the sole discretion to determine the sufficiency of this showing, subject to the appeal rights set forth in Section 9.5.  If the unavailability of medical records also causes the diagnosing physician to be unable to provide a Diagnosing Physician Certification, the Claims Administrator, upon petition by the Representative Claimant, and in addition to the presentation of a certified death certificate referencing the Qualifying Diagnosis made while the Retired NFL Football Player was living, may instead allow an accompanying**

**sworn affidavit from the diagnosing physician attesting to the reasons why the diagnosing physician is unable to provide a Diagnosing Physician Certification without the medical records.  The Claims Administrator has the sole discretion to determine the sufficiency of this showing, subject to the appeal rights set forth in Section 9.5.**

(~~ii~~iii)    In cases where a Retired NFL Football Player has received a Qualifying Diagnosis and the diagnosing physician who provided the Qualifying Diagnosis, as set forth in Exhibit 1, has died or has been deemed by a court of competent jurisdiction legally incapacitated or incompetent prior to the Effective Date, or otherwise prior to completing a Diagnosing Physician Certification, the Retired NFL Football Player (or his Representative Claimant, if applicable) may obtain a Diagnosing Physician Certification from a separate qualified physician for the Qualifying Diagnosis as specified in Exhibit 1 based on an independent examination by the qualified physician and a review of the Retired NFL Football Player's  medical records that formed the basis of the Qualifying Diagnosis by the deceased or legally incapacitated or incompetent physician.  If the same Qualifying Diagnosis is found by both doctors, the date of Qualifying Diagnosis used to calculate Monetary Awards shall be the date of the earlier Qualifying Diagnosis.

(b)    The content of Derivative Claim Packages will be agreed to by Co-Lead Class Counsel and Counsel for the NFL Parties, and will include, without limitation:  (i) a Derivative Claim Form with the Personal Signature of the Derivative Claimant either on the Derivative Claim Form or on an acknowledgement form verifying the contents of the Derivative Claim Form; and (ii) records sufficient to verify the relationship with the subject Retired NFL Football Player or deceased Retired NFL Football Player that properly and legally provides the Derivative Claimant the right under applicable state law to sue independently and derivatively.

(c)    All statements made in Claim Forms, Derivative Claim Forms, any acknowledgement forms, and Diagnosing Physician Certifications will be sworn statements under penalty of perjury.

(d)    Each Settlement Class Member has the obligation to submit to the Claims Administrator all of the documents required in Section 8.2 to receive a Monetary Award or Derivative Claimant Award.

Section 8.3    <u>Submission</u>

(a)    Settlement Class Members must submit Claim Packages and Derivative Claim Packages to the Claims Administrator in accordance with Section 30.15.

(i)    Claim Packages must be submitted to the Claims Administrator no later than two (2) years after the date of the Qualifying Diagnosis or within two (2) years after the Settlement Class Supplemental Notice is posted on the Settlement Website, whichever is later.  Failure to comply with this two (2) year time

41

limitation will preclude a Monetary Award for that Qualifying Diagnosis, unless the Settlement Class Member can show substantial hardship that extends beyond the Retired NFL Football Player's Qualifying Diagnosis and that precluded the Settlement Class Member from complying with the two (2) year deadline, and submits the Claim Package within four (4) years after the date of the Qualifying Diagnosis or after the Settlement Class Supplemental Notice is posted on the Settlement Website, whichever is later.

(ii)     Derivative Claim Packages must be submitted to the Claims Administrator no later than thirty (30) days after the Retired NFL Football Player through whom the relationship is the basis of the claim (or the Representative Claimant of a deceased or legally incapacitated or incompetent Retired NFL Football Player through whom the relationship is the basis of the claim) receives a Notice of Monetary Award Claim Determination that provides a determination that the Retired NFL Football Player (or his Representative Claimant) is entitled to a Monetary Award. Failure to comply with this time limitation will preclude a Derivative Claimant Award based on that Monetary Award.

(b)     Each Settlement Class Member will promptly notify the Claims Administrator of any changes or updates to the information the Settlement Class Member has provided in the Claim Package or Derivative Claim Package, including any change in mailing address.

(c)     All information submitted by Settlement Class Members to the Claims Administrator will be recorded in a computerized database that will be maintained and secured in accordance with all applicable federal, state and local laws, regulations and guidelines, including, without limitation, HIPAA. The Claims Administrator must ensure that information is recorded and used properly, that an orderly system of data management and maintenance is adopted, and that the information is retained under responsible custody. The Claims Administrator will keep the database in a form that grants access for claims administration use, but otherwise restricts access rights, including to employees of the Claims Administrator who are not working on claims administration for the Class Action Settlement.

(i)     The Claims Administrator and Lien Resolution Administrator, and their respective agents, representatives, and professionals who are administering the Class Action Settlement, will have access to all information submitted by Settlement Class Members to the Claims Administrator and/or Lien Resolution Administrator necessary to perform their responsibilities under the Settlement Agreement.

(ii)     All information submitted by Settlement Class Members to the Claims Administrator will be treated as confidential, as set forth in Section 17.2.

Section 8.4    <u>Preliminary Review</u>

(a)    Within forty-five (45) days of the date on which the Claims Administrator receives a Claim Package or Derivative Claim Package from a Settlement Class Member, the Claims Administrator will determine the sufficiency and completeness of the required contents, as set forth in Section 8.2.  To the extent the volume of claims warrants, this deadline may be extended by agreement between Co-Lead Class Counsel and Counsel for the NFL Parties, subject to approval by the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof).

(b)    The Claims Administrator will reject a claim submitted by a Settlement Class Member, subject to the cure provisions of Section 8.5, if the Claims Administrator has not received all required content.

Section 8.5    <u>Deficiencies and Cure</u>.  For rejected Claim Packages or Derivative Claim Packages, the Claims Administrator will send a Notice of Deficiency to the Settlement Class Member, which Notice will contain a brief explanation of the Deficiency(ies) giving rise to rejection of the Claim Package or Derivative Claim Package, and will, where necessary, request additional information and/or documentation.  The Claims Administrator will make available to the Settlement Class Member through a secure online web interface any document(s) with a Deficiency needing correction or, upon request from the Settlement Class Member, will mail the Settlement Class Member a copy of such document(s).  The Notice of Deficiency will be sent no later than forty-five (45) days from the date of receipt of the Claim Package or Derivative Claim Package by the Claims Administrator.  To the extent the volume of claims warrants, this deadline may be extended by agreement between Co-Lead Class Counsel and Counsel for the NFL Parties, subject to approval by the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof).  The Notice of Deficiency will contain a recommendation for how, if possible, the Settlement Class Member can cure the Deficiency, and will provide a reasonable deadline not less than 120 days (from the date the Notice of Deficiency is sent to the Settlement Class Member) for the Settlement Class Member to submit Deficiency cure materials.  Within that time period, the Settlement Class Member will have the opportunity to cure all Deficiencies and provide any requested additional information or documentation, except that the failure to submit timely a Claim Package or Derivative Claim Package in accordance with the terms of this Settlement Agreement cannot be cured other than upon a showing of substantial hardship as set forth in Section 8.3(a)(i).  Any Claim Package or Derivative Claim Package that continues to suffer from a Deficiency identified on the Notice of Deficiency following the submission of documentation intended to cure the Deficiency will be denied by the Claims Administrator.

Section 8.6    <u>Verification and Investigation</u>

(a)    Each Settlement Class Member claiming a Monetary Award or Derivative Claimant Award will authorize the Claims Administrator and/or

43

Lien Resolution Administrator, as applicable, consistent with HIPAA and other applicable privacy laws, to verify facts and details of any aspect of the Claim Package or Derivative Claim Package and/or the existence and amounts, if any, of any Liens. The Claims Administrator or Lien Resolution Administrator, at its sole discretion, may request additional documentation, which each Settlement Class Member agrees to provide in order to claim a Monetary Award or Derivative Claimant Award.

(b)    The Claims Administrator will have the discretion to undertake or cause to be undertaken further verification and investigation, including into the nature and sufficiency of any Claim Package or Derivative Claim Package documentation, including, without limitation, as set forth in Section 10.3.

## ARTICLE IX
## Notice of Claim Determinations, Payments, and Appeals

Section 9.1    <u>Monetary Award Determination</u>.  Based upon its review of the Claim Package, and the results of any investigations of the Settlement Class Member's claim, the Claims Administrator will determine whether a Settlement Class Member qualifies for a Monetary Award and the amount of any such Award.  In order to decide whether a Settlement Class Member is entitled to a Monetary Award, and at what level, the Claims Administrator will determine whether the Retired NFL Football Player or deceased Retired NFL Football Player has a Qualifying Diagnosis according to the Diagnosing Physician Certification, including consideration of, without limitation, the qualifications of the diagnosing physician, or in the case of a deceased Retired NFL Football Player diagnosed by a deceased physician, as set forth in Section 8.2(a)(i), according to the supporting medical records.  If the Claims Administrator determines that there is a Qualifying Diagnosis, it will determine the level of Monetary Award based on the Monetary Award Grid (attached as Exhibit 3) and a review of the Diagnosing Physician Certification for the age at the time of the Qualifying Diagnosis, and will review the Claim Package, including the Claim Form and medical records reflecting the Qualifying Diagnosis, for information relating to all other Offsets, and must apply all applicable Offsets to the Monetary Award.  For the avoidance of any doubt, the Claims Administrator has no discretion to make a Monetary Award determination other than as set forth above.

(a)    <u>Evidence of NFL Employment and Participation</u>.  To the extent that the Claims Administrator determines that the Settlement Class Member has provided in the Claim Package insufficient evidence of the Retired NFL Football Player's NFL employment and participation to substantiate the claimed Eligible Seasons, the Claims Administrator will request that the NFL Parties and Member Clubs provide any employment or participation records of the Retired NFL Football Player in their reasonable possession, custody or control, which the NFL Parties and Member Clubs will provide in good faith.  The Claims Administrator will consider all of the evidence provided to it by the Retired NFL Football Player and the NFL Parties and Member Clubs in determining the appropriate number of Eligible Seasons to apply to the Retired NFL Football Player's claim.  The Claims Administrator shall credit only the Eligible Seasons substantiated by the overall evidence.  To the extent there is no

44

objective evidence regarding an Eligible Season claimed by the Retired NFL Football Player beyond his sworn statement, the Claims Administrator will take into account the reasons offered by the Retired NFL Football Player for the lack of such objective evidence in arriving at its final decision.

(i)     The assertion of NFL employment and participation in more than one (1) Eligible Season, however, must be substantiated by the Retired NFL Football Player with objective evidence beyond his sworn statement, the sufficiency of which shall be in the Claims Administrator's discretion.  In the event there is no objective evidence of NFL employment and participation in more than one (1) Eligible Season, the Claims Administrator may credit the Retired NFL Football Player with one (1) or fewer Eligible Seasons consistent with Section 9.1(a).

(b)     <u>Timing of Monetary Award Determination</u>.  The Claims Administrator will make such determination and will send a corresponding Notice of Monetary Award Claim Determination to the Settlement Class Member and the NFL Parties no later than sixty (60) days from the later of:  (i) the date when a completed Claim Package that is free from all Deficiencies is received by the Claims Administrator; (ii) the date, if any, when all Deficiencies with a Settlement Class Member's Claim Package have been deemed cured by the Claims Administrator; (iii) the date, if any, on which the additional information or documentation identified in the Notice of Deficiency, if applicable, has been timely provided to the Claims Administrator; (iv) the date of a decision by a member of the Appeals Advisory Panel under Section 8.6(b); or (v) the date on which the Settlement Class Member no longer has the right to cure such Deficiencies or provide additional information or documentation, in accordance with Section 8.5; provided, however, that to the extent the volume of claims warrants, these deadlines may be extended by agreement between Co-Lead Class Counsel and Counsel for the NFL Parties, subject to approval by the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof).

(c)     <u>Notice Content</u>

(i)     Notices of Monetary Award Claim Determination that provide an adverse determination will include a short statement regarding the reasons for the adverse determination and information regarding how the Settlement Class Member can appeal the determination, as set forth in Section 9.7.  An adverse Notice of Monetary Award Claim Determination does not preclude a Settlement Class Member from submitting a Claim Package in the future for a Monetary Award should the Retired NFL Football Player's medical condition change.  The Claims Administrator shall develop reasonable procedures and rules to ensure the right of Settlement Class Members to submit a Claim Package for the same or different Qualifying Diagnoses in the future, while preventing unwarranted repetitive claims that do not disclose materially changed circumstances from prior claims made by the Settlement Class Member.

(ii)    Notices of Monetary Award Claim Determination that provide a determination that the Settlement Class Member is entitled to a Monetary Award will provide:  (a) the net amount of that Monetary Award after application of Offsets; (b) a listing of the Offsets applied to that Monetary Award; (c) the Lien Resolution Administrator's determination of any amount deducted from the Monetary Award to satisfy identified Liens, as set forth in ARTICLE XI; or the Lien Resolution Administrator's determination of the "holdback" amount to be deducted from the Monetary Award under which identified Liens shall be resolved, as set forth in ARTICLE XI; (d) information regarding how the Settlement Class Member can appeal the Monetary Award determination, as set forth in Section 9.7; and (e) information regarding the timing of payment, as set forth in Section 9.3.

(d)    NFL Parties' and Co-Lead Class Counsel's Review of Claim Packages.  If a Notice of Monetary Award Determination provides a determination that the Settlement Class Member is entitled to a Monetary Award, the Claims Administrator will make the Settlement Class Member's Claim Package and the review determinations available to the NFL Parties and Co-Lead Class Counsel.

Section 9.2    Derivative Claimant Award Determination.  Based upon its review of the Derivative Claim Package, and the results of any investigations of the Derivative Claimant's claim, the Claims Administrator will determine whether a Derivative Claimant qualifies for a Derivative Claimant Award, as set forth in Section 7.3.

(a)    Timing of Derivative Claimant Award Determination. The Claims Administrator will make such determination and will send a corresponding Notice of Derivative Claimant Award Determination to the Settlement Class Member and the NFL Parties no later than thirty (30) days from the later of:  (i) the date when a completed Derivative Claim Package that is free from all Deficiencies is received by the Claims Administrator; (ii) the date when all Deficiencies with a Settlement Class Member's Derivative Claim Package have been determined by the Claims Administrator to be satisfactorily cured; (iii) the date, if any, on which the additional information or documentation identified in the Notice of Deficiency, if applicable, has been timely provided to the Claims Administrator; or (iv) the date on which the Settlement Class Member no longer has the right to cure such Deficiencies or provide additional information or documentation, in accordance with Section 8.5; provided, however, that to the extent the volume of claims warrants, these deadlines may be extended by agreement between Co-Lead Class Counsel and Counsel for the NFL Parties, subject to approval by the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof).

(b)    Notice Content

(i)    Notices of Derivative Claimant Award Determination that provide an adverse determination will include a short statement regarding the reasons for the adverse determination and information regarding how the Settlement Class Member can appeal the determination, as set forth in Section 9.7.  An

46

adverse Notice of Derivative Claimant Award Determination does not preclude a Derivative Claimant from submitting a Derivative Claim Package in the future for a Derivative Claimant Award should the Retired NFL Football Player receive a Supplemental Monetary Award or succeed on an appeal of a previously denied claim for a Monetary Award.

(ii) Notices of Derivative Claimant Award Determination that provide a determination that the Settlement Class Member is entitled to a Derivative Claimant Award will provide:  (a) the amount of that Derivative Claimant Award; (b) the Lien Resolution Administrator's determination of any amount deducted from the Derivative Claimant Award to satisfy identified Liens, as set forth in ARTICLE XI; or the Lien Resolution Administrator's determination of the "holdback" amount to be deducted from the Derivative Claimant Award under which identified Liens will be resolved, as set forth in ARTICLE XI; (c) information regarding how the Derivative Claimant can appeal the Derivative Claimant Award determination, as set forth in Section 9.7; and (d) information regarding the timing of payment, as set forth in Section 9.4.

(c) **NFL Parties' and Co-Lead Class Counsel's Review of Derivative Claim Packages**.  If a Notice of Derivative Claimant Award Determination provides a determination that the Settlement Class Member is entitled to a Derivative Claimant Award, the Claims Administrator will make the Settlement Class Member's Claim Package and the review determinations available to the NFL Parties and Co-Lead Class Counsel.

Section 9.3    Remuneration and Payment of Monetary Awards.

(a) The Claims Administrator will promptly pay any Monetary Awards to Settlement Class Members who qualify under the terms of the Monetary Award Grid and all applicable Offsets after the Claims Administrator sends a Notice of Monetary Award Claim Determination; provided, however, any such payment will not occur until after the completion of the processes for (i) appealing Monetary Award determinations, as set forth in Section 9.7; (ii) auditing claims and investigating claims for fraud, as set forth in Section 10.3; (iii) identifying and satisfying Liens, as set forth in ARTICLE XI; and (iv) determining if any Derivative Claimants have filed timely, and are entitled to, Derivative Claimant Awards based on their relationship with the subject Retired NFL Football Player.  Such payment shall be made consistent with Section 23.3(b)(iv) of this Settlement Agreement.

(b) In connection with a Monetary Award issued to a Representative Claimant, the Claims Administrator will abide by all substantive laws of the domicile of such Representative Claimant concerning distribution and will not issue payment until the Claims Administrator has received from the Settlement Class Member proof of such court approvals or other documents necessary to authorize payment. Where short form procedures exist concerning such distribution that do not require domiciliary court approval or supervision, the Claims Administrator is authorized to adopt those procedures as part of the claims administration process

47

applicable to such Representative Claimant.  The Claims Administrator also is authorized to adopt procedures as are approved by the Court to aid or facilitate in the payment of claims to minor, incapacitated or incompetent Settlement Class Members or their guardians.

(c)     Upon the completion of the Monetary Award Fund term, as set forth in Section 6.10, the Court shall determine the proper disposition of any funds remaining in the Monetary Award Fund consistent with the purpose of this Settlement, including to promote safety and injury prevention with respect to football players and/or the treatment or prevention of traumatic brain injuries.

Section 9.4     Remuneration and Payment of Derivative Claimant Awards

(a)     The Claims Administrator will promptly pay any Derivative Claimant Awards to Settlement Class Members who qualify; provided, however, any such payment will not occur until after expiration or completion of:  (i) the time period for Derivative Claimants to file Derivative Claim Packages, as set forth in Section 8.3(a)(ii), has expired; (ii) the process for appealing Derivative Claimant Awards, including appeals by any other Derivative Claimants asserting claims based on the same Retired NFL Football Player, as set forth in Section 9.7; (iii) the process for auditing claims and investigating claims for fraud, set forth in Section 10.3; and (iv) the process for identifying and satisfying Liens, as set forth in ARTICLE XI.  Such payment shall be made consistent with Section 23.3(b)(iv) of this Settlement Agreement.

(b)     In paying a Derivative Claimant Award to a minor, the Claims Administrator will abide by all substantive laws of the domicile of such Settlement Class Member concerning distribution and will not issue payment until the Claims Administrator has received from the Settlement Class Member proof of such court approvals or other documents necessary to authorize payment.  Where short form procedures exist concerning such distribution that do not require domiciliary court approval or supervision, the Claims Administrator is authorized to adopt those procedures as part of the claims administration process applicable to such Settlement Class Members.  The Claims Administrator also is authorized to adopt procedures as are approved by the Court to aid or facilitate in the payment of claims to minor, incapacitated or incompetent Settlement Class Members or their guardians.

Section 9.5     Scope of Appeals.  The Claims Administrator's determination as to whether a Settlement Class Member is entitled to a Monetary Award or Derivative Claimant Award under this Settlement Agreement, and/or the calculation of the Monetary Award or Derivative Claimant Award, is appealable by the Settlement Class Member, Co-Lead Class Counsel, or the NFL Parties based on their respective good faith belief that the determination by the Claims Administrator was incorrect.

48

Section 9.6    Appellant Fees and Limitations

(a)    Any Settlement Class Member taking an appeal will be charged a fee of One Thousand United States dollars (U.S. $1,000) by the Claims Administrator that must be paid before the appeal may proceed, which fee will be refunded if the Settlement Class Member's appeal is successful. If the appeal is unsuccessful, the fee will be paid to the Settlement Trust for transfer by the Trustee into the Monetary Award Fund.

**(i)    Settlement Class Members may make a hardship request to the Claims Administrator and ask that the fee of One Thousand United States dollars (U.S. $1,000) be waived for good cause. The Claims Administrator will require that the Settlement Class Member provide such financial information as may be necessary to decide the request to waive the fee, which request shall be approved or denied in the Claims Administrator's sole discretion.**

(b)    The NFL Parties may appeal Monetary Award or Derivative Claimant Award determinations in good faith. To the extent that Co-Lead Class Counsel believe that the NFL Parties are submitting vexatious, frivolous or bad faith appeals, Co-Lead Class Counsel may petition the Court for appropriate relief.

Section 9.7    Submissions on Appeals

(a)    The appellant must submit to the Court his or her notice of appeal, using an Appeals Form to be agreed upon by Co-Lead Class Counsel and the NFL Parties and provided by the Claims Administrator, with written copy to the appellee(s) Settlement Class Member or the NFL Parties (as applicable), Co-Lead Class Counsel, and to the Claims Administrator, no later than thirty (30) days after receipt of a Notice of Monetary Award Claim Determination or Notice of Derivative Claimant Award Determination. Appellants must present evidence in support of their appeal, and any written statements may not exceed five (5) single-spaced pages in length.

(b)    The appellee(s) may submit a written opposition to the appeal no later than thirty (30) days after receipt of the Appeals Form. This written opposition must not exceed five (5) single-spaced pages in length. The Court will not deem the lack of an opposition to be an admission regarding the merits of the appeal. The appellant may not submit a reply.

(c)    Co-Lead Class Counsel may submit a written statement in support of or opposition to the appeal no later than fifteen (15) days after receipt of the Appeals Form or an appellee's written opposition. This written statement must not exceed five (5) single-spaced pages in length. The Court will not deem the lack of a statement to be an admission regarding the merits of the appeal. The appellant and appellee(s) may each submit a reply.

Section 9.8    Review and Decision. The Court will make a determination based upon a showing by the appellant of clear and convincing evidence.

49

The Court may be assisted, in its discretion, by any member of the Appeals Advisory Panel and/or an Appeals Advisory Panel Consultant. The decision of the Court will be final and binding.

> (a)    Appeals Advisory Panel and Appeals Advisory Panel Consultants

> (i)    Within ninety (90) days after the Effective Date, Co-Lead Class Counsel and Counsel for the NFL Parties will agree to, and jointly recommend to the Court for appointment, the members of the Appeals Advisory Panel and the Appeals Advisory Panel Consultants. Under no circumstances may a member of the Appeals Advisory Panel or an Appeals Advisory Panel Consultant have been convicted of a crime of dishonesty, or serve, on or after the Final Approval Date, as a litigation expert consultant or expert witness in connection with litigation relating to the subject matter of the Class Action Complaint for a party, a Member Club, or an Opt Out, or his, her or its counsel. If selected and approved, under no circumstances shall an Appeals Advisory Panel member or Appeals Advisory Panel Consultant continue to serve in that role if convicted of a crime of dishonesty and/or thereafter retained as an expert consultant or expert witness in connection with litigation relating to the subject matter of the Class Action Complaint by a party, a Member Club, or an Opt Out, or his, her or its counsel.

> (ii)    Co-Lead Class Counsel and Counsel for the NFL Parties will jointly retain the members of the Appeals Advisory Panel and the Appeals Advisory Panel Consultants appointed by the Court.

> (iii)    Upon request of the Court or the Special Master, the Appeals Advisory Panel will take all steps necessary to provide sound advice with respect to medical aspects of the Class Action Settlement.

> (iv)    The Court will oversee the Appeals Advisory Panel and the Appeals Advisory Panel Consultants, and may, in its discretion, request reports or information from the Appeals Advisory Panel or the Appeals Advisory Panel Consultants.

> (v)    Compensation of the Appeals Advisory Panel and Appeals Advisory Panel Consultants, at a reasonable rate for their time agreed to by Co-Lead Class Counsel and Counsel for the NFL Parties, will be paid out of the Monetary Award Fund, except that compensation of an Appeals Advisory Panel member or Appeals Advisory Panel Consultant will be paid out of the BAP fund for reviewing and advising the Court whether a Retired NFL Football player has Level 1 Neurocognitive Impairment, Level 1.5 Neurocognitive Impairment, Level 2 Neurocognitive Impairment, or none, in cases where there are conflicting diagnoses by Qualified BAP Providers.

> (vi)    Members of the Appeals Advisory Panel or the Appeals Advisory Panel Consultants may be replaced by joint motion made by Co-

50

Lead Class Counsel and Counsel for the NFL Parties, or for cause by motion of either Co-Lead Class Counsel or Counsel for the NFL Parties, upon order of the Court. If any member of the Appeals Advisory Panel or an Appeals Advisory Panel Consultant resigns, dies, is replaced, or is otherwise unable to continue in his or her position, Co-Lead Class Counsel and Counsel for the NFL Parties will agree to and jointly recommend a new proposed member for appointment by the Court.

(b)    Conflicts of Interest. Within ninety (90) days after the Effective Date, Co-Lead Class Counsel, Counsel for the NFL Parties, and the Special Master will establish and implement procedures to promptly detect and resolve possible conflicts of interest between members of the Appeals Advisory Panel or Appeals Advisory Panel Consultants, on the one hand, and an appellant or appellee(s), on the other hand. Co-Lead Class Counsel and Counsel for the NFL Parties, subject to approval of the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof) may modify such procedures in the future, if appropriate. For the avoidance of any doubt, employment of the Special Master by any Party as an expert in unrelated matters will not constitute a conflict of interest.

(c)    Liability. The Parties, Class Counsel, Counsel for the NFL Parties, and the Special Master, and their respective Affiliates, will not be liable for any act, or failure to act, of a member of the Appeals Advisory Panel or an Appeals Advisory Panel Consultant.

## ARTICLE X
## Class Action Settlement Administration

Section 10.1   Special Master

(a)    Appointment and Oversight

(i)    The Motion for Preliminary Approval of the Class Action Settlement filed by Class Counsel  will request that the Court appoint, in consultation with Co-Lead Class Counsel and Counsel for the NFL Parties, a Special Master pursuant to Federal Rule of Civil Procedure 53.

(ii)    It is the intention of the Parties that the Special Master will perform his or her responsibilities and take all steps necessary to faithfully oversee the implementation and administration of the Settlement Agreement. The Special Master shall be appointed for a term of five (5) years commencing on the Effective Date. The term of the Special Master shall be extended, or a new Special Master shall be appointed, for additional five-year terms for the life of the Settlement Agreement, unless the Court determines, in consultation with Co-lead Class Counsel and Counsel for the NFL Parties, that the Special Master's role is no longer necessary.

(iii)    The Special Master will maintain at all times appropriate and sufficient bonding insurance in connection with his or her performance

51

of responsibilities under the Settlement Agreement.  The cost for this insurance will be paid out of the Monetary Award Fund.

(iv)    The Court may, at its sole discretion, request reports or information from the Special Master.  The Special Master will be responsible for reporting and providing information to the Court at such frequency and in such a manner as the Court directs.  The Claims Administrator may assist with such reports if requested by the Special Master.

(v)    Following the five (5) year term of the Special Master, and any extension(s) thereof, oversight of the administration of the Class Action Settlement will revert to the Court.

(b)    Roles and Responsibilities

(i)    The Special Master will, among other responsibilities set forth in this Settlement Agreement:

(1)    Provide reports or information that the Court may, at its sole discretion, request from the Special Master, who will be responsible for reporting and providing information to the Court at such frequency and in such a manner as the Court directs;

(2)    Oversee complaints raised by Co-Lead Class Counsel, Counsel for the NFL Parties, the BAP Administrator, Claims Administrator and/or the Lien Resolution Administrator regarding aspects of the Class Action Settlement;

(3)    Hear appeals of registration determinations, if requested by the Court, as set forth in Section 4.3(a)(iv);

(4)    Oversee the BAP Administrator, Claims Administrator and Lien Resolution Administrator, as set forth in Section 5.6(a)(iv), Section 10.2(a)(iv), and Section 11.1(a)(iv), and receive monthly and annual reports from those Administrators; and

(5)    Oversee fraud detection and prevention procedures, and review and decide the appropriate disposition of potentially fraudulent claims as further specified in Section 10.3(i).

(c)    Compensation and Expenses.  Annual compensation of the Special Master will not exceed Two Hundred Thousand United States dollars (U.S. $200,000).  The annual compensation and reasonable out-of-pocket costs and expenses of the Special Master directly incurred as a result of the performance of his or her responsibilities will be paid out of the Monetary Award Fund.  Either Co-Lead Class Counsel or Counsel for the NFL Parties may challenge the reasonableness of the Special Master's out-of-pocket costs and expenses, in which case the Court will determine the reasonableness of such costs and expenses.  If the Court determines that

52

any costs and expenses are unreasonable, the Special Master will not be paid for such costs and expenses or, if such costs and expenses have already been paid, the Special Master will refund that amount to the Monetary Award Fund.

(d)    Replacement.  The Court, in its discretion, can replace the Special Master for good cause.  If the Special Master resigns, dies, or is otherwise unable to continue employment in this position, Co-Lead Class Counsel and Counsel for the NFL Parties may file a motion for the appointment by the Court of a new Special Master.

(e)    Conflicts of Interest.  Within ninety (90) days after the Effective Date, Co-Lead Class Counsel, Counsel for the NFL Parties, and the Special Master will establish and implement procedures to promptly detect and resolve possible conflicts of interest between the Special Master, on the one hand, and Settlement Class Members (and counsel individually representing them, if any), Class Counsel,  the NFL Parties, Counsel for the NFL Parties, the BAP Administrator, the Claims Administrator, or the Lien Resolution Administrator, on the other hand.  Co-Lead Class Counsel and Counsel for the NFL Parties, subject to approval of the Court, may modify such procedures in the future, if appropriate.  For the avoidance of any doubt, employment of the Special Master by any Party as an expert in unrelated matters will not constitute a conflict of interest.

Section 10.2    Claims Administrator

(a)    Appointment and Oversight

(i)    The Motion for Preliminary Approval of the Class Action Settlement filed by Class Counsel will request that the Court appoint BrownGreer PLC as Claims Administrator.  Within ten (10) days after the Effective Date, Co-Lead Class Counsel will retain the Claims Administrator appointed by the Court.

(ii)    Co-Lead Class Counsel's retention agreement with the Claims Administrator will provide that the Claims Administrator will perform its responsibilities and take all steps necessary to faithfully implement and administer the Settlement Agreement, and will require that the Claims Administrator maintain at all times appropriate and sufficient bonding insurance in connection with its performance of its responsibilities under the Settlement Agreement.

(iii)    The Court may, at its sole discretion, request reports or information from the Claims Administrator.  The Claims Administrator will be responsible for reporting and providing information to the Court at such frequency and in such a manner as the Court directs.

(iv)    The Special Master, for the duration of his or her term, will oversee the Claims Administrator, and may, at his or her sole discretion, request reports or information from the Claims Administrator.

(v)        Beyond the reporting requirements set forth in Section 10.2(a)(iii)-(iv), beginning one month after the Effective Date, the Claims Administrator will issue a regular monthly report to the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof), Co-Lead Class Counsel, and Counsel for the NFL Parties during the first three years of the Monetary Award Fund, and thereafter on a quarterly basis or as reasonably agreed upon by the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof), Co-Lead Class Counsel and the NFL Parties, regarding the status and progress of claims administration.  The monthly (or quarterly) report will include, without limitation:   (a) the monthly and total number of Settlement Class Members who registered timely, and the biographical information for each Settlement Class Member who registered timely in the preceding month, as set forth in Section 4.2(c); (b) the identity of each Settlement Class Member who submitted a Claim Package or Derivative Claim Package in the preceding month, the review status of such package (*e.g*, under preliminary review, subject to a Notice of Deficiency, subject to verification and investigation, received a Notice of Claim Determination), and the monthly and total number of Settlement Class Member claims for Monetary Awards and Derivative Claimant Awards; (c) the monthly and total number of Monetary Awards and Derivative Claimant Awards paid; (d) the monthly and total number of each Qualifying Diagnosis for which a Monetary Award has been paid; (e) the monthly and total number of Settlement Class Members for whom appeals are pending regarding Monetary Awards and Derivative Claimant Awards; (f) the monthly identification/breakdown of physicians diagnosing Qualifying Diagnoses and/or law firms representing Settlement Class Members who submitted claims for Monetary Awards and Derivative Claimant Awards; (g) the monthly expenses/administrative costs, including a summary accounting of the administrative expenses incurred by the Claims Administrator; and (h) any other information requested by the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof), Co-Lead Class Counsel, or Counsel for the NFL Parties.

(vi)        Beginning on the first January after the Effective Date, the Claims Administrator will provide annual financial reports to the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof), Co-Lead Class Counsel and Counsel for the NFL Parties, based on information from the preceding year, regarding:  (a) the number of Settlement Class Members, broken down by Qualifying Diagnosis, who received Monetary Awards, and the corresponding number of Settlement Class Members who sought but were found by the Claims Administrator or the Court not to qualify for Monetary Awards; (b) the number of Settlement Class Members who received Derivative Claimant Awards, and the corresponding number of Settlement Class Members who sought but were found by the Claims Administrator or the Court not to qualify for Derivative Claimant Awards; (c) the monetary amounts paid through Monetary Awards and Derivative Claimant Awards, including the monetary amounts over the term of the Class Action Settlement; (d) the number of Settlement Class Members for whom appeals are pending regarding Monetary Awards and Derivative Claimant Awards; (e) the identification/breakdown of physicians diagnosing Qualifying Diagnoses and/or law firms representing Settlement Class Members who submitted claims for Monetary Awards and Derivative Claimant

54

Awards; (f) expenses/administrative costs, including a summary accounting of the administrative expenses incurred by the Claims Administrator; (g) the projected expenses/administrative costs for the remainder of the Monetary Award Fund term; (h) the monies remaining in the Monetary Award Fund; and (i) any other information requested by the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof), Co-Lead Class Counsel, or Counsel for the NFL Parties.

(vii)   The NFL Parties may elect, at their own expense, to cause an audit to be performed by a certified public accountant of the financial records of the Claims Administrator, and the Claims Administrator shall cooperate in good faith with the audit. Audits may be conducted at any time during the term of the Monetary Award Fund. Complete copies of the audit findings report will be provided to the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof), Co-Lead Class Counsel, and Counsel for the NFL Parties.

(b)   Roles and Responsibilities

(i)   The Claims Administrator will, among other responsibilities set forth in this Settlement Agreement:

(1)   Maintain the Settlement Website, as set forth in Section 4.1(a);

(2)   Maintain an automated telephone system to provide information about the Class Action Settlement, as set forth in Section 4.1(b);

(3)   Establish and administer both online and hard copy registration methods, as set forth in Section 4.2(a);

(4)   Review a purported Settlement Class Member's registration and determine its validity, as set forth in Section 4.3;

(5)   Process and review Claim Packages and Derivative Claim Packages, as set forth in ARTICLE VIII;

(6)   Determine whether Settlement Class Members who submit Claim Packages and Derivative Claim Packages are entitled to Monetary Awards or Derivative Claimant Awards, as set forth in ARTICLE VI and ARTICLE VII;

(7)   Audit Claim Packages and Derivative Claim Packages, and establish and implement procedures to detect and prevent fraudulent submissions to, and payments of fraudulent claims from, the Monetary Award Fund, as set forth in Section 10.3; and

55

**-2989-**

(8)    Perform such other tasks reasonably necessary to accomplish the goals contemplated by this Settlement Agreement, as agreed to by Co-Lead Class Counsel and Counsel for the NFL Parties.

(c)    <u>Compensation and Expenses</u>.  Reasonable compensation of the Claims Administrator, as agreed to by Co-Lead Class Counsel and Counsel for the NFL Parties, and reasonable out-of-pocket costs and expenses directly incurred as a result of the Claims Administrator's responsibilities set forth in this Settlement Agreement will be paid out of the Monetary Award Fund.  The Claims Administrator shall submit an annual budget to the Court for review and approval.  Either Co-Lead Class Counsel or Counsel for the NFL Parties may challenge the reasonableness of the Claims Administrator's out-of-pocket costs and expenses, in which case the Court will determine (or may, in its discretion, refer the challenge to the Special Master to determine) the reasonableness of such costs and expenses.  If the Court or Special Master, as applicable, determines that any costs and expenses are unreasonable, the Claims Administrator will not be paid for such costs and expenses or, if such costs and expenses have already been paid, the Claims Administrator will refund that amount to the Monetary Award Fund.

(d)    <u>Liability</u>.  The Parties, Class Counsel, Counsel for the NFL Parties, and the Special Master, and their respective Affiliates, will not be liable for any act, or failure to act, of the Claims Administrator.

(e)    <u>Replacement</u>.  The Claims Administrator may be replaced by joint motion made by Co-Lead Class Counsel and Counsel for the NFL Parties, or for cause by motion of either Co-Lead Class Counsel or Counsel for the NFL Parties, upon order of the Court.  If the Claims Administrator resigns, dies, is replaced, or is otherwise unable to continue employment in this position, Co-Lead Class Counsel and Counsel for the NFL Parties will jointly recommend a new proposed Claims Administrator for appointment by the Court.

(f)    <u>Conflicts of Interest</u>.  Within ninety (90) days after the Effective Date, Co-Lead Class Counsel, Counsel for the NFL Parties, the Special Master and the Claims Administrator will establish and implement procedures to promptly detect and resolve possible conflicts of interest between the Claims Administrator, including, without limitation, its executive leadership team and all employees working on the Class Action Settlement, on the one hand, and Settlement Class Members and their counsel (if any), the NFL Parties, Counsel for the NFL Parties, or the Special Master, on the other hand.  Co-Lead Class Counsel, Counsel for the NFL Parties, and the Claims Administrator, subject to approval of the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof), may modify such procedures in the future, if appropriate.  Notwithstanding anything herein to the contrary, Co-Lead Class Counsel, Counsel for the NFL Parties, and the Special Master understand that the Claims Administrator regularly provides settlement claims administration and other related services to settling parties and their attorneys, and the Special Master, Co-Lead Class Counsel, and Counsel for the NFL Parties acknowledge and agree that it shall not be a conflict of

56

interest for the Claims Administrator to provide such services to such individuals or to receive compensation for such work.

Section 10.3   <u>Audit Rights and Detection and Prevention of Fraud</u>

(a)   Co-Lead Class Counsel and the NFL Parties each will have the absolute right and discretion, at any time, but at their sole expense, in good faith to conduct, or have conducted by an independent auditor, audits to verify Monetary Award and Derivative Claimant Award claims submitted by Settlement Class Members.

(b)   In addition, Co-Lead Class Counsel, Counsel for the NFL Parties, and the Claims Administrator will establish and implement procedures to detect and prevent fraudulent submissions to, and payments of fraudulent claims from, the Monetary Award Fund.  Among other fraud detection and prevention procedures, the Claims Administrator, with the approval of Co-Lead Class Counsel and Counsel for the NFL Parties, will institute the following procedures relating to claim audits:

(i)   A Settlement Class Member whose claim has been selected for audit by the Claims Administrator, Co-Lead Class Counsel or Counsel for the NFL Parties may be required to submit additional records, including medical records, and information as requested by the auditing party; and

(ii)   A Settlement Class Member who refuses to cooperate with an audit, including by unreasonably failing or refusing to provide the auditing party with all records and information sought within the time frame specified, will have the claim denied by the Claims Administrator, without right to an appeal.

(c)   On a monthly basis, the Claims Administrator will audit ten percent (10%) of the total Claim Packages and Derivative Claim Packages that the Claims Administrator has found to qualify for Monetary Awards or Derivative Claimant Awards during the preceding month.  The Claims Administrator will select such Claim Packages and Derivative Claim Packages for auditing on a random basis or to address a specific concern raised by a Claim Package or Derivative Claim Package, but will audit at least one Claim Package, if any qualify, each month.

(d)   In addition, the Claims Administrator will audit Claim Packages that:  (i) seek a Monetary Award for a given Qualifying Diagnosis when the Retired NFL Football Player took part in the BAP within the prior 365 days and was not diagnosed with that Qualifying Diagnosis during the BAP baseline assessment examination; (ii) seek a Monetary Award for a given Qualifying Diagnosis when the Retired NFL Football Player submitted a different Claim Package within the prior 365 days based upon a diagnosis of that same Qualifying Diagnosis by a different physician, and that Claim Package was found not to qualify for a Monetary Award; and (iii) reflect a Qualifying Diagnosis made through a medical examination conducted at a location other than a standard treatment or diagnosis setting (*e.g.*, hotel rooms).

(e)      Upon selection of a Settlement Class Member's Claim Package for audit, the Claims Administrator will notify Co-Lead Class Counsel, the Settlement Class Member (and his/her individual counsel, if applicable), and Counsel for the NFL Parties of the selection and will require that, within ninety (90) days, or such other time as is necessary and reasonable under the circumstances, the audited Settlement Class Member submit to the Claims Administrator, to the extent not already provided, such information as may be necessary and appropriate to audit the Claim Package, which may include the following records and information:

(i)      All of the Retired NFL Football Player's medical records in the Settlement Class Member's possession, custody, or control that relate to the underlying medical condition that is the basis for the Qualifying Diagnosis claimed by the Settlement Class Member;

(ii)      A list of all health care providers seen by the Retired NFL Football Player in the last five (5) years;

(iii)      The Settlement Class Member's (or subject Retired NFL Football Player's) employment records from Member Clubs or other NFL Football employers, but only to the extent that the Settlement Class Member is authorized under applicable state law or Collective Bargaining Agreement to request and receive such records from the Member Club or other NFL Football employer;

(iv)      Such other relevant documents or information within the Settlement Class Member's possession, custody, or control as may reasonably be requested by the Claims Administrator under the circumstances, including, if necessary, authorizations to obtain the medical records of the Settlement Class Member (or subject Retired NFL Football Player) created or obtained by any health care providers seen by the Settlement Class Member (or subject Retired NFL Football Player) in the last five (5) years; and

(v)      Where the audit is conducted because of the circumstances set forth in Section 10.3(d), authorizations to obtain the medical records of the Settlement Class Member (or subject Retired NFL Football Player) held by the primary care physician of the Retired NFL Football Player and the medical records of all other physicians or neuropsychologists who have examined the Retired NFL Football Player relating to the Qualifying Diagnosis.

(f)      Upon selection of a Settlement Class Member's Derivative Claim Package for audit, the Claims Administrator will notify Co-Lead Class Counsel, the Settlement Class Member (and his/her individual counsel, if applicable), and Counsel for the NFL Parties of the selection and will require that, within ninety (90) days, or such other time as is necessary and reasonable under the circumstances, the audited Settlement Class Member submit to the Claims Administrator, to the extent not already provided, such information as may be necessary and appropriate to audit the Claim Package, which may include relevant documents or information within the Settlement Class Member's possession, custody,

or control as may reasonably be requested by the Claims Administrator under the circumstances.

(g)       When auditing a Settlement Class Member's claim for a Monetary Award or Derivative Claimant Award, the Claims Administrator will review the records and information relating to that claim and determine whether the Claim Form or Derivative Claim Form misrepresents, omits, and/or conceals material facts that affect the claim.

(h)       If, upon completion of an audit, the Claims Administrator determines that there has not been a misrepresentation, omission, or concealment of a material fact made in connection with the claim, the process of issuing a Monetary Award or Derivative Claimant Award, subject to appeal, will proceed.

(i)       If, upon completion of an audit, the Claims Administrator determines that there has been a misrepresentation, omission, or concealment of a material fact made in connection with the claim, the Claims Administrator will notify the Settlement Class Member and will refer the claim to the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof) for review and findings.  The Special Master's review and findings shall take into account whether the misrepresentation, omission or concealment was intentional, and may include the following relief, without limitation:  (a) denial of the claim in the event of fraud; (b) additional audits of claims from the same law firm or physician (if applicable), including those already paid; (c) referral of the attorney or physician (if applicable) to the appropriate disciplinary boards; (d) referral to federal authorities; (e) disqualification of the attorney, physician and/or Settlement Class Member from further participation in the Class Action Settlement; and/or (f) if a law firm is found by the Claims Administrator to have submitted more than one fraudulent submission on behalf of Settlement Class Members, claim submissions by that law firm will no longer be accepted, and attorneys' fees paid to the firm by the Settlement Class Member will be forfeited and paid to the Settlement Trust for transfer by the Trustee into the Monetary Award Fund.

(j)       In addition, if the Claims Administrator at any time makes a finding (based on its own detection processes or from information received from Co-Lead Class Counsel or Counsel for the NFL Parties) of fraud by a Settlement Class Member submitting a claim for a Monetary Award or Derivative Claimant Award, and/or by the physician providing the Qualifying Diagnosis, including, without limitation, misrepresentations, omissions, or concealment of material facts relating to the claim, the Claims Administrator will notify the Settlement Class Member and will make a recommendation to Co-Lead Class Counsel and Counsel for the NFL Parties to refer the claim to the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof) for review and findings that may include, without limitation, those set forth in Section 10.3(i).

(i)       If both Co-Lead Class Counsel and Counsel for the NFL Parties do not agree with the Claims Administrator's recommendation to refer

a claim to the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof), they will notify the Claims Administrator, who will continue with the processing of the claim.

Section 10.4    The Claims Administrator, in consultation with Co-Lead Class Counsel and Counsel for the NFL Parties, will also establish system-wide processes to detect and prevent fraud, including, without limitation, claims processing quality training and review and data analytics to spot "red flags" of fraud, including, without limitation, alteration of documents, questionable signatures, duplicative documents submitted on claims, the number of claims from similar addresses or supported by the same physician or office of physicians, data metrics indicating patterns of fraudulent submissions, and such other attributes of claim submissions that create a reasonable suspicion of fraud.

## ARTICLE XI
### Identification and Satisfaction of Liens

Section 11.1    Lien Resolution Administrator

(a)    Appointment and Oversight

(i)    The Motion for Preliminary Approval of the Class Action Settlement filed by Class Counsel,  will request that the Court appoint Garretson Group as Lien Resolution Administrator.  Within ten (10) days after the Effective Date, Co-Lead Class Counsel will retain the Lien Resolution Administrator appointed by the Court.

(ii)    Co-Lead Class Counsel's retention agreement with the Lien Resolution Administrator will provide that the Lien Resolution Administrator will perform its responsibilities and take all steps necessary to faithfully implement and administer the Lien-related provisions of the Settlement Agreement, and will require that the Lien Resolution Administrator maintain at all times appropriate and sufficient bonding insurance in connection with its performance of its responsibilities under the Settlement Agreement.

(iii)    The Court may, at its sole discretion, request reports or information from the Lien Resolution Administrator.  The Lien Resolution Administrator will be responsible for reporting and providing information to the Court at such frequency and in such a manner as the Court directs.

(iv)    The Special Master, for the duration of his or her term, will oversee the Lien Resolution Administrator, and may, at his or her sole discretion, request reports or information from the Lien Resolution Administrator.

(b)    Roles and Responsibilities.    The Lien Resolution Administrator will, among other responsibilities set forth in this Settlement Agreement, administer the process for the identification and satisfaction of all applicable Liens, as set forth in Section 11.3.  Each Settlement Class Member (and his or her respective

60

counsel, if applicable) claiming a Monetary Award or Derivative Claimant Award, however, will be solely responsible for the satisfaction and discharge of all Liens.

(c)     Compensation and Expenses.   Reasonable compensation of the Lien Resolution Administrator, as agreed to by Co-Lead Class Counsel and Counsel for the NFL Parties, and reasonable out-of-pocket costs and expenses directly incurred as a result of the Lien Resolution Administrator's responsibilities will be paid out of the Monetary Award Fund, unless otherwise specified herein.   The Lien Resolution Administrator shall submit an annual budget to the Court for review and approval.   Either Co-Lead Class Counsel or Counsel for the NFL Parties may challenge the reasonableness of the Lien Resolution Administrator's out-of-pocket costs and expenses, in which case the Court will determine (or may, in its discretion, refer the challenge to the Special Master to determine) the reasonableness of such costs and expenses.   If the Court or Special Master, as applicable, determines that any costs and expenses are unreasonable, the Lien Resolution Administrator will not be paid for such costs and expenses or, if such costs and expenses have already been paid, the Lien Resolution Administrator will refund that amount to the Monetary Award Fund.

(d)     Liability.   The Parties, Class Counsel, Counsel for the NFL Parties, and the Special Master, and their respective Affiliates, will not be liable for any act, or failure to act, of the Lien Resolution Administrator.

(e)     Replacement.   The Lien Resolution Administrator may be replaced by joint motion made by Co-Lead Class Counsel and Counsel for the NFL Parties, or for cause by motion of either Co-Lead Class Counsel or Counsel for the NFL Parties, upon order of the Court.   If the Lien Resolution Administrator resigns, dies, is replaced, or is otherwise unable to continue employment in this position, Co-Lead Class Counsel and Counsel for the NFL Parties will agree to and jointly recommend a new proposed Lien Resolution Administrator for appointment by the Court.

Section 11.2   Conflicts of Interest.   Within ninety (90) days after the Effective Date, Co-Lead Class Counsel, Counsel for the NFL Parties, the Special Master and the Lien Resolution Administrator will establish and implement procedures to promptly detect and resolve possible conflicts of interest between the Lien Resolution Administrator, including, without limitation, its executive leadership team and all employees working on the Class Action Settlement, on the one hand, and Settlement Class Members (and counsel individually representing them, if any), the NFL Parties, Counsel for the NFL Parties, or the Special Master, on the other hand. Co-Lead Class Counsel, Counsel for the NFL Parties, and the Lien Resolution Administrator, subject to approval of the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof), may modify such procedures in the future, if appropriate.   Notwithstanding anything herein to the contrary, Co-Lead Class Counsel, Counsel for the NFL Parties, and the Special Master understand that the Lien Resolution Administrator regularly provides lien resolution and other related services to settling parties and their attorneys, and the Special Master, Co-Lead Class Counsel, and Counsel for the NFL Parties acknowledge and agree that

it shall not be a conflict of interest for the Lien Resolution Administrator to provide such services to such individuals or to receive compensation for such work.

Section 11.3 <u>Lien Identification, Satisfaction and Discharge</u>

(a)     Each Settlement Class Member claiming a Monetary Award or Derivative Claimant Award will identify all Liens held or asserted by Governmental Payors or Medicare Part C or Part D Program sponsors with respect to any Monetary Award or Derivative Claimant Award in his or her Claim Form or Derivative Claim Form.

(b)     Each Settlement Class Member (and counsel individually representing him or her, if any) shall cooperate with the Lien Resolution Administrator to identify all Liens held or asserted by Governmental Payors or Medicare Part C or Part D Program sponsors with respect to any Monetary Award or Derivative Claimant Award as a prerequisite to receiving payment of any Monetary Award or Derivative Claimant Award, including by providing the requested information and authorizations to the Lien Resolution Administrator and/or Claims Administrator in the timeframe specified for so doing.

(c)     Among other things, each Settlement Class Member will authorize the Lien Resolution Administrator to:

(i)     Establish procedures and protocols to identify and resolve Liens held or asserted by Governmental Payors or Medicare Part C or Part D Program sponsors with respect to any Monetary Award or Derivative Claimant Award;

(ii)     Undertake to obtain an agreement in writing and other supporting documentation with CMS promptly following the Effective Date that:

(1)     Establishes a global repayment amount per Qualifying Diagnosis and/or for all or certain Qualifying Diagnoses for Settlement Class Members who are or were beneficiaries of the Medicare Program, or, alternatively, otherwise sets forth a conditional payment resolution process.  Such amounts will be based on the routine costs associated with the medically accepted standard of care for the treatment and management of each Qualifying Diagnosis, as well as actual utilization of treatment by Settlement Class Members related to each Qualifying Diagnosis.  The agreement, in writing, and supporting documentation with CMS will demonstrate reasonable proof of satisfaction of Medicare's Part A and/or Part B fee-for-service recovery claim in connection with Settlement Class Member's (who are or were beneficiaries of the Medicare Program) receipt of any Monetary Award or Derivative Claimant Award and any benefits provided pursuant to this Settlement Agreement.

(2)     Establishes reporting processes recognized by CMS as satisfying the reporting obligations, if any, under the mandatory Medicare reporting requirements of Section 111 of the Medicare, Medicaid and SCHIP Extension

62

Act of 2007, 110 Pub. L. No. 173, 121 Stat. 2492 ("MMSEA") in connection with this Settlement Agreement;

(iii)     Fulfill all state and federal reporting obligations, including those to CMS that are agreed upon with CMS;

(iv)     Satisfy Lien amounts owed to a Governmental Payor or, to the extent identified by the Class Member pursuant to Section 11.3(a), Medicare Part C or Part D Program sponsor for medical items, services, and/or prescription drugs paid on behalf of Settlement Class Members out of any Monetary Award or Derivative Claimant Award to the Settlement Class Member pursuant to this Settlement Agreement; and

(v)     Transmit all information received from any Governmental Payor or Medicare Part C or Part D Program sponsor pursuant to such authorizations (i) to the NFL Parties, Claims Administrator, and/or Special Master solely for purposes of verifying compliance with the MSP Laws or other similar reporting obligations and for verifying satisfaction and full discharge of all such Liens, or (ii) as otherwise directed by the Court.

(d)     If the Lien Resolution Administrator is able to negotiate a global repayment amount for some or all of the Qualifying Diagnoses for Settlement Class Members who are or were beneficiaries of the Medicare Program with CMS, as set forth in Section 11.3(c)(ii)(1), the Lien Resolution Administrator shall: (i) satisfy such global repayment amount out of any Monetary Award to such Settlement Class Member; and (ii) provide that reasonable compensation of the Lien Resolution Administrator for such efforts, will be paid out of any Monetary Award to such Settlement Class Member.

(e)     If the Lien Resolution Administrator is unable to negotiate a global repayment amount for some or all of the Qualifying Diagnoses for Settlement Class Members who are or were beneficiaries of the Medicare Program with CMS, as set forth in Section 11.3(c)(ii)(1), the Lien Resolution Administrator will put in place a mechanism for resolving these Liens on an individual basis, as agreed to by Co-Lead Class Counsel and Counsel for the NFL Parties.  In addition, the Lien Resolution Administrator will put in place a mechanism for resolving Liens owed to other Governmental Payors or  Medicare Part C or Part D Program sponsors on an individual basis, as agreed to by Co-Lead Class Counsel and Counsel for the NFL Parties.  These mechanisms for resolving such Liens on an individual basis will allow the Lien Resolution Administrator to:  (i) satisfy such Lien amounts owed for medical items, services, and/or prescription drugs paid on behalf of a Settlement Class Member out of any Monetary Award to the Settlement Class Member, subject to the Settlement Class Member's right to object to the fact and/or amount of such Lien amount; and (ii) provide that the Lien Resolution Administrator's reasonable costs and expenses incurred in resolving such Liens, including the reasonable compensation of the Lien

63

Resolution Administrator for such efforts, will be paid out of any Monetary Award to the Settlement Class Member.

(f)    The Parties further understand and agree that the Lien Resolution Administrator's performance of functions described in this Article is not intended to modify the legal and financial rights and obligations of Settlement Class Members, including the duty to pay and/or arrange for reimbursement of each Settlement Class Member's past, current, or future bills or costs, if any, for medical items, services, and/and prescription drugs, and to satisfy and discharge any and all statutory recovery obligations for any Liens.

(g)    Notwithstanding any other provision of this Settlement Agreement relating to timely payment, the Claims Administrator will not pay any Monetary Award to a Settlement Class Member who is or was entitled to benefits under a Governmental Payor program or Medicare Part C or Part D Program prior to: (i) the Lien Resolution Administrator's determination of the final amount needed to satisfy the reimbursement obligation that any Governmental Payor or Medicare Part C or Part D Program sponsor states is due and owing (as reflected in a final demand letter or other formal written communication), and satisfaction and discharge of that reimbursement obligation as evidenced by the Lien Resolution Administrator's receipt of a written satisfaction and discharge from the applicable Governmental Payor or Medicare Part C or Part D Program sponsor; or (ii) the Lien Resolution Administrator's determination of the "holdback" amount to be deducted from the Monetary Award or Derivative Claimant Award under which such reimbursement obligation will be resolved.

(h)    Notwithstanding any other provision of this Settlement Agreement relating to timely payment, if any person or entity claims any Liens, other than those set forth in Section 11.3(g), with respect to a Settlement Class Member's Monetary Award or Derivative Claimant Award, then the Claims Administrator will not pay any such Monetary Award or Derivative Claimant Award if the Claims Administrator or Lien Resolution Administrator has received notice of that Lien and there is a legal obligation to withhold payment to the Settlement Class Member under applicable federal or state law. The Claims Administrator will hold such Monetary Award or Derivative Claimant Award in an escrow account until the Settlement Class Member (and counsel individually representing him or her, if any) presents documentary proof, such as a court order or release or notice of satisfaction by the party asserting the Lien, that such Lien has been satisfied and discharged; or until the Lien Resolution Administrator's determination of the "holdback" amount to be deducted from the Monetary Award, Supplemental Monetary Award or Derivative Claimant Award under which such reimbursement obligation will be resolved.

(i)    Settlement Class Members who are or were entitled to benefits under Medicare Part C or Part D Programs may be required by statute or otherwise, when making a claim for and/or receiving compensation pursuant to this Settlement Agreement, to notify the relevant Medicare Part C or Part D Program sponsor or others of the existence of, and that Settlement Class Member's participation

64

in, this Class Action Settlement. It is the sole responsibility of each Settlement Class Member to determine whether he or she has such a notice obligation, and to perform timely any such notice reporting.

Section 11.4    Indemnification.    Each Settlement Class Member, on his or her own behalf, and on behalf of his or her estate, predecessors, successors, assigns, representatives, heirs, beneficiaries, executors, and administrators, in return for the benefits and consideration provided in this Settlement Agreement, will indemnify and forever hold harmless, and pay all final judgments, damages, costs, expenses, fines, penalties, interest, multipliers, or liabilities, including the costs of defense and attorneys' fees of, the Released Parties against any and all claims by Other Parties arising from, relating to, or resulting from (a) any undisclosed Lien relating to, or resulting from, compensation or benefits received by a Settlement Class Member pursuant to this Class Action Settlement and/or (b) the failure of a Settlement Class Member timely and accurately to report or provide information that is necessary for compliance with the MSP Laws, or for the Lien Resolution Administrator to identify and/or satisfy all Governmental Payors or Medicare Part C or Part D Program sponsors who may hold or assert a reimbursement right. The amount of indemnification will not exceed the total Monetary Award or Derivative Claimant Award for that Settlement Class Member's claim. **CLASS AND SUBCLASS REPRESENTATIVES AND SETTLEMENT CLASS MEMBERS ACKNOWLEDGE THAT THIS SECTION COMPLIES WITH ANY REQUIREMENT TO EXPRESSLY STATE THAT LIABILITY FOR SUCH CLAIMS IS INDEMNIFIED AND THAT THIS SECTION IS CONSPICUOUS AND AFFORDS FAIR AND ADEQUATE NOTICE.**

Section 11.5    No Admission.    Any reporting performed by the Lien Resolution Administrator and/or Claims Administrator for the purpose of resolving Liens, if any, related to compensation provided to Settlement Class Members pursuant to this Settlement Agreement does not constitute an admission by any Settlement Class Member or any Released Party of any liability or evidence of liability in any manner.

Section 11.6    The foregoing provisions of this Article are solely for the several benefit of the NFL Parties, the Lien Resolution Administrator, the Special Master, and the Claims Administrator. No Settlement Class Member (or counsel individually representing them, if any) will have any rights or defenses based upon or arising out of any act or omission of the NFL Parties or any Administrator with respect to this Article.

**ARTICLE XII**
**Education Fund**

Section 12.1    An Education Fund will be established to fund programs promoting safety and injury prevention with respect to football players, including safety-related initiatives in youth football, the education of Retired NFL Football Players regarding the NFL CBA Medical and Disability Benefits programs and other educational initiatives benefitting Retired NFL Football Players. The Court shall

65

approve these education programs, with input from Co-Lead Class Counsel, Counsel for the NFL Parties and medical experts, as further set forth below. Co-Lead Class Counsel and Counsel for the NFL Parties will agree to a protocol through which Retired NFL Football Players will actively participate in such initiatives.

Section 12.2    Co-Lead Class Counsel, with input from Counsel for the NFL Parties, and with Court approval, will take all necessary steps to establish the Education Fund and establish procedures and controls to manage and account for the disbursement of funds to the education projects and all other costs associated with the Education Fund. The costs and expenses to administer the Education Fund will be paid out of the Education Fund Amount.

## ARTICLE XIII
## Preliminary Approval and Class Certification

Section 13.1    Promptly after execution, Class Counsel will file the Motion for Preliminary Approval of the Class Action Settlement and the Settlement Agreement as an exhibit thereto. Simultaneously, the Class and Subclass Representatives will file a Motion for Certification of Rule 23(b)(3) Class and Subclasses for Purposes of Settlement.

Section 13.2    The Parties agree to take all actions reasonably necessary to obtain the Preliminary Approval and Class Certification Order from the Court.

Section 13.3    The Parties agree to jointly request that the Court stay this action and all Related Lawsuits, and enjoin all Settlement Class Members, unless and until they have been excluded from the Settlement Class by action of the Court, or until the Court denies approval of the Class Action Settlement, or until the Settlement Agreement is otherwise terminated, from filing, commencing, prosecuting, intervening in, participating in and/or maintaining, as plaintiffs, claimants, or class members in, any other lawsuit, including, without limitation, a Related Lawsuit, or administrative, regulatory, arbitration, or other proceeding in any jurisdiction (whether state, federal or otherwise), against Released Parties based on, relating to, or arising out of the claims and causes of action, or the facts and circumstances at issue, in the Class Action Complaint, Related Lawsuits and/or the Released Claims, except that claims for workers' compensation and claims alleging entitlement to NFL CBA Medical and Disability Benefits will not be stayed or enjoined. For the avoidance of any doubt, the Parties are not requesting that the Court stay any actions against Riddell.

(a)    The Parties recognize that there may be further pleadings, discovery responses, documents, testimony, or other matters or materials owed by the Parties to each other pursuant to existing pleading requirements, discovery requests, pretrial rules, procedures, orders, decisions, or otherwise. As of the Settlement Date, each Party expressly waives any right to receive, inspect, or hear such pleadings, discovery, testimony, or other matters or materials during the pendency of the

66

settlement proceedings contemplated by this Settlement Agreement and subject to further order of the Court.

Section 13.4    The Parties agree that any certification of the Settlement Class and Subclasses will be for settlement purposes only.  The Parties do not waive or concede any position or arguments they have for or against certification of any class for any other purpose in any action or proceeding.  Any class certification order entered in connection with this Settlement Agreement will not constitute an admission by the NFL Parties, or finding or evidence, that the Class and Subclass Representatives' claims, or the claims of any other Settlement Class Member, or the claims of the Settlement Class, are appropriate for class treatment if the claims were contested in this or any other federal, state, arbitral, or foreign forum.  If the Court enters the proposed form of Preliminary Approval and Class Certification Order, the Final Order and Judgment will provide for vacation of the Final Order and Judgment and the Preliminary Approval and Class Certification Order in the event that this Settlement Agreement does not become effective.

Section 13.5    Upon entry of the Preliminary Approval and Class Certification Order, the statutes of limitation applicable to any and all claims or causes of action that have been or could be asserted by or on behalf of any Settlement Class Members related to the subject matter of the Settlement Agreement will be tolled and stayed to the extent not already tolled by the initiation of an action in this litigation or a Related Lawsuit.  The limitations period will not begin to run again for any Settlement Class Member unless and until he or she is deemed to have Opted Out of the Settlement Class, this Settlement Agreement is terminated pursuant to ARTICLE XVI, or a Settlement Class Member's Release and Covenant Not to Sue has been rendered null and void by the Court as set forth in Section 25.6(g).  In the event the Settlement Agreement is terminated pursuant to ARTICLE XVI, to the extent not otherwise tolled, the limitations period for each Settlement Class Member as to whom the limitations period had not expired as of the date of the Preliminary Approval and Class Certification Order will extend for the longer of thirty (30) days from the last required issuance of notice of termination or the period otherwise remaining before expiration.  Notwithstanding the tolling agreement herein, the Parties recognize that any time already elapsed for any Class or Subclass Representatives or Settlement Class Members on any applicable statutes of limitations will not be reset, and no expired claims will be revived, by virtue of this tolling agreement.  Class and Subclass Representatives and Settlement Class Members do not admit, by entering into this Settlement Agreement, that they have waived any applicable tolling protections available as a matter of law or equity.  Nothing in this Settlement Agreement will constitute an admission in any manner that the statute of limitations has been tolled for anyone outside the Settlement Class, nor does it constitute a waiver of legal positions regarding tolling.

**ARTICLE XIV**
**Notice, Opt Out, and Objections**

Section 14.1    Notice

(a)    As part of Plaintiffs' Motion for Preliminary Approval of Class Action Settlement, Plaintiffs will submit to the Court a Settlement Class Notice Plan agreed upon by Class Counsel and Counsel for the NFL Parties.

(b)    The Settlement Class Notice Plan, to be implemented by the Settlement Class Notice Agent following the Court's entry of the Preliminary Approval and Class Certification Order, and approval of the Settlement Class Notice (in the form of Exhibit 5), paid for by the NFL Parties' transfer of Four Million United States dollars (U.S. $4,000,000) to Co-Lead Class Counsel, as set forth in Sections 23.1 and 23.3, will be designed to meet the requirements of Fed. R. Civ. P. 23 (c)(2)(B), and will include:  (i) direct notice by first-class mail; (ii) broad notice through the use of paid media including national radio spots, national consumer magazines, television and internet advertising; and (iii) electronic notice through the Settlement Website created under Section 4.1(a) and an automated telephone system created under Section 4.1(b).

(c)    The Parties and the Claims Administrator will maintain a list of the names and addresses of each person to whom the Settlement Class Notice is transmitted in accordance with any order entered by the Court pursuant to ARTICLE XIII.  These names and addresses will be kept strictly confidential and will be used only for purposes of administering this Class Action Settlement, except as otherwise ordered by the Court.

(d)    Within thirty (30) days of the Effective Date, upon Court approval, Co-Lead Class Counsel shall cause the Settlement Class Supplemental Notice to be disseminated to Settlement Class Members by first-class mail and by posting on the Settlement Website created under Section 4.1(a) and through an automated telephone system created under Section 4.1(b), to advise Settlement Class Members of the previously disclosed deadlines:  (i) to register for participation in the Class Action Settlement, as set forth in Section 4.2; (ii) as to eligible Retired NFL Football Players, to participate in the BAP, as set forth in Section 5.3; and (iii) to submit Claim Packages or Derivative Claim Packages, as set forth in Section 8.3.  The Settlement Class Supplemental Notice shall include the above information, and any other information, as agreed upon by Co-Lead Class Counsel and Counsel for the NFL Parties, and approved by the Court.

Section 14.2    Opt Outs

(a)    The Settlement Class Notice will provide instructions regarding the procedures that must be followed to Opt Out of the Settlement Class pursuant to Fed. R. Civ. P. 23(c)(2)(B)(v).  The Parties agree that, to Opt Out validly from the Settlement Class, a Settlement Class Member must submit a written request

68

to Opt Out stating "I wish to exclude myself from the Settlement Class in *In re: National Football League Players' Concussion Injury Litigation*, No. 2:12-md-02323" (or substantially similar clear and unambiguous language) to the Claims Administrator on or before such date as is ordered by the Court.  That written request also will contain the Settlement Class Member's printed name, address, telephone number, and date of birth and enclose a copy of his or her driver's license or other government issued identification.  A written request to Opt Out may not be signed using any form of electronic signature, but must contain the dated Personal Signature of the Retired NFL Football Player, Representative Claimant, or Derivative Claimant seeking to exclude himself or herself from the Settlement Class.  Attorneys for Settlement Class Members may submit a written request to Opt Out on behalf of a Settlement Class Member, but such request must contain the Personal Signature of the Settlement Class Member.  The Claims Administrator will provide copies of all requests to Opt Out to Class Counsel and Counsel for the NFL Parties within seven (7) days of receipt of each such request.  Valid requests to Opt Out from the Settlement Class will become effective on the Final Approval Date.

(b)    All Settlement Class Members who do not timely and properly Opt Out from the Settlement Class will in all respects be bound by all terms of this Settlement Agreement and the Final Order and Judgment upon the Effective Date, will be entitled to all procedural opportunities and protections described in this Settlement Agreement and provided by the Court, and to all compensation and benefits for which they qualify under its terms, and will be barred permanently and forever from commencing, filing, initiating, prosecuting, asserting, and/or maintaining any and all Released Claims against any Released Parties in any court of law or equity, arbitration tribunal, or administrative or other forum.

(c)    Prior to the Final Approval Date, any Retired NFL Football Player, Representative Claimant, or Derivative Claimant may seek to revoke his or her Opt Out from the Settlement Class and thereby receive the benefits of this Class Action Settlement by submitting a written request to Co-Lead Class Counsel and Counsel for the NFL Parties stating "I wish to revoke my request to be excluded from the Settlement Class" (or substantially similar clear and unambiguous language), and also containing the Settlement Class Member's printed name, address, phone number, and date of birth.  The written request to revoke an Opt Out must contain the Personal Signature of the Settlement Class Member seeking to revoke his or her Opt Out.

Section 14.3    <u>Objections</u>

(a)    Provided a Settlement Class Member has not submitted a written request to Opt Out, as set forth in Section 14.2(a), the Settlement Class Member may present written objections, if any, explaining why he or she believes the Class Action Settlement should not be approved by the Court as fair, reasonable, and adequate.  No later than such date as is ordered by the Court, a Settlement Class Member who wishes to object to any aspect of the Class Action Settlement must file with the Court , or as the Court otherwise may direct, a written statement of the objection(s).  The written statement of objection(s) must include a detailed statement of

69

the Settlement Class Member's objection(s), as well as the specific reasons, if any, for each such objection, including any evidence and legal authority the Settlement Class Member wishes to bring to the Court's attention. That written statement also will contain the Settlement Class Member's printed name, address, telephone number, and date of birth, written evidence establishing that the objector is a Settlement Class Member, and any other supporting papers, materials, or briefs the Settlement Class Member wishes the Court to consider when reviewing the objection. A written objection may not be signed using any form of electronic signature, but must contain the dated Personal Signature of the Retired NFL Football Player, Representative Claimant, or Derivative Claimant making the objection. The Court shall determine whether any Settlement Class Members who do not follow the procedures will have waived any objections they may have.

(b)     A Settlement Class Member may object on his or her own behalf or through an attorney hired at that Settlement Class Member's own expense, provided the Settlement Class Member has not submitted a written request to Opt Out, as set forth in Section 14.2(a). Attorneys asserting objections on behalf of Settlement Class Members must: (i) file a notice of appearance with the Court by the date set forth in the Preliminary Approval and Class Certification Order, or as the Court otherwise may direct; (ii) file a sworn declaration attesting to his or her representation of each Settlement Class Member on whose behalf the objection is being filed or a copy of the contract (to be filed *in camera*) between that attorney and each such Settlement Class Member; and (iii) comply with the procedures described in this Section.

(c)     A Settlement Class Member (or counsel individually representing him or her, if any) seeking to make an appearance at the Fairness Hearing must file with the Court, by the date set forth in the Preliminary Approval and Class Certification Order, or as the Court otherwise may direct, a written notice of his or her intention to appear at the Fairness Hearing, in accordance with the requirements set forth in the Preliminary Approval and Class Certification Order.

(d)     Any Settlement Class Member who fails to comply with the provisions of this Section 14.3 will waive and forfeit any and all rights he or she may have to object to the Class Action Settlement.

## ARTICLE XV
### Communications to the Public

Section 15.1     The form, content, and timing of any public statement announcing the filing of this Settlement Agreement will be subject to mutual agreement by Class Counsel and Counsel for the NFL Parties. The Parties and their counsel agree not to make any public statements, including statements to the media, that are inconsistent with the Settlement Agreement. Any communications to the public or the media made by or on behalf of the Parties and their respective counsel regarding the Class Action Settlement will be made in good faith and will be consistent with the Parties' agreement to take all actions reasonably necessary for preliminary and final

approval of this Class Action Settlement. Any information contained in such communications will be balanced, fair, accurate, and consistent with the content of the Settlement Class Notice.

(a)     Nothing herein is intended or will be interpreted to inhibit or interfere with the ability of Class Counsel or Counsel for the NFL Parties to communicate with the Court, their clients, or Settlement Class Members and/or their counsel.

(b)     Class Counsel acknowledge and agree, and the Preliminary Approval and Class Certification Order will provide, that the NFL Parties have the right to communicate orally and in writing with, and to respond to inquiries from, Settlement Class Members on matters unrelated to the Class Action Settlement in connection with the NFL Parties' normal business.

**ARTICLE XVI**
**Termination**

Section 16.1     <u>Walk-Away Right of NFL Parties</u>.  Without limiting any other rights under this Settlement Agreement, the NFL Parties will have the absolute and unconditional right, in their sole good faith discretion, to unilaterally terminate and render null and void this Class Action Settlement and Settlement Agreement for any reason whatsoever following notice of Opt Outs and prior to the Fairness Hearing.  The NFL Parties must provide written election to terminate this Settlement Agreement to Class Counsel and the Court prior to the Fairness Hearing.

Section 16.2     <u>Party Termination Rights</u>

(a)     Class Counsel and Counsel for the NFL Parties each have the absolute and unconditional right, in their sole discretion, which discretion will be exercised in good faith, to terminate and render null and void this Class Action Settlement and Settlement Agreement if (i) the Court, or any appellate court(s), rejects, modifies, or denies approval of any portion of this Settlement Agreement that Class Counsel or Counsel for the NFL Parties reasonably and in good faith determines is material, including, without limitation, the Releases or the definition of the Settlement Class, or (ii) the Court, or any appellate court(s), does not enter or completely affirm, or alters or expands, any portion of the proposed Preliminary Approval and Class Certification Order or the proposed Final Order and Judgment (Exhibit 4) that Class Counsel or Counsel for the NFL Parties reasonably and in good faith believes is material.  Such written election to terminate this Settlement Agreement must be made to the Court within thirty (30) days of such Court order.

(b)     Class Counsel may not terminate and render null and void this Class Action Settlement and Settlement Agreement on the basis of the attorneys' fees award ordered, or modified, by the Court or any appellate court(s), as set forth in ARTICLE XXI.

71

Section 16.3    <u>Post-Termination Actions</u>

        (a)     In the event this Settlement Agreement is terminated or becomes null and void, this Settlement Agreement will not be offered into evidence or used in this or in any other action in the Court, or in any other federal court, state court, arbitration, regulatory agency, or other tribunal or forum for any purpose, including, but not limited to, the existence, certification, or maintenance of any purported class. In addition, in such event, this Settlement Agreement and all negotiations, proceedings, documents prepared and statements made in connection with this Settlement Agreement will be without prejudice to all Parties and will not be admissible into evidence and will not be deemed or construed to be an admission or concession by any of the Parties of any fact, matter, or proposition of law and will not be used in any manner for any purpose, and all Parties will stand in the same position as if this Settlement Agreement had not been negotiated, made, or filed with the Court.

        (b)     In the event this Settlement Agreement is terminated or becomes null and void, the Parties will jointly move the Court to vacate the Preliminary Approval and Certification Order and any other orders certifying a Settlement Class provided.

        (c)     If this Settlement Agreement is terminated or becomes null and void after notice has been given, the Parties will provide Court-approved notice of termination to the Settlement Class. If a Party terminates the Settlement Agreement in accordance with Section 16.1 or Section 16.2, that Party will pay the cost of notice of termination.

        (d)     In the event this Settlement Agreement is terminated or becomes null and void, any unspent and uncommitted monies in the Funds will revert to the NFL Parties within ten (10) days, and all data provided by the NFL Parties, Class Counsel and/or Settlement Class Members shall be returned or destroyed.

## ARTICLE XVII
## Treatment of Confidential Information

Section 17.1    <u>Confidentiality of Information Relating to the Settlement Agreement</u>. The Parties will treat all confidential or proprietary information shared hereunder, or in connection herewith, either prior to, on or after the Settlement Date, and any and all prior or subsequent drafts, representations, negotiations, conversations, correspondence, understandings, analyses, proposals, term sheets, and letters, whether oral or written, of any kind or nature, with respect to the subject matter hereof ("Confidential Information") in conformity with strict confidence and will not disclose Confidential Information to any non-Party without the prior written consent of the Party that shared the Confidential Information, except: (i) as required by applicable law, regulation, or by order or request of a court of competent jurisdiction, regulator, or self-regulatory organization (including subpoena or document request), provided that the Party that shared the Confidential Information is given prompt written notice thereof and, to the extent practicable, an opportunity to seek a protective order or other

72

confidential treatment thereof, provided further that the Party subject to such requirement or request cooperates fully with the Party that shared the Confidential Information in connection therewith, and only such Confidential Information is disclosed as is legally required to be disclosed in the opinion of legal counsel for the disclosing Party; (ii) under legal (including contractual) or ethical obligations of confidentiality, on an as-needed and confidential basis to such Party's present and future accountants, counsel, insurers, or reinsurers; or (iii) with regard to any information that is already publicly known through no fault of such Party or its Affiliates. This Settlement Agreement, all exhibits hereto, any other documents filed in connection with the Class Action Settlement, and any information disclosed through a public court proceeding shall not be deemed Confidential Information.

Section 17.2    <u>Confidentiality of Retired NFL Football Player Information</u>

(a)    All information relating to a Retired NFL Football Player that is disclosed to or obtained by the Special Master, BAP Administrator, Claims Administrator, Lien Resolution Administrator, designated Qualified BAP Providers, the NFL Parties, an Appeals Advisory Panel member, an Appeals Advisory Panel Consultant, or the Court, may be used only by the Special Master, BAP Administrator, Claims Administrator, Lien Resolution Administrator, designated Qualified BAP Providers, the NFL Parties, an Appeals Advisory Panel member, an Appeals Advisory Panel Consultant, or the Court for the administration of this Class Action Settlement according to the Settlement Agreement terms and conditions. All such information relating to a Retired NFL Football Player will be treated as Confidential Information hereunder, will be subject to the terms of Section 17.1 hereof, and, where applicable, will be treated as Protected Health Information subject to HIPAA and other applicable privacy laws.

## ARTICLE XVIII
## Releases and Covenant Not to Sue

Section 18.1    <u>Releases</u>

(a)    In consideration of the benefits described and the agreement and covenants contained in this Settlement Agreement, and by operation of the Final Order and Judgment, the Settlement Class, the Class and Subclass Representatives, and each Settlement Class Member, on his or her own behalf and on behalf of his or her respective predecessors, successors, assigns, assignors, representatives, attorneys, agents, trustees, insurers, heirs, next of kin, estates, beneficiaries, executors, administrators, and any natural, legal, or juridical person or entity to the extent he, she, or it is entitled to assert any claim on behalf of any Settlement Class Member (the "Releasors"), hereby waive and release, forever discharge and hold harmless the Released Parties, and each of them, of and from any and all past, present and future claims, counterclaims, actions, rights or causes of action, liabilities, suits, demands, damages, losses, payments, judgments, debts, dues, sums of money, costs and expenses (including, without limitation, attorneys' fees and

73

costs), accounts, reckonings, bills, covenants, contracts, controversies, agreements, obligations, or promises, in law or in equity, contingent or non-contingent, known or unknown, suspected or unsuspected, foreseen or unforeseen, matured or unmatured, accrued or unaccrued, liquidated or unliquidated, whether direct, representative, class or individual in nature, in any forum that the Releasors, and each of them, had, has, or may have in the future arising out of, in any way relating to or in connection with the allegations, transactions, facts, matters, occurrences, representations or omissions involved, set forth, referred to or relating to the Class Action Complaint and/or Related Lawsuits ("Claims"), including, without limitation, Claims:

(i)       that were, are or could have been asserted in the Class Action Complaint or any other Related Lawsuit; and/or

(ii)      arising out of, or relating to, head, brain and/or cognitive injury, as well as any injuries arising out of, or relating to, concussions and/or subconcussive events (including, without limitation, prevention, diagnosis and treatment thereof) of whatever cause and its damages (whether short-term, long-term or death), whenever arising, including, without limitation, Claims for personal or bodily injury, including disease, mental or physical pain or suffering, emotional or mental harm, or anguish or loss of enjoyment of life (and exacerbation and/or progression of personal or bodily injury), or wrongful death and/or survival actions as a result of such injury and/or exacerbation and/or progression thereof; and/or

(iii)     arising out of, or relating to, neurocognitive deficits or impairment, or cognitive disorders, of whatever kind or degree, including, without limitation, mild cognitive impairment, moderate cognitive impairment, dementia, Alzheimer's Disease, Parkinson's Disease, and ALS; and/or

(iv)     arising out of, or relating to, CTE; and/or

(v)      arising out of, or relating to, loss of support, services, consortium, companionship, society, or affection, or damage to familial relations (including disease, mental or physical pain or suffering, emotional or mental harm, or anguish or loss of enjoyment of life); and/or

(vi)     arising out of, or relating to, increased risk, possibility, or fear of suffering in the future from any head, brain and/or cognitive injury, as well as any injuries arising out of, or relating to, concussions and/or subconcussive events (including, without limitation, prevention, diagnosis and treatment thereof), and including disease, mental or physical pain or suffering, emotional or mental harm, or anguish or loss of enjoyment of life); and/or

(vii)    arising out of, or relating to, medical screening and medical monitoring for undeveloped, unmanifested, and/or undiagnosed head, brain and/or cognitive injury, as well as any injuries arising out of, or relating to, concussions and/or subconcussive events (including, without limitation, prevention, diagnosis and treatment thereof); and/or

(viii)  premised on any purported or alleged breach of any Collective Bargaining Agreement related to the issues in the Class Action Complaint and/or Related Lawsuits, except claims for workers' compensation and claims alleging entitlement to NFL CBA Medical and Disability Benefits.

(b)  In consideration of the benefits described and the agreement and covenants contained in this Settlement Agreement, and by operation of the Final Order and Judgment, the Releasors do hereby release, forever discharge and hold harmless the Released Parties from any and all Claims, including unknown Claims, arising from, relating to, or resulting from the reporting, transmittal of information, or communications between or among the NFL Parties, Counsel for the NFL Parties, the Special Master, Claims Administrator, Lien Resolution Administrator, any Governmental Payor, and/or Medicare Part C or Part D Program sponsor regarding any claim for benefits under this Settlement Agreement, including any consequences in the event that this Settlement Agreement impacts, limits, or precludes any Settlement Class Member's right to benefits under Social Security or from any Governmental Payor or Medicare Part C or Part D Program sponsor.

(c)  In consideration of the benefits described and the agreement and covenants contained in this Settlement Agreement, and by operation of the Final Order and Judgment, the Releasors do hereby release, forever discharge and hold harmless the Released Parties from any and all Claims, including unknown Claims, pursuant to the MSP Laws, or other similar causes of action, arising from, relating to, or resulting from the failure or alleged failure of any of the Released Parties to provide for a primary payment or appropriate reimbursement to a Governmental Payor or Medicare Part C or Part D Program sponsor with a Lien in connection with claims for medical items, services, and/or prescription drugs provided in connection with compensation or benefits claimed or received by a Settlement Class Member pursuant to this Settlement Agreement.

(d)  In consideration of the benefits described and the agreement and covenants contained in this Settlement Agreement, and by operation of the Final Order and Judgment, the Releasors do hereby release, forever discharge and hold harmless the Released Parties, the Special Master, BAP Administrator, Claims Administrator, and their respective officers, directors, and employees from any and all Claims, including unknown Claims, arising from, relating to, or resulting from their participation, if any, in the BAP, including, but not limited to, Claims for negligence, medical malpractice, wrongful or delayed diagnosis, personal injury, bodily injury (including disease, trauma, mental or physical pain or suffering, emotional or mental harm, or anguish or loss of enjoyment of life), or death arising from, relating to, or resulting from such participation.

Section 18.2  <u>Release of Unknown Claims</u>.  In connection with the releases in Section 18.1, the Class and Subclass Representatives, all Settlement Class Members, and the Settlement Class acknowledge that they are aware that they may hereafter discover Claims now unknown or unsuspected, or facts in addition to or different from those which they now know or believe to be true, with respect to actions

or matters released herein. Class and Subclass Representatives, all Settlement Class Members, and the Settlement Class explicitly took unknown or unsuspected claims into account in entering into the Settlement Agreement and it is the intention of the Parties fully, finally and forever to settle and release all Claims as provided in Section 18.1 with respect to all such matters.

Section 18.3    Scope of Releases

(a)    Each Party acknowledges that it has been informed of Section 1542 of the Civil Code of the State of California (and similar statutes) by its counsel and that it does hereby expressly waive and relinquish all rights and benefits, if any, which it, he or she has or may have under said section (and similar sections) which reads as follows:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

(b)    The Parties acknowledge that the foregoing waiver of the provisions of Section 1542 of the California Civil Code and all similar provisions of the statutory or common law of any other state, territory, or other jurisdiction was separately bargained for and that the Parties would not have entered into this Settlement Agreement unless it included a broad release of unknown claims relating to the matters released herein.

(c)    The Releasors intend to be legally bound by the Releases.

(d)    The Releases are not intended to prevent the NFL Parties from exercising their rights of contribution, subrogation, or indemnity under any law.

(e)    Nothing in the Releases will preclude any action to enforce the terms of this Settlement Agreement in the Court.

(f)    The Parties represent and warrant that no promise or inducement has been offered or made for the Releases contained in this Article except as set forth in this Settlement Agreement and that the Releases are executed without reliance on any statements or any representations not contained in this Settlement Agreement.

Section 18.4    Covenant Not to Sue.  From and after the Effective Date, for the consideration provided for herein and by operation of the Final Order and Judgment, the Class and Subclass Representatives, each Settlement Class Member, and the Settlement Class, on behalf of the Releasors, and each of them, covenant, promise, and agree that they will not, at any time, continue to prosecute, commence, file, initiate, institute, cause to be instituted, assist in instituting, or permit to be instituted

76

on their, his, her, or its behalf, or on behalf of any other individual or entity, any proceeding:  (a) alleging or asserting any of his or her respective Released Claims against the Released Parties in any federal court, state court, arbitration, regulatory agency, or other tribunal or forum, including, without limitation, the Claims set forth in Section 18.1; or (b) challenging the validity of the Releases.  To the extent any such proceeding exists in any court, tribunal or other forum as of the Effective Date, the Releasors covenant, promise and agree to withdraw, and seek a dismissal with prejudice of, such proceeding forthwith.

Section 18.5    No Release for Insurance Coverage.

(a)    Notwithstanding anything herein to the contrary, this Settlement Agreement is not intended to and does not release any Governmental Payor or Medicare Part C or Part D Program sponsor from its or their obligation to provide any health insurance coverage, major medical insurance coverage, or disability insurance coverage to a Settlement Class Member, or from any claims, demands, rights, or causes of action of any kind that a Settlement Class Member has or hereafter may have with respect to such individuals or entities.

(b)    Notwithstanding anything herein to the contrary, this Settlement Agreement is not intended to and does not effect a release of any rights or obligations that any insurer has under or in relation to any contract or policy of insurance to any named insured, insured, additional insured, or other insured person or entity thereunder, including those persons or entities referred to in Section 2.1(bbbb)(i)-(ii).

Section 18.6    No Release for Claims for Workers' Compensation and NFL CBA Medical and Disability Benefits.   Nothing contained in this Settlement Agreement, including the Release and Covenant Not to Sue provisions in this ARTICLE XVIII, affects the rights of Settlement Class Members to pursue claims for workers' compensation and claims alleging entitlement to NFL CBA Medical and Disability Benefits.  For the avoidance of any doubt, this Settlement Agreement does not alter the showing that Settlement Class Members must demonstrate to pursue successful claims for workers' compensation and/or successful claims alleging entitlement to NFL CBA Medical and Disability Benefits, nor does it alter the defenses to such claims available to Released Parties except as set forth in ARTICLE XXIX.

## ARTICLE XIX
## Bar Order

Section 19.1    Bar Order.   As a condition to the Settlement, the Parties agree to move the Court for a bar order, as part of the Final Order and Judgment (substantially in the form of Exhibit 4), as set forth in Section 20.1.

Section 19.2    Judgment Reduction.   With respect to any litigation by the Releasors against Riddell, the Releasors further agree that if a verdict in their favor results in a verdict or judgment for contribution or indemnity against the Released

Parties, the Releasors will not enforce their right to collect this verdict or judgment to the extent that such enforcement creates liability against the Released Parties. In such event, the Releasors agree that they will reduce their claim or agree to a judgment reduction or satisfy the verdict or judgment to the extent necessary to eliminate the claim of liability against the Released Parties or any Other Party claiming contribution or indemnity.

## ARTICLE XX
### Final Order and Judgment and Dismissal With Prejudice

Section 20.1   The Parties will jointly seek a Final Order and Judgment from the Court, substantially in the form of Exhibit 4, approval and entry of which shall be a condition of this Settlement Agreement, that:

(a)    Approves the Class Action Settlement in its entirety pursuant to Fed. R. Civ. P. 23(e) as fair, reasonable, and adequate;

(b)    Finds that this Settlement Agreement, with respect to each Subclass, is fair, reasonable, and adequate;

(c)    Confirms the certification of the Settlement Class for settlement purposes only;

(d)    Confirms the appointments of the Class and Subclass Representatives;

(e)    Confirms the appointments of Co-Lead Class Counsel, Class Counsel and Subclass Counsel;

(f)    Finds that the Settlement Class Notice satisfied the requirements set forth in Fed. R. Civ. P. 23(c)(2)(B);

(g)    Permanently bars, enjoins and restrains the Releasors (and each of them) from commencing, filing, initiating, prosecuting, asserting, and/or maintaining any and all Released Claims against any Released Party;

(h)    Dismisses with prejudice the Class Action Complaint, without further costs, including claims for interest, penalties, costs and attorneys' fees, except that the motion for an award of attorneys' fees and reasonable costs, as set forth in in Section 21.1, will be made at an appropriate time to be determined by the Court;

(i)    Orders the dismissal with prejudice, and without further costs, including claims for interest, penalties, costs, and attorneys' fees, of all Related Lawsuits pending in the Court as to the Released Parties, thereby effectuating in part the Releases;

(j)    Orders all Releasors with Related Lawsuits pending in any federal court, state court, arbitration, regulatory agency, or other tribunal or forum,

78

other than the Court, promptly to dismiss with prejudice, and without further costs, including claims for interest, penalties, costs, and attorneys' fees, all such Related Lawsuits as to the Released Parties, thereby effectuating in part the Releases;

(k)    Permanently bars and enjoins the commencement, assertion, and/or prosecution of any claim for contribution and/or indemnity in the Court, in any other federal court, state court, arbitration, regulatory agency, or other tribunal or forum between the Released Parties and all alleged joint tortfeasors, other than Riddell, together with an appropriate judgment reduction provision;

(l)    Confirms the appointment of the Special Master, Garretson Group as the BAP Administrator, BrownGreer as the Claims Administrator, Garretson Group as the Liens Resolution Administrator, and Citibank, N.A. as the Trustee, and confirms that the Court retains continuing jurisdiction over those appointed;

(m)    Confirms that the Court retains continuing jurisdiction over the "qualified settlement funds," as defined under §1.468B-1 of the Treasury Regulations promulgated under Sections 461(h) and 468B of the Internal Revenue Code of 1986, as amended, created under the Settlement Agreement; and

(n)    Expressly incorporates the terms of this Settlement Agreement and provides that the Court retains continuing and exclusive jurisdiction over the Parties, the Settlement Class Members and this Settlement Agreement, to interpret, implement, administer and enforce the Settlement Agreement in accordance with its terms.

## ARTICLE XXI
## Attorneys' Fees

Section 21.1    <u>Award</u>.    Separately and in addition to the NFL Parties' payment of the monies set forth in ARTICLE XXIII and any consideration received by Settlement Class Members under this Settlement, the NFL Parties shall pay class attorneys' fees and reasonable costs. Class Counsel shall be entitled, at an appropriate time to be determined by the Court, to petition the Court on behalf of all entitled attorneys for an award of class attorneys' fees and reasonable costs. Provided that said petition does not seek an award of class attorneys' fees and reasonable costs exceeding One Hundred and Twelve Million, Five Hundred Thousand United States dollars (U.S. $112,500,000), the NFL Parties agree not to oppose or object to the petition. Ultimately, the award of class attorneys' fees and reasonable costs to be paid by the NFL Parties is subject to the approval of the Court. For the avoidance of any doubt, the NFL Parties' obligation to pay class attorneys' fees and reasonable costs is limited to those attorneys' fees and reasonable costs ordered by the Court as a result of the initial petition by Class Counsel. The NFL Parties shall not be responsible for the payment of any further attorneys' fees and/or costs for the term of this Agreement. After the Effective Date, Co-Lead Class Counsel may petition the Court to set aside up to five percent (5%) of each Monetary Award and Derivative Claimant Award to

facilitate the Settlement program and related efforts of Class Counsel. These set-aside monies shall be held in a separate fund overseen by the Court. Any future petition for a set-aside will describe: (i) the proposed amount; (ii) how the money will be used; and (iii) any other relevant information (for example, the assurance that any "set-aside" from a Monetary Award or Derivative Claimant Award for a Settlement Class Member represented by his/her individual counsel will reduce the attorney's fee payable to that counsel by the amount of the "set-aside"). No money will be held back or set aside from any Monetary Award or Derivative Claimant Award without Court approval. The NFL Parties believe that any such proposed set aside application is a matter strictly between and among Settlement Class Members, Class Counsel, and individual counsel for Settlement Class Members. The NFL Parties therefore take no position on the proposed set aside and will take no position on the proposed set aside in the event such an application is made.

Section 21.2   Payment. No later than sixty (60) days after the Effective Date, the NFL Parties will pay, or cause to be paid, a total of One Hundred and Twelve Million, Five Hundred Thousand United States dollars (U.S. $112,500,000) into the Attorneys' Fees Qualified Settlement Fund, as set forth in Section 23.7, to be held in escrow until such payment shall be made as directed by the Court.

## ARTICLE XXII
## Enforceability of Settlement Agreement and Dismissal of Claims

Section 22.1   It is a condition of this Settlement Agreement that the Court approve and enter the Preliminary Approval and Class Certification Order and Final Order and Judgment substantially in the form of Exhibit 4.

Section 22.2   The Parties agree that this Class Action Settlement is not final and enforceable until the Effective Date, except that upon entry of the Preliminary Approval and Class Certification Order, the NFL Parties will be obligated to make the Settlement Class Notice Payment as set forth in Sections 14.1, 23.1 and 23.3.

Section 22.3   From and after the Effective Date, for the consideration provided for herein and by operation of the Final Order and Judgment, the Court will dismiss with prejudice all Released Claims by any and all Releasors against any and all Released Parties pending in the Court, and any and all Releasors with Related Lawsuits pending in any federal court, state court, arbitration, regulatory agency, or other tribunal or forum, other than the Court, will dismiss with prejudice the Related Lawsuits as to the Released Parties, including any related appeals.

Section 22.4   From and after the Effective Date, for the consideration provided for herein and by operation of the Final Order and Judgment, the Parties agree that each and every Releasor will be permanently barred and enjoined from commencing, filing, initiating, instituting, prosecuting, and/or maintaining any judicial, arbitral, or regulatory action against any Released Party with respect to any and all Released Claims.

Section 22.5   From and after the Effective Date, for the consideration provided for herein and by operation of the Final Order and Judgment, this Settlement Agreement will be the exclusive remedy for any and all Released Claims by or on behalf of any and all Releasors against any and all Released Parties, and no Releasor will recover, directly or indirectly, any sums from any Released Parties for Released Claims other than those received for the Released Claims under the terms of this Settlement Agreement, if any.

Section 22.6   From and after the Effective Date, if any Releasor, in violation of Section 18.4, commences, files, initiates, or institutes any new action or other proceeding for any Released Claims against any Released Parties, or continues to prosecute any pending claims, or challenges the validity of the Releases, in any federal court, state court, arbitration, regulatory agency, or other tribunal or forum, such action or other proceeding will be dismissed with prejudice and at such Releasor's cost; provided, however, before any costs may be assessed, counsel for such Releasor or, if not represented, such Releasor, will be given reasonable notice and an opportunity voluntarily to dismiss such new action or proceeding with prejudice.  Furthermore, if the NFL Parties or any other Released Party brings any legal action before the Court to enforce its rights under this Settlement Agreement against a Settlement Class Member and prevails in such action, that Released Party will be entitled to recover any and all related costs and expenses (including attorneys' fees) from any Releasor found to be in violation or breach of his or her obligations under this Article.

**ARTICLE XXIII**
**NFL Payment Obligations**

Section 23.1   <u>Funding Amount</u>.  In consideration of the Releases and Covenant Not to Sue set forth in ARTICLE XVIII, and the dismissal with prejudice of the Class Action Complaint and the Related Lawsuits, and subject to the terms and conditions of this Settlement Agreement, the NFL Parties will pay in accordance with the funding terms set forth herein:

(a)   <u>Monetary Award Fund Amount</u>.  The amount of money sufficient to make all payments set forth in Section 23.3(b) for sixty-five (65) years from the Effective Date.  For the avoidance of any doubt, the NFL Parties shall have no payment obligations under this Settlement Agreement after the end of the Monetary Award Fund sixty-five (65) year term;

(b)   <u>BAP Fund Amount</u>.  The amount of money, up to a maximum of Seventy-Five Million United States dollars (U.S. $75,000,000), sufficient to make all payments set forth in Section 23.3(d), except that every qualified Retired NFL Football Player, as set forth in Section 5.1, is entitled to one baseline assessment examination**. For the avoidance of doubt, if the Seventy-Five Million United States dollars (U.S. $75,000,000) is insufficient to cover the costs of one baseline assessment examination for every qualified Retired NFL Football Player electing to receive an examination by the deadline set forth in Section 5.3, the NFL Parties**

81

-3015-

**agree to pay the amount of money necessary to provide the examinations in accordance with this Settlement Agreement;**

(c)    <u>Education Fund Amount</u>.    Ten Million United States dollars (U.S. $10,000,000), which monies will be used exclusively to fund the Education Fund;

(d)    <u>Settlement Class Notice Amount</u>.    Four Million United States dollars (U.S. $4,000,000), to pay for Settlement Class Notice and related expenses; and

(e)    <u>Annual Compensation of the Special Master</u>.    The annual compensation of the Special Master appointed by the Court, whose total annual compensation shall not exceed Two Hundred Thousand United States dollars (U.S. $200,000).

(f)    Notwithstanding any provision of the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119, amended by the Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, 124 Stat. 1029, or any subsequent legislation mandating or subsidizing health insurance coverage, the NFL Parties will pay, or cause to be paid, in full the amounts set forth above in Section 23.1(a)-(e), and will not bill any Governmental Payor or Medicare Part C or Part D Program for any such costs.

Section 23.2    <u>Exclusive Payments</u>.    For the avoidance of any doubt, other than as set forth in Section 21.2, the NFL Parties will have no additional payment obligations in connection with this Settlement Agreement.

Section 23.3    <u>Funding Terms</u>.    The NFL Parties' payment obligations will be funded as follows:

(a)    <u>Education Fund.</u>    No later than thirty (30) days after the Effective Date, the NFL Parties will pay, or cause to be paid, a total of Ten Million United States dollars (U.S. $10,000,000) into the Settlement Trust Account, as set forth in Section 23.5, for transfer by the Trustee into the Education Fund.

(b)    <u>Monetary Award Fund.</u>    The NFL Parties will pay, or cause to be paid six initial monthly installments of Twenty Million United States dollars (U.S. $20,000,000) each, into the Settlement Trust Account for transfer by the Trustee into the Monetary Award Fund, beginning no later than thirty (30) days after the Effective Date.    If additional funds are necessary in any given month during this six month period, they shall be requested and paid in accordance with the procedures set forth in section 23.3(b)(i)-(iv).    The Claims Administrator shall provide in writing to the NFL Parties and Co-Lead Class Counsel a monthly report for this initial six month period that includes an accounting of the items set forth in Section 23.3(b)(i)(1)-(5).

(i)    Beginning no later than thirty (30) days after the Effective Date,  on or before the 10th day of each month, the Claims Administrator shall provide in writing to the NFL Parties and Co-Lead Class Counsel a monthly funding request identifying the monetary amount necessary to pay all final and accrued Monetary Awards, Derivative Claimant Awards and the costs and expenses paid out of the Monetary Award Fund, as set forth in Section 23.5(d)(ii), and any additional amount necessary to maintain the Monetary Award Fund targeted reserve, as set forth in Section 23.3(b)(v), after all final and accrued Monetary Awards, Derivative Claimant Awards and costs and expenses are paid.  This monthly funding request shall provide, in addition to the total monetary amount requested, an accounting of:

(1)    The name of each Settlement Class Member with a final and accrued Monetary Awards or Derivative Claimant Award since the last monthly funding request, identification of his/her counsel, identification of the Award as a Monetary Award or Derivative Claimant Award, the Award amount, and identification of any "holdback" amount deducted from the Award as set forth in Sections 9.1(c)(ii) and 9.2(b)(ii), 11.3(g) and 11.3(h);

(2)    The amount of costs and expenses related to the appeals process, as set forth in ARTICLE IX, since the last monthly funding request;

(3)    The amount of costs and expenses of claims administration, as set forth in ARTICLE X, since the last monthly funding request;

(4)    The amount of costs and expenses of the Lien identification and resolution process, as set forth in ARTICLE XI, since the last monthly funding request;

(5)    The amount necessary to maintain the Monetary Award Fund targeted reserve, as set forth in Section 23.3(b)(v), after all final and accrued Monetary Awards, Derivative Claimant Awards, and costs and expenses are paid.

(ii)    Subject to the objection process set forth in Section 23.3(b)(iii), the NFL Parties will pay, or cause to be paid, within thirty (30) days of receipt of the written monthly funding request, a payment of the total amount requested into the Settlement Trust Account for transfer by the Trustee into the Monetary Award Fund.

(iii)    Within ten (10) days after receipt of the written monthly funding request, the NFL Parties and Co-Lead Class Counsel shall each notify the Claims Administrator in writing of any objection to any aspect of the funding request.  If an objection is timely made, the NFL Parties, will pay, or cause to be paid, within thirty (30) days of such written monthly funding request, a payment of the undisputed portion of the total amount requested into the Settlement Trust Account for

transfer by the Trustee into the Monetary Award Fund.  The NFL Parties, Co-Lead Class Counsel and the Claims Administrator shall use their best efforts to resolve any objections within fifteen (15) days after receipt of the written monthly funding request. If the NFL Parties, Co-Lead Class Counsel and the Claims Administrator are unable to resolve the objection within twenty (20) days after receipt of the written monthly funding request, the objecting party shall present the matter in writing to the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof).

(1)    After an agreement on the resolution of an objection, or a decision by the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof) resolving an objection by requiring the NFL Parties to pay, or cause to be paid, additional amounts beyond the undisputed portion of the monthly funding request, the NFL Parties will pay, or cause to be paid, the additional amounts beyond the undisputed portion of the monthly funding request within the longer of thirty (30) days of receiving the written monthly funding request or ten (10) days after resolution of the objection.

(iv)    Within ten (10) days after transfer of funds into the Monetary Award Fund pursuant to a monthly funding request or decision of the Special Master or Court, as set forth in Section 23.3(b)(iii)(1), the Claims Administrator shall cause payment to be issued on all applicable final and accrued Monetary Awards, Derivative Claimant Awards and costs and expenses paid out of the Monetary Award Fund, as set forth in Section 23.5(d)(ii).

(v)    The Monetary Award Fund shall maintain a targeted reserve, as set forth in Section 23.3(b)(v)(1), beyond the monetary amounts necessary to pay written monthly funding requests, which reserve may be used to pay any costs and expenses that must be satisfied pursuant to a contractual or other legal obligation before receipt of the monthly funding request amount and that are properly paid out of the Monetary Award Fund, as set forth in Section 23.5(d)(ii).  The Claims Administrator shall report promptly any such payments from the Monetary Award Fund to the NFL Parties and Co-Lead Class Counsel.  Either Co-Lead Class Counsel or Counsel for the NFL Parties may challenge the appropriateness of such payments, in which case the Court will determine (or may, in its discretion, refer the challenge to the Special Master to determine) the appropriateness of such payments.  If the Court or Special Master, as applicable, determines that any such payment constituted willful misconduct, the Court or Special Master may, in its discretion, deduct that amount from the compensation of the Claims Administrator.

(1)    The Monetary Award Fund shall maintain a targeted reserve of:  (i) Ten Million United States dollars (U.S. $10,000,000) during the first through tenth years of the Monetary Award Fund; (ii) Five Million United States dollars (U.S. $5,000,000) during the eleventh through fiftieth years of the Monetary Award Fund; (iii) One Million United States dollars ($1,000,000) during the fifty-first through sixtieth years of the Monetary Award Fund; and (iv) Two Hundred

84

and Fifty Thousand United States dollars (U.S. $250,000) during the sixty-first through sixty-fifth years of the Monetary Award Fund.

(c)    During the eleventh, fifty-first, and sixty-first years of the Monetary Award Fund, monthly funding requests shall first be satisfied by the money constituting the balance in the Monetary Award Fund until the revised targeted reserve, as set forth in Section 23.3(b)(v)(1), is achieved.  For example, in the eleventh year of the Monetary Award Fund, all monthly funding requests shall be paid from the Monetary Award Fund balance until the reserve is reduced to Five Million United States dollars ($5,000,000).  The process for the monthly funding request shall otherwise remain as set forth in Section 23.3(b).

(d)    BAP Fund.  No later than thirty (30) days after the Effective Date, the NFL Parties will pay, or cause to be paid, a total of Thirty-Five Million United States dollars (U.S. $35,000,000) into the Settlement Trust Account for transfer by the Trustee into the BAP Fund.  If at any point following the Effective Date until the expiration the five-year period for the provision of BAP Supplemental Benefits, as set forth in Sections 5.5 and 5.11, the balance of the BAP Fund falls below Ten Million United States dollars (U.S. $10,000,000), the NFL Parties, upon written notice from the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof), who shall act upon application of the BAP Administrator, will pay, or cause to be paid, within thirty (30) days of such written notice, additional payments into the Settlement Trust Account for transfer by the Trustee into the BAP Fund in order to maintain a balance of no less than Ten Million United States dollars (U.S. $10,000,000), and no more than Eleven Million United States dollars (U.S. $11,000,000).  Under no circumstances will the aggregate transfers to the BAP Fund exceed Seventy-Five Million United States dollars (U.S. $75,000,000) in total**, except if necessary to provide every qualified Retired NFL Football Player with one baseline assessment examination as provided for in Sections 5.1 and 23.1(b)**.  Any funds remaining in the BAP Fund at the conclusion of the five-year period for the provision of BAP Supplemental Benefits, as set forth in Sections 5.5 and 5.11, shall be transferred to the Settlement Trust for transfer by the Trustee into the Monetary Award Fund.

(e)    Class Notice Costs.  No later than five (5) days after the date of the Preliminary Approval and Class Certification Order, the NFL Parties will pay, or cause to be paid, a total of Four Million United States dollars (U.S. $4,000,000) to Co-Lead Class Counsel for the Settlement Class Notice and related expenses, as set forth in Section 14.1.

(f)    Prepayment Right.  The NFL Parties will have the right (but not the obligation) to prepay, or cause to be prepaid, any of their payment obligations to the Funds under the Settlement Agreement.  In connection with any such prepayment, the NFL Parties will designate in writing the payment obligation that is being prepaid and how such prepayment should affect the NFL Parties' remaining payment obligations (i.e., whether the amount prepaid should be credited against the

85

next payment obligation or to one or more subsequent payment obligations or a combination thereof).

Section 23.4    No Interest or Inflation Adjustment.  For the avoidance of any doubt, the payments set forth in Section 23.1 will not be subject to any interest obligation or inflation adjustment.

Section 23.5    Settlement Trust

(a)    Promptly following the Effective Date, Co-Lead Class Counsel and Counsel for the NFL Parties will file a motion seeking the creation of a Settlement Trust under Delaware law and the appointment of the Trustee.  Co-Lead Class Counsel and Counsel for the NFL Parties will file a proposed Settlement Trust Agreement with the Court.

(b)    Co-Lead Class Counsel and Counsel for the NFL Parties will jointly recommend Citibank, N.A. as the Trustee, subject to the approval of the Court.  The Trustee may be replaced by joint motion made by Co-Lead Class Counsel and Counsel for the NFL Parties, and granted by the Court.  If the Trustee resigns, dies, is replaced, or is otherwise unable to continue employment in that position, Co-Lead Class Counsel and Counsel for the NFL Parties will agree to and jointly recommend a new proposed Trustee for appointment by the Court.

(c)    Upon Court approval of the proposed Settlement Trust Agreement, Co-Lead Class Counsel, the NFL Parties, the Trustee and the Special Master, will execute the Settlement Trust Agreement approved by the Court, thereby creating the Settlement Trust.  The Settlement Trust will be structured and operated in a manner so that it qualifies as a "qualified settlement fund" under §1.468B-1 of the Treasury Regulations promulgated under Sections 461(h) and 468B of the Internal Revenue Code of 1986, as amended.

(d)    The Settlement Trust will be composed of the Funds. The Trustee will establish the Settlement Trust Account, into which the NFL Parties will make payments as required by this Settlement Agreement.  The Trustee will also establish three separate funds (the "Funds"), into which the Trustee will transfer funds at the direction of the Special Master (or the Claims Administrator after expiration of the term of the Special Master and extension(s) thereof) and pursuant to the terms of this Settlement Agreement and on which the Special Master (or the Claims Administrator after expiration of the term of the Special Master and any extension(s) thereof) will have signatory authority.  These Funds will constitute a single qualified settlement fund:

(i)    The BAP Fund, which will be used to make payments for the BAP, as set forth in ARTICLE V.

(ii)    The Monetary Award Fund, which will be used to make payments for:  (a) all Monetary Awards and Derivative Claimant Awards, as set forth in ARTICLE VI and ARTICLE VII; (b) certain costs and expenses of the appeals

86

process, as set forth in ARTICLE IX; (c) costs and expenses of claims administration, as set forth in ARTICLE X; and (d) certain costs and expenses of the Lien identification and resolution process, as set forth in ARTICLE XI;

(iii)    The Education Fund, which will be used exclusively to make payments to support education programs and initiatives, as set forth in ARTICLE XII; and

(iv)    The Settlement Trust Account, which will be used solely to transfer funds into the Funds described above in Section 23.5(d)(i)-(iii).

(e)    The Settlement Trust will be managed by the Trustee as provided in the Settlement Trust Agreement, and both the Settlement Trust and Trustee will be subject to the continuing jurisdiction and supervision of the Court. Each of the Funds will be maintained in separate bank accounts at one or more federally insured depository institutions approved by Co-Lead Class Counsel and Counsel for the NFL Parties. The Trustee will have the authority to make payments from the Settlement Trust Account into the other Funds at the direction of the Special Master (or the Claims Administrator after expiration of the term of the Special Master and any extension(s) thereof) and to make disbursements from the Funds at the direction of the Special Master (or the Claims Administrator at the direction of Co-Lead Class Counsel and Counsel for the NFL Parties, after expiration of the term of the Special Master and any extension(s) thereof), and consistent with the terms of this Settlement Agreement and the Settlement Trust Agreement.

(f)    The Trustee will be responsible for making any necessary tax filings and payments of taxes, estimated taxes, and associated interest and penalties, if any, by the Settlement Trust and responding to any questions from, or audits regarding such taxes by, the Internal Revenue Service or any state or local tax authority. The Trustee also will be responsible for complying with all tax information reporting and withholding requirements with respect to payments made by the Settlement Trust, as well as paying any associated interest and penalties. Any such taxes, interest, and penalty payments will be paid by the Trustee from the Monetary Award Fund.

Section 23.6    Funds Investment

(a)    To the extent funds are available for investment, amounts deposited in each of the Funds will be invested conservatively in a manner designed to assure timely availability of funds, protection of principal and avoidance of concentration risk.

(b)    Any earnings attributable to the BAP Fund, the Monetary Award Fund, and/or the Education Fund will be retained in the respective Fund.

Section 23.7    Attorneys' Fees Qualified Settlement Fund.    Unless the Court directs otherwise, a separate fund (intended to qualify as a "qualified settlement fund" under §1.468B-1 of the Treasury Regulations promulgated under Sections 461(h)

87

and 468B of the Internal Revenue Code of 1986, as amended) will be established out of which attorneys' fees will be paid pursuant to order of the Court, as set forth in ARTICLE XXI.  This separate qualified settlement fund will be established pursuant to order of the Court, and will operate under Court supervision and control.  This separate qualified settlement fund will be separate from the qualified settlement fund described in Section 23.5(c) and any of the Funds described therein, and will not be administered by the Trustee.  The Court will determine the form and manner of administering this fund, in which the NFL Parties will have no reversionary interest.

Section 23.8    Trustee Satisfaction of Monetary Obligations.  Wherever in this Settlement Agreement the Special Master, BAP Administrator, Claims Administrator, or Lien Resolution Administrator is authorized or directed, as the context may reflect, to pay, disburse, reimburse, hold, waive, or satisfy any monetary obligation provided for or recognized under any of the terms of this Settlement Agreement, the Special Master, BAP Administrator, Claims Administrator, or Lien Resolution Administrator may comply with such authorization or direction by directing the Trustee to, as appropriate, pay, disburse, reimburse, hold, waive, or satisfy any such monetary obligation.

## ARTICLE XXIV
### Denial of Wrongdoing, No Admission of Liability

Section 24.1    This Settlement Agreement, whether or not the Class Action Settlement becomes effective, is for settlement purposes only and is to be construed solely as a reflection of the Parties' desire to facilitate a resolution of the Class Action Complaint and of the Released Claims and Related Lawsuits.  The NFL Parties expressly deny that they, or the other Released Parties, have violated any duty to, breached any obligation to, committed any fraud on, or otherwise engaged in any wrongdoing with respect to, the Class and Subclass Representatives, the Settlement Class, any Settlement Class Member, or any Opt Out, and expressly deny the allegations asserted in the Class Action Complaint and Related Lawsuits, and deny any and all liability related thereto.  Neither this Settlement Agreement nor any actions undertaken by the NFL Parties or the Released Parties in the negotiation, execution, or satisfaction of this Settlement Agreement will constitute, or be construed as, an admission of any liability or wrongdoing, or recognition of the validity of any claim made by the Class and Subclass Representatives, the Settlement Class, any Settlement Class Member, or any Opt Out, in this or any other action or proceeding.

Section 24.2    In no event will the Settlement Agreement, whether or not the Class Action Settlement becomes effective, or any of its provisions, or any negotiations, statements, or court proceedings relating to its provisions, or any actions undertaken in this Settlement Agreement, in any way be construed as, offered as, received as, used as, or deemed to be evidence, admissible or otherwise, of any kind, or used in any other fashion, by the Class and Subclass Representatives, the Settlement Class, any Settlement Class Member, Class Counsel, or any of the Released Parties in any litigation, action, hearing, or any judicial, arbitral, administrative, regulatory or other proceeding for any purpose, except a proceeding to resolve a dispute arising

88

under, or to enforce, the Settlement Agreement.  Without limiting the foregoing, neither the Settlement Agreement nor any of its provisions, negotiations, statements, or court proceedings relating to its provisions, nor any actions undertaken in this Settlement Agreement, will be construed as, offered as, received as, used as, or deemed to be evidence, admissible or otherwise, or an admission or concession of any liability or wrongdoing whatsoever on the part of any person or entity, including, but not limited to, the Released Parties, or as a waiver by the Released Parties of any applicable defense, or as a waiver by the Class and Subclass Representatives, the Settlement Class, any Settlement Class Member of any claims, causes of action, or remedies.  This Section 24.2 shall not apply to disputes between the NFL Parties and their insurers, as to which the NFL Parties reserve all rights.

## ARTICLE XXV
## Representations and Warranties

Section 25.1    Authority.  Class Counsel represent and warrant as of the **date of the** Settlement ~~Date~~**Agreement, as amended,** that they have authority to enter into this Settlement Agreement on behalf of the Class and Subclass Representatives.

Section 25.2    Class and Subclass Representatives.  Each of the Class and Subclass Representatives, through a duly authorized representative, represents and warrants that he:  (i) has agreed to serve as a representative of the Settlement Class proposed to be certified herein; (ii) is willing, able, and ready to perform all of the duties and obligations as a representative of the Settlement Class; (iii) is familiar with the pleadings in In re: National Football League Players' Concussion Injury Litigation, MDL 2323, or has had the contents of such pleadings described to him; (iv) is familiar with the terms of this Settlement Agreement, including the exhibits attached to this Settlement Agreement, or has received a description of the Settlement Agreement, including the exhibits attached to this Settlement Agreement, from Class Counsel, and has agreed to its terms; (v) has consulted with, and received legal advice from, Class Counsel about the litigation, this Settlement Agreement (including the advisability of entering into this Settlement Agreement and its Releases and the legal effects of this Settlement Agreements and its Releases), and the obligations of a representative of the Settlement Class; (vi) has authorized Class Counsel to execute this Settlement Agreement on his behalf; and (vii) will remain in and not request exclusion from the Settlement Class and will serve as a representative of the Settlement Class until the terms of this Settlement Agreement are effectuated, this Settlement Agreement is terminated in accordance with its terms, or the Court at any time determines that such Class or Subclass Representative cannot represent the Settlement Class.

Section 25.3    NFL Parties.  The NFL Parties represent and warrant as of the **date of the** Settlement ~~Date~~**Agreement, as amended,** that:  (i) they have all requisite corporate power and authority to execute, deliver, and perform this Settlement Agreement; (ii) the execution, delivery, and performance by the NFL Parties of this Settlement Agreement has been duly authorized by all necessary corporate action; (iii) this Settlement Agreement has been duly and validly executed and delivered by the

NFL Parties; and (iv) this Settlement Agreement constitutes their legal, valid, and binding obligation.

Section 25.4    NFL Parties' Representation and Warranty Regarding Member Clubs.    The NFL Parties represent and warrant as of the **date of the** Settlement ~~Date~~**Agreement, as amended,** that the current Member Clubs have duly authorized the execution, delivery, and performance by the NFL Parties of this Settlement Agreement.

Section 25.5    Investigation and Future Events.    The Parties and their counsel represent and warrant that they have each performed an independent investigation of the allegations of fact and law made in connection with the Class Action Complaint in In re: National Football League Players' Concussion Injury Litigation, MDL No. 2323, and may hereafter discover facts in addition to, or different from, those that they now know or believe to be true with respect to the subject matter of this Settlement Agreement. Nevertheless, the Parties intend to resolve their disputes pursuant to the terms of this Settlement Agreement and thus, in furtherance of their intentions, this Settlement Agreement will remain in full force and effect notwithstanding the discovery of any additional facts or law, or changes in law, and this Settlement Agreement will not be subject to rescission or modification by reason of any change or difference in facts or law.

Section 25.6    Security

(a)    The NFL Parties represent and warrant that the NFL currently maintains, and will continue to maintain, an investment grade rating on its Stadium Program Bonds, as rated by Fitch Ratings. This investment grade rating shall serve as security that the NFL Parties will meet their payment obligations as set forth in Section 23.3 for the first ten years of the Settlement following the Effective Date.

(b)    If the identity of the rating agency that rates the NFL's Stadium Program Bonds changes during the first ten years of the Settlement from the Effective Date, then an investment grade rating by the new rating agency on the NFL's Stadium Program Bonds will satisfy the NFL Parties' obligations under Section 25.6(a).

(c)    The applicable definition of "investment grade" will be as provided by the rating agency rating the  NFL's Stadium Program Bonds.

(d)    No later than the tenth anniversary of the Effective Date (the "Tenth Anniversary Date"), the NFL Parties shall establish, or cause to be established, a special-purpose Delaware statutory trust (the "Statutory Trust"), with an independent trustee, that will be funded and managed as follows:  the NFL Parties shall contribute cash to the Statutory Trust so that as of the Tenth Anniversary Date, it shall contain funds that, in the reasonable belief of the NFL Parties, and after taking into account reasonably expected investment returns over time, will be sufficient to satisfy the NFL Parties' remaining anticipated payment obligations, as set forth in

Section 23.5(d)(ii), as they come due.  In the event that the remaining anticipated payment obligations on the Tenth Anniversary Date materially exceed the NFL Parties' reasonable expectations as of the Effective Date due to participation rates and/or the claims experience during the first ten years of the Settlement, the NFL Parties may apply to the Court to fund the Statutory Trust as follows: seventy percent of the required funds to be contributed by the NFL Parties to the Statutory Trust by the Tenth Anniversary Date and the remaining thirty percent of the required funds to be contributed on a three-year schedule set by the Court so that all required funds are deposited in the Statutory Trust no later than the thirteenth anniversary of the Effective Date.  The NFL Parties shall not have the right to pledge or assign the property of the Statutory Trust (including any investment returns earned thereon and remaining in the Statutory Trust, as provided herein) to any third-party, and, as contemplated by §3805(b) of Title 12 of the Delaware Code, no other creditor of any of the NFL Parties shall have any right to obtain possession of, or otherwise exercise legal or equitable remedies with respect to, the property of the Statutory Trust.  The documents governing the Statutory Trust will provide that the NFL Parties may direct how the funds in the Statutory Trust are invested from time to time, but the Trustee will be instructed to permit withdrawals of funds from the Statutory Trust only for the limited purposes of: (i) satisfying the NFL Parties' payment obligations under this Settlement Agreement as set forth in Section 23.5(d)(ii); (ii) the NFL Parties' costs and expenses related to the Statutory Trust, including, without limitation, taxes, investment-related expenses and administrative costs; (iii) the return of excess monies in the Statutory Trust to the NFL Parties based on attaining investment returns exceeding the amount necessary to satisfy the NFL Parties' remaining anticipated payment obligations, but only upon Court approval; (iv) the return of excess monies in the Statutory Trust to the NFL Parties based on reductions to the NFL Parties' remaining anticipated payment obligations, but only upon Court approval; or (v) upon the completion of the NFL Parties' payment obligations, as set forth in this Settlement Agreement, but only upon Court approval.  To the extent that Court approval is required for the withdrawal of funds from the Statutory Trust, such approval shall be granted unless there has been either a material default on the NFL Parties' payment obligations within the prior thirty (30) days, or upon a showing, by clear and convincing evidence, that the proposed withdrawal would materially impair the Settlement Agreement.

(e)    In the event of a material default by the NFL Parties in satisfying their payment obligations as set forth in this Settlement Agreement, and the NFL Parties' failure to cure any such material default within sixty (60) days of written notification of such default by the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof), Co-Lead Class Counsel shall have the right to petition the Court to make a finding that there has been a material, uncured default in satisfying the NFL Parties' payment obligations and to enter an order directing the NFL Parties to meet their payment obligations.  Beginning on the Tenth Anniversary Date, any such petition by Co-Lead Class Counsel may request that the Court direct the NFL Parties to meet their payment obligations with the funds available in the Statutory Trust established by the NFL Parties pursuant to Section 25.6(d).

(f)     The NFL Parties historically have maintained liability insurance policies under which they are seeking coverage and are pursuing their rights to recover under said policies.  It is understood that if the NFL Parties secure funding commitments from one or more insurers under their historical policies, or a court order obligating one or more such insurers to fund in whole or in part certain of the NFL Parties' obligations under this Settlement Agreement, after such insurance funding is deposited into the Statutory Trust, the NFL Parties may seek Court approval to reduce, dollar-for-dollar, the equivalent amount of such funding for anticipated remaining liabilities that otherwise would be required to be deposited in the Statutory Trust by the NFL Parties pursuant to Section 25.6(d).   In addition, if the NFL Parties obtain additional insurance policies from one or more third-party insurers with a rating of A or above, to insure in whole or in part certain of their obligations under the Settlement, the NFL Parties may seek Court approval to reduce, dollar-for-dollar, the equivalent amount of funding for anticipated remaining liabilities that otherwise would be required to be deposited in the Statutory Trust by the NFL Parties pursuant to Section 25.6(d).  To do so, the NFL Parties must demonstrate to the Court that the Court or the Statutory Trust provided for in Section 25.6(d) will have sufficient control over such insurance policies and their proceeds to ensure that the proceeds are available to meet the NFL Parties' payment obligations, if necessary.

(g)     In the event the Court enters an order pursuant to Section 25.6(e) directing the NFL Parties to meet their payment obligations pursuant to Section 23.3 and the NFL Parties fail materially to comply with such Order, as set forth in Section 25.6(e), Co-Lead Class Counsel may request that the Court provide the NFL Parties sixty (60) days to show cause why the Court shall not render null and void the Releases and Covenants Not to Sue provided to Released Parties, as set forth in Section 18.1, by Settlement Class Members who:  (i) have received a final, favorable Notice of Registration Determination, as set forth in Section 4.3, and have not received a final and accrued Monetary Award or final and accrued Derivative Claimant Award as of the date of such application; or (ii) who have only received a final and accrued Monetary Award for a Level 1.5 Neurocognitive Impairment or a final and accrued Derivative Claimant Award for a Level 1.5 Neurocognitive Impairment as of the date of such application.  For the avoidance of any doubt, all other Releases and Covenants Not to Sue shall remain effective.  In the event that a Settlement Class Member's Release and Covenant Not to Sue is rendered null and void, such Settlement Class Member shall not challenge, if applicable, any Released Party's right to offset any final judgment received by the Settlement Class Member as a result of Section 25.6(g)(ii) in the amount of the Monetary Award or Derivative Claimant Award received by the Settlement Class Member.  For the avoidance of any doubt, nothing in this subsection 25.6, shall affect any rights or obligations of Settlement Class Members and Released Parties as otherwise provided in, or with respect to, this Settlement Agreement or any breach thereof.

## ARTICLE XXVI
## Cooperation

Section 26.1   The Parties will cooperate, assist, and undertake all reasonable actions to accomplish the steps contemplated by this Settlement Agreement and to implement the Class Action Settlement on the terms and conditions provided herein.

Section 26.2   The Parties agree to take all actions necessary to obtain final approval of the Class Action Settlement and entry of a Final Order and Judgment, including the terms and provisions described in this Settlement Agreement, and, upon final approval and entry of such order, an order dismissing the Class Action Complaint and Related Lawsuits with prejudice as to the Class and Subclass Representatives, the Settlement Class, and each Settlement Class Member.

Section 26.3   The Parties and their counsel agree to support the final approval and implementation of this Settlement Agreement and defend it against objections, appeal, collateral attack or any efforts to hinder or delay its approval and implementation.   Neither the Parties nor their counsel, directly or indirectly, will encourage any person to object to the Class Action Settlement or assist them in doing so.

## ARTICLE XXVII
## Continuing Jurisdiction

Section 27.1   Pursuant to the Final Order and Judgment, the Court will retain continuing and exclusive jurisdiction over the Parties and their counsel, all Settlement Class Members, the Special Master, BAP Administrator, Claims Administrator, Liens Resolution Administrator, Appeals Advisory Panel, Appeals Advisory Panel Consultants, and Trustee with respect to the terms of the Settlement Agreement.   Any disputes or controversies arising out of, or related to, the interpretation, implementation, administration, and enforcement of this Settlement Agreement will be made by motion to the Court.   In addition, the Parties, including each Settlement Class Member, are hereby deemed to have submitted to the exclusive jurisdiction of this Court for any suit, action, proceeding, or dispute arising out of, or relating to, this Settlement Agreement.   The terms of the Settlement Agreement will be incorporated into the Final Order and Judgment of the Court, which will allow that Final Order and Judgment to serve as an enforceable injunction by the Court for purposes of the Court's continuing jurisdiction related to the Settlement Agreement.

(a)   Notwithstanding any contrary law applicable to the underlying claims, this Settlement Agreement and the Releases hereunder will be interpreted and enforced in accordance with the laws of the State of New York, without regard to conflict of law principles.

## ARTICLE XXVIII
### Role of Co-Lead Class Counsel, Class Counsel and Subclass Counsel

Section 28.1   Co-Lead Class Counsel and Class Counsel acknowledge that, under applicable law, their respective duty is to the entire Settlement Class, to act in the best interest of the Settlement Class as a whole, with respect to promoting, supporting, and effectuating, as fair, adequate, and reasonable, the approval, implementation, and administration of the settlement embodied in the Settlement Agreement, and that their professional responsibilities as attorneys are to be viewed in this light, under the ongoing supervision and jurisdiction of the Court that appoints them to represent the interests of the Settlement Class.

Section 28.2   Subclass Counsel acknowledge that, under applicable law, their respective duty is to their respective Subclasses, to act in the best interest of the respective Subclass as a whole, with respect to promoting, supporting, and effectuating, as fair, adequate, and reasonable, the approval, implementation, and administration of the settlement embodied in the Settlement Agreement, and that their professional responsibilities as attorneys are to be viewed in this light, under the ongoing supervision and jurisdiction of the Court that appoints them to represent the interests of the respective Subclass.

## ARTICLE XXIX
### Bargained-For Benefits

Section 29.1   Nothing in the Collective Bargaining Agreement will preclude Settlement Class Members from receiving benefits under the Settlement Agreement.  In addition, the fact that a Settlement Class Member has signed, or will sign, a release and covenant not to sue pursuant to Article 65 of the 2011 Collective Bargaining Agreement will not preclude the Settlement Class Member from receiving benefits under the Settlement Agreement, and the NFL Parties agree not to assert any defense or objection to the Settlement Class Member's receipt of benefits under the Settlement Agreement on the ground that he executed a release and covenant not to sue pursuant to Article 65 of the 2011 Collective Bargaining Agreement.

Section 29.2   A Retired NFL Football Player's participation in the Settlement Agreement will not in any way affect his eligibility for bargained-for benefits under the Collective Bargaining Agreement or the terms or conditions under which those benefits are provided, except as set forth in Section 18.1.

## ARTICLE XXX
### Miscellaneous Provisions

Section 30.1   <u>No Assignment of Claims</u>.  Neither the Settlement Class nor any Class or Subclass Representative or Settlement Class Member has assigned, will assign, or will attempt to assign, to any person or entity other than the NFL Parties any rights or claims relating to the subject matter of the Class Action Complaint.  Any such assignment, or attempt to assign, to any person or entity other than the NFL

94

**-3028-**

Parties any rights or claims relating to the subject matter of the Class Action Complaint will be void, invalid, and of no force and effect and the Claims Administrator shall not recognize any such action.

Section 30.2    Individual Counsel

(a)    Counsel individually representing a Settlement Class Member shall provide notice of his or her representation to the Claims Administrator within thirty (30) days of the Effective Date or within thirty (30) days of the retention if Counsel is retained after the Effective Date.  Counsel acting on his or her client's behalf may submit all claim forms, proof, correspondence, or other documents to the Special Master, BAP Administrator, Claims Administrator or Lien Resolution Administrator on behalf of that Settlement Class Member; provided, however, that counsel individually representing a Settlement Class Member may not sign on behalf of that Settlement Class Member:  (i) an Opt Out request; (ii) a revocation of an Opt Out; (iii) an objection, as set forth in Section 14.3; (iv) a Claim Form, (v) a Derivative Claim Form, or (vi) an Appeals Form.

(b)    Where a Settlement Class Member indicates in writing to the Special Master, BAP Administrator, Claims Administrator or Lien Resolution Administrator that he or she is individually represented by counsel, the Special Master, BAP Administrator, Claims Administrator or Lien Resolution Administrator will copy the counsel individually representing a Settlement Class Member on any written communications with the Settlement Class Member.  Any communications, whether written or oral, by the Special Master, BAP Administrator, Claims Administrator or Lien Resolution Administrator with counsel individually representing a Settlement Class Member will be deemed to be a communication directly with such individually represented Settlement Class Member.

Section 30.3    Integration.  This Settlement Agreement and its exhibits, attachments, and appendices will constitute the entire agreement and understanding among the Parties and supersedes all prior proposals, negotiations, letters, conversations, agreements, term sheets, and understandings, whether written or oral, relating to the subject matter of this Settlement Agreement, including the Settlement Term Sheet dated August 29, 2013.  The Parties acknowledge, stipulate, and agree that no covenant, obligation, condition, representation, warranty, inducement, negotiation, agreement, arrangement, or understanding, whether written or oral, concerning any part or all of the subject matter of this Settlement Agreement has been made or relied on except as expressly set forth in this Settlement Agreement.

Section 30.4    Headings.    The headings used in this Settlement Agreement are intended for the convenience of the reader only and will not affect the meaning or interpretation of this Settlement Agreement in any manner.    Any inconsistency between the headings used in this Settlement Agreement and the text of the Articles and Sections of this Settlement Agreement will be resolved in favor of the text.

Section 30.5    <u>Incorporation of Exhibits</u>.    All of the exhibits attached hereto are hereby incorporated by reference as though fully set forth herein. Notwithstanding the foregoing, any inconsistency between this Settlement Agreement and any attachments, exhibits, or appendices hereto will be resolved in favor of this Settlement Agreement.

Section 30.6    <u>Amendment</u>.    This Settlement Agreement will not be subject to any change, modification, amendment, or addition without the express written consent of Class Counsel and Counsel for the NFL Parties, on behalf of all Parties to this Settlement Agreement, and upon Court approval.

Section 30.7    <u>Mutual Preparation</u>.    The Parties have negotiated all of the terms and conditions of this Settlement Agreement at arm's length.    Neither the Settlement Class Members nor the NFL Parties, nor any one of them, nor any of their counsel will be considered to be the sole drafter of this Settlement Agreement or any of its provisions for the purpose of any statute, case law, or rule of interpretation or construction that would or might cause any provision to be construed against the drafter of this Settlement Agreement.    This Settlement Agreement will be deemed to have been mutually prepared by the Parties and will not be construed against any of them by reason of authorship.

Section 30.8    <u>Beneficiaries</u>.    This Settlement Agreement will be binding upon the Parties and will inure to the benefit of the Settlement Class Members and the Released Parties.    All Released Parties who are not the NFL Parties are intended third-party beneficiaries who are entitled to enforce the terms of the Releases and Covenant Not to Sue set forth in ARTICLE XVIII.    No provision in this Settlement Agreement is intended to create any third-party beneficiary to this Settlement Agreement other than the Released Parties.    Nothing expressed or implied in this Settlement Agreement is intended to or will be construed to confer upon or give any person or entity other than Class and Subclass Representatives, the Settlement Class Members, Class Counsel, the NFL Parties, the Released Parties, and Counsel for the NFL Parties, any right or remedy under or by reason of this Settlement Agreement.

Section 30.9    <u>Extensions of Time</u>.    Co-Lead Class Counsel and Counsel for the NFL Parties may agree in writing, subject to approval of the Court where required, to reasonable extensions of time to implement the provisions of this Settlement Agreement.

Section 30.10    <u>Execution in Counterparts</u>.    This Settlement Agreement may be executed in counterparts, and a facsimile signature will be deemed an original signature for purposes of this Settlement Agreement.

Section 30.11    <u>Good Faith Implementation</u>.    Co-Lead Class Counsel and Counsel for the NFL Parties will undertake to implement the terms of this Settlement Agreement in good faith.    Before filing any motion or petition in the Court raising a dispute arising out of or related to this Settlement Agreement, Co-Lead Class Counsel

and Counsel for the NFL Parties will consult with each other in good faith and certify to the Court that they have conferred in good faith.

Section 30.12 <u>Force Majeure</u>. The Parties will be excused from any failure to perform timely any obligation hereunder to the extent such failure is caused by war, acts of public enemies or terrorists, strikes or other labor disturbances, fires, floods, acts of God, or any causes of the like or different kind beyond the reasonable control of the Parties.

Section 30.13 <u>Waiver</u>. The waiver by any Party of any breach of this Settlement Agreement by another Party will not be deemed or construed as a waiver of any other breach, whether prior, subsequent, or contemporaneous, of this Settlement Agreement.

Section 30.14 <u>Tax Consequences</u>. No opinion regarding the tax consequences of this Settlement Agreement to any individual Settlement Class Member is being given or will be given by the NFL Parties, Counsel for the NFL Parties, Class and Subclass Representatives, Class Counsel, nor is any representation or warranty in this regard made by virtue of this Settlement Agreement. Settlement Class Members must consult their own tax advisors regarding the tax consequences of the Settlement Agreement, including any payments provided hereunder and any tax reporting obligations they may have with respect thereto. Each Settlement Class Member's tax obligations, and the determination thereof, are his or her sole responsibility, and it is understood that the tax consequences may vary depending on the particular circumstances of each individual Settlement Class Member. The NFL Parties, Counsel for the NFL Parties, Class Counsel will have no liability or responsibility whatsoever for any such tax consequences resulting from payments under this Settlement Agreement. To the extent required by law, the Claims Administrator will report payments made under the Settlement Agreement to the appropriate authorities.

Section 30.15 <u>Issuance of Notices and Submission of Materials</u>. In any instance in which this Settlement Agreement requires the issuance of any notice regarding registration, a claim or an award, unless specified otherwise in this Settlement Agreement, such notice must be issued by: (a) online submission through any secure web-based portal established by the Claims Administrator for this purpose to the Settlement Class Member or NFL Parties, which shall be accompanied by an email certifying receipt; or (b) U.S. mail (or its foreign equivalent). In any instance in which this Settlement Agreement requires submission of materials by or on behalf of a Settlement Class Member or the NFL Parties, unless specified otherwise in this Settlement Agreement, such submission must be made by: (a) online submission through any secure web-based portal established by the Claims Administrator for this purpose; or (b) U.S. mail (or its foreign equivalent); or (c) delivery. Written notice to the Class Representatives or Co-Lead Class Counsel must be given to: Christopher A. Seeger, Seeger Weiss LLP, 77 Water Street, New York, New York 10005; and Sol Weiss, Anapol Schwartz, 1710 Spruce Street, Philadelphia, PA 19103. Written notice to the NFL Parties or Counsel for the NFL Parties must be given to: Jeffrey Pash, Executive Vice President and General Counsel, National Football League, 345 Park

Avenue, New York, New York 10154; Anastasia Danias, Senior Vice President and Chief Litigation Officer, National Football League, 345 Park Avenue, New York, New York 10154; and Brad S. Karp, Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York 10019, or such other person or persons as shall be designated by the Parties.

98

Section 30.16 Party Burden.    Unless explicitly provided otherwise, whenever a showing is required to be made in this Settlement Agreement, the party seeking the relief shall bear the burden of substantiation.

Agreed to as of this 25**13**th day of ~~June~~**February**, ~~2014~~**2015**.

NATIONAL FOOTBALL LEAGUE, NFL PROPERTIES LLC

By: _____
    Jeffrey Pash
    NFL Executive Vice President


COUNSEL FOR THE NFL PARTIES

By: _____
    PAUL, WEISS, RIFKIND, WHARTON &
    GARRISON LLP
    Brad S. Karp
    Theodore V. Wells, Jr.
    Bruce Birenboim
    Beth A. Wilkinson
    Lynn B. Bayard


CO-LEAD CLASS COUNSEL

By: _____          By: _____
    SEEGER WEISS LLP                        ANAPOL SCHWARTZ
    Christopher A. Seeger                    Sol Weiss

CLASS COUNSEL

By: _____          By: _____
    PODHURST ORSECK, P.A.                  LOCKS LAW FIRM
    Steven C. Marks                         Gene Locks

SUBCLASS COUNSEL

By: _____          By: _____
    LEVIN, FISHBEIN, SEDRAN &               NASTLAW LLC
    BERMAN                                  Dianne M. Nast
    Arnold Levin

# EXHIBIT B-1

| **INJURY DEFINITIONS** |
|---|

### DIAGNOSIS FOR BAP SUPPLEMENTAL BENEFITS

#### Level 1 Neurocognitive Impairment

(a)     For Retired NFL Football Players diagnosed through the BAP, a diagnosis of Level 1 Neurocognitive Impairment must meet the criteria set forth in subsections (i)-(iv) below:

(i)     Concern of the Retired NFL Football Player, a knowledgeable informant, or the Qualified BAP Provider that there has been a decline in cognitive function.

(ii)     Evidence of moderate cognitive decline from a previous level of performance, as determined by and in accordance with the standardized neuropsychological testing protocol annexed in Exhibit 2 to the Settlement Agreement, in two or more cognitive domains (complex attention, executive function, learning and memory, language, perceptual-spatial), provided one of the cognitive domains is (a) executive function, (b) learning and memory, or (c) complex attention.

(iii)     The Retired NFL Football Player exhibits functional impairment generally consistent with the criteria set forth in the National Alzheimer's Coordinating Center's Clinical Dementia Rating scale Category 0.5 (Questionable) in the areas of Community Affairs, Home & Hobbies, and Personal Care.

(iv)     The cognitive deficits do not occur exclusively in the context of a delirium, acute substance abuse, or as a result of medication side effects.

(b)     Level 1 Neurocognitive Impairment, for the purposes of this Settlement Agreement, may only be diagnosed by Qualified BAP Providers during a BAP baseline assessment examination, with agreement on the diagnosis by the Qualified BAP Providers.

---

Exhibit 1 ~~Page~~, as amended                                                                 Page 1

## QUALIFYING DIAGNOSES FOR MONETARY AWARDS

1.    **Level 1.5 Neurocognitive Impairment**

(a)    For Retired NFL Football Players diagnosed through the BAP, a diagnosis of Level 1.5 Neurocognitive Impairment must meet the criteria set forth in subsections (i)-(iv) below:

(i)    Concern of the Retired NFL Football Player, a knowledgeable informant, or the Qualified BAP Provider that there has been a severe decline in cognitive function.

(ii)    Evidence of a moderate to severe cognitive decline from a previous level of performance, as determined by and in accordance with the standardized neuropsychological testing protocol annexed in Exhibit 2 to the Settlement Agreement, in two or more cognitive domains (complex attention, executive function, learning and memory, language, perceptual-spatial), provided one of the cognitive domains is (a) executive function, (b) learning and memory, or (c) complex attention.

(iii)    The Retired NFL Football Player exhibits functional impairment generally consistent with the criteria set forth in the National Alzheimer's Coordinating Center's Clinical Dementia Rating (CDR) scale Category 1.0 (Mild) in the areas of Community Affairs, Home & Hobbies, and Personal Care.  Such functional impairment shall be corroborated by documentary evidence (*e.g.*, medical records, employment records), the sufficiency of which will be determined by the physician making the Qualifying Diagnosis.  In the event that no documentary evidence of functional impairment exists or is available, then (a) there must be evidence of moderate to severe cognitive decline from a previous level of performance, as determined by and in accordance with the standardized neuropsychological testing protocol annexed in Exhibit 2 to the Settlement Agreement, in the executive function cognitive domain or the learning and memory cognitive domain, and at least one other cognitive domain; and (b) the Retired NFL Football Player's functional impairment, as described above, must be corroborated by a third-party sworn affidavit from a person familiar with the Retired NFL Football Player's condition (other than the player or his family members), the sufficiency of which will be determined by the physician making the Qualifying Diagnosis.

(iv)    The cognitive deficits do not occur exclusively in the context of a delirium, acute substance abuse, or as a result of medication side effects.

(b)    For living Retired NFL Football Players diagnosed outside of the BAP, a diagnosis while living of Level 1.5 Neurocognitive Impairment, *i.e.*, early dementia, based on evaluation and evidence generally consistent with the diagnostic criteria set forth in subsection 1(a)(i)-(iv) above, made by a Qualified MAF Physician or a board-certified or otherwise qualified neurologist, neurosurgeon, or other neuro-specialist physician, as set forth and provided in Sections 6.3(b)-(d) of the Settlement Agreement.

(c)    For Retired NFL Football Players deceased prior to the Effective Date, a diagnosis of Level 1.5 Neurocognitive Impairment, *i.e.*, early dementia, based on evaluation and evidence generally consistent with the diagnostic criteria set forth in subsection 1(a)(i)-(iv)

Exhibit 1~~Page~~, as amended                                                    Page 2

-3036-

above, made while the Retired NFL Football Player was living by a board-certified or otherwise qualified neurologist, neurosurgeon, or other neuro-specialist physician, or by a physician with sufficient qualifications in the field of neurology or neurocognitive disorders, as set forth and provided in Sections 6.3(c)-(e) of the Settlement Agreement.

2.    **Level 2 Neurocognitive Impairment**

(a)    For Retired NFL Football Players diagnosed through the BAP, a diagnosis of Level 2 Neurocognitive Impairment must meet the criteria set forth in subsections (i)-(iv) below:

(i)    Concern of the Retired NFL Football Player, a knowledgeable informant, or the Qualified BAP Provider that there has been a severe decline in cognitive function.

(ii)    Evidence of a severe cognitive decline from a previous level of performance, as determined by and in accordance with the standardized neuropsychological testing protocol annexed in Exhibit 2 to the Settlement Agreement, in two or more cognitive domains (complex attention, executive function, learning and memory, language, perceptual-spatial), provided one of the cognitive domains is (a) executive function, (b) learning and memory, or (c) complex attention.

(iii)    The Retired NFL Football Player exhibits functional impairment generally consistent with the criteria set forth in the National Alzheimer's Coordinating Center's Clinical Dementia Rating (CDR) scale Category 2.0 (Moderate) in the areas of Community Affairs, Home & Hobbies, and Personal Care.  Such functional impairment shall be corroborated by documentary evidence (*e.g.*, medical records, employment records), the sufficiency of which will be determined by the physician making the Qualifying Diagnosis.  In the event that no documentary evidence of functional impairment exists or is available, then (a) there must be evidence of severe cognitive decline from a previous level of performance, as determined by and in accordance with the standardized neuropsychological testing protocol annexed in Exhibit 2 to the Settlement Agreement, in the executive function cognitive domain or the learning and memory cognitive domain, and at least one other cognitive domain; and (b) the Retired NFL Football Player's functional impairment, as described above, must be corroborated by a third-party sworn affidavit from a person familiar with the Retired NFL Football Player's condition (other than the player or his family members), the sufficiency of which will be determined by the physician making the Qualifying Diagnosis.

(iv)    The cognitive deficits do not occur exclusively in the context of a delirium, acute substance abuse, or as a result of medication side effects.

(b)    For living Retired NFL Football Players diagnosed outside of the BAP, a diagnosis while living of Level 2 Neurocognitive Impairment, *i.e.*, moderate dementia, based on evaluation and evidence generally consistent with the diagnostic criteria set forth in subsection 2(a)(i)-(iv) above, unless the diagnosing physician can certify in the Diagnosing Physician Certification that certain testing in 2(a)(i)-(iv) is medically unnecessary because the Retired NFL Football Player's dementia is so severe, made by a Qualified MAF Physician or a board-certified

Exhibit 1~~Page~~, as amended                                                                    Page 3

or otherwise qualified neurologist, neurosurgeon, or other neuro-specialist physician, as set forth and provided in Sections 6.3(b)-(d) of the Settlement Agreement.

(c)    For Retired NFL Football Players deceased prior to the Effective Date, a diagnosis of Level 2 Neurocognitive Impairment, *i.e.*, moderate dementia, based on evaluation and evidence generally consistent with the diagnostic criteria set forth in subsection 2(a)(i)-(iv) above, unless the diagnosing physician can certify in the Diagnosing Physician Certification that certain testing in 2(a)(i)-(iv) was medically unnecessary because the Retired NFL Football Player's dementia was so severe, made while the Retired NFL Football Player was living by a board-certified or otherwise qualified neurologist, neurosurgeon, or other neuro-specialist physician, or by a physician with sufficient qualifications in the field of neurology or neurocognitive disorders, as set forth and provided in Sections 6.3(c)-(e) of the Settlement Agreement.

3.    **Alzheimer's Disease**

(a)    For living Retired NFL Football Players, a diagnosis while living of the specific disease of Alzheimer's Disease as defined by the World Health Organization's International Classification of Diseases, 9th Edition (ICD-9), the World Health Organization's International Classification of Diseases, 10th Edition (ICD-10), or a diagnosis of Major Neurocognitive Disorder due to probable Alzheimer's Disease as defined in the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5), made by a Qualified MAF Physician or a board-certified or otherwise qualified neurologist, neurosurgeon, or other neuro-specialist physician, as set forth and provided in Sections 6.3(b)-(d) of the Settlement Agreement.

(b)    For Retired NFL Football Players deceased prior to the Effective Date, a diagnosis of Major Neurocognitive Disorder due to probable Alzheimer's Disease consistent with the definition in *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5), or a diagnosis of Alzheimer's Disease, made while the Retired NFL Football Player was living by a board-certified or otherwise qualified  neurologist, neurosurgeon, or other neuro-specialist physician, or by a physician with sufficient qualifications in the field of neurology to make such a diagnosis, as set forth and provided in Sections 6.3(c)-(e) of the Settlement Agreement.

4.    **Parkinson's Disease**

(a)    For living Retired NFL Football Players, a diagnosis while living of the specific disease of Parkinson's Disease as defined by the World Health Organization's International Classification of Diseases, 9th Edition (ICD-9), the World Health Organization's International Classification of Diseases, 10th Edition (ICD-10), or a diagnosis of Major Neurocognitive Disorder probably due to Parkinson's Disease as defined in the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5), made by a Qualified MAF Physician or a board-certified or otherwise qualified neurologist, neurosurgeon, or other neuro-specialist physician, as set forth and provided in Sections 6.3(b)-(d) of the Settlement Agreement.

(b)    For Retired NFL Football Players deceased prior to the Effective Date, a diagnosis of Parkinson's Disease, made while the Retired NFL Football Player was living by a board-certified or otherwise qualified  neurologist, neurosurgeon, or other neuro-specialist

Exhibit 1~~Page~~, as amended                                                                          Page 4

physician, or by a physician with sufficient qualifications in the field of neurology to make such a diagnosis, as set forth and provided in Sections 6.3(c)-(e) of the Settlement Agreement.

### 5. __Death with Chronic Traumatic Encephalopathy (CTE)__

For Retired NFL Football Players who died prior to the ~~date of the Preliminary~~**Final** Approval ~~and Class Certification Order~~**Date**, a post-mortem diagnosis of CTE made by a board-certified neuropathologist **prior to the Final Approval Date, provided that a Retired NFL Football Player who died between July 7, 2014 and the Final Approval Date shall have until 270 days from his date of death to obtain such a post-mortem diagnosis**.

### 6. __Amyotrophic Lateral Sclerosis (ALS)__

(a)    For living Retired NFL Football Players, a diagnosis while living of the specific disease of Amyotrophic Lateral Sclerosis, also known as Lou Gehrig's Disease ("ALS"), as defined by the World Health Organization's International Classification of Diseases, 9th Edition (ICD-9) or the World Health Organization's International Classification of Diseases, 10th Edition (ICD-10), made by a Qualified MAF Physician or a board-certified or otherwise qualified neurologist, neurosurgeon, or other neuro-specialist physician, as set forth and provided in Sections 6.3(b)-(d) of the Settlement Agreement.

(b)    For Retired NFL Football Players deceased prior to the Effective Date, a diagnosis of ALS, made while the Retired NFL Football Player was living by a board-certified or otherwise qualified   neurologist, neurosurgeon, or other neuro-specialist physician, or by a physician with sufficient qualifications in the field of neurology to make such a diagnosis, as set forth and provided in Sections 6.3(c)-(e) of the Settlement Agreement.

Exhibit 1~~Page~~**, as amended**                                          **Page** 5

-3039-

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIG., | ) ) ) ) | 2:12-md-02323-AB |

## SUPPLEMENTAL OBJECTION TO SETTLEMENT

Objectors Cleo Miller, Judson Flint, Elmer Underwood, Vincent Clark, Sr., Fred Smerlas, Ken Jones, Jim Rourke, Lou Piccone, James David Wilkins II and Robert Jackson hereby submit this supplemental objection to address the amendments made by the proponents of the settlement on February 13, 2015, and their implications for objections previously make by Objectors.

To date, the parties' only defense of an arbitrary cutoff date for Death with CTE benefits has been the argument that offering Death with CTE benefits to living players serves as an inducement to suicide. That argument never held much water, however, since extending Death with CTE benefits for the entire 65-year duration of the settlement would provide every former player with assurance that his family would be paid benefits whenever he died. There would be no arbitrary cutoff when CTE benefits would disappear.

Now, however, for the first time ever, the parties have created an actual incentive for suicide. They have announced a deadline *that has not yet arrived* for the cutoff of Death with CTE benefits. Any former player who dies with CTE between now and the Final Approval Date is eligible to receive up to $4 million. Any former player who dies with CTE after that date will receive nothing. This has for the first time created an actual

incentive for suicide in that there is a looming arbitrary cutoff date *in the future* for Death with CTE benefits, rather than in the past, as was the case with the July 7, 2014 cutoff.

The parties' readiness to agree to this extension for Death with CTE benefits undermines their previous defense of the arbitrary cutoff date for those benefits, and makes it clear that the July 7, 2014 cutoff date for Death with CTE had nothing to do with a concern about not incentivizing suicide, and everything to do with saving the NFL money. The new arbitrary deadline of the Final Approval Date is similarly unrelated to any rational concerns about players' welfare. It, however, has the added drawback that it sets a cutoff date set in the future, after which class members will receive nothing for Death with CTE.

The parties' agreement to the amended Death with CTE deadline undermines everything they have said to date in defense of the original cutoff date, and casts doubt on the need for any cutoff date for Death with CTE benefits. The Court should take this into account when rendering a decision on the amended settlement currently under advisement. Under no circumstances may a concern about not incentivizing suicide be cynically employed as a defense of this completely arbitrary and unconstitutional line-drawing.

Respectfully submitted,
Cleo Miller, Judson Flint,
Elmer Underwood, Vincent Clark, Sr.,
Ken Jones, Fred Smerlas, Jim Rourke,
Lou Piccone, James David Wilkins II, and
Robert Jackson,
By their attorneys,

*/s/ John J Pentz*
John J. Pentz
19 Widow Rites Lane
Sudbury, MA 01776

Phone: (978) 261-5725
jjpentz3@gmail.com

Edward W. Cochran
20030 Marchmont Rd.
Cleveland Ohio 44122
Phone: (216) 751-5546
EdwardCochran@wowway.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing document was filed via the ECF filing system on February 27, 2015, and that as a result electronic notice of the filing was served upon all attorneys of record.

*/s/ John J. Pentz*
John J. Pentz

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE: | No. 2:12-md-02323-AB |
| PLAYERS' CONCUSSION | |
| INJURY LITIGATION | MDL No. 2323 |
| | |
| Kevin Turner and Shawn Wooden, | |
| *on behalf of themselves and* | |
| *others similarly situated,* | |
| Plaintiffs, | CIVIL ACTION NO: 14-cv-0029 |
| | |
| v. | |
| | |
| National Football League and | **Hon. Anita B. Brody** |
| NFL Properties LLC, | |
| successor-in-interest to | |
| NFL Properties, Inc., | |
| Defendants. | |
| | |
| THIS DOCUMENT RELATES TO: | |
| ALL ACTIONS | |

## STATEMENT REGARDING 28 U.S.C. § 1715

Defendants National Football League and NFL Properties LLC (collectively, the "NFL Parties") submit this Statement Regarding the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1715.

1.    On July 3, 2014, pursuant to 28 U.S.C. § 1715(b), the NFL Parties mailed notice of the proposed Class Action Settlement Agreement (the "Settlement") in this action to the United States Attorney General, and to the Attorney General of each State in the United States, the District of Columbia and the United States territories.[1]

2.    In accordance with 28 U.S.C. § 1715(b), the notice and its accompanying exhibits were mailed within ten days of the filing of the proposed Settlement on June 25, 2014, and included the following:

> a.  Copies of the complaints and amended complaints filed in this action;
>
> b.  The proposed Settlement;
>
> c.  The proposed notification to Settlement Class Members; and
>
> d.  A list, based on the information available to the NFL Parties, of the names of Settlement Class Members organized by the state in which they reside, which the NFL Parties also believed to represent the proportionate share of each state's Settlement Class Member claims relative to the entire settlement.

3.    On July 7, 2014, this Court preliminarily approved the proposed Settlement, and on July 16, 2014, pursuant to 28 U.S.C. § 1715(b), the NFL Parties mailed supplemental notice of the Court's order to the United States Attorney General,

---

[1]  *See* Exhibit 1 for an exemplar copy of the Class Action Fairness Act of 2005 Notification.  *See* Exhibit 2 for a complete list of recipients to whom this notification was mailed.

and to the Attorney General of each State in the United States, the District of Columbia and the United States territories.[2]

4. Pursuant to 28 U.S.C. § 1715(b), the supplemental notice and its accompanying exhibits were served within ten days of the Court's preliminary approval of the proposed Class Action Settlement entered into by the parties, and included the following:

    a. The Court's Preliminary Approval Order and Memorandum;

    b. Final, completed versions of the Long-Form Notice and Summary Notice; and

    c. The date, time and location of the Court's scheduled Fairness Hearing.

5. Because the Court has not yet entered a final judgment in this case, none has been provided as part of the NFL Parties' notice or supplemental notice letters. *See* 28 U.S.C. § 1715(b)(8).

6. Defendants have, therefore, complied with CAFA's notice obligations under 28 U.S.C. § 1715(b).

7. Furthermore, as required by 28 U.S.C. § 1715(d), the parties and the Court have complied with the ninety-day waiting period, which ended in October 2014. *See id.* ("An order giving final approval of a proposed settlement may not be issued earlier than 90 days after the later of the dates on which the appropriate Federal official and the appropriate State official are served with the notice required under [§ 1715(b)].").

---

[2]   *See* Exhibit 3 for an exemplar copy of the Class Action Fairness Act of 2005 Supplemental Notification. *See* Exhibit 2 for a complete list of recipients to whom this supplemental notification was mailed.

Dated:  April 7, 2014     Respectfully submitted,

/s/ Brad S. Karp
Brad S. Karp
Theodore V. Wells Jr.
Bruce Birenboim
Lynn B. Bayard
PAUL, WEISS, RIFKIND, WHARTON &
 GARRISON LLP
1285 Avenue of the Americas
New York, NY  10019-6064
Main: 212.373.3000
Fax: 212.757.3990
bkarp@paulweiss.com
twells@paulweiss.com
bbirenboim@paulweiss.com
lbayard@paulweiss.com

Beth A. Wilkinson
PAUL, WEISS, RIFKIND, WHARTON &
 GARRISON LLP
2001 K Street, NW
Washington, DC 20006-1047
Main: 202.223.7300
Fax: 202.223.7420
bwilkinson@paulweiss.com

and

Robert C. Heim (Pa. Atty. ID 15758)
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104-2808
Main: 215.994.4000
Fax: 215.994.2222
Robert.heim@dechert.com

**Attorneys for National Football League
and NFL Properties LLC**

**CERTIFICATE OF SERVICE**

It is hereby certified that a true copy of the foregoing document was served electronically via the Court's electronic filing system on the 7th day of April, 2015, upon all counsel of record.

Dated:  April 7, 2015                                          /s/ Brad S. Karp
                                                                          Brad S. Karp

# EXHIBIT 1

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

1285 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10019-6064

TELEPHONE (212) 373-3000

LLOYD K GARRISON   (1946-1991)
RANDOLPH E PAUL   (1946-1956)
SIMON H RIFKIND   (1950-1995)
LOUIS S WEISS   (1927-1950)
JOHN F WHARTON   (1927-1977)

WRITER'S DIRECT DIAL NUMBER

(212) 373-3316

WRITER'S DIRECT FACSIMILE

(212) 492-0316

WRITER'S DIRECT E-MAIL ADDRESS

bkarp@paulweiss.com

July 3, 2014

UNIT 3601, OFFICE TOWER A  BEIJING FORTUNE PLAZA
NO 7 DONGSANHUAN ZHONGLU
CHAOYANG DISTRICT
PEOPLE'S REPUBLIC OF CHINA
TELEPHONE (86-10) 5828-6300

12TH FLOOR, HONG KONG CLUB BUILDING
3A CHATER ROAD, CENTRAL
HONG KONG
TELEPHONE (852) 2846-0300

ALDER CASTLE
10 NOBLE STREET
LONDON EC2V 7JU  U K
TELEPHONE (44 20) 7367 1600

FUKOKU SEIMEI BUILDING
2-2 UCHISAIWAICHO 2-CHOME
CHIYODA-KU, TOKYO 100-0011, JAPAN
TELEPHONE (81-3) 3597-8101

TORONTO-DOMINION CENTRE
77 KING STREET WEST, SUITE 3100
PO BOX 226
TORONTO, ONTARIO M5K 1J3
TELEPHONE (416) 504-0520

2001 K STREET, NW
WASHINGTON, DC 20006-1047
TELEPHONE (202) 223-7300

500 DELAWARE AVENUE, SUITE 200
POST OFFICE BOX 32
WILMINGTON  DE 19899-0032
TELEPHONE (302) 655-4410

MATTHEW W ABBOTT
ALLAN J ARFFA
ROBERT A ATKINS
DAVID J BALL
JOHN F BAUGHMAN
LYNN B BAYARD
DANIEL J BELLER
CRAIG A BENSON
MITCHELL L BERG
MARK S BERGMAN
BRUCE BIRENBOIM
H CHRISTOPHER BOEHNING
ANGELO BONVINO
JAMES L BROCHIN
RICHARD J BRONSTEIN
DAVID W BROWN
SUSANNA M BUERGEL
PATRICK S CAMPBELL*
JESSICA S CAREY
JEANETTE K CHAN
YVONNE Y F CHAN
LEWIS R CLAYTON
JAY COHEN
KELLEY A CORNISH
CHRISTOPHER J CUMMINGS
CHARLES E DAVIDOW
DOUGLAS R DAVIS
THOMAS V DE LA BASTIDE III
ARIEL J DECKELBAUM
ALICE BELISLE EATON
ANDREW J EHRLICH
GREGORY A EZRING
LESLIE GORDON FAGEN
MARC FALCONE
ROSS A FIELDSTON
BRAD S KARP
ANDREW C FINCH
BRAD J FINKELSTEIN
BRIAN P FINNEGAN
ROBERTO FINZI
PETER E FISCH
ROBERT C FLEDER
MARTIN FLUMENBAUM
ANDREW J FOLEY
HARRIS B FREIDUS
MANUEL S FREY
ANDREW L GAINES
KENNETH A GALLO
MICHAEL E GERTZMAN
ADAM M GIVERTZ
SALVATORE GOGLIORMELLA
ROBERT D GOLDBAUM
NEIL GOLDMAN
ERIC GOODISON
CHARLES H GOOGE, JR
ANDREW G GORDON
UDI GROFMAN
NICHOLAS GROOMBRIDGE
BRUCE A GUTENPLAN
GAINES GWATHMEY, III
ALAN S HALPERIN
JUSTIN G HAMILL
CLAUDIA HAMMERMAN
GERARD E HARPER
BRIAN S HERMANN
ROBERT M HIRSH
MICHELE HIRSHMAN
MICHAEL S HONG
DAVID S HUNTINGTON
LORETTA A IPPOLITO
JAREN JANGHORBANI
MEREDITH J KANE

ROBERTA A KAPLAN
BRAD S KARP
PATRICK N KARSNITZ
JOHN C KENNEDY
BRIAN KIM
ALAN W KORNBERG
DANIEL J KRAMER
DAVID K LAKHDHIR
STEPHEN P LAMB*
JOHN E LANGE
DANIEL J LEFFELL
XIAOYU GREG LIU
JEFFREY D MARELL
MARCO V MASOTTI
EDWIN S MAYNARD
DAVID W MAYO
ELIZABETH R McCOLM
MARK F MENDELSOHN
WILLIAM B MICHAEL
TOBY S MYERSON
CATHERINE NYARADY
JANE B O'BRIEN
ALEX YOUNG K OH
BRAD R OKUN
KELLEY D PARKER
MARC E PERLMUTTER
VALERIE E RADWANER
CARL L REISNER
WALTER R RICCIARDI
WALTER RIEMAN
RICHARD A ROSEN
ANDREW N ROSENBERG
PETER J ROTHENBERG
RAPHAEL M RUSSO
JEFFREY D SAFERSTEIN
JEFFREY B SAMUELS
DALE M SARRO
TERRY E SCHIMEK
KENNETH M SCHNEIDER
ROBERT B SCHUMER
JAMES H SCHWAB
JOHN M SCOTT
STEPHEN J SHIMSHAK
DAVID R SICULAR
MOSES SILVERMAN
STEVEN SIMKIN
JOSEPH J SIMONS
MARILYN SOBEL
AUDRA J SOLOWAY
SCOTT M SONTAG
TARUN M STEWART
NEIL GOLDMAN
ERIC ALAN STONE
AIDAN SYNNOTT
ROBYN F TARNOFSKY
MONICA K THURMOND
DANIEL J TOAL
LIZA M VELAZQUEZ
MARIA T VULLO
ALEXANDRA M WALSH*
LAWRENCE G WEE
THEODORE V WELLS, JR
BETH A WILKINSON
STEVEN J WILLIAMS
LAWRENCE I WITDORCHIC
MARK B WLAZLO
JULIA MASON WOOD
JORDAN E YARETT
KAYE N YOSHINO
TONG YU
TRACEY A ZACCONE
T ROBERT ZOCHOWSKI, JR

*NOT ADMITTED TO THE NEW YORK BAR

**CONFIDENTIAL**

**VIA U.S. MAIL**

Attorney General of Alabama
501 Washington Avenue
P.O. Box 300152
Montgomery, AL  36130-0152

Re:  **Class Action Fairness Act of 2005 Notification**

*Kevin Turner and Shawn Wooden, on behalf of themselves and others similarly situated* **v.** *National Football League and NFL Properties LLC*, No. 2:14-cv-00029 (E.D. Pa.); *In re: National Football League Players' Concussion Injury Litigation*, No. 2:12-md-02323-AB, MDL No. 2323 (E.D. Pa.)

Dear Sir/Madam Attorney General:

     Pursuant to the provisions of the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1715, the defendants National Football League and NFL Properties LLC (collectively the "NFL Parties") hereby give notice that the parties[1] in the above-referenced lawsuit have entered

---

[1] The parties include the NFL Parties and proposed Class and Subclass Representative Plaintiffs.  The proposed Settlement Class is defined as all Retired NFL Football Players, Representative Claimants and Derivative Claimants, where:

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

into a proposed settlement of a class action subject to the final approval of the United States District Court for the Eastern District of Pennsylvania. In compliance with 28 U.S.C. § 1715, the NFL Parties submit with this notice the following:

1. Copies of the complaints and amended complaints filed in this action:

    a. The Master Administrative Class Action Complaint for Medical Monitoring filed on June 7, 2012;

    b. The Master Administrative Long-Form Complaint filed on June 7, 2012;

    c. The Amended Master Administrative Long-Form Complaint filed on July 9, 2012;

    d. The Class Action Complaint filed on January 6, 2014 in *Turner, et al.* v. *National Football League, et al.*, No. 2:14-cv-00029-AB (E.D. Pa.).

2. The proposed class action settlement, entered into on June 25, 2014;

3. The proposed notification to proposed Settlement Class Members;

4. A list, based on the information available to the NFL Parties, of the names of proposed Settlement Class Members organized by the state in which they reside. The NFL Parties believe the proportionate share of the benefits of the settlement will be consistent with the percentage of residents in the states as listed.

Hard copies of the complaints listed in #1, above, are enclosed. The documents identified in #2 - #4, above, are enclosed on a CD-ROM. In addition, copies of these documents were filed with the court electronically and, therefore, are also available through the Public Access to Court Electronic Records (PACER) docketing system. *See* 2:12-md-02323, Dkt. Nos. 83, 84, 2642, 6073; 2:14-cv-00029, Dkt. No. 1.

The files on the enclosed disk are encrypted and can be accessed using the following codes:

---

"Retired NFL Football Players" means all living NFL Football players who, prior to the date of the Preliminary Approval and Class Certification Order, retired, formally or informally, from playing professional football with the NFL or any Member Club, including American Football League, World League of American Football, NFL Europe League and NFL Europa League players, or were formerly on any roster, including preseason, regular season, or postseason, of any such Member Club or league and who no longer are under contract to a Member Club and are not seeking active employment as players with any Member Club, whether signed to a roster or signed to any practice squad, developmental squad, or taxi squad of a Member Club;

"Representative Claimants" means authorized representatives, ordered by a court or other official of competent jurisdiction under applicable state law, of deceased or legally incapacitated or incompetent Retired NFL Football Players; and

"Derivative Claimants" means spouses, parents, children who are dependents, or any other persons who properly under applicable state law assert the right to sue independently or derivatively by reason of their relationship with a Retired NFL Football Player or deceased Retired NFL Football Player.

2

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

    Encryption Password: muJL+ZIx

    Encryption Type/Version: SecureZip

    At this time, there has been no final judgment or notice of dismissal (28 U.S.C. § 1715(b)(6)), and there is no written judicial opinion relating to the materials described in subparagraphs (3) through (6) of subsection 1715(b) (28 U.S.C. § 1715(b)(8)).  Furthermore, there are no other contemporaneous settlement agreements between the NFL Parties and Co-Lead Class Counsel, Class Counsel, or Subclass Counsel.  The NFL Parties will provide supplemental notice of each of the events and documents described in this Paragraph.

    Any correspondence concerning the proposed settlement should be sent to the Clerk of the Court, James A. Byrne U.S. Courthouse, 601 Market Street, Philadelphia, PA.  Copies of any such correspondence should also be sent to me and Co-Lead Class Counsel, Class Counsel, and Subclass Counsel, contact information for whom is annexed hereto as Appendix A.

    This notice is given pursuant to 28 U.S.C. § 1715.  Subsection 1715(f) provides that "[n]othing in this section shall be construed to expand the authority of, or impose any obligations, duties, or responsibilities upon, Federal or State officials."

    If you have any questions about the proposed settlement agreement, or the underlying litigation, please feel free to contact me.

          Sincerely,

          Brad S. Karp

          PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
          1285 Avenue of the Americas
          New York, NY 10019-6064
          (212) 373-3000

          *Attorneys for NFL Parties*

Dated:  July 3, 2014

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

## Appendix A

### *Co-Lead Counsel*

Christopher A. Seeger
**SEEGER WEISS LLP**
77 Water Street
New York, NY 10005
Phone: (212) 584-0700
Fax: (212) 584-0799
cseeger@seegerweiss.com

Sol Weiss
**ANAPOL SCHWARTZ**
1710 Spruce Street
Philadelphia, PA 19103
Phone: (215) 735-1130
Fax: (215) 735-2024
sweiss@anapolschwartz.com

### *Class Counsel*

Steven C. Marks
**PODHURST ORSECK P.A.**
City National Bank Building
25 W. Flagler Street, Suite 800
Miami, FL 33130-1780
Phone: (305) 358-2800
Fax: (305) 358-2382
smarks@podhurst.com

Gene Locks
**LOCKS LAW FIRM**
The Curtis Center
Suite 720 East
601 Walnut Street
Philadelphia, PA 19106
Phone: 866-562-5752
Fax: (215) 893-3444
glocks@lockslaw.com

### *Subclass Counsel*

Arnold Levin
**LEVIN FISHBEIN SEDRAN & BERMAN**
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Phone: (215) 592-1500
Fax: (215) 592-4663
alevin@lfsblaw.com

Dianne M. Nast
**NAST LAW LLC**
1101 Market Street, Suite 2801
Philadelphia, Pennsylvania 19107
Phone: (215) 923-9300
Fax: (215) 923-9302
DNast@nastlaw.com

*Counsel for Subclass 1*

*Counsel for Subclass 2*

Case 2:12-md-02323-AB    Document 6501-2    Filed 04/07/15    Page 1 of 5

# EXHIBIT 2

**Recipients of Notifications and**
**Supplemental Notifications Pursuant to 28 U.S.C. § 1715**

| | |
|---|---|
| Attorney General of Alabama<br>501 Washington Avenue<br>Montgomery, AL 36130-0152 | Attorney General of Alaska<br>P.O Box 110300<br>Juneau, AK 99811-0300 |
| Attorney General of American Samoa<br>American Samoa Gov't, Exec. Ofc. Bldg.<br>Utulei, Territory of American Samoa<br>Pago Pago, AS 96799 | Attorney General of Arizona<br>1275 West Washington Street<br>Phoenix, AZ 85007-2926 |
| Attorney General of Arkansas<br>323 Center St., Suite 200<br>Little Rock, AR 72201-2610 | Attorney General of California<br>California Department of Justice<br>Attn: Public Inquiry Unit<br>P.O. Box 944255<br>Sacramento. CA 94244-22550 |
| Attorney General of Colorado<br>Ralph L. Carr Colorado Judicial Center<br>1300 Broadway, 10th Floor<br>Denver, CO 80203 | Attorney General of Connecticut<br>Office of the Attorney General<br>55 Elm Street<br>Hartford, CT 06106 |
| Attorney General of Delaware<br>Carvel State Office Bldg.<br>820 North French Street<br>Wilmington, DE 19801 | Attorney General of District of Columbia<br>441 4th Street, NW<br>Washington, D.C. 20001 |
| Attorney General of Florida<br>State of Florida<br>The Capital PL-01<br>Tallahassee, FL 32399-1050 | Attorney General of Georgia<br>40 Capital Square, SW<br>Atlanta, GA 30334-1300 |
| Attorney General Of Guam<br>ITC Building<br>590 S. Marine Corps Dr, Ste. 706<br>Tamunig, Guam 96913 | Attorney General of Hawaii<br>Department of the Attorney General<br>425 Queen Street<br>Honolulu, HI 96813 |
| Attorney General of Idaho<br>700 W. Jefferson Street, Suite 210<br>P.O. Box 83720<br>Boise, Idaho 83720-0010 | Attorney General of Illinois<br>James R. Thompson Center<br>100 W. Randolph St.<br>Chicago, IL 60601 |

| | |
|---|---|
| Attorney General of Indiana<br>Indiana Gov't. Center South – 5th Floor<br>302 West Washington Street<br>Indianapolis, IN 46204 | Attorney General of Iowa<br>Hoover State Office Bldg.<br>1305 E. Walnut Street<br>Des Moines, IA 50319 |
| Attorney General of Kansas<br>120 SW 10th Avenue, 2nd Floor<br>Topeka, KS 66612 | Attorney General of Kentucky<br>Capital Suite 118<br>700 Capitol Avenue<br>Frankfort, Kentucky 40601-3449 |
| Attorney General of Louisiana<br>P.O. Box 94095<br>Baton Rouge, LA 70804-4095 | Attorney General of Maine<br>6 State House Station<br>Augusta, ME 04333 |
| Attorney General of Maryland<br>200 St. Paul Place<br>Baltimore, MD 21202-2202 | Attorney General of Massachusetts<br>One Ashburton Place<br>Boston, MA 02108-1518 |
| Attorney General of Michigan<br>G. Mennen Williams Building, 7th Floor<br>525 W. Ottawa St.<br>P.O. Box 30212<br>Lansing, MI 48909 | Attorney General of Minnesota<br>1400 Bremer Tower<br>445 Minnesota Street<br>St. Paul, MN 55101-2131 |
| Attorney General of Mississippi<br>Walter Sillers Building<br>550 High Street, Suite 1200<br>Jackson, MS 39201 | Attorney General of Missouri<br>Supreme Ct. Bldg., 207 E. High St.,<br>Jefferson City, MO 65101 |
| Attorney General of Montana<br>Justice Building, Third Floor<br>215 North Sanders<br>P.O. Box 201401<br>Helena, MT 59620 | Attorney General of Nebraska<br>2115 State Capitol<br>Lincoln, NE 68509 |
| Attorney General of Nevada<br>100 North Carson Street<br>Carson City, NV 89701 | Attorney General of New Hampshire<br>NH Department of Justice<br>33 Capitol Street<br>Concord, NH 03301 |
| Attorney General of New Jersey<br>Richard J. Hughes Justice Complex<br>25 Markey Street<br>P.O. Box 080<br>Trenton, NJ 08625 | Attorney General of New Mexico<br>408 Galisteo Street<br>Villagra Building<br>Santa Fe, NM 87501 |

| | |
|---|---|
| Attorney General of New York<br>The Capitol<br>Department of Law<br>Albany, NY 12224-0341 | Attorney General of North Carolina<br>9001Mail Service Center<br>Raleigh, NC 27699-9001 |
| Attorney General of North Dakota<br>State Capitol<br>600 E. Boulevard  Ave. Dept. 125<br>Bismarck, ND 58505 | Attorney General of Northern Mariana<br>Islands<br>Administration Building<br>P.O. Box 10007<br>Saipan, MP 96950-8907 |
| Attorney General of Ohio<br>State Office Tower<br>30 E. Broad St., 14th Floor<br>Columbus, OH 43215 | Attorney General of Oklahoma<br>313 NE 21st Street<br>Oklahoma City, OK 73105 |
| Attorney General of Oregon<br>Oregon Department of Justice<br>1162 Court Street NE<br>Salem, OR 97301 | Attorney General of Pennsylvania<br>16th Floor, Strawberry Square<br>Harrisburg, PA 17120 |
| Attorney General of Puerto Rico<br>PO Box 902192<br>San Juan, PR 00902-0192 | Attorney General of Rhode Island<br>150 S. Main Street<br>Providence, RI 02903 |
| Attorney General of South Carolina<br>P.O. Box 11549<br>Columbia, SC 29211 | Attorney General of South Dakota<br>1302 E. Highway 14 Suite 1<br>Pierre, SD 57501-8501 |
| Attorney General of Tennessee<br>P.O. Box 20207<br>Nashville, TN 37202-0207 | Attorney General of Texas<br>Capitol Station, P.O. Box 12548<br>Austin, TX 78701 |
| Attorney General of the United States<br>Department of Justice<br>950 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20530-0001 | Attorney General of Utah<br>P.O. Box 142320<br>Salt Lak City, UT 84114-2320 |
| Attorney General of Vermont<br>P 109 State Street<br>Montpelier, VT 05609-1001 | Attorney General of the Virgin Islands<br>Department of Justice<br>G.E.R.S Complex 488-50C Kronprinsdens<br>Gade<br>St. Thomas, VI 00802 |

| | |
|---|---|
| Attorney General of Virginia<br>900 East Main Street<br>Richmond, VA 23219 | Attorney General of Washington<br>1125 Washington St. SE.<br>P.O. Box 40100<br>Olympia, WA 98504-0100 |
| Attorney General of West Virginia<br>State Capitol Complex<br>Bldg. 1, Room E-26<br>Charleston, WV 25305 | Attorney General of Wisconsin<br>Wisconsin Department of Justice<br>P.O. Box. 7857<br>Madison, WI 53707-7857 |
| Attorney General of Wyoming<br>123 Capitol Building<br>200 W. 24th Street<br>Cheyenne, WY 82002 | |

# EXHIBIT 3

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

1285 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10019-6064

TELEPHONE (212) 373-3000

LLOYD K. GARRISON (1946-1991)
RANDOLPH E. PAUL (1946-1956)
SIMON H. RIFKIND (1950-1995)
LOUIS S. WEISS (1927-1950)
JOHN F. WHARTON (1927-1977)

WRITER'S DIRECT DIAL NUMBER

(212) 373-3316

WRITER'S DIRECT FACSIMILE

(212) 492-0316

WRITER'S DIRECT E-MAIL ADDRESS

bkarp@paulweiss.com

July 16, 2014

UNIT 3601, OFFICE TOWER A, BEIJING FORTUNE PLAZA
NO. 7 DONGSANHUAN ZHONGLU
CHAOYANG DISTRICT
BEIJING 100020
PEOPLE'S REPUBLIC OF CHINA
TELEPHONE (86-10) 5828-6300

12TH FLOOR, HONG KONG CLUB BUILDING
3A CHATER ROAD, CENTRAL
HONG KONG
TELEPHONE (852) 2846-0300

ALDER CASTLE
10 NOBLE STREET
LONDON EC2V 7JU, U.K
TELEPHONE (44 20) 7367 1600

FUKOKU SEIMEI BUILDING
2-2 UCHISAIWAICHO 2-CHOME
CHIYODA-KU, TOKYO 100-0011, JAPAN
TELEPHONE (81-3) 3597-8101

TORONTO-DOMINION CENTRE
77 KING STREET WEST, SUITE 3100
P.O. BOX 226
TORONTO, ONTARIO M5K 1J3
TELEPHONE (416) 504-0520

2001 K STREET, NW
WASHINGTON, DC 20006-1047
TELEPHONE (202) 223-7300

500 DELAWARE AVENUE, SUITE 200
POST OFFICE BOX 32
WILMINGTON, DE 19899-0032
TELEPHONE (302) 655-4410

MATTHEW W. ABBOTT
ALLAN J. ARFFA
ROBERT A. ATKINS
DAVID J. BALL
JOHN F. BAUGHMAN
LYNN B. BAYARD
DANIEL J. BELLER
CRAIG A. BENSON
MITCHELL L. BERG
MARK S. BERGMAN
BRUCE BIRENBOIM
H. CHRISTOPHER BOEHNING
ANGELO BONVINO
JAMES L. BROCHIN
RICHARD J. BRONSTEIN
DAVID W. BROWN
SUSANNA M. BUERGEL
PATRICK S. CAMPBELL*
JESSICA S. CAREY
JEANETTE K. CHAN
YVONNE Y. F. CHAN
LEWIS R. CLAYTON
JAY COHEN
KELLEY A. CORNISH
CHRISTOPHER J. CUMMINGS
CHARLES E. DAVIDOW
DOUGLAS R. DAVIS
THOMAS V. DE LA BASTIDE III
ARIEL J. DECKELBAUM
ALICE BELISLE EATON
ANDREW J. EHRLICH
GREGORY A. EZRING
LESLIE GORDON FAGEN
MARC FALCONE
ROSS A. FIELDSTON
ANDREW C. FINCH
BRAD J. FINKELSTEIN
BRIAN P. FINNEGAN
ROBERTO FINZI
PETER E. FISCH
ROBERT C. FLEDER
MARTIN FLUMENBAUM
ANDREW J. FOLEY
HARRIS B. FREIDUS
MANUEL S. FREY
ANDREW L. GAINES
KENNETH A. GALLO
MICHAEL E. GERTZMAN
ADAM M. GIVERTZ
SALVATORE GOGLIORMELLA
ROBERT D. GOLDBAUM
NEIL GOLDMAN
ERIC GOODISON
CHARLES H. GOOGE, JR
ANDREW G. GORDON
UDI GROFMAN
NICHOLAS GROOMBRIDGE
BRUCE A. GUTENPLAN
GAINES GWATHMEY, III
ALAN S. HALPERIN
JUSTIN G. HAMILL
CLAUDIA HAMMERMAN
GERARD E. HARPER
BRIAN S. HERMANN
ROBERT M. HIRSH
MICHELE HIRSHMAN
MICHAEL S. HONG
DAVID S. HUNTINGTON
LORETTA A. IPPOLITO
JAREN JANGHORBANI
MEREDITH J. KANE

ROBERTA A. KAPLAN
BRAD S. KARP
PATRICK N. KARSNITZ
JOHN C. KENNEDY
BRIAN KIM
ALAN W. KORNBERG
DANIEL J. KRAMER
DAVID N. LAKHDHIR
STEPHEN P. LAMB*
JOHN E. LANGE
DANIEL J. LEFFELL
XIAOYU GREG LIU
JEFFREY D. MARELL
MARCO V. MASOTTI
EDWIN S. MAYNARD
DAVID W. MAYO
ELIZABETH R. McCOLM
MARK F. MENDELSOHN
WILLIAM B. MICHAEL
TOBY S. MYERSON
CATHERINE NYARADY
JANE B. O'BRIEN
ALEX YOUNG K. OH
BRAD R. OKUN
KELLEY D. PARKER
MARC E. PERLMUTTER
VALERIE E. RADWANER
CARL L. REISNER
WALTER G. RICCIARDI
WALTER RIEMAN
RICHARD A. ROSEN
ANDREW N. ROSENBERG
JACQUELINE P. RUBIN
RAPHAEL M. RUSSO
JEFFREY D. SAFERSTEIN
JEFFREY B. SAMUELS
DALE M. SARRO
TERRY E. SCHIMEK
KENNETH M. SCHNEIDER
ROBERT B. SCHUMER
JAMES H. SCHWAB
JOHN M. SCOTT
STEPHEN J. SHIMSHAK
DAVID R. SICULAR
MOSES SILVERMAN
STEVEN SIMKIN
JOSEPH J. SIMONS
MARILYN SOBEL
AUDRA J. SOLOWAY
SCOTT M. SONTAG
TARUN M. STEWART
ERIC ALAN STONE
AIDAN SYNNOTT
ROBYN F. TARNOFSKY
MONICA K. THURMOND
DANIEL J. TOAL
LIZA M. VELAZQUEZ
MARIA T. VULLO
ALEXANDRA M. WALSH*
LAWRENCE G. WEE
THEODORE V. WELLS, JR.
BETH A. WILKINSON
STEVEN J. WILLIAMS
LAWRENCE I. WITDORCHIC
MARK B. WLAZLO
JULIA MASON WOOD
JORDAN E. YARETT
KAYE N. YOSHINO
TONG YU
TRACEY A. ZACCONE
T. ROBERT ZOCHOWSKI, JR.

*NOT ADMITTED TO THE NEW YORK BAR

**CONFIDENTIAL**

**VIA U.S. MAIL**

Attorney General of Alabama
501 Washington Ave.
Montgomery, AL 36130-0152

Re:  Class Action Fairness Act of 2005 Supplemental Notification

*Kevin Turner and Shawn Wooden, on behalf of themselves and others similarly situated* v. *National Football League and NFL Properties LLC*, No. 2:14-cv-00029 (E.D. Pa.); *In re: National Football League Players' Concussion Injury Litigation*, No. 2:12-md-02323-AB, MDL No. 2323 (E.D. Pa.)

Dear Sir/Madam Attorney General:

        Pursuant to the provisions of the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1715, the defendants National Football League and NFL Properties LLC (collectively the "NFL Parties") hereby give supplemental notice that the United States District Court for the Eastern District of Pennsylvania has preliminarily approved the proposed settlement entered into

1

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

by the parties[1] in the above-referenced actions. By letter dated July 3, 2014, the NFL Parties provided copies of the complaints and amended complaints filed in this action, the proposed Class Action Settlement Agreement, dated as of June 25, 2014, the proposed notification to proposed Settlement Class Members, and a list based on the information available to the NFL Parties of the names of proposed Settlement Class Members organized by the state in which they reside.

In compliance with 28 U.S.C. § 1715, the NFL Parties submit with this supplemental notice:

    1.     The Court's Preliminary Approval Order and Memorandum, dated July 7, 2014; and

    2.     Final, completed versions of the Long-Form Notice and Summary Notice.

The documents identified are enclosed on a CD-ROM. In addition, copies of these documents were filed with the court electronically and, therefore, are also available through the Public Access to Court Electronic Records (PACER) docketing system. *See* 2:12-md-02323, Dkt. Nos. 6083, 6084, 6086 (E.D. Pa.).

The files on the enclosed disk are encrypted and can be accessed using the following codes:

Encryption Password: *d64sV7D

Encryption Type/Version: SecureZip

A Fairness Hearing will be held on Wednesday, November 19, 2014, at 10:00 a.m. before the Honorable Anita B. Brody at Courtroom 7B of the United States Courthouse, 601 Market Street, Philadelphia, Pennsylvania 19106 to, among other items, determine whether the proposed settlement agreement is fair, reasonable, and adequate.

---

[1] The parties include the NFL Parties and proposed Class and Subclass Representative Plaintiffs. The proposed Settlement Class is defined as all Retired NFL Football Players, Representative Claimants and Derivative Claimants, where:

"Retired NFL Football Players" means all living NFL Football players who, prior to the date of the Preliminary Approval and Class Certification Order, retired, formally or informally, from playing professional football with the NFL or any Member Club, including American Football League, World League of American Football, NFL Europe League and NFL Europa League players, or were formerly on any roster, including preseason, regular season, or postseason, of any such Member Club or league and who no longer are under contract to a Member Club and are not seeking active employment as players with any Member Club, whether signed to a roster or signed to any practice squad, developmental squad, or taxi squad of a Member Club;

"Representative Claimants" means authorized representatives, ordered by a court or other official of competent jurisdiction under applicable state law, of deceased or legally incapacitated or incompetent Retired NFL Football Players; and

"Derivative Claimants" means spouses, parents, children who are dependents, or any other persons who properly under applicable state law assert the right to sue independently or derivatively by reason of their relationship with a Retired NFL Football Player or deceased Retired NFL Football Player.

2

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

       At this time, there has been no final judgment or notice of dismissal, and apart from the attached Preliminary Approval Memorandum, there are no written judicial opinions relating to the proposed settlement described in this supplemental notice. Furthermore, there are no other contemporaneous settlement agreements between the NFL Parties and Co-Lead Class Counsel, Class Counsel, or Subclass Counsel. The NFL Parties will provide supplemental notice of the events and documents described in this Paragraph as necessary.

       Any correspondence concerning the proposed settlement should be sent to the Clerk of the Court, James A. Byrne U.S. Courthouse, 601 Market Street, Philadelphia, PA. Copies of any such correspondence should also be sent to me and Co-Lead Class Counsel, Class Counsel, and Subclass Counsel, contact information for whom is annexed hereto as Appendix A.

       This supplemental notice is given pursuant to 28 U.S.C. § 1715. Subsection 1715(f) provides that "[n]othing in this section shall be construed to expand the authority of, or impose any obligations, duties, or responsibilities upon, Federal or State officials."

       If you have any questions about the proposed settlement agreement, or the underlying litigation, please feel free to contact me.

Sincerely,

*Brad S. Karp / C. T.*

Brad S. Karp

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3000

*Attorneys for NFL Parties*

Dated: July 16, 2014

3

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

## Appendix A

### *Co-Lead Counsel*

Christopher A. Seeger
**SEEGER WEISS LLP**
77 Water Street
New York, NY 10005
Phone: (212) 584-0700
Fax: (212) 584-0799
cseeger@seegerweiss.com

Sol Weiss
**ANAPOL SCHWARTZ**
1710 Spruce Street
Philadelphia, PA 19103
Phone: (215) 735-1130
Fax: (215) 735-2024
sweiss@anapolschwartz.com

### *Class Counsel*

Steven C. Marks
**PODHURST ORSECK P.A.**
City National Bank Building
25 W. Flagler Street, Suite 800
Miami, FL 33130-1780
Phone: (305) 358-2800
Fax: (305) 358-2382
smarks@podhurst.com

Gene Locks
**LOCKS LAW FIRM**
The Curtis Center
Suite 720 East
601 Walnut Street
Philadelphia, PA 19106
Phone: 866-562-5752
Fax: (215) 893-3444
glocks@lockslaw.com

### *Subclass Counsel*

Arnold Levin
**LEVIN FISHBEIN SEDRAN & BERMAN**
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Phone: (215) 592-1500
Fax: (215) 592-4663
alevin@lfsblaw.com

Dianne M. Nast
**NAST LAW LLC**
1101 Market Street, Suite 2801
Philadelphia, Pennsylvania 19107
Phone: (215) 923-9300
Fax: (215) 923-9302
DNast@nastlaw.com

***Counsel for Subclass 1***

***Counsel for Subclass 2***

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN OF PENNSYLVANIA

IN RE: NATIONAL FOOTBALL § 
LEAGUE PLAYERS' CONCUSSION §
LITIGATION §
_____ §     No. 12-md-2323 (AB)
§
§     MDL No. 2323
THIS DOCUMENT RELATES TO: §
ALL ACTIONS §

**ARMSTRONG OBJECTORS' SUPPLEMENTAL OBJECTION TO THE AMENDED
CLASS ACTION SETTLEMENT**

**TO THE HONORABLE UNITED STATES DISTRICT COURT:**

     Settlement Class Members Ramon Armstrong, Nathaniel Newton, Jr., Larry Brown, Kenneth Davis, Michael McGruder, Clifton L. Odom, George Teague, Drew Coleman, Dennis DeVaughn, Alvin Harper, Ernest Jones, Michael Kiselak, Jeremy Loyd, Gary Wayne Lewis, Lorenzo Lynch, Hurles Scales, Gregory Evans, David Mims, Evan Ogelsby, Phillip E. Epps, Charles L. Haley, Sr., Kevin Rey Smith, Darryl Gerard Lewis, Curtis Bernard Wilson, Kelvin Mack Edwards, Sr., Dwayne Levels, Solomon Page, Tim McKyer, Larry Barnes, Mary Hughes, and Barbara Scheer (collectively, the "Armstrong Objectors") file this Supplemental Objection to the Class Action Settlement (Doc. #6087), as amended by the amendments in Class Counsel's and the NFL Parties' Joint Submission in Response to the Court's February 2, 2015 Order (Doc. #6481). The Armstrong Objectors respectfully state the following:

     1.     In their original Objection (Doc. #6353) (submitted *in camera* on September 3, 2014 and later filed by the Court) and Amended Objection (Doc. #6233), the Armstrong Objectors articulate sixteen detailed, multi-part objections to the class action settlement, as well as concrete proposals for curing the defects—none of which are meaningfully addressed by Class

Counsel's and the NFL Parties' recent settlement amendments. As a threshold matter, therefore, the Armstrong Objectors incorporate all of their previously stated objections, by reference, and reiterate them here as to the amended class action settlement in its current form. The recent amendments (Doc. #6481) are limited in scope and cosmetic at best. The resolution of thousands of unique, individual head injury claims does not fit within the "one size fits all" class action settlement framework proposed by Class Counsel and the NFL Parties.

2.       Class Counsel and the NFL Parties had an opportunity to go above and beyond the Court's directive, seriously consider the substantive objections lodged by the Armstrong Objectors, cure the numerous significant defects in the settlement, and re-structure the settlement to provide meaningful relief to thousands of suffering former players and their families. The only relief granted by the amendments, however, is for the benefit of the NFL Parties; they are further relieved of any obligation to provide substantive relief to former players and their families. By its February 2, 2015 Order (Dox. #6479), the Court gave Class Counsel and the NFL Parties an extra down at the goal line. Unfortunately, they fumbled the ball.

3.       For example, the Armstrong Objectors objected to several aspects of the Death with CTE provisions in the settlement. *See, e.g.,* Doc. #6233. Notwithstanding the new amendments, the Death with CTE provisions remain severely limited. While expanding the covered deaths to those occurring between the preliminary approval and final approval dates, and extending the deadline to secure the necessary post-mortem diagnosis until 270 days after the date of death, are steps in the right direction, in truth, there should be no deadline for Death with CTE benefits since death is one of the elements of the claim. The amended class action settlement does not assign similar deadlines to former players diagnosed with ALS, Alzheimer's or Parkinson's. Why is CTE singled out and treated differently? There is no credible answer to

this question.  If there must be a deadline to qualify for Death with CTE benefits, it should be pegged to a former player's date of death—to wit, 270 days from the date of death or 270 days from the date the final approval order becomes final and non-appealable, whichever is later.

4.  The Armstrong Objectors also objected to the Death with CTE provisions on other grounds (*see* Doc. #6233)—none of which are addressed by the recent amendments.  The Armstrong Objectors, therefore, incorporate all of their "Death with CTE" objections, by reference, and reiterate them here.

5.  The Armstrong Objectors also objected to several aspects of the "Baseline Assessment Program" (BAP).  *See, e.g.,* Doc. #6233.  Notwithstanding the new BAP amendment—that every eligible former player will be entitled to a baseline assessment examination regardless of the funds available under the BAP—the BAP essentially remains unchanged.  Since Class Counsel and the NFL Parties did not address the Armstrong Objectors' BAP objections in any meaningful way, the Armstrong Objectors incorporate all of their BAP objections, by reference, and reiterate them here.

6.  The Armstrong Objectors also objected to several aspects of the appeals procedure.  *See, e.g.,* Doc. #6233.  Notwithstanding the new amendment waiving the $1000 adverse decision appellate fee in hardship cases, the appeals process remains flawed.  Simply stated, requiring a $1000 appellate fee for any reason is mean spirited.  This paltry amount of money will not come close to defraying the actual cost of an appeal.  It is nothing more than a barrier to entry.  There should be no appellate fee of any kind for any reason at any time.  *See* Doc. #6233.  Since Class Counsel and the NFL Parties did not address the Armstrong Objectors'

objections to the appeal procedures in any meaningful way, the Armstrong Objectors incorporate all of their appeal procedures objections, by reference, and reiterate them here.[1]

**WHEREFORE,** the Armstrong Objectors respectfully request that the Court enter an order (i) denying final approval of the settlement embodied in the June 25, 2014 Class Action Settlement Agreement (Doc. #6087), as amended by the amendments set forth in Class Counsel's and the NFL Parties' Joint Submission in Response to the Court's February 2, 2015 Order (Doc. #6481), (ii) recommending that Class Counsel and the NFL Parties revise the class action settlement to cure the defects identified in the Armstrong Objectors' objections, and (iii) granting all other appropriate relief to the Armstrong Objectors and Settlement Class Members.

Date:  April 13, 2015

Respectfully submitted,

/s/  *Richard L. Coffman*
Richard L. Coffman
**THE COFFMAN LAW FIRM**
505 Orleans St., Ste. 505
Beaumont, TX 77701
Telephone: (409) 833-7700
Facsimile: (866) 835-8250
Email: rcoffman@coffmanlawfirm.com

Mitchell A. Toups
**WELLER, GREEN, TOUPS & TERRELL, LLP**
2615 Calder Ave., Suite 400
Beaumont, TX 77702
Telephone: (409) 838-0101
Facsimile: (409) 838-6780
Email: matoups@wgttlaw.com

---

[1]    The other two amendments in Class Counsel's and the NFL Parties' Joint Submission (Doc. #6481) (*i.e.*, credit for time played in the World League of American Football, NFL Europe League, and NFL Europa League *and* waiver of the necessity of medical records when they are unavailable because of a *force majeure*-type event) do not pertain to any of the Armstrong Objectors' objections; the Armstrong Objectors do not take a position on them here.

Jason Webster
**THE WEBSTER LAW FIRM**
6200 Savoy, Suite 515
Houston, TX 77036
Telephone: (713) 581-3900
Facsimile: (713) 409-6464
Email: jwebster@thewebsterlawfirm.com

Mike Warner
**THE WARNER LAW FIRM**
101 Southeast 11th Suite 301
Amarillo, TX 79101
Telephone: (806) 372-2595
Email: mike@thewarnerlawfirm.com

**COUNSEL FOR THE ARMSTRONG OBJECTORS**


## CERTIFICATE OF SERVICE

I certify that a true copy of the Armstrong Objectors' Supplemental Objection to the Amended Class Action Settlement was served on all counsel of record, via the Court's ECF system, on April 13, 2015.

/s/ *Richard L. Coffman*
Richard L. Coffman

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB  MDL No. 2323 |

Kevin Turner and Shawn Wooden,
*on behalf of themselves and*
*others similarly situated,*
          Plaintiffs,

       v.

National Football League and
NFL Properties, LLC,
successor-in-interest to
NFL Properties, Inc.,
          Defendants.

THIS DOCUMENT RELATES TO:
ALL ACTIONS

**AMENDED FINAL ORDER AND JUDGMENT**[1]

    **AND NOW**, this 8th day of ＿MAY＿, 2015, in accordance with the Court's Memorandum (ECF. No. 6509), it is **ORDERED**:

    1.    The Court has jurisdiction over the subject matter of this action.

    2.    The Court certifies the Settlement Class and Subclasses under Federal Rule of Civil Procedure 23.

---

[1] Unless otherwise noted, the terms used in this Order that are defined in the Settlement Agreement have the same meanings in this Order as in the Settlement Agreement.

The Settlement Class is defined as follows:

(i)    All living NFL Football Players who, prior to the date of the Preliminary Approval and Class Certification Order, retired, formally or informally, from playing professional football with the NFL or any Member Club, including American Football League, World League of American Football, NFL Europe League and NFL Europa League players, or were formerly on any roster, including preseason, regular season, or postseason, of any such Member Club or league and who no longer are under contract to a Member Club and are not seeking active employment as players with any Member Club, whether signed to a roster or signed to any practice squad, developmental squad, or taxi squad of a Member Club ("Retired NFL Football Players"); and

(ii)    Authorized representatives, ordered by a court or other official of competent jurisdiction under applicable state law, of deceased or legally incapacitated or incompetent Retired NFL Football Players ("Representative Claimants"); and

(iii)    Spouses, parents, children who are dependents, or any other persons who properly under applicable state law assert the right to sue independently or derivatively by reason of their relationship with a Retired NFL Football Player or deceased Retired NFL Football Player ("Derivative Claimants").

The Subclasses are defined as follows:

(i)    "Subclass 1" means Retired NFL Football Players who were not diagnosed with a Qualifying Diagnosis prior to the date of the Preliminary Approval and Class Certification Order and their Representative Claimants and Derivative Claimants.

(ii)    "Subclass 2" means Retired NFL Football Players who were diagnosed with a Qualifying Diagnosis prior to the date of the Preliminary Approval and Class Certification Order and their Representative Claimants and Derivative Claimants, and the Representative Claimants of deceased Retired NFL Football Players who were diagnosed with a Qualifying Diagnosis prior to death or who died prior to the date of the Preliminary Approval and Class Certification Order and who received a post-mortem diagnosis of CTE.

3.    The Court finds that the Settlement Class satisfies the applicable prerequisites for class action treatment under Federal Rules of Civil Procedure 23(a) and (b). The Settlement Class Members are so numerous that their joinder is impracticable. There are questions of law and fact common to the Class and Subclasses. The claims of the Class Representatives and Subclass Representatives are typical of the Settlement Class Members and the respective Subclass Members. The Class Representatives and Subclass Representatives and

Co-Lead Class Counsel, Class Counsel and Subclass Counsel have fairly and adequately represented and protected the interests of all Settlement Class Members. The questions of law or fact common to the Class and Subclasses predominate over any questions affecting only individual Settlement Class Members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

4.    The Court finds that the dissemination of the Settlement Class Notice and the publication of the Summary Notice were implemented in accordance with the Order granting preliminary approval, and satisfy the requirements of Federal Rules of Civil Procedure 23(c)(2)(B) and 23(e), the United States Constitution and other applicable laws and rules, and constituted the best notice practicable under the circumstances.  The Notice given by the NFL Parties to state and federal officials pursuant to 28 U.S.C. § 1715 fully satisfied the requirements of that statute.

5.    The Court confirms the appointment of Shawn Wooden and Kevin Turner as Class Representatives and Shawn Wooden as Subclass 1 Representative and Kevin Turner as Subclass 2 Representative.

6.    Pursuant to Federal Rule of Civil Procedure 23(g), the Court confirms the appointment of Christopher A. Seeger, Sol Weiss, Steven C. Marks, Gene Locks, Arnold Levin and Dianne M. Nast as Class Counsel.  In addition the Court confirms the appointment of Christopher A. Seeger and Sol Weiss as Co-Lead Class Counsel, and confirms the appointments of Arnold Levin and Dianne M. Nast as Subclass Counsel for Subclasses 1 and 2, respectively.

7.      Pursuant to Federal Rule of Civil Procedure 23, the Court finds that the Settlement Agreement is fair, reasonable and adequate and approves the Settlement Agreement in its entirety.

8.      The Court expressly incorporates into this Final Order and Judgment: (a) the Settlement Agreement and exhibits originally filed with the Court on June 25, 2014, as amended and filed on February 13, 2015, and (b) the Settlement Class Notice Plan and the Summary Notice, both of which were filed with the Court on June 25, 2014.

9.      The Parties are ordered to implement each and every obligation set forth in the Settlement Agreement in accordance with the terms and provisions of the Settlement Agreement.

10.     So there can be no misunderstanding, Article XVIII of the Settlement Agreement is expressly incorporated in this Order. Therefore the Settlement Class, the Class and Subclass Representatives and each Settlement Class Member, on his or her own behalf and on behalf of his or her respective predecessors, successors, assigns, assignors, representatives, attorneys, agents, trustees, insurers, heirs, next of kin, estates, beneficiaries, executors, administrators, and any natural, legal, or juridical person or entity to the extent he, she, or it is entitled to assert any claim on behalf of any Settlement Class Member (the "Releasors"), waive and release, forever discharge and hold harmless the Released Parties, and each of them, of and from all Released Claims.

11.     Any judgment or award obtained by the Releasors against any alleged tortfeasor, co-tortfeasor, co-conspirator or co-obligor, other than Riddell, by reason of judgment or settlement, for any claims that are or could have been asserted in the Class Action Complaint or in any Related Lawsuit, or that arise out of or relate to any claims that are or could have been

asserted in the Class Action Complaint or in any Related Lawsuit, or that arise out of or relate to any facts in connection with the Class Action Complaint or any Related Lawsuit (collectively, "Tortfeasors"), shall be reduced by the amount or percentage, if any, necessary under applicable law to relieve the Released Parties of all liability to such Tortfeasors on claims for contribution or indemnity (whether styled as a claim for contribution, indemnity or otherwise). Such judgment reduction, partial or complete release, settlement credit, relief, or setoff, if any, shall be in an amount or percentage sufficient under applicable law to compensate such Tortfeasors for the loss of any such claims for contribution or indemnity (whether styled as a claim for contribution, indemnity or otherwise) against the Released Parties.

12.     Notwithstanding anything to the contrary in this Final Order and Judgment, this Final Order and Judgment and the Settlement Agreement are not intended to and do not effect a release of any rights or obligations that any insurer has under or in relation to any contract or policy of insurance to any named insured, insured, additional insured, or other insured person or entity thereunder, including those persons or entities referred to in Section 2.1(bbbb)(i)-(ii) of the Settlement Agreement.

13.     The Court confirms the appointment of The Garretson Resolution Group, Inc. as the BAP Administrator, BrownGreer PLC as the Claims Administrator, The Garretson Resolution Group, Inc. as the Lien Resolution Administrator and Citibank, N.A. as the Trustee, and confirms that the Court retains continuing jurisdiction over those appointed. Pursuant to Federal Rule of Civil Procedure 53 and the inherent authority of the Court, the Court appoints Wendell Pritchett and Jo-Ann M. Verrier as Special Master to perform the duties of the Special Master as set forth in the Settlement Agreement for a five-year term commencing from the Effective Date of the Settlement Agreement.

14.     As provided in the Settlement Agreement, this Final Order and Judgment and the related documents and any actions taken by the NFL Parties or the Released Parties in the negotiation, execution, or satisfaction of the Settlement Agreement: (a) do not and shall not, in any event, constitute, or be construed as, an admission of any liability or wrongdoing, or recognition of the validity of any claim made by the Class and Subclass Representatives, the Settlement Class, or any Settlement Class Member in this or any other action or proceeding; and (b) shall not, in any way, be construed as, offered as, received as, used as, or deemed to be evidence, admissible or otherwise, of any kind, or used in any other fashion, by the Class and Subclass Representatives, the Settlement Class, any Settlement Class Member, Class Counsel, or any of the Released Parties in any litigation, action, hearing, or any judicial, arbitral, administrative, regulatory or other proceeding for any purpose, except a proceeding to resolve a dispute arising under, or to enforce, the Settlement Agreement. Neither the Settlement Agreement nor any of its provisions, negotiations, statements, or court proceedings relating to its provisions, nor any actions undertaken in this Settlement Agreement, will be construed as, offered as, received as, used as, or deemed to be evidence, admissible or otherwise, or admission or concession of any liability or wrongdoing whatsoever on the part of any person or entity, including, but not limited to, the Released Parties, or as a waiver by the Released Parties of any applicable defense, or as a waiver by the Class and Subclass Representatives, the Settlement Class, or any Settlement Class Member, of any claims, causes of action, or remedies.  This Paragraph shall not apply to disputes between the NFL Parties and their insurers, as to which the NFL Parties reserve all rights.

15.    The Class Action Complaint is dismissed with prejudice, without further costs, including claims for interest, penalties, costs and attorneys' fees, except that motions for an award of attorneys' fees and reasonable incurred costs, as contemplated by the Parties in Section 21.1 of the Settlement Agreement, may be filed at an appropriate time to be determined by the Court, after the Effective Date of the Settlement Agreement.

16.    All Related Lawsuits pending in the Court are dismissed with prejudice.

17.    The Court retains continuing and exclusive jurisdiction over this action including jurisdiction over the Parties and their counsel, all Settlement Class Members, the Special Master, BAP Administrator, Claims Administrator, Lien Resolution Administrator, Appeals Advisory Panel, Appeals Advisory Panel Consultants, and Trustee. In accordance with the terms of the Settlement Agreement, the Court retains continuing and exclusive jurisdiction to interpret, implement, administer and enforce the Settlement Agreement, and to implement and complete the claims administration and distribution process. The Court also retains continuing jurisdiction over any "qualified settlement funds," that are established under the Settlement Agreement as defined under § 1.468B-1 of the Treasury Regulations promulgated under Sections 461(h) and 468B of the Internal Revenue Code of 1986, as amended.

18.    Without further approval from the Court, and without the express written consent of Class Counsel and Counsel for the NFL Parties, the Settlement Agreement is not subject to any change, modification, amendment, or addition.

19.    The terms of the Settlement Agreement and of this Final Order and Judgment are forever binding on the Parties, as well as on their respective heirs, executors, administrators, predecessors, successors, affiliates and assigns.  The Opt Outs are excluded from the Settlement Class pursuant to request and are not bound by the terms of the Settlement

Agreement or this Final Order and Judgment.  The Claims Administrator has posted a list of Opt

Outs.  *See* ECF No. 6533.


                                         s/Anita B. Brody

                                         _____

                                         ANITA B. BRODY, J.




Copies **VIA ECF** on _____ to:    Copies **MAILED** on _____ to:

 **CONCUSSION SETTLEMENT**
*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

## REGISTRATION FORM

**All Settlement Class Members, whether a Retired NFL Football Player, a Representative Claimant, or a Derivative Claimant, must register to be eligible for benefits. Please complete this form to the best of your ability. You also may complete this form online by clicking the Register Now button at www.NFLConcussionsettlement.com. If you need assistance, call 1-855-887-3485.**

### EVERYONE MUST SELECT ONE OPTION BELOW

☐  I am a <u>Retired NFL Football Player</u>.

☒  I am a <u>Representative Claimant</u>. I have a legal right to act on behalf of a Retired NFL Football Player.

☐  I am a <u>Derivative Claimant</u>. I have certain legal rights because of my relationship with a Retired NFL Football Player.

### SECTION I.  IDENTITY OF RETIRED NFL FOOTBALL PLAYER
### Everyone must complete this section

| **Name of Retired Player** | First<br>Robin | M.I.<br>B | Last<br>Cornish | Suffix |
|---|---|---|---|---|

| **Retired Player's SSN, Taxpayer ID or Foreign ID Number** (if not a U.S. Citizen) | \|3\|4\|0\| - \|7\|2\| - \|4\|0\|6\|8\|<br>**or**<br>_____ | **Retired Player's Date of Birth** | \|0\|9\|/\|2\|4\|/\|1\|9\|6\|7\|<br>(Month/Day/Year) |
|---|---|---|---|

| **Retired Player's Professional Football Employment History (if known)**<br><br>Please complete this section to the best of your ability, as shown in the example. If you need space for more than six teams, please attach an extra page to this form. | **Team** | **From** | **To** |
|---|---|---|---|
| | ***Example:*** New York Giants | 2001 | 2005 |
| | San Diego Chargers | 1990 | 1992 |
| | Dallas Cowboys | 1992 | 1995 |
| | Minnesota Vikings | 1994 | 1994 |
| | Jacksonville Jaguars | 1995 | 1995 |
| | Philadelphia Eagles | 1995 | 1996 |
| | | | |

**CONTINUE TO PAGE 2**

## REGISTRATION FORM

### SECTION II.  FOR RETIRED NFL FOOTBALL PLAYER CLAIMANTS ONLY

If you are a Retired NFL Football Player, complete this section.  If you are NOT a Retired NFL Football Player, skip this section and go to Section III

| | |
|---|---|
| **Settlement Program ID** (if known) | |

| **Your Mailing Address** | Address 1 |
|---|---|
| | Address 2 |
| | City |
| | State/Province |
| | Postal Code / Country |

| **Your Telephone Number** | \|_\|_\|_\| - \|_\|_\|_\| - \|_\|_\|_\|_\| |
|---|---|
| **Your Email Address** | |

| **Preferred Method for Us to Communicate with You** | ☐ **Online Portal**    ☐ **Email**    ☐ **U.S. Mail** |
|---|---|

**CONTINUE TO PAGE 3**

| REGISTRATION FORM |
|---|

| SECTION III.  FOR REPRESENTATIVE CLAIMANTS ONLY |
|---|

If you are a Representative Claimant, complete this section.  If you are NOT a Representative Claimant, skip this section and go to Section IV.

A Representative Claimant is an authorized representative, ordered by a court or other official of competent jurisdiction under applicable state law, of a deceased or legally incapacitated or incompetent Retired NFL Football Player.

| Settlement Program ID (if known) | 950012548 | | | |
|---|---|---|---|---|

| **Your Name** | First<br>Robin | M.I.<br>B | Last<br>Cornish | Suffix |
|---|---|---|---|---|

| **Your Mailing Address** | Address 1<br>2213 Frio Dr |
|---|---|
| | Address 2 |
| | City<br>Keller |
| | State/Province<br>TX |
| | Postal Code<br>76248 · Country<br>United States |

| **Your Telephone Number** | \| 8 \| 1 \| 7 \| - \| 8 \| 4 \| 5 \| - \| 9 \| 4 \| 4 \| 5 \| |
|---|---|

| **Your Email Address** | rbc0917@yahoo.com |
|---|---|

| **Preferred Method for Us to Communicate with You** | ☐ **Online Portal** | ☒ **Email** | ☐ **U.S. Mail** |
|---|---|---|---|

| **Is the Retired NFL Football Player for whom you are acting deceased or legally incapacitated or incompetent?** | ☒ **Deceased**<br>☐ **Legally Incapacitated or Incompetent** |
|---|---|

| **Date of Death** (if applicable) | \| 0 \| 8 \|/\| 2 \| 3 \|/\| 2 \| 0 \| 0 \| 8 \|<br>(Month/Day/Year) | **Retired NFL Football Player's Last Known State of Residence** | TX |
|---|---|---|---|

**Note to Representative Claimants:**

Along with this Registration Form, <u>YOU MUST SUBMIT</u> a copy of the court order or other document issued by an official of competent jurisdiction that gives you legal authority to act on behalf of the deceased or legally incapacitated or incompetent Retired NFL Football Player.

If you have not yet been ordered by a court or other official of competent jurisdiction to be the authorized representative of the deceased or legally incapacitated or incompetent Retired NFL Football Player before the Registration deadline, <u>you may request a deadline extension</u> to submit your Registration Form by: (1) using your secure online portal; or (2) writing to the NFL Concussion Settlement Claims Administrator, P.O. Box 25369, Richmond, VA 23260.

**CONTINUE TO PAGE 4**

## REGISTRATION FORM

## SECTION IV.  FOR DERIVATIVE CLAIMANTS ONLY

If you are a Derivative Claimant, complete this section.  If you are NOT a Derivative Claimant, skip this section and go to Section V.

A Derivative Claimant is a spouse, parent, child who is a dependent, or any other person who properly under applicable state law asserts the right to sue independently or derivatively by reason of their relationship with a Retired NFL Football Player.

| **Settlement Program ID** (if known) | | | |
|---|---|---|---|

| **Your Name** | First | M.I. | Last | Suffix |
|---|---|---|---|---|

| **Your Mailing Address** | Address 1 |
|---|---|
| | Address 2 |
| | City |
| | State/Province |
| | Postal Code | Country |

| **Your Telephone Number** | \|_\|_\|_\| - \|_\|_\|_\| - \|_\|_\|_\|_\| |
|---|---|

| **Your Email Address** | |
|---|---|

| **Preferred Method for Us to Communicate with You** | ☐ **Online Portal** | ☐ **Email** | ☐ **U.S. Mail** |
|---|---|---|---|

| **What is your relationship to the Retired NFL Football Player?** | |
|---|---|

**CONTINUE TO PAGE 5**

| REGISTRATION FORM | | | | |
|---|---|---|---|---|
| **SECTION V.  ATTORNEY INFORMATION**<br>**FOR ALL REGISTRANTS** | | | | |

If an attorney is representing you in connection with the NFL Concussion Settlement, complete this section.  If an attorney is NOT representing you in connection with the NFL Concussion Settlement, skip this section and go to Section VI.

| **Attorney Name** | First<br>Justin | M.I. | Last<br>Demerath | Suffix |
|---|---|---|---|---|
| **Law Firm Name** | O'Hanlon, McCollom & Demerath | | | |

| **Attorney Mailing Address** | Address 1<br>808 West Avenue | |
|---|---|---|
| | Address 2 | |
| | City<br>Austin | |
| | State/Province<br>TX | |
| | Postal Code<br>78701 | Country<br>United States |

| **Attorney Telephone** | \| 5 \| 1 \| 2 \| - \| 4 \| 9 \| 4 \| - \| 9 \| 9 \| 4 \| 9 \| |
|---|---|
| **Attorney Fax** | \| 5 \| 1 \| 2 \| - \| 4 \| 9 \| 4 \| - \| 9 \| 9 \| 1 \| 9 \| |
| **Attorney Email Address** | jdemerath@808west.com |

All future communications related to the NFL Concussion Settlement will be directed to your attorney.

**CONTINUE TO PAGE 6**

| REGISTRATION FORM | | | | | |
|---|---|---|---|---|---|
| **SECTION VI.  SIGNATURE**<br>**FOR ALL REGISTRANTS** | | | | | |

This Form is an official document submitted in connection with the Class Action Settlement in *In re: National Football League Players' Concussion Injury Litigation,* No. 2:12-md-2323 (E.D. Pa.).  **By signing below, I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that all information provided in this Registration Form is true and correct to the best of my knowledge, information and belief.**

| **Signature** | *s/* Robin B Cornish | | **Date** | | | |0|7|/|2|5|/|2|0|1|7|<br>(Month/Day/Year) |
|---|---|---|---|---|---|---|
| **Printed Name** | First<br>Robin | | M.I.<br>B | Last<br>Cornish | | Suffix |

| **SECTION VII.  HOW TO SUBMIT THIS REGISTRATION FORM** | |
|---|---|
| **By Email:** | ClaimsAdministrator@NFLConcussionSettlement.com |
| **By Mail:** | NFL Concussion Settlement<br>Claims Administrator<br>P.O. Box 25369<br>Richmond, VA 23260 |
| **By Delivery:**<br>(FedEx, UPS, etc.) | NFL Concussion Settlement<br>c/o BrownGreer PLC<br>250 Rocketts Way<br>Richmond, VA 23231 |

**If you are a valid Settlement Class Member you will be REGISTERED once you submit this form.  The Claims Administrator will contact you if there are any additional questions about the information you have provided.**

**END OF REGISTRATION FORM**



# NFL CONCUSSION SETTLEMENT

*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

## NOTICE OF ATTORNEY REPRESENTATION
### DATE OF NOTICE: **July 27, 2017**

### I. REGISTRANT INFORMATION

| **Settlement Program ID** (This is your assigned ID for use throughout the Settlement Program.) | 950012548 |
|---|---|

| **Name:** | First: Robin | M.I.: B | Last: Cornish |
|---|---|---|---|

This Notice is an official communication from the Claims Administrator for the NFL Concussion Settlement Program. The lawyer identified in Section II below has told us that he or she represents you as your lawyer in the NFL Concussion Settlement Program. If we have an email address for you, we also emailed this same Notice to you.

### II. LAWYER INFORMATION

| **Law Firm:** | Law Firm Name: O'Hanlon, McCollom & Demerath | | | |
|---|---|---|---|---|
| | Attorney First Name: Justin | M.I.: B | Attorney Last Name: Demerath | Suffix: |

| **Address:** | Street: 808 West Avenue | | Apt/Ste/Unit: |
|---|---|---|---|
| | City: Austin | State/Province: TX | |
| | Postal Code: 78701 | Country: United States | |
| | Email: jdemerath@808west.com | Telephone: | 5 | 1 | 2 | - | 4 | 9 | 4 | - | 9 | 9 | 4 | 9 | | |

### III. WHAT THIS MEANS

We have sent this Notice to you and the lawyer listed above.

If this lawyer represents you in the NFL Concussion Settlement Program, no further action is required. We will direct all future communications, including all notices about registration or claim determinations, to this lawyer. If you have questions about the Settlement Program or your next steps, contact that lawyer.

If this lawyer does not represent you in the NFL Concussion Settlement Program, promptly inform us in writing who represents you or that you have no lawyer and are proceeding on your own. If you have questions, call us toll-free at 1-855-887-3485.

| **By Email:** | ClaimsAdministrator@NFLConcussionSettlement.com |
|---|---|
| **By U.S. Mail:** | NFL Concussion Settlement Claims Administrator P.O. Box 25369 Richmond, VA 23260 |

| By Delivery: | NFL Concussion Settlement<br>c/o BrownGreer PLC<br>250 Rocketts Way<br>Richmond, VA 23231 |
|---|---|

## ORDER

On this day, the Court considered the Small Estate Affidavit (the "Affidavit") that was executed by Distributee of the estate of Frank Edgar Cornish IV.

The Court FINDS that the Affidavit complies with the terms and provisions of Section 137 of the Texas Probate Code, that this Court has jurisdiction and venue, that the estate of Frank Edgar Cornish IV qualifies under the provisions of the Texas Probate Code as a Small Estate, and that the Affidavit should be approved.

IT IS ORDERED and DECREED that the foregoing Affidavit be, and the same is hereby, APPROVED, and shall forthwith be recorded as an official public record under Chapter 194, Texas Local Government Code, or the Affidavit must be recorded in the Small Estates records of this County, and the Clerk of this Court shall issue certified copies thereof to all persons entitled thereto.

IT IS FURTHER ORDERED and DECREED that this Order shall constitute sufficient legal authority to any persons having custody of any property, or acting as registrar or transfer agent of any evidence of any interest, property, or right belonging to the estate of Frank Edgar Cornish IV, or to any person purchasing from or otherwise dealing with the estate of Frank Edgar Cornish IV, for payment or transfer, without liability, to the persons described in the Affidavit, who are entitled to receive the asset without administration. The person or persons entitled to property as described in the Affidavit shall be entitled to deal with and treat the properties to which they are entitled in the same manner as if the record of title thereof was vested in their names.

SIGNED this _January 12_, 200_9_.

_____
Judge Presiding

**Please return to:**
Alan C. Duncan
Cantey Hanger, LLP
181 Grand Avenue, Suite 222
Southlake, Texas 76092



A CERTIFIED COPY,

ATTEST: _1 - 15_, 20_09_
SUZANNE HENDERSON, County Clerk
Tarrant County, Texas
BY: _____ Deputy

Small Estate Affidavit and Order
Estate of Frank Edgar Cornish IV, Deceased

SCANNED
-3084-
JAN 1 4 2009

SCANNED
JAN 09 2009

Page 7 of 7

09- SE00003-2

NO. _____

FILED
TARRANT COUNTY TEXAS
2009 JAN -9 AM 11: 30
SUZANNE HENDERSON
COUNTY CLERK
BY _____

| | | |
|---|---|---|
| ESTATE OF | § | IN PROBATE COURT |
| | § | |
| FRANK EDGAR CORNISH IV, | § | NUMBER _____ OF |
| | § | |
| DECEASED | § | TARRANT COUNTY, TEXAS |

## SMALL ESTATE AFFIDAVIT AND ORDER

| | |
|---|---|
| STATE OF TEXAS | § |
| COUNTY OF TARRANT | § |

The undersigned ("Distributee"), being first duly sworn, states on oath and furnishes the following information to the Court:

1.    FRANK EDGAR CORNISH IV ("Decedent") died on August 23, 2008, in Southlake, Tarrant County, Texas.  To the best of my knowledge, Decedent died intestate.

2.    At the time of his death, Decedent was domiciled and had a fixed place of residence in Tarrant County, Texas.

3.    No petition for the appointment of a personal representative of Decedent's estate is pending or has been granted.

4.    More than thirty days have elapsed since the death of Decedent.

5.    The value of the entire assets of Decedent's estate, not including homestead and exempt property, does not exceed $50,000, and those nonexempt assets exceed the known liabilities of the estate exclusive of liabilities secured by homestead and exempt property.

TRUE AND CORRECT COPY OF
ORIGINAL RECORD FILED IN
TARRANT COUNTY, TEXAS:
SUZANNE HENDERSON, COUNTY CLERK

Small Estate Affidavit and Order
Estate of Frank Edgar Cornish IV, Deceased

SCANNED
-3085-
JAN 14 2009

SCANNED
JAN 09 2009

Page 1 of 7

6.    All of the known assets of Decedent's estate, including homestead and exempt property, are as follows:

| Description | Exempt Property | Community or Separate Property | Estimated Full Value | Decedent's Community Share |
|---|---|---|---|---|
| Cash Deposit-Wachovia Securities Command Asset (Account Number XXXX-4682) | No | Community | $21,451 | 50% |
| Account Receivable-Wachovia Securities | No | Community | $20,000 | 50% |
| EECU Certificate of Deposit (Account Number XXXXXXX931) | No | Community | $5,056 | 50% |
| 1994 Chevrolet Suburban (V.I.N. 1GNEC16K9R1392597) | No | Community | $1,600 | 50% |
| 1991 Jeep Cherokee Limited (V.I.N. 1J4FJ78S1ML508207) | No | Community | $1,500 | 50% |
| Jewelry | No | Community | $8,500 | 50% |
| **TOTAL NONEXEMPT PROPERTY** | | | **$58,107** | |
| **DECEDENT'S 50% COMMUNITY SHARE** | | | **$29,054** | |

| | | | | |
|---|---|---|---|---|
| 2007 Chevrolet Suburban (V.I.N. 3GNFC16047G190588) | Yes | Community | $23,000 | 50% |
| 2007 Honda Accord (V.I.N. 1HGCM56827A089586) | Yes | Community | $17,000 | 50% |
| Jewelry | Yes | Community | $13,000 | 50% |
| Household Furnishings, Family Heirlooms & Wearing Apparel | Yes | Community | $5,000 | 50% |
| **TOTAL EXEMPT PROPERTY** | | | **$58,000** | |
| **DECEDENT'S 50% COMMUNITY SHARE** | | | **$29,000** | |



TRUE AND CORRECT COPY OF
ORIGINAL RECORD FILED IN
TARRANT COUNTY, TEXAS.
SUZANNE HENDERSON, COUNTY CLERK
-3086-

7.    All of the known liabilities of Decedent's estate are as follows:

| Creditor | Description | Amount |
|----------|-------------|--------|
| EECU | Loan Secured by 2007 Honda Accord | $14,860 |
| EECU | Loan Secured by 2007 Chevrolet Suburban | $26,579 |

8.    Decedent was married to and was survived by Robin Blake Cornish on the date of his death; Robin Blake Cornish is, therefore, Decedent's surviving spouse.  During this marriage, the following children were born to Decedent and Robin Blake Cornish:  Frank E. Cornish V (born June 15, 1994), Gabrielle D. Cornish (born May 11, 1995), Sydney S. Cornish (born September 27, 1996), Sarah J. Cornish (born September 27, 1996) and Blake J. Cornish (born July 20, 2000).  All of the children born to Decedent and Robin Blake Cornish survived Decedent and reside with Robin Blake Cornish at the address set forth in paragraph 10 below.

9.    All children born to or adopted by Decedent have been listed and all such children are also children of Robin Blake Cornish.  All marriages and divorces of Decedent have been listed.

10.    The name and address of the sole Distributee, Distributee's relationship to Decedent, and the share of the estate claimed by Distributee (to the extent that the assets of the estate, exclusive of the homestead and exempt property, exceed the known liabilities of the estate) are as follows:

| Name and Address | Relationship to Decedent | Portion of Estate Claimed |
|------------------|--------------------------|---------------------------|
| Robin Blake Cornish 305 Sheffield Drive Southlake, Texas 76092 | Surviving Spouse | 100% |



TRUE AND CORRECT COPY OF
ORIGINAL RECORD FILED IN
TARRANT COUNTY, TEXAS:
SUZANNE HENDERSON, COUNTY CLERK

11.    None of the affiants is a minor or incapacitated.

12.    The facts recited above are within my personal knowledge and are true and correct.

Distributee prays that this Affidavit be approved by the Court, that this Affidavit be filed as an official public record under Chapter 194, Texas Local Government Code (or be kept by the County Clerk in an appropriate Small Estates book), and that the County Clerk issue certified copies of the filed Affidavit to Distributee so that she may present them to the persons owing money to the estate, having custody or possession of estate property, or acting as registrar, fiduciary, or transfer agent of anyone having evidence of interest, indebtedness, property, or other rights belonging to the estate in order for those persons to pay, deliver, issue, or transfer the property.



ROBIN BLAKE CORNISH, Distributee


SWORN TO and SUBSCRIBED BEFORE ME by Robin Blake Cornish, on December 3, 2008, to certify which witness my hand and seal of office.

_Vanessa Bench_
Notary Public, State of Texas

VANESSA BENCH
MY COMMISSION EXPIRES
February 9, 2011

Small Estate Affidavit and Order
Estate of Frank Edgar Cornish IV, Deceased

TRUE AND CORRECT COPY OF
ORIGINAL RECORD FILED IN
TARRANT COUNTY, TEXAS.
SUZANNE HENDERSON, COUNTY CLERK

Page 4 of 7

The undersigned witness, being first duly sworn, states on oath that:

I have no financial or beneficial interest in the estate of Frank EDGAR Cornish IV, deceased, under the laws of descent and distribution of the State of Texas or otherwise. I have read the document to which my affidavit is attached and have personal knowledge of all matters set forth therein and the facts therein set forth are true and correct.

RUSSELL MARYLAND, Affiant
1330 Eagle Bend
Southlake, Texas 76092

SWORN TO and SUBSCRIBED BEFORE ME by Russell Maryland, on December 31, 2008, to certify which witness my hand and seal of office.



VANESSA BENCH
MY COMMISSION EXPIRES
February 9, 2011

Notary Public, State of Texas

The undersigned witness, being first duly sworn, states on oath that:

I have no financial or beneficial interest in the estate of Frank Edgar Cornish IV, deceased, under the laws of descent and distribution of the State of Texas or otherwise. I have read the document to which my affidavit is attached and have personal knowledge of all matters set forth therein and the facts therein set forth are true and correct.

ANTHONY TOLBERT, Affiant
475 S. White Chapel Blvd.
Southlake, Texas 76092



2009 SWORN TO and SUBSCRIBED BEFORE ME by Anthony Tolbert, on ~~December 2008~~ January 7, to certify which witness my hand and seal of office.

VANESSA BENCH
MY COMMISSION EXPIRES
February 9, 2011

Notary Public, State of Texas



TRUE AND CORRECT COPY OF
ORIGINAL RECORD FILED IN
TARRANT COUNTY, TEXAS.
SUZANNE HENDERSON, COUNTY CLERK

APPROVED AS TO FORM ONLY:

Alan C. Duncan
State Bar #24002021
Cantey Hanger, LLP
181 Grand Avenue, Suite 222
Southlake, Texas 76092
Phone:        (817) 877-2879
Fax #:        (817) 878-6050
ATTORNEYS FOR ROBIN BLAKE CORNISH

A CERTIFIED COPY,

ATTEST: _____1-15_____, 2009

SUZANNE HENDERSON, County Clerk
Tarrant County, Texas

BY_____ Deputy



# NFL CONCUSSION SETTLEMENT

*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

## REGISTRATION FORM

**All Settlement Class Members, whether a Retired NFL Football Player, a Representative Claimant, or a Derivative Claimant, must register to be eligible for benefits. Please complete this form to the best of your ability. You also may complete this form online by clicking the Register Now button at www.NFLConcussionsettlement.com. If you need assistance, call 1-855-887-3485.**

### EVERYONE MUST SELECT ONE OPTION BELOW

☐ I am a <u>Retired NFL Football Player</u>.

☒ I am a <u>Representative Claimant</u>. I have a legal right to act on behalf of a Retired NFL Football Player.

☐ I am a <u>Derivative Claimant</u>. I have certain legal rights because of my relationship with a Retired NFL Football Player.

### SECTION I.  IDENTITY OF RETIRED NFL FOOTBALL PLAYER
### Everyone must complete this section

| **Name of Retired Player** | First: Frank | | M.I. | Last: Cornish | Suffix |
|---|---|---|---|---|---|

| **Retired Player's SSN, Taxpayer ID or Foreign ID Number** (if not a U.S. Citizen) | \|3\|4\|0\| - \|7\|2\| - \|4\|0\|6\|8\| **or** _____ | **Retired Player's Date of Birth** | \|0\|9\|/\|2\|4\|/\|1\|9\|6\|7\| (Month/Day/Year) |
|---|---|---|---|

**Retired Player's Professional Football Employment History (if known)**

Please complete this section to the best of your ability, as shown in the example. If you need space for more than six teams, please attach an extra page to this form.

| Team | From | To |
|---|---|---|
| ***Example***: New York Giants | 2001 | 2005 |
| San Diego Chargers | 1990 | 1992 |
| Dallas Cowboys | 1992 | 1995 |
| Minnesota Vikings | 1994 | 1994 |
| Jacksonville Jaguars | 1995 | 1995 |
| Philadelphia Eagles | 1995 | 1996 |
| | | |

**CONTINUE TO PAGE 2**

| REGISTRATION FORM |
| --- |

| SECTION II.  FOR RETIRED NFL FOOTBALL PLAYER CLAIMANTS ONLY |
| --- |

If you are a Retired NFL Football Player, complete this section.  If you are NOT a Retired NFL Football Player, skip this section and go to Section III

| **Settlement Program ID** (if known) | |
| --- | --- |
| **Your Mailing Address** | Address 1 |
| | Address 2 |
| | City |
| | State/Province |
| | Postal Code | Country |
| **Your Telephone Number** | \|_\|_\|_\| - \|_\|_\|_\| - \|_\|_\|_\|_\| |
| **Your Email Address** | |
| **Preferred Method for Us to Communicate with You** | ☐ **Online Portal**     ☐ **Email**     ☐ **U.S. Mail** |

**CONTINUE TO PAGE 3**

## REGISTRATION FORM

## SECTION III.  FOR REPRESENTATIVE CLAIMANTS ONLY

If you are a Representative Claimant, complete this section.  If you are NOT a Representative Claimant, skip this section and go to Section IV.

A Representative Claimant is an authorized representative, ordered by a court or other official of competent jurisdiction under applicable state law, of a deceased or legally incapacitated or incompetent Retired NFL Football Player.

| Settlement Program ID (if known) | 950012548 | | |
|---|---|---|---|

| **Your Name** | First<br>Robin | M.I.<br>B | Last<br>Cornish | Suffix |
|---|---|---|---|---|

| **Your Mailing Address** | Address 1<br>2213 Frio Dr |
|---|---|
| | Address 2 |
| | City<br>Keller |
| | State/Province<br>TX |
| | Postal Code<br>76248 | Country<br>United States |

| **Your Telephone Number** | \| 8 \| 1 \| 7 \| - \| 8 \| 4 \| 5 \| - \| 9 \| 4 \| 4 \| 5 \| |
|---|---|

| **Your Email Address** | rbc0917@yahoo.com |
|---|---|

| **Preferred Method for Us to Communicate with You** | ☐ **Online Portal** | ☒ **Email** | ☐ **U.S. Mail** |
|---|---|---|---|

| **Is the Retired NFL Football Player for whom you are acting deceased or legally incapacitated or incompetent?** | ☒ **Deceased**<br>☐ **Legally Incapacitated or Incompetent** |
|---|---|

| **Date of Death** (if applicable) | \| 0 \| 8 \|/\| 2 \| 3 \|/\| 2 \| 0 \| 0 \| 8 \|<br>(Month/Day/Year) | **Retired NFL Football Player's Last Known State of Residence** | TX |
|---|---|---|---|

**Note to Representative Claimants:**

Along with this Registration Form, <u>YOU MUST SUBMIT</u> a copy of the court order or other document issued by an official of competent jurisdiction that gives you legal authority to act on behalf of the deceased or legally incapacitated or incompetent Retired NFL Football Player.

If you have not yet been ordered by a court or other official of competent jurisdiction to be the authorized representative of the deceased or legally incapacitated or incompetent Retired NFL Football Player before the Registration deadline, <u>you may request a deadline extension</u> to submit your Registration Form by: (1) using your secure online portal; or (2) writing to the NFL Concussion Settlement Claims Administrator, P.O. Box 25369, Richmond, VA 23260.

**CONTINUE TO PAGE 4**

| REGISTRATION FORM |
|---|
| **SECTION IV.  FOR DERIVATIVE CLAIMANTS ONLY** |

If you are a Derivative Claimant, complete this section.  If you are NOT a Derivative Claimant, skip this section and go to Section V.
A Derivative Claimant is a spouse, parent, child who is a dependent, or any other person who properly under applicable state law asserts the right to sue independently or derivatively by reason of their relationship with a Retired NFL Football Player.

| **Settlement Program ID** (if known) | |
|---|---|

| **Your Name** | First | | M.I. | Last | | Suffix |
|---|---|---|---|---|---|---|

| **Your Mailing Address** | Address 1 |
|---|---|
| | Address 2 |
| | City |
| | State/Province |
| | Postal Code | Country |

| **Your Telephone Number** | \|_\|_\|_\| - \|_\|_\|_\| - \|_\|_\|_\|_\| |
|---|---|

| **Your Email Address** | |
|---|---|

| **Preferred Method for Us to Communicate with You** | ☐ **Online Portal** | ☐ **Email** | ☐ **U.S. Mail** |
|---|---|---|---|

| **What is your relationship to the Retired NFL Football Player?** | |
|---|---|

**CONTINUE TO PAGE 5**

| REGISTRATION FORM | | | | |
|---|---|---|---|---|
| **SECTION V.  ATTORNEY INFORMATION FOR ALL REGISTRANTS** | | | | |

If an attorney is representing you in connection with the NFL Concussion Settlement, complete this section.  If an attorney is NOT representing you in connection with the NFL Concussion Settlement, skip this section and go to Section VI.

| **Attorney Name** | First<br>Justin | M.I.<br>B | Last<br>Demerath | Suffix |
|---|---|---|---|---|

| **Law Firm Name** | O'Hanlon, McCollom & Demerath |
|---|---|

| **Attorney Mailing Address** | Address 1<br>808 West Avenue |
|---|---|
| | Address 2 |
| | City<br>Austin |
| | State/Province<br>TX |
| | Postal Code<br>78701 · Country<br>United States |

| **Attorney Telephone** | \| 5 \| 1 \| 2 \| - \| 4 \| 9 \| 4 \| - \| 9 \| 9 \| 4 \| 9 \| |
|---|---|
| **Attorney Fax** | \| \| \| \| - \| \| \| \| - \| \| \| \| \| |
| **Attorney Email Address** | jdemerath@808west.com |

All future communications related to the NFL Concussion Settlement will be directed to your attorney.

**CONTINUE TO PAGE 6**

| REGISTRATION FORM | | | |
|---|---|---|---|
| **SECTION VI.  SIGNATURE**<br>**FOR ALL REGISTRANTS** | | | |
| This Form is an official document submitted in connection with the Class Action Settlement in *In re: National Football League Players' Concussion Injury Litigation,* No. 2:12-md-2323 (E.D. Pa.).  **By signing below, I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that all information provided in this Registration Form is true and correct to the best of my knowledge, information and belief.** | | | |
| **Signature** | *s/* Justin Demerath | **Date** | \|_0_\|_7_\|/\|_3_\|_1_\|/\|_2_\|_0_\|_1_\|_7_\|<br>(Month/Day/Year) |
| **Printed Name** | First<br>Justin | M.I. | Last<br>Demerath                    Suffix |

| SECTION VII.  HOW TO SUBMIT THIS REGISTRATION FORM | |
|---|---|
| **By Email:** | ClaimsAdministrator@NFLConcussionSettlement.com |
| **By Mail:** | NFL Concussion Settlement<br>Claims Administrator<br>P.O. Box 25369<br>Richmond, VA 23260 |
| **By Delivery:**<br>(FedEx, UPS, etc.) | NFL Concussion Settlement<br>c/o BrownGreer PLC<br>250 Rocketts Way<br>Richmond, VA 23231 |
| **If you are a valid Settlement Class Member you will be REGISTERED once you submit this form.  The Claims Administrator will contact you if there are any additional questions about the information you have provided.** | |

**END OF REGISTRATION FORM**

# STATE OF CALIFORNIA
## CERTIFICATION OF VITAL RECORD

### COUNTY OF LOS ANGELES • REGISTRAR–RECORDER/COUNTY CLERK

**CERTIFICATE OF DEATH**
STATE OF CALIFORNIA
USE BLACK INK ONLY / NO ERASURES, WHITEOUTS OR ALTERATIONS
VS-11 (REV 1/06)

STATE FILE NUMBER: 3200819043413

LOCAL REGISTRATION NUMBER

**DECEDENT'S PERSONAL DATA**

| | | |
|---|---|---|
| 1 NAME OF DECEDENT — FIRST (Given) CHRISTOPHER | 2 MIDDLE EDDIE | 3 LAST (Family) MIMS |

AKA ALSO KNOWN AS — include full AKA (FIRST, MIDDLE, LAST) - - -

4 DATE OF BIRTH mm/dd/ccyy 09/29/1970 | 5 AGE Yrs 38 | IF UNDER ONE YEAR Months / Days | IF UNDER 24 HOURS Hours / Minutes | 6 SEX M

| 9 BIRTH STATE/FOREIGN COUNTRY CALIFORNIA | 10 SOCIAL SECURITY NUMBER 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 | 11 EVER IN U S ARMED FORCES? YES [X] NO UNK | 12 MARITAL STATUS (at Time of Death) DIVORCED | 7 DATE OF DEATH mm/dd/ccyy 10/15/2008 | 8 HOUR (24 Hours) 0935 |

13 EDUCATION — Highest Level/Degree (see worksheet on back) SOME COLLEGE

14/15 WAS DECEDENT HISPANIC/LATINO(A)/SPANISH? (If yes, see worksheet on back) [X] NO

16 DECEDENT'S RACE — Up to 3 races may be listed (see worksheet on back) AFRICAN AMERICAN

17 USUAL OCCUPATION — Type of work for most of life DO NOT USE RETIRED PROFESSIONAL ATHLETE | 18 KIND OF BUSINESS OR INDUSTRY (e g grocery store, road construction, employment agency etc) FOOTBALL ATHLETE | 19 YEARS IN OCCUPATION 8

**USUAL RESIDENCE**

20 DECEDENT'S RESIDENCE (Street and number or location) 612 SOUTH FLOWER STREET #409

| 21 CITY LOS ANGELES | 22 COUNTY/PROVINCE LOS ANGELES | 23 ZIP CODE 90017 | 24 YEARS IN COUNTY 25 | 25 STATE/FOREIGN COUNTRY CALIFORNIA |

**INFORMANT**

26 INFORMANT'S NAME, RELATIONSHIP MAREA BARSKY, FRIEND | 27 INFORMANT'S MAILING ADDRESS (Street and number or rural route number, city or town, state, ZIP) 249 SANTA BARBARA, IRVINE, CA 92606

**SPOUSE AND PARENT INFORMATION**

| 28 NAME OF SURVIVING SPOUSE — FIRST - | 29 MIDDLE - | 30 LAST (Maiden Name) - |
| 31 NAME OF FATHER — FIRST LORENZO | 32 MIDDLE VICTOR | 33 LAST MIMS | 34 BIRTH STATE CA |
| 35 NAME OF MOTHER — FIRST CARLEEN | 36 MIDDLE - | 37 LAST (Maiden) HASTINGS | 38 BIRTH STATE TN |

**1 of 2**

**FUNERAL DIRECTOR / LOCAL REGISTRAR**

39 DISPOSITION DATE mm/dd/ccyy 10/25/2008 | 40 PLACE OF FINAL DISPOSITION FOREST LAWN MEMORIAL PARK 6300 FOREST LAWN DR., LOS ANGELES, CA 90068

41 TYPE OF DISPOSITION(S) BU | 42 SIGNATURE OF EMBALMER ▸ JESSICA SOLIS 🖋 | 43 LICENSE NUMBER 9091

44 NAME OF FUNERAL ESTABLISHMENT FOREST LAWN MEMR PRKS & MTYS | 45 LICENSE NUMBER FD 904 | 46 SIGNATURE OF LOCAL REGISTRAR ▸ JONATHAN FIELDING, MD 🖋 | 47 DATE mm/dd/ccyy 10/23/2008

**PLACE OF DEATH**

101 PLACE OF DEATH RESIDENCE | 102 IF HOSPITAL, SPECIFY ONE: IP / ER/OP / DOA | 103 IF OTHER THAN HOSPITAL, SPECIFY ONE: Hospice / Nursing Home/LTC / [X] Decedent's Home / Other

104 COUNTY LOS ANGELES | 105 FACILITY ADDRESS OR LOCATION WHERE FOUND (Street and number or location) 612 SOUTH FLOWER STREET #409 | 106 CITY LOS ANGELES

**CAUSE OF DEATH**

107 CAUSE OF DEATH Enter the chain of events — diseases, injuries, or complications — that directly caused the death. DO NOT enter terminal events such as cardiac arrest, respiratory arrest, or ventricular fibrillation without showing the etiology. DO NOT ABBREVIATE.

IMMEDIATE CAUSE (Final disease or condition resulting in death) (A) DEFERRED

Sequentially list conditions, if any, leading to cause on Line A. Enter UNDERLYING CAUSE (disease or injury that initiated the events resulting in death) LAST (B) / (C) / (D)

Time Interval Between Onset and Death: (A) - / (B) / (C) / (D)

108 DEATH REPORTED TO CORONER? [X] YES / NO
REFERRAL NUMBER 2008-07210

109 BIOPSY PERFORMED? YES / [X] NO

110 AUTOPSY PERFORMED? [X] YES / NO

111 USED IN DETERMINING CAUSE? [X] YES / NO

112 OTHER SIGNIFICANT CONDITIONS CONTRIBUTING TO DEATH BUT NOT RESULTING IN THE UNDERLYING CAUSE GIVEN IN 107 NONE

113 WAS OPERATION PERFORMED FOR ANY CONDITION IN ITEM 107 OR 112? (If yes, list type of operation and date) NO

113A IF FEMALE, PREGNANT IN LAST YEAR? YES / NO / UNK

**PHYSICIAN'S CERTIFICATION**

114 I CERTIFY THAT TO THE BEST OF MY KNOWLEDGE DEATH OCCURRED AT THE HOUR, DATE AND PLACE STATED FROM THE CAUSES STATED. Decedent Attended Since (A) mm/dd/ccyy / Decedent Last Seen Alive (B) mm/dd/ccyy | 115 SIGNATURE AND TITLE OF CERTIFIER ▸ | 116 LICENSE NUMBER | 117 DATE mm/dd/ccyy

118 TYPE ATTENDING PHYSICIAN'S NAME, MAILING ADDRESS, ZIP CODE

**CORONER'S USE ONLY**

118 I CERTIFY THAT IN MY OPINION DEATH OCCURRED AT THE HOUR, DATE, AND PLACE STATED FROM THE CAUSES STATED. MANNER OF DEATH: Natural / Accident / Homicide / Suicide / [X] Pending Investigation / Could not be determined | 120 INJURED AT WORK? YES / NO / UNK | 121 INJURY DATE mm/dd/ccyy | 122 HOUR (24 Hours)

123 PLACE OF INJURY (e g home, construction site, wooded area, etc)

124 DESCRIBE HOW INJURY OCCURRED (Events which resulted in injury)

125 LOCATION OF INJURY (Street and number or location and city, and ZIP)

126 SIGNATURE OF CORONER / DEPUTY CORONER ▸ EVONNE D REED 🖋 | 127 DATE mm/dd/ccyy 10/20/2008 | 128 TYPE NAME, TITLE OF CORONER / DEPUTY CORONER EVONNE D REED, DEPUTY CORONER

**STATE REGISTRAR** A / B / C / D / E

*01200800916134*

FAX AUTH # | CENSUS TRACT

---

This is to certify that this document is a true copy of the official record filed with the Registrar-Recorder/County Clerk.

*Dean C. Logan (signature)*
DEAN C. LOGAN
Registrar-Recorder/County Clerk

SEP 0 4 2015

*1 00000069 9023*



This copy not valid unless prepared on engraved border displaying the Seal and Signature of the Registrar-Recorder/County Clerk. PBNCO (REV) 07/11

ANY ALTERATION OR ERASURE VOIDS THIS CERTIFICATE

# COUNTY OF LOS ANGELES • REGISTRAR–RECORDER/COUNTY CLERK

3052008191127
**STATE FILE NUMBER**

### PHYSICIAN/CORONER'S AMENDMENT
NO ERASURES, WHITEOUTS, PHOTOCOPIES, OR ALTERATIONS

3200819043413
**LOCAL REGISTRATION NUMBER**

1.1

☐ BIRTH    ☒ DEATH    ☐ FETAL DEATH

TYPE OR PRINT CLEARLY IN BLACK INK ONLY – THIS AMENDMENT BECOMES AN ACTUAL PART OF THE OFFICIAL RECORD

## PART I    INFORMATION TO LOCATE RECORD

| INFORMATION AS IT APPEARS ON ORIGINAL RECORD | 1A. NAME—FIRST CHRISTOPHER | 1B. MIDDLE EDDIE | 1C. LAST MIMS | 2. SEX M |
|---|---|---|---|---|
| | 3. DATE OF EVENT—MM/DD/CCYY 10/15/2008 | 4. CITY OF EVENT LOS ANGELES | 5. COUNTY OF EVENT LOS ANGELES | |

## PART II    STATEMENT OF CORRECTIONS

2 of 2

| | 6. CERTIFICATE ITEM NUMBER | 7. INFORMATION AS IT APPEARS ON ORIGINAL RECORD | 8. INFORMATION AS IT SHOULD APPEAR |
|---|---|---|---|
| LIST ONE ITEM PER LINE | 107A | DEFERRED | DILATED CARDIOMYOPATHY |
| | 107AT | - | YEARS |
| | 112' | NONE | HEPATIC STEATOSIS, HISTORY OF HYPERTENSION |
| | 119. | PENDING INVESTIGATION | NATURAL |

I HEREBY DECLARE UNDER PENALTY OF PERJURY THAT THE ABOVE INFORMATION IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.

**DECLARATION OF CERTIFYING PHYSICIAN OR CORONER**

| 9. SIGNATURE OF CERTIFYING PHYSICIAN OR CORONER ▶ LOUIS A PENA MD | 10. DATE SIGNED—MM/DD/CCYY 12/12/2008 | 11. TYPED OR PRINTED NAME AND TITLE/DEGREE OF CERTIFIER DME |
|---|---|---|
| 12. ADDRESS—STREET and NUMBER 1104 NORTH MISSION ROAD | 13. CITY LOS ANGELES | 14. STATE CA | 15. ZIP CODE 90033 |

**STATE/LOCAL REGISTRAR USE ONLY**

| 16. OFFICE OF VITAL RECORDS OR LOCAL REGISTRAR ▶ STATE REGISTRAR - OFFICE OF VITAL RECORDS | 17. DATE ACCEPTED FOR REGISTRATION—MM/DD/CCYY 12/15/2008 |
|---|---|

STATE OF CALIFORNIA, DEPARTMENT OF PUBLIC HEALTH, OFFICE OF VITAL RECORDS

*022008000147340*

**FORM VS 24Ae (REV. 1/08)**

1.1

This is to certify that this document is a true copy of the official record filed with the Registrar-Recorder/County Clerk.

SEP 04 2015

Dean C Logan
DEAN C. LOGAN
Registrar-Recorder/County Clerk



*100000699024*

This copy not valid unless prepared on engraved border displaying the Seal and Signature of the Registrar-Recorder/County Clerk.
PBNCO (REV) 07/11

-3098-

ANY ALTERATION OR ERASURE VOIDS THIS CERTIFICATE

# COUNTY OF LOS ANGELES · REGISTRAR–RECORDER/COUNTY CLERK

**CERTIFICATE OF DEATH**
STATE OF CALIFORNIA
USE BLACK INK ONLY / NO ERASURES, WHITEOUTS OR ALTERATIONS
VS-11(REV 1/05)

3200819043413

LOCAL REGISTRATION NUMBER

| | | |
|---|---|---|
| STATE FILE NUMBER | | |

**DECEDENT'S PERSONAL DATA**

| 1 NAME OF DECEDENT — FIRST (Given) CHRISTOPHER | 2 MIDDLE EDDIE | 3 LAST (Family) MIMS | |
|---|---|---|---|
| AKA ALSO KNOWN AS — include full AKA (FIRST MIDDLE LAST) - - - | 4 DATE OF BIRTH mm/dd/ccyy 09/29/1970 | 5 AGE Yrs 38 | IF UNDER ONE YEAR Months / Days | IF UNDER 24 HOURS Hours / Minutes | 6 SEX M |
| 9 BIRTH STATE/FOREIGN COUNTRY CALIFORNIA | 10 SOCIAL SECURITY NUMBER 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 | 11 EVER IN U.S. ARMED FORCES? YES ☒ NO ☐ UNK | 12 MARITAL STATUS (at Time of Death) DIVORCED | 7 DATE OF DEATH mm/dd/ccyy 10/15/2008 | 8 HOUR (24 Hours) 0935 |
| 13 EDUCATION — Highest Level/Degree (see worksheet on back) SOME COLLEGE | 14/15 WAS DECEDENT HISPANIC/LATINO(A)/SPANISH? (If yes, see worksheet on back) YES ☐ ☒ NO | | 16 DECEDENT'S RACE — Up to 3 races may be listed (see worksheet on back) AFRICAN AMERICAN | | |
| 17 USUAL OCCUPATION — Type of work for most of life. DO NOT USE RETIRED PROFESSIONAL ATHLETE | | 18 KIND OF BUSINESS OR INDUSTRY (e.g. grocery store, road construction, employment agency, etc.) FOOTBALL ATHLETE | | 19 YEARS IN OCCUPATION 8 | |

**DECEDENT'S USUAL RESIDENCE**

| 20 DECEDENT'S RESIDENCE (Street and number or location) 612 SOUTH FLOWER STREET #409 | | | | |
|---|---|---|---|---|
| 21 CITY LOS ANGELES | 22 COUNTY/PROVINCE LOS ANGELES | 23 ZIP CODE 90017 | 24 YEARS IN COUNTY 25 | 25 STATE/FOREIGN COUNTRY CALIFORNIA |

**INFORMANT**

| 26 INFORMANT'S NAME, RELATIONSHIP MAREA BARSKY, FRIEND | 27 INFORMANT'S MAILING ADDRESS (Street and number or rural route number, city or town, state, ZIP) 249 SANTA BARBARA, IRVINE, CA 92606 |
|---|---|

**SPOUSE AND PARENT INFORMATION**

| 28 NAME OF SURVIVING SPOUSE — FIRST - | 29 MIDDLE - | 30 LAST (Maiden Name) - | |
|---|---|---|---|
| 31 NAME OF FATHER — FIRST LORENZO | 32 MIDDLE VICTOR | 33 LAST MIMS | 34 BIRTH STATE CA |
| 35 NAME OF MOTHER — FIRST CARLEEN | 36 MIDDLE - | 37 LAST (Maiden) HASTINGS | 38 BIRTH STATE TN |

1 of 2

**FUNERAL DIRECTOR / LOCAL REGISTRAR**

| 39 DISPOSITION DATE mm/dd/ccyy 10/25/2008 | 40 PLACE OF FINAL DISPOSITION FOREST LAWN MEMORIAL PARK 6300 FOREST LAWN DR., LOS ANGELES, CA 90068 | | |
|---|---|---|---|
| 41 TYPE OF DISPOSITION(S) BU | 42 SIGNATURE OF EMBALMER ▸ JESSICA SOLIS | 🖊 | 43 LICENSE NUMBER 9091 |
| 44 NAME OF FUNERAL ESTABLISHMENT FOREST LAWN MEMR PRKS & MTYS | 45 LICENSE NUMBER FD 904 | 46 SIGNATURE OF LOCAL REGISTRAR ▸ JONATHAN FIELDING, MD 🖊 | 47 DATE mm/dd/ccyy 10/23/2008 |

**PLACE OF DEATH**

| 101 PLACE OF DEATH RESIDENCE | 102 IF HOSPITAL, SPECIFY ONE IP ☐ ER/OP ☐ DOA ☐ | 103 IF OTHER THAN HOSPITAL, SPECIFY ONE Hospice ☐ Nursing Home/LTC ☐ ☒ Decedent's Home ☐ Other |
|---|---|---|
| 104 COUNTY LOS ANGELES | 105 FACILITY ADDRESS OR LOCATION WHERE FOUND (Street and number or location) 612 SOUTH FLOWER STREET #409 | 106 CITY LOS ANGELES |

**CAUSE OF DEATH**

| 107 CAUSE OF DEATH Enter the chain of events — diseases, injuries, or complications — that directly caused the death. DO NOT enter terminal events such as cardiac arrest, respiratory arrest, or ventricular fibrillation without showing the etiology. DO NOT ABBREVIATE. | | Time Interval Between Onset and Death | 108 DEATH REPORTED TO CORONER? ☒ YES ☐ NO |
|---|---|---|---|
| IMMEDIATE CAUSE (Final disease or condition resulting in death) (A) DEFERRED | | | REFERRAL NUMBER 2008-07210 |
| Sequentially list conditions, if any, leading to cause on Line A. Enter UNDERLYING CAUSE (disease or injury that initiated the events resulting in death) LAST (B) | | (B?) | 109 BIOPSY PERFORMED? ☐ YES ☒ NO |
| (C) | | (C?) | 110 AUTOPSY PERFORMED? ☒ YES ☐ NO |
| (D) | | (D?) | 111 USED IN DETERMINING CAUSE? ☒ YES ☐ NO |
| 112 OTHER SIGNIFICANT CONDITIONS CONTRIBUTING TO DEATH BUT NOT RESULTING IN THE UNDERLYING CAUSE GIVEN IN 107 NONE | | | |
| 113 WAS OPERATION PERFORMED FOR ANY CONDITION IN ITEM 107 OR 112? (If yes, list type of operation and date) NO | | | 113A IF FEMALE, PREGNANT IN LAST YEAR? ☐ YES ☐ NO ☐ UNK |

**PHYSICIAN'S CERTIFICATION**

| 114 I CERTIFY THAT TO THE BEST OF MY KNOWLEDGE DEATH OCCURRED AT THE HOUR, DATE AND PLACE STATED FROM THE CAUSES STATED Decedent Attended Since (A) mm/dd/ccyy Decedent Last Seen Alive (B) mm/dd/ccyy | 115 SIGNATURE AND TITLE OF CERTIFIER ▸ | 116 LICENSE NUMBER | 117 DATE mm/dd/ccyy |
|---|---|---|---|
| | 118 TYPE ATTENDING PHYSICIAN'S NAME, MAILING ADDRESS, ZIP CODE | | |

**CORONER'S USE ONLY**

| 119 I CERTIFY THAT IN MY OPINION DEATH OCCURRED AT THE HOUR, DATE, AND PLACE STATED FROM THE CAUSES STATED | 120 MANNER OF DEATH Natural ☐ Accident ☐ Homicide ☐ Suicide ☐ Pending Investigation ☒ Could not be determined ☐ | 120 INJURED AT WORK? ☐ YES ☐ NO ☐ UNK | 121 INJURY DATE mm/dd/ccyy | 122 HOUR (24 Hours) |
|---|---|---|---|---|
| 123 PLACE OF INJURY (e.g. home, construction site, wooded area, etc.) | | | | |
| 124 DESCRIBE HOW INJURY OCCURRED (Events which resulted in injury) | | | | |
| 125 LOCATION OF INJURY (Street and number or location and city, and ZIP) | | | | |
| 126 SIGNATURE OF CORONER / DEPUTY CORONER ▸ EVONNE D REED 🖊 | 127 DATE mm/dd/ccyy 10/20/2008 | 128 TYPE NAME, TITLE OF CORONER / DEPUTY CORONER EVONNE D REED, DEPUTY CORONER | | |

**STATE REGISTRAR**

| A | B | C | D | E | | FAX AUTH # | CENSUS TRACT |
|---|---|---|---|---|---|---|---|
| | | | | | ‖‖‖‖ "01208000916134" | | |

This is to certify that this document is a true copy of the official record filed with the Registrar-Recorder/County Clerk.

SEP 0 4 2015

*Dean C Logan*
DEAN C. LOGAN
Registrar-Recorder/County Clerk



*1 0 0 0 0 0 6 9 9 0 2 3 *

This copy not valid unless prepared on engraved border displaying the Seal and Signature of the Registrar-Recorder/County Clerk.
PBNCO (REV) 07/11

ANY ALTERATION OR ERASURE VOIDS THIS CERTIFICATE



**STATE OF CALIFORNIA**

**COUNTY OF LOS ANGELES • REGISTRAR–RECORDER/COUNTY CLERK**

3052008191127
STATE FILE NUMBER

1.1

**PHYSICIAN/CORONER'S AMENDMENT**
NO ERASURES, WHITEOUTS, PHOTOCOPIES,
OR ALTERATIONS

3200819043413
LOCAL REGISTRATION NUMBER

☐ BIRTH   ☒ DEATH   ☐ FETAL DEATH

TYPE OR PRINT CLEARLY IN BLACK INK ONLY – THIS AMENDMENT BECOMES AN ACTUAL PART OF THE OFFICIAL RECORD

## PART I    INFORMATION TO LOCATE RECORD

| INFORMATION AS IT APPEARS ON ORIGINAL RECORD | 1A. NAME—FIRST<br>CHRISTOPHER | 1B. MIDDLE<br>EDDIE | 1C. LAST<br>MIMS | 2. SEX<br>M |
|---|---|---|---|---|
| | 3. DATE OF EVENT—MM/DD/CCYY<br>10/15/2008 | 4. CITY OF EVENT<br>LOS ANGELES | 5. COUNTY OF EVENT<br>LOS ANGELES | |

## PART II    STATEMENT OF CORRECTIONS

2 of 2

| | 6. CERTIFICATE ITEM NUMBER | 7. INFORMATION AS IT APPEARS ON ORIGINAL RECORD | 8. INFORMATION AS IT SHOULD APPEAR |
|---|---|---|---|
| LIST ONE ITEM PER LINE | 107A | DEFERRED | DILATED CARDIOMYOPATHY |
| | 107AT | - | YEARS |
| | 112' | NONE | HEPATIC STEATOSIS,<br>HISTORY OF HYPERTENSION |
| | 119. | PENDING INVESTIGATION | NATURAL |

I HEREBY DECLARE UNDER PENALTY OF PERJURY THAT THE ABOVE INFORMATION IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.

| DECLARATION OF CERTIFYING PHYSICIAN OR CORONER | 9. SIGNATURE OF CERTIFYING PHYSICIAN OR CORONER<br>► LOUIS A PENA MD | 10. DATE SIGNED—MM/DD/CCYY<br>12/12/2008 | 11. TYPED OR PRINTED NAME AND TITLE/DEGREE OF CERTIFIER<br>DME | | |
|---|---|---|---|---|---|
| | 12. ADDRESS—STREET and NUMBER<br>1104 NORTH MISSION ROAD | 13. CITY<br>LOS ANGELES | | 14. STATE<br>CA | 15. ZIP CODE<br>90033 |

| STATE/LOCAL REGISTRAR USE ONLY | 16. OFFICE OF VITAL RECORDS OR LOCAL REGISTRAR<br>► STATE REGISTRAR - OFFICE OF VITAL RECORDS | 17. DATE ACCEPTED FOR REGISTRATION—MM/DD/CCYY<br>12/15/2008 |
|---|---|---|

STATE OF CALIFORNIA, DEPARTMENT OF PUBLIC HEALTH, OFFICE OF VITAL RECORDS

*022008000147340*

FORM VS 24Ae (REV. 1/08)

1.1

This is to certify that this document is a true copy of the official record filed with the Registrar-Recorder/County Clerk.

SEP 0 4 2015

Dean C Logan
DEAN C. LOGAN
Registrar-Recorder/County Clerk



* 1 0 0 0 0 0 6 9 9 0 2 4 *

This copy not valid unless prepared on engraved border displaying the Seal and Signature of the Registrar-Recorder/County Clerk.
PBINCO (REV) 07/11

-3100-

ANY ALTERATION OR ERASURE VOIDS THIS CERTIFICATE



# NFL CONCUSSION SETTLEMENT
*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

## REGISTRATION FORM

**All Settlement Class Members, whether a Retired NFL Football Player, a Representative Claimant, or a Derivative Claimant, must register to be eligible for benefits.  Please complete this form to the best of your ability. You also may complete this form online by clicking the Register Now button at www.NFLConcussionsettlement.com.  If you need assistance, call 1-855-887-3485.**

### EVERYONE MUST SELECT ONE OPTION BELOW

☐ I am a <u>Retired NFL Football Player</u>.

☒ I am a <u>Representative Claimant</u>. I have a legal right to act on behalf of a Retired NFL Football Player.

☐ I am a <u>Derivative Claimant</u>. I have certain legal rights because of my relationship with a Retired NFL Football Player.

### SECTION I.  IDENTITY OF RETIRED NFL FOOTBALL PLAYER
### Everyone must complete this section

| **Name of Retired Player** | First<br>Christopher | | M.I. | Last<br>Mims | | | Suffix |
|---|---|---|---|---|---|---|---|

| **Retired Player's SSN, Taxpayer ID or Foreign ID Number** (if not a U.S. Citizen) | \|5\|6\|0\| - \|4\|9\| - \|8\|8\|2\|8\|<br>**or**<br>_____ | **Retired Player's Date of Birth** | \|0\|8\|/\|2\|9\|/\|1\|9\|7\|0\|<br>(Month/Day/Year) |
|---|---|---|---|

| **Retired Player's Professional Football Employment History (if known)**<br><br>Please complete this section to the best of your ability, as shown in the example.  If you need space for more than six teams, please attach an extra page to this form. | Team | From | To |
|---|---|---|---|
| | ***Example:*** New York Giants | 2001 | 2005 |
| | San Diego Chargers | 1992 | 1996 |
| | Washington Redskins | 1997 | 1997 |
| | San Diego Chargers | 1998 | 1999 |
| | | | |
| | | | |
| | | | |

**CONTINUE TO PAGE 2**

## REGISTRATION FORM

### SECTION II.  FOR RETIRED NFL FOOTBALL PLAYER CLAIMANTS ONLY

If you are a Retired NFL Football Player, complete this section.  If you are NOT a Retired NFL Football Player, skip this section and go to Section III

| | |
|---|---|
| **Settlement Program ID** (if known) | |

| | | |
|---|---|---|
| **Your Mailing Address** | Address 1 | |
| | Address 2 | |
| | City | |
| | State/Province | |
| | Postal Code | Country |

| | |
|---|---|
| **Your Telephone Number** | \|\_\|\_\|\_\| - \|\_\|\_\|\_\|\_\| - \|\_\|\_\|\_\|\_\| |
| **Your Email Address** | |
| **Preferred Method for Us to Communicate with You** | ☐ **Online Portal**      ☐ **Email**      ☐ **U.S. Mail** |

**CONTINUE TO PAGE 3**

## REGISTRATION FORM

## SECTION III.  FOR REPRESENTATIVE CLAIMANTS ONLY

If you are a Representative Claimant, complete this section.  If you are NOT a Representative Claimant, skip this section and go to Section IV.

A Representative Claimant is an authorized representative, ordered by a court or other official of competent jurisdiction under applicable state law, of a deceased or legally incapacitated or incompetent Retired NFL Football Player.

| Settlement Program ID (if known) | 950013395 | | |
|---|---|---|---|

| **Your Name** | First<br>Carleen | M.I. | Last<br>Hastings | Suffix |
|---|---|---|---|---|

| **Your Mailing Address** | Address 1<br>1715 W. 70th Street |
|---|---|
| | Address 2 |
| | City<br>Los Angeles |
| | State/Province<br>CA |
| | Postal Code<br>90047 | Country<br>United States |

| **Your Telephone Number** | \| 3 \| 2 \| 3 \| - \| 3 \| 4 \| 2 \| - \| 3 \| 1 \| 2 \| 7 \| |
|---|---|

| **Your Email Address** | None |
|---|---|

| **Preferred Method for Us to Communicate with You** | ☒ **Online Portal** | ☐ **Email** | ☐ **U.S. Mail** |
|---|---|---|---|

| **Is the Retired NFL Football Player for whom you are acting deceased or legally incapacitated or incompetent?** | ☒ **Deceased**<br>☐ **Legally Incapacitated or Incompetent** |
|---|---|

| **Date of Death** (if applicable) | \| 1 \| 0 \|/\| 1 \| 0 \|/\| 2 \| 0 \| 0 \| 8 \|<br>(Month/Day/Year) | **Retired NFL Football Player's Last Known State of Residence** | CA |
|---|---|---|---|

**Note to Representative Claimants:**

Along with this Registration Form, <u>YOU MUST SUBMIT</u> a copy of the court order or other document issued by an official of competent jurisdiction that gives you legal authority to act on behalf of the deceased or legally incapacitated or incompetent Retired NFL Football Player.

If you have not yet been ordered by a court or other official of competent jurisdiction to be the authorized representative of the deceased or legally incapacitated or incompetent Retired NFL Football Player before the Registration deadline, <u>you may request a deadline extension</u> to submit your Registration Form by: (1) using your secure online portal; or (2) writing to the NFL Concussion Settlement Claims Administrator, P.O. Box 25369, Richmond, VA 23260.

**CONTINUE TO PAGE 4**

| REGISTRATION FORM |
|---|

| SECTION IV.  FOR DERIVATIVE CLAIMANTS ONLY |
|---|

If you are a Derivative Claimant, complete this section.  If you are NOT a Derivative Claimant, skip this section and go to Section V.

A Derivative Claimant is a spouse, parent, child who is a dependent, or any other person who properly under applicable state law asserts the right to sue independently or derivatively by reason of their relationship with a Retired NFL Football Player.

| **Settlement Program ID** (if known) | | | | |
|---|---|---|---|---|
| **Your Name** | First | M.I. | Last | Suffix |

| **Your Mailing Address** | Address 1 | |
|---|---|---|
| | Address 2 | |
| | City | |
| | State/Province | |
| | Postal Code | Country |

| **Your Telephone Number** | \|_\|_\|_\| - \|_\|_\|_\| - \|_\|_\|_\|_\| |
|---|---|

| **Your Email Address** | |
|---|---|

| **Preferred Method for Us to Communicate with You** | ☐ **Online Portal** ☐ **Email** ☐ **U.S. Mail** |
|---|---|

| **What is your relationship to the Retired NFL Football Player?** | |
|---|---|

**CONTINUE TO PAGE 5**

| REGISTRATION FORM |
|---|

| SECTION V.  ATTORNEY INFORMATION<br>FOR ALL REGISTRANTS |
|---|

If an attorney is representing you in connection with the NFL Concussion Settlement, complete this section.  If an attorney is NOT representing you in connection with the NFL Concussion Settlement, skip this section and go to Section VI.

| **Attorney Name** | First<br>Ian | M.I.<br>P. | Last<br>Cloud | | Suffix |
|---|---|---|---|---|---|
| **Law Firm Name** | Robins Cloud LLP | | | | |
| **Attorney Mailing Address** | Address 1<br>2000 West Loop South | | | | |
| | Address 2<br>Suite 2200 | | | | |
| | City<br>Houston | | | | |
| | State/Province<br>TX | | | | |
| | Postal Code<br>77027 | | Country<br>United States | | |
| **Attorney Telephone** | | |7|1|3| - |6|5|0| - |1|2|0|0| | | |
| **Attorney Fax** | | |7|1|3| - |6|5|0| - |1|4|0|0| | | |
| **Attorney Email Address** | | icloud@robinscloud.com | | | |

All future communications related to the NFL Concussion Settlement will be directed to your attorney.

**CONTINUE TO PAGE 6**

## REGISTRATION FORM

### SECTION VI.  SIGNATURE
### FOR ALL REGISTRANTS

This Form is an official document submitted in connection with the Class Action Settlement in *In re: National Football League Players' Concussion Injury Litigation,* No. 2:12-md-2323 (E.D. Pa.).  **By signing below, I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that all information provided in this Registration Form is true and correct to the best of my knowledge, information and belief.**

| Signature | *s/* Toni Catchings | | Date | | 0 | 8 |/| 0 | 1 |/| 2 | 0 | 1 | 7 | |
|---|---|---|---|---|---|
| | | | | (Month/Day/Year) |
| **Printed Name** | First<br>Toni | M.I. | Last<br>Catchings | | Suffix |

### SECTION VII.  HOW TO SUBMIT THIS REGISTRATION FORM

| **By Email:** | ClaimsAdministrator@NFLConcussionSettlement.com |
|---|---|
| **By Mail:** | NFL Concussion Settlement<br>Claims Administrator<br>P.O. Box 25369<br>Richmond, VA 23260 |
| **By Delivery:**<br>(FedEx, UPS, etc.) | NFL Concussion Settlement<br>c/o BrownGreer PLC<br>250 Rocketts Way<br>Richmond, VA 23231 |

**If you are a valid Settlement Class Member you will be REGISTERED once you submit this form.  The Claims Administrator will contact you if there are any additional questions about the information you have provided.**

**END OF REGISTRATION FORM**



# NFL CONCUSSION SETTLEMENT
*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

## NOTICE OF ATTORNEY REPRESENTATION
### DATE OF NOTICE: **August 1, 2017**

### I. REGISTRANT INFORMATION

| | |
|---|---|
| **Settlement Program ID** (This is your assigned ID for use throughout the Settlement Program.) | 950013395 |

| | First | M.I. | Last |
|---|---|---|---|
| **Name:** | Carleen | | Hastings |

This Notice is an official communication from the Claims Administrator for the NFL Concussion Settlement Program. The lawyer identified in Section II below has told us that he or she represents you as your lawyer in the NFL Concussion Settlement Program. If we have an email address for you, we also emailed this same Notice to you.

### II. LAWYER INFORMATION

| | Law Firm Name | | |
|---|---|---|---|
| **Law Firm:** | Robins Cloud LLP | | |

| | Attorney First Name | M.I. | Attorney Last Name | Suffix |
|---|---|---|---|---|
| | Ian | P. | Cloud | |

| | Street | | Apt/Ste/Unit |
|---|---|---|---|
| | 2000 West Loop South | | Suite 2200 |

| | City | State/Province |
|---|---|---|
| **Address:** | Houston | TX |

| | Postal Code | Country |
|---|---|---|
| | 77027 | United States |

| | Email | Telephone |
|---|---|---|
| | icloud@robinscloud.com | \|7\|1\|3\| - \|6\|5\|0\| - \|1\|2\|0\|0\| |

### III. WHAT THIS MEANS

We have sent this Notice to you and the lawyer listed above.

If this lawyer represents you in the NFL Concussion Settlement Program, no further action is required. We will direct all future communications, including all notices about registration or claim determinations, to this lawyer. If you have questions about the Settlement Program or your next steps, contact that lawyer.

If this lawyer does not represent you in the NFL Concussion Settlement Program, promptly inform us in writing who represents you or that you have no lawyer and are proceeding on your own. If you have questions, call us toll-free at 1-855-887-3485.

| | |
|---|---|
| **By Email:** | ClaimsAdministrator@NFLConcussionSettlement.com |
| **By U.S. Mail:** | NFL Concussion Settlement Claims Administrator P.O. Box 25369 Richmond, VA 23260 |

| | |
|---|---|
| **By Delivery:** | NFL Concussion Settlement<br>c/o BrownGreer PLC<br>250 Rocketts Way<br>Richmond, VA 23231 |



# NFL CONCUSSION SETTLEMENT

*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*

No. 2:12-md-02323 (E.D. Pa.)

## NOTICE OF REGISTRATION DETERMINATION

**DATE OF NOTICE: August 24, 2017**

**DEADLINE TO CHALLENGE REGISTRATION DETERMINATION: October 23, 2017**

### I. REGISTRANT INFORMATION

| | |
|---|---|
| **Settlement Program ID** (This is your assigned ID for use throughout the Settlement Program.) | 950012548 |

| **Name** | First: Robin | M.I.: B | Last: Cornish |
|---|---|---|---|

| **Settlement Class Member Type** | Representative Claimant |
|---|---|
| **Primary Counsel** | O'Hanlon, McCollom & Demerath |

### II. REGISTRATION DETERMINATIONS

This Notice is an official communication from the Claims Administrator for the NFL Concussion Settlement Program. We reviewed the submitted Registration materials and determined the following:

| | | |
|---|---|---|
| **A.** | **Are You a Settlement Class Member?** | **Yes** |
| **B.** | **Did You Timely and Properly Register?** | **Yes** |
| **C.** | **Are You Eligible to Participate in the Baseline Assessment Program?** | **No** |

### III. EXPLANATION OF REGISTRATION DETERMINATIONS

You have timely and properly registered as a Settlement Class Member. As a registered Settlement Class Member, you are now eligible to submit a Claim Package or Derivative Claim Package to request a Monetary Award or Derivative Claimant Award. However, you are not eligible to participate in the Baseline Assessment Program ("BAP") because representative claimants for deceased retired nfl football players are not eligible for the baseline assessment program.

**Refer to the attached Guidance on Seeking Settlement Benefits document for additional information.**

### IV. NFL RIGHT TO CHALLENGE THIS DETERMINATION

Section 4.3(a)(iii) of the Settlement Agreement gives the NFL the right to challenge, for good cause, our decision to classify you as a Settlement Class Member who timely and properly registered. If the NFL chooses to challenge this Registration Determination, it must do so by the deadline stated above, and we will make a determination on the challenge and notify you of our decision by issuing a Notice of Registration Challenge Determination.

### V. HOW TO CONTACT US WITH QUESTIONS OR FOR HELP

If you are represented by a lawyer, consult with your lawyer if you have questions or need assistance. If you are unrepresented and have any questions about this Notice or need help, contact us at 1-855-887-3485 or send an email to ClaimsAdministrator@NFLConcussionSettlement.com. If you are a lawyer, call or email your designated Firm Contact for assistance. For more information about the Settlement Program, visit the official website at www.NFLConcussionSettlement.com to read the Frequently Asked Questions or download a copy of the complete Settlement Agreement.





**NFL CONCUSSION SETTLEMENT**

*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

# GUIDANCE ON SEEKING SETTLEMENT BENEFITS



# NFL CONCUSSION SETTLEMENT

*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*

No. 2:12-md-02323 (E.D. Pa.)

| CONTENTS | | |
|---|---|---|
| | **TITLE** | **PAGE** |
| **1.** | **Baseline Assessment Program** | **3** |
| **2.** | **Claim Package Information** | **5** |
| **3.** | **Derivative Claim Package Information** | **6** |
| **4.** | **Submitting a Claim Package** | **6** |
| **5.** | **Information Regarding the Settlement Program** | **7** |

| | **1. BASELINE ASSESSMENT PROGRAM** | |
|---|---|---|
| 1. | **What is the Baseline Assessment Program ("BAP")?** | All Retired NFL Football Players who have earned at least one-half of an Eligible Season, who did not Opt Out from the Settlement, and who timely register to participate in the Settlement may participate in the Baseline Assessment Program ("BAP").<br><br>The BAP entitles eligible Retired NFL Football Players to one baseline assessment examination conducted by Qualified BAP Providers, which includes: (1) a standardized neuropsychological examination in accordance with the testing protocol set forth in Exhibit 2 of the Class Action Settlement Agreement; and (2) a basic neurological examination.<br><br>A baseline assessment examination may result in a diagnosis of Level 1 Neurocognitive Impairment, a Qualifying Diagnosis of Level 1.5 Neurocognitive Impairment or Level 2 Neurocognitive Impairment, or no diagnosis. Other Qualifying Diagnoses of Alzheimer's Disease, Parkinson's Disease, ALS or Death with CTE may not be made as part of a BAP baseline assessment examination.<br><br>Retired NFL Football Players who are diagnosed with Level 1 Neurocognitive Impairment (*i.e.*, moderate cognitive impairment) are eligible to receive "BAP Supplemental Benefits" in the form of further medical testing and/or treatment (including counseling and pharmaceuticals) for that condition during the ten-year term of the BAP or within five years from diagnosis, whichever is later.<br><br>Retired NFL Football Players who are diagnosed with Level 1.5 Neurocognitive Impairment or Level 2 Neurocognitive Impairment may submit a Claim Package for a Monetary Award to the Claims Administrator.<br><br>Retired NFL Football Players who participate in the BAP will be encouraged to provide their confidential medical records for use in research into cognitive impairment and safety and injury prevention with respect to football players.<br><br>Although all eligible Retired NFL Football Players are encouraged to take advantage of the BAP and receive a baseline examination, they do not need to participate in the BAP to receive a Monetary Award. However, any Monetary Award to a Retired NFL Football Player may be reduced by 10% if the Retired NFL Football Player does not participate in the BAP, as explained in more detail below. |
| 2. | **How do I request a baseline assessment examination?** | Baseline assessment examinations will begin on **June 6, 2017**. If your Notice of Registration Determination indicates that the Retired NFL Football Player is eligible to participate in the BAP, the BAP Administrator will begin accepting requests for baseline assessment examinations on **May 8, 2017**.<br><br>To request a baseline assessment examination, you may call the BAP Administrator at 1-855-887-3485 or click the BAP menu at the top of your Portal and follow the instructions there. |



| | | The deadline to participate in the BAP depends on the Retired NFL Football Player's age as of the Effective Date, which was January 7, 2017. |
|---|---|---|

| | | Age as of January 7, 2017 | Deadline to Receive Baseline Assessment Examination |
|---|---|---|---|
| 3. | What is the deadline to participate in the BAP? | 43 or older | **June 6, 2019** |
| | | 42 or younger | The earliest of the following: (1) The day before the Retired NFL Football Player's 45th birthday; or (2) By **June 7, 2027.** |

| 4. | What if the Retired NFL Football Player has already received a Qualifying Diagnosis and does not wish to participate in the BAP? | If the Retired NFL Football Player received a Qualifying Diagnosis before the Effective Date of January 7, 2017, he does not need to participate in the BAP and will not have his Monetary Award reduced for not participating. |
|---|---|---|
| 5. | What if the Retired NFL Football Player has not already received a Qualifying Diagnosis and does not wish to participate in the BAP? | If the Retired NFL Football Player did not receive a Qualifying Diagnosis before the Effective Date of January 7, 2017, and chooses not to participate in the BAP, any Monetary Award will be subject to a 10% Offset (*i.e.*, reduction), unless: (1) the Qualifying Diagnosis is ALS; or (2) he received any Qualifying Diagnosis other than ALS prior to his deadline to receive a BAP baseline assessment examination. |



| | | |
|---|---|---|
| 6. | **This Notice of Registration Determination indicates that the Retired NFL Football Player is not eligible to participate in the BAP.  What does that mean?** | If your Notice of Registration Determination indicates that the Retired NFL Football Player is not eligible to participate in the BAP, that means that we could not confirm that he earned at least half of an Eligible Season based on the information you provided.  In order to qualify for the BAP, the Retired NFL Football Player's participation in NFL Football had to earn him at least one half of an Eligible Season.  An "Eligible Season" means a season in which a Retired NFL Football Player or deceased Retired NFL Football Player was:  (i) on a Member Club's Active List on the date of three (3) or more regular season or postseason games; or (ii) on a Member Club's Active List on the date of one (1) or more regular or postseason games, and then spent at least two (2) regular or postseason games on a Member Club's injured reserve list or inactive list due to a concussion or head injury.   A "half of an Eligible Season" means a season in which a Retired NFL Football Player or deceased Retired NFL Football Player was:  (i) on a Member Club's practice, developmental, or taxi squad roster for at least eight (8) regular or postseason games; or (ii) on a World League of American Football, NFL Europe League, or NFL Europa League team's active roster on the date of three (3) or more regular season or postseason games or on the active roster on the date of one (1) or more regular or postseason games, and then spent at least two (2) regular or postseason games on the World League of American Football, NFL Europe League, or NFL Europa League injured reserve list or team inactive list due to a concussion or head injury. If you disagree with our determination, you may submit a challenge by following the instructions on the attached Challenge Form.<br><br>Even if the Retired NFL Football Player is not eligible to participate in the BAP, you still may participate in the Settlement program by submitting a Claim Package for a Monetary Award. |
| **2.  CLAIM PACKAGE INFORMATION FOR RETIRED NFL FOOTBALL PLAYERS AND REPRESENTATIVE CLAIMANTS** | | |
| 1. | **What must I include in my Claim Package?** | A complete Claim Package must include the following documents:<br>(1)  The Claim Form with your Personal Signature;<br>(2)  The Diagnosing Physician Certification Form;<br>(3)  All medical records created by or received from your diagnosing physician or medical professional in connection with your Qualifying Diagnosis;<br>(4)  A Monetary Award Claim Package HIPAA Authorization Form; and<br>(5)  Records demonstrating the Retired NFL Football Player's employment and participation in NFL Football.  [These records will not be required if the Retired NFL Football Player or his Representative Claimant accepts the number of Eligible Seasons calculated from available data provided by the NFL.  The calculated Eligible Seasons are available only if you use the secure portal to submit a Claim Package.] |

| 2. | **Which version of the Diagnosing Physician Certification Form do I submit with my Claim Package?** | The version of the Diagnosing Physician Certification Form you submit depends on when and how you received your Qualifying Diagnosis:<br>(1) If you received a Qualifying Diagnosis of Level 1.5 Neurocognitive Impairment or Level 2 Neurocognitive Impairment following the baseline assessment examination you received through the BAP, submit a **BAP Diagnosing Physician Certification Form**.<br>(2) If you received a Qualifying Diagnosis before the Effective Date of January 7, 2017, submit a **Pre-Effective Date Diagnosing Physician Certification Form**.<br>(3) If you received a Qualifying Diagnosis from a Qualified MAF Physician after the Effective Date of January 7, 2017, submit a **MAF Diagnosing Physician Certification Form**. |
| :---: | :--- | :--- |
| 3. | **What is the deadline to submit a Claim Package?** | Your deadline to submit a Claim Package is: (1) two years after the date of the Qualifying Diagnosis; or (2) **February 6, 2019**, whichever is later. |
| 4. | **How do I submit a Claim Package?** | See Section 4 for information about how to submit a Claim Package to the Claims Administrator. |

| **3.  DERIVATIVE CLAIM PACKAGE INFORMATION** | | |
| :---: | :--- | :--- |
| 1. | **What must I include in my Derivative Claim Package?** | A complete Derivative Claim Package must include the following documents:<br>(1) A Derivative Claim Form with your Personal Signature; and<br>(2) A Derivative Claimant HIPAA Authorization Form. |
| 2. | **What is my deadline to submit a Derivative Claim Package?** | Your deadline to submit a Derivative Claim Package is 30 days after the Retired NFL Football Player through whom the relationship is the basis of the claim (or his Representative Claimant) receives a Notice of Monetary Award Claim Determination that provides a determination that he (or his Representative Claimant) is entitled to a Monetary Award.<br><br>If you are a registered Derivative Claimant, we will notify you when we issue a favorable Notice of Monetary Award Claim Determination to the Retired NFL Football Player to whom you are related, or his Representative Claimant. |
| 3. | **How do I submit a Derivative Claim Package?** | See Section 4 for information about how to submit a Derivative Claim Package to the Claims Administrator. |

| **4.  SUBMITTING A CLAIM PACKAGE** | | |
| :---: | :--- | :--- |

You may obtain the Claim Form, Derivative Claim Form, HIPAA Authorization Form, and Diagnosing Physician Certification Form through the secure online portal, by printing them from the Settlement Website or by contacting us.  If you do not have access to the secure online portal, you may request access by going to www.NFLConcussionSettlement.com/Login.aspx, clicking the Create New User button and following the instructions there.

You may submit your Claim Package or Derivative Claim Package using one of these methods:

| 1. | **By Using the Secure Online Portal:** | Click the Claim Package menu item to complete and upload all components of your Claim Package or Derivative Claim Package. |
| :---: | :--- | :--- |
| 2. | **By Mail:** | NFL Concussion Settlement<br>Claims Administrator<br>P.O. Box 25369<br>Richmond, VA 23260 |

| 3. | **By Delivery:** | NFL Concussion Settlement<br>c/o BrownGreer PLC<br>250 Rocketts Way<br>Richmond, VA 23231 |
|---|---|---|

| **5.  INFORMATION REGARDING THE SETTLEMENT PROGRAM** |
|---|
| If you have questions regarding any aspect of the Settlement program, you can review the Frequently Asked Questions (FAQs) available at www.NFLConcussionSettlement.com/FAQ.aspx.  If after reviewing the FAQs you still have a question, contact your lawyer if represented.  If you are unrepresented, contact us by email at ClaimsAdministrator@NFLConcussionSettlement.com or by phone at 1-855-887-3485.   If you are a lawyer, call or email your designated Firm Contact for assistance. |





# NFL CONCUSSION SETTLEMENT

*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

## NOTICE OF INCOMPLETE REGISTRATION
### DATE OF NOTICE: **August 30, 2017**
### RESPONSE DEADLINE: **September 29, 2017**

### I. REGISTRANT INFORMATION

| **Settlement Program ID**<br>(This is your assigned ID for use throughout the Settlement Program.) | 950013395 |
|---|---|

| **Name** | First<br>Carleen | M.I. | Last<br>Hastings |
|---|---|---|---|

| **Settlement Class Member Type** | Representative Claimant |
|---|---|

| **Primary Counsel** | Robins Cloud LLP |
|---|---|

### II. THE PURPOSE OF THIS NOTICE

This Notice is an official communication from the Claims Administrator for the NFL Concussion Settlement Program. Your Registration is missing information or documents required by Section 4.2(b) of the Settlement Agreement. This Notice explains what is missing and what you need to do now. Contact us if you have questions or if you feel you have already provided us with the information requested in this Notice.

### III. HOW TO RESPOND TO THIS NOTICE

Log in to your secure online portal with us, click the Respond to Notice of Incomplete Registration button on your Notice Details page, and follow the instructions given to provide the missing information identified in Section IV of this Notice. If Section IV says you are missing documents, upload copies of those documents. While you should try to correct these items by the Response Date at the top of this Notice, you have until August 7, 2017, to complete your Registration.

### IV. EXPLANATION OF WHAT IS MISSING

You have to supply the following before we can act further:

| | **What is Missing** | **How to Address this Item** |
|---|---|---|



| 1. | You did not provide documents demonstrating your legal authority to act on behalf of the deceased Retired NFL Football Player. | You can submit a copy of an order or other document showing that a court or other official of competent jurisdiction has appointed you as the authorized representative of the deceased Retired NFL Football Player. If you already have these documents, upload them in the Representative Claimant or Derivative Claimant for a Retired NFL Football Player section. If you do not have a local appointment order, you can be appointed by the federal court overseeing this settlement. To do this, complete and send us: (1) a Petition for Appointment of Representative Claimant; (2) a complete Proposed Representative Claimant Declaration for Deceased Retired NFL Football Player; (3) a death certificate, medical records or other documents showing that the Retired NFL Football Player is deceased; and (4) all documents listed in your Declaration supporting your authority to act on behalf of the Retired NFL Football Player. Copies of the Petition and Declaration, a list including examples of supporting documents, and instructions for completing and submitting these documents are available in the Forms section on the Settlement Website (https://nflconcussionsettlement.com/Forms.aspx). |

## V. HOW TO CONTACT US WITH QUESTIONS OR FOR HELP

If you are represented by a lawyer, consult with your lawyer if you have questions or need assistance. If you are unrepresented and have any questions about this Notice or need help, contact us at 1-855-887-3485 or send an email to ClaimsAdministrator@NFLConcussionSettlement.com. If you are a lawyer, call or email your designated Firm Contact for assistance. For more information about the Settlement Program, visit the official website at www.NFLConcussionSettlement.com to read the Frequently Asked Questions or download a copy of the complete Settlement Agreement.



# NFL CONCUSSION SETTLEMENT

*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

## RESPONSE FORM TO NOTICE OF INCOMPLETE REGISTRATION
### DATE OF NOTICE: **August 30, 2017**
### RESPONSE DEADLINE: **September 29, 2017**

### I. REGISTRANT INFORMATION

| | | | |
|---|---|---|---|
| **Settlement Program ID** | | 950013395 | |
| **Name** | First<br>Carleen | M.I. | Last<br>Hastings |
| **Settlement Class Member Type** | Representative Claimant | | |
| **Primary Counsel** | Robins Cloud LLP | | |

### II. MISSING REGISTRATION INFORMATION

Your Registration is missing the following information and/or documents required by Section 4.2(b) of the Settlement Agreement. If you are missing documents, send us copies of those documents by the Cure Deadline. If you do not respond in full by the Cure Deadline, you will receive a Notice of Denial of Registration, which may prohibit you from participating in the Settlement Program.

| What is Missing | Response |
|---|---|
| You did not provide documents demonstrating your legal authority to act on behalf of the deceased Retired NFL Football Player. | Representative Claimants must provide a court order or other document issued by an official of competent jurisdiction that establishes their legal authority to act on behalf of the deceased or legally incapacitated or incompetent Retired NFL Football Player. Provide the legal document that authorizes you to act on the Retired NFL Football Player's behalf. If you have not yet been ordered by a court or other official of competent jurisdiction to be the authorized representative of the deceased or legally incapacitated or incompetent Retired NFL Football Player, Section 4.2(c)(i) of the Settlement Agreement allows you an extension to register for 180 days after you secure the appointment.<br><br>Check here to request a deadline extension under Section 4.2(c)(i): ☐<br>We will grant this extension automatically when we receive this Response Form. |

### III. HOW TO SUBMIT THIS RESPONSE FORM

You may submit this Response Form using one of these methods:

| | |
|---|---|
| **By Email:**<br>(must be sent on or before the cure deadline date) | ClaimsAdministrator@NFLConcussionSettlement.com |
| **By Mail:**<br>(must be postmarked on or before the cure deadline date) | NFL Concussion Settlement<br>Claims Administrator<br>P.O. Box 25369<br>Richmond, VA 23260 |



| **By Delivery:** <br> (must be placed with the carrier on or before the cure deadline date) | NFL Concussion Settlement <br> c/o BrownGreer PLC <br> 250 Rocketts Way <br> Richmond, VA 23231 |
| --- | --- |



# NFL CONCUSSION SETTLEMENT
*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

## FINAL DEADLINE TO SUBMIT REPRESENTATIVE CLAIMANT APPROVAL DOCUMENTS
### DATE OF NOTICE: **November 10, 2017**
### RESPONSE DEADLINE: **January 9, 2018**

## I. SETTLEMENT CLASS MEMBER INFORMATION

| | |
|---|---|
| **Settlement Program ID** | 950013395 |

| **Name** | First<br>Carleen | M.I. | Last<br>Hastings |
|---|---|---|---|

| **Settlement Class Member Type** | Representative Claimant |
|---|---|
| **Primary Counsel** | Robins Cloud LLP |

## II. EXPLANATION OF NOTICE

This Notice is an official communication from the Claims Administrator for the NFL Concussion Settlement Program. We previously sent you a Notice of Incomplete Registration that explained missing information or documents required by Section 4.2(b) of the Settlement Agreement to be able to register in the NFL Concussion Settlement Program. Even though the 30-day response deadline described in that Notice has passed, you can still send us what is needed to finish out your registration. We want to help you get this all cleared up. We are still accepting information and documents, but you must submit them by the Response Deadline identified at the top of this Notice. If you do not submit the documents described in Section III by this Response Deadline, we will have to close out this registration. After that, if you ever want to seek any benefits in the Settlement for this Retired NFL Football Player, you will have to get appointed as his representative by a local court and then start over to register with us within 180 days after that appointment.

## III. REQUIRED REPRESENTATIVE CLAIMANT APPROVAL DOCUMENTS

There are two ways to be authorized to register and pursue benefits as the Representative Claimant of a deceased or legally incapacitated or incompetent Retired NFL Football Player:

**A. Proof of Appointment:** You can submit a copy of an order or other document showing that a court or other official has appointed you as the representative of the deceased or legally incapacitated or incompetent Retired NFL Football Player. For a legally incapacitated or incompetent Retired NFL Football Player, you can also submit a copy of a "durable" or "springing" power of attorney ("POA") signed by the Retired NFL Football Player naming you as authorized to act for him if he became legally incapacitated or incompetent. A POA is not sufficient to show authority to act on behalf of a deceased Retired NFL Football Player.

**B. Centralized Appointment Process in the Federal Court:** If you do not have the documents identified in Section A, you can be appointed by the federal court overseeing this settlement. However, to take advantage of this process, you must have started your registration on or before the August 7, 2017 Registration Deadline. If you started registering by this deadline or are stepping in for someone else who did, send us the following documents:

1. A completed Petition for Appointment of Representative Claimant;

2. A completed Representative Claimant Declaration;

3. A medical record or other document showing that the Retired NFL Football Player is deceased, legally incapacitated or incompetent; and

**4.** The document(s) you listed in the Declaration to support your authority to act on behalf of the Retired NFL Football Player.

Blank copies the Petition and Declaration and a list of documents that may support your authority to act as Representative Claimant are available on the Settlement Website at https://nflconcussionsettlement.com/Forms.aspx.  There are separate versions of the Petition and Declaration for Deceased Retired NFL Football Players and for Legally Incapacitated or Incompetent Retired NFL Football Players.  Make sure you use the right version.

After you submit all required documents, we will provide your materials to the Special Master and then will send you a Notice informing you of the Special Master's decision.

## IV.  HOW TO RESPOND TO THIS NOTICE

Log in to your secure online Portal with us, click the Respond to Notice of Incomplete Registration button on your Notice Details page, and follow the instructions given to provide the missing information identified in Section IV of your Notice of Incomplete Registration, including uploading copies of documents identified in Section III above.

## V. HOW TO CONTACT US WITH QUESTIONS OR FOR HELP

If you are represented by a lawyer, consult with your lawyer if you have questions or need assistance.  If you are unrepresented and have any questions about this Notice or need help, contact us at 1-855-887-3485 or send an email to ClaimsAdministrator@NFLConcussionSettlement.com.  If you are a lawyer, call or email your designated Firm Contact for assistance.  For more information about the Settlement Program, visit the official website at www.NFLConcussionSettlement.com to read the Frequently Asked Questions or download a copy of the complete Settlement Agreement.



**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br><br>MDL No. 2323 |
| THIS DOCUMENT RELATES TO ALL ACTIONS | **Hon. Anita J. Brody** |

## <u>PETITION FOR APPOINTMENT OF REPRESENTATIVE CLAIMANT</u>

I, Carleen Hastings                                    , respectfully move

this Court for appointment as the Representative Claimant authorized to act on behalf of

Christopher Mims                                    , a deceased

Retired NFL Football Player, in connection with the NFL Concussion Settlement as follows:

1.    I seek appointment as the Representative Claimant to act on behalf of the Retired NFL

Football Player and his estate, heirs, and beneficiaries    but have not been appointed to act in that

capacity by a court or other official of competent jurisdiction and do not have such other proof of

representative capacity that the Claims Administrator has been authorized by the Court or the Parties

to accept.

2.    To establish my authority to act as the Representative Claimant, I submit and

incorporate in this Petition the Representative Claimant Declaration and supporting documents

attached as Exhibit A.

3.    I have confirmed with the Claims Administrator that it has not received documents

or information indicating that any other individual or entity is appointed or is seeking appointment

as the Representative Claimant on behalf of the Retired NFL Football Player.

1

4.      Accordingly, I respectfully request that the Court enter an order approving this

Petition.

5.      A proposed order accompanies this Petition.

Respectfully submitted,


By:    /s/ Ian P. Cloud
Ian P. Cloud

Attorney for Carleen Hastings

Robins Cloud LLP

2000 West Loop South, 22nd Floor

Houston, TX 77027

713-650-1200

Date:   11/9/2017

2

 **CONCUSSION SETTLEMENT**

*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

| RC001 | PROPOSED REPRESENTATIVE CLAIMANT DECLARATION: DECEASED RETIRED NFL FOOTBALL PLAYER |
|---|---|

A person who has not been appointed as the authorized representative of a deceased Retired NFL Football Player ("Player") by a court or other official of competent jurisdiction under applicable state law, and who cannot submit to the Claims Administrator such other proof of representative capacity that the Claims Administrator has been authorized by the Court or the Parties to accept, must complete and submit this Declaration in support of his or her Petition for Appointment as Representative Claimant on behalf of the Player and/or his estate, heirs, and beneficiaries in connection with the NFL Concussion Settlement program.

## I. PLAYER INFORMATION

**Name** — First Name: Christopher  M.I.:  Last Name: Mims

**Settlement Program ID:** 950013395

**Player's Social Security Number:** 560 - 49 - 8828

**Date of Death:** Oct / 10 / 2008 (Month/Day/Year)

**Player's Residence Address at Time of Death:**
Street: 612 South Flower St., #409
City: Los Angeles   State: CA   Zip Code: 90017

## II. PROPOSED REPRESENTATIVE CLAIMANT INFORMATION

**Name** — First Name: Carleen  M.I.:  Last Name: Hastings

**Proposed Representative Claimant's Social Security Number:** 548 - 82 - 4010

**Proposed Representative Claimant's Address:**
Street: 4847 W. Slauson Ave., Apt. 6
City: Los Angeles   State: CA   Zip Code: 90056

**Relationship to Player:** Mother

**Basis of Authority to Act for Player:** Mother



# NFL CONCUSSION SETTLEMENT

*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*

No. 2:12-md-02323 (E.D. Pa.)

|  |  |
|---|---|
| **List All Document(s) Submitted Evidencing the Basis for Your Authority** (attach additional sheets, if needed) | Death Certificate<br>Birth Certificate of Christopher Mims |

## III.    PROPOSED REPRESENTATIVE CLAIMANT CERTIFICATION

This Declaration is an official document submitted in connection with the Class Action Settlement in *In re: National Football League Players' Concussion Injury Litigation, MDL No. 2323*. By signing this Declaration, I certify and declare under penalty of perjury pursuant to 28 U.S.C. Section 1746 that:

(a) I have authority to act on behalf of the Player and his estate, heirs, and beneficiaries in connection with the NFL Concussion Settlement program (the "Program"), including with respect to the submission of materials to register for the Program, the filing of any Claim Packages for Monetary Awards, and the receipt of payment for any Monetary Awards.

(b) I will abide by all substantive laws of the Player's last state of domicile concerning the compromise and distribution of any Monetary Award or Supplemental Monetary Award to the appropriate heirs or other beneficiaries and any other parties with any right to receive any portion of any payments.

(c) I will notify the Claims Administrator promptly if my authority to act is curtailed, surrendered, withdrawn, or terminated.

(d) I am not aware of any objections to my appointment and service as the Representative Claimant on behalf of the Player and his estate, heirs, and beneficiaries.

(e) I will indemnify and hold harmless the Released Parties, as defined in Section 2.1(bbbb) of the Settlement Agreement, and their attorneys and insurers, Class Counsel, Co-Lead Class Counsel, the Claims Administrator, the BAP Administrator, the Lien Resolution Administrator, the Special Masters, and the agents and representatives of any of the foregoing, from any and all claims, demands, or expenses of any kind arising out of or relating to my actions in connection with the Program, including, without limitation, as set forth in Section 11.4 of the Settlement Agreement.

The information I have provided in this Declaration is true and correct. I understand that the Claims Administrator and Court will rely on this Declaration and false statements or claims made in connection with this Declaration may result in fines, imprisonment, and/or any other remedy available by law to the federal government.

© 2017 BrownGreer PLC
6/15/17
#533638



 **CONCUSSION SETTLEMENT**

*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

| IV. | PROPOSED REPRESENTATIVE CLAIMANT SIGNATURE | | | |
|---|---|---|---|---|
| **Signature** | *Carleen Hastings* | **Date** | Sep / 18 / 2017 | (Month/Day/Year) |

## V.    HOW TO SUBMIT THIS DECLARATION

Complete this Declaration fully, sign it, and submit it to the Claims Administrator using one of the methods below. If you have not already done so, you must also submit: (1) a completed Petition for Appointment of Representative Claimant; (2) documents evidencing that the Player is deceased; and (3) all documents you identified in Section II as supporting your authority to serve as the proposed Representative Claimant.

| **By Mail:** | NFL Concussion Settlement<br>Claims Administrator<br>P.O. Box 25369<br>Richmond, VA 23260 |
|---|---|
| **By Delivery:** | NFL Concussion Settlement<br>c/o BrownGreer PLC<br>250 Rocketts Way<br>Richmond, VA 23231 |

## VI.    HOW TO CONTACT US WITH QUESTIONS OR FOR HELP

If you are represented by a lawyer, consult with your lawyer if you have questions or need assistance. If you are unrepresented and have any questions about this Declaration or need help, contact us at 1-855-887-3485 or send an email to ClaimsAdministrator@NFLConcussionSettlement.com. If you are a lawyer, call or email your designated Firm Contact for assistance. For more information about the Settlement Program, visit the official website at www.NFLConcussionSettlement.com to read the Frequently Asked Questions or download a copy of the complete Settlement Agreement.

© 2017 BrownGreer PLC
6/15/17
#533638

3



STATE OF CALIFORNIA
CERTIFICATION OF VITAL RECORD

# COUNTY OF LOS ANGELES • REGISTRAR–RECORDER/COUNTY CLERK

**CERTIFICATE OF DEATH**
STATE OF CALIFORNIA
USE BLACK INK ONLY / NO ERASURES, WHITEOUTS OR ALTERATIONS
VS-11(REV 1/05)

3200819043413

STATE FILE NUMBER | LOCAL REGISTRATION NUMBER

| | | | |
|---|---|---|---|
| 1 NAME OF DECEDENT — FIRST (Given) **CHRISTOPHER** | 2 MIDDLE **EDDIE** | 3 LAST (Family) **MIMS** | |

**DECEDENT'S PERSONAL DATA**

| AKA ALSO KNOWN AS — include full AKA (FIRST MIDDLE LAST) - - - | 4 DATE OF BIRTH mm/dd/ccyy **09/29/1970** | 5 AGE Yrs **38** | IF UNDER ONE YEAR Months / Days | IF UNDER 24 HOURS Hours / Minutes | 6 SEX **M** |
|---|---|---|---|---|---|

| 9 BIRTH STATE/FOREIGN COUNTRY **CALIFORNIA** | 10 SOCIAL SECURITY NUMBER **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** | 11 EVER IN U.S ARMED FORCES? YES [X] NO UNK | 12 MARITAL STATUS (at Time of Death) **DIVORCED** | 7 DATE OF DEATH mm/dd/ccyy **10/15/2008** | 8 HOUR (24 Hours) **0935** |
|---|---|---|---|---|---|

| 13 EDUCATION — Highest Level/Degree (see worksheet on back) **SOME COLLEGE** | 14/15 WAS DECEDENT HISPANIC/LATINO(A)/SPANISH? (if yes, see worksheet on back) YES [X] NO | 16 DECEDENTS RACE — Up to 3 races may be listed (see worksheet on back) **AFRICAN AMERICAN** | |
|---|---|---|---|

| 17 USUAL OCCUPATION — Type of work for most of life. DO NOT USE RETIRED **PROFESSIONAL ATHLETE** | 18 KIND OF BUSINESS OR INDUSTRY (e.g. grocery store, road construction, employment agency, etc.) **FOOTBALL ATHLETE** | 18 YEARS IN OCCUPATION **8** |
|---|---|---|

**USUAL RESIDENCE**

| 20 DECEDENT'S RESIDENCE (Street and number or location) **612 SOUTH FLOWER STREET #409** | | | | |
|---|---|---|---|---|
| 21 CITY **LOS ANGELES** | 22 COUNTY/PROVINCE **LOS ANGELES** | 23 ZIP CODE **90017** | 24 YEARS IN COUNTY **25** | 25 STATE/FOREIGN COUNTRY **CALIFORNIA** |

**INFOR-MANT**

| 26 INFORMANT'S NAME, RELATIONSHIP **MAREA BARSKY, FRIEND** | 27 INFORMANTS MAILING ADDRESS (Street and number or rural route number, city or town, state, ZIP) **249 SANTA BARBARA, IRVINE, CA 92606** |
|---|---|

**SPOUSE AND PARENT INFORMATION**

| 28 NAME OF SURVIVING SPOUSE — FIRST - | 29 MIDDLE - | 30 LAST (Maiden Name) - | |
|---|---|---|---|
| 31 NAME OF FATHER — FIRST **LORENZO** | 32 MIDDLE **VICTOR** | 33 LAST **MIMS** | 34 BIRTH STATE **CA** |
| 35 NAME OF MOTHER — FIRST **CARLEEN** | 36 MIDDLE - | 37 LAST (Maiden) **HASTINGS** | 38 BIRTH STATE **TN** |

**1 of 2**

**FUNERAL DIRECTOR LOCAL REGISTRAR**

| 39 DISPOSITION DATE mm/dd/ccyy **10/25/2008** | 40 PLACE OF FINAL DISPOSITION **FOREST LAWN MEMORIAL PARK 6300 FOREST LAWN DR., LOS ANGELES, CA 90068** | | |
|---|---|---|---|
| 41 TYPE OF DISPOSITION(S) **BU** | 42 SIGNATURE OF EMBALMER ▶ **JESSICA SOLIS** E@ | | 43 LICENSE NUMBER **9091** |
| 44 NAME OF FUNERAL ESTABLISHMENT **FOREST LAWN MEMR PRKS & MTYS** | 45 LICENSE NUMBER **FD 904** | 46 SIGNATURE OF LOCAL REGISTRAR ▶ **JONATHAN FIELDING, MD** E@ | 47 DATE mm/dd/ccyy **10/23/2008** |

**PLACE OF DEATH**

| 101 PLACE OF DEATH **RESIDENCE** | | 102 IF HOSPITAL, SPECIFY ONE IP / ER/OP / DOA | 103 IF OTHER THAN HOSPITAL, SPECIFY ONE Hospice / Nursing Home/LTC [X] Decedent's Home / Other |
|---|---|---|---|
| 104 COUNTY **LOS ANGELES** | 105 FACILITY ADDRESS OR LOCATION WHERE FOUND (Street and number or location) **612 SOUTH FLOWER STREET #409** | | 106 CITY **LOS ANGELES** |

**CAUSE OF DEATH**

| 107 CAUSE OF DEATH Enter the chain of events — diseases, injuries, or complications — that directly caused death. DO NOT enter terminal events such as cardiac arrest, respiratory arrest, or ventricular fibrillation without showing the etiology. DO NOT ABBREVIATE. | Time Interval Between Onset and Death | 108 DEATH REPORTED TO CORONER? [X] YES / NO |
|---|---|---|
| IMMEDIATE CAUSE (Final disease or condition resulting in death) (A) **DEFERRED** | (AT) - | **2008-07210** |
| Sequentially list conditions, if any, leading to cause on Line A. Enter UNDERLYING CAUSE (disease or injury that initiated the events resulting in death) LAST (B) | (BT) | 109 BIOPSY PERFORMED? YES [X] NO |
| (C) | (CT) | 110 AUTOPSY PERFORMED? [X] YES / NO |
| (D) | (DT) | 111 USED IN DETERMINING CAUSE? [X] YES / NO |
| 112 OTHER SIGNIFICANT CONDITIONS CONTRIBUTING TO DEATH BUT NOT RESULTING IN THE UNDERLYING CAUSE GIVEN IN 107 **NONE** | | |

| 113 WAS OPERATION PERFORMED FOR ANY CONDITION IN ITEM 107 OR 112? (if yes, list type of operation and date) **NO** | | 113A IF FEMALE, PREGNANT IN LAST YEAR? YES / NO / UNK |
|---|---|---|

**PHYSICIAN'S CERTIFICATION**

| 114 I CERTIFY THAT TO THE BEST OF MY KNOWLEDGE DEATH OCCURRED AT THE HOUR, DATE AND PLACE STATED FROM THE CAUSES STATED Decedent Attended Since (A) mm/dd/ccyy / Decedent Last Seen Alive (B) mm/dd/ccyy | 115 SIGNATURE AND TITLE OF CERTIFIER ▶ | 116 LICENSE NUMBER | 117 DATE mm/dd/ccyy |
|---|---|---|---|
| | 118 TYPE ATTENDING PHYSICIAN'S NAME, MAILING ADDRESS, ZIP CODE | | |

**CORONER'S USE ONLY**

| 119 I CERTIFY THAT IN MY OPINION DEATH OCCURRED AT THE HOUR, DATE AND PLACE STATED FROM THE CAUSES STATED MANNER OF DEATH Natural / Accident / Homicide / Suicide / [X] Pending investigation / Could not be determined | 120 INJURED AT WORK? YES / NO / UNK | 121 INJURY DATE mm/dd/ccyy | 122 HOUR (24 Hours) |
|---|---|---|---|
| 123 PLACE OF INJURY (e.g. home, construction site, wooded area, etc.) | | | |
| 124 DESCRIBE HOW INJURY OCCURRED (Events which resulted in injury) | | | |
| 125 LOCATION OF INJURY (Street and number or location and city, and ZIP) | | | |
| 126 SIGNATURE OF CORONER / DEPUTY CORONER ▶ **EVONNE D REED** E@ | 127 DATE mm/dd/ccyy **10/20/2008** | 128 TYPE NAME, TITLE OF CORONER / DEPUTY CORONER **EVONNE D REED, DEPUTY CORONER** | |

**STATE REGISTRAR**

| A | B | C | D | E | | FAX AUTH # | CENSUS TRACT |
|---|---|---|---|---|---|---|---|
| | | | | | ‖‖‖‖‖ "01208000916134" | | |

---

This is to certify that this document is a true copy of the official record filed with the Registrar-Recorder/County Clerk.

*Dean C Logan*
DEAN C. LOGAN
Registrar-Recorder/County Clerk

**SEP 0 4 2015**



‖‖‖‖‖ *1 0 0 0 0 0 6 9 9 0 2 3*

This copy not valid unless prepared on engraved border displaying the Seal and Signature of the Registrar-Recorder/County Clerk.
PBNCO (REV) 07/11



ANY ALTERATION OR ERASURE VOIDS THIS CERTIFICATE

STATE OF CALIFORNIA
DEPARTMENT OF PUBLIC HEALTH • VITAL RECORDS

# COUNTY OF LOS ANGELES • REGISTRAR–RECORDER/COUNTY CLERK

**PHYSICIAN/CORONER'S AMENDMENT**
NO ERASURES, WHITEOUTS, PHOTOCOPIES, OR ALTERATIONS

3052008191127
STATE FILE NUMBER

1.1

3200819043413
LOCAL REGISTRATION NUMBER

☐ BIRTH   ☒ DEATH   ☐ FETAL DEATH

TYPE OR PRINT CLEARLY IN BLACK INK ONLY – THIS AMENDMENT BECOMES AN ACTUAL PART OF THE OFFICIAL RECORD

## PART I    INFORMATION TO LOCATE RECORD

| INFORMATION AS IT APPEARS ON ORIGINAL RECORD | 1A. NAME—FIRST | 1B. MIDDLE | 1C. LAST | 2. SEX |
|---|---|---|---|---|
| | CHRISTOPHER | EDDIE | MIMS | M |
| | 3. DATE OF EVENT—MM/DD/CCYY | 4. CITY OF EVENT | 5. COUNTY OF EVENT | |
| | 10/15/2008 | LOS ANGELES | LOS ANGELES | |

## PART II    STATEMENT OF CORRECTIONS

2 of 2

| | 6. CERTIFICATE ITEM NUMBER | 7. INFORMATION AS IT APPEARS ON ORIGINAL RECORD | 8. INFORMATION AS IT SHOULD APPEAR |
|---|---|---|---|
| LIST ONE ITEM PER LINE | 107A | DEFERRED | DILATED CARDIOMYOPATHY |
| | 107AT | - | YEARS |
| | 112' | NONE | HEPATIC STEATOSIS, HISTORY OF HYPERTENSION |
| | 119. | PENDING INVESTIGATION | NATURAL |

I HEREBY DECLARE UNDER PENALTY OF PERJURY THAT THE ABOVE INFORMATION IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.

| DECLARATION OF CERTIFYING PHYSICIAN OR CORONER | 9. SIGNATURE OF CERTIFYING PHYSICIAN OR CORONER ▶ LOUIS A PENA MD | 10. DATE SIGNED—MM/DD/CCYY 12/12/2008 | 11. TYPED OR PRINTED NAME AND TITLE/DEGREE OF CERTIFIER DME | | |
|---|---|---|---|---|---|
| | 12. ADDRESS—STREET and NUMBER 1104 NORTH MISSION ROAD | 13. CITY LOS ANGELES | | 14. STATE CA | 15. ZIP CODE 90033 |
| STATE/LOCAL REGISTRAR USE ONLY | 16. OFFICE OF VITAL RECORDS OR LOCAL REGISTRAR ▶ STATE REGISTRAR - OFFICE OF VITAL RECORDS | | 17. DATE ACCEPTED FOR REGISTRATION—MM/DD/CCYY 12/15/2008 | | |

STATE OF CALIFORNIA, DEPARTMENT OF PUBLIC HEALTH, OFFICE OF VITAL RECORDS

*022008000147340*

FORM VS 24Ae (REV. 1/08)

1.1

This is to certify that this document is a true copy of the official record filed with the Registrar-Recorder/County Clerk.

SEP 0 4 2015

*Dean C Logan*
DEAN C. LOGAN
Registrar-Recorder/County Clerk



* 1 0 0 0 0 0 6 9 9 0 2 4 *

This copy not valid unless prepared on engraved border displaying the Seal and Signature of the Registrar-Recorder/County Clerk.
PBINCO (REV) 07/11

ANY ALTERATION OR ERASURE VOIDS THIS CERTIFICATE