No. 25-2271

# UNITED STATES COURT OF APPEALS

# FOR THE THIRD CIRCUIT

————————————

ROBIN CORNISH AND CARLEEN HASTINGS,

*Plaintiffs-Appellants,*

v.

NATIONAL FOOTBALL LEAGUE AND NFL PROPERTIES LLC,

*Defendants-Appellees,*

————————————

On Appeal from the United States District Court
for the Eastern District of Pennsylvania, No. 2:12-md-02323 (Brody, A.)

————————————

**APPENDIX VOLUME IV (pp. 3130-4977)**

————————————

DAVID J. CAMPBELL

THOMPSON & HORTON LLP

8300 N. MOPAC EXPRESSWAY, SUITE 220

AUSTIN, TEXAS 78759

(512) 615-2350

October 8, 2025

## TABLE OF CONTENTS

## VOLUME IV

Certificate of Live Birth, Carleen Hastings, Claim Doc. No. 142715, Nov. 10, 2017 ................................................................................................3130

[Proposed] Order Appointing Representative Claimant, Carleen Hastings, Claim Doc. No. 163441, Mar. 23, 2018 ..................................................3131

Order Appointing Representative Claimant, Carleen Hastings, Claim Doc. No. 163625, Mar. 26, 2018........................................................................3133

Notice of Registration Determination, Carleen Hastings, Claim Doc. No. 164078, Mar. 28, 2018...............................................................................3135

Claim Form Signature Acknowledgement Form, Carleen Hastings, Claim Doc. No. 198424, Feb. 5, 2019.................................................................3143

NFL Concussion Settlement Claim Form for Retired NFL Football Players and Representative Claimants, Carleen Hastings, Claim Doc. No. 198425, Feb. 5, 2019 ...................................................................3144

Monetary Award Claim Package HIPAA Authorization Form, Carleen Hastings, Claim Doc. No. 198426, Feb. 5, 2019.......................................3155

Claim Form Signature Acknowledgement Form, Robin Cornish, Claim Doc. No. 199402, Feb. 6, 2019 .......................................................................3158

NFL Concussion Settlement Claim Form for Retired NFL Football Players and Representative Claimants, Robin Cornish, Claim Doc. No. 199403, Feb. 6, 2019 ..............................................................................3159

Pre-effective Date Diagnosing Physician Certification Form, Robin Cornish, Claim Doc. No. 199404, Feb. 6, 2019......................................................3170

Hamilton Letter, Robin Cornish, Claim Doc. No. 199405, Feb. 6, 2019............3217

Certificate of Death, Robin Cornish, Claim Doc. No. 199406, Feb. 6, 2019......3218

Autopsy Report, Robin Cornish, Claim Doc. No. 199407, Feb. 6, 2019............3219

Monetary Award Claim Package HIPAA Authorization Form, Robin Cornish, Claim Doc. No. 199409, Feb. 6, 2019....................................................3224

Pre-effective Date Diagnosing Physician Certification Form, Carleen
    Hastings, Claim Doc. No. 199429, Feb. 6, 2019 ....................................... 3228

Hamilton Letter, Carleen Hastings, Claim Doc. No. 199435, Feb. 6, 2019 ........ 3275

Certificate of Death, Carleen Hastings, Claim Doc. No. 199437, Feb. 6, 2019
    .................................................................................................................... 3276

Autopsy Report, Carleen Hastings, Claim Doc. No. 199440, Feb. 6, 2019 ........ 3278

Notice of Request for Additional Documents, Robin Cornish, Claim Doc. No.
    201410, Feb. 20, 2019 ............................................................................... 3304

Notice of Request for Additional Documents, Carleen Hastings, Claim Doc.
    No. 201411, Feb. 20, 2019 ........................................................................ 3306

Notice of Denial of Monetary Award Claim, Robin Cornish, Claim Doc. No.
    209824, June 25, 2019 ............................................................................... 3308

Written Statement in Support of Class Member's Appeal of the Claims
    Administrator's Notice of Denial of Monetary Award Claim, Robin
    Cornish, Claim Doc. No. 210928, July 12, 2019 .................................... 3310

    Appeal Statement Exhibits 1-4, Robin Cornish, Claim Doc. No.
    210929, July 12, 2019 ................................................................... 3318

Appeals Form for Monetary Award or Derivative Claimant Award Claim
    Determination, Robin Cornish, Claim Doc. No. 210930, July 12, 2019 .. 3420

Notice of Denial of Monetary Award Claim, Carleen Hastings, Claim Doc.
    No. 211985, July 30, 2019 ........................................................................ 3422

NFL Parties' Opposition to Appeal of Claim Denial by Representative
    Claimant Robin Cornish, Robin Cornish, Claim Doc. No. 212794, Aug.
    14, 2019 .................................................................................................... 3424

    Exhibit 1: Memorandum of Law of the NFL Parties' in
    Opposition to Settlement Class Member Yvonne Sagapolutele's
    Motion to Modify the Amended Final Order and Judgment,
    Claim Doc. No. 212795, Aug. 14, 2019 ......................................... 3428

Written Statement in Support of Class Member's Appeal of the Claims
    Administrator's Notice of Denial of Monetary Award Claim, Carleen
    Hastings, Claim Doc. No. 213485, Aug. 28, 2019 .................................. 3452

Exhibit 1: Notice of Denial of Monetary Award Claim, Carleen Hastings, Claim Doc. No. 213486, Aug. 28, 2019..........................3462

Exhibit 2: Claim Form Signature Acknowledgement Form, Carleen Hastings, Claim Doc. No. 213487, Aug. 28, 2019 ............3464

Exhibit 3: Notice of Request for Additional Documents, Carleen Hastings, Claim Doc. No. 213488, Aug. 28, 2019..........................3544

Appeals Form for Monetary Award or Derivative Claimant Award Claim Determination, Carleen Hastings, Claim Doc. No. 213489, Aug. 28, 2019 .............................................................................................3546

NFL Parties' Opposition to Appeal of Claim Denial by Representative Claimant Carleen Hastings, Carleen Hastings, Claim Doc. No. 214907, Oct. 3, 2019..............................................................................................3548

Exhibit 1: Memorandum of Law of the NFL Parties' in Opposition to Settlement Class Member Yvonne Sagapolutele's Motion to Modify the Amended Final Order and Judgment, Claim Doc No. 214908, Oct. 3, 2019...............................................3553

Settlement Class Member's Objection to the Special Master's Decision Denying Class Member's Appeal, Robin Cornish, Claim Doc. No. 215680, Oct. 16, 2019.............................................................................3577

Exhibit 1: Notice of Denial of Monetary Award Claim, Robin Cornish, Claim Doc. No. 215681, Oct. 16, 2019 ............................3587

Exhibit 2: Excerpts from Class Member's Claim Package, Robin Cornish, Claim Doc. No. 215682, Oct. 16, 2019 ............................3589

Exhibit 3: Notice of Request for Additional Documents, Robin Cornish, Claim Doc. No. 215683, Oct. 16, 2019 ............................3643

Exhibit 4: Written Statement in Support of Class Member's Appeal of the Claims Administrator's Notice of Denial of Monetary Award Claim, Robin Cornish, Claim Doc. No. 215684, Oct. 16, 2019 .................................................................................3645

Exhibit 5: NFL Parties' Opposition to Appeal of Claim Denial by Representative Claimant Robin Cornish, Robin Cornish, Claim Doc. No. 215685, Oct. 16, 2019.....................................................3653

Exhibit 6: Post-Appeal Notice of Denial of Monetary Award Claim, Robin Cornish, Claim Doc. No. 215686, Oct. 16, 2019 .....3681

Response of the NFL Parties' in Opposition to Robin Cornish's Objection to Post-Appeal Notice of Denial of Monetary Award Claim, Robin Cornish, Claim Doc. No. 216980, Nov. 12, 2019 ....................................3682

Settlement Class Member's Objection to the Special Master's Decision Denying Class Member's Appeal, Carleen Hastings, Claim Doc. No. 217476, Nov. 20, 2019................................................................3690

Exhibit 1: Notice of Denial of Monetary Award Claim, Carleen Hastings, Claim Doc. No. 217477, Nov. 20, 2019..........................3702

Exhibit 2: Excerpts from Class Member's Claim Package, Carleen Hastings, Claim Doc. No. 217478, Nov. 20, 2019 ............3704

Exhibit 3: Notice of Request for Additional Documents, Carleen Hastings, Claim Doc. No. 217480, Nov. 20, 2019..........................3780

Exhibit 4: Written Statement in Support of Class Member's Appeal of the Claims Administrator's Notice of Denial of Monetary Award Claim, Carleen Hastings, Claim Doc. No. 217481, Nov. 20, 2019 ................................................................3782

Exhibit 5: NFL Parties' Opposition to Appeal of Claim Denial by Representative Claimant Carleen Hastings, Carleen Hastings, Claim Doc. No. 217482, Nov. 20, 2019.........................................3792

Exhibit 6: Post-Appeal Notice of Denial of Monetary Award Claim, Carleen Hastings, Claim Doc. No. 217483, Nov. 20, 2019 ...................................................................................................3821

Response of the NFL Parties' in Opposition to Carleen Hasting's Objection to Post-Appeal Notice of Denial of Monetary Award Claim, Carleen Hastings, Claim Doc. No. 218336, Dec. 12, 2019 ....................................3822

Settlement Implementation Order [Remanding Claim Appeal to Special Master for Further Explanation], Robin Cornish, Claim Doc. No. 225723, June 17, 2020............................................................3833

Settlement Implementation Order [Remanding Claim Appeal to Special Master for Further Explanation], Carleen Hastings, Claim Doc. No. 225731, June 17, 2020............................................................3835

Special Master Decision, Carleen Hastings, Claim Doc. No. 226585, July 15, 2020 ..................................................................................................3837

Special Master Decision, Robin Cornish, Claim Doc. No. 226586, July 15, 2020 ..................................................................................................3841

Supplement to Settlement Class Member's Objections to the Special Master's Decisions, Robin Cornish, Claim Doc. No. 227401, Aug. 14, 2020.........3845

Supplement to Settlement Class Member's Objections to the Special Master's Decisions, Carleen Hastings, Claim Doc. No. 227408, Aug. 14, 2020.....3848

Response of the NFL Parties' in Opposition to Supplement to Settlement Class Members' Objections to the Special Master's Decision, Carleen Hastings, Claim Doc. No. 231450, Dec. 28, 2020 ....................................3851

Response of the NFL Parties' in Opposition to Supplement to Settlement Class Members' Objections to the Special Master's Decision, Robin Cornish, Claim Doc. No. 231458, Dec. 28, 2020 ....................................................3855

Explanation About the Norming Agreement, Robin Cornish, Claim Doc. No. 255802, Apr. 12, 2022..................................................................3859

Explanation About the Norming Agreement, Carleen Hastings, Claim Doc. No. 255954, Apr. 12, 2022........................................................................3863

Order [Remanding Class Member's Objections to the Special Master], Robin Cornish, Claim Doc. No. 278160, Feb. 27, 2023 .....................................3867

Order [Remanding Class Member's Objections to the Special Master], Carleen Hastings, Claim Doc. No. 278167, Feb. 27, 2023 ......................3869

Notice of Remand of Appeal for Re-review, Robin Cornish, Clain Doc. No. 278421, Mar. 3, 2023...............................................................................3871

Notice of Remand of Appeal for Re-review, Carleen Hastings, Clain Doc. No. 278422, Mar. 3, 2023.................................................................................3872

Notice of Denial of Monetary Award Claim, Robin Cornish, Claim Doc. No. 282802, May 16, 2023 ...........................................................................3873

Notice of Denial of Monetary Award Claim, Carleen Hastings, Claim Doc. No. 282803, May 16, 2023 ......................................................................3876

Written Statement in Support of Class Member's Appeal of the Claims
Administrator's Notice of Denial of Monetary Award Claim, Robin
Cornish, Claim Doc. No. 284510, June 15, 2023 ...................................... 3879

Exhibit 1: Notice of Denial of Monetary Award Claim, Robin
Cornish, Claim Doc. No. 284511, June 15, 2023 ............................ 3889

Exhibit 2: Excerpts from Class Member's Claim Package, Robin
Cornish, Claim Doc. No. 284512, June 15, 2023 ........................... 3892

Exhibit 3: Notice of Request for Additional Documents, Robin
Cornish, Claim Doc. No. 284514, June 15, 2023 ........................... 3947

Exhibit 4: Counsel Letter regarding upload of Diagnosis Physician
Certification Form & Medical Records, Robin Cornish, Claim
Doc. No. 284515, June 15, 2023 ..................................................... 3950

Exhibit 5: Appeals Form for Monetary Award of Derivative
Claimant Award Claim Determination, Robin Cornish, Claim
Doc. No. 284516, June 15, 2023 ..................................................... 3979

Exhibit 6: Written Statement in Support of Class Member's
Appeal of the Claims Administrator's Notice of denial of
Monetary Award Claim, Robin Cornish, Claim Doc. No. 284517,
June 15, 2023 ................................................................................... 3982

Exhibit 7: Filed Appeal Alert, Robin Cornish, Claim Doc. No.
284518, June 15, 2023 ..................................................................... 4093

Exhibit 8: NFL Parties' Opposition to Appeal of Claim Denial by
Representative Claimant Robin Cornish, Robin Cornish, Claim
Doc. No. 284519, June 15, 2023 ..................................................... 4096

Exhibit 9: Post-Appeal Notice of Denial of Monetary Award
Claim, Robin Cornish, Claim Doc. No. 284520, June 15, 2023 ..... 4125

Exhibit 10: Settlement Class Member's Objections to the Special
Master's Decision Denying Class Member's Appeal, Robin
Cornish, Claim Doc. No. 284521, June 15, 2023 ........................... 4127

Exhibit 11: Response of NFL Parties in Opposition to Robin
Cornish's Objection to Post-Appeal Notice of Denial of
Monetary Award Claim, Robin Cornish, Claim Doc. No. 284522,
June 15, 2023 ................................................................................... 4233

Exhibit 12: Settlement Implementation Order, Robin Cornish, Claim Doc. No. 284523, June 15, 2023 .........................................4242

Exhibit 13: Special Master's Decision, Robin Cornish, Claim Doc. No. 284524, June 15, 2023 ....................................................4245

Exhibit 14: Post-Appeal Notice of Denial of Monetary Award Claim, Robin Cornish, Claim Doc. No. 284525, June 15, 2023.....4250

Exhibit 15: Supplement to Settlement Class Members' Objections to the Special Master's Decision, Robin Cornish, Claim Doc. No. 284526, June 15, 2023 ........................................4252

Exhibit 16: Response of the NFL Parties in Opposition to Supplement to Settlement Class Members' Objections to the Special Master's Decision, Robin Cornish, Claim Doc. No. 284527, June 15, 2023 ..................................................................4256

Exhibit 17: Order, Robin Cornish, Claim Doc. No. 284528, June 15, 2023 .........................................................................4261

Exhibit 18: Notice of Remand of Appeal for Re-Review, Robin Cornish, Claim Doc. No. 284529, June 15, 2023 ..........................4264

Exhibit 19: Notice of Denial of Monetary Award Claim, Robin Cornish, Claim Doc. No. 284531, June 15, 2023 ..........................4266

Appeals Form for Monetary Award or Derivative Claimant Award Claim Determination, Robin Cornish, Claim Doc. No. 284532, June 15, 2023 ...........................................................................4270

Appeals Form for Monetary Award or Derivative Claimant Award Claim Determination, Robin Cornish, Claim Doc. No. 284533, June 15, 2023 ...........................................................................4272

Appeals Form for Monetary Award or Derivative Claimant Award Claim Determination, Robin Cornish, Claim Doc. No. 284534, June 15, 2023 ...........................................................................4274

Appeals Form for Monetary Award or Derivative Claimant Award Claim Determination, Robin Cornish, Claim Doc. No. 284535, June 15, 2023 ...........................................................................4276

Appeals Form for Monetary Award or Derivative Claimant Award Claim Determination, Robin Cornish, Claim Doc. No. 284536, June 15, 2023 ...........................................................................................4278

Appeals Form for Monetary Award or Derivative Claimant Award Claim Determination, Robin Cornish, Claim Doc. No. 284537, June 15, 2023 ...........................................................................................4280

Appeals Form for Monetary Award or Derivative Claimant Award Claim Determination, Robin Cornish, Claim Doc. No. 284538, June 15, 2023 ...........................................................................................4282

Appeals Form for Monetary Award or Derivative Claimant Award Claim Determination, Robin Cornish, Claim Doc. No. 284539, June 15, 2023 ...........................................................................................4284

Appeals Form for Monetary Award or Derivative Claimant Award Claim Determination, Robin Cornish, Claim Doc. No. 284540, June 15, 2023 ...........................................................................................4286

Appeals Form for Monetary Award or Derivative Claimant Award Claim Determination, Robin Cornish, Claim Doc. No. 284541, June 15, 2023 ...........................................................................................4288

Written Statement in Support of Class Member's Appeal of the Claims Administrator's Notice of Denial of Monetary Award Claim, Carleen Hastings, Claim Doc. No. 284543, June 15, 2023 ....................................4290

    Exhibit 1: Notice of Denial of Monetary Award Claim, Carleen Hastings, Claim Doc. No. 284544, June 15, 2023 .........................4300

    Exhibit 2: Excerpts from Class Member's Claim Package, Carleen Hastings, Claim Doc. No. 284545, June 15, 2023.............4303

    Exhibit 3: Notice of Request for Additional Documents, Carleen Hastings, Claim Doc. No. 284546, June 15, 2023 .........................4380

    Exhibit 4: Counsel Letter regarding upload of Diagnosis Physician Certification Form & Medical Records, Carleen Hastings, Claim Doc. No. 284547, June 15, 2023 ....................................................4383

    Exhibit 5: Appeals Form for Monetary Award of Derivative Claimant Award Claim Determination, Carleen Hastings, Claim Doc. No. 284548, June 15, 2023 ....................................................4412

Exhibit 6: Written Statement in Support of Class Member's Appeal of the Claims Administrator's Notice of denial of Monetary Award Claim, Carleen Hastings, Claim Doc. No. 284551, June 15, 2023 ..................................................................4415

Exhibit 7: Filed Appeal Alert, Carleen Hastings, Claim Doc. No. 284553, June 15, 2023 ....................................................................4510

Exhibit 8: NFL Parties' Opposition to Appeal of Claim Denial by Representative Claimant Carleen Hastings, Carleen Hastings, Claim Doc. No. 284554, June 15, 2023 .........................................4513

Exhibit 9: Post-Appeal Notice of Denial of Monetary Award Claim, Carleen Hastings, Claim Doc. No. 284555, June 15, 2023 ....................................................................................................4543

Exhibit 10: Settlement Class Member's Objections to the Special Master's Decision Denying Class Member's Appeal, Carleen Hastings, Claim Doc. No. 284556, June 15, 2023 .........................4545

Exhibit 11: Response of NFL Parties in Opposition to Carleen Hastings's Objection to Post-Appeal Notice of Denial of Monetary Award Claim, Carleen Hastings, Claim Doc. No. 284557, June 15, 2023 ....................................................................4678

Exhibit 12: Settlement Implementation Order, Carleen Hastings, Claim Doc. No. 284558, June 15, 2023 .........................................4690

Exhibit 13: Special Master's Decision, Carleen Hastings, Claim Doc. No. 284559, June 15, 2023 ....................................................4693

Exhibit 14: Post-Appeal Notice of Denial of Monetary Award Claim, Carleen Hastings, Claim Doc. No. 284560, June 15, 2023 ....................................................................................................4698

Exhibit 15: Supplement to Settlement Class Members' Objections to the Special Master's Decision, Carleen Hastings, Claim Doc. No. 284561, June 15, 2023 .........................................4700

Exhibit 16: Response of the NFL Parties in Opposition to Supplement to Settlement Class Members' Objections to the Special Master's Decision, Carleen Hastings, Claim Doc. No. 284562, June 15, 2023 .................................................................4704

Exhibit 17: Order, Carleen Hastings, Claim Doc. No. 284563, June 15, 2023 ..............................................................................4709

Exhibit 18: Notice of Remand of Appeal for Re-Review, Carleen Hastings, Claim Doc. No. 284564, June 15, 2023 .........................4712

Exhibit 19: Notice of Denial of Monetary Award Claim, Carleen Hastings, Claim Doc. No. 284565, June 15, 2023 .........................4714

Appeals Form for Monetary Award or Derivative Claimant Award Claim Determination, Carleen Hastings, Claim Doc. No. 284567, June 15, 2023 ..............................................................................................4718

Appeals Form for Monetary Award or Derivative Claimant Award Claim Determination, Carleen Hastings, Claim Doc. No. 284568, June 15, 2023 ..............................................................................................4720

Filed Appeal Alert, Robin Cornish, Claim Doc. No. 284891, June 22, 2023 .....4722

Filed Appeal Alert, Carleen Hastings, Claim Doc. No. 284892, June 22, 2023 ..............................................................................................4724

NFL Parties' Opposition to Appeal of Claim Denial by Carleen Hastings, Carleen Hastings, Claim Doc. No. 287132, Aug. 7, 2023 .........................4726

Exhibit 1: Memorandum of Law of the NFL Parties in Opposition to Settlement Class Member Yvonne Sagapolutele's Motion to Modify the Amended Final Order and Judgment, Carleen Hastings, Claim Doc. No. 287133, Aug. 7, 2023 .............4732

NFL Parties' Opposition to Appeal of Claim Denial by Robin Cornish, Robin Cornish, Claim Doc. No. 287134, Aug. 7, 2023 .......................................4756

Exhibit 1: Memorandum of Law of the NFL Parties in Opposition to Settlement Class Member Yvonne Sagapolutele's Motion to Modify the Amended Final Order and Judgment, Robin Cornish, Claim Doc. No. 287135, Aug. 7, 2023 .................4762

Supplement in Support of Class Member's Appeal of the Claims Administrator's notice of denial of Monetary Award Claim, Robin Cornish, Claim Doc. No. 289319, Sept. 18, 2023 ....................................4786

Supplement in Support of Class Member's Appeal of the Claims Administrator's notice of denial of Monetary Award Claim, Carleen Hastings, Claim Doc. No. 289320, Sept. 18, 2023 ....................................4798

NFL Parties' Supplemental Brief in Opposition to Appeal of Claim Denial by Carleen Hastings, Carleen Hastings, Claim Doc. No. 2893332, Sept. 19, 2023 ................................................................................4810

NFL Parties' Supplemental Brief in Opposition to Appeal of Claim Denial by Robin Cornish, Robin Cornish, Claim Doc. No. 2893333, Sept. 19, 2023 ................................................................................4821

    Exhibit 1: NFL Concussion Settlement Frequently Asked Questions, Robin Cornish, Claim Doc. No. 289367, Sept. 19, 2023 ................................................................................4832

Exhibit 1: NFL Concussion Settlement Frequently Asked Questions, Carleen Hastings, Claim Doc. No. 289368, Sept. 19, 2023 ..............................................4847

Special Master's Decision, Carleen Hastings, Claim Doc. No. 290416, Oct. 7, 2023 ................................................................................4862

Special Master's Decision, Robin Cornish, Claim Doc. No. 290417, Oct. 7, 2023 ................................................................................4884

Post-Appeal Notice of Denial, Robin Cornish, Claim Doc. No. 290751, Oct. 13, 2023 ................................................................................4906

Post-Appeal Notice of Denial, Carleen Hastings, Claim Doc. No. 290752, Oct. 13, 2023 ................................................................................4907

Settlement Class Member's Objection to the Special Master's Decision Denying Class Member's Appeal, Carleen Hastings, Claim Doc. No. 291993, Nov. 2, 2023 ................................................................................4908

Settlement Class Member's Objection to the Special Master's Decision Denying Class Member's Appeal, Robin Cornish, Claim Doc. No. 291995, Nov. 2, 2023 ................................................................................4919

Response of the NFL Parties in Opposition to Settlement Class Member Carleen Hastings' Objection to the Special Master's October 7, 2023 Ruling, Carleen Hastings, Claim Doc. No. 297153, Dec. 14, 2023 ..........4930

Response of the NFL Parties in Opposition to Settlement Class Member Robin Cornish's Objection to the Special Master's October 7, 2023 Ruling, Robin Cornish, Claim Doc. No. 297154, Dec. 14, 2023 ..........................4952

Settlement Implementation Determination, Robin Cornish, Claim Doc. No. 395363,  June 9, 2025 ................................................................................4974

Settlement Implementation Determination, Carleen Hastings, Claim Doc. No. 395364,  June 9, 2025 .................................................................................4976

# STATE OF CALIFORNIA
### CERTIFICATION OF VITAL RECORD

# COUNTY OF LOS ANGELES
### REGISTRAR-RECORDER/COUNTY CLERK

## CERTIFICATE OF LIVE BIRTH
STATE OF CALIFORNIA—DEPARTMENT OF PUBLIC HEALTH

STATE BIRTH CERTIFICATE NUMBER

LOCAL REGISTRATION DISTRICT AND CERTIFICATE NUMBER: **7097-092528**



FILED 10-48-70 RAX LEE COUNTY RECORDER

| | | | |
|---|---|---|---|
| **THIS CHILD** | 1A. NAME OF CHILD—FIRST NAME CHRISTOPHER | 1B. MIDDLE NAME EDDIE | 1C. LAST NAME MIMS |
| | 2. SEX MALE | 3A. THIS BIRTH: SINGLE, TWIN, OR TRIPLET SINGLE | 3B. IF TWIN OR TRIPLET, THIS CHILD BORN 1ST, 2ND, 3RD | 4A. DATE OF BIRTH—MONTH, DAY, YEAR SEPTEMBER 29, 1970 | 4B. HOUR 12:34 P.M. |

| | | | |
|---|---|---|---|
| **PLACE OF BIRTH** | 5A. PLACE OF BIRTH—NAME OF HOSPITAL WHITE MEMORIAL MEDICAL CENTER | 5B. STREET ADDRESS (STREET AND NUMBER OR LOCATION) 1720 BROOKLYN AVENUE | 5C. INSIDE CITY CORPORATE LIMITS (SPECIFY YES OR NO) yes |
| | 5D. CITY OR TOWN LOS ANGELES | 5E. COUNTY LOS ANGELES | |

| | | | |
|---|---|---|---|
| **MOTHER OF CHILD** | 6A. MAIDEN NAME OF MOTHER—FIRST NAME CARLEEN | 6B. MIDDLE NAME | 6C. LAST NAME (MAIDEN SURNAME) HASTINGS | 7. BIRTHPLACE (STATE OR FOREIGN COUNTRY) TENNESSEE |
| | 8. AGE OF MOTHER (AT TIME OF THIS BIRTH) 18 YEARS | 9. COLOR OR RACE OF MOTHER NEGRO | 10A. RESIDENCE OF MOTHER—STREET ADDRESS (STREET AND NUMBER, RURAL LOCATION OR LOCATION) 1461 E. 42nd STREET | 10B. INSIDE CITY CORPORATE LIMITS (SPECIFY YES OR NO) yes |
| | 10C. RESIDENCE OF MOTHER—CITY OR TOWN LOS ANGELES | 10D. RESIDENCE OF MOTHER—COUNTY LOS ANGELES | 10E. RESIDENCE OF MOTHER—STATE CALIFORNIA 90011 |

| | | | |
|---|---|---|---|
| **FATHER OF CHILD** | 11A. NAME OF FATHER—FIRST NAME LORENZO | 11B. MIDDLE NAME VICTOR | 11C. LAST NAME MIMS | 12. BIRTHPLACE (STATE OR FOREIGN COUNTRY) CALIFORNIA |
| | 13. AGE OF FATHER (AT TIME OF THIS BIRTH) 19 YEARS | 14. COLOR OR RACE OF FATHER NEGRO | 15A. PRESENT OR LAST OCCUPATION STUDENT | 15B. KIND OF INDUSTRY OR BUSINESS COLLEGE |

| | | |
|---|---|---|
| **INFORMANT'S CERTIFICATION** | I HEREBY CERTIFY THAT I HAVE REVIEWED THE ABOVE STATED INFORMATION AND THAT IT IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE. X Carleen Hastings 16. PARENT OR OTHER INFORMANT—SIGNATURE (IF OTHER PARENT, SPECIFY) | 16B. DATE REVIEWED AND SIGNED BY INFORMANT SEPTEMBER 30, 1970 |
| **ATTENDANT'S CERTIFICATION** | I HEREBY CERTIFY THAT I ATTENDED THIS BIRTH AND THAT THE CHILD WAS BORN ALIVE AT THE HOUR, DATE AND PLACE STATED ABOVE. Wilber B. Dunningan MD 17A. PHYSICIAN (OR OTHER PERSON WHO ATTENDED THIS BIRTH) SIGNATURE—DEGREE OR TITLE 17C. ADDRESS 9608 COMPTON AVENUE, LOS ANGELES 90031 | 17B. DATE SIGNED BY PHYSICIAN OR OTHER ATTENDANT SEPTEMBER 29, 1970 17D. PHYSICIAN'S CALIFORNIA LICENSE NUMBER G 9698 |
| **LOCAL REGISTRAR** | 18 REQUEST OMISSION FROM SOLICITATION LISTS 19. LOCAL REGISTRAR—SIGNATURE ▶ Sidmedonada M.D. | 20. DATE ACCEPTED BY LOCAL REGISTRAR OCT 8 1970 |

This is to certify that this document is a true copy of the official record filed with the Registrar-Recorder/County Clerk.

Dean C. Logan
**DEAN C. LOGAN**
Registrar-Recorder/County Clerk

This copy is not valid unless prepared on an engraved border displaying the seal and signature of the Registrar-Recorder/County Clerk.

ANY ALTERATION OR ERASURE VOIDS THIS CERTIFICATE

OCT 0 6 2017

CALOSANGO2



1000001996931



**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

---

IN RE:  NATIONAL FOOTBALL
LEAGUE PLAYERS'
CONCUSSION INJURY
LITIGATION

No. 2:12-md-02323-AB

MDL No. 2323

---

THIS DOCUMENT RELATES TO
ALL ACTIONS

**Hon. Anita J. Brody**

---

## [PROPOSED] ORDER APPOINTING REPRESENTATIVE CLAIMANT

Before the Court is the Petition of **Carleen Hastings** for appointment as the Representative Claimant authorized to act on behalf of **Christopher Mims**, a deceased Retired NFL Football Player, in connection with the NFL Concussion Settlement.  The Court hereby **GRANTS** the Petition, and **ORDERS** as follows:

1.    **Carleen Hastings** is appointed as the Representative Claimant on behalf of **Christopher Mims** and his estate, heirs, and beneficiaries in connection with the NFL Concussion Settlement program (the "Program").

2. The Representative Claimant is authorized to act on behalf of the Retired NFL Football Player, including the submission of materials to register for the Program, the decision to participate in the Baseline Assessment Program (where applicable), the filing of any Claim Packages for Monetary Awards, and the receipt of payment for any Monetary Awards.

3. The Claims Administrator, BAP Administrator and Lien Resolution Administrator shall accept this Order as proof of the Representative Claimant's appointment.

1

4.   Any final Monetary Award or Supplemental Monetary Award amount the Claims Administrator shall determine and award to or on behalf of the Retired NFL Football Player in accordance with the Settlement Agreement is approved as fair, reasonable and adequate.

5.   The Claims Administrator shall pay the Monetary Award or Supplemental Monetary Award amount to the Representative Claimant.

6.   The Representative Claimant shall abide by all substantive laws of the applicable Retired NFL Football Player's state of domicile or any other applicable state law concerning the compromise and distribution of any Monetary Award or Supplemental Monetary Award.

7.   The Representative Claimant shall indemnify and hold harmless the Released Parties, as defined in Section 2.1(bbbb) of the Settlement Agreement, and their attorneys and insurers, Class Counsel, Co-Lead Class Counsel, the Claims Administrator, the BAP Administrator, the Lien Resolution Administrator, the Special Masters, and the agents and representatives of any of the foregoing, from any and all claims, demands, or expenses of any kind arising out of or relating to his or her action in connection with the Program, including, without limitation, as set forth in Section 11.4 of the Settlement Agreement.

8.   The Representative Claimant shall immediately notify the Claims Administrator if his or her authority is curtailed, surrendered, withdrawn, or terminated.

**SIGNED AND ENTERED** this ___ day of _____, _____.

_____
Wendell Pritchett
Special Master, NFL Concussion Settlement

2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

---

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br><br>MDL No. 2323 |

---

| | |
|---|---|
| THIS DOCUMENT RELATES TO ALL ACTIONS | **Hon. Anita J. Brody** |

---

### <u>ORDER APPOINTING REPRESENTATIVE CLAIMANT</u>

Before the Court is the Petition of **Carleen Hastings** for appointment as the Representative Claimant authorized to act on behalf of **Christopher Mims**, a deceased Retired NFL Football Player, in connection with the NFL Concussion Settlement. The Court hereby **GRANTS** the Petition, and **ORDERS** as follows:

1. **Carleen Hastings** is appointed as the Representative Claimant on behalf of **Christopher Mims**, and his estate, heirs, and beneficiaries in connection with the NFL Concussion Settlement program (the "Program").

2. The Representative Claimant is authorized to act on behalf of the Retired NFL Football Player, including the submission of materials to register for the Program, the decision to participate in the Baseline Assessment Program (where applicable), the filing of any Claim Packages for Monetary Awards, and the receipt of payment for any Monetary Awards.

3. The Claims Administrator, BAP Administrator and Lien Resolution Administrator shall accept this Order as proof of the Representative Claimant's appointment.

1

4.   Any final Monetary Award or Supplemental Monetary Award amount the Claims Administrator shall determine and award to or on behalf of the Retired NFL Football Player in accordance with the Settlement Agreement is approved as fair, reasonable and adequate.

5.   The Claims Administrator shall pay the Monetary Award or Supplemental Monetary Award amount to the Representative Claimant.

6.   The Representative Claimant shall abide by all substantive laws of the applicable Retired NFL Football Player's state of domicile or any other applicable state law concerning the compromise and distribution of any Monetary Award or Supplemental Monetary Award.

7.   The Representative Claimant shall indemnify and hold harmless the Released Parties, as defined in Section 2.1(bbbb) of the Settlement Agreement, and their attorneys and insurers, Class Counsel, Co-Lead Class Counsel, the Claims Administrator, the BAP Administrator, the Lien Resolution Administrator, the Special Masters, and the agents and representatives of any of the foregoing, from any and all claims, demands, or expenses of any kind arising out of or relating to his or her action in connection with the Program, including, without limitation, as set forth in Section 11.4 of the Settlement Agreement.

8.   The Representative Claimant shall immediately notify the Claims Administrator if his or her authority is curtailed, surrendered, withdrawn, or terminated.

**SIGNED AND ENTERED** this 24ᵗʰ day of March, 2018.

_____

Wendell Pritchett
Special Master, NFL Concussion Settlement



# NFL CONCUSSION SETTLEMENT
*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

## NOTICE OF REGISTRATION DETERMINATION
### DATE OF NOTICE: **March 28, 2018**
### DEADLINE TO CHALLENGE REGISTRATION DETERMINATION: **May 29, 2018**

## I.  REGISTRANT INFORMATION

| **Settlement Program ID** (This is your assigned ID for use throughout the Settlement Program.) | 950013395 |
|---|---|

| **Name** | First Carleen | | M.I. | Last Hastings |
|---|---|---|---|---|

| **Settlement Class Member Type** | Representative Claimant |
|---|---|
| **Primary Counsel** | Robins Cloud LLP |

## II.  REGISTRATION DETERMINATIONS

This Notice is an official communication from the Claims Administrator for the NFL Concussion Settlement Program. We reviewed the submitted Registration materials and determined the following:

| A. | **Are You a Settlement Class Member?** | **Yes** |
|---|---|---|
| B. | **Did You Timely and Properly Register?** | **Yes** |
| C. | **Are You Eligible to Participate in the Baseline Assessment Program?** | **No** |

## III.  EXPLANATION OF REGISTRATION DETERMINATIONS

You have timely and properly registered as a Settlement Class Member. As a registered Settlement Class Member, you are now eligible to submit a Claim Package or Derivative Claim Package to request a Monetary Award or Derivative Claimant Award. However, you are not eligible to participate in the Baseline Assessment Program ("BAP") because representative claimants for deceased retired nfl football players are not eligible for the baseline assessment program.

**Refer to the attached Guidance on Seeking Settlement Benefits document for additional information.**

## IV.  NFL RIGHT TO CHALLENGE THIS DETERMINATION

Section 4.3(a)(iii) of the Settlement Agreement gives the NFL the right to challenge, for good cause, our decision to classify you as a Settlement Class Member who timely and properly registered. If the NFL chooses to challenge this Registration Determination, it must do so by the deadline stated above, and we will make a determination on the challenge and notify you of our decision by issuing a Notice of Registration Challenge Determination.

## V. HOW TO CONTACT US WITH QUESTIONS OR FOR HELP

If you are represented by a lawyer, consult with your lawyer if you have questions or need assistance. If you are unrepresented and have any questions about this Notice or need help, contact us at 1-855-887-3485 or send an email to ClaimsAdministrator@NFLConcussionSettlement.com. If you are a lawyer, call or email your designated Firm Contact for assistance. For more information about the Settlement Program, visit the official website at www.NFLConcussionSettlement.com to read the Frequently Asked Questions or download a copy of the complete Settlement Agreement.





IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION
No. 2:12-md-02323 (E.D. Pa.)

# GUIDANCE ON SEEKING SETTLEMENT BENEFITS



# NFL CONCUSSION SETTLEMENT

*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

| CONTENTS | | |
|---|---|---|
| | **TITLE** | **PAGE** |
| **1.** | **Baseline Assessment Program** | **3** |
| **2.** | **Claim Package Information** | **5** |
| **3.** | **Derivative Claim Package Information** | **6** |
| **4.** | **Submitting a Claim Package** | **6** |
| **5.** | **Information Regarding the Settlement Program** | **7** |

| | 1. BASELINE ASSESSMENT PROGRAM | |
|---|---|---|
| 1. | **What is the Baseline Assessment Program ("BAP")?** | All Retired NFL Football Players who have earned at least one-half of an Eligible Season, who did not Opt Out from the Settlement, and who timely register to participate in the Settlement may participate in the Baseline Assessment Program ("BAP").<br><br>The BAP entitles eligible Retired NFL Football Players to one baseline assessment examination conducted by Qualified BAP Providers, which includes: (1) a standardized neuropsychological examination in accordance with the testing protocol set forth in Exhibit 2 of the Class Action Settlement Agreement; and (2) a basic neurological examination.<br><br>A baseline assessment examination may result in a diagnosis of Level 1 Neurocognitive Impairment, a Qualifying Diagnosis of Level 1.5 Neurocognitive Impairment or Level 2 Neurocognitive Impairment, or no diagnosis. Other Qualifying Diagnoses of Alzheimer's Disease, Parkinson's Disease, ALS or Death with CTE may not be made as part of a BAP baseline assessment examination.<br><br>Retired NFL Football Players who are diagnosed with Level 1 Neurocognitive Impairment (*i.e.*, moderate cognitive impairment) are eligible to receive "BAP Supplemental Benefits" in the form of further medical testing and/or treatment (including counseling and pharmaceuticals) for that condition during the ten-year term of the BAP or within five years from diagnosis, whichever is later.<br><br>Retired NFL Football Players who are diagnosed with Level 1.5 Neurocognitive Impairment or Level 2 Neurocognitive Impairment may submit a Claim Package for a Monetary Award to the Claims Administrator.<br><br>Retired NFL Football Players who participate in the BAP will be encouraged to provide their confidential medical records for use in research into cognitive impairment and safety and injury prevention with respect to football players.<br><br>Although all eligible Retired NFL Football Players are encouraged to take advantage of the BAP and receive a baseline examination, they do not need to participate in the BAP to receive a Monetary Award. However, any Monetary Award to a Retired NFL Football Player may be reduced by 10% if the Retired NFL Football Player does not participate in the BAP, as explained in more detail below. |
| 2. | **How do I request a baseline assessment examination?** | Baseline assessment examinations will begin on **June 6, 2017**. If your Notice of Registration Determination indicates that the Retired NFL Football Player is eligible to participate in the BAP, the BAP Administrator will begin accepting requests for baseline assessment examinations on **May 8, 2017**.<br><br>To request a baseline assessment examination, you may call the BAP Administrator at 1-855-887-3485 or click the BAP menu at the top of your Portal and follow the instructions there. |



| | | |
|---|---|---|
| **3.** | **What is the deadline to participate in the BAP?** | The deadline to participate in the BAP depends on the Retired NFL Football Player's age as of the Effective Date, which was January 7, 2017. <table><tr><th>Age as of<br>January 7, 2017</th><th>Deadline to Receive Baseline<br>Assessment Examination</th></tr><tr><td>43 or older</td><td>**June 6, 2019**</td></tr><tr><td>42 or younger</td><td>The earliest of the following:<br>(1) The day before the Retired NFL Football Player's 45th birthday; or<br>(2) By **June 7, 2027.**</td></tr></table> |
| **4.** | **What if the Retired NFL Football Player has already received a Qualifying Diagnosis and does not wish to participate in the BAP?** | If the Retired NFL Football Player received a Qualifying Diagnosis before the Effective Date of January 7, 2017, he does not need to participate in the BAP and will not have his Monetary Award reduced for not participating. |
| **5.** | **What if the Retired NFL Football Player has not already received a Qualifying Diagnosis and does not wish to participate in the BAP?** | If the Retired NFL Football Player did not receive a Qualifying Diagnosis before the Effective Date of January 7, 2017, and chooses not to participate in the BAP, any Monetary Award will be subject to a 10% Offset (*i.e.*, reduction), unless: (1) the Qualifying Diagnosis is ALS; or (2) he received any Qualifying Diagnosis other than ALS prior to his deadline to receive a BAP baseline assessment examination. |



| | | |
|---|---|---|
| 6. | **This Notice of Registration Determination indicates that the Retired NFL Football Player is not eligible to participate in the BAP.  What does that mean?** | If your Notice of Registration Determination indicates that the Retired NFL Football Player is not eligible to participate in the BAP, that means that we could not confirm that he earned at least half of an Eligible Season based on the information you provided.  In order to qualify for the BAP, the Retired NFL Football Player's participation in NFL Football had to earn him at least one half of an Eligible Season.  An "Eligible Season" means a season in which a Retired NFL Football Player or deceased Retired NFL Football Player was:  (i) on a Member Club's Active List on the date of three (3) or more regular season or postseason games; or (ii) on a Member Club's Active List on the date of one (1) or more regular or postseason games, and then spent at least two (2) regular or postseason games on a Member Club's injured reserve list or inactive list due to a concussion or head injury.   A "half of an Eligible Season" means a season in which a Retired NFL Football Player or deceased Retired NFL Football Player was:  (i) on a Member Club's practice, developmental, or taxi squad roster for at least eight (8) regular or postseason games; or (ii) on a World League of American Football, NFL Europe League, or NFL Europa League team's active roster on the date of three (3) or more regular season or postseason games or on the active roster on the date of one (1) or more regular or postseason games, and then spent at least two (2) regular or postseason games on the World League of American Football, NFL Europe League, or NFL Europa League injured reserve list or team inactive list due to a concussion or head injury. If you disagree with our determination, you may submit a challenge by following the instructions on the attached Challenge Form. <br><br> Even if the Retired NFL Football Player is not eligible to participate in the BAP, you still may participate in the Settlement program by submitting a Claim Package for a Monetary Award. |
| **2.  CLAIM PACKAGE INFORMATION FOR RETIRED NFL FOOTBALL PLAYERS AND REPRESENTATIVE CLAIMANTS** | | |
| 1. | **What must I include in my Claim Package?** | A complete Claim Package must include the following documents: <br>(1) The Claim Form with your Personal Signature; <br>(2) The Diagnosing Physician Certification Form; <br>(3) All medical records created by or received from your diagnosing physician or medical professional in connection with your Qualifying Diagnosis; <br>(4) A Monetary Award Claim Package HIPAA Authorization Form; and <br>(5) Records demonstrating the Retired NFL Football Player's employment and participation in NFL Football.  [These records will not be required if the Retired NFL Football Player or his Representative Claimant accepts the number of Eligible Seasons calculated from available data provided by the NFL.  The calculated Eligible Seasons are available only if you use the secure portal to submit a Claim Package.] |

| 2. | **Which version of the Diagnosing Physician Certification Form do I submit with my Claim Package?** | The version of the Diagnosing Physician Certification Form you submit depends on when and how you received your Qualifying Diagnosis:<br>(1) If you received a Qualifying Diagnosis of Level 1.5 Neurocognitive Impairment or Level 2 Neurocognitive Impairment following the baseline assessment examination you received through the BAP, submit a **BAP Diagnosing Physician Certification Form**.<br>(2) If you received a Qualifying Diagnosis before the Effective Date of January 7, 2017, submit a **Pre-Effective Date Diagnosing Physician Certification Form**.<br>(3) If you received a Qualifying Diagnosis from a Qualified MAF Physician after the Effective Date of January 7, 2017, submit a **MAF Diagnosing Physician Certification Form**. |
|---|---|---|
| 3. | **What is the deadline to submit a Claim Package?** | Your deadline to submit a Claim Package is: (1) two years after the date of the Qualifying Diagnosis; or (2) **February 6, 2019**, whichever is later. |
| 4. | **How do I submit a Claim Package?** | See Section 4 for information about how to submit a Claim Package to the Claims Administrator. |

### 3.  DERIVATIVE CLAIM PACKAGE INFORMATION

| 1. | **What must I include in my Derivative Claim Package?** | A complete Derivative Claim Package must include the following documents:<br>(1) A Derivative Claim Form with your Personal Signature; and<br>(2) A Derivative Claimant HIPAA Authorization Form. |
|---|---|---|
| 2. | **What is my deadline to submit a Derivative Claim Package?** | Your deadline to submit a Derivative Claim Package is 30 days after the Retired NFL Football Player through whom the relationship is the basis of the claim (or his Representative Claimant) receives a Notice of Monetary Award Claim Determination that provides a determination that he (or his Representative Claimant) is entitled to a Monetary Award.<br><br>If you are a registered Derivative Claimant, we will notify you when we issue a favorable Notice of Monetary Award Claim Determination to the Retired NFL Football Player to whom you are related, or his Representative Claimant. |
| 3. | **How do I submit a Derivative Claim Package?** | See Section 4 for information about how to submit a Derivative Claim Package to the Claims Administrator. |

### 4.  SUBMITTING A CLAIM PACKAGE

You may obtain the Claim Form, Derivative Claim Form, HIPAA Authorization Form, and Diagnosing Physician Certification Form through the secure online portal, by printing them from the Settlement Website or by contacting us.  If you do not have access to the secure online portal, you may request access by going to www.NFLConcussionSettlement.com/Login.aspx, clicking the Create New User button and following the instructions there.

You may submit your Claim Package or Derivative Claim Package using one of these methods:

| 1. | **By Using the Secure Online Portal:** | Click the Claim Package menu item to complete and upload all components of your Claim Package or Derivative Claim Package. |
|---|---|---|
| 2. | **By Mail:** | NFL Concussion Settlement<br>Claims Administrator<br>P.O. Box 25369<br>Richmond, VA 23260 |

| 3. | By Delivery: | NFL Concussion Settlement<br>c/o BrownGreer PLC<br>250 Rocketts Way<br>Richmond, VA 23231 |
|---|---|---|

| **5.  INFORMATION REGARDING THE SETTLEMENT PROGRAM** |
|---|
| If you have questions regarding any aspect of the Settlement program, you can review the Frequently Asked Questions (FAQs) available at www.NFLConcussionSettlement.com/FAQ.aspx.  If after reviewing the FAQs you still have a question, contact your lawyer if represented.  If you are unrepresented, contact us by email at ClaimsAdministrator@NFLConcussionSettlement.com or by phone at 1-855-887-3485.   If you are a lawyer, call or email your designated Firm Contact for assistance. |



 **CONCUSSION SETTLEMENT**
*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

## CLAIM FORM SIGNATURE ACKNOWLEDGEMENT FORM

If you completed your Claim Form using your Portal, you must submit this Claim Form Signature Acknowledgement Form with the Personal Signature of the Settlement Class Member identified in Section I who is submitting the claim for a Monetary Award.

### I. SETTLEMENT CLASS MEMBER & CLAIM FORM INFORMATION

| Settlement Program ID | 950013395 | | | |
|---|---|---|---|---|
| **Name** | First <br> Carleen | M.I. | Last <br> Hastings | Suffix |

### II. PERSONAL SIGNATURE

**By signing below, I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that all information provided in the Claim Form submitted through the Secure Portal, and in any of its attachments, is true and correct to the best of my knowledge, information, and belief.**

| Signature | *Carleen Hastings* | Date | \|0 \|2 \|/\|0 \|5 \|/\|2 \|0 \|1 \|9 \| <br> (Month/Day/Year) |
|---|---|---|---|

### III. HOW TO SUBMIT THIS SIGNATURE ACKNOWLEDGEMENT FORM

After printing this form, the Settlement Class Member must sign in the Personal Signature box above. Scan and upload the signed document using the Upload Signed Signature Acknowledgement Form button on the Claim Package Page of your Portal. If you are unable to scan the form, you may return the signed form through either of the following options:

| By Mail: | NFL Concussion Settlement <br> Claims Administrator <br> P.O. Box 25369 <br> Richmond, VA 23260 |
|---|---|
| By FedEx/UPS: | NFL Concussion Settlement <br> c/o BrownGreer PLC <br> 250 Rocketts Way <br> Richmond, VA 23231 |

 **CONCUSSION SETTLEMENT**

*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

## NFL CONCUSSION SETTLEMENT CLAIM FORM
## FOR RETIRED NFL FOOTBALL PLAYERS AND REPRESENTATIVE CLAIMANTS

Complete this Claim Form if you are a **Retired NFL Football Player** or the **Representative Claimant** of a Retired NFL Football Player and want to apply for a Monetary Award under the NFL Concussion Settlement Program. You must fill out Section II only if you are a **Representative Claimant**.

**Your Claim Package must be submitted to the Claims Administrator no later than two years after the date that you received your Qualifying Diagnosis or within two years after February 6, 2017, whichever is later. Failure to meet this deadline will preclude you from receiving a Monetary Award for that Qualifying Diagnosis unless you can: (1) show substantial hardship (beyond the Qualifying Diagnosis) that prevented your compliance; and (2) submit the Claim Package within two years of the missed deadline.**

Certain Claim Packages may be selected for audit pursuant to Section 10.3 of the Settlement Agreement. If your claim is selected for audit, you may be required to submit additional records or information now or in the future. You are required to preserve all such additional records in your possession, custody or control and to instruct your healthcare providers to preserve such records that may be requested under Section 10.3(e) of the Settlement Agreement. These documents include but are not limited to historical medical records related to the underlying medical condition that is the basis for the Qualifying Diagnosis. Unreasonable failure to preserve, and later provide upon request, such records and information will result in the claim being denied without the right to an appeal.

## I. RETIRED NFL FOOTBALL PLAYER INFORMATION

Enter only the **Retired NFL Football Player's** information in this Section I.

| | | | | | |
|---|---|---|---|---|---|
| **Settlement Program ID** | 950013395 | | | | |
| **Player Name** | First<br>Christopher | M.I. | Last<br>Mims | | Suffix |
| **Player Date of Birth** | | | Sep / 29 / 1970<br>(Month/Day/Year) | | |
| **Player Date of Death (if applicable)** | | | Oct / 15 / 2008<br>(Month/Day/Year) | | |
| **Player Social Security Number** | | | 560 - 49 - 8828 | | |

| **Player Mailing Address** | Address 1 | |
|---|---|---|
| | Address 2 | |
| | City | |
| | State/Province | |
| | Postal Code | Country<br>United States |

| **Player Telephone** | _____ - _____ - _____ | **Player Email Address** | |
|---|---|---|---|

| NFL CONCUSSION SETTLEMENT CLAIM FORM<br>FOR RETIRED NFL FOOTBALL PLAYERS AND REPRESENTATIVE CLAIMANTS | | | |
|---|---|---|---|

## II. REPRESENTATIVE CLAIMANT INFORMATION

If you are a **Representative Claimant** of a Retired NFL Football Player who is deceased, or legally incapacitated or incompetent, fill out this Section II with your own information.

| Representative Name | First<br>Carleen | M.I. | Last<br>Hastings | Suffix |
|---|---|---|---|---|
| Representative Date of Birth | | Mar / 13 / 1952<br>(Month/Day/Year) | | |
| Representative Social Security Number | | 548 - 82 - 4010 | | |

| Representative Mailing Address | Address 1<br>P.O. Box 92 | |
|---|---|---|
| | Address 2 | |
| | City<br>Inglewood | |
| | State/Province<br>CA | |
| | Postal Code<br>90306 | Country<br>United States |

| Representative Telephone | 323 - 342 - 3127 | Representative Email Address | hastings9494@hotmail.com |
|---|---|---|---|

## III. ATTORNEY INFORMATION

If you are represented by an attorney, enter the attorney's information in this Section III.

| Attorney Name | First<br>Justin | M.I.<br>B | Last<br>Demerath | Suffix |
|---|---|---|---|---|
| Law Firm Name | O'Hanlon, Demerath & Castillo | | | |

| Law Firm Mailing Address | Address 1<br>808 West Avenue | |
|---|---|---|
| | Address 2 | |
| | City<br>Austin | |
| | State/Province<br>TX | |
| | Postal Code<br>78701 | Country<br>United States |

| Attorney Telephone | ___ - ___ - ___ | Attorney Email Address | jdemerath@808west.com |
|---|---|---|---|

## IV. QUALIFYING DIAGNOSIS/ES

## NFL CONCUSSION SETTLEMENT CLAIM FORM
## FOR RETIRED NFL FOOTBALL PLAYERS AND REPRESENTATIVE CLAIMANTS

Check the Qualifying Diagnosis/es for which the Retired NFL Football Player seeks an award and provide the date of each diagnosis and his State of Domicile at the time of that diagnosis. If the Retired NFL Football Player was diagnosed with either Level 1.5 or Level 2 Neurocognitive Impairment through the Baseline Assessment Program ("BAP"), you must provide the name of **both** the diagnosing neuropsychologist and the diagnosing board-certified neurologist.

| Qualifying Diagnosis/es | | | Date of Diagnosis/es | State of Domicile at Time of Diagnosis |
|---|---|---|---|---|
| ☐   Level 1.5 Neurocognitive Impairment | | | -- / -- / ---- <br> (Month/Day/Year) | _____ <br> (State) |
| **Diagnosing medical professional:** | | | | |
| Name | First | M.I. | Last | Suffix |
| **Second diagnosing medical professional (if diagnosis was made through the BAP):** | | | | |
| Name | First | M.I. | Last | Suffix |
| ☐   Level 2 Neurocognitive Impairment | | | -- / -- / ---- <br> (Month/Day/Year) | _____ <br> (State) |
| **Diagnosing medical professional:** | | | | |
| Name | First | M.I. | Last | Suffix |
| **Second diagnosing medical professional (if diagnosis was made through the BAP):** | | | | |
| Name | First | M.I. | Last | Suffix |
| ☐   Alzheimer's Disease | | | -- / -- / ---- <br> (Month/Day/Year) | _____ <br> (State) |
| **Diagnosing medical professional:** | | | | |
| Name | First | M.I. | Last | Suffix |
| ☐   Parkinson's Disease | | | -- / -- / ---- <br> (Month/Day/Year) | _____ <br> (State) |
| **Diagnosing medical professional:** | | | | |
| Name | First | M.I. | Last | Suffix |
| ☐   ALS (Amyotrophic Lateral Sclerosis, or "Lou Gehrig's Disease") | | | -- / -- / ---- <br> (Month/Day/Year) | _____ <br> (State) |
| **Diagnosing medical professional:** | | | | |
| Name | First | M.I. | Last | Suffix |
| ☒   Death with CTE (Chronic Traumatic Encephalopathy) | | | Oct / 15 / 2008 <br> (Month/Day/Year) | CA <br> (State) |

## NFL CONCUSSION SETTLEMENT CLAIM FORM
### FOR RETIRED NFL FOOTBALL PLAYERS AND REPRESENTATIVE CLAIMANTS

**Diagnosing medical professional:**

| Name | First<br>Ronald | M.I.<br>L. | Last<br>Hamilton | Suffix |
|------|------|------|------|------|

## V. ADDITIONAL MEDICAL INFORMATION

### A. Stroke

Was the Retired NFL Football Player diagnosed as having suffered a Stroke before the Qualifying Diagnosis identified in Section V?  A medically diagnosed Stroke does not include a transient cerebral ischemic attack and related syndromes.

☐ **YES**   If you answered Yes, provide additional information about the Stroke.  Then go to Section VI. B.

☒ **NO**    If you answered No, go to Section VI. B.

| **Date of Stroke** | -- / -- / ----<br>(Month/Day/Year) |
|------|------|

**Medical professional who diagnosed the Stroke:**

| Name | First | M.I. | Last | Suffix |
|------|------|------|------|------|

☐   Check here if you believe that the Qualifying Diagnosis for which you are claiming a Monetary Award is not causally related to the prior Stroke and you are submitting records and other evidence supporting this position.  If you provide information regarding a prior Stroke but do not check this box, we will apply an Offset, which will result in a 75% reduction of any Monetary Award.

### B. Traumatic Brain Injury

Was the Retired NFL Football Player diagnosed as having suffered a *severe* traumatic brain injury unrelated to NFL Football play that occurred during or after the time he played NFL Football and before the Qualifying Diagnosis identified in Section V?  A severe traumatic brain injury is one that caused the Retired NFL Football Player to lose consciousness for more than 24 hours.

☐ **YES**   If you answered Yes, provide additional information about the Traumatic Brain Injury.  Then go to Section VII.

☒ **NO**    If you answered No, go to Section VII.

| **Date of Traumatic Brain Injury** | -- / -- / ----<br>(Month/Day/Year) |
|------|------|

**Medical professional who diagnosed the Traumatic Brain Injury:**

| Name | First | M.I. | Last | Suffix |
|------|------|------|------|------|

☐   Check here if you believe that the Qualifying Diagnosis for which you are claiming a Monetary Award is not causally related to the Traumatic Brain Injury and you are submitting records and other evidence supporting this position.  If you provide information regarding a Traumatic Brain Injury but do not check this box, we will apply an Offset, which will result in a 75% reduction of any Monetary Award.

## VI. MEDICARE, MEDICAID AND OTHER LIEN INFORMATION

## NFL CONCUSSION SETTLEMENT CLAIM FORM
## FOR RETIRED NFL FOOTBALL PLAYERS AND REPRESENTATIVE CLAIMANTS

As set forth in Article XI of the Settlement Agreement, the Lien Resolution Administrator, with assistance from the Claims Administrator, is administering the process for the identification, verification, and satisfaction of Liens that may be withheld or asserted against your Monetary Award. If you or the Lien Resolution Administrator identifies a potential Lien asserted against your Monetary Award and the Lien Resolution Administrator confirms the validity and final amount of such Lien(s), we are required to deduct those amounts from your Monetary Award along with any other deductions required by state or federal law.

Are you aware of a potential Lien that could be asserted against your Monetary Award?

☐ **YES**  If you answered Yes, fill out the appropriate questions in this Section VI. Then go to Section VII.

☒ **NO**  If you answered No, go to Section VII.

### A. Medicare

1. If the Retired NFL Football Player is now enrolled, or has been enrolled at any time, in Medicare Part A or Medicare Part B program(s), provide the following information.

   HICN (Medicare Claim #):

   Enrollment date: _____ -- _____/ _____ -- _____/ _____ ----  _____
   (Month/Day/Year)

2. If the Retired NFL Football Player is now enrolled, or has been enrolled at any time, in a Medicare Part C program (for example, a Medicare Advantage, Medicare cost, Medicare healthcare prepayment plan benefits, or similar Medicare plan administered by private entities), provide the following information.

   Name of plan:

   Member number for plan:

   Enrollment date: _____ -- _____/ _____ -- _____/ _____ ----  _____
   (Month/Day/Year)

3. If the Retired NFL Football Player is now enrolled, or has been enrolled at any time, in a Medicare Part D program (prescription drug benefits), provide the following information.

   Name of Medicare Part D Plan:

   Member number of Medical Part D Plan:

   Enrollment date: _____ -- _____/ _____ -- _____/ _____ ----  _____
   (Month/Day/Year)

### B. Medicaid

1. If the Retired NFL Football Player is currently enrolled in a state Medicaid Program, provide the following information.

   Medical ID number:

   State of Issuance:

   Enrollment date: _____ -- _____/ _____ -- _____/ _____ ----  _____
   (Month/Day/Year)

| NFL CONCUSSION SETTLEMENT CLAIM FORM |
|---|
| **FOR RETIRED NFL FOOTBALL PLAYERS AND REPRESENTATIVE CLAIMANTS** |

2. If the Retired NFL Football Player has been enrolled in any other state Medicaid Program at any time, provide the following information.

Medical ID number:

State of Issuance:

Enrollment date:  _____ -- ____/____ -- ____/____ ---- _____
(Month/Day/Year)

### C. Department of Veterans Affairs, TRICARE, or Indian Health Service

Check any of the following federal healthcare programs that the Retired NFL Football Player has enrolled in or has been entitled to receive benefits from at any time. If you check any of the programs below, provide the required information about each program.

☐ **Department of Veterans Affairs healthcare or prescription drug benefits**

Claim Number:
_____

Enrollment Date:  _____ -- ____/____ -- ____/____ ---- _____   **TO**   _____ -- ____/____ -- ____/____ ---- _____
(Month/Day/Year)                                (Month/Day/Year)

Branch: _____

Sponsor: _____

Sponsor SSN: _____ - _____ - _____

Treating Facility: _____

☐ **TRICARE health care or prescription drug benefits**

Claim Number:
_____

Enrollment Date:  _____ -- ____/____ -- ____/____ ---- _____   **TO**   _____ -- ____/____ -- ____/____ ---- _____
(Month/Day/Year)                                (Month/Day/Year)

Branch: _____

Sponsor: _____

Sponsor SSN: _____ - _____ - _____

Treating Facility: _____

☐ **Indian Health Service healthcare or prescription drug benefits**

Claim Number:
_____

Enrollment Date:  _____ -- ____/____ -- ____/____ ---- _____   **TO**   _____ -- ____/____ -- ____/____ ---- _____
(Month/Day/Year)                                (Month/Day/Year)

Branch: _____

Sponsor: _____

Sponsor SSN: _____ - _____ - _____

## NFL CONCUSSION SETTLEMENT CLAIM FORM
## FOR RETIRED NFL FOOTBALL PLAYERS AND REPRESENTATIVE CLAIMANTS

Tribe: _____

Treating Facility: _____

### D. Other Governmental Payor

If at any time the Retired NFL Football Player was entitled to receive medical items, services, and/or prescription drugs from any federal, state, or other governmental body, agency, department, plan, program, or entity that administers, funds, pays, contracts for, or provides medical items, services, and/or prescription drugs not previously listed above, provide the following information.

Name of Plan/Entity:

_____

Policyholder Name:

_____

Policy Number:

_____

Medical Condition Covered by Plan/Entity: _____

### E. Private Healthcare Insurance

If the Retired NFL Football Player has received medical treatment for the Qualifying Diagnosis/es that was covered by a private healthcare insurance plan or other form of payment, provide the following information for every such plan or entity.

Name of Plan/Entity:

_____

Policyholder Name:

_____

Policy Number:

_____

Medical Condition Covered by Plan/Entity: _____

### F.  Other Lien Information

Identify any known Lien of any nature whatsoever not identified above. Such a lien may include, without limitation, any mortgage, lien, pledge, charge, security interest, or legal encumbrance held by any person or entity (such as an attorney, child support agency, federal or state tax agency, or judgment creditor), where that person or entity may be legally entitled to a share of any Monetary Award that you may receive.

You must also attach to this Claim Form a copy of the letter, form, or writing from such person or entity informing you of this Lien.

Name of Lienholder: _____

Amount of Lien: $_____ ,  _____ .  _____

Contact Information for Lienholder: _____

Nature of Lien: _____

| NFL CONCUSSION SETTLEMENT CLAIM FORM FOR RETIRED NFL FOOTBALL PLAYERS AND REPRESENTATIVE CLAIMANTS |
|---|

## VII. BANKRUPTCY INFORMATION

Has the Retired NFL Football Player ever been a debtor in a bankruptcy proceeding?

☐ **YES**    If you answered Yes, provide additional information about the bankruptcy proceeding.  Then go to Section IX.

☒ **NO**    If you answered No, go to Section IX.

U.S. Bankruptcy Court, _____ District of _____
(District Name)                                    (District Name)

Case Number: _____ – _____

Chapter:    ☐ Chapter 7    ☐ Chapter 11    ☐ Chapter 12    ☐ Chapter 13

Date bankruptcy was filed: _____ -- / -- / ----
(Month/Day/Year)

If closed, date bankruptcy was closed: _____ -- / -- / ----
(Month/Day/Year)

## VIII. RELEASE

As more fully set forth in the Settlement Agreement, all Settlement Class Members, among others including you, have released the National Football League, NFL Properties LLC and any Member Club, among others, from all claims and liabilities arising out of, or relating to, the allegations in the Class Action Complaint and other similar lawsuits.  In addition, as more fully set forth in the Settlement Agreement, all Settlement Class Members have promised not to commence, and to withdraw and seek dismissal of, any litigation or other proceeding asserting a claim that the Settlement Class Member has released.  For example, you, as a Settlement Class Member, have agreed not to sue the NFL Parties, the NFL's Member Clubs and other related persons or entities in connection with any claim you may have now or in the future relating to any head, brain and/or cognitive injury, as well as any injuries arising out of, or relating to, concussions and/or subconcussive events of whatever cause and its damages, whenever arising.

The above paragraph is an incomplete summary of the Releases and Covenants in the Settlement Agreement. Nothing in the above paragraph limits, expands, or in any way alters the terms of the Settlement Agreement. The Settlement Agreement is available at https://www.nflconcussionsettlement.com.

**Releases.**

(a) In consideration of the benefits described and the agreement and covenants contained in the Settlement Agreement, and by operation of the Final Order and Judgment, I, on my own behalf and on behalf of my respective predecessors, successors, assigns, assignors, representatives, attorneys, agents, trustees, insurers, heirs, next of kin, estates, beneficiaries, executors, administrators, and any natural, legal, or juridical person or entity to the extent he, she, or it is entitled to assert any claim on my behalf (hereafter "I", "My" or "Me"), hereby waive and release, forever discharge and hold harmless the Released Parties, and each of them, of and from any and all past, present and future claims, counterclaims, actions, rights or causes of action, liabilities, suits, demands, damages, losses, payments, judgments, debts, dues, sums of money, costs and expenses (including, without limitation, attorneys' fees and costs), accounts, reckonings, bills, covenants, contracts, controversies, agreements, obligations, or promises, in law or in equity, contingent or non-contingent, known or unknown, suspected or unsuspected, foreseen or unforeseen, matured or unmatured, accrued or unaccrued, liquidated or unliquidated, whether direct, representative, class or individual in nature, in any forum that I had, have, or may have in the future arising out of, in any way relating to or in connection with the allegations, transactions, facts, matters, occurrences, representations or omissions involved, set forth, referred to or relating to the Class Action Complaint and/or Related Lawsuits ("Claims"), including, without limitation, Claims:

(i) that were, are or could have been asserted in the Class Action Complaint or any other Related Lawsuit; and/or

**NFL CONCUSSION SETTLEMENT CLAIM FORM
FOR RETIRED NFL FOOTBALL PLAYERS AND REPRESENTATIVE CLAIMANTS**

(ii) arising out of, or relating to, head, brain and/or cognitive injury, as well as any injuries arising out of, or relating to, concussions and/or subconcussive events (including, without limitation, prevention, diagnosis and treatment thereof) of whatever cause and its damages (whether short-term, long-term or death), whenever arising, including, without limitation, Claims for personal or bodily injury, including disease, mental or physical pain or suffering, emotional or mental harm, or anguish or loss of enjoyment of life (and exacerbation and/or progression of personal or bodily injury), or wrongful death and/or survival actions as a result of such injury and/or exacerbation and/or progression thereof; and/or

(iii) arising out of, or relating to, neurocognitive deficits or impairment, or cognitive disorders, of whatever kind or degree, including, without limitation, mild cognitive impairment, moderate cognitive impairment, dementia, Alzheimer's Disease, Parkinson's Disease, and ALS; and/or

(iv) arising out of, or relating to, CTE; and/or

(v) arising out of, or relating to, loss of support, services, consortium,  companionship, society, or affection, or damage to familial relations (including disease, mental or physical pain or suffering, emotional or mental harm, or anguish or loss of enjoyment of life); and/or

(vi) arising out of, or relating to, increased risk, possibility, or fear of suffering in the future from any head, brain and/or cognitive injury, as well as any injuries arising out of, or relating to, concussions and/or subconcussive events (including, without limitation, prevention, diagnosis and treatment thereof), and including disease, mental or physical pain or suffering, emotional or mental harm, or anguish or loss of enjoyment of life); and/or

(vii) arising out of, or relating to, medical screening and medical monitoring for  undeveloped, unmanifested, and/or undiagnosed head, brain and/or cognitive injury, as well as any injuries arising out of, or relating to, concussions and/or subconcussive events (including, without limitation, prevention, diagnosis and treatment thereof); and/or

(viii) premised on any purported or alleged breach of any Collective Bargaining Agreement related to the issues in the Class Action Complaint and/or Related Lawsuits, except claims for workers' compensation and claims alleging entitlement to NFL CBA Medical and Disability Benefits.

(b) In consideration of the benefits described and the agreement and covenants contained in the Settlement Agreement, and by operation of the Final Order and Judgment, I do hereby release, forever discharge and hold harmless the Released Parties from any and all Claims, including unknown Claims, arising from, relating to, or resulting from the reporting, transmittal of information, or communications between or among the NFL Parties, Counsel for the NFL Parties, the Special Master, Claims Administrator, Lien Resolution Administrator, any Governmental Payor, and/or Medicare Part C or Part D Program sponsor regarding any claim for benefits under the Settlement Agreement, including any consequences in the event that this Settlement Agreement impacts, limits, or precludes My right to benefits under Social Security or from any Governmental Payor or Medicare Part C or Part D Program sponsor.

(c) In consideration of the benefits described and the agreement and covenants contained in the Settlement Agreement, and by operation of the Final Order and Judgment, I do hereby release, forever discharge and hold harmless the Released Parties from any and all Claims, including unknown Claims, pursuant to the MSP Laws, or other similar causes of action, arising from, relating to, or resulting from the failure or alleged failure of any of the Released Parties to provide for a primary payment or appropriate reimbursement to a Governmental Payor or Medicare Part C or Part D Program sponsor with a Lien in connection with claims for medical items, services, and/or prescription drugs provided in connection with compensation or benefits claimed or received by Me pursuant to the Settlement Agreement.

(d) In consideration of the benefits described and the agreement and covenants contained in the Settlement Agreement, and by operation of the Final Order and Judgment, I do hereby release, forever discharge and hold harmless the Released Parties, the Special Master, BAP Administrator, Claims Administrator, and their respective officers, directors, and employees from any and all Claims, including unknown Claims, arising from, relating to, or resulting from their participation, if any, in the BAP, including, but not limited to, Claims for negligence, medical malpractice, wrongful or delayed diagnosis, personal injury, bodily injury (including disease, trauma, mental or physical pain or suffering, emotional or mental harm, or anguish or loss of enjoyment of life), or death arising from, relating to, or resulting from such participation.

**Release of Unknown Claims.**

| NFL CONCUSSION SETTLEMENT CLAIM FORM |
| :---: |
| **FOR RETIRED NFL FOOTBALL PLAYERS AND REPRESENTATIVE CLAIMANTS** |

(a) I acknowledge that I have been informed of Section 1542 of the Civil Code of the State of California (and similar statutes) by My counsel and that I do hereby expressly waive and relinquish all rights and benefits, if any, which I have or may have under said section (and similar sections) which reads as follows:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR

(b) I acknowledge that the foregoing waiver of the provisions of Section 1542 of the California Civil Code and all similar provisions of the statutory or common law of any other state, territory, or other jurisdiction was separately bargained for and that the Parties would not have entered into the Settlement Agreement unless it included a broad release of unknown claims relating to the matters released herein.

(c) I intend to be legally bound by the Releases.

(d) The Releases are not intended to prevent the NFL Parties from exercising their rights of contribution, subrogation, or indemnity under any law.

(e) Nothing in the Releases will preclude any action to enforce the terms of the Settlement Agreement in the Court.

(f) I represent and warrant that no promise or inducement has been offered or made for the Releases contained in this Article except as set forth in the Settlement Agreement and that the Releases are executed without reliance on any statements or any representations not contained in the Settlement Agreement.

**Covenant Not to Sue.**

From and after the Effective Date, for the consideration provided for in the Settlement Agreement, and by operation of the Final Order and Judgment, I covenant, promise, and agree that I will not, at any time, continue to prosecute, commence, file, initiate, institute, cause to be instituted, assist in instituting, or permit to be instituted on My behalf, or on behalf of any other individual or entity, any proceeding: (a) alleging or asserting any of his or her respective Released Claims against the Released Parties in any federal court, state court, arbitration, regulatory agency, or other tribunal or forum, including, without limitation, the Claims set forth in Section 18.1 of the Settlement Agreement; or (b) challenging the validity of the Releases. To the extent any such proceeding exists in any court, tribunal or other forum as of the Effective Date, I covenant, promise and agree to withdraw, and seek a dismissal with prejudice of, such proceeding forthwith.

**No Release for Insurance Coverage.**

(a) Notwithstanding anything herein to the contrary, the Settlement Agreement is not intended to and does not release any Governmental Payor or Medicare Part C or Part D Program sponsor from its or their obligation to provide any health insurance coverage, major medical insurance coverage, or disability insurance coverage to a Settlement Class Member, or from any claims, demands, rights, or causes of action of any kind that a Settlement Class Member has or hereafter may have with respect to such individuals or entities.

(b) Notwithstanding anything herein to the contrary, the Settlement Agreement is not intended to and does not effect a release of any rights or obligations that any insurer has under or in relation to any contract or policy of insurance to any named insured, insured, additional insured, or other insured person or entity thereunder, including those persons or entities referred to in Section 2.1(bbbb)(i)-(ii) of the Settlement Agreement.

**No Release for Claims for Workers' Compensation and NFL CBA Medical and Disability Benefits**

Nothing contained in the Settlement Agreement, including the Release and Covenant Not to Sue provisions in ARTICLE XVIII of the Settlement Agreement, affects My rights to pursue claims for workers' compensation and claims alleging entitlement to NFL CBA Medical and Disability Benefits. For the avoidance of any doubt, the Settlement Agreement does not alter the showing that I must demonstrate to pursue successful claims for workers' compensation and/or successful claims alleging entitlement to NFL CBA Medical and Disability Benefits, nor does it alter the defenses to such claims available to Released Parties except as set forth in ARTICLE XXIX of the Settlement Agreement.

**Judgment Reduction.**

**NFL CONCUSSION SETTLEMENT CLAIM FORM
FOR RETIRED NFL FOOTBALL PLAYERS AND REPRESENTATIVE CLAIMANTS**

(a) With respect to any litigation by Me against Riddell, I further agree that if a verdict in My favor results in a verdict or judgment for contribution or indemnity against the Released Parties, I will not enforce My right to collect this verdict or judgment to the extent that such enforcement creates liability against the Released Parties. In such event, I agree that I will reduce My claim or agree to a judgment reduction or satisfy the verdict or judgment to the extent necessary to eliminate the claim of liability against the Released Parties or any Other Party claiming contribution or indemnity.

(b) Any judgment or award obtained by Me against any alleged tortfeasor, co-tortfeasor, co-conspirator or co-obligor, other than Riddell, by reason of judgment or settlement, for any claims that are or could have been asserted in the Class Action Complaint or in any Related Lawsuit, or that arise out of or relate to any claims that are or could have been asserted in the Class Action Complaint or in any Related Lawsuit, or that arise out of or relate to any facts in connection with the Class Action Complaint or any Related Lawsuit (collectively, "Tortfeasors"), shall be reduced by the amount or percentage, if any, necessary under applicable law to relieve the Released Parties of all liability to such Tortfeasors on claims for contribution or indemnity (whether styled as a claim for contribution, indemnity or otherwise). Such judgment reduction, partial or complete release, settlement credit, relief, setoff, if any, shall be in an amount or percentage sufficient under applicable law to compensate such Tortfeasors for the loss of any such claims for contribution or indemnity (whether styled as a claim for contribution, indemnity, or otherwise) against the Released Parties.

**No Assignment of Claims.**

I have not assigned, will not assign, and will not attempt to assign, to any person or entity other than the NFL Parties any rights or claims relating to the subject matter of the Class Action Complaint. Any such assignment, or attempt to assign, to any person or entity other than the NFL Parties any rights or claims relating to the subject matter of the Class Action Complaint will be void, invalid, and of no force and effect and the Claims Administrator shall not recognize any such action.

## IX. RELEASE

You must promptly notify the Claims Administrator of any changes or updates to the information in your Claim Form, including any changes in your medical condition, whether a person or entity asserts a lien or entitlement to any monies received under the Settlement Agreement, and any change in mailing address.

 **CONCUSSION SETTLEMENT**
*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

## MONETARY AWARD CLAIM PACKAGE HIPAA AUTHORIZATION FORM

You must complete and sign this Form if you are a **Retired NFL Football Player** or the **Representative Claimant** of a Retired NFL Football Player and want to apply for a Monetary Award. This Form authorizes the use and disclosure of "Protected Health Information" as that term is defined in 45 C.F.R. § 160.103, relating to the processing of your claim in the NFL Concussion Settlement Program. Protected Health Information includes, but is not limited to, information regarding the Retired NFL Football Player's medical care, treatment, physical or mental condition, and medical expenses.

## I. RETIRED NFL FOOTBALL PLAYER INFORMATION

| Settlement Program ID | | 950013395 | | | |
|---|---|---|---|---|---|
| **Player Name** | First<br>Christopher | | M.I. | Last<br>Mims | Suffix |

| **Social Security Number, Taxpayer ID or Foreign ID Number** (if Retired NFL Football Player is not a U.S. Citizen) **of Retired NFL Football Player** (if known) | | 5 6 0 - 4 9 - 8 8 2 8 <br> **or** <br> _____ |
|---|---|---|
| **Date of Birth of Retired NFL Football Player** | | 0 9 / 2 9 / 1 9 7 0 <br> (Month/Day/Year) |

## II. ENTITIES AUTHORIZED TO USE AND DISCLOSE PROTECTED HEALTH INFORMATION

By signing and submitting this Form, I authorize the use and disclosure of all Protected Health Information regarding my (or the Retired NFL Football Player's, if signed by a Representative Claimant) medical care, treatment, physical or mental condition, and medical expenses relating to my claim in the *In re: National Football League Players' Concussion Injury Litigation* Settlement program, as follows: (1) by the Claims Administrator, Special Master, BAP Administrator, Lien Resolution Administrator, designated Qualified BAP Providers, Qualified BAP Pharmacy Vendors, Qualified MAF Physicians, Appeals Advisory Panel members, Appeals Advisory Panel Consultants, the Court, Class Counsel, Counsel for the NFL Parties and the NFL Parties (which, in turn, may share the Protected Health Information with the NFL Parties' insurers or reinsurers) for use and/or disclosure with one another in the performance of their functions and duties pursuant to the Settlement Agreement; (2) by the Lien Resolution Administrator for use and/or disclosure to the holders of any liens, claims, or rights of subrogation, indemnity, reimbursement, conditional or other payments, or interests of any type, including all Governmental Payors (such as the Medicare Program, any state Medicaid Program, the Department of Veterans Affairs, Tricare, Indian Health Services, and their respective contractors), Medicare Part C or Part D Programs, private health care providers, health plans, and health insurers, and any contractors or recovery agents of the foregoing persons and entities (collectively, "Lienholders"), for the purpose of identifying and resolving any potential Liens in connection with any Monetary Award that I may receive; and (3) by the Lienholders for disclosure to the Lien Resolution Administrator and Claims Administrator for the purpose of identifying and resolving any potential Liens in connection with any Monetary Award that I may receive.

## MONETARY AWARD CLAIM PACKAGE HIPAA AUTHORIZATION FORM

### III. AUTHORIZATION

By signing below, I acknowledge and understand all of the following:

| | |
|---|---|
| 1. | I have the right to revoke this authorization at any time. If I wish to revoke the authorization, I must do so in writing and must provide my written revocation to the Claims Administrator. The written revocation must be signed and dated. The revocation will not apply to any disclosures that already have been made in reliance on this authorization prior to the date upon which the Claims Administrator receives my written revocation. |
| 2. | My authorization of the disclosure of the subject Retired NFL Football Player's Protected Health Information is voluntary, which means I can refuse to sign this Form. I do not need to sign this Form to obtain health treatment from any medical provider or to enroll in or be eligible for any health plan benefits. However, I recognize that if I do not sign this Form and submit it to the Claims Administrator, my Claim Package will be incomplete under the terms of the Settlement Agreement and will not be processed. |
| 3. | Any Protected Health Information or other information released to the Claims Administrator, Special Master, BAP Administrator, Lien Resolution Administrator, Qualified BAP Providers, Qualified BAP Pharmacy Vendors, Qualified MAF Physicians, Appeals Advisory Panel members, Appeals Advisory Panel Consultants, the Court, Class Counsel, Counsel for the NFL Parties and the NFL Parties (including the NFL Parties' insurers or reinsurers) may be subject to re-disclosure by such person/entity, and may no longer be protected by applicable federal and state privacy laws. Each of those persons and entities, however, is permitted to use and disclose your information only in accordance with this Form, the Settlement Agreement, a contract executed pursuant to the Settlement Agreement, orders of the Court, and/or applicable law. |
| 4. | My Protected Health Information may include information relating to sexually transmitted disease, acquired immunodeficiency syndrome ("AIDS"), or human immunodeficiency virus ("HIV"), behavioral or mental health services and treatment for alcohol and drug abuse. |
| 5. | This Form is valid from the date of my signature in Section IV until the date that the Claims Administrator performs the last act to process the claim for a Monetary Award that I submitted with this Form. |
| 6. | I have a right to receive and retain a copy of this Form. |
| 7. | Any photostatic copy of this Form shall have the same authority as the original, and may be substituted in its place. |

### IV. SIGNATURE

The Retired NFL Football Player or Representative Claimant of the Retired NFL Football Player named in Section I must sign and date this Form below. **By signing below, I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that all information provided in this HIPAA Authorization Form is true and correct to the best of my knowledge, information and belief.**

| Signature | *Carleen Hastings* | | Date | 0 2/0 5/2 0 1 9 (Month/Day/Year) | |
|---|---|---|---|---|---|
| **Printed Name** | First Carleen | M.I. | Last Hastings | | Suffix |

| If you are signing this Form as a Representative Claimant, describe your relationship to the Retired NFL Football Player and your authority to act on his behalf: | Mother of Retired NFL Football Player, Deceased |
|---|---|

| MONETARY AWARD CLAIM PACKAGE HIPAA AUTHORIZATION FORM | |
|---|---|
| **V.  HOW TO SUBMIT THIS FORM** | |
| You may submit this Form in one of two ways: | |
| **By U.S. Mail:** | NFL Concussion Settlement<br>Claims Administrator<br>P.O. Box 25369<br>Richmond, VA 23260 |
| **By Delivery:** | NFL Concussion Settlement<br>c/o BrownGreer PLC<br>250 Rocketts Way<br>Richmond, VA 23231 |



# **NFL** **CONCUSSION SETTLEMENT**

*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

## CLAIM FORM SIGNATURE ACKNOWLEDGEMENT FORM

If you completed your Claim Form using your Portal, you must submit this Claim Form Signature Acknowledgement Form with the Personal Signature of the Settlement Class Member identified in Section I who is submitting the claim for a Monetary Award.

## I. SETTLEMENT CLASS MEMBER & CLAIM FORM INFORMATION

| Settlement Program ID | 950012548 | | | | |
|---|---|---|---|---|---|
| **Name** | First<br>Robin | M.I.<br>B | Last<br>Cornish | | Suffix |

## II. PERSONAL SIGNATURE

**By signing below, I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that all information provided in the Claim Form submitted through the Secure Portal, and in any of its attachments, is true and correct to the best of my knowledge, information, and belief.**

| Signature | | Date | |0  |2 |/|0  |5 |/|2 |0 |1  |9 |<br>(Month/Day/Year) |
|---|---|---|---|

## III. HOW TO SUBMIT THIS SIGNATURE ACKNOWLEDGEMENT FORM

After printing this form, the Settlement Class Member must sign in the Personal Signature box above. Scan and upload the signed document using the Upload Signed Signature Acknowledgement Form button on the Claim Package Page of your Portal. If you are unable to scan the form, you may return the signed form through either of the following options:

| **By Mail:** | NFL Concussion Settlement<br>Claims Administrator<br>P.O. Box 25369<br>Richmond, VA 23260 |
|---|---|
| **By FedEx/UPS:** | NFL Concussion Settlement<br>c/o BrownGreer PLC<br>250 Rocketts Way<br>Richmond, VA 23231 |



# NFL CONCUSSION SETTLEMENT
### IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION
No. 2:12-md-02323 (E.D. Pa.)

## NFL CONCUSSION SETTLEMENT CLAIM FORM
## FOR RETIRED NFL FOOTBALL PLAYERS AND REPRESENTATIVE CLAIMANTS

Complete this Claim Form if you are a **Retired NFL Football Player** or the **Representative Claimant** of a Retired NFL Football Player and want to apply for a Monetary Award under the NFL Concussion Settlement Program. You must fill out Section II only if you are a **Representative Claimant**.

**Your Claim Package must be submitted to the Claims Administrator no later than two years after the date that you received your Qualifying Diagnosis or within two years after February 6, 2017, whichever is later. Failure to meet this deadline will preclude you from receiving a Monetary Award for that Qualifying Diagnosis unless you can: (1) show substantial hardship (beyond the Qualifying Diagnosis) that prevented your compliance; and (2) submit the Claim Package within two years of the missed deadline.**

Certain Claim Packages may be selected for audit pursuant to Section 10.3 of the Settlement Agreement. If your claim is selected for audit, you may be required to submit additional records or information now or in the future. You are required to preserve all such additional records in your possession, custody or control and to instruct your healthcare providers to preserve such records that may be requested under Section 10.3(e) of the Settlement Agreement. These documents include but are not limited to historical medical records related to the underlying medical condition that is the basis for the Qualifying Diagnosis. Unreasonable failure to preserve, and later provide upon request, such records and information will result in the claim being denied without the right to an appeal.

## I. RETIRED NFL FOOTBALL PLAYER INFORMATION

Enter only the **Retired NFL Football Player's** information in this Section I.

| | | | | | |
|---|---|---|---|---|---|
| **Settlement Program ID** | 950012548 | | | | |
| **Player Name** | First<br>Frank | M.I. | Last<br>Cornish | | Suffix |
| **Player Date of Birth** | | | Sep / 24 / 1967<br>(Month/Day/Year) | | |
| **Player Date of Death (if applicable)** | | | Aug / 23 / 2008<br>(Month/Day/Year) | | |
| **Player Social Security Number** | | | 340 - 72 - 4068 | | |

| **Player Mailing Address** | Address 1 | |
|---|---|---|
| | Address 2 | |
| | City | |
| | State/Province | |
| | Postal Code | Country<br>United States |
| **Player Telephone** | _____ - _____ - _____ | **Player Email Address** | |

## NFL CONCUSSION SETTLEMENT CLAIM FORM
### FOR RETIRED NFL FOOTBALL PLAYERS AND REPRESENTATIVE CLAIMANTS

### II. REPRESENTATIVE CLAIMANT INFORMATION

If you are a **Representative Claimant** of a Retired NFL Football Player who is deceased, or legally incapacitated or incompetent, fill out this Section II with your own information.

| Representative Name | First: Robin | M.I. B | Last: Cornish | Suffix |
|---|---|---|---|---|

**Representative Date of Birth:** Sep / 17 / 1969 (Month/Day/Year)

**Representative Social Security Number:** 354 - 60 - 9187

**Representative Mailing Address**
Address 1: 2213 Frio Dr.
Address 2:
City: Keller
State/Province: TX
Postal Code: 76248
Country: United States

**Representative Telephone:** 817 - 845 - 9445
**Representative Email Address:** rbc0917@verizon.net

### III. ATTORNEY INFORMATION

If you are represented by an attorney, enter the attorney's information in this Section III.

| Attorney Name | First: Justin | M.I. B | Last: Demerath | Suffix |
|---|---|---|---|---|

**Law Firm Name:** O'Hanlon, Demerath & Castillo

**Law Firm Mailing Address**
Address 1: 808 West Avenue
Address 2:
City: Austin
State/Province: TX
Postal Code: 78701
Country: United States

**Attorney Telephone:** ___ - ___ - ___
**Attorney Email Address:** jdemerath@808west.com

### IV. QUALIFYING DIAGNOSIS/ES

## NFL CONCUSSION SETTLEMENT CLAIM FORM
## FOR RETIRED NFL FOOTBALL PLAYERS AND REPRESENTATIVE CLAIMANTS

Check the Qualifying Diagnosis/es for which the Retired NFL Football Player seeks an award and provide the date of each diagnosis and his State of Domicile at the time of that diagnosis. If the Retired NFL Football Player was diagnosed with either Level 1.5 or Level 2 Neurocognitive Impairment through the Baseline Assessment Program ("BAP"), you must provide the name of **both** the diagnosing neuropsychologist and the diagnosing board-certified neurologist.

| Qualifying Diagnosis/es | | Date of Diagnosis/es | State of Domicile at Time of Diagnosis |
|---|---|---|---|
| ☐  Level 1.5 Neurocognitive Impairment | | -- / -- / ---- <br> (Month/Day/Year) | _____ <br> (State) |
| **Diagnosing medical professional:** | | | |
| Name | First | M.I.    Last | Suffix |
| **Second diagnosing medical professional (if diagnosis was made through the BAP):** | | | |
| Name | First | M.I.    Last | Suffix |
| ☐  Level 2 Neurocognitive Impairment | | -- / -- / ---- <br> (Month/Day/Year) | _____ <br> (State) |
| **Diagnosing medical professional:** | | | |
| Name | First | M.I.    Last | Suffix |
| **Second diagnosing medical professional (if diagnosis was made through the BAP):** | | | |
| Name | First | M.I.    Last | Suffix |
| ☐  Alzheimer's Disease | | -- / -- / ---- <br> (Month/Day/Year) | _____ <br> (State) |
| **Diagnosing medical professional:** | | | |
| Name | First | M.I.    Last | Suffix |
| ☐  Parkinson's Disease | | -- / -- / ---- <br> (Month/Day/Year) | _____ <br> (State) |
| **Diagnosing medical professional:** | | | |
| Name | First | M.I.    Last | Suffix |
| ☐  ALS (Amyotrophic Lateral Sclerosis, or "Lou Gehrig's Disease") | | -- / -- / ---- <br> (Month/Day/Year) | _____ <br> (State) |
| **Diagnosing medical professional:** | | | |
| Name | First | M.I.    Last | Suffix |
| ☒  Death with CTE (Chronic Traumatic Encephalopathy) | | Aug / 23 / 2008 <br> (Month/Day/Year) | TX <br> (State) |

| NFL CONCUSSION SETTLEMENT CLAIM FORM<br>FOR RETIRED NFL FOOTBALL PLAYERS AND REPRESENTATIVE CLAIMANTS |||||
|---|---|---|---|---|
| **Diagnosing medical professional:** |||||
| Name | First<br>Ronald | M.I.<br>L. | Last<br>Hamilton | Suffix |

## V. ADDITIONAL MEDICAL INFORMATION

### A. Stroke

Was the Retired NFL Football Player diagnosed as having suffered a Stroke before the Qualifying Diagnosis identified in Section V?  A medically diagnosed Stroke does not include a transient cerebral ischemic attack and related syndromes.

☐ **YES**   If you answered Yes, provide additional information about the Stroke.  Then go to Section VI. B.

☒ **NO**    If you answered No, go to Section VI. B.

| **Date of Stroke** | -- ___ / __ -- __ / ___ ----<br>(Month/Day/Year) |
|---|---|

| **Medical professional who diagnosed the Stroke:** ||||
|---|---|---|---|
| Name | First | M.I. | Last | Suffix |

☐   Check here if you believe that the Qualifying Diagnosis for which you are claiming a Monetary Award is not causally related to the prior Stroke and you are submitting records and other evidence supporting this position.  If you provide information regarding a prior Stroke but do not check this box, we will apply an Offset, which will result in a 75% reduction of any Monetary Award.

### B. Traumatic Brain Injury

Was the Retired NFL Football Player diagnosed as having suffered a *severe* traumatic brain injury unrelated to NFL Football play that occurred during or after the time he played NFL Football and before the Qualifying Diagnosis identified in Section V?  A severe traumatic brain injury is one that caused the Retired NFL Football Player to lose consciousness for more than 24 hours.

☐ **YES**   If you answered Yes, provide additional information about the Traumatic Brain Injury.  Then go to Section VII.

☒ **NO**    If you answered No, go to Section VII.

| **Date of Traumatic Brain Injury** | -- ___ / __ -- __ / ___ ----<br>(Month/Day/Year) |
|---|---|

| **Medical professional who diagnosed the Traumatic Brain Injury:** ||||
|---|---|---|---|
| Name | First | M.I. | Last | Suffix |

☐   Check here if you believe that the Qualifying Diagnosis for which you are claiming a Monetary Award is not causally related to the Traumatic Brain Injury and you are submitting records and other evidence supporting this position.  If you provide information regarding a Traumatic Brain Injury but do not check this box, we will apply an Offset, which will result in a 75% reduction of any Monetary Award.

## VI. MEDICARE, MEDICAID AND OTHER LIEN INFORMATION

## NFL CONCUSSION SETTLEMENT CLAIM FORM
## FOR RETIRED NFL FOOTBALL PLAYERS AND REPRESENTATIVE CLAIMANTS

As set forth in Article XI of the Settlement Agreement, the Lien Resolution Administrator, with assistance from the Claims Administrator, is administering the process for the identification, verification, and satisfaction of Liens that may be withheld or asserted against your Monetary Award. If you or the Lien Resolution Administrator identifies a potential Lien asserted against your Monetary Award and the Lien Resolution Administrator confirms the validity and final amount of such Lien(s), we are required to deduct those amounts from your Monetary Award along with any other deductions required by state or federal law.

Are you aware of a potential Lien that could be asserted against your Monetary Award?

☐ **YES** If you answered Yes, fill out the appropriate questions in this Section VI. Then go to Section VII.

☒ **NO** If you answered No, go to Section VII.

### A. Medicare

1. If the Retired NFL Football Player is now enrolled, or has been enrolled at any time, in Medicare Part A or Medicare Part B program(s), provide the following information.

    HICN (Medicare Claim #):

    Enrollment date:  _____ -- / _____ -- / _____ ----
    <br>(Month/Day/Year)

2. If the Retired NFL Football Player is now enrolled, or has been enrolled at any time, in a Medicare Part C program (for example, a Medicare Advantage, Medicare cost, Medicare healthcare prepayment plan benefits, or similar Medicare plan administered by private entities), provide the following information.

    Name of plan:

    Member number for plan:

    Enrollment date:  _____ -- / _____ -- / _____ ----
    <br>(Month/Day/Year)

3. If the Retired NFL Football Player is now enrolled, or has been enrolled at any time, in a Medicare Part D program (prescription drug benefits), provide the following information.

    Name of Medicare Part D Plan:

    Member number of Medical Part D Plan:

    Enrollment date:  _____ -- / _____ -- / _____ ----
    <br>(Month/Day/Year)

### B. Medicaid

1. If the Retired NFL Football Player is currently enrolled in a state Medicaid Program, provide the following information.

    Medical ID number:

    State of Issuance:

    Enrollment date:  _____ -- / _____ -- / _____ ----
    <br>(Month/Day/Year)

| NFL CONCUSSION SETTLEMENT CLAIM FORM<br>FOR RETIRED NFL FOOTBALL PLAYERS AND REPRESENTATIVE CLAIMANTS |
|---|

2.  If the Retired NFL Football Player has been enrolled in any other state Medicaid Program at any time, provide the following information.

Medical ID number:

State of Issuance:

Enrollment date: _____ -- _____ / _____ -- _____ / _____ ---- _____
                              (Month/Day/Year)

| **C. Department of Veterans Affairs, TRICARE, or Indian Health Service** |
|---|

Check any of the following federal healthcare programs that the Retired NFL Football Player has enrolled in or has been entitled to receive benefits from at any time.  If you check any of the programs below, provide the required information about each program.

☐ **Department of Veterans Affairs healthcare or prescription drug benefits**

Claim Number:
_____

Enrollment Date: _____ -- / _____ -- / _____ ---- **TO** _____ -- / _____ -- / _____ ----
                        (Month/Day/Year)                              (Month/Day/Year)

Branch: _____

Sponsor: _____

Sponsor SSN: _____ - _____ - _____

Treating Facility: _____

☐ **TRICARE health care or prescription drug benefits**

Claim Number:
_____

Enrollment Date: _____ -- / _____ -- / _____ ---- **TO** _____ -- / _____ -- / _____ ----
                        (Month/Day/Year)                              (Month/Day/Year)

Branch: _____

Sponsor: _____

Sponsor SSN: _____ - _____ - _____

Treating Facility: _____

☐ **Indian Health Service healthcare or prescription drug benefits**

Claim Number:
_____

Enrollment Date: _____ -- / _____ -- / _____ ---- **TO** _____ -- / _____ -- / _____ ----
                        (Month/Day/Year)                              (Month/Day/Year)

Branch: _____

Sponsor: _____

Sponsor SSN: _____ - _____ - _____

## NFL CONCUSSION SETTLEMENT CLAIM FORM
### FOR RETIRED NFL FOOTBALL PLAYERS AND REPRESENTATIVE CLAIMANTS

Tribe: _____

Treating Facility: _____

### D. Other Governmental Payor

If at any time the Retired NFL Football Player was entitled to receive medical items, services, and/or prescription drugs from any federal, state, or other governmental body, agency, department, plan, program, or entity that administers, funds, pays, contracts for, or provides medical items, services, and/or prescription drugs not previously listed above, provide the following information.

Name of Plan/Entity:
_____

Policyholder Name:
_____

Policy Number:
_____

Medical Condition Covered by Plan/Entity: _____

### E. Private Healthcare Insurance

If the Retired NFL Football Player has received medical treatment for the Qualifying Diagnosis/es that was covered by a private healthcare insurance plan or other form of payment, provide the following information for every such plan or entity.

Name of Plan/Entity:
_____

Policyholder Name:
_____

Policy Number:
_____

Medical Condition Covered by Plan/Entity: _____

### F.  Other Lien Information

Identify any known Lien of any nature whatsoever not identified above. Such a lien may include, without limitation, any mortgage, lien, pledge, charge, security interest, or legal encumbrance held by any person or entity (such as an attorney, child support agency, federal or state tax agency, or judgment creditor), where that person or entity may be legally entitled to a share of any Monetary Award that you may receive.

You must also attach to this Claim Form a copy of the letter, form, or writing from such person or entity informing you of this Lien.

Name of Lienholder: _____

Amount of Lien: $_____  ,  _____  .  _____

Contact Information for Lienholder: _____

Nature of Lien: _____

| NFL CONCUSSION SETTLEMENT CLAIM FORM FOR RETIRED NFL FOOTBALL PLAYERS AND REPRESENTATIVE CLAIMANTS |
|---|

## VII. BANKRUPTCY INFORMATION

Has the Retired NFL Football Player ever been a debtor in a bankruptcy proceeding?

☒ **YES**   If you answered Yes, provide additional information about the bankruptcy proceeding.  Then go to Section IX.

☐ **NO**   If you answered No, go to Section IX.

U.S. Bankruptcy Court, _____unknown_____   District of _____unknown_____
(District Name)   (District Name)

Case Number: ___?___ – ___?___

Chapter:   ☒ Chapter 7   ☐ Chapter 11   ☐ Chapter 12   ☐ Chapter 13

Date bankruptcy was filed: _____Jan / 1 / 2004_____
(Month/Day/Year)

If closed, date bankruptcy was closed: _____Jan / 1 / 2013_____
(Month/Day/Year)

## VIII. RELEASE

As more fully set forth in the Settlement Agreement, all Settlement Class Members, among others including you, have released the National Football League, NFL Properties LLC and any Member Club, among others, from all claims and liabilities arising out of, or relating to, the allegations in the Class Action Complaint and other similar lawsuits.  In addition, as more fully set forth in the Settlement Agreement, all Settlement Class Members have promised not to commence, and to withdraw and seek dismissal of, any litigation or other proceeding asserting a claim that the Settlement Class Member has released.  For example, you, as a Settlement Class Member, have agreed not to sue the NFL Parties, the NFL's Member Clubs and other related persons or entities in connection with any claim you may have now or in the future relating to any head, brain and/or cognitive injury, as well as any injuries arising out of, or relating to, concussions and/or subconcussive events of whatever cause and its damages, whenever arising.

The above paragraph is an incomplete summary of the Releases and Covenants in the Settlement Agreement. Nothing in the above paragraph limits, expands, or in any way alters the terms of the Settlement Agreement. The Settlement Agreement is available at https://www.nflconcussionsettlement.com.

**Releases.**

(a) In consideration of the benefits described and the agreement and covenants contained in the Settlement Agreement, and by operation of the Final Order and Judgment, I, on my own behalf and on behalf of my respective predecessors, successors, assigns, assignors, representatives, attorneys, agents, trustees, insurers, heirs, next of kin, estates, beneficiaries, executors, administrators, and any natural, legal, or juridical person or entity to the extent he, she, or it is entitled to assert any claim on my behalf (hereafter "I", "My" or "Me"), hereby waive and release, forever discharge and hold harmless the Released Parties, and each of them, of and from any and all past, present and future claims, counterclaims, actions, rights or causes of action, liabilities, suits, demands, damages, losses, payments, judgments, debts, dues, sums of money, costs and expenses (including, without limitation, attorneys' fees and costs), accounts, reckonings, bills, covenants, contracts, controversies, agreements, obligations, or promises, in law or in equity, contingent or non-contingent, known or unknown, suspected or unsuspected, foreseen or unforeseen, matured or unmatured, accrued or unaccrued, liquidated or unliquidated, whether direct, representative, class or individual in nature, in any forum that I had, have, or may have in the future arising out of, in any way relating to or in connection with the allegations, transactions, facts, matters, occurrences, representations or omissions involved, set forth, referred to or relating to the Class Action Complaint and/or Related Lawsuits ("Claims"), including, without limitation, Claims:

(i) that were, are or could have been asserted in the Class Action Complaint or any other Related Lawsuit; and/or

**NFL CONCUSSION SETTLEMENT CLAIM FORM**
**FOR RETIRED NFL FOOTBALL PLAYERS AND REPRESENTATIVE CLAIMANTS**

(ii) arising out of, or relating to, head, brain and/or cognitive injury, as well as any injuries arising out of, or relating to, concussions and/or subconcussive events (including, without limitation, prevention, diagnosis and treatment thereof) of whatever cause and its damages (whether short-term, long-term or death), whenever arising, including, without limitation, Claims for personal or bodily injury, including disease, mental or physical pain or suffering, emotional or mental harm, or anguish or loss of enjoyment of life (and exacerbation and/or progression of personal or bodily injury), or wrongful death and/or survival actions as a result of such injury and/or exacerbation and/or progression thereof; and/or

(iii) arising out of, or relating to, neurocognitive deficits or impairment, or cognitive disorders, of whatever kind or degree, including, without limitation, mild cognitive impairment, moderate cognitive impairment, dementia, Alzheimer's Disease, Parkinson's Disease, and ALS; and/or

(iv) arising out of, or relating to, CTE; and/or

(v) arising out of, or relating to, loss of support, services, consortium,  companionship, society, or affection, or damage to familial relations (including disease, mental or physical pain or suffering, emotional or mental harm, or anguish or loss of enjoyment of life); and/or

(vi) arising out of, or relating to, increased risk, possibility, or fear of suffering in the future from any head, brain and/or cognitive injury, as well as any injuries arising out of, or relating to, concussions and/or subconcussive events (including, without limitation, prevention, diagnosis and treatment thereof), and including disease, mental or physical pain or suffering, emotional or mental harm, or anguish or loss of enjoyment of life); and/or

(vii) arising out of, or relating to, medical screening and medical monitoring for  undeveloped, unmanifested, and/or undiagnosed head, brain and/or cognitive injury, as well as any injuries arising out of, or relating to, concussions and/or subconcussive events (including, without limitation, prevention, diagnosis and treatment thereof); and/or

(viii) premised on any purported or alleged breach of any Collective Bargaining Agreement related to the issues in the Class Action Complaint and/or Related Lawsuits, except claims for workers' compensation and claims alleging entitlement to NFL CBA Medical and Disability Benefits.

(b) In consideration of the benefits described and the agreement and covenants contained in the Settlement Agreement, and by operation of the Final Order and Judgment, I do hereby release, forever discharge and hold harmless the Released Parties from any and all Claims, including unknown Claims, arising from, relating to, or resulting from the reporting, transmittal of information, or communications between or among the NFL Parties, Counsel for the NFL Parties, the Special Master, Claims Administrator, Lien Resolution Administrator, any Governmental Payor, and/or Medicare Part C or Part D Program sponsor regarding any claim for benefits under the Settlement Agreement, including any consequences in the event that this Settlement Agreement impacts, limits, or precludes My right to benefits under Social Security or from any Governmental Payor or Medicare Part C or Part D Program sponsor.

(c) In consideration of the benefits described and the agreement and covenants contained in the Settlement Agreement, and by operation of the Final Order and Judgment, I do hereby release, forever discharge and hold harmless the Released Parties from any and all Claims, including unknown Claims, pursuant to the MSP Laws, or other similar causes of action, arising from, relating to, or resulting from the failure or alleged failure of any of the Released Parties to provide for a primary payment or appropriate reimbursement to a Governmental Payor or Medicare Part C or Part D Program sponsor with a Lien in connection with claims for medical items, services, and/or prescription drugs provided in connection with compensation or benefits claimed or received by Me pursuant to the Settlement Agreement.

(d) In consideration of the benefits described and the agreement and covenants contained in the Settlement Agreement, and by operation of the Final Order and Judgment, I do hereby release, forever discharge and hold harmless the Released Parties, the Special Master, BAP Administrator, Claims Administrator, and their respective officers, directors, and employees from any and all Claims, including unknown Claims, arising from, relating to, or resulting from their participation, if any, in the BAP, including, but not limited to, Claims for negligence, medical malpractice, wrongful or delayed diagnosis, personal injury, bodily injury (including disease, trauma, mental or physical pain or suffering, emotional or mental harm, or anguish or loss of enjoyment of life), or death arising from, relating to, or resulting from such participation.

**Release of Unknown Claims.**

| NFL CONCUSSION SETTLEMENT CLAIM FORM |
| :---: |
| **FOR RETIRED NFL FOOTBALL PLAYERS AND REPRESENTATIVE CLAIMANTS** |

(a) I acknowledge that I have been informed of Section 1542 of the Civil Code of the State of California (and similar statutes) by My counsel and that I do hereby expressly waive and relinquish all rights and benefits, if any, which I have or may have under said section (and similar sections) which reads as follows:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR

(b) I acknowledge that the foregoing waiver of the provisions of Section 1542 of the California Civil Code and all similar provisions of the statutory or common law of any other state, territory, or other jurisdiction was separately bargained for and that the Parties would not have entered into the Settlement Agreement unless it included a broad release of unknown claims relating to the matters released herein.

(c) I intend to be legally bound by the Releases.

(d) The Releases are not intended to prevent the NFL Parties from exercising their rights of contribution, subrogation, or indemnity under any law.

(e) Nothing in the Releases will preclude any action to enforce the terms of the Settlement Agreement in the Court.

(f) I represent and warrant that no promise or inducement has been offered or made for the Releases contained in this Article except as set forth in the Settlement Agreement and that the Releases are executed without reliance on any statements or any representations not contained in the Settlement Agreement.

**Covenant Not to Sue.**

From and after the Effective Date, for the consideration provided for in the Settlement Agreement, and by operation of the Final Order and Judgment, I covenant, promise, and agree that I will not, at any time, continue to prosecute, commence, file, initiate, institute, cause to be instituted, assist in instituting, or permit to be instituted on My behalf, or on behalf of any other individual or entity, any proceeding: (a) alleging or asserting any of his or her respective Released Claims against the Released Parties in any federal court, state court, arbitration, regulatory agency, or other tribunal or forum, including, without limitation, the Claims set forth in Section 18.1 of the Settlement Agreement; or (b) challenging the validity of the Releases.  To the extent any such proceeding exists in any court, tribunal or other forum as of the Effective Date, I covenant, promise and agree to withdraw, and seek a dismissal with prejudice of, such proceeding forthwith.

**No Release for Insurance Coverage.**

(a) Notwithstanding anything herein to the contrary, the Settlement Agreement is not intended to and does not release any Governmental Payor or Medicare Part C or Part D Program sponsor from its or their obligation to provide any health insurance coverage, major medical insurance coverage, or disability insurance coverage to a Settlement Class Member, or from any claims, demands, rights, or causes of action of any kind that a Settlement Class Member has or hereafter may have with respect to such individuals or entities.

(b) Notwithstanding anything herein to the contrary, the Settlement Agreement is not intended to and does not effect a release of any rights or obligations that any insurer has under or in relation to any contract or policy of insurance to any named insured, insured, additional insured, or other insured person or entity thereunder, including those persons or entities referred to in Section 2.1(bbbb)(i)-(ii) of the Settlement Agreement.

**No Release for Claims for Workers' Compensation and NFL CBA Medical and Disability Benefits**

Nothing contained in the Settlement Agreement, including the Release and Covenant Not to Sue provisions in ARTICLE XVIII of the Settlement Agreement, affects My rights to pursue claims for workers' compensation and claims alleging entitlement to NFL CBA Medical and Disability Benefits.  For the avoidance of any doubt, the Settlement Agreement does not alter the showing that I must demonstrate to pursue successful claims for workers' compensation and/or successful claims alleging entitlement to NFL CBA Medical and Disability Benefits, nor does it alter the defenses to such claims available to Released Parties except as set forth in ARTICLE XXIX of the Settlement Agreement.

**Judgment Reduction.**

**NFL CONCUSSION SETTLEMENT CLAIM FORM**
**FOR RETIRED NFL FOOTBALL PLAYERS AND REPRESENTATIVE CLAIMANTS**

(a) With respect to any litigation by Me against Riddell, I further agree that if a verdict in My favor results in a verdict or judgment for contribution or indemnity against the Released Parties, I will not enforce My right to collect this verdict or judgment to the extent that such enforcement creates liability against the Released Parties. In such event, I agree that I will reduce My claim or agree to a judgment reduction or satisfy the verdict or judgment to the extent necessary to eliminate the claim of liability against the Released Parties or any Other Party claiming contribution or indemnity.

(b) Any judgment or award obtained by Me against any alleged tortfeasor, co-tortfeasor, co-conspirator or co-obligor, other than Riddell, by reason of judgment or settlement, for any claims that are or could have been asserted in the Class Action Complaint or in any Related Lawsuit, or that arise out of or relate to any claims that are or could have been asserted in the Class Action Complaint or in any Related Lawsuit, or that arise out of or relate to any facts in connection with the Class Action Complaint or any Related Lawsuit (collectively, "Tortfeasors"), shall be reduced by the amount or percentage, if any, necessary under applicable law to relieve the Released Parties of all liability to such Tortfeasors on claims for contribution or indemnity (whether styled as a claim for contribution, indemnity or otherwise). Such judgment reduction, partial or complete release, settlement credit, relief, setoff, if any, shall be in an amount or percentage sufficient under applicable law to compensate such Tortfeasors for the loss of any such claims for contribution or indemnity (whether styled as a claim for contribution, indemnity, or otherwise) against the Released Parties.

**No Assignment of Claims.**

I have not assigned, will not assign, and will not attempt to assign, to any person or entity other than the NFL Parties any rights or claims relating to the subject matter of the Class Action Complaint. Any such assignment, or attempt to assign, to any person or entity other than the NFL Parties any rights or claims relating to the subject matter of the Class Action Complaint will be void, invalid, and of no force and effect and the Claims Administrator shall not recognize any such action.

## IX. RELEASE

You must promptly notify the Claims Administrator of any changes or updates to the information in your Claim Form, including any changes in your medical condition, whether a person or entity asserts a lien or entitlement to any monies received under the Settlement Agreement, and any change in mailing address.

 **CONCUSSION SETTLEMENT**
*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

## PRE-EFFECTIVE DATE DIAGNOSING PHYSICIAN CERTIFICATION FORM
### (for diagnoses made by physicians who are qualified to render Qualifying Diagnoses for purposes of Monetary Award claims before January 7, 2017)

This Pre-Effective Date Diagnosing Physician Certification Form is to be used only by physicians qualified to render Qualifying Diagnoses before January 7, 2017, in connection with the Class Action Settlement in In re: National Football League Players' Concussion Injury Litigation and who made a Qualifying Diagnosis before January 7, 2017. The Qualifying Diagnoses are found in Appendix A to this Pre-Effective Date Diagnosing Physician Certification Form.

Use this form to certify a Qualifying Diagnosis you made before January 7, 2017, based on your personal examination of the Retired NFL Football Player. **Do not sign this form unless you personally examined the player** or, in the case of a Qualifying Diagnosis of Death with CTE, you are the board-certified neuropathologist who made the post-mortem diagnosis of CTE. If you made a Qualifying Diagnosis as a Qualified MAF Physician on or after January 7, 2017, do not use this form; use the MAF Diagnosing Physician Certification Form instead. Also, if you are a Qualified BAP Provider certifying a diagnosis you made in the Baseline Assessment Program, do not use this form; use the BAP Diagnosing Physician Certification Form instead.

You must complete this form in its entirety, sign it under penalty of perjury, and return it to the patient along with copies of all supporting medical records that you created or received in connection with the Qualifying Diagnosis. In turn, the patient, or the patient's counsel, must submit this form and all supporting medical records referred to above to the Claims Administrator as part of a claim for compensation under the Class Action Settlement. The Claims Administrator will review the form, including your qualifications to provide the Qualifying Diagnosis, and the supporting medical records. All claims also are subject to audit. Any finding of fraudulent conduct by you will be subject to, without limitation, your referral to appropriate regulatory and disciplinary boards and agencies and/or federal authorities, and your disqualification from serving in any aspect of the Class Action Settlement.

You are required to preserve all supporting medical records that you created or received in connection with the Qualifying Diagnosis for the greater of: (a) 10 years after January 7, 2017; or (b) the period of time required under applicable state and federal laws.

If you have any questions, call the Claims Administrator toll free at 1-855-887-3485 or visit the Settlement Website at https://www.nflconcussionsettlement.com.

---

## PRE-EFFECTIVE DATE DIAGNOSING PHYSICIAN CERTIFICATION FORM
### (for diagnoses made by physicians who are qualified to render Qualifying Diagnoses for purposes of Monetary Award claims before January 7, 2017)

### I. PATIENT INFORMATION

| Settlement Program ID (if known) | 950012548 | | |
|---|---|---|---|
| **Name:** | First<br>Frank | M.I. | Last<br>Cornish | Suffix |

| **Address:** | Address 1<br>2213 Frio Dr. |
|---|---|
| | Address 2 |
| | City<br>Keller |
| | State/Province<br>TX |
| | Postal Code<br>76248 | Country<br>United States |

| Telephone | \|8\|1\|7\| - \|8\|4\|5\| - \|9\|4\|4\|5\| |
|---|---|
| Date of Birth | \|0\|9\|/\|2\|4\|/\|1\|9\|6\|7\|<br>(Month/Day/Year) |
| Date of Death (if applicable) | \|0\|8\|/\|2\|3\|/\|2\|0\|0\|8\|<br>(Month/Day/Year) |

### II. DIAGNOSING PHYSICIAN INFORMATION

| National Provider Identifier (NPI) | 1013980978 | | |
|---|---|---|---|
| **Physician Name** | First<br>Ronald | M.I.<br>L. | Last<br>Hamilton | Suffix |

**(a) Are you approved as a Qualified BAP Provider or a Qualified MAF Physician?**

☐ **YES.** If YES, you do not need to fill out the rest of this Section II or Sections III or IV. Instead, go to Section V.

☒ **NO.**

**(b) If you answered No, have you previously completed this form for another Retired NFL Football Player, that you know was submitted to the Claims Administrator?**

☐ **YES.** If YES, you do not need to fill out this Section II or Sections III or IV. Instead, go to Section V.

☒ **NO.**

If you answered No to both questions, fill out the rest of this Section II and then go to Section III.

## PRE-EFFECTIVE DATE DIAGNOSING PHYSICIAN CERTIFICATION FORM
### (for diagnoses made by physicians who are qualified to render Qualifying Diagnoses for purposes of Monetary Award claims before January 7, 2017)

| Office/Practice Name | University of Pittsburgh Medical Center | |
|---|---|---|
| **Address** | Address 1<br>A724.1 Scaife Hall | |
| | Address 2<br>200 Lothrop Street | |
| | City<br>Pittsburgh | |
| | State/Province<br>Pennsylvania | |
| | Postal Code<br>15213 | Country<br>USA |
| **Telephone** | 4 1 2 - 6 2 4 - 6 6 1 0 | |
| **Fax** | 4 1 2 - 6 2 4 - 5 4 8 8 | |
| **Email Address** | hamiltonrl@upmc.edu | |

## III.    BOARD CERTIFICATIONS

Check all board certifications that apply and list the board providing the certification and any identification number provided by the board (*e.g.*, American Board of Psychiatry and Neurology diplomate number). If you do not have any board certifications, summarize your relevant medical training and experience and then go to Section IV.

| Certification | Board | Board Identification Number | Effective Date | Expiration Date |
|---|---|---|---|---|
| ☐ Neurology | | | | |
| ☐ Neurosurgery | | | | |
| ☒ Neuropathology | American Board of Pathology | | certified: 5/23/1996<br>recertified:1/1/2014 | |
| ☐ Neuropsychology | | | | |
| ☐ Other Neuro-specialty | | | | |
| ☒ Other Board Certification | American Board of Pathology | | certified: 5/23/1996 | |

## PRE-EFFECTIVE DATE DIAGNOSING PHYSICIAN CERTIFICATION FORM
### (for diagnoses made by physicians who are qualified to render Qualifying Diagnoses for purposes of Monetary Award claims before January 7, 2017)

If you are not board-certified in a neuro-specialty area, summarize your relevant medical training and experience in the field of neurology and related fields that you believe qualifies you to make the diagnosis provided in Section V.

### IV.    OTHER QUALIFICATIONS

| | | Education Level | Institution | Degree/Area of Focus | Date Received |
|---|---|---|---|---|---|
| Educational Information | 1. | Undergraduate Education | University of Nebraska-Lincoln | B.S / Psychology | 1 9 8 5 (Month/Year) |
| | 2. | Medical School | University of Nebraska Medical Center | M.D. | 1 9 8 9 (Month/Year) |
| | 3. | Internship | Univ. of California, San Diego | Resident Anatomic Pathology | 1 9 9 1 (Month/Year) |
| | 4. | Residency | Univ. of California, San Diego | Resident Neuropathology | 1 9 9 3 (Month/Year) |
| | 5. | Fellowship | Univ. of Pittsburgh | Fellow Neuropathology | 1 9 9 4 (Month/Year) |
| | 6. | Other (Graduate) | Univ. of Pittsburgh | Fellow: NIMH Training Grant in Neuroscience | 1 9 9 5 (Month/Year) |

| | | State | State License Number | Effective Date | Expiration Date |
|---|---|---|---|---|---|
| States Where Licensed to Practice | 1. | California | G69731 | 9/10/1990 | Expired |

**PRE-EFFECTIVE DATE DIAGNOSING PHYSICIAN CERTIFICATION FORM**
(for diagnoses made by physicians who are qualified to render Qualifying Diagnoses
for purposes of Monetary Award claims before January 7, 2017)

| | | | | |
|---|---|---|---|---|
| | 2. | Pennsylvania | MD049717L | 5/12/1993 | 12/31/2018 |
| | 3. | Indiana | 01067332A | 9/29/2009 | 10/31/2019 |
| | 4. | | | | |
| | 5. | | | | |
| | 6. | | | | |

| | |
|---|---|
| **Specialties** | Check all specialties that apply. |
| | [ ] **Neurology** |
| | [ ] **Neurosurgery** |
| | [X] **Neuropathology** |
| | [ ] **Neuropsychology** |
| | [ ] **Other Neuro-specialty** (e.g., brain injury medicine, clinical neurophysiology, etc.) _____ |
| | [X] **Other Specialty** (list all)    **Anatomic Pathology** _____ |

-3174-

**PRE-EFFECTIVE DATE DIAGNOSING PHYSICIAN CERTIFICATION FORM**
**(for diagnoses made by physicians who are qualified to render Qualifying Diagnoses**
**for purposes of Monetary Award claims before January 7, 2017)**

## V. QUALIFYING DIAGNOSIS

Identify the patient's diagnosis and the date of such diagnosis. *See Appendix A* for the criteria for each diagnosis. Other than for Death with CTE, the identification of a condition, including through a blood test, genetic test, imaging technique, or otherwise, that has not yet resulted in actual cognitive impairment and/or actual neuromuscular impairment in the patient is **not** a Qualifying Diagnosis.

| Qualifying Diagnosis | Date of Diagnosis |
|---|---|
| ☐ Level 1.5 Neurocognitive Impairment | \|__\|__\|/\|__\|__\|/\|__\|__\|__\|__\| (Month/Day/Year) |
| ☐ Level 2 Neurocognitive Impairment* | \|__\|__\|/\|__\|__\|/\|__\|__\|__\|__\| (Month/Day/Year) |
| ☐ Alzheimer's Disease | \|__\|__\|/\|__\|__\|/\|__\|__\|__\|__\| (Month/Day/Year) |
| ☐ Parkinson's Disease | \|__\|__\|/\|__\|__\|/\|__\|__\|__\|__\| (Month/Day/Year) |
| ☐ ALS (amyotrophic lateral sclerosis) | \|__\|__\|/\|__\|__\|/\|__\|__\|__\|__\| (Month/Day/Year) |
| ☒ Death with CTE | \|0\|8\|/\|2\|3\|/\|2\|0\|0\|8\|* (Month/Day/Year) |

* If you provided a diagnosis of Level 2 Neurocognitive Impairment, did you determine that certain testing was medically unnecessary because of the severity of the patient's dementia (*see Appendix A*)?

☐ YES        ☐ NO

If you answered Yes, provide the factual basis for that determination:

\*Pursuant to FAQ 93, Posted Settlement Program FAQs (as of November 7, 2018), for this claim, "the date of the Qualifying Diagnosis is the date of the Player's death, even though the diagnosis is not made until after the Player dies".

| PRE-EFFECTIVE DATE DIAGNOSING PHYSICIAN CERTIFICATION FORM (for diagnoses made by physicians who are qualified to render Qualifying Diagnoses for purposes of Monetary Award claims before January 7, 2017) | | | |
|---|---|---|---|
| **VI. CERTIFICATION** | | | |

By signing below, I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that all information provided in this form, and all related supporting medical records, are true and correct to the best of my knowledge, information and belief, and that I personally examined the Retired NFL Football Player named in Section I or, in the case of a Qualifying Diagnosis of Death with CTE, I am the board-certified neuropathologist who made the post-mortem diagnosis of CTE.

I acknowledge that any finding of fraudulent conduct may subject me to, without limitation, referral to appropriate regulatory and disciplinary boards and agencies and/or federal authorities, and disqualification from serving in any aspect of the Class Action Settlement.

| Signature of Diagnosing Physician | | Date of Signature | 0 2 / 0 / 2 / 1 9 (Month/Day/Year) |
|---|---|---|---|
| **Printed Name** | First Ronald | M.I. L. | Last Hamilton |

## APPENDIX A

Other than for Death with CTE, the identification of a condition, including through a blood test, genetic test, imaging technique, or otherwise, that has not yet resulted in actual cognitive impairment and/or actual neuromuscular impairment experienced by the patient does not qualify as a diagnosis.

LEVEL 1.5 NEUROCOGNITIVE IMPAIRMENT

**The following diagnosis can only be made:**

(1) prior to July 7, 2014, by a board-certified neurologist, board-certified neurosurgeon, other board-certified neuro-specialist physician, or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician, except as provided in (c), below;

(2) from July 7, 2014 through January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified neurologist, board-certified neurosurgeon, or other board-certified neuro-specialist physician, except as provided in (c), below; or

(3) for a patient who died prior to January 7, 2017 (the Effective Date of the Settlement Agreement), where the diagnosis occurred while the patient was living, by a board-certified or otherwise qualified neurologist, neurosurgeon, or other neuro-specialist physician, or by a physician with sufficient qualifications in the field of neurology or neurocognitive disorders to make a diagnosis of Level 1.5 Neurocognitive Impairment:

A diagnosis made outside of the Baseline Assessment Program (BAP) that a living patient suffers from Level 1.5 Neurocognitive Impairment, as set forth below, i.e., early dementia, based on evaluation and evidence generally consistent with the diagnostic criteria set forth and provided below:

There is: (i) Concern of the patient, a knowledgeable informant, or the Qualified BAP Provider that there has been a severe decline in cognitive function; (ii) Evidence of a moderate to severe cognitive decline from a previous level of performance, as determined by and in accordance with the standardized neuropsychological testing protocol annexed in *Appendix B*, in two or more cognitive domains (complex attention, executive function, learning and memory, language, perceptual-spatial), provided one of the cognitive domains is (a) executive function, (b) learning and memory, or (c) complex attention; (iii) The patient exhibits functional impairment generally consistent with the criteria set forth in the National Alzheimer's Coordinating Center's Clinical Dementia Rating scale Category 1.0 (Mild) in the areas of Community Affairs, Home & Hobbies, and Personal Care—where such functional impairment is corroborated by documentary evidence (e.g., medical records, employment records), the sufficiency of which will be determined by the physician making the diagnosis (and where no documentary evidence of functional impairment exists or is available, then (a) there must be evidence of moderate to severe cognitive decline from a previous level of performance, as determined by and in accordance with the standardized neuropsychological testing protocol annexed in *Appendix B*, in the executive function cognitive domain or the learning and memory cognitive domain, and at least one other cognitive domain; and (b) the patient's functional impairment, as described above, must be corroborated by a third-party sworn affidavit from a person familiar with the patient's condition (other than the player or his family members), the sufficiency of which will be determined by the diagnosing physician); and (iv) The cognitive deficits do not occur exclusively in the context of a delirium, acute substance abuse, or as a result of medication side effects.

## LEVEL 2 NEUROCOGNITIVE IMPAIRMENT

**The following diagnosis can only be made:**

> (1) prior to July 7, 2014, by a board-certified neurologist, board-certified neurosurgeon, other board-certified neuro-specialist physician, or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician, except as provided in (c), below;

> (2) from July 7, 2014 through January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified neurologist, board-certified neurosurgeon, or other board-certified neuro-specialist physician, except as provided in (c), below; or

> (3) for a patient who died prior to January 7, 2017 (the Effective Date of the Settlement Agreement), where the diagnosis occurred while the patient was living, by a board-certified or otherwise qualified neurologist, neurosurgeon, or other neuro-specialist physician, or by a physician with sufficient qualifications in the field of neurology or neurocognitive disorders to make a diagnosis of Level 2 Neurocognitive Impairment:

A diagnosis made outside of the Baseline Assessment Program (BAP) that a living patient suffers from Level 2 Neurocognitive Impairment, as set forth below, *i.e.*, moderate dementia, based on evaluation and evidence generally consistent with the diagnostic criteria set forth and provided below, unless the diagnosing physician can certify in Section IV of the Diagnosing Physician Certification Form, above, that certain testing specified below for Level 2 Neurocognitive Impairment is medically unnecessary because the patient's dementia is so severe:

There is: (i) Concern of the patient, a knowledgeable informant, or the Qualified BAP Provider that there has been a severe decline in cognitive function; (ii) Evidence of a severe cognitive decline from a previous level of performance, as determined by and in accordance with the standardized neuropsychological testing protocol annexed in *Appendix B*, in two or more cognitive domains (complex attention, executive function, learning and memory, language, perceptual-spatial), provided one of the cognitive domains is (a) executive function, (b) learning and memory, or (c) complex attention; (iii) The patient exhibits functional impairment generally consistent with the criteria set forth in the National Alzheimer's Coordinating Center's Clinical Dementia Rating scale Category 2.0 (Moderate) in the areas of Community Affairs, Home & Hobbies, and Personal Care—where such functional impairment is corroborated by documentary evidence (*e.g.*, medical records, employment records), the sufficiency of which will be determined by the physician making the diagnosis (and where no documentary evidence of functional evidence exists or is available, then (a) there must be evidence of severe cognitive decline from a previous level of performance, as determined by and in accordance with the standardized neuropsychological testing protocol annexed in *Appendix B*, in the executive function cognitive domain or the learning and memory cognitive domain, and at least one other cognitive domain; and (b) the patient's functional impairment, as described above, must be corroborated by a third-party sworn affidavit from a person familiar with the patient's condition (other than the player or his family members), the sufficiency of which will be determined by the diagnosing physician); and (iv) The cognitive deficits do not occur exclusively in the context of a delirium, acute substance abuse, or as a result of medication side effects.

## ALZHEIMER'S DISEASE

(1) The following diagnosis can only be made:

 (a) prior to July 7, 2014, by a board-certified neurologist, board-certified neurosurgeon, other board-certified neuro-specialist physician, or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician; or

 (b) from July 7, 2014 through January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified neurologist, board-certified neurosurgeon, or other board-certified neuro-specialist physician:

A diagnosis in a living patient of the specific disease of Alzheimer's Disease as defined by the World Health Organization 's International Classification of Diseases, 9th Edition (ICD-9), the World Health Organization's International Classification of Diseases, 10th Edition (ICD-10), or a diagnosis of Major Neurocognitive Disorder due to probable Alzheimer's Disease as defined in the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5).

(2) The following diagnosis can only be made prior to January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician, or by a physician with sufficient qualifications in the field of neurology to make such a diagnosis, where the diagnosis was made while the patient was living but thereafter died prior to January 7, 2017 (the Effective Date of the Settlement Agreement):

A diagnosis of Major Neurocognitive Disorder due to probable Alzheimer's Disease consistent with the definition in *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) or a diagnosis of Alzheimer's Disease.

## PARKINSON'S DISEASE

(1) The following diagnosis can only be made:

 (a) prior to July 7, 2014, by a board-certified neurologist, board-certified neurosurgeon, other board-certified neuro-specialist physician, or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician; or

 (b) from July 7, 2014 through January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified neurologist, board-certified neurosurgeon, or other board-certified neuro-specialist physician:

A diagnosis in a living patient of the specific disease of Parkinson's Disease as defined by the World Health Organization 's International Classification of Diseases, 9th Edition (ICD-9), the World Health Organization's International Classification of Diseases, 10th Edition (ICD-10), or a diagnosis of Major Neurocognitive Disorder probably due to Parkinson's Disease as defined in the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5).

(2) The following diagnosis can only be made prior to January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician, or by a physician with sufficient qualifications in the field of neurology to make such a diagnosis, where the diagnosis was made while the patient was living but thereafter died prior to January 7, 2017 (the Effective Date of the Settlement Agreement):

A diagnosis of Parkinson's Disease.

## ALS

**(1) The following diagnosis can only be made:**

> **(a) prior to July 7, 2014, by a board-certified neurologist, board-certified neurosurgeon, other board-certified neuro-specialist physician, or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician; or**

> **(b) from July 7, 2014 through January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified neurologist, board-certified neurosurgeon, or other board-certified neuro-specialist physician:**

A diagnosis in a living patient of the specific disease of Amyotrophic Lateral Sclerosis, also known as Lou Gehrig's Disease (ALS), as defined by the World Health Organization's International Classification of Diseases, 9th Edition (ICD-9) or the World Health Organization's International Classification of Diseases, 10th Edition (ICD-10).

> **(2) The following diagnosis can only be made prior to January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician, or by a physician with sufficient qualifications in the field of neurology to make such a diagnosis, where the diagnosis was made while the patient was living but thereafter died prior to January 7, 2017 (the Effective Date of the Settlement Agreement):**

A diagnosis of the specific disease of Amyotrophic Lateral Sclerosis (ALS).

## CTE

**The following diagnosis can only be made prior to April 22, 2015 by a board-certified neuropathologist, provided that a patient who died between July 7, 2014 and April 22, 2015 has until 270 days from the date of death to obtain such a post-mortem diagnosis:**

A post-mortem diagnosis of Chronic Traumatic Encephalopathy (CTE).

# APPENDIX B

## BASELINE NEUROPSYCHOLOGICAL TEST BATTERY AND SPECIFIC IMPAIRMENT CRITERIA FOR RETIRED NFL FOOTBALL PLAYERS

### Section 1: Test Battery

**Estimating Premorbid Intellectual Ability**

ACS Test of Premorbid Functioning (TOPF)

**Complex Attention/Processing Speed (6 scores)**

WAIS-IV Digit Span

WAIS-IV Arithmetic

WAIS-IV Letter Number Sequencing

WAIS-IV Coding

WAIS-IV Symbol Search

WAIS-IV Cancellation

**Executive Functioning (4 scores)**

Verbal Fluency (FAS)

Trails B

Booklet Category Test

WAIS-IV Similarities

**Effort/Performance Validity (8 scores)**

*ACS Effort Scores*

ACS-WAIS-IV Reliable Digit Span

ACS-WMS-IV Logical Memory Recognition

ACS-WMS-IV Verbal Paired Associates Recognition

ACS-WMS-IV Visual Reproduction Recognition

ACS-Word Choice

*Additional Effort Tests*

Test of Memory Malingering (TOMM)

Medical Symptom Validity Test (MSVT)

**Learning and Memory (6 scores)**

WMS-IV Logical Memory I

WMS-IV Logical Memory II

WMS-IV Verbal Paired Associates I

WMS-IV Verbal Paired Associates II

WMS-IV Visual Reproduction I

WMS-IV Visual Reproduction II

**Language (3 scores)**

Boston Naming Test

Category Fluency (Animal Naming)

BDAE Complex Ideational Material

**Spatial-Perceptual (3 scores)**

WAIS-IV Block Design

WAIS-IV Visual Puzzles

WAIS-IV Matrix Reasoning

**Mental Health**

MMPI-2RF

Mini International Neuropsychiatric Interview

### Section 2: Evaluate Performance Validity

Freestanding, embedded and regression based performance validity metrics will be administered to each Retired NFL Football Player during baseline and, if relevant, subsequent neuropsychological examinations. There will be at least seven performance validity metrics utilized during each assessment. The specific performance validity metrics utilized will not be released to the public in order to maintain the highest standards of assessment validity.  The performance

---

## APPENDIX B

validity metrics employed will be rotated at intervals determined by the Appeals Advisory Panel in consultation with Co-Lead Class Counsel and Counsel for the NFL Parties.

Each neuropsychological examiner must complete a checklist of validity criteria as set forth in *Slick et al.* 1999, and revised in 2013 (see below) for every Retired NFL Football Player examined in order to determine whether the Retired NFL Football Player's test data is a valid reflection of his optimal level of neurocognitive functioning.

1. Suboptimal scores on performance validity embedded indicators or tests. The cutoffs for each test should be established based on empirical findings.

2. A pattern of neuropsychological test performance that is markedly discrepant from currently accepted models of normal and abnormal central nervous system (CNS) function. The discrepancy must be consistent with an attempt to exaggerate or fabricate neuropsychological dysfunction (e.g., a patient performs in the severely impaired range on verbal attention measures but in the average range on memory testing; a patient misses items on recognition testing that were consistently provided on previous free recall trials, or misses many easy items when significantly harder items from the same test are passed).

3. Discrepancy between test data and observed behavior. Performance on two or more neuropsychological tests within a domain are discrepant with observed level of cognitive function in a way that suggests exaggeration or fabrication of dysfunction (e.g., a well-educated patient who presents with no significant visual-perceptual deficits or language disturbance in conversational speech performs in the severely impaired range on verbal fluency and confrontation naming tests).

4. Discrepancy between test data and reliable collateral reports. Performance on two or more neuropsychological tests within a domain are discrepant with day-to-day level of cognitive function described by at least one reliable collateral informant in a way that suggests exaggeration or fabrication of dysfunction (e.g., a patient handles all family finances but is unable to perform simple math problems in testing).

5. Discrepancy between test data and documented background history. Improbably poor performance on two or more standardized tests of cognitive function within a specific domain (e.g., memory) that is inconsistent with documented neurological or psychiatric history.

6. Self-reported history is discrepant with documented history. Reported history is markedly discrepant with documented medical or psychosocial history and suggests attempts to exaggerate deficits.

7. Self-reported symptoms are discrepant with known patterns of brain functioning. Reported or endorsed symptoms are improbable in number, pattern, or severity; or markedly inconsistent with expectations for the type or severity of documented medical problems.

8. Self-reported symptoms are discrepant with behavioral observations. Reported symptoms are markedly inconsistent with observed behavior (e.g., a patient complains of severe episodic memory deficits yet has little difficulty remembering names, events, or appointments; a patient complains of severe cognitive deficits yet has little difficulty driving independently and arrives on time for an appointment in an unfamiliar area; a patient complains of severely slowed mentation and concentration problems yet easily follows complex conversation).

9. Self-reported symptoms are discrepant with information obtained from collateral informants. Reported symptoms, history, or observed behavior is inconsistent with information obtained from other informants judged to be adequately reliable. The discrepancy must be consistent with an attempt to exaggerate deficits (e.g., a patient reports severe memory impairment and/or behaves as if severely memory-impaired, but his spouse reports that the patient has minimal memory dysfunction at home).

## APPENDIX B

Notwithstanding a practitioner's determination of sufficient effort in accordance with the foregoing factors, a Retired NFL Football Player's failure on two or more effort tests may result in the Retired NFL Football Player's test results being subjected to independent review, or result in a need for supplemental testing of the Retired NFL Football Player.

Note: Additional information relating to the evaluation of effort and performance validity will be provided in a clinician's interpretation guide.

### Section 3: Estimate Premorbid Intellectual Ability

| Test | Ability |
|------|---------|
| Test of Premorbid Functioning (TOPF) | Reading<br>Reading + Demographic Variables |

The Test of Premorbid Functioning (TOPF) provides three models for predicting premorbid functioning: (a) demographics only, (b) TOPF only, and (c) combined demographics and TOPF prediction equations. For each model using demographic data, a simple and complex prediction equation can be selected. In the simple model, only sex, race/ethnicity, and education, are used in predicting premorbid ability. In the complex model, developmental, personal, and more specific demographic data is incorporated into the equations. The clinician should select a model based on the patient's background and his or her current level of reading or language impairment.

Note: It is necessary to estimate premorbid intellectual functioning in order to use the criteria for impairment set out in this document. Estimated premorbid intellectual ability will be assessed and classified as:

➢ Below Average (estimated IQ below 90);

➢ Average (estimated IQ between 90 and 109);

➢ Above Average (estimated IQ above 110).

### Section 4: Neuropsychological Test Score Criteria by Domain of Cognitive Functioning

There are 5 domains of cognitive functioning. In each domain, there are several tests that contribute 3, 4, or 6 demographically-adjusted test scores for consideration. Test selection in the domains was based on the availability of demographically-adjusted normative data for Caucasians and African Americans. These domains and scores are set out below.

The basic principle for defining impairment on testing is that there must be a pattern of performance that is approximately 1.5 standard deviations (for Level 1 Impairment), 1.7-1.8 standard deviations (for Level 1.5 Impairment) or 2 standard deviations (for Level 2 Impairment) below the person's expected level of premorbid functioning. Therefore, it is necessary to have more than one low test score in each domain. A user manual will be provided to neuropsychologists setting out the cutoff scores, criteria for identifying impairment in each cognitive domain, and statistical and normative data to support the impairment criteria.

## APPENDIX B

| Domain/Test | Ability |
|---|---|
| **Complex Attention/Speed of Processing (6 Scores)** | |
| Digit Span | Attention & Working Memory |
| Arithmetic | Mental Arithmetic |
| Letter Number Sequencing | Attention & Working Memory |
| Coding | Visual-Processing & Clerical Speed |
| Symbol Search | Visual-Scanning & Processing Speed |
| Cancellation | Visual-Scanning Speed |
| **Executive Functioning (4 scores)** | |
| Similarities | Verbal Reasoning |
| Verbal Fluency (FAS) | Phonemic Verbal Fluency |
| Trails B | Complex Sequencing |
| Booklet Category Test | Conceptual Reasoning |
| **Learning and Memory (6 scores)** | |
| Logical Memory I | Immediate Memory for Stories |
| Logical Memory II | Delayed Memory for Stories |
| Verbal Paired Associates I | Learning Word Pairs |
| Verbal Paired Associates II | Delayed Memory for Word Pairs |
| Visual Reproduction I | Immediate Memory for Designs |
| Visual Reproduction II | Delayed Memory for Designs |
| **Language** | |
| Boston Naming Test | Confrontation Naming |
| BDAE Complex Ideational Material | Language Comprehension |
| Category Fluency | Category (Semantic) Fluency |
| **Visual-Perceptual** | |
| Block Design | Spatial Skills & Problem Solving |
| Visual Puzzles | Visual Perceptual Reasoning |
| Matrix Reasoning | Visual Perceptual Reasoning |

**Impairment Criteria:** *Below Average* **Estimated Intellectual Functioning (A1 – E1)**

**A1.  Complex Attention (6 test scores)**

1. Level 1 Impairment: 3 or more scores below a T score of 35

2. Level 1.5 Impairment: 4 or more scores below a T score of 35; or meet for Level 1 and 2 scores below a T score of 30

3. Level 2 Impairment: 3 or more scores below a T score of 30

**B1.  Executive Function (4 test scores)**

1. Level 1 Impairment: 2 or more scores below a T score of 35

2. Level 1.5 Impairment: 3 or more scores below a T score of 35; or meet for Level 1 and 1 score below a T score of 30

## APPENDIX B

3. Level 2 Impairment: 2 or more scores below a T score of 30

### C1. Learning and Memory (6 test scores)

1. Level 1 Impairment: 3 or more scores below a T score of 35

2. Level 1.5 Impairment: 4 or more scores below a T score of 35; or meet for Level 1 and 2 scores below a T score of 30

3. Level 2 Impairment: 3 or more scores below a T score of 30

### D1. Language (3 test scores)

1. Level 1 Impairment: 3 or more scores below a T score of 37

2. Level 1.5 Impairment: meet for Level 1 and 2 scores below a T score of 35

3. Level 2 Impairment: 3 or more scores below a T score of 35

### E1. Visual-Perceptual (3 test scores)

1. Level 1 Impairment: 3 or more scores below a T score of 37

2. Level 1.5 Impairment: meet for Level 1 and 2 scores below a T score of 35

3. Level 2 Impairment: 3 or more scores below a T score of 35

## Impairment Criteria: *Average* Estimated Intellectual Functioning (A2 – E2)

### A2. Complex Attention (6 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 35

2. Level 1.5 Impairment: 3 or more scores below a T score of 35; or meet for Level 1 and 1 score below a T score of 30

3. Level 2 Impairment: 2 or more scores below a T score of 30

### B2. Executive Function (4 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 35

2. Level 1.5 Impairment: 3 or more scores below a T score of 35; or meet for Level 1 and 1 score below a T score of 30

3. Level 2 Impairment: 2 or more scores below a T score of 30

### C2. Learning and Memory (6 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 35

2. Level 1.5 Impairment: 3 or more scores below a T score of 35; or meet for Level 1 and 1 score below a T score of 30

3. Level 2 Impairment: 2 or more scores below a T score of 30

### D2. Language (3 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 37

2. Level 1.5 Impairment: 3 or more scores below a T score of 37; or meet for Level 1 and 1 score below a T score of 35

3. Level 2 Impairment: 2 or more scores below a T score of 35

### E2. Visual-Perceptual (3 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 37

2. Level 1.5 Impairment: 3 or more scores below a T score of 37; or meet for Level 1 and 1 score below a T score of 35

3. Level 2 Impairment: 2 or more scores below a T score of 35

## APPENDIX B

**Impairment Criteria:** *Below Average* **Estimated Intellectual Functioning (A3 – E3)**

### A3. Complex Attention (6 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 35

2. Level 1.5 Impairment: meet for Level 1 and 3 or more scores below a T score of 37

3. Level 2 Impairment: 3 or more scores below a T score of 35

### B3. Executive Function (4 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 37

2. Level 1.5 Impairment: meet for Level 1 and 3 or more scores below a T score of 37; or meet for Level 1 and 1 score below a T score of 30

3. Level 2 Impairment: 2 or more scores below a T score of 30

### C3. Learning and Memory (6 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 35

2. Level 1.5 Impairment: meet for Level 1 and 3 or more scores below a T score of 37

3. Level 2 Impairment: 3 or more scores below a T score of 35

### D3. Language (3 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 40

2. Level 1.5 Impairment: 3 scores below at T score of 40; or meet for Level 1 and 1 score below a T score of 37

3. Level 2 Impairment: 2 or more scores below a T score of 37

### E3. Visual-Perceptual (3 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 40

2. Level 1.5 Impairment: 3 scores below at T score of 40; or meet for Level 1 and 1 score below a T score of 37

3. Level 2 Impairment: 2 or more scores below a T score of 37

### Section 5: Mental Health Assessment

| Test | Symptoms/Functioning | Assessment |
|---|---|---|
| MMPI-2RF | Mental Health Assessment | Evaluation of Validity Scales and Configurations; T-Scores for Symptom Domains |
| Mini International Neuropsychiatric Interview (M.I.N.I. Version 5.0.0) | Semi-structured Psychiatric Interview | Scale Criteria for Various Psychiatric Diagnoses |

**Ronald L. Hamilton, M.D.**

1/2/2017

## CURRICULUM VITAE

### BIOGRAPHICAL

| | | | |
|---|---|---|---|
| **Name:** | Ronald Lee Hamilton | **Birth Date:** | September 20, 1959 |
| **Home Address:** | 6 Graham Place<br>Pittsburgh, PA 15232 | **Birth Place:** | Omaha, Nebraska |
| **Marital status:** | single | | |
| **Home Phone** | 412-310-9874 | **Citizenship:** | USA |

**Business Address:**  Division of Neuropathology
A724.1 Scaife Hall
200 Lothrop Street
Pittsburgh, PA 15213

**Business Phone:**  412-624-6610

**Business Fax:**  412-624-5488
**e-mail address**  hamiltonrl@upmc.edu

### EDUCATION AND TRAINING

| | | | |
|---|---|---|---|
| 1977-1985 | University of Nebraska-Lincoln | B.S. | Psychology |
| 1985-1989 | University of Nebraska Medical Center | M.D. | |
| 1989-1991 | University of California, San Diego<br>Program Director, David Bailey | Resident Anatomic Pathology | |
| 1991-1993 | University of California, San Diego<br>Program Director, Henry C. Powell | Resident Neuropathology | |
| 1993-1994 | University of Pittsburgh<br>Program Director, Clayton A Wiley | Fellow Neuropathology | |
| 1994-1995 | University of Pittsburgh<br><br>Program Director, Michael Zigmond | Fellow: NIMH Training Grant in Neuroscience | |

### APPOINTMENTS AND POSITIONS:

| | |
|---|---|
| 1995-2002 | University of Pittsburgh School of Medicine -Assistant Professor of Pathology |
| 2002-present | University of Pittsburgh School of Medicine -Associate Professor of Pathology |

### DISTRIBUTION OF % TIME

| | |
|---|---|
| Research | 20% |
| Other scholarly activity | 8% |
| Teaching | 10% |
| Clinical | 35% |
| Combined clinical and teaching | 20% |
| Service activities | 5% |
| Administrative activities. | 2% |
| | |
| TOTAL | 100% |

**Ronald L. Hamilton, M.D.**

## CERTIFICATION and LICENSURE

**SPECIALTY CERTIFICATION**

| | | |
|---|---|---|
| American Board of Pathology | Anatomic Pathology | 5/23/96 |
| American Board of Pathology | Neuropathology | 5/23/96 |
| American Board of Pathology – recertification | Neuropathology | 1/1/2014 |

**MEDICAL or OTHER PROFESSIONAL LICENSURE**

| | |
|---|---|
| 1990 | California Medical License (G69731) expired |
| 1993 | Pennsylvania Medical License (MD-049717-L) |
| 2009 | Indiana Medical License (01067332A) |

## MEMBERSHIPS IN PROFESSIONAL AND SCIENTIFIC SOCIETIES

| | |
|---|---|
| 1992 | American Association for the Advancement of Science |
| 1993 | American Association of Neuropathology |
| 1993 | International Society of Neuropathology |
| 1994 | College of American Pathologists (CAP) |
| 1995-97 | CAP Neuropathology Subcommittee |
| 1998 | Children's Cancer Group, Study Committee for CCGB975 |
| 1999 | Society for Neuroscience |

## HONORS

| | |
|---|---|
| Nominated "Teacher of the Year: Anatomic Pathology" | 1997 |
| Nominated "Teacher of the Year: Anatomic Pathology" | 1998 |
| Nominated "Teacher of the Year: Anatomic Pathology" | 1999 |
| Nominated "Teacher of the Year: Anatomic Pathology" | 2000 |
| Nominated "Teacher of the Year: Anatomic Pathology" | 2001 |
| Nominated "Teacher of the Year: Anatomic Pathology" | 2002 |
| UPMC ACES Award winner (ACES is an Award for | 2003 |

Clinical Excellence and Service and is given to about 10 physicians per year at UPMC)

| | |
|---|---|
| Letter of appreciation from Chief Residents | 1997-1998 |
| AP Pathology "TEACHER OF THE YEAR" | 2004-05 |

## PUBLICATIONS

**Refereed Articles**

1. Esch O, Spinosa JC, **Hamilton RL**, Crombie DL, Schteigart CO, Rondinone JF, D'Agostino HB,Lillienau J and Hofmann AF: Acute effects of topical methyl tert-butyl ether or ethyl propionate on gallbladder histology in animals: a comparison of two solvents for contact dissolution of cholesterol gallstones. Hepatology 16 (4):984-991, 1992.

2. Anders KH, Becker PS, Holden JK, Sharer LR, Cornford ME, Hansen LA, **Hamilton R,** Vinters, HV: Multifocal necrotizing leukoencephalopathy with pontine predilection in immunosuppressed patients: a clinicopathologic review of sixteen cases. Human Pathology 24:897-904, 1993.

3. **Hamilton RL**, Achim C, Grafe MR, Fremont JC, Miners D, Wiley CA: Herpes simplex virus brainstem encephalitis in an AIDS patient. Clinical Neuropathology, 14: 45-50, 1995.

**Ronald L. Hamilton, M.D.**

4.  Rose J, Haskell WL, Gamble JG, **Hamilton RL**, Brown DA, Rinsky L: Muscle pathophysiology and clinical measures of disability in children with cerebral palsy. Journal of Orthopedic Research, 12(6): 758-768, 1994.

5.  **Hamilton RL**, Grafe MR: Complete absence of the cerebellum: a report of two cases. Acta Neuropathologica 88 (3): 258-261, 1994.

6.  **Hamilton RL**, Haas RH, Nyhan WL, Powell HC, Grafe MR: The neuropathology of propionic academia: a report of two additional cases.  Journal of Child Neurology 10(1): 25-30, 1995.

7.  Haas RH, Marsden DL, Capistrano-Estrada S, **Hamilton RL**, Grafe MR, Wong W, Nyhan WL: Acute basal ganglia infarction in propionic acidemia.  Journal of Child Neurology 10(1) 18-22, 1995.

8.  Kupperman BD, Quiceno JI, Wiley C, Hesselink J**, Hamilton R**, Keefe K, Garcia R, Freeman WR: Clinical and histopathologic study of varicella zoster virus retinitis in patients with the acquired immunodeficiency syndrome.  American Journal of Ophthalmology 118:589-600, 1994.

9.  Adelson PD, Robichaurd P, **Hamilton RL**, Kochanek PM. A Model of Diffuse Traumatic Brain  Injury in the Immature Rat.  J Neurosurg 85:877-884, 1996.

10. Alper G, Crumrine PK, **Hamilton RL**, Albright L, Wald ER. An unusual case of inflammatory spinal epidural  mass (Castleman's syndrome) Pediatric Neurology  15: 60-2 , 1996

11. Adelson PD, Firlik KS, Firlik AD, **Hamilton RL**. A meningeal cyst of the thoracic spine presenting as prolonged paresis after ankle injury: case report. Neuropediatrics 27:207-210, 1996.

12. Cramer SC, Segal A, **Hamilton RL**, Schmahman J, Ma J. Leukoencephalitis Due to Varicella Zoster Virus:   Report of a Case and Review of Clinical Features.  Contemporary Neurology, 1, 1996 (electronic journal).

13. Mansfield RT, Schiding JK, **Hamilton R**, Kochanek PM: Effects of hypothermia on traumatic brain injury in immature rats. J Cerebral Blood Flow  Metabo 16(2): 244-252, 1996.

14. Pollack IF, Campbell JW, **Hamilton RL**, Martinez AJ, Bozik ME. Proliferation index as a predictor of prognosis in malignant gliomas of childhood. Cancer 79:849-856, 1996

15. Pollack IF, **Hamilton RL,** Finkelstein SD, Campbell JW, Martinez AJ, Sherwin RN, Bozik ME, Gollin SM. The relationship between tp53 mutations and overexpression of p53 and prognosis in malignant gliomas of childhood. Cancer Research 57:304-309, 1997.

16. Ikonomovic MD, Mizukami K, Davies P, **Hamilton R**, Sheffield R, Armstrong DM. The loss of GluR2(3) immunoreactivity preceded neurofibrillary tangle formation in the entorhinal cortex and hippocampus of Alzheimer brains. J Neuropath Exp Neurol 56:1018-1027, 1997.

17. Bredel M, Pollack IF, Campbell JW, **Hamilton RL**: Basic fibroblast growth factor as a predictor of prognosis in pediatric high-grade gliomas. Clinical Cancer Research 3:2157-2164, 1997

18. Blatt J, **Hamilton RL**: Neurodevelopmental anomalies in children with neuroblastoma. Cancer 82: 1603-8, 1998.

19. Fukui MB, Livstone BJ, Meltzer CC, **Hamilton RL**: Hemorrhagic presentation of untreated primary central nervous system lymphoma in the acquired immunodeficiency syndrome. Am J Roentgenol 170:1114-1115, 1998..

20. Bredel M, Pollack IF, **Hamilton RL**, James CD: Epidermal growth factor receptor (EGFR) and gene amplification in high-grade non-brainstem gliomas of childhood. Clin Can Res 5:1786-92, 1999

**Ronald L. Hamilton, M.D.**

21. Gerszten PC, Pollack IF, **Hamilton RL**. Primary parafalcine chondrosarcoma in a child. Acta Neuropathologica 95:111-4, 1998.

22. Pollack IF, **Hamilton RL**, Fitz C, Orenstein DM. An intrasylvian "fibroma" in a child with cystic fibrosis. Pediatric Neurosurgery 46:744-747 2000.

23. Liachenko S, Tang P, **Hamilton RL**, Xu Y: A reproducible model of circulatory arrest and remote resuscitation in rats for NMR investigation. Stroke 29:1229-1238, 1998

24. Meltzer CC, Liu AY, Perrone AM, **Hamilton RL** Meningioangiomatosis MR imaging with histopathologic correlation. AJR 170:804-5, 1998

25. Clark RSB, Kochanek PM, Chen M, Watkins SC, Marion DW, Chen J, **Hamilton RL**, Loeffert JE, Graham SH. Increases in Bcl-2 and cleavage of caspase-1 and caspase-3 in human brain after head injury. FASEB J, 13:813-821, 1999

26. Soontornniyomkij V, Wang G, Pittman CA, **Hamilton RL**, Wiley CA, Achim CL Absence of brain-derived neurotrophic factor and trkB receptor immunoreactivity in glia of Alzheimer's disease. Acta Neuropathologica 98:345-8, 1999.

27. Wang G, Achim CL, **Hamilton RL**, Wiley CA, Soontornniyomkij V  Tyramide signal amplification methods in multiple label immunofluorescence confocal microscopy. Methods 18(4):459-464, 1999

28. Firlik KS, Adelson PD, **Hamilton RL**: Coexistence of a ganglioglioma and Rasmussen's encephalitis: successful treatment in a four-year-old boy. Pediatr Neurosurg 30:278-282, 1999

29. Ikonomovic MD, Mizukami K, Warde D, Sheffield R, **Hamilton R**, Wenthold RJ, Armstrong DM Distribution of glutamate receptor subunit NMDAR1 in the hippocampus of normal elderly and patients with Alzheimer's disease. Exp Neurol 160(1):194-204, 1999.

30. Dallasta, LM, Wang G, Bodnar RJ, Draviam R, Wiley CA, Achim CA, **Hamilton RL**: Differential expression of intercellular adhesion molecules-1 (ICAM-1) and vascular adhesion cell molecule-1 (VCAM-1) in chronic murine retroviral encephalitis. Neuropathol Appl Neurobiol 26:332-341, 2000.

31.  Luabeya MK, Dallasta LM, Achim CL, Pauza CD, **Hamilton RL**: Blood-brain Barrier Disruption in Simian Immunodeficiency Virus Encephalitis. Neuropathol Appl Neurobiol 26:454-462, 2000.

32.  **Hamilton RL**. Lewy Bodies in Alzheimer's Disease: A Neuropathological Review of 145 Cases Using    -synuclein Immunohistochemistry. Brain Pathol 10: 378-384, 2000.

33.  Sweet, RA, **Hamilton RL**, Healy MT, Wisniewski SR, Henteleff R, Pollack BG, Lewis DA, DeKosky ST. Alterations of Striatal Dopamine Receptor Binding in Alzheimer's Disease Are Associated with Lewy Body Pathology and With Antemortem Psychosis. Arch Neurol 58:466-472, 2001.

34.  Styren S, **Hamilton RL**, Styren GC, Klunk WE X-34: a novel and intensely fluorescent stain for Alzheimer's disease pathology. J Histochem Cytochem 48:1223-1232, 2000.

35.  Lopez OL, **Hamilton RL**, Becker JT, Wisniewski S, Kaufer DI, DeKosky ST. Severity of cognitive impairment and the clinical diagnosis of AD with Lewy bodies. Neurology 54:1780-1787, 2000

36.  Lopez OL, Wisniewski S, **Hamilton RL**, Becker JT, Kaufer DI, DeKosky ST. Predictors of progression in patients with AD and Lewy bodies. Neurology 54:1774-1779, 2000.

**Ronald L. Hamilton, M.D.**

37.   Sweet RA, **Hamilton RL**, Lopez OL, Klunk WE, Wisnieski SR, Kaufer DI, Healy MT, Dekosky ST. Psychotic symptoms in Alzheimer's Disease are not associated with more severe neuropathologic features. Internat Psychogeriatr 12: 547-558, 2000.

38.   Lopez OL, Becker JT, Klunk W, Saxton J, **Hamilton RL**, Kaufer DI, Sweet RA, Meltzer CC, Wisniewski S, Kamboh MI, DeKosky ST. Research evaluation and diagnosis of probable Alzheimer's Disease over the last two decades. I. Neurology 55:1854-1862, 2000.

39.   Lopez OL, Becker JT, Klunk W, Saxton J, **Hamilton RL**, Kaufer DI, Sweet RA, Meltzer CC, Wisniewski S, Kamboh MI, DeKosky ST. Research evaluation and diagnosis of possible Alzheimer's Disease over the last two decades. II. Neurology 55:1863-1869, 2000.

40.   Pollack IF, **Hamilton RL**, Fitz C, Kassam A, Snyderman C. Congenital Reactive Myofibroblastic Tumor of the Petrous Bone: Case Report. Neurosurgery 48:430-435, 2001.

41.   Levy EI, Scarrow A, **Hamilton** RC (sic), Wollman MR, Fitz C. Pollack IF. Medical Management Of Eosinophilic Granuloma of the Cervical Spine. Pediatr Neurosurg 31:159-62, 1999.

42.   Pettegrew JW, Panchalingam K, **Hamilton RL**, and McClur RJ Brain Membrane Phospholipid Alterations in Alzheimer's Disease.  Neurochem Res 26:771-782, 2001

43.   Levy EI, Harris AE, Omalu BA, **Hamilton RL**, Branstetter BF, Pollack IF. Sudden Death from Fulminant Acute Cerebellitis.  Pediatr Neurosurg 35:24-28, 2001

44.   Lianchenko S, Tang P, **Hamilton RL**, Xu Y. Regional Dependence of Cerebral Reperfusion After Circulatory Arrest in Rats.  J Cerebr Blood Flow Met 21:1320-1329, 2001 .

45.   Pollack IF, Finkelstein SD, Burnham J, Holmes EJ, **Hamilton RL**, Yates AJ, Finlay J, Sposto R, and CCG. Age and TP53 Mutation Frequency in Childhood Malignant Gliomas: Results of a Multi-institutional Cohort. Cancer Res 61:7404-7407, 2001

46.   Adelson PD, Jenkins LW, **Hamilton RL**, Robichaud P, Tran MP, Kochanek PM. Histopathologic Response of the Immature Rat to Diffuse Traumatic Brain Injury.  J Neurotrauma 18 :967-976, 2001

47.   Pollack IF, Finkelstein SD, Woods J, Burnham J, Holmes EJ, **Hamilton RL**, Yates AJ, Boyett JM, Finlay J, Sposto R, and CCG. TP53 Mutations, Expression of p53 and Prognosis in Children with Malignant Gliomas.  New England Journal of Medicine 346:420-427, 2002

48.   Lopez OL, Becker JT, Kaufer DI, **Hamilton RL**, Sweet RA, Klunk W, DeKosky ST. Research Evaluation and Prospective Diagnosis of Dementia With Lewy Bodies.  Arch Neurol 59:43-46, 2002.

49.   Wang L, Yushmanov VE, Lianchenko SM, Tang P, **Hamilton RL**, Xu Y.  Late Reversal of Cerebral Perfusion and Water Diffusion After Transient Focal Ischemia in Rats.  J Cereb Blood Flow Metab 22:253-261, 2002.

50.  Pollack IF, Biegal JA, Yates AJ, **Hamilton RL**, Finkelstein SD.Risk Assignment in Childhood Brain Tumors: The Emerging Role of Molecular and Biologic Classification. Current Oncology Reports 4:114-122, 2002.

51.   Pollack IF, **Hamilton RL**, Burnham J, Holmes EJ, Finkelstein SD, Sposto R, Yates AJ, Boyett JM, Finley JL. The impact of proliferation index on outcome in childhood malignant gliomas: results in a multi-institutional cohort. Neurosurgery 50:1238-1245, 2002.

**Ronald L. Hamilton, M.D.**

52. Sweet RA, Panchalingam K, Pettefrew JW, McClure RJ, **Hamilton RL**, Lopez OL, Kaufer DI, DeKosky ST, Klunk WE.  Psychosis in Alzheimer disease: postmortem magnetic resonance spectroscopy evidence of excess neuronal and membrane phospholipid pathology. Neurobiol Aging 23:547-53, 2002.

53.  Mazzola CA, Albright AL, Sutton LN, Tuite GF, **Hamilton RL**, Pollack IF.  Dermoid inclusion cysts and early spinal cord tethering after fetal surgery.  New Engl. J Med 347:256-9, 2002.

54.  Bredel M, Pollack IF, **Hamilton RL**, Birner P, Hainfellner JA, Zentner J.  DNA topoisomerase II-alpha predicts progression-free and overall survival in pediatric malignant non-brainstem gliomas.  Int J Cancer 99:817-20, 2002.

55.  Klunk WE, Wang Y, Huang G, Debnath ML, Holt DP, Shao L, **Hamilton RL**, Ikonomovic MD, DeKosky ST, Mathis CA.  The binding of BTA-1 to post-mortem brain homogenates is dominated by the amyloid component. J Neurosci 23:2086-2092, 2003.

56. Castellano-Sanchez, AA, Ohgaki H, Yokoo H, Scheithauer BW, Burger PC, **Hamilton RL**, Finkelstein SD, Brat, DJ.  Cerebral granular cell astrocytomas show a high frequency of allelic loss but lack a defining genotype. Brain Pathology 13: 62-78, 2003.

57.  Gilbertson RJ, Hill DA, Hernan R, Kocak M, Geyer R, Olson J, Gajjar A, Rush L, **Hamilton RL**, Finkelstein SD, Pollack IF.  ERBB1 is amplified and overexpressed in high-grade diffusely infiltrative pediatric brain stem glioma.  Clin Cancer Res 9:3620-3624, 2003.

58. Pollack IF, Finkelstein SD, Burnham J, **Hamilton RL**, Yates AJ, Holmes EJ, Boyett JM, Finlay JL.  The association between chromosome 1p loss and outcome in pediatric malignant gliomas: results from the CCG-945 cohort. Pediatr Neurosurg 39:114-121, 2003.

59.  Carter TL, Rissman RA, Mishizen-Eberz AJ, Wolfe BB, **Hamilton RL**, Gandy S, Armstrong DM.  Differential Preservation of AMPA Receptor Subunits in the Hippocampi of Alzheimer's Disease Patients According to Braak Stage Experimental Neurology 187:299-309, 2004

60.  Finkelstein SD, Mohan D, **Hamilton RL**, Sasatomi E, Swalsky PA, Lieberman FS.  Microdissection-based genotyping assists discrimination of reactive gliosis versus glioma. Am J Clin Pathol 121:671-678, 2004

61.  **Hamilton RL**, Bowser B Alzheimer Disease Pathology in ALS Acta Neuropathologica107:515-522, 2004

62.  Mohan D, Couce ME, Wiley CA, **Hamilton RL**, Sasatomi E, Swalsky PA, Lieberman MD, Finkelstein SD.  Microdissection based genotyping of human gliomas: diagnostic and prognostic considerations Modern Pathology 17:1346-1358, 2004

63. Marshall GA, Kaufer DI, Lopez OL, Rao GR, **Hamilton RL**, DeKosky ST.  Right prosubiculum amyloid plaque density correlates with anosognosia in Alzheimer's Disease.  J Neurol Neurosurg Psychiatry 75:1396-4000, 2004.  **PMCID:  PMC1738763**

64.  Sweet RA, **Hamilton RL**, Butters ME, Mulsant BH, Pollock BG, Lewis DA, DeKosky ST, Reynolds CF.  Neuropathologic Correlates of Dementia in Late Life Major Depression Neuropsychopharmacology 29:2242-2250, 2004

65  Lee JYK, Finkelstein S, **Hamilton RL**, Rekha P, Pirris S, King Jr, JT, Omalu B.  Loss of heterozygosity Analysis of Benign, Atypical and Anaplastic Meningiomas.  Neurosurgery 55:1163-1173, 2004.

**Ronald L. Hamilton, M.D.**

66. Beckner ME, Sasatomi E, Swalsky PA, **Hamilton RL**, Pollack, IF, Finkelstein SD. Loss of heterozygosity reveals non-VHL Allelic loss in hemangioblastomas at 22q13. Human Pathology 35:1105-1111, 2004.

67. Tsuang D, Wilson R, Lopez OL, Luedecking-Zimmer EK, Leverenz JB, DeKosky ST, Kamboh MI, **Hamilton RL**. Genetic Association Between APOE*4 Allele and Lewy Bodies in Alzheimer's Disease Neurology, 64:509-513, 2005. **PMCID: PMC1487185**

68. Bredel C, Lassman S, Pollack IF, Knoth R, **Hamilton RL**, Werner M, Bredel M. DNA Topoisomerase II-alpha and Her-2/Neu Gene Dosages in Pediatric Malignant Gliomas. Int J Cancer 26:1188-92, 2005.

69. Witham TF, Okada H, Fellows W, **Hamilton RL**, Flickinger JC, Chambers WH, Pollack IF, Watkins SC, Kondziolka D. The characterization of tumor apoptosis after experimental radiosurgery. Stereotact Funct Neurosurg 83:17-24 2005.

70. McFadden K, **Hamilton RL**, Insalaco SJ, Lavine L, Al-Mateen M, Guoji Wang G, Wiley CA Neuronal intranuclear inclusion disease in a child without polyglutamine inclusions J Neuropathol Exper Neurol 64:545-552, 2005. **PMCID: PMC1402362**

71. Hatano M, Eguchi J, Tatsumi T, Kuwashima N, Dusak JE, Kinch MS, Pollack IF, **Hamilton RL**, Storkus WJ, Okada H. EphA2 as a glioma-associated antigen: a novel target for glioma-vaccines. Neoplasia 7:717-722, 2005. **PMCID: PMC1501889**

72. Jordan S, Ruoyan C, Koprivica V, **Hamilton RL**, Whitehead R, Tottori K, Kikuchi T. In vitro profile of the antidepressant candidate OPC-14523 at rat and human 5-HT$_{1A}$ receptors.Eur J Pharmacol, 517:165-173, 2005.

73. Omalu BI, Minster RL, Kamboh MI, **Hamilton RL**, Wecht CH, DeKosky ST. Chronic Traumatic Encephalopathy (CTE) in a National Football League (NFL) Player Neurosurgery, 57:128-134, 2005.

74. Judkins AR, Burger PC, **Hamilton RL**, Kleinschmidt-DeMasters B, Perry A, Pomeroy SL, Rosenblum MK, Yachnis AT, Zhou H, Rorke LB, Biegel JA. INI1 Protein Expression Distinguishes Atypical Teratoid/Rhabdopid Tumor from Choroid Plexus Carcinoma. J Neuropathol Exp Neurol 64:391-397, 2005.

75. Desai PP, Ikonomovic I, Abrahamson EE, **Hamilton RL,** Isanski BA, Hope CE, Klunk WE, Dekosky ST, Kamboh MI. Apolipoprotein D is a component of compact but not diffuse amyloid-beta plaques in Alzheimer's Disease temporal cortex. Neurobiol Dis May 22, 2005 (epub)

76. Carson-Walter EB, Hampton J, Geynisman D,Pillai PK, Sathanoori R, Madden SL, **Hamilton RL**, Walter KA. Plasmalemmal Vesicle associated protein-1 (PV-1) is a novel and critical marker of brain tumor angiogenesis. Clin Cancer Res 11:7643-7650, 2005.

77. Lopez OL, Becker JT, Sweet RA, Martin-Sanchez FJ, **Hamilton RL** Lewy bodies in the Amygdala increase risk for major depression in subjects with Alzheimer disease. Neurology 67:660-665, 2006.

78. Pollack IF, **Hamilton RL**, Sobol R, Burnham J, Yates AJ, Holmes EJ, Zhou T, Finlay J (for Children Oncology Group).O6-methylguanine-DNA methyltransferase strongly Correlates with Outcome in Childhood Malignant Gliomas: Results from the CCG-945 Cohort J Clin Oncol. Jul 20;24(21):3431-7, 2006.

**Ronald L. Hamilton, M.D.**

79. Mandal PK, Pettegrew JW, Masliah E, **Hamilton RL**, Mandal R. Interaction between Aβ Peptide and α Synuclein: Molecular Mechanisms in Overlapping Pathology of Alzheimer's and Parkinson's in Dementia with Lewy Body disease. Neurochemical Research, 2006 31, 1153-1162, 2006.

80. Omalu B, DeKosky ST, **Hamilton RL**, Minster RL, Kamboh MI, Shakir AM, Wecht Chronic Traumatic Encephalopathy in a National Football League Player: part II. Neurosurgery 59:1086-92, 2006

81. Ramsey CP, Glass CA, Koike MA, Montgomery MB, Ritson GP, Chia L, **Hamilton RL**, Chu CT, Jordan-Sciutto KL. Expression of Nrf2 in neurodegenerative diseases. J Neuropathol Exp Neurol 66:75-85, 2007. **PMCID: PMC2253896**

82. Boada FE, Tanase C, Davis D, Walter K, Torres-Trejo A, Couce M, **Hamilton R**, Kondziolka D, Bartinski W, Lieberman F. Non-invasive assessment of tumor proliferation using triple quantum filtered 23/Na MRI: technical challenges and solutions. Conf Proc IEEE Eng Med Biol Sci Soc. 2004; 7:5238-41

83. Pollack IF, **Hamilton RL**, James CD, Finkelstein SD, Burnham J, Yates AJ, Holmes EJ, Zhou T, Finlay J (for Children Oncology Group). Rarity of *PTEN* Deletions and *EGFR* Amplification in Malignant Gliomas of Childhood: Results from the Children's Cancer Group-945 Cohort J Neurosurg 105(5 Suppl):418-424, 2006.

84. Guzman A, Wood WL, Alpert E, Prasad MD, Miller RG, Rothstein JD, Bowser R, **Hamilton R**, Wood TD, Cleveland DW, Lingappa VR, Liu J. Common molecular signature in SOD1 for both sporadic and familial amyotrophic lateral sclerosis. Proc Nat Acad Sci 104:12524-12529, 2007. **PMCID: PMC2408940**

85. Beckner ME, Jane EP, Jankowitz B, Agostino NR, Walter KA, **Hamilton RL**, Pollack IF. Tumor cells from ultrasonic aspirations of glioblastomas migrate and from spheres with radial outgrowth. Cancer Letters 255:135-44, 2007. PMID 17543444, **PMCID: PMC2000342**

86. McIntyre JA, Chapman J, Shavit E, **Hamilton RL**, and DeKosky ST. Redox-Reactive Autoantibodies in Alzheimer's Patients' Cerebrospinal Fluids: Preliminary Studies. Autoimmunity, 40:390-396, 2007. PMID 17612901

87. Nakashima-Yasuda, Uryu, K, Robinson J, Xie S, Hurtig H, Duda J, Arnold S, Siderowf A, Grossman M, Leverenz J, Woltjer R, Lopez OL, **Hamilton R**, Tsuang DW, Galaska D, Masliah M, Kaye J, Clark C, Montine TJ, Lee VMY, Trojanowski J. Co-morbidity of TDP-43 Proteinopathy in Lewy Body Related Diseases. Acta Neuropathol 114:221-9, 2007. PMID 17653732

88. McIntyre JA, **Hamilton RL**, DeKosky ST. Redox-reactive autoantibodies in cerebrospinal fluids. Ann NY Acad Sci 1109:296-302, 2007. PMID 17785318

89. Okada H, Lieberman FS, Walter KA, Lunsford LD, Kondziolka DS, Bejjani GK, **Hamilton RL**, Torres-Trejo A, Kalinski P, Cai Q, Mabold JL, Edington HD, Butterfield LH, Whiteside TL, Potter DM, Schold SC Jr., Pollack IF Autologous glioma cell vaccine admixed with interleukin-4 gene transfected fibroblasts in the treatment of patients with malignant gliomas. J Transl Med 5:67, 2007. PMID 18093335. **PMCID: PMC2254376**

90. Beach TG, White CL, **Hamilton, RL**, Duda JE, Iwatsubo T, Dickson DW, Leverenz JB, Roncaroli F, Buttini M, Hladik CL, Sue LI, Noorigian JV, Adler CH. Evaluation of alpha-synuclein immunohistochemical methods used by invited experts. Acta Neuropathol 116:277-88, 2008. PMID 18626651. **PMCID: PMC2708176**

91. Ikonomovic MD, Klunk WE, Abrahamson EE, Mathis CA, Price JC, Tsopelas ND, Lopresti BJ, Ziolko S, Bi W, Paljug WR, Debnath ML, Hope CE, Isanski BA, **Hamilton RL**, DeKosky ST. Post-

**Ronald L. Hamilton, M.D.**

mortem correlates of in vivo PiB-PET amyloid imaging in a typical case of Alzheimers disease. Brain  131(Pt 6):1630-45, 2008.  PMID  18339640.  **PMCID:  PMC2408940**

92. Leverenz JB, **Hamilton R**, Tsuang DW, Schantz A, Vavrek D, Larson EB, Kukall WA, Lopez O, Galasko D, Masliah E, Woltjer R, Clark C, Trojanowski JQ, Montine TJ. Empiric refinement of the pathologic assessment of Lewy-related pathology in the dementia patient.  Brain Pathol 18:220-224, 2008. PMID 18241249.  **PMCID:  PMC2689097 NIHMS29359**

93. Raja AI, Yeaney GA, Jakacki RI, **Hamilton RL**, Pollack IF  Extraventricular neurocytoma in neurofibromatosis Type I: Case report.  J Neurosurg Pediatrics 2:63-67, 2008.PMID 18590398

94. Okada H, Low KL, Kohanbash G, McDonald HA, **Hamilton RL**, Pollack IF.  Expression of glioma-associated antigens in pediatric brain stem and non-brain stem gliomas.  J Neurooncol 88:245-50, 2008. PMID 18324354.  **PMCID:  PMC2561297 NIHMS70086**

95. Venneti S, Lopresti BJ, Wang G, **Hamilton RL**, Mathis CA, Klunk WE, Apte UM, Wiley CA. PK11195 labels activated microglia in Alzheimer's disease and in vivo in a mouse model using PET.  Neurobiol Aging 2009, 30:1217-26. PMID 18178291

96. Mullett SJ, **Hamilton RL**, Hinkle DA.  DJ-1 immunoreactivity in human brain astrocytes is dependent on infarct presence and infarct age.  Neurology 2009, 29:125-31. PMID 18647263

97. Park DM, Yeaney GA, **Hamilton RL**, Mabold J, Urban N, Appleman L, Flickinger J, Lieberman F, Mintz A.  Identifying Muir-Torre syndrome in a patient with glioblastoma multiforme.  Neuro Oncol, 2009 11:452-5. PMID 19028998.  )

98. Horbinski C, Bartynski WS, Carson-Walter E, **Hamilton RL**, Tan HP, Cheng S.  Reversible encephalopathy after cardiac transplantation:  Histologic evidence of endothelial activation, T-cell specific trafficking, and vascular endothelial growth factor expression.  Am J Neuroradiol 2008 30:588-90. PMID 18854444.

99. Northcott P, Nakahara Y, Peacock J, Ellison D, Croul S, Feuk L, Ra YS, Kongham P, Zilerberg K, Mack S, McLeod J, Scherer S, Rao S, Grajkowska W, Gillespie Y, Lach B, Grundy R, Pollack IF, **Hamilton RL,** Van Meter T, Carlotti C, Boop R, Bigner D, Gilbertson R, Rutka J, Taylor MD.  Multiple recurrent genetic events converge on control of histone lysine methylation in medulloblastoma.  Nat Genet 2009 41:465-72. PMID 19270706.

100. Ueda R, Kohanbash G, Sasaki K, Fujita M, Zhu X, Kastenhuber ER, McDonald HA, Potter DM, **Hamilton RL,** Lotze MT, Khan SA, Sobol RW, Okada H.  Dicer-regulated microRNAs 222 and 339 promote resistance of cancer cells to cytotoxic T-lymphocytes by down-regulation of ICAM-1.  Proc Natl Acad Sci U S A. 2009 Jun 30;106(26):10746-51.  PMID: 19520829

101. Maki RA, Tyurin VA, Lyon RC, **Hamilton RL**, DeKosky ST, Kagan VE, Reynolds WF.  Aberrant expression of myeloperoxidase in astrocytes promotes phospholipid oxidation and memory deficits in a mouse model of Alzheimer disease. J Biol Chem. 2009 Jan 30;284(5):3158-69. PMID: 19059911.

102. Horbinski C, **Hamilton RL**, Lovell C, Burnham J, Pollack IF.  Impact of morphology, MIB-1, p53, and MGMT on Outcome in Pilocytic Astrocytomas.  Brain Pathology 2010; 20:581-8  e-pub Sept 21, 2009

103. Armstrong RA, Ellis W, **Hamilton RL**, MacKenzie IR, Hedreen J, Gearing M, Montine T, Vonsattel JP, Head E, Lieberman AP, Cairns NJ.  Neuropathological heterogeneity in frontotemporal lobar degeneration with TDP-43 proteinopathy: a quantitative study of 94 cases using principle components analysis.  J Neural Transm 2010, 117:227-239.

**Ronald L. Hamilton, M.D.**

104. Horbinski C, **Hamilton RL**, Nikiforov Y, Pollack IF.  Association of molecular alterations, including BRAF, with biology and outcome in pilocytic astrocytomas.  Acta Neuropathol 2010 Jan 1, e-pub.

105. Van Deerlin VM, Sleiman PM, Martinez-Lage M, Chen-Plotkin A, Wang LS, Graff-Radford NR, Dickson DW, Rademakers R, Boeve BF, Grossman M, Arnold SE, Mann DM, Pickering-Brown SM, Seelaar H, Heutink P, van Swieten JC, Murrell JR, Ghetti B, Spina S, Grafman J, Hodges J, Spillantini MG, Gilman S, Lieberman AP, Kaye JA, Woltjer RL, Bigio EH, Mesulam M, Al-Sarraj S, Troakes C, Rosenberg RN, White CL 3rd, Ferrer I, Lladó A, Neumann M, Kretzschmar HA, Hulette CM, Welsh-Bohmer KA, Miller BL, Alzualde A, de Munain AL, McKee AC, Gearing M, Levey AI, Lah JJ, Hardy J, Rohrer JD, Lashley T, Mackenzie IR, Feldman HH, **Hamilton RL**, Dekosky ST, van der Zee J, Kumar-Singh S, Van Broeckhoven C, Mayeux R, Vonsattel JP, Troncoso JC, Kril JJ, Kwok JB, Halliday GM, Bird TD, Ince PG, Shaw PJ, Cairns NJ, Morris JC, McLean CA, DeCarli C, Ellis WG, Freeman SH, Frosch MP, Growdon JH, Perl DP, Sano M, Bennett DA, Schneider JA, Beach TG, Reiman EM, Woodruff BK, Cummings J, Vinters HV, Miller CA, Chui HC, Alafuzoff I, Hartikainen P, Seilhean D, Galasko D, Masliah E, Cotman CW, Tuñón MT, Martínez MC, Munoz DG, Carroll SL, Marson D, Riederer PF, Bogdanovic N, Schellenberg GD, Hakonarson H, Trojanowski JQ, Lee VM.  Common variants at 7p21 are associated with frontotemporal lobar degeneration with TDP-43 inclusions. Nat Genet 2010 42:234-239.

106. Omalu BI, **Hamilton RL**, Kamboh MI, DeKosky ST, Bailes J.  Chronic traumatic encephalopathy in a National Football League Player: Case report and emerging medicolegal practice questions.  J Forensic Nurs, 2010, 6: 40-46.

107. Caltagarone J, **Hamilton RL**, Murdoch G, Jing Z, DeFranco DB, Bowser R. Paxillin and hydrogen peroxide-induced clone 5 expression and distribution in control and Alzheimer disease hippocampi. J Neuropathol Exp Neurol. 2010: 69:356-71.

108. Pollack IF, **Hamilton RL**, Sobol RW, Nikiforova MN, Lyons-Weiler MA, Laframboise WA, Burger PC, Brat DJ, Rosenblum MK, Holmes EJ, Zhou T, Jakacki RI; for the Children's Oncology Group. IDH1 mutations are common in malignant gliomas arising in adolescents: a report from the Children's Oncology Group. Childs Nerv Syst. 2010; 27:87-94

109. Jun G, Naj AC, Beecham GW, Wang LS, Buros J, Gallins PJ, Buxbaum JD, Ertekin-Taner N, Fallin MD, Friedland R, Inzelberg R, Kramer P, Rogaeva E, St George-Hyslop P, Arnold SE, Baldwin CT, Barber R, Beach T, Bigio EH, Bird TD, Boxer A, Burke JR, Cairns N, Carroll SL, Chui HC, Clark DG, Cotman CW, Cummings JL, Decarli C, Diaz-Arrastia R, Dick M, Dickson DW, Ellis WG, Fallon KB, Farlow MR, Ferris S, Frosch MP, Galasko DR, Gearing M, Geschwind DH, Ghetti B, Gilman S, Giordani B, Glass J, Graff-Radford NR, Green RC, Growdon JH, **Hamilton RL**, Harrell LE, Head E, Honig LS, Hulette CM, Hyman BT, Jicha GA, Jin LW, Johnson N, Karlawish J, Karydas A, Kaye JA, Kim R, Koo EH, Kowall NW, Lah JJ, Levey AI, Lieberman A, Lopez OL, Mack WJ, Markesbery W, Marson DC, Martiniuk F, Masliah E, McKee AC, Mesulam M, Miller JW, Miller BL, Miller CA, Parisi JE, Perl DP, Peskind E, Petersen RC, Poon W, Quinn JF, Raskind M, Reisberg B, Ringman JM, Roberson ED, Rosenberg RN, Sano M, Schneider JA, Schneider LS, Seeley W, Shelanski ML, Smith CD, Spina S, Stern RA, Tanzi RE, Trojanowski JQ, Troncoso JC, Van Deerlin VM, Vinters HV, Vonsattel JP, Weintraub S, Welsh-Bohmer KA, Woltjer RL, Younkin SG, Cantwell LB, Dombroski BA, Saykin AJ, Reiman EM, Bennett DA, Morris JC, Lunetta KL, Martin ER, Montine TJ, Goate AM, Blacker D, Tsuang DW, Beekly D, Cupples LA, Hakonarson H, Kukull W, Foroud TM, Haines J, Mayeux R, Farrer LA, Pericak-Vance MA, Schellenberg GD; Alzheimer's Disease Genetics Consortium, Arnold SE, Baldwin CT, Barber R, Beach T, Bigio EH, Bird TD, Boxer A, Burke JR, Cairns N, Carroll SL, Chui HC, Clark DG, Cotman CW, Cummings JL, Decarli C, Diaz-Arrastia R, Dick M, Dickson DW, Ellis WG, Fallon KB, Farlow MR, Ferris S, Frosch MP, Galasko DR, Gearing M, Geschwind DH, Ghetti B, Gilman S, Giordani B, Glass J, Graff-Radford NR, Green RC, Growdon JH, Hamilton RL, Harrell LE, Head E, Honig LS, Hulette CM, Hyman BT, Jicha GA, Jin LW, Johnson N, Karlawish J, Karydas A, Kaye JA, Kim R, Koo EH, Kowall NW, Lah JJ, Levey AI, Lieberman A, Lopez OL, Mack WJ, Markesbery W, Marson DC, Martiniuk F, Masliah E, McKee AC, Mesulam M, Miller JW, Miller BL, Miller CA, Parisi JE, Perl DP, Peskind E, Petersen RC, Poon W, Quinn JF, Raskind M, Reisberg B, Ringman JM, Roberson ED, Rosenberg RN, Sano M, Schneider JA, Schneider LS, Seeley W, Shelanski ML, Smith CD, Spina S, Stern RA, Tanzi RE, Trojanowski JQ, Troncoso JC, Van Deerlin VM, Vinters HV, Vonsattel JP, Weintraub S, Welsh-Bohmer KA, Woltjer RL, Younkin SG.  Meta-analysis confirms CR1, CLU and PICALM as Alzheimer Disease Risk Loci and reveals interactions with APOE Genotypes. Arch Neurol, 2010, Sep 3 (epub ahead of print)

110. Pollack IF, **Hamilton RL**, Burger PC, Brat DJ, Rosenblum MK, Murdoch GH, Nikiforova MN, Holmes EJ, Zhou T, Cohen KJ, Jakacki RI; Children's Oncology Group. Akt activation is a common event in pediatric malignant gliomas and a potential adverse prognostic marker: a report from the Children's Oncology Group. J Neurooncol. 2010 Sep;99(2):155-63. Epub 2010 Jul 4

**Ronald L. Hamilton, M.D.**

111. Pollack IF, **Hamilton RL**, Sobol RW, Nikiforova MN, Nikiforov YE, Lyons-Weiler MA, Laframboise WA, Burger PC, Brat DJ, Rosenblum MK, Gilles FH, Yates AJ, Zhou T, Cohen KJ, Finlay JL, Jakacki RI; for the Children's Oncology Group. Mismatch repair deficiency is an uncommon mechanism of alkylator resistance in pediatric malignant gliomas: a report from the Children's Oncology Group. Pediatr Blood Cancer 2010 Jun 29 epub ahead of print

112. Bonneh-Barkay D, Wang G, Starkey A, **Hamilton RL**, Wiley CA. In vivo CHI3L1 (YKL-40) expression in astrocytes in acute and chronic neurological diseases. J Neuroinflammation 2010 Jun 11:7-34.

113. Hinkle DA, Mullett SJ, Gabris BE, **Hamilton RL**. DJ-1 expression in glioblastomas shows positive correlation with p53 expression and negative correlation with epidermal growth factor receptor amplification. Neuropathology 2010 May 19 (epub ahead of print)xx

114. Okada H, Kalinski P, Ueda R, Hoji A, Kohanbash G, Donegan TE, Mintz AH, Engh JA, Bartlett DL, Brown CK, Zeh H, Holtman MP, Reinhart TA, Whiteside TL,Butterfield LH, **Hamilton RL**, Potter DM, Pollack IF, Salazar AM, Lieberman FS. Induction of CD8+ T-cell responses against novel glioma-associated antigen peptides and clinical activity by vaccinations with {alpha}-type 1 polarized dendritic cells and polyinosinic-polycytidylic acid stabilized by lysine and carboxymethylcellulose In patients with recurrent malignant glioma. J Clin Oncol. 2011;29:330-6.PMID: 21149657

115. Kofler J, Bartynski WS, Reynolds TQ, Lieberman FS, Murdoch GH, **Hamilton RL**. Posterior reversible encephalopathy syndrome (PRES) with immune system activation, VEGF up-regulation, and cerebral amyloid angiopathy. J. Comput Assist Tomogr. 2011; 35:39-42. PMID: 21150450

116. Bonfield CM, Amin D, **Hamilton RL**, Gerszten PC. Extramedullary ependymoma near the conus medullaris with lumbar nerve root attachment: case report. Neurosurgery. 2011 Mar;68:E831-4. PMID:21311277

117. Fujita M, Kohanbash G, Fellows-Mayle W, **Hamilton RL**, Komohara Y, Decker SA, Ohlfest JR, Okada H.COX-2 blockade suppresses gliomagenesis by inhibiting myeloid-derived suppressor cells. Cancer Res. 2011 Apr 1;71:2664-74. Epub 2011 Feb 15. PMID: 21324923

118. Cohen KJ, Pollack IF, Zhou T, Buxton A, Holmes EF, Burger PC, Brat DJ, Rosenblum MK, **Hamilton RL**, Lavey RS, Heideman RL. Temozolomide in the treatment of high-grade gliomas in children: a report from the Children's Oncology Group. Neuro Oncol. 2011 Mar;13:317-23. PMID: 21339192

119. Omalu B, Bailes J, **Hamilton RL**, Kamboh MI, Hammers J, Case M, Fitzsimmons R. Emerging histomorphologic phenotypes of chronic traumatic encephalopathy in American athletes. Neurosurgery. 2011 Jul;69:173-83; discussion 183. PMID: 21358359

120. Tang JB, Svilar D, Trivedi RN, Wang XH, Goellner EM, Moore B, **Hamilton RL**, Banze LA, Brown AR, Sobol RW. N-methylpurine DNA glycosylase and DNA polymerase beta modulate BER inhibitor potentiation of glioma cell to temozolomide. Neurosurgery Oncol. 2011;13:471-86. PMID: 21377995

121. Liu KW, Feng H, Bachoo R, Kazlauskas A, Smith EM, Symes K, **Hamilton RL**, Nagane M, Nishikawa R, Hu, B, Cheng Sy. SHP-2/PTPN 11 mediates gliomagenesis driven by PDGFRA and INK4A/ARF aberrations in mice and humans. J. Clin Invest. 2011 Mar;121:905-17. PMID: 21393858

122. Naj AC, Jun G, Beecham GW, Wang LS, Vardarajan BN, Buros J, Gallins PJ, Buxbaum JD, Jarvidk GP, Crane PK, Larson EB, Bird TB, Boeve BF, Graff-Radford NR, De Jager PL, Evans D, Schneider JA, Carrasquillo MM, Ertekin-Taner N, Younkin SG, Cruchaga C, Kauwe JS, Nowotny P, Kramer P, Hardy J, Huentelman MJ, Myers AJ, Barmada MM, Demirci FY, Baldwin CT, Green RC, Rogaeva E, St. George-Hyslop P, Arnold SE, Barber R, Beach T, Bigio EH, Bowen JD, Boxer A, Burke JR, Cairns NJ, Carlson CS, Carney RM, Carroll SL, Chui HC, Clark DG, Corneveaux J, Cotman CW, Cummings JL, Decarli C, DeKosy ST, Diaz-Arrastia R, Dick M, Dickson DW, Ellis WG, Faber KM, Fallon KB, Farlow MR, Ferris S. Frosch MP, Galasko Dr, Ganguli M, Gearing M, Geschwind DH, Ghetti B, Gilbert JR, Gilman S, Giordani B, Glass JD, Growdon JH, **Hamilton RL**,R, Koo EH, Kowall NW, Lah JJ, Levey AI, Lieberman AP, Lopez OL, Mack WJ, Marson DC, Martiniuk F, Mash DC, Masliah E, McCormick WC, McCurry SM, McDavid AN, McKee AC, Mesulam M, Miller BL, Miller JW, Parisi JE, Perl DP, Peskind E,Petersen, RC, Poon, WV, Quinn JF, Rajbhandary RA, Raskind M, Reisberg B, Ringman JM, Roberson ED, Rosenberg RN,Sano M, Schneider LS, Seeley W, Shelanksi ML, Slifer MA, Smith CD, Sonnen JA, Spina S. Stern RA, Tanzi RE, Trojanowski JQ, Troncoso JC, Van Deerlin VM, Vinters HV, Vonsattel JP, Weintraub S, Welsh-Bohmer KA, Williamson

**Ronald L. Hamilton, M.D.**

J, Woltjer RL,Cantwell LB, Dombroski BA, Beekly D, Lunetta KL, Martin ER, Kamboh MI, Saykin AJ, Reiman EM, Bennett DA, Morris JC, Montine TJ, Goate AM, lacker D, Tsuang DW, Hakonarson, H, Kukull WA, Foroud TM, Haines JL, Mayeux R, Pericak-Vance MA, Farrer LA, Schellenberg GD. Commons variants as MS4A4/MS4A6E, CD2AP, CD33 and EPHA1 are associated with late Onset Alzheimer's Disease. Nat Genet. 2011 May;43:436-41 Epub 2011 Apr 3. PMID: 21460841

123.    Chen-Plotkin AS, Martinez-Lage M,Sleiman PM, Hu W, Greene R, Wood EM, Bing S, Grossman M, Schellenberg GD, Hatanpaa KJ, Weiner MF, White CL 3rd, Brooks WS, Halliday GM, Kril JJ, Gearing M, Beach TG, Graff-Radford NR, Dickson DW, Rademakers R, Boeve BF, Pickering-Brown SM, Snowden J, van Swieten JC, Heutink P, Seelaar H, Murrell JR, Ghetti B, Spina S, Grafman J, Kaye JA, Woltjer RL, Mesulam M, Bigio E, Llad'o A, Miller BL, Alzualde A, Moreno F,Rohrer JD, Mackenzie IR, Feldman HH, **Hamilton RL**, Cruts M, Engelborghs S, De Deyn PP, Van Broeckhoven C, Bird TD, Cairns NJ, Goate A, Frosch MP, Riederer PF, Bogdanovic N, Lee VM, Trojanowksi JQ, Van Deerlin VM. Genetic and clinical features of progranulin-associated frontotemporal lobar degeneration. Arch Neurol. 2011 Apr;68:488-97. PMID: 21482928

124.    Nikiforova MN, **Hamilton RL**. Molecular diagnostics of gliomas. Arch Pathol Lab Med. 2011 May;135:558-68. Review. PMID: 21526954

125.    Monaco EA 3rd, Armah HB, Nikiforova MN, **Hamilton RL**, Engh JA. Grade II Oligodendroglioma localized to the corpus callosum. Brain Tumor Pathol. 2011 Oct;28:305-9. Epub 2011 Jul 22. PMID: 21833577

126.    Horbinski C, Hobbs, J, Cieply K, Dacic S, **Hamilton RL.** EGFR expression stratifies oligodendroglioma behavior.Am J Pathol. 2011 Oct; 179:1638-44. Epub 2011 Aug 11. PMID: 21839716

127.    Omalu B, hammers, JL, bailes J**, Hamilton RL**. Kamboh MI, Webster G, Fitzsimmons RP. Chronic traumatic Encephalopathy in an Iraqi war veteran with posttraumatic stress disorder who committed suicide. Neurosurg Focus. 2011 Nov; :E3. PMID: 22044102

128.    Liu Y, Komohara Y, Domenick N, Ohno M, Ikeura M, **Hamilton RL**, Horbinski C, Wang X, Ferrone S, Okada H. Expression of antigen processing molecules in brain metastasis of breast cancer. Cancer Immunol Immunother. 2011 Nov 8. (Epub ahead of print } PMID:22065046

129.    Feng H, Hu B, Liu KW, Li Y, Lu X, Cheng T, Yiin JJ, Lu S, Keezer S, Fenton T, Furnari FB, **Hamilton RL**, Vuori K, Sarkaria JN, Nagane M, Nishikawa R, Cavenee WK, Cheng SY. Activation of Rac 1 by src-dependent phosphorylation of Dock180(Y1811) mediates PDGFRa-stimulated glioma tumorigenesis in mice and humans. J Clin Invest. 2011 Dec; 121:4670-84. doi: 10.1172/JCI58559. Epub 2011 Nov 14. PMID: 22080864

130.    Horbinski C, Nikiforova MN, Hobbs J, Bortoluzzi S. Cieply K, Dacic S, **Hamilton RL**. The importance of 10q status in an outcomes-based comparison between 1p/19q fluorescence in situ hybridization and polymerase chain reaction-based microsatellite loss of heterozygosity analysis of oligodendrogliomas. J. Neuropathol Exp Neurol. 2012 Jan;71:73-82. PMID: 22157622

131.    Ikonomovic MD, Abrahamson EE, Price JC, **Hamilton RL**, Mathis CA, Paljug WR, Cohen AD, Mizukami K, DeKosky ST, Lopez OL, Klunk WE. Early AD pathology in a {C-11} PiB-negative case: a PiB-amyloid imaging, biochemical, and Immunohistochemical study. Acta Neuropathol. 2012 Mar;123:433-47. Epub 2012 Jan 24. PMID: 22271153

132.    Feng H, Hu B, Jarzynka MJ, Li Y, Keezer S, Johns TG, Tang CK, **Hamilton RL**, Vuuori K, Nishikawa R, Sarkaria JN, Fenton T, Cheng T, Furnari FB, Cavenee WK, Cheng SY. Phosphorylation of dedicator of cytokinesis 1(Dock 180) at tyrosine residue Y722 by Src family kinases mediates EGRFvIII-driven glioblastoma tumorigenesis. Proc Natl Acad Sci U S A. 2012 Feb 21;109:3018-23. Epub 2012 Feb 7. PMID: 22323579

133.    Wu Y, Lou H, Alerte TN, Stachowski EK, Chen J, Singleton AB, **Hamilton RL**, Perez RG. Neuroscience. 2012 Jan 25. {Epubahead a print} PMID: 22326202

134.    Murray PS, Kirkwood CM, Gray MC, Ikonomovic MD, Paljug WR, Abrahamson EE, Henteleff RA, **Hamilton RL**, Kofler JK, Klunk WE, Lopez OL, Penzes P, Sweet RA. β-Amyloid 42/40 ratio and kalirin expression in Alzheimer disease with psychosis. Neurobiol Aging. 2012 Mar 17. [Epub ahead of print] PMID:22429885

**Ronald L. Hamilton, M.D.**

135.    Choi SH, Olabarrieta M, Lopez OL, Maruca V, DeKosky ST, **Hamilton RL**, Becker JT. Gray Matter Atrophy Associated with Extrapyramidal Signs in the Lewy Body Variant of Alzheimer's Disease. J Alzheimers Dis. 2012 Aug 9. [Epub ahead of print] PMID:22886020

136.    Armstrong RA, **Hamilton RL**, Mackenzie IR, Hedreen J, Cairns NJ. Laminar Distribution of the Pathological Changes in Sporadic Frontotemporal Lobar Degeneration with TDP-43 Proteinopathy: A Quantitative Study Using Polynomial Curve Fitting. Neuropathol Appl Neurobiol. 2012 Jul 16. [Epub ahead of print] PMID:22804696

137.    Atkinson DM, **Hamilton RL** A 52-year-old male with visual changes. Brain Pathol. 2012 Jul;22(4):575-8. PMID:22697384

138.    Zou F, Chai HS, Younkin CS, Allen M, Crook J, Pankratz VS, Carrasquillo MM, Rowley CN, Nair AA, Middha S, Maharjan S, Nguyen T, Ma L, Malphrus KG, Palusak R, Lincoln S, Bisceglio G, Georgescu C, Kouri N, Kolbert CP, Jen J, Haines JL, Mayeux R, Pericak-Vance MA, Farrer LA, Schellenberg GD; Alzheimer's Disease Genetics Consortium, Petersen RC, Graff-Radford NR, Dickson DW, **Hamilton RL**, Younkin SG, Ertekin-Taner N. Brain expression genome-wide association study (eGWAS) identifies human disease-associated variants. PLoS Genet. 2012;8(6): e1002707. Epub 2012 Jun 7 PMID:22685416

139.    Horbinski C, Nikiforova MN, Hagenkord JM, **Hamilton RL**, Pollack IF. Interplay among BRAF, p16, p53, and MIB1 in pediatric low-grade gliomas. Neuro Oncol. 2012 Jun;14(6):777-89 (1012) PMID:22492957

140.    Hobbs J, Nikiforova MN, Fardo DW, Bortoluzzi S, Cieply K, **Hamilton RL**, Horbinski C. Paradoxical relationship between the degree of EGFR amplification and outcome in glioblastomas. Am J Surg Pathol. 2012 Aug;36(8):1186-93. PMID:22472960

141. Armstrong, R. A., **R. L. Hamilton**, I. R. Mackenzie, J. Hedreen and N. J. Cairns. "Laminar Distribution of the Pathological Changes in Sporadic Frontotemporal Lobar Degeneration with Transactive Response (Tar) DNA-Binding Protein of 43 Kda (Tdp-43) Proteinopathy: A Quantitative Study Using Polynomial Curve Fitting." *Neuropathol Appl Neurobiol* 39, no. 4 (2013): 335-47.

142. Clark, K. H., J. L. Villano, M. N. Nikiforova, **R. L. Hamilton** and C. Horbinski. "1p/19q Testing Has No Significance in the Workup of Glioblastomas." *Neuropathol Appl Neurobiol*, (2013).

143. Gheorghe, G., O. Radu, S. Milanovich, **R. L. Hamilton**, R. Jaffe, J. F. Southern and J. A. Ozolek. "Pathology of Central Nervous System Posttransplant Lymphoproliferative Disorders: Lessons from Pediatric Autopsies." *Pediatr Dev Pathol* 16, no. 2 (2013): 67-73.

1444. Holton, P., M. Ryten, M. Nalls, D. Trabzuni, M. E. Weale, D. Hernandez, H. Crehan, J. R. Gibbs, R. Mayeux, J. L. Haines, L. A. Farrer, M. A. Pericak-Vance, G. D. Schellenberg, M. Ramirez-Restrepo, A. Engel, A. J. Myers, J. J. Corneveaux, M. J. Huentelman, A. Dillman, M. R. Cookson, E. M. Reiman, A. Singleton, J. Hardy and R. Guerreiro. "Initial Assessment of the Pathogenic Mechanisms of the Recently Identified Alzheimer Risk Loci." *Ann Hum Genet* 77, no. 2 (2013): 85-105.

145. Miyashita, A., A. Koike, G. Jun, L. S. Wang, S. Takahashi, E. Matsubara, T. Kawarabayashi, M. Shoji, N. Tomita, H. Arai, T. Asada, Y. Harigaya, M. Ikeda, M. Amari, H. Hanyu, S. Higuchi, T. Ikeuchi, M. Nishizawa, M. Suga, Y. Kawase, H. Akatsu, K. Kosaka, T. Yamamoto, M. Imagawa, T. Hamaguchi, M. Yamada, T. Moriaha, M. Takeda, T. Takao, K. Nakata, Y. Fujisawa, K. Sasaki, K. Watanabe, K. Nakashima, K. Urakami, T. Ooya, M. Takahashi, T. Yuzuriha, K. Serikawa, S. Yoshimoto, R. Nakagawa, J. W. Kim, C. S. Ki, H. H. Won, D. L. Na, S. W. Seo, I. Mook-Jung, P. St George-Hyslop, R. Mayeux, J. L. Haines, M. A. Pericak-Vance, M. Yoshida, N. Nishida, K. Tokunaga, K. Yamamoto, S. Tsuji, I. Kanazawa, Y. Ihara, G. D. Schellenberg, L. A Farrer and R. Kuwano. "Sorl1 Is Genetically Associated with Late-Onset Alzheimer's Disease in Japanese, Koreans and Caucasians." *PLoS One* 8, no. 4 (2013): e58618.

146. Pang, B., M. B. Durso, **R. L. Hamilton** and M. N. Nikiforova. "A Novel Cold-Pcr/Fmca Assay Enhances the Detection of Low-Abundance Idh1 Mutations in Gliomas." *Diagn Mol Pathol* 22, no. 1 (2013): 28-34.

147. Reitz, C., G. Jun, A. Naj, R. Rajbhandary, B. N. Vardarajan, L. S. Wang, O. Valladares, C. F. Lin, E. B. Larson, N. R. Graff-Radford, D. Evans, P. L. De Jager, P. K. Crane, J. D. Buxbaum, J. R. Murrell, T. Raj, N. Ertekin-Taner, M. Logue, C. T. Baldwin, R. C. Green, L. L. Barnes, L. B. Cantwell, M. D. Fallin, R. C. Go, P. Griffith, T. O. Obisesan, J. J. Manly, K. L. Lunetta, M. I. Kamboh, O. L. Lopez, D. A. Bennett, H. Hendrie, K. S. Hall, A. M. Goate, G. S. Byrd, W. A. Kukull, T. M. Foroud, J. L. Haines, L. A. Farrer, M. A. Pericak-Vance, G. D. Schellenberg and R. Mayeux. "Variants

**Ronald L. Hamilton, M.D.**

in the Atp-Binding Cassette Transporter (Abca7), Apolipoprotein E 4,and the Risk of Late-Onset Alzheimer Disease in African Americans." *JAMA* 309, no. 14 (2013): 1483-92.

148. Schlegel, J., M. J. Sambade, S. Sather, S. J. Moschos, A. C. Tan, A. Winges, D. DeRyckere, C. C. Carson, D. G. Trembath, J. J. Tentler, S. G. Eckhardt, P. F. Kuan, **R. L. Hamilton**, L. M. Duncan, C. R. Miller, N. 9. Nikolaishvili-Feinberg, B. R. Midkiff, J. Liu, W. Zhang, C. Yang, X. Wang, S. V. Frye, H. S. Earp, J. M. Shields and D. K. Graham. "Mertk Receptor Tyrosine Kinase Is a Therapeutic Target in Melanoma." *J Clin Invest* 123, no. 5 (2013): 2257-67.

150. Spina, S., A. D. Van Laar, J. R. Murrell, **R. L. Hamilton**, J. K. Kofler, F. Epperson, M. R. Farlow, O. L. Lopez, J. Quinlan, S. T. DeKosky and B. Ghetti. "Phenotypic Variability in Three Families with Valosin-Containing Protein Mutation." *Eur J Neurol* 20, no. 2 (2013): 251-8.

151. Tsuang, D., J. B. Leverenz, O. L. Lopez, **R. L. Hamilton,** D. A. Bennett, J. A. Schneider, A. S. Buchman, E. B. Larson, P. K. Crane, J. A. Kaye, P. Kramer, R. Woltjer, J. Q. Trojanowski, D. Weintraub, A. S. Chen-Plotkin, D. J. Irwin, J. Rick, G. D. Schellenberg, G. S. Watson, W. Kukull, P. T. Nelson, G. A. Jicha, J. H. Neltner, D. Galasko, E. Masliah, J. F. Quinn, K. A. Chung, D. Yearout, I. F. Mata, J. Y. Wan, K. L. Edwards, T. J. Montine and C. P. Zabetian. "Apoe Epsilon4 Increases Risk for Dementia in Pure Synucleinopathies." *JAMA Neurol* 70, no. 2 (2013): 223-8.

152. Yeung, J. T., **R. L. Hamilton**, K. Ohnishi, M. Ikeura, D. M. Potter, M. N. Nikiforova, S. Ferrone, R. I. Jakacki, I. F. Pollack and H. Okada. "Loh in the Hla Class I Region at 6p21 Is Associated with Shorter Survival in Newly Diagnosed Adult Glioblastoma." *Clin Cancer Res* 19, no. 7 (2013): 1816-26.

153. Yeung, J. T., **R. L. Hamilton**, H. Okada, R. I. Jakacki and I. F. Pollack. "Increased Expression of Tumor-Associated Antigens in Pediatric and Adult Ependymomas: Implication for Vaccine Therapy." *J Neurooncol* 111, no. 2 (2013): 103-11.

**154. Hamilton R**, Krauze M, Romkes M, Omolo B, Konstantinopoulos P, Reinhart T, Harasymczuk M, Wang Y, Lin Y, Ferrone S, Whiteside T, Bortoluzzi S, Werley J, Nukui T, Fallert-Junecko B, Kondziolka D, Ibrahim J, Becker D, Kirkwood J, Moschos S. Pathologic and gene expression features of metastatic melanomas to the brain.Cancer. 2013 Aug 1;119(15):2737-46. doi: 10.1002/cncr.28029. Epub 2013 May 21.PMID:23695963 [PubMed - in process]

155. Lam S, Grandhi R, Wong R, **Hamilton R**, Greene S. Neuromuscular hamartoma of the sciatic nerve: Case report and review of the literature. Surg Neurol Int. 2013;4:8. doi: 10.4103/2152-7806.106266. Epub 2013 Jan 18.PMID:23493803[PubMed]

156. Reitz C, Mayeux R; Alzheimer's Disease Genetics Consortium. TREM2 and neurodegenerative disease. N Engl J Med. 2013 Oct 17;369(16):1564-5. doi: 10.1056/NEJMc1306509#SA1. PMID:24131184

157. Tempel ZJ, Johnson SA, Richard PS, Friedlander RM, Rothfus WE, **Hamilton RL**. Parasellar arachnoid cyst presenting with a nonpupil sparing third nerve palsy mimicking a posterior communicating artery aneurysm in an adult. Surg Neurol Int. 2013 Jul 9;4:87. doi: 10.4103/2152-7806.114799. eCollection 2013.PMID:23956930

158. Murray PS, Kirkwood CM, Gray MC, Fish KN, Ikonomovic MD, **Hamilton RL**, Kofler JK, Klunk WE, Lopez OL, Sweet RA. Hyperphosphorylated tau is elevated in Alzheimer's Disease with psychosis. J Alzheimers Dis, 2014 204;39:759-773. PMID:24270207

159. Oborski MJ, Laymon CM, Lieberman FS, Drappatz J, **Hamilton RL**, Mountz JM. First use of (18)F-labeled ML-10 PET to assess apoptosis change in a newly diagnosed glioblastoma multiforme patient before and early after therapy. Brain Behav 2014 4:312-315. PMID:24683522

160 Shin SS, Murdoch G, Hamilton RL, Faraji AH, Kano H, Zwagerman NT, Gardner PA, Lunsford LD, Friedlander RM The Pathological Response of Cavernous Malformations Following Radiosurgery. J Neurosurg (in press).

160. Pollack IF, Jakacki RI, Butterfield LH, **Hamilton RL**, Panigrahy A, Potter DM, Connelly AK, Dibridge SA, Whiteside TL, Okada H. Antigen-specific immune responses and clinical outcome after vaccination with glioma-associated antigen peptides and polyinosinic-polycytidylic Acid stabilized by lysine and carboxymethylcellulose in children with newly diagnosed malignant brainstem and nonbrainstem gliomas. J Clin Oncol. 2014 Jul 1;32(19):2050-8. PMID:24888813

161. Naj AC, Jun G, Reitz C, Kunkle BW, Perry W, Park YS, Beecham GW, Rajbhandary RA, Hamilton-Nelson KL, Wang LS, Kauwe JS, Huentelman MJ, Myers AJ, Bird TD, Boeve BF, Baldwin CT, Jarvik GP, Crane PK, Rogaeva E, Barmada MM, Demirci FY, Cruchaga C, Kramer PL, Ertekin-Taner N, Hardy J, Graff-Radford NR, Green RC, Larson

**Ronald L. Hamilton, M.D.**

EB, St George-Hyslop PH, Buxbaum JD, Evans DA, Schneider JA, Lunetta KL, Kamboh MI, Saykin AJ, Reiman EM, De Jager PL, Bennett DA, Morris JC, Montine TJ, Goate AM, Blacker D, Tsuang DW, Hakonarson H, Kukull WA, Foroud TM, Martin ER, Haines JL, Mayeux RP, Farrer LA, Schellenberg GD, Pericak-Vance MA; Alzheimer Disease Genetics Consortium, Albert MS, Albin RL, Apostolova LG, Arnold SE, Barber R, Barnes LL, Beach TG, Becker JT, Beekly D, Bigio EH, Bowen JD, Boxer A, Burke JR, Cairns NJ, Cantwell LB, Cao C, Carlson CS, Carney RM, Carrasquillo MM, Carroll SL, Chui HC, Clark DG, Corneveaux J, Cribbs DH, Crocco EA, DeCarli C, DeKosky ST, Dick M, Dickson DW, Duara R, Faber KM, Fallon KB, Farlow MR, Ferris S, Frosch MP, Galasko DR, Ganguli M, Gearing M, Geschwind DH, Ghetti B, Gilbert JR, Glass JD, Growdon JH, **Hamilton RL**, Harrell LE, Head E, Honig LS, Hulette CM, Hyman BT, Jicha GA, Jin LW, Karydas A, Kaye JA, Kim R, Koo EH, Kowall NW, Kramer JH, LaFerla FM, Lah JJ, Leverenz JB, Levey AI, Li G, Lieberman AP, Lin CF, Lopez OL, Lyketsos CG, Mack WJ, Martiniuk F, Mash DC, Masliah E, McCormick WC, McCurry SM, McDavid AN, McKee AC, Mesulam M, Miller BL, Miller CA, Miller JW, Murrell JR, Olichney JM, Pankratz VS, Parisi JE, Paulson HL, Peskind E, Petersen RC, Pierce A, Poon WW, Potter H, Quinn JF, Raj A, Raskind M, Reisberg B, Ringman JM, Roberson ED, Rosen HJ, Rosenberg RN, Sano M, Schneider LS, Seeley WW, Smith AG, Sonnen JA, Spina S, Stern RA, Tanzi RE, Thornton-Wells TA, Trojanowski JQ, Troncoso JC, Valladares O, Van Deerlin VM, Van Eldik LJ, Vardarajan BN, Vinters HV, Vonsattel JP, Weintraub S, Welsh-Bohmer KA, Williamson J, Wishnek S, Woltjer RL, Wright CB, Younkin SG, Yu CE, Yu L. .  Effects of multiple genetic Loci on age at onset in late-onset Alzheimer disease: a genome-wide association study.   JAMA Neurol. 2014 Nov 1;71(11):1394-404. doi: 10.1001/jamaneurol.2014.1491

162. Pollack IF, Jakacki RI, Butterfield LH, **Hamilton H**, Panigrahy A, Potter DM, Connelly AK, Dibridge SA, Whiteside TL, Okada H.  Antigen-specific immune responses and clinical outcome after vaccination with glioma-associated antigen peptides and polyinosinic-polycytidylic acid stabilized by lysine and carboxymethylcellulose in children with newly diagnosed malignant brainstem and nonbrainstem gliomas.   J Clin Oncol. 2014 Jul 1;32(19):2050-8. doi: 10.1200/JCO.2013.54.0526. Epub 2014 Jun 2. PMID: 24888813

163.. Okada H, Butterfield LH, **Hamilton RL**, Hoji A, Sakaki M, Ahn BJ, Kohanbash G, Drappatz J, Engh J, Amankulor N, Lively MO, Chan MD, Salazar AM, Shaw EG, Potter DM, Lieberman FS.  Induction of robust type-1 CD8+ T-cell responses in WHO grade II low-grade glioma patients receiving peptide-based vaccines in combination with poly-ICLC Clin Cancer Res. 2014 Nov 25. pii: clincanres.1790.2014

164. Salloway S, Sperling R, Fox NC, Blennow K, Klunk W, Raskind M, Sabbagh M, Honig LS, Porsteinsson AP, Ferris S, Reichert M, Ketter N, Nejadnik B, Guenzler V, Miloslavsky M, Wang D, Lu Y, Lull J, Tudor IC, Liu E, Grundman M, Yuen E, Black R, Brashear HR; **Hamilton RL**,  Bapineuzumab 301 and 302 Clinical Trial Investigators. Two phase 3 trials of bapineuzumab in mild-to-moderate Alzheimer's disease  N Engl J Med. 2014 Jan 23;370(4):322-33. doi: 10.1056/NEJMoa1304839.

165. Leone JP, Bhargava R, Theisen BK, **Hamilton RL**, Lee AV, Brufsky AM. Expression of high affinity folate receptor in breast cancer brain metastasis. Oncotarget. 2015 Jun 25. [Epub ahead of print]  PMID: 24450891

166.  Wang LS, Naj AC, Graham RR, Crane PK, Kunkle BW, Cruchaga C, Murcia JD, Cannon-Albright L, Baldwin CT, Zetterberg H, Blennow K, Kukull WA, Faber KM, Schupf N, Norton MC, Tschanz JT, Munger RG, Corcoran CD, Rogaeva E; Alzheimer's Disease Genetics Consortium, Lin CF, Dombroski BA, Cantwell LB, Partch A, Valladares O, Hakonarson H, St George-Hyslop P, Green RC, Goate AM, Foroud TM, Carney RM, Larson EB, Behrens TW, Kauwe JS, Haines JL, Farrer LA, Pericak-Vance MA, Mayeux R, Schellenberg GD; National Institute on Aging-Late-Onset Alzheimer's Disease (NIA-LOAD) Family Study, Albert MS, Albin RL, Apostolova LG, Arnold SE, Barber R, Barmada M, Barnes LL, Beach TG, Becker JT, Beecham GW, Beekly D, Bennett DA, Bigio EH, Bird TD, Blacker D, Boeve BF, Bowen JD, Boxer A, Burke JR, Buxbaum JD, Cairns NJ, Cao C, Carlson CS, Carroll SL, Chui HC, Clark DG, Cribbs DH, Crocco EA, DeCarli C, DeKosky ST, Demirci FY, Dick M, Dickson DW, Duara R, Ertekin-Taner N, Fallon KB, Farlow MR, Ferris S, Frosch MP, Galasko DR, Ganguli M, Gearing M, Geschwind DH, Ghetti B, Gilbert JR, Glass JD, Graff-Radford NR, Growdon JH, **Hamilton RL**, Hamilton-Nelson KL, Harrell LE, Head E, Honig LS, Hulette CM, Hyman BT, Jarvik GP, Jicha GA, Jin LW, Jun G, Jun G, Kamboh MI, Karydas A, Kaye JA, Kim R, Koo EH, Kowall NW, Kramer JH, LaFerla FM, Lah JJ, Leverenz JB, Levey AI, Li G, Lieberman AP, Lopez OL, Lunetta KL, Lyketsos CG, Mack WJ, Marson DC, Martin ER, Martiniuk F, Mash DC, Masliah E, McCormick WC, McCurry SM, McDavid AN, McKee AC, Mesulam WM, Miller BL, Miller CA, Miller JW, Montine TJ, Morris JC, Murrell JR, Olichney JM, Parisi JE, Perry W, Peskind E, Petersen RC, Pierce A, Poon WW, Potter H, Quinn JF, Raj A, Raskind M, Reiman EM, Reisberg B, Reitz C, Ringman JM, Roberson ED, Rosen HJ, Rosenberg RN, Sano M, Saykin AJ, Schneider JA, Schneider LS, Seeley WW, Smith AG, Sonnen JA, Spina S, Stern RA, Tanzi RE, Thornton-Wells TA, Trojanowski JQ, Troncoso JC, Tsuang DW, Van Deerlin VM, Van Eldik LJ, Vardarajan BN, Vinters HV, Vonsattel JP, Weintraub S, Welsh-Bohmer KA, Williamson J, Wishnek S, Woltjer RL, Wright CB, Younkin SG, Yu CE, Yu L.**Rarity of the Alzheimer disease-protective APP A673T variant in the United States.** JAMA Neurol. 2015 Feb;72(2):209-16. doi: 10.1001/jamaneurol.2014.2157.

**Ronald L. Hamilton, M.D.**

167. 2. Jun G, Ibrahim-Verbaas CA, Vronskaya M, Lambert JC, Chung J, Naj AC, Kunkle BW, Wang LS, Bis JC, Bellenguez C, Harold D, Lunetta KL, Destefano AL, Grenier-Boley B, Sims M, Beecham GW, Smith AV, Chouraki V, Hamilton-Nelson KL, Ikram MA, Fievet N, Denning N, Martin ER, Schmidt H, Kamatani Y, Dunstan ML, Valladares O, Laza AR, Zelenika D, Ramirez A, Foroud TM, Choi SH, Boland A, Becker T, Kukull WA, van der Lee SJ, Pasquier F, Cruchaga C, Beekly D, Fitzpatrick AL, Hanon O, Gill M, Barber R, Gudnason V, Campion D, Love S, Bennett DA, Amin N, Berr C, Tsolaki M, Buxbaum JD, Lopez OL, Deramecourt V, Fox NC, Cantwell LB, Tárraga L, Dufouil C, Hardy J, Crane PK, Eiriksdottir G, Hannequin D, Clarke R, Evans D, Mosley TH Jr, Letenneur L, Brayne C, Maier W, De Jager P, Emilsson V, Dartigues JF, Hampel H, Kamboh MI, de Bruijn RF, Tzourio C, Pastor P, Larson EB, Rotter JI, O'Donovan MC, Montine TJ, Nalls MA, Mead S, Reiman EM, Jonsson PV, Holmes C, St George-Hyslop PH, Boada M, Passmore P, Wendland JR, Schmidt H, Morgan K, Winslow AR, Powell JF, Carasquillo M, Younkin SG, Jakobsdóttir J, Kauwe JS, Wilhelmsen KC, Rujescu D, Nöthen MM, Hofman A, Jones L; IGAP Consortium, Haines JL, Psaty BM, Van Broeckhoven C, Holmans P, Launer LJ, Mayeux R, Lathrop M, Goate AM, Escott-Price V, Seshadri S, Pericak-Vance MA, Amouyel P, Williams J, van Duijn CM, Schellenberg GD, Farrer LA and . Collaborators (including **Hamilton RL**) (296)  **A novel Alzheimer disease locus located near the gene encoding tau protein**. Mol Psychiatry. 2015 Mar 17. doi: 10.1038/mp.2015.23.

168. . Østergaard SD, Mukherjee S, Sharp SJ, Proitsi P, Lotta LA, Day F, Perry JR, Boehme KL, Walter S, Kauwe JS, Gibbons LE; Alzheimer's Disease Genetics Consortium; GERAD1 Consortium; EPIC-InterAct Consortium, Larson EB, Powell JF, Langenberg C, Crane PK, Wareham NJ, Scott RA.
Collaborators (including **Hamilton RL**) (296)  Associations between Potentially Modifiable Risk Factors and Alzheimer Disease: A Mendelian Randomization Study. PLoS Med. 2015 Jun 16;12(6):e1001841; discussion e1001841. doi:

169. Wang P, Bahreini A, Gyanchandani R, Lucas PC, Hartmaier RJ, Watters RJ, Jonnalagadda AR, Trejo Bittar HE, Berg A, **Hamilton RL**, Kurland BF, Weiss KR, Mathew A, Leone JP, Davidson NE, Nikiforova MN, Brufsky AM, Ambros TF, Stern AM, Puhalla SL, Lee AV, Oesterreich S. Sensitive detection of mono- and polyclonal ESR1 mutations in primary tumors, metastatic lesions and cell free DNA of breast cancer patients. Clin Cancer Res. 2015 Oct 23. pii: 1534.2015. PMID: 26500237

170. Salgado CM, Basu D, Nikiforova M, **Hamilton RL**, Gehris R, Jakacki R, Panigrahy A, Yatsenko S, Reyes-Múgica M. Amplification of mutated NRAS leading to congenital melanoma in neurocutaneous melanocytosis. Melanoma Res. 2015 Oct;25(5):453-60.  PMID: 26266759

171. Shin SS, Murdoch G, Hamilton RL, Faraji AH, Kano H, Zwagerman NT, Gardner PA, Lunsford LD, Friedlander RM. Pathological response of cavernous malformations following radiosurgery. J Neurosurg. 2015 Oct;123(4):938-44. doi: 10.3171/2014.10.JNS14499. Epub 2015 Jun 19. PMID: 26090838

--------------------

172. Mukherjee S, Walter S, Kauwe JS, Saykin AJ, Bennett DA, Larson EB, Crane PK, Glymour MM; Adult Changes in Thought Study Investigators; Religious Orders Study/Memory and Aging Project Investigators; Alzheimer's Disease Genetics Consortium. Alzheimers Dement. Genetically predicted body mass index and Alzheimer's disease-related phenotypes in three large samples: Mendelian randomization analyses. 2015 Dec;11(12):1439-51. doi: 10.1016/j.jalz.2015.05.015. Epub 2015 Jun 12. PMID: 26079416

173. Ghani M, Reitz C, Cheng R, Vardarajan BN, Jun G, Sato C, Naj A, Rajbhandary R, Wang LS, Valladares O, Lin CF, Larson EB, Graff-Radford NR, Evans D, De Jager PL, Crane PK, Buxbaum JD, Murrell JR, Raj T, Ertekin-Taner N, Logue M, Baldwin CT, Green RC, Barnes LL, Cantwell LB, Fallin MD, Go RC, Griffith PA, Obisesan TO, Manly JJ, Lunetta KL, Kamboh MI, Lopez OL, Bennett DA, Hendrie H, Hall KS, Goate AM, Byrd GS, Kukull WA, Foroud TM, Haines JL, Farrer LA, Pericak-Vance MA, Lee JH, Schellenberg GD, St George-Hyslop P, Mayeux R, Rogaeva E; Alzheimer's Disease Genetics Consortium. Association of Long Runs of Homozygosity With Alzheimer Disease Among African American Individuals. JAMA Neurol. 2015 Nov;72(11):1313-23. doi: 10.1001/jamaneurol.2015.1700. PMID: 26366463

174. Nikiforova MN, Wald AI, Melan MA, Roy S, Zhong S, Hamilton RL, Lieberman FS, Drappatz J, Amankulor NM, Pollack IF, Nikiforov YE, Horbinski C.
Targeted next-generation sequencing panel (GlioSeq) provides comprehensive genetic profiling of central nervous system tumors. Neuro Oncol. 2016 Mar;18(3):379-87. doi: 10.1093/neuonc/nov289. Epub 2015 Dec 17. PMID: 2668176

175. Morrissy AS, Garzia L, Shih DJ, Zuyderduyn S, Huang X, Skowron P, Remke M, Cavalli FM, Ramaswamy V, Lindsay PE, Jelveh S, Donovan LK, Wang X, Luu B, Zayne K, Li Y, Mayoh C, Thiessen N, Mercier E, Mungall KL, Ma

**Ronald L. Hamilton, M.D.**

Y, Tse K, Zeng T, Shumansky K, Roth AJ, Shah S, Farooq H, Kijima N, Holgado BL, Lee JJ, Matan-Lithwick S, Liu J, Mack SC, Manno A, Michealraj KA, Nor C, Peacock J, Qin L, Reimand J, Rolider A, Thompson YY, Wu X, Pugh T, Ally A, Bilenky M, Butterfield YS, Carlsen R, Cheng Y, Chuah E, Corbett RD, Dhalla N, He A, Lee D, Li HI, Long W, Mayo M, Plettner P, Qian JQ, Schein JE, Tam A, Wong T, Birol I, Zhao Y, Faria CC, Pimentel J, Nunes S, Shalaby T, Grotzer M, Pollack IF, Hamilton RL, Li XN, Bendel AE, Fults DW, Walter AW, Kumabe T, Tominaga T, Collins VP, Cho YJ, Hoffman C, Lyden D, Wisoff JH, Garvin JH Jr, Stearns DS, Massimi L, Schüller U, Sterba J, Zitterbart K, Puget S, Ayrault O, Dunn SE, Tirapelli DP, Carlotti CG, Wheeler H, Hallahan AR, Ingram W, MacDonald TJ, Olson JJ, Van Meir EG, Lee JY, Wang KC, Kim SK, Cho BK, Pietsch T, Fleischhack G, Tippelt S, Ra YS, Bailey S, Lindsey JC, Clifford SC, Eberhart CG, Cooper MK, Packer RJ, Massimino M, Garre ML, Bartels U, Tabori U, Hawkins CE, Dirks P, Bouffet E, Rutka JT, Wechsler-Reya RJ, Weiss WA, Collier LS, Dupuy AJ, Korshunov A, Jones DT, Kool M, Northcott PA, Pfister SM, Largaespada DA, Mungall AJ, Moore RA, Jabado N, Bader GD, Jones SJ, Malkin D, Marra MA, Taylor MD. Divergent clonal selection dominates medulloblastoma at recurrence. Nature. 2016 Jan 21;529(7586):351-7. doi: 10.1038/nature16478. Epub 2016 Jan 13

176. Gandhoke GS, Yilmaz S, Grunwaldt L, Hamilton RL, Salvetti DJ, Greene S. A case of spinal epidural venous malformation with mediastinal extension: management with combined surgery and percutaneous sclerotherapy. J Neurosurg Pediatr. 2016 May;17(5):612-7. doi: 10.3171/2015.9.PEDS15341. Epub 2016 Jan 15.

177. Thompson EM, Hielscher T, Bouffet E, Remke M, Luu B, Gururangan S, McLendon RE, Bigner DD, Lipp ES, Perreault S, Cho YJ, Grant G, Kim SK, Lee JY, Rao AA, Giannini C, Li KK, Ng HK, Yao Y, Kumabe T, Tominaga T, Grajkowska WA, Perek-Polnik M, Low DC, Seow WT, Chang KT, Mora J, Pollack IF, Hamilton RL, Leary S, Moore AS, Ingram WJ, Hallahan AR, Jouvet A, Fèvre-Montange M, Vasiljevic A, Faure-Conter C, Shofuda T, Kagawa N, Hashimoto N, Jabado N, Weil AG, Gayden T, Wataya T, Shalaby T, Grotzer M, Zitterbart K, Sterba J, Kren L, Hortobágyi T, Klekner A, László B, Pócza T, Hauser P, Schüller U, Jung S, Jang WY, French PJ, Kros JM, van Veelen MC, Massimi L, Leonard JR, Rubin JB, Vibhakar R, Chambless LB, Cooper MK, Thompson RC, Faria CC, Carvalho A, Nunes S, Pimentel J, Fan X, Muraszko KM, López-Aguilar E, Lyden D, Garzia L, Shih DJ, Kijima N, Schneider C, Adamski J, Northcott PA, Kool M, Jones DT, Chan JA, Nikolic A, Garre ML, Van Meir EG, Osuka S, Olson JJ, Jahangiri A, Castro BA, Gupta N, Weiss WA, Moxon-Emre I, Mabbott DJ, Lassaletta A, Hawkins CE, Tabori U, Drake J, Kulkarni A, Dirks P, Rutka JT, Korshunov A, Pfister SM, Packer RJ, Ramaswamy V, Taylor MD. Prognostic value of medulloblastoma extent of resection after accounting for molecular subgroup: a retrospective integrated clinical and molecular analysis. Lancet Oncol. 2016 Mar 11. pii: S1470-2045(15)00581-1. doi: 10.1016/S1470-2045(15)00581-1. [Epub ahead of print]

178. Pollack IF, Jakacki RI, Butterfield LH, Hamilton RL, Panigrahy A, Normolle DP, Connelly AK, Dibridge S, Mason G, Whiteside TL, Okada H. Immune responses and outcome after vaccination with glioma-associated antigen peptides and poly-ICLC in a pilot study for pediatric recurrent low-grade gliomas†. Neuro Oncol. 2016 Mar 15. pii: now026. [Epub ahead of print]

179. Jakacki RI, Cohen KJ, Buxton A, Krailo MD, Burger PC, Rosenblum MK, Brat DJ, Hamilton RL, Eckel SP, Zhou T, Lavey RS, Pollack IF. Phase 2 study of concurrent radiotherapy and temozolomide followed by temozolomide and lomustine in the treatment of children with high-grade glioma: a report of the Children's Oncology Group ACNS0423 study. Neuro Oncol. 2016 Mar 22. pii: now038. [Epub ahead of print]

180. Ridge PG, Hoyt KB, Boehme K, Mukherjee S, Crane PK, Haines JL, Mayeux R, Farrer LA, Pericak-Vance MA, Schellenberg GD, Kauwe JS; Alzheimer's Disease Genetics Consortium (ADGC). Assessment of the genetic variance of late-onset Alzheimer's disease. Neurobiol Aging. 2016 May;41:200.e13-20. doi: 10.1016/j.neurobiolaging.2016.02.024. Epub 2016 Mar 3

181. Beckner ME, Pollack IF, Nordberg ML, Hamilton RL. Glioblastomas with copy number gains in EGFR and RNF139 show increased expressions of carbonic anhydrase genes transformed by ENO1. BBA Clin. 2015 Nov 10;5:1-15. doi: 10.1016/j.bbacli.2015.11.001. eCollection 2016 Jun. PMID: 27051584 Free PMC Article

182. Fernandes-Cabral DT, Zenonos GA, Hamilton RL, Panesar SS, Fernandez-Miranda JC. High-Definition Fiber Tractography in the Evaluation and Surgical Planning of Lhermitte-Duclos Disease: A Case Report. World Neurosurg. 2016 May 7. pii: S1878-8750(16)30257-1. doi: 10.1016/j.wneu.2016.04.128. [Epub ahead of print] PMID: 27168233

**Reviews, invited published papers, proceedings of conference and symposia, monographs, books and book chapters**

**Ronald L. Hamilton, M.D.**

1. **Hamilton RL**, Wiley CA. New developments in the neuropathology of AIDS. CAP Today, 10 (12): p 42, 1996.
2  **Hamilton RL**: Hydrocephalus in a 9 month-old infant. Brain Pathol 6:533-534, 1996
3. **Hamilton RL**: New onset hemiparesis. Brain Pathol 7: 715-716, 1997.
4. **Hamilton RL**: Precocious Puberty. Brain Pathol 7: 711-712, 1997
5. **Hamilton RL**: Frontal lobe tumor in 11 year-old girl. Brain Pathol 7: 713-714, 1997
6 **Hamilton RL**, Pollack, IF: The Molecular Biology of Ependymomas. Brain Pathology 7:807-822, 1997.
7. **Hamilton RL**: A 26 year old woman with new onset seizures. Brain Pathol 8: 239-240, 1997.
8. **Hamilton RL**, Wiley, CA, The Neuropathology of Viral Infections of the Nervous System. In: Textbook of Neuropathology; Davis RL, Robertson DM eds. Williams and Wilkins, 3rd edition,  Baltimore, MD. 1997.

9. **Hamilton RL**: Guidelines for the neuropathological diagnosis of Alzheimer's Disease and Dementia with Lewy Bodies. Revista de Neurologia 27 (S1): S67-S70, 1998
10. **Hamilton RL**: Experimental neuropathology of Alzheimer's Disease: animal models. Revista de Neurologia 27 (S1): S84-S86, 1998
11. Sanders VJ, Wiley CA, **Hamilton RL**: The mechanisms of neuronal damage in retroviral infections of the nervous system. in The Mechanisms of Neuronal Damage in Virus Infections of the Nervous System (Gosztonyi G, ed). Springer Verlag, Berlin, 2001.
12.  **Hamilton RL**. [Recent Advances in the neuropathological evaluation of Alzheimer's Disease: the importance of synuclein] Rev Neurol 35:765-7, 2002 (Spanish).
13. Pollack IF, **Hamilton RL**, Finkelstein SD, Lieberman F.  Molecular abnormalities and correlations with tumor response and outcome in glioma patients.  Neuroimaging Clinics of North America: Advances in Brain Tumor Imaging and Therapy (Provenzale J, ed.) WB Saunders, Philadelphia,  2002.
14. **Hamilton RL**.  The other dementias: the neuropathology of the non-Alzheimer's Disease dementias. Rev Neurol 37:130-139, 2003 (Spanish).
15. Omalu BI, Wiley CA, **Hamilton RL**.  Case of the Month February 2003. Brain Pathology 13:419-420, 2003.
16. DeKosky ST, Ikonomovic MD, **Hamilton RL**, Bennett DA, Mufson EJ. Neuropathology of Mild Cognitive Impairment in the Elderly. In John Morris J, Scheltens P, and Cummings JL), (eds), *Alzheimer's Disease and Related Disorders:* London, Taylor & Francis, 1-16, 2006.
17. Crain BJ, Alston SR, Bruch LA, **Hamilton RL**, McLendon RE, Rhodes H, Tihan T, Weidenheim KM. Accreditation Council for Graduate Medical Education (ACGME) Competencies in Neuropathology Training.  J Neuropathol Exp Neurol 64:273-279, 2005.
18. McIntyre JA, **Hamilton RL**, Dekosky ST.  Redox-reactive autoantibodies in cerebrospinal fluids. Annals of NY Acad Sci 1109: 296-302, 2007.
19. DeKosky ST, Kaufer DI, **Hamilton R**, Wolk D, Lopez OL: Dementia. In: Neurology in Clinical Practice: Principles of Diagnosis and Management, 5th Edition. Editors: Bradley WG, Daroff RB, Fenichel GM & Jankovic J. Boston MA, Butterworth-Heinemann, 2007: 1855-1907.
20. Tyurin VA, Tyurina YY, Kochanek PM, **Hamilton R**, DeKosky ST, Greenberger JS, Bayir H, Kagan VE.  Chapter 19: Oxidative lipidomics of programmed cell death.  Methods Enzymol 442:375-93, 2008.
21. Yeaney GA, O'Conn SM, Jankowitz BT, **Hamilton RL**.  A 16 year-old male with cerebellar mass. Brain Pathol. 2009 19, 167-170. PMID 19076785
22. Horbinski, C, **Hamilton RL**.  Application of telepathology for neuropathologic intraoperative consultations. Brain Pathol 2009 19; 317-322. PMID 19290998

**Abstracts**

1. **Hamilton RL**, Sanger WG, and McComb RD: Characterization of cell lines derived from malignant tumors in patients with neurofibromatosis. Federation Proceedings 46: 433, 1987.
2. Esch O, Spinosa JC, **Hamilton RL**, Crombie DL, Schteigart CD, Hofmann AF: Reversible cytotoxicity to the gallbladder mucosa of contact dissolution solvents for cholesterol gallstones: a comparison of methyl tert-butyl ether (mtbe) and ethyl propionate (ep) in two animal models. Gastroenterology 100 (5, part 2): A135, 1991.

**Ronald L. Hamilton, M.D.**

3. Haas RH, Popovitch B, **Hamilton RL**: The utility of DNA dystrophin gene analysis in non-specific myopathy: presented at Child Neurology Society Annual Meeting, October, 1992: New Orleans, LA.

4. Haas RH, Mansden DL, Estrada S, **Hamilton RL**, Grafe MG, Nyhan WL: Acute basal ganglia infarction in propionic acidemia in spite of good metabolic control: presented at Child Neurology Society Annual Meeting, October, 1992: New Orleans, LA.

5. **Hamilton RL**, Haas RH, Nyhan W, Powell HP, Grafe MR:  The neuropathology of propionic acidemia: a report of two additional cases. American association of Neuropathology Annual Meeting, June 1993, Salt Lake City, UT; J Neuropathol Exp Neurol 52:299, 1993.

6. Mansfield RT, Schiding JK**, Hamilton R,** Kochanek PM: Hypothermia fails to reduce lesion volume after traumatic brain injury in immature rats.  Pediatric Research 35(4):55, 1994.

7. **Hamilton RL**, Bodnar RJ, Wang G, Wiley CA.  The effect of AZT on retroviral encephalitis: a murine model: presented at the Sixth Workshop on the Pathogenesis of Animal Retroviruses, Philadelphia, PA, Nov. 17-19, 1994.

8. Adelson PD, Robichaurd P, **Hamilton RL**, Kochanek PM. Brain edema and neuropathology after diffuse traumatic injury in immature rats.  Neurotrauma Society meeting, San Diego CA, Nov 10-11, 1995.

9. **Hamilton RL**, Bodnar RJ, Wang G, Klunk W, Wiley CA, Treatment of chronic retroviral encephalitis with zidovudine (AZT) in a murine model. Society for Neuroscience Meeting, San Diego, CA Nov 11-16 1995.

10. **Hamilton RL**, Bodnar RJ, Wang G, Klunk W, Wiley CA. The effect of zidovudine (AZT) on murine retroviral encephalitis. Amer. Assoc of Neuropathology, San Antonio, June, 1995. J Neuropathol Exp Neurol 54 (3): 438, 1995.

11. **Hamilton RL**, and Claassen D. Neonatal Methylmalonic Acidemia With Hemicerebellum: An Autopsy Report;  Society of Pediatric Pathology / Child Neurology Society (joint meeting), Baltimore, Oct 27-29, 1995.

12. **Hamilton RL**, Baldwin M, Wiley CA. Human Herpesviruses And Temporal Arteritis American Association of Neuropathology, Vancouver, BC, Canada, June 1996.

13. Mizukami K, Ikonomovic MD, Sheffield R, Rubin RT, Grayson D, **Hamilton R**, Warde D, Armstrong DM. Immunohistochemical Localization of GABA-A Receptor ß2/3 Subunits in the Hippocampal Formation in Aged Brain with Alzheimer-related Neuropathology. Society for Neuroscience meeting, Washington DC, Nov 1996.

14. Bodnar RJ and **Hamilton RL**. Effect of zidovudine (AZT) and saquinavir on retroviral infection of the central nervous system (CNS) Society for Neuroscience meeting, Nov 17-21, 1996 Washington D.C.

15. Bredel M, Pollack I, **Hamilton RL**, Finkelstein SD, Campbell JW, Martinez AJ, Sherwin R, Bozik ME, Gollin S. Overexpression of EGF receptor and p53 mutations in pediatric malignant gliomas. American Association of Neurological Surgeons, 1997 Annual meeting.

16. Xu Y, Liachennko S, Tang P, **Hamilton RL** Correlation of neuropathologic changes with cerebral metabolic and ADC abnormalities after prolonged asphyxial cardiac arrest. International Society of Magnetic Resonance in Medicine, annual meeting, 1997

17. Bredel M, Pollack IF, Campbell JW, **Hamilton RL**. Basic fibroblast growth factor as a prognostic indicator in pediatric high grade glioma patients. American Association of Neuropathology, Pittsburgh, PA, June 1997. J Neuropathol Exp Neurol 56 (5): 581, 1997

18. **Hamilton RL**, Bodnar RJ, Lackner AA, Lane JH, Wiley CA Neurotrophic factors in simian immunodeficiency virus encephalitis. American Association of Neuropathology, Pittsburgh, PA, June 1997. J Neuropathol Exp Neurol 56 (5): 618, 1997

19. Adelson, PD, Robichaud, P, **Hamilton, RL**, Kochanek, PM. Histologic analyses of severe diffuse traumatic brain injury in the immature rat . National Neurotrama Society, New Orleans Oct 24-25, 1997.

20. Dorsey RW, Achim CL, Wiley CA, **Hamilton RL**\*,  Soontornniyomkij V. Gene expression and cellular localization of neurotrophic factors in Alzheimer's disease. Society of Neuroscience meeting Nov, 1997, New Orleans.

21.  Klunk WE, **Hamilton RL**, Styren SD, Styren G, Debnath ML, Mathis CA, Mahood K, Hsiao KK. Staining of AD and Tg2576 mouse brain wirh X-34, a highly flourescent derivative of chrysamine

**Ronald L. Hamilton, M.D.**

G and A potential in vivo probe for sheet fibrils.  Siociety for Neuroscience meeting, New Orleans 1997.

22. Klunk WE, **Hamilton RL**, Styren SD, Styren G, Debnath ML.  Neuropathological study of AD brain with X-34, a new highly fluorescent derivative of congo red.  Society for  Neuroscience meeting. Los Angeles, CA 1998.

23. Halks-Miller M, Hesselgesser J, Horuk R, Soontornniyomkij V, **Hamilton R,** Achim C.  CCR1 immunoreactivity in Alzheimer's Disease brains.  Society for Neurosciences meeting. Los Angeles, CA 1998.

24.  Wang G, Soontornniyomkij V, Pittman CA, Achim CL, Wiley CA, **Hamilton RL**.  Glial expression of BDNF and TRK B receptor proteins in Alzheimer's Disease and HIV-1 encephalitis brains. Society for Neuroscience meeting. Los Angeles, CA 1998.

25. Ikonomovic MD, Mizukami K, Davies P, **Hamilton R**, Sheffield R, Armstrong DM.  Co-localization of interneurons and an ad-specific antibody in the hippocampal formation of Alzheimer brains. Society for Neurosciences. Los Angeles, CA 1998.

26. Mizukami K, Ikonomovic MD, Grayson DR, Rubin RT, Warde D, Sheffield R, **Hamilton RL,** Davies P, Armstrong DM.  Immunohistochemical study of GABA(A) receptor beta 2/3 subunits in the hippocampal formation of aged brains with Alzheimer-related neuropathologic changes. Experimental Neurology 147 2 333-45 (1997).

27. Bredel M, Pollack IF, **Hamilton RL**: Expression of the c-erbB1 Oncogene Product Epidermal Growth Factor Receptor (EGFR) and its Relevance for Outcome in Children with Supratentorial High-Grade Gliomas ; XVI Congress of the European Society for Pediatric Neurosurgery; November 11-15, 1998, Marseille, France

28. **Hamilton, RL** Numerous widespread alpha-synuclein positive thread-like processes characterize dementia with Lewy Bodies. Foundation IPSEN Conference, April 12, 1999, Paris France

29  **Hamilton RL** Numerous and widespread alpha-synuclein thread-like processes in dementia with Lewy bodies. American Assoc of Neuropathologist Annual Meeting, 1999, Portland, OR. J Neuropathol Exper Neurol 58:552, 1999.

30. Klunk WE, **Hamilton RL**, Styren SD, Head E: Evaluation of the aged canine as a screening system for the x-34 class of in vivo probes for amyloid deposition in AD. Soc. of Neuroscience, 1999

31. Kaufer, DL, **Hamilton RL**, Lopez OL, DeKosky ST MRI white matter hyperintensities and cerebral amyloid angiopathy in a case of dementia with Lewy bodies. Amer Neuropsychiatric Assoc, annual meeting, 2/2000, Ft. Myers, FLA.

32. **Hamilton RL**, Mash DC. Widespread Alpha-synucleinopathy in the Parkinson's Disease brain. 6th National Parkinson's Disease Foundation International Symposium on Parkinson's Disease Research, to be held in conjunction with the Society of Neuroscience meeting in Miami Beach, Oct 22-23[rd], 1999.

33. **Hamilton, RL**, Mash DC. Widespread alpha-synuclein-positive neuropil threads in the Parkinson's Disease brain. American Assoc of Neuropathology, Atlanta, GA, June 8-11, 2000.

34.  Snyder JV, Gebel JM, Kassam A, **Hamilton RL**, Goldstein S, Watkins S, Yonas H, Chelluri L, Thulborn K. Guidance by MR Tissue Sodium Concentration of Infarct Resection in Massive Stroke. Neurology 54(7): A97-A98, Suppl. 3, 2000.

35. Chow TM, Kaufer DI, Lopez OL, **Hamilton RL**, Becker JT, DeKosky ST. Temporal Evolution of Lewy Body Phenotype in Autopsy Confirmed Cases of Alzheimer's Disease and Dementia With Lewy Bodies. Neurology 56(8): A300-A301, Suppl 3, 2001.

36.  Castellano-Sanchez A, Ohgaki HH, Yokoo, Finkelstein SD, Medina-Flores R, **Hamilton RL**, Scheithauer BW, Burger PC, Brat DJ.  Genetic Alterations in Granular Cell Astrocytomas. USCAP, 2002.

37.  Demidovich J, Pittman CA, Hamilton RL.  Altered calpain proteolysis of mutant alpha-synuclein. Honors Thesis presentation, Univ. Pitt, 2002

38.  Omalu BI, **Hamilton RL**, Swalsky PA, Finkelstein SD. Microdissection-based mutational profiling of malignant, atypical and benign meningiomas: the determination of meningioma grade by fractional mutational index.  AANP, Denver, 2002 (JNEN 61:491, 2002)

39.  Wilson, RK, Luedecking-Zimmer EK, Kamboh MI, DeKosky ST, **Hamilton RL**.  Association of the ApoE4 allele and Lewy bodies in Alzheimer's Disease.  AANP, Denver 2002 (JNEN 61: 455, 2002).

**Ronald L. Hamilton, M.D.**

40. Desai PP, Ikonomovic MD, **Hamilton RL**, DeKosky ST, Kamboh MI.  Apolipoprotein D in Alzheimer's Disease: implications for amyloid pathology.  Soc. for Neuroscience, Orlando, 2002.

41. Garb S, **Hamilton RL**.  Sequestration of soluble alpha-synuclein in Lewy body Variant of Alzheimer's Disease. Soc for Neuroscience, Orlando, 2002.

42. Marshall GA, Kaufer DI, Lopez OL, Rao GR, **Hamilton RL**, DeKosky ST.  A neuropathological correlate of anosognosia in Alzheimer's Disease.  American Association of Neurology, May 2003.

43.  Sweet RA, Butters MA, **Hamilton RL**, Mulsant BH, Lopez OL, PollockBG, DeKosky ST, Reynolds CF Neuropathology Of Late Life Mood Disorders.  American College of Neuropsychopharmacology, 2003

44.  Mohan D, Couce ME, Wiley CA, **Hamilton RL**, Sasatomi E, Swalsky PA, Lieberman MD, Finkelstein SD.  Microdissection based genotyping of human gliomas: diagnostic and prognostic considerations (USCAP, Vancouver 3/04)

45. Beckner ME, Sasatomi E, Swalsky PA, **Hamilton RL**, Pollack, IF, Finkelstein SD.  Loss of heterozygosity reveals non-VHL Allelic loss in hemangioblastomas at 22q13, (AANP Cleveland, June 24-27, 2004).

46. Judkins AR, Burger P, **Hamilton RL**, Kleinschmidt-DeMasters B, Perry A, Pomeroy S, Rosenblum MK, Yachnis AT, Rorke LB, Biegel JA. INI1 Expression Distinguishes Atypical Teratoid/Rhabdoid Tumor (ATR) from Choroid Plexus Carcinoma (CPC); (AANP Cleveland, June 24-27, 2004).

47. McFadden KA, **Hamilton RL**, Visvesvara GS, Gardner P, Couce ME.  Granulomatous Amebic Encephalitis in a Patient with Gardners Syndrome and Multi-organ Transplant (AANP Cleveland, June 24-27, 2004).

48. Yen, Amy, Lopez, OL, BeckerJ, **Hamilton RL.**  Mesial Temporal Sclerosis is associated with Lewy Bodies in Alzheimer's Disease. AANP Annual meeting June 9-12, 2005, Arlington, VA (platform). (J Neuropathol Exper Neurol 64:434, 2005.

49. Hinkle DA, Mullett SJ, **Hamilton RL** DJ-1 is over-expressed in human stroke reactive astrocytes. Society for Neuroscience Oct 2005.

50. Ramsey CP, Glass CA, Marshall MB, Morgan KL, Kioke MA, **Hamilton R**, Chu CT, Jordan-Sciutto KL.  Altered expression patterns of the antioxidant response transcriptional regulator NRF2, in Alzheimer's Disease and Parkinson's Disease. Society For Neuroscience, Nov. 2005, Washington DC.

51. Chu CT, Uchiyama Y, **Hamilton R**, Zhu J.  Extracellular signal regulated protein kinase acts upstream of both autophagy and cell death in MPP+ treated neurons.  Society For Neuroscience, Nov. 2005, Washington DC

52. Cieply K, Carol R. Sherer, Jennifer L. Hunt **Hamilton RL** Assessment of 1p and 19q Status in Pediatric Oligodendrogliomas by FISH, Association of Molecular Pathology,  Nov 10-13, 2005 Scottsdale AZ

53.  Bencherif B, Lieberman FS, Wenzhu B, Price JC, Muthukrishnan A, Walter K, **Hamilton RL**, Lunsford LD, Mountz JM.   Increased F-18 Fluorothymidine Uptake is Seen in Non-Proliferating Recurrent/Residual Glioma Society for Nuclear Medicine, San Diego, 2006 June 3-7

54. **Hamilton, RL** Variations On A Theme: Lewy Bodies And Mesial Temporal Sclerosis In Alzheimer's Disease: A Review Of 278 Autopsy Cases. 10th International Conference on Alzheimer's Disease, Madrid, Spain, July-15-20, 2006.

55. DeKosky ST, Mathis CA, Price JC, Ikonomovic MD, **Hamilton RL**, Abrahamson EE, Paljug WR, Debnath ML, Hope CE, Isanski BA, Tsopelas ND, Lopresti BJ, Ziolko S, Bi W and Klunk WE. Correlation of In Vivo PiB Retention and Post-Mortem A$\beta$ Levels: A Case Study. 10th International Conference on Alzheimer's Disease, Madrid, Spain, July-15-20, 2006.

56. Leverenz J, **Hamilton RL**, Larson E, Vavrek D, Lopez O, Galasko D, Masliah E, Kaye J, Nixon R, Clark C, Trojanowski J, Kukull W, Montine T, Tsuang D. Lewy-Related Pathology in Two Large Autopsied Dementia Samples: Application of Classification Criteria. 10th International Conference on Alzheimer's Disease, Madrid, Spain, July-15-20, 2006.

57.  Venneti S, Lopresti BJ, Wang G, Mathis CA, Klunk WE, Shmookler AD, **Hamilton RL**, Apte UM, Wiley CA. PET imaging of microglia in a mouse model of Alzheimer's disease. 10th International Conference on Alzheimer's Disease, Madrid, Spain, July-15-20, 2006.

58. Kofler JK, Moore RA, **Hamilton RL**.  Concomitant Dementia with Lewy Bodies and Multiple System Atrophy in a Demented Patient.  International Congress of Neuropathology/American Association of Neuropathology Annual Meeting, San Francisco, CA, Sept 10-15, 2006.

Ronald L. Hamilton, M.D.

59. DeKosky ST, Mathis CA, Price JC, Ikonomovic MD, **Hamilton RL**, Abrahamson EE, Paljug WR, Debnath ML, Hope CE, Isanski BA, Tsopelas ND, Lopresti BJ, Ziolko S, Bi W, Klunk WE. Correlation of Regional in vivo Pittsburgh Compound B (PIB) Retention With in vitro PIB, A Levels, and Amyloid Plaque Density: Validation of PIB-PET in Postmortem Human Brain. Alzheimer's Association International Conference on Prevention of Dementia. June 9-12, 2007 Washington, D.C.

60. Kellermier HC, Nikiforova MN, Cieply K, **Hamilton RL**. Alterations of 1p in glioblastomas. ASIP/AANP Annual meeting, Washington DC April 2007.

61. Bliecher AG, Branstetter BF, Hamilton R, Murdoch G, Kellermeir HC. Clival Chordoma: Radiologic-Pathologic Correlations. American Society of Neuroradiology annual meeting, Chicago, IL. June 9-14, 2007.

62. Butters MA, Aizenstein HJ, Meltzer CC, **Hamilton RL,** Price JC, Mathis CA, Klunk WE, Becker JT, DeKosky ST, Reynolds CF. Cognition, cerebrovascular disease and Alzheimer's Disease in late-life depression. International Neuropsychological Society meeting, Bilbao Spain, July 2007.

63 Tyurin VA, Zhao Q, Mnuskin A, **Hamilton R**, DeKosky ST, Reynolds WF, Kagan VE. Phospholipid peroxidation biomarkers of Alzheimer's Disease in the Brain: Selective Oxidation of Phosphatidylserine. Society of Toxicology Meeting San Diego, CA. October 2, 2007.

64. Moschos SJ, D. Trembath D, Snavely A, Bradler E, Midkiff B, Nikolaishvilli-Feinberg N, Werley J, Krauze M, **Hamilton R**, Kirkwood JM. Prognostic Significance of PD-L1 Expression, Angiogenesis, and Hypoxia in Melanoma Brain Metastases (MBM); A Histopathologic Analysis. Annual meeting of the American Association of Clinical Oncology, Chicago Il, 5/29-6/2/2014.

65. Trembath DG, Moschos SJ, Snavely AC, Bradler E, Nikolaishvilli-Feinberg N, Bentley R. Midkiff BR, Jonette Werley J, Krauze MT, **Hamilton RL**. Analysis of select angiogenic markers in melanoma brain metastases. Annual meeting AANP, Portland OR. June 2014

66. Salgado CM, Basu D, Nikiforova M, Hamilton R, Gheris R, Jakacki R, Panigrahy A, Yatsenko S, Reyes-Mugica M. Congenital Melanoma: The full spectrum og p.Q61R mutation in NRAS. Accepted for the Annual Soc. Pediatric Pathology meeting, Birmingham AL, Sept 4-6, 2014.

67. Melan MA, Wald AI, Zhong S, **Hamilton R**, Horbinski C. Nikiforova MN. BrainSeq: Next-Generation Sequencing Panel for Detection of Genetic Alterations in Central Nervous System (CNS) Malignancies. National Harbor MD, Nov 12-15, 2014.

68. Hamilton RL. Chronic Traumatic Encephalopathy: Update on an Emerging Disease. Invited speaker: 18th International Congress of Neuropathology, July 12-16, 2014, Rio de Janeiro, Brazil

69. Hamilton RL. Cases of the Month: 16 Years of Unknowns. Invited speaker: 18th International Congress of Neuropathology, July 12-16, 2014, Rio de Janeiro, Brazil

70. Trembath DG, Moschos SJ, Snavely AC, Bradler E, Nikolaishvilli-Feinberg N, Midkiff BR, Werley J, **Krauze MT, Hamilton RL** Role of PD-L1, HIF-1a, and reactive gliosis in melanoma brain metastases. USCAP 2015, Boston, MA, March 21-27, 2015.

71. Nolan Priedigkeit, Ryan J. Hartmaier, Yijing Chen, Damir Vareslija, Ahmed Basudan, Roby Thomas, Jose P Leone, Peter C. Lucas, Rohit Bhargava, Ron L. Hamilton, Juliann Chmielecki, Nancy E. Davidson, Steffi Oesterreich, Adam M. Brufsky, Leonie Young, Adrian V. Lee Breast cancer brain metastases show limited intrinsic subtype switching, yet exhibit acquired ERBB2 amplifications and activating mutations. San Antonio Breast Cancer Symposium, 12/7/16

72. Steffi Oesterreich, Ahmed Basudan, Nolan Priedigkeit, Ryan Hartmaier, Amir Bahreini, Rekha Gyanchandani, Jose P Leone, Peter Lucas,, Rohit Bhargava, Ron Hamilton, Ryan Hartmaier, Adam Brufsky, Adrian V. LeePerivascular Inflammation in Temporal Artery Biopsies That Are Negative for Arteritis: Incidental or Harbinger American College of Rheumatology/ Association of Rheumatology Health Professionals (ACR/ARHP) Annual Meeting, Washington DC, 11/13/16

73. Expression of Carbonic Anhydrase Genes, CA3 and CA12, Transformed with ENO1, Relate to Copy Numbers of EGFR or RNF139 and XIAP, and Gender in Glioblastomas Using PCR Assays. Experimental Biology 2015 Annual Meeting

74. Evaluation of GlioSeq Targeted NGS Panel for Detection of O6-Methylguanine-DNA Methyltransferase (MGMT) mRNA Expression in Glioma Patients Alicia Hunt, Sarika Jain, Melissa A Melan, Abigail Wald, Ronald Hamilton, Marina N. Nikiforova Association For Molecular Pathology (AMP) Charlotte, NC. November 10-12, 2016.

## PROFESSIONAL ACTIVITIES

**Ronald L. Hamilton, M.D.**


**TEACHING**

University of California, San Diego, Dept of Neuroscience
      1991-93      lab assistant - graduate neuroanatomy course
University of California, San Diego, School of Medicine
      1991-93      Sophomore pathology course, neuropathology section (lab assistant)
University of California, San Diego, Dept of Pathology
      1991-93      Clinical Correlation Conference - Neuropath and Neurosurgery (monthly)
      1991-93      Neuropathology review for neurology residents (bi-monthly)
University of Pittsburgh, School of Medicine
      Freshman pathology course –
      PBL facilitator for musculoskeletal course 1994-1998
      Neuroscience Module – lecture M2 students full class: CNS tumors
            Annually since 1999.
                 April 29, 2014 1-3 pm
      Neuroscience Module   lecture MS1 students
            CNS tumors  March 2004
            CNS tumors  March 2005
            CNS tumors March 2006
            CNS Tumors    5/7/07
      Neuroscience rotation – small weekly lab, M3 students
            7/99-present
      Neuroscience rotation – small group M3 students
            6/18/2007 3-5pm
Weekly brain-cutting conference at Children's Hospital (2-5 medical (M3) students/week)
      Academic Advising: Kate McFadden 2/2000 to 6-2001
Other:
      High school - gifted science students of Mr. James Coll
            11/21/2002 , 11/14/ 2003, 10/28/2004, 11/18/2005, 11/3/2006


University of Pittsburgh, graduate students
      Cellular and Molecular Mechanisms of Neurodegeneration (MSCMP 3720)
                Organizers: Robert Bowser, Cristian Achim,
            1. Neuroanatomy and Neurohistology in neurodegeneration
                 1/13/98,  1/19/99
            2. Mitochondria and disease / Prion encephalopathies
                 3-24-98
            3. The role of alpha-synuclein in neurodegenerative diseases
                 10-11-00
      Molecular Pathobiology (organizers Frye and Achim) (MSCMP 2740)
            .Tumors of the Central Nervous System,  4-7-98,  4-20-99
            Alpha-synuclein and Neurodegeneration
                 4-2003, 1/8/04, 5/15/06
            Neuropathology of Neurodegeneration
                 1/6/04
            Alpha-synuclein and Tau in Neurodegeneration
                 1/5/07, 2/7/2008
            Pathologic diagnosis of the Lewy Body Disorders
                 2/12/09
University of Pittsburgh, Dept of Neuroscience - Combined Neuroscience Conference Wed 4-5
      10/3/95 *      Varicella Zoster Infections of the CNS in AIDS patients
      10/9/96 *      Lewy Bodies and Dementia
      2/19/97 *      The Neuropathology of Pediatric Seizures
      4/23/97 *      CNS manifestations of non-CNS tumors in children
      2/11/98        Case Presentation with Ian Pollack

**Ronald L. Hamilton, M.D.**

      3/18/98 *         A 77 year old woman with Multiple sclerosis and dementia
      11/4/98          *Pediatric meningiomas – two cases
      1/20/99          Methanol Intoxication – with C. Foley
      2/3/99           Gliomatosis cerebri with Dallasta
      2/10/99          Amyloid angiopathy and leukomalacia – with D. Kaufer
      3/17/99          Metachromatic Leukodystrophy – with D. Kaufer
      9/18/02          Iatrogenic CJD*
      * as primary presenter

University of Pittsburgh, Dept. of Pathology, Chief Resident's Fri noon slide conference
      8/1/96 - Pediatric brain tumors
      10/5/97 Pediatric brain tumors
      1/9/98          NP REVIEW - Tumors I
      1/16/98          NP REVIEW - Tumors II
      1/23/98          NP REVIEW - Tumors III
      1/30/98          NP REVIEW - Infections
      2/6/98           NP REVIEW - Demyelinative diseases
      2/13/98          NP REVIEW - Neurodegenerative diseases
      2/20/98          NP Review - Cerebrovascular disease and developmental
      5/24/02          Pediatric Neoplasms and Congenital Malformations
      5/31/02          Degenerative Diseases

University of Pittsburgh, undergraduate
      Independent Course and Honors Research Project –
         Theodore Kaplan (1/97-6/97)
         Emily Rogerson (1/99-5/99, 9/99-12/99, 1/00-4/00)
         Kyle Hubbard (1/99 – 5/99, 9/99-12/99, 1/00-4/00)
         Joe Demidovich – 2000-2002
         Stan Garb (2001-2001)

      Pathology Summer Undergraduate Research Program (SURP)
         Kathleen Anderson 6/00-8/00
         Kathleen Anderson 6/01-8-01

University of Pittsburgh, Dept. of Pathology,
      Neuropathology of dementia conference - weekly (Fri 10-11)

University of Pittsburgh - ADRC Topics at Noon
      X-34 and alpha-synuclein – New stains in Alzheimer's Disease 11/98
      Lewy Body Pathology in Alzheimer's Disease, 11/01

Children's Hospital of Pittsburgh, Grand rounds
      1996 - methyl malonic acidemia with hemi-cerebellum
      2/13/97 - Pediatric AIDS with HIV encephalopathy
      5/22/97 - 11 month-old boy with Hypotonia (Leigh's Disease)
      3/18/98 - Becker's muscular dystrophy with severe cardiomyopathy
      5/19/98 – Friedreich's Ataxia
      10/15/98 – Spinal Muscular Atrophy Type I
      2/2005  - Congenital Dystrophies – Pediatric Neurology

## Other Presentations

Neurology Grand Rounds - 11-19-03 - CNS vasculitis
Pathology Noon Diagnostic Conference - 11-20-03 – "Some Bodies in the Brain"
AP Didactic Lecture – 11-25-03 - Neuropathology of Neurodegeneration
NP Didactic – 4-28-04 - ApoE4 and Lewy Bodies in AD

**Ronald L. Hamilton, M.D.**

NP Didactic -    3/31/2005 – AD Pathology in ALS and MTS and LB in AD
Pathology Noon Diagnostic Conference – 8-4-2006: Tauopathies
ADRC CPC 8-10-06
ADRC CPC 11-30-06
ADRC CPC 2-8-07
ADRC 20th Anniversary meeting, "Neuropathology of AD:"  9-28-06
ADRC Topics at Noon.  "Tauopathies"  11-16-06
ADRC CPC 8/16/2007
ADRC CPC 11/30/2007
Pediatric CPC 2/25/08
DJ-1 in glioblastomas (NP Didactic conference) – 3/10/2009 (1 hour)
Neuropathology review for Neurosurgery residents – 3/10/2010 (1 hour).
AP Chief Residents didactic conference.  2 hour conference.  Non-glial Tumors. Feb 25, 2014
CMU graduate class:  BioE 2630 – Methods in medical iamage analysis in neuropathology. April 4, 2014.
Anatomic Pathology Grand Rounds, July 10, 2014  Chronic Traumatic Encephalopathy: an Update.

**Clinical Conferences (recurring)**

| | | |
|---|---|---|
| ADRC Brain cutting | weekly | Tue 8-10 |
| ADRC Dementia signout - | weekly | Fri 10-11 |
| PUH – Neuropathology QA - | weekly | Wed 10-11 |
| CH  Brain cutting | weekly | Mon 10-11:00 |
| CH  Neuro-Oncology conf | weekly | Mon 11:30-12:30 |
| CH Gross autopsy conference | weekly | Tue 11-12 |
| CH Micro autopsy conf | weekly | Tue 1-2 |

University of Pittsburgh School of Medicine –
2009 Brain Tumors – lecture to 1st year students
2009 Klionsky summer research scholarship – Peter Kang (June-Aug 2009)
   Clinicopathologic correlations of chordomas
2009 Monday 2 hour small group 3rd year  (5-12 students)
   4/6/2009, 7/27/2009, 9/10/2009, 10/12/2009, 12/7/2009, 1/25/2010, 2/15/2010

## RESEARCH

## OTHER SUPPORT

## ACTIVE

**HAMILTON, R.**
ACTIVE
**R01 NS037704**    (PI: Pollack)            9/1/98-1/31/17            0.7 calendar months
National Institutes of Health            $105,970
Role:  Co-Investigator
Title: Molecular Markers as Predictors of Outcome in Gliomas
The major goal of this project is to further characterize the molecular features of tumorigenesis in pediatric malignant gliomas.

**1R01 CA174858-01**(PI: Pollack)            5/6/13-8/30/17            0.4 calendar months
National Institutes of Health            $54,696
Role:  Co-Investigator
Title: Peptide Vaccine-Based Immunotherapy for Children with Recurrent Ependymomas
This project focuses on a pilot clinical trial of peptide-based immunotherapy for ependymomas, among the most challenging childhood brain tumors.  The study will incorporate separate strata

**Ronald L. Hamilton, M.D.**

for posterior fossa and non-posterior fossa ependymomas.  We will treat a total of 12 patients in each of the two strata with subcutaneous TAA epitope vaccinations every 3 weeks for 8 courses combined with topical imiquimod. Participants will be evaluated for adverse events, regimen limiting toxicity (RLT), and treatment response by clinical and laboratory evaluations and MR imaging. We hypothesize that vaccine-based immunotherapy will not only prove safe for the treatment of pediatric ependymomas, but will also demonstrate activity as assessed by immunologic and clinical parameters.

(PI: Pollack)   5/8/14-6/1/17
Child Brain Tumor Foundation                            $10,487                                    1.2
calendar months
**Children's Brain Tumor Tissue Consortium**
The CBTTC is a unique research platform in which tumor tissue is processed for comprehensive molecular (e.g., DNA, RNA, and protein) analysis using state-of-the-art methods and the data results of that analysis, together with new brain tumor models and relevant clinical information, are sent back to the participating institutions. In comparison to tissue banks, the CBTTC actively stimulates research by providing high-quality data that can be rapidly and efficiently analyzed by participating institutions.
PI: Pollack. 10% salary for Jonette Werley

<u>OVERLAP</u> No Overlap


**<u>Completed Research Support</u>**

National Institutes of Health                           3/1/02 – 2/28/05
P30 MH52247-10    (PI: Reynolds)          $23,305
Intervention Research Center for the Study of Late-Life Mood Disorders
a supplement to the above grant to establish a brain bank to investigate the neuropathological substrate of late life mood disorders.
Role:  Co-Investigator

R01 NS048595    (PI: Montine)                    09/30/03 – 07/31/08
National Institutes of Health
Subcontract to the University of Washington on grant "Characterization of DLB: a Collaborative Study"
The major goal of this multi-institutional project is to investigate the role of ApoE4 alleles and other genetic polymorphisms in the Lewy Body Variant of Alzheimer's Disease.
Role:  Co-Investigator

Brain Tumor Society                            07/01/07-05/31/09
PI: Ian Pollack
JPA & Pediatric Low Grade Astrocytoma
The major goals of these two grants is to examine molecular markers of prognosis in pediatric gliomas.
Role:  Co-Investigator

U10 CA13539-27 (Reaman (subcontract 6172) (Pollack)                    1/1/06-12/30/09
NIH/NCI
Children's Oncology Group Brain Tumor Resource Laboratory

**Ronald L. Hamilton, M.D.**

This contract is providing infrastructure support for maintaining tissue processing and banking of high-grade gliomas.
Role:  Laboratory Director

R01 MH47346    (PI: Zubenko)                     12/1/04 – 11/30/09
National Institutes of Health
Morphologic/Neurochemical Correlates of Depression in AD
The major goal of this project is to better define the biological substrates of major depression in AD and to provide additional insight into the clinical biology of major depressive disorders affecting the elderly.
Role:  Co-Investigator

P50 AG05133    (PI: Lopez)              3/30/85 – 3/31/15          0 calendar months
National Institutes of Health              $71,764
Alzheimer Disease Research Center, Core C: Neuropathology
The three objectives of the Neuropathology Core are to (1) procure and bank brain from autopsies of ADRC patients and controls, (2) perform detailed neuropathologic analysis of all AD cases and (3) maintain well catalogued brain bank.
Role:  Core Advisor

Child Brain Tumor Fund (CBTF) (PI: Pollack)        5/8/13-5/7/14
0.3 cal months (2.5% support) PITT subaccount #: 05.35206.xxxx.00000.709203.-----

P01 NS040923    (PI: Pollack)              7/1/02-5/31/13          1.20 calendar months
National Institutes of Health              $22,074
Novel Strategies for Brain Tumor Therapy
The unifying hypothesis of this program project grant is that novel therapeutic approaches that take into account the unique features of central nervous system (CNS) tumors will have utility for preventing tumor growth and inducing tumor regression, and will potentiate the effects of conventional treatment approaches, particularly radiotherapy, for inducing glioma cell killing.
Role:  Co-Investigator


**Prior Grant Support**

| | |
|---|---|
| 1995-1997 | Murine Model of Retroviral Encephalitis<br>Children's Hospital of Pittsburgh Research Fund ($50,000)<br>0% effort, 0% support |
| 1995-1998 | Blood Brain Barrier in HIV encephalitis (PI: Achim)<br>Co PI. 10% effort and salary ($186,264) |
| 11/98 | PD Center Grant, Equipment $6000<br>for freezer for PD Brain Bank (one time equipment funding) |
| 7/1/98-6/30/99 | Neurotrophic Factors in SIV encephalitis<br>Competitive Medical Research Fund (CMRF), $25,000,<br>0% effort, 0% support |
| 12/01/98-11/30/99 | Parkinson's Disease Brain Bank<br>PI: Hamilton RL<br>Parkinson's Disease Foundation ($24,899) 0% effort, 0% support |
| 7/1/98-6/30/00 | Molecular Markers of Prognosis in Pediatric Gliomas |

**Ronald L. Hamilton, M.D.**

> PAR 95-063, NIH
> PI: IF Pollack
> 10% effort and support ($263,311)

4/1/00-3/31/01:  Alpha-synuclein Aggregation in Dementia With Lewy Bodies
> PI: RL Hamilton
> Parkinson's Disease Foundation Seed Money Grant, $25,000 0% effort, 0% support

10/1/00-9/30/02    Millennium Agreement (Neuro Module)
> PI: Rajiv Dhir
> 0% effort, 0% Support.
> ($25,000 per year for supplies, plus support for 100% Level IV Res Tech)

1/1/99 – 12/31/03 COG Brain Tumor Resource Laboratory
> PI: Pollack, IF ($5800)  (subcontract 6172)
> Co-I – 5% effort and support
> NIH-U10 CA13539-27

3/01/02 - 2/28/07 - Supplemental Award to Establish a Late Life Mood Disorder Brain Bank
> PI: RA Sweet (for supplement)
>> Supplement to 3 P30 MH52247-08S1 (PI: CF Reynolds)
>> Co-I : 5% effort and support

7/1/98-6/30/05 Morphologic/Neurochemical Correlates of Depression in AD
> PI: G Zubenko
>> 2.5% effort and support ($20,000)

National Institutes of Health              09/30/03 – 07/31/08              5%
R01 NS048595    (PI: Montine)              $75,000

*Subcontract to the University of Washington on grant "Characterization of DLB: a Collaborative Study"*
The major goal of this multi-institutional project is to investigate the role of ApoE4 alleles and other genetic polymorphisms in the Lewy Body Variant of Alzheimer's Disease

R01 MH072947    (PI: Butters)          12/1/04 –11/30/11            0.36 calendar months
National Institutes of Health                  $6,018
Pathways Linking Late Life Depression to Mild Cognitive Impairment and Dementia
The goal of this project is to investigate the relationships among late-life depression (LLD), cognitive impairment and progressive neurodegeneration.
Role:  Co-Investigator

R01 MH072947    (PI: Butters)          12/1/04 –11/30/11            0.36 calendar months
National Institutes of Health                  $6,018
Pathways Linking Late Life Depression to Mild Cognitive Impairment and Dementia
The goal of this project is to investigate the relationships among late-life depression (LLD), cognitive impairment and progressive neurodegeneration.
Role:  Co-Investigator

**<u>Seminars and Invited Lectureships Related to Research</u>**

Presentation of an Unknown Case (Herpes simplex brainstem encephalitis) to American Association of Neuropathologists Annual Meeting, June 1992: St. Louis, MO.

**Ronald L. Hamilton, M.D.**

Presentation of an Unknown Case (Varicella zoster virus encephalitis in an AIDS patient) to XII International Congress of Neuropathology, Sept, 1994: Toronto, Ont, Canada.

Presentation of an Unknown Case (Atypical neurocytoma) to American Association of Neuropathologists Annual Meeting, June 2002: Denver (presenter: Rafael Medina-Flores).

**Other Research Related Activities**

| | |
|---|---|
| 1995-2003 | Co-Director, Neuropathology Core ADRC |
| 2003-2012 | Director, Neuropathology Core ADRC. |
| 1995-2012- | Director, Neuropathology Brain Bank |
| 1997 - present - | Director of Neurohistology laboratory |
| 1997-present | Co-Director, Brain Tumor Resource Laboratory, Children's Cancer Group |
| 2001- 2009 | Director of Neuropathology Core of the Stephen Tuttle ALS Tissue Bank. |
| 2001-present | Co-Director, UP Brain Tumor Bank |

**CURRENT RESEARCH INTERESTS**

1. Molecular Biology of Brain Tumors

**SERVICE**

**University and Medical School**

Residency Committee (Pathology) – 1997 to 2008
Institutional Review Board        3/02 – 5/2005
'Member of the UPSOM Interviewing Committee' jan 2010-present
Member, UPMC Professional Practice and Ethics Committee Jan 2014 - present

**OTHER**

| | |
|---|---|
| 4/1996 - present | Case Editor - Brain Pathology, |
| | Case of the Month feature |
| | Case of the Month web site |
| | Increase to 2 cases per month 1/2007 |
| 10/99 | ad hoc reviewer, J Neuroscience |
| 1/2000 | ad hoc reviewer, J American Medical Association (JAMA) |
| 3/2000 | ad hoc reviewer, Neuropathology and Applied Neurobiology |
| 3/01 | ad hoc reviewer American Journal Pathology |
| 5/02 | ad hoc reviewer Neuroscience |
| 11/02 | ad hoc reviewer JNEN |
| 2004 | AANP Awards Committee, AANP, Cleveland |
| 2006 | AANP Awards committee, AANP-ISN San Fran |
| 10/2006 | ad hoc reviewer        Eur J Neurosci |
| 2/2007 | Ad hoc reviewer        Neuroscience |
| 2007 | Chairmen, Awards Committee, AANP Washington DC. (2 year term) |
| 7/29/2007 | ad hoc reviewer, Brain Pathology |
| 7/25/2007 | ad hoc reviewer Acta Neuropathologica |
| 10/19/2007 | ad hoc reviewer J Neuropathol Exp Neurol |
| 2008 | Chairman Awards Committee AANP, San Diego Annual Meeting |
| 2008 | ad hoc reviewer Brain Pathology |
| 2009 | ad hoc reviewer Pedi and Developmental Pathology |
| 2009 | ad hoc reviewer Amer. J. Pathol. |

**Ronald L. Hamilton, M.D.**

2014 – Featured in non-fiction book: League of Denial:  The NFL, Concussions and the Battle for the Truth (Crown Publishing, New York). Chapters 8 and 10 detail my role in the discovery of CTE in NFL football players.

January 2015 – Consulted with Sony Pictures about movie CONCUSSION based on the discovery of Chronic Traumatic Encephalopathy (CTE) in American NFL football players by my student, Bennet Omalu and me in July 2005.  I was also interviewed on the set by Sony documentary filmmakers for a bonus feature on the DVD:  The Making of "Concussion."  The movie is scheduled to be released Christmas Day, Dec 25, 2015.

January 2015 – interviewed by Jeane Marie Laskas (who wrote the 2009 GQ article the movie is based on) for a companion book to be released with the movie, December 2015.


**International Invitations**

1998 – Invited lecturer at Barcelona-Pittsburgh ADRC meeting, "Dementia Today," Barcelona, Spain (Oct 1998)

2000 – Invited lecturer at Barcelona-Pittsburgh ADRC meeting Dementia Today II", Barcelona, Spain (Oct 2000)

2001 - Invited symposia speaker at 10th Congress of the International Psychogeriatric Association (Nice, France, Sept 2001). "Pathological Diagnosis of Dementia With Lewy Bodies" (Symposia Organizer, Ian McKeith)

2002 – Invited lecturer at Barcelona-Pittsburgh ADRC meeting Dementia Today III", Barcelona, Spain (Oct 2002)

2003 – Symposium speaker "Dementia with Lewy Bodies" at International Psychogeriatric Associations meeting, Chicago, IL, USA, 08/19/03

2004  Invited lecturer at Barcelona-Pittsburgh ADRC meeting Dementia Today IV", Barcelona, Spain (Oct 2004)

2006  Invited lecturer at Barcelona-Pittsburgh ADRC meeting Dementia Today V", Barcelona, Spain (Oct 2006)

2008  Invited lecturer at Barcelona-Pittsburgh ADRC meeting Dementia Today VI", Barcelona, Spain (May 2008)

2014 – Invited lecturer AANP annual meeting June 2014.  What Every Neuropathologist Should Know: Molecular studies in metastatic brain tumors.

2014 - Invited as member of scientific committee International Congress of Neuropathology quadrennial meeting Sept 2014, Rio de Janeiro

2014 – Chair of Forensic Pathology Session, committee International Congress of Neuropathology quadrennial meeting Sept 2014, Rio de Janeiro

2014 – co-chair telepathology session with Dr. Wiley

2014 – Presentation – Chronic Traumatic Encephalopathy – update, International Congress of Neuropathology quadrennial meeting Sept 2014, Rio de Janeiro

2014 – presentation – Cases of the Month – 16 Years of Unknowns  International Congress of Neuropathology quadrennial meeting Sept 2014, Rio de Janeiro s



University of Pittsburgh
Physicians, Department
of Pathology

Division of Neuropathology

Clayton A. Wiley, MD, PhD
Director

Charleen T. Chu, MD, PhD
Robert H. Garman, DVM
Ronald Hamilton, MD
Julia Kofler, MD
Scott M. Kulich, MD, PhD
David Lacomis, MD
Geoffrey Murdoch, MD, PhD
Gutti R. Rao, MD

UPMC Presbyterian
Room 5701 Scaife Hall
200 Lothrop Street
Pittsburgh, PA 15213
T 412-624-9415
F 412-624-5610

To Whom it may concern,

I have conducted a study of F. Cornish's brain tissue. Additionally, in my Neuropathology practice I conduct an ongoing study of all available and existing medical literature related to the existence and diagnosis of CTE and I combine that knowledge with my training and extensive experience related to the study and diagnosis of CTE.

Frank Cornish died on August 23, 2008.

Received from the Tarrant County Medical Examiner are three H&E stained slides (08-10049 slides 1, 2 and 3) and their corresponding formalin-fixed paraffin embedded tissue blocks.

H&E stained recuts are examined:

    slide 1 has neocortex, basal ganglia and thalamus;

    slide 2 has cerebellum and medulla;

    slide 3 has neocortex and midbrain with substantia nigra.

Immunostain of slide 1 for the AD-related protein Beta-A4 is negative. Tau immunostains (PHF-1) are negative in the cerebellum and medulla (slide 2), but reveal numerous neocortical PHF-1/tau positive tangles in neurons (Fig 1a), with staining of many neuronal processes (neuropil threads) (Fig 1b) as well as tau-positive glial cells (Fig 1c), especially in the depths of the sulcus and focally around some blood vessels. In the midbrain, the substantia nigra had tangles and neuropil threads (Fig 1d). The mesencephalic tegmentum shows many tau-positive neurons in the oculomotor nucleus . These histopathologic findings are diagnostic of CTE.



Frank Cornish had CTE.

Sincerely
/s/
Ronald L Hamilton, M.D.

Affiliated with the University of Pittsburgh School of Medicine

**CERTIFICATION OF VITAL RECORD**

# CITY OF GRAPEVINE, TEXAS
## VITAL STATISTICS DIVISION

STATE OF TEXAS     CERTIFICATE OF DEATH     STATE FILE NUMBER

1. DECEDENT'S NAME (Include AKA's, if any)
FRANK EDGAR CORNISH IV

2. DATE OF DEATH - ACTUAL OR PRESUMED
08/23/2008

3. SEX
MALE

4. DATE OF BIRTH
09/24/1967

5. AGE
40

6. BIRTHPLACE (City & State or Foreign Country)
CHICAGO, IL

7. SOCIAL SECURITY NUMBER
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

8. MARITAL STATUS AT TIME OF DEATH
☒ Married

9. SURVIVING SPOUSE'S NAME (if wife, give maiden prior to first marriage)
ROBIN BLAKE

10. RESIDENCE-STREET ADDRESS
305 SHEFFIELD DRIVE

11. COUNTY
TARRANT

12. STATE
TEXAS

13. ZIP CODE
76092

14. CITY OR TOWN
SOUTHLAKE

15. INSIDE CITY LIMITS
☒ Yes   ☐ No

16. FATHER'S NAME
FRANK EDGAR CORNISH III

17. MOTHER'S NAME PRIOR TO FIRST MARRIAGE
GLORIA KNIGHTEN

18. DEATH OCCURRED IN A HOSPITAL?   IF DEATH OCCURRED SOMEWHERE OTHER THAN A HOSPITAL
☒ Inpatient  ☐ ER/Outpatient  ☐ DOA     ☐ Hospice Facility  ☐ Nursing Home  ☐ Decedent's Home  ☐ Other (Specify)

19. COUNTY OF DEATH
TARRANT

20. CITY OR LOCATION OF DEATH
GRAPEVINE, 76051

21. FACILITY NAME (If not institution, give street address)
BAYLOR MEDICAL CENTER AT GRAPEVINE

22. INFORMANT'S NAME & RELATIONSHIP TO DECEASED
ROBIN B. CORNISH - WIFE

23. MAILING ADDRESS OF INFORMANT (Street and Number, City, State, Zip Code)
305 SHEFFIELD DRIVE, SOUTHLAKE, TX 76092

24. METHOD OF DISPOSITION
☒ Burial   ☐ Cremation   ☐ Donation
☐ Entombment   ☐ Removal from state
☐ Other (Specify)

25. SIGNATURE AND LICENSE NUMBER OF FUNERAL DIRECTOR OR PERSON ACTING AS SUCH
JOHN BECKWITH - BY ELECTRONIC SIGNATURE - 9037

26. PLACE OF DISPOSITION (Name of cemetery, crematory, other place)
BLUEBONNET CEMETERY

27. LOCATION (City, State)
COLLEYVILLE, TX

28. NAME OF FUNERAL FACILITY
GOLDEN GATE FUNERAL HOME-THORNTON FRWY

29. COMPLETE ADDRESS OF FUNERAL FACILITY (Street and Number, City, State, Zip Code)
4155 S. R.L. THORNTON FRWY, DALLAS, TX 75224

30. PRINTED NAME, ADDRESS OF CERTIFIER (Street and Number, City, State, Zip Code)
MARC ANDREW KROUSE , BY ELECTRONIC SIGNATURE

DATE CERTIFIED
08/28/2008

LICENSE NUMBER
E8845

TIME OF DEATH
09:18 AM

31. PRINTED NAME, ADDRESS OF CERTIFIER (Street and Number, City, State, Zip Code)
MARC ANDREW KROUSE 200 FELIKS GWOZDZ PLACE, FORT WORTH, TX 76104-4919

TITLE OF CERTIFIER
M E

32. PART I. ENTER THE CHAIN OF EVENTS --DISEASES, INJURIES, OR COMPLICATIONS-- THAT DIRECTLY CAUSED THE DEATH. DO NOT ENTER TERMINAL EVENTS SUCH AS CARDIAC ARREST, RESPIRATORY ARREST, OR VENTRICULAR FIBRILLATION WITHOUT SHOWING THE ETIOLOGY. DO NOT ABBREVIATE. ENTER ONLY ONE CAUSE ON EACH

IMMEDIATE CAUSE (Final disease or condition resulting in death)
a. SUDDEN ADULT DEATH WITH EVIDENCE OF HYPERTENSIVE HEART DISEASE

Approximate interval Onset to death
UNKNOWN

Sequentially list conditions, if any, leading to the cause listed on line a. Enter the UNDERLYING CAUSE (disease or injury that initiated the events resulting in death) LAST.

b. Due to (or as a consequence of):

c. Due to (or as a consequence of):

d. Due to (or as a consequence of):

33. PART II. ENTER OTHER SIGNIFICANT CONDITIONS CONTRIBUTING TO DEATH BUT NOT RESULTING IN THE UNDERLYING CAUSE GIVEN IN PART I

34. WAS AN AUTOPSY PERFORMED?
☒ Yes   ☐ No

35. WERE AUTOPSY FINDINGS AVAILABLE TO COMPLETE THE CAUSE OF DEATH?
☒ Yes   ☐ No

36. MANNER OF DEATH
☒ Natural
☐ Accident
☐ Suicide
☐ Homicide
☐ Pending Investigation
☐ Could not be determined

37. DID TOBACCO CONTRIBUTE TO DEATH
☐ Yes
☒ No
☐ Probably
☐ Unknown

38. IF FEMALE
☐ Not pregnant within past year
☐ Pregnant at time of death
☐ Not pregnant, but pregnant within 42 days of death
☐ Not pregnant, but pregnant 43 days to one year before death
☐ Unknown if pregnant within the past year

39. IF TRANSPORTATION INJURY, SPECIFY
☐ Driver/Operator
☐ Passenger
☐ Pedestrian
☐ Other (Specify)

40. DATE OF INJURY (Mo/Day/Yr)

41. TIME OF INJURY

42. INJURY AT WORK?
☐ Yes   ☐ No

43. PLACE OF INJURY (e.g. Decedent's home, construction site, restaurant, wooded area)

44a. LOCATION (Street and Number, City, State, Zip Code)

45. COUNTY OF INJURY

47. DESCRIBE HOW INJURY OCCURRED

48a. REGISTRAR FILE NO.
15-265

48b. STATE RECEIVED BY LOCAL REGISTRAR
08/28/2008

49. REGISTRAR
REGISTRAR - CITY OF GRAPEVINE, ELECTRONICALLY FILED

VS-112 REV 1/2006

CONTROL NO.
**76861**

This is to certify that this is a true and correct reproduction of the original record as recorded in this office. Issued under authority of Sec. 191.051, Health and Safety Code.

FEB-06 '09 PM01:27

ISSUED

*Linda Huff*
LINDA HUFF
LOCAL REGISTRAR

5218

WARNING: IT IS ILLEGAL TO DUPLICATE THIS COPY

ANY ALTERATION OR ERASURE VOIDS THIS CERTIFICATE

THE STATE OF TEXAS

THE CITY OF GRAPEVINE, TEXAS



Office of Chief Medical Examiner
Tarrant County Medical Examiner's District
Tarrant County, Texas
200 Feliks Gwozdz Place, Fort Worth, Texas 76104-4919
(817) 920-5700  FAX (817) 920-5713

# AUTOPSY REPORT

**Name: Frank Cornish**
**Approximate Age: 40 years**
**Height: 79 inches**

**CASE NO: 0810049**
**Sex: Male**
**Weight: 327.6 pounds**

I hereby certify that on the **24**th day of **August 2008**, beginning at 0805 hours, I, Marc A. Krouse, M.D., pursuant to Statute 49.25 of Texas Criminal Code, performed an inspection and autopsy limited to the cranial cavity, neck, and thoracic cavity,  on the body of **Frank Cornish** at the Tarrant County Medical Examiner's District Morgue in Fort Worth, Texas and upon investigation of the essential facts concerning the circumstances of the death and history of the case as known to me, I am of the opinion that the findings, cause and manner of death are as follows:

**FINDINGS:**
I)    Marked cardiomegaly (758 gms) with left ventricular hypertrophy and mild coronary arterial sclerosis, consistent with hypertensive heart disease
II)   Multinodular goiter
III)  No evidence of trauma
IV)  Postmortem toxicology attached

**CAUSE OF DEATH:    SUDDEN ADULT DEATH WITH EVIDENCE OF HYPERTENSIVE HEART DISEASE**

**MANNER OF DEATH:  NATURAL**

Signature

**Marc A. Krouse, M.D.**
**Deputy Chief Medical Examiner**



0810049
Frank Cornish

Inspection and autopsy limited to the cranial cavity, neck, and thoracic cavity are performed August 24, 2008 at 8:05 a.m. (cranial cavity exam 08/25/08 at 0900).

## GROSS ANATOMIC DESCRIPTION

**I.    CLOTHING AND PERSONAL EFFECTS:** At the time of examination the body is clothed in white briefs and wrapped in white sheets.

**II.    THERAPEUTIC INTERVENTION:** Evidence of medical intervention includes an oral endotracheal tube secured with tape, intravenous line in the right antecubital fossa, right tibial intraosseous line, and 1 electrocardiographic monitor pad on the torso.

**III.    EXTERNAL BODY DESCRIPTION:** The body is that of a normally developed, large muscular and slightly obese adult African American male appearing near the stated age of 40 years. The body length is 79 inches and the weight is 327.6 pounds (200 cm, 143.6 kg). The body is well-preserved, unembalmed, and cool. Rigor is full. Lividity is developed over the head and back, is purple, and fixed.

The scalp is shaved except for a black and occasional gray mustache and goatee. The face is shaved and body hair is male distribution.

The calvarium is symmetric and intact to palpation and the scalp is intact. The eyes are closed, the corneas are slightly clouded. There is no conjunctival hemorrhage. The irides are brown and the pupils are 6 mm. Orbital soft tissues are unremarkable. The nasal and oral cavities are clear. Lips and oral mucosa are cyanotic. The dentition is natural and well-maintained. The external ears are clear and a single healed pierce is found in the left earlobe. The face, neck, and larynx are symmetric and intact and the trachea and larynx are midline.

The anterior chest is symmetric and intact. The breasts are male. The abdomen is minimally protuberant and the pelvis is intact. The penis is uncircumcised and the testes are descended. The perineum and anal orifice are unremarkable. The back is symmetric and intact.

0810049
Frank Cornish

The extremities are symmetric, normally developed, and are intact. The nails of the hands and feet are cyanotic. A healed 18 cm scar is found along the left hip and upper thigh.

There are no external signs of trauma or foul play.

## IV.   INTERNAL EXAMINATION

**1.   INTEGUMENT:**   The body is opened with a modified thoracoabdominal and coronal scalp incision. The viscera are examined in situ and neck and thoracic viscera and cranial contents are removed for further inspection.

**2.   SEROUS CAVITIES:**   The soft tissues of the anterior chest and neck are unremarkable. There is no evidence of occult trauma. The serous cavity membranes are smooth. There is no hemorrhage or fluid accumulation within major body cavities.

**3.   CARDIOVASCULAR SYSTEM:**   The thoracic and abdominal aorta, vena cava and pulmonary arteries and veins are unremarkable. The major vessels and heart contain fluid blood and scattered postmortem thrombi. There is patchy intimal hemoglobin staining.

The heart weighs 758 gms. The coronary arteries arise normally and posterior circulation is right dominant. Circumferential sclerosis produces approximately 10-15% occlusion of the surface coronary arteries with an atheromatous plaque adding to approximately 25% occlusion of the proximal left anterior descending coronary. All cardiac chambers are dilated and there is symmetric hypertrophy of the left ventricle (anterior left ventricle 2.3 cm, septum 2.2 cm, right ventricle 0.5 cm). The myocardium is otherwise grossly unremarkable. The endocardium and cardiac valves are unremarkable.

**4.   RESPIRATORY SYSTEM:**   The larynx and hyoid are intact. Central and peripheral airways are clear. The lungs are congested. There is patchy lower lobe edema with no additional gross pulmonary pathology. The right lung weighs 780 gms and the left 678 gms.

**5.   GASTROINTESTINAL SYSTEM:**   The pharynx and esophagus are intact and unremarkable. Limited inspection of intraabdominal organs is remarkable only for slight yellow-tan coloration of the liver parenchyma.

0810049
Frank Cornish

**6.    HEMATOPOIETIC SYSTEM:** Lymph nodes of the neck and thorax are unremarkable. The thymus is involuted.

**8.    ENDOCRINE SYSTEM:** There is a multinodular goiter (some with cystic degeneration) and the total mass of the thyroid gland is 143 gms. Parathyroid glands are not identified. The pituitary is grossly unremarkable.

**9.    CRANIAL CAVITY/CENTRAL NERVOUS SYSTEM:** Subgaleal soft tissues are unremarkable. There is no evidence of occult head trauma. The calvarium and base of the skull are intact. The cerebrospinal fluid is clear and the meninges are congested. The arteries over the base of the brain and dural sinuses are intact and unremarkable.

The brain weighs 1505 gms. There is slight brain swelling with notching of the uncal gyri and cerebellar tonsils but no evidence of overt herniation. The gray and white matter of the brain are grossly unremarkable. The ventricular system is patent and contains clear cerebrospinal fluid. The upper cervical spinal cord is unremarkable. The atlanto-occipital joint is intact.

## SPECIMENS AND EVIDENCE COLLECTED

1.    Aortic blood 30 mL, femoral venous blood 30 mL, and vitreous humor 5 mL for toxicology
2.    Samples of viscera in fixative
3.    Blood card
4.    Five photographs

EDC: 10/23/08
Dictated: 09/02/08
Transcribed: 09/04/08
Completed: 09/04/08
MAK:cal

# Toxicology Test Results

Office of Chief Medical Examiner
Toxicology Laboratory Service
200 Feliks Gwozdz Place
Fort Worth, Texas 76104
Name: Frank Edgar Cornish
Case Number: 0810049
Toxicology Work Number: 0801591

Nizam Peerwani, M.D., DABFP
Chief Medical Examiner
Angela Springfield, PH.D., DABFT
Chief Toxicologist
Priority: 1

Service Request Number: 002

| Specimen | Drug | Result | Drug Amount | Performed By |
|----------|------|--------|-------------|--------------|
| AORTA BLOOD | ETHANOL | NEGATIVE | | J HO |
| AORTA BLOOD | BASE | NEGATIVE | | C WHEELER |
| AORTA BLOOD | ACID | NEGATIVE | | C WHEELER |

Report Prepared By:

Approved By:

Approved Date: 8/28/08

# NFL CONCUSSION SETTLEMENT

*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

## MONETARY AWARD CLAIM PACKAGE HIPAA AUTHORIZATION FORM

You must complete and sign this Form if you are a **Retired NFL Football Player** or the **Representative Claimant** of a Retired NFL Football Player and want to apply for a Monetary Award. This Form authorizes the use and disclosure of "Protected Health Information" as that term is defined in 45 C.F.R. § 160.103, relating to the processing of your claim in the NFL Concussion Settlement Program. Protected Health Information includes, but is not limited to, information regarding the Retired NFL Football Player's medical care, treatment, physical or mental condition, and medical expenses.

### I. RETIRED NFL FOOTBALL PLAYER INFORMATION

| Settlement Program ID | | 950012548 | | | |
|---|---|---|---|---|---|
| **Player Name** | First<br>Frank | | M.I. | Last<br>Cornish | Suffix |
| **Social Security Number, Taxpayer ID or Foreign ID Number** (if Retired NFL Football Player is not a U.S. Citizen) **of Retired NFL Football Player** (if known) | | | \|3\|4\|0\| - \|7\|2\| - \|4\|0\|6\|8\|<br>**or** | | |
| **Date of Birth of Retired NFL Football Player** | | | \|0\|9\|/\|2\|4\|/\|1\|9\|6\|7\|<br>(Month/Day/Year) | | |

### II. ENTITIES AUTHORIZED TO USE AND DISCLOSE PROTECTED HEALTH INFORMATION

By signing and submitting this Form, I authorize the use and disclosure of all Protected Health Information regarding my (or the Retired NFL Football Player's, if signed by a Representative Claimant) medical care, treatment, physical or mental condition, and medical expenses relating to my claim in the *In re: National Football League Players' Concussion Injury Litigation* Settlement program, as follows: (1) by the Claims Administrator, Special Master, BAP Administrator, Lien Resolution Administrator, designated Qualified BAP Providers, Qualified BAP Pharmacy Vendors, Qualified MAF Physicians, Appeals Advisory Panel members, Appeals Advisory Panel Consultants, the Court, Class Counsel, Counsel for the NFL Parties and the NFL Parties (which, in turn, may share the Protected Health Information with the NFL Parties' insurers or reinsurers) for use and/or disclosure with one another in the performance of their functions and duties pursuant to the Settlement Agreement; (2) by the Lien Resolution Administrator for use and/or disclosure to the holders of any liens, claims, or rights of subrogation, indemnity, reimbursement, conditional or other payments, or interests of any type, including all Governmental Payors (such as the Medicare Program, any state Medicaid Program, the Department of Veterans Affairs, Tricare, Indian Health Services, and their respective contractors), Medicare Part C or Part D Programs, private health care providers, health plans, and health insurers, and any contractors or recovery agents of the foregoing persons and entities (collectively, "Lienholders"), for the purpose of identifying and resolving any potential Liens in connection with any Monetary Award that I may receive; and (3) by the Lienholders for disclosure to the Lien Resolution Administrator and Claims Administrator for the purpose of identifying and resolving any potential Liens in connection with any Monetary Award that I may receive.

## MONETARY AWARD CLAIM PACKAGE HIPAA AUTHORIZATION FORM

### III. AUTHORIZATION

By signing below, I acknowledge and understand all of the following:

| | |
|---|---|
| 1. | I have the right to revoke this authorization at any time. If I wish to revoke the authorization, I must do so in writing and must provide my written revocation to the Claims Administrator. The written revocation must be signed and dated. The revocation will not apply to any disclosures that already have been made in reliance on this authorization prior to the date upon which the Claims Administrator receives my written revocation. |
| 2. | My authorization of the disclosure of the subject Retired NFL Football Player's Protected Health Information is voluntary, which means I can refuse to sign this Form. I do not need to sign this Form to obtain health treatment from any medical provider or to enroll in or be eligible for any health plan benefits. However, I recognize that if I do not sign this Form and submit it to the Claims Administrator, my Claim Package will be incomplete under the terms of the Settlement Agreement and will not be processed. |
| 3. | Any Protected Health Information or other information released to the Claims Administrator, Special Master, BAP Administrator, Lien Resolution Administrator, Qualified BAP Providers, Qualified BAP Pharmacy Vendors, Qualified MAF Physicians, Appeals Advisory Panel members, Appeals Advisory Panel Consultants, the Court, Class Counsel, Counsel for the NFL Parties and the NFL Parties (including the NFL Parties' insurers or reinsurers) may be subject to re-disclosure by such person/entity, and may no longer be protected by applicable federal and state privacy laws. Each of those persons and entities, however, is permitted to use and disclose your information only in accordance with this Form, the Settlement Agreement, a contract executed pursuant to the Settlement Agreement, orders of the Court, and/or applicable law. |
| 4. | My Protected Health Information may include information relating to sexually transmitted disease, acquired immunodeficiency syndrome ("AIDS"), or human immunodeficiency virus ("HIV"), behavioral or mental health services and treatment for alcohol and drug abuse. |
| 5. | This Form is valid from the date of my signature in Section IV until the date that the Claims Administrator performs the last act to process the claim for a Monetary Award that I submitted with this Form. |
| 6. | I have a right to receive and retain a copy of this Form. |
| 7. | Any photostatic copy of this Form shall have the same authority as the original, and may be substituted in its place. |

### IV. SIGNATURE

The Retired NFL Football Player or Representative Claimant of the Retired NFL Football Player named in Section I must sign and date this Form below. **By signing below, I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that all information provided in this HIPAA Authorization Form is true and correct to the best of my knowledge, information and belief.**

| Signature | | Date | 0 3/ 0 5/ 2 0 1 9 (Month/Day/Year) | |
|---|---|---|---|---|
| **Printed Name** | First Robin | M.I. B | Last Cornish | Suffix |
| If you are signing this Form as a Representative Claimant, describe your relationship to the Retired NFL Football Player and your authority to act on his behalf: | | Widow | | |

| MONETARY AWARD CLAIM PACKAGE HIPAA AUTHORIZATION FORM | |
|---|---|
| V. HOW TO SUBMIT THIS FORM | |
| You may submit this Form in one of two ways: | |
| By U.S. Mail: | NFL Concussion Settlement<br>Claims Administrator<br>P.O. Box 25369<br>Richmond, VA 23260 |
| By Delivery: | NFL Concussion Settlement<br>c/o BrownGreer PLC<br>250 Rocketts Way<br>Richmond, VA 23231 |

 **CONCUSSION SETTLEMENT**
*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

### PRE-EFFECTIVE DATE DIAGNOSING PHYSICIAN CERTIFICATION FORM
**(for diagnoses made by physicians who are qualified to render Qualifying Diagnoses for purposes of Monetary Award claims before January 7, 2017)**

This Pre-Effective Date Diagnosing Physician Certification Form is to be used only by physicians qualified to render Qualifying Diagnoses before January 7, 2017, in connection with the Class Action Settlement in In re: National Football League Players' Concussion Injury Litigation and who made a Qualifying Diagnosis before January 7, 2017. The Qualifying Diagnoses are found in Appendix A to this Pre-Effective Date Diagnosing Physician Certification Form.

Use this form to certify a Qualifying Diagnosis you made before January 7, 2017, based on your personal examination of the Retired NFL Football Player. **Do not sign this form unless you personally examined the player** or, in the case of a Qualifying Diagnosis of Death with CTE, you are the board-certified neuropathologist who made the post-mortem diagnosis of CTE. If you made a Qualifying Diagnosis as a Qualified MAF Physician on or after January 7, 2017, do not use this form; use the MAF Diagnosing Physician Certification Form instead. Also, if you are a Qualified BAP Provider certifying a diagnosis you made in the Baseline Assessment Program, do not use this form; use the BAP Diagnosing Physician Certification Form instead.

You must complete this form in its entirety, sign it under penalty of perjury, and return it to the patient along with copies of all supporting medical records that you created or received in connection with the Qualifying Diagnosis. In turn, the patient, or the patient's counsel, must submit this form and all supporting medical records referred to above to the Claims Administrator as part of a claim for compensation under the Class Action Settlement. The Claims Administrator will review the form, including your qualifications to provide the Qualifying Diagnosis, and the supporting medical records. All claims also are subject to audit. Any finding of fraudulent conduct by you will be subject to, without limitation, your referral to appropriate regulatory and disciplinary boards and agencies and/or federal authorities, and your disqualification from serving in any aspect of the Class Action Settlement.

You are required to preserve all supporting medical records that you created or received in connection with the Qualifying Diagnosis for the greater of: (a) 10 years after January 7, 2017; or (b) the period of time required under applicable state and federal laws.

If you have any questions, call the Claims Administrator toll free at 1-855-887-3485 or visit the Settlement Website at https://www.nflconcussionsettlement.com.

---

## PRE-EFFECTIVE DATE DIAGNOSING PHYSICIAN CERTIFICATION FORM
**(for diagnoses made by physicians who are qualified to render Qualifying Diagnoses for purposes of Monetary Award claims before January 7, 2017)**

### I. PATIENT INFORMATION

| Settlement Program ID (if known) | 950013395 | | |
|---|---|---|---|

| Name: | First Christopher | M.I. | Last Mims | Suffix |
|---|---|---|---|---|

| Address: | Address 1 1715 W. 70Th Street | | |
|---|---|---|---|
| | Address 2 | | |
| | City Los Angeles | | |
| | State/Province CA | | |
| | Postal Code 90047 | Country United States | |

| Telephone | ⎵⎵⎵⎵ - ⎵⎵⎵⎵ - ⎵⎵⎵⎵⎵ |
|---|---|

| Date of Birth | 0 9 / 2 9 / 1 9 7 0 (Month/Day/Year) |
|---|---|

| Date of Death (if applicable) | 1 0 / 1 5 / 2 0 0 8 (Month/Day/Year) |
|---|---|

### II. DIAGNOSING PHYSICIAN INFORMATION

| National Provider Identifier (NPI) | 1013980978 | | |
|---|---|---|---|

| Physician Name | First Ronald | M.I. L. | Last Hamilton | Suffix |
|---|---|---|---|---|

**(a) Are you approved as a Qualified BAP Provider or a Qualified MAF Physician?**

☐ **YES.** If YES, you do not need to fill out the rest of this Section II or Sections III or IV. Instead, go to Section V.

☒ **NO.**

**(b) If you answered No, have you previously completed this form for another Retired NFL Football Player, that you know was submitted to the Claims Administrator?**

☐ **YES.** If YES, you do not need to fill out this Section II or Sections III or IV. Instead, go to Section V.

☒ **NO.**

If you answered No to both questions, fill out the rest of this Section II and then go to Section III.

## PRE-EFFECTIVE DATE DIAGNOSING PHYSICIAN CERTIFICATION FORM
### (for diagnoses made by physicians who are qualified to render Qualifying Diagnoses for purposes of Monetary Award claims before January 7, 2017)

| | |
|---|---|
| Office/Practice Name | University of Pittsburgh Medical Center |

| | |
|---|---|
| **Address** | Address 1 <br> A724.1 Scaife Hall <br> Address 2 <br> 200 Lothrop Street <br> City <br> Pittsburgh <br> State/Province <br> Pennsylvania <br> Postal Code      Country <br> 15213      USA |
| Telephone | 4 1 2 - 6 2 4 - 6 6 1 0 |
| Fax | 4 1 2 - 6 2 4 - 5 4 8 8 |
| Email Address | hamiltonrl@upmc.edu |

## III.   BOARD CERTIFICATIONS

Check all board certifications that apply and list the board providing the certification and any identification number provided by the board (*e.g.*, American Board of Psychiatry and Neurology diplomate number). If you do not have any board certifications, summarize your relevant medical training and experience and then go to Section IV.

| | Certification | Board | Board Identification Number | Effective Date | Expiration Date |
|---|---|---|---|---|---|
| ☐ | Neurology | | | | |
| ☐ | Neurosurgery | | | | |
| X | Neuropathology | American Board of Pathology | | certified: 5/23/1996 <br> recertified:1/1/2014 | |
| ☐ | Neuropsychology | | | | |
| ☐ | Other Neuro-specialty | | | | |
| X | Other Board Certification | American Board of Pathology | | certified: 5/23/1996 | |

## PRE-EFFECTIVE DATE DIAGNOSING PHYSICIAN CERTIFICATION FORM
### (for diagnoses made by physicians who are qualified to render Qualifying Diagnoses for purposes of Monetary Award claims before January 7, 2017)

If you are not board-certified in a neuro-specialty area, summarize your relevant medical training and experience in the field of neurology and related fields that you believe qualifies you to make the diagnosis provided in Section V.

### IV.    OTHER QUALIFICATIONS

| Educational Information | | Education Level | Institution | Degree/Area of Focus | Date Received |
|---|---|---|---|---|---|
| | 1. | **Undergraduate Education** | University of Nebraska-Lincoln | B.S / Psychology | 1 9 8 5 (Month/Year) |
| | 2. | **Medical School** | University of Nebraska Medical Center | M.D. | 1 9 8 9 (Month/Year) |
| | 3. | **Internship** | Univ. of California, San Diego | Resident Anatomic Pathology | 1 9 9 1 (Month/Year) |
| | 4. | **Residency** | Univ. of California, San Diego | Resident Neuropathology | 1 9 9 3 (Month/Year) |
| | 5. | **Fellowship** | Univ. of Pittsburgh | Fellow Neuropathology | 1 9 9 4 (Month/Year) |
| | 6. | **Other (Graduate)** | Univ. of Pittsburgh | Fellow: NIMH Training Grant in Neuroscience | 1 9 9 5 (Month/Year) |

| States Where Licensed to Practice | | State | State License Number | Effective Date | Expiration Date |
|---|---|---|---|---|---|
| | 1. | **California** | **G69731** | **9/10/1990** | **Expired** |

**PRE-EFFECTIVE DATE DIAGNOSING PHYSICIAN CERTIFICATION FORM**
(for diagnoses made by physicians who are qualified to render Qualifying Diagnoses for purposes of Monetary Award claims before January 7, 2017)

|  | | | | |
|---|---|---|---|---|
| 2. | Pennsylvania | MD049717L | 5/12/1993 | 12/31/2018 |
| 3. | Indiana | 01067332A | 9/29/2009 | 10/31/2019 |
| 4. | | | | |
| 5. | | | | |
| 6. | | | | |

| Specialties | Check all specialties that apply. |
|---|---|
| | ☐ Neurology |
| | ☐ Neurosurgery |
| | ☒ Neuropathology |
| | ☐ Neuropsychology |
| | ☐ Other Neuro-specialty (*e.g.*, brain injury medicine, clinical neurophysiology, etc.) |
| | ☒ Other Specialty (list all)    **Anatomic Pathology** |

-3232-

**PRE-EFFECTIVE DATE DIAGNOSING PHYSICIAN CERTIFICATION FORM**
**(for diagnoses made by physicians who are qualified to render Qualifying Diagnoses**
**for purposes of Monetary Award claims before January 7, 2017)**

### V. QUALIFYING DIAGNOSIS

Identify the patient's diagnosis and the date of such diagnosis. See **Appendix A** for the criteria for each diagnosis. Other than for Death with CTE, the identification of a condition, including through a blood test, genetic test, imaging technique, or otherwise, that has not yet resulted in actual cognitive impairment and/or actual neuromuscular impairment in the patient is **not** a Qualifying Diagnosis.

| Qualifying Diagnosis | Date of Diagnosis |
|---|---|
| ☐  Level 1.5 Neurocognitive Impairment | \|__\|__\| / \|__\|__\| / \|__\|__\|__\|__\| (Month/Day/Year) |
| ☐  Level 2 Neurocognitive Impairment* | \|__\|__\| / \|__\|__\| / \|__\|__\|__\|__\| (Month/Day/Year) |
| ☐  Alzheimer's Disease | \|__\|__\| / \|__\|__\| / \|__\|__\|__\|__\| (Month/Day/Year) |
| ☐  Parkinson's Disease | \|__\|__\| / \|__\|__\| / \|__\|__\|__\|__\| (Month/Day/Year) |
| ☐  ALS (amyotrophic lateral sclerosis) | \|__\|__\| / \|__\|__\| / \|__\|__\|__\|__\| (Month/Day/Year) |
| ☒  Death with CTE | \| 1 \| 0 \| / \| 1 \| 5 \| / \| 2 \| 0 \| 0 \| 8 \|* (Month/Day/Year) |

* If you provided a diagnosis of Level 2 Neurocognitive Impairment, did you determine that certain testing was medically unnecessary because of the severity of the patient's dementia (*see **Appendix A***)?

☐  YES        ☐  NO

If you answered Yes, provide the factual basis for that determination:

\*Pursuant to FAQ 93, Posted Settlement Program FAQs (as of November 7, 2018), for this claim, "the date of the Qualifying Diagnosis is the date of the Player's death, even though the diagnosis is not made until after the Player dies".

**PRE-EFFECTIVE DATE DIAGNOSING PHYSICIAN CERTIFICATION FORM**
**(for diagnoses made by physicians who are qualified to render Qualifying Diagnoses**
**for purposes of Monetary Award claims before January 7, 2017)**

## VI. CERTIFICATION

By signing below, I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that all information provided in this form, and all related supporting medical records, are true and correct to the best of my knowledge, information and belief, and that I personally examined the Retired NFL Football Player named in Section I or, in the case of a Qualifying Diagnosis of Death with CTE, I am the board-certified neuropathologist who made the post-mortem diagnosis of CTE.

I acknowledge that any finding of fraudulent conduct may subject me to, without limitation, referral to appropriate regulatory and disciplinary boards and agencies and/or federal authorities, and disqualification from serving in any aspect of the Class Action Settlement.

| Signature of Diagnosing Physician | | Date of Signature | 0 2 0 1 2 0 1 9 (Month/Day/Year) |
|---|---|---|---|
| Printed Name | First Ronald | M.I. L. | Last Hamilton |

## APPENDIX A

**Other than for Death with CTE, the identification of a condition, including through a blood test, genetic test, imaging technique, or otherwise, that has not yet resulted in actual cognitive impairment and/or actual neuromuscular impairment experienced by the patient does not qualify as a diagnosis.**

LEVEL 1.5 NEUROCOGNITIVE IMPAIRMENT

**The following diagnosis can only be made:**

> **(1) prior to July 7, 2014, by a board-certified neurologist, board-certified neurosurgeon, other board-certified neuro-specialist physician, or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician, except as provided in (c), below;**

> **(2) from July 7, 2014 through January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified neurologist, board-certified neurosurgeon, or other board-certified neuro-specialist physician, except as provided in (c), below; or**

> **(3) for a patient who died prior to January 7, 2017 (the Effective Date of the Settlement Agreement), where the diagnosis occurred while the patient was living, by a board-certified or otherwise qualified neurologist, neurosurgeon, or other neuro-specialist physician, or by a physician with sufficient qualifications in the field of neurology or neurocognitive disorders to make a diagnosis of Level 1.5 Neurocognitive Impairment:**

A diagnosis made outside of the Baseline Assessment Program (BAP) that a living patient suffers from Level 1.5 Neurocognitive Impairment, as set forth below, *i.e.*, early dementia, based on evaluation and evidence generally consistent with the diagnostic criteria set forth and provided below:

There is: (i) Concern of the patient, a knowledgeable informant, or the Qualified BAP Provider that there has been a severe decline in cognitive function; (ii) Evidence of a moderate to severe cognitive decline from a previous level of performance, as determined by and in accordance with the standardized neuropsychological testing protocol annexed in *Appendix B*, in two or more cognitive domains (complex attention, executive function, learning and memory, language, perceptual-spatial), provided one of the cognitive domains is (a) executive function, (b) learning and memory, or (c) complex attention; (iii) The patient exhibits functional impairment generally consistent with the criteria set forth in the National Alzheimer's Coordinating Center's Clinical Dementia Rating scale Category 1.0 (Mild) in the areas of Community Affairs, Home & Hobbies, and Personal Care—where such functional impairment is corroborated by documentary evidence (*e.g.*, medical records, employment records), the sufficiency of which will be determined by the physician making the diagnosis (and where no documentary evidence of functional impairment exists or is available, then (a) there must be evidence of moderate to severe cognitive decline from a previous level of performance, as determined by and in accordance with the standardized neuropsychological testing protocol annexed in *Appendix B*, in the executive function cognitive domain or the learning and memory cognitive domain, and at least one other cognitive domain; and (b) the patient's functional impairment, as described above, must be corroborated by a third-party sworn affidavit from a person familiar with the patient's condition (other than the player or his family members), the sufficiency of which will be determined by the diagnosing physician); and (iv) The cognitive deficits do not occur exclusively in the context of a delirium, acute substance abuse, or as a result of medication side effects.

## LEVEL 2 NEUROCOGNITIVE IMPAIRMENT

**The following diagnosis can only be made:**

> **(1) prior to July 7, 2014, by a board-certified neurologist, board-certified neurosurgeon, other board-certified neuro-specialist physician, or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician, except as provided in (c), below;**

> **(2) from July 7, 2014 through January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified neurologist, board-certified neurosurgeon, or other board-certified neuro-specialist physician, except as provided in (c), below; or**

> **(3) for a patient who died prior to January 7, 2017 (the Effective Date of the Settlement Agreement), where the diagnosis occurred while the patient was living, by a board-certified or otherwise qualified neurologist, neurosurgeon, or other neuro-specialist physician, or by a physician with sufficient qualifications in the field of neurology or neurocognitive disorders to make a diagnosis of Level 2 Neurocognitive Impairment:**

A diagnosis made outside of the Baseline Assessment Program (BAP) that a living patient suffers from Level 2 Neurocognitive Impairment, as set forth below, *i.e.*, moderate dementia, based on evaluation and evidence generally consistent with the diagnostic criteria set forth and provided below, unless the diagnosing physician can certify in Section IV of the Diagnosing Physician Certification Form, above, that certain testing specified below for Level 2 Neurocognitive Impairment is medically unnecessary because the patient's dementia is so severe:

There is: (i) Concern of the patient, a knowledgeable informant, or the Qualified BAP Provider that there has been a severe decline in cognitive function; (ii) Evidence of a severe cognitive decline from a previous level of performance, as determined by and in accordance with the standardized neuropsychological testing protocol annexed in *Appendix B*, in two or more cognitive domains (complex attention, executive function, learning and memory, language, perceptual-spatial), provided one of the cognitive domains is (a) executive function, (b) learning and memory, or (c) complex attention; (iii) The patient exhibits functional impairment generally consistent with the criteria set forth in the National Alzheimer's Coordinating Center's Clinical Dementia Rating scale Category 2.0 (Moderate) in the areas of Community Affairs, Home & Hobbies, and Personal Care—where such functional impairment is corroborated by documentary evidence (*e.g.*, medical records, employment records), the sufficiency of which will be determined by the physician making the diagnosis (and where no documentary evidence of functional evidence exists or is available, then (a) there must be evidence of severe cognitive decline from a previous level of performance, as determined by and in accordance with the standardized neuropsychological testing protocol annexed in *Appendix B*, in the executive function cognitive domain or the learning and memory cognitive domain, and at least one other cognitive domain; and (b) the patient's functional impairment, as described above, must be corroborated by a third-party sworn affidavit from a person familiar with the patient's condition (other than the player or his family members), the sufficiency of which will be determined by the diagnosing physician); and (iv) The cognitive deficits do not occur exclusively in the context of a delirium, acute substance abuse, or as a result of medication side effects.

## ALZHEIMER'S DISEASE

(1) **The following diagnosis can only be made:**

    **(a) prior to July 7, 2014, by a board-certified neurologist, board-certified neurosurgeon, other board-certified neuro-specialist physician, or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician; or**

    **(b) from July 7, 2014 through January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified neurologist, board-certified neurosurgeon, or other board-certified neuro-specialist physician:**

A diagnosis in a living patient of the specific disease of Alzheimer's Disease as defined by the World Health Organization's International Classification of Diseases, 9th Edition (ICD-9), the World Health Organization's International Classification of Diseases, 10th Edition (ICD-10), or a diagnosis of Major Neurocognitive Disorder due to probable Alzheimer's Disease as defined in the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5).

(2) **The following diagnosis can only be made prior to January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician, or by a physician with sufficient qualifications in the field of neurology to make such a diagnosis, where the diagnosis was made while the patient was living but thereafter died prior to January 7, 2017 (the Effective Date of the Settlement Agreement):**

A diagnosis of Major Neurocognitive Disorder due to probable Alzheimer's Disease consistent with the definition in *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) or a diagnosis of Alzheimer's Disease.

## PARKINSON'S DISEASE

(1) **The following diagnosis can only be made:**

    **(a) prior to July 7, 2014, by a board-certified neurologist, board-certified neurosurgeon, other board-certified neuro-specialist physician, or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician; or**

    **(b) from July 7, 2014 through January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified neurologist, board-certified neurosurgeon, or other board-certified neuro-specialist physician:**

A diagnosis in a living patient of the specific disease of Parkinson's Disease as defined by the World Health Organization's International Classification of Diseases, 9th Edition (ICD-9), the World Health Organization's International Classification of Diseases, 10th Edition (ICD-10), or a diagnosis of Major Neurocognitive Disorder probably due to Parkinson's Disease as defined in the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5).

(2) **The following diagnosis can only be made prior to January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician, or by a physician with sufficient qualifications in the field of neurology to make such a diagnosis, where the diagnosis was made while the patient was living but thereafter died prior to January 7, 2017 (the Effective Date of the Settlement Agreement):**

A diagnosis of Parkinson's Disease.

## ALS

(1) **The following diagnosis can only be made:**

(a) **prior to July 7, 2014, by a board-certified neurologist, board-certified neurosurgeon, other board-certified neuro-specialist physician, or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician; or**

(b) **from July 7, 2014 through January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified neurologist, board-certified neurosurgeon, or other board-certified neuro-specialist physician:**

A diagnosis in a living patient of the specific disease of Amyotrophic Lateral Sclerosis, also known as Lou Gehrig's Disease (ALS), as defined by the World Health Organization's International Classification of Diseases, 9th Edition (ICD-9) or the World Health Organization's International Classification of Diseases, 10th Edition (ICD-10).

(2) **The following diagnosis can only be made prior to January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician, or by a physician with sufficient qualifications in the field of neurology to make such a diagnosis, where the diagnosis was made while the patient was living but thereafter died prior to January 7, 2017 (the Effective Date of the Settlement Agreement):**

A diagnosis of the specific disease of Amyotrophic Lateral Sclerosis (ALS).

## CTE

**The following diagnosis can only be made prior to April 22, 2015 by a board-certified neuropathologist, provided that a patient who died between July 7, 2014 and April 22, 2015 has until 270 days from the date of death to obtain such a post-mortem diagnosis:**

A post-mortem diagnosis of Chronic Traumatic Encephalopathy (CTE).

## APPENDIX B

## BASELINE NEUROPSYCHOLOGICAL TEST BATTERY AND SPECIFIC IMPAIRMENT CRITERIA FOR RETIRED NFL FOOTBALL PLAYERS

### Section 1: Test Battery

**Estimating Premorbid Intellectual Ability**

ACS Test of Premorbid Functioning (TOPF)

**Complex Attention/Processing Speed (6 scores)**

WAIS-IV Digit Span

WAIS-IV Arithmetic

WAIS-IV Letter Number Sequencing

WAIS-IV Coding

WAIS-IV Symbol Search

WAIS-IV Cancellation

**Executive Functioning (4 scores)**

Verbal Fluency (FAS)

Trails B

Booklet Category Test

WAIS-IV Similarities

**Effort/Performance Validity (8 scores)**

*ACS Effort Scores*

ACS-WAIS-IV Reliable Digit Span

ACS-WMS-IV Logical Memory Recognition

ACS-WMS-IV Verbal Paired Associates Recognition

ACS-WMS-IV Visual Reproduction Recognition

ACS-Word Choice

*Additional Effort Tests*

Test of Memory Malingering (TOMM)

Medical Symptom Validity Test (MSVT)

**Learning and Memory (6 scores)**

WMS-IV Logical Memory I

WMS-IV Logical Memory II

WMS-IV Verbal Paired Associates I

WMS-IV Verbal Paired Associates II

WMS-IV Visual Reproduction I

WMS-IV Visual Reproduction II

**Language (3 scores)**

Boston Naming Test

Category Fluency (Animal Naming)

BDAE Complex Ideational Material

**Spatial-Perceptual (3 scores)**

WAIS-IV Block Design

WAIS-IV Visual Puzzles

WAIS-IV Matrix Reasoning

**Mental Health**

MMPI-2RF

Mini International Neuropsychiatric Interview

### Section 2: Evaluate Performance Validity

Freestanding, embedded and regression based performance validity metrics will be administered to each Retired NFL Football Player during baseline and, if relevant, subsequent neuropsychological examinations. There will be at least seven performance validity metrics utilized during each assessment. The specific performance validity metrics utilized will not be released to the public in order to maintain the highest standards of assessment validity.  The performance

## APPENDIX B

validity metrics employed will be rotated at intervals determined by the Appeals Advisory Panel in consultation with Co-Lead Class Counsel and Counsel for the NFL Parties.

Each neuropsychological examiner must complete a checklist of validity criteria as set forth in *Slick et al.* 1999, and revised in 2013 (see below) for every Retired NFL Football Player examined in order to determine whether the Retired NFL Football Player's test data is a valid reflection of his optimal level of neurocognitive functioning.

1. Suboptimal scores on performance validity embedded indicators or tests. The cutoffs for each test should be established based on empirical findings.

2. A pattern of neuropsychological test performance that is markedly discrepant from currently accepted models of normal and abnormal central nervous system (CNS) function. The discrepancy must be consistent with an attempt to exaggerate or fabricate neuropsychological dysfunction (e.g., a patient performs in the severely impaired range on verbal attention measures but in the average range on memory testing; a patient misses items on recognition testing that were consistently provided on previous free recall trials, or misses many easy items when significantly harder items from the same test are passed).

3. Discrepancy between test data and observed behavior. Performance on two or more neuropsychological tests within a domain are discrepant with observed level of cognitive function in a way that suggests exaggeration or fabrication of dysfunction (e.g., a well-educated patient who presents with no significant visual-perceptual deficits or language disturbance in conversational speech performs in the severely impaired range on verbal fluency and confrontation naming tests).

4. Discrepancy between test data and reliable collateral reports. Performance on two or more neuropsychological tests within a domain are discrepant with day-to-day level of cognitive function described by at least one reliable collateral informant in a way that suggests exaggeration or fabrication of dysfunction (e.g., a patient handles all family finances but is unable to perform simple math problems in testing).

5. Discrepancy between test data and documented background history. Improbably poor performance on two or more standardized tests of cognitive function within a specific domain (e.g., memory) that is inconsistent with documented neurological or psychiatric history.

6. Self-reported history is discrepant with documented history. Reported history is markedly discrepant with documented medical or psychosocial history and suggests attempts to exaggerate deficits.

7. Self-reported symptoms are discrepant with known patterns of brain functioning. Reported or endorsed symptoms are improbable in number, pattern, or severity; or markedly inconsistent with expectations for the type or severity of documented medical problems.

8. Self-reported symptoms are discrepant with behavioral observations. Reported symptoms are markedly inconsistent with observed behavior (e.g., a patient complains of severe episodic memory deficits yet has little difficulty remembering names, events, or appointments; a patient complains of severe cognitive deficits yet has little difficulty driving independently and arrives on time for an appointment in an unfamiliar area; a patient complains of severely slowed mentation and concentration problems yet easily follows complex conversation).

9. Self-reported symptoms are discrepant with information obtained from collateral informants. Reported symptoms, history, or observed behavior is inconsistent with information obtained from other informants judged to be adequately reliable. The discrepancy must be consistent with an attempt to exaggerate deficits (e.g., a patient reports severe memory impairment and/or behaves as if severely memory-impaired, but his spouse reports that the patient has minimal memory dysfunction at home).

## APPENDIX B

Notwithstanding a practitioner's determination of sufficient effort in accordance with the foregoing factors, a Retired NFL Football Player's failure on two or more effort tests may result in the Retired NFL Football Player's test results being subjected to independent review, or result in a need for supplemental testing of the Retired NFL Football Player.

Note: Additional information relating to the evaluation of effort and performance validity will be provided in a clinician's interpretation guide.

### Section 3: Estimate Premorbid Intellectual Ability

| Test | Ability |
|------|---------|
| Test of Premorbid Functioning (TOPF) | Reading<br>Reading + Demographic Variables |

The Test of Premorbid Functioning (TOPF) provides three models for predicting premorbid functioning: (a) demographics only, (b) TOPF only, and (c) combined demographics and TOPF prediction equations. For each model using demographic data, a simple and complex prediction equation can be selected. In the simple model, only sex, race/ethnicity, and education, are used in predicting premorbid ability. In the complex model, developmental, personal, and more specific demographic data is incorporated into the equations. The clinician should select a model based on the patient's background and his or her current level of reading or language impairment.

Note: It is necessary to estimate premorbid intellectual functioning in order to use the criteria for impairment set out in this document. Estimated premorbid intellectual ability will be assessed and classified as:

➤ Below Average (estimated IQ below 90);

➤ Average (estimated IQ between 90 and 109);

➤ Above Average (estimated IQ above 110).

### Section 4: Neuropsychological Test Score Criteria by Domain of Cognitive Functioning

There are 5 domains of cognitive functioning. In each domain, there are several tests that contribute 3, 4, or 6 demographically-adjusted test scores for consideration. Test selection in the domains was based on the availability of demographically-adjusted normative data for Caucasians and African Americans. These domains and scores are set out below.

The basic principle for defining impairment on testing is that there must be a pattern of performance that is approximately 1.5 standard deviations (for Level 1 Impairment), 1.7-1.8 standard deviations (for Level 1.5 Impairment) or 2 standard deviations (for Level 2 Impairment) below the person's expected level of premorbid functioning. Therefore, it is necessary to have more than one low test score in each domain. A user manual will be provided to neuropsychologists setting out the cutoff scores, criteria for identifying impairment in each cognitive domain, and statistical and normative data to support the impairment criteria.

## APPENDIX B

| Domain/Test | Ability |
|---|---|
| **Complex Attention/Speed of Processing (6 Scores)** | |
| Digit Span | Attention & Working Memory |
| Arithmetic | Mental Arithmetic |
| Letter Number Sequencing | Attention & Working Memory |
| Coding | Visual-Processing & Clerical Speed |
| Symbol Search | Visual-Scanning & Processing Speed |
| Cancellation | Visual-Scanning Speed |
| **Executive Functioning (4 scores)** | |
| Similarities | Verbal Reasoning |
| Verbal Fluency (FAS) | Phonemic Verbal Fluency |
| Trails B | Complex Sequencing |
| Booklet Category Test | Conceptual Reasoning |
| **Learning and Memory (6 scores)** | |
| Logical Memory I | Immediate Memory for Stories |
| Logical Memory II | Delayed Memory for Stories |
| Verbal Paired Associates I | Learning Word Pairs |
| Verbal Paired Associates II | Delayed Memory for Word Pairs |
| Visual Reproduction I | Immediate Memory for Designs |
| Visual Reproduction II | Delayed Memory for Designs |
| **Language** | |
| Boston Naming Test | Confrontation Naming |
| BDAE Complex Ideational Material | Language Comprehension |
| Category Fluency | Category (Semantic) Fluency |
| **Visual-Perceptual** | |
| Block Design | Spatial Skills & Problem Solving |
| Visual Puzzles | Visual Perceptual Reasoning |
| Matrix Reasoning | Visual Perceptual Reasoning |

**Impairment Criteria: *Below Average* Estimated Intellectual Functioning (A1 – E1)**

### A1. Complex Attention (6 test scores)

1. Level 1 Impairment: 3 or more scores below a T score of 35

2. Level 1.5 Impairment: 4 or more scores below a T score of 35; or meet for Level 1 and 2 scores below a T score of 30

3. Level 2 Impairment: 3 or more scores below a T score of 30

### B1. Executive Function (4 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 35

2. Level 1.5 Impairment: 3 or more scores below a T score of 35; or meet for Level 1 and 1 score below a T score of 30

## APPENDIX B

3. Level 2 Impairment: 2 or more scores below a T score of 30

**C1. Learning and Memory (6 test scores)**

1. Level 1 Impairment: 3 or more scores below a T score of 35

2. Level 1.5 Impairment: 4 or more scores below a T score of 35; or meet for Level 1 and 2 scores below a T score of 30

3. Level 2 Impairment: 3 or more scores below a T score of 30

**D1. Language (3 test scores)**

1. Level 1 Impairment: 3 or more scores below a T score of 37

2. Level 1.5 Impairment: meet for Level 1 and 2 scores below a T score of 35

3. Level 2 Impairment: 3 or more scores below a T score of 35

**E1. Visual-Perceptual (3 test scores)**

1. Level 1 Impairment: 3 or more scores below a T score of 37

2. Level 1.5 Impairment: meet for Level 1 and 2 scores below a T score of 35

3. Level 2 Impairment: 3 or more scores below a T score of 35

## Impairment Criteria: *Average* Estimated Intellectual Functioning (A2 – E2)

**A2. Complex Attention (6 test scores)**

1. Level 1 Impairment: 2 or more scores below a T score of 35

2. Level 1.5 Impairment: 3 or more scores below a T score of 35; or meet for Level 1 and 1 score below a T score of 30

3. Level 2 Impairment: 2 or more scores below a T score of 30

**B2. Executive Function (4 test scores)**

1. Level 1 Impairment: 2 or more scores below a T score of 35

2. Level 1.5 Impairment: 3 or more scores below a T score of 35; or meet for Level 1 and 1 score below a T score of 30

3. Level 2 Impairment: 2 or more scores below a T score of 30

**C2. Learning and Memory (6 test scores)**

1. Level 1 Impairment: 2 or more scores below a T score of 35

2. Level 1.5 Impairment: 3 or more scores below a T score of 35; or meet for Level 1 and 1 score below a T score of 30

3. Level 2 Impairment: 2 or more scores below a T score of 30

**D2. Language (3 test scores)**

1. Level 1 Impairment: 2 or more scores below a T score of 37

2. Level 1.5 Impairment: 3 or more scores below a T score of 37; or meet for Level 1 and 1 score below a T score of 35

3. Level 2 Impairment: 2 or more scores below a T score of 35

**E2. Visual-Perceptual (3 test scores)**

1. Level 1 Impairment: 2 or more scores below a T score of 37

2. Level 1.5 Impairment: 3 or more scores below a T score of 37; or meet for Level 1 and 1 score below a T score of 35

3. Level 2 Impairment: 2 or more scores below a T score of 35

## APPENDIX B

**Impairment Criteria: *Below Average* Estimated Intellectual Functioning (A3 – E3)**

### A3. Complex Attention (6 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 35

2. Level 1.5 Impairment: meet for Level 1 and 3 or more scores below a T score of 37

3. Level 2 Impairment: 3 or more scores below a T score of 35

### B3. Executive Function (4 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 37

2. Level 1.5 Impairment: meet for Level 1 and 3 or more scores below a T score of 37; or meet for Level 1 and 1 score below a T score of 30

3. Level 2 Impairment: 2 or more scores below a T score of 30

### C3. Learning and Memory (6 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 35

2. Level 1.5 Impairment: meet for Level 1 and 3 or more scores below a T score of 37

3. Level 2 Impairment: 3 or more scores below a T score of 35

### D3. Language (3 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 40

2. Level 1.5 Impairment: 3 scores below at T score of 40; or meet for Level 1 and 1 score below a T score of 37

3. Level 2 Impairment: 2 or more scores below a T score of 37

### E3. Visual-Perceptual (3 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 40

2. Level 1.5 Impairment: 3 scores below at T score of 40; or meet for Level 1 and 1 score below a T score of 37

3. Level 2 Impairment: 2 or more scores below a T score of 37

### Section 5: Mental Health Assessment

| Test | Symptoms/Functioning | Assessment |
|------|---------------------|------------|
| MMPI-2RF | Mental Health Assessment | Evaluation of Validity Scales and Configurations; T-Scores for Symptom Domains |
| Mini International Neuropsychiatric Interview (M.I.N.I. Version 5.0.0) | Semi-structured Psychiatric Interview | Scale Criteria for Various Psychiatric Diagnoses |

**Ronald L. Hamilton, M.D.**

1/2/2017

## CURRICULUM VITAE

### BIOGRAPHICAL

| | | | |
|---|---|---|---|
| **Name:** | Ronald Lee Hamilton | **Birth Date:** | September 20, 1959 |
| **Home Address:** | 6 Graham Place<br>Pittsburgh, PA 15232 | **Birth Place:** | Omaha, Nebraska |
| **Marital status:** | single | | |
| **Home Phone** | 412-310-9874 | **Citizenship:** | USA |

**Business Address:**  Division of Neuropathology
A724.1 Scaife Hall
200 Lothrop Street
Pittsburgh, PA 15213

**Business Phone:**  412-624-6610

**Business Fax:**  412-624-5488
**e-mail address**  hamiltonrl@upmc.edu

### EDUCATION AND TRAINING

| | | | |
|---|---|---|---|
| 1977-1985 | University of Nebraska-Lincoln | B.S. | Psychology |
| 1985-1989 | University of Nebraska Medical Center | | M.D. |
| 1989-1991 | University of California, San Diego<br>Program Director, David Bailey | Resident Anatomic Pathology | |
| 1991-1993 | University of California, San Diego<br>Program Director, Henry C. Powell | Resident Neuropathology | |
| 1993-1994 | University of Pittsburgh<br>Program Director, Clayton A Wiley | Fellow Neuropathology | |
| 1994-1995 | University of Pittsburgh<br><br>Program Director, Michael Zigmond | Fellow: NIMH Training Grant<br>in Neuroscience | |

### APPOINTMENTS AND POSITIONS:

1995-2002    University of Pittsburgh School of Medicine -Assistant Professor of Pathology
2002-present    University of Pittsburgh School of Medicine -Associate Professor of Pathology

### DISTRIBUTION OF % TIME

| | |
|---|---|
| Research | 20% |
| Other scholarly activity | 8% |
| Teaching | 10% |
| Clinical | 35% |
| Combined clinical and teaching | 20% |
| Service activities | 5% |
| Administrative activities. | 2% |
| | |
| TOTAL | 100% |

**Ronald L. Hamilton, M.D.**


## CERTIFICATION and LICENSURE

**SPECIALTY CERTIFICATION**

| | | |
|---|---|---|
| American Board of Pathology | Anatomic Pathology | 5/23/96 |
| American Board of Pathology | Neuropathology | 5/23/96 |
| American Board of Pathology – recertification | Neuropathology | 1/1/2014 |

**MEDICAL or OTHER PROFESSIONAL LICENSURE**

| | |
|---|---|
| 1990 | California Medical License (G69731) expired |
| 1993 | Pennsylvania Medical License (MD-049717-L) |
| 2009 | Indiana Medical License (01067332A) |


## MEMBERSHIPS IN PROFESSIONAL AND SCIENTIFIC SOCIETIES

| | |
|---|---|
| 1992 | American Association for the Advancement of Science |
| 1993 | American Association of Neuropathology |
| 1993 | International Society of Neuropathology |
| 1994 | College of American Pathologists (CAP) |
| 1995-97 | CAP Neuropathology Subcommittee |
| 1998 | Children's Cancer Group, Study Committee for CCGB975 |
| 1999 | Society for Neuroscience |


## HONORS

| | |
|---|---|
| Nominated "Teacher of the Year: Anatomic Pathology" | 1997 |
| Nominated "Teacher of the Year: Anatomic Pathology" | 1998 |
| Nominated "Teacher of the Year: Anatomic Pathology" | 1999 |
| Nominated "Teacher of the Year: Anatomic Pathology" | 2000 |
| Nominated "Teacher of the Year: Anatomic Pathology" | 2001 |
| Nominated "Teacher of the Year: Anatomic Pathology" | 2002 |
| UPMC ACES Award winner (ACES is an Award for | 2003 |

Clinical Excellence and Service and is given to about 10 physicians per year at UPMC)

| | |
|---|---|
| Letter of appreciation from Chief Residents | 1997-1998 |
| AP Pathology "TEACHER OF THE YEAR" | 2004-05 |


## PUBLICATIONS

**Refereed Articles**

1.  Esch O, Spinosa JC, **Hamilton RL**, Crombie DL, Schteigart CO, Rondinone JF, D'Agostino HB,Lillienau J and Hofmann AF: Acute effects of topical methyl tert-butyl ether or ethyl propionate on gallbladder histology in animals: a comparison of two solvents for contact dissolution of cholesterol gallstones. Hepatology 16 (4):984-991, 1992.

2.  Anders KH, Becker PS, Holden JK, Sharer LR, Cornford ME, Hansen LA, **Hamilton R,** Vinters, HV: Multifocal necrotizing leukoencephalopathy with pontine predilection in immunosuppressed patients: a clinicopathologic review of sixteen cases. Human Pathology 24:897-904, 1993.

3.  **Hamilton RL**, Achim C, Grafe MR, Fremont JC, Miners D, Wiley CA: Herpes simplex virus brainstem encephalitis in an AIDS patient. Clinical Neuropathology, 14: 45-50, 1995.

**Ronald L. Hamilton, M.D.**

4. Rose J, Haskell WL, Gamble JG, **Hamilton RL**, Brown DA, Rinsky L: Muscle pathophysiology and clinical measures of disability in children with cerebral palsy. Journal of Orthopedic Research, 12(6): 758-768, 1994.

5. **Hamilton RL**, Grafe MR: Complete absence of the cerebellum: a report of two cases. Acta Neuropathologica 88 (3): 258-261, 1994.

6. **Hamilton RL**, Haas RH, Nyhan WL, Powell HC, Grafe MR: The neuropathology of propionic academia: a report of two additional cases.  Journal of Child Neurology 10(1): 25-30, 1995.

7. Haas RH, Marsden DL, Capistrano-Estrada S, **Hamilton RL**, Grafe MR, Wong W, Nyhan WL: Acute basal ganglia infarction in propionic acidemia.  Journal of Child Neurology 10(1) 18-22, 1995.

8. Kupperman BD, Quiceno JI, Wiley C, Hesselink J, **Hamilton R**, Keefe K, Garcia R, Freeman WR: Clinical and histopathologic study of varicella zoster virus retinitis in patients with the acquired immunodeficiency syndrome.  American Journal of Ophthalmology 118:589-600, 1994.

9. Adelson PD, Robichaurd P, **Hamilton RL**, Kochanek PM. A Model of Diffuse Traumatic Brain  Injury in the Immature Rat.  J Neurosurg 85:877-884, 1996.

10. Alper G, Crumrine PK, **Hamilton RL**, Albright L, Wald ER. An unusual case of inflammatory spinal epidural  mass (Castleman's syndrome) Pediatric Neurology  15: 60-2 , 1996

11. Adelson PD, Firlik KS, Firlik AD, **Hamilton RL**. A meningeal cyst of the thoracic spine presenting as prolonged paresis after ankle injury: case report. Neuropediatrics 27:207-210, 1996.

12. Cramer SC, Segal A, **Hamilton RL**, Schmahman J, Ma J. Leukoencephalitis Due to Varicella Zoster Virus:   Report of a Case and Review of Clinical Features.  Contemporary Neurology, 1, 1996 (electronic journal).

13. Mansfield RT, Schiding JK, **Hamilton R**, Kochanek PM: Effects of hypothermia on traumatic brain injury in immature rats. J Cerebral Blood Flow  Metabo 16(2): 244-252, 1996.

14. Pollack IF, Campbell JW, **Hamilton RL**, Martinez AJ, Bozik ME. Proliferation index as a predictor of prognosis in malignant gliomas of childhood. Cancer 79:849-856, 1996

15. Pollack IF, **Hamilton RL,** Finkelstein SD, Campbell JW, Martinez AJ, Sherwin RN, Bozik ME, Gollin SM. The relationship between tp53 mutations and overexpression of p53 and prognosis in malignant gliomas of childhood. Cancer Research 57:304-309, 1997.

16. Ikonomovic MD, Mizukami K, Davies P, **Hamilton R**, Sheffield R, Armstrong DM. The loss of GluR2(3) immunoreactivity preceded neurofibrillary tangle formation in the entorhinal cortex and hippocampus of Alzheimer brains. J Neuropath Exp Neurol 56:1018-1027, 1997.

17. Bredel M, Pollack IF, Campbell JW, **Hamilton RL**: Basic fibroblast growth factor as a predictor of prognosis in pediatric high-grade gliomas. Clinical Cancer Research 3:2157-2164, 1997

18. Blatt J, **Hamilton RL**: Neurodevelopmental anomalies in children with neuroblastoma. Cancer 82: 1603-8, 1998.

19. Fukui MB, Livstone BJ, Meltzer CC, **Hamilton RL**: Hemorrhagic presentation of untreated primary central nervous system lymphoma in the acquired immunodeficiency syndrome. Am J Roentgenol 170:1114-1115, 1998..

20. Bredel M, Pollack IF, **Hamilton RL**, James CD: Epidermal growth factor receptor (EGFR) and gene amplification in high-grade non-brainstem gliomas of childhood. Clin Can Res 5:1786-92, 1999

**Ronald L. Hamilton, M.D.**

21. Gerszten PC, Pollack IF, **Hamilton RL**. Primary parafalcine chondrosarcoma in a child. Acta Neuropathologica 95:111-4, 1998.

22. Pollack IF, **Hamilton RL**, Fitz C, Orenstein DM. An intrasylvian "fibroma" in a child with cystic fibrosis. Pediatric Neurosurgery 46:744-747 2000.

23. Liachenko S, Tang P, **Hamilton RL**, Xu Y: A reproducible model of circulatory arrest and remote resuscitation in rats for NMR investigation. Stroke 29:1229-1238, 1998

24. Meltzer CC, Liu AY, Perrone AM, **Hamilton RL** Meningioangiomatosis MR imaging with histopathologic correlation. AJR 170:804-5, 1998

25. Clark RSB, Kochanek PM, Chen M, Watkins SC, Marion DW, Chen J, **Hamilton RL**, Loeffert JE, Graham SH. Increases in Bcl-2 and cleavage of caspase-1 and caspase-3 in human brain after head injury. FASEB J, 13:813-821, 1999

26. Soontornniyomkij V, Wang G, Pittman CA, **Hamilton RL**, Wiley CA, Achim CL Absence of brain-derived neurotrophic factor and trkB receptor immunoreactivity in glia of Alzheimer's disease. Acta Neuropathologica 98:345-8, 1999.

27. Wang G, Achim CL, **Hamilton RL**, Wiley CA, Soontornniyomkij V Tyramide signal amplification methods in multiple label immunofluorescence confocal microscopy. Methods 18(4):459-464, 1999

28. Firlik KS, Adelson PD, **Hamilton RL**: Coexistence of a ganglioglioma and Rasmussen's encephalitis: successful treatment in a four-year-old boy. Pediatr Neurosurg 30:278-282, 1999

29. Ikonomovic MD, Mizukami K, Warde D, Sheffield R, **Hamilton R**, Wenthold RJ, Armstrong DM Distribution of glutamate receptor subunit NMDAR1 in the hippocampus of normal elderly and patients with Alzheimer's disease. Exp Neurol 160(1):194-204, 1999.

30. Dallasta, LM, Wang G, Bodnar RJ, Draviam R, Wiley CA, Achim CA, **Hamilton RL**: Differential expression of intercellular adhesion molecules-1 (ICAM-1) and vascular adhesion cell molecule-1 (VCAM-1) in chronic murine retroviral encephalitis. Neuropathol Appl Neurobiol 26:332-341, 2000.

31. Luabeya MK, Dallasta LM, Achim CL, Pauza CD, **Hamilton RL**: Blood-brain Barrier Disruption in Simian Immunodeficiency Virus Encephalitis. Neuropathol Appl Neurobiol 26:454-462, 2000.

32. **Hamilton RL**. Lewy Bodies in Alzheimer's Disease: A Neuropathological Review of 145 Cases Using -synuclein Immunohistochemistry. Brain Pathol 10: 378-384, 2000.

33. Sweet, RA, **Hamilton RL**, Healy MT, Wisniewski SR, Henteleff R, Pollack BG, Lewis DA, DeKosky ST. Alterations of Striatal Dopamine Receptor Binding in Alzheimer's Disease Are Associated with Lewy Body Pathology and With Antemortem Psychosis. Arch Neurol 58:466-472, 2001.

34. Styren S, **Hamilton RL**, Styren GC, Klunk WE X-34: a novel and intensely fluorescent stain for Alzheimer's disease pathology. J Histochem Cytochem 48:1223-1232, 2000.

35. Lopez OL, **Hamilton RL**, Becker JT, Wisniewski S, Kaufer DI, DeKosky ST. Severity of cognitive impairment and the clinical diagnosis of AD with Lewy bodies. Neurology 54:1780-1787, 2000

36. Lopez OL, Wisniewski S, **Hamilton RL**, Becker JT, Kaufer DI, DeKosky ST. Predictors of progression in patients with AD and Lewy bodies. Neurology 54:1774-1779, 2000.

**Ronald L. Hamilton, M.D.**

37.    Sweet RA, **Hamilton RL**, Lopez OL, Klunk WE, Wisnieski SR, Kaufer DI, Healy MT, Dekosky ST. Psychotic symptoms in Alzheimer's Disease are not associated with more severe neuropathologic features. Internat Psychogeriatr 12: 547-558, 2000.

38.    Lopez OL, Becker JT, Klunk W, Saxton J, **Hamilton RL**, Kaufer DI, Sweet RA, Meltzer CC, Wisniewski S, Kamboh MI, DeKosky ST. Research evaluation and diagnosis of probable Alzheimer's Disease over the last two decades. I. Neurology 55:1854-1862, 2000.

39.    Lopez OL, Becker JT, Klunk W, Saxton J, **Hamilton RL**, Kaufer DI, Sweet RA, Meltzer CC, Wisniewski S, Kamboh MI, DeKosky ST. Research evaluation and diagnosis of possible Alzheimer's Disease over the last two decades. II. Neurology 55:1863-1869, 2000.

40.    Pollack IF, **Hamilton RL**, Fitz C, Kassam A, Snyderman C. Congenital Reactive Myofibroblastic Tumor of the Petrous Bone: Case Report. Neurosurgery 48:430-435, 2001.

41.    Levy EI, Scarrow A, **Hamilton** RC (sic), Wollman MR, Fitz C. Pollack IF. Medical Management Of Eosinophilic Granuloma of the Cervical Spine. Pediatr Neurosurg 31:159-62, 1999.

42.    Pettegrew JW, Panchalingam K, **Hamilton RL**, and McClur RJ Brain Membrane Phospholipid Alterations in Alzheimer's Disease.  Neurochem Res 26:771-782, 2001

43.    Levy EI, Harris AE, Omalu BA, **Hamilton RL**, Branstetter BF, Pollack IF. Sudden Death from Fulminant Acute Cerebellitis.  Pediatr Neurosurg 35:24-28, 2001

44.    Lianchenko S, Tang P, **Hamilton RL**, Xu Y. Regional Dependence of Cerebral Reperfusion After Circulatory Arrest in Rats.  J Cerebr Blood Flow Met 21:1320-1329, 2001 .

45.    Pollack IF, Finkelstein SD, Burnham J, Holmes EJ, **Hamilton RL**, Yates AJ, Finlay J, Sposto R, and CCG. Age and TP53 Mutation Frequency in Childhood Malignant Gliomas: Results of a Multi-institutional Cohort. Cancer Res 61:7404-7407, 2001

46.    Adelson PD, Jenkins LW, **Hamilton RL**, Robichaud P, Tran MP, Kochanek PM. Histopathologic Response of the Immature Rat to Diffuse Traumatic Brain Injury.  J Neurotrauma 18 :967-976, 2001

47.    Pollack IF, Finkelstein SD, Woods J, Burnham J, Holmes EJ, **Hamilton RL**, Yates AJ, Boyett JM, Finlay J, Sposto R, and CCG. TP53 Mutations, Expression of p53 and Prognosis in Children with Malignant Gliomas.  New England Journal of Medicine 346:420-427, 2002

48.    Lopez OL, Becker JT, Kaufer DI, **Hamilton RL**, Sweet RA, Klunk W, DeKosky ST. Research Evaluation and Prospective Diagnosis of Dementia With Lewy Bodies.  Arch Neurol 59:43-46, 2002.

49.    Wang L, Yushmanov VE, Lianchenko SM, Tang P, **Hamilton RL**, Xu Y.  Late Reversal of Cerebral Perfusion and Water Diffusion After Transient Focal Ischemia in Rats.  J Cereb Blood Flow Metab 22:253-261, 2002.

50.    Pollack IF, Biegal JA, Yates AJ, **Hamilton RL**, Finkelstein SD.Risk Assignment in Childhood Brain Tumors: The Emerging Role of Molecular and Biologic Classification. Current Oncology Reports 4:114-122, 2002.

51.    Pollack IF, **Hamilton RL**, Burnham J, Holmes EJ, Finkelstein SD, Sposto R, Yates AJ, Boyett JM, Finley JL. The impact of proliferation index on outcome in childhood malignant gliomas: results in a multi-institutional cohort. Neurosurgery 50:1238-1245, 2002.

**Ronald L. Hamilton, M.D.**

52. Sweet RA, Panchalingam K, Pettefrew JW, McClure RJ, **Hamilton RL**, Lopez OL, Kaufer DI, DeKosky ST, Klunk WE.  Psychosis in Alzheimer disease: postmortem magnetic resonance spectroscopy evidence of excess neuronal and membrane phospholipid pathology. Neurobiol Aging 23:547-53, 2002.

53.  Mazzola CA, Albright AL, Sutton LN, Tuite GF, **Hamilton RL**, Pollack IF.  Dermoid inclusion cysts and early spinal cord tethering after fetal surgery.  New Engl. J Med 347:256-9, 2002.

54.  Bredel M, Pollack IF, **Hamilton RL**, Birner P, Hainfellner JA, Zentner J.  DNA topoisomerase II-alpha predicts progression-free and overall survival in pediatric malignant non-brainstem gliomas.  Int J Cancer 99:817-20, 2002.

55.  Klunk WE, Wang Y, Huang G, Debnath ML, Holt DP, Shao L, **Hamilton RL**, Ikonomovic MD, DeKosky ST, Mathis CA.  The binding of BTA-1 to post-mortem brain homogenates is dominated by the amyloid component. J Neurosci 23:2086-2092, 2003.

56. Castellano-Sanchez, AA, Ohgaki H, Yokoo H, Scheithauer BW, Burger PC, **Hamilton RL**, Finkelstein SD, Brat, DJ.  Cerebral granular cell astrocytomas show a high frequency of allelic loss but lack a defining genotype. Brain Pathology 13: 62-78, 2003.

57.  Gilbertson RJ, Hill DA, Hernan R, Kocak M, Geyer R, Olson J, Gajjar A, Rush L, **Hamilton RL**, Finkelstein SD, Pollack IF.  ERBB1 is amplified and overexpressed in high-grade diffusely infiltrative pediatric brain stem glioma.  Clin Cancer Res 9:3620-3624, 2003.

58. Pollack IF, Finkelstein SD, Burnham J, **Hamilton RL**, Yates AJ, Holmes EJ, Boyett JM, Finlay JL. The association between chromosome 1p loss and outcome in pediatric malignant gliomas: results from the CCG-945 cohort. Pediatr Neurosurg 39:114-121, 2003.

59.  Carter TL, Rissman RA, Mishizen-Eberz AJ, Wolfe BB, **Hamilton RL**, Gandy S, Armstrong DM. Differential Preservation of AMPA Receptor Subunits in the Hippocampi of Alzheimer's Disease Patients According to Braak Stage Experimental Neurology 187:299-309, 2004

60.  Finkelstein SD, Mohan D, **Hamilton RL**, Sasatomi E, Swalsky PA, Lieberman FS.  Microdissection-based genotyping assists discrimination of reactive gliosis versus glioma. Am J Clin Pathol 121:671-678, 2004

61.  **Hamilton RL**, Bowser B Alzheimer Disease Pathology in ALS Acta Neuropathologica107:515-522, 2004

62.  Mohan D, Couce ME, Wiley CA, **Hamilton RL**, Sasatomi E, Swalsky PA, Lieberman MD, Finkelstein SD.  Microdissection based genotyping of human gliomas: diagnostic and prognostic considerations Modern Pathology 17:1346-1358, 2004

63. Marshall GA, Kaufer DI, Lopez OL, Rao GR, **Hamilton RL**, DeKosky ST.  Right prosubiculum amyloid plaque density correlates with anosognosia in Alzheimer's Disease.  J Neurol Neurosurg Psychiatry 75:1396-4000, 2004.  **PMCID:  PMC1738763**

64.  Sweet RA, **Hamilton RL**, Butters ME, Mulsant BH, Pollock BG, Lewis DA, DeKosky ST, Reynolds CF.  Neuropathologic Correlates of Dementia in Late Life Major Depression Neuropsychopharmacology 29:2242-2250, 2004

65  Lee JYK, Finkelstein S, **Hamilton RL**, Rekha P, Pirris S, King Jr, JT, Omalu B.  Loss of heterozygosity Analysis of Benign, Atypical and Anaplastic Meningiomas.  Neurosurgery 55:1163-1173, 2004.

**Ronald L. Hamilton, M.D.**

66. Beckner ME, Sasatomi E, Swalsky PA, **Hamilton RL**, Pollack, IF, Finkelstein SD. Loss of heterozygosity reveals non-VHL Allelic loss in hemangioblastomas at 22q13. Human Pathology 35:1105-1111, 2004.

67. Tsuang D, Wilson R, Lopez OL, Luedecking-Zimmer EK, Leverenz JB, DeKosky ST, Kamboh MI, **Hamilton RL**. Genetic Association Between APOE*4 Allele and Lewy Bodies in Alzheimer's Disease Neurology, 64:509-513, 2005. **PMCID: PMC1487185**

68. Bredel C, Lassman S, Pollack IF, Knoth R, **Hamilton RL**, Werner M, Bredel M. DNA Topoisomerase II-alpha and Her-2/Neu Gene Dosages in Pediatric Malignant Gliomas. Int J Cancer 26:1188-92, 2005.

69. Witham TF, Okada H, Fellows W, **Hamilton RL**, Flickinger JC, Chambers WH, Pollack IF, Watkins SC, Kondziolka D. The characterization of tumor apoptosis after experimental radiosurgery. Stereotact Funct Neurosurg 83:17-24 2005.

70. McFadden K, **Hamilton RL**, Insalaco SJ, Lavine L, Al-Mateen M, Guoji Wang G, Wiley CA Neuronal intranuclear inclusion disease in a child without polyglutamine inclusions J Neuropathol Exper Neurol 64:545-552, 2005. **PMCID: PMC1402362**

71. Hatano M, Eguchi J, Tatsumi T, Kuwashima N, Dusak JE, Kinch MS, Pollack IF, **Hamilton RL**, Storkus WJ, Okada H. EphA2 as a glioma-associated antigen: a novel target for glioma-vaccines. Neoplasia 7:717-722, 2005. **PMCID: PMC1501889**

72. Jordan S, Ruoyan C, Koprivica V, **Hamilton RL**, Whitehead R, Tottori K, Kikuchi T. In vitro profile of the antidepressant candidate OPC-14523 at rat and human 5-HT$_{1A}$ receptors.Eur J Pharmacol, 517:165-173, 2005.

73. Omalu BI, Minster RL, Kamboh MI, **Hamilton RL**, Wecht CH, DeKosky ST. Chronic Traumatic Encephalopathy (CTE) in a National Football League (NFL) Player Neurosurgery, 57:128-134, 2005.

74. Judkins AR, Burger PC, **Hamilton RL**, Kleinschmidt-DeMasters B, Perry A, Pomeroy SL, Rosenblum MK, Yachnis AT, Zhou H, Rorke LB, Biegel JA. INI1 Protein Expression Distinguishes Atypical Teratoid/Rhabdopid Tumor from Choroid Plexus Carcinoma. J Neuropathol Exp Neurol 64:391-397, 2005.

75. Desai PP, Ikonomovic I, Abrahamson EE, **Hamilton RL,** Isanski BA, Hope CE, Klunk WE, Dekosky ST, Kamboh MI. Apolipoprotein D is a component of compact but not diffuse amyloid-beta plaques in Alzheimer's Disease temporal cortex. Neurobiol Dis May 22, 2005 (epub)

76. Carson-Walter EB, Hampton J, Geynisman D,Pillai PK, Sathanoori R, Madden SL, **Hamilton RL**, Walter KA. Plasmalemmal Vesicle associated protein-1 (PV-1) is a novel and critical marker of brain tumor angiogenesis. Clin Cancer Res 11:7643-7650, 2005.

77. Lopez OL, Becker JT, Sweet RA, Martin-Sanchez FJ, **Hamilton RL** Lewy bodies in the Amygdala increase risk for major depression in subjects with Alzheimer disease. Neurology 67:660-665, 2006.

78. Pollack IF, **Hamilton RL**, Sobol R, Burnham J, Yates AJ, Holmes EJ, Zhou T, Finlay J (for Children Oncology Group).O6-methylguanine-DNA methyltransferase strongly Correlates with Outcome in Childhood Malignant Gliomas: Results from the CCG-945 Cohort J Clin Oncol. Jul 20;24(21):3431-7, 2006.

**Ronald L. Hamilton, M.D.**

79. Mandal PK, Pettegrew JW, Masliah E, **Hamilton RL**, Mandal R. Interaction between Aβ Peptide and α Synuclein: Molecular Mechanisms in Overlapping Pathology of Alzheimer's and Parkinson's in Dementia with Lewy Body disease.  Neurochemical Research, 2006 31, 1153-1162, 2006.

80. Omalu B, DeKosky ST, **Hamilton RL**, Minster RL, Kamboh MI, Shakir AM, Wecht Chronic Traumatic Encephalopathy in a National Football League Player: part II.  Neurosurgery 59:1086-92, 2006

81. Ramsey CP, Glass CA, Koike MA, Montgomery MB, Ritson GP, Chia L, **Hamilton RL**, Chu CT, Jordan-Sciutto KL. Expression of Nrf2 in neurodegenerative diseases. J Neuropathol Exp Neurol 66:75-85, 2007.  **PMCID: PMC2253896**

82.  Boada FE, Tanase C, Davis D, Walter K, Torres-Trejo A, Couce M, **Hamilton R**, Kondziolka D, Bartinski W, Lieberman F.  Non-invasive assessment of tumor proliferation using triple quantum filtered 23/Na MRI: technical challenges and solutions.  Conf Proc IEEE Eng Med Biol Sci Soc. 2004; 7:5238-41

83. Pollack IF, **Hamilton RL**, James CD, Finkelstein SD, Burnham J, Yates AJ, Holmes EJ, Zhou T, Finlay J (for Children Oncology Group). Rarity of *PTEN* Deletions and *EGFR* Amplification in Malignant Gliomas of Childhood: Results from the Children's Cancer Group-945 Cohort J Neurosurg 105(5 Suppl):418-424, 2006.

84. Guzman A, Wood WL, Alpert E, Prasad MD, Miller RG, Rothstein JD, Bowser R, **Hamilton R**, Wood TD, Cleveland DW, Lingappa VR, Liu J.  Common molecular signature in SOD1 for both sporadic and familial amyotrophic lateral sclerosis.  Proc Nat Acad Sci 104:12524-12529, 2007. **PMCID: PMC2408940**

85. Beckner ME, Jane EP, Jankowitz B, Agostino NR, Walter KA, **Hamilton RL**, Pollack IF.  Tumor cells from ultrasonic aspirations of glioblastomas migrate and from spheres with radial outgrowth. Cancer Letters 255:135-44, 2007. PMID 17543444, **PMCID: PMC2000342**

86. McIntyre JA, Chapman J, Shavit E, **Hamilton RL**, and DeKosky ST. Redox-Reactive Autoantibodies in Alzheimer's Patients' Cerebrospinal Fluids: Preliminary Studies.  Autoimmunity, 40:390-396, 2007. PMID 17612901

87. Nakashima-Yasuda, Uryu, K, Robinson J, Xie S, Hurtig H, Duda J, Arnold S, Siderowf A, Grossman M, Leverenz J, Woltjer R, Lopez OL, **Hamilton R**, Tsuang DW, Galaska D, Masliah M, Kaye J, Clark C, Montine TJ, Lee VMY, Trojanowski J. Co-morbidity of TDP-43 Proteinopathy in Lewy Body Related Diseases. Acta Neuropathol 114:221-9, 2007.  PMID 17653732

88. McIntyre JA, **Hamilton RL**, DeKosky ST. Redox-reactive autoantibodies in cerebrospinal fluids.  Ann NY Acad Sci 1109:296-302, 2007. PMID 17785318

89. Okada H, Lieberman FS, Walter KA, Lunsford LD, Kondziolka DS, Bejjani GK, **Hamilton RL**, Torres-Trejo A, Kalinski P, Cai Q, Mabold JL, Edington HD, Butterfield LH, Whiteside TL, Potter DM, Schold SC Jr., Pollack IF  Autologous glioma cell vaccine admixed with interleukin-4 gene transfected fibroblasts in the treatment of patients with malignant gliomas.  J Transl Med 5:67, 2007.  PMID 18093335. **PMCID: PMC2254376**

90. Beach TG, White CL, **Hamilton, RL**, Duda JE, Iwatsubo T, Dickson DW, Leverenz JB, Roncaroli F, Buttini M, Hladik CL, Sue LI, Noorigian JV, Adler CH.  Evaluation of alpha-synuclein immunohistochemical methods used by invited experts.  Acta Neuropathol 116:277-88, 2008. PMID 18626651.  **PMCID: PMC2708176**

91. Ikonomovic MD, Klunk WE, Abrahamson EE, Mathis CA, Price JC, Tsopelas ND, Lopresti BJ, Ziolko S, Bi W, Paljug WR, Debnath ML, Hope CE, Isanski BA, **Hamilton RL**, DeKosky ST. Post-

**Ronald L. Hamilton, M.D.**

mortem correlates of in vivo PiB-PET amyloid imaging in a typical case of Alzheimers disease. Brain  131(Pt 6):1630-45, 2008.  PMID  18339640.  **PMCID:  PMC2408940**

92.  Leverenz JB, **Hamilton R**, Tsuang DW, Schantz A, Vavrek D, Larson EB, Kukall WA, Lopez O, Galasko D, Masliah E, Woltjer R, Clark C, Trojanowski JQ, Montine TJ. Empiric refinement of the pathologic assessment of Lewy-related pathology in the dementia patient.  Brain Pathol 18:220-224, 2008. PMID 18241249.  **PMCID:  PMC2689097  NIHMS29359**

93.  Raja AI, Yeaney GA, Jakacki RI, **Hamilton RL**, Pollack IF  Extraventricular neurocytoma in neurofibromatosis Type I: Case report.  J Neurosurg Pediatrics 2:63-67, 2008.PMID 18590398

94.  Okada H, Low KL, Kohanbash G, McDonald HA, **Hamilton RL**, Pollack IF.  Expression of glioma-associated antigens in pediatric brain stem and non-brain stem gliomas.  J Neurooncol 88:245-50, 2008. PMID 18324354.  **PMCID:  PMC2561297 NIHMS70086**

95.  Venneti S, Lopresti BJ, Wang G, **Hamilton RL**, Mathis CA, Klunk WE, Apte UM, Wiley CA. PK11195 labels activated microglia in Alzheimer's disease and in vivo in a mouse model using PET. Neurobiol Aging 2009, 30:1217-26. PMID 18178291

96.  Mullett SJ, **Hamilton RL**, Hinkle DA.  DJ-1 immunoreactivity in human brain astrocytes is dependent on infarct presence and infarct age.  Neurology 2009, 29:125-31. PMID 18647263

97.  Park DM, Yeaney GA, **Hamilton RL**, Mabold J, Urban N, Appleman L, Flickinger J, Lieberman F, Mintz A.  Identifying Muir-Torre syndrome in a patient with glioblastoma multiforme.  Neuro Oncol, 2009 11:452-5. PMID 19028998.  )

98.  Horbinski C, Bartynski WS, Carson-Walter E, **Hamilton RL**, Tan HP, Cheng S.  Reversible encephalopathy after cardiac transplantation:  Histologic evidence of endothelial activation, T-cell specific trafficking, and vascular endothelial growth factor expression.  Am J Neuroradiol 2008 30:588-90. PMID 18854444.

99.  Northcott P, Nakahara Y, Peacock J, Ellison D, Croul S, Feuk L, Ra YS, Kongham P, Zilerberg K, Mack S, McLeod J, Scherer S, Rao S, Grajkowska W, Gillespie Y, Lach B, Grundy R, Pollack IF, **Hamilton RL,** Van Meter T, Carlotti C, Boop R, Bigner D, Gilbertson R, Rutka J, Taylor MD. Multiple recurrent genetic events converge on control of histone lysine methylation in medulloblastoma.  Nat Genet 2009 41:465-72. PMID 19270706.

100. Ueda R, Kohanbash G, Sasaki K, Fujita M, Zhu X, Kastenhuber ER, McDonald HA, Potter DM, **Hamilton RL,** Lotze MT, Khan SA, Sobol RW, Okada H.  Dicer-regulated microRNAs 222 and 339 promote resistance of cancer cells to cytotoxic T-lymphocytes by down-regulation of ICAM-1. Proc Natl Acad Sci U S A. 2009 Jun 30;106(26):10746-51.  PMID: 19520829

101.  Maki RA, Tyurin VA, Lyon RC, **Hamilton RL**, DeKosky ST, Kagan VE, Reynolds WF.  Aberrant expression of myeloperoxidase in astrocytes promotes phospholipid oxidation and memory deficits in a mouse model of Alzheimer disease. J Biol Chem. 2009 Jan 30;284(5):3158-69. PMID: 19059911.

102.  Horbinski C, **Hamilton RL**, Lovell C, Burnham J, Pollack IF.  Impact of morphology, MIB-1, p53, and MGMT on Outcome in Pilocytic Astrocytomas.  Brain Pathology 2010; 20:581-8  e-pub Sept 21, 2009

103.  Armstrong RA, Ellis W, **Hamilton RL**, MacKenzie IR, Hedreen J, Gearing M, Montine T, Vonsattel JP, Head E, Lieberman AP, Cairns NJ.  Neuropathological heterogeneity in frontotemporal lobar degeneration with TDP-43 proteinopathy: a quantitative study of 94 cases using principle components analysis.  J Neural Transm 2010, 117:227-239.

**Ronald L. Hamilton, M.D.**

104. Horbinski C, **Hamilton RL**, Nikiforov Y, Pollack IF.  Association of molecular alterations, including BRAF, with biology and outcome in pilocytic astrocytomas.  Acta Neuropathol 2010 Jan 1, e-pub.

105. Van Deerlin VM, Sleiman PM, Martinez-Lage M, Chen-Plotkin A, Wang LS, Graff-Radford NR, Dickson DW, Rademakers R, Boeve BF, Grossman M, Arnold SE, Mann DM, Pickering-Brown SM, Seelaar H, Heutink P, van Swieten JC, Murrell JR, Ghetti B, Spina S, Grafman J, Hodges J, Spillantini MG, Gilman S, Lieberman AP, Kaye JA, Woltjer RL, Bigio EH, Mesulam M, Al-Sarraj S, Troakes C, Rosenberg RN, White CL 3rd, Ferrer I, Lladó A, Neumann M, Kretzschmar HA, Hulette CM, Welsh-Bohmer KA, Miller BL, Alzualde A, de Munain AL, McKee AC, Gearing M, Levey AI, Lah JJ, Hardy J, Rohrer JD, Lashley T, Mackenzie IR, Feldman HH, **Hamilton RL**, Dekosky ST, van der Zee J, Kumar-Singh S, Van Broeckhoven C, Mayeux R, Vonsattel JP, Troncoso JC, Kril JJ, Kwok JB, Halliday GM, Bird TD, Ince PG, Shaw PJ, Cairns NJ, Morris JC, McLean CA, DeCarli C, Ellis WG, Freeman SH, Frosch MP, Growdon JH, Perl DP, Sano M, Bennett DA, Schneider JA, Beach TG, Reiman EM, Woodruff BK, Cummings J, Vinters HV, Miller CA, Chui HC, Alafuzoff I, Hartikainen P, Seilhean D, Galasko D, Masliah E, Cotman CW, Tuñón MT, Martínez MC, Munoz DG, Carroll SL, Marson D, Riederer PF, Bogdanovic N, Schellenberg GD, Hakonarson H, Trojanowski JQ, Lee VM.  Common variants at 7p21 are associated with frontotemporal lobar degeneration with TDP-43 inclusions. Nat Genet 2010 42:234-239.

106. Omalu BI, **Hamilton RL**, Kamboh MI, DeKosky ST, Bailes J.  Chronic traumatic encephalopathy in a National Football League Player: Case report and emerging medicolegal practice questions.  J Forensic Nurs, 2010, 6: 40-46.

107. Caltagarone J, **Hamilton RL**, Murdoch G, Jing Z, DeFranco DB, Bowser R. Paxillin and hydrogen peroxide-induced clone 5 expression and distribution in control and Alzheimer disease hippocampi. J Neuropathol Exp Neurol. 2010: 69:356-71.

108. Pollack IF, **Hamilton RL**, Sobol RW, Nikiforova MN, Lyons-Weiler MA, Laframboise WA, Burger PC, Brat DJ, Rosenblum MK, Holmes EJ, Zhou T, Jakacki RI; for the Children's Oncology Group. IDH1 mutations are common in malignant gliomas arising in adolescents: a report from the Children's Oncology Group. Childs Nerv Syst. 2010; 27:87-94

109. Jun G, Naj AC, Beecham GW, Wang LS, Buros J, Gallins PJ, Buxbaum JD, Ertekin-Taner N, Fallin MD, Friedland R, Inzelberg R, Kramer P, Rogaeva E, St George-Hyslop P, Arnold SE, Baldwin CT, Barber R, Beach T, Bigio EH, Bird TD, Boxer A, Burke JR, Cairns N, Carroll SL, Chui HC, Clark DG, Cotman CW, Cummings JL, Decarli C, Diaz-Arrastia R, Dick M, Dickson DW, Ellis WG, Fallon KB, Farlow MR, Ferris S, Frosch MP, Galasko DR, Gearing M, Geschwind DH, Ghetti B, Gilman S, Giordani B, Glass J, Graff-Radford NR, Green RC, Growdon JH, **Hamilton RL**, Harrell LE, Head E, Honig LS, Hulette CM, Hyman BT, Jicha GA, Jin LW, Johnson N, Karlawish J, Karydas A, Kaye JA, Kim R, Koo EH, Kowall NW, Lah JJ, Levey AI, Lieberman A, Lopez OL, Mack WJ, Markesbery W, Marson DC, Martiniuk F, Masliah E, McKee AC, Mesulam M, Miller JW, Miller BL, Miller CA, Parisi JE, Perl DP, Peskind E, Petersen RC, Poon W, Quinn JF, Raskind M, Reisberg B, Ringman JM, Roberson ED, Rosenberg RN, Sano M, Schneider JA, Schneider LS, Seeley W, Shelanski ML, Smith CD, Spina S, Stern RA, Tanzi RE, Trojanowski JQ, Troncoso JC, Van Deerlin VM, Vinters HV, Vonsattel JP, Weintraub S, Welsh-Bohmer KA, Woltjer RL, Younkin SG, Cantwell LB, Dombroski BA, Saykin AJ, Reiman EM, Bennett DA, Morris JC, Lunetta KL, Martin ER, Montine TJ, Goate AM, Blacker D, Tsuang DW, Beekly D, Cupples LA, Hakonarson H, Kukull W, Foroud TM, Haines J, Mayeux R, Farrer LA, Pericak-Vance MA, Schellenberg GD; Alzheimer's Disease Genetics Consortium, Arnold SE, Baldwin CT, Barber R, Beach T, Bigio EH, Bird TD, Boxer A, Burke JR, Cairns N, Carroll SL, Chui HC, Clark DG, Cotman CW, Cummings JL, Decarli C, Diaz-Arrastia R, Dick M, Dickson DW, Ellis WG, Fallon KB, Farlow MR, Ferris S, Frosch MP, Galasko D, Gearing M, Geschwind DH, Ghetti B, Gilman S, Giordani B, Glass J, Graff-Radford NR, Green RC, Growdon JH, Hamilton RL, Harrell LE, Head E, Honig LS, Hulette CM, Hyman BT, Jicha GA, Jin LW, Johnson N, Karlawish J, Karydas A, Kaye JA, Kim R, Koo EH, Kowall NW, Lah JJ, Levey AI, Lieberman A, Lopez OL, Mack WJ, Markesbery W, Marson DC, Martiniuk F, Masliah E, McKee AC, Mesulam M, Miller JW, Miller BL, Miller CA, Parisi JE, Perl DP, Peskind E, Petersen RC, Poon W, Quinn JF, Raskind M, Reisberg B, Ringman JM, Roberson ED, Rosenberg RN, Sano M, Schneider JA, Schneider LS, Seeley W, Shelanski ML, Smith CD, Spina S, Stern RA, Tanzi RE, Trojanowski JQ, Troncoso JC, Van Deerlin VM, Vinters HV, Vonsattel JP, Weintraub S, Welsh-Bohmer KA, Woltjer RL, Younkin SG. Meta-analysis confirms CR1, CLU and PICALM as Alzheimer Disease Risk Loci and reveals interactions with APOE Genotypes. Arch Neurol, 2010, Sep 3 (epub ahead of print)

110. Pollack IF, **Hamilton RL**, Burger PC, Brat DJ, Rosenblum MK, Murdoch GH, Nikiforova MN, Holmes EJ, Zhou T, Cohen KJ, Jakacki RI; Children's Oncology Group. Akt activation is a common event in pediatric malignant gliomas and a potential adverse prognostic marker: a report from the Children's Oncology Group. J Neurooncol. 2010 Sep;99(2):155-63. Epub 2010 Jul 4

**Ronald L. Hamilton, M.D.**

111. Pollack IF, **Hamilton RL**, Sobol RW, Nikiforova MN, Nikiforov YE, Lyons-Weiler MA, Laframboise WA, Burger PC, Brat DJ, Rosenblum MK, Gilles FH, Yates AJ, Zhou T, Cohen KJ, Finlay JL, Jakacki RI; for the Children's Oncology Group. Mismatch repair deficiency is an uncommon mechanism of alkylator resistance in pediatric malignant gliomas: a report from the Children's Oncology Group. Pediatr Blood Cancer 2010 Jun 29 epub ahead of print

112. Bonneh-Barkay D, Wang G, Starkey A, **Hamilton RL**, Wiley CA. In vivo CHI3L1 (YKL-40) expression in astrocytes in acute and chronic neurological diseases. J Neuroinflammation 2010 Jun 11:7-34.

113. Hinkle DA, Mullett SJ, Gabris BE, **Hamilton RL**. DJ-1 expression in glioblastomas shows positive correlation with p53 expression and negative correlation with epidermal growth factor receptor amplification. Neuropathology 2010 May 19 (epub ahead of print)xx

114. Okada H, Kalinski P, Ueda R, Hoji A, Kohanbash G, Donegan TE, Mintz AH, Engh JA, Bartlett DL, Brown CK, Zeh H, Holtman MP, Reinhart TA, Whiteside TL,Butterfield LH, **Hamilton RL**, Potter DM, Pollack IF, Salazar AM, Lieberman FS. Induction of CD8+ T-cell responses against novel glioma-associated antigen peptides and clinical activity by vaccinations with {alpha}-type 1 polarized dendritic cells and polyinosinic-polycytidylic acid stabilized by lysine and carboxymethylcellulose In patients with recurrent malignant glioma. J Clin Oncol. 2011;29:330-6.PMID: 21149657

115. Kofler J, Bartynski WS, Reynolds TQ, Lieberman FS, Murdoch GH, **Hamilton RL**. Posterior reversible encephalopathy syndrome (PRES) with immune system activation, VEGF up-regulation, and cerebral amyloid angiopathy. J. Comput Assist Tomogr. 2011; 35:39-42. PMID: 21150450

116. Bonfield CM, Amin D, **Hamilton RL**, Gerszten PC. Extramedullary ependymoma near the conus medullaris with lumbar nerve root attachment: case report. Neurosurgery. 2011 Mar;68:E831-4. PMID:21311277

117. Fujita M, Kohanbash G, Fellows-Mayle W, **Hamilton RL**, Komohara Y, Decker SA, Ohlfest JR, Okada H.COX-2 blockade suppresses gliomagenesis by inhibiting myeloid-derived suppressor cells. Cancer Res. 2011 Apr 1;71:2664-74. Epub 2011 Feb 15. PMID: 21324923

118. Cohen KJ, Pollack IF, Zhou T, Buxton A, Holmes EF, Burger PC, Brat DJ, Rosenblum MK, **Hamilton RL**, Lavey RS, Heideman RL. Temozolomide in the treatment of high-grade gliomas in children: a report from the Children's Oncology Group. Neuro Oncol. 2011 Mar;13:317-23. PMID: 21339192

119. Omalu B, Bailes J, **Hamilton RL**, Kamboh MI, Hammers J, Case M, Fitzsimmons R. Emerging histomorphologic phenotypes of chronic traumatic encephalopathy in American athletes. Neurosurgery. 2011 Jul;69:173-83; discussion 183. PMID: 21358359

120. Tang JB, Svilar D, Trivedi RN, Wang XH, Goellner EM, Moore B, **Hamilton RL**, Banze LA, Brown AR, Sobol RW. N-methylpurine DNA glycosylase and DNA polymerase beta modulate BER inhibitor potentiation of glioma cell to temozolomide. Neurosurgery Oncol. 2011;13:471-86. PMID: 21377995

121. Liu KW, Feng H, Bachoo R, Kazlauskas A, Smith EM, Symes K, **Hamilton RL**, Nagane M, Nishikawa R, Hu, B, Cheng Sy. SHP-2/PTPN 11 mediates gliomagenesis driven by PDGFRA and INK4A/ARF aberrations in mice and humans. J. Clin Invest. 2011 Mar;121:905-17. PMID: 21393858

122. Naj AC, Jun G, Beecham GW, Wang LS, Vardarajan BN, Buros J, Gallins PJ, Buxbaum JD, Jarvidk GP, Crane PK, Larson EB, Bird TB, Boeve BF, Graff-Radford NR, De Jager PL, Evans D, Schneider JA, Carrasquillo MM, Ertekin-Taner N, Younkin SG, Cruchaga C, Kauwe JS, Nowotny P, Kramer P, Hardy J, Huentelman MJ, Myers AJ, Barmada MM, Demirci FY, Baldwin CT, Green RC, Rogaeva E, St. George-Hyslop P, Arnold SE, Barber R, Beach T, Bigio EH, Bowen JD, Boxer A, Burke JR, Cairns NJ, Carlson CS, Carney RM, Carroll SL, Chui HC, Clark DG, Corneveaux J, Cotman CW, Cummings JL, Decarli C, DeKosy ST, Diaz-Arrastia R, Dick M, Dickson DW, Ellis WG, Faber KM, Fallon KB, Farlow MR, Ferris S. Frosch MP, Galasko Dr, Ganguli M, Gearing M, Geschwind DH, Ghetti B, Gilbert JR, Gilman S, Giordani B, Glass JD, Growdon JH, **Hamilton RL**,R, Koo EH, Kowall NW, Lah JJ, Levey AI, Lieberman AP, Lopez OL, Mack WJ, Marson DC, Martiniuk F, Mash DC, Masliah E, McCormick WC, McCurry SM, McDavid AN, McKee AC, Mesulam M, Miller BL, Miller JW, Parisi JE, Perl DP, Peskind E,Petersen, RC, Poon, WV, Quinn JF, Rajbhandary RA, Raskind M, Reisberg B, Ringman JM, Roberson ED, Rosenberg RN,Sano M, Schneider LS, Seeley W, Shelanksi ML, Slifer MA, Smith CD, Sonnen JA, Spina S. Stern RA, Tanzi RE, Trojanowski JQ, Troncoso JC, Van Deerlin VM, Vinters HV, Vonsattel JP, Weintraub S, Welsh-Bohmer KA, Williamson

**Ronald L. Hamilton, M.D.**

J, Woltjer RL,Cantwell LB, Dombroski BA, Beekly D, Lunetta KL, Martin ER, Kamboh MI, Saykin AJ, Reiman EM, Bennett DA, Morris JC, Montine TJ, Goate AM, lacker D, Tsuang DW, Hakonarson, H, Kukull WA, Foroud TM, Haines JL, Mayeux R, Pericak-Vance MA, Farrer LA, Schellenberg GD. Commons variants as MS4A4/MS4A6E, CD2AP, CD33 and EPHA1 are associated with late Onset Alzheimer's Disease. Nat Genet. 2011 May;43:436-41 Epub 2011 Apr 3. PMID: 21460841

123.    Chen-Plotkin AS, Martinez-Lage M,Sleiman PM, Hu W, Greene R, Wood  EM, Bing S, Grossman M, Schellenberg GD, Hatanpaa KJ, Weiner MF, White CL 3rd, Brooks WS, Halliday GM, Kril JJ, Gearing M, Beach TG, Graff-Radford NR, Dickson DW, Rademakers R, Boeve BF, Pickering-Brown SM, Snowden J, van Swieten JC, Heutink P, Seelaar H, Murrell JR, Ghetti B, Spina S, Grafman J, Kaye JA, Woltjer RL, Mesulam M, Bigio E, Llad'o A, Miller BL, Alzualde A, Moreno F,Rohrer JD, Mackenzie IR, Feldman HH, **Hamilton RL**, Cruts M, Engelborghs S, De Deyn PP, Van Broeckhoven C, Bird TD, Cairns NJ, Goate A, Frosch MP, Riederer PF, Bogdanovic N, Lee VM, Trojanowksi JQ, Van Deerlin VM. Genetic and clinical features of progranulin-associated frontotemporal lobar degeneration. Arch Neurol. 2011 Apr;68:488-97. PMID: 21482928

124.    Nikiforova MN, **Hamilton RL**. Molecular diagnostics of gliomas. Arch Pathol Lab Med. 2011 May;135:558-68. Review. PMID: 21526954

125.    Monaco EA 3rd, Armah HB, Nikiforova MN, **Hamilton RL**, Engh JA. Grade II Oligodendroglioma localized to the corpus callosum. Brain Tumor Pathol. 2011 Oct;28:305-9. Epub 2011 Jul 22. PMID: 21833577

126.    Horbinski C, Hobbs, J, Cieply K, Dacic S, **Hamilton RL.** EGFR expression stratifies oligodendroglioma behavior.Am J Pathol. 2011 Oct; 179:1638-44. Epub 2011 Aug 11. PMID: 21839716

127.    Omalu B, hammers, JL, bailes J**, Hamilton RL**. Kamboh MI, Webster G, Fitzsimmons RP. Chronic traumatic Encephalopathy  in an Iraqi war veteran with posttraumatic stress disorder who committed suicide. Neurosurg Focus. 2011 Nov; :E3. PMID: 22044102

128.    Liu Y, Komohara Y, Domenick N, Ohno M, Ikeura M, **Hamilton RL**, Horbinski C, Wang X, Ferrone S, Okada H. Expression of antigen processing molecules in brain metastasis of breast cancer. Cancer Immunol Immunother. 2011 Nov 8. (Epub ahead of print } PMID:22065046

129.    Feng H, Hu B, Liu KW, Li Y, Lu X, Cheng T, Yiin JJ, Lu S, Keezer S, Fenton T, Furnari FB, **Hamilton RL**, Vuori K, Sarkaria JN, Nagane M, Nishikawa R, Cavenee WK, Cheng SY. Activation of Rac 1 by src-dependent phosphorylation of Dock180(Y1811) mediates PDGFRa-stimulated glioma tumorigenesis in mice and humans. J Clin Invest. 2011 Dec; 121:4670-84. doi: 10.1172/JCI58559. Epub 2011 Nov 14. PMID: 22080864

130.    Horbinski C, Nikiforova MN, Hobbs J, Bortoluzzi S. Cieply K, Dacic S, **Hamilton RL**. The importance of 10q status in an outcomes-based comparison between 1p/19q fluorescence in situ hybridization and polymerase chain reaction-based microsatellite loss of heterozygosity analysis of oligodendrogliomas.  J. Neuropathol Exp Neurol. 2012 Jan;71:73-82. PMID: 22157622

131.    Ikonomovic MD, Abrahamson EE, Price JC, **Hamilton RL**, Mathis CA, Paljug WR, Cohen AD, Mizukami K, DeKosky ST, Lopez OL, Klunk WE. Early AD pathology in a {C-11} PiB-negative case: a PiB-amyloid imaging, biochemical, and  Immunohistochemical study. Acta Neuropathol. 2012 Mar;123:433-47. Epub 2012 Jan 24. PMID: 22271153

132.    Feng H, Hu B, Jarzynka MJ, Li Y, Keezer S, Johns TG, Tang CK, **Hamilton RL**, Vuuori K, Nishikawa R, Sarkaria JN, Fenton T, Cheng T, Furnari FB, Cavenee WK, Cheng SY. Phosphorylation of dedicator of cytokinesis 1(Dock 180) at tyrosine residue Y722 by Src family kinases mediates EGRFvIII-driven glioblastoma tumorigenesis. Proc Natl Acad Sci U S A. 2012 Feb 21;109:3018-23. Epub 2012 Feb 7. PMID: 22323579

133.    Wu Y, Lou H, Alerte TN, Stachowski EK, Chen J, Singleton AB, **Hamilton RL**, Perez RG. Neuroscience. 2012 Jan 25. {Epubahead a print} PMID: 22326202

134.    Murray PS, Kirkwood CM, Gray MC, Ikonomovic MD, Paljug WR, Abrahamson EE, Henteleff RA, **Hamilton RL**, Kofler JK, Klunk WE, Lopez OL, Penzes P, Sweet RA. β-Amyloid 42/40 ratio and kalirin expression in Alzheimer disease with psychosis. Neurobiol Aging. 2012 Mar 17. [Epub ahead of print] PMID:22429885

**Ronald L. Hamilton, M.D.**

135.    Choi SH, Olabarrieta M, Lopez OL, Maruca V, DeKosky ST, **Hamilton RL**, Becker JT. Gray Matter Atrophy Associated with Extrapyramidal Signs in the Lewy Body Variant of Alzheimer's Disease. J Alzheimers Dis. 2012 Aug 9. [Epub ahead of print] PMID:22886020

136.    Armstrong RA, **Hamilton RL**, Mackenzie IR, Hedreen J, Cairns NJ. Laminar Distribution of the Pathological Changes in Sporadic Frontotemporal Lobar Degeneration with TDP-43 Proteinopathy: A Quantitative Study Using Polynomial Curve Fitting. Neuropathol Appl Neurobiol. 2012 Jul 16. [Epub ahead of print] PMID:22804696

137.    Atkinson DM, **Hamilton RL** A 52-year-old male with visual changes. Brain Pathol. 2012 Jul;22(4):575-8. PMID:22697384

138.    Zou F, Chai HS, Younkin CS, Allen M, Crook J, Pankratz VS, Carrasquillo MM, Rowley CN, Nair AA, Middha S, Maharjan S, Nguyen T, Ma L, Malphrus KG, Palusak R, Lincoln S, Bisceglio G, Georgescu C, Kouri N, Kolbert CP, Jen J, Haines JL, Mayeux R, Pericak-Vance MA, Farrer LA, Schellenberg GD; Alzheimer's Disease Genetics Consortium, Petersen RC, Graff-Radford NR, Dickson DW, **Hamilton RL**, Younkin SG, Ertekin-Taner N. Brain expression genome-wide association study (eGWAS) identifies human disease-associated variants. PLoS Genet. 2012;8(6): e1002707. Epub 2012 Jun 7 PMID:22685416

139.    Horbinski C, Nikiforova MN, Hagenkord JM, **Hamilton RL**, Pollack IF. Interplay among BRAF, p16, p53, and MIB1 in pediatric low-grade gliomas. Neuro Oncol. 2012 Jun;14(6):777-89 (1012) PMID:22492957

140.    Hobbs J, Nikiforova MN, Fardo DW, Bortoluzzi S, Cieply K, **Hamilton RL**, Horbinski C. Paradoxical relationship between the degree of EGFR amplification and outcome in glioblastomas. Am J Surg Pathol. 2012 Aug;36(8):1186-93. PMID:22472960

141. Armstrong, R. A., **R. L. Hamilton**, I. R. Mackenzie, J. Hedreen and N. J. Cairns. "Laminar Distribution of the Pathological Changes in Sporadic Frontotemporal Lobar Degeneration with Transactive Response (Tar) DNA-Binding Protein of 43 Kda (Tdp-43) Proteinopathy: A Quantitative Study Using Polynomial Curve Fitting." *Neuropathol Appl Neurobiol* 39, no. 4 (2013): 335-47.

142. Clark, K. H., J. L. Villano, M. N. Nikiforova, **R. L. Hamilton** and C. Horbinski. "1p/19q Testing Has No Significance in the Workup of Glioblastomas." *Neuropathol Appl Neurobiol*,  (2013).

143. Gheorghe, G., O. Radu, S. Milanovich, **R. L. Hamilton**, R. Jaffe, J. F. Southern and J. A. Ozolek. "Pathology of Central Nervous System Posttransplant Lymphoproliferative Disorders: Lessons from Pediatric Autopsies." *Pediatr Dev Pathol* 16, no. 2 (2013): 67-73.

1444. Holton, P., M. Ryten, M. Nalls, D. Trabzuni, M. E. Weale, D. Hernandez, H. Crehan, J. R. Gibbs, R. Mayeux, J. L. Haines, L. A. Farrer, M. A. Pericak-Vance, G. D. Schellenberg, M. Ramirez-Restrepo, A. Engel, A. J. Myers, J. J. Corneveaux, M. J. Huentelman, A. Dillman, M. R. Cookson, E. M. Reiman, A. Singleton, J. Hardy and R. Guerreiro. "Initial Assessment of the Pathogenic Mechanisms of the Recently Identified Alzheimer Risk Loci." *Ann Hum Genet* 77, no. 2 (2013): 85-105.

145. Miyashita, A., A. Koike, G. Jun, L. S. Wang, S. Takahashi, E. Matsubara, T. Kawarabayashi, M. Shoji, N. Tomita, H. Arai, T. Asada, Y. Harigaya, M. Ikeda, M. Amari, H. Hanyu, S. Higuchi, T. Ikeuchi, M. Nishizawa, M. Suga, Y. Kawase, H. Akatsu, K. Kosaka, T. Yamamoto, M. Imagawa, T. Hamaguchi, M. Yamada, T. Moriaha, M. Takeda, T. Takao, K. Nakata, Y. Fujisawa, K. Sasaki, K. Watanabe, K. Nakashima, K. Urakami, T. Ooya, M. Takahashi, T. Yuzuriha, K. Serikawa, S. Yoshimoto, R. Nakagawa, J. W. Kim, C. S. Ki, H. H. Won, D. L. Na, S. W. Seo, I. Mook-Jung, P. St George-Hyslop, R. Mayeux, J. L. Haines, M. A. Pericak-Vance, M. Yoshida, N. Nishida, K. Tokunaga, K. Yamamoto, S. Tsuji, I. Kanazawa, Y. Ihara, G. D. Schellenberg, L. A Farrer and R. Kuwano. "Sorl1 Is Genetically Associated with Late-Onset Alzheimer's Disease in Japanese, Koreans and Caucasians." *PLoS One* 8, no. 4 (2013): e58618.

146. Pang, B., M. B. Durso, **R. L. Hamilton** and M. N. Nikiforova. "A Novel Cold-Pcr/Fmca Assay Enhances the Detection of Low-Abundance Idh1 Mutations in Gliomas." *Diagn Mol Pathol* 22, no. 1 (2013): 28-34.

147. Reitz, C., G. Jun, A. Naj, R. Rajbhandary, B. N. Vardarajan, L. S. Wang, O. Valladares, C. F. Lin, E. B. Larson, N. R. Graff-Radford, D. Evans, P. L. De Jager, P. K. Crane, J. D. Buxbaum, J. R. Murrell, T. Raj, N. Ertekin-Taner, M. Logue, C. T. Baldwin, R. C. Green, L. L. Barnes, L. B. Cantwell, M. D. Fallin, R. C. Go, P. Griffith, T. O. Obisesan, J. J. Manly, K. L. Lunetta, M. I. Kamboh, O. L. Lopez, D. A. Bennett, H. Hendrie, K. S. Hall, A. M. Goate, G. S. Byrd, W. A. Kukull, T. M. Foroud, J. L. Haines, L. A. Farrer, M. A. Pericak-Vance, G. D. Schellenberg and R. Mayeux. "Variants

**Ronald L. Hamilton, M.D.**

in the Atp-Binding Cassette Transporter (Abca7), Apolipoprotein E 4,and the Risk of Late-Onset Alzheimer Disease in African Americans." *JAMA* 309, no. 14 (2013): 1483-92.

148. Schlegel, J., M. J. Sambade, S. Sather, S. J. Moschos, A. C. Tan, A. Winges, D. DeRyckere, C. C. Carson, D. G. Trembath, J. J. Tentler, S. G. Eckhardt, P. F. Kuan, **R. L. Hamilton**, L. M. Duncan, C. R. Miller, N. 9. Nikolaishvili-Feinberg, B. R. Midkiff, J. Liu, W. Zhang, C. Yang, X. Wang, S. V. Frye, H. S. Earp, J. M. Shields and D. K. Graham. "Mertk Receptor Tyrosine Kinase Is a Therapeutic Target in Melanoma." *J Clin Invest* 123, no. 5 (2013): 2257-67.

150. Spina, S., A. D. Van Laar, J. R. Murrell, **R. L. Hamilton**, J. K. Kofler, F. Epperson, M. R. Farlow, O. L. Lopez, J. Quinlan, S. T. DeKosky and B. Ghetti. "Phenotypic Variability in Three Families with Valosin-Containing Protein Mutation." *Eur J Neurol* 20, no. 2 (2013): 251-8.

151. Tsuang, D., J. B. Leverenz, O. L. Lopez, **R. L. Hamilton,** D. A. Bennett, J. A. Schneider, A. S. Buchman, E. B. Larson, P. K. Crane, J. A. Kaye, P. Kramer, R. Woltjer, J. Q. Trojanowski, D. Weintraub, A. S. Chen-Plotkin, D. J. Irwin, J. Rick, G. D. Schellenberg, G. S. Watson, W. Kukull, P. T. Nelson, G. A. Jicha, J. H. Neltner, D. Galasko, E. Masliah, J. F. Quinn, K. A. Chung, D. Yearout, I. F. Mata, J. Y. Wan, K. L. Edwards, T. J. Montine and C. P. Zabetian. "Apoe Epsilon4 Increases Risk for Dementia in Pure Synucleinopathies." *JAMA Neurol* 70, no. 2 (2013): 223-8.

152. Yeung, J. T., **R. L. Hamilton**, K. Ohnishi, M. Ikeura, D. M. Potter, M. N. Nikiforova, S. Ferrone, R. I. Jakacki, I. F. Pollack and H. Okada. "Loh in the Hla Class I Region at 6p21 Is Associated with Shorter Survival in Newly Diagnosed Adult Glioblastoma." *Clin Cancer Res* 19, no. 7 (2013): 1816-26.

153. Yeung, J. T., **R. L. Hamilton**, H. Okada, R. I. Jakacki and I. F. Pollack. "Increased Expression of Tumor-Associated Antigens in Pediatric and Adult Ependymomas: Implication for Vaccine Therapy." *J Neurooncol* 111, no. 2 (2013): 103-11.

154. **Hamilton R**, Krause M, Romkes M, Omolo B, Konstantinopoulos P, Reinhart T, Harasymczuk M, Wang Y, Lin Y, Ferrone S, Whiteside T, Bortoluzzi S, Werley J, Nukui T, Fallert-Junecko B, Kondziolka D, Ibrahim J, Becker D, Kirkwood J, Moschos S. Pathologic and gene expression features of metastatic melanomas to the brain.Cancer. 2013 Aug 1;119(15):2737-46. doi: 10.1002/cncr.28029. Epub 2013 May 21.PMID:23695963 [PubMed - in process]

155. Lam S, Grandhi R, Wong R, **Hamilton R**, Greene S. Neuromuscular hamartoma of the sciatic nerve: Case report and review of the literature. Surg Neurol Int. 2013;4:8. doi: 10.4103/2152-7806.106266. Epub 2013 Jan 18.PMID:23493803[PubMed]

156. Reitz C, Mayeux R; Alzheimer's Disease Genetics Consortium. TREM2 and neurodegenerative disease. N Engl J Med. 2013 Oct 17;369(16):1564-5. doi: 10.1056/NEJMc1306509#SA1. PMID:24131184

157. Tempel ZJ, Johnson SA, Richard PS, Friedlander RM, Rothfus WE, **Hamilton RL**.  Parasellar arachnoid cyst presenting with a nonpupil sparing third nerve palsy mimicking a posterior communicating artery aneurysm in an adult. Surg Neurol Int. 2013 Jul 9;4:87. doi: 10.4103/2152-7806.114799. eCollection 2013.PMID:23956930

158. Murray PS, Kirkwood CM, Gray MC, Fish KN, Ikonomovic MD, **Hamilton RL**, Kofler JK, Klunk WE, Lopez OL, Sweet RA.  Hyperphosphorylated tau is elevated in Alzheimer's Disease with psychosis. J Alzheimers Dis, 2014 204;39:759-773. PMID:24270207

159. Oborski MJ, Laymon CM, Lieberman FS, Drappatz J, **Hamilton RL**, Mountz JM. First use of (18)F-labeled ML-10 PET to assess apoptosis change in a newly diagnosed glioblastoma multiforme patient before and early after therapy. Brain Behav 2014 4:312-315.  PMID:24683522

160  Shin SS, Murdoch G, Hamilton RL, Faraji AH, Kano H, Zwagerman NT, Gardner PA, Lunsford LD, Friedlander RM The Pathological Response of Cavernous Malformations Following Radiosurgery.  J Neurosurg (in press).

160.  Pollack IF, Jakacki RI, Butterfield LH, **Hamilton RL**, Panigrahy A, Potter DM, Connelly AK, Dibridge SA, Whiteside TL, Okada H. Antigen-specific immune responses and clinical outcome after vaccination with glioma-associated antigen peptides and polyinosinic-polycytidylic Acid stabilized by lysine and carboxymethylcellulose in children with newly diagnosed malignant brainstem and nonbrainstem gliomas. J Clin Oncol. 2014 Jul 1;32(19):2050-8. PMID:24888813

161.  Naj AC, Jun G, Reitz C, Kunkle BW, Perry W, Park YS, Beecham GW, Rajbhandary RA, Hamilton-Nelson KL, Wang LS, Kauwe JS, Huentelman MJ, Myers AJ, Bird TD, Boeve BF, Baldwin CT, Jarvik GP, Crane PK, Rogaeva E, Barmada MM, Demirci FY, Cruchaga C, Kramer PL, Ertekin-Taner N, Hardy J, Graff-Radford NR, Green RC, Larson

**Ronald L. Hamilton, M.D.**

EB, St George-Hyslop PH, Buxbaum JD, Evans DA, Schneider JA, Lunetta KL, Kamboh MI, Saykin AJ, Reiman EM, De Jager PL, Bennett DA, Morris JC, Montine TJ, Goate AM, Blacker D, Tsuang DW, Hakonarson H, Kukull WA, Foroud TM, Martin ER, Haines JL, Mayeux RP, Farrer LA, Schellenberg GD, Pericak-Vance MA; Alzheimer Disease Genetics Consortium, Albert MS, Albin RL, Apostolova LG, Arnold SE, Barber R, Barnes LL, Beach TG, Becker JT, Beekly D, Bigio EH, Bowen JD, Boxer A, Burke JR, Cairns NJ, Cantwell LB, Cao C, Carlson CS, Carney RM, Carrasquillo MM, Carroll SL, Chui HC, Clark DG, Corneveaux J, Cribbs DH, Crocco EA, DeCarli C, DeKosky ST, Dick M, Dickson DW, Duara R, Faber KM, Fallon KB, Farlow MR, Ferris S, Frosch MP, Galasko DR, Ganguli M, Gearing M, Geschwind DH, Ghetti B, Gilbert JR, Glass JD, Growdon JH, **Hamilton RL**, Harrell LE, Head E, Honig LS, Hulette CM, Hyman BT, Jicha GA, Jin LW, Karydas A, Kaye JA, Kim R, Koo EH, Kowall NW, Kramer JH, LaFerla FM, Lah JJ, Leverenz JB, Levey AI, Li G, Lieberman AP, Lin CF, Lopez OL, Lyketsos CG, Mack WJ, Martiniuk F, Mash DC, Masliah E, McCormick WC, McCurry SM, McDavid AN, McKee AC, Mesulam M, Miller BL, Miller CA, Miller JW, Murrell JR, Olichney JM, Pankratz VS, Parisi JE, Paulson HL, Peskind E, Petersen RC, Pierce A, Poon WW, Potter H, Quinn JF, Raj A, Raskind M, Reisberg B, Ringman JM, Roberson ED, Rosen HJ, Rosenberg RN, Sano M, Schneider LS, Seeley WW, Smith AG, Sonnen JA, Spina S, Stern RA, Tanzi RE, Thornton-Wells TA, Trojanowski JQ, Troncoso JC, Valladares O, Van Deerlin VM, Van Eldik LJ, Vardarajan BN, Vinters HV, Vonsattel JP, Weintraub S, Welsh-Bohmer KA, Williamson J, Wishnek S, Woltjer RL, Wright CB, Younkin SG, Yu CE, Yu L. .  Effects of multiple genetic Loci on age at onset in late-onset Alzheimer disease: a genome-wide association study.   JAMA Neurol. 2014 Nov 1;71(11):1394-404. doi: 10.1001/jamaneurol.2014.1491

162. Pollack IF, Jakacki RI, Butterfield LH, **Hamilton RL**, Panigrahy A, Potter DM, Connelly AK, Dibridge SA, Whiteside TL, Okada H.  Antigen-specific immune responses and clinical outcome after vaccination with glioma-associated antigen peptides and polyinosinic-polycytidylic acid stabilized by lysine and carboxymethylcellulose in children with newly diagnosed malignant brainstem and nonbrainstem gliomas.   J Clin Oncol. 2014 Jul 1;32(19):2050-8. doi: 10.1200/JCO.2013.54.0526. Epub 2014 Jun 2.  PMID: 24888813

163.. Okada H, Butterfield LH, **Hamilton RL**, Hoji A, Sakaki M, Ahn BJ, Kohanbash G, Drappatz J, Engh J, Amankulor N, Lively MO, Chan MD, Salazar AM, Shaw EG, Potter DM, Lieberman FS.  Induction of robust type-1 CD8+ T-cell responses in WHO grade II low-grade glioma patients receiving peptide-based vaccines in combination with poly-ICLC Clin Cancer Res. 2014 Nov 25. pii: clincanres.1790.2014

164. Salloway S, Sperling R, Fox NC, Blennow K, Klunk W, Raskind M, Sabbagh M, Honig LS, Porsteinsson AP, Ferris S, Reichert M, Ketter N, Nejadnik B, Guenzler V, Miloslavsky M, Wang D, Lu Y, Lull J, Tudor IC, Liu E, Grundman M, Yuen E, Black R, Brashear HR; **Hamilton RL**, Bapineuzumab 301 and 302 Clinical Trial Investigators.  Two phase 3 trials of bapineuzumab in mild-to-moderate Alzheimer's disease  N Engl J Med. 2014 Jan 23;370(4):322-33. doi: 10.1056/NEJMoa1304839.

165. Leone JP, Bhargava R, Theisen BK, **Hamilton RL**, Lee AV, Brufsky AM. Expression of high affinity folate receptor in breast cancer brain metastasis. Oncotarget. 2015 Jun 25. [Epub ahead of print]  PMID: 24450891

166. Wang LS, Naj AC, Graham RR, Crane PK, Kunkle BW, Cruchaga C, Murcia JD, Cannon-Albright L, Baldwin CT, Zetterberg H, Blennow K, Kukull WA, Faber KM, Schupf N, Norton MC, Tschanz JT, Munger RG, Corcoran CD, Rogaeva E; Alzheimer's Disease Genetics Consortium, Lin CF, Dombroski BA, Cantwell LB, Partch A, Valladares O, Hakonarson H, St George-Hyslop P, Green RC, Goate AM, Foroud TM, Carney RM, Larson EB, Behrens TW, Kauwe JS, Haines JL, Farrer LA, Pericak-Vance MA, Mayeux R, Schellenberg GD; National Institute on Aging-Late-Onset Alzheimer's Disease (NIA-LOAD) Family Study, Albert MS, Albin RL, Apostolova LG, Arnold SE, Barber R, Barmada M, Barnes LL, Beach TG, Becker JT, Beecham GW, Beekly D, Bennett DA, Bigio EH, Bird TD, Blacker D, Boeve BF, Bowen JD, Boxer A, Burke JR, Buxbaum JD, Cairns NJ, Cao C, Carlson CS, Carroll SL, Chui HC, Clark DG, Cribbs DH, Crocco EA, DeCarli C, DeKosky ST, Demirci F, Dick M, Dickson DW, Duara R, Ertekin-Taner N, Fallon KB, Farlow MR, Ferris S, Frosch MP, Galasko DR, Ganguli M, Gearing M, Geschwind DH, Ghetti B, Gilbert JR, Glass JD, Graff-Radford NR, Growdon JH, **Hamilton RL**, Hamilton-Nelson KL, Harrell LE, Head E, Honig LS, Hulette CM, Hyman BT, Jarvik GP, Jicha GA, Jin LW, Jun G, Jun G, Kamboh MI, Karydas A, Kaye JA, Kim R, Koo EH, Kowall NW, Kramer JH, LaFerla FM, Lah JJ, Leverenz JB, Levey AI, Li G, Lieberman AP, Lopez OL, Lunetta KL, Lyketsos CG, Mack WJ, Marson DC, Martin ER, Martiniuk F, Mash DC, Masliah E, McCormick WC, McCurry SM, McDavid AN, McKee AC, Mesulam WM, Miller BL, Miller CA, Miller JW, Montine TJ, Morris JC, Murrell JR, Olichney JM, Parisi JE, Perry W, Peskind E, Petersen RC, Pierce A, Poon WW, Potter H, Quinn JF, Raj A, Raskind M, Reiman EM, Reisberg B, Reitz C, Ringman JM, Roberson ED, Rosen HJ, Rosenberg RN, Sano M, Saykin AJ, Schneider JA, Schneider LS, Seeley WW, Smith AG, Sonnen JA, Spina S, Stern RA, Tanzi RE, Thornton-Wells TA, Trojanowski JQ, Troncoso JC, Tsuang DW, Van Deerlin VM, Van Eldik LJ, Vardarajan BN, Vinters HV, Vonsattel JP, Weintraub S, Welsh-Bohmer KA, Williamson J, Wishnek S, Woltjer RL, Wright CB, Younkin SG, Yu CE, Yu L.**Rarity of the Alzheimer disease-protective APP A673T variant in the United States.** JAMA Neurol. 2015 Feb;72(2):209-16. doi: 10.1001/jamaneurol.2014.2157.

**Ronald L. Hamilton, M.D.**

167. 2. Jun G, Ibrahim-Verbaas CA, Vronskaya M, Lambert JC, Chung J, Naj AC, Kunkle BW, Wang LS, Bis JC, Bellenguez C, Harold D, Lunetta KL, Destefano AL, Grenier-Boley B, Sims M, Beecham GW, Smith AV, Chouraki V, Hamilton-Nelson KL, Ikram MA, Fievet N, Denning N, Martin ER, Schmidt H, Kamatani Y, Dunstan ML, Valladares O, Laza AR, Zelenika D, Ramirez A, Foroud TM, Choi SH, Boland A, Becker T, Kukull WA, van der Lee SJ, Pasquier F, Cruchaga C, Beekly D, Fitzpatrick AL, Hanon O, Gill M, Barber R, Gudnason V, Campion D, Love S, Bennett DA, Amin N, Berr C, Tsolaki M, Buxbaum JD, Lopez OL, Deramecourt V, Fox NC, Cantwell LB, Tárraga L, Dufouil C, Hardy J, Crane PK, Eiriksdottir G, Hannequin D, Clarke R, Evans D, Mosley TH Jr, Letenneur L, Brayne C, Maier W, De Jager P, Emilsson V, Dartigues JF, Hampel H, Kamboh MI, de Bruijn RF, Tzourio C, Pastor P, Larson EB, Rotter JI, O'Donovan MC, Montine TJ, Nalls MA, Mead S, Reiman EM, Jonsson PV, Holmes C, St George-Hyslop PH, Boada M, Passmore P, Wendland JR, Schmidt H, Morgan K, Winslow AR, Powell JF, Carasquillo M, Younkin SG, Jakobsdóttir J, Kauwe JS, Wilhelmsen KC, Rujescu D, Nöthen MM, Hofman A, Jones L; IGAP Consortium, Haines JL, Psaty BM, Van Broeckhoven C, Holmans P, Launer LJ, Mayeux R, Lathrop M, Goate AM, Escott-Price V, Seshadri S, Pericak-Vance MA, Amouyel P, Williams J, van Duijn CM, Schellenberg GD, Farrer LA and . Collaborators (including **Hamilton RL**) (296)   **A novel Alzheimer disease locus located near the gene encoding tau protein**. Mol Psychiatry. 2015 Mar 17. doi: 10.1038/mp.2015.23.

168. . Østergaard SD, Mukherjee S, Sharp SJ, Proitsi P, Lotta LA, Day F, Perry JR, Boehme KL, Walter S, Kauwe JS, Gibbons LE; Alzheimer's Disease Genetics Consortium; GERAD1 Consortium; EPIC-InterAct Consortium, Larson EB, Powell JF, Langenberg C, Crane PK, Wareham NJ, Scott RA.
Collaborators (including **Hamilton RL**) (296)   Associations between Potentially Modifiable Risk Factors and Alzheimer Disease: A Mendelian Randomization Study. PLoS Med. 2015 Jun 16;12(6):e1001841; discussion e1001841. doi:

169. Wang P, Bahreini A, Gyanchandani R, Lucas PC, Hartmaier RJ, Watters RJ, Jonnalagadda AR, Trejo Bittar HE, Berg A, **Hamilton RL**, Kurland BF, Weiss KR, Mathew A, Leone JP, Davidson NE, Nikiforova MN, Brufsky AM, Ambros TF, Stern AM, Puhalla SL, Lee AV, Oesterreich S. Sensitive detection of mono- and polyclonal ESR1 mutations in primary tumors, metastatic lesions and cell free DNA of breast cancer patients. Clin Cancer Res. 2015 Oct 23. pii: 1534.2015. PMID: 26500237

170. Salgado CM, Basu D, Nikiforova M, **Hamilton RL**, Gehris R, Jakacki R, Panigrahy A, Yatsenko S, Reyes-Múgica M. Amplification of mutated NRAS leading to congenital melanoma in neurocutaneous melanocytosis. Melanoma Res. 2015 Oct;25(5):453-60.  PMID: 26266759

171. Shin SS, Murdoch G, Hamilton RL, Faraji AH, Kano H, Zwagerman NT, Gardner PA, Lunsford LD, Friedlander RM. Pathological response of cavernous malformations following radiosurgery. J Neurosurg. 2015 Oct;123(4):938-44. doi: 10.3171/2014.10.JNS14499. Epub 2015 Jun 19. PMID: 26090838

---------------------

172. Mukherjee S, Walter S, Kauwe JS, Saykin AJ, Bennett DA, Larson EB, Crane PK, Glymour MM; Adult Changes in Thought Study Investigators; Religious Orders Study/Memory and Aging Project Investigators; Alzheimer's Disease Genetics Consortium. Alzheimers Dement. Genetically predicted body mass index and Alzheimer's disease-related phenotypes in three large samples: Mendelian randomization analyses. 2015 Dec;11(12):1439-51. doi: 10.1016/j.jalz.2015.05.015. Epub 2015 Jun 12. PMID: 26079416

173. Ghani M, Reitz C, Cheng R, Vardarajan BN, Jun G, Sato C, Naj A, Rajbhandary R, Wang LS, Valladares O, Lin CF, Larson EB, Graff-Radford NR, Evans D, De Jager PL, Crane PK, Buxbaum JD, Murrell JR, Raj T, Ertekin-Taner N, Logue M, Baldwin CT, Green RC, Barnes LL, Cantwell LB, Fallin MD, Go RC, Griffith PA, Obisesan TO, Manly JJ, Lunetta KL, Kamboh MI, Lopez OL, Bennett DA, Hendrie H, Hall KS, Goate AM, Byrd GS, Kukull WA, Foroud TM, Haines JL, Farrer LA, Pericak-Vance MA, Lee JH, Schellenberg GD, St George-Hyslop P, Mayeux R, Rogaeva E; Alzheimer's Disease Genetics Consortium. Association of Long Runs of Homozygosity With Alzheimer Disease Among African American Individuals. JAMA Neurol. 2015 Nov;72(11):1313-23. doi: 10.1001/jamaneurol.2015.1700. PMID: 26366463

174. Nikiforova MN, Wald AI, Melan MA, Roy S, Zhong S, Hamilton RL, Lieberman FS, Drappatz J, Amankulor NM, Pollack IF, Nikiforov YE, Horbinski C.
Targeted next-generation sequencing panel (GlioSeq) provides comprehensive genetic profiling of central nervous system tumors. Neuro Oncol. 2016 Mar;18(3):379-87. doi: 10.1093/neuonc/nov289. Epub 2015 Dec 17. PMID: 2668176

175. Morrissy AS, Garzia L, Shih DJ, Zuyderduyn S, Huang X, Skowron P, Remke M, Cavalli FM, Ramaswamy V, Lindsay PE, Jelveh S, Donovan LK, Wang X, Luu B, Zayne K, Li Y, Mayoh C, Thiessen N, Mercier E, Mungall KL, Ma

**Ronald L. Hamilton, M.D.**

Y, Tse K, Zeng T, Shumansky K, Roth AJ, Shah S, Farooq H, Kijima N, Holgado BL, Lee JJ, Matan-Lithwick S, Liu J, Mack SC, Manno A, Michealraj KA, Nor C, Peacock J, Qin L, Reimand J, Rolider A, Thompson YY, Wu X, Pugh T, Ally A, Bilenky M, Butterfield YS, Carlsen R, Cheng Y, Chuah E, Corbett RD, Dhalla N, He A, Lee D, Li HI, Long W, Mayo M, Plettner P, Qian JQ, Schein JE, Tam A, Wong T, Birol I, Zhao Y, Faria CC, Pimentel J, Nunes S, Shalaby T, Grotzer M, Pollack IF, Hamilton RL, Li XN, Bendel AE, Fults DW, Walter AW, Kumabe T, Tominaga T, Collins VP, Cho YJ, Hoffman C, Lyden D, Wisoff JH, Garvin JH Jr, Stearns DS, Massimi L, Schüller U, Sterba J, Zitterbart K, Puget S, Ayrault O, Dunn SE, Tirapelli DP, Carlotti CG, Wheeler H, Hallahan AR, Ingram W, MacDonald TJ, Olson JJ, Van Meir EG, Lee JY, Wang KC, Kim SK, Cho BK, Pietsch T, Fleischhack G, Tippelt S, Ra YS, Bailey S, Lindsey JC, Clifford SC, Eberhart CG, Cooper MK, Packer RJ, Massimino M, Garre ML, Bartels U, Tabori U, Hawkins CE, Dirks P, Bouffet E, Rutka JT, Wechsler-Reya RJ, Weiss WA, Collier LS, Dupuy AJ, Korshunov A, Jones DT, Kool M, Northcott PA, Pfister SM, Largaespada DA, Mungall AJ, Moore RA, Jabado N, Bader GD, Jones SJ, Malkin D, Marra MA, Taylor MD. Divergent clonal selection dominates medulloblastoma at recurrence. Nature. 2016 Jan 21;529(7586):351-7. doi: 10.1038/nature16478. Epub 2016 Jan 13

176. Gandhoke GS, Yilmaz S, Grunwaldt L, Hamilton RL, Salvetti DJ, Greene S. A case of spinal epidural venous malformation with mediastinal extension: management with combined surgery and percutaneous sclerotherapy. J Neurosurg Pediatr. 2016 May;17(5):612-7. doi: 10.3171/2015.9.PEDS15341. Epub 2016 Jan 15.

177. Thompson EM, Hielscher T, Bouffet E, Remke M, Luu B, Gururangan S, McLendon RE, Bigner DD, Lipp ES, Perreault S, Cho YJ, Grant G, Kim SK, Lee JY, Rao AA, Giannini C, Li KK, Ng HK, Yao Y, Kumabe T, Tominaga T, Grajkowska WA, Perek-Polnik M, Low DC, Seow WT, Chang KT, Mora J, Pollack IF, Hamilton RL, Leary S, Moore AS, Ingram WJ, Hallahan AR, Jouvet A, Fèvre-Montange M, Vasiljevic A, Faure-Conter C, Shofuda T, Kagawa N, Hashimoto N, Jabado N, Weil AG, Gayden T, Wataya T, Shalaby T, Grotzer M, Zitterbart K, Sterba J, Kren L, Hortobágyi T, Klekner A, László B, Pócza T, Hauser P, Schüller U, Jung S, Jang WY, French PJ, Kros JM, van Veelen MC, Massimi L, Leonard JR, Rubin JB, Vibhakar R, Chambless LB, Cooper MK, Thompson RC, Faria CC, Carvalho A, Nunes S, Pimentel J, Fan X, Muraszko KM, López-Aguilar E, Lyden D, Garzia L, Shih DJ, Kijima N, Schneider C, Adamski J, Northcott PA, Kool M, Jones DT, Chan JA, Nikolic A, Garre ML, Van Meir EG, Osuka S, Olson JJ, Jahangiri A, Castro BA, Gupta N, Weiss WA, Moxon-Emre I, Mabbott DJ, Lassaletta A, Hawkins CE, Tabori U, Drake J, Kulkarni A, Dirks P, Rutka JT, Korshunov A, Pfister SM, Packer RJ, Ramaswamy V, Taylor MD. Prognostic value of medulloblastoma extent of resection after accounting for molecular subgroup: a retrospective integrated clinical and molecular analysis. Lancet Oncol. 2016 Mar 11. pii: S1470-2045(15)00581-1. doi: 10.1016/S1470-2045(15)00581-1. [Epub ahead of print]

178. Pollack IF, Jakacki RI, Butterfield LH, Hamilton RL, Panigrahy A, Normolle DP, Connelly AK, Dibridge S, Mason G, Whiteside TL, Okada H. Immune responses and outcome after vaccination with glioma-associated antigen peptides and poly-ICLC in a pilot study for pediatric recurrent low-grade gliomas†. Neuro Oncol. 2016 Mar 15. pii: now026. [Epub ahead of print]

179. Jakacki RI, Cohen KJ, Buxton A, Krailo MD, Burger PC, Rosenblum MK, Brat DJ, Hamilton RL, Eckel SP, Zhou T, Lavey RS, Pollack IF. Phase 2 study of concurrent radiotherapy and temozolomide followed by temozolomide and lomustine in the treatment of children with high-grade glioma: a report of the Children's Oncology Group ACNS0423 study. Neuro Oncol. 2016 Mar 22. pii: now038. [Epub ahead of print]

180. Ridge PG, Hoyt KB, Boehme K, Mukherjee S, Crane PK, Haines JL, Mayeux R, Farrer LA, Pericak-Vance MA, Schellenberg GD, Kauwe JS; Alzheimer's Disease Genetics Consortium (ADGC). Assessment of the genetic variance of late-onset Alzheimer's disease. Neurobiol Aging. 2016 May;41:200.e13-20. doi: 10.1016/j.neurobiolaging.2016.02.024. Epub 2016 Mar 3

181. Beckner ME, Pollack IF, Nordberg ML, Hamilton RL. Glioblastomas with copy number gains in EGFR and RNF139 show increased expressions of carbonic anhydrase genes transformed by ENO1. BBA Clin. 2015 Nov 10;5:1-15. doi: 10.1016/j.bbacli.2015.11.001. eCollection 2016 Jun. PMID: 27051584 Free PMC Article

182. Fernandes-Cabral DT, Zenonos GA, Hamilton RL, Panesar SS, Fernandez-Miranda JC. High-Definition Fiber Tractography in the Evaluation and Surgical Planning of Lhermitte-Duclos Disease: A Case Report. World Neurosurg. 2016 May 7. pii: S1878-8750(16)30257-1. doi: 10.1016/j.wneu.2016.04.128. [Epub ahead of print] PMID: 27168233

**Reviews, invited published papers, proceedings of conference and symposia, monographs, books and book chapters**

**Ronald L. Hamilton, M.D.**

1. **Hamilton RL**, Wiley CA. New developments in the neuropathology of AIDS. CAP Today, 10 (12): p 42, 1996.
2. **Hamilton RL**: Hydrocephalus in a 9 month-old infant. Brain Pathol 6:533-534, 1996
3. **Hamilton RL**: New onset hemiparesis. Brain Pathol 7: 715-716, 1997.
4. **Hamilton RL**: Precocious Puberty. Brain Pathol 7: 711-712, 1997
5. **Hamilton RL**: Frontal lobe tumor in 11 year-old girl. Brain Pathol 7: 713-714, 1997
6. **Hamilton RL**, Pollack, IF: The Molecular Biology of Ependymomas. Brain Pathology 7:807-822, 1997.
7. **Hamilton RL**: A 26 year old woman with new onset seizures. Brain Pathol 8: 239-240, 1997.
8. **Hamilton RL**, Wiley, CA, The Neuropathology of Viral Infections of the Nervous System. In: Textbook of Neuropathology; Davis RL, Robertson DM eds. Williams and Wilkins, 3rd edition,  Baltimore, MD. 1997.

9. **Hamilton RL**: Guidelines for the neuropathological diagnosis of Alzheimer's Disease and Dementia with Lewy Bodies. Revista de Neurologia 27 (S1): S67-S70, 1998
10. **Hamilton RL**: Experimental neuropathology of Alzheimer's Disease: animal models. Revista de Neurologia 27 (S1): S84-S86, 1998
11. Sanders VJ, Wiley CA, **Hamilton RL**: The mechanisms of neuronal damage in retroviral infections of the nervous system. in The Mechanisms of Neuronal Damage in Virus Infections of the Nervous System (Gosztonyi G, ed). Springer Verlag, Berlin, 2001.
12. **Hamilton RL**. [Recent Advances in the neuropathological evaluation of Alzheimer's Disease: the importance of synuclein] Rev Neurol 35:765-7, 2002 (Spanish).
13. Pollack IF, **Hamilton RL**, Finkelstein SD, Lieberman F.  Molecular abnormalities and correlations with tumor response and outcome in glioma patients.  Neuroimaging Clinics of North America: Advances in Brain Tumor Imaging and Therapy (Provenzale J, ed.) WB Saunders, Philadelphia,  2002.
14. **Hamilton RL**.  The other dementias: the neuropathology of the non-Alzheimer's Disease dementias. Rev Neurol 37:130-139, 2003 (Spanish).
15. Omalu BI, Wiley CA, **Hamilton RL**.  Case of the Month February 2003. Brain Pathology 13:419-420, 2003.
16. DeKosky ST, Ikonomovic MD, **Hamilton RL**, Bennett DA, Mufson EJ. Neuropathology of Mild Cognitive Impairment in the Elderly. In John Morris J, Scheltens P, and Cummings JL), (eds), *Alzheimer's Disease and Related Disorders:* London, Taylor & Francis, 1-16, 2006.
17. Crain BJ, Alston SR, Bruch LA, **Hamilton RL**, McLendon RE, Rhodes H, Tihan T, Weidenheim KM. Accreditation Council for Graduate Medical Education (ACGME) Competencies in Neuropathology Training.  J Neuropathol Exp Neurol 64:273-279, 2005.
18. McIntyre JA, **Hamilton RL**, Dekosky ST.  Redox-reactive autoantibodies in cerebrospinal fluids. Annals of NY Acad Sci 1109: 296-302, 2007.
19. DeKosky ST, Kaufer DI, **Hamilton R**, Wolk D, Lopez OL: Dementia. In: Neurology in Clinical Practice: Principles of Diagnosis and Management, 5th Edition. Editors: Bradley WG, Daroff RB, Fenichel GM & Jankovic J. Boston MA, Butterworth-Heinemann, 2007: 1855-1907.
20. Tyurin VA, Tyurina YY, Kochanek PM, **Hamilton R**, DeKosky ST, Greenberger JS, Bayir H, Kagan VE.  Chapter 19: Oxidative lipidomics of programmed cell death.  Methods Enzymol 442:375-93, 2008.
21. Yeaney GA, O'Conn SM, Jankowitz BT, **Hamilton RL**.  A 16 year-old male with cerebellar mass. Brain Pathol. 2009 19, 167-170. PMID 19076785
22. Horbinski, C, **Hamilton RL**.  Application of telepathology for neuropathologic intraoperative consultations. Brain Pathol 2009 19; 317-322. PMID 19290998

## Abstracts

1. **Hamilton RL**, Sanger WG, and McComb RD: Characterization of cell lines derived from malignant tumors in patients with neurofibromatosis. Federation Proceedings 46: 433, 1987.
2. Esch O, Spinosa JC, **Hamilton RL**, Crombie DL, Schteigart CD, Hofmann AF: Reversible cytotoxicity to the gallbladder mucosa of contact dissolution solvents for cholesterol gallstones: a comparison of methyl tert-butyl ether (mtbe) and ethyl propionate (ep) in two animal models. Gastroenterology 100 (5, part 2): A135, 1991.

**Ronald L. Hamilton, M.D.**

3. Haas RH, Popovitch B, **Hamilton RL**: The utility of DNA dystrophin gene analysis in non-specific myopathy: presented at Child Neurology Society Annual Meeting, October, 1992: New Orleans, LA.

4. Haas RH, Mansden DL, Estrada S, **Hamilton RL**, Grafe MG, Nyhan WL: Acute basal ganglia infarction in propionic acidemia in spite of good metabolic control: presented at Child Neurology Society Annual Meeting, October, 1992: New Orleans, LA.

5. **Hamilton RL**, Haas RH, Nyhan W, Powell HP, Grafe MR:  The neuropathology of propionic acidemia: a report of two additional cases. American association of Neuropathology Annual Meeting, June 1993, Salt Lake City, UT; J Neuropathol Exp Neurol 52:299, 1993.

6. Mansfield RT, Schiding JK**, Hamilton R,** Kochanek PM: Hypothermia fails to reduce lesion volume after traumatic brain injury in immature rats.  Pediatric Research 35(4):55, 1994.

7. **Hamilton RL**, Bodnar RJ, Wang G, Wiley CA.  The effect of AZT on retroviral encephalitis: a murine model: presented at the Sixth Workshop on the Pathogenesis of Animal Retroviruses, Philadelphia, PA, Nov. 17-19, 1994.

8. Adelson PD, Robichaurd P, **Hamilton RL**, Kochanek PM. Brain edema and neuropathology after diffuse traumatic injury in immature rats.  Neurotrauma Society meeting, San Diego CA, Nov 10-11, 1995.

9. **Hamilton RL**, Bodnar RJ, Wang G, Klunk W, Wiley CA, Treatment of chronic retroviral encephalitis with zidovudine (AZT) in a murine model. Society for Neuroscience Meeting, San Diego, CA Nov 11-16 1995.

10. **Hamilton RL**, Bodnar RJ, Wang G, Klunk W, Wiley CA. The effect of zidovudine (AZT) on murine retroviral encephalitis. Amer. Assoc of Neuropathology, San Antonio, June, 1995. J Neuropathol Exp Neurol 54 (3): 438, 1995.

11. **Hamilton RL**, and Claassen D. Neonatal Methylmalonic Acidemia With Hemicerebellum: An Autopsy Report;  Society of Pediatric Pathology / Child Neurology Society (joint meeting), Baltimore, Oct 27-29, 1995.

12. **Hamilton RL**, Baldwin M, Wiley CA. Human Herpesviruses And Temporal Arteritis American Association of Neuropathology, Vancouver, BC, Canada, June 1996.

13. Mizukami K, Ikonomovic MD, Sheffield R, Rubin RT, Grayson D, **Hamilton R**, Warde D, Armstrong DM. Immunohistochemical Localization of GABA-A Receptor ß2/3 Subunits in the Hippocampal Formation in Aged Brain with Alzheimer-related Neuropathology. Society for Neuroscience meeting, Washington DC, Nov 1996.

14. Bodnar RJ and **Hamilton RL**. Effect of zidovudine (AZT) and saquinavir on retroviral infection of the central nervous system (CNS) Society for Neuroscience meeting, Nov 17-21, 1996 Washington D.C.

15. Bredel M, Pollack I, **Hamilton RL**, Finkelstein SD, Campbell JW, Martinez AJ, Sherwin R, Bozik ME, Gollin S. Overexpression of EGF receptor and p53 mutations in pediatric malignant gliomas. American Association of Neurological Surgeons, 1997 Annual meeting.

16. Xu Y, Liachennko S, Tang P, **Hamilton RL** Correlation of neuropathologic changes with cerebral metabolic and ADC abnormalities after prolonged asphyxial cardiac arrest. International Society of Magnetic Resonance in Medicine, annual meeting, 1997

17. Bredel M, Pollack IF, Campbell JW, **Hamilton RL**. Basic fibroblast growth factor as a prognostic indicator in pediatric high grade glioma patients. American Association of Neuropathology, Pittsburgh, PA, June 1997. J Neuropathol Exp Neurol 56 (5): 581, 1997

18. **Hamilton RL**, Bodnar RJ, Lackner AA, Lane JH, Wiley CA Neurotrophic factors in simian immunodeficiency virus encephalitis. American Association of Neuropathology, Pittsburgh, PA, June 1997. J Neuropathol Exp Neurol 56 (5): 618, 1997.

19. Adelson, PD, Robichaud, P, **Hamilton, RL**, Kochanek, PM. Histologic analyses of severe diffuse traumatic brain injury in the immature rat . National Neurotrama Society, New Orleans Oct 24-25, 1997.

20. Dorsey RW, Achim CL, Wiley CA, **Hamilton RL**\*,  Soontornniyomkij V. Gene expression and cellular localization of neurotrophic factors in Alzheimer's disease. Society of Neuroscience meeting Nov, 1997, New Orleans.

21.  Klunk WE, **Hamilton RL**, Styren SD, Styren G, Debnath ML, Mathis CA, Mahood K, Hsiao KK. Staining of AD and Tg2576 mouse brain wirh X-34, a highly flourescent derivative of chrysamine

**Ronald L. Hamilton, M.D.**

G and A potential in vivo probe for sheet fibrils. Siociety for Neuroscience meeting, New Orleans 1997.

22. Klunk WE, **Hamilton RL**, Styren SD, Styren G, Debnath ML. Neuropathological study of AD brain with X-34, a new highly fluorescent derivative of congo red. Society for Neuroscience meeting. Los Angeles, CA 1998.

23. Halks-Miller M, Hesselgesser J, Horuk R, Soontornniyomkij V, **Hamilton R,** Achim C. CCR1 immunoreactivity in Alzheimer's Disease brains. Society for Neurosciences meeting. Los Angeles, CA 1998.

24. Wang G, Soontornniyomkij V, Pittman CA, Achim CL, Wiley CA, **Hamilton RL**. Glial expression of BDNF and TRK B receptor proteins in Alzheimer's Disease and HIV-1 encephalitis brains. Society for Neuroscience meeting. Los Angeles, CA 1998.

25. Ikonomovic MD, Mizukami K, Davies P, **Hamilton R**, Sheffield R, Armstrong DM. Co-localization of interneurons and an ad-specific antibody in the hippocampal formation of Alzheimer brains. Society for Neurosciences. Los Angeles, CA 1998.

26. Mizukami K, Ikonomovic MD, Grayson DR, Rubin RT, Warde D, Sheffield R, **Hamilton RL,** Davies P, Armstrong DM. Immunohistochemical study of GABA(A) receptor beta 2/3 subunits in the hippocampal formation of aged brains with Alzheimer-related neuropathologic changes. Experimental Neurology 147 2 333-45 (1997).

27. Bredel M, Pollack IF, **Hamilton RL**: Expression of the c-erbB1 Oncogene Product Epidermal Growth Factor Receptor (EGFR) and its Relevance for Outcome in Children with Supratentorial High-Grade Gliomas ; XVI Congress of the European Society for Pediatric Neurosurgery; November 11-15, 1998, Marseille, France

28. **Hamilton, RL** Numerous widespread alpha-synuclein positive thread-like processes characterize dementia with Lewy Bodies. Foundation IPSEN Conference, April 12, 1999, Paris France

29 **Hamilton RL** Numerous and widespread alpha-synuclein thread-like processes in dementia with Lewy bodies. American Assoc of Neuropathologist Annual Meeting, 1999, Portland, OR. J Neuropathol Exper Neurol 58:552, 1999.

30. Klunk WE, **Hamilton RL**, Styren SD, Head E: Evaluation of the aged canine as a screening system for the x-34 class of in vivo probes for amyloid deposition in AD. Soc. of Neuroscience, 1999

31. Kaufer, DL, **Hamilton RL**, Lopez OL, DeKosky ST MRI white matter hyperintensities and cerebral amyloid angiopathy in a case of dementia with Lewy bodies. Amer Neuropsychiatric Assoc, annual meeting, 2/2000, Ft. Myers, FLA.

32. **Hamilton RL**, Mash DC. Widespread Alpha-synucleinopathy in the Parkinson's Disease brain. 6th National Parkinson's Disease Foundation International Symposium on Parkinson's Disease Research, to be held in conjunction with the Society of Neuroscience meeting in Miami Beach, Oct 22-23[rd], 1999.

33. **Hamilton, RL**, Mash DC. Widespread alpha-synuclein-positive neuropil threads in the Parkinson's Disease brain. American Assoc of Neuropathology, Atlanta, GA, June 8-11, 2000.

34. Snyder JV, Gebel JM, Kassam A, **Hamilton RL**, Goldstein S, Watkins S, Yonas H, Chelluri L, Thulborn K. Guidance by MR Tissue Sodium Concentration of Infarct Resection in Massive Stroke. Neurology 54(7): A97-A98, Suppl. 3, 2000.

35. Chow TM, Kaufer DI, Lopez OL, **Hamilton RL**, Becker JT, DeKosky ST. Temporal Evolution of Lewy Body Phenotype in Autopsy Confirmed Cases of Alzheimer's Disease and Dementia With Lewy Bodies. Neurology 56(8): A300-A301, Suppl 3, 2001.

36. Castellano-Sanchez A, Ohgaki HH, Yokoo, Finkelstein SD, Medina-Flores R, **Hamilton RL**, Scheithauer BW, Burger PC, Brat DJ. Genetic Alterations in Granular Cell Astrocytomas. USCAP, 2002.

37. Demidovich J, Pittman CA, Hamilton RL. Altered calpain proteolysis of mutant alpha-synuclein. Honors Thesis presentation, Univ. Pitt, 2002

38. Omalu BI, **Hamilton RL**, Swalsky PA, Finkelstein SD. Microdissection-based mutational profiling of malignant, atypical and benign meningiomas: the determination of meningioma grade by fractional mutational index. AANP, Denver, 2002 (JNEN 61:491, 2002)

39. Wilson, RK, Luedecking-Zimmer EK, Kamboh MI, DeKosky ST, **Hamilton RL**. Association of the ApoE4 allele and Lewy bodies in Alzheimer's Disease. AANP, Denver 2002 (JNEN 61: 455, 2002).

**Ronald L. Hamilton, M.D.**

40. Desai PP, Ikonomovic MD, **Hamilton RL**, DeKosky ST, Kamboh MI. Apolipoprotein D in Alzheimer's Disease: implications for amyloid pathology. Soc. for Neuroscience, Orlando, 2002.

41. Garb S, **Hamilton RL**. Sequestration of soluble alpha-synuclein in Lewy body Variant of Alzheimer's Disease. Soc for Neuroscience, Orlando, 2002.

42. Marshall GA, Kaufer DI, Lopez OL, Rao GR, **Hamilton RL**, DeKosky ST. A neuropathological correlate of anosognosia in Alzheimer's Disease. American Association of Neurology, May 2003.

43. Sweet RA, Butters MA, **Hamilton RL**, Mulsant BH, Lopez OL, PollockBG, DeKosky ST, Reynolds CF Neuropathology Of Late Life Mood Disorders. American College of Neuropsychopharmacology, 2003

44. Mohan D, Couce ME, Wiley CA, **Hamilton RL**, Sasatomi E, Swalsky PA, Lieberman MD, Finkelstein SD. Microdissection based genotyping of human gliomas: diagnostic and prognostic considerations (USCAP, Vancouver 3/04)

45. Beckner ME, Sasatomi E, Swalsky PA, **Hamilton RL**, Pollack, IF, Finkelstein SD. Loss of heterozygosity reveals non-VHL Allelic loss in hemangioblastomas at 22q13, (AANP Cleveland, June 24-27, 2004).

46. Judkins AR, Burger P, **Hamilton RL**, Kleinschmidt-DeMasters B, Perry A, Pomeroy S, Rosenblum MK, Yachnis AT, Rorke LB, Biegel JA. INI1 Expression Distinguishes Atypical Teratoid/Rhabdoid Tumor (ATR) from Choroid Plexus Carcinoma (CPC); (AANP Cleveland, June 24-27, 2004).

47. McFadden KA, **Hamilton RL**, Visvesvara GS, Gardner P, Couce ME. Granulomatous Amebic Encephalitis in a Patient with Gardners Syndrome and Multi-organ Transplant (AANP Cleveland, June 24-27, 2004).

48. Yen, Amy, Lopez, OL, BeckerJ, **Hamilton RL.** Mesial Temporal Sclerosis is associated with Lewy Bodies in Alzheimer's Disease. AANP Annual meeting June 9-12, 2005, Arlington, VA (platform). (J Neuropathol Exper Neurol 64:434, 2005.

49. Hinkle DA, Mullett SJ, **Hamilton RL** DJ-1 is over-expressed in human stroke reactive astrocytes. Society for Neuroscience Oct 2005.

50. Ramsey CP, Glass CA, Marshall MB, Morgan KL, Kioke MA, **Hamilton R**, Chu CT, Jordan-Sciutto KL. Altered expression patterns of the antioxidant response transcriptional regulator NRF2, in Alzheimer's Disease and Parkinson's Disease. Society For Neuroscience, Nov. 2005, Washington DC.

51. Chu CT, Uchiyama Y, **Hamilton R**, Zhu J. Extracellular signal regulated protein kinase acts upstream of both autophagy and cell death in MPP+ treated neurons. Society For Neuroscience, Nov. 2005, Washington DC

52. Cieply K, Carol R. Sherer, Jennifer L. Hunt **Hamilton RL** Assessment of 1p and 19q Status in Pediatric Oligodendrogliomas by FISH, Association of Molecular Pathology, Nov 10-13, 2005 Scottsdale AZ

53. Bencherif B, Lieberman FS, Wenzhu B, Price JC, Muthukrishnan A, Walter K, **Hamilton RL**, Lunsford LD, Mountz JM. Increased F-18 Fluorothymidine Uptake is Seen in Non-Proliferating Recurrent/Residual Glioma Society for Nuclear Medicine, San Diego, 2006 June 3-7

54. **Hamilton, RL** Variations On A Theme: Lewy Bodies And Mesial Temporal Sclerosis In Alzheimer's Disease: A Review Of 278 Autopsy Cases. 10th International Conference on Alzheimer's Disease, Madrid, Spain, July-15-20, 2006.

55. DeKosky ST, Mathis CA, Price JC, Ikonomovic MD, **Hamilton RL**, Abrahamson EE, Paljug WR, Debnath ML, Hope CE, Isanski BA, Tsopelas ND, Lopresti BJ, Ziolko S, Bi W and Klunk WE. Correlation of In Vivo PiB Retention and Post-Mortem Aβ Levels: A Case Study. 10th International Conference on Alzheimer's Disease, Madrid, Spain, July-15-20, 2006.

56. Leverenz J, **Hamilton RL**, Larson E, Vavrek D, Lopez O, Galasko D, Masliah E, Kaye J, Nixon R, Clark C, Trojanowski J, Kukull W, Montine T, Tsuang D. Lewy-Related Pathology in Two Large Autopsied Dementia Samples: Application of Classification Criteria. 10th International Conference on Alzheimer's Disease, Madrid, Spain, July-15-20, 2006.

57. Venneti S, Lopresti BJ, Wang G, Mathis CA, Klunk WE, Shmookler AD, **Hamilton RL**, Apte UM, Wiley CA. PET imaging of microglia in a mouse model of Alzheimer's disease. 10th International Conference on Alzheimer's Disease, Madrid, Spain, July-15-20, 2006.

58. Kofler JK, Moore RA, **Hamilton RL**. Concomitant Dementia with Lewy Bodies and Multiple System Atrophy in a Demented Patient. International Congress of Neuropathology/American Association of Neuropathology Annual Meeting, San Francisco, CA, Sept 10-15, 2006.

**Ronald L. Hamilton, M.D.**

59. DeKosky ST, Mathis CA, Price JC, Ikonomovic MD, **Hamilton RL**, Abrahamson EE, Paljug WR, Debnath ML, Hope CE, Isanski BA, Tsopelas ND, Lopresti BJ, Ziolko S, Bi W, Klunk WE. Correlation of Regional in vivo Pittsburgh Compound B (PIB) Retention With in vitro PIB, A Levels, and Amyloid Plaque Density: Validation of PIB-PET in Postmortem Human Brain. Alzheimer's Association International Conference on Prevention of Dementia. June 9-12, 2007 Washington, D.C.

60. Kellermier HC, Nikiforova MN, Cieply K, **Hamilton RL**. Alterations of 1p in glioblastomas. ASIP/AANP Annual meeting, Washington DC April 2007.

61. Bliecher AG, Branstetter BF, Hamilton R, Murdoch G, Kellermeir HC. Clival Chordoma: Radiologic-Pathologic Correlations. American Society of Neuroradiology annual meeting, Chicago, IL. June 9-14, 2007.

62. Butters MA, Aizenstein HJ, Meltzer CC, **Hamilton RL,** Price JC, Mathis CA, Klunk WE, Becker JT, DeKosky ST, Reynolds CF. Cognition, cerebrovascular disease and Alzheimer's Disease in late-life depression. International Neuropsychological Society meeting, Bilbao Spain, July 2007.

63 Tyurin VA, Zhao Q, Mnuskin A, **Hamilton R**, DeKosky ST, Reynolds WF, Kagan VE. Phospholipid peroxidation biomarkers of Alzheimer's Disease in the Brain: Selective Oxidation of Phosphatidylserine. Society of Toxicology Meeting San Diego, CA. October 2, 2007.

64. Moschos SJ, D. Trembath D, Snavely A, Bradler E, Midkiff B, Nikolaishvilli-Feinberg N, Werley J, Krauze M, **Hamilton R**, Kirkwood JM. Prognostic Significance of PD-L1 Expression, Angiogenesis, and Hypoxia in Melanoma Brain Metastases (MBM); A Histopathologic Analysis. Annual meeting of the American Association of Clinical Oncology, Chicago Il, 5/29-6/2/2014.

65. Trembath DG, Moschos SJ, Snavely AC, Bradler E, Nikolaishvilli-Feinberg N, Bentley R. Midkiff BR, Jonette Werley J, Krauze MT, **Hamilton RL**. Analysis of select angiogenic markers in melanoma brain metastases. Annual meeting AANP, Portland OR. June 2014

66. Salgado CM, Basu D, Nikiforova M, Hamilton R, Gheris R, Jakacki R, Panigrahy A, Yatsenko S, Reyes-Mugica M. Congenital Melanoma: The full spectrum og p.Q61R mutation in NRAS. Accepted for the Annual Soc. Pediatric Pathology meeting, Birmingham AL, Sept 4-6, 2014.

67. Melan MA, Wald AI, Zhong S, **Hamilton R**, Horbinski C. Nikiforova MN. BrainSeq: Next-Generation Sequencing Panel for Detection of Genetic Alterations in Central Nervous System (CNS) Malignancies. National Harbor MD, Nov 12-15, 2014.

68. Hamilton RL. Chronic Traumatic Encephalopathy: Update on an Emerging Disease. Invited speaker: 18th International Congress of Neuropathology, July 12-16, 2014, Rio de Janeiro, Brazil

69. Hamilton RL. Cases of the Month: 16 Years of Unknowns. Invited speaker: 18th International Congress of Neuropathology, July 12-16, 2014, Rio de Janeiro, Brazil

70. Trembath DG, Moschos SJ, Snavely AC, Bradler E, Nikolaishvilli-Feinberg N, Midkiff BR, Werley J, **Krauze MT, Hamilton RL** Role of PD-L1, HIF-1a, and reactive gliosis in melanoma brain metastases. USCAP 2015, Boston, MA, March 21-27, 2015.

71. Nolan Priedigkeit, Ryan J. Hartmaier, Yijing Chen, Damir Vareslija, Ahmed Basudan, Roby Thomas, Jose P Leone, Peter C. Lucas, Rohit Bhargava, Ron L. Hamilton, Juliann Chmielecki, Nancy E. Davidson, Steffi Oesterreich, Adam M. Brufsky, Leonie Young, Adrian V. Lee Breast cancer brain metastases show limited intrinsic subtype switching, yet exhibit acquired ERBB2 amplifications and activating mutations. San Antonio Breast Cancer Symposium, 12/7/16

72. Steffi Oesterreich, Ahmed Basudan, Nolan Priedigkeit, Ryan Hartmaier, Amir Bahreini, Rekha Gyanchandani, Jose P Leone, Peter Lucas,, Rohit Bhargava, Ron Hamilton, Ryan Hartmaier, Adam Brufsky, Adrian V. LeePerivascular Inflammation in Temporal Artery Biopsies That Are Negative for Arteritis: Incidental or Harbinger American College of Rheumatology/ Association of Rheumatology Health Professionals (ACR/ARHP) Annual Meeting, Washington DC, 11/13/16

73. Expression of Carbonic Anhydrase Genes, CA3 and CA12, Transformed with ENO1, Relate to Copy Numbers of EGFR or RNF139 and XIAP, and Gender in Glioblastomas Using PCR Assays. Experimental Biology 2015 Annual Meeting

74. Evaluation of GlioSeq Targeted NGS Panel for Detection of O6-Methylguanine-DNA Methyltransferase (MGMT) mRNA Expression in Glioma Patients Alicia Hunt, Sarika Jain, Melissa A Melan, Abigail Wald, Ronald Hamilton, Marina N. Nikiforova Association For Molecular Pathology (AMP) Charlotte, NC. November 10-12, 2016.

## PROFESSIONAL ACTIVITIES

**Ronald L. Hamilton, M.D.**

**TEACHING**

University of California, San Diego, Dept of Neuroscience
      1991-93      lab assistant - graduate neuroanatomy course
University of California, San Diego, School of Medicine
      1991-93      Sophomore pathology course, neuropathology section (lab assistant)
University of California, San Diego, Dept of Pathology
      1991-93      Clinical Correlation Conference - Neuropath and Neurosurgery (monthly)
      1991-93      Neuropathology review for neurology residents (bi-monthly)
University of Pittsburgh, School of Medicine
      Freshman pathology course –
      PBL facilitator for musculoskeletal course 1994-1998
      Neuroscience Module – lecture M2 students full class: CNS tumors
            Annually since 1999.
                  April 29, 2014 1-3 pm
      Neuroscience Module   lecture MS1 students
            CNS tumors  March 2004
            CNS tumors  March 2005
            CNS tumors March 2006
            CNS Tumors    5/7/07
      Neuroscience rotation – small weekly lab, M3 students
            7/99-present
      Neuroscience rotation – small group M3 students
            6/18/2007 3-5pm
Weekly brain-cutting conference at Children's Hospital (2-5 medical (M3) students/week)
            Academic Advising: Kate McFadden 2/2000 to 6-2001
Other:
      High school - gifted science students of Mr. James Coll
            11/21/2002 , 11/14/ 2003, 10/28/2004, 11/18/2005, 11/3/2006


University of Pittsburgh, graduate students
      Cellular and Molecular Mechanisms of Neurodegeneration (MSCMP 3720)
              Organizers: Robert Bowser, Cristian Achim,
           1. Neuroanatomy and Neurohistology in neurodegeneration
               1/13/98,  1/19/99
           2. Mitochondria and disease / Prion encephalopathies
               3-24-98
           3. The role of alpha-synuclein in neurodegenerative diseases
               10-11-00
      Molecular Pathobiology (organizers Frye and Achim) (MSCMP 2740)
           .Tumors of the Central Nervous System,  4-7-98,  4-20-99
           Alpha-synuclein and Neurodegeneration
               4-2003, 1/8/04, 5/15/06
           Neuropathology of Neurodegeneration
               1/6/04
           Alpha-synuclein and Tau in Neurodegeneration
               1/5/07, 2/7/2008
           Pathologic diagnosis of the Lewy Body Disorders
               2/12/09
University of Pittsburgh, Dept of Neuroscience - Combined Neuroscience Conference Wed 4-5
      10/3/95 *      Varicella Zoster Infections of the CNS in AIDS patients
      10/9/96 *      Lewy Bodies and Dementia
      2/19/97 *      The Neuropathology of Pediatric Seizures
      4/23/97 *      CNS manifestations of non-CNS tumors in children
      2/11/98         Case Presentation with Ian Pollack

**Ronald L. Hamilton, M.D.**

| | | |
|---|---|---|
| 3/18/98 * | A 77 year old woman with Multiple sclerosis and dementia | |
| 11/4/98 | *Pediatric meningiomas – two cases | |
| 1/20/99 | Methanol Intoxication – with C. Foley | |
| 2/3/99 | Gliomatosis cerebri with Dallasta | |
| 2/10/99 | Amyloid angiopathy and leukomalacia – with D. Kaufer | |
| 3/17/99 | Metachromatic Leukodystrophy – with D. Kaufer | |
| 9/18/02 | Iatrogenic CJD* | |

* as primary presenter

University of Pittsburgh, Dept. of Pathology, Chief Resident's Fri noon slide conference
8/1/96 - Pediatric brain tumors
10/5/97 Pediatric brain tumors
1/9/98          NP REVIEW - Tumors I
1/16/98         NP REVIEW - Tumors II
1/23/98         NP REVIEW - Tumors III
1/30/98         NP REVIEW - Infections
2/6/98          NP REVIEW - Demyelinative diseases
2/13/98         NP REVIEW - Neurodegenerative diseases
2/20/98         NP Review - Cerebrovascular disease and developmental
5/24/02         Pediatric Neoplasms and Congenital Malformations
5/31/02         Degenerative Diseases

University of Pittsburgh, undergraduate
Independent Course and Honors Research Project –
Theodore Kaplan (1/97-6/97)
Emily Rogerson (1/99-5/99, 9/99-12/99, 1/00-4/00)
Kyle Hubbard (1/99 – 5/99, 9/99-12/99, 1/00-4/00)
Joe Demidovich – 2000-2002
Stan Garb (2001-2001)

Pathology Summer Undergraduate Research Program (SURP)
Kathleen Anderson 6/00-8/00
Kathleen Anderson 6/01-8-01

University of Pittsburgh, Dept. of Pathology,
Neuropathology of dementia conference - weekly (Fri 10-11)

University of Pittsburgh - ADRC Topics at Noon
X-34 and alpha-synuclein – New stains in Alzheimer's Disease 11/98
Lewy Body Pathology in Alzheimer's Disease, 11/01

Children's Hospital of Pittsburgh, Grand rounds
1996 - methyl malonic acidemia with hemi-cerebellum
2/13/97 - Pediatric AIDS with HIV encephalopathy
5/22/97 - 11 month-old boy with Hypotonia (Leigh's Disease)
3/18/98 - Becker's muscular dystrophy with severe cardiomyopathy
5/19/98 – Friedreich's Ataxia
10/15/98 – Spinal Muscular Atrophy Type I
2/2005  - Congenital Dystrophies – Pediatric Neurology

## Other Presentations

Neurology Grand Rounds - 11-19-03 - CNS vasculitis
Pathology Noon Diagnostic Conference - 11-20-03 – "Some Bodies in the Brain"
AP Didactic Lecture – 11-25-03 - Neuropathology of Neurodegeneration
NP Didactic – 4-28-04 - ApoE4 and Lewy Bodies in AD

**Ronald L. Hamilton, M.D.**

NP Didactic -    3/31/2005 – AD Pathology in ALS and MTS and LB in AD
Pathology Noon Diagnostic Conference – 8-4-2006: Tauopathies
ADRC CPC 8-10-06
ADRC CPC 11-30-06
ADRC CPC 2-8-07
ADRC 20th Anniversary meeting, "Neuropathology of AD:"  9-28-06
ADRC Topics at Noon.  "Tauopathies"  11-16-06
ADRC CPC 8/16/2007
ADRC CPC 11/30/2007
Pediatric CPC 2/25/08
DJ-1 in glioblastomas (NP Didactic conference) – 3/10/2009 (1 hour)
Neuropathology review for Neurosurgery residents – 3/10/2010 (1 hour).
AP Chief Residents didactic conference.  2 hour conference.  Non-glial Tumors. Feb 25, 2014
CMU graduate class:  BioE 2630 – Methods in medical iamage analysis in neuropathology. April 4, 2014.
Anatomic Pathology Grand Rounds, July 10, 2014  Chronic Traumatic Encephalopathy: an Update.

**Clinical Conferences (recurring)**

| | | |
|---|---|---|
| ADRC Brain cutting | weekly | Tue 8-10 |
| ADRC Dementia signout - | weekly | Fri 10-11 |
| PUH – Neuropathology QA - | weekly | Wed 10-11 |
| CH  Brain cutting | weekly | Mon 10-11:00 |
| CH  Neuro-Oncology conf | weekly | Mon 11:30-12:30 |
| CH Gross autopsy conference | weekly | Tue 11-12 |
| CH Micro autopsy conf | weekly | Tue 1-2 |

University of Pittsburgh School of Medicine –
2009 Brain Tumors – lecture to 1st year students
2009 Klionsky summer research scholarship – Peter Kang (June-Aug 2009)
        Clinicopathologic correlations of chordomas
2009 Monday 2 hour small group 3rd year  (5-12 students)
        4/6/2009, 7/27/2009, 9/10/2009, 10/12/2009, 12/7/2009, 1/25/2010, 2/15/2010

**RESEARCH**

**OTHER SUPPORT**

**ACTIVE**

**HAMILTON, R.**
ACTIVE
**R01 NS037704**    (PI: Pollack)        9/1/98-1/31/17            0.7 calendar months
National Institutes of Health        $105,970
Role:  Co-Investigator
Title: Molecular Markers as Predictors of Outcome in Gliomas
The major goal of this project is to further characterize the molecular features of tumorigenesis in pediatric malignant gliomas.

**1R01 CA174858-01**(PI: Pollack)        5/6/13-8/30/17            0.4 calendar months
National Institutes of Health                $54,696
Role:  Co-Investigator
Title: Peptide Vaccine-Based Immunotherapy for Children with Recurrent Ependymomas
This project focuses on a pilot clinical trial of peptide-based immunotherapy for ependymomas, among the most challenging childhood brain tumors.  The study will incorporate separate strata

Ronald L. Hamilton, M.D.

for posterior fossa and non-posterior fossa ependymomas.  We will treat a total of 12 patients in each of the two strata with subcutaneous TAA epitope vaccinations every 3 weeks for 8 courses combined with topical imiquimod. Participants will be evaluated for adverse events, regimen limiting toxicity (RLT), and treatment response by clinical and laboratory evaluations and MR imaging. We hypothesize that vaccine-based immunotherapy will not only prove safe for the treatment of pediatric ependymomas, but will also demonstrate activity as assessed by immunologic and clinical parameters.


(PI: Pollack)    5/8/14-6/1/17
Child Brain Tumor Foundation                    $10,487                              1.2
calendar months
**Children's Brain Tumor Tissue Consortium**
The CBTTC is a unique research platform in which tumor tissue is processed for comprehensive molecular (e.g., DNA, RNA, and protein) analysis using state-of-the-art methods and the data results of that analysis, together with new brain tumor models and relevant clinical information, are sent back to the participating institutions. In comparison to tissue banks, the CBTTC actively stimulates research by providing high-quality data that can be rapidly and efficiently analyzed by participating institutions.
PI: Pollack. 10% salary for Jonette Werley


<u>OVERLAP</u> No Overlap


**Completed Research Support**

National Institutes of Health                    3/1/02 – 2/28/05
P30 MH52247-10    (PI: Reynolds)        $23,305
Intervention Research Center for the Study of Late-Life Mood Disorders
a supplement to the above grant to establish a brain bank to investigate the neuropathological substrate of late life mood disorders.
Role:  Co-Investigator


R01 NS048595    (PI: Montine)                    09/30/03 – 07/31/08
National Institutes of Health
Subcontract to the University of Washington on grant "Characterization of DLB: a Collaborative Study"
The major goal of this multi-institutional project is to investigate the role of ApoE4 alleles and other genetic polymorphisms in the Lewy Body Variant of Alzheimer's Disease.
Role:  Co-Investigator


Brain Tumor Society                    07/01/07-05/31/09
PI: Ian Pollack
JPA & Pediatric Low Grade Astrocytoma
The major goals of these two grants is to examine molecular markers of prognosis in pediatric gliomas.
Role:  Co-Investigator


U10 CA13539-27 (Reaman (subcontract 6172) (Pollack)                    1/1/06-12/30/09
NIH/NCI
Children's Oncology Group Brain Tumor Resource Laboratory

**Ronald L. Hamilton, M.D.**

This contract is providing infrastructure support for maintaining tissue processing and banking of high-grade gliomas.
Role:  Laboratory Director

R01 MH47346    (PI: Zubenko)                12/1/04 – 11/30/09
National Institutes of Health
Morphologic/Neurochemical Correlates of Depression in AD
The major goal of this project is to better define the biological substrates of major depression in AD and to provide additional insight into the clinical biology of major depressive disorders affecting the elderly.
Role:  Co-Investigator

P50 AG05133    (PI: Lopez)            3/30/85 – 3/31/15        0 calendar months
National Institutes of Health            $71,764
Alzheimer Disease Research Center, Core C: Neuropathology
The three objectives of the Neuropathology Core are to (1) procure and bank brain from autopsies of ADRC patients and controls, (2) perform detailed neuropathologic analysis of all AD cases and (3) maintain well catalogued brain bank.
Role:  Core Advisor

Child Brain Tumor Fund (CBTF) (PI: Pollack)        5/8/13-5/7/14
0.3 cal months (2.5% support) PITT subaccount #: 05.35206.xxxx.00000.709203.-----

P01 NS040923    (PI: Pollack)            7/1/02-5/31/13        1.20 calendar months
National Institutes of Health            $22,074
Novel Strategies for Brain Tumor Therapy
The unifying hypothesis of this program project grant is that novel therapeutic approaches that take into account the unique features of central nervous system (CNS) tumors will have utility for preventing tumor growth and inducing tumor regression, and will potentiate the effects of conventional treatment approaches, particularly radiotherapy, for inducing glioma cell killing.
Role:  Co-Investigator


**Prior Grant Support**

1995-1997            Murine Model of Retroviral Encephalitis
                Children's Hospital of Pittsburgh Research Fund ($50,000)
                0% effort, 0% support

 1995-1998            Blood Brain Barrier in HIV encephalitis (PI: Achim)
                Co PI. 10% effort and salary ($186,264)

11/98                PD Center Grant, Equipment $6000
            for freezer for PD Brain Bank (one time equipment funding)

7/1/98-6/30/99  Neurotrophic Factors in SIV encephalitis
            Competitive Medical Research Fund (CMRF), $25,000,
            0% effort, 0% support

12/01/98-11/30/99        Parkinson's Disease Brain Bank
                PI: Hamilton RL
                Parkinson's Disease Foundation ($24,899) 0% effort, 0% support

7/1/98-6/30/00  Molecular Markers of Prognosis in Pediatric Gliomas

**Ronald L. Hamilton, M.D.**

        PAR 95-063, NIH
        PI: IF Pollack
        10% effort and support ($263,311)

4/1/00-3/31/01:  Alpha-synuclein Aggregation in Dementia With Lewy Bodies
        PI: RL Hamilton
        Parkinson's Disease Foundation Seed Money Grant, $25,000 0% effort, 0% support

10/1/00-9/30/02  Millennium Agreement (Neuro Module)
        PI: Rajiv Dhir
        0% effort, 0% Support.
        ($25,000 per year for supplies, plus support for 100% Level IV Res Tech)

1/1/99 – 12/31/03 COG Brain Tumor Resource Laboratory
     PI: Pollack, IF ($5800)  (subcontract 6172)
     Co-I – 5% effort and support
     NIH-U10 CA13539-27

3/01/02 - 2/28/05 - Supplemental Award to Establish a Late Life Mood Disorder Brain Bank
     PI: RA Sweet (for supplement)
       Supplement to 3 P30 MH52247-08S1 (PI: CF Reynolds)
        Co-I : 5% effort and support

7/1/98-6/30/05 Morphologic/Neurochemical Correlates of Depression in AD
     PI: G Zubenko
      2.5% effort and support ($20,000)

National Institutes of Health     09/30/03 – 07/31/08   5%
R01 NS048595 (PI: Montine)    $75,000

*Subcontract to the University of Washington on grant "Characterization of DLB: a Collaborative Study"*
The major goal of this multi-institutional project is to investigate the role of ApoE4 alleles and other genetic polymorphisms in the Lewy Body Variant of Alzheimer's Disease

R01 MH072947 (PI: Butters)   12/1/04 –11/30/11   0.36 calendar months
National Institutes of Health     $6,018
Pathways Linking Late Life Depression to Mild Cognitive Impairment and Dementia
The goal of this project is to investigate the relationships among late-life depression (LLD), cognitive impairment and progressive neurodegeneration.
Role:  Co-Investigator

R01 MH072947 (PI: Butters)   12/1/04 –11/30/11   0.36 calendar months
National Institutes of Health     $6,018
Pathways Linking Late Life Depression to Mild Cognitive Impairment and Dementia
The goal of this project is to investigate the relationships among late-life depression (LLD), cognitive impairment and progressive neurodegeneration.
Role:  Co-Investigator

**<u>Seminars and Invited Lectureships Related to Research</u>**

Presentation of an Unknown Case (Herpes simplex brainstem encephalitis) to American Association of Neuropathologists Annual Meeting, June 1992: St. Louis, MO.

**Ronald L. Hamilton, M.D.**


Presentation of an Unknown Case (Varicella zoster virus encephalitis in an AIDS patient) to XII International Congress of Neuropathology, Sept, 1994: Toronto, Ont, Canada.

Presentation of an Unknown Case (Atypical neurocytoma) to American Association of Neuropathologists Annual Meeting, June 2002: Denver (presenter: Rafael Medina-Flores).

**Other Research Related Activities**

| | |
|---|---|
| 1995-2003 | Co-Director, Neuropathology Core ADRC |
| 2003-2012 | Director, Neuropathology Core ADRC. |
| 1995-2012- | Director, Neuropathology Brain Bank |
| 1997 - present - | Director of Neurohistology laboratory |
| 1997-present | Co-Director, Brain Tumor Resource Laboratory, Children's Cancer Group |
| 2001- 2009 | Director of Neuropathology Core of the Stephen Tuttle ALS Tissue Bank. |
| 2001-present | Co-Director, UP Brain Tumor Bank |


**CURRENT RESEARCH INTERESTS**

1. Molecular Biology of Brain Tumors

**SERVICE**

**University and Medical School**

Residency Committee (Pathology) – 1997 to 2008
Institutional Review Board        3/02 – 5/2005
'Member of the UPSOM Interviewing Committee' jan 2010-present
Member, UPMC Professional Practice and Ethics Committee Jan 2014 - present

**OTHER**

| | |
|---|---|
| 4/1996 - present | Case Editor - Brain Pathology, |
| | Case of the Month feature |
| | Case of the Month web site |
| | Increase to 2 cases per month 1/2007 |
| 10/99 | ad hoc reviewer, J Neuroscience |
| 1/2000 | ad hoc reviewer, J American Medical Association (JAMA) |
| 3/2000 | ad hoc reviewer, Neuropathology and Applied Neurobiology |
| 3/01 | ad hoc reviewer American Journal Pathology |
| 5/02 | ad hoc reviewer Neuroscience |
| 11/02 | ad hoc reviewer JNEN |
| 2004 | AANP Awards Committee, AANP, Cleveland |
| 2006 | AANP Awards committee, AANP-ISN San Fran |
| 10/2006 | ad hoc reviewer      Eur J Neurosci |
| 2/2007 | Ad hoc reviewer        Neuroscience |
| 2007 | Chairmen, Awards Committee, AANP Washington DC. (2 year term) |
| 7/29/2007 | ad hoc reviewer, Brain Pathology |
| 7/25/2007 | ad hoc reviewer Acta Neuropathologica |
| 10/19/2007 | ad hoc reviewer J Neuropathol Exp Neurol |
| 2008 | Chairman Awards Committee AANP, San Diego Annual Meeting |
| 2008 | ad hoc reviewer Brain Pathology |
| 2009 | ad hoc reviewer Pedi and Developmental Pathology |
| 2009 | ad hoc reviewer Amer. J. Pathol. |

**Ronald L. Hamilton, M.D.**

2014 – Featured in non-fiction book: League of Denial:  The NFL, Concussions and the Battle for the Truth (Crown Publishing, New York). Chapters 8 and 10 detail my role in the discovery of CTE in NFL football players.

January 2015 – Consulted with Sony Pictures about movie CONCUSSION based on the discovery of Chronic Traumatic Encephalopathy (CTE) in American NFL football players by my student, Bennet Omalu and me in July 2005.  I was also interviewed on the set by Sony documentary filmmakers for a bonus feature on the DVD:  The Making of "Concussion."  The movie is scheduled to be released Christmas Day, Dec 25, 2015.

January 2015 – interviewed by Jeane Marie Laskas (who wrote the 2009 GQ article the movie is based on) for a companion book to be released with the movie, December 2015.


**International Invitations**

1998 – Invited lecturer at Barcelona-Pittsburgh ADRC meeting, "Dementia Today," Barcelona, Spain (Oct 1998)

2000 – Invited lecturer at Barcelona-Pittsburgh ADRC meeting Dementia Today II", Barcelona, Spain (Oct 2000)

2001 - Invited symposia speaker at 10th Congress of the International Psychogeriatric Association (Nice, France, Sept 2001). "Pathological Diagnosis of Dementia With Lewy Bodies" (Symposia Organizer, Ian McKeith)

2002 – Invited lecturer at Barcelona-Pittsburgh ADRC meeting Dementia Today III", Barcelona, Spain (Oct 2002)

2003 – Symposium speaker "Dementia with Lewy Bodies" at International Psychogeriatric Associations meeting, Chicago, IL, USA, 08/19/03

2004  Invited lecturer at Barcelona-Pittsburgh ADRC meeting Dementia Today IV", Barcelona, Spain (Oct 2004)

2006  Invited lecturer at Barcelona-Pittsburgh ADRC meeting Dementia Today V", Barcelona, Spain (Oct 2006)

2008  Invited lecturer at Barcelona-Pittsburgh ADRC meeting Dementia Today VI", Barcelona, Spain (May 2008)

2014 – Invited lecturer AANP annual meeting June 2014.  What Every Neuropathologist Should Know: Molecular studies in metastatic brain tumors.

2014 - Invited as member of scientific committee International Congress of Neuropathology quadrennial meeting Sept 2014, Rio de Janeiro

2014 – Chair of Forensic Pathology Session, committee International Congress of Neuropathology quadrennial meeting Sept 2014, Rio de Janeiro

2014 – co-chair telepathology session with Dr. Wiley

2014 – Presentation – Chronic Traumatic Encephalopathy – update, International Congress of Neuropathology quadrennial meeting Sept 2014, Rio de Janeiro

2014 – presentation – Cases of the Month – 16 Years of Unknowns  International Congress of Neuropathology quadrennial meeting Sept 2014, Rio de Janeiro s



University of Pittsburgh
Physicians, Department
of Pathology

Division of Neuropathology

Clayton A. Wiley, MD, PhD
*Director*

Charleen T. Chu, MD, PhD
Robert H. Garman, DVM
Ronald Hamilton, MD
Julia Kofler, MD
Scott M. Kulich, MD, PhD
David Lacomis, MD
Geoffrey Murdoch, MD, PhD
Gutti R. Rao, MD

UPMC Presbyterian
Room S701 Scaife Hall
200 Lothrop Street
Pittsburgh, PA 15213
T 412-624-9415
F 412-624-5610

I have conducted a study of Cristopher Mims' brain tissue. Additionally, in my Neuropathology practice I conduct an ongoing study of all available and existing medical literature related to the existence and diagnosis of CTE and I combine that knowledge with my training and extensive experience related to the study and diagnosis of CTE.

Christopher Mims died on October 15, 2008 at age 38.

Received from Eric J Wahoske, LA County Department of ME Coroner are 180 unstained tissue sections on glass slides labeled 08-7210-H LAC ME Coroner, US recuts (10 unstained slides from 8 tissue blocks).

H&E stained recuts are examined:

slide A  dura mater;
slide B  cerebral cortex
slide C          hippocampus
slide D  hippocampus
slide E  insular cortex, putamen, globus pallidus and thalamus
slide F          cerebral cortex
slide G  cerebellum cortex and dentate nucleus
slide H          medulla

PHF-1/tau immunostaining of slides G and H were negative for abnormally aggregated tau. PHF-1/tau immunostaining of slides B, C, D, E and F show numerous neocortical PHF-1/tau positive tangles in neurons, with staining of many neuronal processes (neuropil threads) as well as tau-positive glial cells, especially in the depths of the sulcus and focally around some blood vessels best seen in slide B. There are no neuritic plaques and the tangles are much more common in the neocortex than in the hippocampus. These findings are diagnostic of CTE.

Figure 1: neocortex with numerous tangles, neuropil threads, glial tau and perivascular location; on the right is a close up of the distinctive perivascular pathology of CTE.



Christopher Mims had CTE.

Signed:
/s/
Ronald L Hamilton, M.D.

Affiliated with the University of Pittsburgh School of Medicine

# CERTIFICATION OF VITAL RECORD

## COUNTY OF LOS ANGELES · REGISTRAR–RECORDER/COUNTY CLERK

### CERTIFICATE OF DEATH
STATE OF CALIFORNIA
USE BLACK INK ONLY · NO ERASURES, WHITEOUTS OR ALTERATIONS
VS-11 (REV. 1/06)

3200819043413

**STATE FILE NUMBER** | **LOCAL REGISTRATION NUMBER**

**DECEDENT'S PERSONAL DATA**

| 1 NAME OF DECEDENT — FIRST (Given) | 2 MIDDLE | 3 LAST (Family) |
|---|---|---|
| CHRISTOPHER | EDDIE | MIMS |

| AKA ALSO KNOWN AS — Include full AKA (FIRST MIDDLE LAST) | 4 DATE OF BIRTH mm/dd/ccyy | 5 AGE Yrs | IF UNDER ONE YEAR Months / Days | IF UNDER 24 HOURS Hours / Minutes | 6 SEX |
|---|---|---|---|---|---|
| - - - | 09/29/1970 | 38 | | | M |

| 9 BIRTH STATE/FOREIGN COUNTRY | 10 SOCIAL SECURITY NUMBER | 11 EVER IN U.S. ARMED FORCES? | 12 MARITAL STATUS (at Time of Death) | 7 DATE OF DEATH mm/dd/ccyy | 8 HOUR (24 Hours) |
|---|---|---|---|---|---|
| CALIFORNIA | 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 | YES [X] NO UNK | DIVORCED | 10/15/2008 | 0935 |

| 13 EDUCATION — Highest Level/Degree | 14/15 WAS DECEDENT HISPANIC/LATINO/A(SPANISH? (if yes, see worksheet on back) | 16 DECEDENT'S RACE — Up to 3 races may be listed (see worksheet on back) |
|---|---|---|
| SOME COLLEGE | YES [X] NO | AFRICAN AMERICAN |

| 17 USUAL OCCUPATION — Type of work for most of life. DO NOT USE RETIRED | 18 KIND OF BUSINESS OR INDUSTRY (e.g. grocery store, road construction, employment agency, etc.) | 19 YEARS IN OCCUPATION |
|---|---|---|
| PROFESSIONAL ATHLETE | FOOTBALL ATHLETE | 8 |

**USUAL RESIDENCE**

| 20 DECEDENT'S RESIDENCE (Street and number or location) |
|---|
| 612 SOUTH FLOWER STREET #409 |

| 21 CITY | 22 COUNTY/PROVINCE | 23 ZIP CODE | 24 YEARS IN COUNTY | 25 STATE/FOREIGN COUNTRY |
|---|---|---|---|---|
| LOS ANGELES | LOS ANGELES | 90017 | 25 | CALIFORNIA |

**INFORMANT**

| 26 INFORMANT'S NAME, RELATIONSHIP | 27 INFORMANT'S MAILING ADDRESS (Street and number or rural route number, city or town, state, ZIP) |
|---|---|
| MAREA BARSKY, FRIEND | 249 SANTA BARBARA, IRVINE, CA 92606 |

**SPOUSE AND PARENT INFORMATION**

| 28 NAME OF SURVIVING SPOUSE — FIRST | 29 MIDDLE | 30 LAST (Maiden Name) |
|---|---|---|
| - | - | - |

| 31 NAME OF FATHER — FIRST | 32 MIDDLE | 33 LAST | 34 BIRTH STATE |
|---|---|---|---|
| LORENZO | VICTOR | MIMS | CA |

| 35 NAME OF MOTHER — FIRST | 36 MIDDLE | 37 LAST (Maiden) | 38 BIRTH STATE |
|---|---|---|---|
| CARLEEN | | HASTINGS | TN |

**1 of 2**

**FUNERAL DIRECTOR / LOCAL REGISTRAR**

| 39 DISPOSITION DATE mm/dd/ccyy | 40 PLACE OF FINAL DISPOSITION FOREST LAWN MEMORIAL PARK |
|---|---|
| 10/25/2008 | 6300 FOREST LAWN DR., LOS ANGELES, CA 90068 |

| 41 TYPE OF DISPOSITION(S) | 42 SIGNATURE OF EMBALMER | 43 LICENSE NUMBER |
|---|---|---|
| BU | JESSICA SOLIS | 9091 |

| 44 NAME OF FUNERAL ESTABLISHMENT | 45 LICENSE NUMBER | 46 SIGNATURE OF LOCAL REGISTRAR | 47 DATE mm/dd/ccyy |
|---|---|---|---|
| FOREST LAWN MEMR PRKS & MTYS | FD 904 | JONATHAN FIELDING, MD | 10/23/2008 |

**PLACE OF DEATH**

| 101 PLACE OF DEATH | 122 IF HOSPITAL, SPECIFY ONE | 103 IF OTHER THAN HOSPITAL, SPECIFY ONE |
|---|---|---|
| RESIDENCE | IP / ER/OP / DOA | Hospice / Nursing Home/LTC / [X] Decedent's Home / Other |

| 104 COUNTY | 105 FACILITY ADDRESS OR LOCATION WHERE FOUND (Street and number or location) | 106 CITY |
|---|---|---|
| LOS ANGELES | 612 SOUTH FLOWER STREET #409 | LOS ANGELES |

**CAUSE OF DEATH**

| 107 CAUSE OF DEATH Enter the chain of events — diseases, injuries, or complications — that directly caused death. DO NOT enter terminal events such as cardiac arrest, respiratory arrest, or ventricular fibrillation without showing the etiology. DO NOT ABBREVIATE. | | Time Interval Between Onset and Death | 108 DEATH REPORTED TO CORONER? |
|---|---|---|---|
| IMMEDIATE CAUSE (Final disease or condition resulting in death) (A) DEFERRED | | (AT) | [X] YES NO |
| Sequentially list conditions, if any, leading to cause on Line A. Enter UNDERLYING CAUSE (disease or injury that initiated the events resulting in death) LAST (B) | | (BT) | 109 BIOPSY PERFORMED? YES [X] NO |
| (C) | | (CT) | 110 AUTOPSY PERFORMED? YES [X] NO |
| (D) | | (DT) | 111 USED IN DETERMINING CAUSE? [X] YES NO |

112 OTHER SIGNIFICANT CONDITIONS CONTRIBUTING TO DEATH BUT NOT RESULTING IN THE UNDERLYING CAUSE GIVEN IN 107
NONE

113 WAS OPERATION PERFORMED FOR ANY CONDITION IN ITEM 107 OR 112? (if yes, list type of operation and date.)
NO

| | 113A IF FEMALE, PREGNANT IN LAST YEAR? |
|---|---|
| | YES NO UNK |

Coroner reported: 2008-07210

**PHYSICIAN'S CERTIFICATION**

| 114 I CERTIFY THAT TO THE BEST OF MY KNOWLEDGE DEATH OCCURRED AT THE HOUR, DATE AND PLACE STATED FROM THE CAUSES STATED | 115 SIGNATURE AND TITLE OF CERTIFIER | 116 LICENSE NUMBER | 117 DATE mm/dd/ccyy |
|---|---|---|---|
| Decedent Attended Since mm/dd/ccyy / Decedent Last Seen Alive mm/dd/ccyy | | | |

118 TYPE ATTENDING PHYSICIAN'S NAME, MAILING ADDRESS, ZIP CODE

**CORONER USE ONLY**

| 119 I CERTIFY THAT IN MY OPINION DEATH OCCURRED AT THE HOUR, DATE, AND PLACE STATED FROM THE CAUSES STATED MANNER OF DEATH: Natural / Accident / Homicide / Suicide [X] Pending Investigation / Could not be Determined | 120 INJURED AT WORK? YES NO UNK | 121 INJURY DATE mm/dd/ccyy | 122 HOUR (24 Hours) |
|---|---|---|---|

123 PLACE OF INJURY (e.g. home, construction site, wooded area, etc.)

124 DESCRIBE HOW INJURY OCCURRED (Events which resulted in injury)

125 LOCATION OF INJURY (Street and number or location and city, and ZIP)

| 126 SIGNATURE OF CORONER / DEPUTY CORONER | 127 DATE mm/dd/ccyy | 128 TYPE NAME, TITLE OF CORONER / DEPUTY CORONER |
|---|---|---|
| EVONNE D REED | 10/20/2008 | EVONNE D REED, DEPUTY CORONER |

**STATE REGISTRAR**

| A | B | C | D | E | | FAX AUTH # | CENSUS TRACT |
|---|---|---|---|---|---|---|---|
| | | | | | *01200800916134* | | |

---

This is to certify that this document is a true copy of the official record filed with the Registrar-Recorder/County Clerk.

**SEP 04 2015**

*Dean C. Logan*
DEAN C. LOGAN
Registrar-Recorder/County Clerk


*100000699023*

This copy not valid unless prepared on engraved border displaying the Seal and Signature of the Registrar-Recorder/County Clerk. (FBINCO (REV) 07/11)

ANY ALTERATION OR ERASURE VOIDS THIS CERTIFICATE

CERTIFICATION OF VITAL RECORD

## COUNTY OF LOS ANGELES • REGISTRAR–RECORDER/COUNTY CLERK

### PHYSICIAN/CORONER'S AMENDMENT

| 3052008191127 | | | 3200819043413 |
|---|---|---|---|
| STATE FILE NUMBER | NO ERASURES, WHITEOUTS, PHOTOCOPIES, OR ALTERATIONS | | LOCAL REGISTRATION NUMBER |

1.1

☐ BIRTH  ☒ DEATH  ☐ FETAL DEATH

TYPE OR PRINT CLEARLY IN BLACK INK ONLY – THIS AMENDMENT BECOMES AN ACTUAL PART OF THE OFFICIAL RECORD

**PART I   INFORMATION TO LOCATE RECORD**

| INFORMATION AS IT APPEARS ON ORIGINAL RECORD | 1A. NAME—FIRST CHRISTOPHER | 1B. MIDDLE EDDIE | 1C. LAST MIMS | 2. SEX M |
|---|---|---|---|---|
| | 3. DATE OF EVENT—MM/DD/CCYY 10/15/2008 | 4. CITY OF EVENT LOS ANGELES | 5. COUNTY OF EVENT LOS ANGELES | |

**PART II   STATEMENT OF CORRECTIONS**     2 of 2

| | 6. CERTIFICATE ITEM NUMBER | 7. INFORMATION AS IT APPEARS ON ORIGINAL RECORD | 8. INFORMATION AS IT SHOULD APPEAR |
|---|---|---|---|
| LIST ONE ITEM PER LINE | 107A | DEFERRED | DILATED CARDIOMYOPATHY |
| | 107AT | - | YEARS |
| | 112 | NONE | HEPATIC STEATOSIS, HISTORY OF HYPERTENSION |
| | 119 | PENDING INVESTIGATION | NATURAL |

I HEREBY DECLARE UNDER PENALTY OF PERJURY THAT THE ABOVE INFORMATION IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.

| DECLARATION OF CERTIFYING PHYSICIAN OR CORONER | 9. SIGNATURE OF CERTIFYING PHYSICIAN OR CORONER ▶ LOUIS A PENA MD | 10. DATE SIGNED—MM/DD/CCYY 12/12/2008 | 11. TYPED OR PRINTED NAME AND TITLE/DEGREE OF CERTIFIER DME | |
|---|---|---|---|---|
| | 12. ADDRESS—STREET and NUMBER 1104 NORTH MISSION ROAD | 13. CITY LOS ANGELES | 14. STATE CA | 15. ZIP CODE 90033 |
| STATE/LOCAL REGISTRAR USE ONLY | 16. OFFICE OF VITAL RECORDS OR LOCAL REGISTRAR ▶ STATE REGISTRAR - OFFICE OF VITAL RECORDS | 17. DATE ACCEPTED FOR REGISTRATION—MM/DD/CCYY 12/15/2008 | | |

STATE OF CALIFORNIA, DEPARTMENT OF PUBLIC HEALTH, OFFICE OF VITAL RECORDS      *022008000147349*      FORM VS 24Ae (REV. 1/08)

1.1

This is to certify that this document is a true copy of the official record filed with the Registrar-Recorder/County Clerk.

SEP 0 4 2015



DEAN C. LOGAN
Registrar-Recorder/County Clerk



*1 0 0 0 0 0 6 9 9 0 2 4 *



This copy not valid unless prepared on engraved border displaying the Seal and Signature of the Registrar-Recorder/County Clerk.
PRNCO (REV) 07/11

ANY ALTERATION OR ERASURE VOIDS THIS CERTIFICATE

COUNTY OF LOS ANGELES                                                    DEPARTMENT OF CORONER

# **12** AUTOPSY REPORT

I performed an autopsy on the body of

the DEPARTMENT OF CORONER

at _____

No.

2008-07210

MIMS, CHRISTOPHER

Los Angeles, California _____ on OCTOBER 16, 2008 @ 1525 HOURS
                                      (Date)                    (Time)

From the anatomic findings and pertinent history I ascribe the death to:

(A)    DILATED CARDIOMYOPATHY

DUE TO, OR AS A CONSEQUENCE OF

(B)

DUE TO, OR AS A CONSEQUENCE OF

(C)

DUE TO, OR AS A CONSEQUENCE OF

(D)

OTHER CONDITIONS CONTRIBUTING BUT NOT RELATED TO THE IMMEDIATE CAUSE OF DEATH

    HEPATIC STEATOSIS, HISTORY HYPERTENSION

*Anatomical Summary:*

   I.   Dilated cardiomyopathy, 1010 grams.

        A.   Pulmonary congestion and edema.

             1.   Secretions of bronchi and trachea.

        B.   Chronic hepatic congestion.

             1.   Hepatomegaly, 3200 grams.

             2.   Probable congestive heart failure.

                  a.   Lower legs, dorsum of feet, with edema.

        C.   History of hypertension.

        D.   History of alcohol abuse.

             1.   Hepatic steatosis, moderate.

   II.  Other findings:

        A.   Morbid obesity.

        B.   No evidence of external or internal trauma.

        C.   No pulmonary emboli.

        D.   Bilateral knees with old surgical scars.

76A890M—Rev. 8/94

COUNTY OF LOS ANGELES

DEPARTMENT OF CORONER

# 12

## AUTOPSY REPORT

No.

2008-07210

MIMS, CHRISTOPHER

Page 2

    E.    Upper torso, face with congestion and Tardieu spots consistent with prone position found.

    F.    Skin, body creases of the axilla, legs and back with psoriatic-type lesions.

III.    See Toxicology Report.

IV.    See Microscopic Report.

V.    See Neuropathology Report.

CIRCUMSTANCES:

See the brief Investigator's Narrative Report.

This is a 38-year-old Black gentleman with a history of hypertension, sports-related knee injuries and alcohol abuse. On 10/15/08 at about 0900 hours, the decedent was found lying on the bathroom floor unresponsive. 911 was called, and the Los Angeles Fire Department responded to the scene and determined death on 10/15/08 at 0935 hours. The decedent apparently smoked tobacco heavily and used alcohol daily. The decedent had complained of labored breathing on 10/14/08. He was last seen alive by a friend on 10/14/08 at about 2230 hours.

EXTERNAL EXAMINATION:

The body is identified by toe tags and is that of an unembalmed, refrigerated adult Black male who appears about the reported age of 38 years. The body weighs 456 pounds, measures 80 inches, and is extremely obese.

The skin shows numerous psoriatic scaly-type skin lesions at the axilla, legs, dorsum of the feet and the torso. The skin is otherwise free of abrasions, lacerations, bruises and burns. There are scars over both knee regions: On the right knee, an old scar, 2 inches transversely oriented and on the left knee, an irregularly-shaped old scar, 1-1/2 inches. No old surgical scars are seen over the abdomen or torso regions.

COUNTY OF LOS ANGELES                                    DEPARTMENT OF CORONER

# **AUTOPSY REPORT**

**12**

Page ___3___

No.

2008-07210

MIMS, CHRISTOPHER

Tattoos are present and identified as follows:

1.  Right anterior forearm, "Tough As" and below this, a tattoo of four nails vertically oriented, and below this, the word "Nails".

2.  Left anterior forearm, the words "Balls of Steel" and in between is a brick wall with balls going through it.

3.  Left upper lateral arm is a tattoo of four cards with the letter "A", diamond, spade, heart and clubs and the words "Fat Doctor", and below this a smiling man face that is green with dark hair. There are other designs around this tattoo.

4.  Right upper lateral arm, multicolored tiger.

5.  Right wrist, tribal-like band tattoo with a focal red color design.

Rigor has presumably been abolished. Livor mortis is slight red and fixed on the posterior upper back. Also, the face shows purple congestion and dependent purple fixed livor on the upper torso and neck regions with Tardieu spots present.

The head is otherwise normocephalic and covered by black hair. There is slight frontal receding of the hairline, and the hair can be described as short and curly. A mustache and beard are present. Examination of the eyes reveals irides that show corneal clouding and sclerae that are congested. There are no petechial hemorrhages of the conjunctivae of the lids or the sclerae. The oronasal passages are unobstructed. At autopsy, there is foam, red, frothy material from the mouth that is observed. Upper and lower teeth are present. The frenulum is intact. The neck is unremarkable. There is no chest deformity. There is no increased anterior-posterior diameter. The abdomen is obese. The genitalia are those of an adult male. The penis appears circumcised. The external genitalia are without trauma or lesions. The extremities show no edema, joint deformity, abnormal mobility, or needle tracks. The lower legs and dorsum of the feet are swollen.

76A798P—Rev. 2/91

COUNTY OF LOS ANGELES

**12**

Page ___4___

# AUTOPSY REPORT

DEPARTMENT OF CORONER

No.

2008-07210

MIMS, CHRISTOPHER

EVIDENCE OF THERAPEUTIC INTERVENTION:

There is no evidence of any previous or recent hospitalization.

EVIDENCE OF EXTERNAL TRAUMATIC INJURIES:

None.

CLOTHING:

The body was not clothed, and I did not see the clothing.

INITIAL INCISION:

The body cavities are entered through the standard coronal and Y-shaped incisions. No foreign material is present in the mouth, upper airway, and trachea.

EVIDENCE OF INTERNAL INJURIES:

None.

NECK:

The neck organs are removed en bloc with the tongue. No lesions are present, nor is trauma of the gingiva, lips, or oral mucosa demonstrated. There is no edema of the larynx. Both hyoid bone and larynx are intact and without fractures. No hemorrhage is present in the adjacent throat organs, investing fascia, strap muscles, thyroid, or visceral fascia. There are no prevertebral fascial hemorrhages. The tongue when sectioned shows no trauma.

CHEST/ABDOMINAL CAVITY:

Both pleural cavities contain no fluid or adhesions. The parietal pleurae are intact. The lungs are well-expanded. Soft tissues of the thoracic and abdominal walls are well-preserved. The subcutaneous fat of the abdominal wall measures 8.0 cm in thickness, and the chest wall measures 6.0 cm. The breasts are

COUNTY OF LOS ANGELES                                                    DEPARTMENT OF CORONER

# 12   AUTOPSY REPORT

Page ___5___

No.

2008-07210

MIMS, CHRISTOPHER

examined and palpated in the usual manner and show no
abnormalities. The organs of the abdominal cavity have a normal
arrangement, and none are absent. There is no fluid collection.
The peritoneal cavity is without evidence of peritonitis. There
are no adhesions.

## SYSTEMIC AND ORGAN REVIEW

The following observations are limited to findings other than
injuries, if described above.

MUSCULOSKELETAL SYSTEM:

No abnormalities of the bony framework or muscles are present.

CARDIOVASCULAR SYSTEM:

The aorta is elastic and of even caliber throughout, with
vessels distributed normally from it. The abdominal and
thoracic aorta have minimal atherosclerotic plaques. There is
no tortuosity or widening of the thoracic segment. There is no
dilatation of the lower abdominal segment. No aneurysm is
present. The major branches of the aorta show no abnormality.

Within the pericardial sac, there is a minimal amount of
serosanguineous fluid. The heart weighs 1010 grams. It is
severely dilated with no significant ventricular hypertrophy.
The right ventricle is 0.4 cm thick, and the left ventricle is
1.5 cm thick. The septal wall measures 2.0 cm. The chambers
are normally developed and are without mural thrombosis. The
valves are thin, leafy and competent but dilated. The
circumferences of the valve rings are: Tricuspid valve 15.0 cm,
pulmonic valve 10.0 cm, mitral valve 15.0 cm, and aortic valve
10.0 cm. There is mottled red and pale endocardial
discoloration. There are no infarcts of the myocardium seen
grossly. There is no abnormality of the apices of the papillary
musculature. There are no defects of the septum. The great
vessels enter and leave in a normal fashion. The ductus
arteriosus is obliterated. The coronary ostia are widely
patent. The right coronary artery is the dominant vessel.
There is no coronary atherosclerosis. The blood within the
heart and large blood vessels is liquid.

COUNTY OF LOS ANGELES

**12**

Page ___6___

# AUTOPSY REPORT

DEPARTMENT OF CORONER

No.

2008-07210

MIMS, CHRISTOPHER

RESPIRATORY SYSTEM:

An extremely large amount of edema fluid is found in the upper respiratory and lower bronchial passages. The mucosa is intact and pale with secretions present. The lungs are subcrepitant, and there is dependent congestion. The left lung weighs 1030 grams. The right lung weighs 1050 grams. The visceral pleurae are smooth and intact. The parenchyma is congested and edematous. The pulmonary vasculature is without thromboembolism. Thromboemboli are not present in the distal tertiary branches.

GASTROINTESTINAL SYSTEM:

The esophagus is intact throughout. The stomach is not distended. It contains about 150 ml of green well-digested food and liquid present. The mucosa is smooth and green with no erosions or ulcerations. Portions of tablets and capsules cannot be discerned in the stomach. The small intestine and colon are examined by inspection, palpation and multiple incisions and show soft green stool in each region. The appendix is present. The pancreas occupies a normal position. There is no necrosis or trauma. The parenchyma is lobular and firm. The pancreatic ducts are not ectatic, and there is no parenchymal calcification.

HEPATOBILIARY SYSTEM:

The liver weighs 3200 grams, is enlarged, and is red-brown. The capsule is intact, and the consistency of the parenchyma is soft. The cut surface is smooth. There is chronic passive congestion. The gallbladder is present. The wall is thin and pliable. It contains a minimal amount of green liquid bile and no calculi. There is no obstruction or dilatation of the extra-hepatic ducts. The periportal lymph nodes are not' enlarged.

COUNTY OF LOS ANGELES

DEPARTMENT OF CORONER

# **12**

Page ___7___

# **AUTOPSY REPORT**

No.

2008-07210

MIMS, CHRISTOPHER

URINARY SYSTEM:

The left kidney weighs 310 grams. The right kidney weighs 330 grams. The kidneys are normally situated, and the capsules strip easily revealing a surface that is focally pitted, light red and smooth. The corticomedullary demarcation is preserved. The pyramids are not remarkable. The peripelvic fat is not increased. The ureters are without dilatation or obstruction and pursue their normal course. The urinary bladder is contracted. It contains no urine.

GENITAL SYSTEM (MALE):

The prostate is without enlargement or nodularity. Both testes are in the scrotum and are unremarkable and without trauma.

HEMOLYMPHATIC SYSTEM:

The spleen weighs 220 grams and is slightly enlarged. The capsule is intact. The parenchyma is soft. There is no increased follicular pattern. Lymph nodes throughout the body are small and inconspicuous. There is focal enlargement of the lymph nodes observed in the peribronchial regions. The bone is not remarkable. The bone marrow of the rib is red, moist and unremarkable.

ENDOCRINE SYSTEM:

The thyroid gland is unremarkable. The parathyroid glands are not identified. The adrenal glands are unremarkable. The thymus gland is unremarkable. The pituitary gland is of normal size and is unremarkable.

SPECIAL SENSES:

The eyes are not dissected. The middle and inner ear are not dissected.

76A798P—Rev. 2/91

**12**

# AUTOPSY REPORT

Page ___8___

No.

2008-07210

MIMS, CHRISTOPHER

## HEAD AND CENTRAL NERVOUS SYSTEM:

There is no subcutaneous or subgaleal hemorrhage in the scalp.
The external periosteum and dura mater are stripped showing no
fractures of the calvarium or base of the skull. There are no
tears of the dura mater. There is no epidural, subdural or
subarachnoid hemorrhage. The fresh brain weighs 1440 grams.
The leptomeninges are thin and transparent. A normal
convolutional pattern is observed (see separate Neuropathology
Report to follow). Vessels at the base of the brain have a
normal pattern of distribution. There are no aneurysms. The
cranial nerves are intact, symmetrical and normal in size,
location and course. The cerebral arteries are without
arteriosclerosis.

See separate Neuropathology Report.

## SPINAL CORD:

The entire cord is not dissected. The superior portion of the
cervical spinal cord is examined through the foramen magnum and
is unremarkable.

## NEUROPATHOLOGY:

The brain is placed in formalin solution for further fixation
and later neuropathology consultation.

## HISTOLOGIC SECTIONS:

Representative sections from various organs are preserved in one
storage jar in 10% formalin. Sections of heart, right and left
lungs, liver and spleen, kidneys, and dorsum of right foot skin
are submitted for slides. The slide key is #2008-07210: 1, 2,
3, 4, left ventricle of heart; 5, right ventricle of heart; 6,
right lung; 7, left lung; 8, liver and spleen; 9, right and left
kidneys; 10, dorsum of right foot and section of skin.

## TOXICOLOGY:

Blood (heart and femoral), bile, liver tissue, stomach contents
and vitreous humor have been submitted to the laboratory. A
comprehensive screen is requested.

COUNTY OF LOS ANGELES

DEPARTMENT OF CORONER

# 12

## AUTOPSY REPORT

No.

2008-07210

MIMS, CHRISTOPHER

Page ____9____

PHOTOGRAPHY:

At-scene photos are available (34). Photographs have been taken during the course of the autopsy.

RADIOLOGY:

No x-rays are obtained.

WITNESSES:

None.

DIAGRAMS USED:

Diagram Form 20 was used during the performance of the autopsy. The diagram is not intended to be a facsimile.

OPINION:

This 38-year-old Black male died as a result of dilated cardiomyopathy. Hepatic steatosis and history of hypertension were contributory factors to his final demise.

Blood toxicology studies show a 0.11 g% alcohol femoral blood level. This is not a lethal level. The remainder of the toxicology studies show no drugs of abuse. A non-significant level of diphenhydramine is present. The vitreous fluid shows no evidence of diabetic ketoacidosis.

Alcohol abuse is strongly associated with the development of dilated cardiomyopathy, which may be a secondary nutritional disturbance or ethanol toxicity causing myocardial injury.

Based on the history and circumstances, as currently known, the manner of death is natural.

76A798P—Rev 2/91

-3286-

COUNTY OF LOS ANGELES

DEPARTMENT OF CORONER

# **12**

## **AUTOPSY REPORT**

Page _____ 10

No.

2008-07210

MIMS, CHRISTOPHER

NOTE:

Dr. Christopher Rogers, Chief of Forensic Medicine Division, reviewed the opinion and case and concurs.

_____
LOUIS A. PENA, M.D.
DEPUTY MEDICAL EXAMINER

_____
1-17-2009
DATE

LAP:am/jm:c
D-10/16/08-1900 hours
T-10/21/08

76A798P—Rev. 2/91

COUNTY OF LOS ANGELES                    DEPARTMENT OF CORONER



**20**

3:25pm                    —Rigor

2008-07210
MING, CHRISTOPHER
NAT   AP 10-16-08        34 1

Hair black short curly
slight frontal (receding) Hairline

eyes = corneal clouding, congested

No End of external trauma.

L                                    R

Ear lobes pierced
black mustache, beard
foam Red, frothy mouth

Teeth = own Frenulum intact

Skin tags-upper chest

Tattoo:
4 cards A
Diamonds, spade, Heart + Clubes
Fat Doctor
men's face
green dark Hair smilin
other designs ahead (this)

Purple Fixed Livor + Trafdiev spots
scaly psoriatic type skin lesions (chronic)

slight Red Fixed Livor

Tattoo: multicolored Tiger

psoriasis type-lesions onskin and Fold areas

Liver Temp Incision mark

Tattoos of steel (back Jaw Loaded Thigh?)

Tattoos: Touch As 4 nails/Jjjj Nails

obese Red

Yellow Band matches CC# 2008-07210

Tattoo: Tiger like Band Face and Color

Circumcised penis Testes

Numerous small old scars, Healed Abrasions

P Sopiriti type Skin (lesion) scaly

Nails short
No Trauma to hands, palms or Digits.

Red scar 1½"

anus &

SLP Scar 2"

scaly Hyperatie Skin ? Psoriasis

Legs/Dorsum feet Swollen

10-16-2008

Blue, white toe tags matches decedent's Name & CC# 2008-07210

_Nauni a. Peña_ M.D.
Deputy Medical Examiner

P5/93

COUNTY OF LOS ANGELES          **FORENSIC CONSULTANT'S REPORT**          DEPARTMENT OF CORONER

## 13

<u>NEUROPATHOLOGY</u>

2008-07210

MIMS, CHRISTOPHER E.

November 20, 2008

AGE: 38 years

DATE OF DEATH: October 15, 2008

REFERRING DME: Louis A. Pena, M.D.

CIRCUMSTANCES:

The following information is taken from the Investigator
Report and preliminary autopsy notes. This 38-year-old man
reportedly had a past medical history of hypertension,
sports-related knee injuries, heavy smoking, and alcohol
abuse. He was last known alive on 10/14/08 at 2230 hours,
reportedly complaining of labored breathing. On 10/15/08, he
was found unresponsive on the bathroom floor by a friend. He
was pronounced at the scene on 10/15/08 at 0935 hours by
responding paramedics.

At the time of postmortem examination on 10/16/08, the
findings included dilated cardiomyopathy (heart weight 1010
grams), pulmonary congestion and edema, hepatomegaly (3200
grams), marked obesity, and no evidence of acute trauma
including no scalp, skull or intracranial abnormality noted.
Brain weight at removal was 1440 grams.

GROSS DESCRIPTION:

Specimens available for examination are cranial dura mater
and brain. Cranial dura mater submitted includes the dorsal
convexity regions with falx cerebri, posterior fossa with
tentorium cerebelli, and much of the right temporal fossa.
The external and internal surfaces of the dura mater are
smooth and shiny without evidence of hemorrhage,
discoloration or subdural neomembranes, the only exception
being a 0.8 x 0.5 x 0.4 cm light brown flattened nodule (0.4
cm in thickness) in the right anterolateral temporal fossa,
apparently within the dura. It is sampled. Dural venous
sinuses appear normal in pattern.

**13**

<u>NEUROPATHOLOGY</u>

2008-07210

MIMS, CHRISTOPHER E.

<u>Page 2</u>

Cerebral leptomeninges show mildly increased milky opacity
over the dorsolateral convexities, considered within normal
limits for age group.  There is moderately severe
leptomeningeal vascular congestion.  Cerebral hemispheres are
approximately symmetrical with a midline and closely apposed
interhemispheric fissure.  There is no evidence of
significant brain swelling and no evidence of herniation at
the uncus, cerebellar tonsillar region, superior cerebellar
vermis or cingulate gyrus.  There is some artifact present,
including partial avulsion of the inferomedial left
cerebellar hemisphere and deep incision into the right
anterior inferior cerebellar hemisphere.  Convolutional
pattern is unremarkable.  No recent or remote cerebral or
cerebellar cortical contusions are seen.  No focal areas of
increased softening, firmness or discoloration are present.

Rectus-orbital and basitemporal areas are unremarkable.
Cranial nerves I through XII are intact except for avulsion
of olfactory bulbs bilaterally.  Major basal arteries have a
normal pattern of distribution, discounting the absence of
the bilateral vertebral arteries, not included with the
specimen.  The left posterior communicating artery is larger
than average, slightly exceeding the contribution to the left
posterior cerebral artery by basilar artery, thus consistent
with a fetal pattern.  No aneurysms and no evidence of
occlusive vascular disease are apparent.  Belly of the pons
is full and symmetrical, and medulla is remarkable only for
partial avulsion of the right medulla compared to the left.
Cerebellar hemispheres are approximately symmetrical with
normal-appearing folia.  Basal cisterns are open.

The brain is sectioned in a coronal plane, and the brainstem
and cerebellum in a transverse plane.

COUNTY OF LOS ANGELES          **FORENSIC CONSULTANT'S REPORT**          DEPARTMENT OF CORONER

## 13

<u>NEUROPATHOLOGY</u>

2008-07210

MIMS, CHRISTOPHER E.

December 3, 2008

MICROSCOPIC DESCRIPTION:

Sections of cranial dura mater and brain (8) stained by H&E
method include the right temporal fossa dural nodule (Slide
A), right frontal lobe (Slide B), left and right hippocampi
(Slides C and D, respectively), right basal ganglia (Slide
E), right parietal lobe (Slide F), cerebellum (Slide G), and
medulla (Slide H).

Slide A demonstrates native dura mater, with the expanded
zone composed of vascular channels and some ovoid pale
connective areas with a lace-like internal architecture.  The
appearance is typical of a benign arachnoid villus.  Some
leptomeningeal melanosis is incidentally noted in the brain
sections.  In basal ganglia, some mild to moderate fine
granular calcification is noted in globus pallidus, primarily
in pericapillary areas and in the walls of some small blood
vessels.  Mild autolysis is present in the sections.

There is no evidence of meningitis, encephalitis, abnormal
neuronal inclusions, developmental anomalies, hippocampal
sclerosis or neoplasia.

FINAL NEUROPATHOLOGIC DIAGNOSIS:

A.    Cerebrovascular congestion.

B.    Basal ganglia calcification, mild; incidental finding.


JOHN M. ANDREWS, M.D.
DEPUTY MEDICAL EXAMINER
NEUROPATHOLOGY CONSULTANT

DATE    12/9/08

JMA:am/hg:c
T-12/04/08

76F589(Rev 8/93)

COUNTY OF LOS ANGELES     **FORENSIC CONSULTANT'S REPORT**     DEPARTMENT OF CORONER

**13**

<u>NEUROPATHOLOGY</u>

2008-07210

MIMS, CHRISTOPHER E.

<u>Page 3</u>

Coronal sections reveal the cortical ribbon to be normal in
thickness and color. Gray/white demarcation is distinct.
Underlying white matter is homogeneous and clear. Corpus
callosum is normal in thickness, color and symmetry. Lateral
ventricles are normal in size and configuration with sharp
superior angles. A cavum septi pellucidi is present
anteriorly without fenestration of septum pellucidum. Third
ventricle is midline and does not exceed 0.3 cm in maximum
transverse diameter. Cerebral aqueduct and fourth ventricle
are unremarkable. Choroid plexus is unremarkable
bilaterally. Mammillary bodies and pineal body are grossly
unremarkable. Substantia nigra is normally pigmented. Basal
ganglia are normal in size, symmetry, contour and color.
Amygdaloid complex of nuclei and hippocampi are grossly
unremarkable.

Multiple transverse sections of the brainstem and cerebellum
reveal no abnormality.

Selected areas are retained in storage. Representative
sections are submitted for microscopic examination.

GROSS IMPRESSIONS:

A.    Adult cranial dura mater with small right middle fossa
      dural nodule.

B.    Cerebrovascular congestion.

C.    Otherwise, grossly unremarkable adult brain and
      coverings.


JOHN M. ANDREWS, M.D.                    12-3-08
DEPUTY MEDICAL EXAMINER                  DATE
NEUROPATHOLOGY CONSULTANT

JMA:am/hg:c
T-11/21/08

76F389(Rev 8/93)

-3292-

COUNTY OF LOS ANGELES                    **MICROSCOPIC REPORT**                    DEPARTMENT OF CORONER

# 14

I performed a microscopic examination on

DECEMBER 4, 2008

at _THE DEPARTMENT OF CORONER_

Los Angeles, California

2008-07210

MIMS, CHRISTOPHER E.

## MICROSCOPIC DESCRIPTION

<u>Slides #1,2,3 and 4/10</u>:  Sections of cardiac muscle show patchy areas of significant, severe interstitial fibrosis.  There are focal areas of myocyte hypertrophy, myocyte attenuation, and myocyte fiber disarray.  Slide #4 shows an adherent blood clot with fibrin, red cells and acute inflammation.

There is no acute or chronic myocarditis.

The trichrome stain confirms the abundant interstitial fibrosis, and one cross-section of the left anterior descending coronary artery shows minimal fibrointimal hyperplasia.

<u>Slide #5/10</u>:  Section of unremarkable right ventricle.

<u>Slides #6 and #7/10</u>:  Sections of lung show interstitial red blood cell congestion and pulmonary edema.  Focal lung atelectasis is present.  There are a few foreign body giant type cells and abundant alveolar macrophages.  No pneumonia is observed.  These sections are polarized and are unremarkable with some non- and refractile particles of nonspecific nature.

<u>Slide #8/10</u>:  Section of liver with moderate steatosis.  No cirrhosis is observed.

Section of autolyzed spleen with red blood cell congestion and numerous microvacuoles.

<u>Slide #9/10</u>:  Sections of autolyzed kidney; otherwise, unremarkable.

COUNTY OF LOS ANGELES                    MICROSCOPIC REPORT                    DEPARTMENT OF CORONER

# 14

2008-07210

MIMS, CHRISTOPHER E.

Page_____ 2

Slide #10/10: Section of skin from the dorsum of the right foot with hyperkeratosis and subepidermal focal slight inflammation.

NOTE: No sickled red blood cells are observed.

_____                    _____
LOUIS A. PENA, M.D.                          DATE   1-17-2009
DEPUTY MEDICAL EXAMINER

LAP:am/brr:c/f
T-12/17/08

(Rev 2-92)

-3294-

COUNTY OF LOS ANGELES          AUTOPSY CHECK SHEET          DEPARTMENT OF CORONER

# 16

LT
2008-07210          341
mims, christopher
LP 10-16-08

& ＝ unremark. /none

**EXTERNAL EXAM**
Sex  male
Race  Black
Age  38 y.o.
Height  80"
Weight  456 pds.
Hair  B. Cnchl
Eyes  corneal cloudin)
Sclera  conjested
Teeth  own
Mouth
Tongue  & septum intact
Nose  & Tardieu spots - positional
Chest  &
Breasts  &
Abdomen  obese
Scar
Genitals  circum ♂ testo ds
Edema  &
Skin  See diagram #20
Decubitus  &
HEART Wt. 1,0109  , 0109
  Pericardium  &          RV 0.4cm
Dilated Hypertrophy
  Dilation)+          LV 1.5cm
  Muscle  &          Septum 2.0cm
  Valves  ≥≥ TV = 15cm, PV = 10cm, MV = 15cm, AV = 10cm
  Coronaries  &
AORTA  minimal atherosclerosis
VESSELS  &          No pulmonary
LUNGS Wt.          Emboli
  R 10509
  L 10309
  Adhesions  & -
  Fluid  &
  Atelectasis  &
  Oedema  sev.
  Congestion
  Consolidation  &
  Bronchi  secretions
  Nodes  enlarged
PHARYNX  &
TRACHEA  secretion
THYROID  &
THYMUS  &
LARYNX  &
HYOID  &
ABDOMINAL WALL FAT  8cm
  CHEST WALL FAT  6cm

**PERITONEUM**
  Fluid  &
  Adhesions  &
LIVER Wt. 32009 chronic Hep.
  Capsule intact congestion
  Lobules  &
  Fibros  &
  GB + minimal green liquid Bile
  Calculus  &
  Bile ducts  &
SPLEEN Wt. 2209  slight
  Color  purple  enlarg-megaly
  Consistency  soft  spleen
  Capsule  intact
  Malpigment  &
PANCREAS  &
ADRENALS  &
KIDNEYS Wt.
  R 3309          pitted, fecally
  L 3109
  Capsule  intact
  Cortex  &
  Vessels  &
  Pelvis  &
  Ureters  &
BLADDER  contracted, No urine.
GENITALIA  &
  Prostate  &
  Testes  &, No trauma ,
  Uterus  ♂
  Tubes  &
  Ovaries  &
OESOPHAGUS  &
STOMACH - Contents 150ml green well-Dig foul, liquid present
DUOD. & SM. INT. Soft green stool
APPENDIX + Soft green stool
LARGE INT.
ABDOM. NODES  &
SKELETON
  Spine  ext. &
  Marrow  R/D &
  Rib Cage  &
  Long bones  &
  Pelvis  &
  No fractures

**SCALP**  &
**CALVARIUM**  &
**BRAIN** Wt. 14409
  Dura  &
  Fluid  &          See separate
  Ventricles  &       neuro path
  Vessels  &          report
  Middle ears  &
  Other  &
**PITUITARY**  &

**SPINAL CORD**  cervical
  Sup. portion cervical
  spinal cord  &

**TOXICOLOGY SPECIMENS**
blood - Heart, fem.
Liver, stomach, vitreous, Bile

SECTIONS FOR  (10)
HISTOPATHOLOGY
1 & 5. RV & kidney
2 & R. Lung 10. R. Dorsen foot skin
3 & 7. Lung
4 ↓ & Liver, spleen    ↓ stool J1qa

MICROBIOLOGY  &

DIAGRAMS  #20
X-RAYS  &

OTHER PROCEDURES  &

GROSS IMPRESSIONS
See Adult Form #12
Dictated report ④

Date  10-16-2008          Time  -17:00          Deputy Medical Examiner
                                    end          Lauren O. Pene M.D.

COUNTY OF LOS ANGELES        **MEDICAL REPORT**        DEPARTMENT OF CORONER

**15**

AUTOPSY CLASS: ☐ A ☒ B ☐ C   ☐ Examination Only D

Date _10-16-2008_ Time _15¹²⁵_ Dr. _Louis A. Peña_

print

FINAL ON _12-11-2008_ By _Louis A. Peña_

print

APPROXI-MATE INTERVAL BETWEEN ONSET AND DEATH

2008-07210
MIMS, CHRISTOPHER

_ℒℋ_
_10-16-08_

DEATH WAS CAUSED BY: (Enter only one cause per line for A, B, C, and D)

**IMMEDIATE CAUSE**

(A) _Dilated Cardiomyopathy_ ◀ _yrs_

DUE TO, OR AS A CONSEQUENCE OF

(B) ◀

DUE TO, OR AS A CONSEQUENCE OF

(C) ◀

DUE TO, OR AS A CONSEQUENCE OF

(D) ◀

Other conditions contributing but not related to the immediate cause of death:

_Hepatic Steatosis, History of Hypertension_

☒ **NATURAL**    ☐ **SUICIDE**    ☐ **HOMICIDE**

☐ **ACCIDENT**    ☐ **COULD NOT BE DETERMINED**

If other than natural causes
HOW DID INJURY OCCUR?

WAS OPERATION PERFORMED FOR ANY CONDITION STATED ABOVE: ☐YES ☒NO

TYPE SURGERY_____ DATE _____

☐ ORGAN PROCUREMENT    ☒ TECHNICIAN _George Reid_

☐ WITNESSES TO AUTOPSY    ☐ EVIDENCE RECOVERED AT AUTOPSY
       Item Description:

_38 y.o. B. ♂ H/o HTN._
_sports related knee Inj. ↓ EtOH Abuse._
_10-15-08 FND Lying on B.R. Floor unrespon._
_at residence pronounced 0935am._
_Appear a smoker, Drank ~ 1 gal EtOH Vooka/day._
_c/o Labored Breathing 10-14-08. LKA 10-14-08 2230._

_Autopsy - Dilated "Cardiomyopathy" 1,010 grams_
_No CAD. Aort Disease. Hepatom. c/w chronic Hep._
_C'mg → CHF. Indirect Myocard. Dysfunct. HTN ♡ Disease_
_No P.E. No Evid. Ext/Int. Trauma._ _ℒℋ_

_10-16-2008_
_M.D._

_Louis A. Peña_ M.D.

Resident        DME

**PRIOR EXAMINATION REVIEW BY DME**

☒ BODY TAG _ℋ_    ☐ CLOTHING
☐ X-RAY (No._0_)    ☐ FLUORO
☐ SPECIAL    ☐ MED. RECORDS
PROCESSING TAG
☒ AT SCENE PHOTOS (No._34_ _ℋ_

TYPING BLOOD TAKEN BY_____
SOURCE _____

**TOXICOLOGY**

☐ NO BLOOD
   ☐ Embalmed
   ☐ >24 hr in hospital
   ☐ Decomposed
   ☐ Other _____
       Reason

**SPECIMENS**

Collected by _Louis A. Peña_
☒ HEART BLOOD    ☒ STOMACH CONT.
☒ FEMORAL BLOOD    ☐ BRAIN
☐ _____ BLOOD    ☐ SPLEEN
☐ _____ BLOOD    ☐ KIDNEY
☒ BILE    ☒ VITREOUS
☒ LIVER    ☐ _____
☒ URINE _none_    ☐ _____

**STORAGE JARS**

☒ Regular (No. _1_ )    ☐ Oversize (No._____)
Histopath Cut: ☒ Autopsy   ☐ Lab

☐ NO TOXICOLOGY REQUESTED

**TOXICOLOGICAL ANALYSES ORDERED**

SCREEN: ☒ C ☐ H ☐ T ☐ S
☐ ALCOHOL ONLY
☐ CARBON MONOXIDE
☐ NEOGEN SCREEN
☒ OTHER (specify drug and tissue)
_Vitreous - glucose, Ketones_ _Thanks_

**REQUESTED MATERIAL ON PENDING CASES**

☐ Police Report    ☐ Med History
☒ Tox    ☒ Histo
☐ Microbiology    ☐ Investigations
☐ Radiology Cons.    ☐ Eye Path. Cons
☐ Consult on
☒ Brain Submitted
☒ Neuro Consult   ☐ DME to Cut
☐ Criminalistics
   ☐ GSR    ☐ Sexual Assault    ☐ Other

_10 cassettes_



# Department of Coroner, County of Los Angeles
# FORENSIC SCIENCE LABORATORIES
## Laboratory Analysis Summary Report



Friday, November 07, 2008

☑ PendingTox

**To:**    Dr. Pena
**Deputy Medical Examiner**

**Subject:    Coroner Case Number** 2008-07210    MIMS, CHRISTOPHER EDDIE

The following results have been technically and administratively reviewed and are the opinions and interpretations of the Analyst:

| SPECIMEN | SERVICE | DRUG | LEVEL | UNITS | ANALYST |
|----------|---------|------|-------|-------|---------|
| **Blood, Femoral** | | | | | |
| | Alcohol | Ethanol | 0.11 | g% | M. Schuchardt |
| | Volatiles | Acetone | | ND | M. Schuchardt |
| **Blood, Heart** | | | | | |
| | Alcohol | Ethanol | 0.09 | g% | M. Schuchardt |
| | Barbiturate | Barbiturates | | ND | D. Kowal |
| | Bases | Diphenhydramine | < 0.50 | ug/ml | S. DeQuintana |
| | Cocaine | Cocaine and Metabolites | | ND | D. Kowal |
| | Fentanyl | Fentanyl | | ND | D. Kowal |
| | Methamphetamine | Methamphetamine | | ND | D. Kowal |
| | Opiates | Codeine | | ND | D. Kowal |
| | Opiates | Morphine | | ND | D. Kowal |
| | Phencyclidine | Phencyclidine | | ND | D. Kowal |
| | Volatiles | Acetone | | ND | M. Schuchardt |
| **Vitreous** | | | | | |
| | Alcohol | Ethanol | 0.14 | g% | M. Schuchardt |
| | Outside Test | Glucose | < 20 | mg/dl | NMS Labs, Inc. |
| | Volatiles | Acetone | | ND | M. Schuchardt |

**Legend:**

- - - - -
% Saturation
*
Done
g              Grams
g%             Gram Percent
Inc.           Inconclusive
mEq/l          Milli equivalents
mg             Milligrams
mg/dl          Milligram per Deciliter
mg/l           Milligram per Liter
mmol/l         Millimoles per Liter
ND             Not Detected
Negative
ng/gm          Nanograms per Gram

QNS    Quantity Not Sufficent
TNP    Test Not Performed
Trace
ug     Micrograms
ug/g   Micrograms per Gram
ug/l
ug/ml  Microgram per Milliliter

dP
11-1306

Administratively reviewed by:  **Daniel T. Anderson**
*Supervising Criminalist II*
**FORENSIC LABORATORIES**

Page 1 of 2




Department of Coroner, County of Los Angeles

# FORENSIC SCIENCE LABORATORIES
### Laboratory Analysis Summary Report

Friday, November 07, 2008

☑ **PendingTox**

**To:**  Dr. Pena
**Deputy Medical Examiner**

**Subject:**  **Coroner Case Number**  2008-07210   MIMS, CHRISTOPHER EDDIE

The following results have been technically and administratively reviewed and are the opinions and interpretations of the Analyst:

| SPECIMEN | SERVICE | DRUG | LEVEL | UNITS | ANALYST |
|----------|---------|------|-------|-------|---------|



**Legend:**

| | | | |
|---|---|---|---|
| % Saturation | | QNS | Quantity Not Sufficent |
| * | | TNP | Test Not Performed |
| Done | | Trace | |
| g | Grams | ug | Micrograms |
| g% | Gram Percent | ug/g | Micrograms per Gram |
| Inc. | Inconclusive | ug/l | |
| mEq/l | Milli equivalents | ug/ml | Microgram per Milliliter |
| mg | Milligrams | | |
| mg/dl | Milligram per Deciliter | | |
| mg/l | Milligram per Liter | | |
| mmol/l | Millimoles per Liter | | |
| ND | Not Detected | | |
| Negative | | | |
| ng/gm | Nanograms per Gram | | |

Administratively reviewed by:  **Daniel T. Anderson**
**Supervising Criminalist II**
**FORENSIC LABORATORIES**

Page 2 of 2

B Pena

| COUNTY OF LOS ANGELES | | CASE REPORT EDRS# 916134 | | | DEPARTMENT OF CORONER |
|---|---|---|---|---|---|

| | APPARENT MODE | NATURAL | | CASE NO. |
|---|---|---|---|---|
| **1** | | | | 2008-07210 |
| | SPECIAL CIRCUMSTANCES | | | CRYPT |
| | Media Interest | | | 341 |

| LAST, FIRST MIDDLE | | AKA | # |
|---|---|---|---|
| MIMS, CHRISTOPHER EDDIE | | | |

| ADDRESS | | | | | | CITY | | STATE | ZIP |
|---|---|---|---|---|---|---|---|---|---|
| 612 S. FLOWER ST APT #409 | | | | | | LOS ANGELES | | CA | 90017 |

| SEX | RACE APPEARS | DOB | AGS | HGT | WGT | EYES | HAIR | TEETH | FACIAL HAIR | ID VIEW | CONDITION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| MALE | BLACK | 9/29/1970 | 38 | 80 in. | 456 lbs. | BROWN | BLACK | ALL NATURAL TEETH | BEARD AND MUSTACHE | Yes | FAIR |

| MARK TYPE | MARK LOCATION | MARK DESCRIPTION |
|---|---|---|
| TATTOO | LEFT ARM | "BALLS OF STEEL" |
| TATTOO | RIGHT ARM | "TOUGH AS NAILS" |
| SCAR | BOTH KNEES | HEALED SCARS |
| TATTOO | LEFT ARM | "FAT DOCTOR" |

| NOK | | ADDRESS | | CITY | | STATE | ZIP |
|---|---|---|---|---|---|---|---|

| RELATIONSHIP | PHONE | NOTIFIED BY | | DATE | TIME |
|---|---|---|---|---|---|
| SEE CASE NOTES | | | | | 00:00 |

| SSN | DL ID | STATE | PENDING BY |
|---|---|---|---|
| | | CA | |

| ID METHOD |
|---|
| VISUALLY AT SCENE |

| LA # | MAIN # | CII # | FBI # | MILITARY # | POB |
|---|---|---|---|---|---|
| 2020867M | 04072535 | | | | |

| IDENTIFIED BY NAME (PRINT) | RELATIONSHIP | PHONE | DATE | TIME |
|---|---|---|---|---|
| LAHOMA GRIFFIN | EX-WIFE | (562) 313-3666 | 10/15/2008 | 13:06 |

| PLACE OF DEATH / PLACE FOUND | ADDRESS OR LOCATION | CITY | ZIP |
|---|---|---|---|
| RESIDENCE | 612 S. FLOWER ST APT #409 | LOS ANGELES | 90017 |

| PLACE OF INJURY | AT WORK | DATE | TIME | LOCATION OR ADDRESS | ZIP |
|---|---|---|---|---|---|
| | No | | | | |

| DOD | TIME | FOUND OR PRONOUNCED BY |
|---|---|---|
| 10/15/2008 | 09:35 | LAFD # 3 |

| OTHER AGENCY INV. OFFICER | PHONE | REPORT NO. | NOTIFIED BY | NO |
|---|---|---|---|---|
| LAPD CENTRAL - SUVIATE/ MILLER | (213) 485-3294 | | | |

| TRANSPORTED BY | TO | DATE | TIME |
|---|---|---|---|
| RAMIRO GONZALEZ JR. | LOS ANGELES FSC | 10/15/2008 | 13:55 |

| FINGERPRINTS? | Yes | CLOTHING | Yes | PA RPT | No | MORTUARY | |
|---|---|---|---|---|---|---|---|
| MED. EV. | Yes | INVEST. PHOTO # | 34 | SEAL TYPE | CORONER SEAL | HOSP RPT | No |
| PHYS. EV. | No | EVIDENCE LOG | Yes | PROPERTY? | Yes | HOSP CHART | No |
| SUICIDE NOTE | No | GSR NO | | RCPT. NO. | 233635 | PF NO. | |

| SYNOPSIS |
|---|
| ACCORDING TO THE REPORTED INFORMATION, THE DECEDENT WAS A 38 YEAR OLD BLACK MALE WITH A HISTORY OF HYPERTENSION, SPORTS RELATED KNEE INJURIES, AND ALCOHOL ABUSE. ON 10/15/08 AT 0900 HOURS, THE DECEDENT WAS FOUND LYING ON THE BATHROOM FLOOR, UNRESPONSIVE. 911 WAS CALLED AND LOS ANGELES FIRE DEPARTMENT #3 RESPONDED TO THE SCENE AND DETERMINED DEATH ON 10/15/08 AT 0935 HOURS. DECEDENT APPARENTLY SMOKED TOBACCO HEAVILY AND DRANK ABOUT 1 GALLON OF VODKA DAILY. DECEDENT COMPLAINED OF LABORED BREATHING ON 10/14/08, THE DECEDENT WAS LAST SEEN ALIVE ON 10/14/08 AT 2230 HOURS BY FRIEND. NO FOUL PLAY SUSPECTED. |

| LYDIA GRANADO-MATA | | DATE | 10/15/2008 | REVIEWED BY | | DATE | 10/15/08 |
|---|---|---|---|---|---|---|---|
| S16235 | | TIME | 17:05 | | | TIME | 2013 |
| | INVESTIGATOR | | | | | | |

FORM #3 NARRATIVE TO FOLLOW? ☑



**County of Los Angeles, Department of Coroner**
**Investigator's Narrative**



Case Number: 2008-07210                    Decedent: MIMS, CHRISTOPHER EDDIE

## Information Sources:

1. LAPD Central Division, Officer Suviate #35743 & Miller #39293. 213-485-3294.

## Investigation:

On 10/15/08 at 1039 hours, Officer Miller of LAPD Central Division reported this apparent natural death. On 10/15/08 at 1107 hours, I was assigned this field call. I arrived on scene at 1158 hours and departed at 1326 hours. No foul play suspected. The apartment was secured with a coroner seal.

## Location:

The death occurred at a residence, 612 S. Flower St. Apt. #409, Los Angeles, CA 90017.

## Informant/Witness Statements:

According to the information obtained from Officer Suviate and Miller, the decedent was last seen alive on 10/14/08 at 2230 hours and apparently complained of labored breathing. On 10/15/08 at about 0900 hours, the decedent was found unresponsive on the bathroom floor by a friend. 911 was dialed and Los Angeles Fire Department responded to the scene and determined death at 0935 hours. Per officers, the decedent abused alcohol, drinking about 1 gallon of vodka daily. The decedent reportedly drank to the point of passing out and when he would wake, would continue to drink. The decedent also smoked heavily, going through about 1 pack of cigarettes daily. The decedent's medical history included hypertension and a knee surgery about 7 months ago.

## Scene Description:

The scene was an apartment at the above listed location. The apartment appeared dirty, cluttered, and unkempt. Several medication bottles were located on the kitchen cabinet. Two large bottles of vodka were noted on top of the refrigerator and appeared empty. The decedent was located in the bathroom. The bathroom appeared dirty and contained several large duffle bags. The scene appeared to be void of any illicit drugs and drug paraphernalia.

## Evidence:

On 10/15/08 at 1221 hours, I collected several prescription medication bottles from the scene. I booked the items as evidence at the FSC.

## Body Examination:

The decedent appeared to be a 38 year old Black male. He was observed lying prone on wooden floor inside the bathroom. His arms were bent up at the elbow with his hands closed and resting near his head and his right leg straight with the left leg bent at the knee and turned out at the hip. A brown towel was noted under his head and appeared to be soiled with bloody, frothy purge. He appeared to be dressed in a blue shirt and blue underwear. He appeared to have black hair, brown eyes, beard and mustache and apparent natural teeth. The following tattoos were noted: right arm-"TOUGH AS NAILS", nails with the initials "C. MIMS", right arm- cougar, right wrist-tribal band, left arm-"FAT DOCTOR", "A" playing cards, male face, left arm- "BALLS OF STEEL." I observed healed scars to the knees, abdomen, back, and feet. No petechiea was noted. Lesions/ wounds were noted to the left calf, right shin, and lower right calf. No trauma was noted. On 10/15/08 at 1231 hours, rigor mortis was rated 3 throughout; and at 1234 hours, livor mortis appeared fixed and consistent with the position found. The ambient temperature on 10/15/08 at 1225 hours was 72.3 degrees F, and algor mortis was 101.2 degrees F at 0830 hours 1236 hours.

 

**County of Los Angeles, Department of Coroner**
**Investigator's Narrative**

Case Number:  2008-07210                    Decedent: MIMS, CHRISTOPHER EDDIE

## Identification:

On 10/15/08 at 1306 hours, ███████████ visually identified the decedent as Mims, Christopher Eddie.

## Next of Kin Notification:

Please see case notes.

## Tissue Donation:

At the completion of this report, family did not give permission for tissue donations.

## Autopsy Notification:

There is no request for autopsy notification regarding this particular case.

*L. Granado Mata*

LYDIA GRANADO-MATA        516235

*Kelly Yagerlener*

LARRY DIETZ

10/15/2008

Date of Report

COUNTY OF LOS ANGELES    **PRELIMINARY EXAMINATION REPORT - FIELD**    DEPARTMENT OF CORONER

**6**

WAS ORIGINAL SCENE DISTURBED BY OTHERS?  Y [ ]  N [X]
IF YES, NOTE CHANGES IN NARRATIVE FORM #3.
DATE _____ 10/15/2008 _____

| | | | |
|---|---|---|---|
| AMBIENT #1 | 72.3 F | TIME | 12:25 |
| AMBIENT #2 | F | TIME | |
| WATER | F | TIME | |

LIVER TEMPERATURE #1 _____ 101.2 _ F    TIME ___ 12:36

LIVER TEMPERATURE #2 _____ F    TIME _____

**2008-07210**

**MIMS, CHRISTOPHER EDDIE**
Nat
**DOD- 10/15/2008**

THERMOMETER # ___ 07-17

DATE & TIME FOUND ___ 10/15/2008 @ 9:00 ___    LAST KNOWN ALIVE ___ 10/14/2008 @ 22:30

APPROX. AGE _38_ SEX _Male_ EST. HEIGHT _80_ EST. WEIGHT _456_ CLOTHED ? YES [X] NO [ ] IF YES, DESCRIBE:
Blue Shirt, Blue Underwear

DESCRIPTION AS TO WHERE REMAINS FOUND AND CONTACT MATERIAL TO BODY:
Prone on wood floor

SCENE TEMPERATURE REGULATED? YES [ ]  NO [X] IF YES, THERMOSTAT SET AT _____ DEGREES F.

LIVOR MORTIS: TIME OBSERVED 12:34

RIGOR MORTIS: TIME OBSERVED ___ 12:31

NECK FLEXION:

| | |
|---|---|
| ANTERIOR | 3 |
| POSTERIOR | 3 |
| RT. LATERAL | 3 |
| LT. LATERAL | 3 |

| | | | |
|---|---|---|---|
| JAW | 3 | HIP | 3 |
| SHOULDER | 3 | KNEE | 3 |
| ELBOW | 3 | ANKLE | 3 |
| WRIST | 3 | | |

SCALE
0 = ABSENT / NEGATIVE
1 +
2 +
3 +
4 = EXTREME DEGREE

USE SCALE TO DESCRIBE INTENSITY OF RIGOR

SHADE DIAGRAMS TO ILLUSTRATE THE LOCATION OF LIVOR MORTIS.

DESCRIBE INTENSITY OF COLORATION AND WHETHER LIVOR MORTIS IS PERMANENT OR BLANCHES UNDER PRESSURE

Appeared fixed and
consistent with
position found.

**L. Granado-Mata # 516235**

Investigator    REVIEWED BY:

NOTE: ALL DATA COLLECTED FOR THIS FORM MUST BE COLLECTED AT SCENE.

COUNTY OF LOS ANGELES

MEDICAL EVIDENCE

DEPARTMENT OF CORONER

CASE #: 2008-07210
DECEDENT'S NAME: MIMS, CHRISTOPHER EDDIE
DOD: 10/15/2008
INCOMING MODE:

Page 1 of 1

**3A**

| Drug Name | Rx Number | Date of Issue | Number Issued | Number Remaining | Form | Dosage | Rx Directions | Physician | Pharmacy Phone/ Comments |
|---|---|---|---|---|---|---|---|---|---|
| ALLOPURINOL | 06383 01468 | 9/30/2008 | 30 | 19 | TABLET | 300 MG | 1 TAB DAILY | KALPARI, KAMRAN | RITE AID 213-494-1762 |
| ATENOLOL | 06383 01395 | 7/26/2008 | 90 | 14 | TABLET | 100 MG | 1 TAB DAILY | KALPARI, KAMRAN | RITE AID 213-494-1762 |
| BAYER ASPIRIN | | | 100 | 40 | TABLET | 325 MG | 1-2 TABS EVERY 4 HRS | | OTC MED |
| DIOVAN | | | 7 | 0 | TABLET | 320 MG/25 MG | | | SAMPLE BOTTLE |
| INDOMETHACIN | 05785 05748 | 2/1/2008 | 40 | 3 | CAPSULE | 50 MG | 1 CAP 4X DAILY | KALPARI, KAMRAN | RITE AID 213-494-1762 |
| LOTREL | 06383 01383 | 9/30/2008 | 14 | 0 | CAPSULE | 10-40 MG | 1 CAP DAILY | KALPARI, KAMRAN | RITE AID 213-494-1762 |
| NEXIUM | 063836 0144 | 10/6/2008 | 5 | 0 | CAPSULE | 40 MG | 1 CAP DAILY | KALPARI, KAMRAN | RITE AID 213-494-1762 |
| TYLENOL PM | | | 24 | 0 | TABLET | 500 MG/ 25 MG | 2 CAPLETS @ BEDTIME | | OTC MED |
| | | | | | | | | | |

**Paraphernalia Description**

(1) UNLABELED RX BOTTLE CONTAINING 53 CLEAR GEL CAPS; (2) CEPHALEXIN, 250 MG- ORANGE CAPSULES WITH "93 3147", (2) VALSARTAN, 320 MG- GRAY TEAR DROP SHAPED TABLET WITH "NVR" ON ONE SIDE & "DXL" ON OTHER SIDE.

Investigator:
LYDIA GRANADO-MATA (516235

Date:
10/15/2008

 **CONCUSSION SETTLEMENT**

*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

## NOTICE OF REQUEST FOR ADDITIONAL DOCUMENTS
### DATE OF NOTICE: February 20, 2019
### RESPONSE DEADLINE: June 20, 2019

### I.  SETTLEMENT CLASS MEMBER INFORMATION

| | |
|---|---|
| **Settlement Program ID** | 950012548 |

| | | | | | |
|---|---|---|---|---|---|
| **Name:** | First<br>Robin | | M.I.<br>B | Last<br>Cornish | |

| | |
|---|---|
| **Settlement Class Member Type** | Representative Claimant |
| **Primary Counsel** | O'Hanlon, Demerath & Castillo |

| | | | |
|---|---|---|---|
| **Asserted Qualifying Diagnosis** | Death with CTE (Chronic Traumatic Encephalopathy) | **Date of Asserted Qualifying Diagnosis** | 8/23/08 |

### II.  EXPLANATION OF REQUEST(S)

This Notice is an official communication from the Claims Administrator for the NFL Concussion Settlement Program. Your Claim Package is missing documents or information.

This Notice explains what is missing and what you may do to address the issue. We can help if you have questions. To cure the issues identified in this Notice, click the Respond to Request for Additional Documents button on your secure online portal and follow the instructions provided to upload the information identified below.  If you already have provided us with the missing information, let us know because we may have received it after conducting the review that generated this notice.

The following requires attention before we can act further:

| | **What is Missing** | **How to Address this Item** |
|---|---|---|
| **1.** | You have not submitted any medical records reflecting the Qualifying Diagnosis. | Click the Respond button, go to Section 3 for Medical Records, click on the Upload Medical Records button and follow the instructions to upload medical records reflecting the Qualifying Diagnosis. |

### III.  ADDITIONAL EXPLANATION OF WHAT IS MISSING

The medical records must show a post-mortem diagnosis of CTE made before April 22, 2015 (the Final Approval Date) by a board-certified neuropathologist for a Retired NFL Football Player who died before April 22, 2015.  See Section 6.3 (f) of the Settlement Agreement and FAQ 109.  Mr. Cornish died on August 23, 2008, and the August 24, 2008 autopsy report signed by Marc A. Krouse does not reference CTE and neither does the death certificate.  You provided an undated letter from Dr. Ronald L. Hamilton who diagnosed Mr. Cornish with CTE.  You must establish that Dr. Hamilton reviewed Mr. Cornish's brain tissue and made a CTE diagnosis on or before April 22, 2015.

### IV.  HOW TO RESPOND TO THIS NOTICE

You have 120 days to respond to this Notice and provide the missing information or documents. **We encourage you to gather the requested information or documents now and respond to this Notice promptly, rather than using the full 120 days allowed to answer.  The sooner you respond, the sooner your claim can move forward in the review process.**

By the Response Deadline stated above, send us the missing information or documents identified in Section II.  We will wait the full 120 days to re-review your claim, unless you click the Submit Claim Package for Review button to confirm that your response is complete and we may continue to review your claim.  If you do not respond in full on or before the Response Deadline, we will have to assess your claim based on the materials we have, which could lead to a lower Monetary Award or denial of your claim in its entirety.

Submit the requested information using your secure online portal to upload additional documents.

## V. HOW TO CONTACT US WITH QUESTIONS OR FOR HELP

If you are represented by a lawyer, consult with your lawyer if you have questions or need assistance. If you are unrepresented and have any questions about this Notice or need help, contact us at 1-855-887-3485 or send an email to ClaimsAdministrator@NFLConcussionSettlement.com.  If you are a lawyer, call or email your designated Firm Contact for assistance. For more information about the Settlement program, visit the official website at www.NFLConcussionSettlement.com to read the Frequently Asked Questions or download a copy of the complete Settlement Agreement.



# NFL CONCUSSION SETTLEMENT

*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

## NOTICE OF REQUEST FOR ADDITIONAL DOCUMENTS
### DATE OF NOTICE: February 20, 2019
### RESPONSE DEADLINE: June 20, 2019

### I. SETTLEMENT CLASS MEMBER INFORMATION

| | |
|---|---|
| **Settlement Program ID** | 950013395 |

| | First | M.I. | Last |
|---|---|---|---|
| **Name:** | Carleen | | Hastings |

| | |
|---|---|
| **Settlement Class Member Type** | Representative Claimant |
| **Primary Counsel** | O'Hanlon, Demerath & Castillo |

| **Asserted Qualifying Diagnosis** | Death with CTE (Chronic Traumatic Encephalopathy) | **Date of Asserted Qualifying Diagnosis** | 10/15/08 |
|---|---|---|---|

### II. EXPLANATION OF REQUEST(S)

This Notice is an official communication from the Claims Administrator for the NFL Concussion Settlement Program. Your Claim Package is missing documents or information.

This Notice explains what is missing and what you may do to address the issue. We can help if you have questions. To cure the issues identified in this Notice, click the Respond to Request for Additional Documents button on your secure online portal and follow the instructions provided to upload the information identified below.  If you already have provided us with the missing information, let us know because we may have received it after conducting the review that generated this notice.

The following requires attention before we can act further:

| | **What is Missing** | **How to Address this Item** |
|---|---|---|
| **1.** | You have not submitted any medical records reflecting the Qualifying Diagnosis. | Click the Respond button, go to Section 3 for Medical Records, click on the Upload Medical Records button and follow the instructions to upload medical records reflecting the Qualifying Diagnosis. |

### III. ADDITIONAL EXPLANATION OF WHAT IS MISSING

The medical records must show a post-mortem diagnosis of CTE made before April 22, 2015 (the Final Approval Date) by a board-certified neuropathologist for a Retired NFL Football Player who died before April 22, 2015.  See Section 6.3 (f) of the Settlement Agreement and FAQ 109.  Mr. Mims died on October 15, 2008, and the October 16, 2008 autopsy report signed by Louis A. Pena does not reference CTE and neither does the death certificate.  You provided an undated letter from Dr. Ronald L. Hamilton who diagnosed Mr. Mims with CTE.  You must establish that Dr. Hamilton reviewed Mr Mim's brain tissue and made a CTE diagnosis on or before April 22, 2015.

### IV. HOW TO RESPOND TO THIS NOTICE

You have 120 days to respond to this Notice and provide the missing information or documents. **We encourage you to gather the requested information or documents now and respond to this Notice promptly, rather than using the full 120 days allowed to answer.  The sooner you respond, the sooner your claim can move forward in the review process.**

By the Response Deadline stated above, send us the missing information or documents identified in Section II.  We will wait the full 120 days to re-review your claim, unless you click the Submit Claim Package for Review button to confirm that your response is complete and we may continue to review your claim.  If you do not respond in full on or before the Response Deadline, we will have to assess your claim based on the materials we have, which could lead to a lower Monetary Award or denial of your claim in its entirety.

Submit the requested information using your secure online portal to upload additional documents.

## V. HOW TO CONTACT US WITH QUESTIONS OR FOR HELP

If you are represented by a lawyer, consult with your lawyer if you have questions or need assistance. If you are unrepresented and have any questions about this Notice or need help, contact us at 1-855-887-3485 or send an email to ClaimsAdministrator@NFLConcussionSettlement.com.  If you are a lawyer, call or email your designated Firm Contact for assistance. For more information about the Settlement program, visit the official website at www.NFLConcussionSettlement.com to read the Frequently Asked Questions or download a copy of the complete Settlement Agreement.





# NFL CONCUSSION SETTLEMENT

*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*

No. 2:12-md-02323 (E.D. Pa.)

## NOTICE OF DENIAL OF MONETARY AWARD CLAIM

**DATE OF NOTICE: June 25, 2019**

**DEADLINE TO APPEAL: July 25, 2019**

### I. SETTLEMENT CLASS MEMBER INFORMATION

| Settlement Program ID | 950012548 | | |
|---|---|---|---|

| Name | First<br>Robin | M.I.<br>B | Last<br>Cornish |
|---|---|---|---|

| Settlement Class Member Type | Representative Claimant | | |
|---|---|---|---|
| Law Firm | O'Hanlon, Demerath & Castillo | | |
| Asserted Qualifying Diagnosis | Death with CTE (Chronic Traumatic Encephalopathy) | Date | 8/23/08 |

### II. EXPLANATION OF CLAIM DETERMINATION

This Notice is an official communication from the Claims Administrator for the NFL Concussion Settlement Program. We sent you a Notice of Request for Additional Documents or Notice of Preliminary Review telling you about insufficient documents and/or missing information in your Claim Package. The response deadline on that Notice has expired, or you have responded but did not resolve the issue(s) we told you about, and your claim is denied because it remains incomplete for these reason(s):

| | What was Missing | How We Told You to Address this Item |
|---|---|---|
| 1. | You have not submitted any medical records reflecting the Qualifying Diagnosis. | Click the Respond button, go to Section 3 for Medical Records, click on the Upload Medical Records button and follow the instructions to upload medical records reflecting the Qualifying Diagnosis. |

Section III below explains your right to appeal this denied claim, but you also have the option to submit a new Claim Package under Section 9.1(c)(i) of the Settlement Agreement. We will determine whether the new claim can be considered for a Monetary Award based on several factors, including whether the new claim shows materially changed circumstances from the earlier claim. These materially changed circumstances may include: (a) a different type of Qualifying Diagnosis than the one that was denied; or (b) the same type of Qualifying Diagnosis but with a different diagnosis date supported by additional medical records. If you submit a new claim within 365 days of this denial notice, Section 10.3(d)(ii) of the Settlement Agreement requires us to audit that new claim if it is based on the same Qualifying Diagnosis as this denied claim, but the new diagnosis was made by a different physician.

### III. YOUR RIGHT TO APPEAL THIS DETERMINATION

If you have a good faith belief that the decision to deny your Monetary Award claim is incorrect, you may appeal this determination to the Court under Section 9.5 of the Settlement Agreement. To do so, click the Appeal Denied Claim button on your secure online portal and follow the instructions provided. You must submit supporting evidence to support your appeal. Any written statement may not be more than 10 double-spaced pages. You must do so on or before the Deadline to Appeal stated at the top of this Notice.



If you decide to appeal, the Settlement Agreement requires you to pay an Appeal Fee of $1,000, which you can do using the online PayPal option or by check made payable to the NFL Claims Administrator. This fee will be refunded if your appeal is successful. If you are unable to pay the $1,000 fee, you may make a hardship request to us to waive the fee and will have to submit financial information showing a sufficient hardship.

If paying the $1,000 Appeal Fee by check, mail the check to the address below.

NFL Concussion Settlement
Claims Administrator
P.O. Box 25369
Richmond, VA  23260

The Special Master appointed by the Court will decide your appeal based upon a showing by you of clear and convincing evidence. The Special Master's factual determinations will be final and binding, but you or Co-Lead Class Counsel or the NFL Parties may object to any of the Special Master's conclusions of law, which will then be subject to de novo (*i.e.*, a new) review by the Court.

If an appeal is not submitted on or before the deadline stated at the top of this Notice, the determination in this Notice will become final.

## IV. CO-LEAD CLASS COUNSEL'S RIGHT TO APPEAL THIS DETERMINATION

Section 9.5 of the Settlement Agreement also gives Co-Lead Class Counsel the right to challenge our decision to deny your Monetary Award claim. If Co-Lead Class Counsel chooses to appeal, it must do so by the Deadline to Appeal stated at the top of this Notice and must provide a written copy of its Appeals Form and any supporting evidence to you, the NFL Parties, and us.

If an appeal is taken by you or Co-Lead Class Counsel, the NFL Parties may submit a written opposition (not to exceed 10 double-spaced pages) no later than 30 days after receipt of the Appeals Form. The party taking the appeal is not permitted to submit a reply.

Co-Lead Class Counsel may also submit a written statement (not to exceed 10 double-spaced pages) in response to your appeal no later than 15 days after receipt of the Appeals Form, and you and the NFL Parties may each submit a reply to any such submission by Co-Lead Class Counsel.

## V. HOW TO CONTACT US WITH QUESTIONS OR FOR HELP

If you are represented by a lawyer, consult with your lawyer if you have questions or need assistance. If you are unrepresented and have any questions about this Notice or need help, contact us at 1-855-887-3485 or send an email to ClaimsAdministrator@NFLConcussionSettlement.com. If you are a lawyer, call or email your designated Firm Contact for assistance. For more information about the Settlement program, visit the official website at www.NFLConcussionSettlement.com to read the Frequently Asked Questions or download a copy of the complete Settlement Agreement.



**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| IN RE: NATIONAL FOOTBALL | § | No. 2:12-md-02323-AB |
| LEAGUE PLAYERS' CONCUSSION | § | |
| INJURY LITIGATION | § | MDL No. 2323 |
| | § | |
| | § | **Hon. Anita B. Brody** |
| THIS DOCUMENT RELATES TO: | § | |
| Settlement Class Member Robin B. Cornish | § | |
| (SPID 950012548) | § | |

**WRITTEN STATEMENT IN SUPPORT OF CLASS MEMBER'S APPEAL**
**OF THE CLAIMS ADMINISTRATOR'S NOTICE OF DENIAL OF**
**MONETARY AWARD CLAIM**

Class Member Robin B. Cornish, by and through counsel, files this written statement in support of this appeal and respectfully requests that the Claims Administrator's denial of this claim be reversed and remanded for a calculation of the Class Member's Monetary Award because the Claims Administrator erred in concluding that the Amended Settlement Agreement required Class Member to submit proof that the board-certified neuropathologist who provided a post-mortem diagnosis of CTE made the diagnosis on or before 4/22/15.[1]

---

[1]    If the Amended Settlement Agreement [ECF 6481] is construed to require a diagnosis on or before 4/22/15, Class Member reserves the right to seek relief from the Court pursuant to both Rule 60 and the Court's inherent authority to amend the judgment in this case in order to implement the settlement.

## **SUPPORTING EVIDENCE**[2]

Exhibit 1          Notice of Denial of Monetary Award Claim

Exhibit 2          Relevant Excerpts from Class Member's Claim Package

Exhibit 3          Notice of Request for Additional Documents

Exhibit 4          Letter dated May 6, 2019 to Claims Administrator regarding Class
                   Member's claim

---

[2]   Class Member also incorporates by reference the following documents that have been filed in this MDL
or published on the Settlement Website:

(1) Original Settlement Agreement [ECF 6073-2];

(2) the Amended Settlement Agreement [ECF 6481];

(3) Absent Class Member and Plaintiff Yvonne Sagapolutele's Motion to Modify the Amended Final
    Order and Judgment [ECF 6534] by Conforming the Definition of "Death with CTE" to the Version
    Contemplated in the Fairness Hearing Order [ECF 6479] and Noticed to the Class in the Long Form
    Notice [ECF 6093-1] and Summary Notice [ECF 6093-2] Pursuant to Rule 60 and the Authority
    Retained in the Settlement Agreement [ECF 8263] ("Motion to Modify");

(4) Response in Opposition to the Motion to Modify [ECF 8430];

(5) Statement of Co-Lead Counsel in Opposition to the Motion to Modify [ECF 8431];

(6) Reply in Support of Motion to Modify [ECF 8442];

(7) Notice of Joinder [ECF 8443];

(8) Order denying, without prejudice, the Motion to Modify [ECF 8557];

(9) Posted Settlement Program FAQs (as of February 19, 2019); and

(10) Posted Settlement Program FAQs (as of July 8, 2019).

### BACKGROUND

Class Member submitted a claim package that included a post-mortem diagnosis of Chronic Traumatic Encephalopathy ("CTE") made by Dr. Hamilton, a board-certified neuropathologist.[3] Class Member's submitted claim package also includes documentation showing that the Player died prior to April 22, 2015.[4]  The claim package includes an autopsy report, death certificate, and letter from Dr. Hamilton describing his diagnosis of CTE based on brain tissue slides from the Tarrant County Medical Examiner.

The Claims Administrator initially requested additional documents, stating: "You have not submitted any medical records reflecting the Qualifying Diagnosis."[5]  The Claims Administrator further explained the following:

> The medical records must show a post-mortem diagnosis of CTE made before April 22, 2015 (the Final Approval Date) by a board-certified neuropathologist for a Retired NFL Football Player who died before April 22, 2015.  See Section 6.3(f) of the Settlement Agreement and FAQ 109.  Mr. Cornish died on August 23, 2008, and the August 24, 2008 autopsy report signed by Marc A. Krouse does not reference CTE and neither does the death certificate.  You provided an undated letter from Dr. Ronald L. Hamilton who diagnosed Mr. Cornish with CTE.  You must establish that Dr. Hamilton reviewed Mr. Cornish's brain tissue and made a CTE diagnosis on or before April 22, 2015.

In a correspondence dated May 6, 2019, Class Member's counsel explained that FAQ 109 must be read in conjunction with FAQ 93, which states that the diagnosis date for a Death with CTE diagnosis is "the date of the Player's death, even though the diagnosis is

---

[3]    Exhibit 2.

[4]    *Id.*

[5]    Exhibit 3

not made until after the Player dies."[6]

Despite this response, the Claims Administrator denied Class Member's Monetary Award Claim.[7]  Class Member has timely filed this appeal of the Claims Administrator's Notice of Denial of Monetary Award Claim.

## **ARGUMENTS**

The Claims Administrator denied Class Member's claim because the claim package does not show that Dr. Hamilton (a board-certified neuropathologist) "reviewed Mr. Cornish's brain tissue and made a CTE diagnosis on or before April 22, 2015."

## I. **The Claims Administrator erred in concluding that the CTE Diagnosis was not timely.**

The Claims Administrator's reason for denying the claim is legally flawed in two respects. First, the diagnosis date for Death with CTE is the date of the Player's death, even if the diagnosis occurs later.  Second, if the Amended Settlement Agreement [ECF 6481] does require that the diagnosis be made prior to 4/22/2015, this requirement violates Class Member's rights because it was not contained in the Original Settlement Agreement [ECF 6073-20] and was added (1) despite the Court's instructions that any changes to the Original Settlement Agreement should make it *more* favorable, not *less* favorable, to class members; (2) without notice to Class Member; and (3) after Class Member's opt-out deadline had already passed.

### A. **The diagnosis date for Death with CTE is the date of the Player's death.**

The Claims Administrator has posted several versions of "Posted Settlement Program FAQs" on the Settlement Website with answers to frequently asked questions.  All of the content in the

---

[6]   *See* Exhibit 4.

[7]   Exhibit 1.

Posted Settlement Program FAQs is subject to advance approval by Counsel for the NFL Parties.[8]

According to FAQ 93 in these Posted Settlement Program FAQs, the diagnosis date for Death with CTE is the date of the Player's death, even though the diagnosis is not made until after the Player dies:[9]

> **93. How is the date of a Qualifying Diagnosis determined?**
>
> The physician making a Qualifying Diagnosis of a Retired NFL Football Player must determine and verify the date on which that Qualifying Diagnosis was made. This date is important under the Settlement Agreement. It affects the amount of a Monetary Award, because the younger a Player is at the time of the Qualifying Diagnosis, the larger the award.
>
> The diagnosing physician uses his or her professional medical judgment in deciding when the Player had the conditions amounting to a Qualifying Diagnosis under Exhibit 1 to the Settlement Agreement. There are some basic rules about this:
>
> (a) *Death with CTE*: For these claims, the date of the Qualifying Diagnosis is the date of the Player's death, even though the diagnosis is not made until after the Player dies. The Monetary Award is based on the Player's age when he died.

Based on the Claims Administrator's representations to the class members that the date of the Qualifying Diagnosis for Death With CTE is the date of the Player's death, the only date that is relevant in determining the date of a Qualifying Diagnosis for Death with CTE is the date of the Player's death. The Claims Administrator's insistence on proof that the diagnosis "was done on or before 4/22/15" ignores these representations, which establish that the date of the Player's death is the date of the Qualifying Diagnosis.

Here, the claim package establishes that the Player's death occurred before April 22, 2015.

---

[8]    *See* Amended Settlement Agreement § 4.1(a).

[9]    This language is from the Posted Settlement Program FAQs (as of February 19, 2019). Since this claim package was submitted, a new version of the FAQs have been published on the Settlement Website in the Posted Settlement Program FAQs (as of July 8, 2019). The language in FAQ 93 is unchanged in the new version of Posted Settlement Program FAQs; it has merely been moved to FAQ 99.

Accordingly, the date of the Qualifying Diagnosis is before April 22, 2015, and the Claims Administrator erred in denying this claim.

> **B. In the alternative, if this Denial is based on language that was surreptitiously added to the Settlement Agreement putatively imposing a deadline for a Qualifying Diagnosis for Death with CTE, the Denial must reversed.**

The Court has previously considered a Motion to Modify the Amended Final Order and Judgment [ECF 8263] and denied the motion without prejudice to a consideration of the issues in that motion at a later time.[10]  In that motion, Class Member Yvonne Sagapolutele brought the Court's attention to the fact that although the Original Settlement Agreement contained no deadline for obtaining a Death with CTE Diagnosis, language appears to have been surreptitiously added to the Amended Settlement Agreement that could be read to have added a diagnosis deadline without notice to the Court or to the class members.[11]  The motion sought relief under both Rule 60 and the Court's inherent authority to implement the settlement by amending the Court's judgment.[12]

The Court denied the motion without prejudice and stated that before it would consider the "extraordinary action of modifying the Settlement Agreement," class members must first submit a claim to the Claims Administrator.[13]

If the Special Master concludes that the Amended Settlement Agreement does require Class Member to have obtained a CTE diagnosis prior to April 22, 2015 despite the contrary language

---

[10]   *See* Order [ECF 8557]

[11]   Motion to Modify [ECF 8263]

[12]   *Id.*

[13]   Order [ECF 8557]

in the Posted Settlement Program FAQs and in other notices, it does not appear that the Special Master would have the necessary authority to provide a remedy.[14]  To the extent the Special Master may have the authority to provide a remedy, Class Member incorporates by reference the arguments in the Motion to Modify [ECF 8263].  If the denial of this claim is not reversed, Class Member expressly reserves the right to seek appropriate relief from the Court under Rule 60 and under the Court's inherent authority to implement the settlement by amending the Court's judgment.

## CONCLUSION

For all of the foregoing reasons, Class Member respectfully requests that the Special Master reverse the Claims Administrator's denial of this Monetary Award Claim and remand to the Claims Administrator for a calculation of the Monetary Award.


Dated:  July 12, 2019

Respectfully Submitted:

/s/ Justin Demerath

**Justin Demerath**
Texas State Bar No. 24034415
**David Campbell**
Texas State Bar No. 24057033
O'HANLON, DEMERATH & CASTILLO
808 West Avenue |  Austin, TX 78701
Tel: (512) 494-9949  |  Fax: (512) 494-9919
jdemerath@808west.com
dcampbell@808west.com

**Counsel for Class Member**

---

[14]  *See* Order [ECF 6871] (providing Special Masters with the authority to faithfully oversee the implementation and administration of the Settlement Agreement); *see also* Motion to Modify [ECF 8263] (seeking relief under Rule 60).

**CERTIFICATE OF SERVICE**

It is hereby certified that a true copy of the foregoing document was submitted on the Court

Portal on the 12th day of July, 2019.

/s/ Justin B. Demerath_____
Justin B. Demerath



# NFL CONCUSSION SETTLEMENT

*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

## NOTICE OF DENIAL OF MONETARY AWARD CLAIM
### DATE OF NOTICE: **June 25, 2019**
### DEADLINE TO APPEAL: **July 25, 2019**

### I. SETTLEMENT CLASS MEMBER INFORMATION

| | |
|---|---|
| **Settlement Program ID** | 950012548 |

| **Name** | First<br>Robin | M.I.<br>B | Last<br>Cornish |
|---|---|---|---|

| | |
|---|---|
| **Settlement Class Member Type** | Representative Claimant |
| **Law Firm** | O'Hanlon, Demerath & Castillo |

| **Asserted Qualifying Diagnosis** | Death with CTE (Chronic Traumatic Encephalopathy) | **Date** | 8/23/08 |
|---|---|---|---|

### II. EXPLANATION OF CLAIM DETERMINATION

This Notice is an official communication from the Claims Administrator for the NFL Concussion Settlement Program. We sent you a Notice of Request for Additional Documents or Notice of Preliminary Review telling you about insufficient documents and/or missing information in your Claim Package. The response deadline on that Notice has expired, or you have responded but did not resolve the issue(s) we told you about, and your claim is denied because it remains incomplete for these reason(s):

| | **What was Missing** | **How We Told You to Address this Item** |
|---|---|---|
| **1.** | You have not submitted any medical records reflecting the Qualifying Diagnosis. | Click the Respond button, go to Section 3 for Medical Records, click the Upload Medical Records button and follow the instructions to upload medical records reflecting the Qualifying Diagnosis. |

Section III below explains your right to appeal this denied claim, but you also have the option to submit a new Claim Package under Section 9.1(c)(i) of the Settlement Agreement. We will determine whether the new claim can be considered for a Monetary Award based on several factors, including whether the new claim shows materially changed circumstances from the earlier claim. These materially changed circumstances may include: (a) a different type of Qualifying Diagnosis than the one that was denied; or (b) the same type of Qualifying Diagnosis but with a different diagnosis date supported by additional medical records. If you submit a new claim within 365 days of this denial notice, Section 10.3(d)(ii) of the Settlement Agreement requires us to audit that new claim if it is based on the same Qualifying Diagnosis as this denied claim, but the new diagnosis was made by a different physician.

### III. YOUR RIGHT TO APPEAL THIS DETERMINATION

If you have a good faith belief that the decision to deny your Monetary Award claim is incorrect, you may appeal this determination to the Court under Section 9.5 of the Settlement Agreement. To do so, click the Appeal Denied Claim button on your secure online portal and follow the instructions provided. You must submit supporting evidence to support your appeal. Any written statement may not be more than 10 double-spaced pages. You must do so on or before the Deadline to Appeal stated at the top of this Notice.



If you decide to appeal, the Settlement Agreement requires you to pay an Appeal Fee of $1,000, which you can do using the online PayPal option or by check made payable to the NFL Claims Administrator. This fee will be refunded if your appeal is successful. If you are unable to pay the $1,000 fee, you may make a hardship request to us to waive the fee and will have to submit financial information showing a sufficient hardship.

If paying the $1,000 Appeal Fee by check, mail the check to the address below.

    NFL Concussion Settlement
    Claims Administrator
    P.O. Box 25369
    Richmond, VA  23260

The Special Master appointed by the Court will decide your appeal based upon a showing by you of clear and convincing evidence. The Special Master's factual determinations will be final and binding, but you or Co-Lead Class Counsel or the NFL Parties may object to any of the Special Master's conclusions of law, which will then be subject to de novo (*i.e.*, a new) review by the Court.

If an appeal is not submitted on or before the deadline stated at the top of this Notice, the determination in this Notice will become final.

## IV. CO-LEAD CLASS COUNSEL'S RIGHT TO APPEAL THIS DETERMINATION

Section 9.5 of the Settlement Agreement also gives Co-Lead Class Counsel the right to challenge our decision to deny your Monetary Award claim. If Co-Lead Class Counsel chooses to appeal, it must do so by the Deadline to Appeal stated at the top of this Notice and must provide a written copy of its Appeals Form and any supporting evidence to you, the NFL Parties, and us.

If an appeal is taken by you or Co-Lead Class Counsel, the NFL Parties may submit a written opposition (not to exceed 10 double-spaced pages) no later than 30 days after receipt of the Appeals Form. The party taking the appeal is not permitted to submit a reply.

Co-Lead Class Counsel may also submit a written statement (not to exceed 10 double-spaced pages) in response to your appeal no later than 15 days after receipt of the Appeals Form, and you and the NFL Parties may each submit a reply to any such submission by Co-Lead Class Counsel.

## V. HOW TO CONTACT US WITH QUESTIONS OR FOR HELP

If you are represented by a lawyer, consult with your lawyer if you have questions or need assistance. If you are unrepresented and have any questions about this Notice or need help, contact us at 1-855-887-3485 or send an email to ClaimsAdministrator@NFLConcussionSettlement.com. If you are a lawyer, call or email your designated Firm Contact for assistance. For more information about the Settlement program, visit the official website at www.NFLConcussionSettlement.com to read the Frequently Asked Questions or download a copy of the complete Settlement Agreement.



 **CONCUSSION SETTLEMENT**

*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

## CLAIM FORM SIGNATURE ACKNOWLEDGEMENT FORM

If you completed your Claim Form using your Portal, you must submit this Claim Form Signature Acknowledgement Form with the Personal Signature of the Settlement Class Member identified in Section I who is submitting the claim for a Monetary Award.

## I. SETTLEMENT CLASS MEMBER & CLAIM FORM INFORMATION

| Settlement Program ID | 950012548 | | | | |
|---|---|---|---|---|---|
| **Name** | First<br>Robin | M.I.<br>B | Last<br>Cornish | | Suffix |

## II. PERSONAL SIGNATURE

**By signing below, I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that all information provided in the Claim Form submitted through the Secure Portal, and in any of its attachments, is true and correct to the best of my knowledge, information, and belief.**

| Signature | | Date | |0 |2 |/|0 |5 |/|2 |0 |1 |9 |<br>(Month/Day/Year) |
|---|---|---|---|

## III. HOW TO SUBMIT THIS SIGNATURE ACKNOWLEDGEMENT FORM

After printing this form, the Settlement Class Member must sign in the Personal Signature box above. Scan and upload the signed document using the Upload Signed Signature Acknowledgement Form button on the Claim Package Page of your Portal. If you are unable to scan the form, you may return the signed form through either of the following options:

| **By Mail:** | NFL Concussion Settlement<br>Claims Administrator<br>P.O. Box 25369<br>Richmond, VA 23260 |
|---|---|
| **By FedEx/UPS:** | NFL Concussion Settlement<br>c/o BrownGreer PLC<br>250 Rocketts Way<br>Richmond, VA 23231 |

 **CONCUSSION SETTLEMENT**

*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*

No. 2:12-md-02323 (E.D. Pa.)

## NFL CONCUSSION SETTLEMENT CLAIM FORM
## FOR RETIRED NFL FOOTBALL PLAYERS AND REPRESENTATIVE CLAIMANTS

Complete this Claim Form if you are a **Retired NFL Football Player** or the **Representative Claimant** of a Retired NFL Football Player and want to apply for a Monetary Award under the NFL Concussion Settlement Program. You must fill out Section II only if you are a **Representative Claimant.**

**Your Claim Package must be submitted to the Claims Administrator no later than two years after the date that you received your Qualifying Diagnosis or within two years after February 6, 2017, whichever is later. Failure to meet this deadline will preclude you from receiving a Monetary Award for that Qualifying Diagnosis unless you can: (1) show substantial hardship (beyond the Qualifying Diagnosis) that prevented your compliance; and (2) submit the Claim Package within two years of the missed deadline.**

Certain Claim Packages may be selected for audit pursuant to Section 10.3 of the Settlement Agreement. If your claim is selected for audit, you may be required to submit additional records or information now or in the future. You are required to preserve all such additional records in your possession, custody or control and to instruct your healthcare providers to preserve such records that may be requested under Section 10.3(e) of the Settlement Agreement. These documents include but are not limited to historical medical records related to the underlying medical condition that is the basis for the Qualifying Diagnosis. Unreasonable failure to preserve, and later provide upon request, such records and information will result in the claim being denied without the right to an appeal.

## I. RETIRED NFL FOOTBALL PLAYER INFORMATION

Enter only the **Retired NFL Football Player's** information in this Section I.

| Settlement Program ID | 950012548 | | | |
|---|---|---|---|---|
| **Player Name** | First<br>Frank | M.I. | Last<br>Cornish | Suffix |
| **Player Date of Birth** | | Sep / 24 / 1967<br>(Month/Day/Year) | | |
| **Player Date of Death (if applicable)** | | Aug / 23 / 2008<br>(Month/Day/Year) | | |
| **Player Social Security Number** | | 340 - 72 - 4068 | | |

| **Player Mailing Address** | Address 1 | |
|---|---|---|
| | Address 2 | |
| | City | |
| | State/Province | |
| | Postal Code | Country<br>United States |

| **Player Telephone** | _____ - _____ - _____ | **Player Email Address** | |
|---|---|---|---|

| NFL CONCUSSION SETTLEMENT CLAIM FORM<br>FOR RETIRED NFL FOOTBALL PLAYERS AND REPRESENTATIVE CLAIMANTS | | | |
|---|---|---|---|
| **II. REPRESENTATIVE CLAIMANT INFORMATION** | | | |

If you are a **Representative Claimant** of a Retired NFL Football Player who is deceased, or legally incapacitated or incompetent, fill out this Section II with your own information.

| **Representative Name** | First<br>Robin | M.I.<br>B | Last<br>Cornish | Suffix |
|---|---|---|---|---|
| **Representative Date of Birth** | | Sep / 17 / 1969<br>(Month/Day/Year) | | |
| **Representative Social Security Number** | | 354 - 60 - 9187 | | |

| **Representative Mailing Address** | Address 1<br>2213 Frio Dr. | |
|---|---|---|
| | Address 2 | |
| | City<br>Keller | |
| | State/Province<br>TX | |
| | Postal Code<br>76248 | Country<br>United States |

| **Representative Telephone** | 817 - 845 - 9445 | **Representative Email Address** | rbc0917@verizon.net |
|---|---|---|---|

| **III. ATTORNEY INFORMATION** | | | |
|---|---|---|---|

If you are represented by an attorney, enter the attorney's information in this Section III.

| **Attorney Name** | First<br>Justin | M.I.<br>B | Last<br>Demerath | Suffix |
|---|---|---|---|---|
| **Law Firm Name** | O'Hanlon, Demerath & Castillo | | | |

| **Law Firm Mailing Address** | Address 1<br>808 West Avenue | |
|---|---|---|
| | Address 2 | |
| | City<br>Austin | |
| | State/Province<br>TX | |
| | Postal Code<br>78701 | Country<br>United States |

| **Attorney Telephone** | ___ - ___ - ___ | **Attorney Email Address** | jdemerath@808west.com |
|---|---|---|---|

| **IV. QUALIFYING DIAGNOSIS/ES** | | | |
|---|---|---|---|

## NFL CONCUSSION SETTLEMENT CLAIM FORM
## FOR RETIRED NFL FOOTBALL PLAYERS AND REPRESENTATIVE CLAIMANTS

Check the Qualifying Diagnosis/es for which the Retired NFL Football Player seeks an award and provide the date of each diagnosis and his State of Domicile at the time of that diagnosis. If the Retired NFL Football Player was diagnosed with either Level 1.5 or Level 2 Neurocognitive Impairment through the Baseline Assessment Program ("BAP"), you must provide the name of **both** the diagnosing neuropsychologist and the diagnosing board-certified neurologist.

| Qualifying Diagnosis/es | Date of Diagnosis/es | State of Domicile at Time of Diagnosis |
|---|---|---|
| ☐  Level 1.5 Neurocognitive Impairment | -- / -- / ---- <br> (Month/Day/Year) | _____ <br> (State) |

**Diagnosing medical professional:**

| Name | First | M.I. | Last | Suffix |
|---|---|---|---|---|
| | | | | |

**Second diagnosing medical professional (if diagnosis was made through the BAP):**

| Name | First | M.I. | Last | Suffix |
|---|---|---|---|---|
| | | | | |

| | | |
|---|---|---|
| ☐  Level 2 Neurocognitive Impairment | -- / -- / ---- <br> (Month/Day/Year) | _____ <br> (State) |

**Diagnosing medical professional:**

| Name | First | M.I. | Last | Suffix |
|---|---|---|---|---|
| | | | | |

**Second diagnosing medical professional (if diagnosis was made through the BAP):**

| Name | First | M.I. | Last | Suffix |
|---|---|---|---|---|
| | | | | |

| | | |
|---|---|---|
| ☐  Alzheimer's Disease | -- / -- / ---- <br> (Month/Day/Year) | _____ <br> (State) |

**Diagnosing medical professional:**

| Name | First | M.I. | Last | Suffix |
|---|---|---|---|---|
| | | | | |

| | | |
|---|---|---|
| ☐  Parkinson's Disease | -- / -- / ---- <br> (Month/Day/Year) | _____ <br> (State) |

**Diagnosing medical professional:**

| Name | First | M.I. | Last | Suffix |
|---|---|---|---|---|
| | | | | |

| | | |
|---|---|---|
| ☐  ALS (Amyotrophic Lateral Sclerosis, or "Lou Gehrig's Disease") | -- / -- / ---- <br> (Month/Day/Year) | _____ <br> (State) |

**Diagnosing medical professional:**

| Name | First | M.I. | Last | Suffix |
|---|---|---|---|---|
| | | | | |

| | | |
|---|---|---|
| ☒  Death with CTE (Chronic Traumatic Encephalopathy) | Aug / 23 / 2008 <br> (Month/Day/Year) | TX <br> (State) |

## NFL CONCUSSION SETTLEMENT CLAIM FORM
## FOR RETIRED NFL FOOTBALL PLAYERS AND REPRESENTATIVE CLAIMANTS

**Diagnosing medical professional:**

| Name | First<br>Ronald | M.I.<br>L. | Last<br>Hamilton | Suffix |
|------|-----------------|------------|------------------|--------|

## V. ADDITIONAL MEDICAL INFORMATION

### A. Stroke

Was the Retired NFL Football Player diagnosed as having suffered a Stroke before the Qualifying Diagnosis identified in Section V?  A medically diagnosed Stroke does not include a transient cerebral ischemic attack and related syndromes.

☐ **YES**   If you answered Yes, provide additional information about the Stroke.  Then go to Section VI. B.

☒ **NO**    If you answered No, go to Section VI. B.

| **Date of Stroke** | -- /  -- / ----<br>(Month/Day/Year) |
|--------------------|-------------------------------------|

**Medical professional who diagnosed the Stroke:**

| Name | First | M.I. | Last | Suffix |
|------|-------|------|------|--------|

☐    Check here if you believe that the Qualifying Diagnosis for which you are claiming a Monetary Award is not causally related to the prior Stroke and you are submitting records and other evidence supporting this position.  If you provide information regarding a prior Stroke but do not check this box, we will apply an Offset, which will result in a 75% reduction of any Monetary Award.

### B. Traumatic Brain Injury

Was the Retired NFL Football Player diagnosed as having suffered a *severe* traumatic brain injury unrelated to NFL Football play that occurred during or after the time he played NFL Football and before the Qualifying Diagnosis identified in Section V?  A severe traumatic brain injury is one that caused the Retired NFL Football Player to lose consciousness for more than 24 hours.

☐ **YES**   If you answered Yes, provide additional information about the Traumatic Brain Injury.  Then go to Section VII.

☒ **NO**    If you answered No, go to Section VII.

| **Date of Traumatic Brain Injury** | -- /  -- / ----<br>(Month/Day/Year) |
|------------------------------------|-------------------------------------|

**Medical professional who diagnosed the Traumatic Brain Injury:**

| Name | First | M.I. | Last | Suffix |
|------|-------|------|------|--------|

☐    Check here if you believe that the Qualifying Diagnosis for which you are claiming a Monetary Award is not causally related to the Traumatic Brain Injury and you are submitting records and other evidence supporting this position.  If you provide information regarding a Traumatic Brain Injury but do not check this box, we will apply an Offset, which will result in a 75% reduction of any Monetary Award.

## VI. MEDICARE, MEDICAID AND OTHER LIEN INFORMATION

## NFL CONCUSSION SETTLEMENT CLAIM FORM
## FOR RETIRED NFL FOOTBALL PLAYERS AND REPRESENTATIVE CLAIMANTS

As set forth in Article XI of the Settlement Agreement, the Lien Resolution Administrator, with assistance from the Claims Administrator, is administering the process for the identification, verification, and satisfaction of Liens that may be withheld or asserted against your Monetary Award.  If you or the Lien Resolution Administrator identifies a potential Lien asserted against your Monetary Award and the Lien Resolution Administrator confirms the validity and final amount of such Lien(s), we are required to deduct those amounts from your Monetary Award along with any other deductions required by state or federal law.

Are you aware of a potential Lien that could be asserted against your Monetary Award?

☐ **YES**  If you answered Yes, fill out the appropriate questions in this Section VI.  Then go to Section VII.

☒ **NO**  If you answered No, go to Section VII.

### A. Medicare

1. If the Retired NFL Football Player is now enrolled, or has been enrolled at any time, in Medicare Part A or Medicare Part B program(s), provide the following information.

   HICN (Medicare Claim #):

   Enrollment date: _____ -- / _____ -- / _____ ----
   (Month/Day/Year)

2. If the Retired NFL Football Player is now enrolled, or has been enrolled at any time, in a Medicare Part C program (for example, a Medicare Advantage, Medicare cost, Medicare healthcare prepayment plan benefits, or similar Medicare plan administered by private entities), provide the following information.

   Name of plan:

   Member number for plan:

   Enrollment date: _____ -- / _____ -- / _____ ----
   (Month/Day/Year)

3. If the Retired NFL Football Player is now enrolled, or has been enrolled at any time, in a Medicare Part D program (prescription drug benefits), provide the following information.

   Name of Medicare Part D Plan:

   Member number of Medical Part D Plan:

   Enrollment date: _____ -- / _____ -- / _____ ----
   (Month/Day/Year)

### B. Medicaid

1. If the Retired NFL Football Player is currently enrolled in a state Medicaid Program, provide the following information.

   Medical ID number:

   State of Issuance:

   Enrollment date: _____ -- / _____ -- / _____ ----
   (Month/Day/Year)

| NFL CONCUSSION SETTLEMENT CLAIM FORM |
| :---: |
| **FOR RETIRED NFL FOOTBALL PLAYERS AND REPRESENTATIVE CLAIMANTS** |

2. If the Retired NFL Football Player has been enrolled in any other state Medicaid Program at any time, provide the following information.

Medical ID number:

State of Issuance:

Enrollment date:  _____ -- ____ / ____ -- ____ / ____ ----
          (Month/Day/Year)

| **C. Department of Veterans Affairs, TRICARE, or Indian Health Service** |
| :---: |

Check any of the following federal healthcare programs that the Retired NFL Football Player has enrolled in or has been entitled to receive benefits from at any time.  If you check any of the programs below, provide the required information about each program.

☐  **Department of Veterans Affairs healthcare or prescription drug benefits**

Claim Number:

_____

Enrollment Date:  ____ -- ___ / ___ -- ___ / ___ ----     **TO**     ____ -- ___ / ___ -- ___ / ___ ----
          (Month/Day/Year)                    (Month/Day/Year)

Branch: _____

Sponsor: _____

Sponsor SSN: _____ - _____ - _____

Treating Facility: _____

☐  **TRICARE health care or prescription drug benefits**

Claim Number:

_____

Enrollment Date:  ____ -- ___ / ___ -- ___ / ___ ----     **TO**     ____ -- ___ / ___ -- ___ / ___ ----
          (Month/Day/Year)                    (Month/Day/Year)

Branch: _____

Sponsor: _____

Sponsor SSN: _____ - _____ - _____

Treating Facility: _____

☐  **Indian Health Service healthcare or prescription drug benefits**

Claim Number:

_____

Enrollment Date:  ____ -- ___ / ___ -- ___ / ___ ----     **TO**     ____ -- ___ / ___ -- ___ / ___ ----
          (Month/Day/Year)                    (Month/Day/Year)

Branch: _____

Sponsor: _____

Sponsor SSN: _____ - _____ - _____

## NFL CONCUSSION SETTLEMENT CLAIM FORM
### FOR RETIRED NFL FOOTBALL PLAYERS AND REPRESENTATIVE CLAIMANTS

Tribe: _____

Treating Facility: _____

### D. Other Governmental Payor

If at any time the Retired NFL Football Player was entitled to receive medical items, services, and/or prescription drugs from any federal, state, or other governmental body, agency, department, plan, program, or entity that administers, funds, pays, contracts for, or provides medical items, services, and/or prescription drugs not previously listed above, provide the following information.

Name of Plan/Entity:
_____

Policyholder Name:
_____

Policy Number:
_____

Medical Condition Covered by Plan/Entity: _____

### E. Private Healthcare Insurance

If the Retired NFL Football Player has received medical treatment for the Qualifying Diagnosis/es that was covered by a private healthcare insurance plan or other form of payment, provide the following information for every such plan or entity.

Name of Plan/Entity:
_____

Policyholder Name:
_____

Policy Number:
_____

Medical Condition Covered by Plan/Entity: _____

### F.  Other Lien Information

Identify any known Lien of any nature whatsoever not identified above. Such a lien may include, without limitation, any mortgage, lien, pledge, charge, security interest, or legal encumbrance held by any person or entity (such as an attorney, child support agency, federal or state tax agency, or judgment creditor), where that person or entity may be legally entitled to a share of any Monetary Award that you may receive.

You must also attach to this Claim Form a copy of the letter, form, or writing from such person or entity informing you of this Lien.

Name of Lienholder: _____

Amount of Lien: $_____  ,  _____  .  _____

Contact Information for Lienholder: _____

Nature of Lien: _____

**NFL CONCUSSION SETTLEMENT CLAIM FORM
FOR RETIRED NFL FOOTBALL PLAYERS AND REPRESENTATIVE CLAIMANTS**

## VII. BANKRUPTCY INFORMATION

Has the Retired NFL Football Player ever been a debtor in a bankruptcy proceeding?

☒ **YES**    If you answered Yes, provide additional information about the bankruptcy proceeding.  Then go to Section IX.

☐ **NO**    If you answered No, go to Section IX.

U.S. Bankruptcy Court,                      <u>    unknown    </u>                 District of              <u>    unknown    </u>
                                                                (District Name)                                                                      (District Name)

Case Number:  <u>    ?    </u> – <u>    ?    </u>

Chapter:      ☒    Chapter 7        ☐    Chapter 11        ☐    Chapter 12        ☐    Chapter 13

Date bankruptcy was filed:                                        <u>    Jan    </u> / <u>    1    </u> / <u>    2004    </u>
                                                                                                                        (Month/Day/Year)

If closed, date bankruptcy was closed:                    <u>    Jan    </u> / <u>    1    </u> / <u>    2013    </u>
                                                                                                                        (Month/Day/Year)

## VIII. RELEASE

As more fully set forth in the Settlement Agreement, all Settlement Class Members, among others including you, have released the National Football League, NFL Properties LLC and any Member Club, among others, from all claims and liabilities arising out of, or relating to, the allegations in the Class Action Complaint and other similar lawsuits.  In addition, as more fully set forth in the Settlement Agreement, all Settlement Class Members have promised not to commence, and to withdraw and seek dismissal of, any litigation or other proceeding asserting a claim that the Settlement Class Member has released.  For example, you, as a Settlement Class Member, have agreed not to sue the NFL Parties, the NFL's Member Clubs and other related persons or entities in connection with any claim you may have now or in the future relating to any head, brain and/or cognitive injury, as well as any injuries arising out of, or relating to, concussions and/or subconcussive events of whatever cause and its damages, whenever arising.

The above paragraph is an incomplete summary of the Releases and Covenants in the Settlement Agreement. Nothing in the above paragraph limits, expands, or in any way alters the terms of the Settlement Agreement. The Settlement Agreement is available at https://www.nflconcussionsettlement.com.

**Releases.**

    (a) In consideration of the benefits described and the agreement and covenants contained in the Settlement Agreement, and by operation of the Final Order and Judgment, I, on my own behalf and on behalf of my respective predecessors, successors, assigns, assignors, representatives, attorneys, agents, trustees, insurers, heirs, next of kin, estates, beneficiaries, executors, administrators, and any natural, legal, or juridical person or entity to the extent he, she, or it is entitled to assert any claim on my behalf (hereafter "I", "My" or "Me"), hereby waive and release, forever discharge and hold harmless the Released Parties, and each of them, of and from any and all past, present and future claims, counterclaims, actions, rights or causes of action, liabilities, suits, demands, damages, losses, payments, judgments, debts, dues, sums of money, costs and expenses (including, without limitation, attorneys' fees and costs), accounts, reckonings, bills, covenants, contracts, controversies, agreements, obligations, or promises, in law or in equity, contingent or non-contingent, known or unknown, suspected or unsuspected, foreseen or unforeseen, matured or unmatured, accrued or unaccrued, liquidated or unliquidated, whether direct, representative, class or individual in nature, in any forum that I had, have, or may have in the future arising out of, in any way relating to or in connection with the allegations, transactions, facts, matters, occurrences, representations or omissions involved, set forth, referred to or relating to the Class Action Complaint and/or Related Lawsuits ("Claims"), including, without limitation, Claims:

    (i) that were, are or could have been asserted in the Class Action Complaint or any other Related Lawsuit; and/or

| NFL CONCUSSION SETTLEMENT CLAIM FORM<br>FOR RETIRED NFL FOOTBALL PLAYERS AND REPRESENTATIVE CLAIMANTS |
|---|

(ii) arising out of, or relating to, head, brain and/or cognitive injury, as well as any injuries arising out of, or relating to, concussions and/or subconcussive events (including, without limitation, prevention, diagnosis and treatment thereof) of whatever cause and its damages (whether short-term, long-term or death), whenever arising, including, without limitation, Claims for personal or bodily injury, including disease, mental or physical pain or suffering, emotional or mental harm, or anguish or loss of enjoyment of life (and exacerbation and/or progression of personal or bodily injury), or wrongful death and/or survival actions as a result of such injury and/or exacerbation and/or progression thereof; and/or

(iii) arising out of, or relating to, neurocognitive deficits or impairment, or cognitive disorders, of whatever kind or degree, including, without limitation, mild cognitive impairment, moderate cognitive impairment, dementia, Alzheimer's Disease, Parkinson's Disease, and ALS; and/or

(iv) arising out of, or relating to, CTE; and/or

(v) arising out of, or relating to, loss of support, services, consortium,  companionship, society, or affection, or damage to familial relations (including disease, mental or physical pain or suffering, emotional or mental harm, or anguish or loss of enjoyment of life); and/or

(vi) arising out of, or relating to, increased risk, possibility, or fear of suffering in the future from any head, brain and/or cognitive injury, as well as any injuries arising out of, or relating to, concussions and/or subconcussive events (including, without limitation, prevention, diagnosis and treatment thereof), and including disease, mental or physical pain or suffering, emotional or mental harm, or anguish or loss of enjoyment of life); and/or

(vii) arising out of, or relating to, medical screening and medical monitoring for  undeveloped, unmanifested, and/or undiagnosed head, brain and/or cognitive injury, as well as any injuries arising out of, or relating to, concussions and/or subconcussive events (including, without limitation, prevention, diagnosis and treatment thereof); and/or

(viii) premised on any purported or alleged breach of any Collective Bargaining Agreement related to the issues in the Class Action Complaint and/or Related Lawsuits, except claims for workers' compensation and claims alleging entitlement to NFL CBA Medical and Disability Benefits.

(b) In consideration of the benefits described and the agreement and covenants contained in the Settlement Agreement, and by operation of the Final Order and Judgment, I do hereby release, forever discharge and hold harmless the Released Parties from any and all Claims, including unknown Claims, arising from, relating to, or resulting from the reporting, transmittal of information, or communications between or among the NFL Parties, Counsel for the NFL Parties, the Special Master, Claims Administrator, Lien Resolution Administrator, any Governmental Payor, and/or Medicare Part C or Part D Program sponsor regarding any claim for benefits under the Settlement Agreement, including any consequences in the event that this Settlement Agreement impacts, limits, or precludes My right to benefits under Social Security or from any Governmental Payor or Medicare Part C or Part D Program sponsor.

(c) In consideration of the benefits described and the agreement and covenants contained in the Settlement Agreement, and by operation of the Final Order and Judgment, I do hereby release, forever discharge and hold harmless the Released Parties from any and all Claims, including unknown Claims, pursuant to the MSP Laws, or other similar causes of action, arising from, relating to, or resulting from the failure or alleged failure of any of the Released Parties to provide for a primary payment or appropriate reimbursement to a Governmental Payor or Medicare Part C or Part D Program sponsor with a Lien in connection with claims for medical items, services, and/or prescription drugs provided in connection with compensation or benefits claimed or received by Me pursuant to the Settlement Agreement.

(d) In consideration of the benefits described and the agreement and covenants contained in the Settlement Agreement, and by operation of the Final Order and Judgment, I do hereby release, forever discharge and hold harmless the Released Parties, the Special Master, BAP Administrator, Claims Administrator, and their respective officers, directors, and employees from any and all Claims, including unknown Claims, arising from, relating to, or resulting from their participation, if any, in the BAP, including, but not limited to, Claims for negligence, medical malpractice, wrongful or delayed diagnosis, personal injury, bodily injury (including disease, trauma, mental or physical pain or suffering, emotional or mental harm, or anguish or loss of enjoyment of life), or death arising from, relating to, or resulting from such participation.

**<u>Release of Unknown Claims</u>.**

## NFL CONCUSSION SETTLEMENT CLAIM FORM
## FOR RETIRED NFL FOOTBALL PLAYERS AND REPRESENTATIVE CLAIMANTS

(a) I acknowledge that I have been informed of Section 1542 of the Civil Code of the State of California (and similar statutes) by My counsel and that I do hereby expressly waive and relinquish all rights and benefits, if any, which I have or may have under said section (and similar sections) which reads as follows:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR

(b) I acknowledge that the foregoing waiver of the provisions of Section 1542 of the California Civil Code and all similar provisions of the statutory or common law of any other state, territory, or other jurisdiction was separately bargained for and that the Parties would not have entered into the Settlement Agreement unless it included a broad release of unknown claims relating to the matters released herein.

(c) I intend to be legally bound by the Releases.

(d) The Releases are not intended to prevent the NFL Parties from exercising their rights of contribution, subrogation, or indemnity under any law.

(e) Nothing in the Releases will preclude any action to enforce the terms of the Settlement Agreement in the Court.

(f) I represent and warrant that no promise or inducement has been offered or made for the Releases contained in this Article except as set forth in the Settlement Agreement and that the Releases are executed without reliance on any statements or any representations not contained in the Settlement Agreement.

**Covenant Not to Sue.**

From and after the Effective Date, for the consideration provided for in the Settlement Agreement, and by operation of the Final Order and Judgment, I covenant, promise, and agree that I will not, at any time, continue to prosecute, commence, file, initiate, institute, cause to be instituted, assist in instituting, or permit to be instituted on My behalf, or on behalf of any other individual or entity, any proceeding: (a) alleging or asserting any of his or her respective Released Claims against the Released Parties in any federal court, state court, arbitration, regulatory agency, or other tribunal or forum, including, without limitation, the Claims set forth in Section 18.1 of the Settlement Agreement; or (b) challenging the validity of the Releases. To the extent any such proceeding exists in any court, tribunal or other forum as of the Effective Date, I covenant, promise and agree to withdraw, and seek a dismissal with prejudice of, such proceeding forthwith.

**No Release for Insurance Coverage.**

(a) Notwithstanding anything herein to the contrary, the Settlement Agreement is not intended to and does not release any Governmental Payor or Medicare Part C or Part D Program sponsor from its or their obligation to provide any health insurance coverage, major medical insurance coverage, or disability insurance coverage to a Settlement Class Member, or from any claims, demands, rights, or causes of action of any kind that a Settlement Class Member has or hereafter may have with respect to such individuals or entities.

(b) Notwithstanding anything herein to the contrary, the Settlement Agreement is not intended to and does not effect a release of any rights or obligations that any insurer has under or in relation to any contract or policy of insurance to any named insured, insured, additional insured, or other insured person or entity thereunder, including those persons or entities referred to in Section 2.1(bbbb)(i)-(ii) of the Settlement Agreement.

**No Release for Claims for Workers' Compensation and NFL CBA Medical and Disability Benefits**

Nothing contained in the Settlement Agreement, including the Release and Covenant Not to Sue provisions in ARTICLE XVIII of the Settlement Agreement, affects My rights to pursue claims for workers' compensation and claims alleging entitlement to NFL CBA Medical and Disability Benefits. For the avoidance of any doubt, the Settlement Agreement does not alter the showing that I must demonstrate to pursue successful claims for workers' compensation and/or successful claims alleging entitlement to NFL CBA Medical and Disability Benefits, nor does it alter the defenses to such claims available to Released Parties except as set forth in ARTICLE XXIX of the Settlement Agreement.

**Judgment Reduction.**

## NFL CONCUSSION SETTLEMENT CLAIM FORM
## FOR RETIRED NFL FOOTBALL PLAYERS AND REPRESENTATIVE CLAIMANTS

(a) With respect to any litigation by Me against Riddell, I further agree that if a verdict in My favor results in a verdict or judgment for contribution or indemnity against the Released Parties, I will not enforce My right to collect this verdict or judgment to the extent that such enforcement creates liability against the Released Parties. In such event, I agree that I will reduce My claim or agree to a judgment reduction or satisfy the verdict or judgment to the extent necessary to eliminate the claim of liability against the Released Parties or any Other Party claiming contribution or indemnity.

(b) Any judgment or award obtained by Me against any alleged tortfeasor, co-tortfeasor, co-conspirator or co-obligor, other than Riddell, by reason of judgment or settlement, for any claims that are or could have been asserted in the Class Action Complaint or in any Related Lawsuit, or that arise out of or relate to any claims that are or could have been asserted in the Class Action Complaint or in any Related Lawsuit, or that arise out of or relate to any facts in connection with the Class Action Complaint or any Related Lawsuit (collectively, "Tortfeasors"), shall be reduced by the amount or percentage, if any, necessary under applicable law to relieve the Released Parties of all liability to such Tortfeasors on claims for contribution or indemnity (whether styled as a claim for contribution, indemnity or otherwise). Such judgment reduction, partial or complete release, settlement credit, relief, setoff, if any, shall be in an amount or percentage sufficient under applicable law to compensate such Tortfeasors for the loss of any such claims for contribution or indemnity (whether styled as a claim for contribution, indemnity, or otherwise) against the Released Parties.

**No Assignment of Claims.**

I have not assigned, will not assign, and will not attempt to assign, to any person or entity other than the NFL Parties any rights or claims relating to the subject matter of the Class Action Complaint. Any such assignment, or attempt to assign, to any person or entity other than the NFL Parties any rights or claims relating to the subject matter of the Class Action Complaint will be void, invalid, and of no force and effect and the Claims Administrator shall not recognize any such action.

## IX. RELEASE

You must promptly notify the Claims Administrator of any changes or updates to the information in your Claim Form, including any changes in your medical condition, whether a person or entity asserts a lien or entitlement to any monies received under the Settlement Agreement, and any change in mailing address.

# NFL CONCUSSION SETTLEMENT

*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

## MONETARY AWARD CLAIM PACKAGE HIPAA AUTHORIZATION FORM

You must complete and sign this Form if you are a **Retired NFL Football Player** or the **Representative Claimant** of a Retired NFL Football Player and want to apply for a Monetary Award. This Form authorizes the use and disclosure of "Protected Health Information" as that term is defined in 45 C.F.R. § 160.103, relating to the processing of your claim in the NFL Concussion Settlement Program. Protected Health Information includes, but is not limited to, information regarding the Retired NFL Football Player's medical care, treatment, physical or mental condition, and medical expenses.

### I. RETIRED NFL FOOTBALL PLAYER INFORMATION

| Settlement Program ID | | 950012548 | | | |
|---|---|---|---|---|---|
| **Player Name** | First<br>Frank | | M.I. | Last<br>Cornish | Suffix |

| **Social Security Number, Taxpayer ID or Foreign ID Number** (if Retired NFL Football Player is not a U.S. Citizen) **of Retired NFL Football Player** (if known) | \|3\|4\|0\| - \|7\|2\| - \|4\|0\|6\|8\|<br>**or** |
|---|---|
| **Date of Birth of Retired NFL Football Player** | \|0\|9\|/\|2\|4\|/\|1\|9\|6\|7\|<br>(Month/Day/Year) |

### II. ENTITIES AUTHORIZED TO USE AND DISCLOSE PROTECTED HEALTH INFORMATION

By signing and submitting this Form, I authorize the use and disclosure of all Protected Health Information regarding my (or the Retired NFL Football Player's, if signed by a Representative Claimant) medical care, treatment, physical or mental condition, and medical expenses relating to my claim in the *In re: National Football League Players' Concussion Injury Litigation* Settlement program, as follows: (1) by the Claims Administrator, Special Master, BAP Administrator, Lien Resolution Administrator, designated Qualified BAP Providers, Qualified BAP Pharmacy Vendors, Qualified MAF Physicians, Appeals Advisory Panel members, Appeals Advisory Panel Consultants, the Court, Class Counsel, Counsel for the NFL Parties and the NFL Parties (which, in turn, may share the Protected Health Information with the NFL Parties' insurers or reinsurers) for use and/or disclosure with one another in the performance of their functions and duties pursuant to the Settlement Agreement; (2) by the Lien Resolution Administrator for use and/or disclosure to the holders of any liens, claims, or rights of subrogation, indemnity, reimbursement, conditional or other payments, or interests of any type, including all Governmental Payors (such as the Medicare Program, any state Medicaid Program, the Department of Veterans Affairs, Tricare, Indian Health Services, and their respective contractors), Medicare Part C or Part D Programs, private health care providers, health plans, and health insurers, and any contractors or recovery agents of the foregoing persons and entities (collectively, "Lienholders"), for the purpose of identifying and resolving any potential Liens in connection with any Monetary Award that I may receive; and (3) by the Lienholders for disclosure to the Lien Resolution Administrator and Claims Administrator for the purpose of identifying and resolving any potential Liens in connection with any Monetary Award that I may receive.

-3332-

## MONETARY AWARD CLAIM PACKAGE HIPAA AUTHORIZATION FORM

### III. AUTHORIZATION

By signing below, I acknowledge and understand all of the following:

| | |
|---|---|
| 1. | I have the right to revoke this authorization at any time. If I wish to revoke the authorization, I must do so in writing and must provide my written revocation to the Claims Administrator. The written revocation must be signed and dated. The revocation will not apply to any disclosures that already have been made in reliance on this authorization prior to the date upon which the Claims Administrator receives my written revocation. |
| 2. | My authorization of the disclosure of the subject Retired NFL Football Player's Protected Health Information is voluntary, which means I can refuse to sign this Form. I do not need to sign this Form to obtain health treatment from any medical provider or to enroll in or be eligible for any health plan benefits. However, I recognize that if I do not sign this Form and submit it to the Claims Administrator, my Claim Package will be incomplete under the terms of the Settlement Agreement and will not be processed. |
| 3. | Any Protected Health Information or other information released to the Claims Administrator, Special Master, BAP Administrator, Lien Resolution Administrator, Qualified BAP Providers, Qualified BAP Pharmacy Vendors, Qualified MAF Physicians, Appeals Advisory Panel members, Appeals Advisory Panel Consultants, the Court, Class Counsel, Counsel for the NFL Parties and the NFL Parties (including the NFL Parties' insurers or reinsurers) may be subject to re-disclosure by such person/entity, and may no longer be protected by applicable federal and state privacy laws. Each of those persons and entities, however, is permitted to use and disclose your information only in accordance with this Form, the Settlement Agreement, a contract executed pursuant to the Settlement Agreement, orders of the Court, and/or applicable law. |
| 4. | My Protected Health Information may include information relating to sexually transmitted disease, acquired immunodeficiency syndrome ("AIDS"), or human immunodeficiency virus ("HIV"), behavioral or mental health services and treatment for alcohol and drug abuse. |
| 5. | This Form is valid from the date of my signature in Section IV until the date that the Claims Administrator performs the last act to process the claim for a Monetary Award that I submitted with this Form. |
| 6. | I have a right to receive and retain a copy of this Form. |
| 7. | Any photostatic copy of this Form shall have the same authority as the original, and may be substituted in its place. |

### IV. SIGNATURE

The Retired NFL Football Player or Representative Claimant of the Retired NFL Football Player named in Section I must sign and date this Form below. **By signing below, I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that all information provided in this HIPAA Authorization Form is true and correct to the best of my knowledge, information and belief.**

| Signature | | | Date | 0 3/1 9 5/1 2 9 1 9 (Month/Day/Year) | |
|---|---|---|---|---|---|
| **Printed Name** | First Robin | M.I. B | Last Cornish | | Suffix |

| If you are signing this Form as a Representative Claimant, describe your relationship to the Retired NFL Football Player and your authority to act on his behalf: | Widow |
|---|---|

| MONETARY AWARD CLAIM PACKAGE HIPAA AUTHORIZATION FORM | |
|---|---|
| **V. HOW TO SUBMIT THIS FORM** | |
| You may submit this Form in one of two ways: | |
| **By U.S. Mail:** | NFL Concussion Settlement<br>Claims Administrator<br>P.O. Box 25369<br>Richmond, VA 23260 |
| **By Delivery:** | NFL Concussion Settlement<br>c/o BrownGreer PLC<br>250 Rocketts Way<br>Richmond, VA 23231 |

**CERTIFICATION OF VITAL RECORD**

# CITY OF GRAPEVINE, TEXAS
## VITAL STATISTICS DIVISION

STATE OF TEXAS          CERTIFICATE OF DEATH          STATE FILE NUMBER

1. DECEASED'S NAME: FRANK EDGAR CORNISH IV

DATE OF DEATH: 08/23/2008

2. SEX: MALE    4. DATE OF BIRTH: 09/24/1967    AGE: 40

BIRTHPLACE: CHICAGO, IL.

6. SOCIAL SECURITY NUMBER: 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

MARITAL STATUS AT TIME OF DEATH: ☑ Married

SURVIVING SPOUSE'S NAME: ROBIN BLAKE

RESIDENCE STREET ADDRESS: 305 SHEFFIELD DRIVE

COUNTY: TARRANT    STATE: TEXAS    ZIP CODE: 76092    CITY: SOUTHLAKE    INSIDE CITY LIMITS: ☑ Yes  ☐ No

FATHER'S NAME: FRANK EDGAR CORNISH III

MOTHER'S NAME PRIOR TO FIRST MARRIAGE: GLORIA KNIGHTEN

DID DEATH OCCUR IN A HOSPITAL?    PLACE OF DEATH: ☑ Inpatient

COUNTY OF DEATH: TARRANT    CITY: GRAPEVINE, 76051

FACILITY NAME: BAYLOR MEDICAL CENTER AT GRAPEVINE

INFORMANT'S NAME & RELATIONSHIP TO DECEASED: ROBIN B. CORNISH - WIFE    MAILING ADDRESS: 305 SHEFFIELD DRIVE, SOUTHLAKE, TX 76092

METHOD OF DISPOSITION: ☑ Burial

SIGNATURE AND LICENSE NUMBER OF FUNERAL DIRECTOR OR PERSON ACTING AS SUCH: JOHN BECKWITH  BY ELECTRONIC SIGNATURE - 9037

PLACE OF DISPOSITION: BLUEBONNET CEMETERY    LOCATION: COLLEYVILLE, TX.

NAME OF FUNERAL FACILITY: GOLDEN GATE FUNERAL HOME-THORNTON FRWY    ADDRESS: 4155 S. R.L. THORNTON FRWY, DALLAS, TX 75224

PRINTED NAME, ADDRESS OF CERTIFIER: MARC ANDREW KROUSE , BY ELECTRONIC SIGNATURE

DATE CERTIFIED: 08/28/2008    LICENSE NUMBER: E8845    TIME OF DEATH: 09:18 AM

MARC ANDREW KROUSE 200 FELIKS GWOZDZ PLACE, FORT WORTH, TX 76104-4919    TITLE OF CERTIFIER: M E

IMMEDIATE CAUSE: a. SUDDEN ADULT DEATH WITH EVIDENCE OF HYPERTENSIVE HEART DISEASE    INTERVAL: UNKNOWN

b.
c.

MANNER OF DEATH: ☑ Natural

IF FEMALE: ☑ Not pregnant within past year

DATE OF INJURY: ☐ Yes  ☐ No

LOCATION (Street and Number, City, State, Zip Code):

REGISTRAR FILE NO: 15-265    DATE FILED BY LOCAL REGISTRAR: 08/29/2008    REGISTRAR - CITY OF GRAPEVINE, ELECTRONICALLY FILED

VS-112 REV 12008

CONTROL NO. 76861

This is to certify that this is a true and correct reproduction of the original record as recorded in this office. Issued under authority of Sec. 191.051, Health and Safety Code.

FEB-06 '09 PM 01:27

*Linda Huff*
LINDA HUFF
LOCAL REGISTRAR

ISSUED

**WARNING: IT IS ILLEGAL TO DUPLICATE THIS COPY**

ANY ALTERATION OR ERASURE VOIDS THIS CERTIFICATE

THE STATE OF TEXAS          THE CITY OF GRAPEVINE TEXAS



Office of Chief Medical Examiner
Tarrant County Medical Examiner's District
Tarrant County, Texas
200 Feliks Gwozdz Place, Fort Worth, Texas 76104-4919
(817) 920-5700  FAX (817) 920-5713

# AUTOPSY REPORT

**Name: Frank Cornish**
**Approximate Age: 40 years**
**Height: 79 inches**

**CASE NO: 0810049**
**Sex: Male**
**Weight: 327.6 pounds**

I hereby certify that on the **24th** day of **August 2008**, beginning at 0805 hours, I, Marc A. Krouse, M.D., pursuant to Statute 49.25 of Texas Criminal Code, performed an inspection and autopsy limited to the cranial cavity, neck, and thoracic cavity,  on the body of **Frank Cornish** at the Tarrant County Medical Examiner's District Morgue in Fort Worth, Texas and upon investigation of the essential facts concerning the circumstances of the death and history of the case as known to me, I am of the opinion that the findings, cause and manner of death are as follows:

**FINDINGS:**
I)   Marked cardiomegaly (758 gms) with left ventricular hypertrophy and mild coronary arterial sclerosis, consistent with hypertensive heart disease
II)  Multinodular goiter
III) No evidence of trauma
IV)  Postmortem toxicology attached

**CAUSE OF DEATH:**    **SUDDEN ADULT DEATH WITH EVIDENCE OF HYPERTENSIVE HEART DISEASE**

**MANNER OF DEATH:  NATURAL**

*Signature*

Signature

**Marc A. Krouse, M.D.**
**Deputy Chief Medical Examiner**

0810049
Frank Cornish

Inspection and autopsy limited to the cranial cavity, neck, and thoracic cavity are performed August 24, 2008 at 8:05 a.m. (cranial cavity exam 08/25/08 at 0900).

## GROSS ANATOMIC DESCRIPTION

**I.    CLOTHING AND PERSONAL EFFECTS:** At the time of examination the body is clothed in white briefs and wrapped in white sheets.

**II.    THERAPEUTIC INTERVENTION:** Evidence of medical intervention includes an oral endotracheal tube secured with tape, intravenous line in the right antecubital fossa, right tibial intraosseous line, and 1 electrocardiographic monitor pad on the torso.

**III.    EXTERNAL BODY DESCRIPTION:** The body is that of a normally developed, large muscular and slightly obese adult African American male appearing near the stated age of 40 years. The body length is 79 inches and the weight is 327.6 pounds (200 cm, 143.6 kg). The body is well-preserved, unembalmed, and cool. Rigor is full. Lividity is developed over the head and back, is purple, and fixed.

The scalp is shaved except for a black and occasional gray mustache and goatee. The face is shaved and body hair is male distribution.

The calvarium is symmetric and intact to palpation and the scalp is intact. The eyes are closed, the corneas are slightly clouded. There is no conjunctival hemorrhage. The irides are brown and the pupils are 6 mm. Orbital soft tissues are unremarkable. The nasal and oral cavities are clear. Lips and oral mucosa are cyanotic. The dentition is natural and well-maintained. The external ears are clear and a single healed pierce is found in the left earlobe. The face, neck, and larynx are symmetric and intact and the trachea and larynx are midline.

The anterior chest is symmetric and intact. The breasts are male. The abdomen is minimally protuberant and the pelvis is intact. The penis is uncircumcised and the testes are descended. The perineum and anal orifice are unremarkable. The back is symmetric and intact.

0810049
Frank Cornish

The extremities are symmetric, normally developed, and are intact. The nails of the hands and feet are cyanotic. A healed 18 cm scar is found along the left hip and upper thigh.

There are no external signs of trauma or foul play.

## IV.   INTERNAL EXAMINATION

**1.   INTEGUMENT:**   The body is opened with a modified thoracoabdominal and coronal scalp incision. The viscera are examined in situ and neck and thoracic viscera and cranial contents are removed for further inspection.

**2.   SEROUS CAVITIES:** The soft tissues of the anterior chest and neck are unremarkable. There is no evidence of occult trauma. The serous cavity membranes are smooth. There is no hemorrhage or fluid accumulation within major body cavities.

**3.   CARDIOVASCULAR SYSTEM:** The thoracic and abdominal aorta, vena cava and pulmonary arteries and veins are unremarkable. The major vessels and heart contain fluid blood and scattered postmortem thrombi. There is patchy intimal hemoglobin staining.

The heart weighs 758 gms. The coronary arteries arise normally and posterior circulation is right dominant. Circumferential sclerosis produces approximately 10-15% occlusion of the surface coronary arteries with an atheromatous plaque adding to approximately 25% occlusion of the proximal left anterior descending coronary. All cardiac chambers are dilated and there is symmetric hypertrophy of the left ventricle (anterior left ventricle 2.3 cm, septum 2.2 cm, right ventricle 0.5 cm). The myocardium is otherwise grossly unremarkable. The endocardium and cardiac valves are unremarkable.

**4.   RESPIRATORY SYSTEM:** The larynx and hyoid are intact. Central and peripheral airways are clear. The lungs are congested. There is patchy lower lobe edema with no additional gross pulmonary pathology. The right lung weighs 780 gms and the left 678 gms.

**5.   GASTROINTESTINAL SYSTEM:**   The pharynx and esophagus are intact and unremarkable. Limited inspection of intraabdominal organs is remarkable only for slight yellow-tan coloration of the liver parenchyma.

0810049
Frank Cornish

**6.    HEMATOPOIETIC SYSTEM:** Lymph nodes of the neck and thorax are unremarkable. The thymus is involuted.

**8.    ENDOCRINE SYSTEM:** There is a multinodular goiter (some with cystic degeneration) and the total mass of the thyroid gland is 143 gms. Parathyroid glands are not identified. The pituitary is grossly unremarkable.

**9.    CRANIAL CAVITY/CENTRAL NERVOUS SYSTEM:** Subgaleal soft tissues are unremarkable. There is no evidence of occult head trauma. The calvarium and base of the skull are intact. The cerebrospinal fluid is clear and the meninges are congested. The arteries over the base of the brain and dural sinuses are intact and unremarkable.

The brain weighs 1505 gms. There is slight brain swelling with notching of the uncal gyri and cerebellar tonsils but no evidence of overt herniation. The gray and white matter of the brain are grossly unremarkable. The ventricular system is patent and contains clear cerebrospinal fluid. The upper cervical spinal cord is unremarkable. The atlanto-occipital joint is intact.

## SPECIMENS AND EVIDENCE COLLECTED

1.    Aortic blood 30 mL, femoral venous blood 30 mL, and vitreous humor 5 mL for toxicology
2.    Samples of viscera in fixative
3.    Blood card
4.    Five photographs

EDC: 10/23/08
Dictated: 09/02/08
Transcribed: 09/04/08
Completed: 09/04/08
MAK:cal

# Toxicology Test Results

Office of Chief Medical Examiner
Toxicology Laboratory Service
200 Feliks Gwozdz Place
Fort Worth, Texas 76104
Name: Frank Edgar Cornish
Case Number: 0810049
Toxicology Work Number: 0801591

Nizam Peerwani, M.D., DABFP
Chief Medical Examiner
Angela Springfield, PH.D., DABFT
Chief Toxicologist
Priority: 1
Service Request Number: 002

| Specimen | Drug | Result | Drug Amount | Performed By |
|---|---|---|---|---|
| AORTA BLOOD | ETHANOL | NEGATIVE | | J HO |
| AORTA BLOOD | BASE | NEGATIVE | | C WHEELER |
| AORTA BLOOD | ACID | NEGATIVE | | C WHEELER |

Report Prepared By:

Approved By:

Approved Date: 8/28/08

 **CONCUSSION SETTLEMENT**
*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

### PRE-EFFECTIVE DATE DIAGNOSING PHYSICIAN CERTIFICATION FORM
### (for diagnoses made by physicians who are qualified to render Qualifying Diagnoses
### for purposes of Monetary Award claims before January 7, 2017)

This Pre-Effective Date Diagnosing Physician Certification Form is to be used only by physicians qualified to render Qualifying Diagnoses before January 7, 2017, in connection with the Class Action Settlement in In re: National Football League Players' Concussion Injury Litigation and who made a Qualifying Diagnosis before January 7, 2017. The Qualifying Diagnoses are found in Appendix A to this Pre-Effective Date Diagnosing Physician Certification Form.

Use this form to certify a Qualifying Diagnosis you made before January 7, 2017, based on your personal examination of the Retired NFL Football Player. **Do not sign this form unless you personally examined the player** or, in the case of a Qualifying Diagnosis of Death with CTE, you are the board-certified neuropathologist who made the post-mortem diagnosis of CTE. If you made a Qualifying Diagnosis as a Qualified MAF Physician on or after January 7, 2017, do not use this form; use the MAF Diagnosing Physician Certification Form instead. Also, if you are a Qualified BAP Provider certifying a diagnosis you made in the Baseline Assessment Program, do not use this form; use the BAP Diagnosing Physician Certification Form instead.

You must complete this form in its entirety, sign it under penalty of perjury, and return it to the patient along with copies of all supporting medical records that you created or received in connection with the Qualifying Diagnosis. In turn, the patient, or the patient's counsel, must submit this form and all supporting medical records referred to above to the Claims Administrator as part of a claim for compensation under the Class Action Settlement. The Claims Administrator will review the form, including your qualifications to provide the Qualifying Diagnosis, and the supporting medical records. All claims also are subject to audit. Any finding of fraudulent conduct by you will be subject to, without limitation, your referral to appropriate regulatory and disciplinary boards and agencies and/or federal authorities, and your disqualification from serving in any aspect of the Class Action Settlement.

You are required to preserve all supporting medical records that you created or received in connection with the Qualifying Diagnosis for the greater of: (a) 10 years after January 7, 2017; or (b) the period of time required under applicable state and federal laws.

If you have any questions, call the Claims Administrator toll free at 1-855-887-3485 or visit the Settlement Website at https://www.nflconcussionsettlement.com.

## PRE-EFFECTIVE DATE DIAGNOSING PHYSICIAN CERTIFICATION FORM
### (for diagnoses made by physicians who are qualified to render Qualifying Diagnoses for purposes of Monetary Award claims before January 7, 2017)

### I. PATIENT INFORMATION

| Settlement Program ID (if known) | | | 950012548 | |
|---|---|---|---|---|
| Name: | First<br>Frank | M.I. | Last<br>Cornish | Suffix |

| Address: | Address 1<br>2213 Frio Dr. | |
|---|---|---|
| | Address 2 | |
| | City<br>Keller | |
| | State/Province<br>TX | |
| | Postal Code<br>76248 | Country<br>United States |

| Telephone | $|8\,|1\,|7\,|$ - $|8\,|4\,|5\,|$ - $|9\,|4\,|4\,|5\,|$ |
|---|---|
| Date of Birth | $|0\,|9\,|/|2\,|4\,|/|1\,|9\,|6\,|7\,|$<br>(Month/Day/Year) |
| Date of Death (if applicable) | $|0\,|8\,|/|2\,|3\,|/|2\,|0\,|0\,|8\,|$<br>(Month/Day/Year) |

### II. DIAGNOSING PHYSICIAN INFORMATION

| National Provider Identifier (NPI) | | | 1013980978 | |
|---|---|---|---|---|
| Physician Name | First<br>Ronald | M.I.<br>L. | Last<br>Hamilton | Suffix |

**(a) Are you approved as a Qualified BAP Provider or a Qualified MAF Physician?**

☐ **YES.** If YES, you do not need to fill out the rest of this Section II or Sections III or IV. Instead, go to Section V.

☒ **NO.**

**(b) If you answered No, have you previously completed this form for another Retired NFL Football Player, that you know was submitted to the Claims Administrator?**

☐ **YES.** If YES, you do not need to fill out this Section II or Sections III or IV. Instead, go to Section V.

☒ **NO.**

If you answered No to both questions, fill out the rest of this Section II and then go to Section III.

## PRE-EFFECTIVE DATE DIAGNOSING PHYSICIAN CERTIFICATION FORM
### (for diagnoses made by physicians who are qualified to render Qualifying Diagnoses for purposes of Monetary Award claims before January 7, 2017)

| Office/Practice Name | University of Pittsburgh Medical Center | |
|---|---|---|
| **Address** | Address 1<br>A724.1 Scaife Hall | |
| | Address 2<br>200 Lothrop Street | |
| | City<br>Pittsburgh | |
| | State/Province<br>Pennsylvania | |
| | Postal Code<br>15213 | Country<br>USA |
| **Telephone** | 4 1 2 - 6 2 4 - 6 6 1 0 | |
| **Fax** | 4 1 2 - 6 2 4 - 5 4 8 8 | |
| **Email Address** | hamiltonrl@upmc.edu | |

### III.   BOARD CERTIFICATIONS

Check all board certifications that apply and list the board providing the certification and any identification number provided by the board (*e.g.*, American Board of Psychiatry and Neurology diplomate number). If you do not have any board certifications, summarize your relevant medical training and experience and then go to Section IV.

| | Certification | Board | Board Identification Number | Effective Date | Expiration Date |
|---|---|---|---|---|---|
| [ ] | Neurology | | | | |
| [ ] | Neurosurgery | | | | |
| [X] | Neuropathology | American Board of Pathology | | certified: 5/23/1996<br>recertified:1/1/2014 | |
| [ ] | Neuropsychology | | | | |
| [ ] | Other Neuro-specialty | | | | |
| [X] | Other Board Certification | American Board of Pathology | | certified: 5/23/1996 | |

## PRE-EFFECTIVE DATE DIAGNOSING PHYSICIAN CERTIFICATION FORM
### (for diagnoses made by physicians who are qualified to render Qualifying Diagnoses for purposes of Monetary Award claims before January 7, 2017)

If you are not board-certified in a neuro-specialty area, summarize your relevant medical training and experience in the field of neurology and related fields that you believe qualifies you to make the diagnosis provided in Section V.

### IV.   OTHER QUALIFICATIONS

| | | Education Level | Institution | Degree/Area of Focus | Date Received |
|---|---|---|---|---|---|
| Educational Information | 1. | Undergraduate Education | University of Nebraska-Lincoln | B.S / Psychology | 1 9 8 5 (Month/Year) |
| | 2. | Medical School | University of Nebraska Medical Center | M.D. | 1 9 8 9 (Month/Year) |
| | 3. | Internship | Univ. of California, San Diego | Resident Anatomic Pathology | 1 9 9 1 (Month/Year) |
| | 4. | Residency | Univ. of California, San Diego | Resident Neuropathology | 1 9 9 3 (Month/Year) |
| | 5. | Fellowship | Univ. of Pittsburgh | Fellow Neuropathology | 1 9 9 4 (Month/Year) |
| | 6. | Other (Graduate) | Univ. of Pittsburgh | Fellow: NIMH Training Grant in Neuroscience | 1 9 9 5 (Month/Year) |

| | | State | State License Number | Effective Date | Expiration Date |
|---|---|---|---|---|---|
| States Where Licensed to Practice | 1. | California | G69731 | 9/10/1990 | Expired |

**PRE-EFFECTIVE DATE DIAGNOSING PHYSICIAN CERTIFICATION FORM**
**(for diagnoses made by physicians who are qualified to render Qualifying Diagnoses**
**for purposes of Monetary Award claims before January 7, 2017)**

|  |  |  |  |  |
|---|---|---|---|---|
| | 2. | Pennsylvania | MD049717L | 5/12/1993 | 12/31/2018 |
| | 3. | Indiana | 01067332A | 9/29/2009 | 10/31/2019 |
| | 4. | | | | |
| | 5. | | | | |
| | 6. | | | | |

| Specialties | Check all specialties that apply. |
|---|---|
| | ☐ **Neurology** |
| | ☐ **Neurosurgery** |
| | ☒ **Neuropathology** |
| | ☐ **Neuropsychology** |
| | ☐ **Other Neuro-specialty** (*e.g.*, brain injury medicine, clinical neurophysiology, etc.) _____ |
| | ☒ **Other Specialty** (list all)   **Anatomic Pathology** _____ |

**PRE-EFFECTIVE DATE DIAGNOSING PHYSICIAN CERTIFICATION FORM
(for diagnoses made by physicians who are qualified to render Qualifying Diagnoses
for purposes of Monetary Award claims before January 7, 2017)**

### V. QUALIFYING DIAGNOSIS

Identify the patient's diagnosis and the date of such diagnosis. *See Appendix A* for the criteria for each diagnosis. Other than for Death with CTE, the identification of a condition, including through a blood test, genetic test, imaging technique, or otherwise, that has not yet resulted in actual cognitive impairment and/or actual neuromuscular impairment in the patient is **not** a Qualifying Diagnosis.

| | Qualifying Diagnosis | Date of Diagnosis |
|---|---|---|
| ☐ | Level 1.5 Neurocognitive Impairment | ⎵⎵ /⎵⎵/ ⎵⎵⎵⎵ (Month/Day/Year) |
| ☐ | Level 2 Neurocognitive Impairment* | ⎵⎵ /⎵⎵/ ⎵⎵⎵⎵ (Month/Day/Year) |
| ☐ | Alzheimer's Disease | ⎵⎵ /⎵⎵/ ⎵⎵⎵⎵ (Month/Day/Year) |
| ☐ | Parkinson's Disease | ⎵⎵ /⎵⎵/ ⎵⎵⎵⎵ (Month/Day/Year) |
| ☐ | ALS (amyotrophic lateral sclerosis) | ⎵⎵ /⎵⎵/ ⎵⎵⎵⎵ (Month/Day/Year) |
| ☒ | Death with CTE | 0 8 / 2 3 / 2 0 0 8 * (Month/Day/Year) |

\* If you provided a diagnosis of Level 2 Neurocognitive Impairment, did you determine that certain testing was medically unnecessary because of the severity of the patient's dementia (*see Appendix A*)?

☐  YES        ☐  NO

If you answered Yes, provide the factual basis for that determination:

\*Pursuant to FAQ 93, Posted Settlement Program FAQs (as of November 7, 2018), for this claim, "the date of the Qualifying Diagnosis is the date of the Player's death, even though the diagnosis is not made until after the Player dies".

| PRE-EFFECTIVE DATE DIAGNOSING PHYSICIAN CERTIFICATION FORM<br>(for diagnoses made by physicians who are qualified to render Qualifying Diagnoses<br>for purposes of Monetary Award claims before January 7, 2017) |||
|---|---|---|
| **VI. CERTIFICATION** |||

By signing below, I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that all information provided in this form, and all related supporting medical records, are true and correct to the best of my knowledge, information and belief, and that I personally examined the Retired NFL Football Player named in Section I or, in the case of a Qualifying Diagnosis of Death with CTE, I am the board-certified neuropathologist who made the post-mortem diagnosis of CTE.

I acknowledge that any finding of fraudulent conduct may subject me to, without limitation, referral to appropriate regulatory and disciplinary boards and agencies and/or federal authorities, and disqualification from serving in any aspect of the Class Action Settlement.

| Signature of Diagnosing Physician | | Date of Signature | 02/07/2019 (Month/Day/Year) |
|---|---|---|---|
| **Printed Name** | First Ronald | M.I. L. | Last Hamilton |

## APPENDIX A

Other than for Death with CTE, the identification of a condition, including through a blood test, genetic test, imaging technique, or otherwise, that has not yet resulted in actual cognitive impairment and/or actual neuromuscular impairment experienced by the patient does not qualify as a diagnosis.

LEVEL 1.5 NEUROCOGNITIVE IMPAIRMENT

**The following diagnosis can only be made:**

> (1) prior to July 7, 2014, by a board-certified neurologist, board-certified neurosurgeon, other board-certified neuro-specialist physician, or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician, except as provided in (c), below;

> (2) from July 7, 2014 through January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified neurologist, board-certified neurosurgeon, or other board-certified neuro-specialist physician, except as provided in (c), below; or

> (3) for a patient who died prior to January 7, 2017 (the Effective Date of the Settlement Agreement), where the diagnosis occurred while the patient was living, by a board-certified or otherwise qualified neurologist, neurosurgeon, or other neuro-specialist physician, or by a physician with sufficient qualifications in the field of neurology or neurocognitive disorders to make a diagnosis of Level 1.5 Neurocognitive Impairment:

A diagnosis made outside of the Baseline Assessment Program (BAP) that a living patient suffers from Level 1.5 Neurocognitive Impairment, as set forth below, *i.e.*, early dementia, based on evaluation and evidence generally consistent with the diagnostic criteria set forth and provided below:

There is: (i) Concern of the patient, a knowledgeable informant, or the Qualified BAP Provider that there has been a severe decline in cognitive function; (ii) Evidence of a moderate to severe cognitive decline from a previous level of performance, as determined by and in accordance with the standardized neuropsychological testing protocol annexed in *Appendix B*, in two or more cognitive domains (complex attention, executive function, learning and memory, language, perceptual-spatial), provided one of the cognitive domains is (a) executive function, (b) learning and memory, or (c) complex attention; (iii) The patient exhibits functional impairment generally consistent with the criteria set forth in the National Alzheimer's Coordinating Center's Clinical Dementia Rating scale Category 1.0 (Mild) in the areas of Community Affairs, Home & Hobbies, and Personal Care—where such functional impairment is corroborated by documentary evidence (*e.g.*, medical records, employment records), the sufficiency of which will be determined by the physician making the diagnosis (and where no documentary evidence of functional impairment exists or is available, then (a) there must be evidence of moderate to severe cognitive decline from a previous level of performance, as determined by and in accordance with the standardized neuropsychological testing protocol annexed in *Appendix B*, in the executive function cognitive domain or the learning and memory cognitive domain, and at least one other cognitive domain; and (b) the patient's functional impairment, as described above, must be corroborated by a third-party sworn affidavit from a person familiar with the patient's condition (other than the player or his family members), the sufficiency of which will be determined by the diagnosing physician); and (iv) The cognitive deficits do not occur exclusively in the context of a delirium, acute substance abuse, or as a result of medication side effects.

LEVEL 2 NEUROCOGNITIVE IMPAIRMENT

**The following diagnosis can only be made:**

> **(1) prior to July 7, 2014, by a board-certified neurologist, board-certified neurosurgeon, other board-certified neuro-specialist physician, or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician, except as provided in (c), below;**

> **(2) from July 7, 2014 through January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified neurologist, board-certified neurosurgeon, or other board-certified neuro-specialist physician, except as provided in (c), below; or**

> **(3) for a patient who died prior to January 7, 2017 (the Effective Date of the Settlement Agreement), where the diagnosis occurred while the patient was living, by a board-certified or otherwise qualified neurologist, neurosurgeon, or other neuro-specialist physician, or by a physician with sufficient qualifications in the field of neurology or neurocognitive disorders to make a diagnosis of Level 2 Neurocognitive Impairment:**

A diagnosis made outside of the Baseline Assessment Program (BAP) that a living patient suffers from Level 2 Neurocognitive Impairment, as set forth below, *i.e.*, moderate dementia, based on evaluation and evidence generally consistent with the diagnostic criteria set forth and provided below, unless the diagnosing physician can certify in Section IV of the Diagnosing Physician Certification Form, above, that certain testing specified below for Level 2 Neurocognitive Impairment is medically unnecessary because the patient's dementia is so severe:

There is: (i) Concern of the patient, a knowledgeable informant, or the Qualified BAP Provider that there has been a severe decline in cognitive function; (ii) Evidence of a severe cognitive decline from a previous level of performance, as determined by and in accordance with the standardized neuropsychological testing protocol annexed in *Appendix B*, in two or more cognitive domains (complex attention, executive function, learning and memory, language, perceptual-spatial), provided one of the cognitive domains is (a) executive function, (b) learning and memory, or (c) complex attention; (iii) The patient exhibits functional impairment generally consistent with the criteria set forth in the National Alzheimer's Coordinating Center's Clinical Dementia Rating scale Category 2.0 (Moderate) in the areas of Community Affairs, Home & Hobbies, and Personal Care—where such functional impairment is corroborated by documentary evidence (*e.g.*, medical records, employment records), the sufficiency of which will be determined by the physician making the diagnosis (and where no documentary evidence of functional evidence exists or is available, then (a) there must be evidence of severe cognitive decline from a previous level of performance, as determined by and in accordance with the standardized neuropsychological testing protocol annexed in *Appendix B*, in the executive function cognitive domain or the learning and memory cognitive domain, and at least one other cognitive domain; and (b) the patient's functional impairment, as described above, must be corroborated by a third-party sworn affidavit from a person familiar with the patient's condition (other than the player or his family members), the sufficiency of which will be determined by the diagnosing physician); and (iv) The cognitive deficits do not occur exclusively in the context of a delirium, acute substance abuse, or as a result of medication side effects.

## ALZHEIMER'S DISEASE

(1) **The following diagnosis can only be made:**

(a) **prior to July 7, 2014, by a board-certified neurologist, board-certified neurosurgeon, other board-certified neuro-specialist physician, or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician; or**

(b) **from July 7, 2014 through January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified neurologist, board-certified neurosurgeon, or other board-certified neuro-specialist physician:**

A diagnosis in a living patient of the specific disease of Alzheimer's Disease as defined by the World Health Organization 's International Classification of Diseases, 9th Edition (ICD-9), the World Health Organization's International Classification of Diseases, 10th Edition (ICD-10), or a diagnosis of Major Neurocognitive Disorder due to probable Alzheimer's Disease as defined in the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5).

(2) **The following diagnosis can only be made prior to January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician, or by a physician with sufficient qualifications in the field of neurology to make such a diagnosis, where the diagnosis was made while the patient was living but thereafter died prior to January 7, 2017 (the Effective Date of the Settlement Agreement):**

A diagnosis of Major Neurocognitive Disorder due to probable Alzheimer's Disease consistent with the definition in *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) or a diagnosis of Alzheimer's Disease.

## PARKINSON'S DISEASE

(1) **The following diagnosis can only be made:**

(a) **prior to July 7, 2014, by a board-certified neurologist, board-certified neurosurgeon, other board-certified neuro-specialist physician, or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician; or**

(b) **from July 7, 2014 through January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified neurologist, board-certified neurosurgeon, or other board-certified neuro-specialist physician:**

A diagnosis in a living patient of the specific disease of Parkinson's Disease as defined by the World Health Organization 's International Classification of Diseases, 9th Edition (ICD-9), the World Health Organization's International Classification of Diseases, 10th Edition (ICD-10), or a diagnosis of Major Neurocognitive Disorder probably due to Parkinson's Disease as defined in the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5).

(2) **The following diagnosis can only be made prior to January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician, or by a physician with sufficient qualifications in the field of neurology to make such a diagnosis, where the diagnosis was made while the patient was living but thereafter died prior to January 7, 2017 (the Effective Date of the Settlement Agreement):**

A diagnosis of Parkinson's Disease.

## ALS

(1) **The following diagnosis can only be made:**

    **(a) prior to July 7, 2014, by a board-certified neurologist, board-certified neurosurgeon, other board-certified neuro-specialist physician, or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician; or**

    **(b) from July 7, 2014 through January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified neurologist, board-certified neurosurgeon, or other board-certified neuro-specialist physician:**

A diagnosis in a living patient of the specific disease of Amyotrophic Lateral Sclerosis, also known as Lou Gehrig's Disease (ALS), as defined by the World Health Organization's International Classification of Diseases, 9th Edition (ICD-9) or the World Health Organization's International Classification of Diseases, 10th Edition (ICD-10).

(2) **The following diagnosis can only be made prior to January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician, or by a physician with sufficient qualifications in the field of neurology to make such a diagnosis, where the diagnosis was made while the patient was living but thereafter died prior to January 7, 2017 (the Effective Date of the Settlement Agreement):**

A diagnosis of the specific disease of Amyotrophic Lateral Sclerosis (ALS).

## CTE

**The following diagnosis can only be made prior to April 22, 2015 by a board-certified neuropathologist, provided that a patient who died between July 7, 2014 and April 22, 2015 has until 270 days from the date of death to obtain such a post-mortem diagnosis:**

A post-mortem diagnosis of Chronic Traumatic Encephalopathy (CTE).

## APPENDIX B

### BASELINE NEUROPSYCHOLOGICAL TEST BATTERY AND SPECIFIC IMPAIRMENT CRITERIA FOR RETIRED NFL FOOTBALL PLAYERS

#### Section 1: Test Battery

**Estimating Premorbid Intellectual Ability**

ACS Test of Premorbid Functioning (TOPF)

**Complex Attention/Processing Speed (6 scores)**

WAIS-IV Digit Span

WAIS-IV Arithmetic

WAIS-IV Letter Number Sequencing

WAIS-IV Coding

WAIS-IV Symbol Search

WAIS-IV Cancellation

**Executive Functioning (4 scores)**

Verbal Fluency (FAS)

Trails B

Booklet Category Test

WAIS-IV Similarities

**Effort/Performance Validity (8 scores)**

*ACS Effort Scores*

ACS-WAIS-IV Reliable Digit Span

ACS-WMS-IV Logical Memory Recognition

ACS-WMS-IV Verbal Paired Associates Recognition

ACS-WMS-IV Visual Reproduction Recognition

ACS-Word Choice

*Additional Effort Tests*

Test of Memory Malingering (TOMM)

Medical Symptom Validity Test (MSVT)

**Learning and Memory (6 scores)**

WMS-IV Logical Memory I

WMS-IV Logical Memory II

WMS-IV Verbal Paired Associates I

WMS-IV Verbal Paired Associates II

WMS-IV Visual Reproduction I

WMS-IV Visual Reproduction II

**Language (3 scores)**

Boston Naming Test

Category Fluency (Animal Naming)

BDAE Complex Ideational Material

**Spatial-Perceptual (3 scores)**

WAIS-IV Block Design

WAIS-IV Visual Puzzles

WAIS-IV Matrix Reasoning

**Mental Health**

MMPI-2RF

Mini International Neuropsychiatric Interview

#### Section 2: Evaluate Performance Validity

Freestanding, embedded and regression based performance validity metrics will be administered to each Retired NFL Football Player during baseline and, if relevant, subsequent neuropsychological examinations. There will be at least seven performance validity metrics utilized during each assessment. The specific performance validity metrics utilized will not be released to the public in order to maintain the highest standards of assessment validity. The performance

# APPENDIX B

validity metrics employed will be rotated at intervals determined by the Appeals Advisory Panel in consultation with Co-Lead Class Counsel and Counsel for the NFL Parties.

Each neuropsychological examiner must complete a checklist of validity criteria as set forth in *Slick et al.* 1999, and revised in 2013 (see below) for every Retired NFL Football Player examined in order to determine whether the Retired NFL Football Player's test data is a valid reflection of his optimal level of neurocognitive functioning.

1. Suboptimal scores on performance validity embedded indicators or tests. The cutoffs for each test should be established based on empirical findings.

2. A pattern of neuropsychological test performance that is markedly discrepant from currently accepted models of normal and abnormal central nervous system (CNS) function. The discrepancy must be consistent with an attempt to exaggerate or fabricate neuropsychological dysfunction (e.g., a patient performs in the severely impaired range on verbal attention measures but in the average range on memory testing; a patient misses items on recognition testing that were consistently provided on previous free recall trials, or misses many easy items when significantly harder items from the same test are passed).

3. Discrepancy between test data and observed behavior. Performance on two or more neuropsychological tests within a domain are discrepant with observed level of cognitive function in a way that suggests exaggeration or fabrication of dysfunction (e.g., a well-educated patient who presents with no significant visual-perceptual deficits or language disturbance in conversational speech performs in the severely impaired range on verbal fluency and confrontation naming tests).

4. Discrepancy between test data and reliable collateral reports. Performance on two or more neuropsychological tests within a domain are discrepant with day-to-day level of cognitive function described by at least one reliable collateral informant in a way that suggests exaggeration or fabrication of dysfunction (e.g., a patient handles all family finances but is unable to perform simple math problems in testing).

5. Discrepancy between test data and documented background history. Improbably poor performance on two or more standardized tests of cognitive function within a specific domain (e.g., memory) that is inconsistent with documented neurological or psychiatric history.

6. Self-reported history is discrepant with documented history. Reported history is markedly discrepant with documented medical or psychosocial history and suggests attempts to exaggerate deficits.

7. Self-reported symptoms are discrepant with known patterns of brain functioning. Reported or endorsed symptoms are improbable in number, pattern, or severity; or markedly inconsistent with expectations for the type or severity of documented medical problems.

8. Self-reported symptoms are discrepant with behavioral observations. Reported symptoms are markedly inconsistent with observed behavior (e.g., a patient complains of severe episodic memory deficits yet has little difficulty remembering names, events, or appointments; a patient complains of severe cognitive deficits yet has little difficulty driving independently and arrives on time for an appointment in an unfamiliar area; a patient complains of severely slowed mentation and concentration problems yet easily follows complex conversation).

9. Self-reported symptoms are discrepant with information obtained from collateral informants. Reported symptoms, history, or observed behavior is inconsistent with information obtained from other informants judged to be adequately reliable. The discrepancy must be consistent with an attempt to exaggerate deficits (e.g., a patient reports severe memory impairment and/or behaves as if severely memory-impaired, but his spouse reports that the patient has minimal memory dysfunction at home).

## APPENDIX B

Notwithstanding a practitioner's determination of sufficient effort in accordance with the foregoing factors, a Retired NFL Football Player's failure on two or more effort tests may result in the Retired NFL Football Player's test results being subjected to independent review, or result in a need for supplemental testing of the Retired NFL Football Player.

Note: Additional information relating to the evaluation of effort and performance validity will be provided in a clinician's interpretation guide.

### Section 3: Estimate Premorbid Intellectual Ability

| Test | Ability |
|------|---------|
| Test of Premorbid Functioning (TOPF) | Reading<br>Reading + Demographic Variables |

The Test of Premorbid Functioning (TOPF) provides three models for predicting premorbid functioning: (a) demographics only, (b) TOPF only, and (c) combined demographics and TOPF prediction equations. For each model using demographic data, a simple and complex prediction equation can be selected. In the simple model, only sex, race/ethnicity, and education, are used in predicting premorbid ability. In the complex model, developmental, personal, and more specific demographic data is incorporated into the equations. The clinician should select a model based on the patient's background and his or her current level of reading or language impairment.

Note: It is necessary to estimate premorbid intellectual functioning in order to use the criteria for impairment set out in this document. Estimated premorbid intellectual ability will be assessed and classified as:

➢ Below Average (estimated IQ below 90);

➢ Average (estimated IQ between 90 and 109);

➢ Above Average (estimated IQ above 110).

### Section 4: Neuropsychological Test Score Criteria by Domain of Cognitive Functioning

There are 5 domains of cognitive functioning. In each domain, there are several tests that contribute 3, 4, or 6 demographically-adjusted test scores for consideration. Test selection in the domains was based on the availability of demographically-adjusted normative data for Caucasians and African Americans. These domains and scores are set out below.

The basic principle for defining impairment on testing is that there must be a pattern of performance that is approximately 1.5 standard deviations (for Level 1 Impairment), 1.7-1.8 standard deviations (for Level 1.5 Impairment) or 2 standard deviations (for Level 2 Impairment) below the person's expected level of premorbid functioning. Therefore, it is necessary to have more than one low test score in each domain. A user manual will be provided to neuropsychologists setting out the cutoff scores, criteria for identifying impairment in each cognitive domain, and statistical and normative data to support the impairment criteria.

## APPENDIX B

| Domain/Test | Ability |
|---|---|
| **Complex Attention/Speed of Processing (6 Scores)** | |
| Digit Span | Attention & Working Memory |
| Arithmetic | Mental Arithmetic |
| Letter Number Sequencing | Attention & Working Memory |
| Coding | Visual-Processing & Clerical Speed |
| Symbol Search | Visual-Scanning & Processing Speed |
| Cancellation | Visual-Scanning Speed |
| **Executive Functioning (4 scores)** | |
| Similarities | Verbal Reasoning |
| Verbal Fluency (FAS) | Phonemic Verbal Fluency |
| Trails B | Complex Sequencing |
| Booklet Category Test | Conceptual Reasoning |
| **Learning and Memory (6 scores)** | |
| Logical Memory I | Immediate Memory for Stories |
| Logical Memory II | Delayed Memory for Stories |
| Verbal Paired Associates I | Learning Word Pairs |
| Verbal Paired Associates II | Delayed Memory for Word Pairs |
| Visual Reproduction I | Immediate Memory for Designs |
| Visual Reproduction II | Delayed Memory for Designs |
| **Language** | |
| Boston Naming Test | Confrontation Naming |
| BDAE Complex Ideational Material | Language Comprehension |
| Category Fluency | Category (Semantic) Fluency |
| **Visual-Perceptual** | |
| Block Design | Spatial Skills & Problem Solving |
| Visual Puzzles | Visual Perceptual Reasoning |
| Matrix Reasoning | Visual Perceptual Reasoning |

**Impairment Criteria: *Below Average* Estimated Intellectual Functioning (A1 – E1)**

**A1. Complex Attention (6 test scores)**

1. Level 1 Impairment: 3 or more scores below a T score of 35

2. Level 1.5 Impairment: 4 or more scores below a T score of 35; or meet for Level 1 and 2 scores below a T score of 30

3. Level 2 Impairment: 3 or more scores below a T score of 30

**B1. Executive Function (4 test scores)**

1. Level 1 Impairment: 2 or more scores below a T score of 35

2. Level 1.5 Impairment: 3 or more scores below a T score of 35; or meet for Level 1 and 1 score below a T score of 30

## APPENDIX B

3. Level 2 Impairment: 2 or more scores below a T score of 30

**C1.  Learning and Memory (6 test scores)**

1. Level 1 Impairment: 3 or more scores below a T score of 35

2. Level 1.5 Impairment: 4 or more scores below a T score of 35; or meet for Level 1 and 2 scores below a T score of 30

3. Level 2 Impairment: 3 or more scores below a T score of 30

**D1.  Language (3 test scores)**

1. Level 1 Impairment: 3 or more scores below a T score of 37

2. Level 1.5 Impairment: meet for Level 1 and 2 scores below a T score of 35

3. Level 2 Impairment: 3 or more scores below a T score of 35

**E1.  Visual-Perceptual (3 test scores)**

1. Level 1 Impairment: 3 or more scores below a T score of 37

2. Level 1.5 Impairment: meet for Level 1 and 2 scores below a T score of 35

3. Level 2 Impairment: 3 or more scores below a T score of 35

**Impairment Criteria:** *Average* **Estimated Intellectual Functioning (A2 – E2)**

**A2.  Complex Attention (6 test scores)**

1. Level 1 Impairment: 2 or more scores below a T score of 35

2. Level 1.5 Impairment: 3 or more scores below a T score of 35; or meet for Level 1 and 1 score below a T score of 30

3. Level 2 Impairment: 2 or more scores below a T score of 30

**B2.  Executive Function (4 test scores)**

1. Level 1 Impairment: 2 or more scores below a T score of 35

2. Level 1.5 Impairment: 3 or more scores below a T score of 35; or meet for Level 1 and 1 score below a T score of 30

3. Level 2 Impairment: 2 or more scores below a T score of 30

**C2.  Learning and Memory (6 test scores)**

1. Level 1 Impairment: 2 or more scores below a T score of 35

2. Level 1.5 Impairment: 3 or more scores below a T score of 35; or meet for Level 1 and 1 score below a T score of 30

3. Level 2 Impairment: 2 or more scores below a T score of 30

**D2.  Language (3 test scores)**

1. Level 1 Impairment: 2 or more scores below a T score of 37

2. Level 1.5 Impairment: 3 or more scores below a T score of 37; or meet for Level 1 and 1 score below a T score of 35

3. Level 2 Impairment: 2 or more scores below a T score of 35

**E2.  Visual-Perceptual (3 test scores)**

1. Level 1 Impairment: 2 or more scores below a T score of 37

2. Level 1.5 Impairment: 3 or more scores below a T score of 37; or meet for Level 1 and 1 score below a T score of 35

3. Level 2 Impairment: 2 or more scores below a T score of 35

## APPENDIX B

**Impairment Criteria:** *Below Average* **Estimated Intellectual Functioning (A3 – E3)**

### A3. Complex Attention (6 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 35

2. Level 1.5 Impairment: meet for Level 1 and 3 or more scores below a T score of 37

3. Level 2 Impairment: 3 or more scores below a T score of 35

### B3. Executive Function (4 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 37

2. Level 1.5 Impairment: meet for Level 1 and 3 or more scores below a T score of 37; or meet for Level 1 and 1 score below a T score of 30

3. Level 2 Impairment: 2 or more scores below a T score of 30

### C3. Learning and Memory (6 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 35

2. Level 1.5 Impairment: meet for Level 1 and 3 or more scores below a T score of 37

3. Level 2 Impairment: 3 or more scores below a T score of 35

### D3. Language (3 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 40

2. Level 1.5 Impairment: 3 scores below at T score of 40; or meet for Level 1 and 1 score below a T score of 37

3. Level 2 Impairment: 2 or more scores below a T score of 37

### E3. Visual-Perceptual (3 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 40

2. Level 1.5 Impairment: 3 scores below at T score of 40; or meet for Level 1 and 1 score below a T score of 37

3. Level 2 Impairment: 2 or more scores below a T score of 37

### Section 5: Mental Health Assessment

| Test | Symptoms/Functioning | Assessment |
|---|---|---|
| MMPI-2RF | Mental Health Assessment | Evaluation of Validity Scales and Configurations; T-Scores for Symptom Domains |
| Mini International Neuropsychiatric Interview (M.I.N.I. Version 5.0.0) | Semi-structured Psychiatric Interview | Scale Criteria for Various Psychiatric Diagnoses |

**Ronald L. Hamilton, M.D.**

1/2/2017
## CURRICULUM VITAE

### BIOGRAPHICAL

| | | | |
|---|---|---|---|
| **Name:** | Ronald Lee Hamilton | **Birth Date:** | September 20, 1959 |
| **Home Address:** | 6 Graham Place Pittsburgh, PA 15232 | **Birth Place:** | Omaha, Nebraska |
| **Marital status:** | single | | |
| **Home Phone** | 412-310-9874 | **Citizenship:** | USA |

| | |
|---|---|
| **Business Address:** | Division of Neuropathology A724.1 Scaife Hall 200 Lothrop Street Pittsburgh, PA 15213 |
| **Business Phone:** | 412-624-6610 |
| **Business Fax:** | 412-624-5488 |
| **e-mail address** | hamiltonrl@upmc.edu |

### EDUCATION AND TRAINING

| 1977-1985 | University of Nebraska-Lincoln | B.S. | Psychology |
|---|---|---|---|
| 1985-1989 | University of Nebraska Medical Center | | M.D. |

| | | |
|---|---|---|
| 1989-1991 | University of California, San Diego Program Director, David Bailey | Resident Anatomic Pathology |
| 1991-1993 | University of California, San Diego Program Director, Henry C. Powell | Resident Neuropathology |
| 1993-1994 | University of Pittsburgh Program Director, Clayton A Wiley | Fellow Neuropathology |
| 1994-1995 | University of Pittsburgh Program Director, Michael Zigmond | Fellow: NIMH Training Grant in Neuroscience |

### APPOINTMENTS AND POSITIONS:

| 1995-2002 | University of Pittsburgh School of Medicine -Assistant Professor of Pathology |
|---|---|
| 2002-present | University of Pittsburgh School of Medicine -Associate Professor of Pathology |

### DISTRIBUTION OF % TIME

| | |
|---|---|
| Research | 20% |
| Other scholarly activity | 8% |
| Teaching | 10% |
| Clinical | 35% |
| Combined clinical and teaching | 20% |
| Service activities | 5% |
| Administrative activities. | 2% |
| | |
| TOTAL | 100% |

**Ronald L. Hamilton, M.D.**

## CERTIFICATION and LICENSURE

**SPECIALTY CERTIFICATION**

| | | |
|---|---|---|
| American Board of Pathology | Anatomic Pathology | 5/23/96 |
| American Board of Pathology | Neuropathology | 5/23/96 |
| American Board of Pathology – recertification | Neuropathology | 1/1/2014 |

**MEDICAL or OTHER PROFESSIONAL LICENSURE**

| | |
|---|---|
| 1990 | California Medical License (G69731) expired |
| 1993 | Pennsylvania Medical License (MD-049717-L) |
| 2009 | Indiana Medical License (01067332A) |

## MEMBERSHIPS IN PROFESSIONAL AND SCIENTIFIC SOCIETIES

| | |
|---|---|
| 1992 | American Association for the Advancement of Science |
| 1993 | American Association of Neuropathology |
| 1993 | International Society of Neuropathology |
| 1994 | College of American Pathologists (CAP) |
| 1995-97 | CAP Neuropathology Subcommittee |
| 1998 | Children's Cancer Group, Study Committee for CCGB975 |
| 1999 | Society for Neuroscience |

## HONORS

| | |
|---|---|
| Nominated "Teacher of the Year: Anatomic Pathology" | 1997 |
| Nominated "Teacher of the Year: Anatomic Pathology" | 1998 |
| Nominated "Teacher of the Year: Anatomic Pathology" | 1999 |
| Nominated "Teacher of the Year: Anatomic Pathology" | 2000 |
| Nominated "Teacher of the Year: Anatomic Pathology" | 2001 |
| Nominated "Teacher of the Year: Anatomic Pathology" | 2002 |
| UPMC ACES Award winner (ACES is an Award for | 2003 |

Clinical Excellence and Service and is given to about 10 physicians per year at UPMC)

| | |
|---|---|
| Letter of appreciation from Chief Residents | 1997-1998 |
| AP Pathology "TEACHER OF THE YEAR" | 2004-05 |

## PUBLICATIONS

**Refereed Articles**

1. Esch O, Spinosa JC, **Hamilton RL**, Crombie DL, Schteigart CO, Rondinone JF, D'Agostino HB,Lillienau J and Hofmann AF: Acute effects of topical methyl tert-butyl ether or ethyl propionate on gallbladder histology in animals: a comparison of two solvents for contact dissolution of cholesterol gallstones. Hepatology 16 (4):984-991, 1992.

2. Anders KH, Becker PS, Holden JK, Sharer LR, Cornford ME, Hansen LA, **Hamilton R,** Vinters, HV: Multifocal necrotizing leukoencephalopathy with pontine predilection in immunosuppressed patients: a clinicopathologic review of sixteen cases. Human Pathology 24:897-904, 1993.

3. **Hamilton RL**, Achim C, Grafe MR, Fremont JC, Miners D, Wiley CA: Herpes simplex virus brainstem encephalitis in an AIDS patient. Clinical Neuropathology, 14: 45-50, 1995.

**Ronald L. Hamilton, M.D.**

4.  Rose J, Haskell WL, Gamble JG, **Hamilton RL**, Brown DA, Rinsky L: Muscle pathophysiology and clinical measures of disability in children with cerebral palsy. Journal of Orthopedic Research, 12(6): 758-768, 1994.

5.  **Hamilton RL**, Grafe MR: Complete absence of the cerebellum: a report of two cases. Acta Neuropathologica 88 (3): 258-261, 1994.

6.  **Hamilton RL**, Haas RH, Nyhan WL, Powell HC, Grafe MR: The neuropathology of propionic academia: a report of two additional cases.  Journal of Child Neurology 10(1): 25-30, 1995.

7.  Haas RH, Marsden DL, Capistrano-Estrada S, **Hamilton RL**, Grafe MR, Wong W, Nyhan WL: Acute basal ganglia infarction in propionic acidemia.  Journal of Child Neurology 10(1) 18-22, 1995.

8.  Kupperman BD, Quiceno JI, Wiley C, Hesselink J**, Hamilton R**, Keefe K, Garcia R, Freeman WR: Clinical and histopathologic study of varicella zoster virus retinitis in patients with the acquired immunodeficiency syndrome.  American Journal of Ophthalmology 118:589-600, 1994.

9.  Adelson PD, Robichaurd P, **Hamilton RL**, Kochanek PM. A Model of Diffuse Traumatic Brain  Injury in the Immature Rat.  J Neurosurg 85:877-884, 1996.

10. Alper G, Crumrine PK, **Hamilton RL**, Albright L, Wald ER. An unusual case of inflammatory spinal epidural  mass (Castleman's syndrome) Pediatric Neurology  15: 60-2 , 1996

11. Adelson PD, Firlik KS, Firlik AD, **Hamilton RL**. A meningeal cyst of the thoracic spine presenting as prolonged paresis after ankle injury: case report. Neuropediatrics 27:207-210, 1996.

12. Cramer SC, Segal A, **Hamilton RL**, Schmahman J, Ma J. Leukoencephalitis Due to Varicella Zoster Virus:   Report of a Case and Review of Clinical Features.  Contemporary Neurology, 1, 1996 (electronic journal).

13. Mansfield RT, Schiding JK, **Hamilton R**, Kochanek PM: Effects of hypothermia on traumatic brain injury in immature rats. J Cerebral Blood Flow  Metabo 16(2): 244-252, 1996.

14. Pollack IF, Campbell JW, **Hamilton RL**, Martinez AJ, Bozik ME. Proliferation index as a predictor of prognosis in malignant gliomas of childhood. Cancer 79:849-856, 1996

15. Pollack IF, **Hamilton RL,** Finkelstein SD, Campbell JW, Martinez AJ, Sherwin RN, Bozik ME, Gollin SM. The relationship between tp53 mutations and overexpression of p53 and prognosis in malignant gliomas of childhood. Cancer Research 57:304-309, 1997.

16. Ikonomovic MD, Mizukami K, Davies P, **Hamilton R**, Sheffield R, Armstrong DM. The loss of GluR2(3) immunoreactivity preceded neurofibrillary tangle formation in the entorhinal cortex and hippocampus of Alzheimer brains. J Neuropath Exp Neurol 56:1018-1027, 1997.

17. Bredel M, Pollack IF, Campbell JW, **Hamilton RL**: Basic fibroblast growth factor as a predictor of prognosis in pediatric high-grade gliomas. Clinical Cancer Research 3:2157-2164, 1997

18. Blatt J, **Hamilton RL**: Neurodevelopmental anomalies in children with neuroblastoma. Cancer 82: 1603-8, 1998.

19. Fukui MB, Livstone BJ, Meltzer CC, **Hamilton RL**: Hemorrhagic presentation of untreated primary central nervous system lymphoma in the acquired immunodeficiency syndrome. Am J Roentgenol 170:1114-1115, 1998..

20. Bredel M, Pollack IF, **Hamilton RL**, James CD: Epidermal growth factor receptor (EGFR) and gene amplification in high-grade non-brainstem gliomas of childhood. Clin Can Res 5:1786-92, 1999

**Ronald L. Hamilton, M.D.**

21. Gerszten PC, Pollack IF, **Hamilton RL**. Primary parafalcine chondrosarcoma in a child. Acta Neuropathologica 95:111-4, 1998.

22. Pollack IF, **Hamilton RL**, Fitz C, Orenstein DM. An intrasylvian "fibroma" in a child with cystic fibrosis. Pediatric Neurosurgery 46:744-747 2000.

23. Liachenko S, Tang P, **Hamilton RL**, Xu Y: A reproducible model of circulatory arrest and remote resuscitation in rats for NMR investigation. Stroke 29:1229-1238, 1998

24. Meltzer CC, Liu AY, Perrone AM, **Hamilton RL** Meningioangiomatosis MR imaging with histopathologic correlation. AJR 170:804-5, 1998

25. Clark RSB, Kochanek PM, Chen M, Watkins SC, Marion DW, Chen J, **Hamilton RL**, Loeffert JE, Graham SH. Increases in Bcl-2 and cleavage of caspase-1 and caspase-3 in human brain after head injury. FASEB J, 13:813-821, 1999

26. Soontornniyomkij V, Wang G, Pittman CA, **Hamilton RL**, Wiley CA, Achim CL Absence of brain-derived neurotrophic factor and trkB receptor immunoreactivity in glia of Alzheimer's disease. Acta Neuropathologica 98:345-8, 1999.

27. Wang G, Achim CL, **Hamilton RL**, Wiley CA, Soontornniyomkij V  Tyramide signal amplification methods in multiple label immunofluorescence confocal microscopy. Methods 18(4):459-464, 1999

28. Firlik KS, Adelson PD, **Hamilton RL**: Coexistence of a ganglioglioma and Rasmussen's encephalitis: successful treatment in a four-year-old boy. Pediatr Neurosurg 30:278-282, 1999

29. Ikonomovic MD, Mizukami K, Warde D, Sheffield R, **Hamilton R**, Wenthold RJ, Armstrong DM Distribution of glutamate receptor subunit NMDAR1 in the hippocampus of normal elderly and patients with Alzheimer's disease. Exp Neurol 160(1):194-204, 1999.

30. Dallasta, LM, Wang G, Bodnar RJ, Draviam R, Wiley CA, Achim CA, **Hamilton RL**: Differential expression of intercellular adhesion molecules-1 (ICAM-1) and vascular adhesion cell molecule-1 (VCAM-1) in chronic murine retroviral encephalitis. Neuropathol Appl Neurobiol 26:332-341, 2000.

31.  Luabeya MK, Dallasta LM, Achim CL, Pauza CD, **Hamilton RL**: Blood-brain Barrier Disruption in Simian Immunodeficiency Virus Encephalitis. Neuropathol Appl Neurobiol 26:454-462, 2000.

32.   **Hamilton RL**. Lewy Bodies in Alzheimer's Disease: A Neuropathological Review of 145 Cases Using   -synuclein Immunohistochemistry. Brain Pathol 10: 378-384, 2000.

33.  Sweet, RA, **Hamilton RL**, Healy MT, Wisniewski SR, Henteleff R, Pollack BG, Lewis DA, DeKosky ST. Alterations of Striatal Dopamine Receptor Binding in Alzheimer's Disease Are Associated with Lewy Body Pathology and With Antemortem Psychosis. Arch Neurol 58:466-472, 2001.

34.  Styren S, **Hamilton RL**, Styren GC, Klunk WE X-34: a novel and intensely fluorescent stain for Alzheimer's disease pathology. J Histochem Cytochem 48:1223-1232, 2000.

35.  Lopez OL, **Hamilton RL**, Becker JT, Wisniewski S, Kaufer DI, DeKosky ST. Severity of cognitive impairment and the clinical diagnosis of AD with Lewy bodies. Neurology 54:1780-1787, 2000

36.  Lopez OL, Wisniewski S, **Hamilton RL**, Becker JT, Kaufer DI, DeKosky ST. Predictors of progression in patients with AD and Lewy bodies. Neurology 54:1774-1779, 2000.

**Ronald L. Hamilton, M.D.**

37.   Sweet RA, **Hamilton RL**, Lopez OL, Klunk WE, Wisnieski SR, Kaufer DI, Healy MT, Dekosky ST. Psychotic symptoms in Alzheimer's Disease are not associated with more severe neuropathologic features. Internat Psychogeriatr 12: 547-558, 2000.

38.   Lopez OL, Becker JT, Klunk W, Saxton J, **Hamilton RL**, Kaufer DI, Sweet RA, Meltzer CC, Wisniewski S, Kamboh MI, DeKosky ST. Research evaluation and diagnosis of probable Alzheimer's Disease over the last two decades. I. Neurology 55:1854-1862, 2000.

39.   Lopez OL, Becker JT, Klunk W, Saxton J, **Hamilton RL**, Kaufer DI, Sweet RA, Meltzer CC, Wisniewski S, Kamboh MI, DeKosky ST. Research evaluation and diagnosis of possible Alzheimer's Disease over the last two decades. II. Neurology 55:1863-1869, 2000.

40.   Pollack IF, **Hamilton RL**, Fitz C, Kassam A, Snyderman C. Congenital Reactive Myofibroblastic Tumor of the Petrous Bone: Case Report. Neurosurgery 48:430-435, 2001.

41.   Levy EI, Scarrow A, **Hamilton** RC (sic), Wollman MR, Fitz C. Pollack IF. Medical Management Of Eosinophilic Granuloma of the Cervical Spine. Pediatr Neurosurg 31:159-62, 1999.

42.   Pettegrew JW, Panchalingam K, **Hamilton RL**, and McClur RJ Brain Membrane Phospholipid Alterations in Alzheimer's Disease.  Neurochem Res 26:771-782, 2001

43.   Levy EI, Harris AE, Omalu BA, **Hamilton RL**, Branstetter BF, Pollack IF. Sudden Death from Fulminant Acute Cerebellitis.  Pediatr Neurosurg 35:24-28, 2001

44.   Lianchenko S, Tang P, **Hamilton RL**, Xu Y. Regional Dependence of Cerebral Reperfusion After Circulatory Arrest in Rats.  J Cerebr Blood Flow Met 21:1320-1329, 2001 .

45.   Pollack IF, Finkelstein SD, Burnham J, Holmes EJ, **Hamilton RL**, Yates AJ, Finlay J, Sposto R, and CCG. Age and TP53 Mutation Frequency in Childhood Malignant Gliomas: Results of a Multi-institutional Cohort. Cancer Res 61:7404-7407, 2001

46.   Adelson PD, Jenkins LW, **Hamilton RL**, Robichaud P, Tran MP, Kochanek PM. Histopathologic Response of the Immature Rat to Diffuse Traumatic Brain Injury.  J Neurotrauma 18 :967-976, 2001

47.   Pollack IF, Finkelstein SD, Woods J, Burnham J, Holmes EJ, **Hamilton RL**, Yates AJ, Boyett JM, Finlay J, Sposto R, and CCG. TP53 Mutations, Expression of p53 and Prognosis in Children with Malignant Gliomas.  New England Journal of Medicine 346:420-427, 2002

48.   Lopez OL, Becker JT, Kaufer DI, **Hamilton RL**, Sweet RA, Klunk W, DeKosky ST. Research Evaluation and Prospective Diagnosis of Dementia With Lewy Bodies.  Arch Neurol 59:43-46, 2002.

49.   Wang L, Yushmanov VE, Lianchenko SM, Tang P, **Hamilton RL**, Xu Y.  Late Reversal of Cerebral Perfusion and Water Diffusion After Transient Focal Ischemia in Rats.  J Cereb Blood Flow Metab 22:253-261, 2002.

50.  Pollack IF, Biegal JA, Yates AJ, **Hamilton RL**, Finkelstein SD.Risk Assignment in Childhood Brain Tumors: The Emerging Role of Molecular and Biologic Classification. Current Oncology Reports 4:114-122, 2002.

51.   Pollack IF, **Hamilton RL**, Burnham J, Holmes EJ, Finkelstein SD, Sposto R, Yates AJ, Boyett JM, Finley JL. The impact of proliferation index on outcome in childhood malignant gliomas: results in a multi-institutional cohort. Neurosurgery 50:1238-1245, 2002.

**Ronald L. Hamilton, M.D.**

52. Sweet RA, Panchalingam K, Pettefrew JW, McClure RJ, **Hamilton RL**, Lopez OL, Kaufer DI, DeKosky ST, Klunk WE.  Psychosis in Alzheimer disease: postmortem magnetic resonance spectroscopy evidence of excess neuronal and membrane phospholipid pathology. Neurobiol Aging 23:547-53, 2002.

53.  Mazzola CA, Albright AL, Sutton LN, Tuite GF, **Hamilton RL**, Pollack IF.  Dermoid inclusion cysts and early spinal cord tethering after fetal surgery.  New Engl. J Med 347:256-9, 2002.

54.  Bredel M, Pollack IF, **Hamilton RL**, Birner P, Hainfellner JA, Zentner J.  DNA topoisomerase II-alpha predicts progression-free and overall survival in pediatric malignant non-brainstem gliomas.  Int J Cancer 99:817-20, 2002.

55.  Klunk WE, Wang Y, Huang G, Debnath ML, Holt DP, Shao L, **Hamilton RL**, Ikonomovic MD, DeKosky ST, Mathis CA.  The binding of BTA-1 to post-mortem brain homogenates is dominated by the amyloid component. J Neurosci 23:2086-2092, 2003.

56. Castellano-Sanchez, AA, Ohgaki H, Yokoo H, Scheithauer BW, Burger PC, **Hamilton RL**, Finkelstein SD, Brat, DJ.  Cerebral granular cell astrocytomas show a high frequency of allelic loss but lack a defining genotype. Brain Pathology 13: 62-78, 2003.

57.  Gilbertson RJ, Hill DA, Hernan R, Kocak M, Geyer R, Olson J, Gajjar A, Rush L, **Hamilton RL**, Finkelstein SD, Pollack IF.  ERBB1 is amplified and overexpressed in high-grade diffusely infiltrative pediatric brain stem glioma.  Clin Cancer Res 9:3620-3624, 2003.

58. Pollack IF, Finkelstein SD, Burnham J, **Hamilton RL**, Yates AJ, Holmes EJ, Boyett JM, Finlay JL.  The association between chromosome 1p loss and outcome in pediatric malignant gliomas: results from the CCG-945 cohort. Pediatr Neurosurg 39:114-121, 2003.

59.  Carter TL, Rissman RA, Mishizen-Eberz AJ, Wolfe BB, **Hamilton RL**, Gandy S, Armstrong DM.  Differential Preservation of AMPA Receptor Subunits in the Hippocampi of Alzheimer's Disease Patients According to Braak Stage Experimental Neurology 187:299-309, 2004

60.  Finkelstein SD, Mohan D, **Hamilton RL**, Sasatomi E, Swalsky PA, Lieberman FS.  Microdissection-based genotyping assists discrimination of reactive gliosis versus glioma. Am J Clin Pathol 121:671-678, 2004

61.  **Hamilton RL**, Bowser B Alzheimer Disease Pathology in ALS Acta Neuropathologica107:515-522, 2004

62.  Mohan D, Couce ME, Wiley CA, **Hamilton RL**, Sasatomi E, Swalsky PA, Lieberman MD, Finkelstein SD.  Microdissection based genotyping of human gliomas: diagnostic and prognostic considerations Modern Pathology 17:1346-1358, 2004

63. Marshall GA, Kaufer DI, Lopez OL, Rao GR, **Hamilton RL**, DeKosky ST.  Right prosubiculum amyloid plaque density correlates with anosognosia in Alzheimer's Disease.  J Neurol Neurosurg Psychiatry 75:1396-4000, 2004.  **PMCID:  PMC1738763**

64.  Sweet RA, **Hamilton RL**, Butters ME, Mulsant BH, Pollock BG, Lewis DA, DeKosky ST, Reynolds CF.  Neuropathologic Correlates of Dementia in Late Life Major Depression Neuropsychopharmacology 29:2242-2250, 2004

65  Lee JYK, Finkelstein S, **Hamilton RL**, Rekha P, Pirris S, King Jr, JT, Omalu B.  Loss of heterozygosity Analysis of Benign, Atypical and Anaplastic Meningiomas.  Neurosurgery 55:1163-1173, 2004.

**Ronald L. Hamilton, M.D.**

66. Beckner ME, Sasatomi E, Swalsky PA, **Hamilton RL**, Pollack, IF, Finkelstein SD. Loss of heterozygosity reveals non-VHL Allelic loss in hemangioblastomas at 22q13. Human Pathology 35:1105-1111, 2004.

67. Tsuang D, Wilson R, Lopez OL, Luedecking-Zimmer EK, Leverenz JB, DeKosky ST, Kamboh MI, **Hamilton RL**. Genetic Association Between APOE*4 Allele and Lewy Bodies in Alzheimer's Disease Neurology, 64:509-513, 2005. **PMCID: PMC1487185**

68. Bredel C, Lassman S, Pollack IF, Knoth R, **Hamilton RL**, Werner M, Bredel M. DNA Topoisomerase II-alpha and Her-2/Neu Gene Dosages in Pediatric Malignant Gliomas. Int J Cancer 26:1188-92, 2005.

69. Witham TF, Okada H, Fellows W, **Hamilton RL**, Flickinger JC, Chambers WH, Pollack IF, Watkins SC, Kondziolka D. The characterization of tumor apoptosis after experimental radiosurgery. Stereotact Funct Neurosurg 83:17-24 2005.

70. McFadden K, **Hamilton RL**, Insalaco SJ, Lavine L, Al-Mateen M, Guoji Wang G, Wiley CA Neuronal intranuclear inclusion disease in a child without polyglutamine inclusions J Neuropathol Exper Neurol 64:545-552, 2005. **PMCID: PMC1402362**

71. Hatano M, Eguchi J, Tatsumi T, Kuwashima N, Dusak JE, Kinch MS, Pollack IF, **Hamilton RL**, Storkus WJ, Okada H. EphA2 as a glioma-associated antigen: a novel target for glioma-vaccines. Neoplasia 7:717-722, 2005. **PMCID: PMC1501889**

72. Jordan S, Ruoyan C, Koprivica V, **Hamilton RL**, Whitehead R, Tottori K, Kikuchi T. In vitro profile of the antidepressant candidate OPC-14523 at rat and human 5-HT$_{1A}$ receptors.Eur J Pharmacol, 517:165-173, 2005.

73. Omalu BI, Minster RL, Kamboh MI, **Hamilton RL**, Wecht CH, DeKosky ST. Chronic Traumatic Encephalopathy (CTE) in a National Football League (NFL) Player Neurosurgery, 57:128-134, 2005.

74. Judkins AR, Burger PC, **Hamilton RL**, Kleinschmidt-DeMasters B, Perry A, Pomeroy SL, Rosenblum MK, Yachnis AT, Zhou H, Rorke LB, Biegel JA. INI1 Protein Expression Distinguishes Atypical Teratoid/Rhabdopid Tumor from Choroid Plexus Carcinoma. J Neuropathol Exp Neurol 64:391-397, 2005.

75. Desai PP, Ikonomovic I, Abrahamson EE, **Hamilton RL,** Isanski BA, Hope CE, Klunk WE, Dekosky ST, Kamboh MI. Apolipoprotein D is a component of compact but not diffuse amyloid-beta plaques in Alzheimer's Disease temporal cortex. Neurobiol Dis May 22, 2005 (epub)

76. Carson-Walter EB, Hampton J, Geynisman D,Pillai PK, Sathanoori R, Madden SL, **Hamilton RL**, Walter KA. Plasmalemmal Vesicle associated protein-1 (PV-1) is a novel and critical marker of brain tumor angiogenesis. Clin Cancer Res 11:7643-7650, 2005.

77. Lopez OL, Becker JT, Sweet RA, Martin-Sanchez FJ, **Hamilton RL** Lewy bodies in the Amygdala increase risk for major depression in subjects with Alzheimer disease. Neurology 67:660-665, 2006.

78. Pollack IF, **Hamilton RL**, Sobol R, Burnham J, Yates AJ, Holmes EJ, Zhou T, Finlay J (for Children Oncology Group).O6-methylguanine-DNA methyltransferase strongly Correlates with Outcome in Childhood Malignant Gliomas: Results from the CCG-945 Cohort J Clin Oncol. Jul 20;24(21):3431-7, 2006.

**Ronald L. Hamilton, M.D.**

79. Mandal PK, Pettegrew JW, Masliah E, **Hamilton RL**, Mandal R. Interaction between Aβ Peptide and α Synuclein: Molecular Mechanisms in Overlapping Pathology of Alzheimer's and Parkinson's in Dementia with Lewy Body disease. Neurochemical Research, 2006 31, 1153-1162, 2006.

80. Omalu B, DeKosky ST, **Hamilton RL**, Minster RL, Kamboh MI, Shakir AM, Wecht Chronic Traumatic Encephalopathy in a National Football League Player: part II. Neurosurgery 59:1086-92, 2006

81. Ramsey CP, Glass CA, Koike MA, Montgomery MB, Ritson GP, Chia L, **Hamilton RL**, Chu CT, Jordan-Sciutto KL. Expression of Nrf2 in neurodegenerative diseases. J Neuropathol Exp Neurol 66:75-85, 2007. **PMCID: PMC2253896**

82. Boada FE, Tanase C, Davis D, Walter K, Torres-Trejo A, Couce M, **Hamilton R**, Kondziolka D, Bartinski W, Lieberman F. Non-invasive assessment of tumor proliferation using triple quantum filtered 23/Na MRI: technical challenges and solutions. Conf Proc IEEE Eng Med Biol Sci Soc. 2004; 7:5238-41

83. Pollack IF, **Hamilton RL**, James CD, Finkelstein SD, Burnham J, Yates AJ, Holmes EJ, Zhou T, Finlay J (for Children Oncology Group). Rarity of *PTEN* Deletions and *EGFR* Amplification in Malignant Gliomas of Childhood: Results from the Children's Cancer Group-945 Cohort J Neurosurg 105(5 Suppl):418-424, 2006.

84. Guzman A, Wood WL, Alpert E, Prasad MD, Miller RG, Rothstein JD, Bowser R, **Hamilton R**, Wood TD, Cleveland DW, Lingappa VR, Liu J. Common molecular signature in SOD1 for both sporadic and familial amyotrophic lateral sclerosis. Proc Nat Acad Sci 104:12524-12529, 2007. **PMCID: PMC2408940**

85. Beckner ME, Jane EP, Jankowitz B, Agostino NR, Walter KA, **Hamilton RL**, Pollack IF. Tumor cells from ultrasonic aspirations of glioblastomas migrate and from spheres with radial outgrowth. Cancer Letters 255:135-44, 2007. PMID 17543444, **PMCID: PMC2000342**

86. McIntyre JA, Chapman J, Shavit E, **Hamilton RL**, and DeKosky ST. Redox-Reactive Autoantibodies in Alzheimer's Patients' Cerebrospinal Fluids: Preliminary Studies. Autoimmunity, 40:390-396, 2007. PMID 17612901

87. Nakashima-Yasuda, Uryu, K, Robinson J, Xie S, Hurtig H, Duda J, Arnold S, Siderowf A, Grossman M, Leverenz J, Woltjer R, Lopez OL, **Hamilton R**, Tsuang DW, Galaska D, Masliah M, Kaye J, Clark C, Montine TJ, Lee VMY, Trojanowski J. Co-morbidity of TDP-43 Proteinopathy in Lewy Body Related Diseases. Acta Neuropathol 114:221-9, 2007. PMID 17653732

88. McIntyre JA, **Hamilton RL**, DeKosky ST. Redox-reactive autoantibodies in cerebrospinal fluids. Ann NY Acad Sci 1109:296-302, 2007. PMID 17785318

89. Okada H, Lieberman FS, Walter KA, Lunsford LD, Kondziolka DS, Bejjani GK, **Hamilton RL**, Torres-Trejo A, Kalinski P, Cai Q, Mabold JL, Edington HD, Butterfield LH, Whiteside TL, Potter DM, Schold SC Jr., Pollack IF Autologous glioma cell vaccine admixed with interleukin-4 gene transfected fibroblasts in the treatment of patients with malignant gliomas. J Transl Med 5:67, 2007. PMID 18093335. **PMCID: PMC2254376**

90. Beach TG, White CL, **Hamilton, RL**, Duda JE, Iwatsubo T, Dickson DW, Leverenz JB, Roncaroli F, Buttini M, Hladik CL, Sue LI, Noorigian JV, Adler CH. Evaluation of alpha-synuclein immunohistochemical methods used by invited experts. Acta Neuropathol 116:277-88, 2008. PMID 18626651. **PMCID: PMC2708176**

91. Ikonomovic MD, Klunk WE, Abrahamson EE, Mathis CA, Price JC, Tsopelas ND, Lopresti BJ, Ziolko S, Bi W, Paljug WR, Debnath ML, Hope CE, Isanski BA, **Hamilton RL**, DeKosky ST. Post-

**Ronald L. Hamilton, M.D.**

mortem correlates of in vivo PiB-PET amyloid imaging in a typical case of Alzheimers disease. Brain  131(Pt 6):1630-45, 2008.  PMID  18339640. **PMCID: PMC2408940**

92.  Leverenz JB, **Hamilton R**, Tsuang DW, Schantz A, Vavrek D, Larson EB, Kukall WA, Lopez O, Galasko D, Masliah E, Woltjer R, Clark C, Trojanowski JQ, Montine TJ. Empiric refinement of the pathologic assessment of Lewy-related pathology in the dementia patient.  Brain Pathol 18:220-224, 2008. PMID 18241249.  **PMCID: PMC2689097 NIHMS29359**

93.  Raja AI, Yeaney GA, Jakacki RI, **Hamilton RL**, Pollack IF  Extraventricular neurocytoma in neurofibromatosis Type I: Case report.  J Neurosurg Pediatrics 2:63-67, 2008.PMID 18590398

94.  Okada H, Low KL, Kohanbash G, McDonald HA, **Hamilton RL**, Pollack IF.  Expression of glioma-associated antigens in pediatric brain stem and non-brain stem gliomas.  J Neurooncol 88:245-50, 2008. PMID 18324354.  **PMCID: PMC2561297 NIHMS70086**

95.  Venneti S, Lopresti BJ, Wang G, **Hamilton RL**, Mathis CA, Klunk WE, Apte UM, Wiley CA. PK11195 labels activated microglia in Alzheimer's disease and in vivo in a mouse model using PET. Neurobiol Aging 2009, 30:1217-26. PMID 18178291

96.  Mullett SJ, **Hamilton RL**, Hinkle DA.  DJ-1 immunoreactivity in human brain astrocytes is dependent on infarct presence and infarct age.  Neurology 2009, 29:125-31. PMID 18647263

97.  Park DM, Yeaney GA, **Hamilton RL**, Mabold J, Urban N, Appleman L, Flickinger J, Lieberman F, Mintz A.  Identifying Muir-Torre syndrome in a patient with glioblastoma multiforme.  Neuro Oncol, 2009 11:452-5. PMID 19028998.  )

98.  Horbinski C, Bartynski WS, Carson-Walter E, **Hamilton RL**, Tan HP, Cheng S.  Reversible encephalopathy after cardiac transplantation:  Histologic evidence of endothelial activation, T-cell specific trafficking, and vascular endothelial growth factor expression.  Am J Neuroradiol 2008 30:588-90. PMID 18854444.

99.  Northcott P, Nakahara Y, Peacock J, Ellison D, Croul S, Feuk L, Ra YS, Kongham P, Zilerberg K, Mack S, McLeod J, Scherer S, Rao S, Grajkowska W, Gillespie Y, Lach B, Grundy R, Pollack IF, **Hamilton RL,** Van Meter T, Carlotti C, Boop R, Bigner D, Gilbertson R, Rutka J, Taylor MD. Multiple recurrent genetic events converge on control of histone lysine methylation in medulloblastoma.  Nat Genet 2009 41:465-72. PMID 19270706.

100. Ueda R, Kohanbash G, Sasaki K, Fujita M, Zhu X, Kastenhuber ER, McDonald HA, Potter DM, **Hamilton RL,** Lotze MT, Khan SA, Sobol RW, Okada H.  Dicer-regulated microRNAs 222 and 339 promote resistance of cancer cells to cytotoxic T-lymphocytes by down-regulation of ICAM-1. Proc Natl Acad Sci U S A. 2009 Jun 30;106(26):10746-51.  PMID: 19520829

101.  Maki RA, Tyurin VA, Lyon RC, **Hamilton RL**, DeKosky ST, Kagan VE, Reynolds WF.  Aberrant expression of myeloperoxidase in astrocytes promotes phospholipid oxidation and memory deficits in a mouse model of Alzheimer disease. J Biol Chem. 2009 Jan 30;284(5):3158-69. PMID: 19059911.

102.  Horbinski C, **Hamilton RL**, Lovell C, Burnham J, Pollack IF.  Impact of morphology, MIB-1, p53, and MGMT on Outcome in Pilocytic Astrocytomas.  Brain Pathology 2010; 20:581-8  e-pub Sept 21, 2009

103.  Armstrong RA, Ellis W, **Hamilton RL**, MacKenzie IR, Hedreen J, Gearing M, Montine T, Vonsattel JP, Head E, Lieberman AP, Cairns NJ.  Neuropathological heterogeneity in frontotemporal lobar degeneration with TDP-43 proteinopathy: a quantitative study of 94 cases using principle components analysis.  J Neural Transm 2010, 117:227-239.

**Ronald L. Hamilton, M.D.**

104. Horbinski C, **Hamilton RL**, Nikiforov Y, Pollack IF.  Association of molecular alterations, including BRAF, with biology and outcome in pilocytic astrocytomas.  Acta Neuropathol 2010 Jan 1, e-pub.

105. Van Deerlin VM, Sleiman PM, Martinez-Lage M, Chen-Plotkin A, Wang LS, Graff-Radford NR, Dickson DW, Rademakers R, Boeve BF, Grossman M, Arnold SE, Mann DM, Pickering-Brown SM, Seelaar H, Heutink P, van Swieten JC, Murrell JR, Ghetti B, Spina S, Grafman J, Hodges J, Spillantini MG, Gilman S, Lieberman AP, Kaye JA, Woltjer RL, Bigio EH, Mesulam M, Al-Sarraj S, Troakes C, Rosenberg RN, White CL 3rd, Ferrer I, Lladó A, Neumann M, Kretzschmar HA, Hulette CM, Welsh-Bohmer KA, Miller BL, Alzualde A, de Munain AL, McKee AC, Gearing M, Levey AI, Lah JJ, Hardy J, Rohrer JD, Lashley T, Mackenzie IR, Feldman HH, **Hamilton RL**, Dekosky ST, van der Zee J, Kumar-Singh S, Van Broeckhoven C, Mayeux R, Vonsattel JP, Troncoso JC, Kril JJ, Kwok JB, Halliday GM, Bird TD, Ince PG, Shaw PJ, Cairns NJ, Morris JC, McLean CA, DeCarli C, Ellis WG, Freeman SH, Frosch MP, Growdon JH, Perl DP, Sano M, Bennett DA, Schneider JA, Beach TG, Reiman EM, Woodruff BK, Cummings J, Vinters HV, Miller CA, Chui HC, Alafuzoff I, Hartikainen P, Seilhean D, Galasko D, Masliah E, Cotman CW, Tuñón MT, Martínez MC, Munoz DG, Carroll SL, Marson D, Riederer PF, Bogdanovic N, Schellenberg GD, Hakonarson H, Trojanowski JQ, Lee VM.  Common variants at 7p21 are associated with frontotemporal lobar degeneration with TDP-43 inclusions. Nat Genet 2010 42:234-239.

106. Omalu BI, **Hamilton RL**, Kamboh MI, DeKosky ST, Bailes J.  Chronic traumatic encephalopathy in a National Football League Player: Case report and emerging medicolegal practice questions.  J Forensic Nurs, 2010, 6: 40-46.

107. Caltagarone J, **Hamilton RL**, Murdoch G, Jing Z, DeFranco DB, Bowser R. Paxillin and hydrogen peroxide-induced clone 5 expression and distribution in control and Alzheimer disease hippocampi. J Neuropathol Exp Neurol. 2010: 69:356-71.

108. Pollack IF, **Hamilton RL**, Sobol RW, Nikiforova MN, Lyons-Weiler MA, Laframboise WA, Burger PC, Brat DJ, Rosenblum MK, Holmes EJ, Zhou T, Jakacki RI; for the Children's Oncology Group. IDH1 mutations are common in malignant gliomas arising in adolescents: a report from the Children's Oncology Group. Childs Nerv Syst. 2010; 27:87-94

109. Jun G, Naj AC, Beecham GW, Wang LS, Buros J, Gallins PJ, Buxbaum JD, Ertekin-Taner N, Fallin MD, Friedland R, Inzelberg R, Kramer P, Rogaeva E, St George-Hyslop P, Arnold SE, Baldwin CT, Barber R, Beach T, Bigio EH, Bird TD, Boxer A, Burke JR, Cairns N, Carroll SL, Chui HC, Clark DG, Cotman CW, Cummings JL, Decarli C, Diaz-Arrastia R, Dick M, Dickson DW, Ellis WG, Fallon KB, Farlow MR, Ferris S, Frosch MP, Galasko DR, Gearing M, Geschwind DH, Ghetti B, Gilman S, Giordani B, Glass J, Graff-Radford NR, Green RC, Growdon JH, **Hamilton RL**, Harrell LE, Head E, Honig LS, Hulette CM, Hyman BT, Jicha GA, Jin LW, Johnson N, Karlawish J, Karydas A, Kaye JA, Kim R, Koo EH, Kowall NW, Lah JJ, Levey AI, Lieberman A, Lopez OL, Mack WJ, Markesbery W, Marson DC, Martiniuk F, Masliah E, McKee AC, Mesulam M, Miller JW, Miller BL, Miller CA, Parisi JE, Perl DP, Peskind E, Petersen RC, Poon W, Quinn JF, Raskind M, Reisberg B, Ringman JM, Roberson ED, Rosenberg RN, Sano M, Schneider JA, Schneider LS, Seeley W, Shelanski ML, Smith CD, Spina S, Stern RA, Tanzi RE, Trojanowski JQ, Troncoso JC, Van Deerlin VM, Vinters HV, Vonsattel JP, Weintraub S, Welsh-Bohmer KA, Woltjer RL, Younkin SG, Cantwell LB, Dombroski BA, Saykin AJ, Reiman EM, Bennett DA, Morris JC, Lunetta KL, Martin ER, Montine TJ, Goate AM, Blacker D, Tsuang DW, Beekly D, Cupples LA, Hakonarson H, Kukull W, Foroud TM, Haines J, Mayeux R, Farrer LA, Pericak-Vance MA, Schellenberg GD; Alzheimer's Disease Genetics Consortium, Arnold SE, Baldwin CT, Barber R, Beach T, Bigio EH, Bird TD, Boxer A, Burke JR, Cairns N, Carroll SL, Chui HC, Clark DG, Cotman CW, Cummings JL, Decarli C, Diaz-Arrastia R, Dick M, Dickson DW, Ellis WG, Fallon KB, Farlow MR, Ferris S, Frosch MP, Galasko DR, Gearing M, Geschwind DH, Ghetti B, Gilman S, Giordani B, Glass J, Graff-Radford NR, Green RC, Growdon JH, Hamilton RL, Harrell LE, Head E, Honig LS, Hulette CM, Hyman BT, Jicha GA, Jin LW, Johnson N, Karlawish J, Karydas A, Kaye JA, Kim R, Koo EH, Kowall NW, Lah JJ, Levey AI, Lieberman A, Lopez OL, Mack WJ, Markesbery W, Marson DC, Martiniuk F, Masliah E, McKee AC, Mesulam M, Miller JW, Miller BL, Miller CA, Parisi JE, Perl DP, Peskind E, Petersen RC, Poon W, Quinn JF, Raskind M, Reisberg B, Ringman JM, Roberson ED, Rosenberg RN, Sano M, Schneider JA, Schneider LS, Seeley W, Shelanski ML, Smith CD, Spina S, Stern RA, Tanzi RE, Trojanowski JQ, Troncoso JC, Van Deerlin VM, Vinters HV, Vonsattel JP, Weintraub S, Welsh-Bohmer KA, Woltjer RL, Younkin SG.  Meta-analysis confirms CR1, CLU and PICALM as Alzheimer Disease Risk Loci and reveals interactions with APOE Genotypes. Arch Neurol, 2010, Sep 3 (epub ahead of print)

110. Pollack IF, **Hamilton RL**, Burger PC, Brat DJ, Rosenblum MK, Murdoch GH, Nikiforova MN, Holmes EJ, Zhou T, Cohen KJ, Jakacki RI; Children's Oncology Group. Akt activation is a common event in pediatric malignant gliomas and a potential adverse prognostic marker: a report from the Children's Oncology Group. J Neurooncol. 2010 Sep;99(2):155-63. Epub 2010 Jul 4

**Ronald L. Hamilton, M.D.**

111. Pollack IF, **Hamilton RL**, Sobol RW, Nikiforova MN, Nikiforov YE, Lyons-Weiler MA, Laframboise WA, Burger PC, Brat DJ, Rosenblum MK, Gilles FH, Yates AJ, Zhou T, Cohen KJ, Finlay JL, Jakacki RI; for the Children's Oncology Group. Mismatch repair deficiency is an uncommon mechanism of alkylator resistance in pediatric malignant gliomas: a report from the Children's Oncology Group. Pediatr Blood Cancer 2010 Jun 29 epub ahead of print

112. Bonneh-Barkay D, Wang G, Starkey A, **Hamilton RL**, Wiley CA. In vivo CHI3L1 (YKL-40) expression in astrocytes in acute and chronic neurological diseases. J Neuroinflammation 2010 Jun 11:7-34.

113. Hinkle DA, Mullett SJ, Gabris BE, **Hamilton RL**. DJ-1 expression in glioblastomas shows positive correlation with p53 expression and negative correlation with epidermal growth factor receptor amplification. Neuropathology 2010 May 19 (epub ahead of print)xx

114. Okada H, Kalinski P, Ueda R, Hoji A, Kohanbash G, Donegan TE, Mintz AH, Engh JA, Bartlett DL, Brown CK, Zeh H, Holtman MP, Reinhart TA, Whiteside TL,Butterfield LH, **Hamilton RL**, Potter DM, Pollack IF, Salazar AM, Lieberman FS. Induction of CD8+ T-cell responses against novel glioma-associated antigen peptides and clinical activity by vaccinations with {alpha}-type 1 polarized dendritic cells and polyinosinic-polycytidylic acid stabilized by lysine and carboxymethylcellulose In patients with recurrent malignant glioma. J Clin Oncol. 2011;29:330-6.PMID: 21149657

115. Kofler J, Bartynski WS, Reynolds TQ, Lieberman FS, Murdoch GH, **Hamilton RL**. Posterior reversible encephalopathy syndrome (PRES) with immune system activation, VEGF up-regulation, and cerebral amyloid angiopathy. J. Comput Assist Tomogr. 2011; 35:39-42. PMID: 21150450

116. Bonfield CM, Amin D, **Hamilton RL**, Gerszten PC. Extramedullary ependymoma near the conus medullaris with lumbar nerve root attachment: case report. Neurosurgery. 2011 Mar;68:E831-4. PMID:21311277

117. Fujita M, Kohanbash G, Fellows-Mayle W, **Hamilton RL**, Komohara Y, Decker SA, Ohlfest JR, Okada H.COX-2 blockade suppresses gliomagenesis by inhibiting myeloid-derived suppressor cells. Cancer Res. 2011 Apr 1;71:2664-74. Epub 2011 Feb 15. PMID: 21324923

118. Cohen KJ, Pollack IF, Zhou T, Buxton A, Holmes EF, Burger PC, Brat DJ, Rosenblum MK, **Hamilton RL**, Lavey RS, Heideman RL. Temozolomide in the treatment of high-grade gliomas in children: a report from the Children's Oncology Group.
Neuro Oncol. 2011 Mar;13:317-23. PMID: 21339192

119. Omalu B, Bailes J, **Hamilton RL**, Kamboh MI, Hammers J, Case M, Fitzsimmons R.
Emerging histomorphologic phenotypes of chronic traumatic encephalopathy in American athletes.
Neurosurgery. 2011 Jul;69:173-83; discussion 183. PMID: 21358359

120. Tang JB, Svilar D, Trivedi RN, Wang XH, Goellner EM, Moore B, **Hamilton RL**, Banze LA, Brown AR, Sobol RW. N-methylpurine DNA glycosylase and DNA polymerase beta modulate BER inhibitor potentiation of glioma cell to temozolomide. Neurosurgery Oncol. 2011;13:471-86. PMID: 21377995

121. Liu KW, Feng H, Bachoo R, Kazlauskas A, Smith EM, Symes K, **Hamilton RL**, Nagane M, Nishikawa R, Hu, B, Cheng Sy. SHP-2/PTPN 11 mediates gliomagenesis driven by PDGFRA and INK4A/ARF aberrations in mice and humans. J. Clin Invest. 2011 Mar;121:905-17. PMID: 21393858

122. Naj AC, Jun G, Beecham GW, Wang LS, Vardarajan BN, Buros J, Gallins PJ, Buxbaum JD, Jarvidk GP, Crane PK, Larson EB, Bird TB, Boeve BF, Graff-Radford NR, De Jager PL, Evans D, Schneider JA, Carrasquillo MM, Ertekin-Taner N, Younkin SG, Cruchaga C, Kauwe JS, Nowotny P, Kramer P, Hardy J, Huentelman MJ, Myers AJ, Barmada MM, Demirci FY, Baldwin CT, Green RC, Rogaeva E, St. George-Hyslop P, Arnold SE, Barber R, Beach T, Bigio EH, Bowen JD, Boxer A, Burke JR, Cairns NJ, Carlson CS, Carney RM, Carroll SL, Chui HC, Clark DG, Corneveaux J, Cotman CW, Cummings JL, Decarli C, DeKosy ST, Diaz-Arrastia R, Dick M, Dickson DW, Ellis WG, Faber KM, Fallon KB, Farlow MR, Ferris S. Frosch MP, Galasko Dr, Ganguli M, Gearing M, Geschwind DH, Ghetti B, Gilbert JR, Gilman S, Giordani B, Glass JD, Growdon JH, **Hamilton RL**,R, Koo EH, Kowall NW, Lah JJ, Levey AI, Lieberman AP, Lopez OL, Mack WJ, Marson DC, Martiniuk F, Mash DC, Masliah E, McCormick WC, McCurry SM, McDavid AN, McKee AC, Mesulam M, Miller BL, Miller JW, Parisi JE, Perl DP, Peskind E,Petersen, RC, Poon, WV, Quinn JF, Rajbhandary RA, Raskind M, Reisberg B, Ringman JM, Roberson ED, Rosenberg RN,Sano M, Schneider LS, Seeley W, Shelanksi ML, Slifer MA, Smith CD, Sonnen JA, Spina S. Stern RA, Tanzi RE, Trojanowski JQ, Troncoso JC, Van Deerlin VM, Vinters HV, Vonsattel JP, Weintraub S, Welsh-Bohmer KA, Williamson

**Ronald L. Hamilton, M.D.**

J, Woltjer RL,Cantwell LB, Dombroski BA, Beekly D, Lunetta KL, Martin ER, Kamboh MI, Saykin AJ, Reiman EM, Bennett DA, Morris JC, Montine TJ, Goate AM, Iacker D, Tsuang DW, Hakonarson, H, Kukull WA, Foroud TM, Haines JL, Mayeux R, Pericak-Vance MA, Farrer LA, Schellenberg GD. Commons variants as MS4A4/MS4A6E, CD2AP, CD33 and EPHA1 are associated with late Onset Alzheimer's Disease. Nat Genet. 2011 May;43:436-41 Epub 2011 Apr 3. PMID: 21460841

123.   Chen-Plotkin AS, Martinez-Lage M,Sleiman PM, Hu W, Greene R, Wood  EM, Bing S, Grossman M, Schellenberg GD, Hatanpaa KJ, Weiner MF, White CL 3rd, Brooks WS, Halliday GM, Kril JJ, Gearing M, Beach TG, Graff-Radford NR, Dickson DW, Rademakers R, Boeve BF, Pickering-Brown SM, Snowden J, van Swieten JC, Heutink P, Seelaar H, Murrell JR, Ghetti B, Spina S, Grafman J, Kaye JA, Woltjer RL, Mesulam M, Bigio E, Llad'o A, Miller BL, Alzualde A, Moreno F,Rohrer JD, Mackenzie IR, Feldman HH, **Hamilton RL**, Cruts M, Engelborghs S, De Deyn PP, Van Broeckhoven C, Bird TD, Cairns NJ, Goate A, Frosch MP, Riederer PF, Bogdanovic N, Lee VM, Trojanowksi JQ, Van Deerlin VM. Genetic and clinical features of progranulin-associated frontotemporal lobar degeneration. Arch Neurol. 2011 Apr;68:488-97. PMID: 21482928

124.   Nikiforova MN, **Hamilton RL**. Molecular diagnostics of gliomas. Arch Pathol Lab Med. 2011 May;135:558-68. Review. PMID: 21526954

125.   Monaco EA 3rd, Armah HB, Nikiforova MN, **Hamilton RL**, Engh JA. Grade II Oligodendroglioma localized to the corpus callosum. Brain Tumor Pathol. 2011 Oct;28:305-9. Epub 2011 Jul 22. PMID: 21833577

126.   Horbinski C, Hobbs, J, Cieply K, Dacic S, **Hamilton RL.** EGFR expression stratifies oligodendroglioma behavior.Am J Pathol. 2011 Oct; 179:1638-44. Epub 2011 Aug 11. PMID: 21839716

127.   Omalu B, hammers, JL, bailes J**, Hamilton RL**. Kamboh MI, Webster G, Fitzsimmons RP. Chronic traumatic Encephalopathy  in an Iraqi war veteran with posttraumatic stress disorder who committed suicide. Neurosurg Focus. 2011 Nov; :E3. PMID: 22044102

128.   Liu Y, Komohara Y, Domenick N, Ohno M, Ikeura M, **Hamilton RL**, Horbinski C, Wang X, Ferrone S, Okada H. Expression of antigen processing molecules in brain metastasis of breast cancer. Cancer Immunol Immunother. 2011 Nov 8. (Epub ahead of print } PMID:22055046

129.   Feng H, Hu B, Liu KW, Li Y, Lu X, Cheng T, Yiin JJ, Lu S, Keezer S, Fenton T, Furnari FB, **Hamilton RL**, Vuori K, Sarkaria JN, Nagane M, Nishikawa R, Cavenee WK, Cheng SY. Activation of Rac 1 by src-dependent phosphorylation of Dock180(Y1811) mediates PDGFRa-stimulated glioma tumorigenesis in mice and humans. J Clin Invest. 2011 Dec; 121:4670-84. doi: 10.1172/JCI58559. Epub 2011 Nov 14. PMID: 22080864

130.   Horbinski C, Nikiforova MN, Hobbs J, Bortoluzzi S. Cieply K, Dacic S, **Hamilton RL**. The importance of 10q status in an outcomes-based comparison between 1p/19q fluorescence in situ hybridization and polymerase chain reaction-based microsatellite loss of heterozygosity analysis of oligodendrogliomas.  J. Neuropathol Exp Neurol. 2012 Jan;71:73-82. PMID: 22157622

131.   Ikonomovic MD, Abrahamson EE, Price JC, **Hamilton RL**, Mathis CA, Paljug WR, Cohen AD, Mizukami K, DeKosky ST, Lopez OL, Klunk WE. Early AD pathology in a {C-11} PiB-negative case: a PiB-amyloid imaging, biochemical, and  immunohistochemical study. Acta Neuropathol. 2012 Mar;123:433-47. Epub 2012 Jan 24. PMID: 22271153

132.   Feng H, Hu B, Jarzynka MJ, Li Y, Keezer S, Johns TG, Tang CK, **Hamilton RL**, Vuuori K, Nishikawa R, Sarkaria JN, Fenton T, Cheng T, Furnari FB, Cavenee WK, Cheng SY. Phosphorylation of dedicator of cytokinesis 1(Dock 180) at tyrosine residue Y722 by Src family kinases mediates EGRFvIII-driven glioblastoma tumorigenesis. Proc Natl Acad Sci U S A. 2012 Feb 21;109:3018-23. Epub 2012 Feb 7. PMID: 22323579

133.   Wu Y, Lou H, Alerte TN, Stachowski EK, Chen J, Singleton AB, **Hamilton RL**, Perez RG. Neuroscience. 2012 Jan 25. {Epubahead a print} PMID: 22326202

134.   Murray PS, Kirkwood CM, Gray MC, Ikonomovic MD, Paljug WR, Abrahamson EE, Henteleff RA, **Hamilton RL**, Kofler JK, Klunk WE, Lopez OL, Penzes P, Sweet RA. β-Amyloid 42/40 ratio and kalirin expression in Alzheimer disease with psychosis. Neurobiol Aging. 2012 Mar 17. [Epub ahead of print] PMID:22429885

**Ronald L. Hamilton, M.D.**

135.    Choi SH, Olabarrieta M, Lopez OL, Maruca V, DeKosky ST, **Hamilton RL**, Becker JT. Gray Matter Atrophy Associated with Extrapyramidal Signs in the Lewy Body Variant of Alzheimer's Disease. J Alzheimers Dis. 2012 Aug 9. [Epub ahead of print] PMID:22886020

136.    Armstrong RA, **Hamilton RL**, Mackenzie IR, Hedreen J, Cairns NJ. Laminar Distribution of the Pathological Changes in Sporadic Frontotemporal Lobar Degeneration with TDP-43 Proteinopathy: A Quantitative Study Using Polynomial Curve Fitting. Neuropathol Appl Neurobiol. 2012 Jul 16. [Epub ahead of print] PMID:22804696

137.    Atkinson DM, **Hamilton RL** A 52-year-old male with visual changes. Brain Pathol. 2012 Jul;22(4):575-8. PMID:22697384

138.    Zou F, Chai HS, Younkin CS, Allen M, Crook J, Pankratz VS, Carrasquillo MM, Rowley CN, Nair AA, Middha S, Maharjan S, Nguyen T, Ma L, Malphrus KG, Palusak R, Lincoln S, Bisceglio G, Georgescu C, Kouri N, Kolbert CP, Jen J, Haines JL, Mayeux R, Pericak-Vance MA, Farrer LA, Schellenberg GD; Alzheimer's Disease Genetics Consortium, Petersen RC, Graff-Radford NR, Dickson DW, **Hamilton RL**, Younkin SG, Ertekin-Taner N. Brain expression genome-wide association study (eGWAS) identifies human disease-associated variants. PLoS Genet. 2012;8(6): e1002707. Epub 2012 Jun 7 PMID:22685416

139.    Horbinski C, Nikiforova MN, Hagenkord JM, **Hamilton RL**, Pollack IF. Interplay among BRAF, p16, p53, and MIB1 in pediatric low-grade gliomas. Neuro Oncol. 2012 Jun;14(6):777-89 (1012) PMID:22492957

140.    Hobbs J, Nikiforova MN, Fardo DW, Bortoluzzi S, Cieply K, **Hamilton RL**, Horbinski C. Paradoxical relationship between the degree of EGFR amplification and outcome in glioblastomas. Am J Surg Pathol. 2012 Aug;36(8):1186-93. PMID:22472960

141. Armstrong, R. A., **R. L. Hamilton**, I. R. Mackenzie, J. Hedreen and N. J. Cairns. "Laminar Distribution of the Pathological Changes in Sporadic Frontotemporal Lobar Degeneration with Transactive Response (Tar) DNA-Binding Protein of 43 Kda (Tdp-43) Proteinopathy: A Quantitative Study Using Polynomial Curve Fitting." *Neuropathol Appl Neurobiol* 39, no. 4 (2013): 335-47.

142. Clark, K. H., J. L. Villano, M. N. Nikiforova, **R. L. Hamilton** and C. Horbinski. "1p/19q Testing Has No Significance in the Workup of Glioblastomas." *Neuropathol Appl Neurobiol,* (2013).

143. Gheorghe, G., O. Radu, S. Milanovich, **R. L. Hamilton**, R. Jaffe, J. F. Southern and J. A. Ozolek. "Pathology of Central Nervous System Posttransplant Lymphoproliferative Disorders: Lessons from Pediatric Autopsies." *Pediatr Dev Pathol* 16, no. 2 (2013): 67-73.

1444. Holton, P., M. Ryten, M. Nalls, D. Trabzuni, M. E. Weale, D. Hernandez, H. Crehan, J. R. Gibbs, R. Mayeux, J. L. Haines, L. A. Farrer, M. A. Pericak-Vance, G. D. Schellenberg, M. Ramirez-Restrepo, A. Engel, A. J. Myers, J. J. Corneveaux, M. J. Huentelman, A. Dillman, M. R. Cookson, E. M. Reiman, A. Singleton, J. Hardy and R. Guerreiro. "Initial Assessment of the Pathogenic Mechanisms of the Recently Identified Alzheimer Risk Loci." *Ann Hum Genet* 77, no. 2 (2013): 85-105.

145. Miyashita, A., A. Koike, G. Jun, L. S. Wang, S. Takahashi, E. Matsubara, T. Kawarabayashi, M. Shoji, N. Tomita, H. Arai, T. Asada, Y. Harigaya, M. Ikeda, M. Amari, H. Hanyu, S. Higuchi, T. Ikeuchi, M. Nishizawa, M. Suga, Y. Kawase, H. Akatsu, K. Kosaka, T. Yamamoto, M. Imagawa, T. Hamaguchi, M. Yamada, T. Moriaha, M. Takeda, T. Takao, K. Nakata, Y. Fujisawa, K. Sasaki, K. Watanabe, K. Nakashima, K. Urakami, T. Ooya, M. Takahashi, T. Yuzuriha, K. Serikawa, S. Yoshimoto, R. Nakagawa, J. W. Kim, C. S. Ki, H. H. Won, D. L. Na, S. W. Seo, I. Mook-Jung, P. St George-Hyslop, R. Mayeux, J. L. Haines, M. A. Pericak-Vance, M. Yoshida, N. Nishida, K. Tokunaga, K. Yamamoto, S. Tsuji, I. Kanazawa, Y. Ihara, G. D. Schellenberg, L. A Farrer and R. Kuwano. "Sorl1 Is Genetically Associated with Late-Onset Alzheimer's Disease in Japanese, Koreans and Caucasians." *PLoS One* 8, no. 4 (2013): e58618.

146. Pang, B., M. B. Durso, **R. L. Hamilton** and M. N. Nikiforova. "A Novel Cold-Pcr/Fmca Assay Enhances the Detection of Low-Abundance Idh1 Mutations in Gliomas." *Diagn Mol Pathol* 22, no. 1 (2013): 28-34.

147. Reitz, C., G. Jun, A. Naj, R. Rajbhandary, B. N. Vardarajan, L. S. Wang, O. Valladares, C. F. Lin, E. B. Larson, N. R. Graff-Radford, D. Evans, P. L. De Jager, P. K. Crane, J. D. Buxbaum, J. R. Murrell, T. Raj, N. Ertekin-Taner, M. Logue, C. T. Baldwin, R. C. Green, L. L. Barnes, L. B. Cantwell, M. D. Fallin, R. C. Go, P. Griffith, T. O. Obisesan, J. J. Manly, K. L. Lunetta, M. I. Kamboh, O. L. Lopez, D. A. Bennett, H. Hendrie, K. S. Hall, A. M. Goate, G. S. Byrd, W. A. Kukull, T. M. Foroud, J. L. Haines, L. A. Farrer, M. A. Pericak-Vance, G. D. Schellenberg and R. Mayeux. "Variants

**Ronald L. Hamilton, M.D.**

in the Atp-Binding Cassette Transporter (Abca7), Apolipoprotein E 4,and the Risk of Late-Onset Alzheimer Disease in African Americans." *JAMA* 309, no. 14 (2013): 1483-92.

148. Schlegel, J., M. J. Sambade, S. Sather, S. J. Moschos, A. C. Tan, A. Winges, D. DeRyckere, C. C. Carson, D. G. Trembath, J. J. Tentler, S. G. Eckhardt, P. F. Kuan, **R. L. Hamilton**, L. M. Duncan, C. R. Miller, N. 9. Nikolaishvili-Feinberg, B. R. Midkiff, J. Liu, W. Zhang, C. Yang, X. Wang, S. V. Frye, H. S. Earp, J. M. Shields and D. K. Graham. "Mertk Receptor Tyrosine Kinase Is a Therapeutic Target in Melanoma." *J Clin Invest* 123, no. 5 (2013): 2257-67.

150. Spina, S., A. D. Van Laar, J. R. Murrell, **R. L. Hamilton**, J. K. Kofler, F. Epperson, M. R. Farlow, O. L. Lopez, J. Quinlan, S. T. DeKosky and B. Ghetti. "Phenotypic Variability in Three Families with Valosin-Containing Protein Mutation." *Eur J Neurol* 20, no. 2 (2013): 251-8.

151. Tsuang, D., J. B. Leverenz, O. L. Lopez, **R. L. Hamilton**, D. A. Bennett, J. A. Schneider, A. S. Buchman, E. B. Larson, P. K. Crane, J. A. Kaye, P. Kramer, R. Woltjer, J. Q. Trojanowski, D. Weintraub, A. S. Chen-Plotkin, D. J. Irwin, J. Rick, G. D. Schellenberg, G. S. Watson, W. Kukull, P. T. Nelson, G. A. Jicha, J. H. Neltner, D. Galasko, E. Masliah, J. F. Quinn, K. A. Chung, D. Yearout, I. F. Mata, J. Y. Wan, K. L. Edwards, T. J. Montine and C. P. Zabetian. "Apoe Epsilon4 Increases Risk for Dementia in Pure Synucleinopathies." *JAMA Neurol* 70, no. 2 (2013): 223-8.

152. Yeung, J. T., **R. L. Hamilton**, K. Ohnishi, M. Ikeura, D. M. Potter, M. N. Nikiforova, S. Ferrone, R. I. Jakacki, I. F. Pollack and H. Okada. "Loh in the Hla Class I Region at 6p21 Is Associated with Shorter Survival in Newly Diagnosed Adult Glioblastoma." *Clin Cancer Res* 19, no. 7 (2013): 1816-26.

153. Yeung, J. T., **R. L. Hamilton**, H. Okada, R. I. Jakacki and I. F. Pollack. "Increased Expression of Tumor-Associated Antigens in Pediatric and Adult Ependymomas: Implication for Vaccine Therapy." *J Neurooncol* 111, no. 2 (2013): 103-11.

154. **Hamilton R**, Krauze M, Romkes M, Omolo B, Konstantinopoulos P, Reinhart T, Harasymczuk M, Wang Y, Lin Y, Ferrone S, Whiteside T, Bortoluzzi S, Werley J, Nukui T, Fallert-Junecko B, Kondziolka D, Ibrahim J, Becker D, Kirkwood J, Moschos S. Pathologic and gene expression features of metastatic melanomas to the brain.Cancer. 2013 Aug 1;119(15):2737-46. doi: 10.1002/cncr.28029. Epub 2013 May 21.PMID:23695963 [PubMed - in process]

155. Lam S, Grandhi R, Wong R, **Hamilton R**, Greene S. Neuromuscular hamartoma of the sciatic nerve: Case report and review of the literature. Surg Neurol Int. 2013;4:8. doi: 10.4103/2152-7806.106266. Epub 2013 Jan 18.PMID:23493803[PubMed]

156. Reitz C, Mayeux R; Alzheimer's Disease Genetics Consortium. TREM2 and neurodegenerative disease. N Engl J Med. 2013 Oct 17;369(16):1564-5. doi: 10.1056/NEJMc1306509#SA1. PMID:24131184

157. Tempel ZJ, Johnson SA, Richard PS, Friedlander RM, Rothfus WE, **Hamilton RL**. Parasellar arachnoid cyst presenting with a nonpupil sparing third nerve palsy mimicking a posterior communicating artery aneurysm in an adult. Surg Neurol Int. 2013 Jul 9;4:87. doi: 10.4103/2152-7806.114799. eCollection 2013.PMID:23956930

158. Murray PS, Kirkwood CM, Gray MC, Fish KN, Ikonomovic MD, **Hamilton RL**, Kofler JK, Klunk WE, Lopez OL, Sweet RA. Hyperphosphorylated tau is elevated in Alzheimer's Disease with psychosis. J Alzheimers Dis, 2014 204;39:759-773. PMID:24270207

159. Oborski MJ, Laymon CM, Lieberman FS, Drappatz J, **Hamilton RL**, Mountz JM. First use of (18)F-labeled ML-10 PET to assess apoptosis change in a newly diagnosed glioblastoma multiforme patient before and early after therapy. Brain Behav 2014 4:312-315. PMID:24683522

160  Shin SS, Murdoch G, Hamilton RL, Faraji AH, Kano H, Zwagerman NT, Gardner PA, Lunsford LD, Friedlander RM The Pathological Response of Cavernous Malformations Following Radiosurgery.  J Neurosurg (in press).

160. Pollack IF, Jakacki RI, Butterfield LH, **Hamilton RL**, Panigrahy A, Potter DM, Connelly AK, Dibridge SA, Whiteside TL, Okada H. Antigen-specific immune responses and clinical outcome after vaccination with glioma-associated antigen peptides and polyvinosinic-polycytidylic Acid stabilized by lysine and carboxymethylcellulose in children with newly diagnosed malignant brainstem and nonbrainstem gliomas. J Clin Oncol. 2014 Jul 1;32(19):2050-8. PMID:24888813

161. Naj AC, Jun G, Reitz C, Kunkle BW, Perry W, Park YS, Beecham GW, Rajbhandary RA, Hamilton-Nelson KL, Wang LS, Kauwe JS, Huentelman MJ, Myers AJ, Bird TD, Boeve BF, Baldwin CT, Jarvik GP, Crane PK, Rogaeva E, Barmada MM, Demirci FY, Cruchaga C, Kramer PL, Ertekin-Taner N, Hardy J, Graff-Radford NR, Green RC, Larson

**Ronald L. Hamilton, M.D.**

EB, St George-Hyslop PH, Buxbaum JD, Evans DA, Schneider JA, Lunetta KL, Kamboh MI, Saykin AJ, Reiman EM, De Jager PL, Bennett DA, Morris JC, Montine TJ, Goate AM, Blacker D, Tsuang DW, Hakonarson H, Kukull WA, Foroud TM, Martin ER, Haines JL, Mayeux RP, Farrer LA, Schellenberg GD, Pericak-Vance MA; Alzheimer Disease Genetics Consortium, Albert MS, Albin RL, Apostolova LG, Arnold SE, Barber R, Barnes LL, Beach TG, Becker JT, Beekly D, Bigio EH, Bowen JD, Boxer A, Burke JR, Cairns NJ, Cantwell LB, Cao C, Carlson CS, Carney RM, Carrasquillo MM, Carroll SL, Chui HC, Clark DG, Corneveaux J, Cribbs DH, Crocco EA, DeCarli C, DeKosky ST, Dick M, Dickson DW, Duara R, Faber KM, Fallon KB, Farlow MR, Ferris S, Frosch MP, Galasko DR, Ganguli M, Gearing M, Geschwind DH, Ghetti B, Gilbert JR, Glass JD, Growdon JH, **Hamilton RL**, Harrell LE, Head E, Honig LS, Hulette CM, Hyman BT, Jicha GA, Jin LW, Karydas A, Kaye JA, Kim R, Koo EH, Kowall NW, Kramer JH, LaFerla FM, Lah JJ, Leverenz JB, Levey AI, Li G, Lieberman AP, Lin CF, Lopez OL, Lyketsos CG, Mack WJ, Martiniuk F, Mash DC, Masliah E, McCormick WC, McCurry SM, McDavid AN, McKee AC, Mesulam M, Miller BL, Miller CA, Miller JW, Murrell JR, Olichney JM, Pankratz VS, Parisi JE, Paulson HL, Peskind E, Petersen RC, Pierce A, Poon WW, Potter H, Quinn JF, Raj A, Raskind M, Reisberg B, Ringman JM, Roberson ED, Rosen HJ, Rosenberg RN, Sano M, Schneider LS, Seeley WW, Smith AG, Sonnen JA, Spina S, Stern RA, Tanzi RE, Thornton-Wells TA, Trojanowski JQ, Troncoso JC, Valladares O, Van Deerlin VM, Van Eldik LJ, Vardarajan BN, Vinters HV, Vonsattel JP, Weintraub S, Welsh-Bohmer KA, Williamson J, Wishnek S, Woltjer RL, Wright CB, Younkin SG, Yu CE, Yu L. . Effects of multiple genetic Loci on age at onset in late-onset Alzheimer disease: a genome-wide association study. JAMA Neurol. 2014 Nov 1;71(11):1394-404. doi: 10.1001/jamaneurol.2014.1491

162. Pollack IF, Jakacki RI, Butterfield LH, **Hamilton RL**, Panigrahy A, Potter DM, Connelly AK, Dibridge SA, Whiteside TL, Okada H. Antigen-specific immune responses and clinical outcome after vaccination with glioma-associated antigen peptides and polyinosinic-polycytidylic acid stabilized by lysine and carboxymethylcellulose in children with newly diagnosed malignant brainstem and nonbrainstem gliomas. J Clin Oncol. 2014 Jul 1;32(19):2050-8. doi: 10.1200/JCO.2013.54.0526. Epub 2014 Jun 2. PMID: 24888813

163.. Okada H, Butterfield LH, **Hamilton RL**, Hoji A, Sakaki M, Ahn BJ, Kohanbash G, Drappatz J, Engh J, Amankulor N, Lively MO, Chan MD, Salazar AM, Shaw EG, Potter DM, Lieberman FS. Induction of robust type-1 CD8+ T-cell responses in WHO grade II low-grade glioma patients receiving peptide-based vaccines in combination with poly-ICLC Clin Cancer Res. 2014 Nov 25. pii: clincanres.1790.2014

164. Salloway S, Sperling R, Fox NC, Blennow K, Klunk W, Raskind M, Sabbagh M, Honig LS, Porsteinsson AP, Ferris S, Reichert M, Ketter N, Nejadnik B, Guenzler V, Miloslavsky M, Wang D, Lu Y, Lull J, Tudor IC, Liu E, Grundman M, Yuen E, Black R, Brashear HR; **Hamilton RL**, Bapineuzumab 301 and 302 Clinical Trial Investigators. Two phase 3 trials of bapineuzumab in mild-to-moderate Alzheimer's disease N Engl J Med. 2014 Jan 23;370(4):322-33. doi: 10.1056/NEJMoa1304839.

165. Leone JP, Bhargava R, Theisen BK, **Hamilton RL**, Lee AV, Brufsky AM. Expression of high affinity folate receptor in breast cancer brain metastasis. Oncotarget. 2015 Jun 25. [Epub ahead of print] PMID: 24450891

166. Wang LS, Naj AC, Graham RR, Crane PK, Kunkle BW, Cruchaga C, Murcia JD, Cannon-Albright L, Baldwin CT, Zetterberg H, Blennow K, Kukull WA, Faber KM, Schupf N, Norton MC, Tschanz JT, Munger RG, Corcoran CD, Rogaeva E; Alzheimer's Disease Genetics Consortium, Lin CF, Dombroski BA, Cantwell LB, Partch A, Valladares O, Hakonarson H, St George-Hyslop P, Green RC, Goate AM, Foroud TM, Carney RM, Larson EB, Behrens TW, Kauwe JS, Haines JL, Farrer LA, Pericak-Vance MA, Mayeux R, Schellenberg GD; National Institute on Aging-Late-Onset Alzheimer's Disease (NIA-LOAD) Family Study, Albert MS, Albin RL, Apostolova LG, Arnold SE, Barber R, Barmada M, Barnes LL, Beach TG, Becker JT, Beecham GW, Beekly D, Bennett DA, Bigio EH, Bird TD, Blacker D, Boeve BF, Bowen JD, Boxer A, Burke JR, Buxbaum JD, Cairns NJ, Cao C, Carlson CS, Carroll SL, Chui HC, Clark DG, Cribbs DH, Crocco EA, DeCarli C, DeKosky ST, Demirci FY, Dick M, Dickson DW, Duara R, Ertekin-Taner N, Fallon KB, Farlow MR, Ferris S, Frosch MP, Galasko DR, Ganguli M, Gearing M, Geschwind DH, Ghetti B, Gilbert JR, Glass JD, Graff-Radford NR, Growdon JH, **Hamilton RL**, Hamilton-Nelson KL, Harrell LE, Head E, Honig LS, Hulette CM, Hyman BT, Jarvik GP, Jicha GA, Jin LW, Jun G, Jun G, Kamboh MI, Karydas A, Kaye JA, Kim R, Koo EH, Kowall NW, Kramer JH, LaFerla FM, Lah JJ, Leverenz JB, Levey AI, Li G, Lieberman AP, Lopez OL, Lunetta KL, Lyketsos CG, Mack WJ, Marson DC, Martin ER, Martiniuk F, Mash DC, Masliah E, McCormick WC, McCurry SM, McDavid AN, McKee AC, Mesulam WM, Miller BL, Miller CA, Miller JW, Montine TJ, Morris JC, Murrell JR, Olichney JM, Parisi JE, Perry W, Peskind E, Petersen RC, Pierce A, Poon WW, Potter H, Quinn JF, Raj A, Raskind M, Reiman EM, Reisberg B, Reitz C, Ringman JM, Roberson ED, Rosen HJ, Rosenberg RN, Sano M, Saykin AJ, Schneider JA, Schneider LS, Seeley WW, Smith AG, Sonnen JA, Spina S, Stern RA, Tanzi RE, Thornton-Wells TA, Trojanowski JQ, Troncoso JC, Tsuang DW, Van Deerlin VM, Van Eldik LJ, Vardarajan BN, Vinters HV, Vonsattel JP, Weintraub S, Welsh-Bohmer KA, Williamson J, Wishnek S, Woltjer RL, Wright CB, Younkin SG, Yu CE, Yu L.**Rarity of the Alzheimer disease-protective APP A673T variant in the United States.** JAMA Neurol. 2015 Feb;72(2):209-16. doi: 10.1001/jamaneurol.2014.2157.

**Ronald L. Hamilton, M.D.**

167. 2. Jun G, Ibrahim-Verbaas CA, Vronskaya M, Lambert JC, Chung J, Naj AC, Kunkle BW, Wang LS, Bis JC, Bellenguez C, Harold D, Lunetta KL, Destefano AL, Grenier-Boley B, Sims R, Beecham GW, Smith AV, Chouraki V, Hamilton-Nelson KL, Ikram MA, Fievet N, Denning N, Martin ER, Schmidt H, Kamatani Y, Dunstan ML, Valladares O, Laza AR, Zelenika D, Ramirez A, Foroud TM, Choi SH, Boland A, Becker T, Kukull WA, van der Lee SJ, Pasquier F, Cruchaga C, Beekly D, Fitzpatrick AL, Hanon O, Gill M, Barber R, Gudnason V, Campion D, Love S, Bennett DA, Amin N, Berr C, Tsolaki M, Buxbaum JD, Lopez OL, Deramecourt V, Fox NC, Cantwell LB, Tárraga L, Dufouil C, Hardy J, Crane PK, Eiriksdottir G, Hannequin D, Clarke R, Evans D, Mosley TH Jr, Letenneur L, Brayne C, Maier W, De Jager P, Emilsson V, Dartigues JF, Hampel H, Kamboh MI, de Bruijn RF, Tzourio C, Pastor P, Larson EB, Rotter JI, O'Donovan MC, Montine TJ, Nalls MA, Mead S, Reiman EM, Jonsson PV, Holmes C, St George-Hyslop PH, Boada M, Passmore P, Wendland JR, Schmidt H, Morgan K, Winslow AR, Powell JF, Carasquillo M, Younkin SG, Jakobsdóttir J, Kauwe JS, Wilhelmsen KC, Rujescu D, Nöthen MM, Hofman A, Jones L; IGAP Consortium, Haines JL, Psaty BM, Van Broeckhoven C, Holmans P, Launer LJ, Mayeux R, Lathrop M, Goate AM, Escott-Price V, Seshadri S, Pericak-Vance MA, Amouyel P, Williams J, van Duijn CM, Schellenberg GD, Farrer LA and . Collaborators (including **Hamilton RL**) (296)  **A novel Alzheimer disease locus located near the gene encoding tau protein**. Mol Psychiatry. 2015 Mar 17. doi: 10.1038/mp.2015.23.

168. . Østergaard SD, Mukherjee S, Sharp SJ, Proitsi P, Lotta LA, Day F, Perry JR, Boehme KL, Walter S, Kauwe JS, Gibbons LE; Alzheimer's Disease Genetics Consortium; GERAD1 Consortium; EPIC-InterAct Consortium, Larson EB, Powell JF, Langenberg C, Crane PK, Wareham NJ, Scott RA.
Collaborators (including **Hamilton RL**) (296)  Associations between Potentially Modifiable Risk Factors and Alzheimer Disease: A Mendelian Randomization Study. PLoS Med. 2015 Jun 16;12(6):e1001841; discussion e1001841. doi:

169. Wang P, Bahreini A, Gyanchandani R, Lucas PC, Hartmaier RJ, Watters RJ, Jonnalagadda AR, Trejo Bittar HE, Berg A, **Hamilton RL**, Kurland BF, Weiss KR, Mathew A, Leone JP, Davidson NE, Nikiforova MN, Brufsky AM, Ambros TF, Stern AM, Puhalla SL, Lee AV, Oesterreich S. Sensitive detection of mono- and polyclonal ESR1 mutations in primary tumors, metastatic lesions and cell free DNA of breast cancer patients. Clin Cancer Res. 2015 Oct 23. pii: 1534.2015. PMID: 26500237

170. Salgado CM, Basu D, Nikiforova M, **Hamilton RL**, Gehris R, Jakacki R, Panigrahy A, Yatsenko S, Reyes-Múgica M. Amplification of mutated NRAS leading to congenital melanoma in neurocutaneous melanocytosis. Melanoma Res. 2015 Oct;25(5):453-60.  PMID: 26266759

171. Shin SS, Murdoch G, Hamilton RL, Faraji AH, Kano H, Zwagerman NT, Gardner PA, Lunsford LD, Friedlander RM. Pathological response of cavernous malformations following radiosurgery. J Neurosurg. 2015 Oct;123(4):938-44. doi: 10.3171/2014.10.JNS14499. Epub 2015 Jun 19. PMID: 26090838

--------------------

172. Mukherjee S, Walter S, Kauwe JS, Saykin AJ, Bennett DA, Larson EB, Crane PK, Glymour MM; Adult Changes in Thought Study Investigators; Religious Orders Study/Memory and Aging Project Investigators; Alzheimer's Disease Genetics Consortium. Alzheimers Dement. Genetically predicted body mass index and Alzheimer's disease-related phenotypes in three large samples: Mendelian randomization analyses. 2015 Dec;11(12):1439-51. doi: 10.1016/j.jalz.2015.05.015. Epub 2015 Jun 12. PMID: 26079416

173. Ghani M, Reitz C, Cheng R, Vardarajan BN, Jun G, Sato C, Naj A, Rajbhandary R, Wang LS, Valladares O, Lin CF, Larson EB, Graff-Radford NR, Evans D, De Jager PL, Crane PK, Buxbaum JD, Murrell JR, Raj T, Ertekin-Taner N, Logue M, Baldwin CT, Green RC, Barnes LL, Cantwell LB, Fallin MD, Go RC, Griffith PA, Obisesan TO, Manly JJ, Lunetta KL, Kamboh MI, Lopez OL, Bennett DA, Hendrie H, Hall KS, Goate AM, Byrd GS, Kukull WA, Foroud TM, Haines JL, Farrer LA, Pericak-Vance MA, Lee JH, Schellenberg GD, St George-Hyslop P, Mayeux R, Rogaeva E; Alzheimer's Disease Genetics Consortium. Association of Long Runs of Homozygosity With Alzheimer Disease Among African American Individuals. JAMA Neurol. 2015 Nov;72(11):1313-23. doi: 10.1001/jamaneurol.2015.1700. PMID: 26366463

174. Nikiforova MN, Wald AI, Melan MA, Roy S, Zhong S, Hamilton RL, Lieberman FS, Drappatz J, Amankulor NM, Pollack IF, Nikiforov YE, Horbinski C.
Targeted next-generation sequencing panel (GlioSeq) provides comprehensive genetic profiling of central nervous system tumors. Neuro Oncol. 2016 Mar;18(3):379-87. doi: 10.1093/neuonc/nov289. Epub 2015 Dec 17. PMID: 2668176

175. Morrissy AS, Garzia L, Shih DJ, Zuyderduyn S, Huang X, Skowron P, Remke M, Cavalli FM, Ramaswamy V, Lindsay PE, Jelveh S, Donovan LK, Wang X, Luu B, Zayne K, Li Y, Mayoh C, Thiessen N, Mercier E, Mungall KL, Ma

**Ronald L. Hamilton, M.D.**

Y, Tse K, Zeng T, Shumansky K, Roth AJ, Shah S, Farooq H, Kijima N, Holgado BL, Lee JJ, Matan-Lithwick S, Liu J, Mack SC, Manno A, Michealraj KA, Nor C, Peacock J, Qin L, Reimand J, Rolider A, Thompson YY, Wu X, Pugh T, Ally A, Bilenky M, Butterfield YS, Carlsen R, Cheng Y, Chuah E, Corbett RD, Dhalla N, He A, Lee D, Li HI, Long W, Mayo M, Plettner P, Qian JQ, Schein JE, Tam A, Wong T, Birol I, Zhao Y, Faria CC, Pimentel J, Nunes S, Shalaby T, Grotzer M, Pollack IF, Hamilton RL, Li XN, Bendel AE, Fults DW, Walter AW, Kumabe T, Tominaga T, Collins VP, Cho YJ, Hoffman C, Lyden D, Wisoff JH, Garvin JH Jr, Stearns DS, Massimi L, Schüller U, Sterba J, Zitterbart K, Puget S, Ayrault O, Dunn SE, Tirapelli DP, Carlotti CG, Wheeler H, Hallahan AR, Ingram W, MacDonald TJ, Olson JJ, Van Meir EG, Lee JY, Wang KC, Kim SK, Cho BK, Pietsch T, Fleischhack G, Tippelt S, Ra YS, Bailey S, Lindsey JC, Clifford SC, Eberhart CG, Cooper MK, Packer RJ, Massimino M, Garre ML, Bartels U, Tabori U, Hawkins CE, Dirks P, Bouffet E, Rutka JT, Wechsler-Reya RJ, Weiss WA, Collier LS, Dupuy AJ, Korshunov A, Jones DT, Kool M, Northcott PA, Pfister SM, Largaespada DA, Mungall AJ, Moore RA, Jabado N, Bader GD, Jones SJ, Malkin D, Marra MA, Taylor MD. Divergent clonal selection dominates medulloblastoma at recurrence. Nature. 2016 Jan 21;529(7586):351-7. doi: 10.1038/nature16478. Epub 2016 Jan 13

176. Gandhoke GS, Yilmaz S, Grunwaldt L, Hamilton RL, Salvetti DJ, Greene S. A case of spinal epidural venous malformation with mediastinal extension: management with combined surgery and percutaneous sclerotherapy. J Neurosurg Pediatr. 2016 May;17(5):612-7. doi: 10.3171/2015.9.PEDS15341. Epub 2016 Jan 15.

177. Thompson EM, Hielscher T, Bouffet E, Remke M, Luu B, Gururangan S, McLendon RE, Bigner DD, Lipp ES, Perreault S, Cho YJ, Grant G, Kim SK, Lee JY, Rao AA, Giannini C, Li KK, Ng HK, Yao Y, Kumabe T, Tominaga T, Grajkowska WA, Perek-Polnik M, Low DC, Seow WT, Chang KT, Mora J, Pollack IF, Hamilton RL, Leary S, Moore AS, Ingram WJ, Hallahan AR, Jouvet A, Fèvre-Montange M, Vasiljevic A, Faure-Conter C, Shofuda T, Kagawa N, Hashimoto N, Jabado N, Weil AG, Gayden T, Wataya T, Shalaby T, Grotzer M, Zitterbart K, Sterba J, Kren L, Hortobágyi T, Klekner A, László B, Pócza T, Hauser P, Schüller U, Jung S, Jang WY, French PJ, Kros JM, van Veelen MC, Massimi L, Leonard JR, Rubin JB, Vibhakar R, Chambless LB, Cooper MK, Thompson RC, Faria CC, Carvalho A, Nunes S, Pimentel J, Fan X, Muraszko KM, López-Aguilar E, Lyden D, Garzia L, Shih DJ, Kijima N, Schneider C, Adamski J, Northcott PA, Kool M, Jones DT, Chan JA, Nikolic A, Garre ML, Van Meir EG, Osuka S, Olson JJ, Jahangiri A, Castro BA, Gupta N, Weiss WA, Moxon-Emre I, Mabbott DJ, Lassaletta A, Hawkins CE, Tabori U, Drake J, Kulkarni A, Dirks P, Rutka JT, Korshunov A, Pfister SM, Packer RJ, Ramaswamy V, Taylor MD. Prognostic value of medulloblastoma extent of resection after accounting for molecular subgroup: a retrospective integrated clinical and molecular analysis. Lancet Oncol. 2016 Mar 11. pii: S1470-2045(15)00581-1. doi: 10.1016/S1470-2045(15)00581-1. [Epub ahead of print]

178. Pollack IF, Jakacki RI, Butterfield LH, Hamilton RL, Panigrahy A, Normolle DP, Connelly AK, Dibridge S, Mason G, Whiteside TL, Okada H. Immune responses and outcome after vaccination with glioma-associated antigen peptides and poly-ICLC in a pilot study for pediatric recurrent low-grade gliomas†. Neuro Oncol. 2016 Mar 15. pii: now026. [Epub ahead of print]

179. Jakacki RI, Cohen KJ, Buxton A, Krailo MD, Burger PC, Rosenblum MK, Brat DJ, Hamilton RL, Eckel SP, Zhou T, Lavey RS, Pollack IF. Phase 2 study of concurrent radiotherapy and temozolomide followed by temozolomide and lomustine in the treatment of children with high-grade glioma: a report of the Children's Oncology Group ACNS0423 study. Neuro Oncol. 2016 Mar 22. pii: now038. [Epub ahead of print]

180. Ridge PG, Hoyt KB, Boehme K, Mukherjee S, Crane PK, Haines JL, Mayeux R, Farrer LA, Pericak-Vance MA, Schellenberg GD, Kauwe JS; Alzheimer's Disease Genetics Consortium (ADGC). Assessment of the genetic variance of late-onset Alzheimer's disease. Neurobiol Aging. 2016 May;41:200.e13-20. doi: 10.1016/j.neurobiolaging.2016.02.024. Epub 2016 Mar 3

181. Beckner ME, Pollack IF, Nordberg ML, Hamilton RL. Glioblastomas with copy number gains in EGFR and RNF139 show increased expressions of carbonic anhydrase genes transformed by ENO1. BBA Clin. 2015 Nov 10;5:1-15. doi: 10.1016/j.bbacli.2015.11.001. eCollection 2016 Jun. PMID: 27051584 Free PMC Article

182. Fernandes-Cabral DT, Zenonos GA, Hamilton RL, Panesar SS, Fernandez-Miranda JC. High-Definition Fiber Tractography in the Evaluation and Surgical Planning of Lhermitte-Duclos Disease: A Case Report. World Neurosurg. 2016 May 7. pii: S1878-8750(16)30257-1. doi: 10.1016/j.wneu.2016.04.128. [Epub ahead of print] PMID: 27168233

**Reviews, invited published papers, proceedings of conference and symposia, monographs, books and book chapters**

**Ronald L. Hamilton, M.D.**

1. **Hamilton RL**, Wiley CA. New developments in the neuropathology of AIDS. CAP Today, 10 (12): p 42, 1996.
2. **Hamilton RL**: Hydrocephalus in a 9 month-old infant. Brain Pathol 6:533-534, 1996
3. **Hamilton RL**: New onset hemiparesis. Brain Pathol 7: 715-716, 1997.
4. **Hamilton RL**: Precocious Puberty. Brain Pathol 7: 711-712, 1997
5. **Hamilton RL**: Frontal lobe tumor in 11 year-old girl. Brain Pathol 7: 713-714, 1997
6 **Hamilton RL**, Pollack, IF: The Molecular Biology of Ependymomas. Brain Pathology 7:807-822, 1997.
7. **Hamilton RL**: A 26 year old woman with new onset seizures. Brain Pathol 8: 239-240, 1997.
8. **Hamilton RL**, Wiley, CA, The Neuropathology of Viral Infections of the Nervous System. In: Textbook of Neuropathology; Davis RL, Robertson DM eds. Williams and Wilkins, 3rd edition, Baltimore, MD. 1997.

9. **Hamilton RL**: Guidelines for the neuropathological diagnosis of Alzheimer's Disease and Dementia with Lewy Bodies. Revista de Neurologia 27 (S1): S67-S70, 1998
10. **Hamilton RL**: Experimental neuropathology of Alzheimer's Disease: animal models. Revista de Neurologia 27 (S1): S84-S86, 1998
11. Sanders VJ, Wiley CA, **Hamilton RL**: The mechanisms of neuronal damage in retroviral infections of the nervous system. in The Mechanisms of Neuronal Damage in Virus Infections of the Nervous System (Gosztonyi G, ed). Springer Verlag, Berlin, 2001.
12. **Hamilton RL**. [Recent Advances in the neuropathological evaluation of Alzheimer's Disease: the importance of synuclein] Rev Neurol 35:765-7, 2002 (Spanish).
13. Pollack IF, **Hamilton RL**, Finkelstein SD, Lieberman F. Molecular abnormalities and correlations with tumor response and outcome in glioma patients. Neuroimaging Clinics of North America: Advances in Brain Tumor Imaging and Therapy (Provenzale J, ed.) WB Saunders, Philadelphia, 2002.
14. **Hamilton RL**. The other dementias: the neuropathology of the non-Alzheimer's Disease dementias. Rev Neurol 37:130-139, 2003 (Spanish).
15. Omalu BI, Wiley CA, **Hamilton RL**. Case of the Month February 2003. Brain Pathology 13:419-420, 2003.
16. DeKosky ST, Ikonomovic MD, **Hamilton RL**, Bennett DA, Mufson EJ. Neuropathology of Mild Cognitive Impairment in the Elderly. In John Morris J, Scheltens P, and Cummings JL), (eds), *Alzheimer's Disease and Related Disorders:* London, Taylor & Francis, 1-16, 2006.
17. Crain BJ, Alston SR, Bruch LA, **Hamilton RL**, McLendon RE, Rhodes H, Tihan T, Weidenheim KM. Accreditation Council for Graduate Medical Education (ACGME) Competencies in Neuropathology Training. J Neuropathol Exp Neurol 64:273-279, 2005.
18. McIntyre JA, **Hamilton RL**, Dekosky ST. Redox-reactive autoantibodies in cerebrospinal fluids. Annals of NY Acad Sci 1109: 296-302, 2007.
19. DeKosky ST, Kaufer DI, **Hamilton R**, Wolk D, Lopez OL: Dementia. In: Neurology in Clinical Practice: Principles of Diagnosis and Management, 5th Edition. Editors: Bradley WG, Daroff RB, Fenichel GM & Jankovic J. Boston MA, Butterworth-Heinemann, 2007: 1855-1907.
20. Tyurin VA, Tyurina YY, Kochanek PM, **Hamilton R**, DeKosky ST, Greenberger JS, Bayir H, Kagan VE. Chapter 19: Oxidative lipidomics of programmed cell death. Methods Enzymol 442:375-93, 2008.
21. Yeaney GA, O'Conn SM, Jankowitz BT, **Hamilton RL**. A 16 year-old male with cerebellar mass. Brain Pathol. 2009 19, 167-170. PMID 19076785
22. Horbinski, C, **Hamilton RL**. Application of telepathology for neuropathologic intraoperative consultations. Brain Pathol 2009 19; 317-322. PMID 19290998

**Abstracts**

1. **Hamilton RL**, Sanger WG, and McComb RD: Characterization of cell lines derived from malignant tumors in patients with neurofibromatosis. Federation Proceedings 46: 433, 1987.
2. Esch O, Spinosa JC, **Hamilton RL**, Crombie DL, Schteigart CD, Hofmann AF: Reversible cytotoxicity to the gallbladder mucosa of contact dissolution solvents for cholesterol gallstones: a comparison of methyl tert-butyl ether (mtbe) and ethyl propionate (ep) in two animal models. Gastroenterology 100 (5, part 2): A135, 1991.

**Ronald L. Hamilton, M.D.**

3. Haas RH, Popovitch B, **Hamilton RL**: The utility of DNA dystrophin gene analysis in non-specific myopathy: presented at Child Neurology Society Annual Meeting, October, 1992: New Orleans, LA.

4. Haas RH, Mansden DL, Estrada S, **Hamilton RL**, Grafe MG, Nyhan WL: Acute basal ganglia infarction in propionic acidemia in spite of good metabolic control: presented at Child Neurology Society Annual Meeting, October, 1992: New Orleans, LA.

5. **Hamilton RL**, Haas RH, Nyhan W, Powell HP, Grafe MR:  The neuropathology of propionic acidemia: a report of two additional cases. American association of Neuropathology Annual Meeting, June 1993, Salt Lake City, UT; J Neuropathol Exp Neurol 52:299, 1993.

6. Mansfield RT, Schiding JK**, Hamilton R,** Kochanek PM: Hypothermia fails to reduce lesion volume after traumatic brain injury in immature rats.  Pediatric Research 35(4):55, 1994.

7. **Hamilton RL**, Bodnar RJ, Wang G, Wiley CA.  The effect of AZT on retroviral encephalitis: a murine model: presented at the Sixth Workshop on the Pathogenesis of Animal Retroviruses, Philadelphia, PA, Nov. 17-19, 1994.

8. Adelson PD, Robichaurd P, **Hamilton RL**, Kochanek PM. Brain edema and neuropathology after diffuse traumatic injury in immature rats.  Neurotrauma Society meeting, San Diego CA, Nov 10-11, 1995.

9. **Hamilton RL**, Bodnar RJ, Wang G, Klunk W, Wiley CA, Treatment of chronic retroviral encephalitis with zidovudine (AZT) in a murine model. Society for Neuroscience Meeting, San Diego, CA Nov 11-16 1995.

10. **Hamilton RL**, Bodnar RJ, Wang G, Klunk W, Wiley CA. The effect of zidovudine (AZT) on murine retroviral encephalitis. Amer. Assoc of Neuropathology, San Antonio, June, 1995. J Neuropathol Exp Neurol 54 (3): 438, 1995.

11. **Hamilton RL**, and Claassen D. Neonatal Methylmalonic Acidemia With Hemicerebellum: An Autopsy Report;  Society of Pediatric Pathology / Child Neurology Society (joint meeting), Baltimore, Oct 27-29, 1995.

12. **Hamilton RL**, Baldwin M, Wiley CA. Human Herpesviruses And Temporal Arteritis American Association of Neuropathology, Vancouver, BC, Canada, June 1996.

13. Mizukami K, Ikonomovic MD, Sheffield R, Rubin RT, Grayson D, **Hamilton R**, Warde D, Armstrong DM. Immunohistochemical Localization of GABA-A Receptor ß2/3 Subunits in the Hippocampal Formation in Aged Brain with Alzheimer-related Neuropathology. Society for Neuroscience meeting, Washington DC, Nov 1996.

14. Bodnar RJ and **Hamilton RL**. Effect of zidovudine (AZT) and saquinavir on retroviral infection of the central nervous system (CNS) Society for Neuroscience meeting, Nov 17-21, 1996 Washington D.C.

15. Bredel M, Pollack I, **Hamilton RL**, Finkelstein SD, Campbell JW, Martinez AJ, Sherwin R, Bozik ME, Gollin S. Overexpression of EGF receptor and p53 mutations in pediatric malignant gliomas. American Association of Neurological Surgeons, 1997 Annual meeting.

16. Xu Y, Liachennko S, Tang P, **Hamilton RL** Correlation of neuropathologic changes with cerebral metabolic and ADC abnormalities after prolonged asphyxial cardiac arrest. International Society of Magnetic Resonance in Medicine, annual meeting, 1997

17. Bredel M, Pollack IF, Campbell JW, **Hamilton RL**. Basic fibroblast growth factor as a prognostic indicator in pediatric high grade glioma patients. American Association of Neuropathology, Pittsburgh, PA, June 1997. J Neuropathol Exp Neurol 56 (5): 581, 1997

18. **Hamilton RL**, Bodnar RJ, Lackner AA, Lane JH, Wiley CA Neurotrophic factors in simian immunodeficiency virus encephalitis. American Association of Neuropathology, Pittsburgh, PA, June 1997. J Neuropathol Exp Neurol 56 (5): 618, 1997.

19. Adelson, PD, Robichaud, P, **Hamilton, RL**, Kochanek, PM. Histologic analyses of severe diffuse traumatic brain injury in the immature rat . National Neurotrama Society, New Orleans Oct 24-25, 1997.

20. Dorsey RW, Achim CL, Wiley CA, **Hamilton RL**\*,  Soontornniyomkij V. Gene expression and cellular localization of neurotrophic factors in Alzheimer's disease. Society of Neuroscience meeting Nov, 1997, New Orleans.

21.  Klunk WE, **Hamilton RL**, Styren SD, Styren G, Debnath ML, Mathis CA, Mahood K, Hsiao KK. Staining of AD and Tg2576 mouse brain wirh X-34, a highly flourescent derivative of chrysamine

**Ronald L. Hamilton, M.D.**

G and A potential in vivo probe for sheet fibrils.  Siociety for Neuroscience meeting, New Orleans 1997.

22. Klunk WE, **Hamilton RL**, Styren SD, Styren G, Debnath ML.  Neuropathological study of AD brain with X-34, a new highly fluorescent derivative of congo red.  Society for  Neuroscience meeting. Los Angeles, CA 1998.

23. Halks-Miller M, Hesselgesser J, Horuk R, Soontornniyomkij V, **Hamilton R,** Achim C.  CCR1 immunoreactivity in Alzheimer's Disease brains.  Society for Neurosciences meeting. Los Angeles, CA 1998.

24.  Wang G, Soontornniyomkij V, Pittman CA, Achim CL, Wiley CA, **Hamilton RL**.  Glial expression of BDNF and TRK B receptor proteins in Alzheimer's Disease and HIV-1 encephalitis brains. Society for Neuroscience meeting. Los Angeles, CA 1998.

25. Ikonomovic MD, Mizukami K, Davies P, **Hamilton R**, Sheffield R, Armstrong DM.  Co-localization of interneurons and an ad-specific antibody in the hippocampal formation of Alzheimer brains. Society for Neurosciences. Los Angeles, CA 1998.

26. Mizukami K, Ikonomovic MD, Grayson DR, Rubin RT, Warde D, Sheffield R, **Hamilton RL,** Davies P, Armstrong DM.  Immunohistochemical study of GABA(A) receptor beta 2/3 subunits in the hippocampal formation of aged brains with Alzheimer-related neuropathologic changes. Experimental Neurology 147 2 333-45 (1997).

27. Bredel M, Pollack IF, **Hamilton RL**: Expression of the c-erbB1 Oncogene Product Epidermal Growth Factor Receptor (EGFR) and its Relevance for Outcome in Children with Supratentorial High-Grade Gliomas ; XVI Congress of the European Society for Pediatric Neurosurgery; November 11-15, 1998, Marseille, France

28. **Hamilton, RL** Numerous widespread alpha-synuclein positive thread-like processes characterize dementia with Lewy Bodies. Foundation IPSEN Conference, April 12, 1999, Paris France

29 **Hamilton RL** Numerous and widespread alpha-synuclein thread-like processes in dementia with Lewy bodies. American Assoc of Neuropathologist Annual Meeting, 1999, Portland, OR. J Neuropathol Exper Neurol 58:552, 1999.

30. Klunk WE, **Hamilton RL**, Styren SD, Head E: Evaluation of the aged canine as a screening system for the x-34 class of in vivo probes for amyloid deposition in AD. Soc. of Neuroscience, 1999

31. Kaufer, DL, **Hamilton RL**, Lopez OL, DeKosky ST MRI white matter hyperintensities and cerebral amyloid angiopathy in a case of dementia with Lewy bodies. Amer Neuropsychiatric Assoc, annual meeting, 2/2000, Ft. Myers, FLA.

32. **Hamilton RL**, Mash DC. Widespread Alpha-synucleinopathy in the Parkinson's Disease brain. 6th National Parkinson's Disease Foundation International Symposium on Parkinson's Disease Research, to be held in conjunction with the Society of Neuroscience meeting in Miami Beach, Oct 22-23[rd], 1999.

33. **Hamilton, RL**, Mash DC. Widespread alpha-synuclein-positive neuropil threads in the Parkinson's Disease brain. American Assoc of Neuropathology, Atlanta, GA, June 8-11, 2000.

34.  Snyder JV, Gebel JM, Kassam A, **Hamilton RL**, Goldstein S, Watkins S, Yonas H, Chelluri L, Thulborn K. Guidance by MR Tissue Sodium Concentration of Infarct Resection in Massive Stroke. Neurology 54(7): A97-A98, Suppl. 3, 2000.

35. Chow TM, Kaufer DI, Lopez OL, **Hamilton RL**, Becker JT, DeKosky ST. Temporal Evolution of Lewy Body Phenotype in Autopsy Confirmed Cases of Alzheimer's Disease and Dementia With Lewy Bodies. Neurology 56(8): A300-A301, Suppl 3, 2001.

36.  Castellano-Sanchez A, Ohgaki HH, Yokoo, Finkelstein SD, Medina-Flores R, **Hamilton RL**, Scheithauer BW, Burger PC, Brat DJ.  Genetic Alterations in Granular Cell Astrocytomas. USCAP, 2002.

37.  Demidovich J, Pittman CA, Hamilton RL.  Altered calpain proteolysis of mutant alpha-synuclein. Honors Thesis presentation, Univ. Pitt, 2002

38.  Omalu BI, **Hamilton RL**, Swalsky PA, Finkelstein SD. Microdissection-based mutational profiling of malignant, atypical and benign meningiomas: the determination of meningioma grade by fractional mutational index.  AANP, Denver, 2002 (JNEN 61:491, 2002)

39.  Wilson, RK, Luedecking-Zimmer EK, Kamboh MI, DeKosky ST, **Hamilton RL**.  Association of the ApoE4 allele and Lewy bodies in Alzheimer's Disease.  AANP, Denver 2002 (JNEN 61: 455, 2002).

**Ronald L. Hamilton, M.D.**

40. Desai PP, Ikonomovic MD, **Hamilton RL**, DeKosky ST, Kamboh MI. Apolipoprotein D in Alzheimer's Disease: implications for amyloid pathology. Soc. for Neuroscience, Orlando, 2002.

41. Garb S, **Hamilton RL**. Sequestration of soluble alpha-synuclein in Lewy body Variant of Alzheimer's Disease. Soc for Neuroscience, Orlando, 2002.

42. Marshall GA, Kaufer DI, Lopez OL, Rao GR, **Hamilton RL**, DeKosky ST. A neuropathological correlate of anosognosia in Alzheimer's Disease. American Association of Neurology, May 2003.

43. Sweet RA, Butters MA, **Hamilton RL**, Mulsant BH, Lopez OL, PollockBG, DeKosky ST, Reynolds CF Neuropathology Of Late Life Mood Disorders. American College of Neuropsychopharmacology, 2003

44. Mohan D, Couce ME, Wiley CA, **Hamilton RL**, Sasatomi E, Swalsky PA, Lieberman MD, Finkelstein SD. Microdissection based genotyping of human gliomas: diagnostic and prognostic considerations (USCAP, Vancouver 3/04)

45. Beckner ME, Sasatomi E, Swalsky PA, **Hamilton RL**, Pollack, IF, Finkelstein SD. Loss of heterozygosity reveals non-VHL Allelic loss in hemangioblastomas at 22q13, (AANP Cleveland, June 24-27, 2004).

46. Judkins AR, Burger P, **Hamilton RL**, Kleinschmidt-DeMasters B, Perry A, Pomeroy S, Rosenblum MK, Yachnis AT, Rorke LB, Biegel JA. INI1 Expression Distinguishes Atypical Teratoid/Rhabdoid Tumor (ATR) from Choroid Plexus Carcinoma (CPC); (AANP Cleveland, June 24-27, 2004).

47. McFadden KA, **Hamilton RL**, Visvesvara GS, Gardner P, Couce ME. Granulomatous Amebic Encephalitis in a Patient with Gardners Syndrome and Multi-organ Transplant (AANP Cleveland, June 24-27, 2004).

48. Yen, Amy, Lopez, OL, BeckerJ, **Hamilton RL.** Mesial Temporal Sclerosis is associated with Lewy Bodies in Alzheimer's Disease. AANP Annual meeting June 9-12, 2005, Arlington, VA (platform). (J Neuropathol Exper Neurol 64:434, 2005.

49. Hinkle DA, Mullett SJ, **Hamilton RL** DJ-1 is over-expressed in human stroke reactive astrocytes. Society for Neuroscience Oct 2005.

50. Ramsey CP, Glass CA, Marshall MB, Morgan KL, Kioke MA, **Hamilton R**, Chu CT, Jordan-Sciutto KL. Altered expression patterns of the antioxidant response transcriptional regulator NRF2, in Alzheimer's Disease and Parkinson's Disease. Society For Neuroscience, Nov. 2005, Washington DC.

51. Chu CT, Uchiyama Y, **Hamilton R**, Zhu J. Extracellular signal regulated protein kinase acts upstream of both autophagy and cell death in MPP+ treated neurons. Society For Neuroscience, Nov. 2005, Washington DC

52. Cieply K, Carol R. Sherer, Jennifer L. Hunt **Hamilton RL** Assessment of 1p and 19q Status in Pediatric Oligodendrogliomas by FISH, Association of Molecular Pathology, Nov 10-13, 2005 Scottsdale AZ

53. Bencherif B, Lieberman FS, Wenzhu B, Price JC, Muthukrishnan A, Walter K, **Hamilton RL**, Lunsford LD, Mountz JM. Increased F-18 Fluorothymidine Uptake is Seen in Non-Proliferating Recurrent/Residual Glioma Society for Nuclear Medicine, San Diego, 2006 June 3-7

54. **Hamilton, RL** Variations On A Theme: Lewy Bodies And Mesial Temporal Sclerosis In Alzheimer's Disease: A Review Of 278 Autopsy Cases. 10th International Conference on Alzheimer's Disease, Madrid, Spain, July-15-20, 2006.

55. DeKosky ST, Mathis CA, Price JC, Ikonomovic MD, **Hamilton RL**, Abrahamson EE, Paljug WR, Debnath ML, Hope CE, Isanski BA, Tsopelas ND, Lopresti BJ, Ziolko S, Bi W and Klunk WE. Correlation of In Vivo PiB Retention and Post-Mortem Aβ Levels: A Case Study. 10th International Conference on Alzheimer's Disease, Madrid, Spain, July-15-20, 2006.

56. Leverenz J, **Hamilton RL**, Larson E, Vavrek D, Lopez O, Galasko D, Masliah E, Kaye J, Nixon R, Clark C, Trojanowski J, Kukull W, Montine T, Tsuang D. Lewy-Related Pathology in Two Large Autopsied Dementia Samples: Application of Classification Criteria. 10th International Conference on Alzheimer's Disease, Madrid, Spain, July-15-20, 2006.

57. Venneti S, Lopresti BJ, Wang G, Mathis CA, Klunk WE, Shmookler AD, **Hamilton RL**, Apte UM, Wiley CA. PET imaging of microglia in a mouse model of Alzheimer's disease. 10th International Conference on Alzheimer's Disease, Madrid, Spain, July-15-20, 2006.

58. Kofler JK, Moore RA, **Hamilton RL**. Concomitant Dementia with Lewy Bodies and Multiple System Atrophy in a Demented Patient. International Congress of Neuropathology/American Association of Neuropathology Annual Meeting, San Francisco, CA, Sept 10-15, 2006.

**Ronald L. Hamilton, M.D.**

59. DeKosky ST, Mathis CA, Price JC, Ikonomovic MD, **Hamilton RL**, Abrahamson EE, Paljug WR, Debnath ML, Hope CE, Isanski BA, Tsopelas ND, Lopresti BJ, Ziolko S, Bi W, Klunk WE. Correlation of Regional in vivo Pittsburgh Compound B (PIB) Retention With in vitro PIB, A Levels, and Amyloid Plaque Density: Validation of PIB-PET in Postmortem Human Brain. Alzheimer's Association International Conference on Prevention of Dementia. June 9-12, 2007 Washington, D.C.

60. Kellermier HC, Nikiforova MN, Cieply K, **Hamilton RL**. Alterations of 1p in glioblastomas. ASIP/AANP Annual meeting, Washington DC April 2007.

61. Bliecher AG, Branstetter BF, Hamilton R, Murdoch G, Kellermier HC. Clival Chordoma: Radiologic-Pathologic Correlations. American Society of Neuroradiology annual meeting, Chicago, IL. June 9-14, 2007.

62. Butters MA, Aizenstein HJ, Meltzer CC, **Hamilton RL,** Price JC, Mathis CA, Klunk WE, Becker JT, DeKosky ST, Reynolds CF. Cognition, cerebrovascular disease and Alzheimer's Disease in late-life depression. International Neuropsychological Society meeting, Bilbao Spain, July 2007.

63 Tyurin VA, Zhao Q, Mnuskin A, **Hamilton R**, DeKosky ST, Reynolds WF, Kagan VE. Phospholipid peroxidation biomarkers of Alzheimer's Disease in the Brain: Selective Oxidation of Phosphatidylserine. Society of Toxicology Meeting San Diego, CA. October 2, 2007.

64. Moschos SJ, D. Trembath D, Snavely A, Bradler E, Midkiff B, Nikolaishvilli-Feinberg N, Werley J, Krauze M, **Hamilton R**, Kirkwood JM. Prognostic Significance of PD-L1 Expression, Angiogenesis, and Hypoxia in Melanoma Brain Metastases (MBM); A Histopathologic Analysis. Annual meeting of the American Association of Clinical Oncology, Chicago II, 5/29-6/2/2014.

65. Trembath DG, Moschos SJ, Snavely AC, Bradler E, Nikolaishvilli-Feinberg N, Bentley R. Midkiff BR, Jonette Werley J, Krauze MT, **Hamilton RL**. Analysis of select angiogenic markers in melanoma brain metastases. Annual meeting AANP, Portland OR. June 2014

66. Salgado CM, Basu D, Nikiforova M, Hamilton R, Gheris R, Jakacki R, Panigrahy A, Yatsenko S, Reyes-Mugica M. Congenital Melanoma: The full spectrum og p.Q61R mutation in NRAS. Accepted for the Annual Soc. Pediatric Pathology meeting, Birmingham AL, Sept 4-6, 2014.

67. Melan MA, Wald AI, Zhong S, **Hamilton R**, Horbinski C. Nikiforova MN. BrainSeq: Next-Generation Sequencing Panel for Detection of Genetic Alterations in Central Nervous System (CNS) Malignancies. National Harbor MD, Nov 12-15, 2014.

68. Hamilton RL. Chronic Traumatic Encephalopathy: Update on an Emerging Disease. Invited speaker: 18th International Congress of Neuropathology, July 12-16, 2014, Rio de Janeiro, Brazil

69. Hamilton RL. Cases of the Month: 16 Years of Unknowns. Invited speaker: 18th International Congress of Neuropathology, July 12-16, 2014, Rio de Janeiro, Brazil

70. Trembath DG, Moschos SJ, Snavely AC, Bradler E, Nikolaishvilli-Feinberg N, Midkiff BR, Werley J, **Krauze MT, Hamilton RL** Role of PD-L1, HIF-1a, and reactive gliosis in melanoma brain metastases. USCAP 2015, Boston, MA, March 21-27, 2015.

71. Nolan Priedigkeit, Ryan J. Hartmaier, Yijing Chen, Damir Vareslija, Ahmed Basudan, Roby Thomas, Jose P Leone, Peter C. Lucas, Rohit Bhargava, Ron L. Hamilton, Juliann Chmielecki, Nancy E. Davidson, Steffi Oesterreich, Adam M. Brufsky, Leonie Young, Adrian V. Lee Breast cancer brain metastases show limited intrinsic subtype switching, yet exhibit acquired ERBB2 amplifications and activating mutations. San Antonio Breast Cancer Symposium, 12/7/16

72. Steffi Oesterreich, Ahmed Basudan, Nolan Priedigkeit, Ryan Hartmaier, Amir Bahreini, Rekha Gyanchandani, Jose P Leone, Peter Lucas,, Rohit Bhargava, Ron Hamilton, Ryan Hartmaier, Adam Brufsky, Adrian V. LeePerivascular Inflammation in Temporal Artery Biopsies That Are Negative for Arteritis: Incidental or Harbinger American College of Rheumatology/ Association of Rheumatology Health Professionals (ACR/ARHP) Annual Meeting, Washington DC, 11/13/16

73. Expression of Carbonic Anhydrase Genes, CA3 and CA12, Transformed with ENO1, Relate to Copy Numbers of EGFR or RNF139 and XIAP, and Gender in Glioblastomas Using PCR Assays. Experimental Biology 2015 Annual Meeting

74. Evaluation of GlioSeq Targeted NGS Panel for Detection of O6-Methylguanine-DNA Methyltransferase (MGMT) mRNA Expression in Glioma Patients Alicia Hunt, Sarika Jain, Melissa A Melan, Abigail Wald, Ronald Hamilton, Marina N. Nikiforova  Association For Molecular Pathology (AMP) Charlotte, NC. November 10-12, 2016.

**PROFESSIONAL ACTIVITIES**

**Ronald L. Hamilton, M.D.**


**TEACHING**

University of California, San Diego, Dept of Neuroscience
      1991-93      lab assistant - graduate neuroanatomy course
University of California, San Diego, School of Medicine
      1991-93      Sophomore pathology course, neuropathology section (lab assistant)
University of California, San Diego, Dept of Pathology
      1991-93      Clinical Correlation Conference - Neuropath and Neurosurgery (monthly)
      1991-93      Neuropathology review for neurology residents (bi-monthly)
University of Pittsburgh, School of Medicine
      Freshman pathology course –
      PBL facilitator for musculoskeletal course 1994-1998
      Neuroscience Module – lecture M2 students full class: CNS tumors
           Annually since 1999.
               April 29, 2014 1-3 pm
      Neuroscience Module   lecture MS1 students
           CNS tumors  March 2004
           CNS tumors  March 2005
           CNS tumors March 2006
           CNS Tumors    5/7/07
      Neuroscience rotation – small weekly lab, M3 students
           7/99-present
      Neuroscience rotation – small group M3 students
           6/18/2007 3-5pm
Weekly brain-cutting conference at Children's Hospital (2-5 medical (M3) students/week)
      Academic Advising: Kate McFadden 2/2000 to 6-2001
Other:
      High school - gifted science students of Mr. James Coll
           11/21/2002 , 11/14/ 2003, 10/28/2004, 11/18/2005, 11/3/2006


University of Pittsburgh, graduate students
      Cellular and Molecular Mechanisms of Neurodegeneration (MSCMP 3720)
               Organizers: Robert Bowser, Cristian Achim,
           1. Neuroanatomy and Neurohistology in neurodegeneration
               1/13/98,  1/19/99
           2. Mitochondria and disease / Prion encephalopathies
               3-24-98
           3. The role of alpha-synuclein in neurodegenerative diseases
               10-11-00
      Molecular Pathobiology (organizers Frye and Achim) (MSCMP 2740)
           .Tumors of the Central Nervous System,  4-7-98,  4-20-99
           Alpha-synuclein and Neurodegeneration
               4-2003, 1/8/04, 5/15/06
           Neuropathology of Neurodegeneration
               1/6/04
           Alpha-synuclein and Tau in Neurodegeneration
               1/5/07, 2/7/2008
           Pathologic diagnosis of the Lewy Body Disorders
               2/12/09
University of Pittsburgh, Dept of Neuroscience - Combined Neuroscience Conference Wed 4-5
      10/3/95 *      Varicella Zoster Infections of the CNS in AIDS patients
      10/9/96 *      Lewy Bodies and Dementia
      2/19/97 *      The Neuropathology of Pediatric Seizures
      4/23/97 *      CNS manifestations of non-CNS tumors in children
      2/11/98        Case Presentation with Ian Pollack

**Ronald L. Hamilton, M.D.**

| | |
|---|---|
| 3/18/98 * | A 77 year old woman with Multiple sclerosis and dementia |
| 11/4/98 | *Pediatric meningiomas – two cases |
| 1/20/99 | Methanol Intoxication – with C. Foley |
| 2/3/99 | Gliomatosis cerebri with Dallasta |
| 2/10/99 | Amyloid angiopathy and leukomalacia – with D. Kaufer |
| 3/17/99 | Metachromatic Leukodystrophy – with D. Kaufer |
| 9/18/02 | Iatrogenic CJD* |

* as primary presenter

University of Pittsburgh, Dept. of Pathology, Chief Resident's Fri noon slide conference
8/1/96 - Pediatric brain tumors
10/5/97 Pediatric brain tumors

| | |
|---|---|
| 1/9/98 | NP REVIEW - Tumors I |
| 1/16/98 | NP REVIEW - Tumors II |
| 1/23/98 | NP REVIEW - Tumors III |
| 1/30/98 | NP REVIEW - Infections |
| 2/6/98 | NP REVIEW - Demyelinative diseases |
| 2/13/98 | NP REVIEW - Neurodegenerative diseases |
| 2/20/98 | NP Review - Cerebrovascular disease and developmental |
| 5/24/02 | Pediatric Neoplasms and Congenital Malformations |
| 5/31/02 | Degenerative Diseases |

University of Pittsburgh, undergraduate
Independent Course and Honors Research Project –
Theodore Kaplan (1/97-6/97)
Emily Rogerson (1/99-5/99, 9/99-12/99, 1/00-4/00)
Kyle Hubbard (1/99 – 5/99, 9/99-12/99, 1/00-4/00)
Joe Demidovich – 2000-2002
Stan Garb (2001-2001)

Pathology Summer Undergraduate Research Program (SURP)
Kathleen Anderson 6/00-8/00
Kathleen Anderson 6/01-8-01

University of Pittsburgh, Dept. of Pathology,
Neuropathology of dementia conference - weekly (Fri 10-11)

University of Pittsburgh - ADRC Topics at Noon
X-34 and alpha-synuclein – New stains in Alzheimer's Disease 11/98
Lewy Body Pathology in Alzheimer's Disease, 11/01

Children's Hospital of Pittsburgh, Grand rounds
1996 - methyl malonic acidemia with hemi-cerebellum
2/13/97 - Pediatric AIDS with HIV encephalopathy
5/22/97 - 11 month-old boy with Hypotonia (Leigh's Disease)
3/18/98 - Becker's muscular dystrophy with severe cardiomyopathy
5/19/98 – Friedreich's Ataxia
10/15/98 – Spinal Muscular Atrophy Type I
2/2005  - Congenital Dystrophies – Pediatric Neurology

**Other Presentations**

Neurology Grand Rounds - 11-19-03 - CNS vasculitis
Pathology Noon Diagnostic Conference - 11-20-03 – "Some Bodies in the Brain"
AP Didactic Lecture – 11-25-03 - Neuropathology of Neurodegeneration
NP Didactic – 4-28-04 - ApoE4 and Lewy Bodies in AD

**Ronald L. Hamilton, M.D.**

NP Didactic -    3/31/2005 – AD Pathology in ALS and MTS and LB in AD
Pathology Noon Diagnostic Conference – 8-4-2006: Tauopathies
ADRC CPC 8-10-06
ADRC CPC 11-30-06
ADRC CPC 2-8-07
ADRC 20th Anniversary meeting, "Neuropathology of AD:"  9-28-06
ADRC Topics at Noon.  "Tauopathies"  11-16-06
ADRC CPC 8/16/2007
ADRC CPC 11/30/2007
Pediatric CPC 2/25/08
DJ-1 in glioblastomas (NP Didactic conference) – 3/10/2009 (1 hour)
Neuropathology review for Neurosurgery residents – 3/10/2010 (1 hour).
AP Chief Residents didactic conference.  2 hour conference.  Non-glial Tumors. Feb 25, 2014
CMU graduate class:  BioE 2630 – Methods in medical iamage analysis in neuropathology. April 4, 2014.
Anatomic Pathology Grand Rounds, July 10, 2014  Chronic Traumatic Encephalopathy: an Update.

**Clinical Conferences (recurring)**

| | | |
|---|---|---|
| ADRC Brain cutting | weekly | Tue 8-10 |
| ADRC Dementia signout - | weekly | Fri 10-11 |
| PUH – Neuropathology QA - | weekly | Wed 10-11 |
| CH  Brain cutting | weekly | Mon 10-11:00 |
| CH  Neuro-Oncology conf | weekly | Mon 11:30-12:30 |
| CH Gross autopsy conference | weekly | Tue 11-12 |
| CH Micro autopsy conf | weekly | Tue 1-2 |

University of Pittsburgh School of Medicine –
    2009 Brain Tumors – lecture to 1st year students
    2009 Klionsky summer research scholarship – Peter Kang (June-Aug 2009)
        Clinicopathologic correlations of chordomas
    2009 Monday 2 hour small group 3rd year  (5-12 students)
        4/6/2009, 7/27/2009, 9/10/2009, 10/12/2009, 12/7/2009, 1/25/2010, 2/15/2010

**RESEARCH**

**OTHER SUPPORT**

**ACTIVE**

**HAMILTON, R.**
ACTIVE
**R01 NS037704**    (PI: Pollack)          9/1/98-1/31/17              0.7 calendar months
National Institutes of Health          $105,970
Role:  Co-Investigator
Title: Molecular Markers as Predictors of Outcome in Gliomas
The major goal of this project is to further characterize the molecular features of tumorigenesis
in pediatric malignant gliomas.

**1R01 CA174858-01**(PI: Pollack)          5/6/13-8/30/17              0.4 calendar months
National Institutes of Health                    $54,696
Role:  Co-Investigator
Title: Peptide Vaccine-Based Immunotherapy for Children with Recurrent Ependymomas
This project focuses on a pilot clinical trial of peptide-based immunotherapy for ependymomas,
among the most challenging childhood brain tumors.  The study will incorporate separate strata

**Ronald L. Hamilton, M.D.**

for posterior fossa and non-posterior fossa ependymomas.  We will treat a total of 12 patients in each of the two strata with subcutaneous TAA epitope vaccinations every 3 weeks for 8 courses combined with topical imiquimod. Participants will be evaluated for adverse events, regimen limiting toxicity (RLT), and treatment response by clinical and laboratory evaluations and MR imaging. We hypothesize that vaccine-based immunotherapy will not only prove safe for the treatment of pediatric ependymomas, but will also demonstrate activity as assessed by immunologic and clinical parameters.

(PI: Pollack)    5/8/14-6/1/17
Child Brain Tumor Foundation                      $10,487                                1.2
calendar months
**Children's Brain Tumor Tissue Consortium**
The CBTTC is a unique research platform in which tumor tissue is processed for comprehensive molecular (e.g., DNA, RNA, and protein) analysis using state-of-the-art methods and the data results of that analysis, together with new brain tumor models and relevant clinical information, are sent back to the participating institutions. In comparison to tissue banks, the CBTTC actively stimulates research by providing high-quality data that can be rapidly and efficiently analyzed by participating institutions.
PI: Pollack. 10% salary for Jonette Werley

<u>OVERLAP</u> No Overlap


**Completed Research Support**

National Institutes of Health                    3/1/02 – 2/28/05
P30 MH52247-10    (PI: Reynolds)        $23,305
Intervention Research Center for the Study of Late-Life Mood Disorders
a supplement to the above grant to establish a brain bank to investigate the neuropathological substrate of late life mood disorders.
Role:  Co-Investigator

R01 NS048595    (PI: Montine)                  09/30/03 – 07/31/08
National Institutes of Health
Subcontract to the University of Washington on grant "Characterization of DLB: a Collaborative Study"
The major goal of this multi-institutional project is to investigate the role of ApoE4 alleles and other genetic polymorphisms in the Lewy Body Variant of Alzheimer's Disease.
Role:  Co-Investigator

Brain Tumor Society                      07/01/07-05/31/09
PI: Ian Pollack
JPA & Pediatric Low Grade Astrocytoma
The major goals of these two grants is to examine molecular markers of prognosis in pediatric gliomas.
Role:  Co-Investigator

U10 CA13539-27 (Reaman (subcontract 6172) (Pollack)              1/1/06-12/30/09
NIH/NCI
Children's Oncology Group Brain Tumor Resource Laboratory

**Ronald L. Hamilton, M.D.**


 This contract is providing infrastructure support for maintaining tissue processing and banking of high-grade gliomas.
Role: Laboratory Director

R01 MH47346    (PI: Zubenko)                    12/1/04 – 11/30/09
National Institutes of Health
Morphologic/Neurochemical Correlates of Depression in AD
The major goal of this project is to better define the biological substrates of major depression in AD and to provide additional insight into the clinical biology of major depressive disorders affecting the elderly.
Role: Co-Investigator

P50 AG05133    (PI: Lopez)              3/30/85 – 3/31/15          0 calendar months
National Institutes of Health              $71,764
Alzheimer Disease Research Center, Core C: Neuropathology
The three objectives of the Neuropathology Core are to (1) procure and bank brain from autopsies of ADRC patients and controls, (2) perform detailed neuropathologic analysis of all AD cases and (3) maintain well catalogued brain bank.
Role: Core Advisor

Child Brain Tumor Fund (CBTF) (PI: Pollack)        5/8/13-5/7/14
0.3 cal months (2.5% support) `PITT subaccount #: 05.35206.xxxx.00000.709203.-----`

P01 NS040923    (PI: Pollack)            7/1/02-5/31/13          1.20 calendar months
National Institutes of Health            $22,074
Novel Strategies for Brain Tumor Therapy
The unifying hypothesis of this program project grant is that novel therapeutic approaches that take into account the unique features of central nervous system (CNS) tumors will have utility for preventing tumor growth and inducing tumor regression, and will potentiate the effects of conventional treatment approaches, particularly radiotherapy, for inducing glioma cell killing.
Role: Co-Investigator


**Prior Grant Support**

1995-1997          Murine Model of Retroviral Encephalitis
                        Children's Hospital of Pittsburgh Research Fund ($50,000)
                        0% effort, 0% support

 1995-1998          Blood Brain Barrier in HIV encephalitis (PI: Achim)
                        Co PI. 10% effort and salary ($186,264)

11/98              PD Center Grant, Equipment $6000
                   for freezer for PD Brain Bank (one time equipment funding)

7/1/98-6/30/99  Neurotrophic Factors in SIV encephalitis
                   Competitive Medical Research Fund (CMRF), $25,000,
                   0% effort, 0% support

12/01/98-11/30/99     Parkinson's Disease Brain Bank
                        PI: Hamilton RL
                        Parkinson's Disease Foundation ($24,899) 0% effort, 0% support

7/1/98-6/30/00  Molecular Markers of Prognosis in Pediatric Gliomas

**Ronald L. Hamilton, M.D.**


PAR 95-063, NIH
PI: IF Pollack
10% effort and support ($263,311)

4/1/00-3/31/01:  Alpha-synuclein Aggregation in Dementia With Lewy Bodies
PI: RL Hamilton
Parkinson's Disease Foundation Seed Money Grant, $25,000 0% effort, 0% support

10/1/00-9/30/02    Millennium Agreement (Neuro Module)
PI: Rajiv Dhir
0% effort, 0% Support.
($25,000 per year for supplies, plus support for 100% Level IV Res Tech)

1/1/99 – 12/31/03 COG Brain Tumor Resource Laboratory
PI: Pollack, IF ($5800)  (subcontract 6172)
Co-I – 5% effort and support
NIH-U10 CA13539-27

3/01/02 - 2/28/07 - Supplemental Award to Establish a Late Life Mood Disorder Brain Bank
PI: RA Sweet (for supplement)
Supplement to 3 P30 MH52247-08S1 (PI: CF Reynolds)
Co-I : 5% effort and support

7/1/98-6/30/05 Morphologic/Neurochemical Correlates of Depression in AD
PI: G Zubenko
2.5% effort and support ($20,000)

National Institutes of Health                09/30/03 – 07/31/08            5%
R01 NS048595    (PI: Montine)              $75,000

*Subcontract to the University of Washington on grant "Characterization of DLB: a Collaborative Study"*
The major goal of this multi-institutional project is to investigate the role of ApoE4 alleles and other genetic polymorphisms in the Lewy Body Variant of Alzheimer's Disease

R01 MH072947    (PI: Butters)          12/1/04 –11/30/11          0.36 calendar months
National Institutes of Health                 $6,018
Pathways Linking Late Life Depression to Mild Cognitive Impairment and Dementia
The goal of this project is to investigate the relationships among late-life depression (LLD), cognitive impairment and progressive neurodegeneration.
Role:  Co-Investigator

R01 MH072947    (PI: Butters)          12/1/04 –11/30/11          0.36 calendar months
National Institutes of Health                 $6,018
Pathways Linking Late Life Depression to Mild Cognitive Impairment and Dementia
The goal of this project is to investigate the relationships among late-life depression (LLD), cognitive impairment and progressive neurodegeneration.
Role:  Co-Investigator


**Seminars and Invited Lectureships Related to Research**

Presentation of an Unknown Case (Herpes simplex brainstem encephalitis) to American Association of Neuropathologists Annual Meeting, June 1992: St. Louis, MO.

**Ronald L. Hamilton, M.D.**

Presentation of an Unknown Case (Varicella zoster virus encephalitis in an AIDS patient) to XII International Congress of Neuropathology, Sept, 1994: Toronto, Ont, Canada.

Presentation of an Unknown Case (Atypical neurocytoma) to American Association of Neuropathologists Annual Meeting, June 2002: Denver (presenter: Rafael Medina-Flores).

**Other Research Related Activities**

| | |
|---|---|
| 1995-2003 | Co-Director, Neuropathology Core ADRC |
| 2003-2012 | Director, Neuropathology Core ADRC. |
| 1995-2012- | Director, Neuropathology Brain Bank |
| 1997 - present - | Director of Neurohistology laboratory |
| 1997-present | Co-Director, Brain Tumor Resource Laboratory, Children's Cancer Group |
| 2001- 2009 | Director of Neuropathology Core of the Stephen Tuttle ALS Tissue Bank. |
| 2001-present | Co-Director, UP Brain Tumor Bank |


**CURRENT RESEARCH INTERESTS**

1. Molecular Biology of Brain Tumors

**SERVICE**

**University and Medical School**

Residency Committee (Pathology) – 1997 to 2008
Institutional Review Board        3/02 – 5/2005
'Member of the UPSOM Interviewing Committee' jan 2010-present
Member, UPMC Professional Practice and Ethics Committee Jan 2014 - present

**OTHER**

| | |
|---|---|
| 4/1996 - present | Case Editor - Brain Pathology, |
| | Case of the Month feature |
| | Case of the Month web site |
| | Increase to 2 cases per month 1/2007 |
| 10/99 | ad hoc reviewer, J Neuroscience |
| 1/2000 | ad hoc reviewer, J American Medical Association (JAMA) |
| 3/2000 | ad hoc reviewer, Neuropathology and Applied Neurobiology |
| 3/01 | ad hoc reviewer American Journal Pathology |
| 5/02 | ad hoc reviewer Neuroscience |
| 11/02 | ad hoc reviewer JNEN |
| 2004 | AANP Awards Committee, AANP, Cleveland |
| 2006 | AANP Awards committee, AANP-ISN San Fran |
| 10/2006 | ad hoc reviewer      Eur J Neurosci |
| 2/2007 | Ad hoc reviewer       Neuroscience |
| 2007 | Chairmen, Awards Committee, AANP Washington DC. (2 year term) |
| 7/29/2007 | ad hoc reviewer, Brain Pathology |
| 7/25/2007 | ad hoc reviewer Acta Neuropathologica |
| 10/19/2007 | ad hoc reviewer J Neuropathol Exp Neurol |
| 2008 | Chairman Awards Committee AANP, San Diego Annual Meeting |
| 2008 | ad hoc reviewer Brain Pathology |
| 2009 | ad hoc reviewer Pedi and Developmental Pathology |
| 2009 | ad hoc reviewer Amer. J. Pathol. |

**Ronald L. Hamilton, M.D.**

2014 – Featured in non-fiction book: League of Denial:  The NFL, Concussions and the Battle for the Truth (Crown Publishing, New York). Chapters 8 and 10 detail my role in the discovery of CTE in NFL football players.

January 2015 – Consulted with Sony Pictures about movie CONCUSSION based on the discovery of Chronic Traumatic Encephalopathy (CTE) in American NFL football players by my student, Bennet Omalu and me in July 2005.  I was also interviewed on the set by Sony documentary filmmakers for a bonus feature on the DVD:  The Making of "Concussion."  The movie is scheduled to be released Christmas Day, Dec 25, 2015.

January 2015 – interviewed by Jeane Marie Laskas (who wrote the 2009 GQ article the movie is based on) for a companion book to be released with the movie, December 2015.


**International Invitations**

1998 – Invited lecturer at Barcelona-Pittsburgh ADRC meeting, "Dementia Today," Barcelona, Spain (Oct 1998)

2000 – Invited lecturer at Barcelona-Pittsburgh ADRC meeting Dementia Today II", Barcelona, Spain (Oct 2000)

2001 - Invited symposia speaker at 10th Congress of the International Psychogeriatric Association (Nice, France, Sept 2001). "Pathological Diagnosis of Dementia With Lewy Bodies" (Symposia Organizer, Ian McKeith)

2002 – Invited lecturer at Barcelona-Pittsburgh ADRC meeting Dementia Today III", Barcelona, Spain (Oct 2002)

2003 – Symposium speaker "Dementia with Lewy Bodies" at International Psychogeriatric Associations meeting, Chicago, IL, USA, 08/19/03

2004  Invited lecturer at Barcelona-Pittsburgh ADRC meeting Dementia Today IV", Barcelona, Spain (Oct 2004)

2006  Invited lecturer at Barcelona-Pittsburgh ADRC meeting Dementia Today V", Barcelona, Spain (Oct 2006)

2008  Invited lecturer at Barcelona-Pittsburgh ADRC meeting Dementia Today VI", Barcelona, Spain (May 2008)

2014 – Invited lecturer AANP annual meeting June 2014.  What Every Neuropathologist Should Know: Molecular studies in metastatic brain tumors.

2014 - Invited as member of scientific committee International Congress of Neuropathology quadrennial meeting Sept 2014, Rio de Janeiro

2014 – Chair of Forensic Pathology Session, committee International Congress of Neuropathology quadrennial meeting Sept 2014, Rio de Janeiro

2014 – co-chair telepathology session with Dr. Wiley

2014 – Presentation – Chronic Traumatic Encephalopathy – update, International Congress of Neuropathology quadrennial meeting Sept 2014, Rio de Janeiro

2014 – presentation – Cases of the Month – 16 Years of Unknowns  International Congress of Neuropathology quadrennial meeting Sept 2014, Rio de Janeiro s



**University of Pittsburgh**
**Physicians, Department**
**of Pathology**

Division of Neuropathology

Clayton A. Wiley, MD, PhD
Director

Charleen T. Chu, MD, PhD
Robert H. Garman, DVM
Ronald Hamilton, MD
Julia Kofler, MD
Scott M. Kulich, MD, PhD
David Lacomis, MD
Geoffrey Murdoch, MD, PhD
Gutti R. Rao, MD

UPMC Presbyterian
Room 5701 Scaife Hall
200 Lothrop Street
Pittsburgh, PA 15213
T 412-624-9415
F 412-624-5610

To Whom it may concern,

I have conducted a study of F. Cornish's brain tissue. Additionally, in my Neuropathology practice I conduct an ongoing study of all available and existing medical literature related to the existence and diagnosis of CTE and I combine that knowledge with my training and extensive experience related to the study and diagnosis of CTE.

Frank Cornish died on August 23, 2008.

Received from the Tarrant County Medical Examiner are three H&E stained slides (08-10049 slides 1, 2 and 3) and their corresponding formalin-fixed paraffin embedded tissue blocks.

H&E stained recuts are examined:

    slide 1 has neocortex, basal ganglia and thalamus;
    slide 2 has cerebellum and medulla;
    slide 3 has neocortex and midbrain with substantia nigra.

Immunostain of slide 1 for the AD-related protein Beta-A4 is negative. Tau immunostains (PHF-1) are negative in the cerebellum and medulla (slide 2), but reveal numerous neocortical PHF-1/tau positive tangles in neurons (Fig 1a), with staining of many neuronal processes (neuropil threads) (Fig 1b) as well as tau-positive glial cells (Fig 1c), especially in the depths of the sulcus and focally around some blood vessels. In the midbrain, the substantia nigra had tangles and neuropil threads (Fig 1d). The mesencephalic tegmentum shows many tau-positive neurons in the oculomotor nucleus . These histopathologic findings are diagnostic of CTE.



Frank Cornish had CTE.

Sincerely
/s/
Ronald L Hamilton, M.D.

Affiliated with the University of Pittsburgh School of Medicine

 **CONCUSSION SETTLEMENT**
*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

## NOTICE OF REQUEST FOR ADDITIONAL DOCUMENTS
**DATE OF NOTICE: February 20, 2019**
**RESPONSE DEADLINE: June 20, 2019**

### I. SETTLEMENT CLASS MEMBER INFORMATION

| | |
|---|---|
| **Settlement Program ID** | 950012548 |

| **Name:** | First<br>Robin | M.I.<br>B | Last<br>Cornish |
|---|---|---|---|

| | |
|---|---|
| **Settlement Class Member Type** | Representative Claimant |
| **Primary Counsel** | O'Hanlon, Demerath & Castillo |

| **Asserted Qualifying Diagnosis** | Death with CTE (Chronic Traumatic Encephalopathy) | **Date of Asserted Qualifying Diagnosis** | 8/23/08 |
|---|---|---|---|

### II. EXPLANATION OF REQUEST(S)

This Notice is an official communication from the Claims Administrator for the NFL Concussion Settlement Program. Your Claim Package is missing documents or information.

This Notice explains what is missing and what you may do to address the issue. We can help if you have questions. To cure the issues identified in this Notice, click the Respond to Request for Additional Documents button on your secure online portal and follow the instructions provided to upload the information identified below.  If you already have provided us with the missing information, let us know because we may have received it after conducting the review that generated this notice.

The following requires attention before we can act further:

| | What is Missing | How to Address this Item |
|---|---|---|
| **1.** | You have not submitted any medical records reflecting the Qualifying Diagnosis. | Click the Respond button, go to Section 3 for Medical Records, click on the Upload Medical Records button and follow the instructions to upload medical records reflecting the Qualifying Diagnosis. |

### III. ADDITIONAL EXPLANATION OF WHAT IS MISSING

The medical records must show a post-mortem diagnosis of CTE made before April 22, 2015 (the Final Approval Date) by a board-certified neuropathologist for a Retired NFL Football Player who died before April 22, 2015.  See Section 6.3 (f) of the Settlement Agreement and FAQ 109.  Mr. Cornish died on August 23, 2008, and the August 24, 2008 autopsy report signed by Marc A. Krouse does not reference CTE and neither does the death certificate.  You provided an undated letter from Dr. Ronald L. Hamilton who diagnosed Mr. Cornish with CTE.  You must establish that Dr. Hamilton reviewed Mr. Cornish's brain tissue and made a CTE diagnosis on or before April 22, 2015.

### IV. HOW TO RESPOND TO THIS NOTICE

You have 120 days to respond to this Notice and provide the missing information or documents. **We encourage you to gather the requested information or documents now and respond to this Notice promptly, rather than using the full 120 days allowed to answer.  The sooner you respond, the sooner your claim can move forward in the review process.**

By the Response Deadline stated above, send us the missing information or documents identified in Section II.  We will wait the full 120 days to re-review your claim, unless you click the Submit Claim Package for Review button to confirm that your response is complete and we may continue to review your claim.  If you do not respond in full on or before the Response Deadline, we will have to assess your claim based on the materials we have, which could lead to a lower Monetary Award or denial of your claim in its entirety.

Submit the requested information using your secure online portal to upload additional documents.

## V. HOW TO CONTACT US WITH QUESTIONS OR FOR HELP

If you are represented by a lawyer, consult with your lawyer if you have questions or need assistance. If you are unrepresented and have any questions about this Notice or need help, contact us at 1-855-887-3485 or send an email to ClaimsAdministrator@NFLConcussionSettlement.com.  If you are a lawyer, call or email your designated Firm Contact for assistance. For more information about the Settlement program, visit the official website at www.NFLConcussionSettlement.com to read the Frequently Asked Questions or download a copy of the complete Settlement Agreement.



# O'HANLON, DEMERATH & CASTILLO

### ATTORNEYS AND COUNSELORS AT LAW

808 WEST AVENUE
AUSTIN, TEXAS 78701
PHONE: (512) 494-9949
FAX: (512) 494-9919

**DAVID J. CAMPBELL**
*Board Certified, Civil Appellate Law*
*dcampbell@808west.com*

**Rio Grande Valley Office**
426 W. Caffery Ave.
Pharr, Texas 78577

**San Antonio Office**
117 W. Craig Place
San Antonio, Texas 78212

May 6, 2019

***via email***
Jason Russell
BROWNGREER PLC
250 Rocketts Way
Richmond, VA 23231
*jrussell@browngreer.com*

      Re:    Claimant ID: 950012548; Robin B. Cornish
              Claimant ID: 950013395; Carleen Hastings

Mr. Russell:

Please allow this correspondence to provide you with the additional information you requested in your prior email correspondence regarding the above two claimants.

In your attached email correspondence, you accurately quote FAQ 109, which states that for a Death with CTE diagnosis, "the medical records must show a post-mortem diagnosis of CTE made before April 22, 2015 (the Final Approval Date)."[1]  However, FAQ 109 must be read in conjunction with FAQ 82, FAQ 84, and FAQ 93.

FAQ 82 explains that a Player who died before April 22, 2015 is eligible for a Monetary Award if there is a diagnosis of Death with CTE.[2]  FAQ 84 states that a

---

[1]   *See* Tab 1.  As you know, the representations in the FAQ were made with the approval of counsel for the NFL Parties.  *See* Amended Settlement Agreement § 4.1(a).

[2]   *See* Tab 2, Relevant Excerpts from Posted Settlement Program FAQs (as of February 19, 2019), FAQ 82.

May 6, 2019
Page 2

diagnosis of Death with CTE can be made by any board-certified neuropathologist at any time after the Player's death.[3]  FAQ 93 addresses how the date of the diagnosis is determined.[4]

FAQ 93 describes how to determine the diagnosis date for Death with CTE.[5]  It states that the date of the diagnosis is important because it impacts a Player's eligibility for a Monetary Award.[6]  For diagnoses *other than Death with CTE*, the diagnosis date is the date "when the diagnosing physician has enough information and materials, including test results, to be able to render a medically sound and reliable judgment about the Player's condition . . .."[7]  But diagnoses for Death with CTE are different.[8]  For Death with CTE, the diagnosis date is "the date of the Player's death, **even though the diagnosis is not made until after the Player dies**."[9]

Pursuant to FAQ 82, 84, 93, and 109, the diagnosis date for Mr. Cornish (Claimant ID: 950012548) is August 23, 2008. Robin Cornish's claim package regarding the deceased Mr. Cornish includes the post-mortem diagnosis of Dr. Ronald L. Hamilton, a board-certified neuropathologist who has provided a post-mortem diagnosis of Death with CTE.  The date of this Qualifying Diagnosis is the date of Mr. Cornish's death, which is August 23, 2008.

Pursuant to FAQ 82, 84, 93, and 109, the diagnosis date for Mr. Mims (Claimant ID: 950013395) is October 15, 2008. Carleen Hastings's claim package regarding the deceased Mr. Mims includes the post-mortem diagnosis of Dr. Ronald L. Hamilton, a board-certified neuropathologist who has provided a post-mortem diagnosis of Death with CTE.  The date of this Qualifying Diagnosis is the date of Mr. Cornish's death, which is October 15, 2008.

---

[3]    *See id.*, FAQ 84.

[4]    *See id.*, FAQ 93.

[5]    *See id.*

[6]    *See id.*

[7]    *See id.*, FAQ 93(b).

[8]    *Compare id.*, FAQ 93(b) *with id.*, FAQ 93(a).

[9]    *See id.*, FAQ 93(a) (emphasis added).

May 6, 2019
Page 3


    I appreciate your diligence in reviewing these claims and would be happy to discuss these claims if you have any additional questions or require any additional information.


Best regards,


David J. Campbell


Enclosures    Tab 1
                  Tab 2

| | |
|---|---|
| From: | Jason Russell |
| To: | Alice Keeran |
| Cc: | Justin Demerath; David Campbell |
| Subject: | RE: Claimant ID: 950012548: Robin B Cornish and Claimant ID: 950013395: Carleen Hastings |
| Date: | Monday, February 25, 2019 12:04:02 PM |
| Attachments: | image001.png |

Hi Alice,

I see Death with CTE was the asserted Qualifying Diagnosis for both.  For Death with CTE, the medical records must show a post-mortem diagnosis of CTE made before April 22, 2015 (the Final Approval Date) by a board-certified neuropathologist for a Retired NFL Football Player who died before April 22, 2015 (Section 6.3(f) of the Settlement Agreement and FAQ 109).

**Robin Cornish – 950012548**
Mr. Cornish died on August 23, 2008, and the August 24, 2008 autopsy report signed by Marc A. Krouse does not reference CTE and neither does the death certificate.  We received an undated letter from Dr. Ronald L. Hamilton who diagnosed Mr. Cornish with CTE.  You must establish that Dr. Hamilton reviewed Mr. Cornish's brain tissue and made a CTE diagnosis on or before April 22, 2015.

**Carleen Hastings - 950013395**
Mr. Mims died on October 15, 2008, and the October 16, 2008 autopsy report signed by Louis A. Pena does not reference CTE and neither does the death certificate.  We received an undated letter from Dr. Ronald L. Hamilton who diagnosed Mr. Mims with CTE.  You must establish that Dr. Hamilton reviewed Mr. Mim's brain tissue and made a CTE diagnosis on or before April 22, 2015.

Please let me know if you have any further questions concerning this.

Thank you,
Jason

**From:** Alice Keeran <akeeran@808west.com>
**Sent:** Monday, February 25, 2019 8:21 AM
**To:** Jason Russell <jrussell@browngreer.com>
**Cc:** Justin Demerath <jdemerath@808west.com>; David Campbell <dcampbell@808west.com>
**Subject:** Claimant ID: 950012548; Robin B Cornish and Claimant ID: 950013395; Carleen Hastings

Hi Jason,

I'm writing to follow-up on a couple of Notices of Request for Additional Documents for the above-referenced claimants. Both of these notices reference that accompanying medical records are missing, but I can see the records we provided when I checked the portal for each of them.

Please give me a call when you have a moment. Thank you!

Sincerely,
*Alice Keeran*

Senior Paralegal to
Justin B. Demerath
O'HANLON, DEMERATH & CASTILLO, PC
ATTORNEYS AND COUNSELORS AT LAW
       Austin  Office
       808 West Avenue
       Austin, Texas 78701
       (512) 494-9949  Office
       (512) 494-9919 Fax
       email: akeeran@808west.com
       website: www.808west.com

CONFIDENTIALITY NOTICE:
The information contained in this transmittal and any attached documents maybe  attorney privileged and contain confidential and/or privileged information and  has been sent for the sole use of the intended recipient(s).  Any review, use, printing, dissemination, disclosure, distribution, retransmission, or other use  of, or taking in any action in reliance upon this information by persons or  entities other than the intended recipient(s) is strictly prohibited.  If you  have received this transmittal in error, please immediately notify us by telephone at (512) 494-9949 and delete the material from any computer. Please be advised that nothing in this email shall create or be taken to create an attorney client relationship, which may only be created by executing a power of attorney agreement.

# NFL CONCUSSION SETTLEMENT

*In Re: National Football League Players' Concussion Injury Litigation* No. 2:12-md-02323 (E.D. Pa.)

# Posted Settlement Program FAQs

(as of February 19, 2019)



# Table of Contents

**I.  Basic Information** ...................................................................................................... 1

   **1.  What is the Settlement about?** ............................................................... 1

   **2.  What are the benefits of the Settlement?** ........................................... 1

   **3.  Who is included in the Settlement Class?** ........................................... 2

   **4.  Who are the settlement administrators?** ............................................. 2

   **5.  Who are the Special Masters?** .............................................................. 3

   **6.  What if I do not like how the settlement administrators or Special Masters are administering the Settlement Agreement?** ............................................................................ 3

   **7.  Do the settlement administrators report to Co-Lead Class Counsel or the NFL Parties?** ......................................................................... 3

   **8.  Does the Claims Administrator share the contents of my Claim Package with Co-Lead Class Counsel or the NFL Parties?** ............................ 4

   **9.  Does the Claims Administrator share the contents of my Claim Package with any other people or entities?** ....................................... 4

  **10.  How do I authorize the Claims Administrator to speak to someone else about my claim?** ............................................................................ 4

  **11.  When was the Effective Date? What is it?** ......................................... 5

  **12.  How does the Claims Administrator calculate the number of days I have to respond to a notice or take other actions in the Settlement Program?** ............................................................. 5

  **13.  If I have to respond to the Claims Administrator by a deadline, what is considered the date of my response or submission?** ................. 6

  **14.  If I opted out of the Settlement, can I still get benefits from this Settlement?** ..................... 6

  **15.  I opted out of the Settlement. May I revoke that Opt Out and get back into the Settlement Program?** ......................................................... 7

  **16.  If I am a Settlement Class Member who did not opt out of the Settlement, can I sue the NFL Parties for the same thing later?** ............... 7

  **17.  Can I still opt out of the Settlement?** ................................................. 7

  **18.  What if I do not like the terms of the Settlement Agreement?** ........... 7

  **19.  Are there any tools on the Settlement Website to help me understand the Settlement Agreement and how to make a claim?** ..................... 7

  **20.  Where can I find the Special Master's or the Court's published decisions on appeals or statute of limitations matters?** ........................... 8

  **21.  How do I get more information about the Settlement?** ....................... 8

  **22.  How do I report potential fraud to the Claims Administrator?** ........... 9

  **23.  What if my situation or circumstances are not covered by these FAQs?** ............................. 9

2/19/19

**II.  Settlement Agreement Benefits – General Information** ........................................10

**24.  Must a Retired NFL Football Player be vested under the NFL Retirement Plan to receive Settlement benefits?** ........................................................................................ 10

**25.  Are the Settlement benefits connected to any NFL or NFLPA-related benefits programs?** ..................................................................................................................... 10

**26.  If I receive benefits under the 88 Plan or any other disability plan, do I automatically qualify for a Monetary Award in the Settlement Program?** ........................ 10

**27.  Does this Settlement prevent Retired NFL Football Players from bringing workers' compensation claims?** ............................................................................................. 10

**28.  What types of education programs are supported by the Settlement?** ............................... 10

**29.  If the science about the Qualifying Diagnoses changes, will the Settlement Program change the definitions or testing protocols for them?** ........................................... 11

**III. Registration** ..................................................................................................................12

**30.  May I still register in the Settlement as a Retired NFL Football Player?** ......................... 12

**31.  May I still register in the Settlement as a Representative Claimant?** ............................... 12

**32.  May I still register in the Settlement as a Derivative Claimant?** ..................................... 13

**33.  What if I disagree with the Claims Administrator's initial determination on my registration?** ............................................................................................................ 13

**34.  What if I disagree with the Claims Administrator's decision about my registration determination challenge?** ........................................................................................... 13

**35.  Are there any rules covering registration determinations and appeals?** ........................... 14

**36.  How can I send registration information to the Claims Administrator?** ............................ 14

**37.  Does registering mean I filed a claim?** ........................................................................ 14

**38.  How do I change my mailing address?** ........................................................................ 14

**39.  How do I change my name or Social Security Number (or other Taxpayer Identification Number) that I have given the Program?** ................................................. 14

**40.  Do I have to provide my Social Security Number to participate in the Settlement Program?** ..................................................................................................................... 15

**41.  How does the Claims Administrator calculate a Retired NFL Football Player's Eligible Seasons?** ..................................................................................................... 15

**42.  Where does the Claims Administrator get information about a Retired NFL Football Player's Eligible Seasons?** .............................................................................. 16

**43.  I received a Notice of Incomplete Registration saying I am missing proof of playing NFL Football. What are the next steps?** ........................................................... 16

**IV. Baseline Assessment Program** ......................................................................................17

**44.  What is the Baseline Assessment Program ("BAP")?** ................................................... 17

**45.  Who can participate in the BAP?** ............................................................................... 17

**46.  Why should I have a BAP exam?** ................................................................................ 17

47. How many doctors will I see in a BAP exam? .................................................. 18

48. Who pays for these BAP exams? ................................................................... 18

49. Who can be a Qualified BAP Provider? ....................................................... 18

50. Can I choose my own doctors for the BAP exam? ........................................ 18

51. Do the Qualified BAP Providers report to the NFL? ................................... 18

52. Is there a deadline for getting the BAP exam? ............................................ 18

53. How long will the Baseline Assessment Program be available? ................... 19

54. How do I access the BAP Portal? ................................................................ 19

55. How can I schedule a BAP exam? ................................................................ 19

56. Where do I go for my BAP exam? ................................................................ 19

57. How long does a BAP exam take? ................................................................ 20

58. Is it possible to schedule both parts of the BAP exam on the same day? .......... 20

59. Can BAP appointments be rescheduled or cancelled? ................................ 20

60. What happens if I miss a BAP appointment? ............................................... 20

61. What do I need to prepare for my BAP appointment? ................................ 20

62. Should I bring someone with me to my BAP appointment? ........................ 20

63. What kind of diagnosis can I get from a BAP exam? .................................. 21

64. What about conditions like ALS, Parkinson's Disease, or Alzheimer's Disease? ............. 21

65. Does there have to be a diagnosis? What if I am OK? ................................ 21

66. What happens after a BAP exam? ............................................................... 22

67. What should I do if my BAP exam results in a diagnosis? .......................... 22

68. Will my Monetary Award be affected if I do not have a BAP exam? ......... 23

69. What are BAP Supplemental Benefits? ........................................................ 23

70. How long will I have to use my BAP Supplemental Benefits? ................... 23

71. How much will my BAP Supplemental Benefits cover? Is there a limit? ......... 24

72. Will any medical or pharmacy records from BAP Supplemental Benefits be available to the NFL? ...................................................................................... 24

73. What is a Qualified BAP Pharmacy Vendor? ............................................... 24

74. I received a "Baseline Assessment Program HIPAA Authorization Form." What do I do with it? ................................................................................................ 24

V. Monetary Awards ................................................................................................ 25

75. Who can submit a claim for a Monetary Award? ........................................ 25

76. What is a Claim Package? ............................................................................ 25

77. How do I submit a Claim Package? .............................................................. 25

78. Where do I send my Claim Package if I do not use an online Portal? ........ 26

2/19/19

79. When can I submit a Claim Package? ................................................................ 26

80. Is there a deadline to submit my Claim Package? ........................................... 26

81. How can I change answers I made in my Claim Form? .................................... 26

82. What is a Qualifying Diagnosis? ....................................................................... 27

83. Should I get a BAP exam or see a Qualified MAF Physician? ......................... 27

84. What kind of physicians are authorized to make a Qualifying Diagnosis? ....... 27

85. Who is a Qualified MAF Physician? .................................................................. 29

86. How do I get evaluated for a Qualifying Diagnosis if I do not already have one? ............. 29

87. If my diagnosing physician is both a Qualified BAP Provider and a Qualified MAF Physician, how do I know if the diagnosis is made in or outside the BAP? ....................... 29

88. Does the physician who makes the Qualifying Diagnosis of a Retired NFL Football Player have to see and examine that Player in person? ........................... 29

89. Can the representative of a deceased Retired NFL Football Player get a Qualifying Diagnosis for that Player now? ......................................................... 30

90. What should I do if I already have a Qualifying Diagnosis? ............................. 31

91. Does it matter when the Retired NFL Football Player was diagnosed? ............ 31

92. What dates matter for when the Qualifying Diagnosis is made? ...................... 31

93. How is the date of a Qualifying Diagnosis determined? .................................. 32

94. Which diagnostic criteria must a physician use when making my Qualifying Diagnosis? When and to what diagnoses does the "generally consistent" criteria apply? ........................................................................................................ 34

95. What does "generally consistent" mean? ......................................................... 34

96. What makes a Claim Package complete? .......................................................... 35

97. What can I submit to prove that I have more Eligible Seasons than what the Claims Administrator found for me when I registered? ...................................... 35

98. What counts as a medical record? .................................................................... 36

99. What does it mean for medical records to "reflect" my Qualifying Diagnosis? ..... 36

100. What does it mean for medical records to "support" my Qualifying Diagnosis? ..... 37

101. What must the medical records show for Level 1.5 and Level 2 Neurocognitive Impairment diagnoses made in the BAP by Qualified BAP Providers? ........... 37

102. What must the medical records show for Level 1.5 and Level 2 Neurocognitive Impairment diagnoses made outside the BAP for *living* Retired NFL Football Players? ............................................................................................................. 39

103. What must the medical records show for Level 1.5 and Level 2 Neurocognitive Impairment diagnoses for Retired NFL Football Players who *died before January 7, 2017* (the Effective Date) and cannot participate in the BAP or be diagnosed by a Qualified MAF Physician? ............................................................................. 40

104. How are diagnosing physicians to apply the Clinical Dementia Rating (CDR) scale to Level 1.5 and Level 2 Neurocognitive Impairment Qualifying Diagnoses?.................... 40

105. What must be included in a sworn statement corroborating a Retired NFL Football Player's functional impairment for a Level 1.5 or Level 2 claim?....................................... 42

106. Are raw scores and/or raw data required for all Monetary Award claims? ..................... 42

107. What must the medical records show for Alzheimer's Disease?........................................ 43

108. What must the medical records show for Parkinson's Disease? ........................................ 43

109. What must the medical records show for Death with CTE?............................................... 44

110. What must the medical records show for ALS? ................................................................. 44

111. What if I cannot get medical records or a Diagnosing Physician Certification Form from the diagnosing physician?......................................................................................... 45

112. If I cannot get medical records or a Diagnosing Physician Certification Form from the diagnosing physician, is there anything specific I should submit to show my attempts to get such documents?............................................................................................... 45

113. What exceptions are allowed under Section 8.2(a) of the Settlement Agreement for Representative Claimants of deceased Retired NFL Football Players? ............................ 45

114. What is the SWS-2? ........................................................................................................... 47

115. What exceptions are allowed under Section 8.2(a) of the Settlement Agreement for living Retired NFL Football Players or Representative Claimants of legally incapacitated or incompetent Players?.......................................................................... 47

116. Are there other instances not listed in Section 8.2 of the Settlement Agreement where the Claims Administrator may excuse the medical records or Diagnosing Physician Certification Form requirement? ....................................................................... 48

117. What happens after the Claims Administrator grants an exception under Section 8.2(a) or a situation not covered by Section 8.2(a)?............................................................ 49

118. Who reviews my claim for a Monetary Award?................................................................ 49

119. How is my diagnosis reviewed? When and to what does the "generally consistent" standard apply? .................................................................................................................. 50

120. What is the AAP and what does it do? ............................................................................. 50

121. What is the AAPC and what does it do? .......................................................................... 50

122. I received a Qualifying Diagnosis through the BAP. Do I have to do anything else to receive a Monetary Award?............................................................................................... 51

123. I received a Qualifying Diagnosis from a Qualified MAF Physician. Do I have to do anything else to receive a Monetary Award? .......................................................... 51

124. If I received a Qualifying Diagnosis from a Qualified MAF Physician, what types of records will the physician send to the Claims Administrator? ........................................... 51

125. What happens after I submit my Claim Package? ............................................................. 52

126. Can I receive a Monetary Award for more than one Qualifying Diagnosis on the same claim? ......................................................................................................................... 52

127. I received a Notice of Preliminary Review. What does that mean? ...................................... 52

128. I received a Notice of Request for Additional Documents. What does that mean? ........... 52

129. What happens after I respond to my notice asking for more information for my claim? ..................................................................................................................................... 53

130. What happens if I never respond to the Notice of Preliminary Review or the Notice of Request for Additional Documents? ................................................................................. 53

131. May I get more time to respond to a notice from the Settlement Program? ...................... 53

132. Does the Claims Administrator question the medical judgment of the physician who made the Qualifying Diagnosis? ....................................................................................... 54

133. I have provided my claim to the Claims Administrator and it is now complete enough to send to the AAP. What happens next? .......................................................... 54

134. How can I check the status of my Claim Package review? ..................................................... 54

135. How long could it take to review my Claim Package from start to finish? ......................... 54

136. If I am eligible for a Monetary Award, how much money will I receive? ............................. 55

137. What is a Stroke or Traumatic Brain Injury in this Settlement Program? ......................... 56

138. Can I be found eligible for a Monetary Award based on a Qualifying Diagnosis that is different than the one I claimed? ................................................................................... 56

139. What can I do if I do not like my Claim Package determination (eligible or denied)? ...... 57

140. Can I withdraw my claim? ......................................................................................................... 57

141. Can the Claims Administrator change the outcome of my claim after I receive a notice? ....................................................................................................................................... 57

142. Can I submit a new claim for a Monetary Award if the Claims Administrator has denied my claim? .................................................................................................................... 58

143. If I received a Monetary Award for one Qualifying Diagnosis, can I later receive a Monetary Award for a different Qualifying Diagnosis? What is a Supplemental Monetary Award? ............................................................................................................... 58

144. Can Co-Lead Class Counsel or the NFL appeal my Claim Package determination? ........ 58

145. Are there any rules covering determinations that a Monetary Award claim is or is not barred by the statute of limitations under applicable state law? ............................... 59

**VI. Representative Claimants** ................................................................................................ 60

146. Who is a Representative Claimant? .......................................................................................... 60

147. How do I become a Representative Claimant? ........................................................................ 60

148. How will the Claims Administrator determine whether my court order or other official document is sufficient proof that I can be a Retired NFL Football Player's Representative Claimant? ...................................................................................................... 61

149. How will the Claims Administrator determine whether my Power of Attorney (POA) is sufficient proof that I can be a legally incapacitated or incompetent Retired Player's Representative Claimant? ............................................................................. 62

150. Can a Retired NFL Football Player have more than one Representative Claimant? ........ 62

151. What happens if more than one person registers as a Representative Claimant for the same Retired NFL Football Player? .................................................................... 62

152. Can I be a Retired NFL Football Player's Derivative Claimant if I am his Representative Claimant? .................................................................................... 62

153. Do Representative Claimants have to register for benefits? ................................ 62

154. What happens if a registered Retired NFL Football Player or Representative Claimant becomes legally incompetent or incapacitated or dies after registering? .......... 63

155. If I am a Representative Claimant, do I have to submit a Claim Package? ...................... 63

VII.    Derivative Claimants ........................................................................ 64

156. Who is a Derivative Claimant? ................................................................ 64

157. Can a Retired NFL Football Player have more than one Derivative Claimant? ............... 64

158. May someone be a Derivative Claimant of more than one Retired NFL Football Player? .................................................................................................. 64

159. Can a deceased person be a Derivative Claimant? .......................................... 64

160. Can I register as a Retired NFL Football Player's Derivative Claimant if I also registered as a Representative Claimant? .......................................................... 64

161. Do Derivative Claimants have to register for benefits? ...................................... 64

162. What happens if no one registers as a Derivative Claimant for a Retired NFL Football Player? ...................................................................................... 65

163. How do I submit a Derivative Claim Package? ................................................ 65

164. Where do I send my Derivative Claim Package if I do not use an online Portal? ............. 66

165. Is there a deadline to submit my Derivative Claim Package? ................................ 66

167. What makes a Derivative Claim Package complete? .......................................... 66

168. How will the Retired NFL Football Player know if someone has registered as a Derivative Claimant? .............................................................................. 67

169. How will I know if other Derivative Claimants have registered for the same Retired NFL Football Player? ................................................................................ 67

170. How will I know if the Retired NFL Football Player challenged my Derivative Claimant status? .................................................................................. 67

171. What happens if one Derivative Claimant does not want to share the 1% Derivative Claimant Award equally with another Derivative Claimant? ........................................ 67

172. What law does the Claims Administrator use to analyze Derivative Claimant issues? ..... 68

173. Are there any rules covering appeals of Derivative Claimant challenge determinations? ...................................................................................... 68

VIII.    Lawyers ........................................................................................ 69

174. Who is Class Counsel? .......................................................................... 69

175. Do I need a lawyer to represent me individually in this Program? ...................................... 69

176. How did a lawyer register me? ........................................................................................... 69

177. What are Common Benefit Fees and how will Class Counsel be paid? ............................. 70

178. How will my individual lawyer be paid? ........................................................................... 70

179. Can I terminate my relationship with my individual lawyer? ........................................... 70

180. How do I tell the Claims Administrator I have a new lawyer or that I do not have a
lawyer? .................................................................................................................................. 70

## IX. Petitions for Deviation from Fee Cap ............................................................................ 72

181. What is a Petition for Deviation from the fee cap? ........................................................... 72

182. Will the attorney's fees be reduced to pay for common benefit attorneys? ..................... 72

183. Where can I get a copy of the Rules Governing Petitions for Deviation from the Fee
Cap? ...................................................................................................................................... 72

184. Who are the Parties involved in a Petition for Deviation from the fee cap? .................... 72

185. Can a party to an Attorney's Lien Dispute file a Petition for Deviation? ......................... 72

186. How will a Petition for Deviation be resolved if there is also an Attorney's Lien
asserted against the Settlement Class Member? .................................................................. 73

187. Who determines whether to grant a Petition for Deviation from the fee cap? ................. 73

188. Where do I file a Petition for Deviation from the fee cap? ............................................... 73

189. What is the deadline for filing a Petition for Deviation from the fee cap? ....................... 73

190. How do I serve documents related to a Petition for Deviation from the fee cap? ............. 74

191. What information must be included in a Petition for Deviation from the fee cap? .......... 74

192. What is a Memorandum in Support and when is it due? .................................................... 74

193. What information must be included in a Memorandum in Support? ................................. 75

194. What is a Response Memorandum and when is it due? ..................................................... 76

195. What information must be included in a Response Memorandum? ................................... 76

196. What is a Reply Memorandum and when is it due? .......................................................... 77

197. What information may be included in a Reply Memorandum? ......................................... 77

198. What if I miss the deadline to submit my Memorandum in Support, Response
Memorandum, or Reply Memorandum? .............................................................................. 77

199. What information will the Magistrate Judge consider in making the Report and
Recommendation or the final decision? .............................................................................. 77

200. If I am unrepresented in the Petition for Deviation proceedings, can I ask to have a
lawyer appointed to represent me? ...................................................................................... 78

201. Can I ask for a hearing on a Petition for Deviation from the fee cap? .............................. 78

202. How will I find out if the Magistrate Judge grants a hearing and when will the
hearing be scheduled? .......................................................................................................... 78

203. What happens at a hearing? ..................................................................... 78

204. Do I have to participate in the hearing? ................................................. 79

205. Do I have to be represented by a lawyer at the hearing?  Can I have a non-lawyer advocate? ..................................................................................... 79

206. When will the Magistrate Judge issue a Report and Recommendation or a final decision? ...................................................................................... 79

207. Can I object to the Magistrate Judge's Report and Recommendation? ............................ 79

208. Who makes the final decision resolving the Petition for Deviation from the fee cap? ....... 80

209. Can the District Judge or the Magistrate Judge change the final decision? ..................... 80

210. Can I appeal the final decision? .............................................................. 80

211. How will the withheld funds be paid after the final decision? ................................ 80

X. Liens – Information for Settlement Class Members ............................................ 81

212. What is a Lien? ................................................................................ 81

213. What Liens will the Claims Administrator pay out of my Award? ............................. 81

214. What is a Medical Lien? ..................................................................... 81

215. What is an Attorney's Lien? ................................................................. 81

216. What are the kinds of Other Liens recognized in the Settlement Program? ..................... 82

217. Are there any debts that the Claims Administrator will not pay? ............................... 82

218. Do Medical Liens have to be resolved out of my Award? ..................................... 82

219. What could happen if I do not resolve my Medical Liens? .................................... 83

220. How do I know if there is a Lien against me? ................................................. 84

221. What if I identify a Lien on my Claim Form? ................................................ 85

222. How do I respond to the notice of Lien from the Settlement Program? ......................... 85

223. I received a notice from my healthcare insurer saying that it may have a Lien against me. What should I do? ..................................................................... 85

224. Should I contact a lienholder to speed up the Medical Lien resolution process? .............. 85

225. I have medical coverage through Medicare. What should I do? ............................... 86

226. What about Medicare Part C and Part D Liens? ............................................. 86

227. I have medical coverage through Medicaid. What should I do? ............................... 86

228. I (or my spouse) served in the military, so I have medical coverage through TRICARE or the Department of Veterans Affairs. What should I do? ..................... 87

229. I have medical coverage through the Department of Indian Health Services. What should I do? ................................................................................. 87

230. What agreements and with which agencies has the Lien Resolution Administrator been able to secure on behalf of Settlement Class Members? ............................... 87

231. I have a private medical insurance plan. Can they claim a Lien on my Award? .............. 88

2/19/19

232. What happens if I dispute a Lien? ................................................................ 88

233. What is a Dispute over an Attorney's Lien? .............................................. 89

234. Where can I get a copy of the Rules that apply to the Attorneys' Liens dispute resolution process? ............................................................................. 89

235. How does a Dispute over an Attorney's Lien get into the Attorneys' Liens dispute resolution process? ....................................................................... 89

236. Who are the Parties in an Attorney's Lien Dispute? ................................ 89

237. Who resolves an Attorney's Lien Dispute? .............................................. 89

238. Do I have to try to reach an agreement with the attorney who asserted a Lien against my Award? ..................................................................................... 90

239. How do I serve document submissions in the Attorneys' Liens dispute resolution process? ....................................................................................... 90

240. What do I need to submit in the Attorneys' Liens dispute resolution process? ................ 90

241. What is a Statement of Dispute and when is it due? ................................ 90

242. What information must be included in my Statement of Dispute? .................. 90

243. What is a Response Memorandum and when is it due? ............................ 91

244. What if I miss the deadline to submit my Statement of Dispute or Response Memorandum? ................................................................................................. 92

245. What information will the Magistrate Judge consider in making the Report and Recommendation or the final decision? .......................................................... 92

246. If I am unrepresented, can I ask to have a lawyer appointed to represent me in the Attorney's Lien Dispute? .............................................................................. 93

247. Can I ask for a hearing on the Attorney's Lien Dispute? ........................ 93

248. How will I find out if the Magistrate Judge grants a hearing on the Attorney's Lien Dispute and when will the hearing be scheduled? ........................................ 93

249. What happens at a hearing on an Attorney's Lien Dispute? .................... 93

250. Do I have to participate in the hearing on the Attorney's Lien Dispute? ........... 94

251. Do I have to be represented by a lawyer at the hearing on the Attorney's Lien Dispute? Can I have a non-lawyer advocate? ................................................ 94

252. Can I withdraw a Dispute from the Attorneys' Liens dispute resolution process? ........... 94

253. How do I withdraw a Dispute from the Attorneys' Liens dispute resolution process? ..... 94

254. What information will the Magistrate Judge consider in making the Report and Recommendation or the final decision on the Withdrawals? .......................... 94

255. When will the Magistrate Judge issue a Report and Recommendation or a final decision? ...................................................................................................... 95

256. Can I object to the Magistrate Judge's Report and Recommendation? ............ 95

257. Who makes the final decision resolving an Attorney's Lien Dispute? ............ 95

2/19/19

258. Can the District Judge or the Magistrate Judge change the final decision on an Attorney's Lien Dispute? ................................................................................ 95

259. Can I appeal the final decision on an Attorney's Lien Dispute? ............................................. 95

260. How will the withheld funds be paid after the final decision on an Attorney's Lien Dispute? ............................................................................................................... 96

261. How and when is a Lien paid? ................................................................................................. 96

262. What happens if more than one Lien exists against a single Monetary Award or Derivative Claimant Award and there is not enough money to pay all of the Liens in full? ....................................................................................................................................... 97

263. Will I be notified when the Claims Administrator pays a Lien? ............................................. 97

264. Whom do I contact with questions about Liens? .................................................................... 98

XI. Liens – Information for Lienholders ....................................................................................... 99

265. How does a lienholder notify the Settlement Program of a Medical Lien? ........................... 99

266. How does a lienholder notify the Settlement Program of an Attorney's Lien or an Other Lien? ............................................................................................................................. 99

267. What information must a government health insurer provide to assert a Medical Lien? ....................................................................................................................................... 100

268. What information is required from a private healthcare insurer to assert an alleged Lien? ....................................................................................................................................... 100

269. What information is required to assert an Attorney's Lien? .................................................. 100

270. What information is required to assert an Other Lien? ......................................................... 101

271. What happens after I submit the required information and documents for a valid Lien? ....................................................................................................................................... 102

272. What happens if a Settlement Class Member disputes a Medical Lien? ............................. 102

273. What happens if a Settlement Class Member disputes an Attorney's Lien? ........................ 102

274. What happens if a Settlement Class Member disputes an Other Lien? ............................... 102

275. What is a Dispute over an Attorney's Lien? ......................................................................... 103

276. Where can I get a copy of the Rules that apply to the Attorneys' Liens dispute resolution process? ............................................................................................................... 103

277. How does a Dispute over an Attorney's Lien get into the Attorneys' Liens dispute resolution process? ............................................................................................................... 103

278. Who are the Parties in an Attorney's Lien Dispute? ............................................................ 103

279. Who resolves an Attorney's Lien Dispute? .......................................................................... 103

280. Do I have to try to reach an agreement with the Settlement Class Member over the disputed Attorney's Lien? ..................................................................................................... 104

281. How do I serve document submissions in the Attorneys' Liens dispute resolution process? ................................................................................................................................. 104

282. What do I need to submit in the Attorneys' Liens dispute resolution process? .................. 104

283. What is a Statement of Dispute and when is it due? ............................. 104

284. What information must be included in my Statement of Dispute? ................... 104

285. What is a Response Memorandum and when is it due? ........................... 105

286. What if I miss the deadline to submit my Statement of Dispute or Response Memorandum? ................................................................ 105

287. What information will the Magistrate Judge consider in making the Report and Recommendation or the final decision? ........................................ 106

288. Can I request a hearing on the Attorney's Lien Dispute? ....................... 106

289. How will I find out if the Magistrate Judge grants a hearing on the Attorney's Lien Dispute and when will the hearing be scheduled? ......................... 106

290. What happens at a hearing on an Attorney's Lien Dispute? ..................... 106

291. Do I have to participate in the hearing on the Attorney's Lien Dispute? .......... 107

292. Can I withdraw a Dispute from the Attorneys' Liens dispute resolution process? ......... 107

293. How do I withdraw a Dispute from the Attorneys' Liens dispute resolution process? ... 107

294. What information will the Magistrate Judge consider in making the Report and Recommendation or the final decision on the Withdrawals? ...................... 107

295. When will the Magistrate Judge issue a Report and Recommendation or a final decision? ................................................................ 108

296. Can I object to the Magistrate Judge's Report and Recommendation? ........... 108

297. Who makes the final decision resolving the Attorney's Lien Dispute? ........... 108

298. Can the District Judge or the Magistrate Judge change the final decision on an Attorney's Lien Dispute? ................................................... 108

299. Can I appeal the final decision on an Attorney's Lien Dispute? ................. 109

300. How will the withheld funds be paid after the final decision on an Attorney's Lien Dispute? ................................................................ 109

301. Whom do I contact with questions about Liens? ............................... 109

XII.    Payments ................................................................ 110

302. I received a Notice of Monetary Award Claim Determination or Notice of Derivative Claimant Award Determination. Do I need to do anything else to receive payment of the award? ................................................................ 110

303. When will I receive payment for my Monetary Award or Derivative Claimant Award? ................................................................... 111

304. Who will issue the payment to me? ......................................... 112

305. How will the funds be issued by Citibank? .................................. 112

306. If I want to appeal only part of my Monetary Award amount, can I get paid for the rest before my appeal is final? ............................................. 112

307. Will my Monetary Award or Derivative Claimant Award be issued to my lawyer or directly to me? .............................................................. 112

308. Can a Settlement Class Member assign rights to receive his or her Monetary Award or Derivative Claimant Award, or a portion of the Award, to a third party? .................. 113

309. What is the fee cap? ........................................................................................... 113

310. What happens to those lawyers' fees and expenses that the Claims Administrator has withheld from Award payments? .................................................. 114

311. What are claims service providers and are they covered by the fee cap? ......................... 114

312. Do lawyers have to send a statement of contingency fees and expenses to the Claims Administrator? ......................................................................................... 114

313. What does the Claims Administrator do with the 5% Common Benefit Fund Holdback? ........................................................................................... 114

XIII.   Audit .......................................................................................................116

314. What is an audit? ............................................................................................ 116

315. How does an audit affect the regular processing of my claim? ......................................... 116

316. Why did I receive a Notice of Audit of Claim? ......................................................... 116

317. I received a Notice of Audit of Claim after I received a Notice of Monetary Award Claim Determination or a Notice of Denial of Monetary Award Claim. How does the audit affect my claim? .................................................................................... 117

318. Are there any rules covering the audit of claims? ......................................................... 117

XIV.   Bankruptcy .............................................................................................118

319. Why does the Settlement Program need to know whether I filed bankruptcy? .............. 118

320. How does the Settlement Program identify a Bankruptcy Issue Claimant? ..................... 118

321. How does a current or prior bankruptcy case affect my Monetary Award Claim? ........ 118

322. What is the Bankruptcy Review process? ................................................................... 118

323. Which Bankruptcy Issue Claimants must provide Bankruptcy Documents? .................. 119

324. What Bankruptcy Documents are required? .............................................................. 119

325. I received a Notice of Bankruptcy Question Delaying Payment. What does this mean? .................................................................................................................... 120

326. My Bankruptcy Case is closed. Why am I required to provide Bankruptcy Documents? .......................................................................................................... 120

327. I received a Bankruptcy Trustee Notice. What does this mean? ................................... 121

328. My bankruptcy proceeding is closed, and I cannot provide the required Bankruptcy Documents. What can I do? ..................................................................... 121

329. I received a Bankruptcy Trustee Communication Notice. What does this mean? ........... 121

330. My Bankruptcy Trustee signed the Bankruptcy Trustee Release of Information form. Am I still required to provide Bankruptcy Documents? ...................................... 121

XV.   Appeals ...................................................................................................122

331. Are there any rules covering appeals of claim determinations? ....................................... 122

**332.** Can I appeal the Claims Administrator's determination of any amounts deducted from my Monetary Award or Derivative Claimant Award for Liens? ........................... 122

**333.** Who are the appellant and the appellee on an appeal of a claim? .................................... 122

**334.** Why was my claim remanded to the Claims Administrator? ........................................... 122

**335.** If my claim is remanded from an appeal to the Claims Administrator, what happens to the $1,000 Appeals Fee I paid? ........................................................................... 122

**336.** May the NFL Parties offer medical or other new evidence on appeal? ........................... 122

**337.** If a party offers new evidence in a brief on appeal, how does that affect the due date for the responding party's brief? How will I know whether there will be a remand or whether I need to address the new evidence in what I file? ........................................ 123

**338.** If new evidence added on appeal leads to remand to the Claims Administrator, can a party offer new evidence in every appeal to force a remand and re-review, either to get another chance at payment or denial, or to delay things? ........................................... 123

**339.** Will the Court review a decision by a Special Master allowing or excluding new evidence on a claim appeal? .................................................................................... 123

**340.** How will remands of claims on appeal work? ...................................................... 124

    **(a)**    Will the re-review be assigned to the same AAP doctor who reviewed it before? ..... 124

    **(b)**    If the Special Master remands my claim, will the Claims Administrator or the AAP review the entire claim all over again? ...................................................... 124

    **(c)**    If an AAP doctor reviews the claim after remand, will that AAP doctor see the entire claim file on remand, or only the new evidence? ..................................... 124

    **(d)**    Does that mean that AAP doctor will see all the briefs on the appeal too? ................ 124

    **(e)**    On remand, does the original outcome set a floor for the result, or can the claim go down in value? .......................................................................................... 125

    **(f)**    What if the Claims Administrator did the original review and not the AAP. Do these same rules apply? ...................................................................................... 125

**341.** Can a claim be appealed again after the Special Master remands it and the Claims Administrator issues a new notice? ................................................................... 125

your Claim Form or want to check the status of your claim and a Program Specialist will help you.

**82.   What is a Qualifying Diagnosis?**

These diagnoses are eligible for a Monetary Award:

   (a)  Level 1.5 Neurocognitive Impairment;

   (b)  Level 2 Neurocognitive Impairment;

   (c)  Alzheimer's Disease;

   (d)  Parkinson's Disease;

   (e)  Death with CTE (for a Retired NFL Football Player who died before April 22, 2015); and

   (f)  ALS.

Click here to read how these Qualifying Diagnoses are defined in Exhibit 1 of the Settlement Agreement.

**83.   Should I get a BAP exam or see a Qualified MAF Physician?**

This is up to you and depends on the Qualifying Diagnosis.

**Level 1.5 and Level 2:** If you are eligible for the BAP, you can get your diagnosis from either Qualified BAP Providers or a Qualified MAF Physician. The BAP exam is free.

**Alzheimer's Disease, Parkinson's Disease and ALS**: You must see a Qualified MAF Physician. These Qualifying Diagnoses cannot be made in the BAP.

**84.   What kind of physicians are authorized to make a Qualifying Diagnosis?**

This depends on the kind of Qualifying Diagnosis and when it was made. Click here for the Diagnosis and Review Table showing how this works. Find the kind of Qualifying Diagnosis in column 1 of Row A, B or C of the Diagnosis and Review Table. Then look at column 2 for when the diagnosis was made and column 3 for what kind of doctor has authority under the Settlement Agreement to make that diagnosis for purposes of a Monetary Award.

This is what the Diagnosis and Review Table shows:

(a)  Level 1.5, Level 2, Alzheimer's Disease, Parkinson's Disease, or ALS diagnosed before July 7, 2014, which was the date the Settlement Agreement was preliminarily approved by the Court: These must be made by what the Table calls Group 1 Specialists, who are:

Board-certified neurologists, board-certified neurosurgeons, or other board-certified neuro-specialist physicians, or otherwise qualified neurologists, neurosurgeons, or other neuro-specialist physicians. (See Section 6.3(d) of the Settlement Agreement, available by clicking here.)

(b) Level 1.5, Level 2, Alzheimer's Disease, Parkinson's Disease, or ALS diagnosed from July 7, 2014, through January 7, 2017, which was the date the Settlement Agreement became effective after all appeals: These must be made by what the Table calls Group 2 Specialists, who are:

Board-certified neurologists, board-certified neurosurgeons, or other board-certified neuro-specialist physicians. (See Section 6.3(c) of the Settlement Agreement, available by clicking here.)

NOTE: This is the same as the Group 1 Specialists listed above, except it does not include the "otherwise qualified neurologists, neurosurgeons, or other neuro-specialist physicians."

(c) Level 1.5, Level 2, Alzheimer's Disease, Parkinson's Disease, or ALS diagnosed on a Player while living but who died before January 7, 2017: These must be made by what the Table calls Group 3 Specialists, who are:

Board-certified neurologists, board-certified neurosurgeons, other board-certified neuro-specialist physicians, otherwise qualified neurologists, neurosurgeons, or other neuro-specialist physicians, or other physicians who have sufficient qualifications (a) in the field of neurology to make a Qualifying Diagnosis of Level 1.5 Neurocognitive Impairment, Level 2 Neurocognitive Impairment, Alzheimer's Disease, Parkinson's Disease, or ALS, or (b) in the field of neurocognitive disorders to make a Qualifying Diagnosis of Level 1.5 Neurocognitive Impairment or Level 2 Neurocognitive Impairment. (See Section 6.3(e) of the Settlement Agreement, available by clicking here.)

(d) Diagnoses made on Players after January 7, 2017:

(1) Level 1.5 or Level 2 Diagnoses: After January 7, 2017, these must be diagnosed either by Qualified BAP Providers in the BAP or by a Qualified MAF Physician;

(2) Alzheimer's Disease, Parkinson's Disease, or ALS: After January 7, 2017, these can be diagnosed only by a Qualified MAF Physician.

(e) Death with CTE: This can be diagnosed only by a board-certified neuropathologist after the Player's death.

*Reminder: You do not have to prove that the Qualifying Diagnosis was caused by playing football or from head injuries the Player experienced. The fact that a Player has a Qualifying Diagnosis is enough.*

**85.  Who is a Qualified MAF Physician?**

A Qualified MAF Physician is a board-certified neurologist, board-certified neurosurgeon, or other board-certified neuro-specialist physician, who is part of a list of physicians approved by Co-Lead Class Counsel and the NFL Parties as authorized to make a Qualifying Diagnosis after January 7, 2017. A physician is not a Qualified MAF Physician until he or she has been approved by the Parties and has signed a contract with the Claims Administrator. The list of Qualified MAF Physicians eligible to make Qualifying Diagnoses is posted on the Settlement Website (click here to see it). Also click here to see the Diagnosis and Review Table, which summarizes Qualifying Diagnoses that Qualified MAF Physicians make and the diagnostic criteria they use to make those diagnoses.

**86.  How do I get evaluated for a Qualifying Diagnosis if I do not already have one?**

You can make an appointment with either:

(a)  Qualified BAP Providers (if you are BAP-eligible) who can determine whether you have Level 1.5 Neurocognitive Impairment or Level 2 Neurocognitive Impairment; or

(b)  A Qualified MAF Physician, who can determine whether you have Level 1.5 Neurocognitive Impairment, Level 2 Neurocognitive Impairment, Alzheimer's Disease, Parkinson's Disease, or ALS.

*Reminder: BAP exams are free of charge. You are responsible for paying for an examination by a Qualified MAF Physician, but many Qualified MAF Physicians accept health insurance.*

**87.  If my diagnosing physician is both a Qualified BAP Provider and a Qualified MAF Physician, how do I know if the diagnosis is made in or outside the BAP?**

Qualifying Diagnoses of Alzheimer's Disease, Parkinson's Disease and ALS cannot be made through the BAP. After January 7, 2017, a Qualifying Diagnosis of Alzheimer's Disease, Parkinson's Disease, or ALS must be made by a Qualified MAF Physician, even if he or she is also a Qualified BAP Provider. However, a Qualifying Diagnosis of Level 1.5 Neurocognitive Impairment or Level 2 Neurocognitive Impairment may be made after January 7, 2017, by Qualified BAP Providers or a Qualified MAF Physician.

Most of the Qualified BAP Providers are also Qualified MAF Physicians. If you or your lawyer scheduled a BAP exam with the BAP Administrator, then you will receive a BAP exam. If you have any doubt about in which capacity the physician is acting, then ask him or her during your visit.

**88.  Does the physician who makes the Qualifying Diagnosis of a Retired NFL Football Player have to see and examine that Player in person?**

Yes, for all types of Qualifying Diagnoses other than Death with CTE, which only could have been diagnosed after the death of the Player.

The diagnosing physician who signs a Diagnosing Physician Certification Form for a diagnosis made on a living Retired NFL Football Player must have examined that Player in person. Section 8.2(a)(iii) of the Settlement Agreement allows a physician to make a Qualifying Diagnosis for a living Player relying on the records and work done by a prior physician and to use that earlier date as the diagnosis date *only if* that prior physician is deceased or incompetent *and only if* the new physician independently examines the Player. This means that other than those situations, a Qualifying Diagnosis of a living Player must be made by a physician based on his or her own examination and records, rather than the examination and records of someone else.

As a result:

(1) The diagnosing physician cannot base a Qualifying Diagnosis solely on a review of test results or the medical records of another physician; and

(2) The diagnosing physician must have met with the Player in person, rather than communicating with him by email, texts, letters, or on the phone.

There must be records in the Claim Package showing that the diagnosing physician who signed the Diagnosing Physician Certification Form submitted in the Claim Package followed both of these rules. If there is not, the Claim Package is incomplete. If the physician who signed the Diagnosing Physician Certification Form did not meet with the Player in person, that physician must do so to re-do the diagnosis, or the doctor who did meet the Player must sign the Diagnosing Physician Certification Form instead.

## 89. Can the representative of a deceased Retired NFL Football Player get a Qualifying Diagnosis for that Player now?

For a Qualifying Diagnosis of Death with CTE, the Retired NFL Football Player had to have died before April 22, 2015, and received a post-mortem diagnosis of CTE from a board-certified neuropathologist before April 22, 2015, or within 270 days after the Player's death, if the Player died between July 7, 2014, and April 22, 2015. If you represent a deceased Player who received this type of post-mortem diagnosis, you should contact the neuropathologist who provided it and ask him or her to complete and sign a Pre-Effective Date Diagnosing Physician Certification Form attesting to the Qualifying Diagnosis. This is the only type of Qualifying Diagnosis that can be made after the Player died.

For Qualifying Diagnoses of Level 1.5 Neurocognitive Impairment, Level 2 Neurocognitive Impairment, Alzheimer's Disease, Parkinson's Disease and ALS, the Player had to have been diagnosed while he was living by a physician with the appropriate qualifications, which are described in the FAQ found here. If the Player received one of these diagnoses while he was alive, you should contact the physician who made the diagnosis and ask him or her to complete and sign a Pre-Effective Date Diagnosing Physician Certification Form.

**90.  What should I do if I already have a Qualifying Diagnosis?**

You should submit a Claim Package for that Qualifying Diagnosis, including a Diagnosing Physician Certification Form and any medical records from the physician who made the diagnosis and the other required parts of a Claim Package. If you received a Qualifying Diagnosis through the BAP, the Claims Administrator already has your medical records and Diagnosing Physician Certification Form. However, you must submit a Claim Form before the Claims Administrator will review your claim for a Monetary Award determination.

*Reminder: Only Qualified BAP Providers and Qualified MAF Physicians can make Qualifying Diagnoses after January 7, 2017.*

**91.  Does it matter when the Retired NFL Football Player was diagnosed?**

Yes. The Settlement Agreement sets out what kind of doctors are authorized to make a Qualifying Diagnosis, depending on when the diagnosis is made. (See Section 6.3 of the Settlement Agreement, available by clicking here.)

The Settlement Agreement controls what medical criteria applies when making a Qualifying Diagnosis and who reviews that diagnosis to see if it qualifies for a Monetary Award, whether the Appeals Advisory Panel of neurologists or the Claims Administrator, and how the review is to be done. That also depends on when the diagnosis is made. (See Section 6.4 and Exhibit 1 of the Settlement Agreement, available by clicking here.)

Click here for the Diagnosis and Review Table showing how this works. Find your diagnosis in Column 1 and then look in Columns 2 through 6 of that table for who makes the diagnosis, who reviews it and how.

**92.  What dates matter for when the Qualifying Diagnosis is made?**

The Settlement Agreement divides diagnoses into these time periods. The Claims Administrator created a Diagnosis and Review Table to show how this works. Click here to see column 2 of the Table, which shows:

(a)  Diagnoses made on or before July 1, 2011;

(b)  Diagnoses made from July 2, 2011 through July 6, 2014;

(c)  Diagnoses made from July 7, 2014, the date the Settlement Agreement was preliminarily approved by the Court, through January 7, 2017, which was the date the Settlement Agreement became effective after all appeals;

(d)  Diagnoses made on Players while living but who died before January 7, 2017;

(e)  Diagnoses made on Players after January 7, 2017; and

(f) Diagnoses of Death with CTE made on Players who died on or before April 22, 2015, which was the date the Court finally approved the Settlement Agreement but before all appeals were done.

**93. How is the date of a Qualifying Diagnosis determined?**

The physician making a Qualifying Diagnosis of a Retired NFL Football Player must determine and verify the date on which that Qualifying Diagnosis was made. This date is important under the Settlement Agreement. It affects the amount of a Monetary Award, because the younger a Player is at the time of the Qualifying Diagnosis, the larger the award.

The diagnosing physician uses his or her professional medical judgment in deciding when the Player had the conditions amounting to a Qualifying Diagnosis under Exhibit 1 to the Settlement Agreement. There are some basic rules about this:

(a) *Death with CTE:* For these claims, the date of the Qualifying Diagnosis is the date of the Player's death, even though the diagnosis is not made until after the Player dies. The Monetary Award is based on the Player's age when he died.

(b) *General Rule for the other Qualifying Diagnoses:* The date of a Qualifying Diagnosis other than Death with CTE is when the diagnosing physician has enough information and materials, including test results, to be able to render a medically sound and reliable judgment about the Player's condition, the way a physician normally does in his or her clinical practice. In some cases, using sound medical judgment, a physician may conclude that a Qualifying Diagnosis existed at some prior point in time.

(c) *Are there other cases when the Qualifying Diagnosis might be before the date the physician personally examines the Player?* Maybe. The unique facts and circumstances of a particular claim may allow the diagnosis date to be before the date the diagnosing physician personally examined the Player. Here are the rules:

(1) *Diagnosing Physician is deceased or legally incompetent:* Section 8.2(a)(iii) of the Settlement Agreement allows use of the date of an earlier Qualifying Diagnosis to calculate a Monetary Award where: (a) the Player received a Qualifying Diagnosis; (b) the diagnosing physician died or was deemed by a court to be legally incapacitated or incompetent before the January 7, 2017 Effective Date or before completing a Diagnosing Physician Certification Form; (c) a separate qualified physician made an independent examination and reviewed the Player's medical records that formed the basis of the Qualifying Diagnosis; and (d) that physician found the same Qualifying Diagnosis. Here, the Settlement Agreement allows a later physician to adopt the date of diagnosis based upon the earlier medical records of another physician.

(2) *88 Plan diagnoses:* If the diagnosis was made by an 88 Plan neutral physician who cannot or will not sign the Diagnosing Physician Certification Form, the date of the diagnosis made as part of the 88 Plan Independent Medical Examination ("IME")

may be used where: (a) the Player sees a Qualified MAF Physician for an independent examination or Qualified BAP Providers for a BAP exam; (b) the Player provides the Qualified MAF Physician or Qualified BAP Providers with all records of the prior 88 Plan IME diagnosis in his possession or to which he has access and all records of evaluation and treatment for that impairment between the dates of the 88 Plan IME and the Qualified MAF Physician appointment or BAP exam in his possession or to which he has access; (c) the Qualified MAF Physician performs an independent examination or the Qualified BAP Providers perform a BAP exam of the Player and review the additional records provided by the Player; and (d) if the Qualified MAF Physician or Qualified BAP Providers find the same Qualifying Diagnosis – both as of the date of the independent examination and the prior IME for the 88 Plan – then the date of Qualifying Diagnosis will be the date of the 88 Plan IME.

This exception applies only to diagnoses made through the 88 Plan. If you received a diagnosis through another NFL disability plan, such as the Neuro-Cognitive Disability Benefit Plan or the NFL Player Supplemental Disability Plan, contact the Claims Administrator to see if the date of diagnosis made through that plan can be used as the date of the Qualifying Diagnosis for purposes of a Monetary Award. The Claims Administrator will review your case with Co-Lead Class Counsel and Counsel for the NFL Parties.

(3) *Medical Records unavailable:* If the Player died before the January 7, 2017 Effective Date of the Settlement Agreement and the medical records reflecting the Qualifying Diagnosis are unavailable because of a force majeure type event or for some other reason the Claims Administrator deems acceptable, the date of the Qualifying Diagnosis will be the earlier of: (1) the date of the onset of the Qualifying Diagnosis reflected in other available contemporaneous medical records or the death certificate; or (2) the date of the Player's death provided on the death certificate.

(4) *Other instances where the earlier diagnosing doctor or medical records are not available:* If you face other situations not covered by the terms of Section 8.2(a)(iii) of the Settlement Agreement and not involving a Plan 88 IME, then contact the Claims Administrator and explain the problem you have. There may be other circumstances in which a diagnosis by a later physician might adopt the earlier date of a diagnosis by another doctor.

(5) *Sound clinical medical judgment:* Also, the physician making a diagnosis may conclude, in the exercise of his or her sound medical judgment, that he or she has enough information from personal examination, medical records from other healthcare providers, medical history, corroborating evidence from non-family members and other information that medical specialists rely on in their clinical practices, to form a sound medical judgment that the Player's Qualifying Diagnosis conditions existed at a date earlier than the date of a personal examination of the Player by the physician making the diagnosis and signing the Diagnosing Physician

Certification Form. The Settlement Class Member is best served by having the doctor who made an earlier diagnosis sign the Diagnosing Physician Certification Form. But there may be situations where the diagnosing physician can pinpoint an earlier date that is based on sound clinical judgment and best medical practices.

Any such diagnosis will be strictly scrutinized in the claims review process. The Claims Administrator may request additional information and/or documents to support the claimed diagnosis date and prevent misrepresentations of material fact in connection with the claim.

**94. Which diagnostic criteria must a physician use when making my Qualifying Diagnosis? When and to what diagnoses does the "generally consistent" criteria apply?**

The Diagnosis and Review Table shows how this works; click <u>here</u> to review the Table.

For diagnoses of Level 1.5 and Level 2 Neurocognitive Impairment made in the BAP, Qualified BAP Providers follow the diagnostic criteria set forth in Exhibits 1 and 2.

Diagnoses of Level 1.5 and 2 Neurocognitive Impairment made outside the BAP must show that the evaluation and evidence behind those diagnoses are "generally consistent" with the diagnostic criteria set for Qualified BAP Providers and outlined in Exhibits 1 and 2.

Diagnoses of Alzheimer's Disease, Parkinson's Disease, ALS and Death with CTE are not made in the BAP and are all made following the diagnostic criteria set out in Exhibit 1 (and the "generally consistent" standard does not apply).

**95. What does "generally consistent" mean?**

Something is "generally consistent with" something else if the two things have more elements or characteristics in common with each other than they have elements or characteristics that differ from each other. The common elements or characteristics must predominate over the uncommon ones.

The Settlement Agreement states specifically that diagnostic criteria for a diagnosis made outside the BAP do not have to be identical to the diagnostic criteria for a diagnosis made in the BAP. The diagnostic criteria, or the medical rules the doctor must follow to make the diagnosis, outside the BAP do not have to be 100% the same as the Exhibit 1 criteria.

With this said, the closer a set of diagnostic criteria match those specified in Exhibit 1, the more "consistent" it will be with Exhibit 1.

A claim based on a Qualifying Diagnosis is most solid when its elements match closely those required in Exhibit 1. For example, where Exhibit 1 requires documentary evidence or a third-party sworn affidavit corroborating functional impairment, or neuropsychological testing, the claim of a Qualifying Diagnosis is most solid when its Claim Package contains documentary evidence or a third-party sworn affidavit corroborating functional impairment and proof of

 **CONCUSSION SETTLEMENT**

*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

## APPEALS FORM FOR MONETARY AWARD OR DERIVATIVE CLAIMANT AWARD CLAIM DETERMINATION

**DATE OF NOTICE: June 25, 2019**
**DEADLINE TO APPEAL: July 25, 2019**

### I. SETTLEMENT CLASS MEMBER INFORMATION

| | |
|---|---|
| **Settlement Program ID** | 950012548 |

| **Name:** | First<br>Robin | M.I.<br>B | Last<br>Cornish |
|---|---|---|---|

| **Settlement Class Member Type** | Representative Claimant |
|---|---|
| **Primary Counsel** | O'Hanlon, Demerath & Castillo |

### II. REASON FOR THIS APPEAL

Here is a short statement explaining the reason(s) for my appeal. Raise all issues you wish to appeal. Issues not raised at this time will not be addressed by the Court.

Class Member files the attached written statement in support of this appeal and respectfully requests that the Claims Administrator's denial of this claim be reversed and remanded for a calculation of the Class Member's Monetary Award because the Claims Administrator erred in concluding that the Amended Settlement Agreement required Class Member to submit proof that the board-certified neuropathologist who provided a post-mortem diagnosis of CTE made the diagnosis on or before 4/22/15. (If the Amended Settlement Agreement [ECF 6481] is construed to require a diagnosis on or before 4/22/15, Class Member reserves the right to seek relief from the Court pursuant to both Rule 60 and the Court's inherent authority to amend the judgment in this case in order to implement the settlement.)

### III. HOW TO SUBMIT THIS FORM

You may submit this Appeals Form and any accompanying documents using one of these methods:

| | |
|---|---|
| **By Mail:**<br>(must be postmarked on or before the appeal deadline date) | NFL Concussion Settlement<br>Claims Administrator<br>P.O. Box 25369<br>Richmond, VA 23260 |
| **By Overnight Delivery:**<br>(must be placed with the overnight carrier on or before the appeal deadline date) | NFL Concussion Settlement<br>c/o BrownGreer PLC<br>250 Rocketts Way<br>Richmond, VA 23231 |
| **By Hand Delivery:**<br>(must delivered on or before the appeal deadline date) | NFL Concussion Settlement<br>c/o BrownGreer PLC<br>250 Rocketts Way<br>Richmond, VA 23231 |

### IV. HOW TO CONTACT US WITH QUESTIONS OR FOR HELP

If you are represented by a lawyer, consult with your lawyer if you have questions or need assistance. If you are unrepresented and have any questions about this Form or need help, contact us at 1-855-887-3485 or send an email to ClaimsAdministrator@NFLConcussionSettlement.com.  If you are a lawyer, call or email your designated Firm Contact for assistance. For more information about the Settlement Program, visit the official website at www.NFLConcussionSettlement.com, where you can read or download the Rules Governing Appeals of Claim Determinations, Frequently Asked Questions about the Settlement, the complete Settlement Agreement and other helpful materials.

 **CONCUSSION SETTLEMENT**

*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

## NOTICE OF DENIAL OF MONETARY AWARD CLAIM
### DATE OF NOTICE: July 30, 2019
### DEADLINE TO APPEAL: August 29, 2019

### I. SETTLEMENT CLASS MEMBER INFORMATION

| | |
|---|---|
| **Settlement Program ID** | 950013395 |

| **Name** | First<br>Carleen | M.I. | Last<br>Hastings |
|---|---|---|---|

| | |
|---|---|
| **Settlement Class Member Type** | Representative Claimant |
| **Lawyer** | O'Hanlon, Demerath & Castillo |

| **Asserted Qualifying Diagnosis** | Death with CTE (Chronic Traumatic Encephalopathy) | **Date** | 10/15/08 |
|---|---|---|---|

### II. EXPLANATION OF CLAIM DETERMINATION

This Notice is an official communication from the Claims Administrator for the NFL Concussion Settlement Program. We reviewed your Claim Package and determined that you are not entitled to a Monetary Award because:

| 1. | Section 6.3(f) of the Settlement Agreement allows a CTE diagnosis if: (1) the Retired Player died before 4/22/15, and (2) there was a post-mortem diagnosis of CTE made by a board-certified neuropathologist prior to 4/22/15. Although Dr. Hamilton is a board-certified neuropathologist and signed a Pre-Effective Date Diagnosing Physician Certification Form indicating a CTE diagnosis, we must have proof that he personally performed the post-mortem exam on the Retired Player and that it was done on or before 4/22/15. There was no post-mortem examination report submitted to indicate that Dr. Hamilton examined the Retired Player's brain tissue to confirm a CTE diagnosis. The two-page letter provided by Dr. Hamilton does not satisfy the requirements for a CTE diagnosis under this Settlement Program. For these reasons, this claim is denied. |
|---|---|

Section III below explains your right to appeal this denied claim, but living Retired Players may have the option to submit a new Claim Package under Section 9.1(c)(i) of the Settlement Agreement if they receive a new Qualifying Diagnosis. We will determine whether the new claim can be considered for a Monetary Award based on several factors, including whether the new claim shows materially changed circumstances from the earlier claim. These materially changed circumstances may include: (a) a different type of Qualifying Diagnosis than the one that was denied; or (b) the same type of Qualifying Diagnosis but with a different diagnosis date supported by additional medical records. If you submit a new claim within 365 days of the claim that is the subject of this denial notice, Section 10.3(d)(ii) of the Settlement Agreement requires us to audit that new claim if it is based on the same Qualifying Diagnosis as this denied claim, but the new diagnosis was made by a different physician.

### III. YOUR RIGHT TO APPEAL THIS DETERMINATION

If you have a good faith belief that the decision to deny your Monetary Award claim is incorrect, you may appeal this determination to the Court under Section 9.5 of the Settlement Agreement. To do so, click the Appeal Denied Claim button on your secure online portal and follow the instructions provided. You must submit supporting evidence to support your appeal. Any written statement may not be more than 10 double-spaced pages. You must do so on or before the Deadline to Appeal stated at the top of this Notice.

If you decide to appeal, the Settlement Agreement requires you to pay an Appeal Fee of $1,000, which you can do using the online PayPal option or by check made payable to the NFL Claims Administrator.  This fee will be refunded if your appeal is successful.  If you are unable to pay the $1,000 fee, you may make a hardship request to us to waive the fee and will have to submit financial information showing a sufficient hardship.

If paying the $1,000 Appeal Fee by check, mail the check to the address below.
> NFL Concussion Settlement
> Claims Administrator
> P.O. Box 25369
> Richmond, VA  23260

The Special Master appointed by the Court will decide your appeal based upon a showing by you of clear and convincing evidence.  The Special Master's factual determinations will be final and binding, but you or Class Counsel or the NFL Parties may object to any of the Special Master's conclusions of law, which will then be subject to de novo (*i.e.*, a new) review by the Court.

If an appeal is not submitted on or before the deadline stated at the top of this Notice, the determination in this Notice will become final.

## IV. CLASS COUNSEL'S RIGHT TO APPEAL THIS DETERMINATION

Section 9.5 of the Settlement Agreement also gives Class Counsel the right to challenge our decision to deny your Monetary Award claim.  If Class Counsel chooses to appeal, it must do so by the Deadline to Appeal stated at the top of this Notice and must provide a written copy of its Appeals Form and any supporting evidence to you, the NFL Parties, and us.

If an appeal is taken by you or Class Counsel, the NFL Parties may submit a written opposition (not to exceed 10 double-spaced pages) no later than 30 days after receipt of the Appeals Form.  The party taking the appeal is not permitted to submit a reply.

Class Counsel may also submit a written statement (not to exceed 10 double-spaced pages) in response to your appeal no later than 15 days after receipt of the Appeals Form, and you and the NFL Parties may each submit a reply to any such submission by Class Counsel.

## V. HOW TO CONTACT US WITH QUESTIONS OR FOR HELP

If you are represented by a lawyer, consult with your lawyer if you have questions or need assistance. If you are unrepresented and have any questions about this Notice or need help, contact us at 1-855-887-3485 or send an email to ClaimsAdministrator@NFLConcussionSettlement.com.  If you are a lawyer, call or email your designated Firm Contact for assistance. For more information about the Settlement program, visit the official website at www.NFLConcussionSettlement.com to read the Frequently Asked Questions or download a copy of the complete Settlement Agreement.



**NFL Parties' Opposition to Appeal of**
**Claim Denial by Representative Claimant Robin Cornish**

Robin Cornish, Representative Claimant for her late husband, Frank Cornish, submitted a claim on February 5, 2019—the day before the deadline for pre-Effective Date claims—for a Qualifying Diagnosis of Death with CTE purportedly rendered by neuropathologist Dr. Ronald L. Hamilton.  (*See* Claim Form; Diagnosing Physician Certification.)  In support of her claim, Ms. Cornish submitted (1) a Diagnosing Physician Certification from Dr. Hamilton, reflecting a purported Qualifying Diagnosis of Death with CTE (Diagnosing Physician Certification at 6); (2) an undated letter from Dr. Hamilton, purporting to diagnose Mr. Cornish with CTE (Hamilton Letter); (3) a death certificate indicating that Mr. Cornish died on August 23, 2008 and listing Mr. Cornish's cause of death as "SUDDEN ADULT DEATH WITH EVIDENCE OF HYPERTENSIVE HEART DISEASE" (Death Certificate); and (4) an autopsy report completed by Dr. Marc A. Krouse, indicating the same cause of death listed in Mr. Cornish's death certificate (*see* Autopsy Report at 1).

On February 20, 2019, the Claims Administrator issued a Notice of Request for Additional Documents advising Ms. Cornish that her Claim Package was incomplete because Ms. Cornish did not submit any medical records reflecting the Qualifying Diagnosis.  (*See* Notice of Request for Additional Documents.)  In the section titled "Additional Explanation of What is Missing," the Claims Administrator explained that Ms. Cornish's Claim Package materials did not show that Dr. Hamilton administered a post-mortem examination in which he diagnosed Mr. Cornish with CTE prior to the Settlement Final Approval Date of April 22, 2015, as required by the Settlement Agreement.  (*See id.*)  In response to the Notice of Request for Additional Documents, counsel for Ms. Cornish sent a letter to the Claims Administrator asserting that no additional documents were required because the Settlement Program FAQs provide that the date of Mr. Cornish's Qualifying Diagnosis is the date of his death.  (*See* May 6, 2019 email from David J. Campbell to the Claims Administrator at 1-2.)  On June 25, 2019, the Claims Administrator denied Ms. Cornish's claim because she failed to submit any additional Claim Package materials to show that Dr. Hamilton actually rendered a diagnosis of CTE prior to the Final Approval Date, as required by the Settlement Agreement.  (*See* Notice of Denial of Monetary Award Claim ("Denial Notice") at 1.)

On appeal, Ms. Cornish does not contend that Dr. Hamilton diagnosed Mr. Cornish with CTE based on a post-mortem examination prior to April 22, 2015.  Instead, she argues that: (1) the still unspecified date that Dr. Hamilton actually diagnosed Mr. Cornish does not matter, because the diagnosis date for any Retired NFL Football Player diagnosed with Death with CTE purportedly is the date of the player's death; and (2) if the Claims Administrator determines that a diagnosing physician must render a diagnosis of Death with CTE prior to April 22, 2015, the amended Settlement Agreement purportedly violates Settlement Class Members' due process rights because it was a change to the original Settlement Agreement without proper notice.  (*See* Written Statement in Support of Class Member's Appeal of the Claims Administrator's Notice of Denial of Monetary Award Claim ("Appeal").)[1]

---

[1]    With knowledge that Mr. Cornish and other clients never received a diagnosis of CTE prior to the Final Approval Date, counsel for Ms. Cornish has engaged in a lengthy history of legal gamesmanship concerning the deadline for Qualifying Diagnoses of Death with CTE.  On August 15, 2017, counsel for Ms. Cornish, on behalf of client Yvonne Sagapolutele, filed a Motion to Modify the Amended Final Order and Judgment, in which she alleged that the Settlement Agreement's deadline to obtain a Qualifying Diagnosis of Death with CTE was "imposed after the deadline to opt out and without notice to Class Members."  (Mem. of Law in Supp. of Absent Class Member

The NFL Parties respectfully oppose the Appeal because it is utterly unfounded, and there is no question this claim must be denied. The Settlement Agreement clearly requires that a board-certified neuropathologist render a Qualifying Diagnosis of Death with CTE prior to April 22, 2015, and Ms. Cornish has not provided—and undoubtedly cannot provide—any evidence that Dr. Hamilton rendered such a diagnosis prior to that date. In addition, the amended Settlement Agreement's requirement that a Qualifying Diagnosis of Death with CTE must be rendered prior to April 22, 2015 does not violate Settlement Class Members' due process rights; to the contrary, it expanded the deadline for Death with CTE diagnoses compared to the original Settlement Agreement to the benefit of Settlement Class Members.

For these reasons, and those set forth below, Ms. Cornish's appeal should be denied.

## I.    There Is No Evidence That Dr. Hamilton Rendered a Qualifying Diagnosis of Death With CTE Prior to April 22, 2015, as Required by the Settlement Agreement

For a Qualifying Diagnosis of Death with CTE, the Settlement Agreement explicitly requires that a diagnosing physician render the diagnosis prior to the Settlement's Final Approval Date of April 22, 2015. Specifically, Section 2.1(aa) of the Settlement Agreement provides that the Qualifying Diagnosis of "Death with CTE is defined in Exhibit 1," and Exhibit 1 states that the definition of Death with CTE is: "For Retired NFL Football Players who died prior to the Final Approval Date, *a post-mortem diagnosis of CTE made by a board-certified neuropathologist prior to the Final Approval Date*, provided that a Retired NFL Football Player who died between July 7, 2014 and the Final Approval Date shall have until 270 days from his date of death to obtain such a postmortem diagnosis." (Settlement Agreement, Ex. A-1 at 5 § 5 (emphasis added).) Section 6.3(f) of the Settlement Agreement reiterates that requirement, stating that "[a] Qualifying Diagnosis of Death with CTE shall be made only for Retired NFL Football Players who died prior to the Final Approval Date, through *a post-mortem diagnosis made by a board-certified neuropathologist prior to the Final Approval Date* . . . ." (*See id.* at 6.3(f) (emphasis added).)

In the Appeal, Ms. Cornish argues that a Diagnosing Physician is not required to actually render a Qualifying Diagnosis of Death with CTE prior to April 22, 2015 because "the only date that is relevant in determining the date of a Qualifying Diagnosis for Death with CTE is the date of the Player's death." (Appeal at 5.) As support for this argument, Ms. Cornish cites Settlement FAQ 99 (formerly Settlement FAQ 93), which states in part:

> *Death with CTE*: For these claims, the date of the Qualifying Diagnosis is the date of the Player's death, even though the diagnosis is not made until after the Player dies. The Monetary Award is based on the Player's age when he died.

---

and Pl. Yvonne Sagapolutele's Mot. to Modify the Am. Final Order and J. at 18, 12-md-2323, ECF No. 8263-2 (the "Motion to Modify the Amended Final Order and Judgment").) After the Parties fully briefed that motion, the Court denied the motion without prejudice to Ms. Sagapolutele's (or other similarly situated Settlement Class Members') ability to raise the issue at a later time if she filed a Death with CTE claim that would have been valid but for the deadline. (Order, 12-md-2323, ECF No. 8557.) Counsel then waited over 16 months to file Ms. Cornish's Death with CTE claim, which relies on an *undated* letter from Dr. Hamilton, with the clear intention of obfuscating the timing and nature of Dr. Hamilton's purported CTE diagnosis.

(Settlement FAQ 99.)

Ms. Cornish's argument rests on willful ignorance of the Settlement Agreement and a misinterpretation of Settlement FAQ 99. Specifically, the Settlement Agreement plainly requires that, "[f]or Retired NFL Football Players who died prior to the Final Approval Date, a ***post-mortem diagnosis***" of Death with CTE must be "made by a board-certified neuropathologist ***prior to the Final Approval Date***." (Settlement Agreement Ex. A-1 at 5 § 5 (emphasis added).) If, as Ms. Cornish argues, the Settlement Agreement required only that a Retired NFL Football Player died prior to the Final Approval Date in order for a diagnosis made at *any unlimited future date* to be timely, the Settlement Agreement would not include subsequent language providing that a player who died between July 7, 2014 and the Final Approval Date "shall have until 270 days from his date of death to obtain such a postmortem diagnosis." (*Id.*)

Moreover, Settlement FAQ 99 does not concern the date by which a Diagnosing Physician must have *actually made* a Death with CTE diagnosis, but instead concerns the date of diagnosis ***for compensation purposes***. The Parties to the Settlement Agreement did not wish to reduce the compensatory award of a decedent who otherwise would have aged between death and the neuropathological examination. The Death with CTE portion of Settlement FAQ 99 confirms this, as it clearly states that "[t]he ***Monetary Award*** is based on the Player's age when he died." (Settlement FAQ 99 (emphasis added).)

Ms. Cornish has not provided—and presumably cannot provide—any evidence that Dr. Hamilton rendered his purported Qualifying Diagnosis of Mr. Cornish prior to the Final Approval Date of April 22, 2015. In fact, Dr. Hamilton's letter containing the purported diagnosis does not contain any dates whatsoever, and Dr. Hamilton's Diagnosing Physician Certification form only lists the date of Mr. Cornish's death (August 23, 2008) as the date of diagnosis. (*See* Hamilton Letter; Diagnosing Physician Certification.) Accordingly, Ms. Cornish's appeal must be denied, and her claim denial upheld, for this fundamental reason alone.

## II.     The Settlement Agreement Requirement That a Death With CTE Diagnosis Be Rendered Prior to April 22, 2015 Does Not Violate Settlement Class Members' Due Process Rights

Fully aware that her purported Death with CTE diagnosis is untimely because it was not rendered prior to the Final Approval Date of April 22, 2015, Ms. Cornish argues that such requirement somehow violates her right to due process. Specifically, Ms. Cornish argues that the Special Master should consider the arguments in Yvonne Sagapolutele's August 15, 2017 Motion to Modify the Amended Final Order and Judgment to remove the deadline to obtain the Qualifying Diagnosis, which Motion was denied without prejudice by Judge Brody with instruction that Ms. Sagapolutele "must first show that she would be entitled to recover but for the Death with CTE diagnosis deadline," and then may raise the due process argument in the claims appeal process. (Order, 12-md-2323, ECF No. 8557.) Ms. Cornish's argument that the amendments to the Settlement Agreement somehow violated her due process rights is meritless.

Relying on Ms. Sagapolutele's prior Motion to Modify the Amended Final Order and Judgment, Ms. Cornish alleges that the Settlement Agreement's deadline to obtain a Qualifying Diagnosis of Death with CTE was "surreptitiously added to the Amended Settlement Agreement" after the deadline to opt out and without notice to Settlement Class Members. (Appeal at 6.) Ms. Sagapolutele's prior motion argues that absent class members' due process rights were violated by the change, and that the Court should remedy the violation by modifying the Settlement Agreement

to remove the deadline for a Qualifying Diagnosis of Death with CTE. (*See* Motion to Modify the Amended Final Order and Judgment at 15-24.)

In response, the NFL Parties, too, incorporate all of the arguments set forth in their Opposition to that Motion, attached in full as Exhibit 1.[2]  As the NFL Parties explained in their Opposition, far from injuring Settlement Class Members' rights by "imposing" a new deadline for a Qualifying Diagnosis of Death with CTE, the amendments to the Settlement Agreement *extended* the deadline to obtain the Qualifying Diagnosis from the Preliminary Approval Date to the Final Approval Date (*see id.* at 10-11), and provided a 270-day grace period in which Settlement Class Members who died between the Preliminary Approval Date and the Final Approval Date could obtain a Qualifying Diagnosis (*see id.* at 6, 10).  Accordingly, the relevant changes solely benefited absent class members and in no way violated their due process rights. (*See id.* at 9-13.)

For these additional reasons, Ms. Cornish's appeal must be denied, and her claim denial must be upheld.

### Conclusion

The denial of Ms. Cornish's claim was required under the judicially-approved terms of the Settlement Agreement.  Because Ms. Cornish does not present clear and convincing evidence that such determination was in error, the Special Master should affirm denial of the claim.

Dated:  August 14, 2019

Respectfully submitted,

PAUL, WEISS, RIFKIND,
   WHARTON & GARRISON LLP

*/s/ Brad S. Karp*_____
Brad S. Karp
Bruce Birenboim
Claudia Hammerman
Lynn B. Bayard
Douglas M. Burns
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990
Email:  bkarp@paulweiss.com

*ATTORNEYS FOR THE
NATIONAL FOOTBALL LEAGUE
AND NFL PROPERTIES LLC*

---

[2]    (*See* Ex. 1, Mem. of Law of the National Football League and NFL Properties LLC in Opp. to Settlement Class Member Yvonne Sagapolutele's Mot. to Modify the Am. Final Order and J., 12-md-2323, ECF No. 8430.)

EXHIBIT 1

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br><br>MDL No. 2323<br><br>Hon. Anita B. Brody |
| Kevin Turner and Shawn Wooden, *on behalf of themselves and others similarly situated*,<br><br>                    Plaintiffs,<br><br>                    v.<br><br>National Football League and NFL Properties, LLC, successor-in-interest to NFL Properties, Inc.<br>                    Defendants. | Civ. Action No.: 14-cv-00029-AB |
| THIS DOCUMENT RELATES TO:<br>ALL ACTIONS | Hon. Anita B. Brody |

## MEMORANDUM OF LAW OF THE NATIONAL FOOTBALL LEAGUE AND NFL PROPERTIES LLC IN OPPOSITION TO SETTLEMENT CLASS MEMBER YVONNE SAGAPOLUTELE'S MOTION TO MODIFY THE AMENDED FINAL ORDER AND JUDGMENT

## **TABLE OF CONTENTS**

**Page**

Preliminary Statement ........................................................................................ 1

Background ........................................................................................................ 4

    A.    Parties ................................................................................................ 4

    B.    Procedural Background ..................................................................... 4

Argument ........................................................................................................... 8

I.    THE PARTIES WERE NOT REQUIRED TO NOTIFY THE SETTLEMENT
CLASS ABOUT THE AMENDMENTS ......................................................... 8

    A.    The Amendments Did Not Require New Notice .................................. 9

    B.    The Original Settlement Notice Was Sufficient ................................. 11

II.    SAGAPOLUTELE IS NOT ENTITLED TO REWRITE THE SETTLEMENT
AGREEMENT ............................................................................................... 13

Conclusion ......................................................................................................... 17

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Adelson* v. *Ocwen Fin. Corp.*,
    621 F. App'x 348 (7th Cir. 2015) .......................................................14

*In re Baby Prods. Antitrust Litig.*,
    708 F.3d 163 (3d Cir. 2013)...........................................................9, 11

*Blue Diamond Coal Co.* v. *Trustees of UMWA Combined Ben. Fund*,
    249 F.3d 519 (6th Cir. 2001) .......................................................16

*In re Diet Drugs Prods. Liab. Litig.*,
    200 F. App'x 95 (3d Cir. 2006) .....................................................14

*In re Diet Drugs Prods. Liab. Litig.*,
    No. 99-cv-20593, 2010 WL 2735414 (E.D. Pa. July 2, 2010) ....................9, 11, 13

*F.A.C., Inc.* v. *Cooperativa de Seguros de Vida de Puerto Rico*,
    449 F.3d 185 (1st Cir. 2006)........................................................17

*Federman* v. *Artzt*,
    339 F. App'x 31 (2d Cir. 2009) ....................................................14, 15

*In re Four Seasons Sec. Laws Litig.*,
    525 F.2d 500 (10th Cir. 1975) ......................................................15

*Harris* v. *Graddick*,
    615 F. Supp. 239 (N.D. Ala. 1985)..................................................9, 11

*Hensley* v. *Alcon Labs., Inc.*,
    277 F.3d 535 (4th Cir. 2002) .......................................................17

*Inmates of Suffolk Cty. Jail* v. *Rufo*,
    No. 71-cv-00162, 2015 WL 6958070 (D. Mass. Nov. 10, 2015) ..........................16

*Kokkonen* v. *Guardian Life Ins. Co. of Am.*,
    511 U.S. 375 (1994)................................................................17

*In re Linerboard Antitrust Litig.*,
    223 F.R.D. 357 (E.D. Pa.), *amended*, 223 F.R.D. 370 (E.D. Pa. 2004)...................17

*Matthews, Wilson & Matthews, Inc.* v. *Capital City Bank*,
    614 F. App'x 969 (11th Cir. 2015) ..................................................15

**Page(s)**

*In re Nat'l Football League Players' Concussion Injury Litig.*,
   307 F.R.D. 351 (E.D. Pa. 2015), *amended*, No. 12-MD-02323, 2015 WL
   12827803 (E.D. Pa. May 8, 2015) .......................................................................... passim

*In re Nat'l Football League Players Concussion Injury Litig.*,
   821 F.3d 410 (3d Cir. 2016), *amended* (May 2, 2016) ............................................7

*In re Nissan Motor Corp. Antitrust Litig.*,
   552 F.2d 1088 (5th Cir. 1977) ...............................................................................11

*Orlando Residence, Ltd.* v. *Hilton Head Hotel Inv'rs*,
   No. 89-cv-0662, 2013 WL 1103027 (D.S.C. Mar. 15, 2013) .................................15

*In re PaineWebber Ltd. P'ships Litig.*,
   171 F.R.D. 104 (S.D.N.Y 1997) .............................................................................11

*Roman-Oliveras* v. *Puerto Rico Elec. Power Auth.*,
   797 F.3d 83 (1st Cir. 2015) ....................................................................................17

*Sawka* v. *Healtheast, Inc.*,
   989 F.2d 138 (3d Cir. 1993) ....................................................................................15

## OTHER AUTHORITIES

11 Fed. Prac. & Proc. Civ. § 2852 (3d ed.) ...................................................................17

20 Fed. Prac. & Proc. Deskbook § 104 .........................................................................16

Fed. R. Civ. P. 23 .........................................................................................................2, 9

Fed. R. Civ. P. 60 ........................................................................................1, 3, 14, 15, 16

Newberg on Class Actions § 1:5 (5th ed.) ........................................................................9

Newberg on Class Actions § 8:17 (5th ed.) ......................................................................9

Newberg on Class Actions § 8:36 (5th ed.) ......................................................................9

Newberg on Class Actions § 8:7 (5th ed.) ........................................................................9

Newberg on Class Actions § 18:40 (5th ed.) ...................................................................15

Defendants National Football League and NFL Properties LLC (collectively, the "NFL Parties") respectfully submit this memorandum of law in opposition to Settlement Class Member Yvonne Sagapolutele's ("Sagapolutele's") motion to modify the Amended Final Order and Judgment (the "Motion") (ECF No. 8263).

<div align="center">

**Preliminary Statement**

</div>

Sagapolutele, an absent Settlement Class Member and representative of the estate of Retired NFL Football Player Pio Sagapolutele, brings this motion, ostensibly as a matter of due process, seeking significant revisions to the Final Order and Judgment that the Court entered more than two years ago approving the Class Action Settlement Agreement in this case.[1]  But no due process violation has occurred, and Sagapolutele has shown no justification for this Court to take the extraordinary step of rewriting a settlement agreement approved by both this Court and the Third Circuit that has been in place for years.  Sagapolutele's motion should therefore be denied.

The primary ground for Sagapolutele's motion is the amendments to the Settlement Agreement in February 2015, which expanded the definition of the Death with CTE Qualifying Diagnosis in response to the Court's directives.  Contrary to fact, Sagapolutele contends that the amendment imposed a deadline to obtain a Qualifying Diagnosis of Death with CTE, and "[b]ecause this change was made both without notice to absent class members and after the deadline to opt out of the settlement, [her] due process rights were violated."  (Pl. Mem. at 15.)  Sagapolutele asks this Court, pursuant to Rule 60 of the Federal Rules of Civil Procedure and the Court's inherent power, to amend the Final Order and Judgment to "remov[e] the deadline to obtain a Qualifying Diagnosis of Death with CTE."  (Pl. Mem. at 1.)

---

[1]    Unless otherwise defined, the capitalized terms used in this memorandum have the same meaning as those in the Settlement Agreement.

Sagapolutele's motion has no basis in fact or law for several reasons.

*First*, the amendments in question concerned an *expansion* of settlement benefits to the Settlement Class—namely, the expansion of the Qualifying Diagnosis of Death with CTE to include Retired NFL Football Players who died with CTE between Preliminary and Final Approval of the Settlement Agreement; the original agreement limited the Qualifying Diagnosis to those who died *prior* to Preliminary Approval.  It is well settled that additional notice to a class is necessary only when amendments to a settlement agreement are "materially adverse" to the class, not where, as here, they benefit the class.  Neither the Due Process Clause nor Rule 23 of the Federal Rules of Civil Procedure require notice in the event of beneficial, or even neutral, amendments.  As this Court correctly held in granting Final Approval of the Settlement Agreement over various objections to this very amendment (although on a different ground), no additional notice was required in this case for that very reason.

*Second*, contrary to Sagapolutele's contentions regarding lack of notice, the class notice in connection with the original settlement agreement was all that was necessary.  The Short- and Long-Form notices distributed to the Settlement Class Members made clear, as this Court and the Third Circuit held, that an award of Death with CTE would *not* be available to all Retired NFL Football Players diagnosed with CTE.  Rather, only particular cases of CTE meeting "certain" predetermined and agreed-to standards under the Settlement Agreement would be compensated—namely, cases where, prior to Preliminary Approval,[2] the Retired NFL Football Player received a post-mortem diagnosis of CTE made by a board-certified neuropathologist.  Further, the amendments in question were in fact made public; the NFL Parties and Class Counsel posted the amendments—including a redline comparison clearly

---

[2]    As noted above, the amendments to the Settlement Agreement extended this deadline to Final Approval.

reflecting the changes to the text of the Settlement Agreement—on the Court's publicly accessible PACER docket, where any member of the public, including the more than 5,000 Settlement Class Members with legal representation, could view it. In fact, over 40 Settlement Class Members objected to the amendments, including the very amendment that Sagapolutele complains of here.

*Finally*, even if Sagapolutele could show a due process violation, which she cannot, neither Rule 60 nor this Court's "inherent authority" allows Sagapolutele to rewrite the Settlement Agreement as she seeks. Rule 60(a) is limited to correction of "clerical mistakes" that do not affect the substantive rights of the parties. Yet her contention that the amendments were simply "clerical mistakes" is at odds with her characterization of those same amendments as impairing her rights under the settlement. Further, not only does Sagapolutele—as an absent class member—lack standing to move pursuant to Rule 60(b)(6), she also fails to establish that the "extraordinary remedy" of amendment pursuant to Rule 60(b)(6) is warranted here because she does not show that she will experience *any* hardship without the relief she seeks. For example, Sagapolutele has neither shown (nor even claimed) that the brain of her late husband, who died in 2009, has ever been examined by a board-certified neuropathologist for CTE, much less diagnosed as having CTE. Nor has she explained why any such examination—if such a belated diagnosis were even medically possible—did not occur prior to the Court's Final Approval Order on April 22, 2015 (as amended May 8, 2015). Finally, Sagapolutele has not shown that she is entitled to relief under the Court's "inherent authority" to amend the Final Order and Judgment because that authority is no more expansive than Rule 60.

Accordingly, Sagapolutele's motion should be denied.

## Background

### A.    Parties

The National Football League ("NFL") is an unincorporated association of 32 Clubs that promotes, organizes, and regulates the sport of professional football in the United States.  NFL Properties LLC ("NFLP") is a limited liability company organized under the laws of the State of Delaware and headquartered in New York.  Sagapolutele is a self-described absent Settlement Class Member and the representative of the estate of late Retired NFL Football Player Pio Sagapolutele.  (Pl. Mot. at 1.)

### B.    Procedural Background

The Judicial Panel on Multidistrict Litigation established this multidistrict litigation as MDL 2323 on January 31, 2012.  Since that time, over 300 additional cases, brought on behalf of approximately 5,000 former NFL players, have been included in the MDL.  *See In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. 351, 361 (E.D. Pa. 2015), *amended*, No. 12-MD-02323, 2015 WL 12827803 (E.D. Pa. May 8, 2015), *and aff'd*, 821 F.3d 410 (3d Cir. 2016), *amended* (May 2, 2016), *cert. denied*, 137 S. Ct. 591 (2016), and *cert. denied*, 137 S. Ct. 607 (2016).  Plaintiffs in these cases asserted fraud- and negligence-based claims against the NFL Parties based on, among other things, a purported duty to provide players with rules and information needed to protect them from the alleged effects of repetitive mild traumatic brain injuries sustained during NFL play, including CTE.  *Id*. at 361-62.

On June 25, 2014, the NFL Parties and Class Counsel[3] (collectively, the "Parties") filed a motion for preliminary class certification and preliminary approval of the Settlement Agreement, and on July 7, 2014, the Court approved the motion.  *See id.* at 363-65.

---

[3]    Class Counsel consists of attorneys whom this Court duly appointed as legal representatives for the Settlement Class, including Christopher A. Seeger, Sol Weiss, Steven C. Marks, Gene Locks, Arnold Levin, and Dianne M. Nast.  (Final Order & Judg. ¶ 6,  ECF No. 6510.)

The Settlement Agreement defined the Settlement Class as "'[a]ll living NFL Football Players who, prior to the date of Preliminary Approval . . . retired . . . from playing professional football with the NFL,'" as well as their Representative Claimants and Derivative Claimants. *Id.* at 365 ("Representative Claimants are those duly authorized by law to assert the claims of deceased, legally incapacitated, or incompetent Retired Players. Derivative Claimants are those, such as parents, spouses, or dependent children, who have some legal right to the income of Retired Players."). The Settlement Agreement also provides funding for Retired NFL Football Players to receive a baseline assessment examination of their objective neurological functioning, for safety and educational initiatives, and for monetary awards for certain Qualifying Diagnoses, including, as relevant here, the Qualifying Diagnosis of Death with CTE. *Id.* at 366-67.

Prior to the Fairness Hearing, the Parties distributed Court-approved Short- and Long-Form notices to the Settlement Class. *See id.* at 382-86. "Each was written in plain and straightforward language," and together, they disclosed the key components of the Settlement Agreement, making clear that "only 'certain' cases of CTE are covered." *Id.* at 383-84. As explained by the notice, under the original agreement, the Settlement's benefits included "[m]onetary awards for ***diagnoses*** of Death with CTE ***prior to July 7, 2014*** . . . ." (*See* Long-Form Notice at 6, ECF No. 6086-1 (emphasis added); *see also* Class Action Settlement Agreement as of June 24, 2014 § 6.3(f), ECF No. 6087 (a "Qualifying Diagnosis of Death with CTE shall be made only for Retired NFL Football Players who died prior to the date of the Preliminary Approval and Class Certification Order, through a post-mortem diagnosis by a board-certified neuropathologist of CTE.").)

After the Fairness Hearing, the Parties—at this Court's request—agreed to several amendments to the Settlement Agreement, each of which made the Settlement Agreement more

beneficial to Settlement Class Members.  *In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. at 386.  For example, the amendments provided credit for Settlement Class Members who played in NFL Europe; ensured that all eligible Retired NFL Football Players who elected to receive a baseline assessment examination would receive one regardless of any funding limitations in the Settlement Agreement; included a hardship provision with respect to the appeal fee for Settlement Class Members; and allowed reasonable accommodation for Settlement Class Members who do not possess certain medical records.  (Class Counsel and the NFL Parties' Joint Submission in Resp. to the Feb. 2, 2015 Order of the Ct., Feb. 13, 2015, ECF No. 6481.)  In addition, as is relevant here, one amendment expanded the Qualifying Diagnosis of Death with CTE to cover not only Retired NFL Football Players who died prior to Preliminary Approval, but also Retired NFL Football Players who died between Preliminary Approval and Final Approval.  (*Id*. at 4-5.)  In addition, the Parties explained to the Court that "**consistent with the Parties' intent under the original Settlement Agreement**, and recognizing that obtaining such a [CTE] diagnosis **may take several months post-death**, the Parties have provided for a grace period of 270 days following any date of death between preliminary approval and the Final Approval Date to allow Claimants to obtain the necessary diagnosis." (*Id*. (emphasis added).)

Copies of the proposed amended Settlement Agreement, including a redline showing the exact changes made, were posted on the Court's publicly accessible PACER database in February 2015.  (Class Counsel and the NFL Parties' Joint Submission in Resp. to the Feb. 2, 2015 Order of the Ct., Ex. A, Feb. 13, 2015, ECF No. 6481-1.)  Between February and April 2015, more than 40 Settlement Class Members filed objections to the amendments, including objections to the amendment to the definition of Death with CTE at issue here. (*See*

Armstrong Objectors' Suppl. Obj. to the Am. Class Action Settlement, ECF No. 6503; Miller Suppl. Obj. to Settlement, ECF No. 6484.) Sagapolutele did not file any objection.

After considering those objections, the Court issued its opinion approving the Settlement Agreement and finding that "Class Members who opted out . . . received adequate notice of these changes, ***and notification of Class Members is not required***." *In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. at 386 (emphasis added). The Court explained: "Because these changes improved the deal for Class Members without providing any concessions to the NFL Parties, an additional round of notice for Class Members is unnecessary." *Id*. On appeal, the Third Circuit affirmed this Court's Final Order and Judgment in full. Regarding notice, the Third Circuit agreed with the District Court, finding "that the content of the class notice . . . satisfied Rule 23 and due process." *In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 435-36 (3d Cir. 2016), *amended* (May 2, 2016), *cert. denied*, 137 S. Ct. 591 (2016), and *cert. denied*, 137 S. Ct. 607 (2016). Notably, the Third Circuit also "conclude[d] that the settlement's treatment of CTE does not render the agreement fundamentally unfair." *Id.* at 444.

On August 15, 2017, over two years after this Court granted final approval of the Settlement, Sagapolutele filed this Motion challenging the Court's determination that the amendments were beneficial to Settlement Class Members and therefore did not require additional notice, and seeking "modification of the Final Order and Judgment by removal of the deadline to obtain a Qualifying Diagnosis of Death with CTE."[4] (Pl. Mot. at 2.) Sagapolutele contends that "[t]his deadline was added to the Settlement Agreement in February 2015 without

---

[4]    Relatedly, Sagapolutele also seeks an "instruction to the settlement administrator to develop forms and procedures that allows Class Members to obtain a Qualifying Diagnosis of Death with CTE by obtaining a post-mortem diagnosis by a board-certified neuropathologist at any time during the 65-year term of the Monetary Award Fund." (Pl. Mot. at 2.)

notice to the class," and "effectively prevented Class Members . . . from obtaining a Qualifying Diagnosis of Death with CTE." (*Id.*)  Despite Sagapolutele's claim that "this deadline materially prejudices" Settlement Class Members (*id.*), she offers no explanation, much less an evidentiary showing, of how her own rights were in any way impaired by the alleged lack of notice.  She does not demonstrate—or even assert—that the brain of her late husband has been examined by a board-certified neuropathologist and determined to have CTE.   Therefore, not only is Sagapolutele's injury entirely hypothetical, but she also does not establish that such an examination would even be viable, given her husband's death in 2009.[5]

The NFL Parties, through this memorandum of law, oppose the Motion.

## **Argument**

## **I.**

## **THE PARTIES WERE NOT REQUIRED TO NOTIFY THE SETTLEMENT CLASS ABOUT THE AMENDMENTS**

Sagapolutele argues that her due process rights were violated because she did not receive notice that the February 2015 amendment "impos[ed] a deadline to obtain a Qualifying Diagnosis of Death with CTE" when the original Settlement Agreement purportedly permitted "Class Members [to] obtain a Qualifying Diagnosis for Death with CTE anytime within the 65-year life of the Monetary Award Fund." (Pl. Mem. at 17.)  Not so.

"[T]he Due Process Clause of the Fourteenth Amendment requires that notice [concerning a class action settlement] be 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" *In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. at

---

[5]     *See* Compl. ¶ 43, *Sagapolutele* v. *Nat'l Football League*, No. 17-cv-00348 (E.D. Pa. Jan. 25, 2017), ECF No. 1; *see also* Am. Stip. of Dismissal, *Sagapolutele* v. *Nat'l Football League*, No. 17-cv-00348 (E.D. Pa. May 3, 2017), ECF No. 4 (approving stipulation of dismissal without prejudice).

383 (quoting *Mullane* v. *Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)).[6] Parties

settling a class action litigation should therefore distribute notice that "'fairly apprises' class

members of the action and their rights." Newberg on Class Actions § 8:17 (5th ed.). Additional

notice is only required when the settling parties subsequently introduce amendments that "would

have a *material adverse* effect on the rights of class members." *In re Diet Drugs Prods. Liab.*

*Litig.*, No. 99-cv-20593, 2010 WL 2735414, at *6 (E.D. Pa. July 2, 2010) (emphasis added); *see*

*also In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 175 n.10, 182 (3d Cir. 2013) (supplemental

notice required only for "*material* alterations" (emphasis added)). Conversely, if the

amendments are neutral or beneficial to the settlement class, no additional notice is required. *See*

*Harris* v. *Graddick*, 615 F. Supp. 239, 244 (N.D. Ala. 1985) (holding that where "the

amendment is narrow and it is clearly apparent that the interests of the classes are not

*substantially impaired*, . . . the notice already given is adequate" (emphasis added)); *see also In*

*re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. at 383 (collecting cases,

including *Harris*). That is the case here.

### A.     The Amendments Did Not Require New Notice

Sagapolutele's argument—that the Parties should have re-distributed notice

reflecting the February 2015 amendments to the Settlement Agreement—fundamentally

misunderstands the substance of the amendments. In Sagapolutele's telling, "in the midst of

otherwise beneficial amendments" to the Settlement Agreement, the Parties "impose[d] an

additional requirement that prevents Class Members from recovering settlement proceeds [for

CTE] unless they obtained a Qualifying Diagnosis before" Final Approval. (Pl. Mem. at 8.) But

---

[6]     Due process notice requirements mirror those of Rule 23 of the Federal Rules of Civil Procedure. *See* Newberg on Class Actions § 1:5 (5th ed.) ("Rule 23 is constructed to ensure that the representative nature of class action litigation safeguards these absent class members' due process rights."); *id.* § 8:7 (5th ed.) (the notice requirements under Rule 23 "echo[] the constitutional test set forth by the Supreme Court"); *id.* § 8:36 (5th ed.) ("[A]s Rule 23's requirements are quite similar to the Constitution's, the distinction may be immaterial.").

the amendment only clarified what was always the case and extended the deadline for Death with
CTE to Final Approval.

The original settlement agreement provided that an award for a Qualifying
Diagnosis of Death with CTE would be available only to Retired NFL Football Players who died
*and* received a CTE diagnosis prior to Preliminary Approval. The Long-Form Notice made this
explicit, stating that the Settlement's benefits include "[m]onetary awards for ***diagnoses*** of Death
with CTE ***prior to July 7, 2014*** . . . ." (*See* Long-Form Notice at 6, ECF No. 6086-1 (emphasis
added); *see also* Decl. of Robert H. Klonoff Relating to the Proposed Class Settlement in the
Nat'l Football League Players' Concussion Injury Litig. ¶ 85, Nov. 12, 2014, ECF No. 6423-9
("[C]ontrary to the arguments advanced by various objectors, ***excluding CTE in cases diagnosed
after July 7, 2014***, is not irrational." (emphasis added)).) Similarly, the Parties' publicly filed
submission to the Court in support of the amendment stated specifically that the amendment's
language providing only a grace period of time following death within which to obtain a
neuropathological diagnosis of CTE was "*consistent with the Parties' intent under the original
Settlement Agreement*." (*See* Class Counsel and the NFL Parties' Joint Submission in Resp. to
the Feb. 2, 2015 Order of the Ct. at 4, ECF No. 6481 (emphasis added).)

Contrary to Sagapolutele's contentions, this amendment did not adversely affect
the Settlement Class—much less materially so. In fact, the amendment *expanded* settlement
benefits to encompass any additional Settlement Class Members who died after Preliminary
Approval but before Final Approval, and provided 270 days to receive a CTE diagnosis for such
players—thereby, increasing the time covered by the definition of Death with CTE by *nine*
months. (*See id.* at 4-5.)

Accordingly, far from being materially adverse to Settlement Class Members, these amendments actually made the Settlement Agreement *more beneficial* by expanding the availability of an award for Death with CTE to a larger class of claimants. (*Id.*) Thus, as this Court previously held, "[b]ecause these changes improved the deal for Class Members without providing any concessions to the NFL Parties, an additional round of notice for Class Members is unnecessary." *In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. at 386; *see also In re Baby Prods. Antitrust Litig.*, 708 F.3d at 175 n.10, 182; *In re Diet Drugs Prods. Liab. Litig.*, 2010 WL 2735414, at *6; *Harris*, 615 F. Supp. at 244.

## B.    The Original Settlement Notice Was Sufficient

Sagapolutele's due process argument fails for an additional reason. The original notice, as this Court held, was clear that not all CTE diagnoses would be compensated under the Settlement Agreement, and the publicly available amendments sufficiently defined those CTE diagnoses eligible for compensation.

*First*, the Short- and Long-Form notices distributed to Settlement Class Members adequately protected their due process rights. To comport with due process, settlement notice need only be adequate and summarize the terms of the Settlement; perfection and painstaking detail are not required. *See In re Nat'l Football League Concussion Injury Litig.*, 307 F.R.D. at 382-83; *see also In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1104-05 (5th Cir. 1977) (explaining that notice need not "[be] perfectly correct in its form," and instead that "[t]he standard [] is that the notice . . . must contain information that a reasonable person would consider to be material in making an informed, intelligent decision" about whether to opt out); *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 124 (S.D.N.Y 1997) ("The notice need not be highly specific, and indeed 'numerous decisions, no doubt recognizing that notices to class members can practicably contain only a limited amount of information, have approved very

general descriptions of the proposed settlement.'" (quoting *Weinberger* v. *Kendrick*, 698 F.2d 61, 70 (2d Cir. 1982)).

As this Court previously held in overruling objections that "the Long-Form Notice is confusing because the term 'Death with CTE' appears several times without the accompanying cutoff date, . . . [b]oth the Summary Notice and the Long-Form Notice indicate that **only 'certain' cases of CTE are covered**." *In re Nat'l Football League Concussion Injury Litig.*, 307 F.R.D. at 383-84 (emphasis added) (citing Summary Notice at 1, ECF No. 6086-2; Long-Form Notice at 1, ECF No. 6086-1). Moreover, as stated above, the Long-Form Notice specifically stated that the Settlement's benefits include "[m]onetary awards for **diagnoses** of Death with CTE **prior to July 7, 2014** . . . ." (*See* Long-Form Notice at 6, ECF No. 6086-1 (emphasis added).) Both the Short- and Long-Form notice thus alerted Settlement Class Members that an award for CTE was not absolute or unconditional; rather, a Settlement Class Member would need to satisfy "certain" criteria before any award would be made. That is the case here—under the original and amended Settlement Agreement, Sagapolutele must satisfy particular criteria before receiving an award of Death with CTE, including that she obtain her decedent's CTE diagnosis within a predetermined time period—and the original notice satisfied Sagapolutele's Due Process rights by alerting her to this fact.

*Second*, the Parties made the February 2015 amendments publicly available months prior to this Court's April 22, 2015 Final Approval Order (as amended May 8, 2015). Not only did the Parties post a copy of the amendments to this Court's publicly available PACER database as early as February 2015, but they also submitted a redline showing the exact changes to be made to the Settlement Agreement as a result of those proposed amendments. (Class Counsel and the NFL Parties' Joint Submission in Resp. to the Feb. 2, 2015 Order of the Ct., Ex.

A, Feb. 13, 2015, ECF No. 6481-1.)  This is especially significant in light of the widespread attention paid to the docket in this matter by, among others, the more than 5,000 Retired NFL Football Players who, at the time of settlement, were represented by counsel in MDL 2323.  *See In re Nat'l Football League Concussion Injury Litig.*, 307 F.R.D. at 389; *see also In re Diet Drugs Prods. Liab. Litig.*, 2010 WL 2735414, at *4  (holding that no notice of settlement agreement amendments was required because, in part, "notice of the proposed Tenth Amendment, along with an opportunity to object, was supplied to representatives of all class members with active cases in MDL No. 1203.").

In fact, the Parties' efforts to publicize the amendments were successful, as evidenced by the fact that over 40 Settlement Class Members filed objections to the amendments, *including objections to the very Death with CTE provision about which Sagapolutele complains*.  (*See* Armstrong Objectors' Suppl. Obj. to the Am. Class Action Settlement, ECF No. 6503; *see also* Miller Suppl. Obj. to Settlement, ECF No. 6484.)  While these objectors raised somewhat different concerns than Sagapolutele raises here—they argued that the award of Death with CTE should be available to Retired NFL Football Players who die after Final Approval—they nonetheless sought, at least in part, the same relief that Sagapolutele appears to now seek: "modification of the Final Order and Judgment by removal of the deadline to obtain a Qualifying Diagnosis of Death with CTE."  (Pl. Mot. at 2.)  This Court properly rejected these objectors' requests, and similarly should reject Sagapolutele's efforts here.

## II.

### SAGAPOLUTELE IS NOT ENTITLED TO REWRITE THE SETTLEMENT AGREEMENT

Even if Sagapolutele had established that notice of the amendments should have been given—which she has not, as explained above—her Motion would fail.  Sagapolutele first

argues that under Rule 60(a), the Court should rewrite the Settlement Agreement and amend the Final Order and Judgment because the Court made a "clerical error" when approving the amendments to the Settlement Agreement. Second, Sagapolutele contends that amendment under Rule 60(b)(6) is justified by "extraordinary circumstances." Finally, Sagapolutele argues that the Court's inherent authority permits it to amend the Final Order and Judgment here. (Pl. Mem. at 18-24.) These arguments lack merit.

*First*, Sagapolutele has not made the necessary showing under Rule 60(a). It is well settled that amendment of judgments pursuant to Rule 60(a) "is limited to the correction of 'clerical mistakes'; it encompasses only errors 'mechanical in nature, apparent on the record, and not involving an error of substantive judgment.'" *In re Diet Drugs Prods. Liab. Litig.*, 200 F. App'x 95, 103 (3d Cir. 2006) (quoting *Pfizer Inc.* v. *Uprichard*, 422 F.3d 124, 129 (3d Cir. 2005)). For Rule 60(a) to apply, the change to be corrected must not "affect[] the substantive rights of the parties." *Id.* at 103-04 (quoting *Pfizer*, 422 F.3d at 130) (holding Rule 60(a) inapplicable because the "correction here goes beyond the correction of a 'mindless and mechanistic mistake'" (quotation omitted)). Here, Sagapolutele has only ever alleged that the amendments in question were deliberate attempts by the Parties to modify the criteria for the Qualifying Diagnosis of Death with CTE. She cannot simultaneously argue these amendments were mere "clerical mistakes." As such, Rule 60(a) is inapplicable here.

*Second*, Sagapolutele's attempts to seek relief under Rule 60(b)(6) fail, too.[7] Relief under Rule 60(b) is "not ordinarily . . . available to non-parties," *Federman* v. *Artzt*, 339 F. App'x 31, 33-34 (2d Cir. 2009), and "[a]bsent class members such as [movant] are treated, with limited exceptions inapplicable here, as non-parties to a class action." *Adelson* v. *Ocwen*

---

[7]    Although Sagapolutele broadly states she is moving for relief under Rule 60(b), her memorandum of law cites only to the Rule's catchall provision, which permits the modification of a final judgment based on "any other reason that justifies relief." Fed. R. Civ. P. 60(b)(6).

*Fin. Corp.*, 621 F. App'x 348, 351 (7th Cir. 2015); *Federman*, 339 F. App'x at 33-34 (holding that absent class members who did not object to settlement were not "parties" for purposes of Rule 60(b) and declining "to expand the narrow exception to the general rule that non-parties cannot bring Rule 60(b) motions"); *In re Four Seasons Sec. Laws Litig.*, 525 F.2d 500, 504 (10th Cir. 1975) (absent class member "did not become a party for the purposes of Rule 60(b) to enable him to challenge the adequacy or nature of the settlement"); *see also* Fed. R. Civ. Proc. 60(b) ("the court may relieve *a party* . . . from a final judgment, order, or proceeding for the following reasons" (emphasis added)).  Sagapolutele did not object, intervene, or otherwise take steps to become a "party" to this action, so Rule 60(b) is not available to her here.  *See also* Newberg on Class Actions § 18:40 (5th ed.) ("[A]ll the circuits that have considered the issue have taken the position that absent class members are generally not authorized to file Rule 60 motions.").

Even if Sagapolutele were a "party," she has not met her burden to seek relief pursuant to Rule 60(b)(6) because such "[r]elief . . . may only be granted under extraordinary circumstances where, without such relief, an *extreme and unexpected hardship* would occur." *Sawka* v. *Healtheast, Inc.*, 989 F.2d 138, 140 (3d Cir. 1993) (emphasis added); *see also Matthews, Wilson & Matthews, Inc.* v. *Capital City Bank*, 614 F. App'x 969, 971 (11th Cir. 2015) (Rule 60(b)(6) "is an extraordinary remedy which may be invoked only upon a showing of exceptional circumstances, and the party seeking relief has the burden of showing that absent such relief, an extreme and unexpected hardship will result." (internal quotations omitted)); *Orlando Residence, Ltd.* v. *Hilton Head Hotel Inv'rs*, No. 89-cv-0662, 2013 WL 1103027, at *8 (D.S.C. Mar. 15, 2013), *aff'd sub nom. Orlando Residence, Ltd.* v. *Nelson,* 565 F. App'x 212 (4th Cir. 2014) ("Relief is rarely granted under . . . [Rule] 60(b)(6).").  The bar for relief under

Rule 60(b) is particularly high where the movant seeks to amend in "a class action [because] a too liberal application of Rule 60(b) would undermine the finality of judgments entered in such actions and would discourage their settlement." *Inmates of Suffolk Cty. Jail* v. *Rufo*, No. 71-cv-00162, 2015 WL 6958070, at *2 (D. Mass. Nov. 10, 2015); *see also Blue Diamond Coal Co.* v. *Trustees of UMWA Combined Ben. Fund*, 249 F.3d 519, 524 (6th Cir. 2001) ("[R]elief under Rule 60(b) is circumscribed by public policy favoring finality of judgments and termination of litigation. This is especially true in an application of subsection (6) of Rule 60(b) . . . ." (internal quotations omitted)).

Sagapolutele has not made any showing whatsoever that the amendment will cause her any hardship, much less "extreme and unexpected hardship." Tellingly, she has not shown—through supporting exhibits, affidavits, or even proffered facts in her brief—that the brain of her late husband, who passed away in 2009, has been examined by a board-certified neuropathologist and diagnosed with CTE at *any time*, much less that she would, but for the amendment, be entitled to an award. She also has not established that a belated diagnosis years after death (indeed, her husband died approximately eight years ago) would even be possible given the deterioration of brain matter after death. Nor does she seek to justify her apparent delay in seeking an examination. Instead, Sagapolutele invites only speculation and offers only conclusory assertions as to how the purported change impacts her rights under the agreement, and she therefore fails to show that the exceptional remedy of Rule 60(b)(6) is warranted here.

*Finally*, Sagapolutele's invocation of the Court's "inherent authority" to amend a judgment does not salvage her claim because that authority is no broader than that provided by Rule 60, which, as explained above, does not permit Sagapolutele the relief she seeks. *See* 20 Fed. Prac. & Proc. Deskbook § 104 (after 28 days from entry, "the judgment may be attacked,

other than by appeal, only as provided in Rule 60."); 11 Fed. Prac. & Proc. Civ. § 2852 (3d ed.) (while "the power of a court to modify an interlocutory judgment or order at any time prior to final judgment remains unchanged and is not limited by the provisions of Rule 60(b) . . . , [t]he rule does apply, however, to all final judgments entered in civil actions."). Sagapolutele's cases are not to the contrary; none holds that Courts have inherent authority to amend a final judgment approving a settlement agreement. (*See* Pl. Mem. at 23-24.) Three of the five cited cases concern only a court's authority to *enforce* a settlement agreement. *See Kokkonen* v. *Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 381 (1994) (holding that a district court has inherent authority to *enforce* a settlement agreement under particular circumstances); *Roman-Oliveras* v. *Puerto Rico Elec. Power Auth.*, 797 F.3d 83, 86-87 (1st Cir. 2015) (same); *Hensley* v. *Alcon Labs., Inc.*, 277 F.3d 535, 540-41 (4th Cir. 2002) (same). The fourth case, *In re Linerboard Antitrust Litig.*, 223 F.R.D. 357, 363 (E.D. Pa.), *amended*, 223 F.R.D. 370 (E.D. Pa. 2004) simply stands for the proposition that a court overseeing an MDL has inherent power to control the discovery process—an issue not relevant or in dispute here. Finally, while the fifth case involved an *amendment* of an order entering a settlement agreement, the Court did not hold that the district court had inherent authority to make the amendment; rather, it simply held that "the merits of [the district court's] decision to amend are no longer open to review." *F.A.C., Inc.* v. *Cooperativa de Seguros de Vida de Puerto Rico*, 449 F.3d 185, 190–91 (1st Cir. 2006).

In sum, Sagapolutele has not demonstrated (and cannot demonstrate) that she is entitled to rewrite the Settlement Agreement.

## <u>Conclusion</u>

For the foregoing reasons, the NFL Parties respectfully request that the Court deny the Motion in its entirety.

Dated:  September 28, 2017

Respectfully submitted,

/s/ Brad S. Karp
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
Brad S. Karp
Bruce Birenboim
Lynn B. Bayard
1285 Avenue of the Americas
New York, NY 10019-6064
Tel:   (212) 373-3000
bkarp@paulweiss.com

PEPPER HAMILTON LLP
Sean P. Fahey
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA 19103-2799
Tel:   (215) 981-4000

*Attorneys for Defendants the National Football
League and NFL Properties LLC*

## <u>CERTIFICATE OF SERVICE</u>

It is hereby certified that a true copy of the foregoing Memorandum of Law of the

National Football League and NFL Properties LLC in Opposition to Settlement Class Member

Yvonne Sagapolutele's Motion to Modify the Amended Final Order and Judgment was served

electronically via the Court's electronic filing system on the 28th day of September, 2017, upon

all counsel of record.


Dated:  September 28, 2017                                   /s/Brad S. Karp
                                                            Brad S. Karp

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | § § § § § § | No. 2:12-md-02323-AB<br><br>MDL No. 2323<br><br>**Hon. Anita B. Brody** |
| THIS DOCUMENT RELATES TO:<br>Settlement Class Member Carleen Hastings<br>(SPID 950013395) | § § § | |

**WRITTEN STATEMENT IN SUPPORT OF CLASS MEMBER'S APPEAL**
**OF THE CLAIMS ADMINISTRATOR'S NOTICE OF DENIAL OF**
**MONETARY AWARD CLAIM**

Class Member Carleen Hastings, by and through counsel, files this written statement in support of this appeal and respectfully requests that the Claims Administrator's denial of this claim be reversed and remanded for a calculation of the Class Member's Monetary Award. The Claims Administrator erred in making two erroneous legal conclusions and one erroneous factual determination.

First, the Claims Administrator erred in concluding that the Amended Settlement Agreement required Class Member to submit proof that the board-certified neuropathologist who provided a post-mortem diagnosis of CTE made the diagnosis on or before 4/22/15.[1]

Second, the Claims Administrator erred in concluding that the Amended Settlement Agreement required the board-certified neuropathologist who provided the CTE diagnosis for this claim to also "confirm" his CTE diagnosis by examining the Player's brain tissue. The Amended

---

[1] If the Amended Settlement Agreement [ECF 6481] is construed to require a diagnosis on or before 4/22/15, Class Member reserves the right to seek relief from the Court pursuant to both Rule 60 and the Court's inherent authority to amend the judgment in this case in order to implement the settlement.

Settlement Agreement requires a post-mortem diagnosis of CTE by a board-certified neuropathologist; it does not require any additional "confirmation" of the diagnosis by the board-certified neuropathologist.

Third, the Claims Administrator erred in concluding that there is no proof that Dr. Hamilton "personally performed the post-mortem exam on the Retired Player." Dr. Hamilton did personally review brain tissue from the Retired Player as he states in his letter.

**<u>SUPPORTING EVIDENCE</u>[2]**

| | |
|---|---|
| Exhibit 1 | Notice of Denial of Monetary Award Claim |
| Exhibit 2 | Relevant Excerpts from Class Member's Claim Package |
| Exhibit 3 | Notice of Request for Additional Documents |

---

[2] Class Member also incorporates by reference the following documents that have been filed in this MDL or published on the Settlement Website:

(1) Original Settlement Agreement [ECF 6073-2];

(2) the Amended Settlement Agreement [ECF 6481];

(3) Absent Class Member and Plaintiff Yvonne Sagapolutele's Motion to Modify the Amended Final Order and Judgment [ECF 6534] by Conforming the Definition of "Death with CTE" to the Version Contemplated in the Fairness Hearing Order [ECF 6479] and Noticed to the Class in the Long Form Notice [ECF 6093-1] and Summary Notice [ECF 6093-2] Pursuant to Rule 60 and the Authority Retained in the Settlement Agreement [ECF 8263] ("Motion to Modify");

(4) Response in Opposition to the Motion to Modify [ECF 8430];

(5) Statement of Co-Lead Counsel in Opposition to the Motion to Modify [ECF 8431];

(6) Reply in Support of Motion to Modify [ECF 8442];

(7) Notice of Joinder [ECF 8443];

## **BACKGROUND**

Class Member submitted a claim package that included a post-mortem diagnosis of Chronic Traumatic Encephalopathy ("CTE") made by a board-certified neuropathologist after personally reviewing the Retired Player's brain tissue.[3]  Class Member's submitted claim package also includes documentation showing that the Player died prior to April 22, 2015.[4]

Despite the documentation in the claim package, the Claims Administrator denied Class Member's Monetary Award Claim for the following reason:[5]

> Section 6.3(f) of the Settlement Agreement allows a CTE diagnosis if: (1) the Retired Player died before 4/22/15, and (2) there was a post-mortem diagnosis of CTE made by a board-certified neuropathologist prior to 4/22/15.  Although Dr. Hamilton is a board-certified neuropathologist and signed a Pre-Effective Date Diagnosing Physician Certification Form indicating a CTE diagnosis, we must have proof that he personally performed the post-mortem exam on the Retired Player and that it was done on or before 4/22/15.  There was no post-mortem examination report submitted to indicate that Dr. Hamilton examined the Retired Player's brain tissue to confirm a CTE diagnosis.  The two-page letter provided by Dr. Hamilton does not satisfy the requirements for a CTE diagnosis under this Settlement Program.  For these reasons, this claim is denied.

Class Member has timely filed this appeal of the Claims Administrator's Notice of Denial of Monetary Award Claim.

---

(8) Order denying, without prejudice, the Motion to Modify [ECF 8557];

(9) Posted Settlement Program FAQs (as of February 19, 2019); and

(10) Posted Settlement Program FAQs (as of July 8, 2019).

[3]   Exhibit 2.

[4]   *Id.*

[5]   Exhibit 1.

**ARGUMENTS**

The Claims Administrator denied Class Member's claim for two reasons: (1) the claim package does not show that Dr. Hamilton (a board-certified neuropathologist) made the post-mortem diagnosis of CTE prior to 4/22/2015; and (2) Dr. Hamilton's report does not "indicate that [he] examined the Retired Player's brain tissue to confirm a CTE diagnosis." Neither reason merits denial of this claim as a matter of law. *And as a factual matter, Dr. Hamilton's report <u>does</u> indicate that he examined the Retired Player's brain tissue.*

## I.  The Claims Administrator erred in concluding that the CTE Diagnosis was not timely.

The Claims Administrator's first reason for denying the claim package is legally flawed in two respects. First, the diagnosis date for Death with CTE is the date of the Player's death, even if the diagnosis occurs later. Second, if the Amended Settlement Agreement [ECF 6481] does require that the diagnosis be made prior to 4/22/2015, this requirement violates Class Member's rights because it was not contained in the Original Settlement Agreement [ECF 6073-20] and was added (1) despite the Court's instructions that any changes to the Original Settlement Agreement should make it *more* favorable, not *less* favorable, to class members; (2) without notice to Class Member; and (3) after Class Member's opt-out deadline had already passed.

### A.  The diagnosis date for Death with CTE is the date of the Player's death.

The Claims Administrator has posted several versions of "Posted Settlement Program FAQs" on the Settlement Website with answers to frequently asked questions. All of the content in the Posted Settlement Program FAQs is subject to advance approval by Counsel for the NFL Parties.[6]

---

[6]    *See* Amended Settlement Agreement § 4.1(a).

According to FAQ 93 in these Posted Settlement Program FAQs, the diagnosis date for Death with CTE is the date of the Player's death, even though the diagnosis is not made until after the Player dies:[7]

> **93. How is the date of a Qualifying Diagnosis determined?**
>
> The physician making a Qualifying Diagnosis of a Retired NFL Football Player must determine and verify the date on which that Qualifying Diagnosis was made. This date is important under the Settlement Agreement. It affects the amount of a Monetary Award, because the younger a Player is at the time of the Qualifying Diagnosis, the larger the award.
>
> The diagnosing physician uses his or her professional medical judgment in deciding when the Player had the conditions amounting to a Qualifying Diagnosis under Exhibit 1 to the Settlement Agreement. There are some basic rules about this:
>
> > (a) *Death with CTE:* For these claims, the date of the Qualifying Diagnosis is the date of the Player's death, even though the diagnosis is not made until after the Player dies. The Monetary Award is based on the Player's age when he died.

Based on the Claims Administrator's representations to the class members that the date of the Qualifying Diagnosis for Death with CTE is the date of the Player's death, the only date that is relevant in determining the date of a Qualifying Diagnosis for Death with CTE is the date of the Player's death. The Claims Administrator's insistence on proof that the diagnosis "was done on or before 4/22/15" ignores these representations, which establish that the date of the Player's death is the date of the Qualifying Diagnosis.

Here, the claim package establishes that the Player's death occurred before April 22, 2015. Accordingly, the date of the Qualifying Diagnosis is before April 22, 2015, and the Claims Administrator erred in denying this claim.

---

[7]    This language is from the Posted Settlement Program FAQs (as of February 19, 2019). Since this claim package was submitted, a new version of the FAQs have been published on the Settlement Website in the Posted Settlement Program FAQs (as of July 8, 2019). The language in FAQ 93 is unchanged in the new version of Posted Settlement Program FAQs; it has merely been moved to FAQ 99.

**B. In the alternative, if this Denial is based on language that was surreptitiously added to the Settlement Agreement putatively imposing a deadline for a Qualifying Diagnosis for Death with CTE, the Denial must be reversed.**

The Court has previously considered a Motion to Modify the Amended Final Order and Judgment [ECF 8263] and denied the motion without prejudice to a consideration of the issues in that motion at a later time.[8]   In that motion, Class Member Yvonne Sagapolutele brought the Court's attention to the fact that although the Original Settlement Agreement contained no deadline for obtaining a Death with CTE Diagnosis, language appears to have been surreptitiously added to the Amended Settlement Agreement that could be read to have added a diagnosis deadline without notice to the Court or to the class members.[9]   The motion sought relief under both Rule 60 and the Court's inherent authority to implement the settlement by amending the Court's judgment.[10]

The Court denied the motion without prejudice and stated that before it would consider the "extraordinary action of modifying the Settlement Agreement," class members must first submit a claim to the Claims Administrator.[11]

If the Special Master concludes that the Amended Settlement Agreement does require Class Member to have obtained a CTE diagnosis prior to April 22, 2015 despite the contrary language in the Posted Settlement Program FAQs and in other notices, it does not appear that the Special

---

[8]    *See* Order [ECF 8557]

[9]    Motion to Modify [ECF 8263]

[10]    *Id.*

[11]    Order [ECF 8557]

Master would have the necessary authority to provide a remedy.[12]  To the extent the Special Master may have the authority to provide a remedy, Class Member incorporates by reference the arguments in the Motion to Modify [ECF 8263].  If the denial of this claim is not reversed, Class Member expressly reserves the right to seek appropriate relief from the Court under Rule 60 and under the Court's inherent authority to implement the settlement by amending the Court's judgment.

## II.     The Claims Administrator erred in requiring that the board-certified neuropathologist "confirm" his CTE Diagnosis.

The Claims Administrator also states that the denial of this claim is based on the lack of evidence that "Dr. Hamilton examined the Retired Player's brain tissue to confirm a CTE diagnosis."  But there is no requirement in the Amended Settlement Agreement that a board-certified neuropathologist "confirm his diagnosis."[13]  The Amended Settlement Agreement simply requires a diagnosis.[14]

If the Parties to the settlement in this case had intended to impose a requirement that a CTE diagnosis be confirmed by an examination of the Player's brain tissue, the parties could have included that requirement in the settlement agreement.  Regarding other diagnoses, the Parties agreed to specific and detailed procedures for reviewing and confirming the diagnoses.[15]  But for

---

[12]  *See* Order [ECF 6871] (providing Special Masters with the authority to faithfully oversee the implementation and administration of the Settlement Agreement); *see also* Motion to Modify [ECF 8263] (seeking relief under Rule 60).

[13]  *See* Amended Settlement Agreement [ECF 6481] § 6.4(f).

[14]  *See id.*

[15]  *See id.* §§ 5.1–5.14 (creating the Baseline Assessment Program and exempting Death with CTE from the program), § 6.3(a)–(e) (requiring that certain diagnoses, other than Death with CTE, be made by

Death with CTE diagnoses, the Amended Settlement Agreement simply requires "a post-mortem diagnosis made by a board-certified neuropathologist."[16]  Dr. Hamilton is one of only a handful of board-certified neuropathologists in the United States, and he has provided a post-mortem diagnosis that this Player "had CTE on his date of death."[17]

The Claims Administrator erred by imposing an arbitrary requirement that Dr. Hamilton confirm his diagnosis by examining the Player's brain tissue.  Adding this arbitrary requirement ignores the terms of the Amended Settlement Agreement and violates due process.

## III.    The Claims Administrator erred in stating that Dr. Hamilton did not examine the Player's brain tissue.

The Claims Administrator's denial of this claim is based on the purported lack of evidence that "Dr. Hamilton examined the Retired Player's brain tissue to confirm a CTE diagnosis" is also erroneous because Dr. Hamilton *did* examine the Retired Player's brain tissue to confirm the CTE diagnosis.

Dr. Hamilton's letter states: "I have conducted a study of Christopher Mims' brain tissue." Dr. Hamilton further states that he received "180 unstained tissue sections on glass slides" and examined stained recuts of brain tissue from the dura mater, cerebral cortex, hippocampus, insular cortex, putamen, globulus pallidus, thalamus, cerebellum cortex, dentate nucleus, and medulla.[18] Based, in part, on his review of the brain tissue, Dr. Hamilton concluded that his "findings are

---

certain physicians on an approved list), Exhibit 2 to the Amended Settlement Agreement (providing standardized neuropsychological testing protocols for determining certain diagnoses).

[16]    *See* Amended Settlement Agreement [ECF 6481] § 6.4(f).

[17]    Exhibit 2.

[18]    *See id.*

diagnostic of CTE." [19]

The Claims Administrator erred in stating that there is no evidence that "Dr. Hamilton examined the Retired Player's brain tissue to confirm a CTE diagnosis."  Dr. Hamilton's letter clearly establishes that he examined the Retired Player's brain tissue to confirm the CTE diagnosis.

## CONCLUSION

For all of the foregoing reasons, Class Member respectfully requests that the Special Master reverse the Claims Administrator's denial of this Monetary Award Claim and remand to the Claims Administrator for a calculation of the Monetary Award.

Dated:  August 28, 2019

Respectfully Submitted:

/s/ Justin Demerath

**Justin Demerath**
Texas State Bar No. 24034415
**David Campbell**
Texas State Bar No. 24057033
O'HANLON, DEMERATH & CASTILLO
808 West Avenue | Austin, TX 78701
Tel: (512) 494-9949 | Fax: (512) 494-9919
jdemerath@808west.com
dcampbell@808west.com

**Counsel for Class Member**

---

[19]    *See id.*

## <u>CERTIFICATE OF SERVICE</u>

It is hereby certified that a true copy of the foregoing document was submitted on the Court Portal on the 28th day of August, 2019.

<u>/s/ Justin B. Demerath</u>
Justin B. Demerath



# NFL CONCUSSION SETTLEMENT
*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

## NOTICE OF DENIAL OF MONETARY AWARD CLAIM
### DATE OF NOTICE: July 30, 2019
### DEADLINE TO APPEAL: August 29, 2019

## I. SETTLEMENT CLASS MEMBER INFORMATION

| Settlement Program ID | 950013395 | | | |
|---|---|---|---|---|
| **Name** | First: Carleen | | M.I. | Last: Hastings |
| **Settlement Class Member Type** | Representative Claimant | | | |
| **Lawyer** | O'Hanlon, Demerath & Castillo | | | |
| **Asserted Qualifying Diagnosis** | Death with CTE (Chronic Traumatic Encephalopathy) | **Date** | | 10/15/08 |

## II. EXPLANATION OF CLAIM DETERMINATION

This Notice is an official communication from the Claims Administrator for the NFL Concussion Settlement Program. We reviewed your Claim Package and determined that you are not entitled to a Monetary Award because:

1. Section 6.3(f) of the Settlement Agreement allows a CTE diagnosis if: (1) the Retired Player died before 4/22/15, and (2) there was a post-mortem diagnosis of CTE made by a board-certified neuropathologist prior to 4/22/15. Although Dr. Hamilton is a board-certified neuropathologist and signed a Pre-Effective Date Diagnosing Physician Certification Form indicating a CTE diagnosis, we must have proof that he personally performed the post-mortem exam on the Retired Player and that it was done on or before 4/22/15. There was no post-mortem examination report submitted to indicate that Dr. Hamilton examined the Retired Player's brain tissue to confirm a CTE diagnosis. The two-page letter provided by Dr. Hamilton does not satisfy the requirements for a CTE diagnosis under this Settlement Program. For these reasons, this claim is denied.

Section III below explains your right to appeal this denied claim, but living Retired Players may have the option to submit a new Claim Package under Section 9.1(c)(i) of the Settlement Agreement if they receive a new Qualifying Diagnosis. We will determine whether the new claim can be considered for a Monetary Award based on several factors, including whether the new claim shows materially changed circumstances from the earlier claim. These materially changed circumstances may include: (a) a different type of Qualifying Diagnosis than the one that was denied; or (b) the same type of Qualifying Diagnosis but with a different diagnosis date supported by additional medical records. If you submit a new claim within 365 days of the claim that is the subject of this denial notice, Section 10.3(d)(ii) of the Settlement Agreement requires us to audit that new claim if it is based on the same Qualifying Diagnosis as this denied claim, but the new diagnosis was made by a different physician.

## III. YOUR RIGHT TO APPEAL THIS DETERMINATION

If you have a good faith belief that the decision to deny your Monetary Award claim is incorrect, you may appeal this determination to the Court under Section 9.5 of the Settlement Agreement. To do so, click the Appeal Denied Claim button on your secure online portal and follow the instructions provided. You must submit supporting evidence to support your appeal. Any written statement may not be more than 10 double-spaced pages. You must do so on or before the Deadline to Appeal stated at the top of this Notice.

If you decide to appeal, the Settlement Agreement requires you to pay an Appeal Fee of $1,000, which you can do using the online PayPal option or by check made payable to the NFL Claims Administrator.  This fee will be refunded if your appeal is successful.  If you are unable to pay the $1,000 fee, you may make a hardship request to us to waive the fee and will have to submit financial information showing a sufficient hardship.

If paying the $1,000 Appeal Fee by check, mail the check to the address below.
     NFL Concussion Settlement
     Claims Administrator
     P.O. Box 25369
     Richmond, VA  23260

The Special Master appointed by the Court will decide your appeal based upon a showing by you of clear and convincing evidence.  The Special Master's factual determinations will be final and binding, but you or Class Counsel or the NFL Parties may object to any of the Special Master's conclusions of law, which will then be subject to de novo (*i.e.*, a new) review by the Court.

If an appeal is not submitted on or before the deadline stated at the top of this Notice, the determination in this Notice will become final.

## IV. CLASS COUNSEL'S RIGHT TO APPEAL THIS DETERMINATION

Section 9.5 of the Settlement Agreement also gives Class Counsel the right to challenge our decision to deny your Monetary Award claim.  If Class Counsel chooses to appeal, it must do so by the Deadline to Appeal stated at the top of this Notice and must provide a written copy of its Appeals Form and any supporting evidence to you, the NFL Parties, and us.

If an appeal is taken by you or Class Counsel, the NFL Parties may submit a written opposition (not to exceed 10 double-spaced pages) no later than 30 days after receipt of the Appeals Form.  The party taking the appeal is not permitted to submit a reply.

Class Counsel may also submit a written statement (not to exceed 10 double-spaced pages) in response to your appeal no later than 15 days after receipt of the Appeals Form, and you and the NFL Parties may each submit a reply to any such submission by Class Counsel.

## V. HOW TO CONTACT US WITH QUESTIONS OR FOR HELP

If you are represented by a lawyer, consult with your lawyer if you have questions or need assistance. If you are unrepresented and have any questions about this Notice or need help, contact us at 1-855-887-3485 or send an email to ClaimsAdministrator@NFLConcussionSettlement.com.  If you are a lawyer, call or email your designated Firm Contact for assistance. For more information about the Settlement program, visit the official website at www.NFLConcussionSettlement.com to read the Frequently Asked Questions or download a copy of the complete Settlement Agreement.





# NFL CONCUSSION SETTLEMENT

*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

## CLAIM FORM SIGNATURE ACKNOWLEDGEMENT FORM

If you completed your Claim Form using your Portal, you must submit this Claim Form Signature Acknowledgement Form with the Personal Signature of the Settlement Class Member identified in Section I who is submitting the claim for a Monetary Award.

### I. SETTLEMENT CLASS MEMBER & CLAIM FORM INFORMATION

| Settlement Program ID | 950013395 | | | |
|---|---|---|---|---|
| **Name** | First<br>Carleen | M.I. | Last<br>Hastings | Suffix |

### II. PERSONAL SIGNATURE

**By signing below, I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that all information provided in the Claim Form submitted through the Secure Portal, and in any of its attachments, is true and correct to the best of my knowledge, information, and belief.**

| Signature | *Carleen Hastings* | Date | 0 2 / 0 5 / 2 0 1 9<br>(Month/Day/Year) |
|---|---|---|---|

### III. HOW TO SUBMIT THIS SIGNATURE ACKNOWLEDGEMENT FORM

After printing this form, the Settlement Class Member must sign in the Personal Signature box above. Scan and upload the signed document using the Upload Signed Signature Acknowledgement Form button on the Claim Package Page of your Portal. If you are unable to scan the form, you may return the signed form through either of the following options:

| **By Mail:** | NFL Concussion Settlement<br>Claims Administrator<br>P.O. Box 25369<br>Richmond, VA 23260 |
|---|---|
| **By FedEx/UPS:** | NFL Concussion Settlement<br>c/o BrownGreer PLC<br>250 Rocketts Way<br>Richmond, VA 23231 |

# NFL CONCUSSION SETTLEMENT

*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

## MONETARY AWARD CLAIM PACKAGE HIPAA AUTHORIZATION FORM

You must complete and sign this Form if you are a **Retired NFL Football Player** or the **Representative Claimant** of a Retired NFL Football Player and want to apply for a Monetary Award. This Form authorizes the use and disclosure of "Protected Health Information" as that term is defined in 45 C.F.R. § 160.103, relating to the processing of your claim in the NFL Concussion Settlement Program. Protected Health Information includes, but is not limited to, information regarding the Retired NFL Football Player's medical care, treatment, physical or mental condition, and medical expenses.

## I. RETIRED NFL FOOTBALL PLAYER INFORMATION

| Settlement Program ID | 950013395 | | | |
|---|---|---|---|---|
| **Player Name** | First: Christopher | M.I. | Last: Mims | Suffix |

| **Social Security Number, Taxpayer ID or Foreign ID Number** (if Retired NFL Football Player is not a U.S. Citizen) **of Retired NFL Football Player** (if known) | \|5\|6\|0\| - \|4\|9\| - \|8\|8\|2\|8\| **or** _____ |
|---|---|
| **Date of Birth of Retired NFL Football Player** | \|0\|9\|/\|2\|9\|/\|1\|9\|7\|0\| (Month/Day/Year) |

## II. ENTITIES AUTHORIZED TO USE AND DISCLOSE PROTECTED HEALTH INFORMATION

By signing and submitting this Form, I authorize the use and disclosure of all Protected Health Information regarding my (or the Retired NFL Football Player's, if signed by a Representative Claimant) medical care, treatment, physical or mental condition, and medical expenses relating to my claim in the *In re: National Football League Players' Concussion Injury Litigation* Settlement program, as follows: (1) by the Claims Administrator, Special Master, BAP Administrator, Lien Resolution Administrator, designated Qualified BAP Providers, Qualified BAP Pharmacy Vendors, Qualified MAF Physicians, Appeals Advisory Panel members, Appeals Advisory Panel Consultants, the Court, Class Counsel, Counsel for the NFL Parties and the NFL Parties (which, in turn, may share the Protected Health Information with the NFL Parties' insurers or reinsurers) for use and/or disclosure with one another in the performance of their functions and duties pursuant to the Settlement Agreement; (2) by the Lien Resolution Administrator for use and/or disclosure to the holders of any liens, claims, or rights of subrogation, indemnity, reimbursement, conditional or other payments, or interests of any type, including all Governmental Payors (such as the Medicare Program, any state Medicaid Program, the Department of Veterans Affairs, Tricare, Indian Health Services, and their respective contractors), Medicare Part C or Part D Programs, private health care providers, health plans, and health insurers, and any contractors or recovery agents of the foregoing persons and entities (collectively, "Lienholders"), for the purpose of identifying and resolving any potential Liens in connection with any Monetary Award that I may receive; and (3) by the Lienholders for disclosure to the Lien Resolution Administrator and Claims Administrator for the purpose of identifying and resolving any potential Liens in connection with any Monetary Award that I may receive.

## MONETARY AWARD CLAIM PACKAGE HIPAA AUTHORIZATION FORM

### III. AUTHORIZATION

By signing below, I acknowledge and understand all of the following:

| | |
|---|---|
| 1. | I have the right to revoke this authorization at any time. If I wish to revoke the authorization, I must do so in writing and must provide my written revocation to the Claims Administrator. The written revocation must be signed and dated. The revocation will not apply to any disclosures that already have been made in reliance on this authorization prior to the date upon which the Claims Administrator receives my written revocation. |
| 2. | My authorization of the disclosure of the subject Retired NFL Football Player's Protected Health Information is voluntary, which means I can refuse to sign this Form. I do not need to sign this Form to obtain health treatment from any medical provider or to enroll in or be eligible for any health plan benefits. However, I recognize that if I do not sign this Form and submit it to the Claims Administrator, my Claim Package will be incomplete under the terms of the Settlement Agreement and will not be processed. |
| 3. | Any Protected Health Information or other information released to the Claims Administrator, Special Master, BAP Administrator, Lien Resolution Administrator, Qualified BAP Providers, Qualified BAP Pharmacy Vendors, Qualified MAF Physicians, Appeals Advisory Panel members, Appeals Advisory Panel Consultants, the Court, Class Counsel, Counsel for the NFL Parties and the NFL Parties (including the NFL Parties' insurers or reinsurers) may be subject to re-disclosure by such person/entity, and may no longer be protected by applicable federal and state privacy laws. Each of those persons and entities, however, is permitted to use and disclose your information only in accordance with this Form, the Settlement Agreement, a contract executed pursuant to the Settlement Agreement, orders of the Court, and/or applicable law. |
| 4. | My Protected Health Information may include information relating to sexually transmitted disease, acquired immunodeficiency syndrome ("AIDS"), or human immunodeficiency virus ("HIV"), behavioral or mental health services and treatment for alcohol and drug abuse. |
| 5. | This Form is valid from the date of my signature in Section IV until the date that the Claims Administrator performs the last act to process the claim for a Monetary Award that I submitted with this Form. |
| 6. | I have a right to receive and retain a copy of this Form. |
| 7. | Any photostatic copy of this Form shall have the same authority as the original, and may be substituted in its place. |

### IV. SIGNATURE

The Retired NFL Football Player or Representative Claimant of the Retired NFL Football Player named in Section I must sign and date this Form below. **By signing below, I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that all information provided in this HIPAA Authorization Form is true and correct to the best of my knowledge, information and belief.**

| Signature | *Carleen Hastings* | | Date | 0 2/0 5/2 0 1 9 (Month/Day/Year) | |
|---|---|---|---|---|---|
| **Printed Name** | First Carleen | M.I. | Last Hastings | | Suffix |

| If you are signing this Form as a Representative Claimant, describe your relationship to the Retired NFL Football Player and your authority to act on his behalf: | Mother of Retired NFL Football Player, Deceased |
|---|---|

| MONETARY AWARD CLAIM PACKAGE HIPAA AUTHORIZATION FORM | |
|---|---|
| **V.  HOW TO SUBMIT THIS FORM** | |
| You may submit this Form in one of two ways: | |
| **By U.S. Mail:** | NFL Concussion Settlement<br>Claims Administrator<br>P.O. Box 25369<br>Richmond, VA 23260 |
| **By Delivery:** | NFL Concussion Settlement<br>c/o BrownGreer PLC<br>250 Rocketts Way<br>Richmond, VA 23231 |

# CERTIFICATION OF VITAL RECORD

## COUNTY OF LOS ANGELES • REGISTRAR–RECORDER/COUNTY CLERK

### CERTIFICATE OF DEATH
STATE OF CALIFORNIA
USE BLACK INK ONLY / NO ERASURES, WHITEOUTS OR ALTERATIONS

3200819043413

LOCAL REGISTRATION NUMBER

**DECEDENT'S PERSONAL DATA**

| STATE FILE NUMBER | | |
|---|---|---|
| 1 NAME OF DECEDENT — FIRST (Given) CHRISTOPHER | 2 MIDDLE EDDIE | 3 LAST (Family) MIMS |

AKA ALSO KNOWN AS — Include full AKA (FIRST MIDDLE LAST) - - -

| 4 DATE OF BIRTH mm/dd/ccyy 09/29/1970 | 5 AGE Yrs 38 | IF UNDER ONE YEAR Months / Days | IF UNDER 24 HOURS Hours / Minutes | 6 SEX M |

| 9 BIRTH STATE/FOREIGN COUNTRY CALIFORNIA | 10 SOCIAL SECURITY NUMBER 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 | 11 EVER IN U.S. ARMED FORCES? [ ] YES [X] NO [ ] UNK | 12 MARITAL STATUS (at Time of Death) DIVORCED | 7 DATE OF DEATH mm/dd/ccyy 10/15/2008 | 8 HOUR (24 Hours) 0935 |

| 14/15 EDUCATION — Highest Level/Degree SOME COLLEGE | 14/15 WAS DECEDENT HISPANIC/LATINO(A)/SPANISH? [X] NO | 16 DECEDENT'S RACE AFRICAN AMERICAN |

| 17 USUAL OCCUPATION — Type of work for most of life. DO NOT USE RETIRED PROFESSIONAL ATHLETE | 18 KIND OF BUSINESS OR INDUSTRY FOOTBALL ATHLETE | 19 YEARS IN OCCUPATION 8 |

**USUAL RESIDENCE**

| 20 DECEDENT'S RESIDENCE (Street and number or location) 612 SOUTH FLOWER STREET #409 | | | |
|---|---|---|---|
| 21 CITY LOS ANGELES | 22 COUNTY/PROVINCE LOS ANGELES | 23 ZIP CODE 90017 | 24 YEARS IN STATE 25 | 25 STATE/FOREIGN COUNTRY CALIFORNIA |

**INFORMANT**

| 26 INFORMANT'S NAME, RELATIONSHIP MAREA BARSKY, FRIEND | 27 INFORMANT'S MAILING ADDRESS 249 SANTA BARBARA, IRVINE, CA 92606 |

**SPOUSE AND PARENT INFORMATION**

| 28 NAME OF SURVIVING SPOUSE — FIRST - | 29 MIDDLE - | 30 LAST (Maiden Name) - |
| 31 NAME OF FATHER — FIRST LORENZO | 32 MIDDLE VICTOR | 33 LAST MIMS | 34 BIRTH STATE CA |
| 35 NAME OF MOTHER — FIRST CARLEEN | 36 MIDDLE - | 37 LAST (Maiden) HASTINGS | 38 BIRTH STATE TN |

1 of 2

**FUNERAL DIRECTOR / LOCAL REGISTRAR**

| 38 DISPOSITION DATE mm/dd/ccyy 10/25/2008 | 40 PLACE OF FINAL DISPOSITION FOREST LAWN MEMORIAL PARK 6300 FOREST LAWN DR., LOS ANGELES, CA 90068 | |
| 41 TYPE OF DISPOSITION(S) BU | 42 SIGNATURE OF EMBALMER JESSICA SOLIS | 43 LICENSE NUMBER 9091 |
| 44 NAME OF FUNERAL ESTABLISHMENT FOREST LAWN MEMR PRKS & MTYS | 45 LICENSE NUMBER FD 904 | 46 SIGNATURE OF LOCAL REGISTRAR JONATHAN FIELDING, MD | 47 DATE mm/dd/ccyy 10/23/2008 |

**PLACE OF DEATH**

| 101 PLACE OF DEATH RESIDENCE | 122 IF HOSPITAL SPECIFY ONE | 123 IF OTHER THAN HOSPITAL SPECIFY ONE [X] Decedent's Home |
| 104 COUNTY LOS ANGELES | 105 FACILITY ADDRESS OR LOCATION WHERE DEATH OCCURRED 612 SOUTH FLOWER STREET #409 | 106 CITY LOS ANGELES |

| 107 CAUSE OF DEATH | | Time Interval Between Onset and Death | 108 DEATH REPORTED TO CORONER? [X] YES [ ] NO |
| IMMEDIATE CAUSE (A) DEFERRED | | (AT) | 2008-07210 |
| Sequentially list conditions (B) | | (BT) | 109 BIOPSY PERFORMED? [ ] YES [X] NO |
| UNDERLYING CAUSE (C) | | (CT) | 110 AUTOPSY PERFORMED? [X] YES [ ] NO |
| (D) | | (DT) | 111 USED IN DETERMINING CAUSE? [X] YES [ ] NO |

**CAUSE OF DEATH**

| 112 OTHER SIGNIFICANT CONDITIONS CONTRIBUTING TO DEATH NONE | |
| 113 WAS OPERATION PERFORMED FOR ANY CONDITION IN ITEM 107 OR 112? NO | 115A IF FEMALE, PREGNANT IN LAST YEAR? [ ] YES [ ] NO [ ] UNK |

**PHYSICIAN'S CERTIFICATION**

| 114 I CERTIFY THAT TO THE BEST OF MY KNOWLEDGE DEATH OCCURRED... Decedent Attended Since mm/dd/ccyy — mm/dd/ccyy | 115 SIGNATURE AND TITLE OF CERTIFIER | 116 LICENSE NUMBER | 117 DATE mm/dd/ccyy |
| 118 TYPE ATTENDING PHYSICIAN'S NAME, MAILING ADDRESS, ZIP CODE | | | |

**CORONER'S USE ONLY**

| 119 I CERTIFY THAT IN MY OPINION DEATH OCCURRED AT THE HOUR, DATE, AND PLACE STATED FROM THE CAUSES STATED | 120 MANNER OF DEATH [ ] Natural [ ] Accident [ ] Homicide [ ] Suicide [X] Pending Investigation [ ] Could not be Determined | 120 INJURED AT WORK? [ ] YES [ ] NO [ ] UNK | 121 INJURY DATE mm/dd/ccyy | 122 HOUR (24 Hours) |
| 123 PLACE OF INJURY | | | |
| 124 DESCRIBE HOW INJURY OCCURRED | | | |
| 125 LOCATION OF INJURY | | | |
| 126 SIGNATURE OF CORONER / DEPUTY CORONER EVONNE D REED | 127 DATE mm/dd/ccyy 10/20/2008 | 128 TYPE NAME, TITLE OF CORONER / DEPUTY CORONER EVONNE D REED, DEPUTY CORONER |

| STATE REGISTRAR | A | B | C | D | E | *012008000916134* | FAX AUTH # | CENSUS TRACT |

This is to certify that this document is a true copy of the official record filed with the Registrar-Recorder/County Clerk.

SEP 0 4 2015

*Dean C. Logan*
DEAN C. LOGAN
Registrar-Recorder/County Clerk

*1000000699023*

This copy not valid unless prepared on engraved border displaying the Seal and Signature of the Registrar-Recorder/County Clerk.   PBN&O (REV) 07/11

ANY ALTERATION OR ERASURE VOIDS THIS CERTIFICATE



CERTIFICATION OF VITAL RECORD

## COUNTY OF LOS ANGELES • REGISTRAR–RECORDER/COUNTY CLERK

### PHYSICIAN/CORONER'S AMENDMENT

3052008191127
STATE FILE NUMBER

NO ERASURES, WHITEOUTS, PHOTOCOPIES,
OR ALTERATIONS

3200819043413
LOCAL REGISTRATION NUMBER

1.1     ☐ BIRTH    ☒ DEATH    ☐ FETAL DEATH

TYPE OR PRINT CLEARLY IN BLACK INK ONLY – THIS AMENDMENT BECOMES AN ACTUAL PART OF THE OFFICIAL RECORD

| PART I | INFORMATION TO LOCATE RECORD | | | |
|---|---|---|---|---|
| INFORMATION AS IT APPEARS ON ORIGINAL RECORD | 1A. NAME—FIRST CHRISTOPHER | 1B. MIDDLE EDDIE | 1C. LAST MIMS | 2. SEX M |
| | 3. DATE OF EVENT—MM/DD/CCYY 10/15/2008 | 4. CITY OF EVENT LOS ANGELES | 5. COUNTY OF EVENT LOS ANGELES | |

| PART II | STATEMENT OF CORRECTIONS | | |
|---|---|---|---|
| | 6. CERTIFICATE ITEM NUMBER | 7. INFORMATION AS IT APPEARS ON ORIGINAL RECORD | 9. INFORMATION AS IT SHOULD APPEAR |
| LIST ONE ITEM PER LINE | 107A | DEFERRED | DILATED CARDIOMYOPATHY |
| | 107AT | - | YEARS |
| | 112 | NONE | HEPATIC STEATOSIS, HISTORY OF HYPERTENSION |
| | 119 | PENDING INVESTIGATION | NATURAL |

*2 of 2*

I HEREBY DECLARE UNDER PENALTY OF PERJURY THAT THE ABOVE INFORMATION IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.

| DECLARATION OF CERTIFYING PHYSICIAN OR CORONER | 9. SIGNATURE OF CERTIFYING PHYSICIAN OR CORONER ▶ LOUIS A PENA MD | 10. DATE SIGNED—MM/DD/CCYY 12/12/2008 | 11. TYPED OR PRINTED NAME AND TITLE/DEGREE OF CERTIFIER DME | | |
|---|---|---|---|---|---|
| | 12. ADDRESS—STREET and NUMBER 1104 NORTH MISSION ROAD | 13. CITY LOS ANGELES | | 14. STATE CA | 15. ZIP CODE 90033 |
| STATE/LOCAL REGISTRAR USE ONLY | 16. OFFICE OF VITAL RECORDS OR LOCAL REGISTRAR ▶ STATE REGISTRAR - OFFICE OF VITAL RECORDS | | 17. DATE ACCEPTED FOR REGISTRATION—MM/DD/CCYY 12/15/2008 | | |

STATE OF CALIFORNIA, DEPARTMENT OF PUBLIC HEALTH, OFFICE OF VITAL RECORDS    *022008000147349*    FORM VS 24Ae (REV. 1/08)

1.1

This is to certify that this document is a true copy of the official record filed with the Registrar-Recorder/County Clerk.

SEP 0 4 2015



DEAN C. LOGAN
Registrar-Recorder/County Clerk



*1 0 0 0 0 0 6 9 9 0 2 4 *

This copy not valid unless prepared on engraved border displaying the Seal and Signature of the Registrar-Recorder/County Clerk.
PBNCO (REV) 07/11

**3469**

ANY ALTERATION OR ERASURE VOIDS THIS CERTIFICATE

COUNTY OF LOS ANGELES                                                    DEPARTMENT OF CORONER

# 12 | AUTOPSY REPORT

No.

2008-07210

MIMS, CHRISTOPHER

I performed an autopsy on the body of

at _____ the DEPARTMENT OF CORONER

Los Angeles, California _____ on  OCTOBER 16, 2008 @ 1525 HOURS
_____    (Date)                    (Time)

From the anatomic findings and pertinent history I ascribe the death to:

(A)     DILATED CARDIOMYOPATHY
DUE TO, OR AS A CONSEQUENCE OF

(B)
DUE TO, OR AS A CONSEQUENCE OF

(C)
DUE TO, OR AS A CONSEQUENCE OF

(D)
OTHER CONDITIONS CONTRIBUTING BUT NOT RELATED TO THE IMMEDIATE CAUSE OF DEATH:
        HEPATIC STEATOSIS, HISTORY HYPERTENSION

*Anatomical Summary:*

    I.    Dilated cardiomyopathy, 1010 grams.

        A.    Pulmonary congestion and edema.

            1.    Secretions of bronchi and trachea.

        B.    Chronic hepatic congestion.

            1.    Hepatomegaly, 3200 grams.

            2.    Probable congestive heart failure.

                a.    Lower legs, dorsum of feet, with edema.

        C.    History of hypertension.

        D.    History of alcohol abuse.

            1.    Hepatic steatosis, moderate.

    II.    Other findings:

        A.    Morbid obesity.

        B.    No evidence of external or internal trauma.

        C.    No pulmonary emboli.

        D.    Bilateral knees with old surgical scars.

76A890M—Rev. 8/94

DEPARTMENT OF CORONER

# **12**

## **AUTOPSY REPORT**

No.

2008-07210

MIMS, CHRISTOPHER

Page ___2___

          E.    Upper torso, face with congestion and Tardieu
               spots consistent with prone position found.

          F.    Skin, body creases of the axilla, legs and back
               with psoriatic-type lesions.

   III.   See Toxicology Report.

    IV.   See Microscopic Report.

     V.   See Neuropathology Report.

CIRCUMSTANCES:

See the brief Investigator's Narrative Report.

This is a 38-year-old Black gentleman with a history of
hypertension, sports-related knee injuries and alcohol abuse.
On 10/15/08 at about 0900 hours, the decedent was found lying on
the bathroom floor unresponsive.  911 was called, and the Los
Angeles Fire Department responded to the scene and determined
death on 10/15/08 at 0935 hours.  The decedent apparently smoked
tobacco heavily and used alcohol daily.  The decedent had
complained of labored breathing on 10/14/08.  He was last seen
alive by a friend on 10/14/08 at about 2230 hours.

EXTERNAL EXAMINATION:

The body is identified by toe tags and is that of an unembalmed,
refrigerated adult Black male who appears about the reported age
of 38 years.  The body weighs 456 pounds, measures 80 inches,
and is extremely obese.

The skin shows numerous psoriatic scaly-type skin lesions at the
axilla, legs, dorsum of the feet and the torso.  The skin is
otherwise free of abrasions, lacerations, bruises and burns.
There are scars over both knee regions:  On the right knee, an
old scar, 2 inches transversely oriented and on the left knee,
an irregularly-shaped old scar, 1-1/2 inches.  No old surgical
scars are seen over the abdomen or torso regions.

COUNTY OF LOS ANGELES

**AUTOPSY REPORT**

DEPARTMENT OF CORONER

No.

2008-07210

MIMS, CHRISTOPHER

**12**

Page _____3_____

Tattoos are present and identified as follows:

1.  Right anterior forearm, "Tough As" and below this, a tattoo of four nails vertically oriented, and below this, the word "Nails".

2.  Left anterior forearm, the words "Balls of Steel" and in between is a brick wall with balls going through it.

3.  Left upper lateral arm is a tattoo of four cards with the letter "A", diamond, spade, heart and clubs and the words "Fat Doctor", and below this a smiling man face that is green with dark hair.  There are other designs around this tattoo.

4.  Right upper lateral arm, multicolored tiger.

5.  Right wrist, tribal-like band tattoo with a focal red color design.

Rigor has presumably been abolished.  Livor mortis is slight red and fixed on the posterior upper back.  Also, the face shows purple congestion and dependent purple fixed livor on the upper torso and neck regions with Tardieu spots present.

The head is otherwise normocephalic and covered by black hair. There is slight frontal receding of the hairline, and the hair can be described as short and curly.  A mustache and beard are present.  Examination of the eyes reveals irides that show corneal clouding and sclerae that are congested.  There are no petechial hemorrhages of the conjunctivae of the lids or the sclerae.  The oronasal passages are unobstructed.  At autopsy, there is foam, red, frothy material from the mouth that is observed.  Upper and lower teeth are present.  The frenulum is intact.  The neck is unremarkable.  There is no chest deformity. There is no increased anterior-posterior diameter.  The abdomen is obese.  The genitalia are those of an adult male.  The penis appears circumcised.  The external genitalia are without trauma or lesions.  The extremities show no edema, joint deformity, abnormal mobility, or needle tracks.  The lower legs and dorsum of the feet are swollen.

76A798P—Rev. 2/91

COUNTY OF LOS ANGELES

**12**

Page __4__

# AUTOPSY REPORT

DEPARTMENT OF CORONER

No.

2008-07210

MIMS, CHRISTOPHER

EVIDENCE OF THERAPEUTIC INTERVENTION:

There is no evidence of any previous or recent hospitalization.

EVIDENCE OF EXTERNAL TRAUMATIC INJURIES:

None.

CLOTHING:

The body was not clothed, and I did not see the clothing.

INITIAL INCISION:

The body cavities are entered through the standard coronal and
Y-shaped incisions. No foreign material is present in the
mouth, upper airway, and trachea.

EVIDENCE OF INTERNAL INJURIES:

None.

NECK:

The neck organs are removed en bloc with the tongue. No lesions
are present, nor is trauma of the gingiva, lips, or oral mucosa
demonstrated. There is no edema of the larynx. Both hyoid bone
and larynx are intact and without fractures. No hemorrhage is
present in the adjacent throat organs, investing fascia, strap
muscles, thyroid, or visceral fascia. There are no prevertebral
fascial hemorrhages. The tongue when sectioned shows no trauma.

CHEST/ABDOMINAL CAVITY:

Both pleural cavities contain no fluid or adhesions. The
parietal pleurae are intact. The lungs are well-expanded. Soft
tissues of the thoracic and abdominal walls are well-preserved.
The subcutaneous fat of the abdominal wall measures 8.0 cm in
thickness, and the chest wall measures 6.0 cm. The breasts are

COUNTY OF LOS ANGELES

**12**

Page ___5___

# AUTOPSY REPORT

DEPARTMENT OF CORONER

No.

2008-07210

MIMS, CHRISTOPHER

examined and palpated in the usual manner and show no
abnormalities. The organs of the abdominal cavity have a normal
arrangement, and none are absent. There is no fluid collection.
The peritoneal cavity is without evidence of peritonitis. There
are no adhesions.

## SYSTEMIC AND ORGAN REVIEW

The following observations are limited to findings other than
injuries, if described above.

MUSCULOSKELETAL SYSTEM:

No abnormalities of the bony framework or muscles are present.

CARDIOVASCULAR SYSTEM:

The aorta is elastic and of even caliber throughout, with
vessels distributed normally from it. The abdominal and
thoracic aorta have minimal atherosclerotic plaques. There is
no tortuosity or widening of the thoracic segment. There is no
dilatation of the lower abdominal segment. No aneurysm is
present. The major branches of the aorta show no abnormality.

Within the pericardial sac, there is a minimal amount of
serosanguineous fluid. The heart weighs 1010 grams. It is
severely dilated with no significant ventricular hypertrophy.
The right ventricle is 0.4 cm thick, and the left ventricle is
1.5 cm thick. The septal wall measures 2.0 cm. The chambers
are normally developed and are without mural thrombosis. The
valves are thin, leafy and competent but dilated. The
circumferences of the valve rings are: Tricuspid valve 15.0 cm,
pulmonic valve 10.0 cm, mitral valve 15.0 cm, and aortic valve
10.0 cm. There is mottled red and pale endocardial
discoloration. There are no infarcts of the myocardium seen
grossly. There is no abnormality of the apices of the papillary
musculature. There are no defects of the septum. The great
vessels enter and leave in a normal fashion. The ductus
arteriosus is obliterated. The coronary ostia are widely
patent. The right coronary artery is the dominant vessel.
There is no coronary atherosclerosis. The blood within the
heart and large blood vessels is liquid.

76A798P—Rev. 2/91

COUNTY OF LOS ANGELES

**12**

# AUTOPSY REPORT

DEPARTMENT OF CORONER

No.

2008-07210

MIMS, CHRISTOPHER

Page ___6___

RESPIRATORY SYSTEM:

An extremely large amount of edema fluid is found in the upper respiratory and lower bronchial passages. The mucosa is intact and pale with secretions present. The lungs are subcrepitant, and there is dependent congestion. The left lung weighs 1030 grams. The right lung weighs 1050 grams. The visceral pleurae are smooth and intact. The parenchyma is congested and edematous. The pulmonary vasculature is without thromboembolism. Thromboemboli are not present in the distal tertiary branches.

GASTROINTESTINAL SYSTEM:

The esophagus is intact throughout. The stomach is not distended. It contains about 150 ml of green well-digested food and liquid present. The mucosa is smooth and green with no erosions or ulcerations. Portions of tablets and capsules cannot be discerned in the stomach. The small intestine and colon are examined by inspection, palpation and multiple incisions and show soft green stool in each region. The appendix is present. The pancreas occupies a normal position. There is no necrosis or trauma. The parenchyma is lobular and firm. The pancreatic ducts are not ectatic, and there is no parenchymal calcification.

HEPATOBILIARY SYSTEM:

The liver weighs 3200 grams, is enlarged, and is red-brown. The capsule is intact, and the consistency of the parenchyma is soft. The cut surface is smooth. There is chronic passive congestion. The gallbladder is present. The wall is thin and pliable. It contains a minimal amount of green liquid bile and no calculi. There is no obstruction or dilatation of the extra-hepatic ducts. The periportal lymph nodes are not enlarged.

COUNTY OF LOS ANGELES

DEPARTMENT OF CORONER

# AUTOPSY REPORT

**12**

Page 7

No.

2008-07210

MIMS, CHRISTOPHER

URINARY SYSTEM:

The left kidney weighs 310 grams. The right kidney weighs 330 grams. The kidneys are normally situated, and the capsules strip easily revealing a surface that is focally pitted, light red and smooth. The corticomedullary demarcation is preserved. The pyramids are not remarkable. The peripelvic fat is not increased. The ureters are without dilatation or obstruction and pursue their normal course. The urinary bladder is contracted. It contains no urine.

GENITAL SYSTEM (MALE):

The prostate is without enlargement or nodularity. Both testes are in the scrotum and are unremarkable and without trauma.

HEMOLYMPHATIC SYSTEM:

The spleen weighs 220 grams and is slightly enlarged. The capsule is intact. The parenchyma is soft. There is no increased follicular pattern. Lymph nodes throughout the body are small and inconspicuous. There is focal enlargement of the lymph nodes observed in the peribronchial regions. The bone is not remarkable. The bone marrow of the rib is red, moist and unremarkable.

ENDOCRINE SYSTEM:

The thyroid gland is unremarkable. The parathyroid glands are not identified. The adrenal glands are unremarkable. The thymus gland is unremarkable. The pituitary gland is of normal size and is unremarkable.

SPECIAL SENSES:

The eyes are not dissected. The middle and inner ear are not dissected.

# AUTOPSY REPORT

**12**

Page ___8___

No.

2008-07210

MIMS, CHRISTOPHER

---

HEAD AND CENTRAL NERVOUS SYSTEM:

There is no subcutaneous or subgaleal hemorrhage in the scalp.
The external periosteum and dura mater are stripped showing no
fractures of the calvarium or base of the skull. There are no
tears of the dura mater. There is no epidural, subdural or
subarachnoid hemorrhage. The fresh brain weighs 1440 grams.
The leptomeninges are thin and transparent. A normal
convolutional pattern is observed (see separate Neuropathology
Report to follow). Vessels at the base of the brain have a
normal pattern of distribution. There are no aneurysms. The
cranial nerves are intact, symmetrical and normal in size,
location and course. The cerebral arteries are without
arteriosclerosis.

See separate Neuropathology Report.


SPINAL CORD:

The entire cord is not dissected. The superior portion of the
cervical spinal cord is examined through the foramen magnum and
is unremarkable.


NEUROPATHOLOGY:

The brain is placed in formalin solution for further fixation
and later neuropathology consultation.


HISTOLOGIC SECTIONS:

Representative sections from various organs are preserved in one
storage jar in 10% formalin. Sections of heart, right and left
lungs, liver and spleen, kidneys, and dorsum of right foot skin
are submitted for slides. The slide key is #2008-07210: 1, 2,
3, 4, left ventricle of heart; 5, right ventricle of heart; 6,
right lung; 7, left lung; 8, liver and spleen; 9, right and left
kidneys; 10, dorsum of right foot and section of skin.


TOXICOLOGY:

Blood (heart and femoral), bile, liver tissue, stomach contents
and vitreous humor have been submitted to the laboratory. A
comprehensive screen is requested.

COUNTY OF LOS ANGELES    DEPARTMENT OF CORONER

# **12**

# **AUTOPSY REPORT**

Page ___9___

No.

2008-07210

MIMS, CHRISTOPHER

PHOTOGRAPHY:

At-scene photos are available (34). Photographs have been taken during the course of the autopsy.

RADIOLOGY:

No x-rays are obtained.

WITNESSES:

None.

DIAGRAMS USED:

Diagram Form 20 was used during the performance of the autopsy. The diagram is not intended to be a facsimile.

OPINION:

This 38-year-old Black male died as a result of dilated cardiomyopathy. Hepatic steatosis and history of hypertension were contributory factors to his final demise.

Blood toxicology studies show a 0.11 g% alcohol femoral blood level. This is not a lethal level. The remainder of the toxicology studies show no drugs of abuse. A non-significant level of diphenhydramine is present. The vitreous fluid shows no evidence of diabetic ketoacidosis.

Alcohol abuse is strongly associated with the development of dilated cardiomyopathy, which may be a secondary nutritional disturbance or ethanol toxicity causing myocardial injury.

Based on the history and circumstances, as currently known, the manner of death is natural.

76A798P—Rev 2/91

COUNTY OF LOS ANGELES

DEPARTMENT OF CORONER

# **AUTOPSY REPORT**

**12**

Page ____ 10

No.

2008-07210

MIMS, CHRISTOPHER

NOTE:

Dr. Christopher Rogers, Chief of Forensic Medicine Division, reviewed the opinion and case and concurs.

_____Louis a. Pena_ M.D._____          _1-17-2009_

LOUIS A. PENA, M.D.          DATE
DEPUTY MEDICAL EXAMINER

LAP:am/jm:c
D-10/16/08-1900 hours
T-10/21/08

COUNTY OF LOS ANGELES                                    DEPARTMENT OF CORONER



COUNTY OF LOS ANGELES          **FORENSIC CONSULTANT'S REPORT**          DEPARTMENT OF CORONER

## 13

NEUROPATHOLOGY

2008-07210

MIMS, CHRISTOPHER E.

November 20, 2008

AGE: 38 years

DATE OF DEATH: October 15, 2008

REFERRING DME: Louis A. Pena, M.D.


CIRCUMSTANCES:

The following information is taken from the Investigator
Report and preliminary autopsy notes. This 38-year-old man
reportedly had a past medical history of hypertension,
sports-related knee injuries, heavy smoking, and alcohol
abuse. He was last known alive on 10/14/08 at 2230 hours,
reportedly complaining of labored breathing. On 10/15/08, he
was found unresponsive on the bathroom floor by a friend. He
was pronounced at the scene on 10/15/08 at 0935 hours by
responding paramedics.

At the time of postmortem examination on 10/16/08, the
findings included dilated cardiomyopathy (heart weight 1010
grams), pulmonary congestion and edema, hepatomegaly (3200
grams), marked obesity, and no evidence of acute trauma
including no scalp, skull or intracranial abnormality noted.
Brain weight at removal was 1440 grams.


GROSS DESCRIPTION:

Specimens available for examination are cranial dura mater
and brain. Cranial dura mater submitted includes the dorsal
convexity regions with falx cerebri, posterior fossa with
tentorium cerebelli, and much of the right temporal fossa.
The external and internal surfaces of the dura mater are
smooth and shiny without evidence of hemorrhage,
discoloration or subdural neomembranes, the only exception
being a 0.8 x 0.5 x 0.4 cm light brown flattened nodule (0.4
cm in thickness) in the right anterolateral temporal fossa,
apparently within the dura. It is sampled. Dural venous
sinuses appear normal in pattern.

COUNTY OF LOS ANGELES    **FORENSIC CONSULTANT'S REPORT**    DEPARTMENT OF CORONER

**13**

NEUROPATHOLOGY

2008-07210

MIMS, CHRISTOPHER E.

Page 2

Cerebral leptomeninges show mildly increased milky opacity over the dorsolateral convexities, considered within normal limits for age group. There is moderately severe leptomeningeal vascular congestion. Cerebral hemispheres are approximately symmetrical with a midline and closely apposed interhemispheric fissure. There is no evidence of significant brain swelling and no evidence of herniation at the uncus, cerebellar tonsillar region, superior cerebellar vermis or cingulate gyrus. There is some artifact present, including partial avulsion of the inferomedial left cerebellar hemisphere and deep incision into the right anterior inferior cerebellar hemisphere. Convolutional pattern is unremarkable. No recent or remote cerebral or cerebellar cortical contusions are seen. No focal areas of increased softening, firmness or discoloration are present.

Rectus-orbital and basitemporal areas are unremarkable. Cranial nerves I through XII are intact except for avulsion of olfactory bulbs bilaterally. Major basal arteries have a normal pattern of distribution, discounting the absence of the bilateral vertebral arteries, not included with the specimen. The left posterior communicating artery is larger than average, slightly exceeding the contribution to the left posterior cerebral artery by basilar artery, thus consistent with a fetal pattern. No aneurysms and no evidence of occlusive vascular disease are apparent. Belly of the pons is full and symmetrical, and medulla is remarkable only for partial avulsion of the right medulla compared to the left. Cerebellar hemispheres are approximately symmetrical with normal-appearing folia. Basal cisterns are open.

The brain is sectioned in a coronal plane, and the brainstem and cerebellum in a transverse plane.

76F389(Rev 8/93)

COUNTY OF LOS ANGELES        **FORENSIC CONSULTANT'S REPORT**        DEPARTMENT OF CORONER

**13**

NEUROPATHOLOGY

2008-07210

MIMS, CHRISTOPHER E.

December 3, 2008

MICROSCOPIC DESCRIPTION:

Sections of cranial dura mater and brain (8) stained by H&E
method include the right temporal fossa dural nodule (Slide
A), right frontal lobe (Slide B), left and right hippocampi
(Slides C and D, respectively), right basal ganglia (Slide
E), right parietal lobe (Slide F), cerebellum (Slide G), and
medulla (Slide H).

Slide A demonstrates native dura mater, with the expanded
zone composed of vascular channels and some ovoid pale
connective areas with a lace-like internal architecture.  The
appearance is typical of a benign arachnoid villus.  Some
leptomeningeal melanosis is incidentally noted in the brain
sections.  In basal ganglia, some mild to moderate fine
granular calcification is noted in globus pallidus, primarily
in pericapillary areas and in the walls of some small blood
vessels.  Mild autolysis is present in the sections.

There is no evidence of meningitis, encephalitis, abnormal
neuronal inclusions, developmental anomalies, hippocampal
sclerosis or neoplasia.

FINAL NEUROPATHOLOGIC DIAGNOSIS:

A.    Cerebrovascular congestion.

B.    Basal ganglia calcification, mild; incidental finding.

JOHN M. ANDREWS, M.D.                    DATE    12/9/08
DEPUTY MEDICAL EXAMINER
NEUROPATHOLOGY CONSULTANT

JMA:am/hg:c
T-12/04/08

76F3591Rev 8/03)

COUNTY OF LOS ANGELES        **FORENSIC CONSULTANT'S REPORT**        DEPARTMENT OF CORONER

**13**

NEUROPATHOLOGY

2008-07210

MIMS, CHRISTOPHER E.

Page 3

Coronal sections reveal the cortical ribbon to be normal in
thickness and color. Gray/white demarcation is distinct.
Underlying white matter is homogeneous and clear. Corpus
callosum is normal in thickness, color and symmetry. Lateral
ventricles are normal in size and configuration with sharp
superior angles. A cavum septi pellucidi is present
anteriorly without fenestration of septum pellucidum. Third
ventricle is midline and does not exceed 0.3 cm in maximum
transverse diameter. Cerebral aqueduct and fourth ventricle
are unremarkable. Choroid plexus is unremarkable
bilaterally. Mammillary bodies and pineal body are grossly
unremarkable. Substantia nigra is normally pigmented. Basal
ganglia are normal in size, symmetry, contour and color.
Amygdaloid complex of nuclei and hippocampi are grossly
unremarkable.

Multiple transverse sections of the brainstem and cerebellum
reveal no abnormality.

Selected areas are retained in storage. Representative
sections are submitted for microscopic examination.

GROSS IMPRESSIONS:

A.    Adult cranial dura mater with small right middle fossa
      dural nodule.

B.    Cerebrovascular congestion.

C.    Otherwise, grossly unremarkable adult brain and
      coverings.


JOHN M. ANDREWS, M.D.                    12-3-08
DEPUTY MEDICAL EXAMINER                  DATE
NEUROPATHOLOGY CONSULTANT

JMA:am/hg:c
T-11/21/08

76F589(Rev 8/93)

COUNTY OF LOS ANGELES                    **MICROSCOPIC REPORT**                    DEPARTMENT OF CORONER

## 14

I performed a microscopic examination on

DECEMBER 4, 2008

at ___THE DEPARTMENT OF CORONER___

Los Angeles, California

2008-07210

MIMS, CHRISTOPHER E.

### MICROSCOPIC DESCRIPTION

<u>Slides #1,2,3 and 4/10</u>:  Sections of cardiac muscle show patchy areas of significant, severe interstitial fibrosis.  There are focal areas of myocyte hypertrophy, myocyte attenuation, and myocyte fiber disarray.  Slide #4 shows an adherent blood clot with fibrin, red cells and acute inflammation.

There is no acute or chronic myocarditis.

The trichrome stain confirms the abundant interstitial fibrosis, and one cross-section of the left anterior descending coronary artery shows minimal fibrointimal hyperplasia.

<u>Slide #5/10</u>:  Section of unremarkable right ventricle.

<u>Slides #6 and #7/10</u>:  Sections of lung show interstitial red blood cell congestion and pulmonary edema.  Focal lung atelectasis is present.  There are a few foreign body giant type cells and abundant alveolar macrophages.  No pneumonia is observed.  These sections are polarized and are unremarkable with some non- and refractile particles of nonspecific nature.

<u>Slide #8/10</u>:  Section of liver with moderate steatosis.  No cirrhosis is observed.

Section of autolyzed spleen with red blood cell congestion and numerous microvacuoles.

<u>Slide #9/10</u>:  Sections of autolyzed kidney; otherwise, unremarkable.

76M350 (Rev. 1/93) P1/93

COUNTY OF LOS ANGELES          MICROSCOPIC REPORT          DEPARTMENT OF CORONER

# 14

2008-07210

MIMS, CHRISTOPHER E.

Page ___2___

Slide #10/10: Section of skin from the dorsum of the right foot with hyperkeratosis and subepidermal focal slight inflammation.

NOTE: No sickled red blood cells are observed.


_____          ___1-17-2009___
LOUIS A. PENA, M.D.                   DATE
DEPUTY MEDICAL EXAMINER

LAP:am/brr:c/f
T-12/17/08

(Rev 2-92)

-3486-

COUNTY OF LOS ANGELES                    AUTOPSY CHECK SHEET                    DEPARTMENT OF CORONER

# 16

TP1C
2008-07210          341
mims, christopher
LP 10-16-08

& = unremark. / none

**EXTERNAL EXAM**
Sex mate
Race Black
Age 38 y.o.
Height 80"
Weight 456 pds
Hair Black
Eyes corneal cloudiy
Sclera congested
Teeth own
Mouth
Tongue & septum Intact
Nose & Tardieu spots - positional
Chest &
Breasts &
Abdomen obese
Scar &
Genitals circum & testo &
Edema &
Skin see diagram # 20
Decubitus &, o/09
**HEART** Wt. 1, o/09
Dilated   Pericardium &            RV 0.4cm
          Hypertrophy &            LV 1.5cm
          Dilation &
          Muscle &       Septum 2.0cm
          Valves &   TV = 15cm, PV = 10cm, MV = 15cm, AV = 10cm
          Coronaries &
**AORTA** minimal Atherosclerosis
**VESSELS** &   No pulmonary
**LUNGS** Wt.        Emboli
          R 1050g
          L 1030g
          Adhesions &
          Fluid &
          Atelectasis &
          Oedema sev.
          Congestion &
          Consolidation &
          Bronchi Secretions
          Nodes enlarged
**PHARYNX** &
**TRACHEA** secretion
**THYROID** &
**THYMUS** &
**LARYNX** &
**HYOID** &
**ABDOMINAL WALL FAT** 8cm
          CHEST WALL FAT 6cm

**PERITONEUM**
Fluid &
Adhesions &
LIVER Wt. 3200g chronic Hep.
          Capsule Intact congestion
          Lobules &
          Fibros &
          GB + minimal green Liquid Bile
          Calculus &
          Bile ducts &
SPLEEN Wt. 220g   slight
          Color purple   cong./megaly
          Consistency soft   spleno
          Capsule Intact
          Malpigment &
**PANCREAS** &
**ADRENALS** &
**KIDNEYS** Wt.         pitted, Pecalls
          R 330g
          L 310g
          Capsule Intact
          Cortex &
          Vessels &
          Pelvis &
          Ureters &
**BLADDER** contracted, No urine.
**GENITALIA**
          Prostate &
          Testes &, No trauma ,
          Uterus &
          Tubes &
          Ovaries &
**OESOPHAGUS** &
**STOMACH** - Contents 150ml green well-Dig Foul, Liquid present
**DUOD. & SM. INT.** Soft green stool
**APPENDIX** +
**LARGE INT.** + Soft green stool
**ABDOM. NODES** &
**SKELETON**
          Spine EXT. &
          Marrow R/B &
          Rib Cage &
          Long bones &
          Pelvis &
          No Fractures

SCALP &
CALVARIUM &
BRAIN Wt. 1440g
          Dura &
          Fluid &      See separate
          Ventricles &   Neuropath
          Vessels &      report
          Middle ears &
          Other &
PITUITARY &

SPINAL CORD cervical
          Sup. portion
          spinal cord &

**TOXICOLOGY SPECIMENS**
blood - Heart, Fem-
Liver, Stomach, vitreous, Bile
SECTIONS FOR   (10)
HISTOPATHOLOGY
1. & RV & Kidney
2. & R Lung  10. R Decism Foot skin
3. & L Lung
4. & Liver, Spleen   & Stock Jar
MICROBIOLOGY &

DIAGRAMS #20
X-RAYS &

OTHER PROCEDURES &

GROSS IMPRESSIONS
See A-Bull Form # 12
Dictated Report &

| Date 10-16-2008 | Time -17:00 end | Deputy Medical Examiner  Louis A. Pena M.D. |

-3487-

COUNTY OF LOS ANGELES                **MEDICAL REPORT**                DEPARTMENT OF CORONER

**15**

AUTOPSY CLASS: ☐ A ☒ B ☐ C   ☐ Examination Only D

Date _10-16-2008_ Time _1525_ Dr. _Louis A. Peña_
                                                         print

FINAL ON _12-11-2008_ By _Louis A. Peña_
                                                         print

| APPROXI-MATE INTERVAL BETWEEN ONSET AND DEATH |

2008-07210
MIMS, CHRISTOPHER

_LP_
_10-16-08_

DEATH WAS CAUSED BY: (Enter only one cause per line for A, B, C, and D)

**IMMEDIATE CAUSE**

(A) _Dilated Cardiomyopathy_ ◄ _yrs_

DUE TO, OR AS A CONSEQUENCE OF

(B) ◄

DUE TO, OR AS A CONSEQUENCE OF

(C) ◄

DUE TO, OR AS A CONSEQUENCE OF

(D) ◄

Other conditions contributing but not related to the immediate cause of death:

_Hepatic Steatosis, History of Hypertension_

☒ **NATURAL**    ☐ **SUICIDE**    ☐ **HOMICIDE**

☐ **ACCIDENT**    ☐ **COULD NOT BE DETERMINED**

If other than natural causes
HOW DID INJURY OCCUR?

WAS OPERATION PERFORMED FOR ANY CONDITION STATED ABOVE: ☐ YES ☒ NO

TYPE SURGERY_____ DATE_____

☐ ORGAN PROCUREMENT    ☒ TECHNICIAN _George Reid_

☐ WITNESSES TO AUTOPSY    ☐ EVIDENCE RECOVERED AT AUTOPSY
        ☒                          Item Description: ☒

38 y.o. B.M. H/o HTN.
S-ports related Knee Inj. ↓ EtOH Abuse.
10-15-08 FND Lying on B.R. Floor unrespon.
at residence pronounced 0935am.
Appar. a smoker, Drank ~1 gal EtOH Vodka/day.
C/o Labored Breathing 10-14-08. LWA 10-14-08 2230.

Autopsy - Dilated "Cardiomyopathy" 1,010 grams
No CAD. Aort Disease. Hepatomeg. Suv Chronic Hep.
Cmg → CHF. Indirect Myocard. Dysfunct. HTN D Discase
No P.E. No Evid. Ext/Int. Trauma. _LP_

_10-16-2008_

_Louis A. Peña_ M.D.

Resident _____    _Louis A. Peña_
                              DME

WHITE - FILE COPY   CANARY - FORENSIC LAB   PINK - INVESTIGATIONS   GOLDENROD - DME          Rev. 1/99

---

**PRIOR EXAMINATION REVIEW BY DME**
☒ BODY TAG          ☐ CLOTHING
☐ X-RAY (No. _0_ )  ☐ FLUORO
☐ SPECIAL           ☐ MED. RECORDS
PROCESSING TAG
☒ AT SCENE PHOTOS (No _34_ )

TYPING BLOOD TAKEN BY_____
SOURCE_____

**TOXICOLOGY**

☐ NO BLOOD
☐ Embalmed
☐ >24 hr in hospital
☐ Decomposed
☐ Other_____
                Reason

**SPECIMENS**
Collected by _Louis A. Peña_
☒ HEART BLOOD        ☒ STOMACH CONT.
☒ FEMORAL BLOOD      ☐ BRAIN
☐ _____ BLOOD       ☐ SPLEEN
☐ _____ BLOOD       ☐ KIDNEY
☒ BILE               ☒ VITREOUS
☒ LIVER              ☐ _____
☒ URINE _none_       ☐ _____

**STORAGE JARS**
☒ Regular (No _1_ )   ☐ Oversize (No ___)
Histopath Cut: ☒ Autopsy   ☐ Lab

☐ NO TOXICOLOGY REQUESTED

**TOXICOLOGICAL ANALYSES ORDERED**
SCREEN: ☒ C ☐ H ☐ T ☐ S
☐ ALCOHOL ONLY
☐ CARBON MONOXIDE
☐ NEOGEN SCREEN
☒ OTHER (specify drug and tissue)
_Vitreous - glucose, Ketones_ _Tox?_

**REQUESTED MATERIAL ON PENDING CASES**
☐ Police Report      ☐ Med History
☒ Tox                ☒ Histo
☐ Microbiology       ☐ Investigations
☐ Radiology Cons.    ☐ Eye Path. Cons
☐ Consult on
☒ Brain Submitted
☒ Neuro Consult  ☐ DME to Cut
☐ Criminalistics
☐ GSR   ☐ Sexual Assault   ☐ Other

_10 cassettes_

-3488-




Department of Coroner, County of Los Angeles

# FORENSIC SCIENCE LABORATORIES
### Laboratory Analysis Summary Report

Friday, November 07, 2008

☑ PendingTox

**To:**   Dr. Pena
**Deputy Medical Examiner**

**Subject:**   **Coroner Case Number**   2008-07210   MIMS, CHRISTOPHER EDDIE

The following results have been technically and administratively reviewed and are the opinions and interpretations of the Analyst:

| SPECIMEN | SERVICE | DRUG | LEVEL | UNITS | ANALYST |
|---|---|---|---|---|---|
| **Blood, Femoral** | | | | | |
| | Alcohol | Ethanol | 0.11 | g% | M. Schuchardt |
| | Volatiles | Acetone | | ND | M. Schuchardt |
| **Blood, Heart** | | | | | |
| | Alcohol | Ethanol | 0.09 | g% | M. Schuchardt |
| | Barbiturate | Barbiturates | | ND | D. Kowal |
| | Bases | Diphenhydramine | < 0.50 | ug/ml | S. DeQuintana |
| | Cocaine | Cocaine and Metabolites | | ND | D. Kowal |
| | Fentanyl | Fentanyl | | ND | D. Kowal |
| | Methamphetamine | Methamphetamine | | ND | D. Kowal |
| | Opiates | Codeine | | ND | D. Kowal |
| | Opiates | Morphine | | ND | D. Kowal |
| | Phencyclidine | Phencyclidine | | ND | D. Kowal |
| | Volatiles | Acetone | | ND | M. Schuchardt |
| **Vitreous** | | | | | |
| | Alcohol | Ethanol | 0.14 | g% | M. Schuchardt |
| | Outside Test | Glucose | < 20 | mg/dl | NMS Labs, Inc. |
| | Volatiles | Acetone | | ND | M. Schuchardt |

Legend:
- - - - -
% Saturation
*
Done
g          Grams
g%         Gram Percent
Inc.       Inconclusive
mEq/l      Milli equivalents
mg         Milligrams
mg/dl      Milligram per Deciliter
mg/l       Milligram per Liter
mmol/l     Millimoles per Liter
ND         Not Detected
Negative
ng/gm      Nanograms per Gram

QNS    Quantity Not Sufficent
TNP    Test Not Performed
Trace
ug     Micrograms
ug/g   Micrograms per Gram
ug/l
ug/ml  Microgram per Milliliter

dP
11-1306

Administratively reviewed by:  **Daniel T. Anderson**
*Supervising Criminalist II*
**FORENSIC LABORATORIES**

Page 1 of 2



Department of Coroner, County of Los Angeles
# FORENSIC SCIENCE LABORATORIES
### Laboratory Analysis Summary Report



Friday, November 07, 2008

**To:**   Dr. Pena          ☑ PendingTox
**Deputy Medical Examiner**

**Subject:**   **Coroner Case Number**   2008-07210   MIMS, CHRISTOPHER EDDIE

The following results have been technically and administratively reviewed and are the opinions and interpretations of the Analyst:

| SPECIMEN | SERVICE | DRUG | LEVEL | UNITS | ANALYST |
|----------|---------|------|-------|-------|---------|

**Legend:**

- - - - -
% Saturation
*
Done

| | |
|---|---|
| g | Grams |
| g% | Gram Percent |
| Inc. | Inconclusive |
| mEq/l | Milli equivalents |
| mg | Milligrams |
| mg/dl | Milligram per Deciliter |
| mg/l | Milligram per Liter |
| mmol/l | Millimoles per Liter |
| ND | Not Detected |
| Negative | |
| ng/gm | Nanograms per Gram |

| | |
|---|---|
| QNS | Quantity Not Sufficent |
| TNP | Test Not Performed |
| Trace | |
| ug | Micrograms |
| ug/g | Micrograms per Gram |
| ug/l | |
| ug/ml | Microgram per Milliliter |



**Administratively reviewed by:**   Daniel T. Anderson
Supervising Criminalist II
**FORENSIC LABORATORIES**

Page 2 of 2

COUNTY OF LOS ANGELES

CASE REPORT EDRS# 916134  B Peng

DEPARTMENT OF CORONER

| 1 | APPARENT MODE | NATURAL | | CASE NO. 2008-07210 |
|---|---|---|---|---|
| | SPECIAL CIRCUMSTANCES | Media Interest | | CRYPT 341 |

| LAST, FIRST MIDDLE | AKA | # |
|---|---|---|
| MIMS, CHRISTOPHER EDDIE | | |

| ADDRESS | | | | | | | CITY | | STATE | ZIP |
|---|---|---|---|---|---|---|---|---|---|---|
| 612 S. FLOWER ST APT #409 | | | | | | | LOS ANGELES | | CA | 90017 |

| SEX | RACE APPEARS | DOB | AGE | HGT | WGT | EYES | HAIR | TEETH | FACIAL HAIR | ID VIEW | CONDITION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| MALE | BLACK | 9/29/1970 | 38 | 80 in. | 456 lbs. | BROWN | BLACK | ALL NATURAL TEETH | BEARD AND MUSTACHE | Yes | FAIR |

| MARK TYPE | MARK LOCATION | MARK DESCRIPTION |
|---|---|---|
| TATTOO | LEFT ARM | "BALLS OF STEEL" |
| TATTOO | RIGHT ARM | "TOUGH AS NAILS" |
| SCAR | BOTH KNEES | HEALED SCARS |
| TATTOO | LEFT ARM | "FAT DOCTOR" |

| NOK | | ADDRESS | | CITY | | STATE | ZIP |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

| RELATIONSHIP | PHONE | NOTIFIED BY | | DATE | TIME |
|---|---|---|---|---|---|
| SEE CASE NOTES | | | | | 00:00 |

| SSN | DL ID | STATE CA | PENDING BY |
|---|---|---|---|

| ID METHOD |
|---|
| VISUALLY AT SCENE |

| LA # | MAIN # | CII # | FBI # | MILITARY # | POB |
|---|---|---|---|---|---|
| 2020867M | 04072535 | | | | |

| IDENTIFIED BY NAME (PRINT) | RELATIONSHIP | PHONE | DATE | TIME |
|---|---|---|---|---|
| LAHOMA GRIFFIN | EX-WIFE | (562) 313-3666 | 10/15/2008 | 13:06 |

| PLACE OF DEATH / PLACE FOUND | ADDRESS OR LOCATION | CITY | ZIP |
|---|---|---|---|
| RESIDENCE | 612 S. FLOWER ST APT #409 | LOS ANGELES | 90017 |

| PLACE OF INJURY | AT WORK | DATE | TIME | LOCATION OR ADDRESS | ZIP |
|---|---|---|---|---|---|
| | No | | | | |

| DOD | TIME | FOUND OR PRONOUNCED BY |
|---|---|---|
| 10/15/2008 | 09:35 | LAFD # 3 |

| OTHER AGENCY INV. OFFICER | PHONE | REPORT NO. | NOTIFIED BY | NO |
|---|---|---|---|---|
| LAPD CENTRAL - SUVIATE/ MILLER | (213) 485-3294 | | | |

| TRANSPORTED BY | TO | DATE | TIME |
|---|---|---|---|
| RAMIRO GONZALEZ JR. | LOS ANGELES FSC | 10/15/2008 | 13:55 |

| FINGERPRINTS? | Yes | CLOTHING | Yes | PA RPT | No | MORTUARY | |
|---|---|---|---|---|---|---|---|
| MED. EV. | Yes | INVEST. PHOTO # | 34 | SEAL TYPE | CORONER SEAL | HOSP RPT | No |
| PHYS. EV. | No | EVIDENCE LOG | Yes | PROPERTY? | Yes | HOSP CHART | No |
| SUICIDE NOTE | No | GSR NO | | RCPT. NO. | 233635 | PF NO. | |

SYNOPSIS

ACCORDING TO THE REPORTED INFORMATION, THE DECEDENT WAS A 38 YEAR OLD BLACK MALE WITH A HISTORY OF HYPERTENSION, SPORTS RELATED KNEE INJURIES, AND ALCOHOL ABUSE. ON 10/15/08 AT 0900 HOURS, THE DECEDENT WAS FOUND LYING ON THE BATHROOM FLOOR, UNRESPONSIVE. 911 WAS CALLED AND LOS ANGELES FIRE DEPARTMENT #3 RESPONDED TO THE SCENE AND DETERMINED DEATH ON 10/15/08 AT 0935 HOURS. DECEDENT APPARENTLY SMOKED TOBACCO HEAVILY AND DRANK ABOUT 1 GALLON OF VODKA DAILY. DECEDENT COMPLAINED OF LABORED BREATHING ON 10/14/08, THE DECEDENT WAS LAST SEEN ALIVE ON 10/14/08 AT 2230 HOURS BY FRIEND. NO FOUL PLAY SUSPECTED.

| LYDIA GRANADO-MATA | | DATE 10/15/2008 | REVIEWED BY | DATE 10/15/08 |
|---|---|---|---|---|
| S16235 | INVESTIGATOR | TIME 17:05 | Yagerlener | TIME 2013 |

FORM #3 NARRATIVE TO FOLLOW? ☑

 

## County of Los Angeles, Department of Coroner
## Investigator's Narrative

Case Number: 2008-07210                    Decedent: MIMS, CHRISTOPHER EDDIE

### Information Sources:

1.  LAPD Central Division, Officer Suviate #35743 & Miller #39293. 213-485-3294.

### Investigation:

On 10/15/08 at 1039 hours, Officer Miller of LAPD Central Division reported this apparent natural death. On 10/15/08 at 1107 hours, I was assigned this field call. I arrived on scene at 1158 hours and departed at 1326 hours. No foul play suspected. The apartment was secured with a coroner seal.

### Location:

The death occurred at a residence, 612 S. Flower St. Apt. #409, Los Angeles, CA 90017.

### Informant/Witness Statements:

According to the information obtained from Officer Suviate and Miller, the decedent was last seen alive on 10/14/08 at 2230 hours and apparently complained of labored breathing. On 10/15/08 at about 0900 hours, the decedent was found unresponsive on the bathroom floor by a friend. 911 was dialed and Los Angeles Fire Department responded to the scene and determined death at 0935 hours. Per officers, the decedent abused alcohol, drinking about 1 gallon of vodka daily. The decedent reportedly drank to the point of passing out and when he would wake, would continue to drink. The decedent also smoked heavily, going through about 1 pack of cigarettes daily. The decedent's medical history included hypertension and a knee surgery about 7 months ago.

### Scene Description:

The scene was an apartment at the above listed location. The apartment appeared dirty, cluttered, and unkempt. Several medication bottles were located on the kitchen cabinet. Two large bottles of vodka were noted on top of the refrigerator and appeared empty. The decedent was located in the bathroom. The bathroom appeared dirty and contained several large duffle bags. The scene appeared to be void of any illicit drugs and drug paraphernalia.

### Evidence:

On 10/15/08 at 1221 hours, I collected several prescription medication bottles from the scene. I booked the items as evidence at the FSC.

### Body Examination:

The decedent appeared to be a 38 year old Black male. He was observed lying prone on wooden floor inside the bathroom. His arms were bent up at the elbow with his hands closed and resting near his head and his right leg straight with the left leg bent at the knee and turned out at the hip. A brown towel was noted under his head and appeared to be soiled with bloody, frothy purge. He appeared to be dressed in a blue shirt and blue underwear. He appeared to have black hair, brown eyes, beard and mustache and apparent natural teeth. The following tattoos were noted: right arm-"TOUGH AS NAILS", nails with the initials "C. MIMS", right arm- cougar, right wrist-tribal band, left arm-"FAT DOCTOR", "A" playing cards, male face, left arm- "BALLS OF STEEL." I observed healed scars to the knees, abdomen, back, and feet. No petechiea was noted. Lesions/ wounds were noted to the left calf, right shin, and lower right calf. No trauma was noted. On 10/15/08 at 1231 hours, rigor mortis was rated 3 throughout; and at 1234 hours, livor mortis appeared fixed and consistent with the position found. The ambient temperature on 10/15/08 at 1225 hours was 72.3 degrees F, and algor mortis was 101.2 degrees F at 0830 hours 1236 hours.



**County of Los Angeles, Department of Coroner
Investigator's Narrative**



Case Number:  2008-07210                    Decedent: MIMS, CHRISTOPHER EDDIE

## Identification:

On 10/15/08 at 1306 hours, ▓▓▓▓▓▓▓▓ visually identified the decedent as Mims, Christopher Eddie.

## Next of Kin Notification:

Please see case notes.

## Tissue Donation:

At the completion of this report, family did not give permission for tissue donations.

## Autopsy Notification:

There is no request for autopsy notification regarding this particular case.

_L. Granado Mata_                          _Kelly Yagerlener_

LYDIA GRANADO-MATA      516235          LARRY DIETZ

10/15/2008

_____

Date of Report

COUNTY OF LOS ANGELES **PRELIMINARY EXAMINATION REPORT - FIELD** DEPARTMENT OF CORONER

# 6

WAS ORIGINAL SCENE DISTURBED BY OTHERS? Y[ ] N[X]
IF YES, NOTE CHANGES IN NARRATIVE FORM #3.

DATE _____ 10/15/2008 _____

| | | |
|---|---|---|
| AMBIENT #1 __72.3__ F | TIME __12:25__ | |
| AMBIENT #2 _____ F | TIME _____ | |
| WATER _____ F | TIME _____ | |

LIVER TEMPERATURE #1 __101.2__ F TIME __12:36__

LIVER TEMPERATURE #2 _____ F TIME _____

**2008-07210**

**MIMS, CHRISTOPHER EDDIE**
**Nat**
**DOD- 10/15/2008**

THERMOMETER # __07-17__

DATE & TIME FOUND __10/15/2008 @ 9:00__    LAST KNOWN ALIVE __10/14/2008 @ 22:30__

APPROX. AGE __38__ SEX __Male__ EST. HEIGHT __80__ EST. WEIGHT __456__ CLOTHED ? YES[X] NO[ ] IF YES, DESCRIBE:

Blue Shirt, Blue Underwear

DESCRIPTION AS TO WHERE REMAINS FOUND AND CONTACT MATERIAL TO BODY:

Prone on wood floor

SCENE TEMPERATURE REGULATED? YES [ ] NO[X] IF YES, THERMOSTAT SET AT _____ DEGREES F.

LIVOR MORTIS: TIME OBSERVED __12:34__     RIGOR MORTIS: TIME OBSERVED __12:31__

NECK FLEXION:

| | |
|---|---|
| ANTERIOR | 3 |
| POSTERIOR | 3 |
| RT. LATERAL | 3 |
| LT. LATERAL | 3 |

| | | | |
|---|---|---|---|
| JAW | 3 | HIP | 3 |
| SHOULDER | 3 | KNEE | 3 |
| ELBOW | 3 | ANKLE | 3 |
| WRIST | 3 | | |

SCALE
0 = ABSENT / NEGATIVE
1 +
2 +
3 +
4 = EXTREME DEGREE

USE SCALE TO DESCRIBE INTENSITY OF RIGOR

SHADE DIAGRAMS TO ILLUSTRATE THE LOCATION OF LIVOR MORTIS.

DESCRIBE INTENSITY OF COLORATION AND WHETHER LIVOR MORTIS IS PERMANENT OR BLANCHES UNDER PRESSURE

*Appeared fixed and consistent with position found.*

**L. Granado-Mata # 516235**

Investigator

REVIEWED BY:

NOTE: ALL DATA COLLECTED FOR THIS FORM MUST BE COLLECTED AT SCENE.

COUNTY OF LOS ANGELES                    MEDICAL EVIDENCE                    DEPARTMENT OF CORONER

**3A**

| CASE # | 2008-07210 |
| DECEDENT'S NAME: | MIMS, CHRISTOPHER EDDIE |
| DOD: | 10/15/2008 |
| INCOMING MODE: | |

Page 1 of 1

| Drug Name | Rx Number | Date of Issue | Number Issued | Number Remaining | Form | Dosage | Rx Directions | Physician | Pharmacy Phone/ Comments |
|---|---|---|---|---|---|---|---|---|---|
| ALLOPURINOL | 06383 01468 | 9/30/2008 | 30 | 19 | TABLET | 300 MG | 1 TAB DAILY | KALPARI, KAMRAN | RITE AID 213-494-1762 |
| ATENOLOL | 06383 01395 | 7/25/2008 | 90 | 14 | TABLET | 100 MG | 1 TAB DAILY | KALPARI, KAMRAN | RITE AID 213-494-1762 |
| BAYER ASPIRIN | | | 100 | 40 | TABLET | 325 MG | 1-2 TABS EVERY 4 HRS | | OTC MED |
| DIOVAN | | | 7 | 0 | TABLET | 320 MG/25 MG | | | SAMPLE BOTTLE |
| INDOMETHACIN | 05785 05748 | 2/1/2008 | 40 | 3 | CAPSULE | 50 MG | 1 CAP 4X DAILY | KALPARI, KAMRAN | RITE AID 213-494-1762 |
| LOTREL | 06383 01383 | 9/30/2008 | 14 | 0 | CAPSULE | 10-40 MG | 1 CAP DAILY | KALPARI, KAMRAN | RITE AID 213-494-1762 |
| NEXIUM | 063836 0144 | 10/6/2008 | 5 | 0 | CAPSULE | 40 MG | 1 CAP DAILY | KALPARI, KAMRAN | RITE AID 213-494-1762 |
| TYLENOL PM | | | 24 | 0 | TABLET | 500 MG/ 25 MG | 2 CAPLETS @ BEDTIME | | OTC MED |
| | | | | | | | | | |
| | | | | | | | | | |

**Paraphernalia Description**

(1) UNLABELED RX BOTTLE CONTAINING 53 CLEAR GEL CAPS; (2) CEPHALEXIN, 250 MG- ORANGE CAPSULES WITH "93 3147", (2) VALSARTAN, 320 MG- GRAY TEAR DROP SHAPED TABLET WITH "NVR" ON ONE SIDE & "DXL" ON OTHER SIDE.

| Investigator: |
| LYDIA GRANADO-MATA (516235 |
| Date: |
| 10/15/2008 |

 **CONCUSSION SETTLEMENT**
*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

### PRE-EFFECTIVE DATE DIAGNOSING PHYSICIAN CERTIFICATION FORM
**(for diagnoses made by physicians who are qualified to render Qualifying Diagnoses for purposes of Monetary Award claims before January 7, 2017)**

This Pre-Effective Date Diagnosing Physician Certification Form is to be used only by physicians qualified to render Qualifying Diagnoses before January 7, 2017, in connection with the Class Action Settlement in <u>In re: National Football League Players' Concussion Injury Litigation</u> and who made a Qualifying Diagnosis before January 7, 2017. The Qualifying Diagnoses are found in Appendix A to this Pre-Effective Date Diagnosing Physician Certification Form.

Use this form to certify a Qualifying Diagnosis you made before January 7, 2017, based on your personal examination of the Retired NFL Football Player. **Do not sign this form unless you personally examined the player** or, in the case of a Qualifying Diagnosis of Death with CTE, you are the board-certified neuropathologist who made the post-mortem diagnosis of CTE. If you made a Qualifying Diagnosis as a Qualified MAF Physician on or after January 7, 2017, do not use this form; use the MAF Diagnosing Physician Certification Form instead. Also, if you are a Qualified BAP Provider certifying a diagnosis you made in the Baseline Assessment Program, do not use this form; use the BAP Diagnosing Physician Certification Form instead.

You must complete this form in its entirety, sign it under penalty of perjury, and return it to the patient along with copies of all supporting medical records that you created or received in connection with the Qualifying Diagnosis. In turn, the patient, or the patient's counsel, must submit this form and all supporting medical records referred to above to the Claims Administrator as part of a claim for compensation under the Class Action Settlement. The Claims Administrator will review the form, including your qualifications to provide the Qualifying Diagnosis, and the supporting medical records. All claims also are subject to audit. Any finding of fraudulent conduct by you will be subject to, without limitation, your referral to appropriate regulatory and disciplinary boards and agencies and/or federal authorities, and your disqualification from serving in any aspect of the Class Action Settlement.

You are required to preserve all supporting medical records that you created or received in connection with the Qualifying Diagnosis for the greater of: (a) 10 years after January 7, 2017; or (b) the period of time required under applicable state and federal laws.

If you have any questions, call the Claims Administrator toll free at 1-855-887-3485 or visit the Settlement Website at https://www.nflconcussionsettlement.com.

## PRE-EFFECTIVE DATE DIAGNOSING PHYSICIAN CERTIFICATION FORM
### (for diagnoses made by physicians who are qualified to render Qualifying Diagnoses for purposes of Monetary Award claims before January 7, 2017)

### I. PATIENT INFORMATION

| Settlement Program ID (if known) | | 950013395 | | |
|---|---|---|---|---|
| **Name:** | First<br>Christopher | M.I. | Last<br>Mims | Suffix |

| **Address:** | Address 1<br>1715 W. 70Th Street | |
|---|---|---|
| | Address 2 | |
| | City<br>Los Angeles | |
| | State/Province<br>CA | |
| | Postal Code<br>90047 | Country<br>United States |

| **Telephone** | \|\_\|\_\|\_\| - \|\_\|\_\|\_\| - \|\_\|\_\|\_\|\_\| |
|---|---|
| **Date of Birth** | 0 9 / 2 9 / 1 9 7 0<br>(Month/Day/Year) |
| **Date of Death** (if applicable) | 1 0 / 1 5 / 2 0 0 8<br>(Month/Day/Year) |

### II. DIAGNOSING PHYSICIAN INFORMATION

| National Provider Identifier (NPI) | | 1013980978 | | |
|---|---|---|---|---|
| **Physician Name** | First<br>Ronald | M.I.<br>L. | Last<br>Hamilton | Suffix |

**(a) Are you approved as a Qualified BAP Provider or a Qualified MAF Physician?**

☐ **YES.** If YES, you do not need to fill out the rest of this Section II or Sections III or IV. Instead, go to Section V.

☒ **NO.**

**(b) If you answered No, have you previously completed this form for another Retired NFL Football Player, that you know was submitted to the Claims Administrator?**

☐ **YES.** If YES, you do not need to fill out this Section II or Sections III or IV. Instead, go to Section V.

☒ **NO.**

If you answered No to both questions, fill out the rest of this Section II and then go to Section III.

---

## PRE-EFFECTIVE DATE DIAGNOSING PHYSICIAN CERTIFICATION FORM
### (for diagnoses made by physicians who are qualified to render Qualifying Diagnoses for purposes of Monetary Award claims before January 7, 2017)

| Office/Practice Name | University of Pittsburgh Medical Center | |
|---|---|---|
| **Address** | Address 1<br>A724.1 Scaife Hall | |
| | Address 2<br>200 Lothrop Street | |
| | City<br>Pittsburgh | |
| | State/Province<br>Pennsylvania | |
| | Postal Code<br>15213 | Country<br>USA |
| Telephone | 4 1 2 - 6 2 4 - 6 6 1 0 | |
| Fax | 4 1 2 - 6 2 4 - 5 4 8 8 | |
| Email Address | hamiltonrl@upmc.edu | |

## III.   BOARD CERTIFICATIONS

Check all board certifications that apply and list the board providing the certification and any identification number provided by the board (*e.g.*, American Board of Psychiatry and Neurology diplomate number). If you do not have any board certifications, summarize your relevant medical training and experience and then go to Section IV.

| | Certification | Board | Board Identification Number | Effective Date | Expiration Date |
|---|---|---|---|---|---|
| ☐ | Neurology | | | | |
| ☐ | Neurosurgery | | | | |
| X | Neuropathology | American Board of Pathology | | certified: 5/23/1996<br>recertified:1/1/2014 | |
| ☐ | Neuropsychology | | | | |
| ☐ | Other Neuro-specialty | | | | |
| X | Other Board Certification | American Board of Pathology | | certified: 5/23/1996 | |

## PRE-EFFECTIVE DATE DIAGNOSING PHYSICIAN CERTIFICATION FORM
### (for diagnoses made by physicians who are qualified to render Qualifying Diagnoses for purposes of Monetary Award claims before January 7, 2017)

If you are not board-certified in a neuro-specialty area, summarize your relevant medical training and experience in the field of neurology and related fields that you believe qualifies you to make the diagnosis provided in Section V.

### IV.    OTHER QUALIFICATIONS

| Educational Information | | Education Level | Institution | Degree/Area of Focus | Date Received |
|---|---|---|---|---|---|
| | 1. | **Undergraduate Education** | University of Nebraska-Lincoln | B.S / Psychology | 1 9 8 5 (Month/Year) |
| | 2. | **Medical School** | University of Nebraska Medical Center | M.D. | 1 9 8 9 (Month/Year) |
| | 3. | **Internship** | Univ. of California, San Diego | Resident Anatomic Pathology | 1 9 9 1 (Month/Year) |
| | 4. | **Residency** | Univ. of California, San Diego | Resident Neuropathology | 1 9 9 3 (Month/Year) |
| | 5. | **Fellowship** | Univ. of Pittsburgh | Fellow Neuropathology | 1 9 9 4 (Month/Year) |
| | 6. | **Other (Graduate)** | Univ. of Pittsburgh | Fellow: NIMH Training Grant in Neuroscience | 1 9 9 5 (Month/Year) |

| States Where Licensed to Practice | | State | State License Number | Effective Date | Expiration Date |
|---|---|---|---|---|---|
| | 1. | **California** | G69731 | 9/10/1990 | **Expired** |

---

**Pre-Effective Date Diagnosing Physician Certification Form**  **Page 4 of 17**

**PRE-EFFECTIVE DATE DIAGNOSING PHYSICIAN CERTIFICATION FORM**
**(for diagnoses made by physicians who are qualified to render Qualifying Diagnoses**
**for purposes of Monetary Award claims before January 7, 2017)**

|  | | | | |
|---|---|---|---|---|
| 2. | Pennsylvania | MD049717L | 5/12/1993 | 12/31/2018 |
| 3. | Indiana | 01067332A | 9/29/2009 | 10/31/2019 |
| 4. | | | | |
| 5. | | | | |
| 6. | | | | |

| Specialties | Check all specialties that apply. |
|---|---|
| | ☐ Neurology |
| | ☐ Neurosurgery |
| | ☒ Neuropathology |
| | ☐ Neuropsychology |
| | ☐ Other Neuro-specialty (e.g., brain injury medicine, clinical neurophysiology, etc.) |
| | ☒ Other Specialty (list all)    **Anatomic Pathology** |

## PRE-EFFECTIVE DATE DIAGNOSING PHYSICIAN CERTIFICATION FORM
### (for diagnoses made by physicians who are qualified to render Qualifying Diagnoses for purposes of Monetary Award claims before January 7, 2017)

### V. QUALIFYING DIAGNOSIS

Identify the patient's diagnosis and the date of such diagnosis. See ***Appendix A*** for the criteria for each diagnosis. Other than for Death with CTE, the identification of a condition, including through a blood test, genetic test, imaging technique, or otherwise, that has not yet resulted in actual cognitive impairment and/or actual neuromuscular impairment in the patient is **not** a Qualifying Diagnosis.

| Qualifying Diagnosis | Date of Diagnosis |
|---|---|
| ☐  Level 1.5 Neurocognitive Impairment | \|__\|__\|/\|__\|__\|/\|__\|__\|__\|__\| (Month/Day/Year) |
| ☐  Level 2 Neurocognitive Impairment* | \|__\|__\|/\|__\|__\|/\|__\|__\|__\|__\| (Month/Day/Year) |
| ☐  Alzheimer's Disease | \|__\|__\|/\|__\|__\|/\|__\|__\|__\|__\| (Month/Day/Year) |
| ☐  Parkinson's Disease | \|__\|__\|/\|__\|__\|/\|__\|__\|__\|__\| (Month/Day/Year) |
| ☐  ALS (amyotrophic lateral sclerosis) | \|__\|__\|/\|__\|__\|/\|__\|__\|__\|__\| (Month/Day/Year) |
| ☒  Death with CTE | \| 1 \| 0 \|/\| 1 \| 5 \|/\| 2 \| 0 \| 0 \| 8 \|* (Month/Day/Year) |

\* If you provided a diagnosis of Level 2 Neurocognitive Impairment, did you determine that certain testing was medically unnecessary because of the severity of the patient's dementia (*see **Appendix A***)?

☐  **YES**        ☐  **NO**

If you answered Yes, provide the factual basis for that determination:

*Pursuant to FAQ 93, Posted Settlement Program FAQs (as of November 7, 2018), for this claim, "the date of the Qualifying Diagnosis is the date of the Player's death, even though the diagnosis is not made until after the Player dies".

**PRE-EFFECTIVE DATE DIAGNOSING PHYSICIAN CERTIFICATION FORM**
**(for diagnoses made by physicians who are qualified to render Qualifying Diagnoses**
**for purposes of Monetary Award claims before January 7, 2017)**

## VI. CERTIFICATION

By signing below, I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that all information provided in this form, and all related supporting medical records, are true and correct to the best of my knowledge, information and belief, and that I personally examined the Retired NFL Football Player named in Section I or, in the case of a Qualifying Diagnosis of Death with CTE, I am the board-certified neuropathologist who made the post-mortem diagnosis of CTE.

I acknowledge that any finding of fraudulent conduct may subject me to, without limitation, referral to appropriate regulatory and disciplinary boards and agencies and/or federal authorities, and disqualification from serving in any aspect of the Class Action Settlement.

| Signature of Diagnosing Physician | | Date of Signature | 0 2 0 1 2 0 1 9 (Month/Day/Year) |
|---|---|---|---|
| Printed Name | First Ronald | M.I. L. | Last Hamilton |

## APPENDIX A

Other than for Death with CTE, the identification of a condition, including through a blood test, genetic test, imaging technique, or otherwise, that has not yet resulted in actual cognitive impairment and/or actual neuromuscular impairment experienced by the patient does not qualify as a diagnosis.

LEVEL 1.5 NEUROCOGNITIVE IMPAIRMENT

**The following diagnosis can only be made:**

(1) prior to July 7, 2014, by a board-certified neurologist, board-certified neurosurgeon, other board-certified neuro-specialist physician, or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician, except as provided in (c), below;

(2) from July 7, 2014 through January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified neurologist, board-certified neurosurgeon, or other board-certified neuro-specialist physician, except as provided in (c), below; or

(3) for a patient who died prior to January 7, 2017 (the Effective Date of the Settlement Agreement), where the diagnosis occurred while the patient was living, by a board-certified or otherwise qualified neurologist, neurosurgeon, or other neuro-specialist physician, or by a physician with sufficient qualifications in the field of neurology or neurocognitive disorders to make a diagnosis of Level 1.5 Neurocognitive Impairment:

A diagnosis made outside of the Baseline Assessment Program (BAP) that a living patient suffers from Level 1.5 Neurocognitive Impairment, as set forth below, *i.e.*, early dementia, based on evaluation and evidence generally consistent with the diagnostic criteria set forth and provided below:

There is: (i) Concern of the patient, a knowledgeable informant, or the Qualified BAP Provider that there has been a severe decline in cognitive function; (ii) Evidence of a moderate to severe cognitive decline from a previous level of performance, as determined by and in accordance with the standardized neuropsychological testing protocol annexed in *Appendix B*, in two or more cognitive domains (complex attention, executive function, learning and memory, language, perceptual-spatial), provided one of the cognitive domains is (a) executive function, (b) learning and memory, or (c) complex attention; (iii) The patient exhibits functional impairment generally consistent with the criteria set forth in the National Alzheimer's Coordinating Center's Clinical Dementia Rating scale Category 1.0 (Mild) in the areas of Community Affairs, Home & Hobbies, and Personal Care—where such functional impairment is corroborated by documentary evidence (*e.g.*, medical records, employment records), the sufficiency of which will be determined by the physician making the diagnosis (and where no documentary evidence of functional impairment exists or is available, then (a) there must be evidence of moderate to severe cognitive decline from a previous level of performance, as determined by and in accordance with the standardized neuropsychological testing protocol annexed in *Appendix B*, in the executive function cognitive domain or the learning and memory cognitive domain, and at least one other cognitive domain; and (b) the patient's functional impairment, as described above, must be corroborated by a third-party sworn affidavit from a person familiar with the patient's condition (other than the player or his family members), the sufficiency of which will be determined by the diagnosing physician); and (iv) The cognitive deficits do not occur exclusively in the context of a delirium, acute substance abuse, or as a result of medication side effects.

## LEVEL 2 NEUROCOGNITIVE IMPAIRMENT

**The following diagnosis can only be made:**

> **(1) prior to July 7, 2014, by a board-certified neurologist, board-certified neurosurgeon, other board-certified neuro-specialist physician, or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician, except as provided in (c), below;**

> **(2) from July 7, 2014 through January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified neurologist, board-certified neurosurgeon, or other board-certified neuro-specialist physician, except as provided in (c), below; or**

> **(3) for a patient who died prior to January 7, 2017 (the Effective Date of the Settlement Agreement), where the diagnosis occurred while the patient was living, by a board-certified or otherwise qualified neurologist, neurosurgeon, or other neuro-specialist physician, or by a physician with sufficient qualifications in the field of neurology or neurocognitive disorders to make a diagnosis of Level 2 Neurocognitive Impairment:**

A diagnosis made outside of the Baseline Assessment Program (BAP) that a living patient suffers from Level 2 Neurocognitive Impairment, as set forth below, *i.e.*, moderate dementia, based on evaluation and evidence generally consistent with the diagnostic criteria set forth and provided below, unless the diagnosing physician can certify in Section IV of the Diagnosing Physician Certification Form, above, that certain testing specified below for Level 2 Neurocognitive Impairment is medically unnecessary because the patient's dementia is so severe:

There is: (i) Concern of the patient, a knowledgeable informant, or the Qualified BAP Provider that there has been a severe decline in cognitive function; (ii) Evidence of a severe cognitive decline from a previous level of performance, as determined by and in accordance with the standardized neuropsychological testing protocol annexed in *Appendix B*, in two or more cognitive domains (complex attention, executive function, learning and memory, language, perceptual-spatial), provided one of the cognitive domains is (a) executive function, (b) learning and memory, or (c) complex attention; (iii) The patient exhibits functional impairment generally consistent with the criteria set forth in the National Alzheimer's Coordinating Center's Clinical Dementia Rating scale Category 2.0 (Moderate) in the areas of Community Affairs, Home & Hobbies, and Personal Care—where such functional impairment is corroborated by documentary evidence (*e.g.*, medical records, employment records), the sufficiency of which will be determined by the physician making the diagnosis (and where no documentary evidence of functional evidence exists or is available, then (a) there must be evidence of severe cognitive decline from a previous level of performance, as determined by and in accordance with the standardized neuropsychological testing protocol annexed in *Appendix B*, in the executive function cognitive domain or the learning and memory cognitive domain, and at least one other cognitive domain; and (b) the patient's functional impairment, as described above, must be corroborated by a third-party sworn affidavit from a person familiar with the patient's condition (other than the player or his family members), the sufficiency of which will be determined by the diagnosing physician); and (iv) The cognitive deficits do not occur exclusively in the context of a delirium, acute substance abuse, or as a result of medication side effects.

## ALZHEIMER'S DISEASE

(1) **The following diagnosis can only be made:**

> **(a) prior to July 7, 2014, by a board-certified neurologist, board-certified neurosurgeon, other board-certified neuro-specialist physician, or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician; or**

> **(b) from July 7, 2014 through January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified neurologist, board-certified neurosurgeon, or other board-certified neuro-specialist physician:**

A diagnosis in a living patient of the specific disease of Alzheimer's Disease as defined by the World Health Organization's International Classification of Diseases, 9th Edition (ICD-9), the World Health Organization's International Classification of Diseases, 10th Edition (ICD-10), or a diagnosis of Major Neurocognitive Disorder due to probable Alzheimer's Disease as defined in the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5).

(2) **The following diagnosis can only be made prior to January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician, or by a physician with sufficient qualifications in the field of neurology to make such a diagnosis, where the diagnosis was made while the patient was living but thereafter died prior to January 7, 2017 (the Effective Date of the Settlement Agreement):**

A diagnosis of Major Neurocognitive Disorder due to probable Alzheimer's Disease consistent with the definition in *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) or a diagnosis of Alzheimer's Disease.

## PARKINSON'S DISEASE

(1) **The following diagnosis can only be made:**

> **(a) prior to July 7, 2014, by a board-certified neurologist, board-certified neurosurgeon, other board-certified neuro-specialist physician, or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician; or**

> **(b) from July 7, 2014 through January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified neurologist, board-certified neurosurgeon, or other board-certified neuro-specialist physician:**

A diagnosis in a living patient of the specific disease of Parkinson's Disease as defined by the World Health Organization's International Classification of Diseases, 9th Edition (ICD-9), the World Health Organization's International Classification of Diseases, 10th Edition (ICD-10), or a diagnosis of Major Neurocognitive Disorder probably due to Parkinson's Disease as defined in the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5).

(2) **The following diagnosis can only be made prior to January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician, or by a physician with sufficient qualifications in the field of neurology to make such a diagnosis, where the diagnosis was made while the patient was living but thereafter died prior to January 7, 2017 (the Effective Date of the Settlement Agreement):**

A diagnosis of Parkinson's Disease.

## ALS

(1) The following diagnosis can only be made:

(a) prior to July 7, 2014, by a board-certified neurologist, board-certified neurosurgeon, other board-certified neuro-specialist physician, or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician; or

(b) from July 7, 2014 through January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified neurologist, board-certified neurosurgeon, or other board-certified neuro-specialist physician:

A diagnosis in a living patient of the specific disease of Amyotrophic Lateral Sclerosis, also known as Lou Gehrig's Disease (ALS), as defined by the World Health Organization's International Classification of Diseases, 9th Edition (ICD-9) or the World Health Organization's International Classification of Diseases, 10th Edition (ICD-10).

(2) The following diagnosis can only be made prior to January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician, or by a physician with sufficient qualifications in the field of neurology to make such a diagnosis, where the diagnosis was made while the patient was living but thereafter died prior to January 7, 2017 (the Effective Date of the Settlement Agreement):

A diagnosis of the specific disease of Amyotrophic Lateral Sclerosis (ALS).

## CTE

The following diagnosis can only be made prior to April 22, 2015 by a board-certified neuropathologist, provided that a patient who died between July 7, 2014 and April 22, 2015 has until 270 days from the date of death to obtain such a post-mortem diagnosis:

A post-mortem diagnosis of Chronic Traumatic Encephalopathy (CTE).

## APPENDIX B

### BASELINE NEUROPSYCHOLOGICAL TEST BATTERY AND SPECIFIC IMPAIRMENT CRITERIA FOR RETIRED NFL FOOTBALL PLAYERS

#### Section 1: Test Battery

**Estimating Premorbid Intellectual Ability**

ACS Test of Premorbid Functioning (TOPF)

**Complex Attention/Processing Speed (6 scores)**

WAIS-IV Digit Span

WAIS-IV Arithmetic

WAIS-IV Letter Number Sequencing

WAIS-IV Coding

WAIS-IV Symbol Search

WAIS-IV Cancellation

**Executive Functioning (4 scores)**

Verbal Fluency (FAS)

Trails B

Booklet Category Test

WAIS-IV Similarities

**Effort/Performance Validity (8 scores)**

*ACS Effort Scores*

ACS-WAIS-IV Reliable Digit Span

ACS-WMS-IV Logical Memory Recognition

ACS-WMS-IV Verbal Paired Associates Recognition

ACS-WMS-IV Visual Reproduction Recognition

ACS-Word Choice

*Additional Effort Tests*

Test of Memory Malingering (TOMM)

Medical Symptom Validity Test (MSVT)

**Learning and Memory (6 scores)**

WMS-IV Logical Memory I

WMS-IV Logical Memory II

WMS-IV Verbal Paired Associates I

WMS-IV Verbal Paired Associates II

WMS-IV Visual Reproduction I

WMS-IV Visual Reproduction II

**Language (3 scores)**

Boston Naming Test

Category Fluency (Animal Naming)

BDAE Complex Ideational Material

**Spatial-Perceptual (3 scores)**

WAIS-IV Block Design

WAIS-IV Visual Puzzles

WAIS-IV Matrix Reasoning

**Mental Health**

MMPI-2RF

Mini International Neuropsychiatric Interview

#### Section 2: Evaluate Performance Validity

Freestanding, embedded and regression based performance validity metrics will be administered to each Retired NFL Football Player during baseline and, if relevant, subsequent neuropsychological examinations. There will be at least seven performance validity metrics utilized during each assessment. The specific performance validity metrics utilized will not be released to the public in order to maintain the highest standards of assessment validity. The performance

## APPENDIX B

validity metrics employed will be rotated at intervals determined by the Appeals Advisory Panel in consultation with Co-Lead Class Counsel and Counsel for the NFL Parties.

Each neuropsychological examiner must complete a checklist of validity criteria as set forth in *Slick et al.* 1999, and revised in 2013 (see below) for every Retired NFL Football Player examined in order to determine whether the Retired NFL Football Player's test data is a valid reflection of his optimal level of neurocognitive functioning.

1. Suboptimal scores on performance validity embedded indicators or tests. The cutoffs for each test should be established based on empirical findings.

2. A pattern of neuropsychological test performance that is markedly discrepant from currently accepted models of normal and abnormal central nervous system (CNS) function. The discrepancy must be consistent with an attempt to exaggerate or fabricate neuropsychological dysfunction (e.g., a patient performs in the severely impaired range on verbal attention measures but in the average range on memory testing; a patient misses items on recognition testing that were consistently provided on previous free recall trials, or misses many easy items when significantly harder items from the same test are passed).

3. Discrepancy between test data and observed behavior. Performance on two or more neuropsychological tests within a domain are discrepant with observed level of cognitive function in a way that suggests exaggeration or fabrication of dysfunction (e.g., a well-educated patient who presents with no significant visual-perceptual deficits or language disturbance in conversational speech performs in the severely impaired range on verbal fluency and confrontation naming tests).

4. Discrepancy between test data and reliable collateral reports. Performance on two or more neuropsychological tests within a domain are discrepant with day-to-day level of cognitive function described by at least one reliable collateral informant in a way that suggests exaggeration or fabrication of dysfunction (e.g., a patient handles all family finances but is unable to perform simple math problems in testing).

5. Discrepancy between test data and documented background history. Improbably poor performance on two or more standardized tests of cognitive function within a specific domain (e.g., memory) that is inconsistent with documented neurological or psychiatric history.

6. Self-reported history is discrepant with documented history. Reported history is markedly discrepant with documented medical or psychosocial history and suggests attempts to exaggerate deficits.

7. Self-reported symptoms are discrepant with known patterns of brain functioning. Reported or endorsed symptoms are improbable in number, pattern, or severity; or markedly inconsistent with expectations for the type or severity of documented medical problems.

8. Self-reported symptoms are discrepant with behavioral observations. Reported symptoms are markedly inconsistent with observed behavior (e.g., a patient complains of severe episodic memory deficits yet has little difficulty remembering names, events, or appointments; a patient complains of severe cognitive deficits yet has little difficulty driving independently and arrives on time for an appointment in an unfamiliar area; a patient complains of severely slowed mentation and concentration problems yet easily follows complex conversation).

9. Self-reported symptoms are discrepant with information obtained from collateral informants. Reported symptoms, history, or observed behavior is inconsistent with information obtained from other informants judged to be adequately reliable. The discrepancy must be consistent with an attempt to exaggerate deficits (e.g., a patient reports severe memory impairment and/or behaves as if severely memory-impaired, but his spouse reports that the patient has minimal memory dysfunction at home).

## APPENDIX B

Notwithstanding a practitioner's determination of sufficient effort in accordance with the foregoing factors, a Retired NFL Football Player's failure on two or more effort tests may result in the Retired NFL Football Player's test results being subjected to independent review, or result in a need for supplemental testing of the Retired NFL Football Player.

Note: Additional information relating to the evaluation of effort and performance validity will be provided in a clinician's interpretation guide.

### Section 3: Estimate Premorbid Intellectual Ability

| Test | Ability |
|------|---------|
| Test of Premorbid Functioning (TOPF) | Reading<br>Reading + Demographic Variables |

The Test of Premorbid Functioning (TOPF) provides three models for predicting premorbid functioning: (a) demographics only, (b) TOPF only, and (c) combined demographics and TOPF prediction equations. For each model using demographic data, a simple and complex prediction equation can be selected. In the simple model, only sex, race/ethnicity, and education, are used in predicting premorbid ability. In the complex model, developmental, personal, and more specific demographic data is incorporated into the equations. The clinician should select a model based on the patient's background and his or her current level of reading or language impairment.

Note: It is necessary to estimate premorbid intellectual functioning in order to use the criteria for impairment set out in this document. Estimated premorbid intellectual ability will be assessed and classified as:

➢ Below Average (estimated IQ below 90);

➢ Average (estimated IQ between 90 and 109);

➢ Above Average (estimated IQ above 110).

### Section 4: Neuropsychological Test Score Criteria by Domain of Cognitive Functioning

There are 5 domains of cognitive functioning. In each domain, there are several tests that contribute 3, 4, or 6 demographically-adjusted test scores for consideration. Test selection in the domains was based on the availability of demographically-adjusted normative data for Caucasians and African Americans. These domains and scores are set out below.

The basic principle for defining impairment on testing is that there must be a pattern of performance that is approximately 1.5 standard deviations (for Level 1 Impairment), 1.7-1.8 standard deviations (for Level 1.5 Impairment) or 2 standard deviations (for Level 2 Impairment) below the person's expected level of premorbid functioning. Therefore, it is necessary to have more than one low test score in each domain. A user manual will be provided to neuropsychologists setting out the cutoff scores, criteria for identifying impairment in each cognitive domain, and statistical and normative data to support the impairment criteria.

## APPENDIX B

| Domain/Test | Ability |
|---|---|
| **Complex Attention/Speed of Processing (6 Scores)** | |
| Digit Span | Attention & Working Memory |
| Arithmetic | Mental Arithmetic |
| Letter Number Sequencing | Attention & Working Memory |
| Coding | Visual-Processing & Clerical Speed |
| Symbol Search | Visual-Scanning & Processing Speed |
| Cancellation | Visual-Scanning Speed |
| **Executive Functioning (4 scores)** | |
| Similarities | Verbal Reasoning |
| Verbal Fluency (FAS) | Phonemic Verbal Fluency |
| Trails B | Complex Sequencing |
| Booklet Category Test | Conceptual Reasoning |
| **Learning and Memory (6 scores)** | |
| Logical Memory I | Immediate Memory for Stories |
| Logical Memory II | Delayed Memory for Stories |
| Verbal Paired Associates I | Learning Word Pairs |
| Verbal Paired Associates II | Delayed Memory for Word Pairs |
| Visual Reproduction I | Immediate Memory for Designs |
| Visual Reproduction II | Delayed Memory for Designs |
| **Language** | |
| Boston Naming Test | Confrontation Naming |
| BDAE Complex Ideational Material | Language Comprehension |
| Category Fluency | Category (Semantic) Fluency |
| **Visual-Perceptual** | |
| Block Design | Spatial Skills & Problem Solving |
| Visual Puzzles | Visual Perceptual Reasoning |
| Matrix Reasoning | Visual Perceptual Reasoning |

**Impairment Criteria: *Below Average* Estimated Intellectual Functioning (A1 – E1)**

**A1. Complex Attention (6 test scores)**

1. Level 1 Impairment: 3 or more scores below a T score of 35

2. Level 1.5 Impairment: 4 or more scores below a T score of 35; or meet for Level 1 and 2 scores below a T score of 30

3. Level 2 Impairment: 3 or more scores below a T score of 30

**B1. Executive Function (4 test scores)**

1. Level 1 Impairment: 2 or more scores below a T score of 35

2. Level 1.5 Impairment: 3 or more scores below a T score of 35; or meet for Level 1 and 1 score below a T score of 30

## APPENDIX B

3. Level 2 Impairment: 2 or more scores below a T score of 30

**C1.  Learning and Memory (6 test scores)**

1. Level 1 Impairment: 3 or more scores below a T score of 35

2. Level 1.5 Impairment: 4 or more scores below a T score of 35; or meet for Level 1 and 2 scores below a T score of 30

3. Level 2 Impairment: 3 or more scores below a T score of 30

**D1.  Language (3 test scores)**

1. Level 1 Impairment: 3 or more scores below a T score of 37

2. Level 1.5 Impairment: meet for Level 1 and 2 scores below a T score of 35

3. Level 2 Impairment: 3 or more scores below a T score of 35

**E1.  Visual-Perceptual (3 test scores)**

1. Level 1 Impairment: 3 or more scores below a T score of 37

2. Level 1.5 Impairment: meet for Level 1 and 2 scores below a T score of 35

3. Level 2 Impairment: 3 or more scores below a T score of 35

## Impairment Criteria: *Average* Estimated Intellectual Functioning (A2 – E2)

**A2.  Complex Attention (6 test scores)**

1. Level 1 Impairment: 2 or more scores below a T score of 35

2. Level 1.5 Impairment: 3 or more scores below a T score of 35; or meet for Level 1 and 1 score below a T score of 30

3. Level 2 Impairment: 2 or more scores below a T score of 30

**B2.  Executive Function (4 test scores)**

1. Level 1 Impairment: 2 or more scores below a T score of 35

2. Level 1.5 Impairment: 3 or more scores below a T score of 35; or meet for Level 1 and 1 score below a T score of 30

3. Level 2 Impairment: 2 or more scores below a T score of 30

**C2.  Learning and Memory (6 test scores)**

1. Level 1 Impairment: 2 or more scores below a T score of 35

2. Level 1.5 Impairment: 3 or more scores below a T score of 35; or meet for Level 1 and 1 score below a T score of 30

3. Level 2 Impairment: 2 or more scores below a T score of 30

**D2.  Language (3 test scores)**

1. Level 1 Impairment: 2 or more scores below a T score of 37

2. Level 1.5 Impairment: 3 or more scores below a T score of 37; or meet for Level 1 and 1 score below a T score of 35

3. Level 2 Impairment: 2 or more scores below a T score of 35

**E2.  Visual-Perceptual (3 test scores)**

1. Level 1 Impairment: 2 or more scores below a T score of 37

2. Level 1.5 Impairment: 3 or more scores below a T score of 37; or meet for Level 1 and 1 score below a T score of 35

3. Level 2 Impairment: 2 or more scores below a T score of 35

# APPENDIX B

## Impairment Criteria: *Below Average* Estimated Intellectual Functioning (A3 – E3)

### A3. Complex Attention (6 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 35

2. Level 1.5 Impairment: meet for Level 1 and 3 or more scores below a T score of 37

3. Level 2 Impairment: 3 or more scores below a T score of 35

### B3. Executive Function (4 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 37

2. Level 1.5 Impairment: meet for Level 1 and 3 or more scores below a T score of 37; or meet for Level 1 and 1 score below a T score of 30

3. Level 2 Impairment: 2 or more scores below a T score of 30

### C3. Learning and Memory (6 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 35

2. Level 1.5 Impairment: meet for Level 1 and 3 or more scores below a T score of 37

3. Level 2 Impairment: 3 or more scores below a T score of 35

### D3. Language (3 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 40

2. Level 1.5 Impairment: 3 scores below at T score of 40; or meet for Level 1 and 1 score below a T score of 37

3. Level 2 Impairment: 2 or more scores below a T score of 37

### E3. Visual-Perceptual (3 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 40

2. Level 1.5 Impairment: 3 scores below at T score of 40; or meet for Level 1 and 1 score below a T score of 37

3. Level 2 Impairment: 2 or more scores below a T score of 37

## Section 5: Mental Health Assessment

| Test | Symptoms/Functioning | Assessment |
|---|---|---|
| MMPI-2RF | Mental Health Assessment | Evaluation of Validity Scales and Configurations; T-Scores for Symptom Domains |
| Mini International Neuropsychiatric Interview (M.I.N.I. Version 5.0.0) | Semi-structured Psychiatric Interview | Scale Criteria for Various Psychiatric Diagnoses |

**Ronald L. Hamilton, M.D.**

1/2/2017

## CURRICULUM VITAE

### BIOGRAPHICAL

| | | | |
|---|---|---|---|
| **Name:** | Ronald Lee Hamilton | **Birth Date:** | September 20, 1959 |
| **Home Address:** | 6 Graham Place Pittsburgh, PA 15232 | **Birth Place:** | Omaha, Nebraska |
| **Marital status:** | single | | |
| **Home Phone** | 412-310-9874 | **Citizenship:** | USA |

| | |
|---|---|
| **Business Address:** | Division of Neuropathology A724.1 Scaife Hall 200 Lothrop Street Pittsburgh, PA 15213 |
| **Business Phone:** | 412-624-6610 |
| **Business Fax:** | 412-624-5488 |
| **e-mail address** | hamiltonrl@upmc.edu |

### EDUCATION AND TRAINING

| | | | |
|---|---|---|---|
| 1977-1985 | University of Nebraska-Lincoln | B.S. | Psychology |
| 1985-1989 | University of Nebraska Medical Center | M.D. | |
| 1989-1991 | University of California, San Diego Program Director, David Bailey | Resident Anatomic Pathology | |
| 1991-1993 | University of California, San Diego Program Director, Henry C. Powell | Resident Neuropathology | |
| 1993-1994 | University of Pittsburgh Program Director, Clayton A Wiley | Fellow Neuropathology | |
| 1994-1995 | University of Pittsburgh Program Director, Michael Zigmond | Fellow: NIMH Training Grant in Neuroscience | |

### APPOINTMENTS AND POSITIONS:

| | |
|---|---|
| 1995-2002 | University of Pittsburgh School of Medicine -Assistant Professor of Pathology |
| 2002-present | University of Pittsburgh School of Medicine -Associate Professor of Pathology |

### DISTRIBUTION OF % TIME

| | |
|---|---|
| Research | 20% |
| Other scholarly activity | 8% |
| Teaching | 10% |
| Clinical | 35% |
| Combined clinical and teaching | 20% |
| Service activities | 5% |
| Administrative activities. | 2% |
| TOTAL | 100% |

**Ronald L. Hamilton, M.D.**

## CERTIFICATION and LICENSURE

**SPECIALTY CERTIFICATION**

| | | |
|---|---|---|
| American Board of Pathology | Anatomic Pathology | 5/23/96 |
| American Board of Pathology | Neuropathology | 5/23/96 |
| American Board of Pathology – recertification | Neuropathology | 1/1/2014 |

**MEDICAL or OTHER PROFESSIONAL LICENSURE**

| | |
|---|---|
| 1990 | California Medical License (G69731) expired |
| 1993 | Pennsylvania Medical License (MD-049717-L) |
| 2009 | Indiana Medical License (01067332A) |

## MEMBERSHIPS IN PROFESSIONAL AND SCIENTIFIC SOCIETIES

| | |
|---|---|
| 1992 | American Association for the Advancement of Science |
| 1993 | American Association of Neuropathology |
| 1993 | International Society of Neuropathology |
| 1994 | College of American Pathologists (CAP) |
| 1995-97 | CAP Neuropathology Subcommittee |
| 1998 | Children's Cancer Group, Study Committee for CCGB975 |
| 1999 | Society for Neuroscience |

## HONORS

| | |
|---|---|
| Nominated "Teacher of the Year: Anatomic Pathology" | 1997 |
| Nominated "Teacher of the Year: Anatomic Pathology" | 1998 |
| Nominated "Teacher of the Year: Anatomic Pathology" | 1999 |
| Nominated "Teacher of the Year: Anatomic Pathology" | 2000 |
| Nominated "Teacher of the Year: Anatomic Pathology" | 2001 |
| Nominated "Teacher of the Year: Anatomic Pathology" | 2002 |
| UPMC ACES Award winner (ACES is an Award for | 2003 |

Clinical Excellence and Service and is given to about 10 physicians per year at UPMC)

| | |
|---|---|
| Letter of appreciation from Chief Residents | 1997-1998 |
| AP Pathology "TEACHER OF THE YEAR" | 2004-05 |

## PUBLICATIONS

**Refereed Articles**

1. Esch O, Spinosa JC, **Hamilton RL**, Crombie DL, Schteigart CO, Rondinone JF, D'Agostino HB,Lillienau J and Hofmann AF: Acute effects of topical methyl tert-butyl ether or ethyl propionate on gallbladder histology in animals: a comparison of two solvents for contact dissolution of cholesterol gallstones. Hepatology 16 (4):984-991, 1992.

2. Anders KH, Becker PS, Holden JK, Sharer LR, Cornford ME, Hansen LA, **Hamilton R,** Vinters, HV: Multifocal necrotizing leukoencephalopathy with pontine predilection in immunosuppressed patients: a clinicopathologic review of sixteen cases. Human Pathology 24:897-904, 1993.

3. **Hamilton RL**, Achim C, Grafe MR, Fremont JC, Miners D, Wiley CA: Herpes simplex virus brainstem encephalitis in an AIDS patient. Clinical Neuropathology, 14: 45-50, 1995.

**Ronald L. Hamilton, M.D.**

4.  Rose J, Haskell WL, Gamble JG, **Hamilton RL**, Brown DA, Rinsky L: Muscle pathophysiology and clinical measures of disability in children with cerebral palsy. Journal of Orthopedic Research, 12(6): 758-768, 1994.

5.  **Hamilton RL**, Grafe MR: Complete absence of the cerebellum: a report of two cases. Acta Neuropathologica 88 (3): 258-261, 1994.

6.  **Hamilton RL**, Haas RH, Nyhan WL, Powell HC, Grafe MR: The neuropathology of propionic academia: a report of two additional cases.  Journal of Child Neurology 10(1): 25-30, 1995.

7.  Haas RH, Marsden DL, Capistrano-Estrada S, **Hamilton RL**, Grafe MR, Wong W, Nyhan WL: Acute basal ganglia infarction in propionic acidemia.  Journal of Child Neurology 10(1) 18-22, 1995.

8.  Kupperman BD, Quiceno JI, Wiley C, Hesselink J**, Hamilton R**, Keefe K, Garcia R, Freeman WR: Clinical and histopathologic study of varicella zoster virus retinitis in patients with the acquired immunodeficiency syndrome.  American Journal of Ophthalmology 118:589-600, 1994.

9.  Adelson PD, Robichaurd P, **Hamilton RL**, Kochanek PM. A Model of Diffuse Traumatic Brain  Injury in the Immature Rat.  J Neurosurg 85:877-884, 1996.

10. Alper G, Crumrine PK, **Hamilton RL**, Albright L, Wald ER. An unusual case of inflammatory spinal epidural  mass (Castleman's syndrome) Pediatric Neurology  15: 60-2 , 1996

11. Adelson PD, Firlik KS, Firlik AD, **Hamilton RL**. A meningeal cyst of the thoracic spine presenting as prolonged paresis after ankle injury: case report. Neuropediatrics 27:207-210, 1996.

12. Cramer SC, Segal A, **Hamilton RL**, Schmahman J, Ma J. Leukoencephalitis Due to Varicella Zoster Virus:   Report of a Case and Review of Clinical Features.  Contemporary Neurology, 1, 1996 (electronic journal).

13. Mansfield RT, Schiding JK, **Hamilton R**, Kochanek PM: Effects of hypothermia on traumatic brain injury in immature rats. J Cerebral Blood Flow  Metabo 16(2): 244-252, 1996.

14. Pollack IF, Campbell JW, **Hamilton RL**, Martinez AJ, Bozik ME. Proliferation index as a predictor of prognosis in malignant gliomas of childhood. Cancer 79:849-856, 1996

15. Pollack IF, **Hamilton RL,** Finkelstein SD, Campbell JW, Martinez AJ, Sherwin RN, Bozik ME, Gollin SM. The relationship between tp53 mutations and overexpression of p53 and prognosis in malignant gliomas of childhood. Cancer Research 57:304-309, 1997.

16. Ikonomovic MD, Mizukami K, Davies P, **Hamilton R**, Sheffield R, Armstrong DM. The loss of GluR2(3) immunoreactivity preceded neurofibrillary tangle formation in the entorhinal cortex and hippocampus of Alzheimer brains. J Neuropath Exp Neurol 56:1018-1027, 1997.

17. Bredel M, Pollack IF, Campbell JW, **Hamilton RL**: Basic fibroblast growth factor as a predictor of prognosis in pediatric high-grade gliomas. Clinical Cancer Research 3:2157-2164, 1997

18. Blatt J, **Hamilton RL**: Neurodevelopmental anomalies in children with neuroblastoma. Cancer 82: 1603-8, 1998.

19. Fukui MB, Livstone BJ, Meltzer CC, **Hamilton RL**: Hemorrhagic presentation of untreated primary central nervous system lymphoma in the acquired immunodeficiency syndrome. Am J Roentgenol 170:1114-1115, 1998..

20. Bredel M, Pollack IF, **Hamilton RL**, James CD: Epidermal growth factor receptor (EGFR) and gene amplification in high-grade non-brainstem gliomas of childhood. Clin Can Res 5:1786-92, 1999

**Ronald L. Hamilton, M.D.**

21. Gerszten PC, Pollack IF, **Hamilton RL**. Primary parafalcine chondrosarcoma in a child. Acta Neuropathologica 95:111-4, 1998.

22. Pollack IF, **Hamilton RL**, Fitz C, Orenstein DM. An intrasylvian "fibroma" in a child with cystic fibrosis. Pediatric Neurosurgery 46:744-747 2000.

23. Liachenko S, Tang P, **Hamilton RL**, Xu Y: A reproducible model of circulatory arrest and remote resuscitation in rats for NMR investigation. Stroke 29:1229-1238, 1998

24. Meltzer CC, Liu AY, Perrone AM, **Hamilton RL** Meningioangiomatosis MR imaging with histopathologic correlation. AJR 170:804-5, 1998

25. Clark RSB, Kochanek PM, Chen M, Watkins SC, Marion DW, Chen J, **Hamilton RL**, Loeffert JE, Graham SH. Increases in Bcl-2 and cleavage of caspase-1 and caspase-3 in human brain after head injury. FASEB J, 13:813-821, 1999

26. Soontornniyomkij V, Wang G, Pittman CA, **Hamilton RL**, Wiley CA, Achim CL Absence of brain-derived neurotrophic factor and trkB receptor immunoreactivity in glia of Alzheimer's disease. Acta Neuropathologica 98:345-8, 1999.

27. Wang G, Achim CL, **Hamilton RL**, Wiley CA, Soontornniyomkij V Tyramide signal amplification methods in multiple label immunofluorescence confocal microscopy. Methods 18(4):459-464, 1999

28. Firlik KS, Adelson PD, **Hamilton RL**: Coexistence of a ganglioglioma and Rasmussen's encephalitis: successful treatment in a four-year-old boy. Pediatr Neurosurg 30:278-282, 1999

29. Ikonomovic MD, Mizukami K, Warde D, Sheffield R, **Hamilton R**, Wenthold RJ, Armstrong DM Distribution of glutamate receptor subunit NMDAR1 in the hippocampus of normal elderly and patients with Alzheimer's disease. Exp Neurol 160(1):194-204, 1999.

30. Dallasta, LM, Wang G, Bodnar RJ, Draviam R, Wiley CA, Achim CA, **Hamilton RL**: Differential expression of intercellular adhesion molecules-1 (ICAM-1) and vascular adhesion cell molecule-1 (VCAM-1) in chronic murine retroviral encephalitis. Neuropathol Appl Neurobiol 26:332-341, 2000.

31. Luabeya MK, Dallasta LM, Achim CL, Pauza CD, **Hamilton RL**: Blood-brain Barrier Disruption in Simian Immunodeficiency Virus Encephalitis. Neuropathol Appl Neurobiol 26:454-462, 2000.

32. **Hamilton RL**. Lewy Bodies in Alzheimer's Disease: A Neuropathological Review of 145 Cases Using -synuclein Immunohistochemistry. Brain Pathol 10: 378-384, 2000.

33. Sweet, RA, **Hamilton RL**, Healy MT, Wisniewski SR, Henteleff R, Pollack BG, Lewis DA, DeKosky ST. Alterations of Striatal Dopamine Receptor Binding in Alzheimer's Disease Are Associated with Lewy Body Pathology and With Antemortem Psychosis. Arch Neurol 58:466-472, 2001.

34. Styren S, **Hamilton RL**, Styren GC, Klunk WE X-34: a novel and intensely fluorescent stain for Alzheimer's disease pathology. J Histochem Cytochem 48:1223-1232, 2000.

35. Lopez OL, **Hamilton RL**, Becker JT, Wisniewski S, Kaufer DI, DeKosky ST. Severity of cognitive impairment and the clinical diagnosis of AD with Lewy bodies. Neurology 54:1780-1787, 2000

36. Lopez OL, Wisniewski S, **Hamilton RL**, Becker JT, Kaufer DI, DeKosky ST. Predictors of progression in patients with AD and Lewy bodies. Neurology 54:1774-1779, 2000.

**Ronald L. Hamilton, M.D.**

37.    Sweet RA, **Hamilton RL**, Lopez OL, Klunk WE, Wisnieski SR, Kaufer DI, Healy MT, Dekosky ST. Psychotic symptoms in Alzheimer's Disease are not associated with more severe neuropathologic features. Internat Psychogeriatr 12: 547-558, 2000.

38.    Lopez OL, Becker JT, Klunk W, Saxton J, **Hamilton RL**, Kaufer DI, Sweet RA, Meltzer CC, Wisniewski S, Kamboh MI, DeKosky ST. Research evaluation and diagnosis of probable Alzheimer's Disease over the last two decades. I. Neurology 55:1854-1862, 2000.

39.    Lopez OL, Becker JT, Klunk W, Saxton J, **Hamilton RL**, Kaufer DI, Sweet RA, Meltzer CC, Wisniewski S, Kamboh MI, DeKosky ST. Research evaluation and diagnosis of possible Alzheimer's Disease over the last two decades. II. Neurology 55:1863-1869, 2000.

40.    Pollack IF, **Hamilton RL**, Fitz C, Kassam A, Snyderman C. Congenital Reactive Myofibroblastic Tumor of the Petrous Bone: Case Report. Neurosurgery 48:430-435, 2001.

41.    Levy EI, Scarrow A, **Hamilton** RC (sic), Wollman MR, Fitz C. Pollack IF. Medical Management Of Eosinophilic Granuloma of the Cervical Spine. Pediatr Neurosurg 31:159-62, 1999.

42.    Pettegrew JW, Panchalingam K, **Hamilton RL**, and McClur RJ Brain Membrane Phospholipid Alterations in Alzheimer's Disease.  Neurochem Res 26:771-782, 2001

43.    Levy EI, Harris AE, Omalu BA, **Hamilton RL**, Branstetter BF, Pollack IF. Sudden Death from Fulminant Acute Cerebellitis.  Pediatr Neurosurg 35:24-28, 2001

44.    Lianchenko S, Tang P, **Hamilton RL**, Xu Y. Regional Dependence of Cerebral Reperfusion After Circulatory Arrest in Rats.  J Cerebr Blood Flow Met 21:1320-1329, 2001 .

45.    Pollack IF, Finkelstein SD, Burnham J, Holmes EJ, **Hamilton RL**, Yates AJ, Finlay J, Sposto R, and CCG.  Age and TP53 Mutation Frequency in Childhood Malignant Gliomas: Results of a Multi-institutional Cohort. Cancer Res 61:7404-7407, 2001

46.    Adelson PD, Jenkins LW, **Hamilton RL**, Robichaud P, Tran MP, Kochanek PM. Histopathologic Response of the Immature Rat to Diffuse Traumatic Brain Injury.  J Neurotrauma 18 :967-976, 2001

47.    Pollack IF, Finkelstein SD, Woods J, Burnham J, Holmes EJ, **Hamilton RL**, Yates AJ, Boyett JM, Finlay J, Sposto R, and CCG. TP53 Mutations, Expression of p53 and Prognosis in Children with Malignant Gliomas.  New England Journal of Medicine 346:420-427, 2002

48.    Lopez OL, Becker JT, Kaufer DI, **Hamilton RL**, Sweet RA, Klunk W, DeKosky ST. Research Evaluation and Prospective Diagnosis of Dementia With Lewy Bodies.  Arch Neurol 59:43-46, 2002.

49.    Wang L, Yushmanov VE, Lianchenko SM, Tang P, **Hamilton RL**, Xu Y.  Late Reversal of Cerebral Perfusion and Water Diffusion After Transient Focal Ischemia in Rats.  J Cereb Blood Flow Metab 22:253-261, 2002.

50.    Pollack IF, Biegal JA, Yates AJ, **Hamilton RL**, Finkelstein SD.Risk Assignment in Childhood Brain Tumors: The Emerging Role of Molecular and Biologic Classification. Current Oncology Reports 4:114-122, 2002.

51.    Pollack IF, **Hamilton RL**, Burnham J, Holmes EJ, Finkelstein SD, Sposto R, Yates AJ, Boyett JM, Finley JL. The impact of proliferation index on outcome in childhood malignant gliomas: results in a multi-institutional cohort. Neurosurgery 50:1238-1245, 2002.

**Ronald L. Hamilton, M.D.**

52. Sweet RA, Panchalingam K, Pettefrew JW, McClure RJ, **Hamilton RL**, Lopez OL, Kaufer DI, DeKosky ST, Klunk WE.  Psychosis in Alzheimer disease: postmortem magnetic resonance spectroscopy evidence of excess neuronal and membrane phospholipid pathology. Neurobiol Aging 23:547-53, 2002.

53.  Mazzola CA, Albright AL, Sutton LN, Tuite GF, **Hamilton RL**, Pollack IF.  Dermoid inclusion cysts and early spinal cord tethering after fetal surgery.  New Engl. J Med 347:256-9, 2002.

54.  Bredel M, Pollack IF, **Hamilton RL**, Birner P, Hainfellner JA, Zentner J.  DNA topoisomerase II-alpha predicts progression-free and overall survival in pediatric malignant non-brainstem gliomas.  Int J Cancer 99:817-20, 2002.

55.  Klunk WE, Wang Y, Huang G, Debnath ML, Holt DP, Shao L, **Hamilton RL**, Ikonomovic MD, DeKosky ST, Mathis CA.  The binding of BTA-1 to post-mortem brain homogenates is dominated by the amyloid component. J Neurosci 23:2086-2092, 2003.

56. Castellano-Sanchez, AA, Ohgaki H, Yokoo H, Scheithauer BW, Burger PC, **Hamilton RL**, Finkelstein SD, Brat, DJ.  Cerebral granular cell astrocytomas show a high frequency of allelic loss but lack a defining genotype. Brain Pathology 13: 62-78, 2003.

57.  Gilbertson RJ, Hill DA, Hernan R, Kocak M, Geyer R, Olson J, Gajjar A, Rush L, **Hamilton RL**, Finkelstein SD, Pollack IF.  ERBB1 is amplified and overexpressed in high-grade diffusely infiltrative pediatric brain stem glioma.  Clin Cancer Res 9:3620-3624, 2003.

58. Pollack IF, Finkelstein SD, Burnham J, **Hamilton RL**, Yates AJ, Holmes EJ, Boyett JM, Finlay JL. The association between chromosome 1p loss and outcome in pediatric malignant gliomas: results from the CCG-945 cohort. Pediatr Neurosurg 39:114-121, 2003.

59.  Carter TL, Rissman RA, Mishizen-Eberz AJ, Wolfe BB, **Hamilton RL**, Gandy S, Armstrong DM. Differential Preservation of AMPA Receptor Subunits in the Hippocampi of Alzheimer's Disease Patients According to Braak Stage Experimental Neurology 187:299-309, 2004

60.  Finkelstein SD, Mohan D, **Hamilton RL**, Sasatomi E, Swalsky PA, Lieberman FS.  Microdissection-based genotyping assists discrimination of reactive gliosis versus glioma. Am J Clin Pathol 121:671-678, 2004

61.  **Hamilton RL**, Bowser B Alzheimer Disease Pathology in ALS Acta Neuropathologica107:515-522, 2004

62.  Mohan D, Couce ME, Wiley CA, **Hamilton RL**, Sasatomi E, Swalsky PA, Lieberman MD, Finkelstein SD.  Microdissection based genotyping of human gliomas: diagnostic and prognostic considerations Modern Pathology 17:1346-1358, 2004

63. Marshall GA, Kaufer DI, Lopez OL, Rao GR, **Hamilton RL**, DeKosky ST.  Right prosubiculum amyloid plaque density correlates with anosognosia in Alzheimer's Disease.  J Neurol Neurosurg Psychiatry 75:1396-4000, 2004.  **PMCID:  PMC1738763**

64.  Sweet RA, **Hamilton RL**, Butters ME, Mulsant BH, Pollock BG, Lewis DA, DeKosky ST, Reynolds CF.  Neuropathologic Correlates of Dementia in Late Life Major Depression Neuropsychopharmacology 29:2242-2250, 2004

65  Lee JYK, Finkelstein S, **Hamilton RL**, Rekha P, Pirris S, King Jr, JT, Omalu B.  Loss of heterozygosity Analysis of Benign, Atypical and Anaplastic Meningiomas.  Neurosurgery 55:1163-1173, 2004.

**Ronald L. Hamilton, M.D.**

66. Beckner ME, Sasatomi E, Swalsky PA, **Hamilton RL**, Pollack, IF, Finkelstein SD. Loss of heterozygosity reveals non-VHL Allelic loss in hemangioblastomas at 22q13. Human Pathology 35:1105-1111, 2004.

67. Tsuang D, Wilson R, Lopez OL, Luedecking-Zimmer EK, Leverenz JB, DeKosky ST, Kamboh MI, **Hamilton RL**. Genetic Association Between APOE*4 Allele and Lewy Bodies in Alzheimer's Disease Neurology, 64:509-513, 2005. **PMCID: PMC1487185**

68. Bredel C, Lassman S, Pollack IF, Knoth R, **Hamilton RL**, Werner M, Bredel M. DNA Topoisomerase II-alpha and Her-2/Neu Gene Dosages in Pediatric Malignant Gliomas. Int J Cancer 26:1188-92, 2005.

69. Witham TF, Okada H, Fellows W, **Hamilton RL**, Flickinger JC, Chambers WH, Pollack IF, Watkins SC, Kondziolka D. The characterization of tumor apoptosis after experimental radiosurgery. Stereotact Funct Neurosurg 83:17-24 2005.

70. McFadden K, **Hamilton RL**, Insalaco SJ, Lavine L, Al-Mateen M, Guoji Wang G, Wiley CA Neuronal intranuclear inclusion disease in a child without polyglutamine inclusions J Neuropathol Exper Neurol 64:545-552, 2005. **PMCID: PMC1402362**

71. Hatano M, Eguchi J, Tatsumi T, Kuwashima N, Dusak JE, Kinch MS, Pollack IF, **Hamilton RL**, Storkus WJ, Okada H. EphA2 as a glioma-associated antigen: a novel target for glioma-vaccines. Neoplasia 7:717-722, 2005. **PMCID: PMC1501889**

72. Jordan S, Ruoyan C, Koprivica V, **Hamilton RL**, Whitehead R, Tottori K, Kikuchi T. In vitro profile of the antidepressant candidate OPC-14523 at rat and human 5-HT$_{1A}$ receptors.Eur J Pharmacol, 517:165-173, 2005.

73. Omalu BI, Minster RL, Kamboh MI, **Hamilton RL**, Wecht CH, DeKosky ST. Chronic Traumatic Encephalopathy (CTE) in a National Football League (NFL) Player Neurosurgery, 57:128-134, 2005.

74. Judkins AR, Burger PC, **Hamilton RL**, Kleinschmidt-DeMasters B, Perry A, Pomeroy SL, Rosenblum MK, Yachnis AT, Zhou H, Rorke LB, Biegel JA. INI1 Protein Expression Distinguishes Atypical Teratoid/Rhabdopid Tumor from Choroid Plexus Carcinoma. J Neuropathol Exp Neurol 64:391-397, 2005.

75. Desai PP, Ikonomovic I, Abrahamson EE, **Hamilton RL,** Isanski BA, Hope CE, Klunk WE, Dekosky ST, Kamboh MI. Apolipoprotein D is a component of compact but not diffuse amyloid-beta plaques in Alzheimer's Disease temporal cortex. Neurobiol Dis May 22, 2005 (epub)

76. Carson-Walter EB, Hampton J, Geynisman D,Pillai PK, Sathanoori R, Madden SL, **Hamilton RL**, Walter KA. Plasmalemmal Vesicle associated protein-1 (PV-1) is a novel and critical marker of brain tumor angiogenesis. Clin Cancer Res 11:7643-7650, 2005.

77. Lopez OL, Becker JT, Sweet RA, Martin-Sanchez FJ, **Hamilton RL** Lewy bodies in the Amygdala increase risk for major depression in subjects with Alzheimer disease. Neurology 67:660-665, 2006.

78. Pollack IF, **Hamilton RL**, Sobol R, Burnham J, Yates AJ, Holmes EJ, Zhou T, Finlay J (for Children Oncology Group).O6-methylguanine-DNA methyltransferase  strongly Correlates with Outcome in Childhood Malignant Gliomas: Results from the CCG-945 Cohort J Clin Oncol. Jul 20;24(21):3431-7, 2006.

**Ronald L. Hamilton, M.D.**

79. Mandal PK, Pettegrew JW, Masliah E, **Hamilton RL**, Mandal R. Interaction between Aβ Peptide and α Synuclein: Molecular Mechanisms in Overlapping Pathology of Alzheimer's and Parkinson's in Dementia with Lewy Body disease.  Neurochemical Research, 2006 31, 1153-1162, 2006.

80. Omalu B, DeKosky ST, **Hamilton RL**, Minster RL, Kamboh MI, Shakir AM, Wecht Chronic Traumatic Encephalopathy in a National Football League Player: part II.  Neurosurgery 59:1086-92, 2006

81. Ramsey CP, Glass CA, Koike MA, Montgomery MB, Ritson GP, Chia L, **Hamilton RL**, Chu CT, Jordan-Sciutto KL. Expression of Nrf2 in neurodegenerative diseases. J Neuropathol Exp Neurol 66:75-85, 2007. **PMCID: PMC2253896**

82. Boada FE, Tanase C, Davis D, Walter K, Torres-Trejo A, Couce M, **Hamilton R**, Kondziolka D, Bartinski W, Lieberman F.  Non-invasive assessment of tumor proliferation using triple quantum filtered 23/Na MRI: technical challenges and solutions.  Conf Proc IEEE Eng Med Biol Sci Soc. 2004; 7:5238-41

83. Pollack IF, **Hamilton RL**, James CD, Finkelstein SD, Burnham J, Yates AJ, Holmes EJ, Zhou T, Finlay J (for Children Oncology Group). Rarity of *PTEN* Deletions and *EGFR* Amplification in Malignant Gliomas of Childhood: Results from the Children's Cancer Group-945 Cohort J Neurosurg 105(5 Suppl):418-424, 2006.

84. Guzman A, Wood WL, Alpert E, Prasad MD, Miller RG, Rothstein JD, Bowser R, **Hamilton R**, Wood TD, Cleveland DW, Lingappa VR, Liu J.  Common molecular signature in SOD1 for both sporadic and familial amyotrophic lateral sclerosis.  Proc Nat Acad Sci 104:12524-12529, 2007. **PMCID: PMC2408940**

85. Beckner ME, Jane EP, Jankowitz B, Agostino NR, Walter KA, **Hamilton RL**, Pollack IF.  Tumor cells from ultrasonic aspirations of glioblastomas migrate and from spheres with radial outgrowth. Cancer Letters 255:135-44, 2007. PMID  17543444,  **PMCID: PMC2000342**

86. McIntyre JA, Chapman J, Shavit E, **Hamilton RL**, and DeKosky ST. Redox-Reactive Autoantibodies in Alzheimer's Patients' Cerebrospinal Fluids: Preliminary Studies.  Autoimmunity, 40:390-396, 2007. PMID 17612901

87. Nakashima-Yasuda, Uryu, K, Robinson J, Xie S, Hurtig H, Duda J, Arnold S, Siderowf A, Grossman M, Leverenz J, Woltjer R, Lopez OL, **Hamilton R,** Tsuang DW, Galaska D, Masliah M, Kaye J, Clark C, Montine TJ, Lee VMY, Trojanowski J. Co-morbidity of TDP-43 Proteinopathy in Lewy Body Related Diseases. Acta Neuropathol 114:221-9, 2007.  PMID 17653732

88. McIntyre JA, **Hamilton RL**, DeKosky ST. Redox-reactive autoantibodies in cerebrospinal fluids.  Ann NY Acad Sci 1109:296-302, 2007. PMID 17785318

89. Okada H, Lieberman FS, Walter KA, Lunsford LD, Kondziolka DS, Bejjani GK, **Hamilton RL**, Torres-Trejo A, Kalinski P, Cai Q, Mabold JL, Edington HD, Butterfield LH, Whiteside TL, Potter DM, Schold SC Jr., Pollack IF  Autologous glioma cell vaccine admixed with interleukin-4 gene transfected fibroblasts in the treatment of patients with malignant gliomas.  J Transl Med 5:67, 2007.  PMID 18093335. **PMCID: PMC2254376**

90. Beach TG, White CL, **Hamilton, RL**, Duda JE, Iwatsubo T, Dickson DW, Leverenz JB, Roncaroli F, Buttini M, Hladik CL, Sue LI, Noorigian JV, Adler CH.  Evaluation of alpha-synuclein immunohistochemical methods used by invited experts.  Acta Neuropathol 116:277-88, 2008. PMID 18626651.  **PMCID: PMC2708176**

91. Ikonomovic MD, Klunk WE, Abrahamson EE, Mathis CA, Price JC, Tsopelas ND, Lopresti BJ, Ziolko S, Bi W, Paljug WR, Debnath ML, Hope CE, Isanski BA, **Hamilton RL**, DeKosky ST. Post-

**Ronald L. Hamilton, M.D.**

mortem correlates of in vivo PiB-PET amyloid imaging in a typical case of Alzheimers disease. Brain  131(Pt 6):1630-45, 2008.  PMID  18339640.  **PMCID:  PMC2408940**

92.  Leverenz JB, **Hamilton R**, Tsuang DW, Schantz A, Vavrek D, Larson EB, Kukall WA, Lopez O, Galasko D, Masliah E, Woltjer R, Clark C, Trojanowski JQ, Montine TJ. Empiric refinement of the pathologic assessment of Lewy-related pathology in the dementia patient.  Brain Pathol 18:220-224, 2008. PMID 18241249.  **PMCID:  PMC2689097  NIHMS29359**

93.  Raja AI, Yeaney GA, Jakacki RI, **Hamilton RL**, Pollack IF  Extraventricular neurocytoma in neurofibromatosis Type I: Case report.  J Neurosurg Pediatrics 2:63-67, 2008.PMID 18590398

94.  Okada H, Low KL, Kohanbash G, McDonald HA, **Hamilton RL**, Pollack IF.  Expression of glioma-associated antigens in pediatric brain stem and non-brain stem gliomas.  J Neurooncol 88:245-50, 2008. PMID 18324354.  **PMCID:  PMC2561297 NIHMS70086**

95.  Venneti S, Lopresti BJ, Wang G, **Hamilton RL**, Mathis CA, Klunk WE, Apte UM, Wiley CA. PK11195 labels activated microglia in Alzheimer's disease and in vivo in a mouse model using PET. Neurobiol Aging 2009, 30:1217-26. PMID 18178291

96.  Mullett SJ, **Hamilton RL**, Hinkle DA.  DJ-1 immunoreactivity in human brain astrocytes is dependent on infarct presence and infarct age. Neurology 2009, 29:125-31. PMID 18647263

97.  Park DM, Yeaney GA, **Hamilton RL**, Mabold J, Urban N, Appleman L, Flickinger J, Lieberman F, Mintz A.  Identifying Muir-Torre syndrome in a patient with glioblastoma multiforme.  Neuro Oncol, 2009 11:452-5. PMID 19028998.  )

98.  Horbinski C, Bartynski WS, Carson-Walter E, **Hamilton RL**, Tan HP, Cheng S.  Reversible encephalopathy after cardiac transplantation:  Histologic evidence of endothelial activation, T-cell specific trafficking, and vascular endothelial growth factor expression.  Am J Neuroradiol 2008 30:588-90. PMID 18854444.

99.  Northcott P, Nakahara Y, Peacock J, Ellison D, Croul S, Feuk L, Ra YS, Kongham P, Zilerberg K, Mack S, McLeod J, Scherer S, Rao S, Grajkowska W, Gillespie Y, Lach B, Grundy R, Pollack IF, **Hamilton RL,** Van Meter T, Carlotti C, Boop R, Bigner D, Gilbertson R, Rutka J, Taylor MD. Multiple recurrent genetic events converge on control of histone lysine methylation in medulloblastoma.  Nat Genet 2009 41:465-72. PMID 19270706.

100. Ueda R, Kohanbash G, Sasaki K, Fujita M, Zhu X, Kastenhuber ER, McDonald HA, Potter DM, **Hamilton RL,** Lotze MT, Khan SA, Sobol RW, Okada H.  Dicer-regulated microRNAs 222 and 339 promote resistance of cancer cells to cytotoxic T-lymphocytes by down-regulation of ICAM-1. Proc Natl Acad Sci U S A. 2009 Jun 30;106(26):10746-51.  PMID: 19520829

101.  Maki RA, Tyurin VA, Lyon RC, **Hamilton RL**, DeKosky ST, Kagan VE, Reynolds WF.  Aberrant expression of myeloperoxidase in astrocytes promotes phospholipid oxidation and memory deficits in a mouse model of Alzheimer disease. J Biol Chem. 2009 Jan 30;284(5):3158-69. PMID: 19059911.

102.  Horbinski C, **Hamilton RL**, Lovell C, Burnham J, Pollack IF.  Impact of morphology, MIB-1, p53, and MGMT on Outcome in Pilocytic Astrocytomas.  Brain Pathology 2010; 20:581-8  e-pub Sept 21, 2009

103.  Armstrong RA, Ellis W, **Hamilton RL**, MacKenzie IR, Hedreen J, Gearing M, Montine T, Vonsattel JP, Head E, Lieberman AP, Cairns NJ.  Neuropathological heterogeneity in frontotemporal lobar degeneration with TDP-43 proteinopathy: a quantitative study of 94 cases using principle components analysis.  J Neural Transm 2010, 117:227-239.

**Ronald L. Hamilton, M.D.**

104. Horbinski C, **Hamilton RL**, Nikiforov Y, Pollack IF.  Association of molecular alterations, including BRAF, with biology and outcome in pilocytic astrocytomas.  Acta Neuropathol 2010 Jan 1, e-pub.

105. Van Deerlin VM, Sleiman PM, Martinez-Lage M, Chen-Plotkin A, Wang LS, Graff-Radford NR, Dickson DW, Rademakers R, Boeve BF, Grossman M, Arnold SE, Mann DM, Pickering-Brown SM, Seelaar H, Heutink P, van Swieten JC, Murrell JR, Ghetti B, Spina S, Grafman J, Hodges J, Spillantini MG, Gilman S, Lieberman AP, Kaye JA, Woltjer RL, Bigio EH, Mesulam M, Al-Sarraj S, Troakes C, Rosenberg RN, White CL 3rd, Ferrer I, Lladó A, Neumann M, Kretzschmar HA, Hulette CM, Welsh-Bohmer KA, Miller BL, Alzualde A, de Munain AL, McKee AC, Gearing M, Levey AI, Lah JJ, Hardy J, Rohrer JD, Lashley T, Mackenzie IR, Feldman HH, **Hamilton RL**, Dekosky ST, van der Zee J, Kumar-Singh S, Van Broeckhoven C, Mayeux R, Vonsattel JP, Troncoso JC, Kril JJ, Kwok JB, Halliday GM, Bird TD, Ince PG, Shaw PJ, Cairns NJ, Morris JC, McLean CA, DeCarli C, Ellis WG, Freeman SH, Frosch MP, Growdon JH, Perl DP, Sano M, Bennett DA, Schneider JA, Beach TG, Reiman EM, Woodruff BK, Cummings J, Vinters HV, Miller CA, Chui HC, Alafuzoff I, Hartikainen P, Seilhean D, Galasko D, Masliah E, Cotman CW, Tuñón MT, Martínez MC, Munoz DG, Carroll SL, Marson D, Riederer PF, Bogdanovic N, Schellenberg GD, Hakonarson H, Trojanowski JQ, Lee VM.  Common variants at 7p21 are associated with frontotemporal lobar degeneration with TDP-43 inclusions. Nat Genet 2010 42:234-239.

106. Omalu BI, **Hamilton RL**, Kamboh MI, DeKosky ST, Bailes J.  Chronic traumatic encephalopathy in a National Football League Player: Case report and emerging medicolegal practice questions.  J Forensic Nurs, 2010, 6: 40-46.

107. Caltagarone J, **Hamilton RL**, Murdoch G, Jing Z, DeFranco DB, Bowser R. Paxillin and hydrogen peroxide-induced clone 5 expression and distribution in control and Alzheimer disease hippocampi. J Neuropathol Exp Neurol. 2010: 69:356-71.

108. Pollack IF, **Hamilton RL**, Sobol RW, Nikiforova MN, Lyons-Weiler MA, Laframboise WA, Burger PC, Brat DJ, Rosenblum MK, Holmes EJ, Zhou T, Jakacki RI; for the Children's Oncology Group. IDH1 mutations are common in malignant gliomas arising in adolescents: a report from the Children's Oncology Group. Childs Nerv Syst. 2010; 27:87-94

109. Jun G, Naj AC, Beecham GW, Wang LS, Buros J, Gallins PJ, Buxbaum JD, Ertekin-Taner N, Fallin MD, Friedland R, Inzelberg R, Kramer P, Rogaeva E, St George-Hyslop P, Arnold SE, Baldwin CT, Barber R, Beach T, Bigio EH, Bird TD, Boxer A, Burke JR, Cairns N, Carroll SL, Chui HC, Clark DG, Cotman CW, Cummings JL, Decarli C, Diaz-Arrastia R, Dick M, Dickson DW, Ellis WG, Fallon KB, Farlow MR, Ferris S, Frosch MP, Galasko DR, Gearing M, Geschwind DH, Ghetti B, Gilman S, Giordani B, Glass J, Graff-Radford NR, Green RC, Growdon JH, **Hamilton RL**, Harrell LE, Head E, Honig LS, Hulette CM, Hyman BT, Jicha GA, Jin LW, Johnson N, Karlawish J, Karydas A, Kaye JA, Kim R, Koo EH, Kowall NW, Lah JJ, Levey AI, Lieberman A, Lopez OL, Mack WJ, Markesbery W, Marson DC, Martiniuk F, Masliah E, McKee AC, Mesulam M, Miller JW, Miller BL, Miller CA, Parisi JE, Perl DP, Peskind E, Petersen RC, Poon W, Quinn JF, Raskind M, Reisberg B, Ringman JM, Roberson ED, Rosenberg RN, Sano M, Schneider JA, Schneider LS, Seeley W, Shelanski ML, Smith CD, Spina S, Stern RA, Tanzi RE, Trojanowski JQ, Troncoso JC, Van Deerlin VM, Vinters HV, Vonsattel JP, Weintraub S, Welsh-Bohmer KA, Woltjer RL, Younkin SG, Cantwell LB, Dombroski BA, Saykin AJ, Reiman EM, Bennett DA, Morris JC, Lunetta KL, Martin ER, Montine TJ, Goate AM, Blacker D, Tsuang DW, Beekly D, Cupples LA, Hakonarson H, Kukull W, Foroud TM, Haines J, Mayeux R, Farrer LA, Pericak-Vance MA, Schellenberg GD; Alzheimer's Disease Genetics Consortium, Arnold SE, Baldwin CT, Barber R, Beach T, Bigio EH, Bird TD, Boxer A, Burke JR, Cairns N, Carroll SL, Chui HC, Clark DG, Cotman CW, Cummings JL, Decarli C, Diaz-Arrastia R, Dick M, Dickson DW, Ellis WG, Fallon KB, Farlow MR, Ferris S, Frosch MP, Galasko DR, Gearing M, Geschwind DH, Ghetti B, Gilman S, Giordani B, Glass J, Graff-Radford NR, Green RC, Growdon JH, Hamilton RL, Harrell LE, Head E, Honig LS, Hulette CM, Hyman BT, Jicha GA, Jin LW, Johnson N, Karlawish J, Karydas A, Kaye JA, Kim R, Koo EH, Kowall NW, Lah JJ, Levey AI, Lieberman A, Lopez OL, Mack WJ, Markesbery W, Marson DC, Martiniuk F, Masliah E, McKee AC, Mesulam M, Miller JW, Miller BL, Miller CA, Parisi JE, Perl DP, Peskind E, Petersen RC, Poon W, Quinn JF, Raskind M, Reisberg B, Ringman JM, Roberson ED, Rosenberg RN, Sano M, Schneider JA, Schneider LS, Seeley W, Shelanski ML, Smith CD, Spina S, Stern RA, Tanzi RE, Trojanowski JQ, Troncoso JC, Van Deerlin VM, Vinters HV, Vonsattel JP, Weintraub S, Welsh-Bohmer KA, Woltjer RL, Younkin SG. Meta-analysis confirms CR1, CLU and PICALM as Alzheimer Disease Risk Loci and reveals interactions with APOE Genotypes. Arch Neurol, 2010, Sep 3 (epub ahead of print)

110. Pollack IF, **Hamilton RL**, Burger PC, Brat DJ, Rosenblum MK, Murdoch GH, Nikiforova MN, Holmes EJ, Zhou T, Cohen KJ, Jakacki RI; Children's Oncology Group. Akt activation is a common event in pediatric malignant gliomas and a potential adverse prognostic marker: a report from the Children's Oncology Group. J Neurooncol. 2010 Sep;99(2):155-63. Epub 2010 Jul 4

**Ronald L. Hamilton, M.D.**

111. Pollack IF, **Hamilton RL**, Sobol RW, Nikiforova MN, Nikiforov YE, Lyons-Weiler MA, Laframboise WA, Burger PC, Brat DJ, Rosenblum MK, Gilles FH, Yates AJ, Zhou T, Cohen KJ, Finlay JL, Jakacki RI; for the Children's Oncology Group. Mismatch repair deficiency is an uncommon mechanism of alkylator resistance in pediatric malignant gliomas: a report from the Children's Oncology Group. Pediatr Blood Cancer 2010 Jun 29 epub ahead of print

112. Bonneh-Barkay D, Wang G, Starkey A, **Hamilton RL**, Wiley CA. In vivo CHI3L1 (YKL-40) expression in astrocytes in acute and chronic neurological diseases. J Neuroinflammation 2010 Jun 11:7-34.

113. Hinkle DA, Mullett SJ, Gabris BE, **Hamilton RL**. DJ-1 expression in glioblastomas shows positive correlation with p53 expression and negative correlation with epidermal growth factor receptor amplification. Neuropathology 2010 May 19 (epub ahead of print)xx

114. Okada H, Kalinski P, Ueda R, Hoji A, Kohanbash G, Donegan TE, Mintz AH, Engh JA, Bartlett DL, Brown CK, Zeh H, Holtman MP, Reinhart TA, Whiteside TL,Butterfield LH, **Hamilton RL**, Potter DM, Pollack IF, Salazar AM, Lieberman FS. Induction of CD8+ T-cell responses against novel glioma-associated antigen peptides and clinical activity by vaccinations with {alpha}-type 1 polarized dendritic cells and polyinosinic-polycytidylic acid stabilized by lysine and carboxymethylcellulose In patients with recurrent malignant glioma. J Clin Oncol. 2011;29:330-6.PMID: 21149657

115. Kofler J, Bartynski WS, Reynolds TQ, Lieberman FS, Murdoch GH, **Hamilton RL**. Posterior reversible encephalopathy syndrome (PRES) with immune system activation, VEGF up-regulation, and cerebral amyloid angiopathy. J. Comput Assist Tomogr. 2011; 35:39-42. PMID: 21150450

116. Bonfield CM, Amin D, **Hamilton RL**, Gerszten PC. Extramedullary ependymoma near the conus medullaris with lumbar nerve root attachment: case report. Neurosurgery. 2011 Mar;68:E831-4. PMID:21311277

117. Fujita M, Kohanbash G, Fellows-Mayle W, **Hamilton RL**, Komohara Y, Decker SA, Ohlfest JR, Okada H.COX-2 blockade suppresses gliomagenesis by inhibiting myeloid-derived suppressor cells.     Cancer Res. 2011 Apr 1;71:2664-74. Epub 2011 Feb 15. PMID: 21324923

118. Cohen KJ, Pollack IF, Zhou T, Buxton A, Holmes EF, Burger PC, Brat DJ, Rosenblum MK, **Hamilton RL**, Lavey RS, Heideman RL. Temozolomide in the treatment of high-grade gliomas in children: a report from the Children's Oncology Group.
Neuro Oncol. 2011 Mar;13:317-23. PMID: 21339192

119. Omalu B, Bailes J, **Hamilton RL**, Kamboh MI, Hammers J, Case M, Fitzsimmons R.
Emerging histomorphologic phenotypes of chronic traumatic encephalopathy in American athletes.
Neurosurgery. 2011 Jul;69:173-83; discussion 183. PMID: 21358359

120. Tang JB, Svilar D, Trivedi RN, Wang XH, Goellner EM, Moore B, **Hamilton RL**, Banze LA, Brown AR, Sobol RW. N-methylpurine DNA glycosylase and DNA polymerase beta modulate BER inhibitor potentiation of glioma cell to temozolomide. Neurosurgery Oncol. 2011;13:471-86. PMID: 21377995

121. Liu KW, Feng H, Bachoo R, Kazlauskas A, Smith EM, Symes K, **Hamilton RL**, Nagane M, Nishikawa R, Hu, B, Cheng Sy. SHP-2/PTPN 11 mediates gliomagenesis driven by PDGFRA and INK4A/ARF aberrations in mice and humans. J. Clin Invest. 2011 Mar;121:905-17. PMID: 21393858

122. Naj AC, Jun G, Beecham GW, Wang LS, Vardarajan BN, Buros J, Gallins PJ, Buxbaum JD, Jarvidk GP, Crane PK, Larson EB, Bird TB, Boeve BF, Graff-Radford NR, De Jager PL, Evans D, Schneider JA, Carrasquillo MM, Ertekin-Taner N, Younkin SG, Cruchaga C, Kauwe JS, Nowotny P, Kramer P, Hardy J, Huentelman MJ, Myers AJ, Barmada MM, Demirci FY, Baldwin CT, Green RC, Rogaeva E, St. George-Hyslop P, Arnold SE, Barber R, Beach T, Bigio EH, Bowen JD, Boxer A, Burke JR, Cairns NJ, Carlson CS, Carney RM, Carroll SL, Chui HC, Clark DG, Corneveaux J, Cotman CW, Cummings JL, Decarli C, DeKosy ST, Diaz-Arrastia R, Dick M, Dickson DW, Ellis WG, Faber KM, Fallon KB, Farlow MR, Ferris S. Frosch MP, Galasko Dr, Ganguli M, Gearing M, Geschwind DH, Ghetti B, Gilbert JR, Gilman S, Giordani B, Glass JD, Growdon JH, **Hamilton RL**,R, Koo EH, Kowall NW, Lah JJ, Levey AI, Lieberman AP, Lopez OL, Mack WJ, Marson DC, Martiniuk F, Mash DC, Masliah E, McCormick WC, McCurry SM, McDavid AN, McKee AC, Mesulam M, Miller BL, Miller JW, Parisi JE, Perl DP, Peskind E,Petersen, RC, Poon, WV, Quinn JF, Rajbhandary RA, Raskind M, Reisberg B, Ringman JM, Roberson ED, Rosenberg RN,Sano M, Schneider LS, Seeley W, Shelanksi ML, Slifer MA, Smith CD, Sonnen JA, Spina S. Stern RA, Tanzi RE, Trojanowski JQ, Troncoso JC, Van Deerlin VM, Vinters HV, Vonsattel JP, Weintraub S, Welsh-Bohmer KA, Williamson

**Ronald L. Hamilton, M.D.**

J, Woltjer RL,Cantwell LB, Dombroski BA, Beekly D, Lunetta KL, Martin ER, Kamboh MI, Saykin AJ, Reiman EM, Bennett DA, Morris JC, Montine TJ, Goate AM, Iacker D, Tsuang DW, Hakonarson, H, Kukull WA, Foroud TM, Haines JL, Mayeux R, Pericak-Vance MA, Farrer LA, Schellenberg GD. Commons variants as MS4A4/MS4A6E, CD2AP, CD33 and EPHA1 are associated with late Onset Alzheimer's Disease. Nat Genet. 2011 May;43:436-41 Epub 2011 Apr 3. PMID: 21460841

123.   Chen-Plotkin AS, Martinez-Lage M,Sleiman PM, Hu W, Greene R, Wood  EM, Bing S, Grossman M, Schellenberg GD, Hatanpaa KJ, Weiner MF, White CL 3rd, Brooks WS, Halliday GM, Kril JJ, Gearing M, Beach TG, Graff-Radford NR, Dickson DW, Rademakers R, Boeve BF, Pickering-Brown SM, Snowden J, van Swieten JC, Heutink P, Seelaar H, Murrell JR, Ghetti B, Spina S, Grafman J, Kaye JA, Woltjer RL, Mesulam M, Bigio E, Llad'o A, Miller BL, Alzualde A, Moreno F,Rohrer JD, Mackenzie IR, Feldman HH, **Hamilton RL**, Cruts M, Engelborghs S, De Deyn PP, Van Broeckhoven C, Bird TD, Cairns NJ, Goate A, Frosch MP, Riederer PF, Bogdanovic N, Lee VM, Trojanowksi JQ, Van Deerlin VM. Genetic and clinical features of progranulin-associated frontotemporal lobar degeneration. Arch Neurol. 2011 Apr;68:488-97. PMID: 21482928

124.   Nikiforova MN, **Hamilton RL**. Molecular diagnostics of gliomas. Arch Pathol Lab Med. 2011 May;135:558-68. Review. PMID: 21526954

125.   Monaco EA 3rd, Armah HB, Nikiforova MN, **Hamilton RL**, Engh JA. Grade II Oligodendroglioma localized to the corpus callosum. Brain Tumor Pathol. 2011 Oct;28:305-9. Epub 2011 Jul 22. PMID: 21833577

126.   Horbinski C, Hobbs, J, Cieply K, Dacic S, **Hamilton RL**. EGFR expression stratifies oligodendroglioma behavior.Am J Pathol. 2011 Oct; 179:1638-44. Epub 2011 Aug 11. PMID: 21839716

127.   Omalu B, hammers, JL, bailes J**, Hamilton RL**. Kamboh MI, Webster G, Fitzsimmons RP. Chronic traumatic Encephalopathy  in an Iraqi war veteran with posttraumatic stress disorder who committed suicide. Neurosurg Focus. 2011 Nov; :E3. PMID: 22044102

128.   Liu Y, Komohara Y, Domenick N, Ohno M, Ikeura M, **Hamilton RL**, Horbinski C, Wang X, Ferrone S, Okada H. Expression of antigen processing molecules in brain metastasis of breast cancer. Cancer Immunol Immunother. 2011 Nov 8. (Epub ahead of print } PMID:22065046

129.   Feng H, Hu B, Liu KW, Li Y, Lu X, Cheng T, Yiin JJ, Lu S, Keezer S, Fenton T, Furnari FB, **Hamilton RL**, Vuori K, Sarkaria JN, Nagane M, Nishikawa R, Cavenee WK, Cheng SY. Activation of Rac 1 by src-dependent phosphorylation of Dock180(Y1811) mediates PDGFRa-stimulated glioma tumorigenesis in mice and humans. J Clin Invest. 2011 Dec; 121:4670-84. doi: 10.1172/JCI58559. Epub 2011 Nov 14. PMID: 22080864

130.   Horbinski C, Nikiforova MN, Hobbs J, Bortoluzzi S. Cieply K, Dacic S, **Hamilton RL**. The importance of 10q status in an outcomes-based comparison between 1p/19q fluorescence in situ hybridization and polymerase chain reaction-based microsatellite loss of heterozygosity analysis of oligodendrogliomas.  J. Neuropathol Exp Neurol. 2012 Jan;71:73-82. PMID: 22157622

131.   Ikonomovic MD, Abrahamson EE, Price JC, **Hamilton RL**, Mathis CA, Paljug WR, Cohen AD, Mizukami K, DeKosky ST, Lopez OL, Klunk WE. Early AD pathology in a {C-11} PiB-negative case: a PiB-amyloid imaging, biochemical, and  Immunohistochemical study. Acta Neuropathol. 2012 Mar;123:433-47. Epub 2012 Jan 24. PMID: 22271153

132.   Feng H, Hu B, Jarzynka MJ, Li Y, Keezer S, Johns TG, Tang CK, **Hamilton RL**, Vuuori K, Nishikawa R, Sarkaria JN, Fenton T, Cheng T, Furnari FB, Cavenee WK, Cheng SY. Phosphorylation of dedicator of cytokinesis 1(Dock 180) at tyrosine residue Y722 by Src family kinases mediates EGRFvIII-driven glioblastoma tumorigenesis. Proc Natl Acad Sci U S A. 2012 Feb 21;109:3018-23. Epub 2012 Feb 7. PMID: 22323579

133.   Wu Y, Lou H, Alerte TN, Stachowski EK, Chen J, Singleton AB, **Hamilton RL**, Perez RG. Neuroscience. 2012 Jan 25. {Epubahead a print} PMID: 22326202

134.   Murray PS, Kirkwood CM, Gray MC, Ikonomovic MD, Paljug WR, Abrahamson EE, Henteleff RA, **Hamilton RL**, Kofler JK, Klunk WE, Lopez OL, Penzes P, Sweet RA. β-Amyloid 42/40 ratio and kalirin expression in Alzheimer disease with psychosis. Neurobiol Aging. 2012 Mar 17. [Epub ahead of print] PMID:22429885

**Ronald L. Hamilton, M.D.**

135.    Choi SH, Olabarrieta M, Lopez OL, Maruca V, DeKosky ST, **Hamilton RL**, Becker JT. Gray Matter Atrophy Associated with Extrapyramidal Signs in the Lewy Body Variant of Alzheimer's Disease. J Alzheimers Dis. 2012 Aug 9. [Epub ahead of print] PMID:22886020

136.    Armstrong RA, **Hamilton RL**, Mackenzie IR, Hedreen J, Cairns NJ. Laminar Distribution of the Pathological Changes in Sporadic Frontotemporal Lobar Degeneration with TDP-43 Proteinopathy: A Quantitative Study Using Polynomial Curve Fitting. Neuropathol Appl Neurobiol. 2012 Jul 16. [Epub ahead of print] PMID:22804696

137.    Atkinson DM, **Hamilton RL** A 52-year-old male with visual changes. Brain Pathol. 2012 Jul;22(4):575-8. PMID:22697384

138.    Zou F, Chai HS, Younkin CS, Allen M, Crook J, Pankratz VS, Carrasquillo MM, Rowley CN, Nair AA, Middha S, Maharjan S, Nguyen T, Ma L, Malphrus KG, Palusak R, Lincoln S, Bisceglio G, Georgescu C, Kouri N, Kolbert CP, Jen J, Haines JL, Mayeux R, Pericak-Vance MA, Farrer LA, Schellenberg GD; Alzheimer's Disease Genetics Consortium, Petersen RC, Graff-Radford NR, Dickson DW, **Hamilton RL**, Younkin SG, Ertekin-Taner N. Brain expression genome-wide association study (eGWAS) identifies human disease-associated variants. PLoS Genet. 2012;8(6): e1002707. Epub 2012 Jun 7 PMID:22685416

139.    Horbinski C, Nikiforova MN, Hagenkord JM, **Hamilton RL**, Pollack IF. Interplay among BRAF, p16, p53, and MIB1 in pediatric low-grade gliomas. Neuro Oncol. 2012 Jun;14(6):777-89 (1012) PMID:22492957

140.    Hobbs J, Nikiforova MN, Fardo DW, Bortoluzzi S, Cieply K, **Hamilton RL**, Horbinski C. Paradoxical relationship between the degree of EGFR amplification and outcome in glioblastomas. Am J Surg Pathol. 2012 Aug;36(8):1186-93. PMID:22472960

141. Armstrong, R. A., **R. L. Hamilton**, I. R. Mackenzie, J. Hedreen and N. J. Cairns. "Laminar Distribution of the Pathological Changes in Sporadic Frontotemporal Lobar Degeneration with Transactive Response (Tar) DNA-Binding Protein of 43 Kda (Tdp-43) Proteinopathy: A Quantitative Study Using Polynomial Curve Fitting." *Neuropathol Appl Neurobiol* 39, no. 4 (2013): 335-47.

142. Clark, K. H., J. L. Villano, M. N. Nikiforova, **R. L. Hamilton** and C. Horbinski. "1p/19q Testing Has No Significance in the Workup of Glioblastomas." *Neuropathol Appl Neurobiol*,  (2013).

143. Gheorghe, G., O. Radu, S. Milanovich, **R. L. Hamilton**, R. Jaffe, J. F. Southern and J. A. Ozolek. "Pathology of Central Nervous System Posttransplant Lymphoproliferative Disorders: Lessons from Pediatric Autopsies." *Pediatr Dev Pathol* 16, no. 2 (2013): 67-73.

1444. Holton, P., M. Ryten, M. Nalls, D. Trabzuni, M. E. Weale, D. Hernandez, H. Crehan, J. R. Gibbs, R. Mayeux, J. L. Haines, L. A. Farrer, M. A. Pericak-Vance, G. D. Schellenberg, M. Ramirez-Restrepo, A. Engel, A. J. Myers, J. J. Corneveaux, M. J. Huentelman, A. Dillman, M. R. Cookson, E. M. Reiman, A. Singleton, J. Hardy and R. Guerreiro. "Initial Assessment of the Pathogenic Mechanisms of the Recently Identified Alzheimer Risk Loci." *Ann Hum Genet* 77, no. 2 (2013): 85-105.

145. Miyashita, A., A. Koike, G. Jun, L. S. Wang, S. Takahashi, E. Matsubara, T. Kawarabayashi, M. Shoji, N. Tomita, H. Arai, T. Asada, Y. Harigaya, M. Ikeda, M. Amari, H. Hanyu, S. Higuchi, T. Ikeuchi, M. Nishizawa, M. Suga, Y. Kawase, H. Akatsu, K. Kosaka, T. Yamamoto, M. Imagawa, T. Hamaguchi, M. Yamada, T. Moriaha, M. Takeda, T. Takao, K. Nakata, Y. Fujisawa, K. Sasaki, K. Watanabe, K. Nakashima, K. Urakami, T. Ooya, M. Takahashi, T. Yuzuriha, K. Serikawa, S. Yoshimoto, R. Nakagawa, J. W. Kim, C. S. Ki, H. H. Won, D. L. Na, S. W. Seo, I. Mook-Jung, P. St George-Hyslop, R. Mayeux, J. L. Haines, M. A. Pericak-Vance, M. Yoshida, N. Nishida, K. Tokunaga, K. Yamamoto, S. Tsuji, I. Kanazawa, Y. Ihara, G. D. Schellenberg, L. A. Farrer and R. Kuwano. "Sorl1 Is Genetically Associated with Late-Onset Alzheimer's Disease in Japanese, Koreans and Caucasians." *PLoS One* 8, no. 4 (2013): e58618.

146. Pang, B., M. B. Durso, **R. L. Hamilton** and M. N. Nikiforova. "A Novel Cold-Pcr/Fmca Assay Enhances the Detection of Low-Abundance Idh1 Mutations in Gliomas." *Diagn Mol Pathol* 22, no. 1 (2013): 28-34.

147. Reitz, C., G. Jun, A. Naj, R. Rajbhandary, B. N. Vardarajan, L. S. Wang, O. Valladares, C. F. Lin, E. B. Larson, N. R. Graff-Radford, D. Evans, P. L. De Jager, P. K. Crane, J. D. Buxbaum, J. R. Murrell, T. Raj, N. Ertekin-Taner, M. Logue, C. T. Baldwin, R. C. Green, L. L. Barnes, L. B. Cantwell, M. D. Fallin, R. C. Go, P. Griffith, T. O. Obisesan, J. J. Manly, K. L. Lunetta, M. I. Kamboh, O. L. Lopez, D. A. Bennett, H. Hendrie, K. S. Hall, A. M. Goate, G. S. Byrd, W. A. Kukull, T. M. Foroud, J. L. Haines, L. A. Farrer, M. A. Pericak-Vance, G. D. Schellenberg and R. Mayeux. "Variants

**Ronald L. Hamilton, M.D.**

in the Atp-Binding Cassette Transporter (Abca7), Apolipoprotein E 4,and the Risk of Late-Onset Alzheimer Disease in African Americans." *JAMA* 309, no. 14 (2013): 1483-92.

148. Schlegel, J., M. J. Sambade, S. Sather, S. J. Moschos, A. C. Tan, A. Winges, D. DeRyckere, C. C. Carson, D. G. Trembath, J. J. Tentler, S. G. Eckhardt, P. F. Kuan, **R. L. Hamilton**, L. M. Duncan, C. R. Miller, N. 9. Nikolaishvili-Feinberg, B. R. Midkiff, J. Liu, W. Zhang, C. Yang, X. Wang, S. V. Frye, H. S. Earp, J. M. Shields and D. K. Graham. "Mertk Receptor Tyrosine Kinase Is a Therapeutic Target in Melanoma." *J Clin Invest* 123, no. 5 (2013): 2257-67.

150. Spina, S., A. D. Van Laar, J. R. Murrell, **R. L. Hamilton**, J. K. Kofler, F. Epperson, M. R. Farlow, O. L. Lopez, J. Quinlan, S. T. DeKosky and B. Ghetti. "Phenotypic Variability in Three Families with Valosin-Containing Protein Mutation." *Eur J Neurol* 20, no. 2 (2013): 251-8.

151. Tsuang, D., J. B. Leverenz, O. L. Lopez, **R. L. Hamilton,** D. A. Bennett, J. A. Schneider, A. S. Buchman, E. B. Larson, P. K. Crane, J. A. Kaye, P. Kramer, R. Woltjer, J. Q. Trojanowski, D. Weintraub, A. S. Chen-Plotkin, D. J. Irwin, J. Rick, G. D. Schellenberg, G. S. Watson, W. Kukull, P. T. Nelson, G. A. Jicha, J. H. Neltner, D. Galasko, E. Masliah, J. F. Quinn, K. A. Chung, D. Yearout, I. F. Mata, J. Y. Wan, K. L. Edwards, T. J. Montine and C. P. Zabetian. "Apoe Epsilon4 Increases Risk for Dementia in Pure Synucleinopathies." *JAMA Neurol* 70, no. 2 (2013): 223-8.

152. Yeung, J. T., **R. L. Hamilton**, K. Ohnishi, M. Ikeura, D. M. Potter, M. N. Nikiforova, S. Ferrone, R. I. Jakacki, I. F. Pollack and H. Okada. "Loh in the Hla Class I Region at 6p21 Is Associated with Shorter Survival in Newly Diagnosed Adult Glioblastoma." *Clin Cancer Res* 19, no. 7 (2013): 1816-26.

153. Yeung, J. T., **R. L. Hamilton**, H. Okada, R. I. Jakacki and I. F. Pollack. "Increased Expression of Tumor-Associated Antigens in Pediatric and Adult Ependymomas: Implication for Vaccine Therapy." *J Neurooncol* 111, no. 2 (2013): 103-11.

154. **Hamilton R**, Krauze M, Romkes M, Omolo B, Konstantinopoulos P, Reinhart T, Harasymczuk M, Wang Y, Lin Y, Ferrone S, Whiteside T, Bortoluzzi S, Werley J, Nukui T, Fallert-Junecko B, Kondziolka D, Ibrahim J, Becker D, Kirkwood J, Moschos S. Pathologic and gene expression features of metastatic melanomas to the brain.Cancer. 2013 Aug 1;119(15):2737-46. doi: 10.1002/cncr.28029. Epub 2013 May 21.PMID:23695963 [PubMed - in process]

155. Lam S, Grandhi R, Wong R, **Hamilton R**, Greene S. Neuromuscular hamartoma of the sciatic nerve: Case report and review of the literature. Surg Neurol Int. 2013;4:8. doi: 10.4103/2152-7806.106266. Epub 2013 Jan 18.PMID:23493803[PubMed]

156. Reitz C, Mayeux R; Alzheimer's Disease Genetics Consortium. TREM2 and neurodegenerative disease. N Engl J Med. 2013 Oct 17;369(16):1564-5. doi: 10.1056/NEJMc1306509#SA1. PMID:24131184

157. Tempel ZJ, Johnson SA, Richard PS, Friedlander RM, Rothfus WE, **Hamilton RL**. Parasellar arachnoid cyst presenting with a nonpupil sparing third nerve palsy mimicking a posterior communicating artery aneurysm in an adult. Surg Neurol Int. 2013 Jul 9;4:87. doi: 10.4103/2152-7806.114799. eCollection 2013.PMID:23956930

158. Murray PS, Kirkwood CM, Gray MC, Fish KN, Ikonomovic MD, **Hamilton RL**, Kofler JK, Klunk WE, Lopez OL, Sweet RA. Hyperphosphorylated tau is elevated in Alzheimer's Disease with psychosis. J Alzheimers Dis, 2014 204;39:759-773. PMID:24270207

159. Oborski MJ, Laymon CM, Lieberman FS, Drappatz J, **Hamilton RL**, Mountz JM. First use of (18)F-labeled ML-10 PET to assess apoptosis change in a newly diagnosed glioblastoma multiforme patient before and early after therapy. Brain Behav 2014 4:312-315.  PMID:24683522

160  Shin SS, Murdoch G, Hamilton RL, Faraji AH, Kano H, Zwagerman NT, Gardner PA, Lunsford LD, Friedlander RM The Pathological Response of Cavernous Malformations Following Radiosurgery.  J Neurosurg (in press).

160.  Pollack IF, Jakacki RI, Butterfield LH, **Hamilton RL**, Panigrahy A, Potter DM, Connelly AK, Dibridge SA, Whiteside TL, Okada H. Antigen-specific immune responses and clinical outcome after vaccination with glioma-associated antigen peptides and polyinosinic-polycytidylic Acid stabilized by lysine and carboxymethylcellulose in children with newly diagnosed malignant brainstem and nonbrainstem gliomas. J Clin Oncol. 2014 Jul 1;32(19):2050-8. PMID:24888813

161.  Naj AC, Jun G, Reitz C, Kunkle BW, Perry W, Park YS, Beecham GW, Rajbhandary RA, Hamilton-Nelson KL, Wang LS, Kauwe JS, Huentelman MJ, Myers AJ, Bird TD, Boeve BF, Baldwin CT, Jarvik GP, Crane PK, Rogaeva E, Barmada MM, Demirci FY, Cruchaga C, Kramer PL, Ertekin-Taner N, Hardy J, Graff-Radford NR, Green RC, Larson

**Ronald L. Hamilton, M.D.**

EB, St George-Hyslop PH, Buxbaum JD, Evans DA, Schneider JA, Lunetta KL, Kamboh MI, Saykin AJ, Reiman EM, De Jager PL, Bennett DA, Morris JC, Montine TJ, Goate AM, Blacker D, Tsuang DW, Hakonarson H, Kukull WA, Foroud TM, Martin ER, Haines JL, Mayeux RP, Farrer LA, Schellenberg GD, Pericak-Vance MA; Alzheimer Disease Genetics Consortium, Albert MS, Albin RL, Apostolova LG, Arnold SE, Barber R, Barnes LL, Beach TG, Becker JT, Beekly D, Bigio EH, Bowen JD, Boxer A, Burke JR, Cairns NJ, Cantwell LB, Cao C, Carlson CS, Carney RM, Carrasquillo MM, Carroll SL, Chui HC, Clark DG, Corneveaux J, Cribbs DH, Crocco EA, DeCarli C, DeKosky ST, Dick M, Dickson DW, Duara R, Faber KM, Fallon KB, Farlow MR, Ferris S, Frosch MP, Galasko DR, Ganguli M, Gearing M, Geschwind DH, Ghetti B, Gilbert JR, Glass JD, Growdon JH, **Hamilton RL**, Harrell LE, Head E, Honig LS, Hulette CM, Hyman BT, Jicha GA, Jin LW, Karydas A, Kaye JA, Kim R, Koo EH, Kowall NW, Kramer JH, LaFerla FM, Lah JJ, Leverenz JB, Levey AI, Li G, Lieberman AP, Lin CF, Lopez OL, Lyketsos CG, Mack WJ, Martiniuk F, Mash DC, Masliah E, McCormick WC, McCurry SM, McDavid AN, McKee AC, Mesulam M, Miller BL, Miller CA, Miller JW, Murrell JR, Olichney JM, Pankratz VS, Parisi JE, Paulson HL, Peskind E, Petersen RC, Pierce A, Poon WW, Potter H, Quinn JF, Raj A, Raskind M, Reisberg B, Ringman JM, Roberson ED, Rosen HJ, Rosenberg RN, Sano M, Schneider LS, Seeley WW, Smith AG, Sonnen JA, Spina S, Stern RA, Tanzi RE, Thornton-Wells TA, Trojanowski JQ, Troncoso JC, Valladares O, Van Deerlin VM, Van Eldik LJ, Vardarajan BN, Vinters HV, Vonsattel JP, Weintraub S, Welsh-Bohmer KA, Williamson J, Wishnek S, Woltjer RL, Wright CB, Younkin SG, Yu CE, Yu L. .  Effects of multiple genetic Loci on age at onset in late-onset Alzheimer disease: a genome-wide association study.   JAMA Neurol. 2014 Nov 1;71(11):1394-404. doi: 10.1001/jamaneurol.2014.1491

162. Pollack IF, Jakacki RI, Butterfield LH, **Hamilton RL**, Panigrahy A, Potter DM, Connelly AK, Dibridge SA, Whiteside TL, Okada H.  Antigen-specific immune responses and clinical outcome after vaccination with glioma-associated antigen peptides and polyinosinic-polycytidylic acid stabilized by lysine and carboxymethylcellulose in children with newly diagnosed malignant brainstem and nonbrainstem gliomas.   J Clin Oncol. 2014 Jul 1;32(19):2050-8. doi: 10.1200/JCO.2013.54.0526. Epub 2014 Jun 2. PMID: 24888813

163.. Okada H, Butterfield LH, **Hamilton RL**, Hoji A, Sakaki M, Ahn BJ, Kohanbash G, Drappatz J, Engh J, Amankulor N, Lively MO, Chan MD, Salazar AM, Shaw EG, Potter DM, Lieberman FS.  Induction of robust type-1 CD8+ T-cell responses in WHO grade II low-grade glioma patients receiving peptide-based vaccines in combination with poly-ICLC Clin Cancer Res. 2014 Nov 25. pii: clincanres.1790.2014

164. Salloway S, Sperling R, Fox NC, Blennow K, Klunk W, Raskind M, Sabbagh M, Honig LS, Porsteinsson AP, Ferris S, Reichert M, Ketter N, Nejadnik B, Guenzler V, Miloslavsky M, Wang D, Lu Y, Lull J, Tudor IC, Liu E, Grundman M, Yuen E, Black R, Brashear HR; **Hamilton RL**, Bapineuzumab 301 and 302 Clinical Trial Investigators. Two phase 3 trials of bapineuzumab in mild-to-moderate Alzheimer's disease  N Engl J Med. 2014 Jan 23;370(4):322-33. doi: 10.1056/NEJMoa1304839.

165. Leone JP, Bhargava R, Theisen BK, **Hamilton RL**, Lee AV, Brufsky AM. Expression of high affinity folate receptor in breast cancer brain metastasis. Oncotarget. 2015 Jun 25. [Epub ahead of print]  PMID: 24450891

166. Wang LS, Naj AC, Graham RR, Crane PK, Kunkle BW, Cruchaga C, Murcia JD, Cannon-Albright L, Baldwin CT, Zetterberg H, Blennow K, Kukull WA, Faber KM, Schupf N, Norton MC, Tschanz JT, Munger RG, Corcoran CD, Rogaeva E; Alzheimer's Disease Genetics Consortium, Lin CF, Dombroski BA, Cantwell LB, Partch A, Valladares O, Hakonarson H, St George-Hyslop P, Green RC, Goate AM, Foroud TM, Carney RM, Larson EB, Behrens TW, Kauwe JS, Haines JL, Farrer LA, Pericak-Vance MA, Mayeux R, Schellenberg GD; National Institute on Aging-Late-Onset Alzheimer's Disease (NIA-LOAD) Family Study, Albert MS, Albin RL, Apostolova LG, Arnold SE, Barber R, Barmada M, Barnes LL, Beach TG, Becker JT, Beecham GW, Beekly D, Bennett DA, Bigio EH, Bird TD, Blacker D, Boeve BF, Bowen JD, Boxer A, Burke JR, Buxbaum JD, Cairns NJ, Cao C, Carlson CS, Carroll SL, Chui HC, Clark DG, Cribbs DH, Crocco EA, DeCarli C, DeKosky ST, Demirci FY, Dick M, Dickson DW, Duara R, Ertekin-Taner N, Fallon KB, Farlow MR, Ferris S, Frosch MP, Galasko DR, Ganguli M, Gearing M, Geschwind DH, Ghetti B, Gilbert JR, Glass JD, Graff-Radford NR, Growdon JH, **Hamilton RL**, Hamilton-Nelson KL, Harrell LE, Head E, Honig LS, Hulette CM, Hyman BT, Jarvik GP, Jicha GA, Jin LW, Jun G, Jun G, Kamboh MI, Karydas A, Kaye JA, Kim R, Koo EH, Kowall NW, Kramer JH, LaFerla FM, Lah JJ, Leverenz JB, Levey AI, Li G, Lieberman AP, Lopez OL, Lunetta KL, Lyketsos CG, Mack WJ, Marson DC, Martin ER, Martiniuk F, Mash DC, Masliah E, McCormick WC, McCurry SM, McDavid AN, McKee AC, Mesulam WM, Miller BL, Miller CA, Miller JW, Montine TJ, Morris JC, Murrell JR, Olichney JM, Parisi JE, Perry W, Peskind E, Petersen RC, Pierce A, Poon WW, Potter H, Quinn JF, Raj A, Raskind M, Reiman EM, Reisberg B, Reitz C, Ringman JM, Roberson ED, Rosen HJ, Rosenberg RN, Sano M, Saykin AJ, Schneider JA, Schneider LS, Seeley WW, Smith AG, Sonnen JA, Spina S, Stern RA, Tanzi RE, Thornton-Wells TA, Trojanowski JQ, Troncoso JC, Tsuang DW, Van Deerlin VM, Van Eldik LJ, Vardarajan BN, Vinters HV, Vonsattel JP, Weintraub S, Welsh-Bohmer KA, Williamson J, Wishnek S, Woltjer RL, Wright CB, Younkin SG, Yu CE, Yu L.**Rarity of the Alzheimer disease-protective APP A673T variant in the United States.** JAMA Neurol. 2015 Feb;72(2):209-16. doi: 10.1001/jamaneurol.2014.2157.

**Ronald L. Hamilton, M.D.**

167. 2. Jun G, Ibrahim-Verbaas CA, Vronskaya M, Lambert JC, Chung J, Naj AC, Kunkle BW, Wang LS, Bis JC, Bellenguez C, Harold D, Lunetta KL, Destefano AL, Grenier-Boley B, Sims R, Beecham GW, Smith AV, Chouraki V, Hamilton-Nelson KL, Ikram MA, Fievet N, Denning N, Martin ER, Schmidt H, Kamatani Y, Dunstan ML, Valladares O, Laza AR, Zelenika D, Ramirez A, Foroud TM, Choi SH, Boland A, Becker T, Kukull WA, van der Lee SJ, Pasquier F, Cruchaga C, Beekly D, Fitzpatrick AL, Hanon O, Gill M, Barber R, Gudnason V, Campion D, Love S, Bennett DA, Amin N, Berr C, Tsolaki M, Buxbaum JD, Lopez OL, Deramecourt V, Fox NC, Cantwell LB, Tárraga L, Dufouil C, Hardy J, Crane PK, Eiriksdottir G, Hannequin D, Clarke R, Evans D, Mosley TH Jr, Letenneur L, Brayne C, Maier W, De Jager P, Emilsson V, Dartigues JF, Hampel H, Kamboh MI, de Bruijn RF, Tzourio C, Pastor P, Larson EB, Rotter JI, O'Donovan MC, Montine TJ, Nalls MA, Mead S, Reiman EM, Jonsson PV, Holmes C, St George-Hyslop PH, Boada M, Passmore P, Wendland JR, Schmidt R, Morgan K, Winslow AR, Powell JF, Carasquillo M, Younkin SG, Jakobsdóttir J, Kauwe JS, Wilhelmsen KC, Rujescu D, Nöthen MM, Hofman A, Jones L; IGAP Consortium, Haines JL, Psaty BM, Van Broeckhoven C, Holmans P, Launer LJ, Mayeux R, Lathrop M, Goate AM, Escott-Price V, Seshadri S, Pericak-Vance MA, Amouyel P, Williams J, van Duijn CM, Schellenberg GD, Farrer LA and **.** Collaborators (including **Hamilton RL**) (296)   **A novel Alzheimer disease locus located near the gene encoding tau protein**. Mol Psychiatry. 2015 Mar 17. doi: 10.1038/mp.2015.23.

168. . Østergaard SD, Mukherjee S, Sharp SJ, Proitsi P, Lotta LA, Day F, Perry JR, Boehme KL, Walter S, Kauwe JS, Gibbons LE; Alzheimer's Disease Genetics Consortium; GERAD1 Consortium; EPIC-InterAct Consortium, Larson EB, Powell JF, Langenberg C, Crane PK, Wareham NJ, Scott RA.
Collaborators (including **Hamilton RL**) (296)   Associations between Potentially Modifiable Risk Factors and Alzheimer Disease: A Mendelian Randomization Study. PLoS Med. 2015 Jun 16;12(6):e1001841; discussion e1001841. doi:

169. Wang P, Bahreini A, Gyanchandani R, Lucas PC, Hartmaier RJ, Watters RJ, Jonnalagadda AR, Trejo Bittar HE, Berg A, **Hamilton RL**, Kurland BF, Weiss KR, Mathew A, Leone JP, Davidson NE, Nikiforova MN, Brufsky AM, Ambros TF, Stern AM, Puhalla SL, Lee AV, Oesterreich S. Sensitive detection of mono- and polyclonal ESR1 mutations in primary tumors, metastatic lesions and cell free DNA of breast cancer patients. Clin Cancer Res. 2015 Oct 23. pii: 1534.2015. PMID: 26500237

170. Salgado CM, Basu D, Nikiforova M, **Hamilton RL**, Gehris R, Jakacki R, Panigrahy A, Yatsenko S, Reyes-Múgica M. Amplification of mutated NRAS leading to congenital melanoma in neurocutaneous melanocytosis. Melanoma Res. 2015 Oct;25(5):453-60.  PMID: 26266759

171. Shin SS, Murdoch G, Hamilton RL, Faraji AH, Kano H, Zwagerman NT, Gardner PA, Lunsford LD, Friedlander RM. Pathological response of cavernous malformations following radiosurgery. J Neurosurg. 2015 Oct;123(4):938-44. doi: 10.3171/2014.10.JNS14499. Epub 2015 Jun 19. PMID: 26090838

--------------------

172. Mukherjee S, Walter S, Kauwe JS, Saykin AJ, Bennett DA, Larson EB, Crane PK, Glymour MM; Adult Changes in Thought Study Investigators; Religious Orders Study/Memory and Aging Project Investigators; Alzheimer's Disease Genetics Consortium. Alzheimers Dement. Genetically predicted body mass index and Alzheimer's disease-related phenotypes in three large samples: Mendelian randomization analyses. 2015 Dec;11(12):1439-51. doi: 10.1016/j.jalz.2015.05.015. Epub 2015 Jun 12. PMID: 26079416

173. Ghani M, Reitz C, Cheng R, Vardarajan BN, Jun G, Sato C, Naj A, Rajbhandary R, Wang LS, Valladares O, Lin CF, Larson EB, Graff-Radford NR, Evans D, De Jager PL, Crane PK, Buxbaum JD, Murrell JR, Raj T, Ertekin-Taner N, Logue M, Baldwin CT, Green RC, Barnes LL, Cantwell LB, Fallin MD, Go RC, Griffith PA, Obisesan TO, Manly JJ, Lunetta KL, Kamboh MI, Lopez OL, Bennett DA, Hendrie H, Hall KS, Goate AM, Byrd GS, Kukull WA, Foroud TM, Haines JL, Farrer LA, Pericak-Vance MA, Lee JH, Schellenberg GD, St George-Hyslop P, Mayeux R, Rogaeva E; Alzheimer's Disease Genetics Consortium. Association of Long Runs of Homozygosity With Alzheimer Disease Among African American Individuals. JAMA Neurol. 2015 Nov;72(11):1313-23. doi: 10.1001/jamaneurol.2015.1700. PMID: 26366463

174. Nikiforova MN, Wald AI, Melan MA, Roy S, Zhong S, Hamilton RL, Lieberman FS, Drappatz J, Amankulor NM, Pollack IF, Nikiforov YE, Horbinski C.
Targeted next-generation sequencing panel (GlioSeq) provides comprehensive genetic profiling of central nervous system tumors. Neuro Oncol. 2016 Mar;18(3):379-87. doi: 10.1093/neuonc/nov289. Epub 2015 Dec 17. PMID: 2668176

175. Morrissy AS, Garzia L, Shih DJ, Zuyderduyn S, Huang X, Skowron P, Remke M, Cavalli FM, Ramaswamy V, Lindsay PE, Jelveh S, Donovan LK, Wang X, Luu B, Zayne K, Li Y, Mayoh C, Thiessen N, Mercier E, Mungall KL, Ma

**Ronald L. Hamilton, M.D.**

Y, Tse K, Zeng T, Shumansky K, Roth AJ, Shah S, Farooq H, Kijima N, Holgado BL, Lee JJ, Matan-Lithwick S, Liu J, Mack SC, Manno A, Michealraj KA, Nor C, Peacock J, Qin L, Reimand J, Rolider A, Thompson YY, Wu X, Pugh T, Ally A, Bilenky M, Butterfield YS, Carlsen R, Cheng Y, Chuah E, Corbett RD, Dhalla N, He A, Lee D, Li HI, Long W, Mayo M, Plettner P, Qian JQ, Schein JE, Tam A, Wong T, Birol I, Zhao Y, Faria CC, Pimentel J, Nunes S, Shalaby T, Grotzer M, Pollack IF, Hamilton RL, Li XN, Bendel AE, Fults DW, Walter AW, Kumabe T, Tominaga T, Collins VP, Cho YJ, Hoffman C, Lyden D, Wisoff JH, Garvin JH Jr, Stearns DS, Massimi L, Schüller U, Sterba J, Zitterbart K, Puget S, Ayrault O, Dunn SE, Tirapelli DP, Carlotti CG, Wheeler H, Hallahan AR, Ingram W, MacDonald TJ, Olson JJ, Van Meir EG, Lee JY, Wang KC, Kim SK, Cho BK, Pietsch T, Fleischhack G, Tippelt S, Ra YS, Bailey S, Lindsey JC, Clifford SC, Eberhart CG, Cooper MK, Packer RJ, Massimino M, Garre ML, Bartels U, Tabori U, Hawkins CE, Dirks P, Bouffet E, Rutka JT, Wechsler-Reya RJ, Weiss WA, Collier LS, Dupuy AJ, Korshunov A, Jones DT, Kool M, Northcott PA, Pfister SM, Largaespada DA, Mungall AJ, Moore RA, Jabado N, Bader GD, Jones SJ, Malkin D, Marra MA, Taylor MD. Divergent clonal selection dominates medulloblastoma at recurrence. Nature. 2016 Jan 21;529(7586):351-7. doi: 10.1038/nature16478. Epub 2016 Jan 13

176. Gandhoke GS, Yilmaz S, Grunwaldt L, Hamilton RL, Salvetti DJ, Greene S. A case of spinal epidural venous malformation with mediastinal extension: management with combined surgery and percutaneous sclerotherapy. J Neurosurg Pediatr. 2016 May;17(5):612-7. doi: 10.3171/2015.9.PEDS15341. Epub 2016 Jan 15.

177. Thompson EM, Hielscher T, Bouffet E, Remke M, Luu B, Gururangan S, McLendon RE, Bigner DD, Lipp ES, Perreault S, Cho YJ, Grant G, Kim SK, Lee JY, Rao AA, Giannini C, Li KK, Ng HK, Yao Y, Kumabe T, Tominaga T, Grajkowska WA, Perek-Polnik M, Low DC, Seow WT, Chang KT, Mora J, Pollack IF, Hamilton RL, Leary S, Moore AS, Ingram WJ, Hallahan AR, Jouvet A, Fèvre-Montange M, Vasiljevic A, Faure-Conter C, Shofuda T, Kagawa N, Hashimoto N, Jabado N, Weil AG, Gayden T, Wataya T, Shalaby T, Grotzer M, Zitterbart K, Sterba J, Kren L, Hortobágyi T, Klekner A, László B, Pócza T, Hauser P, Schüller U, Jung S, Jang WY, French PJ, Kros JM, van Veelen MC, Massimi L, Leonard JR, Rubin JB, Vibhakar R, Chambless LB, Cooper MK, Thompson RC, Faria CC, Carvalho A, Nunes S, Pimentel J, Fan X, Muraszko KM, López-Aguilar E, Lyden D, Garzia L, Shih DJ, Kijima N, Schneider C, Adamski J, Northcott PA, Kool M, Jones DT, Chan JA, Nikolic A, Garre ML, Van Meir EG, Osuka S, Olson JJ, Jahangiri A, Castro BA, Gupta N, Weiss WA, Moxon-Emre I, Mabbott DJ, Lassaletta A, Hawkins CE, Tabori U, Drake J, Kulkarni A, Dirks P, Rutka JT, Korshunov A, Pfister SM, Packer RJ, Ramaswamy V, Taylor MD. Prognostic value of medulloblastoma extent of resection after accounting for molecular subgroup: a retrospective integrated clinical and molecular analysis. Lancet Oncol. 2016 Mar 11. pii: S1470-2045(15)00581-1. doi: 10.1016/S1470-2045(15)00581-1. [Epub ahead of print]

178. Pollack IF, Jakacki RI, Butterfield LH, Hamilton RL, Panigrahy A, Normolle DP, Connelly AK, Dibridge S, Mason G, Whiteside TL, Okada H. Immune responses and outcome after vaccination with glioma-associated antigen peptides and poly-ICLC in a pilot study for pediatric recurrent low-grade gliomas†. Neuro Oncol. 2016 Mar 15. pii: now026. [Epub ahead of print]

179. Jakacki RI, Cohen KJ, Buxton A, Krailo MD, Burger PC, Rosenblum MK, Brat DJ, Hamilton RL, Eckel SP, Zhou T, Lavey RS, Pollack IF. Phase 2 study of concurrent radiotherapy and temozolomide followed by temozolomide and lomustine in the treatment of children with high-grade glioma: a report of the Children's Oncology Group ACNS0423 study. Neuro Oncol. 2016 Mar 22. pii: now038. [Epub ahead of print]

180. Ridge PG, Hoyt KB, Boehme K, Mukherjee S, Crane PK, Haines JL, Mayeux R, Farrer LA, Pericak-Vance MA, Schellenberg GD, Kauwe JS; Alzheimer's Disease Genetics Consortium (ADGC). Assessment of the genetic variance of late-onset Alzheimer's disease. Neurobiol Aging. 2016 May;41:200.e13-20. doi: 10.1016/j.neurobiolaging.2016.02.024. Epub 2016 Mar 3

181. Beckner ME, Pollack IF, Nordberg ML, Hamilton RL. Glioblastomas with copy number gains in EGFR and RNF139 show increased expressions of carbonic anhydrase genes transformed by ENO1. BBA Clin. 2015 Nov 10;5:1-15. doi: 10.1016/j.bbacli.2015.11.001. eCollection 2016 Jun. PMID: 27051584 Free PMC Article

182. Fernandes-Cabral DT, Zenonos GA, Hamilton RL, Panesar SS, Fernandez-Miranda JC. High-Definition Fiber Tractography in the Evaluation and Surgical Planning of Lhermitte-Duclos Disease: A Case Report. World Neurosurg. 2016 May 7. pii: S1878-8750(16)30257-1. doi: 10.1016/j.wneu.2016.04.128. [Epub ahead of print] PMID: 27168233

**Reviews, invited published papers, proceedings of conference and symposia, monographs, books and book chapters**

**Ronald L. Hamilton, M.D.**

1. **Hamilton RL**, Wiley CA. New developments in the neuropathology of AIDS. CAP Today, 10 (12): p 42, 1996.
2. **Hamilton RL**: Hydrocephalus in a 9 month-old infant. Brain Pathol 6:533-534, 1996
3. **Hamilton RL**: New onset hemiparesis. Brain Pathol 7: 715-716, 1997.
4. **Hamilton RL**: Precocious Puberty. Brain Pathol 7: 711-712, 1997
5. **Hamilton RL**: Frontal lobe tumor in 11 year-old girl. Brain Pathol 7: 713-714, 1997
6 **Hamilton RL**, Pollack, IF: The Molecular Biology of Ependymomas. Brain Pathology 7:807-822, 1997.
7. **Hamilton RL**: A 26 year old woman with new onset seizures. Brain Pathol 8: 239-240, 1997.
8. **Hamilton RL**, Wiley, CA, The Neuropathology of Viral Infections of the Nervous System. In: Textbook of Neuropathology; Davis RL, Robertson DM eds. Williams and Wilkins, 3rd edition,  Baltimore, MD. 1997.

9. **Hamilton RL**: Guidelines for the neuropathological diagnosis of Alzheimer's Disease and Dementia with Lewy Bodies. Revista de Neurologia 27 (S1): S67-S70, 1998
10. **Hamilton RL**: Experimental neuropathology of Alzheimer's Disease: animal models. Revista de Neurologia 27 (S1): S84-S86, 1998
11. Sanders VJ, Wiley CA, **Hamilton RL**: The mechanisms of neuronal damage in retroviral infections of the nervous system. in The Mechanisms of Neuronal Damage in Virus Infections of the Nervous System (Gosztonyi G, ed). Springer Verlag, Berlin, 2001.
12.  **Hamilton RL**. [Recent Advances in the neuropathological evaluation of Alzheimer's Disease: the importance of synuclein] Rev Neurol 35:765-7, 2002 (Spanish).
13. Pollack IF, **Hamilton RL**, Finkelstein SD, Lieberman F.  Molecular abnormalities and correlations with tumor response and outcome in glioma patients.  Neuroimaging Clinics of North America: Advances in Brain Tumor Imaging and Therapy (Provenzale J, ed.) WB Saunders, Philadelphia,  2002.
14. **Hamilton RL**.  The other dementias: the neuropathology of the non-Alzheimer's Disease dementias. Rev Neurol 37:130-139, 2003 (Spanish).
15. Omalu BI, Wiley CA, **Hamilton RL**.  Case of the Month February 2003. Brain Pathology 13:419-420, 2003.
16. DeKosky ST, Ikonomovic MD, **Hamilton RL**, Bennett DA, Mufson EJ. Neuropathology of Mild Cognitive Impairment in the Elderly. In John Morris J, Scheltens P, and Cummings JL), (eds), *Alzheimer's Disease and Related Disorders:* London, Taylor & Francis, 1-16, 2006.
17. Crain BJ, Alston SR, Bruch LA, **Hamilton RL**, McLendon RE, Rhodes H, Tihan T, Weidenheim KM. Accreditation Council for Graduate Medical Education (ACGME) Competencies in Neuropathology Training.  J Neuropathol Exp Neurol 64:273-279, 2005.
18. McIntyre JA, **Hamilton RL**, Dekosky ST.  Redox-reactive autoantibodies in cerebrospinal fluids. Annals of NY Acad Sci 1109: 296-302, 2007.
19. DeKosky ST, Kaufer DI, **Hamilton R**, Wolk D, Lopez OL: Dementia. In: Neurology in Clinical Practice: Principles of Diagnosis and Management, 5th Edition. Editors: Bradley WG, Daroff RB, Fenichel GM & Jankovic J. Boston MA, Butterworth-Heinemann, 2007: 1855-1907.
20. Tyurin VA, Tyurina YY, Kochanek PM, **Hamilton R**, DeKosky ST, Greenberger JS, Bayir H, Kagan VE.  Chapter 19: Oxidative lipidomics of programmed cell death.  Methods Enzymol 442:375-93, 2008.
21. Yeaney GA, O'Conn SM, Jankowitz BT, **Hamilton RL**.  A 16 year-old male with cerebellar mass. Brain Pathol. 2009 19, 167-170. PMID 19076785
22. Horbinski, C, **Hamilton RL**.  Application of telepathology for neuropathologic intraoperative consultations. Brain Pathol 2009 19; 317-322. PMID 19290998

## Abstracts

1. **Hamilton RL**, Sanger WG, and McComb RD: Characterization of cell lines derived from malignant tumors in patients with neurofibromatosis. Federation Proceedings 46: 433, 1987.
2. Esch O, Spinosa JC, **Hamilton RL**, Crombie DL, Schteigart CD, Hofmann AF: Reversible cytotoxicity to the gallbladder mucosa of contact dissolution solvents for cholesterol gallstones: a comparison of methyl tert-butyl ether (mtbe) and ethyl propionate (ep) in two animal models. Gastroenterology 100 (5, part 2): A135, 1991.

**Ronald L. Hamilton, M.D.**

3. Haas RH, Popovitch B, **Hamilton RL**: The utility of DNA dystrophin gene analysis in non-specific myopathy: presented at Child Neurology Society Annual Meeting, October, 1992: New Orleans, LA.

4. Haas RH, Mansden DL, Estrada S, **Hamilton RL**, Grafe MG, Nyhan WL: Acute basal ganglia infarction in propionic acidemia in spite of good metabolic control: presented at Child Neurology Society Annual Meeting, October, 1992: New Orleans, LA.

5. **Hamilton RL**, Haas RH, Nyhan W, Powell HP, Grafe MR:  The neuropathology of propionic acidemia: a report of two additional cases. American association of Neuropathology Annual Meeting, June 1993, Salt Lake City, UT; J Neuropathol Exp Neurol 52:299, 1993.

6. Mansfield RT, Schiding JK**, Hamilton R,** Kochanek PM: Hypothermia fails to reduce lesion volume after traumatic brain injury in immature rats.  Pediatric Research 35(4):55, 1994.

7. **Hamilton RL**, Bodnar RJ, Wang G, Wiley CA.  The effect of AZT on retroviral encephalitis: a murine model: presented at the Sixth Workshop on the Pathogenesis of Animal Retroviruses, Philadelphia, PA, Nov. 17-19, 1994.

8. Adelson PD, Robichaurd P, **Hamilton RL**, Kochanek PM. Brain edema and neuropathology after diffuse traumatic injury in immature rats.  Neurotrauma Society meeting, San Diego CA, Nov 10-11, 1995.

9. **Hamilton RL**, Bodnar RJ, Wang G, Klunk W, Wiley CA, Treatment of chronic retroviral encephalitis with zidovudine (AZT) in a murine model. Society for Neuroscience Meeting, San Diego, CA Nov 11-16 1995.

10. **Hamilton RL**, Bodnar RJ, Wang G, Klunk W, Wiley CA. The effect of zidovudine (AZT) on murine retroviral encephalitis. Amer. Assoc of Neuropathology, San Antonio, June, 1995. J Neuropathol Exp Neurol 54 (3): 438, 1995.

11. **Hamilton RL**, and Claassen D. Neonatal Methylmalonic Acidemia With Hemicerebellum: An Autopsy Report;  Society of Pediatric Pathology / Child Neurology Society (joint meeting), Baltimore, Oct 27-29, 1995.

12. **Hamilton RL**, Baldwin M, Wiley CA. Human Herpesviruses And Temporal Arteritis American Association of Neuropathology, Vancouver, BC, Canada, June 1996.

13. Mizukami K, Ikonomovic MD, Sheffield R, Rubin RT, Grayson D, **Hamilton R**, Warde D, Armstrong DM. Immunohistochemical Localization of GABA-A Receptor ß2/3 Subunits in the Hippocampal Formation in Aged Brain with Alzheimer-related Neuropathology. Society for Neuroscience meeting, Washington DC, Nov 1996.

14. Bodnar RJ and **Hamilton RL**. Effect of zidovudine (AZT) and saquinavir on retroviral infection of the central nervous system (CNS) Society for Neuroscience meeting, Nov 17-21, 1996 Washington D.C.

15. Bredel M, Pollack I, **Hamilton RL**, Finkelstein SD, Campbell JW, Martinez AJ, Sherwin R, Bozik ME, Gollin S. Overexpression of EGF receptor and p53 mutations in pediatric malignant gliomas. American Association of Neurological Surgeons, 1997 Annual meeting.

16. Xu Y, Liachennko S, Tang P, **Hamilton RL** Correlation of neuropathologic changes with cerebral metabolic and ADC abnormalities after prolonged asphyxial cardiac arrest. International Society of Magnetic Resonance in Medicine, annual meeting, 1997

17. Bredel M, Pollack IF, Campbell JW, **Hamilton RL**. Basic fibroblast growth factor as a prognostic indicator in pediatric high grade glioma patients. American Association of Neuropathology, Pittsburgh, PA, June 1997. J Neuropathol Exp Neurol 56 (5): 581, 1997

18. **Hamilton RL**, Bodnar RJ, Lackner AA, Lane JH, Wiley CA Neurotrophic factors in simian immunodeficiency virus encephalitis. American Association of Neuropathology, Pittsburgh, PA, June 1997. J Neuropathol Exp Neurol 56 (5): 618, 1997

19. Adelson, PD, Robichaud, P, **Hamilton, RL**, Kochanek, PM. Histologic analyses of severe diffuse traumatic brain injury in the immature rat . National Neurotrama Society, New Orleans Oct 24-25, 1997.

20. Dorsey RW, Achim CL, Wiley CA, **Hamilton RL**\*,  Soontornniyomkij V. Gene expression and cellular localization of neurotrophic factors in Alzheimer's disease. Society of Neuroscience meeting Nov, 1997, New Orleans.

21.  Klunk WE, **Hamilton RL**, Styren SD, Styren G, Debnath ML, Mathis CA, Mahood K, Hsiao KK. Staining of AD and Tg2576 mouse brain wirh X-34, a highly flourescent derivative of chrysamine

**Ronald L. Hamilton, M.D.**

G and A potential in vivo probe for sheet fibrils. Siociety for Neuroscience meeting, New Orleans 1997.

22. Klunk WE, **Hamilton RL**, Styren SD, Styren G, Debnath ML. Neuropathological study of AD brain with X-34, a new highly fluorescent derivative of congo red. Society for Neuroscience meeting. Los Angeles, CA 1998.

23. Halks-Miller M, Hesselgesser J, Horuk R, Soontornniyomkij V, **Hamilton R,** Achim C. CCR1 immunoreactivity in Alzheimer's Disease brains. Society for Neurosciences meeting. Los Angeles, CA 1998.

24. Wang G, Soontornniyomkij V, Pittman CA, Achim CL, Wiley CA, **Hamilton RL**. Glial expression of BDNF and TRK B receptor proteins in Alzheimer's Disease and HIV-1 encephalitis brains. Society for Neuroscience meeting. Los Angeles, CA 1998.

25. Ikonomovic MD, Mizukami K, Davies P, **Hamilton R**, Sheffield R, Armstrong DM. Co-localization of interneurons and an ad-specific antibody in the hippocampal formation of Alzheimer brains. Society for Neurosciences. Los Angeles, CA 1998.

26. Mizukami K, Ikonomovic MD, Grayson DR, Rubin RT, Warde D, Sheffield R, **Hamilton RL,** Davies P, Armstrong DM. Immunohistochemical study of GABA(A) receptor beta 2/3 subunits in the hippocampal formation of aged brains with Alzheimer-related neuropathologic changes. Experimental Neurology 147 2 333-45 (1997).

27. Bredel M, Pollack IF, **Hamilton RL**: Expression of the c-erbB1 Oncogene Product Epidermal Growth Factor Receptor (EGFR) and its Relevance for Outcome in Children with Supratentorial High-Grade Gliomas ; XVI Congress of the European Society for Pediatric Neurosurgery; November 11-15, 1998, Marseille, France

28. **Hamilton, RL** Numerous widespread alpha-synuclein positive thread-like processes characterize dementia with Lewy Bodies. Foundation IPSEN Conference, April 12, 1999, Paris France

29 **Hamilton RL** Numerous and widespread alpha-synuclein thread-like processes in dementia with Lewy bodies. American Assoc of Neuropathologist Annual Meeting, 1999, Portland, OR. J Neuropathol Exper Neurol 58:552, 1999.

30. Klunk WE, **Hamilton RL**, Styren SD, Head E: Evaluation of the aged canine as a screening system for the x-34 class of in vivo probes for amyloid deposition in AD. Soc. of Neuroscience, 1999

31. Kaufer, DL, **Hamilton RL**, Lopez OL, DeKosky ST MRI white matter hyperintensities and cerebral amyloid angiopathy in a case of dementia with Lewy bodies. Amer Neuropsychiatric Assoc, annual meeting, 2/2000, Ft. Myers, FLA.

32. **Hamilton RL**, Mash DC. Widespread Alpha-synucleinopathy in the Parkinson's Disease brain. 6th National Parkinson's Disease Foundation International Symposium on Parkinson's Disease Research, to be held in conjunction with the Society of Neuroscience meeting in Miami Beach, Oct 22-23[rd], 1999.

33. **Hamilton, RL**, Mash DC. Widespread alpha-synuclein-positive neuropil threads in the Parkinson's Disease brain. American Assoc of Neuropathology, Atlanta, GA, June 8-11, 2000.

34. Snyder JV, Gebel JM, Kassam A, **Hamilton RL**, Goldstein S, Watkins S, Yonas H, Chelluri L, Thulborn K. Guidance by MR Tissue Sodium Concentration of Infarct Resection in Massive Stroke. Neurology 54(7): A97-A98, Suppl. 3, 2000.

35. Chow TM, Kaufer DI, Lopez OL, **Hamilton RL**, Becker JT, DeKosky ST. Temporal Evolution of Lewy Body Phenotype in Autopsy Confirmed Cases of Alzheimer's Disease and Dementia With Lewy Bodies. Neurology 56(8): A300-A301, Suppl 3, 2001.

36. Castellano-Sanchez A, Ohgaki HH, Yokoo, Finkelstein SD, Medina-Flores R, **Hamilton RL**, Scheithauer BW, Burger PC, Brat DJ. Genetic Alterations in Granular Cell Astrocytomas. USCAP, 2002.

37. Demidovich J, Pittman CA, Hamilton RL. Altered calpain proteolysis of mutant alpha-synuclein. Honors Thesis presentation, Univ. Pitt, 2002

38. Omalu BI, **Hamilton RL**, Swalsky PA, Finkelstein SD. Microdissection-based mutational profiling of malignant, atypical and benign meningiomas: the determination of meningioma grade by fractional mutational index. AANP, Denver, 2002 (JNEN 61:491, 2002)

39. Wilson, RK, Luedecking-Zimmer EK, Kamboh MI, DeKosky ST, **Hamilton RL**. Association of the ApoE4 allele and Lewy bodies in Alzheimer's Disease. AANP, Denver 2002 (JNEN 61: 455, 2002).

**Ronald L. Hamilton, M.D.**

40. Desai PP, Ikonomovic MD, **Hamilton RL**, DeKosky ST, Kamboh MI. Apolipoprotein D in Alzheimer's Disease: implications for amyloid pathology. Soc. for Neuroscience, Orlando, 2002.

41. Garb S, **Hamilton RL**. Sequestration of soluble alpha-synuclein in Lewy body Variant of Alzheimer's Disease. Soc for Neuroscience, Orlando, 2002.

42. Marshall GA, Kaufer DI, Lopez OL, Rao GR, **Hamilton RL**, DeKosky ST. A neuropathological correlate of anosognosia in Alzheimer's Disease. American Association of Neurology, May 2003.

43. Sweet RA, Butters MA, **Hamilton RL**, Mulsant BH, Lopez OL, PollockBG, DeKosky ST, Reynolds CF Neuropathology Of Late Life Mood Disorders. American College of Neuropsychopharmacology, 2003

44. Mohan D, Couce ME, Wiley CA, **Hamilton RL**, Sasatomi E, Swalsky PA, Lieberman MD, Finkelstein SD. Microdissection based genotyping of human gliomas: diagnostic and prognostic considerations (USCAP, Vancouver 3/04)

45. Beckner ME, Sasatomi E, Swalsky PA, **Hamilton RL**, Pollack, IF, Finkelstein SD. Loss of heterozygosity reveals non-VHL Allelic loss in hemangioblastomas at 22q13, (AANP Cleveland, June 24-27, 2004).

46. Judkins AR, Burger P, **Hamilton RL**, Kleinschmidt-DeMasters B, Perry A, Pomeroy S, Rosenblum MK, Yachnis AT, Rorke LB, Biegel JA. INI1 Expression Distinguishes Atypical Teratoid/Rhabdoid Tumor (ATR) from Choroid Plexus Carcinoma (CPC); (AANP Cleveland, June 24-27, 2004).

47. McFadden KA, **Hamilton RL**, Visvesvara GS, Gardner P, Couce ME. Granulomatous Amebic Encephalitis in a Patient with Gardners Syndrome and Multi-organ Transplant (AANP Cleveland, June 24-27, 2004).

48. Yen, Amy, Lopez, OL, BeckerJ, **Hamilton RL.** Mesial Temporal Sclerosis is associated with Lewy Bodies in Alzheimer's Disease. AANP Annual meeting June 9-12, 2005, Arlington, VA (platform). (J Neuropathol Exper Neurol 64:434, 2005.

49. Hinkle DA, Mullett SJ, **Hamilton RL** DJ-1 is over-expressed in human stroke reactive astrocytes. Society for Neuroscience Oct 2005.

50. Ramsey CP, Glass CA, Marshall MB, Morgan KL, Kioke MA, **Hamilton R**, Chu CT, Jordan-Sciutto KL. Altered expression patterns of the antioxidant response transcriptional regulator NRF2, in Alzheimer's Disease and Parkinson's Disease. Society For Neuroscience, Nov. 2005, Washington DC.

51. Chu CT, Uchiyama Y, **Hamilton R**, Zhu J. Extracellular signal regulated protein kinase acts upstream of both autophagy and cell death in MPP+ treated neurons. Society For Neuroscience, Nov. 2005, Washington DC

52. Cieply K, Carol R. Sherer, Jennifer L. Hunt **Hamilton RL** Assessment of 1p and 19q Status in Pediatric Oligodendrogliomas by FISH, Association of Molecular Pathology, Nov 10-13, 2005 Scottsdale AZ

53. Bencherif B, Lieberman FS, Wenzhu B, Price JC, Muthukrishnan A, Walter K, **Hamilton RL**, Lunsford LD, Mountz JM. Increased F-18 Fluorothymidine Uptake is Seen in Non-Proliferating Recurrent/Residual Glioma Society for Nuclear Medicine, San Diego, 2006 June 3-7

54. **Hamilton, RL** Variations On A Theme: Lewy Bodies And Mesial Temporal Sclerosis In Alzheimer's Disease: A Review Of 278 Autopsy Cases. 10th International Conference on Alzheimer's Disease, Madrid, Spain, July-15-20, 2006.

55. DeKosky ST, Mathis CA, Price JC, Ikonomovic MD, **Hamilton RL**, Abrahamson EE, Paljug WR, Debnath ML, Hope CE, Isanski BA, Tsopelas ND, Lopresti BJ, Ziolko S, Bi W and Klunk WE. Correlation of In Vivo PiB Retention and Post-Mortem Aβ Levels: A Case Study. 10th International Conference on Alzheimer's Disease, Madrid, Spain, July-15-20, 2006.

56. Leverenz J, **Hamilton RL**, Larson E, Vavrek D, Lopez O, Galasko D, Masliah E, Kaye J, Nixon R, Clark C, Trojanowski J, Kukull W, Montine T, Tsuang D. Lewy-Related Pathology in Two Large Autopsied Dementia Samples: Application of Classification Criteria. 10th International Conference on Alzheimer's Disease, Madrid, Spain, July-15-20, 2006.

57. Venneti S, Lopresti BJ, Wang G, Mathis CA, Klunk WE, Shmookler AD, **Hamilton RL**, Apte UM, Wiley CA. PET imaging of microglia in a mouse model of Alzheimer's disease. 10th International Conference on Alzheimer's Disease, Madrid, Spain, July-15-20, 2006.

58. Kofler JK, Moore RA, **Hamilton RL**. Concomitant Dementia with Lewy Bodies and Multiple System Atrophy in a Demented Patient. International Congress of Neuropathology/American Association of Neuropathology Annual Meeting, San Francisco, CA, Sept 10-15, 2006.

**Ronald L. Hamilton, M.D.**

59. DeKosky ST, Mathis CA, Price JC, Ikonomovic MD, **Hamilton RL**, Abrahamson EE, Paljug WR, Debnath ML, Hope CE, Isanski BA, Tsopelas ND, Lopresti BJ, Ziolko S, Bi W, Klunk WE. Correlation of Regional in vivo Pittsburgh Compound B (PIB) Retention With in vitro PIB, A Levels, and Amyloid Plaque Density: Validation of PIB-PET in Postmortem Human Brain. Alzheimer's Association International Conference on Prevention of Dementia. June 9-12, 2007 Washington, D.C.

60. Kellermier HC, Nikiforova MN, Cieply K, **Hamilton RL**. Alterations of 1p in glioblastomas. ASIP/AANP Annual meeting, Washington DC April 2007.

61. Bliecher AG, Branstetter BF, Hamilton R, Murdoch G, Kellermeir HC. Clival Chordoma: Radiologic-Pathologic Correlations. American Society of Neuroradiology annual meeting, Chicago, IL. June 9-14, 2007.

62. Butters MA, Aizenstein HJ, Meltzer CC, **Hamilton RL,** Price JC, Mathis CA, Klunk WE, Becker JT, DeKosky ST, Reynolds CF. Cognition, cerebrovascular disease and Alzheimer's Disease in late-life depression. International Neuropsychological Society meeting, Bilbao Spain, July 2007.

63 Tyurin VA, Zhao Q, Mnuskin A, **Hamilton R**, DeKosky ST, Reynolds WF, Kagan VE. Phospholipid peroxidation biomarkers of Alzheimer's Disease in the Brain: Selective Oxidation of Phosphatidylserine. Society of Toxicology Meeting San Diego, CA. October 2, 2007.

64. Moschos SJ, D. Trembath D, Snavely A, Bradler E, Midkiff B, Nikolaishvilli-Feinberg N, Werley J, Krauze M, **Hamilton R**, Kirkwood JM. Prognostic Significance of PD-L1 Expression, Angiogenesis, and Hypoxia in Melanoma Brain Metastases (MBM); A Histopathologic Analysis. Annual meeting of the American Association of Clinical Oncology, Chicago Il, 5/29-6/2/2014.

65. Trembath DG, Moschos SJ, Snavely AC, Bradler E, Nikolaishvilli-Feinberg N, Bentley R. Midkiff BR, Jonette Werley J, Krauze MT, **Hamilton RL**. Analysis of select angiogenic markers in melanoma brain metastases. Annual meeting AANP, Portland OR. June 2014

66. Salgado CM, Basu D, Nikiforova M, Hamilton R, Gheris R, Jakacki R, Panigrahy A, Yatsenko S, Reyes-Mugica M. Congenital Melanoma: The full spectrum og p.Q61R mutation in NRAS. Accepted for the Annual Soc. Pediatric Pathology meeting, Birmingham AL, Sept 4-6, 2014.

67. Melan MA, Wald AI, Zhong S, **Hamilton R**, Horbinski C. Nikiforova MN. BrainSeq: Next-Generation Sequencing Panel for Detection of Genetic Alterations in Central Nervous System (CNS) Malignancies. National Harbor MD, Nov 12-15, 2014.

68. Hamilton RL. Chronic Traumatic Encephalopathy: Update on an Emerging Disease. Invited speaker: 18th International Congress of Neuropathology, July 12-16, 2014, Rio de Janeiro, Brazil

69. Hamilton RL. Cases of the Month: 16 Years of Unknowns. Invited speaker: 18th International Congress of Neuropathology, July 12-16, 2014, Rio de Janeiro, Brazil

70. Trembath DG, Moschos SJ, Snavely AC, Bradler E, Nikolaishvilli-Feinberg N, Midkiff BR, Werley J, **Krauze MT, Hamilton RL** Role of PD-L1, HIF-1a, and reactive gliosis in melanoma brain metastases. USCAP 2015, Boston, MA, March 21-27, 2015.

71. Nolan Priedigkeit, Ryan J. Hartmaier, Yijing Chen, Damir Vareslija, Ahmed Basudan, Roby Thomas, Jose P Leone, Peter C. Lucas, Rohit Bhargava, Ron L. Hamilton, Juliann Chmielecki, Nancy E. Davidson, Steffi Oesterreich, Adam M. Brufsky, Leonie Young, Adrian V. Lee Breast cancer brain metastases show limited intrinsic subtype switching, yet exhibit acquired ERBB2 amplifications and activating mutations. San Antonio Breast Cancer Symposium, 12/7/16

72. Steffi Oesterreich, Ahmed Basudan, Nolan Priedigkeit, Ryan Hartmaier, Amir Bahreini, Rekha Gyanchandani, Jose P Leone, Peter Lucas,, Rohit Bhargava, Ron Hamilton, Ryan Hartmaier, Adam Brufsky, Adrian V. LeePerivascular Inflammation in Temporal Artery Biopsies That Are Negative for Arteritis: Incidental or Harbinger American College of Rheumatology/ Association of Rheumatology Health Professionals (ACR/ARHP) Annual Meeting, Washington DC, 11/13/16

73. Expression of Carbonic Anhydrase Genes, CA3 and CA12, Transformed with ENO1, Relate to Copy Numbers of EGFR or RNF139 and XIAP, and Gender in Glioblastomas Using PCR Assays. Experimental Biology 2015 Annual Meeting

74. Evaluation of GlioSeq Targeted NGS Panel for Detection of O6-Methylguanine-DNA Methyltransferase (MGMT) mRNA Expression in Glioma Patients Alicia Hunt, Sarika Jain, Melissa A Melan, Abigail Wald, Ronald Hamilton, Marina N. Nikiforova Association For Molecular Pathology (AMP) Charlotte, NC. November 10-12, 2016.

## PROFESSIONAL ACTIVITIES

**Ronald L. Hamilton, M.D.**

**TEACHING**

University of California, San Diego, Dept of Neuroscience
      1991-93      lab assistant - graduate neuroanatomy course
University of California, San Diego, School of Medicine
      1991-93      Sophomore pathology course, neuropathology section (lab assistant)
University of California, San Diego, Dept of Pathology
      1991-93      Clinical Correlation Conference - Neuropath and Neurosurgery (monthly)
      1991-93      Neuropathology review for neurology residents (bi-monthly)
University of Pittsburgh, School of Medicine
      Freshman pathology course –
      PBL facilitator for musculoskeletal course 1994-1998
      Neuroscience Module – lecture M2 students full class: CNS tumors
            Annually since 1999.
                 April 29, 2014 1-3 pm
      Neuroscience Module   lecture MS1 students
            CNS tumors  March 2004
            CNS tumors  March 2005
            CNS tumors March 2006
            CNS Tumors     5/7/07
      Neuroscience rotation – small weekly lab, M3 students
            7/99-present
      Neuroscience rotation – small group M3 students
            6/18/2007 3-5pm
Weekly brain-cutting conference at Children's Hospital (2-5 medical (M3) students/week)
            Academic Advising: Kate McFadden 2/2000 to 6-2001
Other:
      High school - gifted science students of Mr. James Coll
            11/21/2002 , 11/14/ 2003, 10/28/2004, 11/18/2005, 11/3/2006

University of Pittsburgh, graduate students
      Cellular and Molecular Mechanisms of Neurodegeneration (MSCMP 3720)
               Organizers: Robert Bowser, Cristian Achim,
            1. Neuroanatomy and Neurohistology in neurodegeneration
                 1/13/98,  1/19/99
            2. Mitochondria and disease / Prion encephalopathies
                 3-24-98
            3. The role of alpha-synuclein in neurodegenerative diseases
                 10-11-00
      Molecular Pathobiology (organizers Frye and Achim) (MSCMP 2740)
            .Tumors of the Central Nervous System,  4-7-98,  4-20-99
            Alpha-synuclein and Neurodegeneration
                 4-2003, 1/8/04, 5/15/06
            Neuropathology of Neurodegeneration
                 1/6/04
            Alpha-synuclein and Tau in Neurodegeneration
                 1/5/07, 2/7/2008
            Pathologic diagnosis of the Lewy Body Disorders
                 2/12/09
University of Pittsburgh, Dept of Neuroscience - Combined Neuroscience Conference Wed 4-5
      10/3/95 *      Varicella Zoster Infections of the CNS in AIDS patients
      10/9/96 *      Lewy Bodies and Dementia
      2/19/97 *      The Neuropathology of Pediatric Seizures
      4/23/97 *      CNS manifestations of non-CNS tumors in children
      2/11/98        Case Presentation with Ian Pollack

**Ronald L. Hamilton, M.D.**

| | | |
|---|---|---|
| 3/18/98 * | A 77 year old woman with Multiple sclerosis and dementia | |
| 11/4/98 | *Pediatric meningiomas – two cases | |
| 1/20/99 | Methanol Intoxication – with C. Foley | |
| 2/3/99 | Gliomatosis cerebri with Dallasta | |
| 2/10/99 | Amyloid angiopathy and leukomalacia – with D. Kaufer | |
| 3/17/99 | Metachromatic Leukodystrophy – with D. Kaufer | |
| 9/18/02 | Iatrogenic CJD* | |

* as primary presenter

University of Pittsburgh, Dept. of Pathology, Chief Resident's Fri noon slide conference
8/1/96 - Pediatric brain tumors
10/5/97 Pediatric brain tumors
1/9/98            NP REVIEW - Tumors I
1/16/98           NP REVIEW - Tumors II
1/23/98           NP REVIEW - Tumors III
1/30/98           NP REVIEW - Infections
2/6/98            NP REVIEW - Demyelinative diseases
2/13/98           NP REVIEW - Neurodegenerative diseases
2/20/98           NP Review - Cerebrovascular disease and developmental
5/24/02           Pediatric Neoplasms and Congenital Malformations
5/31/02           Degenerative Diseases

University of Pittsburgh, undergraduate
Independent Course and Honors Research Project –
Theodore Kaplan (1/97-6/97)
Emily Rogerson (1/99-5/99, 9/99-12/99, 1/00-4/00)
Kyle Hubbard (1/99 – 5/99, 9/99-12/99, 1/00-4/00)
Joe Demidovich – 2000-2002
Stan Garb (2001-2001)

Pathology Summer Undergraduate Research Program (SURP)
Kathleen Anderson 6/00-8/00
Kathleen Anderson 6/01-8-01

University of Pittsburgh, Dept. of Pathology,
Neuropathology of dementia conference - weekly (Fri 10-11)

University of Pittsburgh - ADRC Topics at Noon
X-34 and alpha-synuclein – New stains in Alzheimer's Disease 11/98
Lewy Body Pathology in Alzheimer's Disease, 11/01

Children's Hospital of Pittsburgh, Grand rounds
1996 - methyl malonic acidemia with hemi-cerebellum
2/13/97 - Pediatric AIDS with HIV encephalopathy
5/22/97 - 11 month-old boy with Hypotonia (Leigh's Disease)
3/18/98 - Becker's muscular dystrophy with severe cardiomyopathy
5/19/98 – Friedreich's Ataxia
10/15/98 – Spinal Muscular Atrophy Type I
2/2005 - Congenital Dystrophies – Pediatric Neurology

## **Other Presentations**

Neurology Grand Rounds - 11-19-03 - CNS vasculitis
Pathology Noon Diagnostic Conference - 11-20-03 – "Some Bodies in the Brain"
AP Didactic Lecture – 11-25-03 - Neuropathology of Neurodegeneration
NP Didactic – 4-28-04 - ApoE4 and Lewy Bodies in AD

**Ronald L. Hamilton, M.D.**

NP Didactic -    3/31/2005 – AD Pathology in ALS and MTS and LB in AD
Pathology Noon Diagnostic Conference – 8-4-2006: Tauopathies
ADRC CPC 8-10-06
ADRC CPC 11-30-06
ADRC CPC 2-8-07
ADRC 20th Anniversary meeting, "Neuropathology of AD:"  9-28-06
ADRC Topics at Noon.  "Tauopathies"  11-16-06
ADRC CPC 8/16/2007
ADRC CPC 11/30/2007
Pediatric CPC 2/25/08
DJ-1 in glioblastomas (NP Didactic conference) – 3/10/2009 (1 hour)
Neuropathology review for Neurosurgery residents – 3/10/2010 (1 hour).
AP Chief Residents didactic conference.  2 hour conference.  Non-glial Tumors. Feb 25, 2014
CMU graduate class:  BioE 2630 – Methods in medical iamage analysis in neuropathology. April 4, 2014.
Anatomic Pathology Grand Rounds, July 10, 2014  Chronic Traumatic Encephalopathy: an Update.

**Clinical Conferences (recurring)**

| | | |
|---|---|---|
| ADRC Brain cutting | weekly | Tue 8-10 |
| ADRC Dementia signout - | weekly | Fri 10-11 |
| PUH – Neuropathology QA - | weekly | Wed 10-11 |
| CH  Brain cutting | weekly | Mon 10-11:00 |
| CH  Neuro-Oncology conf | weekly | Mon 11:30-12:30 |
| CH Gross autopsy conference | weekly | Tue 11-12 |
| CH Micro autopsy conf | weekly | Tue 1-2 |

University of Pittsburgh School of Medicine –
2009 Brain Tumors – lecture to 1st year students
2009 Klionsky summer research scholarship – Peter Kang (June-Aug 2009)
Clinicopathologic correlations of chordomas
2009 Monday 2 hour small group 3rd year  (5-12 students)
4/6/2009, 7/27/2009, 9/10/2009, 10/12/2009, 12/7/2009, 1/25/2010, 2/15/2010

## RESEARCH

## OTHER SUPPORT

## ACTIVE

**HAMILTON, R.**
ACTIVE
**R01 NS037704**    (PI: Pollack)          9/1/98-1/31/17          0.7 calendar months
National Institutes of Health          $105,970
Role:  Co-Investigator
Title: Molecular Markers as Predictors of Outcome in Gliomas
The major goal of this project is to further characterize the molecular features of tumorigenesis in pediatric malignant gliomas.

**1R01 CA174858-01**(PI: Pollack)          5/6/13-8/30/17          0.4 calendar months
National Institutes of Health                    $54,696
Role:  Co-Investigator
Title: Peptide Vaccine-Based Immunotherapy for Children with Recurrent Ependymomas
This project focuses on a pilot clinical trial of peptide-based immunotherapy for ependymomas, among the most challenging childhood brain tumors.  The study will incorporate separate strata

Ronald L. Hamilton, M.D.

for posterior fossa and non-posterior fossa ependymomas.  We will treat a total of 12 patients in each of the two strata with subcutaneous TAA epitope vaccinations every 3 weeks for 8 courses combined with topical imiquimod. Participants will be evaluated for adverse events, regimen limiting toxicity (RLT), and treatment response by clinical and laboratory evaluations and MR imaging. We hypothesize that vaccine-based immunotherapy will not only prove safe for the treatment of pediatric ependymomas, but will also demonstrate activity as assessed by immunologic and clinical parameters.


(PI: Pollack)    5/8/14-6/1/17
Child Brain Tumor Foundation                          $10,487                                        1.2
calendar months
**Children's Brain Tumor Tissue Consortium**
The CBTTC is a unique research platform in which tumor tissue is processed for comprehensive molecular (e.g., DNA, RNA, and protein) analysis using state-of-the-art methods and the data results of that analysis, together with new brain tumor models and relevant clinical information, are sent back to the participating institutions. In comparison to tissue banks, the CBTTC actively stimulates research by providing high-quality data that can be rapidly and efficiently analyzed by participating institutions.
PI: Pollack. 10% salary for Jonette Werley


<u>OVERLAP</u> No Overlap


**Completed Research Support**

National Institutes of Health                          3/1/02 – 2/28/05
P30 MH52247-10    (PI: Reynolds)         $23,305
Intervention Research Center for the Study of Late-Life Mood Disorders
a supplement to the above grant to establish a brain bank to investigate the neuropathological substrate of late life mood disorders.
Role:  Co-Investigator


R01 NS048595    (PI: Montine)                          09/30/03 – 07/31/08
National Institutes of Health
Subcontract to the University of Washington on grant "Characterization of DLB: a Collaborative Study"
The major goal of this multi-institutional project is to investigate the role of ApoE4 alleles and other genetic polymorphisms in the Lewy Body Variant of Alzheimer's Disease.
Role:  Co-Investigator


Brain Tumor Society                          07/01/07-05/31/09
PI: Ian Pollack
JPA & Pediatric Low Grade Astrocytoma
The major goals of these two grants is to examine molecular markers of prognosis in pediatric gliomas.
Role:  Co-Investigator


U10 CA13539-27 (Reaman (subcontract 6172) (Pollack)                          1/1/06-12/30/09
NIH/NCI
Children's Oncology Group Brain Tumor Resource Laboratory

**Ronald L. Hamilton, M.D.**

This contract is providing infrastructure support for maintaining tissue processing and banking of high-grade gliomas.
Role:  Laboratory Director

R01 MH47346    (PI: Zubenko)                    12/1/04 – 11/30/09
National Institutes of Health
Morphologic/Neurochemical Correlates of Depression in AD
The major goal of this project is to better define the biological substrates of major depression in AD and to provide additional insight into the clinical biology of major depressive disorders affecting the elderly.
Role:  Co-Investigator

P50 AG05133    (PI: Lopez)            3/30/85 – 3/31/15        0 calendar months
National Institutes of Health            $71,764
Alzheimer Disease Research Center, Core C: Neuropathology
The three objectives of the Neuropathology Core are to (1) procure and bank brain from autopsies of ADRC patients and controls, (2) perform detailed neuropathologic analysis of all AD cases and (3) maintain well catalogued brain bank.
Role:  Core Advisor

Child Brain Tumor Fund (CBTF) (PI: Pollack)      5/8/13-5/7/14
0.3 cal months (2.5% support) `PITT subaccount #: 05.35206.xxxx.00000.709203.-----`

P01 NS040923    (PI: Pollack)            7/1/02-5/31/13        1.20 calendar months
National Institutes of Health            $22,074
Novel Strategies for Brain Tumor Therapy
The unifying hypothesis of this program project grant is that novel therapeutic approaches that take into account the unique features of central nervous system (CNS) tumors will have utility for preventing tumor growth and inducing tumor regression, and will potentiate the effects of conventional treatment approaches, particularly radiotherapy, for inducing glioma cell killing.
Role:  Co-Investigator


**Prior Grant Support**

| | |
|---|---|
| 1995-1997 | Murine Model of Retroviral Encephalitis |
| | Children's Hospital of Pittsburgh Research Fund ($50,000) |
| | 0% effort, 0% support |
| 1995-1998 | Blood Brain Barrier in HIV encephalitis (PI: Achim) |
| | Co PI. 10% effort and salary ($186,264) |
| 11/98 | PD Center Grant, Equipment $6000 |
| | for freezer for PD Brain Bank (one time equipment funding) |
| 7/1/98-6/30/99 | Neurotrophic Factors in SIV encephalitis |
| | Competitive Medical Research Fund (CMRF), $25,000, |
| | 0% effort, 0% support |
| 12/01/98-11/30/99 | Parkinson's Disease Brain Bank |
| | PI: Hamilton RL |
| | Parkinson's Disease Foundation ($24,899) 0% effort, 0% support |
| 7/1/98-6/30/00 | Molecular Markers of Prognosis in Pediatric Gliomas |

**Ronald L. Hamilton, M.D.**

<blockquote>
PAR 95-063, NIH<br>
PI: IF Pollack<br>
10% effort and support ($263,311)
</blockquote>

4/1/00-3/31/01:  Alpha-synuclein Aggregation in Dementia With Lewy Bodies
> PI: RL Hamilton
> Parkinson's Disease Foundation Seed Money Grant, $25,000 0% effort, 0% support

10/1/00-9/30/02    Millennium Agreement (Neuro Module)
> PI: Rajiv Dhir
> 0% effort, 0% Support.
> ($25,000 per year for supplies, plus support for 100% Level IV Res Tech)

1/1/99 – 12/31/03 COG Brain Tumor Resource Laboratory
> PI: Pollack, IF ($5800)  (subcontract 6172)
> Co-I – 5% effort and support
> NIH-U10 CA13539-27

3/01/02 - 2/28/05 - Supplemental Award to Establish a Late Life Mood Disorder Brain Bank
> PI: RA Sweet (for supplement)
>> Supplement to 3 P30 MH52247-08S1 (PI: CF Reynolds)
>> Co-I : 5% effort and support

7/1/98-6/30/05 Morphologic/Neurochemical Correlates of Depression in AD
> PI: G Zubenko
>> 2.5% effort and support ($20,000)

National Institutes of Health            09/30/03 – 07/31/08            5%
R01 NS048595    (PI: Montine)            $75,000

*Subcontract to the University of Washington on grant "Characterization of DLB: a Collaborative Study"*
The major goal of this multi-institutional project is to investigate the role of ApoE4 alleles and other genetic polymorphisms in the Lewy Body Variant of Alzheimer's Disease

R01 MH072947    (PI: Butters)        12/1/04 –11/30/11        0.36 calendar months
National Institutes of Health                $6,018
Pathways Linking Late Life Depression to Mild Cognitive Impairment and Dementia
The goal of this project is to investigate the relationships among late-life depression (LLD), cognitive impairment and progressive neurodegeneration.
Role:  Co-Investigator

R01 MH072947    (PI: Butters)        12/1/04 –11/30/11        0.36 calendar months
National Institutes of Health                $6,018
Pathways Linking Late Life Depression to Mild Cognitive Impairment and Dementia
The goal of this project is to investigate the relationships among late-life depression (LLD), cognitive impairment and progressive neurodegeneration.
Role:  Co-Investigator

**<u>Seminars and Invited Lectureships Related to Research</u>**

Presentation of an Unknown Case (Herpes simplex brainstem encephalitis) to American Association of Neuropathologists Annual Meeting, June 1992: St. Louis, MO.

**Ronald L. Hamilton, M.D.**

Presentation of an Unknown Case (Varicella zoster virus encephalitis in an AIDS patient) to XII International Congress of Neuropathology, Sept, 1994: Toronto, Ont, Canada.

Presentation of an Unknown Case (Atypical neurocytoma) to American Association of Neuropathologists Annual Meeting, June 2002: Denver (presenter: Rafael Medina-Flores).

**Other Research Related Activities**

| | |
|---|---|
| 1995-2003 | Co-Director, Neuropathology Core ADRC |
| 2003-2012 | Director, Neuropathology Core ADRC. |
| 1995-2012- | Director, Neuropathology Brain Bank |
| 1997 - present - | Director of Neurohistology laboratory |
| 1997-present | Co-Director, Brain Tumor Resource Laboratory, Children's Cancer Group |
| 2001- 2009 | Director of Neuropathology Core of the Stephen Tuttle ALS Tissue Bank. |
| 2001-present | Co-Director, UP Brain Tumor Bank |

**CURRENT RESEARCH INTERESTS**

1. Molecular Biology of Brain Tumors

**SERVICE**

**University and Medical School**

Residency Committee (Pathology) – 1997 to 2008
Institutional Review Board        3/02 – 5/2005
'Member of the UPSOM Interviewing Committee' jan 2010-present
Member, UPMC Professional Practice and Ethics Committee Jan 2014 - present

**OTHER**

| | |
|---|---|
| 4/1996 - present | Case Editor - Brain Pathology, |
| | Case of the Month feature |
| | Case of the Month web site |
| | Increase to 2 cases per month 1/2007 |
| 10/99 | ad hoc reviewer, J Neuroscience |
| 1/2000 | ad hoc reviewer, J American Medical Association (JAMA) |
| 3/2000 | ad hoc reviewer, Neuropathology and Applied Neurobiology |
| 3/01 | ad hoc reviewer American Journal Pathology |
| 5/02 | ad hoc reviewer Neuroscience |
| 11/02 | ad hoc reviewer JNEN |
| 2004 | AANP Awards Committee, AANP, Cleveland |
| 2006 | AANP Awards committee, AANP-ISN San Fran |
| 10/2006 | ad hoc reviewer      Eur J Neurosci |
| 2/2007 | Ad hoc reviewer        Neuroscience |
| 2007 | Chairmen, Awards Committee, AANP Washington DC. (2 year term) |
| 7/29/2007 | ad hoc reviewer, Brain Pathology |
| 7/25/2007 | ad hoc reviewer Acta Neuropathologica |
| 10/19/2007 | ad hoc reviewer J Neuropathol Exp Neurol |
| 2008 | Chairman Awards Committee AANP, San Diego Annual Meeting |
| 2008 | ad hoc reviewer Brain Pathology |
| 2009 | ad hoc reviewer Pedi and Developmental Pathology |
| 2009 | ad hoc reviewer Amer. J. Pathol. |

**Ronald L. Hamilton, M.D.**

2014 – Featured in non-fiction book: League of Denial:  The NFL, Concussions and the Battle for the Truth (Crown Publishing, New York). Chapters 8 and 10 detail my role in the discovery of CTE in NFL football players.

January 2015 – Consulted with Sony Pictures about movie CONCUSSION based on the discovery of Chronic Traumatic Encephalopathy (CTE) in American NFL football players by my student, Bennet Omalu and me in July 2005.  I was also interviewed on the set by Sony documentary filmmakers for a bonus feature on the DVD:  The Making of "Concussion."  The movie is scheduled to be released Christmas Day, Dec 25, 2015.

January 2015 – interviewed by Jeane Marie Laskas (who wrote the 2009 GQ article the movie is based on) for a companion book to be released with the movie, December 2015.


**International Invitations**

1998 – Invited lecturer at Barcelona-Pittsburgh ADRC meeting, "Dementia Today," Barcelona, Spain (Oct 1998)

2000 – Invited lecturer at Barcelona-Pittsburgh ADRC meeting Dementia Today II", Barcelona, Spain (Oct 2000)

2001 - Invited symposia speaker at 10th Congress of the International Psychogeriatric Association (Nice, France, Sept 2001). "Pathological Diagnosis of Dementia With Lewy Bodies" (Symposia Organizer, Ian McKeith)

2002 – Invited lecturer at Barcelona-Pittsburgh ADRC meeting Dementia Today III", Barcelona, Spain (Oct 2002)

2003 – Symposium speaker "Dementia with Lewy Bodies" at International Psychogeriatric Associations meeting, Chicago, IL, USA, 08/19/03

2004  Invited lecturer at Barcelona-Pittsburgh ADRC meeting Dementia Today IV", Barcelona, Spain (Oct 2004)

2006  Invited lecturer at Barcelona-Pittsburgh ADRC meeting Dementia Today V", Barcelona, Spain (Oct 2006)

2008  Invited lecturer at Barcelona-Pittsburgh ADRC meeting Dementia Today VI", Barcelona, Spain (May 2008)

2014 – Invited lecturer AANP annual meeting June 2014.  What Every Neuropathologist Should Know: Molecular studies in metastatic brain tumors.

2014 - Invited as member of scientific committee International Congress of Neuropathology quadrennial meeting Sept 2014, Rio de Janeiro

2014 – Chair of Forensic Pathology Session, committee International Congress of Neuropathology quadrennial meeting Sept 2014, Rio de Janeiro

2014 – co-chair telepathology session with Dr. Wiley

2014 – Presentation – Chronic Traumatic Encephalopathy – update, International Congress of Neuropathology quadrennial meeting Sept 2014, Rio de Janeiro

2014 – presentation – Cases of the Month – 16 Years of Unknowns  International Congress of Neuropathology quadrennial meeting Sept 2014, Rio de Janeiro s



University of Pittsburgh
Physicians, Department
of Pathology

Division of Neuropathology

Clayton A. Wiley, MD, PhD
Director

Charleen T. Chu, MD, PhD
Robert H. Garman, DVM
Ronald Hamilton, MD
Julia Kofler, MD
Scott M. Kulich, MD, PhD
David Lacomis, MD
Geoffrey Murdoch, MD, PhD
Gutti R. Rao, MD

UPMC Presbyterian
Room 5701 Scaife Hall
200 Lothrop Street
Pittsburgh, PA 15213
T 412-624-9415
F 412-624-5610

I have conducted a study of Cristopher Mims' brain tissue. Additionally, in my Neuropathology practice I conduct an ongoing study of all available and existing medical literature related to the existence and diagnosis of CTE and I combine that knowledge with my training and extensive experience related to the study and diagnosis of CTE.

Christopher Mims died on October 15, 2008 at age 38.

Received from Eric J Wahoske, LA County Department of ME Coroner are 180 unstained tissue sections on glass slides labeled 08-7210-H LAC ME Coroner, US recuts (10 unstained slides from 8 tissue blocks).

H&E stained recuts are examined:

    slide A  dura mater;
    slide B  cerebral cortex
    slide C       hippocampus
    slide D  hippocampus
    slide E  insular cortex, putamen, globus pallidus and thalamus
    slide F       cerebral cortex
    slide G  cerebellum cortex and dentate nucleus
    slide H      medulla

PHF-1/tau immunostaining of slides G and H were negative for abnormally aggregated tau. PHF-1/tau immunostaining of slides B, C, D, E and F show numerous neocortical PHF-1/tau positive tangles in neurons, with staining of many neuronal processes (neuropil threads) as well as tau-positive glial cells, especially in the depths of the sulcus and focally around some blood vessels best seen in slide B. There are no neuritic plaques and the tangles are much more common in the neocortex than in the hippocampus. These findings are diagnostic of CTE.

Figure 1: neocortex with numerous tangles, neuropil threads, glial tau and perivascular location; on the right is a close up of the distinctive perivascular pathology of CTE.



Christopher Mims had CTE.

Signed:
/s/
Ronald L Hamilton, M.D.

Affiliated with the University of Pittsburgh School of Medicine



# NFL CONCUSSION SETTLEMENT
*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

## NOTICE OF REQUEST FOR ADDITIONAL DOCUMENTS
### DATE OF NOTICE: February 20, 2019
### RESPONSE DEADLINE: June 20, 2019

### I. SETTLEMENT CLASS MEMBER INFORMATION

| | |
|---|---|
| **Settlement Program ID** | 950013395 |

| **Name:** | First<br>Carleen | M.I. | Last<br>Hastings |
|---|---|---|---|

| | |
|---|---|
| **Settlement Class Member Type** | Representative Claimant |
| **Primary Counsel** | O'Hanlon, Demerath & Castillo |

| **Asserted Qualifying Diagnosis** | Death with CTE (Chronic Traumatic Encephalopathy) | **Date of Asserted Qualifying Diagnosis** | 10/15/08 |
|---|---|---|---|

### II. EXPLANATION OF REQUEST(S)

This Notice is an official communication from the Claims Administrator for the NFL Concussion Settlement Program. Your Claim Package is missing documents or information.

This Notice explains what is missing and what you may do to address the issue. We can help if you have questions. To cure the issues identified in this Notice, click the Respond to Request for Additional Documents button on your secure online portal and follow the instructions provided to upload the information identified below.  If you already have provided us with the missing information, let us know because we may have received it after conducting the review that generated this notice.

The following requires attention before we can act further:

| | **What is Missing** | **How to Address this Item** |
|---|---|---|
| **1.** | You have not submitted any medical records reflecting the Qualifying Diagnosis. | Click the Respond button, go to Section 3 for Medical Records, click on the Upload Medical Records button and follow the instructions to upload medical records reflecting the Qualifying Diagnosis. |

### III. ADDITIONAL EXPLANATION OF WHAT IS MISSING

The medical records must show a post-mortem diagnosis of CTE made before April 22, 2015 (the Final Approval Date) by a board-certified neuropathologist for a Retired NFL Football Player who died before April 22, 2015.  See Section 6.3 (f) of the Settlement Agreement and FAQ 109.  Mr. Mims died on October 15, 2008, and the October 16, 2008 autopsy report signed by Louis A. Pena does not reference CTE and neither does the death certificate.  You provided an undated letter from Dr. Ronald L. Hamilton who diagnosed Mr. Mims with CTE.  You must establish that Dr. Hamilton reviewed Mr Mim's brain tissue and made a CTE diagnosis on or before April 22, 2015.

### IV. HOW TO RESPOND TO THIS NOTICE

You have 120 days to respond to this Notice and provide the missing information or documents. **We encourage you to gather the requested information or documents now and respond to this Notice promptly, rather than using the full 120 days allowed to answer.  The sooner you respond, the sooner your claim can move forward in the review process.**

By the Response Deadline stated above, send us the missing information or documents identified in Section II.  We will wait the full 120 days to re-review your claim, unless you click the Submit Claim Package for Review button to confirm that your response is complete and we may continue to review your claim.  If you do not respond in full on or before the Response Deadline, we will have to assess your claim based on the materials we have, which could lead to a lower Monetary Award or denial of your claim in its entirety.

Submit the requested information using your secure online portal to upload additional documents.

## V. HOW TO CONTACT US WITH QUESTIONS OR FOR HELP

If you are represented by a lawyer, consult with your lawyer if you have questions or need assistance. If you are unrepresented and have any questions about this Notice or need help, contact us at 1-855-887-3485 or send an email to ClaimsAdministrator@NFLConcussionSettlement.com.  If you are a lawyer, call or email your designated Firm Contact for assistance. For more information about the Settlement program, visit the official website at www.NFLConcussionSettlement.com to read the Frequently Asked Questions or download a copy of the complete Settlement Agreement.





# NFL CONCUSSION SETTLEMENT

*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

## APPEALS FORM FOR MONETARY AWARD OR DERIVATIVE CLAIMANT AWARD CLAIM DETERMINATION

### DATE OF NOTICE: July 30, 2019
### DEADLINE TO APPEAL: August 29, 2019

### I. SETTLEMENT CLASS MEMBER INFORMATION

| | |
|---|---|
| **Settlement Program ID** | 950013395 |

| **Name:** | First<br>Carleen | M.I. | Last<br>Hastings |
|---|---|---|---|

| **Settlement Class Member Type** | Representative Claimant |
|---|---|
| **Primary Counsel** | O'Hanlon, Demerath & Castillo |

### II. REASON FOR THIS APPEAL

Here is a short statement explaining the reason(s) for my appeal. Raise all issues you wish to appeal. Issues not raised at this time will not be addressed by the Court.

Class Member Carleen Hastings, by and through counsel, files this written statement in support of this appeal and respectfully requests that the Claims Administrator's denial of this claim be reversed and remanded for a calculation of the Class Member's Monetary Award. The Claims Administrator erred in making two erroneous legal conclusions and one erroneous factual determination.

First, the Claims Administrator erred in concluding that the Amended Settlement Agreement required Class Member to submit proof that the board-certified neuropathologist who provided a post-mortem diagnosis of CTE made the diagnosis on or before 4/22/15.*

Second, the Claims Administrator erred in concluding that the Amended Settlement Agreement required the board-certified neuropathologist who provided the CTE diagnosis for this claim to also "confirm" his CTE diagnosis by examining the Player's brain tissue. The Amended Settlement Agreement requires a post-mortem diagnosis of CTE by a board-certified neuropathologist; it does not require any additional "confirmation" of the diagnosis by the board-certified neuropathologist.

Third, the Claims Administrator erred in concluding that there is no proof that Dr. Hamilton "personally performed the post-mortem exam on the Retired Player." Dr. Hamilton did personally review brain tissue from the Retired Player as he states in his letter.

_____
* If the Amended Settlement Agreement [ECF 6481] is construed to require a diagnosis on or before 4/22/15, Class Member reserves the right to seek relief from the Court pursuant to both Rule 60 and the Court's inherent authority to amend the judgment in this case in order to implement the settlement.

### III. HOW TO SUBMIT THIS FORM

You may submit this Appeals Form and any accompanying documents using one of these methods:

| | |
|---|---|
| **By Mail:**<br>(must be postmarked on or before the appeal deadline date) | NFL Concussion Settlement<br>Claims Administrator<br>P.O. Box 25369<br>Richmond, VA 23260 |
| **By Overnight Delivery:**<br>(must be placed with the overnight carrier on or before the appeal deadline date) | NFL Concussion Settlement<br>c/o BrownGreer PLC<br>250 Rocketts Way<br>Richmond, VA 23231 |
| **By Hand Delivery:**<br>(must delivered on or before the appeal deadline date) | NFL Concussion Settlement<br>c/o BrownGreer PLC<br>250 Rocketts Way<br>Richmond, VA 23231 |

## IV. HOW TO CONTACT US WITH QUESTIONS OR FOR HELP

If you are represented by a lawyer, consult with your lawyer if you have questions or need assistance. If you are unrepresented and have any questions about this Form or need help, contact us at 1-855-887-3485 or send an email to ClaimsAdministrator@NFLConcussionSettlement.com.  If you are a lawyer, call or email your designated Firm Contact for assistance. For more information about the Settlement Program, visit the official website at www.NFLConcussionSettlement.com, where you can read or download the Rules Governing Appeals of Claim Determinations, Frequently Asked Questions about the Settlement, the complete Settlement Agreement and other helpful materials.

## NFL Parties' Opposition to Appeal of
## Claim Denial by Representative Claimant Carleen Hastings

Carleen Hastings, Representative Claimant for the late Christopher Mims, submitted a claim on February 5, 2019—the day before the deadline for pre-Effective Date claims—for a Qualifying Diagnosis of Death with CTE purportedly rendered by neuropathologist Dr. Ronald L. Hamilton. (*See* Claim Form; Diagnosing Physician Certification.) In support of her claim, Ms. Hastings submitted (1) a Diagnosing Physician Certification from Dr. Hamilton, reflecting a purported Qualifying Diagnosis of Death with CTE (Diagnosing Physician Certification at 6); (2) an undated letter from Dr. Hamilton, purporting to diagnose Mr. Mims with CTE (Hamilton Letter); (3) a death certificate indicating that Mr. Mims died on October 15, 2008 and listing Mr. Mims' primary cause of death as "DILATED CARDIOMYOPATHY" and contributing causes of death as "HEPATIC STEATOSIS" and "HISTORY OF HYPERTENSION" (Death Certificate at 2); and (4) an autopsy report completed by Dr. Louis A. Pena, indicating the same causes of death listed in Mr. Mims' death certificate (*see* Autopsy Report at 1).

On February 20, 2019, the Claims Administrator issued a Notice of Request for Additional Documents advising Ms. Hastings that her Claim Package was incomplete because Ms. Hastings did not submit any medical records reflecting the Qualifying Diagnosis. (*See* Notice of Request for Additional Documents.) In the section titled "Additional Explanation of What is Missing," the Claims Administrator explained that Ms. Hastings' Claim Package materials did not show that Dr. Hamilton administered a post-mortem examination in which he diagnosed Mr. Mims with CTE prior to the Settlement Final Approval Date of April 22, 2015, as required by the Settlement Agreement. (*See id.*) On July 30, 2019, the Claims Administrator denied Ms. Hastings' claim because she failed to submit any Claim Package materials to show that Dr. Hamilton actually performed a post-mortem examination and rendered a diagnosis of CTE prior to the Final Approval Date, as required by the Settlement Agreement. (*See* Notice of Denial of Monetary Award Claim ("Denial Notice") at 1.)

On appeal, Ms. Hastings does not contend that Dr. Hamilton diagnosed Mr. Mims with CTE based on a post-mortem examination prior to April 22, 2015. Instead, she argues that: (1) the still unspecified date that Dr. Hamilton actually diagnosed Mr. Mims does not matter, because the diagnosis date for any Retired NFL Football Player diagnosed with Death with CTE purportedly is the date of the player's death; (2) if the Claims Administrator determines that a diagnosing physician must render a diagnosis of Death with CTE prior to April 22, 2015, the amended Settlement Agreement purportedly violates Settlement Class Members' due process rights because it was a change to the original Settlement Agreement without proper notice; (3) the Settlement Agreement allegedly did not require Dr. Hamilton to examine Mr. Mims' brain tissue in a post-mortem examination to render a Death with CTE diagnosis; and (4) Dr. Hamilton did examine Mr. Mims' brain tissue. (*See* Written Statement in Support of Class Member's Appeal of the Claims Administrator's Notice of Denial of Monetary Award Claim ("Appeal").)[1]

---

[1]    With knowledge that Mr. Mims and other clients never received a diagnosis of CTE prior to the Final Approval Date, counsel for Ms. Hastings has engaged in a lengthy history of legal gamesmanship concerning the deadline for Qualifying Diagnoses of Death with CTE. On August 15, 2017, counsel for Ms. Hastings, on behalf of client Yvonne Sagapolutele, filed a Motion to Modify the Amended Final Order and Judgment, in which she alleged that the Settlement Agreement's deadline to obtain a Qualifying Diagnosis of Death with CTE was "imposed after the deadline to opt out and without notice to Class Members." (Mem. of Law in Supp. of Absent Class Member and Pl. Yvonne Sagapolutele's Mot. to Modify the Am. Final Order and J. at 18, 12-md-2323, ECF No. 8263-2

The NFL Parties respectfully oppose the Appeal because it is utterly unfounded, and there is no question this claim must be denied. The Settlement Agreement clearly requires that a board-certified neuropathologist render a Qualifying Diagnosis of Death with CTE prior to April 22, 2015, and Ms. Hastings has not provided—and undoubtedly cannot provide—any evidence that Dr. Hamilton rendered such a diagnosis prior to that date. In addition, the amended Settlement Agreement's requirement that a Qualifying Diagnosis of Death with CTE must be rendered prior to April 22, 2015 does not violate Settlement Class Members' due process rights; to the contrary, it expanded the deadline for Death with CTE diagnoses compared to the original Settlement Agreement to the benefit of Settlement Class Members. Finally, although this issue need not be reached on appeal, the Settlement Agreement requires that a board-certified neuropathologist personally examine a Retired NFL Football Player's brain tissue prior to rendering a timely Qualifying Diagnosis of Death with CTE.

For these reasons, and those set forth below, Ms. Hastings' appeal should be denied.

**I.      There Is No Evidence That Dr. Hamilton Rendered a Qualifying Diagnosis of Death With CTE Prior to April 22, 2015, as Required by the Settlement Agreement**

For a Qualifying Diagnosis of Death with CTE, the Settlement Agreement explicitly requires that a diagnosing physician render the diagnosis prior to the Settlement's Final Approval Date of April 22, 2015. Specifically, Section 2.1(aa) of the Settlement Agreement provides that the Qualifying Diagnosis of "Death with CTE is defined in Exhibit 1," and Exhibit 1 states that the definition of Death with CTE is: "For Retired NFL Football Players who died prior to the Final Approval Date, *a post-mortem diagnosis of CTE made by a board-certified neuropathologist prior to the Final Approval Date*, provided that a Retired NFL Football Player who died between July 7, 2014 and the Final Approval Date shall have until 270 days from his date of death to obtain such a postmortem diagnosis." (Settlement Agreement, Ex. A-1 at 5 § 5 (emphasis added).) Section 6.3(f) of the Settlement Agreement reiterates that requirement, stating that "[a] Qualifying Diagnosis of Death with CTE shall be made only for Retired NFL Football Players who died prior to the Final Approval Date, through *a post-mortem diagnosis made by a board-certified neuropathologist prior to the Final Approval Date* . . . ." (*See id.* at 6.3(f) (emphasis added).)

In the Appeal, Ms. Hastings argues that a Diagnosing Physician is not required to actually render a Qualifying Diagnosis of Death with CTE prior to April 22, 2015 because "the only date that is relevant in determining the date of a Qualifying Diagnosis for Death with CTE is the date of the Player's death." (Appeal at 5.) As support for this argument, Ms. Hastings cites Settlement FAQ 99 (formerly Settlement FAQ 93), which states in part:

> *Death with CTE*: For these claims, the date of the Qualifying Diagnosis is the date of the Player's death, even though the diagnosis is not made until after the Player dies. The Monetary Award is based on the Player's age when he died.

---

(the "Motion to Modify the Amended Final Order and Judgment").) After the Parties fully briefed that motion, the Court denied the motion without prejudice to Ms. Sagapolutele's (or other similarly situated Settlement Class Members') ability to raise the issue at a later time if she filed a Death with CTE claim that would have been valid but for the deadline. (Order, 12-md-2323, ECF No. 8557.) Counsel then waited over 16 months to file Ms. Hastings' Death with CTE claim, which relies on an *undated* letter from Dr. Hamilton, with the clear intention of obfuscating the timing and nature of Dr. Hamilton's purported CTE diagnosis.

(Settlement FAQ 99.)

Ms. Hastings' argument rests on willful ignorance of the Settlement Agreement and a misinterpretation of Settlement FAQ 99. Specifically, the Settlement Agreement plainly requires that, "[f]or Retired NFL Football Players who died prior to the Final Approval Date, a ***post-mortem diagnosis***" of Death with CTE must be "made by a board-certified neuropathologist ***prior to the Final Approval Date***." (Settlement Agreement Ex. A-1 at 5 § 5 (emphasis added).) If, as Ms. Hastings argues, the Settlement Agreement required only that a Retired NFL Football Player died prior to the Final Approval Date in order for a diagnosis made at *any unlimited future date* to be timely, the Settlement Agreement would not include subsequent language providing that a player who died between July 7, 2014 and the Final Approval Date "shall have until 270 days from his date of death to obtain such a postmortem diagnosis." (*Id.*)

Moreover, Settlement FAQ 99 does not concern the date by which a Diagnosing Physician must have *actually made* a Death with CTE diagnosis, but instead concerns the date of diagnosis ***for compensation purposes***. The Parties to the Settlement Agreement did not wish to reduce the compensatory award of a decedent who otherwise would have aged between death and the neuropathological examination. The Death with CTE portion of Settlement FAQ 99 confirms this, as it clearly states that "[t]he ***Monetary Award*** is based on the Player's age when he died." (Settlement FAQ 99 (emphasis added).)

Ms. Hastings has not provided—and presumably cannot provide—any evidence that Dr. Hamilton rendered his purported Qualifying Diagnosis of Mr. Mims prior to the Final Approval Date of April 22, 2015. In fact, Dr. Hamilton's letter containing the purported diagnosis does not contain any dates whatsoever, and Dr. Hamilton's Diagnosing Physician Certification form only lists the date of Mr. Mims' death (October 15, 2008) as the date of diagnosis. (*See* Hamilton Letter; Diagnosing Physician Certification.) Accordingly, Ms. Hastings' appeal must be denied, and her claim denial upheld, for this fundamental reason alone.

II.     **The Settlement Agreement Requirement That a Death With CTE Diagnosis Be Rendered Prior to April 22, 2015 Does Not Violate Settlement Class Members' Due Process Rights**

Fully aware that her purported Death with CTE diagnosis is untimely because it was not rendered prior to the Final Approval Date of April 22, 2015, Ms. Hastings argues that such requirement somehow violates her right to due process. Specifically, Ms. Hastings argues that the Special Master should consider the arguments in Yvonne Sagapolutele's August 15, 2017 Motion to Modify the Amended Final Order and Judgment to remove the deadline to obtain the Qualifying Diagnosis, which Motion was denied without prejudice by Judge Brody with instruction that Ms. Sagapolutele "must first show that she would be entitled to recover but for the Death with CTE diagnosis deadline," and then may raise the due process argument in the claims appeal process. (Order, 12-md-2323, ECF No. 8557.) Ms. Hastings' argument that the amendments to the Settlement Agreement somehow violated her due process rights is meritless.

Relying on Ms. Sagapolutele's prior Motion to Modify the Amended Final Order and Judgment, Ms. Hastings alleges that the Settlement Agreement's deadline to obtain a Qualifying Diagnosis of Death with CTE was "surreptitiously added to the Amended Settlement Agreement" after the deadline to opt out and without notice to Settlement Class Members. (Appeal at 6.) Ms. Sagapolutele's prior motion argues that absent class members' due process rights were violated by the change, and that the Court should remedy the violation by modifying the Settlement Agreement

to remove the deadline for a Qualifying Diagnosis of Death with CTE. (*See* Motion to Modify the Amended Final Order and Judgment at 15-24.)

In response, the NFL Parties, too, incorporate all of the arguments set forth in their Opposition to that Motion, attached in full as Exhibit 1.[2]  As the NFL Parties explained in their Opposition, far from injuring Settlement Class Members' rights by "imposing" a new deadline for a Qualifying Diagnosis of Death with CTE, the amendments to the Settlement Agreement *extended* the deadline to obtain the Qualifying Diagnosis from the Preliminary Approval Date to the Final Approval Date (*see id.* at 10-11), and provided a 270-day grace period in which Settlement Class Members who died between the Preliminary Approval Date and the Final Approval Date could obtain a Qualifying Diagnosis (*see id.* at 6, 10).  Accordingly, the relevant changes solely benefited absent class members and in no way violated their due process rights. (*See id.* at 9-13.)

For these additional reasons, Ms. Hastings' appeal must be denied, and her claim denial must be upheld.

### III.    The Settlement Agreement Requires a Diagnosing Physician to Examine a Retired NFL Football Player's Brain Tissue in Order to Render a Qualifying Diagnosis of Death with CTE

Ms. Hastings further argues that the Claims Administrator erred in stating that the Claim Package must contain evidence that the Diagnosing Physician "examined the Retired Player's brain tissue to confirm a CTE diagnosis" (Denial Notice at 1) because the Settlement Agreement purportedly does not require a Diagnosing Physician to examine brain tissue in order to render a Qualifying Diagnosis of Death with CTE. (*See* Appeal at 7.)  Although this issue need not be reached on appeal because Ms. Hastings has not provided any evidence that Mr. Mims was rendered a Qualifying Diagnosis of Death with CTE prior to April 22, 2015, Ms. Hastings is simply wrong.

As previously discussed, a Qualifying Diagnosis of Death with CTE requires "a post-mortem diagnosis of CTE made by a board-certified neuropathologist prior to the Final Approval Date." (Settlement Agreement, Ex. A-1 at 5 § 5; *see also* Settlement Agreement §§ 2.1(aa), 6.3(f).)  Post-mortem examination of brain tissue is the ***only*** way that CTE can be diagnosed, as Judge Brody made clear in the Court's Memorandum supporting Final Approval of the Settlement Agreement:

> Chronic Traumatic Encephalopathy is a neuropathological diagnosis that currently can only be made post mortem. This means no one can conclusively say that someone had CTE until a scientist looks at sections of that person's brain under a microscope to see if abnormally phosphorylated tau protein ("abnormal tau protein") is present, and if so whether it is present in a reportedly unique pattern.

*In re Nat. Football League Players' Concussion Injury Litig.*, 307 F.R.D. 351, 397 (E.D. Pa. 2015), *amended*, No. 2:12-MD-02323-AB, 2015 WL 12827803 (E.D. Pa. May 8, 2015), and *aff'd*, 821 F.3d 410 (3d Cir. 2016).  Judge Brody further stated that "Retired Players cannot be compensated for CTE in life because no diagnostic or clinical profile of CTE exists, and the symptoms of the disease, if any, are unknown." (*Id.*)

---

[2]    (*See* Ex. 1, Mem. of Law of the National Football League and NFL Properties LLC in Opp. to Settlement Class Member Yvonne Sagapolutele's Mot. to Modify the Am. Final Order and J., 12-md-2323, ECF No. 8430.)

4

Thus, the Settlement Agreement and its implementing orders clearly require that a diagnosing physician personally examine a Retired NFL Football Player's brain tissue in order to render a Qualifying Diagnosis of Death with CTE. Here, Dr. Hamilton's letter indicated that he examined slides of Mr. Mims' brain tissue, but, as previously discussed, Ms. Hastings has not provided any evidence that he performed such a post-mortem examination and diagnosed Mr. Mims with CTE prior to April 22, 2015.

**Conclusion**

The denial of Ms. Hastings' claim was required under the judicially-approved terms of the Settlement Agreement. The Special Master has already denied 19 substantially similar appeals filed by Settlement Class Members represented by Ms. Hastings' counsel, and Ms. Hastings' appeal presents no additional evidence to warrant a different outcome.[3] Because Ms. Hastings does not present clear and convincing evidence that such determination was in error, the Special Master should affirm denial of the claim.


Dated:  October 3, 2019                    Respectfully submitted,

                                           PAUL, WEISS, RIFKIND,
                                             WHARTON & GARRISON LLP

                                           */s/ Brad S. Karp*_____
                                           Brad S. Karp
                                           Bruce Birenboim
                                           Claudia Hammerman
                                           Lynn B. Bayard
                                           Douglas M. Burns
                                           1285 Avenue of the Americas
                                           New York, New York 10019-6064
                                           Telephone:  (212) 373-3000
                                           Facsimile:  (212) 757-3990
                                           Email:  bkarp@paulweiss.com

                                           *ATTORNEYS FOR THE*
                                           *NATIONAL FOOTBALL LEAGUE*
                                           *AND NFL PROPERTIES LLC*

---

[3] (*See, e.g.*, SPID 950012548, Doc. No. 214641.)

# EXHIBIT 1

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br><br>MDL No. 2323<br><br>Hon. Anita B. Brody |
| Kevin Turner and Shawn Wooden, *on behalf of themselves and others similarly situated*,<br><br>Plaintiffs,<br><br>v.<br><br>National Football League and NFL Properties, LLC, successor-in-interest to NFL Properties, Inc.<br>Defendants. | Civ. Action No.: 14-cv-00029-AB |
| THIS DOCUMENT RELATES TO:<br>ALL ACTIONS | Hon. Anita B. Brody |

### MEMORANDUM OF LAW OF THE NATIONAL FOOTBALL LEAGUE AND NFL PROPERTIES LLC IN OPPOSITION TO SETTLEMENT CLASS MEMBER YVONNE SAGAPOLUTELE'S MOTION TO MODIFY THE <u>AMENDED FINAL ORDER AND JUDGMENT</u>

## TABLE OF CONTENTS

**Page**

Preliminary Statement .................................................................................................. 1

Background ...................................................................................................................... 4

    A.    Parties .................................................................................................. 4

    B.    Procedural Background ....................................................................... 4

Argument ........................................................................................................................ 8

I.    THE PARTIES WERE NOT REQUIRED TO NOTIFY THE SETTLEMENT CLASS ABOUT THE AMENDMENTS .......................................................... 8

    A.    The Amendments Did Not Require New Notice .................................. 9

    B.    The Original Settlement Notice Was Sufficient ................................. 11

II.    SAGAPOLUTELE IS NOT ENTITLED TO REWRITE THE SETTLEMENT AGREEMENT .................................................................................................. 13

Conclusion .................................................................................................................... 17

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Adelson* v. *Ocwen Fin. Corp.*,
    621 F. App'x 348 (7th Cir. 2015) ................................................................14

*In re Baby Prods. Antitrust Litig.*,
    708 F.3d 163 (3d Cir. 2013).............................................................9, 11

*Blue Diamond Coal Co.* v. *Trustees of UMWA Combined Ben. Fund*,
    249 F.3d 519 (6th Cir. 2001) ................................................................16

*In re Diet Drugs Prods. Liab. Litig.*,
    200 F. App'x 95 (3d Cir. 2006) ................................................................14

*In re Diet Drugs Prods. Liab. Litig.*,
    No. 99-cv-20593, 2010 WL 2735414 (E.D. Pa. July 2, 2010) ....................9, 11, 13

*F.A.C., Inc.* v. *Cooperativa de Seguros de Vida de Puerto Rico*,
    449 F.3d 185 (1st Cir. 2006)................................................................17

*Federman* v. *Artzt*,
    339 F. App'x 31 (2d Cir. 2009) ................................................................14, 15

*In re Four Seasons Sec. Laws Litig.*,
    525 F.2d 500 (10th Cir. 1975) ................................................................15

*Harris* v. *Graddick*,
    615 F. Supp. 239 (N.D. Ala. 1985)................................................................9, 11

*Hensley* v. *Alcon Labs., Inc.*,
    277 F.3d 535 (4th Cir. 2002) ................................................................17

*Inmates of Suffolk Cty. Jail* v. *Rufo*,
    No. 71-cv-00162, 2015 WL 6958070 (D. Mass. Nov. 10, 2015) ...........................16

*Kokkonen* v. *Guardian Life Ins. Co. of Am.*,
    511 U.S. 375 (1994)................................................................17

*In re Linerboard Antitrust Litig.*,
    223 F.R.D. 357 (E.D. Pa.), *amended*, 223 F.R.D. 370 (E.D. Pa. 2004)..................17

*Matthews, Wilson & Matthews, Inc.* v. *Capital City Bank*,
    614 F. App'x 969 (11th Cir. 2015) ................................................................15

|  | **Page(s)** |
|---|---|

*In re Nat'l Football League Players' Concussion Injury Litig.*,
    307 F.R.D. 351 (E.D. Pa. 2015), *amended*, No. 12-MD-02323, 2015 WL
    12827803 (E.D. Pa. May 8, 2015) ................................................................ passim

*In re Nat'l Football League Players Concussion Injury Litig.*,
    821 F.3d 410 (3d Cir. 2016), *amended* (May 2, 2016) ............................................7

*In re Nissan Motor Corp. Antitrust Litig.*,
    552 F.2d 1088 (5th Cir. 1977) ........................................................................11

*Orlando Residence, Ltd.* v. *Hilton Head Hotel Inv'rs*,
    No. 89-cv-0662, 2013 WL 1103027 (D.S.C. Mar. 15, 2013)................................15

*In re PaineWebber Ltd. P'ships Litig.*,
    171 F.R.D. 104 (S.D.N.Y 1997) ........................................................................11

*Roman-Oliveras* v. *Puerto Rico Elec. Power Auth.*,
    797 F.3d 83 (1st Cir. 2015)................................................................................17

*Sawka* v. *Healtheast, Inc.*,
    989 F.2d 138 (3d Cir. 1993)................................................................................15

**OTHER AUTHORITIES**

11 Fed. Prac. & Proc. Civ. § 2852 (3d ed.)........................................................17

20 Fed. Prac. & Proc. Deskbook § 104................................................................16

Fed. R. Civ. P. 23 ..............................................................................................2, 9

Fed. R. Civ. P. 60 ............................................................................1, 3, 14, 15, 16

Newberg on Class Actions § 1:5 (5th ed.) ............................................................9

Newberg on Class Actions § 8:17 (5th ed.) ..........................................................9

Newberg on Class Actions § 8:36 (5th ed.) ..........................................................9

Newberg on Class Actions § 8:7 (5th ed.) ............................................................9

Newberg on Class Actions § 18:40 (5th ed.) ......................................................15

Defendants National Football League and NFL Properties LLC (collectively, the "NFL Parties") respectfully submit this memorandum of law in opposition to Settlement Class Member Yvonne Sagapolutele's ("Sagapolutele's") motion to modify the Amended Final Order and Judgment (the "Motion") (ECF No. 8263).

<u>**Preliminary Statement**</u>

Sagapolutele, an absent Settlement Class Member and representative of the estate of Retired NFL Football Player Pio Sagapolutele, brings this motion, ostensibly as a matter of due process, seeking significant revisions to the Final Order and Judgment that the Court entered more than two years ago approving the Class Action Settlement Agreement in this case.[1]  But no due process violation has occurred, and Sagapolutele has shown no justification for this Court to take the extraordinary step of rewriting a settlement agreement approved by both this Court and the Third Circuit that has been in place for years.  Sagapolutele's motion should therefore be denied.

The primary ground for Sagapolutele's motion is the amendments to the Settlement Agreement in February 2015, which expanded the definition of the Death with CTE Qualifying Diagnosis in response to the Court's directives.  Contrary to fact, Sagapolutele contends that the amendment imposed a deadline to obtain a Qualifying Diagnosis of Death with CTE, and "[b]ecause this change was made both without notice to absent class members and after the deadline to opt out of the settlement, [her] due process rights were violated."  (Pl. Mem. at 15.)  Sagapolutele asks this Court, pursuant to Rule 60 of the Federal Rules of Civil Procedure and the Court's inherent power, to amend the Final Order and Judgment to "remov[e] the deadline to obtain a Qualifying Diagnosis of Death with CTE."  (Pl. Mem. at 1.)

---

[1]    Unless otherwise defined, the capitalized terms used in this memorandum have the same meaning as those in the Settlement Agreement.

Sagapolutele's motion has no basis in fact or law for several reasons.

*First*, the amendments in question concerned an *expansion* of settlement benefits to the Settlement Class—namely, the expansion of the Qualifying Diagnosis of Death with CTE to include Retired NFL Football Players who died with CTE between Preliminary and Final Approval of the Settlement Agreement; the original agreement limited the Qualifying Diagnosis to those who died *prior* to Preliminary Approval.  It is well settled that additional notice to a class is necessary only when amendments to a settlement agreement are "materially adverse" to the class, not where, as here, they benefit the class.  Neither the Due Process Clause nor Rule 23 of the Federal Rules of Civil Procedure require notice in the event of beneficial, or even neutral, amendments.  As this Court correctly held in granting Final Approval of the Settlement Agreement over various objections to this very amendment (although on a different ground), no additional notice was required in this case for that very reason.

*Second*, contrary to Sagapolutele's contentions regarding lack of notice, the class notice in connection with the original settlement agreement was all that was necessary.  The Short- and Long-Form notices distributed to the Settlement Class Members made clear, as this Court and the Third Circuit held, that an award of Death with CTE would *not* be available to all Retired NFL Football Players diagnosed with CTE.  Rather, only particular cases of CTE meeting "certain" predetermined and agreed-to standards under the Settlement Agreement would be compensated—namely, cases where, prior to Preliminary Approval,[2] the Retired NFL Football Player received a post-mortem diagnosis of CTE made by a board-certified neuropathologist.  Further, the amendments in question were in fact made public; the NFL Parties and Class Counsel posted the amendments—including a redline comparison clearly

---

[2]    As noted above, the amendments to the Settlement Agreement extended this deadline to Final Approval.

reflecting the changes to the text of the Settlement Agreement—on the Court's publicly accessible PACER docket, where any member of the public, including the more than 5,000 Settlement Class Members with legal representation, could view it. In fact, over 40 Settlement Class Members objected to the amendments, including the very amendment that Sagapolutele complains of here.

*Finally*, even if Sagapolutele could show a due process violation, which she cannot, neither Rule 60 nor this Court's "inherent authority" allows Sagapolutele to rewrite the Settlement Agreement as she seeks. Rule 60(a) is limited to correction of "clerical mistakes" that do not affect the substantive rights of the parties. Yet her contention that the amendments were simply "clerical mistakes" is at odds with her characterization of those same amendments as impairing her rights under the settlement. Further, not only does Sagapolutele—as an absent class member—lack standing to move pursuant to Rule 60(b)(6), she also fails to establish that the "extraordinary remedy" of amendment pursuant to Rule 60(b)(6) is warranted here because she does not show that she will experience *any* hardship without the relief she seeks. For example, Sagapolutele has neither shown (nor even claimed) that the brain of her late husband, who died in 2009, has ever been examined by a board-certified neuropathologist for CTE, much less diagnosed as having CTE. Nor has she explained why any such examination—if such a belated diagnosis were even medically possible—did not occur prior to the Court's Final Approval Order on April 22, 2015 (as amended May 8, 2015). Finally, Sagapolutele has not shown that she is entitled to relief under the Court's "inherent authority" to amend the Final Order and Judgment because that authority is no more expansive than Rule 60.

Accordingly, Sagapolutele's motion should be denied.

## Background

### A.     Parties

The National Football League ("NFL") is an unincorporated association of 32 Clubs that promotes, organizes, and regulates the sport of professional football in the United States.  NFL Properties LLC ("NFLP") is a limited liability company organized under the laws of the State of Delaware and headquartered in New York.  Sagapolutele is a self-described absent Settlement Class Member and the representative of the estate of late Retired NFL Football Player Pio Sagapolutele.  (Pl. Mot. at 1.)

### B.     Procedural Background

The Judicial Panel on Multidistrict Litigation established this multidistrict litigation as MDL 2323 on January 31, 2012.  Since that time, over 300 additional cases, brought on behalf of approximately 5,000 former NFL players, have been included in the MDL.  *See In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. 351, 361 (E.D. Pa. 2015), *amended*, No. 12-MD-02323, 2015 WL 12827803 (E.D. Pa. May 8, 2015), *and aff'd*, 821 F.3d 410 (3d Cir. 2016), *amended* (May 2, 2016), *cert. denied*, 137 S. Ct. 591 (2016), and *cert. denied*, 137 S. Ct. 607 (2016).  Plaintiffs in these cases asserted fraud- and negligence-based claims against the NFL Parties based on, among other things, a purported duty to provide players with rules and information needed to protect them from the alleged effects of repetitive mild traumatic brain injuries sustained during NFL play, including CTE.  *Id*. at 361-62.

On June 25, 2014, the NFL Parties and Class Counsel[3] (collectively, the "Parties") filed a motion for preliminary class certification and preliminary approval of the Settlement Agreement, and on July 7, 2014, the Court approved the motion.  *See id.* at 363-65.

---

[3]  Class Counsel consists of attorneys whom this Court duly appointed as legal representatives for the Settlement Class, including Christopher A. Seeger, Sol Weiss, Steven C. Marks, Gene Locks, Arnold Levin, and Dianne M. Nast.  (Final Order & Judg. ¶ 6,  ECF No. 6510.)

The Settlement Agreement defined the Settlement Class as "'[a]ll living NFL Football Players who, prior to the date of Preliminary Approval . . . retired . . . from playing professional football with the NFL,'" as well as their Representative Claimants and Derivative Claimants.  *Id.* at 365 ("Representative Claimants are those duly authorized by law to assert the claims of deceased, legally incapacitated, or incompetent Retired Players.  Derivative Claimants are those, such as parents, spouses, or dependent children, who have some legal right to the income of Retired Players.").  The Settlement Agreement also provides funding for Retired NFL Football Players to receive a baseline assessment examination of their objective neurological functioning, for safety and educational initiatives, and for monetary awards for certain Qualifying Diagnoses, including, as relevant here, the Qualifying Diagnosis of Death with CTE.  *Id*. at 366-67.

Prior to the Fairness Hearing, the Parties distributed Court-approved Short- and Long-Form notices to the Settlement Class.  *See id.* at 382-86.  "Each was written in plain and straightforward language," and together, they disclosed the key components of the Settlement Agreement, making clear that "only 'certain' cases of CTE are covered."  *Id.* at 383-84.  As explained by the notice, under the original agreement, the Settlement's benefits included "[m]onetary awards for ***diagnoses*** of Death with CTE ***prior to July 7, 2014*** . . . ."  (*See* Long-Form Notice at 6, ECF No. 6086-1 (emphasis added); *see also* Class Action Settlement Agreement as of June 24, 2014 § 6.3(f), ECF No. 6087 (a "Qualifying Diagnosis of Death with CTE shall be made only for Retired NFL Football Players who died prior to the date of the Preliminary Approval and Class Certification Order, through a post-mortem diagnosis by a board-certified neuropathologist of CTE.").)

After the Fairness Hearing, the Parties—at this Court's request—agreed to several amendments to the Settlement Agreement, each of which made the Settlement Agreement more

beneficial to Settlement Class Members. *In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. at 386. For example, the amendments provided credit for Settlement Class Members who played in NFL Europe; ensured that all eligible Retired NFL Football Players who elected to receive a baseline assessment examination would receive one regardless of any funding limitations in the Settlement Agreement; included a hardship provision with respect to the appeal fee for Settlement Class Members; and allowed reasonable accommodation for Settlement Class Members who do not possess certain medical records. (Class Counsel and the NFL Parties' Joint Submission in Resp. to the Feb. 2, 2015 Order of the Ct., Feb. 13, 2015, ECF No. 6481.) In addition, as is relevant here, one amendment expanded the Qualifying Diagnosis of Death with CTE to cover not only Retired NFL Football Players who died prior to Preliminary Approval, but also Retired NFL Football Players who died between Preliminary Approval and Final Approval. (*Id.* at 4-5.) In addition, the Parties explained to the Court that "**consistent with the Parties' intent under the original Settlement Agreement**, and recognizing that obtaining such a [CTE] diagnosis **may take several months post-death**, the Parties have provided for a grace period of 270 days following any date of death between preliminary approval and the Final Approval Date to allow Claimants to obtain the necessary diagnosis." (*Id.* (emphasis added).)

Copies of the proposed amended Settlement Agreement, including a redline showing the exact changes made, were posted on the Court's publicly accessible PACER database in February 2015. (Class Counsel and the NFL Parties' Joint Submission in Resp. to the Feb. 2, 2015 Order of the Ct., Ex. A, Feb. 13, 2015, ECF No. 6481-1.) Between February and April 2015, more than 40 Settlement Class Members filed objections to the amendments, including objections to the amendment to the definition of Death with CTE at issue here. (*See*

Armstrong Objectors' Suppl. Obj. to the Am. Class Action Settlement, ECF No. 6503; Miller Suppl. Obj. to Settlement, ECF No. 6484.) Sagapolutele did not file any objection.

After considering those objections, the Court issued its opinion approving the Settlement Agreement and finding that "Class Members who opted out . . . received adequate notice of these changes, **and notification of Class Members is not required**." *In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. at 386 (emphasis added). The Court explained: "Because these changes improved the deal for Class Members without providing any concessions to the NFL Parties, an additional round of notice for Class Members is unnecessary." *Id*. On appeal, the Third Circuit affirmed this Court's Final Order and Judgment in full. Regarding notice, the Third Circuit agreed with the District Court, finding "that the content of the class notice . . . satisfied Rule 23 and due process." *In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 435-36 (3d Cir. 2016), *amended* (May 2, 2016), *cert. denied*, 137 S. Ct. 591 (2016), and *cert. denied*, 137 S. Ct. 607 (2016). Notably, the Third Circuit also "conclude[d] that the settlement's treatment of CTE does not render the agreement fundamentally unfair." *Id.* at 444.

On August 15, 2017, over two years after this Court granted final approval of the Settlement, Sagapolutele filed this Motion challenging the Court's determination that the amendments were beneficial to Settlement Class Members and therefore did not require additional notice, and seeking "modification of the Final Order and Judgment by removal of the deadline to obtain a Qualifying Diagnosis of Death with CTE."[4] (Pl. Mot. at 2.) Sagapolutele contends that "[t]his deadline was added to the Settlement Agreement in February 2015 without

---

[4] Relatedly, Sagapolutele also seeks an "instruction to the settlement administrator to develop forms and procedures that allows Class Members to obtain a Qualifying Diagnosis of Death with CTE by obtaining a post-mortem diagnosis by a board-certified neuropathologist at any time during the 65-year term of the Monetary Award Fund." (Pl. Mot. at 2.)

notice to the class," and "effectively prevented Class Members . . . from obtaining a Qualifying Diagnosis of Death with CTE." (*Id.*) Despite Sagapolutele's claim that "this deadline materially prejudices" Settlement Class Members (*id.*), she offers no explanation, much less an evidentiary showing, of how her own rights were in any way impaired by the alleged lack of notice. She does not demonstrate—or even assert—that the brain of her late husband has been examined by a board-certified neuropathologist and determined to have CTE. Therefore, not only is Sagapolutele's injury entirely hypothetical, but she also does not establish that such an examination would even be viable, given her husband's death in 2009.[5]

The NFL Parties, through this memorandum of law, oppose the Motion.

<u>Argument</u>

<center>I.</center>

### THE PARTIES WERE NOT REQUIRED TO NOTIFY THE SETTLEMENT CLASS ABOUT THE AMENDMENTS

Sagapolutele argues that her due process rights were violated because she did not receive notice that the February 2015 amendment "impos[ed] a deadline to obtain a Qualifying Diagnosis of Death with CTE" when the original Settlement Agreement purportedly permitted "Class Members [to] obtain a Qualifying Diagnosis for Death with CTE anytime within the 65-year life of the Monetary Award Fund." (Pl. Mem. at 17.) Not so.

"[T]he Due Process Clause of the Fourteenth Amendment requires that notice [concerning a class action settlement] be 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" *In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. at

---

[5] *See* Compl. ¶ 43, *Sagapolutele* v. *Nat'l Football League*, No. 17-cv-00348 (E.D. Pa. Jan. 25, 2017), ECF No. 1; *see also* Am. Stip. of Dismissal, *Sagapolutele* v. *Nat'l Football League*, No. 17-cv-00348 (E.D. Pa. May 3, 2017), ECF No. 4 (approving stipulation of dismissal without prejudice).

<center>8</center>

383 (quoting *Mullane* v. *Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)).[6]  Parties

settling a class action litigation should therefore distribute notice that "'fairly apprises' class

members of the action and their rights."  Newberg on Class Actions § 8:17 (5th ed.).  Additional

notice is only required when the settling parties subsequently introduce amendments that "would

have a *material adverse* effect on the rights of class members."  *In re Diet Drugs Prods. Liab.*

*Litig.*, No. 99-cv-20593, 2010 WL 2735414, at *6 (E.D. Pa. July 2, 2010) (emphasis added); *see*

*also In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 175 n.10, 182 (3d Cir. 2013) (supplemental

notice required only for "*material* alterations" (emphasis added)).  Conversely, if the

amendments are neutral or beneficial to the settlement class, no additional notice is required.  *See*

*Harris* v. *Graddick*, 615 F. Supp. 239, 244 (N.D. Ala. 1985) (holding that where "the

amendment is narrow and it is clearly apparent that the interests of the classes are not

*substantially impaired*, . . . the notice already given is adequate" (emphasis added)); *see also In*

*re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. at 383 (collecting cases,

including *Harris*).  That is the case here.

## A.    <u>The Amendments Did Not Require New Notice</u>

Sagapolutele's argument—that the Parties should have re-distributed notice

reflecting the February 2015 amendments to the Settlement Agreement—fundamentally

misunderstands the substance of the amendments.  In Sagapolutele's telling, "in the midst of

otherwise beneficial amendments" to the Settlement Agreement, the Parties "impose[d] an

additional requirement that prevents Class Members from recovering settlement proceeds [for

CTE] unless they obtained a Qualifying Diagnosis before" Final Approval.  (Pl. Mem. at 8.)  But

---

[6]    Due process notice requirements mirror those of Rule 23 of the Federal Rules of Civil Procedure.  *See* Newberg
on Class Actions § 1:5 (5th ed.) ("Rule 23 is constructed to ensure that the representative nature of class action
litigation safeguards these absent class members' due process rights."); *id.* § 8:7 (5th ed.) (the notice
requirements under Rule 23 "echo[] the constitutional test set forth by the Supreme Court"); *id.* § 8:36 (5th ed.)
("[A]s Rule 23's requirements are quite similar to the Constitution's, the distinction may be immaterial.").

the amendment only clarified what was always the case and extended the deadline for Death with CTE to Final Approval.

The original settlement agreement provided that an award for a Qualifying Diagnosis of Death with CTE would be available only to Retired NFL Football Players who died *and* received a CTE diagnosis prior to Preliminary Approval.  The Long-Form Notice made this explicit, stating that the Settlement's benefits include "[m]onetary awards for **diagnoses** of Death with CTE **prior to July 7, 2014** . . . ."  (*See* Long-Form Notice at 6, ECF No. 6086-1 (emphasis added); *see also* Decl. of Robert H. Klonoff Relating to the Proposed Class Settlement in the Nat'l Football League Players' Concussion Injury Litig. ¶ 85, Nov. 12, 2014, ECF No. 6423-9 ("[C]ontrary to the arguments advanced by various objectors, **excluding CTE in cases diagnosed after July 7, 2014**, is not irrational." (emphasis added)).)  Similarly, the Parties' publicly filed submission to the Court in support of the amendment stated specifically that the amendment's language providing only a grace period of time following death within which to obtain a neuropathological diagnosis of CTE was "*consistent with the Parties' intent under the original Settlement Agreement*."  (*See* Class Counsel and the NFL Parties' Joint Submission in Resp. to the Feb. 2, 2015 Order of the Ct. at 4, ECF No. 6481 (emphasis added).)

Contrary to Sagapolutele's contentions, this amendment did not adversely affect the Settlement Class—much less materially so.  In fact, the amendment *expanded* settlement benefits to encompass any additional Settlement Class Members who died after Preliminary Approval but before Final Approval, and provided 270 days to receive a CTE diagnosis for such players—thereby, increasing the time covered by the definition of Death with CTE by *nine* months.  (*See id.* at 4-5.)

Accordingly, far from being materially adverse to Settlement Class Members, these amendments actually made the Settlement Agreement *more beneficial* by expanding the availability of an award for Death with CTE to a larger class of claimants. (*Id.*) Thus, as this Court previously held, "[b]ecause these changes improved the deal for Class Members without providing any concessions to the NFL Parties, an additional round of notice for Class Members is unnecessary." *In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. at 386; *see also In re Baby Prods. Antitrust Litig.*, 708 F.3d at 175 n.10, 182; *In re Diet Drugs Prods. Liab. Litig.*, 2010 WL 2735414, at *6; *Harris*, 615 F. Supp. at 244.

## B.    The Original Settlement Notice Was Sufficient

Sagapolutele's due process argument fails for an additional reason.  The original notice, as this Court held, was clear that not all CTE diagnoses would be compensated under the Settlement Agreement, and the publicly available amendments sufficiently defined those CTE diagnoses eligible for compensation.

*First*, the Short- and Long-Form notices distributed to Settlement Class Members adequately protected their due process rights.  To comport with due process, settlement notice need only be adequate and summarize the terms of the Settlement; perfection and painstaking detail are not required.  *See In re Nat'l Football League Concussion Injury Litig.*, 307 F.R.D. at 382-83; *see also In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1104-05 (5th Cir. 1977) (explaining that notice need not "[be] perfectly correct in its form," and instead that "[t]he standard [] is that the notice . . . must contain information that a reasonable person would consider to be material in making an informed, intelligent decision" about whether to opt out); *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 124 (S.D.N.Y 1997) ("The notice need not be highly specific, and indeed 'numerous decisions, no doubt recognizing that notices to class members can practicably contain only a limited amount of information, have approved very

general descriptions of the proposed settlement.'" (quoting *Weinberger* v. *Kendrick*, 698 F.2d 61, 70 (2d Cir. 1982)).

As this Court previously held in overruling objections that "the Long-Form Notice is confusing because the term 'Death with CTE' appears several times without the accompanying cutoff date, . . . [b]oth the Summary Notice and the Long-Form Notice indicate that **only 'certain' cases of CTE are covered**." *In re Nat'l Football League Concussion Injury Litig.*, 307 F.R.D. at 383-84 (emphasis added) (citing Summary Notice at 1, ECF No. 6086-2; Long-Form Notice at 1, ECF No. 6086-1). Moreover, as stated above, the Long-Form Notice specifically stated that the Settlement's benefits include "[m]onetary awards for **diagnoses** of Death with CTE **prior to July 7, 2014** . . . ." (*See* Long-Form Notice at 6, ECF No. 6086-1 (emphasis added).) Both the Short- and Long-Form notice thus alerted Settlement Class Members that an award for CTE was not absolute or unconditional; rather, a Settlement Class Member would need to satisfy "certain" criteria before any award would be made. That is the case here—under the original and amended Settlement Agreement, Sagapolutele must satisfy particular criteria before receiving an award of Death with CTE, including that she obtain her decedent's CTE diagnosis within a predetermined time period—and the original notice satisfied Sagapolutele's Due Process rights by alerting her to this fact.

*Second*, the Parties made the February 2015 amendments publicly available months prior to this Court's April 22, 2015 Final Approval Order (as amended May 8, 2015). Not only did the Parties post a copy of the amendments to this Court's publicly available PACER database as early as February 2015, but they also submitted a redline showing the exact changes to be made to the Settlement Agreement as a result of those proposed amendments. (Class Counsel and the NFL Parties' Joint Submission in Resp. to the Feb. 2, 2015 Order of the Ct., Ex.

A, Feb. 13, 2015, ECF No. 6481-1.)  This is especially significant in light of the widespread attention paid to the docket in this matter by, among others, the more than 5,000 Retired NFL Football Players who, at the time of settlement, were represented by counsel in MDL 2323.  *See In re Nat'l Football League Concussion Injury Litig.*, 307 F.R.D. at 389; *see also In re Diet Drugs Prods. Liab. Litig.*, 2010 WL 2735414, at *4  (holding that no notice of settlement agreement amendments was required because, in part, "notice of the proposed Tenth Amendment, along with an opportunity to object, was supplied to representatives of all class members with active cases in MDL No. 1203.").

In fact, the Parties' efforts to publicize the amendments were successful, as evidenced by the fact that over 40 Settlement Class Members filed objections to the amendments, *including objections to the very Death with CTE provision about which Sagapolutele complains*.  (*See* Armstrong Objectors' Suppl. Obj. to the Am. Class Action Settlement, ECF No. 6503; *see also* Miller Suppl. Obj. to Settlement, ECF No. 6484.)  While these objectors raised somewhat different concerns than Sagapolutele raises here—they argued that the award of Death with CTE should be available to Retired NFL Football Players who die after Final Approval—they nonetheless sought, at least in part, the same relief that Sagapolutele appears to now seek: "modification of the Final Order and Judgment by removal of the deadline to obtain a Qualifying Diagnosis of Death with CTE."  (Pl. Mot. at 2.)  This Court properly rejected these objectors' requests, and similarly should reject Sagapolutele's efforts here.

## II.

### SAGAPOLUTELE IS NOT ENTITLED TO REWRITE THE SETTLEMENT AGREEMENT

Even if Sagapolutele had established that notice of the amendments should have been given—which she has not, as explained above—her Motion would fail.  Sagapolutele first

argues that under Rule 60(a), the Court should rewrite the Settlement Agreement and amend the Final Order and Judgment because the Court made a "clerical error" when approving the amendments to the Settlement Agreement. Second, Sagapolutele contends that amendment under Rule 60(b)(6) is justified by "extraordinary circumstances." Finally, Sagapolutele argues that the Court's inherent authority permits it to amend the Final Order and Judgment here. (Pl. Mem. at 18-24.) These arguments lack merit.

*First*, Sagapolutele has not made the necessary showing under Rule 60(a). It is well settled that amendment of judgments pursuant to Rule 60(a) "is limited to the correction of 'clerical mistakes'; it encompasses only errors 'mechanical in nature, apparent on the record, and not involving an error of substantive judgment.'" *In re Diet Drugs Prods. Liab. Litig.*, 200 F. App'x 95, 103 (3d Cir. 2006) (quoting *Pfizer Inc.* v. *Uprichard*, 422 F.3d 124, 129 (3d Cir. 2005)). For Rule 60(a) to apply, the change to be corrected must not "affect[] the substantive rights of the parties." *Id.* at 103-04 (quoting *Pfizer*, 422 F.3d at 130) (holding Rule 60(a) inapplicable because the "correction here goes beyond the correction of a 'mindless and mechanistic mistake'" (quotation omitted)). Here, Sagapolutele has only ever alleged that the amendments in question were deliberate attempts by the Parties to modify the criteria for the Qualifying Diagnosis of Death with CTE. She cannot simultaneously argue these amendments were mere "clerical mistakes." As such, Rule 60(a) is inapplicable here.

*Second*, Sagapolutele's attempts to seek relief under Rule 60(b)(6) fail, too.[7] Relief under Rule 60(b) is "not ordinarily . . . available to non-parties," *Federman* v. *Artzt*, 339 F. App'x 31, 33-34 (2d Cir. 2009), and "[a]bsent class members such as [movant] are treated, with limited exceptions inapplicable here, as non-parties to a class action." *Adelson* v. *Ocwen*

---

[7]    Although Sagapolutele broadly states she is moving for relief under Rule 60(b), her memorandum of law cites only to the Rule's catchall provision, which permits the modification of a final judgment based on "any other reason that justifies relief." Fed. R. Civ. P. 60(b)(6).

*Fin. Corp.*, 621 F. App'x 348, 351 (7th Cir. 2015); *Federman*, 339 F. App'x at 33-34 (holding that absent class members who did not object to settlement were not "parties" for purposes of Rule 60(b) and declining "to expand the narrow exception to the general rule that non-parties cannot bring Rule 60(b) motions"); *In re Four Seasons Sec. Laws Litig.*, 525 F.2d 500, 504 (10th Cir. 1975) (absent class member "did not become a party for the purposes of Rule 60(b) to enable him to challenge the adequacy or nature of the settlement"); *see also* Fed. R. Civ. Proc. 60(b) ("the court may relieve *a party* . . . from a final judgment, order, or proceeding for the following reasons" (emphasis added)). Sagapolutele did not object, intervene, or otherwise take steps to become a "party" to this action, so Rule 60(b) is not available to her here. *See also* Newberg on Class Actions § 18:40 (5th ed.) ("[A]ll the circuits that have considered the issue have taken the position that absent class members are generally not authorized to file Rule 60 motions.").

Even if Sagapolutele were a "party," she has not met her burden to seek relief pursuant to Rule 60(b)(6) because such "[r]elief . . . may only be granted under extraordinary circumstances where, without such relief, an *extreme and unexpected hardship* would occur." *Sawka* v. *Healtheast, Inc.*, 989 F.2d 138, 140 (3d Cir. 1993) (emphasis added); *see also Matthews, Wilson & Matthews, Inc.* v. *Capital City Bank*, 614 F. App'x 969, 971 (11th Cir. 2015) (Rule 60(b)(6) "is an extraordinary remedy which may be invoked only upon a showing of exceptional circumstances, and the party seeking relief has the burden of showing that absent such relief, an extreme and unexpected hardship will result." (internal quotations omitted)); *Orlando Residence, Ltd.* v. *Hilton Head Hotel Inv'rs*, No. 89-cv-0662, 2013 WL 1103027, at *8 (D.S.C. Mar. 15, 2013), *aff'd sub nom. Orlando Residence, Ltd.* v. *Nelson*, 565 F. App'x 212 (4th Cir. 2014) ("Relief is rarely granted under . . . [Rule] 60(b)(6)."). The bar for relief under

Rule 60(b) is particularly high where the movant seeks to amend in "a class action [because] a too liberal application of Rule 60(b) would undermine the finality of judgments entered in such actions and would discourage their settlement." *Inmates of Suffolk Cty. Jail* v. *Rufo*, No. 71-cv-00162, 2015 WL 6958070, at *2 (D. Mass. Nov. 10, 2015); *see also Blue Diamond Coal Co.* v. *Trustees of UMWA Combined Ben. Fund*, 249 F.3d 519, 524 (6th Cir. 2001) ("[R]elief under Rule 60(b) is circumscribed by public policy favoring finality of judgments and termination of litigation.  This is especially true in an application of subsection (6) of Rule 60(b) . . . ." (internal quotations omitted)).

Sagapolutele has not made any showing whatsoever that the amendment will cause her any hardship, much less "extreme and unexpected hardship."  Tellingly, she has not shown—through supporting exhibits, affidavits, or even proffered facts in her brief—that the brain of her late husband, who passed away in 2009, has been examined by a board-certified neuropathologist and diagnosed with CTE at *any time*, much less that she would, but for the amendment, be entitled to an award.  She also has not established that a belated diagnosis years after death (indeed, her husband died approximately eight years ago) would even be possible given the deterioration of brain matter after death.  Nor does she seek to justify her apparent delay in seeking an examination.  Instead, Sagapolutele invites only speculation and offers only conclusory assertions as to how the purported change impacts her rights under the agreement, and she therefore fails to show that the exceptional remedy of Rule 60(b)(6) is warranted here.

*Finally*, Sagapolutele's invocation of the Court's "inherent authority" to amend a judgment does not salvage her claim because that authority is no broader than that provided by Rule 60, which, as explained above, does not permit Sagapolutele the relief she seeks.  *See* 20 Fed. Prac. & Proc. Deskbook § 104 (after 28 days from entry, "the judgment may be attacked,

other than by appeal, only as provided in Rule 60."); 11 Fed. Prac. & Proc. Civ. § 2852 (3d ed.) (while "the power of a court to modify an interlocutory judgment or order at any time prior to final judgment remains unchanged and is not limited by the provisions of Rule 60(b) . . . , [t]he rule does apply, however, to all final judgments entered in civil actions."). Sagapolutele's cases are not to the contrary; none holds that Courts have inherent authority to amend a final judgment approving a settlement agreement. (*See* Pl. Mem. at 23-24.) Three of the five cited cases concern only a court's authority to *enforce* a settlement agreement. *See Kokkonen* v. *Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 381 (1994) (holding that a district court has inherent authority to *enforce* a settlement agreement under particular circumstances); *Roman-Oliveras* v. *Puerto Rico Elec. Power Auth.*, 797 F.3d 83, 86-87 (1st Cir. 2015) (same); *Hensley* v. *Alcon Labs., Inc.*, 277 F.3d 535, 540-41 (4th Cir. 2002) (same). The fourth case, *In re Linerboard Antitrust Litig.*, 223 F.R.D. 357, 363 (E.D. Pa.), *amended*, 223 F.R.D. 370 (E.D. Pa. 2004) simply stands for the proposition that a court overseeing an MDL has inherent power to control the discovery process—an issue not relevant or in dispute here. Finally, while the fifth case involved an *amendment* of an order entering a settlement agreement, the Court did not hold that the district court had inherent authority to make the amendment; rather, it simply held that "the merits of [the district court's] decision to amend are no longer open to review." *F.A.C., Inc.* v. *Cooperativa de Seguros de Vida de Puerto Rico*, 449 F.3d 185, 190–91 (1st Cir. 2006).

In sum, Sagapolutele has not demonstrated (and cannot demonstrate) that she is entitled to rewrite the Settlement Agreement.

## <u>Conclusion</u>

For the foregoing reasons, the NFL Parties respectfully request that the Court deny the Motion in its entirety.

Dated:  September 28, 2017

Respectfully submitted,

/s/ Brad S. Karp
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
Brad S. Karp
Bruce Birenboim
Lynn B. Bayard
1285 Avenue of the Americas
New York, NY 10019-6064
Tel:   (212) 373-3000
bkarp@paulweiss.com

PEPPER HAMILTON LLP
Sean P. Fahey
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA 19103-2799
Tel:   (215) 981-4000

*Attorneys for Defendants the National Football
League and NFL Properties LLC*

## CERTIFICATE OF SERVICE

It is hereby certified that a true copy of the foregoing Memorandum of Law of the National Football League and NFL Properties LLC in Opposition to Settlement Class Member Yvonne Sagapolutele's Motion to Modify the Amended Final Order and Judgment was served electronically via the Court's electronic filing system on the 28th day of September, 2017, upon all counsel of record.


Dated:  September 28, 2017                    /s/Brad S. Karp
                                              Brad S. Karp

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| | § | |
| IN RE: NATIONAL FOOTBALL | § | No. 2:12-md-02323-AB |
| LEAGUE PLAYERS' CONCUSSION | § | |
| INJURY LITIGATION | § | MDL No. 2323 |
| | § | |
| | § | **Hon. Anita B. Brody** |
| THIS DOCUMENT RELATES TO: | § | |
| Settlement Class Member Robin B. Cornish | § | |
| (SPID 950012548) | § | |

---

**SETTLMENT CLASS MEMBER'S OBJECTION TO THE SPECIAL**
**MASTER'S DECISION DENYING CLASS MEMBER'S APPEAL**

---

## TABLE OF CONTENTS

**Supporting Evidence**...............................................................2

**Background** ...........................................................................3

**Standard of Review** ...............................................................4

**Argument** ..............................................................................5

    I.   Class Member's claim was erroneously denied because the date of the Qualifying Diagnosis for Death with CTE is the date of the Player's death..................5

**Conclusion** ............................................................................7

i

TO THE HONORABLE DISTRICT COURT JUDGE:

Class Member Robin Cornish ("Class Member") respectfully submits this objection to the Special Master's September 26, 2019 decision denying Class Member's appeal of the Denial of Monetary Award Claim. Unlike the other objections filed contemporaneously with this Class Member's objection, this Class Member's claim package shows that a board-certified neuropathologist provided a CTE diagnosis after reviewing the Player's brain tissue.

Nevertheless, the Special Master erred in affirming the Claims Administrator's denial based on one erroneous conclusion of law. This appeal presents the following legal question regarding these conclusions of law:

1) Is the date of a Qualifying Diagnosis for Death with CTE the date of the Player's death, as stated in the Posted Settlement Program FAQs?

The answer to this question is "yes." The Court should overturn the Special Master's decision because the Special Master affirmed the Claims Administrator's denial despite the Claims Administrator's error by incorrectly answering "no" to this question.

The Claims Administrator erroneously concluded that the date of diagnosis is not the date of the Player's death. But according to the Posted Settlement FAQs, which the NFL Parties approved, the date of the Qualifying Diagnosis for Death with CTE is "the date of the Player's death, even though the diagnosis is not made until after

the Player dies."[1]

.

## SUPPORTING EVIDENCE

Exhibit 1        Notice of Denial of Monetary Award Claim

Exhibit 2        Relevant Excerpts from Class Member's Claim Package

Exhibit 3        Notice of Request for Additional Documents

Exhibit 4        Class Member's Appeal

Exhibit 5        NFL Parties' Response

Exhibit 6        Post-Appeal Notice of Denial of Monetary Award Claim

---

[1]    Posted Settlement FAQs (as of September 12, 2019), FAQ 99.  In prior versions of the Posted Settlement FAQs, this language was included as part of FAQ 93.

2

## BACKGROUND

Class Member submitted a claim package that included a post-mortem diagnosis of Chronic Traumatic Encephalopathy ("CTE") made by a board-certified neuropathologist.[2]   Class Member's claim package also includes documentation showing that the Player died prior to April 22, 2015 and that Dr. Hamilton reviewed the Player's brain tissue.[3]

Despite the documentation in the claim package, the Claims Administrator denied Class Member's Monetary Award Claim for the following reason:[4]

> The medical records must show a post-mortem diagnosis of CTE made before April 22, 2015 (the Final Approval Date) by a board-certified neuropathologist for a Retired NFL Football Player who died before April 22, 2015. See Section 6.3(f) of the Settlement Agreement and FAQ 109. Mr. Cornish died on August 23, 2008, and the August 24, 2008 autopsy report signed by Marc A. Krouse does not reference CTE and neither does the death certificate. You provided an undated letter from Dr. Ronald L. Hamilton who diagnosed Mr. Cornish with CTE. You must establish that Dr. Hamilton reviewed Mr. Cornish's brain tissue and made a CTE diagnosis on or before April 22, 2015.

Class Member timely filed an appeal of the Claims Administrator's Notice of Denial of Monetary Award Claim challenging the two conclusions of law in the Notice regarding the diagnosis date and the "confirmation" requirement.[5]

The Special Master denied the Class Member's appeal on September 26, 2019

---

[2]   Exhibit 2.

[3]   *Id.*

[4]   Exhibit 1.

[5]   Exhibit 4.

without addressing the legal argument raised in Class Member's Appeal.[6]

## STANDARD OF REVIEW

The Court reviews de novo Class Member's objections to conclusions of law from its Special Masters. *See* ECF No. 6871 at 4–5 (appointing the Special Masters and defining their roles). Class Member has challenged the Claims Administrator's conclusions of law, the facts are undisputed. The Court's decision regarding this objection is final and binding under both the original settlement agreement (of which Class Member received notice with an opportunity to opt out) and the amended settlement agreement (of which Class Member did not receive notice and which was entered after the opt-out deadline). *See* ECF No. 6073-2, Original Settlement Agreement § 9.8 *and* ECF No. 6481, Amended Settlement Agreement § 9.8. In the event this objection is not sustained, Class Member expressly reserves the right to re-urge the Motion to Modify [ECF 6479] this Court denied without prejudice on October 24, 2017 [ECF 8557].

---

[6]    Exhibit 6.

4

## ARGUMENT

**I.    Class Member's claim was erroneously denied because the date of the Qualifying Diagnosis for Death with CTE is the date of the Player's death.**

The Claims Administrator's first reason for denying the claim package is legally flawed because the diagnosis date for Death with CTE is the date of the Player's death, even if the diagnosis occurs later.

The Claims Administrator published "Posted Program FAQs" on the Settlement Website with answers to frequently asked questions. The content in the Posted Settlement Program FAQs was subject to advance approval by Counsel for the NFL Parties.[7]

According to the Posted Settlement Program FAQs, the diagnosis date for Death with CTE is the date of the Player's death, even though the diagnosis is not made until after the Player dies:[8]

> **How is the date of a Qualifying Diagnosis determined?**
>
> . . . .
>
> (a) *Death with CTE:* For these claims, the date of the Qualifying Diagnosis is the date of the Player's death, even though the diagnosis is not made until after the Player dies.

---

[7]    *See* Amended Settlement Agreement § 4.1(a).

[8]    This relevant language is from FAQ 99 in the Posted Settlement Program FAQs (as of September 12, 2019) and was also contained in prior versions of the Posted Settlement Program FAQs. In some earlier versions of the Posted Settlement Program FAQs, this language was originally published in FAQ 93.

Based on the Claims Administrator's public, posted representations to class members that the date of the Qualifying Diagnosis for Death with CTE is the date of the Player's death, the only date that is relevant in determining the date of a Qualifying Diagnosis for Death with CTE is the date of the Player's death. That is the date Class Member provided in the submitted claim package. The Claims Administrator's insistence on proof that the diagnosis "was done on or before 4/22/15" ignores these posted representations and erroneously concludes that evidence regarding the date of the Player's death does not establish the date of the Qualifying Diagnosis.

In reviewing other portions of this FAQ, the Court has noted that "by requiring the 'date of diagnosis,' the Settlement language implies that the 'date of diagnosis' is not necessarily the 'date of the examination.'" ECF 10810, Settlement Implementation Determination, at 2. The Court further recognized that FAQ 99 is a "sensible and reasonable interpretation of the Settlement," which "recognizes that there may be infrequent situations in which a Retired NFL Player's past symptoms were not recognized as a Qualifying Diagnosis at the time but now can be identified by a physician." *Id.* at 3. The Court noted that in these circumstances, "the Retired NFL Player should not be penalized for their previous doctor's failure to identify a Qualifying Diagnosis" but "should be compensated based on the date their diagnosis actually began." *Id.*

The Court's reasoning applies with equal, if not greater, force to Death with CTE diagnoses. Class Member's claim package establishes that the Player's death

occurred before April 22, 2015.  Accordingly, the date of the Qualifying Diagnosis is before April 22, 2015, and the Claims Administrator erred, as a matter of law, in denying this claim.

## CONCLUSION

For the foregoing reasons, Class Member respectfully requests the Court sustain this objection, reverse the Special Master's decision based on the two erroneous conclusions of law in the Claims Administrator's Notice of Denial, and order the approval of Class Member's claim.

Dated:  October 16, 2019

Respectfully Submitted:

/s/ Justin Demerath

**Justin Demerath**
Texas State Bar No. 24034415
**David Campbell**
Texas State Bar No. 24057033
O'HANLON, DEMERATH & CASTILLO
808 West Avenue |  Austin, TX 78701
Tel: (512) 494-9949  |  Fax: (512) 494-9919
jdemerath@808west.com
dcampbell@808west.com

**Counsel    for    Class Member**

7

**-3585-**

## **CERTIFICATE OF SERVICE**

It is hereby certified that a true copy of the foregoing document was submitted on the Court Portal on October 16, 2019.

/s/ Justin B. Demerath
Justin B. Demerath



# NFL CONCUSSION SETTLEMENT

*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

## NOTICE OF DENIAL OF MONETARY AWARD CLAIM
### DATE OF NOTICE: **June 25, 2019**
### DEADLINE TO APPEAL: **July 25, 2019**

### I. SETTLEMENT CLASS MEMBER INFORMATION

| Settlement Program ID | 950012548 | | |
|---|---|---|---|
| **Name** | First<br>Robin | M.I.<br>B | Last<br>Cornish |
| **Settlement Class Member Type** | Representative Claimant | | |
| **Law Firm** | O'Hanlon, Demerath & Castillo | | |
| **Asserted Qualifying Diagnosis** | Death with CTE (Chronic Traumatic Encephalopathy) | **Date** | 8/23/08 |

### II. EXPLANATION OF CLAIM DETERMINATION

This Notice is an official communication from the Claims Administrator for the NFL Concussion Settlement Program. We sent you a Notice of Request for Additional Documents or Notice of Preliminary Review telling you about insufficient documents and/or missing information in your Claim Package. The response deadline on that Notice has expired, or you have responded but did not resolve the issue(s) we told you about, and your claim is denied because it remains incomplete for these reason(s):

| | What was Missing | How We Told You to Address this Item |
|---|---|---|
| **1.** | You have not submitted any medical records reflecting the Qualifying Diagnosis. | Click the Respond button, go to Section 3 for Medical Records, click the Upload Medical Records button and follow the instructions to upload medical records reflecting the Qualifying Diagnosis. |

Section III below explains your right to appeal this denied claim, but you also have the option to submit a new Claim Package under Section 9.1(c)(i) of the Settlement Agreement. We will determine whether the new claim can be considered for a Monetary Award based on several factors, including whether the new claim shows materially changed circumstances from the earlier claim. These materially changed circumstances may include: (a) a different type of Qualifying Diagnosis than the one that was denied; or (b) the same type of Qualifying Diagnosis but with a different diagnosis date supported by additional medical records. If you submit a new claim within 365 days of this denial notice, Section 10.3(d)(ii) of the Settlement Agreement requires us to audit that new claim if it is based on the same Qualifying Diagnosis as this denied claim, but the new diagnosis was made by a different physician.

### III. YOUR RIGHT TO APPEAL THIS DETERMINATION

If you have a good faith belief that the decision to deny your Monetary Award claim is incorrect, you may appeal this determination to the Court under Section 9.5 of the Settlement Agreement. To do so, click the Appeal Denied Claim button on your secure online portal and follow the instructions provided. You must submit supporting evidence to support your appeal. Any written statement may not be more than 10 double-spaced pages. You must do so on or before the Deadline to Appeal stated at the top of this Notice.



If you decide to appeal, the Settlement Agreement requires you to pay an Appeal Fee of $1,000, which you can do using the online PayPal option or by check made payable to the NFL Claims Administrator. This fee will be refunded if your appeal is successful. If you are unable to pay the $1,000 fee, you may make a hardship request to us to waive the fee and will have to submit financial information showing a sufficient hardship.

If paying the $1,000 Appeal Fee by check, mail the check to the address below.

     NFL Concussion Settlement
     Claims Administrator
     P.O. Box 25369
     Richmond, VA  23260

The Special Master appointed by the Court will decide your appeal based upon a showing by you of clear and convincing evidence. The Special Master's factual determinations will be final and binding, but you or Co-Lead Class Counsel or the NFL Parties may object to any of the Special Master's conclusions of law, which will then be subject to de novo (*i.e.*, a new) review by the Court.

If an appeal is not submitted on or before the deadline stated at the top of this Notice, the determination in this Notice will become final.

## IV. CO-LEAD CLASS COUNSEL'S RIGHT TO APPEAL THIS DETERMINATION

Section 9.5 of the Settlement Agreement also gives Co-Lead Class Counsel the right to challenge our decision to deny your Monetary Award claim. If Co-Lead Class Counsel chooses to appeal, it must do so by the Deadline to Appeal stated at the top of this Notice and must provide a written copy of its Appeals Form and any supporting evidence to you, the NFL Parties, and us.

If an appeal is taken by you or Co-Lead Class Counsel, the NFL Parties may submit a written opposition (not to exceed 10 double-spaced pages) no later than 30 days after receipt of the Appeals Form. The party taking the appeal is not permitted to submit a reply.

Co-Lead Class Counsel may also submit a written statement (not to exceed 10 double-spaced pages) in response to your appeal no later than 15 days after receipt of the Appeals Form, and you and the NFL Parties may each submit a reply to any such submission by Co-Lead Class Counsel.

## V. HOW TO CONTACT US WITH QUESTIONS OR FOR HELP

If you are represented by a lawyer, consult with your lawyer if you have questions or need assistance. If you are unrepresented and have any questions about this Notice or need help, contact us at 1-855-887-3485 or send an email to ClaimsAdministrator@NFLConcussionSettlement.com. If you are a lawyer, call or email your designated Firm Contact for assistance. For more information about the Settlement program, visit the official website at www.NFLConcussionSettlement.com to read the Frequently Asked Questions or download a copy of the complete Settlement Agreement.





University of Pittsburgh
Physicians, Department
of Pathology

Division of Neuropathology

Clayton A. Wiley, MD, PhD
Director

Charleen T. Chu, MD, PhD
Robert H. Garman, DVM
Ronald Hamilton, MD
Julia Kofler, MD
Scott M. Kulich, MD, PhD
David Lacomis, MD
Geoffrey Murdoch, MD, PhD
Gutti R. Rao, MD

UPMC Presbyterian
Room 5701 Scaife Hall
200 Lothrop Street
Pittsburgh, PA 15213
T 412-624-9415
F 412-624-5610

To Whom it may concern,

I have conducted a study of F. Cornish's brain tissue. Additionally, in my Neuropathology practice I conduct an ongoing study of all available and existing medical literature related to the existence and diagnosis of CTE and I combine that knowledge with my training and extensive experience related to the study and diagnosis of CTE.

Frank Cornish died on August 23, 2008.

Received from the Tarrant County Medical Examiner are three H&E stained slides (08-10049 slides 1, 2 and 3) and their corresponding formalin-fixed paraffin embedded tissue blocks.

H&E stained recuts are examined:

    slide 1 has neocortex, basal ganglia and thalamus;
    slide 2 has cerebellum and medulla;
    slide 3 has neocortex and midbrain with substantia nigra.

Immunostain of slide 1 for the AD-related protein Beta-A4 is negative. Tau immunostains (PHF-1) are negative in the cerebellum and medulla (slide 2), but reveal numerous neocortical PHF-1/tau positive tangles in neurons (Fig 1a), with staining of many neuronal processes (neuropil threads) (Fig 1b) as well as tau-positive glial cells (Fig 1c), especially in the depths of the sulcus and focally around some blood vessels. In the midbrain, the substantia nigra had tangles and neuropil threads (Fig 1d). The mesencephalic tegmentum shows many tau-positive neurons in the oculomotor nucleus . These histopathologic findings are diagnostic of CTE.



Frank Cornish had CTE.

Sincerely
/s/
Ronald L Hamilton, M.D.

Affiliated with the University of Pittsburgh School of Medicine

 **CONCUSSION SETTLEMENT**

*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

### PRE-EFFECTIVE DATE DIAGNOSING PHYSICIAN CERTIFICATION FORM
### (for diagnoses made by physicians who are qualified to render Qualifying Diagnoses
### for purposes of Monetary Award claims before January 7, 2017)

This Pre-Effective Date Diagnosing Physician Certification Form is to be used only by physicians qualified to render Qualifying Diagnoses before January 7, 2017, in connection with the Class Action Settlement in In re: National Football League Players' Concussion Injury Litigation and who made a Qualifying Diagnosis before January 7, 2017. The Qualifying Diagnoses are found in Appendix A to this Pre-Effective Date Diagnosing Physician Certification Form.

Use this form to certify a Qualifying Diagnosis you made before January 7, 2017, based on your personal examination of the Retired NFL Football Player. **Do not sign this form unless you personally examined the player** or, in the case of a Qualifying Diagnosis of Death with CTE, you are the board-certified neuropathologist who made the post-mortem diagnosis of CTE. If you made a Qualifying Diagnosis as a Qualified MAF Physician on or after January 7, 2017, do not use this form; use the MAF Diagnosing Physician Certification Form instead. Also, if you are a Qualified BAP Provider certifying a diagnosis you made in the Baseline Assessment Program, do not use this form; use the BAP Diagnosing Physician Certification Form instead.

You must complete this form in its entirety, sign it under penalty of perjury, and return it to the patient along with copies of all supporting medical records that you created or received in connection with the Qualifying Diagnosis. In turn, the patient, or the patient's counsel, must submit this form and all supporting medical records referred to above to the Claims Administrator as part of a claim for compensation under the Class Action Settlement. The Claims Administrator will review the form, including your qualifications to provide the Qualifying Diagnosis, and the supporting medical records. All claims also are subject to audit. Any finding of fraudulent conduct by you will be subject to, without limitation, your referral to appropriate regulatory and disciplinary boards and agencies and/or federal authorities, and your disqualification from serving in any aspect of the Class Action Settlement.

You are required to preserve all supporting medical records that you created or received in connection with the Qualifying Diagnosis for the greater of: (a) 10 years after January 7, 2017; or (b) the period of time required under applicable state and federal laws.

If you have any questions, call the Claims Administrator toll free at 1-855-887-3485 or visit the Settlement Website at https://www.nflconcussionsettlement.com.

---

Pre-Effective Date Diagnosing Physician Certification Form                    Page 1 of 17

## PRE-EFFECTIVE DATE DIAGNOSING PHYSICIAN CERTIFICATION FORM
### (for diagnoses made by physicians who are qualified to render Qualifying Diagnoses for purposes of Monetary Award claims before January 7, 2017)

### I. PATIENT INFORMATION

| Settlement Program ID (if known) | 950012548 | | |
|---|---|---|---|
| Name: | First<br>Frank | M.I. | Last<br>Cornish | Suffix |

| Address: | Address 1<br>2213 Frio Dr. |
|---|---|
| | Address 2 |
| | City<br>Keller |
| | State/Province<br>TX |
| | Postal Code<br>76248 | Country<br>United States |

| Telephone | | 8 1 7 - 8 4 5 - 9 4 4 5 |
|---|---|---|
| Date of Birth | | 0 9 / 2 4 / 1 9 6 7<br>(Month/Day/Year) |
| Date of Death (if applicable) | | 0 8 / 2 3 / 2 0 0 8<br>(Month/Day/Year) |

### II. DIAGNOSING PHYSICIAN INFORMATION

| National Provider Identifier (NPI) | | 1013980978 | |
|---|---|---|---|
| Physician Name | First<br>Ronald | M.I.<br>L. | Last<br>Hamilton | Suffix |

**(a) Are you approved as a Qualified BAP Provider or a Qualified MAF Physician?**

☐ **YES.** If YES, you do not need to fill out the rest of this Section II or Sections III or IV. Instead, go to Section V.

☒ **NO.**

**(b) If you answered No, have you previously completed this form for another Retired NFL Football Player, that you know was submitted to the Claims Administrator?**

☐ **YES.** If YES, you do not need to fill out this Section II or Sections III or IV. Instead, go to Section V.

☒ **NO.**

If you answered No to both questions, fill out the rest of this Section II and then go to Section III.

## PRE-EFFECTIVE DATE DIAGNOSING PHYSICIAN CERTIFICATION FORM
### (for diagnoses made by physicians who are qualified to render Qualifying Diagnoses for purposes of Monetary Award claims before January 7, 2017)

| Office/Practice Name | University of Pittsburgh Medical Center |
|---|---|

| Address | |
|---|---|
| | Address 1 <br> A724.1 Scaife Hall |
| | Address 2 <br> 200 Lothrop Street |
| | City <br> Pittsburgh |
| | State/Province <br> Pennsylvania |
| | Postal Code <br> 15213 | Country <br> USA |

| Telephone | 4 1 2 - 6 2 4 - 6 6 1 0 |
|---|---|
| **Fax** | 4 1 2 - 6 2 4 - 5 4 8 8 |
| **Email Address** | hamiltonrl@upmc.edu |

### III.   BOARD CERTIFICATIONS

Check all board certifications that apply and list the board providing the certification and any identification number provided by the board (*e.g.*, American Board of Psychiatry and Neurology diplomate number). If you do not have any board certifications, summarize your relevant medical training and experience and then go to Section IV.

| | Certification | Board | Board Identification Number | Effective Date | Expiration Date |
|---|---|---|---|---|---|
| ☐ | Neurology | | | | |
| ☐ | Neurosurgery | | | | |
| X | Neuropathology | American Board of Pathology | | certified: 5/23/1996 <br> recertified:1/1/2014 | |
| | Neuropsychology | | | | |
| ☐ | Other Neuro-specialty | | | | |
| X | Other Board Certification | American Board of Pathology | | certified: 5/23/1996 | |

**PRE-EFFECTIVE DATE DIAGNOSING PHYSICIAN CERTIFICATION FORM**
**(for diagnoses made by physicians who are qualified to render Qualifying Diagnoses**
**for purposes of Monetary Award claims before January 7, 2017)**

If you are not board-certified in a neuro-specialty area, summarize your relevant medical training and experience in the field of neurology and related fields that you believe qualifies you to make the diagnosis provided in Section V.

## IV. OTHER QUALIFICATIONS

| | | Education Level | Institution | Degree/Area of Focus | Date Received |
|---|---|---|---|---|---|
| Educational Information | 1. | Undergraduate Education | University of Nebraska-Lincoln | B.S / Psychology | 1985 (Month/Year) |
| | 2. | Medical School | University of Nebraska Medical Center | M.D. | 1989 (Month/Year) |
| | 3. | Internship | Univ. of California, San Diego | Resident Anatomic Pathology | 1991 (Month/Year) |
| | 4. | Residency | Univ. of California, San Diego | Resident Neuropathology | 1993 (Month/Year) |
| | 5. | Fellowship | Univ. of Pittsburgh | Fellow Neuropathology | 1994 (Month/Year) |
| | 6. | Other (Graduate) | Univ. of Pittsburgh | Fellow: NIMH Training Grant in Neuroscience | 1995 (Month/Year) |

| States Where Licensed to Practice | | State | State License Number | Effective Date | Expiration Date |
|---|---|---|---|---|---|
| | 1. | California | G69731 | 9/10/1990 | Expired |

**PRE-EFFECTIVE DATE DIAGNOSING PHYSICIAN CERTIFICATION FORM**
(for diagnoses made by physicians who are qualified to render Qualifying Diagnoses
for purposes of Monetary Award claims before January 7, 2017)

| | | | | | |
|---|---|---|---|---|---|
| | 2. | Pennsylvania | MD049717L | 5/12/1993 | 12/31/2018 |
| | 3. | Indiana | 01067332A | 9/29/2009 | 10/31/2019 |
| | 4. | | | | |
| | 5. | | | | |
| | 6. | | | | |

| | |
|---|---|
| **Specialties** | Check all specialties that apply. |
| | [ ] **Neurology** |
| | [ ] **Neurosurgery** |
| | [X] **Neuropathology** |
| | [ ] **Neuropsychology** |
| | [ ] **Other Neuro-specialty** (*e.g.*, brain injury medicine, clinical neurophysiology, etc.) _____ |
| | [X] **Other Specialty** (list all)   **Anatomic Pathology** _____ |

-3594-

**PRE-EFFECTIVE DATE DIAGNOSING PHYSICIAN CERTIFICATION FORM
(for diagnoses made by physicians who are qualified to render Qualifying Diagnoses
for purposes of Monetary Award claims before January 7, 2017)**

## V. QUALIFYING DIAGNOSIS

Identify the patient's diagnosis and the date of such diagnosis. *See **Appendix A** for the criteria for each diagnosis.*
Other than for Death with CTE, the identification of a condition, including through a blood test, genetic test, imaging
technique, or otherwise, that has not yet resulted in actual cognitive impairment and/or actual neuromuscular impairment
in the patient is **not** a Qualifying Diagnosis.

| Qualifying Diagnosis | Date of Diagnosis |
|---|---|
| ☐ Level 1.5 Neurocognitive Impairment | \|\_\|\_\|/\|\_\|\_\|/\|\_\|\_\|\_\|\_\| (Month/Day/Year) |
| ☐ Level 2 Neurocognitive Impairment* | \|\_\|\_\|/\|\_\|\_\|/\|\_\|\_\|\_\|\_\| (Month/Day/Year) |
| ☐ Alzheimer's Disease | \|\_\|\_\|/\|\_\|\_\|/\|\_\|\_\|\_\|\_\| (Month/Day/Year) |
| ☐ Parkinson's Disease | \|\_\|\_\|/\|\_\|\_\|/\|\_\|\_\|\_\|\_\| (Month/Day/Year) |
| ☐ ALS (amyotrophic lateral sclerosis) | \|\_\|\_\|/\|\_\|\_\|/\|\_\|\_\|\_\|\_\| (Month/Day/Year) |
| ☒ Death with CTE | \|0\|8\|/\|2\|3\|/\|2\|0\|0\|8\|* (Month/Day/Year) |

* If you provided a diagnosis of Level 2 Neurocognitive Impairment, did you determine that certain testing was medically
unnecessary because of the severity of the patient's dementia (*see **Appendix A***)?

☐ YES        ☐ NO

If you answered Yes, provide the factual basis for that determination:

*Pursuant to FAQ 93, Posted Settlement Program FAQs (as of November 7, 2018), for this claim, "the
date of the Qualifying Diagnosis is the date of the Player's death, even though the diagnosis is not made
until after the Player dies".

| PRE-EFFECTIVE DATE DIAGNOSING PHYSICIAN CERTIFICATION FORM (for diagnoses made by physicians who are qualified to render Qualifying Diagnoses for purposes of Monetary Award claims before January 7, 2017) |
|---|

| VI. CERTIFICATION |
|---|

By signing below, I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that all information provided in this form, and all related supporting medical records, are true and correct to the best of my knowledge, information and belief, and that I personally examined the Retired NFL Football Player named in Section I or, in the case of a Qualifying Diagnosis of Death with CTE, I am the board-certified neuropathologist who made the post-mortem diagnosis of CTE.

I acknowledge that any finding of fraudulent conduct may subject me to, without limitation, referral to appropriate regulatory and disciplinary boards and agencies and/or federal authorities, and disqualification from serving in any aspect of the Class Action Settlement.

| Signature of Diagnosing Physician | | Date of Signature | 0 2 / 0 6 / 2 0 1 9 (Month/Day/Year) |
|---|---|---|---|
| Printed Name | First Ronald | M.I. L. | Last Hamilton |

## APPENDIX A

Other than for Death with CTE, the identification of a condition, including through a blood test, genetic test, imaging technique, or otherwise, that has not yet resulted in actual cognitive impairment and/or actual neuromuscular impairment experienced by the patient does not qualify as a diagnosis.

<u>LEVEL 1.5 NEUROCOGNITIVE IMPAIRMENT</u>

**The following diagnosis can only be made:**

> (1) prior to July 7, 2014, by a board-certified neurologist, board-certified neurosurgeon, other board-certified neuro-specialist physician, or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician, except as provided in (c), below;

> (2) from July 7, 2014 through January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified neurologist, board-certified neurosurgeon, or other board-certified neuro-specialist physician, except as provided in (c), below; or

> (3) for a patient who died prior to January 7, 2017 (the Effective Date of the Settlement Agreement), where the diagnosis occurred while the patient was living, by a board-certified or otherwise qualified neurologist, neurosurgeon, or other neuro-specialist physician, or by a physician with sufficient qualifications in the field of neurology or neurocognitive disorders to make a diagnosis of Level 1.5 Neurocognitive Impairment:

A diagnosis made outside of the Baseline Assessment Program (BAP) that a living patient suffers from Level 1.5 Neurocognitive Impairment, as set forth below, *i.e.*, early dementia, based on evaluation and evidence generally consistent with the diagnostic criteria set forth and provided below:

There is: (i) Concern of the patient, a knowledgeable informant, or the Qualified BAP Provider that there has been a severe decline in cognitive function; (ii) Evidence of a moderate to severe cognitive decline from a previous level of performance, as determined by and in accordance with the standardized neuropsychological testing protocol annexed in *Appendix B*, in two or more cognitive domains (complex attention, executive function, learning and memory, language, perceptual-spatial), provided one of the cognitive domains is (a) executive function, (b) learning and memory, or (c) complex attention; (iii) The patient exhibits functional impairment generally consistent with the criteria set forth in the National Alzheimer's Coordinating Center's Clinical Dementia Rating scale Category 1.0 (Mild) in the areas of Community Affairs, Home & Hobbies, and Personal Care—where such functional impairment is corroborated by documentary evidence (*e.g.*, medical records, employment records), the sufficiency of which will be determined by the physician making the diagnosis (and where no documentary evidence of functional impairment exists or is available, then (a) there must be evidence of moderate to severe cognitive decline from a previous level of performance, as determined by and in accordance with the standardized neuropsychological testing protocol annexed in *Appendix B*, in the executive function cognitive domain or the learning and memory cognitive domain, and at least one other cognitive domain; and (b) the patient's functional impairment, as described above, must be corroborated by a third-party sworn affidavit from a person familiar with the patient's condition (other than the player or his family members), the sufficiency of which will be determined by the diagnosing physician); and (iv) The cognitive deficits do not occur exclusively in the context of a delirium, acute substance abuse, or as a result of medication side effects.

## LEVEL 2 NEUROCOGNITIVE IMPAIRMENT

**The following diagnosis can only be made:**

> **(1) prior to July 7, 2014, by a board-certified neurologist, board-certified neurosurgeon, other board-certified neuro-specialist physician, or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician, except as provided in (c), below;**
>
> **(2) from July 7, 2014 through January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified neurologist, board-certified neurosurgeon, or other board-certified neuro-specialist physician, except as provided in (c), below; or**
>
> **(3) for a patient who died prior to January 7, 2017 (the Effective Date of the Settlement Agreement), where the diagnosis occurred while the patient was living, by a board-certified or otherwise qualified neurologist, neurosurgeon, or other neuro-specialist physician, or by a physician with sufficient qualifications in the field of neurology or neurocognitive disorders to make a diagnosis of Level 2 Neurocognitive Impairment:**

A diagnosis made outside of the Baseline Assessment Program (BAP) that a living patient suffers from Level 2 Neurocognitive Impairment, as set forth below, *i.e.*, moderate dementia, based on evaluation and evidence generally consistent with the diagnostic criteria set forth and provided below, unless the diagnosing physician can certify in Section IV of the Diagnosing Physician Certification Form, above, that certain testing specified below for Level 2 Neurocognitive Impairment is medically unnecessary because the patient's dementia is so severe:

There is: (i) Concern of the patient, a knowledgeable informant, or the Qualified BAP Provider that there has been a severe decline in cognitive function; (ii) Evidence of a severe cognitive decline from a previous level of performance, as determined by and in accordance with the standardized neuropsychological testing protocol annexed in *Appendix B*, in two or more cognitive domains (complex attention, executive function, learning and memory, language, perceptual-spatial), provided one of the cognitive domains is (a) executive function, (b) learning and memory, or (c) complex attention; (iii) The patient exhibits functional impairment generally consistent with the criteria set forth in the National Alzheimer's Coordinating Center's Clinical Dementia Rating scale Category 2.0 (Moderate) in the areas of Community Affairs, Home & Hobbies, and Personal Care—where such functional impairment is corroborated by documentary evidence (*e.g.*, medical records, employment records), the sufficiency of which will be determined by the physician making the diagnosis (and where no documentary evidence of functional evidence exists or is available, then (a) there must be evidence of severe cognitive decline from a previous level of performance, as determined by and in accordance with the standardized neuropsychological testing protocol annexed in *Appendix B*, in the executive function cognitive domain or the learning and memory cognitive domain, and at least one other cognitive domain; and (b) the patient's functional impairment, as described above, must be corroborated by a third-party sworn affidavit from a person familiar with the patient's condition (other than the player or his family members), the sufficiency of which will be determined by the diagnosing physician); and (iv) The cognitive deficits do not occur exclusively in the context of a delirium, acute substance abuse, or as a result of medication side effects.

## ALZHEIMER'S DISEASE

(1) **The following diagnosis can only be made:**

**(a) prior to July 7, 2014, by a board-certified neurologist, board-certified neurosurgeon, other board-certified neuro-specialist physician, or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician; or**

**(b) from July 7, 2014 through January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified neurologist, board-certified neurosurgeon, or other board-certified neuro-specialist physician:**

A diagnosis in a living patient of the specific disease of Alzheimer's Disease as defined by the World Health Organization's International Classification of Diseases, 9th Edition (ICD-9), the World Health Organization's International Classification of Diseases, 10th Edition (ICD-10), or a diagnosis of Major Neurocognitive Disorder due to probable Alzheimer's Disease as defined in the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5).

(2) **The following diagnosis can only be made prior to January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician, or by a physician with sufficient qualifications in the field of neurology to make such a diagnosis, where the diagnosis was made while the patient was living but thereafter died prior to January 7, 2017 (the Effective Date of the Settlement Agreement):**

A diagnosis of Major Neurocognitive Disorder due to probable Alzheimer's Disease consistent with the definition in *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) or a diagnosis of Alzheimer's Disease.

## PARKINSON'S DISEASE

(1) **The following diagnosis can only be made:**

**(a) prior to July 7, 2014, by a board-certified neurologist, board-certified neurosurgeon, other board-certified neuro-specialist physician, or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician; or**

**(b) from July 7, 2014 through January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified neurologist, board-certified neurosurgeon, or other board-certified neuro-specialist physician:**

A diagnosis in a living patient of the specific disease of Parkinson's Disease as defined by the World Health Organization's International Classification of Diseases, 9th Edition (ICD-9), the World Health Organization's International Classification of Diseases, 10th Edition (ICD-10), or a diagnosis of Major Neurocognitive Disorder probably due to Parkinson's Disease as defined in the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5).

(2) **The following diagnosis can only be made prior to January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician, or by a physician with sufficient qualifications in the field of neurology to make such a diagnosis, where the diagnosis was made while the patient was living but thereafter died prior to January 7, 2017 (the Effective Date of the Settlement Agreement):**

A diagnosis of Parkinson's Disease.

## ALS

**(1) The following diagnosis can only be made:**

    **(a) prior to July 7, 2014, by a board-certified neurologist, board-certified neurosurgeon, other board-certified neuro-specialist physician, or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician; or**

    **(b) from July 7, 2014 through January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified neurologist, board-certified neurosurgeon, or other board-certified neuro-specialist physician:**

A diagnosis in a living patient of the specific disease of Amyotrophic Lateral Sclerosis, also known as Lou Gehrig's Disease (ALS), as defined by the World Health Organization's International Classification of Diseases, 9th Edition (ICD-9) or the World Health Organization's International Classification of Diseases, 10th Edition (ICD-10).

**(2) The following diagnosis can only be made prior to January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician, or by a physician with sufficient qualifications in the field of neurology to make such a diagnosis, where the diagnosis was made while the patient was living but thereafter died prior to January 7, 2017 (the Effective Date of the Settlement Agreement):**

A diagnosis of the specific disease of Amyotrophic Lateral Sclerosis (ALS).

## CTE

**The following diagnosis can only be made prior to April 22, 2015 by a board-certified neuropathologist, provided that a patient who died between July 7, 2014 and April 22, 2015 has until 270 days from the date of death to obtain such a post-mortem diagnosis:**

A post-mortem diagnosis of Chronic Traumatic Encephalopathy (CTE).

# APPENDIX B

## BASELINE NEUROPSYCHOLOGICAL TEST BATTERY AND SPECIFIC IMPAIRMENT CRITERIA FOR RETIRED NFL FOOTBALL PLAYERS

### Section 1: Test Battery

**Estimating Premorbid Intellectual Ability**

ACS Test of Premorbid Functioning (TOPF)

**Complex Attention/Processing Speed (6 scores)**

WAIS-IV Digit Span

WAIS-IV Arithmetic

WAIS-IV Letter Number Sequencing

WAIS-IV Coding

WAIS-IV Symbol Search

WAIS-IV Cancellation

**Executive Functioning (4 scores)**

Verbal Fluency (FAS)

Trails B

Booklet Category Test

WAIS-IV Similarities

**Effort/Performance Validity (8 scores)**

*ACS Effort Scores*

ACS-WAIS-IV Reliable Digit Span

ACS-WMS-IV Logical Memory Recognition

ACS-WMS-IV Verbal Paired Associates Recognition

ACS-WMS-IV Visual Reproduction Recognition

ACS-Word Choice

*Additional Effort Tests*

Test of Memory Malingering (TOMM)

Medical Symptom Validity Test (MSVT)

**Learning and Memory (6 scores)**

WMS-IV Logical Memory I

WMS-IV Logical Memory II

WMS-IV Verbal Paired Associates I

WMS-IV Verbal Paired Associates II

WMS-IV Visual Reproduction I

WMS-IV Visual Reproduction II

**Language (3 scores)**

Boston Naming Test

Category Fluency (Animal Naming)

BDAE Complex Ideational Material

**Spatial-Perceptual (3 scores)**

WAIS-IV Block Design

WAIS-IV Visual Puzzles

WAIS-IV Matrix Reasoning

**Mental Health**

MMPI-2RF

Mini International Neuropsychiatric Interview

### Section 2: Evaluate Performance Validity

Freestanding, embedded and regression based performance validity metrics will be administered to each Retired NFL Football Player during baseline and, if relevant, subsequent neuropsychological examinations. There will be at least seven performance validity metrics utilized during each assessment. The specific performance validity metrics utilized will not be released to the public in order to maintain the highest standards of assessment validity. The performance

## APPENDIX B

validity metrics employed will be rotated at intervals determined by the Appeals Advisory Panel in consultation with Co-Lead Class Counsel and Counsel for the NFL Parties.

Each neuropsychological examiner must complete a checklist of validity criteria as set forth in *Slick et al.* 1999, and revised in 2013 (see below) for every Retired NFL Football Player examined in order to determine whether the Retired NFL Football Player's test data is a valid reflection of his optimal level of neurocognitive functioning.

1. Suboptimal scores on performance validity embedded indicators or tests. The cutoffs for each test should be established based on empirical findings.

2. A pattern of neuropsychological test performance that is markedly discrepant from currently accepted models of normal and abnormal central nervous system (CNS) function. The discrepancy must be consistent with an attempt to exaggerate or fabricate neuropsychological dysfunction (e.g., a patient performs in the severely impaired range on verbal attention measures but in the average range on memory testing; a patient misses items on recognition testing that were consistently provided on previous free recall trials, or misses many easy items when significantly harder items from the same test are passed).

3. Discrepancy between test data and observed behavior. Performance on two or more neuropsychological tests within a domain are discrepant with observed level of cognitive function in a way that suggests exaggeration or fabrication of dysfunction (e.g., a well-educated patient who presents with no significant visual-perceptual deficits or language disturbance in conversational speech performs in the severely impaired range on verbal fluency and confrontation naming tests).

4. Discrepancy between test data and reliable collateral reports. Performance on two or more neuropsychological tests within a domain are discrepant with day-to-day level of cognitive function described by at least one reliable collateral informant in a way that suggests exaggeration or fabrication of dysfunction (e.g., a patient handles all family finances but is unable to perform simple math problems in testing).

5. Discrepancy between test data and documented background history. Improbably poor performance on two or more standardized tests of cognitive function within a specific domain (e.g., memory) that is inconsistent with documented neurological or psychiatric history.

6. Self-reported history is discrepant with documented history. Reported history is markedly discrepant with documented medical or psychosocial history and suggests attempts to exaggerate deficits.

7. Self-reported symptoms are discrepant with known patterns of brain functioning. Reported or endorsed symptoms are improbable in number, pattern, or severity; or markedly inconsistent with expectations for the type or severity of documented medical problems.

8. Self-reported symptoms are discrepant with behavioral observations. Reported symptoms are markedly inconsistent with observed behavior (e.g., a patient complains of severe episodic memory deficits yet has little difficulty remembering names, events, or appointments; a patient complains of severe cognitive deficits yet has little difficulty driving independently and arrives on time for an appointment in an unfamiliar area; a patient complains of severely slowed mentation and concentration problems yet easily follows complex conversation).

9. Self-reported symptoms are discrepant with information obtained from collateral informants. Reported symptoms, history, or observed behavior is inconsistent with information obtained from other informants judged to be adequately reliable. The discrepancy must be consistent with an attempt to exaggerate deficits (e.g., a patient reports severe memory impairment and/or behaves as if severely memory-impaired, but his spouse reports that the patient has minimal memory dysfunction at home).

## APPENDIX B

Notwithstanding a practitioner's determination of sufficient effort in accordance with the foregoing factors, a Retired NFL Football Player's failure on two or more effort tests may result in the Retired NFL Football Player's test results being subjected to independent review, or result in a need for supplemental testing of the Retired NFL Football Player.

Note: Additional information relating to the evaluation of effort and performance validity will be provided in a clinician's interpretation guide.

### Section 3: Estimate Premorbid Intellectual Ability

| Test | Ability |
|---|---|
| Test of Premorbid Functioning (TOPF) | Reading<br>Reading + Demographic Variables |

The Test of Premorbid Functioning (TOPF) provides three models for predicting premorbid functioning: (a) demographics only, (b) TOPF only, and (c) combined demographics and TOPF prediction equations. For each model using demographic data, a simple and complex prediction equation can be selected. In the simple model, only sex, race/ethnicity, and education, are used in predicting premorbid ability. In the complex model, developmental, personal, and more specific demographic data is incorporated into the equations. The clinician should select a model based on the patient's background and his or her current level of reading or language impairment.

Note: It is necessary to estimate premorbid intellectual functioning in order to use the criteria for impairment set out in this document. Estimated premorbid intellectual ability will be assessed and classified as:

➤ Below Average (estimated IQ below 90);

➤ Average (estimated IQ between 90 and 109);

➤ Above Average (estimated IQ above 110).

### Section 4: Neuropsychological Test Score Criteria by Domain of Cognitive Functioning

There are 5 domains of cognitive functioning. In each domain, there are several tests that contribute 3, 4, or 6 demographically-adjusted test scores for consideration. Test selection in the domains was based on the availability of demographically-adjusted normative data for Caucasians and African Americans. These domains and scores are set out below.

The basic principle for defining impairment on testing is that there must be a pattern of performance that is approximately 1.5 standard deviations (for Level 1 Impairment), 1.7-1.8 standard deviations (for Level 1.5 Impairment) or 2 standard deviations (for Level 2 Impairment) below the person's expected level of premorbid functioning. Therefore, it is necessary to have more than one low test score in each domain. A user manual will be provided to neuropsychologists setting out the cutoff scores, criteria for identifying impairment in each cognitive domain, and statistical and normative data to support the impairment criteria.

## APPENDIX B

| Domain/Test | Ability |
|---|---|
| **Complex Attention/Speed of Processing (6 Scores)** | |
| Digit Span | Attention & Working Memory |
| Arithmetic | Mental Arithmetic |
| Letter Number Sequencing | Attention & Working Memory |
| Coding | Visual-Processing & Clerical Speed |
| Symbol Search | Visual-Scanning & Processing Speed |
| Cancellation | Visual-Scanning Speed |
| **Executive Functioning (4 scores)** | |
| Similarities | Verbal Reasoning |
| Verbal Fluency (FAS) | Phonemic Verbal Fluency |
| Trails B | Complex Sequencing |
| Booklet Category Test | Conceptual Reasoning |
| **Learning and Memory (6 scores)** | |
| Logical Memory I | Immediate Memory for Stories |
| Logical Memory II | Delayed Memory for Stories |
| Verbal Paired Associates I | Learning Word Pairs |
| Verbal Paired Associates II | Delayed Memory for Word Pairs |
| Visual Reproduction I | Immediate Memory for Designs |
| Visual Reproduction II | Delayed Memory for Designs |
| **Language** | |
| Boston Naming Test | Confrontation Naming |
| BDAE Complex Ideational Material | Language Comprehension |
| Category Fluency | Category (Semantic) Fluency |
| **Visual-Perceptual** | |
| Block Design | Spatial Skills & Problem Solving |
| Visual Puzzles | Visual Perceptual Reasoning |
| Matrix Reasoning | Visual Perceptual Reasoning |

Impairment Criteria: *Below Average* Estimated Intellectual Functioning (A1 – E1)

**A1. Complex Attention (6 test scores)**

1. Level 1 Impairment: 3 or more scores below a T score of 35

2. Level 1.5 Impairment: 4 or more scores below a T score of 35; or meet for Level 1 and 2 scores below a T score of 30

3. Level 2 Impairment: 3 or more scores below a T score of 30

**B1. Executive Function (4 test scores)**

1. Level 1 Impairment: 2 or more scores below a T score of 35

2. Level 1.5 Impairment: 3 or more scores below a T score of 35; or meet for Level 1 and 1 score below a T score of 30

## APPENDIX B

3. Level 2 Impairment: 2 or more scores below a T score of 30

### C1. Learning and Memory (6 test scores)

1. Level 1 Impairment: 3 or more scores below a T score of 35

2. Level 1.5 Impairment: 4 or more scores below a T score of 35; or meet for Level 1 and 2 scores below a T score of 30

3. Level 2 Impairment: 3 or more scores below a T score of 30

### D1. Language (3 test scores)

1. Level 1 Impairment: 3 or more scores below a T score of 37

2. Level 1.5 Impairment: meet for Level 1 and 2 scores below a T score of 35

3. Level 2 Impairment: 3 or more scores below a T score of 35

### E1. Visual-Perceptual (3 test scores)

1. Level 1 Impairment: 3 or more scores below a T score of 37

2. Level 1.5 Impairment: meet for Level 1 and 2 scores below a T score of 35

3. Level 2 Impairment: 3 or more scores below a T score of 35

## Impairment Criteria: *Average* Estimated Intellectual Functioning (A2 – E2)

### A2. Complex Attention (6 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 35

2. Level 1.5 Impairment: 3 or more scores below a T score of 35; or meet for Level 1 and 1 score below a T score of 30

3. Level 2 Impairment: 2 or more scores below a T score of 30

### B2. Executive Function (4 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 35

2. Level 1.5 Impairment: 3 or more scores below a T score of 35; or meet for Level 1 and 1 score below a T score of 30

3. Level 2 Impairment: 2 or more scores below a T score of 30

### C2. Learning and Memory (6 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 35

2. Level 1.5 Impairment: 3 or more scores below a T score of 35; or meet for Level 1 and 1 score below a T score of 30

3. Level 2 Impairment: 2 or more scores below a T score of 30

### D2. Language (3 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 37

2. Level 1.5 Impairment: 3 or more scores below a T score of 37; or meet for Level 1 and 1 score below a T score of 35

3. Level 2 Impairment: 2 or more scores below a T score of 35

### E2. Visual-Perceptual (3 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 37

2. Level 1.5 Impairment: 3 or more scores below a T score of 37; or meet for Level 1 and 1 score below a T score of 35

3. Level 2 Impairment: 2 or more scores below a T score of 35

# APPENDIX B

**Impairment Criteria:** *Below Average* **Estimated Intellectual Functioning (A3 – E3)**

### A3. Complex Attention (6 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 35

2. Level 1.5 Impairment: meet for Level 1 and 3 or more scores below a T score of 37

3. Level 2 Impairment: 3 or more scores below a T score of 35

### B3. Executive Function (4 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 37

2. Level 1.5 Impairment: meet for Level 1 and 3 or more scores below a T score of 37; or meet for Level 1 and 1 score below a T score of 30

3. Level 2 Impairment: 2 or more scores below a T score of 30

### C3. Learning and Memory (6 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 35

2. Level 1.5 Impairment: meet for Level 1 and 3 or more scores below a T score of 37

3. Level 2 Impairment: 3 or more scores below a T score of 35

### D3. Language (3 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 40

2. Level 1.5 Impairment: 3 scores below at T score of 40; or meet for Level 1 and 1 score below a T score of 37

3. Level 2 Impairment: 2 or more scores below a T score of 37

### E3. Visual-Perceptual (3 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 40

2. Level 1.5 Impairment: 3 scores below at T score of 40; or meet for Level 1 and 1 score below a T score of 37

3. Level 2 Impairment: 2 or more scores below a T score of 37

## Section 5: Mental Health Assessment

| Test | Symptoms/Functioning | Assessment |
|---|---|---|
| MMPI-2RF | Mental Health Assessment | Evaluation of Validity Scales and Configurations; T-Scores for Symptom Domains |
| Mini International Neuropsychiatric Interview (M.I.N.I. Version 5.0.0) | Semi-structured Psychiatric Interview | Scale Criteria for Various Psychiatric Diagnoses |

**Ronald L. Hamilton, M.D.**

1/2/2017

## CURRICULUM VITAE

### BIOGRAPHICAL

| | | | |
|---|---|---|---|
| **Name:** | Ronald Lee Hamilton | **Birth Date:** | September 20, 1959 |
| **Home Address:** | 6 Graham Place Pittsburgh, PA 15232 | **Birth Place:** | Omaha, Nebraska |
| **Marital status:** | single | | |
| **Home Phone** | 412-310-9874 | **Citizenship:** | USA |

**Business Address:**  Division of Neuropathology
A724.1 Scaife Hall
200 Lothrop Street
Pittsburgh, PA 15213

**Business Phone:**  412-624-6610

**Business Fax:**  412-624-5488
**e-mail address**  hamiltonrl@upmc.edu

### EDUCATION AND TRAINING

| | | | |
|---|---|---|---|
| 1977-1985 | University of Nebraska-Lincoln | B.S. | Psychology |
| 1985-1989 | University of Nebraska Medical Center | M.D. | |
| 1989-1991 | University of California, San Diego Program Director, David Bailey | Resident Anatomic Pathology | |
| 1991-1993 | University of California, San Diego Program Director, Henry C. Powell | Resident Neuropathology | |
| 1993-1994 | University of Pittsburgh Program Director, Clayton A Wiley | Fellow Neuropathology | |
| 1994-1995 | University of Pittsburgh Program Director, Michael Zigmond | Fellow: NIMH Training Grant in Neuroscience | |

### APPOINTMENTS AND POSITIONS:

1995-2002  University of Pittsburgh School of Medicine -Assistant Professor of Pathology
2002-present  University of Pittsburgh School of Medicine -Associate Professor of Pathology

### DISTRIBUTION OF % TIME

| | |
|---|---|
| Research | 20% |
| Other scholarly activity | 8% |
| Teaching | 10% |
| Clinical | 35% |
| Combined clinical and teaching | 20% |
| Service activities | 5% |
| Administrative activities. | 2% |
| | |
| TOTAL | 100% |

**Ronald L. Hamilton, M.D.**

## CERTIFICATION and LICENSURE

**SPECIALTY CERTIFICATION**

| | | |
|---|---|---|
| American Board of Pathology | Anatomic Pathology | 5/23/96 |
| American Board of Pathology | Neuropathology | 5/23/96 |
| American Board of Pathology – recertification | Neuropathology | 1/1/2014 |

**MEDICAL or OTHER PROFESSIONAL LICENSURE**

| | |
|---|---|
| 1990 | California Medical License (G69731) expired |
| 1993 | Pennsylvania Medical License (MD-049717-L) |
| 2009 | Indiana Medical License (01067332A) |

## MEMBERSHIPS IN PROFESSIONAL AND SCIENTIFIC SOCIETIES

| | |
|---|---|
| 1992 | American Association for the Advancement of Science |
| 1993 | American Association of Neuropathology |
| 1993 | International Society of Neuropathology |
| 1994 | College of American Pathologists (CAP) |
| 1995-97 | CAP Neuropathology Subcommittee |
| 1998 | Children's Cancer Group, Study Committee for CCGB975 |
| 1999 | Society for Neuroscience |

## HONORS

| | |
|---|---|
| Nominated "Teacher of the Year: Anatomic Pathology" | 1997 |
| Nominated "Teacher of the Year: Anatomic Pathology" | 1998 |
| Nominated "Teacher of the Year: Anatomic Pathology" | 1999 |
| Nominated "Teacher of the Year: Anatomic Pathology" | 2000 |
| Nominated "Teacher of the Year: Anatomic Pathology" | 2001 |
| Nominated "Teacher of the Year: Anatomic Pathology" | 2002 |
| UPMC ACES Award winner (ACES is an Award for | 2003 |

Clinical Excellence and Service and is given to about 10 physicians per year at UPMC)

| | |
|---|---|
| Letter of appreciation from Chief Residents | 1997-1998 |
| AP Pathology "TEACHER OF THE YEAR" | 2004-05 |

## PUBLICATIONS

**Refereed Articles**

1. Esch O, Spinosa JC, **Hamilton RL**, Crombie DL, Schteigart CO, Rondinone JF, D'Agostino HB,Lillienau J and Hofmann AF: Acute effects of topical methyl tert-butyl ether or ethyl propionate on gallbladder histology in animals: a comparison of two solvents for contact dissolution of cholesterol gallstones. Hepatology 16 (4):984-991, 1992.

2. Anders KH, Becker PS, Holden JK, Sharer LR, Cornford ME, Hansen LA, **Hamilton R,** Vinters, HV: Multifocal necrotizing leukoencephalopathy with pontine predilection in immunosuppressed patients: a clinicopathologic review of sixteen cases. Human Pathology 24:897-904, 1993.

3. **Hamilton RL**, Achim C, Grafe MR, Fremont JC, Miners D, Wiley CA: Herpes simplex virus brainstem encephalitis in an AIDS patient. Clinical Neuropathology, 14: 45-50, 1995.

**Ronald L. Hamilton, M.D.**

4. Rose J, Haskell WL, Gamble JG, **Hamilton RL**, Brown DA, Rinsky L: Muscle pathophysiology and clinical measures of disability in children with cerebral palsy. Journal of Orthopedic Research, 12(6): 758-768, 1994.

5. **Hamilton RL**, Grafe MR: Complete absence of the cerebellum: a report of two cases. Acta Neuropathologica 88 (3): 258-261, 1994.

6. **Hamilton RL**, Haas RH, Nyhan WL, Powell HC, Grafe MR: The neuropathology of propionic academia: a report of two additional cases.  Journal of Child Neurology 10(1): 25-30, 1995.

7. Haas RH, Marsden DL, Capistrano-Estrada S, **Hamilton RL**, Grafe MR, Wong W, Nyhan WL: Acute basal ganglia infarction in propionic acidemia.  Journal of Child Neurology 10(1) 18-22, 1995.

8. Kupperman BD, Quiceno JI, Wiley C, Hesselink J**, Hamilton R**, Keefe K, Garcia R, Freeman WR: Clinical and histopathologic study of varicella zoster virus retinitis in patients with the acquired immunodeficiency syndrome.  American Journal of Ophthalmology 118:589-600, 1994.

9. Adelson PD, Robichaurd P, **Hamilton RL**, Kochanek PM. A Model of Diffuse Traumatic Brain  Injury in the Immature Rat.  J Neurosurg 85:877-884, 1996.

10. Alper G, Crumrine PK, **Hamilton RL**, Albright L, Wald ER. An unusual case of inflammatory spinal epidural  mass (Castleman's syndrome) Pediatric Neurology  15: 60-2 , 1996

11. Adelson PD, Firlik KS, Firlik AD, **Hamilton RL**. A meningeal cyst of the thoracic spine presenting as prolonged paresis after ankle injury: case report. Neuropediatrics 27:207-210, 1996.

12. Cramer SC, Segal A, **Hamilton RL**, Schmahman J, Ma J. Leukoencephalitis Due to Varicella Zoster Virus:   Report of a Case and Review of Clinical Features.  Contemporary Neurology, 1, 1996 (electronic journal).

13. Mansfield RT, Schiding JK, **Hamilton R**, Kochanek PM: Effects of hypothermia on traumatic brain injury in immature rats. J Cerebral Blood Flow  Metabo 16(2): 244-252, 1996.

14. Pollack IF, Campbell JW, **Hamilton RL**, Martinez AJ, Bozik ME. Proliferation index as a predictor of prognosis in malignant gliomas of childhood. Cancer 79:849-856, 1996

15. Pollack IF, **Hamilton RL,** Finkelstein SD, Campbell JW, Martinez AJ, Sherwin RN, Bozik ME, Gollin SM. The relationship between tp53 mutations and overexpression of p53 and prognosis in malignant gliomas of childhood. Cancer Research 57:304-309, 1997.

16. Ikonomovic MD, Mizukami K, Davies P, **Hamilton R**, Sheffield R, Armstrong DM. The loss of GluR2(3) immunoreactivity preceded neurofibrillary tangle formation in the entorhinal cortex and hippocampus of Alzheimer brains. J Neuropath Exp Neurol 56:1018-1027, 1997.

17. Bredel M, Pollack IF, Campbell JW, **Hamilton RL**: Basic fibroblast growth factor as a predictor of prognosis in pediatric high-grade gliomas. Clinical Cancer Research 3:2157-2164, 1997

18. Blatt J, **Hamilton RL**: Neurodevelopmental anomalies in children with neuroblastoma. Cancer 82: 1603-8, 1998.

19. Fukui MB, Livstone BJ, Meltzer CC, **Hamilton RL**: Hemorrhagic presentation of untreated primary central nervous system lymphoma in the acquired immunodeficiency syndrome. Am J Roentgenol 170:1114-1115, 1998..

20. Bredel M, Pollack IF, **Hamilton RL**, James CD: Epidermal growth factor receptor (EGFR) and gene amplification in high-grade non-brainstem gliomas of childhood. Clin Can Res 5:1786-92, 1999

**Ronald L. Hamilton, M.D.**

21. Gerszten PC, Pollack IF, **Hamilton RL**. Primary parafalcine chondrosarcoma in a child. Acta Neuropathologica 95:111-4, 1998.

22. Pollack IF, **Hamilton RL**, Fitz C, Orenstein DM. An intrasylvian "fibroma" in a child with cystic fibrosis. Pediatric Neurosurgery 46:744-747 2000.

23. Liachenko S, Tang P, **Hamilton RL**, Xu Y: A reproducible model of circulatory arrest and remote resuscitation in rats for NMR investigation. Stroke 29:1229-1238, 1998

24. Meltzer CC, Liu AY, Perrone AM, **Hamilton RL** Meningioangiomatosis MR imaging with histopathologic correlation. AJR 170:804-5, 1998

25. Clark RSB, Kochanek PM, Chen M, Watkins SC, Marion DW, Chen J, **Hamilton RL**, Loeffert JE, Graham SH. Increases in Bcl-2 and cleavage of caspase-1 and caspase-3 in human brain after head injury. FASEB J, 13:813-821, 1999

26. Soontornniyomkij V, Wang G, Pittman CA, **Hamilton RL**, Wiley CA, Achim CL Absence of brain-derived neurotrophic factor and trkB receptor immunoreactivity in glia of Alzheimer's disease. Acta Neuropathologica 98:345-8, 1999.

27. Wang G, Achim CL, **Hamilton RL**, Wiley CA, Soontornniyomkij V Tyramide signal amplification methods in multiple label immunofluorescence confocal microscopy. Methods 18(4):459-464, 1999

28. Firlik KS, Adelson PD, **Hamilton RL**: Coexistence of a ganglioglioma and Rasmussen's encephalitis: successful treatment in a four-year-old boy. Pediatr Neurosurg 30:278-282, 1999

29. Ikonomovic MD, Mizukami K, Warde D, Sheffield R, **Hamilton R**, Wenthold RJ, Armstrong DM Distribution of glutamate receptor subunit NMDAR1 in the hippocampus of normal elderly and patients with Alzheimer's disease. Exp Neurol 160(1):194-204, 1999.

30. Dallasta, LM, Wang G, Bodnar RJ, Draviam R, Wiley CA, Achim CA, **Hamilton RL**: Differential expression of intercellular adhesion molecules-1 (ICAM-1) and vascular adhesion cell molecule-1 (VCAM-1) in chronic murine retroviral encephalitis. Neuropathol Appl Neurobiol 26:332-341, 2000.

31. Luabeya MK, Dallasta LM, Achim CL, Pauza CD, **Hamilton RL**: Blood-brain Barrier Disruption in Simian Immunodeficiency Virus Encephalitis. Neuropathol Appl Neurobiol 26:454-462, 2000.

32. **Hamilton RL**. Lewy Bodies in Alzheimer's Disease: A Neuropathological Review of 145 Cases Using -synuclein Immunohistochemistry. Brain Pathol 10: 378-384, 2000.

33. Sweet, RA, **Hamilton RL**, Healy MT, Wisniewski SR, Henteleff R, Pollack BG, Lewis DA, DeKosky ST. Alterations of Striatal Dopamine Receptor Binding in Alzheimer's Disease Are Associated with Lewy Body Pathology and With Antemortem Psychosis. Arch Neurol 58:466-472, 2001.

34. Styren S, **Hamilton RL**, Styren GC, Klunk WE X-34: a novel and intensely fluorescent stain for Alzheimer's disease pathology. J Histochem Cytochem 48:1223-1232, 2000.

35. Lopez OL, **Hamilton RL**, Becker JT, Wisniewski S, Kaufer DI, DeKosky ST. Severity of cognitive impairment and the clinical diagnosis of AD with Lewy bodies. Neurology 54:1780-1787, 2000

36. Lopez OL, Wisniewski S, **Hamilton RL**, Becker JT, Kaufer DI, DeKosky ST. Predictors of progression in patients with AD and Lewy bodies. Neurology 54:1774-1779, 2000.

**Ronald L. Hamilton, M.D.**

37.  Sweet RA, **Hamilton RL**, Lopez OL, Klunk WE, Wisnieski SR, Kaufer DI, Healy MT, Dekosky ST. Psychotic symptoms in Alzheimer's Disease are not associated with more severe neuropathologic features. Internat Psychogeriatr 12: 547-558, 2000.

38.  Lopez OL, Becker JT, Klunk W, Saxton J, **Hamilton RL**, Kaufer DI, Sweet RA, Meltzer CC, Wisniewski S, Kamboh MI, DeKosky ST. Research evaluation and diagnosis of probable Alzheimer's Disease over the last two decades. I. Neurology 55:1854-1862, 2000.

39.  Lopez OL, Becker JT, Klunk W, Saxton J, **Hamilton RL**, Kaufer DI, Sweet RA, Meltzer CC, Wisniewski S, Kamboh MI, DeKosky ST. Research evaluation and diagnosis of possible Alzheimer's Disease over the last two decades. II. Neurology 55:1863-1869, 2000.

40.  Pollack IF, **Hamilton RL**, Fitz C, Kassam A, Snyderman C. Congenital Reactive Myofibroblastic Tumor of the Petrous Bone: Case Report. Neurosurgery 48:430-435, 2001.

41.  Levy EI, Scarrow A, **Hamilton** RC (sic), Wollman MR, Fitz C. Pollack IF. Medical Management Of Eosinophilic Granuloma of the Cervical Spine. Pediatr Neurosurg 31:159-62, 1999.

42.  Pettegrew JW, Panchalingam K, **Hamilton RL**, and McClur RJ Brain Membrane Phospholipid Alterations in Alzheimer's Disease.  Neurochem Res 26:771-782, 2001

43.  Levy EI, Harris AE, Omalu BA, **Hamilton RL**, Branstetter BF, Pollack IF. Sudden Death from Fulminant Acute Cerebellitis.  Pediatr Neurosurg 35:24-28, 2001

44.  Lianchenko S, Tang P, **Hamilton RL**, Xu Y. Regional Dependence of Cerebral Reperfusion After Circulatory Arrest in Rats.  J Cerebr Blood Flow Met 21:1320-1329, 2001 .

45.  Pollack IF, Finkelstein SD, Burnham J, Holmes EJ, **Hamilton RL**, Yates AJ, Finlay J, Sposto R, and CCG. Age and TP53 Mutation Frequency in Childhood Malignant Gliomas: Results of a Multi-institutional Cohort. Cancer Res 61:7404-7407, 2001

46.  Adelson PD, Jenkins LW, **Hamilton RL**, Robichaud P, Tran MP, Kochanek PM. Histopathologic Response of the Immature Rat to Diffuse Traumatic Brain Injury.  J Neurotrauma 18 :967-976, 2001

47.  Pollack IF, Finkelstein SD, Woods J, Burnham J, Holmes EJ, **Hamilton RL**, Yates AJ, Boyett JM, Finlay J, Sposto R, and CCG. TP53 Mutations, Expression of p53 and Prognosis in Children with Malignant Gliomas.  New England Journal of Medicine 346:420-427, 2002

48.  Lopez OL, Becker JT, Kaufer DI, **Hamilton RL**, Sweet RA, Klunk W, DeKosky ST. Research Evaluation and Prospective Diagnosis of Dementia With Lewy Bodies.  Arch Neurol 59:43-46, 2002.

49.  Wang L, Yushmanov VE, Lianchenko SM, Tang P, **Hamilton RL**, Xu Y.  Late Reversal of Cerebral Perfusion and Water Diffusion After Transient Focal Ischemia in Rats.  J Cereb Blood Flow Metab 22:253-261, 2002.

50. Pollack IF, Biegal JA, Yates AJ, **Hamilton RL**, Finkelstein SD.Risk Assignment in Childhood Brain Tumors: The Emerging Role of Molecular and Biologic Classification. Current Oncology Reports 4:114-122, 2002.

51.  Pollack IF, **Hamilton RL**, Burnham J, Holmes EJ, Finkelstein SD, Sposto R, Yates AJ, Boyett JM, Finley JL. The impact of proliferation index on outcome in childhood malignant gliomas: results in a multi-institutional cohort. Neurosurgery 50:1238-1245, 2002.

**Ronald L. Hamilton, M.D.**

52. Sweet RA, Panchalingam K, Pettefrew JW, McClure RJ, **Hamilton RL**, Lopez OL, Kaufer DI, DeKosky ST, Klunk WE. Psychosis in Alzheimer disease: postmortem magnetic resonance spectroscopy evidence of excess neuronal and membrane phospholipid pathology. Neurobiol Aging 23:547-53, 2002.

53. Mazzola CA, Albright AL, Sutton LN, Tuite GF, **Hamilton RL**, Pollack IF. Dermoid inclusion cysts and early spinal cord tethering after fetal surgery. New Engl. J Med 347:256-9, 2002.

54. Bredel M, Pollack IF, **Hamilton RL**, Birner P, Hainfellner JA, Zentner J. DNA topoisomerase II-alpha predicts progression-free and overall survival in pediatric malignant non-brainstem gliomas. Int J Cancer 99:817-20, 2002.

55. Klunk WE, Wang Y, Huang G, Debnath ML, Holt DP, Shao L, **Hamilton RL**, Ikonomovic MD, DeKosky ST, Mathis CA. The binding of BTA-1 to post-mortem brain homogenates is dominated by the amyloid component. J Neurosci 23:2086-2092, 2003.

56. Castellano-Sanchez, AA, Ohgaki H, Yokoo H, Scheithauer BW, Burger PC, **Hamilton RL**, Finkelstein SD, Brat, DJ. Cerebral granular cell astrocytomas show a high frequency of allelic loss but lack a defining genotype. Brain Pathology 13: 62-78, 2003.

57. Gilbertson RJ, Hill DA, Hernan R, Kocak M, Geyer R, Olson J, Gajjar A, Rush L, **Hamilton RL**, Finkelstein SD, Pollack IF. ERBB1 is amplified and overexpressed in high-grade diffusely infiltrative pediatric brain stem glioma. Clin Cancer Res 9:3620-3624, 2003.

58. Pollack IF, Finkelstein SD, Burnham J, **Hamilton RL**, Yates AJ, Holmes EJ, Boyett JM, Finlay JL. The association between chromosome 1p loss and outcome in pediatric malignant gliomas: results from the CCG-945 cohort. Pediatr Neurosurg 39:114-121, 2003.

59. Carter TL, Rissman RA, Mishizen-Eberz AJ, Wolfe BB, **Hamilton RL**, Gandy S, Armstrong DM. Differential Preservation of AMPA Receptor Subunits in the Hippocampi of Alzheimer's Disease Patients According to Braak Stage Experimental Neurology 187:299-309, 2004

60. Finkelstein SD, Mohan D, **Hamilton RL**, Sasatomi E, Swalsky PA, Lieberman FS. Microdissection-based genotyping assists discrimination of reactive gliosis versus glioma. Am J Clin Pathol 121:671-678, 2004

61. **Hamilton RL**, Bowser B Alzheimer Disease Pathology in ALS Acta Neuropathologica107:515-522, 2004

62. Mohan D, Couce ME, Wiley CA, **Hamilton RL**, Sasatomi E, Swalsky PA, Lieberman MD, Finkelstein SD. Microdissection based genotyping of human gliomas: diagnostic and prognostic considerations Modern Pathology 17:1346-1358, 2004

63. Marshall GA, Kaufer DI, Lopez OL, Rao GR, **Hamilton RL**, DeKosky ST. Right prosubiculum amyloid plaque density correlates with anosognosia in Alzheimer's Disease. J Neurol Neurosurg Psychiatry 75:1396-4000, 2004. **PMCID: PMC1738763**

64. Sweet RA, **Hamilton RL**, Butters ME, Mulsant BH, Pollock BG, Lewis DA, DeKosky ST, Reynolds CF. Neuropathologic Correlates of Dementia in Late Life Major Depression Neuropsychopharmacology 29:2242-2250, 2004

65 Lee JYK, Finkelstein S, **Hamilton RL**, Rekha P, Pirris S, King Jr, JT, Omalu B. Loss of heterozygosity Analysis of Benign, Atypical and Anaplastic Meningiomas. Neurosurgery 55:1163-1173, 2004.

**Ronald L. Hamilton, M.D.**

66. Beckner ME, Sasatomi E, Swalsky PA, **Hamilton RL**, Pollack, IF, Finkelstein SD. Loss of heterozygosity reveals non-VHL Allelic loss in hemangioblastomas at 22q13. Human Pathology 35:1105-1111, 2004.

67. Tsuang D, Wilson R, Lopez OL, Luedecking-Zimmer EK, Leverenz JB, DeKosky ST, Kamboh MI, **Hamilton RL**. Genetic Association Between APOE*4 Allele and Lewy Bodies in Alzheimer's Disease Neurology, 64:509-513, 2005. **PMCID: PMC1487185**

68. Bredel C, Lassman S, Pollack IF, Knoth R, **Hamilton RL**, Werner M, Bredel M. DNA Topoisomerase II-alpha and Her-2/Neu Gene Dosages in Pediatric Malignant Gliomas. Int J Cancer 26:1188-92, 2005.

69. Witham TF, Okada H, Fellows W, **Hamilton RL**, Flickinger JC, Chambers WH, Pollack IF, Watkins SC, Kondziolka D. The characterization of tumor apoptosis after experimental radiosurgery. Stereotact Funct Neurosurg 83:17-24 2005.

70. McFadden K, **Hamilton RL**, Insalaco SJ, Lavine L, Al-Mateen M, Guoji Wang G, Wiley CA Neuronal intranuclear inclusion disease in a child without polyglutamine inclusions J Neuropathol Exper Neurol 64:545-552, 2005. **PMCID: PMC1402362**

71. Hatano M, Eguchi J, Tatsumi T, Kuwashima N, Dusak JE, Kinch MS, Pollack IF, **Hamilton RL**, Storkus WJ, Okada H. EphA2 as a glioma-associated antigen: a novel target for glioma-vaccines. Neoplasia 7:717-722, 2005. **PMCID: PMC1501889**

72. Jordan S, Ruoyan C, Koprivica V, **Hamilton RL**, Whitehead R, Tottori K, Kikuchi T. In vitro profile of the antidepressant candidate OPC-14523 at rat and human 5-HT$_{1A}$ receptors.Eur J Pharmacol, 517:165-173, 2005.

73. Omalu BI, Minster RL, Kamboh MI, **Hamilton RL**, Wecht CH, DeKosky ST. Chronic Traumatic Encephalopathy (CTE) in a National Football League (NFL) Player Neurosurgery, 57:128-134, 2005.

74. Judkins AR, Burger PC, **Hamilton RL**, Kleinschmidt-DeMasters B, Perry A, Pomeroy SL, Rosenblum MK, Yachnis AT, Zhou H, Rorke LB, Biegel JA. INI1 Protein Expression Distinguishes Atypical Teratoid/Rhabdopid Tumor from Choroid Plexus Carcinoma. J Neuropathol Exp Neurol 64:391-397, 2005.

75. Desai PP, Ikonomovic I, Abrahamson EE, **Hamilton RL,** Isanski BA, Hope CE, Klunk WE, Dekosky ST, Kamboh MI. Apolipoprotein D is a component of compact but not diffuse amyloid-beta plaques in Alzheimer's Disease temporal cortex. Neurobiol Dis May 22, 2005 (epub)

76. Carson-Walter EB, Hampton J, Geynisman D,Pillai PK, Sathanoori R, Madden SL, **Hamilton RL**, Walter KA. Plasmalemmal Vesicle associated protein-1 (PV-1) is a novel and critical marker of brain tumor angiogenesis. Clin Cancer Res 11:7643-7650, 2005.

77. Lopez OL, Becker JT, Sweet RA, Martin-Sanchez FJ, **Hamilton RL** Lewy bodies in the Amygdala increase risk for major depression in subjects with Alzheimer disease. Neurology 67:660-665, 2006.

78. Pollack IF, **Hamilton RL**, Sobol R, Burnham J, Yates AJ, Holmes EJ, Zhou T, Finlay J (for Children Oncology Group).O6-methylguanine-DNA methyltransferase  strongly Correlates with Outcome in Childhood Malignant Gliomas: Results from the CCG-945 Cohort J Clin Oncol. Jul 20;24(21):3431-7, 2006.

**Ronald L. Hamilton, M.D.**

79. Mandal PK, Pettegrew JW, Masliah E, **Hamilton RL**, Mandal R. Interaction between Aβ Peptide and α Synuclein: Molecular Mechanisms in Overlapping Pathology of Alzheimer's and Parkinson's in Dementia with Lewy Body disease.  Neurochemical Research, 2006 31, 1153-1162, 2006.

80. Omalu B, DeKosky ST, **Hamilton RL**, Minster RL, Kamboh MI, Shakir AM, Wecht Chronic Traumatic Encephalopathy in a National Football League Player: part II.  Neurosurgery 59:1086-92, 2006

81. Ramsey CP, Glass CA, Koike MA, Montgomery MB, Ritson GP, Chia L, **Hamilton RL**, Chu CT, Jordan-Sciutto KL. Expression of Nrf2 in neurodegenerative diseases. J Neuropathol Exp Neurol 66:75-85, 2007. **PMCID: PMC2253896**

82. Boada FE, Tanase C, Davis D, Walter K, Torres-Trejo A, Couce M, **Hamilton R**, Kondziolka D, Bartinski W, Lieberman F.  Non-invasive assessment of tumor proliferation using triple quantum filtered 23/Na MRI: technical challenges and solutions.  Conf Proc IEEE Eng Med Biol Sci Soc. 2004; 7:5238-41

83. Pollack IF, **Hamilton RL**, James CD, Finkelstein SD, Burnham J, Yates AJ, Holmes EJ, Zhou T, Finlay J (for Children Oncology Group). Rarity of *PTEN* Deletions and *EGFR* Amplification in Malignant Gliomas of Childhood: Results from the Children's Cancer Group-945 Cohort J Neurosurg 105(5 Suppl):418-424, 2006.

84. Guzman A, Wood WL, Alpert E, Prasad MD, Miller RG, Rothstein JD, Bowser R, **Hamilton R**, Wood TD, Cleveland DW, Lingappa VR, Liu J.  Common molecular signature in SOD1 for both sporadic and familial amyotrophic lateral sclerosis.  Proc Nat Acad Sci 104:12524-12529, 2007. **PMCID: PMC2408940**

85. Beckner ME, Jane EP, Jankowitz B, Agostino NR, Walter KA, **Hamilton RL**, Pollack IF.  Tumor cells from ultrasonic aspirations of glioblastomas migrate and from spheres with radial outgrowth. Cancer Letters 255:135-44, 2007. PMID 17543444, **PMCID: PMC2000342**

86. McIntyre JA, Chapman J, Shavit E, **Hamilton RL**, and DeKosky ST. Redox-Reactive Autoantibodies in Alzheimer's Patients' Cerebrospinal Fluids: Preliminary Studies.  Autoimmunity, 40:390-396, 2007. PMID 17612901

87. Nakashima-Yasuda, Uryu, K, Robinson J, Xie S, Hurtig H, Duda J, Arnold S, Siderowf A, Grossman M, Leverenz J, Woltjer R, Lopez OL, **Hamilton R**, Tsuang DW, Galaska D, Masliah M, Kaye J, Clark C, Montine TJ, Lee VMY, Trojanowski J. Co-morbidity of TDP-43 Proteinopathy in Lewy Body Related Diseases. Acta Neuropathol 114:221-9, 2007.  PMID 17653732

88. McIntyre JA, **Hamilton RL**, DeKosky ST. Redox-reactive autoantibodies in cerebrospinal fluids.  Ann NY Acad Sci 1109:296-302, 2007. PMID 17785318

89. Okada H, Lieberman FS, Walter KA, Lunsford LD, Kondziolka DS, Bejjani GK, **Hamilton RL**, Torres-Trejo A, Kalinski P, Cai Q, Mabold JL, Edington HD, Butterfield LH, Whiteside TL, Potter DM, Schold SC Jr., Pollack IF  Autologous glioma cell vaccine admixed with interleukin-4 gene transfected fibroblasts in the treatment of patients with malignant gliomas.  J Transl Med 5:67, 2007.  PMID 18093335. **PMCID: PMC2254376**

90. Beach TG, White CL, **Hamilton, RL**, Duda JE, Iwatsubo T, Dickson DW, Leverenz JB, Roncaroli F, Buttini M, Hladik CL, Sue LI, Noorigian JV, Adler CH.  Evaluation of alpha-synuclein immunohistochemical methods used by invited experts.  Acta Neuropathol 116:277-88, 2008. PMID 18626651. **PMCID: PMC2708176**

91. Ikonomovic MD, Klunk WE, Abrahamson EE, Mathis CA, Price JC, Tsopelas ND, Lopresti BJ, Ziolko S, Bi W, Paljug WR, Debnath ML, Hope CE, Isanski BA, **Hamilton RL**, DeKosky ST. Post-

**Ronald L. Hamilton, M.D.**

mortem correlates of in vivo PiB-PET amyloid imaging in a typical case of Alzheimers disease. Brain  131(Pt 6):1630-45, 2008.  PMID  18339640. **PMCID:  PMC2408940**

92.  Leverenz JB, **Hamilton R**, Tsuang DW, Schantz A, Vavrek D, Larson EB, Kukall WA, Lopez O, Galasko D, Masliah E, Woltjer R, Clark C, Trojanowski JQ, Montine TJ. Empiric refinement of the pathologic assessment of Lewy-related pathology in the dementia patient.  Brain Pathol 18:220-224, 2008. PMID 18241249.  **PMCID:  PMC2689097  NIHMS29359**

93.  Raja AI, Yeaney GA, Jakacki RI, **Hamilton RL**, Pollack IF  Extraventricular neurocytoma in neurofibromatosis Type I: Case report.  J Neurosurg Pediatrics 2:63-67, 2008.PMID 18590398

94.  Okada H, Low KL, Kohanbash G, McDonald HA, **Hamilton RL**, Pollack IF.  Expression of glioma-associated antigens in pediatric brain stem and non-brain stem gliomas.  J Neurooncol 88:245-50, 2008. PMID 18324354.  **PMCID:  PMC2561297 NIHMS70086**

95.  Venneti S, Lopresti BJ, Wang G, **Hamilton RL**, Mathis CA, Klunk WE, Apte UM, Wiley CA. PK11195 labels activated microglia in Alzheimer's disease and in vivo in a mouse model using PET.  Neurobiol Aging 2009, 30:1217-26. PMID 18178291

96.  Mullett SJ, **Hamilton RL**, Hinkle DA.  DJ-1 immunoreactivity in human brain astrocytes is dependent on infarct presence and infarct age. Neurology 2009, 29:125-31. PMID 18647263

97.  Park DM, Yeaney GA, **Hamilton RL**, Mabold J, Urban N, Appleman L, Flickinger J, Lieberman F, Mintz A.  Identifying Muir-Torre syndrome in a patient with glioblastoma multiforme.  Neuro Oncol, 2009 11:452-5. PMID 19028998.  )

98.  Horbinski C, Bartynski WS, Carson-Walter E, **Hamilton RL**, Tan HP, Cheng S.  Reversible encephalopathy after cardiac transplantation:  Histologic evidence of endothelial activation, T-cell specific trafficking, and vascular endothelial growth factor expression.  Am J Neuroradiol 2008 30:588-90. PMID 18854444.

99.  Northcott P, Nakahara Y, Peacock J, Ellison D, Croul S, Feuk L, Ra YS, Kongham P, Zilerberg K, Mack S, McLeod J, Scherer S, Rao S, Grajkowska W, Gillespie Y, Lach B, Grundy R, Pollack IF, **Hamilton RL,** Van Meter T, Carlotti C, Boop R, Bigner D, Gilbertson R, Rutka J, Taylor MD. Multiple recurrent genetic events converge on control of histone lysine methylation in medulloblastoma.  Nat Genet 2009 41:465-72. PMID 19270706.

100. Ueda R, Kohanbash G, Sasaki K, Fujita M, Zhu X, Kastenhuber ER, McDonald HA, Potter DM, **Hamilton RL,** Lotze MT, Khan SA, Sobol RW, Okada H.  Dicer-regulated microRNAs 222 and 339 promote resistance of cancer cells to cytotoxic T-lymphocytes by down-regulation of ICAM-1.  Proc Natl Acad Sci U S A. 2009 Jun 30;106(26):10746-51.  PMID: 19520829

101.  Maki RA, Tyurin VA, Lyon RC, **Hamilton RL**, DeKosky ST, Kagan VE, Reynolds WF.  Aberrant expression of myeloperoxidase in astrocytes promotes phospholipid oxidation and memory deficits in a mouse model of Alzheimer disease. J Biol Chem. 2009 Jan 30;284(5):3158-69. PMID: 19059911.

102.  Horbinski C, **Hamilton RL**, Lovell C, Burnham J, Pollack IF.  Impact of morphology, MIB-1, p53, and MGMT on Outcome in Pilocytic Astrocytomas.  Brain Pathology 2010; 20:581-8  e-pub Sept 21, 2009

103.  Armstrong RA, Ellis W, **Hamilton RL**, MacKenzie IR, Hedreen J, Gearing M, Montine T, Vonsattel JP, Head E, Lieberman AP, Cairns NJ.  Neuropathological heterogeneity in frontotemporal lobar degeneration with TDP-43 proteinopathy: a quantitative study of 94 cases using principle components analysis.  J Neural Transm 2010, 117:227-239.

**Ronald L. Hamilton, M.D.**

104. Horbinski C, **Hamilton RL**, Nikiforov Y, Pollack IF.  Association of molecular alterations, including BRAF, with biology and outcome in pilocytic astrocytomas.  Acta Neuropathol 2010 Jan 1, e-pub.

105. Van Deerlin VM, Sleiman PM, Martinez-Lage M, Chen-Plotkin A, Wang LS, Graff-Radford NR, Dickson DW, Rademakers R, Boeve BF, Grossman M, Arnold SE, Mann DM, Pickering-Brown SM, Seelaar H, Heutink P, van Swieten JC, Murrell JR, Ghetti B, Spina S, Grafman J, Hodges J, Spillantini MG, Gilman S, Lieberman AP, Kaye JA, Woltjer RL, Bigio EH, Mesulam M, Al-Sarraj S, Troakes C, Rosenberg RN, White CL 3rd, Ferrer I, Lladó A, Neumann M, Kretzschmar HA, Hulette CM, Welsh-Bohmer KA, Miller BL, Alzualde A, de Munain AL, McKee AC, Gearing M, Levey AI, Lah JJ, Hardy J, Rohrer JD, Lashley T, Mackenzie IR, Feldman HH, **Hamilton RL**, Dekosky ST, van der Zee J, Kumar-Singh S, Van Broeckhoven C, Mayeux R, Vonsattel JP, Troncoso JC, Kril JJ, Kwok JB, Halliday GM, Bird TD, Ince PG, Shaw PJ, Cairns NJ, Morris JC, McLean CA, DeCarli C, Ellis WG, Freeman SH, Frosch MP, Growdon JH, Perl DP, Sano M, Bennett DA, Schneider JA, Beach TG, Reiman EM, Woodruff BK, Cummings J, Vinters HV, Miller CA, Chui HC, Alafuzoff I, Hartikainen P, Seilhean D, Galasko D, Masliah E, Cotman CW, Tuñón MT, Martínez MC, Munoz DG, Carroll SL, Marson D, Riederer PF, Bogdanovic N, Schellenberg GD, Hakonarson H, Trojanowski JQ, Lee VM.  Common variants at 7p21 are associated with frontotemporal lobar degeneration with TDP-43 inclusions. Nat Genet 2010 42:234-239.

106. Omalu BI, **Hamilton RL**, Kamboh MI, DeKosky ST, Bailes J.  Chronic traumatic encephalopathy in a National Football League Player: Case report and emerging medicolegal practice questions.  J Forensic Nurs, 2010, 6: 40-46.

107. Caltagarone J, **Hamilton RL**, Murdoch G, Jing Z, DeFranco DB, Bowser R. Paxillin and hydrogen peroxide-induced clone 5 expression and distribution in control and Alzheimer disease hippocampi. J Neuropathol Exp Neurol. 2010: 69:356-71.

108. Pollack IF, **Hamilton RL**, Sobol RW, Nikiforova MN, Lyons-Weiler MA, Laframboise WA, Burger PC, Brat DJ, Rosenblum MK, Holmes EJ, Zhou T, Jakacki RI; for the Children's Oncology Group. IDH1 mutations are common in malignant gliomas arising in adolescents: a report from the Children's Oncology Group. Childs Nerv Syst. 2010; 27:87-94

109. Jun G, Naj AC, Beecham GW, Wang LS, Buros J, Gallins PJ, Buxbaum JD, Ertekin-Taner N, Fallin MD, Friedland R, Inzelberg R, Kramer P, Rogaeva E, St George-Hyslop P, Arnold SE, Baldwin CT, Barber R, Beach T, Bigio EH, Bird TD, Boxer A, Burke JR, Cairns N, Carroll SL, Chui HC, Clark DG, Cotman CW, Cummings JL, Decarli C, Diaz-Arrastia R, Dick M, Dickson DW, Ellis WG, Fallon KB, Farlow MR, Ferris S, Frosch MP, Galasko DR, Gearing M, Geschwind DH, Ghetti B, Gilman S, Giordani B, Glass J, Graff-Radford NR, Green RC, Growdon JH, **Hamilton RL**, Harrell LE, Head E, Honig LS, Hulette CM, Hyman BT, Jicha GA, Jin LW, Johnson N, Karlawish J, Karydas A, Kaye JA, Kim R, Koo EH, Kowall NW, Lah JJ, Levey AI, Lieberman A, Lopez OL, Mack WJ, Markesbery W, Marson DC, Martiniuk F, Masliah E, McKee AC, Mesulam M, Miller JW, Miller BL, Miller CA, Parisi JE, Perl DP, Peskind E, Petersen RC, Poon W, Quinn JF, Raskind M, Reisberg B, Ringman JM, Roberson ED, Rosenberg RN, Sano M, Schneider JA, Schneider LS, Seeley W, Shelanski ML, Smith CD, Spina S, Stern RA, Tanzi RE, Trojanowski JQ, Troncoso JC, Van Deerlin VM, Vinters HV, Vonsattel JP, Weintraub S, Welsh-Bohmer KA, Woltjer RL, Younkin SG, Cantwell LB, Dombroski BA, Saykin AJ, Reiman EM, Bennett DA, Morris JC, Lunetta KL, Martin ER, Montine TJ, Goate AM, Blacker D, Tsuang DW, Beekly D, Cupples LA, Hakonarson H, Kukull W, Foroud TM, Haines J, Mayeux R, Farrer LA, Pericak-Vance MA, Schellenberg GD; Alzheimer's Disease Genetics Consortium, Arnold SE, Baldwin CT, Barber R, Beach T, Bigio EH, Bird TD, Boxer A, Burke JR, Cairns N, Carroll SL, Chui HC, Clark DG, Cotman CW, Cummings JL, Decarli C, Diaz-Arrastia R, Dick M, Dickson DW, Ellis WG, Fallon KB, Farlow MR, Ferris S, Frosch MP, Galasko DR, Gearing M, Geschwind DH, Ghetti B, Gilman S, Giordani B, Glass J, Graff-Radford NR, Green RC, Growdon JH, Hamilton RL, Harrell LE, Head E, Honig LS, Hulette CM, Hyman BT, Jicha GA, Jin LW, Johnson N, Karlawish J, Karydas A, Kaye JA, Kim R, Koo EH, Kowall NW, Lah JJ, Levey AI, Lieberman A, Lopez OL, Mack WJ, Markesbery W, Marson DC, Martiniuk F, Masliah E, McKee AC, Mesulam M, Miller JW, Miller BL, Miller CA, Parisi JE, Perl DP, Peskind E, Petersen RC, Poon W, Quinn JF, Raskind M, Reisberg B, Ringman JM, Roberson ED, Rosenberg RN, Sano M, Schneider JA, Schneider LS, Seeley W, Shelanski ML, Smith CD, Spina S, Stern RA, Tanzi RE, Trojanowski JQ, Troncoso JC, Van Deerlin VM, Vinters HV, Vonsattel JP, Weintraub S, Welsh-Bohmer KA, Woltjer RL, Younkin SG. Meta-analysis confirms CR1, CLU and PICALM as Alzheimer Disease Risk Loci and reveals interactions with APOE Genotypes. Arch Neurol, 2010, Sep 3 (epub ahead of print)

110. Pollack IF, **Hamilton RL**, Burger PC, Brat DJ, Rosenblum MK, Murdoch GH, Nikiforova MN, Holmes EJ, Zhou T, Cohen KJ, Jakacki RI; Children's Oncology Group. Akt activation is a common event in pediatric malignant gliomas and a potential adverse prognostic marker: a report from the Children's Oncology Group. J Neurooncol. 2010 Sep;99(2):155-63. Epub 2010 Jul 4

**Ronald L. Hamilton, M.D.**

111. Pollack IF, **Hamilton RL**, Sobol RW, Nikiforova MN, Nikiforov YE, Lyons-Weiler MA, Laframboise WA, Burger PC, Brat DJ, Rosenblum MK, Gilles FH, Yates AJ, Zhou T, Cohen KJ, Finlay JL, Jakacki RI; for the Children's Oncology Group. Mismatch repair deficiency is an uncommon mechanism of alkylator resistance in pediatric malignant gliomas: a report from the Children's Oncology Group. Pediatr Blood Cancer 2010 Jun 29 epub ahead of print

112. Bonneh-Barkay D, Wang G, Starkey A, **Hamilton RL**, Wiley CA. In vivo CHI3L1 (YKL-40) expression in astrocytes in acute and chronic neurological diseases. J Neuroinflammation 2010 Jun 11:7-34.

113. Hinkle DA, Mullett SJ, Gabris BE, **Hamilton RL**. DJ-1 expression in glioblastomas shows positive correlation with p53 expression and negative correlation with epidermal growth factor receptor amplification. Neuropathology 2010 May 19 (epub ahead of print)xx

114. Okada H, Kalinski P, Ueda R, Hoji A, Kohanbash G, Donegan TE, Mintz AH, Engh JA, Bartlett DL, Brown CK, Zeh H, Holtman MP, Reinhart TA, Whiteside TL,Butterfield LH, **Hamilton RL**, Potter DM, Pollack IF, Salazar AM, Lieberman FS. Induction of CD8+ T-cell responses against novel glioma-associated antigen peptides and clinical activity by vaccinations with {alpha}-type 1 polarized dendritic cells and polyinosinic-polycytidylic acid stabilized by lysine and carboxymethylcellulose In patients with recurrent malignant glioma. J Clin Oncol. 2011;29:330-6.PMID: 21149657

115. Kofler J, Bartynski WS, Reynolds TQ, Lieberman FS, Murdoch GH, **Hamilton RL**. Posterior reversible encephalopathy syndrome (PRES) with immune system activation, VEGF up-regulation, and cerebral amyloid angiopathy. J. Comput Assist Tomogr. 2011; 35:39-42. PMID: 21150450

116. Bonfield CM, Amin D, **Hamilton RL**, Gerszten PC. Extramedullary ependymoma near the conus medullaris with lumbar nerve root attachment: case report. Neurosurgery. 2011 Mar;68:E831-4. PMID:21311277

117. Fujita M, Kohanbash G, Fellows-Mayle W, **Hamilton RL**, Komohara Y, Decker SA, Ohlfest JR, Okada H.COX-2 blockade suppresses gliomagenesis by inhibiting myeloid-derived suppressor cells. Cancer Res. 2011 Apr 1;71:2664-74. Epub 2011 Feb 15. PMID: 21324923

118. Cohen KJ, Pollack IF, Zhou T, Buxton A, Holmes EF, Burger PC, Brat DJ, Rosenblum MK, **Hamilton RL**, Lavey RS, Heideman RL. Temozolomide in the treatment of high-grade gliomas in children: a report from the Children's Oncology Group. Neuro Oncol. 2011 Mar;13:317-23. PMID: 21339192

119. Omalu B, Bailes J, **Hamilton RL**, Kamboh MI, Hammers J, Case M, Fitzsimmons R. Emerging histomorphologic phenotypes of chronic traumatic encephalopathy in American athletes. Neurosurgery. 2011 Jul;69:173-83; discussion 183. PMID: 21358359

120. Tang JB, Svilar D, Trivedi RN, Wang XH, Goellner EM, Moore B, **Hamilton RL**, Banze LA, Brown AR, Sobol RW. N-methylpurine DNA glycosylase and DNA polymerase beta modulate BER inhibitor potentiation of glioma cell to temozolomide. Neurosurgery Oncol. 2011;13:471-86. PMID: 21377995

121. Liu KW, Feng H, Bachoo R, Kazlauskas A, Smith EM, Symes K, **Hamilton RL**, Nagane M, Nishikawa R, Hu, B, Cheng Sy. SHP-2/PTPN 11 mediates gliomagenesis driven by PDGFRA and INK4A/ARF aberrations in mice and humans. J. Clin Invest. 2011 Mar;121:905-17. PMID: 21393858

122. Naj AC, Jun G, Beecham GW, Wang LS, Vardarajan BN, Buros J, Gallins PJ, Buxbaum JD, Jarvidk GP, Crane PK, Larson EB, Bird TB, Boeve BF, Graff-Radford NR, De Jager PL, Evans D, Schneider JA, Carrasquillo MM, Ertekin-Taner N, Younkin SG, Cruchaga C, Kauwe JS, Nowotny P, Kramer P, Hardy J, Huentelman MJ, Myers AJ, Barmada MM, Demirci FY, Baldwin CT, Green RC, Rogaeva E, St. George-Hyslop P, Arnold SE, Barber R, Beach T, Bigio EH, Bowen JD, Boxer A, Burke JR, Cairns NJ, Carlson CS, Carney RM, Carroll SL, Chui HC, Clark DG, Corneveaux J, Cotman CW, Cummings JL, Decarli C, DeKosy ST, Diaz-Arrastia R, Dick M, Dickson DW, Ellis WG, Faber KM, Fallon KB, Farlow MR, Ferris S. Frosch MP, Galasko Dr, Ganguli M, Gearing M, Geschwind DH, Ghetti B, Gilbert JR, Gilman S, Giordani B, Glass JD, Growdon JH, **Hamilton RL**,R, Koo EH, Kowall NW, Lah JJ, Levey AI, Lieberman AP, Lopez OL, Mack WJ, Marson DC, Martiniuk F, Mash DC, Masliah E, McCormick WC, McCurry SM, McDavid AN, McKee AC, Mesulam M, Miller BL, Miller JW, Parisi JE, Perl DP, Peskind E,Petersen, RC, Poon, WV, Quinn JF, Rajbhandary RA, Raskind M, Reisberg B, Ringman JM, Roberson ED, Rosenberg RN,Sano M, Schneider LS, Seeley W, Shelanksi ML, Slifer MA, Smith CD, Sonnen JA, Spina S. Stern RA, Tanzi RE, Trojanowski JQ, Troncoso JC, Van Deerlin VM, Vinters HV, Vonsattel JP, Weintraub S, Welsh-Bohmer KA, Williamson

**Ronald L. Hamilton, M.D.**

J, Woltjer RL,Cantwell LB, Dombroski BA, Beekly D, Lunetta KL, Martin ER, Kamboh MI, Saykin AJ, Reiman EM, Bennett DA, Morris JC, Montine TJ, Goate AM, Iacker D, Tsuang DW, Hakonarson, H, Kukull WA, Foroud TM, Haines JL, Mayeux R, Pericak-Vance MA, Farrer LA, Schellenberg GD. Commons variants as MS4A4/MS4A6E, CD2AP, CD33 and EPHA1 are associated with late Onset Alzheimer's Disease. Nat Genet. 2011 May;43:436-41 Epub 2011 Apr 3. PMID: 21460841

123.    Chen-Plotkin AS, Martinez-Lage M,Sleiman PM, Hu W, Greene R, Wood EM, Bing S, Grossman M, Schellenberg GD, Hatanpaa KJ, Weiner MF, White CL 3rd, Brooks WS, Halliday GM, Kril JJ, Gearing M, Beach TG, Graff-Radford NR, Dickson DW, Rademakers R, Boeve BF, Pickering-Brown SM, Snowden J, van Swieten JC, Heutink P, Seelaar H, Murrell JR, Ghetti B, Spina S, Grafman J, Kaye JA, Woltjer RL, Mesulam M, Bigio E, Llad'o A, Miller BL, Alzualde A, Moreno F,Rohrer JD, Mackenzie IR, Feldman HH, **Hamilton RL**, Cruts M, Engelborghs S, De Deyn PP, Van Broeckhoven C, Bird TD, Cairns NJ, Goate A, Frosch MP, Riederer PF, Bogdanovic N, Lee VM, Trojanowksi JQ, Van Deerlin VM. Genetic and clinical features of progranulin-associated frontotemporal lobar degeneration. Arch Neurol. 2011 Apr;68:488-97. PMID: 21482928

124.    Nikiforova MN, **Hamilton RL**. Molecular diagnostics of gliomas. Arch Pathol Lab Med. 2011 May;135:558-68. Review. PMID: 21526954

125.    Monaco EA 3rd, Armah HB, Nikiforova MN, **Hamilton RL**, Engh JA. Grade II Oligodendroglioma localized to the corpus callosum. Brain Tumor Pathol. 2011 Oct;28:305-9. Epub 2011 Jul 22. PMID: 21833577

126.    Horbinski C, Hobbs, J, Cieply K, Dacic S, **Hamilton RL.** EGFR expression stratifies oligodendroglioma behavior.Am J Pathol. 2011 Oct; 179:1638-44. Epub 2011 Aug 11. PMID: 21839716

127.    Omalu B, hammers, JL, bailes J, **Hamilton RL**. Kamboh MI, Webster G, Fitzsimmons RP. Chronic traumatic Encephalopathy in an Iraqi war veteran with posttraumatic stress disorder who committed suicide. Neurosurg Focus. 2011 Nov; :E3. PMID: 22044102

128.    Liu Y, Komohara Y, Domenick N, Ohno M, Ikeura M, **Hamilton RL**, Horbinski C, Wang X, Ferrone S, Okada H. Expression of antigen processing molecules in brain metastasis of breast cancer. Cancer Immunol Immunother. 2011 Nov 8. (Epub ahead of print } PMID:22065046

129.    Feng H, Hu B, Liu KW, Li Y, Lu X, Cheng T, Yiin JJ, Lu S, Keezer S, Fenton T, Furnari FB, **Hamilton RL**, Vuori K, Sarkaria JN, Nagane M, Nishikawa R, Cavenee WK, Cheng SY. Activation of Rac 1 by src-dependent phosphorylation of Dock180(Y1811) mediates PDGFRa-stimulated glioma tumorigenesis in mice and humans. J Clin Invest. 2011 Dec; 121:4670-84. doi: 10.1172/JCI58559. Epub 2011 Nov 14. PMID: 22080864

130.    Horbinski C, Nikiforova MN, Hobbs J, Bortoluzzi S. Cieply K, Dacic S, **Hamilton RL**. The importance of 10q status in an outcomes-based comparison between 1p/19q fluorescence in situ hybridization and polymerase chain reaction-based microsatellite loss of heterozygosity analysis of oligodendrogliomas. J. Neuropathol Exp Neurol. 2012 Jan;71:73-82. PMID: 22157622

131.    Ikonomovic MD, Abrahamson EE, Price JC, **Hamilton RL**, Mathis CA, Paljug WR, Cohen AD, Mizukami K, DeKosky ST, Lopez OL, Klunk WE. Early AD pathology in a {C-11} PiB-negative case: a PiB-amyloid imaging, biochemical, and Immunohistochemical study. Acta Neuropathol. 2012 Mar;123:433-47. Epub 2012 Jan 24. PMID: 22271153

132.    Feng H, Hu B, Jarzynka MJ, Li Y, Keezer S, Johns TG, Tang CK, **Hamilton RL**, Vuuori K, Nishikawa R, Sarkaria JN, Fenton T, Cheng T, Furnari FB, Cavenee WK, Cheng SY. Phosphorylation of dedicator of cytokinesis 1(Dock 180) at tyrosine residue Y722 by Src family kinases mediates EGRFvIII-driven glioblastoma tumorigenesis. Proc Natl Acad Sci U S A. 2012 Feb 21;109:3018-23. Epub 2012 Feb 7. PMID: 22323579

133.    Wu Y, Lou H, Alerte TN, Stachowski EK, Chen J, Singleton AB, **Hamilton RL**, Perez RG. Neuroscience. 2012 Jan 25. {Epubahead a print} PMID: 22326202

134.    Murray PS, Kirkwood CM, Gray MC, Ikonomovic MD, Paljug WR, Abrahamson EE, Henteleff RA, **Hamilton RL**, Kofler JK, Klunk WE, Lopez OL, Penzes P, Sweet RA. β-Amyloid 42/40 ratio and kalirin expression in Alzheimer disease with psychosis. Neurobiol Aging. 2012 Mar 17. [Epub ahead of print] PMID:22429885

**Ronald L. Hamilton, M.D.**

135.    Choi SH, Olabarrieta M, Lopez OL, Maruca V, DeKosky ST, **Hamilton RL**, Becker JT. Gray Matter Atrophy Associated with Extrapyramidal Signs in the Lewy Body Variant of Alzheimer's Disease. J Alzheimers Dis. 2012 Aug 9. [Epub ahead of print] PMID:22886020

136.    Armstrong RA, **Hamilton RL**, Mackenzie IR, Hedreen J, Cairns NJ. Laminar Distribution of the Pathological Changes in Sporadic Frontotemporal Lobar Degeneration with TDP-43 Proteinopathy: A Quantitative Study Using Polynomial Curve Fitting. Neuropathol Appl Neurobiol. 2012 Jul 16. [Epub ahead of print] PMID:22804696

137.    Atkinson DM, **Hamilton RL** A 52-year-old male with visual changes. Brain Pathol. 2012 Jul;22(4):575-8. PMID:22697384

138.    Zou F, Chai HS, Younkin CS, Allen M, Crook J, Pankratz VS, Carrasquillo MM, Rowley CN, Nair AA, Middha S, Maharjan S, Nguyen T, Ma L, Malphrus KG, Palusak R, Lincoln S, Bisceglio G, Georgescu C, Kouri N, Kolbert CP, Jen J, Haines JL, Mayeux R, Pericak-Vance MA, Farrer LA, Schellenberg GD; Alzheimer's Disease Genetics Consortium, Petersen RC, Graff-Radford NR, Dickson DW, **Hamilton RL**, Younkin SG, Ertekin-Taner N. Brain expression genome-wide association study (eGWAS) identifies human disease-associated variants. PLoS Genet. 2012;8(6): e1002707. Epub 2012 Jun 7 PMID:22685416

139.    Horbinski C, Nikiforova MN, Hagenkord JM, **Hamilton RL**, Pollack IF. Interplay among BRAF, p16, p53, and MIB1 in pediatric low-grade gliomas. Neuro Oncol. 2012 Jun;14(6):777-89 (1012) PMID:22492957

140.    Hobbs J, Nikiforova MN, Fardo DW, Bortoluzzi S, Cieply K, **Hamilton RL**, Horbinski C. Paradoxical relationship between the degree of EGFR amplification and outcome in glioblastomas. Am J Surg Pathol. 2012 Aug;36(8):1186-93. PMID:22472960

141. Armstrong, R. A., **R. L. Hamilton**, I. R. Mackenzie, J. Hedreen and N. J. Cairns. "Laminar Distribution of the Pathological Changes in Sporadic Frontotemporal Lobar Degeneration with Transactive Response (Tar) DNA-Binding Protein of 43 Kda (Tdp-43) Proteinopathy: A Quantitative Study Using Polynomial Curve Fitting." *Neuropathol Appl Neurobiol* 39, no. 4 (2013): 335-47.

142. Clark, K. H., J. L. Villano, M. N. Nikiforova, **R. L. Hamilton** and C. Horbinski. "1p/19q Testing Has No Significance in the Workup of Glioblastomas." *Neuropathol Appl Neurobiol*,  (2013).

143. Gheorghe, G., O. Radu, S. Milanovich, **R. L. Hamilton**, R. Jaffe, J. F. Southern and J. A. Ozolek. "Pathology of Central Nervous System Posttransplant Lymphoproliferative Disorders: Lessons from Pediatric Autopsies." *Pediatr Dev Pathol* 16, no. 2 (2013): 67-73.

1444. Holton, P., M. Ryten, M. Nalls, D. Trabzuni, M. E. Weale, D. Hernandez, H. Crehan, J. R. Gibbs, R. Mayeux, J. L. Haines, L. A. Farrer, M. A. Pericak-Vance, G. D. Schellenberg, M. Ramirez-Restrepo, A. Engel, A. J. Myers, J. J. Corneveaux, M. J. Huentelman, A. Dillman, M. R. Cookson, E. M. Reiman, A. Singleton, J. Hardy and R. Guerreiro. "Initial Assessment of the Pathogenic Mechanisms of the Recently Identified Alzheimer Risk Loci." *Ann Hum Genet* 77, no. 2 (2013): 85-105.

145. Miyashita, A., A. Koike, G. Jun, L. S. Wang, S. Takahashi, E. Matsubara, T. Kawarabayashi, M. Shoji, N. Tomita, H. Arai, T. Asada, Y. Harigaya, M. Ikeda, M. Amari, H. Hanyu, S. Higuchi, T. Ikeuchi, M. Nishizawa, M. Suga, Y. Kawase, H. Akatsu, K. Kosaka, T. Yamamoto, M. Imagawa, T. Hamaguchi, M. Yamada, T. Moriaha, M. Takeda, T. Takao, K. Nakata, Y. Fujisawa, K. Sasaki, K. Watanabe, K. Nakashima, K. Urakami, T. Ooya, M. Takahashi, T. Yuzuriha, K. Serikawa, S. Yoshimoto, R. Nakagawa, J. W. Kim, C. S. Ki, H. H. Won, D. L. Na, S. W. Seo, I. Mook-Jung, P. St George-Hyslop, R. Mayeux, J. L. Haines, M. A. Pericak-Vance, M. Yoshida, N. Nishida, K. Tokunaga, K. Yamamoto, S. Tsuji, I. Kanazawa, Y. Ihara, G. D. Schellenberg, L. A. Farrer and R. Kuwano. "Sorl1 Is Genetically Associated with Late-Onset Alzheimer's Disease in Japanese, Koreans and Caucasians." *PLoS One* 8, no. 4 (2013): e58618.

146. Pang, B., M. B. Durso, **R. L. Hamilton** and M. N. Nikiforova. "A Novel Cold-Pcr/Fmca Assay Enhances the Detection of Low-Abundance Idh1 Mutations in Gliomas." *Diagn Mol Pathol* 22, no. 1 (2013): 28-34.

147. Reitz, C., G. Jun, A. Naj, R. Rajbhandary, B. N. Vardarajan, L. S. Wang, O. Valladares, C. F. Lin, E. B. Larson, N. R. Graff-Radford, D. Evans, P. L. De Jager, P. K. Crane, J. D. Buxbaum, J. R. Murrell, T. Raj, N. Ertekin-Taner, M. Logue, C. T. Baldwin, R. C. Green, L. L. Barnes, L. B. Cantwell, M. D. Fallin, R. C. Go, P. Griffith, T. O. Obisesan, J. J. Manly, K. L. Lunetta, M. I. Kamboh, O. L. Lopez, D. A. Bennett, H. Hendrie, K. S. Hall, A. M. Goate, G. S. Byrd, W. A. Kukull, T. M. Foroud, J. L. Haines, L. A. Farrer, M. A. Pericak-Vance, G. D. Schellenberg and R. Mayeux. "Variants

**Ronald L. Hamilton, M.D.**

in the Atp-Binding Cassette Transporter (Abca7), Apolipoprotein E 4,and the Risk of Late-Onset Alzheimer Disease in African Americans." *JAMA* 309, no. 14 (2013): 1483-92.

148. Schlegel, J., M. J. Sambade, S. Sather, S. J. Moschos, A. C. Tan, A. Winges, D. DeRyckere, C. C. Carson, D. G. Trembath, J. J. Tentler, S. G. Eckhardt, P. F. Kuan, **R. L. Hamilton**, L. M. Duncan, C. R. Miller, N. 9. Nikolaishvili-Feinberg, B. R. Midkiff, J. Liu, W. Zhang, C. Yang, X. Wang, S. V. Frye, H. S. Earp, J. M. Shields and D. K. Graham. "Mertk Receptor Tyrosine Kinase Is a Therapeutic Target in Melanoma." *J Clin Invest* 123, no. 5 (2013): 2257-67.

150. Spina, S., A. D. Van Laar, J. R. Murrell, **R. L. Hamilton**, J. K. Kofler, F. Epperson, M. R. Farlow, O. L. Lopez, J. Quinlan, S. T. DeKosky and B. Ghetti. "Phenotypic Variability in Three Families with Valosin-Containing Protein Mutation." *Eur J Neurol* 20, no. 2 (2013): 251-8.

151. Tsuang, D., J. B. Leverenz, O. L. Lopez, **R. L. Hamilton,** D. A. Bennett, J. A. Schneider, A. S. Buchman, E. B. Larson, P. K. Crane, J. A. Kaye, P. Kramer, R. Woltjer, J. Q. Trojanowski, D. Weintraub, A. S. Chen-Plotkin, D. J. Irwin, J. Rick, G. D. Schellenberg, G. S. Watson, W. Kukull, P. T. Nelson, G. A. Jicha, J. H. Neltner, D. Galasko, E. Masliah, J. F. Quinn, K. A. Chung, D. Yearout, I. F. Mata, J. Y. Wan, K. L. Edwards, T. J. Montine and C. P. Zabetian. "Apoe Epsilon4 Increases Risk for Dementia in Pure Synucleinopathies." *JAMA Neurol* 70, no. 2 (2013): 223-8.

152. Yeung, J. T., **R. L. Hamilton**, K. Ohnishi, M. Ikeura, D. M. Potter, M. N. Nikiforova, S. Ferrone, R. I. Jakacki, I. F. Pollack and H. Okada. "Loh in the Hla Class I Region at 6p21 Is Associated with Shorter Survival in Newly Diagnosed Adult Glioblastoma." *Clin Cancer Res* 19, no. 7 (2013): 1816-26.

153. Yeung, J. T., **R. L. Hamilton**, H. Okada, R. I. Jakacki and I. F. Pollack. "Increased Expression of Tumor-Associated Antigens in Pediatric and Adult Ependymomas: Implication for Vaccine Therapy." *J Neurooncol* 111, no. 2 (2013): 103-11.

**154. Hamilton R**, Krauze M, Romkes M, Omolo B, Konstantinopoulos P, Reinhart T, Harasymczuk M, Wang Y, Lin Y, Ferrone S, Whiteside T, Bortoluzzi S, Werley J, Nukui T, Fallert-Junecko B, Kondziolka D, Ibrahim J, Becker D, Kirkwood J, Moschos S. Pathologic and gene expression features of metastatic melanomas to the brain.Cancer. 2013 Aug 1;119(15):2737-46. doi: 10.1002/cncr.28029. Epub 2013 May 21.PMID:23695963 [PubMed - in process]

155. Lam S, Grandhi R, Wong R, **Hamilton R**, Greene S. Neuromuscular hamartoma of the sciatic nerve: Case report and review of the literature. Surg Neurol Int. 2013;4:8. doi: 10.4103/2152-7806.106266. Epub 2013 Jan 18.PMID:23493803[PubMed]

156. Reitz C, Mayeux R; Alzheimer's Disease Genetics Consortium. TREM2 and neurodegenerative disease. N Engl J Med. 2013 Oct 17;369(16):1564-5. doi: 10.1056/NEJMc1306509#SA1. PMID:24131184

157. Tempel ZJ, Johnson SA, Richard PS, Friedlander RM, Rothfus WE, **Hamilton RL**. Parasellar arachnoid cyst presenting with a nonpupil sparing third nerve palsy mimicking a posterior communicating artery aneurysm in an adult. Surg Neurol Int. 2013 Jul 9;4:87. doi: 10.4103/2152-7806.114799. eCollection 2013.PMID:23956930

158. Murray PS, Kirkwood CM, Gray MC, Fish KN, Ikonomovic MD, **Hamilton RL**, Kofler JK, Klunk WE, Lopez OL, Sweet RA. Hyperphosphorylated tau is elevated in Alzheimer's Disease with psychosis. J Alzheimers Dis, 2014 204;39:759-773. PMID:24270207

159. Oborski MJ, Laymon CM, Lieberman FS, Drappatz J, **Hamilton RL**, Mountz JM. First use of (18)F-labeled ML-10 PET to assess apoptosis change in a newly diagnosed glioblastoma multiforme patient before and early after therapy. Brain Behav 2014 4:312-315. PMID:24683522

160 Shin SS, Murdoch G, Hamilton RL, Faraji AH, Kano H, Zwagerman NT, Gardner PA, Lunsford LD, Friedlander RM The Pathological Response of Cavernous Malformations Following Radiosurgery. J Neurosurg (in press).

160. Pollack IF, Jakacki RI, Butterfield LH, **Hamilton RL**, Panigrahy A, Potter DM, Connelly AK, Dibridge SA, Whiteside TL, Okada H. Antigen-specific immune responses and clinical outcome after vaccination with glioma-associated antigen peptides and polyvinosinic-polycytidylic Acid stabilized by lysine and carboxymethylcellulose in children with newly diagnosed malignant brainstem and nonbrainstem gliomas. J Clin Oncol. 2014 Jul 1;32(19):2050-8. PMID:24888813

161. Naj AC, Jun G, Reitz C, Kunkle BW, Perry W, Park YS, Beecham GW, Rajbhandary RA, Hamilton-Nelson KL, Wang LS, Kauwe JS, Huentelman MJ, Myers AJ, Bird TD, Boeve BF, Baldwin CT, Jarvik GP, Crane PK, Rogaeva E, Barmada MM, Demirci FY, Cruchaga C, Kramer PL, Ertekin-Taner N, Hardy J, Graff-Radford NR, Green RC, Larson

**Ronald L. Hamilton, M.D.**

EB, St George-Hyslop PH, Buxbaum JD, Evans DA, Schneider JA, Lunetta KL, Kamboh MI, Saykin AJ, Reiman EM, De Jager PL, Bennett DA, Morris JC, Montine TJ, Goate AM, Blacker D, Tsuang DW, Hakonarson H, Kukull WA, Foroud TM, Martin ER, Haines JL, Mayeux RP, Farrer LA, Schellenberg GD, Pericak-Vance MA; Alzheimer Disease Genetics Consortium, Albert MS, Albin RL, Apostolova LG, Arnold SE, Barber R, Barnes LL, Beach TG, Becker JT, Beekly D, Bigio EH, Bowen JD, Boxer A, Burke JR, Cairns NJ, Cantwell LB, Cao C, Carlson CS, Carney RM, Carrasquillo MM, Carroll SL, Chui HC, Clark DG, Corneveaux J, Cribbs DH, Crocco EA, DeCarli C, DeKosky ST, Dick M, Dickson DW, Duara R, Faber KM, Fallon KB, Farlow MR, Ferris S, Frosch MP, Galasko DR, Ganguli M, Gearing M, Geschwind DH, Ghetti B, Gilbert JR, Glass JD, Growdon JH, **Hamilton RL**, Harrell LE, Head E, Honig LS, Hulette CM, Hyman BT, Jicha GA, Jin LW, Karydas A, Kaye JA, Kim R, Koo EH, Kowall NW, Kramer JH, LaFerla FM, Lah JJ, Leverenz JB, Levey AI, Li G, Lieberman AP, Lin CF, Lopez OL, Lyketsos CG, Mack WJ, Martiniuk F, Mash DC, Masliah E, McCormick WC, McCurry SM, McDavid AN, McKee AC, Mesulam M, Miller BL, Miller CA, Miller JW, Murrell JR, Olichney JM, Pankratz VS, Parisi JE, Paulson HL, Peskind E, Petersen RC, Pierce A, Poon WW, Potter H, Quinn JF, Raj A, Raskind M, Reisberg B, Ringman JM, Roberson ED, Rosen HJ, Rosenberg RN, Sano M, Schneider LS, Seeley WW, Smith AG, Sonnen JA, Spina S, Stern RA, Tanzi RE, Thornton-Wells TA, Trojanowski JQ, Troncoso JC, Valladares O, Van Deerlin VM, Van Eldik LJ, Vardarajan BN, Vinters HV, Vonsattel JP, Weintraub S, Welsh-Bohmer KA, Williamson J, Wishnek S, Woltjer RL, Wright CB, Younkin SG, Yu CE, Yu L. .  Effects of multiple genetic Loci on age at onset in late-onset Alzheimer disease: a genome-wide association study.  JAMA Neurol. 2014 Nov 1;71(11):1394-404. doi: 10.1001/jamaneurol.2014.1491

162. Pollack IF, Jakacki RI, Butterfield LH, **Hamilton RL**, Panigrahy A, Potter DM, Connelly AK, Dibridge SA, Whiteside TL, Okada H.  Antigen-specific immune responses and clinical outcome after vaccination with glioma-associated antigen peptides and polyinosinic-polycytidylic acid stabilized by lysine and carboxymethylcellulose in children with newly diagnosed malignant brainstem and nonbrainstem gliomas.  J Clin Oncol. 2014 Jul 1;32(19):2050-8. doi: 10.1200/JCO.2013.54.0526. Epub 2014 Jun 2. PMID: 24888813

163.. Okada H, Butterfield LH, **Hamilton RL**, Hoji A, Sakaki M, Ahn BJ, Kohanbash G, Drappatz J, Engh J, Amankulor N, Lively MO, Chan MD, Salazar AM, Shaw EG, Potter DM, Lieberman FS.  Induction of robust type-1 CD8+ T-cell responses in WHO grade II low-grade glioma patients receiving peptide-based vaccines in combination with poly-ICLC Clin Cancer Res. 2014 Nov 25. pii: clincanres.1790.2014

164. Salloway S, Sperling R, Fox NC, Blennow K, Klunk W, Raskind M, Sabbagh M, Honig LS, Porsteinsson AP, Ferris S, Reichert M, Ketter N, Nejadnik B, Guenzler V, Miloslavsky M, Wang D, Lu Y, Lull J, Tudor IC, Liu E, Grundman M, Yuen E, Black R, Brashear HR; **Hamilton RL**,  Bapineuzumab 301 and 302 Clinical Trial Investigators.  Two phase 3 trials of bapineuzumab in mild-to-moderate Alzheimer's disease  N Engl J Med. 2014 Jan 23;370(4):322-33. doi: 10.1056/NEJMoa1304839.

165. Leone JP, Bhargava R, Theisen BK, **Hamilton RL**, Lee AV, Brufsky AM. Expression of high affinity folate receptor in breast cancer brain metastasis. Oncotarget. 2015 Jun 25. [Epub ahead of print]  PMID: 24450891

166. Wang LS, Naj AC, Graham RR, Crane PK, Kunkle BW, Cruchaga C, Murcia JD, Cannon-Albright L, Baldwin CT, Zetterberg H, Blennow K, Kukull WA, Faber KM, Schupf N, Norton MC, Tschanz JT, Munger RG, Corcoran CD, Rogaeva E; Alzheimer's Disease Genetics Consortium, Lin CF, Dombroski BA, Cantwell LB, Partch A, Valladares O, Hakonarson H, St George-Hyslop P, Green RC, Goate AM, Foroud TM, Carney RM, Larson EB, Behrens TW, Kauwe JS, Haines JL, Farrer LA, Pericak-Vance MA, Mayeux R, Schellenberg GD; National Institute on Aging-Late-Onset Alzheimer's Disease (NIA-LOAD) Family Study, Albert MS, Albin RL, Apostolova LG, Arnold SE, Barber R, Barmada M, Barnes LL, Beach TG, Becker JT, Beecham GW, Beekly D, Bennett DA, Bigio EH, Bird TD, Blacker D, Boeve BF, Bowen JD, Boxer A, Burke JR, Buxbaum JD, Cairns NJ, Cao C, Carlson CS, Carroll SL, Chui HC, Clark DG, Cribbs DH, Crocco EA, DeCarli C, DeKosky ST, Demirci F, Dick M, Dickson DW, Duara R, Ertekin-Taner N, Fallon KB, Farlow MR, Ferris S, Frosch MP, Galasko DR, Ganguli M, Gearing M, Geschwind DH, Ghetti B, Gilbert JR, Glass JD, Graff-Radford NR, Growdon JH, **Hamilton RL**, Hamilton-Nelson KL, Harrell LE, Head E, Honig LS, Hulette CM, Hyman BT, Jarvik GP, Jicha GA, Jin LW, Jun G, Jun G, Kamboh MI, Karydas A, Kaye JA, Kim R, Koo EH, Kowall NW, Kramer JH, LaFerla FM, Lah JJ, Leverenz JB, Levey AI, Li G, Lieberman AP, Lopez OL, Lunetta KL, Lyketsos CG, Mack WJ, Marson DC, Martin ER, Martiniuk F, Mash DC, Masliah E, McCormick WC, McCurry SM, McDavid AN, McKee AC, Mesulam WM, Miller BL, Miller CA, Miller JW, Montine TJ, Morris JC, Murrell JR, Olichney JM, Parisi JE, Perry W, Peskind E, Petersen RC, Pierce A, Poon WW, Potter H, Quinn JF, Raj A, Raskind M, Reiman EM, Reisberg B, Reitz C, Ringman JM, Roberson ED, Rosen HJ, Rosenberg RN, Sano M, Saykin AJ, Schneider JA, Schneider LS, Seeley WW, Smith AG, Sonnen JA, Spina S, Stern RA, Tanzi RE, Thornton-Wells TA, Trojanowski JQ, Troncoso JC, Tsuang DW, Van Deerlin VM, Van Eldik LJ, Vardarajan BN, Vinters HV, Vonsattel JP, Weintraub S, Welsh-Bohmer KA, Williamson J, Wishnek S, Woltjer RL, Wright CB, Younkin SG, Yu CE, Yu L.**Rarity of the Alzheimer disease-protective APP A673T variant in the United States.** JAMA Neurol. 2015 Feb;72(2):209-16. doi: 10.1001/jamaneurol.2014.2157.

**Ronald L. Hamilton, M.D.**

167. 2. Jun G, Ibrahim-Verbaas CA, Vronskaya M, Lambert JC, Chung J, Naj AC, Kunkle BW, Wang LS, Bis JC, Bellenguez C, Harold D, Lunetta KL, Destefano AL, Grenier-Boley B, Sims R, Beecham GW, Smith AV, Chouraki V, Hamilton-Nelson KL, Ikram MA, Fievet N, Denning N, Martin ER, Schmidt H, Kamatani Y, Dunstan ML, Valladares O, Laza AR, Zelenika D, Ramirez A, Foroud TM, Choi SH, Boland A, Becker T, Kukull WA, van der Lee SJ, Pasquier F, Cruchaga C, Beekly D, Fitzpatrick AL, Hanon O, Gill M, Barber R, Gudnason V, Campion D, Love S, Bennett DA, Amin N, Berr C, Tsolaki M, Buxbaum JD, Lopez OL, Deramecourt V, Fox NC, Cantwell LB, Tárraga L, Dufouil C, Hardy J, Crane PK, Eiriksdottir G, Hannequin D, Clarke R, Evans D, Mosley TH Jr, Letenneur L, Brayne C, Maier W, De Jager P, Emilsson V, Dartigues JF, Hampel H, Kamboh MI, de Bruijn RF, Tzourio C, Pastor P, Larson EB, Rotter JI, O'Donovan MC, Montine TJ, Nalls MA, Mead S, Reiman EM, Jonsson PV, Holmes C, St George-Hyslop PH, Boada M, Passmore P, Wendland JR, Schmidt H, Morgan K, Winslow AR, Powell JF, Carasquillo M, Younkin SG, Jakobsdóttir J, Kauwe JS, Wilhelmsen KC, Rujescu D, Nöthen MM, Hofman A, Jones L; IGAP Consortium, Haines JL, Psaty BM, Van Broeckhoven C, Holmans P, Launer LJ, Mayeux R, Lathrop M, Goate AM, Escott-Price V, Seshadri S, Pericak-Vance MA, Amouyel P, Williams J, van Duijn CM, Schellenberg GD, Farrer LA and . Collaborators (including **Hamilton RL**) (296) **A novel Alzheimer disease locus located near the gene encoding tau protein**. Mol Psychiatry. 2015 Mar 17. doi: 10.1038/mp.2015.23.

168. . Østergaard SD, Mukherjee S, Sharp SJ, Proitsi P, Lotta LA, Day F, Perry JR, Boehme KL, Walter S, Kauwe JS, Gibbons LE; Alzheimer's Disease Genetics Consortium; GERAD1 Consortium; EPIC-InterAct Consortium, Larson EB, Powell JF, Langenberg C, Crane PK, Wareham NJ, Scott RA.
Collaborators (including **Hamilton RL**) (296)  Associations between Potentially Modifiable Risk Factors and Alzheimer Disease: A Mendelian Randomization Study. PLoS Med. 2015 Jun 16;12(6):e1001841; discussion e1001841. doi:

169. Wang P, Bahreini A, Gyanchandani R, Lucas PC, Hartmaier RJ, Watters RJ, Jonnalagadda AR, Trejo Bittar HE, Berg A, **Hamilton RL**, Kurland BF, Weiss KR, Mathew A, Leone JP, Davidson NE, Nikiforova MN, Brufsky AM, Ambros TF, Stern AM, Puhalla SL, Lee AV, Oesterreich S. Sensitive detection of mono- and polyclonal ESR1 mutations in primary tumors, metastatic lesions and cell free DNA of breast cancer patients. Clin Cancer Res. 2015 Oct 23. pii: 1534.2015. PMID: 26500237

170. Salgado CM, Basu D, Nikiforova M, **Hamilton RL**, Gehris R, Jakacki R, Panigrahy A, Yatsenko S, Reyes-Múgica M. Amplification of mutated NRAS leading to congenital melanoma in neurocutaneous melanocytosis. Melanoma Res. 2015 Oct;25(5):453-60.  PMID: 26266759

171. Shin SS, Murdoch G, Hamilton RL, Faraji AH, Kano H, Zwagerman NT, Gardner PA, Lunsford LD, Friedlander RM. Pathological response of cavernous malformations following radiosurgery. J Neurosurg. 2015 Oct;123(4):938-44. doi: 10.3171/2014.10.JNS14499. Epub 2015 Jun 19. PMID: 26090838

--------------------

172. Mukherjee S, Walter S, Kauwe JS, Saykin AJ, Bennett DA, Larson EB, Crane PK, Glymour MM; Adult Changes in Thought Study Investigators; Religious Orders Study/Memory and Aging Project Investigators; Alzheimer's Disease Genetics Consortium. Alzheimers Dement. Genetically predicted body mass index and Alzheimer's disease-related phenotypes in three large samples: Mendelian randomization analyses. 2015 Dec;11(12):1439-51. doi: 10.1016/j.jalz.2015.05.015. Epub 2015 Jun 12. PMID: 26079416

173. Ghani M, Reitz C, Cheng R, Vardarajan BN, Jun G, Sato C, Naj A, Rajbhandary R, Wang LS, Valladares O, Lin CF, Larson EB, Graff-Radford NR, Evans D, De Jager PL, Crane PK, Buxbaum JD, Murrell JR, Raj T, Ertekin-Taner N, Logue M, Baldwin CT, Green RC, Barnes LL, Cantwell LB, Fallin MD, Go RC, Griffith PA, Obisesan TO, Manly JJ, Lunetta KL, Kamboh MI, Lopez OL, Bennett DA, Hendrie H, Hall KS, Goate AM, Byrd GS, Kukull WA, Foroud TM, Haines JL, Farrer LA, Pericak-Vance MA, Lee JH, Schellenberg GD, St George-Hyslop P, Mayeux R, Rogaeva E; Alzheimer's Disease Genetics Consortium. Association of Long Runs of Homozygosity With Alzheimer Disease Among African American Individuals. JAMA Neurol. 2015 Nov;72(11):1313-23. doi: 10.1001/jamaneurol.2015.1700. PMID: 26366463

174. Nikiforova MN, Wald AI, Melan MA, Roy S, Zhong S, Hamilton RL, Lieberman FS, Drappatz J, Amankulor NM, Pollack IF, Nikiforov YE, Horbinski C.
Targeted next-generation sequencing panel (GlioSeq) provides comprehensive genetic profiling of central nervous system tumors. Neuro Oncol. 2016 Mar;18(3):379-87. doi: 10.1093/neuonc/nov289. Epub 2015 Dec 17. PMID: 2668176

175. Morrissy AS, Garzia L, Shih DJ, Zuyderduyn S, Huang X, Skowron P, Remke M, Cavalli FM, Ramaswamy V, Lindsay PE, Jelveh S, Donovan LK, Wang X, Luu B, Zayne K, Li Y, Mayoh C, Thiessen N, Mercier E, Mungall KL, Ma

**Ronald L. Hamilton, M.D.**

Y, Tse K, Zeng T, Shumansky K, Roth AJ, Shah S, Farooq H, Kijima N, Holgado BL, Lee JJ, Matan-Lithwick S, Liu J, Mack SC, Manno A, Michealraj KA, Nor C, Peacock J, Qin L, Reimand J, Rolider A, Thompson YY, Wu X, Pugh T, Ally A, Bilenky M, Butterfield YS, Carlsen R, Cheng Y, Chuah E, Corbett RD, Dhalla N, He A, Lee D, Li HI, Long W, Mayo M, Plettner P, Qian JQ, Schein JE, Tam A, Wong T, Birol I, Zhao Y, Faria CC, Pimentel J, Nunes S, Shalaby T, Grotzer M, Pollack IF, Hamilton RL, Li XN, Bendel AE, Fults DW, Walter AW, Kumabe T, Tominaga T, Collins VP, Cho YJ, Hoffman C, Lyden D, Wisoff JH, Garvin JH Jr, Stearns DS, Massimi L, Schüller U, Sterba J, Zitterbart K, Puget S, Ayrault O, Dunn SE, Tirapelli DP, Carlotti CG, Wheeler H, Hallahan AR, Ingram W, MacDonald TJ, Olson JJ, Van Meir EG, Lee JY, Wang KC, Kim SK, Cho BK, Pietsch T, Fleischhack G, Tippelt S, Ra YS, Bailey S, Lindsey JC, Clifford SC, Eberhart CG, Cooper MK, Packer RJ, Massimino M, Garre ML, Bartels U, Tabori U, Hawkins CE, Dirks P, Bouffet E, Rutka JT, Wechsler-Reya RJ, Weiss WA, Collier LS, Dupuy AJ, Korshunov A, Jones DT, Kool M, Northcott PA, Pfister SM, Largaespada DA, Mungall AJ, Moore RA, Jabado N, Bader GD, Jones SJ, Malkin D, Marra MA, Taylor MD. Divergent clonal selection dominates medulloblastoma at recurrence. Nature. 2016 Jan 21;529(7586):351-7. doi: 10.1038/nature16478. Epub 2016 Jan 13

176. Gandhoke GS, Yilmaz S, Grunwaldt L, Hamilton RL, Salvetti DJ, Greene S. A case of spinal epidural venous malformation with mediastinal extension: management with combined surgery and percutaneous sclerotherapy. J Neurosurg Pediatr. 2016 May;17(5):612-7. doi: 10.3171/2015.9.PEDS15341. Epub 2016 Jan 15.

177. Thompson EM, Hielscher T, Bouffet E, Remke M, Luu B, Gururangan S, McLendon RE, Bigner DD, Lipp ES, Perreault S, Cho YJ, Grant G, Kim SK, Lee JY, Rao AA, Giannini C, Li KK, Ng HK, Yao Y, Kumabe T, Tominaga T, Grajkowska WA, Perek-Polnik M, Low DC, Seow WT, Chang KT, Mora J, Pollack IF, Hamilton RL, Leary S, Moore AS, Ingram WJ, Hallahan AR, Jouvet A, Fèvre-Montange M, Vasiljevic A, Faure-Conter C, Shofuda T, Kagawa N, Hashimoto N, Jabado N, Weil AG, Gayden T, Wataya T, Shalaby T, Grotzer M, Zitterbart K, Sterba J, Kren L, Hortobágyi T, Klekner A, László B, Pócza T, Hauser P, Schüller U, Jung S, Jang WY, French PJ, Kros JM, van Veelen MC, Massimi L, Leonard JR, Rubin JB, Vibhakar R, Chambless LB, Cooper MK, Thompson RC, Faria CC, Carvalho A, Nunes S, Pimentel J, Fan X, Muraszko KM, López-Aguilar E, Lyden D, Garzia L, Shih DJ, Kijima N, Schneider C, Adamski J, Northcott PA, Kool M, Jones DT, Chan JA, Nikolic A, Garre ML, Van Meir EG, Osuka S, Olson JJ, Jahangiri A, Castro BA, Gupta N, Weiss WA, Moxon-Emre I, Mabbott DJ, Lassaletta A, Hawkins CE, Tabori U, Drake J, Kulkarni A, Dirks P, Rutka JT, Korshunov A, Pfister SM, Packer RJ, Ramaswamy V, Taylor MD. Prognostic value of medulloblastoma extent of resection after accounting for molecular subgroup: a retrospective integrated clinical and molecular analysis. Lancet Oncol. 2016 Mar 11. pii: S1470-2045(15)00581-1. doi: 10.1016/S1470-2045(15)00581-1. [Epub ahead of print]

178. Pollack IF, Jakacki RI, Butterfield LH, Hamilton RL, Panigrahy A, Normolle DP, Connelly AK, Dibridge S, Mason G, Whiteside TL, Okada H. Immune responses and outcome after vaccination with glioma-associated antigen peptides and poly-ICLC in a pilot study for pediatric recurrent low-grade gliomas†. Neuro Oncol. 2016 Mar 15. pii: now026. [Epub ahead of print]

179. Jakacki RI, Cohen KJ, Buxton A, Krailo MD, Burger PC, Rosenblum MK, Brat DJ, Hamilton RL, Eckel SP, Zhou T, Lavey RS, Pollack IF. Phase 2 study of concurrent radiotherapy and temozolomide followed by temozolomide and lomustine in the treatment of children with high-grade glioma: a report of the Children's Oncology Group ACNS0423 study. Neuro Oncol. 2016 Mar 22. pii: now038. [Epub ahead of print]

180. Ridge PG, Hoyt KB, Boehme K, Mukherjee S, Crane PK, Haines JL, Mayeux R, Farrer LA, Pericak-Vance MA, Schellenberg GD, Kauwe JS; Alzheimer's Disease Genetics Consortium (ADGC). Assessment of the genetic variance of late-onset Alzheimer's disease. Neurobiol Aging. 2016 May;41:200.e13-20. doi: 10.1016/j.neurobiolaging.2016.02.024. Epub 2016 Mar 3

181. Beckner ME, Pollack IF, Nordberg ML, Hamilton RL. Glioblastomas with copy number gains in EGFR and RNF139 show increased expressions of carbonic anhydrase genes transformed by ENO1. BBA Clin. 2015 Nov 10;5:1-15. doi: 10.1016/j.bbacli.2015.11.001. eCollection 2016 Jun. PMID: 27051584 Free PMC Article

182. Fernandes-Cabral DT, Zenonos GA, Hamilton RL, Panesar SS, Fernandez-Miranda JC. High-Definition Fiber Tractography in the Evaluation and Surgical Planning of Lhermitte-Duclos Disease: A Case Report. World Neurosurg. 2016 May 7. pii: S1878-8750(16)30257-1. doi: 10.1016/j.wneu.2016.04.128. [Epub ahead of print] PMID: 27168233

**Reviews, invited published papers, proceedings of conference and symposia, monographs, books and book chapters**

**Ronald L. Hamilton, M.D.**

1. **Hamilton RL**, Wiley CA. New developments in the neuropathology of AIDS. CAP Today, 10 (12): p 42, 1996.
2  **Hamilton RL**: Hydrocephalus in a 9 month-old infant. Brain Pathol 6:533-534, 1996
3. **Hamilton RL**: New onset hemiparesis. Brain Pathol 7: 715-716, 1997.
4. **Hamilton RL**: Precocious Puberty. Brain Pathol 7: 711-712, 1997
5. **Hamilton RL**: Frontal lobe tumor in 11 year-old girl. Brain Pathol 7: 713-714, 1997
6 **Hamilton RL**, Pollack, IF: The Molecular Biology of Ependymomas. Brain Pathology 7:807-822, 1997.
7. **Hamilton RL**: A 26 year old woman with new onset seizures. Brain Pathol 8: 239-240, 1997.
8. **Hamilton RL**, Wiley, CA, The Neuropathology of Viral Infections of the Nervous System. In: Textbook of Neuropathology; Davis RL, Robertson DM eds. Williams and Wilkins, 3rd edition,  Baltimore, MD. 1997.

9. **Hamilton RL**: Guidelines for the neuropathological diagnosis of Alzheimer's Disease and Dementia with Lewy Bodies. Revista de Neurologia 27 (S1): S67-S70, 1998
10. **Hamilton RL**: Experimental neuropathology of Alzheimer's Disease: animal models. Revista de Neurologia 27 (S1): S84-S86, 1998
11. Sanders VJ, Wiley CA, **Hamilton RL**: The mechanisms of neuronal damage in retroviral infections of the nervous system. in The Mechanisms of Neuronal Damage in Virus Infections of the Nervous System (Gosztonyi G, ed). Springer Verlag, Berlin, 2001.
12. **Hamilton RL**. [Recent Advances in the neuropathological evaluation of Alzheimer's Disease: the importance of synuclein] Rev Neurol 35:765-7, 2002 (Spanish).
13. Pollack IF, **Hamilton RL**, Finkelstein SD, Lieberman F.  Molecular abnormalities and correlations with tumor response and outcome in glioma patients.  Neuroimaging Clinics of North America: Advances in Brain Tumor Imaging and Therapy (Provenzale J, ed.) WB Saunders, Philadelphia,  2002.
14. **Hamilton RL**.  The other dementias: the neuropathology of the non-Alzheimer's Disease dementias. Rev Neurol 37:130-139, 2003 (Spanish).
15. Omalu BI, Wiley CA, **Hamilton RL**.  Case of the Month February 2003. Brain Pathology 13:419-420, 2003.
16. DeKosky ST, Ikonomovic MD, **Hamilton RL**, Bennett DA, Mufson EJ. Neuropathology of Mild Cognitive Impairment in the Elderly. In John Morris J, Scheltens P, and Cummings JL), (eds), *Alzheimer's Disease and Related Disorders:* London, Taylor & Francis, 1-16, 2006.
17. Crain BJ, Alston SR, Bruch LA, **Hamilton RL**, McLendon RE, Rhodes H, Tihan T, Weidenheim KM. Accreditation Council for Graduate Medical Education (ACGME) Competencies in Neuropathology Training.  J Neuropathol Exp Neurol 64:273-279, 2005.
18. McIntyre JA, **Hamilton RL**, Dekosky ST.  Redox-reactive autoantibodies in cerebrospinal fluids. Annals of NY Acad Sci 1109: 296-302, 2007.
19. DeKosky ST, Kaufer DI, **Hamilton R**, Wolk D, Lopez OL: Dementia. In: Neurology in Clinical Practice: Principles of Diagnosis and Management, 5th Edition. Editors: Bradley WG, Daroff RB, Fenichel GM & Jankovic J. Boston MA, Butterworth-Heinemann, 2007: 1855-1907.
20. Tyurin VA, Tyurina YY, Kochanek PM, **Hamilton R**, DeKosky ST, Greenberger JS, Bayir H, Kagan VE.  Chapter 19: Oxidative lipidomics of programmed cell death.  Methods Enzymol 442:375-93, 2008.
21. Yeaney GA, O'Conn SM, Jankowitz BT, **Hamilton RL**.  A 16 year-old male with cerebellar mass. Brain Pathol. 2009 19, 167-170. PMID 19076785
22. Horbinski, C, **Hamilton RL**.  Application of telepathology for neuropathologic intraoperative consultations. Brain Pathol 2009 19; 317-322. PMID 19290998

**Abstracts**

1. **Hamilton RL**, Sanger WG, and McComb RD: Characterization of cell lines derived from malignant tumors in patients with neurofibromatosis. Federation Proceedings 46: 433, 1987.
2. Esch O, Spinosa JC, **Hamilton RL**, Crombie DL, Schteigart CD, Hofmann AF: Reversible cytotoxicity to the gallbladder mucosa of contact dissolution solvents for cholesterol gallstones: a comparison of methyl tert-butyl ether (mtbe) and ethyl propionate (ep) in two animal models. Gastroenterology 100 (5, part 2): A135, 1991.

**Ronald L. Hamilton, M.D.**

3. Haas RH, Popovitch B, **Hamilton RL**: The utility of DNA dystrophin gene analysis in non-specific myopathy: presented at Child Neurology Society Annual Meeting, October, 1992: New Orleans, LA.

4. Haas RH, Mansden DL, Estrada S, **Hamilton RL**, Grafe MG, Nyhan WL: Acute basal ganglia infarction in propionic acidemia in spite of good metabolic control: presented at Child Neurology Society Annual Meeting, October, 1992: New Orleans, LA.

5. **Hamilton RL**, Haas RH, Nyhan W, Powell HP, Grafe MR:  The neuropathology of propionic acidemia: a report of two additional cases. American association of Neuropathology Annual Meeting, June 1993, Salt Lake City, UT; J Neuropathol Exp Neurol 52:299, 1993.

6. Mansfield RT, Schiding JK**, Hamilton R,** Kochanek PM: Hypothermia fails to reduce lesion volume after traumatic brain injury in immature rats.  Pediatric Research 35(4):55, 1994.

7. **Hamilton RL**, Bodnar RJ, Wang G, Wiley CA.  The effect of AZT on retroviral encephalitis: a murine model: presented at the Sixth Workshop on the Pathogenesis of Animal Retroviruses, Philadelphia, PA, Nov. 17-19, 1994.

8. Adelson PD, Robichaurd P, **Hamilton RL**, Kochanek PM. Brain edema and neuropathology after diffuse traumatic injury in immature rats.  Neurotrauma Society meeting, San Diego CA, Nov 10-11, 1995.

9. **Hamilton RL**, Bodnar RJ, Wang G, Klunk W, Wiley CA, Treatment of chronic retroviral encephalitis with zidovudine (AZT) in a murine model. Society for Neuroscience Meeting, San Diego, CA Nov 11-16 1995.

10. **Hamilton RL**, Bodnar RJ, Wang G, Klunk W, Wiley CA. The effect of zidovudine (AZT) on murine retroviral encephalitis. Amer. Assoc of Neuropathology, San Antonio, June, 1995. J Neuropathol Exp Neurol 54 (3): 438, 1995.

11. **Hamilton RL**, and Claassen D. Neonatal Methylmalonic Acidemia With Hemicerebellum: An Autopsy Report;  Society of Pediatric Pathology / Child Neurology Society (joint meeting), Baltimore, Oct 27-29, 1995.

12. **Hamilton RL**, Baldwin M, Wiley CA. Human Herpesviruses And Temporal Arteritis American Association of Neuropathology, Vancouver, BC, Canada, June 1996.

13. Mizukami K, Ikonomovic MD, Sheffield R, Rubin RT, Grayson D, **Hamilton R**, Warde D, Armstrong DM. Immunohistochemical Localization of GABA-A Receptor ß2/3 Subunits in the Hippocampal Formation in Aged Brain with Alzheimer-related Neuropathology. Society for Neuroscience meeting, Washington DC, Nov 1996.

14. Bodnar RJ and **Hamilton RL**. Effect of zidovudine (AZT) and saquinavir on retroviral infection of the central nervous system (CNS) Society for Neuroscience meeting, Nov 17-21, 1996 Washington D.C.

15. Bredel M, Pollack I, **Hamilton RL**, Finkelstein SD, Campbell JW, Martinez AJ, Sherwin R, Bozik ME, Gollin S. Overexpression of EGF receptor and p53 mutations in pediatric malignant gliomas. American Association of Neurological Surgeons, 1997 Annual meeting.

16. Xu Y, Liachennko S, Tang P, **Hamilton RL** Correlation of neuropathologic changes with cerebral metabolic and ADC abnormalities after prolonged asphyxial cardiac arrest. International Society of Magnetic Resonance in Medicine, annual meeting, 1997

17. Bredel M, Pollack IF, Campbell JW, **Hamilton RL**. Basic fibroblast growth factor as a prognostic indicator in pediatric high grade glioma patients. American Association of Neuropathology, Pittsburgh, PA, June 1997. J Neuropathol Exp Neurol 56 (5): 581, 1997

18. **Hamilton RL**, Bodnar RJ, Lackner AA, Lane JH, Wiley CA Neurotrophic factors in simian immunodeficiency virus encephalitis. American Association of Neuropathology, Pittsburgh, PA, June 1997. J Neuropathol Exp Neurol 56 (5): 618, 1997.

19. Adelson, PD, Robichaud, P, **Hamilton, RL**, Kochanek, PM. Histologic analyses of severe diffuse traumatic brain injury in the immature rat . National Neurotrama Society, New Orleans Oct 24-25, 1997.

20. Dorsey RW, Achim CL, Wiley CA, **Hamilton RL**\*,  Soontornniyomkij V. Gene expression and cellular localization of neurotrophic factors in Alzheimer's disease. Society of Neuroscience meeting Nov, 1997, New Orleans.

21.  Klunk WE, **Hamilton RL**, Styren SD, Styren G, Debnath ML, Mathis CA, Mahood K, Hsiao KK. Staining of AD and Tg2576 mouse brain wirh X-34, a highly flourescent derivative of chrysamine

**Ronald L. Hamilton, M.D.**

G and A potential in vivo probe for sheet fibrils.  Siociety for Neuroscience meeting, New Orleans 1997.

22. Klunk WE, **Hamilton RL**, Styren SD, Styren G, Debnath ML.  Neuropathological study of AD brain with X-34, a new highly fluorescent derivative of congo red.  Society for  Neuroscience meeting. Los Angeles, CA 1998.

23. Halks-Miller M, Hesselgesser J, Horuk R, Soontornniyomkij V, **Hamilton R,** Achim C.  CCR1 immunoreactivity in Alzheimer's Disease brains.  Society for Neurosciences meeting. Los Angeles, CA 1998.

24.  Wang G, Soontornniyomkij V, Pittman CA, Achim CL, Wiley CA, **Hamilton RL**.  Glial expression of BDNF and TRK B receptor proteins in Alzheimer's Disease and HIV-1 encephalitis brains. Society for Neuroscience meeting. Los Angeles, CA 1998.

25. Ikonomovic MD, Mizukami K, Davies P, **Hamilton R**, Sheffield R, Armstrong DM.  Co-localization of interneurons and an ad-specific antibody in the hippocampal formation of Alzheimer brains. Society for Neurosciences. Los Angeles, CA 1998.

26. Mizukami K, Ikonomovic MD, Grayson DR, Rubin RT, Warde D, Sheffield R, **Hamilton RL,** Davies P, Armstrong DM.  Immunohistochemical study of GABA(A) receptor beta 2/3 subunits in the hippocampal formation of aged brains with Alzheimer-related neuropathologic changes. Experimental Neurology 147 2 333-45 (1997).

27. Bredel M, Pollack IF, **Hamilton RL**: Expression of the c-erbB1 Oncogene Product Epidermal Growth Factor Receptor (EGFR) and its Relevance for Outcome in Children with Supratentorial High-Grade Gliomas ; XVI Congress of the European Society for Pediatric Neurosurgery; November 11-15, 1998, Marseille, France

28. **Hamilton, RL** Numerous widespread alpha-synuclein positive thread-like processes characterize dementia with Lewy Bodies. Foundation IPSEN Conference, April 12, 1999, Paris France

29 **Hamilton RL** Numerous and widespread alpha-synuclein thread-like processes in dementia with Lewy bodies. American Assoc of Neuropathologist Annual Meeting, 1999, Portland, OR. J Neuropathol Exper Neurol 58:552, 1999.

30. Klunk WE, **Hamilton RL**, Styren SD, Head E: Evaluation of the aged canine as a screening system for the x-34 class of in vivo probes for amyloid deposition in AD. Soc. of Neuroscience, 1999

31. Kaufer, DL, **Hamilton RL**, Lopez OL, DeKosky ST MRI white matter hyperintensities and cerebral amyloid angiopathy in a case of dementia with Lewy bodies. Amer Neuropsychiatric Assoc, annual meeting, 2/2000, Ft. Myers, FLA.

32. **Hamilton RL**, Mash DC. Widespread Alpha-synucleinopathy in the Parkinson's Disease brain. 6th National Parkinson's Disease Foundation International Symposium on Parkinson's Disease Research, to be held in conjunction with the Society of Neuroscience meeting in Miami Beach, Oct 22-23[rd], 1999.

33. **Hamilton, RL**, Mash DC. Widespread alpha-synuclein-positive neuropil threads in the Parkinson's Disease brain. American Assoc of Neuropathology, Atlanta, GA, June 8-11, 2000.

34.  Snyder JV, Gebel JM, Kassam A, **Hamilton RL**, Goldstein S, Watkins S, Yonas H, Chelluri L, Thulborn K. Guidance by MR Tissue Sodium Concentration of Infarct Resection in Massive Stroke. Neurology 54(7): A97-A98, Suppl. 3, 2000.

35. Chow TM, Kaufer DI, Lopez OL, **Hamilton RL**, Becker JT, DeKosky ST. Temporal Evolution of Lewy Body Phenotype in Autopsy Confirmed Cases of Alzheimer's Disease and Dementia With Lewy Bodies. Neurology 56(8): A300-A301, Suppl 3, 2001.

36.  Castellano-Sanchez A, Ohgaki HH, Yokoo, Finkelstein SD, Medina-Flores R, **Hamilton RL**, Scheithauer BW, Burger PC, Brat DJ.  Genetic Alterations in Granular Cell Astrocytomas. USCAP, 2002.

37.  Demidovich J, Pittman CA, Hamilton RL.  Altered calpain proteolysis of mutant alpha-synuclein. Honors Thesis presentation, Univ. Pitt, 2002

38.  Omalu BI, **Hamilton RL**, Swalsky PA, Finkelstein SD. Microdissection-based mutational profiling of malignant, atypical and benign meningiomas: the determination of meningioma grade by fractional mutational index.  AANP, Denver, 2002 (JNEN 61:491, 2002)

39.  Wilson, RK, Luedecking-Zimmer EK, Kamboh MI, DeKosky ST, **Hamilton RL**.  Association of the ApoE4 allele and Lewy bodies in Alzheimer's Disease.  AANP, Denver 2002 (JNEN 61: 455, 2002).

**Ronald L. Hamilton, M.D.**

40. Desai PP, Ikonomovic MD, **Hamilton RL**, DeKosky ST, Kamboh MI.  Apolipoprotein D in Alzheimer's Disease: implications for amyloid pathology.  Soc. for Neuroscience, Orlando, 2002.

41. Garb S, **Hamilton RL**.  Sequestration of soluble alpha-synuclein in Lewy body Variant of Alzheimer's Disease. Soc for Neuroscience, Orlando, 2002.

42. Marshall GA, Kaufer DI, Lopez OL, Rao GR, **Hamilton RL**, DeKosky ST.  A neuropathological correlate of anosognosia in Alzheimer's Disease.  American Association of Neurology, May 2003.

43. Sweet RA, Butters MA, **Hamilton RL**, Mulsant BH, Lopez OL, PollockBG, DeKosky ST, Reynolds CF Neuropathology Of Late Life Mood Disorders.  American College of Neuropsychopharmacology, 2003

44. Mohan D, Couce ME, Wiley CA, **Hamilton RL**, Sasatomi E, Swalsky PA, Lieberman MD, Finkelstein SD.  Microdissection based genotyping of human gliomas: diagnostic and prognostic considerations (USCAP, Vancouver 3/04)

45. Beckner ME, Sasatomi E, Swalsky PA, **Hamilton RL**, Pollack, IF, Finkelstein SD.  Loss of heterozygosity reveals non-VHL Allelic loss in hemangioblastomas at 22q13, (AANP Cleveland, June 24-27, 2004).

46. Judkins AR, Burger P, **Hamilton RL**, Kleinschmidt-DeMasters B, Perry A, Pomeroy S, Rosenblum MK, Yachnis AT, Rorke LB, Biegel JA. INI1 Expression Distinguishes Atypical Teratoid/Rhabdoid Tumor (ATR) from Choroid Plexus Carcinoma (CPC); (AANP Cleveland, June 24-27, 2004).

47. McFadden KA, **Hamilton RL**, Visvesvara GS, Gardner P, Couce ME.  Granulomatous Amebic Encephalitis in a Patient with Gardners Syndrome and Multi-organ Transplant (AANP Cleveland, June 24-27, 2004).

48. Yen, Amy, Lopez, OL, BeckerJ, **Hamilton RL.**  Mesial Temporal Sclerosis is associated with Lewy Bodies in Alzheimer's Disease. AANP Annual meeting June 9-12, 2005, Arlington, VA (platform). (J Neuropathol Exper Neurol 64:434, 2005.

49. Hinkle DA, Mullett SJ, **Hamilton RL** DJ-1 is over-expressed in human stroke reactive astrocytes. Society for Neuroscience Oct 2005.

50. Ramsey CP, Glass CA, Marshall MB, Morgan KL, Kioke MA, **Hamilton R**, Chu CT, Jordan-Sciutto KL.  Altered expression patterns of the antioxidant response transcriptional regulator NRF2, in Alzheimer's Disease and Parkinson's Disease. Society For Neuroscience, Nov. 2005, Washington DC.

51. Chu CT, Uchiyama Y, **Hamilton R**, Zhu J.  Extracellular signal regulated protein kinase acts upstream of both autophagy and cell death in MPP+ treated neurons.  Society For Neuroscience, Nov. 2005, Washington DC

52. Cieply K, Carol R. Sherer, Jennifer L. Hunt **Hamilton RL** Assessment of 1p and 19q Status in Pediatric Oligodendrogliomas by FISH, Association of Molecular Pathology,  Nov 10-13, 2005 Scottsdale AZ

53. Bencherif B, Lieberman FS, Wenzhu B, Price JC, Muthukrishnan A, Walter K, **Hamilton RL**, Lunsford LD, Mountz JM.   Increased F-18 Fluorothymidine Uptake is Seen in Non-Proliferating Recurrent/Residual Glioma Society for Nuclear Medicine, San Diego, 2006 June 3-7

54. **Hamilton, RL** Variations On A Theme: Lewy Bodies And Mesial Temporal Sclerosis In Alzheimer's Disease: A Review Of 278 Autopsy Cases. 10th International Conference on Alzheimer's Disease, Madrid, Spain, July-15-20, 2006.

55. DeKosky ST, Mathis CA, Price JC, Ikonomovic MD, **Hamilton RL**, Abrahamson EE, Paljug WR, Debnath ML, Hope CE, Isanski BA, Tsopelas ND, Lopresti BJ, Ziolko S, Bi W and Klunk WE.  Correlation of In Vivo PiB Retention and Post-Mortem A$\beta$ Levels: A Case Study. 10th International Conference on Alzheimer's Disease, Madrid, Spain, July-15-20, 2006.

56. Leverenz J, **Hamilton RL**, Larson E, Vavrek D, Lopez O, Galasko D, Masliah E, Kaye J, Nixon R, Clark C, Trojanowski J, Kukull W, Montine T, Tsuang D. Lewy-Related Pathology in Two Large Autopsied Dementia Samples: Application of Classification Criteria. 10th International Conference on Alzheimer's Disease, Madrid, Spain, July-15-20, 2006.

57. Venneti S, Lopresti BJ, Wang G, Mathis CA, Klunk WE, Shmookler AD, **Hamilton RL**, Apte UM, Wiley CA. PET imaging of microglia in a mouse model of Alzheimer's disease. 10th International Conference on Alzheimer's Disease, Madrid, Spain, July-15-20, 2006.

58. Kofler JK, Moore RA, **Hamilton RL**.  Concomitant Dementia with Lewy Bodies and Multiple System Atrophy in a Demented Patient.  International Congress of Neuropathology/American Association of Neuropathology Annual Meeting, San Francisco, CA, Sept 10-15, 2006.

**Ronald L. Hamilton, M.D.**

59. DeKosky ST, Mathis CA, Price JC, Ikonomovic MD, **Hamilton RL**, Abrahamson EE, Paljug WR, Debnath ML, Hope CE, Isanski BA, Tsopelas ND, Lopresti BJ, Ziolko S, Bi W, Klunk WE. Correlation of Regional in vivo Pittsburgh Compound B (PIB) Retention With in vitro PIB, A Levels, and Amyloid Plaque Density: Validation of PIB-PET in Postmortem Human Brain. Alzheimer's Association International Conference on Prevention of Dementia. June 9-12, 2007 Washington, D.C.

60. Kellermier HC, Nikiforova MN, Cieply K, **Hamilton RL**.  Alterations of 1p in glioblastomas. ASIP/AANP Annual meeting, Washington DC April 2007.

61. Bliecher AG, Branstetter BF, Hamilton R, Murdoch G, Kellermeir HC.  Clival Chordoma: Radiologic-Pathologic Correlations.  American Society of Neuroradiology annual meeting, Chicago, IL.  June 9-14, 2007.

62. Butters MA, Aizenstein HJ, Meltzer CC, **Hamilton RL,** Price JC, Mathis CA, Klunk WE, Becker JT, DeKosky ST, Reynolds CF.  Cognition, cerebrovascular disease and Alzheimer's Disease in late-life depression.  International Neuropsychological Society meeting, Bilbao Spain, July 2007.

63 Tyurin VA, Zhao Q, Mnuskin A, **Hamilton R**, DeKosky ST, Reynolds WF, Kagan VE.  Phospholipid peroxidation biomarkers of Alzheimer's Disease in the Brain: Selective Oxidation of Phosphatidylserine. Society of Toxicology Meeting San Diego, CA. October 2, 2007.

64. Moschos SJ, D. Trembath D, Snavely A, Bradler E, Midkiff B, Nikolaishvilli-Feinberg N, Werley J, Krauze M, **Hamilton R**, Kirkwood JM.  Prognostic Significance of PD-L1 Expression, Angiogenesis, and Hypoxia in Melanoma Brain Metastases (MBM); A Histopathologic Analysis.  Annual meeting of the American Association of Clinical Oncology, Chicago II, 5/29-6/2/2014.

65. Trembath DG, Moschos SJ, Snavely AC, Bradler E, Nikolaishvilli-Feinberg N, Bentley R. Midkiff BR, Jonette Werley J, Krauze MT, **Hamilton RL**. Analysis of select angiogenic markers in melanoma brain metastases. Annual meeting AANP, Portland OR. June 2014

66. Salgado CM, Basu D, Nikiforova M, Hamilton R, Gheris R, Jakacki R, Panigrahy A, Yatsenko S, Reyes-Mugica M.  Congenital Melanoma: The full spectrum og p.Q61R mutation in NRAS.  Accepted for the Annual Soc. Pediatric Pathology meeting,  Birmingham AL, Sept 4-6, 2014.

67. Melan MA, Wald AI, Zhong S, **Hamilton R**, Horbinski C. Nikiforova MN. BrainSeq: Next-Generation Sequencing Panel for Detection of Genetic Alterations in Central Nervous System (CNS) Malignancies.  National Harbor MD, Nov 12-15, 2014.

68. Hamilton RL.  Chronic Traumatic Encephalopathy: Update on an Emerging Disease.  Invited speaker: 18th International Congress of Neuropathology, July 12-16, 2014, Rio de Janeiro, Brazil

69. Hamilton RL.  Cases of the Month: 16 Years of Unknowns.  Invited speaker: 18th International Congress of Neuropathology, July 12-16, 2014, Rio de Janeiro, Brazil

70. Trembath DG, Moschos SJ, Snavely AC, Bradler E, Nikolaishvilli-Feinberg N, Midkiff BR, Werley J, **Krauze MT, Hamilton RL** Role of PD-L1, HIF-1a, and reactive gliosis in melanoma brain metastases. USCAP 2015, Boston, MA, March 21-27, 2015.

71. Nolan Priedigeit, Ryan J. Hartmaier, Yijing Chen, Damir Vareslija, Ahmed Basudan, Roby Thomas, Jose P Leone, Peter C. Lucas, Rohit Bhargava, Ron L. Hamilton, Juliann Chmielecki, Nancy E. Davidson, Steffi Oesterreich, Adam M. Brufsky, Leonie Young, Adrian V. Lee  Breast cancer brain metastases show limited intrinsic subtype switching, yet exhibit acquired ERBB2 amplifications and activating mutations. San Antonio Breast Cancer Symposium, 12/7/16

72. Steffi Oesterreich, Ahmed Basudan, Nolan Priedigeit, Ryan Hartmaier, Amir Bahreini, Rekha Gyanchandani, Jose P Leone, Peter Lucas,, Rohit Bhargava, Ron Hamilton, Ryan Hartmaier, Adam Brufsky, Adrian V. LeePerivascular Inflammation in Temporal Artery Biopsies That Are Negative for Arteritis: Incidental or Harbinger American College of Rheumatology/ Association of Rheumatology Health Professionals (ACR/ARHP) Annual Meeting, Washington DC, 11/13/16

73. Expression of Carbonic Anhydrase Genes, CA3 and CA12, Transformed with ENO1, Relate to Copy Numbers of EGFR or RNF139 and XIAP, and Gender in Glioblastomas Using PCR Assays. Experimental Biology 2015 Annual Meeting

74. Evaluation of GlioSeq Targeted NGS Panel for Detection of O6-Methylguanine-DNA Methyltransferase (MGMT) mRNA Expression in Glioma Patients Alicia Hunt, Sarika Jain, Melissa A Melan, Abigail Wald, Ronald Hamilton, Marina N. Nikiforova  Association For Molecular Pathology (AMP) Charlotte, NC. November 10-12, 2016.

**PROFESSIONAL ACTIVITIES**

**Ronald L. Hamilton, M.D.**


**TEACHING**

University of California, San Diego, Dept of Neuroscience
      1991-93      lab assistant - graduate neuroanatomy course
University of California, San Diego, School of Medicine
      1991-93      Sophomore pathology course, neuropathology section (lab assistant)
University of California, San Diego, Dept of Pathology
      1991-93      Clinical Correlation Conference - Neuropath and Neurosurgery (monthly)
      1991-93      Neuropathology review for neurology residents (bi-monthly)
University of Pittsburgh, School of Medicine
      Freshman pathology course –
      PBL facilitator for musculoskeletal course 1994-1998
      Neuroscience Module – lecture M2 students full class: CNS tumors
            Annually since 1999.
                 April 29, 2014 1-3 pm
      Neuroscience Module   lecture MS1 students
            CNS tumors  March 2004
            CNS tumors  March 2005
            CNS tumors March 2006
            CNS Tumors    5/7/07
      Neuroscience rotation – small weekly lab, M3 students
            7/99-present
      Neuroscience rotation – small group M3 students
            6/18/2007 3-5pm
Weekly brain-cutting conference at Children's Hospital (2-5 medical (M3) students/week)
            Academic Advising: Kate McFadden 2/2000 to 6-2001
Other:
      High school - gifted science students of Mr. James Coll
            11/21/2002 , 11/14/ 2003, 10/28/2004, 11/18/2005, 11/3/2006


University of Pittsburgh, graduate students
      Cellular and Molecular Mechanisms of Neurodegeneration (MSCMP 3720)
              Organizers: Robert Bowser, Cristian Achim,
            1. Neuroanatomy and Neurohistology in neurodegeneration
                1/13/98,  1/19/99
            2. Mitochondria and disease / Prion encephalopathies
                3-24-98
            3. The role of alpha-synuclein in neurodegenerative diseases
                10-11-00
      Molecular Pathobiology (organizers Frye and Achim) (MSCMP 2740)
            .Tumors of the Central Nervous System,  4-7-98,  4-20-99
            Alpha-synuclein and Neurodegeneration
                4-2003, 1/8/04, 5/15/06
            Neuropathology of Neurodegeneration
                1/6/04
            Alpha-synuclein and Tau in Neurodegeneration
                1/5/07, 2/7/2008
            Pathologic diagnosis of the Lewy Body Disorders
                2/12/09
University of Pittsburgh, Dept of Neuroscience - Combined Neuroscience Conference Wed 4-5
      10/3/95 *      Varicella Zoster Infections of the CNS in AIDS patients
      10/9/96 *      Lewy Bodies and Dementia
      2/19/97 *      The Neuropathology of Pediatric Seizures
      4/23/97 *      CNS manifestations of non-CNS tumors in children
      2/11/98        Case Presentation with Ian Pollack

**Ronald L. Hamilton, M.D.**

| | |
|---|---|
| 3/18/98 * | A 77 year old woman with Multiple sclerosis and dementia |
| 11/4/98 | *Pediatric meningiomas – two cases |
| 1/20/99 | Methanol Intoxication – with C. Foley |
| 2/3/99 | Gliomatosis cerebri with Dallasta |
| 2/10/99 | Amyloid angiopathy and leukomalacia – with D. Kaufer |
| 3/17/99 | Metachromatic Leukodystrophy – with D. Kaufer |
| 9/18/02 | Iatrogenic CJD* |

\* as primary presenter

University of Pittsburgh, Dept. of Pathology, Chief Resident's Fri noon slide conference

| | |
|---|---|
| 8/1/96 - Pediatric brain tumors | |
| 10/5/97 Pediatric brain tumors | |
| 1/9/98 | NP REVIEW - Tumors I |
| 1/16/98 | NP REVIEW - Tumors II |
| 1/23/98 | NP REVIEW - Tumors III |
| 1/30/98 | NP REVIEW - Infections |
| 2/6/98 | NP REVIEW - Demyelinative diseases |
| 2/13/98 | NP REVIEW - Neurodegenerative diseases |
| 2/20/98 | NP Review - Cerebrovascular disease and developmental |
| 5/24/02 | Pediatric Neoplasms and Congenital Malformations |
| 5/31/02 | Degenerative Diseases |

University of Pittsburgh, undergraduate

Independent Course and Honors Research Project –
Theodore Kaplan (1/97-6/97)
Emily Rogerson (1/99-5/99, 9/99-12/99, 1/00-4/00)
Kyle Hubbard (1/99 – 5/99, 9/99-12/99, 1/00-4/00)
Joe Demidovich – 2000-2002
Stan Garb (2001-2001)

Pathology Summer Undergraduate Research Program (SURP)
Kathleen Anderson 6/00-8/00
Kathleen Anderson 6/01-8-01

University of Pittsburgh, Dept. of Pathology,
Neuropathology of dementia conference - weekly (Fri 10-11)

University of Pittsburgh - ADRC Topics at Noon
X-34 and alpha-synuclein – New stains in Alzheimer's Disease 11/98
Lewy Body Pathology in Alzheimer's Disease, 11/01

Children's Hospital of Pittsburgh, Grand rounds
1996 - methyl malonic acidemia with hemi-cerebellum
2/13/97 - Pediatric AIDS with HIV encephalopathy
5/22/97 - 11 month-old boy with Hypotonia (Leigh's Disease)
3/18/98 - Becker's muscular dystrophy with severe cardiomyopathy
5/19/98 – Friedreich's Ataxia
10/15/98 – Spinal Muscular Atrophy Type I
2/2005  - Congenital Dystrophies – Pediatric Neurology

**Other Presentations**

Neurology Grand Rounds - 11-19-03 - CNS vasculitis
Pathology Noon Diagnostic Conference - 11-20-03 – "Some Bodies in the Brain"
AP Didactic Lecture – 11-25-03 - Neuropathology of Neurodegeneration
NP Didactic – 4-28-04 - ApoE4 and Lewy Bodies in AD

**Ronald L. Hamilton, M.D.**

NP Didactic -    3/31/2005 – AD Pathology in ALS and MTS and LB in AD
Pathology Noon Diagnostic Conference – 8-4-2006: Tauopathies
ADRC CPC 8-10-06
ADRC CPC 11-30-06
ADRC CPC 2-8-07
ADRC 20th Anniversary meeting, "Neuropathology of AD:" 9-28-06
ADRC Topics at Noon.  "Tauopathies"  11-16-06
ADRC CPC 8/16/2007
ADRC CPC 11/30/2007
Pediatric CPC 2/25/08
DJ-1 in glioblastomas (NP Didactic conference) – 3/10/2009 (1 hour)
Neuropathology review for Neurosurgery residents – 3/10/2010 (1 hour).
AP Chief Residents didactic conference.  2 hour conference.  Non-glial Tumors. Feb 25, 2014
CMU graduate class:  BioE 2630 – Methods in medical iamage analysis in neuropathology. April 4, 2014.
Anatomic Pathology Grand Rounds, July 10, 2014  Chronic Traumatic Encephalopathy: an Update.

**Clinical Conferences (recurring)**

| | | |
|---|---|---|
| ADRC Brain cutting | weekly | Tue 8-10 |
| ADRC Dementia signout - | weekly | Fri 10-11 |
| PUH – Neuropathology QA - | weekly | Wed 10-11 |
| CH  Brain cutting | weekly | Mon 10-11:00 |
| CH  Neuro-Oncology conf | weekly | Mon 11:30-12:30 |
| CH Gross autopsy conference | weekly | Tue 11-12 |
| CH Micro autopsy conf | weekly | Tue 1-2 |

University of Pittsburgh School of Medicine –
    2009 Brain Tumors – lecture to 1st year students
    2009 Klionsky summer research scholarship – Peter Kang (June-Aug 2009)
        Clinicopathologic correlations of chordomas
    2009 Monday 2 hour small group 3rd year  (5-12 students)
        4/6/2009, 7/27/2009, 9/10/2009, 10/12/2009, 12/7/2009, 1/25/2010, 2/15/2010

<u>**RESEARCH**</u>

<u>**OTHER SUPPORT**</u>

<u>**ACTIVE**</u>

**HAMILTON, R.**
<u>ACTIVE</u>
**R01 NS037704**    (PI: Pollack)        9/1/98-1/31/17            0.7 calendar months
National Institutes of Health        $105,970
Role:  Co-Investigator
Title: Molecular Markers as Predictors of Outcome in Gliomas
The major goal of this project is to further characterize the molecular features of tumorigenesis in pediatric malignant gliomas.

**1R01 CA174858-01**(PI: Pollack)        5/6/13-8/30/17            0.4 calendar months
National Institutes of Health                $54,696
Role:  Co-Investigator
Title: Peptide Vaccine-Based Immunotherapy for Children with Recurrent Ependymomas
This project focuses on a pilot clinical trial of peptide-based immunotherapy for ependymomas, among the most challenging childhood brain tumors.  The study will incorporate separate strata

**Ronald L. Hamilton, M.D.**

for posterior fossa and non-posterior fossa ependymomas.  We will treat a total of 12 patients in each of the two strata with subcutaneous TAA epitope vaccinations every 3 weeks for 8 courses combined with topical imiquimod. Participants will be evaluated for adverse events, regimen limiting toxicity (RLT), and treatment response by clinical and laboratory evaluations and MR imaging. We hypothesize that vaccine-based immunotherapy will not only prove safe for the treatment of pediatric ependymomas, but will also demonstrate activity as assessed by immunologic and clinical parameters.

(PI: Pollack)    5/8/14-6/1/17
Child Brain Tumor Foundation                    $10,487                              1.2
calendar months
**Children's Brain Tumor Tissue Consortium**
The CBTTC is a unique research platform in which tumor tissue is processed for comprehensive molecular (e.g., DNA, RNA, and protein) analysis using state-of-the-art methods and the data results of that analysis, together with new brain tumor models and relevant clinical information, are sent back to the participating institutions. In comparison to tissue banks, the CBTTC actively stimulates research by providing high-quality data that can be rapidly and efficiently analyzed by participating institutions.
PI: Pollack. 10% salary for Jonette Werley

<u>OVERLAP</u> No Overlap


**<u>Completed Research Support</u>**

National Institutes of Health                    3/1/02 – 2/28/05
P30 MH52247-10    (PI: Reynolds)        $23,305
Intervention Research Center for the Study of Late-Life Mood Disorders
a supplement to the above grant to establish a brain bank to investigate the neuropathological substrate of late life mood disorders.
Role:  Co-Investigator

R01 NS048595    (PI: Montine)                    09/30/03 – 07/31/08
National Institutes of Health
Subcontract to the University of Washington on grant "Characterization of DLB: a Collaborative Study"
The major goal of this multi-institutional project is to investigate the role of ApoE4 alleles and other genetic polymorphisms in the Lewy Body Variant of Alzheimer's Disease.
Role:  Co-Investigator

Brain Tumor Society                    07/01/07-05/31/09
PI: Ian Pollack
JPA & Pediatric Low Grade Astrocytoma
The major goals of these two grants is to examine molecular markers of prognosis in pediatric gliomas.
Role:  Co-Investigator

U10 CA13539-27 (Reaman (subcontract 6172) (Pollack)                    1/1/06-12/30/09
NIH/NCI
Children's Oncology Group Brain Tumor Resource Laboratory

**Ronald L. Hamilton, M.D.**

This contract is providing infrastructure support for maintaining tissue processing and banking of high-grade gliomas.
Role:  Laboratory Director

R01 MH47346    (PI: Zubenko)                    12/1/04 – 11/30/09
National Institutes of Health
Morphologic/Neurochemical Correlates of Depression in AD
The major goal of this project is to better define the biological substrates of major depression in AD and to provide additional insight into the clinical biology of major depressive disorders affecting the elderly.
Role:  Co-Investigator

P50 AG05133    (PI: Lopez)              3/30/85 – 3/31/15          0 calendar months
National Institutes of Health              $71,764
Alzheimer Disease Research Center, Core C: Neuropathology
The three objectives of the Neuropathology Core are to (1) procure and bank brain from autopsies of ADRC patients and controls, (2) perform detailed neuropathologic analysis of all AD cases and (3) maintain well catalogued brain bank.
Role:  Core Advisor

Child Brain Tumor Fund (CBTF) (PI: Pollack)        5/8/13-5/7/14
0.3 cal months (2.5% support) PITT subaccount #: 05.35206.xxxx.00000.709203.-----

P01 NS040923    (PI: Pollack)              7/1/02-5/31/13          1.20 calendar months
National Institutes of Health              $22,074
Novel Strategies for Brain Tumor Therapy
The unifying hypothesis of this program project grant is that novel therapeutic approaches that take into account the unique features of central nervous system (CNS) tumors will have utility for preventing tumor growth and inducing tumor regression, and will potentiate the effects of conventional treatment approaches, particularly radiotherapy, for inducing glioma cell killing.
Role:  Co-Investigator

**Prior Grant Support**

| | | |
|---|---|---|
| 1995-1997 | Murine Model of Retroviral Encephalitis | |
| | Children's Hospital of Pittsburgh Research Fund ($50,000) | |
| | 0% effort, 0% support | |

1995-1998        Blood Brain Barrier in HIV encephalitis (PI: Achim)
                    Co PI. 10% effort and salary ($186,264)

11/98              PD Center Grant, Equipment $6000
                    for freezer for PD Brain Bank (one time equipment funding)

7/1/98-6/30/99   Neurotrophic Factors in SIV encephalitis
                    Competitive Medical Research Fund (CMRF), $25,000,
                    0% effort, 0% support

12/01/98-11/30/99    Parkinson's Disease Brain Bank
                    PI: Hamilton RL
                    Parkinson's Disease Foundation ($24,899) 0% effort, 0% support

7/1/98-6/30/00   Molecular Markers of Prognosis in Pediatric Gliomas

**Ronald L. Hamilton, M.D.**

PAR 95-063, NIH
PI: IF Pollack
10% effort and support ($263,311)

4/1/00-3/31/01:  Alpha-synuclein Aggregation in Dementia With Lewy Bodies
PI: RL Hamilton
Parkinson's Disease Foundation Seed Money Grant, $25,000 0% effort, 0%
support

10/1/00-9/30/02   Millennium Agreement (Neuro Module)
PI: Rajiv Dhir
0% effort, 0% Support.
($25,000 per year for supplies, plus support for 100% Level IV Res Tech)

1/1/99 – 12/31/03 COG Brain Tumor Resource Laboratory
PI: Pollack, IF ($5800)  (subcontract 6172)
Co-I – 5% effort and support
NIH-U10 CA13539-27

3/01/02 - 2/28/07 - Supplemental Award to Establish a Late Life Mood Disorder Brain Bank
PI: RA Sweet (for supplement)
Supplement to 3 P30 MH52247-08S1 (PI: CF Reynolds)
Co-I : 5% effort and support

7/1/98-6/30/05 Morphologic/Neurochemical Correlates of Depression in AD
PI: G Zubenko
2.5% effort and support ($20,000)

National Institutes of Health          09/30/03 – 07/31/08          5%
R01 NS048595    (PI: Montine)          $75,000

*Subcontract to the University of Washington on grant "Characterization of DLB: a Collaborative Study"*
The major goal of this multi-institutional project is to investigate the role of ApoE4 alleles and other
genetic polymorphisms in the Lewy Body Variant of Alzheimer's Disease

R01 MH072947    (PI: Butters)          12/1/04 –11/30/11          0.36 calendar months
National Institutes of Health          $6,018
Pathways Linking Late Life Depression to Mild Cognitive Impairment and Dementia
The goal of this project is to investigate the relationships among late-life depression (LLD), cognitive
impairment and progressive neurodegeneration.
Role:  Co-Investigator

R01 MH072947    (PI: Butters)          12/1/04 –11/30/11          0.36 calendar months
National Institutes of Health          $6,018
Pathways Linking Late Life Depression to Mild Cognitive Impairment and Dementia
The goal of this project is to investigate the relationships among late-life depression (LLD), cognitive
impairment and progressive neurodegeneration.
Role:  Co-Investigator

**Seminars and Invited Lectureships Related to Research**

Presentation of an Unknown Case (Herpes simplex brainstem encephalitis) to American Association of
Neuropathologists Annual Meeting, June 1992: St. Louis, MO.

**Ronald L. Hamilton, M.D.**

Presentation of an Unknown Case (Varicella zoster virus encephalitis in an AIDS patient) to XII International Congress of Neuropathology, Sept, 1994: Toronto, Ont, Canada.

Presentation of an Unknown Case (Atypical neurocytoma) to American Association of Neuropathologists Annual Meeting, June 2002: Denver (presenter: Rafael Medina-Flores).

## Other Research Related Activities

| | |
|---|---|
| 1995-2003 | Co-Director, Neuropathology Core ADRC |
| 2003-2012 | Director, Neuropathology Core ADRC. |
| 1995-2012- | Director, Neuropathology Brain Bank |
| 1997 - present - | Director of Neurohistology laboratory |
| 1997-present | Co-Director, Brain Tumor Resource Laboratory, Children's Cancer Group |
| 2001- 2009 | Director of Neuropathology Core of the Stephen Tuttle ALS Tissue Bank. |
| 2001-present | Co-Director, UP Brain Tumor Bank |

## CURRENT RESEARCH INTERESTS

1. Molecular Biology of Brain Tumors

## SERVICE

## University and Medical School

Residency Committee (Pathology) – 1997 to 2008
Institutional Review Board        3/02 – 5/2005
'Member of the UPSOM Interviewing Committee' jan 2010-present
Member, UPMC Professional Practice and Ethics Committee Jan 2014 - present

## OTHER

| | |
|---|---|
| 4/1996 - present | Case Editor - Brain Pathology, |
| | Case of the Month feature |
| | Case of the Month web site |
| | Increase to 2 cases per month 1/2007 |
| 10/99 | ad hoc reviewer, J Neuroscience |
| 1/2000 | ad hoc reviewer, J American Medical Association (JAMA) |
| 3/2000 | ad hoc reviewer, Neuropathology and Applied Neurobiology |
| 3/01 | ad hoc reviewer American Journal Pathology |
| 5/02 | ad hoc reviewer Neuroscience |
| 11/02 | ad hoc reviewer JNEN |
| 2004 | AANP Awards Committee, AANP, Cleveland |
| 2006 | AANP Awards committee, AANP-ISN San Fran |
| 10/2006 | ad hoc reviewer      Eur J Neurosci |
| 2/2007 | Ad hoc reviewer        Neuroscience |
| 2007 | Chairmen, Awards Committee, AANP Washington DC. (2 year term) |
| 7/29/2007 | ad hoc reviewer, Brain Pathology |
| 7/25/2007 | ad hoc reviewer Acta Neuropathologica |
| 10/19/2007 | ad hoc reviewer J Neuropathol Exp Neurol |
| 2008 | Chairman Awards Committee AANP, San Diego Annual Meeting |
| 2008 | ad hoc reviewer Brain Pathology |
| 2009 | ad hoc reviewer Pedi and Developmental Pathology |
| 2009 | ad hoc reviewer Amer. J. Pathol. |

**Ronald L. Hamilton, M.D.**

2014 – Featured in non-fiction book: League of Denial:  The NFL, Concussions and the Battle for the Truth (Crown Publishing, New York). Chapters 8 and 10 detail my role in the discovery of CTE in NFL football players.

January 2015 – Consulted with Sony Pictures about movie CONCUSSION based on the discovery of Chronic Traumatic Encephalopathy (CTE) in American NFL football players by my student, Bennet Omalu and me in July 2005.  I was also interviewed on the set by Sony documentary filmmakers for a bonus feature on the DVD:  The Making of "Concussion."  The movie is scheduled to be released Christmas Day, Dec 25, 2015.

January 2015 – interviewed by Jeane Marie Laskas (who wrote the 2009 GQ article the movie is based on) for a companion book to be released with the movie, December 2015.


**International Invitations**

1998 – Invited lecturer at Barcelona-Pittsburgh ADRC meeting, "Dementia Today," Barcelona, Spain (Oct 1998)

2000 – Invited lecturer at Barcelona-Pittsburgh ADRC meeting Dementia Today II", Barcelona, Spain (Oct 2000)

2001 - Invited symposia speaker at 10th Congress of the International Psychogeriatric Association (Nice, France, Sept 2001). "Pathological Diagnosis of Dementia With Lewy Bodies" (Symposia Organizer, Ian McKeith)

2002 – Invited lecturer at Barcelona-Pittsburgh ADRC meeting Dementia Today III", Barcelona, Spain (Oct 2002)

2003 – Symposium speaker "Dementia with Lewy Bodies" at International Psychogeriatric Associations meeting, Chicago, IL, USA, 08/19/03

2004  Invited lecturer at Barcelona-Pittsburgh ADRC meeting Dementia Today IV", Barcelona, Spain (Oct 2004)

2006  Invited lecturer at Barcelona-Pittsburgh ADRC meeting Dementia Today V", Barcelona, Spain (Oct 2006)

2008  Invited lecturer at Barcelona-Pittsburgh ADRC meeting Dementia Today VI", Barcelona, Spain (May 2008)

2014 – Invited lecturer AANP annual meeting June 2014.  What Every Neuropathologist Should Know: Molecular studies in metastatic brain tumors.

2014 - Invited as member of scientific committee International Congress of Neuropathology quadrennial meeting Sept 2014, Rio de Janeiro

2014 – Chair of Forensic Pathology Session, committee International Congress of Neuropathology quadrennial meeting Sept 2014, Rio de Janeiro

2014 – co-chair telepathology session with Dr. Wiley

2014 – Presentation – Chronic Traumatic Encephalopathy – update, International Congress of Neuropathology quadrennial meeting Sept 2014, Rio de Janeiro

2014 – presentation – Cases of the Month – 16 Years of Unknowns  International Congress of Neuropathology quadrennial meeting Sept 2014, Rio de Janeiro s



Office of Chief Medical Examiner
Tarrant County Medical Examiner's District
Tarrant County, Texas
200 Feliks Gwozdz Place, Fort Worth, Texas 76104-4919
(817) 920-5700  FAX (817) 920-5713

# AUTOPSY REPORT

**Name: Frank Cornish**
**Approximate Age: 40 years**
**Height: 79 inches**

**CASE NO: 0810049**
**Sex: Male**
**Weight: 327.6 pounds**

I hereby certify that on the **24th** day of **August 2008**, beginning at 0805 hours, I, Marc A. Krouse, M.D., pursuant to Statute 49.25 of Texas Criminal Code, performed an inspection and autopsy limited to the cranial cavity, neck, and thoracic cavity,  on the body of **Frank Cornish** at the Tarrant County Medical Examiner's District Morgue in Fort Worth, Texas and upon investigation of the essential facts concerning the circumstances of the death and history of the case as known to me, I am of the opinion that the findings, cause and manner of death are as follows:

**FINDINGS:**
I)    Marked cardiomegaly (758 gms) with left ventricular hypertrophy and mild coronary arterial sclerosis, consistent with hypertensive heart disease
II)   Multinodular goiter
III)  No evidence of trauma
IV)   Postmortem toxicology attached

**CAUSE OF DEATH:      SUDDEN ADULT DEATH WITH EVIDENCE OF
                      HYPERTENSIVE HEART DISEASE**

**MANNER OF DEATH:  NATURAL**

_Signature_ — **Marc A. Krouse, M.D.**
**Deputy Chief Medical Examiner**


0810049
Frank Cornish

Inspection and autopsy limited to the cranial cavity, neck, and thoracic cavity are performed August 24, 2008 at 8:05 a.m. (cranial cavity exam 08/25/08 at 0900).

## GROSS ANATOMIC DESCRIPTION

**I.    CLOTHING AND PERSONAL EFFECTS:** At the time of examination the body is clothed in white briefs and wrapped in white sheets.

**II.    THERAPEUTIC INTERVENTION:** Evidence of medical intervention includes an oral endotracheal tube secured with tape, intravenous line in the right antecubital fossa, right tibial intraosseous line, and 1 electrocardiographic monitor pad on the torso.

**III.    EXTERNAL BODY DESCRIPTION:** The body is that of a normally developed, large muscular and slightly obese adult African American male appearing near the stated age of 40 years. The body length is 79 inches and the weight is 327.6 pounds (200 cm, 143.6 kg). The body is well-preserved, unembalmed, and cool. Rigor is full. Lividity is developed over the head and back, is purple, and fixed.

The scalp is shaved except for a black and occasional gray mustache and goatee. The face is shaved and body hair is male distribution.

The calvarium is symmetric and intact to palpation and the scalp is intact. The eyes are closed, the corneas are slightly clouded. There is no conjunctival hemorrhage. The irides are brown and the pupils are 6 mm. Orbital soft tissues are unremarkable. The nasal and oral cavities are clear. Lips and oral mucosa are cyanotic. The dentition is natural and well-maintained. The external ears are clear and a single healed pierce is found in the left earlobe. The face, neck, and larynx are symmetric and intact and the trachea and larynx are midline.

The anterior chest is symmetric and intact. The breasts are male. The abdomen is minimally protuberant and the pelvis is intact. The penis is uncircumcised and the testes are descended. The perineum and anal orifice are unremarkable. The back is symmetric and intact.

0810049
Frank Cornish

The extremities are symmetric, normally developed, and are intact. The nails of the hands and feet are cyanotic. A healed 18 cm scar is found along the left hip and upper thigh.

There are no external signs of trauma or foul play.

## IV.  INTERNAL EXAMINATION

**1.    INTEGUMENT:** The body is opened with a modified thoracoabdominal and coronal scalp incision. The viscera are examined in situ and neck and thoracic viscera and cranial contents are removed for further inspection.

**2.    SEROUS CAVITIES:** The soft tissues of the anterior chest and neck are unremarkable. There is no evidence of occult trauma. The serous cavity membranes are smooth. There is no hemorrhage or fluid accumulation within major body cavities.

**3.    CARDIOVASCULAR SYSTEM:** The thoracic and abdominal aorta, vena cava and pulmonary arteries and veins are unremarkable. The major vessels and heart contain fluid blood and scattered postmortem thrombi. There is patchy intimal hemoglobin staining.

The heart weighs 758 gms. The coronary arteries arise normally and posterior circulation is right dominant. Circumferential sclerosis produces approximately 10-15% occlusion of the surface coronary arteries with an atheromatous plaque adding to approximately 25% occlusion of the proximal left anterior descending coronary. All cardiac chambers are dilated and there is symmetric hypertrophy of the left ventricle (anterior left ventricle 2.3 cm, septum 2.2 cm, right ventricle 0.5 cm). The myocardium is otherwise grossly unremarkable. The endocardium and cardiac valves are unremarkable.

**4.    RESPIRATORY SYSTEM:** The larynx and hyoid are intact. Central and peripheral airways are clear. The lungs are congested. There is patchy lower lobe edema with no additional gross pulmonary pathology. The right lung weighs 780 gms and the left 678 gms.

**5.    GASTROINTESTINAL SYSTEM:** The pharynx and esophagus are intact and unremarkable. Limited inspection of intraabdominal organs is remarkable only for slight yellow-tan coloration of the liver parenchyma.

0810049
Frank Cornish

6.    **HEMATOPOIETIC SYSTEM:** Lymph nodes of the neck and thorax are unremarkable. The thymus is involuted.

8.    **ENDOCRINE SYSTEM:** There is a multinodular goiter (some with cystic degeneration) and the total mass of the thyroid gland is 143 gms. Parathyroid glands are not identified. The pituitary is grossly unremarkable.

9.    **CRANIAL CAVITY/CENTRAL NERVOUS SYSTEM:** Subgaleal soft tissues are unremarkable. There is no evidence of occult head trauma. The calvarium and base of the skull are intact. The cerebrospinal fluid is clear and the meninges are congested. The arteries over the base of the brain and dural sinuses are intact and unremarkable.

The brain weighs 1505 gms. There is slight brain swelling with notching of the uncal gyri and cerebellar tonsils but no evidence of overt herniation. The gray and white matter of the brain are grossly unremarkable. The ventricular system is patent and contains clear cerebrospinal fluid. The upper cervical spinal cord is unremarkable. The atlanto-occipital joint is intact.

## SPECIMENS AND EVIDENCE COLLECTED

1.    Aortic blood 30 mL, femoral venous blood 30 mL, and vitreous humor 5 mL for toxicology
2.    Samples of viscera in fixative
3.    Blood card
4.    Five photographs

EDC: 10/23/08
Dictated: 09/02/08
Transcribed: 09/04/08
Completed: 09/04/08
MAK:cal

# Toxicology Test Results

Office of Chief Medical Examiner
Toxicology Laboratory Service
200 Feliks Gwozdz Place
Fort Worth, Texas 76104
Name: Frank Edgar Cornish
Case Number: 0810049
Toxicology Work Number: 0801591

Nizam Peerwani, M.D., DABFP
Chief Medical Examiner
Angela Springfield, PH.D., DABFT
Chief Toxicologist
Priority: 1
Service Request Number: 002

| Specimen | Drug | Result | Drug Amount | Performed By |
|---|---|---|---|---|
| AORTA BLOOD | ETHANOL | NEGATIVE | | J HO |
| AORTA BLOOD | BASE | NEGATIVE | | C WHEELER |
| AORTA BLOOD | ACID | NEGATIVE | | C WHEELER |

Report Prepared By:

Approved By:

Approved Date: 8/28/08

**CERTIFICATION OF VITAL RECORD**

# CITY OF GRAPEVINE, TEXAS
## VITAL STATISTICS DIVISION

**STATE OF TEXAS**       **CERTIFICATE OF DEATH**       **STATE FILE NUMBER**

| Field | Value |
|---|---|
| 1. LEGAL NAME OF DECEASED | FRANK EDGAR CORNISH IV |
| 2. DATE OF DEATH | 08/23/2008 |
| 3. SEX | MALE |
| 4. DATE OF BIRTH | 09/24/1967 |
| 6. AGE | 40 |
| 8. BIRTHPLACE | CHICAGO, IL |
| 9. SOCIAL SECURITY NUMBER | 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 |
| MARITAL STATUS | Married |
| SURVIVING SPOUSE NAME | ROBIN BLAKE |
| RESIDENCE STREET ADDRESS | 305 SHEFFIELD DRIVE |
| CITY | SOUTHLAKE |
| COUNTY | TARRANT |
| STATE | TEXAS |
| ZIP CODE | 76092 |
| INSIDE CITY LIMITS | ☑ Yes ☐ No |
| FATHER'S NAME | FRANK EDGAR CORNISH III |
| MOTHER'S NAME PRIOR TO FIRST MARRIAGE | GLORIA KNIGHTEN |
| DEATH OCCURRED IN A HOSPITAL | ☑ Inpatient |
| PLACE OF DEATH | BAYLOR MEDICAL CENTER AT GRAPEVINE |
| COUNTY OF DEATH | TARRANT |
| CITY | GRAPEVINE, 76051 |
| INFORMANT'S NAME & RELATIONSHIP TO DECEASED | ROBIN B. CORNISH - WIFE |
| MAILING ADDRESS OF INFORMANT | 305 SHEFFIELD DRIVE, SOUTHLAKE, TX 76092 |
| METHOD OF DISPOSITION | ☑ Burial |
| SIGNATURE OF FUNERAL DIRECTOR | JOHN BECKWITH - BY ELECTRONIC SIGNATURE - 9037 |
| PLACE OF DISPOSITION | BLUEBONNET CEMETERY |
| LOCATION | COLLEYVILLE, TX |
| NAME OF FUNERAL FACILITY | GOLDEN GATE FUNERAL HOME-THORNTON FRWY |
| ADDRESS OF FUNERAL FACILITY | 4155 S. R.L. THORNTON FRWY, DALLAS, TX 75224 |

| 31. PRINTED NAME, ADDRESS OF CERTIFIER | 28. DATE CERTIFIED | 29. LICENSE NUMBER | 30. TIME OF DEATH |
|---|---|---|---|
| MARC ANDREW KROUSE - BY ELECTRONIC SIGNATURE | 08/28/2008 | E8845 | 09:18 AM |

| 32. PART 1. ENTER THE CHAIN OF EVENTS | |
|---|---|
| MARC ANDREW KROUSE 200 FELIKS GWOZDZ PLACE, FORT WORTH, TX 76104-4919 | M E |
| IMMEDIATE CAUSE: SUDDEN ADULT DEATH WITH EVIDENCE OF HYPERTENSIVE HEART DISEASE | UNKNOWN |

| 35. MANNER OF DEATH | |
|---|---|
| ☑ Natural | |
| ☐ Accident | |
| ☐ Suicide | |
| ☐ Homicide | |
| ☐ Pending Investigation | |
| ☐ Could not be determined | |

| 43a. REGISTRAR FILE NO | 43b. DATE RECEIVED BY LOCAL REGISTRAR | 44. REGISTRAR |
|---|---|---|
| 15-265 | 08/28/2008 | REGISTRAR - CITY OF GRAPEVINE, ELECTRONICALLY FILED |

CONTROL NO.

**76861**

This is to certify that this is a true and correct reproduction of the original record as recorded in this office. Issued under authority of Sec. 191.051, Health and Safety Code.

*Linda Huff*
LINDA HUFF
LOCAL REGISTRAR

FEB-06 '09 PM01:27

ISSUED

**WARNING: IT IS ILLEGAL TO DUPLICATE THIS COPY**

3642

ANY ALTERATION OR ERASURE VOIDS THIS CERTIFICATE

THE STATE OF TEXAS

THE CITY OF GRAPEVINE TEXAS

 **CONCUSSION SETTLEMENT**

*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

## NOTICE OF REQUEST FOR ADDITIONAL DOCUMENTS
### DATE OF NOTICE: February 20, 2019
### RESPONSE DEADLINE: June 20, 2019

### I. SETTLEMENT CLASS MEMBER INFORMATION

| | |
|---|---|
| **Settlement Program ID** | 950012548 |

| **Name:** | First<br>Robin | M.I.<br>B | Last<br>Cornish |
|---|---|---|---|

| | |
|---|---|
| **Settlement Class Member Type** | Representative Claimant |
| **Primary Counsel** | O'Hanlon, Demerath & Castillo |

| **Asserted Qualifying Diagnosis** | Death with CTE (Chronic Traumatic Encephalopathy) | **Date of Asserted Qualifying Diagnosis** | 8/23/08 |
|---|---|---|---|

### II. EXPLANATION OF REQUEST(S)

This Notice is an official communication from the Claims Administrator for the NFL Concussion Settlement Program. Your Claim Package is missing documents or information.

This Notice explains what is missing and what you may do to address the issue. We can help if you have questions. To cure the issues identified in this Notice, click the Respond to Request for Additional Documents button on your secure online portal and follow the instructions provided to upload the information identified below.  If you already have provided us with the missing information, let us know because we may have received it after conducting the review that generated this notice.

The following requires attention before we can act further:

| | What is Missing | How to Address this Item |
|---|---|---|
| **1.** | You have not submitted any medical records reflecting the Qualifying Diagnosis. | Click the Respond button, go to Section 3 for Medical Records, click on the Upload Medical Records button and follow the instructions to upload medical records reflecting the Qualifying Diagnosis. |

### III. ADDITIONAL EXPLANATION OF WHAT IS MISSING

The medical records must show a post-mortem diagnosis of CTE made before April 22, 2015 (the Final Approval Date) by a board-certified neuropathologist for a Retired NFL Football Player who died before April 22, 2015.  See Section 6.3 (f) of the Settlement Agreement and FAQ 109.  Mr. Cornish died on August 23, 2008, and the August 24, 2008 autopsy report signed by Marc A. Krouse does not reference CTE and neither does the death certificate.  You provided an undated letter from Dr. Ronald L. Hamilton who diagnosed Mr. Cornish with CTE.  You must establish that Dr. Hamilton reviewed Mr. Cornish's brain tissue and made a CTE diagnosis on or before April 22, 2015.

### IV. HOW TO RESPOND TO THIS NOTICE

You have 120 days to respond to this Notice and provide the missing information or documents. **We encourage you to gather the requested information or documents now and respond to this Notice promptly, rather than using the full 120 days allowed to answer. The sooner you respond, the sooner your claim can move forward in the review process.**

By the Response Deadline stated above, send us the missing information or documents identified in Section II. We will wait the full 120 days to re-review your claim, unless you click the Submit Claim Package for Review button to confirm that your response is complete and we may continue to review your claim. If you do not respond in full on or before the Response Deadline, we will have to assess your claim based on the materials we have, which could lead to a lower Monetary Award or denial of your claim in its entirety.

Submit the requested information using your secure online portal to upload additional documents.

### V. HOW TO CONTACT US WITH QUESTIONS OR FOR HELP

If you are represented by a lawyer, consult with your lawyer if you have questions or need assistance. If you are unrepresented and have any questions about this Notice or need help, contact us at 1-855-887-3485 or send an email to ClaimsAdministrator@NFLConcussionSettlement.com. If you are a lawyer, call or email your designated Firm Contact for assistance. For more information about the Settlement program, visit the official website at www.NFLConcussionSettlement.com to read the Frequently Asked Questions or download a copy of the complete Settlement Agreement.



**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE: NATIONAL FOOTBALL | § | No. 2:12-md-02323-AB |
| LEAGUE PLAYERS' CONCUSSION | § | |
| INJURY LITIGATION | § | MDL No. 2323 |
| | § | |
| | § | **Hon. Anita B. Brody** |
| THIS DOCUMENT RELATES TO: | § | |
| Settlement Class Member Robin B. Cornish | § | |
| (SPID 950012548) | § | |

**WRITTEN STATEMENT IN SUPPORT OF CLASS MEMBER'S APPEAL**
**OF THE CLAIMS ADMINISTRATOR'S NOTICE OF DENIAL OF**
**MONETARY AWARD CLAIM**

Class Member Robin B. Cornish, by and through counsel, files this written statement in

support of this appeal and respectfully requests that the Claims Administrator's denial of this

claim be reversed and remanded for a calculation of the Class Member's Monetary Award because

the Claims Administrator erred in concluding that the Amended Settlement Agreement required

Class Member to submit proof that the board-certified neuropathologist who provided a post-

mortem diagnosis of CTE made the diagnosis on or before 4/22/15.[1]

---

[1]    If the Amended Settlement Agreement [ECF 6481] is construed to require a diagnosis on or before
4/22/15, Class Member reserves the right to seek relief from the Court pursuant to both Rule 60 and the
Court's inherent authority to amend the judgment in this case in order to implement the settlement.

## SUPPORTING EVIDENCE[2]

Exhibit 1　　　　Notice of Denial of Monetary Award Claim

Exhibit 2　　　　Relevant Excerpts from Class Member's Claim Package

Exhibit 3　　　　Notice of Request for Additional Documents

Exhibit 4　　　　Letter dated May 6, 2019 to Claims Administrator regarding Class Member's claim

---

[2]　Class Member also incorporates by reference the following documents that have been filed in this MDL or published on the Settlement Website:

(1) Original Settlement Agreement [ECF 6073-2];

(2) the Amended Settlement Agreement [ECF 6481];

(3) Absent Class Member and Plaintiff Yvonne Sagapolutele's Motion to Modify the Amended Final Order and Judgment [ECF 6534] by Conforming the Definition of "Death with CTE" to the Version Contemplated in the Fairness Hearing Order [ECF 6479] and Noticed to the Class in the Long Form Notice [ECF 6093-1] and Summary Notice [ECF 6093-2] Pursuant to Rule 60 and the Authority Retained in the Settlement Agreement [ECF 8263] ("Motion to Modify");

(4) Response in Opposition to the Motion to Modify [ECF 8430];

(5) Statement of Co-Lead Counsel in Opposition to the Motion to Modify [ECF 8431];

(6) Reply in Support of Motion to Modify [ECF 8442];

(7) Notice of Joinder [ECF 8443];

(8) Order denying, without prejudice, the Motion to Modify [ECF 8557];

(9) Posted Settlement Program FAQs (as of February 19, 2019); and

(10) Posted Settlement Program FAQs (as of July 8, 2019).

## BACKGROUND

Class Member submitted a claim package that included a post-mortem diagnosis of Chronic Traumatic Encephalopathy ("CTE") made by Dr. Hamilton, a board-certified neuropathologist.[3] Class Member's submitted claim package also includes documentation showing that the Player died prior to April 22, 2015.[4]  The claim package includes an autopsy report, death certificate, and letter from Dr. Hamilton describing his diagnosis of CTE based on brain tissue slides from the Tarrant County Medical Examiner.

The Claims Administrator initially requested additional documents, stating: "You have not submitted any medical records reflecting the Qualifying Diagnosis."[5]  The Claims Administrator further explained the following:

> The medical records must show a post-mortem diagnosis of CTE made before April 22, 2015 (the Final Approval Date) by a board-certified neuropathologist for a Retired NFL Football Player who died before April 22, 2015.  See Section 6.3(f) of the Settlement Agreement and FAQ 109.  Mr. Cornish died on August 23, 2008, and the August 24, 2008 autopsy report signed by Marc A. Krouse does not reference CTE and neither does the death certificate.  You provided an undated letter from Dr. Ronald L. Hamilton who diagnosed Mr. Cornish with CTE.  You must establish that Dr. Hamilton reviewed Mr. Cornish's brain tissue and made a CTE diagnosis on or before April 22, 2015.

In a correspondence dated May 6, 2019, Class Member's counsel explained that FAQ 109 must be read in conjunction with FAQ 93, which states that the diagnosis date for a Death with CTE diagnosis is "the date of the Player's death, even though the diagnosis is

---

[3]    Exhibit 2.

[4]    *Id.*

[5]    Exhibit 3

not made until after the Player dies."[6]

Despite this response, the Claims Administrator denied Class Member's Monetary Award Claim.[7]  Class Member has timely filed this appeal of the Claims Administrator's Notice of Denial of Monetary Award Claim.

<div align="center">**ARGUMENTS**</div>

The Claims Administrator denied Class Member's claim because the claim package does not show that Dr. Hamilton (a board-certified neuropathologist) "reviewed Mr. Cornish's brain tissue and made a CTE diagnosis on or before April 22, 2015."

## I. The Claims Administrator erred in concluding that the CTE Diagnosis was not timely.

The Claims Administrator's reason for denying the claim is legally flawed in two respects. First, the diagnosis date for Death with CTE is the date of the Player's death, even if the diagnosis occurs later.  Second, if the Amended Settlement Agreement [ECF 6481] does require that the diagnosis be made prior to 4/22/2015, this requirement violates Class Member's rights because it was not contained in the Original Settlement Agreement [ECF 6073-20] and was added (1) despite the Court's instructions that any changes to the Original Settlement Agreement should make it *more* favorable, not *less* favorable, to class members; (2) without notice to Class Member; and (3) after Class Member's opt-out deadline had already passed.

### A. The diagnosis date for Death with CTE is the date of the Player's death.

The Claims Administrator has posted several versions of "Posted Settlement Program FAQs" on the Settlement Website with answers to frequently asked questions.  All of the content in the

---

[6]    *See* Exhibit 4.

[7]    Exhibit 1.

<div align="center">4</div>

Posted Settlement Program FAQs is subject to advance approval by Counsel for the NFL Parties.[8]

According to FAQ 93 in these Posted Settlement Program FAQs, the diagnosis date for Death

with CTE is the date of the Player's death, even though the diagnosis is not made until after the

Player dies:[9]

> **93.  How is the date of a Qualifying Diagnosis determined?**
>
> The physician making a Qualifying Diagnosis of a Retired NFL Football Player must determine and verify the date on which that Qualifying Diagnosis was made. This date is important under the Settlement Agreement. It affects the amount of a Monetary Award, because the younger a Player is at the time of the Qualifying Diagnosis, the larger the award.
>
> The diagnosing physician uses his or her professional medical judgment in deciding when the Player had the conditions amounting to a Qualifying Diagnosis under Exhibit 1 to the Settlement Agreement. There are some basic rules about this:
>
> (a)  *Death with CTE:* For these claims, the date of the Qualifying Diagnosis is the date of the Player's death, even though the diagnosis is not made until after the Player dies. The Monetary Award is based on the Player's age when he died.

Based on the Claims Administrator's representations to the class members that the date of the

Qualifying Diagnosis for Death With CTE is the date of the Player's death, the only date that is

relevant in determining the date of a Qualifying Diagnosis for Death with CTE is the date of the

Player's death.  The Claims Administrator's insistence on proof that the diagnosis "was done on

or before 4/22/15" ignores these representations, which establish that the date of the Player's death

is the date of the Qualifying Diagnosis.

Here, the claim package establishes that the Player's death occurred before April 22, 2015.

---

[8]    *See* Amended Settlement Agreement § 4.1(a).

[9]    This language is from the Posted Settlement Program FAQs (as of February 19, 2019).  Since this claim package was submitted, a new version of the FAQs have been published on the Settlement Website in the Posted Settlement Program FAQs (as of July 8, 2019).  The language in FAQ 93 is unchanged in the new version of Posted Settlement Program FAQs; it has merely been moved to FAQ 99.

Accordingly, the date of the Qualifying Diagnosis is before April 22, 2015, and the Claims Administrator erred in denying this claim.

      **B. In the alternative, if this Denial is based on language that was surreptitiously added to the Settlement Agreement putatively imposing a deadline for a Qualifying Diagnosis for Death with CTE, the Denial must reversed.**

The Court has previously considered a Motion to Modify the Amended Final Order and Judgment [ECF 8263] and denied the motion without prejudice to a consideration of the issues in that motion at a later time.[10]  In that motion, Class Member Yvonne Sagapolutele brought the Court's attention to the fact that although the Original Settlement Agreement contained no deadline for obtaining a Death with CTE Diagnosis, language appears to have been surreptitiously added to the Amended Settlement Agreement that could be read to have added a diagnosis deadline without notice to the Court or to the class members.[11]  The motion sought relief under both Rule 60 and the Court's inherent authority to implement the settlement by amending the Court's judgment.[12]

The Court denied the motion without prejudice and stated that before it would consider the "extraordinary action of modifying the Settlement Agreement," class members must first submit a claim to the Claims Administrator.[13]

If the Special Master concludes that the Amended Settlement Agreement does require Class Member to have obtained a CTE diagnosis prior to April 22, 2015 despite the contrary language

---

[10]  *See* Order [ECF 8557]

[11]  Motion to Modify [ECF 8263]

[12]  *Id.*

[13]  Order [ECF 8557]

in the Posted Settlement Program FAQs and in other notices, it does not appear that the Special Master would have the necessary authority to provide a remedy.[14]  To the extent the Special Master may have the authority to provide a remedy, Class Member incorporates by reference the arguments in the Motion to Modify [ECF 8263].  If the denial of this claim is not reversed, Class Member expressly reserves the right to seek appropriate relief from the Court under Rule 60 and under the Court's inherent authority to implement the settlement by amending the Court's judgment.

## CONCLUSION

For all of the foregoing reasons, Class Member respectfully requests that the Special Master reverse the Claims Administrator's denial of this Monetary Award Claim and remand to the Claims Administrator for a calculation of the Monetary Award.

Dated:  July 12, 2019

<div style="margin-left:40%">

Respectfully Submitted:

/s/ Justin Demerath

**Justin Demerath**
Texas State Bar No. 24034415
**David Campbell**
Texas State Bar No. 24057033
O'HANLON, DEMERATH & CASTILLO
808 West Avenue |  Austin, TX 78701
Tel: (512) 494-9949  |  Fax: (512) 494-9919
jdemerath@808west.com
dcampbell@808west.com

**Counsel for Class Member**

</div>

---

[14]  *See* Order [ECF 6871] (providing Special Masters with the authority to faithfully oversee the implementation and administration of the Settlement Agreement); *see also* Motion to Modify [ECF 8263] (seeking relief under Rule 60).

## **CERTIFICATE OF SERVICE**

It is hereby certified that a true copy of the foregoing document was submitted on the Court

Portal on the 12th day of July, 2019.

/s/ Justin B. Demerath_____
Justin B. Demerath

## NFL Parties' Opposition to Appeal of
## Claim Denial by Representative Claimant Robin Cornish

Robin Cornish, Representative Claimant for her late husband, Frank Cornish, submitted a claim on February 5, 2019—the day before the deadline for pre-Effective Date claims—for a Qualifying Diagnosis of Death with CTE purportedly rendered by neuropathologist Dr. Ronald L. Hamilton. (*See* Claim Form; Diagnosing Physician Certification.) In support of her claim, Ms. Cornish submitted (1) a Diagnosing Physician Certification from Dr. Hamilton, reflecting a purported Qualifying Diagnosis of Death with CTE (Diagnosing Physician Certification at 6); (2) an undated letter from Dr. Hamilton, purporting to diagnose Mr. Cornish with CTE (Hamilton Letter); (3) a death certificate indicating that Mr. Cornish died on August 23, 2008 and listing Mr. Cornish's cause of death as "SUDDEN ADULT DEATH WITH EVIDENCE OF HYPERTENSIVE HEART DISEASE" (Death Certificate); and (4) an autopsy report completed by Dr. Marc A. Krouse, indicating the same cause of death listed in Mr. Cornish's death certificate (*see* Autopsy Report at 1).

On February 20, 2019, the Claims Administrator issued a Notice of Request for Additional Documents advising Ms. Cornish that her Claim Package was incomplete because Ms. Cornish did not submit any medical records reflecting the Qualifying Diagnosis. (*See* Notice of Request for Additional Documents.) In the section titled "Additional Explanation of What is Missing," the Claims Administrator explained that Ms. Cornish's Claim Package materials did not show that Dr. Hamilton administered a post-mortem examination in which he diagnosed Mr. Cornish with CTE prior to the Settlement Final Approval Date of April 22, 2015, as required by the Settlement Agreement. (*See id.*) In response to the Notice of Request for Additional Documents, counsel for Ms. Cornish sent a letter to the Claims Administrator asserting that no additional documents were required because the Settlement Program FAQs provide that the date of Mr. Cornish's Qualifying Diagnosis is the date of his death. (*See* May 6, 2019 email from David J. Campbell to the Claims Administrator at 1-2.) On June 25, 2019, the Claims Administrator denied Ms. Cornish's claim because she failed to submit any additional Claim Package materials to show that Dr. Hamilton actually rendered a diagnosis of CTE prior to the Final Approval Date, as required by the Settlement Agreement. (*See* Notice of Denial of Monetary Award Claim ("Denial Notice") at 1.)

On appeal, Ms. Cornish does not contend that Dr. Hamilton diagnosed Mr. Cornish with CTE based on a post-mortem examination prior to April 22, 2015. Instead, she argues that: (1) the still unspecified date that Dr. Hamilton actually diagnosed Mr. Cornish does not matter, because the diagnosis date for any Retired NFL Football Player diagnosed with Death with CTE purportedly is the date of the player's death; and (2) if the Claims Administrator determines that a diagnosing physician must render a diagnosis of Death with CTE prior to April 22, 2015, the amended Settlement Agreement purportedly violates Settlement Class Members' due process rights because it was a change to the original Settlement Agreement without proper notice. (*See* Written Statement in Support of Class Member's Appeal of the Claims Administrator's Notice of Denial of Monetary Award Claim ("Appeal").)[1]

---

[1]    With knowledge that Mr. Cornish and other clients never received a diagnosis of CTE prior to the Final Approval Date, counsel for Ms. Cornish has engaged in a lengthy history of legal gamesmanship concerning the deadline for Qualifying Diagnoses of Death with CTE. On August 15, 2017, counsel for Ms. Cornish, on behalf of client Yvonne Sagapolutele, filed a Motion to Modify the Amended Final Order and Judgment, in which she alleged that the Settlement Agreement's deadline to obtain a Qualifying Diagnosis of Death with CTE was "imposed after the deadline to opt out and without notice to Class Members." (Mem. of Law in Supp. of Absent Class Member

The NFL Parties respectfully oppose the Appeal because it is utterly unfounded, and there is no question this claim must be denied. The Settlement Agreement clearly requires that a board-certified neuropathologist render a Qualifying Diagnosis of Death with CTE prior to April 22, 2015, and Ms. Cornish has not provided—and undoubtedly cannot provide—any evidence that Dr. Hamilton rendered such a diagnosis prior to that date. In addition, the amended Settlement Agreement's requirement that a Qualifying Diagnosis of Death with CTE must be rendered prior to April 22, 2015 does not violate Settlement Class Members' due process rights; to the contrary, it expanded the deadline for Death with CTE diagnoses compared to the original Settlement Agreement to the benefit of Settlement Class Members.

For these reasons, and those set forth below, Ms. Cornish's appeal should be denied.

I.      **There Is No Evidence That Dr. Hamilton Rendered a Qualifying Diagnosis of Death With CTE Prior to April 22, 2015, as Required by the Settlement Agreement**

For a Qualifying Diagnosis of Death with CTE, the Settlement Agreement explicitly requires that a diagnosing physician render the diagnosis prior to the Settlement's Final Approval Date of April 22, 2015. Specifically, Section 2.1(aa) of the Settlement Agreement provides that the Qualifying Diagnosis of "Death with CTE is defined in Exhibit 1," and Exhibit 1 states that the definition of Death with CTE is: "For Retired NFL Football Players who died prior to the Final Approval Date, *a post-mortem diagnosis of CTE made by a board-certified neuropathologist prior to the Final Approval Date*, provided that a Retired NFL Football Player who died between July 7, 2014 and the Final Approval Date shall have until 270 days from his date of death to obtain such a postmortem diagnosis." (Settlement Agreement, Ex. A-1 at 5 § 5 (emphasis added).) Section 6.3(f) of the Settlement Agreement reiterates that requirement, stating that "[a] Qualifying Diagnosis of Death with CTE shall be made only for Retired NFL Football Players who died prior to the Final Approval Date, through *a post-mortem diagnosis made by a board-certified neuropathologist prior to the Final Approval Date* . . . ." (*See id.* at 6.3(f) (emphasis added).)

In the Appeal, Ms. Cornish argues that a Diagnosing Physician is not required to actually render a Qualifying Diagnosis of Death with CTE prior to April 22, 2015 because "the only date that is relevant in determining the date of a Qualifying Diagnosis for Death with CTE is the date of the Player's death." (Appeal at 5.) As support for this argument, Ms. Cornish cites Settlement FAQ 99 (formerly Settlement FAQ 93), which states in part:

> *Death with CTE*: For these claims, the date of the Qualifying Diagnosis is the date of the Player's death, even though the diagnosis is not made until after the Player dies. The Monetary Award is based on the Player's age when he died.

---

and Pl. Yvonne Sagapolutele's Mot. to Modify the Am. Final Order and J. at 18, 12-md-2323, ECF No. 8263-2 (the "Motion to Modify the Amended Final Order and Judgment").) After the Parties fully briefed that motion, the Court denied the motion without prejudice to Ms. Sagapolutele's (or other similarly situated Settlement Class Members') ability to raise the issue at a later time if she filed a Death with CTE claim that would have been valid but for the deadline. (Order, 12-md-2323, ECF No. 8557.) Counsel then waited over 16 months to file Ms. Cornish's Death with CTE claim, which relies on an *undated* letter from Dr. Hamilton, with the clear intention of obfuscating the timing and nature of Dr. Hamilton's purported CTE diagnosis.

(Settlement FAQ 99.)

Ms. Cornish's argument rests on willful ignorance of the Settlement Agreement and a misinterpretation of Settlement FAQ 99. Specifically, the Settlement Agreement plainly requires that, "[f]or Retired NFL Football Players who died prior to the Final Approval Date, a ***post-mortem diagnosis***" of Death with CTE must be "made by a board-certified neuropathologist ***prior to the Final Approval Date***." (Settlement Agreement Ex. A-1 at 5 § 5 (emphasis added).) If, as Ms. Cornish argues, the Settlement Agreement required only that a Retired NFL Football Player died prior to the Final Approval Date in order for a diagnosis made at *any unlimited future date* to be timely, the Settlement Agreement would not include subsequent language providing that a player who died between July 7, 2014 and the Final Approval Date "shall have until 270 days from his date of death to obtain such a postmortem diagnosis." (*Id.*)

Moreover, Settlement FAQ 99 does not concern the date by which a Diagnosing Physician must have *actually made* a Death with CTE diagnosis, but instead concerns the date of diagnosis ***for compensation purposes***. The Parties to the Settlement Agreement did not wish to reduce the compensatory award of a decedent who otherwise would have aged between death and the neuropathological examination. The Death with CTE portion of Settlement FAQ 99 confirms this, as it clearly states that "[t]he ***Monetary Award*** is based on the Player's age when he died." (Settlement FAQ 99 (emphasis added).)

Ms. Cornish has not provided—and presumably cannot provide—any evidence that Dr. Hamilton rendered his purported Qualifying Diagnosis of Mr. Cornish prior to the Final Approval Date of April 22, 2015. In fact, Dr. Hamilton's letter containing the purported diagnosis does not contain any dates whatsoever, and Dr. Hamilton's Diagnosing Physician Certification form only lists the date of Mr. Cornish's death (August 23, 2008) as the date of diagnosis. (*See* Hamilton Letter; Diagnosing Physician Certification.) Accordingly, Ms. Cornish's appeal must be denied, and her claim denial upheld, for this fundamental reason alone.

## II.   The Settlement Agreement Requirement That a Death With CTE Diagnosis Be Rendered Prior to April 22, 2015 Does Not Violate Settlement Class Members' Due Process Rights

Fully aware that her purported Death with CTE diagnosis is untimely because it was not rendered prior to the Final Approval Date of April 22, 2015, Ms. Cornish argues that such requirement somehow violates her right to due process. Specifically, Ms. Cornish argues that the Special Master should consider the arguments in Yvonne Sagapolutele's August 15, 2017 Motion to Modify the Amended Final Order and Judgment to remove the deadline to obtain the Qualifying Diagnosis, which Motion was denied without prejudice by Judge Brody with instruction that Ms. Sagapolutele "must first show that she would be entitled to recover but for the Death with CTE diagnosis deadline," and then may raise the due process argument in the claims appeal process. (Order, 12-md-2323, ECF No. 8557.) Ms. Cornish's argument that the amendments to the Settlement Agreement somehow violated her due process rights is meritless.

Relying on Ms. Sagapolutele's prior Motion to Modify the Amended Final Order and Judgment, Ms. Cornish alleges that the Settlement Agreement's deadline to obtain a Qualifying Diagnosis of Death with CTE was "surreptitiously added to the Amended Settlement Agreement" after the deadline to opt out and without notice to Settlement Class Members. (Appeal at 6.) Ms. Sagapolutele's prior motion argues that absent class members' due process rights were violated by the change, and that the Court should remedy the violation by modifying the Settlement Agreement

to remove the deadline for a Qualifying Diagnosis of Death with CTE. (*See* Motion to Modify the Amended Final Order and Judgment at 15-24.)

In response, the NFL Parties, too, incorporate all of the arguments set forth in their Opposition to that Motion, attached in full as Exhibit 1.[2]  As the NFL Parties explained in their Opposition, far from injuring Settlement Class Members' rights by "imposing" a new deadline for a Qualifying Diagnosis of Death with CTE, the amendments to the Settlement Agreement *extended* the deadline to obtain the Qualifying Diagnosis from the Preliminary Approval Date to the Final Approval Date (*see id.* at 10-11), and provided a 270-day grace period in which Settlement Class Members who died between the Preliminary Approval Date and the Final Approval Date could obtain a Qualifying Diagnosis (*see id.* at 6, 10).  Accordingly, the relevant changes solely benefited absent class members and in no way violated their due process rights. (*See id.* at 9-13.)

For these additional reasons, Ms. Cornish's appeal must be denied, and her claim denial must be upheld.

### Conclusion

The denial of Ms. Cornish's claim was required under the judicially-approved terms of the Settlement Agreement.  Because Ms. Cornish does not present clear and convincing evidence that such determination was in error, the Special Master should affirm denial of the claim.

Dated:  August 14, 2019

Respectfully submitted,

PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP

*/s/ Brad S. Karp*_____
Brad S. Karp
Bruce Birenboim
Claudia Hammerman
Lynn B. Bayard
Douglas M. Burns
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990
Email:  bkarp@paulweiss.com

*ATTORNEYS FOR THE
NATIONAL FOOTBALL LEAGUE
AND NFL PROPERTIES LLC*

---

[2]    (*See* Ex. 1, Mem. of Law of the National Football League and NFL Properties LLC in Opp. to Settlement Class Member Yvonne Sagapolutele's Mot. to Modify the Am. Final Order and J., 12-md-2323, ECF No. 8430.)

# EXHIBIT 1

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br><br>MDL No. 2323<br><br>Hon. Anita B. Brody |
| Kevin Turner and Shawn Wooden, *on behalf of themselves and others similarly situated*,<br><br>               Plaintiffs,<br><br>         v.<br><br>National Football League and NFL Properties, LLC, successor-in-interest to NFL Properties, Inc.<br>               Defendants. | Civ. Action No.: 14-cv-00029-AB |
| THIS DOCUMENT RELATES TO:<br>ALL ACTIONS | Hon. Anita B. Brody |

**MEMORANDUM OF LAW OF THE NATIONAL FOOTBALL LEAGUE AND NFL PROPERTIES LLC IN OPPOSITION TO SETTLEMENT CLASS MEMBER YVONNE SAGAPOLUTELE'S MOTION TO MODIFY THE <u>AMENDED FINAL ORDER AND JUDGMENT</u>**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

Preliminary Statement ........................................................................................ 1

Background ........................................................................................................ 4

      A.    Parties ................................................................................................. 4

      B.    Procedural Background ...................................................................... 4

Argument ........................................................................................................... 8

I.     THE PARTIES WERE NOT REQUIRED TO NOTIFY THE SETTLEMENT
      CLASS ABOUT THE AMENDMENTS ............................................. 8

      A.    The Amendments Did Not Require New Notice ................................. 9

      B.    The Original Settlement Notice Was Sufficient ................................. 11

II.    SAGAPOLUTELE IS NOT ENTITLED TO REWRITE THE SETTLEMENT
      AGREEMENT ................................................................................... 13

Conclusion ......................................................................................................... 17

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Adelson* v. *Ocwen Fin. Corp.*,
    621 F. App'x 348 (7th Cir. 2015) ........................................14

*In re Baby Prods. Antitrust Litig.*,
    708 F.3d 163 (3d Cir. 2013)...................................................9, 11

*Blue Diamond Coal Co.* v. *Trustees of UMWA Combined Ben. Fund*,
    249 F.3d 519 (6th Cir. 2001) ................................................16

*In re Diet Drugs Prods. Liab. Litig.*,
    200 F. App'x 95 (3d Cir. 2006) ............................................14

*In re Diet Drugs Prods. Liab. Litig.*,
    No. 99-cv-20593, 2010 WL 2735414 (E.D. Pa. July 2, 2010) ....................9, 11, 13

*F.A.C., Inc.* v. *Cooperativa de Seguros de Vida de Puerto Rico*,
    449 F.3d 185 (1st Cir. 2006)................................................17

*Federman* v. *Artzt*,
    339 F. App'x 31 (2d Cir. 2009) ............................................14, 15

*In re Four Seasons Sec. Laws Litig.*,
    525 F.2d 500 (10th Cir. 1975) ..............................................15

*Harris* v. *Graddick*,
    615 F. Supp. 239 (N.D. Ala. 1985)........................................9, 11

*Hensley* v. *Alcon Labs., Inc.*,
    277 F.3d 535 (4th Cir. 2002) ...............................................17

*Inmates of Suffolk Cty. Jail* v. *Rufo*,
    No. 71-cv-00162, 2015 WL 6958070 (D. Mass. Nov. 10, 2015) ....................16

*Kokkonen* v. *Guardian Life Ins. Co. of Am.*,
    511 U.S. 375 (1994)..........................................................17

*In re Linerboard Antitrust Litig.*,
    223 F.R.D. 357 (E.D. Pa.), *amended*, 223 F.R.D. 370 (E.D. Pa. 2004)...................17

*Matthews, Wilson & Matthews, Inc.* v. *Capital City Bank*,
    614 F. App'x 969 (11th Cir. 2015) ........................................15

**Page(s)**

*In re Nat'l Football League Players' Concussion Injury Litig.*,
   307 F.R.D. 351 (E.D. Pa. 2015), *amended*, No. 12-MD-02323, 2015 WL
   12827803 (E.D. Pa. May 8, 2015) ............................................................................ passim

*In re Nat'l Football League Players Concussion Injury Litig.*,
   821 F.3d 410 (3d Cir. 2016), *amended* (May 2, 2016) ...........................................7

*In re Nissan Motor Corp. Antitrust Litig.*,
   552 F.2d 1088 (5th Cir. 1977) .................................................................................11

*Orlando Residence, Ltd.* v. *Hilton Head Hotel Inv'rs*,
   No. 89-cv-0662, 2013 WL 1103027 (D.S.C. Mar. 15, 2013) ...................................15

*In re PaineWebber Ltd. P'ships Litig.*,
   171 F.R.D. 104 (S.D.N.Y 1997) ...............................................................................11

*Roman-Oliveras* v. *Puerto Rico Elec. Power Auth.*,
   797 F.3d 83 (1st Cir. 2015) ......................................................................................17

*Sawka* v. *Healtheast, Inc.*,
   989 F.2d 138 (3d Cir. 1993) .....................................................................................15

## OTHER AUTHORITIES

11 Fed. Prac. & Proc. Civ. § 2852 (3d ed.) ...................................................................17

20 Fed. Prac. & Proc. Deskbook § 104 ..........................................................................16

Fed. R. Civ. P. 23 .........................................................................................................2, 9

Fed. R. Civ. P. 60 ..........................................................................................1, 3, 14, 15, 16

Newberg on Class Actions § 1:5 (5th ed.) ........................................................................9

Newberg on Class Actions § 8:17 (5th ed.) ......................................................................9

Newberg on Class Actions § 8:36 (5th ed.) ......................................................................9

Newberg on Class Actions § 8:7 (5th ed.) ........................................................................9

Newberg on Class Actions § 18:40 (5th ed.) ...................................................................15

Defendants National Football League and NFL Properties LLC (collectively, the "NFL Parties") respectfully submit this memorandum of law in opposition to Settlement Class Member Yvonne Sagapolutele's ("Sagapolutele's") motion to modify the Amended Final Order and Judgment (the "Motion") (ECF No. 8263).

**Preliminary Statement**

Sagapolutele, an absent Settlement Class Member and representative of the estate of Retired NFL Football Player Pio Sagapolutele, brings this motion, ostensibly as a matter of due process, seeking significant revisions to the Final Order and Judgment that the Court entered more than two years ago approving the Class Action Settlement Agreement in this case.[1]  But no due process violation has occurred, and Sagapolutele has shown no justification for this Court to take the extraordinary step of rewriting a settlement agreement approved by both this Court and the Third Circuit that has been in place for years.  Sagapolutele's motion should therefore be denied.

The primary ground for Sagapolutele's motion is the amendments to the Settlement Agreement in February 2015, which expanded the definition of the Death with CTE Qualifying Diagnosis in response to the Court's directives.  Contrary to fact, Sagapolutele contends that the amendment imposed a deadline to obtain a Qualifying Diagnosis of Death with CTE, and "[b]ecause this change was made both without notice to absent class members and after the deadline to opt out of the settlement, [her] due process rights were violated."  (Pl. Mem. at 15.)  Sagapolutele asks this Court, pursuant to Rule 60 of the Federal Rules of Civil Procedure and the Court's inherent power, to amend the Final Order and Judgment to "remov[e] the deadline to obtain a Qualifying Diagnosis of Death with CTE."  (Pl. Mem. at 1.)

---

[1]    Unless otherwise defined, the capitalized terms used in this memorandum have the same meaning as those in the Settlement Agreement.

Sagapolutele's motion has no basis in fact or law for several reasons.

*First*, the amendments in question concerned an *expansion* of settlement benefits to the Settlement Class—namely, the expansion of the Qualifying Diagnosis of Death with CTE to include Retired NFL Football Players who died with CTE between Preliminary and Final Approval of the Settlement Agreement; the original agreement limited the Qualifying Diagnosis to those who died *prior* to Preliminary Approval.  It is well settled that additional notice to a class is necessary only when amendments to a settlement agreement are "materially adverse" to the class, not where, as here, they benefit the class.  Neither the Due Process Clause nor Rule 23 of the Federal Rules of Civil Procedure require notice in the event of beneficial, or even neutral, amendments.  As this Court correctly held in granting Final Approval of the Settlement Agreement over various objections to this very amendment (although on a different ground), no additional notice was required in this case for that very reason.

*Second*, contrary to Sagapolutele's contentions regarding lack of notice, the class notice in connection with the original settlement agreement was all that was necessary.  The Short- and Long-Form notices distributed to the Settlement Class Members made clear, as this Court and the Third Circuit held, that an award of Death with CTE would *not* be available to all Retired NFL Football Players diagnosed with CTE.  Rather, only particular cases of CTE meeting "certain" predetermined and agreed-to standards under the Settlement Agreement would be compensated—namely, cases where, prior to Preliminary Approval,[2] the Retired NFL Football Player received a post-mortem diagnosis of CTE made by a board-certified neuropathologist.  Further, the amendments in question were in fact made public; the NFL Parties and Class Counsel posted the amendments—including a redline comparison clearly

---

[2]    As noted above, the amendments to the Settlement Agreement extended this deadline to Final Approval.

reflecting the changes to the text of the Settlement Agreement—on the Court's publicly accessible PACER docket, where any member of the public, including the more than 5,000 Settlement Class Members with legal representation, could view it.  In fact, over 40 Settlement Class Members objected to the amendments, including the very amendment that Sagapolutele complains of here.

*Finally*, even if Sagapolutele could show a due process violation, which she cannot, neither Rule 60 nor this Court's "inherent authority" allows Sagapolutele to rewrite the Settlement Agreement as she seeks.  Rule 60(a) is limited to correction of "clerical mistakes" that do not affect the substantive rights of the parties.  Yet her contention that the amendments were simply "clerical mistakes" is at odds with her characterization of those same amendments as impairing her rights under the settlement.  Further, not only does Sagapolutele—as an absent class member—lack standing to move pursuant to Rule 60(b)(6), she also fails to establish that the "extraordinary remedy" of amendment pursuant to Rule 60(b)(6) is warranted here because she does not show that she will experience *any* hardship without the relief she seeks.  For example, Sagapolutele has neither shown (nor even claimed) that the brain of her late husband, who died in 2009, has ever been examined by a board-certified neuropathologist for CTE, much less diagnosed as having CTE.  Nor has she explained why any such examination—if such a belated diagnosis were even medically possible—did not occur prior to the Court's Final Approval Order on April 22, 2015 (as amended May 8, 2015).  Finally, Sagapolutele has not shown that she is entitled to relief under the Court's "inherent authority" to amend the Final Order and Judgment because that authority is no more expansive than Rule 60.

Accordingly, Sagapolutele's motion should be denied.

### Background

**A.    Parties**

The National Football League ("NFL") is an unincorporated association of 32 Clubs that promotes, organizes, and regulates the sport of professional football in the United States.  NFL Properties LLC ("NFLP") is a limited liability company organized under the laws of the State of Delaware and headquartered in New York.  Sagapolutele is a self-described absent Settlement Class Member and the representative of the estate of late Retired NFL Football Player Pio Sagapolutele.  (Pl. Mot. at 1.)

**B.    Procedural Background**

The Judicial Panel on Multidistrict Litigation established this multidistrict litigation as MDL 2323 on January 31, 2012.  Since that time, over 300 additional cases, brought on behalf of approximately 5,000 former NFL players, have been included in the MDL.  *See In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. 351, 361 (E.D. Pa. 2015), *amended*, No. 12-MD-02323, 2015 WL 12827803 (E.D. Pa. May 8, 2015), *and aff'd*, 821 F.3d 410 (3d Cir. 2016), *amended* (May 2, 2016), *cert. denied*, 137 S. Ct. 591 (2016), and *cert. denied*, 137 S. Ct. 607 (2016).  Plaintiffs in these cases asserted fraud- and negligence-based claims against the NFL Parties based on, among other things, a purported duty to provide players with rules and information needed to protect them from the alleged effects of repetitive mild traumatic brain injuries sustained during NFL play, including CTE.  *Id.* at 361-62.

On June 25, 2014, the NFL Parties and Class Counsel[3] (collectively, the "Parties") filed a motion for preliminary class certification and preliminary approval of the Settlement Agreement, and on July 7, 2014, the Court approved the motion.  *See id.* at 363-65.

---

[3]    Class Counsel consists of attorneys whom this Court duly appointed as legal representatives for the Settlement Class, including Christopher A. Seeger, Sol Weiss, Steven C. Marks, Gene Locks, Arnold Levin, and Dianne M. Nast.  (Final Order & Judg. ¶ 6,  ECF No. 6510.)

The Settlement Agreement defined the Settlement Class as "'[a]ll living NFL Football Players who, prior to the date of Preliminary Approval . . . retired . . . from playing professional football with the NFL,'" as well as their Representative Claimants and Derivative Claimants. *Id.* at 365 ("Representative Claimants are those duly authorized by law to assert the claims of deceased, legally incapacitated, or incompetent Retired Players. Derivative Claimants are those, such as parents, spouses, or dependent children, who have some legal right to the income of Retired Players."). The Settlement Agreement also provides funding for Retired NFL Football Players to receive a baseline assessment examination of their objective neurological functioning, for safety and educational initiatives, and for monetary awards for certain Qualifying Diagnoses, including, as relevant here, the Qualifying Diagnosis of Death with CTE. *Id.* at 366-67.

Prior to the Fairness Hearing, the Parties distributed Court-approved Short- and Long-Form notices to the Settlement Class. *See id.* at 382-86. "Each was written in plain and straightforward language," and together, they disclosed the key components of the Settlement Agreement, making clear that "only 'certain' cases of CTE are covered." *Id.* at 383-84. As explained by the notice, under the original agreement, the Settlement's benefits included "[m]onetary awards for *diagnoses* of Death with CTE *prior to July 7, 2014* . . . ." (*See* Long-Form Notice at 6, ECF No. 6086-1 (emphasis added); *see also* Class Action Settlement Agreement as of June 24, 2014 § 6.3(f), ECF No. 6087 (a "Qualifying Diagnosis of Death with CTE shall be made only for Retired NFL Football Players who died prior to the date of the Preliminary Approval and Class Certification Order, through a post-mortem diagnosis by a board-certified neuropathologist of CTE.").)

After the Fairness Hearing, the Parties—at this Court's request—agreed to several amendments to the Settlement Agreement, each of which made the Settlement Agreement more

beneficial to Settlement Class Members. *In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. at 386. For example, the amendments provided credit for Settlement Class Members who played in NFL Europe; ensured that all eligible Retired NFL Football Players who elected to receive a baseline assessment examination would receive one regardless of any funding limitations in the Settlement Agreement; included a hardship provision with respect to the appeal fee for Settlement Class Members; and allowed reasonable accommodation for Settlement Class Members who do not possess certain medical records. (Class Counsel and the NFL Parties' Joint Submission in Resp. to the Feb. 2, 2015 Order of the Ct., Feb. 13, 2015, ECF No. 6481.) In addition, as is relevant here, one amendment expanded the Qualifying Diagnosis of Death with CTE to cover not only Retired NFL Football Players who died prior to Preliminary Approval, but also Retired NFL Football Players who died between Preliminary Approval and Final Approval. (*Id.* at 4-5.) In addition, the Parties explained to the Court that "**consistent with the Parties' intent under the original Settlement Agreement**, and recognizing that obtaining such a [CTE] diagnosis **may take several months post-death**, the Parties have provided for a grace period of 270 days following any date of death between preliminary approval and the Final Approval Date to allow Claimants to obtain the necessary diagnosis." (*Id.* (emphasis added).)

Copies of the proposed amended Settlement Agreement, including a redline showing the exact changes made, were posted on the Court's publicly accessible PACER database in February 2015. (Class Counsel and the NFL Parties' Joint Submission in Resp. to the Feb. 2, 2015 Order of the Ct., Ex. A, Feb. 13, 2015, ECF No. 6481-1.) Between February and April 2015, more than 40 Settlement Class Members filed objections to the amendments, including objections to the amendment to the definition of Death with CTE at issue here. (*See*

Armstrong Objectors' Suppl. Obj. to the Am. Class Action Settlement, ECF No. 6503; Miller Suppl. Obj. to Settlement, ECF No. 6484.)  Sagapolutele did not file any objection.

   After considering those objections, the Court issued its opinion approving the Settlement Agreement and finding that "Class Members who opted out . . . received adequate notice of these changes, ***and notification of Class Members is not required***."  *In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. at 386 (emphasis added).  The Court explained:  "Because these changes improved the deal for Class Members without providing any concessions to the NFL Parties, an additional round of notice for Class Members is unnecessary."  *Id*.  On appeal, the Third Circuit affirmed this Court's Final Order and Judgment in full.  Regarding notice, the Third Circuit agreed with the District Court, finding "that the content of the class notice . . . satisfied Rule 23 and due process."  *In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 435-36 (3d Cir. 2016), *amended* (May 2, 2016), *cert. denied*, 137 S. Ct. 591 (2016), and *cert. denied*, 137 S. Ct. 607 (2016).  Notably, the Third Circuit also "conclude[d] that the settlement's treatment of CTE does not render the agreement fundamentally unfair."  *Id.* at 444.

   On August 15, 2017, over two years after this Court granted final approval of the Settlement, Sagapolutele filed this Motion challenging the Court's determination that the amendments were beneficial to Settlement Class Members and therefore did not require additional notice, and seeking "modification of the Final Order and Judgment by removal of the deadline to obtain a Qualifying Diagnosis of Death with CTE."[4]  (Pl. Mot. at 2.)  Sagapolutele contends that "[t]his deadline was added to the Settlement Agreement in February 2015 without

---

[4] Relatedly, Sagapolutele also seeks an "instruction to the settlement administrator to develop forms and procedures that allows Class Members to obtain a Qualifying Diagnosis of Death with CTE by obtaining a post-mortem diagnosis by a board-certified neuropathologist at any time during the 65-year term of the Monetary Award Fund."  (Pl. Mot. at 2.)

notice to the class," and "effectively prevented Class Members . . . from obtaining a Qualifying Diagnosis of Death with CTE." (*Id.*) Despite Sagapolutele's claim that "this deadline materially prejudices" Settlement Class Members (*id.*), she offers no explanation, much less an evidentiary showing, of how her own rights were in any way impaired by the alleged lack of notice. She does not demonstrate—or even assert—that the brain of her late husband has been examined by a board-certified neuropathologist and determined to have CTE. Therefore, not only is Sagapolutele's injury entirely hypothetical, but she also does not establish that such an examination would even be viable, given her husband's death in 2009.[5]

The NFL Parties, through this memorandum of law, oppose the Motion.

<u>**Argument**</u>

**I.**

**THE PARTIES WERE NOT REQUIRED TO NOTIFY
THE SETTLEMENT CLASS ABOUT THE AMENDMENTS**

Sagapolutele argues that her due process rights were violated because she did not receive notice that the February 2015 amendment "impos[ed] a deadline to obtain a Qualifying Diagnosis of Death with CTE" when the original Settlement Agreement purportedly permitted "Class Members [to] obtain a Qualifying Diagnosis for Death with CTE anytime within the 65-year life of the Monetary Award Fund." (Pl. Mem. at 17.) Not so.

"[T]he Due Process Clause of the Fourteenth Amendment requires that notice [concerning a class action settlement] be 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" *In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. at

---

[5]    *See* Compl. ¶ 43, *Sagapolutele* v. *Nat'l Football League*, No. 17-cv-00348 (E.D. Pa. Jan. 25, 2017), ECF No. 1; *see also* Am. Stip. of Dismissal, *Sagapolutele* v. *Nat'l Football League*, No. 17-cv-00348 (E.D. Pa. May 3, 2017), ECF No. 4 (approving stipulation of dismissal without prejudice).

383 (quoting *Mullane* v. *Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)).[6]  Parties

settling a class action litigation should therefore distribute notice that "'fairly apprises' class

members of the action and their rights."  Newberg on Class Actions § 8:17 (5th ed.).  Additional

notice is only required when the settling parties subsequently introduce amendments that "would

have a *material adverse* effect on the rights of class members."  *In re Diet Drugs Prods. Liab.*

*Litig.*, No. 99-cv-20593, 2010 WL 2735414, at *6 (E.D. Pa. July 2, 2010) (emphasis added); *see*

*also In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 175 n.10, 182 (3d Cir. 2013) (supplemental

notice required only for "*material* alterations" (emphasis added)).  Conversely, if the

amendments are neutral or beneficial to the settlement class, no additional notice is required.  *See*

*Harris* v. *Graddick*, 615 F. Supp. 239, 244 (N.D. Ala. 1985) (holding that where "the

amendment is narrow and it is clearly apparent that the interests of the classes are not

*substantially impaired*, . . . the notice already given is adequate" (emphasis added)); *see also In*

*re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. at 383 (collecting cases,

including *Harris*).  That is the case here.

## A.    <u>The Amendments Did Not Require New Notice</u>

        Sagapolutele's argument—that the Parties should have re-distributed notice

reflecting the February 2015 amendments to the Settlement Agreement—fundamentally

misunderstands the substance of the amendments.  In Sagapolutele's telling, "in the midst of

otherwise beneficial amendments" to the Settlement Agreement, the Parties "impose[d] an

additional requirement that prevents Class Members from recovering settlement proceeds [for

CTE] unless they obtained a Qualifying Diagnosis before" Final Approval.  (Pl. Mem. at 8.)  But

---

[6]  Due process notice requirements mirror those of Rule 23 of the Federal Rules of Civil Procedure.  *See* Newberg on Class Actions § 1:5 (5th ed.) ("Rule 23 is constructed to ensure that the representative nature of class action litigation safeguards these absent class members' due process rights."); *id.* § 8:7 (5th ed.) (the notice requirements under Rule 23 "echo[] the constitutional test set forth by the Supreme Court"); *id.* § 8:36 (5th ed.) ("[A]s Rule 23's requirements are quite similar to the Constitution's, the distinction may be immaterial.").

the amendment only clarified what was always the case and extended the deadline for Death with CTE to Final Approval.

The original settlement agreement provided that an award for a Qualifying Diagnosis of Death with CTE would be available only to Retired NFL Football Players who died *and* received a CTE diagnosis prior to Preliminary Approval.  The Long-Form Notice made this explicit, stating that the Settlement's benefits include "[m]onetary awards for ***diagnoses*** of Death with CTE ***prior to July 7, 2014*** . . . ."  (*See* Long-Form Notice at 6, ECF No. 6086-1 (emphasis added); *see also* Decl. of Robert H. Klonoff Relating to the Proposed Class Settlement in the Nat'l Football League Players' Concussion Injury Litig. ¶ 85, Nov. 12, 2014, ECF No. 6423-9 ("[C]ontrary to the arguments advanced by various objectors, ***excluding CTE in cases diagnosed after July 7, 2014***, is not irrational." (emphasis added)).)  Similarly, the Parties' publicly filed submission to the Court in support of the amendment stated specifically that the amendment's language providing only a grace period of time following death within which to obtain a neuropathological diagnosis of CTE was "*consistent with the Parties' intent under the original Settlement Agreement*."  (*See* Class Counsel and the NFL Parties' Joint Submission in Resp. to the Feb. 2, 2015 Order of the Ct. at 4, ECF No. 6481 (emphasis added).)

Contrary to Sagapolutele's contentions, this amendment did not adversely affect the Settlement Class—much less materially so.  In fact, the amendment *expanded* settlement benefits to encompass any additional Settlement Class Members who died after Preliminary Approval but before Final Approval, and provided 270 days to receive a CTE diagnosis for such players—thereby, increasing the time covered by the definition of Death with CTE by *nine* months.  (*See id.* at 4-5.)

Accordingly, far from being materially adverse to Settlement Class Members, these amendments actually made the Settlement Agreement *more beneficial* by expanding the availability of an award for Death with CTE to a larger class of claimants. (*Id*.) Thus, as this Court previously held, "[b]ecause these changes improved the deal for Class Members without providing any concessions to the NFL Parties, an additional round of notice for Class Members is unnecessary." *In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. at 386; *see also In re Baby Prods. Antitrust Litig.*, 708 F.3d at 175 n.10, 182; *In re Diet Drugs Prods. Liab. Litig.*, 2010 WL 2735414, at *6; *Harris*, 615 F. Supp. at 244.

### B.      The Original Settlement Notice Was Sufficient

Sagapolutele's due process argument fails for an additional reason.  The original notice, as this Court held, was clear that not all CTE diagnoses would be compensated under the Settlement Agreement, and the publicly available amendments sufficiently defined those CTE diagnoses eligible for compensation.

*First*, the Short- and Long-Form notices distributed to Settlement Class Members adequately protected their due process rights.  To comport with due process, settlement notice need only be adequate and summarize the terms of the Settlement; perfection and painstaking detail are not required.  *See In re Nat'l Football League Concussion Injury Litig.*, 307 F.R.D. at 382-83; *see also In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1104-05 (5th Cir. 1977) (explaining that notice need not "[be] perfectly correct in its form," and instead that "[t]he standard [] is that the notice . . . must contain information that a reasonable person would consider to be material in making an informed, intelligent decision" about whether to opt out); *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 124 (S.D.N.Y 1997) ("The notice need not be highly specific, and indeed 'numerous decisions, no doubt recognizing that notices to class members can practicably contain only a limited amount of information, have approved very

general descriptions of the proposed settlement.'" (quoting *Weinberger* v. *Kendrick*, 698 F.2d 61, 70 (2d Cir. 1982)).

As this Court previously held in overruling objections that "the Long-Form Notice is confusing because the term 'Death with CTE' appears several times without the accompanying cutoff date, . . . [b]oth the Summary Notice and the Long-Form Notice indicate that **only 'certain' cases of CTE are covered**." *In re Nat'l Football League Concussion Injury Litig.*, 307 F.R.D. at 383-84 (emphasis added) (citing Summary Notice at 1, ECF No. 6086-2; Long-Form Notice at 1, ECF No. 6086-1). Moreover, as stated above, the Long-Form Notice specifically stated that the Settlement's benefits include "[m]onetary awards for **diagnoses** of Death with CTE **prior to July 7, 2014** . . . ." (*See* Long-Form Notice at 6, ECF No. 6086-1 (emphasis added).) Both the Short- and Long-Form notice thus alerted Settlement Class Members that an award for CTE was not absolute or unconditional; rather, a Settlement Class Member would need to satisfy "certain" criteria before any award would be made. That is the case here—under the original and amended Settlement Agreement, Sagapolutele must satisfy particular criteria before receiving an award of Death with CTE, including that she obtain her decedent's CTE diagnosis within a predetermined time period—and the original notice satisfied Sagapolutele's Due Process rights by alerting her to this fact.

*Second*, the Parties made the February 2015 amendments publicly available months prior to this Court's April 22, 2015 Final Approval Order (as amended May 8, 2015). Not only did the Parties post a copy of the amendments to this Court's publicly available PACER database as early as February 2015, but they also submitted a redline showing the exact changes to be made to the Settlement Agreement as a result of those proposed amendments. (Class Counsel and the NFL Parties' Joint Submission in Resp. to the Feb. 2, 2015 Order of the Ct., Ex.

A, Feb. 13, 2015, ECF No. 6481-1.)  This is especially significant in light of the widespread attention paid to the docket in this matter by, among others, the more than 5,000 Retired NFL Football Players who, at the time of settlement, were represented by counsel in MDL 2323.  *See In re Nat'l Football League Concussion Injury Litig.*, 307 F.R.D. at 389; *see also In re Diet Drugs Prods. Liab. Litig.*, 2010 WL 2735414, at *4  (holding that no notice of settlement agreement amendments was required because, in part, "notice of the proposed Tenth Amendment, along with an opportunity to object, was supplied to representatives of all class members with active cases in MDL No. 1203.").

In fact, the Parties' efforts to publicize the amendments were successful, as evidenced by the fact that over 40 Settlement Class Members filed objections to the amendments, *including objections to the very Death with CTE provision about which Sagapolutele complains.*  (*See* Armstrong Objectors' Suppl. Obj. to the Am. Class Action Settlement, ECF No. 6503; *see also* Miller Suppl. Obj. to Settlement, ECF No. 6484.)  While these objectors raised somewhat different concerns than Sagapolutele raises here—they argued that the award of Death with CTE should be available to Retired NFL Football Players who die after Final Approval—they nonetheless sought, at least in part, the same relief that Sagapolutele appears to now seek: "modification of the Final Order and Judgment by removal of the deadline to obtain a Qualifying Diagnosis of Death with CTE."  (Pl. Mot. at 2.)  This Court properly rejected these objectors' requests, and similarly should reject Sagapolutele's efforts here.

## II.

## SAGAPOLUTELE IS NOT ENTITLED TO REWRITE THE SETTLEMENT AGREEMENT

Even if Sagapolutele had established that notice of the amendments should have been given—which she has not, as explained above—her Motion would fail.  Sagapolutele first

argues that under Rule 60(a), the Court should rewrite the Settlement Agreement and amend the Final Order and Judgment because the Court made a "clerical error" when approving the amendments to the Settlement Agreement.  Second, Sagapolutele contends that amendment under Rule 60(b)(6) is justified by "extraordinary circumstances."  Finally, Sagapolutele argues that the Court's inherent authority permits it to amend the Final Order and Judgment here.  (Pl. Mem. at 18-24.)  These arguments lack merit.

*First*, Sagapolutele has not made the necessary showing under Rule 60(a).  It is well settled that amendment of judgments pursuant to Rule 60(a) "is limited to the correction of 'clerical mistakes'; it encompasses only errors 'mechanical in nature, apparent on the record, and not involving an error of substantive judgment.'"  *In re Diet Drugs Prods. Liab. Litig*., 200 F. App'x 95, 103 (3d Cir. 2006) (quoting *Pfizer Inc.* v. *Uprichard*, 422 F.3d 124, 129 (3d Cir. 2005)).  For Rule 60(a) to apply, the change to be corrected must not "affect[] the substantive rights of the parties."  *Id.* at 103-04 (quoting *Pfizer*, 422 F.3d at 130) (holding Rule 60(a) inapplicable because the "correction here goes beyond the correction of a 'mindless and mechanistic mistake'" (quotation omitted)).  Here, Sagapolutele has only ever alleged that the amendments in question were deliberate attempts by the Parties to modify the criteria for the Qualifying Diagnosis of Death with CTE.  She cannot simultaneously argue these amendments were mere "clerical mistakes."  As such, Rule 60(a) is inapplicable here.

*Second*, Sagapolutele's attempts to seek relief under Rule 60(b)(6) fail, too.[7] Relief under Rule 60(b) is "not ordinarily . . . available to non-parties," *Federman* v. *Artzt*, 339 F. App'x 31, 33-34 (2d Cir. 2009), and "[a]bsent class members such as [movant] are treated, with limited exceptions inapplicable here, as non-parties to a class action."  *Adelson* v. *Ocwen*

---

[7] Although Sagapolutele broadly states she is moving for relief under Rule 60(b), her memorandum of law cites only to the Rule's catchall provision, which permits the modification of a final judgment based on "any other reason that justifies relief."  Fed. R. Civ. P. 60(b)(6).

*Fin. Corp.*, 621 F. App'x 348, 351 (7th Cir. 2015); *Federman*, 339 F. App'x at 33-34 (holding that absent class members who did not object to settlement were not "parties" for purposes of Rule 60(b) and declining "to expand the narrow exception to the general rule that non-parties cannot bring Rule 60(b) motions"); *In re Four Seasons Sec. Laws Litig.*, 525 F.2d 500, 504 (10th Cir. 1975) (absent class member "did not become a party for the purposes of Rule 60(b) to enable him to challenge the adequacy or nature of the settlement"); *see also* Fed. R. Civ. Proc. 60(b) ("the court may relieve *a party* . . . from a final judgment, order, or proceeding for the following reasons" (emphasis added)).  Sagapolutele did not object, intervene, or otherwise take steps to become a "party" to this action, so Rule 60(b) is not available to her here.  *See also* Newberg on Class Actions § 18:40 (5th ed.) ("[A]ll the circuits that have considered the issue have taken the position that absent class members are generally not authorized to file Rule 60 motions.").

Even if Sagapolutele were a "party," she has not met her burden to seek relief pursuant to Rule 60(b)(6) because such "[r]elief . . . may only be granted under extraordinary circumstances where, without such relief, an *extreme and unexpected hardship* would occur." *Sawka* v. *Healtheast, Inc.*, 989 F.2d 138, 140 (3d Cir. 1993) (emphasis added); *see also Matthews, Wilson & Matthews, Inc.* v. *Capital City Bank*, 614 F. App'x 969, 971 (11th Cir. 2015) (Rule 60(b)(6) "is an extraordinary remedy which may be invoked only upon a showing of exceptional circumstances, and the party seeking relief has the burden of showing that absent such relief, an extreme and unexpected hardship will result." (internal quotations omitted)); *Orlando Residence, Ltd.* v. *Hilton Head Hotel Inv'rs*, No. 89-cv-0662, 2013 WL 1103027, at *8 (D.S.C. Mar. 15, 2013), *aff'd sub nom. Orlando Residence, Ltd.* v. *Nelson,* 565 F. App'x 212 (4th Cir. 2014) ("Relief is rarely granted under . . . [Rule] 60(b)(6).").  The bar for relief under

Rule 60(b) is particularly high where the movant seeks to amend in "a class action [because] a too liberal application of Rule 60(b) would undermine the finality of judgments entered in such actions and would discourage their settlement." *Inmates of Suffolk Cty. Jail* v. *Rufo*, No. 71-cv-00162, 2015 WL 6958070, at *2 (D. Mass. Nov. 10, 2015); *see also Blue Diamond Coal Co.* v. *Trustees of UMWA Combined Ben. Fund*, 249 F.3d 519, 524 (6th Cir. 2001) ("[R]elief under Rule 60(b) is circumscribed by public policy favoring finality of judgments and termination of litigation.  This is especially true in an application of subsection (6) of Rule 60(b) . . . ." (internal quotations omitted)).

Sagapolutele has not made any showing whatsoever that the amendment will cause her any hardship, much less "extreme and unexpected hardship."  Tellingly, she has not shown—through supporting exhibits, affidavits, or even proffered facts in her brief—that the brain of her late husband, who passed away in 2009, has been examined by a board-certified neuropathologist and diagnosed with CTE at *any time*, much less that she would, but for the amendment, be entitled to an award.  She also has not established that a belated diagnosis years after death (indeed, her husband died approximately eight years ago) would even be possible given the deterioration of brain matter after death.  Nor does she seek to justify her apparent delay in seeking an examination.  Instead, Sagapolutele invites only speculation and offers only conclusory assertions as to how the purported change impacts her rights under the agreement, and she therefore fails to show that the exceptional remedy of Rule 60(b)(6) is warranted here.

*Finally*, Sagapolutele's invocation of the Court's "inherent authority" to amend a judgment does not salvage her claim because that authority is no broader than that provided by Rule 60, which, as explained above, does not permit Sagapolutele the relief she seeks.  *See* 20 Fed. Prac. & Proc. Deskbook § 104 (after 28 days from entry, "the judgment may be attacked,

other than by appeal, only as provided in Rule 60."); 11 Fed. Prac. & Proc. Civ. § 2852 (3d ed.) (while "the power of a court to modify an interlocutory judgment or order at any time prior to final judgment remains unchanged and is not limited by the provisions of Rule 60(b) . . . , [t]he rule does apply, however, to all final judgments entered in civil actions."). Sagapolutele's cases are not to the contrary; none holds that Courts have inherent authority to amend a final judgment approving a settlement agreement. (*See* Pl. Mem. at 23-24.) Three of the five cited cases concern only a court's authority to *enforce* a settlement agreement. *See Kokkonen* v. *Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 381 (1994) (holding that a district court has inherent authority to *enforce* a settlement agreement under particular circumstances); *Roman-Oliveras* v. *Puerto Rico Elec. Power Auth.*, 797 F.3d 83, 86-87 (1st Cir. 2015) (same); *Hensley* v. *Alcon Labs., Inc.*, 277 F.3d 535, 540-41 (4th Cir. 2002) (same). The fourth case, *In re Linerboard Antitrust Litig.*, 223 F.R.D. 357, 363 (E.D. Pa.), *amended*, 223 F.R.D. 370 (E.D. Pa. 2004) simply stands for the proposition that a court overseeing an MDL has inherent power to control the discovery process—an issue not relevant or in dispute here. Finally, while the fifth case involved an *amendment* of an order entering a settlement agreement, the Court did not hold that the district court had inherent authority to make the amendment; rather, it simply held that "the merits of [the district court's] decision to amend are no longer open to review." *F.A.C., Inc.* v. *Cooperativa de Seguros de Vida de Puerto Rico*, 449 F.3d 185, 190–91 (1st Cir. 2006).

In sum, Sagapolutele has not demonstrated (and cannot demonstrate) that she is entitled to rewrite the Settlement Agreement.

## <u>Conclusion</u>

For the foregoing reasons, the NFL Parties respectfully request that the Court deny the Motion in its entirety.

Dated:  September 28, 2017

Respectfully submitted,

/s/ Brad S. Karp

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
Brad S. Karp
Bruce Birenboim
Lynn B. Bayard
1285 Avenue of the Americas
New York, NY 10019-6064
Tel:   (212) 373-3000
bkarp@paulweiss.com

PEPPER HAMILTON LLP
Sean P. Fahey
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA 19103-2799
Tel:   (215) 981-4000

*Attorneys for Defendants the National Football
League and NFL Properties LLC*

## <u>CERTIFICATE OF SERVICE</u>

It is hereby certified that a true copy of the foregoing Memorandum of Law of the National Football League and NFL Properties LLC in Opposition to Settlement Class Member Yvonne Sagapolutele's Motion to Modify the Amended Final Order and Judgment was served electronically via the Court's electronic filing system on the 28th day of September, 2017, upon all counsel of record.

Dated:  September 28, 2017                     /s/Brad S. Karp
                                              Brad S. Karp



# NFL CONCUSSION SETTLEMENT

*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

## POST-APPEAL NOTICE OF DENIAL OF MONETARY AWARD CLAIM
### DATE OF NOTICE: September 26, 2019

### I. SETTLEMENT CLASS MEMBER INFORMATION

| | |
|---|---|
| **Settlement Program ID** | 950012548 |

| **Name:** | First<br>Robin | M.I.<br>B | Last<br>Cornish |
|---|---|---|---|

| **Settlement Class Member Type** | Representative Claimant |
|---|---|
| **Lawyer** | O'Hanlon, Demerath & Castillo |

| **Qualifying Diagnosis** | Death with CTE (Chronic Traumatic Encephalopathy) | **Date of Qualifying Diagnosis** | 8/23/08 |
|---|---|---|---|
| **Appellant** | Settlement Class Member | | |
| **Appellee** | NFL | | |

### II. EXPLANATION OF CLAIM DETERMINATION

This Notice is an official communication from the Claims Administrator for the NFL Concussion Settlement Program. The Special Master reviewed the appeal and determined the following, which is final and binding:

Appeal denied. Appellant did not show clear and convincing evidence of error in the Claims Administrator's decision. The Special Master's decision is a factual determination and is final and binding.

| 1. | Special Master ruled that the claim is denied |
|---|---|

### III. HOW TO CONTACT US WITH QUESTIONS OR FOR HELP

If you are represented by a lawyer, consult with your lawyer if you have questions or need assistance. If you are unrepresented and have any questions about this Notice or need help, contact us at 1-855-887-3485 or send an email to ClaimsAdministrator@NFLConcussionSettlement.com. If you are a lawyer, call or email your designated Firm Contact for assistance. For more information about the Settlement program, visit the official website at www.NFLConcussionSettlement.com to read the Frequently Asked Questions or download a copy of the complete Settlement Agreement.



# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br><br>MDL No. 2323<br><br>Hon. Anita B. Brody |
| Kevin Turner and Shawn Wooden, *on behalf of themselves and others similarly situated*,<br><br>                    Plaintiffs,<br><br>                    v.<br><br>National Football League and NFL Properties, LLC, successor-in-interest to NFL Properties, Inc.<br>                    Defendants. | Civ. Action No.: 14-cv-00029-AB |
| THIS DOCUMENT RELATES TO:<br>Settlement Class Member Robin Cornish (SPID 950012548) | Hon. Anita B. Brody |

## RESPONSE OF THE NATIONAL FOOTBALL LEAGUE AND NFL PROPERTIES LLC IN OPPOSITION TO ROBIN CORNISH'S OBJECTION TO POST-APPEAL NOTICE OF DENIAL OF <u>MONETARY AWARD CLAIM</u>

# TABLE OF CONTENTS

TABLE OF CONTENTS.............................................................................................. i

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND ........................................................................................................ 2

ARGUMENT .............................................................................................................. 4

      A.     Qualifying Diagnoses of Death with CTE Must Be Rendered Prior to the
Deadline Set Forth in the Settlement Agreement .................................................. 4

Conclusion ................................................................................................................. 6

The National Football League and NFL Properties LLC (collectively, the "NFL Parties") respectfully submit this response in opposition to Robin Cornish's Objection to Post-Appeal Notice of Denial of Monetary Award Claim (the "Objection"). In the Objection, Ms. Cornish seeks reversal of the Special Master's decision denying her appeal of a Qualifying Diagnosis of Death with CTE based on purported legal error. For the reasons set forth below, Ms. Cornish's arguments are without merit, and the Objection should be denied.

## PRELIMINARY STATEMENT

On June 25, 2019, the Claims Administrator denied Ms. Cornish's claim for a Qualifying Diagnosis of Death with CTE on behalf of the late Frank Cornish.[1] The Claims Administrator explained that Ms. Cornish's claim was insufficient to satisfy the Settlement criteria for the alleged Qualifying Diagnosis because it did not provide any evidence that the diagnosing physician, Dr. Ronald Hamilton, personally performed a post-mortem examination of Mr. Cornish's brain before the deadline set forth in the Settlement Agreement (here, April 22, 2015 given that Mr. Cornish died prior to Preliminary Approval of the Settlement). Ms. Cornish then appealed her claim determination to the Special Masters, arguing that (1) the date on which Dr. Hamilton actually diagnosed Mr. Cornish does not matter, because FAQ 99 allegedly establishes that the "diagnosis date" for Death with CTE is the date of the player's death, regardless of when the actual diagnosis later occurs; and (2) if the Claims Administrator determines that a diagnosing physician must render a diagnosis of Death with CTE prior to a deadline set forth in the operative Settlement Agreement, then the Settlement Agreement violates Settlement Class Members' due process rights because it purportedly reflects an adverse change to the original Settlement Agreement without

---

[1]  Mr. Cornish's death certificate and autopsy report indicate that he died on August 23, 2008 as a result of hypertensive heart disease. (*See* Death Certificate, Doc. No. 199406; Autopsy Report, Doc. No. 199407.)

proper notice.  Upon considering these arguments, the Special Master denied the appeal and concurred with the Claims Administrator's determination that Ms. Cornish's claim did not satisfy the Settlement criteria for a Qualifying Diagnosis of Death with CTE.  Ms. Cornish now asks the Court to overturn the Special Master's determination on legal grounds.

In the Objection, Ms. Cornish advances a nearly identical version of the first argument set forth in her prior appeal:  Dr. Hamilton's alleged diagnosis of Mr. Cornish was timely pursuant to Settlement FAQ 99 because the "diagnosis date" purportedly is the date of the player's death as opposed to when the diagnosis actually occurred.  There is no merit to this argument.

In fact, the Injury Definition for Death with CTE set forth in the Settlement Agreement expressly requires that a board-certified neuropathologist render the diagnosis prior to the Final Approval Date (April 22, 2015) or within 270 days after the player's death when the player died between Preliminary and Final Approval.  The Objection willfully ignores the express language of the Settlement Agreement while attempting to twist the meaning of FAQ 99 to displace the Settlement Agreement's unambiguous requirements.  Here, Ms. Cornish did not provide—and undoubtedly cannot provide—any evidence that Dr. Hamilton rendered the diagnosis prior to the April 22, 2015 deadline, and that factual record is final and binding for this Objection.

For these reasons, and those set forth herein and in the NFL Parties' opposition to Ms. Cornish's appeal, the Objection should be denied.

## **<u>BACKGROUND</u>**

This Objection is one of a series of 19 separate objections filed by the law firm of O'Hanlon, Demerath & Castillo ("O'Hanlon") on behalf of claimants whose Claim Packages relied on undated letters from neuropathologist Dr. Ronald Hamilton purporting to render Qualifying Diagnoses of Death with CTE.  For each of these claims, neither Dr. Hamilton's undated letter nor the remaining Claim Package materials provide any evidence that Dr. Hamilton

actually rendered a Qualifying Diagnosis of Death with CTE prior to Final Approval of the Settlement (or within 270 days of death when the Retired Player died between Preliminary and Final Approval).

With knowledge that Mr. Cornish and its other clients never received a diagnosis of Death with CTE prior to the deadline set forth in the Settlement Agreement, O'Hanlon has engaged in a lengthy campaign to evade the deadline plainly established for Qualifying Diagnoses of Death with CTE. On August 15, 2017, O'Hanlon, on behalf of client Yvonne Sagapolutele, filed a Motion to Modify the Amended Final Order and Judgment, alleging that the Settlement Agreement's deadline to obtain a Qualifying Diagnosis of Death with CTE was "imposed after the deadline to opt out and without notice to Class Members." (Mem. of Law in Supp. of Absent Class Member and Pl. Yvonne Sagapolutele's Mot. to Modify the Am. Final Order and J. at 18, 12-md-2323, ECF No. 8263-2 (the "Motion to Modify the Amended Final Order and Judgment").) After full briefing, the Court denied the motion without prejudice to Ms. Sagapolutele's (or other similarly situated Settlement Class Members') ability to raise the issue at a later time if she filed a Death with CTE claim that would have been valid but for the deadline. (Order, 12-md-2323, ECF No. 8557.) O'Hanlon then waited over 16 months to file any Death with CTE claims—ultimately filing 20 separate claims on February 5, 2019 (the day before the deadline for pre-Effective Date claims)—and relying on undated letters from Dr. Hamilton with the clear intention of obfuscating the timing and nature of the purported Death with CTE diagnoses. O'Hanlon is now back before the Court advancing meritless arguments with respect to Qualifying Diagnoses of Death with CTE that the Court should summarily reject.

## **ARGUMENT**

In the Objection, Ms. Cornish argues that Dr. Hamilton's alleged diagnosis was timely because the "diagnosis date" for a Death with CTE claim purportedly is the date of the player's death. This argument is wholly without merit.

### A.    Qualifying Diagnoses of Death with CTE Must Be Rendered Prior to the Deadline Set Forth in the Settlement Agreement

*First*, Ms. Cornish argues that the Special Master erred in denying her appeal because a diagnosing physician need not render a Qualifying Diagnosis of Death with CTE prior to *any* deadline so long as the retired player decedent passed away before the Settlement's Final Approval Date. (*See* Objection at 5-7.) That argument, however, is contradicted by the clear terms of the Settlement Agreement.

For a Qualifying Diagnosis of Death with CTE, the Settlement Agreement explicitly requires that a diagnosing physician render the diagnosis prior to a specified deadline set by the Settlement Agreement. Specifically, Section 2.1(aa) of the Settlement Agreement provides that the Qualifying Diagnosis of "Death with CTE is defined in Exhibit 1," and Exhibit 1 states that the definition of Death with CTE is: "For Retired NFL Football Players who died prior to the Final Approval Date, *a post-mortem diagnosis of CTE made by a board-certified neuropathologist prior to the Final Approval Date, provided that a Retired NFL Football Player who died between July 7, 2014 and the Final Approval Date shall have until 270 days from his date of death to obtain such a postmortem diagnosis*." (Settlement Agreement, Ex. A-1 at 5 § 5 (emphasis added).) Section 6.3(f) of the Settlement Agreement reiterates that requirement.

In the Objection, as in her prior appeal, Ms. Cornish argues that, where a player died before the Final Approval Date, *no deadline applies* to when a physician must render a Qualifying Diagnosis of Death with CTE because "the diagnosis date for Death with CTE is the date of the

Player's death, even if the diagnosis occurs later." (Objection at 5; *see also* Written Statement in

Support of Class Member's Appeal of the Claims Administrator's Notice of Denial of Monetary

Award Claim, Doc. No. 210928 at 5 (arguing that "the only date that is relevant in determining the

date of a Qualifying Diagnosis for Death with CTE is the date of the Player's death").)  As support

for this argument, Ms. Cornish cites Settlement FAQ 99 (formerly Settlement FAQ 93), which

states in part:

> *Death with CTE*: For these claims, the date of the Qualifying
> Diagnosis is the date of the Player's death, even though the
> diagnosis is not made until after the Player dies. The Monetary
> Award is based on the Player's age when he died.

(Settlement FAQ 99.)

Ms. Cornish's argument rests on willful ignorance of the Settlement Agreement and a

misinterpretation of Settlement FAQ 99.  Specifically, as outlined above, the Settlement

Agreement plainly requires that, "[f]or Retired NFL Football Players who died prior to the Final

Approval Date, a post-mortem diagnosis" of Death with CTE must be "made by a board-certified

neuropathologist *prior to the Final Approval Date* . . . ."  (Settlement Agreement Ex. A-1 at 5 § 5

(emphasis added).)  Moreover, if, as Ms. Cornish argues, the Settlement Agreement required only

that a Retired NFL Football Player died prior to the Final Approval Date in order for a diagnosis

made at *any unlimited future date* to be timely, the Settlement Agreement would not include

subsequent language providing that a player who died between July 7, 2014 and April 22, 2015

"*shall have until 270 days from his date of death to obtain such a postmortem diagnosis*."  (*Id.*)

Moreover, Settlement FAQ 99 does not—and cannot—alter the Settlement Agreement's

Injury Definition setting forth the date by which a Diagnosing Physician must have *actually made*

a Death with CTE diagnosis. Instead, FAQ 99 concerns the date of diagnosis used *for calculating*

*compensation*.  The Parties to the Settlement Agreement did not wish to reduce the compensatory

award of a decedent by calculating the award value from the date of the neuropathological examination and diagnosis because, unlike living claimants, the decedent would not have aged between death and the relevant examination.  Thus, the Death with CTE discussion in Settlement FAQ 99 clearly states that "[t]he ***Monetary Award*** is based on the Player's age when he died." (Settlement FAQ 99 (emphasis added).)   Ms. Cornish's counsel shamelessly excluded that clarifying language from the FAQ quotation included in the Objection.  (*See* Objection at 5.)

For these reasons, Ms. Cornish's argument lacks any merit whatsoever.

<u>**Conclusion**</u>

For the foregoing reasons, the NFL Parties respectfully request that the Court deny Ms. Cornish's Objection and affirm the Special Master's decision.

Dated: November 11, 2019                    Respectfully submitted,

                                                /s/ Brad S. Karp

                                                PAUL, WEISS, RIFKIND, WHARTON
                                                  & GARRISON LLP
                                                Brad S. Karp
                                                Bruce Birenboim
                                                Lynn B. Bayard
                                                Claudia Hammerman
                                                Douglas M. Burns
                                                1285 Avenue of the Americas
                                                New York, NY 10019-6064
                                                Tel: (212) 373-3000
                                                bkarp@paulweiss.com

                                                *Attorneys for the National Football League and*
                                                *NFL Properties LLC*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| | § | |
| IN RE: NATIONAL FOOTBALL | § | No. 2:12-md-02323-AB |
| LEAGUE PLAYERS' CONCUSSION | § | |
| INJURY LITIGATION | § | MDL No. 2323 |
| | § | |
| | § | **Hon. Anita B. Brody** |
| THIS DOCUMENT RELATES TO: | § | |
| Settlement Class Member Carleen Hastings | § | |
| (SPID 950013395) | § | |

---

**SETTLMENT CLASS MEMBER'S OBJECTION TO THE SPECIAL**
**MASTER'S DECISION DENYING CLASS MEMBER'S APPEAL**

---

## **TABLE OF CONTENTS**

Table of Contents...................................................................................... i

Supporting Evidence............................................................................... 4

Background............................................................................................. 4

Standard of Review ............................................................................... 5

Argument ............................................................................................... 6

    I.    Class Member's claim was erroneously denied because the date of the Qualifying Diagnosis for Death with CTE is the date of the Player's death.................................. 6

    II.    Class Member's claim was erroneously denied because the Amended Settlement Agreement does not require a board-certified neuropathologist to personally examine brain tissue. ............................................................ 7

    III.    The Claims Administrator erred in stating that Dr. Hamilton did not examine the Player's brain tissue.................................... 8

Conclusion............................................................................................. 9

i

TO THE HONORABLE DISTRICT COURT JUDGE:

Class Member Carleen Hastings ("Class Member") respectfully submits this objection to the Special Master's October 31, 2019 decision denying Class Member's appeal of the Denial of Monetary Award Claim. The Special Master erred in affirming the Claims Administrator's denial based on erroneous conclusions of law and by ignoring undisputed evidence that the diagnosing board-certified neuropathologist personally examined the deceased Retired Player's brain tissue.

This appeal presents the following three questions regarding these errors:

1) Is the date of a Qualifying Diagnosis for Death with CTE the date of the Player's death, as stated in the Posted Settlement Program FAQs?

2) Does a board-certified neuropathologist's diagnosis of Death with CTE satisfy the Amended Settlement Agreement's requirements without an additional "confirmation" of the diagnosis?

3) Did the Claims Administrator err in stating there was no post-mortem examination report that showed Dr. Hamilton has personally examined the Retired Player's brain tissue when there was a post-mortem examination report that showed Dr. Hamilton personally examined the Retired Player's brain tissue?

The answer to all three of these questions is "yes." The Court should overturn the Special Master's decision because the Special Master affirmed the Claims Administrator's denial despite the Claims Administrator's error by incorrectly answering "no" to these questions.

First, the Claims Administrator erroneously concluded that the date of diagnosis is not the date of the Player's death. But according to the Posted Settlement FAQs, which the NFL Parties approved, the date of the Qualifying Diagnosis for Death with CTE is "the date of the Player's death, even though the diagnosis is not made until

1

after the Player dies."[1]

Second, the Claims Administrator erroneously concluded that the board-certified neuropathologist was required to confirm a CTE diagnosis by examining the Player's brain tissue. But that requirement can be found nowhere in the Amended Settlement Agreement. The settlement agreement simply requires a CTE diagnosis by a board-certified neuropathologist.

Third, the Claims Administrator stated there was no post-mortem examination report that showed Dr. Hamilton has personally examined the Retired Player's brain tissue, but there was, in fact, a post-mortem examination report that showed Dr. Hamilton personally examined the Retired Player's brain tissue.[2]

---

[1]    Posted Settlement FAQs (as of September 12, 2019), FAQ 99. In prior versions of the Posted Settlement FAQs, this language was included as part of FAQ 93.

[2]    The post-mortem examination report is the last page of Exhibit 2, Class Member's Claim Package, and it looks like this:



**University of Pittsburgh Physicians, Department of Pathology**

Division of Neuropathology

Clayton A. Wiley, MD, PhD
*Director*

Charleen T. Chu, MD, PhD
Robert H. Garman, DVM
Ronald Hamilton, MD
Julia Kofler, MD
Scott M. Kulich, MD, PhD
David Lacomis, MD
Geoffrey Murdoch, MD, PhD
Gutti R. Rao, MD

UPMC Presbyterian
Room S701 Scaife Hall
200 Lothrop Street
Pittsburgh, PA 15213
T 412-624-9415
F 412-624-5610

I have conducted a study of Cristopher Mims' brain tissue. Additionally, in my Neuropathology practice I conduct an ongoing study of all available and existing medical literature related to the existence and diagnosis of CTE and I combine that knowledge with my training and extensive experience related to the study and diagnosis of CTE.

Christopher Mims died on October 15, 2008 at age 38.

Received from Eric J Wahoske, LA County Department of ME Coroner are 180 unstained tissue sections on glass slides labeled 08-7210-H LAC ME Coroner, US recuts (10 unstained slides from 8 tissue blocks).

H&E stained recuts are examined:

    slide A  dura mater;
    slide B  cerebral cortex
    slide C          hippocampus
    slide D  hippocampus
    slide E  insular cortex, putamen, globus pallidus and thalamus
    slide F          cerebral cortex
    slide G  cerebellum cortex and dentate nucleus
    slide H          medulla

PHF-1/tau immunostaining of slides G and H were negative for abnormally aggregated tau. PHF-1/tau immunostaining of slides B, C, D, E and F show numerous neocortical PHF-1/tau positive tangles in neurons, with staining of many neuronal processes (neuropil threads) as well as tau-positive glial cells, especially in the depths of the sulcus and focally around some blood vessels best seen in slide B. There are no neuritic plaques and the tangles are much more common in the neocortex than in the hippocampus. These findings are diagnostic of CTE.

Figure 1: neocortex with numerous tangles, neuropil threads, glial tau and perivascular location; on the right is a close up of the distinctive perivascular pathology of CTE.



Christopher Mims had CTE.

Signed:
/s/
Ronald L Hamilton, M.D.

Affiliated with the University of Pittsburgh School of Medicine

3

<u>**SUPPORTING EVIDENCE**</u>

Exhibit 1          Notice of Denial of Monetary Award Claim

Exhibit 2          Relevant Excerpts from Class Member's Claim Package

Exhibit 3          Notice of Request for Additional Documents

Exhibit 4          Class Member's Appeal

Exhibit 5          NFL Parties' Response

Exhibit 6          Post-Appeal Notice of Denial of Monetary Award Claim

<u>**BACKGROUND**</u>

Class Member submitted a claim package that included a post-mortem diagnosis of Chronic Traumatic Encephalopathy ("CTE") made by a board-certified neuropathologist.[3]   Class Member's claim package also includes documentation showing that the Player died prior to April 22, 2015.[4]

Despite the documentation in the claim package, the Claims Administrator denied Class Member's Monetary Award Claim for the following reason:[5]

> Section 6.3(f) of the Settlement Agreement allows a CTE diagnosis if: (1) the Retired Player died before 4/22/15, and (2) there was a post-mortem diagnosis of CTE made by a board-certified neuropathologist prior to 4/22/15.  Although Dr. Hamilton is a board-certified neuropathologist and signed a Pre-Effective Date Diagnosing Physician Certification Form indicating a CTE diagnosis, we must have proof that he personally performed the post-mortem exam on the Retired Player and that it was done on or before 4/22/15.  There was no post-mortem examination report submitted to indicate that Dr. Hamilton examined the Retired Player's brain tissue to confirm a CTE diagnosis.  The two-page letter provided by Dr. Hamilton does not satisfy the requirements for a CTE diagnosis under this Settlement Program.  For these reasons, this claim is denied.

---

[3]   Exhibit 2.

[4]   *Id.*

[5]   Exhibit 1.

4

Contrary to the Claims Administrator's assertion that "[t]here was no post-mortem examination report submitted to indicate that Dr. Hamilton examined the Retired Player's brain tissue to confirm a CTE diagnosis," there was a post-mortem examination report that showed Dr. Hamilton has personally examined the Retired Player's brain tissue.[6]

Class Member timely filed an appeal of the Claims Administrator's Notice of Denial of Monetary Award Claim challenging the two conclusions of law in the Notice regarding the diagnosis date and the "confirmation" requirement and the failure to acknowledge that a post-mortem examination report showed that Dr. Hamilton did confirm his CTE diagnosis by examining the Retired Player's brain tissue.[7]

The Special Master denied the Class Member's appeal on October 31, 2019 without addressing the legal arguments raised in Class Member's Appeal or acknowledging that there is a post-mortem report showing that Dr. Hamilton personally examined the Retired Player's brain tissue.[8]

## STANDARD OF REVIEW

The Court reviews de novo Class Member's objections to conclusions of law from its Special Masters. *See* ECF No. 6871 at 4–5 (appointing the Special Masters and defining their roles). Class Member has challenged the Claims Administrator's conclusions of law, the facts are undisputed. The Court's decision regarding this objection is final and binding under both the original settlement agreement (of which Class Member received notice with an opportunity to opt out) and the amended settlement agreement (of which Class Member did not receive notice and which was entered after the opt-out deadline). *See* ECF No. 6073-2, Original Settlement Agreement § 9.8 *and* ECF No. 6481, Amended Settlement Agreement § 9.8. In the event this objection is not sustained, Class Member expressly reserves the right to re-urge the Motion to Modify [ECF 6479] this Court denied without prejudice on October 24, 2017 [ECF 8557].

---

[6]   The full post-mortem report is included as part of Exhibit 2 and shows that Dr. Hamilton personally examined the Retired Player's brain tissue.

[7]   Exhibit 4.

[8]   Exhibit 6.

## ARGUMENT

**I.    Class Member's claim was erroneously denied because the date of the Qualifying Diagnosis for Death with CTE is the date of the Player's death.**

The Claims Administrator's first reason for denying the claim package is legally flawed because the diagnosis date for Death with CTE is the date of the Player's death, even if the diagnosis occurs later.

The Claims Administrator published "Posted Program FAQs" on the Settlement Website with answers to frequently asked questions.   The content in the Posted Settlement Program FAQs was subject to advance approval by Counsel for the NFL Parties.[9]

According to the Posted Settlement Program FAQs, the diagnosis date for Death with CTE is the date of the Player's death, even though the diagnosis is not made until after the Player dies:[10]

> **How is the date of a Qualifying Diagnosis determined?**
>
> . . . .
>
> (a)  *Death with CTE:* For these claims, the date of the Qualifying Diagnosis is the date of the Player's death, even though the diagnosis is not made until after the Player dies.

Based on the Claims Administrator's public, posted representations to class members that the date of the Qualifying Diagnosis for Death with CTE is the date of the Player's death, the only date that is relevant in determining the date of a Qualifying Diagnosis for Death with CTE is the date of the Player's death.  That is the date Class Member provided in the submitted claim package.  The Claims Administrator's insistence on proof that the diagnosis "was done on or before 4/22/15"

---

[9]    *See* Amended Settlement Agreement § 4.1(a).

[10]    This relevant language is from FAQ 99 in the Posted Settlement Program FAQs (as of September 12, 2019) and was also contained in prior versions of the Posted Settlement Program FAQs.  In some earlier versions of the Posted Settlement Program FAQs, this language was originally published in FAQ 93.

ignores these posted representations and erroneously concludes that evidence regarding the date of the Player's death does not establish the date of the Qualifying Diagnosis.

In reviewing other portions of this FAQ, the Court has noted that "by requiring the 'date of diagnosis,' the Settlement language implies that the 'date of diagnosis' is not necessarily the 'date of the examination.'" ECF 10810, Settlement Implementation Determination, at 2. The Court further recognized that FAQ 99 is a "sensible and reasonable interpretation of the Settlement," which "recognizes that there may be infrequent situations in which a Retired NFL Player's past symptoms were not recognized as a Qualifying Diagnosis at the time but now can be identified by a physician." *Id.* at 3. The Court noted that in these circumstances, "the Retired NFL Player should not be penalized for their previous doctor's failure to identify a Qualifying Diagnosis" but "should be compensated based on the date their diagnosis actually began." *Id.*

The Court's reasoning applies with equal, if not greater, force to Death with CTE diagnoses. Class Member's claim package establishes that the Player's death occurred before April 22, 2015. Accordingly, the date of the Qualifying Diagnosis is before April 22, 2015, and the Claims Administrator erred, as a matter of law, in denying this claim.

## II. Class Member's claim was erroneously denied because the Amended Settlement Agreement does not require a board-certified neuropathologist to personally examine brain tissue.

The Claims Administrator also stated that the denial of this claim was based on the lack of evidence that "Dr. Hamilton examined the Retired Player's brain tissue to confirm a CTE diagnosis." It is undisputed that there is no evidence that Dr. Hamilton reviewed the Player's brain tissue. But, as a matter of law, there is no requirement in the Amended Settlement Agreement that a board-certified neuropathologist "confirm his diagnosis" by reviewing brain tissue.[11] The Amended Settlement Agreement simply requires a diagnosis, which Dr. Hamilton provided.[12]

If the NFL Parties had intended to impose a requirement that a CTE diagnosis

---

[11]   *See* Amended Settlement Agreement [ECF 6481] § 6.4(f).

[12]   *See id.*

be confirmed by an examination of the Player's brain tissue, they should have included that requirement in the settlement agreement. But it's not there.

Regarding other diagnoses, the NFL Parties chose to require specific and detailed procedures for reviewing and confirming the diagnoses.[13] But for Death with CTE diagnoses, the Amended Settlement Agreement simply requires "a post-mortem diagnosis made by a board-certified neuropathologist."[14] It does not require an examination of the deceased Player's brain tissue.

Dr. Hamilton is one of only a handful of board-certified neuropathologists in the United States, and he has provided a post-mortem diagnosis that this Player "had CTE on his date of death."[15]

The Special Master erred by not correcting the Claims Administrator's erroneous conclusion of law that Class Member is required to compel Dr. Hamilton to confirm his diagnosis by examining the Player's brain tissue. There is no requirement in the Amended Settlement Agreement. Adding this arbitrary, after-the-fact requirement ignores the terms of the Amended Settlement Agreement and violates due process.

## III. The Claims Administrator erred in stating that Dr. Hamilton did not examine the Player's brain tissue.

The Claims Administrator's denial of this claim is based on the purported lack of evidence that "Dr. Hamilton examined the Retired Player's brain tissue to confirm a CTE diagnosis" is also erroneous because Dr. Hamilton *did* examine the Retired Player's brain tissue to confirm the CTE diagnosis.

Dr. Hamilton's letter states: "I have conducted a study of Christopher Mims' brain tissue." Dr. Hamilton further states that he received "180 unstained tissue sections on glass slides" and examined stained recuts of brain tissue from the dura mater,

---

[13] *See id.* §§ 5.1–5.14 (creating the Baseline Assessment Program and exempting Death with CTE from the program), § 6.3(a)–(e) (requiring that certain diagnoses, other than Death with CTE, be made by certain physicians on an approved list); *see also* Exhibit 2 to the Amended Settlement Agreement (providing standardized neuropsychological testing protocols for determining certain diagnoses).

[14] *See* Amended Settlement Agreement [ECF 6481] § 6.4(f).

[15] Exhibit 2.

cerebral cortex, hippocampus, insular cortex, putamen, globulus pallidus, thalamus, cerebellum cortex, dentate nucleus, and medulla.[16]  Based, in part, on his review of the brain tissue, Dr. Hamilton concluded that his "findings are diagnostic of CTE." [17]

The Claims Administrator erred in stating that there is no evidence that "Dr. Hamilton examined the Retired Player's brain tissue to confirm a CTE diagnosis." Dr. Hamilton's letter clearly establishes that he examined the Retired Player's brain tissue to confirm the CTE diagnosis.

## <u>CONCLUSION</u>

For the foregoing reasons, Class Member respectfully requests the Court sustain this objection, reverse the Special Master's decision based on the errors in the Claims Administrator's Notice of Denial, and order the approval of Class Member's claim.

Dated:  November 20, 2019

<div style="text-align:center">

Respectfully Submitted:

/s/ Justin Demerath

**Justin Demerath**
Texas State Bar No. 24034415
**David Campbell**
Texas State Bar No. 24057033
O'HANLON, DEMERATH & CASTILLO
808 West Avenue |  Austin, TX 78701
Tel: (512) 494-9949  |  Fax: (512) 494-9919
jdemerath@808west.com
dcampbell@808west.com

**Counsel for Class Member**

</div>

---

[16]  *See id.*

[17]  *See id.*

## <u>CERTIFICATE OF SERVICE</u>

It is hereby certified that a true copy of the foregoing document was submitted

on the Court Portal on November 20, 2019.

<u>/s/ Justin B. Demerath</u>
Justin B. Demerath

 **CONCUSSION SETTLEMENT**

*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

## NOTICE OF DENIAL OF MONETARY AWARD CLAIM
### DATE OF NOTICE: July 30, 2019
### DEADLINE TO APPEAL: August 29, 2019

### I. SETTLEMENT CLASS MEMBER INFORMATION

| | |
|---|---|
| **Settlement Program ID** | 950013395 |

| **Name** | First<br>Carleen | M.I. | Last<br>Hastings |
|---|---|---|---|

| | |
|---|---|
| **Settlement Class Member Type** | Representative Claimant |
| **Lawyer** | O'Hanlon, Demerath & Castillo |

| **Asserted Qualifying Diagnosis** | Death with CTE (Chronic Traumatic Encephalopathy) | **Date** | 10/15/08 |
|---|---|---|---|

### II. EXPLANATION OF CLAIM DETERMINATION

This Notice is an official communication from the Claims Administrator for the NFL Concussion Settlement Program. We reviewed your Claim Package and determined that you are not entitled to a Monetary Award because:

| 1. | Section 6.3(f) of the Settlement Agreement allows a CTE diagnosis if: (1) the Retired Player died before 4/22/15, and (2) there was a post-mortem diagnosis of CTE made by a board-certified neuropathologist prior to 4/22/15. Although Dr. Hamilton is a board-certified neuropathologist and signed a Pre-Effective Date Diagnosing Physician Certification Form indicating a CTE diagnosis, we must have proof that he personally performed the post-mortem exam on the Retired Player and that it was done on or before 4/22/15. There was no post-mortem examination report submitted to indicate that Dr. Hamilton examined the Retired Player's brain tissue to confirm a CTE diagnosis. The two-page letter provided by Dr. Hamilton does not satisfy the requirements for a CTE diagnosis under this Settlement Program. For these reasons, this claim is denied. |
|---|---|

Section III below explains your right to appeal this denied claim, but living Retired Players may have the option to submit a new Claim Package under Section 9.1(c)(i) of the Settlement Agreement if they receive a new Qualifying Diagnosis. We will determine whether the new claim can be considered for a Monetary Award based on several factors, including whether the new claim shows materially changed circumstances from the earlier claim. These materially changed circumstances may include: (a) a different type of Qualifying Diagnosis than the one that was denied; or (b) the same type of Qualifying Diagnosis but with a different diagnosis date supported by additional medical records. If you submit a new claim within 365 days of the claim that is the subject of this denial notice, Section 10.3(d)(ii) of the Settlement Agreement requires us to audit that new claim if it is based on the same Qualifying Diagnosis as this denied claim, but the new diagnosis was made by a different physician.

### III. YOUR RIGHT TO APPEAL THIS DETERMINATION

If you have a good faith belief that the decision to deny your Monetary Award claim is incorrect, you may appeal this determination to the Court under Section 9.5 of the Settlement Agreement. To do so, click the Appeal Denied Claim button on your secure online portal and follow the instructions provided. You must submit supporting evidence to support your appeal. Any written statement may not be more than 10 double-spaced pages. You must do so on or before the Deadline to Appeal stated at the top of this Notice.

If you decide to appeal, the Settlement Agreement requires you to pay an Appeal Fee of $1,000, which you can do using the online PayPal option or by check made payable to the NFL Claims Administrator. This fee will be refunded if your appeal is successful. If you are unable to pay the $1,000 fee, you may make a hardship request to us to waive the fee and will have to submit financial information showing a sufficient hardship.

If paying the $1,000 Appeal Fee by check, mail the check to the address below.

> NFL Concussion Settlement
> Claims Administrator
> P.O. Box 25369
> Richmond, VA  23260

The Special Master appointed by the Court will decide your appeal based upon a showing by you of clear and convincing evidence. The Special Master's factual determinations will be final and binding, but you or Class Counsel or the NFL Parties may object to any of the Special Master's conclusions of law, which will then be subject to de novo (*i.e.*, a new) review by the Court.

If an appeal is not submitted on or before the deadline stated at the top of this Notice, the determination in this Notice will become final.

## IV. CLASS COUNSEL'S RIGHT TO APPEAL THIS DETERMINATION

Section 9.5 of the Settlement Agreement also gives Class Counsel the right to challenge our decision to deny your Monetary Award claim. If Class Counsel chooses to appeal, it must do so by the Deadline to Appeal stated at the top of this Notice and must provide a written copy of its Appeals Form and any supporting evidence to you, the NFL Parties, and us.

If an appeal is taken by you or Class Counsel, the NFL Parties may submit a written opposition (not to exceed 10 double-spaced pages) no later than 30 days after receipt of the Appeals Form. The party taking the appeal is not permitted to submit a reply.

Class Counsel may also submit a written statement (not to exceed 10 double-spaced pages) in response to your appeal no later than 15 days after receipt of the Appeals Form, and you and the NFL Parties may each submit a reply to any such submission by Class Counsel.

## V. HOW TO CONTACT US WITH QUESTIONS OR FOR HELP

If you are represented by a lawyer, consult with your lawyer if you have questions or need assistance. If you are unrepresented and have any questions about this Notice or need help, contact us at 1-855-887-3485 or send an email to ClaimsAdministrator@NFLConcussionSettlement.com. If you are a lawyer, call or email your designated Firm Contact for assistance. For more information about the Settlement program, visit the official website at www.NFLConcussionSettlement.com to read the Frequently Asked Questions or download a copy of the complete Settlement Agreement.





University of Pittsburgh
Physicians, Department
of Pathology

Division of Neuropathology

Clayton A. Wiley, MD, PhD
*Director*

Charleen T. Chu, MD, PhD
Robert H. Garman, DVM
Ronald Hamilton, MD
Julia Kofler, MD
Scott M. Kulich, MD, PhD
David Lacomis, MD
Geoffrey Murdoch, MD, PhD
Gutti R. Rao, MD

UPMC Presbyterian
Room S701 Scaife Hall
200 Lothrop Street
Pittsburgh, PA 15213
T 412-624-9415
F 412-624-5610

I have conducted a study of Cristopher Mims' brain tissue. Additionally, in my Neuropathology practice I conduct an ongoing study of all available and existing medical literature related to the existence and diagnosis of CTE and I combine that knowledge with my training and extensive experience related to the study and diagnosis of CTE.

Christopher Mims died on October 15, 2008 at age 38.

Received from Eric J Wahoske, LA County Department of ME Coroner are 180 unstained tissue sections on glass slides labeled 08-7210-H LAC ME Coroner, US recuts (10 unstained slides from 8 tissue blocks).

H&E stained recuts are examined:
      slide A  dura mater;
      slide B  cerebral cortex
      slide C         hippocampus
      slide D  hippocampus
      slide E  insular cortex, putamen, globus pallidus and thalamus
      slide F         cerebral cortex
      slide G  cerebellum cortex and dentate nucleus
      slide H        medulla

PHF-1/tau immunostaining of slides G and H were negative for abnormally aggregated tau. PHF-1/tau immunostaining of slides B, C, D, E and F show numerous neocortical PHF-1/tau positive tangles in neurons, with staining of many neuronal processes (neuropil threads) as well as tau-positive glial cells, especially in the depths of the sulcus and focally around some blood vessels best seen in slide B. There are no neuritic plaques and the tangles are much more common in the neocortex than in the hippocampus. These findings are diagnostic of CTE.

Figure 1: neocortex with numerous tangles, neuropil threads, glial tau and perivascular location; on the right is a close up of the distinctive perivascular pathology of CTE.



Christopher Mims had CTE.

Signed:
/s/
Ronald L Hamilton, M.D.

Affiliated with the University of Pittsburgh School of Medicine

 **CONCUSSION SETTLEMENT**
*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

## PRE-EFFECTIVE DATE DIAGNOSING PHYSICIAN CERTIFICATION FORM
### (for diagnoses made by physicians who are qualified to render Qualifying Diagnoses
### for purposes of Monetary Award claims before January 7, 2017)

This Pre-Effective Date Diagnosing Physician Certification Form is to be used only by physicians qualified to render Qualifying Diagnoses before January 7, 2017, in connection with the Class Action Settlement in In re: National Football League Players' Concussion Injury Litigation and who made a Qualifying Diagnosis before January 7, 2017. The Qualifying Diagnoses are found in Appendix A to this Pre-Effective Date Diagnosing Physician Certification Form.

Use this form to certify a Qualifying Diagnosis you made before January 7, 2017, based on your personal examination of the Retired NFL Football Player. **Do not sign this form unless you personally examined the player** or, in the case of a Qualifying Diagnosis of Death with CTE, you are the board-certified neuropathologist who made the post-mortem diagnosis of CTE. If you made a Qualifying Diagnosis as a Qualified MAF Physician on or after January 7, 2017, do not use this form; use the MAF Diagnosing Physician Certification Form instead. Also, if you are a Qualified BAP Provider certifying a diagnosis you made in the Baseline Assessment Program, do not use this form; use the BAP Diagnosing Physician Certification Form instead.

You must complete this form in its entirety, sign it under penalty of perjury, and return it to the patient along with copies of all supporting medical records that you created or received in connection with the Qualifying Diagnosis. In turn, the patient, or the patient's counsel, must submit this form and all supporting medical records referred to above to the Claims Administrator as part of a claim for compensation under the Class Action Settlement. The Claims Administrator will review the form, including your qualifications to provide the Qualifying Diagnosis, and the supporting medical records. All claims also are subject to audit. Any finding of fraudulent conduct by you will be subject to, without limitation, your referral to appropriate regulatory and disciplinary boards and agencies and/or federal authorities, and your disqualification from serving in any aspect of the Class Action Settlement.

You are required to preserve all supporting medical records that you created or received in connection with the Qualifying Diagnosis for the greater of: (a) 10 years after January 7, 2017; or (b) the period of time required under applicable state and federal laws.

If you have any questions, call the Claims Administrator toll free at 1-855-887-3485 or visit the Settlement Website at https://www.nflconcussionsettlement.com.

## PRE-EFFECTIVE DATE DIAGNOSING PHYSICIAN CERTIFICATION FORM
### (for diagnoses made by physicians who are qualified to render Qualifying Diagnoses for purposes of Monetary Award claims before January 7, 2017)

### I. PATIENT INFORMATION

| Settlement Program ID (if known) | | 950013395 | | |
|---|---|---|---|---|
| **Name:** | First<br>Christopher | M.I. | Last<br>Mims | Suffix |

| **Address:** | Address 1<br>1715 W. 70Th Street | |
|---|---|---|
| | Address 2 | |
| | City<br>Los Angeles | |
| | State/Province<br>CA | |
| | Postal Code<br>90047 | Country<br>United States |

| Telephone | \|_\|_\|_\| - \|_\|_\|_\| - \|_\|_\|_\|_\| |
|---|---|
| **Date of Birth** | \|0\|9\|/\|2\|9\|/\|1\|9\|7\|0\|<br>(Month/Day/Year) |
| **Date of Death** (if applicable) | \|1\|0\|/\|1\|5\|/\|2\|0\|0\|8\|<br>(Month/Day/Year) |

### II. DIAGNOSING PHYSICIAN INFORMATION

| National Provider Identifier (NPI) | | 1013980978 | | |
|---|---|---|---|---|
| **Physician Name** | First<br>Ronald | M.I.<br>L. | Last<br>Hamilton | Suffix |

**(a) Are you approved as a Qualified BAP Provider or a Qualified MAF Physician?**

☐ **YES.** If YES, you do not need to fill out the rest of this Section II or Sections III or IV. Instead, go to Section V.

☒ **NO.**

**(b) If you answered No, have you previously completed this form for another Retired NFL Football Player, that you know was submitted to the Claims Administrator?**

☐ **YES.** If YES, you do not need to fill out this Section II or Sections III or IV. Instead, go to Section V.

☒ **NO.**

If you answered No to both questions, fill out the rest of this Section II and then go to Section III.

## PRE-EFFECTIVE DATE DIAGNOSING PHYSICIAN CERTIFICATION FORM
### (for diagnoses made by physicians who are qualified to render Qualifying Diagnoses for purposes of Monetary Award claims before January 7, 2017)

| Office/Practice Name | University of Pittsburgh Medical Center | |
|---|---|---|
| **Address** | Address 1<br>A724.1 Scaife Hall | |
| | Address 2<br>200 Lothrop Street | |
| | City<br>Pittsburgh | |
| | State/Province<br>Pennsylvania | |
| | Postal Code<br>15213 | Country<br>USA |
| Telephone | 4 1 2 - 6 2 4 - 6 6 1 0 | |
| Fax | 4 1 2 - 6 2 4 - 5 4 8 8 | |
| Email Address | hamiltonrl@upmc.edu | |

## III.   BOARD CERTIFICATIONS

Check all board certifications that apply and list the board providing the certification and any identification number provided by the board (*e.g.*, American Board of Psychiatry and Neurology diplomate number). If you do not have any board certifications, summarize your relevant medical training and experience and then go to Section IV.

| Certification | Board | Board Identification Number | Effective Date | Expiration Date |
|---|---|---|---|---|
| [ ] Neurology | | | | |
| [ ] Neurosurgery | | | | |
| [X] Neuropathology | American Board of Pathology | | certified: 5/23/1996<br>recertified:1/1/2014 | |
| [ ] Neuropsychology | | | | |
| [ ] Other Neuro-specialty | | | | |
| [X] Other Board Certification | American Board of Pathology | | certified: 5/23/1996 | |

---

**PRE-EFFECTIVE DATE DIAGNOSING PHYSICIAN CERTIFICATION FORM**
**(for diagnoses made by physicians who are qualified to render Qualifying Diagnoses**
**for purposes of Monetary Award claims before January 7, 2017)**

If you are not board-certified in a neuro-specialty area, summarize your relevant medical training and experience in the field of neurology and related fields that you believe qualifies you to make the diagnosis provided in Section V.

## IV.    OTHER QUALIFICATIONS

| Educational Information | | Education Level | Institution | Degree/Area of Focus | Date Received |
|---|---|---|---|---|---|
| | 1. | **Undergraduate Education** | University of Nebraska-Lincoln | B.S / Psychology | 1985 (Month/Year) |
| | 2. | **Medical School** | University of Nebraska Medical Center | M.D. | 1989 (Month/Year) |
| | 3. | **Internship** | Univ. of California, San Diego | Resident Anatomic Pathology | 1991 (Month/Year) |
| | 4. | **Residency** | Univ. of California, San Diego | Resident Neuropathology | 1993 (Month/Year) |
| | 5. | **Fellowship** | Univ. of Pittsburgh | Fellow Neuropathology | 1994 (Month/Year) |
| | 6. | **Other (Graduate)** | Univ. of Pittsburgh | Fellow: NIMH Training Grant in Neuroscience | 1995 (Month/Year) |

| States Where Licensed to Practice | | State | State License Number | Effective Date | Expiration Date |
|---|---|---|---|---|---|
| | 1. | **California** | **G69731** | **9/10/1990** | **Expired** |

## PRE-EFFECTIVE DATE DIAGNOSING PHYSICIAN CERTIFICATION FORM
(for diagnoses made by physicians who are qualified to render Qualifying Diagnoses for purposes of Monetary Award claims before January 7, 2017)

| | | | | |
|---|---|---|---|---|
| 2. | Pennsylvania | MD049717L | 5/12/1993 | 12/31/2018 |
| 3. | Indiana | 01067332A | 9/29/2009 | 10/31/2019 |
| 4. | | | | |
| 5. | | | | |
| 6. | | | | |

**Specialties**

Check all specialties that apply.

- [ ] Neurology
- [ ] Neurosurgery
- [X] Neuropathology
- [ ] Neuropsychology
- [ ] Other Neuro-specialty
  (*e.g.*, brain injury medicine, clinical neurophysiology, etc.)
- [X] Other Specialty (list all)     **Anatomic Pathology**

-3709-

## PRE-EFFECTIVE DATE DIAGNOSING PHYSICIAN CERTIFICATION FORM
### (for diagnoses made by physicians who are qualified to render Qualifying Diagnoses for purposes of Monetary Award claims before January 7, 2017)

### V. QUALIFYING DIAGNOSIS

Identify the patient's diagnosis and the date of such diagnosis. See **Appendix A** for the criteria for each diagnosis. Other than for Death with CTE, the identification of a condition, including through a blood test, genetic test, imaging technique, or otherwise, that has not yet resulted in actual cognitive impairment and/or actual neuromuscular impairment in the patient is **not** a Qualifying Diagnosis.

| Qualifying Diagnosis | Date of Diagnosis |
|---|---|
| ☐ Level 1.5 Neurocognitive Impairment | \|__\|__\|/\|__\|__\|/\|__\|__\|__\|__\| (Month/Day/Year) |
| ☐ Level 2 Neurocognitive Impairment* | \|__\|__\|/\|__\|__\|/\|__\|__\|__\|__\| (Month/Day/Year) |
| ☐ Alzheimer's Disease | \|__\|__\|/\|__\|__\|/\|__\|__\|__\|__\| (Month/Day/Year) |
| ☐ Parkinson's Disease | \|__\|__\|/\|__\|__\|/\|__\|__\|__\|__\| (Month/Day/Year) |
| ☐ ALS (amyotrophic lateral sclerosis) | \|__\|__\|/\|__\|__\|/\|__\|__\|__\|__\| (Month/Day/Year) |
| ☒ Death with CTE | \|_1_\|_0_\|/\|_1_\|_5_\|/\|_2_\|_0_\|_0_\|_8_\|* (Month/Day/Year) |

\* If you provided a diagnosis of Level 2 Neurocognitive Impairment, did you determine that certain testing was medically unnecessary because of the severity of the patient's dementia (*see Appendix A*)?

☐ YES        ☐ NO

If you answered Yes, provide the factual basis for that determination:

\*Pursuant to FAQ 93, Posted Settlement Program FAQs (as of November 7, 2018), for this claim, "the date of the Qualifying Diagnosis is the date of the Player's death, even though the diagnosis is not made until after the Player dies".

### PRE-EFFECTIVE DATE DIAGNOSING PHYSICIAN CERTIFICATION FORM
**(for diagnoses made by physicians who are qualified to render Qualifying Diagnoses for purposes of Monetary Award claims before January 7, 2017)**

### VI. CERTIFICATION

By signing below, I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that all information provided in this form, and all related supporting medical records, are true and correct to the best of my knowledge, information and belief, and that I personally examined the Retired NFL Football Player named in Section I or, in the case of a Qualifying Diagnosis of Death with CTE, I am the board-certified neuropathologist who made the post-mortem diagnosis of CTE.

I acknowledge that any finding of fraudulent conduct may subject me to, without limitation, referral to appropriate regulatory and disciplinary boards and agencies and/or federal authorities, and disqualification from serving in any aspect of the Class Action Settlement.

| Signature of Diagnosing Physician | | Date of Signature | 0 2 0 1 2 0 1 9 (Month/Day/Year) |
|---|---|---|---|
| **Printed Name** | First: Ronald | M.I.: L. | Last: Hamilton |

## APPENDIX A

**Other than for Death with CTE, the identification of a condition, including through a blood test, genetic test, imaging technique, or otherwise, that has not yet resulted in actual cognitive impairment and/or actual neuromuscular impairment experienced by the patient does not qualify as a diagnosis.**

LEVEL 1.5 NEUROCOGNITIVE IMPAIRMENT

**The following diagnosis can only be made:**

> **(1) prior to July 7, 2014, by a board-certified neurologist, board-certified neurosurgeon, other board-certified neuro-specialist physician, or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician, except as provided in (c), below;**

> **(2) from July 7, 2014 through January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified neurologist, board-certified neurosurgeon, or other board-certified neuro-specialist physician, except as provided in (c), below; or**

> **(3) for a patient who died prior to January 7, 2017 (the Effective Date of the Settlement Agreement), where the diagnosis occurred while the patient was living, by a board-certified or otherwise qualified neurologist, neurosurgeon, or other neuro-specialist physician, or by a physician with sufficient qualifications in the field of neurology or neurocognitive disorders to make a diagnosis of Level 1.5 Neurocognitive Impairment:**

A diagnosis made outside of the Baseline Assessment Program (BAP) that a living patient suffers from Level 1.5 Neurocognitive Impairment, as set forth below, *i.e.*, early dementia, based on evaluation and evidence generally consistent with the diagnostic criteria set forth and provided below:

There is: (i) Concern of the patient, a knowledgeable informant, or the Qualified BAP Provider that there has been a severe decline in cognitive function; (ii) Evidence of a moderate to severe cognitive decline from a previous level of performance, as determined by and in accordance with the standardized neuropsychological testing protocol annexed in *Appendix B*, in two or more cognitive domains (complex attention, executive function, learning and memory, language, perceptual-spatial), provided one of the cognitive domains is (a) executive function, (b) learning and memory, or (c) complex attention; (iii) The patient exhibits functional impairment generally consistent with the criteria set forth in the National Alzheimer's Coordinating Center's Clinical Dementia Rating scale Category 1.0 (Mild) in the areas of Community Affairs, Home & Hobbies, and Personal Care—where such functional impairment is corroborated by documentary evidence (*e.g.*, medical records, employment records), the sufficiency of which will be determined by the physician making the diagnosis (and where no documentary evidence of functional impairment exists or is available, then (a) there must be evidence of moderate to severe cognitive decline from a previous level of performance, as determined by and in accordance with the standardized neuropsychological testing protocol annexed in *Appendix B*, in the executive function cognitive domain or the learning and memory cognitive domain, and at least one other cognitive domain; and (b) the patient's functional impairment, as described above, must be corroborated by a third-party sworn affidavit from a person familiar with the patient's condition (other than the player or his family members), the sufficiency of which will be determined by the diagnosing physician); and (iv) The cognitive deficits do not occur exclusively in the context of a delirium, acute substance abuse, or as a result of medication side effects.

## LEVEL 2 NEUROCOGNITIVE IMPAIRMENT

**The following diagnosis can only be made:**

> **(1) prior to July 7, 2014, by a board-certified neurologist, board-certified neurosurgeon, other board-certified neuro-specialist physician, or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician, except as provided in (c), below;**

> **(2) from July 7, 2014 through January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified neurologist, board-certified neurosurgeon, or other board-certified neuro-specialist physician, except as provided in (c), below; or**

> **(3) for a patient who died prior to January 7, 2017 (the Effective Date of the Settlement Agreement), where the diagnosis occurred while the patient was living, by a board-certified or otherwise qualified neurologist, neurosurgeon, or other neuro-specialist physician, or by a physician with sufficient qualifications in the field of neurology or neurocognitive disorders to make a diagnosis of Level 2 Neurocognitive Impairment:**

A diagnosis made outside of the Baseline Assessment Program (BAP) that a living patient suffers from Level 2 Neurocognitive Impairment, as set forth below, *i.e.*, moderate dementia, based on evaluation and evidence generally consistent with the diagnostic criteria set forth and provided below, unless the diagnosing physician can certify in Section IV of the Diagnosing Physician Certification Form, above, that certain testing specified below for Level 2 Neurocognitive Impairment is medically unnecessary because the patient's dementia is so severe:

There is: (i) Concern of the patient, a knowledgeable informant, or the Qualified BAP Provider that there has been a severe decline in cognitive function; (ii) Evidence of a severe cognitive decline from a previous level of performance, as determined by and in accordance with the standardized neuropsychological testing protocol annexed in *Appendix B*, in two or more cognitive domains (complex attention, executive function, learning and memory, language, perceptual-spatial), provided one of the cognitive domains is (a) executive function, (b) learning and memory, or (c) complex attention; (iii) The patient exhibits functional impairment generally consistent with the criteria set forth in the National Alzheimer's Coordinating Center's Clinical Dementia Rating scale Category 2.0 (Moderate) in the areas of Community Affairs, Home & Hobbies, and Personal Care—where such functional impairment is corroborated by documentary evidence (*e.g.*, medical records, employment records), the sufficiency of which will be determined by the physician making the diagnosis (and where no documentary evidence of functional evidence exists or is available, then (a) there must be evidence of severe cognitive decline from a previous level of performance, as determined by and in accordance with the standardized neuropsychological testing protocol annexed in *Appendix B*, in the executive function cognitive domain or the learning and memory cognitive domain, and at least one other cognitive domain; and (b) the patient's functional impairment, as described above, must be corroborated by a third-party sworn affidavit from a person familiar with the patient's condition (other than the player or his family members), the sufficiency of which will be determined by the diagnosing physician); and (iv) The cognitive deficits do not occur exclusively in the context of a delirium, acute substance abuse, or as a result of medication side effects.

## ALZHEIMER'S DISEASE

(1) **The following diagnosis can only be made:**

> **(a) prior to July 7, 2014, by a board-certified neurologist, board-certified neurosurgeon, other board-certified neuro-specialist physician, or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician; or**

> **(b) from July 7, 2014 through January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified neurologist, board-certified neurosurgeon, or other board-certified neuro-specialist physician:**

A diagnosis in a living patient of the specific disease of Alzheimer's Disease as defined by the World Health Organization's International Classification of Diseases, 9th Edition (ICD-9), the World Health Organization's International Classification of Diseases, 10th Edition (ICD-10), or a diagnosis of Major Neurocognitive Disorder due to probable Alzheimer's Disease as defined in the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5).

(2) **The following diagnosis can only be made prior to January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician, or by a physician with sufficient qualifications in the field of neurology to make such a diagnosis, where the diagnosis was made while the patient was living but thereafter died prior to January 7, 2017 (the Effective Date of the Settlement Agreement):**

A diagnosis of Major Neurocognitive Disorder due to probable Alzheimer's Disease consistent with the definition in *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) or a diagnosis of Alzheimer's Disease.

## PARKINSON'S DISEASE

(1) **The following diagnosis can only be made:**

> **(a) prior to July 7, 2014, by a board-certified neurologist, board-certified neurosurgeon, other board-certified neuro-specialist physician, or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician; or**

> **(b) from July 7, 2014 through January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified neurologist, board-certified neurosurgeon, or other board-certified neuro-specialist physician:**

A diagnosis in a living patient of the specific disease of Parkinson's Disease as defined by the World Health Organization's International Classification of Diseases, 9th Edition (ICD-9), the World Health Organization's International Classification of Diseases, 10th Edition (ICD-10), or a diagnosis of Major Neurocognitive Disorder probably due to Parkinson's Disease as defined in the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5).

(2) **The following diagnosis can only be made prior to January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician, or by a physician with sufficient qualifications in the field of neurology to make such a diagnosis, where the diagnosis was made while the patient was living but thereafter died prior to January 7, 2017 (the Effective Date of the Settlement Agreement):**

A diagnosis of Parkinson's Disease.

## ALS

(1) The following diagnosis can only be made:

    (a) prior to July 7, 2014, by a board-certified neurologist, board-certified neurosurgeon, other board-certified neuro-specialist physician, or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician; or

    (b) from July 7, 2014 through January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified neurologist, board-certified neurosurgeon, or other board-certified neuro-specialist physician:

A diagnosis in a living patient of the specific disease of Amyotrophic Lateral Sclerosis, also known as Lou Gehrig's Disease (ALS), as defined by the World Health Organization's International Classification of Diseases, 9th Edition (ICD-9) or the World Health Organization's International Classification of Diseases, 10th Edition (ICD-10).

(2) The following diagnosis can only be made prior to January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician, or by a physician with sufficient qualifications in the field of neurology to make such a diagnosis, where the diagnosis was made while the patient was living but thereafter died prior to January 7, 2017 (the Effective Date of the Settlement Agreement):

A diagnosis of the specific disease of Amyotrophic Lateral Sclerosis (ALS).

## CTE

The following diagnosis can only be made prior to April 22, 2015 by a board-certified neuropathologist, provided that a patient who died between July 7, 2014 and April 22, 2015 has until 270 days from the date of death to obtain such a post-mortem diagnosis:

A post-mortem diagnosis of Chronic Traumatic Encephalopathy (CTE).

## APPENDIX B

## BASELINE NEUROPSYCHOLOGICAL TEST BATTERY AND SPECIFIC IMPAIRMENT CRITERIA FOR RETIRED NFL FOOTBALL PLAYERS

### Section 1: Test Battery

**Estimating Premorbid Intellectual Ability**

ACS Test of Premorbid Functioning (TOPF)

**Complex Attention/Processing Speed (6 scores)**

WAIS-IV Digit Span

WAIS-IV Arithmetic

WAIS-IV Letter Number Sequencing

WAIS-IV Coding

WAIS-IV Symbol Search

WAIS-IV Cancellation

**Executive Functioning (4 scores)**

Verbal Fluency (FAS)

Trails B

Booklet Category Test

WAIS-IV Similarities

**Effort/Performance Validity (8 scores)**

*ACS Effort Scores*

ACS-WAIS-IV Reliable Digit Span

ACS-WMS-IV Logical Memory Recognition

ACS-WMS-IV Verbal Paired Associates Recognition

ACS-WMS-IV Visual Reproduction Recognition

ACS-Word Choice

*Additional Effort Tests*

Test of Memory Malingering (TOMM)

Medical Symptom Validity Test (MSVT)

**Learning and Memory (6 scores)**

WMS-IV Logical Memory I

WMS-IV Logical Memory II

WMS-IV Verbal Paired Associates I

WMS-IV Verbal Paired Associates II

WMS-IV Visual Reproduction I

WMS-IV Visual Reproduction II

**Language (3 scores)**

Boston Naming Test

Category Fluency (Animal Naming)

BDAE Complex Ideational Material

**Spatial-Perceptual (3 scores)**

WAIS-IV Block Design

WAIS-IV Visual Puzzles

WAIS-IV Matrix Reasoning

**Mental Health**

MMPI-2RF

Mini International Neuropsychiatric Interview

### Section 2: Evaluate Performance Validity

Freestanding, embedded and regression based performance validity metrics will be administered to each Retired NFL Football Player during baseline and, if relevant, subsequent neuropsychological examinations. There will be at least seven performance validity metrics utilized during each assessment. The specific performance validity metrics utilized will not be released to the public in order to maintain the highest standards of assessment validity.  The performance

# APPENDIX B

validity metrics employed will be rotated at intervals determined by the Appeals Advisory Panel in consultation with Co-Lead Class Counsel and Counsel for the NFL Parties.

Each neuropsychological examiner must complete a checklist of validity criteria as set forth in *Slick et al.* 1999, and revised in 2013 (see below) for every Retired NFL Football Player examined in order to determine whether the Retired NFL Football Player's test data is a valid reflection of his optimal level of neurocognitive functioning.

1. Suboptimal scores on performance validity embedded indicators or tests. The cutoffs for each test should be established based on empirical findings.

2. A pattern of neuropsychological test performance that is markedly discrepant from currently accepted models of normal and abnormal central nervous system (CNS) function. The discrepancy must be consistent with an attempt to exaggerate or fabricate neuropsychological dysfunction (e.g., a patient performs in the severely impaired range on verbal attention measures but in the average range on memory testing; a patient misses items on recognition testing that were consistently provided on previous free recall trials, or misses many easy items when significantly harder items from the same test are passed).

3. Discrepancy between test data and observed behavior. Performance on two or more neuropsychological tests within a domain are discrepant with observed level of cognitive function in a way that suggests exaggeration or fabrication of dysfunction (e.g., a well-educated patient who presents with no significant visual-perceptual deficits or language disturbance in conversational speech performs in the severely impaired range on verbal fluency and confrontation naming tests).

4. Discrepancy between test data and reliable collateral reports. Performance on two or more neuropsychological tests within a domain are discrepant with day-to-day level of cognitive function described by at least one reliable collateral informant in a way that suggests exaggeration or fabrication of dysfunction (e.g., a patient handles all family finances but is unable to perform simple math problems in testing).

5. Discrepancy between test data and documented background history. Improbably poor performance on two or more standardized tests of cognitive function within a specific domain (e.g., memory) that is inconsistent with documented neurological or psychiatric history.

6. Self-reported history is discrepant with documented history. Reported history is markedly discrepant with documented medical or psychosocial history and suggests attempts to exaggerate deficits.

7. Self-reported symptoms are discrepant with known patterns of brain functioning. Reported or endorsed symptoms are improbable in number, pattern, or severity; or markedly inconsistent with expectations for the type or severity of documented medical problems.

8. Self-reported symptoms are discrepant with behavioral observations. Reported symptoms are markedly inconsistent with observed behavior (e.g., a patient complains of severe episodic memory deficits yet has little difficulty remembering names, events, or appointments; a patient complains of severe cognitive deficits yet has little difficulty driving independently and arrives on time for an appointment in an unfamiliar area; a patient complains of severely slowed mentation and concentration problems yet easily follows complex conversation).

9. Self-reported symptoms are discrepant with information obtained from collateral informants. Reported symptoms, history, or observed behavior is inconsistent with information obtained from other informants judged to be adequately reliable. The discrepancy must be consistent with an attempt to exaggerate deficits (e.g., a patient reports severe memory impairment and/or behaves as if severely memory-impaired, but his spouse reports that the patient has minimal memory dysfunction at home).

# APPENDIX B

Notwithstanding a practitioner's determination of sufficient effort in accordance with the foregoing factors, a Retired NFL Football Player's failure on two or more effort tests may result in the Retired NFL Football Player's test results being subjected to independent review, or result in a need for supplemental testing of the Retired NFL Football Player.

Note: Additional information relating to the evaluation of effort and performance validity will be provided in a clinician's interpretation guide.

## Section 3: Estimate Premorbid Intellectual Ability

| Test | Ability |
|------|---------|
| Test of Premorbid Functioning (TOPF) | Reading<br>Reading + Demographic Variables |

The Test of Premorbid Functioning (TOPF) provides three models for predicting premorbid functioning: (a) demographics only, (b) TOPF only, and (c) combined demographics and TOPF prediction equations. For each model using demographic data, a simple and complex prediction equation can be selected. In the simple model, only sex, race/ethnicity, and education, are used in predicting premorbid ability. In the complex model, developmental, personal, and more specific demographic data is incorporated into the equations. The clinician should select a model based on the patient's background and his or her current level of reading or language impairment.

Note: It is necessary to estimate premorbid intellectual functioning in order to use the criteria for impairment set out in this document. Estimated premorbid intellectual ability will be assessed and classified as:

➢ Below Average (estimated IQ below 90);

➢ Average (estimated IQ between 90 and 109);

➢ Above Average (estimated IQ above 110).

## Section 4: Neuropsychological Test Score Criteria by Domain of Cognitive Functioning

There are 5 domains of cognitive functioning. In each domain, there are several tests that contribute 3, 4, or 6 demographically-adjusted test scores for consideration. Test selection in the domains was based on the availability of demographically-adjusted normative data for Caucasians and African Americans. These domains and scores are set out below.

The basic principle for defining impairment on testing is that there must be a pattern of performance that is approximately 1.5 standard deviations (for Level 1 Impairment), 1.7-1.8 standard deviations (for Level 1.5 Impairment) or 2 standard deviations (for Level 2 Impairment) below the person's expected level of premorbid functioning. Therefore, it is necessary to have more than one low test score in each domain. A user manual will be provided to neuropsychologists setting out the cutoff scores, criteria for identifying impairment in each cognitive domain, and statistical and normative data to support the impairment criteria.

## APPENDIX B

| Domain/Test | Ability |
|---|---|
| **Complex Attention/Speed of Processing (6 Scores)** | |
| Digit Span | Attention & Working Memory |
| Arithmetic | Mental Arithmetic |
| Letter Number Sequencing | Attention & Working Memory |
| Coding | Visual-Processing & Clerical Speed |
| Symbol Search | Visual-Scanning & Processing Speed |
| Cancellation | Visual-Scanning Speed |
| **Executive Functioning (4 scores)** | |
| Similarities | Verbal Reasoning |
| Verbal Fluency (FAS) | Phonemic Verbal Fluency |
| Trails B | Complex Sequencing |
| Booklet Category Test | Conceptual Reasoning |
| **Learning and Memory (6 scores)** | |
| Logical Memory I | Immediate Memory for Stories |
| Logical Memory II | Delayed Memory for Stories |
| Verbal Paired Associates I | Learning Word Pairs |
| Verbal Paired Associates II | Delayed Memory for Word Pairs |
| Visual Reproduction I | Immediate Memory for Designs |
| Visual Reproduction II | Delayed Memory for Designs |
| **Language** | |
| Boston Naming Test | Confrontation Naming |
| BDAE Complex Ideational Material | Language Comprehension |
| Category Fluency | Category (Semantic) Fluency |
| **Visual-Perceptual** | |
| Block Design | Spatial Skills & Problem Solving |
| Visual Puzzles | Visual Perceptual Reasoning |
| Matrix Reasoning | Visual Perceptual Reasoning |

**Impairment Criteria: *Below Average* Estimated Intellectual Functioning (A1 – E1)**

**A1. Complex Attention (6 test scores)**

1. Level 1 Impairment: 3 or more scores below a T score of 35

2. Level 1.5 Impairment: 4 or more scores below a T score of 35; or meet for Level 1 and 2 scores below a T score of 30

3. Level 2 Impairment: 3 or more scores below a T score of 30

**B1. Executive Function (4 test scores)**

1. Level 1 Impairment: 2 or more scores below a T score of 35

2. Level 1.5 Impairment: 3 or more scores below a T score of 35; or meet for Level 1 and 1 score below a T score of 30

## APPENDIX B

3. Level 2 Impairment: 2 or more scores below a T score of 30

### C1. Learning and Memory (6 test scores)

1. Level 1 Impairment: 3 or more scores below a T score of 35

2. Level 1.5 Impairment: 4 or more scores below a T score of 35; or meet for Level 1 and 2 scores below a T score of 30

3. Level 2 Impairment: 3 or more scores below a T score of 30

### D1. Language (3 test scores)

1. Level 1 Impairment: 3 or more scores below a T score of 37

2. Level 1.5 Impairment: meet for Level 1 and 2 scores below a T score of 35

3. Level 2 Impairment: 3 or more scores below a T score of 35

### E1. Visual-Perceptual (3 test scores)

1. Level 1 Impairment: 3 or more scores below a T score of 37

2. Level 1.5 Impairment: meet for Level 1 and 2 scores below a T score of 35

3. Level 2 Impairment: 3 or more scores below a T score of 35

## Impairment Criteria: *Average* Estimated Intellectual Functioning (A2 – E2)

### A2. Complex Attention (6 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 35

2. Level 1.5 Impairment: 3 or more scores below a T score of 35; or meet for Level 1 and 1 score below a T score of 30

3. Level 2 Impairment: 2 or more scores below a T score of 30

### B2. Executive Function (4 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 35

2. Level 1.5 Impairment: 3 or more scores below a T score of 35; or meet for Level 1 and 1 score below a T score of 30

3. Level 2 Impairment: 2 or more scores below a T score of 30

### C2. Learning and Memory (6 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 35

2. Level 1.5 Impairment: 3 or more scores below a T score of 35; or meet for Level 1 and 1 score below a T score of 30

3. Level 2 Impairment: 2 or more scores below a T score of 30

### D2. Language (3 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 37

2. Level 1.5 Impairment: 3 or more scores below a T score of 37; or meet for Level 1 and 1 score below a T score of 35

3. Level 2 Impairment: 2 or more scores below a T score of 35

### E2. Visual-Perceptual (3 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 37

2. Level 1.5 Impairment: 3 or more scores below a T score of 37; or meet for Level 1 and 1 score below a T score of 35

3. Level 2 Impairment: 2 or more scores below a T score of 35

## APPENDIX B

**Impairment Criteria: *Below Average* Estimated Intellectual Functioning (A3 – E3)**

### A3.  Complex Attention (6 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 35

2. Level 1.5 Impairment: meet for Level 1 and 3 or more scores below a T score of 37

3. Level 2 Impairment: 3 or more scores below a T score of 35

### B3.  Executive Function (4 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 37

2. Level 1.5 Impairment: meet for Level 1 and 3 or more scores below a T score of 37; or meet for Level 1 and 1 score below a T score of 30

3. Level 2 Impairment: 2 or more scores below a T score of 30

### C3.  Learning and Memory (6 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 35

2. Level 1.5 Impairment: meet for Level 1 and 3 or more scores below a T score of 37

3. Level 2 Impairment: 3 or more scores below a T score of 35

### D3.  Language (3 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 40

2. Level 1.5 Impairment: 3 scores below at T score of 40; or meet for Level 1 and 1 score below a T score of 37

3. Level 2 Impairment: 2 or more scores below a T score of 37

### E3.  Visual-Perceptual (3 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 40

2. Level 1.5 Impairment: 3 scores below at T score of 40; or meet for Level 1 and 1 score below a T score of 37

3. Level 2 Impairment: 2 or more scores below a T score of 37

### Section 5: Mental Health Assessment

| Test | Symptoms/Functioning | Assessment |
|------|----------------------|------------|
| MMPI-2RF | Mental Health Assessment | Evaluation of Validity Scales and Configurations; T-Scores for Symptom Domains |
| Mini International Neuropsychiatric Interview (M.I.N.I. Version 5.0.0) | Semi-structured Psychiatric Interview | Scale Criteria for Various Psychiatric Diagnoses |

**Ronald L. Hamilton, M.D.**

1/2/2017

## CURRICULUM VITAE

### BIOGRAPHICAL

| | | | |
|---|---|---|---|
| **Name:** | Ronald Lee Hamilton | **Birth Date:** | September 20, 1959 |
| **Home Address:** | 6 Graham Place Pittsburgh, PA 15232 | **Birth Place:** | Omaha, Nebraska |
| **Marital status:** | single | | |
| **Home Phone** | 412-310-9874 | **Citizenship:** | USA |

**Business Address:**    Division of Neuropathology
A724.1 Scaife Hall
200 Lothrop Street
Pittsburgh, PA 15213

**Business Phone:**    412-624-6610

**Business Fax:**    412-624-5488
**e-mail address**    hamiltonrl@upmc.edu

### EDUCATION AND TRAINING

| | | | |
|---|---|---|---|
| 1977-1985 | University of Nebraska-Lincoln | B.S. | Psychology |
| 1985-1989 | University of Nebraska Medical Center | M.D. | |
| 1989-1991 | University of California, San Diego Program Director, David Bailey | Resident Anatomic Pathology | |
| 1991-1993 | University of California, San Diego Program Director, Henry C. Powell | Resident Neuropathology | |
| 1993-1994 | University of Pittsburgh Program Director, Clayton A Wiley | Fellow Neuropathology | |
| 1994-1995 | University of Pittsburgh Program Director, Michael Zigmond | Fellow: NIMH Training Grant in Neuroscience | |

### APPOINTMENTS AND POSITIONS:

1995-2002    University of Pittsburgh School of Medicine -Assistant Professor of Pathology
2002-present    University of Pittsburgh School of Medicine -Associate Professor of Pathology

### DISTRIBUTION OF % TIME

| | |
|---|---|
| Research | 20% |
| Other scholarly activity | 8% |
| Teaching | 10% |
| Clinical | 35% |
| Combined clinical and teaching | 20% |
| Service activities | 5% |
| Administrative activities. | 2% |
| | |
| TOTAL | 100% |

**Ronald L. Hamilton, M.D.**

<u>**CERTIFICATION and LICENSURE**</u>

**SPECIALTY CERTIFICATION**

| | | |
|---|---|---|
| American Board of Pathology | Anatomic Pathology | 5/23/96 |
| American Board of Pathology | Neuropathology | 5/23/96 |
| American Board of Pathology – recertification | Neuropathology | 1/1/2014 |

**MEDICAL or OTHER PROFESSIONAL LICENSURE**

| | |
|---|---|
| 1990 | California Medical License (G69731) expired |
| 1993 | Pennsylvania Medical License (MD-049717-L) |
| 2009 | Indiana Medical License (01067332A) |

<u>**MEMBERSHIPS IN PROFESSIONAL AND SCIENTIFIC SOCIETIES**</u>

| | |
|---|---|
| 1992 | American Association for the Advancement of Science |
| 1993 | American Association of Neuropathology |
| 1993 | International Society of Neuropathology |
| 1994 | College of American Pathologists (CAP) |
| 1995-97 | CAP Neuropathology Subcommittee |
| 1998 | Children's Cancer Group, Study Committee for CCGB975 |
| 1999 | Society for Neuroscience |

<u>**HONORS**</u>

| | |
|---|---|
| Nominated "Teacher of the Year: Anatomic Pathology" | 1997 |
| Nominated "Teacher of the Year: Anatomic Pathology" | 1998 |
| Nominated "Teacher of the Year: Anatomic Pathology" | 1999 |
| Nominated "Teacher of the Year: Anatomic Pathology" | 2000 |
| Nominated "Teacher of the Year: Anatomic Pathology" | 2001 |
| Nominated "Teacher of the Year: Anatomic Pathology" | 2002 |
| UPMC ACES Award winner (ACES is an Award for | 2003 |

Clinical Excellence and Service and is given to about 10 physicians per year at UPMC)

| | |
|---|---|
| Letter of appreciation from Chief Residents | 1997-1998 |
| AP Pathology "TEACHER OF THE YEAR" | 2004-05 |

<u>**PUBLICATIONS**</u>

**Refereed Articles**

1. Esch O, Spinosa JC, **Hamilton RL**, Crombie DL, Schteigart CO, Rondinone JF, D'Agostino HB,Lillienau J and Hofmann AF: Acute effects of topical methyl tert-butyl ether or ethyl propionate on gallbladder histology in animals: a comparison of two solvents for contact dissolution of cholesterol gallstones. Hepatology 16 (4):984-991, 1992.

2. Anders KH, Becker PS, Holden JK, Sharer LR, Cornford ME, Hansen LA, **Hamilton R,** Vinters, HV: Multifocal necrotizing leukoencephalopathy with pontine predilection in immunosuppressed patients: a clinicopathologic review of sixteen cases. Human Pathology 24:897-904, 1993.

3. **Hamilton RL**, Achim C, Grafe MR, Fremont JC, Miners D, Wiley CA: Herpes simplex virus brainstem encephalitis in an AIDS patient. Clinical Neuropathology, 14: 45-50, 1995.

**Ronald L. Hamilton, M.D.**

4.  Rose J, Haskell WL, Gamble JG, **Hamilton RL**, Brown DA, Rinsky L: Muscle pathophysiology and clinical measures of disability in children with cerebral palsy. Journal of Orthopedic Research, 12(6): 758-768, 1994.

5.  **Hamilton RL**, Grafe MR: Complete absence of the cerebellum: a report of two cases. Acta Neuropathologica 88 (3): 258-261, 1994.

6.  **Hamilton RL**, Haas RH, Nyhan WL, Powell HC, Grafe MR: The neuropathology of propionic academia: a report of two additional cases.  Journal of Child Neurology 10(1): 25-30, 1995.

7.  Haas RH, Marsden DL, Capistrano-Estrada S, **Hamilton RL**, Grafe MR, Wong W, Nyhan WL: Acute basal ganglia infarction in propionic acidemia.  Journal of Child Neurology 10(1) 18-22, 1995.

8.  Kupperman BD, Quiceno JI, Wiley C, Hesselink J**, Hamilton R**, Keefe K, Garcia R, Freeman WR: Clinical and histopathologic study of varicella zoster virus retinitis in patients with the acquired immunodeficiency syndrome.  American Journal of Ophthalmology 118:589-600, 1994.

9.  Adelson PD, Robichaurd P, **Hamilton RL**, Kochanek PM. A Model of Diffuse Traumatic Brain  Injury in the Immature Rat.  J Neurosurg 85:877-884, 1996.

10. Alper G, Crumrine PK, **Hamilton RL**, Albright L, Wald ER. An unusual case of inflammatory spinal epidural  mass (Castleman's syndrome) Pediatric Neurology  15: 60-2 , 1996

11. Adelson PD, Firlik KS, Firlik AD, **Hamilton RL**. A meningeal cyst of the thoracic spine presenting as prolonged paresis after ankle injury: case report. Neuropediatrics 27:207-210, 1996.

12. Cramer SC, Segal A, **Hamilton RL**, Schmahman J, Ma J. Leukoencephalitis Due to Varicella Zoster Virus:   Report of a Case and Review of Clinical Features.  Contemporary Neurology, 1, 1996 (electronic journal).

13. Mansfield RT, Schiding JK, **Hamilton R**, Kochanek PM: Effects of hypothermia on traumatic brain injury in immature rats. J Cerebral Blood Flow  Metabo 16(2): 244-252, 1996.

14. Pollack IF, Campbell JW, **Hamilton RL**, Martinez AJ, Bozik ME. Proliferation index as a predictor of prognosis in malignant gliomas of childhood. Cancer 79:849-856, 1996

15. Pollack IF, **Hamilton RL,** Finkelstein SD, Campbell JW, Martinez AJ, Sherwin RN, Bozik ME, Gollin SM. The relationship between tp53 mutations and overexpression of p53 and prognosis in malignant gliomas of childhood. Cancer Research 57:304-309, 1997.

16. Ikonomovic MD, Mizukami K, Davies P, **Hamilton R**, Sheffield R, Armstrong DM. The loss of GluR2(3) immunoreactivity preceded neurofibrillary tangle formation in the entorhinal cortex and hippocampus of Alzheimer brains. J Neuropath Exp Neurol 56:1018-1027, 1997.

17. Bredel M, Pollack IF, Campbell JW, **Hamilton RL**: Basic fibroblast growth factor as a predictor of prognosis in pediatric high-grade gliomas. Clinical Cancer Research 3:2157-2164, 1997

18. Blatt J, **Hamilton RL**: Neurodevelopmental anomalies in children with neuroblastoma. Cancer 82: 1603-8, 1998.

19. Fukui MB, Livstone BJ, Meltzer CC, **Hamilton RL**: Hemorrhagic presentation of untreated primary central nervous system lymphoma in the acquired immunodeficiency syndrome. Am J Roentgenol 170:1114-1115, 1998..

20. Bredel M, Pollack IF, **Hamilton RL**, James CD: Epidermal growth factor receptor (EGFR) and gene amplification in high-grade non-brainstem gliomas of childhood. Clin Can Res 5:1786-92, 1999

**Ronald L. Hamilton, M.D.**

21. Gerszten PC, Pollack IF, **Hamilton RL**. Primary parafalcine chondrosarcoma in a child. Acta Neuropathologica 95:111-4, 1998.

22. Pollack IF, **Hamilton RL**, Fitz C, Orenstein DM. An intrasylvian "fibroma" in a child with cystic fibrosis. Pediatric Neurosurgery 46:744-747 2000.

23. Liachenko S, Tang P, **Hamilton RL**, Xu Y: A reproducible model of circulatory arrest and remote resuscitation in rats for NMR investigation. Stroke 29:1229-1238, 1998

24. Meltzer CC, Liu AY, Perrone AM, **Hamilton RL** Meningioangiomatosis MR imaging with histopathologic correlation. AJR 170:804-5, 1998

25. Clark RSB, Kochanek PM, Chen M, Watkins SC, Marion DW, Chen J, **Hamilton RL**, Loeffert JE, Graham SH. Increases in Bcl-2 and cleavage of caspase-1 and caspase-3 in human brain after head injury. FASEB J, 13:813-821, 1999

26. Soontornniyomkij V, Wang G, Pittman CA, **Hamilton RL**, Wiley CA, Achim CL Absence of brain-derived neurotrophic factor and trkB receptor immunoreactivity in glia of Alzheimer's disease. Acta Neuropathologica 98:345-8, 1999.

27. Wang G, Achim CL, **Hamilton RL**, Wiley CA, Soontornniyomkij V Tyramide signal amplification methods in multiple label immunofluorescence confocal microscopy. Methods 18(4):459-464, 1999

28. Firlik KS, Adelson PD, **Hamilton RL**: Coexistence of a ganglioglioma and Rasmussen's encephalitis: successful treatment in a four-year-old boy. Pediatr Neurosurg 30:278-282, 1999

29. Ikonomovic MD, Mizukami K, Warde D, Sheffield R, **Hamilton R**, Wenthold RJ, Armstrong DM Distribution of glutamate receptor subunit NMDAR1 in the hippocampus of normal elderly and patients with Alzheimer's disease. Exp Neurol 160(1):194-204, 1999.

30. Dallasta, LM, Wang G, Bodnar RJ, Draviam R, Wiley CA, Achim CA, **Hamilton RL**: Differential expression of intercellular adhesion molecules-1 (ICAM-1) and vascular adhesion cell molecule-1 (VCAM-1) in chronic murine retroviral encephalitis. Neuropathol Appl Neurobiol 26:332-341, 2000.

31. Luabeya MK, Dallasta LM, Achim CL, Pauza CD, **Hamilton RL**: Blood-brain Barrier Disruption in Simian Immunodeficiency Virus Encephalitis. Neuropathol Appl Neurobiol 26:454-462, 2000.

32. **Hamilton RL**. Lewy Bodies in Alzheimer's Disease: A Neuropathological Review of 145 Cases Using  -synuclein Immunohistochemistry. Brain Pathol 10: 378-384, 2000.

33. Sweet, RA, **Hamilton RL**, Healy MT, Wisniewski SR, Henteleff R, Pollack BG, Lewis DA, DeKosky ST. Alterations of Striatal Dopamine Receptor Binding in Alzheimer's Disease Are Associated with Lewy Body Pathology and With Antemortem Psychosis. Arch Neurol 58:466-472, 2001.

34. Styren S, **Hamilton RL**, Styren GC, Klunk WE X-34: a novel and intensely fluorescent stain for Alzheimer's disease pathology. J Histochem Cytochem 48:1223-1232, 2000.

35. Lopez OL, **Hamilton RL**, Becker JT, Wisniewski S, Kaufer DI, DeKosky ST. Severity of cognitive impairment and the clinical diagnosis of AD with Lewy bodies. Neurology 54:1780-1787, 2000

36. Lopez OL, Wisniewski S, **Hamilton RL**, Becker JT, Kaufer DI, DeKosky ST. Predictors of progression in patients with AD and Lewy bodies. Neurology 54:1774-1779, 2000.

Ronald L. Hamilton, M.D.

37.    Sweet RA, **Hamilton RL**, Lopez OL, Klunk WE, Wisnieski SR, Kaufer DI, Healy MT, Dekosky ST. Psychotic symptoms in Alzheimer's Disease are not associated with more severe neuropathologic features. Internat Psychogeriatr 12: 547-558, 2000.

38.    Lopez OL, Becker JT, Klunk W, Saxton J, **Hamilton RL**, Kaufer DI, Sweet RA, Meltzer CC, Wisniewski S, Kamboh MI, DeKosky ST. Research evaluation and diagnosis of probable Alzheimer's Disease over the last two decades. I. Neurology 55:1854-1862, 2000.

39.    Lopez OL, Becker JT, Klunk W, Saxton J, **Hamilton RL**, Kaufer DI, Sweet RA, Meltzer CC, Wisniewski S, Kamboh MI, DeKosky ST. Research evaluation and diagnosis of possible Alzheimer's Disease over the last two decades. II. Neurology 55:1863-1869, 2000.

40.    Pollack IF, **Hamilton RL**, Fitz C, Kassam A, Snyderman C. Congenital Reactive Myofibroblastic Tumor of the Petrous Bone: Case Report. Neurosurgery 48:430-435, 2001.

41.    Levy EI, Scarrow A, **Hamilton** RC (sic), Wollman MR, Fitz C. Pollack IF. Medical Management Of Eosinophilic Granuloma of the Cervical Spine. Pediatr Neurosurg 31:159-62, 1999.

42.    Pettegrew JW, Panchalingam K, **Hamilton RL**, and McClur RJ Brain Membrane Phospholipid Alterations in Alzheimer's Disease.  Neurochem Res 26:771-782, 2001

43.    Levy EI, Harris AE, Omalu BA, **Hamilton RL**, Branstetter BF, Pollack IF. Sudden Death from Fulminant Acute Cerebellitis.  Pediatr Neurosurg 35:24-28, 2001

44.    Lianchenko S, Tang P, **Hamilton RL**, Xu Y. Regional Dependence of Cerebral Reperfusion After Circulatory Arrest in Rats.  J Cerebr Blood Flow Met 21:1320-1329, 2001 .

45.    Pollack IF, Finkelstein SD, Burnham J, Holmes EJ, **Hamilton RL**, Yates AJ, Finlay J, Sposto R, and CCG. Age and TP53 Mutation Frequency in Childhood Malignant Gliomas: Results of a Multi-institutional Cohort. Cancer Res 61:7404-7407, 2001

46.    Adelson PD, Jenkins LW, **Hamilton RL**, Robichaud P, Tran MP, Kochanek PM. Histopathologic Response of the Immature Rat to Diffuse Traumatic Brain Injury.  J Neurotrauma 18 :967-976, 2001

47.    Pollack IF, Finkelstein SD, Woods J, Burnham J, Holmes EJ, **Hamilton RL**, Yates AJ, Boyett JM, Finlay J, Sposto R, and CCG. TP53 Mutations, Expression of p53 and Prognosis in Children with Malignant Gliomas.  New England Journal of Medicine 346:420-427, 2002

48.    Lopez OL, Becker JT, Kaufer DI, **Hamilton RL**, Sweet RA, Klunk W, DeKosky ST. Research Evaluation and Prospective Diagnosis of Dementia With Lewy Bodies.  Arch Neurol 59:43-46, 2002.

49.    Wang L, Yushmanov VE, Lianchenko SM, Tang P, **Hamilton RL**, Xu Y.  Late Reversal of Cerebral Perfusion and Water Diffusion After Transient Focal Ischemia in Rats.  J Cereb Blood Flow Metab 22:253-261, 2002.

50.    Pollack IF, Biegal JA, Yates AJ, **Hamilton RL**, Finkelstein SD.Risk Assignment in Childhood Brain Tumors: The Emerging Role of Molecular and Biologic Classification. Current Oncology Reports 4:114-122, 2002.

51.    Pollack IF, **Hamilton RL**, Burnham J, Holmes EJ, Finkelstein SD, Sposto R, Yates AJ, Boyett JM, Finley JL. The impact of proliferation index on outcome in childhood malignant gliomas: results in a multi-institutional cohort. Neurosurgery 50:1238-1245, 2002.

**Ronald L. Hamilton, M.D.**

52. Sweet RA, Panchalingam K, Pettefrew JW, McClure RJ, **Hamilton RL**, Lopez OL, Kaufer DI, DeKosky ST, Klunk WE.  Psychosis in Alzheimer disease: postmortem magnetic resonance spectroscopy evidence of excess neuronal and membrane phospholipid pathology. Neurobiol Aging 23:547-53, 2002.

53.  Mazzola CA, Albright AL, Sutton LN, Tuite GF, **Hamilton RL**, Pollack IF.  Dermoid inclusion cysts and early spinal cord tethering after fetal surgery.  New Engl. J Med 347:256-9, 2002.

54.  Bredel M, Pollack IF, **Hamilton RL**, Birner P, Hainfellner JA, Zentner J.  DNA topoisomerase II-alpha predicts progression-free and overall survival in pediatric malignant non-brainstem gliomas.  Int J Cancer 99:817-20, 2002.

55.  Klunk WE, Wang Y, Huang G, Debnath ML, Holt DP, Shao L, **Hamilton RL**, Ikonomovic MD, DeKosky ST, Mathis CA.  The binding of BTA-1 to post-mortem brain homogenates is dominated by the amyloid component. J Neurosci 23:2086-2092, 2003.

56. Castellano-Sanchez, AA, Ohgaki H, Yokoo H, Scheithauer BW, Burger PC, **Hamilton RL**, Finkelstein SD, Brat, DJ.  Cerebral granular cell astrocytomas show a high frequency of allelic loss but lack a defining genotype. Brain Pathology 13: 62-78, 2003.

57.  Gilbertson RJ, Hill DA, Hernan R, Kocak M, Geyer R, Olson J, Gajjar A, Rush L, **Hamilton RL**, Finkelstein SD, Pollack IF.  ERBB1 is amplified and overexpressed in high-grade diffusely infiltrative pediatric brain stem glioma.  Clin Cancer Res 9:3620-3624, 2003.

58. Pollack IF, Finkelstein SD, Burnham J, **Hamilton RL**, Yates AJ, Holmes EJ, Boyett JM, Finlay JL.  The association between chromosome 1p loss and outcome in pediatric malignant gliomas: results from the CCG-945 cohort. Pediatr Neurosurg 39:114-121, 2003.

59.  Carter TL, Rissman RA, Mishizen-Eberz AJ, Wolfe BB, **Hamilton RL**, Gandy S, Armstrong DM.  Differential Preservation of AMPA Receptor Subunits in the Hippocampi of Alzheimer's Disease Patients According to Braak Stage Experimental Neurology 187:299-309, 2004

60.  Finkelstein SD, Mohan D, **Hamilton RL**, Sasatomi E, Swalsky PA, Lieberman FS.  Microdissection-based genotyping assists discrimination of reactive gliosis versus glioma. Am J Clin Pathol 121:671-678, 2004

61.  **Hamilton RL**, Bowser B Alzheimer Disease Pathology in ALS Acta Neuropathologica107:515-522, 2004

62.  Mohan D, Couce ME, Wiley CA, **Hamilton RL**, Sasatomi E, Swalsky PA, Lieberman MD, Finkelstein SD.  Microdissection based genotyping of human gliomas: diagnostic and prognostic considerations Modern Pathology 17:1346-1358, 2004

63. Marshall GA, Kaufer DI, Lopez OL, Rao GR, **Hamilton RL**, DeKosky ST.  Right prosubiculum amyloid plaque density correlates with anosognosia in Alzheimer's Disease.  J Neurol Neurosurg Psychiatry 75:1396-4000, 2004.  **PMCID:  PMC1738763**

64.  Sweet RA, **Hamilton RL**, Butters ME, Mulsant BH, Pollock BG, Lewis DA, DeKosky ST, Reynolds CF.  Neuropathologic Correlates of Dementia in Late Life Major Depression Neuropsychopharmacology 29:2242-2250, 2004

65  Lee JYK, Finkelstein S, **Hamilton RL**, Rekha P, Pirris S, King Jr, JT, Omalu B.  Loss of heterozygosity Analysis of Benign, Atypical and Anaplastic Meningiomas.  Neurosurgery 55:1163-1173, 2004.

**Ronald L. Hamilton, M.D.**

66. Beckner ME, Sasatomi E, Swalsky PA, **Hamilton RL**, Pollack, IF, Finkelstein SD. Loss of heterozygosity reveals non-VHL Allelic loss in hemangioblastomas at 22q13. Human Pathology 35:1105-1111, 2004.

67. Tsuang D, Wilson R, Lopez OL, Luedecking-Zimmer EK, Leverenz JB, DeKosky ST, Kamboh MI, **Hamilton RL**. Genetic Association Between APOE*4 Allele and Lewy Bodies in Alzheimer's Disease Neurology, 64:509-513, 2005. **PMCID: PMC1487185**

68. Bredel C, Lassman S, Pollack IF, Knoth R, **Hamilton RL**, Werner M, Bredel M. DNA Topoisomerase II-alpha and Her-2/Neu Gene Dosages in Pediatric Malignant Gliomas. Int J Cancer 26:1188-92, 2005.

69. Witham TF, Okada H, Fellows W, **Hamilton RL**, Flickinger JC, Chambers WH, Pollack IF, Watkins SC, Kondziolka D. The characterization of tumor apoptosis after experimental radiosurgery. Stereotact Funct Neurosurg 83:17-24 2005.

70. McFadden K, **Hamilton RL**, Insalaco SJ, Lavine L, Al-Mateen M, Guoji Wang G, Wiley CA Neuronal intranuclear inclusion disease in a child without polyglutamine inclusions J Neuropathol Exper Neurol 64:545-552, 2005. **PMCID: PMC1402362**

71. Hatano M, Eguchi J, Tatsumi T, Kuwashima N, Dusak JE, Kinch MS, Pollack IF, **Hamilton RL**, Storkus WJ, Okada H. EphA2 as a glioma-associated antigen: a novel target for glioma-vaccines. Neoplasia 7:717-722, 2005. **PMCID: PMC1501889**

72. Jordan S, Ruoyan C, Koprivica V, **Hamilton RL**, Whitehead R, Tottori K, Kikuchi T. In vitro profile of the antidepressant candidate OPC-14523 at rat and human 5-HT$_{1A}$ receptors.Eur J Pharmacol, 517:165-173, 2005.

73. Omalu BI, Minster RL, Kamboh MI, **Hamilton RL**, Wecht CH, DeKosky ST. Chronic Traumatic Encephalopathy (CTE) in a National Football League (NFL) Player Neurosurgery, 57:128-134, 2005.

74. Judkins AR, Burger PC, **Hamilton RL**, Kleinschmidt-DeMasters B, Perry A, Pomeroy SL, Rosenblum MK, Yachnis AT, Zhou H, Rorke LB, Biegel JA. INI1 Protein Expression Distinguishes Atypical Teratoid/Rhabdopid Tumor from Choroid Plexus Carcinoma. J Neuropathol Exp Neurol 64:391-397, 2005.

75. Desai PP, Ikonomovic I, Abrahamson EE, **Hamilton RL,** Isanski BA, Hope CE, Klunk WE, Dekosky ST, Kamboh MI. Apolipoprotein D is a component of compact but not diffuse amyloid-beta plaques in Alzheimer's Disease temporal cortex. Neurobiol Dis May 22, 2005 (epub)

76. Carson-Walter EB, Hampton J, Geynisman D,Pillai PK, Sathanoori R, Madden SL, **Hamilton RL**, Walter KA. Plasmalemmal Vesicle associated protein-1 (PV-1) is a novel and critical marker of brain tumor angiogenesis. Clin Cancer Res 11:7643-7650, 2005.

77. Lopez OL, Becker JT, Sweet RA, Martin-Sanchez FJ, **Hamilton RL** Lewy bodies in the Amygdala increase risk for major depression in subjects with Alzheimer disease. Neurology 67:660-665, 2006.

78. Pollack IF, **Hamilton RL**, Sobol R, Burnham J, Yates AJ, Holmes EJ, Zhou T, Finlay J (for Children Oncology Group).O6-methylguanine-DNA methyltransferase strongly Correlates with Outcome in Childhood Malignant Gliomas: Results from the CCG-945 Cohort J Clin Oncol. Jul 20;24(21):3431-7, 2006.

**Ronald L. Hamilton, M.D.**

79. Mandal PK, Pettegrew JW, Masliah E, **Hamilton RL**, Mandal R. Interaction between Aβ Peptide and α Synuclein: Molecular Mechanisms in Overlapping Pathology of Alzheimer's and Parkinson's in Dementia with Lewy Body disease. Neurochemical Research, 2006 31, 1153-1162, 2006.

80. Omalu B, DeKosky ST, **Hamilton RL**, Minster RL, Kamboh MI, Shakir AM, Wecht Chronic Traumatic Encephalopathy in a National Football League Player: part II. Neurosurgery 59:1086-92, 2006

81. Ramsey CP, Glass CA, Koike MA, Montgomery MB, Ritson GP, Chia L, **Hamilton RL**, Chu CT, Jordan-Sciutto KL. Expression of Nrf2 in neurodegenerative diseases. J Neuropathol Exp Neurol 66:75-85, 2007. **PMCID: PMC2253896**

82. Boada FE, Tanase C, Davis D, Walter K, Torres-Trejo A, Couce M, **Hamilton R**, Kondziolka D, Bartinski W, Lieberman F. Non-invasive assessment of tumor proliferation using triple quantum filtered 23/Na MRI: technical challenges and solutions. Conf Proc IEEE Eng Med Biol Sci Soc. 2004; 7:5238-41

83. Pollack IF, **Hamilton RL**, James CD, Finkelstein SD, Burnham J, Yates AJ, Holmes EJ, Zhou T, Finlay J (for Children Oncology Group). Rarity of *PTEN* Deletions and *EGFR* Amplification in Malignant Gliomas of Childhood: Results from the Children's Cancer Group-945 Cohort J Neurosurg 105(5 Suppl):418-424, 2006.

84. Guzman A, Wood WL, Alpert E, Prasad MD, Miller RG, Rothstein JD, Bowser R, **Hamilton R**, Wood TD, Cleveland DW, Lingappa VR, Liu J. Common molecular signature in SOD1 for both sporadic and familial amyotrophic lateral sclerosis. Proc Nat Acad Sci 104:12524-12529, 2007. **PMCID: PMC2408940**

85. Beckner ME, Jane EP, Jankowitz B, Agostino NR, Walter KA, **Hamilton RL**, Pollack IF. Tumor cells from ultrasonic aspirations of glioblastomas migrate and from spheres with radial outgrowth. Cancer Letters 255:135-44, 2007. PMID 17543444, **PMCID: PMC2000342**

86. McIntyre JA, Chapman J, Shavit E, **Hamilton RL**, and DeKosky ST. Redox-Reactive Autoantibodies in Alzheimer's Patients' Cerebrospinal Fluids: Preliminary Studies. Autoimmunity, 40:390-396, 2007. PMID 17612901

87. Nakashima-Yasuda, Uryu, K, Robinson J, Xie S, Hurtig H, Duda J, Arnold S, Siderowf A, Grossman M, Leverenz J, Woltjer R, Lopez OL, **Hamilton R**, Tsuang DW, Galaska D, Masliah M, Kaye J, Clark C, Montine TJ, Lee VMY, Trojanowski J. Co-morbidity of TDP-43 Proteinopathy in Lewy Body Related Diseases. Acta Neuropathol 114:221-9, 2007. PMID 17653732

88. McIntyre JA, **Hamilton RL**, DeKosky ST. Redox-reactive autoantibodies in cerebrospinal fluids. Ann NY Acad Sci 1109:296-302, 2007. PMID 17785318

89. Okada H, Lieberman FS, Walter KA, Lunsford LD, Kondziolka DS, Bejjani GK, **Hamilton RL**, Torres-Trejo A, Kalinski P, Cai Q, Mabold JL, Edington HD, Butterfield LH, Whiteside TL, Potter DM, Schold SC Jr., Pollack IF Autologous glioma cell vaccine admixed with interleukin-4 gene transfected fibroblasts in the treatment of patients with malignant gliomas. J Transl Med 5:67, 2007. PMID 18093335. **PMCID: PMC2254376**

90. Beach TG, White CL, **Hamilton, RL**, Duda JE, Iwatsubo T, Dickson DW, Leverenz JB, Roncaroli F, Buttini M, Hladik CL, Sue LI, Noorigian JV, Adler CH. Evaluation of alpha-synuclein immunohistochemical methods used by invited experts. Acta Neuropathol 116:277-88, 2008. PMID 18626651. **PMCID: PMC2708176**

91. Ikonomovic MD, Klunk WE, Abrahamson EE, Mathis CA, Price JC, Tsopelas ND, Lopresti BJ, Ziolko S, Bi W, Paljug WR, Debnath ML, Hope CE, Isanski BA, **Hamilton RL**, DeKosky ST. Post-

**Ronald L. Hamilton, M.D.**

mortem correlates of in vivo PiB-PET amyloid imaging in a typical case of Alzheimers disease. Brain  131(Pt 6):1630-45, 2008.  PMID  18339640. **PMCID: PMC2408940**

92. Leverenz JB, **Hamilton R**, Tsuang DW, Schantz A, Vavrek D, Larson EB, Kukall WA, Lopez O, Galasko D, Masliah E, Woltjer R, Clark C, Trojanowski JQ, Montine TJ. Empiric refinement of the pathologic assessment of Lewy-related pathology in the dementia patient.  Brain Pathol 18:220-224, 2008. PMID 18241249.  **PMCID: PMC2689097 NIHMS29359**

93. Raja AI, Yeaney GA, Jakacki RI, **Hamilton RL**, Pollack IF  Extraventricular neurocytoma in neurofibromatosis Type I: Case report.  J Neurosurg Pediatrics 2:63-67, 2008.PMID 18590398

94. Okada H, Low KL, Kohanbash G, McDonald HA, **Hamilton RL**, Pollack IF.  Expression of glioma-associated antigens in pediatric brain stem and non-brain stem gliomas.  J Neurooncol 88:245-50, 2008. PMID 18324354.  **PMCID: PMC2561297 NIHMS70086**

95. Venneti S, Lopresti BJ, Wang G, **Hamilton RL**, Mathis CA, Klunk WE, Apte UM, Wiley CA. PK11195 labels activated microglia in Alzheimer's disease and in vivo in a mouse model using PET. Neurobiol Aging 2009, 30:1217-26. PMID 18178291

96. Mullett SJ, **Hamilton RL**, Hinkle DA.  DJ-1 immunoreactivity in human brain astrocytes is dependent on infarct presence and infarct age. Neurology 2009, 29:125-31. PMID 18647263

97. Park DM, Yeaney GA, **Hamilton RL**, Mabold J, Urban N, Appleman L, Flickinger J, Lieberman F, Mintz A.  Identifying Muir-Torre syndrome in a patient with glioblastoma multiforme.  Neuro Oncol, 2009 11:452-5. PMID 19028998.   )

98. Horbinski C, Bartynski WS, Carson-Walter E, **Hamilton RL**, Tan HP, Cheng S.  Reversible encephalopathy after cardiac transplantation:  Histologic evidence of endothelial activation, T-cell specific trafficking, and vascular endothelial growth factor expression.  Am J Neuroradiol 2008 30:588-90. PMID 18854444.

99. Northcott P, Nakahara Y, Peacock J, Ellison D, Croul S, Feuk L, Ra YS, Kongham P, Zilerberg K, Mack S, McLeod J, Scherer S, Rao S, Grajkowska W, Gillespie Y, Lach B, Grundy R, Pollack IF, **Hamilton RL,** Van Meter T, Carlotti C, Boop R, Bigner D, Gilbertson R, Rutka J, Taylor MD. Multiple recurrent genetic events converge on control of histone lysine methylation in medulloblastoma.  Nat Genet 2009 41:465-72. PMID 19270706.

100. Ueda R, Kohanbash G, Sasaki K, Fujita M, Zhu X, Kastenhuber ER, McDonald HA, Potter DM, **Hamilton RL,** Lotze MT, Khan SA, Sobol RW, Okada H.  Dicer-regulated microRNAs 222 and 339 promote resistance of cancer cells to cytotoxic T-lymphocytes by down-regulation of ICAM-1. Proc Natl Acad Sci U S A. 2009 Jun 30;106(26):10746-51.  PMID: 19520829

101. Maki RA, Tyurin VA, Lyon RC, **Hamilton RL**, DeKosky ST, Kagan VE, Reynolds WF.  Aberrant expression of myeloperoxidase in astrocytes promotes phospholipid oxidation and memory deficits in a mouse model of Alzheimer disease. J Biol Chem. 2009 Jan 30;284(5):3158-69. PMID: 19059911.

102. Horbinski C, **Hamilton RL**, Lovell C, Burnham J, Pollack IF.  Impact of morphology, MIB-1, p53, and MGMT on Outcome in Pilocytic Astrocytomas.  Brain Pathology 2010; 20:581-8  e-pub Sept 21, 2009

103. Armstrong RA, Ellis W, **Hamilton RL**, MacKenzie IR, Hedreen J, Gearing M, Montine T, Vonsattel JP, Head E, Lieberman AP, Cairns NJ.  Neuropathological heterogeneity in frontotemporal lobar degeneration with TDP-43 proteinopathy: a quantitative study of 94 cases using principle components analysis.  J Neural Transm 2010, 117:227-239.

**Ronald L. Hamilton, M.D.**

104. Horbinski C, **Hamilton RL**, Nikiforov Y, Pollack IF.  Association of molecular alterations, including BRAF, with biology and outcome in pilocytic astrocytomas.  Acta Neuropathol 2010 Jan 1, e-pub.

105. Van Deerlin VM, Sleiman PM, Martinez-Lage M, Chen-Plotkin A, Wang LS, Graff-Radford NR, Dickson DW, Rademakers R, Boeve BF, Grossman M, Arnold SE, Mann DM, Pickering-Brown SM, Seelaar H, Heutink P, van Swieten JC, Murrell JR, Ghetti B, Spina S, Grafman J, Hodges J, Spillantini MG, Gilman S, Lieberman AP, Kaye JA, Woltjer RL, Bigio EH, Mesulam M, Al-Sarraj S, Troakes C, Rosenberg RN, White CL 3rd, Ferrer I, Lladó A, Neumann M, Kretzschmar HA, Hulette CM, Welsh-Bohmer KA, Miller BL, Alzualde A, de Munain AL, McKee AC, Gearing M, Levey AI, Lah JJ, Hardy J, Rohrer JD, Lashley T, Mackenzie IR, Feldman HH, **Hamilton RL**, Dekosky ST, van der Zee J, Kumar-Singh S, Van Broeckhoven C, Mayeux R, Vonsattel JP, Troncoso JC, Kril JJ, Kwok JB, Halliday GM, Bird TD, Ince PG, Shaw PJ, Cairns NJ, Morris JC, McLean CA, DeCarli C, Ellis WG, Freeman SH, Frosch MP, Growdon JH, Perl DP, Sano M, Bennett DA, Schneider JA, Beach TG, Reiman EM, Woodruff BK, Cummings J, Vinters HV, Miller CA, Chui HC, Alafuzoff I, Hartikainen P, Seilhean D, Galasko D, Masliah E, Cotman CW, Tuñón MT, Martínez MC, Munoz DG, Carroll SL, Marson D, Riederer PF, Bogdanovic N, Schellenberg GD, Hakonarson H, Trojanowski JQ, Lee VM.  Common variants at 7p21 are associated with frontotemporal lobar degeneration with TDP-43 inclusions. Nat Genet 2010 42:234-239.

106. Omalu BI, **Hamilton RL**, Kamboh MI, DeKosky ST, Bailes J.  Chronic traumatic encephalopathy in a National Football League Player: Case report and emerging medicolegal practice questions.  J Forensic Nurs, 2010, 6: 40-46.

107. Caltagarone J, **Hamilton RL**, Murdoch G, Jing Z, DeFranco DB, Bowser R. Paxillin and hydrogen peroxide-induced clone 5 expression and distribution in control and Alzheimer disease hippocampi. J Neuropathol Exp Neurol. 2010: 69:356-71.

108. Pollack IF, **Hamilton RL**, Sobol RW, Nikiforova MN, Lyons-Weiler MA, Laframboise WA, Burger PC, Brat DJ, Rosenblum MK, Holmes EJ, Zhou T, Jakacki RI; for the Children's Oncology Group. IDH1 mutations are common in malignant gliomas arising in adolescents: a report from the Children's Oncology Group. Childs Nerv Syst. 2010; 27:87-94

109. Jun G, Naj AC, Beecham GW, Wang LS, Buros J, Gallins PJ, Buxbaum JD, Ertekin-Taner N, Fallin MD, Friedland R, Inzelberg R, Kramer P, Rogaeva E, St George-Hyslop P, Arnold SE, Baldwin CT, Barber R, Beach T, Bigio EH, Bird TD, Boxer A, Burke JR, Cairns N, Carroll SL, Chui HC, Clark DG, Cotman CW, Cummings JL, Decarli C, Diaz-Arrastia R, Dick M, Dickson DW, Ellis WG, Fallon KB, Farlow MR, Ferris S, Frosch MP, Galasko DR, Gearing M, Geschwind DH, Ghetti B, Gilman S, Giordani B, Glass J, Graff-Radford NR, Green RC, Growdon JH, **Hamilton RL**, Harrell LE, Head E, Honig LS, Hulette CM, Hyman BT, Jicha GA, Jin LW, Johnson N, Karlawish J, Karydas A, Kaye JA, Kim R, Koo EH, Kowall NW, Lah JJ, Levey AI, Lieberman A, Lopez OL, Mack WJ, Markesbery W, Marson DC, Martiniuk F, Masliah E, McKee AC, Mesulam M, Miller JW, Miller BL, Miller CA, Parisi JE, Perl DP, Peskind E, Petersen RC, Poon W, Quinn JF, Raskind M, Reisberg B, Ringman JM, Roberson ED, Rosenberg RN, Sano M, Schneider JA, Schneider LS, Seeley W, Shelanski ML, Smith CD, Spina S, Stern RA, Tanzi RE, Trojanowski JQ, Troncoso JC, Van Deerlin VM, Vinters HV, Vonsattel JP, Weintraub S, Welsh-Bohmer KA, Woltjer RL, Younkin SG, Cantwell LB, Dombroski BA, Saykin AJ, Reiman EM, Bennett DA, Morris JC, Lunetta KL, Martin ER, Montine TJ, Goate AM, Blacker D, Tsuang DW, Beekly D, Cupples LA, Hakonarson H, Kukull W, Foroud TM, Haines J, Mayeux R, Farrer LA, Pericak-Vance MA, Schellenberg GD; Alzheimer's Disease Genetics Consortium, Arnold SE, Baldwin CT, Barber R, Beach T, Bigio EH, Bird TD, Boxer A, Burke JR, Cairns N, Carroll SL, Chui HC, Clark DG, Cotman CW, Cummings JL, Decarli C, Diaz-Arrastia R, Dick M, Dickson DW, Ellis WG, Fallon KB, Farlow MR, Ferris S, Frosch MP, Galasko DR, Gearing M, Geschwind DH, Ghetti B, Gilman S, Giordani B, Glass J, Graff-Radford NR, Green RC, Growdon JH, Hamilton RL, Harrell LE, Head E, Honig LS, Hulette CM, Hyman BT, Jicha GA, Jin LW, Johnson N, Karlawish J, Karydas A, Kaye JA, Kim R, Koo EH, Kowall NW, Lah JJ, Levey AI, Lieberman A, Lopez OL, Mack WJ, Markesbery W, Marson DC, Martiniuk F, Masliah E, McKee AC, Mesulam M, Miller JW, Miller BL, Miller CA, Parisi JE, Perl DP, Peskind E, Petersen RC, Poon W, Quinn JF, Raskind M, Reisberg B, Ringman JM, Roberson ED, Rosenberg RN, Sano M, Schneider JA, Schneider LS, Seeley W, Shelanski ML, Smith CD, Spina S, Stern RA, Tanzi RE, Trojanowski JQ, Troncoso JC, Van Deerlin VM, Vinters HV, Vonsattel JP, Weintraub S, Welsh-Bohmer KA, Woltjer RL, Younkin SG.  Meta-analysis confirms CR1, CLU and PICALM as Alzheimer Disease Risk Loci and reveals interactions with APOE Genotypes. Arch Neurol, 2010, Sep 3 (epub ahead of print)

110. Pollack IF, **Hamilton RL**, Burger PC, Brat DJ, Rosenblum MK, Murdoch GH, Nikiforova MN, Holmes EJ, Zhou T, Cohen KJ, Jakacki RI; Children's Oncology Group. Akt activation is a common event in pediatric malignant gliomas and a potential adverse prognostic marker: a report from the Children's Oncology Group. J Neurooncol. 2010 Sep;99(2):155-63. Epub 2010 Jul 4

**Ronald L. Hamilton, M.D.**

111. Pollack IF, **Hamilton RL**, Sobol RW, Nikiforova MN, Nikiforov YE, Lyons-Weiler MA, Laframboise WA, Burger PC, Brat DJ, Rosenblum MK, Gilles FH, Yates AJ, Zhou T, Cohen KJ, Finlay JL, Jakacki RI; for the Children's Oncology Group. Mismatch repair deficiency is an uncommon mechanism of alkylator resistance in pediatric malignant gliomas: a report from the Children's Oncology Group. Pediatr Blood Cancer 2010 Jun 29 epub ahead of print

112. Bonneh-Barkay D, Wang G, Starkey A, **Hamilton RL**, Wiley CA. In vivo CHI3L1 (YKL-40) expression in astrocytes in acute and chronic neurological diseases. J Neuroinflammation 2010 Jun 11:7-34.

113. Hinkle DA, Mullett SJ, Gabris BE, **Hamilton RL**. DJ-1 expression in glioblastomas shows positive correlation with p53 expression and negative correlation with epidermal growth factor receptor amplification. Neuropathology 2010 May 19 (epub ahead of print)xx

114. Okada H, Kalinski P, Ueda R, Hoji A, Kohanbash G, Donegan TE, Mintz AH, Engh JA, Bartlett DL, Brown CK, Zeh H, Holtman MP, Reinhart TA, Whiteside TL,Butterfield LH, **Hamilton RL**, Potter DM, Pollack IF, Salazar AM, Lieberman FS. Induction of CD8+ T-cell responses against novel glioma-associated antigen peptides and clinical activity by vaccinations with {alpha}-type 1 polarized dendritic cells and polyinosinic-polycytidylic acid stabilized by lysine and carboxymethylcellulose In patients with recurrent malignant glioma. J Clin Oncol. 2011;29:330-6.PMID: 21149657

115. Kofler J, Bartynski WS, Reynolds TQ, Lieberman FS, Murdoch GH, **Hamilton RL**. Posterior reversible encephalopathy syndrome (PRES) with immune system activation, VEGF up-regulation, and cerebral amyloid angiopathy. J. Comput Assist Tomogr. 2011; 35:39-42. PMID: 21150450

116. Bonfield CM, Amin D, **Hamilton RL**, Gerszten PC. Extramedullary ependymoma near the conus medullaris with lumbar nerve root attachment: case report. Neurosurgery. 2011 Mar;68:E831-4. PMID:21311277

117. Fujita M, Kohanbash G, Fellows-Mayle W, **Hamilton RL**, Komohara Y, Decker SA, Ohlfest JR, Okada H.COX-2 blockade suppresses gliomagenesis by inhibiting myeloid-derived suppressor cells. Cancer Res. 2011 Apr 1;71:2664-74. Epub 2011 Feb 15. PMID: 21324923

118. Cohen KJ, Pollack IF, Zhou T, Buxton A, Holmes EF, Burger PC, Brat DJ, Rosenblum MK, **Hamilton RL**, Lavey RS, Heideman RL. Temozolomide in the treatment of high-grade gliomas in children: a report from the Children's Oncology Group.
Neuro Oncol. 2011 Mar;13:317-23. PMID: 21339192

119. Omalu B, Bailes J, **Hamilton RL**, Kamboh MI, Hammers J, Case M, Fitzsimmons R.
Emerging histomorphologic phenotypes of chronic traumatic encephalopathy in American athletes.
Neurosurgery. 2011 Jul;69:173-83; discussion 183. PMID: 21358359

120. Tang JB, Svilar D, Trivedi RN, Wang XH, Goellner EM, Moore B, **Hamilton RL**, Banze LA, Brown AR, Sobol RW. N-methylpurine DNA glycosylase and DNA polymerase beta modulate BER inhibitor potentiation of glioma cell to temozolomide. Neurosurgery Oncol. 2011;13:471-86. PMID: 21377995

121. Liu KW, Feng H, Bachoo R, Kazlauskas A, Smith EM, Symes K, **Hamilton RL**, Nagane M, Nishikawa R, Hu, B, Cheng Sy. SHP-2/PTPN 11 mediates gliomagenesis driven by PDGFRA and INK4A/ARF aberrations in mice and humans. J. Clin Invest. 2011 Mar;121:905-17. PMID: 21393858

122. Naj AC, Jun G, Beecham GW, Wang LS, Vardarajan BN, Buros J, Gallins PJ, Buxbaum JD, Jarvidk GP, Crane PK, Larson EB, Bird TB, Boeve BF, Graff-Radford NR, De Jager PL, Evans D, Schneider JA, Carrasquillo MM, Ertekin-Taner N, Younkin SG, Cruchaga C, Kauwe JS, Nowotny P, Kramer P, Hardy J, Huentelman MJ, Myers AJ, Barmada MM, Demirci FY, Baldwin CT, Green RC, Rogaeva E, St. George-Hyslop P, Arnold SE, Barber R, Beach T, Bigio EH, Bowen JD, Boxer A, Burke JR, Cairns NJ, Carlson CS, Carney RM, Carroll SL, Chui HC, Clark DG, Corneveaux J, Cotman CW, Cummings JL, Decarli C, DeKosy ST, Diaz-Arrastia R, Dick M, Dickson DW, Ellis WG, Faber KM, Fallon KB, Farlow MR, Ferris S. Frosch MP, Galasko Dr, Ganguli M, Gearing M, Geschwind DH, Ghetti B, Gilbert JR, Gilman S, Giordani B, Glass JD, Growdon JH, **Hamilton RL**,R, Koo EH, Kowall NW, Lah JJ, Levey AI, Lieberman AP, Lopez OL, Mack WJ, Marson DC, Martiniuk F, Mash DC, Masliah E, McCormick WC, McCurry SM, McDavid AN, McKee AC, Mesulam M, Miller BL, Miller JW, Parisi JE, Perl DP, Peskind E,Petersen, RC, Poon, WV, Quinn JF, Rajbhandary RA, Raskind M, Reisberg B, Ringman JM, Roberson ED, Rosenberg RN,Sano M, Schneider LS, Seeley W, Shelanksi ML, Slifer MA, Smith CD, Sonnen JA, Spina S. Stern RA, Tanzi RE, Trojanowski JQ, Troncoso JC, Van Deerlin VM, Vinters HV, Vonsattel JP, Weintraub S, Welsh-Bohmer KA, Williamson

**Ronald L. Hamilton, M.D.**

J, Woltjer RL,Cantwell LB, Dombroski BA, Beekly D, Lunetta KL, Martin ER, Kamboh MI, Saykin AJ, Reiman EM, Bennett DA, Morris JC, Montine TJ, Goate AM, lacker D, Tsuang DW, Hakonarson, H, Kukull WA, Foroud TM, Haines JL, Mayeux R, Pericak-Vance MA, Farrer LA, Schellenberg GD. Commons variants as MS4A4/MS4A6E, CD2AP, CD33 and EPHA1 are associated with late Onset Alzheimer's Disease. Nat Genet. 2011 May;43:436-41 Epub 2011 Apr 3. PMID: 21460841

123.    Chen-Plotkin AS, Martinez-Lage M,Sleiman PM, Hu W, Greene R, Wood  EM, Bing S, Grossman M, Schellenberg GD, Hatanpaa KJ, Weiner MF, White CL 3rd, Brooks WS, Halliday GM, Kril JJ, Gearing M, Beach TG, Graff-Radford NR, Dickson DW, Rademakers R, Boeve BF, Pickering-Brown SM, Snowden J, van Swieten JC, Heutink P, Seelaar H, Murrell JR, Ghetti B, Spina S, Grafman J, Kaye JA, Woltjer RL, Mesulam M, Bigio E, Llad'o A, Miller BL, Alzualde A, Moreno F,Rohrer JD, Mackenzie IR, Feldman HH, **Hamilton RL**, Cruts M, Engelborghs S, De Deyn PP, Van Broeckhoven C, Bird TD, Cairns NJ, Goate A, Frosch MP, Riederer PF, Bogdanovic N, Lee VM, Trojanowksi JQ, Van Deerlin VM. Genetic and clinical features of progranulin-associated frontotemporal lobar degeneration. Arch Neurol. 2011 Apr;68:488-97. PMID: 21482928

124.    Nikiforova MN, **Hamilton RL**. Molecular diagnostics of gliomas. Arch Pathol Lab Med. 2011 May;135:558-68. Review. PMID: 21526954

125.    Monaco EA 3rd, Armah HB, Nikiforova MN, **Hamilton RL**, Engh JA. Grade II Oligodendroglioma localized to the corpus callosum. Brain Tumor Pathol. 2011 Oct;28:305-9. Epub 2011 Jul 22. PMID: 21833577

126.    Horbinski C, Hobbs, J, Cieply K, Dacic S, **Hamilton RL.** EGFR expression stratifies oligodendroglioma behavior.Am J Pathol. 2011 Oct; 179:1638-44. Epub 2011 Aug 11. PMID: 21839716

127.    Omalu B, hammers, JL, bailes J**, Hamilton RL**. Kamboh MI, Webster G, Fitzsimmons RP. Chronic traumatic Encephalopathy  in an Iraqi war veteran with posttraumatic stress disorder who committed suicide. Neurosurg Focus. 2011 Nov; :E3. PMID: 22044102

128.    Liu Y, Komohara Y, Domenick N, Ohno M, Ikeura M, **Hamilton RL**, Horbinski C, Wang X, Ferrone S, Okada H. Expression of antigen processing molecules in brain metastasis of breast cancer. Cancer Immunol Immunother. 2011 Nov 8. (Epub ahead of print } PMID:22065046

129.    Feng H, Hu B, Liu KW, Li Y, Lu X, Cheng T, Yiin JJ, Lu S, Keezer S, Fenton T, Furnari FB, **Hamilton RL**, Vuori K, Sarkaria JN, Nagane M, Nishikawa R, Cavenee WK, Cheng SY. Activation of Rac 1 by src-dependent phosphorylation of Dock180(Y1811) mediates PDGFRa-stimulated glioma tumorigenesis in mice and humans. J Clin Invest. 2011 Dec; 121:4670-84. doi: 10.1172/JCI58559. Epub 2011 Nov 14. PMID: 22080864

130.    Horbinski C, Nikiforova MN, Hobbs J, Bortoluzzi S. Cieply K, Dacic S, **Hamilton RL**. The importance of 10q status in an outcomes-based comparison between 1p/19q fluorescence in situ hybridization and polymerase chain reaction-based microsatellite loss of heterozygosity analysis of oligodendrogliomas.  J. Neuropathol Exp Neurol. 2012 Jan;71:73-82. PMID: 22157622

131.    Ikonomovic MD, Abrahamson EE, Price JC, **Hamilton RL**, Mathis CA, Paljug WR, Cohen AD, Mizukami K, DeKosky ST, Lopez OL, Klunk WE. Early AD pathology in a {C-11} PiB-negative case: a PiB-amyloid imaging, biochemical, and  Immunohistochemical study. Acta Neuropathol. 2012 Mar;123:433-47. Epub 2012 Jan 24. PMID: 22271153

132.    Feng H, Hu B, Jarzynka MJ, Li Y, Keezer S, Johns TG, Tang CK, **Hamilton RL**, Vuuori K, Nishikawa R, Sarkaria JN, Fenton T, Cheng T, Furnari FB, Cavenee WK, Cheng SY. Phosphorylation of dedicator of cytokinesis 1(Dock 180) at tyrosine residue Y722 by Src family kinases mediates EGRFvIII-driven glioblastoma tumorigenesis. Proc Natl Acad Sci U S A. 2012 Feb 21;109:3018-23. Epub 2012 Feb 7. PMID: 22323579

133.    Wu Y, Lou H, Alerte TN, Stachowski EK, Chen J, Singleton AB, **Hamilton RL**, Perez RG. Neuroscience. 2012 Jan 25. {Epubahead a print} PMID: 22326202

134.    Murray PS, Kirkwood CM, Gray MC, Ikonomovic MD, Paljug WR, Abrahamson EE, Henteleff RA, **Hamilton RL**, Kofler JK, Klunk WE, Lopez OL, Penzes P, Sweet RA. β-Amyloid 42/40 ratio and kalirin expression in Alzheimer disease with psychosis. Neurobiol Aging. 2012 Mar 17. [Epub ahead of print] PMID:22429885

**Ronald L. Hamilton, M.D.**

135.    Choi SH, Olabarrieta M, Lopez OL, Maruca V, DeKosky ST, **Hamilton RL**, Becker JT. Gray Matter Atrophy Associated with Extrapyramidal Signs in the Lewy Body Variant of Alzheimer's Disease. J Alzheimers Dis. 2012 Aug 9. [Epub ahead of print] PMID:22886020

136.    Armstrong RA, **Hamilton RL**, Mackenzie IR, Hedreen J, Cairns NJ. Laminar Distribution of the Pathological Changes in Sporadic Frontotemporal Lobar Degeneration with TDP-43 Proteinopathy: A Quantitative Study Using Polynomial Curve Fitting. Neuropathol Appl Neurobiol. 2012 Jul 16. [Epub ahead of print] PMID:22804696

137.    Atkinson DM, **Hamilton RL** A 52-year-old male with visual changes. Brain Pathol. 2012 Jul;22(4):575-8. PMID:22697384

138.    Zou F, Chai HS, Younkin CS, Allen M, Crook J, Pankratz VS, Carrasquillo MM, Rowley CN, Nair AA, Middha S, Maharjan S, Nguyen T, Ma L, Malphrus KG, Palusak R, Lincoln S, Bisceglio G, Georgescu C, Kouri N, Kolbert CP, Jen J, Haines JL, Mayeux R, Pericak-Vance MA, Farrer LA, Schellenberg GD; Alzheimer's Disease Genetics Consortium, Petersen RC, Graff-Radford NR, Dickson DW, **Hamilton RL**, Younkin SG, Ertekin-Taner N. Brain expression genome-wide association study (eGWAS) identifies human disease-associated variants. PLoS Genet. 2012;8(6): e1002707. Epub 2012 Jun 7 PMID:22685416

139.    Horbinski C, Nikiforova MN, Hagenkord JM, **Hamilton RL**, Pollack IF. Interplay among BRAF, p16, p53, and MIB1 in pediatric low-grade gliomas. Neuro Oncol. 2012 Jun;14(6):777-89 (1012) PMID:22492957

140.    Hobbs J, Nikiforova MN, Fardo DW, Bortoluzzi S, Cieply K, **Hamilton RL**, Horbinski C. Paradoxical relationship between the degree of EGFR amplification and outcome in glioblastomas. Am J Surg Pathol. 2012 Aug;36(8):1186-93. PMID:22472960

141. Armstrong, R. A., **R. L. Hamilton**, I. R. Mackenzie, J. Hedreen and N. J. Cairns. "Laminar Distribution of the Pathological Changes in Sporadic Frontotemporal Lobar Degeneration with Transactive Response (Tar) DNA-Binding Protein of 43 Kda (Tdp-43) Proteinopathy: A Quantitative Study Using Polynomial Curve Fitting." *Neuropathol Appl Neurobiol* 39, no. 4 (2013): 335-47.

142. Clark, K. H., J. L. Villano, M. N. Nikiforova, **R. L. Hamilton** and C. Horbinski. "1p/19q Testing Has No Significance in the Workup of Glioblastomas." *Neuropathol Appl Neurobiol*,  (2013).

143. Gheorghe, G., O. Radu, S. Milanovich, **R. L. Hamilton**, R. Jaffe, J. F. Southern and J. A. Ozolek. "Pathology of Central Nervous System Posttransplant Lymphoproliferative Disorders: Lessons from Pediatric Autopsies." *Pediatr Dev Pathol* 16, no. 2 (2013): 67-73.

1444. Holton, P., M. Ryten, M. Nalls, D. Trabzuni, M. E. Weale, D. Hernandez, H. Crehan, J. R. Gibbs, R. Mayeux, J. L. Haines, L. A. Farrer, M. A. Pericak-Vance, G. D. Schellenberg, M. Ramirez-Restrepo, A. Engel, A. J. Myers, J. J. Corneveaux, M. J. Huentelman, A. Dillman, M. R. Cookson, E. M. Reiman, A. Singleton, J. Hardy and R. Guerreiro. "Initial Assessment of the Pathogenic Mechanisms of the Recently Identified Alzheimer Risk Loci." *Ann Hum Genet* 77, no. 2 (2013): 85-105.

145. Miyashita, A., A. Koike, G. Jun, L. S. Wang, S. Takahashi, E. Matsubara, T. Kawarabayashi, M. Shoji, N. Tomita, H. Arai, T. Asada, Y. Harigaya, M. Ikeda, M. Amari, H. Hanyu, S. Higuchi, T. Ikeuchi, M. Nishizawa, M. Suga, Y. Kawase, H. Akatsu, K. Kosaka, T. Yamamoto, M. Imagawa, T. Hamaguchi, M. Yamada, T. Moriaha, M. Takeda, T. Takao, K. Nakata, Y. Fujisawa, K. Sasaki, K. Watanabe, K. Nakashima, K. Urakami, T. Ooya, M. Takahashi, T. Yuzuriha, K. Serikawa, S. Yoshimoto, R. Nakagawa, J. W. Kim, C. S. Ki, H. H. Won, D. L. Na, S. W. Seo, I. Mook-Jung, P. St George-Hyslop, R. Mayeux, J. L. Haines, M. A. Pericak-Vance, M. Yoshida, N. Nishida, K. Tokunaga, K. Yamamoto, S. Tsuji, I. Kanazawa, Y. Ihara, G. D. Schellenberg, L. A. Farrer and R. Kuwano. "Sorl1 Is Genetically Associated with Late-Onset Alzheimer's Disease in Japanese, Koreans and Caucasians." *PLoS One* 8, no. 4 (2013): e58618.

146. Pang, B., M. B. Durso, **R. L. Hamilton** and M. N. Nikiforova. "A Novel Cold-Pcr/Fmca Assay Enhances the Detection of Low-Abundance Idh1 Mutations in Gliomas." *Diagn Mol Pathol* 22, no. 1 (2013): 28-34.

147. Reitz, C., G. Jun, A. Naj, R. Rajbhandary, B. N. Vardarajan, L. S. Wang, O. Valladares, C. F. Lin, E. B. Larson, N. R. Graff-Radford, D. Evans, P. L. De Jager, P. K. Crane, J. D. Buxbaum, J. R. Murrell, T. Raj, N. Ertekin-Taner, M. Logue, C. T. Baldwin, R. C. Green, L. L. Barnes, L. B. Cantwell, M. D. Fallin, R. C. Go, P. Griffith, T. O. Obisesan, J. J. Manly, K. L. Lunetta, M. I. Kamboh, O. L. Lopez, D. A. Bennett, H. Hendrie, K. S. Hall, A. M. Goate, G. S. Byrd, W. A. Kukull, T. M. Foroud, J. L. Haines, L. A. Farrer, M. A. Pericak-Vance, G. D. Schellenberg and R. Mayeux. "Variants

**Ronald L. Hamilton, M.D.**

in the Atp-Binding Cassette Transporter (Abca7), Apolipoprotein E 4,and the Risk of Late-Onset Alzheimer Disease in African Americans." *JAMA* 309, no. 14 (2013): 1483-92.

148. Schlegel, J., M. J. Sambade, S. Sather, S. J. Moschos, A. C. Tan, A. Winges, D. DeRyckere, C. C. Carson, D. G. Trembath, J. J. Tentler, S. G. Eckhardt, P. F. Kuan, **R. L. Hamilton**, L. M. Duncan, C. R. Miller, N. 9. Nikolaishvili-Feinberg, B. R. Midkiff, J. Liu, W. Zhang, C. Yang, X. Wang, S. V. Frye, H. S. Earp, J. M. Shields and D. K. Graham. "Mertk Receptor Tyrosine Kinase Is a Therapeutic Target in Melanoma." *J Clin Invest* 123, no. 5 (2013): 2257-67.

150. Spina, S., A. D. Van Laar, J. R. Murrell, **R. L. Hamilton**, J. K. Kofler, F. Epperson, M. R. Farlow, O. L. Lopez, J. Quinlan, S. T. DeKosky and B. Ghetti. "Phenotypic Variability in Three Families with Valosin-Containing Protein Mutation." *Eur J Neurol* 20, no. 2 (2013): 251-8.

151. Tsuang, D., J. B. Leverenz, O. L. Lopez, **R. L. Hamilton,** D. A. Bennett, J. A. Schneider, A. S. Buchman, E. B. Larson, P. K. Crane, J. A. Kaye, P. Kramer, R. Woltjer, J. Q. Trojanowski, D. Weintraub, A. S. Chen-Plotkin, D. J. Irwin, J. Rick, G. D. Schellenberg, G. S. Watson, W. Kukull, P. T. Nelson, G. A. Jicha, J. H. Neltner, D. Galasko, E. Masliah, J. F. Quinn, K. A. Chung, D. Yearout, I. F. Mata, J. Y. Wan, K. L. Edwards, T. J. Montine and C. P. Zabetian. "Apoe Epsilon4 Increases Risk for Dementia in Pure Synucleinopathies." *JAMA Neurol* 70, no. 2 (2013): 223-8.

152. Yeung, J. T., **R. L. Hamilton**, K. Ohnishi, M. Ikeura, D. M. Potter, M. N. Nikiforova, S. Ferrone, R. I. Jakacki, I. F. Pollack and H. Okada. "Loh in the Hla Class I Region at 6p21 Is Associated with Shorter Survival in Newly Diagnosed Adult Glioblastoma." *Clin Cancer Res* 19, no. 7 (2013): 1816-26.

153. Yeung, J. T., **R. L. Hamilton**, H. Okada, R. I. Jakacki and I. F. Pollack. "Increased Expression of Tumor-Associated Antigens in Pediatric and Adult Ependymomas: Implication for Vaccine Therapy." *J Neurooncol* 111, no. 2 (2013): 103-11.

154. **Hamilton R**, Krauze M, Romkes M, Omolo B, Konstantinopoulos P, Reinhart T, Harasymczuk M, Wang Y, Lin Y, Ferrone S, Whiteside T, Bortoluzzi S, Werley J, Nukui T, Fallert-Junecko B, Kondziolka D, Ibrahim J, Becker D, Kirkwood J, Moschos S. Pathologic and gene expression features of metastatic melanomas to the brain.Cancer. 2013 Aug 1;119(15):2737-46. doi: 10.1002/cncr.28029. Epub 2013 May 21.PMID:23695963 [PubMed - in process]

155. Lam S, Grandhi R, Wong R, **Hamilton R**, Greene S. Neuromuscular hamartoma of the sciatic nerve: Case report and review of the literature. Surg Neurol Int. 2013;4:8. doi: 10.4103/2152-7806.106266. Epub 2013 Jan 18.PMID:23493803[PubMed]

156. Reitz C, Mayeux R; Alzheimer's Disease Genetics Consortium. TREM2 and neurodegenerative disease. N Engl J Med. 2013 Oct 17;369(16):1564-5. doi: 10.1056/NEJMc1306509#SA1. PMID:24131184

157. Tempel ZJ, Johnson SA, Richard PS, Friedlander RM, Rothfus WE, **Hamilton RL**.  Parasellar arachnoid cyst presenting with a nonpupil sparing third nerve palsy mimicking a posterior communicating artery aneurysm in an adult. Surg Neurol Int. 2013 Jul 9;4:87. doi: 10.4103/2152-7806.114799. eCollection 2013.PMID:23956930

158. Murray PS, Kirkwood CM, Gray MC, Fish KN, Ikonomovic MD, **Hamilton RL**, Kofler JK, Klunk WE, Lopez OL, Sweet RA.  Hyperphosphorylated tau is elevated in Alzheimer's Disease with psychosis. J Alzheimers Dis, 2014 204;39:759-773. PMID:24270207

159. Oborski MJ, Laymon CM, Lieberman FS, Drappatz J, **Hamilton RL**, Mountz JM. First use of (18)F-labeled ML-10 PET to assess apoptosis change in a newly diagnosed glioblastoma multiforme patient before and early after therapy. Brain Behav 2014 4:312-315.  PMID:24683522

160  Shin SS, Murdoch G, Hamilton RL, Faraji AH, Kano H, Zwagerman NT, Gardner PA, Lunsford LD, Friedlander RM The Pathological Response of Cavernous Malformations Following Radiosurgery.  J Neurosurg (in press).

160.  Pollack IF, Jakacki RI, Butterfield LH, **Hamilton RL**, Panigrahy A, Potter DM, Connelly AK, Dibridge SA, Whiteside TL, Okada H. Antigen-specific immune responses and clinical outcome after vaccination with glioma-associated antigen peptides and polyinosinic-polycytidylic Acid stabilized by lysine and carboxymethylcellulose in children with newly diagnosed malignant brainstem and nonbrainstem gliomas. J Clin Oncol. 2014 Jul 1;32(19):2050-8. PMID:24888813

161.  Naj AC, Jun G, Reitz C, Kunkle BW, Perry W, Park YS, Beecham GW, Rajbhandary RA, Hamilton-Nelson KL, Wang LS, Kauwe JS, Huentelman MJ, Myers AJ, Bird TD, Boeve BF, Baldwin CT, Jarvik GP, Crane PK, Rogaeva E, Barmada MM, Demirci FY, Cruchaga C, Kramer PL, Ertekin-Taner N, Hardy J, Graff-Radford NR, Green RC, Larson

**Ronald L. Hamilton, M.D.**

EB, St George-Hyslop PH, Buxbaum JD, Evans DA, Schneider JA, Lunetta KL, Kamboh MI, Saykin AJ, Reiman EM, De Jager PL, Bennett DA, Morris JC, Montine TJ, Goate AM, Blacker D, Tsuang DW, Hakonarson H, Kukull WA, Foroud TM, Martin ER, Haines JL, Mayeux RP, Farrer LA, Schellenberg GD, Pericak-Vance MA; Alzheimer Disease Genetics Consortium, Albert MS, Albin RL, Apostolova LG, Arnold SE, Barber R, Barnes LL, Beach TG, Becker JT, Beekly D, Bigio EH, Bowen JD, Boxer A, Burke JR, Cairns NJ, Cantwell LB, Cao C, Carlson CS, Carney RM, Carrasquillo MM, Carroll SL, Chui HC, Clark DG, Corneveaux J, Cribbs DH, Crocco EA, DeCarli C, DeKosky ST, Dick M, Dickson DW, Duara R, Faber KM, Fallon KB, Farlow MR, Ferris S, Frosch MP, Galasko DR, Ganguli M, Gearing M, Geschwind DH, Ghetti B, Gilbert JR, Glass JD, Growdon JH, **Hamilton RL**, Harrell LE, Head E, Honig LS, Hulette CM, Hyman BT, Jicha GA, Jin LW, Karydas A, Kaye JA, Kim R, Koo EH, Kowall NW, Kramer JH, LaFerla FM, Lah JJ, Leverenz JB, Levey AI, Li G, Lieberman AP, Lin CF, Lopez OL, Lyketsos CG, Mack WJ, Martiniuk F, Mash DC, Masliah E, McCormick WC, McCurry SM, McDavid AN, McKee AC, Mesulam M, Miller BL, Miller CA, Miller JW, Murrell JR, Olichney JM, Pankratz VS, Parisi JE, Paulson HL, Peskind E, Petersen RC, Pierce A, Poon WW, Potter H, Quinn JF, Raj A, Raskind M, Reisberg B, Ringman JM, Roberson ED, Rosen HJ, Rosenberg RN, Sano M, Schneider LS, Seeley WW, Smith AG, Sonnen JA, Spina S, Stern RA, Tanzi RE, Thornton-Wells TA, Trojanowski JQ, Troncoso JC, Valladares O, Van Deerlin VM, Van Eldik LJ, Vardarajan BN, Vinters HV, Vonsattel JP, Weintraub S, Welsh-Bohmer KA, Williamson J, Wishnek S, Woltjer RL, Wright CB, Younkin SG, Yu CE, Yu L. . Effects of multiple genetic Loci on age at onset in late-onset Alzheimer disease: a genome-wide association study. JAMA Neurol. 2014 Nov 1;71(11):1394-404. doi: 10.1001/jamaneurol.2014.1491

162. Pollack IF, Jakacki RI, Butterfield LH, **Hamilton RL**, Panigrahy A, Potter DM, Connelly AK, Dibridge SA, Whiteside TL, Okada H. Antigen-specific immune responses and clinical outcome after vaccination with glioma-associated antigen peptides and polyinosinic-polycytidylic acid stabilized by lysine and carboxymethylcellulose in children with newly diagnosed malignant brainstem and nonbrainstem gliomas. J Clin Oncol. 2014 Jul 1;32(19):2050-8. Epub 2014 Jun 2. PMID: 24888813

163.. Okada H, Butterfield LH, **Hamilton RL**, Hoji A, Sakaki M, Ahn BJ, Kohanbash G, Drappatz J, Engh J, Amankulor N, Lively MO, Chan MD, Salazar AM, Shaw EG, Potter DM, Lieberman FS. Induction of robust type-1 CD8+ T-cell responses in WHO grade II low-grade glioma patients receiving peptide-based vaccines in combination with poly-ICLC Clin Cancer Res. 2014 Nov 25. pii: clincanres.1790.2014

164. Salloway S, Sperling R, Fox NC, Blennow K, Klunk W, Raskind M, Sabbagh M, Honig LS, Porsteinsson AP, Ferris S, Reichert M, Ketter N, Nejadnik B, Guenzler V, Miloslavsky M, Wang D, Lu Y, Lull J, Tudor IC, Liu E, Grundman M, Yuen E, Black R, Brashear HR; **Hamilton RL**, Bapineuzumab 301 and 302 Clinical Trial Investigators. Two phase 3 trials of bapineuzumab in mild-to-moderate Alzheimer's disease N Engl J Med. 2014 Jan 23;370(4):322-33. doi: 10.1056/NEJMoa1304839.

165. Leone JP, Bhargava R, Theisen BK, **Hamilton RL**, Lee AV, Brufsky AM. Expression of high affinity folate receptor in breast cancer brain metastasis. Oncotarget. 2015 Jun 25. [Epub ahead of print] PMID: 24450891

166. Wang LS, Naj AC, Graham RR, Crane PK, Kunkle BW, Cruchaga C, Murcia JD, Cannon-Albright L, Baldwin CT, Zetterberg H, Blennow K, Kukull WA, Faber KM, Schupf N, Norton MC, Tschanz JT, Munger RG, Corcoran CD, Rogaeva E; Alzheimer's Disease Genetics Consortium, Lin CF, Dombroski BA, Cantwell LB, Partch A, Valladares O, Hakonarson H, St George-Hyslop P, Green RC, Goate AM, Foroud TM, Carney RM, Larson EB, Behrens TW, Kauwe JS, Haines JL, Farrer LA, Pericak-Vance MA, Mayeux R, Schellenberg GD; National Institute on Aging-Late-Onset Alzheimer's Disease (NIA-LOAD) Family Study, Albert MS, Albin RL, Apostolova LG, Arnold SE, Barber R, Barmada M, Barnes LL, Beach TG, Becker JT, Beecham GW, Beekly D, Bennett DA, Bigio EH, Bird TD, Blacker D, Boeve BF, Bowen JD, Boxer A, Burke JR, Buxbaum JD, Cairns NJ, Cao C, Carlson CS, Carroll SL, Chui HC, Clark DG, Cribbs DH, Crocco EA, DeCarli C, DeKosky ST, Demirci FY, Dick M, Dickson DW, Duara R, Ertekin-Taner N, Fallon KB, Farlow MR, Ferris S, Frosch MP, Galasko DR, Ganguli M, Gearing M, Geschwind DH, Ghetti B, Gilbert JR, Glass JD, Graff-Radford NR, Growdon JH, **Hamilton RL**, Hamilton-Nelson KL, Harrell LE, Head E, Honig LS, Hulette CM, Hyman BT, Jarvik GP, Jicha GA, Jin LW, Jun G, Jun G, Kamboh MI, Karydas A, Kaye JA, Kim R, Koo EH, Kowall NW, Kramer JH, LaFerla FM, Lah JJ, Leverenz JB, Levey AI, Li G, Lieberman AP, Lopez OL, Lunetta KL, Lyketsos CG, Mack WJ, Marson DC, Martin ER, Martiniuk F, Mash DC, Masliah E, McCormick WC, McCurry SM, McDavid AN, McKee AC, Mesulam WM, Miller BL, Miller CA, Miller JW, Montine TJ, Morris JC, Murrell JR, Olichney JM, Parisi JE, Perry W, Peskind E, Petersen RC, Pierce A, Poon WW, Potter H, Quinn JF, Raj A, Raskind M, Reiman EM, Reisberg B, Reitz C, Ringman JM, Roberson ED, Rosen HJ, Rosenberg RN, Sano M, Saykin AJ, Schneider JA, Schneider LS, Seeley WW, Smith AG, Sonnen JA, Spina S, Stern RA, Tanzi RE, Thornton-Wells TA, Trojanowski JQ, Troncoso JC, Tsuang DW, Van Deerlin VM, Van Eldik LJ, Vardarajan BN, Vinters HV, Vonsattel JP, Weintraub S, Welsh-Bohmer KA, Williamson J, Wishnek SG, Woltjer RL, Wright CB, Younkin SG, Yu CE, Yu L.**Rarity of the Alzheimer disease-protective APP A673T variant in the United States.** JAMA Neurol. 2015 Feb;72(2):209-16. doi: 10.1001/jamaneurol.2014.2157.

**Ronald L. Hamilton, M.D.**

167. 2. Jun G, Ibrahim-Verbaas CA, Vronskaya M, Lambert JC, Chung J, Naj AC, Kunkle BW, Wang LS, Bis JC, Bellenguez C, Harold D, Lunetta KL, Destefano AL, Grenier-Boley B, Sims M, Beecham GW, Smith AV, Chouraki V, Hamilton-Nelson KL, Ikram MA, Fievet N, Denning N, Martin ER, Schmidt H, Kamatani Y, Dunstan ML, Valladares O, Laza AR, Zelenika D, Ramirez A, Foroud TM, Choi SH, Boland A, Becker T, Kukull WA, van der Lee SJ, Pasquier F, Cruchaga C, Beekly D, Fitzpatrick AL, Hanon O, Gill M, Barber R, Gudnason V, Campion D, Love S, Bennett DA, Amin N, Berr C, Tsolaki M, Buxbaum JD, Lopez OL, Deramecourt V, Fox NC, Cantwell LB, Tárraga L, Dufouil C, Hardy J, Crane PK, Eiriksdottir G, Hannequin D, Clarke R, Evans D, Mosley TH Jr, Letenneur L, Brayne C, Maier W, De Jager P, Emilsson V, Dartigues JF, Hampel H, Kamboh MI, de Bruijn RF, Tzourio C, Pastor P, Larson EB, Rotter JI, O'Donovan MC, Montine TJ, Nalls MA, Mead S, Reiman EM, Jonsson PV, Holmes C, St George-Hyslop PH, Boada M, Passmore P, Wendland JR, Schmidt H, Morgan K, Winslow AR, Powell JF, Carasquillo M, Younkin SG, Jakobsdóttir J, Kauwe JS, Wilhelmsen KC, Rujescu D, Nöthen MM, Hofman A, Jones L; IGAP Consortium, Haines JL, Psaty BM, Van Broeckhoven C, Holmans P, Launer LJ, Mayeux R, Lathrop M, Goate AM, Escott-Price V, Seshadri S, Pericak-Vance MA, Amouyel P, Williams J, van Duijn CM, Schellenberg GD, Farrer LA and **.** Collaborators (including **Hamilton RL**) (296)   **A novel Alzheimer disease locus located near the gene encoding tau protein**. Mol Psychiatry. 2015 Mar 17. doi: 10.1038/mp.2015.23.

168. . Østergaard SD, Mukherjee S, Sharp SJ, Proitsi P, Lotta LA, Day F, Perry JR, Boehme KL, Walter S, Kauwe JS, Gibbons LE; Alzheimer's Disease Genetics Consortium; GERAD1 Consortium; EPIC-InterAct Consortium, Larson EB, Powell JF, Langenberg C, Crane PK, Wareham NJ, Scott RA.
Collaborators (including **Hamilton RL**) (296)   Associations between Potentially Modifiable Risk Factors and Alzheimer Disease: A Mendelian Randomization Study. PLoS Med. 2015 Jun 16;12(6):e1001841; discussion e1001841. doi:

169. Wang P, Bahreini A, Gyanchandani R, Lucas PC, Hartmaier RJ, Watters RJ, Jonnalagadda AR, Trejo Bittar HE, Berg A, **Hamilton RL**, Kurland BF, Weiss KR, Mathew A, Leone JP, Davidson NE, Nikiforova MN, Brufsky AM, Ambros TF, Stern AM, Puhalla SL, Lee AV, Oesterreich S. Sensitive detection of mono- and polyclonal ESR1 mutations in primary tumors, metastatic lesions and cell free DNA of breast cancer patients. Clin Cancer Res. 2015 Oct 23. pii: 1534.2015. PMID: 26500237

170. Salgado CM, Basu D, Nikiforova M, **Hamilton RL**, Gehris R, Jakacki R, Panigrahy A, Yatsenko S, Reyes-Múgica M. Amplification of mutated NRAS leading to congenital melanoma in neurocutaneous melanocytosis. Melanoma Res. 2015 Oct;25(5):453-60.  PMID: 26256759

171. Shin SS, Murdoch G, Hamilton RL, Faraji AH, Kano H, Zwagerman NT, Gardner PA, Lunsford LD, Friedlander RM. Pathological response of cavernous malformations following radiosurgery. J Neurosurg. 2015 Oct;123(4):938-44. doi: 10.3171/2014.10.JNS14499. Epub 2015 Jun 19. PMID: 26090838

--------------------

172. Mukherjee S, Walter S, Kauwe JS, Saykin AJ, Bennett DA, Larson EB, Crane PK, Glymour MM; Adult Changes in Thought Study Investigators; Religious Orders Study/Memory and Aging Project Investigators; Alzheimer's Disease Genetics Consortium. Alzheimers Dement. Genetically predicted body mass index and Alzheimer's disease-related phenotypes in three large samples: Mendelian randomization analyses. 2015 Dec;11(12):1439-51. doi: 10.1016/j.jalz.2015.05.015. Epub 2015 Jun 12. PMID: 26079416

173. Ghani M, Reitz C, Cheng R, Vardarajan BN, Jun G, Sato C, Naj A, Rajbhandary R, Wang LS, Valladares O, Lin CF, Larson EB, Graff-Radford NR, Evans D, De Jager PL, Crane PK, Buxbaum JD, Murrell JR, Raj T, Ertekin-Taner N, Logue M, Baldwin CT, Green RC, Barnes LL, Cantwell LB, Fallin MD, Go RC, Griffith PA, Obisesan TO, Manly JJ, Lunetta KL, Kamboh MI, Lopez OL, Bennett DA, Hendrie H, Hall KS, Goate AM, Byrd GS, Kukull WA, Foroud TM, Haines JL, Farrer LA, Pericak-Vance MA, Lee JH, Schellenberg GD, St George-Hyslop P, Mayeux R, Rogaeva E; Alzheimer's Disease Genetics Consortium. Association of Long Runs of Homozygosity With Alzheimer Disease Among African American Individuals. JAMA Neurol. 2015 Nov;72(11):1313-23. doi: 10.1001/jamaneurol.2015.1700. PMID: 26366463

174. Nikiforova MN, Wald AI, Melan MA, Roy S, Zhong S, Hamilton RL, Lieberman FS, Drappatz J, Amankulor NM, Pollack IF, Nikiforov YE, Horbinski C.
Targeted next-generation sequencing panel (GlioSeq) provides comprehensive genetic profiling of central nervous system tumors. Neuro Oncol. 2016 Mar;18(3):379-87. doi: 10.1093/neuonc/nov289. Epub 2015 Dec 17. PMID: 2668176

175. Morrissy AS, Garzia L, Shih DJ, Zuyderduyn S, Huang X, Skowron P, Remke M, Cavalli FM, Ramaswamy V, Lindsay PE, Jelveh S, Donovan LK, Wang X, Luu B, Zayne K, Li Y, Mayoh C, Thiessen N, Mercier E, Mungall KL, Ma

**Ronald L. Hamilton, M.D.**

Y, Tse K, Zeng T, Shumansky K, Roth AJ, Shah S, Farooq H, Kijima N, Holgado BL, Lee JJ, Matan-Lithwick S, Liu J, Mack SC, Manno A, Michealraj KA, Nor C, Peacock J, Qin L, Reimand J, Rolider A, Thompson YY, Wu X, Pugh T, Ally A, Bilenky M, Butterfield YS, Carlsen R, Cheng Y, Chuah E, Corbett RD, Dhalla N, He A, Lee D, Li HI, Long W, Mayo M, Plettner P, Qian JQ, Schein JE, Tam A, Wong T, Birol I, Zhao Y, Faria CC, Pimentel J, Nunes S, Shalaby T, Grotzer M, Pollack IF, Hamilton RL, Li XN, Bendel AE, Fults DW, Walter AW, Kumabe T, Tominaga T, Collins VP, Cho YJ, Hoffman C, Lyden D, Wisoff JH, Garvin JH Jr, Stearns DS, Massimi L, Schüller U, Sterba J, Zitterbart K, Puget S, Ayrault O, Dunn SE, Tirapelli DP, Carlotti CG, Wheeler H, Hallahan AR, Ingram W, MacDonald TJ, Olson JJ, Van Meir EG, Lee JY, Wang KC, Kim SK, Cho BK, Pietsch T, Fleischhack G, Tippelt S, Ra YS, Bailey S, Lindsey JC, Clifford SC, Eberhart CG, Cooper MK, Packer RJ, Massimino M, Garre ML, Bartels U, Tabori U, Hawkins CE, Dirks P, Bouffet E, Rutka JT, Wechsler-Reya RJ, Weiss WA, Collier LS, Dupuy AJ, Korshunov A, Jones DT, Kool M, Northcott PA, Pfister SM, Largaespada DA, Mungall AJ, Moore RA, Jabado N, Bader GD, Jones SJ, Malkin D, Marra MA, Taylor MD. Divergent clonal selection dominates medulloblastoma at recurrence. Nature. 2016 Jan 21;529(7586):351-7. doi: 10.1038/nature16478. Epub 2016 Jan 13

176. Gandhoke GS, Yilmaz S, Grunwaldt L, Hamilton RL, Salvetti DJ, Greene S. A case of spinal epidural venous malformation with mediastinal extension: management with combined surgery and percutaneous sclerotherapy. J Neurosurg Pediatr. 2016 May;17(5):612-7. doi: 10.3171/2015.9.PEDS15341. Epub 2016 Jan 15.

177. Thompson EM, Hielscher T, Bouffet E, Remke M, Luu B, Gururangan S, McLendon RE, Bigner DD, Lipp ES, Perreault S, Cho YJ, Grant G, Kim SK, Lee JY, Rao AA, Giannini C, Li KK, Ng HK, Yao Y, Kumabe T, Tominaga T, Grajkowska WA, Perek-Polnik M, Low DC, Seow WT, Chang KT, Mora J, Pollack IF, Hamilton RL, Leary S, Moore AS, Ingram WJ, Hallahan AR, Jouvet A, Fèvre-Montange M, Vasiljevic A, Faure-Conter C, Shofuda T, Kagawa N, Hashimoto N, Jabado N, Weil AG, Gayden T, Wataya T, Shalaby T, Grotzer M, Zitterbart K, Sterba J, Kren L, Hortobágyi T, Klekner A, László B, Pócza T, Hauser P, Schüller U, Jung S, Jang WY, French PJ, Kros JM, van Veelen MC, Massimi L, Leonard JR, Rubin JB, Vibhakar R, Chambless LB, Cooper MK, Thompson RC, Faria CC, Carvalho A, Nunes S, Pimentel J, Fan X, Muraszko KM, López-Aguilar E, Lyden D, Garzia L, Shih DJ, Kijima N, Schneider C, Adamski J, Northcott PA, Kool M, Jones DT, Chan JA, Nikolic A, Garre ML, Van Meir EG, Osuka S, Olson JJ, Jahangiri A, Castro BA, Gupta N, Weiss WA, Moxon-Emre I, Mabbott DJ, Lassaletta A, Hawkins CE, Tabori U, Drake J, Kulkarni A, Dirks P, Rutka JT, Korshunov A, Pfister SM, Packer RJ, Ramaswamy V, Taylor MD. Prognostic value of medulloblastoma extent of resection after accounting for molecular subgroup: a retrospective integrated clinical and molecular analysis. Lancet Oncol. 2016 Mar 11. pii: S1470-2045(15)00581-1. doi: 10.1016/S1470-2045(15)00581-1. [Epub ahead of print]

178. Pollack IF, Jakacki RI, Butterfield LH, Hamilton RL, Panigrahy A, Normolle DP, Connelly AK, Dibridge S, Mason G, Whiteside TL, Okada H. Immune responses and outcome after vaccination with glioma-associated antigen peptides and poly-ICLC in a pilot study for pediatric recurrent low-grade gliomas†. Neuro Oncol. 2016 Mar 15. pii: now026. [Epub ahead of print]

179. Jakacki RI, Cohen KJ, Buxton A, Krailo MD, Burger PC, Rosenblum MK, Brat DJ, Hamilton RL, Eckel SP, Zhou T, Lavey RS, Pollack IF. Phase 2 study of concurrent radiotherapy and temozolomide followed by temozolomide and lomustine in the treatment of children with high-grade glioma: a report of the Children's Oncology Group ACNS0423 study. Neuro Oncol. 2016 Mar 22. pii: now038. [Epub ahead of print]

180. Ridge PG, Hoyt KB, Boehme K, Mukherjee S, Crane PK, Haines JL, Mayeux R, Farrer LA, Pericak-Vance MA, Schellenberg GD, Kauwe JS; Alzheimer's Disease Genetics Consortium (ADGC). Assessment of the genetic variance of late-onset Alzheimer's disease. Neurobiol Aging. 2016 May;41:200.e13-20. doi: 10.1016/j.neurobiolaging.2016.02.024. Epub 2016 Mar 3

181. Beckner ME, Pollack IF, Nordberg ML, Hamilton RL. Glioblastomas with copy number gains in EGFR and RNF139 show increased expressions of carbonic anhydrase genes transformed by ENO1. BBA Clin. 2015 Nov 10;5:1-15. doi: 10.1016/j.bbacli.2015.11.001. eCollection 2016 Jun. PMID: 27051584 Free PMC Article

182. Fernandes-Cabral DT, Zenonos GA, Hamilton RL, Panesar SS, Fernandez-Miranda JC. High-Definition Fiber Tractography in the Evaluation and Surgical Planning of Lhermitte-Duclos Disease: A Case Report. World Neurosurg. 2016 May 7. pii: S1878-8750(16)30257-1. doi: 10.1016/j.wneu.2016.04.128. [Epub ahead of print] PMID: 27168233

**Reviews, invited published papers, proceedings of conference and symposia, monographs, books and book chapters**

**Ronald L. Hamilton, M.D.**

1. **Hamilton RL**, Wiley CA. New developments in the neuropathology of AIDS. CAP Today, 10 (12): p 42, 1996.
2. **Hamilton RL**: Hydrocephalus in a 9 month-old infant. Brain Pathol 6:533-534, 1996
3. **Hamilton RL**: New onset hemiparesis. Brain Pathol 7: 715-716, 1997.
4. **Hamilton RL**: Precocious Puberty. Brain Pathol 7: 711-712, 1997
5. **Hamilton RL**: Frontal lobe tumor in 11 year-old girl. Brain Pathol 7: 713-714, 1997
6 **Hamilton RL**, Pollack, IF: The Molecular Biology of Ependymomas. Brain Pathology 7:807-822, 1997.
7. **Hamilton RL**: A 26 year old woman with new onset seizures. Brain Pathol 8: 239-240, 1997.
8. **Hamilton RL**, Wiley, CA, The Neuropathology of Viral Infections of the Nervous System. In: Textbook of Neuropathology; Davis RL, Robertson DM eds. Williams and Wilkins, 3rd edition, Baltimore, MD. 1997.

9. **Hamilton RL**: Guidelines for the neuropathological diagnosis of Alzheimer's Disease and Dementia with Lewy Bodies. Revista de Neurologia 27 (S1): S67-S70, 1998
10. **Hamilton RL**: Experimental neuropathology of Alzheimer's Disease: animal models. Revista de Neurologia 27 (S1): S84-S86, 1998
11. Sanders VJ, Wiley CA, **Hamilton RL**: The mechanisms of neuronal damage in retroviral infections of the nervous system. in The Mechanisms of Neuronal Damage in Virus Infections of the Nervous System (Gosztonyi G, ed). Springer Verlag, Berlin, 2001.
12. **Hamilton RL**. [Recent Advances in the neuropathological evaluation of Alzheimer's Disease: the importance of synuclein] Rev Neurol 35:765-7, 2002 (Spanish).
13. Pollack IF, **Hamilton RL**, Finkelstein SD, Lieberman F. Molecular abnormalities and correlations with tumor response and outcome in glioma patients. Neuroimaging Clinics of North America: Advances in Brain Tumor Imaging and Therapy (Provenzale J, ed.) WB Saunders, Philadelphia, 2002.
14. **Hamilton RL**. The other dementias: the neuropathology of the non-Alzheimer's Disease dementias. Rev Neurol 37:130-139, 2003 (Spanish).
15. Omalu BI, Wiley CA, **Hamilton RL**. Case of the Month February 2003. Brain Pathology 13:419-420, 2003.
16. DeKosky ST, Ikonomovic MD, **Hamilton RL**, Bennett DA, Mufson EJ. Neuropathology of Mild Cognitive Impairment in the Elderly. In John Morris J, Scheltens P, and Cummings JL), (eds), *Alzheimer's Disease and Related Disorders:* London, Taylor & Francis, 1-16, 2006.
17. Crain BJ, Alston SR, Bruch LA, **Hamilton RL**, McLendon RE, Rhodes H, Tihan T, Weidenheim KM. Accreditation Council for Graduate Medical Education (ACGME) Competencies in Neuropathology Training. J Neuropathol Exp Neurol 64:273-279, 2005.
18. McIntyre JA, **Hamilton RL**, Dekosky ST. Redox-reactive autoantibodies in cerebrospinal fluids. Annals of NY Acad Sci 1109: 296-302, 2007.
19. DeKosky ST, Kaufer DI, **Hamilton R**, Wolk D, Lopez OL: Dementia. In: Neurology in Clinical Practice: Principles of Diagnosis and Management, 5th Edition. Editors: Bradley WG, Daroff RB, Fenichel GM & Jankovic J. Boston MA, Butterworth-Heinemann, 2007: 1855-1907.
20. Tyurin VA, Tyurina YY, Kochanek PM, **Hamilton R**, DeKosky ST, Greenberger JS, Bayir H, Kagan VE. Chapter 19: Oxidative lipidomics of programmed cell death. Methods Enzymol 442:375-93, 2008.
21. Yeaney GA, O'Conn SM, Jankowitz BT, **Hamilton RL**. A 16 year-old male with cerebellar mass. Brain Pathol. 2009 19, 167-170. PMID 19076785
22. Horbinski, C, **Hamilton RL**. Application of telepathology for neuropathologic intraoperative consultations. Brain Pathol 2009 19; 317-322. PMID 19290998

## Abstracts

1. **Hamilton RL**, Sanger WG, and McComb RD: Characterization of cell lines derived from malignant tumors in patients with neurofibromatosis. Federation Proceedings 46: 433, 1987.
2. Esch O, Spinosa JC, **Hamilton RL**, Crombie DL, Schteigart CD, Hofmann AF: Reversible cytotoxicity to the gallbladder mucosa of contact dissolution solvents for cholesterol gallstones: a comparison of methyl tert-butyl ether (mtbe) and ethyl propionate (ep) in two animal models. Gastroenterology 100 (5, part 2): A135, 1991.

**Ronald L. Hamilton, M.D.**

3. Haas RH, Popovitch B, **Hamilton RL**: The utility of DNA dystrophin gene analysis in non-specific myopathy: presented at Child Neurology Society Annual Meeting, October, 1992: New Orleans, LA.

4. Haas RH, Mansden DL, Estrada S, **Hamilton RL**, Grafe MG, Nyhan WL: Acute basal ganglia infarction in propionic acidemia in spite of good metabolic control: presented at Child Neurology Society Annual Meeting, October, 1992: New Orleans, LA.

5. **Hamilton RL**, Haas RH, Nyhan W, Powell HP, Grafe MR:  The neuropathology of propionic acidemia: a report of two additional cases. American association of Neuropathology Annual Meeting, June 1993, Salt Lake City, UT; J Neuropathol Exp Neurol 52:299, 1993.

6. Mansfield RT, Schiding JK**, Hamilton R,** Kochanek PM: Hypothermia fails to reduce lesion volume after traumatic brain injury in immature rats.  Pediatric Research 35(4):55, 1994.

7. **Hamilton RL**, Bodnar RJ, Wang G, Wiley CA.  The effect of AZT on retroviral encephalitis: a murine model: presented at the Sixth Workshop on the Pathogenesis of Animal Retroviruses, Philadelphia, PA, Nov. 17-19, 1994.

8. Adelson PD, Robichaurd P, **Hamilton RL**, Kochanek PM. Brain edema and neuropathology after diffuse traumatic injury in immature rats.  Neurotrauma Society meeting, San Diego CA, Nov 10-11, 1995.

9. **Hamilton RL**, Bodnar RJ, Wang G, Klunk W, Wiley CA, Treatment of chronic retroviral encephalitis with zidovudine (AZT) in a murine model. Society for Neuroscience Meeting, San Diego, CA Nov 11-16 1995.

10. **Hamilton RL**, Bodnar RJ, Wang G, Klunk W, Wiley CA. The effect of zidovudine (AZT) on murine retroviral encephalitis. Amer. Assoc of Neuropathology, San Antonio, June, 1995. J Neuropathol Exp Neurol 54 (3): 438, 1995.

11. **Hamilton RL**, and Claassen D. Neonatal Methylmalonic Acidemia With Hemicerebellum: An Autopsy Report;  Society of Pediatric Pathology / Child Neurology Society (joint meeting), Baltimore, Oct 27-29, 1995.

12. **Hamilton RL**, Baldwin M, Wiley CA. Human Herpesviruses And Temporal Arteritis American Association of Neuropathology, Vancouver, BC, Canada, June 1996.

13. Mizukami K, Ikonomovic MD, Sheffield R, Rubin RT, Grayson D, **Hamilton R**, Warde D, Armstrong DM. Immunohistochemical Localization of GABA-A Receptor ß2/3 Subunits in the Hippocampal Formation in Aged Brain with Alzheimer-related Neuropathology. Society for Neuroscience meeting, Washington DC, Nov 1996.

14. Bodnar RJ and **Hamilton RL**. Effect of zidovudine (AZT) and saquinavir on retroviral infection of the central nervous system (CNS) Society for Neuroscience meeting, Nov 17-21, 1996 Washington D.C.

15. Bredel M, Pollack I, **Hamilton RL**, Finkelstein SD, Campbell JW, Martinez AJ, Sherwin R, Bozik ME, Gollin S. Overexpression of EGF receptor and p53 mutations in pediatric malignant gliomas. American Association of Neurological Surgeons, 1997 Annual meeting.

16. Xu Y, Liachennko S, Tang P, **Hamilton RL** Correlation of neuropathologic changes with cerebral metabolic and ADC abnormalities after prolonged asphyxial cardiac arrest. International Society of Magnetic Resonance in Medicine, annual meeting, 1997

17. Bredel M, Pollack IF, Campbell JW, **Hamilton RL**. Basic fibroblast growth factor as a prognostic indicator in pediatric high grade glioma patients. American Association of Neuropathology, Pittsburgh, PA, June 1997. J Neuropathol Exp Neurol 56 (5): 581, 1997

18. **Hamilton RL**, Bodnar RJ, Lackner AA, Lane JH, Wiley CA Neurotrophic factors in simian immunodeficiency virus encephalitis. American Association of Neuropathology, Pittsburgh, PA, June 1997. J Neuropathol Exp Neurol 56 (5): 618, 1997.

19. Adelson, PD, Robichaud, P, **Hamilton, RL**, Kochanek, PM. Histologic analyses of severe diffuse traumatic brain injury in the immature rat . National Neurotrama Society, New Orleans Oct 24-25, 1997.

20. Dorsey RW, Achim CL, Wiley CA, **Hamilton RL**\*,  Soontornniyomkij V. Gene expression and cellular localization of neurotrophic factors in Alzheimer's disease. Society of Neuroscience meeting Nov, 1997, New Orleans.

21.  Klunk WE, **Hamilton RL**, Styren SD, Styren G, Debnath ML, Mathis CA, Mahood K, Hsiao KK. Staining of AD and Tg2576 mouse brain wirh X-34, a highly flourescent derivative of chrysamine

**Ronald L. Hamilton, M.D.**

G and A potential in vivo probe for sheet fibrils.  Siociety for Neuroscience meeting, New Orleans 1997.

22. Klunk WE, **Hamilton RL**, Styren SD, Styren G, Debnath ML.  Neuropathological study of AD brain with X-34, a new highly fluorescent derivative of congo red.  Society for  Neuroscience meeting.  Los Angeles, CA 1998.

23. Halks-Miller M, Hesselgesser J, Horuk R, Soontornniyomkij V, **Hamilton R,** Achim C.  CCR1 immunoreactivity in Alzheimer's Disease brains.  Society for Neurosciences meeting. Los Angeles, CA 1998.

24.  Wang G, Soontornniyomkij V, Pittman CA, Achim CL, Wiley CA, **Hamilton RL**.  Glial expression of BDNF and TRK B receptor proteins in Alzheimer's Disease and HIV-1 encephalitis brains.  Society for Neuroscience meeting. Los Angeles, CA 1998.

25. Ikonomovic MD, Mizukami K, Davies P, **Hamilton R**, Sheffield R, Armstrong DM.  Co-localization of interneurons and an ad-specific antibody in the hippocampal formation of Alzheimer brains.  Society for Neurosciences. Los Angeles, CA 1998.

26. Mizukami K, Ikonomovic MD, Grayson DR, Rubin RT, Warde D, Sheffield R, **Hamilton RL,** Davies P, Armstrong DM.  Immunohistochemical study of GABA(A) receptor beta 2/3 subunits in the hippocampal formation of aged brains with Alzheimer-related neuropathologic changes.  Experimental Neurology 147 2 333-45 (1997).

27. Bredel M, Pollack IF, **Hamilton RL**: Expression of the c-erbB1 Oncogene Product Epidermal Growth Factor Receptor (EGFR) and its Relevance for Outcome in Children with Supratentorial High-Grade Gliomas ; XVI Congress of the European Society for Pediatric Neurosurgery; November 11-15, 1998, Marseille, France

28. **Hamilton, RL** Numerous widespread alpha-synuclein positive thread-like processes characterize dementia with Lewy Bodies. Foundation IPSEN Conference, April 12, 1999, Paris France

29  **Hamilton RL** Numerous and widespread alpha-synuclein thread-like processes in dementia with Lewy bodies. American Assoc of Neuropathologist Annual Meeting, 1999, Portland, OR. J Neuropathol Exper Neurol 58:552, 1999.

30. Klunk WE, **Hamilton RL**, Styren SD, Head E: Evaluation of the aged canine as a screening system for the x-34 class of in vivo probes for amyloid deposition in AD. Soc. of Neuroscience, 1999

31. Kaufer, DL, **Hamilton RL**, Lopez OL, DeKosky ST MRI white matter hyperintensities and cerebral amyloid angiopathy in a case of dementia with Lewy bodies. Amer Neuropsychiatric Assoc, annual meeting, 2/2000, Ft. Myers, FLA.

32. **Hamilton RL**, Mash DC. Widespread Alpha-synucleinopathy in the Parkinson's Disease brain. 6th National Parkinson's Disease Foundation International Symposium on Parkinson's Disease Research, to be held in conjunction with the Society of Neuroscience meeting in Miami Beach, Oct 22-23[rd], 1999.

33. **Hamilton, RL**, Mash DC. Widespread alpha-synuclein-positive neuropil threads in the Parkinson's Disease brain. American Assoc of Neuropathology, Atlanta, GA, June 8-11, 2000.

34.  Snyder JV, Gebel JM, Kassam A, **Hamilton RL**, Goldstein S, Watkins S, Yonas H, Chelluri L, Thulborn K. Guidance by MR Tissue Sodium Concentration of Infarct Resection in Massive Stroke. Neurology 54(7): A97-A98, Suppl. 3, 2000.

35. Chow TM, Kaufer DI, Lopez OL, **Hamilton RL**, Becker JT, DeKosky ST. Temporal Evolution of Lewy Body Phenotype in Autopsy Confirmed Cases of Alzheimer's Disease and Dementia With Lewy Bodies. Neurology 56(8): A300-A301, Suppl 3, 2001.

36.  Castellano-Sanchez A, Ohgaki HH, Yokoo, Finkelstein SD, Medina-Flores R, **Hamilton RL**, Scheithauer BW, Burger PC, Brat DJ.  Genetic Alterations in Granular Cell Astrocytomas. USCAP, 2002.

37.  Demidovich J, Pittman CA, Hamilton RL.  Altered calpain proteolysis of mutant alpha-synuclein. Honors Thesis presentation, Univ. Pitt, 2002

38.  Omalu BI, **Hamilton RL**, Swalsky PA, Finkelstein SD. Microdissection-based mutational profiling of malignant, atypical and benign meningiomas: the determination of meningioma grade by fractional mutational index.  AANP, Denver, 2002 (JNEN 61:491, 2002)

39.  Wilson, RK, Luedecking-Zimmer EK, Kamboh MI, DeKosky ST, **Hamilton RL**.  Association of the ApoE4 allele and Lewy bodies in Alzheimer's Disease.  AANP, Denver 2002 (JNEN 61: 455, 2002).

**Ronald L. Hamilton, M.D.**

40. Desai PP, Ikonomovic MD, **Hamilton RL**, DeKosky ST, Kamboh MI. Apolipoprotein D in Alzheimer's Disease: implications for amyloid pathology. Soc. for Neuroscience, Orlando, 2002.

41. Garb S, **Hamilton RL**. Sequestration of soluble alpha-synuclein in Lewy body Variant of Alzheimer's Disease. Soc for Neuroscience, Orlando, 2002.

42. Marshall GA, Kaufer DI, Lopez OL, Rao GR, **Hamilton RL**, DeKosky ST. A neuropathological correlate of anosognosia in Alzheimer's Disease. American Association of Neurology, May 2003.

43. Sweet RA, Butters MA, **Hamilton RL**, Mulsant BH, Lopez OL, PollockBG, DeKosky ST, Reynolds CF Neuropathology Of Late Life Mood Disorders. American College of Neuropsychopharmacology, 2003

44. Mohan D, Couce ME, Wiley CA, **Hamilton RL**, Sasatomi E, Swalsky PA, Lieberman MD, Finkelstein SD. Microdissection based genotyping of human gliomas: diagnostic and prognostic considerations (USCAP, Vancouver 3/04)

45. Beckner ME, Sasatomi E, Swalsky PA, **Hamilton RL**, Pollack, IF, Finkelstein SD. Loss of heterozygosity reveals non-VHL Allelic loss in hemangioblastomas at 22q13, (AANP Cleveland, June 24-27, 2004).

46. Judkins AR, Burger P, **Hamilton RL**, Kleinschmidt-DeMasters B, Perry A, Pomeroy S, Rosenblum MK, Yachnis AT, Rorke LB, Biegel JA. INI1 Expression Distinguishes Atypical Teratoid/Rhabdoid Tumor (ATR) from Choroid Plexus Carcinoma (CPC); (AANP Cleveland, June 24-27, 2004).

47. McFadden KA, **Hamilton RL**, Visvesvara GS, Gardner P, Couce ME. Granulomatous Amebic Encephalitis in a Patient with Gardners Syndrome and Multi-organ Transplant (AANP Cleveland, June 24-27, 2004).

48. Yen, Amy, Lopez, OL, BeckerJ, **Hamilton RL.** Mesial Temporal Sclerosis is associated with Lewy Bodies in Alzheimer's Disease. AANP Annual meeting June 9-12, 2005, Arlington, VA (platform). (J Neuropathol Exper Neurol 64:434, 2005.

49. Hinkle DA, Mullett SJ, **Hamilton RL** DJ-1 is over-expressed in human stroke reactive astrocytes. Society for Neuroscience Oct 2005.

50. Ramsey CP, Glass CA, Marshall MB, Morgan KL, Kioke MA, **Hamilton R**, Chu CT, Jordan-Sciutto KL. Altered expression patterns of the antioxidant response transcriptional regulator NRF2, in Alzheimer's Disease and Parkinson's Disease. Society For Neuroscience, Nov. 2005, Washington DC.

51. Chu CT, Uchiyama Y, **Hamilton R**, Zhu J. Extracellular signal regulated protein kinase acts upstream of both autophagy and cell death in MPP+ treated neurons. Society For Neuroscience, Nov. 2005, Washington DC

52. Cieply K, Carol R. Sherer, Jennifer L. Hunt **Hamilton RL** Assessment of 1p and 19q Status in Pediatric Oligodendrogliomas by FISH, Association of Molecular Pathology, Nov 10-13, 2005 Scottsdale AZ

53. Bencherif B, Lieberman FS, Wenzhu B, Price JC, Muthukrishnan A, Walter K, **Hamilton RL**, Lunsford LD, Mountz JM. Increased F-18 Fluorothymidine Uptake is Seen in Non-Proliferating Recurrent/Residual Glioma Society for Nuclear Medicine, San Diego, 2006 June 3-7

54. **Hamilton, RL** Variations On A Theme: Lewy Bodies And Mesial Temporal Sclerosis In Alzheimer's Disease: A Review Of 278 Autopsy Cases. 10th International Conference on Alzheimer's Disease, Madrid, Spain, July-15-20, 2006.

55. DeKosky ST, Mathis CA, Price JC, Ikonomovic MD, **Hamilton RL**, Abrahamson EE, Paljug WR, Debnath ML, Hope CE, Isanski BA, Tsopelas ND, Lopresti BJ, Ziolko S, Bi W and Klunk WE. Correlation of In Vivo PiB Retention and Post-Mortem A$\beta$ Levels: A Case Study. 10th International Conference on Alzheimer's Disease, Madrid, Spain, July-15-20, 2006.

56. Leverenz J, **Hamilton RL**, Larson E, Vavrek D, Lopez O, Galasko D, Masliah E, Kaye J, Nixon R, Clark C, Trojanowski J, Kukull W, Montine T, Tsuang D. Lewy-Related Pathology in Two Large Autopsied Dementia Samples: Application of Classification Criteria. 10th International Conference on Alzheimer's Disease, Madrid, Spain, July-15-20, 2006.

57. Venneti S, Lopresti BJ, Wang G, Mathis CA, Klunk WE, Shmookler AD, **Hamilton RL**, Apte UM, Wiley CA. PET imaging of microglia in a mouse model of Alzheimer's disease. 10th International Conference on Alzheimer's Disease, Madrid, Spain, July-15-20, 2006.

58. Kofler JK, Moore RA, **Hamilton RL**. Concomitant Dementia with Lewy Bodies and Multiple System Atrophy in a Demented Patient. International Congress of Neuropathology/American Association of Neuropathology Annual Meeting, San Francisco, CA, Sept 10-15, 2006.

**Ronald L. Hamilton, M.D.**

59. DeKosky ST, Mathis CA, Price JC, Ikonomovic MD, **Hamilton RL**, Abrahamson EE, Paljug WR, Debnath ML, Hope CE, Isanski BA, Tsopelas ND, Lopresti BJ, Ziolko S, Bi W, Klunk WE. Correlation of Regional in vivo Pittsburgh Compound B (PIB) Retention With in vitro PIB, A Levels, and Amyloid Plaque Density: Validation of PIB-PET in Postmortem Human Brain. Alzheimer's Association International Conference on Prevention of Dementia. June 9-12, 2007 Washington, D.C.

60. Kellermier HC, Nikiforova MN, Cieply K, **Hamilton RL**. Alterations of 1p in glioblastomas. ASIP/AANP Annual meeting, Washington DC April 2007.

61. Bliecher AG, Branstetter BF, Hamilton R, Murdoch G, Kellermier HC. Clival Chordoma: Radiologic-Pathologic Correlations. American Society of Neuroradiology annual meeting, Chicago, IL. June 9-14, 2007.

62. Butters MA, Aizenstein HJ, Meltzer CC, **Hamilton RL,** Price JC, Mathis CA, Klunk WE, Becker JT, DeKosky ST, Reynolds CF. Cognition, cerebrovascular disease and Alzheimer's Disease in late-life depression. International Neuropsychological Society meeting, Bilbao Spain, July 2007.

63 Tyurin VA, Zhao Q, Mnuskin A, **Hamilton R**, DeKosky ST, Reynolds WF, Kagan VE. Phospholipid peroxidation biomarkers of Alzheimer's Disease in the Brain: Selective Oxidation of Phosphatidylserine. Society of Toxicology Meeting San Diego, CA. October 2, 2007.

64. Moschos SJ, D. Trembath D, Snavely A, Bradler E, Midkiff B, Nikolaishvilli-Feinberg N, Werley J, Krauze M, **Hamilton R**, Kirkwood JM. Prognostic Significance of PD-L1 Expression, Angiogenesis, and Hypoxia in Melanoma Brain Metastases (MBM); A Histopathologic Analysis. Annual meeting of the American Association of Clinical Oncology, Chicago Il, 5/29-6/2/2014.

65. Trembath DG, Moschos SJ, Snavely AC, Bradler E, Nikolaishvilli-Feinberg N, Bentley R. Midkiff BR, Jonette Werley J, Krauze MT, **Hamilton RL**. Analysis of select angiogenic markers in melanoma brain metastases. Annual meeting AANP, Portland OR. June 2014

66. Salgado CM, Basu D, Nikiforova M, Hamilton R, Gheris R, Jakacki R, Panigrahy A, Yatsenko S, Reyes-Mugica M. Congenital Melanoma: The full spectrum og p.Q61R mutation in NRAS. Accepted for the Annual Soc. Pediatric Pathology meeting, Birmingham AL, Sept 4-6, 2014.

67. Melan MA, Wald AI, Zhong S, **Hamilton R**, Horbinski C. Nikiforova MN. BrainSeq: Next-Generation Sequencing Panel for Detection of Genetic Alterations in Central Nervous System (CNS) Malignancies. National Harbor MD, Nov 12-15, 2014.

68. Hamilton RL. Chronic Traumatic Encephalopathy: Update on an Emerging Disease. Invited speaker: 18th International Congress of Neuropathology, July 12-16, 2014, Rio de Janeiro, Brazil

69. Hamilton RL. Cases of the Month: 16 Years of Unknowns. Invited speaker: 18th International Congress of Neuropathology, July 12-16, 2014, Rio de Janeiro, Brazil

70. Trembath DG, Moschos SJ, Snavely AC, Bradler E, Nikolaishvilli-Feinberg N, Midkiff BR, Werley J, **Krauze MT, Hamilton RL** Role of PD-L1, HIF-1a, and reactive gliosis in melanoma brain metastases. USCAP 2015, Boston, MA, March 21-27, 2015.

71. Nolan Priedigkeit, Ryan J. Hartmaier, Yijing Chen, Damir Vareslija, Ahmed Basudan, Roby Thomas, Jose P Leone, Peter C. Lucas, Rohit Bhargava, Ron L. Hamilton, Juliann Chmielecki, Nancy E. Davidson, Steffi Oesterreich, Adam M. Brufsky, Leonie Young, Adrian V. Lee Breast cancer brain metastases show limited intrinsic subtype switching, yet exhibit acquired ERBB2 amplifications and activating mutations. San Antonio Breast Cancer Symposium, 12/7/16

72. Steffi Oesterreich, Ahmed Basudan, Nolan Priedigkeit, Ryan Hartmaier, Amir Bahreini, Rekha Gyanchandani, Jose P Leone, Peter Lucas,, Rohit Bhargava, Ron Hamilton, Ryan Hartmaier, Adam Brufsky, Adrian V. LeePerivascular Inflammation in Temporal Artery Biopsies That Are Negative for Arteritis: Incidental or Harbinger American College of Rheumatology/ Association of Rheumatology Health Professionals (ACR/ARHP) Annual Meeting, Washington DC, 11/13/16

73. Expression of Carbonic Anhydrase Genes, CA3 and CA12, Transformed with ENO1, Relate to Copy Numbers of EGFR or RNF139 and XIAP, and Gender in Glioblastomas Using PCR Assays. Experimental Biology 2015 Annual Meeting

74. Evaluation of GlioSeq Targeted NGS Panel for Detection of O6-Methylguanine-DNA Methyltransferase (MGMT) mRNA Expression in Glioma Patients Alicia Hunt, Sarika Jain, Melissa A Melan, Abigail Wald, Ronald Hamilton, Marina N. Nikiforova Association For Molecular Pathology (AMP) Charlotte, NC. November 10-12, 2016.

## PROFESSIONAL ACTIVITIES

**Ronald L. Hamilton, M.D.**

**TEACHING**

University of California, San Diego, Dept of Neuroscience
      1991-93      lab assistant - graduate neuroanatomy course
University of California, San Diego, School of Medicine
      1991-93      Sophomore pathology course, neuropathology section (lab assistant)
University of California, San Diego, Dept of Pathology
      1991-93      Clinical Correlation Conference - Neuropath and Neurosurgery (monthly)
      1991-93      Neuropathology review for neurology residents (bi-monthly)
University of Pittsburgh, School of Medicine
      Freshman pathology course –
      PBL facilitator for musculoskeletal course 1994-1998
      Neuroscience Module – lecture M2 students full class: CNS tumors
            Annually since 1999.
                 April 29, 2014 1-3 pm
      Neuroscience Module   lecture MS1 students
            CNS tumors  March 2004
            CNS tumors  March 2005
            CNS tumors March 2006
            CNS Tumors    5/7/07
      Neuroscience rotation – small weekly lab, M3 students
            7/99-present
      Neuroscience rotation – small group M3 students
            6/18/2007 3-5pm
Weekly brain-cutting conference at Children's Hospital (2-5 medical (M3) students/week)
            Academic Advising: Kate McFadden 2/2000 to 6-2001
Other:
      High school - gifted science students of Mr. James Coll
            11/21/2002 , 11/14/ 2003, 10/28/2004, 11/18/2005, 11/3/2006

University of Pittsburgh, graduate students
      Cellular and Molecular Mechanisms of Neurodegeneration (MSCMP 3720)
               Organizers: Robert Bowser, Cristian Achim,
          1. Neuroanatomy and Neurohistology in neurodegeneration
            1/13/98,  1/19/99
         2. Mitochondria and disease / Prion encephalopathies
            3-24-98
         3. The role of alpha-synuclein in neurodegenerative diseases
            10-11-00
      Molecular Pathobiology (organizers Frye and Achim) (MSCMP 2740)
         .Tumors of the Central Nervous System,  4-7-98,  4-20-99
         Alpha-synuclein and Neurodegeneration
            4-2003, 1/8/04, 5/15/06
         Neuropathology of Neurodegeneration
            1/6/04
          Alpha-synuclein and Tau in Neurodegeneration
            1/5/07, 2/7/2008
         Pathologic diagnosis of the Lewy Body Disorders
            2/12/09
University of Pittsburgh, Dept of Neuroscience - Combined Neuroscience Conference Wed 4-5
      10/3/95 *      Varicella Zoster Infections of the CNS in AIDS patients
      10/9/96 *      Lewy Bodies and Dementia
      2/19/97 *      The Neuropathology of Pediatric Seizures
      4/23/97 *      CNS manifestations of non-CNS tumors in children
      2/11/98        Case Presentation with Ian Pollack

**Ronald L. Hamilton, M.D.**

| | |
|---|---|
| 3/18/98 * | A 77 year old woman with Multiple sclerosis and dementia |
| 11/4/98 | *Pediatric meningiomas – two cases |
| 1/20/99 | Methanol Intoxication – with C. Foley |
| 2/3/99 | Gliomatosis cerebri with Dallasta |
| 2/10/99 | Amyloid angiopathy and leukomalacia – with D. Kaufer |
| 3/17/99 | Metachromatic Leukodystrophy – with D. Kaufer |
| 9/18/02 | Iatrogenic CJD* |

\* as primary presenter

University of Pittsburgh, Dept. of Pathology, Chief Resident's Fri noon slide conference
| | |
|---|---|
| 8/1/96 - Pediatric brain tumors | |
| 10/5/97 Pediatric brain tumors | |
| 1/9/98 | NP REVIEW - Tumors I |
| 1/16/98 | NP REVIEW - Tumors II |
| 1/23/98 | NP REVIEW - Tumors III |
| 1/30/98 | NP REVIEW - Infections |
| 2/6/98 | NP REVIEW - Demyelinative diseases |
| 2/13/98 | NP REVIEW - Neurodegenerative diseases |
| 2/20/98 | NP Review - Cerebrovascular disease and developmental |
| 5/24/02 | Pediatric Neoplasms and Congenital Malformations |
| 5/31/02 | Degenerative Diseases |

University of Pittsburgh, undergraduate
Independent Course and Honors Research Project –
Theodore Kaplan (1/97-6/97)
Emily Rogerson (1/99-5/99, 9/99-12/99, 1/00-4/00)
Kyle Hubbard (1/99 – 5/99, 9/99-12/99, 1/00-4/00)
Joe Demidovich – 2000-2002
Stan Garb (2001-2001)

Pathology Summer Undergraduate Research Program (SURP)
Kathleen Anderson 6/00-8/00
Kathleen Anderson 6/01-8-01

University of Pittsburgh, Dept. of Pathology,
Neuropathology of dementia conference - weekly (Fri 10-11)

University of Pittsburgh - ADRC Topics at Noon
X-34 and alpha-synuclein – New stains in Alzheimer's Disease 11/98
Lewy Body Pathology in Alzheimer's Disease, 11/01

Children's Hospital of Pittsburgh, Grand rounds
1996 - methyl malonic acidemia with hemi-cerebellum
2/13/97 - Pediatric AIDS with HIV encephalopathy
5/22/97 - 11 month-old boy with Hypotonia (Leigh's Disease)
3/18/98 - Becker's muscular dystrophy with severe cardiomyopathy
5/19/98 – Friedreich's Ataxia
10/15/98 – Spinal Muscular Atrophy Type I
2/2005  - Congenital Dystrophies – Pediatric Neurology

## Other Presentations

Neurology Grand Rounds - 11-19-03 - CNS vasculitis
Pathology Noon Diagnostic Conference - 11-20-03 – "Some Bodies in the Brain"
AP Didactic Lecture – 11-25-03 - Neuropathology of Neurodegeneration
NP Didactic – 4-28-04 - ApoE4 and Lewy Bodies in AD

**Ronald L. Hamilton, M.D.**

NP Didactic -    3/31/2005 – AD Pathology in ALS and MTS and LB in AD
Pathology Noon Diagnostic Conference – 8-4-2006: Tauopathies
ADRC CPC 8-10-06
ADRC CPC 11-30-06
ADRC CPC 2-8-07
ADRC 20th Anniversary meeting, "Neuropathology of AD:" 9-28-06
ADRC Topics at Noon. "Tauopathies" 11-16-06
ADRC CPC 8/16/2007
ADRC CPC 11/30/2007
Pediatric CPC 2/25/08
DJ-1 in glioblastomas (NP Didactic conference) – 3/10/2009 (1 hour)
Neuropathology review for Neurosurgery residents – 3/10/2010 (1 hour).
AP Chief Residents didactic conference. 2 hour conference. Non-glial Tumors. Feb 25, 2014
CMU graduate class: BioE 2630 – Methods in medical iamage analysis in neuropathology. April 4, 2014.
Anatomic Pathology Grand Rounds, July 10, 2014  Chronic Traumatic Encephalopathy: an Update.

**Clinical Conferences (recurring)**

| | | |
|---|---|---|
| ADRC Brain cutting | weekly | Tue 8-10 |
| ADRC Dementia signout - | weekly | Fri 10-11 |
| PUH – Neuropathology QA - | weekly | Wed 10-11 |
| CH  Brain cutting | weekly | Mon 10-11:00 |
| CH  Neuro-Oncology conf | weekly | Mon 11:30-12:30 |
| CH Gross autopsy conference | weekly | Tue 11-12 |
| CH Micro autopsy conf | weekly | Tue 1-2 |

University of Pittsburgh School of Medicine –
2009 Brain Tumors – lecture to 1st year students
2009 Klionsky summer research scholarship – Peter Kang (June-Aug 2009)
        Clinicopathologic correlations of chordomas
2009 Monday 2 hour small group 3rd year  (5-12 students)
        4/6/2009, 7/27/2009, 9/10/2009, 10/12/2009, 12/7/2009, 1/25/2010, 2/15/2010

## RESEARCH

## OTHER SUPPORT

## ACTIVE

**HAMILTON, R.**
ACTIVE
**R01 NS037704**    (PI: Pollack)          9/1/98-1/31/17          0.7 calendar months
National Institutes of Health          $105,970
Role:  Co-Investigator
Title: Molecular Markers as Predictors of Outcome in Gliomas
The major goal of this project is to further characterize the molecular features of tumorigenesis in pediatric malignant gliomas.

**1R01 CA174858-01**(PI: Pollack)          5/6/13-8/30/17          0.4 calendar months
National Institutes of Health          $54,696
Role:  Co-Investigator
Title: Peptide Vaccine-Based Immunotherapy for Children with Recurrent Ependymomas
This project focuses on a pilot clinical trial of peptide-based immunotherapy for ependymomas, among the most challenging childhood brain tumors.  The study will incorporate separate strata

Ronald L. Hamilton, M.D.

for posterior fossa and non-posterior fossa ependymomas.  We will treat a total of 12 patients in each of the two strata with subcutaneous TAA epitope vaccinations every 3 weeks for 8 courses combined with topical imiquimod. Participants will be evaluated for adverse events, regimen limiting toxicity (RLT), and treatment response by clinical and laboratory evaluations and MR imaging. We hypothesize that vaccine-based immunotherapy will not only prove safe for the treatment of pediatric ependymomas, but will also demonstrate activity as assessed by immunologic and clinical parameters.

(PI: Pollack)    5/8/14-6/1/17
Child Brain Tumor Foundation                    $10,487                            1.2
calendar months
**Children's Brain Tumor Tissue Consortium**
The CBTTC is a unique research platform in which tumor tissue is processed for comprehensive molecular (e.g., DNA, RNA, and protein) analysis using state-of-the-art methods and the data results of that analysis, together with new brain tumor models and relevant clinical information, are sent back to the participating institutions. In comparison to tissue banks, the CBTTC actively stimulates research by providing high-quality data that can be rapidly and efficiently analyzed by participating institutions.
PI: Pollack. 10% salary for Jonette Werley

<u>OVERLAP</u> No Overlap


**Completed Research Support**

National Institutes of Health                    3/1/02 – 2/28/05
P30 MH52247-10    (PI: Reynolds)        $23,305
Intervention Research Center for the Study of Late-Life Mood Disorders
a supplement to the above grant to establish a brain bank to investigate the neuropathological substrate of late life mood disorders.
Role:  Co-Investigator

R01 NS048595    (PI: Montine)                    09/30/03 – 07/31/08
National Institutes of Health
Subcontract to the University of Washington on grant "Characterization of DLB: a Collaborative Study"
The major goal of this multi-institutional project is to investigate the role of ApoE4 alleles and other genetic polymorphisms in the Lewy Body Variant of Alzheimer's Disease.
Role:  Co-Investigator

Brain Tumor Society                    07/01/07-05/31/09
PI: Ian Pollack
JPA & Pediatric Low Grade Astrocytoma
The major goals of these two grants is to examine molecular markers of prognosis in pediatric gliomas.
Role:  Co-Investigator

U10 CA13539-27 (Reaman (subcontract 6172) (Pollack)                    1/1/06-12/30/09
NIH/NCI
Children's Oncology Group Brain Tumor Resource Laboratory

**Ronald L. Hamilton, M.D.**

This contract is providing infrastructure support for maintaining tissue processing and banking of high-grade gliomas.
Role:  Laboratory Director

R01 MH47346     (PI: Zubenko)                     12/1/04 – 11/30/09
National Institutes of Health
Morphologic/Neurochemical Correlates of Depression in AD
The major goal of this project is to better define the biological substrates of major depression in AD and to provide additional insight into the clinical biology of major depressive disorders affecting the elderly.
Role:  Co-Investigator

P50 AG05133     (PI: Lopez)               3/30/85 – 3/31/15          0 calendar months
National Institutes of Health               $71,764
Alzheimer Disease Research Center, Core C: Neuropathology
The three objectives of the Neuropathology Core are to (1) procure and bank brain from autopsies of ADRC patients and controls, (2) perform detailed neuropathologic analysis of all AD cases and (3) maintain well catalogued brain bank.
Role:  Core Advisor

Child Brain Tumor Fund (CBTF) (PI: Pollack)        5/8/13-5/7/14
0.3 cal months (2.5% support) PITT subaccount #: 05.35206.xxxx.00000.709203.-----

P01 NS040923     (PI: Pollack)            7/1/02-5/31/13          1.20 calendar months
National Institutes of Health               $22,074
Novel Strategies for Brain Tumor Therapy
The unifying hypothesis of this program project grant is that novel therapeutic approaches that take into account the unique features of central nervous system (CNS) tumors will have utility for preventing tumor growth and inducing tumor regression, and will potentiate the effects of conventional treatment approaches, particularly radiotherapy, for inducing glioma cell killing.
Role:  Co-Investigator


**Prior Grant Support**

| | |
|---|---|
| 1995-1997 | Murine Model of Retroviral Encephalitis |
| | Children's Hospital of Pittsburgh Research Fund ($50,000) |
| | 0% effort, 0% support |
| 1995-1998 | Blood Brain Barrier in HIV encephalitis (PI: Achim) |
| | Co PI. 10% effort and salary ($186,264) |
| 11/98 | PD Center Grant, Equipment $6000 |
| | for freezer for PD Brain Bank (one time equipment funding) |
| 7/1/98-6/30/99 | Neurotrophic Factors in SIV encephalitis |
| | Competitive Medical Research Fund (CMRF), $25,000, |
| | 0% effort, 0% support |
| 12/01/98-11/30/99 | Parkinson's Disease Brain Bank |
| | PI: Hamilton RL |
| | Parkinson's Disease Foundation ($24,899) 0% effort, 0% support |
| 7/1/98-6/30/00 | Molecular Markers of Prognosis in Pediatric Gliomas |

**Ronald L. Hamilton, M.D.**

PAR 95-063, NIH
PI: IF Pollack
10% effort and support ($263,311)

4/1/00-3/31/01:  Alpha-synuclein Aggregation in Dementia With Lewy Bodies
PI: RL Hamilton
Parkinson's Disease Foundation Seed Money Grant, $25,000 0% effort, 0% support

10/1/00-9/30/02    Millennium Agreement (Neuro Module)
PI: Rajiv Dhir
0% effort, 0% Support.
($25,000 per year for supplies, plus support for 100% Level IV Res Tech)

1/1/99 – 12/31/03 COG Brain Tumor Resource Laboratory
PI: Pollack, IF ($5800)  (subcontract 6172)
Co-I – 5% effort and support
NIH-U10 CA13539-27

3/01/02 - 2/28/07 - Supplemental Award to Establish a Late Life Mood Disorder Brain Bank
PI: RA Sweet (for supplement)
Supplement to 3 P30 MH52247-08S1 (PI: CF Reynolds)
Co-I : 5% effort and support

7/1/98-6/30/05 Morphologic/Neurochemical Correlates of Depression in AD
PI: G Zubenko
2.5% effort and support ($20,000)

National Institutes of Health          09/30/03 – 07/31/08          5%
R01 NS048595    (PI: Montine)          $75,000

*Subcontract to the University of Washington on grant "Characterization of DLB: a Collaborative Study"*
The major goal of this multi-institutional project is to investigate the role of ApoE4 alleles and other genetic polymorphisms in the Lewy Body Variant of Alzheimer's Disease

R01 MH072947    (PI: Butters)          12/1/04 –11/30/11          0.36 calendar months
National Institutes of Health          $6,018
Pathways Linking Late Life Depression to Mild Cognitive Impairment and Dementia
The goal of this project is to investigate the relationships among late-life depression (LLD), cognitive impairment and progressive neurodegeneration.
Role:  Co-Investigator

R01 MH072947    (PI: Butters)          12/1/04 –11/30/11          0.36 calendar months
National Institutes of Health          $6,018
Pathways Linking Late Life Depression to Mild Cognitive Impairment and Dementia
The goal of this project is to investigate the relationships among late-life depression (LLD), cognitive impairment and progressive neurodegeneration.
Role:  Co-Investigator

**Seminars and Invited Lectureships Related to Research**

Presentation of an Unknown Case (Herpes simplex brainstem encephalitis) to American Association of Neuropathologists Annual Meeting, June 1992: St. Louis, MO.

**Ronald L. Hamilton, M.D.**


Presentation of an Unknown Case (Varicella zoster virus encephalitis in an AIDS patient) to XII International Congress of Neuropathology, Sept, 1994: Toronto, Ont, Canada.

Presentation of an Unknown Case (Atypical neurocytoma) to American Association of Neuropathologists Annual Meeting, June 2002: Denver (presenter: Rafael Medina-Flores).

**Other Research Related Activities**

| | |
|---|---|
| 1995-2003 | Co-Director, Neuropathology Core ADRC |
| 2003-2012 | Director, Neuropathology Core ADRC. |
| 1995-2012- | Director, Neuropathology Brain Bank |
| 1997 - present - | Director of Neurohistology laboratory |
| 1997-present | Co-Director, Brain Tumor Resource Laboratory, Children's Cancer Group |
| 2001- 2009 | Director of Neuropathology Core of the Stephen Tuttle ALS Tissue Bank. |
| 2001-present | Co-Director, UP Brain Tumor Bank |


**CURRENT RESEARCH INTERESTS**

1. Molecular Biology of Brain Tumors

**SERVICE**

**University and Medical School**

Residency Committee (Pathology) – 1997 to 2008
Institutional Review Board     3/02 – 5/2005
'Member of the UPSOM Interviewing Committee' jan 2010-present
Member, UPMC Professional Practice and Ethics Committee Jan 2014 - present

**OTHER**

| | |
|---|---|
| 4/1996 - present | Case Editor - Brain Pathology, |
| | Case of the Month feature |
| | Case of the Month web site |
| | Increase to 2 cases per month 1/2007 |
| 10/99 | ad hoc reviewer, J Neuroscience |
| 1/2000 | ad hoc reviewer, J American Medical Association (JAMA) |
| 3/2000 | ad hoc reviewer, Neuropathology and Applied Neurobiology |
| 3/01 | ad hoc reviewer American Journal Pathology |
| 5/02 | ad hoc reviewer Neuroscience |
| 11/02 | ad hoc reviewer JNEN |
| 2004 | AANP Awards Committee, AANP, Cleveland |
| 2006 | AANP Awards committee, AANP-ISN San Fran |
| 10/2006 | ad hoc reviewer     Eur J Neurosci |
| 2/2007 | Ad hoc reviewer     Neuroscience |
| 2007 | Chairmen, Awards Committee, AANP Washington DC. (2 year term) |
| 7/29/2007 | ad hoc reviewer, Brain Pathology |
| 7/25/2007 | ad hoc reviewer Acta Neuropathologica |
| 10/19/2007 | ad hoc reviewer J Neuropathol Exp Neurol |
| 2008 | Chairman Awards Committee AANP, San Diego Annual Meeting |
| 2008 | ad hoc reviewer Brain Pathology |
| 2009 | ad hoc reviewer Pedi and Developmental Pathology |
| 2009 | ad hoc reviewer Amer. J. Pathol. |

**Ronald L. Hamilton, M.D.**

2014 – Featured in non-fiction book: League of Denial:  The NFL, Concussions and the Battle for the Truth (Crown Publishing, New York). Chapters 8 and 10 detail my role in the discovery of CTE in NFL football players.

January 2015 – Consulted with Sony Pictures about movie CONCUSSION based on the discovery of Chronic Traumatic Encephalopathy (CTE) in American NFL football players by my student, Bennet Omalu and me in July 2005.  I was also interviewed on the set by Sony documentary filmmakers for a bonus feature on the DVD:  The Making of "Concussion."  The movie is scheduled to be released Christmas Day, Dec 25, 2015.

January 2015 – interviewed by Jeane Marie Laskas (who wrote the 2009 GQ article the movie is based on) for a companion book to be released with the movie, December 2015.


**International Invitations**

1998 – Invited lecturer at Barcelona-Pittsburgh ADRC meeting, "Dementia Today," Barcelona, Spain (Oct 1998)

2000 – Invited lecturer at Barcelona-Pittsburgh ADRC meeting Dementia Today II", Barcelona, Spain (Oct 2000)

2001 - Invited symposia speaker at 10th Congress of the International Psychogeriatric Association (Nice, France, Sept 2001). "Pathological Diagnosis of Dementia With Lewy Bodies" (Symposia Organizer, Ian McKeith)

2002 – Invited lecturer at Barcelona-Pittsburgh ADRC meeting Dementia Today III", Barcelona, Spain (Oct 2002)

2003 – Symposium speaker "Dementia with Lewy Bodies" at International Psychogeriatric Associations meeting, Chicago, IL, USA, 08/19/03

2004  Invited lecturer at Barcelona-Pittsburgh ADRC meeting Dementia Today IV", Barcelona, Spain (Oct 2004)

2006  Invited lecturer at Barcelona-Pittsburgh ADRC meeting Dementia Today V", Barcelona, Spain (Oct 2006)

2008  Invited lecturer at Barcelona-Pittsburgh ADRC meeting Dementia Today VI", Barcelona, Spain (May 2008)

2014 – Invited lecturer AANP annual meeting June 2014.  What Every Neuropathologist Should Know: Molecular studies in metastatic brain tumors.

2014 - Invited as member of scientific committee International Congress of Neuropathology quadrennial meeting Sept 2014, Rio de Janeiro

2014 – Chair of Forensic Pathology Session, committee International Congress of Neuropathology quadrennial meeting Sept 2014, Rio de Janeiro

2014 – co-chair telepathology session with Dr. Wiley

2014 – Presentation – Chronic Traumatic Encephalopathy – update, International Congress of Neuropathology quadrennial meeting Sept 2014, Rio de Janeiro

2014 – presentation – Cases of the Month – 16 Years of Unknowns  International Congress of Neuropathology quadrennial meeting Sept 2014, Rio de Janeiro s

**CERTIFICATION OF VITAL RECORD**

## COUNTY OF LOS ANGELES • REGISTRAR–RECORDER/COUNTY CLERK

**CERTIFICATE OF DEATH**
STATE OF CALIFORNIA
USE BLACK INK ONLY / NO ERASURES, WHITEOUTS OR ALTERATIONS

3200819043413

STATE FILE NUMBER | LOCAL REGISTRATION NUMBER

| DECEDENT'S PERSONAL DATA | | | |
|---|---|---|---|
| 1 NAME OF DECEDENT — FIRST (Given) **CHRISTOPHER** | 2 MIDDLE **EDDIE** | | 3 LAST (Family) **MIMS** |
| AKA ALSO KNOWN AS — Include full AKA (FIRST MIDDLE LAST) --- | 4 DATE OF BIRTH mm/dd/yyyy **09/29/1970** | 5 AGE Yrs **38** / IF UNDER 1 YEAR Months Days / IF UNDER 24 HOURS Hours Minutes | 6 SEX **M** |
| 9 BIRTH STATE/FOREIGN COUNTRY **CALIFORNIA** | 10 SOCIAL SECURITY NUMBER **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** | 11 EVER IN U.S. ARMED FORCES? YES [X] NO UNK | 12 MARITAL STATUS (at Time of Death) **DIVORCED** / 7 DATE OF DEATH mm/dd/yyyy **10/15/2008** | 8 HOUR (24 Hours) **0935** |
| 14/15 EDUCATION — Highest Level/Degree **SOME COLLEGE** YES | | 16 WAS DECEDENT HISPANIC/LATINO/A/SPANISH? (If yes, see worksheet on back) [X] NO | 18 DECEDENT'S RACE — Up to 3 races may be listed (see worksheet on back) **AFRICAN AMERICAN** |
| 17 USUAL OCCUPATION — Type of work for most of life. DO NOT USE RETIRED **PROFESSIONAL ATHLETE** | | 18 KIND OF BUSINESS OR INDUSTRY (e.g. grocery store, road construction, employment agency, etc.) **FOOTBALL ATHLETE** | 19 YEARS IN OCCUPATION **8** |

| USUAL RESIDENCE | | | | |
|---|---|---|---|---|
| 20 DECEDENT'S RESIDENCE (Street and number or location) **612 SOUTH FLOWER STREET #409** | | | | |
| 21 CITY **LOS ANGELES** | 22 COUNTY/PROVINCE **LOS ANGELES** | 23 ZIP CODE **90017** | 24 YEARS IN STATE **25** | 25 STATE/FOREIGN COUNTRY **CALIFORNIA** |

| INFORMANT | | |
|---|---|---|
| 26 INFORMANT'S NAME, RELATIONSHIP **MAREA BARSKY, FRIEND** | | 27 INFORMANT'S MAILING ADDRESS (Street and number or rural route number, city or town, state, ZIP) **249 SANTA BARBARA, IRVINE, CA 92606** |

| SPOUSE AND PARENT INFORMATION | | | | |
|---|---|---|---|---|
| 28 NAME OF SURVIVING SPOUSE — FIRST - | 29 MIDDLE - | | 30 LAST (Maiden Name) - | |
| 31 NAME OF FATHER — FIRST **LORENZO** | 32 MIDDLE **VICTOR** | | 33 LAST **MIMS** | 34 BIRTH STATE **CA** |
| 35 NAME OF MOTHER — FIRST **CARLEEN** | 36 MIDDLE - | | 37 LAST (Maiden) **HASTINGS** | 38 BIRTH STATE **TN** |

**1 of 2**

| FUNERAL DIRECTOR / LOCAL REGISTRAR | | | | |
|---|---|---|---|---|
| 39 DISPOSITION DATE mm/dd/yyyy **10/25/2008** | 40 PLACE OF FINAL DISPOSITION **FOREST LAWN MEMORIAL PARK 6300 FOREST LAWN DR., LOS ANGELES, CA 90068** | | | |
| 41 TYPE OF DISPOSITION(S) **BU** | 42 SIGNATURE OF EMBALMER **JESSICA SOLIS** | | | 43 LICENSE NUMBER **9091** |
| 44 NAME OF FUNERAL ESTABLISHMENT **FOREST LAWN MEMR PRKS & MTYS** | 45 LICENSE NUMBER **FD 904** | 46 SIGNATURE OF LOCAL REGISTRAR **JONATHAN FIELDING, MD** | | 47 DATE mm/dd/yyyy **10/23/2008** |

| PLACE OF DEATH | | | |
|---|---|---|---|
| 101 PLACE OF DEATH **RESIDENCE** | 106 FACILITY ADDRESS OR LOCATION WHERE FOUND (Street and number or location) | 122 IF HOSPITAL, SPECIFY ONE IP ER/OP DOA | 123 IF OTHER THAN HOSPITAL, SPECIFY ONE Hospice Nursing Home/LTC [X] Decedent's Home Other |
| 104 COUNTY **LOS ANGELES** | **612 SOUTH FLOWER STREET #409** | | 106 CITY **LOS ANGELES** |

| CAUSE OF DEATH | | | | |
|---|---|---|---|---|
| 107 CAUSE OF DEATH | Enter the chain of events — diseases, injuries, or complications — that directly caused death. DO NOT enter terminal events such as cardiac arrest, respiratory arrest, or ventricular fibrillation without showing the etiology. DO NOT ABBREVIATE. | | Time Interval Between Onset and Death | 108 DEATH REPORTED TO CORONER? [X] YES NO |
| IMMEDIATE CAUSE (Final disease or condition resulting in death) (A) | **DEFERRED** | | (AT) | **2008-07210** |
| Sequentially list conditions, if any, leading to cause on Line A. Enter UNDERLYING CAUSE (disease or injury that initiated the events resulting in death) LAST | (B) | | (BT) | 109 BIOPSY PERFORMED? YES [X] NO |
| | (C) | | (CT) | 110 AUTOPSY PERFORMED? [X] YES NO |
| | (D) | | (DT) | 111 USED IN DETERMINING CAUSE? [X] YES NO |
| 112 OTHER SIGNIFICANT CONDITIONS CONTRIBUTING TO DEATH BUT NOT RESULTING IN THE UNDERLYING CAUSE GIVEN IN 107 **NONE** | | | | |
| 113 WAS OPERATION PERFORMED FOR ANY CONDITION IN ITEM 107 OR 112? (If yes, list type of operation and date.) **NO** | | | 115A IF FEMALE, PREGNANT IN LAST YEAR? YES NO UNK | |

| PHYSICIAN'S CERTIFICATION | | | |
|---|---|---|---|
| 114 I CERTIFY THAT TO THE BEST OF MY KNOWLEDGE DEATH OCCURRED AT THE HOUR, DATE AND PLACE STATED FROM THE CAUSES STATED Decedent Attended Since mm/dd/yyyy (A) _ (B) mm/dd/yyyy _ | 115 SIGNATURE AND TITLE OF CERTIFIER Decedent Last Seen Alive | | 116 LICENSE NUMBER | 117 DATE mm/dd/yyyy |
| | 118 TYPE ATTENDING PHYSICIAN'S NAME, MAILING ADDRESS, ZIP CODE | | | |

| CORONER'S USE ONLY | | | | |
|---|---|---|---|---|
| 119 I CERTIFY THAT IN MY OPINION DEATH OCCURRED AT THE HOUR, DATE AND PLACE STATED FROM THE CAUSES STATED MANNER OF DEATH Natural Accident Homicide Suicide [X] Pending Investigation Could not be Determined | | 120 INJURED AT WORK? YES NO UNK | 121 INJURY DATE mm/dd/yyyy | 122 HOUR (24 Hours) |
| 123 PLACE OF INJURY (e.g. home, construction site, wooded area, etc.) | | | | |
| 124 DESCRIBE HOW INJURY OCCURRED (Events which resulted in injury) | | | | |
| 125 LOCATION OF INJURY (Street and number or location and city, and ZIP) | | | | |
| 126 SIGNATURE OF CORONER / DEPUTY CORONER **EVONNE D REED** | | 127 DATE mm/dd/yyyy **10/20/2008** | 128 TYPE NAME, TITLE OF CORONER / DEPUTY CORONER **EVONNE D REED, DEPUTY CORONER** | |

| STATE REGISTRAR | A | B | C | D | E | | FAX AUTH # | CENSUS TRACT |
|---|---|---|---|---|---|---|---|---|
| | | | | | | *012008000916134* | | |

This is to certify that this document is a true copy of the official record filed with the Registrar-Recorder/County Clerk.

**SEP 04 2015**

*Dean C. Logan*
DEAN C. LOGAN
Registrar-Recorder/County Clerk

*100000699023*

This copy not valid unless prepared on engraved border displaying the Seal and Signature of the Registrar-Recorder/County Clerk.
PBINCO (REV) 07/11

ANY ALTERATION OR ERASURE VOIDS THIS CERTIFICATE

CERTIFICATION OF VITAL RECORD

## COUNTY OF LOS ANGELES • REGISTRAR-RECORDER/COUNTY CLERK

### PHYSICIAN/CORONER'S AMENDMENT

3052008191127
STATE FILE NUMBER

NO ERASURES, WHITEOUTS, PHOTOCOPIES, OR ALTERATIONS

3200819043413
LOCAL REGISTRATION NUMBER

1.1

☐ BIRTH  ☒ DEATH  ☐ FETAL DEATH

TYPE OR PRINT CLEARLY IN BLACK INK ONLY – THIS AMENDMENT BECOMES AN ACTUAL PART OF THE OFFICIAL RECORD

| PART I | INFORMATION TO LOCATE RECORD | | | |
|---|---|---|---|---|
| INFORMATION AS IT APPEARS ON ORIGINAL RECORD | 1A. NAME—FIRST CHRISTOPHER | 1B. MIDDLE EDDIE | 1C. LAST MIMS | 2. SEX M |
| | 3. DATE OF EVENT—MM/DD/CCYY 10/15/2008 | 4. CITY OF EVENT LOS ANGELES | | 5. COUNTY OF EVENT LOS ANGELES |

| PART II | STATEMENT OF CORRECTIONS | | |
|---|---|---|---|
| | 6. CERTIFICATE ITEM NUMBER | 7. INFORMATION AS IT APPEARS ON ORIGINAL RECORD | 8. INFORMATION AS IT SHOULD APPEAR |
| LIST ONE ITEM PER LINE | 107A | DEFERRED | DILATED CARDIOMYOPATHY |
| | 107AT | - | YEARS |
| | 112 | NONE | HEPATIC STEATOSIS, HISTORY OF HYPERTENSION |
| | 119 | PENDING INVESTIGATION | NATURAL |

*2 of 2*

I HEREBY DECLARE UNDER PENALTY OF PERJURY THAT THE ABOVE INFORMATION IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.

| DECLARATION OF CERTIFYING PHYSICIAN OR CORONER | 9. SIGNATURE OF CERTIFYING PHYSICIAN OR CORONER ▶ LOUIS A PENA MD | 10. DATE SIGNED—MM/DD/CCYY 12/12/2008 | 11. TYPED OR PRINTED NAME AND TITLE/DEGREE OF CERTIFIER DME | | |
|---|---|---|---|---|---|
| | 12. ADDRESS—STREET and NUMBER 1104 NORTH MISSION ROAD | 13. CITY LOS ANGELES | | 14. STATE CA | 15. ZIP CODE 90033 |
| STATE/LOCAL REGISTRAR USE ONLY | 16. OFFICE OF VITAL RECORDS OR LOCAL REGISTRAR ▶ STATE REGISTRAR - OFFICE OF VITAL RECORDS | 17. DATE ACCEPTED FOR REGISTRATION—MM/DD/CCYY 12/15/2008 | | | |

STATE OF CALIFORNIA, DEPARTMENT OF PUBLIC HEALTH, OFFICE OF VITAL RECORDS    *022008000147349*    FORM VS 24Ae (REV. 1/08)

1.1

This is to certify that this document is a true copy of the official record filed with the Registrar-Recorder/County Clerk.

SEP 0 4 2015


DEAN C. LOGAN
Registrar-Recorder/County Clerk

* 1 0 0 0 0 0 6 9 9 0 2 4 *

This copy not valid unless prepared on engraved border displaying the Seal and Signature of the Registrar-Recorder/County Clerk.
PBNCO (REV) 07/11


ANY ALTERATION OR ERASURE VOIDS THIS CERTIFICATE

COUNTY OF LOS ANGELES                                                    DEPARTMENT OF CORONER

# 12 AUTOPSY REPORT

No.

2008-07210

MIMS, CHRISTOPHER

I performed an autopsy on the body of

at _____ the DEPARTMENT OF CORONER



Los Angeles, California _____ on OCTOBER 16, 2008 @ 1525 HOURS
                                    (Date)                          (Time)

From the anatomic findings and pertinent history I ascribe the death to:

(A)     DILATED CARDIOMYOPATHY

DUE TO, OR AS A CONSEQUENCE OF

(B)

DUE TO, OR AS A CONSEQUENCE OF

(C)

DUE TO, OR AS A CONSEQUENCE OF

(D)

OTHER CONDITIONS CONTRIBUTING BUT NOT RELATED TO THE IMMEDIATE CAUSE OF DEATH:
    HEPATIC STEATOSIS, HISTORY HYPERTENSION

*Anatomical Summary:*

I.  Dilated cardiomyopathy, 1010 grams.

    A.  Pulmonary congestion and edema.

       1.  Secretions of bronchi and trachea.

    B.  Chronic hepatic congestion.

       1.  Hepatomegaly, 3200 grams.

       2.  Probable congestive heart failure.

          a.  Lower legs, dorsum of feet, with edema.

    C.  History of hypertension.

    D.  History of alcohol abuse.

       1.  Hepatic steatosis, moderate.

II. Other findings:

    A.  Morbid obesity.

    B.  No evidence of external or internal trauma.

    C.  No pulmonary emboli.

    D.  Bilateral knees with old surgical scars.

76A890M—Rev. 8/94

COUNTY OF LOS ANGELES

DEPARTMENT OF CORONER

# 12

## AUTOPSY REPORT

No.

2008-07210

MIMS, CHRISTOPHER

Page 2

    E.    Upper torso, face with congestion and Tardieu
          spots consistent with prone position found.

    F.    Skin, body creases of the axilla, legs and back
          with psoriatic-type lesions.

   III.   See Toxicology Report.

    IV.   See Microscopic Report.

    V.    See Neuropathology Report.

CIRCUMSTANCES:

See the brief Investigator's Narrative Report.

This is a 38-year-old Black gentleman with a history of
hypertension, sports-related knee injuries and alcohol abuse.
On 10/15/08 at about 0900 hours, the decedent was found lying on
the bathroom floor unresponsive.  911 was called, and the Los
Angeles Fire Department responded to the scene and determined
death on 10/15/08 at 0935 hours.  The decedent apparently smoked
tobacco heavily and used alcohol daily.  The decedent had
complained of labored breathing on 10/14/08.  He was last seen
alive by a friend on 10/14/08 at about 2230 hours.

EXTERNAL EXAMINATION:

The body is identified by toe tags and is that of an unembalmed,
refrigerated adult Black male who appears about the reported age
of 38 years.  The body weighs 456 pounds, measures 80 inches,
and is extremely obese.

The skin shows numerous psoriatic scaly-type skin lesions at the
axilla, legs, dorsum of the feet and the torso.  The skin is
otherwise free of abrasions, lacerations, bruises and burns.
There are scars over both knee regions:  On the right knee, an
old scar, 2 inches transversely oriented and on the left knee,
an irregularly-shaped old scar, 1-1/2 inches.  No old surgical
scars are seen over the abdomen or torso regions.

COUNTY OF LOS ANGELES                                                    DEPARTMENT OF CORONER

**12**

# AUTOPSY REPORT

Page ___3___

No.

2008-07210

MIMS, CHRISTOPHER

Tattoos are present and identified as follows:

1.  Right anterior forearm, "Tough As" and below this, a tattoo
    of four nails vertically oriented, and below this, the word
    "Nails".

2.  Left anterior forearm, the words "Balls of Steel" and in
    between is a brick wall with balls going through it.

3.  Left upper lateral arm is a tattoo of four cards with the
    letter "A", diamond, spade, heart and clubs and the words
    "Fat Doctor", and below this a smiling man face that is
    green with dark hair. There are other designs around this
    tattoo.

4.  Right upper lateral arm, multicolored tiger.

5.  Right wrist, tribal-like band tattoo with a focal red color
    design.

Rigor has presumably been abolished. Livor mortis is slight red
and fixed on the posterior upper back. Also, the face shows
purple congestion and dependent purple fixed livor on the upper
torso and neck regions with Tardieu spots present.

The head is otherwise normocephalic and covered by black hair.
There is slight frontal receding of the hairline, and the hair
can be described as short and curly. A mustache and beard are
present. Examination of the eyes reveals irides that show
corneal clouding and sclerae that are congested. There are no
petechial hemorrhages of the conjunctivae of the lids or the
sclerae. The oronasal passages are unobstructed. At autopsy,
there is foam, red, frothy material from the mouth that is
observed. Upper and lower teeth are present. The frenulum is
intact. The neck is unremarkable. There is no chest deformity.
There is no increased anterior-posterior diameter. The abdomen
is obese. The genitalia are those of an adult male. The penis
appears circumcised. The external genitalia are without trauma
or lesions. The extremities show no edema, joint deformity,
abnormal mobility, or needle tracks. The lower legs and dorsum
of the feet are swollen.

76A798P—Rev. 2/91

COUNTY OF LOS ANGELES                                                    DEPARTMENT OF CORONER

# **12** AUTOPSY REPORT

No.

2008-07210

MIMS, CHRISTOPHER

Page __4__

EVIDENCE OF THERAPEUTIC INTERVENTION:

There is no evidence of any previous or recent hospitalization.

EVIDENCE OF EXTERNAL TRAUMATIC INJURIES:

None.

CLOTHING:

The body was not clothed, and I did not see the clothing.

INITIAL INCISION:

The body cavities are entered through the standard coronal and
Y-shaped incisions. No foreign material is present in the
mouth, upper airway, and trachea.

EVIDENCE OF INTERNAL INJURIES:

None.

NECK:

The neck organs are removed en bloc with the tongue. No lesions
are present, nor is trauma of the gingiva, lips, or oral mucosa
demonstrated. There is no edema of the larynx. Both hyoid bone
and larynx are intact and without fractures. No hemorrhage is
present in the adjacent throat organs, investing fascia, strap
muscles, thyroid, or visceral fascia. There are no prevertebral
fascial hemorrhages. The tongue when sectioned shows no trauma.

CHEST/ABDOMINAL CAVITY:

Both pleural cavities contain no fluid or adhesions. The
parietal pleurae are intact. The lungs are well-expanded. Soft
tissues of the thoracic and abdominal walls are well-preserved.
The subcutaneous fat of the abdominal wall measures 8.0 cm in
thickness, and the chest wall measures 6.0 cm. The breasts are

COUNTY OF LOS ANGELES

**12**

Page ___5___

# AUTOPSY REPORT

DEPARTMENT OF CORONER

No.

2008-07210

MIMS, CHRISTOPHER

examined and palpated in the usual manner and show no
abnormalities. The organs of the abdominal cavity have a normal
arrangement, and none are absent. There is no fluid collection.
The peritoneal cavity is without evidence of peritonitis. There
are no adhesions.

## SYSTEMIC AND ORGAN REVIEW

The following observations are limited to findings other than
injuries, if described above.

MUSCULOSKELETAL SYSTEM:

No abnormalities of the bony framework or muscles are present.

CARDIOVASCULAR SYSTEM:

The aorta is elastic and of even caliber throughout, with
vessels distributed normally from it. The abdominal and
thoracic aorta have minimal atherosclerotic plaques. There is
no tortuosity or widening of the thoracic segment. There is no
dilatation of the lower abdominal segment. No aneurysm is
present. The major branches of the aorta show no abnormality.

Within the pericardial sac, there is a minimal amount of
serosanguineous fluid. The heart weighs 1010 grams. It is
severely dilated with no significant ventricular hypertrophy.
The right ventricle is 0.4 cm thick, and the left ventricle is
1.5 cm thick. The septal wall measures 2.0 cm. The chambers
are normally developed and are without mural thrombosis. The
valves are thin, leafy and competent but dilated. The
circumferences of the valve rings are: Tricuspid valve 15.0 cm,
pulmonic valve 10.0 cm, mitral valve 15.0 cm, and aortic valve
10.0 cm. There is mottled red and pale endocardial
discoloration. There are no infarcts of the myocardium seen
grossly. There is no abnormality of the apices of the papillary
musculature. There are no defects of the septum. The great
vessels enter and leave in a normal fashion. The ductus
arteriosus is obliterated. The coronary ostia are widely
patent. The right coronary artery is the dominant vessel.
There is no coronary atherosclerosis. The blood within the
heart and large blood vessels is liquid.

COUNTY OF LOS ANGELES

# AUTOPSY REPORT

DEPARTMENT OF CORONER

**12**

No.

2008-07210

MIMS, CHRISTOPHER

Page __6__

RESPIRATORY SYSTEM:

An extremely large amount of edema fluid is found in the upper
respiratory and lower bronchial passages. The mucosa is intact
and pale with secretions present. The lungs are subcrepitant,
and there is dependent congestion. The left lung weighs 1030
grams. The right lung weighs 1050 grams. The visceral pleurae
are smooth and intact. The parenchyma is congested and
edematous. The pulmonary vasculature is without thrombo-
embolism. Thromboemboli are not present in the distal tertiary
branches.

GASTROINTESTINAL SYSTEM:

The esophagus is intact throughout. The stomach is not
distended. It contains about 150 ml of green well-digested food
and liquid present. The mucosa is smooth and green with no
erosions or ulcerations. Portions of tablets and capsules
cannot be discerned in the stomach. The small intestine and
colon are examined by inspection, palpation and multiple
incisions and show soft green stool in each region. The
appendix is present. The pancreas occupies a normal position.
There is no necrosis or trauma. The parenchyma is lobular and
firm. The pancreatic ducts are not ectatic, and there is no
parenchymal calcification.

HEPATOBILIARY SYSTEM:

The liver weighs 3200 grams, is enlarged, and is red-brown. The
capsule is intact, and the consistency of the parenchyma is
soft. The cut surface is smooth. There is chronic passive
congestion. The gallbladder is present. The wall is thin and
pliable. It contains a minimal amount of green liquid bile and
no calculi. There is no obstruction or dilatation of the extra-
hepatic ducts. The periportal lymph nodes are not enlarged.

76A798P—Rev. 2/91

# **AUTOPSY REPORT**

**12**

Page ___7___

No.

2008-07210

MIMS, CHRISTOPHER

URINARY SYSTEM:

The left kidney weighs 310 grams. The right kidney weighs 330 grams. The kidneys are normally situated, and the capsules strip easily revealing a surface that is focally pitted, light red and smooth. The corticomedullary demarcation is preserved. The pyramids are not remarkable. The peripelvic fat is not increased. The ureters are without dilatation or obstruction and pursue their normal course. The urinary bladder is contracted. It contains no urine.

GENITAL SYSTEM (MALE):

The prostate is without enlargement or nodularity. Both testes are in the scrotum and are unremarkable and without trauma.

HEMOLYMPHATIC SYSTEM:

The spleen weighs 220 grams and is slightly enlarged. The capsule is intact. The parenchyma is soft. There is no increased follicular pattern. Lymph nodes throughout the body are small and inconspicuous. There is focal enlargement of the lymph nodes observed in the peribronchial regions. The bone is not remarkable. The bone marrow of the rib is red, moist and unremarkable.

ENDOCRINE SYSTEM:

The thyroid gland is unremarkable. The parathyroid glands are not identified. The adrenal glands are unremarkable. The thymus gland is unremarkable. The pituitary gland is of normal size and is unremarkable.

SPECIAL SENSES:

The eyes are not dissected. The middle and inner ear are not dissected.

76A798P—Rev. 2/91

COUNTY OF LOS ANGELES                                    DEPARTMENT OF CORONER

# **12**

Page _8_

# AUTOPSY REPORT

No.

2008-07210

MIMS, CHRISTOPHER

HEAD AND CENTRAL NERVOUS SYSTEM:

There is no subcutaneous or subgaleal hemorrhage in the scalp. The external periosteum and dura mater are stripped showing no fractures of the calvarium or base of the skull. There are no tears of the dura mater. There is no epidural, subdural or subarachnoid hemorrhage. The fresh brain weighs 1440 grams. The leptomeninges are thin and transparent. A normal convolutional pattern is observed (see separate Neuropathology Report to follow). Vessels at the base of the brain have a normal pattern of distribution. There are no aneurysms. The cranial nerves are intact, symmetrical and normal in size, location and course. The cerebral arteries are without arteriosclerosis.

See separate Neuropathology Report.


SPINAL CORD:

The entire cord is not dissected. The superior portion of the cervical spinal cord is examined through the foramen magnum and is unremarkable.


NEUROPATHOLOGY:

The brain is placed in formalin solution for further fixation and later neuropathology consultation.


HISTOLOGIC SECTIONS:

Representative sections from various organs are preserved in one storage jar in 10% formalin. Sections of heart, right and left lungs, liver and spleen, kidneys, and dorsum of right foot skin are submitted for slides. The slide key is #2008-07210: 1, 2, 3, 4, left ventricle of heart; 5, right ventricle of heart; 6, right lung; 7, left lung; 8, liver and spleen; 9, right and left kidneys; 10, dorsum of right foot and section of skin.


TOXICOLOGY:

Blood (heart and femoral), bile, liver tissue, stomach contents and vitreous humor have been submitted to the laboratory. A comprehensive screen is requested.

COUNTY OF LOS ANGELES

**12**

Page ___9___

# AUTOPSY REPORT

DEPARTMENT OF CORONER

No.

2008-07210

MIMS, CHRISTOPHER

PHOTOGRAPHY:

At-scene photos are available (34). Photographs have been taken during the course of the autopsy.

RADIOLOGY:

No x-rays are obtained.

WITNESSES:

None.

DIAGRAMS USED:

Diagram Form 20 was used during the performance of the autopsy. The diagram is not intended to be a facsimile.

OPINION:

This 38-year-old Black male died as a result of dilated cardiomyopathy. Hepatic steatosis and history of hypertension were contributory factors to his final demise.

Blood toxicology studies show a 0.11 g% alcohol femoral blood level. This is not a lethal level. The remainder of the toxicology studies show no drugs of abuse. A non-significant level of diphenhydramine is present. The vitreous fluid shows no evidence of diabetic ketoacidosis.

Alcohol abuse is strongly associated with the development of dilated cardiomyopathy, which may be a secondary nutritional disturbance or ethanol toxicity causing myocardial injury.

Based on the history and circumstances, as currently known, the manner of death is natural.

76A798P—Rev 2/91

COUNTY OF LOS ANGELES                                                    DEPARTMENT OF CORONER

# 12

**AUTOPSY REPORT**

No.

2008-07210

MIMS, CHRISTOPHER

Page ___10___

NOTE:

Dr. Christopher Rogers, Chief of Forensic Medicine Division,
reviewed the opinion and case and concurs.

_____*Louis a. Pena M.D.*_____          ___1-17-2009___
LOUIS A. PENA, M.D.                           DATE
DEPUTY MEDICAL EXAMINER

LAP:am/jm:c
D-10/16/08-1900 hours
T-10/21/08

76A798P—Rev. 2/91

COUNTY OF LOS ANGELES

DEPARTMENT OF CORONER



**20**

3:25pm

—Rigor

2008-07210
MINS, CHRISTOPHER
NAT AP 10-16-08

Hair black short curly
slight frontal (receding) Hair line

eyes = corneal cloudin congestion

R

No evid. of external trauma.

L          R

Ear lobes pierced
black mustache, beard
Foam red, frothy mouth

Teeth = own frenulum intact

Purple front
Livor + Trifidical spots

Scaly psoriatic type skin lesions (CHRNA)

Skin tags-upper chest

Tattoo =
4 cards A
Diamonds, spade,
Heart & clubes
AA Doctor
mens face
green dark hair
smilin
other designs ahead this)

slight red fixed livor

Tattoo:
multicolored
Tiger

Liver Temp Incision mark

Tattoo:
Balls of steel
(back jaw, Leabe Tattoo)

psoriasis type—
lesions cashia and fold areas

Tattoos:
Touch AS
4 nails/JJJ
nails

O Bese Abd.

Circoncised penis
testes #

Yellow Band matches
CC# 2008-07210

anus
&

Tattoo:
Tiger like Band
Facial and color

Numerous small old scars, healed abrasions

P Soriatiytype skin (lesion) Scaly

Nails short
No trauma to hands,
palms or Digits.

ed scar 1½"

SLP scar 2°

Legs/Dorsum feet swollen

10-16-2008

Scaly Hypormarted skin
? psoriasis

Blue, white toe tags matches Decedent's name
& cc# 2008-07210

David a. Peña    M.D.
Deputy Medical Examiner

COUNTY OF LOS ANGELES          **FORENSIC CONSULTANT'S REPORT**          DEPARTMENT OF CORONER

**13**

<u>NEUROPATHOLOGY</u>

2008-07210

MIMS, CHRISTOPHER E.

November 20, 2008

AGE:  38 years

DATE OF DEATH:  October 15, 2008

REFERRING DME:  Louis A. Pena, M.D.

CIRCUMSTANCES:

The following information is taken from the Investigator
Report and preliminary autopsy notes.  This 38-year-old man
reportedly had a past medical history of hypertension,
sports-related knee injuries, heavy smoking, and alcohol
abuse.  He was last known alive on 10/14/08 at 2230 hours,
reportedly complaining of labored breathing.  On 10/15/08, he
was found unresponsive on the bathroom floor by a friend.  He
was pronounced at the scene on 10/15/08 at 0935 hours by
responding paramedics.

At the time of postmortem examination on 10/16/08, the
findings included dilated cardiomyopathy (heart weight 1010
grams), pulmonary congestion and edema, hepatomegaly (3200
grams), marked obesity, and no evidence of acute trauma
including no scalp, skull or intracranial abnormality noted.
Brain weight at removal was 1440 grams.

GROSS DESCRIPTION:

Specimens available for examination are cranial dura mater
and brain.  Cranial dura mater submitted includes the dorsal
convexity regions with falx cerebri, posterior fossa with
tentorium cerebelli, and much of the right temporal fossa.
The external and internal surfaces of the dura mater are
smooth and shiny without evidence of hemorrhage,
discoloration or subdural neomembranes, the only exception
being a 0.8 x 0.5 x 0.4 cm light brown flattened nodule (0.4
cm in thickness) in the right anterolateral temporal fossa,
apparently within the dura.  It is sampled.  Dural venous
sinuses appear normal in pattern.

76F589(Rev 8/93)

-3765-

**13**

<u>NEUROPATHOLOGY</u>

2008-07210

MIMS, CHRISTOPHER E.

<u>Page 2</u>

Cerebral leptomeninges show mildly increased milky opacity over the dorsolateral convexities, considered within normal limits for age group. There is moderately severe leptomeningeal vascular congestion. Cerebral hemispheres are approximately symmetrical with a midline and closely apposed interhemispheric fissure. There is no evidence of significant brain swelling and no evidence of herniation at the uncus, cerebellar tonsillar region, superior cerebellar vermis or cingulate gyrus. There is some artifact present, including partial avulsion of the inferomedial left cerebellar hemisphere and deep incision into the right anterior inferior cerebellar hemisphere. Convolutional pattern is unremarkable. No recent or remote cerebral or cerebellar cortical contusions are seen. No focal areas of increased softening, firmness or discoloration are present.

Rectus-orbital and basitemporal areas are unremarkable. Cranial nerves I through XII are intact except for avulsion of olfactory bulbs bilaterally. Major basal arteries have a normal pattern of distribution, discounting the absence of the bilateral vertebral arteries, not included with the specimen. The left posterior communicating artery is larger than average, slightly exceeding the contribution to the left posterior cerebral artery by basilar artery, thus consistent with a fetal pattern. No aneurysms and no evidence of occlusive vascular disease are apparent. Belly of the pons is full and symmetrical, and medulla is remarkable only for partial avulsion of the right medulla compared to the left. Cerebellar hemispheres are approximately symmetrical with normal-appearing folia. Basal cisterns are open.

The brain is sectioned in a coronal plane, and the brainstem and cerebellum in a transverse plane.

COUNTY OF LOS ANGELES        **FORENSIC CONSULTANT'S REPORT**        DEPARTMENT OF CORONER

## 13

NEUROPATHOLOGY

2008-07210

MIMS, CHRISTOPHER E.

December 3, 2008

MICROSCOPIC DESCRIPTION:

Sections of cranial dura mater and brain (8) stained by H&E
method include the right temporal fossa dural nodule (Slide
A), right frontal lobe (Slide B), left and right hippocampi
(Slides C and D, respectively), right basal ganglia (Slide
E), right parietal lobe (Slide F), cerebellum (Slide G), and
medulla (Slide H).

Slide A demonstrates native dura mater, with the expanded
zone composed of vascular channels and some ovoid pale
connective areas with a lace-like internal architecture.  The
appearance is typical of a benign arachnoid villus.  Some
leptomeningeal melanosis is incidentally noted in the brain
sections.  In basal ganglia, some mild to moderate fine
granular calcification is noted in globus pallidus, primarily
in pericapillary areas and in the walls of some small blood
vessels.  Mild autolysis is present in the sections.

There is no evidence of meningitis, encephalitis, abnormal
neuronal inclusions, developmental anomalies, hippocampal
sclerosis or neoplasia.

FINAL NEUROPATHOLOGIC DIAGNOSIS:

A.    Cerebrovascular congestion.

B.    Basal ganglia calcification, mild; incidental finding.


JOHN M. ANDREWS, M.D.                    DATE 12/9/08
DEPUTY MEDICAL EXAMINER
NEUROPATHOLOGY CONSULTANT

JMA:am/hg:c
T-12/04/08

COUNTY OF LOS ANGELES          **FORENSIC CONSULTANT'S REPORT**          DEPARTMENT OF CORONER

**13**

NEUROPATHOLOGY

2008-07210

MIMS, CHRISTOPHER E.

Page 3

Coronal sections reveal the cortical ribbon to be normal in thickness and color. Gray/white demarcation is distinct. Underlying white matter is homogeneous and clear. Corpus callosum is normal in thickness, color and symmetry. Lateral ventricles are normal in size and configuration with sharp superior angles. A cavum septi pellucidi is present anteriorly without fenestration of septum pellucidum. Third ventricle is midline and does not exceed 0.3 cm in maximum transverse diameter. Cerebral aqueduct and fourth ventricle are unremarkable. Choroid plexus is unremarkable bilaterally. Mammillary bodies and pineal body are grossly unremarkable. Substantia nigra is normally pigmented. Basal ganglia are normal in size, symmetry, contour and color. Amygdaloid complex of nuclei and hippocampi are grossly unremarkable.

Multiple transverse sections of the brainstem and cerebellum reveal no abnormality.

Selected areas are retained in storage. Representative sections are submitted for microscopic examination.

GROSS IMPRESSIONS:

A.    Adult cranial dura mater with small right middle fossa dural nodule.

B.    Cerebrovascular congestion.

C.    Otherwise, grossly unremarkable adult brain and coverings.

JOHN M. ANDREWS, M.D.          12-3-08
DEPUTY MEDICAL EXAMINER          DATE
NEUROPATHOLOGY CONSULTANT

JMA:am/hg:c
T-11/21/08

76F589(Rev 8/93)

-3768-

COUNTY OF LOS ANGELES                    MICROSCOPIC REPORT                    DEPARTMENT OF CORONER

**14**

I performed a microscopic examination on

DECEMBER 4, 2008

at    THE DEPARTMENT OF CORONER

Los Angeles, California

2008-07210

MIMS, CHRISTOPHER E.

## MICROSCOPIC DESCRIPTION

Slides #1,2,3 and 4/10:  Sections of cardiac muscle show patchy areas of significant, severe interstitial fibrosis.  There are focal areas of myocyte hypertrophy, myocyte attenuation, and myocyte fiber disarray.  Slide #4 shows an adherent blood clot with fibrin, red cells and acute inflammation.

There is no acute or chronic myocarditis.

The trichrome stain confirms the abundant interstitial fibrosis, and one cross-section of the left anterior descending coronary artery shows minimal fibrointimal hyperplasia.

Slide #5/10:  Section of unremarkable right ventricle.

Slides #6 and #7/10:  Sections of lung show interstitial red blood cell congestion and pulmonary edema.  Focal lung atelectasis is present.  There are a few foreign body giant type cells and abundant alveolar macrophages.  No pneumonia is observed.  These sections are polarized and are unremarkable with some non- and refractile particles of nonspecific nature.

Slide #8/10:  Section of liver with moderate steatosis.  No cirrhosis is observed.

Section of autolyzed spleen with red blood cell congestion and numerous microvacuoles.

Slide #9/10:  Sections of autolyzed kidney; otherwise, unremarkable.

76M350 (Rev. 1/93) P1/93

COUNTY OF LOS ANGELES                    MICROSCOPIC REPORT                    DEPARTMENT OF CORONER

**14**

2008-07210

MIMS, CHRISTOPHER E.

Page____2____

Slide #10/10: Section of skin from the dorsum of the right foot with hyperkeratosis and subepidermal focal slight inflammation.

NOTE: No sickled red blood cells are observed.


_____                    _____
LOUIS A. PENA, M.D.                                  DATE  1-17-2009
DEPUTY MEDICAL EXAMINER

LAP:am/brr:c/f
T-12/17/08

(Rev 2-92)

COUNTY OF LOS ANGELES — AUTOPSY CHECK SHEET — DEPARTMENT OF CORONER

**16**

LT
2008-07210      341
mims, christopher
LP 10-16-08

& =unremark. /none

**EXTERNAL EXAM**
Sex mile
Race Black
Age 38 Y. J.
Height 80"
Weight 456 pds
Hair black
Eyes corneal cloudier
Sclera congested
Teeth own
Mouth &
Tongue &
Nose & septum Intact
Chest & Tardieu spots - positional
Breasts &
Abdomen obese
Scar &
Genitals circum ♂ testo d&
Edema & see diagram #20
Skin see diagram #20
Decubitus &
**HEART** Wt. 6/oloog
Dilated  Pericardium &       RV 0.4cm
   Hypertrophy       LV 1.5cm
   Dilation +       Septum 2.0cm
   Muscle &
   Valves &> TV = 15cm, PV = 10cm, MV = 15cm AV = 10cm
   Coronaries &
AORTA minimal Atherosclerosis
VESSELS &       No pulmonary
LUNGS Wt.       Emboli
   R 1050g
   L 10300g
   Adhesions & -
   Fluid &
   Atelectasis &
   Oedema sev.
   Congestion &
   Consolidation &
   Bronchi secretions
   Nodes enlarged
PHARYNX &
TRACHEA secretion
THYROID &
THYMUS &
LARYNX &
HYOID &
ABDOMINAL WALL FAT 8cm
   CHEST Wall FAT 6cm

**PERITONEUM**
Fluid &
Adhesions &
LIVER Wt. 3200g chronic Hep.
Capsule Intact congestion
Lobules &
Fibros &
GB + minimal green Liquid Bile
Calculus &
Bile ducts &
SPLEEN Wt. 220  slight congestion splen
Color purple  congestion spleno
Consistency soft
Capsule Intact
Malpigment &
PANCREAS &
ADRENALS &
KIDNEYS Wt.       pitted, Pcalls
   R 330g
   L 310g
   Capsule Intact
   Cortex &
   Vessels &
   Pelvis &
   Ureters &
BLADDER contracted, No urine.
GENITALIA
   Prostate &
   Testes &, No trauma &
   Uterus ♂
   Tubes &
   Ovaries &
OESOPHAGUS &
STOMACH - 150ml green well-Dig foul, Liquid present
   Contents
DUOD. & SM. INT. Soft green star
APPENDIX + Soft green star
LARGE INT.
ABDOM. NODES &
SKELETON
   Spine Ext. &
   Marrow R/D &
   Rib Cage &
   Long bones &
   Pelvis &
   No FRActures

**SCALP** &
**CALVARIUM** &
**BRAIN Wt.** 1440g
   Dura &
   Fluid &       See separate
   Ventricles &  neuro path
   Vessels &     report
   Middle ears &
   Other &
**PITUITARY** &

**SPINAL CORD** cervical
   Sup-portion cervical
   spinal cord &

**TOXICOLOGY SPECIMENS**
blood- Heart, Fem-
Liver, stomach, vitreous, Bile
**SECTIONS FOR** (10)
**HISTOPATHOLOGY**
1. & RV & Kidney
2. & R Lun 10. R Deasin Peri skin
3. & L Lun
   & Liver, spleen   ♥ stool J4ge
**MICROBIOLOGY** &

**DIAGRAMS** #20
**X-RAYS** &

**OTHER PROCEDURES** &

**GROSS IMPRESSIONS**
See A-Bult form #12
Dictated Report &

| Date | Time | Deputy Medical Examiner |
|------|------|------|
| 10-16-2008 | -17:00 END | Louis A. Pena M.D. |

COUNTY OF LOS ANGELES     **MEDICAL REPORT**     DEPARTMENT OF CORONER

**15**

AUTOPSY CLASS: ☐ A ☒ B ☐ C    ☐ Examination Only D

Date 10-16-2008   Time 15 25   Dr. Louis A. Peña

FINAL ON 12-11-2008   By Louis A. Peña    print

APPROXI-
MATE
INTERVAL
BETWEEN
ONSET
AND
DEATH

2008-07210
MIMS, CHRISTOPHER

*LP*
10-16-08

**DEATH WAS CAUSED BY:** (Enter only one cause per line for A, B, C, and D)

**IMMEDIATE CAUSE**

(A) Dilated Cardiomyopathy ◄   yrs

DUE TO, OR AS A CONSEQUENCE OF

(B) ◄

DUE TO, OR AS A CONSEQUENCE OF

(C) ◄

DUE TO, OR AS A CONSEQUENCE OF

(D) ◄

Other conditions contributing but not related to the immediate cause of death:

Hepatic Steatosis, History of Hypertension

☒ **NATURAL**    ☐ **SUICIDE**    ☐ **HOMICIDE**

☐ **ACCIDENT**    ☐ **COULD NOT BE DETERMINED**

If other than natural causes
HOW DID INJURY OCCUR?

WAS OPERATION PERFORMED FOR ANY CONDITION STATED ABOVE: ☐ YES ☒ NO

TYPE SURGERY_____ DATE _____

☐ ORGAN PROCUREMENT    ☒ TECHNICIAN George Reid

☐ WITNESSES TO AUTOPSY    ☐ EVIDENCE RECOVERED AT AUTOPSY
     Item Description:

38 y.o. B.M. H/o HTN.
S-ports related Knee Inj. ↓ EtOH Abuse.
10-15-08 FND Lying on B.R. Flor unrespon.
at residence pronounced 0935am.
Appar. a smoker, Drank ~ 1 gal EtOH Vodka/day.
C/o Labored Breathing 10-14-08. LKA 10-14-08 2230.

Autopsy - Dilated "Cardiomyopathy" 1,010 grams
No CoR Art Disease. Hepatomeg. 9/w Chronic Hep.
Cmg → CHF. Indirect Myocard Dysfunct. HTN D Disease
No P.E. No Evid. Ext/Int. Trauma. *LP*

10 cassettes

10-16-2008
*M.D.*
Louis A. Peña

Resident        DME

**PRIOR EXAMINATION REVIEW BY DME**

☒ BODY TAG    ☐ CLOTHING
☐ X-RAY (No. 0 )    ☐ FLUORO
☐ SPECIAL    ☐ MED. RECORDS
      PROCESSING TAG
☒ AT SCENE PHOTOS (No. 34 ) *LP*

TYPING BLOOD TAKEN BY_____
SOURCE _____

**TOXICOLOGY**

☐ NO BLOOD
   ☐ Embalmed
   ☐ >24 hr in hospital
   ☐ Decomposed
   ☐ Other _____
         Reason

**SPECIMENS**

Collected by Louis A. Peña

☒ HEART BLOOD    ☒ STOMACH CONT.
☒ FEMORAL BLOOD    ☐ BRAIN
☐ _____ BLOOD    ☐ SPLEEN
☐ _____ BLOOD    ☐ KIDNEY
☒ BILE    ☒ VITREOUS
☒ LIVER    ☐ _____
☒ URINE none    ☐ _____

**STORAGE JARS**

☒ Regular (No. 1 )    ☐ Oversize (No._____)
Histopath Cut: ☒ Autopsy   ☐ Lab

☐ NO TOXICOLOGY REQUESTED

**TOXICOLOGICAL ANALYSES ORDERED**

SCREEN: ☒ C ☐ H ☐ T ☐ S
☐ ALCOHOL ONLY
☐ CARBON MONOXIDE
☐ NEOGEN SCREEN
☒ OTHER (specify drug and tissue)
Vitreous - glucose, ketones *Thank you*

**REQUESTED MATERIAL ON PENDING CASES**

☐ Police Report    ☐ Med History
☒ Tox    ☒ Histo
☐ Microbiology    ☐ Investigations
☐ Radiology Cons.    ☐ Eye Path. Cons
☐ Consult on
☒ Brain Submitted
☒ Neuro Consult   ☐ DME to Cut
☐ Criminalistics
☐ GSR   ☐ Sexual Assault   ☐ Other



Department of Coroner, County of Los Angeles

# FORENSIC SCIENCE LABORATORIES

### Laboratory Analysis Summary Report



Friday, November 07, 2008

☑ PendingTox

**To:**     Dr. Pena

**Deputy Medical Examiner**

**Subject:**   **Coroner Case Number** 2008-07210   MIMS, CHRISTOPHER EDDIE

The following results have been technically and administratively reviewed and are the opinions and interpretations of the Analyst:

| SPECIMEN | SERVICE | DRUG | LEVEL | UNITS | ANALYST |
|---|---|---|---|---|---|
| Blood, Femoral | | | | | |
| | Alcohol | Ethanol | 0.11 | g% | M. Schuchardt |
| | Volatiles | Acetone | | ND | M. Schuchardt |
| Blood, Heart | | | | | |
| | Alcohol | Ethanol | 0.09 | g% | M. Schuchardt |
| | Barbiturate | Barbiturates | | ND | D. Kowal |
| | Bases | Diphenhydramine | < 0.50 | ug/ml | S. DeQuintana |
| | Cocaine | Cocaine and Metabolites | | ND | D. Kowal |
| | Fentanyl | Fentanyl | | ND | D. Kowal |
| | Methamphetamine | Methamphetamine | | ND | D. Kowal |
| | Opiates | Codeine | | ND | D. Kowal |
| | Opiates | Morphine | | ND | D. Kowal |
| | Phencyclidine | Phencyclidine | | ND | D. Kowal |
| | Volatiles | Acetone | | ND | M. Schuchardt |
| Vitreous | | | | | |
| | Alcohol | Ethanol | 0.14 | g% | M. Schuchardt |
| | Outside Test | Glucose | < 20 | mg/dl | NMS Labs, Inc. |
| | Volatiles | Acetone | | ND | M. Schuchardt |

Legend:

- - - - -

% Saturation

*

Done

| | |
|---|---|
| g | Grams |
| g% | Gram Percent |
| Inc. | Inconclusive |
| mEq/l | Milli equivalents |
| mg | Milligrams |
| mg/dl | Milligram per Deciliter |
| mg/l | Milligram per Liter |
| mmol/l | Millimoles per Liter |
| ND | Not Detected |
| Negative | |
| ng/gm | Nanograms per Gram |

| | |
|---|---|
| QNS | Quantity Not Sufficent |
| TNP | Test Not Performed |
| Trace | |
| ug | Micrograms |
| ug/g | Micrograms per Gram |
| ug/l | |
| ug/ml | Microgram per Milliliter |

$d^P$
$11-1306$

Administratively reviewed by:  **Daniel T. Anderson**

*Supervising Criminalist II*

**FORENSIC LABORATORIES**

Page 1 of 2



Department of Coroner, County of Los Angeles

# FORENSIC SCIENCE LABORATORIES
### Laboratory Analysis Summary Report



Friday, November 07, 2008

☑ PendingTox

**To:**   Dr. Pena
**Deputy Medical Examiner**

**Subject:   Coroner Case Number**   2008-07210   MIMS, CHRISTOPHER EDDIE

The following results have been technically and administratively reviewed and are the opinions and interpretations of the Analyst:

| SPECIMEN | SERVICE | DRUG | LEVEL | UNITS | ANALYST |
|----------|---------|------|-------|-------|---------|

---

**Legend:**

- - - - -

% Saturation

\*

Done

| | |
|---|---|
| g | Grams |
| g% | Gram Percent |
| Inc. | Inconclusive |
| mEq/l | Milli equivalents |
| mg | Milligrams |
| mg/dl | Milligram per Deciliter |
| mg/l | Milligram per Liter |
| mmol/l | Millimoles per Liter |
| ND | Not Detected |
| Negative | |
| ng/gm | Nanograms per Gram |

| | |
|---|---|
| QNS | Quantity Not Sufficent |
| TNP | Test Not Performed |
| Trace | |
| ug | Micrograms |
| ug/g | Micrograms per Gram |
| ug/l | |
| ug/ml | Microgram per Milliliter |

Administratively reviewed by:   Daniel T. Anderson
Supervising Criminalist II
**FORENSIC LABORATORIES**

Page 2 of 2

COUNTY OF LOS ANGELES

CASE REPORT EDCS# 916134 B Pena

DEPARTMENT OF CORONER

| 1 | APPARENT MODE | NATURAL | | CASE NO. 2008-07210 |
|---|---|---|---|---|
| | SPECIAL CIRCUMSTANCES | Media Interest | | CRYPT 341 |

| LAST, FIRST MIDDLE | AKA | # |
|---|---|---|
| MIMS, CHRISTOPHER EDDIE | | |

| ADDRESS | | | | | | CITY | | STATE | ZIP |
|---|---|---|---|---|---|---|---|---|---|
| 612 S. FLOWER ST APT #409 | | | | | | LOS ANGELES | | CA | 90017 |

| SEX | RACE APPEARS | DOB | AGE | HGT | WGT | EYES | HAIR | TEETH | FACIAL HAIR | ID VIEW | CONDITION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| MALE | BLACK | 9/29/1970 | 38 | 80 in. | 456 lbs. | BROWN | BLACK | ALL NATURAL TEETH | BEARD AND MUSTACHE | Yes | FAIR |

| MARK TYPE | MARK LOCATION | MARK DESCRIPTION |
|---|---|---|
| TATTOO | LEFT ARM | "BALLS OF STEEL" |
| TATTOO | RIGHT ARM | "TOUGH AS NAILS" |
| SCAR | BOTH KNEES | HEALED SCARS |
| TATTOO | LEFT ARM | "FAT DOCTOR" |

| NOK | | ADDRESS | | CITY | | STATE | ZIP |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

| RELATIONSHIP | PHONE | NOTIFIED BY | DATE | TIME |
|---|---|---|---|---|
| SEE CASE NOTES | | | | 00:00 |

| SSN | DL ID | STATE | PENDING BY |
|---|---|---|---|
| | | CA | |

| ID METHOD |
|---|
| VISUALLY AT SCENE |

| LA # | MAIN # | CII # | FBI # | MILITARY # | POB |
|---|---|---|---|---|---|
| 2020867M | 04072535 | | | | |

| IDENTIFIED BY NAME (PRINT) | RELATIONSHIP | PHONE | DATE | TIME |
|---|---|---|---|---|
| LAHOMA GRIFFIN | EX-WIFE | (562) 313-3666 | 10/15/2008 | 13:06 |

| PLACE OF DEATH / PLACE FOUND | ADDRESS OR LOCATION | CITY | ZIP |
|---|---|---|---|
| RESIDENCE | 612 S. FLOWER ST APT #409 | LOS ANGELES | 90017 |

| PLACE OF INJURY | AT WORK | DATE | TIME | LOCATION OR ADDRESS | ZIP |
|---|---|---|---|---|---|
| | No | | | | |

| DOD | TIME | FOUND OR PRONOUNCED BY |
|---|---|---|
| 10/15/2008 | 09:35 | LAFD # 3 |

| OTHER AGENCY INV. OFFICER | PHONE | REPORT NO. | NOTIFIED BY | NO |
|---|---|---|---|---|
| LAPD CENTRAL - SUVIATE/ MILLER | (213) 485-3294 | | | |

| TRANSPORTED BY | TO | DATE | TIME |
|---|---|---|---|
| RAMIRO GONZALEZ JR. | LOS ANGELES FSC | 10/15/2008 | 13:55 |

| FINGERPRINTS? | Yes | CLOTHING | Yes | PA RPT | No | MORTUARY | |
|---|---|---|---|---|---|---|---|
| MED. EV. | Yes | INVEST. PHOTO # | 34 | SEAL TYPE | CORONER SEAL | HOSP RPT | No |
| PHYS. EV. | No | EVIDENCE LOG | Yes | PROPERTY? | Yes | HOSP CHART | No |
| SUICIDE NOTE | No | GSR NO | | RCPT. NO. | 233635 | PF NO. | |

SYNOPSIS
ACCORDING TO THE REPORTED INFORMATION, THE DECEDENT WAS A 38 YEAR OLD BLACK MALE WITH A HISTORY OF HYPERTENSION, SPORTS RELATED KNEE INJURIES, AND ALCOHOL ABUSE. ON 10/15/08 AT 0900 HOURS, THE DECEDENT WAS FOUND LYING ON THE BATHROOM FLOOR, UNRESPONSIVE. 911 WAS CALLED AND LOS ANGELES FIRE DEPARTMENT #3 RESPONDED TO THE SCENE AND DETERMINED DEATH ON 10/15/08 AT 0935 HOURS. DECEDENT APPARENTLY SMOKED TOBACCO HEAVILY AND DRANK ABOUT 1 GALLON OF VODKA DAILY. DECEDENT COMPLAINED OF LABORED BREATHING ON 10/14/08, THE DECEDENT WAS LAST SEEN ALIVE ON 10/14/08 AT 2230 HOURS BY FRIEND. NO FOUL PLAY SUSPECTED.

| | DATE | REVIEWED BY | DATE 10/15/08 |
|---|---|---|---|
| LYDIA GRANADO-MATA | 10/15/2008 | | |
| S16235    *L. Granado-Mata*    INVESTIGATOR | TIME 17:05 | *Yagerlener* | TIME 2013 |

FORM #3 NARRATIVE TO FOLLOW? ☑



**County of Los Angeles, Department of Coroner**
**Investigator's Narrative**



Case Number:  2008-07210                    Decedent:  MIMS, CHRISTOPHER EDDIE

## Information Sources:

1.  LAPD Central Division, Officer Suviate #35743 & Miller #39293. 213-485-3294.

## Investigation:

On 10/15/08 at 1039 hours, Officer Miller of LAPD Central Division reported this apparent natural death. On 10/15/08 at 1107 hours, I was assigned this field call. I arrived on scene at 1158 hours and departed at 1326 hours. No foul play suspected. The apartment was secured with a coroner seal.

## Location:

The death occurred at a residence, 612 S. Flower St. Apt. #409, Los Angeles, CA 90017.

## Informant/Witness Statements:

According to the information obtained from Officer Suviate and Miller, the decedent was last seen alive on 10/14/08 at 2230 hours and apparently complained of labored breathing. On 10/15/08 at about 0900 hours, the decedent was found unresponsive on the bathroom floor by a friend. 911 was dialed and Los Angeles Fire Department responded to the scene and determined death at 0935 hours. Per officers, the decedent abused alcohol, drinking about 1 gallon of vodka daily. The decedent reportedly drank to the point of passing out and when he would wake, would continue to drink. The decedent also smoked heavily, going through about 1 pack of cigarettes daily. The decedent's medical history included hypertension and a knee surgery about 7 months ago.

## Scene Description:

The scene was an apartment at the above listed location. The apartment appeared dirty, cluttered, and unkempt. Several medication bottles were located on the kitchen cabinet. Two large bottles of vodka were noted on top of the refrigerator and appeared empty. The decedent was located in the bathroom. The bathroom appeared dirty and contained several large duffle bags. The scene appeared to be void of any illicit drugs and drug paraphernalia.

## Evidence:

On 10/15/08 at 1221 hours, I collected several prescription medication bottles from the scene. I booked the items as evidence at the FSC.

## Body Examination:

The decedent appeared to be a 38 year old Black male. He was observed lying prone on wooden floor inside the bathroom. His arms were bent up at the elbow with his hands closed and resting near his head and his right leg straight with the left leg bent at the knee and turned out at the hip. A brown towel was noted under his head and appeared to be soiled with bloody, frothy purge. He appeared to be dressed in a blue shirt and blue underwear. He appeared to have black hair, brown eyes, beard and mustache and apparent natural teeth. The following tattoos were noted: right arm-"TOUGH AS NAILS", nails with the initials "C. MIMS", right arm- cougar, right wrist-tribal band, left arm-"FAT DOCTOR", "A" playing cards, male face, left arm- "BALLS OF STEEL." I observed healed scars to the knees, abdomen, back, and feet. No petechiea was noted. Lesions/ wounds were noted to the left calf, right shin, and lower right calf. No trauma was noted. On 10/15/08 at 1231 hours, rigor mortis was rated 3 throughout; and at 1234 hours, livor mortis appeared fixed and consistent with the position found. The ambient temperature on 10/15/08 at 1225 hours was 72.3 degrees F, and algor mortis was 101.2 degrees F at 0830 hours 1236 hours.



**County of Los Angeles, Department of Coroner**
**Investigator's Narrative**



Case Number:  2008-07210                              Decedent: MIMS, CHRISTOPHER EDDIE

## Identification:

On 10/15/08 at 1306 hours, ███████████ visually identified the decedent as Mims, Christopher Eddie.

## Next of Kin Notification:

Please see case notes.

## Tissue Donation:

At the completion of this report, family did not give permission for tissue donations.

## Autopsy Notification:

There is no request for autopsy notification regarding this particular case.

*L. Granado-Mata*                                         *Kelly Yagerlener*

LYDIA GRANADO-MATA      516235              LARRY DIETZ

10/15/2008

Date of Report

COUNTY OF LOS ANGELES    **PRELIMINARY EXAMINATION REPORT - FIELD**    DEPARTMENT OF CORONER

**6**

| WAS ORIGINAL SCENE DISTURBED BY OTHERS? Y[ ] N[X] IF YES, NOTE CHANGES IN NARRATIVE FORM #3. | |
|---|---|
| DATE _____ 10/15/2008 _____ | |
| AMBIENT #1 ___72.3___ F | TIME ___12:25___ |
| AMBIENT #2 _____ F | TIME _____ |
| WATER _____ F | TIME _____ |

**2008-07210**

**MIMS, CHRISTOPHER EDDIE**
Nat
**DOD- 10/15/2008**

LIVER TEMPERATURE #1 ___101.2___ F    TIME ___12:36___    THERMOMETER # ___07-17___

LIVER TEMPERATURE #2 _____ F    TIME _____

DATE & TIME FOUND ___10/15/2008 @ 9:00___    LAST KNOWN ALIVE ___10/14/2008 @ 22:30___

APPROX. AGE __38__ SEX __Male__ EST. HEIGHT __80__ EST. WEIGHT __456__ CLOTHED ? YES[X] NO[ ] IF YES, DESCRIBE:

Blue Shirt, Blue Underwear

DESCRIPTION AS TO WHERE REMAINS FOUND AND CONTACT MATERIAL TO BODY:

Prone on wood floor

SCENE TEMPERATURE REGULATED? YES [ ] NO[X] IF YES, THERMOSTAT SET AT _____ DEGREES F.

LIVOR MORTIS: TIME OBSERVED ___12:34___      RIGOR MORTIS: TIME OBSERVED ___12:31___



Appeared fixed and consistent with position found.

NECK FLEXION:

| | |
|---|---|
| ANTERIOR | 3 |
| POSTERIOR | 3 |
| RT. LATERAL | 3 |
| LT. LATERAL | 3 |

| | | | |
|---|---|---|---|
| JAW | 3 | HIP | 3 |
| SHOULDER | 3 | KNEE | 3 |
| ELBOW | 3 | ANKLE | 3 |
| WRIST | 3 | | |

SCALE
0 = ABSENT / NEGATIVE
1 +
2 +
3 +
4 = EXTREME DEGREE

USE SCALE TO DESCRIBE INTENSITY OF RIGOR

SHADE DIAGRAMS TO ILLUSTRATE THE LOCATION OF LIVOR MORTIS.

DESCRIBE INTENSITY OF COLORATION AND WHETHER LIVOR MORTIS IS PERMANENT OR BLANCHES UNDER PRESSURE

**L. Granado-Mata # 516235**

Investigator    REVIEWED BY:

NOTE: ALL DATA COLLECTED FOR THIS FORM MUST BE COLLECTED AT SCENE.

COUNTY OF LOS ANGELES

MEDICAL EVIDENCE

DEPARTMENT OF CORONER

**3A**

CASE #            2008-07210
DECEDENT'S NAME:
                  MIMS, CHRISTOPHER EDDIE
DOD:              10/15/2008
INCOMING MODE:

Page 1 of 1

| Drug Name | Rx Number | Date of Issue | Number Issued | Number Remaining | Form | Dosage | Rx Directions | Physician | Pharmacy Phone/ Comments |
|---|---|---|---|---|---|---|---|---|---|
| ALLOPURINOL | 06383 01468 | 9/30/2008 | 30 | 19 | TABLET | 300 MG | 1 TAB DAILY | KALPARI, KAMRAN | RITE AID 213-494-1762 |
| ATENOLOL | 06383 01395 | 7/26/2008 | 90 | 14 | TABLET | 100 MG | 1 TAB DAILY | KALPARI, KAMRAN | RITE AID 213-494-1762 |
| BAYER ASPIRIN | | | 100 | 40 | TABLET | 325 MG | 1-2 TABS EVERY 4 HRS | | OTC MED |
| DIOVAN | | | 7 | 0 | TABLET | 320 MG/25 MG | | | SAMPLE BOTTLE |
| INDOMETHACIN | 05785 05748 | 2/1/2008 | 40 | 3 | CAPSULE | 50 MG | 1 CAP 4X DAILY | KALPARI, KAMRAN | RITE AID 213-494-1762 |
| LOTREL | 06383 01383 | 9/30/2008 | 14 | 0 | CAPSULE | 10-40 MG | 1 CAP DAILY | KALPARI, KAMRAN | RITE AID 213-494-1762 |
| NEXIUM | 063836 0144 | 10/6/2008 | 5 | 0 | CAPSULE | 40 MG | 1 CAP DAILY | KALPARI, KAMRAN | RITE AID 213-494-1762 |
| TYLENOL PM | | | 24 | 0 | TABLET | 500 MG/ 25 MG | 2 CAPLETS @ BEDTIME | | OTC MED |
| | | | | | | | | | |

**Paraphernalia Description**

(1) UNLABELED RX BOTTLE CONTAINING 53 CLEAR GEL CAPS; (2) CEPHALEXIN, 250 MG- ORANGE CAPSULES WITH "93 3147", (2) VALSARTAN, 320 MG- GRAY TEAR DROP SHAPED TABLET WITH "NVR" ON ONE SIDE & "DXL" ON OTHER SIDE.

Investigator:
LYDIA GRANADO-MATA (516235)

Date:
10/15/2008



# NFL CONCUSSION SETTLEMENT
*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

## NOTICE OF REQUEST FOR ADDITIONAL DOCUMENTS
### DATE OF NOTICE: February 20, 2019
### RESPONSE DEADLINE: June 20, 2019

### I. SETTLEMENT CLASS MEMBER INFORMATION

| | |
|---|---|
| **Settlement Program ID** | 950013395 |

| **Name:** | First<br>Carleen | M.I. | Last<br>Hastings |
|---|---|---|---|

| | |
|---|---|
| **Settlement Class Member Type** | Representative Claimant |
| **Primary Counsel** | O'Hanlon, Demerath & Castillo |

| **Asserted Qualifying Diagnosis** | Death with CTE (Chronic Traumatic Encephalopathy) | **Date of Asserted Qualifying Diagnosis** | 10/15/08 |
|---|---|---|---|

### II. EXPLANATION OF REQUEST(S)

This Notice is an official communication from the Claims Administrator for the NFL Concussion Settlement Program. Your Claim Package is missing documents or information.

This Notice explains what is missing and what you may do to address the issue. We can help if you have questions. To cure the issues identified in this Notice, click the Respond to Request for Additional Documents button on your secure online portal and follow the instructions provided to upload the information identified below.  If you already have provided us with the missing information, let us know because we may have received it after conducting the review that generated this notice.

The following requires attention before we can act further:

| | What is Missing | How to Address this Item |
|---|---|---|
| **1.** | You have not submitted any medical records reflecting the Qualifying Diagnosis. | Click the Respond button, go to Section 3 for Medical Records, click on the Upload Medical Records button and follow the instructions to upload medical records reflecting the Qualifying Diagnosis. |

### III. ADDITIONAL EXPLANATION OF WHAT IS MISSING

The medical records must show a post-mortem diagnosis of CTE made before April 22, 2015 (the Final Approval Date) by a board-certified neuropathologist for a Retired NFL Football Player who died before April 22, 2015.  See Section 6.3 (f) of the Settlement Agreement and FAQ 109.  Mr. Mims died on October 15, 2008, and the October 16, 2008 autopsy report signed by Louis A. Pena does not reference CTE and neither does the death certificate.  You provided an undated letter from Dr. Ronald L. Hamilton who diagnosed Mr. Mims with CTE.  You must establish that Dr. Hamilton reviewed Mr Mim's brain tissue and made a CTE diagnosis on or before April 22, 2015.

### IV. HOW TO RESPOND TO THIS NOTICE

You have 120 days to respond to this Notice and provide the missing information or documents. **We encourage you to gather the requested information or documents now and respond to this Notice promptly, rather than using the full 120 days allowed to answer. The sooner you respond, the sooner your claim can move forward in the review process.**

By the Response Deadline stated above, send us the missing information or documents identified in Section II. We will wait the full 120 days to re-review your claim, unless you click the Submit Claim Package for Review button to confirm that your response is complete and we may continue to review your claim. If you do not respond in full on or before the Response Deadline, we will have to assess your claim based on the materials we have, which could lead to a lower Monetary Award or denial of your claim in its entirety.

Submit the requested information using your secure online portal to upload additional documents.

## V. How to Contact Us with Questions or for Help

If you are represented by a lawyer, consult with your lawyer if you have questions or need assistance. If you are unrepresented and have any questions about this Notice or need help, contact us at 1-855-887-3485 or send an email to ClaimsAdministrator@NFLConcussionSettlement.com. If you are a lawyer, call or email your designated Firm Contact for assistance. For more information about the Settlement program, visit the official website at www.NFLConcussionSettlement.com to read the Frequently Asked Questions or download a copy of the complete Settlement Agreement.



**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | § § § § | No. 2:12-md-02323-AB |
| | § | MDL No. 2323 |
| | § | |
| | § | **Hon. Anita B. Brody** |
| THIS DOCUMENT RELATES TO: | § | |
| Settlement Class Member Carleen Hastings | § | |
| (SPID 950013395) | § | |

**WRITTEN STATEMENT IN SUPPORT OF CLASS MEMBER'S APPEAL**
**OF THE CLAIMS ADMINISTRATOR'S NOTICE OF DENIAL OF**
**MONETARY AWARD CLAIM**

Class Member Carleen Hastings, by and through counsel, files this written statement in support of this appeal and respectfully requests that the Claims Administrator's denial of this claim be reversed and remanded for a calculation of the Class Member's Monetary Award. The Claims Administrator erred in making two erroneous legal conclusions and one erroneous factual determination.

First, the Claims Administrator erred in concluding that the Amended Settlement Agreement required Class Member to submit proof that the board-certified neuropathologist who provided a post-mortem diagnosis of CTE made the diagnosis on or before 4/22/15.[1]

Second, the Claims Administrator erred in concluding that the Amended Settlement Agreement required the board-certified neuropathologist who provided the CTE diagnosis for this claim to also "confirm" his CTE diagnosis by examining the Player's brain tissue. The Amended

---

[1]    If the Amended Settlement Agreement [ECF 6481] is construed to require a diagnosis on or before 4/22/15, Class Member reserves the right to seek relief from the Court pursuant to both Rule 60 and the Court's inherent authority to amend the judgment in this case in order to implement the settlement.

Settlement Agreement requires a post-mortem diagnosis of CTE by a board-certified neuropathologist; it does not require any additional "confirmation" of the diagnosis by the board-certified neuropathologist.

Third, the Claims Administrator erred in concluding that there is no proof that Dr. Hamilton "personally performed the post-mortem exam on the Retired Player." Dr. Hamilton did personally review brain tissue from the Retired Player as he states in his letter.

### SUPPORTING EVIDENCE[2]

| | |
|---|---|
| Exhibit 1 | Notice of Denial of Monetary Award Claim |
| Exhibit 2 | Relevant Excerpts from Class Member's Claim Package |
| Exhibit 3 | Notice of Request for Additional Documents |

---

[2] Class Member also incorporates by reference the following documents that have been filed in this MDL or published on the Settlement Website:

(1) Original Settlement Agreement [ECF 6073-2];

(2) the Amended Settlement Agreement [ECF 6481];

(3) Absent Class Member and Plaintiff Yvonne Sagapolutele's Motion to Modify the Amended Final Order and Judgment [ECF 6534] by Conforming the Definition of "Death with CTE" to the Version Contemplated in the Fairness Hearing Order [ECF 6479] and Noticed to the Class in the Long Form Notice [ECF 6093-1] and Summary Notice [ECF 6093-2] Pursuant to Rule 60 and the Authority Retained in the Settlement Agreement [ECF 8263] ("Motion to Modify");

(4) Response in Opposition to the Motion to Modify [ECF 8430];

(5) Statement of Co-Lead Counsel in Opposition to the Motion to Modify [ECF 8431];

(6) Reply in Support of Motion to Modify [ECF 8442];

(7) Notice of Joinder [ECF 8443];

## **BACKGROUND**

Class Member submitted a claim package that included a post-mortem diagnosis of Chronic Traumatic Encephalopathy ("CTE") made by a board-certified neuropathologist after personally reviewing the Retired Player's brain tissue.[3]   Class Member's submitted claim package also includes documentation showing that the Player died prior to April 22, 2015.[4]

Despite the documentation in the claim package, the Claims Administrator denied Class Member's Monetary Award Claim for the following reason:[5]

> Section 6.3(f) of the Settlement Agreement allows a CTE diagnosis if: (1) the Retired Player died before 4/22/15, and (2) there was a post-mortem diagnosis of CTE made by a board-certified neuropathologist prior to 4/22/15.   Although Dr. Hamilton is a board-certified neuropathologist and signed a Pre-Effective Date Diagnosing Physician Certification Form indicating a CTE diagnosis, we must have proof that he personally performed the post-mortem exam on the Retired Player and that it was done on or before 4/22/15.   There was no post-mortem examination report submitted to indicate that Dr. Hamilton examined the Retired Player's brain tissue to confirm a CTE diagnosis.   The two-page letter provided by Dr. Hamilton does not satisfy the requirements for a CTE diagnosis under this Settlement Program.   For these reasons, this claim is denied.

Class Member has timely filed this appeal of the Claims Administrator's Notice of Denial of Monetary Award Claim.

---

(8) Order denying, without prejudice, the Motion to Modify [ECF 8557];

(9) Posted Settlement Program FAQs (as of February 19, 2019); and

(10) Posted Settlement Program FAQs (as of July 8, 2019).

[3]   Exhibit 2.

[4]   *Id.*

[5]   Exhibit 1.

**<u>ARGUMENTS</u>**

The Claims Administrator denied Class Member's claim for two reasons: (1) the claim package does not show that Dr. Hamilton (a board-certified neuropathologist) made the post-mortem diagnosis of CTE prior to 4/22/2015; and (2) Dr. Hamilton's report does not "indicate that [he] examined the Retired Player's brain tissue to confirm a CTE diagnosis." Neither reason merits denial of this claim as a matter of law. *And as a factual matter, Dr. Hamilton's report <u>does</u> indicate that he examined the Retired Player's brain tissue.*

## I.    The Claims Administrator erred in concluding that the CTE Diagnosis was not timely.

The Claims Administrator's first reason for denying the claim package is legally flawed in two respects. First, the diagnosis date for Death with CTE is the date of the Player's death, even if the diagnosis occurs later. Second, if the Amended Settlement Agreement [ECF 6481] does require that the diagnosis be made prior to 4/22/2015, this requirement violates Class Member's rights because it was not contained in the Original Settlement Agreement [ECF 6073-20] and was added (1) despite the Court's instructions that any changes to the Original Settlement Agreement should make it *more* favorable, not *less* favorable, to class members; (2) without notice to Class Member; and (3) after Class Member's opt-out deadline had already passed.

### A.  The diagnosis date for Death with CTE is the date of the Player's death.

The Claims Administrator has posted several versions of "Posted Settlement Program FAQs" on the Settlement Website with answers to frequently asked questions. All of the content in the Posted Settlement Program FAQs is subject to advance approval by Counsel for the NFL Parties.[6]

---

[6]    *See* Amended Settlement Agreement § 4.1(a).

According to FAQ 93 in these Posted Settlement Program FAQs, the diagnosis date for Death with CTE is the date of the Player's death, even though the diagnosis is not made until after the Player dies:[7]

> **93. How is the date of a Qualifying Diagnosis determined?**
>
> The physician making a Qualifying Diagnosis of a Retired NFL Football Player must determine and verify the date on which that Qualifying Diagnosis was made. This date is important under the Settlement Agreement. It affects the amount of a Monetary Award, because the younger a Player is at the time of the Qualifying Diagnosis, the larger the award.
>
> The diagnosing physician uses his or her professional medical judgment in deciding when the Player had the conditions amounting to a Qualifying Diagnosis under Exhibit 1 to the Settlement Agreement. There are some basic rules about this:
>
> (a) *Death with CTE*: For these claims, the date of the Qualifying Diagnosis is the date of the Player's death, even though the diagnosis is not made until after the Player dies. The Monetary Award is based on the Player's age when he died.

Based on the Claims Administrator's representations to the class members that the date of the Qualifying Diagnosis for Death with CTE is the date of the Player's death, the only date that is relevant in determining the date of a Qualifying Diagnosis for Death with CTE is the date of the Player's death. The Claims Administrator's insistence on proof that the diagnosis "was done on or before 4/22/15" ignores these representations, which establish that the date of the Player's death is the date of the Qualifying Diagnosis.

Here, the claim package establishes that the Player's death occurred before April 22, 2015. Accordingly, the date of the Qualifying Diagnosis is before April 22, 2015, and the Claims Administrator erred in denying this claim.

---

[7]    This language is from the Posted Settlement Program FAQs (as of February 19, 2019). Since this claim package was submitted, a new version of the FAQs have been published on the Settlement Website in the Posted Settlement Program FAQs (as of July 8, 2019). The language in FAQ 93 is unchanged in the new version of Posted Settlement Program FAQs; it has merely been moved to FAQ 99.

**B. In the alternative, if this Denial is based on language that was surreptitiously added to the Settlement Agreement putatively imposing a deadline for a Qualifying Diagnosis for Death with CTE, the Denial must be reversed.**

The Court has previously considered a Motion to Modify the Amended Final Order and Judgment [ECF 8263] and denied the motion without prejudice to a consideration of the issues in that motion at a later time.[8]  In that motion, Class Member Yvonne Sagapolutele brought the Court's attention to the fact that although the Original Settlement Agreement contained no deadline for obtaining a Death with CTE Diagnosis, language appears to have been surreptitiously added to the Amended Settlement Agreement that could be read to have added a diagnosis deadline without notice to the Court or to the class members.[9]  The motion sought relief under both Rule 60 and the Court's inherent authority to implement the settlement by amending the Court's judgment.[10]

The Court denied the motion without prejudice and stated that before it would consider the "extraordinary action of modifying the Settlement Agreement," class members must first submit a claim to the Claims Administrator.[11]

If the Special Master concludes that the Amended Settlement Agreement does require Class Member to have obtained a CTE diagnosis prior to April 22, 2015 despite the contrary language in the Posted Settlement Program FAQs and in other notices, it does not appear that the Special

---

[8]   *See* Order [ECF 8557]

[9]   Motion to Modify [ECF 8263]

[10]   *Id.*

[11]   Order [ECF 8557]

Master would have the necessary authority to provide a remedy.[12]  To the extent the Special Master may have the authority to provide a remedy, Class Member incorporates by reference the arguments in the Motion to Modify [ECF 8263].  If the denial of this claim is not reversed, Class Member expressly reserves the right to seek appropriate relief from the Court under Rule 60 and under the Court's inherent authority to implement the settlement by amending the Court's judgment.

## II.  The Claims Administrator erred in requiring that the board-certified neuropathologist "confirm" his CTE Diagnosis.

The Claims Administrator also states that the denial of this claim is based on the lack of evidence that "Dr. Hamilton examined the Retired Player's brain tissue to confirm a CTE diagnosis."  But there is no requirement in the Amended Settlement Agreement that a board-certified neuropathologist "confirm his diagnosis."[13]  The Amended Settlement Agreement simply requires a diagnosis.[14]

If the Parties to the settlement in this case had intended to impose a requirement that a CTE diagnosis be confirmed by an examination of the Player's brain tissue, the parties could have included that requirement in the settlement agreement.  Regarding other diagnoses, the Parties agreed to specific and detailed procedures for reviewing and confirming the diagnoses.[15]  But for

---

[12]  *See* Order [ECF 6871] (providing Special Masters with the authority to faithfully oversee the implementation and administration of the Settlement Agreement); *see also* Motion to Modify [ECF 8263] (seeking relief under Rule 60).

[13]  *See* Amended Settlement Agreement [ECF 6481] § 6.4(f).

[14]  *See id.*

[15]  *See id.* §§ 5.1–5.14 (creating the Baseline Assessment Program and exempting Death with CTE from the program), § 6.3(a)–(e) (requiring that certain diagnoses, other than Death with CTE, be made by

Death with CTE diagnoses, the Amended Settlement Agreement simply requires "a post-mortem diagnosis made by a board-certified neuropathologist."[16]  Dr. Hamilton is one of only a handful of board-certified neuropathologists in the United States, and he has provided a post-mortem diagnosis that this Player "had CTE on his date of death."[17]

The Claims Administrator erred by imposing an arbitrary requirement that Dr. Hamilton confirm his diagnosis by examining the Player's brain tissue.  Adding this arbitrary requirement ignores the terms of the Amended Settlement Agreement and violates due process.

## III.    The Claims Administrator erred in stating that Dr. Hamilton did not examine the Player's brain tissue.

The Claims Administrator's denial of this claim is based on the purported lack of evidence that "Dr. Hamilton examined the Retired Player's brain tissue to confirm a CTE diagnosis" is also erroneous because Dr. Hamilton *did* examine the Retired Player's brain tissue to confirm the CTE diagnosis.

Dr. Hamilton's letter states: "I have conducted a study of Christopher Mims' brain tissue." Dr. Hamilton further states that he received "180 unstained tissue sections on glass slides" and examined stained recuts of brain tissue from the dura mater, cerebral cortex, hippocampus, insular cortex, putamen, globulus pallidus, thalamus, cerebellum cortex, dentate nucleus, and medulla.[18] Based, in part, on his review of the brain tissue, Dr. Hamilton concluded that his "findings are

---

certain physicians on an approved list), Exhibit 2 to the Amended Settlement Agreement (providing standardized neuropsychological testing protocols for determining certain diagnoses).

16    *See* Amended Settlement Agreement [ECF 6481] § 6.4(f).

17    Exhibit 2.

18    *See id.*

diagnostic of CTE."[19]

The Claims Administrator erred in stating that there is no evidence that "Dr. Hamilton examined the Retired Player's brain tissue to confirm a CTE diagnosis."  Dr. Hamilton's letter clearly establishes that he examined the Retired Player's brain tissue to confirm the CTE diagnosis.

## CONCLUSION

For all of the foregoing reasons, Class Member respectfully requests that the Special Master reverse the Claims Administrator's denial of this Monetary Award Claim and remand to the Claims Administrator for a calculation of the Monetary Award.


Dated:  August 28, 2019

Respectfully Submitted:

/s/ Justin Demerath

**Justin Demerath**
Texas State Bar No. 24034415
**David Campbell**
Texas State Bar No. 24057033
O'HANLON, DEMERATH & CASTILLO
808 West Avenue |  Austin, TX 78701
Tel: (512) 494-9949  | Fax: (512) 494-9919
jdemerath@808west.com
dcampbell@808west.com

**Counsel for Class Member**

---

[19]   *See id.*

## <u>CERTIFICATE OF SERVICE</u>

It is hereby certified that a true copy of the foregoing document was submitted on the Court Portal on the 28th day of August, 2019.

<div align="right">

<u>/s/ Justin B. Demerath</u>
Justin B. Demerath

</div>

### NFL Parties' Opposition to Appeal of
### Claim Denial by Representative Claimant Carleen Hastings

Carleen Hastings, Representative Claimant for the late Christopher Mims, submitted a claim on February 5, 2019—the day before the deadline for pre-Effective Date claims—for a Qualifying Diagnosis of Death with CTE purportedly rendered by neuropathologist Dr. Ronald L. Hamilton.  (*See* Claim Form; Diagnosing Physician Certification.)  In support of her claim, Ms. Hastings submitted (1) a Diagnosing Physician Certification from Dr. Hamilton, reflecting a purported Qualifying Diagnosis of Death with CTE (Diagnosing Physician Certification at 6); (2) an undated letter from Dr. Hamilton, purporting to diagnose Mr. Mims with CTE (Hamilton Letter); (3) a death certificate indicating that Mr. Mims died on October 15, 2008 and listing Mr. Mims' primary cause of death as "DILATED CARDIOMYOPATHY" and contributing causes of death as "HEPATIC STEATOSIS" and "HISTORY OF HYPERTENSION" (Death Certificate at 2); and (4) an autopsy report completed by Dr. Louis A. Pena, indicating the same causes of death listed in Mr. Mims' death certificate (*see* Autopsy Report at 1).

On February 20, 2019, the Claims Administrator issued a Notice of Request for Additional Documents advising Ms. Hastings that her Claim Package was incomplete because Ms. Hastings did not submit any medical records reflecting the Qualifying Diagnosis.  (*See* Notice of Request for Additional Documents.)  In the section titled "Additional Explanation of What is Missing," the Claims Administrator explained that Ms. Hastings' Claim Package materials did not show that Dr. Hamilton administered a post-mortem examination in which he diagnosed Mr. Mims with CTE prior to the Settlement Final Approval Date of April 22, 2015, as required by the Settlement Agreement.  (*See id.*)  On July 30, 2019, the Claims Administrator denied Ms. Hastings' claim because she failed to submit any Claim Package materials to show that Dr. Hamilton actually performed a post-mortem examination and rendered a diagnosis of CTE prior to the Final Approval Date, as required by the Settlement Agreement.  (*See* Notice of Denial of Monetary Award Claim ("Denial Notice") at 1.)

On appeal, Ms. Hastings does not contend that Dr. Hamilton diagnosed Mr. Mims with CTE based on a post-mortem examination prior to April 22, 2015.  Instead, she argues that: (1) the still unspecified date that Dr. Hamilton actually diagnosed Mr. Mims does not matter, because the diagnosis date for any Retired NFL Football Player diagnosed with Death with CTE purportedly is the date of the player's death; (2) if the Claims Administrator determines that a diagnosing physician must render a diagnosis of Death with CTE prior to April 22, 2015, the amended Settlement Agreement purportedly violates Settlement Class Members' due process rights because it was a change to the original Settlement Agreement without proper notice; (3) the Settlement Agreement allegedly did not require Dr. Hamilton to examine Mr. Mims' brain tissue in a post-mortem examination to render a Death with CTE diagnosis; and (4) Dr. Hamilton did examine Mr. Mims' brain tissue.  (*See* Written Statement in Support of Class Member's Appeal of the Claims Administrator's Notice of Denial of Monetary Award Claim ("Appeal").)[1]

---

[1]    With knowledge that Mr. Mims and other clients never received a diagnosis of CTE prior to the Final Approval Date, counsel for Ms. Hastings has engaged in a lengthy history of legal gamesmanship concerning the deadline for Qualifying Diagnoses of Death with CTE.  On August 15, 2017, counsel for Ms. Hastings, on behalf of client Yvonne Sagapolutele, filed a Motion to Modify the Amended Final Order and Judgment, in which she alleged that the Settlement Agreement's deadline to obtain a Qualifying Diagnosis of Death with CTE was "imposed after the deadline to opt out and without notice to Class Members."  (Mem. of Law in Supp. of Absent Class Member and Pl. Yvonne Sagapolutele's Mot. to Modify the Am. Final Order and J. at 18, 12-md-2323, ECF No. 8263-2

The NFL Parties respectfully oppose the Appeal because it is utterly unfounded, and there is no question this claim must be denied. The Settlement Agreement clearly requires that a board-certified neuropathologist render a Qualifying Diagnosis of Death with CTE prior to April 22, 2015, and Ms. Hastings has not provided—and undoubtedly cannot provide—any evidence that Dr. Hamilton rendered such a diagnosis prior to that date. In addition, the amended Settlement Agreement's requirement that a Qualifying Diagnosis of Death with CTE be rendered prior to April 22, 2015 does not violate Settlement Class Members' due process rights; to the contrary, it expanded the deadline for Death with CTE diagnoses compared to the original Settlement Agreement to the benefit of Settlement Class Members. Finally, although this issue need not be reached on appeal, the Settlement Agreement requires that a board-certified neuropathologist personally examine a Retired NFL Football Player's brain tissue prior to rendering a timely Qualifying Diagnosis of Death with CTE.

For these reasons, and those set forth below, Ms. Hastings' appeal should be denied.

### I.     There Is No Evidence That Dr. Hamilton Rendered a Qualifying Diagnosis of Death With CTE Prior to April 22, 2015, as Required by the Settlement Agreement

For a Qualifying Diagnosis of Death with CTE, the Settlement Agreement explicitly requires that a diagnosing physician render the diagnosis prior to the Settlement's Final Approval Date of April 22, 2015. Specifically, Section 2.1(aa) of the Settlement Agreement provides that the Qualifying Diagnosis of "Death with CTE is defined in Exhibit 1," and Exhibit 1 states that the definition of Death with CTE is: "For Retired NFL Football Players who died prior to the Final Approval Date, *a post-mortem diagnosis of CTE made by a board-certified neuropathologist prior to the Final Approval Date*, provided that a Retired NFL Football Player who died between July 7, 2014 and the Final Approval Date shall have until 270 days from his date of death to obtain such a postmortem diagnosis." (Settlement Agreement, Ex. A-1 at 5 § 5 (emphasis added).) Section 6.3(f) of the Settlement Agreement reiterates that requirement, stating that "[a] Qualifying Diagnosis of Death with CTE shall be made only for Retired NFL Football Players who died prior to the Final Approval Date, through *a post-mortem diagnosis made by a board-certified neuropathologist prior to the Final Approval Date* . . . ." (*See id.* at 6.3(f) (emphasis added).)

In the Appeal, Ms. Hastings argues that a Diagnosing Physician is not required to actually render a Qualifying Diagnosis of Death with CTE prior to April 22, 2015 because "the only date that is relevant in determining the date of a Qualifying Diagnosis for Death with CTE is the date of the Player's death." (Appeal at 5.) As support for this argument, Ms. Hastings cites Settlement FAQ 99 (formerly Settlement FAQ 93), which states in part:

> *Death with CTE*: For these claims, the date of the Qualifying Diagnosis is the date of the Player's death, even though the diagnosis is not made until after the Player dies. The Monetary Award is based on the Player's age when he died.

---

(the "Motion to Modify the Amended Final Order and Judgment").) After the Parties fully briefed that motion, the Court denied the motion without prejudice to Ms. Sagapolutele's (or other similarly situated Settlement Class Members') ability to raise the issue at a later time if she filed a Death with CTE claim that would have been valid but for the deadline. (Order, 12-md-2323, ECF No. 8557.) Counsel then waited over 16 months to file Ms. Hastings' Death with CTE claim, which relies on an *undated* letter from Dr. Hamilton, with the clear intention of obfuscating the timing and nature of Dr. Hamilton's purported CTE diagnosis.

(Settlement FAQ 99.)

Ms. Hastings' argument rests on willful ignorance of the Settlement Agreement and a misinterpretation of Settlement FAQ 99. Specifically, the Settlement Agreement plainly requires that, "[f]or Retired NFL Football Players who died prior to the Final Approval Date, a ***post-mortem diagnosis***" of Death with CTE must be "made by a board-certified neuropathologist ***prior to the Final Approval Date***." (Settlement Agreement Ex. A-1 at 5 § 5 (emphasis added).) If, as Ms. Hastings argues, the Settlement Agreement required only that a Retired NFL Football Player died prior to the Final Approval Date in order for a diagnosis made at *any unlimited future date* to be timely, the Settlement Agreement would not include subsequent language providing that a player who died between July 7, 2014 and the Final Approval Date "shall have until 270 days from his date of death to obtain such a postmortem diagnosis." (*Id.*)

Moreover, Settlement FAQ 99 does not concern the date by which a Diagnosing Physician must have *actually made* a Death with CTE diagnosis, but instead concerns the date of diagnosis ***for compensation purposes***. The Parties to the Settlement Agreement did not wish to reduce the compensatory award of a decedent who otherwise would have aged between death and the neuropathological examination. The Death with CTE portion of Settlement FAQ 99 confirms this, as it clearly states that "[t]he ***Monetary Award*** is based on the Player's age when he died." (Settlement FAQ 99 (emphasis added).)

Ms. Hastings has not provided—and presumably cannot provide—any evidence that Dr. Hamilton rendered his purported Qualifying Diagnosis of Mr. Mims prior to the Final Approval Date of April 22, 2015. In fact, Dr. Hamilton's letter containing the purported diagnosis does not contain any dates whatsoever, and Dr. Hamilton's Diagnosing Physician Certification form only lists the date of Mr. Mims' death (October 15, 2008) as the date of diagnosis. (*See* Hamilton Letter; Diagnosing Physician Certification.) Accordingly, Ms. Hastings' appeal must be denied, and her claim denial upheld, for this fundamental reason alone.

## II.    The Settlement Agreement Requirement That a Death With CTE Diagnosis Be Rendered Prior to April 22, 2015 Does Not Violate Settlement Class Members' Due Process Rights

Fully aware that her purported Death with CTE diagnosis is untimely because it was not rendered prior to the Final Approval Date of April 22, 2015, Ms. Hastings argues that such requirement somehow violates her right to due process. Specifically, Ms. Hastings argues that the Special Master should consider the arguments in Yvonne Sagapolutele's August 15, 2017 Motion to Modify the Amended Final Order and Judgment to remove the deadline to obtain the Qualifying Diagnosis, which Motion was denied without prejudice by Judge Brody with instruction that Ms. Sagapolutele "must first show that she would be entitled to recover but for the Death with CTE diagnosis deadline," and then may raise the due process argument in the claims appeal process. (Order, 12-md-2323, ECF No. 8557.) Ms. Hastings' argument that the amendments to the Settlement Agreement somehow violated her due process rights is meritless.

Relying on Ms. Sagapolutele's prior Motion to Modify the Amended Final Order and Judgment, Ms. Hastings alleges that the Settlement Agreement's deadline to obtain a Qualifying Diagnosis of Death with CTE was "surreptitiously added to the Amended Settlement Agreement" after the deadline to opt out and without notice to Settlement Class Members. (Appeal at 6.) Ms. Sagapolutele's prior motion argues that absent class members' due process rights were violated by the change, and that the Court should remedy the violation by modifying the Settlement Agreement

to remove the deadline for a Qualifying Diagnosis of Death with CTE. (*See* Motion to Modify the Amended Final Order and Judgment at 15-24.)

In response, the NFL Parties, too, incorporate all of the arguments set forth in their Opposition to that Motion, attached in full as Exhibit 1.[2] As the NFL Parties explained in their Opposition, far from injuring Settlement Class Members' rights by "imposing" a new deadline for a Qualifying Diagnosis of Death with CTE, the amendments to the Settlement Agreement *extended* the deadline to obtain the Qualifying Diagnosis from the Preliminary Approval Date to the Final Approval Date (*see id.* at 10-11), and provided a 270-day grace period in which Settlement Class Members who died between the Preliminary Approval Date and the Final Approval Date could obtain a Qualifying Diagnosis (*see id.* at 6, 10). Accordingly, the relevant changes solely benefited absent class members and in no way violated their due process rights. (*See id.* at 9-13.)

For these additional reasons, Ms. Hastings' appeal must be denied, and her claim denial must be upheld.

### III. The Settlement Agreement Requires a Diagnosing Physician to Examine a Retired NFL Football Player's Brain Tissue in Order to Render a Qualifying Diagnosis of Death with CTE

Ms. Hastings further argues that the Claims Administrator erred in stating that the Claim Package must contain evidence that the Diagnosing Physician "examined the Retired Player's brain tissue to confirm a CTE diagnosis" (Denial Notice at 1) because the Settlement Agreement purportedly does not require a Diagnosing Physician to examine brain tissue in order to render a Qualifying Diagnosis of Death with CTE. (*See* Appeal at 7.) Although this issue need not be reached on appeal because Ms. Hastings has not provided any evidence that Mr. Mims was rendered a Qualifying Diagnosis of Death with CTE prior to April 22, 2015, Ms. Hastings is simply wrong.

As previously discussed, a Qualifying Diagnosis of Death with CTE requires "a post-mortem diagnosis of CTE made by a board-certified neuropathologist prior to the Final Approval Date." (Settlement Agreement, Ex. A-1 at 5 § 5; *see also* Settlement Agreement §§ 2.1(aa), 6.3(f).) Post-mortem examination of brain tissue is the ***only*** way that CTE can be diagnosed, as Judge Brody made clear in the Court's Memorandum supporting Final Approval of the Settlement Agreement:

> Chronic Traumatic Encephalopathy is a neuropathological diagnosis that currently can only be made post mortem. This means no one can conclusively say that someone had CTE until a scientist looks at sections of that person's brain under a microscope to see if abnormally phosphorylated tau protein ("abnormal tau protein") is present, and if so whether it is present in a reportedly unique pattern.

*In re Nat. Football League Players' Concussion Injury Litig.*, 307 F.R.D. 351, 397 (E.D. Pa. 2015), *amended*, No. 2:12-MD-02323-AB, 2015 WL 12827803 (E.D. Pa. May 8, 2015), and *aff'd*, 821 F.3d 410 (3d Cir. 2016). Judge Brody further stated that "Retired Players cannot be compensated for CTE in life because no diagnostic or clinical profile of CTE exists, and the symptoms of the disease, if any, are unknown." (*Id.*)

---

[2] (*See* Ex. 1, Mem. of Law of the National Football League and NFL Properties LLC in Opp. to Settlement Class Member Yvonne Sagapolutele's Mot. to Modify the Am. Final Order and J., 12-md-2323, ECF No. 8430.)

Thus, the Settlement Agreement and its implementing orders clearly require that a diagnosing physician personally examine a Retired NFL Football Player's brain tissue in order to render a Qualifying Diagnosis of Death with CTE. Here, Dr. Hamilton's letter indicated that he examined slides of Mr. Mims' brain tissue, but, as previously discussed, Ms. Hastings has not provided any evidence that he performed such a post-mortem examination and diagnosed Mr. Mims with CTE prior to April 22, 2015.

**Conclusion**

The denial of Ms. Hastings' claim was required under the judicially-approved terms of the Settlement Agreement. The Special Master has already denied 19 substantially similar appeals filed by Settlement Class Members represented by Ms. Hastings' counsel, and Ms. Hastings' appeal presents no additional evidence to warrant a different outcome.[3] Because Ms. Hastings does not present clear and convincing evidence that such determination was in error, the Special Master should affirm denial of the claim.


Dated:  October 3, 2019

Respectfully submitted,

PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP

*/s/ Brad S. Karp*_____
Brad S. Karp
Bruce Birenboim
Claudia Hammerman
Lynn B. Bayard
Douglas M. Burns
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990
Email:  bkarp@paulweiss.com

*ATTORNEYS FOR THE*
*NATIONAL FOOTBALL LEAGUE*
*AND NFL PROPERTIES LLC*

---

[3] (*See, e.g.*, SPID 950012548, Doc. No. 214641.)

# EXHIBIT 1

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br><br>MDL No. 2323<br><br>Hon. Anita B. Brody |
| Kevin Turner and Shawn Wooden, *on behalf of themselves and others similarly situated*,<br><br>                    Plaintiffs,<br><br>                    v.<br><br>National Football League and NFL Properties, LLC, successor-in-interest to NFL Properties, Inc.<br>                    Defendants. | Civ. Action No.: 14-cv-00029-AB |
| THIS DOCUMENT RELATES TO:<br>ALL ACTIONS | Hon. Anita B. Brody |

### MEMORANDUM OF LAW OF THE NATIONAL FOOTBALL LEAGUE AND NFL PROPERTIES LLC IN OPPOSITION TO SETTLEMENT CLASS MEMBER YVONNE SAGAPOLUTELE'S MOTION TO MODIFY THE AMENDED FINAL ORDER AND JUDGMENT

## TABLE OF CONTENTS

**Page**

Preliminary Statement .................................................................................................. 1

Background ..................................................................................................................... 4

      A.    Parties .......................................................................................................... 4

      B.    Procedural Background .............................................................................. 4

Argument ....................................................................................................................... 8

I.      THE PARTIES WERE NOT REQUIRED TO NOTIFY THE SETTLEMENT
       CLASS ABOUT THE AMENDMENTS .......................................................... 8

      A.    The Amendments Did Not Require New Notice .................................... 9

      B.    The Original Settlement Notice Was Sufficient ................................. 11

II.     SAGAPOLUTELE IS NOT ENTITLED TO REWRITE THE SETTLEMENT
       AGREEMENT ................................................................................................. 13

Conclusion .................................................................................................................. 17

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Adelson* v. *Ocwen Fin. Corp.*,
　621 F. App'x 348 (7th Cir. 2015) ..........................................................14

*In re Baby Prods. Antitrust Litig.*,
　708 F.3d 163 (3d Cir. 2013)..............................................................9, 11

*Blue Diamond Coal Co.* v. *Trustees of UMWA Combined Ben. Fund*,
　249 F.3d 519 (6th Cir. 2001) ..............................................................16

*In re Diet Drugs Prods. Liab. Litig.*,
　200 F. App'x 95 (3d Cir. 2006) ..........................................................14

*In re Diet Drugs Prods. Liab. Litig.*,
　No. 99-cv-20593, 2010 WL 2735414 (E.D. Pa. July 2, 2010) ....................9, 11, 13

*F.A.C., Inc.* v. *Cooperativa de Seguros de Vida de Puerto Rico*,
　449 F.3d 185 (1st Cir. 2006)..............................................................17

*Federman* v. *Artzt*,
　339 F. App'x 31 (2d Cir. 2009) ..........................................................14, 15

*In re Four Seasons Sec. Laws Litig.*,
　525 F.2d 500 (10th Cir. 1975) ............................................................15

*Harris* v. *Graddick*,
　615 F. Supp. 239 (N.D. Ala. 1985)......................................................9, 11

*Hensley* v. *Alcon Labs., Inc.*,
　277 F.3d 535 (4th Cir. 2002) ..............................................................17

*Inmates of Suffolk Cty. Jail* v. *Rufo*,
　No. 71-cv-00162, 2015 WL 6958070 (D. Mass. Nov. 10, 2015) ..................16

*Kokkonen* v. *Guardian Life Ins. Co. of Am.*,
　511 U.S. 375 (1994)........................................................................17

*In re Linerboard Antitrust Litig.*,
　223 F.R.D. 357 (E.D. Pa.), *amended*, 223 F.R.D. 370 (E.D. Pa. 2004)..................17

*Matthews, Wilson & Matthews, Inc.* v. *Capital City Bank*,
　614 F. App'x 969 (11th Cir. 2015) ......................................................15

**Page(s)**

*In re Nat'l Football League Players' Concussion Injury Litig.*,
  307 F.R.D. 351 (E.D. Pa. 2015), *amended*, No. 12-MD-02323, 2015 WL
  12827803 (E.D. Pa. May 8, 2015) ........................................................................ passim

*In re Nat'l Football League Players Concussion Injury Litig.*,
  821 F.3d 410 (3d Cir. 2016), *amended* (May 2, 2016) ........................................7

*In re Nissan Motor Corp. Antitrust Litig.*,
  552 F.2d 1088 (5th Cir. 1977) ............................................................................11

*Orlando Residence, Ltd.* v. *Hilton Head Hotel Inv'rs*,
  No. 89-cv-0662, 2013 WL 1103027 (D.S.C. Mar. 15, 2013) ...............................15

*In re PaineWebber Ltd. P'ships Litig.*,
  171 F.R.D. 104 (S.D.N.Y 1997) ..........................................................................11

*Roman-Oliveras* v. *Puerto Rico Elec. Power Auth.*,
  797 F.3d 83 (1st Cir. 2015) .................................................................................17

*Sawka* v. *Healtheast, Inc.*,
  989 F.2d 138 (3d Cir. 1993) ................................................................................15

**OTHER AUTHORITIES**

11 Fed. Prac. & Proc. Civ. § 2852 (3d ed.) .....................................................................17

20 Fed. Prac. & Proc. Deskbook § 104 ............................................................................16

Fed. R. Civ. P. 23 .........................................................................................................2, 9

Fed. R. Civ. P. 60 ..........................................................................................1, 3, 14, 15, 16

Newberg on Class Actions § 1:5 (5th ed.) .........................................................................9

Newberg on Class Actions § 8:17 (5th ed.) .......................................................................9

Newberg on Class Actions § 8:36 (5th ed.) .......................................................................9

Newberg on Class Actions § 8:7 (5th ed.) .........................................................................9

Newberg on Class Actions § 18:40 (5th ed.) ...................................................................15

Defendants National Football League and NFL Properties LLC (collectively, the "NFL Parties") respectfully submit this memorandum of law in opposition to Settlement Class Member Yvonne Sagapolutele's ("Sagapolutele's") motion to modify the Amended Final Order and Judgment (the "Motion") (ECF No. 8263).

### Preliminary Statement

Sagapolutele, an absent Settlement Class Member and representative of the estate of Retired NFL Football Player Pio Sagapolutele, brings this motion, ostensibly as a matter of due process, seeking significant revisions to the Final Order and Judgment that the Court entered more than two years ago approving the Class Action Settlement Agreement in this case.[1]  But no due process violation has occurred, and Sagapolutele has shown no justification for this Court to take the extraordinary step of rewriting a settlement agreement approved by both this Court and the Third Circuit that has been in place for years.  Sagapolutele's motion should therefore be denied.

The primary ground for Sagapolutele's motion is the amendments to the Settlement Agreement in February 2015, which expanded the definition of the Death with CTE Qualifying Diagnosis in response to the Court's directives.  Contrary to fact, Sagapolutele contends that the amendment imposed a deadline to obtain a Qualifying Diagnosis of Death with CTE, and "[b]ecause this change was made both without notice to absent class members and after the deadline to opt out of the settlement, [her] due process rights were violated."  (Pl. Mem. at 15.)  Sagapolutele asks this Court, pursuant to Rule 60 of the Federal Rules of Civil Procedure and the Court's inherent power, to amend the Final Order and Judgment to "remov[e] the deadline to obtain a Qualifying Diagnosis of Death with CTE."  (Pl. Mem. at 1.)

---

[1]    Unless otherwise defined, the capitalized terms used in this memorandum have the same meaning as those in the Settlement Agreement.

Sagapolutele's motion has no basis in fact or law for several reasons.

*First*, the amendments in question concerned an *expansion* of settlement benefits to the Settlement Class—namely, the expansion of the Qualifying Diagnosis of Death with CTE to include Retired NFL Football Players who died with CTE between Preliminary and Final Approval of the Settlement Agreement; the original agreement limited the Qualifying Diagnosis to those who died *prior* to Preliminary Approval.  It is well settled that additional notice to a class is necessary only when amendments to a settlement agreement are "materially adverse" to the class, not where, as here, they benefit the class.  Neither the Due Process Clause nor Rule 23 of the Federal Rules of Civil Procedure require notice in the event of beneficial, or even neutral, amendments.  As this Court correctly held in granting Final Approval of the Settlement Agreement over various objections to this very amendment (although on a different ground), no additional notice was required in this case for that very reason.

*Second*, contrary to Sagapolutele's contentions regarding lack of notice, the class notice in connection with the original settlement agreement was all that was necessary.  The Short- and Long-Form notices distributed to the Settlement Class Members made clear, as this Court and the Third Circuit held, that an award of Death with CTE would *not* be available to all Retired NFL Football Players diagnosed with CTE.  Rather, only particular cases of CTE meeting "certain" predetermined and agreed-to standards under the Settlement Agreement would be compensated—namely, cases where, prior to Preliminary Approval,[2] the Retired NFL Football Player received a post-mortem diagnosis of CTE made by a board-certified neuropathologist.  Further, the amendments in question were in fact made public; the NFL Parties and Class Counsel posted the amendments—including a redline comparison clearly

---

[2]    As noted above, the amendments to the Settlement Agreement extended this deadline to Final Approval.

reflecting the changes to the text of the Settlement Agreement—on the Court's publicly accessible PACER docket, where any member of the public, including the more than 5,000 Settlement Class Members with legal representation, could view it.  In fact, over 40 Settlement Class Members objected to the amendments, including the very amendment that Sagapolutele complains of here.

      *Finally*, even if Sagapolutele could show a due process violation, which she cannot, neither Rule 60 nor this Court's "inherent authority" allows Sagapolutele to rewrite the Settlement Agreement as she seeks.  Rule 60(a) is limited to correction of "clerical mistakes" that do not affect the substantive rights of the parties.  Yet her contention that the amendments were simply "clerical mistakes" is at odds with her characterization of those same amendments as impairing her rights under the settlement.  Further, not only does Sagapolutele—as an absent class member—lack standing to move pursuant to Rule 60(b)(6), she also fails to establish that the "extraordinary remedy" of amendment pursuant to Rule 60(b)(6) is warranted here because she does not show that she will experience *any* hardship without the relief she seeks.  For example, Sagapolutele has neither shown (nor even claimed) that the brain of her late husband, who died in 2009, has ever been examined by a board-certified neuropathologist for CTE, much less diagnosed as having CTE.  Nor has she explained why any such examination—if such a belated diagnosis were even medically possible—did not occur prior to the Court's Final Approval Order on April 22, 2015 (as amended May 8, 2015).  Finally, Sagapolutele has not shown that she is entitled to relief under the Court's "inherent authority" to amend the Final Order and Judgment because that authority is no more expansive than Rule 60.

      Accordingly, Sagapolutele's motion should be denied.

## Background

### A.   Parties

The National Football League ("NFL") is an unincorporated association of 32 Clubs that promotes, organizes, and regulates the sport of professional football in the United States.  NFL Properties LLC ("NFLP") is a limited liability company organized under the laws of the State of Delaware and headquartered in New York.  Sagapolutele is a self-described absent Settlement Class Member and the representative of the estate of late Retired NFL Football Player Pio Sagapolutele.  (Pl. Mot. at 1.)

### B.   Procedural Background

The Judicial Panel on Multidistrict Litigation established this multidistrict litigation as MDL 2323 on January 31, 2012.  Since that time, over 300 additional cases, brought on behalf of approximately 5,000 former NFL players, have been included in the MDL.  *See In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. 351, 361 (E.D. Pa. 2015), *amended*, No. 12-MD-02323, 2015 WL 12827803 (E.D. Pa. May 8, 2015), *and aff'd*, 821 F.3d 410 (3d Cir. 2016), *amended* (May 2, 2016), *cert. denied*, 137 S. Ct. 591 (2016), and *cert. denied*, 137 S. Ct. 607 (2016).  Plaintiffs in these cases asserted fraud- and negligence-based claims against the NFL Parties based on, among other things, a purported duty to provide players with rules and information needed to protect them from the alleged effects of repetitive mild traumatic brain injuries sustained during NFL play, including CTE.  *Id.* at 361-62.

On June 25, 2014, the NFL Parties and Class Counsel[3] (collectively, the "Parties") filed a motion for preliminary class certification and preliminary approval of the Settlement Agreement, and on July 7, 2014, the Court approved the motion.  *See id.* at 363-65.

---

[3]   Class Counsel consists of attorneys whom this Court duly appointed as legal representatives for the Settlement Class, including Christopher A. Seeger, Sol Weiss, Steven C. Marks, Gene Locks, Arnold Levin, and Dianne M. Nast.  (Final Order & Judg. ¶ 6,  ECF No. 6510.)

The Settlement Agreement defined the Settlement Class as "'[a]ll living NFL Football Players who, prior to the date of Preliminary Approval . . . retired . . . from playing professional football with the NFL,'" as well as their Representative Claimants and Derivative Claimants.  *Id.* at 365 ("Representative Claimants are those duly authorized by law to assert the claims of deceased, legally incapacitated, or incompetent Retired Players.  Derivative Claimants are those, such as parents, spouses, or dependent children, who have some legal right to the income of Retired Players.").  The Settlement Agreement also provides funding for Retired NFL Football Players to receive a baseline assessment examination of their objective neurological functioning, for safety and educational initiatives, and for monetary awards for certain Qualifying Diagnoses, including, as relevant here, the Qualifying Diagnosis of Death with CTE.  *Id.* at 366-67.

Prior to the Fairness Hearing, the Parties distributed Court-approved Short- and Long-Form notices to the Settlement Class.  *See id.* at 382-86.  "Each was written in plain and straightforward language," and together, they disclosed the key components of the Settlement Agreement, making clear that "only 'certain' cases of CTE are covered."  *Id.* at 383-84.  As explained by the notice, under the original agreement, the Settlement's benefits included "[m]onetary awards for ***diagnoses*** of Death with CTE ***prior to July 7, 2014*** . . . ."  (*See* Long-Form Notice at 6, ECF No. 6086-1 (emphasis added); *see also* Class Action Settlement Agreement as of June 24, 2014 § 6.3(f), ECF No. 6087 (a "Qualifying Diagnosis of Death with CTE shall be made only for Retired NFL Football Players who died prior to the date of the Preliminary Approval and Class Certification Order, through a post-mortem diagnosis by a board-certified neuropathologist of CTE.").)

After the Fairness Hearing, the Parties—at this Court's request—agreed to several amendments to the Settlement Agreement, each of which made the Settlement Agreement more

beneficial to Settlement Class Members. *In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. at 386. For example, the amendments provided credit for Settlement Class Members who played in NFL Europe; ensured that all eligible Retired NFL Football Players who elected to receive a baseline assessment examination would receive one regardless of any funding limitations in the Settlement Agreement; included a hardship provision with respect to the appeal fee for Settlement Class Members; and allowed reasonable accommodation for Settlement Class Members who do not possess certain medical records. (Class Counsel and the NFL Parties' Joint Submission in Resp. to the Feb. 2, 2015 Order of the Ct., Feb. 13, 2015, ECF No. 6481.) In addition, as is relevant here, one amendment expanded the Qualifying Diagnosis of Death with CTE to cover not only Retired NFL Football Players who died prior to Preliminary Approval, but also Retired NFL Football Players who died between Preliminary Approval and Final Approval. (*Id*. at 4-5.) In addition, the Parties explained to the Court that "**consistent with the Parties' intent under the original Settlement Agreement**, and recognizing that obtaining such a [CTE] diagnosis **may take several months post-death**, the Parties have provided for a grace period of 270 days following any date of death between preliminary approval and the Final Approval Date to allow Claimants to obtain the necessary diagnosis." (*Id*. (emphasis added).)

Copies of the proposed amended Settlement Agreement, including a redline showing the exact changes made, were posted on the Court's publicly accessible PACER database in February 2015. (Class Counsel and the NFL Parties' Joint Submission in Resp. to the Feb. 2, 2015 Order of the Ct., Ex. A, Feb. 13, 2015, ECF No. 6481-1.) Between February and April 2015, more than 40 Settlement Class Members filed objections to the amendments, including objections to the amendment to the definition of Death with CTE at issue here. (*See*

Armstrong Objectors' Suppl. Obj. to the Am. Class Action Settlement, ECF No. 6503; Miller Suppl. Obj. to Settlement, ECF No. 6484.) Sagapolutele did not file any objection.

After considering those objections, the Court issued its opinion approving the Settlement Agreement and finding that "Class Members who opted out . . . received adequate notice of these changes, ***and notification of Class Members is not required***." *In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. at 386 (emphasis added). The Court explained: "Because these changes improved the deal for Class Members without providing any concessions to the NFL Parties, an additional round of notice for Class Members is unnecessary." *Id.* On appeal, the Third Circuit affirmed this Court's Final Order and Judgment in full. Regarding notice, the Third Circuit agreed with the District Court, finding "that the content of the class notice . . . satisfied Rule 23 and due process." *In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 435-36 (3d Cir. 2016), *amended* (May 2, 2016), *cert. denied*, 137 S. Ct. 591 (2016), and *cert. denied*, 137 S. Ct. 607 (2016). Notably, the Third Circuit also "conclude[d] that the settlement's treatment of CTE does not render the agreement fundamentally unfair." *Id.* at 444.

On August 15, 2017, over two years after this Court granted final approval of the Settlement, Sagapolutele filed this Motion challenging the Court's determination that the amendments were beneficial to Settlement Class Members and therefore did not require additional notice, and seeking "modification of the Final Order and Judgment by removal of the deadline to obtain a Qualifying Diagnosis of Death with CTE."[4] (Pl. Mot. at 2.) Sagapolutele contends that "[t]his deadline was added to the Settlement Agreement in February 2015 without

---

[4]    Relatedly, Sagapolutele also seeks an "instruction to the settlement administrator to develop forms and procedures that allows Class Members to obtain a Qualifying Diagnosis of Death with CTE by obtaining a post-mortem diagnosis by a board-certified neuropathologist at any time during the 65-year term of the Monetary Award Fund." (Pl. Mot. at 2.)

notice to the class," and "effectively prevented Class Members . . . from obtaining a Qualifying Diagnosis of Death with CTE." (*Id.*) Despite Sagapolutele's claim that "this deadline materially prejudices" Settlement Class Members (*id.*), she offers no explanation, much less an evidentiary showing, of how her own rights were in any way impaired by the alleged lack of notice. She does not demonstrate—or even assert—that the brain of her late husband has been examined by a board-certified neuropathologist and determined to have CTE. Therefore, not only is Sagapolutele's injury entirely hypothetical, but she also does not establish that such an examination would even be viable, given her husband's death in 2009.[5]

The NFL Parties, through this memorandum of law, oppose the Motion.

<u>Argument</u>

<center>I.</center>

### THE PARTIES WERE NOT REQUIRED TO NOTIFY THE SETTLEMENT CLASS ABOUT THE AMENDMENTS

Sagapolutele argues that her due process rights were violated because she did not receive notice that the February 2015 amendment "impos[ed] a deadline to obtain a Qualifying Diagnosis of Death with CTE" when the original Settlement Agreement purportedly permitted "Class Members [to] obtain a Qualifying Diagnosis for Death with CTE anytime within the 65-year life of the Monetary Award Fund." (Pl. Mem. at 17.) Not so.

"[T]he Due Process Clause of the Fourteenth Amendment requires that notice [concerning a class action settlement] be 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" *In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. at

---

[5]    *See* Compl. ¶ 43, *Sagapolutele* v. *Nat'l Football League*, No. 17-cv-00348 (E.D. Pa. Jan. 25, 2017), ECF No. 1; *see also* Am. Stip. of Dismissal, *Sagapolutele* v. *Nat'l Football League*, No. 17-cv-00348 (E.D. Pa. May 3, 2017), ECF No. 4 (approving stipulation of dismissal without prejudice).

<center>8</center>

383 (quoting *Mullane* v. *Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)).[6]  Parties

settling a class action litigation should therefore distribute notice that "'fairly apprises' class

members of the action and their rights."  Newberg on Class Actions § 8:17 (5th ed.).  Additional

notice is only required when the settling parties subsequently introduce amendments that "would

have a *material adverse* effect on the rights of class members."  *In re Diet Drugs Prods. Liab.*

*Litig.*, No. 99-cv-20593, 2010 WL 2735414, at *6 (E.D. Pa. July 2, 2010) (emphasis added); *see*

*also In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 175 n.10, 182 (3d Cir. 2013) (supplemental

notice required only for "*material* alterations" (emphasis added)).  Conversely, if the

amendments are neutral or beneficial to the settlement class, no additional notice is required.  *See*

*Harris* v. *Graddick*, 615 F. Supp. 239, 244 (N.D. Ala. 1985) (holding that where "the

amendment is narrow and it is clearly apparent that the interests of the classes are not

*substantially impaired*, . . . the notice already given is adequate" (emphasis added)); *see also In*

*re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. at 383 (collecting cases,

including *Harris*).  That is the case here.

### A.    The Amendments Did Not Require New Notice

Sagapolutele's argument—that the Parties should have re-distributed notice

reflecting the February 2015 amendments to the Settlement Agreement—fundamentally

misunderstands the substance of the amendments.  In Sagapolutele's telling, "in the midst of

otherwise beneficial amendments" to the Settlement Agreement, the Parties "impose[d] an

additional requirement that prevents Class Members from recovering settlement proceeds [for

CTE] unless they obtained a Qualifying Diagnosis before" Final Approval.  (Pl. Mem. at 8.)  But

---

[6]  Due process notice requirements mirror those of Rule 23 of the Federal Rules of Civil Procedure.  *See* Newberg
on Class Actions § 1:5 (5th ed.) ("Rule 23 is constructed to ensure that the representative nature of class action
litigation safeguards these absent class members' due process rights."); *id.* § 8:7 (5th ed.) (the notice
requirements under Rule 23 "echo[] the constitutional test set forth by the Supreme Court"); *id.* § 8:36 (5th ed.)
("[A]s Rule 23's requirements are quite similar to the Constitution's, the distinction may be immaterial.").

the amendment only clarified what was always the case and extended the deadline for Death with CTE to Final Approval.

The original settlement agreement provided that an award for a Qualifying Diagnosis of Death with CTE would be available only to Retired NFL Football Players who died *and* received a CTE diagnosis prior to Preliminary Approval.  The Long-Form Notice made this explicit, stating that the Settlement's benefits include "[m]onetary awards for **diagnoses** of Death with CTE **prior to July 7, 2014** . . . ."  (*See* Long-Form Notice at 6, ECF No. 6086-1 (emphasis added); *see also* Decl. of Robert H. Klonoff Relating to the Proposed Class Settlement in the Nat'l Football League Players' Concussion Injury Litig. ¶ 85, Nov. 12, 2014, ECF No. 6423-9 ("[C]ontrary to the arguments advanced by various objectors, **excluding CTE in cases diagnosed after July 7, 2014**, is not irrational." (emphasis added)).)  Similarly, the Parties' publicly filed submission to the Court in support of the amendment stated specifically that the amendment's language providing only a grace period of time following death within which to obtain a neuropathological diagnosis of CTE was "*consistent with the Parties' intent under the original Settlement Agreement*."  (*See* Class Counsel and the NFL Parties' Joint Submission in Resp. to the Feb. 2, 2015 Order of the Ct. at 4, ECF No. 6481 (emphasis added).)

Contrary to Sagapolutele's contentions, this amendment did not adversely affect the Settlement Class—much less materially so.  In fact, the amendment *expanded* settlement benefits to encompass any additional Settlement Class Members who died after Preliminary Approval but before Final Approval, and provided 270 days to receive a CTE diagnosis for such players—thereby, increasing the time covered by the definition of Death with CTE by *nine* months.  (*See id.* at 4-5.)

Accordingly, far from being materially adverse to Settlement Class Members, these amendments actually made the Settlement Agreement *more beneficial* by expanding the availability of an award for Death with CTE to a larger class of claimants. (*Id.*) Thus, as this Court previously held, "[b]ecause these changes improved the deal for Class Members without providing any concessions to the NFL Parties, an additional round of notice for Class Members is unnecessary." *In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. at 386; *see also In re Baby Prods. Antitrust Litig.*, 708 F.3d at 175 n.10, 182; *In re Diet Drugs Prods. Liab. Litig.*, 2010 WL 2735414, at *6; *Harris*, 615 F. Supp. at 244.

**B.   The Original Settlement Notice Was Sufficient**

Sagapolutele's due process argument fails for an additional reason. The original notice, as this Court held, was clear that not all CTE diagnoses would be compensated under the Settlement Agreement, and the publicly available amendments sufficiently defined those CTE diagnoses eligible for compensation.

*First*, the Short- and Long-Form notices distributed to Settlement Class Members adequately protected their due process rights. To comport with due process, settlement notice need only be adequate and summarize the terms of the Settlement; perfection and painstaking detail are not required. *See In re Nat'l Football League Concussion Injury Litig.*, 307 F.R.D. at 382-83; *see also In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1104-05 (5th Cir. 1977) (explaining that notice need not "[be] perfectly correct in its form," and instead that "[t]he standard [] is that the notice . . . must contain information that a reasonable person would consider to be material in making an informed, intelligent decision" about whether to opt out); *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 124 (S.D.N.Y 1997) ("The notice need not be highly specific, and indeed 'numerous decisions, no doubt recognizing that notices to class members can practicably contain only a limited amount of information, have approved very

general descriptions of the proposed settlement.'" (quoting *Weinberger* v. *Kendrick*, 698 F.2d 61, 70 (2d Cir. 1982)).

As this Court previously held in overruling objections that "the Long-Form Notice is confusing because the term 'Death with CTE' appears several times without the accompanying cutoff date, . . . [b]oth the Summary Notice and the Long-Form Notice indicate that **only 'certain' cases of CTE are covered**." *In re Nat'l Football League Concussion Injury Litig.*, 307 F.R.D. at 383-84 (emphasis added) (citing Summary Notice at 1, ECF No. 6086-2; Long-Form Notice at 1, ECF No. 6086-1). Moreover, as stated above, the Long-Form Notice specifically stated that the Settlement's benefits include "[m]onetary awards for **diagnoses** of Death with CTE **prior to July 7, 2014** . . . ." (*See* Long-Form Notice at 6, ECF No. 6086-1 (emphasis added).) Both the Short- and Long-Form notice thus alerted Settlement Class Members that an award for CTE was not absolute or unconditional; rather, a Settlement Class Member would need to satisfy "certain" criteria before any award would be made. That is the case here—under the original and amended Settlement Agreement, Sagapolutele must satisfy particular criteria before receiving an award of Death with CTE, including that she obtain her decedent's CTE diagnosis within a predetermined time period—and the original notice satisfied Sagapolutele's Due Process rights by alerting her to this fact.

*Second*, the Parties made the February 2015 amendments publicly available months prior to this Court's April 22, 2015 Final Approval Order (as amended May 8, 2015). Not only did the Parties post a copy of the amendments to this Court's publicly available PACER database as early as February 2015, but they also submitted a redline showing the exact changes to be made to the Settlement Agreement as a result of those proposed amendments. (Class Counsel and the NFL Parties' Joint Submission in Resp. to the Feb. 2, 2015 Order of the Ct., Ex.

A, Feb. 13, 2015, ECF No. 6481-1.)  This is especially significant in light of the widespread attention paid to the docket in this matter by, among others, the more than 5,000 Retired NFL Football Players who, at the time of settlement, were represented by counsel in MDL 2323.  *See In re Nat'l Football League Concussion Injury Litig.*, 307 F.R.D. at 389; *see also In re Diet Drugs Prods. Liab. Litig.*, 2010 WL 2735414, at *4  (holding that no notice of settlement agreement amendments was required because, in part, "notice of the proposed Tenth Amendment, along with an opportunity to object, was supplied to representatives of all class members with active cases in MDL No. 1203.").

In fact, the Parties' efforts to publicize the amendments were successful, as evidenced by the fact that over 40 Settlement Class Members filed objections to the amendments, *including objections to the very Death with CTE provision about which Sagapolutele complains*.  (*See* Armstrong Objectors' Suppl. Obj. to the Am. Class Action Settlement, ECF No. 6503; *see also* Miller Suppl. Obj. to Settlement, ECF No. 6484.)  While these objectors raised somewhat different concerns than Sagapolutele raises here—they argued that the award of Death with CTE should be available to Retired NFL Football Players who die after Final Approval—they nonetheless sought, at least in part, the same relief that Sagapolutele appears to now seek: "modification of the Final Order and Judgment by removal of the deadline to obtain a Qualifying Diagnosis of Death with CTE."  (Pl. Mot. at 2.)  This Court properly rejected these objectors' requests, and similarly should reject Sagapolutele's efforts here.

## II.

## SAGAPOLUTELE IS NOT ENTITLED TO REWRITE
## THE SETTLEMENT AGREEMENT

Even if Sagapolutele had established that notice of the amendments should have been given—which she has not, as explained above—her Motion would fail.  Sagapolutele first

argues that under Rule 60(a), the Court should rewrite the Settlement Agreement and amend the Final Order and Judgment because the Court made a "clerical error" when approving the amendments to the Settlement Agreement. Second, Sagapolutele contends that amendment under Rule 60(b)(6) is justified by "extraordinary circumstances." Finally, Sagapolutele argues that the Court's inherent authority permits it to amend the Final Order and Judgment here. (Pl. Mem. at 18-24.) These arguments lack merit.

*First*, Sagapolutele has not made the necessary showing under Rule 60(a). It is well settled that amendment of judgments pursuant to Rule 60(a) "is limited to the correction of 'clerical mistakes'; it encompasses only errors 'mechanical in nature, apparent on the record, and not involving an error of substantive judgment.'" *In re Diet Drugs Prods. Liab. Litig.*, 200 F. App'x 95, 103 (3d Cir. 2006) (quoting *Pfizer Inc.* v. *Uprichard*, 422 F.3d 124, 129 (3d Cir. 2005)). For Rule 60(a) to apply, the change to be corrected must not "affect[] the substantive rights of the parties." *Id.* at 103-04 (quoting *Pfizer*, 422 F.3d at 130) (holding Rule 60(a) inapplicable because the "correction here goes beyond the correction of a 'mindless and mechanistic mistake'" (quotation omitted)). Here, Sagapolutele has only ever alleged that the amendments in question were deliberate attempts by the Parties to modify the criteria for the Qualifying Diagnosis of Death with CTE. She cannot simultaneously argue these amendments were mere "clerical mistakes." As such, Rule 60(a) is inapplicable here.

*Second*, Sagapolutele's attempts to seek relief under Rule 60(b)(6) fail, too.[7] Relief under Rule 60(b) is "not ordinarily . . . available to non-parties," *Federman* v. *Artzt*, 339 F. App'x 31, 33-34 (2d Cir. 2009), and "[a]bsent class members such as [movant] are treated, with limited exceptions inapplicable here, as non-parties to a class action." *Adelson* v. *Ocwen*

---

[7] Although Sagapolutele broadly states she is moving for relief under Rule 60(b), her memorandum of law cites only to the Rule's catchall provision, which permits the modification of a final judgment based on "any other reason that justifies relief." Fed. R. Civ. P. 60(b)(6).

*Fin. Corp.*, 621 F. App'x 348, 351 (7th Cir. 2015); *Federman*, 339 F. App'x at 33-34 (holding that absent class members who did not object to settlement were not "parties" for purposes of Rule 60(b) and declining "to expand the narrow exception to the general rule that non-parties cannot bring Rule 60(b) motions"); *In re Four Seasons Sec. Laws Litig.*, 525 F.2d 500, 504 (10th Cir. 1975) (absent class member "did not become a party for the purposes of Rule 60(b) to enable him to challenge the adequacy or nature of the settlement"); *see also* Fed. R. Civ. Proc. 60(b) ("the court may relieve *a party* . . . from a final judgment, order, or proceeding for the following reasons" (emphasis added)).  Sagapolutele did not object, intervene, or otherwise take steps to become a "party" to this action, so Rule 60(b) is not available to her here.  *See also* Newberg on Class Actions § 18:40 (5th ed.) ("[A]ll the circuits that have considered the issue have taken the position that absent class members are generally not authorized to file Rule 60 motions.").

Even if Sagapolutele were a "party," she has not met her burden to seek relief pursuant to Rule 60(b)(6) because such "[r]elief . . . may only be granted under extraordinary circumstances where, without such relief, an *extreme and unexpected hardship* would occur." *Sawka* v. *Healtheast, Inc.*, 989 F.2d 138, 140 (3d Cir. 1993) (emphasis added); *see also Matthews, Wilson & Matthews, Inc.* v. *Capital City Bank*, 614 F. App'x 969, 971 (11th Cir. 2015) (Rule 60(b)(6) "is an extraordinary remedy which may be invoked only upon a showing of exceptional circumstances, and the party seeking relief has the burden of showing that absent such relief, an extreme and unexpected hardship will result." (internal quotations omitted)); *Orlando Residence, Ltd.* v. *Hilton Head Hotel Inv'rs*, No. 89-cv-0662, 2013 WL 1103027, at *8 (D.S.C. Mar. 15, 2013), *aff'd sub nom. Orlando Residence, Ltd.* v. *Nelson,* 565 F. App'x 212 (4th Cir. 2014) ("Relief is rarely granted under . . . [Rule] 60(b)(6).").  The bar for relief under

Rule 60(b) is particularly high where the movant seeks to amend in "a class action [because] a too liberal application of Rule 60(b) would undermine the finality of judgments entered in such actions and would discourage their settlement." *Inmates of Suffolk Cty. Jail* v. *Rufo*, No. 71-cv-00162, 2015 WL 6958070, at *2 (D. Mass. Nov. 10, 2015); *see also Blue Diamond Coal Co.* v. *Trustees of UMWA Combined Ben. Fund*, 249 F.3d 519, 524 (6th Cir. 2001) ("[R]elief under Rule 60(b) is circumscribed by public policy favoring finality of judgments and termination of litigation. This is especially true in an application of subsection (6) of Rule 60(b) . . . ." (internal quotations omitted)).

Sagapolutele has not made any showing whatsoever that the amendment will cause her any hardship, much less "extreme and unexpected hardship." Tellingly, she has not shown—through supporting exhibits, affidavits, or even proffered facts in her brief—that the brain of her late husband, who passed away in 2009, has been examined by a board-certified neuropathologist and diagnosed with CTE at *any time*, much less that she would, but for the amendment, be entitled to an award. She also has not established that a belated diagnosis years after death (indeed, her husband died approximately eight years ago) would even be possible given the deterioration of brain matter after death. Nor does she seek to justify her apparent delay in seeking an examination. Instead, Sagapolutele invites only speculation and offers only conclusory assertions as to how the purported change impacts her rights under the agreement, and she therefore fails to show that the exceptional remedy of Rule 60(b)(6) is warranted here.

*Finally*, Sagapolutele's invocation of the Court's "inherent authority" to amend a judgment does not salvage her claim because that authority is no broader than that provided by Rule 60, which, as explained above, does not permit Sagapolutele the relief she seeks. *See* 20 Fed. Prac. & Proc. Deskbook § 104 (after 28 days from entry, "the judgment may be attacked,

other than by appeal, only as provided in Rule 60."); 11 Fed. Prac. & Proc. Civ. § 2852 (3d ed.) (while "the power of a court to modify an interlocutory judgment or order at any time prior to final judgment remains unchanged and is not limited by the provisions of Rule 60(b) . . . , [t]he rule does apply, however, to all final judgments entered in civil actions."). Sagapolutele's cases are not to the contrary; none holds that Courts have inherent authority to amend a final judgment approving a settlement agreement. (*See* Pl. Mem. at 23-24.) Three of the five cited cases concern only a court's authority to *enforce* a settlement agreement. *See Kokkonen* v. *Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 381 (1994) (holding that a district court has inherent authority to *enforce* a settlement agreement under particular circumstances); *Roman-Oliveras* v. *Puerto Rico Elec. Power Auth.*, 797 F.3d 83, 86-87 (1st Cir. 2015) (same); *Hensley* v. *Alcon Labs., Inc.*, 277 F.3d 535, 540-41 (4th Cir. 2002) (same). The fourth case, *In re Linerboard Antitrust Litig.*, 223 F.R.D. 357, 363 (E.D. Pa.), *amended*, 223 F.R.D. 370 (E.D. Pa. 2004) simply stands for the proposition that a court overseeing an MDL has inherent power to control the discovery process—an issue not relevant or in dispute here. Finally, while the fifth case involved an *amendment* of an order entering a settlement agreement, the Court did not hold that the district court had inherent authority to make the amendment; rather, it simply held that "the merits of [the district court's] decision to amend are no longer open to review." *F.A.C., Inc.* v. *Cooperativa de Seguros de Vida de Puerto Rico*, 449 F.3d 185, 190–91 (1st Cir. 2006).

In sum, Sagapolutele has not demonstrated (and cannot demonstrate) that she is entitled to rewrite the Settlement Agreement.

## <u>Conclusion</u>

For the foregoing reasons, the NFL Parties respectfully request that the Court deny the Motion in its entirety.

Dated:  September 28, 2017

Respectfully submitted,

/s/ Brad S. Karp
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
Brad S. Karp
Bruce Birenboim
Lynn B. Bayard
1285 Avenue of the Americas
New York, NY 10019-6064
Tel:   (212) 373-3000
bkarp@paulweiss.com

PEPPER HAMILTON LLP
Sean P. Fahey
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA 19103-2799
Tel:   (215) 981-4000

*Attorneys for Defendants the National Football
League and NFL Properties LLC*

## <u>CERTIFICATE OF SERVICE</u>

It is hereby certified that a true copy of the foregoing Memorandum of Law of the National Football League and NFL Properties LLC in Opposition to Settlement Class Member Yvonne Sagapolutele's Motion to Modify the Amended Final Order and Judgment was served electronically via the Court's electronic filing system on the 28th day of September, 2017, upon all counsel of record.

Dated:  September 28, 2017                        /s/Brad S. Karp
                                                                   Brad S. Karp



# NFL CONCUSSION SETTLEMENT

*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

## POST-APPEAL NOTICE OF DENIAL OF MONETARY AWARD CLAIM
### DATE OF NOTICE: October 31, 2019

### I. SETTLEMENT CLASS MEMBER INFORMATION

| | |
|---|---|
| **Settlement Program ID** | 950013395 |

| **Name:** | First: Carleen | M.I. | Last: Hastings |
|---|---|---|---|

| | |
|---|---|
| **Settlement Class Member Type** | Representative Claimant |
| **Lawyer** | O'Hanlon, Demerath & Castillo |

| **Qualifying Diagnosis** | Death with CTE (Chronic Traumatic Encephalopathy) | **Date of Qualifying Diagnosis** | 10/15/08 |
|---|---|---|---|

| | |
|---|---|
| **Appellant** | Settlement Class Member |
| **Appellee** | NFL |

### II. EXPLANATION OF CLAIM DETERMINATION

This Notice is an official communication from the Claims Administrator for the NFL Concussion Settlement Program. The Special Master reviewed the appeal and determined the following, which is final and binding:

Appeal denied. Appellant did not show clear and convincing evidence of error in the Claims Administrator's decision. The Special Master's decision is a factual determination and is final and binding.

| 1. | Special Master ruled that the claim is denied |
|---|---|

### III. HOW TO CONTACT US WITH QUESTIONS OR FOR HELP

If you are represented by a lawyer, consult with your lawyer if you have questions or need assistance. If you are unrepresented and have any questions about this Notice or need help, contact us at 1-855-887-3485 or send an email to ClaimsAdministrator@NFLConcussionSettlement.com.  If you are a lawyer, call or email your designated Firm Contact for assistance. For more information about the Settlement program, visit the official website at www.NFLConcussionSettlement.com to read the Frequently Asked Questions or download a copy of the complete Settlement Agreement.



**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br><br>MDL No. 2323<br><br>Hon. Anita B. Brody |
| Kevin Turner and Shawn Wooden, *on behalf of themselves and others similarly situated*,<br><br>                              Plaintiffs,<br><br>                    v.<br><br>National Football League and NFL Properties, LLC, successor-in-interest to NFL Properties, Inc.<br>                              Defendants. | Civ. Action No.: 14-cv-00029-AB |
| THIS DOCUMENT RELATES TO:<br>Settlement Class Member Carleen Hastings (SPID 950013395) | Hon. Anita B. Brody |

**RESPONSE OF THE NATIONAL FOOTBALL LEAGUE AND**
**NFL PROPERTIES LLC IN OPPOSITION TO CARLEEN HASTINGS'**
**OBJECTION TO POST-APPEAL NOTICE OF DENIAL OF**
**MONETARY AWARD CLAIM**

# TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................................... i

PRELIMINARY STATEMENT ........................................................................................ 1

BACKGROUND .............................................................................................................. 3

ARGUMENT .................................................................................................................... 4

    A.    Qualifying Diagnoses of Death with CTE Must Be Rendered Prior to the Deadline Set Forth in the Settlement Agreement ..................................................... 4

    B.    Diagnosing Physicians Must Examine Brain Tissue to Render a Qualifying Diagnosis of Death with CTE............................................................. 7

Conclusion ....................................................................................................................... 8

The National Football League and NFL Properties LLC (collectively, the "NFL Parties") respectfully submit this response in opposition to Carleen Hastings' Objection to Post-Appeal Notice of Denial of Monetary Award Claim (the "Objection"). In the Objection, Ms. Hastings seeks reversal of the Special Master's decision denying her appeal of a Qualifying Diagnosis of Death with CTE based on purported legal error. For the reasons set forth below, Ms. Hastings' arguments are without merit, and the Objection should be denied.

## PRELIMINARY STATEMENT

On July 30, 2019, the Claims Administrator denied Ms. Hastings' claim for a Qualifying Diagnosis of Death with CTE on behalf of the late Christopher Mims.[1] The Claims Administrator explained that Ms. Hastings' claim was insufficient to satisfy the Settlement criteria for the alleged Qualifying Diagnosis because it did not provide any evidence that the diagnosing physician, Dr. Ronald Hamilton, personally performed a post-mortem examination of Mr. Mims' brain before the deadline set forth in the Settlement Agreement (here, April 22, 2015 given that Mr. Mims died prior to Preliminary Approval of the Settlement). Ms. Hastings then appealed her claim determination to the Special Masters, arguing that (1) the date on which Dr. Hamilton actually diagnosed Mr. Mims does not matter, because FAQ 99 allegedly establishes that the "diagnosis date" for Death with CTE is the date of the player's death, regardless of when the actual diagnosis later occurs; (2) if the Claims Administrator determines that a diagnosing physician must render a diagnosis of Death with CTE prior to a deadline set forth in the operative Settlement Agreement, then the Settlement Agreement violates Settlement Class Members' due process rights because it purportedly reflects an adverse change to the original Settlement Agreement without proper notice;

---

[1]    Mr. Mims' death certificate indicates that he died on October 15, 2008 as a result of dilated cardiomyopathy, with contributing causes of hepatic steatosis and hypertension. (*See* Death Certificate, Doc. No. 142714 at 2.)

(3) the Settlement Agreement allegedly did not require Dr. Hamilton to examine Mr. Mims' brain tissue to render a post-mortem diagnosis; and (4) Dr. Hamilton did examine Mr. Mims' brain tissue. Upon considering these arguments, the Special Master denied the appeal and concurred with the Claims Administrator's determination that Ms. Hastings' claim did not satisfy the Settlement criteria for a Qualifying Diagnosis of Death with CTE. Ms. Hastings now asks the Court to overturn the Special Master's determination on legal grounds.

In the Objection, Ms. Hastings advances nearly identical versions of three of the four arguments set forth in her prior appeal: (1) Dr. Hamilton's alleged diagnosis of Mr. Mims was timely pursuant to Settlement FAQ 99 because the "diagnosis date" purportedly is the date of the player's death as opposed to when the diagnosis actually occurred; (2) the Settlement Agreement's Injury Definition for Death with CTE allegedly did not require Dr. Hamilton to examine Mr. Mims' brain tissue to render the diagnosis; and (3) the Claims Administrator allegedly erred in stating that Dr. Hamilton did not examine Mr. Mims' brain tissue. There is no merit to these arguments.

In fact, the Injury Definition for Death with CTE set forth in the Settlement Agreement expressly requires that a board-certified neuropathologist render the diagnosis prior to the Final Approval Date (April 22, 2015) or within 270 days after the player's death when the player died between Preliminary and Final Approval. The Objection willfully ignores the express language of the Settlement Agreement while attempting to twist the meaning of FAQ 99 to displace the Settlement Agreement's unambiguous requirements. Here, Ms. Hastings did not provide—and undoubtedly cannot provide—any evidence that Dr. Hamilton rendered the diagnosis prior to the April 22, 2015 deadline, and that factual record is final and binding for this Objection.

In addition, as this Court made clear in approving the Settlement Agreement, a proper Qualifying Diagnosis of Death with CTE necessarily requires that a board-certified neuropathologist personally examine a Retired NFL Football Player's brain tissue prior to the deadline set forth in the Settlement Agreement.  Moreover, even though Dr. Hamilton indicated that he examined slides of Mr. Mims' brain tissue, neither Dr. Hamilton nor Ms. Hastings have provided any evidence that Dr. Hamilton personally examined Mr. Mims' brain tissue prior to the deadline set forth in the Settlement Agreement.

For these reasons, and those set forth herein and in the NFL Parties' opposition to Ms. Hastings' appeal, the Objection should be denied.

## BACKGROUND

This Objection is one of a series of 20 separate objections filed by the law firm of O'Hanlon, Demerath & Castillo ("O'Hanlon") on behalf of claimants whose Claim Packages relied on undated letters from neuropathologist Dr. Ronald Hamilton purporting to render Qualifying Diagnoses of Death with CTE.  For each of these claims, neither Dr. Hamilton's undated letter nor the remaining Claim Package materials provide any evidence that Dr. Hamilton actually rendered a Qualifying Diagnosis of Death with CTE prior to Final Approval of the Settlement (or within 270 days of death when the Retired Player died between Preliminary and Final Approval).  In addition, for all but one of these claims, Dr. Hamilton's letter fails to provide any evidence that Dr. Hamilton examined the deceased player's brain tissue in order to render the diagnosis.

With knowledge that Mr. Mims and its other clients never received a diagnosis of Death with CTE prior to the deadline set forth in the Settlement Agreement, O'Hanlon has engaged in a lengthy campaign to evade the deadline plainly established for Qualifying Diagnoses of Death with CTE.  On August 15, 2017, O'Hanlon, on behalf of client Yvonne Sagapolutele, filed a

Motion to Modify the Amended Final Order and Judgment, alleging that the Settlement Agreement's deadline to obtain a Qualifying Diagnosis of Death with CTE was "imposed after the deadline to opt out and without notice to Class Members." (Mem. of Law in Supp. of Absent Class Member and Pl. Yvonne Sagapolutele's Mot. to Modify the Am. Final Order and J. at 18, 12-md-2323, ECF No. 8263-2 (the "Motion to Modify the Amended Final Order and Judgment").) After full briefing, the Court denied the motion without prejudice to Ms. Sagapolutele's (or other similarly situated Settlement Class Members') ability to raise the issue at a later time if she filed a Death with CTE claim that would have been valid but for the deadline. (Order, 12-md-2323, ECF No. 8557.) O'Hanlon then waited over 16 months to file any Death with CTE claims—ultimately filing 20 separate claims on February 5, 2019 (the day before the deadline for pre-Effective Date claims)—and relying on undated letters from Dr. Hamilton with the clear intention of obfuscating the timing and nature of the purported Death with CTE diagnoses. O'Hanlon is now back before the Court advancing meritless arguments with respect to Qualifying Diagnoses of Death with CTE that the Court should summarily reject.

## ARGUMENT

In the Objection, Ms. Hastings argues that Dr. Hamilton's alleged diagnosis was timely because the "diagnosis date" for a Death with CTE claim purportedly is the date of the player's death, and that, although Dr. Hamilton allegedly did examine slides of Mr. Mims' brain tissue, the Settlement Agreement did not require Dr. Hamilton to examine Mr. Mims' brain tissue to render the diagnosis. Both arguments are wholly without merit.

### A.    Qualifying Diagnoses of Death with CTE Must Be Rendered Prior to the Deadline Set Forth in the Settlement Agreement

*First*, Ms. Hastings argues that the Special Master erred in denying her appeal because a diagnosing physician need not render a Qualifying Diagnosis of Death with CTE prior to *any*

deadline so long as the retired player decedent passed away before the Settlement's Final Approval Date. (*See* Objection at 6-7.) That argument, however, is contradicted by the clear terms of the Settlement Agreement.

For a Qualifying Diagnosis of Death with CTE, the Settlement Agreement explicitly requires that a diagnosing physician render the diagnosis prior to a specified deadline set by the Settlement Agreement. Specifically, Section 2.1(aa) of the Settlement Agreement provides that the Qualifying Diagnosis of "Death with CTE is defined in Exhibit 1," and Exhibit 1 states that the definition of Death with CTE is: "For Retired NFL Football Players who died prior to the Final Approval Date, *a post-mortem diagnosis of CTE made by a board-certified neuropathologist prior to the Final Approval Date, provided that a Retired NFL Football Player who died between July 7, 2014 and the Final Approval Date shall have until 270 days from his date of death to obtain such a postmortem diagnosis*." (Settlement Agreement, Ex. A-1 at 5 § 5 (emphasis added).) Section 6.3(f) of the Settlement Agreement reiterates that requirement.

In the Objection, as in her prior appeal, Ms. Hastings argues that, where a player died before the Final Approval Date, *no deadline applies* to when a physician must render a Qualifying Diagnosis of Death with CTE because "the diagnosis date for Death with CTE is the date of the Player's death, even if the diagnosis occurs later." (Objection at 6; *see also* Written Statement in Support of Class Member's Appeal of the Claims Administrator's Notice of Denial of Monetary Award Claim, Objection Ex. 4 at 5 (arguing that "the only date that is relevant in determining the date of a Qualifying Diagnosis for Death with CTE is the date of the Player's death").) As support for this argument, Ms. Hastings cites Settlement FAQ 99 (formerly Settlement FAQ 93), which states in part:

> *Death with CTE*: For these claims, the date of the Qualifying Diagnosis is the date of the Player's death, even though the

> diagnosis is not made until after the Player dies. The Monetary
> Award is based on the Player's age when he died.

(Settlement FAQ 99.)

Ms. Hastings' argument rests on willful ignorance of the Settlement Agreement and a misinterpretation of Settlement FAQ 99.  Specifically, as outlined above, the Settlement Agreement plainly requires that, "[f]or Retired NFL Football Players who died prior to the Final Approval Date, a post-mortem diagnosis" of Death with CTE must be "made by a board-certified neuropathologist *prior to the Final Approval Date* . . . ."  (Settlement Agreement Ex. A-1 at 5 § 5 (emphasis added).)  Moreover, if, as Ms. Hastings argues, the Settlement Agreement required only that a Retired NFL Football Player died prior to the Final Approval Date in order for a diagnosis made at *any unlimited future date* to be timely, the Settlement Agreement would not include subsequent language providing that a player who died between July 7, 2014 and April 22, 2015 "*shall have until 270 days from his date of death to obtain such a postmortem diagnosis*."  (*Id.*)

Moreover, Settlement FAQ 99 does not—and cannot—alter the Settlement Agreement's Injury Definition setting forth the date by which a Diagnosing Physician must have *actually made* a Death with CTE diagnosis. Instead, FAQ 99 concerns the date of diagnosis used *for calculating compensation*.  The Parties to the Settlement Agreement did not wish to reduce the compensatory award of a decedent by calculating the award value from the date of the neuropathological examination and diagnosis because, unlike living claimants, the decedent would not have aged between death and the relevant examination.  Thus, the Death with CTE discussion in Settlement FAQ 99 clearly states that "[t]he *Monetary Award* is based on the Player's age when he died."

(Settlement FAQ 99 (emphasis added).)  Ms. Hastings' counsel shamelessly excluded that clarifying language from the FAQ quotation included in the Objection.  (*See* Objection at 6.)

For these reasons, Ms. Hastings' first legal argument lacks any merit whatsoever.

**B.     Diagnosing Physicians Must Examine Brain Tissue to Render a Qualifying Diagnosis of Death with CTE**

*Second*, Ms. Hastings argues that the Special Master erred in denying her appeal because the Settlement Agreement purportedly does not require a diagnosing physician to examine brain tissue to render a Qualifying Diagnosis of Death with CTE.  (*See* Objection at 7-8.)  Ms. Hastings is simply wrong.

As previously discussed, a Qualifying Diagnosis of Death with CTE requires "a post-mortem diagnosis of CTE made by a board-certified neuropathologist prior to the Final Approval Date . . . ."  (Settlement Agreement, Ex. A-1 at 5 § 5; *see also* Settlement Agreement §§ 2.1(aa), 6.3(f).)  As this Court made clear in the Court's Memorandum supporting Final Approval of the Settlement Agreement, post-mortem examination of brain tissue is the ***only*** way that CTE can be diagnosed at present:

> Chronic Traumatic Encephalopathy is a neuropathological diagnosis that currently can only be made post mortem. This means no one can conclusively say that someone had CTE until a scientist looks at sections of that person's brain under a microscope to see if abnormally phosphorylated tau protein ("abnormal tau protein") is present, and if so whether it is present in a reportedly unique pattern.

*In re Nat. Football League Players' Concussion Injury Litig.*, 307 F.R.D. 351, 397 (E.D. Pa. 2015), *amended*, No. 2:12-MD-02323-AB, 2015 WL 12827803 (E.D. Pa. May 8, 2015), and *aff'd*, 821 F.3d 410 (3d Cir. 2016).  This Court further explained that "Retired Players cannot be compensated for CTE in life because no diagnostic or clinical profile of CTE exists, and the symptoms of the disease, if any, are unknown."  (*Id.*)  CTE researchers continue to support this holding with respect

to the diagnosis of CTE today.  *See, e.g.*, Jesse Mez et al., *Duration of American Football Play and Chronic Traumatic Encephalopathy*, Annals of Neurology (forthcoming, first published Oct. 7, 2019), https://onlinelibrary.wiley.com/doi/abs/10.1002/ana.25611 (explaining that "CTE only can be definitively diagnosed by postmortem neuropathologic examination," and that "validated *in vivo* diagnostic criteria do not currently exist").

Thus, the Settlement Agreement and its implementing orders clearly require that a diagnosing physician personally examine a Retired NFL Football Player's brain tissue in order to render a Qualifying Diagnosis of Death with CTE.  Here, Dr. Hamilton submitted an undated letter indicating that he examined slides of Mr. Mims' brain tissue in order to render the diagnosis (*see* Hamilton Letter, Objection at 3), but, as previously discussed, neither Dr. Hamilton nor Ms. Hastings have provided *any* evidence that Dr. Hamilton performed such a post-mortem examination and diagnosed Mr. Mims with CTE prior to April 22, 2015.  For these reasons, even if Dr. Hamilton's evaluation of the slides were considered a sufficient post-mortem examination of Mr. Mims' brain tissue to render a valid diagnosis, Ms. Hastings' claim was still unsupported.

## Conclusion

For the foregoing reasons, the NFL Parties respectfully request that the Court deny Ms. Hastings' Objection and affirm the Special Master's decision.

Dated: December 12, 2019

Respectfully submitted,

/s/ Brad S. Karp

PAUL, WEISS, RIFKIND, WHARTON
  & GARRISON LLP
Brad S. Karp
Bruce Birenboim
Claudia Hammerman
Lynn B. Bayard
Douglas M. Burns
1285 Avenue of the Americas
New York, NY 10019-6064
Tel: (212) 373-3000
bkarp@paulweiss.com

*Attorneys for the National Football League and NFL Properties LLC*

# IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br><br>MDL No. 2323 |
| THIS DOCUMENT RELATES TO:<br><br>ALL CLAIMS LISTED BELOW. | **Hon. Anita B. Brody** |

## SETTLEMENT IMPLEMENTATION ORDER

**AND NOW,** this 16th day of June, 2020, it is **ORDERED** that the following claim

appeals are **REMANDED** to the Special Master for further explanation[1]:

1. SPID 950011814

2. SPID 950011815

3. SPID 950011818

4. SPID 950011819

5. SPID 950011820

---

[1] In each of these cases, the Settlement Class Member submitted a claim for a diagnosis of Death With CTE. In each, the Claims Administrator denied the claim for two reasons: (1) failure to comply with the deadline for obtaining a Death With CTE Diagnosis; and (2) failure to provide proof that a physician examined the deceased's brain-tissue. In each case, the Special Master affirmed the denial, stating that the Appellant did not point to clear and convincing evidence of error in the Claims Administrator's decision. But the Special Master did not specify whether this conclusion applied to *both* of the Claims Administrator's reasons or only *one* of those reasons.

For at least two claims—SPID Nos. 950013395 and 950012548—there is evidence in the record that a doctor personally examined slides with brain tissue of the deceased player. But the Claims Administrator appears to have denied these claims for both reasons above: that (1) the claim packages did not satisfy the diagnosis deadline for Death with CTE claims, and (2) the claims packages did not establish that a doctor reviewed the deceased player's brain tissue. The Special Master affirmed the Claims Administrator's decisions, but never specified the grounds of the affirmance. For these claims, as well as every other claim listed in this Order, the Special Master must specify whether clear and convincing evidence of error exists as to each independent basis given by the Claims Administrator for the denials.

1

6. SPID 950011821

7. SPID 950011822

8. SPID 950012548

9. SPID 950013154

10. SPID 950013174

11. SPID 950013176

12. SPID 950013178

13. SPID 950013179

14. SPID 950013223

15. SPID 950013395

16. SPID 950013403

17. SPID 950013520

18. SPID 950013523

19. SPID 950013608

20. SPID 950015171

June 16, 2020

s/ANITA B. BRODY, J. _____
ANITA B. BRODY, J.

2

## IN THE UNITED STATES DISTRICT COURT FOR THE
### EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br><br>MDL No. 2323 |
| THIS DOCUMENT RELATES TO:<br><br>ALL CLAIMS LISTED BELOW. | **Hon. Anita B. Brody** |

## SETTLEMENT IMPLEMENTATION ORDER

**AND NOW,** this 16th day of June, 2020, it is **ORDERED** that the following claim appeals are **REMANDED** to the Special Master for further explanation[1]:

1. SPID 950011814

2. SPID 950011815

3. SPID 950011818

4. SPID 950011819

5. SPID 950011820

---

[1] In each of these cases, the Settlement Class Member submitted a claim for a diagnosis of Death With CTE. In each, the Claims Administrator denied the claim for two reasons: (1) failure to comply with the deadline for obtaining a Death With CTE Diagnosis; and (2) failure to provide proof that a physician examined the deceased's brain-tissue. In each case, the Special Master affirmed the denial, stating that the Appellant did not point to clear and convincing evidence of error in the Claims Administrator's decision. But the Special Master did not specify whether this conclusion applied to *both* of the Claims Administrator's reasons or only *one* of those reasons.

For at least two claims—SPID Nos. 950013395 and 950012548—there is evidence in the record that a doctor personally examined slides with brain tissue of the deceased player. But the Claims Administrator appears to have denied these claims for both reasons above: that (1) the claim packages did not satisfy the diagnosis deadline for Death with CTE claims, and (2) the claims packages did not establish that a doctor reviewed the deceased player's brain tissue. The Special Master affirmed the Claims Administrator's decisions, but never specified the grounds of the affirmance. For these claims, as well as every other claim listed in this Order, the Special Master must specify whether clear and convincing evidence of error exists as to each independent basis given by the Claims Administrator for the denials.

1

6.  SPID 950011821

7.  SPID 950011822

8.  SPID 950012548

9.  SPID 950013154

10. SPID 950013174

11. SPID 950013176

12. SPID 950013178

13. SPID 950013179

14. SPID 950013223

15. SPID 950013395

16. SPID 950013403

17. SPID 950013520

18. SPID 950013523

19. SPID 950013608

20. SPID 950015171

June 16, 2020

s/ANITA B. BRODY, J. _____ ____
ANITA B. BRODY, J.

2

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | : : : | No. 2:12-md-02323-AB<br><br>MDL No. 2323 |
|  | : : | **Hon. Anita B. Brody** |
| THIS DOCUMENT RELATES TO: APPEAL OF SETTLEMENT CLASS MEMBER CARLEEN HASTINGS REGARDING DENIAL OF MONETARY AWARD | : : : : : : : | SPID No. 950013395 |

## INTRODUCTION

On February 5, 2019, Representative Claimant Carleen Hastings filed a claim for benefits under the Amended Settlement Agreement on behalf of her late son, Christopher E. Mims, a Retired NFL Football Player. Mr. Mims passed away on October 15, 2008, and later received a post-mortem diagnosis of Chronic Traumatic Encephalopathy. The Claims Administrator denied the claim for two reasons: (1) failure to meet the diagnosis deadline for Death with CTE claims, and (2) failure to establish that a doctor reviewed Mr. Mims' brain tissue.

Ms. Hastings timely appealed. Special Master Pritchett affirmed the denial, and Ms. Hastings subsequently appealed to the District Court. Following review of Ms. Hastings' objection, the Court has remanded this claim to the Special Master to clarify whether the affirmance applies to one or both of the reasons for denial provided by the Claims Administrator.[1]

While there is no clear and convincing evidence that a diagnosis was made before the appropriate deadline, I do find there is clear and convincing evidence that the diagnosing neuropathologist personally examined Mr. Mims' brain tissue. I therefore re-affirm the Claims Administrator's denial of Ms. Hastings' claim on the first basis only.

## FACTUAL AND PROCEDURAL BACKGROUND

On the morning of October 15, 2008, Christopher Mims was found unresponsive on his bathroom floor by a friend, who called the paramedics. Doc. 199440. Mr. Mims was pronounced at the scene, and a post-mortem autopsy was performed the following day. *Id.* His cause of death was determined to be dilated cardiomyopathy. *Id.*

---

[1] Settlement Implementation Order, Doc. 225731 (June 16, 2020).

On February 5, 2019, Ms. Hastings filed a claim for relief under the Settlement on behalf of her late son. Doc. 198425. Dr. Ronald Hamilton, a board-certified neuropathologist, provided a letter stating that he conducted an examination of the late Mr. Mims' brain tissue based upon "10 unstained slides from 8 tissue blocks" received from the Los Angeles County Medical Coroner. Doc. 199435. Dr. Hamilton concluded that the "findings are diagnostic of CTE," and that "Christopher Mims had CTE." *Id.* The letter is undated.

On June 17, 2019, the Claims Administrator denied the claim, writing:

> Although Dr. Hamilton is a board-certified neuropathologist and signed a Pre-Effective Date Diagnosing Physician Certification Form indicating a CTE diagnosis, we must have proof that he personally performed the post-mortem exam on the Retired Player and that it was done on or before 4/22/15. There was no post-mortem examination report submitted to indicate that Dr. Hamilton examined the Retired Player's brain tissue to confirm a CTE diagnosis. The two-page letter provided by Dr. Hamilton does not satisfy the requirements for a CTE diagnosis under this Settlement Program. For these reasons, this claim is denied.

Doc. 211985. Ms. Hastings timely appealed. Doc. 213485.

On October 31, 2019, Special Master Pritchett denied the Appeal, stating that "Appellant did not show clear and convincing evidence of error in the Claims Administrator's decision." Doc. 214492.

Ms. Hastings appealed the Special Master's decision to the Federal District Court, asserting that the Special Master erred in affirming the Claims Administrator's denial. Doc. 217476. Judge Brody remanded the claim for clarification, noting that the Special Master's decision "did not specify whether . . . [it] applied to both of the Claims Administrator's reasons or only one of [the] reasons" for denial of Ms. Hastings' claim. Doc. 225731.

## DISCUSSION

There are two criteria that must be satisfied under the Settlement Agreement to support a Qualifying Diagnosis of Death with CTE:[2]

(1) a post-mortem diagnosis made by a board-certified neuropathologist based on examination of the deceased Player's brain tissue,[3] *and*

---

[2] *See* Settlement Agreement, Exhibit A-1(5).

[3] As the Court wrote in the Final Order and Judgment approving the Settlement, "no one can conclusively say that someone had CTE until a scientist looks at sections of that person's brain under a microscope to see if abnormally phosphorylated tau protein ('abnormal tau protein') is present, and if so whether it is present in a reportedly unique pattern." *See* In re Nat'l Football League Players' Concussion Injury Litig., 307 F.R.D. 351, 391 (E.D. Pa. 2015). To conclusively diagnose CTE, the diagnosing neuropathologist must therefore examine the Player's brain tissue.

(2) compliance with the deadline for obtaining the post-mortem diagnosis.[4]

The Claims Administrator determined that Ms. Hastings' claim failed to satisfy either of the two requirements. By order of Judge Brody, I now review this matter to provide additional clarification following Special Master Pritchett's affirmance. Specifically, I will address "whether clear and convincing evidence of error exists as to each independent basis given by the Claims Administrator" for denial of Ms. Hastings' claim. Doc. 225731.

The Settlement explicitly provides that "[a] Qualifying Diagnosis of Death with CTE shall be made only for Retired NFL Football Players who died prior to the Final Approval Date [of April 22, 2015], through a post-mortem diagnosis made by a board-certified neuropathologist prior to the Final Approval Date . . . ." Thus, there are *two* aspects to complying with the deadline for obtaining a Qualifying Diagnosis of Death with CTE: both the date of the Qualifying Diagnosis *and* the date of the neuropathologist's post-mortem examination must be prior to April 22, 2015.

Mr. Mims tragically passed away at the age of 38 on October 15, 2008 due to heart complications. Doc. 199440. A post-mortem autopsy was conducted, which included a neuropathology examination. *Id.* The final neuropathologic diagnosis, reported by neuropathology consultant Dr. John Andrews, did not include CTE; notably, despite several minor abnormalities,[5] Dr. Andrews concluded with the following impression: "[o]therwise, grossly unremarkable adult brain and coverings." *Id.*

The present claim, based upon a diagnosis of Death with CTE, is supported by a conspicuously undated letter from Dr. Hamilton discussing his analysis of Mr. Mims' brain tissue.[6] Doc. 199435. The letter was filed on February 6, 2019. Although the date of the Qualifying Diagnosis (that is, the date of Mr. Mims' passing) is well before the Final Approval Date of April 22, 2015, no proof has been offered to suggest that Dr. Hamilton's examination was timely.

Counsel for Ms. Hastings repeatedly asserts that "the Claims Administrator erroneously concluded that the date of diagnosis is not the date of the Player's death." Doc. 217476. This incorrect assertion misrepresents the deficiency in Ms. Hastings' claim. The problem with this claim—as stated by the Claims Administrator—is not the date of the Qualifying Diagnosis; rather, at issue it is what date the diagnosis was ***actually made***.

Ms. Hastings continues to provide no proof of when Dr. Hamilton examined the late Mr. Mims' brain tissue to make his diagnosis. Thus, there is no clear and convincing evidence of error in the Claims Administrator's decision that the April 22, 2015 deadline for obtaining a diagnosis was not met.

---

[4] *See* Settlement Agreement, Section 6.3(f) ("A Qualifying Diagnosis of Death with CTE shall be made . . . through a post-mortem diagnosis made . . . prior to the Final Approval Date, provided that a Retired NFL Football Player who died between July 7, 2014 and the Final Approval Date shall have until 270 days from his date of death to obtain such a post-mortem diagnosis.") The Final Approval Date was April 22, 2015. *See* Settlement Portal, *Frequently Asked Questions*, FAQ # 98 (f).

[5] Specifically, Dr. Andrews noted the following impressions about Mr. Mims' brain: "adult cranial dura mater with small right middle fossa dural nodule," as well as "cerebrovasular congestion." Neither relates to CTE.

[6] Although it appears that Dr. Hamilton did personally examine slides of Mr. Mims' brain tissue, it is surprising that he does not discuss—or even acknowledge—the findings of Dr. Andrews' neuropathological examination.

## <u>CONCLUSION</u>

The Claims Administrator denied Ms. Hastings' claim for two independent reasons. First, the claim was denied based upon a lack of proof that the diagnosis was timely. I find that there is no evidence that the diagnosis of Death with CTE was obtained before the appropriate deadline. Second, the claim was denied for failure of the diagnosing physician to personally examine the Player's brain tissue. However, the evidence suggests that Dr. Hamilton did examine the late Mr. Mims' brain tissue as is necessary to diagnose Death with CTE.

The Claims Administrator correctly concluded that Ms. Hastings failed to show that the diagnosis was obtained before the appropriate deadline. I thus affirm the denial solely on the first basis.

Date: July 15, 2020

_____

David Hoffman, Special Master

**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | : : : : : | No. 2:12-md-02323-AB<br><br>MDL No. 2323 |
| THIS DOCUMENT RELATES TO: APPEAL OF REPRESENTATIVE CLAIMANT ROBIN CORNISH REGARDING DENIAL OF MONETARY AWARD | : : : : : : : : | **Hon. Anita B. Brody** |

## INTRODUCTION

On February 6, 2019, Representative Claimant Robin B. Cornish filed a claim for benefits under the Amended Settlement Agreement on behalf of her late husband, Frank Cornish, a Retired NFL Football Player. Mr. Cornish passed away on August 23, 2008, and later received a post-mortem diagnosis of Chronic Traumatic Encephalopathy. The Claims Administrator denied the claim for two reasons: (1) failure to meet the diagnosis deadline for Death with CTE claims, and (2) failure to establish that a doctor reviewed Mr. Mims' brain tissue.

Ms. Cornish timely appealed. Special Master Pritchett affirmed the denial, and Ms. Cornish subsequently appealed to the District Court. Following review of Ms. Cornish's objection, the Court has remanded this claim to the Special Master to clarify whether the affirmance applies to one or both of the reasons for denial provided by the Claims Administrator.[1]

While there is no clear and convincing evidence that a diagnosis was made before the appropriate deadline, I do find there is clear and convincing evidence that the diagnosing neuropathologist personally examined Mr. Mims' brain tissue. I therefore re-affirm the Claims Administrator's denial of Ms. Hastings' claim on the first basis only.

## FACTUAL AND PROCEDURAL BACKGROUND

Mr. Cornish passed away at age 40 on August 23, 2008. Doc. 199407. On August 24, 2008, Dr. Marc Krouse, a Tarrant County medical examiner, conducted a post-mortem autopsy and concluded that Mr. Cornish's cause of death was "sudden adult death with evidence of hypertensive heart disease." *Id*.

---

[1] Settlement Implementation Order, Doc. 225723 (June 17, 2020).

On February 6, 2019, Ms. Cornish filed a claim for relief under the Settlement on behalf of her late husband. Doc. 199403. Dr. Ronald Hamilton, a board-certified neuropathologist, provided a letter stating that he conducted an examination of the late Mr. Cornish's brain tissue based upon "three H&E stained slides" received from the Tarrant County Medical Examiner. Doc. 199405. Dr. Hamilton concluded that the "histopathologic findings are diagnostic of CTE," and that "Frank Cornish had CTE." The letter is undated. *Id.*

On February 20, 2019, the Claims Administrator requested additional documentation, writing:

> The medical records must show a post-mortem diagnosis of CTE made before April 22, 2015 (the Final Approval Date) by a board-certified neuropathologist for a Retired NFL Football Player who died before April 22, 2015. See Section 6.3 (f) of the Settlement Agreement and FAQ 109. Mr. Cornish died on August 23, 2008, and the August 24, 2008 autopsy report signed by Marc A. Krouse does not reference CTE and neither does the death certificate. You provided an undated letter from Dr. Ronald L. Hamilton who diagnosed Mr. Cornish with CTE. You must establish that Dr. Hamilton reviewed Mr. Cornish's brain tissue and made a CTE diagnosis on or before April 22, 2015.

Doc. 201410. Ms. Cornish did not respond to the request for additional documentation within the specified 120-day deadline. The Claims Administrator denied the claim on June 25, 2019 based on the unresolved documentation issue. Doc. 209824.

Ms. Cornish timely appealed. Doc. 210928. On September 26, 2019, Special Master Pritchett denied the Appeal, stating that "Appellant did not show clear and convincing evidence of error in the Claims Administrator's decision." Doc. 214641.

Ms. Cornish appealed the Special Master's decision to the Federal District Court, asserting that the Special Master erred in affirming the Claims Administrator's denial. Doc. 215705. Judge Brody remanded the Claim for further explanation. Doc. 225716.

## DISCUSSION

There are two criteria that must be satisfied under the Settlement Agreement to support a Qualifying Diagnosis of Death with CTE:[2]

(1) a post-mortem diagnosis made by a board-certified neuropathologist based on examination of the deceased Player's brain tissue,[3] *and*

---

[2] *See* Settlement Agreement, Exhibit A-1(5).

[3] As the Court wrote in the Final Order and Judgment approving the Settlement, "no one can conclusively say that someone had CTE until a scientist looks at sections of that person's brain under a microscope to see if abnormally phosphorylated tau protein ('abnormal tau protein') is present, and if so whether it is present in a reportedly unique pattern." *See* In re Nat'l Football League Players' Concussion Injury Litig., 307 F.R.D. 351, 391 (E.D. Pa. 2015). To conclusively diagnose CTE, the diagnosing neuropathologist must therefore examine the Player's brain tissue.

(2) compliance with the deadline for obtaining the post-mortem diagnosis.[4]

The Claims Administrator determined that Ms. Cornish's claim failed to satisfy either of the two requirements.[5] Doc. 201410. By order of Judge Brody, I now review this matter to provide additional clarification following Special Master Pritchett's affirmance. Specifically, I will address "whether clear and convincing evidence of error exists as to each independent basis given by the Claims Administrator" for denial of Ms. Cornish's claim. Doc. 225716.

Based on Dr. Hamilton's personal examination of Mr. Cornish's brain tissue, I conclude that it was clearly erroneous for the Claims Administrator to deny his Claim on that basis, if, indeed, that is what it did.

However, the Settlement explicitly provides that "[a] Qualifying Diagnosis of Death with CTE shall be made only for Retired NFL Football Players who died prior to the Final Approval Date [of April 22, 2015], through a post-mortem diagnosis made by a board-certified neuropathologist prior to the Final Approval Date . . . ." Thus, there are *two* aspects to complying with the deadline for obtaining a Qualifying Diagnosis of Death with CTE: both the date of the Qualifying Diagnosis *and* the date of the neuropathologist's post-mortem examination must be prior to April 22, 2015.

Mr. Cornish tragically passed away at the age of 40 on August 23, 2008. An autopsy was performed the following day, and the medical examiner determined that heart complications were the likely cause of death. Doc. 199407. The report does not mention CTE.

The present claim, based upon a diagnosis of Death with CTE, is supported by a conspicuously undated letter from Dr. Hamilton discussing his analysis of Mr. Cornish's brain tissue. Doc. 199405. The letter was filed on February 6, 2019. Although the date of the Qualifying Diagnosis (that is, the date of Mr. Cornish's passing) is well before the Final Approval Date of April 22, 2015, no proof has been offered to suggest that Dr. Hamilton's examination was timely.

Counsel for Ms. Cornish repeatedly asserts that "the Claims Administrator erroneously concluded that the date of diagnosis is not the date of the Player's death." Doc. 215680. This incorrect assertion misrepresents the deficiency in Ms. Cornish's claim. The problem with Ms. Cornish's claim—as stated by the Claims Administrator—is not the date of the Qualifying Diagnosis; rather, at issue it is what date the diagnosis was ***actually made***.

---

[4]  *See* Settlement Agreement, Section 6.3(f) ("A Qualifying Diagnosis of Death with CTE shall be made only for Retired NFL Football Players who died prior to the Final Approval Date, through a post-mortem diagnosis made by a board-certified neuropathologist prior to the Final Approval Date, provided that a Retired NFL Football Player who died between July 7, 2014 and the Final Approval Date shall have until 270 days from his date of death to obtain such a post-mortem diagnosis.") The Final Approval Date was April 22, 2015. *See* Settlement Portal, *Frequently Asked Questions*, FAQ # 98 (f).

[5]  In truth, whether the Claims Administrator accepted that Dr. Hamilton's examination was sufficient to satisfy the first of the requirements is somewhat unclear. I proceed on the understanding, confirmed by Judge Brody's order, that it did not.

Ms. Cornish continues to provide no proof of when Dr. Hamilton examined the late Mr. Cornish's brain tissue to make his diagnosis. Thus, there is no clear and convincing evidence of error in the Claims Administrator's decision that the April 22, 2015 deadline for obtaining a diagnosis was not met.


## **CONCLUSION**

The Claims Administrator denied Ms. Cornish's claim for two independent reasons.

First, the claim was denied based upon a lack of proof that the diagnosis was timely. I find that there is no evidence that the diagnosis of Death with CTE was obtained before the appropriate deadline.

Second, the claim was denied for failure of the diagnosing physician to personally examine the Player's brain tissue. However, the evidence suggests that Dr. Hamilton did examine the late Mr. Cornish's brain tissue as is necessary to diagnose Death with CTE.

The Claims Administrator correctly concluded that Ms. Cornish failed to show that the diagnosis was obtained before the appropriate deadline. I thus affirm the denial solely on the first basis.


Date: July 15, 2020

_____
David Hoffman, Special Master

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | § § § § § § | No. 2:12-md-02323-AB<br><br>MDL No. 2323<br><br>**Hon. Anita B. Brody** |
| THIS DOCUMENT RELATES TO: ALL CLAIMS FOR CLASS MEMBERS LISTED BELOW[1] | § § § | |

---

**SUPPLEMENT TO SETTLEMENT CLASS MEMBERS' OBJECTIONS**
**TO THE SPECIAL MASTER'S DECISIONS**

---

TO THE HONORABLE JUDGE BRODY:

For the reasons previously provided to the Court in their Objections, Class Members respectfully request the Court sustain their objections to the Special Master's decisions and order approval of their claims.

After Class Members filed their Objections, the Court requested that the Special Master provide further explanation regarding the standard of review he used in affirming the denial of the Class Members' claims.[2]  The Special Master has now

---

[1]  "Class Members" refers to the 20 class members identified in the Court's Settlement Implementation Order dated June 16, 2020, who are identified as SPID Nos. 950011814, 950011815, 950011818, 950011819, 950011820, 950011821, 950011822, 950012548, 950013154, 950013174, 950013176, 950013178, 950013179, 950013223, 950013395, 950013403, 950013520, 950013523, 950013608, and 950015171.

[2]  In its June 16, 2020 order, the Court noted that the claims administrator had denied Class Members' claims for two reasons: (1) failure to comply with the deadline for obtaining a Death with CTE Diagnosis; and (2) failure to provide proof that a physician examined the deceased's brain tissue.  The Court asked the Special Master to specify whether he applied a clear and convincing evidence of error standard of review to both of these reasons.

Regarding two claims — SPID Nos. 950013395 and 950012548 — the Court asked the Special Master to explain whether his affirmance was based on both of the above two reasons, or only the former reason.

1

clarified the standard of review he used.[3]

Accordingly, unless the Court requires additional briefing or a hearing on Class Members' Objections, Class Members respectfully request the Court sustain their previously-filed objections, reverse the Special Master's decisions, and order approval of Class Members' claims.

Dated:  August 14, 2020

Respectfully Submitted:

/s/ Justin Demerath

**Justin Demerath**
Texas State Bar No. 24034415
**David Campbell**
Texas State Bar No. 24057033
O'HANLON, DEMERATH & CASTILLO
808 West Avenue |  Austin, TX 78701
Tel: (512) 494-9949  |  Fax: (512) 494-9919
jdemerath@808west.com
dcampbell@808west.com

**Counsel for Class Members**

---

[3]    In response to the Court's request, the Special Master has explained that he applied that standard of review to both reasons.

The Special Master also clarified that for the two claims — SPID Nos. 950013395 and 950012548 — in which there was evidence that the board-certified neuropathologist examined brain tissue, the affirmance was based only on the first reason given for denial.

Regarding the other 18 claims, the Special Master asserts that without examining a deceased person's brain tissue, the CTE diagnosis cannot be "conclusively" established.  But there is no medical or legal requirement cited by the Special Master that a board-certified neuropathologist's CTE diagnosis be "conclusive" as opposed to medically reasonable.  Moreover, the Amended Settlement Agreement provides no basis for second-guessing the diagnosis of a board-certified neuropathologist — it simply requires a "post-mortem diagnosis by a board-certified neuropathologist of CTE."  See Amended Settlement Agreement [ECF 64810], § 6.3(f).  It is undisputed that Class Members have each received a post-mortem diagnosis by a board-certified neuropathologist of CTE. As a matter of law, that diagnosis is sufficient under the terms of the settlement agreement.

2

## **CERTIFICATE OF SERVICE**

It is hereby certified that a true copy of the foregoing document was submitted

on the Court Portal on August 14, 2020.

<u>/s/ Justin B. Demerath</u>
Justin B. Demerath

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | § § § § § § | No. 2:12-md-02323-AB<br><br>MDL No. 2323<br><br>**Hon. Anita B. Brody** |
| THIS DOCUMENT RELATES TO: ALL CLAIMS FOR CLASS MEMBERS LISTED BELOW[1] | § § § § | |

---

**SUPPLEMENT TO SETTLEMENT CLASS MEMBERS' OBJECTIONS TO THE SPECIAL MASTER'S DECISIONS**

---

TO THE HONORABLE JUDGE BRODY:

For the reasons previously provided to the Court in their Objections, Class Members respectfully request the Court sustain their objections to the Special Master's decisions and order approval of their claims.

After Class Members filed their Objections, the Court requested that the Special Master provide further explanation regarding the standard of review he used in affirming the denial of the Class Members' claims.[2] The Special Master has now

---

[1] "Class Members" refers to the 20 class members identified in the Court's Settlement Implementation Order dated June 16, 2020, who are identified as SPID Nos. 950011814, 950011815, 950011818, 950011819, 950011820, 950011821, 950011822, 950012548, 950013154, 950013174, 950013176, 950013178, 950013179, 950013223, 950013395, 950013403, 950013520, 950013523, 950013608, and 950015171.

[2] In its June 16, 2020 order, the Court noted that the claims administrator had denied Class Members' claims for two reasons: (1) failure to comply with the deadline for obtaining a Death with CTE Diagnosis; and (2) failure to provide proof that a physician examined the deceased's brain tissue. The Court asked the Special Master to specify whether he applied a clear and convincing evidence of error standard of review to both of these reasons.

Regarding two claims — SPID Nos. 950013395 and 950012548 — the Court asked the Special Master to explain whether his affirmance was based on both of the above two reasons, or only the former reason.

1

clarified the standard of review he used.[3]

Accordingly, unless the Court requires additional briefing or a hearing on Class Members' Objections, Class Members respectfully request the Court sustain their previously-filed objections, reverse the Special Master's decisions, and order approval of Class Members' claims.

Dated:  August 14, 2020

Respectfully Submitted:

/s/ Justin Demerath

**Justin Demerath**
Texas State Bar No. 24034415
**David Campbell**
Texas State Bar No. 24057033
O'HANLON, DEMERATH & CASTILLO
808 West Avenue  |  Austin, TX 78701
Tel: (512) 494-9949  |  Fax: (512) 494-9919
jdemerath@808west.com
dcampbell@808west.com

**Counsel for Class Members**

---

[3]  In response to the Court's request, the Special Master has explained that he applied that standard of review to both reasons.

The Special Master also clarified that for the two claims — SPID Nos. 950013395 and 950012548 — in which there was evidence that the board-certified neuropathologist examined brain tissue, the affirmance was based only on the first reason given for denial.

Regarding the other 18 claims, the Special Master asserts that without examining a deceased person's brain tissue, the CTE diagnosis cannot be "conclusively" established.  But there is no medical or legal requirement cited by the Special Master that a board-certified neuropathologist's CTE diagnosis be "conclusive" as opposed to medically reasonable.  Moreover, the Amended Settlement Agreement provides no basis for second-guessing the diagnosis of a board-certified neuropathologist — it simply requires a "post-mortem diagnosis by a board-certified neuropathologist of CTE."  See Amended Settlement Agreement [ECF 64810], § 6.3(f).  It is undisputed that Class Members have each received a post-mortem diagnosis by a board-certified neuropathologist of CTE.  As a matter of law, that diagnosis is sufficient under the terms of the settlement agreement.

## **CERTIFICATE OF SERVICE**

It is hereby certified that a true copy of the foregoing document was submitted on the Court Portal on August 14, 2020.

/s/ Justin B. Demerath
Justin B. Demerath

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br><br>MDL No. 2323<br><br>Hon. Anita B. Brody |
| Kevin Turner and Shawn Wooden, *on behalf of themselves and others similarly situated*,<br><br>Plaintiffs,<br><br>v.<br><br>National Football League and NFL Properties, LLC, successor-in-interest to NFL Properties, Inc.<br><br>Defendants. | Civ. Action No.: 14-cv-00029-AB |
| THIS DOCUMENT RELATES TO:<br>Settlement Class Members SPIDs 950011814, 950011815, 950011818, 950011819, 950011820, 950011821, 950011822, 950012548, 950013154, 950013174, 950013176, 950013178, 950013179, 950013223, 950013395, 950013403, 950013520, 950013523, 950013608, and 950015171. | Hon. Anita B. Brody |

## RESPONSE OF THE NATIONAL FOOTBALL LEAGUE AND NFL PROPERTIES LLC IN OPPOSITION TO SUPPLEMENT TO SETTLEMENT CLASS MEMBERS' OBJECTIONS TO THE SPECIAL MASTER'S DECISION

The National Football League and NFL Properties LLC (collectively, the "NFL Parties") respectfully submit this response in opposition to the Supplement filed by twenty Settlement Class Members (the "Demerath Claimants") to their Objections to the Special Master's Decisions affirming denial of their facially deficient Death with CTE claims.

Although the NFL Parties' underlying opposition briefs submitted in connection with each Settlement Class Member's Objection conclusively demonstrate why each should be swiftly denied, the NFL Parties feel compelled to respond briefly to the Supplement's new and audacious argument that Dr. Ronald Hamilton's failure to examine brain tissue of eighteen of the deceased players should somehow be excused because the Settlement Agreement purportedly does not permit any "second-guessing" of a CTE diagnosis by a board-certified neuropathologist and because it nowhere states that such diagnoses must be "conclusive as opposed to medically reasonable." (Supplement at 2 n.3.) That argument is frivolous.

According to the very university with which Dr. Hamilton is affiliated, neuropathologists are medical doctors who specialize in the diagnosis of brain and nervous system disease through microscopic examination of brain and nerve tissue in conjunction with radiologic studies.[1] The suggestion that the Settlement Agreement's requirement for a "post-mortem diagnosis of CTE made by a board-certified neuropathologist" requires anything less than an actual examination of brain tissue is meritless, particularly given this Court's prior statements in its Final Approval Order (*see* NFL Objections at 7 (quoting the Court's Final Approval Order as stating "Chronic Traumatic Encephalopathy is a neuropathological diagnosis that currently can only be made post mortem. This means no one can conclusively say that someone had CTE until a scientist looks at sections

---

[1] *See* "Role of the Neuropathologist," UPMC, Neuropathology, available at https://www.upmc.com/services/pathology/diagnostic-services/anatomic/neuropathology.

of that person's brain under a microscope to see if abnormally phosphorylated tau protein ("abnormal tau protein") is present, and if so whether it is present in a reportedly unique pattern.").)

The denial of the eighteen claims does not amount to "second guessing" a reasonable diagnosis, but instead is the *only* supportable result.  In fact, the only "guessing" here was done by Dr. Ronald Hamilton, who lent his name to "virtually identical, undated, form letter[s]" that essentially posit "it is more likely than not" that these players had CTE at the time of their passing based on the fact they played football."  (*See* July 15, 2020 Special Master Decision at 2 (for SPID 950013154).)  Here, it is entirely irrelevant whether the applicable diagnostic standard is "conclusive" or "medically reasonable" because Dr. Hamilton's actions—providing purported "diagnoses" without any examination of brain tissue—clearly satisfy neither.  Indeed, they fail *any* conceivable medical standard in the field of neuropathology and plainly do not comply with the terms of the Settlement Agreement.

For the foregoing reasons, and those set forth in the Objection responses, the NFL Parties respectfully request that the Court deny these Objections, condemn such frivolous arguments, and affirm the Special Master's decisions.

Dated: December 28, 2020                    Respectfully submitted,

                                            /s/ Brad S. Karp
                                            PAUL, WEISS, RIFKIND, WHARTON
                                             & GARRISON LLP
                                            Brad S. Karp
                                            Bruce Birenboim
                                            Lynn B. Bayard
                                            Claudia Hammerman
                                            Douglas M. Burns
                                            1285 Avenue of the Americas
                                            New York, NY 10019-6064
                                            Tel: (212) 373-3000
                                            bkarp@paulweiss.com

                                            *Attorneys for the National Football League and
                                            NFL Properties LLC*

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br><br>MDL No. 2323<br><br>Hon. Anita B. Brody |
| Kevin Turner and Shawn Wooden, *on behalf of themselves and others similarly situated*,<br><br>                    Plaintiffs,<br><br>              v.<br><br>National Football League and NFL Properties, LLC, successor-in-interest to NFL Properties, Inc.<br>                    Defendants. | Civ. Action No.: 14-cv-00029-AB |
| THIS DOCUMENT RELATES TO:<br>Settlement Class Members SPIDs 950011814, 950011815, 950011818, 950011819, 950011820, 950011821, 950011822, 950012548, 950013154, 950013174, 950013176, 950013178, 950013179, 950013223, 950013395, 950013403, 950013520, 950013523, 950013608, and 950015171. | Hon. Anita B. Brody |

**RESPONSE OF THE NATIONAL FOOTBALL LEAGUE**
**AND NFL PROPERTIES LLC IN OPPOSITION TO**
**SUPPLEMENT TO SETTLEMENT CLASS MEMBERS'**
**OBJECTIONS TO THE SPECIAL MASTER'S DECISION**

The National Football League and NFL Properties LLC (collectively, the "NFL Parties") respectfully submit this response in opposition to the Supplement filed by twenty Settlement Class Members (the "Demerath Claimants") to their Objections to the Special Master's Decisions affirming denial of their facially deficient Death with CTE claims.

Although the NFL Parties' underlying opposition briefs submitted in connection with each Settlement Class Member's Objection conclusively demonstrate why each should be swiftly denied, the NFL Parties feel compelled to respond briefly to the Supplement's new and audacious argument that Dr. Ronald Hamilton's failure to examine brain tissue of eighteen of the deceased players should somehow be excused because the Settlement Agreement purportedly does not permit any "second-guessing" of a CTE diagnosis by a board-certified neuropathologist and because it nowhere states that such diagnoses must be "conclusive as opposed to medically reasonable." (Supplement at 2 n.3.) That argument is frivolous.

According to the very university with which Dr. Hamilton is affiliated, neuropathologists are medical doctors who specialize in the diagnosis of brain and nervous system disease through microscopic examination of brain and nerve tissue in conjunction with radiologic studies.[1] The suggestion that the Settlement Agreement's requirement for a "post-mortem diagnosis of CTE made by a board-certified neuropathologist" requires anything less than an actual examination of brain tissue is meritless, particularly given this Court's prior statements in its Final Approval Order (*see* NFL Objections at 7 (quoting the Court's Final Approval Order as stating "Chronic Traumatic Encephalopathy is a neuropathological diagnosis that currently can only be made post mortem. This means no one can conclusively say that someone had CTE until a scientist looks at sections

---

[1]    *See* "Role of the Neuropathologist," UPMC, Neuropathology, available at https://www.upmc.com/services/pathology/diagnostic-services/anatomic/neuropathology.

of that person's brain under a microscope to see if abnormally phosphorylated tau protein ("abnormal tau protein") is present, and if so whether it is present in a reportedly unique pattern.").)

The denial of the eighteen claims does not amount to "second guessing" a reasonable diagnosis, but instead is the *only* supportable result.  In fact, the only "guessing" here was done by Dr. Ronald Hamilton, who lent his name to "virtually identical, undated, form letter[s]" that essentially posit "it is more likely than not" that these players had CTE at the time of their passing based on the fact they played football."  (*See* July 15, 2020 Special Master Decision at 2 (for SPID 950013154).)   Here, it is entirely irrelevant whether the applicable diagnostic standard is "conclusive" or "medically reasonable" because Dr. Hamilton's actions—providing purported "diagnoses" without any examination of brain tissue—clearly satisfy neither.  Indeed, they fail *any* conceivable medical standard in the field of neuropathology and plainly do not comply with the terms of the Settlement Agreement.

For the foregoing reasons, and those set forth in the Objection responses, the NFL Parties respectfully request that the Court deny these Objections, condemn such frivolous arguments, and affirm the Special Master's decisions.

Dated: December 28, 2020

Respectfully submitted,

/s/ Brad S. Karp
PAUL, WEISS, RIFKIND, WHARTON
  & GARRISON LLP
Brad S. Karp
Bruce Birenboim
Lynn B. Bayard
Claudia Hammerman
Douglas M. Burns
1285 Avenue of the Americas
New York, NY 10019-6064
Tel: (212) 373-3000
bkarp@paulweiss.com

*Attorneys for the National Football League and
NFL Properties LLC*

 **CONCUSSION SETTLEMENT**

*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

## EXPLANATION ABOUT THE NORMING AGREEMENT
### DATE OF NOTICE: April 12, 2022

### I. SETTLEMENT CLASS MEMBER INFORMATION

| Settlement Program ID | 950012548 | | |
|---|---|---|---|
| **Name** | First<br>Robin | M.I.<br>B | Last<br>Cornish |
| **Settlement Class Member Type** | Representative Claimant | | |
| **Lawyer** | O'Hanlon, Demerath & Castillo | | |

### II. BASED ON THE INFORMATION WE HAVE IN YOUR FILES, THE NORMING AGREEMENT DOES NOT AFFECT YOU

This Notice is an official communication from the Claims Administrator for the NFL Concussion Settlement Program. Enclosed with this Notice is an **Informational Sheet** describing the background of the Court's Order and explaining the possible benefits available to certain Settlement Class Members under the terms of the Order and the Norming Agreement.

We reviewed your prior BAP and/or MAF neuropsychological test results and submitted claims (if any) and determined that these changes do not appear to affect you or alter any of your existing rights and remedies in the Settlement Program. Based on the information available to us, you are not affected by the Order or the Norming Agreement for one or more of the following reasons:

1. The neuropsychological testing supporting your prior Settlement Claim and/or BAP evaluation did not use Black Race Norms or Black Race Demographic Estimates to calculate the results.

2. You submitted a Pre-Effective Date claim, and the Norming Agreement applies only to Post-Effective Date claims and BAP evaluations.

3. You submitted a claim for a Qualifying Diagnosis of Alzheimer's Disease, Parkinson's Disease ALS, or Death with CTE and the Norming Agreement applies only to Settlement Claims asserting a Qualifying Diagnosis of Level 1.5 or Level 2 Neurocognitive Impairment.

4. We have no record of any BAP or MAF neuropsychological testing results from you. If you seek neuropsychological testing in the future, it will be performed under the New Method that eliminates the consideration of race. The New Method is explained in the Norming Agreement, the Motion, and the Order. You can review Section III of this Notice to see if you may be entitled to other remedies provided by the Norming Agreement.



## III. OTHER BENEFITS MAY BE AVAILABLE TO YOU BASED ON INFORMATION ONLY YOU MAY HAVE

The Norming Agreement provides certain benefits to eligible Retired Players that you may be eligible for, but we do not have sufficient information to determine your eligibility. Review the Norming Agreement carefully to determine your eligibility for these benefits:

**Potential Eligibility for Expanded BAP Examination.** If you previously received a Post-Effective Date neuropsychological evaluation from a neuropsychologist approved through the MAF program and did not submit a Settlement Claim because that testing and/or your MAF Physician did not find compensable injury, but Black Race Norms or Black Race Demographic Estimates were applied to your neuropsychological testing, you could be eligible for an expanded BAP examination. Refer to Section 2.6 of the Norming Agreement for more details about this benefit. If you think you qualify for an Expanded BAP Examination, contact the BAP Administrator to provide proof of your prior testing results that used Black Race Norms or Black Demographic Estimates and to schedule your exams.

**Potential New Settlement Claim Submission**. If you previously received a **valid** Post-Effective Date neuropsychological evaluation from a neuropsychologist approved through the MAF program (rather than a Qualified BAP Provider through the BAP) and: (1) did not submit a Settlement Claim because Black Race Norms or Black Race Demographic Estimates were applied to your neuropsychological testing, or (2) you did submit a Settlement Claim that was denied in part because the neuropsychological testing did not qualify for a Monetary Award as a result of the use of Black Race Norms or Black Race Demographic Estimates, you may have the neuropsychologist who administered the testing or an AAPC rescore the prior **valid** Post-Effective Date MAF program neuropsychological testing using the New Method. If the neuropsychologist who administered the original testing is deceased or is no longer in the Settlement Program, another BAP neuropsychologist or an AAPC may conduct the rescoring. This rescoring will be at your cost and expense. If your rescored test results indicate that you have a Qualifying Diagnosis, you may submit a complete Claim Package to the Claims Administrator for processing. Refer to Section 2.7 of the Norming Agreement for more details about this benefit.

## IV. HOW TO CONTACT US WITH QUESTIONS OR FOR HELP

In addition to any benefits under the Court's Order, the Class Action Settlement Agreement creates certain rights and benefits to all Settlement Class Members. Refer to the Settlement Program's Website (www.NFLConcussionSettlement.com). If you have any questions about this Notice or need help with general Program questions, call us at 1-855-887-3485 or email ClaimsAdministrator@NFLConcussionSettlement.com.





# NFL CONCUSSION SETTLEMENT
*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

## INFORMATIONAL SHEET ON THE NORMING AGREEMENT

### I. Procedural History and Explanation of the Court's Order and the Norming Agreement.

For six months, under the Court's direction, Class Counsel and the NFL Parties worked together, later joined by counsel for two Claimants, to prohibit use of Retired Players' race in evaluating neuropsychological testing. In October 2021 that mediation resulted in an agreement on how to accomplish this goal, which we will call the "Norming Agreement."

In December, the NFL Parties and Class Counsel jointly filed a motion to approve modifications to the Class Action Settlement Agreement to implement the Norming Agreement.

As Claims Administrator, we posted a copy of the Motion and associated documents on the Settlement Program website. The Court provided a comment period through January 25, 2022. Some of you wrote in with comments and individual concerns.

After considering that feedback, the Court approved the Motion on March 4, 2022.

The Court's order, based on Section 6.6(a) of the original Class Action Settlement Agreement, requires a staged process to ensure that the **Settlement Program clinicians do not consider race in any manner in the Settlement Program**. To start, an expert panel of neuropsychologists has developed an interim, race-neutral method to assess neuropsychological test scores (see new Exhibit A-2.1). This is called the "New Method." Additionally, that panel is working to develop an even more refined, race-neutral, long-term scoring method designed specifically for Retired NFL Football Players. That long-term method will not be used without further notice to you.

For now, clinicians must use the New Method described in Exhibit A-2.1 to assess neuropsychological testing performed through the Baseline Assessment Program and Monetary Award Fund, and we will use it for all pending Settlement Claims.

### II. Explanation of Possible Benefits Under the Norming Agreement.

The Order provides certain benefits to eligible Retired Players:

1. **Automatic Retrospective Rescoring**. Using the New Method, we and the Program's retained neuropsychological consultants will automatically rescore post-Effective Date tests in which Black Race Norms or Black Race Demographic Estimates were applied and where rescoring could potentially result in a Qualifying Diagnosis or a higher Qualifying Diagnosis **solely due to a change** in the Retired Player's neuropsychological test T-scores. The automatic rescoring is at no cost to Retired Players. If a Retired Player's testing is eligible for rescoring, and the rescoring yields test results that meet the requirements for a Qualifying Diagnosis or a higher Qualifying Diagnosis, one of two things will happen:

   a. if a Claim was previously submitted, the Claim will automatically receive a Monetary Award Claim Determination, or,

   b. if a prior Claim was not previously submitted, the Retired Player or his Representative Claimant will be notified that he or she should file a Claim, which will receive a Monetary Award Claim Determination once submitted and determined to be complete.

   If the rescoring results support a Qualifying Diagnosis of Level 1 Neurocognitive Impairment, that Retired Player will be eligible to receive BAP Supplemental Benefits.

2. **Expanded BAP Examinations**.  With only limited exceptions, Retired Players who had Black Race Norms applied to their post-Effective Date test scores, **but whose testing was not automatically rescored because they did not meet the eligibility standards described in the prior section**, will be eligible for a free BAP examination, regardless of whether they had a prior BAP exam or were initially eligible for a BAP exam.

3. **New Settlement Claim Submissions**.  With only limited exceptions, Retired Players who had Black Race Norms applied to their **valid** post-Effective Date test scores and who were examined through the MAF program, **but whose testing was not automatically rescored**, may, instead of receiving a free BAP exam, have their tests rescored using the New Method at their expense, either by their original neuropsychologist or by one of the Program's retained neuropsychological consultants, and may submit a New Settlement Claim relying on the rescored tests.

The notice to which this Informational Sheet is attached outlines how your case has been handled under the Norming Agreement. If you have questions about this Notice or need help with general Program questions, please call us at 1-855-887-3485 or email ClaimsAdministrator@NFLConcussionSettlement.com.





# NFL CONCUSSION SETTLEMENT

*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*

No. 2:12-md-02323 (E.D. Pa.)

## EXPLANATION ABOUT THE NORMING AGREEMENT
### DATE OF NOTICE: April 12, 2022

### I. SETTLEMENT CLASS MEMBER INFORMATION

| | |
|---|---|
| **Settlement Program ID** | 950013395 |

| **Name** | First<br>Carleen | | M.I. | Last<br>Hastings |
|---|---|---|---|---|

| | |
|---|---|
| **Settlement Class Member Type** | Representative Claimant |
| **Lawyer** | O'Hanlon, Demerath & Castillo |

### II. BASED ON THE INFORMATION WE HAVE IN YOUR FILES, THE NORMING AGREEMENT DOES NOT AFFECT YOU

This Notice is an official communication from the Claims Administrator for the NFL Concussion Settlement Program. Enclosed with this Notice is an **Informational Sheet** describing the background of the Court's Order and explaining the possible benefits available to certain Settlement Class Members under the terms of the Order and the Norming Agreement.

We reviewed your prior BAP and/or MAF neuropsychological test results and submitted claims (if any) and determined that these changes do not appear to affect you or alter any of your existing rights and remedies in the Settlement Program. Based on the information available to us, you are not affected by the Order or the Norming Agreement for one or more of the following reasons:

1. The neuropsychological testing supporting your prior Settlement Claim and/or BAP evaluation did not use Black Race Norms or Black Race Demographic Estimates to calculate the results.

2. You submitted a Pre-Effective Date claim, and the Norming Agreement applies only to Post-Effective Date claims and BAP evaluations.

3. You submitted a claim for a Qualifying Diagnosis of Alzheimer's Disease, Parkinson's Disease ALS, or Death with CTE and the Norming Agreement applies only to Settlement Claims asserting a Qualifying Diagnosis of Level 1.5 or Level 2 Neurocognitive Impairment.

4. We have no record of any BAP or MAF neuropsychological testing results from you. If you seek neuropsychological testing in the future, it will be performed under the New Method that eliminates the consideration of race. The New Method is explained in the Norming Agreement, the Motion, and the Order. You can review Section III of this Notice to see if you may be entitled to other remedies provided by the Norming Agreement.

## III. OTHER BENEFITS MAY BE AVAILABLE TO YOU BASED ON INFORMATION ONLY YOU MAY HAVE

The Norming Agreement provides certain benefits to eligible Retired Players that you may be eligible for, but we do not have sufficient information to determine your eligibility. Review the Norming Agreement carefully to determine your eligibility for these benefits:

**Potential Eligibility for Expanded BAP Examination.** If you previously received a Post-Effective Date neuropsychological evaluation from a neuropsychologist approved through the MAF program and did not submit a Settlement Claim because that testing and/or your MAF Physician did not find compensable injury, but Black Race Norms or Black Race Demographic Estimates were applied to your neuropsychological testing, you could be eligible for an expanded BAP examination.  Refer to Section 2.6 of the Norming Agreement for more details about this benefit. If you think you qualify for an Expanded BAP Examination, contact the BAP Administrator to provide proof of your prior testing results that used Black Race Norms or Black Demographic Estimates and to schedule your exams.

**Potential New Settlement Claim Submission**.  If you previously received a **valid** Post-Effective Date neuropsychological evaluation from a neuropsychologist approved through the MAF program (rather than a Qualified BAP Provider through the BAP) and: (1) did not submit a Settlement Claim because Black Race Norms or Black Race Demographic Estimates were applied to your neuropsychological testing, or (2) you did submit a Settlement Claim that was denied in part because the neuropsychological testing did not qualify for a Monetary Award as a result of the use of Black Race Norms or Black Race Demographic Estimates, you may have the neuropsychologist who administered the testing or an AAPC rescore the prior **valid** Post-Effective Date MAF program neuropsychological testing using the New Method.  If the neuropsychologist who administered the original testing is deceased or is no longer in the Settlement Program, another BAP neuropsychologist or an AAPC may conduct the rescoring.  This rescoring will be at your cost and expense. If your rescored test results indicate that you have a Qualifying Diagnosis, you may submit a complete Claim Package to the Claims Administrator for processing.  Refer to Section 2.7 of the Norming Agreement for more details about this benefit.

## IV. HOW TO CONTACT US WITH QUESTIONS OR FOR HELP

In addition to any benefits under the Court's Order, the Class Action Settlement Agreement creates certain rights and benefits to all Settlement Class Members.  Refer to the Settlement Program's Website (www.NFLConcussionSettlement.com). If you have any questions about this Notice or need help with general Program questions, call us at 1-855-887-3485 or email ClaimsAdministrator@NFLConcussionSettlement.com.



 **CONCUSSION SETTLEMENT**

*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

## INFORMATIONAL SHEET ON THE NORMING AGREEMENT

**I.  Procedural History and Explanation of the Court's Order and the Norming Agreement.**

For six months, under the Court's direction, Class Counsel and the NFL Parties worked together, later joined by counsel for two Claimants, to prohibit use of Retired Players' race in evaluating neuropsychological testing. In October 2021 that mediation resulted in an agreement on how to accomplish this goal, which we will call the "Norming Agreement."

In December, the NFL Parties and Class Counsel jointly filed a motion to approve modifications to the Class Action Settlement Agreement to implement the Norming Agreement.

As Claims Administrator, we posted a copy of the Motion and associated documents on the Settlement Program website. The Court provided a comment period through January 25, 2022. Some of you wrote in with comments and individual concerns.

After considering that feedback, the Court approved the Motion on March 4, 2022.

The Court's order, based on Section 6.6(a) of the original Class Action Settlement Agreement, requires a staged process to ensure that the **Settlement Program clinicians do not consider race in any manner in the Settlement Program**. To start, an expert panel of neuropsychologists has developed an interim, race-neutral method to assess neuropsychological test scores (see new Exhibit A-2.1). This is called the "New Method." Additionally, that panel is working to develop an even more refined, race-neutral, long-term scoring method designed specifically for Retired NFL Football Players. That long-term method will not be used without further notice to you.

For now, clinicians must use the New Method described in Exhibit A-2.1 to assess neuropsychological testing performed through the Baseline Assessment Program and Monetary Award Fund, and we will use it for all pending Settlement Claims.

**II.  Explanation of Possible Benefits Under the Norming Agreement.**

The Order provides certain benefits to eligible Retired Players:

1. **Automatic Retrospective Rescoring**. Using the New Method, we and the Program's retained neuropsychological consultants will automatically rescore post-Effective Date tests in which Black Race Norms or Black Race Demographic Estimates were applied and where rescoring could potentially result in a Qualifying Diagnosis or a higher Qualifying Diagnosis **solely due to a change** in the Retired Player's neuropsychological test T-scores. The automatic rescoring is at no cost to Retired Players. If a Retired Player's testing is eligible for rescoring, and the rescoring yields test results that meet the requirements for a Qualifying Diagnosis or a higher Qualifying Diagnosis, one of two things will happen:

   a. if a Claim was previously submitted, the Claim will automatically receive a Monetary Award Claim Determination, or,

   b. if a prior Claim was not previously submitted, the Retired Player or his Representative Claimant will be notified that he or she should file a Claim, which will receive a Monetary Award Claim Determination once submitted and determined to be complete.

   If the rescoring results support a Qualifying Diagnosis of Level 1 Neurocognitive Impairment, that Retired Player will be eligible to receive BAP Supplemental Benefits.

2. **Expanded BAP Examinations**.  With only limited exceptions, Retired Players who had Black Race Norms applied to their post-Effective Date test scores, **but whose testing was not automatically rescored because they did not meet the eligibility standards described in the prior section**, will be eligible for a free BAP examination, regardless of whether they had a prior BAP exam or were initially eligible for a BAP exam.

3. **New Settlement Claim Submissions**.  With only limited exceptions, Retired Players who had Black Race Norms applied to their **valid** post-Effective Date test scores and who were examined through the MAF program, **but whose testing was not automatically rescored**, may, instead of receiving a free BAP exam, have their tests rescored using the New Method at their expense, either by their original neuropsychologist or by one of the Program's retained neuropsychological consultants, and may submit a New Settlement Claim relying on the rescored tests.

The notice to which this Informational Sheet is attached outlines how your case has been handled under the Norming Agreement. If you have questions about this Notice or need help with general Program questions, please call us at 1-855-887-3485 or email ClaimsAdministrator@NFLConcussionSettlement.com.



**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br>MDL No. 2323 |
| THIS DOCUMENT RELATES TO:<br>ALL CLAIMS LISTED BELOW. | **Hon. Anita B. Brody** |

## <u>ORDER</u>

**AND NOW**, this 24th day of February, 2023, it is **ORDERED** that the Objections of the following Class Members are **DENIED** because the claims packages are insufficient:

1. SPID ▉▉▉▉▉
2. SPID ▉▉▉▉▉
3. SPID ▉▉▉▉▉
4. SPID ▉▉▉▉▉
5. SPID ▉▉▉▉▉
6. SPID ▉▉▉▉▉
7. SPID ▉▉▉▉▉
8. SPID ▉▉▉▉▉
9. SPID ▉▉▉▉▉
10. SPID ▉▉▉▉▉
11. SPID ▉▉▉▉▉
12. SPID ▉▉▉▉▉
13. SPID ▉▉▉▉▉

14. SPID ███████

15. SPID ███████

16. SPID ███████

17. SPID ███████

18. SPID ███████

It is further **ORDERED** that the Objections of the following Class Members are **REMANDED** to the Special Master. The Special Master is instructed to return the claims to the Claims Administrator to further determine the sufficiency of the claims packages:

1. SPID ███████

2. SPID 950012548


                                   BY THE COURT:


                                   _____ s/ANITA B. BRODY, J.
                                   ANITA B. BRODY, J.

**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br>MDL No. 2323 |
| THIS DOCUMENT RELATES TO:<br>ALL CLAIMS LISTED BELOW. | **Hon. Anita B. Brody** |

<u>**ORDER**</u>

**AND NOW**, this 24th day of February, 2023, it is **ORDERED** that the Objections of the

following Class Members are **DENIED** because the claims packages are insufficient:

1. SPID ███████

2. SPID ███████

3. SPID ███████

4. SPID ███████

5. SPID ███████

6. SPID ███████

7. SPID ███████

8. SPID ███████

9. SPID ███████

10. SPID ███████

11. SPID ███████

12. SPID ███████

13. SPID ███████

14. SPID ███████

15. SPID ███████

16. SPID ███████

17. SPID ███████

18. SPID ███████

It is further **ORDERED** that the Objections of the following Class Members are **REMANDED** to the Special Master. The Special Master is instructed to return the claims to the Claims Administrator to further determine the sufficiency of the claims packages:

1. SPID 950013395

2. SPID ███████

<div align="center">

BY THE COURT:

</div>

      s/ANITA B. BRODY, J.
ANITA B. BRODY, J.



# NFL CONCUSSION SETTLEMENT
*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

## NOTICE OF REMAND OF APPEAL FOR RE-REVIEW
### DATE OF NOTICE: **March 3, 2023**

| I. SETTLEMENT CLASS MEMBER INFORMATION | | | | |
|---|---|---|---|---|
| **Settlement Program ID** | 950012548 | | | |
| **Name** | First<br>Robin | | M.I.<br>B | Last<br>Cornish |
| **Settlement Class Member Type** | Representative Claimant | | | |
| **Lawyer** | O'Hanlon, Demerath & Castillo | | | |

### II. CLAIM REMANDED FOR RE-REVIEW

This Notice is an official communication from the Claims Administrator for the NFL Concussion Settlement Program. The Special Master has remanded this claim to the Claims Administrator under Appeal Rule 23(c) for re-review for the issues raised in the appeal. In a re-review, an award may go up or down in amount, or the claim may be denied. We will send you a new determination notice on the outcome of the re-review, which will have a new time for the Settlement Class Member, Co-Lead Class Counsel or the NFL Parties to appeal that result.

### III. HOW TO CONTACT US WITH QUESTIONS OR FOR HELP

If you have any questions about this Notice or need help, call us at 1-855-887-3485 or email ClaimsAdministrator@NFLConcussionSettlement.com.





# NFL CONCUSSION SETTLEMENT
*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

## NOTICE OF REMAND OF APPEAL FOR RE-REVIEW
### DATE OF NOTICE: March 3, 2023

| I. SETTLEMENT CLASS MEMBER INFORMATION | | | |
|---|---|---|---|
| **Settlement Program ID** | 950013395 | | |

| **Name** | First<br>Carleen | M.I. | Last<br>Hastings |
|---|---|---|---|

| **Settlement Class Member Type** | Representative Claimant |
|---|---|
| **Lawyer** | O'Hanlon, Demerath & Castillo |

### II. CLAIM REMANDED FOR RE-REVIEW

This Notice is an official communication from the Claims Administrator for the NFL Concussion Settlement Program. The Special Master has remanded this claim to the Claims Administrator under Appeal Rule 23(c) for re-review for the issues raised in the appeal. In a re-review, an award may go up or down in amount, or the claim may be denied. We will send you a new determination notice on the outcome of the re-review, which will have a new time for the Settlement Class Member, Co-Lead Class Counsel or the NFL Parties to appeal that result.

### III. HOW TO CONTACT US WITH QUESTIONS OR FOR HELP

If you have any questions about this Notice or need help, call us at 1-855-887-3485 or email ClaimsAdministrator@NFLConcussionSettlement.com.





# NFL CONCUSSION SETTLEMENT
*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

## NOTICE OF DENIAL OF MONETARY AWARD CLAIM
### DATE OF NOTICE: **May 16, 2023**
### DEADLINE TO APPEAL: **June 15, 2023**

### I. SETTLEMENT CLASS MEMBER INFORMATION

| | |
|---|---|
| **Settlement Program ID** | 950012548 |

| **Name** | First<br>Robin | M.I.<br>B | Last<br>Cornish |
|---|---|---|---|

| | |
|---|---|
| **Settlement Class Member Type** | Representative Claimant |
| **Lawyer** | O'Hanlon, Demerath & Castillo |

| **Asserted Qualifying Diagnosis** | Death with CTE (Chronic Traumatic Encephalopathy) | **Date** | 8/23/08 |
|---|---|---|---|
| **Claim Type** | Pre-Effective Date | **Name of Diagnosing Physician** | Hamilton, Ronald L. |

### II. EXPLANATION OF CLAIM DETERMINATION

This Notice is an official communication from the Claims Administrator for the NFL Concussion Settlement Program. We reviewed your Claim Package and determined that you are not entitled to a Monetary Award because:



1.

In an Order dated 2/24/2023, Hon. Anita B. Brody ordered the Objection of Class Member Robin B. Cornish (SPID 950012548) remanded to the Special Master and instructed the Special Master to return the claim to the Claims Administrator "to further determine the sufficiency of" the Claim Package. The Special Master remanded the claim to the Claims Administrator on 3/3/2023.

A "Claim Package" is defined in Section 2.1(n) of the Amended Class Action Settlement Agreement as "the Claim Form and other documentation, as set forth in Section 8.2(a)." Section 8.2(a) states that the content of Claim Packages will include, without limitation:
(i) A Claim Form with the Personal Signature of the Retired NFL Football Player (or Representative Claimant) either on the Claim Form or on an acknowledgement form verifying the contents of the Claim Form;
(ii) A Diagnosing Physician Certification;
(iii) Medical records reflecting the Qualifying Diagnosis;
(iv) A HIPAA-compliant authorization form; and
(v) Records in the possession, custody or control of the Settlement Class Member demonstrating employment and participation in NFL Football.

All of these Claim Package content requirements have been met except for Section 8.2(a)(iii), medical records reflecting the Qualifying Diagnosis.

Section 6.3(f) of and Exhibit A-1 to the Settlement Agreement state that, for Retired NFL Football Players who died before the 4/22/2015 Final Approval Date, a Qualifying Diagnosis of Death with CTE shall be made only if the Player was diagnosed through a post-mortem diagnosis of CTE made by a board-certified neuropathologist prior to the 4/22/2015 Final Approval Date. Thus, there are three criteria that must be fulfilled to meet the Settlement's requirements for a Qualifying Diagnosis of Death with CTE:

1. The Retired NFL Football Player Died Before the Final Approval Date:  The Player died in 2008, well before the 4/22/2015 Final Approval Date. This criterion is fulfilled.

2. The Post-Mortem Diagnosis of CTE Was Made by a Board-Certified Neuropathologist:  The diagnosis of CTE was made by Dr. Ronald Hamilton, a board-certified neuropathologist. An AAP member reviewed the Claim Package to determine whether the diagnosis of CTE was medically supported. The AAP member determined that the claim meets the Settlement Agreement's requirement of "a post-mortem diagnosis of CTE made by a board-certified neuropathologist" based on examination of the brain tissue. This criterion is fulfilled.

3. The Post-Mortem Diagnosis of CTE Was Made Prior to the Final Approval Date:  We have been unable to confirm whether the diagnosis was made prior to the 4/22/2015 Final Approval Date in order to meet the Settlement's requirements for a Qualifying Diagnosis of Death with CTE. The one-page letter provided by Dr. Hamilton is undated and does not indicate whether the diagnosis was made prior to 4/22/2015, as required by the Settlement's Injury Definition for the Qualifying Diagnosis of Death with CTE. The date of Dr. Hamilton's diagnosis has not been provided. Therefore, this criterion is not fulfilled.

Because the diagnosis does not fulfill the Settlement's requirements for a Qualifying Diagnosis of Death with CTE, the medical records included in the Claim Package do not reflect a Qualifying Diagnosis, and therefore the Claim Package is not sufficient under Section 8.2(a) of the Settlement Agreement.

Section III below explains your right to appeal this denied claim, but living Retired Players may have the option to submit a new Claim Package under Section 9.1(c)(i) of the Settlement Agreement if they receive a new Qualifying Diagnosis. We will determine whether the new claim can be considered for a Monetary Award based on several factors, including whether the new claim shows materially changed circumstances from the earlier claim.  These materially changed circumstances may include: (a) a different type of Qualifying Diagnosis than the one that was denied; or (b) the same type of Qualifying Diagnosis but with a different diagnosis date supported by additional medical records.  If you submit a new claim within 365 days of the claim that is the subject of this denial notice, Section 10.3(d)(ii) of the Settlement Agreement requires us to audit that new claim if it is based on the same Qualifying Diagnosis as this denied claim, but the new diagnosis was made by a different physician.

## III. YOUR RIGHT TO APPEAL THIS DETERMINATION

If you have a good faith belief that the decision to deny your Monetary Award claim is incorrect, you may appeal this determination to the Court under Section 9.5 of the Settlement Agreement. To do so, click the Appeal Denied Claim button on your secure online portal and follow the instructions provided. You must submit supporting evidence to support your appeal. Any written statement may not be more than 10 double-spaced pages. You must do so on or before the Deadline to Appeal stated at the top of this Notice.

If you decide to appeal, the Settlement Agreement requires you to pay an Appeal Fee of $1,000, which you can do using the online PayPal option or by check made payable to the NFL Claims Administrator. This fee will be refunded if your appeal is successful. If you are unable to pay the $1,000 fee, you may make a hardship request to us to waive the fee and will have to submit financial information showing a sufficient hardship.

If paying the $1,000 Appeal Fee by check, mail the check to the address below.

NFL Concussion Settlement
Claims Administrator
P.O. Box 25369
Richmond, VA  23260

The Special Master appointed by the Court will decide your appeal based upon a showing by you of clear and convincing evidence. The Special Master's factual determinations will be final and binding, but you or Class Counsel or the NFL Parties may object to any of the Special Master's conclusions of law, which will then be subject to de novo (*i.e.*, a new) review by the Court.

If an appeal is not submitted on or before the deadline stated at the top of this Notice, the determination in this Notice will become final.

## IV. CLASS COUNSEL'S RIGHT TO APPEAL THIS DETERMINATION

Section 9.5 of the Settlement Agreement also gives Class Counsel the right to challenge our decision to deny your Monetary Award claim. If Class Counsel chooses to appeal, it must do so by the Deadline to Appeal stated at the top of this Notice and must provide a written copy of its Appeals Form and any supporting evidence to you, the NFL Parties, and us.

If an appeal is taken by you or Class Counsel, the NFL Parties may submit a written opposition (not to exceed 10 double-spaced pages) no later than 30 days after receipt of the Appeals Form. The party taking the appeal is not permitted to submit a reply.

Class Counsel may also submit a written statement (not to exceed 10 double-spaced pages) in response to your appeal no later than 15 days after receipt of the Appeals Form, and you and the NFL Parties may each submit a reply to any such submission by Class Counsel.

## V. HOW TO CONTACT US WITH QUESTIONS OR FOR HELP

If you have any questions about this Notice or need help, call us at 1-855-887-3485 or email ClaimsAdministrator@NFLConcussionSettlement.com.


Settlement Program ID: 950012548
Claim ID: 9597



# NFL CONCUSSION SETTLEMENT

*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

## NOTICE OF DENIAL OF MONETARY AWARD CLAIM
### DATE OF NOTICE: **May 16, 2023**
### DEADLINE TO APPEAL: **June 15, 2023**

### I. SETTLEMENT CLASS MEMBER INFORMATION

| | |
|---|---|
| **Settlement Program ID** | 950013395 |

| **Name** | First<br>Carleen | M.I. | Last<br>Hastings |
|---|---|---|---|

| | |
|---|---|
| **Settlement Class Member Type** | Representative Claimant |
| **Lawyer** | O'Hanlon, Demerath & Castillo |

| **Asserted Qualifying Diagnosis** | Death with CTE (Chronic Traumatic Encephalopathy) | **Date** | 10/15/08 |
|---|---|---|---|
| **Claim Type** | Pre-Effective Date | **Name of Diagnosing Physician** | Hamilton, Ronald L. |

### II. EXPLANATION OF CLAIM DETERMINATION

This Notice is an official communication from the Claims Administrator for the NFL Concussion Settlement Program.  We reviewed your Claim Package and determined that you are not entitled to a Monetary Award because:



**1.** In an Order dated 2/24/2023, Hon. Anita B. Brody ordered the Objection of Class Member Carleen Hastings (SPID 950013395) remanded to the Special Master and instructed the Special Master to return the claim to the Claims Administrator "to further determine the sufficiency of" the Claim Package. The Special Master remanded the claim to the Claims Administrator on 3/3/2023.

A "Claim Package" is defined in Section 2.1(n) of the Amended Class Action Settlement Agreement as "the Claim Form and other documentation, as set forth in Section 8.2(a)." Section 8.2(a) states that the content of Claim Packages will include, without limitation:
(i) A Claim Form with the Personal Signature of the Retired NFL Football Player (or Representative Claimant) either on the Claim Form or on an acknowledgement form verifying the contents of the Claim Form;
(ii) A Diagnosing Physician Certification;
(iii) Medical records reflecting the Qualifying Diagnosis;
(iv) A HIPAA-compliant authorization form; and
(v) Records in the possession, custody or control of the Settlement Class Member demonstrating employment and participation in NFL Football.

All of these Claim Package content requirements have been met except for Section 8.2(a)(iii), medical records reflecting the Qualifying Diagnosis.

Section 6.3(f) of and Exhibit A-1 to the Settlement Agreement state that, for Retired NFL Football Players who died before the 4/22/2015 Final Approval Date, a Qualifying Diagnosis of Death with CTE shall be made only if the Player was diagnosed through a post-mortem diagnosis of CTE made by a board-certified neuropathologist prior to the 4/22/2015 Final Approval Date. Thus, there are three criteria that must be fulfilled to meet the Settlement's requirements for a Qualifying Diagnosis of Death with CTE:

1. The Retired NFL Football Player Died Before the Final Approval Date:  The Player died in 2008, well before the 4/22/2015 Final Approval Date. This criterion is fulfilled.

2. The Post-Mortem Diagnosis of CTE Was Made by a Board-Certified Neuropathologist:  The diagnosis of CTE was made by Dr. Ronald Hamilton, a board-certified neuropathologist.  An AAP member reviewed the Claim Package to determine whether the diagnosis of CTE was medically supported. The AAP member determined that the claim meets the Settlement Agreement's requirement of "a post-mortem diagnosis of CTE made by a board-certified neuropathologist" based on examination of the brain tissue. This criterion is fulfilled.

3. The Post-Mortem Diagnosis of CTE Was Made Prior to the Final Approval Date:  We have been unable to confirm whether the diagnosis was made prior to the 4/22/2015 Final Approval Date in order to meet the Settlement's requirements for a Qualifying Diagnosis of Death with CTE. The one-page letter provided by Dr. Hamilton is undated and does not indicate whether the diagnosis was made prior to 4/22/2015, as required by the Settlement's Injury Definition for the Qualifying Diagnosis of Death with CTE. The date of Dr. Hamilton's diagnosis has not been provided. Therefore, this criterion is not fulfilled.

Because the diagnosis in this case does not fulfill the Settlement's requirements for a Qualifying Diagnosis of Death with CTE, the medical records included in the Claim Packages do not reflect a Qualifying Diagnosis, and therefore the Claim Package is not sufficient under Section 8.2(a) of the Settlement Agreement.

Section III below explains your right to appeal this denied claim, but living Retired Players may have the option to submit a new Claim Package under Section 9.1(c)(i) of the Settlement Agreement if they receive a new Qualifying Diagnosis. We will determine whether the new claim can be considered for a Monetary Award based on several factors, including whether the new claim shows materially changed circumstances from the earlier claim.  These materially changed circumstances may include: (a) a different type of Qualifying Diagnosis than the one that was denied; or (b) the same type of Qualifying Diagnosis but with a different diagnosis date supported by additional medical records.  If you submit a new claim within 365 days of the claim that is the subject of this denial notice, Section 10.3(d)(ii) of the Settlement Agreement requires us to audit that new claim if it is based on the same Qualifying Diagnosis as this denied claim, but the new diagnosis was made by a different physician.

### III. YOUR RIGHT TO APPEAL THIS DETERMINATION

If you have a good faith belief that the decision to deny your Monetary Award claim is incorrect, you may appeal this determination to the Court under Section 9.5 of the Settlement Agreement. To do so, click the Appeal Denied Claim button on your secure online portal and follow the instructions provided. You must submit supporting evidence to support your appeal. Any written statement may not be more than 10 double-spaced pages. You must do so on or before the Deadline to Appeal stated at the top of this Notice.

If you decide to appeal, the Settlement Agreement requires you to pay an Appeal Fee of $1,000, which you can do using the online PayPal option or by check made payable to the NFL Claims Administrator. This fee will be refunded if your appeal is successful. If you are unable to pay the $1,000 fee, you may make a hardship request to us to waive the fee and will have to submit financial information showing a sufficient hardship.

If paying the $1,000 Appeal Fee by check, mail the check to the address below.
> NFL Concussion Settlement
> Claims Administrator
> P.O. Box 25369
> Richmond, VA  23260

The Special Master appointed by the Court will decide your appeal based upon a showing by you of clear and convincing evidence. The Special Master's factual determinations will be final and binding, but you or Class Counsel or the NFL Parties may object to any of the Special Master's conclusions of law, which will then be subject to de novo (*i.e.*, a new) review by the Court.

If an appeal is not submitted on or before the deadline stated at the top of this Notice, the determination in this Notice will become final.

## IV. CLASS COUNSEL'S RIGHT TO APPEAL THIS DETERMINATION

Section 9.5 of the Settlement Agreement also gives Class Counsel the right to challenge our decision to deny your Monetary Award claim. If Class Counsel chooses to appeal, it must do so by the Deadline to Appeal stated at the top of this Notice and must provide a written copy of its Appeals Form and any supporting evidence to you, the NFL Parties, and us.

If an appeal is taken by you or Class Counsel, the NFL Parties may submit a written opposition (not to exceed 10 double-spaced pages) no later than 30 days after receipt of the Appeals Form. The party taking the appeal is not permitted to submit a reply.

Class Counsel may also submit a written statement (not to exceed 10 double-spaced pages) in response to your appeal no later than 15 days after receipt of the Appeals Form, and you and the NFL Parties may each submit a reply to any such submission by Class Counsel.

## V. HOW TO CONTACT US WITH QUESTIONS OR FOR HELP

If you have any questions about this Notice or need help, call us at 1-855-887-3485 or email ClaimsAdministrator@NFLConcussionSettlement.com.



**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| | § | |
| IN RE: NATIONAL FOOTBALL | § | No. 2:12-md-02323-AB |
| LEAGUE PLAYERS' CONCUSSION | § | |
| INJURY LITIGATION | § | MDL No. 2323 |
| | § | |
| | § | **Hon. Anita B. Brody** |
| THIS DOCUMENT RELATES TO: | § | |
| Settlement Class Member Robin B. Cornish | § | |
| (SPID 950012548) | § | |

**WRITTEN STATEMENT IN SUPPORT OF CLASS MEMBER'S APPEAL
OF THE CLAIMS ADMINISTRATOR'S NOTICE OF DENIAL OF
MONETARY AWARD CLAIM**

The Special Master should reverse the Claims Administrator's latest denial of Class Member

Robin B. Cornish's claim because the Claims Administrator's latest Notice denies the claim for

the same reason that was already considered and rejected by the Court in its February 24, 2023

Order.

When Class Member previously objected to the Special Master's decision to affirm the denial

of her claim, the Court asked the Special Master to clarify why the claim was being denied.  On

July 15, 2020, Special Master David Hoffman explained the claim was being denied because the

claim was untimely: "I find there is no evidence that the diagnosis of Death with CTE was

obtained before the appropriate deadline [i.e., the Final Approval Date on 4/22/2015]."[1]  In her

objection to the Special Master's decision, Class Member explained to the Court why the

diagnosis was not untimely.  The Court agreed with Class Member's objection and remanded so

the claim could be returned to the Claims Administrator to determine if the claim package was

_____

[1]    Exhibit 13

otherwise sufficient.[2]

The Claims Administrator has now found that Class Member's claim package is otherwise sufficient.  Nevertheless, the Claims Administrator has again denied the claim for the same untimeliness reason the Court already considered.  The Special Master should reverse the Claims Administrator's denial because the Claims Administrator has found no basis for denying this claim other than the purported untimeliness of the CTE diagnosis — a reason the Court has already rejected.

---

[2]    Exhibit 17

**SUPPORTING EVIDENCE**[3]

| | |
|---|---|
| Exhibit 1 | Notice of Denial of Monetary Award Claim |
| Exhibit 2 | Relevant Excerpts from Class Member's Claim Package |
| Exhibit 3 | Notice of Request for Additional Documents |
| Exhibit 4 | Letter dated May 6, 2019 to Claims Administrator regarding Class Member's claim |
| Exhibit 5 | Appeals Form for Monetary Award or Derivative Claimant Award Claim Determination |
| Exhibit 6 | Written Statement in Support of Class Member's Appeal of the Claims Administrator's Notice of Denial of Monetary Award Claim |
| Exhibit 7 | Filed Appeal Alert |
| Exhibit 8 | NFL Parties' Opposition to Appeal of Claim Denial by Representative Claimant Robin Cornish |

---

[3]  Class Member also incorporates by reference the following documents that have been filed in this MDL or published on the Settlement Website:

(1) Original Settlement Agreement [ECF 6073-2];

(2) the Amended Settlement Agreement [ECF 6481];

(3) Absent Class Member and Plaintiff Yvonne Sagapolutele's Motion to Modify the Amended Final Order and Judgment [ECF 6534] by Conforming the Definition of "Death with CTE" to the Version Contemplated in the Fairness Hearing Order [ECF 6479] and Noticed to the Class in the Long Form Notice [ECF 6093-1] and Summary Notice [ECF 6093-2] Pursuant to Rule 60 and the Authority Retained in the Settlement Agreement [ECF 8263] ("Motion to Modify");

(4) Response in Opposition to the Motion to Modify [ECF 8430];

(5) Statement of Co-Lead Counsel in Opposition to the Motion to Modify [ECF 8431];

(6) Reply in Support of Motion to Modify [ECF 8442];

(7) Notice of Joinder [ECF 8443];

(8) Order denying, without prejudice, the Motion to Modify [ECF 8557];

(9) Posted Settlement Program FAQs (as of February 19, 2019); and

(10) Posted Settlement Program FAQs (as of July 8, 2019).

| | |
|---|---|
| Exhibit 9 | Post-Appeal Notice of Denial of Monetary Award Claim |
| Exhibit 10 | Settlement Class Member's Objection to the Special Master's Decision Denying Class Member's Appeal |
| Exhibit 11 | Response of the National Football League and NFL Properties LLC in Opposition to Robin Cornish's Objection to Post-Appeal Notice of Denial of Monetary Award Claim |
| Exhibit 12 | Settlement Implementation Order (June 16, 2020) |
| Exhibit 13 | Special Masters Decision (July 15, 2020) |
| Exhibit 14 | Post-Appeal Notice of Denial of Monetary Award Claim |
| Exhibit 15 | Supplement to Settlement Class Members' Objections to the Special Master's Decisions |
| Exhibit 16 | Response of the National Football League and NFL Properties LLC in Opposition to Supplement to Settlement Class Members' Objections to the Special Master's Decision |
| Exhibit 17 | Order [ECF 12001] (Feb. 24, 2023) |
| Exhibit 18 | Notice of Remand of Appeal for Re-Review |
| Exhibit 19 | Notice of Denial of Monetary Award Claim |

## **BACKGROUND**

Class Member submitted a claim package that included a post-mortem diagnosis of Chronic Traumatic Encephalopathy ("CTE") made by Dr. Hamilton, a board-certified neuropathologist.[4] Class Member's submitted claim package also includes documentation showing that the Player died prior to April 22, 2015.[5]  The claim package includes an autopsy report, death certificate, and letter from Dr. Hamilton describing his diagnosis of CTE based on his post mortem examination of the brain tissue of Class Member.

The Claims Administrator initially requested additional documents, stating: "You have not submitted any medical records reflecting the Qualifying Diagnosis."[6]  The Claims Administrator further explained the following:

> The medical records must show a post-mortem diagnosis of CTE made before April 22, 2015 (the Final Approval Date) by a board-certified neuropathologist for a Retired NFL Football Player who died before April 22, 2015.  See Section 6.3(f) of the Settlement Agreement and FAQ 109.  Mr. Cornish died on August 23, 2008, and the August 24, 2008 autopsy report signed by Marc A. Krouse does not reference CTE and neither does the death certificate.  You provided an undated letter from Dr. Ronald L. Hamilton who diagnosed Mr. Cornish with CTE.  You must establish that Dr. Hamilton reviewed Mr. Cornish's brain tissue and made a CTE diagnosis on or before April 22, 2015.

In a correspondence dated May 6, 2019, Class Member's counsel explained that pursuant to FAQ 109 and FAQ 93, the diagnosis date for a Death with CTE diagnosis is "the date of the Player's death, even though the diagnosis is not made until after the Player dies."[7]

---

[4]    Exhibit 2.

[5]    *Id.*

[6]    Exhibit 3

[7]    *See* Exhibit 4.

Despite this response, the Claims Administrator denied Class Member's Monetary Award Claim.[8] Class Member timely filed an appeal of the Claims Administrator's Notice of Denial of Monetary Award Claim,[9] and the Special Master denied the Class Member's appeal on September 26, 2019.[10] On October 16, 2019, Class Member filed an Objection to the Special Master's Decision Denying Class Member's Appeal.[11]

In response to the Special Master's Decision, the Court issued a Settlement Implementation Order requesting that the Special Master provide further explanation regarding whether the claim was being denied for two reasons, or only for the purported untimeliness of the diagnosis.[12]

On July 15, 2020, Special Master David Hoffman clarified that Class Member's claim was being denied only on the basis of the purported untimeliness of the diagnosis:

> The Claims Administrator denied Ms. Cornish's claim for two independent reasons.
>
> First, the claim was denied based upon a lack of proof that the diagnosis was timely. I find that there is no evidence that the diagnosis of Death with CTE was obtained before the appropriate deadline.
>
> Second, the claim was denied for failure of the diagnosing physician to personally examine the Player's brain tissue. However, the evidence suggests that Dr. Hamilton did examine the late Mr. Cornish's brain tissue as is necessary to diagnose Death with CTE.
>
> The Claims Administrator correctly concluded that Ms. Cornish failed to show that the diagnosis was obtained before the appropriate deadline. I thus affirm the denial solely on the first basis.[13]

---

[8]    Exhibit 1.

[9]    Exhibits 5 and 6.

[10]   Exhibit 9.

[11]   Exhibit 10.

[12]   Exhibit 12.

[13]   Exhibit 13.

Following this decision, Class Member filed a Supplement to Settlement Class Members' Objections to the Special Master's Decisions Class Members requesting the Court remand the claim because the CTE diagnosis was not untimely.[14]

On February 24, 2023, after considering the sole issue before the Court related to this Class Member's claim (i.e., whether the diagnosis was untimely),[15] the Court remanded this claim and instructed the Special Master to return the claims to the Claims Administrator to further determine the sufficiency of the claim package.[16]

The Claims Administrator has now issued a new Notice of Denial of Monetary Award Claim dated May 16, 2023 on the exact same issue that has already been considered and rejected by the Court in its February 24, 2023 Order. The Claims Administrator stated that the claims package is sufficient in all respects except for the alleged untimeliness of the diagnosis:

> The Post-Mortem Diagnosis of CTE Was Made Prior to the Final Approval Date: We have been unable to confirm whether the diagnosis was made prior to the 4/22/2015 Final Approval Date in order to meet the Settlement's requirements for a Qualifying Diagnosis of Death with CTE. The one-page letter provided by Dr. Hamilton is undated and does not indicate whether the diagnosis was made prior to 4/22/2015, as required by the Settlement's Injury Definition for the Qualifying Diagnosis of Death with CTE. The date of Dr. Hamilton's diagnosis has not been provided. Therefore, this criterion is not fulfilled.

> Because the diagnosis does not fulfill the Settlement's requirements for a Qualifying Diagnosis of Death with CTE, the medical records included in the Claim Package do not reflect a Qualifying Diagnosis, and therefore the Claim Package is not sufficient under Section 8.2(a) of the Settlement Agreement.[17]

---

[14] Exhibit 15.

[15] Exhibit 10.

[16] Exhibit 17.

[17] Exhibit 19.

**ARGUMENT**

The Claims Administrator has again denied Class Member's claim because Dr. Hamilton's CTE diagnosis was not made before April 22, 2015, which is the Final Approval Date for the Amended Settlement. But Class Member has already explained — in arguments both to the Court and the Special Master — why the diagnosis is not untimely. And based on those arguments, the Court remanded the claim.

First, as Class Member has already explained in prior briefing, the claims package is not insufficient based on the purported untimeliness of the diagnosis because "the date of the Qualifying Diagnosis is the date of the Player's death, even though the diagnosis is not made until after the Player Dies." *See* Exhibits 6, 10 (quoting FAQ 99 from the Posted Settlement Program FAQs as of September 12, 2019). It is undisputed that the Player's death occurred before the Final Approval Date.

Second, in the alternative, the language the Claims Administrator relies on could not have added a diagnosis-date requirement because it was added to the settlement agreement after the opt out deadline without notice to Class Member and other absent class members. In all notices that were provided regarding the settlement agreement, Class Member and other absent class members were told they could obtain a CTE diagnosis at any time within the 65-year life of the Monetary Award Fund. *See* Exhibits 6, 10; *see also* Motion to Modify [ECF 8263].

Based on these arguments, the Court decided this claim needed to be remanded to determine whether the claim package is otherwise sufficient. Because it is, the claim should be accepted.

**CONCLUSION**

Class Member has already explained in prior briefing to the Special Master and the Court why the CTE diagnosis by Dr. Hamilton is not untimely because the date of the Qualifying Diagnosis

described in Section 6.3(f) of the Amended Settlement Agreement is the date of the Player's death. Additionally, Class Member has previously explained why the Amended Settlement Agreement cannot be interpreted to impose a new deadline because such an interpretation based on language added to the settlement agreement after the opt out deadline would violate Class Member's due process rights. The Court has already considered these arguments and agreed — remanding this claim for the current review. Now that the Claims Administrator has determined that the claims package is otherwise sufficient, this claim should be accepted and paid.

For all of the foregoing reasons, Class Member respectfully requests that the Special Master reverse the Claims Administrator's denial of this Monetary Award Claim and remand to the Claims Administrator for a calculation of the Monetary Award because on remand, the Claims Administrator has found no reason to question the sufficiency of the Class Member's Claim Package other than the reason the Court has already rejected.

Dated:  June 15, 2023

Respectfully Submitted:

*/s/ Justin Demerath*

**Justin Demerath**
Texas State Bar No. 24034415
**David Campbell**
Texas State Bar No. 24057033
O'HANLON, DEMERATH & CASTILLO
808 West Avenue | Austin, TX 78701
Tel: (512) 494-9949 | Fax: (512) 494-9919
jdemerath@808west.com
dcampbell@808west.com

**Counsel for Class Member**

## **CERTIFICATE OF SERVICE**

It is hereby certified that a true copy of the foregoing document was submitted on the Court Portal on the 15th day of June, 2023.

*/s/ Justin B. Demerath*_____

Justin B. Demerath

# Exhibit 1



# NFL CONCUSSION SETTLEMENT

*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

## NOTICE OF DENIAL OF MONETARY AWARD CLAIM
### DATE OF NOTICE: **June 25, 2019**
### DEADLINE TO APPEAL: **July 25, 2019**

### I.  SETTLEMENT CLASS MEMBER INFORMATION

| Settlement Program ID | 950012548 | | | |
|---|---|---|---|---|
| **Name** | First<br>Robin | M.I.<br>B | Last<br>Cornish | |
| **Settlement Class Member Type** | Representative Claimant | | | |
| **Law Firm** | O'Hanlon, Demerath & Castillo | | | |
| **Asserted Qualifying Diagnosis** | Death with CTE (Chronic Traumatic Encephalopathy) | **Date** | | 8/23/08 |

### II.  EXPLANATION OF CLAIM DETERMINATION

This Notice is an official communication from the Claims Administrator for the NFL Concussion Settlement Program.  We sent you a Notice of Request for Additional Documents or Notice of Preliminary Review telling you about insufficient documents and/or missing information in your Claim Package.  The response deadline on that Notice has expired, or you have responded but did not resolve the issue(s) we told you about, and your claim is denied because it remains incomplete for these reason(s):

| | What was Missing | How We Told You to Address this Item |
|---|---|---|
| **1.** | You have not submitted any medical records reflecting the Qualifying Diagnosis. | Click the Respond button, go to Section 3 for Medical Records, click on the Upload Medical Records button and follow the instructions to upload medical records reflecting the Qualifying Diagnosis. |

Section III below explains your right to appeal this denied claim, but you also have the option to submit a new Claim Package under Section 9.1(c)(i) of the Settlement Agreement.  We will determine whether the new claim can be considered for a Monetary Award based on several factors, including whether the new claim shows materially changed circumstances from the earlier claim.  These materially changed circumstances may include: (a) a different type of Qualifying Diagnosis than the one that was denied; or (b) the same type of Qualifying Diagnosis but with a different diagnosis date supported by additional medical records.  If you submit a new claim within 365 days of this denial notice, Section 10.3(d)(ii) of the Settlement Agreement requires us to audit that new claim if it is based on the same Qualifying Diagnosis as this denied claim, but the new diagnosis was made by a different physician.

### III.  YOUR RIGHT TO APPEAL THIS DETERMINATION

If you have a good faith belief that the decision to deny your Monetary Award claim is incorrect, you may appeal this determination to the Court under Section 9.5 of the Settlement Agreement.  To do so, click the Appeal Denied Claim button on your secure online portal and follow the instructions provided.  You must submit supporting evidence to support your appeal. Any written statement may not be more than 10 double-spaced pages.  You must do so on or before the Deadline to Appeal stated at the top of this Notice.



If you decide to appeal, the Settlement Agreement requires you to pay an Appeal Fee of $1,000, which you can do using the online PayPal option or by check made payable to the NFL Claims Administrator. This fee will be refunded if your appeal is successful. If you are unable to pay the $1,000 fee, you may make a hardship request to us to waive the fee and will have to submit financial information showing a sufficient hardship.

If paying the $1,000 Appeal Fee by check, mail the check to the address below.

> NFL Concussion Settlement
> Claims Administrator
> P.O. Box 25369
> Richmond, VA  23260

The Special Master appointed by the Court will decide your appeal based upon a showing by you of clear and convincing evidence. The Special Master's factual determinations will be final and binding, but you or Co-Lead Class Counsel or the NFL Parties may object to any of the Special Master's conclusions of law, which will then be subject to de novo (*i.e.*, a new) review by the Court.

If an appeal is not submitted on or before the deadline stated at the top of this Notice, the determination in this Notice will become final.

## IV. CO-LEAD CLASS COUNSEL'S RIGHT TO APPEAL THIS DETERMINATION

Section 9.5 of the Settlement Agreement also gives Co-Lead Class Counsel the right to challenge our decision to deny your Monetary Award claim. If Co-Lead Class Counsel chooses to appeal, it must do so by the Deadline to Appeal stated at the top of this Notice and must provide a written copy of its Appeals Form and any supporting evidence to you, the NFL Parties, and us.

If an appeal is taken by you or Co-Lead Class Counsel, the NFL Parties may submit a written opposition (not to exceed 10 double-spaced pages) no later than 30 days after receipt of the Appeals Form. The party taking the appeal is not permitted to submit a reply.

Co-Lead Class Counsel may also submit a written statement (not to exceed 10 double-spaced pages) in response to your appeal no later than 15 days after receipt of the Appeals Form, and you and the NFL Parties may each submit a reply to any such submission by Co-Lead Class Counsel.

## V. HOW TO CONTACT US WITH QUESTIONS OR FOR HELP

If you are represented by a lawyer, consult with your lawyer if you have questions or need assistance. If you are unrepresented and have any questions about this Notice or need help, contact us at 1-855-887-3485 or send an email to ClaimsAdministrator@NFLConcussionSettlement.com. If you are a lawyer, call or email your designated Firm Contact for assistance. For more information about the Settlement program, visit the official website at www.NFLConcussionSettlement.com to read the Frequently Asked Questions or download a copy of the complete Settlement Agreement.



# Exhibit 2



University of Pittsburgh
**Physicians, Department
of Pathology**

Division of Neuropathology

Clayton A. Wiley, MD, PhD
*Director*

Charleen T. Chu, MD, PhD
Robert H. Garman, DVM
Ronald Hamilton, MD
Julia Kofler, MD
Scott M. Kulich, MD, PhD
David Lacomis, MD
Geoffrey Murdoch, MD, PhD
Gutti R. Rao, MD

UPMC Presbyterian
Room 5701 Scaife Hall
200 Lothrop Street
Pittsburgh, PA 15213
T 412-624-9415
F 412-624-5610

To Whom it may concern,

I have conducted a study of F. Cornish's brain tissue. Additionally, in my Neuropathology practice I conduct an ongoing study of all available and existing medical literature related to the existence and diagnosis of CTE and I combine that knowledge with my training and extensive experience related to the study and diagnosis of CTE.

Frank Cornish died on August 23, 2008.

Received from the Tarrant County Medical Examiner are three H&E stained slides (08-10049 slides 1, 2 and 3) and their corresponding formalin-fixed paraffin embedded tissue blocks.

H&E stained recuts are examined:

slide 1 has neocortex, basal ganglia and thalamus;
slide 2 has cerebellum and medulla;
slide 3 has neocortex and midbrain with substantia nigra.

Immunostain of slide 1 for the AD-related protein Beta-A4 is negative. Tau immunostains (PHF-1) are negative in the cerebellum and medulla (slide 2), but reveal numerous neocortical PHF-1/tau positive tangles in neurons (Fig 1a), with staining of many neuronal processes (neuropil threads) (Fig 1b) as well as tau-positive glial cells (Fig 1c), especially in the depths of the sulcus and focally around some blood vessels. In the midbrain, the substantia nigra had tangles and neuropil threads (Fig 1d). The mesencephalic tegmentum shows many tau-positive neurons in the oculomotor nucleus . These histopathologic findings are diagnostic of CTE.



Frank Cornish had CTE.

Sincerely
/s/
Ronald L Hamilton, M.D.

Affiliated with the University of Pittsburgh School of Medicine

 **CONCUSSION SETTLEMENT**
*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

### PRE-EFFECTIVE DATE DIAGNOSING PHYSICIAN CERTIFICATION FORM
### (for diagnoses made by physicians who are qualified to render Qualifying Diagnoses for purposes of Monetary Award claims before January 7, 2017)

This Pre-Effective Date Diagnosing Physician Certification Form is to be used only by physicians qualified to render Qualifying Diagnoses before January 7, 2017, in connection with the Class Action Settlement in In re: National Football League Players' Concussion Injury Litigation and who made a Qualifying Diagnosis before January 7, 2017. The Qualifying Diagnoses are found in Appendix A to this Pre-Effective Date Diagnosing Physician Certification Form.

Use this form to certify a Qualifying Diagnosis you made before January 7, 2017, based on your personal examination of the Retired NFL Football Player. **Do not sign this form unless you personally examined the player** or, in the case of a Qualifying Diagnosis of Death with CTE, you are the board-certified neuropathologist who made the post-mortem diagnosis of CTE. If you made a Qualifying Diagnosis as a Qualified MAF Physician on or after January 7, 2017, do not use this form; use the MAF Diagnosing Physician Certification Form instead. Also, if you are a Qualified BAP Provider certifying a diagnosis you made in the Baseline Assessment Program, do not use this form; use the BAP Diagnosing Physician Certification Form instead.

You must complete this form in its entirety, sign it under penalty of perjury, and return it to the patient along with copies of all supporting medical records that you created or received in connection with the Qualifying Diagnosis. In turn, the patient, or the patient's counsel, must submit this form and all supporting medical records referred to above to the Claims Administrator as part of a claim for compensation under the Class Action Settlement. The Claims Administrator will review the form, including your qualifications to provide the Qualifying Diagnosis, and the supporting medical records. All claims also are subject to audit. Any finding of fraudulent conduct by you will be subject to, without limitation, your referral to appropriate regulatory and disciplinary boards and agencies and/or federal authorities, and your disqualification from serving in any aspect of the Class Action Settlement.

You are required to preserve all supporting medical records that you created or received in connection with the Qualifying Diagnosis for the greater of: (a) 10 years after January 7, 2017; or (b) the period of time required under applicable state and federal laws.

If you have any questions, call the Claims Administrator toll free at 1-855-887-3485 or visit the Settlement Website at https://www.nflconcussionsettlement.com.

# PRE-EFFECTIVE DATE DIAGNOSING PHYSICIAN CERTIFICATION FORM
**(for diagnoses made by physicians who are qualified to render Qualifying Diagnoses for purposes of Monetary Award claims before January 7, 2017)**

## I. PATIENT INFORMATION

| Settlement Program ID (if known) | 950012548 | | |
|---|---|---|---|

| Name: | First<br>Frank | M.I. | Last<br>Cornish | Suffix |
|---|---|---|---|---|

| Address: | Address 1<br>█████████ |
|---|---|
| | Address 2 |
| | City<br>Keller |
| | State/Province<br>TX |
| | Postal Code<br>76248 |  Country<br>United States |

| Telephone | █████████ |
|---|---|

| Date of Birth | █████ / | 1 | 9 | 6 | 7 |<br>(Month/Day/Year) |
|---|---|

| Date of Death (if applicable) | | 0 | 8 |/| 2 | 3 |/| 2 | 0 | 0 | 8 |<br>(Month/Day/Year) |
|---|---|

## II. DIAGNOSING PHYSICIAN INFORMATION

| National Provider Identifier (NPI) | 1013980978 | | |
|---|---|---|---|

| Physician Name | First<br>Ronald | M.I.<br>L. | Last<br>Hamilton | Suffix |
|---|---|---|---|---|

**(a) Are you approved as a Qualified BAP Provider or a Qualified MAF Physician?**

☐ **YES.** If YES, you do not need to fill out the rest of this Section II or Sections III or IV. Instead, go to Section V.

☒ **NO.**

**(b) If you answered No, have you previously completed this form for another Retired NFL Football Player, that you know was submitted to the Claims Administrator?**

☐ **YES.** If YES, you do not need to fill out this Section II or Sections III or IV. Instead, go to Section V.

☒ **NO.**

If you answered No to both questions, fill out the rest of this Section II and then go to Section III.

## PRE-EFFECTIVE DATE DIAGNOSING PHYSICIAN CERTIFICATION FORM
### (for diagnoses made by physicians who are qualified to render Qualifying Diagnoses for purposes of Monetary Award claims before January 7, 2017)

| Office/Practice Name | University of Pittsburgh Medical Center | |
|---|---|---|
| **Address** | Address 1 <br> A724.1 Scaife Hall | |
| | Address 2 <br> 200 Lothrop Street | |
| | City <br> Pittsburgh | |
| | State/Province <br> Pennsylvania | |
| | Postal Code <br> 15213 | Country <br> USA |
| **Telephone** | 4 1 2 - 6 2 4 - 6 6 1 0 | |
| **Fax** | 4 1 2 - 6 2 4 - 5 4 8 8 | |
| **Email Address** | hamiltonrl@upmc.edu | |

### III.    BOARD CERTIFICATIONS

Check all board certifications that apply and list the board providing the certification and any identification number provided by the board (*e.g.*, American Board of Psychiatry and Neurology diplomate number). If you do not have any board certifications, summarize your relevant medical training and experience and then go to Section IV.

| | Certification | Board | Board Identification Number | Effective Date | Expiration Date |
|---|---|---|---|---|---|
| ☐ | Neurology | | | | |
| ☐ | Neurosurgery | | | | |
| X | Neuropathology | American Board of Pathology | | certified: 5/23/1996 <br> recertified:1/1/2014 | |
| | Neuropsychology | | | | |
| ☐ | Other Neuro-specialty | | | | |
| X | Other Board Certification | American Board of Pathology | | certified: 5/23/1996 | |

**PRE-EFFECTIVE DATE DIAGNOSING PHYSICIAN CERTIFICATION FORM**
**(for diagnoses made by physicians who are qualified to render Qualifying Diagnoses**
**for purposes of Monetary Award claims before January 7, 2017)**

If you are not board-certified in a neuro-specialty area, summarize your relevant medical training and experience in the field of neurology and related fields that you believe qualifies you to make the diagnosis provided in Section V.

## IV.    OTHER QUALIFICATIONS

| | | Education Level | Institution | Degree/Area of Focus | Date Received |
|---|---|---|---|---|---|
| Educational Information | 1. | Undergraduate Education | University of Nebraska-Lincoln | B.S / Psychology | 1 9 8 5 (Month/Year) |
| | 2. | Medical School | University of Nebraska Medical Center | M.D. | 1 9 8 9 (Month/Year) |
| | 3. | Internship | Univ. of California, San Diego | Resident Anatomic Pathology | 1 9 9 1 (Month/Year) |
| | 4. | Residency | Univ. of California, San Diego | Resident Neuropathology | 1 9 9 3 (Month/Year) |
| | 5. | Fellowship | Univ. of Pittsburgh | Fellow Neuropathology | 1 9 9 4 (Month/Year) |
| | 6. | Other (Graduate) | Univ. of Pittsburgh | Fellow: NIMH Training Grant in Neuroscience | 1 9 9 5 (Month/Year) |

| States Where Licensed to Practice | | State | State License Number | Effective Date | Expiration Date |
|---|---|---|---|---|---|
| | 1. | California | G69731 | 9/10/1990 | Expired |

**PRE-EFFECTIVE DATE DIAGNOSING PHYSICIAN CERTIFICATION FORM**
**(for diagnoses made by physicians who are qualified to render Qualifying Diagnoses**
**for purposes of Monetary Award claims before January 7, 2017)**

| | | | | | |
|---|---|---|---|---|---|
| | 2. | **Pennsylvania** | MD049717L | 5/12/1993 | 12/31/2018 |
| | 3. | **Indiana** | 01067332A | 9/29/2009 | 10/31/2019 |
| | 4. | | | | |
| | 5. | | | | |
| | 6. | | | | |

| | |
|---|---|
| **Specialties** | Check all specialties that apply. <br><br> ☐ **Neurology** <br><br> ☐ **Neurosurgery** <br><br> ☒ **Neuropathology** <br><br> ☐ **Neuropsychology** <br><br> ☐ **Other Neuro-specialty** <br> (*e.g.*, brain injury medicine, clinical neurophysiology, etc.) _____ <br><br> ☒ **Other Specialty** (list all)　　**Anatomic Pathology** _____ |

**PRE-EFFECTIVE DATE DIAGNOSING PHYSICIAN CERTIFICATION FORM**
**(for diagnoses made by physicians who are qualified to render Qualifying Diagnoses**
**for purposes of Monetary Award claims before January 7, 2017)**

### V. QUALIFYING DIAGNOSIS

Identify the patient's diagnosis and the date of such diagnosis. See **Appendix A** for the criteria for each diagnosis. Other than for Death with CTE, the identification of a condition, including through a blood test, genetic test, imaging technique, or otherwise, that has not yet resulted in actual cognitive impairment and/or actual neuromuscular impairment in the patient is **not** a Qualifying Diagnosis.

| Qualifying Diagnosis | Date of Diagnosis |
|---|---|
| ☐ Level 1.5 Neurocognitive Impairment | \|\_\|\_\|/\|\_\|\_\|/\|\_\|\_\|\_\|\_\| (Month/Day/Year) |
| ☐ Level 2 Neurocognitive Impairment* | \|\_\|\_\|/\|\_\|\_\|/\|\_\|\_\|\_\|\_\| (Month/Day/Year) |
| ☐ Alzheimer's Disease | \|\_\|\_\|/\|\_\|\_\|/\|\_\|\_\|\_\|\_\| (Month/Day/Year) |
| ☐ Parkinson's Disease | \|\_\|\_\|/\|\_\|\_\|/\|\_\|\_\|\_\|\_\| (Month/Day/Year) |
| ☐ ALS (amyotrophic lateral sclerosis) | \|\_\|\_\|/\|\_\|\_\|/\|\_\|\_\|\_\|\_\| (Month/Day/Year) |
| ☒ Death with CTE | \|0\|8\|/\|2\|3\|/\|2\|0\|0\|8\| * (Month/Day/Year) |

\* If you provided a diagnosis of Level 2 Neurocognitive Impairment, did you determine that certain testing was medically unnecessary because of the severity of the patient's dementia (see **Appendix A**)?

☐ YES      ☐ NO

If you answered Yes, provide the factual basis for that determination:

\*Pursuant to FAQ 93, Posted Settlement Program FAQs (as of November 7, 2018), for this claim, "the date of the Qualifying Diagnosis is the date of the Player's death, even though the diagnosis is not made until after the Player dies".

**PRE-EFFECTIVE DATE DIAGNOSING PHYSICIAN CERTIFICATION FORM**
**(for diagnoses made by physicians who are qualified to render Qualifying Diagnoses**
**for purposes of Monetary Award claims before January 7, 2017)**

## VI. CERTIFICATION

By signing below, I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that all information provided in this form, and all related supporting medical records, are true and correct to the best of my knowledge, information and belief, and that I personally examined the Retired NFL Football Player named in Section I or, in the case of a Qualifying Diagnosis of Death with CTE, I am the board-certified neuropathologist who made the post-mortem diagnosis of CTE.

I acknowledge that any finding of fraudulent conduct may subject me to, without limitation, referral to appropriate regulatory and disciplinary boards and agencies and/or federal authorities, and disqualification from serving in any aspect of the Class Action Settlement.

| Signature of Diagnosing Physician | | Date of Signature | 0 2 / 0 / 2 / 1 9 (Month/Day/Year) |
|---|---|---|---|
| **Printed Name** | First Ronald | M.I. L. | Last Hamilton |

## APPENDIX A

Other than for Death with CTE, the identification of a condition, including through a blood test, genetic test, imaging technique, or otherwise, that has not yet resulted in actual cognitive impairment and/or actual neuromuscular impairment experienced by the patient does not qualify as a diagnosis.

### LEVEL 1.5 NEUROCOGNITIVE IMPAIRMENT

**The following diagnosis can only be made:**

(1) prior to July 7, 2014, by a board-certified neurologist, board-certified neurosurgeon, other board-certified neuro-specialist physician, or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician, except as provided in (c), below;

(2) from July 7, 2014 through January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified neurologist, board-certified neurosurgeon, or other board-certified neuro-specialist physician, except as provided in (c), below; or

(3) for a patient who died prior to January 7, 2017 (the Effective Date of the Settlement Agreement), where the diagnosis occurred while the patient was living, by a board-certified or otherwise qualified neurologist, neurosurgeon, or other neuro-specialist physician, or by a physician with sufficient qualifications in the field of neurology or neurocognitive disorders to make a diagnosis of Level 1.5 Neurocognitive Impairment:

A diagnosis made outside of the Baseline Assessment Program (BAP) that a living patient suffers from Level 1.5 Neurocognitive Impairment, as set forth below, *i.e.*, early dementia, based on evaluation and evidence generally consistent with the diagnostic criteria set forth and provided below:

There is: (i) Concern of the patient, a knowledgeable informant, or the Qualified BAP Provider that there has been a severe decline in cognitive function; (ii) Evidence of a moderate to severe cognitive decline from a previous level of performance, as determined by and in accordance with the standardized neuropsychological testing protocol annexed in *Appendix B*, in two or more cognitive domains (complex attention, executive function, learning and memory, language, perceptual-spatial), provided one of the cognitive domains is (a) executive function, (b) learning and memory, or (c) complex attention; (iii) The patient exhibits functional impairment generally consistent with the criteria set forth in the National Alzheimer's Coordinating Center's Clinical Dementia Rating scale Category 1.0 (Mild) in the areas of Community Affairs, Home & Hobbies, and Personal Care—where such functional impairment is corroborated by documentary evidence (*e.g.*, medical records, employment records), the sufficiency of which will be determined by the physician making the diagnosis (and where no documentary evidence of functional impairment exists or is available, then (a) there must be evidence of moderate to severe cognitive decline from a previous level of performance, as determined by and in accordance with the standardized neuropsychological testing protocol annexed in *Appendix B*, in the executive function cognitive domain or the learning and memory cognitive domain, and at least one other cognitive domain; and (b) the patient's functional impairment, as described above, must be corroborated by a third-party sworn affidavit from a person familiar with the patient's condition (other than the player or his family members), the sufficiency of which will be determined by the diagnosing physician); and (iv) The cognitive deficits do not occur exclusively in the context of a delirium, acute substance abuse, or as a result of medication side effects.

## LEVEL 2 NEUROCOGNITIVE IMPAIRMENT

**The following diagnosis can only be made:**

> **(1) prior to July 7, 2014, by a board-certified neurologist, board-certified neurosurgeon, other board-certified neuro-specialist physician, or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician, except as provided in (c), below;**

> **(2) from July 7, 2014 through January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified neurologist, board-certified neurosurgeon, or other board-certified neuro-specialist physician, except as provided in (c), below; or**

> **(3) for a patient who died prior to January 7, 2017 (the Effective Date of the Settlement Agreement), where the diagnosis occurred while the patient was living, by a board-certified or otherwise qualified neurologist, neurosurgeon, or other neuro-specialist physician, or by a physician with sufficient qualifications in the field of neurology or neurocognitive disorders to make a diagnosis of Level 2 Neurocognitive Impairment:**

A diagnosis made outside of the Baseline Assessment Program (BAP) that a living patient suffers from Level 2 Neurocognitive Impairment, as set forth below, *i.e.*, moderate dementia, based on evaluation and evidence generally consistent with the diagnostic criteria set forth and provided below, unless the diagnosing physician can certify in Section IV of the Diagnosing Physician Certification Form, above, that certain testing specified below for Level 2 Neurocognitive Impairment is medically unnecessary because the patient's dementia is so severe:

There is: (i) Concern of the patient, a knowledgeable informant, or the Qualified BAP Provider that there has been a severe decline in cognitive function; (ii) Evidence of a severe cognitive decline from a previous level of performance, as determined by and in accordance with the standardized neuropsychological testing protocol annexed in *Appendix B*, in two or more cognitive domains (complex attention, executive function, learning and memory, language, perceptual-spatial), provided one of the cognitive domains is (a) executive function, (b) learning and memory, or (c) complex attention; (iii) The patient exhibits functional impairment generally consistent with the criteria set forth in the National Alzheimer's Coordinating Center's Clinical Dementia Rating scale Category 2.0 (Moderate) in the areas of Community Affairs, Home & Hobbies, and Personal Care—where such functional impairment is corroborated by documentary evidence (*e.g.*, medical records, employment records), the sufficiency of which will be determined by the physician making the diagnosis (and where no documentary evidence of functional evidence exists or is available, then (a) there must be evidence of severe cognitive decline from a previous level of performance, as determined by and in accordance with the standardized neuropsychological testing protocol annexed in *Appendix B*, in the executive function cognitive domain or the learning and memory cognitive domain, and at least one other cognitive domain; and (b) the patient's functional impairment, as described above, must be corroborated by a third-party sworn affidavit from a person familiar with the patient's condition (other than the player or his family members), the sufficiency of which will be determined by the diagnosing physician); and (iv) The cognitive deficits do not occur exclusively in the context of a delirium, acute substance abuse, or as a result of medication side effects.

## ALZHEIMER'S DISEASE

(1) **The following diagnosis can only be made:**

(a) **prior to July 7, 2014, by a board-certified neurologist, board-certified neurosurgeon, other board-certified neuro-specialist physician, or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician; or**

(b) **from July 7, 2014 through January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified neurologist, board-certified neurosurgeon, or other board-certified neuro-specialist physician:**

A diagnosis in a living patient of the specific disease of Alzheimer's Disease as defined by the World Health Organization 's International Classification of Diseases, 9th Edition (ICD-9), the World Health Organization's International Classification of Diseases, 10th Edition (ICD-10), or a diagnosis of Major Neurocognitive Disorder due to probable Alzheimer's Disease as defined in the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5).

(2) **The following diagnosis can only be made prior to January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician, or by a physician with sufficient qualifications in the field of neurology to make such a diagnosis, where the diagnosis was made while the patient was living but thereafter died prior to January 7, 2017 (the Effective Date of the Settlement Agreement):**

A diagnosis of Major Neurocognitive Disorder due to probable Alzheimer's Disease consistent with the definition in *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) or a diagnosis of Alzheimer's Disease.

## PARKINSON'S DISEASE

(1) **The following diagnosis can only be made:**

(a) **prior to July 7, 2014, by a board-certified neurologist, board-certified neurosurgeon, other board-certified neuro-specialist physician, or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician; or**

(b) **from July 7, 2014 through January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified neurologist, board-certified neurosurgeon, or other board-certified neuro-specialist physician:**

A diagnosis in a living patient of the specific disease of Parkinson's Disease as defined by the World Health Organization 's International Classification of Diseases, 9th Edition (ICD-9), the World Health Organization's International Classification of Diseases, 10th Edition (ICD-10), or a diagnosis of Major Neurocognitive Disorder probably due to Parkinson's Disease as defined in the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5).

(2) **The following diagnosis can only be made prior to January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician, or by a physician with sufficient qualifications in the field of neurology to make such a diagnosis, where the diagnosis was made while the patient was living but thereafter died prior to January 7, 2017 (the Effective Date of the Settlement Agreement):**

A diagnosis of Parkinson's Disease.

## ALS

(1) **The following diagnosis can only be made:**

(a) **prior to July 7, 2014, by a board-certified neurologist, board-certified neurosurgeon, other board-certified neuro-specialist physician, or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician; or**

(b) **from July 7, 2014 through January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified neurologist, board-certified neurosurgeon, or other board-certified neuro-specialist physician:**

A diagnosis in a living patient of the specific disease of Amyotrophic Lateral Sclerosis, also known as Lou Gehrig's Disease (ALS), as defined by the World Health Organization's International Classification of Diseases, 9th Edition (ICD-9) or the World Health Organization's International Classification of Diseases, 10th Edition (ICD-10).

(2) **The following diagnosis can only be made prior to January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician, or by a physician with sufficient qualifications in the field of neurology to make such a diagnosis, where the diagnosis was made while the patient was living but thereafter died prior to January 7, 2017 (the Effective Date of the Settlement Agreement):**

A diagnosis of the specific disease of Amyotrophic Lateral Sclerosis (ALS).

## CTE

**The following diagnosis can only be made prior to April 22, 2015 by a board-certified neuropathologist, provided that a patient who died between July 7, 2014 and April 22, 2015 has until 270 days from the date of death to obtain such a post-mortem diagnosis:**

A post-mortem diagnosis of Chronic Traumatic Encephalopathy (CTE).

## APPENDIX B

### BASELINE NEUROPSYCHOLOGICAL TEST BATTERY AND SPECIFIC IMPAIRMENT CRITERIA FOR RETIRED NFL FOOTBALL PLAYERS

#### Section 1: Test Battery

**Estimating Premorbid Intellectual Ability**

ACS Test of Premorbid Functioning (TOPF)

**Complex Attention/Processing Speed (6 scores)**

WAIS-IV Digit Span

WAIS-IV Arithmetic

WAIS-IV Letter Number Sequencing

WAIS-IV Coding

WAIS-IV Symbol Search

WAIS-IV Cancellation

**Executive Functioning (4 scores)**

Verbal Fluency (FAS)

Trails B

Booklet Category Test

WAIS-IV Similarities

**Effort/Performance Validity (8 scores)**

*ACS Effort Scores*

ACS-WAIS-IV Reliable Digit Span

ACS-WMS-IV Logical Memory Recognition

ACS-WMS-IV Verbal Paired Associates Recognition

ACS-WMS-IV Visual Reproduction Recognition

ACS-Word Choice

*Additional Effort Tests*

Test of Memory Malingering (TOMM)

Medical Symptom Validity Test (MSVT)

**Learning and Memory (6 scores)**

WMS-IV Logical Memory I

WMS-IV Logical Memory II

WMS-IV Verbal Paired Associates I

WMS-IV Verbal Paired Associates II

WMS-IV Visual Reproduction I

WMS-IV Visual Reproduction II

**Language (3 scores)**

Boston Naming Test

Category Fluency (Animal Naming)

BDAE Complex Ideational Material

**Spatial-Perceptual (3 scores)**

WAIS-IV Block Design

WAIS-IV Visual Puzzles

WAIS-IV Matrix Reasoning

**Mental Health**

MMPI-2RF

Mini International Neuropsychiatric Interview

#### Section 2: Evaluate Performance Validity

Freestanding, embedded and regression based performance validity metrics will be administered to each Retired NFL Football Player during baseline and, if relevant, subsequent neuropsychological examinations. There will be at least seven performance validity metrics utilized during each assessment. The specific performance validity metrics utilized will not be released to the public in order to maintain the highest standards of assessment validity.  The performance

## APPENDIX B

validity metrics employed will be rotated at intervals determined by the Appeals Advisory Panel in consultation with Co-Lead Class Counsel and Counsel for the NFL Parties.

Each neuropsychological examiner must complete a checklist of validity criteria as set forth in *Slick et al.* 1999, and revised in 2013 (see below) for every Retired NFL Football Player examined in order to determine whether the Retired NFL Football Player's test data is a valid reflection of his optimal level of neurocognitive functioning.

1. Suboptimal scores on performance validity embedded indicators or tests. The cutoffs for each test should be established based on empirical findings.

2. A pattern of neuropsychological test performance that is markedly discrepant from currently accepted models of normal and abnormal central nervous system (CNS) function. The discrepancy must be consistent with an attempt to exaggerate or fabricate neuropsychological dysfunction (e.g., a patient performs in the severely impaired range on verbal attention measures but in the average range on memory testing; a patient misses items on recognition testing that were consistently provided on previous free recall trials, or misses many easy items when significantly harder items from the same test are passed).

3. Discrepancy between test data and observed behavior. Performance on two or more neuropsychological tests within a domain are discrepant with observed level of cognitive function in a way that suggests exaggeration or fabrication of dysfunction (e.g., a well-educated patient who presents with no significant visual-perceptual deficits or language disturbance in conversational speech performs in the severely impaired range on verbal fluency and confrontation naming tests).

4. Discrepancy between test data and reliable collateral reports. Performance on two or more neuropsychological tests within a domain are discrepant with day-to-day level of cognitive function described by at least one reliable collateral informant in a way that suggests exaggeration or fabrication of dysfunction (e.g., a patient handles all family finances but is unable to perform simple math problems in testing).

5. Discrepancy between test data and documented background history. Improbably poor performance on two or more standardized tests of cognitive function within a specific domain (e.g., memory) that is inconsistent with documented neurological or psychiatric history.

6. Self-reported history is discrepant with documented history. Reported history is markedly discrepant with documented medical or psychosocial history and suggests attempts to exaggerate deficits.

7. Self-reported symptoms are discrepant with known patterns of brain functioning. Reported or endorsed symptoms are improbable in number, pattern, or severity; or markedly inconsistent with expectations for the type or severity of documented medical problems.

8. Self-reported symptoms are discrepant with behavioral observations. Reported symptoms are markedly inconsistent with observed behavior (e.g., a patient complains of severe episodic memory deficits yet has little difficulty remembering names, events, or appointments; a patient complains of severe cognitive deficits yet has little difficulty driving independently and arrives on time for an appointment in an unfamiliar area; a patient complains of severely slowed mentation and concentration problems yet easily follows complex conversation).

9. Self-reported symptoms are discrepant with information obtained from collateral informants. Reported symptoms, history, or observed behavior is inconsistent with information obtained from other informants judged to be adequately reliable. The discrepancy must be consistent with an attempt to exaggerate deficits (e.g., a patient reports severe memory impairment and/or behaves as if severely memory-impaired, but his spouse reports that the patient has minimal memory dysfunction at home).

## APPENDIX B

Notwithstanding a practitioner's determination of sufficient effort in accordance with the foregoing factors, a Retired NFL Football Player's failure on two or more effort tests may result in the Retired NFL Football Player's test results being subjected to independent review, or result in a need for supplemental testing of the Retired NFL Football Player.

Note: Additional information relating to the evaluation of effort and performance validity will be provided in a clinician's interpretation guide.

### Section 3: Estimate Premorbid Intellectual Ability

| Test | Ability |
|---|---|
| Test of Premorbid Functioning (TOPF) | Reading<br>Reading + Demographic Variables |

The Test of Premorbid Functioning (TOPF) provides three models for predicting premorbid functioning: (a) demographics only, (b) TOPF only, and (c) combined demographics and TOPF prediction equations. For each model using demographic data, a simple and complex prediction equation can be selected. In the simple model, only sex, race/ethnicity, and education, are used in predicting premorbid ability. In the complex model, developmental, personal, and more specific demographic data is incorporated into the equations. The clinician should select a model based on the patient's background and his or her current level of reading or language impairment.

Note: It is necessary to estimate premorbid intellectual functioning in order to use the criteria for impairment set out in this document. Estimated premorbid intellectual ability will be assessed and classified as:

➢ Below Average (estimated IQ below 90);

➢ Average (estimated IQ between 90 and 109);

➢ Above Average (estimated IQ above 110).

### Section 4: Neuropsychological Test Score Criteria by Domain of Cognitive Functioning

There are 5 domains of cognitive functioning. In each domain, there are several tests that contribute 3, 4, or 6 demographically-adjusted test scores for consideration. Test selection in the domains was based on the availability of demographically-adjusted normative data for Caucasians and African Americans. These domains and scores are set out below.

The basic principle for defining impairment on testing is that there must be a pattern of performance that is approximately 1.5 standard deviations (for Level 1 Impairment), 1.7-1.8 standard deviations (for Level 1.5 Impairment) or 2 standard deviations (for Level 2 Impairment) below the person's expected level of premorbid functioning. Therefore, it is necessary to have more than one low test score in each domain. A user manual will be provided to neuropsychologists setting out the cutoff scores, criteria for identifying impairment in each cognitive domain, and statistical and normative data to support the impairment criteria.

## APPENDIX B

| Domain/Test | Ability |
|---|---|
| **Complex Attention/Speed of Processing (6 Scores)** | |
| Digit Span | Attention & Working Memory |
| Arithmetic | Mental Arithmetic |
| Letter Number Sequencing | Attention & Working Memory |
| Coding | Visual-Processing & Clerical Speed |
| Symbol Search | Visual-Scanning & Processing Speed |
| Cancellation | Visual-Scanning Speed |
| **Executive Functioning (4 scores)** | |
| Similarities | Verbal Reasoning |
| Verbal Fluency (FAS) | Phonemic Verbal Fluency |
| Trails B | Complex Sequencing |
| Booklet Category Test | Conceptual Reasoning |
| **Learning and Memory (6 scores)** | |
| Logical Memory I | Immediate Memory for Stories |
| Logical Memory II | Delayed Memory for Stories |
| Verbal Paired Associates I | Learning Word Pairs |
| Verbal Paired Associates II | Delayed Memory for Word Pairs |
| Visual Reproduction I | Immediate Memory for Designs |
| Visual Reproduction II | Delayed Memory for Designs |
| **Language** | |
| Boston Naming Test | Confrontation Naming |
| BDAE Complex Ideational Material | Language Comprehension |
| Category Fluency | Category (Semantic) Fluency |
| **Visual-Perceptual** | |
| Block Design | Spatial Skills & Problem Solving |
| Visual Puzzles | Visual Perceptual Reasoning |
| Matrix Reasoning | Visual Perceptual Reasoning |

**Impairment Criteria: *Below Average* Estimated Intellectual Functioning (A1 – E1)**

**A1. Complex Attention (6 test scores)**

1. Level 1 Impairment: 3 or more scores below a T score of 35

2. Level 1.5 Impairment: 4 or more scores below a T score of 35; or meet for Level 1 and 2 scores below a T score of 30

3. Level 2 Impairment: 3 or more scores below a T score of 30

**B1. Executive Function (4 test scores)**

1. Level 1 Impairment: 2 or more scores below a T score of 35

2. Level 1.5 Impairment: 3 or more scores below a T score of 35; or meet for Level 1 and 1 score below a T score of 30

## APPENDIX B

3. Level 2 Impairment: 2 or more scores below a T score of 30

### C1. Learning and Memory (6 test scores)

1. Level 1 Impairment: 3 or more scores below a T score of 35

2. Level 1.5 Impairment: 4 or more scores below a T score of 35; or meet for Level 1 and 2 scores below a T score of 30

3. Level 2 Impairment: 3 or more scores below a T score of 30

### D1. Language (3 test scores)

1. Level 1 Impairment: 3 or more scores below a T score of 37

2. Level 1.5 Impairment: meet for Level 1 and 2 scores below a T score of 35

3. Level 2 Impairment: 3 or more scores below a T score of 35

### E1. Visual-Perceptual (3 test scores)

1. Level 1 Impairment: 3 or more scores below a T score of 37

2. Level 1.5 Impairment: meet for Level 1 and 2 scores below a T score of 35

3. Level 2 Impairment: 3 or more scores below a T score of 35

## Impairment Criteria: *Average* Estimated Intellectual Functioning (A2 – E2)

### A2. Complex Attention (6 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 35

2. Level 1.5 Impairment: 3 or more scores below a T score of 35; or meet for Level 1 and 1 score below a T score of 30

3. Level 2 Impairment: 2 or more scores below a T score of 30

### B2. Executive Function (4 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 35

2. Level 1.5 Impairment: 3 or more scores below a T score of 35; or meet for Level 1 and 1 score below a T score of 30

3. Level 2 Impairment: 2 or more scores below a T score of 30

### C2. Learning and Memory (6 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 35

2. Level 1.5 Impairment: 3 or more scores below a T score of 35; or meet for Level 1 and 1 score below a T score of 30

3. Level 2 Impairment: 2 or more scores below a T score of 30

### D2. Language (3 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 37

2. Level 1.5 Impairment: 3 or more scores below a T score of 37; or meet for Level 1 and 1 score below a T score of 35

3. Level 2 Impairment: 2 or more scores below a T score of 35

### E2. Visual-Perceptual (3 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 37

2. Level 1.5 Impairment: 3 or more scores below a T score of 37; or meet for Level 1 and 1 score below a T score of 35

3. Level 2 Impairment: 2 or more scores below a T score of 35

# APPENDIX B

## Impairment Criteria: *Below Average* Estimated Intellectual Functioning (A3 – E3)

### A3. Complex Attention (6 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 35

2. Level 1.5 Impairment: meet for Level 1 and 3 or more scores below a T score of 37

3. Level 2 Impairment: 3 or more scores below a T score of 35

### B3. Executive Function (4 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 37

2. Level 1.5 Impairment: meet for Level 1 and 3 or more scores below a T score of 37; or meet for Level 1 and 1 score below a T score of 30

3. Level 2 Impairment: 2 or more scores below a T score of 30

### C3. Learning and Memory (6 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 35

2. Level 1.5 Impairment: meet for Level 1 and 3 or more scores below a T score of 37

3. Level 2 Impairment: 3 or more scores below a T score of 35

### D3. Language (3 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 40

2. Level 1.5 Impairment: 3 scores below at T score of 40; or meet for Level 1 and 1 score below a T score of 37

3. Level 2 Impairment: 2 or more scores below a T score of 37

### E3. Visual-Perceptual (3 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 40

2. Level 1.5 Impairment: 3 scores below at T score of 40; or meet for Level 1 and 1 score below a T score of 37

3. Level 2 Impairment: 2 or more scores below a T score of 37

## Section 5: Mental Health Assessment

| Test | Symptoms/Functioning | Assessment |
| --- | --- | --- |
| MMPI-2RF | Mental Health Assessment | Evaluation of Validity Scales and Configurations; T-Scores for Symptom Domains |
| Mini International Neuropsychiatric Interview (M.I.N.I. Version 5.0.0) | Semi-structured Psychiatric Interview | Scale Criteria for Various Psychiatric Diagnoses |

**Ronald L. Hamilton, M.D.**

1/2/2017

## CURRICULUM VITAE

### BIOGRAPHICAL

| | | | |
|---|---|---|---|
| **Name:** | Ronald Lee Hamilton | **Birth Date:** | ███████ |
| **Home Address:** | ███████████<br>Pittsburgh, PA 15232 | **Birth Place:** | Omaha, Nebraska |
| **Marital status:** | single | | |
| **Home Phone** | 412-310-9874 | **Citizenship:** | USA |
| **Business Address:** | Division of Neuropathology<br>A724.1 Scaife Hall<br>200 Lothrop Street<br>Pittsburgh, PA 15213 | | |
| **Business Phone:** | 412-624-6610 | | |
| **Business Fax:** | 412-624-5488 | | |
| **e-mail address** | hamiltonrl@upmc.edu | | |

### EDUCATION AND TRAINING

| | | | |
|---|---|---|---|
| 1977-1985 | University of Nebraska-Lincoln | B.S. | Psychology |
| 1985-1989 | University of Nebraska Medical Center | M.D. | |
| 1989-1991 | University of California, San Diego<br>Program Director, David Bailey | Resident Anatomic Pathology | |
| 1991-1993 | University of California, San Diego<br>Program Director, Henry C. Powell | Resident Neuropathology | |
| 1993-1994 | University of Pittsburgh<br>Program Director, Clayton A Wiley | Fellow Neuropathology | |
| 1994-1995 | University of Pittsburgh | Fellow: NIMH Training Grant in Neuroscience | |
| | Program Director, Michael Zigmond | | |

### APPOINTMENTS AND POSITIONS:

| | |
|---|---|
| 1995-2002 | University of Pittsburgh School of Medicine -Assistant Professor of Pathology |
| 2002-present | University of Pittsburgh School of Medicine -Associate Professor of Pathology |

### DISTRIBUTION OF % TIME

| | |
|---|---|
| Research | 20% |
| Other scholarly activity | 8% |
| Teaching | 10% |
| Clinical | 35% |
| Combined clinical and teaching | 20% |
| Service activities | 5% |
| Administrative activities. | 2% |
| | |
| TOTAL | 100% |

**Ronald L. Hamilton, M.D.**

## CERTIFICATION and LICENSURE

**SPECIALTY CERTIFICATION**

| | | |
|---|---|---|
| American Board of Pathology | Anatomic Pathology | 5/23/96 |
| American Board of Pathology | Neuropathology | 5/23/96 |
| American Board of Pathology – recertification | Neuropathology | 1/1/2014 |

**MEDICAL or OTHER PROFESSIONAL LICENSURE**

| | |
|---|---|
| 1990 | California Medical License (G69731) expired |
| 1993 | Pennsylvania Medical License (MD-049717-L) |
| 2009 | Indiana Medical License (01067332A) |

## MEMBERSHIPS IN PROFESSIONAL AND SCIENTIFIC SOCIETIES

| | |
|---|---|
| 1992 | American Association for the Advancement of Science |
| 1993 | American Association of Neuropathology |
| 1993 | International Society of Neuropathology |
| 1994 | College of American Pathologists (CAP) |
| 1995-97 | CAP Neuropathology Subcommittee |
| 1998 | Children's Cancer Group, Study Committee for CCGB975 |
| 1999 | Society for Neuroscience |

## HONORS

| | |
|---|---|
| Nominated "Teacher of the Year: Anatomic Pathology" | 1997 |
| Nominated "Teacher of the Year: Anatomic Pathology" | 1998 |
| Nominated "Teacher of the Year: Anatomic Pathology" | 1999 |
| Nominated "Teacher of the Year: Anatomic Pathology" | 2000 |
| Nominated "Teacher of the Year: Anatomic Pathology" | 2001 |
| Nominated "Teacher of the Year: Anatomic Pathology" | 2002 |
| UPMC ACES Award winner (ACES is an Award for | 2003 |

Clinical Excellence and Service and is given to about 10 physicians per year at UPMC)

| | |
|---|---|
| Letter of appreciation from Chief Residents | 1997-1998 |
| AP Pathology "TEACHER OF THE YEAR" | 2004-05 |

## PUBLICATIONS

**Refereed Articles**

1. Esch O, Spinosa JC, **Hamilton RL**, Crombie DL, Schteigart CO, Rondinone JF, D'Agostino HB,Lillienau J and Hofmann AF: Acute effects of topical methyl tert-butyl ether or ethyl propionate on gallbladder histology in animals: a comparison of two solvents for contact dissolution of cholesterol gallstones. Hepatology 16 (4):984-991, 1992.

2. Anders KH, Becker PS, Holden JK, Sharer LR, Cornford ME, Hansen LA, **Hamilton R,** Vinters, HV: Multifocal necrotizing leukoencephalopathy with pontine predilection in immunosuppressed patients: a clinicopathologic review of sixteen cases. Human Pathology 24:897-904, 1993.

3. **Hamilton RL**, Achim C, Grafe MR, Fremont JC, Miners D, Wiley CA: Herpes simplex virus brainstem encephalitis in an AIDS patient. Clinical Neuropathology, 14: 45-50, 1995.

**Ronald L. Hamilton, M.D.**

4.  Rose J, Haskell WL, Gamble JG, **Hamilton RL**, Brown DA, Rinsky L: Muscle pathophysiology and clinical measures of disability in children with cerebral palsy. Journal of Orthopedic Research, 12(6): 758-768, 1994.

5.  **Hamilton RL**, Grafe MR: Complete absence of the cerebellum: a report of two cases. Acta Neuropathologica 88 (3): 258-261, 1994.

6.  **Hamilton RL**, Haas RH, Nyhan WL, Powell HC, Grafe MR: The neuropathology of propionic academia: a report of two additional cases.  Journal of Child Neurology 10(1): 25-30, 1995.

7.  Haas RH, Marsden DL, Capistrano-Estrada S, **Hamilton RL**, Grafe MR, Wong W, Nyhan WL: Acute basal ganglia infarction in propionic acidemia.  Journal of Child Neurology 10(1) 18-22, 1995.

8.  Kupperman BD, Quiceno JI, Wiley C, Hesselink J**, Hamilton R**, Keefe K, Garcia R, Freeman WR: Clinical and histopathologic study of varicella zoster virus retinitis in patients with the acquired immunodeficiency syndrome.  American Journal of Ophthalmology 118:589-600, 1994.

9.  Adelson PD, Robichaurd P, **Hamilton RL**, Kochanek PM. A Model of Diffuse Traumatic Brain  Injury in the Immature Rat.  J Neurosurg 85:877-884, 1996.

10. Alper G, Crumrine PK, **Hamilton RL**, Albright L, Wald ER. An unusual case of inflammatory spinal epidural  mass (Castleman's syndrome) Pediatric Neurology  15: 60-2 , 1996

11. Adelson PD, Firlik KS, Firlik AD, **Hamilton RL**. A meningeal cyst of the thoracic spine presenting as prolonged paresis after ankle injury: case report. Neuropediatrics 27:207-210, 1996.

12. Cramer SC, Segal A, **Hamilton RL**, Schmahman J, Ma J. Leukoencephalitis Due to Varicella Zoster Virus:   Report of a Case and Review of Clinical Features.  Contemporary Neurology, 1, 1996 (electronic journal).

13. Mansfield RT, Schiding JK, **Hamilton R**, Kochanek PM: Effects of hypothermia on traumatic brain injury in immature rats. J Cerebral Blood Flow  Metabo 16(2): 244-252, 1996.

14. Pollack IF, Campbell JW, **Hamilton RL**, Martinez AJ, Bozik ME. Proliferation index as a predictor of prognosis in malignant gliomas of childhood. Cancer 79:849-856, 1996

15. Pollack IF, **Hamilton RL,** Finkelstein SD, Campbell JW, Martinez AJ, Sherwin RN, Bozik ME, Gollin SM. The relationship between tp53 mutations and overexpression of p53 and prognosis in malignant gliomas of childhood. Cancer Research 57:304-309, 1997.

16. Ikonomovic MD, Mizukami K, Davies P, **Hamilton R**, Sheffield R, Armstrong DM. The loss of GluR2(3) immunoreactivity preceded neurofibrillary tangle formation in the entorhinal cortex and hippocampus of Alzheimer brains. J Neuropath Exp Neurol 56:1018-1027, 1997.

17. Bredel M, Pollack IF, Campbell JW, **Hamilton RL**: Basic fibroblast growth factor as a predictor of prognosis in pediatric high-grade gliomas. Clinical Cancer Research 3:2157-2164, 1997

18. Blatt J, **Hamilton RL**: Neurodevelopmental anomalies in children with neuroblastoma. Cancer 82: 1603-8, 1998.

19. Fukui MB, Livstone BJ, Meltzer CC, **Hamilton RL**: Hemorrhagic presentation of untreated primary central nervous system lymphoma in the acquired immunodeficiency syndrome. Am J Roentgenol 170:1114-1115, 1998..

20. Bredel M, Pollack IF, **Hamilton RL**, James CD: Epidermal growth factor receptor (EGFR) and gene amplification in high-grade non-brainstem gliomas of childhood. Clin Can Res 5:1786-92, 1999

**Ronald L. Hamilton, M.D.**

21. Gerszten PC, Pollack IF, **Hamilton RL**. Primary parafalcine chondrosarcoma in a child. Acta Neuropathologica 95:111-4, 1998.

22. Pollack IF, **Hamilton RL**, Fitz C, Orenstein DM. An intrasylvian "fibroma" in a child with cystic fibrosis. Pediatric Neurosurgery 46:744-747 2000.

23. Liachenko S, Tang P, **Hamilton RL**, Xu Y: A reproducible model of circulatory arrest and remote resuscitation in rats for NMR investigation. Stroke 29:1229-1238, 1998

24. Meltzer CC, Liu AY, Perrone AM, **Hamilton RL** Meningioangiomatosis MR imaging with histopathologic correlation. AJR 170:804-5, 1998

25. Clark RSB, Kochanek PM, Chen M, Watkins SC, Marion DW, Chen J, **Hamilton RL**, Loeffert JE, Graham SH. Increases in Bcl-2 and cleavage of caspase-1 and caspase-3 in human brain after head injury. FASEB J, 13:813-821, 1999

26. Soontornniyomkij V, Wang G, Pittman CA, **Hamilton RL**, Wiley CA, Achim CL Absence of brain-derived neurotrophic factor and trkB receptor immunoreactivity in glia of Alzheimer's disease. Acta Neuropathologica 98:345-8, 1999.

27. Wang G, Achim CL, **Hamilton RL**, Wiley CA, Soontornniyomkij V  Tyramide signal amplification methods in multiple label immunofluorescence confocal microscopy. Methods 18(4):459-464, 1999

28. Firlik KS, Adelson PD, **Hamilton RL**: Coexistence of a ganglioglioma and Rasmussen's encephalitis: successful treatment in a four-year-old boy. Pediatr Neurosurg 30:278-282, 1999

29. Ikonomovic MD, Mizukami K, Warde D, Sheffield R, **Hamilton R**, Wenthold RJ, Armstrong DM Distribution of glutamate receptor subunit NMDAR1 in the hippocampus of normal elderly and patients with Alzheimer's disease. Exp Neurol 160(1):194-204, 1999.

30. Dallasta, LM, Wang G, Bodnar RJ, Draviam R, Wiley CA, Achim CA, **Hamilton RL**: Differential expression of intercellular adhesion molecules-1 (ICAM-1) and vascular adhesion cell molecule-1 (VCAM-1) in chronic murine retroviral encephalitis. Neuropathol Appl Neurobiol 26:332-341, 2000.

31. Luabeya MK, Dallasta LM, Achim CL, Pauza CD, **Hamilton RL**: Blood-brain Barrier Disruption in Simian Immunodeficiency Virus Encephalitis. Neuropathol Appl Neurobiol 26:454-462, 2000.

32. **Hamilton RL**. Lewy Bodies in Alzheimer's Disease: A Neuropathological Review of 145 Cases Using   -synuclein Immunohistochemistry. Brain Pathol 10: 378-384, 2000.

33. Sweet, RA, **Hamilton RL**, Healy MT, Wisniewski SR, Henteleff R, Pollack BG, Lewis DA, DeKosky ST. Alterations of Striatal Dopamine Receptor Binding in Alzheimer's Disease Are Associated with Lewy Body Pathology and With Antemortem Psychosis. Arch Neurol 58:466-472, 2001.

34. Styren S, **Hamilton RL**, Styren GC, Klunk WE X-34: a novel and intensely fluorescent stain for Alzheimer's disease pathology. J Histochem Cytochem 48:1223-1232, 2000.

35. Lopez OL, **Hamilton RL**, Becker JT, Wisniewski S, Kaufer DI, DeKosky ST. Severity of cognitive impairment and the clinical diagnosis of AD with Lewy bodies. Neurology 54:1780-1787, 2000

36. Lopez OL, Wisniewski S, **Hamilton RL**, Becker JT, Kaufer DI, DeKosky ST. Predictors of progression in patients with AD and Lewy bodies. Neurology 54:1774-1779, 2000.

**Ronald L. Hamilton, M.D.**

37.   Sweet RA, **Hamilton RL**, Lopez OL, Klunk WE, Wisnieski SR, Kaufer DI, Healy MT, Dekosky ST. Psychotic symptoms in Alzheimer's Disease are not associated with more severe neuropathologic features. Internat Psychogeriatr 12: 547-558, 2000.

38.   Lopez OL, Becker JT, Klunk W, Saxton J, **Hamilton RL**, Kaufer DI, Sweet RA, Meltzer CC, Wisniewski S, Kamboh MI, DeKosky ST. Research evaluation and diagnosis of probable Alzheimer's Disease over the last two decades. I. Neurology 55:1854-1862, 2000.

39.   Lopez OL, Becker JT, Klunk W, Saxton J, **Hamilton RL**, Kaufer DI, Sweet RA, Meltzer CC, Wisniewski S, Kamboh MI, DeKosky ST. Research evaluation and diagnosis of possible Alzheimer's Disease over the last two decades. II. Neurology 55:1863-1869, 2000.

40.   Pollack IF, **Hamilton RL**, Fitz C, Kassam A, Snyderman C. Congenital Reactive Myofibroblastic Tumor of the Petrous Bone: Case Report. Neurosurgery 48:430-435, 2001.

41.   Levy EI, Scarrow A, **Hamilton** RC (sic), Wollman MR, Fitz C. Pollack IF. Medical Management Of Eosinophilic Granuloma of the Cervical Spine. Pediatr Neurosurg 31:159-62, 1999.

42.   Pettegrew JW, Panchalingam K, **Hamilton RL**, and McClur RJ Brain Membrane Phospholipid Alterations in Alzheimer's Disease.  Neurochem Res 26:771-782, 2001

43.   Levy EI, Harris AE, Omalu BA, **Hamilton RL**, Branstetter BF, Pollack IF. Sudden Death from Fulminant Acute Cerebellitis.  Pediatr Neurosurg 35:24-28, 2001

44.   Lianchenko S, Tang P, **Hamilton RL**, Xu Y. Regional Dependence of Cerebral Reperfusion After Circulatory Arrest in Rats.  J Cerebr Blood Flow Met 21:1320-1329, 2001 .

45.   Pollack IF, Finkelstein SD, Burnham J, Holmes EJ, **Hamilton RL**, Yates AJ, Finlay J, Sposto R, and CCG.  Age and TP53 Mutation Frequency in Childhood Malignant Gliomas: Results of a Multi-institutional Cohort. Cancer Res 61:7404-7407, 2001

46.   Adelson PD, Jenkins LW, **Hamilton RL**, Robichaud P, Tran MP, Kochanek PM. Histopathologic Response of the Immature Rat to Diffuse Traumatic Brain Injury.  J Neurotrauma 18 :967-976, 2001

47.   Pollack IF, Finkelstein SD, Woods J, Burnham J, Holmes EJ, **Hamilton RL**, Yates AJ, Boyett JM, Finlay J, Sposto R, and CCG. TP53 Mutations, Expression of p53 and Prognosis in Children with Malignant Gliomas.  New England Journal of Medicine 346:420-427, 2002

48.   Lopez OL, Becker JT, Kaufer DI, **Hamilton RL**, Sweet RA, Klunk W, DeKosky ST. Research Evaluation and Prospective Diagnosis of Dementia With Lewy Bodies.  Arch Neurol 59:43-46, 2002.

49.   Wang L, Yushmanov VE, Lianchenko SM, Tang P, **Hamilton RL**, Xu Y.  Late Reversal of Cerebral Perfusion and Water Diffusion After Transient Focal Ischemia in Rats.  J Cereb Blood Flow Metab 22:253-261, 2002.

50.  Pollack IF, Biegal JA, Yates AJ, **Hamilton RL**, Finkelstein SD.Risk Assignment in Childhood Brain Tumors: The Emerging Role of Molecular and Biologic Classification. Current Oncology Reports 4:114-122, 2002.

51.   Pollack IF, **Hamilton RL**, Burnham J, Holmes EJ, Finkelstein SD, Sposto R, Yates AJ, Boyett JM, Finley JL. The impact of proliferation index on outcome in childhood malignant gliomas: results in a multi-institutional cohort. Neurosurgery 50:1238-1245, 2002.

**Ronald L. Hamilton, M.D.**

52. Sweet RA, Panchalingam K, Pettefrew JW, McClure RJ, **Hamilton RL**, Lopez OL, Kaufer DI, DeKosky ST, Klunk WE.  Psychosis in Alzheimer disease: postmortem magnetic resonance spectroscopy evidence of excess neuronal and membrane phospholipid pathology. Neurobiol Aging 23:547-53, 2002.

53.  Mazzola CA, Albright AL, Sutton LN, Tuite GF, **Hamilton RL**, Pollack IF.  Dermoid inclusion cysts and early spinal cord tethering after fetal surgery.  New Engl. J Med 347:256-9, 2002.

54.  Bredel M, Pollack IF, **Hamilton RL**, Birner P, Hainfellner JA, Zentner J.  DNA topoisomerase II-alpha predicts progression-free and overall survival in pediatric malignant non-brainstem gliomas.  Int J Cancer 99:817-20, 2002.

55.  Klunk WE, Wang Y, Huang G, Debnath ML, Holt DP, Shao L, **Hamilton RL**, Ikonomovic MD, DeKosky ST, Mathis CA.  The binding of BTA-1 to post-mortem brain homogenates is dominated by the amyloid component. J Neurosci 23:2086-2092, 2003.

56. Castellano-Sanchez, AA, Ohgaki H, Yokoo H, Scheithauer BW, Burger PC, **Hamilton RL**, Finkelstein SD, Brat, DJ.  Cerebral granular cell astrocytomas show a high frequency of allelic loss but lack a defining genotype. Brain Pathology 13: 62-78, 2003.

57.  Gilbertson RJ, Hill DA, Hernan R, Kocak M, Geyer R, Olson J, Gajjar A, Rush L, **Hamilton RL**, Finkelstein SD, Pollack IF.  ERBB1 is amplified and overexpressed in high-grade diffusely infiltrative pediatric brain stem glioma.  Clin Cancer Res 9:3620-3624, 2003.

58. Pollack IF, Finkelstein SD, Burnham J, **Hamilton RL**, Yates AJ, Holmes EJ, Boyett JM, Finlay JL.  The association between chromosome 1p loss and outcome in pediatric malignant gliomas: results from the CCG-945 cohort. Pediatr Neurosurg 39:114-121, 2003.

59. Carter TL, Rissman RA, Mishizen-Eberz AJ, Wolfe BB, **Hamilton RL**, Gandy S, Armstrong DM.  Differential Preservation of AMPA Receptor Subunits in the Hippocampi of Alzheimer's Disease Patients According to Braak Stage Experimental Neurology 187:299-309, 2004

60.  Finkelstein SD, Mohan D, **Hamilton RL**, Sasatomi E, Swalsky PA, Lieberman FS.  Microdissection-based genotyping assists discrimination of reactive gliosis versus glioma. Am J Clin Pathol 121:671-678, 2004

61.  **Hamilton RL**, Bowser B Alzheimer Disease Pathology in ALS Acta Neuropathologica107:515-522, 2004

62.  Mohan D, Couce ME, Wiley CA, **Hamilton RL**, Sasatomi E, Swalsky PA, Lieberman MD, Finkelstein SD.  Microdissection based genotyping of human gliomas: diagnostic and prognostic considerations Modern Pathology 17:1346-1358, 2004

63. Marshall GA, Kaufer DI, Lopez OL, Rao GR, **Hamilton RL**, DeKosky ST.  Right prosubiculum amyloid plaque density correlates with anosognosia in Alzheimer's Disease.  J Neurol Neurosurg Psychiatry 75:1396-4000, 2004.  **PMCID:  PMC1738763**

64.  Sweet RA, **Hamilton RL**, Butters ME, Mulsant BH, Pollock BG, Lewis DA, DeKosky ST, Reynolds CF.  Neuropathologic Correlates of Dementia in Late Life Major Depression Neuropsychopharmacology 29:2242-2250, 2004

65  Lee JYK, Finkelstein S, **Hamilton RL**, Rekha P, Pirris S, King Jr, JT, Omalu B.  Loss of heterozygosity Analysis of Benign, Atypical and Anaplastic Meningiomas.  Neurosurgery 55:1163-1173, 2004.

**Ronald L. Hamilton, M.D.**

66. Beckner ME, Sasatomi E, Swalsky PA, **Hamilton RL**, Pollack, IF, Finkelstein SD.  Loss of heterozygosity reveals non-VHL Allelic loss in hemangioblastomas at 22q13. Human Pathology 35:1105-1111, 2004.

67. Tsuang D, Wilson R, Lopez OL, Luedecking-Zimmer EK, Leverenz JB, DeKosky ST, Kamboh MI, **Hamilton RL**.  Genetic Association Between APOE*4 Allele and Lewy Bodies in Alzheimer's Disease Neurology, 64:509-513, 2005. **PMCID:  PMC1487185**

68. Bredel C, Lassman S, Pollack IF, Knoth R, **Hamilton RL**, Werner M, Bredel M. DNA Topoisomerase II-alpha and Her-2/Neu Gene Dosages in Pediatric Malignant Gliomas. Int J Cancer 26:1188-92, 2005.

69. Witham TF, Okada H, Fellows W, **Hamilton RL**, Flickinger JC, Chambers WH, Pollack IF, Watkins SC, Kondziolka D.  The characterization of tumor apoptosis after experimental radiosurgery. Stereotact Funct Neurosurg 83:17-24 2005.

70. McFadden K, **Hamilton RL**, Insalaco SJ, Lavine L, Al-Mateen M, Guoji Wang G, Wiley CA Neuronal intranuclear inclusion disease in a child without polyglutamine inclusions J Neuropathol Exper Neurol 64:545-552, 2005. **PMCID:  PMC1402362**

71. Hatano M, Eguchi J, Tatsumi T, Kuwashima N, Dusak JE, Kinch MS, Pollack IF, **Hamilton RL**, Storkus WJ, Okada H. EphA2 as a glioma-associated antigen: a novel target for glioma-vaccines. Neoplasia 7:717-722, 2005. **PMCID:  PMC1501889**

72.  Jordan S, Ruoyan C, Koprivica V, **Hamilton RL**, Whitehead R, Tottori K, Kikuchi T. In vitro profile of the antidepressant candidate OPC-14523 at rat and human 5-HT$_{1A}$ receptors.Eur J Pharmacol, 517:165-173, 2005.

73.  Omalu BI, Minster RL, Kamboh MI, **Hamilton RL**, Wecht CH, DeKosky ST.  Chronic Traumatic Encephalopathy (CTE) in a National Football League (NFL) Player Neurosurgery, 57:128-134, 2005.

74. Judkins AR, Burger PC, **Hamilton RL**, Kleinschmidt-DeMasters B, Perry A, Pomeroy SL, Rosenblum MK, Yachnis AT, Zhou H, Rorke LB, Biegel JA.  INI1 Protein Expression Distinguishes Atypical Teratoid/Rhabdopid Tumor from Choroid Plexus Carcinoma. J Neuropathol Exp Neurol 64:391-397, 2005.

75. Desai PP, Ikonomovic I, Abrahamson EE, **Hamilton RL,** Isanski BA, Hope CE, Klunk WE, Dekosky ST, Kamboh MI.  Apolipoprotein D is a component of compact but not diffuse amyloid-beta plaques in Alzheimer's Disease temporal cortex.  Neurobiol Dis May 22, 2005 (epub)

76. Carson-Walter EB, Hampton J, Geynisman D,Pillai PK, Sathanoori R, Madden SL, **Hamilton RL**, Walter KA.  Plasmalemmal Vesicle associated protein-1 (PV-1) is a novel and critical marker of brain tumor angiogenesis. Clin Cancer Res 11:7643-7650, 2005.

77. Lopez OL, Becker JT, Sweet RA, Martin-Sanchez FJ, **Hamilton RL**  Lewy bodies in the Amygdala increase risk for major depression in subjects with Alzheimer disease. Neurology 67:660-665, 2006.

78. Pollack IF, **Hamilton RL**, Sobol R, Burnham J, Yates AJ, Holmes EJ, Zhou T, Finlay J (for Children Oncology Group).O6-methylguanine-DNA methyltransferase  strongly Correlates with Outcome in Childhood Malignant Gliomas: Results from the CCG-945 Cohort J Clin Oncol. Jul 20;24(21):3431-7, 2006.

**Ronald L. Hamilton, M.D.**

79.  Mandal PK, Pettegrew JW, Masliah E, **Hamilton RL**, Mandal R. Interaction between Aβ Peptide and α Synuclein: Molecular Mechanisms in Overlapping Pathology of Alzheimer's and Parkinson's in Dementia with Lewy Body disease.  Neurochemical Research, 2006 31, 1153-1162, 2006.

80.  Omalu B, DeKosky ST, **Hamilton RL**, Minster RL, Kamboh MI, Shakir AM, Wecht Chronic Traumatic Encephalopathy in a National Football League Player: part II.  Neurosurgery 59:1086-92, 2006

81.  Ramsey CP, Glass CA, Koike MA, Montgomery MB, Ritson GP, Chia L, **Hamilton RL**, Chu CT, Jordan-Sciutto KL. Expression of Nrf2 in neurodegenerative diseases. J Neuropathol Exp Neurol 66:75-85, 2007.  **PMCID:  PMC2253896**

82.  Boada FE, Tanase C, Davis D, Walter K, Torres-Trejo A, Couce M, **Hamilton R**, Kondziolka D, Bartinski W, Lieberman F.  Non-invasive assessment of tumor proliferation using triple quantum filtered 23/Na MRI: technical challenges and solutions.  Conf Proc IEEE Eng Med Biol Sci Soc. 2004; 7:5238-41

83.  Pollack IF, **Hamilton RL**, James CD, Finkelstein SD, Burnham J, Yates AJ, Holmes EJ, Zhou T, Finlay J (for Children Oncology Group). Rarity of *PTEN* Deletions and *EGFR* Amplification in Malignant Gliomas of Childhood: Results from the Children's Cancer Group-945 Cohort J Neurosurg 105(5 Suppl):418-424, 2006.

84.  Guzman A, Wood WL, Alpert E, Prasad MD, Miller RG, Rothstein JD, Bowser R, **Hamilton R**, Wood TD, Cleveland DW, Lingappa VR, Liu J.  Common molecular signature in SOD1 for both sporadic and familial amyotrophic lateral sclerosis.  Proc Nat Acad Sci 104:12524-12529, 2007. **PMCID: PMC2408940**

85.  Beckner ME, Jane EP, Jankowitz B, Agostino NR, Walter KA, **Hamilton RL**, Pollack IF.  Tumor cells from ultrasonic aspirations of glioblastomas migrate and from spheres with radial outgrowth. Cancer Letters 255:135-44, 2007. PMID  17543444,  **PMCID: PMC2000342**

86.  McIntyre JA, Chapman J, Shavit E, **Hamilton RL**, and DeKosky ST. Redox-Reactive Autoantibodies in Alzheimer's Patients' Cerebrospinal Fluids: Preliminary Studies.  Autoimmunity, 40:390-396, 2007. PMID 17612901

87.  Nakashima-Yasuda, Uryu, K, Robinson J, Xie S, Hurtig H, Duda J, Arnold S, Siderowf A, Grossman M, Leverenz J, Woltjer R, Lopez OL, **Hamilton R,** Tsuang DW, Galaska D, Masliah M, Kaye J, Clark C, Montine TJ, Lee VMY, Trojanowski J. Co-morbidity of TDP-43 Proteinopathy in Lewy Body Related Diseases. Acta Neuropathol 114:221-9, 2007.  PMID 17653732

88.  McIntyre JA, **Hamilton RL**, DeKosky ST. Redox-reactive autoantibodies in cerebrospinal fluids.  Ann NY Acad Sci 1109:296-302, 2007. PMID 17785318

89.  Okada H, Lieberman FS, Walter KA, Lunsford LD, Kondziolka DS, Bejjani GK, **Hamilton RL**, Torres-Trejo A, Kalinski P, Cai Q, Mabold JL, Edington HD, Butterfield LH, Whiteside TL, Potter DM, Schold SC Jr., Pollack IF  Autologous glioma cell vaccine admixed with interleukin-4 gene transfected fibroblasts in the treatment of patients with malignant gliomas.  J Transl Med 5:67, 2007.  PMID 18093335.  **PMCID:  PMC2254376**

90.  Beach TG, White CL, **Hamilton, RL**, Duda JE, Iwatsubo T, Dickson DW, Leverenz JB, Roncaroli F, Buttini M, Hladik CL, Sue LI, Noorigian JV, Adler CH.  Evaluation of alpha-synuclein immunohistochemical methods used by invited experts.  Acta Neuropathol 116:277-88, 2008. PMID 18626651.  **PMCID:  PMC2708176**

91.  Ikonomovic MD, Klunk WE, Abrahamson EE, Mathis CA, Price JC, Tsopelas ND, Lopresti BJ, Ziolko S, Bi W, Paljug WR, Debnath ML, Hope CE, Isanski BA, **Hamilton RL**, DeKosky ST. Post-

**Ronald L. Hamilton, M.D.**

mortem correlates of in vivo PiB-PET amyloid imaging in a typical case of Alzheimers disease. Brain  131(Pt 6):1630-45, 2008.  PMID  18339640.  **PMCID:  PMC2408940**

92.  Leverenz JB, **Hamilton R**, Tsuang DW, Schantz A, Vavrek D, Larson EB, Kukall WA, Lopez O, Galasko D, Masliah E, Woltjer R, Clark C, Trojanowski JQ, Montine TJ. Empiric refinement of the pathologic assessment of Lewy-related pathology in the dementia patient.  Brain Pathol 18:220-224, 2008. PMID 18241249.  **PMCID:  PMC2689097  NIHMS29359**

93.  Raja AI, Yeaney GA, Jakacki RI, **Hamilton RL**, Pollack IF  Extraventricular neurocytoma in neurofibromatosis Type I: Case report.  J Neurosurg Pediatrics 2:63-67, 2008.PMID 18590398

94.  Okada H, Low KL, Kohanbash G, McDonald HA, **Hamilton RL**, Pollack IF.  Expression of glioma-associated antigens in pediatric brain stem and non-brain stem gliomas.  J Neurooncol 88:245-50, 2008. PMID 18324354.  **PMCID:  PMC2561297 NIHMS70086**

95.  Venneti S, Lopresti BJ, Wang G, **Hamilton RL**, Mathis CA, Klunk WE, Apte UM, Wiley CA. PK11195 labels activated microglia in Alzheimer's disease and in vivo in a mouse model using PET.  Neurobiol Aging 2009, 30:1217-26. PMID 18178291

96.  Mullett SJ, **Hamilton RL**, Hinkle DA.  DJ-1 immunoreactivity in human brain astrocytes is dependent on infarct presence and infarct age. Neurology 2009, 29:125-31. PMID 18647263

97.  Park DM, Yeaney GA, **Hamilton RL**, Mabold J, Urban N, Appleman L, Flickinger J, Lieberman F, Mintz A.  Identifying Muir-Torre syndrome in a patient with glioblastoma multiforme.  Neuro Oncol, 2009 11:452-5. PMID 19028998.  )

98.  Horbinski C, Bartynski WS, Carson-Walter E, **Hamilton RL**, Tan HP, Cheng S.  Reversible encephalopathy after cardiac transplantation:  Histologic evidence of endothelial activation, T-cell specific trafficking, and vascular endothelial growth factor expression.  Am J Neuroradiol 2008 30:588-90. PMID 18854444.

99.  Northcott P, Nakahara Y, Peacock J, Ellison D, Croul S, Feuk L, Ra YS, Kongham P, Zilerberg K, Mack S, McLeod J, Scherer S, Rao S, Grajkowska W, Gillespie Y, Lach B, Grundy R, Pollack IF, **Hamilton RL,** Van Meter T, Carlotti C, Boop R, Bigner D, Gilbertson R, Rutka J, Taylor MD. Multiple recurrent genetic events converge on control of histone lysine methylation in medulloblastoma.  Nat Genet 2009 41:465-72. PMID 19270706.

100. Ueda R, Kohanbash G, Sasaki K, Fujita M, Zhu X, Kastenhuber ER, McDonald HA, Potter DM, **Hamilton RL,** Lotze MT, Khan SA, Sobol RW, Okada H.  Dicer-regulated microRNAs 222 and 339 promote resistance of cancer cells to cytotoxic T-lymphocytes by down-regulation of ICAM-1. Proc Natl Acad Sci U S A. 2009 Jun 30;106(26):10746-51.  PMID: 19520829

101.  Maki RA, Tyurin VA, Lyon RC, **Hamilton RL**, DeKosky ST, Kagan VE, Reynolds WF.  Aberrant expression of myeloperoxidase in astrocytes promotes phospholipid oxidation and memory deficits in a mouse model of Alzheimer disease. J Biol Chem. 2009 Jan 30;284(5):3158-69. PMID: 19059911.

102.  Horbinski C, **Hamilton RL**, Lovell C, Burnham J, Pollack IF.  Impact of morphology, MIB-1, p53, and MGMT on Outcome in Pilocytic Astrocytomas.  Brain Pathology 2010; 20:581-8  e-pub Sept 21, 2009

103.  Armstrong RA, Ellis W, **Hamilton RL**, MacKenzie IR, Hedreen J, Gearing M, Montine T, Vonsattel JP, Head E, Lieberman AP, Cairns NJ.  Neuropathological heterogeneity in frontotemporal lobar degeneration with TDP-43 proteinopathy: a quantitative study of 94 cases using principle components analysis.  J Neural Transm 2010, 117:227-239.

**Ronald L. Hamilton, M.D.**

104. Horbinski C, **Hamilton RL**, Nikiforov Y, Pollack IF.  Association of molecular alterations, including BRAF, with biology and outcome in pilocytic astrocytomas.  Acta Neuropathol 2010 Jan 1, e-pub.

105. Van Deerlin VM, Sleiman PM, Martinez-Lage M, Chen-Plotkin A, Wang LS, Graff-Radford NR, Dickson DW, Rademakers R, Boeve BF, Grossman M, Arnold SE, Mann DM, Pickering-Brown SM, Seelaar H, Heutink P, van Swieten JC, Murrell JR, Ghetti B, Spina S, Grafman J, Hodges J, Spillantini MG, Gilman S, Lieberman AP, Kaye JA, Woltjer RL, Bigio EH, Mesulam M, Al-Sarraj S, Troakes C, Rosenberg RN, White CL 3rd, Ferrer I, Lladó A, Neumann M, Kretzschmar HA, Hulette CM, Welsh-Bohmer KA, Miller BL, Alzualde A, de Munain AL, McKee AC, Gearing M, Levey AI, Lah JJ, Hardy J, Rohrer JD, Lashley T, Mackenzie IR, Feldman HH, **Hamilton RL**, Dekosky ST, van der Zee J, Kumar-Singh S, Van Broeckhoven C, Mayeux R, Vonsattel JP, Troncoso JC, Kril JJ, Kwok JB, Halliday GM, Bird TD, Ince PG, Shaw PJ, Cairns NJ, Morris JC, McLean CA, DeCarli C, Ellis WG, Freeman SH, Frosch MP, Growdon JH, Perl DP, Sano M, Bennett DA, Schneider JA, Beach TG, Reiman EM, Woodruff BK, Cummings J, Vinters HV, Miller CA, Chui HC, Alafuzoff I, Hartikainen P, Seilhean D, Galasko D, Masliah E, Cotman CW, Tuñón MT, Martínez MC, Munoz DG, Carroll SL, Marson D, Riederer PF, Bogdanovic N, Schellenberg GD, Hakonarson H, Trojanowski JQ, Lee VM.  Common variants at 7p21 are associated with frontotemporal lobar degeneration with TDP-43 inclusions. Nat Genet 2010 42:234-239.

106. Omalu BI, **Hamilton RL**, Kamboh MI, DeKosky ST, Bailes J.  Chronic traumatic encephalopathy in a National Football League Player: Case report and emerging medicolegal practice questions.  J Forensic Nurs, 2010, 6: 40-46.

107. Caltagarone J, **Hamilton RL**, Murdoch G, Jing Z, DeFranco DB, Bowser R. Paxillin and hydrogen peroxide-induced clone 5 expression and distribution in control and Alzheimer disease hippocampi. J Neuropathol Exp Neurol. 2010: 69:356-71.

108. Pollack IF, **Hamilton RL**, Sobol RW, Nikiforova MN, Lyons-Weiler MA, Laframboise WA, Burger PC, Brat DJ, Rosenblum MK, Holmes EJ, Zhou T, Jakacki RI; for the Children's Oncology Group. IDH1 mutations are common in malignant gliomas arising in adolescents: a report from the Children's Oncology Group. Childs Nerv Syst. 2010; 27:87-94

109. Jun G, Naj AC, Beecham GW, Wang LS, Buros J, Gallins PJ, Buxbaum JD, Ertekin-Taner N, Fallin MD, Friedland R, Inzelberg R, Kramer P, Rogaeva E, St George-Hyslop P, Arnold SE, Baldwin CT, Barber R, Beach T, Bigio EH, Bird TD, Boxer A, Burke JR, Cairns N, Carroll SL, Chui HC, Clark DG, Cotman CW, Cummings JL, Decarli C, Diaz-Arrastia R, Dick M, Dickson DW, Ellis WG, Fallon KB, Farlow MR, Ferris S, Frosch MP, Galasko DR, Gearing M, Geschwind DH, Ghetti B, Gilman S, Giordani B, Glass J, Graff-Radford NR, Green RC, Growdon JH, **Hamilton RL**, Harrell LE, Head E, Honig LS, Hulette CM, Hyman BT, Jicha GA, Jin LW, Johnson N, Karlawish J, Karydas A, Kaye JA, Kim R, Koo EH, Kowall NW, Lah JJ, Levey AI, Lieberman A, Lopez OL, Mack WJ, Markesbery W, Marson DC, Martiniuk F, Masliah E, McKee AC, Mesulam M, Miller JW, Miller BL, Miller CA, Parisi JE, Perl DP, Peskind E, Petersen RC, Poon W, Quinn JF, Raskind M, Reisberg B, Ringman JM, Roberson ED, Rosenberg RN, Sano M, Schneider JA, Schneider LS, Seeley W, Shelanski ML, Smith CD, Spina S, Stern RA, Tanzi RE, Trojanowski JQ, Troncoso JC, Van Deerlin VM, Vinters HV, Vonsattel JP, Weintraub S, Welsh-Bohmer KA, Woltjer RL, Younkin SG, Cantwell LB, Dombroski BA, Saykin AJ, Reiman EM, Bennett DA, Morris JC, Lunetta KL, Martin ER, Montine TJ, Goate AM, Blacker D, Tsuang DW, Beekly D, Cupples LA, Hakonarson H, Kukull W, Foroud TM, Haines J, Mayeux R, Farrer LA, Pericak-Vance MA, Schellenberg GD; Alzheimer's Disease Genetics Consortium, Arnold SE, Baldwin CT, Barber R, Beach T, Bigio EH, Bird TD, Boxer A, Burke JR, Cairns N, Carroll SL, Chui HC, Clark DG, Cotman CW, Cummings JL, Decarli C, Diaz-Arrastia R, Dick M, Dickson DW, Ellis WG, Fallon KB, Farlow MR, Ferris S, Frosch MP, Galasko DR, Gearing M, Geschwind DH, Ghetti B, Gilman S, Giordani B, Glass J, Graff-Radford NR, Green RC, Growdon JH, Hamilton RL, Harrell LE, Head E, Honig LS, Hulette CM, Hyman BT, Jicha GA, Jin LW, Johnson N, Karlawish J, Karydas A, Kaye JA, Kim R, Koo EH, Kowall NW, Lah JJ, Levey AI, Lieberman A, Lopez OL, Mack WJ, Markesbery W, Marson DC, Martiniuk F, Masliah E, McKee AC, Mesulam M, Miller JW, Miller BL, Miller CA, Parisi JE, Perl DP, Peskind E, Petersen RC, Poon W, Quinn JF, Raskind M, Reisberg B, Ringman JM, Roberson ED, Rosenberg RN, Sano M, Schneider JA, Schneider LS, Seeley W, Shelanski ML, Smith CD, Spina S, Stern RA, Tanzi RE, Trojanowski JQ, Troncoso JC, Van Deerlin VM, Vinters HV, Vonsattel JP, Weintraub S, Welsh-Bohmer KA, Woltjer RL, Younkin SG. Meta-analysis confirms CR1, CLU and PICALM as Alzheimer Disease Risk Loci and reveals interactions with APOE Genotypes. Arch Neurol, 2010, Sep 3 (epub ahead of print)

110. Pollack IF, **Hamilton RL**, Burger PC, Brat DJ, Rosenblum MK, Murdoch GH, Nikiforova MN, Holmes EJ, Zhou T, Cohen KJ, Jakacki RI; Children's Oncology Group. Akt activation is a common event in pediatric malignant gliomas and a potential adverse prognostic marker: a report from the Children's Oncology Group. J Neurooncol. 2010 Sep;99(2):155-63. Epub 2010 Jul 4

**Ronald L. Hamilton, M.D.**

111.  Pollack IF, **Hamilton RL**, Sobol RW, Nikiforova MN, Nikiforov YE, Lyons-Weiler MA, Laframboise WA, Burger PC, Brat DJ, Rosenblum MK, Gilles FH, Yates AJ, Zhou T, Cohen KJ, Finlay JL, Jakacki RI; for the Children's Oncology Group. Mismatch repair deficiency is an uncommon mechanism of alkylator resistance in pediatric malignant gliomas: a report from the Children's Oncology Group. Pediatr Blood Cancer 2010 Jun 29 epub ahead of print

112.  Bonneh-Barkay D, Wang G, Starkey A, **Hamilton RL**, Wiley CA. In vivo CHI3L1 (YKL-40) expression in astrocytes in acute and chronic neurological diseases. J Neuroinflammation 2010 Jun 11:7-34.

113.  Hinkle DA, Mullett SJ, Gabris BE, **Hamilton RL**.  DJ-1 expression in glioblastomas shows positive correlation with p53 expression and negative correlation with epidermal growth factor receptor amplification. Neuropathology 2010 May 19 (epub ahead of print)xx

114.  Okada H, Kalinski P, Ueda R, Hoji A, Kohanbash G, Donegan TE, Mintz AH, Engh JA, Bartlett DL,  Brown CK, Zeh H, Holtman MP, Reinhart TA, Whiteside TL,Butterfield LH, **Hamilton RL**, Potter DM, Pollack IF, Salazar AM, Lieberman FS. Induction of CD8+ T-cell responses against novel glioma-associated antigen peptides and clinical activity by vaccinations  with {alpha}-type 1 polarized dendritic cells and polyinosinic-polycytidylic acid stabilized by lysine and carboxymethylcellulose In patients with recurrent malignant glioma. J Clin Oncol. 2011;29:330-6.PMID: 21149657

115.  Kofler J, Bartynski WS, Reynolds TQ, Lieberman FS, Murdoch GH, **Hamilton RL**. Posterior reversible encephalopathy syndrome (PRES) with immune system activation, VEGF up-regulation, and cerebral amyloid angiopathy. J. Comput Assist Tomogr. 2011; 35:39-42. PMID: 21150450

116.   Bonfield CM, Amin D, **Hamilton RL**, Gerszten PC. Extramedullary ependymoma near the conus medullaris with lumbar nerve root attachment: case report. Neurosurgery. 2011 Mar;68:E831-4. PMID:21311277

117.  Fujita M, Kohanbash G, Fellows-Mayle W, **Hamilton RL**, Komohara Y, Decker SA, Ohlfest JR, Okada H.COX-2 blockade suppresses gliomagenesis by inhibiting myeloid-derived suppressor cells.         Cancer Res. 2011 Apr 1;71:2664-74. Epub 2011 Feb 15. PMID: 21324923

118.   Cohen KJ, Pollack IF, Zhou T, Buxton A, Holmes EF, Burger PC, Brat DJ, Rosenblum MK, **Hamilton RL**, Lavey RS, Heideman RL. Temozolomide in the treatment of high-grade gliomas in children: a report from the Children's Oncology Group.
Neuro Oncol. 2011 Mar;13:317-23. PMID: 21339192

119.  Omalu B, Bailes J, **Hamilton RL**, Kamboh MI, Hammers J, Case M, Fitzsimmons R.
Emerging histomorphologic phenotypes of chronic traumatic encephalopathy in American athletes.
Neurosurgery. 2011 Jul;69:173-83; discussion 183. PMID: 21358359

120.   Tang JB, Svilar D, Trivedi RN, Wang XH, Goellner EM, Moore B, **Hamilton RL**, Banze LA, Brown AR, Sobol RW. N-methylpurine DNA glycosylase and DNA polymerase beta modulate BER inhibitor potentiation of glioma cell to temozolomide. Neurosurgery Oncol. 2011;13:471-86. PMID: 21377995

121.  Liu KW, Feng H, Bachoo R, Kazlauskas A, Smith EM, Symes K, **Hamilton RL**, Nagane M, Nishikawa R, Hu, B, Cheng Sy. SHP-2/PTPN 11 mediates gliomagenesis driven by PDGFRA and INK4A/ARF aberrations in mice and humans. J. Clin Invest. 2011 Mar;121:905-17. PMID: 21393858

122.   Naj AC, Jun G, Beecham GW, Wang LS, Vardarajan BN, Buros J, Gallins PJ, Buxbaum JD, Jarvidk GP, Crane PK, Larson EB, Bird TB, Boeve BF, Graff-Radford NR, De Jager PL, Evans D, Schneider JA, Carrasquillo MM, Ertekin-Taner N, Younkin SG, Cruchaga C, Kauwe JS, Nowotny  P, Kramer P, Hardy J, Huentelman  MJ, Myers AJ, Barmada MM, Demirci FY, Baldwin CT, Green RC, Rogaeva E, St. George-Hyslop P, Arnold SE, Barber R, Beach T, Bigio EH, Bowen JD, Boxer A, Burke JR, Cairns NJ, Carlson CS, Carney RM, Carroll SL, Chui HC, Clark DG, Corneveaux J, Cotman CW, Cummings JL, Decarli C, DeKosy ST, Diaz-Arrastia R, Dick M, Dickson DW, Ellis WG, Faber KM, Fallon KB, Farlow MR, Ferris S. Frosch MP, Galasko Dr, Ganguli M, Gearing M, Geschwind DH, Ghetti B, Gilbert JR, Gilman S, Giordani B, Glass JD, Growdon JH, **Hamilton RL**,R, Koo EH, Kowall NW, Lah JJ, Levey AI, Lieberman AP, Lopez OL, Mack WJ, Marson DC, Martiniuk F, Mash DC, Masliah E, McCormick WC, McCurry SM, McDavid AN, McKee AC, Mesulam M, Miller BL, Miller JW, Parisi JE, Perl DP, Peskind E,Petersen, RC, Poon, WV, Quinn JF, Rajbhandary RA, Raskind M, Reisberg B, Ringman JM, Roberson ED, Rosenberg RN,Sano M, Schneider LS, Seeley W, Shelanksi ML, Slifer MA, Smith CD, Sonnen JA, Spina S. Stern RA, Tanzi RE, Trojanowski JQ, Troncoso JC, Van Deerlin VM, Vinters  HV, Vonsattel JP, Weintraub S, Welsh-Bohmer KA, Williamson

**Ronald L. Hamilton, M.D.**

J, Woltjer RL,Cantwell LB, Dombroski BA, Beekly D, Lunetta KL, Martin ER, Kamboh MI, Saykin AJ, Reiman EM, Bennett DA, Morris JC, Montine TJ, Goate AM, Iacker D, Tsuang DW, Hakonarson, H, Kukull WA, Foroud TM, Haines JL, Mayeux R, Pericak-Vance MA, Farrer LA, Schellenberg GD. Commons variants as MS4A4/MS4A6E, CD2AP, CD33 and EPHA1 are associated with late Onset Alzheimer's Disease. Nat Genet. 2011 May;43:436-41 Epub 2011 Apr 3. PMID: 21460841

123.    Chen-Plotkin AS, Martinez-Lage M,Sleiman PM, Hu W, Greene R, Wood  EM, Bing S, Grossman M, Schellenberg GD, Hatanpaa KJ, Weiner MF, White CL 3rd, Brooks WS, Halliday GM, Kril JJ, Gearing M, Beach TG, Graff-Radford NR, Dickson DW, Rademakers R, Boeve BF, Pickering-Brown SM, Snowden J, van Swieten JC, Heutink P, Seelaar H, Murrell JR, Ghetti B, Spina S, Grafman J, Kaye JA, Woltjer RL, Mesulam M, Bigio E, Llad'o A, Miller BL, Alzualde A, Moreno F,Rohrer JD, Mackenzie IR, Feldman HH, **Hamilton RL**, Cruts M, Engelborghs S, De Deyn PP, Van Broeckhoven C, Bird TD, Cairns NJ, Goate A, Frosch MP, Riederer PF, Bogdanovic N, Lee VM, Trojanowksi JQ, Van Deerlin VM. Genetic and clinical features of progranulin-associated frontotemporal lobar degeneration. Arch Neurol. 2011 Apr;68:488-97. PMID: 21482928

124.    Nikiforova MN, **Hamilton RL**. Molecular diagnostics of gliomas. Arch Pathol Lab Med. 2011 May;135:558-68. Review. PMID: 21526954

125.    Monaco EA 3rd, Armah HB, Nikiforova MN, **Hamilton RL**, Engh JA. Grade II Oligodendroglioma localized to the corpus callosum. Brain Tumor Pathol. 2011 Oct;28:305-9. Epub 2011 Jul 22. PMID: 21833577

126.    Horbinski C, Hobbs, J, Cieply K, Dacic S, **Hamilton RL**. EGFR expression stratifies oligodendroglioma behavior.Am J Pathol. 2011 Oct; 179:1638-44. Epub 2011 Aug 11. PMID: 21839716

127.    Omalu B, hammers, JL, bailes J**, Hamilton RL**. Kamboh MI, Webster G, Fitzsimmons RP. Chronic traumatic Encephalopathy  in an Iraqi war veteran with posttraumatic stress disorder who committed suicide. Neurosurg Focus. 2011 Nov; :E3. PMID: 22044102

128.    Liu Y, Komohara Y, Domenick N, Ohno M, Ikeura M, **Hamilton RL**, Horbinski C, Wang X, Ferrone S, Okada H. Expression of antigen processing molecules in brain metastasis of breast cancer. Cancer Immunol Immunother. 2011 Nov 8. (Epub ahead of print } PMID:22065046

129.    Feng H, Hu B, Liu KW, Li Y, Lu X, Cheng T, Yiin JJ, Lu S, Keezer S, Fenton T, Furnari FB, **Hamilton RL**, Vuori K, Sarkaria JN, Nagane M, Nishikawa R, Cavenee WK, Cheng SY. Activation of Rac 1 by src-dependent phosphorylation of Dock180(Y1811) mediates PDGFRa-stimulated glioma tumorigenesis in mice and humans. J Clin Invest. 2011 Dec; 121:4670-84. doi: 10.1172/JCI58559. Epub 2011 Nov 14. PMID: 22080864

130.    Horbinski C, Nikiforova MN, Hobbs J, Bortoluzzi S. Cieply K, Dacic S, **Hamilton RL**. The importance of 10q status in an outcomes-based comparison between 1p/19q fluorescence in situ hybridization and polymerase chain reaction-based microsatellite loss of heterozygosity analysis of oligodendrogliomas.  J. Neuropathol Exp Neurol. 2012 Jan;71:73-82. PMID: 22157622

131.    Ikonomovic MD, Abrahamson EE, Price JC, **Hamilton RL**, Mathis CA, Paljug WR, Cohen AD, Mizukami K, DeKosky ST, Lopez OL, Klunk WE. Early AD pathology in a {C-11} PiB-negative case: a PiB-amyloid imaging, biochemical, and  Immunohistochemical study. Acta Neuropathol. 2012 Mar;123:433-47. Epub 2012 Jan 24. PMID: 22271153

132.    Feng H, Hu B, Jarzynka MJ, Li Y, Keezer S, Johns TG, Tang CK, **Hamilton RL**, Vuuori K, Nishikawa R, Sarkaria JN, Fenton T, Cheng T, Furnari FB, Cavenee WK, Cheng SY. Phosphorylation of dedicator of cytokinesis 1(Dock 180) at tyrosine residue Y722 by Src family kinases mediates EGRFvIII-driven glioblastoma tumorigenesis. Proc Natl Acad Sci U S A. 2012 Feb 21;109:3018-23. Epub 2012 Feb 7. PMID: 22323579

133.    Wu Y, Lou H, Alerte TN, Stachowski EK, Chen J, Singleton AB, **Hamilton RL**, Perez RG. Neuroscience. 2012 Jan 25. {Epubahead a print} PMID: 22326202

134.    Murray PS, Kirkwood CM, Gray MC, Ikonomovic MD, Paljug WR, Abrahamson EE, Henteleff RA, **Hamilton RL**, Kofler JK, Klunk WE, Lopez OL, Penzes P, Sweet RA. β-Amyloid 42/40 ratio and kalirin expression in Alzheimer disease with psychosis. Neurobiol Aging. 2012 Mar 17. [Epub ahead of print] PMID:22429885

**Ronald L. Hamilton, M.D.**

135.     Choi SH, Olabarrieta M, Lopez OL, Maruca V, DeKosky ST, **Hamilton RL**, Becker JT. Gray Matter Atrophy Associated with Extrapyramidal Signs in the Lewy Body Variant of Alzheimer's Disease. J Alzheimers Dis. 2012 Aug 9. [Epub ahead of print] PMID:22886020

136.     Armstrong RA, **Hamilton RL**, Mackenzie IR, Hedreen J, Cairns NJ. Laminar Distribution of the Pathological Changes in Sporadic Frontotemporal Lobar Degeneration with TDP-43 Proteinopathy: A Quantitative Study Using Polynomial Curve Fitting. Neuropathol Appl Neurobiol. 2012 Jul 16. [Epub ahead of print] PMID:22804696

137.     Atkinson DM, **Hamilton RL** A 52-year-old male with visual changes. Brain Pathol. 2012 Jul;22(4):575-8. PMID:22697384

138.     Zou F, Chai HS, Younkin CS, Allen M, Crook J, Pankratz VS, Carrasquillo MM, Rowley CN, Nair AA, Middha S, Maharjan S, Nguyen T, Ma L, Malphrus KG, Palusak R, Lincoln S, Bisceglio G, Georgescu C, Kouri N, Kolbert CP, Jen J, Haines JL, Mayeux R, Pericak-Vance MA, Farrer LA, Schellenberg GD; Alzheimer's Disease Genetics Consortium, Petersen RC, Graff-Radford NR, Dickson DW, **Hamilton RL**, Younkin SG, Ertekin-Taner N. Brain expression genome-wide association study (eGWAS) identifies human disease-associated variants. PLoS Genet. 2012;8(6): e1002707. Epub 2012 Jun 7 PMID:22685416

139.     Horbinski C, Nikiforova MN, Hagenkord JM, **Hamilton RL**, Pollack IF. Interplay among BRAF, p16, p53, and MIB1 in pediatric low-grade gliomas. Neuro Oncol. 2012 Jun;14(6):777-89 (1012) PMID:22492957

140.     Hobbs J, Nikiforova MN, Fardo DW, Bortoluzzi S, Cieply K, **Hamilton RL**, Horbinski C. Paradoxical relationship between the degree of EGFR amplification and outcome in glioblastomas. Am J Surg Pathol. 2012 Aug;36(8):1186-93. PMID:22472960

141. Armstrong, R. A., **R. L. Hamilton**, I. R. Mackenzie, J. Hedreen and N. J. Cairns. "Laminar Distribution of the Pathological Changes in Sporadic Frontotemporal Lobar Degeneration with Transactive Response (Tar) DNA-Binding Protein of 43 Kda (Tdp-43) Proteinopathy: A Quantitative Study Using Polynomial Curve Fitting." *Neuropathol Appl Neurobiol* 39, no. 4 (2013): 335-47.

142. Clark, K. H., J. L. Villano, M. N. Nikiforova, **R. L. Hamilton** and C. Horbinski. "1p/19q Testing Has No Significance in the Workup of Glioblastomas." *Neuropathol Appl Neurobiol*, (2013).

143. Gheorghe, G., O. Radu, S. Milanovich, **R. L. Hamilton**, R. Jaffe, J. F. Southern and J. A. Ozolek. "Pathology of Central Nervous System Posttransplant Lymphoproliferative Disorders: Lessons from Pediatric Autopsies." *Pediatr Dev Pathol* 16, no. 2 (2013): 67-73.

1444. Holton, P., M. Ryten, M. Nalls, D. Trabzuni, M. E. Weale, D. Hernandez, H. Crehan, J. R. Gibbs, R. Mayeux, J. L. Haines, L. A. Farrer, M. A. Pericak-Vance, G. D. Schellenberg, M. Ramirez-Restrepo, A. Engel, A. J. Myers, J. J. Corneveaux, M. J. Huentelman, A. Dillman, M. R. Cookson, E. M. Reiman, A. Singleton, J. Hardy and R. Guerreiro. "Initial Assessment of the Pathogenic Mechanisms of the Recently Identified Alzheimer Risk Loci." *Ann Hum Genet* 77, no. 2 (2013): 85-105.

145. Miyashita, A., A. Koike, G. Jun, L. S. Wang, S. Takahashi, E. Matsubara, T. Kawarabayashi, M. Shoji, N. Tomita, H. Arai, T. Asada, Y. Harigaya, M. Ikeda, M. Amari, H. Hanyu, S. Higuchi, T. Ikeuchi, M. Nishizawa, M. Suga, Y. Kawase, H. Akatsu, K. Kosaka, T. Yamamoto, M. Imagawa, T. Hamaguchi, M. Yamada, T. Moriaha, M. Takeda, T. Takao, K. Nakata, Y. Fujisawa, K. Sasaki, K. Watanabe, K. Nakashima, K. Urakami, T. Ooya, M. Takahashi, T. Yuzuriha, K. Serikawa, S. Yoshimoto, R. Nakagawa, J. W. Kim, C. S. Ki, H. H. Won, D. L. Na, S. W. Seo, I. Mook-Jung, P. St George-Hyslop, R. Mayeux, J. L. Haines, M. A. Pericak-Vance, M. Yoshida, N. Nishida, K. Tokunaga, K. Yamamoto, S. Tsuji, I. Kanazawa, Y. Ihara, G. D. Schellenberg, L. A. Farrer and R. Kuwano. "Sorl1 Is Genetically Associated with Late-Onset Alzheimer's Disease in Japanese, Koreans and Caucasians." *PLoS One* 8, no. 4 (2013): e58618.

146. Pang, B., M. B. Durso, **R. L. Hamilton** and M. N. Nikiforova. "A Novel Cold-Pcr/Fmca Assay Enhances the Detection of Low-Abundance Idh1 Mutations in Gliomas." *Diagn Mol Pathol* 22, no. 1 (2013): 28-34.

147. Reitz, C., G. Jun, A. Naj, R. Rajbhandary, B. N. Vardarajan, L. S. Wang, O. Valladares, C. F. Lin, E. B. Larson, N. R. Graff-Radford, D. Evans, P. L. De Jager, P. K. Crane, J. D. Buxbaum, J. R. Murrell, T. Raj, N. Ertekin-Taner, M. Logue, C. T. Baldwin, R. C. Green, L. L. Barnes, L. B. Cantwell, M. D. Fallin, R. C. Go, P. Griffith, T. O. Obisesan, J. J. Manly, K. L. Lunetta, M. I. Kamboh, O. L. Lopez, D. A. Bennett, H. Hendrie, K. S. Hall, A. M. Goate, G. S. Byrd, W. A. Kukull, T. M. Foroud, J. L. Haines, L. A. Farrer, M. A. Pericak-Vance, G. D. Schellenberg and R. Mayeux. "Variants

**Ronald L. Hamilton, M.D.**

in the Atp-Binding Cassette Transporter (Abca7), Apolipoprotein E 4,and the Risk of Late-Onset Alzheimer Disease in African Americans." *JAMA* 309, no. 14 (2013): 1483-92.

148. Schlegel, J., M. J. Sambade, S. Sather, S. J. Moschos, A. C. Tan, A. Winges, D. DeRyckere, C. C. Carson, D. G. Trembath, J. J. Tentler, S. G. Eckhardt, P. F. Kuan, **R. L. Hamilton**, L. M. Duncan, C. R. Miller, N. 9. Nikolaishvili-Feinberg, B. R. Midkiff, J. Liu, W. Zhang, C. Yang, X. Wang, S. V. Frye, H. S. Earp, J. M. Shields and D. K. Graham. "Mertk Receptor Tyrosine Kinase Is a Therapeutic Target in Melanoma." *J Clin Invest* 123, no. 5 (2013): 2257-67.

150. Spina, S., A. D. Van Laar, J. R. Murrell, **R. L. Hamilton**, J. K. Kofler, F. Epperson, M. R. Farlow, O. L. Lopez, J. Quinlan, S. T. DeKosky and B. Ghetti. "Phenotypic Variability in Three Families with Valosin-Containing Protein Mutation." *Eur J Neurol* 20, no. 2 (2013): 251-8.

151. Tsuang, D., J. B. Leverenz, O. L. Lopez, **R. L. Hamilton,** D. A. Bennett, J. A. Schneider, A. S. Buchman, E. B. Larson, P. K. Crane, J. A. Kaye, P. Kramer, R. Woltjer, J. Q. Trojanowski, D. Weintraub, A. S. Chen-Plotkin, D. J. Irwin, J. Rick, G. D. Schellenberg, G. S. Watson, W. Kukull, P. T. Nelson, G. A. Jicha, J. H. Neltner, D. Galasko, E. Masliah, J. F. Quinn, K. A. Chung, D. Yearout, I. F. Mata, J. Y. Wan, K. L. Edwards, T. J. Montine and C. P. Zabetian. "Apoe Epsilon4 Increases Risk for Dementia in Pure Synucleinopathies." *JAMA Neurol* 70, no. 2 (2013): 223-8.

152. Yeung, J. T., **R. L. Hamilton**, K. Ohnishi, M. Ikeura, D. M. Potter, M. N. Nikiforova, S. Ferrone, R. I. Jakacki, I. F. Pollack and H. Okada. "Loh in the Hla Class I Region at 6p21 Is Associated with Shorter Survival in Newly Diagnosed Adult Glioblastoma." *Clin Cancer Res* 19, no. 7 (2013): 1816-26.

153. Yeung, J. T., **R. L. Hamilton**, H. Okada, R. I. Jakacki and I. F. Pollack. "Increased Expression of Tumor-Associated Antigens in Pediatric and Adult Ependymomas: Implication for Vaccine Therapy." *J Neurooncol* 111, no. 2 (2013): 103-11.

154. **Hamilton R**, Krauze M, Romkes M, Omolo B, Konstantinopoulos P, Reinhart T, Harasymczuk M, Wang Y, Lin Y, Ferrone S, Whiteside T, Bortoluzzi S, Werley J, Nukui T, Fallert-Junecko B, Kondziolka D, Ibrahim J, Becker D, Kirkwood J, Moschos S. Pathologic and gene expression features of metastatic melanomas to the brain.Cancer. 2013 Aug 1;119(15):2737-46. doi: 10.1002/cncr.28029. Epub 2013 May 21.PMID:23695963 [PubMed - in process]

155. Lam S, Grandhi R, Wong R, **Hamilton R**, Greene S. Neuromuscular hamartoma of the sciatic nerve: Case report and review of the literature. Surg Neurol Int. 2013;4:8. doi: 10.4103/2152-7806.106266. Epub 2013 Jan 18.PMID:23493803[PubMed]

156. Reitz C, Mayeux R; Alzheimer's Disease Genetics Consortium. TREM2 and neurodegenerative disease. N Engl J Med. 2013 Oct 17;369(16):1564-5. doi: 10.1056/NEJMc1306509#SA1. PMID:24131184

157. Tempel ZJ, Johnson SA, Richard PS, Friedlander RM, Rothfus WE, **Hamilton RL**. Parasellar arachnoid cyst presenting with a nonpupil sparing third nerve palsy mimicking a posterior communicating artery aneurysm in an adult. Surg Neurol Int. 2013 Jul 9;4:87. doi: 10.4103/2152-7806.114799. eCollection 2013.PMID:23956930

158. Murray PS, Kirkwood CM, Gray MC, Fish KN, Ikonomovic MD, **Hamilton RL**, Kofler JK, Klunk WE, Lopez OL, Sweet RA. Hyperphosphorylated tau is elevated in Alzheimer's Disease with psychosis. J Alzheimers Dis, 2014 204;39:759-773. PMID:24270207

159. Oborski MJ, Laymon CM, Lieberman FS, Drappatz J, **Hamilton RL**, Mountz JM. First use of (18)F-labeled ML-10 PET to assess apoptosis change in a newly diagnosed glioblastoma multiforme patient before and early after therapy. Brain Behav 2014 4:312-315.  PMID:24683522

160  Shin SS, Murdoch G, Hamilton RL, Faraji AH, Kano H, Zwagerman NT, Gardner PA, Lunsford LD, Friedlander RM The Pathological Response of Cavernous Malformations Following Radiosurgery.  J Neurosurg (in press).

160.  Pollack IF, Jakacki RI, Butterfield LH, **Hamilton RL**, Panigrahy A, Potter DM, Connelly AK, Dibridge SA, Whiteside TL, Okada H. Antigen-specific immune responses and clinical outcome after vaccination with glioma-associated antigen peptides and polyvinosinic-polycytidylic Acid stabilized by lysine and carboxymethylcellulose in children with newly diagnosed malignant brainstem and nonbrainstem gliomas. J Clin Oncol. 2014 Jul 1;32(19):2050-8. PMID:24888813

161.  Naj AC, Jun G, Reitz C, Kunkle BW, Perry W, Park YS, Beecham GW, Rajbhandary RA, Hamilton-Nelson KL, Wang LS, Kauwe JS, Huentelman MJ, Myers AJ, Bird TD, Boeve BF, Baldwin CT, Jarvik GP, Crane PK, Rogaeva E, Barmada MM, Demirci FY, Cruchaga C, Kramer PL, Ertekin-Taner N, Hardy J, Graff-Radford NR, Green RC, Larson

**Ronald L. Hamilton, M.D.**

EB, St George-Hyslop PH, Buxbaum JD, Evans DA, Schneider JA, Lunetta KL, Kamboh MI, Saykin AJ, Reiman EM, De Jager PL, Bennett DA, Morris JC, Montine TJ, Goate AM, Blacker D, Tsuang DW, Hakonarson H, Kukull WA, Foroud TM, Martin ER, Haines JL, Mayeux RP, Farrer LA, Schellenberg GD, Pericak-Vance MA; Alzheimer Disease Genetics Consortium, Albert MS, Albin RL, Apostolova LG, Arnold SE, Barber R, Barnes LL, Beach TG, Becker JT, Beekly D, Bigio EH, Bowen JD, Boxer A, Burke JR, Cairns NJ, Cantwell LB, Cao C, Carlson CS, Carney RM, Carrasquillo MM, Carroll SL, Chui HC, Clark DG, Corneveaux J, Cribbs DH, Crocco EA, DeCarli C, DeKosky ST, Dick M, Dickson DW, Duara R, Faber KM, Fallon KB, Farlow MR, Ferris S, Frosch MP, Galasko DR, Ganguli M, Gearing M, Geschwind DH, Ghetti B, Gilbert JR, Glass JD, Growdon JH, **Hamilton RL**, Harrell LE, Head E, Honig LS, Hulette CM, Hyman BT, Jicha GA, Jin LW, Karydas A, Kaye JA, Kim R, Koo EH, Kowall NW, Kramer JH, LaFerla FM, Lah JJ, Leverenz JB, Levey AI, Li G, Lieberman AP, Lin CF, Lopez OL, Lyketsos CG, Mack WJ, Martiniuk F, Mash DC, Masliah E, McCormick WC, McCurry SM, McDavid AN, McKee AC, Mesulam M, Miller BL, Miller CA, Miller JW, Murrell JR, Olichney JM, Pankratz VS, Parisi JE, Paulson HL, Peskind E, Petersen RC, Pierce A, Poon WW, Potter H, Quinn JF, Raj A, Raskind M, Reisberg B, Ringman JM, Roberson ED, Rosen HJ, Rosenberg RN, Sano M, Schneider LS, Seeley WW, Smith AG, Sonnen JA, Spina S, Stern RA, Tanzi RE, Thornton-Wells TA, Trojanowski JQ, Troncoso JC, Valladares O, Van Deerlin VM, Van Eldik LJ, Vardarajan BN, Vinters HV, Vonsattel JP, Weintraub S, Welsh-Bohmer KA, Williamson J, Wishnek S, Woltjer RL, Wright CB, Younkin SG, Yu CE, Yu L.  Effects of multiple genetic Loci on age at onset in late-onset Alzheimer disease: a genome-wide association study.  JAMA Neurol. 2014 Nov 1;71(11):1394-404. doi: 10.1001/jamaneurol.2014.1491

162. Pollack IF, Jakacki RI, Butterfield LH, **Hamilton RL**, Panigrahy A, Potter DM, Connelly AK, Dibridge SA, Whiteside TL, Okada H.  Antigen-specific immune responses and clinical outcome after vaccination with glioma-associated antigen peptides and polyinosinic-polycytidylic acid stabilized by lysine and carboxymethylcellulose in children with newly diagnosed malignant brainstem and nonbrainstem gliomas.  J Clin Oncol. 2014 Jul 1;32(19):2050-8. doi: 10.1200/JCO.2013.54.0526. Epub 2014 Jun 2. PMID: 24888813

163.. Okada H, Butterfield LH, **Hamilton RL**, Hoji A, Sakaki M, Ahn BJ, Kohanbash G, Drappatz J, Engh J, Amankulor N, Lively MO, Chan MD, Salazar AM, Shaw EG, Potter DM, Lieberman FS.  Induction of robust type-1 CD8+ T-cell responses in WHO grade II low-grade glioma patients receiving peptide-based vaccines in combination with poly-ICLC Clin Cancer Res. 2014 Nov 25. pii: clincanres.1790.2014

164. Salloway S, Sperling R, Fox NC, Blennow K, Klunk W, Raskind M, Sabbagh M, Honig LS, Porsteinsson AP, Ferris S, Reichert M, Ketter N, Nejadnik B, Guenzler V, Miloslavsky M, Wang D, Lu Y, Lull J, Tudor IC, Liu E, Grundman M, Yuen E, Black R, Brashear HR; **Hamilton RL**, Bapineuzumab 301 and 302 Clinical Trial Investigators. Two phase 3 trials of bapineuzumab in mild-to-moderate Alzheimer's disease  N Engl J Med. 2014 Jan 23;370(4):322-33. doi: 10.1056/NEJMoa1304839.

165. Leone JP, Bhargava R, Theisen BK, **Hamilton RL**, Lee AV, Brufsky AM. Expression of high affinity folate receptor in breast cancer brain metastasis. Oncotarget. 2015 Jun 25. [Epub ahead of print]  PMID: 24450891

166. Wang LS, Naj AC, Graham RR, Crane PK, Kunkle BW, Cruchaga C, Murcia JD, Cannon-Albright L, Baldwin CT, Zetterberg H, Blennow K, Kukull WA, Faber KM, Schupf N, Norton MC, Tschanz JT, Munger RG, Corcoran CD, Rogaeva E; Alzheimer's Disease Genetics Consortium, Lin CF, Dombroski BA, Cantwell LB, Partch A, Valladares O, Hakonarson H, St George-Hyslop P, Green RC, Goate AM, Foroud TM, Carney RM, Larson EB, Behrens TW, Kauwe JS, Haines JL, Farrer LA, Pericak-Vance MA, Mayeux R, Schellenberg GD; National Institute on Aging-Late-Onset Alzheimer's Disease (NIA-LOAD) Family Study, Albert MS, Albin RL, Apostolova LG, Arnold SE, Barber R, Barmada M, Barnes LL, Beach TG, Becker JT, Beecham GW, Beekly D, Bennett DA, Bigio EH, Bird TD, Blacker D, Boeve BF, Bowen JD, Boxer A, Burke JR, Buxbaum JD, Cairns NJ, Cao C, Carlson CS, Carroll SL, Chui HC, Clark DG, Cribbs DH, Crocco EA, DeCarli C, DeKosky ST, Demirci F, Dick M, Dickson DW, Duara R, Ertekin-Taner N, Fallon KB, Farlow MR, Ferris S, Frosch MP, Galasko DR, Ganguli M, Gearing M, Geschwind DH, Ghetti B, Gilbert JR, Glass JD, Graff-Radford NR, Growdon JH, **Hamilton RL**, Hamilton-Nelson KL, Harrell LE, Head E, Honig LS, Hulette CM, Hyman BT, Jarvik GP, Jicha GA, Jin LW, Jun G, Jun G, Kamboh MI, Karydas A, Kaye JA, Kim R, Koo EH, Kowall NW, Kramer JH, LaFerla FM, Lah JJ, Leverenz JB, Levey AI, Li G, Lieberman AP, Lopez OL, Lunetta KL, Lyketsos CG, Mack WJ, Marson DC, Martin ER, Martiniuk F, Mash DC, Masliah E, McCormick WC, McCurry SM, McDavid AN, McKee AC, Mesulam WM, Miller BL, Miller CA, Miller JW, Montine TJ, Morris JC, Murrell JR, Olichney JM, Parisi JE, Perry W, Peskind E, Petersen RC, Pierce A, Poon WW, Potter H, Quinn JF, Raj A, Raskind M, Reiman EM, Reisberg B, Reitz C, Ringman JM, Roberson ED, Rosen HJ, Rosenberg RN, Sano M, Saykin AJ, Schneider JA, Schneider LS, Seeley WW, Smith AG, Sonnen JA, Spina S, Stern RA, Tanzi RE, Thornton-Wells TA, Trojanowski JQ, Troncoso JC, Tsuang DW, Van Deerlin VM, Van Eldik LJ, Vardarajan BN, Vinters HV, Vonsattel JP, Weintraub S, Welsh-Bohmer KA, Williamson J, Wishnek S, Woltjer RL, Wright CB, Younkin SG, Yu CE, Yu L.**Rarity of the Alzheimer disease-protective APP A673T variant in the United States.** JAMA Neurol. 2015 Feb;72(2):209-16. doi: 10.1001/jamaneurol.2014.2157.

**Ronald L. Hamilton, M.D.**

167. 2. Jun G, Ibrahim-Verbaas CA, Vronskaya M, Lambert JC, Chung J, Naj AC, Kunkle BW, Wang LS, Bis JC, Bellenguez C, Harold D, Lunetta KL, Destefano AL, Grenier-Boley B, Sims R, Beecham GW, Smith AV, Chouraki V, Hamilton-Nelson KL, Ikram MA, Fievet N, Denning N, Martin ER, Schmidt H, Kamatani Y, Dunstan ML, Valladares O, Laza AR, Zelenika D, Ramirez A, Foroud TM, Choi SH, Boland A, Becker T, Kukull WA, van der Lee SJ, Pasquier F, Cruchaga C, Beekly D, Fitzpatrick AL, Hanon O, Gill M, Barber R, Gudnason V, Campion D, Love S, Bennett DA, Amin N, Berr C, Tsolaki M, Buxbaum JD, Lopez OL, Deramecourt V, Fox NC, Cantwell LB, Tárraga L, Dufouil C, Hardy J, Crane PK, Eiriksdottir G, Hannequin D, Clarke R, Evans D, Mosley TH Jr, Letenneur L, Brayne C, Maier W, De Jager P, Emilsson V, Dartigues JF, Hampel H, Kamboh MI, de Bruijn RF, Tzourio C, Pastor P, Larson EB, Rotter JI, O'Donovan MC, Montine TJ, Nalls MA, Mead S, Reiman EM, Jonsson PV, Holmes C, St George-Hyslop PH, Boada M, Passmore P, Wendland JR, Schmidt R, Morgan K, Winslow AR, Powell JF, Carasquillo M, Younkin SG, Jakobsdóttir J, Kauwe JS, Wilhelmsen KC, Rujescu D, Nöthen MM, Hofman A, Jones L; IGAP Consortium, Haines JL, Psaty BM, Van Broeckhoven C, Holmans P, Launer LJ, Mayeux R, Lathrop M, Goate AM, Escott-Price V, Seshadri S, Pericak-Vance MA, Amouyel P, Williams J, van Duijn CM, Schellenberg GD, Farrer LA and . Collaborators (including **Hamilton RL**) (296)   **A novel Alzheimer disease locus located near the gene encoding tau protein**. Mol Psychiatry. 2015 Mar 17. doi: 10.1038/mp.2015.23.

168. . Østergaard SD, Mukherjee S, Sharp SJ, Proitsi P, Lotta LA, Day F, Perry JR, Boehme KL, Walter S, Kauwe JS, Gibbons LE; Alzheimer's Disease Genetics Consortium; GERAD1 Consortium; EPIC-InterAct Consortium, Larson EB, Powell JF, Langenberg C, Crane PK, Wareham NJ, Scott RA.
Collaborators (including **Hamilton RL**) (296)   Associations between Potentially Modifiable Risk Factors and Alzheimer Disease: A Mendelian Randomization Study. PLoS Med. 2015 Jun 16;12(6):e1001841; discussion e1001841. doi:

169. Wang P, Bahreini A, Gyanchandani R, Lucas PC, Hartmaier RJ, Watters RJ, Jonnalagadda AR, Trejo Bittar HE, Berg A, **Hamilton RL**, Kurland BF, Weiss KR, Mathew A, Leone JP, Davidson NE, Nikiforova MN, Brufsky AM, Ambros TF, Stern AM, Puhalla SL, Lee AV, Oesterreich S. Sensitive detection of mono- and polyclonal ESR1 mutations in primary tumors, metastatic lesions and cell free DNA of breast cancer patients. Clin Cancer Res. 2015 Oct 23. pii: 1534.2015. PMID: 26500237

170. Salgado CM, Basu D, Nikiforova M, **Hamilton RL**, Gehris R, Jakacki R, Panigrahy A, Yatsenko S, Reyes-Múgica M. Amplification of mutated NRAS leading to congenital melanoma in neurocutaneous melanocytosis. Melanoma Res. 2015 Oct;25(5):453-60.  PMID: 26266759

171. Shin SS, Murdoch G, Hamilton RL, Faraji AH, Kano H, Zwagerman NT, Gardner PA, Lunsford LD, Friedlander RM. Pathological response of cavernous malformations following radiosurgery. J Neurosurg. 2015 Oct;123(4):938-44. doi: 10.3171/2014.10.JNS14499. Epub 2015 Jun 19. PMID: 26090838

--------------------

172. Mukherjee S, Walter S, Kauwe JS, Saykin AJ, Bennett DA, Larson EB, Crane PK, Glymour MM; Adult Changes in Thought Study Investigators; Religious Orders Study/Memory and Aging Project Investigators; Alzheimer's Disease Genetics Consortium. Alzheimers Dement. Genetically predicted body mass index and Alzheimer's disease-related phenotypes in three large samples: Mendelian randomization analyses. 2015 Dec;11(12):1439-51. doi: 10.1016/j.jalz.2015.05.015. Epub 2015 Jun 12. PMID: 26079416

173. Ghani M, Reitz C, Cheng R, Vardarajan BN, Jun G, Sato C, Naj A, Rajbhandary R, Wang LS, Valladares O, Lin CF, Larson EB, Graff-Radford NR, Evans D, De Jager PL, Crane PK, Buxbaum JD, Murrell JR, Raj T, Ertekin-Taner N, Logue M, Baldwin CT, Green RC, Barnes LL, Cantwell LB, Fallin MD, Go RC, Griffith PA, Obisesan TO, Manly JJ, Lunetta KL, Kamboh MI, Lopez OL, Bennett DA, Hendrie H, Hall KS, Goate AM, Byrd GS, Kukull WA, Foroud TM, Haines JL, Farrer LA, Pericak-Vance MA, Lee JH, Schellenberg GD, St George-Hyslop P, Mayeux R, Rogaeva E; Alzheimer's Disease Genetics Consortium. Association of Long Runs of Homozygosity With Alzheimer Disease Among African American Individuals. JAMA Neurol. 2015 Nov;72(11):1313-23. doi: 10.1001/jamaneurol.2015.1700. PMID: 26366463

174. Nikiforova MN, Wald AI, Melan MA, Roy S, Zhong S, Hamilton RL, Lieberman FS, Drappatz J, Amankulor NM, Pollack IF, Nikiforov YE, Horbinski C.
Targeted next-generation sequencing panel (GlioSeq) provides comprehensive genetic profiling of central nervous system tumors. Neuro Oncol. 2016 Mar;18(3):379-87. doi: 10.1093/neuonc/nov289. Epub 2015 Dec 17. PMID: 2668176

175. Morrissy AS, Garzia L, Shih DJ, Zuyderduyn S, Huang X, Skowron P, Remke M, Cavalli FM, Ramaswamy V, Lindsay PE, Jelveh S, Donovan LK, Wang X, Luu B, Zayne K, Li Y, Mayoh C, Thiessen N, Mercier E, Mungall KL, Ma

**Ronald L. Hamilton, M.D.**

Y, Tse K, Zeng T, Shumansky K, Roth AJ, Shah S, Farooq H, Kijima N, Holgado BL, Lee JJ, Matan-Lithwick S, Liu J, Mack SC, Manno A, Michealraj KA, Nor C, Peacock J, Qin L, Reimand J, Rolider A, Thompson YY, Wu X, Pugh T, Ally A, Bilenky M, Butterfield YS, Carlsen R, Cheng Y, Chuah E, Corbett RD, Dhalla N, He A, Lee D, Li HI, Long W, Mayo M, Plettner P, Qian JQ, Schein JE, Tam A, Wong T, Birol I, Zhao Y, Faria CC, Pimentel J, Nunes S, Shalaby T, Grotzer M, Pollack IF, Hamilton RL, Li XN, Bendel AE, Fults DW, Walter AW, Kumabe T, Tominaga T, Collins VP, Cho YJ, Hoffman C, Lyden D, Wisoff JH, Garvin JH Jr, Stearns DS, Massimi L, Schüller U, Sterba J, Zitterbart K, Puget S, Ayrault O, Dunn SE, Tirapelli DP, Carlotti CG, Wheeler H, Hallahan AR, Ingram W, MacDonald TJ, Olson JJ, Van Meir EG, Lee JY, Wang KC, Kim SK, Cho BK, Pietsch T, Fleischhack G, Tippelt S, Ra YS, Bailey S, Lindsey JC, Clifford SC, Eberhart CG, Cooper MK, Packer RJ, Massimino M, Garre ML, Bartels U, Tabori U, Hawkins CE, Dirks P, Bouffet E, Rutka JT, Wechsler-Reya RJ, Weiss WA, Collier LS, Dupuy AJ, Korshunov A, Jones DT, Kool M, Northcott PA, Pfister SM, Largaespada DA, Mungall AJ, Moore RA, Jabado N, Bader GD, Jones SJ, Malkin D, Marra MA, Taylor MD. Divergent clonal selection dominates medulloblastoma at recurrence. Nature. 2016 Jan 21;529(7586):351-7. doi: 10.1038/nature16478. Epub 2016 Jan 13

176. Gandhoke GS, Yilmaz S, Grunwaldt L, Hamilton RL, Salvetti DJ, Greene S. A case of spinal epidural venous malformation with mediastinal extension: management with combined surgery and percutaneous sclerotherapy. J Neurosurg Pediatr. 2016 May;17(5):612-7. doi: 10.3171/2015.9.PEDS15341. Epub 2016 Jan 15.

177. Thompson EM, Hielscher T, Bouffet E, Remke M, Luu B, Gururangan S, McLendon RE, Bigner DD, Lipp ES, Perreault S, Cho YJ, Grant G, Kim SK, Lee JY, Rao AA, Giannini C, Li KK, Ng HK, Yao Y, Kumabe T, Tominaga T, Grajkowska WA, Perek-Polnik M, Low DC, Seow WT, Chang KT, Mora J, Pollack IF, Hamilton RL, Leary S, Moore AS, Ingram WJ, Hallahan AR, Jouvet A, Fèvre-Montange M, Vasiljevic A, Faure-Conter C, Shofuda T, Kagawa N, Hashimoto N, Jabado N, Weil AG, Gayden T, Wataya T, Shalaby T, Grotzer M, Zitterbart K, Sterba J, Kren L, Hortobágyi T, Klekner A, László B, Pócza T, Hauser P, Schüller U, Jung S, Jang WY, French PJ, Kros JM, van Veelen MC, Massimi L, Leonard JR, Rubin JB, Vibhakar R, Chambless LB, Cooper MK, Thompson RC, Faria CC, Carvalho A, Nunes S, Pimentel J, Fan X, Muraszko KM, López-Aguilar E, Lyden D, Garzia L, Shih DJ, Kijima N, Schneider C, Adamski J, Northcott PA, Kool M, Jones DT, Chan JA, Nikolic A, Garre ML, Van Meir EG, Osuka S, Olson JJ, Jahangiri A, Castro BA, Gupta N, Weiss WA, Moxon-Emre I, Mabbott DJ, Lassaletta A, Hawkins CE, Tabori U, Drake J, Kulkarni A, Dirks P, Rutka JT, Korshunov A, Pfister SM, Packer RJ, Ramaswamy V, Taylor MD. Prognostic value of medulloblastoma extent of resection after accounting for molecular subgroup: a retrospective integrated clinical and molecular analysis. Lancet Oncol. 2016 Mar 11. pii: S1470-2045(15)00581-1. doi: 10.1016/S1470-2045(15)00581-1. [Epub ahead of print]

178. Pollack IF, Jakacki RI, Butterfield LH, Hamilton RL, Panigrahy A, Normolle DP, Connelly AK, Dibridge S, Mason G, Whiteside TL, Okada H. Immune responses and outcome after vaccination with glioma-associated antigen peptides and poly-ICLC in a pilot study for pediatric recurrent low-grade gliomas†. Neuro Oncol. 2016 Mar 15. pii: now026. [Epub ahead of print]

179. Jakacki RI, Cohen KJ, Buxton A, Krailo MD, Burger PC, Rosenblum MK, Brat DJ, Hamilton RL, Eckel SP, Zhou T, Lavey RS, Pollack IF. Phase 2 study of concurrent radiotherapy and temozolomide followed by temozolomide and lomustine in the treatment of children with high-grade glioma: a report of the Children's Oncology Group ACNS0423 study. Neuro Oncol. 2016 Mar 22. pii: now038. [Epub ahead of print]

180. Ridge PG, Hoyt KB, Boehme K, Mukherjee S, Crane PK, Haines JL, Mayeux R, Farrer LA, Pericak-Vance MA, Schellenberg GD, Kauwe JS; Alzheimer's Disease Genetics Consortium (ADGC). Assessment of the genetic variance of late-onset Alzheimer's disease. Neurobiol Aging. 2016 May;41:200.e13-20. doi: 10.1016/j.neurobiolaging.2016.02.024. Epub 2016 Mar 3

181. Beckner ME, Pollack IF, Nordberg ML, Hamilton RL. Glioblastomas with copy number gains in EGFR and RNF139 show increased expressions of carbonic anhydrase genes transformed by ENO1. BBA Clin. 2015 Nov 10;5:1-15. doi: 10.1016/j.bbacli.2015.11.001. eCollection 2016 Jun. PMID: 27051584 Free PMC Article

182. Fernandes-Cabral DT, Zenonos GA, Hamilton RL, Panesar SS, Fernandez-Miranda JC. High-Definition Fiber Tractography in the Evaluation and Surgical Planning of Lhermitte-Duclos Disease: A Case Report. World Neurosurg. 2016 May 7. pii: S1878-8750(16)30257-1. doi: 10.1016/j.wneu.2016.04.128. [Epub ahead of print] PMID: 27168233

**Reviews, invited published papers, proceedings of conference and symposia, monographs, books and book chapters**

**Ronald L. Hamilton, M.D.**

1. **Hamilton RL**, Wiley CA. New developments in the neuropathology of AIDS. CAP Today, 10 (12): p 42, 1996.
2. **Hamilton RL**: Hydrocephalus in a 9 month-old infant. Brain Pathol 6:533-534, 1996
3. **Hamilton RL**: New onset hemiparesis. Brain Pathol 7: 715-716, 1997.
4. **Hamilton RL**: Precocious Puberty. Brain Pathol 7: 711-712, 1997
5. **Hamilton RL**: Frontal lobe tumor in 11 year-old girl. Brain Pathol 7: 713-714, 1997
6 **Hamilton RL**, Pollack, IF: The Molecular Biology of Ependymomas. Brain Pathology 7:807-822, 1997.
7. **Hamilton RL**: A 26 year old woman with new onset seizures. Brain Pathol 8: 239-240, 1997.
8. **Hamilton RL**, Wiley, CA, The Neuropathology of Viral Infections of the Nervous System. In: Textbook of Neuropathology; Davis RL, Robertson DM eds. Williams and Wilkins, 3rd edition, Baltimore, MD. 1997.

9. **Hamilton RL**: Guidelines for the neuropathological diagnosis of Alzheimer's Disease and Dementia with Lewy Bodies. Revista de Neurologia 27 (S1): S67-S70, 1998
10. **Hamilton RL**: Experimental neuropathology of Alzheimer's Disease: animal models. Revista de Neurologia 27 (S1): S84-S86, 1998
11. Sanders VJ, Wiley CA, **Hamilton RL**: The mechanisms of neuronal damage in retroviral infections of the nervous system. in The Mechanisms of Neuronal Damage in Virus Infections of the Nervous System (Gosztonyi G, ed). Springer Verlag, Berlin, 2001.
12. **Hamilton RL**. [Recent Advances in the neuropathological evaluation of Alzheimer's Disease: the importance of synuclein] Rev Neurol 35:765-7, 2002 (Spanish).
13. Pollack IF, **Hamilton RL**, Finkelstein SD, Lieberman F.  Molecular abnormalities and correlations with tumor response and outcome in glioma patients.  Neuroimaging Clinics of North America: Advances in Brain Tumor Imaging and Therapy (Provenzale J, ed.) WB Saunders, Philadelphia,  2002.
14. **Hamilton RL**.  The other dementias: the neuropathology of the non-Alzheimer's Disease dementias. Rev Neurol 37:130-139, 2003 (Spanish).
15. Omalu BI, Wiley CA, **Hamilton RL**.  Case of the Month February 2003. Brain Pathology 13:419-420, 2003.
16. DeKosky ST, Ikonomovic MD, **Hamilton RL**, Bennett DA, Mufson EJ. Neuropathology of Mild Cognitive Impairment in the Elderly. In John Morris J, Scheltens P, and Cummings JL), (eds), *Alzheimer's Disease and Related Disorders:* London, Taylor & Francis, 1-16, 2006.
17. Crain BJ, Alston SR, Bruch LA, **Hamilton RL**, McLendon RE, Rhodes H, Tihan T, Weidenheim KM. Accreditation Council for Graduate Medical Education (ACGME) Competencies in Neuropathology Training.  J Neuropathol Exp Neurol 64:273-279, 2005.
18. McIntyre JA, **Hamilton RL**, Dekosky ST.  Redox-reactive autoantibodies in cerebrospinal fluids. Annals of NY Acad Sci 1109: 296-302, 2007.
19. DeKosky ST, Kaufer DI, **Hamilton R**, Wolk D, Lopez OL: Dementia. In: Neurology in Clinical Practice: Principles of Diagnosis and Management, 5th Edition. Editors: Bradley WG, Daroff RB, Fenichel GM & Jankovic J. Boston MA, Butterworth-Heinemann, 2007: 1855-1907.
20. Tyurin VA, Tyurina YY, Kochanek PM, **Hamilton R**, DeKosky ST, Greenberger JS, Bayir H, Kagan VE.  Chapter 19: Oxidative lipidomics of programmed cell death.  Methods Enzymol 442:375-93, 2008.
21. Yeaney GA, O'Conn SM, Jankowitz BT, **Hamilton RL**.  A 16 year-old male with cerebellar mass. Brain Pathol. 2009 19, 167-170. PMID 19076785
22. Horbinski, C, **Hamilton RL**.  Application of telepathology for neuropathologic intraoperative consultations. Brain Pathol 2009 19; 317-322. PMID 19290998

<u>**Abstracts**</u>

1. **Hamilton RL**, Sanger WG, and McComb RD: Characterization of cell lines derived from malignant tumors in patients with neurofibromatosis. Federation Proceedings 46: 433, 1987.
2. Esch O, Spinosa JC, **Hamilton RL**, Crombie DL, Schteigart CD, Hofmann AF: Reversible cytotoxicity to the gallbladder mucosa of contact dissolution solvents for cholesterol gallstones: a comparison of methyl tert-butyl ether (mtbe) and ethyl propionate (ep) in two animal models. Gastroenterology 100 (5, part 2): A135, 1991.

**Ronald L. Hamilton, M.D.**

3. Haas RH, Popovitch B, **Hamilton RL**: The utility of DNA dystrophin gene analysis in non-specific myopathy: presented at Child Neurology Society Annual Meeting, October, 1992: New Orleans, LA.

4. Haas RH, Mansden DL, Estrada S, **Hamilton RL**, Grafe MG, Nyhan WL: Acute basal ganglia infarction in propionic acidemia in spite of good metabolic control: presented at Child Neurology Society Annual Meeting, October, 1992: New Orleans, LA.

5. **Hamilton RL**, Haas RH, Nyhan W, Powell HP, Grafe MR:  The neuropathology of propionic acidemia: a report of two additional cases. American association of Neuropathology Annual Meeting, June 1993, Salt Lake City, UT; J Neuropathol Exp Neurol 52:299, 1993.

6. Mansfield RT, Schiding JK**, Hamilton R,** Kochanek PM: Hypothermia fails to reduce lesion volume after traumatic brain injury in immature rats.  Pediatric Research 35(4):55, 1994.

7. **Hamilton RL**, Bodnar RJ, Wang G, Wiley CA.  The effect of AZT on retroviral encephalitis: a murine model: presented at the Sixth Workshop on the Pathogenesis of Animal Retroviruses, Philadelphia, PA, Nov. 17-19, 1994.

8. Adelson PD, Robichaurd P, **Hamilton RL**, Kochanek PM. Brain edema and neuropathology after diffuse traumatic injury in immature rats.  Neurotrauma Society meeting, San Diego CA, Nov 10-11, 1995.

9. **Hamilton RL**, Bodnar RJ, Wang G, Klunk W, Wiley CA, Treatment of chronic retroviral encephalitis with zidovudine (AZT) in a murine model. Society for Neuroscience Meeting, San Diego, CA Nov 11-16 1995.

10. **Hamilton RL**, Bodnar RJ, Wang G, Klunk W, Wiley CA. The effect of zidovudine (AZT) on murine retroviral encephalitis. Amer. Assoc of Neuropathology, San Antonio, June, 1995. J Neuropathol Exp Neurol 54 (3): 438, 1995.

11. **Hamilton RL**, and Claassen D. Neonatal Methylmalonic Acidemia With Hemicerebellum: An Autopsy Report;  Society of Pediatric Pathology / Child Neurology Society (joint meeting), Baltimore, Oct 27-29, 1995.

12. **Hamilton RL**, Baldwin M, Wiley CA. Human Herpesviruses And Temporal Arteritis American Association of Neuropathology, Vancouver, BC, Canada, June 1996.

13. Mizukami K, Ikonomovic MD, Sheffield R, Rubin RT, Grayson D, **Hamilton R**, Warde D, Armstrong DM. Immunohistochemical Localization of GABA-A Receptor ß2/3 Subunits in the Hippocampal Formation in Aged Brain with Alzheimer-related Neuropathology. Society for Neuroscience meeting, Washington DC, Nov 1996.

14. Bodnar RJ and **Hamilton RL**. Effect of zidovudine (AZT) and saquinavir on retroviral infection of the central nervous system (CNS) Society for Neuroscience meeting, Nov 17-21, 1996 Washington D.C.

15. Bredel M, Pollack I, **Hamilton RL**, Finkelstein SD, Campbell JW, Martinez AJ, Sherwin R, Bozik ME, Gollin S. Overexpression of EGF receptor and p53 mutations in pediatric malignant gliomas. American Association of Neurological Surgeons, 1997 Annual meeting.

16. Xu Y, Liachennko S, Tang P, **Hamilton RL** Correlation of neuropathologic changes with cerebral metabolic and ADC abnormalities after prolonged asphyxial cardiac arrest. International Society of Magnetic Resonance in Medicine, annual meeting, 1997

17. Bredel M, Pollack IF, Campbell JW, **Hamilton RL**. Basic fibroblast growth factor as a prognostic indicator in pediatric high grade glioma patients. American Association of Neuropathology, Pittsburgh, PA, June 1997. J Neuropathol Exp Neurol 56 (5): 581, 1997

18. **Hamilton RL**, Bodnar RJ, Lackner AA, Lane JH, Wiley CA Neurotrophic factors in simian immunodeficiency virus encephalitis. American Association of Neuropathology, Pittsburgh, PA, June 1997. J Neuropathol Exp Neurol 56 (5): 618, 1997

19. Adelson, PD, Robichaud, P, **Hamilton, RL**, Kochanek, PM. Histologic analyses of severe diffuse traumatic brain injury in the immature rat . National Neurotrama Society, New Orleans Oct 24-25, 1997.

20. Dorsey RW, Achim CL, Wiley CA, **Hamilton RL**\*,  Soontornniyomkij V. Gene expression and cellular localization of neurotrophic factors in Alzheimer's disease. Society of Neuroscience meeting Nov, 1997, New Orleans.

21.  Klunk WE, **Hamilton RL**, Styren SD, Styren G, Debnath ML, Mathis CA, Mahood K, Hsiao KK. Staining of AD and Tg2576 mouse brain wirh X-34, a highly flourescent derivative of chrysamine

**Ronald L. Hamilton, M.D.**

G and A potential in vivo probe for sheet fibrils.  Siociety for Neuroscience meeting, New Orleans 1997.

22. Klunk WE, **Hamilton RL**, Styren SD, Styren G, Debnath ML.  Neuropathological study of AD brain with X-34, a new highly fluorescent derivative of congo red.  Society for  Neuroscience meeting. Los Angeles, CA 1998.

23. Halks-Miller M, Hesselgesser J, Horuk R, Soontornniyomkij V, **Hamilton R,** Achim C.  CCR1 immunoreactivity in Alzheimer's Disease brains.  Society for Neurosciences meeting. Los Angeles, CA 1998.

24.  Wang G, Soontornniyomkij V, Pittman CA, Achim CL, Wiley CA, **Hamilton RL**.  Glial expression of BDNF and TRK B receptor proteins in Alzheimer's Disease and HIV-1 encephalitis brains. Society for Neuroscience meeting. Los Angeles, CA 1998.

25. Ikonomovic MD, Mizukami K, Davies P, **Hamilton R**, Sheffield R, Armstrong DM.  Co-localization of interneurons and an ad-specific antibody in the hippocampal formation of Alzheimer brains. Society for Neurosciences. Los Angeles, CA 1998.

26. Mizukami K, Ikonomovic MD, Grayson DR, Rubin RT, Warde D, Sheffield R, **Hamilton RL,** Davies P, Armstrong DM.  Immunohistochemical study of GABA(A) receptor beta 2/3 subunits in the hippocampal formation of aged brains with Alzheimer-related neuropathologic changes. Experimental Neurology 147 2 333-45 (1997).

27. Bredel M, Pollack IF, **Hamilton RL**: Expression of the c-erbB1 Oncogene Product Epidermal Growth Factor Receptor (EGFR) and its Relevance for Outcome in Children with Supratentorial High-Grade Gliomas ; XVI Congress of the European Society for Pediatric Neurosurgery; November 11-15, 1998, Marseille, France

28. **Hamilton, RL** Numerous widespread alpha-synuclein positive thread-like processes characterize dementia with Lewy Bodies. Foundation IPSEN Conference, April 12, 1999, Paris France

29  **Hamilton RL** Numerous and widespread alpha-synuclein thread-like processes in dementia with Lewy bodies. American Assoc of Neuropathologist Annual Meeting, 1999, Portland, OR. J Neuropathol Exper Neurol 58:552, 1999.

30. Klunk WE, **Hamilton RL**, Styren SD, Head E: Evaluation of the aged canine as a screening system for the x-34 class of in vivo probes for amyloid deposition in AD. Soc. of Neuroscience, 1999

31. Kaufer, DL, **Hamilton RL**, Lopez OL, DeKosky ST MRI white matter hyperintensities and cerebral amyloid angiopathy in a case of dementia with Lewy bodies. Amer Neuropsychiatric Assoc, annual meeting, 2/2000, Ft. Myers, FLA.

32. **Hamilton RL**, Mash DC. Widespread Alpha-synucleinopathy in the Parkinson's Disease brain. 6th National Parkinson's Disease Foundation International Symposium on Parkinson's Disease Research, to be held in conjunction with the Society of Neuroscience meeting in Miami Beach, Oct 22-23rd, 1999.

33. **Hamilton, RL**, Mash DC. Widespread alpha-synuclein-positive neuropil threads in the Parkinson's Disease brain. American Assoc of Neuropathology, Atlanta, GA, June 8-11, 2000.

34.  Snyder JV, Gebel JM, Kassam A, **Hamilton RL**, Goldstein S, Watkins S, Yonas H, Chelluri L, Thulborn K. Guidance by MR Tissue Sodium Concentration of Infarct Resection in Massive Stroke. Neurology 54(7): A97-A98, Suppl. 3, 2000.

35. Chow TM, Kaufer DI, Lopez OL, **Hamilton RL**, Becker JT, DeKosky ST. Temporal Evolution of Lewy Body Phenotype in Autopsy Confirmed Cases of Alzheimer's Disease and Dementia With Lewy Bodies. Neurology 56(8): A300-A301, Suppl 3, 2001.

36.  Castellano-Sanchez A, Ohgaki HH, Yokoo, Finkelstein SD, Medina-Flores R, **Hamilton RL**, Scheithauer BW, Burger PC, Brat DJ.  Genetic Alterations in Granular Cell Astrocytomas. USCAP, 2002.

37.  Demidovich J, Pittman CA, Hamilton RL.  Altered calpain proteolysis of mutant alpha-synuclein. Honors Thesis presentation, Univ. Pitt, 2002

38.  Omalu BI, **Hamilton RL**, Swalsky PA, Finkelstein SD. Microdissection-based mutational profiling of malignant, atypical and benign meningiomas: the determination of meningioma grade by fractional mutational index.  AANP, Denver, 2002 (JNEN 61:491, 2002)

39.  Wilson, RK, Luedecking-Zimmer EK, Kamboh MI, DeKosky ST, **Hamilton RL**.  Association of the ApoE4 allele and Lewy bodies in Alzheimer's Disease.  AANP, Denver 2002 (JNEN 61: 455, 2002).

**Ronald L. Hamilton, M.D.**

40. Desai PP, Ikonomovic MD, **Hamilton RL**, DeKosky ST, Kamboh MI. Apolipoprotein D in Alzheimer's Disease: implications for amyloid pathology. Soc. for Neuroscience, Orlando, 2002.

41. Garb S, **Hamilton RL**. Sequestration of soluble alpha-synuclein in Lewy body Variant of Alzheimer's Disease. Soc for Neuroscience, Orlando, 2002.

42. Marshall GA, Kaufer DI, Lopez OL, Rao GR, **Hamilton RL**, DeKosky ST. A neuropathological correlate of anosognosia in Alzheimer's Disease. American Association of Neurology, May 2003.

43. Sweet RA, Butters MA, **Hamilton RL**, Mulsant BH, Lopez OL, PollockBG, DeKosky ST, Reynolds CF Neuropathology Of Late Life Mood Disorders. American College of Neuropsychopharmacology, 2003

44. Mohan D, Couce ME, Wiley CA, **Hamilton RL**, Sasatomi E, Swalsky PA, Lieberman MD, Finkelstein SD. Microdissection based genotyping of human gliomas: diagnostic and prognostic considerations (USCAP, Vancouver 3/04)

45. Beckner ME, Sasatomi E, Swalsky PA, **Hamilton RL**, Pollack, IF, Finkelstein SD. Loss of heterozygosity reveals non-VHL Allelic loss in hemangioblastomas at 22q13, (AANP Cleveland, June 24-27, 2004).

46. Judkins AR, Burger P, **Hamilton RL**, Kleinschmidt-DeMasters B, Perry A, Pomeroy S, Rosenblum MK, Yachnis AT, Rorke LB, Biegel JA. INI1 Expression Distinguishes Atypical Teratoid/Rhabdoid Tumor (ATR) from Choroid Plexus Carcinoma (CPC); (AANP Cleveland, June 24-27, 2004).

47. McFadden KA, **Hamilton RL**, Visvesvara GS, Gardner P, Couce ME. Granulomatous Amebic Encephalitis in a Patient with Gardners Syndrome and Multi-organ Transplant (AANP Cleveland, June 24-27, 2004).

48. Yen, Amy, Lopez, OL, BeckerJ, **Hamilton RL.** Mesial Temporal Sclerosis is associated with Lewy Bodies in Alzheimer's Disease. AANP Annual meeting June 9-12, 2005, Arlington, VA (platform). (J Neuropathol Exper Neurol 64:434, 2005.

49. Hinkle DA, Mullett SJ, **Hamilton RL** DJ-1 is over-expressed in human stroke reactive astrocytes. Society for Neuroscience Oct 2005.

50. Ramsey CP, Glass CA, Marshall MB, Morgan KL, Kioke MA, **Hamilton R**, Chu CT, Jordan-Sciutto KL. Altered expression patterns of the antioxidant response transcriptional regulator NRF2, in Alzheimer's Disease and Parkinson's Disease. Society For Neuroscience, Nov. 2005, Washington DC.

51. Chu CT, Uchiyama Y, **Hamilton R**, Zhu J. Extracellular signal regulated protein kinase acts upstream of both autophagy and cell death in MPP+ treated neurons. Society For Neuroscience, Nov. 2005, Washington DC

52. Cieply K, Carol R. Sherer, Jennifer L. Hunt **Hamilton RL** Assessment of 1p and 19q Status in Pediatric Oligodendrogliomas by FISH, Association of Molecular Pathology, Nov 10-13, 2005 Scottsdale AZ

53. Bencherif B, Lieberman FS, Wenzhu B, Price JC, Muthukrishnan A, Walter K, **Hamilton RL**, Lunsford LD, Mountz JM. Increased F-18 Fluorothymidine Uptake is Seen in Non-Proliferating Recurrent/Residual Glioma Society for Nuclear Medicine, San Diego, 2006 June 3-7

54. **Hamilton, RL** Variations On A Theme: Lewy Bodies And Mesial Temporal Sclerosis In Alzheimer's Disease: A Review Of 278 Autopsy Cases. 10th International Conference on Alzheimer's Disease, Madrid, Spain, July-15-20, 2006.

55. DeKosky ST, Mathis CA, Price JC, Ikonomovic MD, **Hamilton RL**, Abrahamson EE, Paljug WR, Debnath ML, Hope CE, Isanski BA, Tsopelas ND, Lopresti BJ, Ziolko S, Bi W and Klunk WE. Correlation of In Vivo PiB Retention and Post-Mortem Aβ Levels: A Case Study. 10th International Conference on Alzheimer's Disease, Madrid, Spain, July-15-20, 2006.

56. Leverenz J, **Hamilton RL**, Larson E, Vavrek D, Lopez O, Galasko D, Masliah E, Kaye J, Nixon R, Clark C, Trojanowski J, Kukull W, Montine T, Tsuang D. Lewy-Related Pathology in Two Large Autopsied Dementia Samples: Application of Classification Criteria. 10th International Conference on Alzheimer's Disease, Madrid, Spain, July-15-20, 2006.

57. Venneti S, Lopresti BJ, Wang G, Mathis CA, Klunk WE, Shmookler AD, **Hamilton RL**, Apte UM, Wiley CA. PET imaging of microglia in a mouse model of Alzheimer's disease. 10th International Conference on Alzheimer's Disease, Madrid, Spain, July-15-20, 2006.

58. Kofler JK, Moore RA, **Hamilton RL**. Concomitant Dementia with Lewy Bodies and Multiple System Atrophy in a Demented Patient. International Congress of Neuropathology/American Association of Neuropathology Annual Meeting, San Francisco, CA, Sept 10-15, 2006.

**Ronald L. Hamilton, M.D.**

59. DeKosky ST, Mathis CA, Price JC, Ikonomovic MD, **Hamilton RL**, Abrahamson EE, Paljug WR, Debnath ML, Hope CE, Isanski BA, Tsopelas ND, Lopresti BJ, Ziolko S, Bi W, Klunk WE. Correlation of Regional in vivo Pittsburgh Compound B (PIB) Retention With in vitro PIB, A Levels, and Amyloid Plaque Density: Validation of PIB-PET in Postmortem Human Brain. Alzheimer's Association International Conference on Prevention of Dementia. June 9-12, 2007 Washington, D.C.

60. Kellermier HC, Nikiforova MN, Cieply K, **Hamilton RL**. Alterations of 1p in glioblastomas. ASIP/AANP Annual meeting, Washington DC April 2007.

61. Bliecher AG, Branstetter BF, Hamilton R, Murdoch G, Kellermier HC. Clival Chordoma: Radiologic-Pathologic Correlations. American Society of Neuroradiology annual meeting, Chicago, IL. June 9-14, 2007.

62. Butters MA, Aizenstein HJ, Meltzer CC, **Hamilton RL,** Price JC, Mathis CA, Klunk WE, Becker JT, DeKosky ST, Reynolds CF. Cognition, cerebrovascular disease and Alzheimer's Disease in late-life depression. International Neuropsychological Society meeting, Bilbao Spain, July 2007.

63 Tyurin VA, Zhao Q, Mnuskin A, **Hamilton R**, DeKosky ST, Reynolds WF, Kagan VE. Phospholipid peroxidation biomarkers of Alzheimer's Disease in the Brain: Selective Oxidation of Phosphatidylserine. Society of Toxicology Meeting San Diego, CA. October 2, 2007.

64. Moschos SJ, D. Trembath D, Snavely A, Bradler E, Midkiff B, Nikolaishvilli-Feinberg N, Werley J, Krauze M, **Hamilton R**, Kirkwood JM. Prognostic Significance of PD-L1 Expression, Angiogenesis, and Hypoxia in Melanoma Brain Metastases (MBM); A Histopathologic Analysis. Annual meeting of the American Association of Clinical Oncology, Chicago Il, 5/29-6/2/2014.

65. Trembath DG, Moschos SJ, Snavely AC, Bradler E, Nikolaishvilli-Feinberg N, Bentley R. Midkiff BR, Jonette Werley J, Krauze MT, **Hamilton RL**. Analysis of select angiogenic markers in melanoma brain metastases. Annual meeting AANP, Portland OR. June 2014

66. Salgado CM, Basu D, Nikiforova M, Hamilton R, Gheris R, Jakacki R, Panigrahy A, Yatsenko S, Reyes-Mugica M. Congenital Melanoma: The full spectrum og p.Q61R mutation in NRAS. Accepted for the Annual Soc. Pediatric Pathology meeting, Birmingham AL, Sept 4-6, 2014.

67. Melan MA, Wald AI, Zhong S, **Hamilton R**, Horbinski C. Nikiforova MN. BrainSeq: Next-Generation Sequencing Panel for Detection of Genetic Alterations in Central Nervous System (CNS) Malignancies. National Harbor MD, Nov 12-15, 2014.

68. Hamilton RL. Chronic Traumatic Encephalopathy: Update on an Emerging Disease. Invited speaker: 18th International Congress of Neuropathology, July 12-16, 2014, Rio de Janeiro, Brazil

69. Hamilton RL. Cases of the Month: 16 Years of Unknowns. Invited speaker: 18th International Congress of Neuropathology, July 12-16, 2014, Rio de Janeiro, Brazil

70. Trembath DG, Moschos SJ, Snavely AC, Bradler E, Nikolaishvilli-Feinberg N, Midkiff BR, Werley J, **Krauze MT, Hamilton RL** Role of PD-L1, HIF-1a, and reactive gliosis in melanoma brain metastases. USCAP 2015, Boston, MA, March 21-27, 2015.

71. Nolan Priedigkeit, Ryan J. Hartmaier, Yijing Chen, Damir Vareslija, Ahmed Basudan, Roby Thomas, Jose P Leone, Peter C. Lucas, Rohit Bhargava, Ron L. Hamilton, Juliann Chmielecki, Nancy E. Davidson, Steffi Oesterreich, Adam M. Brufsky, Leonie Young, Adrian V. Lee Breast cancer brain metastases show limited intrinsic subtype switching, yet exhibit acquired ERBB2 amplifications and activating mutations. San Antonio Breast Cancer Symposium, 12/7/16

72. Steffi Oesterreich, Ahmed Basudan, Nolan Priedigkeit, Ryan Hartmaier, Amir Bahreini, Rekha Gyanchandani, Jose P Leone, Peter Lucas,, Rohit Bhargava, Ron Hamilton, Ryan Hartmaier, Adam Brufsky, Adrian V. LeePerivascular Inflammation in Temporal Artery Biopsies That Are Negative for Arteritis: Incidental or Harbinger American College of Rheumatology/ Association of Rheumatology Health Professionals (ACR/ARHP) Annual Meeting, Washington DC, 11/13/16

73. Expression of Carbonic Anhydrase Genes, CA3 and CA12, Transformed with ENO1, Relate to Copy Numbers of EGFR or RNF139 and XIAP, and Gender in Glioblastomas Using PCR Assays. Experimental Biology 2015 Annual Meeting

74. Evaluation of GlioSeq Targeted NGS Panel for Detection of O6-Methylguanine-DNA Methyltransferase (MGMT) mRNA Expression in Glioma Patients Alicia Hunt, Sarika Jain, Melissa A Melan, Abigail Wald, Ronald Hamilton, Marina N. Nikiforova  Association For Molecular Pathology (AMP) Charlotte, NC. November 10-12, 2016.

## PROFESSIONAL ACTIVITIES

**Ronald L. Hamilton, M.D.**


**TEACHING**

University of California, San Diego, Dept of Neuroscience
      1991-93      lab assistant - graduate neuroanatomy course
University of California, San Diego, School of Medicine
      1991-93      Sophomore pathology course, neuropathology section (lab assistant)
University of California, San Diego, Dept of Pathology
      1991-93      Clinical Correlation Conference - Neuropath and Neurosurgery (monthly)
      1991-93      Neuropathology review for neurology residents (bi-monthly)
University of Pittsburgh, School of Medicine
      Freshman pathology course –
      PBL facilitator for musculoskeletal course 1994-1998
      Neuroscience Module – lecture M2 students full class: CNS tumors
            Annually since 1999.
                 April 29, 2014 1-3 pm
      Neuroscience Module   lecture MS1 students
            CNS tumors  March 2004
            CNS tumors  March 2005
            CNS tumors March 2006
            CNS Tumors    5/7/07
      Neuroscience rotation – small weekly lab, M3 students
            7/99-present
      Neuroscience rotation – small group M3 students
            6/18/2007 3-5pm
Weekly brain-cutting conference at Children's Hospital (2-5 medical (M3) students/week)
            Academic Advising: Kate McFadden 2/2000 to 6-2001
Other:
      High school - gifted science students of Mr. James Coll
            11/21/2002 , 11/14/ 2003, 10/28/2004, 11/18/2005, 11/3/2006


University of Pittsburgh, graduate students
      Cellular and Molecular Mechanisms of Neurodegeneration (MSCMP 3720)
                 Organizers: Robert Bowser, Cristian Achim,
            1. Neuroanatomy and Neurohistology in neurodegeneration
                 1/13/98,  1/19/99
            2. Mitochondria and disease / Prion encephalopathies
                 3-24-98
            3. The role of alpha-synuclein in neurodegenerative diseases
                 10-11-00
      Molecular Pathobiology (organizers Frye and Achim) (MSCMP 2740)
            .Tumors of the Central Nervous System,  4-7-98,  4-20-99
            Alpha-synuclein and Neurodegeneration
                 4-2003, 1/8/04, 5/15/06
            Neuropathology of Neurodegeneration
                 1/6/04
            Alpha-synuclein and Tau in Neurodegeneration
                 1/5/07, 2/7/2008
            Pathologic diagnosis of the Lewy Body Disorders
                 2/12/09
University of Pittsburgh, Dept of Neuroscience - Combined Neuroscience Conference Wed 4-5
      10/3/95 *      Varicella Zoster Infections of the CNS in AIDS patients
      10/9/96 *      Lewy Bodies and Dementia
      2/19/97 *      The Neuropathology of Pediatric Seizures
      4/23/97 *      CNS manifestations of non-CNS tumors in children
      2/11/98        Case Presentation with Ian Pollack

**Ronald L. Hamilton, M.D.**

| | |
|---|---|
| 3/18/98 * | A 77 year old woman with Multiple sclerosis and dementia |
| 11/4/98 | *Pediatric meningiomas – two cases |
| 1/20/99 | Methanol Intoxication – with C. Foley |
| 2/3/99 | Gliomatosis cerebri with Dallasta |
| 2/10/99 | Amyloid angiopathy and leukomalacia – with D. Kaufer |
| 3/17/99 | Metachromatic Leukodystrophy – with D. Kaufer |
| 9/18/02 | Iatrogenic CJD* |

* as primary presenter

University of Pittsburgh, Dept. of Pathology, Chief Resident's Fri noon slide conference

| | |
|---|---|
| 8/1/96 - Pediatric brain tumors | |
| 10/5/97 Pediatric brain tumors | |
| 1/9/98 | NP REVIEW - Tumors I |
| 1/16/98 | NP REVIEW - Tumors II |
| 1/23/98 | NP REVIEW - Tumors III |
| 1/30/98 | NP REVIEW - Infections |
| 2/6/98 | NP REVIEW - Demyelinative diseases |
| 2/13/98 | NP REVIEW - Neurodegenerative diseases |
| 2/20/98 | NP Review - Cerebrovascular disease and developmental |
| 5/24/02 | Pediatric Neoplasms and Congenital Malformations |
| 5/31/02 | Degenerative Diseases |

University of Pittsburgh, undergraduate
  Independent Course and Honors Research Project –
    Theodore Kaplan (1/97-6/97)
    Emily Rogerson (1/99-5/99, 9/99-12/99, 1/00-4/00)
    Kyle Hubbard (1/99 – 5/99, 9/99-12/99, 1/00-4/00)
    Joe Demidovich – 2000-2002
    Stan Garb (2001-2001)

  Pathology Summer Undergraduate Research Program (SURP)
    Kathleen Anderson 6/00-8/00
    Kathleen Anderson 6/01-8-01

University of Pittsburgh, Dept. of Pathology,
  Neuropathology of dementia conference - weekly (Fri 10-11)

University of Pittsburgh - ADRC Topics at Noon
  X-34 and alpha-synuclein – New stains in Alzheimer's Disease 11/98
  Lewy Body Pathology in Alzheimer's Disease, 11/01

Children's Hospital of Pittsburgh, Grand rounds
  1996 - methyl malonic acidemia with hemi-cerebellum
  2/13/97 - Pediatric AIDS with HIV encephalopathy
  5/22/97 - 11 month-old boy with Hypotonia (Leigh's Disease)
  3/18/98 - Becker's muscular dystrophy with severe cardiomyopathy
  5/19/98 – Friedreich's Ataxia
  10/15/98 – Spinal Muscular Atrophy Type I
  2/2005  - Congenital Dystrophies – Pediatric Neurology

**<u>Other Presentations</u>**

Neurology Grand Rounds - 11-19-03 - CNS vasculitis
Pathology Noon Diagnostic Conference - 11-20-03 – "Some Bodies in the Brain"
AP Didactic Lecture – 11-25-03 - Neuropathology of Neurodegeneration
NP Didactic – 4-28-04 - ApoE4 and Lewy Bodies in AD

**Ronald L. Hamilton, M.D.**

NP Didactic -    3/31/2005 – AD Pathology in ALS and MTS and LB in AD
Pathology Noon Diagnostic Conference – 8-4-2006: Tauopathies
ADRC CPC 8-10-06
ADRC CPC 11-30-06
ADRC CPC 2-8-07
ADRC 20th Anniversary meeting, "Neuropathology of AD:"  9-28-06
ADRC Topics at Noon.  "Tauopathies"  11-16-06
ADRC CPC 8/16/2007
ADRC CPC 11/30/2007
Pediatric CPC 2/25/08
DJ-1 in glioblastomas (NP Didactic conference) – 3/10/2009 (1 hour)
Neuropathology review for Neurosurgery residents – 3/10/2010 (1 hour).
AP Chief Residents didactic conference.  2 hour conference.  Non-glial Tumors. Feb 25, 2014
CMU graduate class:  BioE 2630 – Methods in medical iamage analysis in neuropathology. April 4, 2014.
Anatomic Pathology Grand Rounds, July 10, 2014  Chronic Traumatic Encephalopathy: an Update.

**Clinical Conferences (recurring)**

| | | |
|---|---|---|
| ADRC Brain cutting | weekly | Tue 8-10 |
| ADRC Dementia signout - | weekly | Fri 10-11 |
| PUH – Neuropathology QA - | weekly | Wed 10-11 |
| CH  Brain cutting | weekly | Mon 10-11:00 |
| CH  Neuro-Oncology conf | weekly | Mon 11:30-12:30 |
| CH Gross autopsy conference | weekly | Tue 11-12 |
| CH Micro autopsy conf | weekly | Tue 1-2 |

University of Pittsburgh School of Medicine –
    2009 Brain Tumors – lecture to 1st year students
    2009 Klionsky summer research scholarship – Peter Kang (June-Aug 2009)
        Clinicopathologic correlations of chordomas
    2009 Monday 2 hour small group 3rd year  (5-12 students)
        4/6/2009, 7/27/2009, 9/10/2009, 10/12/2009, 12/7/2009, 1/25/2010, 2/15/2010

**RESEARCH**

**OTHER SUPPORT**

**ACTIVE**

**HAMILTON, R.**
ACTIVE
**R01 NS037704**    (PI: Pollack)            9/1/98-1/31/17            0.7 calendar months
National Institutes of Health            $105,970
Role:  Co-Investigator
Title: Molecular Markers as Predictors of Outcome in Gliomas
The major goal of this project is to further characterize the molecular features of tumorigenesis in pediatric malignant gliomas.

**1R01 CA174858-01**(PI: Pollack)            5/6/13-8/30/17            0.4 calendar months
National Institutes of Health                        $54,696
Role:  Co-Investigator
Title: Peptide Vaccine-Based Immunotherapy for Children with Recurrent Ependymomas
This project focuses on a pilot clinical trial of peptide-based immunotherapy for ependymomas, among the most challenging childhood brain tumors.  The study will incorporate separate strata

**Ronald L. Hamilton, M.D.**

for posterior fossa and non-posterior fossa ependymomas.  We will treat a total of 12 patients in each of the two strata with subcutaneous TAA epitope vaccinations every 3 weeks for 8 courses combined with topical imiquimod. Participants will be evaluated for adverse events, regimen limiting toxicity (RLT), and treatment response by clinical and laboratory evaluations and MR imaging. We hypothesize that vaccine-based immunotherapy will not only prove safe for the treatment of pediatric ependymomas, but will also demonstrate activity as assessed by immunologic and clinical parameters.


(PI: Pollack)    5/8/14-6/1/17
Child Brain Tumor Foundation                            $10,487                            1.2
calendar months
**Children's Brain Tumor Tissue Consortium**
The CBTTC is a unique research platform in which tumor tissue is processed for comprehensive molecular (e.g., DNA, RNA, and protein) analysis using state-of-the-art methods and the data results of that analysis, together with new brain tumor models and relevant clinical information, are sent back to the participating institutions. In comparison to tissue banks, the CBTTC actively stimulates research by providing high-quality data that can be rapidly and efficiently analyzed by participating institutions.
PI: Pollack. 10% salary for Jonette Werley


<u>OVERLAP</u> No Overlap


**<u>Completed Research Support</u>**

National Institutes of Health                            3/1/02 – 2/28/05
P30 MH52247-10    (PI: Reynolds)          $23,305
Intervention Research Center for the Study of Late-Life Mood Disorders
a supplement to the above grant to establish a brain bank to investigate the neuropathological substrate of late life mood disorders.
Role:  Co-Investigator


R01 NS048595    (PI: Montine)                       09/30/03 – 07/31/08
National Institutes of Health
Subcontract to the University of Washington on grant "Characterization of DLB: a Collaborative Study"
The major goal of this multi-institutional project is to investigate the role of ApoE4 alleles and other genetic polymorphisms in the Lewy Body Variant of Alzheimer's Disease.
Role:  Co-Investigator


Brain Tumor Society                            07/01/07-05/31/09
PI: Ian Pollack
JPA & Pediatric Low Grade Astrocytoma
The major goals of these two grants is to examine molecular markers of prognosis in pediatric gliomas.
Role:  Co-Investigator


U10 CA13539-27 (Reaman (subcontract 6172) (Pollack)                       1/1/06-12/30/09
NIH/NCI
Children's Oncology Group Brain Tumor Resource Laboratory

**Ronald L. Hamilton, M.D.**

This contract is providing infrastructure support for maintaining tissue processing and banking of high-grade gliomas.
Role:  Laboratory Director

R01 MH47346     (PI: Zubenko)                    12/1/04 – 11/30/09
National Institutes of Health
Morphologic/Neurochemical Correlates of Depression in AD
The major goal of this project is to better define the biological substrates of major depression in AD and to provide additional insight into the clinical biology of major depressive disorders affecting the elderly.
Role:  Co-Investigator

P50 AG05133    (PI: Lopez)               3/30/85 – 3/31/15           0 calendar months
National Institutes of Health                   $71,764
Alzheimer Disease Research Center, Core C: Neuropathology
The three objectives of the Neuropathology Core are to (1) procure and bank brain from autopsies of ADRC patients and controls, (2) perform detailed neuropathologic analysis of all AD cases and (3) maintain well catalogued brain bank.
Role:  Core Advisor

Child Brain Tumor Fund (CBTF) (PI: Pollack)        5/8/13-5/7/14
0.3 cal months (2.5% support) `PITT subaccount #: 05.35206.xxxx.00000.709203.-----`

P01 NS040923     (PI: Pollack)              7/1/02-5/31/13           1.20 calendar months
National Institutes of Health                  $22,074
Novel Strategies for Brain Tumor Therapy
The unifying hypothesis of this program project grant is that novel therapeutic approaches that take into account the unique features of central nervous system (CNS) tumors will have utility for preventing tumor growth and inducing tumor regression, and will potentiate the effects of conventional treatment approaches, particularly radiotherapy, for inducing glioma cell killing.
Role:  Co-Investigator

**Prior Grant Support**

1995-1997              Murine Model of Retroviral Encephalitis
                            Children's Hospital of Pittsburgh Research Fund ($50,000)
                            0% effort, 0% support

 1995-1998             Blood Brain Barrier in HIV encephalitis (PI: Achim)
                            Co PI. 10% effort and salary ($186,264)

11/98                     PD Center Grant, Equipment $6000
                            for freezer for PD Brain Bank (one time equipment funding)

7/1/98-6/30/99   Neurotrophic Factors in SIV encephalitis
                            Competitive Medical Research Fund (CMRF), $25,000,
                            0% effort, 0% support

12/01/98-11/30/99      Parkinson's Disease Brain Bank
                            PI: Hamilton RL
                            Parkinson's Disease Foundation ($24,899) 0% effort, 0% support

7/1/98-6/30/00   Molecular Markers of Prognosis in Pediatric Gliomas

**Ronald L. Hamilton, M.D.**

> PAR 95-063, NIH
> PI: IF Pollack
> 10% effort and support ($263,311)

4/1/00-3/31/01:  Alpha-synuclein Aggregation in Dementia With Lewy Bodies
> PI: RL Hamilton
> Parkinson's Disease Foundation Seed Money Grant, $25,000 0% effort, 0% support

10/1/00-9/30/02    Millennium Agreement (Neuro Module)
> PI: Rajiv Dhir
> 0% effort, 0% Support.
> ($25,000 per year for supplies, plus support for 100% Level IV Res Tech)

1/1/99 – 12/31/03 COG Brain Tumor Resource Laboratory
> PI: Pollack, IF ($5800)  (subcontract 6172)
> Co-I – 5% effort and support
> NIH-U10 CA13539-27

3/01/02 - 2/28/07 - Supplemental Award to Establish a Late Life Mood Disorder Brain Bank
> PI: RA Sweet (for supplement)
>> Supplement to 3 P30 MH52247-08S1 (PI: CF Reynolds)
>> Co-I : 5% effort and support

7/1/98-6/30/05 Morphologic/Neurochemical Correlates of Depression in AD
> PI: G Zubenko
>> 2.5% effort and support ($20,000)

National Institutes of Health            09/30/03 – 07/31/08        5%
R01 NS048595    (PI: Montine)        $75,000

*Subcontract to the University of Washington on grant "Characterization of DLB: a Collaborative Study"*
The major goal of this multi-institutional project is to investigate the role of ApoE4 alleles and other genetic polymorphisms in the Lewy Body Variant of Alzheimer's Disease

R01 MH072947    (PI: Butters)        12/1/04 –11/30/11        0.36 calendar months
National Institutes of Health                $6,018
Pathways Linking Late Life Depression to Mild Cognitive Impairment and Dementia
The goal of this project is to investigate the relationships among late-life depression (LLD), cognitive impairment and progressive neurodegeneration.
Role:  Co-Investigator

R01 MH072947    (PI: Butters)        12/1/04 –11/30/11        0.36 calendar months
National Institutes of Health                $6,018
Pathways Linking Late Life Depression to Mild Cognitive Impairment and Dementia
The goal of this project is to investigate the relationships among late-life depression (LLD), cognitive impairment and progressive neurodegeneration.
Role:  Co-Investigator


**Seminars and Invited Lectureships Related to Research**

Presentation of an Unknown Case (Herpes simplex brainstem encephalitis) to American Association of Neuropathologists Annual Meeting, June 1992: St. Louis, MO.

**Ronald L. Hamilton, M.D.**

Presentation of an Unknown Case (Varicella zoster virus encephalitis in an AIDS patient) to XII International Congress of Neuropathology, Sept, 1994: Toronto, Ont, Canada.

Presentation of an Unknown Case (Atypical neurocytoma) to American Association of Neuropathologists Annual Meeting, June 2002: Denver (presenter: Rafael Medina-Flores).

**Other Research Related Activities**

| | |
|---|---|
| 1995-2003 | Co-Director, Neuropathology Core ADRC |
| 2003-2012 | Director, Neuropathology Core ADRC. |
| 1995-2012- | Director, Neuropathology Brain Bank |
| 1997 - present - | Director of Neurohistology laboratory |
| 1997-present | Co-Director, Brain Tumor Resource Laboratory, Children's Cancer Group |
| 2001- 2009 | Director of Neuropathology Core of the Stephen Tuttle ALS Tissue Bank. |
| 2001-present | Co-Director, UP Brain Tumor Bank |

**CURRENT RESEARCH INTERESTS**

1. Molecular Biology of Brain Tumors

**SERVICE**

**University and Medical School**

Residency Committee (Pathology) – 1997 to 2008
Institutional Review Board        3/02 – 5/2005
'Member of the UPSOM Interviewing Committee' jan 2010-present
Member, UPMC Professional Practice and Ethics Committee Jan 2014 - present

**OTHER**

| | |
|---|---|
| 4/1996 - present | Case Editor - Brain Pathology, |
| | Case of the Month feature |
| | Case of the Month web site |
| | Increase to 2 cases per month 1/2007 |
| 10/99 | ad hoc reviewer, J Neuroscience |
| 1/2000 | ad hoc reviewer, J American Medical Association (JAMA) |
| 3/2000 | ad hoc reviewer, Neuropathology and Applied Neurobiology |
| 3/01 | ad hoc reviewer American Journal Pathology |
| 5/02 | ad hoc reviewer Neuroscience |
| 11/02 | ad hoc reviewer JNEN |
| 2004 | AANP Awards Committee, AANP, Cleveland |
| 2006 | AANP Awards committee, AANP-ISN San Fran |
| 10/2006 | ad hoc reviewer      Eur J Neurosci |
| 2/2007 | Ad hoc reviewer        Neuroscience |
| 2007 | Chairmen, Awards Committee, AANP Washington DC. (2 year term) |
| 7/29/2007 | ad hoc reviewer, Brain Pathology |
| 7/25/2007 | ad hoc reviewer Acta Neuropathologica |
| 10/19/2007 | ad hoc reviewer J Neuropathol Exp Neurol |
| 2008 | Chairman Awards Committee AANP, San Diego Annual Meeting |
| 2008 | ad hoc reviewer Brain Pathology |
| 2009 | ad hoc reviewer Pedi and Developmental Pathology |
| 2009 | ad hoc reviewer Amer. J. Pathol. |

**Ronald L. Hamilton, M.D.**

2014 – Featured in non-fiction book: League of Denial:  The NFL, Concussions and the Battle for the Truth (Crown Publishing, New York). Chapters 8 and 10 detail my role in the discovery of CTE in NFL football players.

January 2015 – Consulted with Sony Pictures about movie CONCUSSION based on the discovery of Chronic Traumatic Encephalopathy (CTE) in American NFL football players by my student, Bennet Omalu and me in July 2005.  I was also interviewed on the set by Sony documentary filmmakers for a bonus feature on the DVD:  The Making of "Concussion."  The movie is scheduled to be released Christmas Day, Dec 25, 2015.

January 2015 – interviewed by Jeane Marie Laskas (who wrote the 2009 GQ article the movie is based on) for a companion book to be released with the movie, December 2015.


**International Invitations**

1998 – Invited lecturer at Barcelona-Pittsburgh ADRC meeting, "Dementia Today," Barcelona, Spain (Oct 1998)

2000 – Invited lecturer at Barcelona-Pittsburgh ADRC meeting Dementia Today II", Barcelona, Spain (Oct 2000)

2001 - Invited symposia speaker at 10th Congress of the International Psychogeriatric Association (Nice, France, Sept 2001). "Pathological Diagnosis of Dementia With Lewy Bodies" (Symposia Organizer, Ian McKeith)

2002 – Invited lecturer at Barcelona-Pittsburgh ADRC meeting Dementia Today III", Barcelona, Spain (Oct 2002)

2003 – Symposium speaker "Dementia with Lewy Bodies" at International Psychogeriatric Associations meeting, Chicago, IL, USA, 08/19/03

2004  Invited lecturer at Barcelona-Pittsburgh ADRC meeting Dementia Today IV", Barcelona, Spain (Oct 2004)

2006  Invited lecturer at Barcelona-Pittsburgh ADRC meeting Dementia Today V", Barcelona, Spain (Oct 2006)

2008  Invited lecturer at Barcelona-Pittsburgh ADRC meeting Dementia Today VI", Barcelona, Spain (May 2008)

2014 – Invited lecturer AANP annual meeting June 2014.  What Every Neuropathologist Should Know: Molecular studies in metastatic brain tumors.

2014 - Invited as member of scientific committee International Congress of Neuropathology quadrennial meeting Sept 2014, Rio de Janeiro

2014 – Chair of Forensic Pathology Session, committee International Congress of Neuropathology quadrennial meeting Sept 2014, Rio de Janeiro

2014 – co-chair telepathology session with Dr. Wiley

2014 – Presentation – Chronic Traumatic Encephalopathy – update, International Congress of Neuropathology quadrennial meeting Sept 2014, Rio de Janeiro

2014 – presentation – Cases of the Month – 16 Years of Unknowns  International Congress of Neuropathology quadrennial meeting Sept 2014, Rio de Janeiro s



Office of Chief Medical Examiner
Tarrant County Medical Examiner's District
Tarrant County, Texas
200 Feliks Gwozdz Place, Fort Worth, Texas 76104-4919
(817) 920-5700  FAX (817) 920-5713

# AUTOPSY REPORT

| | |
|---|---|
| **Name: Frank Cornish** | **CASE NO: 0810049** |
| **Approximate Age: 40 years** | **Sex: Male** |
| **Height: 79 inches** | **Weight: 327.6 pounds** |

I hereby certify that on the **24th** day of **August 2008**, beginning at 0805 hours, I, Marc A. Krouse, M.D., pursuant to Statute 49.25 of Texas Criminal Code, performed an inspection and autopsy limited to the cranial cavity, neck, and thoracic cavity, on the body of **Frank Cornish** at the Tarrant County Medical Examiner's District Morgue in Fort Worth, Texas and upon investigation of the essential facts concerning the circumstances of the death and history of the case as known to me, I am of the opinion that the findings, cause and manner of death are as follows:

**FINDINGS:**
I)   Marked cardiomegaly (758 gms) with left ventricular hypertrophy and mild coronary arterial sclerosis, consistent with hypertensive heart disease
II)  Multinodular goiter
III) No evidence of trauma
IV)  Postmortem toxicology attached

**CAUSE OF DEATH:**   SUDDEN ADULT DEATH WITH EVIDENCE OF HYPERTENSIVE HEART DISEASE

**MANNER OF DEATH:   NATURAL**

_____   **Marc A. Krouse, M.D.**
Signature   **Deputy Chief Medical Examiner**



0810049
Frank Cornish

Inspection and autopsy limited to the cranial cavity, neck, and thoracic cavity are performed August 24, 2008 at 8:05 a.m. (cranial cavity exam 08/25/08 at 0900).

## GROSS ANATOMIC DESCRIPTION

**I.   CLOTHING AND PERSONAL EFFECTS:** At the time of examination the body is clothed in white briefs and wrapped in white sheets.

**II.   THERAPEUTIC INTERVENTION:** Evidence of medical intervention includes an oral endotracheal tube secured with tape, intravenous line in the right antecubital fossa, right tibial intraosseous line, and 1 electrocardiographic monitor pad on the torso.

**III.   EXTERNAL BODY DESCRIPTION:** The body is that of a normally developed, large muscular and slightly obese adult African American male appearing near the stated age of 40 years. The body length is 79 inches and the weight is 327.6 pounds (200 cm, 143.6 kg). The body is well-preserved, unembalmed, and cool. Rigor is full. Lividity is developed over the head and back, is purple, and fixed.

The scalp is shaved except for a black and occasional gray mustache and goatee. The face is shaved and body hair is male distribution.

The calvarium is symmetric and intact to palpation and the scalp is intact. The eyes are closed, the corneas are slightly clouded. There is no conjunctival hemorrhage. The irides are brown and the pupils are 6 mm. Orbital soft tissues are unremarkable. The nasal and oral cavities are clear. Lips and oral mucosa are cyanotic. The dentition is natural and well-maintained. The external ears are clear and a single healed pierce is found in the left earlobe. The face, neck, and larynx are symmetric and intact and the trachea and larynx are midline.

The anterior chest is symmetric and intact. The breasts are male. The abdomen is minimally protuberant and the pelvis is intact. The penis is uncircumcised and the testes are descended. The perineum and anal orifice are unremarkable. The back is symmetric and intact.

0810049
Frank Cornish

The extremities are symmetric, normally developed, and are intact. The nails of the hands and feet are cyanotic. A healed 18 cm scar is found along the left hip and upper thigh.

There are no external signs of trauma or foul play.

## IV.  INTERNAL EXAMINATION

**1.  INTEGUMENT:**  The body is opened with a modified thoracoabdominal and coronal scalp incision.  The viscera are examined in situ and neck and thoracic viscera and cranial contents are removed for further inspection.

**2.  SEROUS CAVITIES:**  The soft tissues of the anterior chest and neck are unremarkable.  There is no evidence of occult trauma.  The serous cavity membranes are smooth.  There is no hemorrhage or fluid accumulation within major body cavities.

**3.  CARDIOVASCULAR SYSTEM:**  The thoracic and abdominal aorta, vena cava and pulmonary arteries  and veins are unremarkable.  The major vessels and heart contain fluid blood and scattered postmortem thrombi.  There is patchy intimal hemoglobin staining.

The heart weighs 758 gms.  The coronary arteries arise normally and posterior circulation is right dominant.  Circumferential sclerosis produces approximately 10-15% occlusion of the surface coronary arteries with an atheromatous plaque adding to approximately 25% occlusion of the proximal left anterior descending coronary.  All cardiac chambers are dilated and there is symmetric hypertrophy of the left ventricle (anterior left ventricle 2.3 cm, septum 2.2 cm, right ventricle 0.5 cm).  The myocardium is otherwise grossly unremarkable. The endocardium and cardiac valves are unremarkable.

**4.  RESPIRATORY SYSTEM:**  The larynx and hyoid are intact.  Central and peripheral airways are clear.  The lungs are congested.  There is patchy lower lobe edema with no additional gross pulmonary pathology.  The right lung weighs 780 gms and the left 678 gms.

**5.  GASTROINTESTINAL SYSTEM:**  The pharynx and esophagus are intact and unremarkable.  Limited inspection of intraabdominal organs is remarkable only for slight yellow-tan coloration of the liver parenchyma.

Page 4 of 4

0810049
Frank Cornish

6.    **HEMATOPOIETIC SYSTEM:** Lymph nodes of the neck and thorax are unremarkable. The thymus is involuted.

8.    **ENDOCRINE SYSTEM:** There is a multinodular goiter (some with cystic degeneration) and the total mass of the thyroid gland is 143 gms. Parathyroid glands are not identified. The pituitary is grossly unremarkable.

9.    **CRANIAL CAVITY/CENTRAL NERVOUS SYSTEM:** Subgaleal soft tissues are unremarkable. There is no evidence of occult head trauma. The calvarium and base of the skull are intact. The cerebrospinal fluid is clear and the meninges are congested. The arteries over the base of the brain and dural sinuses are intact and unremarkable.

The brain weighs 1505 gms. There is slight brain swelling with notching of the uncal gyri and cerebellar tonsils but no evidence of overt herniation. The gray and white matter of the brain are grossly unremarkable. The ventricular system is patent and contains clear cerebrospinal fluid. The upper cervical spinal cord is unremarkable. The atlanto-occipital joint is intact.

## SPECIMENS AND EVIDENCE COLLECTED

1.    Aortic blood 30 mL, femoral venous blood 30 mL, and vitreous humor 5 mL for toxicology
2.    Samples of viscera in fixative
3.    Blood card
4.    Five photographs

EDC: 10/23/08
Dictated: 09/02/08
Transcribed: 09/04/08
Completed: 09/04/08
MAK:cal

# Toxicology Test Results

Office of Chief Medical Examiner
Toxicology Laboratory Service
200 Feliks Gwozdz Place
Fort Worth, Texas 76104
Name: Frank Edgar Cornish
Case Number: 0810049
Toxicology Work Number: 0801591

Nizam Peerwani, M.D., DABFP
Chief Medical Examiner
Angela Springfield, PH.D., DABFT
Chief Toxicologist
Priority: 1
Service Request Number: 002

| Specimen | Drug | Result | Drug Amount | Performed By |
|---|---|---|---|---|
| AORTA BLOOD | ETHANOL | NEGATIVE | | J HO |
| AORTA BLOOD | BASE | NEGATIVE | | C WHEELER |
| AORTA BLOOD | ACID | NEGATIVE | | C WHEELER |

Report Prepared By:

Approved By:

Approved Date: 8/28/08

## CERTIFICATION OF VITAL RECORD

# CITY OF GRAPEVINE, TEXAS
### VITAL STATISTICS DIVISION

**STATE OF TEXAS**  **CERTIFICATE OF DEATH**  **STATE FILE NUMBER**

1. LEGAL NAME OF DECEASED (Include ADULT if any) (First, Middle, Last)
**FRANK EDGAR CORNISH IV**

2. DATE OF DEATH – ACTUAL OR PRESUMED
08/23/2008

3. SEX **MALE**
4. DATE OF BIRTH ___ 1967
5a. AGE (Last Birthday) **40**
5b. UNDER 1 YEAR / 5c. UNDER 1 DAY
6. BIRTHPLACE (City & State or Foreign Country)
**CHICAGO, IL**

7. SOCIAL SECURITY NUMBER ___ 4068
8. MARITAL STATUS AT TIME OF DEATH ☒ Married ☐ Widowed ☐ Divorced ☐ Never Married ☐ Unknown
9. SURVIVING SPOUSE'S NAME (if wife, give maiden prior to first marriage)
**ROBIN BLAKE**

10a. RESIDENCE STREET ADDRESS
10b. APT. NO.
10c. CITY OR TOWN

10d. COUNTY
10e. STATE **TEXAS**
10f. ZIP CODE
10g. INSIDE CITY LIMITS? ☒ Yes ☐ No

11. FATHER'S NAME
**FRANK EDGAR CORNISH III**
12. MOTHER'S NAME PRIOR TO FIRST MARRIAGE
**GLORIA KNIGHTEN**

13. PLACE OF DEATH (CHECK ONLY ONE)
IF DEATH OCCURRED IN A HOSPITAL: ☐ Inpatient ☒ ER/Outpatient ☐ DOA
IF DEATH OCCURRED SOMEWHERE OTHER THAN A HOSPITAL: ☐ Hospice Facility ☐ Nursing Home ☐ Decedent's Home ☐ Other (Specify)

14. COUNTY OF DEATH **TARRANT**
15. CITY OR TOWN OF DEATH (IF OUTSIDE CITY LIMITS, ENTER CITY NEAREST) **GRAPEVINE, 76051**
16. FACILITY NAME (if not institution, give street address) **BAYLOR MEDICAL CENTER AT GRAPEVINE**

17. INFORMANT'S NAME & RELATIONSHIP TO DECEASED
**ROBIN B. CORNISH - WIFE**
18. MAILING ADDRESS OF INFORMANT (Street and Number, City, State, Zip Code)

19. METHOD OF DISPOSITION ☒ Burial ☐ Cremation ☐ Donation ☐ Entombment ☐ Removal from State ☐ Other (Specify)
ACTING AS SUCH
**JOHN BECKWITH, BY ELECTRONIC SIGNATURE - 9037**
☐ Unknown

20. PLACE OF DISPOSITION (Name of cemetery, crematory, other place)
**BLUEBONNET CEMETERY**
21. LOCATION (City/Town, and State)
**COLLEYVILLE, TX.**

22. NAME OF FUNERAL FACILITY
**GOLDEN GATE FUNERAL HOME-THORNTON FRWY**
23. COMPLETE ADDRESS OF FUNERAL FACILITY (Street and Number, City, State, Zip Code)
**4155 S. R.L. THORNTON FRWY, DALLAS, TX 75224**

24. CERTIFIER (Check one box)
☐ Certifying physician-To the best of my knowledge, death occurred due to the cause(s) and manner stated
☐ Medical Examiner/Justice of the Peace - On the basis of examination, and/or investigation, in my opinion, death occurred at the time, date and place, and due to the cause(s) and manner stated

25. DATE CERTIFIED (Mo/Day/Yr)
26. TIME OF DEATH (Actual or presumed)

27. SIGNATURE OF CERTIFIER
28. DATE CERTIFIED (Mo/Day/Yr)
29. LICENSE NUMBER
30. TIME OF DEATH (Actual or presumed)

31. PRINTED NAME, ADDRESS OF CERTIFIER (Street and Number, City, State, Zip Code)
**MARC ANDREW KROUSE , BY ELECTRONIC SIGNATURE**   08/28/2008   E8545   09:18 AM

**MARC ANDREW KROUSE  200 FELIKS GWOZDZ PLACE, FORT WORTH, TX 76104-4919**
32. TITLE OF CERTIFIER **M E**

PART I. ENTER THE CHAIN OF EVENTS – DISEASES, INJURIES, OR COMPLICATIONS – THAT DIRECTLY CAUSED THE DEATH. DO NOT ENTER TERMINAL EVENTS SUCH AS CARDIAC ARREST, RESPIRATORY ARREST, OR VENTRICULAR FIBRILLATION WITHOUT SHOWING THE ETIOLOGY. DO NOT ABBREVIATE. ENTER ONLY ONE CAUSE ON EACH.

Approximate interval Onset to death: **UNKNOWN**

IMMEDIATE CAUSE (Final disease or condition resulting in death) a. **SUDDEN ADULT DEATH WITH EVIDENCE OF HYPERTENSIVE HEART DISEASE**
Due to (or as a consequence of):

Sequentially list conditions, if any, leading to the cause listed on line a. Enter the UNDERLYING CAUSE (disease or injury that initiated the events resulting in death) LAST b.
Due to (or as a consequence of): c.
Due to (or as a consequence of): d.

PART II. ENTER OTHER SIGNIFICANT CONDITIONS CONTRIBUTING TO DEATH BUT NOT RESULTING IN THE UNDERLYING CAUSE GIVEN IN PART I.
34. WAS AN AUTOPSY PERFORMED? ☒ Yes ☐ No
35. WERE AUTOPSY FINDINGS AVAILABLE TO COMPLETE THE CAUSE OF DEATH? ☒ Yes ☐ No

36. MANNER OF DEATH ☒ Natural ☐ Accident ☐ Suicide ☐ Homicide ☐ Pending Investigation ☐ Could not be determined
37. DID TOBACCO USE CONTRIBUTE TO DEATH ☐ Yes ☒ No ☐ Probably ☐ Unknown
38. IF FEMALE ☐ Not pregnant within past year ☐ Pregnant at time of death ☐ Not pregnant, but pregnant within 42 days of death ☐ Not pregnant, but pregnant 43 days to one year before death ☐ Unknown if pregnant within the past year
39. IF TRANSPORTATION INJURY, SPECIFY ☐ Driver/Operator ☐ Passenger ☐ Pedestrian ☐ Other (Specify)

40a. DATE OF INJURY (Mo/Day/Yr)
40b. TIME OF INJURY
40c. INJURY AT WORK? ☐ Yes ☐ No
40d. PLACE OF INJURY (e.g. Decedent's home, construction site, restaurant, wooded area)

40e. LOCATION (Street and Number, City,State,Zip Code)
40f. COUNTY OF INJURY

41. DESCRIBE HOW INJURY OCCURRED

42a. REGISTRAR FILE NO. **15-265**
42b. DATE RECEIVED BY LOCAL REGISTRAR **08/29/2008**
43. REGISTRAR - CITY OF GRAPEVINE, ELECTRONICALLY FILED

EDR NUMBER 0000006A0623

CONTROL NO.
**76861**

This is to certify that this is a true and correct reproduction of the original record as recorded in this office. Issued under authority of Sec. 191.051, Health and Safety Code.

*Linda Huff*
LINDA HUFF
LOCAL REGISTRAR

**FEB-06 '09 PM01:27**

ISSUED

3946

WARNING: IT IS ILLEGAL TO DUPLICATE THIS COPY
ANY ALTERATION OR ERASURE VOIDS THIS CERTIFICATE

THE STATE OF TEXAS    THE CITY OF GRAPEVINE TEXAS

Exhibit 3



# NFL CONCUSSION SETTLEMENT

*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

## NOTICE OF REQUEST FOR ADDITIONAL DOCUMENTS
### DATE OF NOTICE: February 20, 2019
### RESPONSE DEADLINE: June 20, 2019

### I. SETTLEMENT CLASS MEMBER INFORMATION

| | |
|---|---|
| **Settlement Program ID** | 950012548 |

| **Name:** | First<br>Robin | M.I.<br>B | Last<br>Cornish |
|---|---|---|---|

| | |
|---|---|
| **Settlement Class Member Type** | Representative Claimant |
| **Primary Counsel** | O'Hanlon, Demerath & Castillo |

| **Asserted Qualifying Diagnosis** | Death with CTE (Chronic Traumatic Encephalopathy) | **Date of Asserted Qualifying Diagnosis** | 8/23/08 |
|---|---|---|---|

### II. EXPLANATION OF REQUEST(S)

This Notice is an official communication from the Claims Administrator for the NFL Concussion Settlement Program. Your Claim Package is missing documents or information.

This Notice explains what is missing and what you may do to address the issue. We can help if you have questions. To cure the issues identified in this Notice, click the Respond to Request for Additional Documents button on your secure online portal and follow the instructions provided to upload the information identified below.  If you already have provided us with the missing information, let us know because we may have received it after conducting the review that generated this notice.

The following requires attention before we can act further:

| | **What is Missing** | **How to Address this Item** |
|---|---|---|
| **1.** | You have not submitted any medical records reflecting the Qualifying Diagnosis. | Click the Respond button, go to Section 3 for Medical Records, click on the Upload Medical Records button and follow the instructions to upload medical records reflecting the Qualifying Diagnosis. |

### III. ADDITIONAL EXPLANATION OF WHAT IS MISSING

The medical records must show a post-mortem diagnosis of CTE made before April 22, 2015 (the Final Approval Date) by a board-certified neuropathologist for a Retired NFL Football Player who died before April 22, 2015.  See Section 6.3 (f) of the Settlement Agreement and FAQ 109.  Mr. Cornish died on August 23, 2008, and the August 24, 2008 autopsy report signed by Marc A. Krouse does not reference CTE and neither does the death certificate.  You provided an undated letter from Dr. Ronald L. Hamilton who diagnosed Mr. Cornish with CTE.  You must establish that Dr. Hamilton reviewed Mr. Cornish's brain tissue and made a CTE diagnosis on or before April 22, 2015.

### IV. HOW TO RESPOND TO THIS NOTICE

You have 120 days to respond to this Notice and provide the missing information or documents. **We encourage you to gather the requested information or documents now and respond to this Notice promptly, rather than using the full 120 days allowed to answer. The sooner you respond, the sooner your claim can move forward in the review process.**

By the Response Deadline stated above, send us the missing information or documents identified in Section II. We will wait the full 120 days to re-review your claim, unless you click the Submit Claim Package for Review button to confirm that your response is complete and we may continue to review your claim. If you do not respond in full on or before the Response Deadline, we will have to assess your claim based on the materials we have, which could lead to a lower Monetary Award or denial of your claim in its entirety.

Submit the requested information using your secure online portal to upload additional documents.

## V. HOW TO CONTACT US WITH QUESTIONS OR FOR HELP

If you are represented by a lawyer, consult with your lawyer if you have questions or need assistance. If you are unrepresented and have any questions about this Notice or need help, contact us at 1-855-887-3485 or send an email to ClaimsAdministrator@NFLConcussionSettlement.com. If you are a lawyer, call or email your designated Firm Contact for assistance. For more information about the Settlement program, visit the official website at www.NFLConcussionSettlement.com to read the Frequently Asked Questions or download a copy of the complete Settlement Agreement.



# Exhibit 4

# O'HANLON, DEMERATH & CASTILLO

### ATTORNEYS AND COUNSELORS AT LAW

808 WEST AVENUE
AUSTIN, TEXAS 78701
PHONE: (512) 494-9949
FAX: (512) 494-9919

**DAVID J. CAMPBELL**
*Board Certified, Civil Appellate Law*
*dcampbell@808west.com*

**Rio Grande Valley Office**
426 W. Caffery Ave.
Pharr, Texas 78577

**San Antonio Office**
117 W. Craig Place
San Antonio, Texas 78212

May 6, 2019

***via email***
Jason Russell
BROWNGREER PLC
250 Rocketts Way
Richmond, VA 23231
*jrussell@browngreer.com*

Re:     Claimant ID: 950012548; Robin B. Cornish
Claimant ID: ███████████████

Mr. Russell:

Please allow this correspondence to provide you with the additional information you requested in your prior email correspondence regarding the above two claimants.

In your attached email correspondence, you accurately quote FAQ 109, which states that for a Death with CTE diagnosis, "the medical records must show a post-mortem diagnosis of CTE made before April 22, 2015 (the Final Approval Date)."[1]  However, FAQ 109 must be read in conjunction with FAQ 82, FAQ 84, and FAQ 93.

FAQ 82 explains that a Player who died before April 22, 2015 is eligible for a Monetary Award if there is a diagnosis of Death with CTE.[2]  FAQ 84 states that a

---

[1]     *See* Tab 1.  As you know, the representations in the FAQ were made with the approval of counsel for the NFL Parties.  *See* Amended Settlement Agreement § 4.1(a).

[2]     *See* Tab 2, Relevant Excerpts from Posted Settlement Program FAQs (as of February 19, 2019), FAQ 82.

May 6, 2019
Page 2

diagnosis of Death with CTE can be made by any board-certified neuropathologist at any time after the Player's death.[3]  FAQ 93 addresses how the date of the diagnosis is determined.[4]

FAQ 93 describes how to determine the diagnosis date for Death with CTE.[5]  It states that the date of the diagnosis is important because it impacts a Player's eligibility for a Monetary Award.[6]  For diagnoses *other than Death with CTE*, the diagnosis date is the date "when the diagnosing physician has enough information and materials, including test results, to be able to render a medically sound and reliable judgment about the Player's condition . . .."[7]  But diagnoses for Death with CTE are different.[8]  For Death with CTE, the diagnosis date is "the date of the Player's death, **even though the diagnosis is not made until after the Player dies**."[9]

Pursuant to FAQ 82, 84, 93, and 109, the diagnosis date for Mr. Cornish (Claimant ID: 950012548) is August 23, 2008. Robin Cornish's claim package regarding the deceased Mr. Cornish includes the post-mortem diagnosis of Dr. Ronald L. Hamilton, a board-certified neuropathologist who has provided a post-mortem diagnosis of Death with CTE.  The date of this Qualifying Diagnosis is the date of Mr. Cornish's death, which is August 23, 2008.



[3]    *See id.*, FAQ 84.

[4]    *See id.*, FAQ 93.

[5]    *See id.*

[6]    *See id.*

[7]    *See id.*, FAQ 93(b).

[8]    *Compare id.*, FAQ 93(b) *with id.*, FAQ 93(a).

[9]    *See id.*, FAQ 93(a) (emphasis added).

May 6, 2019
Page 3


I appreciate your diligence in reviewing these claims and would be happy to discuss these claims if you have any additional questions or require any additional information.


Best regards,


David J. Campbell


Enclosures     Tab 1
              Tab 2

---

| From: | Jason Russell |
|---|---|
| To: | Alice Keeran |
| Cc: | Justin Demerath; David Campbell |
| Subject: | RE: Claimant ID: 950012548: Robin B Cornish and Claimant ID: ▮▮▮▮ |
| Date: | Monday, February 25, 2019 12:04:02 PM |
| Attachments: | image001.png |

Hi Alice,

I see Death with CTE was the asserted Qualifying Diagnosis for both.  For Death with CTE, the medical records must show a post-mortem diagnosis of CTE made before April 22, 2015 (the Final Approval Date) by a board-certified neuropathologist for a Retired NFL Football Player who died before April 22, 2015 (Section 6.3(f) of the Settlement Agreement and FAQ 109).

**Robin Cornish – 950012548**
Mr. Cornish died on August 23, 2008, and the August 24, 2008 autopsy report signed by Marc A. Krouse does not reference CTE and neither does the death certificate.  We received an undated letter from Dr. Ronald L. Hamilton who diagnosed Mr. Cornish with CTE.  You must establish that Dr. Hamilton reviewed Mr. Cornish's brain tissue and made a CTE diagnosis on or before April 22, 2015.

Please let me know if you have any further questions concerning this.

Thank you,
Jason

**From:** Alice Keeran <akeeran@808west.com>
**Sent:** Monday, February 25, 2019 8:21 AM
**To:** Jason Russell <jrussell@browngreer.com>
**Cc:** Justin Demerath <jdemerath@808west.com>; David Campbell <dcampbell@808west.com>
**Subject:** Claimant ID: 950012548; Robin B Cornish and Claimant ID: ▮▮▮▮

Hi Jason,

I'm writing to follow-up on a couple of Notices of Request for Additional Documents for the above-referenced claimants. Both of these notices reference that accompanying medical records are missing, but I can see the records we provided when I checked the portal for each of them.

Please give me a call when you have a moment. Thank you!

Sincerely,
*Alice Keeran*

Senior Paralegal to
Justin B. Demerath
O'HANLON, DEMERATH & CASTILLO, PC
ATTORNEYS AND COUNSELORS AT LAW
Austin  Office
808 West Avenue
Austin, Texas 78701
(512) 494-9949  Office
(512) 494-9919 Fax
email: akeeran@808west.com
website: www.808west.com

CONFIDENTIALITY NOTICE:

The information contained in this transmittal and any attached documents maybe  attorney privileged and contain confidential and/or privileged information and  has been sent for the sole use of the intended recipient(s).  Any review, use, printing, dissemination, disclosure, distribution, retransmission, or other use  of, or taking in any action in reliance upon this information by persons or  entities other than the intended recipient(s) is strictly prohibited.  If you  have received this transmittal in error, please immediately notify us by telephone at (512) 494-9949 and delete the material from any computer. Please be advised that nothing in this email shall create or be taken to create an attorney client relationship, which may only be created by executing a power of attorney agreement.

# NFL CONCUSSION SETTLEMENT

*In Re: National Football League Players' Concussion Injury Litigation* No. 2:12-md-02323 (E.D. Pa.)

## Posted Settlement Program FAQs

(as of February 19, 2019)



# Table of Contents

**I. Basic Information** ...................................................................................................... 1

   1. **What is the Settlement about?** ........................................................................ 1

   2. **What are the benefits of the Settlement?** ....................................................... 1

   3. **Who is included in the Settlement Class?** ...................................................... 2

   4. **Who are the settlement administrators?** ........................................................ 2

   5. **Who are the Special Masters?** ........................................................................ 3

   6. **What if I do not like how the settlement administrators or Special Masters are administering the Settlement Agreement?** ..................................... 3

   7. **Do the settlement administrators report to Co-Lead Class Counsel or the NFL Parties?** ................................................................................................... 3

   8. **Does the Claims Administrator share the contents of my Claim Package with Co-Lead Class Counsel or the NFL Parties?** .......................................... 4

   9. **Does the Claims Administrator share the contents of my Claim Package with any other people or entities?** ................................................................. 4

  10. **How do I authorize the Claims Administrator to speak to someone else about my claim?** ................................................................................................ 4

  11. **When was the Effective Date? What is it?** ..................................................... 5

  12. **How does the Claims Administrator calculate the number of days I have to respond to a notice or take other actions in the Settlement Program?** ......... 5

  13. **If I have to respond to the Claims Administrator by a deadline, what is considered the date of my response or submission?** ..................................... 6

  14. **If I opted out of the Settlement, can I still get benefits from this Settlement?** ..................... 6

  15. **I opted out of the Settlement. May I revoke that Opt Out and get back into the Settlement Program?** ................................................................................... 7

  16. **If I am a Settlement Class Member who did not opt out of the Settlement, can I sue the NFL Parties for the same thing later?** ...................................... 7

  17. **Can I still opt out of the Settlement?** ............................................................. 7

  18. **What if I do not like the terms of the Settlement Agreement?** ....................... 7

  19. **Are there any tools on the Settlement Website to help me understand the Settlement Agreement and how to make a claim?** ........................................ 7

  20. **Where can I find the Special Master's or the Court's published decisions on appeals or statute of limitations matters?** .................................................. 8

  21. **How do I get more information about the Settlement?** ................................... 8

  22. **How do I report potential fraud to the Claims Administrator?** ...................... 9

  23. **What if my situation or circumstances are not covered by these FAQs?** ...... 9

2/19/19

## II. Settlement Agreement Benefits – General Information ........................................10

**24. Must a Retired NFL Football Player be vested under the NFL Retirement Plan to receive Settlement benefits?** ................................................................................ 10

**25. Are the Settlement benefits connected to any NFL or NFLPA-related benefits programs?** ............................................................................................................... 10

**26. If I receive benefits under the 88 Plan or any other disability plan, do I automatically qualify for a Monetary Award in the Settlement Program?** ....................... 10

**27. Does this Settlement prevent Retired NFL Football Players from bringing workers' compensation claims?** ........................................................................................... 10

**28. What types of education programs are supported by the Settlement?** ............................... 10

**29. If the science about the Qualifying Diagnoses changes, will the Settlement Program change the definitions or testing protocols for them?** ............................................. 11

## III. Registration ..................................................................................................12

**30. May I still register in the Settlement as a Retired NFL Football Player?** .......................... 12

**31. May I still register in the Settlement as a Representative Claimant?** ................................. 12

**32. May I still register in the Settlement as a Derivative Claimant?** ....................................... 13

**33. What if I disagree with the Claims Administrator's initial determination on my registration?** ........................................................................................................ 13

**34. What if I disagree with the Claims Administrator's decision about my registration determination challenge?** ..................................................................................... 13

**35. Are there any rules covering registration determinations and appeals?** ........................... 14

**36. How can I send registration information to the Claims Administrator?** ............................ 14

**37. Does registering mean I filed a claim?** ............................................................................. 14

**38. How do I change my mailing address?** ............................................................................. 14

**39. How do I change my name or Social Security Number (or other Taxpayer Identification Number) that I have given the Program?** ......................................... 14

**40. Do I have to provide my Social Security Number to participate in the Settlement Program?** ............................................................................................................... 15

**41. How does the Claims Administrator calculate a Retired NFL Football Player's Eligible Seasons?** ................................................................................................. 15

**42. Where does the Claims Administrator get information about a Retired NFL Football Player's Eligible Seasons?** ....................................................................... 16

**43. I received a Notice of Incomplete Registration saying I am missing proof of playing NFL Football. What are the next steps?** ............................................................... 16

## IV. Baseline Assessment Program ......................................................................17

**44. What is the Baseline Assessment Program ("BAP")?** ...................................................... 17

**45. Who can participate in the BAP?** ..................................................................................... 17

**46. Why should I have a BAP exam?** ..................................................................................... 17

47.  How many doctors will I see in a BAP exam? ............................................... 18

48.  Who pays for these BAP exams? ................................................................... 18

49.  Who can be a Qualified BAP Provider? ....................................................... 18

50.  Can I choose my own doctors for the BAP exam? ........................................ 18

51.  Do the Qualified BAP Providers report to the NFL? ................................... 18

52.  Is there a deadline for getting the BAP exam? ............................................ 18

53.  How long will the Baseline Assessment Program be available? .................. 19

54.  How do I access the BAP Portal? ................................................................. 19

55.  How can I schedule a BAP exam? ................................................................ 19

56.  Where do I go for my BAP exam? ................................................................ 19

57.  How long does a BAP exam take? ................................................................ 20

58.  Is it possible to schedule both parts of the BAP exam on the same day? ...... 20

59.  Can BAP appointments be rescheduled or cancelled? ................................. 20

60.  What happens if I miss a BAP appointment? ............................................... 20

61.  What do I need to prepare for my BAP appointment? .................................. 20

62.  Should I bring someone with me to my BAP appointment? ......................... 20

63.  What kind of diagnosis can I get from a BAP exam? ................................... 21

64.  What about conditions like ALS, Parkinson's Disease, or Alzheimer's Disease? ............. 21

65.  Does there have to be a diagnosis? What if I am OK? ................................. 21

66.  What happens after a BAP exam? ................................................................ 22

67.  What should I do if my BAP exam results in a diagnosis? ........................... 22

68.  Will my Monetary Award be affected if I do not have a BAP exam? ........... 23

69.  What are BAP Supplemental Benefits? ......................................................... 23

70.  How long will I have to use my BAP Supplemental Benefits? ...................... 23

71.  How much will my BAP Supplemental Benefits cover? Is there a limit? ...... 24

72.  Will any medical or pharmacy records from BAP Supplemental Benefits be available to the NFL? ........... 24

73.  What is a Qualified BAP Pharmacy Vendor? .............................................. 24

74.  I received a "Baseline Assessment Program HIPAA Authorization Form." What do I do with it? .......... 24

V.  Monetary Awards ............................................................................................. 25

75.  Who can submit a claim for a Monetary Award? ........................................ 25

76.  What is a Claim Package? ............................................................................ 25

77.  How do I submit a Claim Package? .............................................................. 25

78.  Where do I send my Claim Package if I do not use an online Portal? ......... 26

79.  When can I submit a Claim Package? ..................................................... 26

80.  Is there a deadline to submit my Claim Package? ................................... 26

81.  How can I change answers I made in my Claim Form? ........................... 26

82.  What is a Qualifying Diagnosis? ............................................................. 27

83.  Should I get a BAP exam or see a Qualified MAF Physician? ............... 27

84.  What kind of physicians are authorized to make a Qualifying Diagnosis? ... 27

85.  Who is a Qualified MAF Physician? ....................................................... 29

86.  How do I get evaluated for a Qualifying Diagnosis if I do not already have one? ............. 29

87.  If my diagnosing physician is both a Qualified BAP Provider and a Qualified MAF
     Physician, how do I know if the diagnosis is made in or outside the BAP? ...................... 29

88.  Does the physician who makes the Qualifying Diagnosis of a Retired NFL Football
     Player have to see and examine that Player in person? ................................ 29

89.  Can the representative of a deceased Retired NFL Football Player get a Qualifying
     Diagnosis for that Player now? ........................................................................ 30

90.  What should I do if I already have a Qualifying Diagnosis? .................. 31

91.  Does it matter when the Retired NFL Football Player was diagnosed? ............. 31

92.  What dates matter for when the Qualifying Diagnosis is made? .......... 31

93.  How is the date of a Qualifying Diagnosis determined? ........................ 32

94.  Which diagnostic criteria must a physician use when making my Qualifying
     Diagnosis? When and to what diagnoses does the "generally consistent" criteria
     apply? ................................................................................................................ 34

95.  What does "generally consistent" mean? .............................................. 34

96.  What makes a Claim Package complete? ............................................... 35

97.  What can I submit to prove that I have more Eligible Seasons than what the Claims
     Administrator found for me when I registered? ............................................ 35

98.  What counts as a medical record? ........................................................... 36

99.  What does it mean for medical records to "reflect" my Qualifying Diagnosis? ............. 36

100. What does it mean for medical records to "support" my Qualifying Diagnosis? ............. 37

101. What must the medical records show for Level 1.5 and Level 2 Neurocognitive
     Impairment diagnoses made in the BAP by Qualified BAP Providers? ............................ 37

102. What must the medical records show for Level 1.5 and Level 2 Neurocognitive
     Impairment diagnoses made outside the BAP for *living* Retired NFL Football
     Players? ............................................................................................................. 39

103. What must the medical records show for Level 1.5 and Level 2 Neurocognitive
     Impairment diagnoses for Retired NFL Football Players who *died before January 7,
     2017* (the Effective Date) and cannot participate in the BAP or be diagnosed by a
     Qualified MAF Physician? .............................................................................. 40

2/19/19

104. How are diagnosing physicians to apply the Clinical Dementia Rating (CDR) scale to Level 1.5 and Level 2 Neurocognitive Impairment Qualifying Diagnoses? ................... 40

105. What must be included in a sworn statement corroborating a Retired NFL Football Player's functional impairment for a Level 1.5 or Level 2 claim? ....................................... 42

106. Are raw scores and/or raw data required for all Monetary Award claims? ...................... 42

107. What must the medical records show for Alzheimer's Disease? ......................................... 43

108. What must the medical records show for Parkinson's Disease? ......................................... 43

109. What must the medical records show for Death with CTE? ............................................... 44

110. What must the medical records show for ALS? ................................................................... 44

111. What if I cannot get medical records or a Diagnosing Physician Certification Form from the diagnosing physician? .............................................................................................. 45

112. If I cannot get medical records or a Diagnosing Physician Certification Form from the diagnosing physician, is there anything specific I should submit to show my attempts to get such documents? .............................................................................................. 45

113. What exceptions are allowed under Section 8.2(a) of the Settlement Agreement for Representative Claimants of deceased Retired NFL Football Players? ............................. 45

114. What is the SWS-2? ............................................................................................................... 47

115. What exceptions are allowed under Section 8.2(a) of the Settlement Agreement for living Retired NFL Football Players or Representative Claimants of legally incapacitated or incompetent Players? ..................................................................................... 47

116. Are there other instances not listed in Section 8.2 of the Settlement Agreement where the Claims Administrator may excuse the medical records or Diagnosing Physician Certification Form requirement? ........................................................................... 48

117. What happens after the Claims Administrator grants an exception under Section 8.2(a) or a situation not covered by Section 8.2(a)? ........................................................... 49

118. Who reviews my claim for a Monetary Award? .................................................................. 49

119. How is my diagnosis reviewed? When and to what does the "generally consistent" standard apply? .......................................................................................................................... 50

120. What is the AAP and what does it do? ................................................................................ 50

121. What is the AAPC and what does it do? .............................................................................. 50

122. I received a Qualifying Diagnosis through the BAP. Do I have to do anything else to receive a Monetary Award? ................................................................................................ 51

123. I received a Qualifying Diagnosis from a Qualified MAF Physician. Do I have to do anything else to receive a Monetary Award? ......................................................................... 51

124. If I received a Qualifying Diagnosis from a Qualified MAF Physician, what types of records will the physician send to the Claims Administrator? ............................................ 51

125. What happens after I submit my Claim Package? ............................................................. 52

126. Can I receive a Monetary Award for more than one Qualifying Diagnosis on the same claim? ............................................................................................................................... 52

127. I received a Notice of Preliminary Review. What does that mean? ................................... 52

128. I received a Notice of Request for Additional Documents. What does that mean? ........... 52

129. What happens after I respond to my notice asking for more information for my claim? ............................................................................................................................ 53

130. What happens if I never respond to the Notice of Preliminary Review or the Notice of Request for Additional Documents? ........................................................................ 53

131. May I get more time to respond to a notice from the Settlement Program? ..................... 53

132. Does the Claims Administrator question the medical judgment of the physician who made the Qualifying Diagnosis? ........................................................................... 54

133. I have provided my claim to the Claims Administrator and it is now complete enough to send to the AAP. What happens next? .................................................... 54

134. How can I check the status of my Claim Package review? ................................................ 54

135. How long could it take to review my Claim Package from start to finish? ...................... 54

136. If I am eligible for a Monetary Award, how much money will I receive? ......................... 55

137. What is a Stroke or Traumatic Brain Injury in this Settlement Program? ...................... 56

138. Can I be found eligible for a Monetary Award based on a Qualifying Diagnosis that is different than the one I claimed? ............................................................................ 56

139. What can I do if I do not like my Claim Package determination (eligible or denied)? ...... 57

140. Can I withdraw my claim? ................................................................................................. 57

141. Can the Claims Administrator change the outcome of my claim after I receive a notice? ............................................................................................................................ 57

142. Can I submit a new claim for a Monetary Award if the Claims Administrator has denied my claim? ......................................................................................................... 58

143. If I received a Monetary Award for one Qualifying Diagnosis, can I later receive a Monetary Award for a different Qualifying Diagnosis? What is a Supplemental Monetary Award? ......................................................................................................... 58

144. Can Co-Lead Class Counsel or the NFL appeal my Claim Package determination? ........ 58

145. Are there any rules covering determinations that a Monetary Award claim is or is not barred by the statute of limitations under applicable state law? ............................... 59

**VI. Representative Claimants** ......................................................................................... 60

146. Who is a Representative Claimant? ................................................................................... 60

147. How do I become a Representative Claimant? .................................................................. 60

148. How will the Claims Administrator determine whether my court order or other official document is sufficient proof that I can be a Retired NFL Football Player's Representative Claimant? ............................................................................................ 61

149. How will the Claims Administrator determine whether my Power of Attorney (POA) is sufficient proof that I can be a legally incapacitated or incompetent Retired Player's Representative Claimant? ......................................................................... 62

150. Can a Retired NFL Football Player have more than one Representative Claimant? ........ 62

151. What happens if more than one person registers as a Representative Claimant for the same Retired NFL Football Player? ................................................................. 62

152. Can I be a Retired NFL Football Player's Derivative Claimant if I am his Representative Claimant? ........................................................................................ 62

153. Do Representative Claimants have to register for benefits? ................................. 62

154. What happens if a registered Retired NFL Football Player or Representative Claimant becomes legally incompetent or incapacitated or dies after registering? ........... 63

155. If I am a Representative Claimant, do I have to submit a Claim Package? ...................... 63

VII.    Derivative Claimants ......................................................................................... 64

156. Who is a Derivative Claimant? ........................................................................ 64

157. Can a Retired NFL Football Player have more than one Derivative Claimant? ............. 64

158. May someone be a Derivative Claimant of more than one Retired NFL Football Player? ............................................................................................................... 64

159. Can a deceased person be a Derivative Claimant? ............................................ 64

160. Can I register as a Retired NFL Football Player's Derivative Claimant if I also registered as a Representative Claimant? ............................................................ 64

161. Do Derivative Claimants have to register for benefits? ..................................... 64

162. What happens if no one registers as a Derivative Claimant for a Retired NFL Football Player? ................................................................................................ 65

163. How do I submit a Derivative Claim Package? ................................................. 65

164. Where do I send my Derivative Claim Package if I do not use an online Portal? ........... 66

165. Is there a deadline to submit my Derivative Claim Package? .............................. 66

167. What makes a Derivative Claim Package complete? ......................................... 66

168. How will the Retired NFL Football Player know if someone has registered as a Derivative Claimant? ....................................................................................... 67

169. How will I know if other Derivative Claimants have registered for the same Retired NFL Football Player? ....................................................................................... 67

170. How will I know if the Retired NFL Football Player challenged my Derivative Claimant status? ............................................................................................. 67

171. What happens if one Derivative Claimant does not want to share the 1% Derivative Claimant Award equally with another Derivative Claimant? ................................... 67

172. What law does the Claims Administrator use to analyze Derivative Claimant issues? ..... 68

173. Are there any rules covering appeals of Derivative Claimant challenge determinations? ................................................................................................. 68

VIII.    Lawyers ........................................................................................................... 69

174. Who is Class Counsel? ................................................................................... 69

175. Do I need a lawyer to represent me individually in this Program? ..................... 69

176. How did a lawyer register me? ............................................... 69

177. What are Common Benefit Fees and how will Class Counsel be paid? ........... 70

178. How will my individual lawyer be paid? ....................................... 70

179. Can I terminate my relationship with my individual lawyer? ................... 70

180. How do I tell the Claims Administrator I have a new lawyer or that I do not have a lawyer? ....................................................................... 70

## IX. Petitions for Deviation from Fee Cap ........................................... 72

181. What is a Petition for Deviation from the fee cap? ........................... 72

182. Will the attorney's fees be reduced to pay for common benefit attorneys? ...... 72

183. Where can I get a copy of the Rules Governing Petitions for Deviation from the Fee Cap? ..................................................................... 72

184. Who are the Parties involved in a Petition for Deviation from the fee cap? ..... 72

185. Can a party to an Attorney's Lien Dispute file a Petition for Deviation? ........ 72

186. How will a Petition for Deviation be resolved if there is also an Attorney's Lien asserted against the Settlement Class Member? ................................ 73

187. Who determines whether to grant a Petition for Deviation from the fee cap? ..... 73

188. Where do I file a Petition for Deviation from the fee cap? ..................... 73

189. What is the deadline for filing a Petition for Deviation from the fee cap? ....... 73

190. How do I serve documents related to a Petition for Deviation from the fee cap? ............. 74

191. What information must be included in a Petition for Deviation from the fee cap? .......... 74

192. What is a Memorandum in Support and when is it due? ......................... 74

193. What information must be included in a Memorandum in Support? ............... 75

194. What is a Response Memorandum and when is it due? ......................... 76

195. What information must be included in a Response Memorandum? ............... 76

196. What is a Reply Memorandum and when is it due? ............................ 77

197. What information may be included in a Reply Memorandum? ................... 77

198. What if I miss the deadline to submit my Memorandum in Support, Response Memorandum, or Reply Memorandum? ........................................ 77

199. What information will the Magistrate Judge consider in making the Report and Recommendation or the final decision? ........................................ 77

200. If I am unrepresented in the Petition for Deviation proceedings, can I ask to have a lawyer appointed to represent me? ........................................... 78

201. Can I ask for a hearing on a Petition for Deviation from the fee cap? ........... 78

202. How will I find out if the Magistrate Judge grants a hearing and when will the hearing be scheduled? ....................................................... 78

203. What happens at a hearing? ......................................................................... 78

204. Do I have to participate in the hearing? ...................................................... 79

205. Do I have to be represented by a lawyer at the hearing?  Can I have a non-lawyer advocate? ................................................................................................... 79

206. When will the Magistrate Judge issue a Report and Recommendation or a final decision? ................................................................................................... 79

207. Can I object to the Magistrate Judge's Report and Recommendation? ........................... 79

208. Who makes the final decision resolving the Petition for Deviation from the fee cap? ....... 80

209. Can the District Judge or the Magistrate Judge change the final decision? ..................... 80

210. Can I appeal the final decision? ................................................................... 80

211. How will the withheld funds be paid after the final decision? ..................................... 80

X.  Liens – Information for Settlement Class Members ........................................... 81

212. What is a Lien? ..................................................................................... 81

213. What Liens will the Claims Administrator pay out of my Award? ............................... 81

214. What is a Medical Lien? ........................................................................... 81

215. What is an Attorney's Lien? ....................................................................... 81

216. What are the kinds of Other Liens recognized in the Settlement Program? .................... 82

217. Are there any debts that the Claims Administrator will not pay? ................................ 82

218. Do Medical Liens have to be resolved out of my Award? ........................................ 82

219. What could happen if I do not resolve my Medical Liens? ....................................... 83

220. How do I know if there is a Lien against me? ................................................... 84

221. What if I identify a Lien on my Claim Form? .................................................. 85

222. How do I respond to the notice of Lien from the Settlement Program? ......................... 85

223. I received a notice from my healthcare insurer saying that it may have a Lien against me. What should I do? ........................................................................ 85

224. Should I contact a lienholder to speed up the Medical Lien resolution process? .............. 85

225. I have medical coverage through Medicare. What should I do? ................................. 86

226. What about Medicare Part C and Part D Liens? ................................................. 86

227. I have medical coverage through Medicaid. What should I do? ................................. 86

228. I (or my spouse) served in the military, so I have medical coverage through TRICARE or the Department of Veterans Affairs. What should I do? ........................... 87

229. I have medical coverage through the Department of Indian Health Services. What should I do? ............................................................................................ 87

230. What agreements and with which agencies has the Lien Resolution Administrator been able to secure on behalf of Settlement Class Members? ..................................... 87

231. I have a private medical insurance plan. Can they claim a Lien on my Award? .............. 88

232. What happens if I dispute a Lien? ........................................................... 88

233. What is a Dispute over an Attorney's Lien? ............................................. 89

234. Where can I get a copy of the Rules that apply to the Attorneys' Liens dispute resolution process? ....................................................................... 89

235. How does a Dispute over an Attorney's Lien get into the Attorneys' Liens dispute resolution process? ..................................................................... 89

236. Who are the Parties in an Attorney's Lien Dispute? ............................... 89

237. Who resolves an Attorney's Lien Dispute? .............................................. 89

238. Do I have to try to reach an agreement with the attorney who asserted a Lien against my Award? ............................................................................. 90

239. How do I serve document submissions in the Attorneys' Liens dispute resolution process? .................................................................................... 90

240. What do I need to submit in the Attorneys' Liens dispute resolution process? ................ 90

241. What is a Statement of Dispute and when is it due? ............................... 90

242. What information must be included in my Statement of Dispute? ........... 90

243. What is a Response Memorandum and when is it due? ........................... 91

244. What if I miss the deadline to submit my Statement of Dispute or Response Memorandum? ........................................................................... 92

245. What information will the Magistrate Judge consider in making the Report and Recommendation or the final decision? .............................................. 92

246. If I am unrepresented, can I ask to have a lawyer appointed to represent me in the Attorney's Lien Dispute? ..................................................................... 93

247. Can I ask for a hearing on the Attorney's Lien Dispute? ....................... 93

248. How will I find out if the Magistrate Judge grants a hearing on the Attorney's Lien Dispute and when will the hearing be scheduled? ......................... 93

249. What happens at a hearing on an Attorney's Lien Dispute? ................... 93

250. Do I have to participate in the hearing on the Attorney's Lien Dispute? ........... 94

251. Do I have to be represented by a lawyer at the hearing on the Attorney's Lien Dispute? Can I have a non-lawyer advocate? ......................................... 94

252. Can I withdraw a Dispute from the Attorneys' Liens dispute resolution process? ........... 94

253. How do I withdraw a Dispute from the Attorneys' Liens dispute resolution process? ..... 94

254. What information will the Magistrate Judge consider in making the Report and Recommendation or the final decision on the Withdrawals? ................ 94

255. When will the Magistrate Judge issue a Report and Recommendation or a final decision? ................................................................................................ 95

256. Can I object to the Magistrate Judge's Report and Recommendation? ............. 95

257. Who makes the final decision resolving an Attorney's Lien Dispute? ................ 95

2/19/19

258. Can the District Judge or the Magistrate Judge change the final decision on an Attorney's Lien Dispute? ................................................................................. 95

259. Can I appeal the final decision on an Attorney's Lien Dispute? ........................................... 95

260. How will the withheld funds be paid after the final decision on an Attorney's Lien Dispute? ................................................................................................................ 96

261. How and when is a Lien paid? ................................................................................................ 96

262. What happens if more than one Lien exists against a single Monetary Award or Derivative Claimant Award and there is not enough money to pay all of the Liens in full? ........................................................................................................................... 97

263. Will I be notified when the Claims Administrator pays a Lien? ........................................... 97

264. Whom do I contact with questions about Liens? ................................................................. 98

**XI. Liens – Information for Lienholders** ........................................................................ 99

265. How does a lienholder notify the Settlement Program of a Medical Lien? ........................ 99

266. How does a lienholder notify the Settlement Program of an Attorney's Lien or an Other Lien? ..................................................................................................................... 99

267. What information must a government health insurer provide to assert a Medical Lien? ...................................................................................................................................... 100

268. What information is required from a private healthcare insurer to assert an alleged Lien? ...................................................................................................................................... 100

269. What information is required to assert an Attorney's Lien? ................................................ 100

270. What information is required to assert an Other Lien? ...................................................... 101

271. What happens after I submit the required information and documents for a valid Lien? ...................................................................................................................................... 102

272. What happens if a Settlement Class Member disputes a Medical Lien? ........................... 102

273. What happens if a Settlement Class Member disputes an Attorney's Lien? ..................... 102

274. What happens if a Settlement Class Member disputes an Other Lien? ............................ 102

275. What is a Dispute over an Attorney's Lien? ....................................................................... 103

276. Where can I get a copy of the Rules that apply to the Attorneys' Liens dispute resolution process? ............................................................................................................. 103

277. How does a Dispute over an Attorney's Lien get into the Attorneys' Liens dispute resolution process? ............................................................................................................. 103

278. Who are the Parties in an Attorney's Lien Dispute? .......................................................... 103

279. Who resolves an Attorney's Lien Dispute? ......................................................................... 103

280. Do I have to try to reach an agreement with the Settlement Class Member over the disputed Attorney's Lien? ................................................................................................... 104

281. How do I serve document submissions in the Attorneys' Liens dispute resolution process? ............................................................................................................................... 104

282. What do I need to submit in the Attorneys' Liens dispute resolution process? ............... 104

283. What is a Statement of Dispute and when is it due? ............................... 104

284. What information must be included in my Statement of Dispute? .................... 104

285. What is a Response Memorandum and when is it due? ............................... 105

286. What if I miss the deadline to submit my Statement of Dispute or Response Memorandum? ................................................................ 105

287. What information will the Magistrate Judge consider in making the Report and Recommendation or the final decision? ........................................ 106

288. Can I request a hearing on the Attorney's Lien Dispute? ........................ 106

289. How will I find out if the Magistrate Judge grants a hearing on the Attorney's Lien Dispute and when will the hearing be scheduled? .................... 106

290. What happens at a hearing on an Attorney's Lien Dispute? ...................... 106

291. Do I have to participate in the hearing on the Attorney's Lien Dispute? ....... 107

292. Can I withdraw a Dispute from the Attorneys' Liens dispute resolution process? ......... 107

293. How do I withdraw a Dispute from the Attorneys' Liens dispute resolution process? ... 107

294. What information will the Magistrate Judge consider in making the Report and Recommendation or the final decision on the Withdrawals? .................... 107

295. When will the Magistrate Judge issue a Report and Recommendation or a final decision? ............................................................... 108

296. Can I object to the Magistrate Judge's Report and Recommendation? ........... 108

297. Who makes the final decision resolving the Attorney's Lien Dispute? .......... 108

298. Can the District Judge or the Magistrate Judge change the final decision on an Attorney's Lien Dispute? ................................................... 108

299. Can I appeal the final decision on an Attorney's Lien Dispute? ................ 109

300. How will the withheld funds be paid after the final decision on an Attorney's Lien Dispute? ................................................................ 109

301. Whom do I contact with questions about Liens? ................................. 109

XII.    Payments ................................................................... 110

302. I received a Notice of Monetary Award Claim Determination or Notice of Derivative Claimant Award Determination. Do I need to do anything else to receive payment of the award? ............................................................... 110

303. When will I receive payment for my Monetary Award or Derivative Claimant Award? ....................................................................... 111

304. Who will issue the payment to me? ............................................ 112

305. How will the funds be issued by Citibank? ................................... 112

306. If I want to appeal only part of my Monetary Award amount, can I get paid for the rest before my appeal is final? ............................................ 112

307. Will my Monetary Award or Derivative Claimant Award be issued to my lawyer or directly to me? ............................................................. 112

308. Can a Settlement Class Member assign rights to receive his or her Monetary Award or Derivative Claimant Award, or a portion of the Award, to a third party? .................. 113

309. What is the fee cap? ........................................................................................... 113

310. What happens to those lawyers' fees and expenses that the Claims Administrator has withheld from Award payments? ................................................. 114

311. What are claims service providers and are they covered by the fee cap? ......................... 114

312. Do lawyers have to send a statement of contingency fees and expenses to the Claims Administrator? ................................................................. 114

313. What does the Claims Administrator do with the 5% Common Benefit Fund Holdback? ................................................................. 114

**XIII.    Audit** .................................................................................................. 116

314. What is an audit? ........................................................................................... 116

315. How does an audit affect the regular processing of my claim? ......................................... 116

316. Why did I receive a Notice of Audit of Claim? ......................................... 116

317. I received a Notice of Audit of Claim after I received a Notice of Monetary Award Claim Determination or a Notice of Denial of Monetary Award Claim. How does the audit affect my claim? ................................................................. 117

318. Are there any rules covering the audit of claims? ......................................... 117

**XIV.    Bankruptcy** .................................................................................... 118

319. Why does the Settlement Program need to know whether I filed bankruptcy? .............. 118

320. How does the Settlement Program identify a Bankruptcy Issue Claimant? .................... 118

321. How does a current or prior bankruptcy case affect my Monetary Award Claim? ........ 118

322. What is the Bankruptcy Review process? ......................................... 118

323. Which Bankruptcy Issue Claimants must provide Bankruptcy Documents? .................. 119

324. What Bankruptcy Documents are required? ......................................... 119

325. I received a Notice of Bankruptcy Question Delaying Payment. What does this mean? ................................................................. 120

326. My Bankruptcy Case is closed. Why am I required to provide Bankruptcy Documents? ................................................................. 120

327. I received a Bankruptcy Trustee Notice. What does this mean? ......................................... 121

328. My bankruptcy proceeding is closed, and I cannot provide the required Bankruptcy Documents. What can I do? ................................................................. 121

329. I received a Bankruptcy Trustee Communication Notice. What does this mean? .......... 121

330. My Bankruptcy Trustee signed the Bankruptcy Trustee Release of Information form. Am I still required to provide Bankruptcy Documents? ................................... 121

**XV.    Appeals** .................................................................................... 122

331. Are there any rules covering appeals of claim determinations? ......................................... 122

**332.** Can I appeal the Claims Administrator's determination of any amounts deducted from my Monetary Award or Derivative Claimant Award for Liens? ............................ 122

**333.** Who are the appellant and the appellee on an appeal of a claim? ..................................... 122

**334.** Why was my claim remanded to the Claims Administrator? ............................................. 122

**335.** If my claim is remanded from an appeal to the Claims Administrator, what happens to the $1,000 Appeals Fee I paid? ........................................................................................... 122

**336.** May the NFL Parties offer medical or other new evidence on appeal? ............................ 122

**337.** If a party offers new evidence in a brief on appeal, how does that affect the due date for the responding party's brief? How will I know whether there will be a remand or whether I need to address the new evidence in what I file? ............................................ 123

**338.** If new evidence added on appeal leads to remand to the Claims Administrator, can a party offer new evidence in every appeal to force a remand and re-review, either to get another chance at payment or denial, or to delay things? ............................................. 123

**339.** Will the Court review a decision by a Special Master allowing or excluding new evidence on a claim appeal? ............................................................................................. 123

**340.** How will remands of claims on appeal work? ................................................................... 124

    **(a)** Will the re-review be assigned to the same AAP doctor who reviewed it before? ..... 124

    **(b)** If the Special Master remands my claim, will the Claims Administrator or the AAP review the entire claim all over again? .................................................................... 124

    **(c)** If an AAP doctor reviews the claim after remand, will that AAP doctor see the entire claim file on remand, or only the new evidence? .................................................... 124

    **(d)** Does that mean that AAP doctor will see all the briefs on the appeal too? ............... 124

    **(e)** On remand, does the original outcome set a floor for the result, or can the claim go down in value? ................................................................................................................ 125

    **(f)** What if the Claims Administrator did the original review and not the AAP. Do these same rules apply? ............................................................................................................. 125

**341.** Can a claim be appealed again after the Special Master remands it and the Claims Administrator issues a new notice? ........................................................................................ 125

your Claim Form or want to check the status of your claim and a Program Specialist will help you.

**82.   What is a Qualifying Diagnosis?**

These diagnoses are eligible for a Monetary Award:

   (a)  Level 1.5 Neurocognitive Impairment;

   (b)  Level 2 Neurocognitive Impairment;

   (c)  Alzheimer's Disease;

   (d)  Parkinson's Disease;

   (e)  Death with CTE (for a Retired NFL Football Player who died before April 22, 2015); and

   (f)  ALS.

Click here to read how these Qualifying Diagnoses are defined in Exhibit 1 of the Settlement Agreement.

**83.   Should I get a BAP exam or see a Qualified MAF Physician?**

This is up to you and depends on the Qualifying Diagnosis.

<u>**Level 1.5 and Level 2**</u>**:** If you are eligible for the BAP, you can get your diagnosis from either Qualified BAP Providers or a Qualified MAF Physician. The BAP exam is free.

<u>**Alzheimer's Disease, Parkinson's Disease and ALS**</u>: You must see a Qualified MAF Physician. These Qualifying Diagnoses cannot be made in the BAP.

**84.   What kind of physicians are authorized to make a Qualifying Diagnosis?**

This depends on the kind of Qualifying Diagnosis and when it was made. Click here for the Diagnosis and Review Table showing how this works. Find the kind of Qualifying Diagnosis in column 1 of Row A, B or C of the Diagnosis and Review Table. Then look at column 2 for when the diagnosis was made and column 3 for what kind of doctor has authority under the Settlement Agreement to make that diagnosis for purposes of a Monetary Award.

This is what the Diagnosis and Review Table shows:

(a)  Level 1.5, Level 2, Alzheimer's Disease, Parkinson's Disease, or ALS diagnosed before July 7, 2014, which was the date the Settlement Agreement was preliminarily approved by the Court: These must be made by what the Table calls Group 1 Specialists, who are:

Board-certified neurologists, board-certified neurosurgeons, or other board-certified neuro-specialist physicians, or otherwise qualified neurologists, neurosurgeons, or other neuro-specialist physicians. (See Section 6.3(d) of the Settlement Agreement, available by clicking here.)

(b) Level 1.5, Level 2, Alzheimer's Disease, Parkinson's Disease, or ALS diagnosed from July 7, 2014, through January 7, 2017, which was the date the Settlement Agreement became effective after all appeals: These must be made by what the Table calls Group 2 Specialists, who are:

Board-certified neurologists, board-certified neurosurgeons, or other board-certified neuro-specialist physicians. (See Section 6.3(c) of the Settlement Agreement, available by clicking here.)

NOTE: This is the same as the Group 1 Specialists listed above, except it does not include the "otherwise qualified neurologists, neurosurgeons, or other neuro-specialist physicians."

(c) Level 1.5, Level 2, Alzheimer's Disease, Parkinson's Disease, or ALS diagnosed on a Player while living but who died before January 7, 2017: These must be made by what the Table calls Group 3 Specialists, who are:

Board-certified neurologists, board-certified neurosurgeons, other board-certified neuro-specialist physicians, otherwise qualified neurologists, neurosurgeons, or other neuro-specialist physicians, or other physicians who have sufficient qualifications (a) in the field of neurology to make a Qualifying Diagnosis of Level 1.5 Neurocognitive Impairment, Level 2 Neurocognitive Impairment, Alzheimer's Disease, Parkinson's Disease, or ALS, or (b) in the field of neurocognitive disorders to make a Qualifying Diagnosis of Level 1.5 Neurocognitive Impairment or Level 2 Neurocognitive Impairment. (See Section 6.3(e) of the Settlement Agreement, available by clicking here.)

(d) Diagnoses made on Players after January 7, 2017:

(1) Level 1.5 or Level 2 Diagnoses: After January 7, 2017, these must be diagnosed either by Qualified BAP Providers in the BAP or by a Qualified MAF Physician;

(2) Alzheimer's Disease, Parkinson's Disease, or ALS: After January 7, 2017, these can be diagnosed only by a Qualified MAF Physician.

(e) Death with CTE: This can be diagnosed only by a board-certified neuropathologist after the Player's death.

*Reminder:* *You do not have to prove that the Qualifying Diagnosis was caused by playing football or from head injuries the Player experienced. The fact that a Player has a Qualifying Diagnosis is enough.*

**85.  Who is a Qualified MAF Physician?**

A Qualified MAF Physician is a board-certified neurologist, board-certified neurosurgeon, or other board-certified neuro-specialist physician, who is part of a list of physicians approved by Co-Lead Class Counsel and the NFL Parties as authorized to make a Qualifying Diagnosis after January 7, 2017. A physician is not a Qualified MAF Physician until he or she has been approved by the Parties and has signed a contract with the Claims Administrator. The list of Qualified MAF Physicians eligible to make Qualifying Diagnoses is posted on the Settlement Website (click here to see it). Also click here to see the Diagnosis and Review Table, which summarizes Qualifying Diagnoses that Qualified MAF Physicians make and the diagnostic criteria they use to make those diagnoses.

**86.  How do I get evaluated for a Qualifying Diagnosis if I do not already have one?**

You can make an appointment with either:

(a)  Qualified BAP Providers (if you are BAP-eligible) who can determine whether you have Level 1.5 Neurocognitive Impairment or Level 2 Neurocognitive Impairment; or

(b)  A Qualified MAF Physician, who can determine whether you have Level 1.5 Neurocognitive Impairment, Level 2 Neurocognitive Impairment, Alzheimer's Disease, Parkinson's Disease, or ALS.

*Reminder: BAP exams are free of charge. You are responsible for paying for an examination by a Qualified MAF Physician, but many Qualified MAF Physicians accept health insurance.*

**87.  If my diagnosing physician is both a Qualified BAP Provider and a Qualified MAF Physician, how do I know if the diagnosis is made in or outside the BAP?**

Qualifying Diagnoses of Alzheimer's Disease, Parkinson's Disease and ALS cannot be made through the BAP. After January 7, 2017, a Qualifying Diagnosis of Alzheimer's Disease, Parkinson's Disease, or ALS must be made by a Qualified MAF Physician, even if he or she is also a Qualified BAP Provider. However, a Qualifying Diagnosis of Level 1.5 Neurocognitive Impairment or Level 2 Neurocognitive Impairment may be made after January 7, 2017, by Qualified BAP Providers or a Qualified MAF Physician.

Most of the Qualified BAP Providers are also Qualified MAF Physicians. If you or your lawyer scheduled a BAP exam with the BAP Administrator, then you will receive a BAP exam. If you have any doubt about in which capacity the physician is acting, then ask him or her during your visit.

**88.  Does the physician who makes the Qualifying Diagnosis of a Retired NFL Football Player have to see and examine that Player in person?**

Yes, for all types of Qualifying Diagnoses other than Death with CTE, which only could have been diagnosed after the death of the Player.

The diagnosing physician who signs a Diagnosing Physician Certification Form for a diagnosis made on a living Retired NFL Football Player must have examined that Player in person. Section 8.2(a)(iii) of the Settlement Agreement allows a physician to make a Qualifying Diagnosis for a living Player relying on the records and work done by a prior physician and to use that earlier date as the diagnosis date *only if* that prior physician is deceased or incompetent *and only if* the new physician independently examines the Player. This means that other than those situations, a Qualifying Diagnosis of a living Player must be made by a physician based on his or her own examination and records, rather than the examination and records of someone else.

As a result:

(1) The diagnosing physician cannot base a Qualifying Diagnosis solely on a review of test results or the medical records of another physician; and

(2) The diagnosing physician must have met with the Player in person, rather than communicating with him by email, texts, letters, or on the phone.

There must be records in the Claim Package showing that the diagnosing physician who signed the Diagnosing Physician Certification Form submitted in the Claim Package followed both of these rules. If there is not, the Claim Package is incomplete. If the physician who signed the Diagnosing Physician Certification Form did not meet with the Player in person, that physician must do so to re-do the diagnosis, or the doctor who did meet the Player must sign the Diagnosing Physician Certification Form instead.

### 89. Can the representative of a deceased Retired NFL Football Player get a Qualifying Diagnosis for that Player now?

For a Qualifying Diagnosis of Death with CTE, the Retired NFL Football Player had to have died before April 22, 2015, and received a post-mortem diagnosis of CTE from a board-certified neuropathologist before April 22, 2015, or within 270 days after the Player's death, if the Player died between July 7, 2014, and April 22, 2015. If you represent a deceased Player who received this type of post-mortem diagnosis, you should contact the neuropathologist who provided it and ask him or her to complete and sign a Pre-Effective Date Diagnosing Physician Certification Form attesting to the Qualifying Diagnosis. This is the only type of Qualifying Diagnosis that can be made after the Player died.

For Qualifying Diagnoses of Level 1.5 Neurocognitive Impairment, Level 2 Neurocognitive Impairment, Alzheimer's Disease, Parkinson's Disease and ALS, the Player had to have been diagnosed while he was living by a physician with the appropriate qualifications, which are described in the FAQ found here. If the Player received one of these diagnoses while he was alive, you should contact the physician who made the diagnosis and ask him or her to complete and sign a Pre-Effective Date Diagnosing Physician Certification Form.

**90. What should I do if I already have a Qualifying Diagnosis?**

You should submit a Claim Package for that Qualifying Diagnosis, including a Diagnosing Physician Certification Form and any medical records from the physician who made the diagnosis and the other required parts of a Claim Package. If you received a Qualifying Diagnosis through the BAP, the Claims Administrator already has your medical records and Diagnosing Physician Certification Form. However, you must submit a Claim Form before the Claims Administrator will review your claim for a Monetary Award determination.

*Reminder: Only Qualified BAP Providers and Qualified MAF Physicians can make Qualifying Diagnoses after January 7, 2017.*

**91. Does it matter when the Retired NFL Football Player was diagnosed?**

Yes. The Settlement Agreement sets out what kind of doctors are authorized to make a Qualifying Diagnosis, depending on when the diagnosis is made. (See Section 6.3 of the Settlement Agreement, available by clicking here.)

The Settlement Agreement controls what medical criteria applies when making a Qualifying Diagnosis and who reviews that diagnosis to see if it qualifies for a Monetary Award, whether the Appeals Advisory Panel of neurologists or the Claims Administrator, and how the review is to be done. That also depends on when the diagnosis is made. (See Section 6.4 and Exhibit 1 of the Settlement Agreement, available by clicking here.)

Click here for the Diagnosis and Review Table showing how this works. Find your diagnosis in Column 1 and then look in Columns 2 through 6 of that table for who makes the diagnosis, who reviews it and how.

**92. What dates matter for when the Qualifying Diagnosis is made?**

The Settlement Agreement divides diagnoses into these time periods. The Claims Administrator created a Diagnosis and Review Table to show how this works. Click here to see column 2 of the Table, which shows:

(a) Diagnoses made on or before July 1, 2011;

(b) Diagnoses made from July 2, 2011 through July 6, 2014;

(c) Diagnoses made from July 7, 2014, the date the Settlement Agreement was preliminarily approved by the Court, through January 7, 2017, which was the date the Settlement Agreement became effective after all appeals;

(d) Diagnoses made on Players while living but who died before January 7, 2017;

(e) Diagnoses made on Players after January 7, 2017; and

(f) Diagnoses of Death with CTE made on Players who died on or before April 22, 2015, which was the date the Court finally approved the Settlement Agreement but before all appeals were done.

**93. How is the date of a Qualifying Diagnosis determined?**

The physician making a Qualifying Diagnosis of a Retired NFL Football Player must determine and verify the date on which that Qualifying Diagnosis was made. This date is important under the Settlement Agreement. It affects the amount of a Monetary Award, because the younger a Player is at the time of the Qualifying Diagnosis, the larger the award.

The diagnosing physician uses his or her professional medical judgment in deciding when the Player had the conditions amounting to a Qualifying Diagnosis under Exhibit 1 to the Settlement Agreement. There are some basic rules about this:

(a) *Death with CTE:* For these claims, the date of the Qualifying Diagnosis is the date of the Player's death, even though the diagnosis is not made until after the Player dies. The Monetary Award is based on the Player's age when he died.

(b) *General Rule for the other Qualifying Diagnoses:* The date of a Qualifying Diagnosis other than Death with CTE is when the diagnosing physician has enough information and materials, including test results, to be able to render a medically sound and reliable judgment about the Player's condition, the way a physician normally does in his or her clinical practice. In some cases, using sound medical judgment, a physician may conclude that a Qualifying Diagnosis existed at some prior point in time.

(c) *Are there other cases when the Qualifying Diagnosis might be before the date the physician personally examines the Player?* Maybe. The unique facts and circumstances of a particular claim may allow the diagnosis date to be before the date the diagnosing physician personally examined the Player. Here are the rules:

(1) *Diagnosing Physician is deceased or legally incompetent:* Section 8.2(a)(iii) of the Settlement Agreement allows use of the date of an earlier Qualifying Diagnosis to calculate a Monetary Award where: (a) the Player received a Qualifying Diagnosis; (b) the diagnosing physician died or was deemed by a court to be legally incapacitated or incompetent before the January 7, 2017 Effective Date or before completing a Diagnosing Physician Certification Form; (c) a separate qualified physician made an independent examination and reviewed the Player's medical records that formed the basis of the Qualifying Diagnosis; and (d) that physician found the same Qualifying Diagnosis. Here, the Settlement Agreement allows a later physician to adopt the date of diagnosis based upon the earlier medical records of another physician.

(2) *88 Plan diagnoses:* If the diagnosis was made by an 88 Plan neutral physician who cannot or will not sign the Diagnosing Physician Certification Form, the date of the diagnosis made as part of the 88 Plan Independent Medical Examination ("IME")

may be used where: (a) the Player sees a Qualified MAF Physician for an independent examination or Qualified BAP Providers for a BAP exam; (b) the Player provides the Qualified MAF Physician or Qualified BAP Providers with all records of the prior 88 Plan IME diagnosis in his possession or to which he has access and all records of evaluation and treatment for that impairment between the dates of the 88 Plan IME and the Qualified MAF Physician appointment or BAP exam in his possession or to which he has access; (c) the Qualified MAF Physician performs an independent examination or the Qualified BAP Providers perform a BAP exam of the Player and review the additional records provided by the Player; and (d) if the Qualified MAF Physician or Qualified BAP Providers find the same Qualifying Diagnosis – both as of the date of the independent examination and the prior IME for the 88 Plan – then the date of Qualifying Diagnosis will be the date of the 88 Plan IME.

This exception applies only to diagnoses made through the 88 Plan. If you received a diagnosis through another NFL disability plan, such as the Neuro-Cognitive Disability Benefit Plan or the NFL Player Supplemental Disability Plan, contact the Claims Administrator to see if the date of diagnosis made through that plan can be used as the date of the Qualifying Diagnosis for purposes of a Monetary Award. The Claims Administrator will review your case with Co-Lead Class Counsel and Counsel for the NFL Parties.

(3) *Medical Records unavailable:* If the Player died before the January 7, 2017 Effective Date of the Settlement Agreement and the medical records reflecting the Qualifying Diagnosis are unavailable because of a force majeure type event or for some other reason the Claims Administrator deems acceptable, the date of the Qualifying Diagnosis will be the earlier of: (1) the date of the onset of the Qualifying Diagnosis reflected in other available contemporaneous medical records or the death certificate; or (2) the date of the Player's death provided on the death certificate.

(4) *Other instances where the earlier diagnosing doctor or medical records are not available:* If you face other situations not covered by the terms of Section 8.2(a)(iii) of the Settlement Agreement and not involving a Plan 88 IME, then contact the Claims Administrator and explain the problem you have. There may be other circumstances in which a diagnosis by a later physician might adopt the earlier date of a diagnosis by another doctor.

(5) *Sound clinical medical judgment:* Also, the physician making a diagnosis may conclude, in the exercise of his or her sound medical judgment, that he or she has enough information from personal examination, medical records from other healthcare providers, medical history, corroborating evidence from non-family members and other information that medical specialists rely on in their clinical practices, to form a sound medical judgment that the Player's Qualifying Diagnosis conditions existed at a date earlier than the date of a personal examination of the Player by the physician making the diagnosis and signing the Diagnosing Physician

Certification Form. The Settlement Class Member is best served by having the doctor who made an earlier diagnosis sign the Diagnosing Physician Certification Form. But there may be situations where the diagnosing physician can pinpoint an earlier date that is based on sound clinical judgment and best medical practices.

Any such diagnosis will be strictly scrutinized in the claims review process. The Claims Administrator may request additional information and/or documents to support the claimed diagnosis date and prevent misrepresentations of material fact in connection with the claim.

**94. Which diagnostic criteria must a physician use when making my Qualifying Diagnosis? When and to what diagnoses does the "generally consistent" criteria apply?**

The Diagnosis and Review Table shows how this works; click <u>here</u> to review the Table.

For diagnoses of Level 1.5 and Level 2 Neurocognitive Impairment made in the BAP, Qualified BAP Providers follow the diagnostic criteria set forth in Exhibits 1 and 2.

Diagnoses of Level 1.5 and 2 Neurocognitive Impairment made outside the BAP must show that the evaluation and evidence behind those diagnoses are "generally consistent" with the diagnostic criteria set for Qualified BAP Providers and outlined in Exhibits 1 and 2.

Diagnoses of Alzheimer's Disease, Parkinson's Disease, ALS and Death with CTE are not made in the BAP and are all made following the diagnostic criteria set out in Exhibit 1 (and the "generally consistent" standard does not apply).

**95. What does "generally consistent" mean?**

Something is "generally consistent with" something else if the two things have more elements or characteristics in common with each other than they have elements or characteristics that differ from each other. The common elements or characteristics must predominate over the uncommon ones.

The Settlement Agreement states specifically that diagnostic criteria for a diagnosis made outside the BAP do not have to be identical to the diagnostic criteria for a diagnosis made in the BAP. The diagnostic criteria, or the medical rules the doctor must follow to make the diagnosis, outside the BAP do not have to be 100% the same as the Exhibit 1 criteria.

With this said, the closer a set of diagnostic criteria match those specified in Exhibit 1, the more "consistent" it will be with Exhibit 1.

A claim based on a Qualifying Diagnosis is most solid when its elements match closely those required in Exhibit 1. For example, where Exhibit 1 requires documentary evidence or a third-party sworn affidavit corroborating functional impairment, or neuropsychological testing, the claim of a Qualifying Diagnosis is most solid when its Claim Package contains documentary evidence or a third-party sworn affidavit corroborating functional impairment and proof of

# Exhibit 5

 **CONCUSSION SETTLEMENT**

*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*

No. 2:12-md-02323 (E.D. Pa.)

## APPEALS FORM FOR MONETARY AWARD OR DERIVATIVE CLAIMANT AWARD CLAIM DETERMINATION

### DATE OF NOTICE: June 25, 2019

### DEADLINE TO APPEAL: July 25, 2019

### I. SETTLEMENT CLASS MEMBER INFORMATION

| Settlement Program ID | 950012548 | | | | |
|---|---|---|---|---|---|
| **Name:** | First<br>Robin | | M.I.<br>B | Last<br>Cornish | |
| **Settlement Class Member Type** | Representative Claimant | | | | |
| **Primary Counsel** | O'Hanlon, Demerath & Castillo | | | | |

### II. REASON FOR THIS APPEAL

Here is a short statement explaining the reason(s) for my appeal. Raise all issues you wish to appeal. Issues not raised at this time will not be addressed by the Court.

Class Member files the attached written statement in support of this appeal and respectfully requests that the Claims Administrator's denial of this claim be reversed and remanded for a calculation of the Class Member's Monetary Award because the Claims Administrator erred in concluding that the Amended Settlement Agreement required Class Member to submit proof that the board-certified neuropathologist who provided a post-mortem diagnosis of CTE made the diagnosis on or before 4/22/15. (If the Amended Settlement Agreement [ECF 6481] is construed to require a diagnosis on or before 4/22/15, Class Member reserves the right to seek relief from the Court pursuant to both Rule 60 and the Court's inherent authority to amend the judgment in this case in order to implement the settlement.)

### III. HOW TO SUBMIT THIS FORM

You may submit this Appeals Form and any accompanying documents using one of these methods:

| **By Mail:**<br>(must be postmarked on or before the appeal deadline date) | NFL Concussion Settlement<br>Claims Administrator<br>P.O. Box 25369<br>Richmond, VA 23260 |
|---|---|
| **By Overnight Delivery:**<br>(must be placed with the overnight carrier on or before the appeal deadline date) | NFL Concussion Settlement<br>c/o BrownGreer PLC<br>250 Rocketts Way<br>Richmond, VA 23231 |
| **By Hand Delivery:**<br>(must delivered on or before the appeal deadline date) | NFL Concussion Settlement<br>c/o BrownGreer PLC<br>250 Rocketts Way<br>Richmond, VA 23231 |

### IV. HOW TO CONTACT US WITH QUESTIONS OR FOR HELP

If you are represented by a lawyer, consult with your lawyer if you have questions or need assistance. If you are unrepresented and have any questions about this Form or need help, contact us at 1-855-887-3485 or send an email to ClaimsAdministrator@NFLConcussionSettlement.com.  If you are a lawyer, call or email your designated Firm Contact for assistance. For more information about the Settlement Program, visit the official website at www.NFLConcussionSettlement.com, where you can read or download the Rules Governing Appeals of Claim Determinations, Frequently Asked Questions about the Settlement, the complete Settlement Agreement and other helpful materials.

# Exhibit 6

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| | § | |
| IN RE: NATIONAL FOOTBALL | § | No. 2:12-md-02323-AB |
| LEAGUE PLAYERS' CONCUSSION | § | |
| INJURY LITIGATION | § | MDL No. 2323 |
| | § | |
| | § | **Hon. Anita B. Brody** |
| THIS DOCUMENT RELATES TO: | § | |
| Settlement Class Member Robin B. Cornish | § | |
| (SPID 950012548) | § | |

**WRITTEN STATEMENT IN SUPPORT OF CLASS MEMBER'S APPEAL**
**OF THE CLAIMS ADMINISTRATOR'S NOTICE OF DENIAL OF**
**MONETARY AWARD CLAIM**

Class Member Robin B. Cornish, by and through counsel, files this written statement in

support of this appeal and respectfully requests that the Claims Administrator's denial of this

claim be reversed and remanded for a calculation of the Class Member's Monetary Award because

the Claims Administrator erred in concluding that the Amended Settlement Agreement required

Class Member to submit proof that the board-certified neuropathologist who provided a post-

mortem diagnosis of CTE made the diagnosis on or before 4/22/15.[1]

---

[1]    If the Amended Settlement Agreement [ECF 6481] is construed to require a diagnosis on or before
4/22/15, Class Member reserves the right to seek relief from the Court pursuant to both Rule 60 and the
Court's inherent authority to amend the judgment in this case in order to implement the settlement.

## **SUPPORTING EVIDENCE**[2]

Exhibit 1          Notice of Denial of Monetary Award Claim

Exhibit 2          Relevant Excerpts from Class Member's Claim Package

Exhibit 3          Notice of Request for Additional Documents

Exhibit 4          Letter dated May 6, 2019 to Claims Administrator regarding Class Member's claim

---

[2]   Class Member also incorporates by reference the following documents that have been filed in this MDL or published on the Settlement Website:

(1) Original Settlement Agreement [ECF 6073-2];

(2) the Amended Settlement Agreement [ECF 6481];

(3) Absent Class Member and Plaintiff Yvonne Sagapolutele's Motion to Modify the Amended Final Order and Judgment [ECF 6534] by Conforming the Definition of "Death with CTE" to the Version Contemplated in the Fairness Hearing Order [ECF 6479] and Noticed to the Class in the Long Form Notice [ECF 6093-1] and Summary Notice [ECF 6093-2] Pursuant to Rule 60 and the Authority Retained in the Settlement Agreement [ECF 8263] ("Motion to Modify");

(4) Response in Opposition to the Motion to Modify [ECF 8430];

(5) Statement of Co-Lead Counsel in Opposition to the Motion to Modify [ECF 8431];

(6) Reply in Support of Motion to Modify [ECF 8442];

(7) Notice of Joinder [ECF 8443];

(8) Order denying, without prejudice, the Motion to Modify [ECF 8557];

(9) Posted Settlement Program FAQs (as of February 19, 2019); and

(10) Posted Settlement Program FAQs (as of July 8, 2019).

## **BACKGROUND**

Class Member submitted a claim package that included a post-mortem diagnosis of Chronic Traumatic Encephalopathy ("CTE") made by Dr. Hamilton, a board-certified neuropathologist.[3] Class Member's submitted claim package also includes documentation showing that the Player died prior to April 22, 2015.[4]  The claim package includes an autopsy report, death certificate, and letter from Dr. Hamilton describing his diagnosis of CTE based on brain tissue slides from the Tarrant County Medical Examiner.

The Claims Administrator initially requested additional documents, stating: "You have not submitted any medical records reflecting the Qualifying Diagnosis."[5]  The Claims Administrator further explained the following:

> The medical records must show a post-mortem diagnosis of CTE made before April 22, 2015 (the Final Approval Date) by a board-certified neuropathologist for a Retired NFL Football Player who died before April 22, 2015.  See Section 6.3(f) of the Settlement Agreement and FAQ 109.  Mr. Cornish died on August 23, 2008, and the August 24, 2008 autopsy report signed by Marc A. Krouse does not reference CTE and neither does the death certificate.  You provided an undated letter from Dr. Ronald L. Hamilton who diagnosed Mr. Cornish with CTE.  You must establish that Dr. Hamilton reviewed Mr. Cornish's brain tissue and made a CTE diagnosis on or before April 22, 2015.

In a correspondence dated May 6, 2019, Class Member's counsel explained that FAQ 109 must be read in conjunction with FAQ 93, which states that the diagnosis date for a Death with CTE diagnosis is "the date of the Player's death, even though the diagnosis is

---

[3]   Exhibit 2.

[4]   *Id.*

[5]   Exhibit 3

not made until after the Player dies."[6]

Despite this response, the Claims Administrator denied Class Member's Monetary Award Claim.[7] Class Member has timely filed this appeal of the Claims Administrator's Notice of Denial of Monetary Award Claim.

### **ARGUMENTS**

The Claims Administrator denied Class Member's claim because the claim package does not show that Dr. Hamilton (a board-certified neuropathologist) "reviewed Mr. Cornish's brain tissue and made a CTE diagnosis on or before April 22, 2015."

## I.  The Claims Administrator erred in concluding that the CTE Diagnosis was not timely.

The Claims Administrator's reason for denying the claim is legally flawed in two respects. First, the diagnosis date for Death with CTE is the date of the Player's death, even if the diagnosis occurs later.  Second, if the Amended Settlement Agreement [ECF 6481] does require that the diagnosis be made prior to 4/22/2015, this requirement violates Class Member's rights because it was not contained in the Original Settlement Agreement [ECF 6073-20] and was added (1) despite the Court's instructions that any changes to the Original Settlement Agreement should make it *more* favorable, not *less* favorable, to class members; (2) without notice to Class Member; and (3) after Class Member's opt-out deadline had already passed.

### A.  The diagnosis date for Death with CTE is the date of the Player's death.

The Claims Administrator has posted several versions of "Posted Settlement Program FAQs" on the Settlement Website with answers to frequently asked questions.  All of the content in the

---

[6]  *See* Exhibit 4.

[7]  Exhibit 1.

Posted Settlement Program FAQs is subject to advance approval by Counsel for the NFL Parties.[8]

According to FAQ 93 in these Posted Settlement Program FAQs, the diagnosis date for Death

with CTE is the date of the Player's death, even though the diagnosis is not made until after the

Player dies:[9]

> **93. How is the date of a Qualifying Diagnosis determined?**
>
> The physician making a Qualifying Diagnosis of a Retired NFL Football Player must determine and verify the date on which that Qualifying Diagnosis was made. This date is important under the Settlement Agreement. It affects the amount of a Monetary Award, because the younger a Player is at the time of the Qualifying Diagnosis, the larger the award.
>
> The diagnosing physician uses his or her professional medical judgment in deciding when the Player had the conditions amounting to a Qualifying Diagnosis under Exhibit 1 to the Settlement Agreement. There are some basic rules about this:
>
> (a) *Death with CTE:* For these claims, the date of the Qualifying Diagnosis is the date of the Player's death, even though the diagnosis is not made until after the Player dies. The Monetary Award is based on the Player's age when he died.

Based on the Claims Administrator's representations to the class members that the date of the

Qualifying Diagnosis for Death With CTE is the date of the Player's death, the only date that is

relevant in determining the date of a Qualifying Diagnosis for Death with CTE is the date of the

Player's death.  The Claims Administrator's insistence on proof that the diagnosis "was done on

or before 4/22/15" ignores these representations, which establish that the date of the Player's death

is the date of the Qualifying Diagnosis.

Here, the claim package establishes that the Player's death occurred before April 22, 2015.

---

[8]    *See* Amended Settlement Agreement § 4.1(a).

[9]    This language is from the Posted Settlement Program FAQs (as of February 19, 2019).  Since this claim package was submitted, a new version of the FAQs have been published on the Settlement Website in the Posted Settlement Program FAQs (as of July 8, 2019).  The language in FAQ 93 is unchanged in the new version of Posted Settlement Program FAQs; it has merely been moved to FAQ 99.

Accordingly, the date of the Qualifying Diagnosis is before April 22, 2015, and the Claims Administrator erred in denying this claim.

> **B. In the alternative, if this Denial is based on language that was surreptitiously added to the Settlement Agreement putatively imposing a deadline for a Qualifying Diagnosis for Death with CTE, the Denial must reversed.**

The Court has previously considered a Motion to Modify the Amended Final Order and Judgment [ECF 8263] and denied the motion without prejudice to a consideration of the issues in that motion at a later time.[10]  In that motion, Class Member Yvonne Sagapolutele brought the Court's attention to the fact that although the Original Settlement Agreement contained no deadline for obtaining a Death with CTE Diagnosis, language appears to have been surreptitiously added to the Amended Settlement Agreement that could be read to have added a diagnosis deadline without notice to the Court or to the class members.[11]  The motion sought relief under both Rule 60 and the Court's inherent authority to implement the settlement by amending the Court's judgment.[12]

The Court denied the motion without prejudice and stated that before it would consider the "extraordinary action of modifying the Settlement Agreement," class members must first submit a claim to the Claims Administrator.[13]

If the Special Master concludes that the Amended Settlement Agreement does require Class Member to have obtained a CTE diagnosis prior to April 22, 2015 despite the contrary language

---

[10]    *See* Order [ECF 8557]

[11]    Motion to Modify [ECF 8263]

[12]    *Id.*

[13]    Order [ECF 8557]

in the Posted Settlement Program FAQs and in other notices, it does not appear that the Special Master would have the necessary authority to provide a remedy.[14]  To the extent the Special Master may have the authority to provide a remedy, Class Member incorporates by reference the arguments in the Motion to Modify [ECF 8263].  If the denial of this claim is not reversed, Class Member expressly reserves the right to seek appropriate relief from the Court under Rule 60 and under the Court's inherent authority to implement the settlement by amending the Court's judgment.

## CONCLUSION

For all of the foregoing reasons, Class Member respectfully requests that the Special Master reverse the Claims Administrator's denial of this Monetary Award Claim and remand to the Claims Administrator for a calculation of the Monetary Award.

Dated:  July 12, 2019

Respectfully Submitted:

/s/ Justin Demerath

**Justin Demerath**
Texas State Bar No. 24034415
**David Campbell**
Texas State Bar No. 24057033
O'HANLON, DEMERATH & CASTILLO
808 West Avenue |  Austin, TX 78701
Tel: (512) 494-9949  |  Fax: (512) 494-9919
jdemerath@808west.com
dcampbell@808west.com

**Counsel for Class Member**

---

[14]  *See* Order [ECF 6871] (providing Special Masters with the authority to faithfully oversee the implementation and administration of the Settlement Agreement); *see also* Motion to Modify [ECF 8263] (seeking relief under Rule 60).

## **CERTIFICATE OF SERVICE**

It is hereby certified that a true copy of the foregoing document was submitted on the Court Portal on the 12th day of July, 2019.

/s/ Justin B. Demerath_____
Justin B. Demerath



# NFL CONCUSSION SETTLEMENT

*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

## NOTICE OF DENIAL OF MONETARY AWARD CLAIM
### DATE OF NOTICE: **June 25, 2019**
### DEADLINE TO APPEAL: **July 25, 2019**

## I. SETTLEMENT CLASS MEMBER INFORMATION

| Settlement Program ID | 950012548 | | | |
|---|---|---|---|---|

| Name | First Robin | M.I. B | Last Cornish | |
|---|---|---|---|---|

| Settlement Class Member Type | Representative Claimant | | |
|---|---|---|---|

| Law Firm | O'Hanlon, Demerath & Castillo | | |
|---|---|---|---|

| Asserted Qualifying Diagnosis | Death with CTE (Chronic Traumatic Encephalopathy) | Date | 8/23/08 |
|---|---|---|---|

## II. EXPLANATION OF CLAIM DETERMINATION

This Notice is an official communication from the Claims Administrator for the NFL Concussion Settlement Program. We sent you a Notice of Request for Additional Documents or Notice of Preliminary Review telling you about insufficient documents and/or missing information in your Claim Package. The response deadline on that Notice has expired, or you have responded but did not resolve the issue(s) we told you about, and your claim is denied because it remains incomplete for these reason(s):

| | What was Missing | How We Told You to Address this Item |
|---|---|---|
| 1. | You have not submitted any medical records reflecting the Qualifying Diagnosis. | Click the Respond button, go to Section 3 for Medical Records, click the Upload Medical Records button and follow the instructions to upload medical records reflecting the Qualifying Diagnosis. |

Section III below explains your right to appeal this denied claim, but you also have the option to submit a new Claim Package under Section 9.1(c)(i) of the Settlement Agreement. We will determine whether the new claim can be considered for a Monetary Award based on several factors, including whether the new claim shows materially changed circumstances from the earlier claim. These materially changed circumstances may include: (a) a different type of Qualifying Diagnosis than the one that was denied; or (b) the same type of Qualifying Diagnosis but with a different diagnosis date supported by additional medical records. If you submit a new claim within 365 days of this denial notice, Section 10.3(d)(ii) of the Settlement Agreement requires us to audit that new claim if it is based on the same Qualifying Diagnosis as this denied claim, but the new diagnosis was made by a different physician.

## III. YOUR RIGHT TO APPEAL THIS DETERMINATION

If you have a good faith belief that the decision to deny your Monetary Award claim is incorrect, you may appeal this determination to the Court under Section 9.5 of the Settlement Agreement. To do so, click the Appeal Denied Claim button on your secure online portal and follow the instructions provided. You must submit supporting evidence to support your appeal. Any written statement may not be more than 10 double-spaced pages. You must do so on or before the Deadline to Appeal stated at the top of this Notice.



If you decide to appeal, the Settlement Agreement requires you to pay an Appeal Fee of $1,000, which you can do using the online PayPal option or by check made payable to the NFL Claims Administrator. This fee will be refunded if your appeal is successful. If you are unable to pay the $1,000 fee, you may make a hardship request to us to waive the fee and will have to submit financial information showing a sufficient hardship.

If paying the $1,000 Appeal Fee by check, mail the check to the address below.

NFL Concussion Settlement
Claims Administrator
P.O. Box 25369
Richmond, VA  23260

The Special Master appointed by the Court will decide your appeal based upon a showing by you of clear and convincing evidence. The Special Master's factual determinations will be final and binding, but you or Co-Lead Class Counsel or the NFL Parties may object to any of the Special Master's conclusions of law, which will then be subject to de novo (*i.e.*, a new) review by the Court.

If an appeal is not submitted on or before the deadline stated at the top of this Notice, the determination in this Notice will become final.

## IV. CO-LEAD CLASS COUNSEL'S RIGHT TO APPEAL THIS DETERMINATION

Section 9.5 of the Settlement Agreement also gives Co-Lead Class Counsel the right to challenge our decision to deny your Monetary Award claim. If Co-Lead Class Counsel chooses to appeal, it must do so by the Deadline to Appeal stated at the top of this Notice and must provide a written copy of its Appeals Form and any supporting evidence to you, the NFL Parties, and us.

If an appeal is taken by you or Co-Lead Class Counsel, the NFL Parties may submit a written opposition (not to exceed 10 double-spaced pages) no later than 30 days after receipt of the Appeals Form. The party taking the appeal is not permitted to submit a reply.

Co-Lead Class Counsel may also submit a written statement (not to exceed 10 double-spaced pages) in response to your appeal no later than 15 days after receipt of the Appeals Form, and you and the NFL Parties may each submit a reply to any such submission by Co-Lead Class Counsel.

## V. HOW TO CONTACT US WITH QUESTIONS OR FOR HELP

If you are represented by a lawyer, consult with your lawyer if you have questions or need assistance. If you are unrepresented and have any questions about this Notice or need help, contact us at 1-855-887-3485 or send an email to ClaimsAdministrator@NFLConcussionSettlement.com. If you are a lawyer, call or email your designated Firm Contact for assistance. For more information about the Settlement program, visit the official website at www.NFLConcussionSettlement.com to read the Frequently Asked Questions or download a copy of the complete Settlement Agreement.



 **CONCUSSION SETTLEMENT**

*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

## CLAIM FORM SIGNATURE ACKNOWLEDGEMENT FORM

If you completed your Claim Form using your Portal, you must submit this Claim Form Signature Acknowledgement Form with the Personal Signature of the Settlement Class Member identified in Section I who is submitting the claim for a Monetary Award.

### I. SETTLEMENT CLASS MEMBER & CLAIM FORM INFORMATION

| Settlement Program ID | 950012548 | | | |
|---|---|---|---|---|

| Name | First<br>Robin | M.I.<br>B | Last<br>Cornish | Suffix |
|---|---|---|---|---|

### II. PERSONAL SIGNATURE

**By signing below, I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that all information provided in the Claim Form submitted through the Secure Portal, and in any of its attachments, is true and correct to the best of my knowledge, information, and belief.**

| Signature | | Date | |0 |2 |/|0 |5 |/|2 |0 |1 |9 |<br>(Month/Day/Year) |
|---|---|---|---|

### III. HOW TO SUBMIT THIS SIGNATURE ACKNOWLEDGEMENT FORM

After printing this form, the Settlement Class Member must sign in the Personal Signature box above. Scan and upload the signed document using the Upload Signed Signature Acknowledgement Form button on the Claim Package Page of your Portal. If you are unable to scan the form, you may return the signed form through either of the following options:

| By Mail: | NFL Concussion Settlement<br>Claims Administrator<br>P.O. Box 25369<br>Richmond, VA 23260 |
|---|---|
| By FedEx/UPS: | NFL Concussion Settlement<br>c/o BrownGreer PLC<br>250 Rocketts Way<br>Richmond, VA 23231 |

 **CONCUSSION SETTLEMENT**

*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

## NFL CONCUSSION SETTLEMENT CLAIM FORM
## FOR RETIRED NFL FOOTBALL PLAYERS AND REPRESENTATIVE CLAIMANTS

Complete this Claim Form if you are a **Retired NFL Football Player** or the **Representative Claimant** of a Retired NFL Football Player and want to apply for a Monetary Award under the NFL Concussion Settlement Program. You must fill out Section II only if you are a **Representative Claimant**.

**Your Claim Package must be submitted to the Claims Administrator no later than two years after the date that you received your Qualifying Diagnosis or within two years after February 6, 2017, whichever is later. Failure to meet this deadline will preclude you from receiving a Monetary Award for that Qualifying Diagnosis unless you can: (1) show substantial hardship (beyond the Qualifying Diagnosis) that prevented your compliance; and (2) submit the Claim Package within two years of the missed deadline.**

Certain Claim Packages may be selected for audit pursuant to Section 10.3 of the Settlement Agreement. If your claim is selected for audit, you may be required to submit additional records or information now or in the future. You are required to preserve all such additional records in your possession, custody or control and to instruct your healthcare providers to preserve such records that may be requested under Section 10.3(e) of the Settlement Agreement. These documents include but are not limited to historical medical records related to the underlying medical condition that is the basis for the Qualifying Diagnosis. Unreasonable failure to preserve, and later provide upon request, such records and information will result in the claim being denied without the right to an appeal.

## I. RETIRED NFL FOOTBALL PLAYER INFORMATION

Enter only the **Retired NFL Football Player's** information in this Section I.

| Settlement Program ID | 950012548 | | | |
|---|---|---|---|---|
| **Player Name** | First<br>Frank | M.I. | Last<br>Cornish | Suffix |
| **Player Date of Birth** | | ██ / ██ / 1967<br>(Month/Day/Year) | | |
| **Player Date of Death (if applicable)** | | Aug / 23 / 2008<br>(Month/Day/Year) | | |
| **Player Social Security Number** | | ██ █ ██ - 4068 | | |

| **Player Mailing Address** | Address 1 | |
|---|---|---|
| | Address 2 | |
| | City | |
| | State/Province | |
| | Postal Code | Country<br>United States |

| **Player Telephone** | ____ - ____ - ____ | **Player Email Address** | |
|---|---|---|---|

## NFL CONCUSSION SETTLEMENT CLAIM FORM
## FOR RETIRED NFL FOOTBALL PLAYERS AND REPRESENTATIVE CLAIMANTS

### II. REPRESENTATIVE CLAIMANT INFORMATION

If you are a **Representative Claimant** of a Retired NFL Football Player who is deceased, or legally incapacitated or incompetent, fill out this Section II with your own information.

| Representative Name | First<br>Robin | | M.I.<br>B | Last<br>Cornish | | Suffix |
|---|---|---|---|---|---|---|

| Representative Date of Birth | ███ ███ ███ <br>(Month/Day/Year) |
|---|---|

| Representative Social Security Number | ██ █ ██ █ ██ |
|---|---|

| Representative Mailing Address | Address 1<br>██████ | |
|---|---|---|
| | Address 2 | |
| | City<br>██ | |
| | State/Province<br>TX | |
| | Postal Code<br>███ | Country<br>United States |

| Representative Telephone | ██ █ ██ █ ██ | Representative Email Address | ████████ |
|---|---|---|---|

### III. ATTORNEY INFORMATION

If you are represented by an attorney, enter the attorney's information in this Section III.

| Attorney Name | First<br>Justin | | M.I.<br>B | Last<br>Demerath | | Suffix |
|---|---|---|---|---|---|---|

| Law Firm Name | O'Hanlon, Demerath & Castillo |
|---|---|

| Law Firm Mailing Address | Address 1<br>808 West Avenue | |
|---|---|---|
| | Address 2 | |
| | City<br>Austin | |
| | State/Province<br>TX | |
| | Postal Code<br>78701 | Country<br>United States |

| Attorney Telephone | _____ - _____ - _____ | Attorney Email Address | jdemerath@808west.com |
|---|---|---|---|

### IV. QUALIFYING DIAGNOSIS/ES

## NFL CONCUSSION SETTLEMENT CLAIM FORM
## FOR RETIRED NFL FOOTBALL PLAYERS AND REPRESENTATIVE CLAIMANTS

Check the Qualifying Diagnosis/es for which the Retired NFL Football Player seeks an award and provide the date of each diagnosis and his State of Domicile at the time of that diagnosis. If the Retired NFL Football Player was diagnosed with either Level 1.5 or Level 2 Neurocognitive Impairment through the Baseline Assessment Program ("BAP"), you must provide the name of **both** the diagnosing neuropsychologist and the diagnosing board-certified neurologist.

| Qualifying Diagnosis/es | | Date of Diagnosis/es | State of Domicile at Time of Diagnosis |
|---|---|---|---|
| ☐  Level 1.5 Neurocognitive Impairment | | -- / -- / ---- (Month/Day/Year) | _____ (State) |
| **Diagnosing medical professional:** | | | |
| Name | First | M.I.   Last | Suffix |
| **Second diagnosing medical professional (if diagnosis was made through the BAP):** | | | |
| Name | First | M.I.   Last | Suffix |
| ☐  Level 2 Neurocognitive Impairment | | -- / -- / ---- (Month/Day/Year) | _____ (State) |
| **Diagnosing medical professional:** | | | |
| Name | First | M.I.   Last | Suffix |
| **Second diagnosing medical professional (if diagnosis was made through the BAP):** | | | |
| Name | First | M.I.   Last | Suffix |
| ☐  Alzheimer's Disease | | -- / -- / ---- (Month/Day/Year) | _____ (State) |
| **Diagnosing medical professional:** | | | |
| Name | First | M.I.   Last | Suffix |
| ☐  Parkinson's Disease | | -- / -- / ---- (Month/Day/Year) | _____ (State) |
| **Diagnosing medical professional:** | | | |
| Name | First | M.I.   Last | Suffix |
| ☐  ALS (Amyotrophic Lateral Sclerosis, or "Lou Gehrig's Disease") | | -- / -- / ---- (Month/Day/Year) | _____ (State) |
| **Diagnosing medical professional:** | | | |
| Name | First | M.I.   Last | Suffix |
| ☒  Death with CTE (Chronic Traumatic Encephalopathy) | | Aug / 23 / 2008 (Month/Day/Year) | TX (State) |

## NFL CONCUSSION SETTLEMENT CLAIM FORM
## FOR RETIRED NFL FOOTBALL PLAYERS AND REPRESENTATIVE CLAIMANTS

**Diagnosing medical professional:**

| Name | First<br>Ronald | M.I.<br>L. | Last<br>Hamilton | Suffix |
|------|------|------|------|--------|

## V. ADDITIONAL MEDICAL INFORMATION

### A. Stroke

Was the Retired NFL Football Player diagnosed as having suffered a Stroke before the Qualifying Diagnosis identified in Section V?  A medically diagnosed Stroke does not include a transient cerebral ischemic attack and related syndromes.

☐ **YES**   If you answered Yes, provide additional information about the Stroke.  Then go to Section VI. B.

☒ **NO**   If you answered No, go to Section VI. B.

| **Date of Stroke** | --- / --- / ---- <br>(Month/Day/Year) |
|------|------|

**Medical professional who diagnosed the Stroke:**

| Name | First | M.I. | Last | Suffix |
|------|------|------|------|--------|

☐   Check here if you believe that the Qualifying Diagnosis for which you are claiming a Monetary Award is not causally related to the prior Stroke and you are submitting records and other evidence supporting this position.  If you provide information regarding a prior Stroke but do not check this box, we will apply an Offset, which will result in a 75% reduction of any Monetary Award.

### B. Traumatic Brain Injury

Was the Retired NFL Football Player diagnosed as having suffered a *severe* traumatic brain injury unrelated to NFL Football play that occurred during or after the time he played NFL Football and before the Qualifying Diagnosis identified in Section V?  A severe traumatic brain injury is one that caused the Retired NFL Football Player to lose consciousness for more than 24 hours.

☐ **YES**   If you answered Yes, provide additional information about the Traumatic Brain Injury.  Then go to Section VII.

☒ **NO**   If you answered No, go to Section VII.

| **Date of Traumatic Brain Injury** | --- / --- / ---- <br>(Month/Day/Year) |
|------|------|

**Medical professional who diagnosed the Traumatic Brain Injury:**

| Name | First | M.I. | Last | Suffix |
|------|------|------|------|--------|

☐   Check here if you believe that the Qualifying Diagnosis for which you are claiming a Monetary Award is not causally related to the Traumatic Brain Injury and you are submitting records and other evidence supporting this position.  If you provide information regarding a Traumatic Brain Injury but do not check this box, we will apply an Offset, which will result in a 75% reduction of any Monetary Award.

## VI. MEDICARE, MEDICAID AND OTHER LIEN INFORMATION

## NFL CONCUSSION SETTLEMENT CLAIM FORM
## FOR RETIRED NFL FOOTBALL PLAYERS AND REPRESENTATIVE CLAIMANTS

As set forth in Article XI of the Settlement Agreement, the Lien Resolution Administrator, with assistance from the Claims Administrator, is administering the process for the identification, verification, and satisfaction of Liens that may be withheld or asserted against your Monetary Award. If you or the Lien Resolution Administrator identifies a potential Lien asserted against your Monetary Award and the Lien Resolution Administrator confirms the validity and final amount of such Lien(s), we are required to deduct those amounts from your Monetary Award along with any other deductions required by state or federal law.

Are you aware of a potential Lien that could be asserted against your Monetary Award?

☐ **YES**  If you answered Yes, fill out the appropriate questions in this Section VI. Then go to Section VII.

☒ **NO**  If you answered No, go to Section VII.

### A. Medicare

1. If the Retired NFL Football Player is now enrolled, or has been enrolled at any time, in Medicare Part A or Medicare Part B program(s), provide the following information.

   HICN (Medicare Claim #):

   Enrollment date: _____ -- / _____ -- / _____ ----
   (Month/Day/Year)

2. If the Retired NFL Football Player is now enrolled, or has been enrolled at any time, in a Medicare Part C program (for example, a Medicare Advantage, Medicare cost, Medicare healthcare prepayment plan benefits, or similar Medicare plan administered by private entities), provide the following information.

   Name of plan:

   Member number for plan:

   Enrollment date: _____ -- / _____ -- / _____ ----
   (Month/Day/Year)

3. If the Retired NFL Football Player is now enrolled, or has been enrolled at any time, in a Medicare Part D program (prescription drug benefits), provide the following information.

   Name of Medicare Part D Plan:

   Member number of Medical Part D Plan:

   Enrollment date: _____ -- / _____ -- / _____ ----
   (Month/Day/Year)

### B. Medicaid

1. If the Retired NFL Football Player is currently enrolled in a state Medicaid Program, provide the following information.

   Medical ID number:

   State of Issuance:

   Enrollment date: _____ -- / _____ -- / _____ ----
   (Month/Day/Year)

–3998–

| NFL CONCUSSION SETTLEMENT CLAIM FORM |
|:---:|
| **FOR RETIRED NFL FOOTBALL PLAYERS AND REPRESENTATIVE CLAIMANTS** |

2. If the Retired NFL Football Player has been enrolled in any other state Medicaid Program at any time, provide the following information.

Medical ID number:

State of Issuance:

Enrollment date: _____ -- _____ / _____ -- _____ / _____ ---- _____
(Month/Day/Year)

### C. Department of Veterans Affairs, TRICARE, or Indian Health Service

Check any of the following federal healthcare programs that the Retired NFL Football Player has enrolled in or has been entitled to receive benefits from at any time.  If you check any of the programs below, provide the required information about each program.

☐ **Department of Veterans Affairs healthcare or prescription drug benefits**

Claim Number:
_____

Enrollment Date: _____ -- ___/___ -- ___/___ ---- _____  **TO**  _____ -- ___/___ -- ___/___ ---- _____
(Month/Day/Year)                                              (Month/Day/Year)

Branch: _____

Sponsor: _____

Sponsor SSN: _____ - _____ - _____

Treating Facility: _____

☐ **TRICARE health care or prescription drug benefits**

Claim Number:
_____

Enrollment Date: _____ -- ___/___ -- ___/___ ---- _____  **TO**  _____ -- ___/___ -- ___/___ ---- _____
(Month/Day/Year)                                              (Month/Day/Year)

Branch: _____

Sponsor: _____

Sponsor SSN: _____ - _____ - _____

Treating Facility: _____

☐ **Indian Health Service healthcare or prescription drug benefits**

Claim Number:
_____

Enrollment Date: _____ -- ___/___ -- ___/___ ---- _____  **TO**  _____ -- ___/___ -- ___/___ ---- _____
(Month/Day/Year)                                              (Month/Day/Year)

Branch: _____

Sponsor: _____

Sponsor SSN: _____ - _____ - _____

## NFL CONCUSSION SETTLEMENT CLAIM FORM
### FOR RETIRED NFL FOOTBALL PLAYERS AND REPRESENTATIVE CLAIMANTS

Tribe: _____

Treating Facility: _____

### D. Other Governmental Payor

If at any time the Retired NFL Football Player was entitled to receive medical items, services, and/or prescription drugs from any federal, state, or other governmental body, agency, department, plan, program, or entity that administers, funds, pays, contracts for, or provides medical items, services, and/or prescription drugs not previously listed above, provide the following information.

Name of Plan/Entity:
_____

Policyholder Name:
_____

Policy Number:
_____

Medical Condition Covered by Plan/Entity: _____

### E. Private Healthcare Insurance

If the Retired NFL Football Player has received medical treatment for the Qualifying Diagnosis/es that was covered by a private healthcare insurance plan or other form of payment, provide the following information for every such plan or entity.

Name of Plan/Entity:
_____

Policyholder Name:
_____

Policy Number:
_____

Medical Condition Covered by Plan/Entity: _____

### F.  Other Lien Information

Identify any known Lien of any nature whatsoever not identified above. Such a lien may include, without limitation, any mortgage, lien, pledge, charge, security interest, or legal encumbrance held by any person or entity (such as an attorney, child support agency, federal or state tax agency, or judgment creditor), where that person or entity may be legally entitled to a share of any Monetary Award that you may receive.

You must also attach to this Claim Form a copy of the letter, form, or writing from such person or entity informing you of this Lien.

Name of Lienholder: _____

Amount of Lien: $_____   ,   _____   .   _____

Contact Information for Lienholder: _____

Nature of Lien: _____

| NFL CONCUSSION SETTLEMENT CLAIM FORM |
| :---: |
| FOR RETIRED NFL FOOTBALL PLAYERS AND REPRESENTATIVE CLAIMANTS |

## VIII. RELEASE

As more fully set forth in the Settlement Agreement, all Settlement Class Members, among others including you, have released the National Football League, NFL Properties LLC and any Member Club, among others, from all claims and liabilities arising out of, or relating to, the allegations in the Class Action Complaint and other similar lawsuits. In addition, as more fully set forth in the Settlement Agreement, all Settlement Class Members have promised not to commence, and to withdraw and seek dismissal of, any litigation or other proceeding asserting a claim that the Settlement Class Member has released. For example, you, as a Settlement Class Member, have agreed not to sue the NFL Parties, the NFL's Member Clubs and other related persons or entities in connection with any claim you may have now or in the future relating to any head, brain and/or cognitive injury, as well as any injuries arising out of, or relating to, concussions and/or subconcussive events of whatever cause and its damages, whenever arising.

The above paragraph is an incomplete summary of the Releases and Covenants in the Settlement Agreement. Nothing in the above paragraph limits, expands, or in any way alters the terms of the Settlement Agreement. The Settlement Agreement is available at https://www.nflconcussionsettlement.com.

**Releases.**

(a) In consideration of the benefits described and the agreement and covenants contained in the Settlement Agreement, and by operation of the Final Order and Judgment, I, on my own behalf and on behalf of my respective predecessors, successors, assigns, assignors, representatives, attorneys, agents, trustees, insurers, heirs, next of kin, estates, beneficiaries, executors, administrators, and any natural, legal, or juridical person or entity to the extent he, she, or it is entitled to assert any claim on my behalf (hereafter "I", "My" or "Me"), hereby waive and release, forever discharge and hold harmless the Released Parties, and each of them, of and from any and all past, present and future claims, counterclaims, actions, rights or causes of action, liabilities, suits, demands, damages, losses, payments, judgments, debts, dues, sums of money, costs and expenses (including, without limitation, attorneys' fees and costs), accounts, reckonings, bills, covenants, contracts, controversies, agreements, obligations, or promises, in law or in equity, contingent or non-contingent, known or unknown, suspected or unsuspected, foreseen or unforeseen, matured or unmatured, accrued or unaccrued, liquidated or unliquidated, whether direct, representative, class or individual in nature, in any forum that I had, have, or may have in the future arising out of, in any way relating to or in connection with the allegations, transactions, facts, matters, occurrences, representations or omissions involved, set forth, referred to or relating to the Class Action Complaint and/or Related Lawsuits ("Claims"), including, without limitation, Claims:

(i) that were, are or could have been asserted in the Class Action Complaint or any other Related Lawsuit; and/or

| NFL CONCUSSION SETTLEMENT CLAIM FORM FOR RETIRED NFL FOOTBALL PLAYERS AND REPRESENTATIVE CLAIMANTS |
|---|

(ii) arising out of, or relating to, head, brain and/or cognitive injury, as well as any injuries arising out of, or relating to, concussions and/or subconcussive events (including, without limitation, prevention, diagnosis and treatment thereof) of whatever cause and its damages (whether short-term, long-term or death), whenever arising, including, without limitation, Claims for personal or bodily injury, including disease, mental or physical pain or suffering, emotional or mental harm, or anguish or loss of enjoyment of life (and exacerbation and/or progression of personal or bodily injury), or wrongful death and/or survival actions as a result of such injury and/or exacerbation and/or progression thereof; and/or

(iii) arising out of, or relating to, neurocognitive deficits or impairment, or cognitive disorders, of whatever kind or degree, including, without limitation, mild cognitive impairment, moderate cognitive impairment, dementia, Alzheimer's Disease, Parkinson's Disease, and ALS; and/or

(iv) arising out of, or relating to, CTE; and/or

(v) arising out of, or relating to, loss of support, services, consortium,  companionship, society, or affection, or damage to familial relations (including disease, mental or physical pain or suffering, emotional or mental harm, or anguish or loss of enjoyment of life); and/or

(vi) arising out of, or relating to, increased risk, possibility, or fear of suffering in the future from any head, brain and/or cognitive injury, as well as any injuries arising out of, or relating to, concussions and/or subconcussive events (including, without limitation, prevention, diagnosis and treatment thereof), and including disease, mental or physical pain or suffering, emotional or mental harm, or anguish or loss of enjoyment of life); and/or

(vii) arising out of, or relating to, medical screening and medical monitoring for  undeveloped, unmanifested, and/or undiagnosed head, brain and/or cognitive injury, as well as any injuries arising out of, or relating to, concussions and/or subconcussive events (including, without limitation, prevention, diagnosis and treatment thereof); and/or

(viii) premised on any purported or alleged breach of any Collective Bargaining Agreement related to the issues in the Class Action Complaint and/or Related Lawsuits, except claims for workers' compensation and claims alleging entitlement to NFL CBA Medical and Disability Benefits.

(b) In consideration of the benefits described and the agreement and covenants contained in the Settlement Agreement, and by operation of the Final Order and Judgment, I do hereby release, forever discharge and hold harmless the Released Parties from any and all Claims, including unknown Claims, arising from, relating to, or resulting from the reporting, transmittal of information, or communications between or among the NFL Parties, Counsel for the NFL Parties, the Special Master, Claims Administrator, Lien Resolution Administrator, any Governmental Payor, and/or Medicare Part C or Part D Program sponsor regarding any claim for benefits under the Settlement Agreement, including any consequences in the event that this Settlement Agreement impacts, limits, or precludes My right to benefits under Social Security or from any Governmental Payor or Medicare Part C or Part D Program sponsor.

(c) In consideration of the benefits described and the agreement and covenants contained in the Settlement Agreement, and by operation of the Final Order and Judgment, I do hereby release, forever discharge and hold harmless the Released Parties from any and all Claims, including unknown Claims, pursuant to the MSP Laws, or other similar causes of action, arising from, relating to, or resulting from the failure or alleged failure of any of the Released Parties to provide for a primary payment or appropriate reimbursement to a Governmental Payor or Medicare Part C or Part D Program sponsor with a Lien in connection with claims for medical items, services, and/or prescription drugs provided in connection with compensation or benefits claimed or received by Me pursuant to the Settlement Agreement.

(d) In consideration of the benefits described and the agreement and covenants contained in the Settlement Agreement, and by operation of the Final Order and Judgment, I do hereby release, forever discharge and hold harmless the Released Parties, the Special Master, BAP Administrator, Claims Administrator, and their respective officers, directors, and employees from any and all Claims, including unknown Claims, arising from, relating to, or resulting from their participation, if any, in the BAP, including, but not limited to, Claims for negligence, medical malpractice, wrongful or delayed diagnosis, personal injury, bodily injury (including disease, trauma, mental or physical pain or suffering, emotional or mental harm, or anguish or loss of enjoyment of life), or death arising from, relating to, or resulting from such participation.

**Release of Unknown Claims.**

| NFL CONCUSSION SETTLEMENT CLAIM FORM |
| :---: |
| FOR RETIRED NFL FOOTBALL PLAYERS AND REPRESENTATIVE CLAIMANTS |

(a) I acknowledge that I have been informed of Section 1542 of the Civil Code of the State of California (and similar statutes) by My counsel and that I do hereby expressly waive and relinquish all rights and benefits, if any, which I have or may have under said section (and similar sections) which reads as follows:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR

(b) I acknowledge that the foregoing waiver of the provisions of Section 1542 of the California Civil Code and all similar provisions of the statutory or common law of any other state, territory, or other jurisdiction was separately bargained for and that the Parties would not have entered into the Settlement Agreement unless it included a broad release of unknown claims relating to the matters released herein.

(c) I intend to be legally bound by the Releases.

(d) The Releases are not intended to prevent the NFL Parties from exercising their rights of contribution, subrogation, or indemnity under any law.

(e) Nothing in the Releases will preclude any action to enforce the terms of the Settlement Agreement in the Court.

(f) I represent and warrant that no promise or inducement has been offered or made for the Releases contained in this Article except as set forth in the Settlement Agreement and that the Releases are executed without reliance on any statements or any representations not contained in the Settlement Agreement.

**Covenant Not to Sue.**

From and after the Effective Date, for the consideration provided for in the Settlement Agreement, and by operation of the Final Order and Judgment, I covenant, promise, and agree that I will not, at any time, continue to prosecute, commence, file, initiate, institute, cause to be instituted, assist in instituting, or permit to be instituted on My behalf, or on behalf of any other individual or entity, any proceeding: (a) alleging or asserting any of his or her respective Released Claims against the Released Parties in any federal court, state court, arbitration, regulatory agency, or other tribunal or forum, including, without limitation, the Claims set forth in Section 18.1 of the Settlement Agreement; or (b) challenging the validity of the Releases. To the extent any such proceeding exists in any court, tribunal or other forum as of the Effective Date, I covenant, promise and agree to withdraw, and seek a dismissal with prejudice of, such proceeding forthwith.

**No Release for Insurance Coverage.**

(a) Notwithstanding anything herein to the contrary, the Settlement Agreement is not intended to and does not release any Governmental Payor or Medicare Part C or Part D Program sponsor from its or their obligation to provide any health insurance coverage, major medical insurance coverage, or disability insurance coverage to a Settlement Class Member, or from any claims, demands, rights, or causes of action of any kind that a Settlement Class Member has or hereafter may have with respect to such individuals or entities.

(b) Notwithstanding anything herein to the contrary, the Settlement Agreement is not intended to and does not effect a release of any rights or obligations that any insurer has under or in relation to any contract or policy of insurance to any named insured, insured, additional insured, or other insured person or entity thereunder, including those persons or entities referred to in Section 2.1(bbbb)(i)-(ii) of the Settlement Agreement.

**No Release for Claims for Workers' Compensation and NFL CBA Medical and Disability Benefits**

Nothing contained in the Settlement Agreement, including the Release and Covenant Not to Sue provisions in ARTICLE XVIII of the Settlement Agreement, affects My rights to pursue claims for workers' compensation and claims alleging entitlement to NFL CBA Medical and Disability Benefits. For the avoidance of any doubt, the Settlement Agreement does not alter the showing that I must demonstrate to pursue successful claims for workers' compensation and/or successful claims alleging entitlement to NFL CBA Medical and Disability Benefits, nor does it alter the defenses to such claims available to Released Parties except as set forth in ARTICLE XXIX of the Settlement Agreement.

**Judgment Reduction.**

**NFL CONCUSSION SETTLEMENT CLAIM FORM**
**FOR RETIRED NFL FOOTBALL PLAYERS AND REPRESENTATIVE CLAIMANTS**

(a) With respect to any litigation by Me against Riddell, I further agree that if a verdict in My favor results in a verdict or judgment for contribution or indemnity against the Released Parties, I will not enforce My right to collect this verdict or judgment to the extent that such enforcement creates liability against the Released Parties.  In such event, I agree that I will reduce My claim or agree to a judgment reduction or satisfy the verdict or judgment to the extent necessary to eliminate the claim of liability against the Released Parties or any Other Party claiming contribution or indemnity.

(b) Any judgment or award obtained by Me against any alleged tortfeasor, co-tortfeasor, co-conspirator or co-obligor, other than Riddell, by reason of judgment or settlement, for any claims that are or could have been asserted in the Class Action Complaint or in any Related Lawsuit, or that arise out of or relate to any claims that are or could have been asserted in the Class Action Complaint or in any Related Lawsuit, or that arise out of or relate to any facts in connection with the Class Action Complaint or any Related Lawsuit (collectively, "Tortfeasors"), shall be reduced by the amount or percentage, if any, necessary under applicable law to relieve the Released Parties of all liability to such Tortfeasors on claims for contribution or indemnity (whether styled as a claim for contribution, indemnity or otherwise). Such judgment reduction, partial or complete release, settlement credit, relief, setoff, if any, shall be in an amount or percentage sufficient under applicable law to compensate such Tortfeasors for the loss of any such claims for contribution or indemnity (whether styled as a claim for contribution, indemnity, or otherwise) against the Released Parties.

**No Assignment of Claims.**

I have not assigned, will not assign, and will not attempt to assign, to any person or entity other than the NFL Parties any rights or claims relating to the subject matter of the Class Action Complaint.  Any such assignment, or attempt to assign, to any person or entity other than the NFL Parties any rights or claims relating to the subject matter of the Class Action Complaint will be void, invalid, and of no force and effect and the Claims Administrator shall not recognize any such action.

## IX. RELEASE

You must promptly notify the Claims Administrator of any changes or updates to the information in your Claim Form, including any changes in your medical condition, whether a person or entity asserts a lien or entitlement to any monies received under the Settlement Agreement, and any change in mailing address.

# NFL **CONCUSSION SETTLEMENT**

*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

## MONETARY AWARD CLAIM PACKAGE HIPAA AUTHORIZATION FORM

You must complete and sign this Form if you are a **Retired NFL Football Player** or the **Representative Claimant** of a Retired NFL Football Player and want to apply for a Monetary Award. This Form authorizes the use and disclosure of "Protected Health Information" as that term is defined in 45 C.F.R. § 160.103, relating to the processing of your claim in the NFL Concussion Settlement Program. Protected Health Information includes, but is not limited to, information regarding the Retired NFL Football Player's medical care, treatment, physical or mental condition, and medical expenses.

## I. RETIRED NFL FOOTBALL PLAYER INFORMATION

| Settlement Program ID | 950012548 | | | | |
|---|---|---|---|---|---|
| **Player Name** | First<br>Frank | M.I. | Last<br>Cornish | | Suffix |
| **Social Security Number, Taxpayer ID or Foreign ID Number** (if Retired NFL Football Player is not a U.S. Citizen) **of Retired NFL Football Player** (if known) | | ▮▮▮▮▮ - | 4 0 6 8 | | |
| | | **or** | | | |
| | | _____ | | | |
| **Date of Birth of Retired NFL Football Player** | | ▮▮▮▮▮ 1 9 6 7 | | | |
| | | (Month/Day/Year) | | | |

## II. ENTITIES AUTHORIZED TO USE AND DISCLOSE PROTECTED HEALTH INFORMATION

By signing and submitting this Form, I authorize the use and disclosure of all Protected Health Information regarding my (or the Retired NFL Football Player's, if signed by a Representative Claimant) medical care, treatment, physical or mental condition, and medical expenses relating to my claim in the *In re: National Football League Players' Concussion Injury Litigation* Settlement program, as follows: (1) by the Claims Administrator, Special Master, BAP Administrator, Lien Resolution Administrator, designated Qualified BAP Providers, Qualified BAP Pharmacy Vendors, Qualified MAF Physicians, Appeals Advisory Panel members, Appeals Advisory Panel Consultants, the Court, Class Counsel, Counsel for the NFL Parties and the NFL Parties (which, in turn, may share the Protected Health Information with the NFL Parties' insurers or reinsurers) for use and/or disclosure with one another in the performance of their functions and duties pursuant to the Settlement Agreement; (2) by the Lien Resolution Administrator for use and/or disclosure to the holders of any liens, claims, or rights of subrogation, indemnity, reimbursement, conditional or other payments, or interests of any type, including all Governmental Payors (such as the Medicare Program, any state Medicaid Program, the Department of Veterans Affairs, Tricare, Indian Health Services, and their respective contractors), Medicare Part C or Part D Programs, private health care providers, health plans, and health insurers, and any contractors or recovery agents of the foregoing persons and entities (collectively, "Lienholders"), for the purpose of identifying and resolving any potential Liens in connection with any Monetary Award that I may receive; and (3) by the Lienholders for disclosure to the Lien Resolution Administrator and Claims Administrator for the purpose of identifying and resolving any potential Liens in connection with any Monetary Award that I may receive.

## MONETARY AWARD CLAIM PACKAGE HIPAA AUTHORIZATION FORM

### III. AUTHORIZATION

By signing below, I acknowledge and understand all of the following:

| | |
|---|---|
| 1. | I have the right to revoke this authorization at any time. If I wish to revoke the authorization, I must do so in writing and must provide my written revocation to the Claims Administrator. The written revocation must be signed and dated. The revocation will not apply to any disclosures that already have been made in reliance on this authorization prior to the date upon which the Claims Administrator receives my written revocation. |
| 2. | My authorization of the disclosure of the subject Retired NFL Football Player's Protected Health Information is voluntary, which means I can refuse to sign this Form. I do not need to sign this Form to obtain health treatment from any medical provider or to enroll in or be eligible for any health plan benefits. However, I recognize that if I do not sign this Form and submit it to the Claims Administrator, my Claim Package will be incomplete under the terms of the Settlement Agreement and will not be processed. |
| 3. | Any Protected Health Information or other information released to the Claims Administrator, Special Master, BAP Administrator, Lien Resolution Administrator, Qualified BAP Providers, Qualified BAP Pharmacy Vendors, Qualified MAF Physicians, Appeals Advisory Panel members, Appeals Advisory Panel Consultants, the Court, Class Counsel, Counsel for the NFL Parties and the NFL Parties (including the NFL Parties' insurers or reinsurers) may be subject to re-disclosure by such person/entity, and may no longer be protected by applicable federal and state privacy laws. Each of those persons and entities, however, is permitted to use and disclose your information only in accordance with this Form, the Settlement Agreement, a contract executed pursuant to the Settlement Agreement, orders of the Court, and/or applicable law. |
| 4. | My Protected Health Information may include information relating to sexually transmitted disease, acquired immunodeficiency syndrome ("AIDS"), or human immunodeficiency virus ("HIV"), behavioral or mental health services and treatment for alcohol and drug abuse. |
| 5. | This Form is valid from the date of my signature in Section IV until the date that the Claims Administrator performs the last act to process the claim for a Monetary Award that I submitted with this Form. |
| 6. | I have a right to receive and retain a copy of this Form. |
| 7. | Any photostatic copy of this Form shall have the same authority as the original, and may be substituted in its place. |

### IV. SIGNATURE

The Retired NFL Football Player or Representative Claimant of the Retired NFL Football Player named in Section I must sign and date this Form below. **By signing below, I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that all information provided in this HIPAA Authorization Form is true and correct to the best of my knowledge, information and belief.**

| Signature | | Date | 0 3/1 9 5/1 2 9 1 9 (Month/Day/Year) | |
|---|---|---|---|---|
| **Printed Name** | First Robin | M.I. B | Last Cornish | Suffix |

| If you are signing this Form as a Representative Claimant, describe your relationship to the Retired NFL Football Player and your authority to act on his behalf: | Widow |
|---|---|

| MONETARY AWARD CLAIM PACKAGE HIPAA AUTHORIZATION FORM | |
|---|---|
| **V. HOW TO SUBMIT THIS FORM** | |
| You may submit this Form in one of two ways: | |
| **By U.S. Mail:** | NFL Concussion Settlement<br>Claims Administrator<br>P.O. Box 25369<br>Richmond, VA 23260 |
| **By Delivery:** | NFL Concussion Settlement<br>c/o BrownGreer PLC<br>250 Rocketts Way<br>Richmond, VA 23231 |

**CERTIFICATION OF VITAL RECORD**

# CITY OF GRAPEVINE, TEXAS
### VITAL STATISTICS DIVISION

**STATE OF TEXAS**      **CERTIFICATE OF DEATH**      **STATE FILE NUMBER**

FRANK EDGAR CORNISH IV

DATE OF DEATH – ACTUAL OR PRESUMED: 08/23/2008

MALE      1967      CHICAGO, IL.

SOCIAL SECURITY NUMBER: 4068

MARITAL STATUS: ☑ Married

SURVIVING SPOUSE'S NAME: ROBIN BLAKE

RESIDENCE STREET ADDRESS

INSIDE CITY LIMITS: ☑ Yes

COUNTY: STATE TEXAS

FATHER'S NAME: FRANK EDGAR CORNISH III

MOTHER'S NAME PRIOR TO FIRST MARRIAGE: GLORIA KNIGHTEN

COUNTY OF DEATH: TARRANT      GRAPEVINE, 76051

PLACE OF DEATH: ☑ Other — BAYLOR MEDICAL CENTER AT GRAPEVINE

NAME & RELATIONSHIP TO DECEASED: ROBIN B. CORNISH – WIFE

JOHN BECKWITH .BY ELECTRONIC SIGNATURE - 9037

NAME OF FUNERAL FACILITY: BLUEBONNET CEMETERY

GOLDEN GATE FUNERAL HOME-THORNTON FRWY      4155 S. R.L. THORNTON FRWY, DALLAS, TX 75224

PRINTED NAME, ADDRESS OF CERTIFIER: MARC ANDREW KROUSE , BY ELECTRONIC SIGNATURE      06/28/2008      E8545      09:18 AM

MARC ANDREW KROUSE 200 FELIKS GWOZDZ PLACE, FORT WORTH, TX 76104-4919      M E

IMMEDIATE CAUSE: SUDDEN ADULT DEATH WITH EVIDENCE OF HYPERTENSIVE HEART DISEASE      UNKNOWN

MANNER OF DEATH: ☑ Natural

REGISTRAR FILE NO.: 15-265      06/28/2008      REGISTRAR - CITY OF GRAPEVINE, ELECTRONICALLY FILED

CONTROL NO. **76861**

This is to certify that this is a true and correct reproduction of the original record as recorded in this office. Issued under authority of Sec. 191.051, Health and Safety Code.

FEB-06 '09 PM01:27

*Linda Huff*
LINDA HUFF
LOCAL REGISTRAR

ISSUED

WARNING: IT IS ILLEGAL TO DUPLICATE THIS COPY

4008

ANY ALTERATION OR ERASURE VOIDS THIS CERTIFICATE



Office of Chief Medical Examiner
Tarrant County Medical Examiner's District
Tarrant County, Texas
200 Feliks Gwozdz Place, Fort Worth, Texas 76104-4919
(817) 920-5700  FAX (817) 920-5713

# AUTOPSY REPORT

| | |
|---|---|
| **Name: Frank Cornish** | **CASE NO: 0810049** |
| **Approximate Age: 40 years** | **Sex: Male** |
| **Height: 79 inches** | **Weight: 327.6 pounds** |

I hereby certify that on the **24th** day of **August 2008**, beginning at 0805 hours, I, Marc A. Krouse, M.D., pursuant to Statute 49.25 of Texas Criminal Code, performed an inspection and autopsy limited to the cranial cavity, neck, and thoracic cavity,  on the body of **Frank Cornish** at the Tarrant County Medical Examiner's District Morgue in Fort Worth, Texas and upon investigation of the essential facts concerning the circumstances of the death and history of the case as known to me, I am of the opinion that the findings, cause and manner of death are as follows:

**FINDINGS:**
I)   Marked cardiomegaly (758 gms) with left ventricular hypertrophy and mild coronary arterial sclerosis, consistent with hypertensive heart disease
II)   Multinodular goiter
III)   No evidence of trauma
IV)   Postmortem toxicology attached

**CAUSE OF DEATH:    SUDDEN ADULT DEATH WITH EVIDENCE OF HYPERTENSIVE HEART DISEASE**

**MANNER OF DEATH:  NATURAL**

_____
Signature

**Marc A. Krouse, M.D.**
**Deputy Chief Medical Examiner**



0810049
Frank Cornish

Inspection and autopsy limited to the cranial cavity, neck, and thoracic cavity are performed August 24, 2008 at 8:05 a.m. (cranial cavity exam 08/25/08 at 0900).

## GROSS ANATOMIC DESCRIPTION

**I.    CLOTHING AND PERSONAL EFFECTS:** At the time of examination the body is clothed in white briefs and wrapped in white sheets.

**II.    THERAPEUTIC INTERVENTION:** Evidence of medical intervention includes an oral endotracheal tube secured with tape, intravenous line in the right antecubital fossa, right tibial intraosseous line, and 1 electrocardiographic monitor pad on the torso.

**III.    EXTERNAL BODY DESCRIPTION:** The body is that of a normally developed, large muscular and slightly obese adult African American male appearing near the stated age of 40 years. The body length is 79 inches and the weight is 327.6 pounds (200 cm, 143.6 kg). The body is well-preserved, unembalmed, and cool. Rigor is full. Lividity is developed over the head and back, is purple, and fixed.

The scalp is shaved except for a black and occasional gray mustache and goatee. The face is shaved and body hair is male distribution.

The calvarium is symmetric and intact to palpation and the scalp is intact. The eyes are closed, the corneas are slightly clouded. There is no conjunctival hemorrhage. The irides are brown and the pupils are 6 mm. Orbital soft tissues are unremarkable. The nasal and oral cavities are clear. Lips and oral mucosa are cyanotic. The dentition is natural and well-maintained. The external ears are clear and a single healed pierce is found in the left earlobe. The face, neck, and larynx are symmetric and intact and the trachea and larynx are midline.

The anterior chest is symmetric and intact. The breasts are male. The abdomen is minimally protuberant and the pelvis is intact. The penis is uncircumcised and the testes are descended. The perineum and anal orifice are unremarkable. The back is symmetric and intact.

0810049
Frank Cornish

The extremities are symmetric, normally developed, and are intact. The nails of the hands and feet are cyanotic. A healed 18 cm scar is found along the left hip and upper thigh.

There are no external signs of trauma or foul play.

## IV. INTERNAL EXAMINATION

**1. INTEGUMENT:** The body is opened with a modified thoracoabdominal and coronal scalp incision. The viscera are examined in situ and neck and thoracic viscera and cranial contents are removed for further inspection.

**2. SEROUS CAVITIES:** The soft tissues of the anterior chest and neck are unremarkable. There is no evidence of occult trauma. The serous cavity membranes are smooth. There is no hemorrhage or fluid accumulation within major body cavities.

**3. CARDIOVASCULAR SYSTEM:** The thoracic and abdominal aorta, vena cava and pulmonary arteries and veins are unremarkable. The major vessels and heart contain fluid blood and scattered postmortem thrombi. There is patchy intimal hemoglobin staining.

The heart weighs 758 gms. The coronary arteries arise normally and posterior circulation is right dominant. Circumferential sclerosis produces approximately 10-15% occlusion of the surface coronary arteries with an atheromatous plaque adding to approximately 25% occlusion of the proximal left anterior descending coronary. All cardiac chambers are dilated and there is symmetric hypertrophy of the left ventricle (anterior left ventricle 2.3 cm, septum 2.2 cm, right ventricle 0.5 cm). The myocardium is otherwise grossly unremarkable. The endocardium and cardiac valves are unremarkable.

**4. RESPIRATORY SYSTEM:** The larynx and hyoid are intact. Central and peripheral airways are clear. The lungs are congested. There is patchy lower lobe edema with no additional gross pulmonary pathology. The right lung weighs 780 gms and the left 678 gms.

**5. GASTROINTESTINAL SYSTEM:** The pharynx and esophagus are intact and unremarkable. Limited inspection of intraabdominal organs is remarkable only for slight yellow-tan coloration of the liver parenchyma.

Page 4 of 4

0810049
Frank Cornish

**6.    HEMATOPOIETIC SYSTEM:**  Lymph nodes of the neck and thorax are unremarkable.  The thymus is involuted.

**8.    ENDOCRINE SYSTEM:**  There is a multinodular goiter (some with cystic degeneration) and the total mass  of the thyroid gland is 143 gms.  Parathyroid glands are not identified.  The pituitary is grossly unremarkable.

**9.    CRANIAL CAVITY/CENTRAL NERVOUS SYSTEM:**  Subgaleal soft tissues are unremarkable.  There is no evidence of occult head trauma.  The calvarium and base of the skull are intact.  The cerebrospinal fluid is clear and the meninges are congested.  The arteries over the base of the brain and dural sinuses are intact and unremarkable.

The brain weighs 1505 gms.  There is slight brain swelling with notching of the uncal gyri and cerebellar tonsils but no evidence of overt herniation.  The gray and white matter of the brain are grossly unremarkable.  The ventricular system is patent and contains clear cerebrospinal fluid.  The upper cervical spinal cord is unremarkable.  The atlanto-occipital joint is intact.

## SPECIMENS AND EVIDENCE COLLECTED

1.    Aortic blood 30 mL, femoral venous blood 30 mL, and vitreous humor 5 mL for toxicology
2.    Samples of viscera in fixative
3.    Blood card
4.    Five photographs

EDC: 10/23/08
Dictated:  09/02/08
Transcribed:  09/04/08
Completed:  09/04/08
MAK:cal

# Toxicology Test Results

Office of Chief Medical Examiner
Toxicology Laboratory Service
200 Feliks Gwozdz Place
Fort Worth, Texas 76104
Name: Frank Edgar Cornish
Case Number: 0810049
Toxicology Work Number: 0801591

Nizam Peerwani, M.D., DABFP
Chief Medical Examiner
Angela Springfield, PH.D., DABFT
Chief Toxicologist
Priority: 1
Service Request Number: 002

| Specimen | Drug | Result | Drug Amount | Performed By |
|---|---|---|---|---|
| AORTA BLOOD | ETHANOL | NEGATIVE | | J HO |
| AORTA BLOOD | BASE | NEGATIVE | | C WHEELER |
| AORTA BLOOD | ACID | NEGATIVE | | C WHEELER |

Report Prepared By:

Approved By:

Approved Date: 8/28/08

 **CONCUSSION SETTLEMENT**

*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

### PRE-EFFECTIVE DATE DIAGNOSING PHYSICIAN CERTIFICATION FORM
### (for diagnoses made by physicians who are qualified to render Qualifying Diagnoses
### for purposes of Monetary Award claims before January 7, 2017)

This Pre-Effective Date Diagnosing Physician Certification Form is to be used only by physicians qualified to render Qualifying Diagnoses before January 7, 2017, in connection with the Class Action Settlement in In re: National Football League Players' Concussion Injury Litigation and who made a Qualifying Diagnosis before January 7, 2017. The Qualifying Diagnoses are found in Appendix A to this Pre-Effective Date Diagnosing Physician Certification Form.

Use this form to certify a Qualifying Diagnosis you made before January 7, 2017, based on your personal examination of the Retired NFL Football Player. **Do not sign this form unless you personally examined the player** or, in the case of a Qualifying Diagnosis of Death with CTE, you are the board-certified neuropathologist who made the post-mortem diagnosis of CTE. If you made a Qualifying Diagnosis as a Qualified MAF Physician on or after January 7, 2017, do not use this form; use the MAF Diagnosing Physician Certification Form instead. Also, if you are a Qualified BAP Provider certifying a diagnosis you made in the Baseline Assessment Program, do not use this form; use the BAP Diagnosing Physician Certification Form instead.

You must complete this form in its entirety, sign it under penalty of perjury, and return it to the patient along with copies of all supporting medical records that you created or received in connection with the Qualifying Diagnosis. In turn, the patient, or the patient's counsel, must submit this form and all supporting medical records referred to above to the Claims Administrator as part of a claim for compensation under the Class Action Settlement. The Claims Administrator will review the form, including your qualifications to provide the Qualifying Diagnosis, and the supporting medical records. All claims also are subject to audit. Any finding of fraudulent conduct by you will be subject to, without limitation, your referral to appropriate regulatory and disciplinary boards and agencies and/or federal authorities, and your disqualification from serving in any aspect of the Class Action Settlement.

You are required to preserve all supporting medical records that you created or received in connection with the Qualifying Diagnosis for the greater of: (a) 10 years after January 7, 2017; or (b) the period of time required under applicable state and federal laws.

If you have any questions, call the Claims Administrator toll free at 1-855-887-3485 or visit the Settlement Website at https://www.nflconcussionsettlement.com.

## PRE-EFFECTIVE DATE DIAGNOSING PHYSICIAN CERTIFICATION FORM
### (for diagnoses made by physicians who are qualified to render Qualifying Diagnoses for purposes of Monetary Award claims before January 7, 2017)

### I. PATIENT INFORMATION

| Settlement Program ID (if known) | | 950012548 | | |
|---|---|---|---|---|
| **Name:** | First<br>Frank | M.I. | Last<br>Cornish | Suffix |

| **Address:** | Address 1<br>█████████ |
|---|---|
| | Address 2 |
| | City<br>Keller |
| | State/Province<br>TX |
| | Postal Code<br>76248 | Country<br>United States |

| Telephone | ██████████████ |
|---|---|
| Date of Birth | ██████ / 1 9 6 7<br>(Month/Day/Year) |
| Date of Death (if applicable) | 0 8 / 2 3 / 2 0 0 8<br>(Month/Day/Year) |

### II. DIAGNOSING PHYSICIAN INFORMATION

| National Provider Identifier (NPI) | | 1013980978 | | |
|---|---|---|---|---|
| **Physician Name** | First<br>Ronald | M.I.<br>L. | Last<br>Hamilton | Suffix |

**(a) Are you approved as a Qualified BAP Provider or a Qualified MAF Physician?**

☐ **YES.** If YES, you do not need to fill out the rest of this Section II or Sections III or IV. Instead, go to Section V.

☒ **NO.**

**(b) If you answered No, have you previously completed this form for another Retired NFL Football Player, that you know was submitted to the Claims Administrator?**

☐ **YES.** If YES, you do not need to fill out this Section II or Sections III or IV. Instead, go to Section V.

☒ **NO.**

If you answered No to both questions, fill out the rest of this Section II and then go to Section III.

## PRE-EFFECTIVE DATE DIAGNOSING PHYSICIAN CERTIFICATION FORM
### (for diagnoses made by physicians who are qualified to render Qualifying Diagnoses for purposes of Monetary Award claims before January 7, 2017)

| | |
|---|---|
| **Office/Practice Name** | University of Pittsburgh Medical Center |
| **Address** | Address 1<br>A724.1 Scaife Hall<br>Address 2<br>200 Lothrop Street<br>City<br>Pittsburgh<br>State/Province<br>Pennsylvania<br>Postal Code: 15213   Country: USA |
| **Telephone** | 4 1 2 - 6 2 4 - 6 6 1 0 |
| **Fax** | 4 1 2 - 6 2 4 - 5 4 8 8 |
| **Email Address** | hamiltonrl@upmc.edu |

## III.   BOARD CERTIFICATIONS

Check all board certifications that apply and list the board providing the certification and any identification number provided by the board (e.g., American Board of Psychiatry and Neurology diplomate number). If you do not have any board certifications, summarize your relevant medical training and experience and then go to Section IV.

| | Certification | Board | Board Identification Number | Effective Date | Expiration Date |
|---|---|---|---|---|---|
| ☐ | Neurology | | | | |
| ☐ | Neurosurgery | | | | |
| X | Neuropathology | American Board of Pathology | | certified: 5/23/1996<br>recertified:1/1/2014 | |
| | Neuropsychology | | | | |
| ☐ | Other Neuro-specialty | | | | |
| X | Other Board Certification | American Board of Pathology | | certified: 5/23/1996 | |

**PRE-EFFECTIVE DATE DIAGNOSING PHYSICIAN CERTIFICATION FORM**
**(for diagnoses made by physicians who are qualified to render Qualifying Diagnoses**
**for purposes of Monetary Award claims before January 7, 2017)**

If you are not board-certified in a neuro-specialty area, summarize your relevant medical training and experience in the field of neurology and related fields that you believe qualifies you to make the diagnosis provided in Section V.

## IV.    OTHER QUALIFICATIONS

| | | Education Level | Institution | Degree/Area of Focus | Date Received |
|---|---|---|---|---|---|
| Educational Information | 1. | Undergraduate Education | University of Nebraska-Lincoln | B.S / Psychology | 1 9 8 5 (Month/Year) |
| | 2. | Medical School | University of Nebraska Medical Center | M.D. | 1 9 8 9 (Month/Year) |
| | 3. | Internship | Univ. of California, San Diego | Resident Anatomic Pathology | 1 9 9 1 (Month/Year) |
| | 4. | Residency | Univ. of California, San Diego | Resident Neuropathology | 1 9 9 3 (Month/Year) |
| | 5. | Fellowship | Univ. of Pittsburgh | Fellow Neuropathology | 1 9 9 4 (Month/Year) |
| | 6. | Other (Graduate) | Univ. of Pittsburgh | Fellow: NIMH Training Grant in Neuroscience | 1 9 9 5 (Month/Year) |

| | | State | State License Number | Effective Date | Expiration Date |
|---|---|---|---|---|---|
| States Where Licensed to Practice | 1. | California | G69731 | 9/10/1990 | Expired |

**PRE-EFFECTIVE DATE DIAGNOSING PHYSICIAN CERTIFICATION FORM**
**(for diagnoses made by physicians who are qualified to render Qualifying Diagnoses**
**for purposes of Monetary Award claims before January 7, 2017)**

|   | 2. | Pennsylvania | MD049717L | 5/12/1993 | 12/31/2018 |
|---|----|---|---|---|---|
|   | 3. | Indiana | 01067332A | 9/29/2009 | 10/31/2019 |
|   | 4. |   |   |   |   |
|   | 5. |   |   |   |   |
|   | 6. |   |   |   |   |

| Specialties | Check all specialties that apply. |
|---|---|
|   | [ ] Neurology |
|   | [ ] Neurosurgery |
|   | [X] Neuropathology |
|   | [ ] Neuropsychology |
|   | [ ] Other Neuro-specialty (*e.g.*, brain injury medicine, clinical neurophysiology, etc.) _____ |
|   | [X] Other Specialty (list all)          Anatomic Pathology _____ |

-4019-

## PRE-EFFECTIVE DATE DIAGNOSING PHYSICIAN CERTIFICATION FORM
### (for diagnoses made by physicians who are qualified to render Qualifying Diagnoses for purposes of Monetary Award claims before January 7, 2017)

### V. QUALIFYING DIAGNOSIS

Identify the patient's diagnosis and the date of such diagnosis. See **Appendix A** for the criteria for each diagnosis. Other than for Death with CTE, the identification of a condition, including through a blood test, genetic test, imaging technique, or otherwise, that has not yet resulted in actual cognitive impairment and/or actual neuromuscular impairment in the patient is **not** a Qualifying Diagnosis.

| | Qualifying Diagnosis | Date of Diagnosis |
|---|---|---|
| ☐ | Level 1.5 Neurocognitive Impairment | \|\_\_\|\_\_\|/\|\_\_\|\_\_\|/\|\_\_\|\_\_\|\_\_\|\_\_\| (Month/Day/Year) |
| ☐ | Level 2 Neurocognitive Impairment* | \|\_\_\|\_\_\|/\|\_\_\|\_\_\|/\|\_\_\|\_\_\|\_\_\|\_\_\| (Month/Day/Year) |
| ☐ | Alzheimer's Disease | \|\_\_\|\_\_\|/\|\_\_\|\_\_\|/\|\_\_\|\_\_\|\_\_\|\_\_\| (Month/Day/Year) |
| ☐ | Parkinson's Disease | \|\_\_\|\_\_\|/\|\_\_\|\_\_\|/\|\_\_\|\_\_\|\_\_\|\_\_\| (Month/Day/Year) |
| ☐ | ALS (amyotrophic lateral sclerosis) | \|\_\_\|\_\_\|/\|\_\_\|\_\_\|/\|\_\_\|\_\_\|\_\_\|\_\_\| (Month/Day/Year) |
| ☒ | Death with CTE | \|0\|8\|/\|2\|3\|/\|2\|0\|0\|8\|* (Month/Day/Year) |

* If you provided a diagnosis of Level 2 Neurocognitive Impairment, did you determine that certain testing was medically unnecessary because of the severity of the patient's dementia (see **Appendix A**)?

☐ YES        ☐ NO

If you answered Yes, provide the factual basis for that determination:

*Pursuant to FAQ 93, Posted Settlement Program FAQs (as of November 7, 2018), for this claim, "the date of the Qualifying Diagnosis is the date of the Player's death, even though the diagnosis is not made until after the Player dies".

**PRE-EFFECTIVE DATE DIAGNOSING PHYSICIAN CERTIFICATION FORM**
**(for diagnoses made by physicians who are qualified to render Qualifying Diagnoses**
**for purposes of Monetary Award claims before January 7, 2017)**

| VI. CERTIFICATION |
|---|

By signing below, I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that all information provided in this form, and all related supporting medical records, are true and correct to the best of my knowledge, information and belief, and that I personally examined the Retired NFL Football Player named in Section I or, in the case of a Qualifying Diagnosis of Death with CTE, I am the board-certified neuropathologist who made the post-mortem diagnosis of CTE.

I acknowledge that any finding of fraudulent conduct may subject me to, without limitation, referral to appropriate regulatory and disciplinary boards and agencies and/or federal authorities, and disqualification from serving in any aspect of the Class Action Settlement.

| Signature of Diagnosing Physician | | Date of Signature | 0 2 / 0 / 1 2 / 1 9 (Month/Day/Year) |
|---|---|---|---|
| Printed Name | First Ronald | M.I. L. | Last Hamilton |

## APPENDIX A

Other than for Death with CTE, the identification of a condition, including through a blood test, genetic test, imaging technique, or otherwise, that has not yet resulted in actual cognitive impairment and/or actual neuromuscular impairment experienced by the patient does not qualify as a diagnosis.

<u>LEVEL 1.5 NEUROCOGNITIVE IMPAIRMENT</u>

**The following diagnosis can only be made:**

(1) prior to July 7, 2014, by a board-certified neurologist, board-certified neurosurgeon, other board-certified neuro-specialist physician, or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician, except as provided in (c), below;

(2) from July 7, 2014 through January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified neurologist, board-certified neurosurgeon, or other board-certified neuro-specialist physician, except as provided in (c), below; or

(3) for a patient who died prior to January 7, 2017 (the Effective Date of the Settlement Agreement), where the diagnosis occurred while the patient was living, by a board-certified or otherwise qualified neurologist, neurosurgeon, or other neuro-specialist physician, or by a physician with sufficient qualifications in the field of neurology or neurocognitive disorders to make a diagnosis of Level 1.5 Neurocognitive Impairment:

A diagnosis made outside of the Baseline Assessment Program (BAP) that a living patient suffers from Level 1.5 Neurocognitive Impairment, as set forth below, *i.e.*, early dementia, based on evaluation and evidence generally consistent with the diagnostic criteria set forth and provided below:

There is: (i) Concern of the patient, a knowledgeable informant, or the Qualified BAP Provider that there has been a severe decline in cognitive function; (ii) Evidence of a moderate to severe cognitive decline from a previous level of performance, as determined by and in accordance with the standardized neuropsychological testing protocol annexed in *Appendix B*, in two or more cognitive domains (complex attention, executive function, learning and memory, language, perceptual-spatial), provided one of the cognitive domains is (a) executive function, (b) learning and memory, or (c) complex attention; (iii) The patient exhibits functional impairment generally consistent with the criteria set forth in the National Alzheimer's Coordinating Center's Clinical Dementia Rating scale Category 1.0 (Mild) in the areas of Community Affairs, Home & Hobbies, and Personal Care—where such functional impairment is corroborated by documentary evidence (*e.g.*, medical records, employment records), the sufficiency of which will be determined by the physician making the diagnosis (and where no documentary evidence of functional impairment exists or is available, then (a) there must be evidence of moderate to severe cognitive decline from a previous level of performance, as determined by and in accordance with the standardized neuropsychological testing protocol annexed in *Appendix B*, in the executive function cognitive domain or the learning and memory cognitive domain, and at least one other cognitive domain; and (b) the patient's functional impairment, as described above, must be corroborated by a third-party sworn affidavit from a person familiar with the patient's condition (other than the player or his family members), the sufficiency of which will be determined by the diagnosing physician); and (iv) The cognitive deficits do not occur exclusively in the context of a delirium, acute substance abuse, or as a result of medication side effects.

## LEVEL 2 NEUROCOGNITIVE IMPAIRMENT

**The following diagnosis can only be made:**

> **(1) prior to July 7, 2014, by a board-certified neurologist, board-certified neurosurgeon, other board-certified neuro-specialist physician, or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician, except as provided in (c), below;**

> **(2) from July 7, 2014 through January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified neurologist, board-certified neurosurgeon, or other board-certified neuro-specialist physician, except as provided in (c), below; or**

> **(3) for a patient who died prior to January 7, 2017 (the Effective Date of the Settlement Agreement), where the diagnosis occurred while the patient was living, by a board-certified or otherwise qualified neurologist, neurosurgeon, or other neuro-specialist physician, or by a physician with sufficient qualifications in the field of neurology or neurocognitive disorders to make a diagnosis of Level 2 Neurocognitive Impairment:**

A diagnosis made outside of the Baseline Assessment Program (BAP) that a living patient suffers from Level 2 Neurocognitive Impairment, as set forth below, *i.e.*, moderate dementia, based on evaluation and evidence generally consistent with the diagnostic criteria set forth and provided below, unless the diagnosing physician can certify in Section IV of the Diagnosing Physician Certification Form, above, that certain testing specified below for Level 2 Neurocognitive Impairment is medically unnecessary because the patient's dementia is so severe:

There is: (i) Concern of the patient, a knowledgeable informant, or the Qualified BAP Provider that there has been a severe decline in cognitive function; (ii) Evidence of a severe cognitive decline from a previous level of performance, as determined by and in accordance with the standardized neuropsychological testing protocol annexed in *Appendix B*, in two or more cognitive domains (complex attention, executive function, learning and memory, language, perceptual-spatial), provided one of the cognitive domains is (a) executive function, (b) learning and memory, or (c) complex attention; (iii) The patient exhibits functional impairment generally consistent with the criteria set forth in the National Alzheimer's Coordinating Center's Clinical Dementia Rating scale Category 2.0 (Moderate) in the areas of Community Affairs, Home & Hobbies, and Personal Care—where such functional impairment is corroborated by documentary evidence (*e.g.*, medical records, employment records), the sufficiency of which will be determined by the physician making the diagnosis (and where no documentary evidence of functional evidence exists or is available, then (a) there must be evidence of severe cognitive decline from a previous level of performance, as determined by and in accordance with the standardized neuropsychological testing protocol annexed in *Appendix B*, in the executive function cognitive domain or the learning and memory cognitive domain, and at least one other cognitive domain; and (b) the patient's functional impairment, as described above, must be corroborated by a third-party sworn affidavit from a person familiar with the patient's condition (other than the player or his family members), the sufficiency of which will be determined by the diagnosing physician); and (iv) The cognitive deficits do not occur exclusively in the context of a delirium, acute substance abuse, or as a result of medication side effects.

## ALZHEIMER'S DISEASE

(1) **The following diagnosis can only be made:**

(a) **prior to July 7, 2014, by a board-certified neurologist, board-certified neurosurgeon, other board-certified neuro-specialist physician, or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician; or**

(b) **from July 7, 2014 through January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified neurologist, board-certified neurosurgeon, or other board-certified neuro-specialist physician:**

A diagnosis in a living patient of the specific disease of Alzheimer's Disease as defined by the World Health Organization's International Classification of Diseases, 9th Edition (ICD-9), the World Health Organization's International Classification of Diseases, 10th Edition (ICD-10), or a diagnosis of Major Neurocognitive Disorder due to probable Alzheimer's Disease as defined in the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5).

(2) **The following diagnosis can only be made prior to January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician, or by a physician with sufficient qualifications in the field of neurology to make such a diagnosis, where the diagnosis was made while the patient was living but thereafter died prior to January 7, 2017 (the Effective Date of the Settlement Agreement):**

A diagnosis of Major Neurocognitive Disorder due to probable Alzheimer's Disease consistent with the definition in *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) or a diagnosis of Alzheimer's Disease.

## PARKINSON'S DISEASE

(1) **The following diagnosis can only be made:**

(a) **prior to July 7, 2014, by a board-certified neurologist, board-certified neurosurgeon, other board-certified neuro-specialist physician, or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician; or**

(b) **from July 7, 2014 through January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified neurologist, board-certified neurosurgeon, or other board-certified neuro-specialist physician:**

A diagnosis in a living patient of the specific disease of Parkinson's Disease as defined by the World Health Organization's International Classification of Diseases, 9th Edition (ICD-9), the World Health Organization's International Classification of Diseases, 10th Edition (ICD-10), or a diagnosis of Major Neurocognitive Disorder probably due to Parkinson's Disease as defined in the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5).

(2) **The following diagnosis can only be made prior to January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician, or by a physician with sufficient qualifications in the field of neurology to make such a diagnosis, where the diagnosis was made while the patient was living but thereafter died prior to January 7, 2017 (the Effective Date of the Settlement Agreement):**

A diagnosis of Parkinson's Disease.

## ALS

(1) **The following diagnosis can only be made:**

(a) **prior to July 7, 2014, by a board-certified neurologist, board-certified neurosurgeon, other board-certified neuro-specialist physician, or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician; or**

(b) **from July 7, 2014 through January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified neurologist, board-certified neurosurgeon, or other board-certified neuro-specialist physician:**

A diagnosis in a living patient of the specific disease of Amyotrophic Lateral Sclerosis, also known as Lou Gehrig's Disease (ALS), as defined by the World Health Organization's International Classification of Diseases, 9th Edition (ICD-9) or the World Health Organization's International Classification of Diseases, 10th Edition (ICD-10).

(2) **The following diagnosis can only be made prior to January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician, or by a physician with sufficient qualifications in the field of neurology to make such a diagnosis, where the diagnosis was made while the patient was living but thereafter died prior to January 7, 2017 (the Effective Date of the Settlement Agreement):**

A diagnosis of the specific disease of Amyotrophic Lateral Sclerosis (ALS).

## CTE

**The following diagnosis can only be made prior to April 22, 2015 by a board-certified neuropathologist, provided that a patient who died between July 7, 2014 and April 22, 2015 has until 270 days from the date of death to obtain such a post-mortem diagnosis:**

A post-mortem diagnosis of Chronic Traumatic Encephalopathy (CTE).

# APPENDIX B

## BASELINE NEUROPSYCHOLOGICAL TEST BATTERY AND SPECIFIC IMPAIRMENT CRITERIA FOR RETIRED NFL FOOTBALL PLAYERS

### Section 1: Test Battery

**Estimating Premorbid Intellectual Ability**

ACS Test of Premorbid Functioning (TOPF)

**Complex Attention/Processing Speed (6 scores)**

WAIS-IV Digit Span

WAIS-IV Arithmetic

WAIS-IV Letter Number Sequencing

WAIS-IV Coding

WAIS-IV Symbol Search

WAIS-IV Cancellation

**Executive Functioning (4 scores)**

Verbal Fluency (FAS)

Trails B

Booklet Category Test

WAIS-IV Similarities

**Effort/Performance Validity (8 scores)**

*ACS Effort Scores*

ACS-WAIS-IV Reliable Digit Span

ACS-WMS-IV Logical Memory Recognition

ACS-WMS-IV Verbal Paired Associates Recognition

ACS-WMS-IV Visual Reproduction Recognition

ACS-Word Choice

*Additional Effort Tests*

Test of Memory Malingering (TOMM)

Medical Symptom Validity Test (MSVT)

**Learning and Memory (6 scores)**

WMS-IV Logical Memory I

WMS-IV Logical Memory II

WMS-IV Verbal Paired Associates I

WMS-IV Verbal Paired Associates II

WMS-IV Visual Reproduction I

WMS-IV Visual Reproduction II

**Language (3 scores)**

Boston Naming Test

Category Fluency (Animal Naming)

BDAE Complex Ideational Material

**Spatial-Perceptual (3 scores)**

WAIS-IV Block Design

WAIS-IV Visual Puzzles

WAIS-IV Matrix Reasoning

**Mental Health**

MMPI-2RF

Mini International Neuropsychiatric Interview

### Section 2: Evaluate Performance Validity

Freestanding, embedded and regression based performance validity metrics will be administered to each Retired NFL Football Player during baseline and, if relevant, subsequent neuropsychological examinations. There will be at least seven performance validity metrics utilized during each assessment. The specific performance validity metrics utilized will not be released to the public in order to maintain the highest standards of assessment validity. The performance

## APPENDIX B

validity metrics employed will be rotated at intervals determined by the Appeals Advisory Panel in consultation with Co-Lead Class Counsel and Counsel for the NFL Parties.

Each neuropsychological examiner must complete a checklist of validity criteria as set forth in *Slick et al.* 1999, and revised in 2013 (see below) for every Retired NFL Football Player examined in order to determine whether the Retired NFL Football Player's test data is a valid reflection of his optimal level of neurocognitive functioning.

1. Suboptimal scores on performance validity embedded indicators or tests. The cutoffs for each test should be established based on empirical findings.

2. A pattern of neuropsychological test performance that is markedly discrepant from currently accepted models of normal and abnormal central nervous system (CNS) function. The discrepancy must be consistent with an attempt to exaggerate or fabricate neuropsychological dysfunction (e.g., a patient performs in the severely impaired range on verbal attention measures but in the average range on memory testing; a patient misses items on recognition testing that were consistently provided on previous free recall trials, or misses many easy items when significantly harder items from the same test are passed).

3. Discrepancy between test data and observed behavior. Performance on two or more neuropsychological tests within a domain are discrepant with observed level of cognitive function in a way that suggests exaggeration or fabrication of dysfunction (e.g., a well-educated patient who presents with no significant visual-perceptual deficits or language disturbance in conversational speech performs in the severely impaired range on verbal fluency and confrontation naming tests).

4. Discrepancy between test data and reliable collateral reports. Performance on two or more neuropsychological tests within a domain are discrepant with day-to-day level of cognitive function described by at least one reliable collateral informant in a way that suggests exaggeration or fabrication of dysfunction (e.g., a patient handles all family finances but is unable to perform simple math problems in testing).

5. Discrepancy between test data and documented background history. Improbably poor performance on two or more standardized tests of cognitive function within a specific domain (e.g., memory) that is inconsistent with documented neurological or psychiatric history.

6. Self-reported history is discrepant with documented history. Reported history is markedly discrepant with documented medical or psychosocial history and suggests attempts to exaggerate deficits.

7. Self-reported symptoms are discrepant with known patterns of brain functioning. Reported or endorsed symptoms are improbable in number, pattern, or severity; or markedly inconsistent with expectations for the type or severity of documented medical problems.

8. Self-reported symptoms are discrepant with behavioral observations. Reported symptoms are markedly inconsistent with observed behavior (e.g., a patient complains of severe episodic memory deficits yet has little difficulty remembering names, events, or appointments; a patient complains of severe cognitive deficits yet has little difficulty driving independently and arrives on time for an appointment in an unfamiliar area; a patient complains of severely slowed mentation and concentration problems yet easily follows complex conversation).

9. Self-reported symptoms are discrepant with information obtained from collateral informants. Reported symptoms, history, or observed behavior is inconsistent with information obtained from other informants judged to be adequately reliable. The discrepancy must be consistent with an attempt to exaggerate deficits (e.g., a patient reports severe memory impairment and/or behaves as if severely memory-impaired, but his spouse reports that the patient has minimal memory dysfunction at home).

## APPENDIX B

Notwithstanding a practitioner's determination of sufficient effort in accordance with the foregoing factors, a Retired NFL Football Player's failure on two or more effort tests may result in the Retired NFL Football Player's test results being subjected to independent review, or result in a need for supplemental testing of the Retired NFL Football Player.

Note: Additional information relating to the evaluation of effort and performance validity will be provided in a clinician's interpretation guide.

### Section 3: Estimate Premorbid Intellectual Ability

| Test | Ability |
|------|---------|
| Test of Premorbid Functioning (TOPF) | Reading<br>Reading + Demographic Variables |

The Test of Premorbid Functioning (TOPF) provides three models for predicting premorbid functioning: (a) demographics only, (b) TOPF only, and (c) combined demographics and TOPF prediction equations. For each model using demographic data, a simple and complex prediction equation can be selected. In the simple model, only sex, race/ethnicity, and education, are used in predicting premorbid ability. In the complex model, developmental, personal, and more specific demographic data is incorporated into the equations. The clinician should select a model based on the patient's background and his or her current level of reading or language impairment.

Note: It is necessary to estimate premorbid intellectual functioning in order to use the criteria for impairment set out in this document. Estimated premorbid intellectual ability will be assessed and classified as:

➢ Below Average (estimated IQ below 90);

➢ Average (estimated IQ between 90 and 109);

➢ Above Average (estimated IQ above 110).

### Section 4: Neuropsychological Test Score Criteria by Domain of Cognitive Functioning

There are 5 domains of cognitive functioning. In each domain, there are several tests that contribute 3, 4, or 6 demographically-adjusted test scores for consideration. Test selection in the domains was based on the availability of demographically-adjusted normative data for Caucasians and African Americans. These domains and scores are set out below.

The basic principle for defining impairment on testing is that there must be a pattern of performance that is approximately 1.5 standard deviations (for Level 1 Impairment), 1.7-1.8 standard deviations (for Level 1.5 Impairment) or 2 standard deviations (for Level 2 Impairment) below the person's expected level of premorbid functioning. Therefore, it is necessary to have more than one low test score in each domain. A user manual will be provided to neuropsychologists setting out the cutoff scores, criteria for identifying impairment in each cognitive domain, and statistical and normative data to support the impairment criteria.

## APPENDIX B

| Domain/Test | Ability |
|---|---|
| **Complex Attention/Speed of Processing (6 Scores)** | |
| Digit Span | Attention & Working Memory |
| Arithmetic | Mental Arithmetic |
| Letter Number Sequencing | Attention & Working Memory |
| Coding | Visual-Processing & Clerical Speed |
| Symbol Search | Visual-Scanning & Processing Speed |
| Cancellation | Visual-Scanning Speed |
| **Executive Functioning (4 scores)** | |
| Similarities | Verbal Reasoning |
| Verbal Fluency (FAS) | Phonemic Verbal Fluency |
| Trails B | Complex Sequencing |
| Booklet Category Test | Conceptual Reasoning |
| **Learning and Memory (6 scores)** | |
| Logical Memory I | Immediate Memory for Stories |
| Logical Memory II | Delayed Memory for Stories |
| Verbal Paired Associates I | Learning Word Pairs |
| Verbal Paired Associates II | Delayed Memory for Word Pairs |
| Visual Reproduction I | Immediate Memory for Designs |
| Visual Reproduction II | Delayed Memory for Designs |
| **Language** | |
| Boston Naming Test | Confrontation Naming |
| BDAE Complex Ideational Material | Language Comprehension |
| Category Fluency | Category (Semantic) Fluency |
| **Visual-Perceptual** | |
| Block Design | Spatial Skills & Problem Solving |
| Visual Puzzles | Visual Perceptual Reasoning |
| Matrix Reasoning | Visual Perceptual Reasoning |

**Impairment Criteria: *Below Average* Estimated Intellectual Functioning (A1 – E1)**

### A1. Complex Attention (6 test scores)

1. Level 1 Impairment: 3 or more scores below a T score of 35

2. Level 1.5 Impairment: 4 or more scores below a T score of 35; or meet for Level 1 and 2 scores below a T score of 30

3. Level 2 Impairment: 3 or more scores below a T score of 30

### B1. Executive Function (4 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 35

2. Level 1.5 Impairment: 3 or more scores below a T score of 35; or meet for Level 1 and 1 score below a T score of 30

## APPENDIX B

3. Level 2 Impairment: 2 or more scores below a T score of 30

### C1. Learning and Memory (6 test scores)

1. Level 1 Impairment: 3 or more scores below a T score of 35

2. Level 1.5 Impairment: 4 or more scores below a T score of 35; or meet for Level 1 and 2 scores below a T score of 30

3. Level 2 Impairment: 3 or more scores below a T score of 30

### D1. Language (3 test scores)

1. Level 1 Impairment: 3 or more scores below a T score of 37

2. Level 1.5 Impairment: meet for Level 1 and 2 scores below a T score of 35

3. Level 2 Impairment: 3 or more scores below a T score of 35

### E1. Visual-Perceptual (3 test scores)

1. Level 1 Impairment: 3 or more scores below a T score of 37

2. Level 1.5 Impairment: meet for Level 1 and 2 scores below a T score of 35

3. Level 2 Impairment: 3 or more scores below a T score of 35

## Impairment Criteria: *Average* Estimated Intellectual Functioning (A2 – E2)

### A2. Complex Attention (6 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 35

2. Level 1.5 Impairment: 3 or more scores below a T score of 35; or meet for Level 1 and 1 score below a T score of 30

3. Level 2 Impairment: 2 or more scores below a T score of 30

### B2. Executive Function (4 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 35

2. Level 1.5 Impairment: 3 or more scores below a T score of 35; or meet for Level 1 and 1 score below a T score of 30

3. Level 2 Impairment: 2 or more scores below a T score of 30

### C2. Learning and Memory (6 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 35

2. Level 1.5 Impairment: 3 or more scores below a T score of 35; or meet for Level 1 and 1 score below a T score of 30

3. Level 2 Impairment: 2 or more scores below a T score of 30

### D2. Language (3 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 37

2. Level 1.5 Impairment: 3 or more scores below a T score of 37; or meet for Level 1 and 1 score below a T score of 35

3. Level 2 Impairment: 2 or more scores below a T score of 35

### E2. Visual-Perceptual (3 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 37

2. Level 1.5 Impairment: 3 or more scores below a T score of 37; or meet for Level 1 and 1 score below a T score of 35

3. Level 2 Impairment: 2 or more scores below a T score of 35

## APPENDIX B

**Impairment Criteria:** *Below Average* **Estimated Intellectual Functioning (A3 – E3)**

### A3. Complex Attention (6 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 35

2. Level 1.5 Impairment: meet for Level 1 and 3 or more scores below a T score of 37

3. Level 2 Impairment: 3 or more scores below a T score of 35

### B3. Executive Function (4 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 37

2. Level 1.5 Impairment: meet for Level 1 and 3 or more scores below a T score of 37; or meet for Level 1 and 1 score below a T score of 30

3. Level 2 Impairment: 2 or more scores below a T score of 30

### C3. Learning and Memory (6 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 35

2. Level 1.5 Impairment: meet for Level 1 and 3 or more scores below a T score of 37

3. Level 2 Impairment: 3 or more scores below a T score of 35

### D3. Language (3 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 40

2. Level 1.5 Impairment: 3 scores below at T score of 40; or meet for Level 1 and 1 score below a T score of 37

3. Level 2 Impairment: 2 or more scores below a T score of 37

### E3. Visual-Perceptual (3 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 40

2. Level 1.5 Impairment: 3 scores below at T score of 40; or meet for Level 1 and 1 score below a T score of 37

3. Level 2 Impairment: 2 or more scores below a T score of 37

---

### Section 5: Mental Health Assessment

| Test | Symptoms/Functioning | Assessment |
|---|---|---|
| MMPI-2RF | Mental Health Assessment | Evaluation of Validity Scales and Configurations; T-Scores for Symptom Domains |
| Mini International Neuropsychiatric Interview (M.I.N.I. Version 5.0.0) | Semi-structured Psychiatric Interview | Scale Criteria for Various Psychiatric Diagnoses |

**Ronald L. Hamilton, M.D.**

1/2/2017

**CURRICULUM VITAE**

**BIOGRAPHICAL**

| | | | |
|---|---|---|---|
| **Name:** | Ronald Lee Hamilton | **Birth Date:** | ███████ |
| **Home Address:** | ████████████ Pittsburgh, PA 15232 | **Birth Place:** | Omaha, Nebraska |
| **Marital status:** | single | | |
| **Home Phone** | ██████████ | **Citizenship:** | USA |
| **Business Address:** | Division of Neuropathology A724.1 Scaife Hall 200 Lothrop Street Pittsburgh, PA 15213 | | |
| **Business Phone:** | 412-624-6610 | | |
| **Business Fax:** | 412-624-5488 | | |
| **e-mail address** | hamiltonrl@upmc.edu | | |

**EDUCATION AND TRAINING**

| | | | |
|---|---|---|---|
| 1977-1985 | University of Nebraska-Lincoln | B.S. | Psychology |
| 1985-1989 | University of Nebraska Medical Center | M.D. | |
| 1989-1991 | University of California, San Diego Program Director, David Bailey | Resident Anatomic Pathology | |
| 1991-1993 | University of California, San Diego Program Director, Henry C. Powell | Resident Neuropathology | |
| 1993-1994 | University of Pittsburgh Program Director, Clayton A Wiley | Fellow Neuropathology | |
| 1994-1995 | University of Pittsburgh Program Director, Michael Zigmond | Fellow: NIMH Training Grant in Neuroscience | |

**APPOINTMENTS AND POSITIONS:**

| | |
|---|---|
| 1995-2002 | University of Pittsburgh School of Medicine -Assistant Professor of Pathology |
| 2002-present | University of Pittsburgh School of Medicine -Associate Professor of Pathology |

**DISTRIBUTION OF % TIME**

| | |
|---|---|
| Research | 20% |
| Other scholarly activity | 8% |
| Teaching | 10% |
| Clinical | 35% |
| Combined clinical and teaching | 20% |
| Service activities | 5% |
| Administrative activities. | 2% |
| TOTAL | 100% |

**Ronald L. Hamilton, M.D.**

<u>**CERTIFICATION and LICENSURE**</u>

**SPECIALTY CERTIFICATION**

| | | |
|---|---|---|
| American Board of Pathology | Anatomic Pathology | 5/23/96 |
| American Board of Pathology | Neuropathology | 5/23/96 |
| American Board of Pathology – recertification | Neuropathology | 1/1/2014 |

**MEDICAL or OTHER PROFESSIONAL LICENSURE**

| | |
|---|---|
| 1990 | California Medical License (G69731) expired |
| 1993 | Pennsylvania Medical License (MD-049717-L) |
| 2009 | Indiana Medical License (01067332A) |

<u>**MEMBERSHIPS IN PROFESSIONAL AND SCIENTIFIC SOCIETIES**</u>

| | |
|---|---|
| 1992 | American Association for the Advancement of Science |
| 1993 | American Association of Neuropathology |
| 1993 | International Society of Neuropathology |
| 1994 | College of American Pathologists (CAP) |
| 1995-97 | CAP Neuropathology Subcommittee |
| 1998 | Children's Cancer Group, Study Committee for CCGB975 |
| 1999 | Society for Neuroscience |

<u>**HONORS**</u>

| | |
|---|---|
| Nominated "Teacher of the Year: Anatomic Pathology" | 1997 |
| Nominated "Teacher of the Year: Anatomic Pathology" | 1998 |
| Nominated "Teacher of the Year: Anatomic Pathology" | 1999 |
| Nominated "Teacher of the Year: Anatomic Pathology" | 2000 |
| Nominated "Teacher of the Year: Anatomic Pathology" | 2001 |
| Nominated "Teacher of the Year: Anatomic Pathology" | 2002 |
| UPMC ACES Award winner (ACES is an Award for | 2003 |

Clinical Excellence and Service and is given to about 10 physicians per year at UPMC)

| | |
|---|---|
| Letter of appreciation from Chief Residents | 1997-1998 |
| AP Pathology "TEACHER OF THE YEAR" | 2004-05 |

<u>**PUBLICATIONS**</u>

**Refereed Articles**

1. Esch O, Spinosa JC, **Hamilton RL**, Crombie DL, Schteigart CO, Rondinone JF, D'Agostino HB,Lillienau J and Hofmann AF: Acute effects of topical methyl tert-butyl ether or ethyl propionate on gallbladder histology in animals: a comparison of two solvents for contact dissolution of cholesterol gallstones. Hepatology 16 (4):984-991, 1992.

2. Anders KH, Becker PS, Holden JK, Sharer LR, Cornford ME, Hansen LA, **Hamilton R,** Vinters, HV: Multifocal necrotizing leukoencephalopathy with pontine predilection in immunosuppressed patients: a clinicopathologic review of sixteen cases. Human Pathology 24:897-904, 1993.

3. **Hamilton RL**, Achim C, Grafe MR, Fremont JC, Miners D, Wiley CA: Herpes simplex virus brainstem encephalitis in an AIDS patient. Clinical Neuropathology, 14: 45-50, 1995.

**Ronald L. Hamilton, M.D.**

4.  Rose J, Haskell WL, Gamble JG, **Hamilton RL**, Brown DA, Rinsky L: Muscle pathophysiology and clinical measures of disability in children with cerebral palsy. Journal of Orthopedic Research, 12(6): 758-768, 1994.

5.  **Hamilton RL**, Grafe MR: Complete absence of the cerebellum: a report of two cases. Acta Neuropathologica 88 (3): 258-261, 1994.

6.  **Hamilton RL**, Haas RH, Nyhan WL, Powell HC, Grafe MR: The neuropathology of propionic academia: a report of two additional cases.  Journal of Child Neurology 10(1): 25-30, 1995.

7.  Haas RH, Marsden DL, Capistrano-Estrada S, **Hamilton RL**, Grafe MR, Wong W, Nyhan WL: Acute basal ganglia infarction in propionic acidemia.  Journal of Child Neurology 10(1) 18-22, 1995.

8.  Kupperman BD, Quiceno JI, Wiley C, Hesselink J**, Hamilton R**, Keefe K, Garcia R, Freeman WR: Clinical and histopathologic study of varicella zoster virus retinitis in patients with the acquired immunodeficiency syndrome.  American Journal of Ophthalmology 118:589-600, 1994.

9.  Adelson PD, Robichaurd P, **Hamilton RL**, Kochanek PM. A Model of Diffuse Traumatic Brain  Injury in the Immature Rat.  J Neurosurg 85:877-884, 1996.

10. Alper G, Crumrine PK, **Hamilton RL**, Albright L, Wald ER. An unusual case of inflammatory spinal epidural  mass (Castleman's syndrome) Pediatric Neurology  15: 60-2 , 1996

11. Adelson PD, Firlik KS, Firlik AD, **Hamilton RL**. A meningeal cyst of the thoracic spine presenting as prolonged paresis after ankle injury: case report. Neuropediatrics 27:207-210, 1996.

12. Cramer SC, Segal A, **Hamilton RL**, Schmahman J, Ma J. Leukoencephalitis Due to Varicella Zoster Virus:   Report of a Case and Review of Clinical Features.  Contemporary Neurology, 1, 1996 (electronic journal).

13. Mansfield RT, Schiding JK, **Hamilton R**, Kochanek PM: Effects of hypothermia on traumatic brain injury in immature rats. J Cerebral Blood Flow  Metabo 16(2): 244-252, 1996.

14. Pollack IF, Campbell JW, **Hamilton RL**, Martinez AJ, Bozik ME. Proliferation index as a predictor of prognosis in malignant gliomas of childhood. Cancer 79:849-856, 1996

15. Pollack IF, **Hamilton RL,** Finkelstein SD, Campbell JW, Martinez AJ, Sherwin RN, Bozik ME, Gollin SM. The relationship between tp53 mutations and overexpression of p53 and prognosis in malignant gliomas of childhood. Cancer Research 57:304-309, 1997.

16. Ikonomovic MD, Mizukami K, Davies P, **Hamilton R**, Sheffield R, Armstrong DM. The loss of GluR2(3) immunoreactivity preceded neurofibrillary tangle formation in the entorhinal cortex and hippocampus of Alzheimer brains. J Neuropath Exp Neurol 56:1018-1027, 1997.

17. Bredel M, Pollack IF, Campbell JW, **Hamilton RL**: Basic fibroblast growth factor as a predictor of prognosis in pediatric high-grade gliomas. Clinical Cancer Research 3:2157-2164, 1997

18. Blatt J, **Hamilton RL**: Neurodevelopmental anomalies in children with neuroblastoma. Cancer 82: 1603-8, 1998.

19. Fukui MB, Livstone BJ, Meltzer CC, **Hamilton RL**: Hemorrhagic presentation of untreated primary central nervous system lymphoma in the acquired immunodeficiency syndrome. Am J Roentgenol 170:1114-1115, 1998..

20. Bredel M, Pollack IF, **Hamilton RL**, James CD: Epidermal growth factor receptor (EGFR) and gene amplification in high-grade non-brainstem gliomas of childhood. Clin Can Res 5:1786-92, 1999

**Ronald L. Hamilton, M.D.**

21. Gerszten PC, Pollack IF, **Hamilton RL**. Primary parafalcine chondrosarcoma in a child. Acta Neuropathologica 95:111-4, 1998.

22. Pollack IF, **Hamilton RL**, Fitz C, Orenstein DM. An intrasylvian "fibroma" in a child with cystic fibrosis. Pediatric Neurosurgery 46:744-747 2000.

23. Liachenko S, Tang P, **Hamilton RL**, Xu Y: A reproducible model of circulatory arrest and remote resuscitation in rats for NMR investigation. Stroke 29:1229-1238, 1998

24. Meltzer CC, Liu AY, Perrone AM, **Hamilton RL** Meningioangiomatosis MR imaging with histopathologic correlation. AJR 170:804-5, 1998

25. Clark RSB, Kochanek PM, Chen M, Watkins SC, Marion DW, Chen J, **Hamilton RL**, Loeffert JE, Graham SH. Increases in Bcl-2 and cleavage of caspase-1 and caspase-3 in human brain after head injury. FASEB J, 13:813-821, 1999

26. Soontornniyomkij V, Wang G, Pittman CA, **Hamilton RL**, Wiley CA, Achim CL Absence of brain-derived neurotrophic factor and trkB receptor immunoreactivity in glia of Alzheimer's disease. Acta Neuropathologica 98:345-8, 1999.

27. Wang G, Achim CL, **Hamilton RL**, Wiley CA, Soontornniyomkij V Tyramide signal amplification methods in multiple label immunofluorescence confocal microscopy. Methods 18(4):459-464, 1999

28. Firlik KS, Adelson PD, **Hamilton RL**: Coexistence of a ganglioglioma and Rasmussen's encephalitis: successful treatment in a four-year-old boy. Pediatr Neurosurg 30:278-282, 1999

29. Ikonomovic MD, Mizukami K, Warde D, Sheffield R, **Hamilton R**, Wenthold RJ, Armstrong DM Distribution of glutamate receptor subunit NMDAR1 in the hippocampus of normal elderly and patients with Alzheimer's disease. Exp Neurol 160(1):194-204, 1999.

30. Dallasta, LM, Wang G, Bodnar RJ, Draviam R, Wiley CA, Achim CA, **Hamilton RL**: Differential expression of intercellular adhesion molecules-1 (ICAM-1) and vascular adhesion cell molecule-1 (VCAM-1) in chronic murine retroviral encephalitis. Neuropathol Appl Neurobiol 26:332-341, 2000.

31. Luabeya MK, Dallasta LM, Achim CL, Pauza CD, **Hamilton RL**: Blood-brain Barrier Disruption in Simian Immunodeficiency Virus Encephalitis. Neuropathol Appl Neurobiol 26:454-462, 2000.

32. **Hamilton RL**. Lewy Bodies in Alzheimer's Disease: A Neuropathological Review of 145 Cases Using -synuclein Immunohistochemistry. Brain Pathol 10: 378-384, 2000.

33. Sweet, RA, **Hamilton RL**, Healy MT, Wisniewski SR, Henteleff R, Pollack BG, Lewis DA, DeKosky ST. Alterations of Striatal Dopamine Receptor Binding in Alzheimer's Disease Are Associated with Lewy Body Pathology and With Antemortem Psychosis. Arch Neurol 58:466-472, 2001.

34. Styren S, **Hamilton RL**, Styren GC, Klunk WE X-34: a novel and intensely fluorescent stain for Alzheimer's disease pathology. J Histochem Cytochem 48:1223-1232, 2000.

35. Lopez OL, **Hamilton RL**, Becker JT, Wisniewski S, Kaufer DI, DeKosky ST. Severity of cognitive impairment and the clinical diagnosis of AD with Lewy bodies. Neurology 54:1780-1787, 2000

36. Lopez OL, Wisniewski S, **Hamilton RL**, Becker JT, Kaufer DI, DeKosky ST. Predictors of progression in patients with AD and Lewy bodies. Neurology 54:1774-1779, 2000.

**Ronald L. Hamilton, M.D.**

37.   Sweet RA, **Hamilton RL**, Lopez OL, Klunk WE, Wisnieski SR, Kaufer DI, Healy MT, Dekosky ST. Psychotic symptoms in Alzheimer's Disease are not associated with more severe neuropathologic features. Internat Psychogeriatr 12: 547-558, 2000.

38.   Lopez OL, Becker JT, Klunk W, Saxton J, **Hamilton RL**, Kaufer DI, Sweet RA, Meltzer CC, Wisniewski S, Kamboh MI, DeKosky ST. Research evaluation and diagnosis of probable Alzheimer's Disease over the last two decades. I. Neurology 55:1854-1862, 2000.

39.   Lopez OL, Becker JT, Klunk W, Saxton J, **Hamilton RL**, Kaufer DI, Sweet RA, Meltzer CC, Wisniewski S, Kamboh MI, DeKosky ST. Research evaluation and diagnosis of possible Alzheimer's Disease over the last two decades. II. Neurology 55:1863-1869, 2000.

40.   Pollack IF, **Hamilton RL**, Fitz C, Kassam A, Snyderman C. Congenital Reactive Myofibroblastic Tumor of the Petrous Bone: Case Report. Neurosurgery 48:430-435, 2001.

41.   Levy EI, Scarrow A, **Hamilton** RC (sic), Wollman MR, Fitz C. Pollack IF. Medical Management Of Eosinophilic Granuloma of the Cervical Spine. Pediatr Neurosurg 31:159-62, 1999.

42.    Pettegrew JW, Panchalingam K, **Hamilton RL**, and McClur RJ Brain Membrane Phospholipid Alterations in Alzheimer's Disease.  Neurochem Res 26:771-782, 2001

43.   Levy EI, Harris AE, Omalu BA, **Hamilton RL**, Branstetter BF, Pollack IF. Sudden Death from Fulminant Acute Cerebellitis.  Pediatr Neurosurg 35:24-28, 2001

44.   Lianchenko S, Tang P, **Hamilton RL**, Xu Y. Regional Dependence of Cerebral Reperfusion After Circulatory Arrest in Rats.  J Cerebr Blood Flow Met 21:1320-1329, 2001 .

45.    Pollack IF, Finkelstein SD, Burnham J, Holmes EJ, **Hamilton RL**, Yates AJ, Finlay J, Sposto R, and CCG.  Age and TP53 Mutation Frequency in Childhood Malignant Gliomas: Results of a Multi-institutional Cohort. Cancer Res 61:7404-7407, 2001

46.    Adelson PD, Jenkins LW, **Hamilton RL**, Robichaud P, Tran MP, Kochanek PM. Histopathologic Response of the Immature Rat to Diffuse Traumatic Brain Injury.  J Neurotrauma 18 :967-976, 2001

47.    Pollack IF, Finkelstein SD, Woods J, Burnham J, Holmes EJ, **Hamilton RL**, Yates AJ, Boyett JM, Finlay J, Sposto R, and CCG. TP53 Mutations, Expression of p53 and Prognosis in Children with Malignant Gliomas.  New England Journal of Medicine 346:420-427, 2002

48.   Lopez OL, Becker JT, Kaufer DI, **Hamilton RL**, Sweet RA, Klunk W, DeKosky ST. Research Evaluation and Prospective Diagnosis of Dementia With Lewy Bodies.  Arch Neurol 59:43-46, 2002.

49.   Wang L, Yushmanov VE, Lianchenko SM, Tang P, **Hamilton RL**, Xu Y.  Late Reversal of Cerebral Perfusion and Water Diffusion After Transient Focal Ischemia in Rats.  J Cereb Blood Flow Metab 22:253-261, 2002.

50.  Pollack IF, Biegal JA, Yates AJ, **Hamilton RL**, Finkelstein SD.Risk Assignment in Childhood Brain Tumors: The Emerging Role of Molecular and Biologic Classification. Current Oncology Reports 4:114-122, 2002.

51.    Pollack IF, **Hamilton RL**, Burnham J, Holmes EJ, Finkelstein SD, Sposto R, Yates AJ, Boyett JM, Finley JL. The impact of proliferation index on outcome in childhood malignant gliomas: results in a multi-institutional cohort. Neurosurgery 50:1238-1245, 2002.

**Ronald L. Hamilton, M.D.**

52. Sweet RA, Panchalingam K, Pettefrew JW, McClure RJ, **Hamilton RL**, Lopez OL, Kaufer DI, DeKosky ST, Klunk WE.  Psychosis in Alzheimer disease: postmortem magnetic resonance spectroscopy evidence of excess neuronal and membrane phospholipid pathology. Neurobiol Aging 23:547-53, 2002.

53.  Mazzola CA, Albright AL, Sutton LN, Tuite GF, **Hamilton RL**, Pollack IF.  Dermoid inclusion cysts and early spinal cord tethering after fetal surgery.  New Engl. J Med 347:256-9, 2002.

54.  Bredel M, Pollack IF, **Hamilton RL**, Birner P, Hainfellner JA, Zentner J.  DNA topoisomerase II-alpha predicts progression-free and overall survival in pediatric malignant non-brainstem gliomas.  Int J Cancer 99:817-20, 2002.

55.  Klunk WE, Wang Y, Huang G, Debnath ML, Holt DP, Shao L, **Hamilton RL**, Ikonomovic MD, DeKosky ST, Mathis CA.  The binding of BTA-1 to post-mortem brain homogenates is dominated by the amyloid component. J Neurosci 23:2086-2092, 2003.

56. Castellano-Sanchez, AA, Ohgaki H, Yokoo H, Scheithauer BW, Burger PC, **Hamilton RL**, Finkelstein SD, Brat, DJ.  Cerebral granular cell astrocytomas show a high frequency of allelic loss but lack a defining genotype. Brain Pathology 13: 62-78, 2003.

57.  Gilbertson RJ, Hill DA, Hernan R, Kocak M, Geyer R, Olson J, Gajjar A, Rush L, **Hamilton RL**, Finkelstein SD, Pollack IF.  ERBB1 is amplified and overexpressed in high-grade diffusely infiltrative pediatric brain stem glioma.  Clin Cancer Res 9:3620-3624, 2003.

58. Pollack IF, Finkelstein SD, Burnham J, **Hamilton RL**, Yates AJ, Holmes EJ, Boyett JM, Finlay JL.  The association between chromosome 1p loss and outcome in pediatric malignant gliomas: results from the CCG-945 cohort. Pediatr Neurosurg 39:114-121, 2003.

59.  Carter TL, Rissman RA, Mishizen-Eberz AJ, Wolfe BB, **Hamilton RL**, Gandy S, Armstrong DM.  Differential Preservation of AMPA Receptor Subunits in the Hippocampi of Alzheimer's Disease Patients According to Braak Stage Experimental Neurology 187:299-309, 2004

60.  Finkelstein SD, Mohan D, **Hamilton RL**, Sasatomi E, Swalsky PA, Lieberman FS.  Microdissection-based genotyping assists discrimination of reactive gliosis versus glioma. Am J Clin Pathol 121:671-678, 2004

61.  **Hamilton RL**, Bowser B Alzheimer Disease Pathology in ALS Acta Neuropathologica107:515-522, 2004

62.  Mohan D, Couce ME, Wiley CA, **Hamilton RL**, Sasatomi E, Swalsky PA, Lieberman MD, Finkelstein SD.  Microdissection based genotyping of human gliomas: diagnostic and prognostic considerations Modern Pathology 17:1346-1358, 2004

63. Marshall GA, Kaufer DI, Lopez OL, Rao GR, **Hamilton RL**, DeKosky ST.  Right prosubiculum amyloid plaque density correlates with anosognosia in Alzheimer's Disease.  J Neurol Neurosurg Psychiatry 75:1396-4000, 2004.  **PMCID:  PMC1738763**

64.  Sweet RA, **Hamilton RL**, Butters ME, Mulsant BH, Pollock BG, Lewis DA, DeKosky ST, Reynolds CF.  Neuropathologic Correlates of Dementia in Late Life Major Depression Neuropsychopharmacology 29:2242-2250, 2004

65  Lee JYK, Finkelstein S, **Hamilton RL**, Rekha P, Pirris S, King Jr, JT, Omalu B.  Loss of heterozygosity Analysis of Benign, Atypical and Anaplastic Meningiomas.  Neurosurgery 55:1163-1173, 2004.

**Ronald L. Hamilton, M.D.**

66.  Beckner ME, Sasatomi E, Swalsky PA, **Hamilton RL**, Pollack, IF, Finkelstein SD.  Loss of heterozygosity reveals non-VHL Allelic loss in hemangioblastomas at 22q13. Human Pathology 35:1105-1111, 2004.

67.  Tsuang D, Wilson R, Lopez OL, Luedecking-Zimmer EK, Leverenz JB, DeKosky ST, Kamboh MI, **Hamilton RL**.  Genetic Association Between APOE*4 Allele and Lewy Bodies in Alzheimer's Disease Neurology, 64:509-513, 2005. **PMCID:  PMC1487185**

68.  Bredel C, Lassman S, Pollack IF, Knoth R, **Hamilton RL**, Werner M, Bredel M. DNA Topoisomerase II-alpha and Her-2/Neu Gene Dosages in Pediatric Malignant Gliomas. Int J Cancer 26:1188-92, 2005.

69.  Witham TF, Okada H, Fellows W, **Hamilton RL**, Flickinger JC, Chambers WH, Pollack IF, Watkins SC, Kondziolka D.  The characterization of tumor apoptosis after experimental radiosurgery. Stereotact Funct Neurosurg 83:17-24 2005.

70.  McFadden K, **Hamilton RL**, Insalaco SJ, Lavine L, Al-Mateen M, Guoji Wang G, Wiley CA Neuronal intranuclear inclusion disease in a child without polyglutamine inclusions J Neuropathol Exper Neurol 64:545-552, 2005. **PMCID:  PMC1402362**

71.  Hatano M, Eguchi J, Tatsumi T, Kuwashima N, Dusak JE, Kinch MS, Pollack IF, **Hamilton RL**, Storkus WJ, Okada H. EphA2 as a glioma-associated antigen: a novel target for glioma-vaccines. Neoplasia 7:717-722, 2005. **PMCID:  PMC1501889**

72.   Jordan S, Ruoyan C, Koprivica V, **Hamilton RL**, Whitehead R, Tottori K, Kikuchi T. In vitro profile of the antidepressant candidate OPC-14523 at rat and human 5-HT$_{1A}$ receptors.Eur J Pharmacol, 517:165-173, 2005.

73.   Omalu BI, Minster RL, Kamboh MI, **Hamilton RL**, Wecht CH, DeKosky ST.  Chronic Traumatic Encephalopathy (CTE) in a National Football League (NFL) Player Neurosurgery, 57:128-134, 2005.

74.  Judkins AR, Burger PC, **Hamilton RL**, Kleinschmidt-DeMasters B, Perry A, Pomeroy SL, Rosenblum MK, Yachnis AT, Zhou H, Rorke LB, Biegel JA.  INI1 Protein Expression Distinguishes Atypical Teratoid/Rhabdopid Tumor from Choroid Plexus Carcinoma. J Neuropathol Exp Neurol 64:391-397, 2005.

75.  Desai PP, Ikonomovic I, Abrahamson EE, **Hamilton RL,** Isanski BA, Hope CE, Klunk WE, Dekosky ST, Kamboh MI.  Apolipoprotein D is a component of compact but not diffuse amyloid-beta plaques in Alzheimer's Disease temporal cortex.  Neurobiol Dis May 22, 2005 (epub)

76.  Carson-Walter EB, Hampton J, Geynisman D,Pillai PK, Sathanoori R, Madden SL, **Hamilton RL**, Walter KA.  Plasmalemmal Vesicle associated protein-1 (PV-1) is a novel and critical marker of brain tumor angiogenesis. Clin Cancer Res 11:7643-7650, 2005.

77.  Lopez OL, Becker JT, Sweet RA, Martin-Sanchez FJ, **Hamilton RL**  Lewy bodies in the Amygdala increase risk for major depression in subjects with Alzheimer disease. Neurology 67:660-665, 2006.

78.  Pollack IF, **Hamilton RL**, Sobol R, Burnham J, Yates AJ, Holmes EJ, Zhou T, Finlay J (for Children Oncology Group).O6-methylguanine-DNA methyltransferase  strongly Correlates with Outcome in Childhood Malignant Gliomas: Results from the CCG-945 Cohort J Clin Oncol. Jul 20;24(21):3431-7, 2006.

**Ronald L. Hamilton, M.D.**

79. Mandal PK, Pettegrew JW, Masliah E, **Hamilton RL**, Mandal R. Interaction between Aβ Peptide and α Synuclein: Molecular Mechanisms in Overlapping Pathology of Alzheimer's and Parkinson's in Dementia with Lewy Body disease.  Neurochemical Research, 2006 31, 1153-1162, 2006.

80. Omalu B, DeKosky ST, **Hamilton RL**, Minster RL, Kamboh MI, Shakir AM, Wecht Chronic Traumatic Encephalopathy in a National Football League Player: part II.  Neurosurgery 59:1086-92, 2006

81. Ramsey CP, Glass CA, Koike MA, Montgomery MB, Ritson GP, Chia L, **Hamilton RL**, Chu CT, Jordan-Sciutto KL. Expression of Nrf2 in neurodegenerative diseases. J Neuropathol Exp Neurol 66:75-85, 2007. **PMCID: PMC2253896**

82. Boada FE, Tanase C, Davis D, Walter K, Torres-Trejo A, Couce M, **Hamilton R**, Kondziolka D, Bartinski W, Lieberman F.  Non-invasive assessment of tumor proliferation using triple quantum filtered 23/Na MRI: technical challenges and solutions.  Conf Proc IEEE Eng Med Biol Sci Soc. 2004; 7:5238-41

83. Pollack IF, **Hamilton RL**, James CD, Finkelstein SD, Burnham J, Yates AJ, Holmes EJ, Zhou T, Finlay J (for Children Oncology Group). Rarity of *PTEN* Deletions and *EGFR* Amplification in Malignant Gliomas of Childhood: Results from the Children's Cancer Group-945 Cohort J Neurosurg 105(5 Suppl):418-424, 2006.

84. Guzman A, Wood WL, Alpert E, Prasad MD, Miller RG, Rothstein JD, Bowser R, **Hamilton R**, Wood TD, Cleveland DW, Lingappa VR, Liu J.  Common molecular signature in SOD1 for both sporadic and familial amyotrophic lateral sclerosis.  Proc Nat Acad Sci 104:12524-12529, 2007. **PMCID: PMC2408940**

85. Beckner ME, Jane EP, Jankowitz B, Agostino NR, Walter KA, **Hamilton RL**, Pollack IF.  Tumor cells from ultrasonic aspirations of glioblastomas migrate and from spheres with radial outgrowth.  Cancer Letters 255:135-44, 2007. PMID  17543444,  **PMCID: PMC2000342**

86. McIntyre JA, Chapman J, Shavit E, **Hamilton RL**, and DeKosky ST. Redox-Reactive Autoantibodies in Alzheimer's Patients' Cerebrospinal Fluids: Preliminary Studies.  Autoimmunity, 40:390-396, 2007. PMID 17612901

87. Nakashima-Yasuda, Uryu, K, Robinson J, Xie S, Hurtig H, Duda J, Arnold S, Siderowf A, Grossman M, Leverenz J, Woltjer R, Lopez OL, **Hamilton R,** Tsuang DW, Galaska D, Masliah M, Kaye J, Clark C, Montine TJ, Lee VMY, Trojanowski J. Co-morbidity of TDP-43 Proteinopathy in Lewy Body Related Diseases. Acta Neuropathol 114:221-9, 2007.  PMID 17653732

88. McIntyre JA, **Hamilton RL**, DeKosky ST. Redox-reactive autoantibodies in cerebrospinal fluids.  Ann NY Acad Sci 1109:296-302, 2007. PMID 17785318

89. Okada H, Lieberman FS, Walter KA, Lunsford LD, Kondziolka DS, Bejjani GK, **Hamilton RL**, Torres-Trejo A, Kalinski P, Cai Q, Mabold JL, Edington HD, Butterfield LH, Whiteside TL, Potter DM, Schold SC Jr., Pollack IF  Autologous glioma cell vaccine admixed with interleukin-4 gene transfected fibroblasts in the treatment of patients with malignant gliomas.  J Transl Med 5:67, 2007.  PMID 18093335. **PMCID: PMC2254376**

90. Beach TG, White CL, **Hamilton, RL**, Duda JE, Iwatsubo T, Dickson DW, Leverenz JB, Roncaroli F, Buttini M, Hladik CL, Sue LI, Noorigian JV, Adler CH.  Evaluation of alpha-synuclein immunohistochemical methods used by invited experts.  Acta Neuropathol 116:277-88, 2008. PMID 18626651.  **PMCID: PMC2708176**

91. Ikonomovic MD, Klunk WE, Abrahamson EE, Mathis CA, Price JC, Tsopelas ND, Lopresti BJ, Ziolko S, Bi W, Paljug WR, Debnath ML, Hope CE, Isanski BA, **Hamilton RL**, DeKosky ST. Post-

**Ronald L. Hamilton, M.D.**

mortem correlates of in vivo PiB-PET amyloid imaging in a typical case of Alzheimers disease. Brain  131(Pt 6):1630-45, 2008.  PMID  18339640.  **PMCID:  PMC2408940**

92. Leverenz JB, **Hamilton R**, Tsuang DW, Schantz A, Vavrek D, Larson EB, Kukall WA, Lopez O, Galasko D, Masliah E, Woltjer R, Clark C, Trojanowski JQ, Montine TJ. Empiric refinement of the pathologic assessment of Lewy-related pathology in the dementia patient.  Brain Pathol 18:220-224, 2008. PMID 18241249.  **PMCID:  PMC2689097  NIHMS29359**

93. Raja AI, Yeaney GA, Jakacki RI, **Hamilton RL**, Pollack IF  Extraventricular neurocytoma in neurofibromatosis Type I: Case report.  J Neurosurg Pediatrics 2:63-67, 2008.PMID 18590398

94. Okada H, Low KL, Kohanbash G, McDonald HA, **Hamilton RL**, Pollack IF.  Expression of glioma-associated antigens in pediatric brain stem and non-brain stem gliomas.  J Neurooncol 88:245-50, 2008. PMID 18324354.  **PMCID:  PMC2561297 NIHMS70086**

95. Venneti S, Lopresti BJ, Wang G, **Hamilton RL**, Mathis CA, Klunk WE, Apte UM, Wiley CA. PK11195 labels activated microglia in Alzheimer's disease and in vivo in a mouse model using PET.  Neurobiol Aging 2009, 30:1217-26. PMID 18178291

96. Mullett SJ, **Hamilton RL**, Hinkle DA.  DJ-1 immunoreactivity in human brain astrocytes is dependent on infarct presence and infarct age. Neurology 2009, 29:125-31. PMID 18647263

97. Park DM, Yeaney GA, **Hamilton RL**, Mabold J, Urban N, Appleman L, Flickinger J, Lieberman F, Mintz A.  Identifying Muir-Torre syndrome in a patient with glioblastoma multiforme.  Neuro Oncol, 2009 11:452-5. PMID 19028998.  )

98. Horbinski C, Bartynski WS, Carson-Walter E, **Hamilton RL**, Tan HP, Cheng S.  Reversible encephalopathy after cardiac transplantation:  Histologic evidence of endothelial activation, T-cell specific trafficking, and vascular endothelial growth factor expression.  Am J Neuroradiol 2008 30:588-90. PMID 18854444.

99. Northcott P, Nakahara Y, Peacock J, Ellison D, Croul S, Feuk L, Ra YS, Kongham P, Zilerberg K, Mack S, McLeod J, Scherer S, Rao S, Grajkowska W, Gillespie Y, Lach B, Grundy R, Pollack IF, **Hamilton RL,** Van Meter T, Carlotti C, Boop R, Bigner D, Gilbertson R, Rutka J, Taylor MD. Multiple recurrent genetic events converge on control of histone lysine methylation in medulloblastoma.  Nat Genet 2009 41:465-72. PMID 19270706.

100. Ueda R, Kohanbash G, Sasaki K, Fujita M, Zhu X, Kastenhuber ER, McDonald HA, Potter DM, **Hamilton RL,** Lotze MT, Khan SA, Sobol RW, Okada H.  Dicer-regulated microRNAs 222 and 339 promote resistance of cancer cells to cytotoxic T-lymphocytes by down-regulation of ICAM-1.  Proc Natl Acad Sci U S A. 2009 Jun 30;106(26):10746-51.  PMID: 19520829

101. Maki RA, Tyurin VA, Lyon RC, **Hamilton RL**, DeKosky ST, Kagan VE, Reynolds WF.  Aberrant expression of myeloperoxidase in astrocytes promotes phospholipid oxidation and memory deficits in a mouse model of Alzheimer disease. J Biol Chem. 2009 Jan 30;284(5):3158-69. PMID: 19059911.

102. Horbinski C, **Hamilton RL**, Lovell C, Burnham J, Pollack IF.  Impact of morphology, MIB-1, p53, and MGMT on Outcome in Pilocytic Astrocytomas.  Brain Pathology 2010; 20:581-8  e-pub Sept 21, 2009

103. Armstrong RA, Ellis W, **Hamilton RL**, MacKenzie IR, Hedreen J, Gearing M, Montine T, Vonsattel JP, Head E, Lieberman AP, Cairns NJ.  Neuropathological heterogeneity in frontotemporal lobar degeneration with TDP-43 proteinopathy: a quantitative study of 94 cases using principle components analysis.  J Neural Transm 2010, 117:227-239.

**Ronald L. Hamilton, M.D.**

104. Horbinski C, **Hamilton RL**, Nikiforov Y, Pollack IF.  Association of molecular alterations, including BRAF, with biology and outcome in pilocytic astrocytomas.  Acta Neuropathol 2010 Jan 1, e-pub.

105. Van Deerlin VM, Sleiman PM, Martinez-Lage M, Chen-Plotkin A, Wang LS, Graff-Radford NR, Dickson DW, Rademakers R, Boeve BF, Grossman M, Arnold SE, Mann DM, Pickering-Brown SM, Seelaar H, Heutink P, van Swieten JC, Murrell JR, Ghetti B, Spina S, Grafman J, Hodges J, Spillantini MG, Gilman S, Lieberman AP, Kaye JA, Woltjer RL, Bigio EH, Mesulam M, Al-Sarraj S, Troakes C, Rosenberg RN, White CL 3rd, Ferrer I, Lladó A, Neumann M, Kretzschmar HA, Hulette CM, Welsh-Bohmer KA, Miller BL, Alzualde A, de Munain AL, McKee AC, Gearing M, Levey AI, Lah JJ, Hardy J, Rohrer JD, Lashley T, Mackenzie IR, Feldman HH, **Hamilton RL**, Dekosky ST, van der Zee J, Kumar-Singh S, Van Broeckhoven C, Mayeux R, Vonsattel JP, Troncoso JC, Kril JJ, Kwok JB, Halliday GM, Bird TD, Ince PG, Shaw PJ, Cairns NJ, Morris JC, McLean CA, DeCarli C, Ellis WG, Freeman SH, Frosch MP, Growdon JH, Perl DP, Sano M, Bennett DA, Schneider JA, Beach TG, Reiman EM, Woodruff BK, Cummings J, Vinters HV, Miller CA, Chui HC, Alafuzoff I, Hartikainen P, Seilhean D, Galasko D, Masliah E, Cotman CW, Tuñón MT, Martínez MC, Munoz DG, Carroll SL, Marson D, Riederer PF, Bogdanovic N, Schellenberg GD, Hakonarson H, Trojanowski JQ, Lee VM.  Common variants at 7p21 are associated with frontotemporal lobar degeneration with TDP-43 inclusions. Nat Genet 2010 42:234-239.

106. Omalu BI, **Hamilton RL**, Kamboh MI, DeKosky ST, Bailes J.  Chronic traumatic encephalopathy in a National Football League Player: Case report and emerging medicolegal practice questions.  J Forensic Nurs, 2010, 6: 40-46.

107. Caltagarone J, **Hamilton RL**, Murdoch G, Jing Z, DeFranco DB, Bowser R. Paxillin and hydrogen peroxide-induced clone 5 expression and distribution in control and Alzheimer disease hippocampi. J Neuropathol Exp Neurol. 2010: 69:356-71.

108. Pollack IF, **Hamilton RL**, Sobol RW, Nikiforova MN, Lyons-Weiler MA, Laframboise WA, Burger PC, Brat DJ, Rosenblum MK, Holmes EJ, Zhou T, Jakacki RI; for the Children's Oncology Group. IDH1 mutations are common in malignant gliomas arising in adolescents: a report from the Children's Oncology Group. Childs Nerv Syst. 2010; 27:87-94

109. Jun G, Naj AC, Beecham GW, Wang LS, Buros J, Gallins PJ, Buxbaum JD, Ertekin-Taner N, Fallin MD, Friedland R, Inzelberg R, Kramer P, Rogaeva E, St George-Hyslop P, Arnold SE, Baldwin CT, Barber R, Beach T, Bigio EH, Bird TD, Boxer A, Burke JR, Cairns N, Carroll SL, Chui HC, Clark DG, Cotman CW, Cummings JL, Decarli C, Diaz-Arrastia R, Dick M, Dickson DW, Ellis WG, Fallon KB, Farlow MR, Ferris S, Frosch MP, Galasko DR, Gearing M, Geschwind DH, Ghetti B, Gilman S, Giordani B, Glass J, Graff-Radford NR, Green RC, Growdon JH, **Hamilton RL**, Harrell LE, Head E, Honig LS, Hulette CM, Hyman BT, Jicha GA, Jin LW, Johnson N, Karlawish J, Karydas A, Kaye JA, Kim R, Koo EH, Kowall NW, Lah JJ, Levey AI, Lieberman A, Lopez OL, Mack WJ, Markesbery W, Marson DC, Martiniuk F, Masliah E, McKee AC, Mesulam M, Miller JW, Miller BL, Miller CA, Parisi JE, Perl DP, Peskind E, Petersen RC, Poon W, Quinn JF, Raskind M, Reisberg B, Ringman JM, Roberson ED, Rosenberg RN, Sano M, Schneider JA, Schneider LS, Seeley W, Shelanski ML, Smith CD, Spina S, Stern RA, Tanzi RE, Trojanowski JQ, Troncoso JC, Van Deerlin VM, Vinters HV, Vonsattel JP, Weintraub S, Welsh-Bohmer KA, Woltjer RL, Younkin SG, Cantwell LB, Dombroski BA, Saykin AJ, Reiman EM, Bennett DA, Morris JC, Lunetta KL, Martin ER, Montine TJ, Goate AM, Blacker D, Tsuang DW, Beekly D, Cupples LA, Hakonarson H, Kukull W, Foroud TM, Haines J, Mayeux R, Farrer LA, Pericak-Vance MA, Schellenberg GD; Alzheimer's Disease Genetics Consortium, Arnold SE, Baldwin CT, Barber R, Beach T, Bigio EH, Bird TD, Boxer A, Burke JR, Cairns N, Carroll SL, Chui HC, Clark DG, Cotman CW, Cummings JL, Decarli C, Diaz-Arrastia R, Dick M, Dickson DW, Ellis WG, Fallon KB, Farlow MR, Ferris S, Frosch MP, Galasko DR, Gearing M, Geschwind DH, Ghetti B, Gilman S, Giordani B, Glass J, Graff-Radford NR, Green RC, Growdon JH, Hamilton RL, Harrell LE, Head E, Honig LS, Hulette CM, Hyman BT, Jicha GA, Jin LW, Johnson N, Karlawish J, Karydas A, Kaye JA, Kim R, Koo EH, Kowall NW, Lah JJ, Levey AI, Lieberman A, Lopez OL, Mack WJ, Markesbery W, Marson DC, Martiniuk F, Masliah E, McKee AC, Mesulam M, Miller JW, Miller BL, Miller CA, Parisi JE, Perl DP, Peskind E, Petersen RC, Poon W, Quinn JF, Raskind M, Reisberg B, Ringman JM, Roberson ED, Rosenberg RN, Sano M, Schneider JA, Schneider LS, Seeley W, Shelanski ML, Smith CD, Spina S, Stern RA, Tanzi RE, Trojanowski JQ, Troncoso JC, Van Deerlin VM, Vinters HV, Vonsattel JP, Weintraub S, Welsh-Bohmer KA, Woltjer RL, Younkin SG.  Meta-analysis confirms CR1, CLU and PICALM as Alzheimer Disease Risk Loci and reveals interactions with APOE Genotypes. Arch Neurol, 2010, Sep 3 (epub ahead of print)

110. Pollack IF, **Hamilton RL**, Burger PC, Brat DJ, Rosenblum MK, Murdoch GH, Nikiforova MN, Holmes EJ, Zhou T, Cohen KJ, Jakacki RI; Children's Oncology Group. Akt activation is a common event in pediatric malignant gliomas and a potential adverse prognostic marker: a report from the Children's Oncology Group. J Neurooncol. 2010 Sep;99(2):155-63. Epub 2010 Jul 4

**Ronald L. Hamilton, M.D.**

111. Pollack IF, **Hamilton RL**, Sobol RW, Nikiforova MN, Nikiforov YE, Lyons-Weiler MA, Laframboise WA, Burger PC, Brat DJ, Rosenblum MK, Gilles FH, Yates AJ, Zhou T, Cohen KJ, Finlay JL, Jakacki RI; for the Children's Oncology Group. Mismatch repair deficiency is an uncommon mechanism of alkylator resistance in pediatric malignant gliomas: a report from the Children's Oncology Group. Pediatr Blood Cancer 2010 Jun 29 epub ahead of print

112. Bonneh-Barkay D, Wang G, Starkey A, **Hamilton RL**, Wiley CA. In vivo CHI3L1 (YKL-40) expression in astrocytes in acute and chronic neurological diseases. J Neuroinflammation 2010 Jun 11:7-34.

113. Hinkle DA, Mullett SJ, Gabris BE, **Hamilton RL**. DJ-1 expression in glioblastomas shows positive correlation with p53 expression and negative correlation with epidermal growth factor receptor amplification. Neuropathology 2010 May 19 (epub ahead of print)xx

114. Okada H, Kalinski P, Ueda R, Hoji A, Kohanbash G, Donegan TE, Mintz AH, Engh JA, Bartlett DL, Brown CK, Zeh H, Holtman MP, Reinhart TA, Whiteside TL,Butterfield LH, **Hamilton RL**, Potter DM, Pollack IF, Salazar AM, Lieberman FS. Induction of CD8+ T-cell responses against novel glioma-associated antigen peptides and clinical activity by vaccinations with {alpha}-type 1 polarized dendritic cells and polyinosinic-polycytidylic acid stabilized by lysine and carboxymethylcellulose In patients with recurrent malignant glioma. J Clin Oncol. 2011;29:330-6.PMID: 21149657

115. Kofler J, Bartynski WS, Reynolds TQ, Lieberman FS, Murdoch GH, **Hamilton RL**. Posterior reversible encephalopathy syndrome (PRES) with immune system activation, VEGF up-regulation, and cerebral amyloid angiopathy. J. Comput Assist Tomogr. 2011; 35:39-42. PMID: 21150450

116. Bonfield CM, Amin D, **Hamilton RL**, Gerszten PC. Extramedullary ependymoma near the conus medullaris with lumbar nerve root attachment: case report. Neurosurgery. 2011 Mar;68:E831-4. PMID:21311277

117. Fujita M, Kohanbash G, Fellows-Mayle W, **Hamilton RL**, Komohara Y, Decker SA, Ohlfest JR, Okada H.COX-2 blockade suppresses gliomagenesis by inhibiting myeloid-derived suppressor cells. Cancer Res. 2011 Apr 1;71:2664-74. Epub 2011 Feb 15. PMID: 21324923

118. Cohen KJ, Pollack IF, Zhou T, Buxton A, Holmes EF, Burger PC, Brat DJ, Rosenblum MK, **Hamilton RL**, Lavey RS, Heideman RL. Temozolomide in the treatment of high-grade gliomas in children: a report from the Children's Oncology Group.
Neuro Oncol. 2011 Mar;13:317-23. PMID: 21339192

119. Omalu B, Bailes J, **Hamilton RL**, Kamboh MI, Hammers J, Case M, Fitzsimmons R.
Emerging histomorphologic phenotypes of chronic traumatic encephalopathy in American athletes.
Neurosurgery. 2011 Jul;69:173-83; discussion 183. PMID: 21358359

120. Tang JB, Svilar D, Trivedi RN, Wang XH, Goellner EM, Moore B, **Hamilton RL**, Banze LA, Brown AR, Sobol RW. N-methylpurine DNA glycosylase and DNA polymerase beta modulate BER inhibitor potentiation of glioma cell to temozolomide. Neurosurgery Oncol. 2011;13:471-86. PMID: 21377995

121. Liu KW, Feng H, Bachoo R, Kazlauskas A, Smith EM, Symes K, **Hamilton RL**, Nagane M, Nishikawa R, Hu, B, Cheng Sy. SHP-2/PTPN 11 mediates gliomagenesis driven by PDGFRA and INK4A/ARF aberrations in mice and humans. J. Clin Invest. 2011 Mar;121:905-17. PMID: 21393858

122. Naj AC, Jun G, Beecham GW, Wang LS, Vardarajan BN, Buros J, Gallins PJ, Buxbaum JD, Jarvidk GP, Crane PK, Larson EB, Bird TB, Boeve BF, Graff-Radford NR, De Jager PL, Evans D, Schneider JA, Carrasquillo MM, Ertekin-Taner N, Younkin SG, Cruchaga C, Kauwe JS, Nowotny P, Kramer P, Hardy J, Huentelman MJ, Myers AJ, Barmada MM, Demirci FY, Baldwin CT, Green RC, Rogaeva E, St. George-Hyslop P, Arnold SE, Barber R, Beach T, Bigio EH, Bowen JD, Boxer A, Burke JR, Cairns NJ, Carlson CS, Carney RM, Carroll SL, Chui HC, Clark DG, Corneveaux J, Cotman CW, Cummings JL, Decarli C, DeKosy ST, Diaz-Arrastia R, Dick M, Dickson DW, Ellis WG, Faber KM, Fallon KB, Farlow MR, Ferris S. Frosch MP, Galasko Dr, Ganguli M, Gearing M, Geschwind DH, Ghetti B, Gilbert JR, Gilman S, Giordani B, Glass JD, Growdon JH, **Hamilton RL**,R, Koo EH, Kowall NW, Lah JJ, Levey AI, Lieberman AP, Lopez OL, Mack WJ, Marson DC, Martiniuk F, Mash DC, Masliah E, McCormick WC, McCurry SM, McDavid AN, McKee AC, Mesulam M, Miller BL, Miller JW, Parisi JE, Perl DP, Peskind E,Petersen, RC, Poon, WV, Quinn JF, Rajbhandary RA, Raskind M, Reisberg B, Ringman JM, Roberson ED, Rosenberg RN,Sano M, Schneider LS, Seeley W, Shelanksi ML, Slifer MA, Smith CD, Sonnen JA, Spina S. Stern RA, Tanzi RE, Trojanowski JQ, Troncoso JC, Van Deerlin VM, Vinters HV, Vonsattel JP, Weintraub S, Welsh-Bohmer KA, Williamson

**Ronald L. Hamilton, M.D.**

J, Woltjer RL,Cantwell LB, Dombroski BA, Beekly D, Lunetta KL, Martin ER, Kamboh MI, Saykin AJ, Reiman EM, Bennett DA, Morris JC, Montine TJ, Goate AM, lacker D, Tsuang DW, Hakonarson, H, Kukull WA, Foroud TM, Haines JL, Mayeux R, Pericak-Vance MA, Farrer LA, Schellenberg GD. Commons variants as MS4A4/MS4A6E, CD2AP, CD33 and EPHA1 are associated with late Onset Alzheimer's Disease. Nat Genet. 2011 May;43:436-41 Epub 2011 Apr 3. PMID: 21460841

123.   Chen-Plotkin AS, Martinez-Lage M,Sleiman PM, Hu W, Greene R, Wood  EM, Bing S, Grossman M, Schellenberg GD, Hatanpaa KJ, Weiner MF, White CL 3rd, Brooks WS, Halliday GM, Kril JJ, Gearing M, Beach TG, Graff-Radford NR, Dickson DW, Rademakers R, Boeve BF, Pickering-Brown SM, Snowden J, van Swieten JC, Heutink P, Seelaar H, Murrell JR, Ghetti B, Spina S, Grafman J, Kaye JA, Woltjer RL, Mesulam M, Bigio E, Llad'o A, Miller BL, Alzualde A, Moreno F,Rohrer JD, Mackenzie IR, Feldman HH, **Hamilton RL**, Cruts M, Engelborghs S, De Deyn PP, Van Broeckhoven C, Bird TD, Cairns NJ, Goate A, Frosch MP, Riederer PF, Bogdanovic N, Lee VM, Trojanowksi JQ, Van Deerlin VM. Genetic and clinical features of progranulin-associated frontotemporal lobar degeneration. Arch Neurol. 2011 Apr;68:488-97. PMID: 21482928

124.   Nikiforova MN, **Hamilton RL**. Molecular diagnostics of gliomas. Arch Pathol Lab Med. 2011 May;135:558-68. Review. PMID: 21526954

125.   Monaco EA 3rd, Armah HB, Nikiforova MN, **Hamilton RL**, Engh JA. Grade II Oligodendroglioma localized to the corpus callosum. Brain Tumor Pathol. 2011 Oct;28:305-9. Epub 2011 Jul 22. PMID: 21833577

126.   Horbinski C, Hobbs, J, Cieply K, Dacic S, **Hamilton RL.** EGFR expression stratifies oligodendroglioma behavior.Am J Pathol. 2011 Oct; 179:1638-44. Epub 2011 Aug 11. PMID: 21839716

127.   Omalu B, hammers, JL, bailes J**, Hamilton RL**. Kamboh MI, Webster G, Fitzsimmons RP. Chronic traumatic Encephalopathy  in an Iraqi war veteran with posttraumatic stress disorder who committed suicide. Neurosurg Focus. 2011 Nov; :E3. PMID: 22044102

128.   Liu Y, Komohara Y, Domenick N, Ohno M, Ikeura M, **Hamilton RL**, Horbinski C, Wang X, Ferrone S, Okada H. Expression of antigen processing molecules in brain metastasis of breast cancer. Cancer Immunol Immunother. 2011 Nov 8. (Epub ahead of print } PMID:22065046

129.   Feng H, Hu B, Liu KW, Li Y, Lu X, Cheng T, Yiin JJ, Lu S, Keezer S, Fenton T, Furnari FB, **Hamilton RL**, Vuori K, Sarkaria JN, Nagane M, Nishikawa R, Cavenee WK, Cheng SY. Activation of Rac 1 by src-dependent phosphorylation of Dock180(Y1811) mediates PDGFRa-stimulated glioma tumorigenesis in mice and humans. J Clin Invest. 2011 Dec; 121:4670-84. doi: 10.1172/JCI58559. Epub 2011 Nov 14. PMID: 22080864

130.   Horbinski C, Nikiforova MN, Hobbs J, Bortoluzzi S. Cieply K, Dacic S, **Hamilton RL**. The importance of 10q status in an outcomes-based comparison between 1p/19q fluorescence in situ hybridization and polymerase chain reaction-based microsatellite loss of heterozygosity analysis of oligodendrogliomas.  J. Neuropathol Exp Neurol. 2012 Jan;71:73-82. PMID: 22157622

131.   Ikonomovic MD, Abrahamson EE, Price JC, **Hamilton RL**, Mathis CA, Paljug WR, Cohen AD, Mizukami K, DeKosky ST, Lopez OL, Klunk WE. Early AD pathology in a {C-11} PiB-negative case: a PiB-amyloid imaging, biochemical, and  immunohistochemical study. Acta Neuropathol. 2012 Mar;123:433-47. Epub 2012 Jan 24. PMID: 22271153

132.   Feng H, Hu B, Jarzynka MJ, Li Y, Keezer S, Johns TG, Tang CK, **Hamilton RL**, Vuuori K, Nishikawa R, Sarkaria JN, Fenton T, Cheng T, Furnari FB, Cavenee WK, Cheng SY. Phosphorylation of dedicator of cytokinesis 1(Dock 180) at tyrosine residue Y722 by Src family kinases mediates EGRFvIII-driven glioblastoma tumorigenesis. Proc Natl Acad Sci U S A. 2012 Feb 21;109:3018-23. Epub 2012 Feb 7. PMID: 22323579

133.   Wu Y, Lou H, Alerte TN, Stachowski EK, Chen J, Singleton AB, **Hamilton RL**, Perez RG. Neuroscience. 2012 Jan 25. {Epubahead a print} PMID: 22326202

134.   Murray PS, Kirkwood CM, Gray MC, Ikonomovic MD, Paljug WR, Abrahamson EE, Henteleff RA, **Hamilton RL**, Kofler JK, Klunk WE, Lopez OL, Penzes P, Sweet RA. β-Amyloid 42/40 ratio and kalirin expression in Alzheimer disease with psychosis. Neurobiol Aging. 2012 Mar 17. [Epub ahead of print] PMID:22429885

**Ronald L. Hamilton, M.D.**

135.    Choi SH, Olabarrieta M, Lopez OL, Maruca V, DeKosky ST, **Hamilton RL**, Becker JT. Gray Matter Atrophy Associated with Extrapyramidal Signs in the Lewy Body Variant of Alzheimer's Disease. J Alzheimers Dis. 2012 Aug 9. [Epub ahead of print] PMID:22886020

136.    Armstrong RA, **Hamilton RL**, Mackenzie IR, Hedreen J, Cairns NJ. Laminar Distribution of the Pathological Changes in Sporadic Frontotemporal Lobar Degeneration with TDP-43 Proteinopathy: A Quantitative Study Using Polynomial Curve Fitting. Neuropathol Appl Neurobiol. 2012 Jul 16. [Epub ahead of print] PMID:22804696

137.    Atkinson DM, **Hamilton RL** A 52-year-old male with visual changes. Brain Pathol. 2012 Jul;22(4):575-8. PMID:22697384

138.    Zou F, Chai HS, Younkin CS, Allen M, Crook J, Pankratz VS, Carrasquillo MM, Rowley CN, Nair AA, Middha S, Maharjan S, Nguyen T, Ma L, Malphrus KG, Palusak R, Lincoln S, Bisceglio G, Georgescu C, Kouri N, Kolbert CP, Jen J, Haines JL, Mayeux R, Pericak-Vance MA, Farrer LA, Schellenberg GD; Alzheimer's Disease Genetics Consortium, Petersen RC, Graff-Radford NR, Dickson DW, **Hamilton RL**, Younkin SG, Ertekin-Taner N. Brain expression genome-wide association study (eGWAS) identifies human disease-associated variants. PLoS Genet. 2012;8(6): e1002707. Epub 2012 Jun 7 PMID:22685416

139.    Horbinski C, Nikiforova MN, Hagenkord JM, **Hamilton RL**, Pollack IF. Interplay among BRAF, p16, p53, and MIB1 in pediatric low-grade gliomas. Neuro Oncol. 2012 Jun;14(6):777-89 (1012) PMID:22492957

140.    Hobbs J, Nikiforova MN, Fardo DW, Bortoluzzi S, Cieply K, **Hamilton RL**, Horbinski C. Paradoxical relationship between the degree of EGFR amplification and outcome in glioblastomas. Am J Surg Pathol. 2012 Aug;36(8):1186-93. PMID:22472960

141. Armstrong, R. A., **R. L. Hamilton**, I. R. Mackenzie, J. Hedreen and N. J. Cairns. "Laminar Distribution of the Pathological Changes in Sporadic Frontotemporal Lobar Degeneration with Transactive Response (Tar) DNA-Binding Protein of 43 Kda (Tdp-43) Proteinopathy: A Quantitative Study Using Polynomial Curve Fitting." *Neuropathol Appl Neurobiol* 39, no. 4 (2013): 335-47.

142. Clark, K. H., J. L. Villano, M. N. Nikiforova, **R. L. Hamilton** and C. Horbinski. "1p/19q Testing Has No Significance in the Workup of Glioblastomas." *Neuropathol Appl Neurobiol*,  (2013).

143. Gheorghe, G., O. Radu, S. Milanovich, **R. L. Hamilton**, R. Jaffe, J. F. Southern and J. A. Ozolek. "Pathology of Central Nervous System Posttransplant Lymphoproliferative Disorders: Lessons from Pediatric Autopsies." *Pediatr Dev Pathol* 16, no. 2 (2013): 67-73.

1444. Holton, P., M. Ryten, M. Nalls, D. Trabzuni, M. E. Weale, D. Hernandez, H. Crehan, J. R. Gibbs, R. Mayeux, J. L. Haines, L. A. Farrer, M. A. Pericak-Vance, G. D. Schellenberg, M. Ramirez-Restrepo, A. Engel, A. J. Myers, J. J. Corneveaux, M. J. Huentelman, A. Dillman, M. R. Cookson, E. M. Reiman, A. Singleton, J. Hardy and R. Guerreiro. "Initial Assessment of the Pathogenic Mechanisms of the Recently Identified Alzheimer Risk Loci." *Ann Hum Genet* 77, no. 2 (2013): 85-105.

145. Miyashita, A., A. Koike, G. Jun, L. S. Wang, S. Takahashi, E. Matsubara, T. Kawarabayashi, M. Shoji, N. Tomita, H. Arai, T. Asada, Y. Harigaya, M. Ikeda, M. Amari, H. Hanyu, S. Higuchi, T. Ikeuchi, M. Nishizawa, M. Suga, Y. Kawase, H. Akatsu, K. Kosaka, T. Yamamoto, M. Imagawa, T. Hamaguchi, M. Yamada, T. Moriaha, M. Takeda, T. Takao, K. Nakata, Y. Fujisawa, K. Sasaki, K. Watanabe, K. Nakashima, K. Urakami, T. Ooya, M. Takahashi, T. Yuzuriha, K. Serikawa, S. Yoshimoto, R. Nakagawa, J. W. Kim, C. S. Ki, H. H. Won, D. L. Na, S. W. Seo, I. Mook-Jung, P. St George-Hyslop, R. Mayeux, J. L. Haines, M. A. Pericak-Vance, M. Yoshida, N. Nishida, K. Tokunaga, K. Yamamoto, S. Tsuji, I. Kanazawa, Y. Ihara, G. D. Schellenberg, L. A Farrer and R. Kuwano. "Sorl1 Is Genetically Associated with Late-Onset Alzheimer's Disease in Japanese, Koreans and Caucasians." *PLoS One* 8, no. 4 (2013): e58618.

146. Pang, B., M. B. Durso, **R. L. Hamilton** and M. N. Nikiforova. "A Novel Cold-Pcr/Fmca Assay Enhances the Detection of Low-Abundance Idh1 Mutations in Gliomas." *Diagn Mol Pathol* 22, no. 1 (2013): 28-34.

147. Reitz, C., G. Jun, A. Naj, R. Rajbhandary, B. N. Vardarajan, L. S. Wang, O. Valladares, C. F. Lin, E. B. Larson, N. R. Graff-Radford, D. Evans, P. L. De Jager, P. K. Crane, J. D. Buxbaum, J. R. Murrell, T. Raj, N. Ertekin-Taner, M. Logue, C. T. Baldwin, R. C. Green, L. L. Barnes, L. B. Cantwell, M. D. Fallin, R. C. Go, P. Griffith, T. O. Obisesan, J. J. Manly, K. L. Lunetta, M. I. Kamboh, O. L. Lopez, D. A. Bennett, H. Hendrie, K. S. Hall, A. M. Goate, G. S. Byrd, W. A. Kukull, T. M. Foroud, J. L. Haines, L. A. Farrer, M. A. Pericak-Vance, G. D. Schellenberg and R. Mayeux. "Variants

**Ronald L. Hamilton, M.D.**

in the Atp-Binding Cassette Transporter (Abca7), Apolipoprotein E 4,and the Risk of Late-Onset Alzheimer Disease in African Americans." *JAMA* 309, no. 14 (2013): 1483-92.

148. Schlegel, J., M. J. Sambade, S. Sather, S. J. Moschos, A. C. Tan, A. Winges, D. DeRyckere, C. C. Carson, D. G. Trembath, J. J. Tentler, S. G. Eckhardt, P. F. Kuan, **R. L. Hamilton**, L. M. Duncan, C. R. Miller, N. 9. Nikolaishvili-Feinberg, B. R. Midkiff, J. Liu, W. Zhang, C. Yang, X. Wang, S. V. Frye, H. S. Earp, J. M. Shields and D. K. Graham. "Mertk Receptor Tyrosine Kinase Is a Therapeutic Target in Melanoma." *J Clin Invest* 123, no. 5 (2013): 2257-67.

150. Spina, S., A. D. Van Laar, J. R. Murrell, **R. L. Hamilton**, J. K. Kofler, F. Epperson, M. R. Farlow, O. L. Lopez, J. Quinlan, S. T. DeKosky and B. Ghetti. "Phenotypic Variability in Three Families with Valosin-Containing Protein Mutation." *Eur J Neurol* 20, no. 2 (2013): 251-8.

151. Tsuang, D., J. B. Leverenz, O. L. Lopez, **R. L. Hamilton,** D. A. Bennett, J. A. Schneider, A. S. Buchman, E. B. Larson, P. K. Crane, J. A. Kaye, P. Kramer, R. Woltjer, J. Q. Trojanowski, D. Weintraub, A. S. Chen-Plotkin, D. J. Irwin, J. Rick, G. D. Schellenberg, G. S. Watson, W. Kukull, P. T. Nelson, G. A. Jicha, J. H. Neltner, D. Galasko, E. Masliah, J. F. Quinn, K. A. Chung, D. Yearout, I. F. Mata, J. Y. Wan, K. L. Edwards, T. J. Montine and C. P. Zabetian. "Apoe Epsilon4 Increases Risk for Dementia in Pure Synucleinopathies." *JAMA Neurol* 70, no. 2 (2013): 223-8.

152. Yeung, J. T., **R. L. Hamilton**, K. Ohnishi, M. Ikeura, D. M. Potter, M. N. Nikiforova, S. Ferrone, R. I. Jakacki, I. F. Pollack and H. Okada. "Loh in the Hla Class I Region at 6p21 Is Associated with Shorter Survival in Newly Diagnosed Adult Glioblastoma." *Clin Cancer Res* 19, no. 7 (2013): 1816-26.

153. Yeung, J. T., **R. L. Hamilton**, H. Okada, R. I. Jakacki and I. F. Pollack. "Increased Expression of Tumor-Associated Antigens in Pediatric and Adult Ependymomas: Implication for Vaccine Therapy." *J Neurooncol* 111, no. 2 (2013): 103-11.

154. **Hamilton R**, Krauze M, Romkes M, Omolo B, Konstantinopoulos P, Reinhart T, Harasymczuk M, Wang Y, Lin Y, Ferrone S, Whiteside T, Bortoluzzi S, Werley J, Nukui T, Fallert-Junecko B, Kondziolka D, Ibrahim J, Becker D, Kirkwood J, Moschos S. Pathologic and gene expression features of metastatic melanomas to the brain.Cancer. 2013 Aug 1;119(15):2737-46. doi: 10.1002/cncr.28029. Epub 2013 May 21.PMID:23695963 [PubMed - in process]

155. Lam S, Grandhi R, Wong R, **Hamilton R**, Greene S. Neuromuscular hamartoma of the sciatic nerve: Case report and review of the literature. Surg Neurol Int. 2013;4:8. doi: 10.4103/2152-7806.106266. Epub 2013 Jan 18.PMID:23493803[PubMed]

156. Reitz C, Mayeux R; Alzheimer's Disease Genetics Consortium. TREM2 and neurodegenerative disease. N Engl J Med. 2013 Oct 17;369(16):1564-5. doi: 10.1056/NEJMc1306509#SA1. PMID:24131184

157. Tempel ZJ, Johnson SA, Richard PS, Friedlander RM, Rothfus WE, **Hamilton RL**. Parasellar arachnoid cyst presenting with a nonpupil sparing third nerve palsy mimicking a posterior communicating artery aneurysm in an adult. Surg Neurol Int. 2013 Jul 9;4:87. doi: 10.4103/2152-7806.114799. eCollection 2013.PMID:23956930

158. Murray PS, Kirkwood CM, Gray MC, Fish KN, Ikonomovic MD, **Hamilton RL**, Kofler JK, Klunk WE, Lopez OL, Sweet RA. Hyperphosphorylated tau is elevated in Alzheimer's Disease with psychosis. J Alzheimers Dis, 2014 204;39:759-773. PMID:24270207

159. Oborski MJ, Laymon CM, Lieberman FS, Drappatz J, **Hamilton RL**, Mountz JM. First use of (18)F-labeled ML-10 PET to assess apoptosis change in a newly diagnosed glioblastoma multiforme patient before and early after therapy. Brain Behav 2014 4:312-315. PMID:24683522

160 Shin SS, Murdoch G, Hamilton RL, Faraji AH, Kano H, Zwagerman NT, Gardner PA, Lunsford LD, Friedlander RM The Pathological Response of Cavernous Malformations Following Radiosurgery. J Neurosurg (in press).

160. Pollack IF, Jakacki RI, Butterfield LH, **Hamilton RL**, Panigrahy A, Potter DM, Connelly AK, Dibridge SA, Whiteside TL, Okada H. Antigen-specific immune responses and clinical outcome after vaccination with glioma-associated antigen peptides and polyinosinic-polycytidylic Acid stabilized by lysine and carboxymethylcellulose in children with newly diagnosed malignant brainstem and nonbrainstem gliomas. J Clin Oncol. 2014 Jul 1;32(19):2050-8. PMID:24888813

161. Naj AC, Jun G, Reitz C, Kunkle BW, Perry W, Park YS, Beecham GW, Rajbhandary RA, Hamilton-Nelson KL, Wang LS, Kauwe JS, Huentelman MJ, Myers AJ, Bird TD, Boeve BF, Baldwin CT, Jarvik GP, Crane PK, Rogaeva E, Barmada MM, Demirci FY, Cruchaga C, Kramer PL, Ertekin-Taner N, Hardy J, Graff-Radford NR, Green RC, Larson

**Ronald L. Hamilton, M.D.**

EB, St George-Hyslop PH, Buxbaum JD, Evans DA, Schneider JA, Lunetta KL, Kamboh MI, Saykin AJ, Reiman EM, De Jager PL, Bennett DA, Morris JC, Montine TJ, Goate AM, Blacker D, Tsuang DW, Hakonarson H, Kukull WA, Foroud TM, Martin ER, Haines JL, Mayeux RP, Farrer LA, Schellenberg GD, Pericak-Vance MA; Alzheimer Disease Genetics Consortium, Albert MS, Albin RL, Apostolova LG, Arnold SE, Barber R, Barnes LL, Beach TG, Becker JT, Beekly D, Bigio EH, Bowen JD, Boxer A, Burke JR, Cairns NJ, Cantwell LB, Cao C, Carlson CS, Carney RM, Carrasquillo MM, Carroll SL, Chui HC, Clark DG, Corneveaux J, Cribbs DH, Crocco EA, DeCarli C, DeKosky ST, Dick M, Dickson DW, Duara R, Faber KM, Fallon KB, Farlow MR, Ferris S, Frosch MP, Galasko DR, Ganguli M, Gearing M, Geschwind DH, Ghetti B, Gilbert JR, Glass JD, Growdon JH, **Hamilton RL**, Harrell LE, Head E, Honig LS, Hulette CM, Hyman BT, Jicha GA, Jin LW, Karydas A, Kaye JA, Kim R, Koo EH, Kowall NW, Kramer JH, LaFerla FM, Lah JJ, Leverenz JB, Levey AI, Li G, Lieberman AP, Lin CF, Lopez OL, Lyketsos CG, Mack WJ, Martiniuk F, Mash DC, Masliah E, McCormick WC, McCurry SM, McDavid AN, McKee AC, Mesulam M, Miller BL, Miller CA, Miller JW, Murrell JR, Olichney JM, Pankratz VS, Parisi JE, Paulson HL, Peskind E, Petersen RC, Pierce A, Poon WW, Potter H, Quinn JF, Raj A, Raskind M, Reisberg B, Ringman JM, Roberson ED, Rosen HJ, Rosenberg RN, Sano M, Schneider LS, Seeley WW, Smith AG, Sonnen JA, Spina S, Stern RA, Tanzi RE, Thornton-Wells TA, Trojanowski JQ, Troncoso JC, Valladares O, Van Deerlin VM, Van Eldik LJ, Vardarajan BN, Vinters HV, Vonsattel JP, Weintraub S, Welsh-Bohmer KA, Williamson J, Wishnek S, Woltjer RL, Wright CB, Younkin SG, Yu CE, Yu L. .  Effects of multiple genetic Loci on age at onset in late-onset Alzheimer disease: a genome-wide association study.   JAMA Neurol. 2014 Nov 1;71(11):1394-404. doi: 10.1001/jamaneurol.2014.1491

162. Pollack IF, Jakacki RI, Butterfield LH, **Hamilton RL**, Panigrahy A, Potter DM, Connelly AK, Dibridge SA, Whiteside TL, Okada H.  Antigen-specific immune responses and clinical outcome after vaccination with glioma-associated antigen peptides and polyinosinic-polycytidylic acid stabilized by lysine and carboxymethylcellulose in children with newly diagnosed malignant brainstem and nonbrainstem gliomas.   J Clin Oncol. 2014 Jul 1;32(19):2050-8. doi: 10.1200/JCO.2013.54.0526. Epub 2014 Jun 2. PMID: 24888813

163.. Okada H, Butterfield LH, **Hamilton RL**, Hoji A, Sakaki M, Ahn BJ, Kohanbash G, Drappatz J, Engh J, Amankulor N, Lively MO, Chan MD, Salazar AM, Shaw EG, Potter DM, Lieberman FS.  Induction of robust type-1 CD8+ T-cell responses in WHO grade II low-grade glioma patients receiving peptide-based vaccines in combination with poly-ICLC Clin Cancer Res. 2014 Nov 25. pii: clincanres.1790.2014

164. Salloway S, Sperling R, Fox NC, Blennow K, Klunk W, Raskind M, Sabbagh M, Honig LS, Porsteinsson AP, Ferris S, Reichert M, Ketter N, Nejadnik B, Guenzler V, Miloslavsky M, Wang D, Lu Y, Lull J, Tudor IC, Liu E, Grundman M, Yuen E, Black R, Brashear HR; **Hamilton RL**, Bapineuzumab 301 and 302 Clinical Trial Investigators.  Two phase 3 trials of bapineuzumab in mild-to-moderate Alzheimer's disease  N Engl J Med. 2014 Jan 23;370(4):322-33. doi: 10.1056/NEJMoa1304839.

165. Leone JP, Bhargava R, Theisen BK, **Hamilton RL**, Lee AV, Brufsky AM. Expression of high affinity folate receptor in breast cancer brain metastasis. Oncotarget. 2015 Jun 25. [Epub ahead of print]  PMID: 24450891

166. Wang LS, Naj AC, Graham RR, Crane PK, Kunkle BW, Cruchaga C, Murcia JD, Cannon-Albright L, Baldwin CT, Zetterberg H, Blennow K, Kukull WA, Faber KM, Schupf N, Norton MC, Tschanz JT, Munger RG, Corcoran CD, Rogaeva E; Alzheimer's Disease Genetics Consortium, Lin CF, Dombroski BA, Cantwell LB, Partch A, Valladares O, Hakonarson H, St George-Hyslop P, Green RC, Goate AM, Foroud TM, Carney RM, Larson EB, Behrens TW, Kauwe JS, Haines JL, Farrer LA, Pericak-Vance MA, Mayeux R, Schellenberg GD; National Institute on Aging-Late-Onset Alzheimer's Disease (NIA-LOAD) Family Study, Albert MS, Albin RL, Apostolova LG, Arnold SE, Barber R, Barmada M, Barnes LL, Beach TG, Becker JT, Beecham GW, Beekly D, Bennett DA, Bigio EH, Bird TD, Blacker D, Boeve BF, Bowen JD, Boxer A, Burke JR, Buxbaum JD, Cairns NJ, Cao C, Carlson CS, Carroll SL, Chui HC, Clark DG, Cribbs DH, Crocco EA, DeCarli C, DeKosky ST, Demirci F, Dick M, Dickson DW, Duara R, Ertekin-Taner N, Fallon KB, Farlow MR, Ferris S, Frosch MP, Galasko DR, Ganguli M, Gearing M, Geschwind DH, Ghetti B, Gilbert JR, Glass JD, Graff-Radford NR, Growdon JH, **Hamilton RL**, Hamilton-Nelson KL, Harrell LE, Head E, Honig LS, Hulette CM, Hyman BT, Jarvik GP, Jicha GA, Jin LW, Jun G, Jun G, Kamboh MI, Karydas A, Kaye JA, Kim R, Koo EH, Kowall NW, Kramer JH, LaFerla FM, Lah JJ, Leverenz JB, Levey AI, Li G, Lieberman AP, Lopez OL, Lunetta KL, Lyketsos CG, Mack WJ, Marson DC, Martin ER, Martiniuk F, Mash DC, Masliah E, McCormick WC, McCurry SM, McDavid AN, McKee AC, Mesulam WM, Miller BL, Miller CA, Miller JW, Montine TJ, Morris JC, Murrell JR, Olichney JM, Parisi JE, Perry W, Peskind E, Petersen RC, Pierce A, Poon WW, Potter H, Quinn JF, Raj A, Raskind M, Reiman EM, Reisberg B, Reitz C, Ringman JM, Roberson ED, Rosen HJ, Rosenberg RN, Sano M, Saykin AJ, Schneider JA, Schneider LS, Seeley WW, Smith AG, Sonnen JA, Spina S, Stern RA, Tanzi RE, Thornton-Wells TA, Trojanowski JQ, Troncoso JC, Tsuang DW, Van Deerlin VM, Van Eldik LJ, Vardarajan BN, Vinters HV, Vonsattel JP, Weintraub S, Welsh-Bohmer KA, Williamson J, Wishnek S, Woltjer RL, Wright CB, Younkin SG, Yu CE, Yu L.**Rarity of the Alzheimer disease-protective APP A673T variant in the United States.** JAMA Neurol. 2015 Feb;72(2):209-16. doi: 10.1001/jamaneurol.2014.2157.

**Ronald L. Hamilton, M.D.**

167. 2. Jun G, Ibrahim-Verbaas CA, Vronskaya M, Lambert JC, Chung J, Naj AC, Kunkle BW, Wang LS, Bis JC, Bellenguez C, Harold D, Lunetta KL, Destefano AL, Grenier-Boley B, Sims R, Beecham GW, Smith AV, Chouraki V, Hamilton-Nelson KL, Ikram MA, Fievet N, Denning N, Martin ER, Schmidt H, Kamatani Y, Dunstan ML, Valladares O, Laza AR, Zelenika D, Ramirez A, Foroud TM, Choi SH, Boland A, Becker T, Kukull WA, van der Lee SJ, Pasquier F, Cruchaga C, Beekly D, Fitzpatrick AL, Hanon O, Gill M, Barber R, Gudnason V, Campion D, Love S, Bennett DA, Amin N, Berr C, Tsolaki M, Buxbaum JD, Lopez OL, Deramecourt V, Fox NC, Cantwell LB, Tárraga L, Dufouil C, Hardy J, Crane PK, Eiriksdottir G, Hannequin D, Clarke R, Evans D, Mosley TH Jr, Letenneur L, Brayne C, Maier W, De Jager P, Emilsson V, Dartigues JF, Hampel H, Kamboh MI, de Bruijn RF, Tzourio C, Pastor P, Larson EB, Rotter JI, O'Donovan MC, Montine TJ, Nalls MA, Mead S, Reiman EM, Jonsson PV, Holmes C, St George-Hyslop PH, Boada M, Passmore P, Wendland JR, Schmidt R, Morgan K, Winslow AR, Powell JF, Carasquillo M, Younkin SG, Jakobsdóttir J, Kauwe JS, Wilhelmsen KC, Rujescu D, Nöthen MM, Hofman A, Jones L; IGAP Consortium, Haines JL, Psaty BM, Van Broeckhoven C, Holmans P, Launer LJ, Mayeux R, Lathrop M, Goate AM, Escott-Price V, Seshadri S, Pericak-Vance MA, Amouyel P, Williams J, van Duijn CM, Schellenberg GD, Farrer LA and . Collaborators (including **Hamilton RL**) (296)  **A novel Alzheimer disease locus located near the gene encoding tau protein**. Mol Psychiatry. 2015 Mar 17. doi: 10.1038/mp.2015.23.

168. . Østergaard SD, Mukherjee S, Sharp SJ, Proitsi P, Lotta LA, Day F, Perry JR, Boehme KL, Walter S, Kauwe JS, Gibbons LE; Alzheimer's Disease Genetics Consortium; GERAD1 Consortium; EPIC-InterAct Consortium, Larson EB, Powell JF, Langenberg C, Crane PK, Wareham NJ, Scott RA. Collaborators (including **Hamilton RL**) (296)  Associations between Potentially Modifiable Risk Factors and Alzheimer Disease: A Mendelian Randomization Study. PLoS Med. 2015 Jun 16;12(6):e1001841; discussion e1001841. doi:

169. Wang P, Bahreini A, Gyanchandani R, Lucas PC, Hartmaier RJ, Watters RJ, Jonnalagadda AR, Trejo Bittar HE, Berg A**, Hamilton RL**, Kurland BF, Weiss KR, Mathew A, Leone JP, Davidson NE, Nikiforova MN, Brufsky AM, Ambros TF, Stern AM, Puhalla SL, Lee AV, Oesterreich S. Sensitive detection of mono- and polyclonal ESR1 mutations in primary tumors, metastatic lesions and cell free DNA of breast cancer patients. Clin Cancer Res. 2015 Oct 23. pii: 1534.2015. PMID: 26500237

170. Salgado CM, Basu D, Nikiforova M, **Hamilton RL**, Gehris R, Jakacki R, Panigrahy A, Yatsenko S, Reyes-Múgica M. Amplification of mutated NRAS leading to congenital melanoma in neurocutaneous melanocytosis. Melanoma Res. 2015 Oct;25(5):453-60.  PMID: 26266759

171. Shin SS, Murdoch G, Hamilton RL, Faraji AH, Kano H, Zwagerman NT, Gardner PA, Lunsford LD, Friedlander RM. Pathological response of cavernous malformations following radiosurgery. J Neurosurg. 2015 Oct;123(4):938-44. doi: 10.3171/2014.10.JNS14499. Epub 2015 Jun 19. PMID: 26090838

---------------------

172. Mukherjee S, Walter S, Kauwe JS, Saykin AJ, Bennett DA, Larson EB, Crane PK, Glymour MM; Adult Changes in Thought Study Investigators; Religious Orders Study/Memory and Aging Project Investigators; Alzheimer's Disease Genetics Consortium. Alzheimers Dement. Genetically predicted body mass index and Alzheimer's disease-related phenotypes in three large samples: Mendelian randomization analyses. 2015 Dec;11(12):1439-51. doi: 10.1016/j.jalz.2015.05.015. Epub 2015 Jun 12. PMID: 26079416

173. Ghani M, Reitz C, Cheng R, Vardarajan BN, Jun G, Sato C, Naj A, Rajbhandary R, Wang LS, Valladares O, Lin CF, Larson EB, Graff-Radford NR, Evans D, De Jager PL, Crane PK, Buxbaum JD, Murrell JR, Raj T, Ertekin-Taner N, Logue M, Baldwin CT, Green RC, Barnes LL, Cantwell LB, Fallin MD, Go RC, Griffith PA, Obisesan TO, Manly JJ, Lunetta KL, Kamboh MI, Lopez OL, Bennett DA, Hendrie H, Hall KS, Goate AM, Byrd GS, Kukull WA, Foroud TM, Haines JL, Farrer LA, Pericak-Vance MA, Lee JH, Schellenberg GD, St George-Hyslop P, Mayeux R, Rogaeva E; Alzheimer's Disease Genetics Consortium. Association of Long Runs of Homozygosity With Alzheimer Disease Among African American Individuals. JAMA Neurol. 2015 Nov;72(11):1313-23. doi: 10.1001/jamaneurol.2015.1700. PMID: 26366463

174. Nikiforova MN, Wald AI, Melan MA, Roy S, Zhong S, Hamilton RL, Lieberman FS, Drappatz J, Amankulor NM, Pollack IF, Nikiforov YE, Horbinski C. Targeted next-generation sequencing panel (GlioSeq) provides comprehensive genetic profiling of central nervous system tumors. Neuro Oncol. 2016 Mar;18(3):379-87. doi: 10.1093/neuonc/nov289. Epub 2015 Dec 17. PMID: 2668176

175. Morrissy AS, Garzia L, Shih DJ, Zuyderduyn S, Huang X, Skowron P, Remke M, Cavalli FM, Ramaswamy V, Lindsay PE, Jelveh S, Donovan LK, Wang X, Luu B, Zayne K, Li Y, Mayoh C, Thiessen N, Mercier E, Mungall KL, Ma

**Ronald L. Hamilton, M.D.**

Y, Tse K, Zeng T, Shumansky K, Roth AJ, Shah S, Farooq H, Kijima N, Holgado BL, Lee JJ, Matan-Lithwick S, Liu J, Mack SC, Manno A, Michealraj KA, Nor C, Peacock J, Qin L, Reimand J, Rolider A, Thompson YY, Wu X, Pugh T, Ally A, Bilenky M, Butterfield YS, Carlsen R, Cheng Y, Chuah E, Corbett RD, Dhalla N, He A, Lee D, Li HI, Long W, Mayo M, Plettner P, Qian JQ, Schein JE, Tam A, Wong T, Birol I, Zhao Y, Faria CC, Pimentel J, Nunes S, Shalaby T, Grotzer M, Pollack IF, Hamilton RL, Li XN, Bendel AE, Fults DW, Walter AW, Kumabe T, Tominaga T, Collins VP, Cho YJ, Hoffman C, Lyden D, Wisoff JH, Garvin JH Jr, Stearns DS, Massimi L, Schüller U, Sterba J, Zitterbart K, Puget S, Ayrault O, Dunn SE, Tirapelli DP, Carlotti CG, Wheeler H, Hallahan AR, Ingram W, MacDonald TJ, Olson JJ, Van Meir EG, Lee JY, Wang KC, Kim SK, Cho BK, Pietsch T, Fleischhack G, Tippelt S, Ra YS, Bailey S, Lindsey JC, Clifford SC, Eberhart CG, Cooper MK, Packer RJ, Massimino M, Garre ML, Bartels U, Tabori U, Hawkins CE, Dirks P, Bouffet E, Rutka JT, Wechsler-Reya RJ, Weiss WA, Collier LS, Dupuy AJ, Korshunov A, Jones DT, Kool M, Northcott PA, Pfister SM, Largaespada DA, Mungall AJ, Moore RA, Jabado N, Bader GD, Jones SJ, Malkin D, Marra MA, Taylor MD. Divergent clonal selection dominates medulloblastoma at recurrence. Nature. 2016 Jan 21;529(7586):351-7. doi: 10.1038/nature16478. Epub 2016 Jan 13

176. Gandhoke GS, Yilmaz S, Grunwaldt L, Hamilton RL, Salvetti DJ, Greene S. A case of spinal epidural venous malformation with mediastinal extension: management with combined surgery and percutaneous sclerotherapy. J Neurosurg Pediatr. 2016 May;17(5):612-7. doi: 10.3171/2015.9.PEDS15341. Epub 2016 Jan 15.

177. Thompson EM, Hielscher T, Bouffet E, Remke M, Luu B, Gururangan S, McLendon RE, Bigner DD, Lipp ES, Perreault S, Cho YJ, Grant G, Kim SK, Lee JY, Rao AA, Giannini C, Li KK, Ng HK, Yao Y, Kumabe T, Tominaga T, Grajkowska WA, Perek-Polnik M, Low DC, Seow WT, Chang KT, Mora J, Pollack IF, Hamilton RL, Leary S, Moore AS, Ingram WJ, Hallahan AR, Jouvet A, Fèvre-Montange M, Vasiljevic A, Faure-Conter C, Shofuda T, Kagawa N, Hashimoto N, Jabado N, Weil AG, Gayden T, Wataya T, Shalaby T, Grotzer M, Zitterbart K, Sterba J, Kren L, Hortobágyi T, Klekner A, László B, Pócza T, Hauser P, Schüller U, Jung S, Jang WY, French PJ, Kros JM, van Veelen MC, Massimi L, Leonard JR, Rubin JB, Vibhakar R, Chambless LB, Cooper MK, Thompson RC, Faria CC, Carvalho A, Nunes S, Pimentel J, Fan X, Muraszko KM, López-Aguilar E, Lyden D, Garzia L, Shih DJ, Kijima N, Schneider C, Adamski J, Northcott PA, Kool M, Jones DT, Chan JA, Nikolic A, Garre ML, Van Meir EG, Osuka S, Olson JJ, Jahangiri A, Castro BA, Gupta N, Weiss WA, Moxon-Emre I, Mabbott DJ, Lassaletta A, Hawkins CE, Tabori U, Drake J, Kulkarni A, Dirks P, Rutka JT, Korshunov A, Pfister SM, Packer RJ, Ramaswamy V, Taylor MD. Prognostic value of medulloblastoma extent of resection after accounting for molecular subgroup: a retrospective integrated clinical and molecular analysis. Lancet Oncol. 2016 Mar 11. pii: S1470-2045(15)00581-1. doi: 10.1016/S1470-2045(15)00581-1. [Epub ahead of print]

178. Pollack IF, Jakacki RI, Butterfield LH, Hamilton RL, Panigrahy A, Normolle DP, Connelly AK, Dibridge S, Mason G, Whiteside TL, Okada H. Immune responses and outcome after vaccination with glioma-associated antigen peptides and poly-ICLC in a pilot study for pediatric recurrent low-grade gliomas†. Neuro Oncol. 2016 Mar 15. pii: now026. [Epub ahead of print]

179. Jakacki RI, Cohen KJ, Buxton A, Krailo MD, Burger PC, Rosenblum MK, Brat DJ, Hamilton RL, Eckel SP, Zhou T, Lavey RS, Pollack IF. Phase 2 study of concurrent radiotherapy and temozolomide followed by temozolomide and lomustine in the treatment of children with high-grade glioma: a report of the Children's Oncology Group ACNS0423 study. Neuro Oncol. 2016 Mar 22. pii: now038. [Epub ahead of print]

180. Ridge PG, Hoyt KB, Boehme K, Mukherjee S, Crane PK, Haines JL, Mayeux R, Farrer LA, Pericak-Vance MA, Schellenberg GD, Kauwe JS; Alzheimer's Disease Genetics Consortium (ADGC). Assessment of the genetic variance of late-onset Alzheimer's disease. Neurobiol Aging. 2016 May;41:200.e13-20. doi: 10.1016/j.neurobiolaging.2016.02.024. Epub 2016 Mar 3

181. Beckner ME, Pollack IF, Nordberg ML, Hamilton RL. Glioblastomas with copy number gains in EGFR and RNF139 show increased expressions of carbonic anhydrase genes transformed by ENO1. BBA Clin. 2015 Nov 10;5:1-15. doi: 10.1016/j.bbacli.2015.11.001. eCollection 2016 Jun. PMID: 27051584 Free PMC Article

182. Fernandes-Cabral DT, Zenonos GA, Hamilton RL, Panesar SS, Fernandez-Miranda JC. High-Definition Fiber Tractography in the Evaluation and Surgical Planning of Lhermitte-Duclos Disease: A Case Report. World Neurosurg. 2016 May 7. pii: S1878-8750(16)30257-1. doi: 10.1016/j.wneu.2016.04.128. [Epub ahead of print] PMID: 27168233

**Reviews, invited published papers, proceedings of conference and symposia, monographs, books and book chapters**

**Ronald L. Hamilton, M.D.**

1. **Hamilton RL**, Wiley CA. New developments in the neuropathology of AIDS. CAP Today, 10 (12): p 42, 1996.
2  **Hamilton RL**: Hydrocephalus in a 9 month-old infant. Brain Pathol 6:533-534, 1996
3. **Hamilton RL**: New onset hemiparesis. Brain Pathol 7: 715-716, 1997.
4. **Hamilton RL**: Precocious Puberty. Brain Pathol 7: 711-712, 1997
5. **Hamilton RL**: Frontal lobe tumor in 11 year-old girl. Brain Pathol 7: 713-714, 1997
6 **Hamilton RL**, Pollack, IF: The Molecular Biology of Ependymomas. Brain Pathology 7:807-822, 1997.
7. **Hamilton RL**: A 26 year old woman with new onset seizures. Brain Pathol 8: 239-240, 1997.
8. **Hamilton RL**, Wiley, CA, The Neuropathology of Viral Infections of the Nervous System. In: Textbook of Neuropathology; Davis RL, Robertson DM eds. Williams and Wilkins, 3rd edition,  Baltimore, MD. 1997.

9. **Hamilton RL**: Guidelines for the neuropathological diagnosis of Alzheimer's Disease and Dementia with Lewy Bodies. Revista de Neurologia 27 (S1): S67-S70, 1998
10. **Hamilton RL**: Experimental neuropathology of Alzheimer's Disease: animal models. Revista de Neurologia 27 (S1): S84-S86, 1998
11. Sanders VJ, Wiley CA, **Hamilton RL**: The mechanisms of neuronal damage in retroviral infections of the nervous system. in The Mechanisms of Neuronal Damage in Virus Infections of the Nervous System (Gosztonyi G, ed). Springer Verlag, Berlin, 2001.
12. **Hamilton RL**. [Recent Advances in the neuropathological evaluation of Alzheimer's Disease: the importance of synuclein] Rev Neurol 35:765-7, 2002 (Spanish).
13. Pollack IF, **Hamilton RL**, Finkelstein SD, Lieberman F.  Molecular abnormalities and correlations with tumor response and outcome in glioma patients.  Neuroimaging Clinics of North America: Advances in Brain Tumor Imaging and Therapy (Provenzale J, ed.) WB Saunders, Philadelphia,  2002.
14. **Hamilton RL**.  The other dementias: the neuropathology of the non-Alzheimer's Disease dementias. Rev Neurol 37:130-139, 2003 (Spanish).
15. Omalu BI, Wiley CA, **Hamilton RL**.  Case of the Month February 2003. Brain Pathology 13:419-420, 2003.
16. DeKosky ST, Ikonomovic MD, **Hamilton RL**, Bennett DA, Mufson EJ. Neuropathology of Mild Cognitive Impairment in the Elderly. In John Morris J, Scheltens P, and Cummings JL), (eds), *Alzheimer's Disease and Related Disorders:* London, Taylor & Francis, 1-16, 2006.
17. Crain BJ, Alston SR, Bruch LA, **Hamilton RL**, McLendon RE, Rhodes H, Tihan T, Weidenheim KM. Accreditation Council for Graduate Medical Education (ACGME) Competencies in Neuropathology Training.  J Neuropathol Exp Neurol 64:273-279, 2005.
18. McIntyre JA, **Hamilton RL**, Dekosky ST.  Redox-reactive autoantibodies in cerebrospinal fluids. Annals of NY Acad Sci 1109: 296-302, 2007.
19. DeKosky ST, Kaufer DI, **Hamilton R**, Wolk D, Lopez OL: Dementia. In: Neurology in Clinical Practice: Principles of Diagnosis and Management, 5th Edition. Editors: Bradley WG, Daroff RB, Fenichel GM & Jankovic J. Boston MA, Butterworth-Heinemann, 2007: 1855-1907.
20. Tyurin VA, Tyurina YY, Kochanek PM, **Hamilton R**, DeKosky ST, Greenberger JS, Bayir H, Kagan VE.  Chapter 19: Oxidative lipidomics of programmed cell death.  Methods Enzymol 442:375-93, 2008.
21. Yeaney GA, O'Conn SM, Jankowitz BT, **Hamilton RL**.  A 16 year-old male with cerebellar mass. Brain Pathol. 2009 19, 167-170. PMID 19076785
22. Horbinski, C, **Hamilton RL**.  Application of telepathology for neuropathologic intraoperative consultations. Brain Pathol 2009 19; 317-322. PMID 19290998

<u>**Abstracts**</u>

1. **Hamilton RL**, Sanger WG, and McComb RD: Characterization of cell lines derived from malignant tumors in patients with neurofibromatosis. Federation Proceedings 46: 433, 1987.
2. Esch O, Spinosa JC, **Hamilton RL**, Crombie DL, Schteigart CD, Hofmann AF: Reversible cytotoxicity to the gallbladder mucosa of contact dissolution solvents for cholesterol gallstones: a comparison of methyl tert-butyl ether (mtbe) and ethyl propionate (ep) in two animal models. Gastroenterology 100 (5, part 2): A135, 1991.

**Ronald L. Hamilton, M.D.**

3. Haas RH, Popovitch B, **Hamilton RL**: The utility of DNA dystrophin gene analysis in non-specific myopathy: presented at Child Neurology Society Annual Meeting, October, 1992: New Orleans, LA.

4. Haas RH, Mansden DL, Estrada S, **Hamilton RL**, Grafe MG, Nyhan WL: Acute basal ganglia infarction in propionic acidemia in spite of good metabolic control: presented at Child Neurology Society Annual Meeting, October, 1992: New Orleans, LA.

5. **Hamilton RL**, Haas RH, Nyhan W, Powell HP, Grafe MR:  The neuropathology of propionic acidemia: a report of two additional cases. American association of Neuropathology Annual Meeting, June 1993, Salt Lake City, UT; J Neuropathol Exp Neurol 52:299, 1993.

6. Mansfield RT, Schiding JK**, Hamilton R,** Kochanek PM: Hypothermia fails to reduce lesion volume after traumatic brain injury in immature rats.  Pediatric Research 35(4):55, 1994.

7. **Hamilton RL**, Bodnar RJ, Wang G, Wiley CA.  The effect of AZT on retroviral encephalitis: a murine model: presented at the Sixth Workshop on the Pathogenesis of Animal Retroviruses, Philadelphia, PA, Nov. 17-19, 1994.

8. Adelson PD, Robichaurd P, **Hamilton RL**, Kochanek PM. Brain edema and neuropathology after diffuse traumatic injury in immature rats.  Neurotrauma Society meeting, San Diego CA, Nov 10-11, 1995.

9. **Hamilton RL**, Bodnar RJ, Wang G, Klunk W, Wiley CA, Treatment of chronic retroviral encephalitis with zidovudine (AZT) in a murine model. Society for Neuroscience Meeting, San Diego, CA Nov 11-16 1995.

10. **Hamilton RL**, Bodnar RJ, Wang G, Klunk W, Wiley CA. The effect of zidovudine (AZT) on murine retroviral encephalitis. Amer. Assoc of Neuropathology, San Antonio, June, 1995. J Neuropathol Exp Neurol 54 (3): 438, 1995.

11. **Hamilton RL**, and Claassen D. Neonatal Methylmalonic Acidemia With Hemicerebellum: An Autopsy Report;  Society of Pediatric Pathology / Child Neurology Society (joint meeting), Baltimore, Oct 27-29, 1995.

12. **Hamilton RL**, Baldwin M, Wiley CA. Human Herpesviruses And Temporal Arteritis American Association of Neuropathology, Vancouver, BC, Canada, June 1996.

13. Mizukami K, Ikonomovic MD, Sheffield R, Rubin RT, Grayson D, **Hamilton R**, Warde D, Armstrong DM. Immunohistochemical Localization of GABA-A Receptor ß2/3 Subunits in the Hippocampal Formation in Aged Brain with Alzheimer-related Neuropathology. Society for Neuroscience meeting, Washington DC, Nov 1996.

14. Bodnar RJ and **Hamilton RL**. Effect of zidovudine (AZT) and saquinavir on retroviral infection of the central nervous system (CNS) Society for Neuroscience meeting, Nov 17-21, 1996 Washington D.C.

15. Bredel M, Pollack I, **Hamilton RL**, Finkelstein SD, Campbell JW, Martinez AJ, Sherwin R, Bozik ME, Gollin S. Overexpression of EGF receptor and p53 mutations in pediatric malignant gliomas. American Association of Neurological Surgeons, 1997 Annual meeting.

16. Xu Y, Liachennko S, Tang P, **Hamilton RL** Correlation of neuropathologic changes with cerebral metabolic and ADC abnormalities after prolonged asphyxial cardiac arrest. International Society of Magnetic Resonance in Medicine, annual meeting, 1997

17. Bredel M, Pollack IF, Campbell JW, **Hamilton RL**. Basic fibroblast growth factor as a prognostic indicator in pediatric high grade glioma patients. American Association of Neuropathology, Pittsburgh, PA, June 1997. J Neuropathol Exp Neurol 56 (5): 581, 1997

18. **Hamilton RL**, Bodnar RJ, Lackner AA, Lane JH, Wiley CA Neurotrophic factors in simian immunodeficiency virus encephalitis. American Association of Neuropathology, Pittsburgh, PA, June 1997. J Neuropathol Exp Neurol 56 (5): 618, 1997

19. Adelson, PD, Robichaud, P, **Hamilton, RL**, Kochanek, PM. Histologic analyses of severe diffuse traumatic brain injury in the immature rat . National Neurotrama Society, New Orleans Oct 24-25, 1997.

20. Dorsey RW, Achim CL, Wiley CA, **Hamilton RL**\*,  Soontornniyomkij V. Gene expression and cellular localization of neurotrophic factors in Alzheimer's disease. Society of Neuroscience meeting Nov, 1997, New Orleans.

21.  Klunk WE, **Hamilton RL**, Styren SD, Styren G, Debnath ML, Mathis CA, Mahood K, Hsiao KK. Staining of AD and Tg2576 mouse brain wirh X-34, a highly flourescent derivative of chrysamine

**Ronald L. Hamilton, M.D.**

G and A potential in vivo probe for sheet fibrils.  Siociety for Neuroscience meeting, New Orleans 1997.

22. Klunk WE, **Hamilton RL**, Styren SD, Styren G, Debnath ML.  Neuropathological study of AD brain with X-34, a new highly fluorescent derivative of congo red.  Society for  Neuroscience meeting. Los Angeles, CA 1998.

23. Halks-Miller M, Hesselgesser J, Horuk R, Soontornniyomkij V, **Hamilton R,** Achim C.  CCR1 immunoreactivity in Alzheimer's Disease brains.  Society for Neurosciences meeting. Los Angeles, CA 1998.

24.  Wang G, Soontornniyomkij V, Pittman CA, Achim CL, Wiley CA, **Hamilton RL**.  Glial expression of BDNF and TRK B receptor proteins in Alzheimer's Disease and HIV-1 encephalitis brains. Society for Neuroscience meeting. Los Angeles, CA 1998.

25. Ikonomovic MD, Mizukami K, Davies P, **Hamilton R**, Sheffield R, Armstrong DM.  Co-localization of interneurons and an ad-specific antibody in the hippocampal formation of Alzheimer brains. Society for Neurosciences. Los Angeles, CA 1998.

26. Mizukami K, Ikonomovic MD, Grayson DR, Rubin RT, Warde D, Sheffield R, **Hamilton RL,** Davies P, Armstrong DM.  Immunohistochemical study of GABA(A) receptor beta 2/3 subunits in the hippocampal formation of aged brains with Alzheimer-related neuropathologic changes. Experimental Neurology 147 2 333-45 (1997).

27. Bredel M, Pollack IF, **Hamilton RL**: Expression of the c-erbB1 Oncogene Product Epidermal Growth Factor Receptor (EGFR) and its Relevance for Outcome in Children with Supratentorial High-Grade Gliomas ; XVI Congress of the European Society for Pediatric Neurosurgery; November 11-15, 1998, Marseille, France

28. **Hamilton, RL** Numerous widespread alpha-synuclein positive thread-like processes characterize dementia with Lewy Bodies. Foundation IPSEN Conference, April 12, 1999, Paris France

29 **Hamilton RL** Numerous and widespread alpha-synuclein thread-like processes in dementia with Lewy bodies. American Assoc of Neuropathologist Annual Meeting, 1999, Portland, OR. J Neuropathol Exper Neurol 58:552, 1999.

30. Klunk WE, **Hamilton RL**, Styren SD, Head E: Evaluation of the aged canine as a screening system for the x-34 class of in vivo probes for amyloid deposition in AD. Soc. of Neuroscience, 1999

31. Kaufer, DL, **Hamilton RL**, Lopez OL, DeKosky ST MRI white matter hyperintensities and cerebral amyloid angiopathy in a case of dementia with Lewy bodies. Amer Neuropsychiatric Assoc, annual meeting, 2/2000, Ft. Myers, FLA.

32. **Hamilton RL**, Mash DC. Widespread Alpha-synucleinopathy in the Parkinson's Disease brain. 6th National Parkinson's Disease Foundation International Symposium on Parkinson's Disease Research, to be held in conjunction with the Society of Neuroscience meeting in Miami Beach, Oct 22-23rd, 1999.

33. **Hamilton, RL**, Mash DC. Widespread alpha-synuclein-positive neuropil threads in the Parkinson's Disease brain. American Assoc of Neuropathology, Atlanta, GA, June 8-11, 2000.

34.  Snyder JV, Gebel JM, Kassam A, **Hamilton RL**, Goldstein S, Watkins S, Yonas H, Chelluri L, Thulborn K. Guidance by MR Tissue Sodium Concentration of Infarct Resection in Massive Stroke. Neurology 54(7): A97-A98, Suppl. 3, 2000.

35. Chow TM, Kaufer DI, Lopez OL, **Hamilton RL**, Becker JT, DeKosky ST. Temporal Evolution of Lewy Body Phenotype in Autopsy Confirmed Cases of Alzheimer's Disease and Dementia With Lewy Bodies. Neurology 56(8): A300-A301, Suppl 3, 2001.

36.  Castellano-Sanchez A, Ohgaki HH, Yokoo, Finkelstein SD, Medina-Flores R, **Hamilton RL**, Scheithauer BW, Burger PC, Brat DJ.  Genetic Alterations in Granular Cell Astrocytomas. USCAP, 2002.

37.  Demidovich J, Pittman CA, Hamilton RL.  Altered calpain proteolysis of mutant alpha-synuclein. Honors Thesis presentation, Univ. Pitt, 2002

38.  Omalu BI, **Hamilton RL**, Swalsky PA, Finkelstein SD. Microdissection-based mutational profiling of malignant, atypical and benign meningiomas: the determination of meningioma grade by fractional mutational index.  AANP, Denver, 2002 (JNEN 61:491, 2002)

39.  Wilson, RK, Luedecking-Zimmer EK, Kamboh MI, DeKosky ST, **Hamilton RL**.  Association of the ApoE4 allele and Lewy bodies in Alzheimer's Disease.  AANP, Denver 2002 (JNEN 61: 455, 2002).

**Ronald L. Hamilton, M.D.**

40. Desai PP, Ikonomovic MD, **Hamilton RL**, DeKosky ST, Kamboh MI.  Apolipoprotein D in Alzheimer's Disease: implications for amyloid pathology.  Soc. for Neuroscience, Orlando, 2002.

41. Garb S, **Hamilton RL**.  Sequestration of soluble alpha-synuclein in Lewy body Variant of Alzheimer's Disease. Soc for Neuroscience, Orlando, 2002.

42. Marshall GA, Kaufer DI, Lopez OL, Rao GR, **Hamilton RL**, DeKosky ST.  A neuropathological correlate of anosognosia in Alzheimer's Disease.  American Association of Neurology, May 2003.

43. Sweet RA, Butters MA, **Hamilton RL**, Mulsant BH, Lopez OL, PollockBG, DeKosky ST, Reynolds CF Neuropathology Of Late Life Mood Disorders.  American College of Neuropsychopharmacology, 2003

44. Mohan D, Couce ME, Wiley CA, **Hamilton RL**, Sasatomi E, Swalsky PA, Lieberman MD, Finkelstein SD.  Microdissection based genotyping of human gliomas: diagnostic and prognostic considerations (USCAP, Vancouver 3/04)

45. Beckner ME, Sasatomi E, Swalsky PA, **Hamilton RL**, Pollack, IF, Finkelstein SD.  Loss of heterozygosity reveals non-VHL Allelic loss in hemangioblastomas at 22q13, (AANP Cleveland, June 24-27, 2004).

46. Judkins AR, Burger P, **Hamilton RL**, Kleinschmidt-DeMasters B, Perry A, Pomeroy S, Rosenblum MK, Yachnis AT, Rorke LB, Biegel JA. INI1 Expression Distinguishes Atypical Teratoid/Rhabdoid Tumor (ATR) from Choroid Plexus Carcinoma (CPC); (AANP Cleveland, June 24-27, 2004).

47. McFadden KA, **Hamilton RL**, Visvesvara GS, Gardner P, Couce ME.  Granulomatous Amebic Encephalitis in a Patient with Gardners Syndrome and Multi-organ Transplant (AANP Cleveland, June 24-27, 2004).

48. Yen, Amy, Lopez, OL, BeckerJ, **Hamilton RL.**  Mesial Temporal Sclerosis is associated with Lewy Bodies in Alzheimer's Disease. AANP Annual meeting June 9-12, 2005, Arlington, VA (platform). (J Neuropathol Exper Neurol 64:434, 2005.

49. Hinkle DA, Mullett SJ, **Hamilton RL** DJ-1 is over-expressed in human stroke reactive astrocytes. Society for Neuroscience Oct 2005.

50. Ramsey CP, Glass CA, Marshall MB, Morgan KL, Kioke MA, **Hamilton R**, Chu CT, Jordan-Sciutto KL.  Altered expression patterns of the antioxidant response transcriptional regulator NRF2, in Alzheimer's Disease and Parkinson's Disease. Society For Neuroscience, Nov. 2005, Washington DC.

51. Chu CT, Uchiyama Y, **Hamilton R**, Zhu J.  Extracellular signal regulated protein kinase acts upstream of both autophagy and cell death in MPP+ treated neurons.  Society For Neuroscience, Nov. 2005, Washington DC

52. Cieply K, Carol R. Sherer, Jennifer L. Hunt **Hamilton RL** Assessment of 1p and 19q Status in Pediatric Oligodendrogliomas by FISH, Association of Molecular Pathology,  Nov 10-13, 2005 Scottsdale AZ

53. Bencherif B, Lieberman FS, Wenzhu B, Price JC, Muthukrishnan A, Walter K, **Hamilton RL**, Lunsford LD, Mountz JM.   Increased F-18 Fluorothymidine Uptake is Seen in Non-Proliferating Recurrent/Residual Glioma Society for Nuclear Medicine, San Diego, 2006 June 3-7

54. **Hamilton, RL** Variations On A Theme: Lewy Bodies And Mesial Temporal Sclerosis In Alzheimer's Disease: A Review Of 278 Autopsy Cases. 10th International Conference on Alzheimer's Disease, Madrid, Spain, July-15-20, 2006.

55. DeKosky ST, Mathis CA, Price JC, Ikonomovic MD, **Hamilton RL**, Abrahamson EE, Paljug WR, Debnath ML, Hope CE, Isanski BA, Tsopelas ND, Lopresti BJ, Ziolko S, Bi W and Klunk WE. Correlation of In Vivo PiB Retention and Post-Mortem $A\beta$ Levels: A Case Study. 10th International Conference on Alzheimer's Disease, Madrid, Spain, July-15-20, 2006.

56. Leverenz J, **Hamilton RL**, Larson E, Vavrek D, Lopez O, Galasko D, Masliah E, Kaye J, Nixon R, Clark C, Trojanowski J, Kukull W, Montine T, Tsuang D. Lewy-Related Pathology in Two Large Autopsied Dementia Samples: Application of Classification Criteria. 10th International Conference on Alzheimer's Disease, Madrid, Spain, July-15-20, 2006.

57. Venneti S, Lopresti BJ, Wang G, Mathis CA, Klunk WE, Shmookler AD, **Hamilton RL**, Apte UM, Wiley CA. PET imaging of microglia in a mouse model of Alzheimer's disease. 10th International Conference on Alzheimer's Disease, Madrid, Spain, July-15-20, 2006.

58. Kofler JK, Moore RA, **Hamilton RL**.  Concomitant Dementia with Lewy Bodies and Multiple System Atrophy in a Demented Patient.  International Congress of Neuropathology/American Association of Neuropathology Annual Meeting, San Francisco, CA, Sept 10-15, 2006.

**Ronald L. Hamilton, M.D.**

59. DeKosky ST, Mathis CA, Price JC, Ikonomovic MD, **Hamilton RL**, Abrahamson EE, Paljug WR, Debnath ML, Hope CE, Isanski BA, Tsopelas ND, Lopresti BJ, Ziolko S, Bi W, Klunk WE. Correlation of Regional in vivo Pittsburgh Compound B (PIB) Retention With in vitro PIB, A Levels, and Amyloid Plaque Density: Validation of PIB-PET in Postmortem Human Brain. Alzheimer's Association International Conference on Prevention of Dementia. June 9-12, 2007 Washington, D.C.

60. Kellermier HC, Nikiforova MN, Cieply K, **Hamilton RL**. Alterations of 1p in glioblastomas. ASIP/AANP Annual meeting, Washington DC April 2007.

61. Bliecher AG, Branstetter BF, Hamilton R, Murdoch G, Kellermier HC. Clival Chordoma: Radiologic-Pathologic Correlations. American Society of Neuroradiology annual meeting, Chicago, IL. June 9-14, 2007.

62. Butters MA, Aizenstein HJ, Meltzer CC, **Hamilton RL,** Price JC, Mathis CA, Klunk WE, Becker JT, DeKosky ST, Reynolds CF. Cognition, cerebrovascular disease and Alzheimer's Disease in late-life depression. International Neuropsychological Society meeting, Bilbao Spain, July 2007.

63 Tyurin VA, Zhao Q, Mnuskin A, **Hamilton R**, DeKosky ST, Reynolds WF, Kagan VE. Phospholipid peroxidation biomarkers of Alzheimer's Disease in the Brain: Selective Oxidation of Phosphatidylserine. Society of Toxicology Meeting San Diego, CA. October 2, 2007.

64. Moschos SJ, D. Trembath D, Snavely A, Bradler E, Midkiff B, Nikolaishvilli-Feinberg N, Werley J, Krauze M, **Hamilton R**, Kirkwood JM. Prognostic Significance of PD-L1 Expression, Angiogenesis, and Hypoxia in Melanoma Brain Metastases (MBM); A Histopathologic Analysis. Annual meeting of the American Association of Clinical Oncology, Chicago Il, 5/29-6/2/2014.

65. Trembath DG, Moschos SJ, Snavely AC, Bradler E, Nikolaishvilli-Feinberg N, Bentley R. Midkiff BR, Jonette Werley J, Krauze MT, **Hamilton RL**. Analysis of select angiogenic markers in melanoma brain metastases. Annual meeting AANP, Portland OR. June 2014

66. Salgado CM, Basu D, Nikiforova M, Hamilton R, Gheris R, Jakacki R, Panigrahy A, Yatsenko S, Reyes-Mugica M. Congenital Melanoma: The full spectrum og p.Q61R mutation in NRAS. Accepted for the Annual Soc. Pediatric Pathology meeting, Birmingham AL, Sept 4-6, 2014.

67. Melan MA, Wald AI, Zhong S, **Hamilton R**, Horbinski C. Nikiforova MN. BrainSeq: Next-Generation Sequencing Panel for Detection of Genetic Alterations in Central Nervous System (CNS) Malignancies. National Harbor MD, Nov 12-15, 2014.

68. Hamilton RL. Chronic Traumatic Encephalopathy: Update on an Emerging Disease. Invited speaker: 18th International Congress of Neuropathology, July 12-16, 2014, Rio de Janeiro, Brazil

69. Hamilton RL. Cases of the Month: 16 Years of Unknowns. Invited speaker: 18th International Congress of Neuropathology, July 12-16, 2014, Rio de Janeiro, Brazil

70. Trembath DG, Moschos SJ, Snavely AC, Bradler E, Nikolaishvilli-Feinberg N, Midkiff BR, Werley J, **Krauze MT, Hamilton RL** Role of PD-L1, HIF-1a, and reactive gliosis in melanoma brain metastases. USCAP 2015, Boston, MA, March 21-27, 2015.

71. Nolan Priedigkeit, Ryan J. Hartmaier, Yijing Chen, Damir Vareslija, Ahmed Basudan, Roby Thomas, Jose P Leone, Peter C. Lucas, Rohit Bhargava, Ron L. Hamilton, Juliann Chmielecki, Nancy E. Davidson, Steffi Oesterreich, Adam M. Brufsky, Leonie Young, Adrian V. Lee Breast cancer brain metastases show limited intrinsic subtype switching, yet exhibit acquired ERBB2 amplifications and activating mutations. San Antonio Breast Cancer Symposium, 12/7/16

72. Steffi Oesterreich, Ahmed Basudan, Nolan Priedigkeit, Ryan Hartmaier, Amir Bahreini, Rekha Gyanchandani, Jose P Leone, Peter Lucas,, Rohit Bhargava, Ron Hamilton, Ryan Hartmaier, Adam Brufsky, Adrian V. LeePerivascular Inflammation in Temporal Artery Biopsies That Are Negative for Arteritis: Incidental or Harbinger American College of Rheumatology/ Association of Rheumatology Health Professionals (ACR/ARHP) Annual Meeting, Washington DC, 11/13/16

73. Expression of Carbonic Anhydrase Genes, CA3 and CA12, Transformed with ENO1, Relate to Copy Numbers of EGFR or RNF139 and XIAP, and Gender in Glioblastomas Using PCR Assays. Experimental Biology 2015 Annual Meeting

74. Evaluation of GlioSeq Targeted NGS Panel for Detection of O6-Methylguanine-DNA Methyltransferase (MGMT) mRNA Expression in Glioma Patients Alicia Hunt, Sarika Jain, Melissa A Melan, Abigail Wald, Ronald Hamilton, Marina N. Nikiforova Association For Molecular Pathology (AMP) Charlotte, NC. November 10-12, 2016.

## PROFESSIONAL ACTIVITIES

**Ronald L. Hamilton, M.D.**


**TEACHING**

University of California, San Diego, Dept of Neuroscience
  1991-93  lab assistant - graduate neuroanatomy course
University of California, San Diego, School of Medicine
  1991-93  Sophomore pathology course, neuropathology section (lab assistant)
University of California, San Diego, Dept of Pathology
  1991-93  Clinical Correlation Conference - Neuropath and Neurosurgery (monthly)
  1991-93  Neuropathology review for neurology residents (bi-monthly)
University of Pittsburgh, School of Medicine
  Freshman pathology course –
  PBL facilitator for musculoskeletal course 1994-1998
  Neuroscience Module – lecture M2 students full class: CNS tumors
    Annually since 1999.
      April 29, 2014 1-3 pm
  Neuroscience Module   lecture MS1 students
    CNS tumors  March 2004
    CNS tumors  March 2005
    CNS tumors March 2006
    CNS Tumors    5/7/07
  Neuroscience rotation – small weekly lab, M3 students
    7/99-present
  Neuroscience rotation – small group M3 students
    6/18/2007 3-5pm
Weekly brain-cutting conference at Children's Hospital (2-5 medical (M3) students/week)
  Academic Advising: Kate McFadden 2/2000 to 6-2001
Other:
  High school - gifted science students of Mr. James Coll
    11/21/2002 , 11/14/ 2003, 10/28/2004, 11/18/2005, 11/3/2006


University of Pittsburgh, graduate students
  Cellular and Molecular Mechanisms of Neurodegeneration (MSCMP 3720)
    Organizers: Robert Bowser, Cristian Achim,
    1. Neuroanatomy and Neurohistology in neurodegeneration
     1/13/98,  1/19/99
    2. Mitochondria and disease / Prion encephalopathies
     3-24-98
    3. The role of alpha-synuclein in neurodegenerative diseases
     10-11-00
  Molecular Pathobiology (organizers Frye and Achim) (MSCMP 2740)
    .Tumors of the Central Nervous System,  4-7-98,  4-20-99
    Alpha-synuclein and Neurodegeneration
     4-2003, 1/8/04, 5/15/06
    Neuropathology of Neurodegeneration
     1/6/04
    Alpha-synuclein and Tau in Neurodegeneration
     1/5/07, 2/7/2008
    Pathologic diagnosis of the Lewy Body Disorders
     2/12/09
University of Pittsburgh, Dept of Neuroscience - Combined Neuroscience Conference Wed 4-5
  10/3/95 *  Varicella Zoster Infections of the CNS in AIDS patients
  10/9/96 *  Lewy Bodies and Dementia
  2/19/97 *  The Neuropathology of Pediatric Seizures
  4/23/97 *  CNS manifestations of non-CNS tumors in children
  2/11/98  Case Presentation with Ian Pollack

**Ronald L. Hamilton, M.D.**

| | |
|---|---|
| 3/18/98 * | A 77 year old woman with Multiple sclerosis and dementia |
| 11/4/98 | *Pediatric meningiomas – two cases |
| 1/20/99 | Methanol Intoxication – with C. Foley |
| 2/3/99 | Gliomatosis cerebri with Dallasta |
| 2/10/99 | Amyloid angiopathy and leukomalacia – with D. Kaufer |
| 3/17/99 | Metachromatic Leukodystrophy – with D. Kaufer |
| 9/18/02 | Iatrogenic CJD* |

* as primary presenter

University of Pittsburgh, Dept. of Pathology, Chief Resident's Fri noon slide conference

| | |
|---|---|
| 8/1/96 - Pediatric brain tumors | |
| 10/5/97 Pediatric brain tumors | |
| 1/9/98 | NP REVIEW - Tumors I |
| 1/16/98 | NP REVIEW - Tumors II |
| 1/23/98 | NP REVIEW - Tumors III |
| 1/30/98 | NP REVIEW - Infections |
| 2/6/98 | NP REVIEW - Demyelinative diseases |
| 2/13/98 | NP REVIEW - Neurodegenerative diseases |
| 2/20/98 | NP Review - Cerebrovascular disease and developmental |
| 5/24/02 | Pediatric Neoplasms and Congenital Malformations |
| 5/31/02 | Degenerative Diseases |

University of Pittsburgh, undergraduate
Independent Course and Honors Research Project –
Theodore Kaplan (1/97-6/97)
Emily Rogerson (1/99-5/99, 9/99-12/99, 1/00-4/00)
Kyle Hubbard (1/99 – 5/99, 9/99-12/99, 1/00-4/00)
Joe Demidovich – 2000-2002
Stan Garb (2001-2001)

Pathology Summer Undergraduate Research Program (SURP)
Kathleen Anderson 6/00-8/00
Kathleen Anderson 6/01-8-01

University of Pittsburgh, Dept. of Pathology,
Neuropathology of dementia conference - weekly (Fri 10-11)

University of Pittsburgh - ADRC Topics at Noon
X-34 and alpha-synuclein – New stains in Alzheimer's Disease 11/98
Lewy Body Pathology in Alzheimer's Disease, 11/01

Children's Hospital of Pittsburgh, Grand rounds
1996 - methyl malonic acidemia with hemi-cerebellum
2/13/97 - Pediatric AIDS with HIV encephalopathy
5/22/97 - 11 month-old boy with Hypotonia (Leigh's Disease)
3/18/98 - Becker's muscular dystrophy with severe cardiomyopathy
5/19/98 – Friedreich's Ataxia
10/15/98 – Spinal Muscular Atrophy Type I
2/2005  - Congenital Dystrophies – Pediatric Neurology

## Other Presentations

Neurology Grand Rounds - 11-19-03 - CNS vasculitis
Pathology Noon Diagnostic Conference - 11-20-03 – "Some Bodies in the Brain"
AP Didactic Lecture – 11-25-03 - Neuropathology of Neurodegeneration
NP Didactic – 4-28-04 - ApoE4 and Lewy Bodies in AD

**Ronald L. Hamilton, M.D.**


NP Didactic -    3/31/2005 – AD Pathology in ALS and MTS and LB in AD
Pathology Noon Diagnostic Conference – 8-4-2006: Tauopathies
ADRC CPC 8-10-06
ADRC CPC 11-30-06
ADRC CPC 2-8-07
ADRC 20th Anniversary meeting, "Neuropathology of AD:"  9-28-06
ADRC Topics at Noon.  "Tauopathies"  11-16-06
ADRC CPC 8/16/2007
ADRC CPC 11/30/2007
Pediatric CPC 2/25/08
DJ-1 in glioblastomas (NP Didactic conference) – 3/10/2009 (1 hour)
Neuropathology review for Neurosurgery residents – 3/10/2010 (1 hour).
AP Chief Residents didactic conference.  2 hour conference.  Non-glial Tumors. Feb 25, 2014
CMU graduate class:  BioE 2630 – Methods in medical iamage analysis in neuropathology. April 4, 2014.
Anatomic Pathology Grand Rounds, July 10, 2014  Chronic Traumatic Encephalopathy: an Update.

**Clinical Conferences (recurring)**

| | | |
|---|---|---|
| ADRC Brain cutting | weekly | Tue 8-10 |
| ADRC Dementia signout - | weekly | Fri 10-11 |
| PUH – Neuropathology QA - | weekly | Wed 10-11 |
| CH  Brain cutting | weekly | Mon 10-11:00 |
| CH  Neuro-Oncology conf | weekly | Mon 11:30-12:30 |
| CH Gross autopsy conference | weekly | Tue 11-12 |
| CH Micro autopsy conf | weekly | Tue 1-2 |

University of Pittsburgh School of Medicine –
      2009 Brain Tumors – lecture to 1st year students
      2009 Klionsky summer research scholarship – Peter Kang (June-Aug 2009)
            Clinicopathologic correlations of chordomas
      2009 Monday 2 hour small group 3rd year  (5-12 students)
            4/6/2009, 7/27/2009, 9/10/2009, 10/12/2009, 12/7/2009, 1/25/2010, 2/15/2010


<u>**RESEARCH**</u>

<u>**OTHER SUPPORT**</u>

<u>**ACTIVE**</u>

**HAMILTON, R.**
<u>ACTIVE</u>
**R01 NS037704**    (PI: Pollack)        9/1/98-1/31/17            0.7 calendar months
National Institutes of Health        $105,970
Role:  Co-Investigator
Title: Molecular Markers as Predictors of Outcome in Gliomas
The major goal of this project is to further characterize the molecular features of tumorigenesis in pediatric malignant gliomas.


**1R01 CA174858-01**(PI: Pollack)        5/6/13-8/30/17            0.4 calendar months
National Institutes of Health                $54,696
Role:  Co-Investigator
Title: Peptide Vaccine-Based Immunotherapy for Children with Recurrent Ependymomas
This project focuses on a pilot clinical trial of peptide-based immunotherapy for ependymomas, among the most challenging childhood brain tumors.  The study will incorporate separate strata

Ronald L. Hamilton, M.D.

for posterior fossa and non-posterior fossa ependymomas.  We will treat a total of 12 patients in each of the two strata with subcutaneous TAA epitope vaccinations every 3 weeks for 8 courses combined with topical imiquimod. Participants will be evaluated for adverse events, regimen limiting toxicity (RLT), and treatment response by clinical and laboratory evaluations and MR imaging. We hypothesize that vaccine-based immunotherapy will not only prove safe for the treatment of pediatric ependymomas, but will also demonstrate activity as assessed by immunologic and clinical parameters.


(PI: Pollack)    5/8/14-6/1/17
Child Brain Tumor Foundation                    $10,487                            1.2
calendar months
**Children's Brain Tumor Tissue Consortium**
The CBTTC is a unique research platform in which tumor tissue is processed for comprehensive molecular (e.g., DNA, RNA, and protein) analysis using state-of-the-art methods and the data results of that analysis, together with new brain tumor models and relevant clinical information, are sent back to the participating institutions. In comparison to tissue banks, the CBTTC actively stimulates research by providing high-quality data that can be rapidly and efficiently analyzed by participating institutions.
PI: Pollack. 10% salary for Jonette Werley


<u>OVERLAP</u> No Overlap


**<u>Completed Research Support</u>**

National Institutes of Health                    3/1/02 – 2/28/05
P30 MH52247-10    (PI: Reynolds)        $23,305
Intervention Research Center for the Study of Late-Life Mood Disorders
a supplement to the above grant to establish a brain bank to investigate the neuropathological substrate of late life mood disorders.
Role:  Co-Investigator


R01 NS048595    (PI: Montine)                    09/30/03 – 07/31/08
National Institutes of Health
Subcontract to the University of Washington on grant "Characterization of DLB: a Collaborative Study"
The major goal of this multi-institutional project is to investigate the role of ApoE4 alleles and other genetic polymorphisms in the Lewy Body Variant of Alzheimer's Disease.
Role:  Co-Investigator


Brain Tumor Society                    07/01/07-05/31/09
PI: Ian Pollack
JPA & Pediatric Low Grade Astrocytoma
The major goals of these two grants is to examine molecular markers of prognosis in pediatric gliomas.
Role:  Co-Investigator


U10 CA13539-27 (Reaman (subcontract 6172) (Pollack)                    1/1/06-12/30/09
NIH/NCI
Children's Oncology Group Brain Tumor Resource Laboratory

**Ronald L. Hamilton, M.D.**

This contract is providing infrastructure support for maintaining tissue processing and banking of high-grade gliomas.
Role:  Laboratory Director

R01 MH47346    (PI: Zubenko)                    12/1/04 – 11/30/09
National Institutes of Health
Morphologic/Neurochemical Correlates of Depression in AD
The major goal of this project is to better define the biological substrates of major depression in AD and to provide additional insight into the clinical biology of major depressive disorders affecting the elderly.
Role:  Co-Investigator

P50 AG05133    (PI: Lopez)              3/30/85 – 3/31/15          0 calendar months
National Institutes of Health              $71,764
Alzheimer Disease Research Center, Core C: Neuropathology
The three objectives of the Neuropathology Core are to (1) procure and bank brain from autopsies of ADRC patients and controls, (2) perform detailed neuropathologic analysis of all AD cases and (3) maintain well catalogued brain bank.
Role:  Core Advisor

Child Brain Tumor Fund (CBTF) (PI: Pollack)        5/8/13-5/7/14
0.3 cal months (2.5% support) `PITT subaccount #: 05.35206.xxxx.00000.709203.-----`

P01 NS040923    (PI: Pollack)              7/1/02-5/31/13          1.20 calendar months
National Institutes of Health              $22,074
Novel Strategies for Brain Tumor Therapy
The unifying hypothesis of this program project grant is that novel therapeutic approaches that take into account the unique features of central nervous system (CNS) tumors will have utility for preventing tumor growth and inducing tumor regression, and will potentiate the effects of conventional treatment approaches, particularly radiotherapy, for inducing glioma cell killing.
Role:  Co-Investigator


**Prior Grant Support**

1995-1997            Murine Model of Retroviral Encephalitis
                            Children's Hospital of Pittsburgh Research Fund ($50,000)
                            0% effort, 0% support

 1995-1998            Blood Brain Barrier in HIV encephalitis (PI: Achim)
                            Co PI. 10% effort and salary ($186,264)

11/98                  PD Center Grant, Equipment $6000
                          for freezer for PD Brain Bank (one time equipment funding)

7/1/98-6/30/99  Neurotrophic Factors in SIV encephalitis
                          Competitive Medical Research Fund (CMRF), $25,000,
                          0% effort, 0% support

12/01/98-11/30/99    Parkinson's Disease Brain Bank
                                PI: Hamilton RL
                                Parkinson's Disease Foundation ($24,899) 0% effort, 0% support

7/1/98-6/30/00  Molecular Markers of Prognosis in Pediatric Gliomas

**Ronald L. Hamilton, M.D.**

PAR 95-063, NIH
PI: IF Pollack
10% effort and support ($263,311)

4/1/00-3/31/01:  Alpha-synuclein Aggregation in Dementia With Lewy Bodies
PI: RL Hamilton
Parkinson's Disease Foundation Seed Money Grant, $25,000 0% effort, 0% support

10/1/00-9/30/02    Millennium Agreement (Neuro Module)
PI: Rajiv Dhir
0% effort, 0% Support.
($25,000 per year for supplies, plus support for 100% Level IV Res Tech)

1/1/99 – 12/31/03 COG Brain Tumor Resource Laboratory
PI: Pollack, IF ($5800)  (subcontract 6172)
Co-I – 5% effort and support
NIH-U10 CA13539-27

3/01/02 - 2/28/05 - Supplemental Award to Establish a Late Life Mood Disorder Brain Bank
PI: RA Sweet (for supplement)
Supplement to 3 P30 MH52247-08S1 (PI: CF Reynolds)
Co-I : 5% effort and support

7/1/98-6/30/05 Morphologic/Neurochemical Correlates of Depression in AD
PI: G Zubenko
2.5% effort and support ($20,000)

National Institutes of Health          09/30/03 – 07/31/08          5%
R01 NS048595    (PI: Montine)          $75,000

*Subcontract to the University of Washington on grant "Characterization of DLB: a Collaborative Study"*
The major goal of this multi-institutional project is to investigate the role of ApoE4 alleles and other genetic polymorphisms in the Lewy Body Variant of Alzheimer's Disease

R01 MH072947    (PI: Butters)          12/1/04 –11/30/11          0.36 calendar months
National Institutes of Health          $6,018
Pathways Linking Late Life Depression to Mild Cognitive Impairment and Dementia
The goal of this project is to investigate the relationships among late-life depression (LLD), cognitive impairment and progressive neurodegeneration.
Role:  Co-Investigator

R01 MH072947    (PI: Butters)          12/1/04 –11/30/11          0.36 calendar months
National Institutes of Health          $6,018
Pathways Linking Late Life Depression to Mild Cognitive Impairment and Dementia
The goal of this project is to investigate the relationships among late-life depression (LLD), cognitive impairment and progressive neurodegeneration.
Role:  Co-Investigator

**Seminars and Invited Lectureships Related to Research**

Presentation of an Unknown Case (Herpes simplex brainstem encephalitis) to American Association of Neuropathologists Annual Meeting, June 1992: St. Louis, MO.

**Ronald L. Hamilton, M.D.**

Presentation of an Unknown Case (Varicella zoster virus encephalitis in an AIDS patient) to XII International Congress of Neuropathology, Sept, 1994: Toronto, Ont, Canada.

Presentation of an Unknown Case (Atypical neurocytoma) to American Association of Neuropathologists Annual Meeting, June 2002: Denver (presenter: Rafael Medina-Flores).

**Other Research Related Activities**

| | |
|---|---|
| 1995-2003 | Co-Director, Neuropathology Core ADRC |
| 2003-2012 | Director, Neuropathology Core ADRC. |
| 1995-2012- | Director, Neuropathology Brain Bank |
| 1997 - present - | Director of Neurohistology laboratory |
| 1997-present | Co-Director, Brain Tumor Resource Laboratory, Children's Cancer Group |
| 2001- 2009 | Director of Neuropathology Core of the Stephen Tuttle ALS Tissue Bank. |
| 2001-present | Co-Director, UP Brain Tumor Bank |

**CURRENT RESEARCH INTERESTS**

1. Molecular Biology of Brain Tumors

**SERVICE**

**University and Medical School**

Residency Committee (Pathology) – 1997 to 2008
Institutional Review Board        3/02 – 5/2005
'Member of the UPSOM Interviewing Committee' jan 2010-present
Member, UPMC Professional Practice and Ethics Committee Jan 2014 - present

**OTHER**

| | |
|---|---|
| 4/1996 - present | Case Editor - Brain Pathology, |
| | Case of the Month feature |
| | Case of the Month web site |
| | Increase to 2 cases per month 1/2007 |
| 10/99 | ad hoc reviewer, J Neuroscience |
| 1/2000 | ad hoc reviewer, J American Medical Association (JAMA) |
| 3/2000 | ad hoc reviewer, Neuropathology and Applied Neurobiology |
| 3/01 | ad hoc reviewer American Journal Pathology |
| 5/02 | ad hoc reviewer Neuroscience |
| 11/02 | ad hoc reviewer JNEN |
| 2004 | AANP Awards Committee, AANP, Cleveland |
| 2006 | AANP Awards committee, AANP-ISN San Fran |
| 10/2006 | ad hoc reviewer     Eur J Neurosci |
| 2/2007 | Ad hoc reviewer        Neuroscience |
| 2007 | Chairmen, Awards Committee, AANP Washington DC. (2 year term) |
| 7/29/2007 | ad hoc reviewer, Brain Pathology |
| 7/25/2007 | ad hoc reviewer Acta Neuropathologica |
| 10/19/2007 | ad hoc reviewer J Neuropathol Exp Neurol |
| 2008 | Chairman Awards Committee AANP, San Diego Annual Meeting |
| 2008 | ad hoc reviewer Brain Pathology |
| 2009 | ad hoc reviewer Pedi and Developmental Pathology |
| 2009 | ad hoc reviewer Amer. J. Pathol. |

**Ronald L. Hamilton, M.D.**

2014 – Featured in non-fiction book: League of Denial:  The NFL, Concussions and the Battle for the Truth (Crown Publishing, New York). Chapters 8 and 10 detail my role in the discovery of CTE in NFL football players.

January 2015 – Consulted with Sony Pictures about movie CONCUSSION based on the discovery of Chronic Traumatic Encephalopathy (CTE) in American NFL football players by my student, Bennet Omalu and me in July 2005.  I was also interviewed on the set by Sony documentary filmmakers for a bonus feature on the DVD:  The Making of "Concussion."  The movie is scheduled to be released Christmas Day, Dec 25, 2015.

January 2015 – interviewed by Jeane Marie Laskas (who wrote the 2009 GQ article the movie is based on) for a companion book to be released with the movie, December 2015.


**International Invitations**

1998 – Invited lecturer at Barcelona-Pittsburgh ADRC meeting, "Dementia Today," Barcelona, Spain (Oct 1998)

2000 – Invited lecturer at Barcelona-Pittsburgh ADRC meeting Dementia Today II", Barcelona, Spain (Oct 2000)

2001 - Invited symposia speaker at 10th Congress of the International Psychogeriatric Association (Nice, France, Sept 2001). "Pathological Diagnosis of Dementia With Lewy Bodies" (Symposia Organizer, Ian McKeith)

2002 – Invited lecturer at Barcelona-Pittsburgh ADRC meeting Dementia Today III", Barcelona, Spain (Oct 2002)

2003 – Symposium speaker "Dementia with Lewy Bodies" at International Psychogeriatric Associations meeting, Chicago, IL, USA, 08/19/03

2004  Invited lecturer at Barcelona-Pittsburgh ADRC meeting Dementia Today IV", Barcelona, Spain (Oct 2004)

2006  Invited lecturer at Barcelona-Pittsburgh ADRC meeting Dementia Today V", Barcelona, Spain (Oct 2006)

2008  Invited lecturer at Barcelona-Pittsburgh ADRC meeting Dementia Today VI", Barcelona, Spain (May 2008)

2014 – Invited lecturer AANP annual meeting June 2014.  What Every Neuropathologist Should Know: Molecular studies in metastatic brain tumors.

2014 - Invited as member of scientific committee International Congress of Neuropathology quadrennial meeting Sept 2014, Rio de Janeiro

2014 – Chair of Forensic Pathology Session, committee International Congress of Neuropathology quadrennial meeting Sept 2014, Rio de Janeiro

2014 – co-chair telepathology session with Dr. Wiley

2014 – Presentation – Chronic Traumatic Encephalopathy – update, International Congress of Neuropathology quadrennial meeting Sept 2014, Rio de Janeiro

2014 – presentation – Cases of the Month – 16 Years of Unknowns  International Congress of Neuropathology quadrennial meeting Sept 2014, Rio de Janeiro s



**University of Pittsburgh**
**Physicians, Department**
**of Pathology**

Division of Neuropathology

Clayton A. Wiley, MD, PhD
*Director*

Charleen T. Chu, MD, PhD
Robert H. Garman, DVM
Ronald Hamilton, MD
Julia Kofler, MD
Scott M. Kulich, MD, PhD
David Lacomis, MD
Geoffrey Murdoch, MD, PhD
Gutti R. Rao, MD

UPMC Presbyterian
Room 5701 Scaife Hall
200 Lothrop Street
Pittsburgh, PA 15213
T 412-624-9415
F 412-624-5610

To Whom it may concern,

I have conducted a study of F. Cornish's brain tissue. Additionally, in my Neuropathology practice I conduct an ongoing study of all available and existing medical literature related to the existence and diagnosis of CTE and I combine that knowledge with my training and extensive experience related to the study and diagnosis of CTE.

Frank Cornish died on August 23, 2008.

Received from the Tarrant County Medical Examiner are three H&E stained slides (08-10049 slides 1, 2 and 3) and their corresponding formalin-fixed paraffin embedded tissue blocks.

H&E stained recuts are examined:

slide 1 has neocortex, basal ganglia and thalamus;
slide 2 has cerebellum and medulla;
slide 3 has neocortex and midbrain with substantia nigra.

Immunostain of slide 1 for the AD-related protein Beta-A4 is negative. Tau immunostains (PHF-1) are negative in the cerebellum and medulla (slide 2), but reveal numerous neocortical PHF-1/tau positive tangles in neurons (Fig 1a), with staining of many neuronal processes (neuropil threads) (Fig 1b) as well as tau-positive glial cells (Fig 1c), especially in the depths of the sulcus and focally around some blood vessels. In the midbrain, the substantia nigra had tangles and neuropil threads (Fig 1d). The mesencephalic tegmentum shows many tau-positive neurons in the oculomotor nucleus . These histopathologic findings are diagnostic of CTE.



Frank Cornish had CTE.

Sincerely
/s/
Ronald L Hamilton, M.D.

 **CONCUSSION SETTLEMENT**
*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

## NOTICE OF REQUEST FOR ADDITIONAL DOCUMENTS
**DATE OF NOTICE: February 20, 2019**
**RESPONSE DEADLINE: June 20, 2019**

### I. SETTLEMENT CLASS MEMBER INFORMATION

| | |
|---|---|
| **Settlement Program ID** | 950012548 |

| **Name:** | First Robin | M.I. B | Last Cornish |
|---|---|---|---|

| | |
|---|---|
| **Settlement Class Member Type** | Representative Claimant |
| **Primary Counsel** | O'Hanlon, Demerath & Castillo |

| **Asserted Qualifying Diagnosis** | Death with CTE (Chronic Traumatic Encephalopathy) | **Date of Asserted Qualifying Diagnosis** | 8/23/08 |
|---|---|---|---|

### II. EXPLANATION OF REQUEST(S)

This Notice is an official communication from the Claims Administrator for the NFL Concussion Settlement Program. Your Claim Package is missing documents or information.

This Notice explains what is missing and what you may do to address the issue. We can help if you have questions. To cure the issues identified in this Notice, click the Respond to Request for Additional Documents button on your secure online portal and follow the instructions provided to upload the information identified below.  If you already have provided us with the missing information, let us know because we may have received it after conducting the review that generated this notice.

The following requires attention before we can act further:

| | **What is Missing** | **How to Address this Item** |
|---|---|---|
| 1. | You have not submitted any medical records reflecting the Qualifying Diagnosis. | Click the Respond button, go to Section 3 for Medical Records, click on the Upload Medical Records button and follow the instructions to upload medical records reflecting the Qualifying Diagnosis. |

### III. ADDITIONAL EXPLANATION OF WHAT IS MISSING

The medical records must show a post-mortem diagnosis of CTE made before April 22, 2015 (the Final Approval Date) by a board-certified neuropathologist for a Retired NFL Football Player who died before April 22, 2015.  See Section 6.3 (f) of the Settlement Agreement and FAQ 109.  Mr. Cornish died on August 23, 2008, and the August 24, 2008 autopsy report signed by Marc A. Krouse does not reference CTE and neither does the death certificate.  You provided an undated letter from Dr. Ronald L. Hamilton who diagnosed Mr. Cornish with CTE.  You must establish that Dr. Hamilton reviewed Mr. Cornish's brain tissue and made a CTE diagnosis on or before April 22, 2015.

### IV. HOW TO RESPOND TO THIS NOTICE

You have 120 days to respond to this Notice and provide the missing information or documents. **We encourage you to gather the requested information or documents now and respond to this Notice promptly, rather than using the full 120 days allowed to answer.  The sooner you respond, the sooner your claim can move forward in the review process.**

By the Response Deadline stated above, send us the missing information or documents identified in Section II.  We will wait the full 120 days to re-review your claim, unless you click the Submit Claim Package for Review button to confirm that your response is complete and we may continue to review your claim.  If you do not respond in full on or before the Response Deadline, we will have to assess your claim based on the materials we have, which could lead to a lower Monetary Award or denial of your claim in its entirety.

Submit the requested information using your secure online portal to upload additional documents.

## V. How to Contact Us with Questions or for Help

If you are represented by a lawyer, consult with your lawyer if you have questions or need assistance. If you are unrepresented and have any questions about this Notice or need help, contact us at 1-855-887-3485 or send an email to ClaimsAdministrator@NFLConcussionSettlement.com.  If you are a lawyer, call or email your designated Firm Contact for assistance. For more information about the Settlement program, visit the official website at www.NFLConcussionSettlement.com to read the Frequently Asked Questions or download a copy of the complete Settlement Agreement.



# O'HANLON, DEMERATH & CASTILLO

### ATTORNEYS AND COUNSELORS AT LAW

808 WEST AVENUE
AUSTIN, TEXAS 78701
PHONE: (512) 494-9949
FAX: (512) 494-9919

**DAVID J. CAMPBELL**
*Board Certified, Civil Appellate Law*
dcampbell@808west.com

**Rio Grande Valley Office**
426 W. Caffery Ave.
Pharr, Texas 78577

**San Antonio Office**
117 W. Craig Place
San Antonio, Texas 78212

May 6, 2019

***via email***
Jason Russell
BROWNGREER PLC
250 Rocketts Way
Richmond, VA 23231
*jrussell@browngreer.com*

      Re:    Claimant ID: 950012548; Robin B. Cornish

████████████████████████████

Mr. Russell:

Please allow this correspondence to provide you with the additional information you requested in your prior email correspondence regarding the above two claimants.

In your attached email correspondence, you accurately quote FAQ 109, which states that for a Death with CTE diagnosis, "the medical records must show a post-mortem diagnosis of CTE made before April 22, 2015 (the Final Approval Date)."[1]  However, FAQ 109 must be read in conjunction with FAQ 82, FAQ 84, and FAQ 93.

FAQ 82 explains that a Player who died before April 22, 2015 is eligible for a Monetary Award if there is a diagnosis of Death with CTE.[2]  FAQ 84 states that a

---

[1]   *See* Tab 1.  As you know, the representations in the FAQ were made with the approval of counsel for the NFL Parties.  *See* Amended Settlement Agreement § 4.1(a).

[2]   *See* Tab 2, Relevant Excerpts from Posted Settlement Program FAQs (as of February 19, 2019), FAQ 82.

May 6, 2019
Page 2

diagnosis of Death with CTE can be made by any board-certified neuropathologist at any time after the Player's death.[3]  FAQ 93 addresses how the date of the diagnosis is determined.[4]

FAQ 93 describes how to determine the diagnosis date for Death with CTE.[5]  It states that the date of the diagnosis is important because it impacts a Player's eligibility for a Monetary Award.[6]  For diagnoses *other than Death with CTE*, the diagnosis date is the date "when the diagnosing physician has enough information and materials, including test results, to be able to render a medically sound and reliable judgment about the Player's condition . . .."[7]  But diagnoses for Death with CTE are different.[8]  For Death with CTE, the diagnosis date is "the date of the Player's death, **even though the diagnosis is not made until after the Player dies**."[9]

Pursuant to FAQ 82, 84, 93, and 109, the diagnosis date for Mr. Cornish (Claimant ID: 950012548) is August 23, 2008. Robin Cornish's claim package regarding the deceased Mr. Cornish includes the post-mortem diagnosis of Dr. Ronald L. Hamilton, a board-certified neuropathologist who has provided a post-mortem diagnosis of Death with CTE.  The date of this Qualifying Diagnosis is the date of Mr. Cornish's death, which is August 23, 2008.



---

[3]    *See id.*, FAQ 84.

[4]    *See id.*, FAQ 93.

[5]    *See id.*

[6]    *See id.*

[7]    *See id.*, FAQ 93(b).

[8]    *Compare id.*, FAQ 93(b) *with id.*, FAQ 93(a).

[9]    *See id.*, FAQ 93(a) (emphasis added).

May 6, 2019
Page 3


I appreciate your diligence in reviewing these claims and would be happy to discuss these claims if you have any additional questions or require any additional information.


Best regards,


David J. Campbell


Enclosures    Tab 1
              Tab 2

| From: | Jason Russell |
| --- | --- |
| To: | Alice Keeran |
| Cc: | Justin Demerath; David Campbell |
| Subject: | RE: Claimant ID: 950012548: Robin B Cornish and Claimant ID: ███████ |
| Date: | Monday, February 25, 2019 12:04:02 PM |
| Attachments: | image001.png |

Hi Alice,

I see Death with CTE was the asserted Qualifying Diagnosis for both.  For Death with CTE, the medical records must show a post-mortem diagnosis of CTE made before April 22, 2015 (the Final Approval Date) by a board-certified neuropathologist for a Retired NFL Football Player who died before April 22, 2015 (Section 6.3(f) of the Settlement Agreement and FAQ 109).

**Robin Cornish – 950012548**
Mr. Cornish died on August 23, 2008, and the August 24, 2008 autopsy report signed by Marc A. Krouse does not reference CTE and neither does the death certificate.  We received an undated letter from Dr. Ronald L. Hamilton who diagnosed Mr. Cornish with CTE.  You must establish that Dr. Hamilton reviewed Mr. Cornish's brain tissue and made a CTE diagnosis on or before April 22, 2015.

Please let me know if you have any further questions concerning this.

Thank you,
Jason

**From:** Alice Keeran <akeeran@808west.com>
**Sent:** Monday, February 25, 2019 8:21 AM
**To:** Jason Russell <jrussell@browngreer.com>
**Cc:** Justin Demerath <jdemerath@808west.com>; David Campbell <dcampbell@808west.com>
**Subject:** Claimant ID: 950012548; Robin B Cornish and Claimant ID: ███████

Hi Jason,

I'm writing to follow-up on a couple of Notices of Request for Additional Documents for the above-referenced claimants. Both of these notices reference that accompanying medical records are missing, but I can see the records we provided when I checked the portal for each of them.

Please give me a call when you have a moment. Thank you!

Sincerely,
*Alice Keeran*

Senior Paralegal to
Justin B. Demerath
O'HANLON, DEMERATH & CASTILLO, PC
ATTORNEYS AND COUNSELORS AT LAW
            Austin  Office
            808 West Avenue
            Austin, Texas 78701
            (512) 494-9949  Office
            (512) 494-9919 Fax
            email: akeeran@808west.com
            website: www.808west.com

CONFIDENTIALITY NOTICE:
The information contained in this transmittal and any attached documents maybe  attorney privileged
and contain confidential and/or privileged information and  has been sent for the sole use of the
intended recipient(s).  Any review, use, printing, dissemination, disclosure, distribution, retransmission,
or other use  of, or taking in any action in reliance upon this information by persons or  entities other
than the intended recipient(s) is strictly prohibited.  If you  have received this transmittal in error, please
immediately notify us by telephone at (512) 494-9949 and delete the material from any computer. Please
be advised that nothing in this email shall create or be taken to create an attorney client relationship,
which may only be created by executing a power of attorney agreement.

# NFL CONCUSSION SETTLEMENT

*In Re: National Football League Players' Concussion Injury Litigation* No. 2:12-md-02323 (E.D. Pa.)

## Posted Settlement Program FAQs

(as of February 19, 2019)



# Table of Contents

**I.  Basic Information** ..................................................................................................... 1

   **1.  What is the Settlement about?** ........................................................................ 1

   **2.  What are the benefits of the Settlement?** ....................................................... 1

   **3.  Who is included in the Settlement Class?** ...................................................... 2

   **4.  Who are the settlement administrators?** ......................................................... 2

   **5.  Who are the Special Masters?** ....................................................................... 3

   **6.  What if I do not like how the settlement administrators or Special Masters are administering the Settlement Agreement?** ..................................... 3

   **7.  Do the settlement administrators report to Co-Lead Class Counsel or the NFL Parties?** ................................................................................................. 3

   **8.  Does the Claims Administrator share the contents of my Claim Package with Co-Lead Class Counsel or the NFL Parties?** ....................................... 4

   **9.  Does the Claims Administrator share the contents of my Claim Package with any other people or entities?** ............................................................. 4

  **10.  How do I authorize the Claims Administrator to speak to someone else about my claim?** ..................................................................................... 4

  **11.  When was the Effective Date? What is it?** ...................................................... 5

  **12.  How does the Claims Administrator calculate the number of days I have to respond to a notice or take other actions in the Settlement Program?** ......... 5

  **13.  If I have to respond to the Claims Administrator by a deadline, what is considered the date of my response or submission?** ...................................... 6

  **14.  If I opted out of the Settlement, can I still get benefits from this Settlement?** ..................... 6

  **15.  I opted out of the Settlement. May I revoke that Opt Out and get back into the Settlement Program?** ................................................................................ 7

  **16.  If I am a Settlement Class Member who did not opt out of the Settlement, can I sue the NFL Parties for the same thing later?** ........................................ 7

  **17.  Can I still opt out of the Settlement?** ............................................................. 7

  **18.  What if I do not like the terms of the Settlement Agreement?** ......................... 7

  **19.  Are there any tools on the Settlement Website to help me understand the Settlement Agreement and how to make a claim?** ........................................ 7

  **20.  Where can I find the Special Master's or the Court's published decisions on appeals or statute of limitations matters?** .................................................. 8

  **21.  How do I get more information about the Settlement?** ..................................... 8

  **22.  How do I report potential fraud to the Claims Administrator?** ......................... 9

  **23.  What if my situation or circumstances are not covered by these FAQs?** ........... 9

## II.  Settlement Agreement Benefits – General Information ........................................10

**24.  Must a Retired NFL Football Player be vested under the NFL Retirement Plan to receive Settlement benefits?**................................................................................. 10

**25.  Are the Settlement benefits connected to any NFL or NFLPA-related benefits programs?**................................................................................................................. 10

**26.  If I receive benefits under the 88 Plan or any other disability plan, do I automatically qualify for a Monetary Award in the Settlement Program?** ....................... 10

**27.  Does this Settlement prevent Retired NFL Football Players from bringing workers' compensation claims?**......................................................................................... 10

**28.  What types of education programs are supported by the Settlement?**............................ 10

**29.  If the science about the Qualifying Diagnoses changes, will the Settlement Program change the definitions or testing protocols for them?** ........................................ 11

## III. Registration ...............................................................................................................12

**30.  May I still register in the Settlement as a Retired NFL Football Player?** ........................ 12

**31.  May I still register in the Settlement as a Representative Claimant?**............................... 12

**32.  May I still register in the Settlement as a Derivative Claimant?**...................................... 13

**33.  What if I disagree with the Claims Administrator's initial determination on my registration?** ....................................................................................................... 13

**34.  What if I disagree with the Claims Administrator's decision about my registration determination challenge?** .................................................................................. 13

**35.  Are there any rules covering registration determinations and appeals?**......................... 14

**36.  How can I send registration information to the Claims Administrator?** ........................... 14

**37.  Does registering mean I filed a claim?** ............................................................................ 14

**38.  How do I change my mailing address?** ............................................................................ 14

**39.  How do I change my name or Social Security Number (or other Taxpayer Identification Number) that I have given the Program?** ..................................... 14

**40.  Do I have to provide my Social Security Number to participate in the Settlement Program?**................................................................................................................ 15

**41.  How does the Claims Administrator calculate a Retired NFL Football Player's Eligible Seasons?**.................................................................................................. 15

**42.  Where does the Claims Administrator get information about a Retired NFL Football Player's Eligible Seasons?**.................................................................... 16

**43.  I received a Notice of Incomplete Registration saying I am missing proof of playing NFL Football. What are the next steps?** ............................................................. 16

## IV. Baseline Assessment Program ...............................................................................17

**44.  What is the Baseline Assessment Program ("BAP")?** ..................................................... 17

**45.  Who can participate in the BAP?** .................................................................................... 17

**46.  Why should I have a BAP exam?** .................................................................................... 17

47.  How many doctors will I see in a BAP exam? ................................................. 18

48.  Who pays for these BAP exams? ................................................................... 18

49.  Who can be a Qualified BAP Provider? ........................................................ 18

50.  Can I choose my own doctors for the BAP exam? ......................................... 18

51.  Do the Qualified BAP Providers report to the NFL? ..................................... 18

52.  Is there a deadline for getting the BAP exam? .............................................. 18

53.  How long will the Baseline Assessment Program be available? ..................... 19

54.  How do I access the BAP Portal? ................................................................. 19

55.  How can I schedule a BAP exam? ................................................................. 19

56.  Where do I go for my BAP exam? ................................................................. 19

57.  How long does a BAP exam take? ................................................................. 20

58.  Is it possible to schedule both parts of the BAP exam on the same day? .......... 20

59.  Can BAP appointments be rescheduled or cancelled? ................................... 20

60.  What happens if I miss a BAP appointment? ................................................ 20

61.  What do I need to prepare for my BAP appointment? ................................... 20

62.  Should I bring someone with me to my BAP appointment? ............................ 20

63.  What kind of diagnosis can I get from a BAP exam? ..................................... 21

64.  What about conditions like ALS, Parkinson's Disease, or Alzheimer's Disease? ............. 21

65.  Does there have to be a diagnosis? What if I am OK? ................................... 21

66.  What happens after a BAP exam? ................................................................. 22

67.  What should I do if my BAP exam results in a diagnosis? ............................. 22

68.  Will my Monetary Award be affected if I do not have a BAP exam? ............. 23

69.  What are BAP Supplemental Benefits? ......................................................... 23

70.  How long will I have to use my BAP Supplemental Benefits? ....................... 23

71.  How much will my BAP Supplemental Benefits cover? Is there a limit? ....... 24

72.  Will any medical or pharmacy records from BAP Supplemental Benefits be
     available to the NFL? .................................................................................... 24

73.  What is a Qualified BAP Pharmacy Vendor? ................................................ 24

74.  I received a "Baseline Assessment Program HIPAA Authorization Form." What do
     I do with it? ................................................................................................... 24

V.  Monetary Awards ..............................................................................................25

75.  Who can submit a claim for a Monetary Award? .......................................... 25

76.  What is a Claim Package? ............................................................................. 25

77.  How do I submit a Claim Package? ............................................................... 25

78.  Where do I send my Claim Package if I do not use an online Portal? ............ 26

79. When can I submit a Claim Package? ................................................................ 26

80. Is there a deadline to submit my Claim Package? ............................................ 26

81. How can I change answers I made in my Claim Form? .................................... 26

82. What is a Qualifying Diagnosis? ....................................................................... 27

83. Should I get a BAP exam or see a Qualified MAF Physician? ........................ 27

84. What kind of physicians are authorized to make a Qualifying Diagnosis?........ 27

85. Who is a Qualified MAF Physician? .................................................................. 29

86. How do I get evaluated for a Qualifying Diagnosis if I do not already have one?............. 29

87. If my diagnosing physician is both a Qualified BAP Provider and a Qualified MAF Physician, how do I know if the diagnosis is made in or outside the BAP? ........................ 29

88. Does the physician who makes the Qualifying Diagnosis of a Retired NFL Football Player have to see and examine that Player in person? ........................ 29

89. Can the representative of a deceased Retired NFL Football Player get a Qualifying Diagnosis for that Player now?............................................................. 30

90. What should I do if I already have a Qualifying Diagnosis? ............................ 31

91. Does it matter when the Retired NFL Football Player was diagnosed? ........... 31

92. What dates matter for when the Qualifying Diagnosis is made? ...................... 31

93. How is the date of a Qualifying Diagnosis determined?................................... 32

94. Which diagnostic criteria must a physician use when making my Qualifying Diagnosis? When and to what diagnoses does the "generally consistent" criteria apply?...................................................................................................... 34

95. What does "generally consistent" mean? ........................................................... 34

96. What makes a Claim Package complete? ........................................................... 35

97. What can I submit to prove that I have more Eligible Seasons than what the Claims Administrator found for me when I registered?.................................... 35

98. What counts as a medical record?....................................................................... 36

99. What does it mean for medical records to "reflect" my Qualifying Diagnosis? ................ 36

100. What does it mean for medical records to "support" my Qualifying Diagnosis? ............. 37

101. What must the medical records show for Level 1.5 and Level 2 Neurocognitive Impairment diagnoses made in the BAP by Qualified BAP Providers? ............................ 37

102. What must the medical records show for Level 1.5 and Level 2 Neurocognitive Impairment diagnoses made outside the BAP for *living* Retired NFL Football Players?........................................................................................................... 39

103. What must the medical records show for Level 1.5 and Level 2 Neurocognitive Impairment diagnoses for Retired NFL Football Players who *died before January 7, 2017* (the Effective Date) and cannot participate in the BAP or be diagnosed by a Qualified MAF Physician?........................................................................................... 40

104. How are diagnosing physicians to apply the Clinical Dementia Rating (CDR) scale to Level 1.5 and Level 2 Neurocognitive Impairment Qualifying Diagnoses? ................... 40

105. What must be included in a sworn statement corroborating a Retired NFL Football Player's functional impairment for a Level 1.5 or Level 2 claim? ........................................ 42

106. Are raw scores and/or raw data required for all Monetary Award claims? ...................... 42

107. What must the medical records show for Alzheimer's Disease? ......................................... 43

108. What must the medical records show for Parkinson's Disease? ......................................... 43

109. What must the medical records show for Death with CTE? ................................................ 44

110. What must the medical records show for ALS? ..................................................................... 44

111. What if I cannot get medical records or a Diagnosing Physician Certification Form from the diagnosing physician? ............................................................................................... 45

112. If I cannot get medical records or a Diagnosing Physician Certification Form from the diagnosing physician, is there anything specific I should submit to show my attempts to get such documents? ................................................................................................ 45

113. What exceptions are allowed under Section 8.2(a) of the Settlement Agreement for Representative Claimants of deceased Retired NFL Football Players? ............................. 45

114. What is the SWS-2? ................................................................................................................. 47

115. What exceptions are allowed under Section 8.2(a) of the Settlement Agreement for living Retired NFL Football Players or Representative Claimants of legally incapacitated or incompetent Players? ................................................................................... 47

116. Are there other instances not listed in Section 8.2 of the Settlement Agreement where the Claims Administrator may excuse the medical records or Diagnosing Physician Certification Form requirement? ..................................................................... 48

117. What happens after the Claims Administrator grants an exception under Section 8.2(a) or a situation not covered by Section 8.2(a)? ......................................................... 49

118. Who reviews my claim for a Monetary Award? ................................................................... 49

119. How is my diagnosis reviewed? When and to what does the "generally consistent" standard apply? ......................................................................................................................... 50

120. What is the AAP and what does it do? ................................................................................. 50

121. What is the AAPC and what does it do? ............................................................................... 50

122. I received a Qualifying Diagnosis through the BAP. Do I have to do anything else to receive a Monetary Award? ............................................................................................... 51

123. I received a Qualifying Diagnosis from a Qualified MAF Physician. Do I have to do anything else to receive a Monetary Award? .................................................................. 51

124. If I received a Qualifying Diagnosis from a Qualified MAF Physician, what types of records will the physician send to the Claims Administrator? ............................................ 51

125. What happens after I submit my Claim Package? ............................................................... 52

126. Can I receive a Monetary Award for more than one Qualifying Diagnosis on the same claim? ............................................................................................................................... 52

127. I received a Notice of Preliminary Review. What does that mean?...................................... 52

128. I received a Notice of Request for Additional Documents. What does that mean?........... 52

129. What happens after I respond to my notice asking for more information for my claim?................................................................................................................................. 53

130. What happens if I never respond to the Notice of Preliminary Review or the Notice of Request for Additional Documents?.................................................................. 53

131. May I get more time to respond to a notice from the Settlement Program? ..................... 53

132. Does the Claims Administrator question the medical judgment of the physician who made the Qualifying Diagnosis?........................................................................... 54

133. I have provided my claim to the Claims Administrator and it is now complete enough to send to the AAP. What happens next?.................................................. 54

134. How can I check the status of my Claim Package review?.............................................. 54

135. How long could it take to review my Claim Package from start to finish?....................... 54

136. If I am eligible for a Monetary Award, how much money will I receive?........................ 55

137. What is a Stroke or Traumatic Brain Injury in this Settlement Program?....................... 56

138. Can I be found eligible for a Monetary Award based on a Qualifying Diagnosis that is different than the one I claimed?..................................................................... 56

139. What can I do if I do not like my Claim Package determination (eligible or denied)?...... 57

140. Can I withdraw my claim? ............................................................................................ 57

141. Can the Claims Administrator change the outcome of my claim after I receive a notice?................................................................................................................. 57

142. Can I submit a new claim for a Monetary Award if the Claims Administrator has denied my claim?.................................................................................................... 58

143. If I received a Monetary Award for one Qualifying Diagnosis, can I later receive a Monetary Award for a different Qualifying Diagnosis? What is a Supplemental Monetary Award?.................................................................................................... 58

144. Can Co-Lead Class Counsel or the NFL appeal my Claim Package determination?........ 58

145. Are there any rules covering determinations that a Monetary Award claim is or is not barred by the statute of limitations under applicable state law? ................................... 59

**VI. Representative Claimants** ...................................................................................60

146. Who is a Representative Claimant?................................................................................ 60

147. How do I become a Representative Claimant? ............................................................... 60

148. How will the Claims Administrator determine whether my court order or other official document is sufficient proof that I can be a Retired NFL Football Player's Representative Claimant?...................................................................................... 61

149. How will the Claims Administrator determine whether my Power of Attorney (POA) is sufficient proof that I can be a legally incapacitated or incompetent Retired Player's Representative Claimant?............................................................................. 62

150. Can a Retired NFL Football Player have more than one Representative Claimant? ........ 62

151. What happens if more than one person registers as a Representative Claimant for the same Retired NFL Football Player? ................................................................. 62

152. Can I be a Retired NFL Football Player's Derivative Claimant if I am his Representative Claimant? ...................................................................................... 62

153. Do Representative Claimants have to register for benefits? ................................... 62

154. What happens if a registered Retired NFL Football Player or Representative Claimant becomes legally incompetent or incapacitated or dies after registering? ........... 63

155. If I am a Representative Claimant, do I have to submit a Claim Package? ...................... 63

VII.    Derivative Claimants ..................................................................................... 64

156. Who is a Derivative Claimant? ......................................................................... 64

157. Can a Retired NFL Football Player have more than one Derivative Claimant? ............... 64

158. May someone be a Derivative Claimant of more than one Retired NFL Football Player? ............................................................................................................ 64

159. Can a deceased person be a Derivative Claimant? ................................................ 64

160. Can I register as a Retired NFL Football Player's Derivative Claimant if I also registered as a Representative Claimant? ............................................................ 64

161. Do Derivative Claimants have to register for benefits? ........................................ 64

162. What happens if no one registers as a Derivative Claimant for a Retired NFL Football Player? ................................................................................................ 65

163. How do I submit a Derivative Claim Package? ..................................................... 65

164. Where do I send my Derivative Claim Package if I do not use an online Portal? ............. 66

165. Is there a deadline to submit my Derivative Claim Package? ................................... 66

167. What makes a Derivative Claim Package complete? .............................................. 66

168. How will the Retired NFL Football Player know if someone has registered as a Derivative Claimant? ....................................................................................... 67

169. How will I know if other Derivative Claimants have registered for the same Retired NFL Football Player? ....................................................................................... 67

170. How will I know if the Retired NFL Football Player challenged my Derivative Claimant status? ............................................................................................. 67

171. What happens if one Derivative Claimant does not want to share the 1% Derivative Claimant Award equally with another Derivative Claimant? ..................................... 67

172. What law does the Claims Administrator use to analyze Derivative Claimant issues? ..... 68

173. Are there any rules covering appeals of Derivative Claimant challenge determinations? ............................................................................................... 68

VIII.    Lawyers ..................................................................................................... 69

174. Who is Class Counsel? ................................................................................... 69

175. Do I need a lawyer to represent me individually in this Program? ..................................... 69

176. How did a lawyer register me? .................................................................................... 69

177. What are Common Benefit Fees and how will Class Counsel be paid? ............................ 70

178. How will my individual lawyer be paid? .................................................................... 70

179. Can I terminate my relationship with my individual lawyer? ........................................ 70

180. How do I tell the Claims Administrator I have a new lawyer or that I do not have a lawyer? ..................................................................................................................... 70

## IX. Petitions for Deviation from Fee Cap ...................................................................... 72

181. What is a Petition for Deviation from the fee cap? ..................................................... 72

182. Will the attorney's fees be reduced to pay for common benefit attorneys? ................... 72

183. Where can I get a copy of the Rules Governing Petitions for Deviation from the Fee Cap? ..................................................................................................................... 72

184. Who are the Parties involved in a Petition for Deviation from the fee cap? ................... 72

185. Can a party to an Attorney's Lien Dispute file a Petition for Deviation? ...................... 72

186. How will a Petition for Deviation be resolved if there is also an Attorney's Lien asserted against the Settlement Class Member? ........................................................... 73

187. Who determines whether to grant a Petition for Deviation from the fee cap? ............... 73

188. Where do I file a Petition for Deviation from the fee cap? ........................................... 73

189. What is the deadline for filing a Petition for Deviation from the fee cap? ..................... 73

190. How do I serve documents related to a Petition for Deviation from the fee cap? ........... 74

191. What information must be included in a Petition for Deviation from the fee cap? .......... 74

192. What is a Memorandum in Support and when is it due? ............................................. 74

193. What information must be included in a Memorandum in Support? ............................. 75

194. What is a Response Memorandum and when is it due? ............................................... 76

195. What information must be included in a Response Memorandum? .............................. 76

196. What is a Reply Memorandum and when is it due? .................................................... 77

197. What information may be included in a Reply Memorandum? ..................................... 77

198. What if I miss the deadline to submit my Memorandum in Support, Response Memorandum, or Reply Memorandum? ...................................................................... 77

199. What information will the Magistrate Judge consider in making the Report and Recommendation or the final decision? ...................................................................... 77

200. If I am unrepresented in the Petition for Deviation proceedings, can I ask to have a lawyer appointed to represent me? ............................................................................. 78

201. Can I ask for a hearing on a Petition for Deviation from the fee cap? .......................... 78

202. How will I find out if the Magistrate Judge grants a hearing and when will the hearing be scheduled? .............................................................................................. 78

2/19/19

203. What happens at a hearing? ........................................................................ 78

204. Do I have to participate in the hearing? .................................................... 79

205. Do I have to be represented by a lawyer at the hearing?  Can I have a non-lawyer advocate? ....................................................................................................... 79

206. When will the Magistrate Judge issue a Report and Recommendation or a final decision? ........................................................................................................ 79

207. Can I object to the Magistrate Judge's Report and Recommendation? ............................ 79

208. Who makes the final decision resolving the Petition for Deviation from the fee cap? ....... 80

209. Can the District Judge or the Magistrate Judge change the final decision? ..................... 80

210. Can I appeal the final decision? ................................................................. 80

211. How will the withheld funds be paid after the final decision? ...................................... 80

## X.   Liens – Information for Settlement Class Members ................................ 81

212. What is a Lien? ...................................................................................... 81

213. What Liens will the Claims Administrator pay out of my Award? ................................. 81

214. What is a Medical Lien? .......................................................................... 81

215. What is an Attorney's Lien? ..................................................................... 81

216. What are the kinds of Other Liens recognized in the Settlement Program? ..................... 82

217. Are there any debts that the Claims Administrator will not pay? ................................... 82

218. Do Medical Liens have to be resolved out of my Award? ............................................ 82

219. What could happen if I do not resolve my Medical Liens? ........................................... 83

220. How do I know if there is a Lien against me? ......................................................... 84

221. What if I identify a Lien on my Claim Form? ........................................................ 85

222. How do I respond to the notice of Lien from the Settlement Program? ............................ 85

223. I received a notice from my healthcare insurer saying that it may have a Lien against me. What should I do? ...................................................................................... 85

224. Should I contact a lienholder to speed up the Medical Lien resolution process? ............... 85

225. I have medical coverage through Medicare. What should I do? ...................................... 86

226. What about Medicare Part C and Part D Liens? ...................................................... 86

227. I have medical coverage through Medicaid. What should I do? ...................................... 86

228. I (or my spouse) served in the military, so I have medical coverage through TRICARE or the Department of Veterans Affairs. What should I do? .............................. 87

229. I have medical coverage through the Department of Indian Health Services. What should I do? ................................................................................................. 87

230. What agreements and with which agencies has the Lien Resolution Administrator been able to secure on behalf of Settlement Class Members? ........................................ 87

231. I have a private medical insurance plan. Can they claim a Lien on my Award? ............... 88

2/19/19

232. What happens if I dispute a Lien? ............................................................. 88

233. What is a Dispute over an Attorney's Lien? ............................................... 89

234. Where can I get a copy of the Rules that apply to the Attorneys' Liens dispute resolution process? ........................................................................... 89

235. How does a Dispute over an Attorney's Lien get into the Attorneys' Liens dispute resolution process? .......................................................................... 89

236. Who are the Parties in an Attorney's Lien Dispute? ................................... 89

237. Who resolves an Attorney's Lien Dispute? ................................................ 89

238. Do I have to try to reach an agreement with the attorney who asserted a Lien against my Award? ......................................................................................... 90

239. How do I serve document submissions in the Attorneys' Liens dispute resolution process? ............................................................................................ 90

240. What do I need to submit in the Attorneys' Liens dispute resolution process? ................ 90

241. What is a Statement of Dispute and when is it due? .................................... 90

242. What information must be included in my Statement of Dispute? ................ 90

243. What is a Response Memorandum and when is it due? ............................... 91

244. What if I miss the deadline to submit my Statement of Dispute or Response Memorandum? ................................................................................................ 92

245. What information will the Magistrate Judge consider in making the Report and Recommendation or the final decision? ......................................................... 92

246. If I am unrepresented, can I ask to have a lawyer appointed to represent me in the Attorney's Lien Dispute? ............................................................................. 93

247. Can I ask for a hearing on the Attorney's Lien Dispute? ............................ 93

248. How will I find out if the Magistrate Judge grants a hearing on the Attorney's Lien Dispute and when will the hearing be scheduled? ....................................... 93

249. What happens at a hearing on an Attorney's Lien Dispute? ....................... 93

250. Do I have to participate in the hearing on the Attorney's Lien Dispute? ........... 94

251. Do I have to be represented by a lawyer at the hearing on the Attorney's Lien Dispute? Can I have a non-lawyer advocate? .............................................. 94

252. Can I withdraw a Dispute from the Attorneys' Liens dispute resolution process? ........... 94

253. How do I withdraw a Dispute from the Attorneys' Liens dispute resolution process? ..... 94

254. What information will the Magistrate Judge consider in making the Report and Recommendation or the final decision on the Withdrawals? ............................ 94

255. When will the Magistrate Judge issue a Report and Recommendation or a final decision? ...................................................................................................... 95

256. Can I object to the Magistrate Judge's Report and Recommendation? ............. 95

257. Who makes the final decision resolving an Attorney's Lien Dispute? ............... 95

258. Can the District Judge or the Magistrate Judge change the final decision on an Attorney's Lien Dispute? ........................................................................ 95

259. Can I appeal the final decision on an Attorney's Lien Dispute? ........................... 95

260. How will the withheld funds be paid after the final decision on an Attorney's Lien Dispute? ................................................................................................................. 96

261. How and when is a Lien paid? ............................................................................... 96

262. What happens if more than one Lien exists against a single Monetary Award or Derivative Claimant Award and there is not enough money to pay all of the Liens in full? ........................................................................................................................ 97

263. Will I be notified when the Claims Administrator pays a Lien? ............................ 97

264. Whom do I contact with questions about Liens? .................................................. 98

XI. Liens – Information for Lienholders ........................................................... 99

265. How does a lienholder notify the Settlement Program of a Medical Lien? .......... 99

266. How does a lienholder notify the Settlement Program of an Attorney's Lien or an Other Lien? ....................................................................................................... 99

267. What information must a government health insurer provide to assert a Medical Lien? .................................................................................................................... 100

268. What information is required from a private healthcare insurer to assert an alleged Lien? .................................................................................................................... 100

269. What information is required to assert an Attorney's Lien? ................................ 100

270. What information is required to assert an Other Lien? ....................................... 101

271. What happens after I submit the required information and documents for a valid Lien? .................................................................................................................... 102

272. What happens if a Settlement Class Member disputes a Medical Lien? ............. 102

273. What happens if a Settlement Class Member disputes an Attorney's Lien? ........ 102

274. What happens if a Settlement Class Member disputes an Other Lien? ............... 102

275. What is a Dispute over an Attorney's Lien? ....................................................... 103

276. Where can I get a copy of the Rules that apply to the Attorneys' Liens dispute resolution process? ............................................................................................. 103

277. How does a Dispute over an Attorney's Lien get into the Attorneys' Liens dispute resolution process? ............................................................................................. 103

278. Who are the Parties in an Attorney's Lien Dispute? ........................................... 103

279. Who resolves an Attorney's Lien Dispute? ........................................................ 103

280. Do I have to try to reach an agreement with the Settlement Class Member over the disputed Attorney's Lien? ................................................................................... 104

281. How do I serve document submissions in the Attorneys' Liens dispute resolution process? ............................................................................................................... 104

282. What do I need to submit in the Attorneys' Liens dispute resolution process? .............. 104

283. What is a Statement of Dispute and when is it due? ............................ 104

284. What information must be included in my Statement of Dispute? ................... 104

285. What is a Response Memorandum and when is it due? ....................... 105

286. What if I miss the deadline to submit my Statement of Dispute or Response Memorandum? ........................................................................... 105

287. What information will the Magistrate Judge consider in making the Report and Recommendation or the final decision? ................................. 106

288. Can I request a hearing on the Attorney's Lien Dispute? ................... 106

289. How will I find out if the Magistrate Judge grants a hearing on the Attorney's Lien Dispute and when will the hearing be scheduled? ................... 106

290. What happens at a hearing on an Attorney's Lien Dispute? ................ 106

291. Do I have to participate in the hearing on the Attorney's Lien Dispute? ........ 107

292. Can I withdraw a Dispute from the Attorneys' Liens dispute resolution process? ......... 107

293. How do I withdraw a Dispute from the Attorneys' Liens dispute resolution process? ... 107

294. What information will the Magistrate Judge consider in making the Report and Recommendation or the final decision on the Withdrawals? ................ 107

295. When will the Magistrate Judge issue a Report and Recommendation or a final decision? ............................................................................ 108

296. Can I object to the Magistrate Judge's Report and Recommendation? .......... 108

297. Who makes the final decision resolving the Attorney's Lien Dispute? ......... 108

298. Can the District Judge or the Magistrate Judge change the final decision on an Attorney's Lien Dispute? ..................................................... 108

299. Can I appeal the final decision on an Attorney's Lien Dispute? ................ 109

300. How will the withheld funds be paid after the final decision on an Attorney's Lien Dispute? ......................................................................... 109

301. Whom do I contact with questions about Liens? ............................ 109

**XII.    Payments** .................................................................... 110

302. I received a Notice of Monetary Award Claim Determination or Notice of Derivative Claimant Award Determination. Do I need to do anything else to receive payment of the award? ............................................... 110

303. When will I receive payment for my Monetary Award or Derivative Claimant Award? ..................................................................... 111

304. Who will issue the payment to me? ......................................... 112

305. How will the funds be issued by Citibank? ................................. 112

306. If I want to appeal only part of my Monetary Award amount, can I get paid for the rest before my appeal is final? ....................................... 112

307. Will my Monetary Award or Derivative Claimant Award be issued to my lawyer or directly to me? .................................................... 112

308. Can a Settlement Class Member assign rights to receive his or her Monetary Award or Derivative Claimant Award, or a portion of the Award, to a third party?................. 113

309. What is the fee cap?................................................................................ 113

310. What happens to those lawyers' fees and expenses that the Claims Administrator has withheld from Award payments? ................................. 114

311. What are claims service providers and are they covered by the fee cap? ........................ 114

312. Do lawyers have to send a statement of contingency fees and expenses to the Claims Administrator?................................................................. 114

313. What does the Claims Administrator do with the 5% Common Benefit Fund Holdback?................................................................. 114

**XIII.    Audit**................................................................................116

314. What is an audit? ................................................................. 116

315. How does an audit affect the regular processing of my claim? ........................................ 116

316. Why did I receive a Notice of Audit of Claim? ................................. 116

317. I received a Notice of Audit of Claim after I received a Notice of Monetary Award Claim Determination or a Notice of Denial of Monetary Award Claim. How does the audit affect my claim? ................................. 117

318. Are there any rules covering the audit of claims? ................................. 117

**XIV.    Bankruptcy** ................................................................................118

319. Why does the Settlement Program need to know whether I filed bankruptcy?.............. 118

320. How does the Settlement Program identify a Bankruptcy Issue Claimant?.................... 118

321. How does a current or prior bankruptcy case affect my Monetary Award Claim? ........ 118

322. What is the Bankruptcy Review process? ................................. 118

323. Which Bankruptcy Issue Claimants must provide Bankruptcy Documents? ................. 119

324. What Bankruptcy Documents are required?................................. 119

325. I received a Notice of Bankruptcy Question Delaying Payment. What does this mean? ................................. 120

326. My Bankruptcy Case is closed. Why am I required to provide Bankruptcy Documents? ................................. 120

327. I received a Bankruptcy Trustee Notice. What does this mean? ................................. 121

328. My bankruptcy proceeding is closed, and I cannot provide the required Bankruptcy Documents. What can I do?................................. 121

329. I received a Bankruptcy Trustee Communication Notice. What does this mean?........... 121

330. My Bankruptcy Trustee signed the Bankruptcy Trustee Release of Information form. Am I still required to provide Bankruptcy Documents? ................................. 121

**XV.    Appeals** ................................................................................122

331. Are there any rules covering appeals of claim determinations? ................................. 122

**332.** Can I appeal the Claims Administrator's determination of any amounts deducted from my Monetary Award or Derivative Claimant Award for Liens? ............................ 122

**333.** Who are the appellant and the appellee on an appeal of a claim? .................................... 122

**334.** Why was my claim remanded to the Claims Administrator? ............................................. 122

**335.** If my claim is remanded from an appeal to the Claims Administrator, what happens to the $1,000 Appeals Fee I paid? .......................................................................... 122

**336.** May the NFL Parties offer medical or other new evidence on appeal? ............................ 122

**337.** If a party offers new evidence in a brief on appeal, how does that affect the due date for the responding party's brief? How will I know whether there will be a remand or whether I need to address the new evidence in what I file? ........................................ 123

**338.** If new evidence added on appeal leads to remand to the Claims Administrator, can a party offer new evidence in every appeal to force a remand and re-review, either to get another chance at payment or denial, or to delay things? ........................................... 123

**339.** Will the Court review a decision by a Special Master allowing or excluding new evidence on a claim appeal? ............................................................................................... 123

**340.** How will remands of claims on appeal work? ................................................................. 124

    **(a)**    Will the re-review be assigned to the same AAP doctor who reviewed it before? ..... 124

    **(b)**    If the Special Master remands my claim, will the Claims Administrator or the AAP review the entire claim all over again? ................................................................... 124

    **(c)**    If an AAP doctor reviews the claim after remand, will that AAP doctor see the entire claim file on remand, or only the new evidence? ..................................... 124

    **(d)**    Does that mean that AAP doctor will see all the briefs on the appeal too? ................ 124

    **(e)**    On remand, does the original outcome set a floor for the result, or can the claim go down in value? ................................................................................................. 125

    **(f)**    What if the Claims Administrator did the original review and not the AAP. Do these same rules apply? ....................................................................................... 125

**341.** Can a claim be appealed again after the Special Master remands it and the Claims Administrator issues a new notice? ............................................................................... 125

2/19/19

your Claim Form or want to check the status of your claim and a Program Specialist will help you.

**82.  What is a Qualifying Diagnosis?**

These diagnoses are eligible for a Monetary Award:

(a)  Level 1.5 Neurocognitive Impairment;

(b)  Level 2 Neurocognitive Impairment;

(c)  Alzheimer's Disease;

(d)  Parkinson's Disease;

(e)  Death with CTE (for a Retired NFL Football Player who died before April 22, 2015); and

(f)  ALS.

Click here to read how these Qualifying Diagnoses are defined in Exhibit 1 of the Settlement Agreement.

**83.  Should I get a BAP exam or see a Qualified MAF Physician?**

This is up to you and depends on the Qualifying Diagnosis.

**Level 1.5 and Level 2:** If you are eligible for the BAP, you can get your diagnosis from either Qualified BAP Providers or a Qualified MAF Physician. The BAP exam is free.

**Alzheimer's Disease, Parkinson's Disease and ALS**: You must see a Qualified MAF Physician. These Qualifying Diagnoses cannot be made in the BAP.

**84.  What kind of physicians are authorized to make a Qualifying Diagnosis?**

This depends on the kind of Qualifying Diagnosis and when it was made. Click here for the Diagnosis and Review Table showing how this works. Find the kind of Qualifying Diagnosis in column 1 of Row A, B or C of the Diagnosis and Review Table. Then look at column 2 for when the diagnosis was made and column 3 for what kind of doctor has authority under the Settlement Agreement to make that diagnosis for purposes of a Monetary Award.

This is what the Diagnosis and Review Table shows:

(a)  Level 1.5, Level 2, Alzheimer's Disease, Parkinson's Disease, or ALS diagnosed before July 7, 2014, which was the date the Settlement Agreement was preliminarily approved by the Court: These must be made by what the Table calls Group 1 Specialists, who are:

Board-certified neurologists, board-certified neurosurgeons, or other board-certified neuro-specialist physicians, or otherwise qualified neurologists, neurosurgeons, or other neuro-specialist physicians. (See Section 6.3(d) of the Settlement Agreement, available by clicking here.)

(b) Level 1.5, Level 2, Alzheimer's Disease, Parkinson's Disease, or ALS diagnosed from July 7, 2014, through January 7, 2017, which was the date the Settlement Agreement became effective after all appeals: These must be made by what the Table calls Group 2 Specialists, who are:

Board-certified neurologists, board-certified neurosurgeons, or other board-certified neuro-specialist physicians. (See Section 6.3(c) of the Settlement Agreement, available by clicking here.)

NOTE: This is the same as the Group 1 Specialists listed above, except it does not include the "otherwise qualified neurologists, neurosurgeons, or other neuro-specialist physicians."

(c) Level 1.5, Level 2, Alzheimer's Disease, Parkinson's Disease, or ALS diagnosed on a Player while living but who died before January 7, 2017: These must be made by what the Table calls Group 3 Specialists, who are:

Board-certified neurologists, board-certified neurosurgeons, other board-certified neuro-specialist physicians, otherwise qualified neurologists, neurosurgeons, or other neuro-specialist physicians, or other physicians who have sufficient qualifications (a) in the field of neurology to make a Qualifying Diagnosis of Level 1.5 Neurocognitive Impairment, Level 2 Neurocognitive Impairment, Alzheimer's Disease, Parkinson's Disease, or ALS, or (b) in the field of neurocognitive disorders to make a Qualifying Diagnosis of Level 1.5 Neurocognitive Impairment or Level 2 Neurocognitive Impairment. (See Section 6.3(e) of the Settlement Agreement, available by clicking here.)

(d) Diagnoses made on Players after January 7, 2017:

(1) Level 1.5 or Level 2 Diagnoses: After January 7, 2017, these must be diagnosed either by Qualified BAP Providers in the BAP or by a Qualified MAF Physician;

(2) Alzheimer's Disease, Parkinson's Disease, or ALS: After January 7, 2017, these can be diagnosed only by a Qualified MAF Physician.

(e) Death with CTE: This can be diagnosed only by a board-certified neuropathologist after the Player's death.

*Reminder: You do not have to prove that the Qualifying Diagnosis was caused by playing football or from head injuries the Player experienced. The fact that a Player has a Qualifying Diagnosis is enough.*

**85. Who is a Qualified MAF Physician?**

A Qualified MAF Physician is a board-certified neurologist, board-certified neurosurgeon, or other board-certified neuro-specialist physician, who is part of a list of physicians approved by Co-Lead Class Counsel and the NFL Parties as authorized to make a Qualifying Diagnosis after January 7, 2017. A physician is not a Qualified MAF Physician until he or she has been approved by the Parties and has signed a contract with the Claims Administrator. The list of Qualified MAF Physicians eligible to make Qualifying Diagnoses is posted on the Settlement Website (click here to see it). Also click here to see the Diagnosis and Review Table, which summarizes Qualifying Diagnoses that Qualified MAF Physicians make and the diagnostic criteria they use to make those diagnoses.

**86. How do I get evaluated for a Qualifying Diagnosis if I do not already have one?**

You can make an appointment with either:

(a) Qualified BAP Providers (if you are BAP-eligible) who can determine whether you have Level 1.5 Neurocognitive Impairment or Level 2 Neurocognitive Impairment; or

(b) A Qualified MAF Physician, who can determine whether you have Level 1.5 Neurocognitive Impairment, Level 2 Neurocognitive Impairment, Alzheimer's Disease, Parkinson's Disease, or ALS.

*Reminder: BAP exams are free of charge. You are responsible for paying for an examination by a Qualified MAF Physician, but many Qualified MAF Physicians accept health insurance.*

**87. If my diagnosing physician is both a Qualified BAP Provider and a Qualified MAF Physician, how do I know if the diagnosis is made in or outside the BAP?**

Qualifying Diagnoses of Alzheimer's Disease, Parkinson's Disease and ALS cannot be made through the BAP. After January 7, 2017, a Qualifying Diagnosis of Alzheimer's Disease, Parkinson's Disease, or ALS must be made by a Qualified MAF Physician, even if he or she is also a Qualified BAP Provider. However, a Qualifying Diagnosis of Level 1.5 Neurocognitive Impairment or Level 2 Neurocognitive Impairment may be made after January 7, 2017, by Qualified BAP Providers or a Qualified MAF Physician.

Most of the Qualified BAP Providers are also Qualified MAF Physicians. If you or your lawyer scheduled a BAP exam with the BAP Administrator, then you will receive a BAP exam. If you have any doubt about in which capacity the physician is acting, then ask him or her during your visit.

**88. Does the physician who makes the Qualifying Diagnosis of a Retired NFL Football Player have to see and examine that Player in person?**

Yes, for all types of Qualifying Diagnoses other than Death with CTE, which only could have been diagnosed after the death of the Player.

The diagnosing physician who signs a Diagnosing Physician Certification Form for a diagnosis made on a living Retired NFL Football Player must have examined that Player in person. Section 8.2(a)(iii) of the Settlement Agreement allows a physician to make a Qualifying Diagnosis for a living Player relying on the records and work done by a prior physician and to use that earlier date as the diagnosis date *only if* that prior physician is deceased or incompetent *and only if* the new physician independently examines the Player. This means that other than those situations, a Qualifying Diagnosis of a living Player must be made by a physician based on his or her own examination and records, rather than the examination and records of someone else.

As a result:

(1) The diagnosing physician cannot base a Qualifying Diagnosis solely on a review of test results or the medical records of another physician; and

(2) The diagnosing physician must have met with the Player in person, rather than communicating with him by email, texts, letters, or on the phone.

There must be records in the Claim Package showing that the diagnosing physician who signed the Diagnosing Physician Certification Form submitted in the Claim Package followed both of these rules. If there is not, the Claim Package is incomplete. If the physician who signed the Diagnosing Physician Certification Form did not meet with the Player in person, that physician must do so to re-do the diagnosis, or the doctor who did meet the Player must sign the Diagnosing Physician Certification Form instead.

## 89.  Can the representative of a deceased Retired NFL Football Player get a Qualifying Diagnosis for that Player now?

For a Qualifying Diagnosis of Death with CTE, the Retired NFL Football Player had to have died before April 22, 2015, and received a post-mortem diagnosis of CTE from a board-certified neuropathologist before April 22, 2015, or within 270 days after the Player's death, if the Player died between July 7, 2014, and April 22, 2015. If you represent a deceased Player who received this type of post-mortem diagnosis, you should contact the neuropathologist who provided it and ask him or her to complete and sign a Pre-Effective Date Diagnosing Physician Certification Form attesting to the Qualifying Diagnosis. This is the only type of Qualifying Diagnosis that can be made after the Player died.

For Qualifying Diagnoses of Level 1.5 Neurocognitive Impairment, Level 2 Neurocognitive Impairment, Alzheimer's Disease, Parkinson's Disease and ALS, the Player had to have been diagnosed while he was living by a physician with the appropriate qualifications, which are described in the FAQ found here. If the Player received one of these diagnoses while he was alive, you should contact the physician who made the diagnosis and ask him or her to complete and sign a Pre-Effective Date Diagnosing Physician Certification Form.

**90. What should I do if I already have a Qualifying Diagnosis?**

You should submit a Claim Package for that Qualifying Diagnosis, including a Diagnosing Physician Certification Form and any medical records from the physician who made the diagnosis and the other required parts of a Claim Package. If you received a Qualifying Diagnosis through the BAP, the Claims Administrator already has your medical records and Diagnosing Physician Certification Form. However, you must submit a Claim Form before the Claims Administrator will review your claim for a Monetary Award determination.

*Reminder: Only Qualified BAP Providers and Qualified MAF Physicians can make Qualifying Diagnoses after January 7, 2017.*

**91. Does it matter when the Retired NFL Football Player was diagnosed?**

Yes. The Settlement Agreement sets out what kind of doctors are authorized to make a Qualifying Diagnosis, depending on when the diagnosis is made. (See Section 6.3 of the Settlement Agreement, available by clicking here.)

The Settlement Agreement controls what medical criteria applies when making a Qualifying Diagnosis and who reviews that diagnosis to see if it qualifies for a Monetary Award, whether the Appeals Advisory Panel of neurologists or the Claims Administrator, and how the review is to be done. That also depends on when the diagnosis is made. (See Section 6.4 and Exhibit 1 of the Settlement Agreement, available by clicking here.)

Click here for the Diagnosis and Review Table showing how this works. Find your diagnosis in Column 1 and then look in Columns 2 through 6 of that table for who makes the diagnosis, who reviews it and how.

**92. What dates matter for when the Qualifying Diagnosis is made?**

The Settlement Agreement divides diagnoses into these time periods. The Claims Administrator created a Diagnosis and Review Table to show how this works. Click here to see column 2 of the Table, which shows:

(a) Diagnoses made on or before July 1, 2011;

(b) Diagnoses made from July 2, 2011 through July 6, 2014;

(c) Diagnoses made from July 7, 2014, the date the Settlement Agreement was preliminarily approved by the Court, through January 7, 2017, which was the date the Settlement Agreement became effective after all appeals;

(d) Diagnoses made on Players while living but who died before January 7, 2017;

(e) Diagnoses made on Players after January 7, 2017; and

(f)  Diagnoses of Death with CTE made on Players who died on or before April 22, 2015, which was the date the Court finally approved the Settlement Agreement but before all appeals were done.

**93.  How is the date of a Qualifying Diagnosis determined?**

The physician making a Qualifying Diagnosis of a Retired NFL Football Player must determine and verify the date on which that Qualifying Diagnosis was made. This date is important under the Settlement Agreement. It affects the amount of a Monetary Award, because the younger a Player is at the time of the Qualifying Diagnosis, the larger the award.

The diagnosing physician uses his or her professional medical judgment in deciding when the Player had the conditions amounting to a Qualifying Diagnosis under Exhibit 1 to the Settlement Agreement. There are some basic rules about this:

(a)  *Death with CTE:* For these claims, the date of the Qualifying Diagnosis is the date of the Player's death, even though the diagnosis is not made until after the Player dies. The Monetary Award is based on the Player's age when he died.

(b)  *General Rule for the other Qualifying Diagnoses:* The date of a Qualifying Diagnosis other than Death with CTE is when the diagnosing physician has enough information and materials, including test results, to be able to render a medically sound and reliable judgment about the Player's condition, the way a physician normally does in his or her clinical practice. In some cases, using sound medical judgment, a physician may conclude that a Qualifying Diagnosis existed at some prior point in time.

(c)  *Are there other cases when the Qualifying Diagnosis might be before the date the physician personally examines the Player?* Maybe. The unique facts and circumstances of a particular claim may allow the diagnosis date to be before the date the diagnosing physician personally examined the Player. Here are the rules:

(1)  *Diagnosing Physician is deceased or legally incompetent:* Section 8.2(a)(iii) of the Settlement Agreement allows use of the date of an earlier Qualifying Diagnosis to calculate a Monetary Award where: (a) the Player received a Qualifying Diagnosis; (b) the diagnosing physician died or was deemed by a court to be legally incapacitated or incompetent before the January 7, 2017 Effective Date or before completing a Diagnosing Physician Certification Form; (c) a separate qualified physician made an independent examination and reviewed the Player's medical records that formed the basis of the Qualifying Diagnosis; and (d) that physician found the same Qualifying Diagnosis. Here, the Settlement Agreement allows a later physician to adopt the date of diagnosis based upon the earlier medical records of another physician.

(2)  *88 Plan diagnoses:* If the diagnosis was made by an 88 Plan neutral physician who cannot or will not sign the Diagnosing Physician Certification Form, the date of the diagnosis made as part of the 88 Plan Independent Medical Examination ("IME")

may be used where: (a) the Player sees a Qualified MAF Physician for an independent examination or Qualified BAP Providers for a BAP exam; (b) the Player provides the Qualified MAF Physician or Qualified BAP Providers with all records of the prior 88 Plan IME diagnosis in his possession or to which he has access and all records of evaluation and treatment for that impairment between the dates of the 88 Plan IME and the Qualified MAF Physician appointment or BAP exam in his possession or to which he has access; (c) the Qualified MAF Physician performs an independent examination or the Qualified BAP Providers perform a BAP exam of the Player and review the additional records provided by the Player; and (d) if the Qualified MAF Physician or Qualified BAP Providers find the same Qualifying Diagnosis – both as of the date of the independent examination and the prior IME for the 88 Plan – then the date of Qualifying Diagnosis will be the date of the 88 Plan IME.

This exception applies only to diagnoses made through the 88 Plan. If you received a diagnosis through another NFL disability plan, such as the Neuro-Cognitive Disability Benefit Plan or the NFL Player Supplemental Disability Plan, contact the Claims Administrator to see if the date of diagnosis made through that plan can be used as the date of the Qualifying Diagnosis for purposes of a Monetary Award. The Claims Administrator will review your case with Co-Lead Class Counsel and Counsel for the NFL Parties.

(3) *Medical Records unavailable:* If the Player died before the January 7, 2017 Effective Date of the Settlement Agreement and the medical records reflecting the Qualifying Diagnosis are unavailable because of a force majeure type event or for some other reason the Claims Administrator deems acceptable, the date of the Qualifying Diagnosis will be the earlier of: (1) the date of the onset of the Qualifying Diagnosis reflected in other available contemporaneous medical records or the death certificate; or (2) the date of the Player's death provided on the death certificate.

(4) *Other instances where the earlier diagnosing doctor or medical records are not available:* If you face other situations not covered by the terms of Section 8.2(a)(iii) of the Settlement Agreement and not involving a Plan 88 IME, then contact the Claims Administrator and explain the problem you have. There may be other circumstances in which a diagnosis by a later physician might adopt the earlier date of a diagnosis by another doctor.

(5) *Sound clinical medical judgment:* Also, the physician making a diagnosis may conclude, in the exercise of his or her sound medical judgment, that he or she has enough information from personal examination, medical records from other healthcare providers, medical history, corroborating evidence from non-family members and other information that medical specialists rely on in their clinical practices, to form a sound medical judgment that the Player's Qualifying Diagnosis conditions existed at a date earlier than the date of a personal examination of the Player by the physician making the diagnosis and signing the Diagnosing Physician

Certification Form. The Settlement Class Member is best served by having the doctor who made an earlier diagnosis sign the Diagnosing Physician Certification Form. But there may be situations where the diagnosing physician can pinpoint an earlier date that is based on sound clinical judgment and best medical practices.

Any such diagnosis will be strictly scrutinized in the claims review process. The Claims Administrator may request additional information and/or documents to support the claimed diagnosis date and prevent misrepresentations of material fact in connection with the claim.

**94.  Which diagnostic criteria must a physician use when making my Qualifying Diagnosis? When and to what diagnoses does the "generally consistent" criteria apply?**

The Diagnosis and Review Table shows how this works; click here to review the Table.

For diagnoses of Level 1.5 and Level 2 Neurocognitive Impairment made in the BAP, Qualified BAP Providers follow the diagnostic criteria set forth in Exhibits 1 and 2.

Diagnoses of Level 1.5 and 2 Neurocognitive Impairment made outside the BAP must show that the evaluation and evidence behind those diagnoses are "generally consistent" with the diagnostic criteria set for Qualified BAP Providers and outlined in Exhibits 1 and 2.

Diagnoses of Alzheimer's Disease, Parkinson's Disease, ALS and Death with CTE are not made in the BAP and are all made following the diagnostic criteria set out in Exhibit 1 (and the "generally consistent" standard does not apply).

**95.  What does "generally consistent" mean?**

Something is "generally consistent with" something else if the two things have more elements or characteristics in common with each other than they have elements or characteristics that differ from each other. The common elements or characteristics must predominate over the uncommon ones.

The Settlement Agreement states specifically that diagnostic criteria for a diagnosis made outside the BAP do not have to be identical to the diagnostic criteria for a diagnosis made in the BAP. The diagnostic criteria, or the medical rules the doctor must follow to make the diagnosis, outside the BAP do not have to be 100% the same as the Exhibit 1 criteria.

With this said, the closer a set of diagnostic criteria match those specified in Exhibit 1, the more "consistent" it will be with Exhibit 1.

A claim based on a Qualifying Diagnosis is most solid when its elements match closely those required in Exhibit 1. For example, where Exhibit 1 requires documentary evidence or a third-party sworn affidavit corroborating functional impairment, or neuropsychological testing, the claim of a Qualifying Diagnosis is most solid when its Claim Package contains documentary evidence or a third-party sworn affidavit corroborating functional impairment and proof of

2/19/19

# Exhibit 7



# NFL CONCUSSION SETTLEMENT
*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

## FILED APPEAL ALERT
### DATE OF NOTICE: **July 15, 2019**

### I. SETTLEMENT CLASS MEMBER INFORMATION

| Settlement Program ID | 950012548 | | |
|---|---|---|---|
| **Name:** | First <br> Robin | M.I. <br> B | Last <br> Cornish |
| **Settlement Class Member Type** | Representative Claimant | | |
| **Lawyer** | O'Hanlon, Demerath & Castillo | | |

### II. APPEAL PROCESS EXPLANATION: ISSUE(S) APPEALED

This Notice is an official communication from the Claims Administrator for the NFL Concussion Settlement Program. The Settlement Class Member (the "Appellant") has filed a timely appeal of this claim. This Notice begins your process under the Rules Governing Appeals of Claim Determinations adopted by the Special Masters. The Appellant's reasons for the appeal are identified below.

| Date of Appeal | Reason for Appeal |
|---|---|
| 7/12/19 | Class Member files the attached written statement in support of this appeal and respectfully requests that the Claims Administrator's denial of this claim be reversed and remanded for a calculation of the Class Member's Monetary Award because the Claims Administrator erred in concluding that the Amended Settlement Agreement required Class Member to submit proof that the board-certified neuropathologist who provided a post-mortem diagnosis of CTE made the diagnosis on or before 4/22/15. (If the Amended Settlement Agreement [ECF 6481] is construed to require a diagnosis on or before 4/22/15, Class Member reserves the right to seek relief from the Court pursuant to both Rule 60 and the Court's inherent authority to amend the judgment in this case in order to implement the settlement.) |

### III. APPEAL SCHEDULE

Section 9.7(b) of the Settlement Agreement and the Rules permit the Appellee(s) to file a written opposition within 30 days of this Filed Appeal Alert. Under Section 9.7(c), Class Counsel may file a written statement in support of or opposition to the appeal within 15 days of the date of this Filed Appeal Alert or no later than 15 days after the NFL Parties post its written opposition to the appeal. These submissions must not exceed 10 double-spaced pages. The Settlement Class Member and the NFL may submit a reply no later than 15 days after Class Counsel posts its written statement, and the reply cannot exceed four double-spaced pages. The claim will then proceed to the Special Masters for a decision on this appeal.

| Appeal Document | Deadline to Submit |
|---|---|
| NFL Opposition Memorandum | 8/14/19 |
| Class Counsel Statement (optional) | 7/30/19 <br> Or <br> 15 days after the NFL Parties post the opposition memorandum |

| Reply to Class Counsel's Statement (optional) | 15 days after Class Counsel submits its statement |
|---|---|

You may use the NFL Settlement Portal to submit any appeal documents. If you do not use the Portal, you may submit documents in any of the following ways:

| **By Mail:**<br>(must be postmarked on or before the appeal deadline date) | NFL Concussion Settlement<br>Claims Administrator<br>P.O. Box 25369<br>Richmond, VA 23260 |
|---|---|
| **By Overnight Delivery:**<br>(must be placed with the carrier on or before the deadline date) | NFL Concussion Settlement<br>c/o BrownGreer PLC<br>250 Rocketts Way<br>Richmond, VA 23231 |
| **By Hand Delivery:**<br>(must be delivered on or before the deadline date) | NFL Concussion Settlement<br>c/o BrownGreer PLC<br>250 Rocketts Way<br>Richmond, VA 23231 |

If you would like to receive and submit forms like this one electronically online rather than on paper, go to www.NFLConcussionSettlement.com/Login.aspx, click the Create New User button and follow the instructions there to establish a secure online portal account with us, if you do not already have one.

## IV. HOW TO CONTACT US WITH QUESTIONS OR FOR HELP

If you are represented by a lawyer, consult with your lawyer if you have questions or need assistance. If you are unrepresented and have any questions about this Notice or need help, contact us at 1-855-887-3485 or send an email to ClaimsAdministrator@NFLConcussionSettlement.com.  If you are a lawyer, call or email your designated Firm Contact for assistance. For more information about the Settlement Program, visit the official website at www.NFLConcussionSettlement.com, where you can read or download the Rules Governing Appeals of Claim Determinations, Frequently Asked Questions about the Settlement, the complete Settlement Agreement and other helpful materials.



# Exhibit 8

## NFL Parties' Opposition to Appeal of
## Claim Denial by Representative Claimant Robin Cornish

Robin Cornish, Representative Claimant for her late husband, Frank Cornish, submitted a claim on February 5, 2019—the day before the deadline for pre-Effective Date claims—for a Qualifying Diagnosis of Death with CTE purportedly rendered by neuropathologist Dr. Ronald L. Hamilton. (*See* Claim Form; Diagnosing Physician Certification.) In support of her claim, Ms. Cornish submitted (1) a Diagnosing Physician Certification from Dr. Hamilton, reflecting a purported Qualifying Diagnosis of Death with CTE (Diagnosing Physician Certification at 6); (2) an undated letter from Dr. Hamilton, purporting to diagnose Mr. Cornish with CTE (Hamilton Letter); (3) a death certificate indicating that Mr. Cornish died on August 23, 2008 and listing Mr. Cornish's cause of death as "SUDDEN ADULT DEATH WITH EVIDENCE OF HYPERTENSIVE HEART DISEASE" (Death Certificate); and (4) an autopsy report completed by Dr. Marc A. Krouse, indicating the same cause of death listed in Mr. Cornish's death certificate (*see* Autopsy Report at 1).

On February 20, 2019, the Claims Administrator issued a Notice of Request for Additional Documents advising Ms. Cornish that her Claim Package was incomplete because Ms. Cornish did not submit any medical records reflecting the Qualifying Diagnosis. (*See* Notice of Request for Additional Documents.) In the section titled "Additional Explanation of What is Missing," the Claims Administrator explained that Ms. Cornish's Claim Package materials did not show that Dr. Hamilton administered a post-mortem examination in which he diagnosed Mr. Cornish with CTE prior to the Settlement Final Approval Date of April 22, 2015, as required by the Settlement Agreement. (*See id.*) In response to the Notice of Request for Additional Documents, counsel for Ms. Cornish sent a letter to the Claims Administrator asserting that no additional documents were required because the Settlement Program FAQs provide that the date of Mr. Cornish's Qualifying Diagnosis is the date of his death. (*See* May 6, 2019 email from David J. Campbell to the Claims Administrator at 1-2.) On June 25, 2019, the Claims Administrator denied Ms. Cornish's claim because she failed to submit any additional Claim Package materials to show that Dr. Hamilton actually rendered a diagnosis of CTE prior to the Final Approval Date, as required by the Settlement Agreement. (*See* Notice of Denial of Monetary Award Claim ("Denial Notice") at 1.)

On appeal, Ms. Cornish does not contend that Dr. Hamilton diagnosed Mr. Cornish with CTE based on a post-mortem examination prior to April 22, 2015. Instead, she argues that: (1) the still unspecified date that Dr. Hamilton actually diagnosed Mr. Cornish does not matter, because the diagnosis date for any Retired NFL Football Player diagnosed with Death with CTE purportedly is the date of the player's death; and (2) if the Claims Administrator determines that a diagnosing physician must render a diagnosis of Death with CTE prior to April 22, 2015, the amended Settlement Agreement purportedly violates Settlement Class Members' due process rights because it was a change to the original Settlement Agreement without proper notice. (*See* Written Statement in Support of Class Member's Appeal of the Claims Administrator's Notice of Denial of Monetary Award Claim ("Appeal").)[1]

---

[1]    With knowledge that Mr. Cornish and other clients never received a diagnosis of CTE prior to the Final Approval Date, counsel for Ms. Cornish has engaged in a lengthy history of legal gamesmanship concerning the deadline for Qualifying Diagnoses of Death with CTE. On August 15, 2017, counsel for Ms. Cornish, on behalf of client Yvonne Sagapolutele, filed a Motion to Modify the Amended Final Order and Judgment, in which she alleged that the Settlement Agreement's deadline to obtain a Qualifying Diagnosis of Death with CTE was "imposed after the deadline to opt out and without notice to Class Members." (Mem. of Law in Supp. of Absent Class Member

The NFL Parties respectfully oppose the Appeal because it is utterly unfounded, and there is no question this claim must be denied. The Settlement Agreement clearly requires that a board-certified neuropathologist render a Qualifying Diagnosis of Death with CTE prior to April 22, 2015, and Ms. Cornish has not provided—and undoubtedly cannot provide—any evidence that Dr. Hamilton rendered such a diagnosis prior to that date. In addition, the amended Settlement Agreement's requirement that a Qualifying Diagnosis of Death with CTE must be rendered prior to April 22, 2015 does not violate Settlement Class Members' due process rights; to the contrary, it expanded the deadline for Death with CTE diagnoses compared to the original Settlement Agreement to the benefit of Settlement Class Members.

For these reasons, and those set forth below, Ms. Cornish's appeal should be denied.

### I. There Is No Evidence That Dr. Hamilton Rendered a Qualifying Diagnosis of Death With CTE Prior to April 22, 2015, as Required by the Settlement Agreement

For a Qualifying Diagnosis of Death with CTE, the Settlement Agreement explicitly requires that a diagnosing physician render the diagnosis prior to the Settlement's Final Approval Date of April 22, 2015. Specifically, Section 2.1(aa) of the Settlement Agreement provides that the Qualifying Diagnosis of "Death with CTE is defined in Exhibit 1," and Exhibit 1 states that the definition of Death with CTE is: "For Retired NFL Football Players who died prior to the Final Approval Date, *a post-mortem diagnosis of CTE made by a board-certified neuropathologist prior to the Final Approval Date*, provided that a Retired NFL Football Player who died between July 7, 2014 and the Final Approval Date shall have until 270 days from his date of death to obtain such a postmortem diagnosis." (Settlement Agreement, Ex. A-1 at 5 § 5 (emphasis added).) Section 6.3(f) of the Settlement Agreement reiterates that requirement, stating that "[a] Qualifying Diagnosis of Death with CTE shall be made only for Retired NFL Football Players who died prior to the Final Approval Date, through *a post-mortem diagnosis made by a board-certified neuropathologist prior to the Final Approval Date* . . . ." (*See id.* at 6.3(f) (emphasis added).)

In the Appeal, Ms. Cornish argues that a Diagnosing Physician is not required to actually render a Qualifying Diagnosis of Death with CTE prior to April 22, 2015 because "the only date that is relevant in determining the date of a Qualifying Diagnosis for Death with CTE is the date of the Player's death." (Appeal at 5.) As support for this argument, Ms. Cornish cites Settlement FAQ 99 (formerly Settlement FAQ 93), which states in part:

> *Death with CTE*: For these claims, the date of the Qualifying Diagnosis is the date of the Player's death, even though the diagnosis is not made until after the Player dies. The Monetary Award is based on the Player's age when he died.

---

and Pl. Yvonne Sagapolutele's Mot. to Modify the Am. Final Order and J. at 18, 12-md-2323, ECF No. 8263-2 (the "Motion to Modify the Amended Final Order and Judgment").) After the Parties fully briefed that motion, the Court denied the motion without prejudice to Ms. Sagapolutele's (or other similarly situated Settlement Class Members') ability to raise the issue at a later time if she filed a Death with CTE claim that would have been valid but for the deadline. (Order, 12-md-2323, ECF No. 8557.) Counsel then waited over 16 months to file Ms. Cornish's Death with CTE claim, which relies on an *undated* letter from Dr. Hamilton, with the clear intention of obfuscating the timing and nature of Dr. Hamilton's purported CTE diagnosis.

(Settlement FAQ 99.)

Ms. Cornish's argument rests on willful ignorance of the Settlement Agreement and a misinterpretation of Settlement FAQ 99. Specifically, the Settlement Agreement plainly requires that, "[f]or Retired NFL Football Players who died prior to the Final Approval Date, a ***post-mortem diagnosis***" of Death with CTE must be "made by a board-certified neuropathologist ***prior to the Final Approval Date***." (Settlement Agreement Ex. A-1 at 5 § 5 (emphasis added).) If, as Ms. Cornish argues, the Settlement Agreement required only that a Retired NFL Football Player died prior to the Final Approval Date in order for a diagnosis made at *any unlimited future date* to be timely, the Settlement Agreement would not include subsequent language providing that a player who died between July 7, 2014 and the Final Approval Date "shall have until 270 days from his date of death to obtain such a postmortem diagnosis." (*Id.*)

Moreover, Settlement FAQ 99 does not concern the date by which a Diagnosing Physician must have *actually made* a Death with CTE diagnosis, but instead concerns the date of diagnosis ***for compensation purposes***. The Parties to the Settlement Agreement did not wish to reduce the compensatory award of a decedent who otherwise would have aged between death and the neuropathological examination. The Death with CTE portion of Settlement FAQ 99 confirms this, as it clearly states that "[t]he ***Monetary Award*** is based on the Player's age when he died." (Settlement FAQ 99 (emphasis added).)

Ms. Cornish has not provided—and presumably cannot provide—any evidence that Dr. Hamilton rendered his purported Qualifying Diagnosis of Mr. Cornish prior to the Final Approval Date of April 22, 2015. In fact, Dr. Hamilton's letter containing the purported diagnosis does not contain any dates whatsoever, and Dr. Hamilton's Diagnosing Physician Certification form only lists the date of Mr. Cornish's death (August 23, 2008) as the date of diagnosis. (*See* Hamilton Letter; Diagnosing Physician Certification.) Accordingly, Ms. Cornish's appeal must be denied, and her claim denial upheld, for this fundamental reason alone.

## II.    The Settlement Agreement Requirement That a Death With CTE Diagnosis Be Rendered Prior to April 22, 2015 Does Not Violate Settlement Class Members' Due Process Rights

Fully aware that her purported Death with CTE diagnosis is untimely because it was not rendered prior to the Final Approval Date of April 22, 2015, Ms. Cornish argues that such requirement somehow violates her right to due process. Specifically, Ms. Cornish argues that the Special Master should consider the arguments in Yvonne Sagapolutele's August 15, 2017 Motion to Modify the Amended Final Order and Judgment to remove the deadline to obtain the Qualifying Diagnosis, which Motion was denied without prejudice by Judge Brody with instruction that Ms. Sagapolutele "must first show that she would be entitled to recover but for the Death with CTE diagnosis deadline," and then may raise the due process argument in the claims appeal process. (Order, 12-md-2323, ECF No. 8557.) Ms. Cornish's argument that the amendments to the Settlement Agreement somehow violated her due process rights is meritless.

Relying on Ms. Sagapolutele's prior Motion to Modify the Amended Final Order and Judgment, Ms. Cornish alleges that the Settlement Agreement's deadline to obtain a Qualifying Diagnosis of Death with CTE was "surreptitiously added to the Amended Settlement Agreement" after the deadline to opt out and without notice to Settlement Class Members. (Appeal at 6.) Ms. Sagapolutele's prior motion argues that absent class members' due process rights were violated by the change, and that the Court should remedy the violation by modifying the Settlement Agreement

to remove the deadline for a Qualifying Diagnosis of Death with CTE.  (*See* Motion to Modify the Amended Final Order and Judgment at 15-24.)

In response, the NFL Parties, too, incorporate all of the arguments set forth in their Opposition to that Motion, attached in full as Exhibit 1.[2]  As the NFL Parties explained in their Opposition, far from injuring Settlement Class Members' rights by "imposing" a new deadline for a Qualifying Diagnosis of Death with CTE, the amendments to the Settlement Agreement *extended* the deadline to obtain the Qualifying Diagnosis from the Preliminary Approval Date to the Final Approval Date (*see id.* at 10-11), and provided a 270-day grace period in which Settlement Class Members who died between the Preliminary Approval Date and the Final Approval Date could obtain a Qualifying Diagnosis (*see id.* at 6, 10).  Accordingly, the relevant changes solely benefited absent class members and in no way violated their due process rights.  (*See id.* at 9-13.)

For these additional reasons, Ms. Cornish's appeal must be denied, and her claim denial must be upheld.

### Conclusion

The denial of Ms. Cornish's claim was required under the judicially-approved terms of the Settlement Agreement.  Because Ms. Cornish does not present clear and convincing evidence that such determination was in error, the Special Master should affirm denial of the claim.


Dated:  August 14, 2019                    Respectfully submitted,

                                           PAUL, WEISS, RIFKIND,
                                              WHARTON & GARRISON LLP

                                           */s/ Brad S. Karp*_____
                                           Brad S. Karp
                                           Bruce Birenboim
                                           Claudia Hammerman
                                           Lynn B. Bayard
                                           Douglas M. Burns
                                           1285 Avenue of the Americas
                                           New York, New York 10019-6064
                                           Telephone:  (212) 373-3000
                                           Facsimile:  (212) 757-3990
                                           Email:  bkarp@paulweiss.com

                                           *ATTORNEYS FOR THE*
                                           *NATIONAL FOOTBALL LEAGUE*
                                           *AND NFL PROPERTIES LLC*

---

[2]     (*See* Ex. 1, Mem. of Law of the National Football League and NFL Properties LLC in Opp. to Settlement Class Member Yvonne Sagapolutele's Mot. to Modify the Am. Final Order and J., 12-md-2323, ECF No. 8430.)

# EXHIBIT 1

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br><br>MDL No. 2323<br><br>Hon. Anita B. Brody |
| Kevin Turner and Shawn Wooden, *on behalf of themselves and others similarly situated*,<br><br>                              Plaintiffs,<br><br>                    v.<br><br>National Football League and NFL Properties, LLC, successor-in-interest to NFL Properties, Inc.<br>                              Defendants. | Civ. Action No.: 14-cv-00029-AB |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | Hon. Anita B. Brody |

## MEMORANDUM OF LAW OF THE NATIONAL FOOTBALL LEAGUE AND NFL PROPERTIES LLC IN OPPOSITION TO SETTLEMENT CLASS MEMBER YVONNE SAGAPOLUTELE'S MOTION TO MODIFY THE <u>AMENDED FINAL ORDER AND JUDGMENT</u>

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

Preliminary Statement ............................................................................................ 1

Background ............................................................................................................. 4

     A.    Parties ................................................................................................. 4

     B.    Procedural Background ....................................................................... 4

Argument ............................................................................................................... 8

I.     THE PARTIES WERE NOT REQUIRED TO NOTIFY THE SETTLEMENT
     CLASS ABOUT THE AMENDMENTS ............................................................ 8

     A.    The Amendments Did Not Require New Notice ................................... 9

     B.    The Original Settlement Notice Was Sufficient .................................. 11

II.    SAGAPOLUTELE IS NOT ENTITLED TO REWRITE THE SETTLEMENT
     AGREEMENT ................................................................................................ 13

Conclusion ........................................................................................................... 17

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Adelson* v. *Ocwen Fin. Corp.*,
  621 F. App'x 348 (7th Cir. 2015) ....................................................................14

*In re Baby Prods. Antitrust Litig.*,
  708 F.3d 163 (3d Cir. 2013) ........................................................................9, 11

*Blue Diamond Coal Co.* v. *Trustees of UMWA Combined Ben. Fund*,
  249 F.3d 519 (6th Cir. 2001) ..........................................................................16

*In re Diet Drugs Prods. Liab. Litig.*,
  200 F. App'x 95 (3d Cir. 2006) .......................................................................14

*In re Diet Drugs Prods. Liab. Litig.*,
  No. 99-cv-20593, 2010 WL 2735414 (E.D. Pa. July 2, 2010) ...................9, 11, 13

*F.A.C., Inc.* v. *Cooperativa de Seguros de Vida de Puerto Rico*,
  449 F.3d 185 (1st Cir. 2006) ...........................................................................17

*Federman* v. *Artzt*,
  339 F. App'x 31 (2d Cir. 2009) ...................................................................14, 15

*In re Four Seasons Sec. Laws Litig.*,
  525 F.2d 500 (10th Cir. 1975) .........................................................................15

*Harris* v. *Graddick*,
  615 F. Supp. 239 (N.D. Ala. 1985) ...............................................................9, 11

*Hensley* v. *Alcon Labs., Inc.*,
  277 F.3d 535 (4th Cir. 2002) ...........................................................................17

*Inmates of Suffolk Cty. Jail* v. *Rufo*,
  No. 71-cv-00162, 2015 WL 6958070 (D. Mass. Nov. 10, 2015) ...........................16

*Kokkonen* v. *Guardian Life Ins. Co. of Am.*,
  511 U.S. 375 (1994) ........................................................................................17

*In re Linerboard Antitrust Litig.*,
  223 F.R.D. 357 (E.D. Pa.), *amended*, 223 F.R.D. 370 (E.D. Pa. 2004) ................17

*Matthews, Wilson & Matthews, Inc.* v. *Capital City Bank*,
  614 F. App'x 969 (11th Cir. 2015) ...................................................................15

|  | **Page(s)** |
| --- | --- |

*In re Nat'l Football League Players' Concussion Injury Litig.*,
307 F.R.D. 351 (E.D. Pa. 2015), *amended*, No. 12-MD-02323, 2015 WL
12827803 (E.D. Pa. May 8, 2015) ................................................................. passim

*In re Nat'l Football League Players Concussion Injury Litig.*,
821 F.3d 410 (3d Cir. 2016), *amended* (May 2, 2016) ...........................................7

*In re Nissan Motor Corp. Antitrust Litig.*,
552 F.2d 1088 (5th Cir. 1977) ..............................................................................11

*Orlando Residence, Ltd.* v. *Hilton Head Hotel Inv'rs*,
No. 89-cv-0662, 2013 WL 1103027 (D.S.C. Mar. 15, 2013)................................15

*In re PaineWebber Ltd. P'ships Litig.*,
171 F.R.D. 104 (S.D.N.Y 1997) ............................................................................11

*Roman-Oliveras* v. *Puerto Rico Elec. Power Auth.*,
797 F.3d 83 (1st Cir. 2015) ..................................................................................17

*Sawka* v. *Healtheast, Inc.*,
989 F.2d 138 (3d Cir. 1993)..................................................................................15

## OTHER AUTHORITIES

11 Fed. Prac. & Proc. Civ. § 2852 (3d ed.)...................................................................17

20 Fed. Prac. & Proc. Deskbook § 104........................................................................16

Fed. R. Civ. P. 23 .......................................................................................................2, 9

Fed. R. Civ. P. 60 ....................................................................................1, 3, 14, 15, 16

Newberg on Class Actions § 1:5 (5th ed.) ......................................................................9

Newberg on Class Actions § 8:17 (5th ed.) ....................................................................9

Newberg on Class Actions § 8:36 (5th ed.) ....................................................................9

Newberg on Class Actions § 8:7 (5th ed.) ......................................................................9

Newberg on Class Actions § 18:40 (5th ed.) ................................................................15

Defendants National Football League and NFL Properties LLC (collectively, the "NFL Parties") respectfully submit this memorandum of law in opposition to Settlement Class Member Yvonne Sagapolutele's ("Sagapolutele's") motion to modify the Amended Final Order and Judgment (the "Motion") (ECF No. 8263).

<u>**Preliminary Statement**</u>

Sagapolutele, an absent Settlement Class Member and representative of the estate of Retired NFL Football Player Pio Sagapolutele, brings this motion, ostensibly as a matter of due process, seeking significant revisions to the Final Order and Judgment that the Court entered more than two years ago approving the Class Action Settlement Agreement in this case.[1]  But no due process violation has occurred, and Sagapolutele has shown no justification for this Court to take the extraordinary step of rewriting a settlement agreement approved by both this Court and the Third Circuit that has been in place for years.  Sagapolutele's motion should therefore be denied.

The primary ground for Sagapolutele's motion is the amendments to the Settlement Agreement in February 2015, which expanded the definition of the Death with CTE Qualifying Diagnosis in response to the Court's directives.  Contrary to fact, Sagapolutele contends that the amendment imposed a deadline to obtain a Qualifying Diagnosis of Death with CTE, and "[b]ecause this change was made both without notice to absent class members and after the deadline to opt out of the settlement, [her] due process rights were violated."  (Pl. Mem. at 15.)  Sagapolutele asks this Court, pursuant to Rule 60 of the Federal Rules of Civil Procedure and the Court's inherent power, to amend the Final Order and Judgment to "remov[e] the deadline to obtain a Qualifying Diagnosis of Death with CTE."  (Pl. Mem. at 1.)

---

[1]    Unless otherwise defined, the capitalized terms used in this memorandum have the same meaning as those in the Settlement Agreement.

Sagapolutele's motion has no basis in fact or law for several reasons.

*First*, the amendments in question concerned an *expansion* of settlement benefits to the Settlement Class—namely, the expansion of the Qualifying Diagnosis of Death with CTE to include Retired NFL Football Players who died with CTE between Preliminary and Final Approval of the Settlement Agreement; the original agreement limited the Qualifying Diagnosis to those who died *prior* to Preliminary Approval.  It is well settled that additional notice to a class is necessary only when amendments to a settlement agreement are "materially adverse" to the class, not where, as here, they benefit the class.  Neither the Due Process Clause nor Rule 23 of the Federal Rules of Civil Procedure require notice in the event of beneficial, or even neutral, amendments.  As this Court correctly held in granting Final Approval of the Settlement Agreement over various objections to this very amendment (although on a different ground), no additional notice was required in this case for that very reason.

*Second*, contrary to Sagapolutele's contentions regarding lack of notice, the class notice in connection with the original settlement agreement was all that was necessary.  The Short- and Long-Form notices distributed to the Settlement Class Members made clear, as this Court and the Third Circuit held, that an award of Death with CTE would *not* be available to all Retired NFL Football Players diagnosed with CTE.  Rather, only particular cases of CTE meeting "certain" predetermined and agreed-to standards under the Settlement Agreement would be compensated—namely, cases where, prior to Preliminary Approval,[2] the Retired NFL Football Player received a post-mortem diagnosis of CTE made by a board-certified neuropathologist.  Further, the amendments in question were in fact made public; the NFL Parties and Class Counsel posted the amendments—including a redline comparison clearly

---

[2]    As noted above, the amendments to the Settlement Agreement extended this deadline to Final Approval.

reflecting the changes to the text of the Settlement Agreement—on the Court's publicly accessible PACER docket, where any member of the public, including the more than 5,000 Settlement Class Members with legal representation, could view it.  In fact, over 40 Settlement Class Members objected to the amendments, including the very amendment that Sagapolutele complains of here.

*Finally*, even if Sagapolutele could show a due process violation, which she cannot, neither Rule 60 nor this Court's "inherent authority" allows Sagapolutele to rewrite the Settlement Agreement as she seeks.  Rule 60(a) is limited to correction of "clerical mistakes" that do not affect the substantive rights of the parties.  Yet her contention that the amendments were simply "clerical mistakes" is at odds with her characterization of those same amendments as impairing her rights under the settlement.  Further, not only does Sagapolutele—as an absent class member—lack standing to move pursuant to Rule 60(b)(6), she also fails to establish that the "extraordinary remedy" of amendment pursuant to Rule 60(b)(6) is warranted here because she does not show that she will experience *any* hardship without the relief she seeks.  For example, Sagapolutele has neither shown (nor even claimed) that the brain of her late husband, who died in 2009, has ever been examined by a board-certified neuropathologist for CTE, much less diagnosed as having CTE.  Nor has she explained why any such examination—if such a belated diagnosis were even medically possible—did not occur prior to the Court's Final Approval Order on April 22, 2015 (as amended May 8, 2015).  Finally, Sagapolutele has not shown that she is entitled to relief under the Court's "inherent authority" to amend the Final Order and Judgment because that authority is no more expansive than Rule 60.

Accordingly, Sagapolutele's motion should be denied.

## Background

### A.    Parties

The National Football League ("NFL") is an unincorporated association of 32 Clubs that promotes, organizes, and regulates the sport of professional football in the United States.  NFL Properties LLC ("NFLP") is a limited liability company organized under the laws of the State of Delaware and headquartered in New York.  Sagapolutele is a self-described absent Settlement Class Member and the representative of the estate of late Retired NFL Football Player Pio Sagapolutele.  (Pl. Mot. at 1.)

### B.    Procedural Background

The Judicial Panel on Multidistrict Litigation established this multidistrict litigation as MDL 2323 on January 31, 2012.  Since that time, over 300 additional cases, brought on behalf of approximately 5,000 former NFL players, have been included in the MDL.  *See In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. 351, 361 (E.D. Pa. 2015), *amended*, No. 12-MD-02323, 2015 WL 12827803 (E.D. Pa. May 8, 2015), *and aff'd*, 821 F.3d 410 (3d Cir. 2016), *amended* (May 2, 2016), *cert. denied*, 137 S. Ct. 591 (2016), and *cert. denied*, 137 S. Ct. 607 (2016).  Plaintiffs in these cases asserted fraud- and negligence-based claims against the NFL Parties based on, among other things, a purported duty to provide players with rules and information needed to protect them from the alleged effects of repetitive mild traumatic brain injuries sustained during NFL play, including CTE.  *Id*. at 361-62.

On June 25, 2014, the NFL Parties and Class Counsel[3] (collectively, the "Parties") filed a motion for preliminary class certification and preliminary approval of the Settlement Agreement, and on July 7, 2014, the Court approved the motion.  *See id.* at 363-65.

---

[3]    Class Counsel consists of attorneys whom this Court duly appointed as legal representatives for the Settlement Class, including Christopher A. Seeger, Sol Weiss, Steven C. Marks, Gene Locks, Arnold Levin, and Dianne M. Nast.  (Final Order & Judg. ¶ 6,  ECF No. 6510.)

The Settlement Agreement defined the Settlement Class as "'[a]ll living NFL Football Players who, prior to the date of Preliminary Approval . . . retired . . . from playing professional football with the NFL,'" as well as their Representative Claimants and Derivative Claimants.  *Id.* at 365 ("Representative Claimants are those duly authorized by law to assert the claims of deceased, legally incapacitated, or incompetent Retired Players.  Derivative Claimants are those, such as parents, spouses, or dependent children, who have some legal right to the income of Retired Players.").  The Settlement Agreement also provides funding for Retired NFL Football Players to receive a baseline assessment examination of their objective neurological functioning, for safety and educational initiatives, and for monetary awards for certain Qualifying Diagnoses, including, as relevant here, the Qualifying Diagnosis of Death with CTE.  *Id.* at 366-67.

Prior to the Fairness Hearing, the Parties distributed Court-approved Short- and Long-Form notices to the Settlement Class.  *See id.* at 382-86.  "Each was written in plain and straightforward language," and together, they disclosed the key components of the Settlement Agreement, making clear that "only 'certain' cases of CTE are covered."  *Id.* at 383-84.  As explained by the notice, under the original agreement, the Settlement's benefits included "[m]onetary awards for ***diagnoses*** of Death with CTE ***prior to July 7, 2014*** . . . ."  (*See* Long-Form Notice at 6, ECF No. 6086-1 (emphasis added); *see also* Class Action Settlement Agreement as of June 24, 2014 § 6.3(f), ECF No. 6087 (a "Qualifying Diagnosis of Death with CTE shall be made only for Retired NFL Football Players who died prior to the date of the Preliminary Approval and Class Certification Order, through a post-mortem diagnosis by a board-certified neuropathologist of CTE.").)

After the Fairness Hearing, the Parties—at this Court's request—agreed to several amendments to the Settlement Agreement, each of which made the Settlement Agreement more

beneficial to Settlement Class Members.  *In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. at 386.  For example, the amendments provided credit for Settlement Class Members who played in NFL Europe; ensured that all eligible Retired NFL Football Players who elected to receive a baseline assessment examination would receive one regardless of any funding limitations in the Settlement Agreement; included a hardship provision with respect to the appeal fee for Settlement Class Members; and allowed reasonable accommodation for Settlement Class Members who do not possess certain medical records.  (Class Counsel and the NFL Parties' Joint Submission in Resp. to the Feb. 2, 2015 Order of the Ct., Feb. 13, 2015, ECF No. 6481.)  In addition, as is relevant here, one amendment expanded the Qualifying Diagnosis of Death with CTE to cover not only Retired NFL Football Players who died prior to Preliminary Approval, but also Retired NFL Football Players who died between Preliminary Approval and Final Approval.  (*Id.* at 4-5.)  In addition, the Parties explained to the Court that "**consistent with the Parties' intent under the original Settlement Agreement**, and recognizing that obtaining such a [CTE] diagnosis **may take several months post-death**, the Parties have provided for a grace period of 270 days following any date of death between preliminary approval and the Final Approval Date to allow Claimants to obtain the necessary diagnosis."  (*Id.* (emphasis added).)

Copies of the proposed amended Settlement Agreement, including a redline showing the exact changes made, were posted on the Court's publicly accessible PACER database in February 2015.  (Class Counsel and the NFL Parties' Joint Submission in Resp. to the Feb. 2, 2015 Order of the Ct., Ex. A, Feb. 13, 2015, ECF No. 6481-1.)  Between February and April 2015, more than 40 Settlement Class Members filed objections to the amendments, including objections to the amendment to the definition of Death with CTE at issue here.  (*See*

Armstrong Objectors' Suppl. Obj. to the Am. Class Action Settlement, ECF No. 6503; Miller Suppl. Obj. to Settlement, ECF No. 6484.)  Sagapolutele did not file any objection.

After considering those objections, the Court issued its opinion approving the Settlement Agreement and finding that "Class Members who opted out . . . received adequate notice of these changes, **and notification of Class Members is not required**."  *In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. at 386 (emphasis added).  The Court explained:  "Because these changes improved the deal for Class Members without providing any concessions to the NFL Parties, an additional round of notice for Class Members is unnecessary."  *Id*.  On appeal, the Third Circuit affirmed this Court's Final Order and Judgment in full.  Regarding notice, the Third Circuit agreed with the District Court, finding "that the content of the class notice . . . satisfied Rule 23 and due process."  *In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 435-36 (3d Cir. 2016), *amended* (May 2, 2016), *cert. denied*, 137 S. Ct. 591 (2016), and *cert. denied*, 137 S. Ct. 607 (2016).  Notably, the Third Circuit also "conclude[d] that the settlement's treatment of CTE does not render the agreement fundamentally unfair."  *Id.* at 444.

On August 15, 2017, over two years after this Court granted final approval of the Settlement, Sagapolutele filed this Motion challenging the Court's determination that the amendments were beneficial to Settlement Class Members and therefore did not require additional notice, and seeking "modification of the Final Order and Judgment by removal of the deadline to obtain a Qualifying Diagnosis of Death with CTE."[4]  (Pl. Mot. at 2.)  Sagapolutele contends that "[t]his deadline was added to the Settlement Agreement in February 2015 without

---

[4]   Relatedly, Sagapolutele also seeks an "instruction to the settlement administrator to develop forms and procedures that allows Class Members to obtain a Qualifying Diagnosis of Death with CTE by obtaining a post-mortem diagnosis by a board-certified neuropathologist at any time during the 65-year term of the Monetary Award Fund."  (Pl. Mot. at 2.)

notice to the class," and "effectively prevented Class Members . . . from obtaining a Qualifying Diagnosis of Death with CTE." (*Id.*)  Despite Sagapolutele's claim that "this deadline materially prejudices" Settlement Class Members (*id.*), she offers no explanation, much less an evidentiary showing, of how her own rights were in any way impaired by the alleged lack of notice.  She does not demonstrate—or even assert—that the brain of her late husband has been examined by a board-certified neuropathologist and determined to have CTE.  Therefore, not only is Sagapolutele's injury entirely hypothetical, but she also does not establish that such an examination would even be viable, given her husband's death in 2009.[5]

The NFL Parties, through this memorandum of law, oppose the Motion.

<div align="center">

**Argument**

**I.**

**THE PARTIES WERE NOT REQUIRED TO NOTIFY
THE SETTLEMENT CLASS ABOUT THE AMENDMENTS**

</div>

Sagapolutele argues that her due process rights were violated because she did not receive notice that the February 2015 amendment "impos[ed] a deadline to obtain a Qualifying Diagnosis of Death with CTE" when the original Settlement Agreement purportedly permitted "Class Members [to] obtain a Qualifying Diagnosis for Death with CTE anytime within the 65-year life of the Monetary Award Fund." (Pl. Mem. at 17.)  Not so.

"[T]he Due Process Clause of the Fourteenth Amendment requires that notice [concerning a class action settlement] be 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'"  *In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. at

---

[5]   *See* Compl. ¶ 43, *Sagapolutele* v. *Nat'l Football League*, No. 17-cv-00348 (E.D. Pa. Jan. 25, 2017), ECF No. 1; *see also* Am. Stip. of Dismissal, *Sagapolutele* v. *Nat'l Football League*, No. 17-cv-00348 (E.D. Pa. May 3, 2017), ECF No. 4 (approving stipulation of dismissal without prejudice).

383 (quoting *Mullane* v. *Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)).[6]  Parties

settling a class action litigation should therefore distribute notice that "'fairly apprises' class

members of the action and their rights."  Newberg on Class Actions § 8:17 (5th ed.).  Additional

notice is only required when the settling parties subsequently introduce amendments that "would

have a *material adverse* effect on the rights of class members."  *In re Diet Drugs Prods. Liab.*

*Litig.*, No. 99-cv-20593, 2010 WL 2735414, at *6 (E.D. Pa. July 2, 2010) (emphasis added); *see*

*also In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 175 n.10, 182 (3d Cir. 2013) (supplemental

notice required only for "*material* alterations" (emphasis added)).    Conversely, if the

amendments are neutral or beneficial to the settlement class, no additional notice is required.  *See*

*Harris* v. *Graddick*, 615 F. Supp. 239, 244 (N.D. Ala. 1985) (holding that where "the

amendment is narrow and it is clearly apparent that the interests of the classes are not

*substantially impaired*, . . . the notice already given is adequate" (emphasis added)); *see also In*

*re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. at 383 (collecting cases,

including *Harris*).  That is the case here.

### A.    The Amendments Did Not Require New Notice

Sagapolutele's argument—that the Parties should have re-distributed notice

reflecting the February 2015 amendments to the Settlement Agreement—fundamentally

misunderstands the substance of the amendments.  In Sagapolutele's telling, "in the midst of

otherwise beneficial amendments" to the Settlement Agreement, the Parties "impose[d] an

additional requirement that prevents Class Members from recovering settlement proceeds [for

CTE] unless they obtained a Qualifying Diagnosis before" Final Approval.  (Pl. Mem. at 8.)  But

---

[6]    Due process notice requirements mirror those of Rule 23 of the Federal Rules of Civil Procedure.  *See* Newberg
on Class Actions § 1:5 (5th ed.) ("Rule 23 is constructed to ensure that the representative nature of class action
litigation safeguards these absent class members' due process rights."); *id.* § 8:7 (5th ed.) (the notice
requirements under Rule 23 "echo[] the constitutional test set forth by the Supreme Court"); *id.* § 8:36 (5th ed.)
("[A]s Rule 23's requirements are quite similar to the Constitution's, the distinction may be immaterial.").

the amendment only clarified what was always the case and extended the deadline for Death with CTE to Final Approval.

The original settlement agreement provided that an award for a Qualifying Diagnosis of Death with CTE would be available only to Retired NFL Football Players who died *and* received a CTE diagnosis prior to Preliminary Approval.  The Long-Form Notice made this explicit, stating that the Settlement's benefits include "[m]onetary awards for ***diagnoses*** of Death with CTE ***prior to July 7, 2014*** . . . ."  (*See* Long-Form Notice at 6, ECF No. 6086-1 (emphasis added); *see also* Decl. of Robert H. Klonoff Relating to the Proposed Class Settlement in the Nat'l Football League Players' Concussion Injury Litig. ¶ 85, Nov. 12, 2014, ECF No. 6423-9 ("[C]ontrary to the arguments advanced by various objectors, ***excluding CTE in cases diagnosed after July 7, 2014***, is not irrational." (emphasis added)).)  Similarly, the Parties' publicly filed submission to the Court in support of the amendment stated specifically that the amendment's language providing only a grace period of time following death within which to obtain a neuropathological diagnosis of CTE was "*consistent with the Parties' intent under the original Settlement Agreement.*"  (*See* Class Counsel and the NFL Parties' Joint Submission in Resp. to the Feb. 2, 2015 Order of the Ct. at 4, ECF No. 6481 (emphasis added).)

Contrary to Sagapolutele's contentions, this amendment did not adversely affect the Settlement Class—much less materially so.  In fact, the amendment *expanded* settlement benefits to encompass any additional Settlement Class Members who died after Preliminary Approval but before Final Approval, and provided 270 days to receive a CTE diagnosis for such players—thereby, increasing the time covered by the definition of Death with CTE by *nine* months.  (*See id.* at 4-5.)

Accordingly, far from being materially adverse to Settlement Class Members, these amendments actually made the Settlement Agreement *more beneficial* by expanding the availability of an award for Death with CTE to a larger class of claimants. (*Id.*) Thus, as this Court previously held, "[b]ecause these changes improved the deal for Class Members without providing any concessions to the NFL Parties, an additional round of notice for Class Members is unnecessary." *In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. at 386; *see also In re Baby Prods. Antitrust Litig.*, 708 F.3d at 175 n.10, 182; *In re Diet Drugs Prods. Liab. Litig.*, 2010 WL 2735414, at *6; *Harris*, 615 F. Supp. at 244.

**B.    The Original Settlement Notice Was Sufficient**

Sagapolutele's due process argument fails for an additional reason.  The original notice, as this Court held, was clear that not all CTE diagnoses would be compensated under the Settlement Agreement, and the publicly available amendments sufficiently defined those CTE diagnoses eligible for compensation.

*First*, the Short- and Long-Form notices distributed to Settlement Class Members adequately protected their due process rights.  To comport with due process, settlement notice need only be adequate and summarize the terms of the Settlement; perfection and painstaking detail are not required.  *See In re Nat'l Football League Concussion Injury Litig.*, 307 F.R.D. at 382-83; *see also In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1104-05 (5th Cir. 1977) (explaining that notice need not "[be] perfectly correct in its form," and instead that "[t]he standard [] is that the notice . . . must contain information that a reasonable person would consider to be material in making an informed, intelligent decision" about whether to opt out); *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 124 (S.D.N.Y 1997) ("The notice need not be highly specific, and indeed 'numerous decisions, no doubt recognizing that notices to class members can practicably contain only a limited amount of information, have approved very

general descriptions of the proposed settlement.'" (quoting *Weinberger* v. *Kendrick*, 698 F.2d 61, 70 (2d Cir. 1982)).

As this Court previously held in overruling objections that "the Long-Form Notice is confusing because the term 'Death with CTE' appears several times without the accompanying cutoff date, . . . [b]oth the Summary Notice and the Long-Form Notice indicate that ***only 'certain' cases of CTE are covered***."  *In re Nat'l Football League Concussion Injury Litig.*, 307 F.R.D. at 383-84 (emphasis added) (citing Summary Notice at 1, ECF No. 6086-2; Long-Form Notice at 1, ECF No. 6086-1).  Moreover, as stated above, the Long-Form Notice specifically stated that the Settlement's benefits include "[m]onetary awards for ***diagnoses*** of Death with CTE ***prior to July 7, 2014*** . . . ."  (*See* Long-Form Notice at 6, ECF No. 6086-1 (emphasis added).)  Both the Short- and Long-Form notice thus alerted Settlement Class Members that an award for CTE was not absolute or unconditional; rather, a Settlement Class Member would need to satisfy "certain" criteria before any award would be made.  That is the case here—under the original and amended Settlement Agreement, Sagapolutele must satisfy particular criteria before receiving an award of Death with CTE, including that she obtain her decedent's CTE diagnosis within a predetermined time period—and the original notice satisfied Sagapolutele's Due Process rights by alerting her to this fact.

*Second*, the Parties made the February 2015 amendments publicly available months prior to this Court's April 22, 2015 Final Approval Order (as amended May 8, 2015). Not only did the Parties post a copy of the amendments to this Court's publicly available PACER database as early as February 2015, but they also submitted a redline showing the exact changes to be made to the Settlement Agreement as a result of those proposed amendments.  (Class Counsel and the NFL Parties' Joint Submission in Resp. to the Feb. 2, 2015 Order of the Ct., Ex.

A, Feb. 13, 2015, ECF No. 6481-1.)  This is especially significant in light of the widespread attention paid to the docket in this matter by, among others, the more than 5,000 Retired NFL Football Players who, at the time of settlement, were represented by counsel in MDL 2323.  *See In re Nat'l Football League Concussion Injury Litig.*, 307 F.R.D. at 389; *see also In re Diet Drugs Prods. Liab. Litig.*, 2010 WL 2735414, at *4  (holding that no notice of settlement agreement amendments was required because, in part, "notice of the proposed Tenth Amendment, along with an opportunity to object, was supplied to representatives of all class members with active cases in MDL No. 1203.").

        In fact, the Parties' efforts to publicize the amendments were successful, as evidenced by the fact that over 40 Settlement Class Members filed objections to the amendments, *including objections to the very Death with CTE provision about which Sagapolutele complains*.  (*See* Armstrong Objectors' Suppl. Obj. to the Am. Class Action Settlement, ECF No. 6503; *see also* Miller Suppl. Obj. to Settlement, ECF No. 6484.)  While these objectors raised somewhat different concerns than Sagapolutele raises here—they argued that the award of Death with CTE should be available to Retired NFL Football Players who die after Final Approval—they nonetheless sought, at least in part, the same relief that Sagapolutele appears to now seek: "modification of the Final Order and Judgment by removal of the deadline to obtain a Qualifying Diagnosis of Death with CTE."  (Pl. Mot. at 2.)  This Court properly rejected these objectors' requests, and similarly should reject Sagapolutele's efforts here.

## II.

### SAGAPOLUTELE IS NOT ENTITLED TO REWRITE THE SETTLEMENT AGREEMENT

        Even if Sagapolutele had established that notice of the amendments should have been given—which she has not, as explained above—her Motion would fail.  Sagapolutele first

argues that under Rule 60(a), the Court should rewrite the Settlement Agreement and amend the Final Order and Judgment because the Court made a "clerical error" when approving the amendments to the Settlement Agreement. Second, Sagapolutele contends that amendment under Rule 60(b)(6) is justified by "extraordinary circumstances." Finally, Sagapolutele argues that the Court's inherent authority permits it to amend the Final Order and Judgment here. (Pl. Mem. at 18-24.) These arguments lack merit.

*First*, Sagapolutele has not made the necessary showing under Rule 60(a). It is well settled that amendment of judgments pursuant to Rule 60(a) "is limited to the correction of 'clerical mistakes'; it encompasses only errors 'mechanical in nature, apparent on the record, and not involving an error of substantive judgment.'" *In re Diet Drugs Prods. Liab. Litig.*, 200 F. App'x 95, 103 (3d Cir. 2006) (quoting *Pfizer Inc.* v. *Uprichard*, 422 F.3d 124, 129 (3d Cir. 2005)). For Rule 60(a) to apply, the change to be corrected must not "affect[] the substantive rights of the parties." *Id.* at 103-04 (quoting *Pfizer*, 422 F.3d at 130) (holding Rule 60(a) inapplicable because the "correction here goes beyond the correction of a 'mindless and mechanistic mistake'" (quotation omitted)). Here, Sagapolutele has only ever alleged that the amendments in question were deliberate attempts by the Parties to modify the criteria for the Qualifying Diagnosis of Death with CTE. She cannot simultaneously argue these amendments were mere "clerical mistakes." As such, Rule 60(a) is inapplicable here.

*Second*, Sagapolutele's attempts to seek relief under Rule 60(b)(6) fail, too.[7] Relief under Rule 60(b) is "not ordinarily . . . available to non-parties," *Federman* v. *Artzt*, 339 F. App'x 31, 33-34 (2d Cir. 2009), and "[a]bsent class members such as [movant] are treated, with limited exceptions inapplicable here, as non-parties to a class action." *Adelson* v. *Ocwen*

---

[7]    Although Sagapolutele broadly states she is moving for relief under Rule 60(b), her memorandum of law cites only to the Rule's catchall provision, which permits the modification of a final judgment based on "any other reason that justifies relief." Fed. R. Civ. P. 60(b)(6).

*Fin. Corp.*, 621 F. App'x 348, 351 (7th Cir. 2015); *Federman*, 339 F. App'x at 33-34 (holding

that absent class members who did not object to settlement were not "parties" for purposes of

Rule 60(b) and declining "to expand the narrow exception to the general rule that non-parties

cannot bring Rule 60(b) motions"); *In re Four Seasons Sec. Laws Litig.*, 525 F.2d 500, 504 (10th

Cir. 1975) (absent class member "did not become a party for the purposes of Rule 60(b) to

enable him to challenge the adequacy or nature of the settlement"); *see also* Fed. R. Civ. Proc.

60(b) ("the court may relieve *a party* . . . from a final judgment, order, or proceeding for the

following reasons" (emphasis added)).  Sagapolutele did not object, intervene, or otherwise take

steps to become a "party" to this action, so Rule 60(b) is not available to her here.  *See also*

Newberg on Class Actions § 18:40 (5th ed.) ("[A]ll the circuits that have considered the issue

have taken the position that absent class members are generally not authorized to file Rule 60

motions.").

        Even if Sagapolutele were a "party," she has not met her burden to seek relief

pursuant to Rule 60(b)(6) because such "[r]elief . . . may only be granted under extraordinary

circumstances where, without such relief, an *extreme and unexpected hardship* would occur."

*Sawka* v. *Healtheast, Inc.*, 989 F.2d 138, 140 (3d Cir. 1993) (emphasis added); *see also*

*Matthews, Wilson & Matthews, Inc.* v. *Capital City Bank*, 614 F. App'x 969, 971 (11th Cir.

2015) (Rule 60(b)(6) "is an extraordinary remedy which may be invoked only upon a showing of

exceptional circumstances, and the party seeking relief has the burden of showing that absent

such relief, an extreme and unexpected hardship will result." (internal quotations omitted));

*Orlando Residence, Ltd.* v. *Hilton Head Hotel Inv'rs*, No. 89-cv-0662, 2013 WL 1103027, at *8

(D.S.C. Mar. 15, 2013), *aff'd sub nom. Orlando Residence, Ltd.* v. *Nelson*, 565 F. App'x 212

(4th Cir. 2014) ("Relief is rarely granted under . . . [Rule] 60(b)(6).").  The bar for relief under

Rule 60(b) is particularly high where the movant seeks to amend in "a class action [because] a too liberal application of Rule 60(b) would undermine the finality of judgments entered in such actions and would discourage their settlement." *Inmates of Suffolk Cty. Jail* v. *Rufo*, No. 71-cv-00162, 2015 WL 6958070, at *2 (D. Mass. Nov. 10, 2015); *see also Blue Diamond Coal Co.* v. *Trustees of UMWA Combined Ben. Fund*, 249 F.3d 519, 524 (6th Cir. 2001) ("[R]elief under Rule 60(b) is circumscribed by public policy favoring finality of judgments and termination of litigation. This is especially true in an application of subsection (6) of Rule 60(b) . . . ." (internal quotations omitted)).

Sagapolutele has not made any showing whatsoever that the amendment will cause her any hardship, much less "extreme and unexpected hardship." Tellingly, she has not shown—through supporting exhibits, affidavits, or even proffered facts in her brief—that the brain of her late husband, who passed away in 2009, has been examined by a board-certified neuropathologist and diagnosed with CTE at *any time*, much less that she would, but for the amendment, be entitled to an award. She also has not established that a belated diagnosis years after death (indeed, her husband died approximately eight years ago) would even be possible given the deterioration of brain matter after death. Nor does she seek to justify her apparent delay in seeking an examination. Instead, Sagapolutele invites only speculation and offers only conclusory assertions as to how the purported change impacts her rights under the agreement, and she therefore fails to show that the exceptional remedy of Rule 60(b)(6) is warranted here.

*Finally*, Sagapolutele's invocation of the Court's "inherent authority" to amend a judgment does not salvage her claim because that authority is no broader than that provided by Rule 60, which, as explained above, does not permit Sagapolutele the relief she seeks. *See* 20 Fed. Prac. & Proc. Deskbook § 104 (after 28 days from entry, "the judgment may be attacked,

other than by appeal, only as provided in Rule 60."); 11 Fed. Prac. & Proc. Civ. § 2852 (3d ed.)
(while "the power of a court to modify an interlocutory judgment or order at any time prior to
final judgment remains unchanged and is not limited by the provisions of Rule 60(b) . . . , [t]he
rule does apply, however, to all final judgments entered in civil actions."). Sagapolutele's cases
are not to the contrary; none holds that Courts have inherent authority to amend a final judgment
approving a settlement agreement. (*See* Pl. Mem. at 23-24.) Three of the five cited cases
concern only a court's authority to *enforce* a settlement agreement. *See Kokkonen* v. *Guardian
Life Ins. Co. of Am.*, 511 U.S. 375, 381 (1994) (holding that a district court has inherent authority
to *enforce* a settlement agreement under particular circumstances); *Roman-Oliveras* v. *Puerto
Rico Elec. Power Auth.*, 797 F.3d 83, 86-87 (1st Cir. 2015) (same); *Hensley* v. *Alcon Labs., Inc.*,
277 F.3d 535, 540-41 (4th Cir. 2002) (same). The fourth case, *In re Linerboard Antitrust Litig.*,
223 F.R.D. 357, 363 (E.D. Pa.), *amended*, 223 F.R.D. 370 (E.D. Pa. 2004) simply stands for the
proposition that a court overseeing an MDL has inherent power to control the discovery
process—an issue not relevant or in dispute here. Finally, while the fifth case involved an
*amendment* of an order entering a settlement agreement, the Court did not hold that the district
court had inherent authority to make the amendment; rather, it simply held that "the merits of
[the district court's] decision to amend are no longer open to review." *F.A.C., Inc.* v.
*Cooperativa de Seguros de Vida de Puerto Rico*, 449 F.3d 185, 190–91 (1st Cir. 2006).

   In sum, Sagapolutele has not demonstrated (and cannot demonstrate) that she is
entitled to rewrite the Settlement Agreement.

## <u>Conclusion</u>

   For the foregoing reasons, the NFL Parties respectfully request that the Court
deny the Motion in its entirety.

Dated: September 28, 2017

Respectfully submitted,

/s/ Brad S. Karp
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
Brad S. Karp
Bruce Birenboim
Lynn B. Bayard
1285 Avenue of the Americas
New York, NY 10019-6064
Tel:   (212) 373-3000
bkarp@paulweiss.com

PEPPER HAMILTON LLP
Sean P. Fahey
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA 19103-2799
Tel:   (215) 981-4000

*Attorneys for Defendants the National Football
League and NFL Properties LLC*

## **CERTIFICATE OF SERVICE**

It is hereby certified that a true copy of the foregoing Memorandum of Law of the National Football League and NFL Properties LLC in Opposition to Settlement Class Member Yvonne Sagapolutele's Motion to Modify the Amended Final Order and Judgment was served electronically via the Court's electronic filing system on the 28th day of September, 2017, upon all counsel of record.


Dated:  September 28, 2017                                    /s/Brad S. Karp
                                                                        Brad S. Karp

# Exhibit 9



# NFL CONCUSSION SETTLEMENT
*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

## POST-APPEAL NOTICE OF DENIAL OF MONETARY AWARD CLAIM
### DATE OF NOTICE: **September 26, 2019**

### I. SETTLEMENT CLASS MEMBER INFORMATION

| | |
|---|---|
| **Settlement Program ID** | 950012548 |

| **Name:** | First<br>Robin | M.I.<br>B | Last<br>Cornish |
|---|---|---|---|

| **Settlement Class Member Type** | Representative Claimant |
|---|---|
| **Lawyer** | O'Hanlon, Demerath & Castillo |

| **Qualifying Diagnosis** | Death with CTE (Chronic Traumatic Encephalopathy) | **Date of Qualifying Diagnosis** | 8/23/08 |
|---|---|---|---|
| **Appellant** | Settlement Class Member | | |
| **Appellee** | NFL | | |

### II. EXPLANATION OF CLAIM DETERMINATION

This Notice is an official communication from the Claims Administrator for the NFL Concussion Settlement Program. The Special Master reviewed the appeal and determined the following, which is final and binding:

Appeal denied. Appellant did not show clear and convincing evidence of error in the Claims Administrator's decision. The Special Master's decision is a factual determination and is final and binding.

| 1. | Special Master ruled that the claim is denied |
|---|---|

### III. HOW TO CONTACT US WITH QUESTIONS OR FOR HELP

If you are represented by a lawyer, consult with your lawyer if you have questions or need assistance. If you are unrepresented and have any questions about this Notice or need help, contact us at 1-855-887-3485 or send an email to ClaimsAdministrator@NFLConcussionSettlement.com.  If you are a lawyer, call or email your designated Firm Contact for assistance. For more information about the Settlement program, visit the official website at www.NFLConcussionSettlement.com to read the Frequently Asked Questions or download a copy of the complete Settlement Agreement.

# Exhibit 10

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| | § | |
| IN RE: NATIONAL FOOTBALL | § | No. 2:12-md-02323-AB |
| LEAGUE PLAYERS' CONCUSSION | § | |
| INJURY LITIGATION | § | MDL No. 2323 |
| | § | |
| | § | **Hon. Anita B. Brody** |
| THIS DOCUMENT RELATES TO: | § | |
| Settlement Class Member Robin B. Cornish | § | |
| (SPID 950012548) | § | |

---

### SETTLEMENT CLASS MEMBER'S OBJECTION TO THE SPECIAL
### MASTER'S DECISION DENYING CLASS MEMBER'S APPEAL

---

## TABLE OF CONTENTS

**Supporting Evidence**..............................................................................2

**Background** ...........................................................................................3

**Standard of Review** ............................................................................4

**Argument** ...............................................................................................5

    I.    Class Member's claim was erroneously denied
             because the date of the Qualifying Diagnosis for
             Death with CTE is the date of the Player's death..................5

**Conclusion** ...........................................................................................7

i

TO THE HONORABLE DISTRICT COURT JUDGE:

Class Member Robin Cornish ("Class Member") respectfully submits this objection to the Special Master's September 26, 2019 decision denying Class Member's appeal of the Denial of Monetary Award Claim.  Unlike the other objections filed contemporaneously with this Class Member's objection, this Class Member's claim package shows that a board-certified neuropathologist provided a CTE diagnosis after reviewing the Player's brain tissue.

Nevertheless, the Special Master erred in affirming the Claims Administrator's denial based on one erroneous conclusion of law.  This appeal presents the following legal question regarding these conclusions of law:

1) Is the date of a Qualifying Diagnosis for Death with CTE the date of the Player's death, as stated in the Posted Settlement Program FAQs?

The answer to this question is "yes."  The Court should overturn the Special Master's decision because the Special Master affirmed the Claims Administrator's denial despite the Claims Administrator's error by incorrectly answering "no" to this question.

The Claims Administrator erroneously concluded that the date of diagnosis is not the date of the Player's death.  But according to the Posted Settlement FAQs, which the NFL Parties approved, the date of the Qualifying Diagnosis for Death with CTE is "the date of the Player's death, even though the diagnosis is not made until after

1

the Player dies."[1]

.

## SUPPORTING EVIDENCE

Exhibit 1        Notice of Denial of Monetary Award Claim

Exhibit 2        Relevant Excerpts from Class Member's Claim Package

Exhibit 3        Notice of Request for Additional Documents

Exhibit 4        Class Member's Appeal

Exhibit 5        NFL Parties' Response

Exhibit 6        Post-Appeal Notice of Denial of Monetary Award Claim

---

[1]    Posted Settlement FAQs (as of September 12, 2019), FAQ 99.  In prior versions of the Posted Settlement FAQs, this language was included as part of FAQ 93.

2

## BACKGROUND

Class Member submitted a claim package that included a post-mortem diagnosis of Chronic Traumatic Encephalopathy ("CTE") made by a board-certified neuropathologist.[2]  Class Member's claim package also includes documentation showing that the Player died prior to April 22, 2015 and that Dr. Hamilton reviewed the Player's brain tissue.[3]

Despite the documentation in the claim package, the Claims Administrator denied Class Member's Monetary Award Claim for the following reason:[4]

> The medical records must show a post-mortem diagnosis of CTE made before April 22, 2015 (the Final Approval Date) by a board-certified neuropathologist for a Retired NFL Football Player who died before April 22, 2015.  See Section 6.3(f) of the Settlement Agreement and FAQ 109.  Mr. Cornish died on August 23, 2008, and the August 24, 2008 autopsy report signed by Marc A. Krouse does not reference CTE and neither does the death certificate.  You provided an undated letter from Dr. Ronald L. Hamilton who diagnosed Mr. Cornish with CTE.  You must establish that Dr. Hamilton reviewed Mr. Cornish's brain tissue and made a CTE diagnosis on or before April 22, 2015.

Class Member timely filed an appeal of the Claims Administrator's Notice of Denial of Monetary Award Claim challenging the two conclusions of law in the Notice regarding the diagnosis date and the "confirmation" requirement.[5]

The Special Master denied the Class Member's appeal on September 26, 2019

---

[2]   Exhibit 2.

[3]   *Id.*

[4]   Exhibit 1.

[5]   Exhibit 4.

without addressing the legal argument raised in Class Member's Appeal.[6]

## STANDARD OF REVIEW

The Court reviews de novo Class Member's objections to conclusions of law from its Special Masters. *See* ECF No. 6871 at 4–5 (appointing the Special Masters and defining their roles). Class Member has challenged the Claims Administrator's conclusions of law, the facts are undisputed. The Court's decision regarding this objection is final and binding under both the original settlement agreement (of which Class Member received notice with an opportunity to opt out) and the amended settlement agreement (of which Class Member did not receive notice and which was entered after the opt-out deadline). *See* ECF No. 6073-2, Original Settlement Agreement § 9.8 *and* ECF No. 6481, Amended Settlement Agreement § 9.8. In the event this objection is not sustained, Class Member expressly reserves the right to re-urge the Motion to Modify [ECF 6479] this Court denied without prejudice on October 24, 2017 [ECF 8557].

---

[6]    Exhibit 6.

## ARGUMENT

**I.    Class Member's claim was erroneously denied because the date of the Qualifying Diagnosis for Death with CTE is the date of the Player's death.**

The Claims Administrator's first reason for denying the claim package is legally flawed because the diagnosis date for Death with CTE is the date of the Player's death, even if the diagnosis occurs later.

The Claims Administrator published "Posted Program FAQs" on the Settlement Website with answers to frequently asked questions. The content in the Posted Settlement Program FAQs was subject to advance approval by Counsel for the NFL Parties.[7]

According to the Posted Settlement Program FAQs, the diagnosis date for Death with CTE is the date of the Player's death, even though the diagnosis is not made until after the Player dies:[8]

> **How is the date of a Qualifying Diagnosis determined?**
>
> . . . .
>
> (a)  *Death with CTE:* For these claims, the date of the Qualifying Diagnosis is the date of the Player's death, even though the diagnosis is not made until after the Player dies.

---

[7]    *See* Amended Settlement Agreement § 4.1(a).

[8]    This relevant language is from FAQ 99 in the Posted Settlement Program FAQs (as of September 12, 2019) and was also contained in prior versions of the Posted Settlement Program FAQs. In some earlier versions of the Posted Settlement Program FAQs, this language was originally published in FAQ 93.

Based on the Claims Administrator's public, posted representations to class members that the date of the Qualifying Diagnosis for Death with CTE is the date of the Player's death, the only date that is relevant in determining the date of a Qualifying Diagnosis for Death with CTE is the date of the Player's death. That is the date Class Member provided in the submitted claim package. The Claims Administrator's insistence on proof that the diagnosis "was done on or before 4/22/15" ignores these posted representations and erroneously concludes that evidence regarding the date of the Player's death does not establish the date of the Qualifying Diagnosis.

In reviewing other portions of this FAQ, the Court has noted that "by requiring the 'date of diagnosis,' the Settlement language implies that the 'date of diagnosis' is not necessarily the 'date of the examination.'" ECF 10810, Settlement Implementation Determination, at 2. The Court further recognized that FAQ 99 is a "sensible and reasonable interpretation of the Settlement," which "recognizes that there may be infrequent situations in which a Retired NFL Player's past symptoms were not recognized as a Qualifying Diagnosis at the time but now can be identified by a physician." *Id.* at 3. The Court noted that in these circumstances, "the Retired NFL Player should not be penalized for their previous doctor's failure to identify a Qualifying Diagnosis" but "should be compensated based on the date their diagnosis actually began." *Id.*

The Court's reasoning applies with equal, if not greater, force to Death with CTE diagnoses. Class Member's claim package establishes that the Player's death

occurred before April 22, 2015.  Accordingly, the date of the Qualifying Diagnosis is before April 22, 2015, and the Claims Administrator erred, as a matter of law, in denying this claim.

## CONCLUSION

For the foregoing reasons, Class Member respectfully requests the Court sustain this objection, reverse the Special Master's decision based on the two erroneous conclusions of law in the Claims Administrator's Notice of Denial, and order the approval of Class Member's claim.

Dated:  October 16, 2019

Respectfully Submitted:

/s/ Justin Demerath

**Justin Demerath**
Texas State Bar No. 24034415
**David Campbell**
Texas State Bar No. 24057033
O'HANLON, DEMERATH & CASTILLO
808 West Avenue |  Austin, TX 78701
Tel: (512) 494-9949  |  Fax: (512) 494-9919
jdemerath@808west.com
dcampbell@808west.com

**Counsel    for    Class Member**

7

## <u>CERTIFICATE OF SERVICE</u>

It is hereby certified that a true copy of the foregoing document was submitted on the Court Portal on October 16, 2019.

/s/ Justin B. Demerath
Justin B. Demerath



# NFL CONCUSSION SETTLEMENT

*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

## NOTICE OF DENIAL OF MONETARY AWARD CLAIM
### DATE OF NOTICE: **June 25, 2019**
### DEADLINE TO APPEAL: **July 25, 2019**

## I. SETTLEMENT CLASS MEMBER INFORMATION

| Settlement Program ID | 950012548 | | | |
|---|---|---|---|---|
| **Name** | First<br>Robin | M.I.<br>B | Last<br>Cornish | |
| **Settlement Class Member Type** | Representative Claimant | | | |
| **Law Firm** | O'Hanlon, Demerath & Castillo | | | |
| **Asserted Qualifying Diagnosis** | Death with CTE (Chronic Traumatic Encephalopathy) | **Date** | | 8/23/08 |

## II. EXPLANATION OF CLAIM DETERMINATION

This Notice is an official communication from the Claims Administrator for the NFL Concussion Settlement Program.  We sent you a Notice of Request for Additional Documents or Notice of Preliminary Review telling you about insufficient documents and/or missing information in your Claim Package.  The response deadline on that Notice has expired, or you have responded but did not resolve the issue(s) we told you about, and your claim is denied because it remains incomplete for these reason(s):

| | **What was Missing** | **How We Told You to Address this Item** |
|---|---|---|
| **1.** | You have not submitted any medical records reflecting the Qualifying Diagnosis. | Click the Respond button, go to Section 3 for Medical Records, click the Upload Medical Records button and follow the instructions to upload medical records reflecting the Qualifying Diagnosis. |

Section III below explains your right to appeal this denied claim, but you also have the option to submit a new Claim Package under Section 9.1(c)(i) of the Settlement Agreement.  We will determine whether the new claim can be considered for a Monetary Award based on several factors, including whether the new claim shows materially changed circumstances from the earlier claim.  These materially changed circumstances may include: (a) a different type of Qualifying Diagnosis than the one that was denied; or (b) the same type of Qualifying Diagnosis but with a different diagnosis date supported by additional medical records.  If you submit a new claim within 365 days of this denial notice, Section 10.3(d)(ii) of the Settlement Agreement requires us to audit that new claim if it is based on the same Qualifying Diagnosis as this denied claim, but the new diagnosis was made by a different physician.

## III. YOUR RIGHT TO APPEAL THIS DETERMINATION

If you have a good faith belief that the decision to deny your Monetary Award claim is incorrect, you may appeal this determination to the Court under Section 9.5 of the Settlement Agreement.  To do so, click the Appeal Denied Claim button on your secure online portal and follow the instructions provided.  You must submit supporting evidence to support your appeal. Any written statement may not be more than 10 double-spaced pages.  You must do so on or before the Deadline to Appeal stated at the top of this Notice.

If you decide to appeal, the Settlement Agreement requires you to pay an Appeal Fee of $1,000, which you can do using the online PayPal option or by check made payable to the NFL Claims Administrator. This fee will be refunded if your appeal is successful. If you are unable to pay the $1,000 fee, you may make a hardship request to us to waive the fee and will have to submit financial information showing a sufficient hardship.

If paying the $1,000 Appeal Fee by check, mail the check to the address below.

> NFL Concussion Settlement
> Claims Administrator
> P.O. Box 25369
> Richmond, VA  23260

The Special Master appointed by the Court will decide your appeal based upon a showing by you of clear and convincing evidence. The Special Master's factual determinations will be final and binding, but you or Co-Lead Class Counsel or the NFL Parties may object to any of the Special Master's conclusions of law, which will then be subject to de novo (*i.e.*, a new) review by the Court.

If an appeal is not submitted on or before the deadline stated at the top of this Notice, the determination in this Notice will become final.

## IV. CO-LEAD CLASS COUNSEL'S RIGHT TO APPEAL THIS DETERMINATION

Section 9.5 of the Settlement Agreement also gives Co-Lead Class Counsel the right to challenge our decision to deny your Monetary Award claim. If Co-Lead Class Counsel chooses to appeal, it must do so by the Deadline to Appeal stated at the top of this Notice and must provide a written copy of its Appeals Form and any supporting evidence to you, the NFL Parties, and us.

If an appeal is taken by you or Co-Lead Class Counsel, the NFL Parties may submit a written opposition (not to exceed 10 double-spaced pages) no later than 30 days after receipt of the Appeals Form. The party taking the appeal is not permitted to submit a reply.

Co-Lead Class Counsel may also submit a written statement (not to exceed 10 double-spaced pages) in response to your appeal no later than 15 days after receipt of the Appeals Form, and you and the NFL Parties may each submit a reply to any such submission by Co-Lead Class Counsel.

## V. HOW TO CONTACT US WITH QUESTIONS OR FOR HELP

If you are represented by a lawyer, consult with your lawyer if you have questions or need assistance. If you are unrepresented and have any questions about this Notice or need help, contact us at 1-855-887-3485 or send an email to ClaimsAdministrator@NFLConcussionSettlement.com. If you are a lawyer, call or email your designated Firm Contact for assistance. For more information about the Settlement program, visit the official website at www.NFLConcussionSettlement.com to read the Frequently Asked Questions or download a copy of the complete Settlement Agreement.





**University of Pittsburgh**
**Physicians, Department**
**of Pathology**

Division of Neuropathology

Clayton A. Wiley, MD, PhD
*Director*

Charleen T. Chu, MD, PhD
Robert H. Garman, DVM
Ronald Hamilton, MD
Julia Kofler, MD
Scott M. Kulich, MD, PhD
David Lacomis, MD
Geoffrey Murdoch, MD, PhD
Gutti R. Rao, MD

UPMC Presbyterian
Room 5701 Scaife Hall
200 Lothrop Street
Pittsburgh, PA 15213
T 412-624-9415
F 412-624-5610

To Whom it may concern,

I have conducted a study of F. Cornish's brain tissue. Additionally, in my Neuropathology practice I conduct an ongoing study of all available and existing medical literature related to the existence and diagnosis of CTE and I combine that knowledge with my training and extensive experience related to the study and diagnosis of CTE.

Frank Cornish died on August 23, 2008.

Received from the Tarrant County Medical Examiner are three H&E stained slides (08-10049 slides 1, 2 and 3) and their corresponding formalin-fixed paraffin embedded tissue blocks.

H&E stained recuts are examined:

      slide 1 has neocortex, basal ganglia and thalamus;

      slide 2 has cerebellum and medulla;

      slide 3 has neocortex and midbrain with substantia nigra.

Immunostain of slide 1 for the AD-related protein Beta-A4 is negative. Tau immunostains (PHF-1) are negative in the cerebellum and medulla (slide 2), but reveal numerous neocortical PHF-1/tau positive tangles in neurons (Fig 1a), with staining of many neuronal processes (neuropil threads) (Fig 1b) as well as tau-positive glial cells (Fig 1c), especially in the depths of the sulcus and focally around some blood vessels. In the midbrain, the substantia nigra had tangles and neuropil threads (Fig 1d). The mesencephalic tegmentum shows many tau-positive neurons in the oculomotor nucleus . These histopathologic findings are diagnostic of CTE.



Frank Cornish had CTE.

Sincerely
/s/
Ronald L Hamilton, M.D.

 **CONCUSSION SETTLEMENT**

*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*

No. 2:12-md-02323 (E.D. Pa.)

## PRE-EFFECTIVE DATE DIAGNOSING PHYSICIAN CERTIFICATION FORM
### (for diagnoses made by physicians who are qualified to render Qualifying Diagnoses for purposes of Monetary Award claims before January 7, 2017)

This Pre-Effective Date Diagnosing Physician Certification Form is to be used only by physicians qualified to render Qualifying Diagnoses before January 7, 2017, in connection with the Class Action Settlement in In re: National Football League Players' Concussion Injury Litigation and who made a Qualifying Diagnosis before January 7, 2017. The Qualifying Diagnoses are found in Appendix A to this Pre-Effective Date Diagnosing Physician Certification Form.

Use this form to certify a Qualifying Diagnosis you made before January 7, 2017, based on your personal examination of the Retired NFL Football Player. **Do not sign this form unless you personally examined the player** or, in the case of a Qualifying Diagnosis of Death with CTE, you are the board-certified neuropathologist who made the post-mortem diagnosis of CTE. If you made a Qualifying Diagnosis as a Qualified MAF Physician on or after January 7, 2017, do not use this form; use the MAF Diagnosing Physician Certification Form instead. Also, if you are a Qualified BAP Provider certifying a diagnosis you made in the Baseline Assessment Program, do not use this form; use the BAP Diagnosing Physician Certification Form instead.

You must complete this form in its entirety, sign it under penalty of perjury, and return it to the patient along with copies of all supporting medical records that you created or received in connection with the Qualifying Diagnosis. In turn, the patient, or the patient's counsel, must submit this form and all supporting medical records referred to above to the Claims Administrator as part of a claim for compensation under the Class Action Settlement. The Claims Administrator will review the form, including your qualifications to provide the Qualifying Diagnosis, and the supporting medical records. All claims also are subject to audit. Any finding of fraudulent conduct by you will be subject to, without limitation, your referral to appropriate regulatory and disciplinary boards and agencies and/or federal authorities, and your disqualification from serving in any aspect of the Class Action Settlement.

You are required to preserve all supporting medical records that you created or received in connection with the Qualifying Diagnosis for the greater of: (a) 10 years after January 7, 2017; or (b) the period of time required under applicable state and federal laws.

If you have any questions, call the Claims Administrator toll free at 1-855-887-3485 or visit the Settlement Website at https://www.nflconcussionsettlement.com.

## PRE-EFFECTIVE DATE DIAGNOSING PHYSICIAN CERTIFICATION FORM
### (for diagnoses made by physicians who are qualified to render Qualifying Diagnoses for purposes of Monetary Award claims before January 7, 2017)

### I. PATIENT INFORMATION

| Settlement Program ID (if known) | | 950012548 | | |
|---|---|---|---|---|
| **Name:** | First<br>Frank | M.I. | Last<br>Cornish | Suffix |

| | | |
|---|---|---|
| **Address:** | Address 1<br>2213 Frio Dr. | |
| | Address 2 | |
| | City<br>Keller | |
| | State/Province<br>TX | |
| | Postal Code<br>76248 | Country<br>United States |

| Telephone | | | | 8 1 7 - 8 4 5 - 9 4 4 5 |
|---|---|---|---|---|

| Date of Birth | ██████ / 1 9 6 7<br>(Month/Day/Year) |
|---|---|
| Date of Death (if applicable) | 0 8 / 2 3 / 2 0 0 8<br>(Month/Day/Year) |

### II. DIAGNOSING PHYSICIAN INFORMATION

| National Provider Identifier (NPI) | | 1013980978 | | |
|---|---|---|---|---|
| **Physician Name** | First<br>Ronald | M.I.<br>L. | Last<br>Hamilton | Suffix |

**(a) Are you approved as a Qualified BAP Provider or a Qualified MAF Physician?**

☐ **YES.** If YES, you do not need to fill out the rest of this Section II or Sections III or IV. Instead, go to Section V.

☒ **NO.**

**(b)** If you answered No, have you previously completed this form for another Retired NFL Football Player, that you know was submitted to the Claims Administrator?

☐ **YES.** If YES, you do not need to fill out this Section II or Sections III or IV. Instead, go to Section V.

☒ **NO.**

If you answered No to both questions, fill out the rest of this Section II and then go to Section III.

## PRE-EFFECTIVE DATE DIAGNOSING PHYSICIAN CERTIFICATION FORM
### (for diagnoses made by physicians who are qualified to render Qualifying Diagnoses for purposes of Monetary Award claims before January 7, 2017)

| Office/Practice Name | University of Pittsburgh Medical Center | |
|---|---|---|
| **Address** | Address 1<br>A724.1 Scaife Hall | |
| | Address 2<br>200 Lothrop Street | |
| | City<br>Pittsburgh | |
| | State/Province<br>Pennsylvania | |
| | Postal Code<br>15213 | Country<br>USA |
| **Telephone** | 4 1 2 - 6 2 4 - 6 6 1 0 | |
| **Fax** | 4 1 2 - 6 2 4 - 5 4 8 8 | |
| **Email Address** | hamiltonrl@upmc.edu | |

## III.   BOARD CERTIFICATIONS

Check all board certifications that apply and list the board providing the certification and any identification number provided by the board (*e.g.*, American Board of Psychiatry and Neurology diplomate number). If you do not have any board certifications, summarize your relevant medical training and experience and then go to Section IV.

| | Certification | Board | Board Identification Number | Effective Date | Expiration Date |
|---|---|---|---|---|---|
| ☐ | Neurology | | | | |
| ☐ | Neurosurgery | | | | |
| X | Neuropathology | American Board of Pathology | | certified: 5/23/1996<br>recertified:1/1/2014 | |
| ☐ | Neuropsychology | | | | |
| ☐ | Other Neuro-specialty | | | | |
| X | Other Board Certification | American Board of Pathology | | certified: 5/23/1996 | |

## PRE-EFFECTIVE DATE DIAGNOSING PHYSICIAN CERTIFICATION FORM
### (for diagnoses made by physicians who are qualified to render Qualifying Diagnoses for purposes of Monetary Award claims before January 7, 2017)

If you are not board-certified in a neuro-specialty area, summarize your relevant medical training and experience in the field of neurology and related fields that you believe qualifies you to make the diagnosis provided in Section V.

## IV.    OTHER QUALIFICATIONS

| | | Education Level | Institution | Degree/Area of Focus | Date Received |
|---|---|---|---|---|---|
| Educational Information | 1. | Undergraduate Education | University of Nebraska-Lincoln | B.S / Psychology | 1 9 8 5 (Month/Year) |
| | 2. | Medical School | University of Nebraska Medical Center | M.D. | 1 9 8 9 (Month/Year) |
| | 3. | Internship | Univ. of California, San Diego | Resident Anatomic Pathology | 1 9 9 1 (Month/Year) |
| | 4. | Residency | Univ. of California, San Diego | Resident Neuropathology | 1 9 9 3 (Month/Year) |
| | 5. | Fellowship | Univ. of Pittsburgh | Fellow Neuropathology | 1 9 9 4 (Month/Year) |
| | 6. | Other (Graduate) | Univ. of Pittsburgh | Fellow: NIMH Training Grant in Neuroscience | 1 9 9 5 (Month/Year) |

| States Where Licensed to Practice | | State | State License Number | Effective Date | Expiration Date |
|---|---|---|---|---|---|
| | 1. | California | G69731 | 9/10/1990 | Expired |

| | | PRE-EFFECTIVE DATE DIAGNOSING PHYSICIAN CERTIFICATION FORM (for diagnoses made by physicians who are qualified to render Qualifying Diagnoses for purposes of Monetary Award claims before January 7, 2017) | | | |
|---|---|---|---|---|---|
| | 2. | **Pennsylvania** | **MD049717L** | **5/12/1993** | **12/31/2018** |
| | 3. | **Indiana** | **01067332A** | 9/29/2009 | **10/31/2019** |
| | 4. | | | | |
| | 5. | | | | |
| | 6. | | | | |
| **Specialties** | Check all specialties that apply.<br><br>☐ **Neurology**<br><br>☐ **Neurosurgery**<br><br>☒ **Neuropathology**<br><br>☐ **Neuropsychology**<br><br>☐ **Other Neuro-specialty**<br>(*e.g.*, brain injury medicine, clinical neurophysiology, etc.) _____<br><br>☒ **Other Specialty** (list all)     **Anatomic Pathology** _____ | | | | |

**PRE-EFFECTIVE DATE DIAGNOSING PHYSICIAN CERTIFICATION FORM**
**(for diagnoses made by physicians who are qualified to render Qualifying Diagnoses**
**for purposes of Monetary Award claims before January 7, 2017)**

## V. QUALIFYING DIAGNOSIS

Identify the patient's diagnosis and the date of such diagnosis. *See Appendix A* for the criteria for each diagnosis. Other than for Death with CTE, the identification of a condition, including through a blood test, genetic test, imaging technique, or otherwise, that has not yet resulted in actual cognitive impairment and/or actual neuromuscular impairment in the patient is **not** a Qualifying Diagnosis.

| Qualifying Diagnosis | Date of Diagnosis |
|---|---|
| ☐ Level 1.5 Neurocognitive Impairment | ⎿_⎿_/⎿_⎿_/⎿_⎿_⎿_⏌ (Month/Day/Year) |
| ☐ Level 2 Neurocognitive Impairment* | ⎿_⎿_/⎿_⎿_/⎿_⎿_⎿_⏌ (Month/Day/Year) |
| ☐ Alzheimer's Disease | ⎿_⎿_/⎿_⎿_/⎿_⎿_⎿_⏌ (Month/Day/Year) |
| ☐ Parkinson's Disease | ⎿_⎿_/⎿_⎿_/⎿_⎿_⎿_⏌ (Month/Day/Year) |
| ☐ ALS (amyotrophic lateral sclerosis) | ⎿_⎿_/⎿_⎿_/⎿_⎿_⎿_⏌ (Month/Day/Year) |
| ☒ Death with CTE | ⎿0⎿8⎿/⎿2⎿3⎿/⎿2⎿0⎿0⎿8⏌ * (Month/Day/Year) |

* If you provided a diagnosis of Level 2 Neurocognitive Impairment, did you determine that certain testing was medically unnecessary because of the severity of the patient's dementia (*see Appendix A*)?

☐ YES          ☐ NO

If you answered Yes, provide the factual basis for that determination:

*Pursuant to FAQ 93, Posted Settlement Program FAQs (as of November 7, 2018), for this claim, "the date of the Qualifying Diagnosis is the date of the Player's death, even though the diagnosis is not made until after the Player dies".

| | |
|---|---|
| **PRE-EFFECTIVE DATE DIAGNOSING PHYSICIAN CERTIFICATION FORM**<br>**(for diagnoses made by physicians who are qualified to render Qualifying Diagnoses**<br>**for purposes of Monetary Award claims before January 7, 2017)** | |
| **VI. CERTIFICATION** | |

By signing below, I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that all information provided in this form, and all related supporting medical records, are true and correct to the best of my knowledge, information and belief, and that I personally examined the Retired NFL Football Player named in Section I or, in the case of a Qualifying Diagnosis of Death with CTE, I am the board-certified neuropathologist who made the post-mortem diagnosis of CTE.

I acknowledge that any finding of fraudulent conduct may subject me to, without limitation, referral to appropriate regulatory and disciplinary boards and agencies and/or federal authorities, and disqualification from serving in any aspect of the Class Action Settlement.

| Signature of Diagnosing Physician | | Date of Signature | 0 2 / 0 6 / 2 0 1 9<br>(Month/Day/Year) |
|---|---|---|---|
| **Printed Name** | First<br>Ronald | M.I.<br>L. | Last<br>Hamilton |

## APPENDIX A

Other than for Death with CTE, the identification of a condition, including through a blood test, genetic test, imaging technique, or otherwise, that has not yet resulted in actual cognitive impairment and/or actual neuromuscular impairment experienced by the patient does not qualify as a diagnosis.

LEVEL 1.5 NEUROCOGNITIVE IMPAIRMENT

**The following diagnosis can only be made:**

> (1) prior to July 7, 2014, by a board-certified neurologist, board-certified neurosurgeon, other board-certified neuro-specialist physician, or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician, except as provided in (c), below;

> (2) from July 7, 2014 through January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified neurologist, board-certified neurosurgeon, or other board-certified neuro-specialist physician, except as provided in (c), below; or

> (3) for a patient who died prior to January 7, 2017 (the Effective Date of the Settlement Agreement), where the diagnosis occurred while the patient was living, by a board-certified or otherwise qualified neurologist, neurosurgeon, or other neuro-specialist physician, or by a physician with sufficient qualifications in the field of neurology or neurocognitive disorders to make a diagnosis of Level 1.5 Neurocognitive Impairment:

A diagnosis made outside of the Baseline Assessment Program (BAP) that a living patient suffers from Level 1.5 Neurocognitive Impairment, as set forth below, *i.e.*, early dementia, based on evaluation and evidence generally consistent with the diagnostic criteria set forth and provided below:

There is: (i) Concern of the patient, a knowledgeable informant, or the Qualified BAP Provider that there has been a severe decline in cognitive function; (ii) Evidence of a moderate to severe cognitive decline from a previous level of performance, as determined by and in accordance with the standardized neuropsychological testing protocol annexed in *Appendix B*, in two or more cognitive domains (complex attention, executive function, learning and memory, language, perceptual-spatial), provided one of the cognitive domains is (a) executive function, (b) learning and memory, or (c) complex attention; (iii) The patient exhibits functional impairment generally consistent with the criteria set forth in the National Alzheimer's Coordinating Center's Clinical Dementia Rating scale Category 1.0 (Mild) in the areas of Community Affairs, Home & Hobbies, and Personal Care—where such functional impairment is corroborated by documentary evidence (*e.g.*, medical records, employment records), the sufficiency of which will be determined by the physician making the diagnosis (and where no documentary evidence of functional impairment exists or is available, then (a) there must be evidence of moderate to severe cognitive decline from a previous level of performance, as determined by and in accordance with the standardized neuropsychological testing protocol annexed in *Appendix B*, in the executive function cognitive domain or the learning and memory cognitive domain, and at least one other cognitive domain; and (b) the patient's functional impairment, as described above, must be corroborated by a third-party sworn affidavit from a person familiar with the patient's condition (other than the player or his family members), the sufficiency of which will be determined by the diagnosing physician); and (iv) The cognitive deficits do not occur exclusively in the context of a delirium, acute substance abuse, or as a result of medication side effects.

## LEVEL 2 NEUROCOGNITIVE IMPAIRMENT

**The following diagnosis can only be made:**

> **(1) prior to July 7, 2014, by a board-certified neurologist, board-certified neurosurgeon, other board-certified neuro-specialist physician, or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician, except as provided in (c), below;**

> **(2) from July 7, 2014 through January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified neurologist, board-certified neurosurgeon, or other board-certified neuro-specialist physician, except as provided in (c), below; or**

> **(3) for a patient who died prior to January 7, 2017 (the Effective Date of the Settlement Agreement), where the diagnosis occurred while the patient was living, by a board-certified or otherwise qualified neurologist, neurosurgeon, or other neuro-specialist physician, or by a physician with sufficient qualifications in the field of neurology or neurocognitive disorders to make a diagnosis of Level 2 Neurocognitive Impairment:**

A diagnosis made outside of the Baseline Assessment Program (BAP) that a living patient suffers from Level 2 Neurocognitive Impairment, as set forth below, *i.e.*, moderate dementia, based on evaluation and evidence generally consistent with the diagnostic criteria set forth and provided below, unless the diagnosing physician can certify in Section IV of the Diagnosing Physician Certification Form, above, that certain testing specified below for Level 2 Neurocognitive Impairment is medically unnecessary because the patient's dementia is so severe:

There is: (i) Concern of the patient, a knowledgeable informant, or the Qualified BAP Provider that there has been a severe decline in cognitive function; (ii) Evidence of a severe cognitive decline from a previous level of performance, as determined by and in accordance with the standardized neuropsychological testing protocol annexed in *Appendix B*, in two or more cognitive domains (complex attention, executive function, learning and memory, language, perceptual-spatial), provided one of the cognitive domains is (a) executive function, (b) learning and memory, or (c) complex attention; (iii) The patient exhibits functional impairment generally consistent with the criteria set forth in the National Alzheimer's Coordinating Center's Clinical Dementia Rating scale Category 2.0 (Moderate) in the areas of Community Affairs, Home & Hobbies, and Personal Care—where such functional impairment is corroborated by documentary evidence (*e.g.*, medical records, employment records), the sufficiency of which will be determined by the physician making the diagnosis (and where no documentary evidence of functional evidence exists or is available, then (a) there must be evidence of severe cognitive decline from a previous level of performance, as determined by and in accordance with the standardized neuropsychological testing protocol annexed in *Appendix B*, in the executive function cognitive domain or the learning and memory cognitive domain, and at least one other cognitive domain; and (b) the patient's functional impairment, as described above, must be corroborated by a third-party sworn affidavit from a person familiar with the patient's condition (other than the player or his family members), the sufficiency of which will be determined by the diagnosing physician); and (iv) The cognitive deficits do not occur exclusively in the context of a delirium, acute substance abuse, or as a result of medication side effects.

## ALZHEIMER'S DISEASE

(1) The following diagnosis can only be made:

(a) prior to July 7, 2014, by a board-certified neurologist, board-certified neurosurgeon, other board-certified neuro-specialist physician, or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician; or

(b) from July 7, 2014 through January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified neurologist, board-certified neurosurgeon, or other board-certified neuro-specialist physician:

A diagnosis in a living patient of the specific disease of Alzheimer's Disease as defined by the World Health Organization's International Classification of Diseases, 9th Edition (ICD-9), the World Health Organization's International Classification of Diseases, 10th Edition (ICD-10), or a diagnosis of Major Neurocognitive Disorder due to probable Alzheimer's Disease as defined in the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5).

(2) The following diagnosis can only be made prior to January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician, or by a physician with sufficient qualifications in the field of neurology to make such a diagnosis, where the diagnosis was made while the patient was living but thereafter died prior to January 7, 2017 (the Effective Date of the Settlement Agreement):

A diagnosis of Major Neurocognitive Disorder due to probable Alzheimer's Disease consistent with the definition in *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) or a diagnosis of Alzheimer's Disease.

## PARKINSON'S DISEASE

(1) The following diagnosis can only be made:

(a) prior to July 7, 2014, by a board-certified neurologist, board-certified neurosurgeon, other board-certified neuro-specialist physician, or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician; or

(b) from July 7, 2014 through January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified neurologist, board-certified neurosurgeon, or other board-certified neuro-specialist physician:

A diagnosis in a living patient of the specific disease of Parkinson's Disease as defined by the World Health Organization's International Classification of Diseases, 9th Edition (ICD-9), the World Health Organization's International Classification of Diseases, 10th Edition (ICD-10), or a diagnosis of Major Neurocognitive Disorder probably due to Parkinson's Disease as defined in the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5).

(2) The following diagnosis can only be made prior to January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician, or by a physician with sufficient qualifications in the field of neurology to make such a diagnosis, where the diagnosis was made while the patient was living but thereafter died prior to January 7, 2017 (the Effective Date of the Settlement Agreement):

A diagnosis of Parkinson's Disease.

## ALS

**(1) The following diagnosis can only be made:**

    **(a) prior to July 7, 2014, by a board-certified neurologist, board-certified neurosurgeon, other board-certified neuro-specialist physician, or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician; or**

    **(b) from July 7, 2014 through January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified neurologist, board-certified neurosurgeon, or other board-certified neuro-specialist physician:**

A diagnosis in a living patient of the specific disease of Amyotrophic Lateral Sclerosis, also known as Lou Gehrig's Disease (ALS), as defined by the World Health Organization's International Classification of Diseases, 9th Edition (ICD-9) or the World Health Organization's International Classification of Diseases, 10th Edition (ICD-10).

**(2) The following diagnosis can only be made prior to January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician, or by a physician with sufficient qualifications in the field of neurology to make such a diagnosis, where the diagnosis was made while the patient was living but thereafter died prior to January 7, 2017 (the Effective Date of the Settlement Agreement):**

A diagnosis of the specific disease of Amyotrophic Lateral Sclerosis (ALS).

## CTE

**The following diagnosis can only be made prior to April 22, 2015 by a board-certified neuropathologist, provided that a patient who died between July 7, 2014 and April 22, 2015 has until 270 days from the date of death to obtain such a post-mortem diagnosis:**

A post-mortem diagnosis of Chronic Traumatic Encephalopathy (CTE).

# APPENDIX B

## BASELINE NEUROPSYCHOLOGICAL TEST BATTERY AND SPECIFIC IMPAIRMENT CRITERIA FOR RETIRED NFL FOOTBALL PLAYERS

### Section 1: Test Battery

**Estimating Premorbid Intellectual Ability**

ACS Test of Premorbid Functioning (TOPF)

**Complex Attention/Processing Speed (6 scores)**

WAIS-IV Digit Span

WAIS-IV Arithmetic

WAIS-IV Letter Number Sequencing

WAIS-IV Coding

WAIS-IV Symbol Search

WAIS-IV Cancellation

**Executive Functioning (4 scores)**

Verbal Fluency (FAS)

Trails B

Booklet Category Test

WAIS-IV Similarities

**Effort/Performance Validity (8 scores)**

*ACS Effort Scores*

ACS-WAIS-IV Reliable Digit Span

ACS-WMS-IV Logical Memory Recognition

ACS-WMS-IV Verbal Paired Associates Recognition

ACS-WMS-IV Visual Reproduction Recognition

ACS-Word Choice

*Additional Effort Tests*

Test of Memory Malingering (TOMM)

Medical Symptom Validity Test (MSVT)

**Learning and Memory (6 scores)**

WMS-IV Logical Memory I

WMS-IV Logical Memory II

WMS-IV Verbal Paired Associates I

WMS-IV Verbal Paired Associates II

WMS-IV Visual Reproduction I

WMS-IV Visual Reproduction II

**Language (3 scores)**

Boston Naming Test

Category Fluency (Animal Naming)

BDAE Complex Ideational Material

**Spatial-Perceptual (3 scores)**

WAIS-IV Block Design

WAIS-IV Visual Puzzles

WAIS-IV Matrix Reasoning

**Mental Health**

MMPI-2RF

Mini International Neuropsychiatric Interview

### Section 2: Evaluate Performance Validity

Freestanding, embedded and regression based performance validity metrics will be administered to each Retired NFL Football Player during baseline and, if relevant, subsequent neuropsychological examinations. There will be at least seven performance validity metrics utilized during each assessment. The specific performance validity metrics utilized will not be released to the public in order to maintain the highest standards of assessment validity.  The performance

---

Pre-Effective Date Diagnosing Physician Certification Form                                    Page 12 of 17

# APPENDIX B

validity metrics employed will be rotated at intervals determined by the Appeals Advisory Panel in consultation with Co-Lead Class Counsel and Counsel for the NFL Parties.

Each neuropsychological examiner must complete a checklist of validity criteria as set forth in *Slick et al.* 1999, and revised in 2013 (see below) for every Retired NFL Football Player examined in order to determine whether the Retired NFL Football Player's test data is a valid reflection of his optimal level of neurocognitive functioning.

1. Suboptimal scores on performance validity embedded indicators or tests. The cutoffs for each test should be established based on empirical findings.

2. A pattern of neuropsychological test performance that is markedly discrepant from currently accepted models of normal and abnormal central nervous system (CNS) function. The discrepancy must be consistent with an attempt to exaggerate or fabricate neuropsychological dysfunction (e.g., a patient performs in the severely impaired range on verbal attention measures but in the average range on memory testing; a patient misses items on recognition testing that were consistently provided on previous free recall trials, or misses many easy items when significantly harder items from the same test are passed).

3. Discrepancy between test data and observed behavior. Performance on two or more neuropsychological tests within a domain are discrepant with observed level of cognitive function in a way that suggests exaggeration or fabrication of dysfunction (e.g., a well-educated patient who presents with no significant visual-perceptual deficits or language disturbance in conversational speech performs in the severely impaired range on verbal fluency and confrontation naming tests).

4. Discrepancy between test data and reliable collateral reports. Performance on two or more neuropsychological tests within a domain are discrepant with day-to-day level of cognitive function described by at least one reliable collateral informant in a way that suggests exaggeration or fabrication of dysfunction (e.g., a patient handles all family finances but is unable to perform simple math problems in testing).

5. Discrepancy between test data and documented background history. Improbably poor performance on two or more standardized tests of cognitive function within a specific domain (e.g., memory) that is inconsistent with documented neurological or psychiatric history.

6. Self-reported history is discrepant with documented history. Reported history is markedly discrepant with documented medical or psychosocial history and suggests attempts to exaggerate deficits.

7. Self-reported symptoms are discrepant with known patterns of brain functioning. Reported or endorsed symptoms are improbable in number, pattern, or severity; or markedly inconsistent with expectations for the type or severity of documented medical problems.

8. Self-reported symptoms are discrepant with behavioral observations. Reported symptoms are markedly inconsistent with observed behavior (e.g., a patient complains of severe episodic memory deficits yet has little difficulty remembering names, events, or appointments; a patient complains of severe cognitive deficits yet has little difficulty driving independently and arrives on time for an appointment in an unfamiliar area; a patient complains of severely slowed mentation and concentration problems yet easily follows complex conversation).

9. Self-reported symptoms are discrepant with information obtained from collateral informants. Reported symptoms, history, or observed behavior is inconsistent with information obtained from other informants judged to be adequately reliable. The discrepancy must be consistent with an attempt to exaggerate deficits (e.g., a patient reports severe memory impairment and/or behaves as if severely memory-impaired, but his spouse reports that the patient has minimal memory dysfunction at home).

## APPENDIX B

Notwithstanding a practitioner's determination of sufficient effort in accordance with the foregoing factors, a Retired NFL Football Player's failure on two or more effort tests may result in the Retired NFL Football Player's test results being subjected to independent review, or result in a need for supplemental testing of the Retired NFL Football Player.

Note: Additional information relating to the evaluation of effort and performance validity will be provided in a clinician's interpretation guide.

### Section 3: Estimate Premorbid Intellectual Ability

| Test | Ability |
|------|---------|
| Test of Premorbid Functioning (TOPF) | Reading<br>Reading + Demographic Variables |

The Test of Premorbid Functioning (TOPF) provides three models for predicting premorbid functioning: (a) demographics only, (b) TOPF only, and (c) combined demographics and TOPF prediction equations. For each model using demographic data, a simple and complex prediction equation can be selected. In the simple model, only sex, race/ethnicity, and education, are used in predicting premorbid ability. In the complex model, developmental, personal, and more specific demographic data is incorporated into the equations. The clinician should select a model based on the patient's background and his or her current level of reading or language impairment.

Note: It is necessary to estimate premorbid intellectual functioning in order to use the criteria for impairment set out in this document. Estimated premorbid intellectual ability will be assessed and classified as:

➢ Below Average (estimated IQ below 90);

➢ Average (estimated IQ between 90 and 109);

➢ Above Average (estimated IQ above 110).

### Section 4: Neuropsychological Test Score Criteria by Domain of Cognitive Functioning

There are 5 domains of cognitive functioning. In each domain, there are several tests that contribute 3, 4, or 6 demographically-adjusted test scores for consideration. Test selection in the domains was based on the availability of demographically-adjusted normative data for Caucasians and African Americans. These domains and scores are set out below.

The basic principle for defining impairment on testing is that there must be a pattern of performance that is approximately 1.5 standard deviations (for Level 1 Impairment), 1.7-1.8 standard deviations (for Level 1.5 Impairment) or 2 standard deviations (for Level 2 Impairment) below the person's expected level of premorbid functioning. Therefore, it is necessary to have more than one low test score in each domain. A user manual will be provided to neuropsychologists setting out the cutoff scores, criteria for identifying impairment in each cognitive domain, and statistical and normative data to support the impairment criteria.

## APPENDIX B

| Domain/Test | Ability |
|---|---|
| **Complex Attention/Speed of Processing (6 Scores)** | |
| Digit Span | Attention & Working Memory |
| Arithmetic | Mental Arithmetic |
| Letter Number Sequencing | Attention & Working Memory |
| Coding | Visual-Processing & Clerical Speed |
| Symbol Search | Visual-Scanning & Processing Speed |
| Cancellation | Visual-Scanning Speed |
| **Executive Functioning (4 scores)** | |
| Similarities | Verbal Reasoning |
| Verbal Fluency (FAS) | Phonemic Verbal Fluency |
| Trails B | Complex Sequencing |
| Booklet Category Test | Conceptual Reasoning |
| **Learning and Memory (6 scores)** | |
| Logical Memory I | Immediate Memory for Stories |
| Logical Memory II | Delayed Memory for Stories |
| Verbal Paired Associates I | Learning Word Pairs |
| Verbal Paired Associates II | Delayed Memory for Word Pairs |
| Visual Reproduction I | Immediate Memory for Designs |
| Visual Reproduction II | Delayed Memory for Designs |
| **Language** | |
| Boston Naming Test | Confrontation Naming |
| BDAE Complex Ideational Material | Language Comprehension |
| Category Fluency | Category (Semantic) Fluency |
| **Visual-Perceptual** | |
| Block Design | Spatial Skills & Problem Solving |
| Visual Puzzles | Visual Perceptual Reasoning |
| Matrix Reasoning | Visual Perceptual Reasoning |

Impairment Criteria: *Below Average* Estimated Intellectual Functioning (A1 – E1)

**A1. Complex Attention (6 test scores)**

1. Level 1 Impairment: 3 or more scores below a T score of 35

2. Level 1.5 Impairment: 4 or more scores below a T score of 35; or meet for Level 1 and 2 scores below a T score of 30

3. Level 2 Impairment: 3 or more scores below a T score of 30

**B1. Executive Function (4 test scores)**

1. Level 1 Impairment: 2 or more scores below a T score of 35

2. Level 1.5 Impairment: 3 or more scores below a T score of 35; or meet for Level 1 and 1 score below a T score of 30

## APPENDIX B

3. Level 2 Impairment: 2 or more scores below a T score of 30

**C1. Learning and Memory (6 test scores)**

1. Level 1 Impairment: 3 or more scores below a T score of 35

2. Level 1.5 Impairment: 4 or more scores below a T score of 35; or meet for Level 1 and 2 scores below a T score of 30

3. Level 2 Impairment: 3 or more scores below a T score of 30

**D1. Language (3 test scores)**

1. Level 1 Impairment: 3 or more scores below a T score of 37

2. Level 1.5 Impairment: meet for Level 1 and 2 scores below a T score of 35

3. Level 2 Impairment: 3 or more scores below a T score of 35

**E1. Visual-Perceptual (3 test scores)**

1. Level 1 Impairment: 3 or more scores below a T score of 37

2. Level 1.5 Impairment: meet for Level 1 and 2 scores below a T score of 35

3. Level 2 Impairment: 3 or more scores below a T score of 35

**Impairment Criteria: *Average* Estimated Intellectual Functioning (A2 – E2)**

**A2. Complex Attention (6 test scores)**

1. Level 1 Impairment: 2 or more scores below a T score of 35

2. Level 1.5 Impairment: 3 or more scores below a T score of 35; or meet for Level 1 and 1 score below a T score of 30

3. Level 2 Impairment: 2 or more scores below a T score of 30

**B2. Executive Function (4 test scores)**

1. Level 1 Impairment: 2 or more scores below a T score of 35

2. Level 1.5 Impairment: 3 or more scores below a T score of 35; or meet for Level 1 and 1 score below a T score of 30

3. Level 2 Impairment: 2 or more scores below a T score of 30

**C2. Learning and Memory (6 test scores)**

1. Level 1 Impairment: 2 or more scores below a T score of 35

2. Level 1.5 Impairment: 3 or more scores below a T score of 35; or meet for Level 1 and 1 score below a T score of 30

3. Level 2 Impairment: 2 or more scores below a T score of 30

**D2. Language (3 test scores)**

1. Level 1 Impairment: 2 or more scores below a T score of 37

2. Level 1.5 Impairment: 3 or more scores below a T score of 37; or meet for Level 1 and 1 score below a T score of 35

3. Level 2 Impairment: 2 or more scores below a T score of 35

**E2. Visual-Perceptual (3 test scores)**

1. Level 1 Impairment: 2 or more scores below a T score of 37

2. Level 1.5 Impairment: 3 or more scores below a T score of 37; or meet for Level 1 and 1 score below a T score of 35

3. Level 2 Impairment: 2 or more scores below a T score of 35

# APPENDIX B

**Impairment Criteria: *Below Average* Estimated Intellectual Functioning (A3 – E3)**

### A3.  Complex Attention (6 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 35

2. Level 1.5 Impairment: meet for Level 1 and 3 or more scores below a T score of 37

3. Level 2 Impairment: 3 or more scores below a T score of 35

### B3.  Executive Function (4 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 37

2. Level 1.5 Impairment: meet for Level 1 and 3 or more scores below a T score of 37; or meet for Level 1 and 1 score below a T score of 30

3. Level 2 Impairment: 2 or more scores below a T score of 30

### C3.  Learning and Memory (6 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 35

2. Level 1.5 Impairment: meet for Level 1 and 3 or more scores below a T score of 37

3. Level 2 Impairment: 3 or more scores below a T score of 35

### D3.  Language (3 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 40

2. Level 1.5 Impairment: 3 scores below at T score of 40; or meet for Level 1 and 1 score below a T score of 37

3. Level 2 Impairment: 2 or more scores below a T score of 37

### E3.  Visual-Perceptual (3 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 40

2. Level 1.5 Impairment: 3 scores below at T score of 40; or meet for Level 1 and 1 score below a T score of 37

3. Level 2 Impairment: 2 or more scores below a T score of 37

## Section 5: Mental Health Assessment

| Test | Symptoms/Functioning | Assessment |
| --- | --- | --- |
| MMPI-2RF | Mental Health Assessment | Evaluation of Validity Scales and Configurations; T-Scores for Symptom Domains |
| Mini International Neuropsychiatric Interview (M.I.N.I. Version 5.0.0) | Semi-structured Psychiatric Interview | Scale Criteria for Various Psychiatric Diagnoses |

**Ronald L. Hamilton, M.D.**

1/2/2017

## CURRICULUM VITAE

### BIOGRAPHICAL

| | | | |
|---|---|---|---|
| **Name:** | Ronald Lee Hamilton | **Birth Date:** | ████████ |
| **Home Address:** | ██████████ Pittsburgh, PA 15232 | **Birth Place:** | Omaha, Nebraska |
| **Marital status:** | single | | |
| **Home Phone** | ███████ | **Citizenship:** | USA |
| **Business Address:** | Division of Neuropathology A724.1 Scaife Hall 200 Lothrop Street Pittsburgh, PA 15213 | | |
| **Business Phone:** | 412-624-6610 | | |
| **Business Fax:** | 412-624-5488 | | |
| **e-mail address** | hamiltonrl@upmc.edu | | |

### EDUCATION AND TRAINING

| | | | |
|---|---|---|---|
| 1977-1985 | University of Nebraska-Lincoln | B.S. | Psychology |
| 1985-1989 | University of Nebraska Medical Center | M.D. | |
| 1989-1991 | University of California, San Diego Program Director, David Bailey | Resident Anatomic Pathology | |
| 1991-1993 | University of California, San Diego Program Director, Henry C. Powell | Resident Neuropathology | |
| 1993-1994 | University of Pittsburgh Program Director, Clayton A Wiley | Fellow Neuropathology | |
| 1994-1995 | University of Pittsburgh Program Director, Michael Zigmond | Fellow: NIMH Training Grant in Neuroscience | |

### APPOINTMENTS AND POSITIONS:

| | |
|---|---|
| 1995-2002 | University of Pittsburgh School of Medicine -Assistant Professor of Pathology |
| 2002-present | University of Pittsburgh School of Medicine -Associate Professor of Pathology |

### DISTRIBUTION OF % TIME

| | |
|---|---|
| Research | 20% |
| Other scholarly activity | 8% |
| Teaching | 10% |
| Clinical | 35% |
| Combined clinical and teaching | 20% |
| Service activities | 5% |
| Administrative activities. | 2% |
| | |
| TOTAL | 100% |

**Ronald L. Hamilton, M.D.**

## CERTIFICATION and LICENSURE

**SPECIALTY CERTIFICATION**

| | | |
|---|---|---|
| American Board of Pathology | Anatomic Pathology | 5/23/96 |
| American Board of Pathology | Neuropathology | 5/23/96 |
| American Board of Pathology – recertification | Neuropathology | 1/1/2014 |

**MEDICAL or OTHER PROFESSIONAL LICENSURE**

| | |
|---|---|
| 1990 | California Medical License (G69731) expired |
| 1993 | Pennsylvania Medical License (MD-049717-L) |
| 2009 | Indiana Medical License (01067332A) |

## MEMBERSHIPS IN PROFESSIONAL AND SCIENTIFIC SOCIETIES

| | |
|---|---|
| 1992 | American Association for the Advancement of Science |
| 1993 | American Association of Neuropathology |
| 1993 | International Society of Neuropathology |
| 1994 | College of American Pathologists (CAP) |
| 1995-97 | CAP Neuropathology Subcommittee |
| 1998 | Children's Cancer Group, Study Committee for CCGB975 |
| 1999 | Society for Neuroscience |

## HONORS

| | |
|---|---|
| Nominated "Teacher of the Year: Anatomic Pathology" | 1997 |
| Nominated "Teacher of the Year: Anatomic Pathology" | 1998 |
| Nominated "Teacher of the Year: Anatomic Pathology" | 1999 |
| Nominated "Teacher of the Year: Anatomic Pathology" | 2000 |
| Nominated "Teacher of the Year: Anatomic Pathology" | 2001 |
| Nominated "Teacher of the Year: Anatomic Pathology" | 2002 |
| UPMC ACES Award winner (ACES is an Award for | 2003 |

Clinical Excellence and Service and is given to about 10 physicians per year at UPMC)

| | |
|---|---|
| Letter of appreciation from Chief Residents | 1997-1998 |
| AP Pathology "TEACHER OF THE YEAR" | 2004-05 |

## PUBLICATIONS

**Refereed Articles**

1. Esch O, Spinosa JC, **Hamilton RL**, Crombie DL, Schteigart CO, Rondinone JF, D'Agostino HB, Lillienau J and Hofmann AF: Acute effects of topical methyl tert-butyl ether or ethyl propionate on gallbladder histology in animals: a comparison of two solvents for contact dissolution of cholesterol gallstones. Hepatology 16 (4):984-991, 1992.

2. Anders KH, Becker PS, Holden JK, Sharer LR, Cornford ME, Hansen LA, **Hamilton R,** Vinters, HV: Multifocal necrotizing leukoencephalopathy with pontine predilection in immunosuppressed patients: a clinicopathologic review of sixteen cases. Human Pathology 24:897-904, 1993.

3. **Hamilton RL**, Achim C, Grafe MR, Fremont JC, Miners D, Wiley CA: Herpes simplex virus brainstem encephalitis in an AIDS patient. Clinical Neuropathology, 14: 45-50, 1995.

**Ronald L. Hamilton, M.D.**

4. Rose J, Haskell WL, Gamble JG, **Hamilton RL**, Brown DA, Rinsky L: Muscle pathophysiology and clinical measures of disability in children with cerebral palsy. Journal of Orthopedic Research, 12(6): 758-768, 1994.

5. **Hamilton RL**, Grafe MR: Complete absence of the cerebellum: a report of two cases. Acta Neuropathologica 88 (3): 258-261, 1994.

6. **Hamilton RL**, Haas RH, Nyhan WL, Powell HC, Grafe MR: The neuropathology of propionic academia: a report of two additional cases.  Journal of Child Neurology 10(1): 25-30, 1995.

7. Haas RH, Marsden DL, Capistrano-Estrada S, **Hamilton RL**, Grafe MR, Wong W, Nyhan WL: Acute basal ganglia infarction in propionic acidemia.  Journal of Child Neurology 10(1) 18-22, 1995.

8. Kupperman BD, Quiceno JI, Wiley C, Hesselink J**, Hamilton R**, Keefe K, Garcia R, Freeman WR: Clinical and histopathologic study of varicella zoster virus retinitis in patients with the acquired immunodeficiency syndrome.  American Journal of Ophthalmology 118:589-600, 1994.

9. Adelson PD, Robichaurd P, **Hamilton RL**, Kochanek PM. A Model of Diffuse Traumatic Brain  Injury in the Immature Rat.  J Neurosurg 85:877-884, 1996.

10. Alper G, Crumrine PK, **Hamilton RL**, Albright L, Wald ER. An unusual case of inflammatory spinal epidural  mass (Castleman's syndrome) Pediatric Neurology  15: 60-2 , 1996

11. Adelson PD, Firlik KS, Firlik AD, **Hamilton RL**. A meningeal cyst of the thoracic spine presenting as prolonged paresis after ankle injury: case report. Neuropediatrics 27:207-210, 1996.

12. Cramer SC, Segal A, **Hamilton RL**, Schmahman J, Ma J. Leukoencephalitis Due to Varicella Zoster Virus:   Report of a Case and Review of Clinical Features.  Contemporary Neurology, 1, 1996 (electronic journal).

13. Mansfield RT, Schiding JK, **Hamilton R**, Kochanek PM: Effects of hypothermia on traumatic brain injury in immature rats. J Cerebral Blood Flow  Metabo 16(2): 244-252, 1996.

14. Pollack IF, Campbell JW, **Hamilton RL**, Martinez AJ, Bozik ME. Proliferation index as a predictor of prognosis in malignant gliomas of childhood. Cancer 79:849-856, 1996

15. Pollack IF, **Hamilton RL,** Finkelstein SD, Campbell JW, Martinez AJ, Sherwin RN, Bozik ME, Gollin SM. The relationship between tp53 mutations and overexpression of p53 and prognosis in malignant gliomas of childhood. Cancer Research 57:304-309, 1997.

16. Ikonomovic MD, Mizukami K, Davies P, **Hamilton R**, Sheffield R, Armstrong DM. The loss of GluR2(3) immunoreactivity preceded neurofibrillary tangle formation in the entorhinal cortex and hippocampus of Alzheimer brains. J Neuropath Exp Neurol 56:1018-1027, 1997.

17. Bredel M, Pollack IF, Campbell JW, **Hamilton RL**: Basic fibroblast growth factor as a predictor of prognosis in pediatric high-grade gliomas. Clinical Cancer Research 3:2157-2164, 1997

18. Blatt J, **Hamilton RL**: Neurodevelopmental anomalies in children with neuroblastoma. Cancer 82: 1603-8, 1998.

19. Fukui MB, Livstone BJ, Meltzer CC, **Hamilton RL**: Hemorrhagic presentation of untreated primary central nervous system lymphoma in the acquired immunodeficiency syndrome. Am J Roentgnol 170:1114-1115, 1998..

20. Bredel M, Pollack IF, **Hamilton RL**, James CD: Epidermal growth factor receptor (EGFR) and gene amplification in high-grade non-brainstem gliomas of childhood. Clin Can Res 5:1786-92, 1999

**Ronald L. Hamilton, M.D.**

21. Gerszten PC, Pollack IF, **Hamilton RL**. Primary parafalcine chondrosarcoma in a child. Acta Neuropathologica 95:111-4, 1998.

22. Pollack IF, **Hamilton RL**, Fitz C, Orenstein DM. An intrasylvian "fibroma" in a child with cystic fibrosis. Pediatric Neurosurgery 46:744-747 2000.

23. Liachenko S, Tang P, **Hamilton RL**, Xu Y: A reproducible model of circulatory arrest and remote resuscitation in rats for NMR investigation. Stroke 29:1229-1238, 1998

24. Meltzer CC, Liu AY, Perrone AM, **Hamilton RL** Meningioangiomatosis MR imaging with histopathologic correlation. AJR 170:804-5, 1998

25. Clark RSB, Kochanek PM, Chen M, Watkins SC, Marion DW, Chen J, **Hamilton RL**, Loeffert JE, Graham SH. Increases in Bcl-2 and cleavage of caspase-1 and caspase-3 in human brain after head injury. FASEB J, 13:813-821, 1999

26. Soontornniyomkij V, Wang G, Pittman CA, **Hamilton RL**, Wiley CA, Achim CL Absence of brain-derived neurotrophic factor and trkB receptor immunoreactivity in glia of Alzheimer's disease. Acta Neuropathologica 98:345-8, 1999.

27. Wang G, Achim CL, **Hamilton RL**, Wiley CA, Soontornniyomkij V  Tyramide signal amplification methods in multiple label immunofluorescence confocal microscopy. Methods 18(4):459-464, 1999

28. Firlik KS, Adelson PD, **Hamilton RL**: Coexistence of a ganglioglioma and Rasmussen's encephalitis: successful treatment in a four-year-old boy. Pediatr Neurosurg 30:278-282, 1999

29. Ikonomovic MD, Mizukami K, Warde D, Sheffield R, **Hamilton R**, Wenthold RJ, Armstrong DM Distribution of glutamate receptor subunit NMDAR1 in the hippocampus of normal elderly and patients with Alzheimer's disease. Exp Neurol 160(1):194-204, 1999.

30. Dallasta, LM, Wang G, Bodnar RJ, Draviam R, Wiley CA, Achim CA, **Hamilton RL**: Differential expression of intercellular adhesion molecules-1 (ICAM-1) and vascular adhesion cell molecule-1 (VCAM-1) in chronic murine retroviral encephalitis. Neuropathol Appl Neurobiol 26:332-341, 2000.

31.  Luabeya MK, Dallasta LM, Achim CL, Pauza CD, **Hamilton RL**: Blood-brain Barrier Disruption in Simian Immunodeficiency Virus Encephalitis. Neuropathol Appl Neurobiol 26:454-462, 2000.

32.  **Hamilton RL**. Lewy Bodies in Alzheimer's Disease: A Neuropathological Review of 145 Cases Using    -synuclein Immunohistochemistry. Brain Pathol 10: 378-384, 2000.

33.  Sweet, RA, **Hamilton RL**, Healy MT, Wisniewski SR, Henteleff R, Pollack BG, Lewis DA, DeKosky ST. Alterations of Striatal Dopamine Receptor Binding in Alzheimer's Disease Are Associated with Lewy Body Pathology and With Antemortem Psychosis. Arch Neurol 58:466-472, 2001.

34.  Styren S, **Hamilton RL**, Styren GC, Klunk WE X-34: a novel and intensely fluorescent stain for Alzheimer's disease pathology. J Histochem Cytochem 48:1223-1232, 2000.

35.  Lopez OL, **Hamilton RL**, Becker JT, Wisniewski S, Kaufer DI, DeKosky ST. Severity of cognitive impairment and the clinical diagnosis of AD with Lewy bodies. Neurology 54:1780-1787, 2000

36.  Lopez OL, Wisniewski S, **Hamilton RL**, Becker JT, Kaufer DI, DeKosky ST. Predictors of progression in patients with AD and Lewy bodies. Neurology 54:1774-1779, 2000.

**Ronald L. Hamilton, M.D.**

37.  Sweet RA, **Hamilton RL**, Lopez OL, Klunk WE, Wisnieski SR, Kaufer DI, Healy MT, Dekosky ST. Psychotic symptoms in Alzheimer's Disease are not associated with more severe neuropathologic features. Internat Psychogeriatr 12: 547-558, 2000.

38.  Lopez OL, Becker JT, Klunk W, Saxton J, **Hamilton RL**, Kaufer DI, Sweet RA, Meltzer CC, Wisniewski S, Kamboh MI, DeKosky ST. Research evaluation and diagnosis of probable Alzheimer's Disease over the last two decades. I. Neurology 55:1854-1862, 2000.

39.  Lopez OL, Becker JT, Klunk W, Saxton J, **Hamilton RL**, Kaufer DI, Sweet RA, Meltzer CC, Wisniewski S, Kamboh MI, DeKosky ST. Research evaluation and diagnosis of possible Alzheimer's Disease over the last two decades. II. Neurology 55:1863-1869, 2000.

40.  Pollack IF, **Hamilton RL**, Fitz C, Kassam A, Snyderman C. Congenital Reactive Myofibroblastic Tumor of the Petrous Bone: Case Report. Neurosurgery 48:430-435, 2001.

41.  Levy EI, Scarrow A, **Hamilton** RC (sic), Wollman MR, Fitz C. Pollack IF. Medical Management Of Eosinophilic Granuloma of the Cervical Spine. Pediatr Neurosurg 31:159-62, 1999.

42.  Pettegrew JW, Panchalingam K, **Hamilton RL**, and McClur RJ Brain Membrane Phospholipid Alterations in Alzheimer's Disease.  Neurochem Res 26:771-782, 2001

43.  Levy EI, Harris AE, Omalu BA, **Hamilton RL**, Branstetter BF, Pollack IF. Sudden Death from Fulminant Acute Cerebellitis.  Pediatr Neurosurg 35:24-28, 2001

44.  Lianchenko S, Tang P, **Hamilton RL**, Xu Y. Regional Dependence of Cerebral Reperfusion After Circulatory Arrest in Rats.  J Cerebr Blood Flow Met 21:1320-1329, 2001 .

45.  Pollack IF, Finkelstein SD, Burnham J, Holmes EJ, **Hamilton RL**, Yates AJ, Finlay J, Sposto R, and CCG. Age and TP53 Mutation Frequency in Childhood Malignant Gliomas: Results of a Multi-institutional Cohort. Cancer Res 61:7404-7407, 2001

46.  Adelson PD, Jenkins LW, **Hamilton RL**, Robichaud P, Tran MP, Kochanek PM. Histopathologic Response of the Immature Rat to Diffuse Traumatic Brain Injury.  J Neurotrauma 18 :967-976, 2001

47.  Pollack IF, Finkelstein SD, Woods J, Burnham J, Holmes EJ, **Hamilton RL**, Yates AJ, Boyett JM, Finlay J, Sposto R, and CCG. TP53 Mutations, Expression of p53 and Prognosis in Children with Malignant Gliomas.  New England Journal of Medicine 346:420-427, 2002.

48.  Lopez OL, Becker JT, Kaufer DI, **Hamilton RL**, Sweet RA, Klunk W, DeKosky ST. Research Evaluation and Prospective Diagnosis of Dementia With Lewy Bodies.  Arch Neurol 59:43-46, 2002.

49.  Wang L, Yushmanov VE, Lianchenko SM, Tang P, **Hamilton RL**, Xu Y.  Late Reversal of Cerebral Perfusion and Water Diffusion After Transient Focal Ischemia in Rats.  J Cereb Blood Flow Metab 22:253-261, 2002.

50.  Pollack IF, Biegal JA, Yates AJ, **Hamilton RL**, Finkelstein SD.Risk Assignment in Childhood Brain Tumors: The Emerging Role of Molecular and Biologic Classification. Current Oncology Reports 4:114-122, 2002.

51.  Pollack IF, **Hamilton RL**, Burnham J, Holmes EJ, Finkelstein SD, Sposto R, Yates AJ, Boyett JM, Finley JL. The impact of proliferation index on outcome in childhood malignant gliomas: results in a multi-institutional cohort. Neurosurgery 50:1238-1245, 2002.

**Ronald L. Hamilton, M.D.**

52. Sweet RA, Panchalingam K, Pettefrew JW, McClure RJ, **Hamilton RL**, Lopez OL, Kaufer DI, DeKosky ST, Klunk WE.  Psychosis in Alzheimer disease: postmortem magnetic resonance spectroscopy evidence of excess neuronal and membrane phospholipid pathology. Neurobiol Aging 23:547-53, 2002.

53.  Mazzola CA, Albright AL, Sutton LN, Tuite GF, **Hamilton RL**, Pollack IF.  Dermoid inclusion cysts and early spinal cord tethering after fetal surgery.  New Engl. J Med 347:256-9, 2002.

54.  Bredel M, Pollack IF, **Hamilton RL**, Birner P, Hainfellner JA, Zentner J.  DNA topoisomerase II-alpha predicts progression-free and overall survival in pediatric malignant non-brainstem gliomas.  Int J Cancer 99:817-20, 2002.

55.  Klunk WE, Wang Y, Huang G, Debnath ML, Holt DP, Shao L, **Hamilton RL**, Ikonomovic MD, DeKosky ST, Mathis CA.  The binding of BTA-1 to post-mortem brain homogenates is dominated by the amyloid component. J Neurosci 23:2086-2092, 2003.

56. Castellano-Sanchez, AA, Ohgaki H, Yokoo H, Scheithauer BW, Burger PC, **Hamilton RL**, Finkelstein SD, Brat, DJ.  Cerebral granular cell astrocytomas show a high frequency of allelic loss but lack a defining genotype. Brain Pathology 13: 62-78, 2003.

57.  Gilbertson RJ, Hill DA, Hernan R, Kocak M, Geyer R, Olson J, Gajjar A, Rush L, **Hamilton RL**, Finkelstein SD, Pollack IF.  ERBB1 is amplified and overexpressed in high-grade diffusely infiltrative pediatric brain stem glioma.  Clin Cancer Res 9:3620-3624, 2003.

58. Pollack IF, Finkelstein SD, Burnham J, **Hamilton RL**, Yates AJ, Holmes EJ, Boyett JM, Finlay JL.  The association between chromosome 1p loss and outcome in pediatric malignant gliomas: results from the CCG-945 cohort. Pediatr Neurosurg 39:114-121, 2003.

59. Carter TL, Rissman RA, Mishizen-Eberz AJ, Wolfe BB, **Hamilton RL**, Gandy S, Armstrong DM.  Differential Preservation of AMPA Receptor Subunits in the Hippocampi of Alzheimer's Disease Patients According to Braak Stage Experimental Neurology 187:299-309, 2004

60.  Finkelstein SD, Mohan D, **Hamilton RL**, Sasatomi E, Swalsky PA, Lieberman FS.  Microdissection-based genotyping assists discrimination of reactive gliosis versus glioma. Am J Clin Pathol 121:671-678, 2004

61.  **Hamilton RL**, Bowser B Alzheimer Disease Pathology in ALS Acta Neuropathologica107:515-522, 2004

62.  Mohan D, Couce ME, Wiley CA, **Hamilton RL**, Sasatomi E, Swalsky PA, Lieberman MD, Finkelstein SD.  Microdissection based genotyping of human gliomas: diagnostic and prognostic considerations Modern Pathology 17:1346-1358, 2004

63. Marshall GA, Kaufer DI, Lopez OL, Rao GR, **Hamilton RL**, DeKosky ST.  Right prosubiculum amyloid plaque density correlates with anosognosia in Alzheimer's Disease.  J Neurol Neurosurg Psychiatry 75:1396-4000, 2004.  **PMCID:  PMC1738763**

64.  Sweet RA, **Hamilton RL**, Butters ME, Mulsant BH, Pollock BG, Lewis DA, DeKosky ST, Reynolds CF.  Neuropathologic Correlates of Dementia in Late Life Major Depression Neuropsychopharmacology 29:2242-2250, 2004

65  Lee JYK, Finkelstein S, **Hamilton RL**, Rekha P, Pirris S, King Jr, JT, Omalu B.  Loss of heterozygosity Analysis of Benign, Atypical and Anaplastic Meningiomas.  Neurosurgery 55:1163-1173, 2004.

**Ronald L. Hamilton, M.D.**

66. Beckner ME, Sasatomi E, Swalsky PA, **Hamilton RL**, Pollack, IF, Finkelstein SD. Loss of heterozygosity reveals non-VHL Allelic loss in hemangioblastomas at 22q13. Human Pathology 35:1105-1111, 2004.

67. Tsuang D, Wilson R, Lopez OL, Luedecking-Zimmer EK, Leverenz JB, DeKosky ST, Kamboh MI, **Hamilton RL**. Genetic Association Between APOE*4 Allele and Lewy Bodies in Alzheimer's Disease Neurology, 64:509-513, 2005. **PMCID: PMC1487185**

68. Bredel C, Lassman S, Pollack IF, Knoth R, **Hamilton RL**, Werner M, Bredel M. DNA Topoisomerase II-alpha and Her-2/Neu Gene Dosages in Pediatric Malignant Gliomas. Int J Cancer 26:1188-92, 2005.

69. Witham TF, Okada H, Fellows W, **Hamilton RL**, Flickinger JC, Chambers WH, Pollack IF, Watkins SC, Kondziolka D. The characterization of tumor apoptosis after experimental radiosurgery. Stereotact Funct Neurosurg 83:17-24 2005.

70. McFadden K, **Hamilton RL**, Insalaco SJ, Lavine L, Al-Mateen M, Guoji Wang G, Wiley CA Neuronal intranuclear inclusion disease in a child without polyglutamine inclusions J Neuropathol Exper Neurol 64:545-552, 2005. **PMCID: PMC1402362**

71. Hatano M, Eguchi J, Tatsumi T, Kuwashima N, Dusak JE, Kinch MS, Pollack IF, **Hamilton RL**, Storkus WJ, Okada H. EphA2 as a glioma-associated antigen: a novel target for glioma-vaccines. Neoplasia 7:717-722, 2005. **PMCID: PMC1501889**

72. Jordan S, Ruoyan C, Koprivica V, **Hamilton RL**, Whitehead R, Tottori K, Kikuchi T. In vitro profile of the antidepressant candidate OPC-14523 at rat and human 5-HT$_{1A}$ receptors.Eur J Pharmacol, 517:165-173, 2005.

73. Omalu BI, Minster RL, Kamboh MI, **Hamilton RL**, Wecht CH, DeKosky ST. Chronic Traumatic Encephalopathy (CTE) in a National Football League (NFL) Player Neurosurgery, 57:128-134, 2005.

74. Judkins AR, Burger PC, **Hamilton RL**, Kleinschmidt-DeMasters B, Perry A, Pomeroy SL, Rosenblum MK, Yachnis AT, Zhou H, Rorke LB, Biegel JA. INI1 Protein Expression Distinguishes Atypical Teratoid/Rhabdopid Tumor from Choroid Plexus Carcinoma. J Neuropathol Exp Neurol 64:391-397, 2005.

75. Desai PP, Ikonomovic I, Abrahamson EE, **Hamilton RL,** Isanski BA, Hope CE, Klunk WE, Dekosky ST, Kamboh MI. Apolipoprotein D is a component of compact but not diffuse amyloid-beta plaques in Alzheimer's Disease temporal cortex. Neurobiol Dis May 22, 2005 (epub)

76. Carson-Walter EB, Hampton J, Geynisman D,Pillai PK, Sathanoori R, Madden SL, **Hamilton RL**, Walter KA. Plasmalemmal Vesicle associated protein-1 (PV-1) is a novel and critical marker of brain tumor angiogenesis. Clin Cancer Res 11:7643-7650, 2005.

77. Lopez OL, Becker JT, Sweet RA, Martin-Sanchez FJ, **Hamilton RL** Lewy bodies in the Amygdala increase risk for major depression in subjects with Alzheimer disease. Neurology 67:660-665, 2006.

78. Pollack IF, **Hamilton RL**, Sobol R, Burnham J, Yates AJ, Holmes EJ, Zhou T, Finlay J (for Children Oncology Group).O6-methylguanine-DNA methyltransferase strongly Correlates with Outcome in Childhood Malignant Gliomas: Results from the CCG-945 Cohort J Clin Oncol. Jul 20;24(21):3431-7, 2006.

**Ronald L. Hamilton, M.D.**

79. Mandal PK, Pettegrew JW, Masliah E, **Hamilton RL**, Mandal R. Interaction between Aβ Peptide and α Synuclein: Molecular Mechanisms in Overlapping Pathology of Alzheimer's and Parkinson's in Dementia with Lewy Body disease. Neurochemical Research, 2006 31, 1153-1162, 2006.

80. Omalu B, DeKosky ST, **Hamilton RL**, Minster RL, Kamboh MI, Shakir AM, Wecht Chronic Traumatic Encephalopathy in a National Football League Player: part II. Neurosurgery 59:1086-92, 2006

81. Ramsey CP, Glass CA, Koike MA, Montgomery MB, Ritson GP, Chia L, **Hamilton RL**, Chu CT, Jordan-Sciutto KL. Expression of Nrf2 in neurodegenerative diseases. J Neuropathol Exp Neurol 66:75-85, 2007. **PMCID: PMC2253896**

82. Boada FE, Tanase C, Davis D, Walter K, Torres-Trejo A, Couce M, **Hamilton R**, Kondziolka D, Bartinski W, Lieberman F. Non-invasive assessment of tumor proliferation using triple quantum filtered 23/Na MRI: technical challenges and solutions. Conf Proc IEEE Eng Med Biol Sci Soc. 2004; 7:5238-41

83. Pollack IF, **Hamilton RL**, James CD, Finkelstein SD, Burnham J, Yates AJ, Holmes EJ, Zhou T, Finlay J (for Children Oncology Group). Rarity of *PTEN* Deletions and *EGFR* Amplification in Malignant Gliomas of Childhood: Results from the Children's Cancer Group-945 Cohort J Neurosurg 105(5 Suppl):418-424, 2006.

84. Guzman A, Wood WL, Alpert E, Prasad MD, Miller RG, Rothstein JD, Bowser R, **Hamilton R**, Wood TD, Cleveland DW, Lingappa VR, Liu J. Common molecular signature in SOD1 for both sporadic and familial amyotrophic lateral sclerosis. Proc Nat Acad Sci 104:12524-12529, 2007. **PMCID: PMC2408940**

85. Beckner ME, Jane EP, Jankowitz B, Agostino NR, Walter KA, **Hamilton RL**, Pollack IF. Tumor cells from ultrasonic aspirations of glioblastomas migrate and from spheres with radial outgrowth. Cancer Letters 255:135-44, 2007. PMID 17543444, **PMCID: PMC2000342**

86. McIntyre JA, Chapman J, Shavit E, **Hamilton RL**, and DeKosky ST. Redox-Reactive Autoantibodies in Alzheimer's Patients' Cerebrospinal Fluids: Preliminary Studies. Autoimmunity, 40:390-396, 2007. PMID 17612901

87. Nakashima-Yasuda, Uryu, K, Robinson J, Xie S, Hurtig H, Duda J, Arnold S, Siderowf A, Grossman M, Leverenz J, Woltjer R, Lopez OL, **Hamilton R**, Tsuang DW, Galaska D, Masliah M, Kaye J, Clark C, Montine TJ, Lee VMY, Trojanowski J. Co-morbidity of TDP-43 Proteinopathy in Lewy Body Related Diseases. Acta Neuropathol 114:221-9, 2007. PMID 17653732

88. McIntyre JA, **Hamilton RL**, DeKosky ST. Redox-reactive autoantibodies in cerebrospinal fluids. Ann NY Acad Sci 1109:296-302, 2007. PMID 17785318

89. Okada H, Lieberman FS, Walter KA, Lunsford LD, Kondziolka DS, Bejjani GK, **Hamilton RL**, Torres-Trejo A, Kalinski P, Cai Q, Mabold JL, Edington HD, Butterfield LH, Whiteside TL, Potter DM, Schold SC Jr., Pollack IF Autologous glioma cell vaccine admixed with interleukin-4 gene transfected fibroblasts in the treatment of patients with malignant gliomas. J Transl Med 5:67, 2007. PMID 18093335. **PMCID: PMC2254376**

90. Beach TG, White CL, **Hamilton, RL**, Duda JE, Iwatsubo T, Dickson DW, Leverenz JB, Roncaroli F, Buttini M, Hladik CL, Sue LI, Noorigian JV, Adler CH. Evaluation of alpha-synuclein immunohistochemical methods used by invited experts. Acta Neuropathol 116:277-88, 2008. PMID 18626651. **PMCID: PMC2708176**

91. Ikonomovic MD, Klunk WE, Abrahamson EE, Mathis CA, Price JC, Tsopelas ND, Lopresti BJ, Ziolko S, Bi W, Paljug WR, Debnath ML, Hope CE, Isanski BA, **Hamilton RL**, DeKosky ST. Post-

**Ronald L. Hamilton, M.D.**

mortem correlates of in vivo PiB-PET amyloid imaging in a typical case of Alzheimers disease. Brain  131(Pt 6):1630-45, 2008.  PMID  18339640.  **PMCID:  PMC2408940**

92.  Leverenz JB, **Hamilton R**, Tsuang DW, Schantz A, Vavrek D, Larson EB, Kukall WA, Lopez O, Galasko D, Masliah E, Woltjer R, Clark C, Trojanowski JQ, Montine TJ. Empiric refinement of the pathologic assessment of Lewy-related pathology in the dementia patient.  Brain Pathol 18:220-224, 2008. PMID 18241249.  **PMCID:  PMC2689097  NIHMS29359**

93.  Raja AI, Yeaney GA, Jakacki RI, **Hamilton RL**, Pollack IF  Extraventricular neurocytoma in neurofibromatosis Type I: Case report.  J Neurosurg Pediatrics 2:63-67, 2008.PMID 18590398

94.  Okada H, Low KL, Kohanbash G, McDonald HA, **Hamilton RL**, Pollack IF.  Expression of glioma-associated antigens in pediatric brain stem and non-brain stem gliomas.  J Neurooncol 88:245-50, 2008. PMID 18324354.  **PMCID:  PMC2561297 NIHMS70086**

95.  Venneti S, Lopresti BJ, Wang G, **Hamilton RL**, Mathis CA, Klunk WE, Apte UM, Wiley CA. PK11195 labels activated microglia in Alzheimer's disease and in vivo in a mouse model using PET. Neurobiol Aging 2009, 30:1217-26. PMID 18178291

96.  Mullett SJ, **Hamilton RL**, Hinkle DA.  DJ-1 immunoreactivity in human brain astrocytes is dependent on infarct presence and infarct age.  Neurology 2009, 29:125-31. PMID 18647263

97.  Park DM, Yeaney GA, **Hamilton RL**, Mabold J, Urban N, Appleman L, Flickinger J, Lieberman F, Mintz A.  Identifying Muir-Torre syndrome in a patient with glioblastoma multiforme.  Neuro Oncol, 2009 11:452-5. PMID 19028998.  )

98.  Horbinski C, Bartynski WS, Carson-Walter E, **Hamilton RL**, Tan HP, Cheng S.  Reversible encephalopathy after cardiac transplantation:  Histologic evidence of endothelial activation, T-cell specific trafficking, and vascular endothelial growth factor expression.  Am J Neuroradiol 2008 30:588-90. PMID 18854444.

99.  Northcott P, Nakahara Y, Peacock J, Ellison D, Croul S, Feuk L, Ra YS, Kongham P, Zilerberg K, Mack S, McLeod J, Scherer S, Rao S, Grajkowska W, Gillespie Y, Lach B, Grundy R, Pollack IF, **Hamilton RL,** Van Meter T, Carlotti C, Boop R, Bigner D, Gilbertson R, Rutka J, Taylor MD.  Multiple recurrent genetic events converge on control of histone lysine methylation in medulloblastoma.  Nat Genet 2009 41:465-72. PMID 19270706.

100. Ueda R, Kohanbash G, Sasaki K, Fujita M, Zhu X, Kastenhuber ER, McDonald HA, Potter DM, **Hamilton RL,** Lotze MT, Khan SA, Sobol RW, Okada H.  Dicer-regulated microRNAs 222 and 339 promote resistance of cancer cells to cytotoxic T-lymphocytes by down-regulation of ICAM-1. Proc Natl Acad Sci U S A. 2009 Jun 30;106(26):10746-51.  PMID: 19520829

101.  Maki RA, Tyurin VA, Lyon RC, **Hamilton RL**, DeKosky ST, Kagan VE, Reynolds WF.  Aberrant expression of myeloperoxidase in astrocytes promotes phospholipid oxidation and memory deficits in a mouse model of Alzheimer disease. J Biol Chem. 2009 Jan 30;284(5):3158-69. PMID: 19059911.

102.  Horbinski C, **Hamilton RL**, Lovell C, Burnham J, Pollack IF.  Impact of morphology, MIB-1, p53, and MGMT on Outcome in Pilocytic Astrocytomas.  Brain Pathology 2010; 20:581-8  e-pub Sept 21, 2009

103.  Armstrong RA, Ellis W, **Hamilton RL**, MacKenzie IR, Hedreen J, Gearing M, Montine T, Vonsattel JP, Head E, Lieberman AP, Cairns NJ.  Neuropathological heterogeneity in frontotemporal lobar degeneration with TDP-43 proteinopathy: a quantitative study of 94 cases using principle components analysis.  J Neural Transm 2010, 117:227-239.

**Ronald L. Hamilton, M.D.**

104. Horbinski C, **Hamilton RL**, Nikiforov Y, Pollack IF.  Association of molecular alterations, including BRAF, with biology and outcome in pilocytic astrocytomas.  Acta Neuropathol 2010 Jan 1, e-pub.

105. Van Deerlin VM, Sleiman PM, Martinez-Lage M, Chen-Plotkin A, Wang LS, Graff-Radford NR, Dickson DW, Rademakers R, Boeve BF, Grossman M, Arnold SE, Mann DM, Pickering-Brown SM, Seelaar H, Heutink P, van Swieten JC, Murrell JR, Ghetti B, Spina S, Grafman J, Hodges J, Spillantini MG, Gilman S, Lieberman AP, Kaye JA, Woltjer RL, Bigio EH, Mesulam M, Al-Sarraj S, Troakes C, Rosenberg RN, White CL 3rd, Ferrer I, Lladó A, Neumann M, Kretzschmar HA, Hulette CM, Welsh-Bohmer KA, Miller BL, Alzualde A, de Munain AL, McKee AC, Gearing M, Levey AI, Lah JJ, Hardy J, Rohrer JD, Lashley T, Mackenzie IR, Feldman HH, **Hamilton RL**, Dekosky ST, van der Zee J, Kumar-Singh S, Van Broeckhoven C, Mayeux R, Vonsattel JP, Troncoso JC, Kril JJ, Kwok JB, Halliday GM, Bird TD, Ince PG, Shaw PJ, Cairns NJ, Morris JC, McLean CA, DeCarli C, Ellis WG, Freeman SH, Frosch MP, Growdon JH, Perl DP, Sano M, Bennett DA, Schneider JA, Beach TG, Reiman EM, Woodruff BK, Cummings J, Vinters HV, Miller CA, Chui HC, Alafuzoff I, Hartikainen P, Seilhean D, Galasko D, Masliah E, Cotman CW, Tuñón MT, Martínez MC, Munoz DG, Carroll SL, Marson D, Riederer PF, Bogdanovic N, Schellenberg GD, Hakonarson H, Trojanowski JQ, Lee VM.  Common variants at 7p21 are associated with frontotemporal lobar degeneration with TDP-43 inclusions. Nat Genet 2010 42:234-239.

106. Omalu BI, **Hamilton RL**, Kamboh MI, DeKosky ST, Bailes J.  Chronic traumatic encephalopathy in a National Football League Player: Case report and emerging medicolegal practice questions.  J Forensic Nurs, 2010, 6: 40-46.

107. Caltagarone J, **Hamilton RL**, Murdoch G, Jing Z, DeFranco DB, Bowser R. Paxillin and hydrogen peroxide-induced clone 5 expression and distribution in control and Alzheimer disease hippocampi. J Neuropathol Exp Neurol. 2010: 69:356-71.

108. Pollack IF, **Hamilton RL**, Sobol RW, Nikiforova MN, Lyons-Weiler MA, Laframboise WA, Burger PC, Brat DJ, Rosenblum MK, Holmes EJ, Zhou T, Jakacki RI; for the Children's Oncology Group. IDH1 mutations are common in malignant gliomas arising in adolescents: a report from the Children's Oncology Group. Childs Nerv Syst. 2010; 27:87-94

109. Jun G, Naj AC, Beecham GW, Wang LS, Buros J, Gallins PJ, Buxbaum JD, Ertekin-Taner N, Fallin MD, Friedland R, Inzelberg R, Kramer P, Rogaeva E, St George-Hyslop P, Arnold SE, Baldwin CT, Barber R, Beach T, Bigio EH, Bird TD, Boxer A, Burke JR, Cairns N, Carroll SL, Chui HC, Clark DG, Cotman CW, Cummings JL, Decarli C, Diaz-Arrastia R, Dick M, Dickson DW, Ellis WG, Fallon KB, Farlow MR, Ferris S, Frosch MP, Galasko DR, Gearing M, Geschwind DH, Ghetti B, Gilman S, Giordani B, Glass J, Graff-Radford NR, Green RC, Growdon JH, **Hamilton RL**, Harrell LE, Head E, Honig LS, Hulette CM, Hyman BT, Jicha GA, Jin LW, Johnson N, Karlawish J, Karydas A, Kaye JA, Kim R, Koo EH, Kowall NW, Lah JJ, Levey AI, Lieberman A, Lopez OL, Mack WJ, Markesbery W, Marson DC, Martiniuk F, Masliah E, McKee AC, Mesulam M, Miller JW, Miller BL, Miller CA, Parisi JE, Perl DP, Peskind E, Petersen RC, Poon W, Quinn JF, Raskind M, Reisberg B, Ringman JM, Roberson ED, Rosenberg RN, Sano M, Schneider JA, Schneider LS, Seeley W, Shelanski ML, Smith CD, Spina S, Stern RA, Tanzi RE, Trojanowski JQ, Troncoso JC, Van Deerlin VM, Vinters HV, Vonsattel JP, Weintraub S, Welsh-Bohmer KA, Woltjer RL, Younkin SG, Cantwell LB, Dombroski BA, Saykin AJ, Reiman EM, Bennett DA, Morris JC, Lunetta KL, Martin ER, Montine TJ, Goate AM, Blacker D, Tsuang DW, Beekly D, Cupples LA, Hakonarson H, Kukull W, Foroud TM, Haines J, Mayeux R, Farrer LA, Pericak-Vance MA, Schellenberg GD; Alzheimer's Disease Genetics Consortium, Arnold SE, Baldwin CT, Barber R, Beach T, Bigio EH, Bird TD, Boxer A, Burke JR, Cairns N, Carroll SL, Chui HC, Clark DG, Cotman CW, Cummings JL, Decarli C, Diaz-Arrastia R, Dick M, Dickson DW, Ellis WG, Fallon KB, Farlow MR, Ferris S, Frosch MP, Galasko DR, Gearing M, Geschwind DH, Ghetti B, Gilman S, Giordani B, Glass J, Graff-Radford NR, Green RC, Growdon JH, Hamilton RL, Harrell LE, Head E, Honig LS, Hulette CM, Hyman BT, Jicha GA, Jin LW, Johnson N, Karlawish J, Karydas A, Kaye JA, Kim R, Koo EH, Kowall NW, Lah JJ, Levey AI, Lieberman A, Lopez OL, Mack WJ, Markesbery W, Marson DC, Martiniuk F, Masliah E, McKee AC, Mesulam M, Miller JW, Miller BL, Miller CA, Parisi JE, Perl DP, Peskind E, Petersen RC, Poon W, Quinn JF, Raskind M, Reisberg B, Ringman JM, Roberson ED, Rosenberg RN, Sano M, Schneider JA, Schneider LS, Seeley W, Shelanski ML, Smith CD, Spina S, Stern RA, Tanzi RE, Trojanowski JQ, Troncoso JC, Van Deerlin VM, Vinters HV, Vonsattel JP, Weintraub S, Welsh-Bohmer KA, Woltjer RL, Younkin SG.  Meta-analysis confirms CR1, CLU and PICALM as Alzheimer Disease Risk Loci and reveals interactions with APOE Genotypes. Arch Neurol, 2010, Sep 3 (epub ahead of print)

110. Pollack IF, **Hamilton RL**, Burger PC, Brat DJ, Rosenblum MK, Murdoch GH, Nikiforova MN, Holmes EJ, Zhou T, Cohen KJ, Jakacki RI; Children's Oncology Group. Akt activation is a common event in pediatric malignant gliomas and a potential adverse prognostic marker: a report from the Children's Oncology Group. J Neurooncol. 2010 Sep;99(2):155-63. Epub 2010 Jul 4

**Ronald L. Hamilton, M.D.**

111. Pollack IF, **Hamilton RL**, Sobol RW, Nikiforova MN, Nikiforov YE, Lyons-Weiler MA, Laframboise WA, Burger PC, Brat DJ, Rosenblum MK, Gilles FH, Yates AJ, Zhou T, Cohen KJ, Finlay JL, Jakacki RI; for the Children's Oncology Group. Mismatch repair deficiency is an uncommon mechanism of alkylator resistance in pediatric malignant gliomas: a report from the Children's Oncology Group. Pediatr Blood Cancer 2010 Jun 29 epub ahead of print

112. Bonneh-Barkay D, Wang G, Starkey A, **Hamilton RL**, Wiley CA. In vivo CHI3L1 (YKL-40) expression in astrocytes in acute and chronic neurological diseases. J Neuroinflammation 2010 Jun 11:7-34.

113. Hinkle DA, Mullett SJ, Gabris BE, **Hamilton RL**.  DJ-1 expression in glioblastomas shows positive correlation with p53 expression and negative correlation with epidermal growth factor receptor amplification. Neuropathology 2010 May 19 (epub ahead of print)xx

114. Okada H, Kalinski P, Ueda R, Hoji A, Kohanbash G, Donegan TE, Mintz AH, Engh JA, Bartlett DL,  Brown CK, Zeh H, Holtman MP, Reinhart TA, Whiteside TL,Butterfield LH, **Hamilton RL**, Potter DM, Pollack IF, Salazar AM, Lieberman FS. Induction of CD8+ T-cell responses against novel glioma-associated antigen peptides and clinical activity by vaccinations  with {alpha}-type 1 polarized dendritic cells and polyinosinic-polycytidylic acid stabilized by lysine and carboxymethylcellulose In patients with recurrent malignant glioma. J Clin Oncol. 2011;29:330-6.PMID: 21149657

115. Kofler J, Bartynski WS, Reynolds TQ, Lieberman FS, Murdoch GH, **Hamilton RL**. Posterior reversible encephalopathy syndrome (PRES) with immune system activation, VEGF up-regulation, and cerebral amyloid angiopathy. J. Comput Assist Tomogr. 2011; 35:39-42. PMID: 21150450

116.  Bonfield CM, Amin D, **Hamilton RL**, Gerszten PC. Extramedullary ependymoma near the conus medullaris with lumbar nerve root attachment: case report. Neurosurgery. 2011 Mar;68:E831-4. PMID:21311277

117. Fujita M, Kohanbash G, Fellows-Mayle W, **Hamilton RL**, Komohara Y, Decker SA, Ohlfest JR, Okada H.COX-2 blockade suppresses gliomagenesis by inhibiting myeloid-derived suppressor cells.         Cancer Res. 2011 Apr 1;71:2664-74. Epub 2011 Feb 15. PMID: 21324923

118.  Cohen KJ, Pollack IF, Zhou T, Buxton A, Holmes EF, Burger PC, Brat DJ, Rosenblum MK, **Hamilton RL**, Lavey RS, Heideman RL. Temozolomide in the treatment of high-grade gliomas in children: a report from the Children's Oncology Group.
Neuro Oncol. 2011 Mar;13:317-23. PMID: 21339192

119. Omalu B, Bailes J, **Hamilton RL**, Kamboh MI, Hammers J, Case M, Fitzsimmons R.
Emerging histomorphologic phenotypes of chronic traumatic encephalopathy in American athletes.
Neurosurgery. 2011 Jul;69:173-83; discussion 183. PMID: 21358359

120. Tang JB, Svilar D, Trivedi RN, Wang XH, Goellner EM, Moore B, **Hamilton RL**, Banze LA, Brown AR, Sobol RW. N-methylpurine DNA glycosylase and DNA polymerase beta modulate BER inhibitor potentiation of glioma cell to temozolomide. Neurosurgery Oncol. 2011;13:471-86. PMID: 21377995

121. Liu KW, Feng H, Bachoo R, Kazlauskas A, Smith EM, Symes K, **Hamilton RL**, Nagane M, Nishikawa R, Hu, B, Cheng Sy. SHP-2/PTPN 11 mediates gliomagenesis driven by PDGFRA and INK4A/ARF aberrations in mice and humans. J. Clin Invest. 2011 Mar;121:905-17. PMID: 21393858

122. Naj AC, Jun G, Beecham GW, Wang LS, Vardarajan BN, Buros J, Gallins PJ, Buxbaum JD, Jarvidk GP, Crane PK, Larson EB, Bird TB, Boeve BF, Graff-Radford NR, De Jager PL, Evans D, Schneider JA, Carrasquillo MM, Ertekin-Taner N, Younkin SG, Cruchaga C, Kauwe JS, Nowotny  P, Kramer P, Hardy J, Huentelman  MJ, Myers AJ, Barmada MM, Demirci FY, Baldwin CT, Green RC, Rogaeva E, St. George-Hyslop P, Arnold SE, Barber R, Beach T, Bigio EH, Bowen JD, Boxer A, Burke JR, Cairns NJ, Carlson CS, Carney RM, Carroll SL, Chui HC, Clark DG, Corneveaux J, Cotman CW, Cummings JL, Decarli C, DeKosy ST, Diaz-Arrastia R, Dick M, Dickson DW, Ellis WG, Faber KM, Fallon KB, Farlow MR, Ferris S. Frosch MP, Galasko Dr, Ganguli M, Gearing M, Geschwind DH, Ghetti B, Gilbert JR, Gilman S, Giordani B, Glass JD, Growdon JH, **Hamilton RL**,R, Koo EH, Kowall NW, Lah JJ, Levey AI, Lieberman AP, Lopez OL, Mack WJ, Marson DC, Martiniuk F, Mash DC, Masliah E, McCormick WC, McCurry SM, McDavid AN, McKee AC, Mesulam M, Miller BL, Miller JW, Parisi JE, Perl DP, Peskind E,Petersen, RC, Poon, WV, Quinn JF, Rajbhandary RA, Raskind M, Reisberg B, Ringman JM, Roberson ED, Rosenberg RN,Sano M, Schneider LS, Seeley W, Shelanksi ML, Slifer MA, Smith CD, Sonnen JA, Spina S. Stern RA, Tanzi RE, Trojanowski JQ, Troncoso JC, Van Deerlin VM, Vinters  HV, Vonsattel JP, Weintraub S, Welsh-Bohmer KA, Williamson

**Ronald L. Hamilton, M.D.**

J, Woltjer RL,Cantwell LB, Dombroski BA, Beekly D, Lunetta KL, Martin ER, Kamboh MI, Saykin AJ, Reiman EM, Bennett DA, Morris JC, Montine TJ, Goate AM, lacker D, Tsuang DW, Hakonarson, H, Kukull WA, Foroud TM, Haines JL, Mayeux R, Pericak-Vance MA, Farrer LA, Schellenberg GD. Commons variants as MS4A4/MS4A6E, CD2AP, CD33 and EPHA1 are associated with late Onset Alzheimer's Disease. Nat Genet. 2011 May;43:436-41 Epub 2011 Apr 3. PMID: 21460841

123.    Chen-Plotkin AS, Martinez-Lage M,Sleiman PM, Hu W, Greene R, Wood  EM, Bing S, Grossman M, Schellenberg GD, Hatanpaa KJ, Weiner MF, White CL 3rd, Brooks WS, Halliday GM, Kril JJ, Gearing M, Beach TG, Graff-Radford NR, Dickson DW, Rademakers R, Boeve BF, Pickering-Brown SM, Snowden J, van Swieten JC, Heutink P, Seelaar H, Murrell JR, Ghetti B, Spina S, Grafman J, Kaye JA, Woltjer RL, Mesulam M, Bigio E, Llad'o A, Miller BL, Alzualde A, Moreno F,Rohrer JD, Mackenzie IR, Feldman HH, **Hamilton RL**, Cruts M, Engelborghs S, De Deyn PP, Van Broeckhoven C, Bird TD, Cairns NJ, Goate A, Frosch MP, Riederer PF, Bogdanovic N, Lee VM, Trojanowksi JQ, Van Deerlin VM. Genetic and clinical features of progranulin-associated frontotemporal lobar degeneration. Arch Neurol. 2011 Apr;68:488-97. PMID: 21482928

124.    Nikiforova MN, **Hamilton RL**. Molecular diagnostics of gliomas. Arch Pathol Lab Med. 2011 May;135:558-68. Review. PMID: 21526954

125.    Monaco EA 3rd, Armah HB, Nikiforova MN, **Hamilton RL**, Engh JA. Grade II Oligodendroglioma localized to the corpus callosum. Brain Tumor Pathol. 2011 Oct;28:305-9. Epub 2011 Jul 22. PMID: 21833577

126.    Horbinski C, Hobbs, J, Cieply K, Dacic S, **Hamilton RL.** EGFR expression stratifies oligodendroglioma behavior.Am J Pathol. 2011 Oct; 179:1638-44. Epub 2011 Aug 11. PMID: 21839716

127.    Omalu B, hammers, JL, bailes J**, Hamilton RL**. Kamboh MI, Webster G, Fitzsimmons RP. Chronic traumatic Encephalopathy  in an Iraqi war veteran with posttraumatic stress disorder who committed suicide. Neurosurg Focus. 2011 Nov; :E3. PMID: 22044102

128.    Liu Y, Komohara Y, Domenick N, Ohno M, Ikeura M, **Hamilton RL**, Horbinski C, Wang X, Ferrone S, Okada H. Expression of antigen processing molecules in brain metastasis of breast cancer. Cancer Immunol Immunother. 2011 Nov 8. (Epub ahead of print } PMID:22065046

129.    Feng H, Hu B, Liu KW, Li Y, Lu X, Cheng T, Yiin JJ, Lu S, Keezer S, Fenton T, Furnari FB, **Hamilton RL**, Vuori K, Sarkaria JN, Nagane M, Nishikawa R, Cavenee WK, Cheng SY. Activation of Rac 1 by src-dependent phosphorylation of Dock180(Y1811) mediates PDGFRa-stimulated glioma tumorigenesis in mice and humans. J Clin Invest. 2011 Dec; 121:4670-84. doi: 10.1172/JCI58559. Epub 2011 Nov 14. PMID: 22080864

130.    Horbinski C, Nikiforova MN, Hobbs J, Bortoluzzi S. Cieply K, Dacic S, **Hamilton RL**. The importance of 10q status in an outcomes-based comparison between 1p/19q fluorescence in situ hybridization and polymerase chain reaction-based microsatellite loss of heterozygosity analysis of oligodendrogliomas.  J. Neuropathol Exp Neurol. 2012 Jan;71:73-82. PMID: 22157622

131.    Ikonomovic MD, Abrahamson EE, Price JC, **Hamilton RL**, Mathis CA, Paljug WR, Cohen AD, Mizukami K, DeKosky ST, Lopez OL, Klunk WE. Early AD pathology in a {C-11} PiB-negative case: a PiB-amyloid imaging, biochemical, and  Immunohistochemical study. Acta Neuropathol. 2012 Mar;123:433-47. Epub 2012 Jan 24. PMID: 22271153

132.    Feng H, Hu B, Jarzynka MJ, Li Y, Keezer S, Johns TG, Tang CK, **Hamilton RL**, Vuuori K, Nishikawa R, Sarkaria JN, Fenton T, Cheng T, Furnari FB, Cavenee WK, Cheng SY. Phosphorylation of dedicator of cytokinesis 1(Dock 180) at tyrosine residue Y722 by Src family kinases mediates EGRFvIII-driven glioblastoma tumorigenesis. Proc Natl Acad Sci U S A. 2012 Feb 21;109:3018-23. Epub 2012 Feb 7. PMID: 22323579

133.    Wu Y, Lou H, Alerte TN, Stachowski EK, Chen J, Singleton AB, **Hamilton RL**, Perez RG. Neuroscience. 2012 Jan 25. {Epubahead a print} PMID: 22326202

134.    Murray PS, Kirkwood CM, Gray MC, Ikonomovic MD, Paljug WR, Abrahamson EE, Henteleff RA, **Hamilton RL**, Kofler JK, Klunk WE, Lopez OL, Penzes P, Sweet RA. β-Amyloid 42/40 ratio and kalirin expression in Alzheimer disease with psychosis. Neurobiol Aging. 2012 Mar 17. [Epub ahead of print] PMID:22429885

**Ronald L. Hamilton, M.D.**

135.    Choi SH, Olabarrieta M, Lopez OL, Maruca V, DeKosky ST, **Hamilton RL**, Becker JT. Gray Matter Atrophy Associated with Extrapyramidal Signs in the Lewy Body Variant of Alzheimer's Disease. J Alzheimers Dis. 2012 Aug 9. [Epub ahead of print] PMID:22886020

136.    Armstrong RA, **Hamilton RL**, Mackenzie IR, Hedreen J, Cairns NJ. Laminar Distribution of the Pathological Changes in Sporadic Frontotemporal Lobar Degeneration with TDP-43 Proteinopathy: A Quantitative Study Using Polynomial Curve Fitting. Neuropathol Appl Neurobiol. 2012 Jul 16. [Epub ahead of print] PMID:22804696

137.    Atkinson DM, **Hamilton RL** A 52-year-old male with visual changes. Brain Pathol. 2012 Jul;22(4):575-8. PMID:22697384

138.    Zou F, Chai HS, Younkin CS, Allen M, Crook J, Pankratz VS, Carrasquillo MM, Rowley CN, Nair AA, Middha S, Maharjan S, Nguyen T, Ma L, Malphrus KG, Palusak R, Lincoln S, Bisceglio G, Georgescu C, Kouri N, Kolbert CP, Jen J, Haines JL, Mayeux R, Pericak-Vance MA, Farrer LA, Schellenberg GD; Alzheimer's Disease Genetics Consortium, Petersen RC, Graff-Radford NR, Dickson DW, **Hamilton RL**, Younkin SG, Ertekin-Taner N. Brain expression genome-wide association study (eGWAS) identifies human disease-associated variants. PLoS Genet. 2012;8(6): e1002707. Epub 2012 Jun 7 PMID:22685416

139.    Horbinski C, Nikiforova MN, Hagenkord JM, **Hamilton RL**, Pollack IF. Interplay among BRAF, p16, p53, and MIB1 in pediatric low-grade gliomas. Neuro Oncol. 2012 Jun;14(6):777-89 (1012) PMID:22492957

140.    Hobbs J, Nikiforova MN, Fardo DW, Bortoluzzi S, Cieply K, **Hamilton RL**, Horbinski C. Paradoxical relationship between the degree of EGFR amplification and outcome in glioblastomas. Am J Surg Pathol. 2012 Aug;36(8):1186-93. PMID:22472960

141. Armstrong, R. A., **R. L. Hamilton**, I. R. Mackenzie, J. Hedreen and N. J. Cairns. "Laminar Distribution of the Pathological Changes in Sporadic Frontotemporal Lobar Degeneration with Transactive Response (Tar) DNA-Binding Protein of 43 Kda (Tdp-43) Proteinopathy: A Quantitative Study Using Polynomial Curve Fitting." *Neuropathol Appl Neurobiol* 39, no. 4 (2013): 335-47.

142. Clark, K. H., J. L. Villano, M. N. Nikiforova, **R. L. Hamilton** and C. Horbinski. "1p/19q Testing Has No Significance in the Workup of Glioblastomas." *Neuropathol Appl Neurobiol*,  (2013).

143. Gheorghe, G., O. Radu, S. Milanovich, **R. L. Hamilton**, R. Jaffe, J. F. Southern and J. A. Ozolek. "Pathology of Central Nervous System Posttransplant Lymphoproliferative Disorders: Lessons from Pediatric Autopsies." *Pediatr Dev Pathol* 16, no. 2 (2013): 67-73.

1444. Holton, P., M. Ryten, M. Nalls, D. Trabzuni, M. E. Weale, D. Hernandez, H. Crehan, J. R. Gibbs, R. Mayeux, J. L. Haines, L. A. Farrer, M. A. Pericak-Vance, G. D. Schellenberg, M. Ramirez-Restrepo, A. Engel, A. J. Myers, J. J. Corneveaux, M. J. Huentelman, A. Dillman, M. R. Cookson, E. M. Reiman, A. Singleton, J. Hardy and R. Guerreiro. "Initial Assessment of the Pathogenic Mechanisms of the Recently Identified Alzheimer Risk Loci." *Ann Hum Genet* 77, no. 2 (2013): 85-105.

145. Miyashita, A., A. Koike, G. Jun, L. S. Wang, S. Takahashi, E. Matsubara, T. Kawarabayashi, M. Shoji, N. Tomita, H. Arai, T. Asada, Y. Harigaya, M. Ikeda, M. Amari, H. Hanyu, S. Higuchi, T. Ikeuchi, M. Nishizawa, M. Suga, Y. Kawase, H. Akatsu, K. Kosaka, T. Yamamoto, M. Imagawa, T. Hamaguchi, M. Yamada, T. Moriaha, M. Takeda, T. Takao, K. Nakata, Y. Fujisawa, K. Sasaki, K. Watanabe, K. Nakashima, K. Urakami, T. Ooya, M. Takahashi, T. Yuzuriha, K. Serikawa, S. Yoshimoto, R. Nakagawa, J. W. Kim, C. S. Ki, H. H. Won, D. L. Na, S. W. Seo, I. Mook-Jung, P. St George-Hyslop, R. Mayeux, J. L. Haines, M. A. Pericak-Vance, M. Yoshida, N. Nishida, K. Tokunaga, K. Yamamoto, S. Tsuji, I. Kanazawa, Y. Ihara, G. D. Schellenberg, L. A. Farrer and R. Kuwano. "Sorl1 Is Genetically Associated with Late-Onset Alzheimer's Disease in Japanese, Koreans and Caucasians." *PLoS One* 8, no. 4 (2013): e58618.

146. Pang, B., M. B. Durso, **R. L. Hamilton** and M. N. Nikiforova. "A Novel Cold-Pcr/Fmca Assay Enhances the Detection of Low-Abundance Idh1 Mutations in Gliomas." *Diagn Mol Pathol* 22, no. 1 (2013): 28-34.

147. Reitz, C., G. Jun, A. Naj, R. Rajbhandary, B. N. Vardarajan, L. S. Wang, O. Valladares, C. F. Lin, E. B. Larson, N. R. Graff-Radford, D. Evans, P. L. De Jager, P. K. Crane, J. D. Buxbaum, J. R. Murrell, T. Raj, N. Ertekin-Taner, M. Logue, C. T. Baldwin, R. C. Green, L. L. Barnes, L. B. Cantwell, M. D. Fallin, R. C. Go, P. Griffith, T. O. Obisesan, J. J. Manly, K. L. Lunetta, M. I. Kamboh, O. L. Lopez, D. A. Bennett, H. Hendrie, K. S. Hall, A. M. Goate, G. S. Byrd, W. A. Kukull, T. M. Foroud, J. L. Haines, L. A. Farrer, M. A. Pericak-Vance, G. D. Schellenberg and R. Mayeux. "Variants

**Ronald L. Hamilton, M.D.**

in the Atp-Binding Cassette Transporter (Abca7), Apolipoprotein E 4,and the Risk of Late-Onset Alzheimer Disease in African Americans." *JAMA* 309, no. 14 (2013): 1483-92.

148. Schlegel, J., M. J. Sambade, S. Sather, S. J. Moschos, A. C. Tan, A. Winges, D. DeRyckere, C. C. Carson, D. G. Trembath, J. J. Tentler, S. G. Eckhardt, P. F. Kuan, **R. L. Hamilton**, L. M. Duncan, C. R. Miller, N. 9. Nikolaishvili-Feinberg, B. R. Midkiff, J. Liu, W. Zhang, C. Yang, X. Wang, S. V. Frye, H. S. Earp, J. M. Shields and D. K. Graham. "Mertk Receptor Tyrosine Kinase Is a Therapeutic Target in Melanoma." *J Clin Invest* 123, no. 5 (2013): 2257-67.

150. Spina, S., A. D. Van Laar, J. R. Murrell, **R. L. Hamilton**, J. K. Kofler, F. Epperson, M. R. Farlow, O. L. Lopez, J. Quinlan, S. T. DeKosky and B. Ghetti. "Phenotypic Variability in Three Families with Valosin-Containing Protein Mutation." *Eur J Neurol* 20, no. 2 (2013): 251-8.

151. Tsuang, D., J. B. Leverenz, O. L. Lopez, **R. L. Hamilton,** D. A. Bennett, J. A. Schneider, A. S. Buchman, E. B. Larson, P. K. Crane, J. A. Kaye, P. Kramer, R. Woltjer, J. Q. Trojanowski, D. Weintraub, A. S. Chen-Plotkin, D. J. Irwin, J. Rick, G. D. Schellenberg, G. S. Watson, W. Kukull, P. T. Nelson, G. A. Jicha, J. H. Neltner, D. Galasko, E. Masliah, J. F. Quinn, K. A. Chung, D. Yearout, I. F. Mata, J. Y. Wan, K. L. Edwards, T. J. Montine and C. P. Zabetian. "Apoe Epsilon4 Increases Risk for Dementia in Pure Synucleinopathies." *JAMA Neurol* 70, no. 2 (2013): 223-8.

152. Yeung, J. T., **R. L. Hamilton**, K. Ohnishi, M. Ikeura, D. M. Potter, M. N. Nikiforova, S. Ferrone, R. I. Jakacki, I. F. Pollack and H. Okada. "Loh in the Hla Class I Region at 6p21 Is Associated with Shorter Survival in Newly Diagnosed Adult Glioblastoma." *Clin Cancer Res* 19, no. 7 (2013): 1816-26.

153. Yeung, J. T., **R. L. Hamilton**, H. Okada, R. I. Jakacki and I. F. Pollack. "Increased Expression of Tumor-Associated Antigens in Pediatric and Adult Ependymomas: Implication for Vaccine Therapy." *J Neurooncol* 111, no. 2 (2013): 103-11.

154. **Hamilton R**, Krauze M, Romkes M, Omolo B, Konstantinopoulos P, Reinhart T, Harasymczuk M, Wang Y, Lin Y, Ferrone S, Whiteside T, Bortoluzzi S, Werley J, Nukui T, Fallert-Junecko B, Kondziolka D, Ibrahim J, Becker D, Kirkwood J, Moschos S. Pathologic and gene expression features of metastatic melanomas to the brain.Cancer. 2013 Aug 1;119(15):2737-46. doi: 10.1002/cncr.28029. Epub 2013 May 21.PMID:23695963 [PubMed - in process]

155. Lam S, Grandhi R, Wong R, **Hamilton R**, Greene S. Neuromuscular hamartoma of the sciatic nerve: Case report and review of the literature. Surg Neurol Int. 2013;4:8. doi: 10.4103/2152-7806.106266. Epub 2013 Jan 18.PMID:23493803[PubMed]

156. Reitz C, Mayeux R; Alzheimer's Disease Genetics Consortium. TREM2 and neurodegenerative disease. N Engl J Med. 2013 Oct 17;369(16):1564-5. doi: 10.1056/NEJMc1306509#SA1. PMID:24131184

157. Tempel ZJ, Johnson SA, Richard PS, Friedlander RM, Rothfus WE, **Hamilton RL**. Parasellar arachnoid cyst presenting with a nonpupil sparing third nerve palsy mimicking a posterior communicating artery aneurysm in an adult. Surg Neurol Int. 2013 Jul 9;4:87. doi: 10.4103/2152-7806.114799. eCollection 2013.PMID:23956930

158. Murray PS, Kirkwood CM, Gray MC, Fish KN, Ikonomovic MD, **Hamilton RL**, Kofler JK, Klunk WE, Lopez OL, Sweet RA. Hyperphosphorylated tau is elevated in Alzheimer's Disease with psychosis. J Alzheimers Dis, 2014 204;39:759-773. PMID:24270207

159. Oborski MJ, Laymon CM, Lieberman FS, Drappatz J, **Hamilton RL**, Mountz JM. First use of (18)F-labeled ML-10 PET to assess apoptosis change in a newly diagnosed glioblastoma multiforme patient before and early after therapy. Brain Behav 2014 4:312-315. PMID:24683522

160 Shin SS, Murdoch G, Hamilton RL, Faraji AH, Kano H, Zwagerman NT, Gardner PA, Lunsford LD, Friedlander RM The Pathological Response of Cavernous Malformations Following Radiosurgery. J Neurosurg (in press).

160. Pollack IF, Jakacki RI, Butterfield LH, **Hamilton RL**, Panigrahy A, Potter DM, Connelly AK, Dibridge SA, Whiteside TL, Okada H. Antigen-specific immune responses and clinical outcome after vaccination with glioma-associated antigen peptides and polyinosinic-polycytidylic Acid stabilized by lysine and carboxymethylcellulose in children with newly diagnosed malignant brainstem and nonbrainstem gliomas. J Clin Oncol. 2014 Jul 1;32(19):2050-8. PMID:24888813

161. Naj AC, Jun G, Reitz C, Kunkle BW, Perry W, Park YS, Beecham GW, Rajbhandary RA, Hamilton-Nelson KL, Wang LS, Kauwe JS, Huentelman MJ, Myers AJ, Bird TD, Boeve BF, Baldwin CT, Jarvik GP, Crane PK, Rogaeva E, Barmada MM, Demirci FY, Cruchaga C, Kramer PL, Ertekin-Taner N, Hardy J, Graff-Radford NR, Green RC, Larson

**Ronald L. Hamilton, M.D.**

EB, St George-Hyslop PH, Buxbaum JD, Evans DA, Schneider JA, Lunetta KL, Kamboh MI, Saykin AJ, Reiman EM, De Jager PL, Bennett DA, Morris JC, Montine TJ, Goate AM, Blacker D, Tsuang DW, Hakonarson H, Kukull WA, Foroud TM, Martin ER, Haines JL, Mayeux RP, Farrer LA, Schellenberg GD, Pericak-Vance MA; Alzheimer Disease Genetics Consortium, Albert MS, Albin RL, Apostolova LG, Arnold SE, Barber R, Barnes LL, Beach TG, Becker JT, Beekly D, Bigio EH, Bowen JD, Boxer A, Burke JR, Cairns NJ, Cantwell LB, Cao C, Carlson CS, Carney RM, Carrasquillo MM, Carroll SL, Chui HC, Clark DG, Corneveaux J, Cribbs DH, Crocco EA, DeCarli C, DeKosky ST, Dick M, Dickson DW, Duara R, Faber KM, Fallon KB, Farlow MR, Ferris S, Frosch MP, Galasko DR, Ganguli M, Gearing M, Geschwind DH, Ghetti B, Gilbert JR, Glass JD, Growdon JH, **Hamilton RL**, Harrell LE, Head E, Honig LS, Hulette CM, Hyman BT, Jicha GA, Jin LW, Karydas A, Kaye JA, Kim R, Koo EH, Kowall NW, Kramer JH, LaFerla FM, Lah JJ, Leverenz JB, Levey AI, Li G, Lieberman AP, Lin CF, Lopez OL, Lyketsos CG, Mack WJ, Martiniuk F, Mash DC, Masliah E, McCormick WC, McCurry SM, McDavid AN, McKee AC, Mesulam M, Miller BL, Miller CA, Miller JW, Murrell JR, Olichney JM, Pankratz VS, Parisi JE, Paulson HL, Peskind E, Petersen RC, Pierce A, Poon WW, Potter H, Quinn JF, Raj A, Raskind M, Reisberg B, Ringman JM, Roberson ED, Rosen HJ, Rosenberg RN, Sano M, Schneider LS, Seeley WW, Smith AG, Sonnen JA, Spina S, Stern RA, Tanzi RE, Thornton-Wells TA, Trojanowski JQ, Troncoso JC, Valladares O, Van Deerlin VM, Van Eldik LJ, Vardarajan BN, Vinters HV, Vonsattel JP, Weintraub S, Welsh-Bohmer KA, Williamson J, Wishnek S, Woltjer RL, Wright CB, Younkin SG, Yu CE, Yu L. . Effects of multiple genetic Loci on age at onset in late-onset Alzheimer disease: a genome-wide association study. JAMA Neurol. 2014 Nov 1;71(11):1394-404. doi: 10.1001/jamaneurol.2014.1491

162. Pollack IF, Jakacki RI, Butterfield LH, **Hamilton RL**, Panigrahy A, Potter DM, Connelly AK, Dibridge SA, Whiteside TL, Okada H. Antigen-specific immune responses and clinical outcome after vaccination with glioma-associated antigen peptides and polyinosinic-polycytidylic acid stabilized by lysine and carboxymethylcellulose in children with newly diagnosed malignant brainstem and nonbrainstem gliomas. J Clin Oncol. 2014 Jul 1;32(19):2050-8. doi: 10.1200/JCO.2013.54.0526. Epub 2014 Jun 2. PMID: 24888813

163.. Okada H, Butterfield LH, **Hamilton RL**, Hoji A, Sakaki M, Ahn BJ, Kohanbash G, Drappatz J, Engh J, Amankulor N, Lively MO, Chan MD, Salazar AM, Shaw EG, Potter DM, Lieberman FS. Induction of robust type-1 CD8+ T-cell responses in WHO grade II low-grade glioma patients receiving peptide-based vaccines in combination with poly-ICLC Clin Cancer Res. 2014 Nov 25. pii: clincanres.1790.2014

164. Salloway S, Sperling R, Fox NC, Blennow K, Klunk W, Raskind M, Sabbagh M, Honig LS, Porsteinsson AP, Ferris S, Reichert M, Ketter N, Nejadnik B, Guenzler V, Miloslavsky M, Wang D, Lu Y, Lull J, Tudor IC, Liu E, Grundman M, Yuen E, Black R, Brashear HR; **Hamilton RL**, Bapineuzumab 301 and 302 Clinical Trial Investigators. Two phase 3 trials of bapineuzumab in mild-to-moderate Alzheimer's disease N Engl J Med. 2014 Jan 23;370(4):322-33. doi: 10.1056/NEJMoa1304839.

165. Leone JP, Bhargava R, Theisen BK, **Hamilton RL**, Lee AV, Brufsky AM. Expression of high affinity folate receptor in breast cancer brain metastasis. Oncotarget. 2015 Jun 25. [Epub ahead of print] PMID: 24450891

166. Wang LS, Naj AC, Graham RR, Crane PK, Kunkle BW, Cruchaga C, Murcia JD, Cannon-Albright L, Baldwin CT, Zetterberg H, Blennow K, Kukull WA, Faber KM, Schupf N, Norton MC, Tschanz JT, Munger RG, Corcoran CD, Rogaeva E; Alzheimer's Disease Genetics Consortium, Lin CF, Dombroski BA, Cantwell LB, Partch A, Valladares O, Hakonarson H, St George-Hyslop P, Green RC, Goate AM, Foroud TM, Carney RM, Larson EB, Behrens TW, Kauwe JS, Haines JL, Farrer LA, Pericak-Vance MA, Mayeux R, Schellenberg GD; National Institute on Aging-Late-Onset Alzheimer's Disease (NIA-LOAD) Family Study, Albert MS, Albin RL, Apostolova LG, Arnold SE, Barber R, Barmada M, Barnes LL, Beach TG, Becker JT, Beecham GW, Beekly D, Bennett DA, Bigio EH, Bird TD, Blacker D, Boeve BF, Bowen JD, Boxer A, Burke JR, Buxbaum JD, Cairns NJ, Cao C, Carlson CS, Carroll SL, Chui HC, Clark DG, Cribbs DH, Crocco EA, DeCarli C, DeKosky ST, Demirci FY, Dick M, Dickson DW, Duara R, Ertekin-Taner N, Fallon KB, Farlow MR, Ferris S, Frosch MP, Galasko DR, Ganguli M, Gearing M, Geschwind DH, Ghetti B, Gilbert JR, Glass JD, Graff-Radford NR, Growdon JH, **Hamilton RL**, Hamilton-Nelson KL, Harrell LE, Head E, Honig LS, Hulette CM, Hyman BT, Jarvik GP, Jicha GA, Jin LW, Jun G, Jun G, Kamboh MI, Karydas A, Kaye JA, Kim R, Koo EH, Kowall NW, Kramer JH, LaFerla FM, Lah JJ, Leverenz JB, Levey AI, Li G, Lieberman AP, Lopez OL, Lunetta KL, Lyketsos CG, Mack WJ, Marson DC, Martin ER, Martiniuk F, Mash DC, Masliah E, McCormick WC, McCurry SM, McDavid AN, McKee AC, Mesulam WM, Miller BL, Miller CA, Miller JW, Montine TJ, Morris JC, Murrell JR, Olichney JM, Parisi JE, Perry W, Peskind E, Petersen RC, Pierce A, Poon WW, Potter H, Quinn JF, Raj A, Raskind M, Reiman EM, Reisberg B, Reitz C, Ringman JM, Roberson ED, Rosen HJ, Rosenberg RN, Sano M, Saykin AJ, Schneider JA, Schneider LS, Seeley WW, Smith AG, Sonnen JA, Spina S, Stern RA, Tanzi RE, Thornton-Wells TA, Trojanowski JQ, Troncoso JC, Tsuang DW, Van Deerlin VM, Van Eldik LJ, Vardarajan BN, Vinters HV, Vonsattel JP, Weintraub S, Welsh-Bohmer KA, Williamson J, Wishnek S, Woltjer RL, Wright CB, Younkin SG, Yu CE, Yu L.**Rarity of the Alzheimer disease-protective APP A673T variant in the United States.** JAMA Neurol. 2015 Feb;72(2):209-16. doi: 10.1001/jamaneurol.2014.2157.

**Ronald L. Hamilton, M.D.**

167. 2. Jun G, Ibrahim-Verbaas CA, Vronskaya M, Lambert JC, Chung J, Naj AC, Kunkle BW, Wang LS, Bis JC, Bellenguez C, Harold D, Lunetta KL, Destefano AL, Grenier-Boley B, Sims R, Beecham GW, Smith AV, Chouraki V, Hamilton-Nelson KL, Ikram MA, Fievet N, Denning N, Martin ER, Schmidt H, Kamatani Y, Dunstan ML, Valladares O, Laza AR, Zelenika D, Ramirez A, Foroud TM, Choi SH, Boland A, Becker T, Kukull WA, van der Lee SJ, Pasquier F, Cruchaga C, Beekly D, Fitzpatrick AL, Hanon O, Gill M, Barber R, Gudnason V, Campion D, Love S, Bennett DA, Amin N, Berr C, Tsolaki M, Buxbaum JD, Lopez OL, Deramecourt V, Fox NC, Cantwell LB, Tárraga L, Dufouil C, Hardy J, Crane PK, Eiriksdottir G, Hannequin D, Clarke R, Evans D, Mosley TH Jr, Letenneur L, Brayne C, Maier W, De Jager P, Emilsson V, Dartigues JF, Hampel H, Kamboh MI, de Bruijn RF, Tzourio C, Pastor P, Larson EB, Rotter JI, O'Donovan MC, Montine TJ, Nalls MA, Mead S, Reiman EM, Jonsson PV, Holmes C, St George-Hyslop PH, Boada M, Passmore P, Wendland JR, Schmidt H, Morgan K, Winslow AR, Powell JF, Carasquillo M, Younkin SG, Jakobsdóttir J, Kauwe JS, Wilhelmsen KC, Rujescu D, Nöthen MM, Hofman A, Jones L; IGAP Consortium, Haines JL, Psaty BM, Van Broeckhoven C, Holmans P, Launer LJ, Mayeux R, Lathrop M, Goate AM, Escott-Price V, Seshadri S, Pericak-Vance MA, Amouyel P, Williams J, van Duijn CM, Schellenberg GD, Farrer LA and . Collaborators (including **Hamilton RL**) (296)   **A novel Alzheimer disease locus located near the gene encoding tau protein**. Mol Psychiatry. 2015 Mar 17. doi: 10.1038/mp.2015.23.

168. . Østergaard SD, Mukherjee S, Sharp SJ, Proitsi P, Lotta LA, Day F, Perry JR, Boehme KL, Walter S, Kauwe JS, Gibbons LE; Alzheimer's Disease Genetics Consortium; GERAD1 Consortium; EPIC-InterAct Consortium, Larson EB, Powell JF, Langenberg C, Crane PK, Wareham NJ, Scott RA.
Collaborators (including **Hamilton RL**) (296)   Associations between Potentially Modifiable Risk Factors and Alzheimer Disease: A Mendelian Randomization Study. PLoS Med. 2015 Jun 16;12(6):e1001841; discussion e1001841. doi:

169. Wang P, Bahreini A, Gyanchandani R, Lucas PC, Hartmaier RJ, Watters RJ, Jonnalagadda AR, Trejo Bittar HE, Berg A, **Hamilton RL**, Kurland BF, Weiss KR, Mathew A, Leone JP, Davidson NE, Nikiforova MN, Brufsky AM, Ambros TF, Stern AM, Puhalla SL, Lee AV, Oesterreich S. Sensitive detection of mono- and polyclonal ESR1 mutations in primary tumors, metastatic lesions and cell free DNA of breast cancer patients. Clin Cancer Res. 2015 Oct 23. pii: 1534.2015. PMID: 26500237

170. Salgado CM, Basu D, Nikiforova M, **Hamilton RL**, Gehris R, Jakacki R, Panigrahy A, Yatsenko S, Reyes-Múgica M. Amplification of mutated NRAS leading to congenital melanoma in neurocutaneous melanocytosis. Melanoma Res. 2015 Oct;25(5):453-60.  PMID: 26266759

171. Shin SS, Murdoch G, Hamilton RL, Faraji AH, Kano H, Zwagerman NT, Gardner PA, Lunsford LD, Friedlander RM. Pathological response of cavernous malformations following radiosurgery. J Neurosurg. 2015 Oct;123(4):938-44. doi: 10.3171/2014.10.JNS14499. Epub 2015 Jun 19. PMID: 26090838

--------------------

172. Mukherjee S, Walter S, Kauwe JS, Saykin AJ, Bennett DA, Larson EB, Crane PK, Glymour MM; Adult Changes in Thought Study Investigators; Religious Orders Study/Memory and Aging Project Investigators; Alzheimer's Disease Genetics Consortium. Alzheimers Dement. Genetically predicted body mass index and Alzheimer's disease-related phenotypes in three large samples: Mendelian randomization analyses. 2015 Dec;11(12):1439-51. doi: 10.1016/j.jalz.2015.05.015. Epub 2015 Jun 12. PMID: 26079416

173. Ghani M, Reitz C, Cheng R, Vardarajan BN, Jun G, Sato C, Naj A, Rajbhandary R, Wang LS, Valladares O, Lin CF, Larson EB, Graff-Radford NR, Evans D, De Jager PL, Crane PK, Buxbaum JD, Murrell JR, Raj T, Ertekin-Taner N, Logue M, Baldwin CT, Green RC, Barnes LL, Cantwell LB, Fallin MD, Go RC, Griffith PA, Obisesan TO, Manly JJ, Lunetta KL, Kamboh MI, Lopez OL, Bennett DA, Hendrie H, Hall KS, Goate AM, Byrd GS, Kukull WA, Foroud TM, Haines JL, Farrer LA, Pericak-Vance MA, Lee JH, Schellenberg GD, St George-Hyslop P, Mayeux R, Rogaeva E; Alzheimer's Disease Genetics Consortium. Association of Long Runs of Homozygosity With Alzheimer Disease Among African American Individuals. JAMA Neurol. 2015 Nov;72(11):1313-23. doi: 10.1001/jamaneurol.2015.1700. PMID: 26366463

174. Nikiforova MN, Wald AI, Melan MA, Roy S, Zhong S, Hamilton RL, Lieberman FS, Drappatz J, Amankulor NM, Pollack IF, Nikiforov YE, Horbinski C.
Targeted next-generation sequencing panel (GlioSeq) provides comprehensive genetic profiling of central nervous system tumors. Neuro Oncol. 2016 Mar;18(3):379-87. doi: 10.1093/neuonc/nov289. Epub 2015 Dec 17. PMID: 2668176

175. Morrissy AS, Garzia L, Shih DJ, Zuyderduyn S, Huang X, Skowron P, Remke M, Cavalli FM, Ramaswamy V, Lindsay PE, Jelveh S, Donovan LK, Wang X, Luu B, Zayne K, Li Y, Mayoh C, Thiessen N, Mercier E, Mungall KL, Ma

**Ronald L. Hamilton, M.D.**

Y, Tse K, Zeng T, Shumansky K, Roth AJ, Shah S, Farooq H, Kijima N, Holgado BL, Lee JJ, Matan-Lithwick S, Liu J, Mack SC, Manno A, Michealraj KA, Nor C, Peacock J, Qin L, Reimand J, Rolider A, Thompson YY, Wu X, Pugh T, Ally A, Bilenky M, Butterfield YS, Carlsen R, Cheng Y, Chuah E, Corbett RD, Dhalla N, He A, Lee D, Li HI, Long W, Mayo M, Plettner P, Qian JQ, Schein JE, Tam A, Wong T, Birol I, Zhao Y, Faria CC, Pimentel J, Nunes S, Shalaby T, Grotzer M, Pollack IF, Hamilton RL, Li XN, Bendel AE, Fults DW, Walter AW, Kumabe T, Tominaga T, Collins VP, Cho YJ, Hoffman C, Lyden D, Wisoff JH, Garvin JH Jr, Stearns DS, Massimi L, Schüller U, Sterba J, Zitterbart K, Puget S, Ayrault O, Dunn SE, Tirapelli DP, Carlotti CG, Wheeler H, Hallahan AR, Ingram W, MacDonald TJ, Olson JJ, Van Meir EG, Lee JY, Wang KC, Kim SK, Cho BK, Pietsch T, Fleischhack G, Tippelt S, Ra YS, Bailey S, Lindsey JC, Clifford SC, Eberhart CG, Cooper MK, Packer RJ, Massimino M, Garre ML, Bartels U, Tabori U, Hawkins CE, Dirks P, Bouffet E, Rutka JT, Wechsler-Reya RJ, Weiss WA, Collier LS, Dupuy AJ, Korshunov A, Jones DT, Kool M, Northcott PA, Pfister SM, Largaespada DA, Mungall AJ, Moore RA, Jabado N, Bader GD, Jones SJ, Malkin D, Marra MA, Taylor MD. Divergent clonal selection dominates medulloblastoma at recurrence. Nature. 2016 Jan 21;529(7586):351-7. doi: 10.1038/nature16478. Epub 2016 Jan 13

176. Gandhoke GS, Yilmaz S, Grunwaldt L, Hamilton RL, Salvetti DJ, Greene S. A case of spinal epidural venous malformation with mediastinal extension: management with combined surgery and percutaneous sclerotherapy. J Neurosurg Pediatr. 2016 May;17(5):612-7. doi: 10.3171/2015.9.PEDS15341. Epub 2016 Jan 15.

177. Thompson EM, Hielscher T, Bouffet E, Remke M, Luu B, Gururangan S, McLendon RE, Bigner DD, Lipp ES, Perreault S, Cho YJ, Grant G, Kim SK, Lee JY, Rao AA, Giannini C, Li KK, Ng HK, Yao Y, Kumabe T, Tominaga T, Grajkowska WA, Perek-Polnik M, Low DC, Seow WT, Chang KT, Mora J, Pollack IF, Hamilton RL, Leary S, Moore AS, Ingram WJ, Hallahan AR, Jouvet A, Fèvre-Montange M, Vasiljevic A, Faure-Conter C, Shofuda T, Kagawa N, Hashimoto N, Jabado N, Weil AG, Gayden T, Wataya T, Shalaby T, Grotzer M, Zitterbart K, Sterba J, Kren L, Hortobágyi T, Klekner A, László B, Pócza T, Hauser P, Schüller U, Jung S, Jang WY, French PJ, Kros JM, van Veelen MC, Massimi L, Leonard JR, Rubin JB, Vibhakar R, Chambless LB, Cooper MK, Thompson RC, Faria CC, Carvalho A, Nunes S, Pimentel J, Fan X, Muraszko KM, López-Aguilar E, Lyden D, Garzia L, Shih DJ, Kijima N, Schneider C, Adamski J, Northcott PA, Kool M, Jones DT, Chan JA, Nikolic A, Garre ML, Van Meir EG, Osuka S, Olson JJ, Jahangiri A, Castro BA, Gupta N, Weiss WA, Moxon-Emre I, Mabbott DJ, Lassaletta A, Hawkins CE, Tabori U, Drake J, Kulkarni A, Dirks P, Rutka JT, Korshunov A, Pfister SM, Packer RJ, Ramaswamy V, Taylor MD. Prognostic value of medulloblastoma extent of resection after accounting for molecular subgroup: a retrospective integrated clinical and molecular analysis. Lancet Oncol. 2016 Mar 11. pii: S1470-2045(15)00581-1. doi: 10.1016/S1470-2045(15)00581-1. [Epub ahead of print]

178. Pollack IF, Jakacki RI, Butterfield LH, Hamilton RL, Panigrahy A, Normolle DP, Connelly AK, Dibridge S, Mason G, Whiteside TL, Okada H. Immune responses and outcome after vaccination with glioma-associated antigen peptides and poly-ICLC in a pilot study for pediatric recurrent low-grade gliomas†. Neuro Oncol. 2016 Mar 15. pii: now026. [Epub ahead of print]

179. Jakacki RI, Cohen KJ, Buxton A, Krailo MD, Burger PC, Rosenblum MK, Brat DJ, Hamilton RL, Eckel SP, Zhou T, Lavey RS, Pollack IF. Phase 2 study of concurrent radiotherapy and temozolomide followed by temozolomide and lomustine in the treatment of children with high-grade glioma: a report of the Children's Oncology Group ACNS0423 study. Neuro Oncol. 2016 Mar 22. pii: now038. [Epub ahead of print]

180. Ridge PG, Hoyt KB, Boehme K, Mukherjee S, Crane PK, Haines JL, Mayeux R, Farrer LA, Pericak-Vance MA, Schellenberg GD, Kauwe JS; Alzheimer's Disease Genetics Consortium (ADGC). Assessment of the genetic variance of late-onset Alzheimer's disease. Neurobiol Aging. 2016 May;41:200.e13-20. doi: 10.1016/j.neurobiolaging.2016.02.024. Epub 2016 Mar 3

181. Beckner ME, Pollack IF, Nordberg ML, Hamilton RL. Glioblastomas with copy number gains in EGFR and RNF139 show increased expressions of carbonic anhydrase genes transformed by ENO1. BBA Clin. 2015 Nov 10;5:1-15. doi: 10.1016/j.bbacli.2015.11.001. eCollection 2016 Jun. PMID: 27051584 Free PMC Article

182. Fernandes-Cabral DT, Zenonos GA, Hamilton RL, Panesar SS, Fernandez-Miranda JC. High-Definition Fiber Tractography in the Evaluation and Surgical Planning of Lhermitte-Duclos Disease: A Case Report. World Neurosurg. 2016 May 7. pii: S1878-8750(16)30257-1. doi: 10.1016/j.wneu.2016.04.128. [Epub ahead of print] PMID: 27168233

**Reviews, invited published papers, proceedings of conference and symposia, monographs, books and book chapters**

**Ronald L. Hamilton, M.D.**

1. **Hamilton RL**, Wiley CA. New developments in the neuropathology of AIDS. CAP Today, 10 (12): p 42, 1996.
2. **Hamilton RL**: Hydrocephalus in a 9 month-old infant. Brain Pathol 6:533-534, 1996
3. **Hamilton RL**: New onset hemiparesis. Brain Pathol 7: 715-716, 1997.
4. **Hamilton RL**: Precocious Puberty. Brain Pathol 7: 711-712, 1997
5. **Hamilton RL**: Frontal lobe tumor in 11 year-old girl. Brain Pathol 7: 713-714, 1997
6 **Hamilton RL**, Pollack, IF: The Molecular Biology of Ependymomas. Brain Pathology 7:807-822, 1997.
7. **Hamilton RL**: A 26 year old woman with new onset seizures. Brain Pathol 8: 239-240, 1997.
8. **Hamilton RL**, Wiley, CA, The Neuropathology of Viral Infections of the Nervous System. In: Textbook of Neuropathology; Davis RL, Robertson DM eds. Williams and Wilkins, 3rd edition,  Baltimore, MD. 1997.

9. **Hamilton RL**: Guidelines for the neuropathological diagnosis of Alzheimer's Disease and Dementia with Lewy Bodies. Revista de Neurologia 27 (S1): S67-S70, 1998
10. **Hamilton RL**: Experimental neuropathology of Alzheimer's Disease: animal models. Revista de Neurologia 27 (S1): S84-S86, 1998
11. Sanders VJ, Wiley CA, **Hamilton RL**: The mechanisms of neuronal damage in retroviral infections of the nervous system. in The Mechanisms of Neuronal Damage in Virus Infections of the Nervous System (Gosztonyi G, ed). Springer Verlag, Berlin, 2001.
12.  **Hamilton RL**. [Recent Advances in the neuropathological evaluation of Alzheimer's Disease: the importance of synuclein] Rev Neurol 35:765-7, 2002 (Spanish).
13. Pollack IF, **Hamilton RL**, Finkelstein SD, Lieberman F.  Molecular abnormalities and correlations with tumor response and outcome in glioma patients.  Neuroimaging Clinics of North America: Advances in Brain Tumor Imaging and Therapy (Provenzale J, ed.) WB Saunders, Philadelphia,  2002.
14. **Hamilton RL**.  The other dementias: the neuropathology of the non-Alzheimer's Disease dementias. Rev Neurol 37:130-139, 2003 (Spanish).
15. Omalu BI, Wiley CA, **Hamilton RL**.  Case of the Month February 2003. Brain Pathology 13:419-420, 2003.
16. DeKosky ST, Ikonomovic MD, **Hamilton RL**, Bennett DA, Mufson EJ. Neuropathology of Mild Cognitive Impairment in the Elderly. In John Morris J, Scheltens P, and Cummings JL), (eds), *Alzheimer's Disease and Related Disorders:* London, Taylor & Francis, 1-16, 2006.
17. Crain BJ, Alston SR, Bruch LA, **Hamilton RL**, McLendon RE, Rhodes H, Tihan T, Weidenheim KM. Accreditation Council for Graduate Medical Education (ACGME) Competencies in Neuropathology Training.  J Neuropathol Exp Neurol 64:273-279, 2005.
18. McIntyre JA, **Hamilton RL**, Dekosky ST.  Redox-reactive autoantibodies in cerebrospinal fluids. Annals of NY Acad Sci 1109: 296-302, 2007.
19. DeKosky ST, Kaufer DI, **Hamilton R**, Wolk D, Lopez OL: Dementia. In: Neurology in Clinical  Practice: Principles of Diagnosis and Management, 5th Edition. Editors: Bradley WG, Daroff RB, Fenichel GM & Jankovic J. Boston MA, Butterworth-Heinemann, 2007: 1855-1907.
20. Tyurin VA, Tyurina YY, Kochanek PM, **Hamilton R**, DeKosky ST, Greenberger JS, Bayir H, Kagan VE.  Chapter 19: Oxidative lipidomics of programmed cell death.  Methods Enzymol 442:375-93, 2008.
21. Yeaney GA, O'Conn SM, Jankowitz BT, **Hamilton RL**.  A 16 year-old male with cerebellar mass. Brain Pathol. 2009 19, 167-170. PMID 19076785
22. Horbinski, C, **Hamilton RL**.  Application of telepathology for neuropathologic intraoperative consultations. Brain Pathol 2009 19; 317-322. PMID 19290998

**Abstracts**

1. **Hamilton RL**, Sanger WG, and McComb RD: Characterization of cell lines derived from malignant tumors in patients with neurofibromatosis. Federation Proceedings 46: 433, 1987.
2. Esch O, Spinosa JC, **Hamilton RL**, Crombie DL, Schteigart CD, Hofmann AF: Reversible cytotoxicity to the gallbladder mucosa of contact dissolution solvents for cholesterol gallstones: a comparison of methyl tert-butyl ether (mtbe) and ethyl propionate (ep) in two animal models. Gastroenterology 100 (5, part 2): A135, 1991.

**Ronald L. Hamilton, M.D.**

3. Haas RH, Popovitch B, **Hamilton RL**: The utility of DNA dystrophin gene analysis in non-specific myopathy: presented at Child Neurology Society Annual Meeting, October, 1992: New Orleans, LA.

4. Haas RH, Mansden DL, Estrada S, **Hamilton RL**, Grafe MG, Nyhan WL: Acute basal ganglia infarction in propionic acidemia in spite of good metabolic control: presented at Child Neurology Society Annual Meeting, October, 1992: New Orleans, LA.

5. **Hamilton RL**, Haas RH, Nyhan W, Powell HP, Grafe MR:  The neuropathology of propionic acidemia: a report of two additional cases. American association of Neuropathology Annual Meeting, June 1993, Salt Lake City, UT; J Neuropathol Exp Neurol 52:299, 1993.

6. Mansfield RT, Schiding JK**, Hamilton R,** Kochanek PM: Hypothermia fails to reduce lesion volume after traumatic brain injury in immature rats.  Pediatric Research 35(4):55, 1994.

7. **Hamilton RL**, Bodnar RJ, Wang G, Wiley CA.  The effect of AZT on retroviral encephalitis: a murine model: presented at the Sixth Workshop on the Pathogenesis of Animal Retroviruses, Philadelphia, PA, Nov. 17-19, 1994.

8. Adelson PD, Robichaurd P, **Hamilton RL**, Kochanek PM. Brain edema and neuropathology after diffuse traumatic injury in immature rats.  Neurotrauma Society meeting, San Diego CA, Nov 10-11, 1995.

9. **Hamilton RL**, Bodnar RJ, Wang G, Klunk W, Wiley CA, Treatment of chronic retroviral encephalitis with zidovudine (AZT) in a murine model. Society for Neuroscience Meeting, San Diego, CA Nov 11-16 1995.

10. **Hamilton RL**, Bodnar RJ, Wang G, Klunk W, Wiley CA. The effect of zidovudine (AZT) on murine retroviral encephalitis. Amer. Assoc of Neuropathology, San Antonio, June, 1995. J Neuropathol Exp Neurol 54 (3): 438, 1995.

11. **Hamilton RL**, and Claassen D. Neonatal Methylmalonic Acidemia With Hemicerebellum: An Autopsy Report;  Society of Pediatric Pathology / Child Neurology Society (joint meeting), Baltimore, Oct 27-29, 1995.

12. **Hamilton RL**, Baldwin M, Wiley CA. Human Herpesviruses And Temporal Arteritis American Association of Neuropathology, Vancouver, BC, Canada, June 1996.

13. Mizukami K, Ikonomovic MD, Sheffield R, Rubin RT, Grayson D, **Hamilton R**, Warde D, Armstrong DM. Immunohistochemical Localization of GABA-A Receptor ß2/3 Subunits in the Hippocampal Formation in Aged Brain with Alzheimer-related Neuropathology. Society for Neuroscience meeting, Washington DC, Nov 1996.

14. Bodnar RJ and **Hamilton RL**. Effect of zidovudine (AZT) and saquinavir on retroviral infection of the central nervous system (CNS) Society for Neuroscience meeting, Nov 17-21, 1996 Washington D.C.

15. Bredel M, Pollack I, **Hamilton RL**, Finkelstein SD, Campbell JW, Martinez AJ, Sherwin R, Bozik ME, Gollin S. Overexpression of EGF receptor and p53 mutations in pediatric malignant gliomas. American Association of Neurological Surgeons, 1997 Annual meeting.

16. Xu Y, Liachennko S, Tang P, **Hamilton RL** Correlation of neuropathologic changes with cerebral metabolic and ADC abnormalities after prolonged asphyxial cardiac arrest. International Society of Magnetic Resonance in Medicine, annual meeting, 1997

17. Bredel M, Pollack IF, Campbell JW, **Hamilton RL**. Basic fibroblast growth factor as a prognostic indicator in pediatric high grade glioma patients. American Association of Neuropathology, Pittsburgh, PA, June 1997. J Neuropathol Exp Neurol 56 (5): 581, 1997

18. **Hamilton RL**, Bodnar RJ, Lackner AA, Lane JH, Wiley CA Neurotrophic factors in simian immunodeficiency virus encephalitis. American Association of Neuropathology, Pittsburgh, PA, June 1997. J Neuropathol Exp Neurol 56 (5): 618, 1997.

19. Adelson, PD, Robichaud, P, **Hamilton, RL**, Kochanek, PM. Histologic analyses of severe diffuse traumatic brain injury in the immature rat . National Neurotrama Society, New Orleans Oct 24-25, 1997.

20. Dorsey RW, Achim CL, Wiley CA, **Hamilton RL**\*,  Soontornniyomkij V. Gene expression and cellular localization of neurotrophic factors in Alzheimer's disease. Society of Neuroscience meeting Nov, 1997, New Orleans.

21.  Klunk WE, **Hamilton RL**, Styren SD, Styren G, Debnath ML, Mathis CA, Mahood K, Hsiao KK. Staining of AD and Tg2576 mouse brain wirh X-34, a highly flourescent derivative of chrysamine

**Ronald L. Hamilton, M.D.**

G and A potential in vivo probe for sheet fibrils.  Siociety for Neuroscience meeting, New Orleans 1997.

22. Klunk WE, **Hamilton RL**, Styren SD, Styren G, Debnath ML.  Neuropathological study of AD brain with X-34, a new highly fluorescent derivative of congo red.  Society for  Neuroscience meeting. Los Angeles, CA 1998.

23. Halks-Miller M, Hesselgesser J, Horuk R, Soontornniyomkij V, **Hamilton R,** Achim C.  CCR1 immunoreactivity in Alzheimer's Disease brains.  Society for Neurosciences meeting. Los Angeles, CA 1998.

24.  Wang G, Soontornniyomkij V, Pittman CA, Achim CL, Wiley CA, **Hamilton RL**.  Glial expression of BDNF and TRK B receptor proteins in Alzheimer's Disease and HIV-1 encephalitis brains. Society for Neuroscience meeting. Los Angeles, CA 1998.

25. Ikonomovic MD, Mizukami K, Davies P, **Hamilton R**, Sheffield R, Armstrong DM.  Co-localization of interneurons and an ad-specific antibody in the hippocampal formation of Alzheimer brains. Society for Neurosciences.  Los Angeles, CA 1998.

26. Mizukami K, Ikonomovic MD, Grayson DR, Rubin RT, Warde D, Sheffield R, **Hamilton RL,** Davies P, Armstrong DM.  Immunohistochemical study of GABA(A) receptor beta 2/3 subunits in the hippocampal formation of aged brains with Alzheimer-related neuropathologic changes. Experimental Neurology 147 2 333-45 (1997).

27. Bredel M, Pollack IF, **Hamilton RL**: Expression of the c-erbB1 Oncogene Product Epidermal Growth Factor Receptor (EGFR) and its Relevance for Outcome in Children with Supratentorial High-Grade Gliomas ; XVI Congress of the European Society for Pediatric Neurosurgery; November 11-15, 1998, Marseille, France

28. **Hamilton, RL** Numerous widespread alpha-synuclein positive thread-like processes characterize dementia with Lewy Bodies. Foundation IPSEN Conference, April 12, 1999, Paris France

29 **Hamilton RL** Numerous and widespread alpha-synuclein thread-like processes in dementia with Lewy bodies. American Assoc of Neuropathologist Annual Meeting, 1999, Portland, OR. J Neuropathol Exper Neurol 58:552, 1999.

30. Klunk WE, **Hamilton RL**, Styren SD, Head E: Evaluation of the aged canine as a screening system for the x-34 class of in vivo probes for amyloid deposition in AD. Soc. of Neuroscience, 1999

31. Kaufer, DL, **Hamilton RL**, Lopez OL, DeKosky ST MRI white matter hyperintensities and cerebral amyloid angiopathy in a case of dementia with Lewy bodies. Amer Neuropsychiatric Assoc, annual meeting, 2/2000, Ft. Myers, FLA.

32. **Hamilton RL**, Mash DC. Widespread Alpha-synucleinopathy in the Parkinson's Disease brain. 6th National Parkinson's Disease Foundation International Symposium on Parkinson's Disease Research, to be held in conjunction with the Society of Neuroscience meeting in Miami Beach, Oct 22-23rd, 1999.

33. **Hamilton, RL**, Mash DC. Widespread alpha-synuclein-positive neuropil threads in the Parkinson's Disease brain. American Assoc of Neuropathology, Atlanta, GA, June 8-11, 2000.

34. Snyder JV, Gebel JM, Kassam A, **Hamilton RL**, Goldstein S, Watkins S, Yonas H, Chelluri L, Thulborn K. Guidance by MR Tissue Sodium Concentration of Infarct Resection in Massive Stroke. Neurology 54(7): A97-A98, Suppl. 3, 2000.

35. Chow TM, Kaufer DI, Lopez OL, **Hamilton RL**, Becker JT, DeKosky ST. Temporal Evolution of Lewy Body Phenotype in Autopsy Confirmed Cases of Alzheimer's Disease and Dementia With Lewy Bodies. Neurology 56(8): A300-A301, Suppl 3, 2001.

36.  Castellano-Sanchez A, Ohgaki HH, Yokoo, Finkelstein SD, Medina-Flores R, **Hamilton RL**, Scheithauer BW, Burger PC, Brat DJ.  Genetic Alterations in Granular Cell Astrocytomas. USCAP, 2002.

37.  Demidovich J, Pittman CA, Hamilton RL.  Altered calpain proteolysis of mutant alpha-synuclein. Honors Thesis presentation, Univ. Pitt, 2002

38.  Omalu BI, **Hamilton RL**, Swalsky PA, Finkelstein SD. Microdissection-based mutational profiling of malignant, atypical and benign meningiomas: the determination of meningioma grade by fractional mutational index.  AANP, Denver, 2002 (JNEN 61:491, 2002)

39.  Wilson, RK, Luedecking-Zimmer EK, Kamboh MI, DeKosky ST, **Hamilton RL**.  Association of the ApoE4 allele and Lewy bodies in Alzheimer's Disease.  AANP, Denver 2002 (JNEN 61: 455, 2002).

**Ronald L. Hamilton, M.D.**

40. Desai PP, Ikonomovic MD, **Hamilton RL**, DeKosky ST, Kamboh MI. Apolipoprotein D in Alzheimer's Disease: implications for amyloid pathology. Soc. for Neuroscience, Orlando, 2002.

41. Garb S, **Hamilton RL**. Sequestration of soluble alpha-synuclein in Lewy body Variant of Alzheimer's Disease. Soc for Neuroscience, Orlando, 2002.

42. Marshall GA, Kaufer DI, Lopez OL, Rao GR, **Hamilton RL**, DeKosky ST. A neuropathological correlate of anosognosia in Alzheimer's Disease. American Association of Neurology, May 2003.

43. Sweet RA, Butters MA, **Hamilton RL**, Mulsant BH, Lopez OL, PollockBG, DeKosky ST, Reynolds CF Neuropathology Of Late Life Mood Disorders. American College of Neuropsychopharmacology, 2003

44. Mohan D, Couce ME, Wiley CA, **Hamilton RL**, Sasatomi E, Swalsky PA, Lieberman MD, Finkelstein SD. Microdissection based genotyping of human gliomas: diagnostic and prognostic considerations (USCAP, Vancouver 3/04)

45. Beckner ME, Sasatomi E, Swalsky PA, **Hamilton RL**, Pollack, IF, Finkelstein SD. Loss of heterozygosity reveals non-VHL Allelic loss in hemangioblastomas at 22q13, (AANP Cleveland, June 24-27, 2004).

46. Judkins AR, Burger P, **Hamilton RL**, Kleinschmidt-DeMasters B, Perry A, Pomeroy S, Rosenblum MK, Yachnis AT, Rorke LB, Biegel JA. INI1 Expression Distinguishes Atypical Teratoid/Rhabdoid Tumor (ATR) from Choroid Plexus Carcinoma (CPC); (AANP Cleveland, June 24-27, 2004).

47. McFadden KA, **Hamilton RL**, Visvesvara GS, Gardner P, Couce ME. Granulomatous Amebic Encephalitis in a Patient with Gardners Syndrome and Multi-organ Transplant (AANP Cleveland, June 24-27, 2004).

48. Yen, Amy, Lopez, OL, BeckerJ, **Hamilton RL.** Mesial Temporal Sclerosis is associated with Lewy Bodies in Alzheimer's Disease. AANP Annual meeting June 9-12, 2005, Arlington, VA (platform). (J Neuropathol Exper Neurol 64:434, 2005.

49. Hinkle DA, Mullett SJ, **Hamilton RL** DJ-1 is over-expressed in human stroke reactive astrocytes. Society for Neuroscience Oct 2005.

50. Ramsey CP, Glass CA, Marshall MB, Morgan KL, Kioke MA, **Hamilton R**, Chu CT, Jordan-Sciutto KL. Altered expression patterns of the antioxidant response transcriptional regulator NRF2, in Alzheimer's Disease and Parkinson's Disease. Society For Neuroscience, Nov. 2005, Washington DC.

51. Chu CT, Uchiyama Y, **Hamilton R**, Zhu J. Extracellular signal regulated protein kinase acts upstream of both autophagy and cell death in MPP+ treated neurons. Society For Neuroscience, Nov. 2005, Washington DC

52. Cieply K, Carol R. Sherer, Jennifer L. Hunt **Hamilton RL** Assessment of 1p and 19q Status in Pediatric Oligodendrogliomas by FISH, Association of Molecular Pathology, Nov 10-13, 2005 Scottsdale AZ

53. Bencherif B, Lieberman FS, Wenzhu B, Price JC, Muthukrishnan A, Walter K, **Hamilton RL**, Lunsford LD, Mountz JM. Increased F-18 Fluorothymidine Uptake is Seen in Non-Proliferating Recurrent/Residual Glioma Society for Nuclear Medicine, San Diego, 2006 June 3-7

54. **Hamilton, RL** Variations On A Theme: Lewy Bodies And Mesial Temporal Sclerosis In Alzheimer's Disease: A Review Of 278 Autopsy Cases. 10th International Conference on Alzheimer's Disease, Madrid, Spain, July-15-20, 2006.

55. DeKosky ST, Mathis CA, Price JC, Ikonomovic MD, **Hamilton RL**, Abrahamson EE, Paljug WR, Debnath ML, Hope CE, Isanski BA, Tsopelas ND, Lopresti BJ, Ziolko S, Bi W and Klunk WE. Correlation of In Vivo PiB Retention and Post-Mortem Aβ Levels: A Case Study. 10th International Conference on Alzheimer's Disease, Madrid, Spain, July-15-20, 2006.

56. Leverenz J, **Hamilton RL**, Larson E, Vavrek D, Lopez O, Galasko D, Masliah E, Kaye J, Nixon R, Clark C, Trojanowski J, Kukull W, Montine T, Tsuang D. Lewy-Related Pathology in Two Large Autopsied Dementia Samples: Application of Classification Criteria. 10th International Conference on Alzheimer's Disease, Madrid, Spain, July-15-20, 2006.

57. Venneti S, Lopresti BJ, Wang G, Mathis CA, Klunk WE, Shmookler AD, **Hamilton RL**, Apte UM, Wiley CA. PET imaging of microglia in a mouse model of Alzheimer's disease. 10th International Conference on Alzheimer's Disease, Madrid, Spain, July-15-20, 2006.

58. Kofler JK, Moore RA, **Hamilton RL**. Concomitant Dementia with Lewy Bodies and Multiple System Atrophy in a Demented Patient. International Congress of Neuropathology/American Association of Neuropathology Annual Meeting, San Francisco, CA, Sept 10-15, 2006.

**Ronald L. Hamilton, M.D.**

59. DeKosky ST, Mathis CA, Price JC, Ikonomovic MD, **Hamilton RL**, Abrahamson EE, Paljug WR, Debnath ML, Hope CE, Isanski BA, Tsopelas ND, Lopresti BJ, Ziolko S, Bi W, Klunk WE. Correlation of Regional in vivo Pittsburgh Compound B (PIB) Retention With in vitro PIB, A Levels, and Amyloid Plaque Density: Validation of PIB-PET in Postmortem Human Brain. Alzheimer's Association International Conference on Prevention of Dementia. June 9-12, 2007 Washington, D.C.

60. Kellermier HC, Nikiforova MN, Cieply K, **Hamilton RL**. Alterations of 1p in glioblastomas. ASIP/AANP Annual meeting, Washington DC April 2007.

61. Bliecher AG, Branstetter BF, Hamilton R, Murdoch G, Kellermeir HC. Clival Chordoma: Radiologic-Pathologic Correlations. American Society of Neuroradiology annual meeting, Chicago, IL. June 9-14, 2007.

62. Butters MA, Aizenstein HJ, Meltzer CC, **Hamilton RL,** Price JC, Mathis CA, Klunk WE, Becker JT, DeKosky ST, Reynolds CF. Cognition, cerebrovascular disease and Alzheimer's Disease in late-life depression. International Neuropsychological Society meeting, Bilbao Spain, July 2007.

63 Tyurin VA, Zhao Q, Mnuskin A, **Hamilton R**, DeKosky ST, Reynolds WF, Kagan VE. Phospholipid peroxidation biomarkers of Alzheimer's Disease in the Brain: Selective Oxidation of Phosphatidylserine. Society of Toxicology Meeting San Diego, CA. October 2, 2007.

64. Moschos SJ, D. Trembath D, Snavely A, Bradler E, Midkiff B, Nikolaishvilli-Feinberg N, Werley J, Krauze M, **Hamilton R**, Kirkwood JM. Prognostic Significance of PD-L1 Expression, Angiogenesis, and Hypoxia in Melanoma Brain Metastases (MBM); A Histopathologic Analysis. Annual meeting of the American Association of Clinical Oncology, Chicago Il, 5/29-6/2/2014.

65. Trembath DG, Moschos SJ, Snavely AC, Bradler E, Nikolaishvilli-Feinberg N, Bentley R. Midkiff BR, Jonette Werley J, Krauze MT, **Hamilton RL**. Analysis of select angiogenic markers in melanoma brain metastases. Annual meeting AANP, Portland OR. June 2014

66. Salgado CM, Basu D, Nikiforova M, Hamilton R, Gheris R, Jakacki R, Panigrahy A, Yatsenko S, Reyes-Mugica M. Congenital Melanoma: The full spectrum og p.Q61R mutation in NRAS. Accepted for the Annual Soc. Pediatric Pathology meeting, Birmingham AL, Sept 4-6, 2014.

67. Melan MA, Wald AI, Zhong S, **Hamilton R**, Horbinski C. Nikiforova MN. BrainSeq: Next-Generation Sequencing Panel for Detection of Genetic Alterations in Central Nervous System (CNS) Malignancies. National Harbor MD, Nov 12-15, 2014.

68. Hamilton RL. Chronic Traumatic Encephalopathy: Update on an Emerging Disease. Invited speaker: 18th International Congress of Neuropathology, July 12-16, 2014, Rio de Janeiro, Brazil

69. Hamilton RL. Cases of the Month: 16 Years of Unknowns. Invited speaker: 18th International Congress of Neuropathology, July 12-16, 2014, Rio de Janeiro, Brazil

70. Trembath DG, Moschos SJ, Snavely AC, Bradler E, Nikolaishvilli-Feinberg N, Midkiff BR, Werley J, **Krauze MT, Hamilton RL** Role of PD-L1, HIF-1a, and reactive gliosis in melanoma brain metastases. USCAP 2015, Boston, MA, March 21-27, 2015.

71. Nolan Priedigkeit, Ryan J. Hartmaier, Yijing Chen, Damir Vareslija, Ahmed Basudan, Roby Thomas, Jose P Leone, Peter C. Lucas, Rohit Bhargava, Ron L. Hamilton, Juliann Chmielecki, Nancy E. Davidson, Steffi Oesterreich, Adam M. Brufsky, Leonie Young, Adrian V. Lee Breast cancer brain metastases show limited intrinsic subtype switching, yet exhibit acquired ERBB2 amplifications and activating mutations. San Antonio Breast Cancer Symposium, 12/7/16

72. Steffi Oesterreich, Ahmed Basudan, Nolan Priedigkeit, Ryan Hartmaier, Amir Bahreini, Rekha Gyanchandani, Jose P Leone, Peter Lucas,, Rohit Bhargava, Ron Hamilton, Ryan Hartmaier, Adam Brufsky, Adrian V. LeePerivascular Inflammation in Temporal Artery Biopsies That Are Negative for Arteritis: Incidental or Harbinger American College of Rheumatology/ Association of Rheumatology Health Professionals (ACR/ARHP) Annual Meeting, Washington DC, 11/13/16

73. Expression of Carbonic Anhydrase Genes, CA3 and CA12, Transformed with ENO1, Relate to Copy Numbers of EGFR or RNF139 and XIAP, and Gender in Glioblastomas Using PCR Assays. Experimental Biology 2015 Annual Meeting

74. Evaluation of GlioSeq Targeted NGS Panel for Detection of O6-Methylguanine-DNA Methyltransferase (MGMT) mRNA Expression in Glioma Patients Alicia Hunt, Sarika Jain, Melissa A Melan, Abigail Wald, Ronald Hamilton, Marina N. Nikiforova  Association For Molecular Pathology (AMP) Charlotte, NC. November 10-12, 2016.

**PROFESSIONAL ACTIVITIES**

**Ronald L. Hamilton, M.D.**

**TEACHING**

University of California, San Diego, Dept of Neuroscience
      1991-93      lab assistant - graduate neuroanatomy course
University of California, San Diego, School of Medicine
      1991-93      Sophomore pathology course, neuropathology section (lab assistant)
University of California, San Diego, Dept of Pathology
      1991-93      Clinical Correlation Conference - Neuropath and Neurosurgery (monthly)
      1991-93      Neuropathology review for neurology residents (bi-monthly)
University of Pittsburgh, School of Medicine
      Freshman pathology course –
      PBL facilitator for musculoskeletal course 1994-1998
      Neuroscience Module – lecture M2 students full class: CNS tumors
          Annually since 1999.
              April 29, 2014 1-3 pm
      Neuroscience Module  lecture MS1 students
          CNS tumors  March 2004
          CNS tumors  March 2005
          CNS tumors March 2006
          CNS Tumors    5/7/07
      Neuroscience rotation – small weekly lab, M3 students
          7/99-present
      Neuroscience rotation – small group M3 students
          6/18/2007 3-5pm
Weekly brain-cutting conference at Children's Hospital (2-5 medical (M3) students/week)
      Academic Advising: Kate McFadden 2/2000 to 6-2001
Other:
      High school - gifted science students of Mr. James Coll
          11/21/2002 , 11/14/ 2003, 10/28/2004, 11/18/2005, 11/3/2006

University of Pittsburgh, graduate students
      Cellular and Molecular Mechanisms of Neurodegeneration (MSCMP 3720)
          Organizers: Robert Bowser, Cristian Achim,
          1. Neuroanatomy and Neurohistology in neurodegeneration
              1/13/98,  1/19/99
          2. Mitochondria and disease / Prion encephalopathies
              3-24-98
          3. The role of alpha-synuclein in neurodegenerative diseases
              10-11-00
      Molecular Pathobiology (organizers Frye and Achim) (MSCMP 2740)
          .Tumors of the Central Nervous System,  4-7-98,  4-20-99
          Alpha-synuclein and Neurodegeneration
              4-2003, 1/8/04, 5/15/06
          Neuropathology of Neurodegeneration
              1/6/04
          Alpha-synuclein and Tau in Neurodegeneration
              1/5/07, 2/7/2008
          Pathologic diagnosis of the Lewy Body Disorders
              2/12/09
University of Pittsburgh, Dept of Neuroscience - Combined Neuroscience Conference Wed 4-5
      10/3/95 *      Varicella Zoster Infections of the CNS in AIDS patients
      10/9/96 *      Lewy Bodies and Dementia
      2/19/97 *      The Neuropathology of Pediatric Seizures
      4/23/97 *      CNS manifestations of non-CNS tumors in children
      2/11/98        Case Presentation with Ian Pollack

**Ronald L. Hamilton, M.D.**

| | |
|---|---|
| 3/18/98 * | A 77 year old woman with Multiple sclerosis and dementia |
| 11/4/98 | *Pediatric meningiomas – two cases |
| 1/20/99 | Methanol Intoxication – with C. Foley |
| 2/3/99 | Gliomatosis cerebri with Dallasta |
| 2/10/99 | Amyloid angiopathy and leukomalacia – with D. Kaufer |
| 3/17/99 | Metachromatic Leukodystrophy – with D. Kaufer |
| 9/18/02 | Iatrogenic CJD* |

\* as primary presenter

University of Pittsburgh, Dept. of Pathology, Chief Resident's Fri noon slide conference

| | |
|---|---|
| 8/1/96 - Pediatric brain tumors | |
| 10/5/97 Pediatric brain tumors | |
| 1/9/98 | NP REVIEW - Tumors I |
| 1/16/98 | NP REVIEW - Tumors II |
| 1/23/98 | NP REVIEW - Tumors III |
| 1/30/98 | NP REVIEW - Infections |
| 2/6/98 | NP REVIEW - Demyelinative diseases |
| 2/13/98 | NP REVIEW - Neurodegenerative diseases |
| 2/20/98 | NP Review - Cerebrovascular disease and developmental |
| 5/24/02 | Pediatric Neoplasms and Congenital Malformations |
| 5/31/02 | Degenerative Diseases |

University of Pittsburgh, undergraduate
Independent Course and Honors Research Project –
Theodore Kaplan (1/97-6/97)
Emily Rogerson (1/99-5/99, 9/99-12/99, 1/00-4/00)
Kyle Hubbard (1/99 – 5/99, 9/99-12/99, 1/00-4/00)
Joe Demidovich – 2000-2002
Stan Garb (2001-2001)

Pathology Summer Undergraduate Research Program (SURP)
Kathleen Anderson 6/00-8/00
Kathleen Anderson 6/01-8-01

University of Pittsburgh, Dept. of Pathology,
Neuropathology of dementia conference - weekly (Fri 10-11)

University of Pittsburgh - ADRC Topics at Noon
X-34 and alpha-synuclein – New stains in Alzheimer's Disease 11/98
Lewy Body Pathology in Alzheimer's Disease, 11/01

Children's Hospital of Pittsburgh, Grand rounds
1996 - methyl malonic acidemia with hemi-cerebellum
2/13/97 - Pediatric AIDS with HIV encephalopathy
5/22/97 - 11 month-old boy with Hypotonia (Leigh's Disease)
3/18/98 - Becker's muscular dystrophy with severe cardiomyopathy
5/19/98 – Friedreich's Ataxia
10/15/98 – Spinal Muscular Atrophy Type I
2/2005  - Congenital Dystrophies – Pediatric Neurology

**Other Presentations**

Neurology Grand Rounds - 11-19-03 - CNS vasculitis
Pathology Noon Diagnostic Conference - 11-20-03 – "Some Bodies in the Brain"
AP Didactic Lecture – 11-25-03 - Neuropathology of Neurodegeneration
NP Didactic – 4-28-04 - ApoE4 and Lewy Bodies in AD

**Ronald L. Hamilton, M.D.**

NP Didactic -    3/31/2005 – AD Pathology in ALS and MTS and LB in AD
Pathology Noon Diagnostic Conference – 8-4-2006: Tauopathies
ADRC CPC 8-10-06
ADRC CPC 11-30-06
ADRC CPC 2-8-07
ADRC 20th Anniversary meeting, "Neuropathology of AD:"  9-28-06
ADRC Topics at Noon.  "Tauopathies"  11-16-06
ADRC CPC 8/16/2007
ADRC CPC 11/30/2007
Pediatric CPC 2/25/08
DJ-1 in glioblastomas (NP Didactic conference) – 3/10/2009 (1 hour)
Neuropathology review for Neurosurgery residents – 3/10/2010 (1 hour).
AP Chief Residents didactic conference.  2 hour conference.  Non-glial Tumors. Feb 25, 2014
CMU graduate class:  BioE 2630 – Methods in medical iamage analysis in neuropathology. April 4, 2014.
Anatomic Pathology Grand Rounds, July 10, 2014  Chronic Traumatic Encephalopathy: an Update.

**Clinical Conferences (recurring)**

| | | |
|---|---|---|
| ADRC Brain cutting | weekly | Tue 8-10 |
| ADRC Dementia signout - | weekly | Fri 10-11 |
| PUH – Neuropathology QA - | weekly | Wed 10-11 |
| CH  Brain cutting | weekly | Mon 10-11:00 |
| CH  Neuro-Oncology conf | weekly | Mon 11:30-12:30 |
| CH Gross autopsy conference | weekly | Tue 11-12 |
| CH Micro autopsy conf | weekly | Tue 1-2 |

University of Pittsburgh School of Medicine –
        2009 Brain Tumors – lecture to 1st year students
        2009 Klionsky summer research scholarship – Peter Kang (June-Aug 2009)
                Clinicopathologic correlations of chordomas
        2009 Monday 2 hour small group 3rd year  (5-12 students)
                4/6/2009, 7/27/2009, 9/10/2009, 10/12/2009, 12/7/2009, 1/25/2010, 2/15/2010


**RESEARCH**

**OTHER SUPPORT**

**ACTIVE**

**HAMILTON, R.**
ACTIVE
**R01 NS037704**    (PI: Pollack)          9/1/98-1/31/17              0.7 calendar months
National Institutes of Health          $105,970
Role:  Co-Investigator
Title: Molecular Markers as Predictors of Outcome in Gliomas
The major goal of this project is to further characterize the molecular features of tumorigenesis in pediatric malignant gliomas.

**1R01 CA174858-01**(PI: Pollack)          5/6/13-8/30/17              0.4 calendar months
National Institutes of Health                    $54,696
Role:  Co-Investigator
Title: Peptide Vaccine-Based Immunotherapy for Children with Recurrent Ependymomas
This project focuses on a pilot clinical trial of peptide-based immunotherapy for ependymomas, among the most challenging childhood brain tumors.  The study will incorporate separate strata

Ronald L. Hamilton, M.D.

for posterior fossa and non-posterior fossa ependymomas.  We will treat a total of 12 patients in each of the two strata with subcutaneous TAA epitope vaccinations every 3 weeks for 8 courses combined with topical imiquimod. Participants will be evaluated for adverse events, regimen limiting toxicity (RLT), and treatment response by clinical and laboratory evaluations and MR imaging. We hypothesize that vaccine-based immunotherapy will not only prove safe for the treatment of pediatric ependymomas, but will also demonstrate activity as assessed by immunologic and clinical parameters.

(PI: Pollack)    5/8/14-6/1/17
Child Brain Tumor Foundation                    $10,487                              1.2
calendar months
**Children's Brain Tumor Tissue Consortium**
The CBTTC is a unique research platform in which tumor tissue is processed for comprehensive molecular (e.g., DNA, RNA, and protein) analysis using state-of-the-art methods and the data results of that analysis, together with new brain tumor models and relevant clinical information, are sent back to the participating institutions. In comparison to tissue banks, the CBTTC actively stimulates research by providing high-quality data that can be rapidly and efficiently analyzed by participating institutions.
PI: Pollack. 10% salary for Jonette Werley

OVERLAP No Overlap


**Completed Research Support**

National Institutes of Health                    3/1/02 – 2/28/05
P30 MH52247-10    (PI: Reynolds)       $23,305
Intervention Research Center for the Study of Late-Life Mood Disorders
a supplement to the above grant to establish a brain bank to investigate the neuropathological substrate of late life mood disorders.
Role:  Co-Investigator

R01 NS048595    (PI: Montine)                    09/30/03 – 07/31/08
National Institutes of Health
Subcontract to the University of Washington on grant "Characterization of DLB: a Collaborative Study"
The major goal of this multi-institutional project is to investigate the role of ApoE4 alleles and other genetic polymorphisms in the Lewy Body Variant of Alzheimer's Disease.
Role:  Co-Investigator

Brain Tumor Society                    07/01/07-05/31/09
PI: Ian Pollack
JPA & Pediatric Low Grade Astrocytoma
The major goals of these two grants is to examine molecular markers of prognosis in pediatric gliomas.
Role:  Co-Investigator

U10 CA13539-27 (Reaman (subcontract 6172) (Pollack)                    1/1/06-12/30/09
NIH/NCI
Children's Oncology Group Brain Tumor Resource Laboratory

**Ronald L. Hamilton, M.D.**


This contract is providing infrastructure support for maintaining tissue processing and banking of high-grade gliomas.
Role:  Laboratory Director

R01 MH47346    (PI: Zubenko)                     12/1/04 – 11/30/09
National Institutes of Health
Morphologic/Neurochemical Correlates of Depression in AD
The major goal of this project is to better define the biological substrates of major depression in AD and to provide additional insight into the clinical biology of major depressive disorders affecting the elderly.
Role:  Co-Investigator

P50 AG05133    (PI: Lopez)            3/30/85 – 3/31/15            0 calendar months
National Institutes of Health            $71,764
Alzheimer Disease Research Center, Core C: Neuropathology
The three objectives of the Neuropathology Core are to (1) procure and bank brain from autopsies of ADRC patients and controls, (2) perform detailed neuropathologic analysis of all AD cases and (3) maintain well catalogued brain bank.
Role:  Core Advisor

Child Brain Tumor Fund (CBTF) (PI: Pollack)        5/8/13-5/7/14
0.3 cal months (2.5% support) `PITT subaccount #: 05.35206.xxxx.00000.709203.-----`

P01 NS040923    (PI: Pollack)            7/1/02-5/31/13            1.20 calendar months
National Institutes of Health            $22,074
Novel Strategies for Brain Tumor Therapy
The unifying hypothesis of this program project grant is that novel therapeutic approaches that take into account the unique features of central nervous system (CNS) tumors will have utility for preventing tumor growth and inducing tumor regression, and will potentiate the effects of conventional treatment approaches, particularly radiotherapy, for inducing glioma cell killing.
Role:  Co-Investigator


**Prior Grant Support**

| | |
|---|---|
| 1995-1997 | Murine Model of Retroviral Encephalitis |
| | Children's Hospital of Pittsburgh Research Fund ($50,000) |
| | 0% effort, 0% support |
| 1995-1998 | Blood Brain Barrier in HIV encephalitis (PI: Achim) |
| | Co PI. 10% effort and salary ($186,264) |
| 11/98 | PD Center Grant, Equipment $6000 |
| | for freezer for PD Brain Bank (one time equipment funding) |
| 7/1/98-6/30/99 | Neurotrophic Factors in SIV encephalitis |
| | Competitive Medical Research Fund (CMRF), $25,000, |
| | 0% effort, 0% support |
| 12/01/98-11/30/99 | Parkinson's Disease Brain Bank |
| | PI: Hamilton RL |
| | Parkinson's Disease Foundation ($24,899) 0% effort, 0% support |
| 7/1/98-6/30/00 | Molecular Markers of Prognosis in Pediatric Gliomas |

**Ronald L. Hamilton, M.D.**

PAR 95-063, NIH
PI: IF Pollack
10% effort and support ($263,311)

4/1/00-3/31/01:  Alpha-synuclein Aggregation in Dementia With Lewy Bodies
PI: RL Hamilton
Parkinson's Disease Foundation Seed Money Grant, $25,000 0% effort, 0% support

10/1/00-9/30/02    Millennium Agreement (Neuro Module)
PI: Rajiv Dhir
0% effort, 0% Support.
($25,000 per year for supplies, plus support for 100% Level IV Res Tech)

1/1/99 – 12/31/03 COG Brain Tumor Resource Laboratory
PI: Pollack, IF ($5800)  (subcontract 6172)
Co-I – 5% effort and support
NIH-U10 CA13539-27

3/01/02 - 2/28/05 - Supplemental Award to Establish a Late Life Mood Disorder Brain Bank
PI: RA Sweet (for supplement)
Supplement to 3 P30 MH52247-08S1 (PI: CF Reynolds)
Co-I : 5% effort and support

7/1/98-6/30/05 Morphologic/Neurochemical Correlates of Depression in AD
PI: G Zubenko
2.5% effort and support ($20,000)

National Institutes of Health            09/30/03 – 07/31/08            5%
R01 NS048595    (PI: Montine)          $75,000

*Subcontract to the University of Washington on grant "Characterization of DLB: a Collaborative Study"*
The major goal of this multi-institutional project is to investigate the role of ApoE4 alleles and other genetic polymorphisms in the Lewy Body Variant of Alzheimer's Disease

R01 MH072947    (PI: Butters)          12/1/04 –11/30/11            0.36 calendar months
National Institutes of Health                  $6,018
Pathways Linking Late Life Depression to Mild Cognitive Impairment and Dementia
The goal of this project is to investigate the relationships among late-life depression (LLD), cognitive impairment and progressive neurodegeneration.
Role:  Co-Investigator

R01 MH072947    (PI: Butters)          12/1/04 –11/30/11            0.36 calendar months
National Institutes of Health                  $6,018
Pathways Linking Late Life Depression to Mild Cognitive Impairment and Dementia
The goal of this project is to investigate the relationships among late-life depression (LLD), cognitive impairment and progressive neurodegeneration.
Role:  Co-Investigator


**Seminars and Invited Lectureships Related to Research**

Presentation of an Unknown Case (Herpes simplex brainstem encephalitis) to American Association of Neuropathologists Annual Meeting, June 1992: St. Louis, MO.

**Ronald L. Hamilton, M.D.**

Presentation of an Unknown Case (Varicella zoster virus encephalitis in an AIDS patient) to XII International Congress of Neuropathology, Sept, 1994: Toronto, Ont, Canada.

Presentation of an Unknown Case (Atypical neurocytoma) to American Association of Neuropathologists Annual Meeting, June 2002: Denver (presenter: Rafael Medina-Flores).

**Other Research Related Activities**

| | |
|---|---|
| 1995-2003 | Co-Director, Neuropathology Core ADRC |
| 2003-2012 | Director, Neuropathology Core ADRC. |
| 1995-2012- | Director, Neuropathology Brain Bank |
| 1997 - present - | Director of Neurohistology laboratory |
| 1997-present | Co-Director, Brain Tumor Resource Laboratory, Children's Cancer Group |
| 2001- 2009 | Director of Neuropathology Core of the Stephen Tuttle ALS Tissue Bank. |
| 2001-present | Co-Director, UP Brain Tumor Bank |

**CURRENT RESEARCH INTERESTS**

1. Molecular Biology of Brain Tumors

**SERVICE**

**University and Medical School**

Residency Committee (Pathology) – 1997 to 2008
Institutional Review Board     3/02 – 5/2005
'Member of the UPSOM Interviewing Committee' jan 2010-present
Member, UPMC Professional Practice and Ethics Committee Jan 2014 - present

**OTHER**

| | |
|---|---|
| 4/1996 - present | Case Editor - Brain Pathology, |
| | Case of the Month feature |
| | Case of the Month web site |
| | Increase to 2 cases per month 1/2007 |
| 10/99 | ad hoc reviewer, J Neuroscience |
| 1/2000 | ad hoc reviewer, J American Medical Association (JAMA) |
| 3/2000 | ad hoc reviewer, Neuropathology and Applied Neurobiology |
| 3/01 | ad hoc reviewer American Journal Pathology |
| 5/02 | ad hoc reviewer Neuroscience |
| 11/02 | ad hoc reviewer JNEN |
| 2004 | AANP Awards Committee, AANP, Cleveland |
| 2006 | AANP Awards committee, AANP-ISN San Fran |
| 10/2006 | ad hoc reviewer     Eur J Neurosci |
| 2/2007 | Ad hoc reviewer     Neuroscience |
| 2007 | Chairmen, Awards Committee, AANP Washington DC. (2 year term) |
| 7/29/2007 | ad hoc reviewer, Brain Pathology |
| 7/25/2007 | ad hoc reviewer Acta Neuropathologica |
| 10/19/2007 | ad hoc reviewer J Neuropathol Exp Neurol |
| 2008 | Chairman Awards Committee AANP, San Diego Annual Meeting |
| 2008 | ad hoc reviewer Brain Pathology |
| 2009 | ad hoc reviewer Pedi and Developmental Pathology |
| 2009 | ad hoc reviewer Amer. J. Pathol. |

**Ronald L. Hamilton, M.D.**

2014 – Featured in non-fiction book: League of Denial:  The NFL, Concussions and the Battle for the Truth (Crown Publishing, New York). Chapters 8 and 10 detail my role in the discovery of CTE in NFL football players.

January 2015 – Consulted with Sony Pictures about movie CONCUSSION based on the discovery of Chronic Traumatic Encephalopathy (CTE) in American NFL football players by my student, Bennet Omalu and me in July 2005.  I was also interviewed on the set by Sony documentary filmmakers for a bonus feature on the DVD:  The Making of "Concussion."  The movie is scheduled to be released Christmas Day, Dec 25, 2015.

January 2015 – interviewed by Jeane Marie Laskas (who wrote the 2009 GQ article the movie is based on) for a companion book to be released with the movie, December 2015.


**International Invitations**

1998 – Invited lecturer at Barcelona-Pittsburgh ADRC meeting, "Dementia Today," Barcelona, Spain (Oct 1998)

2000 – Invited lecturer at Barcelona-Pittsburgh ADRC meeting Dementia Today II", Barcelona, Spain (Oct 2000)

2001 - Invited symposia speaker at 10th Congress of the International Psychogeriatric Association (Nice, France, Sept 2001). "Pathological Diagnosis of Dementia With Lewy Bodies" (Symposia Organizer, Ian McKeith)

2002 – Invited lecturer at Barcelona-Pittsburgh ADRC meeting Dementia Today III", Barcelona, Spain (Oct 2002)

2003 – Symposium speaker "Dementia with Lewy Bodies" at International Psychogeriatric Associations meeting, Chicago, IL, USA, 08/19/03

2004  Invited lecturer at Barcelona-Pittsburgh ADRC meeting Dementia Today IV", Barcelona, Spain (Oct 2004)

2006  Invited lecturer at Barcelona-Pittsburgh ADRC meeting Dementia Today V", Barcelona, Spain (Oct 2006)

2008  Invited lecturer at Barcelona-Pittsburgh ADRC meeting Dementia Today VI", Barcelona, Spain (May 2008)

2014 – Invited lecturer AANP annual meeting June 2014.  What Every Neuropathologist Should Know: Molecular studies in metastatic brain tumors.

2014 - Invited as member of scientific committee International Congress of Neuropathology quadrennial meeting Sept 2014, Rio de Janeiro

2014 – Chair of Forensic Pathology Session, committee International Congress of Neuropathology quadrennial meeting Sept 2014, Rio de Janeiro

2014 – co-chair telepathology session with Dr. Wiley

2014 – Presentation – Chronic Traumatic Encephalopathy – update, International Congress of Neuropathology quadrennial meeting Sept 2014, Rio de Janeiro

2014 – presentation – Cases of the Month – 16 Years of Unknowns  International Congress of Neuropathology quadrennial meeting Sept 2014, Rio de Janeiro s



Office of Chief Medical Examiner
Tarrant County Medical Examiner's District
Tarrant County, Texas
200 Feliks Gwozdz Place, Fort Worth, Texas 76104-4919
(817) 920-5700  FAX (817) 920-5713

# AUTOPSY REPORT

| | |
|---|---|
| **Name: Frank Cornish** | **CASE NO: 0810049** |
| **Approximate Age: 40 years** | **Sex: Male** |
| **Height: 79 inches** | **Weight: 327.6 pounds** |

I hereby certify that on the **24**th day of **August 2008**, beginning at 0805 hours, I, Marc A. Krouse, M.D., pursuant to Statute 49.25 of Texas Criminal Code, performed an inspection and autopsy limited to the cranial cavity, neck, and thoracic cavity, on the body of **Frank Cornish** at the Tarrant County Medical Examiner's District Morgue in Fort Worth, Texas and upon investigation of the essential facts concerning the circumstances of the death and history of the case as known to me, I am of the opinion that the findings, cause and manner of death are as follows:

**FINDINGS:**
I)   Marked cardiomegaly (758 gms) with left ventricular hypertrophy and mild coronary arterial sclerosis, consistent with hypertensive heart disease
II)  Multinodular goiter
III) No evidence of trauma
IV)  Postmortem toxicology attached

**CAUSE OF DEATH:**     **SUDDEN ADULT DEATH WITH EVIDENCE OF HYPERTENSIVE HEART DISEASE**

**MANNER OF DEATH:  NATURAL**

_____    **Marc A. Krouse, M.D.**
         Signature                                    **Deputy Chief Medical Examiner**

0810049
Frank Cornish

Inspection and autopsy limited to the cranial cavity, neck, and thoracic cavity are performed August 24, 2008 at 8:05 a.m. (cranial cavity exam 08/25/08 at 0900).

## GROSS ANATOMIC DESCRIPTION

**I.    CLOTHING AND PERSONAL EFFECTS:**  At the time of examination the body is clothed in white briefs and wrapped in white sheets.

**II.    THERAPEUTIC INTERVENTION:**  Evidence of medical intervention includes an oral endotracheal tube secured with tape, intravenous line in the right antecubital fossa, right tibial intraosseous line, and 1 electrocardiographic monitor pad on the torso.

**III.    EXTERNAL BODY DESCRIPTION:**  The body is that of a normally developed, large muscular and slightly obese adult African American male appearing near the stated age of 40 years. The body length is 79 inches and the weight is 327.6 pounds (200 cm, 143.6 kg). The body is well-preserved, unembalmed, and cool. Rigor is full. Lividity is developed over the head and back, is purple, and fixed.

The scalp is shaved except for a black and occasional gray mustache and goatee. The face is shaved and body hair is male distribution.

The calvarium is symmetric and intact to palpation and the scalp is intact. The eyes are closed, the corneas are slightly clouded. There is no conjunctival hemorrhage. The irides are brown and the pupils are 6 mm. Orbital soft tissues are unremarkable. The nasal and oral cavities are clear. Lips and oral mucosa are cyanotic. The dentition is natural and well-maintained. The external ears are clear and a single healed pierce is found in the left earlobe. The face, neck, and larynx are symmetric and intact and the trachea and larynx are midline.

The anterior chest is symmetric and intact. The breasts are male. The abdomen is minimally protuberant and the pelvis is intact. The penis is uncircumcised and the testes are descended. The perineum and anal orifice are unremarkable. The back is symmetric and intact.

0810049
Frank Cornish

The extremities are symmetric, normally developed, and are intact. The nails of the hands and feet are cyanotic. A healed 18 cm scar is found along the left hip and upper thigh.

There are no external signs of trauma or foul play.

## IV.  INTERNAL EXAMINATION

**1.    INTEGUMENT:**   The body is opened with a modified thoracoabdominal and coronal scalp incision.  The viscera are examined in situ and neck and thoracic viscera and cranial contents are removed for further inspection.

**2.    SEROUS CAVITIES:**  The soft tissues of the anterior chest and neck are unremarkable.  There is no evidence of occult trauma.  The serous cavity membranes are smooth.  There is no hemorrhage or fluid accumulation within major body cavities.

**3.    CARDIOVASCULAR SYSTEM:**  The thoracic and abdominal aorta, vena cava and pulmonary arteries  and veins are unremarkable.  The major vessels and heart contain fluid blood and scattered postmortem thrombi.  There is patchy intimal hemoglobin staining.

The heart weighs 758 gms.  The coronary arteries arise normally and posterior circulation is right dominant.  Circumferential sclerosis produces approximately 10-15% occlusion of the surface coronary arteries with an atheromatous plaque adding to approximately 25% occlusion of the proximal left anterior descending coronary.  All cardiac chambers are dilated and there is symmetric hypertrophy of the left ventricle (anterior left ventricle 2.3 cm, septum 2.2 cm, right ventricle 0.5 cm).  The myocardium is otherwise grossly unremarkable. The endocardium and cardiac valves are unremarkable.

**4.    RESPIRATORY SYSTEM:**  The larynx and hyoid are intact.  Central and peripheral airways are clear.  The lungs are congested.  There is patchy lower lobe edema with no additional gross pulmonary pathology.  The right lung weighs 780 gms and the left 678 gms.

**5.    GASTROINTESTINAL SYSTEM:**    The pharynx and esophagus are intact and unremarkable.   Limited inspection of intraabdominal organs is remarkable only for slight yellow-tan coloration of the liver parenchyma.

0810049
Frank Cornish

**6.    HEMATOPOIETIC SYSTEM:** Lymph nodes of the neck and thorax are unremarkable. The thymus is involuted.

**8.    ENDOCRINE SYSTEM:** There is a multinodular goiter (some with cystic degeneration) and the total mass of the thyroid gland is 143 gms. Parathyroid glands are not identified. The pituitary is grossly unremarkable.

**9.    CRANIAL CAVITY/CENTRAL NERVOUS SYSTEM:** Subgaleal soft tissues are unremarkable. There is no evidence of occult head trauma. The calvarium and base of the skull are intact. The cerebrospinal fluid is clear and the meninges are congested. The arteries over the base of the brain and dural sinuses are intact and unremarkable.

The brain weighs 1505 gms. There is slight brain swelling with notching of the uncal gyri and cerebellar tonsils but no evidence of overt herniation. The gray and white matter of the brain are grossly unremarkable. The ventricular system is patent and contains clear cerebrospinal fluid. The upper cervical spinal cord is unremarkable. The atlanto-occipital joint is intact.

## SPECIMENS AND EVIDENCE COLLECTED

1.    Aortic blood 30 mL, femoral venous blood 30 mL, and vitreous humor 5 mL for toxicology
2.    Samples of viscera in fixative
3.    Blood card
4.    Five photographs

EDC: 10/23/08
Dictated: 09/02/08
Transcribed: 09/04/08
Completed: 09/04/08
MAK:cal

# Toxicology Test Results

Office of Chief Medical Examiner
Toxicology Laboratory Service
200 Feliks Gwozdz Place
Fort Worth, Texas 76104
Name: Frank Edgar Cornish
Case Number: 0810049
Toxicology Work Number: 0801591

Nizam Peerwani, M.D., DABFP
Chief Medical Examiner
Angela Springfield, PH.D., DABFT
Chief Toxicologist
Priority: 1
Service Request Number: 002

| Specimen | Drug | Result | Drug Amount | Performed By |
|----------|------|--------|-------------|--------------|
| AORTA BLOOD | ETHANOL | NEGATIVE | | J HO |
| AORTA BLOOD | BASE | NEGATIVE | | C WHEELER |
| AORTA BLOOD | ACID | NEGATIVE | | C WHEELER |

Report Prepared By:

Approved By:

Approved Date: 8/28/08

CERTIFICATION OF VITAL RECORD

# CITY OF GRAPEVINE, TEXAS
## VITAL STATISTICS DIVISION

**STATE OF TEXAS**  **CERTIFICATE OF DEATH**  **STATE FILE NUMBER**

LEGAL NAME OF DECEASED: FRANK EDGAR CORNISH IV

DATE OF DEATH: 08/23/2008

SEX: MALE

DATE OF BIRTH: 1967

BIRTHPLACE: CHICAGO, IL.

SOCIAL SECURITY NUMBER: 4068

MARITAL STATUS AT TIME OF DEATH: ☒ Married

SURVIVING SPOUSE'S NAME: ROBIN BLAKE

RESIDENCE STREET ADDRESS

STATE: TEXAS

ZIP CODE: 76092

INSIDE CITY LIMITS: ☒ Yes

FATHER'S NAME: FRANK EDGAR CORNISH III

MOTHER'S NAME PRIOR TO FIRST MARRIAGE: GLORIA KNAGHTEN

PLACE OF DEATH: ☐ Nursing Home

COUNTY OF DEATH: TARRANT

GRAPEVINE, 76051

FACILITY NAME: BAYLOR MEDICAL CENTER AT GRAPEVINE

INFORMANT'S NAME & RELATIONSHIP TO DECEASED: ROBIN B. CORNISH - WIFE

METHOD OF DISPOSITION: ☒ Burial

SIGNATURE OF FUNERAL DIRECTOR: JOHN BECKWITH , BY ELECTRONIC SIGNATURE - 9037

PLACE OF DISPOSITION: BLUEBONNET CEMETERY

COLLEYVILLE, TX.

NAME OF FUNERAL FACILITY: GOLDEN GATE FUNERAL HOME-THORNTON FRWY

COMPLETE ADDRESS OF FUNERAL FACILITY: 4155 S. R.L. THORNTON FRWY, DALLAS, TX 75224

PRINTED NAME, ADDRESS OF CERTIFIER: MARC ANDREW KROUSE , BY ELECTRONIC SIGNATURE   08/28/2008   E8545   09:18 AM

MARC ANDREW KROUSE 200 FELIKS GWOZDZ PLACE, FORT WORTH, TX 76104-4919   M E

IMMEDIATE CAUSE: SUDDEN ADULT DEATH WITH EVIDENCE OF HYPERTENSIVE HEART DISEASE   UNKNOWN

MANNER OF DEATH: ☒ Natural

DID TOBACCO CONTRIBUTE TO DEATH: ☐ Yes ☒ No

REGISTRAR FILE NO: 15-265

DATE RECEIVED BY LOCAL REGISTRAR: 08/28/2008

REGISTRAR - CITY OF GRAPEVINE, ELECTRONICALLY FILED

VS-112 REV 1/2006

CONTROL NO.

**76861**

This is to certify that this is a true and correct reproduction of the original record as recorded in this office. Issued under authority of Sec. 191.051, Health and Safety Code.

FEB-06 '09 PM01:27

*Linda Huff*
LINDA HUFF
LOCAL REGISTRAR

ISSUED

**WARNING: IT IS ILLEGAL TO DUPLICATE THIS COPY**

ANY ALTERATION OR ERASURE VOIDS THIS CERTIFICATE

 **CONCUSSION SETTLEMENT**

*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

## NOTICE OF REQUEST FOR ADDITIONAL DOCUMENTS
### DATE OF NOTICE: February 20, 2019
### RESPONSE DEADLINE: June 20, 2019

### I. SETTLEMENT CLASS MEMBER INFORMATION

| | |
|---|---|
| **Settlement Program ID** | 950012548 |

| **Name:** | First Robin | M.I. B | Last Cornish |
|---|---|---|---|

| | |
|---|---|
| **Settlement Class Member Type** | Representative Claimant |
| **Primary Counsel** | O'Hanlon, Demerath & Castillo |

| **Asserted Qualifying Diagnosis** | Death with CTE (Chronic Traumatic Encephalopathy) | **Date of Asserted Qualifying Diagnosis** | 8/23/08 |
|---|---|---|---|

### II. EXPLANATION OF REQUEST(S)

This Notice is an official communication from the Claims Administrator for the NFL Concussion Settlement Program. Your Claim Package is missing documents or information.

This Notice explains what is missing and what you may do to address the issue. We can help if you have questions. To cure the issues identified in this Notice, click the Respond to Request for Additional Documents button on your secure online portal and follow the instructions provided to upload the information identified below. If you already have provided us with the missing information, let us know because we may have received it after conducting the review that generated this notice.

The following requires attention before we can act further:

| | What is Missing | How to Address this Item |
|---|---|---|
| 1. | You have not submitted any medical records reflecting the Qualifying Diagnosis. | Click the Respond button, go to Section 3 for Medical Records, click on the Upload Medical Records button and follow the instructions to upload medical records reflecting the Qualifying Diagnosis. |

### III. ADDITIONAL EXPLANATION OF WHAT IS MISSING

The medical records must show a post-mortem diagnosis of CTE made before April 22, 2015 (the Final Approval Date) by a board-certified neuropathologist for a Retired NFL Football Player who died before April 22, 2015. See Section 6.3 (f) of the Settlement Agreement and FAQ 109. Mr. Cornish died on August 23, 2008, and the August 24, 2008 autopsy report signed by Marc A. Krouse does not reference CTE and neither does the death certificate. You provided an undated letter from Dr. Ronald L. Hamilton who diagnosed Mr. Cornish with CTE. You must establish that Dr. Hamilton reviewed Mr. Cornish's brain tissue and made a CTE diagnosis on or before April 22, 2015.

### IV. HOW TO RESPOND TO THIS NOTICE

You have 120 days to respond to this Notice and provide the missing information or documents. **We encourage you to gather the requested information or documents now and respond to this Notice promptly, rather than using the full 120 days allowed to answer.  The sooner you respond, the sooner your claim can move forward in the review process.**

By the Response Deadline stated above, send us the missing information or documents identified in Section II.  We will wait the full 120 days to re-review your claim, unless you click the Submit Claim Package for Review button to confirm that your response is complete and we may continue to review your claim.  If you do not respond in full on or before the Response Deadline, we will have to assess your claim based on the materials we have, which could lead to a lower Monetary Award or denial of your claim in its entirety.

Submit the requested information using your secure online portal to upload additional documents.

## V. How to Contact Us with Questions or for Help

If you are represented by a lawyer, consult with your lawyer if you have questions or need assistance. If you are unrepresented and have any questions about this Notice or need help, contact us at 1-855-887-3485 or send an email to ClaimsAdministrator@NFLConcussionSettlement.com.  If you are a lawyer, call or email your designated Firm Contact for assistance. For more information about the Settlement program, visit the official website at www.NFLConcussionSettlement.com to read the Frequently Asked Questions or download a copy of the complete Settlement Agreement.



**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE: NATIONAL FOOTBALL | § | No. 2:12-md-02323-AB |
| LEAGUE PLAYERS' CONCUSSION | § | |
| INJURY LITIGATION | § | MDL No. 2323 |
| | § | |
| | § | **Hon. Anita B. Brody** |
| THIS DOCUMENT RELATES TO: | § | |
| Settlement Class Member Robin B. Cornish | § | |
| (SPID 950012548) | § | |

**WRITTEN STATEMENT IN SUPPORT OF CLASS MEMBER'S APPEAL**
**OF THE CLAIMS ADMINISTRATOR'S NOTICE OF DENIAL OF**
**MONETARY AWARD CLAIM**

Class Member Robin B. Cornish, by and through counsel, files this written statement in support of this appeal and respectfully requests that the Claims Administrator's denial of this claim be reversed and remanded for a calculation of the Class Member's Monetary Award because the Claims Administrator erred in concluding that the Amended Settlement Agreement required Class Member to submit proof that the board-certified neuropathologist who provided a post-mortem diagnosis of CTE made the diagnosis on or before 4/22/15.[1]

---

[1]   If the Amended Settlement Agreement [ECF 6481] is construed to require a diagnosis on or before 4/22/15, Class Member reserves the right to seek relief from the Court pursuant to both Rule 60 and the Court's inherent authority to amend the judgment in this case in order to implement the settlement.

**SUPPORTING EVIDENCE**[2]

Exhibit 1        Notice of Denial of Monetary Award Claim

Exhibit 2        Relevant Excerpts from Class Member's Claim Package

Exhibit 3        Notice of Request for Additional Documents

Exhibit 4        Letter dated May 6, 2019 to Claims Administrator regarding Class Member's claim

---

[2]   Class Member also incorporates by reference the following documents that have been filed in this MDL or published on the Settlement Website:

(1) Original Settlement Agreement [ECF 6073-2];

(2) the Amended Settlement Agreement [ECF 6481];

(3) Absent Class Member and Plaintiff Yvonne Sagapolutele's Motion to Modify the Amended Final Order and Judgment [ECF 6534] by Conforming the Definition of "Death with CTE" to the Version Contemplated in the Fairness Hearing Order [ECF 6479] and Noticed to the Class in the Long Form Notice [ECF 6093-1] and Summary Notice [ECF 6093-2] Pursuant to Rule 60 and the Authority Retained in the Settlement Agreement [ECF 8263] ("Motion to Modify");

(4) Response in Opposition to the Motion to Modify [ECF 8430];

(5) Statement of Co-Lead Counsel in Opposition to the Motion to Modify [ECF 8431];

(6) Reply in Support of Motion to Modify [ECF 8442];

(7) Notice of Joinder [ECF 8443];

(8) Order denying, without prejudice, the Motion to Modify [ECF 8557];

(9) Posted Settlement Program FAQs (as of February 19, 2019); and

(10) Posted Settlement Program FAQs (as of July 8, 2019).

## BACKGROUND

Class Member submitted a claim package that included a post-mortem diagnosis of Chronic Traumatic Encephalopathy ("CTE") made by Dr. Hamilton, a board-certified neuropathologist.[3] Class Member's submitted claim package also includes documentation showing that the Player died prior to April 22, 2015.[4] The claim package includes an autopsy report, death certificate, and letter from Dr. Hamilton describing his diagnosis of CTE based on brain tissue slides from the Tarrant County Medical Examiner.

The Claims Administrator initially requested additional documents, stating: "You have not submitted any medical records reflecting the Qualifying Diagnosis."[5] The Claims Administrator further explained the following:

> The medical records must show a post-mortem diagnosis of CTE made before April 22, 2015 (the Final Approval Date) by a board-certified neuropathologist for a Retired NFL Football Player who died before April 22, 2015. See Section 6.3(f) of the Settlement Agreement and FAQ 109. Mr. Cornish died on August 23, 2008, and the August 24, 2008 autopsy report signed by Marc A. Krouse does not reference CTE and neither does the death certificate. You provided an undated letter from Dr. Ronald L. Hamilton who diagnosed Mr. Cornish with CTE. You must establish that Dr. Hamilton reviewed Mr. Cornish's brain tissue and made a CTE diagnosis on or before April 22, 2015.

In a correspondence dated May 6, 2019, Class Member's counsel explained that FAQ 109 must be read in conjunction with FAQ 93, which states that the diagnosis date for a Death with CTE diagnosis is "the date of the Player's death, even though the diagnosis is

---

[3]    Exhibit 2.

[4]    *Id.*

[5]    Exhibit 3

3

not made until after the Player dies."[6]

Despite this response, the Claims Administrator denied Class Member's Monetary Award Claim.[7]  Class Member has timely filed this appeal of the Claims Administrator's Notice of Denial of Monetary Award Claim.

## **ARGUMENTS**

The Claims Administrator denied Class Member's claim because the claim package does not show that Dr. Hamilton (a board-certified neuropathologist) "reviewed Mr. Cornish's brain tissue and made a CTE diagnosis on or before April 22, 2015."

## I.  **The Claims Administrator erred in concluding that the CTE Diagnosis was not timely.**

The Claims Administrator's reason for denying the claim is legally flawed in two respects. First, the diagnosis date for Death with CTE is the date of the Player's death, even if the diagnosis occurs later.  Second, if the Amended Settlement Agreement [ECF 6481] does require that the diagnosis be made prior to 4/22/2015, this requirement violates Class Member's rights because it was not contained in the Original Settlement Agreement [ECF 6073-20] and was added (1) despite the Court's instructions that any changes to the Original Settlement Agreement should make it *more* favorable, not *less* favorable, to class members; (2) without notice to Class Member; and (3) after Class Member's opt-out deadline had already passed.

### A.  **The diagnosis date for Death with CTE is the date of the Player's death.**

The Claims Administrator has posted several versions of "Posted Settlement Program FAQs" on the Settlement Website with answers to frequently asked questions.  All of the content in the

---

[6]    *See* Exhibit 4.

[7]    Exhibit 1.

Posted Settlement Program FAQs is subject to advance approval by Counsel for the NFL Parties.[8]

According to FAQ 93 in these Posted Settlement Program FAQs, the diagnosis date for Death

with CTE is the date of the Player's death, even though the diagnosis is not made until after the

Player dies:[9]

> **93.  How is the date of a Qualifying Diagnosis determined?**
>
> The physician making a Qualifying Diagnosis of a Retired NFL Football Player must
> determine and verify the date on which that Qualifying Diagnosis was made. This date is
> important under the Settlement Agreement. It affects the amount of a Monetary Award,
> because the younger a Player is at the time of the Qualifying Diagnosis, the larger the award.
>
> The diagnosing physician uses his or her professional medical judgment in deciding when the
> Player had the conditions amounting to a Qualifying Diagnosis under Exhibit 1 to the
> Settlement Agreement. There are some basic rules about this:
>
> (a)  *Death with CTE*: For these claims, the date of the Qualifying Diagnosis is the date of
> the Player's death, even though the diagnosis is not made until after the Player dies.
> The Monetary Award is based on the Player's age when he died.

Based on the Claims Administrator's representations to the class members that the date of the

Qualifying Diagnosis for Death With CTE is the date of the Player's death, the only date that is

relevant in determining the date of a Qualifying Diagnosis for Death with CTE is the date of the

Player's death.  The Claims Administrator's insistence on proof that the diagnosis "was done on

or before 4/22/15" ignores these representations, which establish that the date of the Player's death

is the date of the Qualifying Diagnosis.

Here, the claim package establishes that the Player's death occurred before April 22, 2015.

---

[8]    *See* Amended Settlement Agreement § 4.1(a).

[9]    This language is from the Posted Settlement Program FAQs (as of February 19, 2019).  Since this claim
package was submitted, a new version of the FAQs have been published on the Settlement Website in
the Posted Settlement Program FAQs (as of July 8, 2019).  The language in FAQ 93 is unchanged in
the new version of Posted Settlement Program FAQs; it has merely been moved to FAQ 99.

Accordingly, the date of the Qualifying Diagnosis is before April 22, 2015, and the Claims Administrator erred in denying this claim.

**B. In the alternative, if this Denial is based on language that was surreptitiously added to the Settlement Agreement putatively imposing a deadline for a Qualifying Diagnosis for Death with CTE, the Denial must reversed.**

The Court has previously considered a Motion to Modify the Amended Final Order and Judgment [ECF 8263] and denied the motion without prejudice to a consideration of the issues in that motion at a later time.[10]  In that motion, Class Member Yvonne Sagapolutele brought the Court's attention to the fact that although the Original Settlement Agreement contained no deadline for obtaining a Death with CTE Diagnosis, language appears to have been surreptitiously added to the Amended Settlement Agreement that could be read to have added a diagnosis deadline without notice to the Court or to the class members.[11]  The motion sought relief under both Rule 60 and the Court's inherent authority to implement the settlement by amending the Court's judgment.[12]

The Court denied the motion without prejudice and stated that before it would consider the "extraordinary action of modifying the Settlement Agreement," class members must first submit a claim to the Claims Administrator.[13]

If the Special Master concludes that the Amended Settlement Agreement does require Class Member to have obtained a CTE diagnosis prior to April 22, 2015 despite the contrary language

---

[10]   *See* Order [ECF 8557]

[11]   Motion to Modify [ECF 8263]

[12]   *Id.*

[13]   Order [ECF 8557]

in the Posted Settlement Program FAQs and in other notices, it does not appear that the Special Master would have the necessary authority to provide a remedy.[14]  To the extent the Special Master may have the authority to provide a remedy, Class Member incorporates by reference the arguments in the Motion to Modify [ECF 8263].  If the denial of this claim is not reversed, Class Member expressly reserves the right to seek appropriate relief from the Court under Rule 60 and under the Court's inherent authority to implement the settlement by amending the Court's judgment.

## CONCLUSION

For all of the foregoing reasons, Class Member respectfully requests that the Special Master reverse the Claims Administrator's denial of this Monetary Award Claim and remand to the Claims Administrator for a calculation of the Monetary Award.

Dated:  July 12, 2019

Respectfully Submitted:

/s/ Justin Demerath

**Justin Demerath**
Texas State Bar No. 24034415
**David Campbell**
Texas State Bar No. 24057033
O'HANLON, DEMERATH & CASTILLO
808 West Avenue | Austin, TX 78701
Tel: (512) 494-9949 | Fax: (512) 494-9919
jdemerath@808west.com
dcampbell@808west.com

**Counsel for Class Member**

---

[14]  *See* Order [ECF 6871] (providing Special Masters with the authority to faithfully oversee the implementation and administration of the Settlement Agreement); *see also* Motion to Modify [ECF 8263] (seeking relief under Rule 60).

## **CERTIFICATE OF SERVICE**

It is hereby certified that a true copy of the foregoing document was submitted on the Court Portal on the 12th day of July, 2019.

/s/ Justin B. Demerath_____
Justin B. Demerath

## NFL Parties' Opposition to Appeal of
## Claim Denial by Representative Claimant Robin Cornish

Robin Cornish, Representative Claimant for her late husband, Frank Cornish, submitted a claim on February 5, 2019—the day before the deadline for pre-Effective Date claims—for a Qualifying Diagnosis of Death with CTE purportedly rendered by neuropathologist Dr. Ronald L. Hamilton. (*See* Claim Form; Diagnosing Physician Certification.) In support of her claim, Ms. Cornish submitted (1) a Diagnosing Physician Certification from Dr. Hamilton, reflecting a purported Qualifying Diagnosis of Death with CTE (Diagnosing Physician Certification at 6); (2) an undated letter from Dr. Hamilton, purporting to diagnose Mr. Cornish with CTE (Hamilton Letter); (3) a death certificate indicating that Mr. Cornish died on August 23, 2008 and listing Mr. Cornish's cause of death as "SUDDEN ADULT DEATH WITH EVIDENCE OF HYPERTENSIVE HEART DISEASE" (Death Certificate); and (4) an autopsy report completed by Dr. Marc A. Krouse, indicating the same cause of death listed in Mr. Cornish's death certificate (*see* Autopsy Report at 1).

On February 20, 2019, the Claims Administrator issued a Notice of Request for Additional Documents advising Ms. Cornish that her Claim Package was incomplete because Ms. Cornish did not submit any medical records reflecting the Qualifying Diagnosis. (*See* Notice of Request for Additional Documents.) In the section titled "Additional Explanation of What is Missing," the Claims Administrator explained that Ms. Cornish's Claim Package materials did not show that Dr. Hamilton administered a post-mortem examination in which he diagnosed Mr. Cornish with CTE prior to the Settlement Final Approval Date of April 22, 2015, as required by the Settlement Agreement. (*See id.*) In response to the Notice of Request for Additional Documents, counsel for Ms. Cornish sent a letter to the Claims Administrator asserting that no additional documents were required because the Settlement Program FAQs provide that the date of Mr. Cornish's Qualifying Diagnosis is the date of his death. (*See* May 6, 2019 email from David J. Campbell to the Claims Administrator at 1-2.) On June 25, 2019, the Claims Administrator denied Ms. Cornish's claim because she failed to submit any additional Claim Package materials to show that Dr. Hamilton actually rendered a diagnosis of CTE prior to the Final Approval Date, as required by the Settlement Agreement. (*See* Notice of Denial of Monetary Award Claim ("Denial Notice") at 1.)

On appeal, Ms. Cornish does not contend that Dr. Hamilton diagnosed Mr. Cornish with CTE based on a post-mortem examination prior to April 22, 2015. Instead, she argues that: (1) the still unspecified date that Dr. Hamilton actually diagnosed Mr. Cornish does not matter, because the diagnosis date for any Retired NFL Football Player diagnosed with Death with CTE purportedly is the date of the player's death; and (2) if the Claims Administrator determines that a diagnosing physician must render a diagnosis of Death with CTE prior to April 22, 2015, the amended Settlement Agreement purportedly violates Settlement Class Members' due process rights because it was a change to the original Settlement Agreement without proper notice. (*See* Written Statement in Support of Class Member's Appeal of the Claims Administrator's Notice of Denial of Monetary Award Claim ("Appeal").)[1]

---

[1] With knowledge that Mr. Cornish and other clients never received a diagnosis of CTE prior to the Final Approval Date, counsel for Ms. Cornish has engaged in a lengthy history of legal gamesmanship concerning the deadline for Qualifying Diagnoses of Death with CTE. On August 15, 2017, counsel for Ms. Cornish, on behalf of client Yvonne Sagapolutele, filed a Motion to Modify the Amended Final Order and Judgment, in which she alleged that the Settlement Agreement's deadline to obtain a Qualifying Diagnosis of Death with CTE was "imposed after the deadline to opt out and without notice to Class Members." (Mem. of Law in Supp. of Absent Class Member

The NFL Parties respectfully oppose the Appeal because it is utterly unfounded, and there is no question this claim must be denied.  The Settlement Agreement clearly requires that a board-certified neuropathologist render a Qualifying Diagnosis of Death with CTE prior to April 22, 2015, and Ms. Cornish has not provided—and undoubtedly cannot provide—any evidence that Dr. Hamilton rendered such a diagnosis prior to that date.  In addition, the amended Settlement Agreement's requirement that a Qualifying Diagnosis of Death with CTE must be rendered prior to April 22, 2015 does not violate Settlement Class Members' due process rights; to the contrary, it expanded the deadline for Death with CTE diagnoses compared to the original Settlement Agreement to the benefit of Settlement Class Members.

For these reasons, and those set forth below, Ms. Cornish's appeal should be denied.

## I.    There Is No Evidence That Dr. Hamilton Rendered a Qualifying Diagnosis of Death With CTE Prior to April 22, 2015, as Required by the Settlement Agreement

For a Qualifying Diagnosis of Death with CTE, the Settlement Agreement explicitly requires that a diagnosing physician render the diagnosis prior to the Settlement's Final Approval Date of April 22, 2015.  Specifically, Section 2.1(aa) of the Settlement Agreement provides that the Qualifying Diagnosis of "Death with CTE is defined in Exhibit 1," and Exhibit 1 states that the definition of Death with CTE is:  "For Retired NFL Football Players who died prior to the Final Approval Date, *a post-mortem diagnosis of CTE made by a board-certified neuropathologist prior to the Final Approval Date*, provided that a Retired NFL Football Player who died between July 7, 2014 and the Final Approval Date shall have until 270 days from his date of death to obtain such a postmortem diagnosis."  (Settlement Agreement, Ex. A-1 at 5 § 5 (emphasis added).)  Section 6.3(f) of the Settlement Agreement reiterates that requirement, stating that "[a] Qualifying Diagnosis of Death with CTE shall be made only for Retired NFL Football Players who died prior to the Final Approval Date, through *a post-mortem diagnosis made by a board-certified neuropathologist prior to the Final Approval Date* . . . ."  (*See id.* at 6.3(f) (emphasis added).)

In the Appeal, Ms. Cornish argues that a Diagnosing Physician is not required to actually render a Qualifying Diagnosis of Death with CTE prior to April 22, 2015 because "the only date that is relevant in determining the date of a Qualifying Diagnosis for Death with CTE is the date of the Player's death."  (Appeal at 5.)  As support for this argument, Ms. Cornish cites Settlement FAQ 99 (formerly Settlement FAQ 93), which states in part:

> *Death with CTE*: For these claims, the date of the Qualifying Diagnosis is the date of the Player's death, even though the diagnosis is not made until after the Player dies. The Monetary Award is based on the Player's age when he died.

---

and Pl. Yvonne Sagapolutele's Mot. to Modify the Am. Final Order and J. at 18, 12-md-2323, ECF No. 8263-2 (the "Motion to Modify the Amended Final Order and Judgment").)  After the Parties fully briefed that motion, the Court denied the motion without prejudice to Ms. Sagapolutele's (or other similarly situated Settlement Class Members') ability to raise the issue at a later time if she filed a Death with CTE claim that would have been valid but for the deadline.  (Order, 12-md-2323, ECF No. 8557.)  Counsel then waited over 16 months to file Ms. Cornish's Death with CTE claim, which relies on an *undated* letter from Dr. Hamilton, with the clear intention of obfuscating the timing and nature of Dr. Hamilton's purported CTE diagnosis.

(Settlement FAQ 99.)

Ms. Cornish's argument rests on willful ignorance of the Settlement Agreement and a misinterpretation of Settlement FAQ 99. Specifically, the Settlement Agreement plainly requires that, "[f]or Retired NFL Football Players who died prior to the Final Approval Date, a ***post-mortem diagnosis***" of Death with CTE must be "made by a board-certified neuropathologist ***prior to the Final Approval Date***." (Settlement Agreement Ex. A-1 at 5 § 5 (emphasis added).) If, as Ms. Cornish argues, the Settlement Agreement required only that a Retired NFL Football Player died prior to the Final Approval Date in order for a diagnosis made at *any unlimited future date* to be timely, the Settlement Agreement would not include subsequent language providing that a player who died between July 7, 2014 and the Final Approval Date "shall have until 270 days from his date of death to obtain such a postmortem diagnosis." (*Id.*)

Moreover, Settlement FAQ 99 does not concern the date by which a Diagnosing Physician must have *actually made* a Death with CTE diagnosis, but instead concerns the date of diagnosis ***for compensation purposes***. The Parties to the Settlement Agreement did not wish to reduce the compensatory award of a decedent who otherwise would have aged between death and the neuropathological examination. The Death with CTE portion of Settlement FAQ 99 confirms this, as it clearly states that "[t]he ***Monetary Award*** is based on the Player's age when he died." (Settlement FAQ 99 (emphasis added).)

Ms. Cornish has not provided—and presumably cannot provide—any evidence that Dr. Hamilton rendered his purported Qualifying Diagnosis of Mr. Cornish prior to the Final Approval Date of April 22, 2015. In fact, Dr. Hamilton's letter containing the purported diagnosis does not contain any dates whatsoever, and Dr. Hamilton's Diagnosing Physician Certification form only lists the date of Mr. Cornish's death (August 23, 2008) as the date of diagnosis. (*See* Hamilton Letter; Diagnosing Physician Certification.) Accordingly, Ms. Cornish's appeal must be denied, and her claim denial upheld, for this fundamental reason alone.

## II.    The Settlement Agreement Requirement That a Death With CTE Diagnosis Be Rendered Prior to April 22, 2015 Does Not Violate Settlement Class Members' Due Process Rights

Fully aware that her purported Death with CTE diagnosis is untimely because it was not rendered prior to the Final Approval Date of April 22, 2015, Ms. Cornish argues that such requirement somehow violates her right to due process. Specifically, Ms. Cornish argues that the Special Master should consider the arguments in Yvonne Sagapolutele's August 15, 2017 Motion to Modify the Amended Final Order and Judgment to remove the deadline to obtain the Qualifying Diagnosis, which Motion was denied without prejudice by Judge Brody with instruction that Ms. Sagapolutele "must first show that she would be entitled to recover but for the Death with CTE diagnosis deadline," and then may raise the due process argument in the claims appeal process. (Order, 12-md-2323, ECF No. 8557.) Ms. Cornish's argument that the amendments to the Settlement Agreement somehow violated her due process rights is meritless.

Relying on Ms. Sagapolutele's prior Motion to Modify the Amended Final Order and Judgment, Ms. Cornish alleges that the Settlement Agreement's deadline to obtain a Qualifying Diagnosis of Death with CTE was "surreptitiously added to the Amended Settlement Agreement" after the deadline to opt out and without notice to Settlement Class Members. (Appeal at 6.) Ms. Sagapolutele's prior motion argues that absent class members' due process rights were violated by the change, and that the Court should remedy the violation by modifying the Settlement Agreement

to remove the deadline for a Qualifying Diagnosis of Death with CTE.  (*See* Motion to Modify the Amended Final Order and Judgment at 15-24.)

In response, the NFL Parties, too, incorporate all of the arguments set forth in their Opposition to that Motion, attached in full as Exhibit 1.[2]  As the NFL Parties explained in their Opposition, far from injuring Settlement Class Members' rights by "imposing" a new deadline for a Qualifying Diagnosis of Death with CTE, the amendments to the Settlement Agreement *extended* the deadline to obtain the Qualifying Diagnosis from the Preliminary Approval Date to the Final Approval Date (*see id.* at 10-11), and provided a 270-day grace period in which Settlement Class Members who died between the Preliminary Approval Date and the Final Approval Date could obtain a Qualifying Diagnosis (*see id.* at 6, 10).  Accordingly, the relevant changes solely benefited absent class members and in no way violated their due process rights.  (*See id.* at 9-13.)

For these additional reasons, Ms. Cornish's appeal must be denied, and her claim denial must be upheld.

### Conclusion

The denial of Ms. Cornish's claim was required under the judicially-approved terms of the Settlement Agreement.  Because Ms. Cornish does not present clear and convincing evidence that such determination was in error, the Special Master should affirm denial of the claim.

Dated:  August 14, 2019

Respectfully submitted,

PAUL, WEISS, RIFKIND,
    WHARTON & GARRISON LLP

*/s/ Brad S. Karp*_____
Brad S. Karp
Bruce Birenboim
Claudia Hammerman
Lynn B. Bayard
Douglas M. Burns
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990
Email:  bkarp@paulweiss.com

*ATTORNEYS FOR THE*
*NATIONAL FOOTBALL LEAGUE*
*AND NFL PROPERTIES LLC*

---

[2]    (*See* Ex. 1, Mem. of Law of the National Football League and NFL Properties LLC in Opp. to Settlement Class Member Yvonne Sagapolutele's Mot. to Modify the Am. Final Order and J., 12-md-2323, ECF No. 8430.)

# EXHIBIT 1

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br><br>MDL No. 2323<br><br>Hon. Anita B. Brody |
| Kevin Turner and Shawn Wooden, *on behalf of themselves and others similarly situated*,<br><br>　　　　　　　　　　Plaintiffs,<br><br>　　　　　　v.<br><br>National Football League and NFL Properties, LLC, successor-in-interest to NFL Properties, Inc.<br>　　　　　　　　　　Defendants. | Civ. Action No.: 14-cv-00029-AB |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | Hon. Anita B. Brody |

### MEMORANDUM OF LAW OF THE NATIONAL FOOTBALL LEAGUE AND NFL PROPERTIES LLC IN OPPOSITION TO SETTLEMENT CLASS MEMBER YVONNE SAGAPOLUTELE'S MOTION TO MODIFY THE AMENDED FINAL ORDER AND JUDGMENT

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

Preliminary Statement ........................................................................................... 1

Background ............................................................................................................. 4

     A.    Parties ................................................................................................. 4

     B.    Procedural Background ...................................................................... 4

Argument ............................................................................................................... 8

I.     THE PARTIES WERE NOT REQUIRED TO NOTIFY THE SETTLEMENT
     CLASS ABOUT THE AMENDMENTS ........................................................ 8

     A.    The Amendments Did Not Require New Notice .................................. 9

     B.    The Original Settlement Notice Was Sufficient ................................. 11

II.    SAGAPOLUTELE IS NOT ENTITLED TO REWRITE THE SETTLEMENT
     AGREEMENT ............................................................................................. 13

Conclusion ............................................................................................................. 17

## TABLE OF AUTHORITIES

<div align="right"><b><u>Page(s)</u></b></div>

### CASES

*Adelson* v. *Ocwen Fin. Corp.*,
　621 F. App'x 348 (7th Cir. 2015) .......................................14

*In re Baby Prods. Antitrust Litig.*,
　708 F.3d 163 (3d Cir. 2013)........................................9, 11

*Blue Diamond Coal Co.* v. *Trustees of UMWA Combined Ben. Fund*,
　249 F.3d 519 (6th Cir. 2001) ......................................16

*In re Diet Drugs Prods. Liab. Litig.*,
　200 F. App'x 95 (3d Cir. 2006) ...................................14

*In re Diet Drugs Prods. Liab. Litig.*,
　No. 99-cv-20593, 2010 WL 2735414 (E.D. Pa. July 2, 2010) ...................9, 11, 13

*F.A.C., Inc.* v. *Cooperativa de Seguros de Vida de Puerto Rico*,
　449 F.3d 185 (1st Cir. 2006)........................................17

*Federman* v. *Artzt*,
　339 F. App'x 31 (2d Cir. 2009) ...................................14, 15

*In re Four Seasons Sec. Laws Litig.*,
　525 F.2d 500 (10th Cir. 1975) ....................................15

*Harris* v. *Graddick*,
　615 F. Supp. 239 (N.D. Ala. 1985)................................9, 11

*Hensley* v. *Alcon Labs., Inc.*,
　277 F.3d 535 (4th Cir. 2002) .....................................17

*Inmates of Suffolk Cty. Jail* v. *Rufo*,
　No. 71-cv-00162, 2015 WL 6958070 (D. Mass. Nov. 10, 2015) ...........................16

*Kokkonen* v. *Guardian Life Ins. Co. of Am.*,
　511 U.S. 375 (1994)................................................17

*In re Linerboard Antitrust Litig.*,
　223 F.R.D. 357 (E.D. Pa.), *amended*, 223 F.R.D. 370 (E.D. Pa. 2004)..................17

*Matthews, Wilson & Matthews, Inc.* v. *Capital City Bank*,
　614 F. App'x 969 (11th Cir. 2015) .................................15

**Page(s)**

*In re Nat'l Football League Players' Concussion Injury Litig.*,
    307 F.R.D. 351 (E.D. Pa. 2015), *amended*, No. 12-MD-02323, 2015 WL
    12827803 (E.D. Pa. May 8, 2015) ....................................................................... passim

*In re Nat'l Football League Players Concussion Injury Litig.*,
    821 F.3d 410 (3d Cir. 2016), *amended* (May 2, 2016) ............................................7

*In re Nissan Motor Corp. Antitrust Litig.*,
    552 F.2d 1088 (5th Cir. 1977) ...............................................................................11

*Orlando Residence, Ltd.* v. *Hilton Head Hotel Inv'rs*,
    No. 89-cv-0662, 2013 WL 1103027 (D.S.C. Mar. 15, 2013) .................................15

*In re PaineWebber Ltd. P'ships Litig.*,
    171 F.R.D. 104 (S.D.N.Y 1997) ...........................................................................11

*Roman-Oliveras* v. *Puerto Rico Elec. Power Auth.*,
    797 F.3d 83 (1st Cir. 2015) ...................................................................................17

*Sawka* v. *Healtheast, Inc.*,
    989 F.2d 138 (3d Cir. 1993) ..................................................................................15

## OTHER AUTHORITIES

11 Fed. Prac. & Proc. Civ. § 2852 (3d ed.) ..................................................................17

20 Fed. Prac. & Proc. Deskbook § 104 .......................................................................16

Fed. R. Civ. P. 23 .......................................................................................................2, 9

Fed. R. Civ. P. 60 ..........................................................................................1, 3, 14, 15, 16

Newberg on Class Actions § 1:5 (5th ed.) .....................................................................9

Newberg on Class Actions § 8:17 (5th ed.) ...................................................................9

Newberg on Class Actions § 8:36 (5th ed.) ...................................................................9

Newberg on Class Actions § 8:7 (5th ed.) .....................................................................9

Newberg on Class Actions § 18:40 (5th ed.) ...............................................................15

Defendants National Football League and NFL Properties LLC (collectively, the "NFL Parties") respectfully submit this memorandum of law in opposition to Settlement Class Member Yvonne Sagapolutele's ("Sagapolutele's") motion to modify the Amended Final Order and Judgment (the "Motion") (ECF No. 8263).

<p style="text-align:center"><strong><u>Preliminary Statement</u></strong></p>

Sagapolutele, an absent Settlement Class Member and representative of the estate of Retired NFL Football Player Pio Sagapolutele, brings this motion, ostensibly as a matter of due process, seeking significant revisions to the Final Order and Judgment that the Court entered more than two years ago approving the Class Action Settlement Agreement in this case.[1] But no due process violation has occurred, and Sagapolutele has shown no justification for this Court to take the extraordinary step of rewriting a settlement agreement approved by both this Court and the Third Circuit that has been in place for years. Sagapolutele's motion should therefore be denied.

The primary ground for Sagapolutele's motion is the amendments to the Settlement Agreement in February 2015, which expanded the definition of the Death with CTE Qualifying Diagnosis in response to the Court's directives. Contrary to fact, Sagapolutele contends that the amendment imposed a deadline to obtain a Qualifying Diagnosis of Death with CTE, and "[b]ecause this change was made both without notice to absent class members and after the deadline to opt out of the settlement, [her] due process rights were violated." (Pl. Mem. at 15.) Sagapolutele asks this Court, pursuant to Rule 60 of the Federal Rules of Civil Procedure and the Court's inherent power, to amend the Final Order and Judgment to "remov[e] the deadline to obtain a Qualifying Diagnosis of Death with CTE." (Pl. Mem. at 1.)

---

[1]   Unless otherwise defined, the capitalized terms used in this memorandum have the same meaning as those in the Settlement Agreement.

Sagapolutele's motion has no basis in fact or law for several reasons.

*First*, the amendments in question concerned an *expansion* of settlement benefits to the Settlement Class—namely, the expansion of the Qualifying Diagnosis of Death with CTE to include Retired NFL Football Players who died with CTE between Preliminary and Final Approval of the Settlement Agreement; the original agreement limited the Qualifying Diagnosis to those who died *prior* to Preliminary Approval.  It is well settled that additional notice to a class is necessary only when amendments to a settlement agreement are "materially adverse" to the class, not where, as here, they benefit the class.  Neither the Due Process Clause nor Rule 23 of the Federal Rules of Civil Procedure require notice in the event of beneficial, or even neutral, amendments.  As this Court correctly held in granting Final Approval of the Settlement Agreement over various objections to this very amendment (although on a different ground), no additional notice was required in this case for that very reason.

*Second*, contrary to Sagapolutele's contentions regarding lack of notice, the class notice in connection with the original settlement agreement was all that was necessary.  The Short- and Long-Form notices distributed to the Settlement Class Members made clear, as this Court and the Third Circuit held, that an award of Death with CTE would *not* be available to all Retired NFL Football Players diagnosed with CTE.  Rather, only particular cases of CTE meeting "certain" predetermined and agreed-to standards under the Settlement Agreement would be compensated—namely, cases where, prior to Preliminary Approval,[2] the Retired NFL Football Player received a post-mortem diagnosis of CTE made by a board-certified neuropathologist.  Further, the amendments in question were in fact made public; the NFL Parties and Class Counsel posted the amendments—including a redline comparison clearly

---

[2]    As noted above, the amendments to the Settlement Agreement extended this deadline to Final Approval.

reflecting the changes to the text of the Settlement Agreement—on the Court's publicly accessible PACER docket, where any member of the public, including the more than 5,000 Settlement Class Members with legal representation, could view it.  In fact, over 40 Settlement Class Members objected to the amendments, including the very amendment that Sagapolutele complains of here.

*Finally*, even if Sagapolutele could show a due process violation, which she cannot, neither Rule 60 nor this Court's "inherent authority" allows Sagapolutele to rewrite the Settlement Agreement as she seeks.  Rule 60(a) is limited to correction of "clerical mistakes" that do not affect the substantive rights of the parties.  Yet her contention that the amendments were simply "clerical mistakes" is at odds with her characterization of those same amendments as impairing her rights under the settlement.  Further, not only does Sagapolutele—as an absent class member—lack standing to move pursuant to Rule 60(b)(6), she also fails to establish that the "extraordinary remedy" of amendment pursuant to Rule 60(b)(6) is warranted here because she does not show that she will experience *any* hardship without the relief she seeks.  For example, Sagapolutele has neither shown (nor even claimed) that the brain of her late husband, who died in 2009, has ever been examined by a board-certified neuropathologist for CTE, much less diagnosed as having CTE.  Nor has she explained why any such examination—if such a belated diagnosis were even medically possible—did not occur prior to the Court's Final Approval Order on April 22, 2015 (as amended May 8, 2015).  Finally, Sagapolutele has not shown that she is entitled to relief under the Court's "inherent authority" to amend the Final Order and Judgment because that authority is no more expansive than Rule 60.

Accordingly, Sagapolutele's motion should be denied.

## Background

### A.    Parties

The National Football League ("NFL") is an unincorporated association of 32 Clubs that promotes, organizes, and regulates the sport of professional football in the United States.  NFL Properties LLC ("NFLP") is a limited liability company organized under the laws of the State of Delaware and headquartered in New York.  Sagapolutele is a self-described absent Settlement Class Member and the representative of the estate of late Retired NFL Football Player Pio Sagapolutele.  (Pl. Mot. at 1.)

### B.    Procedural Background

The Judicial Panel on Multidistrict Litigation established this multidistrict litigation as MDL 2323 on January 31, 2012.  Since that time, over 300 additional cases, brought on behalf of approximately 5,000 former NFL players, have been included in the MDL.  *See In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. 351, 361 (E.D. Pa. 2015), *amended*, No. 12-MD-02323, 2015 WL 12827803 (E.D. Pa. May 8, 2015), *and aff'd*, 821 F.3d 410 (3d Cir. 2016), *amended* (May 2, 2016), *cert. denied*, 137 S. Ct. 591 (2016), and *cert. denied*, 137 S. Ct. 607 (2016).  Plaintiffs in these cases asserted fraud- and negligence-based claims against the NFL Parties based on, among other things, a purported duty to provide players with rules and information needed to protect them from the alleged effects of repetitive mild traumatic brain injuries sustained during NFL play, including CTE.  *Id*. at 361-62.

On June 25, 2014, the NFL Parties and Class Counsel[3] (collectively, the "Parties") filed a motion for preliminary class certification and preliminary approval of the Settlement Agreement, and on July 7, 2014, the Court approved the motion.  *See id.* at 363-65.

---

[3]    Class Counsel consists of attorneys whom this Court duly appointed as legal representatives for the Settlement Class, including Christopher A. Seeger, Sol Weiss, Steven C. Marks, Gene Locks, Arnold Levin, and Dianne M. Nast.  (Final Order & Judg. ¶ 6,  ECF No. 6510.)

The Settlement Agreement defined the Settlement Class as "'[a]ll living NFL Football Players who, prior to the date of Preliminary Approval . . . retired . . . from playing professional football with the NFL,'" as well as their Representative Claimants and Derivative Claimants.  *Id.* at 365 ("Representative Claimants are those duly authorized by law to assert the claims of deceased, legally incapacitated, or incompetent Retired Players.  Derivative Claimants are those, such as parents, spouses, or dependent children, who have some legal right to the income of Retired Players.").  The Settlement Agreement also provides funding for Retired NFL Football Players to receive a baseline assessment examination of their objective neurological functioning, for safety and educational initiatives, and for monetary awards for certain Qualifying Diagnoses, including, as relevant here, the Qualifying Diagnosis of Death with CTE.  *Id.* at 366-67.

Prior to the Fairness Hearing, the Parties distributed Court-approved Short- and Long-Form notices to the Settlement Class.  *See id.* at 382-86.  "Each was written in plain and straightforward language," and together, they disclosed the key components of the Settlement Agreement, making clear that "only 'certain' cases of CTE are covered."  *Id.* at 383-84.  As explained by the notice, under the original agreement, the Settlement's benefits included "[m]onetary awards for **diagnoses** of Death with CTE **prior to July 7, 2014** . . . ."  (*See* Long-Form Notice at 6, ECF No. 6086-1 (emphasis added); *see also* Class Action Settlement Agreement as of June 24, 2014 § 6.3(f), ECF No. 6087 (a "Qualifying Diagnosis of Death with CTE shall be made only for Retired NFL Football Players who died prior to the date of the Preliminary Approval and Class Certification Order, through a post-mortem diagnosis by a board-certified neuropathologist of CTE.").)

After the Fairness Hearing, the Parties—at this Court's request—agreed to several amendments to the Settlement Agreement, each of which made the Settlement Agreement more

beneficial to Settlement Class Members.  *In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. at 386.  For example, the amendments provided credit for Settlement Class Members who played in NFL Europe; ensured that all eligible Retired NFL Football Players who elected to receive a baseline assessment examination would receive one regardless of any funding limitations in the Settlement Agreement; included a hardship provision with respect to the appeal fee for Settlement Class Members; and allowed reasonable accommodation for Settlement Class Members who do not possess certain medical records.  (Class Counsel and the NFL Parties' Joint Submission in Resp. to the Feb. 2, 2015 Order of the Ct., Feb. 13, 2015, ECF No. 6481.)  In addition, as is relevant here, one amendment expanded the Qualifying Diagnosis of Death with CTE to cover not only Retired NFL Football Players who died prior to Preliminary Approval, but also Retired NFL Football Players who died between Preliminary Approval and Final Approval.  (*Id.* at 4-5.)  In addition, the Parties explained to the Court that "**consistent with the Parties' intent under the original Settlement Agreement**, and recognizing that obtaining such a [CTE] diagnosis **may take several months post-death**, the Parties have provided for a grace period of 270 days following any date of death between preliminary approval and the Final Approval Date to allow Claimants to obtain the necessary diagnosis." (*Id.* (emphasis added).)

Copies of the proposed amended Settlement Agreement, including a redline showing the exact changes made, were posted on the Court's publicly accessible PACER database in February 2015.  (Class Counsel and the NFL Parties' Joint Submission in Resp. to the Feb. 2, 2015 Order of the Ct., Ex. A, Feb. 13, 2015, ECF No. 6481-1.)  Between February and April 2015, more than 40 Settlement Class Members filed objections to the amendments, including objections to the amendment to the definition of Death with CTE at issue here.  (*See*

Armstrong Objectors' Suppl. Obj. to the Am. Class Action Settlement, ECF No. 6503; Miller

Suppl. Obj. to Settlement, ECF No. 6484.) Sagapolutele did not file any objection.

After considering those objections, the Court issued its opinion approving the

Settlement Agreement and finding that "Class Members who opted out . . . received adequate

notice of these changes, ***and notification of Class Members is not required***." *In re Nat'l*

*Football League Players' Concussion Injury Litig.*, 307 F.R.D. at 386 (emphasis added). The

Court explained: "Because these changes improved the deal for Class Members without

providing any concessions to the NFL Parties, an additional round of notice for Class Members

is unnecessary." *Id*. On appeal, the Third Circuit affirmed this Court's Final Order and

Judgment in full. Regarding notice, the Third Circuit agreed with the District Court, finding

"that the content of the class notice . . . satisfied Rule 23 and due process." *In re Nat'l Football*

*League Players Concussion Injury Litig.*, 821 F.3d 410, 435-36 (3d Cir. 2016), *amended* (May 2,

2016), *cert. denied*, 137 S. Ct. 591 (2016), and *cert. denied*, 137 S. Ct. 607 (2016). Notably, the

Third Circuit also "conclude[d] that the settlement's treatment of CTE does not render the

agreement fundamentally unfair." *Id.* at 444.

On August 15, 2017, over two years after this Court granted final approval of the

Settlement, Sagapolutele filed this Motion challenging the Court's determination that the

amendments were beneficial to Settlement Class Members and therefore did not require

additional notice, and seeking "modification of the Final Order and Judgment by removal of the

deadline to obtain a Qualifying Diagnosis of Death with CTE."[4] (Pl. Mot. at 2.) Sagapolutele

contends that "[t]his deadline was added to the Settlement Agreement in February 2015 without

---

[4]    Relatedly, Sagapolutele also seeks an "instruction to the settlement administrator to develop forms and
procedures that allows Class Members to obtain a Qualifying Diagnosis of Death with CTE by obtaining a post-
mortem diagnosis by a board-certified neuropathologist at any time during the 65-year term of the Monetary
Award Fund." (Pl. Mot. at 2.)

notice to the class," and "effectively prevented Class Members . . . from obtaining a Qualifying Diagnosis of Death with CTE." (*Id.*) Despite Sagapolutele's claim that "this deadline materially prejudices" Settlement Class Members (*id.*), she offers no explanation, much less an evidentiary showing, of how her own rights were in any way impaired by the alleged lack of notice. She does not demonstrate—or even assert—that the brain of her late husband has been examined by a board-certified neuropathologist and determined to have CTE. Therefore, not only is Sagapolutele's injury entirely hypothetical, but she also does not establish that such an examination would even be viable, given her husband's death in 2009.[5]

The NFL Parties, through this memorandum of law, oppose the Motion.

## **Argument**

### **I.**

### **THE PARTIES WERE NOT REQUIRED TO NOTIFY THE SETTLEMENT CLASS ABOUT THE AMENDMENTS**

Sagapolutele argues that her due process rights were violated because she did not receive notice that the February 2015 amendment "impos[ed] a deadline to obtain a Qualifying Diagnosis of Death with CTE" when the original Settlement Agreement purportedly permitted "Class Members [to] obtain a Qualifying Diagnosis for Death with CTE anytime within the 65-year life of the Monetary Award Fund." (Pl. Mem. at 17.) Not so.

"[T]he Due Process Clause of the Fourteenth Amendment requires that notice [concerning a class action settlement] be 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" *In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. at

---

[5]  *See* Compl. ¶ 43, *Sagapolutele* v. *Nat'l Football League*, No. 17-cv-00348 (E.D. Pa. Jan. 25, 2017), ECF No. 1; *see also* Am. Stip. of Dismissal, *Sagapolutele* v. *Nat'l Football League*, No. 17-cv-00348 (E.D. Pa. May 3, 2017), ECF No. 4 (approving stipulation of dismissal without prejudice).

383 (quoting *Mullane* v. *Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)).[6]  Parties

settling a class action litigation should therefore distribute notice that "'fairly apprises' class

members of the action and their rights."  Newberg on Class Actions § 8:17 (5th ed.).  Additional

notice is only required when the settling parties subsequently introduce amendments that "would

have a *material adverse* effect on the rights of class members."  *In re Diet Drugs Prods. Liab.*

*Litig.*, No. 99-cv-20593, 2010 WL 2735414, at *6 (E.D. Pa. July 2, 2010) (emphasis added); *see*

*also In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 175 n.10, 182 (3d Cir. 2013) (supplemental

notice required only for "*material* alterations" (emphasis added)).    Conversely, if the

amendments are neutral or beneficial to the settlement class, no additional notice is required.  *See*

*Harris* v. *Graddick*, 615 F. Supp. 239, 244 (N.D. Ala. 1985) (holding that where "the

amendment is narrow and it is clearly apparent that the interests of the classes are not

*substantially impaired*, . . . the notice already given is adequate" (emphasis added)); *see also In*

*re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. at 383 (collecting cases,

including *Harris*).  That is the case here.

### A.    The Amendments Did Not Require New Notice

Sagapolutele's argument—that the Parties should have re-distributed notice

reflecting the February 2015 amendments to the Settlement Agreement—fundamentally

misunderstands the substance of the amendments.  In Sagapolutele's telling, "in the midst of

otherwise beneficial amendments" to the Settlement Agreement, the Parties "impose[d] an

additional requirement that prevents Class Members from recovering settlement proceeds [for

CTE] unless they obtained a Qualifying Diagnosis before" Final Approval.  (Pl. Mem. at 8.)  But

---

[6]    Due process notice requirements mirror those of Rule 23 of the Federal Rules of Civil Procedure.  *See* Newberg
on Class Actions § 1:5 (5th ed.) ("Rule 23 is constructed to ensure that the representative nature of class action
litigation safeguards these absent class members' due process rights."); *id.* § 8:7 (5th ed.) (the notice
requirements under Rule 23 "echo[] the constitutional test set forth by the Supreme Court"); *id.* § 8:36 (5th ed.)
("[A]s Rule 23's requirements are quite similar to the Constitution's, the distinction may be immaterial.").

the amendment only clarified what was always the case and extended the deadline for Death with CTE to Final Approval.

The original settlement agreement provided that an award for a Qualifying Diagnosis of Death with CTE would be available only to Retired NFL Football Players who died *and* received a CTE diagnosis prior to Preliminary Approval. The Long-Form Notice made this explicit, stating that the Settlement's benefits include "[m]onetary awards for ***diagnoses*** of Death with CTE ***prior to July 7, 2014*** . . . ." (*See* Long-Form Notice at 6, ECF No. 6086-1 (emphasis added); *see also* Decl. of Robert H. Klonoff Relating to the Proposed Class Settlement in the Nat'l Football League Players' Concussion Injury Litig. ¶ 85, Nov. 12, 2014, ECF No. 6423-9 ("[C]ontrary to the arguments advanced by various objectors, ***excluding CTE in cases diagnosed after July 7, 2014***, is not irrational." (emphasis added)).) Similarly, the Parties' publicly filed submission to the Court in support of the amendment stated specifically that the amendment's language providing only a grace period of time following death within which to obtain a neuropathological diagnosis of CTE was "*consistent with the Parties' intent under the original Settlement Agreement*." (*See* Class Counsel and the NFL Parties' Joint Submission in Resp. to the Feb. 2, 2015 Order of the Ct. at 4, ECF No. 6481 (emphasis added).)

Contrary to Sagapolutele's contentions, this amendment did not adversely affect the Settlement Class—much less materially so. In fact, the amendment *expanded* settlement benefits to encompass any additional Settlement Class Members who died after Preliminary Approval but before Final Approval, and provided 270 days to receive a CTE diagnosis for such players—thereby, increasing the time covered by the definition of Death with CTE by *nine* months. (*See id.* at 4-5.)

Accordingly, far from being materially adverse to Settlement Class Members, these amendments actually made the Settlement Agreement *more beneficial* by expanding the availability of an award for Death with CTE to a larger class of claimants.  (*Id.*)  Thus, as this Court previously held, "[b]ecause these changes improved the deal for Class Members without providing any concessions to the NFL Parties, an additional round of notice for Class Members is unnecessary."  *In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. at 386; *see also In re Baby Prods. Antitrust Litig.*, 708 F.3d at 175 n.10, 182; *In re Diet Drugs Prods. Liab. Litig.*, 2010 WL 2735414, at *6; *Harris*, 615 F. Supp. at 244.

### B.    The Original Settlement Notice Was Sufficient

Sagapolutele's due process argument fails for an additional reason.  The original notice, as this Court held, was clear that not all CTE diagnoses would be compensated under the Settlement Agreement, and the publicly available amendments sufficiently defined those CTE diagnoses eligible for compensation.

*First*, the Short- and Long-Form notices distributed to Settlement Class Members adequately protected their due process rights.  To comport with due process, settlement notice need only be adequate and summarize the terms of the Settlement; perfection and painstaking detail are not required.  *See In re Nat'l Football League Concussion Injury Litig.*, 307 F.R.D. at 382-83; *see also In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1104-05 (5th Cir. 1977) (explaining that notice need not "[be] perfectly correct in its form," and instead that "[t]he standard [] is that the notice . . . must contain information that a reasonable person would consider to be material in making an informed, intelligent decision" about whether to opt out); *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 124 (S.D.N.Y 1997) ("The notice need not be highly specific, and indeed 'numerous decisions, no doubt recognizing that notices to class members can practicably contain only a limited amount of information, have approved very

general descriptions of the proposed settlement.'" (quoting *Weinberger* v. *Kendrick*, 698 F.2d 61, 70 (2d Cir. 1982)).

As this Court previously held in overruling objections that "the Long-Form Notice is confusing because the term 'Death with CTE' appears several times without the accompanying cutoff date, . . . [b]oth the Summary Notice and the Long-Form Notice indicate that **only 'certain' cases of CTE are covered**." *In re Nat'l Football League Concussion Injury Litig.*, 307 F.R.D. at 383-84 (emphasis added) (citing Summary Notice at 1, ECF No. 6086-2; Long-Form Notice at 1, ECF No. 6086-1). Moreover, as stated above, the Long-Form Notice specifically stated that the Settlement's benefits include "[m]onetary awards for **diagnoses** of Death with CTE **prior to July 7, 2014** . . . ." (*See* Long-Form Notice at 6, ECF No. 6086-1 (emphasis added).) Both the Short- and Long-Form notice thus alerted Settlement Class Members that an award for CTE was not absolute or unconditional; rather, a Settlement Class Member would need to satisfy "certain" criteria before any award would be made. That is the case here—under the original and amended Settlement Agreement, Sagapolutele must satisfy particular criteria before receiving an award of Death with CTE, including that she obtain her decedent's CTE diagnosis within a predetermined time period—and the original notice satisfied Sagapolutele's Due Process rights by alerting her to this fact.

*Second*, the Parties made the February 2015 amendments publicly available months prior to this Court's April 22, 2015 Final Approval Order (as amended May 8, 2015). Not only did the Parties post a copy of the amendments to this Court's publicly available PACER database as early as February 2015, but they also submitted a redline showing the exact changes to be made to the Settlement Agreement as a result of those proposed amendments. (Class Counsel and the NFL Parties' Joint Submission in Resp. to the Feb. 2, 2015 Order of the Ct., Ex.

A, Feb. 13, 2015, ECF No. 6481-1.)  This is especially significant in light of the widespread attention paid to the docket in this matter by, among others, the more than 5,000 Retired NFL Football Players who, at the time of settlement, were represented by counsel in MDL 2323.  *See In re Nat'l Football League Concussion Injury Litig.*, 307 F.R.D. at 389; *see also In re Diet Drugs Prods. Liab. Litig.*, 2010 WL 2735414, at *4  (holding that no notice of settlement agreement amendments was required because, in part, "notice of the proposed Tenth Amendment, along with an opportunity to object, was supplied to representatives of all class members with active cases in MDL No. 1203.").

In fact, the Parties' efforts to publicize the amendments were successful, as evidenced by the fact that over 40 Settlement Class Members filed objections to the amendments, *including objections to the very Death with CTE provision about which Sagapolutele complains*.  (*See* Armstrong Objectors' Suppl. Obj. to the Am. Class Action Settlement, ECF No. 6503; *see also* Miller Suppl. Obj. to Settlement, ECF No. 6484.)  While these objectors raised somewhat different concerns than Sagapolutele raises here—they argued that the award of Death with CTE should be available to Retired NFL Football Players who die after Final Approval—they nonetheless sought, at least in part, the same relief that Sagapolutele appears to now seek: "modification of the Final Order and Judgment by removal of the deadline to obtain a Qualifying Diagnosis of Death with CTE."  (Pl. Mot. at 2.)  This Court properly rejected these objectors' requests, and similarly should reject Sagapolutele's efforts here.

## II.

## SAGAPOLUTELE IS NOT ENTITLED TO REWRITE
## THE SETTLEMENT AGREEMENT

Even if Sagapolutele had established that notice of the amendments should have been given—which she has not, as explained above—her Motion would fail.  Sagapolutele first

argues that under Rule 60(a), the Court should rewrite the Settlement Agreement and amend the Final Order and Judgment because the Court made a "clerical error" when approving the amendments to the Settlement Agreement. Second, Sagapolutele contends that amendment under Rule 60(b)(6) is justified by "extraordinary circumstances." Finally, Sagapolutele argues that the Court's inherent authority permits it to amend the Final Order and Judgment here. (Pl. Mem. at 18-24.) These arguments lack merit.

*First*, Sagapolutele has not made the necessary showing under Rule 60(a). It is well settled that amendment of judgments pursuant to Rule 60(a) "is limited to the correction of 'clerical mistakes'; it encompasses only errors 'mechanical in nature, apparent on the record, and not involving an error of substantive judgment.'" *In re Diet Drugs Prods. Liab. Litig.*, 200 F. App'x 95, 103 (3d Cir. 2006) (quoting *Pfizer Inc.* v. *Uprichard*, 422 F.3d 124, 129 (3d Cir. 2005)). For Rule 60(a) to apply, the change to be corrected must not "affect[] the substantive rights of the parties." *Id.* at 103-04 (quoting *Pfizer*, 422 F.3d at 130) (holding Rule 60(a) inapplicable because the "correction here goes beyond the correction of a 'mindless and mechanistic mistake'" (quotation omitted)). Here, Sagapolutele has only ever alleged that the amendments in question were deliberate attempts by the Parties to modify the criteria for the Qualifying Diagnosis of Death with CTE. She cannot simultaneously argue these amendments were mere "clerical mistakes." As such, Rule 60(a) is inapplicable here.

*Second*, Sagapolutele's attempts to seek relief under Rule 60(b)(6) fail, too.[7] Relief under Rule 60(b) is "not ordinarily . . . available to non-parties," *Federman* v. *Artzt*, 339 F. App'x 31, 33-34 (2d Cir. 2009), and "[a]bsent class members such as [movant] are treated, with limited exceptions inapplicable here, as non-parties to a class action." *Adelson* v. *Ocwen*

---

[7]    Although Sagapolutele broadly states she is moving for relief under Rule 60(b), her memorandum of law cites only to the Rule's catchall provision, which permits the modification of a final judgment based on "any other reason that justifies relief." Fed. R. Civ. P. 60(b)(6).

*Fin. Corp.*, 621 F. App'x 348, 351 (7th Cir. 2015); *Federman*, 339 F. App'x at 33-34 (holding

that absent class members who did not object to settlement were not "parties" for purposes of

Rule 60(b) and declining "to expand the narrow exception to the general rule that non-parties

cannot bring Rule 60(b) motions"); *In re Four Seasons Sec. Laws Litig.*, 525 F.2d 500, 504 (10th

Cir. 1975) (absent class member "did not become a party for the purposes of Rule 60(b) to

enable him to challenge the adequacy or nature of the settlement"); *see also* Fed. R. Civ. Proc.

60(b) ("the court may relieve *a party* . . . from a final judgment, order, or proceeding for the

following reasons" (emphasis added)).  Sagapolutele did not object, intervene, or otherwise take

steps to become a "party" to this action, so Rule 60(b) is not available to her here.  *See also*

Newberg on Class Actions § 18:40 (5th ed.) ("[A]ll the circuits that have considered the issue

have taken the position that absent class members are generally not authorized to file Rule 60

motions.").

    Even if Sagapolutele were a "party," she has not met her burden to seek relief

pursuant to Rule 60(b)(6) because such "[r]elief . . . may only be granted under extraordinary

circumstances where, without such relief, an *extreme and unexpected hardship* would occur."

*Sawka* v. *Healtheast, Inc.*, 989 F.2d 138, 140 (3d Cir. 1993) (emphasis added); *see also*

*Matthews, Wilson & Matthews, Inc.* v. *Capital City Bank*, 614 F. App'x 969, 971 (11th Cir.

2015) (Rule 60(b)(6) "is an extraordinary remedy which may be invoked only upon a showing of

exceptional circumstances, and the party seeking relief has the burden of showing that absent

such relief, an extreme and unexpected hardship will result." (internal quotations omitted));

*Orlando Residence, Ltd.* v. *Hilton Head Hotel Inv'rs*, No. 89-cv-0662, 2013 WL 1103027, at *8

(D.S.C. Mar. 15, 2013), *aff'd sub nom. Orlando Residence, Ltd.* v. *Nelson,* 565 F. App'x 212

(4th Cir. 2014) ("Relief is rarely granted under . . . [Rule] 60(b)(6).").  The bar for relief under

Rule 60(b) is particularly high where the movant seeks to amend in "a class action [because] a too liberal application of Rule 60(b) would undermine the finality of judgments entered in such actions and would discourage their settlement." *Inmates of Suffolk Cty. Jail* v. *Rufo*, No. 71-cv-00162, 2015 WL 6958070, at *2 (D. Mass. Nov. 10, 2015); *see also Blue Diamond Coal Co.* v. *Trustees of UMWA Combined Ben. Fund*, 249 F.3d 519, 524 (6th Cir. 2001) ("[R]elief under Rule 60(b) is circumscribed by public policy favoring finality of judgments and termination of litigation.  This is especially true in an application of subsection (6) of Rule 60(b) . . . ." (internal quotations omitted)).

Sagapolutele has not made any showing whatsoever that the amendment will cause her any hardship, much less "extreme and unexpected hardship."  Tellingly, she has not shown—through supporting exhibits, affidavits, or even proffered facts in her brief—that the brain of her late husband, who passed away in 2009, has been examined by a board-certified neuropathologist and diagnosed with CTE at *any time*, much less that she would, but for the amendment, be entitled to an award.  She also has not established that a belated diagnosis years after death (indeed, her husband died approximately eight years ago) would even be possible given the deterioration of brain matter after death.  Nor does she seek to justify her apparent delay in seeking an examination.  Instead, Sagapolutele invites only speculation and offers only conclusory assertions as to how the purported change impacts her rights under the agreement, and she therefore fails to show that the exceptional remedy of Rule 60(b)(6) is warranted here.

*Finally*, Sagapolutele's invocation of the Court's "inherent authority" to amend a judgment does not salvage her claim because that authority is no broader than that provided by Rule 60, which, as explained above, does not permit Sagapolutele the relief she seeks.  *See* 20 Fed. Prac. & Proc. Deskbook § 104 (after 28 days from entry, "the judgment may be attacked,

other than by appeal, only as provided in Rule 60."); 11 Fed. Prac. & Proc. Civ. § 2852 (3d ed.) (while "the power of a court to modify an interlocutory judgment or order at any time prior to final judgment remains unchanged and is not limited by the provisions of Rule 60(b) . . . , [t]he rule does apply, however, to all final judgments entered in civil actions."). Sagapolutele's cases are not to the contrary; none holds that Courts have inherent authority to amend a final judgment approving a settlement agreement. (*See* Pl. Mem. at 23-24.) Three of the five cited cases concern only a court's authority to *enforce* a settlement agreement. *See Kokkonen* v. *Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 381 (1994) (holding that a district court has inherent authority to *enforce* a settlement agreement under particular circumstances); *Roman-Oliveras* v. *Puerto Rico Elec. Power Auth.*, 797 F.3d 83, 86-87 (1st Cir. 2015) (same); *Hensley* v. *Alcon Labs., Inc.*, 277 F.3d 535, 540-41 (4th Cir. 2002) (same). The fourth case, *In re Linerboard Antitrust Litig.*, 223 F.R.D. 357, 363 (E.D. Pa.), *amended*, 223 F.R.D. 370 (E.D. Pa. 2004) simply stands for the proposition that a court overseeing an MDL has inherent power to control the discovery process—an issue not relevant or in dispute here. Finally, while the fifth case involved an *amendment* of an order entering a settlement agreement, the Court did not hold that the district court had inherent authority to make the amendment; rather, it simply held that "the merits of [the district court's] decision to amend are no longer open to review." *F.A.C., Inc.* v. *Cooperativa de Seguros de Vida de Puerto Rico*, 449 F.3d 185, 190–91 (1st Cir. 2006).

In sum, Sagapolutele has not demonstrated (and cannot demonstrate) that she is entitled to rewrite the Settlement Agreement.

## Conclusion

For the foregoing reasons, the NFL Parties respectfully request that the Court deny the Motion in its entirety.

Dated:  September 28, 2017

Respectfully submitted,

/s/ Brad S. Karp
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
Brad S. Karp
Bruce Birenboim
Lynn B. Bayard
1285 Avenue of the Americas
New York, NY 10019-6064
Tel:   (212) 373-3000
bkarp@paulweiss.com

PEPPER HAMILTON LLP
Sean P. Fahey
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA 19103-2799
Tel:   (215) 981-4000

*Attorneys for Defendants the National Football*
*League and NFL Properties LLC*

## **CERTIFICATE OF SERVICE**

It is hereby certified that a true copy of the foregoing Memorandum of Law of the National Football League and NFL Properties LLC in Opposition to Settlement Class Member Yvonne Sagapolutele's Motion to Modify the Amended Final Order and Judgment was served electronically via the Court's electronic filing system on the 28th day of September, 2017, upon all counsel of record.

Dated:  September 28, 2017                    /s/Brad S. Karp
                                         Brad S. Karp



# NFL CONCUSSION SETTLEMENT
*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

## POST-APPEAL NOTICE OF DENIAL OF MONETARY AWARD CLAIM
### DATE OF NOTICE: **September 26, 2019**

### I. SETTLEMENT CLASS MEMBER INFORMATION

| | |
|---|---|
| **Settlement Program ID** | 950012548 |

| **Name:** | First<br>Robin | M.I.<br>B | Last<br>Cornish |
|---|---|---|---|

| | |
|---|---|
| **Settlement Class Member Type** | Representative Claimant |
| **Lawyer** | O'Hanlon, Demerath & Castillo |

| **Qualifying Diagnosis** | Death with CTE (Chronic Traumatic Encephalopathy) | **Date of Qualifying Diagnosis** | 8/23/08 |
|---|---|---|---|

| | |
|---|---|
| **Appellant** | Settlement Class Member |
| **Appellee** | NFL |

### II. EXPLANATION OF CLAIM DETERMINATION

This Notice is an official communication from the Claims Administrator for the NFL Concussion Settlement Program. The Special Master reviewed the appeal and determined the following, which is final and binding:

Appeal denied. Appellant did not show clear and convincing evidence of error in the Claims Administrator's decision. The Special Master's decision is a factual determination and is final and binding.

| 1. | Special Master ruled that the claim is denied |
|---|---|

### III. HOW TO CONTACT US WITH QUESTIONS OR FOR HELP

If you are represented by a lawyer, consult with your lawyer if you have questions or need assistance. If you are unrepresented and have any questions about this Notice or need help, contact us at 1-855-887-3485 or send an email to ClaimsAdministrator@NFLConcussionSettlement.com.  If you are a lawyer, call or email your designated Firm Contact for assistance. For more information about the Settlement program, visit the official website at www.NFLConcussionSettlement.com to read the Frequently Asked Questions or download a copy of the complete Settlement Agreement.

# Exhibit 11

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br><br>MDL No. 2323<br><br>Hon. Anita B. Brody |
| Kevin Turner and Shawn Wooden, *on behalf of themselves and others similarly situated*,<br><br>                    Plaintiffs,<br><br>                    v.<br><br>National Football League and NFL Properties, LLC, successor-in-interest to NFL Properties, Inc.<br>                    Defendants. | Civ. Action No.: 14-cv-00029-AB |
| THIS DOCUMENT RELATES TO: Settlement Class Member Robin Cornish (SPID 950012548) | Hon. Anita B. Brody |

**RESPONSE OF THE NATIONAL FOOTBALL LEAGUE AND
NFL PROPERTIES LLC IN OPPOSITION TO ROBIN CORNISH'S
OBJECTION TO POST-APPEAL NOTICE OF DENIAL OF
<u>MONETARY AWARD CLAIM</u>**

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS.................................................................................................... i

PRELIMINARY STATEMENT ...................................................................................... 1

BACKGROUND ............................................................................................................. 2

ARGUMENT .................................................................................................................. 4

      A.     Qualifying Diagnoses of Death with CTE Must Be Rendered Prior to the
            Deadline Set Forth in the Settlement Agreement ................................................... 4

Conclusion .................................................................................................................... 6

The National Football League and NFL Properties LLC (collectively, the "NFL Parties") respectfully submit this response in opposition to Robin Cornish's Objection to Post-Appeal Notice of Denial of Monetary Award Claim (the "Objection").  In the Objection, Ms. Cornish seeks reversal of the Special Master's decision denying her appeal of a Qualifying Diagnosis of Death with CTE based on purported legal error.  For the reasons set forth below, Ms. Cornish's arguments are without merit, and the Objection should be denied.

## PRELIMINARY STATEMENT

On June 25, 2019, the Claims Administrator denied Ms. Cornish's claim for a Qualifying Diagnosis of Death with CTE on behalf of the late Frank Cornish.[1]  The Claims Administrator explained that Ms. Cornish's claim was insufficient to satisfy the Settlement criteria for the alleged Qualifying Diagnosis because it did not provide any evidence that the diagnosing physician, Dr. Ronald Hamilton, personally performed a post-mortem examination of Mr. Cornish's brain before the deadline set forth in the Settlement Agreement (here, April 22, 2015 given that Mr. Cornish died prior to Preliminary Approval of the Settlement).  Ms. Cornish then appealed her claim determination to the Special Masters, arguing that (1) the date on which Dr. Hamilton actually diagnosed Mr. Cornish does not matter, because FAQ 99 allegedly establishes that the "diagnosis date" for Death with CTE is the date of the player's death, regardless of when the actual diagnosis later occurs; and (2) if the Claims Administrator determines that a diagnosing physician must render a diagnosis of Death with CTE prior to a deadline set forth in the operative Settlement Agreement, then the Settlement Agreement violates Settlement Class Members' due process rights because it purportedly reflects an adverse change to the original Settlement Agreement without

---

[1]    Mr. Cornish's death certificate and autopsy report indicate that he died on August 23, 2008 as a result of hypertensive heart disease.  (*See* Death Certificate, Doc. No. 199406; Autopsy Report, Doc. No. 199407.)

proper notice.  Upon considering these arguments, the Special Master denied the appeal and concurred with the Claims Administrator's determination that Ms. Cornish's claim did not satisfy the Settlement criteria for a Qualifying Diagnosis of Death with CTE.  Ms. Cornish now asks the Court to overturn the Special Master's determination on legal grounds.

In the Objection, Ms. Cornish advances a nearly identical version of the first argument set forth in her prior appeal:  Dr. Hamilton's alleged diagnosis of Mr. Cornish was timely pursuant to Settlement FAQ 99 because the "diagnosis date" purportedly is the date of the player's death as opposed to when the diagnosis actually occurred.  There is no merit to this argument.

In fact, the Injury Definition for Death with CTE set forth in the Settlement Agreement expressly requires that a board-certified neuropathologist render the diagnosis prior to the Final Approval Date (April 22, 2015) or within 270 days after the player's death when the player died between Preliminary and Final Approval.  The Objection willfully ignores the express language of the Settlement Agreement while attempting to twist the meaning of FAQ 99 to displace the Settlement Agreement's unambiguous requirements.  Here, Ms. Cornish did not provide—and undoubtedly cannot provide—any evidence that Dr. Hamilton rendered the diagnosis prior to the April 22, 2015 deadline, and that factual record is final and binding for this Objection.

For these reasons, and those set forth herein and in the NFL Parties' opposition to Ms. Cornish's appeal, the Objection should be denied.

## **BACKGROUND**

This Objection is one of a series of 19 separate objections filed by the law firm of O'Hanlon, Demerath & Castillo ("O'Hanlon") on behalf of claimants whose Claim Packages relied on undated letters from neuropathologist Dr. Ronald Hamilton purporting to render Qualifying Diagnoses of Death with CTE.  For each of these claims, neither Dr. Hamilton's undated letter nor the remaining Claim Package materials provide any evidence that Dr. Hamilton

actually rendered a Qualifying Diagnosis of Death with CTE prior to Final Approval of the Settlement (or within 270 days of death when the Retired Player died between Preliminary and Final Approval).

With knowledge that Mr. Cornish and its other clients never received a diagnosis of Death with CTE prior to the deadline set forth in the Settlement Agreement, O'Hanlon has engaged in a lengthy campaign to evade the deadline plainly established for Qualifying Diagnoses of Death with CTE.  On August 15, 2017, O'Hanlon, on behalf of client Yvonne Sagapolutele, filed a Motion to Modify the Amended Final Order and Judgment, alleging that the Settlement Agreement's deadline to obtain a Qualifying Diagnosis of Death with CTE was "imposed after the deadline to opt out and without notice to Class Members."  (Mem. of Law in Supp. of Absent Class Member and Pl. Yvonne Sagapolutele's Mot. to Modify the Am. Final Order and J. at 18, 12-md-2323, ECF No. 8263-2 (the "Motion to Modify the Amended Final Order and Judgment").)  After full briefing, the Court denied the motion without prejudice to Ms. Sagapolutele's (or other similarly situated Settlement Class Members') ability to raise the issue at a later time if she filed a Death with CTE claim that would have been valid but for the deadline.  (Order, 12-md-2323, ECF No. 8557.)  O'Hanlon then waited over 16 months to file any Death with CTE claims—ultimately filing 20 separate claims on February 5, 2019 (the day before the deadline for pre-Effective Date claims)—and relying on undated letters from Dr. Hamilton with the clear intention of obfuscating the timing and nature of the purported Death with CTE diagnoses.  O'Hanlon is now back before the Court advancing meritless arguments with respect to Qualifying Diagnoses of Death with CTE that the Court should summarily reject.

## <u>ARGUMENT</u>

In the Objection, Ms. Cornish argues that Dr. Hamilton's alleged diagnosis was timely because the "diagnosis date" for a Death with CTE claim purportedly is the date of the player's death. This argument is wholly without merit.

### A.    Qualifying Diagnoses of Death with CTE Must Be Rendered Prior to the Deadline Set Forth in the Settlement Agreement

*First*, Ms. Cornish argues that the Special Master erred in denying her appeal because a diagnosing physician need not render a Qualifying Diagnosis of Death with CTE prior to *any* deadline so long as the retired player decedent passed away before the Settlement's Final Approval Date. (*See* Objection at 5-7.) That argument, however, is contradicted by the clear terms of the Settlement Agreement.

For a Qualifying Diagnosis of Death with CTE, the Settlement Agreement explicitly requires that a diagnosing physician render the diagnosis prior to a specified deadline set by the Settlement Agreement. Specifically, Section 2.1(aa) of the Settlement Agreement provides that the Qualifying Diagnosis of "Death with CTE is defined in Exhibit 1," and Exhibit 1 states that the definition of Death with CTE is: "For Retired NFL Football Players who died prior to the Final Approval Date, *a post-mortem diagnosis of CTE made by a board-certified neuropathologist prior to the Final Approval Date, provided that a Retired NFL Football Player who died between July 7, 2014 and the Final Approval Date shall have until 270 days from his date of death to obtain such a postmortem diagnosis*." (Settlement Agreement, Ex. A-1 at 5 § 5 (emphasis added).) Section 6.3(f) of the Settlement Agreement reiterates that requirement.

In the Objection, as in her prior appeal, Ms. Cornish argues that, where a player died before the Final Approval Date, *no deadline applies* to when a physician must render a Qualifying Diagnosis of Death with CTE because "the diagnosis date for Death with CTE is the date of the

Player's death, even if the diagnosis occurs later." (Objection at 5; *see also* Written Statement in

Support of Class Member's Appeal of the Claims Administrator's Notice of Denial of Monetary

Award Claim, Doc. No. 210928 at 5 (arguing that "the only date that is relevant in determining the

date of a Qualifying Diagnosis for Death with CTE is the date of the Player's death").) As support

for this argument, Ms. Cornish cites Settlement FAQ 99 (formerly Settlement FAQ 93), which

states in part:

> *Death with CTE*: For these claims, the date of the Qualifying
> Diagnosis is the date of the Player's death, even though the
> diagnosis is not made until after the Player dies. The Monetary
> Award is based on the Player's age when he died.

(Settlement FAQ 99.)

Ms. Cornish's argument rests on willful ignorance of the Settlement Agreement and a

misinterpretation of Settlement FAQ 99. Specifically, as outlined above, the Settlement

Agreement plainly requires that, "[f]or Retired NFL Football Players who died prior to the Final

Approval Date, a post-mortem diagnosis" of Death with CTE must be "made by a board-certified

neuropathologist ***prior to the Final Approval Date*** . . . ." (Settlement Agreement Ex. A-1 at 5 § 5

(emphasis added).) Moreover, if, as Ms. Cornish argues, the Settlement Agreement required only

that a Retired NFL Football Player died prior to the Final Approval Date in order for a diagnosis

made at *any unlimited future date* to be timely, the Settlement Agreement would not include

subsequent language providing that a player who died between July 7, 2014 and April 22, 2015

"***shall have until 270 days from his date of death to obtain such a postmortem diagnosis***." (*Id.*)

Moreover, Settlement FAQ 99 does not—and cannot—alter the Settlement Agreement's

Injury Definition setting forth the date by which a Diagnosing Physician must have *actually made*

a Death with CTE diagnosis. Instead, FAQ 99 concerns the date of diagnosis used ***for calculating***

***compensation***. The Parties to the Settlement Agreement did not wish to reduce the compensatory

award of a decedent by calculating the award value from the date of the neuropathological examination and diagnosis because, unlike living claimants, the decedent would not have aged between death and the relevant examination. Thus, the Death with CTE discussion in Settlement FAQ 99 clearly states that "[t]he ***Monetary Award*** is based on the Player's age when he died." (Settlement FAQ 99 (emphasis added).)  Ms. Cornish's counsel shamelessly excluded that clarifying language from the FAQ quotation included in the Objection. (*See* Objection at 5.)

For these reasons, Ms. Cornish's argument lacks any merit whatsoever.

<u>Conclusion</u>

For the foregoing reasons, the NFL Parties respectfully request that the Court deny Ms. Cornish's Objection and affirm the Special Master's decision.

Dated: November 11, 2019                  Respectfully submitted,

                                          /s/ Brad S. Karp
                                          PAUL, WEISS, RIFKIND, WHARTON
                                            & GARRISON LLP
                                          Brad S. Karp
                                          Bruce Birenboim
                                          Lynn B. Bayard
                                          Claudia Hammerman
                                          Douglas M. Burns
                                          1285 Avenue of the Americas
                                          New York, NY 10019-6064
                                          Tel: (212) 373-3000
                                          bkarp@paulweiss.com

                                          *Attorneys for the National Football League and*
                                          *NFL Properties LLC*

6

# Exhibit 12

**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br><br>MDL No. 2323 |
| THIS DOCUMENT RELATES TO:<br><br>ALL CLAIMS LISTED BELOW. | **Hon. Anita B. Brody** |

## SETTLEMENT IMPLEMENTATION ORDER

**AND NOW,** this 16th day of June, 2020, it is **ORDERED** that the following claim

appeals are **REMANDED** to the Special Master for further explanation[1]:

1. SPID ▮▮▮▮▮
2. SPID ▮▮▮▮▮
3. SPID ▮▮▮▮▮
4. SPID ▮▮▮▮▮
5. SPID ▮▮▮▮▮

---

[1] In each of these cases, the Settlement Class Member submitted a claim for a diagnosis of Death With CTE. In each, the Claims Administrator denied the claim for two reasons: (1) failure to comply with the deadline for obtaining a Death With CTE Diagnosis; and (2) failure to provide proof that a physician examined the deceased's brain-tissue. In each case, the Special Master affirmed the denial, stating that the Appellant did not point to clear and convincing evidence of error in the Claims Administrator's decision. But the Special Master did not specify whether this conclusion applied to *both* of the Claims Administrator's reasons or only *one* of those reasons.

For at least two claims—SPID Nos. ▮▮▮▮ and 950012548—there is evidence in the record that a doctor personally examined slides with brain tissue of the deceased player. But the Claims Administrator appears to have denied these claims for both reasons above: that (1) the claim packages did not satisfy the diagnosis deadline for Death with CTE claims, and (2) the claims packages did not establish that a doctor reviewed the deceased player's brain tissue. The Special Master affirmed the Claims Administrator's decisions, but never specified the grounds of the affirmance. For these claims, as well as every other claim listed in this Order, the Special Master must specify whether clear and convincing evidence of error exists as to each independent basis given by the Claims Administrator for the denials.

1

6. SPID ████████

7. SPID ████████

8. SPID 950012548

9. SPID ████████

10. SPID ████████

11. SPID ████████

12. SPID ████████

13. SPID ████████

14. SPID ████████

15. SPID ████████

16. SPID ████████

17. SPID ████████

18. SPID ████████

19. SPID ████████

20. SPID ████████

June 16, 2020

s/ANITA B. BRODY, J. _____
ANITA B. BRODY, J.

2

# Exhibit 13

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| | : | |
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | : : : | No. 2:12-md-02323-AB |
| | : | MDL No. 2323 |
| | : | |
| | : | **Hon. Anita B. Brody** |
| THIS DOCUMENT RELATES TO: APPEAL OF REPRESENTATIVE CLAIMANT ROBIN CORNISH REGARDING DENIAL OF MONETARY AWARD | : : : : : : | |
| | : | |

## INTRODUCTION

On February 6, 2019, Representative Claimant Robin B. Cornish filed a claim for benefits under the Amended Settlement Agreement on behalf of her late husband, Frank Cornish, a Retired NFL Football Player. Mr. Cornish passed away on August 23, 2008, and later received a post-mortem diagnosis of Chronic Traumatic Encephalopathy. The Claims Administrator denied the claim for two reasons: (1) failure to meet the diagnosis deadline for Death with CTE claims, and (2) failure to establish that a doctor reviewed Mr. Mims' brain tissue.

Ms. Cornish timely appealed. Special Master Pritchett affirmed the denial, and Ms. Cornish subsequently appealed to the District Court. Following review of Ms. Cornish's objection, the Court has remanded this claim to the Special Master to clarify whether the affirmance applies to one or both of the reasons for denial provided by the Claims Administrator.[1]

While there is no clear and convincing evidence that a diagnosis was made before the appropriate deadline, I do find there is clear and convincing evidence that the diagnosing neuropathologist personally examined Mr. Mims' brain tissue. I therefore re-affirm the Claims Administrator's denial of Ms. Hastings' claim on the first basis only.

## FACTUAL AND PROCEDURAL BACKGROUND

Mr. Cornish passed away at age 40 on August 23, 2008. Doc. 199407. On August 24, 2008, Dr. Marc Krouse, a Tarrant County medical examiner, conducted a post-mortem autopsy and concluded that Mr. Cornish's cause of death was "sudden adult death with evidence of hypertensive heart disease." *Id*.

---

[1]  Settlement Implementation Order, Doc. 225723 (June 17, 2020).

On February 6, 2019, Ms. Cornish filed a claim for relief under the Settlement on behalf of her late husband. Doc. 199403. Dr. Ronald Hamilton, a board-certified neuropathologist, provided a letter stating that he conducted an examination of the late Mr. Cornish's brain tissue based upon "three H&E stained slides" received from the Tarrant County Medical Examiner. Doc. 199405. Dr. Hamilton concluded that the "histopathologic findings are diagnostic of CTE," and that "Frank Cornish had CTE." The letter is undated. *Id.*

On February 20, 2019, the Claims Administrator requested additional documentation, writing:

> The medical records must show a post-mortem diagnosis of CTE made before April 22, 2015 (the Final Approval Date) by a board-certified neuropathologist for a Retired NFL Football Player who died before April 22, 2015. See Section 6.3 (f) of the Settlement Agreement and FAQ 109. Mr. Cornish died on August 23, 2008, and the August 24, 2008 autopsy report signed by Marc A. Krouse does not reference CTE and neither does the death certificate. You provided an undated letter from Dr. Ronald L. Hamilton who diagnosed Mr. Cornish with CTE. You must establish that Dr. Hamilton reviewed Mr. Cornish's brain tissue and made a CTE diagnosis on or before April 22, 2015.

Doc. 201410. Ms. Cornish did not respond to the request for additional documentation within the specified 120-day deadline. The Claims Administrator denied the claim on June 25, 2019 based on the unresolved documentation issue. Doc. 209824.

Ms. Cornish timely appealed. Doc. 210928. On September 26, 2019, Special Master Pritchett denied the Appeal, stating that "Appellant did not show clear and convincing evidence of error in the Claims Administrator's decision." Doc. 214641.

Ms. Cornish appealed the Special Master's decision to the Federal District Court, asserting that the Special Master erred in affirming the Claims Administrator's denial. Doc. 215705. Judge Brody remanded the Claim for further explanation. Doc. 225716.

## DISCUSSION

There are two criteria that must be satisfied under the Settlement Agreement to support a Qualifying Diagnosis of Death with CTE:[2]

(1) a post-mortem diagnosis made by a board-certified neuropathologist based on examination of the deceased Player's brain tissue,[3] *and*

---

[2] *See* Settlement Agreement, Exhibit A-1(5).

[3] As the Court wrote in the Final Order and Judgment approving the Settlement, "no one can conclusively say that someone had CTE until a scientist looks at sections of that person's brain under a microscope to see if abnormally phosphorylated tau protein ('abnormal tau protein') is present, and if so whether it is present in a reportedly unique pattern." *See* In re Nat'l Football League Players' Concussion Injury Litig., 307 F.R.D. 351, 391 (E.D. Pa. 2015). To conclusively diagnose CTE, the diagnosing neuropathologist must therefore examine the Player's brain tissue.

(2) compliance with the deadline for obtaining the post-mortem diagnosis.[4]

The Claims Administrator determined that Ms. Cornish's claim failed to satisfy either of the two requirements.[5] Doc. 201410. By order of Judge Brody, I now review this matter to provide additional clarification following Special Master Pritchett's affirmance. Specifically, I will address "whether clear and convincing evidence of error exists as to each independent basis given by the Claims Administrator" for denial of Ms. Cornish's claim. Doc. 225716.

Based on Dr. Hamilton's personal examination of Mr. Cornish's brain tissue, I conclude that it was clearly erroneous for the Claims Administrator to deny his Claim on that basis, if, indeed, that is what it did.

However, the Settlement explicitly provides that "[a] Qualifying Diagnosis of Death with CTE shall be made only for Retired NFL Football Players who died prior to the Final Approval Date [of April 22, 2015], through a post-mortem diagnosis made by a board-certified neuropathologist prior to the Final Approval Date . . . ." Thus, there are *two* aspects to complying with the deadline for obtaining a Qualifying Diagnosis of Death with CTE: both the date of the Qualifying Diagnosis *and* the date of the neuropathologist's post-mortem examination must be prior to April 22, 2015.

Mr. Cornish tragically passed away at the age of 40 on August 23, 2008. An autopsy was performed the following day, and the medical examiner determined that heart complications were the likely cause of death. Doc. 199407. The report does not mention CTE.

The present claim, based upon a diagnosis of Death with CTE, is supported by a conspicuously undated letter from Dr. Hamilton discussing his analysis of Mr. Cornish's brain tissue. Doc. 199405. The letter was filed on February 6, 2019. Although the date of the Qualifying Diagnosis (that is, the date of Mr. Cornish's passing) is well before the Final Approval Date of April 22, 2015, no proof has been offered to suggest that Dr. Hamilton's examination was timely.

Counsel for Ms. Cornish repeatedly asserts that "the Claims Administrator erroneously concluded that the date of diagnosis is not the date of the Player's death." Doc. 215680. This incorrect assertion misrepresents the deficiency in Ms. Cornish's claim. The problem with Ms. Cornish's claim—as stated by the Claims Administrator—is not the date of the Qualifying Diagnosis; rather, at issue it is what date the diagnosis was **_actually made_**.

---

[4] *See* Settlement Agreement, Section 6.3(f) ("A Qualifying Diagnosis of Death with CTE shall be made only for Retired NFL Football Players who died prior to the Final Approval Date, through a post-mortem diagnosis made by a board-certified neuropathologist prior to the Final Approval Date, provided that a Retired NFL Football Player who died between July 7, 2014 and the Final Approval Date shall have until 270 days from his date of death to obtain such a post-mortem diagnosis.") The Final Approval Date was April 22, 2015. *See* Settlement Portal, *Frequently Asked Questions*, FAQ # 98 (f).

[5] In truth, whether the Claims Administrator accepted that Dr. Hamilton's examination was sufficient to satisfy the first of the requirements is somewhat unclear. I proceed on the understanding, confirmed by Judge Brody's order, that it did not.

Ms. Cornish continues to provide no proof of when Dr. Hamilton examined the late Mr. Cornish's brain tissue to make his diagnosis. Thus, there is no clear and convincing evidence of error in the Claims Administrator's decision that the April 22, 2015 deadline for obtaining a diagnosis was not met.

## <u>CONCLUSION</u>

The Claims Administrator denied Ms. Cornish's claim for two independent reasons.

First, the claim was denied based upon a lack of proof that the diagnosis was timely. I find that there is no evidence that the diagnosis of Death with CTE was obtained before the appropriate deadline.

Second, the claim was denied for failure of the diagnosing physician to personally examine the Player's brain tissue. However, the evidence suggests that Dr. Hamilton did examine the late Mr. Cornish's brain tissue as is necessary to diagnose Death with CTE.

The Claims Administrator correctly concluded that Ms. Cornish failed to show that the diagnosis was obtained before the appropriate deadline. I thus affirm the denial solely on the first basis.

Date: July 15, 2020

_____
David Hoffman, Special Master

# Exhibit 14



# NFL CONCUSSION SETTLEMENT

*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*

No. 2:12-md-02323 (E.D. Pa.)

## POST-APPEAL NOTICE OF DENIAL OF MONETARY AWARD CLAIM
### DATE OF NOTICE: July 17, 2020

### I. SETTLEMENT CLASS MEMBER INFORMATION

| | |
|---|---|
| **Settlement Program ID** | 950012548 |

| **Name:** | First<br>Robin | M.I.<br>B | Last<br>Cornish |
|---|---|---|---|

| | |
|---|---|
| **Settlement Class Member Type** | Representative Claimant |
| **Lawyer** | O'Hanlon, Demerath & Castillo |

| **Qualifying Diagnosis** | Death with CTE (Chronic Traumatic Encephalopathy) | **Date of Qualifying Diagnosis** | 8/23/08 |
|---|---|---|---|
| **Appellant** | Settlement Class Member | | |
| **Appellee** | NFL | | |

### II. EXPLANATION OF CLAIM DETERMINATION

This Notice is an official communication from the Claims Administrator for the NFL Concussion Settlement Program.  The Special Master reviewed the appeal and determined the following:

Please see attached.

| | |
|---|---|
| **1.** | Special Master ruled that the claim is denied |

### III. HOW TO CONTACT US WITH QUESTIONS OR FOR HELP

If you are represented by a lawyer, consult with your lawyer if you have questions or need assistance. If you are unrepresented and have any questions about this Notice or need help, contact us at 1-855-887-3485 or send an email to ClaimsAdministrator@NFLConcussionSettlement.com.  If you are a lawyer, call or email your designated Firm Contact for assistance. For more information about the Settlement program, visit the official website at www.NFLConcussionSettlement.com to read the Frequently Asked Questions or download a copy of the complete Settlement Agreement.



# Exhibit 15

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | § § § § § § | No. 2:12-md-02323-AB<br><br>MDL No. 2323<br><br>**Hon. Anita B. Brody** |
| THIS DOCUMENT RELATES TO: ALL CLAIMS FOR CLASS MEMBERS LISTED BELOW[1] | § § § | |

---

**SUPPLEMENT TO SETTLEMENT CLASS MEMBERS' OBJECTIONS TO THE SPECIAL MASTER'S DECISIONS**

---

TO THE HONORABLE JUDGE BRODY:

For the reasons previously provided to the Court in their Objections, Class Members respectfully request the Court sustain their objections to the Special Master's decisions and order approval of their claims.

After Class Members filed their Objections, the Court requested that the Special Master provide further explanation regarding the standard of review he used in affirming the denial of the Class Members' claims.[2]  The Special Master has now

---

[1]   "Class Members" refers to the 20 class members identified in the Court's Settlement Implementation Order dated June 16, 2020, who are identified as SPID Nos. ███████████ 950012548, ███████████, and ███████████

[2]   In its June 16, 2020 order, the Court noted that the claims administrator had denied Class Members' claims for two reasons: (1) failure to comply with the deadline for obtaining a Death with CTE Diagnosis; and (2) failure to provide proof that a physician examined the deceased's brain tissue.  The Court asked the Special Master to specify whether he applied a clear and convincing evidence of error standard of review to both of these reasons.

Regarding two claims — SPID Nos. ███████ and 950012548 — the Court asked the Special Master to explain whether his affirmance was based on both of the above two reasons, or only the former reason.

1

clarified the standard of review he used.[3]

Accordingly, unless the Court requires additional briefing or a hearing on Class Members' Objections, Class Members respectfully request the Court sustain their previously-filed objections, reverse the Special Master's decisions, and order approval of Class Members' claims.

Dated:  August 14, 2020

Respectfully Submitted:

/s/ Justin Demerath

**Justin Demerath**
Texas State Bar No. 24034415
**David Campbell**
Texas State Bar No. 24057033
O'HANLON, DEMERATH & CASTILLO
808 West Avenue |  Austin, TX 78701
Tel: (512) 494-9949  |  Fax: (512) 494-9919
jdemerath@808west.com
dcampbell@808west.com

**Counsel for Class Members**

---

[3]   In response to the Court's request, the Special Master has explained that he applied that standard of review to both reasons.

The Special Master also clarified that for the two claims — SPID Nos. ███████ and 950012548 — in which there was evidence that the board-certified neuropathologist examined brain tissue, the affirmance was based only on the first reason given for denial.

Regarding the other 18 claims, the Special Master asserts that without examining a deceased person's brain tissue, the CTE diagnosis cannot be "conclusively" established.  But there is no medical or legal requirement cited by the Special Master that a board-certified neuropathologist's CTE diagnosis be "conclusive" as opposed to medically reasonable.  Moreover, the Amended Settlement Agreement provides no basis for second-guessing the diagnosis of a board-certified neuropathologist — it simply requires a "post-mortem diagnosis by a board-certified neuropathologist of CTE."  See Amended Settlement Agreement [ECF 64810], § 6.3(f).  It is undisputed that Class Members have each received a post-mortem diagnosis by a board-certified neuropathologist of CTE. As a matter of law, that diagnosis is sufficient under the terms of the settlement agreement.

2

## CERTIFICATE OF SERVICE

It is hereby certified that a true copy of the foregoing document was submitted on the Court Portal on August 14, 2020.

/s/ Justin B. Demerath
Justin B. Demerath

# Exhibit 16

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br><br>MDL No. 2323<br><br>Hon. Anita B. Brody |
| Kevin Turner and Shawn Wooden, *on behalf of themselves and others similarly situated*,<br><br>              Plaintiffs,<br><br>              v.<br><br>National Football League and NFL Properties, LLC, successor-in-interest to NFL Properties, Inc.<br>              Defendants. | Civ. Action No.: 14-cv-00029-AB |
| THIS DOCUMENT RELATES TO:<br>Settlement Class Members SPIDs<br><br>█████ 950012548, █████<br><br>and █████. | Hon. Anita B. Brody |

**RESPONSE OF THE NATIONAL FOOTBALL LEAGUE AND NFL PROPERTIES LLC IN OPPOSITION TO SUPPLEMENT TO SETTLEMENT CLASS MEMBERS' OBJECTIONS TO THE SPECIAL MASTER'S DECISION**

The National Football League and NFL Properties LLC (collectively, the "NFL Parties") respectfully submit this response in opposition to the Supplement filed by twenty Settlement Class Members (the "Demerath Claimants") to their Objections to the Special Master's Decisions affirming denial of their facially deficient Death with CTE claims.

Although the NFL Parties' underlying opposition briefs submitted in connection with each Settlement Class Member's Objection conclusively demonstrate why each should be swiftly denied, the NFL Parties feel compelled to respond briefly to the Supplement's new and audacious argument that Dr. Ronald Hamilton's failure to examine brain tissue of eighteen of the deceased players should somehow be excused because the Settlement Agreement purportedly does not permit any "second-guessing" of a CTE diagnosis by a board-certified neuropathologist and because it nowhere states that such diagnoses must be "conclusive as opposed to medically reasonable." (Supplement at 2 n.3.) That argument is frivolous.

According to the very university with which Dr. Hamilton is affiliated, neuropathologists are medical doctors who specialize in the diagnosis of brain and nervous system disease through microscopic examination of brain and nerve tissue in conjunction with radiologic studies.[1] The suggestion that the Settlement Agreement's requirement for a "post-mortem diagnosis of CTE made by a board-certified neuropathologist" requires anything less than an actual examination of brain tissue is meritless, particularly given this Court's prior statements in its Final Approval Order (*see* NFL Objections at 7 (quoting the Court's Final Approval Order as stating "Chronic Traumatic Encephalopathy is a neuropathological diagnosis that currently can only be made post mortem. This means no one can conclusively say that someone had CTE until a scientist looks at sections

---

[1] *See* "Role of the Neuropathologist," UPMC, Neuropathology, available at
https://www.upmc.com/services/pathology/diagnostic-services/anatomic/neuropathology.

of that person's brain under a microscope to see if abnormally phosphorylated tau protein ("abnormal tau protein") is present, and if so whether it is present in a reportedly unique pattern.").)

The denial of the eighteen claims does not amount to "second guessing" a reasonable diagnosis, but instead is the *only* supportable result.  In fact, the only "guessing" here was done by Dr. Ronald Hamilton, who lent his name to "virtually identical, undated, form letter[s]" that essentially posit "it is more likely than not" that these players had CTE at the time of their passing based on the fact they played football."  (*See* July 15, 2020 Special Master Decision at 2 (for SPID 950013154).)   Here, it is entirely irrelevant whether the applicable diagnostic standard is "conclusive" or "medically reasonable" because Dr. Hamilton's actions—providing purported "diagnoses" without any examination of brain tissue—clearly satisfy neither.  Indeed, they fail *any* conceivable medical standard in the field of neuropathology and plainly do not comply with the terms of the Settlement Agreement.

For the foregoing reasons, and those set forth in the Objection responses, the NFL Parties respectfully request that the Court deny these Objections, condemn such frivolous arguments, and affirm the Special Master's decisions.

Dated: December 28, 2020          Respectfully submitted,

/s/ Brad S. Karp
PAUL, WEISS, RIFKIND, WHARTON
  & GARRISON LLP
Brad S. Karp
Bruce Birenboim
Lynn B. Bayard
Claudia Hammerman
Douglas M. Burns
1285 Avenue of the Americas
New York, NY 10019-6064
Tel: (212) 373-3000
bkarp@paulweiss.com

*Attorneys for the National Football League and NFL Properties LLC*

# Exhibit 17

# IN THE UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br>MDL No. 2323 |
| THIS DOCUMENT RELATES TO:<br>ALL CLAIMS LISTED BELOW. | **Hon. Anita B. Brody** |

## ORDER

**AND NOW**, this 24th day of February, 2023, it is **ORDERED** that the Objections of the following Class Members are **DENIED** because the claims packages are insufficient:

1. SPID ███████
2. SPID ███████
3. SPID ███████
4. SPID ███████
5. SPID ███████
6. SPID ███████
7. SPID ███████
8. SPID ███████
9. SPID ███████
10. SPID ███████
11. SPID ███████
12. SPID ███████
13. SPID ███████

14. SPID ▮▮▮

15. SPID ▮▮▮

16. SPID ▮▮▮

17. SPID ▮▮▮

18. SPID ▮▮▮

It is further **ORDERED** that the Objections of the following Class Members are **REMANDED** to the Special Master. The Special Master is instructed to return the claims to the Claims Administrator to further determine the sufficiency of the claims packages:

1. SPID ▮▮▮

2. SPID 950012548

BY THE COURT:

_____s/ANITA B. BRODY, J._
ANITA B. BRODY, J.

# Exhibit 18



# NFL CONCUSSION SETTLEMENT

*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

## NOTICE OF REMAND OF APPEAL FOR RE-REVIEW
### DATE OF NOTICE: **March 3, 2023**

### I. SETTLEMENT CLASS MEMBER INFORMATION

| | |
|---|---|
| **Settlement Program ID** | 950012548 |

| **Name** | First<br>Robin | M.I.<br>B | Last<br>Cornish |
|---|---|---|---|

| | |
|---|---|
| **Settlement Class Member Type** | Representative Claimant |
| **Lawyer** | O'Hanlon, Demerath & Castillo |

### II. CLAIM REMANDED FOR RE-REVIEW

This Notice is an official communication from the Claims Administrator for the NFL Concussion Settlement Program. The Special Master has remanded this claim to the Claims Administrator under Appeal Rule 23(c) for re-review for the issues raised in the appeal. In a re-review, an award may go up or down in amount, or the claim may be denied. We will send you a new determination notice on the outcome of the re-review, which will have a new time for the Settlement Class Member, Co-Lead Class Counsel or the NFL Parties to appeal that result.

### III. HOW TO CONTACT US WITH QUESTIONS OR FOR HELP

If you have any questions about this Notice or need help, call us at 1-855-887-3485 or email ClaimsAdministrator@NFLConcussionSettlement.com.



# Exhibit 19



# NFL CONCUSSION SETTLEMENT

*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

## NOTICE OF DENIAL OF MONETARY AWARD CLAIM
### DATE OF NOTICE: **May 16, 2023**
### DEADLINE TO APPEAL: **June 15, 2023**

### I. SETTLEMENT CLASS MEMBER INFORMATION

| | |
|---|---|
| **Settlement Program ID** | 950012548 |

| **Name** | First<br>Robin | M.I.<br>B | Last<br>Cornish |
|---|---|---|---|

| | |
|---|---|
| **Settlement Class Member Type** | Representative Claimant |
| **Lawyer** | O'Hanlon, Demerath & Castillo |

| **Asserted Qualifying Diagnosis** | Death with CTE (Chronic Traumatic Encephalopathy) | **Date** | 8/23/08 |
|---|---|---|---|
| **Claim Type** | Pre-Effective Date | **Name of Diagnosing Physician** | Hamilton, Ronald L. |

### II. EXPLANATION OF CLAIM DETERMINATION

This Notice is an official communication from the Claims Administrator for the NFL Concussion Settlement Program. We reviewed your Claim Package and determined that you are not entitled to a Monetary Award because:



**1.**

In an Order dated 2/24/2023, Hon. Anita B. Brody ordered the Objection of Class Member Robin B. Cornish (SPID 950012548) remanded to the Special Master and instructed the Special Master to return the claim to the Claims Administrator "to further determine the sufficiency of" the Claim Package. The Special Master remanded the claim to the Claims Administrator on 3/3/2023.

A "Claim Package" is defined in Section 2.1(n) of the Amended Class Action Settlement Agreement as "the Claim Form and other documentation, as set forth in Section 8.2(a)." Section 8.2(a) states that the content of Claim Packages will include, without limitation:
(i) A Claim Form with the Personal Signature of the Retired NFL Football Player (or Representative Claimant) either on the Claim Form or on an acknowledgement form verifying the contents of the Claim Form;
(ii) A Diagnosing Physician Certification;
(iii) Medical records reflecting the Qualifying Diagnosis;
(iv) A HIPAA-compliant authorization form; and
(v) Records in the possession, custody or control of the Settlement Class Member demonstrating employment and participation in NFL Football.

All of these Claim Package content requirements have been met except for Section 8.2(a)(iii), medical records reflecting the Qualifying Diagnosis.

Section 6.3(f) of and Exhibit A-1 to the Settlement Agreement state that, for Retired NFL Football Players who died before the 4/22/2015 Final Approval Date, a Qualifying Diagnosis of Death with CTE shall be made only if the Player was diagnosed through a post-mortem diagnosis of CTE made by a board-certified neuropathologist prior to the 4/22/2015 Final Approval Date. Thus, there are three criteria that must be fulfilled to meet the Settlement's requirements for a Qualifying Diagnosis of Death with CTE:

1. The Retired NFL Football Player Died Before the Final Approval Date:  The Player died in 2008, well before the 4/22/2015 Final Approval Date. This criterion is fulfilled.

2. The Post-Mortem Diagnosis of CTE Was Made by a Board-Certified Neuropathologist:  The diagnosis of CTE was made by Dr. Ronald Hamilton, a board-certified neuropathologist. An AAP member reviewed the Claim Package to determine whether the diagnosis of CTE was medically supported. The AAP member determined that the claim meets the Settlement Agreement's requirement of "a post-mortem diagnosis of CTE made by a board-certified neuropathologist" based on examination of the brain tissue. This criterion is fulfilled.

3. The Post-Mortem Diagnosis of CTE Was Made Prior to the Final Approval Date:  We have been unable to confirm whether the diagnosis was made prior to the 4/22/2015 Final Approval Date in order to meet the Settlement's requirements for a Qualifying Diagnosis of Death with CTE. The one-page letter provided by Dr. Hamilton is undated and does not indicate whether the diagnosis was made prior to 4/22/2015, as required by the Settlement's Injury Definition for the Qualifying Diagnosis of Death with CTE. The date of Dr. Hamilton's diagnosis has not been provided. Therefore, this criterion is not fulfilled.

Because the diagnosis does not fulfill the Settlement's requirements for a Qualifying Diagnosis of Death with CTE, the medical records included in the Claim Package do not reflect a Qualifying Diagnosis, and therefore the Claim Package is not sufficient under Section 8.2(a) of the Settlement Agreement.

Section III below explains your right to appeal this denied claim, but living Retired Players may have the option to submit a new Claim Package under Section 9.1(c)(i) of the Settlement Agreement if they receive a new Qualifying Diagnosis. We will determine whether the new claim can be considered for a Monetary Award based on several factors, including whether the new claim shows materially changed circumstances from the earlier claim.  These materially changed circumstances may include: (a) a different type of Qualifying Diagnosis than the one that was denied; or (b) the same type of Qualifying Diagnosis but with a different diagnosis date supported by additional medical records.  If you submit a new claim within 365 days of the claim that is the subject of this denial notice, Section 10.3(d)(ii) of the Settlement Agreement requires us to audit that new claim if it is based on the same Qualifying Diagnosis as this denied claim, but the new diagnosis was made by a different physician.

## III.  YOUR RIGHT TO APPEAL THIS DETERMINATION

If you have a good faith belief that the decision to deny your Monetary Award claim is incorrect, you may appeal this determination to the Court under Section 9.5 of the Settlement Agreement.  To do so, click the Appeal Denied Claim button on your secure online portal and follow the instructions provided.  You must submit supporting evidence to support your appeal.  Any written statement may not be more than 10 double-spaced pages.  You must do so on or before the Deadline to Appeal stated at the top of this Notice.

If you decide to appeal, the Settlement Agreement requires you to pay an Appeal Fee of $1,000, which you can do using the online PayPal option or by check made payable to the NFL Claims Administrator.  This fee will be refunded if your appeal is successful.  If you are unable to pay the $1,000 fee, you may make a hardship request to us to waive the fee and will have to submit financial information showing a sufficient hardship.

If paying the $1,000 Appeal Fee by check, mail the check to the address below.

NFL Concussion Settlement
Claims Administrator
P.O. Box 25369
Richmond, VA  23260

The Special Master appointed by the Court will decide your appeal based upon a showing by you of clear and convincing evidence.  The Special Master's factual determinations will be final and binding, but you or Class Counsel or the NFL Parties may object to any of the Special Master's conclusions of law, which will then be subject to de novo (*i.e.*, a new) review by the Court.

If an appeal is not submitted on or before the deadline stated at the top of this Notice, the determination in this Notice will become final.

## IV. CLASS COUNSEL'S RIGHT TO APPEAL THIS DETERMINATION

Section 9.5 of the Settlement Agreement also gives Class Counsel the right to challenge our decision to deny your Monetary Award claim.  If Class Counsel chooses to appeal, it must do so by the Deadline to Appeal stated at the top of this Notice and must provide a written copy of its Appeals Form and any supporting evidence to you, the NFL Parties, and us.

If an appeal is taken by you or Class Counsel, the NFL Parties may submit a written opposition (not to exceed 10 double-spaced pages) no later than 30 days after receipt of the Appeals Form.  The party taking the appeal is not permitted to submit a reply.

Class Counsel may also submit a written statement (not to exceed 10 double-spaced pages) in response to your appeal no later than 15 days after receipt of the Appeals Form, and you and the NFL Parties may each submit a reply to any such submission by Class Counsel.

## V. HOW TO CONTACT US WITH QUESTIONS OR FOR HELP

If you have any questions about this Notice or need help, call us at 1-855-887-3485 or email ClaimsAdministrator@NFLConcussionSettlement.com.



Settlement Program ID: 950012548
Claim ID: 9597

 **CONCUSSION SETTLEMENT**

*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

## APPEALS FORM FOR MONETARY AWARD OR DERIVATIVE CLAIMANT AWARD CLAIM DETERMINATION
### DATE OF NOTICE: **May 16, 2023**
### DEADLINE TO APPEAL: **June 15, 2023**

### I. SETTLEMENT CLASS MEMBER INFORMATION

| | |
|---|---|
| **Settlement Program ID** | 950012548 |

| **Name:** | First<br>Robin | M.I.<br>B | Last<br>Cornish |
|---|---|---|---|

| | |
|---|---|
| **Settlement Class Member Type** | Representative Claimant |
| **Primary Counsel** | O'Hanlon, Demerath & Castillo |

### II. REASON FOR THIS APPEAL

Here is a short statement explaining the reason(s) for my appeal. Raise all issues you wish to appeal. Issues not raised at this time will not be addressed by the Court.

The Special Master should reverse the Claims Administrator's latest denial of Class Member Robin B. Cornish's claim because the Claims Administrator's latest Notice denies the claim for the same reason that was already considered and rejected by the Court in its February 24, 2023 Order.

### III. HOW TO SUBMIT THIS FORM

You may submit this Appeals Form and any accompanying documents using one of these methods:

| **By Mail:**<br>(must be postmarked on or before the appeal deadline date) | NFL Concussion Settlement<br>Claims Administrator<br>P.O. Box 25369<br>Richmond, VA 23260 |
|---|---|
| **By Overnight Delivery:**<br>(must be placed with the overnight carrier on or before the appeal deadline date) | NFL Concussion Settlement<br>c/o BrownGreer PLC<br>250 Rocketts Way<br>Richmond, VA 23231 |
| **By Hand Delivery:**<br>(must delivered on or before the appeal deadline date) | NFL Concussion Settlement<br>c/o BrownGreer PLC<br>250 Rocketts Way<br>Richmond, VA 23231 |

### IV. HOW TO CONTACT US WITH QUESTIONS OR FOR HELP

DC-4

If you are represented by a lawyer, consult with your lawyer if you have questions or need assistance. If you are unrepresented and have any questions about this Form or need help, contact us at 1-855-887-3485 or send an email to ClaimsAdministrator@NFLConcussionSettlement.com.  If you are a lawyer, call or email your designated Firm Contact for assistance. For more information about the Settlement Program, visit the official website at www.NFLConcussionSettlement.com, where you can read or download the Rules Governing Appeals of Claim Determinations, Frequently Asked Questions about the Settlement, the complete Settlement Agreement and other helpful materials.

 **CONCUSSION SETTLEMENT**

*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

## APPEALS FORM FOR MONETARY AWARD OR DERIVATIVE CLAIMANT AWARD CLAIM DETERMINATION
### DATE OF NOTICE: **May 16, 2023**
### DEADLINE TO APPEAL: **June 15, 2023**

### I.  SETTLEMENT CLASS MEMBER INFORMATION

| | |
|---|---|
| **Settlement Program ID** | 950012548 |

| **Name:** | First<br>Robin | | M.I.<br>B | Last<br>Cornish |
|---|---|---|---|---|

| **Settlement Class Member Type** | Representative Claimant |
|---|---|

| **Primary Counsel** | O'Hanlon, Demerath & Castillo |
|---|---|

### II. REASON FOR THIS APPEAL

Here is a short statement explaining the reason(s) for my appeal.  Raise all issues you wish to appeal.  Issues not raised at this time will not be addressed by the Court.

The Special Master should reverse the Claims Administrator's latest denial of Class Member Robin B. Cornish's claim because the Claims Administrator's latest Notice denies the claim for the same reason that was already considered and rejected by the Court in its February 24, 2023 Order.

### III.  HOW TO SUBMIT THIS FORM

You may submit this Appeals Form and any accompanying documents using one of these methods:

| **By Mail:**<br>(must be postmarked on or before the appeal deadline date) | NFL Concussion Settlement<br>Claims Administrator<br>P.O. Box 25369<br>Richmond, VA 23260 |
|---|---|
| **By Overnight Delivery:**<br>(must be placed with the overnight carrier on or before the appeal deadline date) | NFL Concussion Settlement<br>c/o BrownGreer PLC<br>250 Rocketts Way<br>Richmond, VA 23231 |
| **By Hand Delivery:**<br>(must delivered on or before the appeal deadline date) | NFL Concussion Settlement<br>c/o BrownGreer PLC<br>250 Rocketts Way<br>Richmond, VA 23231 |

### IV. HOW TO CONTACT US WITH QUESTIONS OR FOR HELP

DC-4

If you are represented by a lawyer, consult with your lawyer if you have questions or need assistance. If you are unrepresented and have any questions about this Form or need help, contact us at 1-855-887-3485 or send an email to ClaimsAdministrator@NFLConcussionSettlement.com.  If you are a lawyer, call or email your designated Firm Contact for assistance. For more information about the Settlement Program, visit the official website at www.NFLConcussionSettlement.com, where you can read or download the Rules Governing Appeals of Claim Determinations, Frequently Asked Questions about the Settlement, the complete Settlement Agreement and other helpful materials.

 **CONCUSSION SETTLEMENT**

*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

## APPEALS FORM FOR MONETARY AWARD OR DERIVATIVE CLAIMANT AWARD CLAIM DETERMINATION

### DATE OF NOTICE: **May 16, 2023**
### DEADLINE TO APPEAL: **June 15, 2023**

### I.  SETTLEMENT CLASS MEMBER INFORMATION

| | |
|---|---|
| **Settlement Program ID** | 950012548 |

| **Name:** | First<br>Robin | M.I.<br>B | Last<br>Cornish |
|---|---|---|---|

| | |
|---|---|
| **Settlement Class Member Type** | Representative Claimant |
| **Primary Counsel** | O'Hanlon, Demerath & Castillo |

### II. REASON FOR THIS APPEAL

Here is a short statement explaining the reason(s) for my appeal.  Raise all issues you wish to appeal.  Issues not raised at this time will not be addressed by the Court.

The Special Master should reverse the Claims Administrator's latest denial of Class Member Robin B. Cornish's claim because the Claims Administrator's latest Notice denies the claim for the same reason that was already considered and rejected by the Court in its February 24, 2023 Order.

### III.  HOW TO SUBMIT THIS FORM

You may submit this Appeals Form and any accompanying documents using one of these methods:

| | |
|---|---|
| **By Mail:**<br>(must be postmarked on or before the appeal deadline date) | NFL Concussion Settlement<br>Claims Administrator<br>P.O. Box 25369<br>Richmond, VA 23260 |
| **By Overnight Delivery:**<br>(must be placed with the overnight carrier on or before the appeal deadline date) | NFL Concussion Settlement<br>c/o BrownGreer PLC<br>250 Rocketts Way<br>Richmond, VA 23231 |
| **By Hand Delivery:**<br>(must delivered on or before the appeal deadline date) | NFL Concussion Settlement<br>c/o BrownGreer PLC<br>250 Rocketts Way<br>Richmond, VA 23231 |

### IV. HOW TO CONTACT US WITH QUESTIONS OR FOR HELP

If you are represented by a lawyer, consult with your lawyer if you have questions or need assistance. If you are unrepresented and have any questions about this Form or need help, contact us at 1-855-887-3485 or send an email to ClaimsAdministrator@NFLConcussionSettlement.com.  If you are a lawyer, call or email your designated Firm Contact for assistance. For more information about the Settlement Program, visit the official website at www.NFLConcussionSettlement.com, where you can read or download the Rules Governing Appeals of Claim Determinations, Frequently Asked Questions about the Settlement, the complete Settlement Agreement and other helpful materials.



# NFL CONCUSSION SETTLEMENT
## IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION
### No. 2:12-md-02323 (E.D. Pa.)

## APPEALS FORM FOR MONETARY AWARD OR DERIVATIVE CLAIMANT AWARD CLAIM DETERMINATION
### DATE OF NOTICE: May 16, 2023
### DEADLINE TO APPEAL: June 15, 2023

### I. SETTLEMENT CLASS MEMBER INFORMATION

| Settlement Program ID | 950012548 |
|---|---|

| Name: | First<br>Robin | M.I.<br>B | Last<br>Cornish |
|---|---|---|---|

| Settlement Class Member Type | Representative Claimant |
|---|---|

| Primary Counsel | O'Hanlon, Demerath & Castillo |
|---|---|

### II. REASON FOR THIS APPEAL

Here is a short statement explaining the reason(s) for my appeal. Raise all issues you wish to appeal. Issues not raised at this time will not be addressed by the Court.

The Special Master should reverse the Claims Administrator's latest denial of Class Member Robin B. Cornish's claim because the Claims Administrator's latest Notice denies the claim for the same reason that was already considered and rejected by the Court in its February 24, 2023 Order.

### III. HOW TO SUBMIT THIS FORM

You may submit this Appeals Form and any accompanying documents using one of these methods:

| **By Mail:**<br>(must be postmarked on or before the appeal deadline date) | NFL Concussion Settlement<br>Claims Administrator<br>P.O. Box 25369<br>Richmond, VA 23260 |
|---|---|
| **By Overnight Delivery:**<br>(must be placed with the overnight carrier on or before the appeal deadline date) | NFL Concussion Settlement<br>c/o BrownGreer PLC<br>250 Rocketts Way<br>Richmond, VA 23231 |
| **By Hand Delivery:**<br>(must delivered on or before the appeal deadline date) | NFL Concussion Settlement<br>c/o BrownGreer PLC<br>250 Rocketts Way<br>Richmond, VA 23231 |

### IV. HOW TO CONTACT US WITH QUESTIONS OR FOR HELP

If you are represented by a lawyer, consult with your lawyer if you have questions or need assistance. If you are unrepresented and have any questions about this Form or need help, contact us at 1-855-887-3485 or send an email to ClaimsAdministrator@NFLConcussionSettlement.com.  If you are a lawyer, call or email your designated Firm Contact for assistance. For more information about the Settlement Program, visit the official website at www.NFLConcussionSettlement.com, where you can read or download the Rules Governing Appeals of Claim Determinations, Frequently Asked Questions about the Settlement, the complete Settlement Agreement and other helpful materials.



# NFL CONCUSSION SETTLEMENT
### IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION
No. 2:12-md-02323 (E.D. Pa.)

## APPEALS FORM FOR MONETARY AWARD OR DERIVATIVE CLAIMANT AWARD CLAIM DETERMINATION
### DATE OF NOTICE: May 16, 2023
### DEADLINE TO APPEAL: June 15, 2023

### I. SETTLEMENT CLASS MEMBER INFORMATION

| Settlement Program ID | 950012548 | | |
|---|---|---|---|
| **Name:** | First<br>Robin | M.I.<br>B | Last<br>Cornish |
| **Settlement Class Member Type** | Representative Claimant | | |
| **Primary Counsel** | O'Hanlon, Demerath & Castillo | | |

### II. REASON FOR THIS APPEAL

Here is a short statement explaining the reason(s) for my appeal. Raise all issues you wish to appeal. Issues not raised at this time will not be addressed by the Court.

The Special Master should reverse the Claims Administrator's latest denial of Class Member Robin B. Cornish's claim because the Claims Administrator's latest Notice denies the claim for the same reason that was already considered and rejected by the Court in its February 24, 2023 Order.

### III. HOW TO SUBMIT THIS FORM

You may submit this Appeals Form and any accompanying documents using one of these methods:

| **By Mail:**<br>(must be postmarked on or before the appeal deadline date) | NFL Concussion Settlement<br>Claims Administrator<br>P.O. Box 25369<br>Richmond, VA 23260 |
|---|---|
| **By Overnight Delivery:**<br>(must be placed with the overnight carrier on or before the appeal deadline date) | NFL Concussion Settlement<br>c/o BrownGreer PLC<br>250 Rocketts Way<br>Richmond, VA 23231 |
| **By Hand Delivery:**<br>(must delivered on or before the appeal deadline date) | NFL Concussion Settlement<br>c/o BrownGreer PLC<br>250 Rocketts Way<br>Richmond, VA 23231 |

### IV. HOW TO CONTACT US WITH QUESTIONS OR FOR HELP

DC-4

If you are represented by a lawyer, consult with your lawyer if you have questions or need assistance. If you are unrepresented and have any questions about this Form or need help, contact us at 1-855-887-3485 or send an email to ClaimsAdministrator@NFLConcussionSettlement.com.  If you are a lawyer, call or email your designated Firm Contact for assistance. For more information about the Settlement Program, visit the official website at www.NFLConcussionSettlement.com, where you can read or download the Rules Governing Appeals of Claim Determinations, Frequently Asked Questions about the Settlement, the complete Settlement Agreement and other helpful materials.



# NFL CONCUSSION SETTLEMENT

*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

## APPEALS FORM FOR MONETARY AWARD OR DERIVATIVE CLAIMANT AWARD CLAIM DETERMINATION

### DATE OF NOTICE: **May 16, 2023**
### DEADLINE TO APPEAL: **June 15, 2023**

### I. SETTLEMENT CLASS MEMBER INFORMATION

| | |
|---|---|
| **Settlement Program ID** | 950012548 |

| | First | M.I. | Last |
|---|---|---|---|
| **Name:** | Robin | B | Cornish |

| | |
|---|---|
| **Settlement Class Member Type** | Representative Claimant |

| | |
|---|---|
| **Primary Counsel** | O'Hanlon, Demerath & Castillo |

### II. REASON FOR THIS APPEAL

Here is a short statement explaining the reason(s) for my appeal. Raise all issues you wish to appeal. Issues not raised at this time will not be addressed by the Court.

The Special Master should reverse the Claims Administrator's latest denial of Class Member Robin B. Cornish's claim because the Claims Administrator's latest Notice denies the claim for the same reason that was already considered and rejected by the Court in its February 24, 2023 Order.

### III. HOW TO SUBMIT THIS FORM

You may submit this Appeals Form and any accompanying documents using one of these methods:

| | |
|---|---|
| **By Mail:**<br>(must be postmarked on or before the appeal deadline date) | NFL Concussion Settlement<br>Claims Administrator<br>P.O. Box 25369<br>Richmond, VA 23260 |
| **By Overnight Delivery:**<br>(must be placed with the overnight carrier on or before the appeal deadline date) | NFL Concussion Settlement<br>c/o BrownGreer PLC<br>250 Rocketts Way<br>Richmond, VA 23231 |
| **By Hand Delivery:**<br>(must delivered on or before the appeal deadline date) | NFL Concussion Settlement<br>c/o BrownGreer PLC<br>250 Rocketts Way<br>Richmond, VA 23231 |

### IV. HOW TO CONTACT US WITH QUESTIONS OR FOR HELP

If you are represented by a lawyer, consult with your lawyer if you have questions or need assistance. If you are unrepresented and have any questions about this Form or need help, contact us at 1-855-887-3485 or send an email to ClaimsAdministrator@NFLConcussionSettlement.com.  If you are a lawyer, call or email your designated Firm Contact for assistance. For more information about the Settlement Program, visit the official website at www.NFLConcussionSettlement.com, where you can read or download the Rules Governing Appeals of Claim Determinations, Frequently Asked Questions about the Settlement, the complete Settlement Agreement and other helpful materials.

 **CONCUSSION SETTLEMENT**

*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

## APPEALS FORM FOR MONETARY AWARD OR DERIVATIVE CLAIMANT AWARD CLAIM DETERMINATION

**DATE OF NOTICE: May 16, 2023**

**DEADLINE TO APPEAL: June 15, 2023**

### I.  SETTLEMENT CLASS MEMBER INFORMATION

| | |
|---|---|
| **Settlement Program ID** | 950012548 |

| **Name:** | First<br>Robin | M.I.<br>B | Last<br>Cornish |
|---|---|---|---|

| **Settlement Class Member Type** | Representative Claimant |
|---|---|

| **Primary Counsel** | O'Hanlon, Demerath & Castillo |
|---|---|

### II. REASON FOR THIS APPEAL

Here is a short statement explaining the reason(s) for my appeal.  Raise all issues you wish to appeal.  Issues not raised at this time will not be addressed by the Court.

The Special Master should reverse the Claims Administrator's latest denial of Class Member Robin B. Cornish's claim because the Claims Administrator's latest Notice denies the claim for the same reason that was already considered and rejected by the Court in its February 24, 2023 Order.

### III.  HOW TO SUBMIT THIS FORM

You may submit this Appeals Form and any accompanying documents using one of these methods:

| | |
|---|---|
| **By Mail:**<br>(must be postmarked on or before the appeal deadline date) | NFL Concussion Settlement<br>Claims Administrator<br>P.O. Box 25369<br>Richmond, VA 23260 |
| **By Overnight Delivery:**<br>(must be placed with the overnight carrier on or before the appeal deadline date) | NFL Concussion Settlement<br>c/o BrownGreer PLC<br>250 Rocketts Way<br>Richmond, VA 23231 |
| **By Hand Delivery:**<br>(must delivered on or before the appeal deadline date) | NFL Concussion Settlement<br>c/o BrownGreer PLC<br>250 Rocketts Way<br>Richmond, VA 23231 |

### IV. HOW TO CONTACT US WITH QUESTIONS OR FOR HELP

If you are represented by a lawyer, consult with your lawyer if you have questions or need assistance. If you are unrepresented and have any questions about this Form or need help, contact us at 1-855-887-3485 or send an email to ClaimsAdministrator@NFLConcussionSettlement.com.  If you are a lawyer, call or email your designated Firm Contact for assistance. For more information about the Settlement Program, visit the official website at www.NFLConcussionSettlement.com, where you can read or download the Rules Governing Appeals of Claim Determinations, Frequently Asked Questions about the Settlement, the complete Settlement Agreement and other helpful materials.



# NFL CONCUSSION SETTLEMENT
IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION
No. 2:12-md-02323 (E.D. Pa.)

## APPEALS FORM FOR MONETARY AWARD OR DERIVATIVE CLAIMANT AWARD CLAIM DETERMINATION
### DATE OF NOTICE: May 16, 2023
### DEADLINE TO APPEAL: June 15, 2023

| I.  SETTLEMENT CLASS MEMBER INFORMATION | | | |
|---|---|---|---|
| **Settlement Program ID** | 950012548 | | |
| **Name:** | First<br>Robin | M.I.<br>B | Last<br>Cornish |
| **Settlement Class Member Type** | Representative Claimant | | |
| **Primary Counsel** | O'Hanlon, Demerath & Castillo | | |

| II. REASON FOR THIS APPEAL |
|---|
| Here is a short statement explaining the reason(s) for my appeal.  Raise all issues you wish to appeal.  Issues not raised at this time will not be addressed by the Court.<br><br>The Special Master should reverse the Claims Administrator's latest denial of Class Member Robin B. Cornish's claim because the Claims Administrator's latest Notice denies the claim for the same reason that was already considered and rejected by the Court in its February 24, 2023 Order. |

| III.  HOW TO SUBMIT THIS FORM | |
|---|---|
| You may submit this Appeals Form and any accompanying documents using one of these methods: | |
| **By Mail:**<br>(must be postmarked on or before the appeal deadline date) | NFL Concussion Settlement<br>Claims Administrator<br>P.O. Box 25369<br>Richmond, VA 23260 |
| **By Overnight Delivery:**<br>(must be placed with the overnight carrier on or before the appeal deadline date) | NFL Concussion Settlement<br>c/o BrownGreer PLC<br>250 Rocketts Way<br>Richmond, VA 23231 |
| **By Hand Delivery:**<br>(must delivered on or before the appeal deadline date) | NFL Concussion Settlement<br>c/o BrownGreer PLC<br>250 Rocketts Way<br>Richmond, VA 23231 |

| IV. HOW TO CONTACT US WITH QUESTIONS OR FOR HELP |
|---|

If you are represented by a lawyer, consult with your lawyer if you have questions or need assistance. If you are unrepresented and have any questions about this Form or need help, contact us at 1-855-887-3485 or send an email to ClaimsAdministrator@NFLConcussionSettlement.com.  If you are a lawyer, call or email your designated Firm Contact for assistance. For more information about the Settlement Program, visit the official website at www.NFLConcussionSettlement.com, where you can read or download the Rules Governing Appeals of Claim Determinations, Frequently Asked Questions about the Settlement, the complete Settlement Agreement and other helpful materials.



# NFL CONCUSSION SETTLEMENT
*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

## APPEALS FORM FOR MONETARY AWARD OR DERIVATIVE CLAIMANT AWARD CLAIM DETERMINATION

### DATE OF NOTICE: **May 16, 2023**
### DEADLINE TO APPEAL: **June 15, 2023**

### I. SETTLEMENT CLASS MEMBER INFORMATION

| Settlement Program ID | 950012548 | | |
|---|---|---|---|
| **Name:** | First<br>Robin | M.I.<br>B | Last<br>Cornish |
| **Settlement Class Member Type** | Representative Claimant | | |
| **Primary Counsel** | O'Hanlon, Demerath & Castillo | | |

### II. REASON FOR THIS APPEAL

Here is a short statement explaining the reason(s) for my appeal. Raise all issues you wish to appeal. Issues not raised at this time will not be addressed by the Court.

The Special Master should reverse the Claims Administrator's latest denial of Class Member Robin B. Cornish's claim because the Claims Administrator's latest Notice denies the claim for the same reason that was already considered and rejected by the Court in its February 24, 2023 Order.

### III. HOW TO SUBMIT THIS FORM

You may submit this Appeals Form and any accompanying documents using one of these methods:

| **By Mail:**<br>(must be postmarked on or before the appeal deadline date) | NFL Concussion Settlement<br>Claims Administrator<br>P.O. Box 25369<br>Richmond, VA 23260 |
|---|---|
| **By Overnight Delivery:**<br>(must be placed with the overnight carrier on or before the appeal deadline date) | NFL Concussion Settlement<br>c/o BrownGreer PLC<br>250 Rocketts Way<br>Richmond, VA 23231 |
| **By Hand Delivery:**<br>(must delivered on or before the appeal deadline date) | NFL Concussion Settlement<br>c/o BrownGreer PLC<br>250 Rocketts Way<br>Richmond, VA 23231 |

### IV. HOW TO CONTACT US WITH QUESTIONS OR FOR HELP

If you are represented by a lawyer, consult with your lawyer if you have questions or need assistance. If you are unrepresented and have any questions about this Form or need help, contact us at 1-855-887-3485 or send an email to ClaimsAdministrator@NFLConcussionSettlement.com.  If you are a lawyer, call or email your designated Firm Contact for assistance. For more information about the Settlement Program, visit the official website at www.NFLConcussionSettlement.com, where you can read or download the Rules Governing Appeals of Claim Determinations, Frequently Asked Questions about the Settlement, the complete Settlement Agreement and other helpful materials.



# NFL CONCUSSION SETTLEMENT

*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

## APPEALS FORM FOR MONETARY AWARD OR DERIVATIVE CLAIMANT AWARD CLAIM DETERMINATION

### DATE OF NOTICE: **May 16, 2023**
### DEADLINE TO APPEAL: **June 15, 2023**

### I. SETTLEMENT CLASS MEMBER INFORMATION

| | |
|---|---|
| **Settlement Program ID** | 950012548 |

| **Name:** | First<br>Robin | M.I.<br>B | Last<br>Cornish |
|---|---|---|---|

| **Settlement Class Member Type** | Representative Claimant |
|---|---|
| **Primary Counsel** | O'Hanlon, Demerath & Castillo |

### II. REASON FOR THIS APPEAL

Here is a short statement explaining the reason(s) for my appeal. Raise all issues you wish to appeal. Issues not raised at this time will not be addressed by the Court.

The Special Master should reverse the Claims Administrator's latest denial of Class Member Robin B. Cornish's claim because the Claims Administrator's latest Notice denies the claim for the same reason that was already considered and rejected by the Court in its February 24, 2023 Order.

### III. HOW TO SUBMIT THIS FORM

You may submit this Appeals Form and any accompanying documents using one of these methods:

| | |
|---|---|
| **By Mail:**<br>(must be postmarked on or before the appeal deadline date) | NFL Concussion Settlement<br>Claims Administrator<br>P.O. Box 25369<br>Richmond, VA 23260 |
| **By Overnight Delivery:**<br>(must be placed with the overnight carrier on or before the appeal deadline date) | NFL Concussion Settlement<br>c/o BrownGreer PLC<br>250 Rocketts Way<br>Richmond, VA 23231 |
| **By Hand Delivery:**<br>(must delivered on or before the appeal deadline date) | NFL Concussion Settlement<br>c/o BrownGreer PLC<br>250 Rocketts Way<br>Richmond, VA 23231 |

### IV. HOW TO CONTACT US WITH QUESTIONS OR FOR HELP

If you are represented by a lawyer, consult with your lawyer if you have questions or need assistance. If you are unrepresented and have any questions about this Form or need help, contact us at 1-855-887-3485 or send an email to ClaimsAdministrator@NFLConcussionSettlement.com.  If you are a lawyer, call or email your designated Firm Contact for assistance. For more information about the Settlement Program, visit the official website at www.NFLConcussionSettlement.com, where you can read or download the Rules Governing Appeals of Claim Determinations, Frequently Asked Questions about the Settlement, the complete Settlement Agreement and other helpful materials.

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | § § § § | No. 2:12-md-02323-AB MDL No. 2323 |
| THIS DOCUMENT RELATES TO: Settlement Class Member Carleen Hastings (SPID 950013395) | § § § § § | **Hon. Anita B. Brody** |

**WRITTEN STATEMENT IN SUPPORT OF CLASS MEMBER'S APPEAL**
**OF THE CLAIMS ADMINISTRATOR'S NOTICE OF DENIAL OF**
**MONETARY AWARD CLAIM**

The Special Master should reverse the Claims Administrator's latest denial of Class Member Carleen Hastings's claim because the Claims Administrator's latest Notice denies the claim for the same reason that was already considered and rejected by the Court in its February 24, 2023 Order.

When Class Member previously objected to the Special Master's decision to affirm the denial of her claim, the Court asked the Special Master to clarify why the claim was being denied. On July 15, 2020, Special Master David Hoffman explained the claim was being denied because the claim was untimely: "I find there is no evidence that the diagnosis of Death with CTE was obtained before the appropriate deadline [i.e., the Final Approval Date on 4/22/2015]."[1]  In her objection to the Special Master's decision, Class Member explained to the Court why the diagnosis was not untimely.  The Court agreed with Class Member's objection and remanded so the claim could be returned to the Claims Administrator to determine if the

---

[1]    Exhibit 13

claim package was otherwise sufficient.[2]

The Claims Administrator has now found that Class Member's claim package is otherwise sufficient.   Nevertheless, the Claims Administrator has again denied the claim for the same untimeliness reason the Court already considered.   The Special Master should reverse the Claims Administrator's denial because the Claims Administrator has found no basis for denying this claim other than the purported untimeliness of the CTE diagnosis — a reason the Court has already rejected.

---

[2]    Exhibit 17

**<u>SUPPORTING EVIDENCE</u>**[3]

Exhibit 1        Notice of Denial of Monetary Award Claim

Exhibit 2        Relevant Excerpts from Class Member's Claim Package

Exhibit 3        Notice of Request for Additional Documents

Exhibit 4        Letter dated May 6, 2019 to Claims Administrator regarding Class Member's claim

Exhibit 5        Appeals Form for Monetary Award or Derivative Claimant Award Claim Determination

Exhibit 6        Written Statement in Support of Class Member's Appeal of the Claims Administrator's Notice of Denial of Monetary Award Claim

Exhibit 7        Filed Appeal Alert

Exhibit 8        NFL Parties' Opposition to Appeal of Claim Denial by Representative Claimant Carleen Hastings

Exhibit 9        Post-Appeal Notice of Denial of Monetary Award Claim

---

[3]    Class Member also incorporates by reference the following documents that have been filed in this MDL or published on the Settlement Website:

(1) Original Settlement Agreement [ECF 6073-2];

(2) the Amended Settlement Agreement [ECF 6481];

(3) Absent Class Member and Plaintiff Yvonne Sagapolutele's Motion to Modify the Amended Final Order and Judgment [ECF 6534] by Conforming the Definition of "Death with CTE" to the Version Contemplated in the Fairness Hearing Order [ECF 6479] and Noticed to the Class in the Long Form Notice [ECF 6093-1] and Summary Notice [ECF 6093-2] Pursuant to Rule 60 and the Authority Retained in the Settlement Agreement [ECF 8263] ("Motion to Modify");

(4) Response in Opposition to the Motion to Modify [ECF 8430];

(5) Statement of Co-Lead Counsel in Opposition to the Motion to Modify [ECF 8431];

(6) Reply in Support of Motion to Modify [ECF 8442];

(7) Notice of Joinder [ECF 8443];

(8) Order denying, without prejudice, the Motion to Modify [ECF 8557];

(9) Posted Settlement Program FAQs (as of February 19, 2019); and

(10) Posted Settlement Program FAQs (as of July 8, 2019).

Exhibit 10          Settlement Class Member's Objection to the Special Master's Decision Denying Class Member's Appeal

Exhibit 11          Response of the National Football League and NFL Properties LLC in Opposition to Carleen Hastings' Objection to Post-Appeal Notice of Denial of Monetary Award Claim

Exhibit 12          Settlement Implementation Order (June 16, 2020)

Exhibit 13          Special Masters Decision (July 15, 2020)

Exhibit 14          Post-Appeal Notice of Denial of Monetary Award Claim

Exhibit 15          Supplement to Settlement Class Members' Objections to the Special Master's Decisions

Exhibit 16          Response of the National Football League and NFL Properties LLC in Opposition to Supplement to Settlement Class Members' Objections to the Special Master's Decision

Exhibit 17          Order [ECF 12001] (Feb. 24, 2023)

Exhibit 18          Notice of Remand of Appeal for Re-Review

Exhibit 19          Notice of Denial of Monetary Award Claim

## **BACKGROUND**

Class Member submitted a claim package that included a post-mortem diagnosis of Chronic Traumatic Encephalopathy ("CTE") made by Dr. Hamilton, a board-certified neuropathologist.[4] Class Member's submitted claim package also includes documentation showing that the Player died prior to April 22, 2015.[5]  The claim package includes an autopsy report, death certificate, and letter from Dr. Hamilton describing his diagnosis of CTE based on his post mortem examination of the brain tissue of Class Member.

The Claims Administrator initially requested additional documents, stating: "You have not submitted any medical records reflecting the Qualifying Diagnosis."[6]  The Claims Administrator further explained the following:

> The medical records must show a post-mortem diagnosis of CTE made before April 22, 2015 (the Final Approval Date) by a board-certified neuropathologist for a Retired NFL Football Player who died before April 22, 2015.  See Section 6.3(f) of the Settlement Agreement and FAQ 109.  Mr. Mims died on October 15, 2008, and the October 16, 2008 autopsy report signed by Louis A. Pena does not reference CTE and neither does the death certificate.  You provided an undated letter from Dr. Ronald L. Hamilton who diagnosed Mr. Mims with CTE.  You must establish that Dr. Hamilton reviewed Mr. Mim's brain tissue and made a CTE diagnosis on or before April 22, 2015.

In a correspondence dated May 6, 2019, Class Member's counsel explained that pursuant to FAQ 109 and FAQ 93, the diagnosis date for a Death with CTE diagnosis is "the date of the Player's death, even though the diagnosis is not made until after the Player dies."[7]

---

[4]    Exhibit 2.

[5]    *Id.*

[6]    Exhibit 3

[7]    *See* Exhibit 4.

Despite this response, the Claims Administrator denied Class Member's Monetary Award Claim.[8]  Class Member timely filed an appeal of the Claims Administrator's Notice of Denial of Monetary Award Claim[9] and the Special Master denied the Class Member's appeal on October 31, 2019.[10]  On November 20, 2019, Class Member filed an Objection to the Special Master's Decision Denying Class Member's Appeal.[11]

In response to the Special Master's Decision, the Court issued a Settlement Implementation Order requesting that the Special Master provide further explanation regarding whether the claim was being denied for two reasons, or only for the purported untimeliness of the diagnosis.[12]

On July 15, 2020, Special Master David Hoffman clarified that Class Member's claim was being denied only on the basis of the purported untimeliness of the diagnosis:

> The Claims Administrator denied Ms. Hastings' claim for two independent reasons. First, the claim was denied based upon a lack of proof that the diagnosis was timely. I find that there is no evidence that the diagnosis of Death with CTE was obtained before the appropriate deadline. Second, the claim was denied for failure of the diagnosing physician to personally examine the Player's brain tissue. However, the evidence suggests that Dr. Hamilton did examine the late Mr. Mims' brain tissue as is necessary to diagnose Death with CTE.
>
> The Claims Administrator correctly concluded that Ms. Hastings failed to show that the diagnosis was obtained before the appropriate deadline. I thus affirm the denial solely on the first basis.[13]

Following this decision, Class Member filed a Supplement to Settlement Class Members'

---

8    Exhibit 1.

9    Exhibits 5 and 6.

10   Exhibit 9.

11   Exhibit 10.

12   Exhibit 12.

13   Exhibit 13.

Objections to the Special Master's Decisions Class Members requesting the Court remand the claim because the CTE diagnosis was not untimely.[14]

On February 24, 2023, after considering the sole issue before the Court related to this Class Member's claim (i.e., whether the diagnosis was untimely),[15] the Court remanded this claim and instructed the Special Master to return the claims to the Claims Administrator to further determine the sufficiency of the claim package.[16]

The Claims Administrator has now issued a new Notice of Denial of Monetary Award Claim dated May 16, 2023 on the exact same issue that has already been considered and rejected by the Court in its February 24, 2023 Order. The Claims Administrator stated that the claims package is sufficient in all respects except for the alleged untimeliness of the diagnosis:

> The Post-Mortem Diagnosis of CTE Was Made Prior to the Final Approval Date: We have been unable to confirm whether the diagnosis was made prior to the 4/22/2015 Final Approval Date in order to meet the Settlement's requirements for a Qualifying Diagnosis of Death with CTE. The one-page letter provided by Dr. Hamilton is undated and does not indicate whether the diagnosis was made prior to 4/22/2015, as required by the Settlement's Injury Definition for the Qualifying Diagnosis of Death with CTE. The date of Dr. Hamilton's diagnosis has not been provided. Therefore, this criterion is not fulfilled.

> Because the diagnosis does not fulfill the Settlement's requirements for a Qualifying Diagnosis of Death with CTE, the medical records included in the Claim Package do not reflect a Qualifying Diagnosis, and therefore the Claim Package is not sufficient under Section 8.2(a) of the Settlement Agreement.[17]

---

[14]  Exhibit 15.

[15]  Exhibit 10.

[16]  Exhibit 17.

[17]  Exhibit 19.

**ARGUMENT**

The Claims Administrator has again denied Class Member's claim because Dr. Hamilton's CTE diagnosis was not made before April 22, 2015, which is the Final Approval Date for the Amended Settlement. But Class Member has already explained — in arguments both to the Court and the Special Master — why the diagnosis is not untimely. And based on those arguments, the Court remanded the claim.

First, as Class Member has already explained in prior briefing, the claims package is not insufficient based on the purported untimeliness of the diagnosis because "the date of the Qualifying Diagnosis is the date of the Player's death, even though the diagnosis is not made until after the Player Dies." *See* Exhibits 6, 10 (quoting FAQ 99 from the Posted Settlement Program FAQs as of September 12, 2019). It is undisputed that the Player's death occurred before the Final Approval Date.

Second, in the alternative, the language the Claims Administrator relies on could not have added a diagnosis-date requirement because it was added to the settlement agreement after the opt out deadline without notice to Class Member and other absent class members. In all notices that were provided regarding the settlement agreement, Class Member and other absent class members were told they could obtain a CTE diagnosis at any time within the 65-year life of the Monetary Award Fund. *See* Exhibits 6, 10; *see also* Motion to Modify [ECF 8263].

Based on these arguments, the Court decided this claim needed to be remanded to determine whether the claim package is otherwise sufficient. Because it is, the claim should be accepted.

**CONCLUSION**

Class Member has already explained in prior briefing to the Special Master and the Court why the CTE diagnosis by Dr. Hamilton is not untimely because the date of the Qualifying

Diagnosis described in Section 6.3(f) of the Amended Settlement Agreement is the date of the Player's death. Additionally, Class Member has previously explained why the Amended Settlement Agreement cannot be interpreted to impose a new deadline because such an interpretation based on language added to the settlement agreement after the opt out deadline would violate Class Member's due process rights. The Court has already considered these arguments and agreed — remanding this claim for the current review. Now that the Claims Administrator has determined that the claims package is otherwise sufficient, this claim should be accepted and paid.

For all of the foregoing reasons, Class Member respectfully requests that the Special Master reverse the Claims Administrator's denial of this Monetary Award Claim and remand to the Claims Administrator for a calculation of the Monetary Award because on remand, the Claims Administrator has found no reason to question the sufficiency of the Class Member's Claim Package other than the reason the Court has already rejected.

Dated: June 15, 2023

Respectfully Submitted:

*/s/ Justin Demerath*

**Justin Demerath**
Texas State Bar No. 24034415
**David Campbell**
Texas State Bar No. 24057033
O'HANLON, DEMERATH & CASTILLO
808 West Avenue | Austin, TX 78701
Tel: (512) 494-9949 | Fax: (512) 494-9919
jdemerath@808west.com
dcampbell@808west.com

**Counsel for Class Member**

9

**<u>CERTIFICATE OF SERVICE</u>**

It is hereby certified that a true copy of the foregoing document was submitted on the Court Portal on the 15th day of June, 2023.

*/s/ Justin B. Demerath*
Justin B. Demerath

# Exhibit 1



# NFL CONCUSSION SETTLEMENT

*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

## NOTICE OF DENIAL OF MONETARY AWARD CLAIM
### DATE OF NOTICE: July 30, 2019
### DEADLINE TO APPEAL: August 29, 2019

## I. SETTLEMENT CLASS MEMBER INFORMATION

| | |
|---|---|
| **Settlement Program ID** | 950013395 |

| **Name** | First<br>Carleen | M.I. | Last<br>Hastings |
|---|---|---|---|

| | |
|---|---|
| **Settlement Class Member Type** | Representative Claimant |
| **Lawyer** | O'Hanlon, Demerath & Castillo |

| **Asserted Qualifying Diagnosis** | Death with CTE (Chronic Traumatic Encephalopathy) | **Date** | 10/15/08 |
|---|---|---|---|

## II. EXPLANATION OF CLAIM DETERMINATION

This Notice is an official communication from the Claims Administrator for the NFL Concussion Settlement Program. We reviewed your Claim Package and determined that you are not entitled to a Monetary Award because:

**1.** Section 6.3(f) of the Settlement Agreement allows a CTE diagnosis if: (1) the Retired Player died before 4/22/15, and (2) there was a post-mortem diagnosis of CTE made by a board-certified neuropathologist prior to 4/22/15. Although Dr. Hamilton is a board-certified neuropathologist and signed a Pre-Effective Date Diagnosing Physician Certification Form indicating a CTE diagnosis, we must have proof that he personally performed the post-mortem exam on the Retired Player and that it was done on or before 4/22/15. There was no post-mortem examination report submitted to indicate that Dr. Hamilton examined the Retired Player's brain tissue to confirm a CTE diagnosis. The two-page letter provided by Dr. Hamilton does not satisfy the requirements for a CTE diagnosis under this Settlement Program. For these reasons, this claim is denied.

Section III below explains your right to appeal this denied claim, but living Retired Players may have the option to submit a new Claim Package under Section 9.1(c)(i) of the Settlement Agreement if they receive a new Qualifying Diagnosis. We will determine whether the new claim can be considered for a Monetary Award based on several factors, including whether the new claim shows materially changed circumstances from the earlier claim. These materially changed circumstances may include: (a) a different type of Qualifying Diagnosis than the one that was denied; or (b) the same type of Qualifying Diagnosis but with a different diagnosis date supported by additional medical records. If you submit a new claim within 365 days of the claim that is the subject of this denial notice, Section 10.3(d)(ii) of the Settlement Agreement requires us to audit that new claim if it is based on the same Qualifying Diagnosis as this denied claim, but the new diagnosis was made by a different physician.

## III. YOUR RIGHT TO APPEAL THIS DETERMINATION

If you have a good faith belief that the decision to deny your Monetary Award claim is incorrect, you may appeal this determination to the Court under Section 9.5 of the Settlement Agreement. To do so, click the Appeal Denied Claim button on your secure online portal and follow the instructions provided. You must submit supporting evidence to support your appeal. Any written statement may not be more than 10 double-spaced pages. You must do so on or before the Deadline to Appeal stated at the top of this Notice.

If you decide to appeal, the Settlement Agreement requires you to pay an Appeal Fee of $1,000, which you can do using the online PayPal option or by check made payable to the NFL Claims Administrator. This fee will be refunded if your appeal is successful. If you are unable to pay the $1,000 fee, you may make a hardship request to us to waive the fee and will have to submit financial information showing a sufficient hardship.

If paying the $1,000 Appeal Fee by check, mail the check to the address below.
NFL Concussion Settlement
Claims Administrator
P.O. Box 25369
Richmond, VA 23260

The Special Master appointed by the Court will decide your appeal based upon a showing by you of clear and convincing evidence. The Special Master's factual determinations will be final and binding, but you or Class Counsel or the NFL Parties may object to any of the Special Master's conclusions of law, which will then be subject to de novo (*i.e.*, a new) review by the Court.

If an appeal is not submitted on or before the deadline stated at the top of this Notice, the determination in this Notice will become final.

## IV. CLASS COUNSEL'S RIGHT TO APPEAL THIS DETERMINATION

Section 9.5 of the Settlement Agreement also gives Class Counsel the right to challenge our decision to deny your Monetary Award claim. If Class Counsel chooses to appeal, it must do so by the Deadline to Appeal stated at the top of this Notice and must provide a written copy of its Appeals Form and any supporting evidence to you, the NFL Parties, and us.

If an appeal is taken by you or Class Counsel, the NFL Parties may submit a written opposition (not to exceed 10 double-spaced pages) no later than 30 days after receipt of the Appeals Form. The party taking the appeal is not permitted to submit a reply.

Class Counsel may also submit a written statement (not to exceed 10 double-spaced pages) in response to your appeal no later than 15 days after receipt of the Appeals Form, and you and the NFL Parties may each submit a reply to any such submission by Class Counsel.

## V. HOW TO CONTACT US WITH QUESTIONS OR FOR HELP

If you are represented by a lawyer, consult with your lawyer if you have questions or need assistance. If you are unrepresented and have any questions about this Notice or need help, contact us at 1-855-887-3485 or send an email to ClaimsAdministrator@NFLConcussionSettlement.com. If you are a lawyer, call or email your designated Firm Contact for assistance. For more information about the Settlement program, visit the official website at www.NFLConcussionSettlement.com to read the Frequently Asked Questions or download a copy of the complete Settlement Agreement.



# Exhibit 2



University of Pittsburgh
Physicians, Department
of Pathology

Division of Neuropathology

Clayton A. Wiley, MD, PhD
*Director*

Charleen T. Chu, MD, PhD
Robert H. Garman, DVM
Ronald Hamilton, MD
Julia Kofler, MD
Scott M. Kulich, MD, PhD
David Lacomis, MD
Geoffrey Murdoch, MD, PhD
Gutti R. Rao, MD

UPMC Presbyterian
Room 5701 Scaife Hall
200 Lothrop Street
Pittsburgh, PA 15213
T 412-624-9415
F 412-624-5610

I have conducted a study of Cristopher Mims' brain tissue. Additionally, in my Neuropathology practice I conduct an ongoing study of all available and existing medical literature related to the existence and diagnosis of CTE and I combine that knowledge with my training and extensive experience related to the study and diagnosis of CTE.

Christopher Mims died on October 15, 2008 at age 38.

Received from Eric J Wahoske, LA County Department of ME Coroner are 180 unstained tissue sections on glass slides labeled 08-7210-H LAC ME Coroner, US recuts (10 unstained slides from 8 tissue blocks).

H&E stained recuts are examined:

    slide A  dura mater;
    slide B  cerebral cortex
    slide C       hippocampus
    slide D  hippocampus
    slide E  insular cortex, putamen, globus pallidus and thalamus
    slide F       cerebral cortex
    slide G  cerebellum cortex and dentate nucleus
    slide H       medulla

PHF-1/tau immunostaining of slides G and H were negative for abnormally aggregated tau. PHF-1/tau immunostaining of slides B, C, D, E and F show numerous neocortical PHF-1/tau positive tangles in neurons, with staining of many neuronal processes (neuropil threads) as well as tau-positive glial cells, especially in the depths of the sulcus and focally around some blood vessels best seen in slide B. There are no neuritic plaques and the tangles are much more common in the neocortex than in the hippocampus. These findings are diagnostic of CTE.

Figure 1: neocortex with numerous tangles, neuropil threads, glial tau and perivascular location; on the right is a close up of the distinctive perivascular pathology of CTE.



Christopher Mims had CTE.

Signed:
/s/
Ronald L Hamilton, M.D.

Affiliated with the University of Pittsburgh School of Medicine

 **CONCUSSION SETTLEMENT**

*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

## PRE-EFFECTIVE DATE DIAGNOSING PHYSICIAN CERTIFICATION FORM
### (for diagnoses made by physicians who are qualified to render Qualifying Diagnoses
### for purposes of Monetary Award claims before January 7, 2017)

This Pre-Effective Date Diagnosing Physician Certification Form is to be used only by physicians qualified to render Qualifying Diagnoses before January 7, 2017, in connection with the Class Action Settlement in In re: National Football League Players' Concussion Injury Litigation and who made a Qualifying Diagnosis before January 7, 2017. The Qualifying Diagnoses are found in Appendix A to this Pre-Effective Date Diagnosing Physician Certification Form.

Use this form to certify a Qualifying Diagnosis you made before January 7, 2017, based on your personal examination of the Retired NFL Football Player. **Do not sign this form unless you personally examined the player** or, in the case of a Qualifying Diagnosis of Death with CTE, you are the board-certified neuropathologist who made the post-mortem diagnosis of CTE. If you made a Qualifying Diagnosis as a Qualified MAF Physician on or after January 7, 2017, do not use this form; use the MAF Diagnosing Physician Certification Form instead. Also, if you are a Qualified BAP Provider certifying a diagnosis you made in the Baseline Assessment Program, do not use this form; use the BAP Diagnosing Physician Certification Form instead.

You must complete this form in its entirety, sign it under penalty of perjury, and return it to the patient along with copies of all supporting medical records that you created or received in connection with the Qualifying Diagnosis. In turn, the patient, or the patient's counsel, must submit this form and all supporting medical records referred to above to the Claims Administrator as part of a claim for compensation under the Class Action Settlement. The Claims Administrator will review the form, including your qualifications to provide the Qualifying Diagnosis, and the supporting medical records. All claims also are subject to audit. Any finding of fraudulent conduct by you will be subject to, without limitation, your referral to appropriate regulatory and disciplinary boards and agencies and/or federal authorities, and your disqualification from serving in any aspect of the Class Action Settlement.

You are required to preserve all supporting medical records that you created or received in connection with the Qualifying Diagnosis for the greater of: (a) 10 years after January 7, 2017; or (b) the period of time required under applicable state and federal laws.

If you have any questions, call the Claims Administrator toll free at 1-855-887-3485 or visit the Settlement Website at https://www.nflconcussionsettlement.com.

-4305-

## PRE-EFFECTIVE DATE DIAGNOSING PHYSICIAN CERTIFICATION FORM
**(for diagnoses made by physicians who are qualified to render Qualifying Diagnoses for purposes of Monetary Award claims before January 7, 2017)**

### I. PATIENT INFORMATION

| Settlement Program ID (if known) | | 950013395 | | |
|---|---|---|---|---|
| **Name:** | First<br>Christopher | M.I. | Last<br>Mims | Suffix |
| **Address:** | Address 1<br>▉▉▉▉▉▉ | | | |
| | Address 2 | | | |
| | City<br>Los Angeles | | | |
| | State/Province<br>CA | | | |
| | Postal Code<br>90047 | | Country<br>United States | |
| **Telephone** | | ⌴⌴⌴ - ⌴⌴⌴ - ⌴⌴⌴⌴ | | |
| **Date of Birth** | | ▉▉▉▉ / 1 9 7 0<br>(Month/Day/Year) | | |
| **Date of Death** (if applicable) | | 1 0 / 1 5 / 2 0 0 8<br>(Month/Day/Year) | | |

### II. DIAGNOSING PHYSICIAN INFORMATION

| National Provider Identifier (NPI) | | 1013980978 | | |
|---|---|---|---|---|
| **Physician Name** | First<br>Ronald | M.I.<br>L. | Last<br>Hamilton | Suffix |

**(a) Are you approved as a Qualified BAP Provider or a Qualified MAF Physician?**

☐ **YES.** If YES, you do not need to fill out the rest of this Section II or Sections III or IV. Instead, go to Section V.

☒ **NO.**

**(b) If you answered No, have you previously completed this form for another Retired NFL Football Player, that you know was submitted to the Claims Administrator?**

☐ **YES.** If YES, you do not need to fill out this Section II or Sections III or IV. Instead, go to Section V.

☒ **NO.**

If you answered No to both questions, fill out the rest of this Section II and then go to Section III.

## PRE-EFFECTIVE DATE DIAGNOSING PHYSICIAN CERTIFICATION FORM
### (for diagnoses made by physicians who are qualified to render Qualifying Diagnoses for purposes of Monetary Award claims before January 7, 2017)

| Office/Practice Name | University of Pittsburgh Medical Center | |
|---|---|---|
| **Address** | Address 1 <br> A724.1 Scaife Hall | |
| | Address 2 <br> 200 Lothrop Street | |
| | City <br> Pittsburgh | |
| | State/Province <br> Pennsylvania | |
| | Postal Code <br> 15213 | Country <br> USA |
| **Telephone** | 4 1 2 - 6 2 4 - 6 6 1 0 | |
| **Fax** | 4 1 2 - 6 2 4 - 5 4 8 8 | |
| **Email Address** | hamiltonrl@upmc.edu | |

### III.   BOARD CERTIFICATIONS

Check all board certifications that apply and list the board providing the certification and any identification number provided by the board (*e.g.*, American Board of Psychiatry and Neurology diplomate number). If you do not have any board certifications, summarize your relevant medical training and experience and then go to Section IV.

| | Certification | Board | Board Identification Number | Effective Date | Expiration Date |
|---|---|---|---|---|---|
| ☐ | Neurology | | | | |
| ☐ | Neurosurgery | | | | |
| X | Neuropathology | American Board of Pathology | | certified: 5/23/1996 <br> recertified:1/1/2014 | |
| ☐ | Neuropsychology | | | | |
| ☐ | Other Neuro-specialty | | | | |
| X | Other Board Certification | American Board of Pathology | | **certified: 5/23/1996** | |

**PRE-EFFECTIVE DATE DIAGNOSING PHYSICIAN CERTIFICATION FORM**
**(for diagnoses made by physicians who are qualified to render Qualifying Diagnoses**
**for purposes of Monetary Award claims before January 7, 2017)**

If you are not board-certified in a neuro-specialty area, summarize your relevant medical training and experience in the field of neurology and related fields that you believe qualifies you to make the diagnosis provided in Section V.

## IV.    OTHER QUALIFICATIONS

| | | Education Level | Institution | Degree/Area of Focus | Date Received |
|---|---|---|---|---|---|
| Educational Information | 1. | **Undergraduate Education** | University of Nebraska-Lincoln | B.S / Psychology | 1985 (Month/Year) |
| | 2. | **Medical School** | University of Nebraska Medical Center | M.D. | 1989 (Month/Year) |
| | 3. | **Internship** | Univ. of California, San Diego | Resident Anatomic Pathology | 1991 (Month/Year) |
| | 4. | **Residency** | Univ. of California, San Diego | Resident Neuropathology | 1993 (Month/Year) |
| | 5. | **Fellowship** | Univ. of Pittsburgh | Fellow Neuropathology | 1994 (Month/Year) |
| | 6. | **Other (Graduate)** | Univ. of Pittsburgh | Fellow: NIMH Training Grant in Neuroscience | 1995 (Month/Year) |

| | | State | State License Number | Effective Date | Expiration Date |
|---|---|---|---|---|---|
| States Where Licensed to Practice | 1. | **California** | **G69731** | **9/10/1990** | **Expired** |

## PRE-EFFECTIVE DATE DIAGNOSING PHYSICIAN CERTIFICATION FORM
### (for diagnoses made by physicians who are qualified to render Qualifying Diagnoses for purposes of Monetary Award claims before January 7, 2017)

| | | | | |
|---|---|---|---|---|
| 2. | **Pennsylvania** | MD049717L | 5/12/1993 | 12/31/2018 |
| 3. | **Indiana** | 01067332A | 9/29/2009 | 10/31/2019 |
| 4. | | | | |
| 5. | | | | |
| 6. | | | | |

| **Specialties** | Check all specialties that apply. |
|---|---|
| | ☐ **Neurology** |
| | ☐ **Neurosurgery** |
| | ☒ **Neuropathology** |
| | ☐ **Neuropsychology** |
| | ☐ **Other Neuro-specialty** (*e.g.*, brain injury medicine, clinical neurophysiology, etc.) |
| | ☒ **Other Specialty** (list all)    **Anatomic Pathology** |

**PRE-EFFECTIVE DATE DIAGNOSING PHYSICIAN CERTIFICATION FORM**
**(for diagnoses made by physicians who are qualified to render Qualifying Diagnoses**
**for purposes of Monetary Award claims before January 7, 2017)**

## V. QUALIFYING DIAGNOSIS

Identify the patient's diagnosis and the date of such diagnosis.  See **Appendix A** for the criteria for each diagnosis.  Other than for Death with CTE, the identification of a condition, including through a blood test, genetic test, imaging technique, or otherwise, that has not yet resulted in actual cognitive impairment and/or actual neuromuscular impairment in the patient is **not** a Qualifying Diagnosis.

| Qualifying Diagnosis | Date of Diagnosis |
|---|---|
| ☐  Level 1.5 Neurocognitive Impairment | \|__\|__\| / \|__\|__\| / \|__\|__\|__\|__\| (Month/Day/Year) |
| ☐  Level 2 Neurocognitive Impairment* | \|__\|__\| / \|__\|__\| / \|__\|__\|__\|__\| (Month/Day/Year) |
| ☐  Alzheimer's Disease | \|__\|__\| / \|__\|__\| / \|__\|__\|__\|__\| (Month/Day/Year) |
| ☐  Parkinson's Disease | \|__\|__\| / \|__\|__\| / \|__\|__\|__\|__\| (Month/Day/Year) |
| ☐  ALS (amyotrophic lateral sclerosis) | \|__\|__\| / \|__\|__\| / \|__\|__\|__\|__\| (Month/Day/Year) |
| ☒  Death with CTE | \|_1_\|_0_\| / \|_1_\|_5_\| / \|_2_\|_0_\|_0_\|_8_\|* (Month/Day/Year) |

\* If you provided a diagnosis of Level 2 Neurocognitive Impairment, did you determine that certain testing was medically unnecessary because of the severity of the patient's dementia (*see* **Appendix A**)?

☐  **YES**        ☐  **NO**

If you answered Yes, provide the factual basis for that determination:

\*Pursuant to FAQ 93, Posted Settlement Program FAQs (as of November 7, 2018), for this claim, "the date of the Qualifying Diagnosis is the date of the Player's death, even though the diagnosis is not made until after the Player dies".

**PRE-EFFECTIVE DATE DIAGNOSING PHYSICIAN CERTIFICATION FORM**
**(for diagnoses made by physicians who are qualified to render Qualifying Diagnoses**
**for purposes of Monetary Award claims before January 7, 2017)**

## VI. CERTIFICATION

By signing below, I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that all information provided in this form, and all related supporting medical records, are true and correct to the best of my knowledge, information and belief, and that I personally examined the Retired NFL Football Player named in Section I or, in the case of a Qualifying Diagnosis of Death with CTE, I am the board-certified neuropathologist who made the post-mortem diagnosis of CTE.

I acknowledge that any finding of fraudulent conduct may subject me to, without limitation, referral to appropriate regulatory and disciplinary boards and agencies and/or federal authorities, and disqualification from serving in any aspect of the Class Action Settlement.

| Signature of Diagnosing Physician | | Date of Signature | 0 2 / 0 1 / 2 0 1 9 (Month/Day/Year) |
|---|---|---|---|
| **Printed Name** | First Ronald | M.I. L. | Last Hamilton |

# APPENDIX A

Other than for Death with CTE, the identification of a condition, including through a blood test, genetic test, imaging technique, or otherwise, that has not yet resulted in actual cognitive impairment and/or actual neuromuscular impairment experienced by the patient does not qualify as a diagnosis.

## LEVEL 1.5 NEUROCOGNITIVE IMPAIRMENT

**The following diagnosis can only be made:**

> (1) prior to July 7, 2014, by a board-certified neurologist, board-certified neurosurgeon, other board-certified neuro-specialist physician, or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician, except as provided in (c), below;

> (2) from July 7, 2014 through January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified neurologist, board-certified neurosurgeon, or other board-certified neuro-specialist physician, except as provided in (c), below; or

> (3) for a patient who died prior to January 7, 2017 (the Effective Date of the Settlement Agreement), where the diagnosis occurred while the patient was living, by a board-certified or otherwise qualified neurologist, neurosurgeon, or other neuro-specialist physician, or by a physician with sufficient qualifications in the field of neurology or neurocognitive disorders to make a diagnosis of Level 1.5 Neurocognitive Impairment:

A diagnosis made outside of the Baseline Assessment Program (BAP) that a living patient suffers from Level 1.5 Neurocognitive Impairment, as set forth below, *i.e.*, early dementia, based on evaluation and evidence generally consistent with the diagnostic criteria set forth and provided below:

There is: (i) Concern of the patient, a knowledgeable informant, or the Qualified BAP Provider that there has been a severe decline in cognitive function; (ii) Evidence of a moderate to severe cognitive decline from a previous level of performance, as determined by and in accordance with the standardized neuropsychological testing protocol annexed in *Appendix B*, in two or more cognitive domains (complex attention, executive function, learning and memory, language, perceptual-spatial), provided one of the cognitive domains is (a) executive function, (b) learning and memory, or (c) complex attention; (iii) The patient exhibits functional impairment generally consistent with the criteria set forth in the National Alzheimer's Coordinating Center's Clinical Dementia Rating scale Category 1.0 (Mild) in the areas of Community Affairs, Home & Hobbies, and Personal Care—where such functional impairment is corroborated by documentary evidence (*e.g.*, medical records, employment records), the sufficiency of which will be determined by the physician making the diagnosis (and where no documentary evidence of functional impairment exists or is available, then (a) there must be evidence of moderate to severe cognitive decline from a previous level of performance, as determined by and in accordance with the standardized neuropsychological testing protocol annexed in *Appendix B*, in the executive function cognitive domain or the learning and memory cognitive domain, and at least one other cognitive domain; and (b) the patient's functional impairment, as described above, must be corroborated by a third-party sworn affidavit from a person familiar with the patient's condition (other than the player or his family members), the sufficiency of which will be determined by the diagnosing physician); and (iv) The cognitive deficits do not occur exclusively in the context of a delirium, acute substance abuse, or as a result of medication side effects.

**LEVEL 2 NEUROCOGNITIVE IMPAIRMENT**

**The following diagnosis can only be made:**

> **(1) prior to July 7, 2014, by a board-certified neurologist, board-certified neurosurgeon, other board-certified neuro-specialist physician, or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician, except as provided in (c), below;**

> **(2) from July 7, 2014 through January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified neurologist, board-certified neurosurgeon, or other board-certified neuro-specialist physician, except as provided in (c), below; or**

> **(3) for a patient who died prior to January 7, 2017 (the Effective Date of the Settlement Agreement), where the diagnosis occurred while the patient was living, by a board-certified or otherwise qualified neurologist, neurosurgeon, or other neuro-specialist physician, or by a physician with sufficient qualifications in the field of neurology or neurocognitive disorders to make a diagnosis of Level 2 Neurocognitive Impairment:**

A diagnosis made outside of the Baseline Assessment Program (BAP) that a living patient suffers from Level 2 Neurocognitive Impairment, as set forth below, *i.e.*, moderate dementia, based on evaluation and evidence generally consistent with the diagnostic criteria set forth and provided below, unless the diagnosing physician can certify in Section IV of the Diagnosing Physician Certification Form, above, that certain testing specified below for Level 2 Neurocognitive Impairment is medically unnecessary because the patient's dementia is so severe:

There is: (i) Concern of the patient, a knowledgeable informant, or the Qualified BAP Provider that there has been a severe decline in cognitive function; (ii) Evidence of a severe cognitive decline from a previous level of performance, as determined by and in accordance with the standardized neuropsychological testing protocol annexed in *Appendix B*, in two or more cognitive domains (complex attention, executive function, learning and memory, language, perceptual-spatial), provided one of the cognitive domains is (a) executive function, (b) learning and memory, or (c) complex attention; (iii) The patient exhibits functional impairment generally consistent with the criteria set forth in the National Alzheimer's Coordinating Center's Clinical Dementia Rating scale Category 2.0 (Moderate) in the areas of Community Affairs, Home & Hobbies, and Personal Care—where such functional impairment is corroborated by documentary evidence (*e.g.*, medical records, employment records), the sufficiency of which will be determined by the physician making the diagnosis (and where no documentary evidence of functional evidence exists or is available, then (a) there must be evidence of severe cognitive decline from a previous level of performance, as determined by and in accordance with the standardized neuropsychological testing protocol annexed in *Appendix B*, in the executive function cognitive domain or the learning and memory cognitive domain, and at least one other cognitive domain; and (b) the patient's functional impairment, as described above, must be corroborated by a third-party sworn affidavit from a person familiar with the patient's condition (other than the player or his family members), the sufficiency of which will be determined by the diagnosing physician); and (iv) The cognitive deficits do not occur exclusively in the context of a delirium, acute substance abuse, or as a result of medication side effects.

## ALZHEIMER'S DISEASE

(1) **The following diagnosis can only be made:**

**(a) prior to July 7, 2014, by a board-certified neurologist, board-certified neurosurgeon, other board-certified neuro-specialist physician, or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician; or**

**(b) from July 7, 2014 through January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified neurologist, board-certified neurosurgeon, or other board-certified neuro-specialist physician:**

A diagnosis in a living patient of the specific disease of Alzheimer's Disease as defined by the World Health Organization's International Classification of Diseases, 9th Edition (ICD-9), the World Health Organization's International Classification of Diseases, 10th Edition (ICD-10), or a diagnosis of Major Neurocognitive Disorder due to probable Alzheimer's Disease as defined in the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5).

(2) **The following diagnosis can only be made prior to January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician, or by a physician with sufficient qualifications in the field of neurology to make such a diagnosis, where the diagnosis was made while the patient was living but thereafter died prior to January 7, 2017 (the Effective Date of the Settlement Agreement):**

A diagnosis of Major Neurocognitive Disorder due to probable Alzheimer's Disease consistent with the definition in *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) or a diagnosis of Alzheimer's Disease.

## PARKINSON'S DISEASE

(1) **The following diagnosis can only be made:**

**(a) prior to July 7, 2014, by a board-certified neurologist, board-certified neurosurgeon, other board-certified neuro-specialist physician, or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician; or**

**(b) from July 7, 2014 through January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified neurologist, board-certified neurosurgeon, or other board-certified neuro-specialist physician:**

A diagnosis in a living patient of the specific disease of Parkinson's Disease as defined by the World Health Organization's International Classification of Diseases, 9th Edition (ICD-9), the World Health Organization's International Classification of Diseases, 10th Edition (ICD-10), or a diagnosis of Major Neurocognitive Disorder probably due to Parkinson's Disease as defined in the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5).

(2) **The following diagnosis can only be made prior to January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician, or by a physician with sufficient qualifications in the field of neurology to make such a diagnosis, where the diagnosis was made while the patient was living but thereafter died prior to January 7, 2017 (the Effective Date of the Settlement Agreement):**

A diagnosis of Parkinson's Disease.

## ALS

(1) **The following diagnosis can only be made:**

(a) **prior to July 7, 2014, by a board-certified neurologist, board-certified neurosurgeon, other board-certified neuro-specialist physician, or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician; or**

(b) **from July 7, 2014 through January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified neurologist, board-certified neurosurgeon, or other board-certified neuro-specialist physician:**

A diagnosis in a living patient of the specific disease of Amyotrophic Lateral Sclerosis, also known as Lou Gehrig's Disease (ALS), as defined by the World Health Organization's International Classification of Diseases, 9th Edition (ICD-9) or the World Health Organization's International Classification of Diseases, 10th Edition (ICD-10).

(2) **The following diagnosis can only be made prior to January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician, or by a physician with sufficient qualifications in the field of neurology to make such a diagnosis, where the diagnosis was made while the patient was living but thereafter died prior to January 7, 2017 (the Effective Date of the Settlement Agreement):**

A diagnosis of the specific disease of Amyotrophic Lateral Sclerosis (ALS).

## CTE

**The following diagnosis can only be made prior to April 22, 2015 by a board-certified neuropathologist, provided that a patient who died between July 7, 2014 and April 22, 2015 has until 270 days from the date of death to obtain such a post-mortem diagnosis:**

A post-mortem diagnosis of Chronic Traumatic Encephalopathy (CTE).

Case: 25-2271    Document: 20-3    Page: 1200    Date Filed: 10/08/2025

## APPENDIX B

## BASELINE NEUROPSYCHOLOGICAL TEST BATTERY AND SPECIFIC IMPAIRMENT CRITERIA FOR RETIRED NFL FOOTBALL PLAYERS

### Section 1: Test Battery

**Estimating Premorbid Intellectual Ability**

ACS Test of Premorbid Functioning (TOPF)

**Complex Attention/Processing Speed (6 scores)**

WAIS-IV Digit Span

WAIS-IV Arithmetic

WAIS-IV Letter Number Sequencing

WAIS-IV Coding

WAIS-IV Symbol Search

WAIS-IV Cancellation

**Executive Functioning (4 scores)**

Verbal Fluency (FAS)

Trails B

Booklet Category Test

WAIS-IV Similarities

**Effort/Performance Validity (8 scores)**

*ACS Effort Scores*

ACS-WAIS-IV Reliable Digit Span

ACS-WMS-IV Logical Memory Recognition

ACS-WMS-IV Verbal Paired Associates Recognition

ACS-WMS-IV Visual Reproduction Recognition

ACS-Word Choice

*Additional Effort Tests*

Test of Memory Malingering (TOMM)

Medical Symptom Validity Test (MSVT)

**Learning and Memory (6 scores)**

WMS-IV Logical Memory I

WMS-IV Logical Memory II

WMS-IV Verbal Paired Associates I

WMS-IV Verbal Paired Associates II

WMS-IV Visual Reproduction I

WMS-IV Visual Reproduction II

**Language (3 scores)**

Boston Naming Test

Category Fluency (Animal Naming)

BDAE Complex Ideational Material

**Spatial-Perceptual (3 scores)**

WAIS-IV Block Design

WAIS-IV Visual Puzzles

WAIS-IV Matrix Reasoning

**Mental Health**

MMPI-2RF

Mini International Neuropsychiatric Interview

### Section 2: Evaluate Performance Validity

Freestanding, embedded and regression based performance validity metrics will be administered to each Retired NFL Football Player during baseline and, if relevant, subsequent neuropsychological examinations. There will be at least seven performance validity metrics utilized during each assessment. The specific performance validity metrics utilized will not be released to the public in order to maintain the highest standards of assessment validity.  The performance

## APPENDIX B

validity metrics employed will be rotated at intervals determined by the Appeals Advisory Panel in consultation with Co-Lead Class Counsel and Counsel for the NFL Parties.

Each neuropsychological examiner must complete a checklist of validity criteria as set forth in *Slick et al.* 1999, and revised in 2013 (see below) for every Retired NFL Football Player examined in order to determine whether the Retired NFL Football Player's test data is a valid reflection of his optimal level of neurocognitive functioning.

1. Suboptimal scores on performance validity embedded indicators or tests. The cutoffs for each test should be established based on empirical findings.

2. A pattern of neuropsychological test performance that is markedly discrepant from currently accepted models of normal and abnormal central nervous system (CNS) function. The discrepancy must be consistent with an attempt to exaggerate or fabricate neuropsychological dysfunction (e.g., a patient performs in the severely impaired range on verbal attention measures but in the average range on memory testing; a patient misses items on recognition testing that were consistently provided on previous free recall trials, or misses many easy items when significantly harder items from the same test are passed).

3. Discrepancy between test data and observed behavior. Performance on two or more neuropsychological tests within a domain are discrepant with observed level of cognitive function in a way that suggests exaggeration or fabrication of dysfunction (e.g., a well-educated patient who presents with no significant visual-perceptual deficits or language disturbance in conversational speech performs in the severely impaired range on verbal fluency and confrontation naming tests).

4. Discrepancy between test data and reliable collateral reports. Performance on two or more neuropsychological tests within a domain are discrepant with day-to-day level of cognitive function described by at least one reliable collateral informant in a way that suggests exaggeration or fabrication of dysfunction (e.g., a patient handles all family finances but is unable to perform simple math problems in testing).

5. Discrepancy between test data and documented background history. Improbably poor performance on two or more standardized tests of cognitive function within a specific domain (e.g., memory) that is inconsistent with documented neurological or psychiatric history.

6. Self-reported history is discrepant with documented history. Reported history is markedly discrepant with documented medical or psychosocial history and suggests attempts to exaggerate deficits.

7. Self-reported symptoms are discrepant with known patterns of brain functioning. Reported or endorsed symptoms are improbable in number, pattern, or severity; or markedly inconsistent with expectations for the type or severity of documented medical problems.

8. Self-reported symptoms are discrepant with behavioral observations. Reported symptoms are markedly inconsistent with observed behavior (e.g., a patient complains of severe episodic memory deficits yet has little difficulty remembering names, events, or appointments; a patient complains of severe cognitive deficits yet has little difficulty driving independently and arrives on time for an appointment in an unfamiliar area; a patient complains of severely slowed mentation and concentration problems yet easily follows complex conversation).

9. Self-reported symptoms are discrepant with information obtained from collateral informants. Reported symptoms, history, or observed behavior is inconsistent with information obtained from other informants judged to be adequately reliable. The discrepancy must be consistent with an attempt to exaggerate deficits (e.g., a patient reports severe memory impairment and/or behaves as if severely memory-impaired, but his spouse reports that the patient has minimal memory dysfunction at home).

# APPENDIX B

Notwithstanding a practitioner's determination of sufficient effort in accordance with the foregoing factors, a Retired NFL Football Player's failure on two or more effort tests may result in the Retired NFL Football Player's test results being subjected to independent review, or result in a need for supplemental testing of the Retired NFL Football Player.

Note: Additional information relating to the evaluation of effort and performance validity will be provided in a clinician's interpretation guide.

## Section 3: Estimate Premorbid Intellectual Ability

| Test | Ability |
|------|---------|
| Test of Premorbid Functioning (TOPF) | Reading <br> Reading + Demographic Variables |

The Test of Premorbid Functioning (TOPF) provides three models for predicting premorbid functioning: (a) demographics only, (b) TOPF only, and (c) combined demographics and TOPF prediction equations. For each model using demographic data, a simple and complex prediction equation can be selected. In the simple model, only sex, race/ethnicity, and education, are used in predicting premorbid ability. In the complex model, developmental, personal, and more specific demographic data is incorporated into the equations. The clinician should select a model based on the patient's background and his or her current level of reading or language impairment.

Note: It is necessary to estimate premorbid intellectual functioning in order to use the criteria for impairment set out in this document. Estimated premorbid intellectual ability will be assessed and classified as:

➢ Below Average (estimated IQ below 90);

➢ Average (estimated IQ between 90 and 109);

➢ Above Average (estimated IQ above 110).

## Section 4: Neuropsychological Test Score Criteria by Domain of Cognitive Functioning

There are 5 domains of cognitive functioning. In each domain, there are several tests that contribute 3, 4, or 6 demographically-adjusted test scores for consideration. Test selection in the domains was based on the availability of demographically-adjusted normative data for Caucasians and African Americans. These domains and scores are set out below.

The basic principle for defining impairment on testing is that there must be a pattern of performance that is approximately 1.5 standard deviations (for Level 1 Impairment), 1.7-1.8 standard deviations (for Level 1.5 Impairment) or 2 standard deviations (for Level 2 Impairment) below the person's expected level of premorbid functioning. Therefore, it is necessary to have more than one low test score in each domain. A user manual will be provided to neuropsychologists setting out the cutoff scores, criteria for identifying impairment in each cognitive domain, and statistical and normative data to support the impairment criteria.

## APPENDIX B

| Domain/Test | Ability |
|---|---|
| **Complex Attention/Speed of Processing (6 Scores)** | |
| Digit Span | Attention & Working Memory |
| Arithmetic | Mental Arithmetic |
| Letter Number Sequencing | Attention & Working Memory |
| Coding | Visual-Processing & Clerical Speed |
| Symbol Search | Visual-Scanning & Processing Speed |
| Cancellation | Visual-Scanning Speed |
| **Executive Functioning (4 scores)** | |
| Similarities | Verbal Reasoning |
| Verbal Fluency (FAS) | Phonemic Verbal Fluency |
| Trails B | Complex Sequencing |
| Booklet Category Test | Conceptual Reasoning |
| **Learning and Memory (6 scores)** | |
| Logical Memory I | Immediate Memory for Stories |
| Logical Memory II | Delayed Memory for Stories |
| Verbal Paired Associates I | Learning Word Pairs |
| Verbal Paired Associates II | Delayed Memory for Word Pairs |
| Visual Reproduction I | Immediate Memory for Designs |
| Visual Reproduction II | Delayed Memory for Designs |
| **Language** | |
| Boston Naming Test | Confrontation Naming |
| BDAE Complex Ideational Material | Language Comprehension |
| Category Fluency | Category (Semantic) Fluency |
| **Visual-Perceptual** | |
| Block Design | Spatial Skills & Problem Solving |
| Visual Puzzles | Visual Perceptual Reasoning |
| Matrix Reasoning | Visual Perceptual Reasoning |

**Impairment Criteria: *Below Average* Estimated Intellectual Functioning (A1 – E1)**

**A1. Complex Attention (6 test scores)**

1. Level 1 Impairment: 3 or more scores below a T score of 35

2. Level 1.5 Impairment: 4 or more scores below a T score of 35; or meet for Level 1 and 2 scores below a T score of 30

3. Level 2 Impairment: 3 or more scores below a T score of 30

**B1. Executive Function (4 test scores)**

1. Level 1 Impairment: 2 or more scores below a T score of 35

2. Level 1.5 Impairment: 3 or more scores below a T score of 35; or meet for Level 1 and 1 score below a T score of 30

## APPENDIX B

3. Level 2 Impairment: 2 or more scores below a T score of 30

### C1.  Learning and Memory (6 test scores)

1. Level 1 Impairment: 3 or more scores below a T score of 35

2. Level 1.5 Impairment: 4 or more scores below a T score of 35; or meet for Level 1 and 2 scores below a T score of 30

3. Level 2 Impairment: 3 or more scores below a T score of 30

### D1.  Language (3 test scores)

1. Level 1 Impairment: 3 or more scores below a T score of 37

2. Level 1.5 Impairment: meet for Level 1 and 2 scores below a T score of 35

3. Level 2 Impairment: 3 or more scores below a T score of 35

### E1.  Visual-Perceptual (3 test scores)

1. Level 1 Impairment: 3 or more scores below a T score of 37

2. Level 1.5 Impairment: meet for Level 1 and 2 scores below a T score of 35

3. Level 2 Impairment: 3 or more scores below a T score of 35

## Impairment Criteria: *Average* Estimated Intellectual Functioning (A2 – E2)

### A2.  Complex Attention (6 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 35

2. Level 1.5 Impairment: 3 or more scores below a T score of 35; or meet for Level 1 and 1 score below a T score of 30

3. Level 2 Impairment: 2 or more scores below a T score of 30

### B2.  Executive Function (4 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 35

2. Level 1.5 Impairment: 3 or more scores below a T score of 35; or meet for Level 1 and 1 score below a T score of 30

3. Level 2 Impairment: 2 or more scores below a T score of 30

### C2.  Learning and Memory (6 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 35

2. Level 1.5 Impairment: 3 or more scores below a T score of 35; or meet for Level 1 and 1 score below a T score of 30

3. Level 2 Impairment: 2 or more scores below a T score of 30

### D2.  Language (3 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 37

2. Level 1.5 Impairment: 3 or more scores below a T score of 37; or meet for Level 1 and 1 score below a T score of 35

3. Level 2 Impairment: 2 or more scores below a T score of 35

### E2.  Visual-Perceptual (3 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 37

2. Level 1.5 Impairment: 3 or more scores below a T score of 37; or meet for Level 1 and 1 score below a T score of 35

3. Level 2 Impairment: 2 or more scores below a T score of 35

## APPENDIX B

### Impairment Criteria: *Below Average* Estimated Intellectual Functioning (A3 – E3)

#### A3. Complex Attention (6 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 35

2. Level 1.5 Impairment: meet for Level 1 and 3 or more scores below a T score of 37

3. Level 2 Impairment: 3 or more scores below a T score of 35

#### B3. Executive Function (4 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 37

2. Level 1.5 Impairment: meet for Level 1 and 3 or more scores below a T score of 37; or meet for Level 1 and 1 score below a T score of 30

3. Level 2 Impairment: 2 or more scores below a T score of 30

#### C3. Learning and Memory (6 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 35

2. Level 1.5 Impairment: meet for Level 1 and 3 or more scores below a T score of 37

3. Level 2 Impairment: 3 or more scores below a T score of 35

#### D3. Language (3 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 40

2. Level 1.5 Impairment: 3 scores below at T score of 40; or meet for Level 1 and 1 score below a T score of 37

3. Level 2 Impairment: 2 or more scores below a T score of 37

#### E3. Visual-Perceptual (3 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 40

2. Level 1.5 Impairment: 3 scores below at T score of 40; or meet for Level 1 and 1 score below a T score of 37

3. Level 2 Impairment: 2 or more scores below a T score of 37

### Section 5: Mental Health Assessment

| Test | Symptoms/Functioning | Assessment |
|---|---|---|
| MMPI-2RF | Mental Health Assessment | Evaluation of Validity Scales and Configurations; T-Scores for Symptom Domains |
| Mini International Neuropsychiatric Interview (M.I.N.I. Version 5.0.0) | Semi-structured Psychiatric Interview | Scale Criteria for Various Psychiatric Diagnoses |

**Ronald L. Hamilton, M.D.**

1/2/2017

## CURRICULUM VITAE

### BIOGRAPHICAL

| | | | |
|---|---|---|---|
| **Name:** | Ronald Lee Hamilton | **Birth Date:** | ▮▮▮▮▮ |
| **Home Address:** | ▮▮▮▮▮▮▮<br>Pittsburgh, PA 15232 | **Birth Place:** | Omaha,<br>Nebraska |
| **Marital status:** | single | | |
| **Home Phone** | 412-310-9874 | **Citizenship:** | USA |
| **Business Address:** | Division of Neuropathology<br>A724.1 Scaife Hall<br>200 Lothrop Street<br>Pittsburgh, PA 15213 | | |
| **Business Phone:** | 412-624-6610 | | |
| **Business Fax:** | 412-624-5488 | | |
| **e-mail address** | hamiltonrl@upmc.edu | | |

### EDUCATION AND TRAINING

| | | | |
|---|---|---|---|
| 1977-1985 | University of Nebraska-Lincoln | B.S. | Psychology |
| 1985-1989 | University of Nebraska Medical Center | M.D. | |
| 1989-1991 | University of California, San Diego<br>Program Director, David Bailey | Resident Anatomic Pathology | |
| 1991-1993 | University of California, San Diego<br>Program Director, Henry C. Powell | Resident Neuropathology | |
| 1993-1994 | University of Pittsburgh<br>Program Director, Clayton A Wiley | Fellow Neuropathology | |
| 1994-1995 | University of Pittsburgh | Fellow: NIMH Training Grant<br>in Neuroscience | |
| | Program Director, Michael Zigmond | | |

### APPOINTMENTS AND POSITIONS:

| | |
|---|---|
| 1995-2002 | University of Pittsburgh School of Medicine -Assistant Professor of Pathology |
| 2002-present | University of Pittsburgh School of Medicine -Associate Professor of Pathology |

### DISTRIBUTION OF % TIME

| | |
|---|---|
| Research | 20% |
| Other scholarly activity | 8% |
| Teaching | 10% |
| Clinical | 35% |
| Combined clinical and teaching | 20% |
| Service activities | 5% |
| Administrative activities. | 2% |
| | |
| TOTAL | 100% |

**Ronald L. Hamilton, M.D.**

## CERTIFICATION and LICENSURE

**SPECIALTY CERTIFICATION**

| American Board of Pathology | Anatomic Pathology | 5/23/96 |
| American Board of Pathology | Neuropathology | 5/23/96 |
| American Board of Pathology – recertification | Neuropathology | 1/1/2014 |

**MEDICAL or OTHER PROFESSIONAL LICENSURE**

| 1990 | California Medical License (G69731) expired |
| 1993 | Pennsylvania Medical License (MD-049717-L) |
| 2009 | Indiana Medical License (01067332A) |

## MEMBERSHIPS IN PROFESSIONAL AND SCIENTIFIC SOCIETIES

| 1992 | American Association for the Advancement of Science |
| 1993 | American Association of Neuropathology |
| 1993 | International Society of Neuropathology |
| 1994 | College of American Pathologists (CAP) |
| 1995-97 | CAP Neuropathology Subcommittee |
| 1998 | Children's Cancer Group, Study Committee for CCGB975 |
| 1999 | Society for Neuroscience |

## HONORS

| Nominated "Teacher of the Year: Anatomic Pathology" | 1997 |
| Nominated "Teacher of the Year: Anatomic Pathology" | 1998 |
| Nominated "Teacher of the Year: Anatomic Pathology" | 1999 |
| Nominated "Teacher of the Year: Anatomic Pathology" | 2000 |
| Nominated "Teacher of the Year: Anatomic Pathology" | 2001 |
| Nominated "Teacher of the Year: Anatomic Pathology" | 2002 |
| UPMC ACES Award winner (ACES is an Award for | 2003 |

Clinical Excellence and Service and is given to about 10 physicians per year at UPMC)

| Letter of appreciation from Chief Residents | 1997-1998 |
| AP Pathology "TEACHER OF THE YEAR" | 2004-05 |

## PUBLICATIONS

**Refereed Articles**

1. Esch O, Spinosa JC, **Hamilton RL**, Crombie DL, Schteigart CO, Rondinone JF, D'Agostino HB,Lillienau J and Hofmann AF: Acute effects of topical methyl tert-butyl ether or ethyl propionate on gallbladder histology in animals: a comparison of two solvents for contact dissolution of cholesterol gallstones. Hepatology 16 (4):984-991, 1992.

2. Anders KH, Becker PS, Holden JK, Sharer LR, Cornford ME, Hansen LA, **Hamilton R,** Vinters, HV: Multifocal necrotizing leukoencephalopathy with pontine predilection in immunosuppressed patients: a clinicopathologic review of sixteen cases. Human Pathology 24:897-904, 1993.

3. **Hamilton RL**, Achim C, Grafe MR, Fremont JC, Miners D, Wiley CA: Herpes simplex virus brainstem encephalitis in an AIDS patient. Clinical Neuropathology, 14: 45-50, 1995.

**Ronald L. Hamilton, M.D.**

4.  Rose J, Haskell WL, Gamble JG, **Hamilton RL**, Brown DA, Rinsky L: Muscle pathophysiology and clinical measures of disability in children with cerebral palsy. Journal of Orthopedic Research, 12(6): 758-768, 1994.

5.  **Hamilton RL**, Grafe MR: Complete absence of the cerebellum: a report of two cases. Acta Neuropathologica 88 (3): 258-261, 1994.

6.  **Hamilton RL**, Haas RH, Nyhan WL, Powell HC, Grafe MR: The neuropathology of propionic academia: a report of two additional cases.  Journal of Child Neurology 10(1): 25-30, 1995.

7.  Haas RH, Marsden DL, Capistrano-Estrada S, **Hamilton RL**, Grafe MR, Wong W, Nyhan WL: Acute basal ganglia infarction in propionic acidemia.  Journal of Child Neurology 10(1) 18-22, 1995.

8.  Kupperman BD, Quiceno JI, Wiley C, Hesselink J**, Hamilton R**, Keefe K, Garcia R, Freeman WR: Clinical and histopathologic study of varicella zoster virus retinitis in patients with the acquired immunodeficiency syndrome.  American Journal of Ophthalmology 118:589-600, 1994.

9.  Adelson PD, Robichaurd P, **Hamilton RL**, Kochanek PM. A Model of Diffuse Traumatic Brain  Injury in the Immature Rat.  J Neurosurg 85:877-884, 1996.

10. Alper G, Crumrine PK, **Hamilton RL**, Albright L, Wald ER. An unusual case of inflammatory spinal epidural  mass (Castleman's syndrome) Pediatric Neurology  15: 60-2 , 1996

11. Adelson PD, Firlik KS, Firlik AD, **Hamilton RL**. A meningeal cyst of the thoracic spine presenting as prolonged paresis after ankle injury: case report. Neuropediatrics 27:207-210, 1996.

12. Cramer SC, Segal A, **Hamilton RL**, Schmahman J, Ma J. Leukoencephalitis Due to Varicella Zoster Virus:   Report of a Case and Review of Clinical Features.  Contemporary Neurology, 1, 1996 (electronic journal).

13. Mansfield RT, Schiding JK, **Hamilton R**, Kochanek PM: Effects of hypothermia on traumatic brain injury in immature rats. J Cerebral Blood Flow  Metabo 16(2): 244-252, 1996.

14. Pollack IF, Campbell JW, **Hamilton RL**, Martinez AJ, Bozik ME. Proliferation index as a predictor of prognosis in malignant gliomas of childhood. Cancer 79:849-856, 1996

15. Pollack IF, **Hamilton RL,** Finkelstein SD, Campbell JW, Martinez AJ, Sherwin RN, Bozik ME, Gollin SM. The relationship between tp53 mutations and overexpression of p53 and prognosis in malignant gliomas of childhood. Cancer Research 57:304-309, 1997.

16. Ikonomovic MD, Mizukami K, Davies P, **Hamilton R**, Sheffield R, Armstrong DM. The loss of GluR2(3) immunoreactivity preceded neurofibrillary tangle formation in the entorhinal cortex and hippocampus of Alzheimer brains. J Neuropath Exp Neurol 56:1018-1027, 1997.

17. Bredel M, Pollack IF, Campbell JW, **Hamilton RL**: Basic fibroblast growth factor as a predictor of prognosis in pediatric high-grade gliomas. Clinical Cancer Research 3:2157-2164, 1997

18. Blatt J, **Hamilton RL**: Neurodevelopmental anomalies in children with neuroblastoma. Cancer 82: 1603-8, 1998.

19. Fukui MB, Livstone BJ, Meltzer CC, **Hamilton RL**: Hemorrhagic presentation of untreated primary central nervous system lymphoma in the acquired immunodeficiency syndrome. Am J Roentgenol 170:1114-1115, 1998..

20. Bredel M, Pollack IF, **Hamilton RL**, James CD: Epidermal growth factor receptor (EGFR) and gene amplification in high-grade non-brainstem gliomas of childhood. Clin Can Res 5:1786-92, 1999

**Ronald L. Hamilton, M.D.**

21. Gerszten PC, Pollack IF, **Hamilton RL**. Primary parafalcine chondrosarcoma in a child. Acta Neuropathologica 95:111-4, 1998.

22. Pollack IF, **Hamilton RL**, Fitz C, Orenstein DM. An intrasylvian "fibroma" in a child with cystic fibrosis. Pediatric Neurosurgery 46:744-747 2000.

23. Liachenko S, Tang P, **Hamilton RL**, Xu Y: A reproducible model of circulatory arrest and remote resuscitation in rats for NMR investigation. Stroke 29:1229-1238, 1998

24. Meltzer CC, Liu AY, Perrone AM, **Hamilton RL** Meningioangiomatosis MR imaging with histopathologic correlation. AJR 170:804-5, 1998

25. Clark RSB, Kochanek PM, Chen M, Watkins SC, Marion DW, Chen J, **Hamilton RL**, Loeffert JE, Graham SH. Increases in Bcl-2 and cleavage of caspase-1 and caspase-3 in human brain after head injury. FASEB J, 13:813-821, 1999

26. Soontornniyomkij V, Wang G, Pittman CA, **Hamilton RL**, Wiley CA, Achim CL Absence of brain-derived neurotrophic factor and trkB receptor immunoreactivity in glia of Alzheimer's disease. Acta Neuropathologica 98:345-8, 1999.

27. Wang G, Achim CL, **Hamilton RL**, Wiley CA, Soontornniyomkij V Tyramide signal amplification methods in multiple label immunofluorescence confocal microscopy. Methods 18(4):459-464, 1999

28. Firlik KS, Adelson PD, **Hamilton RL**: Coexistence of a ganglioglioma and Rasmussen's encephalitis: successful treatment in a four-year-old boy. Pediatr Neurosurg 30:278-282, 1999

29. Ikonomovic MD, Mizukami K, Warde D, Sheffield R, **Hamilton R**, Wenthold RJ, Armstrong DM Distribution of glutamate receptor subunit NMDAR1 in the hippocampus of normal elderly and patients with Alzheimer's disease. Exp Neurol 160(1):194-204, 1999.

30. Dallasta, LM, Wang G, Bodnar RJ, Draviam R, Wiley CA, Achim CA, **Hamilton RL**: Differential expression of intercellular adhesion molecules-1 (ICAM-1) and vascular adhesion cell molecule-1 (VCAM-1) in chronic murine retroviral encephalitis. Neuropathol Appl Neurobiol 26:332-341, 2000.

31. Luabeya MK, Dallasta LM, Achim CL, Pauza CD, **Hamilton RL**: Blood-brain Barrier Disruption in Simian Immunodeficiency Virus Encephalitis. Neuropathol Appl Neurobiol 26:454-462, 2000.

32. **Hamilton RL**. Lewy Bodies in Alzheimer's Disease: A Neuropathological Review of 145 Cases Using -synuclein Immunohistochemistry. Brain Pathol 10: 378-384, 2000.

33. Sweet, RA, **Hamilton RL**, Healy MT, Wisniewski SR, Henteleff R, Pollack BG, Lewis DA, DeKosky ST. Alterations of Striatal Dopamine Receptor Binding in Alzheimer's Disease Are Associated with Lewy Body Pathology and With Antemortem Psychosis. Arch Neurol 58:466-472, 2001.

34. Styren S, **Hamilton RL**, Styren GC, Klunk WE X-34: a novel and intensely fluorescent stain for Alzheimer's disease pathology. J Histochem Cytochem 48:1223-1232, 2000.

35. Lopez OL, **Hamilton RL**, Becker JT, Wisniewski S, Kaufer DI, DeKosky ST. Severity of cognitive impairment and the clinical diagnosis of AD with Lewy bodies. Neurology 54:1780-1787, 2000

36. Lopez OL, Wisniewski S, **Hamilton RL**, Becker JT, Kaufer DI, DeKosky ST. Predictors of progression in patients with AD and Lewy bodies. Neurology 54:1774-1779, 2000.

**Ronald L. Hamilton, M.D.**

37. Sweet RA, **Hamilton RL**, Lopez OL, Klunk WE, Wisnieski SR, Kaufer DI, Healy MT, Dekosky ST. Psychotic symptoms in Alzheimer's Disease are not associated with more severe neuropathologic features. Internat Psychogeriatr 12: 547-558, 2000.

38. Lopez OL, Becker JT, Klunk W, Saxton J, **Hamilton RL**, Kaufer DI, Sweet RA, Meltzer CC, Wisniewski S, Kamboh MI, DeKosky ST. Research evaluation and diagnosis of probable Alzheimer's Disease over the last two decades. I. Neurology 55:1854-1862, 2000.

39. Lopez OL, Becker JT, Klunk W, Saxton J, **Hamilton RL**, Kaufer DI, Sweet RA, Meltzer CC, Wisniewski S, Kamboh MI, DeKosky ST. Research evaluation and diagnosis of possible Alzheimer's Disease over the last two decades. II. Neurology 55:1863-1869, 2000.

40. Pollack IF, **Hamilton RL**, Fitz C, Kassam A, Snyderman C. Congenital Reactive Myofibroblastic Tumor of the Petrous Bone: Case Report. Neurosurgery 48:430-435, 2001.

41. Levy EI, Scarrow A, **Hamilton** RC (sic), Wollman MR, Fitz C. Pollack IF. Medical Management Of Eosinophilic Granuloma of the Cervical Spine. Pediatr Neurosurg 31:159-62, 1999.

42. Pettegrew JW, Panchalingam K, **Hamilton RL**, and McClur RJ Brain Membrane Phospholipid Alterations in Alzheimer's Disease. Neurochem Res 26:771-782, 2001

43. Levy EI, Harris AE, Omalu BA, **Hamilton RL**, Branstetter BF, Pollack IF. Sudden Death from Fulminant Acute Cerebellitis. Pediatr Neurosurg 35:24-28, 2001

44. Lianchenko S, Tang P, **Hamilton RL**, Xu Y. Regional Dependence of Cerebral Reperfusion After Circulatory Arrest in Rats. J Cerebr Blood Flow Met 21:1320-1329, 2001 .

45. Pollack IF, Finkelstein SD, Burnham J, Holmes EJ, **Hamilton RL**, Yates AJ, Finlay J, Sposto R, and CCG. Age and TP53 Mutation Frequency in Childhood Malignant Gliomas: Results of a Multi-institutional Cohort. Cancer Res 61:7404-7407, 2001

46. Adelson PD, Jenkins LW, **Hamilton RL**, Robichaud P, Tran MP, Kochanek PM. Histopathologic Response of the Immature Rat to Diffuse Traumatic Brain Injury. J Neurotrauma 18 :967-976, 2001

47. Pollack IF, Finkelstein SD, Woods J, Burnham J, Holmes EJ, **Hamilton RL**, Yates AJ, Boyett JM, Finlay J, Sposto R, and CCG. TP53 Mutations, Expression of p53 and Prognosis in Children with Malignant Gliomas. New England Journal of Medicine 346:420-427, 2002

48. Lopez OL, Becker JT, Kaufer DI, **Hamilton RL**, Sweet RA, Klunk W, DeKosky ST. Research Evaluation and Prospective Diagnosis of Dementia With Lewy Bodies. Arch Neurol 59:43-46, 2002.

49. Wang L, Yushmanov VE, Lianchenko SM, Tang P, **Hamilton RL**, Xu Y. Late Reversal of Cerebral Perfusion and Water Diffusion After Transient Focal Ischemia in Rats. J Cereb Blood Flow Metab 22:253-261, 2002.

50. Pollack IF, Biegal JA, Yates AJ, **Hamilton RL**, Finkelstein SD.Risk Assignment in Childhood Brain Tumors: The Emerging Role of Molecular and Biologic Classification. Current Oncology Reports 4:114-122, 2002.

51. Pollack IF, **Hamilton RL**, Burnham J, Holmes EJ, Finkelstein SD, Sposto R, Yates AJ, Boyett JM, Finley JL. The impact of proliferation index on outcome in childhood malignant gliomas: results in a multi-institutional cohort. Neurosurgery 50:1238-1245, 2002.

**Ronald L. Hamilton, M.D.**

52. Sweet RA, Panchalingam K, Pettefrew JW, McClure RJ, **Hamilton RL**, Lopez OL, Kaufer DI, DeKosky ST, Klunk WE.  Psychosis in Alzheimer disease: postmortem magnetic resonance spectroscopy evidence of excess neuronal and membrane phospholipid pathology. Neurobiol Aging 23:547-53, 2002.

53.  Mazzola CA, Albright AL, Sutton LN, Tuite GF, **Hamilton RL**, Pollack IF.  Dermoid inclusion cysts and early spinal cord tethering after fetal surgery.  New Engl. J Med 347:256-9, 2002.

54.  Bredel M, Pollack IF, **Hamilton RL**, Birner P, Hainfellner JA, Zentner J.  DNA topoisomerase II-alpha predicts progression-free and overall survival in pediatric malignant non-brainstem gliomas.  Int J Cancer 99:817-20, 2002.

55.  Klunk WE, Wang Y, Huang G, Debnath ML, Holt DP, Shao L, **Hamilton RL**, Ikonomovic MD, DeKosky ST, Mathis CA.  The binding of BTA-1 to post-mortem brain homogenates is dominated by the amyloid component. J Neurosci 23:2086-2092, 2003.

56. Castellano-Sanchez, AA, Ohgaki H, Yokoo H, Scheithauer BW, Burger PC, **Hamilton RL**, Finkelstein SD, Brat, DJ.  Cerebral granular cell astrocytomas show a high frequency of allelic loss but lack a defining genotype. Brain Pathology 13: 62-78, 2003.

57.  Gilbertson RJ, Hill DA, Hernan R, Kocak M, Geyer R, Olson J, Gajjar A, Rush L, **Hamilton RL**, Finkelstein SD, Pollack IF.  ERBB1 is amplified and overexpressed in high-grade diffusely infiltrative pediatric brain stem glioma.  Clin Cancer Res 9:3620-3624, 2003.

58. Pollack IF, Finkelstein SD, Burnham J, **Hamilton RL**, Yates AJ, Holmes EJ, Boyett JM, Finlay JL.  The association between chromosome 1p loss and outcome in pediatric malignant gliomas: results from the CCG-945 cohort. Pediatr Neurosurg 39:114-121, 2003.

59.  Carter TL, Rissman RA, Mishizen-Eberz AJ, Wolfe BB, **Hamilton RL**, Gandy S, Armstrong DM.  Differential Preservation of AMPA Receptor Subunits in the Hippocampi of Alzheimer's Disease Patients According to Braak Stage Experimental Neurology 187:299-309, 2004

60.  Finkelstein SD, Mohan D, **Hamilton RL**, Sasatomi E, Swalsky PA, Lieberman FS.  Microdissection-based genotyping assists discrimination of reactive gliosis versus glioma. Am J Clin Pathol 121:671-678, 2004

61.  **Hamilton RL**, Bowser B Alzheimer Disease Pathology in ALS Acta Neuropathologica107:515-522, 2004

62.  Mohan D, Couce ME, Wiley CA, **Hamilton RL**, Sasatomi E, Swalsky PA, Lieberman MD, Finkelstein SD.  Microdissection based genotyping of human gliomas: diagnostic and prognostic considerations Modern Pathology 17:1346-1358, 2004

63. Marshall GA, Kaufer DI, Lopez OL, Rao GR, **Hamilton RL**, DeKosky ST.  Right prosubiculum amyloid plaque density correlates with anosognosia in Alzheimer's Disease.  J Neurol Neurosurg Psychiatry 75:1396-4000, 2004.  **PMCID:  PMC1738763**

64.  Sweet RA, **Hamilton RL**, Butters ME, Mulsant BH, Pollock BG, Lewis DA, DeKosky ST, Reynolds CF.  Neuropathologic Correlates of Dementia in Late Life Major Depression Neuropsychopharmacology 29:2242-2250, 2004

65  Lee JYK, Finkelstein S, **Hamilton RL**, Rekha P, Pirris S, King Jr, JT, Omalu B.  Loss of heterozygosity Analysis of Benign, Atypical and Anaplastic Meningiomas.  Neurosurgery 55:1163-1173, 2004.

**Ronald L. Hamilton, M.D.**

66. Beckner ME, Sasatomi E, Swalsky PA, **Hamilton RL**, Pollack, IF, Finkelstein SD. Loss of heterozygosity reveals non-VHL Allelic loss in hemangioblastomas at 22q13. Human Pathology 35:1105-1111, 2004.

67. Tsuang D, Wilson R, Lopez OL, Luedecking-Zimmer EK, Leverenz JB, DeKosky ST, Kamboh MI, **Hamilton RL**. Genetic Association Between APOE*4 Allele and Lewy Bodies in Alzheimer's Disease Neurology, 64:509-513, 2005. **PMCID: PMC1487185**

68. Bredel C, Lassman S, Pollack IF, Knoth R, **Hamilton RL**, Werner M, Bredel M. DNA Topoisomerase II-alpha and Her-2/Neu Gene Dosages in Pediatric Malignant Gliomas. Int J Cancer 26:1188-92, 2005.

69. Witham TF, Okada H, Fellows W, **Hamilton RL**, Flickinger JC, Chambers WH, Pollack IF, Watkins SC, Kondziolka D. The characterization of tumor apoptosis after experimental radiosurgery. Stereotact Funct Neurosurg 83:17-24 2005.

70. McFadden K, **Hamilton RL**, Insalaco SJ, Lavine L, Al-Mateen M, Guoji Wang G, Wiley CA Neuronal intranuclear inclusion disease in a child without polyglutamine inclusions J Neuropathol Exper Neurol 64:545-552, 2005. **PMCID: PMC1402362**

71. Hatano M, Eguchi J, Tatsumi T, Kuwashima N, Dusak JE, Kinch MS, Pollack IF, **Hamilton RL**, Storkus WJ, Okada H. EphA2 as a glioma-associated antigen: a novel target for glioma-vaccines. Neoplasia 7:717-722, 2005. **PMCID: PMC1501889**

72. Jordan S, Ruoyan C, Koprivica V, **Hamilton RL**, Whitehead R, Tottori K, Kikuchi T. In vitro profile of the antidepressant candidate OPC-14523 at rat and human 5-HT$_{1A}$ receptors.Eur J Pharmacol, 517:165-173, 2005.

73. Omalu BI, Minster RL, Kamboh MI, **Hamilton RL**, Wecht CH, DeKosky ST. Chronic Traumatic Encephalopathy (CTE) in a National Football League (NFL) Player Neurosurgery, 57:128-134, 2005.

74. Judkins AR, Burger PC, **Hamilton RL**, Kleinschmidt-DeMasters B, Perry A, Pomeroy SL, Rosenblum MK, Yachnis AT, Zhou H, Rorke LB, Biegel JA. INI1 Protein Expression Distinguishes Atypical Teratoid/Rhabdopid Tumor from Choroid Plexus Carcinoma. J Neuropathol Exp Neurol 64:391-397, 2005.

75. Desai PP, Ikonomovic I, Abrahamson EE, **Hamilton RL,** Isanski BA, Hope CE, Klunk WE, Dekosky ST, Kamboh MI. Apolipoprotein D is a component of compact but not diffuse amyloid-beta plaques in Alzheimer's Disease temporal cortex. Neurobiol Dis May 22, 2005 (epub)

76. Carson-Walter EB, Hampton J, Geynisman D,Pillai PK, Sathanoori R, Madden SL, **Hamilton RL**, Walter KA. Plasmalemmal Vesicle associated protein-1 (PV-1) is a novel and critical marker of brain tumor angiogenesis. Clin Cancer Res 11:7643-7650, 2005.

77. Lopez OL, Becker JT, Sweet RA, Martin-Sanchez FJ, **Hamilton RL** Lewy bodies in the Amygdala increase risk for major depression in subjects with Alzheimer disease. Neurology 67:660-665, 2006.

78. Pollack IF, **Hamilton RL**, Sobol R, Burnham J, Yates AJ, Holmes EJ, Zhou T, Finlay J (for Children Oncology Group).O6-methylguanine-DNA methyltransferase strongly Correlates with Outcome in Childhood Malignant Gliomas: Results from the CCG-945 Cohort J Clin Oncol. Jul 20;24(21):3431-7, 2006.

**Ronald L. Hamilton, M.D.**

79. Mandal PK, Pettegrew JW, Masliah E, **Hamilton RL**, Mandal R. Interaction between Aβ Peptide and α Synuclein: Molecular Mechanisms in Overlapping Pathology of Alzheimer's and Parkinson's in Dementia with Lewy Body disease.  Neurochemical Research, 2006 31, 1153-1162, 2006.

80. Omalu B, DeKosky ST, **Hamilton RL**, Minster RL, Kamboh MI, Shakir AM, Wecht Chronic Traumatic Encephalopathy in a National Football League Player: part II.  Neurosurgery 59:1086-92, 2006

81. Ramsey CP, Glass CA, Koike MA, Montgomery MB, Ritson GP, Chia L, **Hamilton RL**, Chu CT, Jordan-Sciutto KL. Expression of Nrf2 in neurodegenerative diseases. J Neuropathol Exp Neurol 66:75-85, 2007.  **PMCID: PMC2253896**

82.  Boada FE, Tanase C, Davis D, Walter K, Torres-Trejo A, Couce M, **Hamilton R**, Kondziolka D, Bartinski W, Lieberman F.  Non-invasive assessment of tumor proliferation using triple quantum filtered 23/Na MRI: technical challenges and solutions.  Conf Proc IEEE Eng Med Biol Sci Soc. 2004; 7:5238-41

83. Pollack IF, **Hamilton RL**, James CD, Finkelstein SD, Burnham J, Yates AJ, Holmes EJ, Zhou T, Finlay J (for Children Oncology Group). Rarity of *PTEN* Deletions and *EGFR* Amplification in Malignant Gliomas of Childhood: Results from the Children's Cancer Group-945 Cohort J Neurosurg 105(5 Suppl):418-424, 2006.

84. Guzman A, Wood WL, Alpert E, Prasad MD, Miller RG, Rothstein JD, Bowser R, **Hamilton R**, Wood TD, Cleveland DW, Lingappa VR, Liu J.  Common molecular signature in SOD1 for both sporadic and familial amyotrophic lateral sclerosis.  Proc Nat Acad Sci 104:12524-12529, 2007. **PMCID: PMC2408940**

85. Beckner ME, Jane EP, Jankowitz B, Agostino NR, Walter KA, **Hamilton RL**, Pollack IF.  Tumor cells from ultrasonic aspirations of glioblastomas migrate and from spheres with radial outgrowth. Cancer Letters 255:135-44, 2007. PMID  17543444,  **PMCID: PMC2000342**

86. McIntyre JA, Chapman J, Shavit E, **Hamilton RL**, and DeKosky ST. Redox-Reactive Autoantibodies in Alzheimer's Patients' Cerebrospinal Fluids: Preliminary Studies.  Autoimmunity, 40:390-396, 2007. PMID 17612901

87. Nakashima-Yasuda, Uryu, K, Robinson J, Xie S, Hurtig H, Duda J, Arnold S, Siderowf A, Grossman M, Leverenz J, Woltjer R, Lopez OL, **Hamilton R**, Tsuang DW, Galaska D, Masliah M, Kaye J, Clark C, Montine TJ, Lee VMY, Trojanowski J. Co-morbidity of TDP-43 Proteinopathy in Lewy Body Related Diseases. Acta Neuropathol 114:221-9, 2007.  PMID 17653732

88. McIntyre JA, **Hamilton RL**, DeKosky ST. Redox-reactive autoantibodies in cerebrospinal fluids.  Ann NY Acad Sci 1109:296-302, 2007. PMID 17785318

89. Okada H, Lieberman FS, Walter KA, Lunsford LD, Kondziolka DS, Bejjani GK, **Hamilton RL**, Torres-Trejo A, Kalinski P, Cai Q, Mabold JL, Edington HD, Butterfield LH, Whiteside TL, Potter DM, Schold SC Jr., Pollack IF  Autologous glioma cell vaccine admixed with interleukin-4 gene transfected fibroblasts in the treatment of patients with malignant gliomas.  J Transl Med 5:67, 2007.  PMID 18093335. **PMCID: PMC2254376**

90. Beach TG, White CL, **Hamilton, RL**, Duda JE, Iwatsubo T, Dickson DW, Leverenz JB, Roncaroli F, Buttini M, Hladik CL, Sue LI, Noorigian JV, Adler CH.  Evaluation of alpha-synuclein immunohistochemical methods used by invited experts.  Acta Neuropathol 116:277-88, 2008. PMID 18626651.  **PMCID: PMC2708176**

91. Ikonomovic MD, Klunk WE, Abrahamson EE, Mathis CA, Price JC, Tsopelas ND, Lopresti BJ, Ziolko S, Bi W, Paljug WR, Debnath ML, Hope CE, Isanski BA, **Hamilton RL**, DeKosky ST. Post-

**Ronald L. Hamilton, M.D.**

mortem correlates of in vivo PiB-PET amyloid imaging in a typical case of Alzheimers disease. Brain  131(Pt 6):1630-45, 2008.  PMID  18339640.  **PMCID:  PMC2408940**

92.  Leverenz JB, **Hamilton R**, Tsuang DW, Schantz A, Vavrek D, Larson EB, Kukall WA, Lopez O, Galasko D, Masliah E, Woltjer R, Clark C, Trojanowski JQ, Montine TJ. Empiric refinement of the pathologic assessment of Lewy-related pathology in the dementia patient.  Brain Pathol 18:220-224, 2008. PMID 18241249.  **PMCID:  PMC2689097  NIHMS29359**

93.  Raja AI, Yeaney GA, Jakacki RI, **Hamilton RL**, Pollack IF  Extraventricular neurocytoma in neurofibromatosis Type I: Case report.  J Neurosurg Pediatrics 2:63-67, 2008.PMID 18590398

94.  Okada H, Low KL, Kohanbash G, McDonald HA, **Hamilton RL**, Pollack IF.  Expression of glioma-associated antigens in pediatric brain stem and non-brain stem gliomas.  J Neurooncol 88:245-50, 2008. PMID 18324354.  **PMCID:  PMC2561297 NIHMS70086**

95.  Venneti S, Lopresti BJ, Wang G, **Hamilton RL**, Mathis CA, Klunk WE, Apte UM, Wiley CA. PK11195 labels activated microglia in Alzheimer's disease and in vivo in a mouse model using PET.  Neurobiol Aging 2009, 30:1217-26. PMID 18178291

96.  Mullett SJ, **Hamilton RL**, Hinkle DA.  DJ-1 immunoreactivity in human brain astrocytes is dependent on infarct presence and infarct age.  Neurology 2009, 29:125-31. PMID 18647263

97.  Park DM, Yeaney GA, **Hamilton RL**, Mabold J, Urban N, Appleman L, Flickinger J, Lieberman F, Mintz A.  Identifying Muir-Torre syndrome in a patient with glioblastoma multiforme.  Neuro Oncol, 2009 11:452-5. PMID 19028998.  )

98.  Horbinski C, Bartynski WS, Carson-Walter E, **Hamilton RL**, Tan HP, Cheng S.  Reversible encephalopathy after cardiac transplantation:  Histologic evidence of endothelial activation, T-cell specific trafficking, and vascular endothelial growth factor expression.  Am J Neuroradiol 2008 30:588-90. PMID 18854444.

99.  Northcott P, Nakahara Y, Peacock J, Ellison D, Croul S, Feuk L, Ra YS, Kongham P, Zilerberg K, Mack S, McLeod J, Scherer S, Rao S, Grajkowska W, Gillespie Y, Lach B, Grundy R, Pollack IF, **Hamilton RL,** Van Meter T, Carlotti C, Boop R, Bigner D, Gilbertson R, Rutka J, Taylor MD. Multiple recurrent genetic events converge on control of histone lysine methylation in medulloblastoma.  Nat Genet 2009 41:465-72. PMID 19270706.

100. Ueda R, Kohanbash G, Sasaki K, Fujita M, Zhu X, Kastenhuber ER, McDonald HA, Potter DM, **Hamilton RL,** Lotze MT, Khan SA, Sobol RW, Okada H.  Dicer-regulated microRNAs 222 and 339 promote resistance of cancer cells to cytotoxic T-lymphocytes by down-regulation of ICAM-1.  Proc Natl Acad Sci U S A. 2009 Jun 30;106(26):10746-51.  PMID: 19520829

101.  Maki RA, Tyurin VA, Lyon RC, **Hamilton RL**, DeKosky ST, Kagan VE, Reynolds WF.  Aberrant expression of myeloperoxidase in astrocytes promotes phospholipid oxidation and memory deficits in a mouse model of Alzheimer disease. J Biol Chem. 2009 Jan 30;284(5):3158-69. PMID: 19059911.

102.  Horbinski C, **Hamilton RL**, Lovell C, Burnham J, Pollack IF.  Impact of morphology, MIB-1, p53, and MGMT on Outcome in Pilocytic Astrocytomas.  Brain Pathology 2010; 20:581-8  e-pub Sept 21, 2009

103.  Armstrong RA, Ellis W, **Hamilton RL**, MacKenzie IR, Hedreen J, Gearing M, Montine T, Vonsattel JP, Head E, Lieberman AP, Cairns NJ.  Neuropathological heterogeneity in frontotemporal lobar degeneration with TDP-43 proteinopathy: a quantitative study of 94 cases using principle components analysis.  J Neural Transm 2010, 117:227-239.

**Ronald L. Hamilton, M.D.**

104. Horbinski C, **Hamilton RL**, Nikiforov Y, Pollack IF.  Association of molecular alterations, including BRAF, with biology and outcome in pilocytic astrocytomas.  Acta Neuropathol 2010 Jan 1, e-pub.

105. Van Deerlin VM, Sleiman PM, Martinez-Lage M, Chen-Plotkin A, Wang LS, Graff-Radford NR, Dickson DW, Rademakers R, Boeve BF, Grossman M, Arnold SE, Mann DM, Pickering-Brown SM, Seelaar H, Heutink P, van Swieten JC, Murrell JR, Ghetti B, Spina S, Grafman J, Hodges J, Spillantini MG, Gilman S, Lieberman AP, Kaye JA, Woltjer RL, Bigio EH, Mesulam M, Al-Sarraj S, Troakes C, Rosenberg RN, White CL 3rd, Ferrer I, Lladó A, Neumann M, Kretzschmar HA, Hulette CM, Welsh-Bohmer KA, Miller BL, Alzualde A, de Munain AL, McKee AC, Gearing M, Levey AI, Lah JJ, Hardy J, Rohrer JD, Lashley T, Mackenzie IR, Feldman HH, **Hamilton RL**, Dekosky ST, van der Zee J, Kumar-Singh S, Van Broeckhoven C, Mayeux R, Vonsattel JP, Troncoso JC, Kril JJ, Kwok JB, Halliday GM, Bird TD, Ince PG, Shaw PJ, Cairns NJ, Morris JC, McLean CA, DeCarli C, Ellis WG, Freeman SH, Frosch MP, Growdon JH, Perl DP, Sano M, Bennett DA, Schneider JA, Beach TG, Reiman EM, Woodruff BK, Cummings J, Vinters HV, Miller CA, Chui HC, Alafuzoff I, Hartikainen P, Seilhean D, Galasko D, Masliah E, Cotman CW, Tuñón MT, Martínez MC, Munoz DG, Carroll SL, Marson D, Riederer PF, Bogdanovic N, Schellenberg GD, Hakonarson H, Trojanowski JQ, Lee VM.  Common variants at 7p21 are associated with frontotemporal lobar degeneration with TDP-43 inclusions.  Nat Genet 2010 42:234-239.

106. Omalu BI, **Hamilton RL**, Kamboh MI, DeKosky ST, Bailes J.  Chronic traumatic encephalopathy in a National Football League Player: Case report and emerging medicolegal practice questions.  J Forensic Nurs, 2010, 6: 40-46.

107. Caltagarone J, **Hamilton RL**, Murdoch G, Jing Z, DeFranco DB, Bowser R. Paxillin and hydrogen peroxide-induced clone 5 expression and distribution in control and Alzheimer disease hippocampi. J Neuropathol Exp Neurol. 2010: 69:356-71.

108. Pollack IF, **Hamilton RL**, Sobol RW, Nikiforova MN, Lyons-Weiler MA, Laframboise WA, Burger PC, Brat DJ, Rosenblum MK, Holmes EJ, Zhou T, Jakacki RI; for the Children's Oncology Group. IDH1 mutations are common in malignant gliomas arising in adolescents: a report from the Children's Oncology Group. Childs Nerv Syst. 2010; 27:87-94

109. Jun G, Naj AC, Beecham GW, Wang LS, Buros J, Gallins PJ, Buxbaum JD, Ertekin-Taner N, Fallin MD, Friedland R, Inzelberg R, Kramer P, Rogaeva E, St George-Hyslop P, Arnold SE, Baldwin CT, Barber R, Beach T, Bigio EH, Bird TD, Boxer A, Burke JR, Cairns N, Carroll SL, Chui HC, Clark DG, Cotman CW, Cummings JL, Decarli C, Diaz-Arrastia R, Dick M, Dickson DW, Ellis WG, Fallon KB, Farlow MR, Ferris S, Frosch MP, Galasko DR, Gearing M, Geschwind DH, Ghetti B, Gilman S, Giordani B, Glass J, Graff-Radford NR, Green RC, Growdon JH, **Hamilton RL**, Harrell LE, Head E, Honig LS, Hulette CM, Hyman BT, Jicha GA, Jin LW, Johnson N, Karlawish J, Karydas A, Kaye JA, Kim R, Koo EH, Kowall NW, Lah JJ, Levey AI, Lieberman A, Lopez OL, Mack WJ, Markesbery W, Marson DC, Martiniuk F, Masliah E, McKee AC, Mesulam M, Miller JW, Miller BL, Miller CA, Parisi JE, Perl DP, Peskind E, Petersen RC, Poon W, Quinn JF, Raskind M, Reisberg B, Ringman JM, Roberson ED, Rosenberg RN, Sano M, Schneider JA, Schneider LS, Seeley W, Shelanski ML, Smith CD, Spina S, Stern RA, Tanzi RE, Trojanowski JQ, Troncoso JC, Van Deerlin VM, Vinters HV, Vonsattel JP, Weintraub S, Welsh-Bohmer KA, Woltjer RL, Younkin SG, Cantwell LB, Dombroski BA, Saykin AJ, Reiman EM, Bennett DA, Morris JC, Lunetta KL, Martin ER, Montine TJ, Goate AM, Blacker D, Tsuang DW, Beekly D, Cupples LA, Hakonarson H, Kukull W, Foroud TM, Haines J, Mayeux R, Farrer LA, Pericak-Vance MA, Schellenberg GD; Alzheimer's Disease Genetics Consortium, Arnold SE, Baldwin CT, Barber R, Beach T, Bigio EH, Bird TD, Boxer A, Burke JR, Cairns N, Carroll SL, Chui HC, Clark DG, Cotman CW, Cummings JL, Decarli C, Diaz-Arrastia R, Dick M, Dickson DW, Ellis WG, Fallon KB, Farlow MR, Ferris S, Frosch MP, Galasko DR, Gearing M, Geschwind DH, Ghetti B, Gilman S, Giordani B, Glass J, Graff-Radford NR, Green RC, Growdon JH, Hamilton RL, Harrell LE, Head E, Honig LS, Hulette CM, Hyman BT, Jicha GA, Jin LW, Johnson N, Karlawish J, Karydas A, Kaye JA, Kim R, Koo EH, Kowall NW, Lah JJ, Levey AI, Lieberman A, Lopez OL, Mack WJ, Markesbery W, Marson DC, Martiniuk F, Masliah E, McKee AC, Mesulam M, Miller JW, Miller BL, Miller CA, Parisi JE, Perl DP, Peskind E, Petersen RC, Poon W, Quinn JF, Raskind M, Reisberg B, Ringman JM, Roberson ED, Rosenberg RN, Sano M, Schneider JA, Schneider LS, Seeley W, Shelanski ML, Smith CD, Spina S, Stern RA, Tanzi RE, Trojanowski JQ, Troncoso JC, Van Deerlin VM, Vinters HV, Vonsattel JP, Weintraub S, Welsh-Bohmer KA, Woltjer RL, Younkin SG.  Meta-analysis confirms CR1, CLU and PICALM as Alzheimer Disease Risk Loci and reveals interactions with APOE Genotypes. Arch Neurol, 2010, Sep 3 (epub ahead of print)

110. Pollack IF, **Hamilton RL**, Burger PC, Brat DJ, Rosenblum MK, Murdoch GH, Nikiforova MN, Holmes EJ, Zhou T, Cohen KJ, Jakacki RI; Children's Oncology Group. Akt activation is a common event in pediatric malignant gliomas and a potential adverse prognostic marker: a report from the Children's Oncology Group. J Neurooncol. 2010 Sep;99(2):155-63. Epub 2010 Jul 4

**Ronald L. Hamilton, M.D.**

111. Pollack IF, **Hamilton RL**, Sobol RW, Nikiforova MN, Nikiforov YE, Lyons-Weiler MA, Laframboise WA, Burger PC, Brat DJ, Rosenblum MK, Gilles FH, Yates AJ, Zhou T, Cohen KJ, Finlay JL, Jakacki RI; for the Children's Oncology Group. Mismatch repair deficiency is an uncommon mechanism of alkylator resistance in pediatric malignant gliomas: a report from the Children's Oncology Group. Pediatr Blood Cancer 2010 Jun 29 epub ahead of print

112. Bonneh-Barkay D, Wang G, Starkey A, **Hamilton RL**, Wiley CA. In vivo CHI3L1 (YKL-40) expression in astrocytes in acute and chronic neurological diseases. J Neuroinflammation 2010 Jun 11:7-34.

113. Hinkle DA, Mullett SJ, Gabris BE, **Hamilton RL**. DJ-1 expression in glioblastomas shows positive correlation with p53 expression and negative correlation with epidermal growth factor receptor amplification. Neuropathology 2010 May 19 (epub ahead of print)xx

114. Okada H, Kalinski P, Ueda R, Hoji A, Kohanbash G, Donegan TE, Mintz AH, Engh JA, Bartlett DL, Brown CK, Zeh H, Holtman MP, Reinhart TA, Whiteside TL,Butterfield LH, **Hamilton RL**, Potter DM, Pollack IF, Salazar AM, Lieberman FS. Induction of CD8+ T-cell responses against novel glioma-associated antigen peptides and clinical activity by vaccinations with {alpha}-type 1 polarized dendritic cells and polyinosinic-polycytidylic acid stabilized by lysine and carboxymethylcellulose In patients with recurrent malignant glioma. J Clin Oncol. 2011;29:330-6.PMID: 21149657

115. Kofler J, Bartynski WS, Reynolds TQ, Lieberman FS, Murdoch GH, **Hamilton RL**. Posterior reversible encephalopathy syndrome (PRES) with immune system activation, VEGF up-regulation, and cerebral amyloid angiopathy. J. Comput Assist Tomogr. 2011; 35:39-42. PMID: 21150450

116. Bonfield CM, Amin D, **Hamilton RL**, Gerszten PC. Extramedullary ependymoma near the conus medullaris with lumbar nerve root attachment: case report. Neurosurgery. 2011 Mar;68:E831-4. PMID:21311277

117. Fujita M, Kohanbash G, Fellows-Mayle W, **Hamilton RL**, Komohara Y, Decker SA, Ohlfest JR, Okada H.COX-2 blockade suppresses gliomagenesis by inhibiting myeloid-derived suppressor cells.      Cancer Res. 2011 Apr 1;71:2664-74. Epub 2011 Feb 15. PMID: 21324923

118. Cohen KJ, Pollack IF, Zhou T, Buxton A, Holmes EF, Burger PC, Brat DJ, Rosenblum MK, **Hamilton RL**, Lavey RS, Heideman RL. Temozolomide in the treatment of high-grade gliomas in children: a report from the Children's Oncology Group.
Neuro Oncol. 2011 Mar;13:317-23. PMID: 21339192

119. Omalu B, Bailes J, **Hamilton RL**, Kamboh MI, Hammers J, Case M, Fitzsimmons R.
Emerging histomorphologic phenotypes of chronic traumatic encephalopathy in American athletes.
Neurosurgery. 2011 Jul;69:173-83; discussion 183. PMID: 21358359

120. Tang JB, Svilar D, Trivedi RN, Wang XH, Goellner EM, Moore B, **Hamilton RL**, Banze LA, Brown AR, Sobol RW. N-methylpurine DNA glycosylase and DNA polymerase beta modulate BER inhibitor potentiation of glioma cell to temozolomide. Neurosurgery Oncol. 2011;13:471-86. PMID: 21377995

121. Liu KW, Feng H, Bachoo R, Kazlauskas A, Smith EM, Symes K, **Hamilton RL**, Nagane M, Nishikawa R, Hu, B, Cheng Sy. SHP-2/PTPN 11 mediates gliomagenesis driven by PDGFRA and INK4A/ARF aberrations in mice and humans. J. Clin Invest. 2011 Mar;121:905-17. PMID: 21393858

122. Naj AC, Jun G, Beecham GW, Wang LS, Vardarajan BN, Buros J, Gallins PJ, Buxbaum JD, Jarvidk GP, Crane PK, Larson EB, Bird TB, Boeve BF, Graff-Radford NR, De Jager PL, Evans D, Schneider JA, Carrasquillo MM, Ertekin-Taner N, Younkin SG, Cruchaga C, Kauwe JS, Nowotny P, Kramer P, Hardy J, Huentelman MJ, Myers AJ, Barmada MM, Demirci FY, Baldwin CT, Green RC, Rogaeva E, St. George-Hyslop P, Arnold SE, Barber R, Beach T, Bigio EH, Bowen JD, Boxer A, Burke JR, Cairns NJ, Carlson CS, Carney RM, Carroll SL, Chui HC, Clark DG, Corneveaux J, Cotman CW, Cummings JL, Decarli C, DeKosy ST, Diaz-Arrastia R, Dick M, Dickson DW, Ellis WG, Faber KM, Fallon KB, Farlow MR, Ferris S. Frosch MP, Galasko Dr, Ganguli M, Gearing M, Geschwind DH, Ghetti B, Gilbert JR, Gilman S, Giordani B, Glass JD, Growdon JH, **Hamilton RL**,R, Koo EH, Kowall NW, Lah JJ, Levey AI, Lieberman AP, Lopez OL, Mack WJ, Marson DC, Martiniuk F, Mash DC, Masliah E, McCormick WC, McCurry SM, McDavid AN, McKee AC, Mesulam M, Miller BL, Miller JW, Parisi JE, Perl DP, Peskind E,Petersen, RC, Poon, WV, Quinn JF, Rajbhandary RA, Raskind M, Reisberg B, Ringman JM, Roberson ED, Rosenberg RN,Sano M, Schneider LS, Seeley W, Shelanksi ML, Slifer MA, Smith CD, Sonnen JA, Spina S. Stern RA, Tanzi RE, Trojanowski JQ, Troncoso JC, Van Deerlin VM, Vinters HV, Vonsattel JP, Weintraub S, Welsh-Bohmer KA, Williamson

**Ronald L. Hamilton, M.D.**

J, Woltjer RL,Cantwell LB, Dombroski BA, Beekly D, Lunetta KL, Martin ER, Kamboh MI, Saykin AJ, Reiman EM, Bennett DA, Morris JC, Montine TJ, Goate AM, lacker D, Tsuang DW, Hakonarson, H, Kukull WA, Foroud TM, Haines JL, Mayeux R, Pericak-Vance MA, Farrer LA, Schellenberg GD. Commons variants as MS4A4/MS4A6E, CD2AP, CD33 and EPHA1 are associated with late Onset Alzheimer's Disease. Nat Genet. 2011 May;43:436-41 Epub 2011 Apr 3. PMID: 21460841

123.    Chen-Plotkin AS, Martinez-Lage M,Sleiman PM, Hu W, Greene R, Wood EM, Bing S, Grossman M, Schellenberg GD, Hatanpaa KJ, Weiner MF, White CL 3rd, Brooks WS, Halliday GM, Kril JJ, Gearing M, Beach TG, Graff-Radford NR, Dickson DW, Rademakers R, Boeve BF, Pickering-Brown SM, Snowden J, van Swieten JC, Heutink P, Seelaar H, Murrell JR, Ghetti B, Spina S, Grafman J, Kaye JA, Woltjer RL, Mesulam M, Bigio E, Llad'o A, Miller BL, Alzualde A, Moreno F,Rohrer JD, Mackenzie IR, Feldman HH, **Hamilton RL**, Cruts M, Engelborghs S, De Deyn PP, Van Broeckhoven C, Bird TD, Cairns NJ, Goate A, Frosch MP, Riederer PF, Bogdanovic N, Lee VM, Trojanowksi JQ, Van Deerlin VM. Genetic and clinical features of progranulin-associated frontotemporal lobar degeneration. Arch Neurol. 2011 Apr;68:488-97. PMID: 21482928

124.    Nikiforova MN, **Hamilton RL**. Molecular diagnostics of gliomas. Arch Pathol Lab Med. 2011 May;135:558-68. Review. PMID: 21526954

125.    Monaco EA 3rd, Armah HB, Nikiforova MN, **Hamilton RL**, Engh JA. Grade II Oligodendroglioma localized to the corpus callosum. Brain Tumor Pathol. 2011 Oct;28:305-9. Epub 2011 Jul 22. PMID: 21833577

126.    Horbinski C, Hobbs, J, Cieply K, Dacic S, **Hamilton RL**. EGFR expression stratifies oligodendroglioma behavior.Am J Pathol. 2011 Oct; 179:1638-44. Epub 2011 Aug 11. PMID: 21839716

127.    Omalu B, hammers, JL, bailes J**, Hamilton RL**. Kamboh MI, Webster G, Fitzsimmons RP. Chronic traumatic Encephalopathy in an Iraqi war veteran with posttraumatic stress disorder who committed suicide. Neurosurg Focus. 2011 Nov; :E3. PMID: 22044102

128.    Liu Y, Komohara Y, Domenick N, Ohno M, Ikeura M, **Hamilton RL**, Horbinski C, Wang X, Ferrone S, Okada H. Expression of antigen processing molecules in brain metastasis of breast cancer. Cancer Immunol Immunother. 2011 Nov 8. (Epub ahead of print } PMID:22065046

129.    Feng H, Hu B, Liu KW, Li Y, Lu X, Cheng T, Yiin JJ, Lu S, Keezer S, Fenton T, Furnari FB, **Hamilton RL**, Vuori K, Sarkaria JN, Nagane M, Nishikawa R, Cavenee WK, Cheng SY. Activation of Rac 1 by src-dependent phosphorylation of Dock180(Y1811) mediates PDGFRa-stimulated glioma tumorigenesis in mice and humans. J Clin Invest. 2011 Dec; 121:4670-84. doi: 10.1172/JCI58559. Epub 2011 Nov 14. PMID: 22080864

130.    Horbinski C, Nikiforova MN, Hobbs J, Bortoluzzi S. Cieply K, Dacic S, **Hamilton RL**. The importance of 10q status in an outcomes-based comparison between 1p/19q fluorescence in situ hybridization and polymerase chain reaction-based microsatellite loss of heterozygosity analysis of oligodendrogliomas. J. Neuropathol Exp Neurol. 2012 Jan;71:73-82. PMID: 22157622

131.    Ikonomovic MD, Abrahamson EE, Price JC, **Hamilton RL**, Mathis CA, Paljug WR, Cohen AD, Mizukami K, DeKosky ST, Lopez OL, Klunk WE. Early AD pathology in a {C-11} PiB-negative case: a PiB-amyloid imaging, biochemical, and Immunohistochemical study. Acta Neuropathol. 2012 Mar;123:433-47. Epub 2012 Jan 24. PMID: 22271153

132.    Feng H, Hu B, Jarzynka MJ, Li Y, Keezer S, Johns TG, Tang CK, **Hamilton RL**, Vuuori K, Nishikawa R, Sarkaria JN, Fenton T, Cheng T, Furnari FB, Cavenee WK, Cheng SY. Phosphorylation of dedicator of cytokinesis 1(Dock 180) at tyrosine residue Y722 by Src family kinases mediates EGRFvIII-driven glioblastoma tumorigenesis. Proc Natl Acad Sci U S A. 2012 Feb 21;109:3018-23. Epub 2012 Feb 7. PMID: 22323579

133.    Wu J, Lou H, Alerte TN, Stachowski EK, Chen J, Singleton AB, **Hamilton RL**, Perez RG. Neuroscience. 2012 Jan 25. {Epubahead a print} PMID: 22326202

134.    Murray PS, Kirkwood CM, Gray MC, Ikonomovic MD, Paljug WR, Abrahamson EE, Henteleff RA, **Hamilton RL**, Kofler JK, Klunk WE, Lopez OL, Penzes P, Sweet RA. β-Amyloid 42/40 ratio and kalirin expression in Alzheimer disease with psychosis. Neurobiol Aging. 2012 Mar 17. [Epub ahead of print] PMID:22429885

**Ronald L. Hamilton, M.D.**

135.    Choi SH, Olabarrieta M, Lopez OL, Maruca V, DeKosky ST, **Hamilton RL**, Becker JT. Gray Matter Atrophy Associated with Extrapyramidal Signs in the Lewy Body Variant of Alzheimer's Disease. J Alzheimers Dis. 2012 Aug 9. [Epub ahead of print] PMID:22886020

136.    Armstrong RA, **Hamilton RL**, Mackenzie IR, Hedreen J, Cairns NJ. Laminar Distribution of the Pathological Changes in Sporadic Frontotemporal Lobar Degeneration with TDP-43 Proteinopathy: A Quantitative Study Using Polynomial Curve Fitting. Neuropathol Appl Neurobiol. 2012 Jul 16. [Epub ahead of print] PMID:22804696

137.    Atkinson DM, **Hamilton RL** A 52-year-old male with visual changes. Brain Pathol. 2012 Jul;22(4):575-8. PMID:22697384

138.    Zou F, Chai HS, Younkin CS, Allen M, Crook J, Pankratz VS, Carrasquillo MM, Rowley CN, Nair AA, Middha S, Maharjan S, Nguyen T, Ma L, Malphrus KG, Palusak R, Lincoln S, Bisceglio G, Georgescu C, Kouri N, Kolbert CP, Jen J, Haines JL, Mayeux R, Pericak-Vance MA, Farrer LA, Schellenberg GD; Alzheimer's Disease Genetics Consortium, Petersen RC, Graff-Radford NR, Dickson DW, **Hamilton RL**, Younkin SG, Ertekin-Taner N. Brain expression genome-wide association study (eGWAS) identifies human disease-associated variants. PLoS Genet. 2012;8(6): e1002707. Epub 2012 Jun 7 PMID:22685416

139.    Horbinski C, Nikiforova MN, Hagenkord JM, **Hamilton RL**, Pollack IF. Interplay among BRAF, p16, p53, and MIB1 in pediatric low-grade gliomas. Neuro Oncol. 2012 Jun;14(6):777-89 (1012) PMID:22492957

140.    Hobbs J, Nikiforova MN, Fardo DW, Bortoluzzi S, Cieply K, **Hamilton RL**, Horbinski C. Paradoxical relationship between the degree of EGFR amplification and outcome in glioblastomas. Am J Surg Pathol. 2012 Aug;36(8):1186-93. PMID:22472960

141. Armstrong, R. A., **R. L. Hamilton**, I. R. Mackenzie, J. Hedreen and N. J. Cairns. "Laminar Distribution of the Pathological Changes in Sporadic Frontotemporal Lobar Degeneration with Transactive Response (Tar) DNA-Binding Protein of 43 Kda (Tdp-43) Proteinopathy: A Quantitative Study Using Polynomial Curve Fitting." *Neuropathol Appl Neurobiol* 39, no. 4 (2013): 335-47.

142. Clark, K. H., J. L. Villano, M. N. Nikiforova, **R. L. Hamilton** and C. Horbinski. "1p/19q Testing Has No Significance in the Workup of Glioblastomas." *Neuropathol Appl Neurobiol*,  (2013).

143. Gheorghe, G., O. Radu, S. Milanovich, **R. L. Hamilton**, R. Jaffe, J. F. Southern and J. A. Ozolek. "Pathology of Central Nervous System Posttransplant Lymphoproliferative Disorders: Lessons from Pediatric Autopsies." *Pediatr Dev Pathol* 16, no. 2 (2013): 67-73.

1444. Holton, P., M. Ryten, M. Nalls, D. Trabzuni, M. E. Weale, D. Hernandez, H. Crehan, J. R. Gibbs, R. Mayeux, J. L. Haines, L. A. Farrer, M. A. Pericak-Vance, G. D. Schellenberg, M. Ramirez-Restrepo, A. Engel, A. J. Myers, J. J. Corneveaux, M. J. Huentelman, A. Dillman, M. R. Cookson, E. M. Reiman, A. Singleton, J. Hardy and R. Guerreiro. "Initial Assessment of the Pathogenic Mechanisms of the Recently Identified Alzheimer Risk Loci." *Ann Hum Genet* 77, no. 2 (2013): 85-105.

145. Miyashita, A., A. Koike, G. Jun, L. S. Wang, S. Takahashi, E. Matsubara, T. Kawarabayashi, M. Shoji, N. Tomita, H. Arai, T. Asada, Y. Harigaya, M. Ikeda, M. Amari, H. Hanyu, S. Higuchi, T. Ikeuchi, M. Nishizawa, M. Suga, Y. Kawase, H. Akatsu, K. Kosaka, T. Yamamoto, M. Imagawa, T. Hamaguchi, M. Yamada, T. Moriaha, M. Takeda, T. Takao, K. Nakata, Y. Fujisawa, K. Sasaki, K. Watanabe, K. Nakashima, K. Urakami, T. Ooya, M. Takahashi, T. Yuzuriha, K. Serikawa, S. Yoshimoto, R. Nakagawa, J. W. Kim, C. S. Ki, H. H. Won, D. L. Na, S. W. Seo, I. Mook-Jung, P. St George-Hyslop, R. Mayeux, J. L. Haines, M. A. Pericak-Vance, M. Yoshida, N. Nishida, K. Tokunaga, K. Yamamoto, S. Tsuji, I. Kanazawa, Y. Ihara, G. D. Schellenberg, L. A Farrer and R. Kuwano. "Sorl1 Is Genetically Associated with Late-Onset Alzheimer's Disease in Japanese, Koreans and Caucasians." *PLoS One* 8, no. 4 (2013): e58618.

146. Pang, B., M. B. Durso, **R. L. Hamilton** and M. N. Nikiforova. "A Novel Cold-Pcr/Fmca Assay Enhances the Detection of Low-Abundance Idh1 Mutations in Gliomas." *Diagn Mol Pathol* 22, no. 1 (2013): 28-34.

147. Reitz, C., G. Jun, A. Naj, R. Rajbhandary, B. N. Vardarajan, L. S. Wang, O. Valladares, C. F. Lin, E. B. Larson, N. R. Graff-Radford, D. Evans, P. L. De Jager, P. K. Crane, J. D. Buxbaum, J. R. Murrell, T. Raj, N. Ertekin-Taner, M. Logue, C. T. Baldwin, R. C. Green, L. L. Barnes, L. B. Cantwell, M. D. Fallin, R. C. Go, P. Griffith, T. O. Obisesan, J. J. Manly, K. L. Lunetta, M. I. Kamboh, O. L. Lopez, D. A. Bennett, H. Hendrie, K. S. Hall, A. M. Goate, G. S. Byrd, W. A. Kukull, T. M. Foroud, J. L. Haines, L. A. Farrer, M. A. Pericak-Vance, G. D. Schellenberg and R. Mayeux. "Variants

**Ronald L. Hamilton, M.D.**

in the Atp-Binding Cassette Transporter (Abca7), Apolipoprotein E 4,and the Risk of Late-Onset Alzheimer Disease in African Americans." *JAMA* 309, no. 14 (2013): 1483-92.

148. Schlegel, J., M. J. Sambade, S. Sather, S. J. Moschos, A. C. Tan, A. Winges, D. DeRyckere, C. C. Carson, D. G. Trembath, J. J. Tentler, S. G. Eckhardt, P. F. Kuan, **R. L. Hamilton**, L. M. Duncan, C. R. Miller, N. 9. Nikolaishvili-Feinberg, B. R. Midkiff, J. Liu, W. Zhang, C. Yang, X. Wang, S. V. Frye, H. S. Earp, J. M. Shields and D. K. Graham. "Mertk Receptor Tyrosine Kinase Is a Therapeutic Target in Melanoma." *J Clin Invest* 123, no. 5 (2013): 2257-67.

150. Spina, S., A. D. Van Laar, J. R. Murrell, **R. L. Hamilton**, J. K. Kofler, F. Epperson, M. R. Farlow, O. L. Lopez, J. Quinlan, S. T. DeKosky and B. Ghetti. "Phenotypic Variability in Three Families with Valosin-Containing Protein Mutation." *Eur J Neurol* 20, no. 2 (2013): 251-8.

151. Tsuang, D., J. B. Leverenz, O. L. Lopez, **R. L. Hamilton,** D. A. Bennett, J. A. Schneider, A. S. Buchman, E. B. Larson, P. K. Crane, J. A. Kaye, P. Kramer, R. Woltjer, J. Q. Trojanowski, D. Weintraub, A. S. Chen-Plotkin, D. J. Irwin, J. Rick, G. D. Schellenberg, G. S. Watson, W. Kukull, P. T. Nelson, G. A. Jicha, J. H. Neltner, D. Galasko, E. Masliah, J. F. Quinn, K. A. Chung, D. Yearout, I. F. Mata, J. Y. Wan, K. L. Edwards, T. J. Montine and C. P. Zabetian. "Apoe Epsilon4 Increases Risk for Dementia in Pure Synucleinopathies." *JAMA Neurol* 70, no. 2 (2013): 223-8.

152. Yeung, J. T., **R. L. Hamilton**, K. Ohnishi, M. Ikeura, D. M. Potter, M. N. Nikiforova, S. Ferrone, R. I. Jakacki, I. F. Pollack and H. Okada. "Loh in the Hla Class I Region at 6p21 Is Associated with Shorter Survival in Newly Diagnosed Adult Glioblastoma." *Clin Cancer Res* 19, no. 7 (2013): 1816-26.

153. Yeung, J. T., **R. L. Hamilton**, H. Okada, R. I. Jakacki and I. F. Pollack. "Increased Expression of Tumor-Associated Antigens in Pediatric and Adult Ependymomas: Implication for Vaccine Therapy." *J Neurooncol* 111, no. 2 (2013): 103-11.

154. **Hamilton R**, Krauze M, Romkes M, Omolo B, Konstantinopoulos P, Reinhart T, Harasymczuk M, Wang Y, Lin Y, Ferrone S, Whiteside T, Bortoluzzi S, Werley J, Nukui T, Fallert-Junecko B, Kondziolka D, Ibrahim J, Becker D, Kirkwood J, Moschos S. Pathologic and gene expression features of metastatic melanomas to the brain.Cancer. 2013 Aug 1;119(15):2737-46. doi: 10.1002/cncr.28029. Epub 2013 May 21.PMID:23695963 [PubMed - in process]

155. Lam S, Grandhi R, Wong R, **Hamilton R**, Greene S. Neuromuscular hamartoma of the sciatic nerve: Case report and review of the literature. Surg Neurol Int. 2013;4:8. doi: 10.4103/2152-7806.106266. Epub 2013 Jan 18.PMID:23493803[PubMed]

156. Reitz C, Mayeux R; Alzheimer's Disease Genetics Consortium. TREM2 and neurodegenerative disease. N Engl J Med. 2013 Oct 17;369(16):1564-5. doi: 10.1056/NEJMc1306509#SA1. PMID:24131184

157. Tempel ZJ, Johnson SA, Richard PS, Friedlander RM, Rothfus WE, **Hamilton RL**.  Parasellar arachnoid cyst presenting with a nonpupil sparing third nerve palsy mimicking a posterior communicating artery aneurysm in an adult. Surg Neurol Int. 2013 Jul 9;4:87. doi: 10.4103/2152-7806.114799. eCollection 2013.PMID:23956930

158. Murray PS, Kirkwood CM, Gray MC, Fish KN, Ikonomovic MD, **Hamilton RL**, Kofler JK, Klunk WE, Lopez OL, Sweet RA.  Hyperphosphorylated tau is elevated in Alzheimer's Disease with psychosis. J Alzheimers Dis, 2014 204;39:759-773. PMID:24270207

159. Oborski MJ, Laymon CM, Lieberman FS, Drappatz J, **Hamilton RL**, Mountz JM. First use of (18)F-labeled ML-10 PET to assess apoptosis change in a newly diagnosed glioblastoma multiforme patient before and early after therapy. Brain Behav 2014 4:312-315.  PMID:24683522

160  Shin SS, Murdoch G, Hamilton RL, Faraji AH, Kano H, Zwagerman NT, Gardner PA, Lunsford LD, Friedlander RM The Pathological Response of Cavernous Malformations Following Radiosurgery.  J Neurosurg (in press).

160.  Pollack IF, Jakacki RI, Butterfield LH, **Hamilton RL**, Panigrahy A, Potter DM, Connelly AK, Dibridge SA, Whiteside TL, Okada H. Antigen-specific immune responses and clinical outcome after vaccination with glioma-associated antigen peptides and polyinosinic-polycytidylic Acid stabilized by lysine and carboxymethylcellulose in children with newly diagnosed malignant brainstem and nonbrainstem gliomas. J Clin Oncol. 2014 Jul 1;32(19):2050-8. PMID:24888813

161.  Naj AC, Jun G, Reitz C, Kunkle BW, Perry W, Park YS, Beecham GW, Rajbhandary RA, Hamilton-Nelson KL, Wang LS, Kauwe JS, Huentelman MJ, Myers AJ, Bird TD, Boeve BF, Baldwin CT, Jarvik GP, Crane PK, Rogaeva E, Barmada MM, Demirci FY, Cruchaga C, Kramer PL, Ertekin-Taner N, Hardy J, Graff-Radford NR, Green RC, Larson

**Ronald L. Hamilton, M.D.**

EB, St George-Hyslop PH, Buxbaum JD, Evans DA, Schneider JA, Lunetta KL, Kamboh MI, Saykin AJ, Reiman EM, De Jager PL, Bennett DA, Morris JC, Montine TJ, Goate AM, Blacker D, Tsuang DW, Hakonarson H, Kukull WA, Foroud TM, Martin ER, Haines JL, Mayeux RP, Farrer LA, Schellenberg GD, Pericak-Vance MA; Alzheimer Disease Genetics Consortium, Albert MS, Albin RL, Apostolova LG, Arnold SE, Barber R, Barnes LL, Beach TG, Becker JT, Beekly D, Bigio EH, Bowen JD, Boxer A, Burke JR, Cairns NJ, Cantwell LB, Cao C, Carlson CS, Carney RM, Carrasquillo MM, Carroll SL, Chui HC, Clark DG, Corneveaux J, Cribbs DH, Crocco EA, DeCarli C, DeKosky ST, Dick M, Dickson DW, Duara R, Faber KM, Fallon KB, Farlow MR, Ferris S, Frosch MP, Galasko DR, Ganguli M, Gearing M, Geschwind DH, Ghetti B, Gilbert JR, Glass JD, Growdon JH, **Hamilton RL**, Harrell LE, Head E, Honig LS, Hulette CM, Hyman BT, Jicha GA, Jin LW, Karydas A, Kaye JA, Kim R, Koo EH, Kowall NW, Kramer JH, LaFerla FM, Lah JJ, Leverenz JB, Levey AI, Li G, Lieberman AP, Lin CF, Lopez OL, Lyketsos CG, Mack WJ, Martiniuk F, Mash DC, Masliah E, McCormick WC, McCurry SM, McDavid AN, McKee AC, Mesulam M, Miller BL, Miller CA, Miller JW, Murrell JR, Olichney JM, Pankratz VS, Parisi JE, Paulson HL, Peskind E, Petersen RC, Pierce A, Poon WW, Potter H, Quinn JF, Raj A, Raskind M, Reisberg B, Ringman JM, Roberson ED, Rosen HJ, Rosenberg RN, Sano M, Schneider LS, Seeley WW, Smith AG, Sonnen JA, Spina S, Stern RA, Tanzi RE, Thornton-Wells TA, Trojanowski JQ, Troncoso JC, Valladares O, Van Deerlin VM, Van Eldik LJ, Vardarajan BN, Vinters HV, Vonsattel JP, Weintraub S, Welsh-Bohmer KA, Williamson J, Wishnek S, Woltjer RL, Wright CB, Younkin SG, Yu CE, Yu L. .  Effects of multiple genetic Loci on age at onset in late-onset Alzheimer disease: a genome-wide association study.   JAMA Neurol. 2014 Nov 1;71(11):1394-404. doi: 10.1001/jamaneurol.2014.1491

162.  Pollack IF, Jakacki RI, Butterfield LH, **Hamilton RL**, Panigrahy A, Potter DM, Connelly AK, Dibridge SA, Whiteside TL, Okada H.  Antigen-specific immune responses and clinical outcome after vaccination with glioma-associated antigen peptides and polyinosinic-polycytidylic acid stabilized by lysine and carboxymethylcellulose in children with newly diagnosed malignant brainstem and nonbrainstem gliomas.   J Clin Oncol. 2014 Jul 1;32(19):2050-8. doi: 10.1200/JCO.2013.54.0526. Epub 2014 Jun 2. PMID: 24888813

163..  Okada H, Butterfield LH, **Hamilton RL**, Hoji A, Sakaki M, Ahn BJ, Kohanbash G, Drappatz J, Engh J, Amankulor N, Lively MO, Chan MD, Salazar AM, Shaw EG, Potter DM, Lieberman FS.  Induction of robust type-1 CD8+ T-cell responses in WHO grade II low-grade glioma patients receiving peptide-based vaccines in combination with poly-ICLC Clin Cancer Res. 2014 Nov 25. pii: clincanres.1790.2014

164.  Salloway S, Sperling R, Fox NC, Blennow K, Klunk W, Raskind M, Sabbagh M, Honig LS, Porsteinsson AP, Ferris S, Reichert M, Ketter N, Nejadnik B, Guenzler V, Miloslavsky M, Wang D, Lu Y, Lull J, Tudor IC, Liu E, Grundman M, Yuen E, Black R, Brashear HR; **Hamilton RL**,  Bapineuzumab 301 and 302 Clinical Trial Investigators.  Two phase 3 trials of bapineuzumab in mild-to-moderate Alzheimer's disease  N Engl J Med. 2014 Jan 23;370(4):322-33. doi: 10.1056/NEJMoa1304839.

165. Leone JP, Bhargava R, Theisen BK, **Hamilton RL**, Lee AV, Brufsky AM. Expression of high affinity folate receptor in breast cancer brain metastasis. Oncotarget. 2015 Jun 25. [Epub ahead of print]  PMID: 24450891

166.  Wang LS, Naj AC, Graham RR, Crane PK, Kunkle BW, Cruchaga C, Murcia JD, Cannon-Albright L, Baldwin CT, Zetterberg H, Blennow K, Kukull WA, Faber KM, Schupf N, Norton MC, Tschanz JT, Munger RG, Corcoran CD, Rogaeva E; Alzheimer's Disease Genetics Consortium, Lin CF, Dombroski BA, Cantwell LB, Partch A, Valladares O, Hakonarson H, St George-Hyslop P, Green RC, Goate AM, Foroud TM, Carney RM, Larson EB, Behrens TW, Kauwe JS, Haines JL, Farrer LA, Pericak-Vance MA, Mayeux R, Schellenberg GD; National Institute on Aging-Late-Onset Alzheimer's Disease (NIA-LOAD) Family Study, Albert MS, Albin RL, Apostolova LG, Arnold SE, Barber R, Barmada M, Barnes LL, Beach TG, Becker JT, Beecham GW, Beekly D, Bennett DA, Bigio EH, Bird TD, Blacker D, Boeve BF, Bowen JD, Boxer A, Burke JR, Buxbaum JD, Cairns NJ, Cao C, Carlson CS, Carroll SL, Chui HC, Clark DG, Cribbs DH, Crocco EA, DeCarli C, DeKosky ST, Demirci FY, Dick M, Dickson DW, Duara R, Ertekin-Taner N, Fallon KB, Farlow MR, Ferris S, Frosch MP, Galasko DR, Ganguli M, Gearing M, Geschwind DH, Ghetti B, Gilbert JR, Glass JD, Graff-Radford NR, Growdon JH, **Hamilton RL**, Hamilton-Nelson KL, Harrell LE, Head E, Honig LS, Hulette CM, Hyman BT, Jarvik GP, Jicha GA, Jin LW, Jun G, Jun G, Kamboh MI, Karydas A, Kaye JA, Kim R, Koo EH, Kowall NW, Kramer JH, LaFerla FM, Lah JJ, Leverenz JB, Levey AI, Li G, Lieberman AP, Lopez OL, Lunetta KL, Lyketsos CG, Mack WJ, Marson DC, Martin ER, Martiniuk F, Mash DC, Masliah E, McCormick WC, McCurry SM, McDavid AN, McKee AC, Mesulam WM, Miller BL, Miller CA, Miller JW, Montine TJ, Morris JC, Murrell JR, Olichney JM, Parisi JE, Perry W, Peskind E, Petersen RC, Pierce A, Poon WW, Potter H, Quinn JF, Raj A, Raskind M, Reiman EM, Reisberg B, Reitz C, Ringman JM, Roberson ED, Rosen HJ, Rosenberg RN, Sano M, Saykin AJ, Schneider JA, Schneider LS, Seeley WW, Smith AG, Sonnen JA, Spina S, Stern RA, Tanzi RE, Thornton-Wells TA, Trojanowski JQ, Troncoso JC, Tsuang DW, Van Deerlin VM, Van Eldik LJ, Vardarajan BN, Vinters HV, Vonsattel JP, Weintraub S, Welsh-Bohmer KA, Williamson J, Wishnek S, Woltjer RL, Wright CB, Younkin SG, Yu CE, Yu L.**Rarity of the Alzheimer disease-protective APP A673T variant in the United States.** JAMA Neurol. 2015 Feb;72(2):209-16. doi: 10.1001/jamaneurol.2014.2157.

**Ronald L. Hamilton, M.D.**

167. 2. Jun G, Ibrahim-Verbaas CA, Vronskaya M, Lambert JC, Chung J, Naj AC, Kunkle BW, Wang LS, Bis JC, Bellenguez C, Harold D, Lunetta KL, Destefano AL, Grenier-Boley B, Sims M, Beecham GW, Smith AV, Chouraki V, Hamilton-Nelson KL, Ikram MA, Fievet N, Denning N, Martin ER, Schmidt H, Kamatani Y, Dunstan ML, Valladares O, Laza AR, Zelenika D, Ramirez A, Foroud TM, Choi SH, Boland A, Becker T, Kukull WA, van der Lee SJ, Pasquier F, Cruchaga C, Beekly D, Fitzpatrick AL, Hanon O, Gill M, Barber R, Gudnason V, Campion D, Love S, Bennett DA, Amin N, Berr C, Tsolaki M, Buxbaum JD, Lopez OL, Deramecourt V, Fox NC, Cantwell LB, Tárraga L, Dufouil C, Hardy J, Crane PK, Eiriksdottir G, Hannequin D, Clarke R, Evans D, Mosley TH Jr, Letenneur L, Brayne C, Maier W, De Jager P, Emilsson V, Dartigues JF, Hampel H, Kamboh MI, de Bruijn RF, Tzourio C, Pastor P, Larson EB, Rotter JI, O'Donovan MC, Montine TJ, Nalls MA, Mead S, Reiman EM, Jonsson PV, Holmes C, St George-Hyslop PH, Boada M, Passmore P, Wendland JR, Schmidt H, Morgan K, Winslow AR, Powell JF, Carasquillo M, Younkin SG, Jakobsdóttir J, Kauwe JS, Wilhelmsen KC, Rujescu D, Nöthen MM, Hofman A, Jones L; IGAP Consortium, Haines JL, Psaty BM, Van Broeckhoven C, Holmans P, Launer LJ, Mayeux R, Lathrop M, Goate AM, Escott-Price V, Seshadri S, Pericak-Vance MA, Amouyel P, Williams J, van Duijn CM, Schellenberg GD, Farrer LA and . Collaborators (including **Hamilton RL**) (296)  **A novel Alzheimer disease locus located near the gene encoding tau protein**. Mol Psychiatry. 2015 Mar 17. doi: 10.1038/mp.2015.23.

168. . Østergaard SD, Mukherjee S, Sharp SJ, Proitsi P, Lotta LA, Day F, Perry JR, Boehme KL, Walter S, Kauwe JS, Gibbons LE; Alzheimer's Disease Genetics Consortium; GERAD1 Consortium; EPIC-InterAct Consortium, Larson EB, Powell JF, Langenberg C, Crane PK, Wareham NJ, Scott RA.
Collaborators (including **Hamilton RL**) (296)  Associations between Potentially Modifiable Risk Factors and Alzheimer Disease: A Mendelian Randomization Study. PLoS Med. 2015 Jun 16;12(6):e1001841; discussion e1001841. doi:

169. Wang P, Bahreini A, Gyanchandani R, Lucas PC, Hartmaier RJ, Watters RJ, Jonnalagadda AR, Trejo Bittar HE, Berg A, **Hamilton RL**, Kurland BF, Weiss KR, Mathew A, Leone JP, Davidson NE, Nikiforova MN, Brufsky AM, Ambros TF, Stern AM, Puhalla SL, Lee AV, Oesterreich S. Sensitive detection of mono- and polyclonal ESR1 mutations in primary tumors, metastatic lesions and cell free DNA of breast cancer patients. Clin Cancer Res. 2015 Oct 23. pii: 1534.2015. PMID: 26500237

170. Salgado CM, Basu D, Nikiforova M, **Hamilton RL**, Gehris R, Jakacki R, Panigrahy A, Yatsenko S, Reyes-Múgica M. Amplification of mutated NRAS leading to congenital melanoma in neurocutaneous melanocytosis. Melanoma Res. 2015 Oct;25(5):453-60.  PMID: 26266759

171. Shin SS, Murdoch G, Hamilton RL, Faraji AH, Kano H, Zwagerman NT, Gardner PA, Lunsford LD, Friedlander RM. Pathological response of cavernous malformations following radiosurgery. J Neurosurg. 2015 Oct;123(4):938-44. doi: 10.3171/2014.10.JNS14499. Epub 2015 Jun 19. PMID: 26090838

---------------------

172. Mukherjee S, Walter S, Kauwe JS, Saykin AJ, Bennett DA, Larson EB, Crane PK, Glymour MM; Adult Changes in Thought Study Investigators; Religious Orders Study/Memory and Aging Project Investigators; Alzheimer's Disease Genetics Consortium. Alzheimers Dement. Genetically predicted body mass index and Alzheimer's disease-related phenotypes in three large samples: Mendelian randomization analyses. 2015 Dec;11(12):1439-51. doi: 10.1016/j.jalz.2015.05.015. Epub 2015 Jun 12. PMID: 26079416

173. Ghani M, Reitz C, Cheng R, Vardarajan BN, Jun G, Sato C, Naj A, Rajbhandary R, Wang LS, Valladares O, Lin CF, Larson EB, Graff-Radford NR, Evans D, De Jager PL, Crane PK, Buxbaum JD, Murrell JR, Raj T, Ertekin-Taner N, Logue M, Baldwin CT, Green RC, Barnes LL, Cantwell LB, Fallin MD, Go RC, Griffith PA, Obisesan TO, Manly JJ, Lunetta KL, Kamboh MI, Lopez OL, Bennett DA, Hendrie H, Hall KS, Goate AM, Byrd GS, Kukull WA, Foroud TM, Haines JL, Farrer LA, Pericak-Vance MA, Lee JH, Schellenberg GD, St George-Hyslop P, Mayeux R, Rogaeva E; Alzheimer's Disease Genetics Consortium. Association of Long Runs of Homozygosity With Alzheimer Disease Among African American Individuals. JAMA Neurol. 2015 Nov;72(11):1313-23. doi: 10.1001/jamaneurol.2015.1700. PMID: 26366463

174. Nikiforova MN, Wald AI, Melan MA, Roy S, Zhong S, Hamilton RL, Lieberman FS, Drappatz J, Amankulor NM, Pollack IF, Nikiforov YE, Horbinski C.
Targeted next-generation sequencing panel (GlioSeq) provides comprehensive genetic profiling of central nervous system tumors. Neuro Oncol. 2016 Mar;18(3):379-87. doi: 10.1093/neuonc/nov289. Epub 2015 Dec 17. PMID: 2668176

175. Morrissy AS, Garzia L, Shih DJ, Zuyderduyn S, Huang X, Skowron P, Remke M, Cavalli FM, Ramaswamy V, Lindsay PE, Jelveh S, Donovan LK, Wang X, Luu B, Zayne K, Li Y, Mayoh C, Thiessen N, Mercier E, Mungall KL, Ma

**Ronald L. Hamilton, M.D.**

Y, Tse K, Zeng T, Shumansky K, Roth AJ, Shah S, Farooq H, Kijima N, Holgado BL, Lee JJ, Matan-Lithwick S, Liu J, Mack SC, Manno A, Michealraj KA, Nor C, Peacock J, Qin L, Reimand J, Rolider A, Thompson YY, Wu X, Pugh T, Ally A, Bilenky M, Butterfield YS, Carlsen R, Cheng Y, Chuah E, Corbett RD, Dhalla N, He A, Lee D, Li HI, Long W, Mayo M, Plettner P, Qian JQ, Schein JE, Tam A, Wong T, Birol I, Zhao Y, Faria CC, Pimentel J, Nunes S, Shalaby T, Grotzer M, Pollack IF, Hamilton RL, Li XN, Bendel AE, Fults DW, Walter AW, Kumabe T, Tominaga T, Collins VP, Cho YJ, Hoffman C, Lyden D, Wisoff JH, Garvin JH Jr, Stearns DS, Massimi L, Schüller U, Sterba J, Zitterbart K, Puget S, Ayrault O, Dunn SE, Tirapelli DP, Carlotti CG, Wheeler H, Hallahan AR, Ingram M, MacDonald TJ, Olson JJ, Van Meir EG, Lee JY, Wang KC, Kim SK, Cho BK, Pietsch T, Fleischhack G, Tippelt S, Ra YS, Bailey S, Lindsey JC, Clifford SC, Eberhart CG, Cooper MK, Packer RJ, Massimino M, Garre ML, Bartels U, Tabori U, Hawkins CE, Dirks P, Bouffet E, Rutka JT, Wechsler-Reya RJ, Weiss WA, Collier LS, Dupuy AJ, Korshunov A, Jones DT, Kool M, Northcott PA, Pfister SM, Largaespada DA, Mungall AJ, Moore RA, Jabado N, Bader GD, Jones SJ, Malkin D, Marra MA, Taylor MD. Divergent clonal selection dominates medulloblastoma at recurrence. Nature. 2016 Jan 21;529(7586):351-7. doi: 10.1038/nature16478. Epub 2016 Jan 13

176. Gandhoke GS, Yilmaz S, Grunwaldt L, Hamilton RL, Salvetti DJ, Greene S. A case of spinal epidural venous malformation with mediastinal extension: management with combined surgery and percutaneous sclerotherapy. J Neurosurg Pediatr. 2016 May;17(5):612-7. doi: 10.3171/2015.9.PEDS15341. Epub 2016 Jan 15.

177. Thompson EM, Hielscher T, Bouffet E, Remke M, Luu B, Gururangan S, McLendon RE, Bigner DD, Lipp ES, Perreault S, Cho YJ, Grant G, Kim SK, Lee JY, Rao AA, Giannini C, Li KK, Ng HK, Yao Y, Kumabe T, Tominaga T, Grajkowska WA, Perek-Polnik M, Low DC, Seow WT, Chang KT, Mora J, Pollack IF, Hamilton RL, Leary S, Moore AS, Ingram WJ, Hallahan AR, Jouvet A, Fèvre-Montange M, Vasiljevic A, Faure-Conter C, Shofuda T, Kagawa N, Hashimoto N, Jabado N, Weil AG, Gayden T, Wataya T, Shalaby T, Grotzer M, Zitterbart K, Sterba J, Kren L, Hortobágyi T, Klekner A, László B, Pócza T, Hauser P, Schüller U, Jung S, Jang WY, French PJ, Kros JM, van Veelen MC, Massimi L, Leonard JR, Rubin JB, Vibhakar R, Chambless LB, Cooper MK, Thompson RC, Faria CC, Carvalho A, Nunes S, Pimentel J, Fan X, Muraszko KM, López-Aguilar E, Lyden D, Garzia L, Shih DJ, Kijima N, Schneider C, Adamski J, Northcott PA, Kool M, Jones DT, Chan JA, Nikolic A, Garre ML, Van Meir EG, Osuka S, Olson JJ, Jahangiri A, Castro BA, Gupta N, Weiss WA, Moxon-Emre I, Mabbott DJ, Lassaletta A, Hawkins CE, Tabori U, Drake J, Kulkarni A, Dirks P, Rutka JT, Korshunov A, Pfister SM, Packer RJ, Ramaswamy V, Taylor MD. Prognostic value of medulloblastoma extent of resection after accounting for molecular subgroup: a retrospective integrated clinical and molecular analysis. Lancet Oncol. 2016 Mar 11. pii: S1470-2045(15)00581-1. doi: 10.1016/S1470-2045(15)00581-1. [Epub ahead of print]

178. Pollack IF, Jakacki RI, Butterfield LH, Hamilton RL, Panigrahy A, Normolle DP, Connelly AK, Dibridge S, Mason G, Whiteside TL, Okada H. Immune responses and outcome after vaccination with glioma-associated antigen peptides and poly-ICLC in a pilot study for pediatric recurrent low-grade gliomas†. Neuro Oncol. 2016 Mar 15. pii: now026. [Epub ahead of print]

179. Jakacki RI, Cohen KJ, Buxton A, Krailo MD, Burger PC, Rosenblum MK, Brat DJ, Hamilton RL, Eckel SP, Zhou T, Lavey RS, Pollack IF. Phase 2 study of concurrent radiotherapy and temozolomide followed by temozolomide and lomustine in the treatment of children with high-grade glioma: a report of the Children's Oncology Group ACNS0423 study. Neuro Oncol. 2016 Mar 22. pii: now038. [Epub ahead of print]

180. Ridge PG, Hoyt KB, Boehme K, Mukherjee S, Crane PK, Haines JL, Mayeux R, Farrer LA, Pericak-Vance MA, Schellenberg GD, Kauwe JS; Alzheimer's Disease Genetics Consortium (ADGC). Assessment of the genetic variance of late-onset Alzheimer's disease. Neurobiol Aging. 2016 May;41:200.e13-20. doi: 10.1016/j.neurobiolaging.2016.02.024. Epub 2016 Mar 3

181. Beckner ME, Pollack IF, Nordberg ML, Hamilton RL. Glioblastomas with copy number gains in EGFR and RNF139 show increased expressions of carbonic anhydrase genes transformed by ENO1. BBA Clin. 2015 Nov 10;5:1-15. doi: 10.1016/j.bbacli.2015.11.001. eCollection 2016 Jun. PMID: 27051584 Free PMC Article

182. Fernandes-Cabral DT, Zenonos GA, Hamilton RL, Panesar SS, Fernandez-Miranda JC. High-Definition Fiber Tractography in the Evaluation and Surgical Planning of Lhermitte-Duclos Disease: A Case Report. World Neurosurg. 2016 May 7. pii: S1878-8750(16)30257-1. doi: 10.1016/j.wneu.2016.04.128. [Epub ahead of print] PMID: 27168233

**Reviews, invited published papers, proceedings of conference and symposia, monographs, books and book chapters**

-4338-

**Ronald L. Hamilton, M.D.**

1. **Hamilton RL**, Wiley CA. New developments in the neuropathology of AIDS. CAP Today, 10 (12): p 42, 1996.
2. **Hamilton RL**: Hydrocephalus in a 9 month-old infant. Brain Pathol 6:533-534, 1996
3. **Hamilton RL**: New onset hemiparesis. Brain Pathol 7: 715-716, 1997.
4. **Hamilton RL**: Precocious Puberty. Brain Pathol 7: 711-712, 1997
5. **Hamilton RL**: Frontal lobe tumor in 11 year-old girl. Brain Pathol 7: 713-714, 1997
6 **Hamilton RL**, Pollack, IF: The Molecular Biology of Ependymomas. Brain Pathology 7:807-822, 1997.
7. **Hamilton RL**: A 26 year old woman with new onset seizures. Brain Pathol 8: 239-240, 1997.
8. **Hamilton RL**, Wiley, CA, The Neuropathology of Viral Infections of the Nervous System. In: Textbook of Neuropathology; Davis RL, Robertson DM eds. Williams and Wilkins, 3rd edition,  Baltimore, MD. 1997.

9. **Hamilton RL**: Guidelines for the neuropathological diagnosis of Alzheimer's Disease and Dementia with Lewy Bodies. Revista de Neurologia 27 (S1): S67-S70, 1998
10. **Hamilton RL**: Experimental neuropathology of Alzheimer's Disease: animal models. Revista de Neurologia 27 (S1): S84-S86, 1998
11. Sanders VJ, Wiley CA, **Hamilton RL**: The mechanisms of neuronal damage in retroviral infections of the nervous system. in The Mechanisms of Neuronal Damage in Virus Infections of the Nervous System (Gosztonyi G, ed). Springer Verlag, Berlin, 2001.
12. **Hamilton RL**. [Recent Advances in the neuropathological evaluation of Alzheimer's Disease: the importance of synuclein] Rev Neurol 35:765-7, 2002 (Spanish).
13. Pollack IF, **Hamilton RL**, Finkelstein SD, Lieberman F.  Molecular abnormalities and correlations with tumor response and outcome in glioma patients.  Neuroimaging Clinics of North America: Advances in Brain Tumor Imaging and Therapy (Provenzale J, ed.) WB Saunders, Philadelphia,  2002.
14. **Hamilton RL**.  The other dementias: the neuropathology of the non-Alzheimer's Disease dementias. Rev Neurol 37:130-139, 2003 (Spanish).
15. Omalu BI, Wiley CA, **Hamilton RL**.  Case of the Month February 2003. Brain Pathology 13:419-420, 2003.
16. DeKosky ST, Ikonomovic MD, **Hamilton RL**, Bennett DA, Mufson EJ. Neuropathology of Mild Cognitive Impairment in the Elderly. In John Morris J, Scheltens P, and Cummings JL), (eds), *Alzheimer's Disease and Related Disorders:* London, Taylor & Francis, 1-16, 2006.
17. Crain BJ, Alston SR, Bruch LA, **Hamilton RL**, McLendon RE, Rhodes H, Tihan T, Weidenheim KM. Accreditation Council for Graduate Medical Education (ACGME) Competencies in Neuropathology Training.  J Neuropathol Exp Neurol 64:273-279, 2005.
18. McIntyre JA, **Hamilton RL**, Dekosky ST.  Redox-reactive autoantibodies in cerebrospinal fluids. Annals of NY Acad Sci 1109: 296-302, 2007.
19. DeKosky ST, Kaufer DI, **Hamilton R**, Wolk D, Lopez OL: Dementia. In: Neurology in Clinical Practice: Principles of Diagnosis and Management, 5th Edition. Editors: Bradley WG, Daroff RB, Fenichel GM & Jankovic J. Boston MA, Butterworth-Heinemann, 2007: 1855-1907.
20. Tyurin VA, Tyurina YY, Kochanek PM, **Hamilton R**, DeKosky ST, Greenberger JS, Bayir H, Kagan VE.  Chapter 19: Oxidative lipidomics of programmed cell death.  Methods Enzymol 442:375-93, 2008.
21. Yeaney GA, O'Conn SM, Jankowitz BT, **Hamilton RL**.  A 16 year-old male with cerebellar mass. Brain Pathol. 2009 19, 167-170. PMID 19076785
22. Horbinski, C, **Hamilton RL**.  Application of telepathology for neuropathologic intraoperative consultations. Brain Pathol 2009 19; 317-322. PMID 19290998

## Abstracts

1. **Hamilton RL**, Sanger WG, and McComb RD: Characterization of cell lines derived from malignant tumors in patients with neurofibromatosis. Federation Proceedings 46: 433, 1987.
2. Esch O, Spinosa JC, **Hamilton RL**, Crombie DL, Schteigart CD, Hofmann AF: Reversible cytotoxicity to the gallbladder mucosa of contact dissolution solvents for cholesterol gallstones: a comparison of methyl tert-butyl ether (mtbe) and ethyl propionate (ep) in two animal models. Gastroenterology 100 (5, part 2): A135, 1991.

**Ronald L. Hamilton, M.D.**

3. Haas RH, Popovitch B, **Hamilton RL**: The utility of DNA dystrophin gene analysis in non-specific myopathy: presented at Child Neurology Society Annual Meeting, October, 1992: New Orleans, LA.

4. Haas RH, Mansden DL, Estrada S, **Hamilton RL**, Grafe MG, Nyhan WL: Acute basal ganglia infarction in propionic acidemia in spite of good metabolic control: presented at Child Neurology Society Annual Meeting, October, 1992: New Orleans, LA.

5. **Hamilton RL**, Haas RH, Nyhan W, Powell HP, Grafe MR:  The neuropathology of propionic acidemia: a report of two additional cases. American association of Neuropathology Annual Meeting, June 1993, Salt Lake City, UT; J Neuropathol Exp Neurol 52:299, 1993.

6. Mansfield RT, Schiding JK**, Hamilton R,** Kochanek PM: Hypothermia fails to reduce lesion volume after traumatic brain injury in immature rats.  Pediatric Research 35(4):55, 1994.

7. **Hamilton RL**, Bodnar RJ, Wang G, Wiley CA.  The effect of AZT on retroviral encephalitis: a murine model: presented at the Sixth Workshop on the Pathogenesis of Animal Retroviruses, Philadelphia, PA, Nov. 17-19, 1994.

8. Adelson PD, Robichaurd P, **Hamilton RL**, Kochanek PM. Brain edema and neuropathology after diffuse traumatic injury in immature rats.  Neurotrauma Society meeting, San Diego CA, Nov 10-11, 1995.

9. **Hamilton RL**, Bodnar RJ, Wang G, Klunk W, Wiley CA, Treatment of chronic retroviral encephalitis with zidovudine (AZT) in a murine model. Society for Neuroscience Meeting, San Diego, CA Nov 11-16 1995.

10. **Hamilton RL**, Bodnar RJ, Wang G, Klunk W, Wiley CA. The effect of zidovudine (AZT) on murine retroviral encephalitis. Amer. Assoc of Neuropathology, San Antonio, June, 1995. J Neuropathol Exp Neurol 54 (3): 438, 1995.

11. **Hamilton RL**, and Claassen D. Neonatal Methylmalonic Acidemia With Hemicerebellum: An Autopsy Report;  Society of Pediatric Pathology / Child Neurology Society (joint meeting), Baltimore, Oct 27-29, 1995.

12. **Hamilton RL**, Baldwin M, Wiley CA. Human Herpesviruses And Temporal Arteritis American Association of Neuropathology, Vancouver, BC, Canada, June 1996.

13. Mizukami K, Ikonomovic MD, Sheffield R, Rubin RT, Grayson D, **Hamilton R**, Warde D, Armstrong DM. Immunohistochemical Localization of GABA-A Receptor ß2/3 Subunits in the Hippocampal Formation in Aged Brain with Alzheimer-related Neuropathology. Society for Neuroscience meeting, Washington DC, Nov 1996.

14. Bodnar RJ and **Hamilton RL**. Effect of zidovudine (AZT) and saquinavir on retroviral infection of the central nervous system (CNS) Society for Neuroscience meeting, Nov 17-21, 1996 Washington D.C.

15. Bredel M, Pollack I, **Hamilton RL**, Finkelstein SD, Campbell JW, Martinez AJ, Sherwin R, Bozik ME, Gollin S. Overexpression of EGF receptor and p53 mutations in pediatric malignant gliomas. American Association of Neurological Surgeons, 1997 Annual meeting.

16. Xu Y, Liachennko S, Tang P, **Hamilton RL** Correlation of neuropathologic changes with cerebral metabolic and ADC abnormalities after prolonged asphyxial cardiac arrest. International Society of Magnetic Resonance in Medicine, annual meeting, 1997

17. Bredel M, Pollack IF, Campbell JW, **Hamilton RL**. Basic fibroblast growth factor as a prognostic indicator in pediatric high grade glioma patients. American Association of Neuropathology, Pittsburgh, PA, June 1997. J Neuropathol Exp Neurol 56 (5): 581, 1997

18. **Hamilton RL**, Bodnar RJ, Lackner AA, Lane JH, Wiley CA Neurotrophic factors in simian immunodeficiency virus encephalitis. American Association of Neuropathology, Pittsburgh, PA, June 1997. J Neuropathol Exp Neurol 56 (5): 618, 1997

19. Adelson, PD, Robichaud, P, **Hamilton, RL**, Kochanek, PM. Histologic analyses of severe diffuse traumatic brain injury in the immature rat . National Neurotrama Society, New Orleans Oct 24-25, 1997.

20. Dorsey RW, Achim CL, Wiley CA, **Hamilton RL**\*,  Soontornniyomkij V. Gene expression and cellular localization of neurotrophic factors in Alzheimer's disease. Society of Neuroscience meeting Nov, 1997, New Orleans.

21.  Klunk WE, **Hamilton RL**, Styren SD, Styren G, Debnath ML, Mathis CA, Mahood K, Hsiao KK. Staining of AD and Tg2576 mouse brain wirh X-34, a highly flourescent derivative of chrysamine

**Ronald L. Hamilton, M.D.**

G and A potential in vivo probe for sheet fibrils. Siociety for Neuroscience meeting, New Orleans 1997.

22. Klunk WE, **Hamilton RL**, Styren SD, Styren G, Debnath ML. Neuropathological study of AD brain with X-34, a new highly fluorescent derivative of congo red. Society for Neuroscience meeting. Los Angeles, CA 1998.

23. Halks-Miller M, Hesselgesser J, Horuk R, Soontornniyomkij V, **Hamilton R,** Achim C. CCR1 immunoreactivity in Alzheimer's Disease brains. Society for Neurosciences meeting. Los Angeles, CA 1998.

24. Wang G, Soontornniyomkij V, Pittman CA, Achim CL, Wiley CA, **Hamilton RL**. Glial expression of BDNF and TRK B receptor proteins in Alzheimer's Disease and HIV-1 encephalitis brains. Society for Neuroscience meeting. Los Angeles, CA 1998.

25. Ikonomovic MD, Mizukami K, Davies P, **Hamilton R**, Sheffield R, Armstrong DM. Co-localization of interneurons and an ad-specific antibody in the hippocampal formation of Alzheimer brains. Society for Neurosciences. Los Angeles, CA 1998.

26. Mizukami K, Ikonomovic MD, Grayson DR, Rubin RT, Warde D, Sheffield R, **Hamilton RL,** Davies P, Armstrong DM. Immunohistochemical study of GABA(A) receptor beta 2/3 subunits in the hippocampal formation of aged brains with Alzheimer-related neuropathologic changes. Experimental Neurology 147 2 333-45 (1997).

27. Bredel M, Pollack IF, **Hamilton RL**: Expression of the c-erbB1 Oncogene Product Epidermal Growth Factor Receptor (EGFR) and its Relevance for Outcome in Children with Supratentorial High-Grade Gliomas ; XVI Congress of the European Society for Pediatric Neurosurgery; November 11-15, 1998, Marseille, France

28. **Hamilton, RL** Numerous widespread alpha-synuclein positive thread-like processes characterize dementia with Lewy Bodies. Foundation IPSEN Conference, April 12, 1999, Paris France

29 **Hamilton RL** Numerous and widespread alpha-synuclein thread-like processes in dementia with Lewy bodies. American Assoc of Neuropathologist Annual Meeting, 1999, Portland, OR. J Neuropathol Exper Neurol 58:552, 1999.

30. Klunk WE, **Hamilton RL**, Styren SD, Head E: Evaluation of the aged canine as a screening system for the x-34 class of in vivo probes for amyloid deposition in AD. Soc. of Neuroscience, 1999

31. Kaufer, DL, **Hamilton RL**, Lopez OL, DeKosky ST MRI white matter hyperintensities and cerebral amyloid angiopathy in a case of dementia with Lewy bodies. Amer Neuropsychiatric Assoc, annual meeting, 2/2000, Ft. Myers, FLA.

32. **Hamilton RL**, Mash DC. Widespread Alpha-synucleinopathy in the Parkinson's Disease brain. 6th National Parkinson's Disease Foundation International Symposium on Parkinson's Disease Research, to be held in conjunction with the Society of Neuroscience meeting in Miami Beach, Oct 22-23rd, 1999.

33. **Hamilton, RL**, Mash DC. Widespread alpha-synuclein-positive neuropil threads in the Parkinson's Disease brain. American Assoc of Neuropathology, Atlanta, GA, June 8-11, 2000.

34. Snyder JV, Gebel JM, Kassam A, **Hamilton RL**, Goldstein S, Watkins S, Yonas H, Chelluri L, Thulborn K. Guidance by MR Tissue Sodium Concentration of Infarct Resection in Massive Stroke. Neurology 54(7): A97-A98, Suppl. 3, 2000.

35. Chow TM, Kaufer DI, Lopez OL, **Hamilton RL**, Becker JT, DeKosky ST. Temporal Evolution of Lewy Body Phenotype in Autopsy Confirmed Cases of Alzheimer's Disease and Dementia With Lewy Bodies. Neurology 56(8): A300-A301, Suppl 3, 2001.

36. Castellano-Sanchez A, Ohgaki HH, Yokoo, Finkelstein SD, Medina-Flores R, **Hamilton RL**, Scheithauer BW, Burger PC, Brat DJ. Genetic Alterations in Granular Cell Astrocytomas. USCAP, 2002.

37. Demidovich J, Pittman CA, Hamilton RL. Altered calpain proteolysis of mutant alpha-synuclein. Honors Thesis presentation, Univ. Pitt, 2002

38. Omalu BI, **Hamilton RL**, Swalsky PA, Finkelstein SD. Microdissection-based mutational profiling of malignant, atypical and benign meningiomas: the determination of meningioma grade by fractional mutational index. AANP, Denver, 2002 (JNEN 61:491, 2002)

39. Wilson, RK, Luedecking-Zimmer EK, Kamboh MI, DeKosky ST, **Hamilton RL**. Association of the ApoE4 allele and Lewy bodies in Alzheimer's Disease. AANP, Denver 2002 (JNEN 61: 455, 2002).

**Ronald L. Hamilton, M.D.**

40. Desai PP, Ikonomovic MD, **Hamilton RL**, DeKosky ST, Kamboh MI. Apolipoprotein D in Alzheimer's Disease: implications for amyloid pathology. Soc. for Neuroscience, Orlando, 2002.

41. Garb S, **Hamilton RL**. Sequestration of soluble alpha-synuclein in Lewy body Variant of Alzheimer's Disease. Soc for Neuroscience, Orlando, 2002.

42. Marshall GA, Kaufer DI, Lopez OL, Rao GR, **Hamilton RL**, DeKosky ST. A neuropathological correlate of anosognosia in Alzheimer's Disease. American Association of Neurology, May 2003.

43. Sweet RA, Butters MA, **Hamilton RL**, Mulsant BH, Lopez OL, PollockBG, DeKosky ST, Reynolds CF Neuropathology Of Late Life Mood Disorders. American College of Neuropsychopharmacology, 2003

44. Mohan D, Couce ME, Wiley CA, **Hamilton RL**, Sasatomi E, Swalsky PA, Lieberman MD, Finkelstein SD. Microdissection based genotyping of human gliomas: diagnostic and prognostic considerations (USCAP, Vancouver 3/04)

45. Beckner ME, Sasatomi E, Swalsky PA, **Hamilton RL**, Pollack, IF, Finkelstein SD. Loss of heterozygosity reveals non-VHL Allelic loss in hemangioblastomas at 22q13, (AANP Cleveland, June 24-27, 2004).

46. Judkins AR, Burger P, **Hamilton RL**, Kleinschmidt-DeMasters B, Perry A, Pomeroy S, Rosenblum MK, Yachnis AT, Rorke LB, Biegel JA. INI1 Expression Distinguishes Atypical Teratoid/Rhabdoid Tumor (ATR) from Choroid Plexus Carcinoma (CPC); (AANP Cleveland, June 24-27, 2004).

47. McFadden KA, **Hamilton RL**, Visvesvara GS, Gardner P, Couce ME. Granulomatous Amebic Encephalitis in a Patient with Gardners Syndrome and Multi-organ Transplant (AANP Cleveland, June 24-27, 2004).

48. Yen, Amy, Lopez, OL, BeckerJ, **Hamilton RL.** Mesial Temporal Sclerosis is associated with Lewy Bodies in Alzheimer's Disease. AANP Annual meeting June 9-12, 2005, Arlington, VA (platform). (J Neuropathol Exper Neurol 64:434, 2005.

49. Hinkle DA, Mullett SJ, **Hamilton RL** DJ-1 is over-expressed in human stroke reactive astrocytes. Society for Neuroscience Oct 2005.

50. Ramsey CP, Glass CA, Marshall MB, Morgan KL, Kioke MA, **Hamilton R**, Chu CT, Jordan-Sciutto KL. Altered expression patterns of the antioxidant response transcriptional regulator NRF2, in Alzheimer's Disease and Parkinson's Disease. Society For Neuroscience, Nov. 2005, Washington DC.

51. Chu CT, Uchiyama Y, **Hamilton R**, Zhu J. Extracellular signal regulated protein kinase acts upstream of both autophagy and cell death in MPP+ treated neurons. Society For Neuroscience, Nov. 2005, Washington DC

52. Cieply K, Carol R. Sherer, Jennifer L. Hunt **Hamilton RL** Assessment of 1p and 19q Status in Pediatric Oligodendrogliomas by FISH, Association of Molecular Pathology, Nov 10-13, 2005 Scottsdale AZ

53. Bencherif B, Lieberman FS, Wenzhu B, Price JC, Muthukrishnan A, Walter K, **Hamilton RL**, Lunsford LD, Mountz JM. Increased F-18 Fluorothymidine Uptake is Seen in Non-Proliferating Recurrent/Residual Glioma Society for Nuclear Medicine, San Diego, 2006 June 3-7

54. **Hamilton, RL** Variations On A Theme: Lewy Bodies And Mesial Temporal Sclerosis In Alzheimer's Disease: A Review Of 278 Autopsy Cases. 10th International Conference on Alzheimer's Disease, Madrid, Spain, July-15-20, 2006.

55. DeKosky ST, Mathis CA, Price JC, Ikonomovic MD, **Hamilton RL**, Abrahamson EE, Paljug WR, Debnath ML, Hope CE, Isanski BA, Tsopelas ND, Lopresti BJ, Ziolko S, Bi W and Klunk WE. Correlation of In Vivo PiB Retention and Post-Mortem Aβ Levels: A Case Study. 10th International Conference on Alzheimer's Disease, Madrid, Spain, July-15-20, 2006.

56. Leverenz J, **Hamilton RL**, Larson E, Vavrek D, Lopez O, Galasko D, Masliah E, Kaye J, Nixon R, Clark C, Trojanowski J, Kukull W, Montine T, Tsuang D. Lewy-Related Pathology in Two Large Autopsied Dementia Samples: Application of Classification Criteria. 10th International Conference on Alzheimer's Disease, Madrid, Spain, July-15-20, 2006.

57. Venneti S, Lopresti BJ, Wang G, Mathis CA, Klunk WE, Shmookler AD, **Hamilton RL**, Apte UM, Wiley CA. PET imaging of microglia in a mouse model of Alzheimer's disease. 10th International Conference on Alzheimer's Disease, Madrid, Spain, July-15-20, 2006.

58. Kofler JK, Moore RA, **Hamilton RL**. Concomitant Dementia with Lewy Bodies and Multiple System Atrophy in a Demented Patient. International Congress of Neuropathology/American Association of Neuropathology Annual Meeting, San Francisco, CA, Sept 10-15, 2006.

**Ronald L. Hamilton, M.D.**

59. DeKosky ST, Mathis CA, Price JC, Ikonomovic MD, **Hamilton RL**, Abrahamson EE, Paljug WR, Debnath ML, Hope CE, Isanski BA, Tsopelas ND, Lopresti BJ, Ziolko S, Bi W, Klunk WE. Correlation of Regional in vivo Pittsburgh Compound B (PIB) Retention With in vitro PIB, A Levels, and Amyloid Plaque Density: Validation of PIB-PET in Postmortem Human Brain. Alzheimer's Association International Conference on Prevention of Dementia. June 9-12, 2007 Washington, D.C.

60. Kellermier HC, Nikiforova MN, Cieply K, **Hamilton RL**. Alterations of 1p in glioblastomas. ASIP/AANP Annual meeting, Washington DC April 2007.

61. Bliecher AG, Branstetter BF, Hamilton R, Murdoch G, Kellermeir HC. Clival Chordoma: Radiologic-Pathologic Correlations. American Society of Neuroradiology annual meeting, Chicago, IL. June 9-14, 2007.

62. Butters MA, Aizenstein HJ, Meltzer CC, **Hamilton RL,** Price JC, Mathis CA, Klunk WE, Becker JT, DeKosky ST, Reynolds CF. Cognition, cerebrovascular disease and Alzheimer's Disease in late-life depression. International Neuropsychological Society meeting, Bilbao Spain, July 2007.

63 Tyurin VA, Zhao Q, Mnuskin A, **Hamilton R**, DeKosky ST, Reynolds WF, Kagan VE. Phospholipid peroxidation biomarkers of Alzheimer's Disease in the Brain: Selective Oxidation of Phosphatidylserine. Society of Toxicology Meeting San Diego, CA. October 2, 2007.

64. Moschos SJ, D. Trembath D, Snavely A, Bradler E, Midkiff B, Nikolaishvilli-Feinberg N, Werley J, Krauze M, **Hamilton R**, Kirkwood JM. Prognostic Significance of PD-L1 Expression, Angiogenesis, and Hypoxia in Melanoma Brain Metastases (MBM); A Histopathologic Analysis. Annual meeting of the American Association of Clinical Oncology, Chicago Il, 5/29-6/2/2014.

65. Trembath DG, Moschos SJ, Snavely AC, Bradler E, Nikolaishvilli-Feinberg N, Bentley R. Midkiff BR, Jonette Werley J, Krauze MT, **Hamilton RL**. Analysis of select angiogenic markers in melanoma brain metastases. Annual meeting AANP, Portland OR. June 2014

66. Salgado CM, Basu D, Nikiforova M, Hamilton R, Gheris R, Jakacki R, Panigrahy A, Yatsenko S, Reyes-Mugica M. Congenital Melanoma: The full spectrum og p.Q61R mutation in NRAS. Accepted for the Annual Soc. Pediatric Pathology meeting, Birmingham AL, Sept 4-6, 2014.

67. Melan MA, Wald AI, Zhong S, **Hamilton R**, Horbinski C. Nikiforova MN. BrainSeq: Next-Generation Sequencing Panel for Detection of Genetic Alterations in Central Nervous System (CNS) Malignancies. National Harbor MD, Nov 12-15, 2014.

68. Hamilton RL. Chronic Traumatic Encephalopathy: Update on an Emerging Disease. Invited speaker: 18th International Congress of Neuropathology, July 12-16, 2014, Rio de Janeiro, Brazil

69. Hamilton RL. Cases of the Month: 16 Years of Unknowns. Invited speaker: 18th International Congress of Neuropathology, July 12-16, 2014, Rio de Janeiro, Brazil

70. Trembath DG, Moschos SJ, Snavely AC, Bradler E, Nikolaishvilli-Feinberg N, Midkiff BR, Werley J, **Krauze MT, Hamilton RL** Role of PD-L1, HIF-1a, and reactive gliosis in melanoma brain metastases. USCAP 2015, Boston, MA, March 21-27, 2015.

71. Nolan Priedigkeit, Ryan J. Hartmaier, Yijing Chen, Damir Vareslija, Ahmed Basudan, Roby Thomas, Jose P Leone, Peter C. Lucas, Rohit Bhargava, Ron L. Hamilton, Juliann Chmielecki, Nancy E. Davidson, Steffi Oesterreich, Adam M. Brufsky, Leonie Young, Adrian V. Lee Breast cancer brain metastases show limited intrinsic subtype switching, yet exhibit acquired ERBB2 amplifications and activating mutations. San Antonio Breast Cancer Symposium, 12/7/16

72. Steffi Oesterreich, Ahmed Basudan, Nolan Priedigkeit, Ryan Hartmaier, Amir Bahreini, Rekha Gyanchandani, Jose P Leone, Peter Lucas,, Rohit Bhargava, Ron Hamilton, Ryan Hartmaier, Adam Brufsky, Adrian V. LeePerivascular Inflammation in Temporal Artery Biopsies That Are Negative for Arteritis: Incidental or Harbinger American College of Rheumatology/ Association of Rheumatology Health Professionals (ACR/ARHP) Annual Meeting, Washington DC, 11/13/16

73. Expression of Carbonic Anhydrase Genes, CA3 and CA12, Transformed with ENO1, Relate to Copy Numbers of EGFR or RNF139 and XIAP, and Gender in Glioblastomas Using PCR Assays. Experimental Biology 2015 Annual Meeting

74. Evaluation of GlioSeq Targeted NGS Panel for Detection of O6-Methylguanine-DNA Methyltransferase (MGMT) mRNA Expression in Glioma Patients Alicia Hunt, Sarika Jain, Melissa A Melan, Abigail Wald, Ronald Hamilton, Marina N. Nikiforova Association For Molecular Pathology (AMP) Charlotte, NC. November 10-12, 2016.

## **PROFESSIONAL ACTIVITIES**

**Ronald L. Hamilton, M.D.**


**TEACHING**

University of California, San Diego, Dept of Neuroscience
       1991-93      lab assistant - graduate neuroanatomy course
University of California, San Diego, School of Medicine
       1991-93      Sophomore pathology course, neuropathology section (lab assistant)
University of California, San Diego, Dept of Pathology
       1991-93      Clinical Correlation Conference - Neuropath and Neurosurgery (monthly)
       1991-93      Neuropathology review for neurology residents (bi-monthly)
University of Pittsburgh, School of Medicine
       Freshman pathology course –
       PBL facilitator for musculoskeletal course 1994-1998
       Neuroscience Module – lecture M2 students full class: CNS tumors
            Annually since 1999.
                April 29, 2014 1-3 pm
       Neuroscience Module   lecture MS1 students
            CNS tumors  March 2004
            CNS tumors  March 2005
            CNS tumors March 2006
            CNS Tumors    5/7/07
       Neuroscience rotation – small weekly lab, M3 students
            7/99-present
       Neuroscience rotation – small group M3 students
            6/18/2007 3-5pm
Weekly brain-cutting conference at Children's Hospital (2-5 medical (M3) students/week)
       Academic Advising: Kate McFadden 2/2000 to 6-2001
Other:
       High school - gifted science students of Mr. James Coll
            11/21/2002 , 11/14/ 2003, 10/28/2004, 11/18/2005, 11/3/2006


University of Pittsburgh, graduate students
       Cellular and Molecular Mechanisms of Neurodegeneration (MSCMP 3720)
               Organizers: Robert Bowser, Cristian Achim,
            1. Neuroanatomy and Neurohistology in neurodegeneration
                1/13/98,  1/19/99
            2. Mitochondria and disease / Prion encephalopathies
                3-24-98
            3. The role of alpha-synuclein in neurodegenerative diseases
                10-11-00
       Molecular Pathobiology (organizers Frye and Achim) (MSCMP 2740)
            .Tumors of the Central Nervous System,  4-7-98,  4-20-99
            Alpha-synuclein and Neurodegeneration
                4-2003, 1/8/04, 5/15/06
            Neuropathology of Neurodegeneration
                1/6/04
            Alpha-synuclein and Tau in Neurodegeneration
                1/5/07, 2/7/2008
            Pathologic diagnosis of the Lewy Body Disorders
                2/12/09
University of Pittsburgh, Dept of Neuroscience - Combined Neuroscience Conference Wed 4-5
     10/3/95 *      Varicella Zoster Infections of the CNS in AIDS patients
     10/9/96 *      Lewy Bodies and Dementia
     2/19/97 *      The Neuropathology of Pediatric Seizures
     4/23/97 *      CNS manifestations of non-CNS tumors in children
     2/11/98       Case Presentation with Ian Pollack

**Ronald L. Hamilton, M.D.**

|  |  |
|---|---|
| 3/18/98 * | A 77 year old woman with Multiple sclerosis and dementia |
| 11/4/98 | *Pediatric meningiomas – two cases |
| 1/20/99 | Methanol Intoxication – with C. Foley |
| 2/3/99 | Gliomatosis cerebri with Dallasta |
| 2/10/99 | Amyloid angiopathy and leukomalacia – with D. Kaufer |
| 3/17/99 | Metachromatic Leukodystrophy – with D. Kaufer |
| 9/18/02 | Iatrogenic CJD* |

* as primary presenter

University of Pittsburgh, Dept. of Pathology, Chief Resident's Fri noon slide conference

|  |  |
|---|---|
| 8/1/96 - Pediatric brain tumors | |
| 10/5/97 Pediatric brain tumors | |
| 1/9/98 | NP REVIEW - Tumors I |
| 1/16/98 | NP REVIEW - Tumors II |
| 1/23/98 | NP REVIEW - Tumors III |
| 1/30/98 | NP REVIEW - Infections |
| 2/6/98 | NP REVIEW - Demyelinative diseases |
| 2/13/98 | NP REVIEW - Neurodegenerative diseases |
| 2/20/98 | NP Review - Cerebrovascular disease and developmental |
| 5/24/02 | Pediatric Neoplasms and Congenital Malformations |
| 5/31/02 | Degenerative Diseases |

University of Pittsburgh, undergraduate
Independent Course and Honors Research Project –
Theodore Kaplan (1/97-6/97)
Emily Rogerson (1/99-5/99, 9/99-12/99, 1/00-4/00)
Kyle Hubbard (1/99 – 5/99, 9/99-12/99, 1/00-4/00)
Joe Demidovich – 2000-2002
Stan Garb (2001-2001)

Pathology Summer Undergraduate Research Program (SURP)
Kathleen Anderson 6/00-8/00
Kathleen Anderson 6/01-8-01

University of Pittsburgh, Dept. of Pathology,
Neuropathology of dementia conference - weekly (Fri 10-11)

University of Pittsburgh - ADRC Topics at Noon
X-34 and alpha-synuclein – New stains in Alzheimer's Disease 11/98
Lewy Body Pathology in Alzheimer's Disease, 11/01

Children's Hospital of Pittsburgh, Grand rounds
1996 - methyl malonic acidemia with hemi-cerebellum
2/13/97 - Pediatric AIDS with HIV encephalopathy
5/22/97 - 11 month-old boy with Hypotonia (Leigh's Disease)
3/18/98 - Becker's muscular dystrophy with severe cardiomyopathy
5/19/98 – Friedreich's Ataxia
10/15/98 – Spinal Muscular Atrophy Type I
2/2005  - Congenital Dystrophies – Pediatric Neurology

## Other Presentations

Neurology Grand Rounds - 11-19-03 - CNS vasculitis
Pathology Noon Diagnostic Conference - 11-20-03 – "Some Bodies in the Brain"
AP Didactic Lecture – 11-25-03 - Neuropathology of Neurodegeneration
NP Didactic – 4-28-04 - ApoE4 and Lewy Bodies in AD

**Ronald L. Hamilton, M.D.**

NP Didactic -    3/31/2005 – AD Pathology in ALS and MTS and LB in AD
Pathology Noon Diagnostic Conference – 8-4-2006: Tauopathies
ADRC CPC 8-10-06
ADRC CPC 11-30-06
ADRC CPC 2-8-07
ADRC 20th Anniversary meeting, "Neuropathology of AD:" 9-28-06
ADRC Topics at Noon.  "Tauopathies"  11-16-06
ADRC CPC 8/16/2007
ADRC CPC 11/30/2007
Pediatric CPC 2/25/08
DJ-1 in glioblastomas (NP Didactic conference) – 3/10/2009 (1 hour)
Neuropathology review for Neurosurgery residents – 3/10/2010 (1 hour).
AP Chief Residents didactic conference.  2 hour conference.  Non-glial Tumors. Feb 25, 2014
CMU graduate class:  BioE 2630 – Methods in medical iamage analysis in neuropathology. April 4, 2014.
Anatomic Pathology Grand Rounds, July 10, 2014  Chronic Traumatic Encephalopathy: an Update.

**Clinical Conferences (recurring)**

| | | |
|---|---|---|
| ADRC Brain cutting | weekly | Tue 8-10 |
| ADRC Dementia signout - | weekly | Fri 10-11 |
| PUH – Neuropathology QA - | weekly | Wed 10-11 |
| CH  Brain cutting | weekly | Mon 10-11:00 |
| CH  Neuro-Oncology conf | weekly | Mon 11:30-12:30 |
| CH Gross autopsy conference | weekly | Tue 11-12 |
| CH Micro autopsy conf | weekly | Tue 1-2 |

University of Pittsburgh School of Medicine –
        2009 Brain Tumors – lecture to 1st year students
        2009 Klionsky summer research scholarship – Peter Kang (June-Aug 2009)
                Clinicopathologic correlations of chordomas
        2009 Monday 2 hour small group 3rd year  (5-12 students)
                4/6/2009, 7/27/2009, 9/10/2009, 10/12/2009, 12/7/2009, 1/25/2010, 2/15/2010

**RESEARCH**

**OTHER SUPPORT**

**ACTIVE**

**HAMILTON, R.**
ACTIVE
**R01 NS037704**    (PI: Pollack)        9/1/98-1/31/17            0.7 calendar months
National Institutes of Health        $105,970
Role:  Co-Investigator
Title: Molecular Markers as Predictors of Outcome in Gliomas
The major goal of this project is to further characterize the molecular features of tumorigenesis
in pediatric malignant gliomas.

**1R01 CA174858-01**(PI: Pollack)        5/6/13-8/30/17            0.4 calendar
months
National Institutes of Health                $54,696
Role:  Co-Investigator
Title: Peptide Vaccine-Based Immunotherapy for Children with Recurrent Ependymomas
This project focuses on a pilot clinical trial of peptide-based immunotherapy for ependymomas,
among the most challenging childhood brain tumors.  The study will incorporate separate strata

**Ronald L. Hamilton, M.D.**

for posterior fossa and non-posterior fossa ependymomas.  We will treat a total of 12 patients in each of the two strata with subcutaneous TAA epitope vaccinations every 3 weeks for 8 courses combined with topical imiquimod. Participants will be evaluated for adverse events, regimen limiting toxicity (RLT), and treatment response by clinical and laboratory evaluations and MR imaging. We hypothesize that vaccine-based immunotherapy will not only prove safe for the treatment of pediatric ependymomas, but will also demonstrate activity as assessed by immunologic and clinical parameters.


(PI: Pollack)    5/8/14-6/1/17
Child Brain Tumor Foundation                     $10,487                            1.2
calendar months
**Children's Brain Tumor Tissue Consortium**
The CBTTC is a unique research platform in which tumor tissue is processed for comprehensive molecular (e.g., DNA, RNA, and protein) analysis using state-of-the-art methods and the data results of that analysis, together with new brain tumor models and relevant clinical information, are sent back to the participating institutions. In comparison to tissue banks, the CBTTC actively stimulates research by providing high-quality data that can be rapidly and efficiently analyzed by participating institutions.
PI: Pollack. 10% salary for Jonette Werley


<u>OVERLAP</u> No Overlap


**Completed Research Support**

National Institutes of Health                     3/1/02 – 2/28/05
P30 MH52247-10    (PI: Reynolds)      $23,305
Intervention Research Center for the Study of Late-Life Mood Disorders
a supplement to the above grant to establish a brain bank to investigate the neuropathological substrate of late life mood disorders.
Role:  Co-Investigator


R01 NS048595    (PI: Montine)                     09/30/03 – 07/31/08
National Institutes of Health
Subcontract to the University of Washington on grant "Characterization of DLB: a Collaborative Study"
The major goal of this multi-institutional project is to investigate the role of ApoE4 alleles and other genetic polymorphisms in the Lewy Body Variant of Alzheimer's Disease.
Role:  Co-Investigator


Brain Tumor Society                     07/01/07-05/31/09
PI: Ian Pollack
JPA & Pediatric Low Grade Astrocytoma
The major goals of these two grants is to examine molecular markers of prognosis in pediatric gliomas.
Role:  Co-Investigator


U10 CA13539-27 (Reaman (subcontract 6172) (Pollack)                     1/1/06-12/30/09
NIH/NCI
Children's Oncology Group Brain Tumor Resource Laboratory

**Ronald L. Hamilton, M.D.**

This contract is providing infrastructure support for maintaining tissue processing and banking of high-grade gliomas.
Role:  Laboratory Director

R01 MH47346    (PI: Zubenko)                   12/1/04 – 11/30/09
National Institutes of Health
Morphologic/Neurochemical Correlates of Depression in AD
The major goal of this project is to better define the biological substrates of major depression in AD and to provide additional insight into the clinical biology of major depressive disorders affecting the elderly.
Role:  Co-Investigator

P50 AG05133    (PI: Lopez)              3/30/85 – 3/31/15          0 calendar months
National Institutes of Health            $71,764
Alzheimer Disease Research Center, Core C: Neuropathology
The three objectives of the Neuropathology Core are to (1) procure and bank brain from autopsies of ADRC patients and controls, (2) perform detailed neuropathologic analysis of all AD cases and (3) maintain well catalogued brain bank.
Role:  Core Advisor

Child Brain Tumor Fund (CBTF) (PI: Pollack)       5/8/13-5/7/14
0.3 cal months (2.5% support) `PITT subaccount #: 05.35206.xxxx.00000.709203.-----`

P01 NS040923    (PI: Pollack)             7/1/02-5/31/13          1.20 calendar months
National Institutes of Health             $22,074
Novel Strategies for Brain Tumor Therapy
The unifying hypothesis of this program project grant is that novel therapeutic approaches that take into account the unique features of central nervous system (CNS) tumors will have utility for preventing tumor growth and inducing tumor regression, and will potentiate the effects of conventional treatment approaches, particularly radiotherapy, for inducing glioma cell killing.
Role:  Co-Investigator


**Prior Grant Support**

| | |
|---|---|
| 1995-1997 | Murine Model of Retroviral Encephalitis |
| | Children's Hospital of Pittsburgh Research Fund ($50,000) |
| | 0% effort, 0% support |
| 1995-1998 | Blood Brain Barrier in HIV encephalitis (PI: Achim) |
| | Co PI. 10% effort and salary ($186,264) |
| 11/98 | PD Center Grant, Equipment $6000 |
| | for freezer for PD Brain Bank (one time equipment funding) |
| 7/1/98-6/30/99 | Neurotrophic Factors in SIV encephalitis |
| | Competitive Medical Research Fund (CMRF), $25,000, |
| | 0% effort, 0% support |
| 12/01/98-11/30/99 | Parkinson's Disease Brain Bank |
| | PI: Hamilton RL |
| | Parkinson's Disease Foundation ($24,899) 0% effort, 0% support |
| 7/1/98-6/30/00 | Molecular Markers of Prognosis in Pediatric Gliomas |

**Ronald L. Hamilton, M.D.**

PAR 95-063, NIH
PI: IF Pollack
10% effort and support ($263,311)

4/1/00-3/31/01:  Alpha-synuclein Aggregation in Dementia With Lewy Bodies
PI: RL Hamilton
Parkinson's Disease Foundation Seed Money Grant, $25,000 0% effort, 0%
support

10/1/00-9/30/02    Millennium Agreement (Neuro Module)
PI: Rajiv Dhir
0% effort, 0% Support.
($25,000 per year for supplies, plus support for 100% Level IV Res Tech)

1/1/99 – 12/31/03 COG Brain Tumor Resource Laboratory
PI: Pollack, IF ($5800)  (subcontract 6172)
Co-I – 5% effort and support
NIH-U10 CA13539-27

3/01/02 - 2/28/07 - Supplemental Award to Establish a Late Life Mood Disorder Brain Bank
PI: RA Sweet (for supplement)
Supplement to 3 P30 MH52247-08S1 (PI: CF Reynolds)
Co-I : 5% effort and support

7/1/98-6/30/05 Morphologic/Neurochemical Correlates of Depression in AD
PI: G Zubenko
2.5% effort and support ($20,000)

National Institutes of Health            09/30/03 – 07/31/08            5%
R01 NS048595    (PI: Montine)            $75,000

*Subcontract to the University of Washington on grant "Characterization of DLB: a Collaborative Study"*
The major goal of this multi-institutional project is to investigate the role of ApoE4 alleles and other
genetic polymorphisms in the Lewy Body Variant of Alzheimer's Disease

R01 MH072947    (PI: Butters)            12/1/04 –11/30/11            0.36 calendar months
National Institutes of Health            $6,018
Pathways Linking Late Life Depression to Mild Cognitive Impairment and Dementia
The goal of this project is to investigate the relationships among late-life depression (LLD), cognitive
impairment and progressive neurodegeneration.
Role:  Co-Investigator

R01 MH072947    (PI: Butters)            12/1/04 –11/30/11            0.36 calendar months
National Institutes of Health            $6,018
Pathways Linking Late Life Depression to Mild Cognitive Impairment and Dementia
The goal of this project is to investigate the relationships among late-life depression (LLD), cognitive
impairment and progressive neurodegeneration.
Role:  Co-Investigator

**Seminars and Invited Lectureships Related to Research**

Presentation of an Unknown Case (Herpes simplex brainstem encephalitis) to American Association of
Neuropathologists Annual Meeting, June 1992: St. Louis, MO.

**Ronald L. Hamilton, M.D.**

Presentation of an Unknown Case (Varicella zoster virus encephalitis in an AIDS patient) to XII International Congress of Neuropathology, Sept, 1994: Toronto, Ont, Canada.

Presentation of an Unknown Case (Atypical neurocytoma) to American Association of Neuropathologists Annual Meeting, June 2002: Denver (presenter: Rafael Medina-Flores).

## Other Research Related Activities

| | |
|---|---|
| 1995-2003 | Co-Director, Neuropathology Core ADRC |
| 2003-2012 | Director, Neuropathology Core ADRC. |
| 1995-2012- | Director, Neuropathology Brain Bank |
| 1997 - present - | Director of Neurohistology laboratory |
| 1997-present | Co-Director, Brain Tumor Resource Laboratory, Children's Cancer Group |
| 2001- 2009 | Director of Neuropathology Core of the Stephen Tuttle ALS Tissue Bank. |
| 2001-present | Co-Director, UP Brain Tumor Bank |

## CURRENT RESEARCH INTERESTS

1. Molecular Biology of Brain Tumors

## SERVICE

## University and Medical School

Residency Committee (Pathology) – 1997 to 2008
Institutional Review Board        3/02 – 5/2005
'Member of the UPSOM Interviewing Committee' jan 2010-present
Member, UPMC Professional Practice and Ethics Committee Jan 2014 - present

## OTHER

| | |
|---|---|
| 4/1996 - present | Case Editor - Brain Pathology, |
| | Case of the Month feature |
| | Case of the Month web site |
| | Increase to 2 cases per month 1/2007 |
| 10/99 | ad hoc reviewer, J Neuroscience |
| 1/2000 | ad hoc reviewer, J American Medical Association (JAMA) |
| 3/2000 | ad hoc reviewer, Neuropathology and Applied Neurobiology |
| 3/01 | ad hoc reviewer American Journal Pathology |
| 5/02 | ad hoc reviewer Neuroscience |
| 11/02 | ad hoc reviewer JNEN |
| 2004 | AANP Awards Committee, AANP, Cleveland |
| 2006 | AANP Awards committee, AANP-ISN San Fran |
| 10/2006 | ad hoc reviewer    Eur J Neurosci |
| 2/2007 | Ad hoc reviewer    Neuroscience |
| 2007 | Chairmen, Awards Committee, AANP Washington DC. (2 year term) |
| 7/29/2007 | ad hoc reviewer, Brain Pathology |
| 7/25/2007 | ad hoc reviewer Acta Neuropathologica |
| 10/19/2007 | ad hoc reviewer J Neuropathol Exp Neurol |
| 2008 | Chairman Awards Committee AANP, San Diego Annual Meeting |
| 2008 | ad hoc reviewer Brain Pathology |
| 2009 | ad hoc reviewer Pedi and Developmental Pathology |
| 2009 | ad hoc reviewer Amer. J. Pathol. |

**Ronald L. Hamilton, M.D.**

2014 – Featured in non-fiction book: League of Denial:  The NFL, Concussions and the Battle for the Truth (Crown Publishing, New York). Chapters 8 and 10 detail my role in the discovery of CTE in NFL football players.

January 2015 – Consulted with Sony Pictures about movie CONCUSSION based on the discovery of Chronic Traumatic Encephalopathy (CTE) in American NFL football players by my student, Bennet Omalu and me in July 2005.  I was also interviewed on the set by Sony documentary filmmakers for a bonus feature on the DVD:  The Making of "Concussion."  The movie is scheduled to be released Christmas Day, Dec 25, 2015.

January 2015 – interviewed by Jeane Marie Laskas (who wrote the 2009 GQ article the movie is based on) for a companion book to be released with the movie, December 2015.


**International Invitations**

1998 – Invited lecturer at Barcelona-Pittsburgh ADRC meeting, "Dementia Today," Barcelona, Spain (Oct 1998)

2000 – Invited lecturer at Barcelona-Pittsburgh ADRC meeting Dementia Today II", Barcelona, Spain (Oct 2000)

2001 - Invited symposia speaker at 10th Congress of the International Psychogeriatric Association (Nice, France, Sept 2001). "Pathological Diagnosis of Dementia With Lewy Bodies" (Symposia Organizer, Ian McKeith)

2002 – Invited lecturer at Barcelona-Pittsburgh ADRC meeting Dementia Today III", Barcelona, Spain (Oct 2002)

2003 – Symposium speaker "Dementia with Lewy Bodies" at International Psychogeriatric Associations meeting, Chicago, IL, USA, 08/19/03

2004  Invited lecturer at Barcelona-Pittsburgh ADRC meeting Dementia Today IV", Barcelona, Spain (Oct 2004)

2006  Invited lecturer at Barcelona-Pittsburgh ADRC meeting Dementia Today V", Barcelona, Spain (Oct 2006)

2008  Invited lecturer at Barcelona-Pittsburgh ADRC meeting Dementia Today VI", Barcelona, Spain (May 2008)

2014 – Invited lecturer AANP annual meeting June 2014.  What Every Neuropathologist Should Know: Molecular studies in metastatic brain tumors.

2014 - Invited as member of scientific committee International Congress of Neuropathology quadrennial meeting Sept 2014, Rio de Janeiro

2014 – Chair of Forensic Pathology Session, committee International Congress of Neuropathology quadrennial meeting Sept 2014, Rio de Janeiro

2014 – co-chair telepathology session with Dr. Wiley

2014 – Presentation – Chronic Traumatic Encephalopathy – update, International Congress of Neuropathology quadrennial meeting Sept 2014, Rio de Janeiro

2014 – presentation – Cases of the Month – 16 Years of Unknowns  International Congress of Neuropathology quadrennial meeting Sept 2014, Rio de Janeiro s

# CERTIFICATION OF VITAL RECORD

## COUNTY OF LOS ANGELES • REGISTRAR–RECORDER/COUNTY CLERK

### CERTIFICATE OF DEATH
STATE OF CALIFORNIA

3200819043413

*USE BLACK INK ONLY NO ERASURES, WHITEOUTS OR ALTERATIONS*
*VS-11/REV. USE*

STATE FILE NUMBER                                      LOCAL REGISTRATION NUMBER

**DECEDENT'S PERSONAL DATA**

| 1. NAME OF DECEDENT — FIRST (Given) | 2 MIDDLE | 3 LAST (Family) |
|---|---|---|
| CHRISTOPHER | EDDIE | MIMS |

| AKA ALSO KNOWN AS — Include full AKA (FIRST MIDDLE LAST) | 4 DATE OF BIRTH mm/dd/ccyy | 5 AGE Yrs | IF UNDER ONE YEAR Months Days | IF UNDER 24 HOURS Hours Minutes | 6 SEX |
|---|---|---|---|---|---|
| - - - | 1970 | 38 | | | M |

| 9 BIRTH STATE/FOREIGN COUNTRY | 10 SOCIAL SECURITY NUMBER | 11 EVER IN U.S. ARMED FORCES? | 12 MARITAL STATUS (at Time of Death) | 7 DATE OF DEATH mm/dd/ccyy | 8 HOUR (24 Hrs) |
|---|---|---|---|---|---|
| CALIFORNIA | 8828 | YES [X] NO UNK | DIVORCED | 10/15/2008 | 0935 |

| 14 EDUCATION — Highest Level/Degree (see worksheet on back) | 14/15 WAS DECEDENT HISPANIC/LATINO(A)/SPANISH? (if yes, see worksheet on back) | 16 DECEDENT'S RACE — Up to 3 races may be listed (see worksheet on back) |
|---|---|---|
| SOME COLLEGE | [X] NO YES | AFRICAN AMERICAN |

| 17 USUAL OCCUPATION — Type of work for most of life. DO NOT USE RETIRED | 18 KIND OF BUSINESS OR INDUSTRY (e.g. grocery store, road construction, employment agency, etc.) | 19 YEARS IN OCCUPATION |
|---|---|---|
| PROFESSIONAL ATHLETE | FOOTBALL ATHLETE | 8 |

**USUAL RESIDENCE**

| 20 DECEDENT'S RESIDENCE (Street and number or location) | | | | |
|---|---|---|---|---|
| 21 CITY | 22 COUNTY/PROVINCE | 23 ZIP CODE | 24 YEARS IN CITY | 25 STATE/FOREIGN COUNTRY |
| LOS ANGELES | LOS ANGELES | 90017 | 25 | CALIFORNIA |

**INFORMANT**

| 26 INFORMANT'S NAME, RELATIONSHIP | 27 INFORMANT'S MAILING ADDRESS (Street and number or rural route number, city or town, state, ZIP) |
|---|---|
| MAREA BARSKY, FRIEND | IRVINE, CA 92606 |

**SPOUSE AND PARENT INFORMATION**

| 28 NAME OF SURVIVING SPOUSE — FIRST | 29 MIDDLE | 30 LAST (Maiden Name) |
|---|---|---|
| - | - | - |

| 31 NAME OF FATHER — FIRST | 32 MIDDLE | 33 LAST | 34 BIRTH STATE |
|---|---|---|---|
| LORENZO | VICTOR | MIMS | CA |

| 35 NAME OF MOTHER — FIRST | 36 MIDDLE | 37 LAST (Maiden) | 38 BIRTH STATE |
|---|---|---|---|
| CARLEEN | | HASTINGS | TN |

1 of 2

**FUNERAL DIRECTOR / LOCAL REGISTRAR**

| 39 DISPOSITION DATE mm/dd/ccyy | 40 PLACE OF FINAL DISPOSITION FOREST LAWN MEMORIAL PARK |
|---|---|
| 10/25/2008 | 6300 FOREST LAWN DR., LOS ANGELES, CA 90068 |

| 41 TYPE OF DISPOSITION(S) | 42 SIGNATURE OF EMBALMER | 43 LICENSE NUMBER |
|---|---|---|
| BU | JESSICA SOLIS | 9091 |

| 44 NAME OF FUNERAL ESTABLISHMENT | 45 LICENSE NUMBER | 46 SIGNATURE OF LOCAL REGISTRAR | 47 DATE mm/dd/ccyy |
|---|---|---|---|
| FOREST LAWN MEMR PRKS & MTYS | FD 904 | JONATHAN FIELDING, MD | 10/23/2008 |

**PLACE OF DEATH**

| 101 PLACE OF DEATH | 102 IF HOSPITAL, SPECIFY ONE | 103 IF OTHER THAN HOSPITAL, SPECIFY ONE |
|---|---|---|
| RESIDENCE | IP ER/OP DOA | Hospice Nursing Home/LTC [X] Decedent's Home Other |

| 104 COUNTY | 105 FACILITY ADDRESS OR LOCATION WHERE FOUND (Street and number or location) | 106 CITY |
|---|---|---|
| LOS ANGELES | 612 SOUTH FLOWER STREET #409 | LOS ANGELES |

**CAUSE OF DEATH**

| 107 CAUSE OF DEATH | Enter the chain of events — diseases, injuries, or complications — that directly caused death. DO NOT enter terminal events such as cardiac arrest, respiratory arrest, or ventricular fibrillation without showing the etiology. DO NOT ABBREVIATE. | Time interval between Onset and Death | 108 DEATH REPORTED TO CORONER? |
|---|---|---|---|
| IMMEDIATE CAUSE (Final disease or condition resulting in death) (A) → DEFERRED | | (AT) | [X] YES NO |
| Sequentially list conditions, if any, leading to cause on Line A. Enter UNDERLYING CAUSE (disease or injury that initiated the events resulting in death) LAST (B) | | (BT) | REFERRAL NUMBER 2008-07210 |
| (C) | | (CT) | 109 BIOPSY PERFORMED? YES [X] NO |
| (D) | | (DT) | 110 AUTOPSY PERFORMED? [X] YES NO |
| | | | 111 USED IN DETERMINING CAUSE? [X] YES NO |

| 112 OTHER SIGNIFICANT CONDITIONS CONTRIBUTING TO DEATH BUT NOT RESULTING IN THE UNDERLYING CAUSE GIVEN IN 107 |
|---|
| NONE |

| 113 WAS OPERATION PERFORMED FOR ANY CONDITION IN ITEM 107 OR 112? (if yes, list type of operation and date) | 115A IF FEMALE, PREGNANT IN LAST YEAR? |
|---|---|
| NO | YES NO UNK |

**PHYSICIAN'S CERTIFICATION**

| 114 I CERTIFY THAT TO THE BEST OF MY KNOWLEDGE DEATH OCCURRED AT THE HOUR, DATE AND PLACE STATED FROM THE CAUSES STATED | 115 SIGNATURE AND TITLE OF CERTIFIER | 116 LICENSE NUMBER | 117 DATE mm/dd/ccyy |
|---|---|---|---|
| Decedent Attended Since _____ mm/dd/ccyy | Decedent Last Seen Alive _____ mm/dd/ccyy | | |
| | 118 TYPE ATTENDING PHYSICIAN'S NAME, MAILING ADDRESS, ZIP CODE | | |

**CORONER'S USE ONLY**

| 119 I CERTIFY THAT IN MY OPINION DEATH OCCURRED AT THE HOUR, DATE AND PLACE STATED FROM THE CAUSES STATED | 120 INJURED AT WORK? | 121 INJURY DATE mm/dd/ccyy | 122 HOUR (24 Hours) |
|---|---|---|---|
| MANNER OF DEATH Natural Accident Homicide Suicide [X] Pending investigation Could not be Determined | YES NO UNK | | |

| 123 PLACE OF INJURY (e.g. home, construction site, wooded area, etc.) |
|---|

| 124 DESCRIBE HOW INJURY OCCURRED (Events which resulted in injury) |
|---|

| 125 LOCATION OF INJURY (Street and number or location and city, and ZIP) |
|---|

| 126 SIGNATURE OF CORONER / DEPUTY CORONER | 127 DATE mm/dd/ccyy | 128 TYPE NAME, TITLE OF CORONER / DEPUTY CORONER |
|---|---|---|
| EVONNE D REED | 10/20/2008 | EVONNE D REED, DEPUTY CORONER |

**STATE REGISTRAR**

| A | B | C | D | E |
|---|---|---|---|---|

*012008000916134*

FAX AUTH #          CENSUS TRACT

---

This is to certify that this document is a true copy of the official record
filed with the Registrar-Recorder/County Clerk.

SEP 0 4 2015

Dean C. Logan
**DEAN C. LOGAN**
Registrar-Recorder/County Clerk

*1 0 0 0 0 0 0 6 9 9 0 2 3*

This copy not valid unless prepared on engraved border displaying the Seal and Signature of the Registrar-Recorder/County Clerk.          PBNCO (REV) 07/11

-4352-



ANY ALTERATION OR ERASURE VOIDS THIS CERTIFICATE

**CERTIFICATION OF VITAL RECORD**

## COUNTY OF LOS ANGELES • REGISTRAR–RECORDER/COUNTY CLERK

| 3052008191127<br>STATE FILE NUMBER | **PHYSICIAN/CORONER'S AMENDMENT**<br>NO ERASURES, WHITEOUTS, PHOTOCOPIES,<br>OR ALTERATIONS | 3200819043413<br>LOCAL REGISTRATION NUMBER |
|---|---|---|

1.1

☐ BIRTH   ☒ DEATH   ☐ FETAL DEATH

TYPE OR PRINT CLEARLY IN BLACK INK ONLY – THIS AMENDMENT BECOMES AN ACTUAL PART OF THE OFFICIAL RECORD

### PART I  INFORMATION TO LOCATE RECORD

| INFORMATION<br>AS IT APPEARS<br>ON ORIGINAL<br>RECORD | 1A. NAME—FIRST<br>CHRISTOPHER | 1B. MIDDLE<br>EDDIE | 1C. LAST<br>MIMS | 2. SEX<br>M |
|---|---|---|---|---|
| | 3. DATE OF EVENT—MM/DD/CCYY<br>10/15/2008 | 4. CITY OF EVENT<br>LOS ANGELES | | 5. COUNTY OF EVENT<br>LOS ANGELES |

### PART II  STATEMENT OF CORRECTIONS

2 of 2

| | 6. CERTIFICATE<br>ITEM<br>NUMBER | 7. INFORMATION AS IT APPEARS ON ORIGINAL RECORD | 9. INFORMATION AS IT SHOULD APPEAR |
|---|---|---|---|
| LIST ONE<br>ITEM PER<br>LINE | 107A | DEFERRED | DILATED CARDIOMYOPATHY |
| | 107AT | - | YEARS |
| | 112 | NONE | HEPATIC STEATOSIS,<br>HISTORY OF HYPERTENSION |
| | 119 | PENDING INVESTIGATION | NATURAL |

| DECLARATION<br>OF<br>CERTIFYING<br>PHYSICIAN OR<br>CORONER | I HEREBY DECLARE UNDER PENALTY OF PERJURY THAT THE ABOVE INFORMATION IS TRUE AND CORRECT TO THE BEST OF<br>MY KNOWLEDGE. | | | |
|---|---|---|---|---|
| | 9. SIGNATURE OF CERTIFYING PHYSICIAN OR CORONER<br>► LOUIS A PENA MD | 10. DATE SIGNED—MM/DD/CCYY<br>12/12/2008 | 11. TYPED OR PRINTED NAME AND TITLE/DEGREE OF CERTIFIER<br>DME | |
| | 12. ADDRESS—STREET and NUMBER<br>1104 NORTH MISSION ROAD | 13. CITY<br>LOS ANGELES | 14. STATE<br>CA | 15. ZIP CODE<br>90033 |
| STATE/LOCAL<br>REGISTRAR<br>USE ONLY | 16. OFFICE OF VITAL RECORDS OR LOCAL REGISTRAR<br>► STATE REGISTRAR - OFFICE OF VITAL RECORDS | | 17. DATE ACCEPTED FOR REGISTRATION—MM/DD/CCYY<br>12/15/2008 | |

STATE OF CALIFORNIA, DEPARTMENT OF PUBLIC HEALTH, OFFICE OF VITAL RECORDS      *022008000147349*      FORM VS 24Ae (REV. 1/08)

1.1

This is to certify that this document is a true copy of the official record
filed with the Registrar-Recorder/County Clerk.

SEP 0 4 2015



DEAN C. LOGAN
Registrar-Recorder/County Clerk



*100000699024*

This copy not valid unless prepared on engraved border displaying the Seal and Signature of the Registrar-Recorder/County Clerk.
PRINCO (REV) 07/11

ANY ALTERATION OR ERASURE VOIDS THIS CERTIFICATE

4353

COUNTY OF LOS ANGELES                                                DEPARTMENT OF CORONER

# 12 AUTOPSY REPORT

No.

2008-07210

MIMS, CHRISTOPHER

I performed an autopsy on the body of

at ___ the DEPARTMENT OF CORONER

___ Los Angeles, California ___ on OCTOBER 16, 2008 @ 1525 HOURS

(Date)                    (Time)

From the anatomic findings and pertinent history I ascribe the death to:

(A)    DILATED CARDIOMYOPATHY

DUE TO, OR AS A CONSEQUENCE OF

(B)

DUE TO, OR AS A CONSEQUENCE OF

(C)

DUE TO, OR AS A CONSEQUENCE OF

(D)

OTHER CONDITIONS CONTRIBUTING BUT NOT RELATED TO THE IMMEDIATE CAUSE OF DEATH:

HEPATIC STEATOSIS, HISTORY HYPERTENSION

*Anatomical Summary:*

I.   Dilated cardiomyopathy, 1010 grams.

    A.   Pulmonary congestion and edema.

        1.   Secretions of bronchi and trachea.

    B.   Chronic hepatic congestion.

        1.   Hepatomegaly, 3200 grams.

        2.   Probable congestive heart failure.

            a.   Lower legs, dorsum of feet, with edema.

    C.   History of hypertension.

    D.   History of alcohol abuse.

        1.   Hepatic steatosis, moderate.

II.  Other findings:

    A.   Morbid obesity.

    B.   No evidence of external or internal trauma.

    C.   No pulmonary emboli.

    D.   Bilateral knees with old surgical scars.

76A890M—Rev. 8/94

COUNTY OF LOS ANGELES

**AUTOPSY REPORT**

DEPARTMENT OF CORONER

No.

2008-07210

MIMS, CHRISTOPHER

**12**

Page 2

    E.    Upper torso, face with congestion and Tardieu
        spots consistent with prone position found.

    F.    Skin, body creases of the axilla, legs and back
        with psoriatic-type lesions.

  III.  See Toxicology Report.

   IV.  See Microscopic Report.

    V.  See Neuropathology Report.

CIRCUMSTANCES:

See the brief Investigator's Narrative Report.

This is a 38-year-old Black gentleman with a history of
hypertension, sports-related knee injuries and alcohol abuse.
On 10/15/08 at about 0900 hours, the decedent was found lying on
the bathroom floor unresponsive. 911 was called, and the Los
Angeles Fire Department responded to the scene and determined
death on 10/15/08 at 0935 hours. The decedent apparently smoked
tobacco heavily and used alcohol daily. The decedent had
complained of labored breathing on 10/14/08. He was last seen
alive by a friend on 10/14/08 at about 2230 hours.

EXTERNAL EXAMINATION:

The body is identified by toe tags and is that of an unembalmed,
refrigerated adult Black male who appears about the reported age
of 38 years. The body weighs 456 pounds, measures 80 inches,
and is extremely obese.

The skin shows numerous psoriatic scaly-type skin lesions at the
axilla, legs, dorsum of the feet and the torso. The skin is
otherwise free of abrasions, lacerations, bruises and burns.
There are scars over both knee regions: On the right knee, an
old scar, 2 inches transversely oriented and on the left knee,
an irregularly-shaped old scar, 1-1/2 inches. No old surgical
scars are seen over the abdomen or torso regions.

75A798P—Rev. 2/91

COUNTY OF LOS ANGELES                                                    DEPARTMENT OF CORONER

## AUTOPSY REPORT

**12**

Page 3

No.

2008-07210

MIMS, CHRISTOPHER

Tattoos are present and identified as follows:

1.  Right anterior forearm, "Tough As" and below this, a tattoo
    of four nails vertically oriented, and below this, the word
    "Nails".

2.  Left anterior forearm, the words "Balls of Steel" and in
    between is a brick wall with balls going through it.

3.  Left upper lateral arm is a tattoo of four cards with the
    letter "A", diamond, spade, heart and clubs and the words
    "Fat Doctor", and below this a smiling man face that is
    green with dark hair. There are other designs around this
    tattoo.

4.  Right upper lateral arm, multicolored tiger.

5.  Right wrist, tribal-like band tattoo with a focal red color
    design.

Rigor has presumably been abolished. Livor mortis is slight red
and fixed on the posterior upper back. Also, the face shows
purple congestion and dependent purple fixed livor on the upper
torso and neck regions with Tardieu spots present.

The head is otherwise normocephalic and covered by black hair.
There is slight frontal receding of the hairline, and the hair
can be described as short and curly. A mustache and beard are
present. Examination of the eyes reveals irides that show
corneal clouding and sclerae that are congested. There are no
petechial hemorrhages of the conjunctivae of the lids or the
sclerae. The oronasal passages are unobstructed. At autopsy,
there is foam, red, frothy material from the mouth that is
observed. Upper and lower teeth are present. The frenulum is
intact. The neck is unremarkable. There is no chest deformity.
There is no increased anterior-posterior diameter. The abdomen
is obese. The genitalia are those of an adult male. The penis
appears circumcised. The external genitalia are without trauma
or lesions. The extremities show no edema, joint deformity,
abnormal mobility, or needle tracks. The lower legs and dorsum
of the feet are swollen.

76A798P—Rev. 2/91

COUNTY OF LOS ANGELES

DEPARTMENT OF CORONER

# 12

# AUTOPSY REPORT

No.

2008-07210

MIMS, CHRISTOPHER

Page __4__

EVIDENCE OF THERAPEUTIC INTERVENTION:

There is no evidence of any previous or recent hospitalization.

EVIDENCE OF EXTERNAL TRAUMATIC INJURIES:

None.

CLOTHING:

The body was not clothed, and I did not see the clothing.

INITIAL INCISION:

The body cavities are entered through the standard coronal and
Y-shaped incisions. No foreign material is present in the
mouth, upper airway, and trachea.

EVIDENCE OF INTERNAL INJURIES:

None.

NECK:

The neck organs are removed en bloc with the tongue. No lesions
are present, nor is trauma of the gingiva, lips, or oral mucosa
demonstrated. There is no edema of the larynx. Both hyoid bone
and larynx are intact and without fractures. No hemorrhage is
present in the adjacent throat organs, investing fascia, strap
muscles, thyroid, or visceral fascia. There are no prevertebral
fascial hemorrhages. The tongue when sectioned shows no trauma.

CHEST/ABDOMINAL CAVITY:

Both pleural cavities contain no fluid or adhesions. The
parietal pleurae are intact. The lungs are well-expanded. Soft
tissues of the thoracic and abdominal walls are well-preserved.
The subcutaneous fat of the abdominal wall measures 8.0 cm in
thickness, and the chest wall measures 6.0 cm. The breasts are

COUNTY OF LOS ANGELES                                              DEPARTMENT OF CORONER

# 12

# **AUTOPSY REPORT**

No.

2008-07210

MIMS, CHRISTOPHER

Page ___5___

examined and palpated in the usual manner and show no
abnormalities. The organs of the abdominal cavity have a normal
arrangement, and none are absent. There is no fluid collection.
The peritoneal cavity is without evidence of peritonitis. There
are no adhesions.

## SYSTEMIC AND ORGAN REVIEW

The following observations are limited to findings other than
injuries, if described above.

MUSCULOSKELETAL SYSTEM:

No abnormalities of the bony framework or muscles are present.

CARDIOVASCULAR SYSTEM:

The aorta is elastic and of even caliber throughout, with
vessels distributed normally from it. The abdominal and
thoracic aorta have minimal atherosclerotic plaques. There is
no tortuosity or widening of the thoracic segment. There is no
dilatation of the lower abdominal segment. No aneurysm is
present. The major branches of the aorta show no abnormality.

Within the pericardial sac, there is a minimal amount of
serosanguineous fluid. The heart weighs 1010 grams. It is
severely dilated with no significant ventricular hypertrophy.
The right ventricle is 0.4 cm thick, and the left ventricle is
1.5 cm thick. The septal wall measures 2.0 cm. The chambers
are normally developed and are without mural thrombosis. The
valves are thin, leafy and competent but dilated. The
circumferences of the valve rings are: Tricuspid valve 15.0 cm,
pulmonic valve 10.0 cm, mitral valve 15.0 cm, and aortic valve
10.0 cm. There is mottled red and pale endocardial
discoloration. There are no infarcts of the myocardium seen
grossly. There is no abnormality of the apices of the papillary
musculature. There are no defects of the septum. The great
vessels enter and leave in a normal fashion. The ductus
arteriosus is obliterated. The coronary ostia are widely
patent. The right coronary artery is the dominant vessel.
There is no coronary atherosclerosis. The blood within the
heart and large blood vessels is liquid.

76A798P—Rev. 2/91

COUNTY OF LOS ANGELES

# **AUTOPSY REPORT**

DEPARTMENT OF CORONER

**12**

Page __6__

No.

2008-07210

MIMS, CHRISTOPHER

## RESPIRATORY SYSTEM:

An extremely large amount of edema fluid is found in the upper respiratory and lower bronchial passages. The mucosa is intact and pale with secretions present. The lungs are subcrepitant, and there is dependent congestion. The left lung weighs 1030 grams. The right lung weighs 1050 grams. The visceral pleurae are smooth and intact. The parenchyma is congested and edematous. The pulmonary vasculature is without thromboembolism. Thromboemboli are not present in the distal tertiary branches.

## GASTROINTESTINAL SYSTEM:

The esophagus is intact throughout. The stomach is not distended. It contains about 150 ml of green well-digested food and liquid present. The mucosa is smooth and green with no erosions or ulcerations. Portions of tablets and capsules cannot be discerned in the stomach. The small intestine and colon are examined by inspection, palpation and multiple incisions and show soft green stool in each region. The appendix is present. The pancreas occupies a normal position. There is no necrosis or trauma. The parenchyma is lobular and firm. The pancreatic ducts are not ectatic, and there is no parenchymal calcification.

## HEPATOBILIARY SYSTEM:

The liver weighs 3200 grams, is enlarged, and is red-brown. The capsule is intact, and the consistency of the parenchyma is soft. The cut surface is smooth. There is chronic passive congestion. The gallbladder is present. The wall is thin and pliable. It contains a minimal amount of green liquid bile and no calculi. There is no obstruction or dilatation of the extrahepatic ducts. The periportal lymph nodes are not enlarged.

COUNTY OF LOS ANGELES

DEPARTMENT OF CORONER

# **AUTOPSY REPORT**

**12**

No.

2008-07210

MIMS, CHRISTOPHER

Page ____7____

URINARY SYSTEM:

The left kidney weighs 310 grams. The right kidney weighs 330 grams. The kidneys are normally situated, and the capsules strip easily revealing a surface that is focally pitted, light red and smooth. The corticomedullary demarcation is preserved. The pyramids are not remarkable. The peripelvic fat is not increased. The ureters are without dilatation or obstruction and pursue their normal course. The urinary bladder is contracted. It contains no urine.

GENITAL SYSTEM (MALE):

The prostate is without enlargement or nodularity. Both testes are in the scrotum and are unremarkable and without trauma.

HEMOLYMPHATIC SYSTEM:

The spleen weighs 220 grams and is slightly enlarged. The capsule is intact. The parenchyma is soft. There is no increased follicular pattern. Lymph nodes throughout the body are small and inconspicuous. There is focal enlargement of the lymph nodes observed in the peribronchial regions. The bone is not remarkable. The bone marrow of the rib is red, moist and unremarkable.

ENDOCRINE SYSTEM:

The thyroid gland is unremarkable. The parathyroid glands are not identified. The adrenal glands are unremarkable. The thymus gland is unremarkable. The pituitary gland is of normal size and is unremarkable.

SPECIAL SENSES:

The eyes are not dissected. The middle and inner ear are not dissected.

76A798P—Rev. 2/91

COUNTY OF LOS ANGELES

**12**

Page ___8___

# AUTOPSY REPORT

DEPARTMENT OF CORONER

No.

2008-07210

MIMS, CHRISTOPHER

### HEAD AND CENTRAL NERVOUS SYSTEM:

There is no subcutaneous or subgaleal hemorrhage in the scalp.
The external periosteum and dura mater are stripped showing no
fractures of the calvarium or base of the skull. There are no
tears of the dura mater. There is no epidural, subdural or
subarachnoid hemorrhage. The fresh brain weighs 1440 grams.
The leptomeninges are thin and transparent. A normal
convolutional pattern is observed (see separate Neuropathology
Report to follow). Vessels at the base of the brain have a
normal pattern of distribution. There are no aneurysms. The
cranial nerves are intact, symmetrical and normal in size,
location and course. The cerebral arteries are without
arteriosclerosis.

See separate Neuropathology Report.

### SPINAL CORD:

The entire cord is not dissected. The superior portion of the
cervical spinal cord is examined through the foramen magnum and
is unremarkable.

### NEUROPATHOLOGY:

The brain is placed in formalin solution for further fixation
and later neuropathology consultation.

### HISTOLOGIC SECTIONS:

Representative sections from various organs are preserved in one
storage jar in 10% formalin. Sections of heart, right and left
lungs, liver and spleen, kidneys, and dorsum of right foot skin
are submitted for slides. The slide key is #2008-07210: 1, 2,
3, 4, left ventricle of heart; 5, right ventricle of heart; 6,
right lung; 7, left lung; 8, liver and spleen; 9, right and left
kidneys; 10, dorsum of right foot and section of skin.

### TOXICOLOGY:

Blood (heart and femoral), bile, liver tissue, stomach contents
and vitreous humor have been submitted to the laboratory. A
comprehensive screen is requested.

COUNTY OF LOS ANGELES

**12**

Page ___9___

# AUTOPSY REPORT

DEPARTMENT OF CORONER

No.

2008-07210

MIMS, CHRISTOPHER

PHOTOGRAPHY:

At-scene photos are available (34). Photographs have been taken during the course of the autopsy.

RADIOLOGY:

No x-rays are obtained.

WITNESSES:

None.

DIAGRAMS USED:

Diagram Form 20 was used during the performance of the autopsy. The diagram is not intended to be a facsimile.

OPINION:

This 38-year-old Black male died as a result of dilated cardiomyopathy. Hepatic steatosis and history of hypertension were contributory factors to his final demise.

Blood toxicology studies show a 0.11 g% alcohol femoral blood level. This is not a lethal level. The remainder of the toxicology studies show no drugs of abuse. A non-significant level of diphenhydramine is present. The vitreous fluid shows no evidence of diabetic ketoacidosis.

Alcohol abuse is strongly associated with the development of dilated cardiomyopathy, which may be a secondary nutritional disturbance or ethanol toxicity causing myocardial injury.

Based on the history and circumstances, as currently known, the manner of death is natural.

COUNTY OF LOS ANGELES                                              DEPARTMENT OF CORONER

# 12
Page ___ 10

# AUTOPSY REPORT

No.

2008-07210

MIMS, CHRISTOPHER

NOTE:

Dr. Christopher Rogers, Chief of Forensic Medicine Division,
reviewed the opinion and case and concurs.

_____ *Louis a. Pena* M.D. _____          1-17-2009
LOUIS A. PENA, M.D.                               DATE
DEPUTY MEDICAL EXAMINER

LAP:am/jm:c
D-10/16/08-1900 hours
T-10/21/08

76A798P—Rev. 2/91

-4363-

COUNTY OF LOS ANGELES                                    DEPARTMENT OF CORONER

**20**

3:25pm                                    —Rigor

2008-07210
MING, CHRISTOPHER
NAT   ♂ 10-16-08           34 1



eyes = cornel cloudy, congested

Hair black short curly
slight frontal (receding) Hairline

L

No evid of External trauma.    L    R

R
Teeth = own frenulum intact

Ear lobes pierced
black mustache, beard
Foam Red, frothy
mouth

Purple fixed Livor + traded Spots

Scaly psoriatic type skin lesions (chain)

skin tags - upper chest

→ Tattoo =
4 Cards A
Diamonds, spade,
Heart jclubs
RAT Doctor
men's face
green dark Hair
smilin
other Designs
ahead this)

slight Red fixed Livor

Tattoo:
multicolored
flyer

psoriasis type
lesions anscia
and fold arms

Tattoos:
Touch A/S
4 nails/wrist

Liver Temp incision mark

Tardies ball's of steel (brecklam jlockd trade)

yellow Band matches CC# 2008-07210

Circumcised penis
testes

P Soriartictype skin/lesion scaly

Numerous small old scrapes, healed abrasions

Nails short
No trauma to hands, palms or digits.

anus
&

Tattoo:
Triple Like Band Facel and Color

Old scar 2"

red scar 1¼"

Legs/dorsum feet swollen

10-16-2008

scaly Hyperattenation skin ? psoriasis

Blue, white toe tags
matches Decedent's name
& CC# 2008-07210

Dennis A. Peña            M.D.
                    Deputy Medical Examiner

P5/93

-4364-

COUNTY OF LOS ANGELES          **FORENSIC CONSULTANT'S REPORT**          DEPARTMENT OF CORONER

**13**

<u>NEUROPATHOLOGY</u>

2008-07210

MIMS, CHRISTOPHER E.

November 20, 2008

AGE: 38 years

DATE OF DEATH: October 15, 2008

REFERRING DME: Louis A. Pena, M.D.

CIRCUMSTANCES:

The following information is taken from the Investigator
Report and preliminary autopsy notes. This 38-year-old man
reportedly had a past medical history of hypertension,
sports-related knee injuries, heavy smoking, and alcohol
abuse. He was last known alive on 10/14/08 at 2230 hours,
reportedly complaining of labored breathing. On 10/15/08, he
was found unresponsive on the bathroom floor by a friend. He
was pronounced at the scene on 10/15/08 at 0935 hours by
responding paramedics.

At the time of postmortem examination on 10/16/08, the
findings included dilated cardiomyopathy (heart weight 1010
grams), pulmonary congestion and edema, hepatomegaly (3200
grams), marked obesity, and no evidence of acute trauma
including no scalp, skull or intracranial abnormality noted.
Brain weight at removal was 1440 grams.

GROSS DESCRIPTION:

Specimens available for examination are cranial dura mater
and brain. Cranial dura mater submitted includes the dorsal
convexity regions with falx cerebri, posterior fossa with
tentorium cerebelli, and much of the right temporal fossa.
The external and internal surfaces of the dura mater are
smooth and shiny without evidence of hemorrhage,
discoloration or subdural neomembranes, the only exception
being a 0.8 x 0.5 x 0.4 cm light brown flattened nodule (0.4
cm in thickness) in the right anterolateral temporal fossa,
apparently within the dura. It is sampled. Dural venous
sinuses appear normal in pattern.

76FS89(Rev 8/93)

**13**

<u>NEUROPATHOLOGY</u>

2008-07210

MIMS, CHRISTOPHER E.

<u>Page 2</u>

Cerebral leptomeninges show mildly increased milky opacity
over the dorsolateral convexities, considered within normal
limits for age group. There is moderately severe
leptomeningeal vascular congestion. Cerebral hemispheres are
approximately symmetrical with a midline and closely apposed
interhemispheric fissure. There is no evidence of
significant brain swelling and no evidence of herniation at
the uncus, cerebellar tonsillar region, superior cerebellar
vermis or cingulate gyrus. There is some artifact present,
including partial avulsion of the inferomedial left
cerebellar hemisphere and deep incision into the right
anterior inferior cerebellar hemisphere. Convolutional
pattern is unremarkable. No recent or remote cerebral or
cerebellar cortical contusions are seen. No focal areas of
increased softening, firmness or discoloration are present.

Rectus-orbital and basitemporal areas are unremarkable.
Cranial nerves I through XII are intact except for avulsion
of olfactory bulbs bilaterally. Major basal arteries have a
normal pattern of distribution, discounting the absence of
the bilateral vertebral arteries, not included with the
specimen. The left posterior communicating artery is larger
than average, slightly exceeding the contribution to the left
posterior cerebral artery by basilar artery, thus consistent
with a fetal pattern. No aneurysms and no evidence of
occlusive vascular disease are apparent. Belly of the pons
is full and symmetrical, and medulla is remarkable only for
partial avulsion of the right medulla compared to the left.
Cerebellar hemispheres are approximately symmetrical with
normal-appearing folia. Basal cisterns are open.

The brain is sectioned in a coronal plane, and the brainstem
and cerebellum in a transverse plane.

COUNTY OF LOS ANGELES          **FORENSIC CONSULTANT'S REPORT**          DEPARTMENT OF CORONER

**13**

<u>NEUROPATHOLOGY</u>

2008-07210

MIMS, CHRISTOPHER E.

December 3, 2008

MICROSCOPIC DESCRIPTION:

Sections of cranial dura mater and brain (8) stained by H&E
method include the right temporal fossa dural nodule (Slide
A), right frontal lobe (Slide B), left and right hippocampi
(Slides C and D, respectively), right basal ganglia (Slide
E), right parietal lobe (Slide F), cerebellum (Slide G), and
medulla (Slide H).

Slide A demonstrates native dura mater, with the expanded
zone composed of vascular channels and some ovoid pale
connective areas with a lace-like internal architecture. The
appearance is typical of a benign arachnoid villus. Some
leptomeningeal melanosis is incidentally noted in the brain
sections. In basal ganglia, some mild to moderate fine
granular calcification is noted in globus pallidus, primarily
in pericapillary areas and in the walls of some small blood
vessels. Mild autolysis is present in the sections.

There is no evidence of meningitis, encephalitis, abnormal
neuronal inclusions, developmental anomalies, hippocampal
sclerosis or neoplasia.

FINAL NEUROPATHOLOGIC DIAGNOSIS:

A.    Cerebrovascular congestion.

B.    Basal ganglia calcification, mild; incidental finding.

JOHN M. ANDREWS, M.D.                    DATE  12/9/08
DEPUTY MEDICAL EXAMINER
NEUROPATHOLOGY CONSULTANT

JMA:am/hg:c
T-12/04/08

76F389(Rev 8/93)

-4367-

## 13

<u>NEUROPATHOLOGY</u>

2008-07210

MIMS, CHRISTOPHER E.

<u>Page 3</u>

Coronal sections reveal the cortical ribbon to be normal in thickness and color. Gray/white demarcation is distinct. Underlying white matter is homogeneous and clear. Corpus callosum is normal in thickness, color and symmetry. Lateral ventricles are normal in size and configuration with sharp superior angles. A cavum septi pellucidi is present anteriorly without fenestration of septum pellucidum. Third ventricle is midline and does not exceed 0.3 cm in maximum transverse diameter. Cerebral aqueduct and fourth ventricle are unremarkable. Choroid plexus is unremarkable bilaterally. Mammillary bodies and pineal body are grossly unremarkable. Substantia nigra is normally pigmented. Basal ganglia are normal in size, symmetry, contour and color. Amygdaloid complex of nuclei and hippocampi are grossly unremarkable.

Multiple transverse sections of the brainstem and cerebellum reveal no abnormality.

Selected areas are retained in storage. Representative sections are submitted for microscopic examination.

GROSS IMPRESSIONS:

A. Adult cranial dura mater with small right middle fossa dural nodule.

B. Cerebrovascular congestion.

C. Otherwise, grossly unremarkable adult brain and coverings.


JOHN M. ANDREWS, M.D.
DEPUTY MEDICAL EXAMINER
NEUROPATHOLOGY CONSULTANT

12-3-08
DATE

JMA:am/hg:c
T-11/21/08

76F389(Rev 8/93)

-4368-

| COUNTY OF LOS ANGELES | MICROSCOPIC REPORT | DEPARTMENT OF CORONER |

**14**

I performed a microscopic examination on

DECEMBER 4, 2008

at THE DEPARTMENT OF CORONER

Los Angeles, California

2008-07210

MIMS, CHRISTOPHER E.

## MICROSCOPIC DESCRIPTION

<u>Slides #1,2,3 and 4/10</u>: Sections of cardiac muscle show patchy areas of significant, severe interstitial fibrosis. There are focal areas of myocyte hypertrophy, myocyte attenuation, and myocyte fiber disarray. Slide #4 shows an adherent blood clot with fibrin, red cells and acute inflammation.

There is no acute or chronic myocarditis.

The trichrome stain confirms the abundant interstitial fibrosis, and one cross-section of the left anterior descending coronary artery shows minimal fibrointimal hyperplasia.

<u>Slide #5/10</u>: Section of unremarkable right ventricle.

<u>Slides #6 and #7/10</u>: Sections of lung show interstitial red blood cell congestion and pulmonary edema. Focal lung atelectasis is present. There are a few foreign body giant type cells and abundant alveolar macrophages. No pneumonia is observed. These sections are polarized and are unremarkable with some non- and refractile particles of nonspecific nature.

<u>Slide #8/10</u>: Section of liver with moderate steatosis. No cirrhosis is observed.

Section of autolyzed spleen with red blood cell congestion and numerous microvacuoles.

<u>Slide #9/10</u>: Sections of autolyzed kidney; otherwise, unremarkable.

COUNTY OF LOS ANGELES                    MICROSCOPIC REPORT                    DEPARTMENT OF CORONER

# 14

2008-07210

MIMS, CHRISTOPHER E.

Page___2___

Slide #10/10:  Section of skin from the dorsum of the right foot
with hyperkeratosis and subepidermal focal slight inflammation.

NOTE:  No sickled red blood cells are observed.


_____                    _1-17-2009_____
LOUIS A. PENA, M.D.                                DATE
DEPUTY MEDICAL EXAMINER

LAP:am/brr:c/f
T-12/17/08

(Rev 2-92)

COUNTY OF LOS ANGELES     AUTOPSY CHECK SHEET     DEPARTMENT OF CORONER

**16**

2008-07210    341
mims, christopher
LP 10-16-08

& Eunremark / none

**EXTERNAL EXAM**
Sex male
Race Black
Age 38 y.o.
Height 80"
Weight 456 pds
Hair b unc
Eyes cornea cloudy
Sclera congested
Teeth own
Mouth &
Tongue & septum Intact
Nose & Tardieu spots - positional
Chest &
Breasts &
Abdomen obese
Scar &
Genitals circum ♂ testo ds
Edema &
Skin see diagram #20
Decubitus &, o/o9

**HEART** Wt.
Dilated Pericardium &    RV 0.4cm
Hypertrophy
Dilation +    LV 1.5cm
Muscle &    Septum 2.0cm
Valves &  TV=15cm, PV=10cm, MV=15cm
Coronaries &    AV=10cm
AORTA minimal Atherosclerosis
VESSELS &    No pulmonary Emboli
LUNGS Wt.
R 1050g
L 1030g
Adhesions &
Fluid &
Atelectasis & sev.
Oedema &
Congestion &
Consolidation &
Bronchi secretions
Nodes enlarged
PHARYNX &
TRACHEA secretion
THYROID &
THYMUS &
LARYNX &
HYOID &
ABDOMINAL WALL FAT 8cm
CHEST WALL FAT 6cm

PERITONEUM
Fluid &
Adhesions &
LIVER Wt. 3200g chronic Hep.
Capsule Intact congestion
Lobules &
Fibros &
GB + minimal green Liquid Bile
Calculus &
Bile ducts &
SPLEEN Wt. 220 slight congestion/megaly spleen
Color purple
Consistency soft
Capsule Intact
Malpigment &
PANCREAS &
ADRENALS &
KIDNEYS Wt.
R 330g    pitted, Pecall
L 310g
Capsule Intact
Cortex &
Vessels &
Pelvis &
Ureters &
BLADDER contracted, No urine.
GENITALIA
Prostate &
Testes &, No trauma /
Uterus ∅
Tubes ∅
Ovaries ∅
OESOPHAGUS &
STOMACH - Contents 150ml green well-Dig Foul, Liquid present
DUOD. & SM. INT. Soft green stool
APPENDIX +
LARGE INT. soft green stool
ABDOM. NODES &
SKELETON
Spine ext. &
Marrow RbR &
Rib Cage &
Long bones &
Pelvis &
No Fractures

SCALP &
CALVARIUM &
BRAIN Wt. 1440g
Dura &
Fluid &    see separate
Ventricles &  neuropath report
Vessels &
Middle ears &
Other &
PITUITARY &

SPINAL CORD cervical
Sup. portion
spinal cord &

TOXICOLOGY SPECIMENS
blood- Heart, Fem.
Liver, stomach, vitreous, Bile
SECTIONS FOR (10)
HISTOPATHOLOGY
1. & RV & kidney
2. & R Lung 10. R Dorsen Foot skin
3. L Lung
& Liver, spleen  Stool 19qa
MICROBIOLOGY &

DIAGRAMS #20
X-RAYS &

OTHER PROCEDURES &

GROSS IMPRESSIONS
See Adult form #12
Dictated Report Ⓐ

Date 10-16-2008    Time -17:00 end    Deputy Medical Examiner
Louis A. Pena M.D.

-4371-

COUNTY OF LOS ANGELES  **MEDICAL REPORT**  DEPARTMENT OF CORONER

**15**

AUTOPSY CLASS:  ☐ A  ☒ B  ☐ C  ☐ Examination Only D

Date _10-16-2008_  Time _15/25_  Dr. _Louis A. Peña_
print

FINAL ON _12-11-2008_  By _Louis A. Peña_
print

APPROXIMATE INTERVAL BETWEEN ONSET AND DEATH

2008-07210
MIMS, CHRISTOPHER

_LP_
_10-16-08_

DEATH WAS CAUSED BY: (Enter only one cause per line for A, B, C, and D)

**IMMEDIATE CAUSE**

(A) _Dilated Cardiomyopathy_  ◄  _yrs_

DUE TO, OR AS A CONSEQUENCE OF

(B)  ◄

DUE TO, OR AS A CONSEQUENCE OF

(C)  ◄

DUE TO, OR AS A CONSEQUENCE OF

(D)  ◄

Other conditions contributing but not related to the immediate cause of death:

_Hepatic Steatosis, History of Hypertension_

☒ **NATURAL**   ☐ **SUICIDE**   ☐ **HOMICIDE**

☐ **ACCIDENT**   ☐ **COULD NOT BE DETERMINED**

If other than natural causes
HOW DID INJURY OCCUR?

WAS OPERATION PERFORMED FOR ANY CONDITION STATED ABOVE: ☐YES ☒NO

TYPE SURGERY_____ DATE _____

☐ ORGAN PROCUREMENT   ☒ TECHNICIAN _George Reid_

☐ WITNESSES TO AUTOPSY   ☐ EVIDENCE RECOVERED AT AUTOPSY
Item Description:

38 y.o. B.M. H/o HTN,
Sports related Knee Inj. ∠ EtOH Abuse.
10-15-08 FND Lying on B.R. Floor unrespon.
at Residence pronounced 0935 am.
Appear. a smoker, Drank ~ 1 gal EtOH Vodka/day.
C/o Labored Breathing 10-14-08. LKA 10-14-08 2230.

Autopsy - Dilated "Cardiomyopathy" 1,010 grams
No CoR. Art. Disease. Hepatomeg. → Chronic Hep.
Cmg → CHF. Indirect Myocard. Dysfunct. HTN D disease
No P.E. No Evid. Ext/Int. Trauma. _LP_

10-16-2008
M.D.
_Louis A. Peña_

Resident _____  DME _____

**PRIOR EXAMINATION REVIEW BY DME**

☒ BODY TAG  ☐ CLOTHING
☐ X-RAY (No. _0_)  ☐ FLUORO
☐ SPECIAL  ☐ MED. RECORDS

PROCESSING TAG

☒ AT SCENE PHOTOS (No. _34_) _LP_

TYPING BLOOD TAKEN BY_____
SOURCE _____

**TOXICOLOGY**

☐ NO BLOOD
☐ Embalmed
☐ >24 hr in hospital
☐ Decomposed
☐ Other _____
Reason

**SPECIMENS**

Collected by _Louis A. Peña_

☒ HEART BLOOD  ☒ STOMACH CONT.
☒ FEMORAL BLOOD  ☐ BRAIN
☐ _____ BLOOD  ☐ SPLEEN
☐ _____ BLOOD  ☐ KIDNEY
☒ BILE  ☐ VITREOUS
☒ LIVER  ☐ _____
☒ URINE _none_  ☐ _____

**STORAGE JARS**

☒ Regular (No. _1_)   ☐ Oversize (No. ___)
Histopath Cut: ☒ Autopsy  ☐ Lab

☐ NO TOXICOLOGY REQUESTED

**TOXICOLOGICAL ANALYSES ORDERED**
SCREEN: ☒ C  ☐ H  ☐ T  ☐ S
☐ ALCOHOL ONLY
☐ CARBON MONOXIDE
☐ NEOGEN SCREEN
☒ OTHER (specify drug and tissue)
Vitreous - glucose, Ketones _Thanks LP_

**REQUESTED MATERIAL ON PENDING CASES**

☐ Police Report  ☐ Med History
☒ Tox  ☒ Histo
☐ Microbiology  ☐ Investigations
☐ Radiology Cons.  ☐ Eye Path. Cons
☐ Consult on
☒ Brain Submitted
☒ Neuro Consult  ☐ DME to Cut
☐ Criminalistics
☐ GSR  ☐ Sexual Assault  ☐ Other

10 cassettes

WHITE - FILE COPY   CANARY - FORENSIC LAB   PINK - INVESTIGATIONS   GOLDENROD - DME   Rev. 1/99

-4372-





Department of Coroner, County of Los Angeles

# FORENSIC SCIENCE LABORATORIES
### Laboratory Analysis Summary Report

Friday, November 07, 2008

☑ PendingTox

**To:**   Dr. Pena
**Deputy Medical Examiner**

**Subject:   Coroner Case Number   2008-07210   MIMS, CHRISTOPHER EDDIE**

The following results have been technically and administratively reviewed and are the opinions and interpretations of the Analyst:

| SPECIMEN | SERVICE | DRUG | LEVEL | UNITS | ANALYST |
|---|---|---|---|---|---|
| Blood, Femoral | | | | | |
| | Alcohol | Ethanol | 0.11 | g% | M. Schuchardt |
| | Volatiles | Acetone | | ND | M. Schuchardt |
| Blood, Heart | | | | | |
| | Alcohol | Ethanol | 0.09 | g% | M. Schuchardt |
| | Barbiturate | Barbiturates | | ND | D. Kowal |
| | Bases | Diphenhydramine | < 0.50 | ug/ml | S. DeQuintana |
| | Cocaine | Cocaine and Metabolites | | ND | D. Kowal |
| | Fentanyl | Fentanyl | | ND | D. Kowal |
| | Methamphetamine | Methamphetamine | | ND | D. Kowal |
| | Opiates | Codeine | | ND | D. Kowal |
| | Opiates | Morphine | | ND | D. Kowal |
| | Phencyclidine | Phencyclidine | | ND | D. Kowal |
| | Volatiles | Acetone | | ND | M. Schuchardt |
| Vitreous | | | | | |
| | Alcohol | Ethanol | 0.14 | g% | M. Schuchardt |
| | Outside Test | Glucose | < 20 | mg/dl | NMS Labs, Inc. |
| | Volatiles | Acetone | | ND | M. Schuchardt |

Legend:

- - - - -
% Saturation
*
Done
g            Grams
g%           Gram Percent
Inc.         Inconclusive
mEq/l        Milli equivalents
mg           Milligrams
mg/dl        Milligram per Deciliter
mg/l         Milligram per Liter
mmol/l       Millimoles per Liter
ND           Not Detected
Negative
ng/gm        Nanograms per Gram

QNS    Quantity Not Sufficent
TNP    Test Not Performed
Trace
ug     Micrograms
ug/g   Micrograms per Gram
ug/l
ug/ml  Microgram per Milliliter

dP
11-1306

Administratively reviewed by:   Daniel T. Anderson
*Supervising Criminalist II*
**FORENSIC LABORATORIES**

Page 1 of 2



Department of Coroner, County of Los Angeles

# FORENSIC SCIENCE LABORATORIES
### Laboratory Analysis Summary Report



Friday, November 07, 2008

**To:** Dr. Pena

☑ PendingTox

**Deputy Medical Examiner**

**Subject:** **Coroner Case Number** 2008-07210   MIMS, CHRISTOPHER EDDIE

The following results have been technically and administratively reviewed and are the opinions and interpretations of the Analyst:

| SPECIMEN | SERVICE | DRUG | LEVEL | UNITS | ANALYST |
|----------|---------|------|-------|-------|---------|

---

**Legend:**

- - - - -

% Saturation

*

Done

| | |
|---|---|
| g | Grams |
| g% | Gram Percent |
| Inc. | Inconclusive |
| mEq/l | Milli equivalents |
| mg | Milligrams |
| mg/dl | Milligram per Deciliter |
| mg/l | Milligram per Liter |
| mmol/l | Millimoles per Liter |
| ND | Not Detected |
| Negative | |
| ng/gm | Nanograms per Gram |

| | |
|---|---|
| QNS | Quantity Not Sufficent |
| TNP | Test Not Performed |
| Trace | |
| ug | Micrograms |
| ug/g | Micrograms per Gram |
| ug/l | |
| ug/ml | Microgram per Milliliter |



Administratively reviewed by:  **Daniel T. Anderson**
**Supervising Criminalist II**
**FORENSIC LABORATORIES**

Page 2 of 2

B Pena

**CASE REPORT** EDRS# 916134

| COUNTY OF LOS ANGELES | | | DEPARTMENT OF CORONER |
|---|---|---|---|

| **1** | APPARENT MODE | NATURAL | CASE NO. |
|---|---|---|---|
| | SPECIAL CIRCUMSTANCES | | 2008-07210 |
| | Media Interest | | CRYPT |
| | | | 341 |

| LAST, FIRST MIDDLE | AKA | # |
|---|---|---|
| MIMS, CHRISTOPHER EDDIE | | |

| ADDRESS | | CITY | STATE | ZIP |
|---|---|---|---|---|
| | | LOS ANGELES | CA | 90017 |

| SEX | RACE APPEARS | DOB | AGE | HGT | WGT | EYES | HAIR | TEETH | FACIAL HAIR | ID VIEW | CONDITION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| MALE | BLACK | 1970 | 38 | 80 in. | 456 lbs. | BROWN | BLACK | ALL NATURAL TEETH | BEARD AND MUSTACHE | Yes | FAIR |

| MARK TYPE | MARK LOCATION | MARK DESCRIPTION |
|---|---|---|
| TATTOO | LEFT ARM | "BALLS OF STEEL" |
| TATTOO | RIGHT ARM | "TOUGH AS NAILS" |
| SCAR | BOTH KNEES | HEALED SCARS |
| TATTOO | LEFT ARM | "FAT DOCTOR" |

| NOK | ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|---|
| | | | | |

| RELATIONSHIP | PHONE | NOTIFIED BY | DATE | TIME |
|---|---|---|---|---|
| SEE CASE NOTES | | | | 00:00 |

| SSN | DL ID | STATE | PENDING BY |
|---|---|---|---|
| | | CA | |

| ID METHOD |
|---|
| VISUALLY AT SCENE |

| LA # | MAIN # | CII # | FBI # | MILITARY # | POB |
|---|---|---|---|---|---|
| 2020867M | 04072535 | | | | |

| IDENTIFIED BY NAME (PRINT) | RELATIONSHIP | PHONE | DATE | TIME |
|---|---|---|---|---|
| LAHOMA GRIFFIN | EX-WIFE | (562) 313-3666 | 10/15/2008 | 13:06 |

| PLACE OF DEATH / PLACE FOUND | ADDRESS OR LOCATION | CITY | ZIP |
|---|---|---|---|
| RESIDENCE | | LOS ANGELES | 90017 |

| PLACE OF INJURY | AT WORK | DATE | TIME | LOCATION OR ADDRESS | ZIP |
|---|---|---|---|---|---|
| | No | | | | |

| DOD | TIME | FOUND OR PRONOUNCED BY |
|---|---|---|
| 10/15/2008 | 09:35 | LAPD # 3 |

| OTHER AGENCY INV. OFFICER | PHONE | REPORT NO. | NOTIFIED BY | NO |
|---|---|---|---|---|
| LAPD CENTRAL - SUVIATE/ MILLER | (213) 485-3294 | | | |

| TRANSPORTED BY | TO | DATE | TIME |
|---|---|---|---|
| RAMIRO GONZALEZ JR. | LOS ANGELES FSC | 10/15/2008 | 13:55 |

| FINGERPRINTS? | Yes | CLOTHING | Yes | PA RPT | No | MORTUARY | |
|---|---|---|---|---|---|---|---|
| MED. EV. | Yes | INVEST. PHOTO # | 34 | SEAL TYPE | CORONER SEAL | HOSP RPT | No |
| PHYS. EV. | No | EVIDENCE LOG | Yes | PROPERTY? | Yes | HOSP CHART | No |
| SUICIDE NOTE | No | GSR NO | | RCPT. NO. | 233635 | PF NO. | |

SYNOPSIS
ACCORDING TO THE REPORTED INFORMATION, THE DECEDENT WAS A 38 YEAR OLD BLACK MALE WITH A HISTORY OF HYPERTENSION, SPORTS RELATED KNEE INJURIES, AND ALCOHOL ABUSE. ON 10/15/08 AT 0900 HOURS, THE DECEDENT WAS FOUND LYING ON THE BATHROOM FLOOR, UNRESPONSIVE. 911 WAS CALLED AND LOS ANGELES FIRE DEPARTMENT #3 RESPONDED TO THE SCENE AND DETERMINED DEATH ON 10/15/08 AT 0935 HOURS. DECEDENT APPARENTLY SMOKED TOBACCO HEAVILY AND DRANK ABOUT 1 GALLON OF VODKA DAILY. DECEDENT COMPLAINED OF LABORED BREATHING ON 10/14/08, THE DECEDENT WAS LAST SEEN ALIVE ON 10/14/08 AT 2230 HOURS BY FRIEND. NO FOUL PLAY SUSPECTED.

| LYDIA GRANADO-MATA | DATE | 10/15/2008 | REVIEWED BY | DATE | 10/15/08 |
|---|---|---|---|---|---|
| S16235   L Granado Mata   INVESTIGATOR | TIME | 17:05 | Yagerlever | TIME | 2013 |

FORM #3 NARRATIVE TO FOLLOW? ☑



**County of Los Angeles, Department of Coroner
Investigator's Narrative**



Case Number: 2008-07210                    Decedent: MIMS, CHRISTOPHER EDDIE

## Information Sources:

1.  LAPD Central Division, Officer Suviate #35743 & Miller #39293. 213-485-3294.

## Investigation:

On 10/15/08 at 1039 hours, Officer Miller of LAPD Central Division reported this apparent natural death. On 10/15/08 at 1107 hours, I was assigned this field call. I arrived on scene at 1158 hours and departed at 1326 hours. No foul play suspected. The apartment was secured with a coroner seal.

## Location:

The death occurred at a residence, 612 S. Flower St. Apt. #409, Los Angeles, CA 90017.

## Informant/Witness Statements:

According to the information obtained from Officer Suviate and Miller, the decedent was last seen alive on 10/14/08 at 2230 hours and apparently complained of labored breathing. On 10/15/08 at about 0900 hours, the decedent was found unresponsive on the bathroom floor by a friend. 911 was dialed and Los Angeles Fire Department responded to the scene and determined death at 0935 hours. Per officers, the decedent abused alcohol, drinking about 1 gallon of vodka daily. The decedent reportedly drank to the point of passing out and when he would wake, would continue to drink. The decedent also smoked heavily, going through about 1 pack of cigarettes daily. The decedent's medical history included hypertension and a knee surgery about 7 months ago.

## Scene Description:

The scene was an apartment at the above listed location. The apartment appeared dirty, cluttered, and unkempt. Several medication bottles were located on the kitchen cabinet. Two large bottles of vodka were noted on top of the refrigerator and appeared empty. The decedent was located in the bathroom. The bathroom appeared dirty and contained several large duffle bags. The scene appeared to be void of any illicit drugs and drug paraphernalia.

## Evidence:

On 10/15/08 at 1221 hours, I collected several prescription medication bottles from the scene. I booked the items as evidence at the FSC.

## Body Examination:

The decedent appeared to be a 38 year old Black male. He was observed lying prone on wooden floor inside the bathroom. His arms were bent up at the elbow with his hands closed and resting near his head and his right leg straight with the left leg bent at the knee and turned out at the hip. A brown towel was noted under his head and appeared to be soiled with bloody, frothy purge. He appeared to be dressed in a blue shirt and blue underwear. He appeared to have black hair, brown eyes, beard and mustache and apparent natural teeth. The following tattoos were noted: right arm-"TOUGH AS NAILS", nails with the initials "C. MIMS", right arm- cougar, right wrist-tribal band, left arm-"FAT DOCTOR", "A" playing cards, male face, left arm- "BALLS OF STEEL." I observed healed scars to the knees, abdomen, back, and feet. No petechiea was noted. Lesions/ wounds were noted to the left calf, right shin, and lower right calf. No trauma was noted. On 10/15/08 at 1231 hours, rigor mortis was rated 3 throughout; and at 1234 hours, livor mortis appeared fixed and consistent with the position found. The ambient temperature on 10/15/08 at 1225 hours was 72.3 degrees F, and algor mortis was 101.2 degrees F at 0830 hours 1236 hours.




**County of Los Angeles, Department of Coroner**
**Investigator's Narrative**

Case Number: 2008-07210                      Decedent: MIMS, CHRISTOPHER EDDIE

## Identification:

On 10/15/08 at 1306 hours, ▓▓▓▓▓▓▓ visually identified the decedent as Mims, Christopher Eddie.

## Next of Kin Notification:

Please see case notes.

## Tissue Donation:

At the completion of this report, family did not give permission for tissue donations.

## Autopsy Notification:

There is no request for autopsy notification regarding this particular case.

_L. Granado Mata_                                      _Kelly Yagerlener_

LYDIA GRANADO-MATA      516235          LARRY DIETZ

10/15/2008

_____

Date of Report

COUNTY OF LOS ANGELES      **PRELIMINARY EXAMINATION REPORT - FIELD**      DEPARTMENT OF CORONER

**6**

WAS ORIGINAL SCENE DISTURBED BY OTHERS?  Y [ ]  N [X]
IF YES, NOTE CHANGES IN NARRATIVE FORM #3.
DATE _____ 10/15/2008 _____

| AMBIENT #1 | 72.3 F | TIME | 12:25 |
| AMBIENT #2 | F | TIME | |
| WATER | F | TIME | |

LIVER TEMPERATURE #1 ____ 101.2 F    TIME ____ 12:36

LIVER TEMPERATURE #2 ____ F    TIME ____

**2008-07210**

**MIMS, CHRISTOPHER EDDIE**
Nat
DOD- 10/15/2008

THERMOMETER # ____ 07-17

DATE & TIME FOUND ____ 10/15/2008 @ 9:00 ____    LAST KNOWN ALIVE ____ 10/14/2008 @ 22:30

APPROX. AGE _38_ SEX _Male_ EST. HEIGHT _80_ EST. WEIGHT _456_ CLOTHED ? YES [X] NO [ ] IF YES, DESCRIBE:
Blue Shirt, Blue Underwear

DESCRIPTION AS TO WHERE REMAINS FOUND AND CONTACT MATERIAL TO BODY:
Prone on wood floor

SCENE TEMPERATURE REGULATED? YES [ ] NO [X] IF YES, THERMOSTAT SET AT _____ DEGREES F.

LIVOR MORTIS: TIME OBSERVED 12:34    RIGOR MORTIS: TIME OBSERVED 12:31

NECK FLEXION:

| ANTERIOR | 3 |
| POSTERIOR | 3 |
| RT. LATERAL | 3 |
| LT. LATERAL | 3 |

| JAW | 3 | HIP | 3 |
| SHOULDER | 3 | KNEE | 3 |
| ELBOW | 3 | ANKLE | 3 |
| WRIST | 3 | | |

Appeared fixed and consistent with position found.

SCALE
0 = ABSENT / NEGATIVE
1 +
2 +
3 +
4 = EXTREME DEGREE

USE SCALE TO DESCRIBE INTENSITY OF RIGOR

SHADE DIAGRAMS TO ILLUSTRATE THE LOCATION OF LIVOR MORTIS.

DESCRIBE INTENSITY OF COLORATION AND WHETHER LIVOR MORTIS IS PERMANENT OR BLANCHES UNDER PRESSURE

**L. Granado-Mata # 516235**
Investigator    REVIEWED BY:

NOTE: ALL DATA COLLECTED FOR THIS FORM MUST BE COLLECTED AT SCENE.

COUNTY OF LOS ANGELES

MEDICAL EVIDENCE

DEPARTMENT OF CORONER

## 3A

CASE # 2008-07210
DECEDENT'S NAME: MIMS, CHRISTOPHER EDDIE
DOD: 10/15/2008
INCOMING MODE:

Page 1 of 1

| Drug Name | Rx Number | Date of Issue | Number Issued | Number Remaining | Form | Dosage | Rx Directions | Physician | Pharmacy Phone/ Comments |
|---|---|---|---|---|---|---|---|---|---|
| ALLOPURINOL | 06383 01468 | 9/30/2008 | 30 | 19 | TABLET | 300 MG | 1 TAB DAILY | KALPARI, KAMRAN | RITE AID 213-494-1762 |
| ATENOLOL | 06383 01395 | 7/25/2008 | 90 | 14 | TABLET | 100 MG | 1 TAB DAILY | KALPARI, KAMRAN | RITE AID 213-494-1762 |
| BAYER ASPIRIN | | | 100 | 40 | TABLET | 325 MG | 1-2 TABS EVERY 4 HRS | | OTC MED |
| DIOVAN | | | 7 | 0 | TABLET | 320 MG/25 MG | | | SAMPLE BOTTLE |
| INDOMETHACIN | 05785 05748 | 2/1/2008 | 40 | 3 | CAPSULE | 50 MG | 1 CAP 4X DAILY | KALPARI, KAMRAN | RITE AID 213-494-1762 |
| LOTREL | 06383 01383 | 9/30/2008 | 14 | 0 | CAPSULE | 10-40 MG | 1 CAP DAILY | KALPARI, KAMRAN | RITE AID 213-494-1762 |
| NEXIUM | 063836 0144 | 10/6/2008 | 5 | 0 | CAPSULE | 40 MG | 1 CAP DAILY | KALPARI, KAMRAN | RITE AID 213-494-1762 |
| TYLENOL PM | | | 24 | 0 | TABLET | 500 MG/ 25 MG | 2 CAPLETS @ BEDTIME | | OTC MED |
| | | | | | | | | | |
| | | | | | | | | | |

## Paraphernalia Description

(1) UNLABELED RX BOTTLE CONTAINING 53 CLEAR GEL CAPS; (2) CEPHALEXIN, 250 MG- ORANGE CAPSULES WITH "93 3147", (2) VALSARTAN, 320 MG- GRAY TEAR DROP SHAPED TABLET WITH "NVR" ON ONE SIDE & "DXL" ON OTHER SIDE.

Investigator: LYDIA GRANADO-MATA (516235

Date: 10/15/2008

# Exhibit 3

 **CONCUSSION SETTLEMENT**

*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

## NOTICE OF REQUEST FOR ADDITIONAL DOCUMENTS
### DATE OF NOTICE: February 20, 2019
### RESPONSE DEADLINE: June 20, 2019

### I. SETTLEMENT CLASS MEMBER INFORMATION

| | |
|---|---|
| **Settlement Program ID** | 950013395 |

| **Name:** | First<br>Carleen | M.I. | Last<br>Hastings |
|---|---|---|---|

| | |
|---|---|
| **Settlement Class Member Type** | Representative Claimant |
| **Primary Counsel** | O'Hanlon, Demerath & Castillo |

| **Asserted Qualifying Diagnosis** | Death with CTE (Chronic Traumatic Encephalopathy) | **Date of Asserted Qualifying Diagnosis** | 10/15/08 |
|---|---|---|---|

### II. EXPLANATION OF REQUEST(S)

This Notice is an official communication from the Claims Administrator for the NFL Concussion Settlement Program. Your Claim Package is missing documents or information.

This Notice explains what is missing and what you may do to address the issue. We can help if you have questions. To cure the issues identified in this Notice, click the Respond to Request for Additional Documents button on your secure online portal and follow the instructions provided to upload the information identified below.  If you already have provided us with the missing information, let us know because we may have received it after conducting the review that generated this notice.

The following requires attention before we can act further:

| | What is Missing | How to Address this Item |
|---|---|---|
| **1.** | You have not submitted any medical records reflecting the Qualifying Diagnosis. | Click the Respond button, go to Section 3 for Medical Records, click on the Upload Medical Records button and follow the instructions to upload medical records reflecting the Qualifying Diagnosis. |

### III. ADDITIONAL EXPLANATION OF WHAT IS MISSING

The medical records must show a post-mortem diagnosis of CTE made before April 22, 2015 (the Final Approval Date) by a board-certified neuropathologist for a Retired NFL Football Player who died before April 22, 2015.  See Section 6.3 (f) of the Settlement Agreement and FAQ 109.  Mr. Mims died on October 15, 2008, and the October 16, 2008 autopsy report signed by Louis A. Pena does not reference CTE and neither does the death certificate.  You provided an undated letter from Dr. Ronald L. Hamilton who diagnosed Mr. Mims with CTE.  You must establish that Dr. Hamilton reviewed Mr Mim's brain tissue and made a CTE diagnosis on or before April 22, 2015.

### IV. HOW TO RESPOND TO THIS NOTICE

You have 120 days to respond to this Notice and provide the missing information or documents. **We encourage you to gather the requested information or documents now and respond to this Notice promptly, rather than using the full 120 days allowed to answer. The sooner you respond, the sooner your claim can move forward in the review process.**

By the Response Deadline stated above, send us the missing information or documents identified in Section II. We will wait the full 120 days to re-review your claim, unless you click the Submit Claim Package for Review button to confirm that your response is complete and we may continue to review your claim. If you do not respond in full on or before the Response Deadline, we will have to assess your claim based on the materials we have, which could lead to a lower Monetary Award or denial of your claim in its entirety.

Submit the requested information using your secure online portal to upload additional documents.

## V. How to Contact Us with Questions or for Help

If you are represented by a lawyer, consult with your lawyer if you have questions or need assistance. If you are unrepresented and have any questions about this Notice or need help, contact us at 1-855-887-3485 or send an email to ClaimsAdministrator@NFLConcussionSettlement.com. If you are a lawyer, call or email your designated Firm Contact for assistance. For more information about the Settlement program, visit the official website at www.NFLConcussionSettlement.com to read the Frequently Asked Questions or download a copy of the complete Settlement Agreement.



# Exhibit 4

# O'Hanlon, Demerath & Castillo

### Attorneys and Counselors at Law

808 WEST AVENUE
AUSTIN, TEXAS 78701
PHONE: (512) 494-9949
FAX: (512) 494-9919

**David J. Campbell**

*Board Certified, Civil Appellate Law*

dcampbell@808west.com

**Rio Grande Valley Office**
426 W. Caffery Ave.
Pharr, Texas 78577

**San Antonio Office**
117 W. Craig Place
San Antonio, Texas 78212

May 6, 2019

***via email***

Jason Russell
BrownGreer PLC
250 Rocketts Way
Richmond, VA 23231
*jrussell@browngreer.com*

   Re: ████████████████████████
     Claimant ID: 950013395; Carleen Hastings

Mr. Russell:

 Please allow this correspondence to provide you with the additional information you requested in your prior email correspondence regarding the above two claimants.

 In your attached email correspondence, you accurately quote FAQ 109, which states that for a Death with CTE diagnosis, "the medical records must show a post-mortem diagnosis of CTE made before April 22, 2015 (the Final Approval Date)."[1]  However, FAQ 109 must be read in conjunction with FAQ 82, FAQ 84, and FAQ 93.

 FAQ 82 explains that a Player who died before April 22, 2015 is eligible for a Monetary Award if there is a diagnosis of Death with CTE.[2]  FAQ 84 states that a

---

[1] *See* Tab 1.  As you know, the representations in the FAQ were made with the approval of counsel for the NFL Parties.  *See* Amended Settlement Agreement § 4.1(a).

[2] *See* Tab 2, Relevant Excerpts from Posted Settlement Program FAQs (as of February 19, 2019), FAQ 82.

May 6, 2019
Page 2

diagnosis of Death with CTE can be made by any board-certified neuropathologist at any time after the Player's death.[3]  FAQ 93 addresses how the date of the diagnosis is determined.[4]

FAQ 93 describes how to determine the diagnosis date for Death with CTE.[5]  It states that the date of the diagnosis is important because it impacts a Player's eligibility for a Monetary Award.[6]  For diagnoses *other than Death with CTE*, the diagnosis date is the date "when the diagnosing physician has enough information and materials, including test results, to be able to render a medically sound and reliable judgment about the Player's condition . . .."[7]  But diagnoses for Death with CTE are different.[8]  For Death with CTE, the diagnosis date is "the date of the Player's death, **even though the diagnosis is not made until after the Player dies**."[9]



Pursuant to FAQ 82, 84, 93, and 109, the diagnosis date for Mr. Mims (Claimant ID: 950013395) is October 15, 2008. Carleen Hastings's claim package regarding the deceased Mr. Mims includes the post-mortem diagnosis of Dr. Ronald L. Hamilton, a board-certified neuropathologist who has provided a post-mortem diagnosis of Death with CTE.  The date of this Qualifying Diagnosis is the date of Mr. Mims' death, which is October 15, 2008.

---

[3]  *See id.*, FAQ 84.

[4]  *See id.*, FAQ 93.

[5]  *See id.*

[6]  *See id.*

[7]  *See id.*, FAQ 93(b).

[8]  *Compare id.*, FAQ 93(b) *with id.*, FAQ 93(a).

[9]  *See id.*, FAQ 93(a) (emphasis added).

May 6, 2019
Page 3


   I appreciate your diligence in reviewing these claims and would be happy to discuss these claims if you have any additional questions or require any additional information.


                              Best regards,


                              David J. Campbell


Enclosures    Tab 1
              Tab 2

| From: | Jason Russell |
|---|---|
| To: | Alice Keeran |
| Cc: | Justin Demerath; David Campbell |
| Subject: | RE: ████████████ Claimant ID: 950013395: Carleen Hastings |
| Date: | Monday, February 25, 2019 12:04:02 PM |
| Attachments: | image001.png |

Hi Alice,

I see Death with CTE was the asserted Qualifying Diagnosis for both.  For Death with CTE, the medical records must show a post-mortem diagnosis of CTE made before April 22, 2015 (the Final Approval Date) by a board-certified neuropathologist for a Retired NFL Football Player who died before April 22, 2015 (Section 6.3(f) of the Settlement Agreement and FAQ 109).

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

**Carleen Hastings - 950013395**
Mr. Mims died on October 15, 2008, and the October 16, 2008 autopsy report signed by Louis A. Pena does not reference CTE and neither does the death certificate.  We received an undated letter from Dr. Ronald L. Hamilton who diagnosed Mr. Mims with CTE.  You must establish that Dr. Hamilton reviewed Mr. Mim's brain tissue and made a CTE diagnosis on or before April 22, 2015.

Please let me know if you have any further questions concerning this.

Thank you,
Jason

**From:** Alice Keeran <akeeran@808west.com>
**Sent:** Monday, February 25, 2019 8:21 AM
**To:** Jason Russell <jrussell@browngreer.com>
**Cc:** Justin Demerath <jdemerath@808west.com>; David Campbell <dcampbell@808west.com>
**Subject:** ████████████████████████ Claimant ID: 950013395; Carleen Hastings

Hi Jason,

I'm writing to follow-up on a couple of Notices of Request for Additional Documents for the above-referenced claimants. Both of these notices reference that accompanying medical records are missing, but I can see the records we provided when I checked the portal for each of them.

Please give me a call when you have a moment. Thank you!

Sincerely,
*Alice Keeran*

Senior Paralegal to
Justin B. Demerath
O'Hanlon, Demerath & Castillo, PC
Attorneys and Counselors at Law
                Austin  Office
                808 West Avenue
                Austin, Texas 78701
                (512) 494-9949  Office
                (512) 494-9919 Fax
                email: akeeran@808west.com
                website: www.808west.com

CONFIDENTIALITY NOTICE:
The information contained in this transmittal and any attached documents maybe  attorney privileged
and contain confidential and/or privileged information and  has been sent for the sole use of the
intended recipient(s).  Any review, use, printing, dissemination, disclosure, distribution, retransmission,
or other use  of, or taking in any action in reliance upon this information by persons or  entities other
than the intended recipient(s) is strictly prohibited.  If you  have received this transmittal in error, please
immediately notify us by telephone at (512) 494-9949 and delete the material from any computer. Please
be advised that nothing in this email shall create or be taken to create an attorney client relationship,
which may only be created by executing a power of attorney agreement.

# NFL CONCUSSION SETTLEMENT

*In Re: National Football League Players' Concussion Injury Litigation* No. 2:12-md-02323 (E.D. Pa.)

# Posted Settlement Program FAQs

(as of February 19, 2019)



# Table of Contents

**I.  Basic Information** ........................................................................................................ 1

    **1.  What is the Settlement about?** ................................................................. 1

    **2.  What are the benefits of the Settlement?** .............................................. 1

    **3.  Who is included in the Settlement Class?** .............................................. 2

    **4.  Who are the settlement administrators?** ............................................... 2

    **5.  Who are the Special Masters?** ................................................................ 3

    **6.  What if I do not like how the settlement administrators or Special Masters are administering the Settlement Agreement?** ..................... 3

    **7.  Do the settlement administrators report to Co-Lead Class Counsel or the NFL Parties?** ........................................................................... 3

    **8.  Does the Claims Administrator share the contents of my Claim Package with Co-Lead Class Counsel or the NFL Parties?** ............ 4

    **9.  Does the Claims Administrator share the contents of my Claim Package with any other people or entities?** ...................................... 4

    **10.  How do I authorize the Claims Administrator to speak to someone else about my claim?** ................................................................. 4

    **11.  When was the Effective Date? What is it?** ........................................... 5

    **12.  How does the Claims Administrator calculate the number of days I have to respond to a notice or take other actions in the Settlement Program?** ..................................................................... 5

    **13.  If I have to respond to the Claims Administrator by a deadline, what is considered the date of my response or submission?** ............. 6

    **14.  If I opted out of the Settlement, can I still get benefits from this Settlement?** ..................... 6

    **15.  I opted out of the Settlement. May I revoke that Opt Out and get back into the Settlement Program?** ................................................. 7

    **16.  If I am a Settlement Class Member who did not opt out of the Settlement, can I sue the NFL Parties for the same thing later?** ...... 7

    **17.  Can I still opt out of the Settlement?** .................................................... 7

    **18.  What if I do not like the terms of the Settlement Agreement?** ............ 7

    **19.  Are there any tools on the Settlement Website to help me understand the Settlement Agreement and how to make a claim?** .... 7

    **20.  Where can I find the Special Master's or the Court's published decisions on appeals or statute of limitations matters?** ................... 8

    **21.  How do I get more information about the Settlement?** ......................... 8

    **22.  How do I report potential fraud to the Claims Administrator?** ........... 9

    **23.  What if my situation or circumstances are not covered by these FAQs?** ................... 9

**II. Settlement Agreement Benefits – General Information** ...................................... 10

**24. Must a Retired NFL Football Player be vested under the NFL Retirement Plan to receive Settlement benefits?** ....................................................................................... 10

**25. Are the Settlement benefits connected to any NFL or NFLPA-related benefits programs?** ........................................................................................................................ 10

**26. If I receive benefits under the 88 Plan or any other disability plan, do I automatically qualify for a Monetary Award in the Settlement Program?** ..................... 10

**27. Does this Settlement prevent Retired NFL Football Players from bringing workers' compensation claims?** .................................................................................................... 10

**28. What types of education programs are supported by the Settlement?** .............................. 10

**29. If the science about the Qualifying Diagnoses changes, will the Settlement Program change the definitions or testing protocols for them?** ........................................... 11

**III. Registration** ................................................................................................................ 12

**30. May I still register in the Settlement as a Retired NFL Football Player?** .......................... 12

**31. May I still register in the Settlement as a Representative Claimant?** ................................ 12

**32. May I still register in the Settlement as a Derivative Claimant?** ....................................... 13

**33. What if I disagree with the Claims Administrator's initial determination on my registration?** ....................................................................................................................... 13

**34. What if I disagree with the Claims Administrator's decision about my registration determination challenge?** ............................................................................. 13

**35. Are there any rules covering registration determinations and appeals?** ....................... 14

**36. How can I send registration information to the Claims Administrator?** ........................... 14

**37. Does registering mean I filed a claim?** ......................................................................... 14

**38. How do I change my mailing address?** ........................................................................ 14

**39. How do I change my name or Social Security Number (or other Taxpayer Identification Number) that I have given the Program?** ...................................................... 14

**40. Do I have to provide my Social Security Number to participate in the Settlement Program?** ........................................................................................................................ 15

**41. How does the Claims Administrator calculate a Retired NFL Football Player's Eligible Seasons?** ........................................................................................................... 15

**42. Where does the Claims Administrator get information about a Retired NFL Football Player's Eligible Seasons?** ................................................................................ 16

**43. I received a Notice of Incomplete Registration saying I am missing proof of playing NFL Football. What are the next steps?** ........................................................................ 16

**IV. Baseline Assessment Program** ................................................................................. 17

**44. What is the Baseline Assessment Program ("BAP")?** .................................................. 17

**45. Who can participate in the BAP?** ................................................................................ 17

**46. Why should I have a BAP exam?** ................................................................................ 17

47. How many doctors will I see in a BAP exam? ................................................................. 18

48. Who pays for these BAP exams? ...................................................................................... 18

49. Who can be a Qualified BAP Provider? ........................................................................... 18

50. Can I choose my own doctors for the BAP exam? .......................................................... 18

51. Do the Qualified BAP Providers report to the NFL? ..................................................... 18

52. Is there a deadline for getting the BAP exam? ............................................................... 18

53. How long will the Baseline Assessment Program be available? ................................... 19

54. How do I access the BAP Portal? .................................................................................... 19

55. How can I schedule a BAP exam? .................................................................................... 19

56. Where do I go for my BAP exam? .................................................................................... 19

57. How long does a BAP exam take? .................................................................................... 20

58. Is it possible to schedule both parts of the BAP exam on the same day? ..................... 20

59. Can BAP appointments be rescheduled or cancelled? ................................................... 20

60. What happens if I miss a BAP appointment? ................................................................. 20

61. What do I need to prepare for my BAP appointment? ................................................... 20

62. Should I bring someone with me to my BAP appointment? .......................................... 20

63. What kind of diagnosis can I get from a BAP exam? ..................................................... 21

64. What about conditions like ALS, Parkinson's Disease, or Alzheimer's Disease? ........ 21

65. Does there have to be a diagnosis? What if I am OK? ................................................... 21

66. What happens after a BAP exam? .................................................................................... 22

67. What should I do if my BAP exam results in a diagnosis? ............................................ 22

68. Will my Monetary Award be affected if I do not have a BAP exam? ........................... 23

69. What are BAP Supplemental Benefits? ........................................................................... 23

70. How long will I have to use my BAP Supplemental Benefits? ...................................... 23

71. How much will my BAP Supplemental Benefits cover? Is there a limit? ..................... 24

72. Will any medical or pharmacy records from BAP Supplemental Benefits be
    available to the NFL? ....................................................................................................... 24

73. What is a Qualified BAP Pharmacy Vendor? ................................................................. 24

74. I received a "Baseline Assessment Program HIPAA Authorization Form." What do
    I do with it? ....................................................................................................................... 24

V. Monetary Awards ................................................................................................................ 25

75. Who can submit a claim for a Monetary Award? ........................................................... 25

76. What is a Claim Package? ................................................................................................ 25

77. How do I submit a Claim Package? ................................................................................. 25

78. Where do I send my Claim Package if I do not use an online Portal? .......................... 26

79. When can I submit a Claim Package? .................................................. 26

80. Is there a deadline to submit my Claim Package? ............................. 26

81. How can I change answers I made in my Claim Form? ..................... 26

82. What is a Qualifying Diagnosis? ........................................................ 27

83. Should I get a BAP exam or see a Qualified MAF Physician? ......... 27

84. What kind of physicians are authorized to make a Qualifying Diagnosis? ..... 27

85. Who is a Qualified MAF Physician? .................................................. 29

86. How do I get evaluated for a Qualifying Diagnosis if I do not already have one? ..... 29

87. If my diagnosing physician is both a Qualified BAP Provider and a Qualified MAF Physician, how do I know if the diagnosis is made in or outside the BAP? ..... 29

88. Does the physician who makes the Qualifying Diagnosis of a Retired NFL Football Player have to see and examine that Player in person? ..... 29

89. Can the representative of a deceased Retired NFL Football Player get a Qualifying Diagnosis for that Player now? ..... 30

90. What should I do if I already have a Qualifying Diagnosis? ............. 31

91. Does it matter when the Retired NFL Football Player was diagnosed? ..... 31

92. What dates matter for when the Qualifying Diagnosis is made? ....... 31

93. How is the date of a Qualifying Diagnosis determined? ................... 32

94. Which diagnostic criteria must a physician use when making my Qualifying Diagnosis? When and to what diagnoses does the "generally consistent" criteria apply? ..... 34

95. What does "generally consistent" mean? .......................................... 34

96. What makes a Claim Package complete? ........................................... 35

97. What can I submit to prove that I have more Eligible Seasons than what the Claims Administrator found for me when I registered? ..... 35

98. What counts as a medical record? ...................................................... 36

99. What does it mean for medical records to "reflect" my Qualifying Diagnosis? ..... 36

100. What does it mean for medical records to "support" my Qualifying Diagnosis? ..... 37

101. What must the medical records show for Level 1.5 and Level 2 Neurocognitive Impairment diagnoses made in the BAP by Qualified BAP Providers? ..... 37

102. What must the medical records show for Level 1.5 and Level 2 Neurocognitive Impairment diagnoses made outside the BAP for *living* Retired NFL Football Players? ..... 39

103. What must the medical records show for Level 1.5 and Level 2 Neurocognitive Impairment diagnoses for Retired NFL Football Players who *died before January 7, 2017* (the Effective Date) and cannot participate in the BAP or be diagnosed by a Qualified MAF Physician? ..... 40

104. How are diagnosing physicians to apply the Clinical Dementia Rating (CDR) scale to Level 1.5 and Level 2 Neurocognitive Impairment Qualifying Diagnoses? ................... 40

105. What must be included in a sworn statement corroborating a Retired NFL Football Player's functional impairment for a Level 1.5 or Level 2 claim? ....................................... 42

106. Are raw scores and/or raw data required for all Monetary Award claims? ..................... 42

107. What must the medical records show for Alzheimer's Disease? ........................................ 43

108. What must the medical records show for Parkinson's Disease? ........................................ 43

109. What must the medical records show for Death with CTE? ............................................... 44

110. What must the medical records show for ALS? ................................................................. 44

111. What if I cannot get medical records or a Diagnosing Physician Certification Form from the diagnosing physician? ........................................................................................... 45

112. If I cannot get medical records or a Diagnosing Physician Certification Form from the diagnosing physician, is there anything specific I should submit to show my attempts to get such documents? ...................................................................................... 45

113. What exceptions are allowed under Section 8.2(a) of the Settlement Agreement for Representative Claimants of deceased Retired NFL Football Players? ............................ 45

114. What is the SWS-2? ............................................................................................................ 47

115. What exceptions are allowed under Section 8.2(a) of the Settlement Agreement for living Retired NFL Football Players or Representative Claimants of legally incapacitated or incompetent Players? ................................................................................ 47

116. Are there other instances not listed in Section 8.2 of the Settlement Agreement where the Claims Administrator may excuse the medical records or Diagnosing Physician Certification Form requirement? ........................................................................ 48

117. What happens after the Claims Administrator grants an exception under Section 8.2(a) or a situation not covered by Section 8.2(a)? ...................................................... 49

118. Who reviews my claim for a Monetary Award? ............................................................... 49

119. How is my diagnosis reviewed? When and to what does the "generally consistent" standard apply? ................................................................................................................. 50

120. What is the AAP and what does it do? .............................................................................. 50

121. What is the AAPC and what does it do? ........................................................................... 50

122. I received a Qualifying Diagnosis through the BAP. Do I have to do anything else to receive a Monetary Award? ............................................................................................... 51

123. I received a Qualifying Diagnosis from a Qualified MAF Physician. Do I have to do anything else to receive a Monetary Award? .................................................................... 51

124. If I received a Qualifying Diagnosis from a Qualified MAF Physician, what types of records will the physician send to the Claims Administrator? ........................................... 51

125. What happens after I submit my Claim Package? ............................................................ 52

126. Can I receive a Monetary Award for more than one Qualifying Diagnosis on the same claim? ......................................................................................................................... 52

**127.I received a Notice of Preliminary Review. What does that mean?** ...................................... 52

**128.I received a Notice of Request for Additional Documents. What does that mean?** ............ 52

**129.What happens after I respond to my notice asking for more information for my claim?** ...................................................................................................................................... 53

**130.What happens if I never respond to the Notice of Preliminary Review or the Notice of Request for Additional Documents?** ...................................................................................... 53

**131.May I get more time to respond to a notice from the Settlement Program?** ...................... 53

**132.Does the Claims Administrator question the medical judgment of the physician who made the Qualifying Diagnosis?** ............................................................................................ 54

**133.I have provided my claim to the Claims Administrator and it is now complete enough to send to the AAP. What happens next?** ...................................................................... 54

**134.How can I check the status of my Claim Package review?** ................................................... 54

**135.How long could it take to review my Claim Package from start to finish?** ...................... 54

**136.If I am eligible for a Monetary Award, how much money will I receive?** ........................... 55

**137.What is a Stroke or Traumatic Brain Injury in this Settlement Program?** ...................... 56

**138.Can I be found eligible for a Monetary Award based on a Qualifying Diagnosis that is different than the one I claimed?** ....................................................................................... 56

**139.What can I do if I do not like my Claim Package determination (eligible or denied)?** ...... 57

**140.Can I withdraw my claim?** ....................................................................................................... 57

**141.Can the Claims Administrator change the outcome of my claim after I receive a notice?** ................................................................................................................................... 57

**142.Can I submit a new claim for a Monetary Award if the Claims Administrator has denied my claim?** ......................................................................................................................... 58

**143.If I received a Monetary Award for one Qualifying Diagnosis, can I later receive a Monetary Award for a different Qualifying Diagnosis? What is a Supplemental Monetary Award?** ............................................................................................................................ 58

**144.Can Co-Lead Class Counsel or the NFL appeal my Claim Package determination?** ........ 58

**145.Are there any rules covering determinations that a Monetary Award claim is or is not barred by the statute of limitations under applicable state law?** ............................... 59

**VI. Representative Claimants** ................................................................................................. 60

**146.Who is a Representative Claimant?** ....................................................................................... 60

**147.How do I become a Representative Claimant?** ...................................................................... 60

**148.How will the Claims Administrator determine whether my court order or other official document is sufficient proof that I can be a Retired NFL Football Player's Representative Claimant?** ....................................................................................................... 61

**149.How will the Claims Administrator determine whether my Power of Attorney (POA) is sufficient proof that I can be a legally incapacitated or incompetent Retired Player's Representative Claimant?** ....................................................................................... 62

150. Can a Retired NFL Football Player have more than one Representative Claimant? ........ 62

151. What happens if more than one person registers as a Representative Claimant for the same Retired NFL Football Player? ................................................................... 62

152. Can I be a Retired NFL Football Player's Derivative Claimant if I am his Representative Claimant? ...................................................................................... 62

153. Do Representative Claimants have to register for benefits? ................................. 62

154. What happens if a registered Retired NFL Football Player or Representative Claimant becomes legally incompetent or incapacitated or dies after registering? ........... 63

155. If I am a Representative Claimant, do I have to submit a Claim Package? ...................... 63

VII.    Derivative Claimants ........................................................................................ 64

156. Who is a Derivative Claimant? ......................................................................... 64

157. Can a Retired NFL Football Player have more than one Derivative Claimant? .............. 64

158. May someone be a Derivative Claimant of more than one Retired NFL Football Player? ........................................................................................................... 64

159. Can a deceased person be a Derivative Claimant? ............................................... 64

160. Can I register as a Retired NFL Football Player's Derivative Claimant if I also registered as a Representative Claimant? ......................................................... 64

161. Do Derivative Claimants have to register for benefits? ......................................... 64

162. What happens if no one registers as a Derivative Claimant for a Retired NFL Football Player? ............................................................................................... 65

163. How do I submit a Derivative Claim Package? .................................................... 65

164. Where do I send my Derivative Claim Package if I do not use an online Portal? ............. 66

165. Is there a deadline to submit my Derivative Claim Package? ................................. 66

167. What makes a Derivative Claim Package complete? ............................................. 66

168. How will the Retired NFL Football Player know if someone has registered as a Derivative Claimant? ...................................................................................... 67

169. How will I know if other Derivative Claimants have registered for the same Retired NFL Football Player? .......................................................................... 67

170. How will I know if the Retired NFL Football Player challenged my Derivative Claimant status? ............................................................................................ 67

171. What happens if one Derivative Claimant does not want to share the 1% Derivative Claimant Award equally with another Derivative Claimant? ................................. 67

172. What law does the Claims Administrator use to analyze Derivative Claimant issues? ..... 68

173. Are there any rules covering appeals of Derivative Claimant challenge determinations? ............................................................................................. 68

VIII.   Lawyers ........................................................................................................ 69

174. Who is Class Counsel? ................................................................................... 69

175. Do I need a lawyer to represent me individually in this Program? .................................. 69

176. How did a lawyer register me? ............................................................................................ 69

177. What are Common Benefit Fees and how will Class Counsel be paid? ............................ 70

178. How will my individual lawyer be paid? ............................................................................ 70

179. Can I terminate my relationship with my individual lawyer? ........................................ 70

180. How do I tell the Claims Administrator I have a new lawyer or that I do not have a
lawyer? ................................................................................................................................ 70

## IX. Petitions for Deviation from Fee Cap .................................................................. 72

181. What is a Petition for Deviation from the fee cap? ........................................................ 72

182. Will the attorney's fees be reduced to pay for common benefit attorneys? ................ 72

183. Where can I get a copy of the Rules Governing Petitions for Deviation from the Fee
Cap? ..................................................................................................................................... 72

184. Who are the Parties involved in a Petition for Deviation from the fee cap? ............... 72

185. Can a party to an Attorney's Lien Dispute file a Petition for Deviation? .................... 72

186. How will a Petition for Deviation be resolved if there is also an Attorney's Lien
asserted against the Settlement Class Member? .......................................................... 73

187. Who determines whether to grant a Petition for Deviation from the fee cap? ........... 73

188. Where do I file a Petition for Deviation from the fee cap? ........................................... 73

189. What is the deadline for filing a Petition for Deviation from the fee cap? .................. 73

190. How do I serve documents related to a Petition for Deviation from the fee cap? ....... 74

191. What information must be included in a Petition for Deviation from the fee cap? ...... 74

192. What is a Memorandum in Support and when is it due? ................................................ 74

193. What information must be included in a Memorandum in Support? ............................ 75

194. What is a Response Memorandum and when is it due? .................................................. 76

195. What information must be included in a Response Memorandum? .............................. 76

196. What is a Reply Memorandum and when is it due? ....................................................... 77

197. What information may be included in a Reply Memorandum? ..................................... 77

198. What if I miss the deadline to submit my Memorandum in Support, Response
Memorandum, or Reply Memorandum? ....................................................................... 77

199. What information will the Magistrate Judge consider in making the Report and
Recommendation or the final decision? ........................................................................ 77

200. If I am unrepresented in the Petition for Deviation proceedings, can I ask to have a
lawyer appointed to represent me? ................................................................................ 78

201. Can I ask for a hearing on a Petition for Deviation from the fee cap? ........................ 78

202. How will I find out if the Magistrate Judge grants a hearing and when will the
hearing be scheduled? ...................................................................................................... 78

203. What happens at a hearing? .................................................................................. 78

204. Do I have to participate in the hearing? ............................................................... 79

205. Do I have to be represented by a lawyer at the hearing?  Can I have a non-lawyer advocate? ................................................................................................................. 79

206. When will the Magistrate Judge issue a Report and Recommendation or a final decision? ................................................................................................................. 79

207. Can I object to the Magistrate Judge's Report and Recommendation? ............................ 79

208. Who makes the final decision resolving the Petition for Deviation from the fee cap? ....... 80

209. Can the District Judge or the Magistrate Judge change the final decision? ..................... 80

210. Can I appeal the final decision? .......................................................................... 80

211. How will the withheld funds be paid after the final decision? .................................... 80

X.  Liens – Information for Settlement Class Members .......................................... 81

212. What is a Lien? ................................................................................................ 81

213. What Liens will the Claims Administrator pay out of my Award? ............................... 81

214. What is a Medical Lien? .................................................................................... 81

215. What is an Attorney's Lien? .............................................................................. 81

216. What are the kinds of Other Liens recognized in the Settlement Program? ..................... 82

217. Are there any debts that the Claims Administrator will not pay? ................................. 82

218. Do Medical Liens have to be resolved out of my Award? .......................................... 82

219. What could happen if I do not resolve my Medical Liens? ......................................... 83

220. How do I know if there is a Lien against me? ......................................................... 84

221. What if I identify a Lien on my Claim Form? ......................................................... 85

222. How do I respond to the notice of Lien from the Settlement Program? ......................... 85

223. I received a notice from my healthcare insurer saying that it may have a Lien against me. What should I do? ............................................................................... 85

224. Should I contact a lienholder to speed up the Medical Lien resolution process? ............... 85

225. I have medical coverage through Medicare. What should I do? .................................. 86

226. What about Medicare Part C and Part D Liens? ...................................................... 86

227. I have medical coverage through Medicaid. What should I do? .................................. 86

228. I (or my spouse) served in the military, so I have medical coverage through TRICARE or the Department of Veterans Affairs. What should I do? .............................. 87

229. I have medical coverage through the Department of Indian Health Services. What should I do? ......................................................................................................... 87

230. What agreements and with which agencies has the Lien Resolution Administrator been able to secure on behalf of Settlement Class Members? ............................................ 87

231. I have a private medical insurance plan. Can they claim a Lien on my Award? ............... 88

232. What happens if I dispute a Lien? ................................................................ 88

233. What is a Dispute over an Attorney's Lien? ................................................ 89

234. Where can I get a copy of the Rules that apply to the Attorneys' Liens dispute resolution process? ........................................................................................ 89

235. How does a Dispute over an Attorney's Lien get into the Attorneys' Liens dispute resolution process? ............................................................................ 89

236. Who are the Parties in an Attorney's Lien Dispute? ................................. 89

237. Who resolves an Attorney's Lien Dispute? ................................................ 89

238. Do I have to try to reach an agreement with the attorney who asserted a Lien against my Award? ................................................................................... 90

239. How do I serve document submissions in the Attorneys' Liens dispute resolution process? .......................................................................................... 90

240. What do I need to submit in the Attorneys' Liens dispute resolution process? ................. 90

241. What is a Statement of Dispute and when is it due? ................................. 90

242. What information must be included in my Statement of Dispute? ..................................... 90

243. What is a Response Memorandum and when is it due? ............................. 91

244. What if I miss the deadline to submit my Statement of Dispute or Response Memorandum? .................................................................................................. 92

245. What information will the Magistrate Judge consider in making the Report and Recommendation or the final decision? ........................................................ 92

246. If I am unrepresented, can I ask to have a lawyer appointed to represent me in the Attorney's Lien Dispute? .............................................................................. 93

247. Can I ask for a hearing on the Attorney's Lien Dispute? ........................ 93

248. How will I find out if the Magistrate Judge grants a hearing on the Attorney's Lien Dispute and when will the hearing be scheduled? ................................. 93

249. What happens at a hearing on an Attorney's Lien Dispute? .................... 93

250. Do I have to participate in the hearing on the Attorney's Lien Dispute? ......................... 94

251. Do I have to be represented by a lawyer at the hearing on the Attorney's Lien Dispute?  Can I have a non-lawyer advocate? ................................................ 94

252. Can I withdraw a Dispute from the Attorneys' Liens dispute resolution process? ........... 94

253. How do I withdraw a Dispute from the Attorneys' Liens dispute resolution process? ..... 94

254. What information will the Magistrate Judge consider in making the Report and Recommendation or the final decision on the Withdrawals? ............................ 94

255. When will the Magistrate Judge issue a Report and Recommendation or a final decision? ...................................................................................................... 95

256. Can I object to the Magistrate Judge's Report and Recommendation? ............................ 95

257. Who makes the final decision resolving an Attorney's Lien Dispute? ................................ 95

258. Can the District Judge or the Magistrate Judge change the final decision on an Attorney's Lien Dispute? ........................................................................... 95

259. Can I appeal the final decision on an Attorney's Lien Dispute? ............................... 95

260. How will the withheld funds be paid after the final decision on an Attorney's Lien Dispute? ....................................................................................................... 96

261. How and when is a Lien paid? ................................................................................. 96

262. What happens if more than one Lien exists against a single Monetary Award or Derivative Claimant Award and there is not enough money to pay all of the Liens in full? ....................................................................................................................... 97

263. Will I be notified when the Claims Administrator pays a Lien? ............................... 97

264. Whom do I contact with questions about Liens? ...................................................... 98

**XI. Liens – Information for Lienholders** ........................................................................... 99

265. How does a lienholder notify the Settlement Program of a Medical Lien? ............. 99

266. How does a lienholder notify the Settlement Program of an Attorney's Lien or an Other Lien? .............................................................................................................. 99

267. What information must a government health insurer provide to assert a Medical Lien? ....................................................................................................................... 100

268. What information is required from a private healthcare insurer to assert an alleged Lien? ....................................................................................................................... 100

269. What information is required to assert an Attorney's Lien? ................................... 100

270. What information is required to assert an Other Lien? .......................................... 101

271. What happens after I submit the required information and documents for a valid Lien? ....................................................................................................................... 102

272. What happens if a Settlement Class Member disputes a Medical Lien? ............... 102

273. What happens if a Settlement Class Member disputes an Attorney's Lien? ......... 102

274. What happens if a Settlement Class Member disputes an Other Lien? ................ 102

275. What is a Dispute over an Attorney's Lien? .......................................................... 103

276. Where can I get a copy of the Rules that apply to the Attorneys' Liens dispute resolution process? ................................................................................................. 103

277. How does a Dispute over an Attorney's Lien get into the Attorneys' Liens dispute resolution process? ................................................................................................. 103

278. Who are the Parties in an Attorney's Lien Dispute? ............................................. 103

279. Who resolves an Attorney's Lien Dispute? ........................................................... 103

280. Do I have to try to reach an agreement with the Settlement Class Member over the disputed Attorney's Lien? ...................................................................................... 104

281. How do I serve document submissions in the Attorneys' Liens dispute resolution process? ................................................................................................................. 104

282. What do I need to submit in the Attorneys' Liens dispute resolution process? ...... 104

283. What is a Statement of Dispute and when is it due? ............................ 104

284. What information must be included in my Statement of Dispute? ................... 104

285. What is a Response Memorandum and when is it due? ...................... 105

286. What if I miss the deadline to submit my Statement of Dispute or Response Memorandum? ............................................................ 105

287. What information will the Magistrate Judge consider in making the Report and Recommendation or the final decision? ........................ 106

288. Can I request a hearing on the Attorney's Lien Dispute? ................... 106

289. How will I find out if the Magistrate Judge grants a hearing on the Attorney's Lien Dispute and when will the hearing be scheduled? ................... 106

290. What happens at a hearing on an Attorney's Lien Dispute? ........................ 106

291. Do I have to participate in the hearing on the Attorney's Lien Dispute? ................ 107

292. Can I withdraw a Dispute from the Attorneys' Liens dispute resolution process? ......... 107

293. How do I withdraw a Dispute from the Attorneys' Liens dispute resolution process? ... 107

294. What information will the Magistrate Judge consider in making the Report and Recommendation or the final decision on the Withdrawals? ........................ 107

295. When will the Magistrate Judge issue a Report and Recommendation or a final decision? ............................................................ 108

296. Can I object to the Magistrate Judge's Report and Recommendation? ................ 108

297. Who makes the final decision resolving the Attorney's Lien Dispute? ................ 108

298. Can the District Judge or the Magistrate Judge change the final decision on an Attorney's Lien Dispute? ........................................ 108

299. Can I appeal the final decision on an Attorney's Lien Dispute? .................... 109

300. How will the withheld funds be paid after the final decision on an Attorney's Lien Dispute? ............................................................ 109

301. Whom do I contact with questions about Liens? ...................... 109

XII.    Payments ............................................................ 110

302. I received a Notice of Monetary Award Claim Determination or Notice of Derivative Claimant Award Determination. Do I need to do anything else to receive payment of the award? ............................................................ 110

303. When will I receive payment for my Monetary Award or Derivative Claimant Award? ............................................................ 111

304. Who will issue the payment to me? ........................................ 112

305. How will the funds be issued by Citibank? ........................ 112

306. If I want to appeal only part of my Monetary Award amount, can I get paid for the rest before my appeal is final? ........................................ 112

307. Will my Monetary Award or Derivative Claimant Award be issued to my lawyer or directly to me? ............................................................ 112

2/19/19

**308.** **Can a Settlement Class Member assign rights to receive his or her Monetary Award or Derivative Claimant Award, or a portion of the Award, to a third party?** ................. 113

**309.** **What is the fee cap?** ................................................................................................... 113

**310.** **What happens to those lawyers' fees and expenses that the Claims Administrator has withheld from Award payments?** ................................................................. 114

**311.** **What are claims service providers and are they covered by the fee cap?** ....................... 114

**312.** **Do lawyers have to send a statement of contingency fees and expenses to the Claims Administrator?** ............................................................................................................ 114

**313.** **What does the Claims Administrator do with the 5% Common Benefit Fund Holdback?** ......................................................................................................................... 114

**XIII.    Audit** ................................................................................................................ 116

**314.** **What is an audit?** .......................................................................................................... 116

**315.** **How does an audit affect the regular processing of my claim?** ......................................... 116

**316.** **Why did I receive a Notice of Audit of Claim?** ............................................................... 116

**317.** **I received a Notice of Audit of Claim after I received a Notice of Monetary Award Claim Determination or a Notice of Denial of Monetary Award Claim. How does the audit affect my claim?** .................................................................................................... 117

**318.** **Are there any rules covering the audit of claims?** ........................................................... 117

**XIV.    Bankruptcy** ................................................................................................... 118

**319.** **Why does the Settlement Program need to know whether I filed bankruptcy?** ............... 118

**320.** **How does the Settlement Program identify a Bankruptcy Issue Claimant?** .................... 118

**321.** **How does a current or prior bankruptcy case affect my Monetary Award Claim?** ........ 118

**322.** **What is the Bankruptcy Review process?** ....................................................................... 118

**323.** **Which Bankruptcy Issue Claimants must provide Bankruptcy Documents?** ................. 119

**324.** **What Bankruptcy Documents are required?** ................................................................... 119

**325.** **I received a Notice of Bankruptcy Question Delaying Payment. What does this mean?** ............................................................................................................................. 120

**326.** **My Bankruptcy Case is closed. Why am I required to provide Bankruptcy Documents?** ................................................................................................................... 120

**327.** **I received a Bankruptcy Trustee Notice. What does this mean?** ..................................... 121

**328.** **My bankruptcy proceeding is closed, and I cannot provide the required Bankruptcy Documents. What can I do?** ........................................................................................... 121

**329.** **I received a Bankruptcy Trustee Communication Notice. What does this mean?** ........... 121

**330.** **My Bankruptcy Trustee signed the Bankruptcy Trustee Release of Information form. Am I still required to provide Bankruptcy Documents?** ................................... 121

**XV.    Appeals** ........................................................................................................... 122

**331.** **Are there any rules covering appeals of claim determinations?** ....................................... 122

2/19/19

**332.** Can I appeal the Claims Administrator's determination of any amounts deducted from my Monetary Award or Derivative Claimant Award for Liens? ............................ 122

**333.** Who are the appellant and the appellee on an appeal of a claim? ..................................... 122

**334.** Why was my claim remanded to the Claims Administrator? ............................................ 122

**335.** If my claim is remanded from an appeal to the Claims Administrator, what happens to the $1,000 Appeals Fee I paid? ........................................................................... 122

**336.** May the NFL Parties offer medical or other new evidence on appeal? ........................... 122

**337.** If a party offers new evidence in a brief on appeal, how does that affect the due date for the responding party's brief? How will I know whether there will be a remand or whether I need to address the new evidence in what I file? ............................................ 123

**338.** If new evidence added on appeal leads to remand to the Claims Administrator, can a party offer new evidence in every appeal to force a remand and re-review, either to get another chance at payment or denial, or to delay things? ............................................ 123

**339.** Will the Court review a decision by a Special Master allowing or excluding new evidence on a claim appeal? ................................................................................... 123

**340.** How will remands of claims on appeal work? ................................................................. 124

    **(a)** Will the re-review be assigned to the same AAP doctor who reviewed it before? ..... 124

    **(b)** If the Special Master remands my claim, will the Claims Administrator or the AAP review the entire claim all over again? ................................................................. 124

    **(c)** If an AAP doctor reviews the claim after remand, will that AAP doctor see the entire claim file on remand, or only the new evidence? ...................................... 124

    **(d)** Does that mean that AAP doctor will see all the briefs on the appeal too? ............... 124

    **(e)** On remand, does the original outcome set a floor for the result, or can the claim go down in value? ................................................................................................ 125

    **(f)** What if the Claims Administrator did the original review and not the AAP. Do these same rules apply? ................................................................................................ 125

**341.** Can a claim be appealed again after the Special Master remands it and the Claims Administrator issues a new notice? ................................................................................. 125

your Claim Form or want to check the status of your claim and a Program Specialist will help you.

**82.  What is a Qualifying Diagnosis?**

These diagnoses are eligible for a Monetary Award:

(a)  Level 1.5 Neurocognitive Impairment;

(b)  Level 2 Neurocognitive Impairment;

(c)  Alzheimer's Disease;

(d)  Parkinson's Disease;

(e)  Death with CTE (for a Retired NFL Football Player who died before April 22, 2015); and

(f)  ALS.

Click here to read how these Qualifying Diagnoses are defined in Exhibit 1 of the Settlement Agreement.

**83.  Should I get a BAP exam or see a Qualified MAF Physician?**

This is up to you and depends on the Qualifying Diagnosis.

**Level 1.5 and Level 2:** If you are eligible for the BAP, you can get your diagnosis from either Qualified BAP Providers or a Qualified MAF Physician. The BAP exam is free.

**Alzheimer's Disease, Parkinson's Disease and ALS**: You must see a Qualified MAF Physician. These Qualifying Diagnoses cannot be made in the BAP.

**84.  What kind of physicians are authorized to make a Qualifying Diagnosis?**

This depends on the kind of Qualifying Diagnosis and when it was made. Click here for the Diagnosis and Review Table showing how this works. Find the kind of Qualifying Diagnosis in column 1 of Row A, B or C of the Diagnosis and Review Table. Then look at column 2 for when the diagnosis was made and column 3 for what kind of doctor has authority under the Settlement Agreement to make that diagnosis for purposes of a Monetary Award.

This is what the Diagnosis and Review Table shows:

(a)  Level 1.5, Level 2, Alzheimer's Disease, Parkinson's Disease, or ALS diagnosed before July 7, 2014, which was the date the Settlement Agreement was preliminarily approved by the Court: These must be made by what the Table calls Group 1 Specialists, who are:

Board-certified neurologists, board-certified neurosurgeons, or other board-certified neuro-specialist physicians, or otherwise qualified neurologists, neurosurgeons, or other neuro-specialist physicians. (See Section 6.3(d) of the Settlement Agreement, available by clicking here.)

(b) Level 1.5, Level 2, Alzheimer's Disease, Parkinson's Disease, or ALS diagnosed from July 7, 2014, through January 7, 2017, which was the date the Settlement Agreement became effective after all appeals: These must be made by what the Table calls Group 2 Specialists, who are:

Board-certified neurologists, board-certified neurosurgeons, or other board-certified neuro-specialist physicians. (See Section 6.3(c) of the Settlement Agreement, available by clicking here.)

NOTE: This is the same as the Group 1 Specialists listed above, except it does not include the "otherwise qualified neurologists, neurosurgeons, or other neuro-specialist physicians."

(c) Level 1.5, Level 2, Alzheimer's Disease, Parkinson's Disease, or ALS diagnosed on a Player while living but who died before January 7, 2017: These must be made by what the Table calls Group 3 Specialists, who are:

Board-certified neurologists, board-certified neurosurgeons, other board-certified neuro-specialist physicians, otherwise qualified neurologists, neurosurgeons, or other neuro-specialist physicians, or other physicians who have sufficient qualifications (a) in the field of neurology to make a Qualifying Diagnosis of Level 1.5 Neurocognitive Impairment, Level 2 Neurocognitive Impairment, Alzheimer's Disease, Parkinson's Disease, or ALS, or (b) in the field of neurocognitive disorders to make a Qualifying Diagnosis of Level 1.5 Neurocognitive Impairment or Level 2 Neurocognitive Impairment. (See Section 6.3(e) of the Settlement Agreement, available by clicking here.)

(d) Diagnoses made on Players after January 7, 2017:

(1) Level 1.5 or Level 2 Diagnoses: After January 7, 2017, these must be diagnosed either by Qualified BAP Providers in the BAP or by a Qualified MAF Physician;

(2) Alzheimer's Disease, Parkinson's Disease, or ALS: After January 7, 2017, these can be diagnosed only by a Qualified MAF Physician.

(e) Death with CTE: This can be diagnosed only by a board-certified neuropathologist after the Player's death.

*Reminder:* *You do not have to prove that the Qualifying Diagnosis was caused by playing football or from head injuries the Player experienced. The fact that a Player has a Qualifying Diagnosis is enough.*

2/19/19

**85.  Who is a Qualified MAF Physician?**

A Qualified MAF Physician is a board-certified neurologist, board-certified neurosurgeon, or other board-certified neuro-specialist physician, who is part of a list of physicians approved by Co-Lead Class Counsel and the NFL Parties as authorized to make a Qualifying Diagnosis after January 7, 2017. A physician is not a Qualified MAF Physician until he or she has been approved by the Parties and has signed a contract with the Claims Administrator. The list of Qualified MAF Physicians eligible to make Qualifying Diagnoses is posted on the Settlement Website (click here to see it). Also click here to see the Diagnosis and Review Table, which summarizes Qualifying Diagnoses that Qualified MAF Physicians make and the diagnostic criteria they use to make those diagnoses.

**86.  How do I get evaluated for a Qualifying Diagnosis if I do not already have one?**

You can make an appointment with either:

(a)  Qualified BAP Providers (if you are BAP-eligible) who can determine whether you have Level 1.5 Neurocognitive Impairment or Level 2 Neurocognitive Impairment; or

(b)  A Qualified MAF Physician, who can determine whether you have Level 1.5 Neurocognitive Impairment, Level 2 Neurocognitive Impairment, Alzheimer's Disease, Parkinson's Disease, or ALS.

*Reminder: BAP exams are free of charge. You are responsible for paying for an examination by a Qualified MAF Physician, but many Qualified MAF Physicians accept health insurance.*

**87.  If my diagnosing physician is both a Qualified BAP Provider and a Qualified MAF Physician, how do I know if the diagnosis is made in or outside the BAP?**

Qualifying Diagnoses of Alzheimer's Disease, Parkinson's Disease and ALS cannot be made through the BAP. After January 7, 2017, a Qualifying Diagnosis of Alzheimer's Disease, Parkinson's Disease, or ALS must be made by a Qualified MAF Physician, even if he or she is also a Qualified BAP Provider. However, a Qualifying Diagnosis of Level 1.5 Neurocognitive Impairment or Level 2 Neurocognitive Impairment may be made after January 7, 2017, by Qualified BAP Providers or a Qualified MAF Physician.

Most of the Qualified BAP Providers are also Qualified MAF Physicians. If you or your lawyer scheduled a BAP exam with the BAP Administrator, then you will receive a BAP exam. If you have any doubt about in which capacity the physician is acting, then ask him or her during your visit.

**88.  Does the physician who makes the Qualifying Diagnosis of a Retired NFL Football Player have to see and examine that Player in person?**

Yes, for all types of Qualifying Diagnoses other than Death with CTE, which only could have been diagnosed after the death of the Player.

The diagnosing physician who signs a Diagnosing Physician Certification Form for a diagnosis made on a living Retired NFL Football Player must have examined that Player in person. Section 8.2(a)(iii) of the Settlement Agreement allows a physician to make a Qualifying Diagnosis for a living Player relying on the records and work done by a prior physician and to use that earlier date as the diagnosis date *only if* that prior physician is deceased or incompetent *and only if* the new physician independently examines the Player. This means that other than those situations, a Qualifying Diagnosis of a living Player must be made by a physician based on his or her own examination and records, rather than the examination and records of someone else.

As a result:

(1) The diagnosing physician cannot base a Qualifying Diagnosis solely on a review of test results or the medical records of another physician; and

(2) The diagnosing physician must have met with the Player in person, rather than communicating with him by email, texts, letters, or on the phone.

There must be records in the Claim Package showing that the diagnosing physician who signed the Diagnosing Physician Certification Form submitted in the Claim Package followed both of these rules. If there is not, the Claim Package is incomplete. If the physician who signed the Diagnosing Physician Certification Form did not meet with the Player in person, that physician must do so to re-do the diagnosis, or the doctor who did meet the Player must sign the Diagnosing Physician Certification Form instead.

**89. Can the representative of a deceased Retired NFL Football Player get a Qualifying Diagnosis for that Player now?**

For a Qualifying Diagnosis of Death with CTE, the Retired NFL Football Player had to have died before April 22, 2015, and received a post-mortem diagnosis of CTE from a board-certified neuropathologist before April 22, 2015, or within 270 days after the Player's death, if the Player died between July 7, 2014, and April 22, 2015. If you represent a deceased Player who received this type of post-mortem diagnosis, you should contact the neuropathologist who provided it and ask him or her to complete and sign a Pre-Effective Date Diagnosing Physician Certification Form attesting to the Qualifying Diagnosis. This is the only type of Qualifying Diagnosis that can be made after the Player died.

For Qualifying Diagnoses of Level 1.5 Neurocognitive Impairment, Level 2 Neurocognitive Impairment, Alzheimer's Disease, Parkinson's Disease and ALS, the Player had to have been diagnosed while he was living by a physician with the appropriate qualifications, which are described in the FAQ found here. If the Player received one of these diagnoses while he was alive, you should contact the physician who made the diagnosis and ask him or her to complete and sign a Pre-Effective Date Diagnosing Physician Certification Form.

**90. What should I do if I already have a Qualifying Diagnosis?**

You should submit a Claim Package for that Qualifying Diagnosis, including a Diagnosing Physician Certification Form and any medical records from the physician who made the diagnosis and the other required parts of a Claim Package. If you received a Qualifying Diagnosis through the BAP, the Claims Administrator already has your medical records and Diagnosing Physician Certification Form. However, you must submit a Claim Form before the Claims Administrator will review your claim for a Monetary Award determination.

*Reminder: Only Qualified BAP Providers and Qualified MAF Physicians can make Qualifying Diagnoses after January 7, 2017.*

**91. Does it matter when the Retired NFL Football Player was diagnosed?**

Yes. The Settlement Agreement sets out what kind of doctors are authorized to make a Qualifying Diagnosis, depending on when the diagnosis is made. (See Section 6.3 of the Settlement Agreement, available by clicking here.)

The Settlement Agreement controls what medical criteria applies when making a Qualifying Diagnosis and who reviews that diagnosis to see if it qualifies for a Monetary Award, whether the Appeals Advisory Panel of neurologists or the Claims Administrator, and how the review is to be done. That also depends on when the diagnosis is made. (See Section 6.4 and Exhibit 1 of the Settlement Agreement, available by clicking here.)

Click here for the Diagnosis and Review Table showing how this works. Find your diagnosis in Column 1 and then look in Columns 2 through 6 of that table for who makes the diagnosis, who reviews it and how.

**92. What dates matter for when the Qualifying Diagnosis is made?**

The Settlement Agreement divides diagnoses into these time periods. The Claims Administrator created a Diagnosis and Review Table to show how this works. Click here to see column 2 of the Table, which shows:

(a) Diagnoses made on or before July 1, 2011;

(b) Diagnoses made from July 2, 2011 through July 6, 2014;

(c) Diagnoses made from July 7, 2014, the date the Settlement Agreement was preliminarily approved by the Court, through January 7, 2017, which was the date the Settlement Agreement became effective after all appeals;

(d) Diagnoses made on Players while living but who died before January 7, 2017;

(e) Diagnoses made on Players after January 7, 2017; and

(f) Diagnoses of Death with CTE made on Players who died on or before April 22, 2015, which was the date the Court finally approved the Settlement Agreement but before all appeals were done.

## 93. How is the date of a Qualifying Diagnosis determined?

The physician making a Qualifying Diagnosis of a Retired NFL Football Player must determine and verify the date on which that Qualifying Diagnosis was made. This date is important under the Settlement Agreement. It affects the amount of a Monetary Award, because the younger a Player is at the time of the Qualifying Diagnosis, the larger the award.

The diagnosing physician uses his or her professional medical judgment in deciding when the Player had the conditions amounting to a Qualifying Diagnosis under Exhibit 1 to the Settlement Agreement. There are some basic rules about this:

(a) *Death with CTE:* For these claims, the date of the Qualifying Diagnosis is the date of the Player's death, even though the diagnosis is not made until after the Player dies. The Monetary Award is based on the Player's age when he died.

(b) *General Rule for the other Qualifying Diagnoses:* The date of a Qualifying Diagnosis other than Death with CTE is when the diagnosing physician has enough information and materials, including test results, to be able to render a medically sound and reliable judgment about the Player's condition, the way a physician normally does in his or her clinical practice. In some cases, using sound medical judgment, a physician may conclude that a Qualifying Diagnosis existed at some prior point in time.

(c) *Are there other cases when the Qualifying Diagnosis might be before the date the physician personally examines the Player?* Maybe. The unique facts and circumstances of a particular claim may allow the diagnosis date to be before the date the diagnosing physician personally examined the Player. Here are the rules:

(1) *Diagnosing Physician is deceased or legally incompetent:* Section 8.2(a)(iii) of the Settlement Agreement allows use of the date of an earlier Qualifying Diagnosis to calculate a Monetary Award where: (a) the Player received a Qualifying Diagnosis; (b) the diagnosing physician died or was deemed by a court to be legally incapacitated or incompetent before the January 7, 2017 Effective Date or before completing a Diagnosing Physician Certification Form; (c) a separate qualified physician made an independent examination and reviewed the Player's medical records that formed the basis of the Qualifying Diagnosis; and (d) that physician found the same Qualifying Diagnosis. Here, the Settlement Agreement allows a later physician to adopt the date of diagnosis based upon the earlier medical records of another physician.

(2) *88 Plan diagnoses:* If the diagnosis was made by an 88 Plan neutral physician who cannot or will not sign the Diagnosing Physician Certification Form, the date of the diagnosis made as part of the 88 Plan Independent Medical Examination ("IME")

may be used where: (a) the Player sees a Qualified MAF Physician for an independent examination or Qualified BAP Providers for a BAP exam; (b) the Player provides the Qualified MAF Physician or Qualified BAP Providers with all records of the prior 88 Plan IME diagnosis in his possession or to which he has access and all records of evaluation and treatment for that impairment between the dates of the 88 Plan IME and the Qualified MAF Physician appointment or BAP exam in his possession or to which he has access; (c) the Qualified MAF Physician performs an independent examination or the Qualified BAP Providers perform a BAP exam of the Player and review the additional records provided by the Player; and (d) if the Qualified MAF Physician or Qualified BAP Providers find the same Qualifying Diagnosis – both as of the date of the independent examination and the prior IME for the 88 Plan – then the date of Qualifying Diagnosis will be the date of the 88 Plan IME.

This exception applies only to diagnoses made through the 88 Plan. If you received a diagnosis through another NFL disability plan, such as the Neuro-Cognitive Disability Benefit Plan or the NFL Player Supplemental Disability Plan, contact the Claims Administrator to see if the date of diagnosis made through that plan can be used as the date of the Qualifying Diagnosis for purposes of a Monetary Award. The Claims Administrator will review your case with Co-Lead Class Counsel and Counsel for the NFL Parties.

(3) *Medical Records unavailable:* If the Player died before the January 7, 2017 Effective Date of the Settlement Agreement and the medical records reflecting the Qualifying Diagnosis are unavailable because of a force majeure type event or for some other reason the Claims Administrator deems acceptable, the date of the Qualifying Diagnosis will be the earlier of: (1) the date of the onset of the Qualifying Diagnosis reflected in other available contemporaneous medical records or the death certificate; or (2) the date of the Player's death provided on the death certificate.

(4) *Other instances where the earlier diagnosing doctor or medical records are not available:* If you face other situations not covered by the terms of Section 8.2(a)(iii) of the Settlement Agreement and not involving a Plan 88 IME, then contact the Claims Administrator and explain the problem you have. There may be other circumstances in which a diagnosis by a later physician might adopt the earlier date of a diagnosis by another doctor.

(5) *Sound clinical medical judgment:* Also, the physician making a diagnosis may conclude, in the exercise of his or her sound medical judgment, that he or she has enough information from personal examination, medical records from other healthcare providers, medical history, corroborating evidence from non-family members and other information that medical specialists rely on in their clinical practices, to form a sound medical judgment that the Player's Qualifying Diagnosis conditions existed at a date earlier than the date of a personal examination of the Player by the physician making the diagnosis and signing the Diagnosing Physician

Certification Form. The Settlement Class Member is best served by having the doctor who made an earlier diagnosis sign the Diagnosing Physician Certification Form. But there may be situations where the diagnosing physician can pinpoint an earlier date that is based on sound clinical judgment and best medical practices.

Any such diagnosis will be strictly scrutinized in the claims review process. The Claims Administrator may request additional information and/or documents to support the claimed diagnosis date and prevent misrepresentations of material fact in connection with the claim.

94. **Which diagnostic criteria must a physician use when making my Qualifying Diagnosis? When and to what diagnoses does the "generally consistent" criteria apply?**

The Diagnosis and Review Table shows how this works; click here to review the Table.

For diagnoses of Level 1.5 and Level 2 Neurocognitive Impairment made in the BAP, Qualified BAP Providers follow the diagnostic criteria set forth in Exhibits 1 and 2.

Diagnoses of Level 1.5 and 2 Neurocognitive Impairment made outside the BAP must show that the evaluation and evidence behind those diagnoses are "generally consistent" with the diagnostic criteria set for Qualified BAP Providers and outlined in Exhibits 1 and 2.

Diagnoses of Alzheimer's Disease, Parkinson's Disease, ALS and Death with CTE are not made in the BAP and are all made following the diagnostic criteria set out in Exhibit 1 (and the "generally consistent" standard does not apply).

95. **What does "generally consistent" mean?**

Something is "generally consistent with" something else if the two things have more elements or characteristics in common with each other than they have elements or characteristics that differ from each other. The common elements or characteristics must predominate over the uncommon ones.

The Settlement Agreement states specifically that diagnostic criteria for a diagnosis made outside the BAP do not have to be identical to the diagnostic criteria for a diagnosis made in the BAP. The diagnostic criteria, or the medical rules the doctor must follow to make the diagnosis, outside the BAP do not have to be 100% the same as the Exhibit 1 criteria.

With this said, the closer a set of diagnostic criteria match those specified in Exhibit 1, the more "consistent" it will be with Exhibit 1.

A claim based on a Qualifying Diagnosis is most solid when its elements match closely those required in Exhibit 1. For example, where Exhibit 1 requires documentary evidence or a third-party sworn affidavit corroborating functional impairment, or neuropsychological testing, the claim of a Qualifying Diagnosis is most solid when its Claim Package contains documentary evidence or a third-party sworn affidavit corroborating functional impairment and proof of

# Exhibit 5



# NFL CONCUSSION SETTLEMENT

*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

## APPEALS FORM FOR MONETARY AWARD OR DERIVATIVE CLAIMANT AWARD CLAIM DETERMINATION

### DATE OF NOTICE: July 30, 2019
### DEADLINE TO APPEAL: August 29, 2019

### I. SETTLEMENT CLASS MEMBER INFORMATION

| Settlement Program ID | 950013395 | | |
|---|---|---|---|
| **Name:** | First<br>Carleen | M.I. | Last<br>Hastings |
| **Settlement Class Member Type** | Representative Claimant | | |
| **Primary Counsel** | O'Hanlon, Demerath & Castillo | | |

### II. REASON FOR THIS APPEAL

Here is a short statement explaining the reason(s) for my appeal. Raise all issues you wish to appeal. Issues not raised at this time will not be addressed by the Court.

Class Member Carleen Hastings, by and through counsel, files this written statement in support of this appeal and respectfully requests that the Claims Administrator's denial of this claim be reversed and remanded for a calculation of the Class Member's Monetary Award. The Claims Administrator erred in making two erroneous legal conclusions and one erroneous factual determination.

First, the Claims Administrator erred in concluding that the Amended Settlement Agreement required Class Member to submit proof that the board-certified neuropathologist who provided a post-mortem diagnosis of CTE made the diagnosis on or before 4/22/15.*

Second, the Claims Administrator erred in concluding that the Amended Settlement Agreement required the board-certified neuropathologist who provided the CTE diagnosis for this claim to also "confirm" his CTE diagnosis by examining the Player's brain tissue. The Amended Settlement Agreement requires a post-mortem diagnosis of CTE by a board-certified neuropathologist; it does not require any additional "confirmation" of the diagnosis by the board-certified neuropathologist.

Third, the Claims Administrator erred in concluding that there is no proof that Dr. Hamilton "personally performed the post-mortem exam on the Retired Player." Dr. Hamilton did personally review brain tissue from the Retired Player as he states in his letter.

_____
* If the Amended Settlement Agreement [ECF 6481] is construed to require a diagnosis on or before 4/22/15, Class Member reserves the right to seek relief from the Court pursuant to both Rule 60 and the Court's inherent authority to amend the judgment in this case in order to implement the settlement.

### III. HOW TO SUBMIT THIS FORM

You may submit this Appeals Form and any accompanying documents using one of these methods:

| **By Mail:**<br>(must be postmarked on or before the appeal deadline date) | NFL Concussion Settlement<br>Claims Administrator<br>P.O. Box 25369<br>Richmond, VA 23260 |
|---|---|
| **By Overnight Delivery:**<br>(must be placed with the overnight carrier on or before the appeal deadline date) | NFL Concussion Settlement<br>c/o BrownGreer PLC<br>250 Rocketts Way<br>Richmond, VA 23231 |
| **By Hand Delivery:**<br>(must delivered on or before the appeal deadline date) | NFL Concussion Settlement<br>c/o BrownGreer PLC<br>250 Rocketts Way<br>Richmond, VA 23231 |

| **IV. HOW TO CONTACT US WITH QUESTIONS OR FOR HELP** |
|---|
| If you are represented by a lawyer, consult with your lawyer if you have questions or need assistance. If you are unrepresented and have any questions about this Form or need help, contact us at 1-855-887-3485 or send an email to ClaimsAdministrator@NFLConcussionSettlement.com.  If you are a lawyer, call or email your designated Firm Contact for assistance. For more information about the Settlement Program, visit the official website at www.NFLConcussionSettlement.com, where you can read or download the Rules Governing Appeals of Claim Determinations, Frequently Asked Questions about the Settlement, the complete Settlement Agreement and other helpful materials. |

# Exhibit 6

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | § § § § | No. 2:12-md-02323-AB |
| | § | MDL No. 2323 |
| | § | |
| THIS DOCUMENT RELATES TO: | § | **Hon. Anita B. Brody** |
| Settlement Class Member Carleen Hastings (SPID 950013395) | § § § | |

**WRITTEN STATEMENT IN SUPPORT OF CLASS MEMBER'S APPEAL**
**OF THE CLAIMS ADMINISTRATOR'S NOTICE OF DENIAL OF**
**MONETARY AWARD CLAIM**

Class Member Carleen Hastings, by and through counsel, files this written statement in support of this appeal and respectfully requests that the Claims Administrator's denial of this claim be reversed and remanded for a calculation of the Class Member's Monetary Award. The Claims Administrator erred in making two erroneous legal conclusions and one erroneous factual determination.

First, the Claims Administrator erred in concluding that the Amended Settlement Agreement required Class Member to submit proof that the board-certified neuropathologist who provided a post-mortem diagnosis of CTE made the diagnosis on or before 4/22/15.[1]

Second, the Claims Administrator erred in concluding that the Amended Settlement Agreement required the board-certified neuropathologist who provided the CTE diagnosis for this claim to also "confirm" his CTE diagnosis by examining the Player's brain tissue. The Amended

---

[1]    If the Amended Settlement Agreement [ECF 6481] is construed to require a diagnosis on or before 4/22/15, Class Member reserves the right to seek relief from the Court pursuant to both Rule 60 and the Court's inherent authority to amend the judgment in this case in order to implement the settlement.

Settlement Agreement requires a post-mortem diagnosis of CTE by a board-certified neuropathologist; it does not require any additional "confirmation" of the diagnosis by the board-certified neuropathologist.

Third, the Claims Administrator erred in concluding that there is no proof that Dr. Hamilton "personally performed the post-mortem exam on the Retired Player." Dr. Hamilton did personally review brain tissue from the Retired Player as he states in his letter.

### SUPPORTING EVIDENCE[2]

Exhibit 1        Notice of Denial of Monetary Award Claim

Exhibit 2        Relevant Excerpts from Class Member's Claim Package

Exhibit 3        Notice of Request for Additional Documents

---

[2]    Class Member also incorporates by reference the following documents that have been filed in this MDL or published on the Settlement Website:

  (1) Original Settlement Agreement [ECF 6073-2];

  (2) the Amended Settlement Agreement [ECF 6481];

  (3) Absent Class Member and Plaintiff Yvonne Sagapolutele's Motion to Modify the Amended Final Order and Judgment [ECF 6534] by Conforming the Definition of "Death with CTE" to the Version Contemplated in the Fairness Hearing Order [ECF 6479] and Noticed to the Class in the Long Form Notice [ECF 6093-1] and Summary Notice [ECF 6093-2] Pursuant to Rule 60 and the Authority Retained in the Settlement Agreement [ECF 8263] ("Motion to Modify");

  (4) Response in Opposition to the Motion to Modify [ECF 8430];

  (5) Statement of Co-Lead Counsel in Opposition to the Motion to Modify [ECF 8431];

  (6) Reply in Support of Motion to Modify [ECF 8442];

  (7) Notice of Joinder [ECF 8443];

## **BACKGROUND**

Class Member submitted a claim package that included a post-mortem diagnosis of Chronic Traumatic Encephalopathy ("CTE") made by a board-certified neuropathologist after personally reviewing the Retired Player's brain tissue.[3]  Class Member's submitted claim package also includes documentation showing that the Player died prior to April 22, 2015.[4]

Despite the documentation in the claim package, the Claims Administrator denied Class Member's Monetary Award Claim for the following reason:[5]

> Section 6.3(f) of the Settlement Agreement allows a CTE diagnosis if: (1) the Retired Player died before 4/22/15, and (2) there was a post-mortem diagnosis of CTE made by a board-certified neuropathologist prior to 4/22/15.  Although Dr. Hamilton is a board-certified neuropathologist and signed a Pre-Effective Date Diagnosing Physician Certification Form indicating a CTE diagnosis, we must have proof that he personally performed the post-mortem exam on the Retired Player and that it was done on or before 4/22/15.  There was no post-mortem examination report submitted to indicate that Dr. Hamilton examined the Retired Player's brain tissue to confirm a CTE diagnosis.  The two-page letter provided by Dr. Hamilton does not satisfy the requirements for a CTE diagnosis under this Settlement Program.  For these reasons, this claim is denied.

Class Member has timely filed this appeal of the Claims Administrator's Notice of Denial of Monetary Award Claim.

---

(8) Order denying, without prejudice, the Motion to Modify [ECF 8557];

(9) Posted Settlement Program FAQs (as of February 19, 2019); and

(10) Posted Settlement Program FAQs (as of July 8, 2019).

[3]   Exhibit 2.

[4]   *Id.*

[5]   Exhibit 1.

**ARGUMENTS**

The Claims Administrator denied Class Member's claim for two reasons: (1) the claim package does not show that Dr. Hamilton (a board-certified neuropathologist) made the post-mortem diagnosis of CTE prior to 4/22/2015; and (2) Dr. Hamilton's report does not "indicate that [he] examined the Retired Player's brain tissue to confirm a CTE diagnosis." Neither reason merits denial of this claim as a matter of law. *And as a factual matter, Dr. Hamilton's report does indicate that he examined the Retired Player's brain tissue.*

## I.  The Claims Administrator erred in concluding that the CTE Diagnosis was not timely.

The Claims Administrator's first reason for denying the claim package is legally flawed in two respects. First, the diagnosis date for Death with CTE is the date of the Player's death, even if the diagnosis occurs later. Second, if the Amended Settlement Agreement [ECF 6481] does require that the diagnosis be made prior to 4/22/2015, this requirement violates Class Member's rights because it was not contained in the Original Settlement Agreement [ECF 6073-20] and was added (1) despite the Court's instructions that any changes to the Original Settlement Agreement should make it *more* favorable, not *less* favorable, to class members; (2) without notice to Class Member; and (3) after Class Member's opt-out deadline had already passed.

### A.  The diagnosis date for Death with CTE is the date of the Player's death.

The Claims Administrator has posted several versions of "Posted Settlement Program FAQs" on the Settlement Website with answers to frequently asked questions. All of the content in the Posted Settlement Program FAQs is subject to advance approval by Counsel for the NFL Parties.[6]

---

[6]  *See* Amended Settlement Agreement § 4.1(a).

According to FAQ 93 in these Posted Settlement Program FAQs, the diagnosis date for Death with CTE is the date of the Player's death, even though the diagnosis is not made until after the Player dies:[7]

> **93. How is the date of a Qualifying Diagnosis determined?**
>
> The physician making a Qualifying Diagnosis of a Retired NFL Football Player must determine and verify the date on which that Qualifying Diagnosis was made. This date is important under the Settlement Agreement. It affects the amount of a Monetary Award, because the younger a Player is at the time of the Qualifying Diagnosis, the larger the award.
>
> The diagnosing physician uses his or her professional medical judgment in deciding when the Player had the conditions amounting to a Qualifying Diagnosis under Exhibit 1 to the Settlement Agreement. There are some basic rules about this:
>
> > (a) *Death with CTE*: For these claims, the date of the Qualifying Diagnosis is the date of the Player's death, even though the diagnosis is not made until after the Player dies. The Monetary Award is based on the Player's age when he died.

Based on the Claims Administrator's representations to the class members that the date of the Qualifying Diagnosis for Death with CTE is the date of the Player's death, the only date that is relevant in determining the date of a Qualifying Diagnosis for Death with CTE is the date of the Player's death. The Claims Administrator's insistence on proof that the diagnosis "was done on or before 4/22/15" ignores these representations, which establish that the date of the Player's death is the date of the Qualifying Diagnosis.

Here, the claim package establishes that the Player's death occurred before April 22, 2015. Accordingly, the date of the Qualifying Diagnosis is before April 22, 2015, and the Claims Administrator erred in denying this claim.

---

[7]   This language is from the Posted Settlement Program FAQs (as of February 19, 2019). Since this claim package was submitted, a new version of the FAQs have been published on the Settlement Website in the Posted Settlement Program FAQs (as of July 8, 2019). The language in FAQ 93 is unchanged in the new version of Posted Settlement Program FAQs; it has merely been moved to FAQ 99.

**B. In the alternative, if this Denial is based on language that was surreptitiously added to the Settlement Agreement putatively imposing a deadline for a Qualifying Diagnosis for Death with CTE, the Denial must be reversed.**

The Court has previously considered a Motion to Modify the Amended Final Order and Judgment [ECF 8263] and denied the motion without prejudice to a consideration of the issues in that motion at a later time.[8]  In that motion, Class Member Yvonne Sagapolutele brought the Court's attention to the fact that although the Original Settlement Agreement contained no deadline for obtaining a Death with CTE Diagnosis, language appears to have been surreptitiously added to the Amended Settlement Agreement that could be read to have added a diagnosis deadline without notice to the Court or to the class members.[9]  The motion sought relief under both Rule 60 and the Court's inherent authority to implement the settlement by amending the Court's judgment.[10]

The Court denied the motion without prejudice and stated that before it would consider the "extraordinary action of modifying the Settlement Agreement," class members must first submit a claim to the Claims Administrator.[11]

If the Special Master concludes that the Amended Settlement Agreement does require Class Member to have obtained a CTE diagnosis prior to April 22, 2015 despite the contrary language in the Posted Settlement Program FAQs and in other notices, it does not appear that the Special

---

[8]    *See* Order [ECF 8557]

[9]    Motion to Modify [ECF 8263]

[10]    *Id.*

[11]    Order [ECF 8557]

Master would have the necessary authority to provide a remedy.[12]  To the extent the Special Master may have the authority to provide a remedy, Class Member incorporates by reference the arguments in the Motion to Modify [ECF 8263].  If the denial of this claim is not reversed, Class Member expressly reserves the right to seek appropriate relief from the Court under Rule 60 and under the Court's inherent authority to implement the settlement by amending the Court's judgment.

## II.     The Claims Administrator erred in requiring that the board-certified neuropathologist "confirm" his CTE Diagnosis.

The Claims Administrator also states that the denial of this claim is based on the lack of evidence that "Dr. Hamilton examined the Retired Player's brain tissue to confirm a CTE diagnosis."  But there is no requirement in the Amended Settlement Agreement that a board-certified neuropathologist "confirm his diagnosis."[13]  The Amended Settlement Agreement simply requires a diagnosis.[14]

If the Parties to the settlement in this case had intended to impose a requirement that a CTE diagnosis be confirmed by an examination of the Player's brain tissue, the parties could have included that requirement in the settlement agreement.  Regarding other diagnoses, the Parties agreed to specific and detailed procedures for reviewing and confirming the diagnoses.[15]  But for

---

[12]   *See* Order [ECF 6871] (providing Special Masters with the authority to faithfully oversee the implementation and administration of the Settlement Agreement); *see also* Motion to Modify [ECF 8263] (seeking relief under Rule 60).

[13]   *See* Amended Settlement Agreement [ECF 6481] § 6.4(f).

[14]   *See id.*

[15]   *See id.* §§ 5.1–5.14 (creating the Baseline Assessment Program and exempting Death with CTE from the program), § 6.3(a)–(e) (requiring that certain diagnoses, other than Death with CTE, be made by

Death with CTE diagnoses, the Amended Settlement Agreement simply requires "a post-mortem diagnosis made by a board-certified neuropathologist."[16]  Dr. Hamilton is one of only a handful of board-certified neuropathologists in the United States, and he has provided a post-mortem diagnosis that this Player "had CTE on his date of death."[17]

The Claims Administrator erred by imposing an arbitrary requirement that Dr. Hamilton confirm his diagnosis by examining the Player's brain tissue.  Adding this arbitrary requirement ignores the terms of the Amended Settlement Agreement and violates due process.

## III.     The Claims Administrator erred in stating that Dr. Hamilton did not examine the Player's brain tissue.

The Claims Administrator's denial of this claim is based on the purported lack of evidence that "Dr. Hamilton examined the Retired Player's brain tissue to confirm a CTE diagnosis" is also erroneous because Dr. Hamilton *did* examine the Retired Player's brain tissue to confirm the CTE diagnosis.

Dr. Hamilton's letter states: "I have conducted a study of Christopher Mims' brain tissue." Dr. Hamilton further states that he received "180 unstained tissue sections on glass slides" and examined stained recuts of brain tissue from the dura mater, cerebral cortex, hippocampus, insular cortex, putamen, globulus pallidus, thalamus, cerebellum cortex, dentate nucleus, and medulla.[18] Based, in part, on his review of the brain tissue, Dr. Hamilton concluded that his "findings are

---

certain physicians on an approved list), Exhibit 2 to the Amended Settlement Agreement (providing standardized neuropsychological testing protocols for determining certain diagnoses).

[16]     *See* Amended Settlement Agreement [ECF 6481] § 6.4(f).

[17]     Exhibit 2.

[18]     *See id.*

diagnostic of CTE." [19]

The Claims Administrator erred in stating that there is no evidence that "Dr. Hamilton examined the Retired Player's brain tissue to confirm a CTE diagnosis." Dr. Hamilton's letter clearly establishes that he examined the Retired Player's brain tissue to confirm the CTE diagnosis.

<u>**CONCLUSION**</u>

For all of the foregoing reasons, Class Member respectfully requests that the Special Master reverse the Claims Administrator's denial of this Monetary Award Claim and remand to the Claims Administrator for a calculation of the Monetary Award.

Dated: August 28, 2019

Respectfully Submitted:

/s/ Justin Demerath

**Justin Demerath**
Texas State Bar No. 24034415
**David Campbell**
Texas State Bar No. 24057033
O'HANLON, DEMERATH & CASTILLO
808 West Avenue | Austin, TX 78701
Tel: (512) 494-9949 | Fax: (512) 494-9919
jdemerath@808west.com
dcampbell@808west.com

**Counsel for Class Member**

---

[19]  *See id.*

## <u>CERTIFICATE OF SERVICE</u>

It is hereby certified that a true copy of the foregoing document was submitted on the Court Portal on the 28th day of August, 2019.

<div align="right">

<u>/s/ Justin B. Demerath</u>
Justin B. Demerath

</div>

 **CONCUSSION SETTLEMENT**
*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

## NOTICE OF DENIAL OF MONETARY AWARD CLAIM
### DATE OF NOTICE: **July 30, 2019**
### DEADLINE TO APPEAL: **August 29, 2019**

### I. SETTLEMENT CLASS MEMBER INFORMATION

| | |
|---|---|
| **Settlement Program ID** | 950013395 |

| **Name** | First<br>Carleen | M.I. | Last<br>Hastings |
|---|---|---|---|

| | |
|---|---|
| **Settlement Class Member Type** | Representative Claimant |
| **Lawyer** | O'Hanlon, Demerath & Castillo |

| **Asserted Qualifying Diagnosis** | Death with CTE (Chronic Traumatic Encephalopathy) | **Date** | 10/15/08 |
|---|---|---|---|

### II. EXPLANATION OF CLAIM DETERMINATION

This Notice is an official communication from the Claims Administrator for the NFL Concussion Settlement Program. We reviewed your Claim Package and determined that you are not entitled to a Monetary Award because:

1. Section 6.3(f) of the Settlement Agreement allows a CTE diagnosis if: (1) the Retired Player died before 4/22/15, and (2) there was a post-mortem diagnosis of CTE made by a board-certified neuropathologist prior to 4/22/15. Although Dr. Hamilton is a board-certified neuropathologist and signed a Pre-Effective Date Diagnosing Physician Certification Form indicating a CTE diagnosis, we must have proof that he personally performed the post-mortem exam on the Retired Player and that it was done on or before 4/22/15. There was no post-mortem examination report submitted to indicate that Dr. Hamilton examined the Retired Player's brain tissue to confirm a CTE diagnosis. The two-page letter provided by Dr. Hamilton does not satisfy the requirements for a CTE diagnosis under this Settlement Program. For these reasons, this claim is denied.

Section III below explains your right to appeal this denied claim, but living Retired Players may have the option to submit a new Claim Package under Section 9.1(c)(i) of the Settlement Agreement if they receive a new Qualifying Diagnosis. We will determine whether the new claim can be considered for a Monetary Award based on several factors, including whether the new claim shows materially changed circumstances from the earlier claim. These materially changed circumstances may include: (a) a different type of Qualifying Diagnosis than the one that was denied; or (b) the same type of Qualifying Diagnosis but with a different diagnosis date supported by additional medical records. If you submit a new claim within 365 days of the claim that is the subject of this denial notice, Section 10.3(d)(ii) of the Settlement Agreement requires us to audit that new claim if it is based on the same Qualifying Diagnosis as this denied claim, but the new diagnosis was made by a different physician.

### III. YOUR RIGHT TO APPEAL THIS DETERMINATION

If you have a good faith belief that the decision to deny your Monetary Award claim is incorrect, you may appeal this determination to the Court under Section 9.5 of the Settlement Agreement. To do so, click the Appeal Denied Claim button on your secure online portal and follow the instructions provided. You must submit supporting evidence to support your appeal. Any written statement may not be more than 10 double-spaced pages. You must do so on or before the Deadline to Appeal stated at the top of this Notice.

If you decide to appeal, the Settlement Agreement requires you to pay an Appeal Fee of $1,000, which you can do using the online PayPal option or by check made payable to the NFL Claims Administrator. This fee will be refunded if your appeal is successful. If you are unable to pay the $1,000 fee, you may make a hardship request to us to waive the fee and will have to submit financial information showing a sufficient hardship.

If paying the $1,000 Appeal Fee by check, mail the check to the address below.

NFL Concussion Settlement
Claims Administrator
P.O. Box 25369
Richmond, VA 23260

The Special Master appointed by the Court will decide your appeal based upon a showing by you of clear and convincing evidence. The Special Master's factual determinations will be final and binding, but you or Class Counsel or the NFL Parties may object to any of the Special Master's conclusions of law, which will then be subject to de novo (*i.e.*, a new) review by the Court.

If an appeal is not submitted on or before the deadline stated at the top of this Notice, the determination in this Notice will become final.

## IV. CLASS COUNSEL'S RIGHT TO APPEAL THIS DETERMINATION

Section 9.5 of the Settlement Agreement also gives Class Counsel the right to challenge our decision to deny your Monetary Award claim. If Class Counsel chooses to appeal, it must do so by the Deadline to Appeal stated at the top of this Notice and must provide a written copy of its Appeals Form and any supporting evidence to you, the NFL Parties, and us.

If an appeal is taken by you or Class Counsel, the NFL Parties may submit a written opposition (not to exceed 10 double-spaced pages) no later than 30 days after receipt of the Appeals Form. The party taking the appeal is not permitted to submit a reply.

Class Counsel may also submit a written statement (not to exceed 10 double-spaced pages) in response to your appeal no later than 15 days after receipt of the Appeals Form, and you and the NFL Parties may each submit a reply to any such submission by Class Counsel.

## V. HOW TO CONTACT US WITH QUESTIONS OR FOR HELP

If you are represented by a lawyer, consult with your lawyer if you have questions or need assistance. If you are unrepresented and have any questions about this Notice or need help, contact us at 1-855-887-3485 or send an email to ClaimsAdministrator@NFLConcussionSettlement.com. If you are a lawyer, call or email your designated Firm Contact for assistance. For more information about the Settlement program, visit the official website at www.NFLConcussionSettlement.com to read the Frequently Asked Questions or download a copy of the complete Settlement Agreement.





# NFL CONCUSSION SETTLEMENT

*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

## CLAIM FORM SIGNATURE ACKNOWLEDGEMENT FORM

If you completed your Claim Form using your Portal, you must submit this Claim Form Signature Acknowledgement Form with the Personal Signature of the Settlement Class Member identified in Section I who is submitting the claim for a Monetary Award.

### I. SETTLEMENT CLASS MEMBER & CLAIM FORM INFORMATION

| Settlement Program ID | 950013395 | | | |
|---|---|---|---|---|
| **Name** | First<br>Carleen | M.I. | Last<br>Hastings | Suffix |

### II. PERSONAL SIGNATURE

**By signing below, I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that all information provided in the Claim Form submitted through the Secure Portal, and in any of its attachments, is true and correct to the best of my knowledge, information, and belief.**

| Signature | *Carleen Hastings* | Date | 0 2 / 0 5 / 2 0 1 9<br>(Month/Day/Year) |
|---|---|---|---|

### III. HOW TO SUBMIT THIS SIGNATURE ACKNOWLEDGEMENT FORM

After printing this form, the Settlement Class Member must sign in the Personal Signature box above. Scan and upload the signed document using the Upload Signed Signature Acknowledgement Form button on the Claim Package Page of your Portal. If you are unable to scan the form, you may return the signed form through either of the following options:

| **By Mail:** | NFL Concussion Settlement<br>Claims Administrator<br>P.O. Box 25369<br>Richmond, VA 23260 |
|---|---|
| **By FedEx/UPS:** | NFL Concussion Settlement<br>c/o BrownGreer PLC<br>250 Rocketts Way<br>Richmond, VA 23231 |

 **CONCUSSION SETTLEMENT**

*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

## MONETARY AWARD CLAIM PACKAGE HIPAA AUTHORIZATION FORM

You must complete and sign this Form if you are a **Retired NFL Football Player** or the **Representative Claimant** of a Retired NFL Football Player and want to apply for a Monetary Award.  This Form authorizes the use and disclosure of "Protected Health Information" as that term is defined in 45 C.F.R. § 160.103, relating to the processing of your claim in the NFL Concussion Settlement Program.  Protected Health Information includes, but is not limited to, information regarding the Retired NFL Football Player's medical care, treatment, physical or mental condition, and medical expenses.

## I. RETIRED NFL FOOTBALL PLAYER INFORMATION

| Settlement Program ID | 950013395 | | | |
|---|---|---|---|---|
| **Player Name** | First<br>Christopher | M.I. | Last<br>Mims | Suffix |

**Social Security Number, Taxpayer ID or Foreign ID Number** (if Retired NFL Football Player is not a U.S. Citizen) **of Retired NFL Football Player** (if known) — ▮▮▮ - |8|8|2|8|  **or**

**Date of Birth of Retired NFL Football Player** — ▮▮▮ |1|9|7|0| (Month/Day/Year)

## II. ENTITIES AUTHORIZED TO USE AND DISCLOSE PROTECTED HEALTH INFORMATION

By signing and submitting this Form, I authorize the use and disclosure of all Protected Health Information regarding my (or the Retired NFL Football Player's, if signed by a Representative Claimant) medical care, treatment, physical or mental condition, and medical expenses relating to my claim in the *In re: National Football League Players' Concussion Injury Litigation* Settlement program, as follows: (1) by the Claims Administrator, Special Master, BAP Administrator, Lien Resolution Administrator, designated Qualified BAP Providers, Qualified BAP Pharmacy Vendors, Qualified MAF Physicians, Appeals Advisory Panel members, Appeals Advisory Panel Consultants, the Court, Class Counsel, Counsel for the NFL Parties and the NFL Parties (which, in turn, may share the Protected Health Information with the NFL Parties' insurers or reinsurers) for use and/or disclosure with one another in the performance of their functions and duties pursuant to the Settlement Agreement; (2) by the Lien Resolution Administrator for use and/or disclosure to the holders of any liens, claims, or rights of subrogation, indemnity, reimbursement, conditional or other payments, or interests of any type, including all Governmental Payors (such as the Medicare Program, any state Medicaid Program, the Department of Veterans Affairs, Tricare, Indian Health Services, and their respective contractors), Medicare Part C or Part D Programs, private health care providers, health plans, and health insurers, and any contractors or recovery agents of the foregoing persons and entities (collectively, "Lienholders"), for the purpose of identifying and resolving any potential Liens in connection with any Monetary Award that I may receive; and (3) by the Lienholders for disclosure to the Lien Resolution Administrator and Claims Administrator for the purpose of identifying and resolving any potential Liens in connection with any Monetary Award that I may receive.

## MONETARY AWARD CLAIM PACKAGE HIPAA AUTHORIZATION FORM

### III. AUTHORIZATION

By signing below, I acknowledge and understand all of the following:

| | |
|---|---|
| 1. | I have the right to revoke this authorization at any time. If I wish to revoke the authorization, I must do so in writing and must provide my written revocation to the Claims Administrator. The written revocation must be signed and dated. The revocation will not apply to any disclosures that already have been made in reliance on this authorization prior to the date upon which the Claims Administrator receives my written revocation. |
| 2. | My authorization of the disclosure of the subject Retired NFL Football Player's Protected Health Information is voluntary, which means I can refuse to sign this Form. I do not need to sign this Form to obtain health treatment from any medical provider or to enroll in or be eligible for any health plan benefits. However, I recognize that if I do not sign this Form and submit it to the Claims Administrator, my Claim Package will be incomplete under the terms of the Settlement Agreement and will not be processed. |
| 3. | Any Protected Health Information or other information released to the Claims Administrator, Special Master, BAP Administrator, Lien Resolution Administrator, Qualified BAP Providers, Qualified BAP Pharmacy Vendors, Qualified MAF Physicians, Appeals Advisory Panel members, Appeals Advisory Panel Consultants, the Court, Class Counsel, Counsel for the NFL Parties and the NFL Parties (including the NFL Parties' insurers or reinsurers) may be subject to re-disclosure by such person/entity, and may no longer be protected by applicable federal and state privacy laws. Each of those persons and entities, however, is permitted to use and disclose your information only in accordance with this Form, the Settlement Agreement, a contract executed pursuant to the Settlement Agreement, orders of the Court, and/or applicable law. |
| 4. | My Protected Health Information may include information relating to sexually transmitted disease, acquired immunodeficiency syndrome ("AIDS"), or human immunodeficiency virus ("HIV"), behavioral or mental health services and treatment for alcohol and drug abuse. |
| 5. | This Form is valid from the date of my signature in Section IV until the date that the Claims Administrator performs the last act to process the claim for a Monetary Award that I submitted with this Form. |
| 6. | I have a right to receive and retain a copy of this Form. |
| 7. | Any photostatic copy of this Form shall have the same authority as the original, and may be substituted in its place. |

### IV. SIGNATURE

The Retired NFL Football Player or Representative Claimant of the Retired NFL Football Player named in Section I must sign and date this Form below. **By signing below, I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that all information provided in this HIPAA Authorization Form is true and correct to the best of my knowledge, information and belief.**

| Signature | *Carleen Hastings* | | Date | 0 2/0 5/2 0 1 9 (Month/Day/Year) | |
|---|---|---|---|---|---|
| **Printed Name** | First Carleen | M.I. | Last Hastings | | Suffix |

| If you are signing this Form as a Representative Claimant, describe your relationship to the Retired NFL Football Player and your authority to act on his behalf: | Mother of Retired NFL Football Player, Deceased |
|---|---|

| MONETARY AWARD CLAIM PACKAGE HIPAA AUTHORIZATION FORM | |
|---|---|
| **V. HOW TO SUBMIT THIS FORM** | |
| You may submit this Form in one of two ways: | |
| **By U.S. Mail:** | NFL Concussion Settlement<br>Claims Administrator<br>P.O. Box 25369<br>Richmond, VA 23260 |
| **By Delivery:** | NFL Concussion Settlement<br>c/o BrownGreer PLC<br>250 Rocketts Way<br>Richmond, VA 23231 |

**CERTIFICATION OF VITAL RECORD**

## COUNTY OF LOS ANGELES • REGISTRAR–RECORDER/COUNTY CLERK

**CERTIFICATE OF DEATH**
STATE OF CALIFORNIA
USE BLACK INK ONLY / NO ERASURES, WHITEOUTS OR ALTERATIONS

3200819043413

LOCAL REGISTRATION NUMBER

STATE FILE NUMBER

### DECEDENT'S PERSONAL DATA

| 1 NAME OF DECEDENT — FIRST (Given) | 2 MIDDLE | 3 LAST (Family) |
|---|---|---|
| CHRISTOPHER | EDDIE | MIMS |

AKA ALSO KNOWN AS — Include full AKA (FIRST MIDDLE LAST)
- - -

| 4 DATE OF BIRTH mm/dd/ccyy | 5 AGE Yrs | IF UNDER ONE YEAR Months / Days | IF UNDER 24 HOURS Hours / Minutes | 6 SEX |
|---|---|---|---|---|
| 1970 | 38 | | | M |

| 9 BIRTH STATE/FOREIGN COUNTRY | 10 SOCIAL SECURITY NUMBER | 11 EVER IN U.S. ARMED FORCES? | 12 MARITAL STATUS (at Time of Death) | 7 DATE OF DEATH mm/dd/ccyy | 8 HOUR (24 Hours) |
|---|---|---|---|---|---|
| CALIFORNIA | 8828 | YES [X] NO UNK | DIVORCED | 10/15/2008 | 0935 |

| 13 EDUCATION | 14/15 WAS DECEDENT HISPANIC/LATINO/A/SPANISH? | 16 DECEDENT'S RACE |
|---|---|---|
| SOME COLLEGE | [X] NO YES | AFRICAN AMERICAN |

| 17 USUAL OCCUPATION — Type of work for most of life. DO NOT USE RETIRED | 18 KIND OF BUSINESS OR INDUSTRY | 19 YEARS IN OCCUPATION |
|---|---|---|
| PROFESSIONAL ATHLETE | FOOTBALL ATHLETE | 8 |

### USUAL RESIDENCE

| 21 CITY | 22 PROVINCE | 23 ZIP CODE | 24 YEARS IN STATE | 25 STATE/FOREIGN COUNTRY |
|---|---|---|---|---|
| LOS ANGELES | LOS ANGELES | 90017 | 25 | CALIFORNIA |

### INFORMANT

| 26 INFORMANT'S NAME, RELATIONSHIP |
|---|
| MAREA BARSKY, FRIEND |

### SPOUSE AND PARENT INFORMATION

| 28 NAME OF SURVIVING SPOUSE — FIRST | 29 MIDDLE | 30 LAST (Maiden Name) |
|---|---|---|
| - | - | - |

| 31 NAME OF FATHER — FIRST | 32 MIDDLE | 33 LAST | 34 BIRTH STATE |
|---|---|---|---|
| LORENZO | - | MIMS | CA |

| 35 NAME OF MOTHER — FIRST | 36 MIDDLE | 37 LAST (Maiden) | 38 BIRTH STATE |
|---|---|---|---|
| CARLEEN | - | HASTINGS | TN |

*1 of 2*

### FUNERAL DIRECTOR / LOCAL REGISTRAR

| 39 DISPOSITION DATE mm/dd/ccyy | 40 PLACE OF FINAL DISPOSITION |
|---|---|
| 10/25/2008 | FOREST LAWN MEMORIAL PARK |
| | 6300 FOREST LAWN DR., LOS ANGELES, CA 90068 |

| 41 TYPE OF DISPOSITION(S) | 42 SIGNATURE OF EMBALMER | 43 LICENSE NUMBER |
|---|---|---|
| BU | JESSICA SOLIS | 9091 |

| 44 NAME OF FUNERAL ESTABLISHMENT | 45 LICENSE NUMBER | 46 SIGNATURE OF LOCAL REGISTRAR | 47 DATE mm/dd/ccyy |
|---|---|---|---|
| FOREST LAWN MEMR PRKS & MTYS | FD 904 | JONATHAN FIELDING, MD | 10/23/2008 |

### PLACE OF DEATH

| 101 PLACE OF DEATH | 122 IF HOSPITAL, SPECIFY ONE | 103 IF OTHER THAN HOSPITAL, SPECIFY ONE |
|---|---|---|
| RESIDENCE | IP ER/OP DOA | Hospice / Nursing Home, LTC / [X] Decedent's Home / Other |

| 104 COUNTY | 105 FACILITY ADDRESS OR LOCATION WHERE FOUND | 106 CITY |
|---|---|---|
| LOS ANGELES | 612 SOUTH FLOWER STREET #409 | LOS ANGELES |

### CAUSE OF DEATH

| 107 CAUSE OF DEATH | Time Interval Between Onset and Death | 108 DEATH REPORTED TO CORONER? |
|---|---|---|
| IMMEDIATE CAUSE (Final disease or condition resulting in death) (A) → DEFERRED | (AT) | [X] YES NO |
| Sequentially list conditions, if any, leading to cause on Line A. Enter UNDERLYING CAUSE (disease or injury that initiated the events resulting in death) LAST (B) | (BT) | 2008-07210 |
| (C) | (CT) | 109 BIOPSY PERFORMED? YES [X] NO |
| (D) | (DT) | 110 AUTOPSY PERFORMED? [X] YES NO |
| | | 111 USED IN DETERMINING CAUSE? [X] YES NO |

| 112 OTHER SIGNIFICANT CONDITIONS CONTRIBUTING TO DEATH BUT NOT RESULTING IN THE UNDERLYING CAUSE GIVEN IN 107 |
|---|
| NONE |

| 113 WAS OPERATION PERFORMED FOR ANY CONDITION IN ITEM 107 OR 112? | 113A IF FEMALE, PREGNANT IN LAST YEAR? |
|---|---|
| NO | YES NO UNK |

### PHYSICIAN'S CERTIFICATION

| 114 I CERTIFY THAT TO THE BEST OF MY KNOWLEDGE DEATH OCCURRED AT THE HOUR, DATE AND PLACE STATED FROM THE CAUSES STATED | 115 SIGNATURE AND TITLE OF CERTIFIER | 116 LICENSE NUMBER | 117 DATE mm/dd/ccyy |
|---|---|---|---|
| Decedent Attended Since / Decedent Last Seen Alive | | | |

| 118 TYPE ATTENDING PHYSICIAN'S NAME, MAILING ADDRESS, ZIP CODE |
|---|

### CORONER'S USE ONLY

| 119 I CERTIFY THAT IN MY OPINION DEATH OCCURRED AT THE HOUR, DATE AND PLACE STATED FROM THE CAUSES STATED | 120 INJURED AT WORK? | 121 INJURY DATE mm/dd/ccyy | 122 HOUR (24 Hours) |
|---|---|---|---|
| MANNER OF DEATH: Natural / Accident / Homicide / Suicide / [X] Pending investigation / Could not be Determined | YES NO UNK | | |

| 123 PLACE OF INJURY (e.g. home, construction site, wooded area, etc.) |
|---|

| 124 DESCRIBE HOW INJURY OCCURRED (Events which resulted in injury) |
|---|

| 125 LOCATION OF INJURY (Street and number or location and city, and ZIP) |
|---|

| 126 SIGNATURE OF CORONER / DEPUTY CORONER | 127 DATE mm/dd/ccyy | 128 TYPE NAME, TITLE OF CORONER / DEPUTY CORONER |
|---|---|---|
| EVONNE D REED | 10/20/2008 | EVONNE D REED, DEPUTY CORONER |

### STATE REGISTRAR

| A | B | C | D | E | | FAX AUTH # | CENSUS TRACT |
|---|---|---|---|---|---|---|---|

*012008000916134*

This is to certify that this document is a true copy of the official record filed with the Registrar-Recorder/County Clerk.

SEP 0 4 2015

Dean C. Logan
DEAN C. LOGAN
Registrar-Recorder/County Clerk

* 1 0 0 0 0 0 0 6 9 9 0 2 3 *

This copy not valid unless prepared on engraved border displaying the Seal and Signature of the Registrar-Recorder/County Clerk. PBINCO (REV) 07/11

ANY ALTERATION OR ERASURE VOIDS THIS CERTIFICATE

CERTIFICATION OF VITAL RECORD

## COUNTY OF LOS ANGELES • REGISTRAR–RECORDER/COUNTY CLERK

### PHYSICIAN/CORONER'S AMENDMENT

3052008191127
STATE FILE NUMBER

1.1

NO ERASURES, WHITEOUTS, PHOTOCOPIES, OR ALTERATIONS

3200819043413
LOCAL REGISTRATION NUMBER

☐ BIRTH  ☒ DEATH  ☐ FETAL DEATH

TYPE OR PRINT CLEARLY IN BLACK INK ONLY – THIS AMENDMENT BECOMES AN ACTUAL PART OF THE OFFICIAL RECORD

### PART I    INFORMATION TO LOCATE RECORD

| INFORMATION AS IT APPEARS ON ORIGINAL RECORD | 1A. NAME—FIRST CHRISTOPHER | 1B. MIDDLE EDDIE | 1C. LAST MIMS | 2. SEX M |
|---|---|---|---|---|
| | 3. DATE OF EVENT—MM/DD/CCYY 10/15/2008 | 4. CITY OF EVENT LOS ANGELES | | 5. COUNTY OF EVENT LOS ANGELES |

### PART II    STATEMENT OF CORRECTIONS

2 of 2

| | 5. CERTIFICATE ITEM NUMBER | 7. INFORMATION AS IT APPEARS ON ORIGINAL RECORD | 9. INFORMATION AS IT SHOULD APPEAR |
|---|---|---|---|
| LIST ONE ITEM PER LINE | 107A | DEFERRED | DILATED CARDIOMYOPATHY |
| | 107AT | - | YEARS |
| | 112 | NONE | HEPATIC STEATOSIS, HISTORY OF HYPERTENSION |
| | 119 | PENDING INVESTIGATION | NATURAL |

I HEREBY DECLARE UNDER PENALTY OF PERJURY THAT THE ABOVE INFORMATION IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.

| DECLARATION OF CERTIFYING PHYSICIAN OR CORONER | 9. SIGNATURE OF CERTIFYING PHYSICIAN OR CORONER ▶ LOUIS A PENA MD | 10. DATE SIGNED—MM/DD/CCYY 12/12/2008 | 11. TYPED OR PRINTED NAME AND TITLE/DEGREE OF CERTIFIER DME | | |
|---|---|---|---|---|---|
| | 12. ADDRESS—STREET and NUMBER 1104 NORTH MISSION ROAD | 13. CITY LOS ANGELES | | 14. STATE CA | 15. ZIP CODE 90033 |
| STATE/LOCAL REGISTRAR USE ONLY | 16. OFFICE OF VITAL RECORDS OR LOCAL REGISTRAR ▶ STATE REGISTRAR - OFFICE OF VITAL RECORDS | | 17. DATE ACCEPTED FOR REGISTRATION—MM/DD/CCYY 12/15/2008 | | |

STATE OF CALIFORNIA, DEPARTMENT OF PUBLIC HEALTH, OFFICE OF VITAL RECORDS
*022008000147349*
FORM VS 24Ae (REV. 1/08)

1.1

This is to certify that this document is a true copy of the official record filed with the Registrar-Recorder/County Clerk.

SEP 0 4 2015

Dean C Logan
DEAN C. LOGAN
Registrar-Recorder/County Clerk


*100000699024*

This copy not valid unless prepared on engraved border displaying the Seal and Signature of the Registrar-Recorder/County Clerk.
PMNO2 (REV) 07/11

ANY ALTERATION OR ERASURE VOIDS THIS CERTIFICATE

4433

COUNTY OF LOS ANGELES                                                    DEPARTMENT OF CORONER

# **12** **AUTOPSY REPORT**

No.

2008-07210

MIMS, CHRISTOPHER

I performed an autopsy on the body of

at _____ the DEPARTMENT OF CORONER                

Los Angeles, California _____ on  OCTOBER 16, 2008 @ 1525 HOURS

                                (Date)                            (Time)

From the anatomic findings and pertinent history I ascribe the death to:

(A)    DILATED CARDIOMYOPATHY

DUE TO, OR AS A CONSEQUENCE OF

(B)

DUE TO, OR AS A CONSEQUENCE OF

(C)

DUE TO, OR AS A CONSEQUENCE OF

(D)

OTHER CONDITIONS CONTRIBUTING BUT NOT RELATED TO THE IMMEDIATE CAUSE OF DEATH:

    HEPATIC STEATOSIS, HISTORY HYPERTENSION

*Anatomical Summary:*

    I.    Dilated cardiomyopathy, 1010 grams.

        A.    Pulmonary congestion and edema.

            1.    Secretions of bronchi and trachea.

        B.    Chronic hepatic congestion.

            1.    Hepatomegaly, 3200 grams.

            2.    Probable congestive heart failure.

                a.    Lower legs, dorsum of feet, with edema.

        C.    History of hypertension.

        D.    History of alcohol abuse.

            1.    Hepatic steatosis, moderate.

    II.    Other findings:

        A.    Morbid obesity.

        B.    No evidence of external or internal trauma.

        C.    No pulmonary emboli.

        D.    Bilateral knees with old surgical scars.

76A890M—Rev. 8/94

COUNTY OF LOS ANGELES

DEPARTMENT OF CORONER

# 12

## AUTOPSY REPORT

No.

2008-07210

MIMS, CHRISTOPHER

Page ___2___

    E.    Upper torso, face with congestion and Tardieu spots consistent with prone position found.

    F.    Skin, body creases of the axilla, legs and back with psoriatic-type lesions.

III.    See Toxicology Report.

IV.    See Microscopic Report.

V.    See Neuropathology Report.

CIRCUMSTANCES:

See the brief Investigator's Narrative Report.

This is a 38-year-old Black gentleman with a history of hypertension, sports-related knee injuries and alcohol abuse. On 10/15/08 at about 0900 hours, the decedent was found lying on the bathroom floor unresponsive. 911 was called, and the Los Angeles Fire Department responded to the scene and determined death on 10/15/08 at 0935 hours. The decedent apparently smoked tobacco heavily and used alcohol daily. The decedent had complained of labored breathing on 10/14/08. He was last seen alive by a friend on 10/14/08 at about 2230 hours.

EXTERNAL EXAMINATION:

The body is identified by toe tags and is that of an unembalmed, refrigerated adult Black male who appears about the reported age of 38 years. The body weighs 456 pounds, measures 80 inches, and is extremely obese.

The skin shows numerous psoriatic scaly-type skin lesions at the axilla, legs, dorsum of the feet and the torso. The skin is otherwise free of abrasions, lacerations, bruises and burns. There are scars over both knee regions: On the right knee, an old scar, 2 inches transversely oriented and on the left knee, an irregularly-shaped old scar, 1-1/2 inches. No old surgical scars are seen over the abdomen or torso regions.

COUNTY OF LOS ANGELES                                                      DEPARTMENT OF CORONER

# **AUTOPSY REPORT**

**12**

Page ___3___

No.

2008-07210

MIMS, CHRISTOPHER

Tattoos are present and identified as follows:

1. Right anterior forearm, "Tough As" and below this, a tattoo of four nails vertically oriented, and below this, the word "Nails".

2. Left anterior forearm, the words "Balls of Steel" and in between is a brick wall with balls going through it.

3. Left upper lateral arm is a tattoo of four cards with the letter "A", diamond, spade, heart and clubs and the words "Fat Doctor", and below this a smiling man face that is green with dark hair. There are other designs around this tattoo.

4. Right upper lateral arm, multicolored tiger.

5. Right wrist, tribal-like band tattoo with a focal red color design.

Rigor has presumably been abolished. Livor mortis is slight red and fixed on the posterior upper back. Also, the face shows purple congestion and dependent purple fixed livor on the upper torso and neck regions with Tardieu spots present.

The head is otherwise normocephalic and covered by black hair. There is slight frontal receding of the hairline, and the hair can be described as short and curly. A mustache and beard are present. Examination of the eyes reveals irides that show corneal clouding and sclerae that are congested. There are no petechial hemorrhages of the conjunctivae of the lids or the sclerae. The oronasal passages are unobstructed. At autopsy, there is foam, red, frothy material from the mouth that is observed. Upper and lower teeth are present. The frenulum is intact. The neck is unremarkable. There is no chest deformity. There is no increased anterior-posterior diameter. The abdomen is obese. The genitalia are those of an adult male. The penis appears circumcised. The external genitalia are without trauma or lesions. The extremities show no edema, joint deformity, abnormal mobility, or needle tracks. The lower legs and dorsum of the feet are swollen.

76A798P—Rev. 2/91

COUNTY OF LOS ANGELES

DEPARTMENT OF CORONER

# 12

## AUTOPSY REPORT

No.

2008-07210

MIMS, CHRISTOPHER

Page ___4___

EVIDENCE OF THERAPEUTIC INTERVENTION:

There is no evidence of any previous or recent hospitalization.

EVIDENCE OF EXTERNAL TRAUMATIC INJURIES:

None.

CLOTHING:

The body was not clothed, and I did not see the clothing.

INITIAL INCISION:

The body cavities are entered through the standard coronal and
Y-shaped incisions. No foreign material is present in the
mouth, upper airway, and trachea.

EVIDENCE OF INTERNAL INJURIES:

None.

NECK:

The neck organs are removed en bloc with the tongue. No lesions
are present, nor is trauma of the gingiva, lips, or oral mucosa
demonstrated. There is no edema of the larynx. Both hyoid bone
and larynx are intact and without fractures. No hemorrhage is
present in the adjacent throat organs, investing fascia, strap
muscles, thyroid, or visceral fascia. There are no prevertebral
fascial hemorrhages. The tongue when sectioned shows no trauma.

CHEST/ABDOMINAL CAVITY:

Both pleural cavities contain no fluid or adhesions. The
parietal pleurae are intact. The lungs are well-expanded. Soft
tissues of the thoracic and abdominal walls are well-preserved.
The subcutaneous fat of the abdominal wall measures 8.0 cm in
thickness, and the chest wall measures 6.0 cm. The breasts are

76A798P—Rev. 2/91

COUNTY OF LOS ANGELES

DEPARTMENT OF CORONER

# AUTOPSY REPORT

**12**

Page __5__

No.

2008-07210

MIMS, CHRISTOPHER

examined and palpated in the usual manner and show no abnormalities. The organs of the abdominal cavity have a normal arrangement, and none are absent. There is no fluid collection. The peritoneal cavity is without evidence of peritonitis. There are no adhesions.

### SYSTEMIC AND ORGAN REVIEW

The following observations are limited to findings other than injuries, if described above.

MUSCULOSKELETAL SYSTEM:

No abnormalities of the bony framework or muscles are present.

CARDIOVASCULAR SYSTEM:

The aorta is elastic and of even caliber throughout, with vessels distributed normally from it. The abdominal and thoracic aorta have minimal atherosclerotic plaques. There is no tortuosity or widening of the thoracic segment. There is no dilatation of the lower abdominal segment. No aneurysm is present. The major branches of the aorta show no abnormality.

Within the pericardial sac, there is a minimal amount of serosanguineous fluid. The heart weighs 1010 grams. It is severely dilated with no significant ventricular hypertrophy. The right ventricle is 0.4 cm thick, and the left ventricle is 1.5 cm thick. The septal wall measures 2.0 cm. The chambers are normally developed and are without mural thrombosis. The valves are thin, leafy and competent but dilated. The circumferences of the valve rings are: Tricuspid valve 15.0 cm, pulmonic valve 10.0 cm, mitral valve 15.0 cm, and aortic valve 10.0 cm. There is mottled red and pale endocardial discoloration. There are no infarcts of the myocardium seen grossly. There is no abnormality of the apices of the papillary musculature. There are no defects of the septum. The great vessels enter and leave in a normal fashion. The ductus arteriosus is obliterated. The coronary ostia are widely patent. The right coronary artery is the dominant vessel. There is no coronary atherosclerosis. The blood within the heart and large blood vessels is liquid.

76A798P—Rev. 2/91

COUNTY OF LOS ANGELES

**12**

Page 6

# AUTOPSY REPORT

DEPARTMENT OF CORONER

No.

2008-07210

MIMS, CHRISTOPHER

RESPIRATORY SYSTEM:

An extremely large amount of edema fluid is found in the upper respiratory and lower bronchial passages. The mucosa is intact and pale with secretions present. The lungs are subcrepitant, and there is dependent congestion. The left lung weighs 1030 grams. The right lung weighs 1050 grams. The visceral pleurae are smooth and intact. The parenchyma is congested and edematous. The pulmonary vasculature is without thrombo-embolism. Thromboemboli are not present in the distal tertiary branches.

GASTROINTESTINAL SYSTEM:

The esophagus is intact throughout. The stomach is not distended. It contains about 150 ml of green well-digested food and liquid present. The mucosa is smooth and green with no erosions or ulcerations. Portions of tablets and capsules cannot be discerned in the stomach. The small intestine and colon are examined by inspection, palpation and multiple incisions and show soft green stool in each region. The appendix is present. The pancreas occupies a normal position. There is no necrosis or trauma. The parenchyma is lobular and firm. The pancreatic ducts are not ectatic, and there is no parenchymal calcification.

HEPATOBILIARY SYSTEM:

The liver weighs 3200 grams, is enlarged, and is red-brown. The capsule is intact, and the consistency of the parenchyma is soft. The cut surface is smooth. There is chronic passive congestion. The gallbladder is present. The wall is thin and pliable. It contains a minimal amount of green liquid bile and no calculi. There is no obstruction or dilatation of the extra-hepatic ducts. The periportal lymph nodes are not enlarged.

COUNTY OF LOS ANGELES

**12**

# AUTOPSY REPORT

DEPARTMENT OF CORONER

No.

2008-07210

MIMS, CHRISTOPHER

Page 7

URINARY SYSTEM:

The left kidney weighs 310 grams. The right kidney weighs 330 grams. The kidneys are normally situated, and the capsules strip easily revealing a surface that is focally pitted, light red and smooth. The corticomedullary demarcation is preserved. The pyramids are not remarkable. The peripelvic fat is not increased. The ureters are without dilatation or obstruction and pursue their normal course. The urinary bladder is contracted. It contains no urine.

GENITAL SYSTEM (MALE):

The prostate is without enlargement or nodularity. Both testes are in the scrotum and are unremarkable and without trauma.

HEMOLYMPHATIC SYSTEM:

The spleen weighs 220 grams and is slightly enlarged. The capsule is intact. The parenchyma is soft. There is no increased follicular pattern. Lymph nodes throughout the body are small and inconspicuous. There is focal enlargement of the lymph nodes observed in the peribronchial regions. The bone is not remarkable. The bone marrow of the rib is red, moist and unremarkable.

ENDOCRINE SYSTEM:

The thyroid gland is unremarkable. The parathyroid glands are not identified. The adrenal glands are unremarkable. The thymus gland is unremarkable. The pituitary gland is of normal size and is unremarkable.

SPECIAL SENSES:

The eyes are not dissected. The middle and inner ear are not dissected.

76A798P—Rev. 2/91

COUNTY OF LOS ANGELES

**12**

Page __8__

# AUTOPSY REPORT

DEPARTMENT OF CORONER

No.

2008-07210

MIMS, CHRISTOPHER

## HEAD AND CENTRAL NERVOUS SYSTEM:

There is no subcutaneous or subgaleal hemorrhage in the scalp. The external periosteum and dura mater are stripped showing no fractures of the calvarium or base of the skull. There are no tears of the dura mater. There is no epidural, subdural or subarachnoid hemorrhage. The fresh brain weighs 1440 grams. The leptomeninges are thin and transparent. A normal convolutional pattern is observed (see separate Neuropathology Report to follow). Vessels at the base of the brain have a normal pattern of distribution. There are no aneurysms. The cranial nerves are intact, symmetrical and normal in size, location and course. The cerebral arteries are without arteriosclerosis.

See separate Neuropathology Report.

## SPINAL CORD:

The entire cord is not dissected. The superior portion of the cervical spinal cord is examined through the foramen magnum and is unremarkable.

## NEUROPATHOLOGY:

The brain is placed in formalin solution for further fixation and later neuropathology consultation.

## HISTOLOGIC SECTIONS:

Representative sections from various organs are preserved in one storage jar in 10% formalin. Sections of heart, right and left lungs, liver and spleen, kidneys, and dorsum of right foot skin are submitted for slides. The slide key is #2008-07210: 1, 2, 3, 4, left ventricle of heart; 5, right ventricle of heart; 6, right lung; 7, left lung; 8, liver and spleen; 9, right and left kidneys; 10, dorsum of right foot and section of skin.

## TOXICOLOGY:

Blood (heart and femoral), bile, liver tissue, stomach contents and vitreous humor have been submitted to the laboratory. A comprehensive screen is requested.

76A798P—Rev. 2/91

COUNTY OF LOS ANGELES                                          DEPARTMENT OF CORONER

# 12

# AUTOPSY REPORT

No.

2008-07210

MIMS, CHRISTOPHER

Page ___ 9 ___

PHOTOGRAPHY:

At-scene photos are available (34). Photographs have been taken during the course of the autopsy.

RADIOLOGY:

No x-rays are obtained.

WITNESSES:

None.

DIAGRAMS USED:

Diagram Form 20 was used during the performance of the autopsy. The diagram is not intended to be a facsimile.

OPINION:

This 38-year-old Black male died as a result of dilated cardiomyopathy. Hepatic steatosis and history of hypertension were contributory factors to his final demise.

Blood toxicology studies show a 0.11 g% alcohol femoral blood level. This is not a lethal level. The remainder of the toxicology studies show no drugs of abuse. A non-significant level of diphenhydramine is present. The vitreous fluid shows no evidence of diabetic ketoacidosis.

Alcohol abuse is strongly associated with the development of dilated cardiomyopathy, which may be a secondary nutritional disturbance or ethanol toxicity causing myocardial injury.

Based on the history and circumstances, as currently known, the manner of death is natural.

76A798P—Rev 2/91

COUNTY OF LOS ANGELES

DEPARTMENT OF CORONER

# 12

Page 10

# AUTOPSY REPORT

No.

2008-07210

MIMS, CHRISTOPHER

NOTE:

Dr. Christopher Rogers, Chief of Forensic Medicine Division, reviewed the opinion and case and concurs.

_Louis A. Pena M.D._
LOUIS A. PENA, M.D.
DEPUTY MEDICAL EXAMINER

1-17-2009
DATE

LAP:am/jm:c
D-10/16/08-1900 hours
T-10/21/08

76A798P—Rev. 2/91

-4443-



2008-07210
MINE, CHRISTOPHER
NAT  AP 10-16-08                34   1

**20**

3:25pm                                                      —RIGOR

3:25pm

eyes = corneal clouding, congested

Hair black short curly
slight frontal (receding) hair line

R

Teeth = own frenulum intact

No end of external trauma.

L                L                R

Ear lobes pierced
black mustache, beard
foam Red, frothy mouth

Skin tags upper chest

Tattoo:
4 cards A
diamonds, spade,
heart, clubs
Fit Doctor
men's face
green dark hair
smiling
other designs
ahead (this)

Purple face
Livor + trauma
spots

Scaly psoriatic type skin lesions (chronic)

Liver temp
Incision mark

Tattoos roller A/5 4 nails + nails

Tattoo
Balls of steel
(backman Leather Theater)

O bise Red.

Slight Red
fixed Livor

psoriasis type —
lesions anshin
and fold areas

Yellow band
matches cc#
2008-07210

Circumcised penis
testes

Tattoo:
multicolored
flyer

Tattoo:
tiger like band
face and
color

anus
&

Numerous small old scars, healed abrasions

P soriatic type
skin lesion scaly

Nails short
No trauma to hands,
palms or digits.

old
scar 1½"

old
scar 2"

Legs/dorsum feet swollen

10-16-2008

Scaly
Hyperkeratotic skin
? psoriasis

Blue, white toe tags
matches decedent's name
& cc# 2008-07210

_Karen A. Pera_ _____ M.D.
Deputy Medical Examiner

COUNTY OF LOS ANGELES          **FORENSIC CONSULTANT'S REPORT**          DEPARTMENT OF CORONER

**13**

<u>NEUROPATHOLOGY</u>

2008-07210

MIMS, CHRISTOPHER E.

November 20, 2008

AGE: 38 years

DATE OF DEATH: October 15, 2008

REFERRING DME: Louis A. Pena, M.D.


CIRCUMSTANCES:

The following information is taken from the Investigator
Report and preliminary autopsy notes. This 38-year-old man
reportedly had a past medical history of hypertension,
sports-related knee injuries, heavy smoking, and alcohol
abuse. He was last known alive on 10/14/08 at 2230 hours,
reportedly complaining of labored breathing. On 10/15/08, he
was found unresponsive on the bathroom floor by a friend. He
was pronounced at the scene on 10/15/08 at 0935 hours by
responding paramedics.

At the time of postmortem examination on 10/16/08, the
findings included dilated cardiomyopathy (heart weight 1010
grams), pulmonary congestion and edema, hepatomegaly (3200
grams), marked obesity, and no evidence of acute trauma
including no scalp, skull or intracranial abnormality noted.
Brain weight at removal was 1440 grams.


GROSS DESCRIPTION:

Specimens available for examination are cranial dura mater
and brain. Cranial dura mater submitted includes the dorsal
convexity regions with falx cerebri, posterior fossa with
tentorium cerebelli, and much of the right temporal fossa.
The external and internal surfaces of the dura mater are
smooth and shiny without evidence of hemorrhage,
discoloration or subdural neomembranes, the only exception
being a 0.8 x 0.5 x 0.4 cm light brown flattened nodule (0.4
cm in thickness) in the right anterolateral temporal fossa,
apparently within the dura. It is sampled. Dural venous
sinuses appear normal in pattern.

**13**

<u>NEUROPATHOLOGY</u>

2008-07210

MIMS, CHRISTOPHER E.

<u>Page 2</u>

Cerebral leptomeninges show mildly increased milky opacity over the dorsolateral convexities, considered within normal limits for age group. There is moderately severe leptomeningeal vascular congestion. Cerebral hemispheres are approximately symmetrical with a midline and closely apposed interhemispheric fissure. There is no evidence of significant brain swelling and no evidence of herniation at the uncus, cerebellar tonsillar region, superior cerebellar vermis or cingulate gyrus. There is some artifact present, including partial avulsion of the inferomedial left cerebellar hemisphere and deep incision into the right anterior inferior cerebellar hemisphere. Convolutional pattern is unremarkable. No recent or remote cerebral or cerebellar cortical contusions are seen. No focal areas of increased softening, firmness or discoloration are present.

Rectus-orbital and basitemporal areas are unremarkable. Cranial nerves I through XII are intact except for avulsion of olfactory bulbs bilaterally. Major basal arteries have a normal pattern of distribution, discounting the absence of the bilateral vertebral arteries, not included with the specimen. The left posterior communicating artery is larger than average, slightly exceeding the contribution to the left posterior cerebral artery by basilar artery, thus consistent with a fetal pattern. No aneurysms and no evidence of occlusive vascular disease are apparent. Belly of the pons is full and symmetrical, and medulla is remarkable only for partial avulsion of the right medulla compared to the left. Cerebellar hemispheres are approximately symmetrical with normal-appearing folia. Basal cisterns are open.

The brain is sectioned in a coronal plane, and the brainstem and cerebellum in a transverse plane.

COUNTY OF LOS ANGELES    **FORENSIC CONSULTANT'S REPORT**    DEPARTMENT OF CORONER

**13**

NEUROPATHOLOGY

2008-07210

MIMS, CHRISTOPHER E.

December 3, 2008

MICROSCOPIC DESCRIPTION:

Sections of cranial dura mater and brain (8) stained by H&E
method include the right temporal fossa dural nodule (Slide
A), right frontal lobe (Slide B), left and right hippocampi
(Slides C and D, respectively), right basal ganglia (Slide
E), right parietal lobe (Slide F), cerebellum (Slide G), and
medulla (Slide H).

Slide A demonstrates native dura mater, with the expanded
zone composed of vascular channels and some ovoid pale
connective areas with a lace-like internal architecture. The
appearance is typical of a benign arachnoid villus. Some
leptomeningeal melanosis is incidentally noted in the brain
sections. In basal ganglia, some mild to moderate fine
granular calcification is noted in globus pallidus, primarily
in pericapillary areas and in the walls of some small blood
vessels. Mild autolysis is present in the sections.

There is no evidence of meningitis, encephalitis, abnormal
neuronal inclusions, developmental anomalies, hippocampal
sclerosis or neoplasia.

FINAL NEUROPATHOLOGIC DIAGNOSIS:

A.    Cerebrovascular congestion.

B.    Basal ganglia calcification, mild; incidental finding.

JOHN M. ANDREWS, M.D.    DATE  12/9/08
DEPUTY MEDICAL EXAMINER
NEUROPATHOLOGY CONSULTANT

JMA:am/hg:c
T-12/04/08

76F389(Rev 8/93)

-4447-

**13**

NEUROPATHOLOGY

2008-07210

MIMS, CHRISTOPHER E.

Page 3

Coronal sections reveal the cortical ribbon to be normal in thickness and color. Gray/white demarcation is distinct. Underlying white matter is homogeneous and clear. Corpus callosum is normal in thickness, color and symmetry. Lateral ventricles are normal in size and configuration with sharp superior angles. A cavum septi pellucidi is present anteriorly without fenestration of septum pellucidum. Third ventricle is midline and does not exceed 0.3 cm in maximum transverse diameter. Cerebral aqueduct and fourth ventricle are unremarkable. Choroid plexus is unremarkable bilaterally. Mammillary bodies and pineal body are grossly unremarkable. Substantia nigra is normally pigmented. Basal ganglia are normal in size, symmetry, contour and color. Amygdaloid complex of nuclei and hippocampi are grossly unremarkable.

Multiple transverse sections of the brainstem and cerebellum reveal no abnormality.

Selected areas are retained in storage. Representative sections are submitted for microscopic examination.

GROSS IMPRESSIONS:

A.    Adult cranial dura mater with small right middle fossa dural nodule.

B.    Cerebrovascular congestion.

C.    Otherwise, grossly unremarkable adult brain and coverings.

JOHN M. ANDREWS, M.D.
DEPUTY MEDICAL EXAMINER
NEUROPATHOLOGY CONSULTANT

12-3-08
DATE

JMA:am/hg:c
T-11/21/08

76F389(Rev 8/93)

-4448-

COUNTY OF LOS ANGELES                    **MICROSCOPIC REPORT**                    DEPARTMENT OF CORONER

## 14

I performed a microscopic examination on

DECEMBER 4, 2008

at ___THE DEPARTMENT OF CORONER___

Los Angeles, California

2008-07210

MIMS, CHRISTOPHER E.

## MICROSCOPIC DESCRIPTION

<u>Slides #1,2,3 and 4/10</u>:  Sections of cardiac muscle show patchy areas of significant, severe interstitial fibrosis.  There are focal areas of myocyte hypertrophy, myocyte attenuation, and myocyte fiber disarray.  Slide #4 shows an adherent blood clot with fibrin, red cells and acute inflammation.

There is no acute or chronic myocarditis.

The trichrome stain confirms the abundant interstitial fibrosis, and one cross-section of the left anterior descending coronary artery shows minimal fibrointimal hyperplasia.

<u>Slide #5/10</u>:  Section of unremarkable right ventricle.

<u>Slides #6 and #7/10</u>:  Sections of lung show interstitial red blood cell congestion and pulmonary edema.  Focal lung atelectasis is present.  There are a few foreign body giant type cells and abundant alveolar macrophages.  No pneumonia is observed.  These sections are polarized and are unremarkable with some non- and refractile particles of nonspecific nature.

<u>Slide #8/10</u>:  Section of liver with moderate steatosis.  No cirrhosis is observed.

Section of autolyzed spleen with red blood cell congestion and numerous microvacuoles.

<u>Slide #9/10</u>:  Sections of autolyzed kidney; otherwise, unremarkable.

76M350 (Rev. 1/93) P1/93

# 14

2008-07210

MIMS, CHRISTOPHER E.

Page____2____

 

Slide #10/10: Section of skin from the dorsum of the right foot
with hyperkeratosis and subepidermal focal slight inflammation.

NOTE: No sickled red blood cells are observed.


_Louis a Pena M.D_____          _1-17-2009_____
LOUIS A. PENA, M.D.                          DATE
DEPUTY MEDICAL EXAMINER

LAP:am/brr:c/f
T-12/17/08

(Rev 2-92)

COUNTY OF LOS ANGELES          AUTOPSY CHECK SHEET          DEPARTMENT OF CORONER

# 16

2008-07210                341
mims, christopher
LP 10-16-08

& Eunremark./none

**EXTERNAL EXAM**
Sex mme
Race Black
Age 38 x. J.
Height 80"
Weight 456 pds
Hair Black
Eyes corneal cloudin
Sclera congested
Teeth own
Mouth
Tongue
Nose septum Intact
Chest Tardieu spots - positional
Breasts
Abdomen Obese
Scar
Genitals circum ♂ testo ✓
Edema see diagram #20
Skin see diagram #20
Decubitus 0, o109
**HEART** Wt.
Dilated Pericardium          RV 0.4cm
Hypertrophy
Dilation +          LV 1.5cm
Muscle          Septum 2.0cm
Valves          TV = 15cm, PV = 10cm, MV = 15cm
Coronaries          AV = 10cm
AORTA minimal atherosclerosis
VESSELS          No pulmonary
LUNGS Wt.          Embolism
R 1050g
L 1030g
Adhesions
Fluid
Atelectasis
Oedema sev.
Congestion
Consolidation
Bronchi secretions
Nodes enlarged
PHARYNX
TRACHEA secretion
THYROID
THYMUS
LARYNX
HYOID
ABDOMINAL WALL FAT 80cm
CHEST Wall FAT 6cm

**PERITONEUM**
Fluid
Adhesions
LIVER Wt. 3200g chronic Hep.
Capsule Intact congestion
Lobules
Fibros
G B + minimal green liquid Bile
Calculus
Bile ducts
SPLEEN Wt. 220g slight
Color purple enlarged
Consistency soft spleen
Capsule Intact
Malpigment
PANCREAS
ADRENALS
KIDNEYS Wt.          pitted, focally
R 330g
L 310g
Capsule Intact
Cortex
Vessels
Pelvis
Ureters
BLADDER contracted, No urine.
GENITALIA
Prostate
Testes &, No trauma
Uterus ♂
Tubes
Ovaries
OESOPHAGUS
STOMACH - 150ml green well-Dig foul, liquid present
Contents
DUOD. & SM. INT. Soft green stool
APPENDIX +
LARGE INT. Soft green stool
ABDOM. NODES
SKELETON
Spine ext.
Marrow R/O
Rib Cage
Long bones
Pelvis
No Fractures

SCALP
CALVARIUM
BRAIN Wt. 1440g
Dura
Fluid          See separate
Ventricles          Neuropath
Vessels          report
Middle ears
Other
PITUITARY

SPINAL CORD cervical
Sup-portion cervical
spinal cord

**TOXICOLOGY SPECIMENS**
blood- Heart, Fem.
Liver, stomach, vitreous, Bile
SECTIONS FOR (10)
HISTOPATHOLOGY
1. RV & Kidney
2. & R Lung 10. R. Dorsan Foot skin
3. L Lung
& Liver, spleen          Stool 3qa

MICROBIOLOGY

DIAGRAMS #20
X-RAYS

OTHER PROCEDURES

GROSS IMPRESSIONS
See Adult form #12
Dictated Report

| Date | 10-16-2008 | Time | -17:00 end | Deputy Medical Examiner Lauren O. Pene M.D. |

-4451-

COUNTY OF LOS ANGELES          **MEDICAL REPORT**          DEPARTMENT OF CORONER

**15**

AUTOPSY CLASS: ☐ A ☒ B ☐ C   ☐ Examination Only D

Date 10-16-2008 Time 1525 Dr. Louis A. Peña
print

FINAL ON 12-11-2008 By Louis A. Peña
print

APPROXI-MATE INTERVAL BETWEEN ONSET AND DEATH

2008-07210
MIMS, CHRISTOPHER

LP
10-16-08

DEATH WAS CAUSED BY: (Enter only one cause per line for A, B, C, and D)
**IMMEDIATE CAUSE**

(A)   Dilated Cardiomyopathy   ◄ yrs

DUE TO, OR AS A CONSEQUENCE OF

(B)   ◄

DUE TO, OR AS A CONSEQUENCE OF

(C)   ◄

DUE TO, OR AS A CONSEQUENCE OF

(D)   ◄

Other conditions contributing but not related to the immediate cause of death:

Hepatic Steatosis, History of Hypertension

☒ **NATURAL**   ☐ **SUICIDE**   ☐ **HOMICIDE**

☐ **ACCIDENT**   ☐ **COULD NOT BE DETERMINED**

If other than natural causes
HOW DID INJURY OCCUR?

WAS OPERATION PERFORMED FOR ANY CONDITION STATED ABOVE: ☐YES ☒NO

TYPE SURGERY_____ DATE _____

☐ ORGAN PROCUREMENT   ☒ TECHNICIAN George Reid

☐ WITNESSES TO AUTOPSY   ☐ EVIDENCE RECOVERED AT AUTOPSY
Item Description:

38 y.o. B.M. H/o HTN,
Sports related knee Inj. & EtOH Abuse.
10-15-08 FND Lying on B.R. Flr unrespon.
at residence pronounced 0935am.
Appear a smoker, drank ~1gal EtOH vodka/day.
c/o labored Breathing 10-14-08. LWA 10-14-08 2230.

Autopsy - Dilated "Cardiomyopathy" 1,010 grams
No c.a.r. Art Disease. Hepatomeg Sev Chronic Hep.
Cmg → CHF. Indirect myocardial Dysfunct. HTN D Disease
No P.E. No Evid. EXT/INT. Trauma. LP

10
cassettes

10-16-2008
M.D.
Louis A. Peña

Resident _____          DME

**PRIOR EXAMINATION REVIEW BY DME**

☒ BODY TAG   ☐ CLOTHING
☐ X-RAY (No. 0)   ☐ FLUORO
☐ SPECIAL   ☐ MED. RECORDS

PROCESSING TAG
☒ AT SCENE PHOTOS (No. 34)

================================

TYPING BLOOD TAKEN BY _____
SOURCE _____

================================

**TOXICOLOGY**

☐ NO BLOOD
☐ Embalmed
☐ >24 hr in hospital
☐ Decomposed
☐ Other _____
Reason

**SPECIMENS**

Collected by Louis A. Peña

☒ HEART BLOOD   ☒ STOMACH CONT.
☒ FEMORAL BLOOD   ☐ BRAIN
☐ ___ BLOOD   ☐ SPLEEN
☐ ___ BLOOD   ☐ KIDNEY
☒ BILE   ☒ VITREOUS
☒ LIVER   ☐ ___
☒ URINE none   ☐ ___

================================

**STORAGE JARS**

☒ Regular (No. 1 )   ☐ Oversize (No. ____)

Histopath Cut: ☒ Autopsy   ☐ Lab

================================

☐ NO TOXICOLOGY REQUESTED

**TOXICOLOGICAL ANALYSES ORDERED**

SCREEN: ☒ C ☐ H ☐ T ☐ S

☐ ALCOHOL ONLY
☐ CARBON MONOXIDE
☐ NEOGEN SCREEN
☒ OTHER (specify drug and tissue)
Vitreous - glucose, Ketones   Thanks

================================

REQUESTED MATERIAL ON PENDING CASES
☐ Police Report   ☐ Med History
☒ Tox   ☒ Histo
☐ Microbiology   ☐ Investigations
☐ Radiology Cons.   ☐ Eye Path. Cons
☐ Consult on
☒ Brain Submitted
☒ Neuro Consult   ☐ DME to Cut
☐ Criminalistics
☐ GSR   ☐ Sexual Assault   ☐ Other

WHITE - FILE COPY   CANARY - FORENSIC LAB   PINK - INVESTIGATIONS   GOLDENROD - DME          Rev. 1/99

-4452-



Department of Coroner, County of Los Angeles

# FORENSIC SCIENCE LABORATORIES

### Laboratory Analysis Summary Report



Friday, November 07, 2008

☑ PendingTox

**To:**  Dr. Pena

**Deputy Medical Examiner**

**Subject:**  Coroner Case Number  2008-07210  MIMS, CHRISTOPHER EDDIE

The following results have been technically and administratively reviewed and are the opinions and interpretations of the Analyst:

| SPECIMEN | SERVICE | DRUG | LEVEL | UNITS | ANALYST |
|---|---|---|---|---|---|
| Blood, Femoral | | | | | |
| | Alcohol | Ethanol | 0.11 | g% | M. Schuchardt |
| | Volatiles | Acetone | | ND | M. Schuchardt |
| Blood, Heart | | | | | |
| | Alcohol | Ethanol | 0.09 | g% | M. Schuchardt |
| | Barbiturate | Barbiturates | | ND | D. Kowal |
| | Bases | Diphenhydramine | < 0.50 | ug/ml | S. DeQuintana |
| | Cocaine | Cocaine and Metabolites | | ND | D. Kowal |
| | Fentanyl | Fentanyl | | ND | D. Kowal |
| | Methamphetamine | Methamphetamine | | ND | D. Kowal |
| | Opiates | Codeine | | ND | D. Kowal |
| | Opiates | Morphine | | ND | D. Kowal |
| | Phencyclidine | Phencyclidine | | ND | D. Kowal |
| | Volatiles | Acetone | | ND | M. Schuchardt |
| Vitreous | | | | | |
| | Alcohol | Ethanol | 0.14 | g% | M. Schuchardt |
| | Outside Test | Glucose | < 20 | mg/dl | NMS Labs, Inc. |
| | Volatiles | Acetone | | ND | M. Schuchardt |

Legend:

- - - - -
% Saturation
*
Done
| g | Grams |
| g% | Gram Percent |
| Inc. | Inconclusive |
| mEq/l | Milli equivalents |
| mg | Milligrams |
| mg/dl | Milligram per Deciliter |
| mg/l | Milligram per Liter |
| mmol/l | Millimoles per Liter |
| ND | Not Detected |
| Negative | |
| ng/gm | Nanograms per Gram |

| QNS | Quantity Not Sufficent |
| TNP | Test Not Performed |
| Trace | |
| ug | Micrograms |
| ug/g | Micrograms per Gram |
| ug/l | |
| ug/ml | Microgram per Milliliter |

dP
11-1306

Administratively reviewed by:  **Daniel T. Anderson**
*Supervising Criminalist II*
**FORENSIC LABORATORIES**

Page 1 of 2





Department of Coroner, County of Los Angeles

# FORENSIC SCIENCE LABORATORIES
### Laboratory Analysis Summary Report

Friday, November 07, 2008

☑ PendingTox

**To:**    Dr. Pena
**Deputy Medical Examiner**

**Subject:    Coroner Case Number**   2008-07210   MIMS, CHRISTOPHER EDDIE

The following results have been technically and administratively reviewed and are the opinions and
interpretations of the Analyst:

| SPECIMEN | SERVICE | DRUG | LEVEL | UNITS | ANALYST |
|----------|---------|------|-------|-------|---------|

---

**Legend:**

- - - - -
% Saturation
*
Done

| | |
|---|---|
| g | Grams |
| g% | Gram Percent |
| Inc. | Inconclusive |
| mEq/l | Milli equivalents |
| mg | Milligrams |
| mg/dl | Milligram per Deciliter |
| mg/l | Milligram per Liter |
| mmol/l | Millimoles per Liter |
| ND | Not Detected |
| Negative | |
| ng/gm | Nanograms per Gram |

| | |
|---|---|
| QNS | Quantity Not Sufficent |
| TNP | Test Not Performed |
| Trace | |
| ug | Micrograms |
| ug/g | Micrograms per Gram |
| ug/l | |
| ug/ml | Microgram per Milliliter |



Administratively reviewed by:   Daniel T. Anderson
Supervising Criminalist II
**FORENSIC LABORATORIES**

Page 2 of 2

COUNTY OF LOS ANGELES                    **CASE REPORT** EDR# 916134  B Peng          DEPARTMENT OF CORONER

| | APPARENT MODE | | | CASE NO. |
|---|---|---|---|---|
| **1** | NATURAL | | | 2008-07210 |
| | SPECIAL CIRCUMSTANCES | | | CRYPT |
| | Media Interest | | | 341 |

| LAST, FIRST MIDDLE | | | AKA | # |
|---|---|---|---|---|
| MIMS, CHRISTOPHER EDDIE | | | | |

| ADDRESS | | | | | | | | CITY | | | STATE | ZIP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | LOS ANGELES | | | CA | 90017 |

| SEX | RACE APPEARS | DOB | AGE | HGT | WGT | EYES | HAIR | TEETH | FACIAL HAIR | ID VIEW | CONDITION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| MALE | BLACK | 1970 | 38 | 80 in. | 456 lbs. | BROWN | BLACK | ALL NATURAL TEETH | BEARD AND MUSTACHE | Yes | FAIR |

| MARK TYPE | MARK LOCATION | MARK DESCRIPTION |
|---|---|---|
| TATTOO | LEFT ARM | "BALLS OF STEEL" |
| TATTOO | RIGHT ARM | "TOUGH AS NAILS" |
| SCAR | BOTH KNEES | HEALED SCARS |
| TATTOO | LEFT ARM | "FAT DOCTOR" |

| NOK | | ADDRESS | | CITY | | STATE | ZIP |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

| RELATIONSHIP | PHONE | NOTIFIED BY | DATE | TIME |
|---|---|---|---|---|
| SEE CASE NOTES | | | | 00:00 |

| SSN | DL ID | STATE | PENDING BY |
|---|---|---|---|
| | | CA | |

| ID METHOD |
|---|
| VISUALLY AT SCENE |

| LA# | MAIN # | CII # | FBI # | MILITARY # | POB |
|---|---|---|---|---|---|
| 2020867M | 04072535 | | | | |

| IDENTIFIED BY NAME (PRINT) | RELATIONSHIP | PHONE | DATE | TIME |
|---|---|---|---|---|
| LAHOMA GRIFFIN | EX-WIFE | (562) 313-3666 | 10/15/2008 | 13:06 |

| PLACE OF DEATH / PLACE FOUND | ADDRESS OR LOCATION | CITY | ZIP |
|---|---|---|---|
| RESIDENCE | | LOS ANGELES | 90017 |

| PLACE OF INJURY | AT WORK | DATE | TIME | LOCATION OR ADDRESS | ZIP |
|---|---|---|---|---|---|
| | No | | | | |

| DOD | TIME | FOUND OR PRONOUNCED BY |
|---|---|---|
| 10/15/2008 | 09:35 | LAPD # 3 |

| OTHER AGENCY INV. OFFICER | PHONE | REPORT NO. | NOTIFIED BY | NO |
|---|---|---|---|---|
| LAPD CENTRAL - SUVIATE/ MILLER | (213) 485-3294 | | | |

| TRANSPORTED BY | TO | DATE | TIME |
|---|---|---|---|
| RAMIRO GONZALEZ JR. | LOS ANGELES FSC | | 10/15/2008 13:55 |

| FINGERPRINTS? | Yes | CLOTHING | Yes | PA RPT | No | MORTUARY | |
|---|---|---|---|---|---|---|---|
| MED. EV. | Yes | INVEST. PHOTO # | 34 | SEAL TYPE | CORONER SEAL | HOSP RPT | No |
| PHYS. EV. | No | EVIDENCE LOG | Yes | PROPERTY? | Yes | HOSP CHART | No |
| SUICIDE NOTE | No | GSR NO | | RCPT. NO. | 233635 | PF NO. | |

SYNOPSIS
ACCORDING TO THE REPORTED INFORMATION, THE DECEDENT WAS A 38 YEAR OLD BLACK MALE WITH A HISTORY OF HYPERTENSION, SPORTS RELATED KNEE INJURIES, AND ALCOHOL ABUSE. ON 10/15/08 AT 0900 HOURS, THE DECEDENT WAS FOUND LYING ON THE BATHROOM FLOOR, UNRESPONSIVE. 911 WAS CALLED AND LOS ANGELES FIRE DEPARTMENT #3 RESPONDED TO THE SCENE AND DETERMINED DEATH ON 10/15/08 AT 0935 HOURS. DECEDENT APPARENTLY SMOKED TOBACCO HEAVILY AND DRANK ABOUT 1 GALLON OF VODKA DAILY. DECEDENT COMPLAINED OF LABORED BREATHING ON 10/14/08. THE DECEDENT WAS LAST SEEN ALIVE ON 10/14/08 AT 2230 HOURS BY FRIEND. NO FOUL PLAY SUSPECTED.

| LYDIA GRANADO-MATA | | DATE | 10/15/2008 | REVIEWED BY | DATE 10/15/08 |
|---|---|---|---|---|---|
| S16235 | L Granado Mata   INVESTIGATOR | TIME | 17:05 | Yagerleuer | TIME 2013 |

FORM #3 NARRATIVE TO FOLLOW? ☑



## County of Los Angeles, Department of Coroner
## Investigator's Narrative



Case Number:  2008-07210                     Decedent: MIMS, CHRISTOPHER EDDIE

### Information Sources:

1.  LAPD Central Division, Officer Suviate #35743 & Miller #39293. 213-485-3294.

### Investigation:

On 10/15/08 at 1039 hours, Officer Miller of LAPD Central Division reported this apparent natural death. On 10/15/08 at 1107 hours, I was assigned this field call. I arrived on scene at 1158 hours and departed at 1326 hours. No foul play suspected. The apartment was secured with a coroner seal.

### Location:

The death occurred at a residence ▇▇▇▇▇▇▇▇ Los Angeles, CA 90017.

### Informant/Witness Statements:

According to the information obtained from Officer Suviate and Miller, the decedent was last seen alive on 10/14/08 at 2230 hours and apparently complained of labored breathing. On 10/15/08 at about 0900 hours, the decedent was found unresponsive on the bathroom floor by a friend. 911 was dialed and Los Angeles Fire Department responded to the scene and determined death at 0935 hours. Per officers, the decedent abused alcohol, drinking about 1 gallon of vodka daily. The decedent reportedly drank to the point of passing out and when he would wake, would continue to drink. The decedent also smoked heavily, going through about 1 pack of cigarettes daily. The decedent's medical history included hypertension and a knee surgery about 7 months ago.

### Scene Description:

The scene was an apartment at the above listed location. The apartment appeared dirty, cluttered, and unkempt. Several medication bottles were located on the kitchen cabinet. Two large bottles of vodka were noted on top of the refrigerator and appeared empty. The decedent was located in the bathroom. The bathroom appeared dirty and contained several large duffle bags. The scene appeared to be void of any illicit drugs and drug paraphernalia.

### Evidence:

On 10/15/08 at 1221 hours, I collected several prescription medication bottles from the scene. I booked the items as evidence at the FSC.

### Body Examination:

The decedent appeared to be a 38 year old Black male. He was observed lying prone on wooden floor inside the bathroom. His arms were bent up at the elbow with his hands closed and resting near his head and his right leg straight with the left leg bent at the knee and turned out at the hip. A brown towel was noted under his head and appeared to be soiled with bloody, frothy purge. He appeared to be dressed in a blue shirt and blue underwear. He appeared to have black hair, brown eyes, beard and mustache and apparent natural teeth. The following tattoos were noted: right arm-"TOUGH AS NAILS", nails with the initials "C. MIMS", right arm- cougar, right wrist-tribal band, left arm-"FAT DOCTOR", "A" playing cards, male face, left arm- "BALLS OF STEEL." I observed healed scars to the knees, abdomen, back, and feet. No petechiae was noted. Lesions/ wounds were noted to the left calf, right shin, and lower right calf. No trauma was noted. On 10/15/08 at 1231 hours, rigor mortis was rated 3 throughout; and at 1234 hours, livor mortis appeared fixed and consistent with the position found. The ambient temperature on 10/15/08 at 1225 hours was 72.3 degrees F, and algor mortis was 101.2 degrees F at 0830 hours 1236 hours.



**County of Los Angeles, Department of Coroner Investigator's Narrative**



Case Number:  2008-07210                    Decedent: MIMS, CHRISTOPHER EDDIE

### Identification:

On 10/15/08 at 1306 hours, ███████████ visually identified the decedent as Mims, Christopher Eddie.

### Next of Kin Notification:

Please see case notes.

### Tissue Donation:

At the completion of this report, family did not give permission for tissue donations.

### Autopsy Notification:

There is no request for autopsy notification regarding this particular case.

*L. Granado Mata*

LYDIA GRANADO-MATA        516235

*Kelly Yagerlener*

LARRY DIETZ

10/15/2008

_____

Date of Report

COUNTY OF LOS ANGELES    **PRELIMINARY EXAMINATION REPORT - FIELD**    DEPARTMENT OF CORONER

# 6

WAS ORIGINAL SCENE DISTURBED BY OTHERS?  Y [  ]  N [X ]
IF YES, NOTE CHANGES IN NARRATIVE FORM #3.
DATE _____ 10/15/2008 _____

| | | |
|---|---|---|
| AMBIENT #1 | 72.3 F | TIME 12:25 |
| AMBIENT #2 | F | TIME |
| WATER | F | TIME |

LIVER TEMPERATURE #1 _____ 101.2 F          TIME _____ 12:36

LIVER TEMPERATURE #2 _____ F          TIME _____

**2008-07210**

**MIMS, CHRISTOPHER EDDIE**
Nat
**DOD- 10/15/2008**

THERMOMETER # ____ 07-17

DATE & TIME FOUND _____ 10/15/2008 @ 9:00 _____          LAST KNOWN ALIVE _____ 10/14/2008 @ 22:30

APPROX. AGE __38__ SEX __Male__ EST. HEIGHT __80__ EST. WEIGHT __456__ CLOTHED ? YES [X] NO [ ] IF YES, DESCRIBE:

Blue Shirt, Blue Underwear

DESCRIPTION AS TO WHERE REMAINS FOUND AND CONTACT MATERIAL TO BODY:

Prone on wood floor

SCENE TEMPERATURE REGULATED? YES [ ]    NO [X] IF YES, THERMOSTAT SET AT _____ DEGREES F.

LIVOR MORTIS: TIME OBSERVED _12:34_

RIGOR MORTIS: TIME OBSERVED _____ 12:31

NECK FLEXION:

| | |
|---|---|
| ANTERIOR | 3 |
| POSTERIOR | 3 |
| RT. LATERAL | 3 |
| LT. LATERAL | 3 |

| | | | |
|---|---|---|---|
| JAW | 3 | HIP | 3 |
| SHOULDER | 3 | KNEE | 3 |
| ELBOW | 3 | ANKLE | 3 |
| WRIST | 3 | | |



Appeared fixed and
consistent with
position found.

SCALE
0 = ABSENT / NEGATIVE
1 +
2 +
3 +
4 = EXTREME DEGREE

USE SCALE TO DESCRIBE INTENSITY OF RIGOR

SHADE DIAGRAMS TO ILLUSTRATE THE LOCATION OF LIVOR MORTIS.

DESCRIBE INTENSITY OF COLORATION AND WHETHER LIVOR MORTIS IS PERMANENT OR BLANCHES UNDER PRESSURE

**L. Granado-Mata # 516235**

Investigator

REVIEWED BY:

NOTE: ALL DATA COLLECTED FOR THIS FORM MUST BE COLLECTED AT SCENE.

COUNTY OF LOS ANGELES                    MEDICAL EVIDENCE                    DEPARTMENT OF CORONER

## 3A

| | | CASE # | 2008-07210 |
| DECEDENT'S NAME: | MIMS, CHRISTOPHER EDDIE |
| DOD: | 10/15/2008 |
| INCOMING MODE: | |

Page 1 of 1

| Drug Name | Rx Number | Date of Issue | Number Issued | Number Remaining | Form | Dosage | Rx Directions | Physician | Pharmacy Phone/ Comments |
|---|---|---|---|---|---|---|---|---|---|
| ALLOPURINOL | 06383 01468 | 9/30/2008 | 30 | 19 | TABLET | 300 MG | 1 TAB DAILY | KALPARI, KAMRAN | RITE AID 213-494-1762 |
| ATENOLOL | 06383 01395 | 7/26/2008 | 90 | 14 | TABLET | 100 MG | 1 TAB DAILY | KALPARI, KAMRAN | RITE AID 213-494-1762 |
| BAYER ASPIRIN | | | 100 | 40 | TABLET | 325 MG | 1-2 TABS EVERY 4 HRS | | OTC MED |
| DIOVAN | | | 7 | 0 | TABLET | 320 MG/25 MG | | | SAMPLE BOTTLE |
| INDOMETHACIN | 05785 05748 | 2/1/2008 | 40 | 3 | CAPSULE | 50 MG | 1 CAP 4X DAILY | KALPARI, KAMRAN | RITE AID 213-494-1762 |
| LOTREL | 06383 01383 | 9/30/2008 | 14 | 0 | CAPSULE | 10-40 MG | 1 CAP DAILY | KALPARI, KAMRAN | RITE AID 213-494-1762 |
| NEXIUM | 063836 0144 | 10/6/2008 | 5 | 0 | CAPSULE | 40 MG | 1 CAP DAILY | KALPARI, KAMRAN | RITE AID 213-494-1762 |
| TYLENOL PM | | | 24 | 0 | TABLET | 500 MG/25 MG | 2 CAPLETS @ BEDTIME | | OTC MED |
| | | | | | | | | | |
| | | | | | | | | | |

## Paraphernalia Description

(1) UNLABELED RX BOTTLE CONTAINING 53 CLEAR GEL CAPS; (2) CEPHALEXIN, 250 MG- ORANGE CAPSULES WITH "93 3147", (2) VALSARTAN, 320 MG- GRAY TEAR DROP SHAPED TABLET WITH "NVR" ON ONE SIDE & "DXL" ON OTHER SIDE.

| Investigator: | LYDIA GRANADO-MATA (516235 |
| Date: | 10/15/2008 |

# NFL CONCUSSION SETTLEMENT

*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

## PRE-EFFECTIVE DATE DIAGNOSING PHYSICIAN CERTIFICATION FORM
## (for diagnoses made by physicians who are qualified to render Qualifying Diagnoses for purposes of Monetary Award claims before January 7, 2017)

This Pre-Effective Date Diagnosing Physician Certification Form is to be used only by physicians qualified to render Qualifying Diagnoses before January 7, 2017, in connection with the Class Action Settlement in In re: National Football League Players' Concussion Injury Litigation and who made a Qualifying Diagnosis before January 7, 2017. The Qualifying Diagnoses are found in Appendix A to this Pre-Effective Date Diagnosing Physician Certification Form.

Use this form to certify a Qualifying Diagnosis you made before January 7, 2017, based on your personal examination of the Retired NFL Football Player. **Do not sign this form unless you personally examined the player** or, in the case of a Qualifying Diagnosis of Death with CTE, you are the board-certified neuropathologist who made the post-mortem diagnosis of CTE. If you made a Qualifying Diagnosis as a Qualified MAF Physician on or after January 7, 2017, do not use this form; use the MAF Diagnosing Physician Certification Form instead. Also, if you are a Qualified BAP Provider certifying a diagnosis you made in the Baseline Assessment Program, do not use this form; use the BAP Diagnosing Physician Certification Form instead.

You must complete this form in its entirety, sign it under penalty of perjury, and return it to the patient along with copies of all supporting medical records that you created or received in connection with the Qualifying Diagnosis. In turn, the patient, or the patient's counsel, must submit this form and all supporting medical records referred to above to the Claims Administrator as part of a claim for compensation under the Class Action Settlement. The Claims Administrator will review the form, including your qualifications to provide the Qualifying Diagnosis, and the supporting medical records. All claims also are subject to audit. Any finding of fraudulent conduct by you will be subject to, without limitation, your referral to appropriate regulatory and disciplinary boards and agencies and/or federal authorities, and your disqualification from serving in any aspect of the Class Action Settlement.

You are required to preserve all supporting medical records that you created or received in connection with the Qualifying Diagnosis for the greater of: (a) 10 years after January 7, 2017; or (b) the period of time required under applicable state and federal laws.

If you have any questions, call the Claims Administrator toll free at 1-855-887-3485 or visit the Settlement Website at https://www.nflconcussionsettlement.com.

## PRE-EFFECTIVE DATE DIAGNOSING PHYSICIAN CERTIFICATION FORM
### (for diagnoses made by physicians who are qualified to render Qualifying Diagnoses for purposes of Monetary Award claims before January 7, 2017)

### I. PATIENT INFORMATION

| Settlement Program ID (if known) | | 950013395 | | |
|---|---|---|---|---|
| **Name:** | First<br>Christopher | M.I. | Last<br>Mims | Suffix |

| **Address:** | Address 1<br>██████████ | | |
|---|---|---|---|
| | Address 2 | | |
| | City<br>Los Angeles | | |
| | State/Province<br>CA | | |
| | Postal Code<br>90047 | Country<br>United States | |

| Telephone | \|\_\|\_\|\_\| - \|\_\|\_\|\_\| - \|\_\|\_\|\_\|\_\| |
|---|---|
| Date of Birth | \|/\| 1 \| 9 \| 7 \| 0 \|<br>(Month/Day/Year) |
| Date of Death (if applicable) | \| 1 \| 0 \|/\| 1 \| 5 \|/\| 2 \| 0 \| 0 \| 8 \|<br>(Month/Day/Year) |

### II. DIAGNOSING PHYSICIAN INFORMATION

| National Provider Identifier (NPI) | | 1013980978 | | |
|---|---|---|---|---|
| **Physician Name** | First<br>Ronald | M.I.<br>L. | Last<br>Hamilton | Suffix |

**(a) Are you approved as a Qualified BAP Provider or a Qualified MAF Physician?**

☐ **YES.** If YES, you do not need to fill out the rest of this Section II or Sections III or IV. Instead, go to Section V.

☒ **NO.**

**(b)** If you answered No, have you previously completed this form for another Retired NFL Football Player, that you know was submitted to the Claims Administrator?

☐ **YES.** If YES, you do not need to fill out this Section II or Sections III or IV. Instead, go to Section V.

☒ **NO.**

If you answered No to both questions, fill out the rest of this Section II and then go to Section III.

## PRE-EFFECTIVE DATE DIAGNOSING PHYSICIAN CERTIFICATION FORM
### (for diagnoses made by physicians who are qualified to render Qualifying Diagnoses for purposes of Monetary Award claims before January 7, 2017)

| Office/Practice Name | University of Pittsburgh Medical Center | |
|---|---|---|
| **Address** | Address 1 <br> A724.1 Scaife Hall | |
| | Address 2 <br> 200 Lothrop Street | |
| | City <br> Pittsburgh | |
| | State/Province <br> Pennsylvania | |
| | Postal Code <br> 15213 | Country <br> USA |
| Telephone | 4 1 2 - 6 2 4 - 6 6 1 0 | |
| Fax | 4 1 2 - 6 2 4 - 5 4 8 8 | |
| Email Address | hamiltonrl@upmc.edu | |

## III.   BOARD CERTIFICATIONS

Check all board certifications that apply and list the board providing the certification and any identification number provided by the board (*e.g.*, American Board of Psychiatry and Neurology diplomate number). If you do not have any board certifications, summarize your relevant medical training and experience and then go to Section IV.

| Certification | Board | Board Identification Number | Effective Date | Expiration Date |
|---|---|---|---|---|
| [ ] Neurology | | | | |
| [ ] Neurosurgery | | | | |
| [X] Neuropathology | American Board of Pathology | | certified: 5/23/1996 <br> recertified:1/1/2014 | |
| [ ] Neuropsychology | | | | |
| [ ] Other Neuro-specialty | | | | |
| [X] Other Board Certification | American Board of Pathology | | certified: 5/23/1996 | |

## PRE-EFFECTIVE DATE DIAGNOSING PHYSICIAN CERTIFICATION FORM
### (for diagnoses made by physicians who are qualified to render Qualifying Diagnoses for purposes of Monetary Award claims before January 7, 2017)

If you are not board-certified in a neuro-specialty area, summarize your relevant medical training and experience in the field of neurology and related fields that you believe qualifies you to make the diagnosis provided in Section V.

## IV.    OTHER QUALIFICATIONS

| Educational Information | | Education Level | Institution | Degree/Area of Focus | Date Received |
|---|---|---|---|---|---|
| | 1. | Undergraduate Education | University of Nebraska-Lincoln | B.S / Psychology | 1 9 8 5 (Month/Year) |
| | 2. | Medical School | University of Nebraska Medical Center | M.D. | 1 9 8 9 (Month/Year) |
| | 3. | Internship | Univ. of California, San Diego | Resident Anatomic Pathology | 1 9 9 1 (Month/Year) |
| | 4. | Residency | Univ. of California, San Diego | Resident Neuropathology | 1 9 9 3 (Month/Year) |
| | 5. | Fellowship | Univ. of Pittsburgh | Fellow Neuropathology | 1 9 9 4 (Month/Year) |
| | 6. | Other (Graduate) | Univ. of Pittsburgh | Fellow: NIMH Training Grant in Neuroscience | 1 9 9 5 (Month/Year) |

| States Where Licensed to Practice | | State | State License Number | Effective Date | Expiration Date |
|---|---|---|---|---|---|
| | 1. | California | G69731 | 9/10/1990 | Expired |

## PRE-EFFECTIVE DATE DIAGNOSING PHYSICIAN CERTIFICATION FORM
### (for diagnoses made by physicians who are qualified to render Qualifying Diagnoses for purposes of Monetary Award claims before January 7, 2017)

| | | | | |
|---|---|---|---|---|
| 2. | Pennsylvania | MD049717L | 5/12/1993 | 12/31/2018 |
| 3. | Indiana | 01067332A | 9/29/2009 | 10/31/2019 |
| 4. | | | | |
| 5. | | | | |
| 6. | | | | |

**Specialties**

Check all specialties that apply.

☐ Neurology

☐ Neurosurgery

☒ Neuropathology

☐ Neuropsychology

☐ Other Neuro-specialty
(e.g., brain injury medicine, clinical neurophysiology, etc.)

☒ Other Specialty (list all)     **Anatomic Pathology**

-4464-

## PRE-EFFECTIVE DATE DIAGNOSING PHYSICIAN CERTIFICATION FORM
### (for diagnoses made by physicians who are qualified to render Qualifying Diagnoses for purposes of Monetary Award claims before January 7, 2017)

### V. QUALIFYING DIAGNOSIS

Identify the patient's diagnosis and the date of such diagnosis.  See **Appendix A** for the criteria for each diagnosis. Other than for Death with CTE, the identification of a condition, including through a blood test, genetic test, imaging technique, or otherwise, that has not yet resulted in actual cognitive impairment and/or actual neuromuscular impairment in the patient is **not** a Qualifying Diagnosis.

| Qualifying Diagnosis | Date of Diagnosis |
|---|---|
| ☐  Level 1.5 Neurocognitive Impairment | \|\_\_\|\_\_\|/\|\_\_\|\_\_\|/\|\_\_\|\_\_\|\_\_\|\_\_\| (Month/Day/Year) |
| ☐  Level 2 Neurocognitive Impairment* | \|\_\_\|\_\_\|/\|\_\_\|\_\_\|/\|\_\_\|\_\_\|\_\_\|\_\_\| (Month/Day/Year) |
| ☐  Alzheimer's Disease | \|\_\_\|\_\_\|/\|\_\_\|\_\_\|/\|\_\_\|\_\_\|\_\_\|\_\_\| (Month/Day/Year) |
| ☐  Parkinson's Disease | \|\_\_\|\_\_\|/\|\_\_\|\_\_\|/\|\_\_\|\_\_\|\_\_\|\_\_\| (Month/Day/Year) |
| ☐  ALS (amyotrophic lateral sclerosis) | \|\_\_\|\_\_\|/\|\_\_\|\_\_\|/\|\_\_\|\_\_\|\_\_\|\_\_\| (Month/Day/Year) |
| ☒  Death with CTE | \| 1 \| 0 \|/\| 1 \| 5 \|/\| 2 \| 0 \| 0 \| 8 \|* (Month/Day/Year) |

* If you provided a diagnosis of Level 2 Neurocognitive Impairment, did you determine that certain testing was medically unnecessary because of the severity of the patient's dementia (*see **Appendix A***)?

☐  **YES**        ☐  **NO**

If you answered Yes, provide the factual basis for that determination:

*Pursuant to FAQ 93, Posted Settlement Program FAQs (as of November 7, 2018), for this claim, "the date of the Qualifying Diagnosis is the date of the Player's death, even though the diagnosis is not made until after the Player dies".

**PRE-EFFECTIVE DATE DIAGNOSING PHYSICIAN CERTIFICATION FORM**
**(for diagnoses made by physicians who are qualified to render Qualifying Diagnoses**
**for purposes of Monetary Award claims before January 7, 2017)**

## VI. CERTIFICATION

By signing below, I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that all information provided in this form, and all related supporting medical records, are true and correct to the best of my knowledge, information and belief, and that I personally examined the Retired NFL Football Player named in Section I or, in the case of a Qualifying Diagnosis of Death with CTE, I am the board-certified neuropathologist who made the post-mortem diagnosis of CTE.

I acknowledge that any finding of fraudulent conduct may subject me to, without limitation, referral to appropriate regulatory and disciplinary boards and agencies and/or federal authorities, and disqualification from serving in any aspect of the Class Action Settlement.

| Signature of Diagnosing Physician | | Date of Signature | 0 2 / 0 1 / 2 0 1 9 (Month/Day/Year) |
|---|---|---|---|
| **Printed Name** | First Ronald | M.I. L. | Last Hamilton |

## APPENDIX A

Other than for Death with CTE, the identification of a condition, including through a blood test, genetic test, imaging technique, or otherwise, that has not yet resulted in actual cognitive impairment and/or actual neuromuscular impairment experienced by the patient does not qualify as a diagnosis.

LEVEL 1.5 NEUROCOGNITIVE IMPAIRMENT

**The following diagnosis can only be made:**

(1) prior to July 7, 2014, by a board-certified neurologist, board-certified neurosurgeon, other board-certified neuro-specialist physician, or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician, except as provided in (c), below;

(2) from July 7, 2014 through January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified neurologist, board-certified neurosurgeon, or other board-certified neuro-specialist physician, except as provided in (c), below; or

(3) for a patient who died prior to January 7, 2017 (the Effective Date of the Settlement Agreement), where the diagnosis occurred while the patient was living, by a board-certified or otherwise qualified neurologist, neurosurgeon, or other neuro-specialist physician, or by a physician with sufficient qualifications in the field of neurology or neurocognitive disorders to make a diagnosis of Level 1.5 Neurocognitive Impairment:

A diagnosis made outside of the Baseline Assessment Program (BAP) that a living patient suffers from Level 1.5 Neurocognitive Impairment, as set forth below, *i.e.*, early dementia, based on evaluation and evidence generally consistent with the diagnostic criteria set forth and provided below:

There is: (i) Concern of the patient, a knowledgeable informant, or the Qualified BAP Provider that there has been a severe decline in cognitive function; (ii) Evidence of a moderate to severe cognitive decline from a previous level of performance, as determined by and in accordance with the standardized neuropsychological testing protocol annexed in *Appendix B*, in two or more cognitive domains (complex attention, executive function, learning and memory, language, perceptual-spatial), provided one of the cognitive domains is (a) executive function, (b) learning and memory, or (c) complex attention; (iii) The patient exhibits functional impairment generally consistent with the criteria set forth in the National Alzheimer's Coordinating Center's Clinical Dementia Rating scale Category 1.0 (Mild) in the areas of Community Affairs, Home & Hobbies, and Personal Care—where such functional impairment is corroborated by documentary evidence (*e.g.*, medical records, employment records), the sufficiency of which will be determined by the physician making the diagnosis (and where no documentary evidence of functional impairment exists or is available, then (a) there must be evidence of moderate to severe cognitive decline from a previous level of performance, as determined by and in accordance with the standardized neuropsychological testing protocol annexed in *Appendix B*, in the executive function cognitive domain or the learning and memory cognitive domain, and at least one other cognitive domain; and (b) the patient's functional impairment, as described above, must be corroborated by a third-party sworn affidavit from a person familiar with the patient's condition (other than the player or his family members), the sufficiency of which will be determined by the diagnosing physician); and (iv) The cognitive deficits do not occur exclusively in the context of a delirium, acute substance abuse, or as a result of medication side effects.

LEVEL 2 NEUROCOGNITIVE IMPAIRMENT

**The following diagnosis can only be made:**

> **(1) prior to July 7, 2014, by a board-certified neurologist, board-certified neurosurgeon, other board-certified neuro-specialist physician, or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician, except as provided in (c), below;**

> **(2) from July 7, 2014 through January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified neurologist, board-certified neurosurgeon, or other board-certified neuro-specialist physician, except as provided in (c), below; or**

> **(3) for a patient who died prior to January 7, 2017 (the Effective Date of the Settlement Agreement), where the diagnosis occurred while the patient was living, by a board-certified or otherwise qualified neurologist, neurosurgeon, or other neuro-specialist physician, or by a physician with sufficient qualifications in the field of neurology or neurocognitive disorders to make a diagnosis of Level 2 Neurocognitive Impairment:**

A diagnosis made outside of the Baseline Assessment Program (BAP) that a living patient suffers from Level 2 Neurocognitive Impairment, as set forth below, *i.e.*, moderate dementia, based on evaluation and evidence generally consistent with the diagnostic criteria set forth and provided below, unless the diagnosing physician can certify in Section IV of the Diagnosing Physician Certification Form, above, that certain testing specified below for Level 2 Neurocognitive Impairment is medically unnecessary because the patient's dementia is so severe:

There is: (i) Concern of the patient, a knowledgeable informant, or the Qualified BAP Provider that there has been a severe decline in cognitive function; (ii) Evidence of a severe cognitive decline from a previous level of performance, as determined by and in accordance with the standardized neuropsychological testing protocol annexed in *Appendix B*, in two or more cognitive domains (complex attention, executive function, learning and memory, language, perceptual-spatial), provided one of the cognitive domains is (a) executive function, (b) learning and memory, or (c) complex attention; (iii) The patient exhibits functional impairment generally consistent with the criteria set forth in the National Alzheimer's Coordinating Center's Clinical Dementia Rating scale Category 2.0 (Moderate) in the areas of Community Affairs, Home & Hobbies, and Personal Care—where such functional impairment is corroborated by documentary evidence (*e.g.*, medical records, employment records), the sufficiency of which will be determined by the physician making the diagnosis (and where no documentary evidence of functional evidence exists or is available, then (a) there must be evidence of severe cognitive decline from a previous level of performance, as determined by and in accordance with the standardized neuropsychological testing protocol annexed in *Appendix B*, in the executive function cognitive domain or the learning and memory cognitive domain, and at least one other cognitive domain; and (b) the patient's functional impairment, as described above, must be corroborated by a third-party sworn affidavit from a person familiar with the patient's condition (other than the player or his family members), the sufficiency of which will be determined by the diagnosing physician); and (iv) The cognitive deficits do not occur exclusively in the context of a delirium, acute substance abuse, or as a result of medication side effects.

**ALZHEIMER'S DISEASE**

(1) **The following diagnosis can only be made:**

(a) **prior to July 7, 2014, by a board-certified neurologist, board-certified neurosurgeon, other board-certified neuro-specialist physician, or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician; or**

(b) **from July 7, 2014 through January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified neurologist, board-certified neurosurgeon, or other board-certified neuro-specialist physician:**

A diagnosis in a living patient of the specific disease of Alzheimer's Disease as defined by the World Health Organization's International Classification of Diseases, 9th Edition (ICD-9), the World Health Organization's International Classification of Diseases, 10th Edition (ICD-10), or a diagnosis of Major Neurocognitive Disorder due to probable Alzheimer's Disease as defined in the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5).

(2) **The following diagnosis can only be made prior to January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician, or by a physician with sufficient qualifications in the field of neurology to make such a diagnosis, where the diagnosis was made while the patient was living but thereafter died prior to January 7, 2017 (the Effective Date of the Settlement Agreement):**

A diagnosis of Major Neurocognitive Disorder due to probable Alzheimer's Disease consistent with the definition in *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) or a diagnosis of Alzheimer's Disease.

**PARKINSON'S DISEASE**

(1) **The following diagnosis can only be made:**

(a) **prior to July 7, 2014, by a board-certified neurologist, board-certified neurosurgeon, other board-certified neuro-specialist physician, or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician; or**

(b) **from July 7, 2014 through January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified neurologist, board-certified neurosurgeon, or other board-certified neuro-specialist physician:**

A diagnosis in a living patient of the specific disease of Parkinson's Disease as defined by the World Health Organization's International Classification of Diseases, 9th Edition (ICD-9), the World Health Organization's International Classification of Diseases, 10th Edition (ICD-10), or a diagnosis of Major Neurocognitive Disorder probably due to Parkinson's Disease as defined in the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5).

(2) **The following diagnosis can only be made prior to January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician, or by a physician with sufficient qualifications in the field of neurology to make such a diagnosis, where the diagnosis was made while the patient was living but thereafter died prior to January 7, 2017 (the Effective Date of the Settlement Agreement):**

A diagnosis of Parkinson's Disease.

## ALS

**(1) The following diagnosis can only be made:**

(a) **prior to July 7, 2014, by a board-certified neurologist, board-certified neurosurgeon, other board-certified neuro-specialist physician, or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician; or**

(b) **from July 7, 2014 through January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified neurologist, board-certified neurosurgeon, or other board-certified neuro-specialist physician:**

A diagnosis in a living patient of the specific disease of Amyotrophic Lateral Sclerosis, also known as Lou Gehrig's Disease (ALS), as defined by the World Health Organization's International Classification of Diseases, 9th Edition (ICD-9) or the World Health Organization's International Classification of Diseases, 10th Edition (ICD-10).

**(2) The following diagnosis can only be made prior to January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician, or by a physician with sufficient qualifications in the field of neurology to make such a diagnosis, where the diagnosis was made while the patient was living but thereafter died prior to January 7, 2017 (the Effective Date of the Settlement Agreement):**

A diagnosis of the specific disease of Amyotrophic Lateral Sclerosis (ALS).

## CTE

**The following diagnosis can only be made prior to April 22, 2015 by a board-certified neuropathologist, provided that a patient who died between July 7, 2014 and April 22, 2015 has until 270 days from the date of death to obtain such a post-mortem diagnosis:**

A post-mortem diagnosis of Chronic Traumatic Encephalopathy (CTE).

## APPENDIX B

## BASELINE NEUROPSYCHOLOGICAL TEST BATTERY AND SPECIFIC IMPAIRMENT CRITERIA FOR RETIRED NFL FOOTBALL PLAYERS

### Section 1: Test Battery

**Estimating Premorbid Intellectual Ability**

ACS Test of Premorbid Functioning (TOPF)

**Complex Attention/Processing Speed (6 scores)**

WAIS-IV Digit Span

WAIS-IV Arithmetic

WAIS-IV Letter Number Sequencing

WAIS-IV Coding

WAIS-IV Symbol Search

WAIS-IV Cancellation

**Executive Functioning (4 scores)**

Verbal Fluency (FAS)

Trails B

Booklet Category Test

WAIS-IV Similarities

**Effort/Performance Validity (8 scores)**

*ACS Effort Scores*

ACS-WAIS-IV Reliable Digit Span

ACS-WMS-IV Logical Memory Recognition

ACS-WMS-IV Verbal Paired Associates Recognition

ACS-WMS-IV Visual Reproduction Recognition

ACS-Word Choice

*Additional Effort Tests*

Test of Memory Malingering (TOMM)

Medical Symptom Validity Test (MSVT)

**Learning and Memory (6 scores)**

WMS-IV Logical Memory I

WMS-IV Logical Memory II

WMS-IV Verbal Paired Associates I

WMS-IV Verbal Paired Associates II

WMS-IV Visual Reproduction I

WMS-IV Visual Reproduction II

**Language (3 scores)**

Boston Naming Test

Category Fluency (Animal Naming)

BDAE Complex Ideational Material

**Spatial-Perceptual (3 scores)**

WAIS-IV Block Design

WAIS-IV Visual Puzzles

WAIS-IV Matrix Reasoning

**Mental Health**

MMPI-2RF

Mini International Neuropsychiatric Interview

### Section 2: Evaluate Performance Validity

Freestanding, embedded and regression based performance validity metrics will be administered to each Retired NFL Football Player during baseline and, if relevant, subsequent neuropsychological examinations. There will be at least seven performance validity metrics utilized during each assessment. The specific performance validity metrics utilized will not be released to the public in order to maintain the highest standards of assessment validity.  The performance

## APPENDIX B

validity metrics employed will be rotated at intervals determined by the Appeals Advisory Panel in consultation with Co-Lead Class Counsel and Counsel for the NFL Parties.

Each neuropsychological examiner must complete a checklist of validity criteria as set forth in *Slick et al.* 1999, and revised in 2013 (see below) for every Retired NFL Football Player examined in order to determine whether the Retired NFL Football Player's test data is a valid reflection of his optimal level of neurocognitive functioning.

1. Suboptimal scores on performance validity embedded indicators or tests. The cutoffs for each test should be established based on empirical findings.

2. A pattern of neuropsychological test performance that is markedly discrepant from currently accepted models of normal and abnormal central nervous system (CNS) function. The discrepancy must be consistent with an attempt to exaggerate or fabricate neuropsychological dysfunction (e.g., a patient performs in the severely impaired range on verbal attention measures but in the average range on memory testing; a patient misses items on recognition testing that were consistently provided on previous free recall trials, or misses many easy items when significantly harder items from the same test are passed).

3. Discrepancy between test data and observed behavior. Performance on two or more neuropsychological tests within a domain are discrepant with observed level of cognitive function in a way that suggests exaggeration or fabrication of dysfunction (e.g., a well-educated patient who presents with no significant visual-perceptual deficits or language disturbance in conversational speech performs in the severely impaired range on verbal fluency and confrontation naming tests).

4. Discrepancy between test data and reliable collateral reports. Performance on two or more neuropsychological tests within a domain are discrepant with day-to-day level of cognitive function described by at least one reliable collateral informant in a way that suggests exaggeration or fabrication of dysfunction (e.g., a patient handles all family finances but is unable to perform simple math problems in testing).

5. Discrepancy between test data and documented background history. Improbably poor performance on two or more standardized tests of cognitive function within a specific domain (e.g., memory) that is inconsistent with documented neurological or psychiatric history.

6. Self-reported history is discrepant with documented history. Reported history is markedly discrepant with documented medical or psychosocial history and suggests attempts to exaggerate deficits.

7. Self-reported symptoms are discrepant with known patterns of brain functioning. Reported or endorsed symptoms are improbable in number, pattern, or severity; or markedly inconsistent with expectations for the type or severity of documented medical problems.

8. Self-reported symptoms are discrepant with behavioral observations. Reported symptoms are markedly inconsistent with observed behavior (e.g., a patient complains of severe episodic memory deficits yet has little difficulty remembering names, events, or appointments; a patient complains of severe cognitive deficits yet has little difficulty driving independently and arrives on time for an appointment in an unfamiliar area; a patient complains of severely slowed mentation and concentration problems yet easily follows complex conversation).

9. Self-reported symptoms are discrepant with information obtained from collateral informants. Reported symptoms, history, or observed behavior is inconsistent with information obtained from other informants judged to be adequately reliable. The discrepancy must be consistent with an attempt to exaggerate deficits (e.g., a patient reports severe memory impairment and/or behaves as if severely memory-impaired, but his spouse reports that the patient has minimal memory dysfunction at home).

# APPENDIX B

Notwithstanding a practitioner's determination of sufficient effort in accordance with the foregoing factors, a Retired NFL Football Player's failure on two or more effort tests may result in the Retired NFL Football Player's test results being subjected to independent review, or result in a need for supplemental testing of the Retired NFL Football Player.

Note: Additional information relating to the evaluation of effort and performance validity will be provided in a clinician's interpretation guide.

## Section 3: Estimate Premorbid Intellectual Ability

| Test | Ability |
|------|---------|
| Test of Premorbid Functioning (TOPF) | Reading<br>Reading + Demographic Variables |

The Test of Premorbid Functioning (TOPF) provides three models for predicting premorbid functioning: (a) demographics only, (b) TOPF only, and (c) combined demographics and TOPF prediction equations. For each model using demographic data, a simple and complex prediction equation can be selected. In the simple model, only sex, race/ethnicity, and education, are used in predicting premorbid ability. In the complex model, developmental, personal, and more specific demographic data is incorporated into the equations. The clinician should select a model based on the patient's background and his or her current level of reading or language impairment.

Note: It is necessary to estimate premorbid intellectual functioning in order to use the criteria for impairment set out in this document. Estimated premorbid intellectual ability will be assessed and classified as:

➢ Below Average (estimated IQ below 90);

➢ Average (estimated IQ between 90 and 109);

➢ Above Average (estimated IQ above 110).

## Section 4: Neuropsychological Test Score Criteria by Domain of Cognitive Functioning

There are 5 domains of cognitive functioning. In each domain, there are several tests that contribute 3, 4, or 6 demographically-adjusted test scores for consideration. Test selection in the domains was based on the availability of demographically-adjusted normative data for Caucasians and African Americans. These domains and scores are set out below.

The basic principle for defining impairment on testing is that there must be a pattern of performance that is approximately 1.5 standard deviations (for Level 1 Impairment), 1.7-1.8 standard deviations (for Level 1.5 Impairment) or 2 standard deviations (for Level 2 Impairment) below the person's expected level of premorbid functioning. Therefore, it is necessary to have more than one low test score in each domain. A user manual will be provided to neuropsychologists setting out the cutoff scores, criteria for identifying impairment in each cognitive domain, and statistical and normative data to support the impairment criteria.

## APPENDIX B

| Domain/Test | Ability |
|---|---|
| **Complex Attention/Speed of Processing (6 Scores)** | |
| Digit Span | Attention & Working Memory |
| Arithmetic | Mental Arithmetic |
| Letter Number Sequencing | Attention & Working Memory |
| Coding | Visual-Processing & Clerical Speed |
| Symbol Search | Visual-Scanning & Processing Speed |
| Cancellation | Visual-Scanning Speed |
| **Executive Functioning (4 scores)** | |
| Similarities | Verbal Reasoning |
| Verbal Fluency (FAS) | Phonemic Verbal Fluency |
| Trails B | Complex Sequencing |
| Booklet Category Test | Conceptual Reasoning |
| **Learning and Memory (6 scores)** | |
| Logical Memory I | Immediate Memory for Stories |
| Logical Memory II | Delayed Memory for Stories |
| Verbal Paired Associates I | Learning Word Pairs |
| Verbal Paired Associates II | Delayed Memory for Word Pairs |
| Visual Reproduction I | Immediate Memory for Designs |
| Visual Reproduction II | Delayed Memory for Designs |
| **Language** | |
| Boston Naming Test | Confrontation Naming |
| BDAE Complex Ideational Material | Language Comprehension |
| Category Fluency | Category (Semantic) Fluency |
| **Visual-Perceptual** | |
| Block Design | Spatial Skills & Problem Solving |
| Visual Puzzles | Visual Perceptual Reasoning |
| Matrix Reasoning | Visual Perceptual Reasoning |

**Impairment Criteria:** *Below Average* **Estimated Intellectual Functioning (A1 – E1)**

### A1. Complex Attention (6 test scores)

1. Level 1 Impairment: 3 or more scores below a T score of 35

2. Level 1.5 Impairment: 4 or more scores below a T score of 35; or meet for Level 1 and 2 scores below a T score of 30

3. Level 2 Impairment: 3 or more scores below a T score of 30

### B1. Executive Function (4 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 35

2. Level 1.5 Impairment: 3 or more scores below a T score of 35; or meet for Level 1 and 1 score below a T score of 30

## APPENDIX B

3. Level 2 Impairment: 2 or more scores below a T score of 30

**C1. Learning and Memory (6 test scores)**

1. Level 1 Impairment: 3 or more scores below a T score of 35

2. Level 1.5 Impairment: 4 or more scores below a T score of 35; or meet for Level 1 and 2 scores below a T score of 30

3. Level 2 Impairment: 3 or more scores below a T score of 30

**D1. Language (3 test scores)**

1. Level 1 Impairment: 3 or more scores below a T score of 37

2. Level 1.5 Impairment: meet for Level 1 and 2 scores below a T score of 35

3. Level 2 Impairment: 3 or more scores below a T score of 35

**E1. Visual-Perceptual (3 test scores)**

1. Level 1 Impairment: 3 or more scores below a T score of 37

2. Level 1.5 Impairment: meet for Level 1 and 2 scores below a T score of 35

3. Level 2 Impairment: 3 or more scores below a T score of 35

Impairment Criteria: *Average* Estimated Intellectual Functioning (A2 – E2)

**A2. Complex Attention (6 test scores)**

1. Level 1 Impairment: 2 or more scores below a T score of 35

2. Level 1.5 Impairment: 3 or more scores below a T score of 35; or meet for Level 1 and 1 score below a T score of 30

3. Level 2 Impairment: 2 or more scores below a T score of 30

**B2. Executive Function (4 test scores)**

1. Level 1 Impairment: 2 or more scores below a T score of 35

2. Level 1.5 Impairment: 3 or more scores below a T score of 35; or meet for Level 1 and 1 score below a T score of 30

3. Level 2 Impairment: 2 or more scores below a T score of 30

**C2. Learning and Memory (6 test scores)**

1. Level 1 Impairment: 2 or more scores below a T score of 35

2. Level 1.5 Impairment: 3 or more scores below a T score of 35; or meet for Level 1 and 1 score below a T score of 30

3. Level 2 Impairment: 2 or more scores below a T score of 30

**D2. Language (3 test scores)**

1. Level 1 Impairment: 2 or more scores below a T score of 37

2. Level 1.5 Impairment: 3 or more scores below a T score of 37; or meet for Level 1 and 1 score below a T score of 35

3. Level 2 Impairment: 2 or more scores below a T score of 35

**E2. Visual-Perceptual (3 test scores)**

1. Level 1 Impairment: 2 or more scores below a T score of 37

2. Level 1.5 Impairment: 3 or more scores below a T score of 37; or meet for Level 1 and 1 score below a T score of 35

3. Level 2 Impairment: 2 or more scores below a T score of 35

-4475-

## APPENDIX B

### Impairment Criteria: *Below Average* Estimated Intellectual Functioning (A3 – E3)

#### A3. Complex Attention (6 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 35

2. Level 1.5 Impairment: meet for Level 1 and 3 or more scores below a T score of 37

3. Level 2 Impairment: 3 or more scores below a T score of 35

#### B3. Executive Function (4 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 37

2. Level 1.5 Impairment: meet for Level 1 and 3 or more scores below a T score of 37; or meet for Level 1 and 1 score below a T score of 30

3. Level 2 Impairment: 2 or more scores below a T score of 30

#### C3. Learning and Memory (6 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 35

2. Level 1.5 Impairment: meet for Level 1 and 3 or more scores below a T score of 37

3. Level 2 Impairment: 3 or more scores below a T score of 35

#### D3. Language (3 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 40

2. Level 1.5 Impairment: 3 scores below at T score of 40; or meet for Level 1 and 1 score below a T score of 37

3. Level 2 Impairment: 2 or more scores below a T score of 37

#### E3. Visual-Perceptual (3 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 40

2. Level 1.5 Impairment: 3 scores below at T score of 40; or meet for Level 1 and 1 score below a T score of 37

3. Level 2 Impairment: 2 or more scores below a T score of 37

### Section 5: Mental Health Assessment

| Test | Symptoms/Functioning | Assessment |
|---|---|---|
| MMPI-2RF | Mental Health Assessment | Evaluation of Validity Scales and Configurations; T-Scores for Symptom Domains |
| Mini International Neuropsychiatric Interview (M.I.N.I. Version 5.0.0) | Semi-structured Psychiatric Interview | Scale Criteria for Various Psychiatric Diagnoses |

**Ronald L. Hamilton, M.D.**

1/2/2017

## CURRICULUM VITAE

### BIOGRAPHICAL

| | | | |
|---|---|---|---|
| **Name:** | Ronald Lee Hamilton | **Birth Date:** | ██████ |
| **Home Address:** | ████████████ Pittsburgh, PA 15232 | **Birth Place:** | Omaha, Nebraska |
| **Marital status:** | single | | |
| **Home Phone** | 412-310-9874 | **Citizenship:** | USA |

**Business Address:**   Division of Neuropathology
A724.1 Scaife Hall
200 Lothrop Street
Pittsburgh, PA 15213

**Business Phone:**   412-624-6610

**Business Fax:**   412-624-5488
**e-mail address**   hamiltonrl@upmc.edu

### EDUCATION AND TRAINING

| | | | |
|---|---|---|---|
| 1977-1985 | University of Nebraska-Lincoln | B.S. | Psychology |
| 1985-1989 | University of Nebraska Medical Center | M.D. | |
| 1989-1991 | University of California, San Diego Program Director, David Bailey | Resident Anatomic Pathology | |
| 1991-1993 | University of California, San Diego Program Director, Henry C. Powell | Resident Neuropathology | |
| 1993-1994 | University of Pittsburgh Program Director, Clayton A Wiley | Fellow Neuropathology | |
| 1994-1995 | University of Pittsburgh Program Director, Michael Zigmond | Fellow: NIMH Training Grant in Neuroscience | |

### APPOINTMENTS AND POSITIONS:

| | |
|---|---|
| 1995-2002 | University of Pittsburgh School of Medicine -Assistant Professor of Pathology |
| 2002-present | University of Pittsburgh School of Medicine -Associate Professor of Pathology |

### DISTRIBUTION OF % TIME

| | |
|---|---|
| Research | 20% |
| Other scholarly activity | 8% |
| Teaching | 10% |
| Clinical | 35% |
| Combined clinical and teaching | 20% |
| Service activities | 5% |
| Administrative activities. | 2% |
| TOTAL | 100% |

**Ronald L. Hamilton, M.D.**

## CERTIFICATION and LICENSURE

**SPECIALTY CERTIFICATION**

| | | |
|---|---|---|
| American Board of Pathology | Anatomic Pathology | 5/23/96 |
| American Board of Pathology | Neuropathology | 5/23/96 |
| American Board of Pathology – recertification | Neuropathology | 1/1/2014 |

**MEDICAL or OTHER PROFESSIONAL LICENSURE**

| | |
|---|---|
| 1990 | California Medical License (G69731) expired |
| 1993 | Pennsylvania Medical License (MD-049717-L) |
| 2009 | Indiana Medical License (01067332A) |

## MEMBERSHIPS IN PROFESSIONAL AND SCIENTIFIC SOCIETIES

| | |
|---|---|
| 1992 | American Association for the Advancement of Science |
| 1993 | American Association of Neuropathology |
| 1993 | International Society of Neuropathology |
| 1994 | College of American Pathologists (CAP) |
| 1995-97 | CAP Neuropathology Subcommittee |
| 1998 | Children's Cancer Group, Study Committee for CCGB975 |
| 1999 | Society for Neuroscience |

## HONORS

| | |
|---|---|
| Nominated "Teacher of the Year: Anatomic Pathology" | 1997 |
| Nominated "Teacher of the Year: Anatomic Pathology" | 1998 |
| Nominated "Teacher of the Year: Anatomic Pathology" | 1999 |
| Nominated "Teacher of the Year: Anatomic Pathology" | 2000 |
| Nominated "Teacher of the Year: Anatomic Pathology" | 2001 |
| Nominated "Teacher of the Year: Anatomic Pathology" | 2002 |
| UPMC ACES Award winner (ACES is an Award for | 2003 |

Clinical Excellence and Service and is given to about 10 physicians per year at UPMC)

| | |
|---|---|
| Letter of appreciation from Chief Residents | 1997-1998 |
| AP Pathology "TEACHER OF THE YEAR" | 2004-05 |

## PUBLICATIONS

**Refereed Articles**

1. Esch O, Spinosa JC, **Hamilton RL**, Crombie DL, Schteigart CO, Rondinone JF, D'Agostino HB,Lillienau J and Hofmann AF: Acute effects of topical methyl tert-butyl ether or ethyl propionate on gallbladder histology in animals: a comparison of two solvents for contact dissolution of cholesterol gallstones. Hepatology 16 (4):984-991, 1992.

2. Anders KH, Becker PS, Holden JK, Sharer LR, Cornford ME, Hansen LA, **Hamilton R,** Vinters, HV: Multifocal necrotizing leukoencephalopathy with pontine predilection in immunosuppressed patients: a clinicopathologic review of sixteen cases. Human Pathology 24:897-904, 1993.

3. **Hamilton RL**, Achim C, Grafe MR, Fremont JC, Miners D, Wiley CA: Herpes simplex virus brainstem encephalitis in an AIDS patient. Clinical Neuropathology, 14: 45-50, 1995.

**Ronald L. Hamilton, M.D.**

4. Rose J, Haskell WL, Gamble JG, **Hamilton RL**, Brown DA, Rinsky L: Muscle pathophysiology and clinical measures of disability in children with cerebral palsy. Journal of Orthopedic Research, 12(6): 758-768, 1994.

5. **Hamilton RL**, Grafe MR: Complete absence of the cerebellum: a report of two cases. Acta Neuropathologica 88 (3): 258-261, 1994.

6. **Hamilton RL**, Haas RH, Nyhan WL, Powell HC, Grafe MR: The neuropathology of propionic academia: a report of two additional cases. Journal of Child Neurology 10(1): 25-30, 1995.

7. Haas RH, Marsden DL, Capistrano-Estrada S, **Hamilton RL**, Grafe MR, Wong W, Nyhan WL: Acute basal ganglia infarction in propionic acidemia. Journal of Child Neurology 10(1) 18-22, 1995.

8. Kupperman BD, Quiceno JI, Wiley C, Hesselink J**, Hamilton R**, Keefe K, Garcia R, Freeman WR: Clinical and histopathologic study of varicella zoster virus retinitis in patients with the acquired immunodeficiency syndrome. American Journal of Ophthalmology 118:589-600, 1994.

9. Adelson PD, Robichaurd P, **Hamilton RL**, Kochanek PM. A Model of Diffuse Traumatic Brain Injury in the Immature Rat. J Neurosurg 85:877-884, 1996.

10. Alper G, Crumrine PK, **Hamilton RL**, Albright L, Wald ER. An unusual case of inflammatory spinal epidural mass (Castleman's syndrome) Pediatric Neurology 15: 60-2 , 1996

11. Adelson PD, Firlik KS, Firlik AD, **Hamilton RL**. A meningeal cyst of the thoracic spine presenting as prolonged paresis after ankle injury: case report. Neuropediatrics 27:207-210, 1996.

12. Cramer SC, Segal A, **Hamilton RL**, Schmahman J, Ma J. Leukoencephalitis Due to Varicella Zoster Virus: Report of a Case and Review of Clinical Features. Contemporary Neurology, 1, 1996 (electronic journal).

13. Mansfield RT, Schiding JK, **Hamilton R**, Kochanek PM: Effects of hypothermia on traumatic brain injury in immature rats. J Cerebral Blood Flow Metabo 16(2): 244-252, 1996.

14. Pollack IF, Campbell JW, **Hamilton RL**, Martinez AJ, Bozik ME. Proliferation index as a predictor of prognosis in malignant gliomas of childhood. Cancer 79:849-856, 1996

15. Pollack IF, **Hamilton RL,** Finkelstein SD, Campbell JW, Martinez AJ, Sherwin RN, Bozik ME, Gollin SM. The relationship between tp53 mutations and overexpression of p53 and prognosis in malignant gliomas of childhood. Cancer Research 57:304-309, 1997.

16. Ikonomovic MD, Mizukami K, Davies P, **Hamilton R**, Sheffield R, Armstrong DM. The loss of GluR2(3) immunoreactivity preceded neurofibrillary tangle formation in the entorhinal cortex and hippocampus of Alzheimer brains. J Neuropath Exp Neurol 56:1018-1027, 1997.

17. Bredel M, Pollack IF, Campbell JW, **Hamilton RL**: Basic fibroblast growth factor as a predictor of prognosis in pediatric high-grade gliomas. Clinical Cancer Research 3:2157-2164, 1997

18. Blatt J, **Hamilton RL**: Neurodevelopmental anomalies in children with neuroblastoma. Cancer 82: 1603-8, 1998.

19. Fukui MB, Livstone BJ, Meltzer CC, **Hamilton RL**: Hemorrhagic presentation of untreated primary central nervous system lymphoma in the acquired immunodeficiency syndrome. Am J Roentgenol 170:1114-1115, 1998..

20. Bredel M, Pollack IF, **Hamilton RL**, James CD: Epidermal growth factor receptor (EGFR) and gene amplification in high-grade non-brainstem gliomas of childhood. Clin Can Res 5:1786-92, 1999

**Ronald L. Hamilton, M.D.**

21. Gerszten PC, Pollack IF, **Hamilton RL**. Primary parafalcine chondrosarcoma in a child. Acta Neuropathologica 95:111-4, 1998.

22. Pollack IF, **Hamilton RL**, Fitz C, Orenstein DM. An intrasylvian "fibroma" in a child with cystic fibrosis. Pediatric Neurosurgery 46:744-747 2000.

23. Liachenko S, Tang P, **Hamilton RL**, Xu Y: A reproducible model of circulatory arrest and remote resuscitation in rats for NMR investigation. Stroke 29:1229-1238, 1998

24. Meltzer CC, Liu AY, Perrone AM, **Hamilton RL** Meningioangiomatosis MR imaging with histopathologic correlation. AJR 170:804-5, 1998

25. Clark RSB, Kochanek PM, Chen M, Watkins SC, Marion DW, Chen J, **Hamilton RL**, Loeffert JE, Graham SH. Increases in Bcl-2 and cleavage of caspase-1 and caspase-3 in human brain after head injury. FASEB J, 13:813-821, 1999

26. Soontornniyomkij V, Wang G, Pittman CA, **Hamilton RL**, Wiley CA, Achim CL Absence of brain-derived neurotrophic factor and trkB receptor immunoreactivity in glia of Alzheimer's disease. Acta Neuropathologica 98:345-8, 1999.

27. Wang G, Achim CL, **Hamilton RL**, Wiley CA, Soontornniyomkij V  Tyramide signal amplification methods in multiple label immunofluorescence confocal microscopy. Methods 18(4):459-464, 1999

28. Firlik KS, Adelson PD, **Hamilton RL**: Coexistence of a ganglioglioma and Rasmussen's encephalitis: successful treatment in a four-year-old boy. Pediatr Neurosurg 30:278-282, 1999

29. Ikonomovic MD, Mizukami K, Warde D, Sheffield R, **Hamilton R**, Wenthold RJ, Armstrong DM Distribution of glutamate receptor subunit NMDAR1 in the hippocampus of normal elderly and patients with Alzheimer's disease. Exp Neurol 160(1):194-204, 1999.

30. Dallasta, LM, Wang G, Bodnar RJ, Draviam R, Wiley CA, Achim CA, **Hamilton RL**: Differential expression of intercellular adhesion molecules-1 (ICAM-1) and vascular adhesion cell molecule-1 (VCAM-1) in chronic murine retroviral encephalitis. Neuropathol Appl Neurobiol 26:332-341, 2000.

31.  Luabeya MK, Dallasta LM, Achim CL, Pauza CD, **Hamilton RL**: Blood-brain Barrier Disruption in Simian Immunodeficiency Virus Encephalitis. Neuropathol Appl Neurobiol 26:454-462, 2000.

32.  **Hamilton RL**. Lewy Bodies in Alzheimer's Disease: A Neuropathological Review of 145 Cases Using   -synuclein Immunohistochemistry. Brain Pathol 10: 378-384, 2000.

33.  Sweet, RA, **Hamilton RL**, Healy MT, Wisniewski SR, Henteleff R, Pollack BG, Lewis DA, DeKosky ST. Alterations of Striatal Dopamine Receptor Binding in Alzheimer's Disease Are Associated with Lewy Body Pathology and With Antemortem Psychosis. Arch Neurol 58:466-472, 2001.

34.  Styren S, **Hamilton RL**, Styren GC, Klunk WE X-34: a novel and intensely fluorescent stain for Alzheimer's disease pathology. J Histochem Cytochem 48:1223-1232, 2000.

35.  Lopez OL, **Hamilton RL**, Becker JT, Wisniewski S, Kaufer DI, DeKosky ST. Severity of cognitive impairment and the clinical diagnosis of AD with Lewy bodies. Neurology 54:1780-1787, 2000

36.  Lopez OL, Wisniewski S, **Hamilton RL**, Becker JT, Kaufer DI, DeKosky ST. Predictors of progression in patients with AD and Lewy bodies. Neurology 54:1774-1779, 2000.

**Ronald L. Hamilton, M.D.**

37.  Sweet RA, **Hamilton RL**, Lopez OL, Klunk WE, Wisnieski SR, Kaufer DI, Healy MT, Dekosky ST. Psychotic symptoms in Alzheimer's Disease are not associated with more severe neuropathologic features. Internat Psychogeriatr 12: 547-558, 2000.

38.  Lopez OL, Becker JT, Klunk W, Saxton J, **Hamilton RL**, Kaufer DI, Sweet RA, Meltzer CC, Wisniewski S, Kamboh MI, DeKosky ST. Research evaluation and diagnosis of probable Alzheimer's Disease over the last two decades. I. Neurology 55:1854-1862, 2000.

39.  Lopez OL, Becker JT, Klunk W, Saxton J, **Hamilton RL**, Kaufer DI, Sweet RA, Meltzer CC, Wisniewski S, Kamboh MI, DeKosky ST. Research evaluation and diagnosis of possible Alzheimer's Disease over the last two decades. II. Neurology 55:1863-1869, 2000.

40.  Pollack IF, **Hamilton RL**, Fitz C, Kassam A, Snyderman C. Congenital Reactive Myofibroblastic Tumor of the Petrous Bone: Case Report. Neurosurgery 48:430-435, 2001.

41.  Levy EI, Scarrow A, **Hamilton** RC (sic), Wollman MR, Fitz C. Pollack IF. Medical Management Of Eosinophilic Granuloma of the Cervical Spine. Pediatr Neurosurg 31:159-62, 1999.

42.  Pettegrew JW, Panchalingam K, **Hamilton RL**, and McClur RJ Brain Membrane Phospholipid Alterations in Alzheimer's Disease.  Neurochem Res 26:771-782, 2001

43.  Levy EI, Harris AE, Omalu BA, **Hamilton RL**, Branstetter BF, Pollack IF. Sudden Death from Fulminant Acute Cerebellitis.  Pediatr Neurosurg 35:24-28, 2001

44.  Lianchenko S, Tang P, **Hamilton RL**, Xu Y. Regional Dependence of Cerebral Reperfusion After Circulatory Arrest in Rats.  J Cerebr Blood Flow Met 21:1320-1329, 2001 .

45.  Pollack IF, Finkelstein SD, Burnham J, Holmes EJ, **Hamilton RL**, Yates AJ, Finlay J, Sposto R, and CCG. Age and TP53 Mutation Frequency in Childhood Malignant Gliomas: Results of a Multi-institutional Cohort. Cancer Res 61:7404-7407, 2001

46.  Adelson PD, Jenkins LW, **Hamilton RL**, Robichaud P, Tran MP, Kochanek PM. Histopathologic Response of the Immature Rat to Diffuse Traumatic Brain Injury.  J Neurotrauma 18 :967-976, 2001

47.  Pollack IF, Finkelstein SD, Woods J, Burnham J, Holmes EJ, **Hamilton RL**, Yates AJ, Boyett JM, Finlay J, Sposto R, and CCG. TP53 Mutations, Expression of p53 and Prognosis in Children with Malignant Gliomas.  New England Journal of Medicine 346:420-427, 2002

48.  Lopez OL, Becker JT, Kaufer DI, **Hamilton RL**, Sweet RA, Klunk W, DeKosky ST. Research Evaluation and Prospective Diagnosis of Dementia With Lewy Bodies.  Arch Neurol 59:43-46, 2002.

49.  Wang L, Yushmanov VE, Lianchenko SM, Tang P, **Hamilton RL**, Xu Y.  Late Reversal of Cerebral Perfusion and Water Diffusion After Transient Focal Ischemia in Rats.  J Cereb Blood Flow Metab 22:253-261, 2002.

50.  Pollack IF, Biegal JA, Yates AJ, **Hamilton RL**, Finkelstein SD.Risk Assignment in Childhood Brain Tumors: The Emerging Role of Molecular and Biologic Classification. Current Oncology Reports 4:114-122, 2002.

51.  Pollack IF, **Hamilton RL**, Burnham J, Holmes EJ, Finkelstein SD, Sposto R, Yates AJ, Boyett JM, Finley JL. The impact of proliferation index on outcome in childhood malignant gliomas: results in a multi-institutional cohort. Neurosurgery 50:1238-1245, 2002.

**Ronald L. Hamilton, M.D.**

52. Sweet RA, Panchalingam K, Pettefrew JW, McClure RJ, **Hamilton RL**, Lopez OL, Kaufer DI, DeKosky ST, Klunk WE.  Psychosis in Alzheimer disease: postmortem magnetic resonance spectroscopy evidence of excess neuronal and membrane phospholipid pathology. Neurobiol Aging 23:547-53, 2002.

53.  Mazzola CA, Albright AL, Sutton LN, Tuite GF, **Hamilton RL**, Pollack IF.  Dermoid inclusion cysts and early spinal cord tethering after fetal surgery.  New Engl. J Med 347:256-9, 2002.

54.  Bredel M, Pollack IF, **Hamilton RL**, Birner P, Hainfellner JA, Zentner J.  DNA topoisomerase II-alpha predicts progression-free and overall survival in pediatric malignant non-brainstem gliomas.  Int J Cancer 99:817-20, 2002.

55.  Klunk WE, Wang Y, Huang G, Debnath ML, Holt DP, Shao L, **Hamilton RL**, Ikonomovic MD, DeKosky ST, Mathis CA.  The binding of BTA-1 to post-mortem brain homogenates is dominated by the amyloid component. J Neurosci 23:2086-2092, 2003.

56. Castellano-Sanchez, AA, Ohgaki H, Yokoo H, Scheithauer BW, Burger PC, **Hamilton RL**, Finkelstein SD, Brat, DJ.  Cerebral granular cell astrocytomas show a high frequency of allelic loss but lack a defining genotype. Brain Pathology 13: 62-78, 2003.

57.  Gilbertson RJ, Hill DA, Hernan R, Kocak M, Geyer R, Olson J, Gajjar A, Rush L, **Hamilton RL**, Finkelstein SD, Pollack IF.  ERBB1 is amplified and overexpressed in high-grade diffusely infiltrative pediatric brain stem glioma.  Clin Cancer Res 9:3620-3624, 2003.

58. Pollack IF, Finkelstein SD, Burnham J, **Hamilton RL**, Yates AJ, Holmes EJ, Boyett JM, Finlay JL.  The association between chromosome 1p loss and outcome in pediatric malignant gliomas: results from the CCG-945 cohort. Pediatr Neurosurg 39:114-121, 2003.

59.  Carter TL, Rissman RA, Mishizen-Eberz AJ, Wolfe BB, **Hamilton RL**, Gandy S, Armstrong DM.  Differential Preservation of AMPA Receptor Subunits in the Hippocampi of Alzheimer's Disease Patients According to Braak Stage Experimental Neurology 187:299-309, 2004

60.  Finkelstein SD, Mohan D, **Hamilton RL**, Sasatomi E, Swalsky PA, Lieberman FS.  Microdissection-based genotyping assists discrimination of reactive gliosis versus glioma. Am J Clin Pathol 121:671-678, 2004

61.  **Hamilton RL**, Bowser B Alzheimer Disease Pathology in ALS Acta Neuropathologica107:515-522, 2004

62.  Mohan D, Couce ME, Wiley CA, **Hamilton RL**, Sasatomi E, Swalsky PA, Lieberman MD, Finkelstein SD.  Microdissection based genotyping of human gliomas: diagnostic and prognostic considerations Modern Pathology 17:1346-1358, 2004

63. Marshall GA, Kaufer DI, Lopez OL, Rao GR, **Hamilton RL**, DeKosky ST.  Right prosubiculum amyloid plaque density correlates with anosognosia in Alzheimer's Disease.  J Neurol Neurosurg Psychiatry 75:1396-4000, 2004.  **PMCID:  PMC1738763**

64.  Sweet RA, **Hamilton RL**, Butters ME, Mulsant BH, Pollock BG, Lewis DA, DeKosky ST, Reynolds CF.  Neuropathologic Correlates of Dementia in Late Life Major Depression Neuropsychopharmacology 29:2242-2250, 2004

65  Lee JYK, Finkelstein S, **Hamilton RL**, Rekha P, Pirris S, King Jr, JT, Omalu B.  Loss of heterozygosity Analysis of Benign, Atypical and Anaplastic Meningiomas.  Neurosurgery 55:1163-1173, 2004.

**Ronald L. Hamilton, M.D.**

66. Beckner ME, Sasatomi E, Swalsky PA, **Hamilton RL**, Pollack, IF, Finkelstein SD. Loss of heterozygosity reveals non-VHL Allelic loss in hemangioblastomas at 22q13. Human Pathology 35:1105-1111, 2004.

67. Tsuang D, Wilson R, Lopez OL, Luedecking-Zimmer EK, Leverenz JB, DeKosky ST, Kamboh MI, **Hamilton RL**. Genetic Association Between APOE*4 Allele and Lewy Bodies in Alzheimer's Disease Neurology, 64:509-513, 2005. **PMCID: PMC1487185**

68. Bredel C, Lassman S, Pollack IF, Knoth R, **Hamilton RL**, Werner M, Bredel M. DNA Topoisomerase II-alpha and Her-2/Neu Gene Dosages in Pediatric Malignant Gliomas. Int J Cancer 26:1188-92, 2005.

69. Witham TF, Okada H, Fellows W, **Hamilton RL**, Flickinger JC, Chambers WH, Pollack IF, Watkins SC, Kondziolka D. The characterization of tumor apoptosis after experimental radiosurgery. Stereotact Funct Neurosurg 83:17-24 2005.

70. McFadden K, **Hamilton RL**, Insalaco SJ, Lavine L, Al-Mateen M, Guoji Wang G, Wiley CA Neuronal intranuclear inclusion disease in a child without polyglutamine inclusions J Neuropathol Exper Neurol 64:545-552, 2005. **PMCID: PMC1402362**

71. Hatano M, Eguchi J, Tatsumi T, Kuwashima N, Dusak JE, Kinch MS, Pollack IF, **Hamilton RL**, Storkus WJ, Okada H. EphA2 as a glioma-associated antigen: a novel target for glioma-vaccines. Neoplasia 7:717-722, 2005. **PMCID: PMC1501889**

72. Jordan S, Ruoyan C, Koprivica V, **Hamilton RL**, Whitehead R, Tottori K, Kikuchi T. In vitro profile of the antidepressant candidate OPC-14523 at rat and human 5-HT$_{1A}$ receptors.Eur J Pharmacol, 517:165-173, 2005.

73. Omalu BI, Minster RL, Kamboh MI, **Hamilton RL**, Wecht CH, DeKosky ST. Chronic Traumatic Encephalopathy (CTE) in a National Football League (NFL) Player Neurosurgery, 57:128-134, 2005.

74. Judkins AR, Burger PC, **Hamilton RL**, Kleinschmidt-DeMasters B, Perry A, Pomeroy SL, Rosenblum MK, Yachnis AT, Zhou H, Rorke LB, Biegel JA. INI1 Protein Expression Distinguishes Atypical Teratoid/Rhabdopid Tumor from Choroid Plexus Carcinoma. J Neuropathol Exp Neurol 64:391-397, 2005.

75. Desai PP, Ikonomovic I, Abrahamson EE, **Hamilton RL,** Isanski BA, Hope CE, Klunk WE, Dekosky ST, Kamboh MI. Apolipoprotein D is a component of compact but not diffuse amyloid-beta plaques in Alzheimer's Disease temporal cortex. Neurobiol Dis May 22, 2005 (epub)

76. Carson-Walter EB, Hampton J, Geynisman D,Pillai PK, Sathanoori R, Madden SL, **Hamilton RL**, Walter KA. Plasmalemmal Vesicle associated protein-1 (PV-1) is a novel and critical marker of brain tumor angiogenesis. Clin Cancer Res 11:7643-7650, 2005.

77. Lopez OL, Becker JT, Sweet RA, Martin-Sanchez FJ, **Hamilton RL** Lewy bodies in the Amygdala increase risk for major depression in subjects with Alzheimer disease. Neurology 67:660-665, 2006.

78. Pollack IF, **Hamilton RL**, Sobol R, Burnham J, Yates AJ, Holmes EJ, Zhou T, Finlay J (for Children Oncology Group).O6-methylguanine-DNA methyltransferase  strongly Correlates with Outcome in Childhood Malignant Gliomas: Results from the CCG-945 Cohort J Clin Oncol. Jul 20;24(21):3431-7, 2006.

**Ronald L. Hamilton, M.D.**

79. Mandal PK, Pettegrew JW, Masliah E, **Hamilton RL**, Mandal R. Interaction between Aβ Peptide and α Synuclein: Molecular Mechanisms in Overlapping Pathology of Alzheimer's and Parkinson's in Dementia with Lewy Body disease.  Neurochemical Research, 2006 31, 1153-1162, 2006.

80. Omalu B, DeKosky ST, **Hamilton RL**, Minster RL, Kamboh MI, Shakir AM, Wecht Chronic Traumatic Encephalopathy in a National Football League Player: part II.  Neurosurgery 59:1086-92, 2006

81. Ramsey CP, Glass CA, Koike MA, Montgomery MB, Ritson GP, Chia L, **Hamilton RL**, Chu CT, Jordan-Sciutto KL. Expression of Nrf2 in neurodegenerative diseases. J Neuropathol Exp Neurol 66:75-85, 2007.  **PMCID: PMC2253896**

82.  Boada FE, Tanase C, Davis D, Walter K, Torres-Trejo A, Couce M, **Hamilton R**, Kondziolka D, Bartinski W, Lieberman F.  Non-invasive assessment of tumor proliferation using triple quantum filtered 23/Na MRI: technical challenges and solutions.  Conf Proc IEEE Eng Med Biol Sci Soc. 2004; 7:5238-41

83. Pollack IF, **Hamilton RL**, James CD, Finkelstein SD, Burnham J, Yates AJ, Holmes EJ, Zhou T, Finlay J (for Children Oncology Group). Rarity of *PTEN* Deletions and *EGFR* Amplification in Malignant Gliomas of Childhood: Results from the Children's Cancer Group-945 Cohort J Neurosurg 105(5 Suppl):418-424, 2006.

84. Guzman A, Wood WL, Alpert E, Prasad MD, Miller RG, Rothstein JD, Bowser R, **Hamilton R**, Wood TD, Cleveland DW, Lingappa VR, Liu J.  Common molecular signature in SOD1 for both sporadic and familial amyotrophic lateral sclerosis.  Proc Nat Acad Sci 104:12524-12529, 2007. **PMCID: PMC2408940**

85. Beckner ME, Jane EP, Jankowitz B, Agostino NR, Walter KA, **Hamilton RL**, Pollack IF.  Tumor cells from ultrasonic aspirations of glioblastomas migrate and from spheres with radial outgrowth. Cancer Letters 255:135-44, 2007. PMID  17543444,  **PMCID: PMC2000342**

86. McIntyre JA, Chapman J, Shavit E, **Hamilton RL**, and DeKosky ST. Redox-Reactive Autoantibodies in Alzheimer's Patients' Cerebrospinal Fluids: Preliminary Studies.  Autoimmunity, 40:390-396, 2007. PMID 17612901

87. Nakashima-Yasuda, Uryu, K, Robinson J, Xie S, Hurtig H, Duda J, Arnold S, Siderowf A, Grossman M, Leverenz J, Woltjer R, Lopez OL, **Hamilton R**, Tsuang DW, Galaska D, Masliah M, Kaye J, Clark C, Montine TJ, Lee VMY, Trojanowski J. Co-morbidity of TDP-43 Proteinopathy in Lewy Body Related Diseases. Acta Neuropathol 114:221-9, 2007.  PMID 17653732

88. McIntyre JA, **Hamilton RL**, DeKosky ST. Redox-reactive autoantibodies in cerebrospinal fluids.  Ann NY Acad Sci 1109:296-302, 2007. PMID 17785318

89. Okada H, Lieberman FS, Walter KA, Lunsford LD, Kondziolka DS, Bejjani GK, **Hamilton RL**, Torres-Trejo A, Kalinski P, Cai Q, Mabold JL, Edington HD, Butterfield LH, Whiteside TL, Potter DM, Schold SC Jr., Pollack IF  Autologous glioma cell vaccine admixed with interleukin-4 gene transfected fibroblasts in the treatment of patients with malignant gliomas.  J Transl Med 5:67, 2007.  PMID 18093335. **PMCID:  PMC2254376**

90. Beach TG, White CL, **Hamilton, RL**, Duda JE, Iwatsubo T, Dickson DW, Leverenz JB, Roncaroli F, Buttini M, Hladik CL, Sue LI, Noorigian JV, Adler CH.  Evaluation of alpha-synuclein immunohistochemical methods used by invited experts.  Acta Neuropathol 116:277-88, 2008. PMID 18626651.  **PMCID:  PMC2708176**

91. Ikonomovic MD, Klunk WE, Abrahamson EE, Mathis CA, Price JC, Tsopelas ND, Lopresti BJ, Ziolko S, Bi W, Paljug WR, Debnath ML, Hope CE, Isanski BA, **Hamilton RL**, DeKosky ST. Post-

**Ronald L. Hamilton, M.D.**

mortem correlates of in vivo PiB-PET amyloid imaging in a typical case of Alzheimers disease. Brain  131(Pt 6):1630-45, 2008.  PMID  18339640.  **PMCID:  PMC2408940**

92.  Leverenz JB, **Hamilton R**, Tsuang DW, Schantz A, Vavrek D, Larson EB, Kukall WA, Lopez O, Galasko D, Masliah E, Woltjer R, Clark C, Trojanowski JQ, Montine TJ. Empiric refinement of the pathologic assessment of Lewy-related pathology in the dementia patient.  Brain Pathol 18:220-224, 2008. PMID 18241249.  **PMCID:  PMC2689097  NIHMS29359**

93.  Raja AI, Yeaney GA, Jakacki RI, **Hamilton RL**, Pollack IF  Extraventricular neurocytoma in neurofibromatosis Type I: Case report.  J Neurosurg Pediatrics 2:63-67, 2008.PMID 18590398

94.  Okada H, Low KL, Kohanbash G, McDonald HA, **Hamilton RL**, Pollack IF.  Expression of glioma-associated antigens in pediatric brain stem and non-brain stem gliomas.  J Neurooncol 88:245-50, 2008. PMID 18324354.  **PMCID:  PMC2561297 NIHMS70086**

95.  Venneti S, Lopresti BJ, Wang G, **Hamilton RL**, Mathis CA, Klunk WE, Apte UM, Wiley CA. PK11195 labels activated microglia in Alzheimer's disease and in vivo in a mouse model using PET. Neurobiol Aging 2009, 30:1217-26. PMID 18178291

96.  Mullett SJ, **Hamilton RL**, Hinkle DA.  DJ-1 immunoreactivity in human brain astrocytes is dependent on infarct presence and infarct age. Neurology 2009, 29:125-31. PMID 18647263

97.  Park DM, Yeaney GA, **Hamilton RL**, Mabold J, Urban N, Appleman L, Flickinger J, Lieberman F, Mintz A.  Identifying Muir-Torre syndrome in a patient with glioblastoma multiforme.  Neuro Oncol, 2009 11:452-5. PMID 19028998.  )

98.  Horbinski C, Bartynski WS, Carson-Walter E, **Hamilton RL**, Tan HP, Cheng S.  Reversible encephalopathy after cardiac transplantation:  Histologic evidence of endothelial activation, T-cell specific trafficking, and vascular endothelial growth factor expression.  Am J Neuroradiol 2008 30:588-90. PMID 18854444.

99.  Northcott P, Nakahara Y, Peacock J, Ellison D, Croul S, Feuk L, Ra YS, Kongham P, Zilerberg K, Mack S, McLeod J, Scherer S, Rao S, Grajkowska W, Gillespie Y, Lach B, Grundy R, Pollack IF, **Hamilton RL,** Van Meter T, Carlotti C, Boop R, Bigner D, Gilbertson R, Rutka J, Taylor MD. Multiple recurrent genetic events converge on control of histone lysine methylation in medulloblastoma.  Nat Genet 2009 41:465-72. PMID 19270706.

100. Ueda R, Kohanbash G, Sasaki K, Fujita M, Zhu X, Kastenhuber ER, McDonald HA, Potter DM, **Hamilton RL,** Lotze MT, Khan SA, Sobol RW, Okada H.  Dicer-regulated microRNAs 222 and 339 promote resistance of cancer cells to cytotoxic T-lymphocytes by down-regulation of ICAM-1. Proc Natl Acad Sci U S A. 2009 Jun 30;106(26):10746-51.  PMID: 19520829

101.  Maki RA, Tyurin VA, Lyon RC, **Hamilton RL**, DeKosky ST, Kagan VE, Reynolds WF.  Aberrant expression of myeloperoxidase in astrocytes promotes phospholipid oxidation and memory deficits in a mouse model of Alzheimer disease. J Biol Chem. 2009 Jan 30;284(5):3158-69. PMID: 19059911.

102.  Horbinski C, **Hamilton RL**, Lovell C, Burnham J, Pollack IF.  Impact of morphology, MIB-1, p53, and MGMT on Outcome in Pilocytic Astrocytomas.  Brain Pathology 2010; 20:581-8  e-pub Sept 21, 2009

103.  Armstrong RA, Ellis W, **Hamilton RL**, MacKenzie IR, Hedreen J, Gearing M, Montine T, Vonsattel JP, Head E, Lieberman AP, Cairns NJ.  Neuropathological heterogeneity in frontotemporal lobar degeneration with TDP-43 proteinopathy: a quantitative study of 94 cases using principle components analysis.  J Neural Transm 2010, 117:227-239.

**Ronald L. Hamilton, M.D.**

104. Horbinski C, **Hamilton RL**, Nikiforov Y, Pollack IF.  Association of molecular alterations, including BRAF, with biology and outcome in pilocytic astrocytomas.  Acta Neuropathol 2010 Jan 1, e-pub.

105. Van Deerlin VM, Sleiman PM, Martinez-Lage M, Chen-Plotkin A, Wang LS, Graff-Radford NR, Dickson DW, Rademakers R, Boeve BF, Grossman M, Arnold SE, Mann DM, Pickering-Brown SM, Seelaar H, Heutink P, van Swieten JC, Murrell JR, Ghetti B, Spina S, Grafman J, Hodges J, Spillantini MG, Gilman S, Lieberman AP, Kaye JA, Woltjer RL, Bigio EH, Mesulam M, Al-Sarraj S, Troakes C, Rosenberg RN, White CL 3rd, Ferrer I, Lladó A, Neumann M, Kretzschmar HA, Hulette CM, Welsh-Bohmer KA, Miller BL, Alzualde A, de Munain AL, McKee AC, Gearing M, Levey AI, Lah JJ, Hardy J, Rohrer JD, Lashley T, Mackenzie IR, Feldman HH, **Hamilton RL**, Dekosky ST, van der Zee J, Kumar-Singh S, Van Broeckhoven C, Mayeux R, Vonsattel JP, Troncoso JC, Kril JJ, Kwok JB, Halliday GM, Bird TD, Ince PG, Shaw PJ, Cairns NJ, Morris JC, McLean CA, DeCarli C, Ellis WG, Freeman SH, Frosch MP, Growdon JH, Perl DP, Sano M, Bennett DA, Schneider JA, Beach TG, Reiman EM, Woodruff BK, Cummings J, Vinters HV, Miller CA, Chui HC, Alafuzoff I, Hartikainen P, Seilhean D, Galasko D, Masliah E, Cotman CW, Tuñón MT, Martínez MC, Munoz DG, Carroll SL, Marson D, Riederer PF, Bogdanovic N, Schellenberg GD, Hakonarson H, Trojanowski JQ, Lee VM.  Common variants at 7p21 are associated with frontotemporal lobar degeneration with TDP-43 inclusions. Nat Genet 2010 42:234-239.

106. Omalu BI, **Hamilton RL**, Kamboh MI, DeKosky ST, Bailes J.  Chronic traumatic encephalopathy in a National Football League Player: Case report and emerging medicolegal practice questions.  J Forensic Nurs, 2010, 6: 40-46.

107. Caltagarone J, **Hamilton RL**, Murdoch G, Jing Z, DeFranco DB, Bowser R. Paxillin and hydrogen peroxide-induced clone 5 expression and distribution in control and Alzheimer disease hippocampi. J Neuropathol Exp Neurol. 2010: 69:356-71.

108. Pollack IF, **Hamilton RL**, Sobol RW, Nikiforova MN, Lyons-Weiler MA, Laframboise WA, Burger PC, Brat DJ, Rosenblum MK, Holmes EJ, Zhou T, Jakacki RI; for the Children's Oncology Group. IDH1 mutations are common in malignant gliomas arising in adolescents: a report from the Children's Oncology Group. Childs Nerv Syst. 2010; 27:87-94

109. Jun G, Naj AC, Beecham GW, Wang LS, Buros J, Gallins PJ, Buxbaum JD, Ertekin-Taner N, Fallin MD, Friedland R, Inzelberg R, Kramer P, Rogaeva E, St George-Hyslop P, Arnold SE, Baldwin CT, Barber R, Beach T, Bigio EH, Bird TD, Boxer A, Burke JR, Cairns N, Carroll SL, Chui HC, Clark DG, Cotman CW, Cummings JL, Decarli C, Diaz-Arrastia R, Dick M, Dickson DW, Ellis WG, Fallon KB, Farlow MR, Ferris S, Frosch MP, Galasko DR, Gearing M, Geschwind DH, Ghetti B, Gilman S, Giordani B, Glass J, Graff-Radford NR, Green RC, Growdon JH, **Hamilton RL**, Harrell LE, Head E, Honig LS, Hulette CM, Hyman BT, Jicha GA, Jin LW, Johnson N, Karlawish J, Karydas A, Kaye JA, Kim R, Koo EH, Kowall NW, Lah JJ, Levey AI, Lieberman A, Lopez OL, Mack WJ, Markesbery W, Marson DC, Martiniuk F, Masliah E, McKee AC, Mesulam M, Miller JW, Miller BL, Miller CA, Parisi JE, Perl DP, Peskind E, Petersen RC, Poon W, Quinn JF, Raskind M, Reisberg B, Ringman JM, Roberson ED, Rosenberg RN, Sano M, Schneider JA, Schneider LS, Seeley W, Shelanski ML, Smith CD, Spina S, Stern RA, Tanzi RE, Trojanowski JQ, Troncoso JC, Van Deerlin VM, Vinters HV, Vonsattel JP, Weintraub S, Welsh-Bohmer KA, Woltjer RL, Younkin SG, Cantwell LB, Dombroski BA, Saykin AJ, Reiman EM, Bennett DA, Morris JC, Lunetta KL, Martin ER, Montine TJ, Goate AM, Blacker D, Tsuang DW, Beekly D, Cupples LA, Hakonarson H, Kukull W, Foroud TM, Haines J, Mayeux R, Farrer LA, Pericak-Vance MA, Schellenberg GD; Alzheimer's Disease Genetics Consortium, Arnold SE, Baldwin CT, Barber R, Beach T, Bigio EH, Bird TD, Boxer A, Burke JR, Cairns N, Carroll SL, Chui HC, Clark DG, Cotman CW, Cummings JL, Decarli C, Diaz-Arrastia R, Dick M, Dickson DW, Ellis WG, Fallon KB, Farlow MR, Ferris S, Frosch MP, Galasko DR, Gearing M, Geschwind DH, Ghetti B, Gilman S, Giordani B, Glass J, Graff-Radford NR, Green RC, Growdon JH, Hamilton RL, Harrell LE, Head E, Honig LS, Hulette CM, Hyman BT, Jicha GA, Jin LW, Johnson N, Karlawish J, Karydas A, Kaye JA, Kim R, Koo EH, Kowall NW, Lah JJ, Levey AI, Lieberman A, Lopez OL, Mack WJ, Markesbery W, Marson DC, Martiniuk F, Masliah E, McKee AC, Mesulam M, Miller JW, Miller BL, Miller CA, Parisi JE, Perl DP, Peskind E, Petersen RC, Poon W, Quinn JF, Raskind M, Reisberg B, Ringman JM, Roberson ED, Rosenberg RN, Sano M, Schneider JA, Schneider LS, Seeley W, Shelanski ML, Smith CD, Spina S, Stern RA, Tanzi RE, Trojanowski JQ, Troncoso JC, Van Deerlin VM, Vinters HV, Vonsattel JP, Weintraub S, Welsh-Bohmer KA, Woltjer RL, Younkin SG.  Meta-analysis confirms CR1, CLU and PICALM as Alzheimer Disease Risk Loci and reveals interactions with APOE Genotypes. Arch Neurol, 2010, Sep 3 (epub ahead of print)

110. Pollack IF, **Hamilton RL**, Burger PC, Brat DJ, Rosenblum MK, Murdoch GH, Nikiforova MN, Holmes EJ, Zhou T, Cohen KJ, Jakacki RI; Children's Oncology Group. Akt activation is a common event in pediatric malignant gliomas and a potential adverse prognostic marker: a report from the Children's Oncology Group. J Neurooncol. 2010 Sep;99(2):155-63. Epub 2010 Jul 4

**Ronald L. Hamilton, M.D.**

111. Pollack IF, **Hamilton RL**, Sobol RW, Nikiforova MN, Nikiforov YE, Lyons-Weiler MA, Laframboise WA, Burger PC, Brat DJ, Rosenblum MK, Gilles FH, Yates AJ, Zhou T, Cohen KJ, Finlay JL, Jakacki RI; for the Children's Oncology Group. Mismatch repair deficiency is an uncommon mechanism of alkylator resistance in pediatric malignant gliomas: a report from the Children's Oncology Group. Pediatr Blood Cancer 2010 Jun 29 epub ahead of print

112. Bonneh-Barkay D, Wang G, Starkey A, **Hamilton RL**, Wiley CA. In vivo CHI3L1 (YKL-40) expression in astrocytes in acute and chronic neurological diseases. J Neuroinflammation 2010 Jun 11:7-34.

113. Hinkle DA, Mullett SJ, Gabris BE, **Hamilton RL**. DJ-1 expression in glioblastomas shows positive correlation with p53 expression and negative correlation with epidermal growth factor receptor amplification. Neuropathology 2010 May 19 (epub ahead of print)xx

114. Okada H, Kalinski P, Ueda R, Hoji A, Kohanbash G, Donegan TE, Mintz AH, Engh JA, Bartlett DL, Brown CK, Zeh H, Holtman MP, Reinhart TA, Whiteside TL,Butterfield LH, **Hamilton RL**, Potter DM, Pollack IF, Salazar AM, Lieberman FS. Induction of CD8+ T-cell responses against novel glioma-associated antigen peptides and clinical activity by vaccinations with {alpha}-type 1 polarized dendritic cells and polyinosinic-polycytidylic acid stabilized by lysine and carboxymethylcellulose In patients with recurrent malignant glioma. J Clin Oncol. 2011;29:330-6.PMID: 21149657

115. Kofler J, Bartynski WS, Reynolds TQ, Lieberman FS, Murdoch GH, **Hamilton RL**. Posterior reversible encephalopathy syndrome (PRES) with immune system activation, VEGF up-regulation, and cerebral amyloid angiopathy. J. Comput Assist Tomogr. 2011; 35:39-42. PMID: 21150450

116. Bonfield CM, Amin D, **Hamilton RL**, Gerszten PC. Extramedullary ependymoma near the conus medullaris with lumbar nerve root attachment: case report. Neurosurgery. 2011 Mar;68:E831-4. PMID:21311277

117. Fujita M, Kohanbash G, Fellows-Mayle W, **Hamilton RL**, Komohara Y, Decker SA, Ohlfest JR, Okada H.COX-2 blockade suppresses gliomagenesis by inhibiting myeloid-derived suppressor cells. Cancer Res. 2011 Apr 1;71:2664-74. Epub 2011 Feb 15. PMID: 21324923

118. Cohen KJ, Pollack IF, Zhou T, Buxton A, Holmes EF, Burger PC, Brat DJ, Rosenblum MK, **Hamilton RL**, Lavey RS, Heideman RL. Temozolomide in the treatment of high-grade gliomas in children: a report from the Children's Oncology Group. Neuro Oncol. 2011 Mar;13:317-23. PMID: 21339192

119. Omalu B, Bailes J, **Hamilton RL**, Kamboh MI, Hammers J, Case M, Fitzsimmons R. Emerging histomorphologic phenotypes of chronic traumatic encephalopathy in American athletes. Neurosurgery. 2011 Jul;69:173-83; discussion 183. PMID: 21358359

120. Tang JB, Svilar D, Trivedi RN, Wang XH, Goellner EM, Moore B, **Hamilton RL**, Banze LA, Brown AR, Sobol RW. N-methylpurine DNA glycosylase and DNA polymerase beta modulate BER inhibitor potentiation of glioma cell to temozolomide. Neurosurgery Oncol. 2011;13:471-86. PMID: 21377995

121. Liu KW, Feng H, Bachoo R, Kazlauskas A, Smith EM, Symes K, **Hamilton RL**, Nagane M, Nishikawa R, Hu, B, Cheng Sy. SHP-2/PTPN 11 mediates gliomagenesis driven by PDGFRA and INK4A/ARF aberrations in mice and humans. J. Clin Invest. 2011 Mar;121:905-17. PMID: 21393858

122. Naj AC, Jun G, Beecham GW, Wang LS, Vardarajan BN, Buros J, Gallins PJ, Buxbaum JD, Jarvidk GP, Crane PK, Larson EB, Bird TB, Boeve BF, Graff-Radford NR, De Jager PL, Evans D, Schneider JA, Carrasquillo MM, Ertekin-Taner N, Younkin SG, Cruchaga C, Kauwe JS, Nowotny P, Kramer P, Hardy J, Huentelman MJ, Myers AJ, Barmada MM, Demirci FY, Baldwin CT, Green RC, Rogaeva E, St. George-Hyslop P, Arnold SE, Barber R, Beach T, Bigio EH, Bowen JD, Boxer A, Burke JR, Cairns NJ, Carlson CS, Carney RM, Carroll SL, Chui HC, Clark DG, Corneveaux J, Cotman CW, Cummings JL, Decarli C, DeKosy ST, Diaz-Arrastia R, Dick M, Dickson DW, Ellis WG, Faber KM, Fallon KB, Farlow MR, Ferris S. Frosch MP, Galasko Dr, Ganguli M, Gearing M, Geschwind DH, Ghetti B, Gilbert JR, Gilman S, Giordani B, Glass JD, Growdon JH, **Hamilton RL**,R, Koo EH, Kowall NW, Lah JJ, Levey AI, Lieberman AP, Lopez OL, Mack WJ, Marson DC, Martiniuk F, Mash DC, Masliah E, McCormick WC, McCurry SM, McDavid AN, McKee AC, Mesulam M, Miller BL, Miller JW, Parisi JE, Perl DP, Peskind E,Petersen, RC, Poon, WV, Quinn JF, Rajbhandary RA, Raskind M, Reisberg B, Ringman JM, Roberson ED, Rosenberg RN,Sano M, Schneider LS, Seeley W, Shelanksi ML, Slifer MA, Smith CD, Sonnen JA, Spina S. Stern RA, Tanzi RE, Trojanowski JQ, Troncoso JC, Van Deerlin VM, Vinters HV, Vonsattel JP, Weintraub S, Welsh-Bohmer KA, Williamson

**Ronald L. Hamilton, M.D.**

J, Woltjer RL,Cantwell LB, Dombroski BA, Beekly D, Lunetta KL, Martin ER, Kamboh MI, Saykin AJ, Reiman EM, Bennett DA, Morris JC, Montine TJ, Goate AM, Iacker D, Tsuang DW, Hakonarson, H, Kukull WA, Foroud TM, Haines JL, Mayeux R, Pericak-Vance MA, Farrer LA, Schellenberg GD. Commons variants as MS4A4/MS4A6E, CD2AP, CD33 and EPHA1 are associated with late Onset Alzheimer's Disease. Nat Genet. 2011 May;43:436-41 Epub 2011 Apr 3. PMID: 21460841

123.    Chen-Plotkin AS, Martinez-Lage M,Sleiman PM, Hu W, Greene R, Wood  EM, Bing S, Grossman M, Schellenberg GD, Hatanpaa KJ, Weiner MF, White CL 3rd, Brooks WS, Halliday GM, Kril JJ, Gearing M, Beach TG, Graff-Radford NR, Dickson DW, Rademakers R, Boeve BF, Pickering-Brown SM, Snowden J, van Swieten JC, Heutink P, Seelaar H, Murrell JR, Ghetti B, Spina S, Grafman J, Kaye JA, Woltjer RL, Mesulam M, Bigio E, Llad'o A, Miller BL, Alzualde A, Moreno F,Rohrer JD, Mackenzie IR, Feldman HH, **Hamilton RL**, Cruts M, Engelborghs S, De Deyn PP, Van Broeckhoven C, Bird TD, Cairns NJ, Goate A, Frosch MP, Riederer PF, Bogdanovic N, Lee VM, Trojanowksi JQ, Van Deerlin VM. Genetic and clinical features of progranulin-associated frontotemporal lobar degeneration. Arch Neurol. 2011 Apr;68:488-97. PMID: 21482928

124.    Nikiforova MN, **Hamilton RL**. Molecular diagnostics of gliomas. Arch Pathol Lab Med. 2011 May;135:558-68. Review. PMID: 21526954

125.    Monaco EA 3rd, Armah HB, Nikiforova MN, **Hamilton RL**, Engh JA. Grade II Oligodendroglioma localized to the corpus callosum. Brain Tumor Pathol. 2011 Oct;28:305-9. Epub 2011 Jul 22. PMID: 21833577

126.    Horbinski C, Hobbs, J, Cieply K, Dacic S, **Hamilton RL**. EGFR expression stratifies oligodendroglioma behavior.Am J Pathol. 2011 Oct; 179:1638-44. Epub 2011 Aug 11. PMID: 21839716

127.    Omalu B, hammers, JL, bailes J, **Hamilton RL**. Kamboh MI, Webster G, Fitzsimmons RP. Chronic traumatic Encephalopathy  in an Iraqi war veteran with posttraumatic stress disorder who committed suicide. Neurosurg Focus. 2011 Nov; :E3. PMID: 22044102

128.    Liu Y, Komohara Y, Domenick N, Ohno M, Ikeura M, **Hamilton RL**, Horbinski C, Wang X, Ferrone S, Okada H. Expression of antigen processing molecules in brain metastasis of breast cancer. Cancer Immunol Immunother. 2011 Nov 8. (Epub ahead of print } PMID:22065046

129.    Feng H, Hu B, Liu KW, Li Y, Lu X, Cheng T, Yiin JJ, Lu S, Keezer S, Fenton T, Furnari FB, **Hamilton RL**, Vuori K, Sarkaria JN, Nagane M, Nishikawa R, Cavenee WK, Cheng SY. Activation of Rac 1 by src-dependent phosphorylation of Dock180(Y1811) mediates PDGFRa-stimulated glioma tumorigenesis in mice and humans. J Clin Invest. 2011 Dec; 121:4670-84. doi: 10.1172/JCI58559. Epub 2011 Nov 14. PMID: 22080864

130.    Horbinski C, Nikiforova MN, Hobbs J, Bortoluzzi S. Cieply K, Dacic S, **Hamilton RL**. The importance of 10q status in an outcomes-based comparison between 1p/19q fluorescence in situ hybridization and polymerase chain reaction-based microsatellite loss of heterozygosity analysis of oligodendrogliomas.  J. Neuropathol Exp Neurol. 2012 Jan;71:73-82. PMID: 22157622

131.    Ikonomovic MD, Abrahamson EE, Price JC, **Hamilton RL**, Mathis CA, Paljug WR, Cohen AD, Mizukami K, DeKosky ST, Lopez OL, Klunk WE. Early AD pathology in a {C-11} PiB-negative case: a PiB-amyloid imaging, biochemical, and  Immunohistochemical study. Acta Neuropathol. 2012 Mar;123:433-47. Epub 2012 Jan 24. PMID: 22271153

132.    Feng H, Hu B, Jarzynka MJ, Li Y, Keezer S, Johns TG, Tang CK, **Hamilton RL**, Vuuori K, Nishikawa R, Sarkaria JN, Fenton T, Cheng T, Furnari FB, Cavenee WK, Cheng SY. Phosphorylation of dedicator of cytokinesis 1(Dock 180) at tyrosine residue Y722 by Src family kinases mediates EGRFvIII-driven glioblastoma tumorigenesis. Proc Natl Acad Sci U S A. 2012 Feb 21;109:3018-23. Epub 2012 Feb 7. PMID: 22323579

133.    Wu Y, Lou H, Alerte TN, Stachowski EK, Chen J, Singleton AB, **Hamilton RL**, Perez RG. Neuroscience. 2012 Jan 25. {Epubahead a print} PMID: 22326202

134.    Murray PS, Kirkwood CM, Gray MC, Ikonomovic MD, Paljug WR, Abrahamson EE, Henteleff RA, **Hamilton RL**, Kofler JK, Klunk WE, Lopez OL, Penzes P, Sweet RA. β-Amyloid 42/40 ratio and kalirin expression in Alzheimer disease with psychosis. Neurobiol Aging. 2012 Mar 17. [Epub ahead of print] PMID:22429885

**Ronald L. Hamilton, M.D.**

135.    Choi SH, Olabarrieta M, Lopez OL, Maruca V, DeKosky ST, **Hamilton RL**, Becker JT. Gray Matter Atrophy Associated with Extrapyramidal Signs in the Lewy Body Variant of Alzheimer's Disease. J Alzheimers Dis. 2012 Aug 9. [Epub ahead of print] PMID:22886020

136.    Armstrong RA, **Hamilton RL**, Mackenzie IR, Hedreen J, Cairns NJ. Laminar Distribution of the Pathological Changes in Sporadic Frontotemporal Lobar Degeneration with TDP-43 Proteinopathy: A Quantitative Study Using Polynomial Curve Fitting. Neuropathol Appl Neurobiol. 2012 Jul 16. [Epub ahead of print] PMID:22804696

137.    Atkinson DM, **Hamilton RL** A 52-year-old male with visual changes. Brain Pathol. 2012 Jul;22(4):575-8. PMID:22697384

138.    Zou F, Chai HS, Younkin CS, Allen M, Crook J, Pankratz VS, Carrasquillo MM, Rowley CN, Nair AA, Middha S, Maharjan S, Nguyen T, Ma L, Malphrus KG, Palusak R, Lincoln S, Bisceglio G, Georgescu C, Kouri N, Kolbert CP, Jen J, Haines JL, Mayeux R, Pericak-Vance MA, Farrer LA, Schellenberg GD; Alzheimer's Disease Genetics Consortium, Petersen RC, Graff-Radford NR, Dickson DW, **Hamilton RL**, Younkin SG, Ertekin-Taner N. Brain expression genome-wide association study (eGWAS) identifies human disease-associated variants. PLoS Genet. 2012;8(6): e1002707. Epub 2012 Jun 7 PMID:22685416

139.    Horbinski C, Nikiforova MN, Hagenkord JM, **Hamilton RL**, Pollack IF. Interplay among BRAF, p16, p53, and MIB1 in pediatric low-grade gliomas. Neuro Oncol. 2012 Jun;14(6):777-89 (1012) PMID:22492957

140.    Hobbs J, Nikiforova MN, Fardo DW, Bortoluzzi S, Cieply K, **Hamilton RL**, Horbinski C. Paradoxical relationship between the degree of EGFR amplification and outcome in glioblastomas. Am J Surg Pathol. 2012 Aug;36(8):1186-93. PMID:22472960

141. Armstrong, R. A., **R. L. Hamilton**, I. R. Mackenzie, J. Hedreen and N. J. Cairns. "Laminar Distribution of the Pathological Changes in Sporadic Frontotemporal Lobar Degeneration with Transactive Response (Tar) DNA-Binding Protein of 43 Kda (Tdp-43) Proteinopathy: A Quantitative Study Using Polynomial Curve Fitting." *Neuropathol Appl Neurobiol* 39, no. 4 (2013): 335-47.

142. Clark, K. H., J. L. Villano, M. N. Nikiforova, **R. L. Hamilton** and C. Horbinski. "1p/19q Testing Has No Significance in the Workup of Glioblastomas." *Neuropathol Appl Neurobiol*,  (2013).

143. Gheorghe, G., O. Radu, S. Milanovich, **R. L. Hamilton**, R. Jaffe, J. F. Southern and J. A. Ozolek. "Pathology of Central Nervous System Posttransplant Lymphoproliferative Disorders: Lessons from Pediatric Autopsies." *Pediatr Dev Pathol* 16, no. 2 (2013): 67-73.

1444. Holton, P., M. Ryten, M. Nalls, D. Trabzuni, M. E. Weale, D. Hernandez, H. Crehan, J. R. Gibbs, R. Mayeux, J. L. Haines, L. A. Farrer, G. D. Schellenberg, M. Ramirez-Restrepo, A. Engel, A. J. Myers, J. J. Corneveaux, M. J. Huentelman, A. Dillman, M. R. Cookson, E. M. Reiman, A. Singleton, J. Hardy and R. Guerreiro. "Initial Assessment of the Pathogenic Mechanisms of the Recently Identified Alzheimer Risk Loci." *Ann Hum Genet* 77, no. 2 (2013): 85-105.

145. Miyashita, A., A. Koike, G. Jun, L. S. Wang, S. Takahashi, E. Matsubara, T. Kawarabayashi, M. Shoji, N. Tomita, H. Arai, T. Asada, Y. Harigaya, M. Ikeda, M. Amari, H. Hanyu, S. Higuchi, T. Ikeuchi, M. Nishizawa, M. Suga, Y. Kawase, H. Akatsu, K. Kosaka, T. Yamamoto, M. Imagawa, T. Hamaguchi, M. Yamada, T. Moriaha, M. Takeda, T. Takao, K. Nakata, Y. Fujisawa, K. Sasaki, K. Watanabe, K. Nakashima, K. Urakami, T. Ooya, M. Takahashi, T. Yuzuriha, K. Serikawa, S. Yoshimoto, R. Nakagawa, J. W. Kim, C. S. Ki, H. H. Won, D. L. Na, S. W. Seo, I. Mook-Jung, P. St George-Hyslop, R. Mayeux, J. L. Haines, M. A. Pericak-Vance, M. Yoshida, N. Nishida, K. Tokunaga, K. Yamamoto, S. Tsuji, I. Kanazawa, Y. Ihara, G. D. Schellenberg, L. A Farrer and R. Kuwano. "Sorl1 Is Genetically Associated with Late-Onset Alzheimer's Disease in Japanese, Koreans and Caucasians." *PLoS One* 8, no. 4 (2013): e58618.

146. Pang, B., M. B. Durso, **R. L. Hamilton** and M. N. Nikiforova. "A Novel Cold-Pcr/Fmca Assay Enhances the Detection of Low-Abundance Idh1 Mutations in Gliomas." *Diagn Mol Pathol* 22, no. 1 (2013): 28-34.

147. Reitz, C., G. Jun, A. Naj, R. Rajbhandary, B. N. Vardarajan, L. S. Wang, O. Valladares, C. F. Lin, E. B. Larson, N. R. Graff-Radford, D. Evans, P. L. De Jager, P. K. Crane, J. D. Buxbaum, J. R. Murrell, T. Raj, N. Ertekin-Taner, M. Logue, C. T. Baldwin, R. C. Green, L. L. Barnes, L. B. Cantwell, M. D. Fallin, R. C. Go, P. Griffith, T. O. Obisesan, J. J. Manly, K. L. Lunetta, M. I. Kamboh, O. L. Lopez, D. A. Bennett, H. Hendrie, K. S. Hall, A. M. Goate, G. S. Byrd, W. A. Kukull, T. M. Foroud, J. L. Haines, L. A. Farrer, M. A. Pericak-Vance, G. D. Schellenberg and R. Mayeux. "Variants

**Ronald L. Hamilton, M.D.**

in the Atp-Binding Cassette Transporter (Abca7), Apolipoprotein E 4,and the Risk of Late-Onset Alzheimer Disease in African Americans." *JAMA* 309, no. 14 (2013): 1483-92.

148. Schlegel, J., M. J. Sambade, S. Sather, S. J. Moschos, A. C. Tan, A. Winges, D. DeRyckere, C. C. Carson, D. G. Trembath, J. J. Tentler, S. G. Eckhardt, P. F. Kuan, **R. L. Hamilton**, L. M. Duncan, C. R. Miller, N. 9. Nikolaishvili-Feinberg, B. R. Midkiff, J. Liu, W. Zhang, C. Yang, X. Wang, S. V. Frye, H. S. Earp, J. M. Shields and D. K. Graham. "Mertk Receptor Tyrosine Kinase Is a Therapeutic Target in Melanoma." *J Clin Invest* 123, no. 5 (2013): 2257-67.

150. Spina, S., A. D. Van Laar, J. R. Murrell, **R. L. Hamilton**, J. K. Kofler, F. Epperson, M. R. Farlow, O. L. Lopez, J. Quinlan, S. T. DeKosky and B. Ghetti. "Phenotypic Variability in Three Families with Valosin-Containing Protein Mutation." *Eur J Neurol* 20, no. 2 (2013): 251-8.

151. Tsuang, D., J. B. Leverenz, O. L. Lopez, **R. L. Hamilton**, D. A. Bennett, J. A. Schneider, A. S. Buchman, E. B. Larson, P. K. Crane, J. A. Kaye, P. Kramer, R. Woltjer, J. Q. Trojanowski, D. Weintraub, A. S. Chen-Plotkin, D. J. Irwin, J. Rick, G. D. Schellenberg, G. S. Watson, W. Kukull, P. T. Nelson, G. A. Jicha, J. H. Neltner, D. Galasko, E. Masliah, J. F. Quinn, K. A. Chung, D. Yearout, I. F. Mata, J. Y. Wan, K. L. Edwards, T. J. Montine and C. P. Zabetian. "Apoe Epsilon4 Increases Risk for Dementia in Pure Synucleinopathies." *JAMA Neurol* 70, no. 2 (2013): 223-8.

152. Yeung, J. T., **R. L. Hamilton**, K. Ohnishi, M. Ikeura, D. M. Potter, M. N. Nikiforova, S. Ferrone, R. I. Jakacki, I. F. Pollack and H. Okada. "Loh in the Hla Class I Region at 6p21 Is Associated with Shorter Survival in Newly Diagnosed Adult Glioblastoma." *Clin Cancer Res* 19, no. 7 (2013): 1816-26.

153. Yeung, J. T., **R. L. Hamilton**, H. Okada, R. I. Jakacki and I. F. Pollack. "Increased Expression of Tumor-Associated Antigens in Pediatric and Adult Ependymomas: Implication for Vaccine Therapy." *J Neurooncol* 111, no. 2 (2013): 103-11.

154. **Hamilton R**, Krauze M, Romkes M, Omolo B, Konstantinopoulos P, Reinhart T, Harasymczuk M, Wang Y, Lin Y, Ferrone S, Whiteside T, Bortoluzzi S, Werley J, Nukui T, Fallert-Junecko B, Kondziolka D, Ibrahim J, Becker D, Kirkwood J, Moschos S. Pathologic and gene expression features of metastatic melanomas to the brain.Cancer. 2013 Aug 1;119(15):2737-46. doi: 10.1002/cncr.28029. Epub 2013 May 21.PMID:23695963 [PubMed - in process]

155. Lam S, Grandhi R, Wong R, **Hamilton R**, Greene S. Neuromuscular hamartoma of the sciatic nerve: Case report and review of the literature. Surg Neurol Int. 2013;4:8. doi: 10.4103/2152-7806.106266. Epub 2013 Jan 18.PMID:23493803[PubMed]

156. Reitz C, Mayeux R; Alzheimer's Disease Genetics Consortium. TREM2 and neurodegenerative disease. N Engl J Med. 2013 Oct 17;369(16):1564-5. doi: 10.1056/NEJMc1306509#SA1. PMID:24131184

157. Tempel ZJ, Johnson SA, Richard PS, Friedlander RM, Rothfus WE, **Hamilton RL**. Parasellar arachnoid cyst presenting with a nonpupil sparing third nerve palsy mimicking a posterior communicating artery aneurysm in an adult. Surg Neurol Int. 2013 Jul 9;4:87. doi: 10.4103/2152-7806.114799. eCollection 2013.PMID:23956930

158. Murray PS, Kirkwood CM, Gray MC, Fish KN, Ikonomovic MD, **Hamilton RL**, Kofler JK, Klunk WE, Lopez OL, Sweet RA. Hyperphosphorylated tau is elevated in Alzheimer's Disease with psychosis. J Alzheimers Dis, 2014 204;39:759-773. PMID:24270207

159. Oborski MJ, Laymon CM, Lieberman FS, Drappatz J, **Hamilton RL**, Mountz JM. First use of (18)F-labeled ML-10 PET to assess apoptosis change in a newly diagnosed glioblastoma multiforme patient before and early after therapy. Brain Behav 2014 4:312-315.  PMID:24683522

160 Shin SS, Murdoch G, Hamilton RL, Faraji AH, Kano H, Zwagerman NT, Gardner PA, Lunsford LD, Friedlander RM The Pathological Response of Cavernous Malformations Following Radiosurgery.  J Neurosurg (in press).

160. Pollack IF, Jakacki RI, Butterfield LH, **Hamilton RL**, Panigrahy A, Potter DM, Connelly AK, Dibridge SA, Whiteside TL, Okada H. Antigen-specific immune responses and clinical outcome after vaccination with glioma-associated antigen peptides and polyinosinic-polycytidylic Acid stabilized by lysine and carboxymethylcellulose in children with newly diagnosed malignant brainstem and nonbrainstem gliomas. J Clin Oncol. 2014 Jul 1;32(19):2050-8. PMID:24888813

161. Naj AC, Jun G, Reitz C, Kunkle BW, Perry W, Park YS, Beecham GW, Rajbhandary RA, Hamilton-Nelson KL, Wang LS, Kauwe JS, Huentelman MJ, Myers AJ, Bird TD, Boeve BF, Baldwin CT, Jarvik GP, Crane PK, Rogaeva E, Barmada MM, Demirci FY, Cruchaga C, Kramer PL, Ertekin-Taner N, Hardy J, Graff-Radford NR, Green RC, Larson

**Ronald L. Hamilton, M.D.**

EB, St George-Hyslop PH, Buxbaum JD, Evans DA, Schneider JA, Lunetta KL, Kamboh MI, Saykin AJ, Reiman EM, De Jager PL, Bennett DA, Morris JC, Montine TJ, Goate AM, Blacker D, Tsuang DW, Hakonarson H, Kukull WA, Foroud TM, Martin ER, Haines JL, Mayeux RP, Farrer LA, Schellenberg GD, Pericak-Vance MA; Alzheimer Disease Genetics Consortium, Albert MS, Albin RL, Apostolova LG, Arnold SE, Barber R, Barnes LL, Beach TG, Becker JT, Beekly D, Bigio EH, Bowen JD, Boxer A, Burke JR, Cairns NJ, Cantwell LB, Cao C, Carlson CS, Carney RM, Carrasquillo MM, Carroll SL, Chui HC, Clark DG, Corneveaux J, Cribbs DH, Crocco EA, DeCarli C, DeKosky ST, Dick M, Dickson DW, Duara R, Faber KM, Fallon KB, Farlow MR, Ferris S, Frosch MP, Galasko DR, Ganguli M, Gearing M, Geschwind DH, Ghetti B, Gilbert JR, Glass JD, Growdon JH, **Hamilton RL**, Harrell LE, Head E, Honig LS, Hulette CM, Hyman BT, Jicha GA, Jin LW, Karydas A, Kaye JA, Kim R, Koo EH, Kowall NW, Kramer JH, LaFerla FM, Lah JJ, Leverenz JB, Levey AI, Li G, Lieberman AP, Lin CF, Lopez OL, Lyketsos CG, Mack WJ, Martiniuk F, Mash DC, Masliah E, McCormick WC, McCurry SM, McDavid AN, McKee AC, Mesulam M, Miller BL, Miller CA, Miller JW, Murrell JR, Olichney JM, Pankratz VS, Parisi JE, Paulson HL, Peskind E, Petersen RC, Pierce A, Poon WW, Potter H, Quinn JF, Raj A, Raskind M, Reisberg B, Ringman JM, Roberson ED, Rosen HJ, Rosenberg RN, Sano M, Schneider LS, Seeley WW, Smith AG, Sonnen JA, Spina S, Stern RA, Tanzi RE, Thornton-Wells TA, Trojanowski JQ, Troncoso JC, Valladares O, Van Deerlin VM, Van Eldik LJ, Vardarajan BN, Vinters HV, Vonsattel JP, Weintraub S, Welsh-Bohmer KA, Williamson J, Wishnek S, Woltjer RL, Wright CB, Younkin SG, Yu CE, Yu L. . Effects of multiple genetic Loci on age at onset in late-onset Alzheimer disease: a genome-wide association study. JAMA Neurol. 2014 Nov 1;71(11):1394-404. doi: 10.1001/jamaneurol.2014.1491

162. Pollack IF, Jakacki RI, Butterfield LH, **Hamilton RL**, Panigrahy A, Potter DM, Connelly AK, Dibridge SA, Whiteside TL, Okada H. Antigen-specific immune responses and clinical outcome after vaccination with glioma-associated antigen peptides and polyinosinic-polycytidylic acid stabilized by lysine and carboxymethylcellulose in children with newly diagnosed malignant brainstem and nonbrainstem gliomas. J Clin Oncol. 2014 Jul 1;32(19):2050-8. doi: 10.1200/JCO.2013.54.0526. Epub 2014 Jun 2. PMID: 24888813

163.. Okada H, Butterfield LH, **Hamilton RL**, Hoji A, Sakaki M, Ahn BJ, Kohanbash G, Drappatz J, Engh J, Amankulor N, Lively MO, Chan MD, Salazar AM, Shaw EG, Potter DM, Lieberman FS. Induction of robust type-1 CD8+ T-cell responses in WHO grade II low-grade glioma patients receiving peptide-based vaccines in combination with poly-ICLC Clin Cancer Res. 2014 Nov 25. pii: clincanres.1790.2014

164. Salloway S, Sperling R, Fox NC, Blennow K, Klunk W, Raskind M, Sabbagh M, Honig LS, Porsteinsson AP, Ferris S, Reichert M, Ketter N, Nejadnik B, Guenzler V, Miloslavsky M, Wang D, Lu Y, Lull J, Tudor IC, Liu E, Grundman M, Yuen E, Black R, Brashear HR; **Hamilton RL**, Bapineuzumab 301 and 302 Clinical Trial Investigators. Two phase 3 trials of bapineuzumab in mild-to-moderate Alzheimer's disease N Engl J Med. 2014 Jan 23;370(4):322-33. doi: 10.1056/NEJMoa1304839.

165. Leone JP, Bhargava R, Theisen BK, **Hamilton RL**, Lee AV, Brufsky AM. Expression of high affinity folate receptor in breast cancer brain metastasis. Oncotarget. 2015 Jun 25. [Epub ahead of print] PMID: 24450891

166. Wang LS, Naj AC, Graham RR, Crane PK, Kunkle BW, Cruchaga C, Murcia JD, Cannon-Albright L, Baldwin CT, Zetterberg H, Blennow K, Kukull WA, Faber KM, Schupf N, Norton MC, Tschanz JT, Munger RG, Corcoran CD, Rogaeva E; Alzheimer's Disease Genetics Consortium, Lin CF, Dombroski BA, Cantwell LB, Partch A, Valladares O, Hakonarson H, St George-Hyslop P, Green RC, Goate AM, Foroud TM, Carney RM, Larson EB, Behrens TW, Kauwe JS, Haines JL, Farrer LA, Pericak-Vance MA, Mayeux R, Schellenberg GD; National Institute on Aging-Late-Onset Alzheimer's Disease (NIA-LOAD) Family Study, Albert MS, Albin RL, Apostolova LG, Arnold SE, Barber R, Barmada M, Barnes LL, Beach TG, Becker JT, Beecham GW, Beekly D, Bennett DA, Bigio EH, Bird TD, Blacker D, Boeve BF, Bowen JD, Boxer A, Burke JR, Buxbaum JD, Cairns NJ, Cao C, Carlson CS, Carroll SL, Chui HC, Clark DG, Cribbs DH, Crocco EA, DeCarli C, DeKosky ST, Demirci FY, Dick M, Dickson DW, Duara R, Ertekin-Taner N, Fallon KB, Farlow MR, Ferris S, Frosch MP, Galasko DR, Ganguli M, Gearing M, Geschwind DH, Ghetti B, Gilbert JR, Glass JD, Graff-Radford NR, Growdon JH, **Hamilton RL**, Hamilton-Nelson KL, Harrell LE, Head E, Honig LS, Hulette CM, Hyman BT, Jarvik GP, Jicha GA, Jin LW, Jun G, Jun G, Kamboh MI, Karydas A, Kaye JA, Kim R, Koo EH, Kowall NW, Kramer JH, LaFerla FM, Lah JJ, Leverenz JB, Levey AI, Li G, Lieberman AP, Lopez OL, Lunetta KL, Lyketsos CG, Mack WJ, Marson DC, Martin ER, Martiniuk F, Mash DC, Masliah E, McCormick WC, McCurry SM, McDavid AN, McKee AC, Mesulam WM, Miller BL, Miller CA, Miller JW, Montine TJ, Morris JC, Murrell JR, Olichney JM, Parisi JE, Perry W, Peskind E, Petersen RC, Pierce A, Poon WW, Potter H, Quinn JF, Raj A, Raskind M, Reiman EM, Reisberg B, Reitz C, Ringman JM, Roberson ED, Rosen HJ, Rosenberg RN, Sano M, Saykin AJ, Schneider JA, Schneider LS, Seeley WW, Smith AG, Sonnen JA, Spina S, Stern RA, Tanzi RE, Thornton-Wells TA, Trojanowski JQ, Troncoso JC, Tsuang DW, Van Deerlin VM, Van Eldik LJ, Vardarajan BN, Vinters HV, Vonsattel JP, Weintraub S, Welsh-Bohmer KA, Williamson J, Wishnek S, Woltjer RL, Wright CB, Younkin SG, Yu CE, Yu L.**Rarity of the Alzheimer disease-protective APP A673T variant in the United States.** JAMA Neurol. 2015 Feb;72(2):209-16. doi: 10.1001/jamaneurol.2014.2157.

**Ronald L. Hamilton, M.D.**

167. 2. Jun G, Ibrahim-Verbaas CA, Vronskaya M, Lambert JC, Chung J, Naj AC, Kunkle BW, Wang LS, Bis JC, Bellenguez C, Harold D, Lunetta KL, Destefano AL, Grenier-Boley B, Sims M, Beecham GW, Smith AV, Chouraki V, Hamilton-Nelson KL, Ikram MA, Fievet N, Denning N, Martin ER, Schmidt H, Kamatani Y, Dunstan ML, Valladares O, Laza AR, Zelenika D, Ramirez A, Foroud TM, Choi SH, Boland A, Becker T, Kukull WA, van der Lee SJ, Pasquier F, Cruchaga C, Beekly D, Fitzpatrick AL, Hanon O, Gill M, Barber R, Gudnason V, Campion D, Love S, Bennett DA, Amin N, Berr C, Tsolaki M, Buxbaum JD, Lopez OL, Deramecourt V, Fox NC, Cantwell LB, Tárraga L, Dufouil C, Hardy J, Crane PK, Eiriksdottir G, Hannequin D, Clarke R, Evans D, Mosley TH Jr, Letenneur L, Brayne C, Maier W, De Jager P, Emilsson V, Dartigues JF, Hampel H, Kamboh MI, de Bruijn RF, Tzourio C, Pastor P, Larson EB, Rotter JI, O'Donovan MC, Montine TJ, Nalls MA, Mead S, Reiman EM, Jonsson PV, Holmes C, St George-Hyslop PH, Boada M, Passmore P, Wendland JR, Schmidt R, Morgan K, Winslow AR, Powell JF, Carasquillo M, Younkin SG, Jakobsdóttir J, Kauwe JS, Wilhelmsen KC, Rujescu D, Nöthen MM, Hofman A, Jones L; IGAP Consortium, Haines JL, Psaty BM, Van Broeckhoven C, Holmans P, Launer LJ, Mayeux R, Lathrop M, Goate AM, Escott-Price V, Seshadri S, Pericak-Vance MA, Amouyel P, Williams J, van Duijn CM, Schellenberg GD, Farrer LA and . Collaborators (including **Hamilton RL**) (296)  **A novel Alzheimer disease locus located near the gene encoding tau protein**. Mol Psychiatry. 2015 Mar 17. doi: 10.1038/mp.2015.23.

168. . Østergaard SD, Mukherjee S, Sharp SJ, Proitsi P, Lotta LA, Day F, Perry JR, Boehme KL, Walter S, Kauwe JS, Gibbons LE; Alzheimer's Disease Genetics Consortium; GERAD1 Consortium; EPIC-InterAct Consortium, Larson EB, Powell JF, Langenberg C, Crane PK, Wareham NJ, Scott RA.
Collaborators (including **Hamilton RL**) (296)  Associations between Potentially Modifiable Risk Factors and Alzheimer Disease: A Mendelian Randomization Study. PLoS Med. 2015 Jun 16;12(6):e1001841; discussion e1001841. doi:

169. Wang P, Bahreini A, Gyanchandani R, Lucas PC, Hartmaier RJ, Watters RJ, Jonnalagadda AR, Trejo Bittar HE, Berg A, **Hamilton RL**, Kurland BF, Weiss KR, Mathew A, Leone JP, Davidson NE, Nikiforova MN, Brufsky AM, Ambros TF, Stern AM, Puhalla SL, Lee AV, Oesterreich S. Sensitive detection of mono- and polyclonal ESR1 mutations in primary tumors, metastatic lesions and cell free DNA of breast cancer patients. Clin Cancer Res. 2015 Oct 23. pii: 1534.2015. PMID: 26500237

170. Salgado CM, Basu D, Nikiforova M, **Hamilton RL**, Gehris R, Jakacki R, Panigrahy A, Yatsenko S, Reyes-Múgica M. Amplification of mutated NRAS leading to congenital melanoma in neurocutaneous melanocytosis. Melanoma Res. 2015 Oct;25(5):453-60.  PMID: 26266759

171. Shin SS, Murdoch G, Hamilton RL, Faraji AH, Kano H, Zwagerman NT, Gardner PA, Lunsford LD, Friedlander RM. Pathological response of cavernous malformations following radiosurgery. J Neurosurg. 2015 Oct;123(4):938-44. doi: 10.3171/2014.10.JNS14499. Epub 2015 Jun 19. PMID: 26090838

--------------------

172. Mukherjee S, Walter S, Kauwe JS, Saykin AJ, Bennett DA, Larson EB, Crane PK, Glymour MM; Adult Changes in Thought Study Investigators; Religious Orders Study/Memory and Aging Project Investigators; Alzheimer's Disease Genetics Consortium. Alzheimers Dement. Genetically predicted body mass index and Alzheimer's disease-related phenotypes in three large samples: Mendelian randomization analyses. 2015 Dec;11(12):1439-51. doi: 10.1016/j.jalz.2015.05.015. Epub 2015 Jun 12. PMID: 26079416

173. Ghani M, Reitz C, Cheng R, Vardarajan BN, Jun G, Sato C, Naj A, Rajbhandary R, Wang LS, Valladares O, Lin CF, Larson EB, Graff-Radford NR, Evans D, De Jager PL, Crane PK, Buxbaum JD, Murrell JR, Raj T, Ertekin-Taner N, Logue M, Baldwin CT, Green RC, Barnes LL, Cantwell LB, Fallin MD, Go RC, Griffith PA, Obisesan TO, Manly JJ, Lunetta KL, Kamboh MI, Lopez OL, Bennett DA, Hendrie H, Hall KS, Goate AM, Byrd GS, Kukull WA, Foroud TM, Haines JL, Farrer LA, Pericak-Vance MA, Lee JH, Schellenberg GD, St George-Hyslop P, Mayeux R, Rogaeva E; Alzheimer's Disease Genetics Consortium. Association of Long Runs of Homozygosity With Alzheimer Disease Among African American Individuals. JAMA Neurol. 2015 Nov;72(11):1313-23. doi: 10.1001/jamaneurol.2015.1700. PMID: 26366463

174. Nikiforova MN, Wald AI, Melan MA, Roy S, Zhong S, Hamilton RL, Lieberman FS, Drappatz J, Amankulor NM, Pollack IF, Nikiforov YE, Horbinski C.
Targeted next-generation sequencing panel (GlioSeq) provides comprehensive genetic profiling of central nervous system tumors. Neuro Oncol. 2016 Mar;18(3):379-87. doi: 10.1093/neuonc/nov289. Epub 2015 Dec 17. PMID: 2668176

175. Morrissy AS, Garzia L, Shih DJ, Zuyderduyn S, Huang X, Skowron P, Remke M, Cavalli FM, Ramaswamy V, Lindsay PE, Jelveh S, Donovan LK, Wang X, Luu B, Zayne K, Li Y, Mayoh C, Thiessen N, Mercier E, Mungall KL, Ma

**Ronald L. Hamilton, M.D.**

Y, Tse K, Zeng T, Shumansky K, Roth AJ, Shah S, Farooq H, Kijima N, Holgado BL, Lee JJ, Matan-Lithwick S, Liu J, Mack SC, Manno A, Michealraj KA, Nor C, Peacock J, Qin L, Reimand J, Rolider A, Thompson YY, Wu X, Pugh T, Ally A, Bilenky M, Butterfield YS, Carlsen R, Cheng Y, Chuah E, Corbett RD, Dhalla N, He A, Lee D, Li HI, Long W, Mayo M, Plettner P, Qian JQ, Schein JE, Tam A, Wong T, Birol I, Zhao Y, Faria CC, Pimentel J, Nunes S, Shalaby T, Grotzer M, Pollack IF, Hamilton RL, Li XN, Bendel AE, Fults DW, Walter AW, Kumabe T, Tominaga T, Collins VP, Cho YJ, Hoffman C, Lyden D, Wisoff JH, Garvin JH Jr, Stearns DS, Massimi L, Schüller U, Sterba J, Zitterbart K, Puget S, Ayrault O, Dunn SE, Tirapelli DP, Carlotti CG, Wheeler H, Hallahan AR, Ingram W, MacDonald TJ, Olson JJ, Van Meir EG, Lee JY, Wang KC, Kim SK, Cho BK, Pietsch T, Fleischhack G, Tippelt S, Ra YS, Bailey S, Lindsey JC, Clifford SC, Eberhart CG, Cooper MK, Packer RJ, Massimino M, Garre ML, Bartels U, Tabori U, Hawkins CE, Dirks P, Bouffet E, Rutka JT, Wechsler-Reya RJ, Weiss WA, Collier LS, Dupuy AJ, Korshunov A, Jones DT, Kool M, Northcott PA, Pfister SM, Largaespada DA, Mungall AJ, Moore RA, Jabado N, Bader GD, Jones SJ, Malkin D, Marra MA, Taylor MD. Divergent clonal selection dominates medulloblastoma at recurrence. Nature. 2016 Jan 21;529(7586):351-7. doi: 10.1038/nature16478. Epub 2016 Jan 13

176. Gandhoke GS, Yilmaz S, Grunwaldt L, Hamilton RL, Salvetti DJ, Greene S. A case of spinal epidural venous malformation with mediastinal extension: management with combined surgery and percutaneous sclerotherapy. J Neurosurg Pediatr. 2016 May;17(5):612-7. doi: 10.3171/2015.9.PEDS15341. Epub 2016 Jan 15.

177. Thompson EM, Hielscher T, Bouffet E, Remke M, Luu B, Gururangan S, McLendon RE, Bigner DD, Lipp ES, Perreault S, Cho YJ, Grant G, Kim SK, Lee JY, Rao AA, Giannini C, Li KK, Ng HK, Yao Y, Kumabe T, Tominaga T, Grajkowska WA, Perek-Polnik M, Low DC, Seow WT, Chang KT, Mora J, Pollack IF, Hamilton RL, Leary S, Moore AS, Ingram WJ, Hallahan AR, Jouvet A, Fèvre-Montange M, Vasiljevic A, Faure-Conter C, Shofuda T, Kagawa N, Hashimoto N, Jabado N, Weil AG, Gayden T, Wataya T, Shalaby T, Grotzer M, Zitterbart K, Sterba J, Kren L, Hortobágyi T, Klekner A, László B, Pócza T, Hauser P, Schüller U, Jung S, Jang WY, French PJ, Kros JM, van Veelen MC, Massimi L, Leonard JR, Rubin JB, Vibhakar R, Chambless LB, Cooper MK, Thompson RC, Faria CC, Carvalho A, Nunes S, Pimentel J, Fan X, Muraszko KM, López-Aguilar E, Lyden D, Garzia L, Shih DJ, Kijima N, Schneider C, Adamski J, Northcott PA, Kool M, Jones DT, Chan JA, Nikolic A, Garre ML, Van Meir EG, Osuka S, Olson JJ, Jahangiri A, Castro BA, Gupta N, Weiss WA, Moxon-Emre I, Mabbott DJ, Lassaletta A, Hawkins CE, Tabori U, Drake J, Kulkarni A, Dirks P, Rutka JT, Korshunov A, Pfister SM, Packer RJ, Ramaswamy V, Taylor MD. Prognostic value of medulloblastoma extent of resection after accounting for molecular subgroup: a retrospective integrated clinical and molecular analysis. Lancet Oncol. 2016 Mar 11. pii: S1470-2045(15)00581-1. doi: 10.1016/S1470-2045(15)00581-1. [Epub ahead of print]

178. Pollack IF, Jakacki RI, Butterfield LH, Hamilton RL, Panigrahy A, Normolle DP, Connelly AK, Dibridge S, Mason G, Whiteside TL, Okada H. Immune responses and outcome after vaccination with glioma-associated antigen peptides and poly-ICLC in a pilot study for pediatric recurrent low-grade gliomas†. Neuro Oncol. 2016 Mar 15. pii: now026. [Epub ahead of print]

179. Jakacki RI, Cohen KJ, Buxton A, Krailo MD, Burger PC, Rosenblum MK, Brat DJ, Hamilton RL, Eckel SP, Zhou T, Lavey RS, Pollack IF. Phase 2 study of concurrent radiotherapy and temozolomide followed by temozolomide and lomustine in the treatment of children with high-grade glioma: a report of the Children's Oncology Group ACNS0423 study. Neuro Oncol. 2016 Mar 22. pii: now038. [Epub ahead of print]

180. Ridge PG, Hoyt KB, Boehme K, Mukherjee S, Crane PK, Haines JL, Mayeux R, Farrer LA, Pericak-Vance MA, Schellenberg GD, Kauwe JS; Alzheimer's Disease Genetics Consortium (ADGC). Assessment of the genetic variance of late-onset Alzheimer's disease. Neurobiol Aging. 2016 May;41:200.e13-20. doi: 10.1016/j.neurobiolaging.2016.02.024. Epub 2016 Mar 3

181. Beckner ME, Pollack IF, Nordberg ML, Hamilton RL. Glioblastomas with copy number gains in EGFR and RNF139 show increased expressions of carbonic anhydrase genes transformed by ENO1. BBA Clin. 2015 Nov 10;5:1-15. doi: 10.1016/j.bbacli.2015.11.001. eCollection 2016 Jun. PMID: 27051584 Free PMC Article

182. Fernandes-Cabral DT, Zenonos GA, Hamilton RL, Panesar SS, Fernandez-Miranda JC. High-Definition Fiber Tractography in the Evaluation and Surgical Planning of Lhermitte-Duclos Disease: A Case Report. World Neurosurg. 2016 May 7. pii: S1878-8750(16)30257-1. doi: 10.1016/j.wneu.2016.04.128. [Epub ahead of print] PMID: 27168233

**Reviews, invited published papers, proceedings of conference and symposia, monographs, books and book chapters**

**Ronald L. Hamilton, M.D.**

1. **Hamilton RL**, Wiley CA. New developments in the neuropathology of AIDS. CAP Today, 10 (12): p 42, 1996.
2. **Hamilton RL**: Hydrocephalus in a 9 month-old infant. Brain Pathol 6:533-534, 1996
3. **Hamilton RL**: New onset hemiparesis. Brain Pathol 7: 715-716, 1997.
4. **Hamilton RL**: Precocious Puberty. Brain Pathol 7: 711-712, 1997
5. **Hamilton RL**: Frontal lobe tumor in 11 year-old girl. Brain Pathol 7: 713-714, 1997
6. **Hamilton RL**, Pollack, IF: The Molecular Biology of Ependymomas. Brain Pathology 7:807-822, 1997.
7. **Hamilton RL**: A 26 year old woman with new onset seizures. Brain Pathol 8: 239-240, 1997.
8. **Hamilton RL**, Wiley, CA, The Neuropathology of Viral Infections of the Nervous System. In: Textbook of Neuropathology; Davis RL, Robertson DM eds. Williams and Wilkins, 3rd edition,  Baltimore, MD. 1997.

9. **Hamilton RL**: Guidelines for the neuropathological diagnosis of Alzheimer's Disease and Dementia with Lewy Bodies. Revista de Neurologia 27 (S1): S67-S70, 1998
10. **Hamilton RL**: Experimental neuropathology of Alzheimer's Disease: animal models. Revista de Neurologia 27 (S1): S84-S86, 1998
11. Sanders VJ, Wiley CA, **Hamilton RL**: The mechanisms of neuronal damage in retroviral infections of the nervous system. in The Mechanisms of Neuronal Damage in Virus Infections of the Nervous System (Gosztonyi G, ed). Springer Verlag, Berlin, 2001.
12.  **Hamilton RL**. [Recent Advances in the neuropathological evaluation of Alzheimer's Disease: the importance of synuclein] Rev Neurol 35:765-7, 2002 (Spanish).
13. Pollack IF, **Hamilton RL**, Finkelstein SD, Lieberman F.  Molecular abnormalities and correlations with tumor response and outcome in glioma patients.  Neuroimaging Clinics of North America: Advances in Brain Tumor Imaging and Therapy (Provenzale J, ed.) WB Saunders, Philadelphia,  2002.
14. **Hamilton RL**.  The other dementias: the neuropathology of the non-Alzheimer's Disease dementias. Rev Neurol 37:130-139, 2003 (Spanish).
15. Omalu BI, Wiley CA, **Hamilton RL**.  Case of the Month February 2003. Brain Pathology 13:419-420, 2003.
16. DeKosky ST, Ikonomovic MD, **Hamilton RL**, Bennett DA, Mufson EJ. Neuropathology of Mild Cognitive Impairment in the Elderly. In John Morris J, Scheltens P, and Cummings JL), (eds), *Alzheimer's Disease and Related Disorders:* London, Taylor & Francis, 1-16, 2006.
17. Crain BJ, Alston SR, Bruch LA, **Hamilton RL**, McLendon RE, Rhodes H, Tihan T, Weidenheim KM. Accreditation Council for Graduate Medical Education (ACGME) Competencies in Neuropathology Training.  J Neuropathol Exp Neurol 64:273-279, 2005.
18. McIntyre JA, **Hamilton RL**, Dekosky ST.  Redox-reactive autoantibodies in cerebrospinal fluids. Annals of NY Acad Sci 1109: 296-302, 2007.
19. DeKosky ST, Kaufer DI, **Hamilton R**, Wolk D, Lopez OL: Dementia. In: Neurology in Clinical Practice: Principles of Diagnosis and Management, 5th Edition. Editors: Bradley WG, Daroff RB, Fenichel GM & Jankovic J. Boston MA, Butterworth-Heinemann, 2007: 1855-1907.
20. Tyurin VA, Tyurina YY, Kochanek PM, **Hamilton R**, DeKosky ST, Greenberger JS, Bayir H, Kagan VE.  Chapter 19: Oxidative lipidomics of programmed cell death.  Methods Enzymol 442:375-93, 2008.
21. Yeaney GA, O'Conn SM, Jankowitz BT, **Hamilton RL**.  A 16 year-old male with cerebellar mass. Brain Pathol. 2009 19, 167-170. PMID 19076785
22. Horbinski, C, **Hamilton RL**.  Application of telepathology for neuropathologic intraoperative consultations. Brain Pathol 2009 19; 317-322. PMID 19290998

<u>**Abstracts**</u>

1. **Hamilton RL**, Sanger WG, and McComb RD: Characterization of cell lines derived from malignant tumors in patients with neurofibromatosis. Federation Proceedings 46: 433, 1987.
2. Esch O, Spinosa JC, **Hamilton RL**, Crombie DL, Schteigart CD, Hofmann AF: Reversible cytotoxicity to the gallbladder mucosa of contact dissolution solvents for cholesterol gallstones: a comparison of methyl tert-butyl ether (mtbe) and ethyl propionate (ep) in two animal models. Gastroenterology 100 (5, part 2): A135, 1991.

**Ronald L. Hamilton, M.D.**

3. Haas RH, Popovitch B, **Hamilton RL**: The utility of DNA dystrophin gene analysis in non-specific myopathy: presented at Child Neurology Society Annual Meeting, October, 1992: New Orleans, LA.

4. Haas RH, Mansden DL, Estrada S, **Hamilton RL**, Grafe MG, Nyhan WL: Acute basal ganglia infarction in propionic acidemia in spite of good metabolic control: presented at Child Neurology Society Annual Meeting, October, 1992: New Orleans, LA.

5. **Hamilton RL**, Haas RH, Nyhan W, Powell HP, Grafe MR: The neuropathology of propionic acidemia: a report of two additional cases. American association of Neuropathology Annual Meeting, June 1993, Salt Lake City, UT; J Neuropathol Exp Neurol 52:299, 1993.

6. Mansfield RT, Schiding JK**, Hamilton R,** Kochanek PM: Hypothermia fails to reduce lesion volume after traumatic brain injury in immature rats.  Pediatric Research 35(4):55, 1994.

7. **Hamilton RL**, Bodnar RJ, Wang G, Wiley CA.  The effect of AZT on retroviral encephalitis: a murine model: presented at the Sixth Workshop on the Pathogenesis of Animal Retroviruses, Philadelphia, PA, Nov. 17-19, 1994.

8. Adelson PD, Robichaurd P, **Hamilton RL**, Kochanek PM. Brain edema and neuropathology after diffuse traumatic injury in immature rats.  Neurotrauma Society meeting, San Diego CA, Nov 10-11, 1995.

9. **Hamilton RL**, Bodnar RJ, Wang G, Klunk W, Wiley CA, Treatment of chronic retroviral encephalitis with zidovudine (AZT) in a murine model. Society for Neuroscience Meeting, San Diego, CA Nov 11-16 1995.

10. **Hamilton RL**, Bodnar RJ, Wang G, Klunk W, Wiley CA. The effect of zidovudine (AZT) on murine retroviral encephalitis. Amer. Assoc of Neuropathology, San Antonio, June, 1995. J Neuropathol Exp Neurol 54 (3): 438, 1995.

11. **Hamilton RL**, and Claassen D. Neonatal Methylmalonic Acidemia With Hemicerebellum: An Autopsy Report;  Society of Pediatric Pathology / Child Neurology Society (joint meeting), Baltimore, Oct 27-29, 1995.

12. **Hamilton RL**, Baldwin M, Wiley CA. Human Herpesviruses And Temporal Arteritis American Association of Neuropathology, Vancouver, BC, Canada, June 1996.

13. Mizukami K, Ikonomovic MD, Sheffield R, Rubin RT, Grayson D, **Hamilton R**, Warde D, Armstrong DM. Immunohistochemical Localization of GABA-A Receptor ß2/3 Subunits in the Hippocampal Formation in Aged Brain with Alzheimer-related Neuropathology. Society for Neuroscience meeting, Washington DC, Nov 1996.

14. Bodnar RJ and **Hamilton RL**. Effect of zidovudine (AZT) and saquinavir on retroviral infection of the central nervous system (CNS) Society for Neuroscience meeting, Nov 17-21, 1996 Washington D.C.

15. Bredel M, Pollack I, **Hamilton RL**, Finkelstein SD, Campbell JW, Martinez AJ, Sherwin R, Bozik ME, Gollin S. Overexpression of EGF receptor and p53 mutations in pediatric malignant gliomas. American Association of Neurological Surgeons, 1997 Annual meeting.

16. Xu Y, Liachennko S, Tang P, **Hamilton RL** Correlation of neuropathologic changes with cerebral metabolic and ADC abnormalities after prolonged asphyxial cardiac arrest. International Society of Magnetic Resonance in Medicine, annual meeting, 1997

17. Bredel M, Pollack IF, Campbell JW, **Hamilton RL**. Basic fibroblast growth factor as a prognostic indicator in pediatric high grade glioma patients. American Association of Neuropathology, Pittsburgh, PA, June 1997. J Neuropathol Exp Neurol 56 (5): 581, 1997

18. **Hamilton RL**, Bodnar RJ, Lackner AA, Lane JH, Wiley CA Neurotrophic factors in simian immunodeficiency virus encephalitis. American Association of Neuropathology, Pittsburgh, PA, June 1997. J Neuropathol Exp Neurol 56 (5): 618, 1997

19. Adelson, PD, Robichaud, P, **Hamilton, RL**, Kochanek, PM. Histologic analyses of severe diffuse traumatic brain injury in the immature rat . National Neurotrama Society, New Orleans Oct 24-25, 1997.

20. Dorsey RW, Achim CL, Wiley CA, **Hamilton RL***,  Soontornniyomkij V. Gene expression and cellular localization of neurotrophic factors in Alzheimer's disease. Society of Neuroscience meeting Nov, 1997, New Orleans.

21.  Klunk WE, **Hamilton RL**, Styren SD, Styren G, Debnath ML, Mathis CA, Mahood K, Hsiao KK. Staining of AD and Tg2576 mouse brain wirh X-34, a highly flourescent derivative of chrysamine

**Ronald L. Hamilton, M.D.**

G and A potential in vivo probe for sheet fibrils.  Siociety for Neuroscience meeting, New Orleans 1997.

22. Klunk WE, **Hamilton RL**, Styren SD, Styren G, Debnath ML.  Neuropathological study of AD brain with X-34, a new highly fluorescent derivative of congo red.  Society for  Neuroscience meeting. Los Angeles, CA 1998.

23. Halks-Miller M, Hesselgesser J, Horuk R, Soontornniyomkij V, **Hamilton R,** Achim C.  CCR1 immunoreactivity in Alzheimer's Disease brains.  Society for Neurosciences meeting. Los Angeles, CA 1998.

24.  Wang G, Soontornniyomkij V, Pittman CA, Achim CL, Wiley CA, **Hamilton RL**.  Glial expression of BDNF and TRK B receptor proteins in Alzheimer's Disease and HIV-1 encephalitis brains. Society for Neuroscience meeting. Los Angeles, CA 1998.

25. Ikonomovic MD, Mizukami K, Davies P, **Hamilton R**, Sheffield R, Armstrong DM.  Co-localization of interneurons and an ad-specific antibody in the hippocampal formation of Alzheimer brains. Society for Neurosciences. Los Angeles, CA 1998.

26. Mizukami K, Ikonomovic MD, Grayson DR, Rubin RT, Warde D, Sheffield R, **Hamilton RL,** Davies P, Armstrong DM.  Immunohistochemical study of GABA(A) receptor beta 2/3 subunits in the hippocampal formation of aged brains with Alzheimer-related neuropathologic changes. Experimental Neurology 147 2 333-45 (1997).

27. Bredel M, Pollack IF, **Hamilton RL**: Expression of the c-erbB1 Oncogene Product Epidermal Growth Factor Receptor (EGFR) and its Relevance for Outcome in Children with Supratentorial High-Grade Gliomas ; XVI Congress of the European Society for Pediatric Neurosurgery; November 11-15, 1998, Marseille, France

28. **Hamilton, RL** Numerous widespread alpha-synuclein positive thread-like processes characterize dementia with Lewy Bodies. Foundation IPSEN Conference, April 12, 1999, Paris France

29  **Hamilton RL** Numerous and widespread alpha-synuclein thread-like processes in dementia with Lewy bodies. American Assoc of Neuropathologist Annual Meeting, 1999, Portland, OR. J Neuropathol Exper Neurol 58:552, 1999.

30. Klunk WE, **Hamilton RL**, Styren SD, Head E: Evaluation of the aged canine as a screening system for the x-34 class of in vivo probes for amyloid deposition in AD. Soc. of Neuroscience, 1999

31. Kaufer, DL, **Hamilton RL**, Lopez OL, DeKosky ST MRI white matter hyperintensities and cerebral amyloid angiopathy in a case of dementia with Lewy bodies. Amer Neuropsychiatric Assoc, annual meeting, 2/2000, Ft. Myers, FLA.

32. **Hamilton RL**, Mash DC. Widespread Alpha-synucleinopathy in the Parkinson's Disease brain. 6th National Parkinson's Disease Foundation International Symposium on Parkinson's Disease Research, to be held in conjunction with the Society of Neuroscience meeting in Miami Beach, Oct 22-23rd, 1999.

33. **Hamilton, RL**, Mash DC. Widespread alpha-synuclein-positive neuropil threads in the Parkinson's Disease brain. American Assoc of Neuropathology, Atlanta, GA, June 8-11, 2000.

34.  Snyder JV, Gebel JM, Kassam A, **Hamilton RL**, Goldstein S, Watkins S, Yonas H, Chelluri L, Thulborn K. Guidance by MR Tissue Sodium Concentration of Infarct Resection in Massive Stroke. Neurology 54(7): A97-A98, Suppl. 3, 2000.

35. Chow TM, Kaufer DI, Lopez OL, **Hamilton RL**, Becker JT, DeKosky ST. Temporal Evolution of Lewy Body Phenotype in Autopsy Confirmed Cases of Alzheimer's Disease and Dementia With Lewy Bodies. Neurology 56(8): A300-A301, Suppl 3, 2001.

36.  Castellano-Sanchez A, Ohgaki HH, Yokoo, Finkelstein SD, Medina-Flores R, **Hamilton RL**, Scheithauer BW, Burger PC, Brat DJ.  Genetic Alterations in Granular Cell Astrocytomas. USCAP, 2002.

37.  Demidovich J, Pittman CA, Hamilton RL.  Altered calpain proteolysis of mutant alpha-synuclein. Honors Thesis presentation, Univ. Pitt, 2002

38.  Omalu BI, **Hamilton RL**, Swalsky PA, Finkelstein SD. Microdissection-based mutational profiling of malignant, atypical and benign meningiomas: the determination of meningioma grade by fractional mutational index.  AANP, Denver, 2002 (JNEN 61:491, 2002)

39.  Wilson, RK, Luedecking-Zimmer EK, Kamboh MI, DeKosky ST, **Hamilton RL**.  Association of the ApoE4 allele and Lewy bodies in Alzheimer's Disease.  AANP, Denver 2002 (JNEN 61: 455, 2002).

**Ronald L. Hamilton, M.D.**

40. Desai PP, Ikonomovic MD, **Hamilton RL**, DeKosky ST, Kamboh MI.  Apolipoprotein D in Alzheimer's Disease: implications for amyloid pathology.  Soc. for Neuroscience, Orlando, 2002.

41. Garb S, **Hamilton RL**.  Sequestration of soluble alpha-synuclein in Lewy body Variant of Alzheimer's Disease. Soc for Neuroscience, Orlando, 2002.

42. Marshall GA, Kaufer DI, Lopez OL, Rao GR, **Hamilton RL**, DeKosky ST.  A neuropathological correlate of anosognosia in Alzheimer's Disease.  American Association of Neurology, May 2003.

43.  Sweet RA, Butters MA, **Hamilton RL**, Mulsant BH, Lopez OL, PollockBG, DeKosky ST, Reynolds CF Neuropathology Of Late Life Mood Disorders.  American College of Neuropsychopharmacology, 2003

44.  Mohan D, Couce ME, Wiley CA, **Hamilton RL**, Sasatomi E, Swalsky PA, Lieberman MD, Finkelstein SD.  Microdissection based genotyping of human gliomas: diagnostic and prognostic considerations (USCAP, Vancouver 3/04)

45. Beckner ME, Sasatomi E, Swalsky PA, **Hamilton RL**, Pollack, IF, Finkelstein SD.  Loss of heterozygosity reveals non-VHL Allelic loss in hemangioblastomas at 22q13, (AANP Cleveland, June 24-27, 2004).

46. Judkins AR, Burger P, **Hamilton RL**, Kleinschmidt-DeMasters B, Perry A, Pomeroy S, Rosenblum MK, Yachnis AT, Rorke LB, Biegel JA. INI1 Expression Distinguishes Atypical Teratoid/Rhabdoid Tumor (ATR) from Choroid Plexus Carcinoma (CPC); (AANP Cleveland, June 24-27, 2004).

47. McFadden KA, **Hamilton RL**, Visvesvara GS, Gardner P, Couce ME.  Granulomatous Amebic Encephalitis in a Patient with Gardners Syndrome and Multi-organ Transplant (AANP Cleveland, June 24-27, 2004).

48. Yen, Amy, Lopez, OL, BeckerJ, **Hamilton RL.**  Mesial Temporal Sclerosis is associated with Lewy Bodies in Alzheimer's Disease. AANP Annual meeting June 9-12, 2005, Arlington, VA (platform). (J Neuropathol Exper Neurol 64:434, 2005.

49. Hinkle DA, Mullett SJ, **Hamilton RL** DJ-1 is over-expressed in human stroke reactive astrocytes. Society for Neuroscience Oct 2005.

50. Ramsey CP, Glass CA, Marshall MB, Morgan KL, Kioke MA, **Hamilton R**, Chu CT, Jordan-Sciutto KL.  Altered expression patterns of the antioxidant response transcriptional regulator NRF2, in Alzheimer's Disease and Parkinson's Disease. Society For Neuroscience, Nov. 2005, Washington DC.

51. Chu CT, Uchiyama Y, **Hamilton R**, Zhu J.  Extracellular signal regulated protein kinase acts upstream of both autophagy and cell death in MPP+ treated neurons.  Society For Neuroscience, Nov. 2005, Washington DC

52. Cieply K, Carol R. Sherer, Jennifer L. Hunt **Hamilton RL** Assessment of 1p and 19q Status in Pediatric Oligodendrogliomas by FISH, Association of Molecular Pathology,  Nov 10-13, 2005 Scottsdale AZ

53.  Bencherif B, Lieberman FS, Wenzhu B, Price JC, Muthukrishnan A, Walter K, **Hamilton RL**, Lunsford LD, Mountz JM.   Increased F-18 Fluorothymidine Uptake is Seen in Non-Proliferating Recurrent/Residual Glioma Society for Nuclear Medicine, San Diego, 2006 June 3-7

54. **Hamilton, RL** Variations On A Theme: Lewy Bodies And Mesial Temporal Sclerosis In Alzheimer's Disease: A Review Of 278 Autopsy Cases. 10th International Conference on Alzheimer's Disease, Madrid, Spain, July-15-20, 2006.

55. DeKosky ST, Mathis CA, Price JC, Ikonomovic MD, **Hamilton RL**, Abrahamson EE, Paljug WR, Debnath ML, Hope CE, Isanski BA, Tsopelas ND, Lopresti BJ, Ziolko S, Bi W and Klunk WE.  Correlation of In Vivo PiB Retention and Post-Mortem Aβ Levels: A Case Study. 10th International Conference on Alzheimer's Disease, Madrid, Spain, July-15-20, 2006.

56. Leverenz J, **Hamilton RL**, Larson E, Vavrek D, Lopez O, Galasko D, Masliah E, Kaye J, Nixon R, Clark C, Trojanowski J, Kukull W, Montine T, Tsuang D. Lewy-Related Pathology in Two Large Autopsied Dementia Samples: Application of Classification Criteria. 10th International Conference on Alzheimer's Disease, Madrid, Spain, July-15-20, 2006.

57.  Venneti S, Lopresti BJ, Wang G, Mathis CA, Klunk WE, Shmookler AD, **Hamilton RL**, Apte UM, Wiley CA. PET imaging of microglia in a mouse model of Alzheimer's disease. 10th International Conference on Alzheimer's Disease, Madrid, Spain, July-15-20, 2006.

58. Kofler JK, Moore RA, **Hamilton RL**.  Concomitant Dementia with Lewy Bodies and Multiple System Atrophy in a Demented Patient.  International Congress of Neuropathology/American Association of Neuropathology Annual Meeting, San Francisco, CA, Sept 10-15, 2006.

**Ronald L. Hamilton, M.D.**

59. DeKosky ST, Mathis CA, Price JC, Ikonomovic MD, **Hamilton RL**, Abrahamson EE, Paljug WR, Debnath ML, Hope CE, Isanski BA, Tsopelas ND, Lopresti BJ, Ziolko S, Bi W, Klunk WE. Correlation of Regional in vivo Pittsburgh Compound B (PIB) Retention With in vitro PIB, A Levels, and Amyloid Plaque Density: Validation of PIB-PET in Postmortem Human Brain. Alzheimer's Association International Conference on Prevention of Dementia. June 9-12, 2007 Washington, D.C.

60. Kellermier HC, Nikiforova MN, Cieply K, **Hamilton RL**. Alterations of 1p in glioblastomas. ASIP/AANP Annual meeting, Washington DC April 2007.

61. Bliecher AG, Branstetter BF, Hamilton R, Murdoch G, Kellermeir HC. Clival Chordoma: Radiologic-Pathologic Correlations. American Society of Neuroradiology annual meeting, Chicago, IL. June 9-14, 2007.

62. Butters MA, Aizenstein HJ, Meltzer CC, **Hamilton RL,** Price JC, Mathis CA, Klunk WE, Becker JT, DeKosky ST, Reynolds CF. Cognition, cerebrovascular disease and Alzheimer's Disease in late-life depression. International Neuropsychological Society meeting, Bilbao Spain, July 2007.

63 Tyurin VA, Zhao Q, Mnuskin A, **Hamilton R**, DeKosky ST, Reynolds WF, Kagan VE. Phospholipid peroxidation biomarkers of Alzheimer's Disease in the Brain: Selective Oxidation of Phosphatidylserine. Society of Toxicology Meeting San Diego, CA. October 2, 2007.

64. Moschos SJ, D. Trembath D, Snavely A, Bradler E, Midkiff B, Nikolaishvilli-Feinberg N, Werley J, Krauze M, **Hamilton R**, Kirkwood JM. Prognostic Significance of PD-L1 Expression, Angiogenesis, and Hypoxia in Melanoma Brain Metastases (MBM); A Histopathologic Analysis. Annual meeting of the American Association of Clinical Oncology, Chicago Il, 5/29-6/2/2014.

65. Trembath DG, Moschos SJ, Snavely AC, Bradler E, Nikolaishvilli-Feinberg N, Bentley R. Midkiff BR, Jonette Werley J, Krauze MT, **Hamilton RL**. Analysis of select angiogenic markers in melanoma brain metastases. Annual meeting AANP, Portland OR. June 2014

66. Salgado CM, Basu D, Nikiforova M, Hamilton R, Gheris R, Jakacki R, Panigrahy A, Yatsenko S, Reyes-Mugica M. Congenital Melanoma: The full spectrum og p.Q61R mutation in NRAS. Accepted for the Annual Soc. Pediatric Pathology meeting, Birmingham AL, Sept 4-6, 2014.

67. Melan MA, Wald AI, Zhong S, **Hamilton R**, Horbinski C. Nikiforova MN. BrainSeq: Next-Generation Sequencing Panel for Detection of Genetic Alterations in Central Nervous System (CNS) Malignancies. National Harbor MD, Nov 12-15, 2014.

68. Hamilton RL. Chronic Traumatic Encephalopathy: Update on an Emerging Disease. Invited speaker: 18th International Congress of Neuropathology, July 12-16, 2014, Rio de Janeiro, Brazil

69. Hamilton RL. Cases of the Month: 16 Years of Unknowns. Invited speaker: 18th International Congress of Neuropathology, July 12-16, 2014, Rio de Janeiro, Brazil

70. Trembath DG, Moschos SJ, Snavely AC, Bradler E, Nikolaishvilli-Feinberg N, Midkiff BR, Werley J, **Krauze MT, Hamilton RL** Role of PD-L1, HIF-1a, and reactive gliosis in melanoma brain metastases. USCAP 2015, Boston, MA, March 21-27, 2015.

71. Nolan Priedigkeit, Ryan J. Hartmaier, Yijing Chen, Damir Vareslija, Ahmed Basudan, Roby Thomas, Jose P Leone, Peter C. Lucas, Rohit Bhargava, Ron L. Hamilton, Juliann Chmielecki, Nancy E. Davidson, Steffi Oesterreich, Adam M. Brufsky, Leonie Young, Adrian V. Lee Breast cancer brain metastases show limited intrinsic subtype switching, yet exhibit acquired ERBB2 amplifications and activating mutations. San Antonio Breast Cancer Symposium, 12/7/16

72. Steffi Oesterreich, Ahmed Basudan, Nolan Priedigkeit, Ryan Hartmaier, Amir Bahreini, Rekha Gyanchandani, Jose P Leone, Peter Lucas,, Rohit Bhargava, Ron Hamilton, Ryan Hartmaier, Adam Brufsky, Adrian V. LeePerivascular Inflammation in Temporal Artery Biopsies That Are Negative for Arteritis: Incidental or Harbinger American College of Rheumatology/ Association of Rheumatology Health Professionals (ACR/ARHP) Annual Meeting, Washington DC, 11/13/16

73. Expression of Carbonic Anhydrase Genes, CA3 and CA12, Transformed with ENO1, Relate to Copy Numbers of EGFR or RNF139 and XIAP, and Gender in Glioblastomas Using PCR Assays. Experimental Biology 2015 Annual Meeting

74. Evaluation of GlioSeq Targeted NGS Panel for Detection of O6-Methylguanine-DNA Methyltransferase (MGMT) mRNA Expression in Glioma Patients Alicia Hunt, Sarika Jain, Melissa A Melan, Abigail Wald, Ronald Hamilton, Marina N. Nikiforova  Association For Molecular Pathology (AMP) Charlotte, NC. November 10-12, 2016.

## PROFESSIONAL ACTIVITIES

**Ronald L. Hamilton, M.D.**


**TEACHING**

University of California, San Diego, Dept of Neuroscience
      1991-93      lab assistant - graduate neuroanatomy course
University of California, San Diego, School of Medicine
      1991-93      Sophomore pathology course, neuropathology section (lab assistant)
University of California, San Diego, Dept of Pathology
      1991-93      Clinical Correlation Conference - Neuropath and Neurosurgery (monthly)
      1991-93      Neuropathology review for neurology residents (bi-monthly)
University of Pittsburgh, School of Medicine
      Freshman pathology course –
      PBL facilitator for musculoskeletal course 1994-1998
      Neuroscience Module – lecture M2 students full class: CNS tumors
            Annually since 1999.
                  April 29, 2014 1-3 pm
      Neuroscience Module   lecture MS1 students
            CNS tumors  March 2004
            CNS tumors  March 2005
            CNS tumors March 2006
            CNS Tumors    5/7/07
      Neuroscience rotation – small weekly lab, M3 students
            7/99-present
      Neuroscience rotation – small group M3 students
            6/18/2007 3-5pm
Weekly brain-cutting conference at Children's Hospital (2-5 medical (M3) students/week)
            Academic Advising: Kate McFadden 2/2000 to 6-2001
Other:
      High school - gifted science students of Mr. James Coll
            11/21/2002 , 11/14/ 2003, 10/28/2004, 11/18/2005, 11/3/2006


University of Pittsburgh, graduate students
      Cellular and Molecular Mechanisms of Neurodegeneration (MSCMP 3720)
               Organizers: Robert Bowser, Cristian Achim,
          1. Neuroanatomy and Neurohistology in neurodegeneration
            1/13/98,  1/19/99
          2. Mitochondria and disease / Prion encephalopathies
            3-24-98
          3. The role of alpha-synuclein in neurodegenerative diseases
            10-11-00
      Molecular Pathobiology (organizers Frye and Achim) (MSCMP 2740)
          .Tumors of the Central Nervous System,  4-7-98,  4-20-99
         Alpha-synuclein and Neurodegeneration
            4-2003, 1/8/04, 5/15/06
         Neuropathology of Neurodegeneration
            1/6/04
          Alpha-synuclein and Tau in Neurodegeneration
            1/5/07, 2/7/2008
         Pathologic diagnosis of the Lewy Body Disorders
            2/12/09
University of Pittsburgh, Dept of Neuroscience - Combined Neuroscience Conference Wed 4-5
      10/3/95 *      Varicella Zoster Infections of the CNS in AIDS patients
      10/9/96 *      Lewy Bodies and Dementia
      2/19/97 *      The Neuropathology of Pediatric Seizures
      4/23/97 *      CNS manifestations of non-CNS tumors in children
      2/11/98         Case Presentation with Ian Pollack

**Ronald L. Hamilton, M.D.**

| | |
|---|---|
| 3/18/98 * | A 77 year old woman with Multiple sclerosis and dementia |
| 11/4/98 | *Pediatric meningiomas – two cases |
| 1/20/99 | Methanol Intoxication – with C. Foley |
| 2/3/99 | Gliomatosis cerebri with Dallasta |
| 2/10/99 | Amyloid angiopathy and leukomalacia – with D. Kaufer |
| 3/17/99 | Metachromatic Leukodystrophy – with D. Kaufer |
| 9/18/02 | Iatrogenic CJD* |

* as primary presenter

University of Pittsburgh, Dept. of Pathology, Chief Resident's Fri noon slide conference
| | |
|---|---|
| 8/1/96 - | Pediatric brain tumors |
| 10/5/97 | Pediatric brain tumors |
| 1/9/98 | NP REVIEW - Tumors I |
| 1/16/98 | NP REVIEW - Tumors II |
| 1/23/98 | NP REVIEW - Tumors III |
| 1/30/98 | NP REVIEW - Infections |
| 2/6/98 | NP REVIEW - Demyelinative diseases |
| 2/13/98 | NP REVIEW - Neurodegenerative diseases |
| 2/20/98 | NP Review - Cerebrovascular disease and developmental |
| 5/24/02 | Pediatric Neoplasms and Congenital Malformations |
| 5/31/02 | Degenerative Diseases |

University of Pittsburgh, undergraduate
      Independent Course and Honors Research Project –
            Theodore Kaplan (1/97-6/97)
            Emily Rogerson (1/99-5/99, 9/99-12/99, 1/00-4/00)
            Kyle Hubbard (1/99 – 5/99, 9/99-12/99, 1/00-4/00)
            Joe Demidovich – 2000-2002
            Stan Garb (2001-2001)

      Pathology Summer Undergraduate Research Program (SURP)
            Kathleen Anderson 6/00-8/00
            Kathleen Anderson 6/01-8-01

University of Pittsburgh, Dept. of Pathology,
      Neuropathology of dementia conference - weekly (Fri 10-11)

University of Pittsburgh - ADRC Topics at Noon
      X-34 and alpha-synuclein – New stains in Alzheimer's Disease 11/98
      Lewy Body Pathology in Alzheimer's Disease, 11/01

Children's Hospital of Pittsburgh, Grand rounds
      1996 - methyl malonic acidemia with hemi-cerebellum
      2/13/97 - Pediatric AIDS with HIV encephalopathy
      5/22/97 - 11 month-old boy with Hypotonia (Leigh's Disease)
      3/18/98 - Becker's muscular dystrophy with severe cardiomyopathy
      5/19/98 – Friedreich's Ataxia
      10/15/98 – Spinal Muscular Atrophy Type I
      2/2005  - Congenital Dystrophies – Pediatric Neurology

## Other Presentations

Neurology Grand Rounds - 11-19-03 - CNS vasculitis
Pathology Noon Diagnostic Conference - 11-20-03 – "Some Bodies in the Brain"
AP Didactic Lecture – 11-25-03 - Neuropathology of Neurodegeneration
NP Didactic – 4-28-04 - ApoE4 and Lewy Bodies in AD

**Ronald L. Hamilton, M.D.**


NP Didactic -    3/31/2005 – AD Pathology in ALS and MTS and LB in AD
Pathology Noon Diagnostic Conference – 8-4-2006: Tauopathies
ADRC CPC 8-10-06
ADRC CPC 11-30-06
ADRC CPC 2-8-07
ADRC 20th Anniversary meeting, "Neuropathology of AD:"  9-28-06
ADRC Topics at Noon.  "Tauopathies"  11-16-06
ADRC CPC 8/16/2007
ADRC CPC 11/30/2007
Pediatric CPC 2/25/08
DJ-1 in glioblastomas (NP Didactic conference) – 3/10/2009 (1 hour)
Neuropathology review for Neurosurgery residents – 3/10/2010 (1 hour).
AP Chief Residents didactic conference.  2 hour conference.  Non-glial Tumors. Feb 25, 2014
CMU graduate class:  BioE 2630 – Methods in medical iamage analysis in neuropathology. April 4, 2014.
Anatomic Pathology Grand Rounds, July 10, 2014  Chronic Traumatic Encephalopathy: an Update.

**Clinical Conferences (recurring)**

| | | |
|---|---|---|
| ADRC Brain cutting | weekly | Tue 8-10 |
| ADRC Dementia signout - | weekly | Fri 10-11 |
| PUH – Neuropathology QA - | weekly | Wed 10-11 |
| CH  Brain cutting | weekly | Mon 10-11:00 |
| CH  Neuro-Oncology conf | weekly | Mon 11:30-12:30 |
| CH Gross autopsy conference | weekly | Tue 11-12 |
| CH Micro autopsy conf | weekly | Tue 1-2 |

University of Pittsburgh School of Medicine –
        2009 Brain Tumors – lecture to 1st year students
        2009 Klionsky summer research scholarship – Peter Kang (June-Aug 2009)
                Clinicopathologic correlations of chordomas
        2009 Monday 2 hour small group 3rd year  (5-12 students)
                4/6/2009, 7/27/2009, 9/10/2009, 10/12/2009, 12/7/2009, 1/25/2010, 2/15/2010


<u>**RESEARCH**</u>

<u>**OTHER SUPPORT**</u>

<u>**ACTIVE**</u>

**HAMILTON, R.**
<u>ACTIVE</u>

| | | |
|---|---|---|
| **R01 NS037704**    (PI: Pollack) | 9/1/98-1/31/17 | 0.7 calendar months |

National Institutes of Health          $105,970
Role:  Co-Investigator
Title: Molecular Markers as Predictors of Outcome in Gliomas
The major goal of this project is to further characterize the molecular features of tumorigenesis in pediatric malignant gliomas.


| | | |
|---|---|---|
| **1R01 CA174858-01**(PI: Pollack) | 5/6/13-8/30/17 | 0.4 calendar months |

National Institutes of Health          $54,696
Role:  Co-Investigator
Title: Peptide Vaccine-Based Immunotherapy for Children with Recurrent Ependymomas
This project focuses on a pilot clinical trial of peptide-based immunotherapy for ependymomas, among the most challenging childhood brain tumors.  The study will incorporate separate strata

**Ronald L. Hamilton, M.D.**

for posterior fossa and non-posterior fossa ependymomas.  We will treat a total of 12 patients in each of the two strata with subcutaneous TAA epitope vaccinations every 3 weeks for 8 courses combined with topical imiquimod. Participants will be evaluated for adverse events, regimen limiting toxicity (RLT), and treatment response by clinical and laboratory evaluations and MR imaging. We hypothesize that vaccine-based immunotherapy will not only prove safe for the treatment of pediatric ependymomas, but will also demonstrate activity as assessed by immunologic and clinical parameters.

(PI: Pollack)    5/8/14-6/1/17
Child Brain Tumor Foundation                    $10,487                              1.2
calendar months
**Children's Brain Tumor Tissue Consortium**
The CBTTC is a unique research platform in which tumor tissue is processed for comprehensive molecular (e.g., DNA, RNA, and protein) analysis using state-of-the-art methods and the data results of that analysis, together with new brain tumor models and relevant clinical information, are sent back to the participating institutions. In comparison to tissue banks, the CBTTC actively stimulates research by providing high-quality data that can be rapidly and efficiently analyzed by participating institutions.
PI: Pollack. 10% salary for Jonette Werley

<u>OVERLAP</u> No Overlap


**Completed Research Support**

National Institutes of Health                    3/1/02 – 2/28/05
P30 MH52247-10    (PI: Reynolds)        $23,305
Intervention Research Center for the Study of Late-Life Mood Disorders
a supplement to the above grant to establish a brain bank to investigate the neuropathological substrate of late life mood disorders.
Role:  Co-Investigator

R01 NS048595    (PI: Montine)                    09/30/03 – 07/31/08
National Institutes of Health
Subcontract to the University of Washington on grant "Characterization of DLB: a Collaborative Study"
The major goal of this multi-institutional project is to investigate the role of ApoE4 alleles and other genetic polymorphisms in the Lewy Body Variant of Alzheimer's Disease.
Role:  Co-Investigator

Brain Tumor Society                    07/01/07-05/31/09
PI: Ian Pollack
JPA & Pediatric Low Grade Astrocytoma
The major goals of these two grants is to examine molecular markers of prognosis in pediatric gliomas.
Role:  Co-Investigator

U10 CA13539-27 (Reaman (subcontract 6172) (Pollack)                    1/1/06-12/30/09
NIH/NCI
Children's Oncology Group Brain Tumor Resource Laboratory


**-4502-**

**Ronald L. Hamilton, M.D.**

 This contract is providing infrastructure support for maintaining tissue processing and banking of high-grade gliomas.
Role:  Laboratory Director

R01 MH47346    (PI: Zubenko)                12/1/04 – 11/30/09
National Institutes of Health
Morphologic/Neurochemical Correlates of Depression in AD
The major goal of this project is to better define the biological substrates of major depression in AD and to provide additional insight into the clinical biology of major depressive disorders affecting the elderly.
Role:  Co-Investigator

P50 AG05133    (PI: Lopez)            3/30/85 – 3/31/15            0 calendar months
National Institutes of Health            $71,764
Alzheimer Disease Research Center, Core C: Neuropathology
The three objectives of the Neuropathology Core are to (1) procure and bank brain from autopsies of ADRC patients and controls, (2) perform detailed neuropathologic analysis of all AD cases and (3) maintain well catalogued brain bank.
Role:  Core Advisor

Child Brain Tumor Fund (CBTF) (PI: Pollack)        5/8/13-5/7/14
0.3 cal months (2.5% support) `PITT subaccount #: 05.35206.xxxx.00000.709203.-----`

P01 NS040923    (PI: Pollack)            7/1/02-5/31/13            1.20 calendar months
National Institutes of Health            $22,074
Novel Strategies for Brain Tumor Therapy
The unifying hypothesis of this program project grant is that novel therapeutic approaches that take into account the unique features of central nervous system (CNS) tumors will have utility for preventing tumor growth and inducing tumor regression, and will potentiate the effects of conventional treatment approaches, particularly radiotherapy, for inducing glioma cell killing.
Role:  Co-Investigator


**Prior Grant Support**

1995-1997          Murine Model of Retroviral Encephalitis
                         Children's Hospital of Pittsburgh Research Fund ($50,000)
                         0% effort, 0% support

 1995-1998          Blood Brain Barrier in HIV encephalitis (PI: Achim)
                         Co PI. 10% effort and salary ($186,264)

11/98                 PD Center Grant, Equipment $6000
                        for freezer for PD Brain Bank (one time equipment funding)

7/1/98-6/30/99   Neurotrophic Factors in SIV encephalitis
                        Competitive Medical Research Fund (CMRF), $25,000,
                        0% effort, 0% support

12/01/98-11/30/99     Parkinson's Disease Brain Bank
                              PI: Hamilton RL
                              Parkinson's Disease Foundation ($24,899) 0% effort, 0% support

7/1/98-6/30/00   Molecular Markers of Prognosis in Pediatric Gliomas

**Ronald L. Hamilton, M.D.**

          PAR 95-063, NIH
          PI: IF Pollack
          10% effort and support ($263,311)

4/1/00-3/31/01:  Alpha-synuclein Aggregation in Dementia With Lewy Bodies
          PI: RL Hamilton
          Parkinson's Disease Foundation Seed Money Grant, $25,000 0% effort, 0% support

10/1/00-9/30/02    Millennium Agreement (Neuro Module)
          PI: Rajiv Dhir
          0% effort, 0% Support.
          ($25,000 per year for supplies, plus support for 100% Level IV Res Tech)

1/1/99 – 12/31/03 COG Brain Tumor Resource Laboratory
       PI: Pollack, IF ($5800)  (subcontract 6172)
       Co-I – 5% effort and support
       NIH-U10 CA13539-27

3/01/02 - 2/28/06 - Supplemental Award to Establish a Late Life Mood Disorder Brain Bank
       PI: RA Sweet (for supplement)
          Supplement to 3 P30 MH52247-08S1 (PI: CF Reynolds)
          Co-I : 5% effort and support

7/1/98-6/30/05 Morphologic/Neurochemical Correlates of Depression in AD
       PI: G Zubenko
         2.5% effort and support ($20,000)

National Institutes of Health         09/30/03 – 07/31/08      5%
R01 NS048595    (PI: Montine)         $75,000

*Subcontract to the University of Washington on grant "Characterization of DLB: a Collaborative Study"*
The major goal of this multi-institutional project is to investigate the role of ApoE4 alleles and other genetic polymorphisms in the Lewy Body Variant of Alzheimer's Disease

R01 MH072947    (PI: Butters)     12/1/04 –11/30/11      0.36 calendar months
National Institutes of Health             $6,018
Pathways Linking Late Life Depression to Mild Cognitive Impairment and Dementia
The goal of this project is to investigate the relationships among late-life depression (LLD), cognitive impairment and progressive neurodegeneration.
Role:  Co-Investigator

R01 MH072947    (PI: Butters)     12/1/04 –11/30/11      0.36 calendar months
National Institutes of Health             $6,018
Pathways Linking Late Life Depression to Mild Cognitive Impairment and Dementia
The goal of this project is to investigate the relationships among late-life depression (LLD), cognitive impairment and progressive neurodegeneration.
Role:  Co-Investigator

**Seminars and Invited Lectureships Related to Research**

Presentation of an Unknown Case (Herpes simplex brainstem encephalitis) to American Association of Neuropathologists Annual Meeting, June 1992: St. Louis, MO.

**Ronald L. Hamilton, M.D.**

Presentation of an Unknown Case (Varicella zoster virus encephalitis in an AIDS patient) to XII International Congress of Neuropathology, Sept, 1994: Toronto, Ont, Canada.

Presentation of an Unknown Case (Atypical neurocytoma) to American Association of Neuropathologists Annual Meeting, June 2002: Denver (presenter: Rafael Medina-Flores).

**Other Research Related Activities**

| | |
|---|---|
| 1995-2003 | Co-Director, Neuropathology Core ADRC |
| 2003-2012 | Director, Neuropathology Core ADRC. |
| 1995-2012- | Director, Neuropathology Brain Bank |
| 1997 - present - | Director of Neurohistology laboratory |
| 1997-present | Co-Director, Brain Tumor Resource Laboratory, Children's Cancer Group |
| 2001- 2009 | Director of Neuropathology Core of the Stephen Tuttle ALS Tissue Bank. |
| 2001-present | Co-Director, UP Brain Tumor Bank |

**CURRENT RESEARCH INTERESTS**

1. Molecular Biology of Brain Tumors

**SERVICE**

**University and Medical School**

Residency Committee (Pathology) – 1997 to 2008
Institutional Review Board        3/02 – 5/2005
'Member of the UPSOM Interviewing Committee' jan 2010-present
Member, UPMC Professional Practice and Ethics Committee Jan 2014 - present

**OTHER**

| | |
|---|---|
| 4/1996 - present | Case Editor - Brain Pathology, |
| | Case of the Month feature |
| | Case of the Month web site |
| | Increase to 2 cases per month 1/2007 |
| 10/99 | ad hoc reviewer, J Neuroscience |
| 1/2000 | ad hoc reviewer, J American Medical Association (JAMA) |
| 3/2000 | ad hoc reviewer, Neuropathology and Applied Neurobiology |
| 3/01 | ad hoc reviewer American Journal Pathology |
| 5/02 | ad hoc reviewer Neuroscience |
| 11/02 | ad hoc reviewer JNEN |
| 2004 | AANP Awards Committee, AANP, Cleveland |
| 2006 | AANP Awards committee, AANP-ISN San Fran |
| 10/2006 | ad hoc reviewer     Eur J Neurosci |
| 2/2007 | Ad hoc reviewer       Neuroscience |
| 2007 | Chairmen, Awards Committee, AANP Washington DC. (2 year term) |
| 7/29/2007 | ad hoc reviewer, Brain Pathology |
| 7/25/2007 | ad hoc reviewer Acta Neuropathologica |
| 10/19/2007 | ad hoc reviewer J Neuropathol Exp Neurol |
| 2008 | Chairman Awards Committee AANP, San Diego Annual Meeting |
| 2008 | ad hoc reviewer Brain Pathology |
| 2009 | ad hoc reviewer Pedi and Developmental Pathology |
| 2009 | ad hoc reviewer Amer. J. Pathol. |

**Ronald L. Hamilton, M.D.**

2014 – Featured in non-fiction book: League of Denial:  The NFL, Concussions and the Battle for the Truth (Crown Publishing, New York). Chapters 8 and 10 detail my role in the discovery of CTE in NFL football players.

January 2015 – Consulted with Sony Pictures about movie CONCUSSION based on the discovery of Chronic Traumatic Encephalopathy (CTE) in American NFL football players by my student, Bennet Omalu and me in July 2005.  I was also interviewed on the set by Sony documentary filmmakers for a bonus feature on the DVD:  The Making of "Concussion."  The movie is scheduled to be released Christmas Day, Dec 25, 2015.

January 2015 – interviewed by Jeane Marie Laskas (who wrote the 2009 GQ article the movie is based on) for a companion book to be released with the movie, December 2015.


**International Invitations**

1998 – Invited lecturer at Barcelona-Pittsburgh ADRC meeting, "Dementia Today," Barcelona, Spain (Oct 1998)

2000 – Invited lecturer at Barcelona-Pittsburgh ADRC meeting Dementia Today II", Barcelona, Spain (Oct 2000)

2001 - Invited symposia speaker at 10th Congress of the International Psychogeriatric Association (Nice, France, Sept 2001). "Pathological Diagnosis of Dementia With Lewy Bodies" (Symposia Organizer, Ian McKeith)

2002 – Invited lecturer at Barcelona-Pittsburgh ADRC meeting Dementia Today III", Barcelona, Spain (Oct 2002)

2003 – Symposium speaker "Dementia with Lewy Bodies" at International Psychogeriatric Associations meeting, Chicago, IL, USA, 08/19/03

2004  Invited lecturer at Barcelona-Pittsburgh ADRC meeting Dementia Today IV", Barcelona, Spain (Oct 2004)

2006  Invited lecturer at Barcelona-Pittsburgh ADRC meeting Dementia Today V", Barcelona, Spain (Oct 2006)

2008  Invited lecturer at Barcelona-Pittsburgh ADRC meeting Dementia Today VI", Barcelona, Spain (May 2008)

2014 – Invited lecturer AANP annual meeting June 2014.  What Every Neuropathologist Should Know: Molecular studies in metastatic brain tumors.

2014 - Invited as member of scientific committee International Congress of Neuropathology quadrennial meeting Sept 2014, Rio de Janeiro

2014 – Chair of Forensic Pathology Session, committee International Congress of Neuropathology quadrennial meeting Sept 2014, Rio de Janeiro

2014 – co-chair telepathology session with Dr. Wiley

2014 – Presentation – Chronic Traumatic Encephalopathy – update, International Congress of Neuropathology quadrennial meeting Sept 2014, Rio de Janeiro

2014 – presentation – Cases of the Month – 16 Years of Unknowns  International Congress of Neuropathology quadrennial meeting Sept 2014, Rio de Janeiro s



**University of Pittsburgh Physicians, Department of Pathology**

Division of Neuropathology

Clayton A. Wiley, MD, PhD
*Director*

Charleen T. Chu, MD, PhD
Robert H. Garman, DVM
Ronald Hamilton, MD
Julia Kofler, MD
Scott M. Kulich, MD, PhD
David Lacomis, MD
Geoffrey Murdoch, MD, PhD
Gutti R. Rao, MD

UPMC Presbyterian
Room 5701 Scaife Hall
200 Lothrop Street
Pittsburgh, PA 15213
T 412-624-9415
F 412-624-5610

I have conducted a study of Cristopher Mims' brain tissue. Additionally, in my Neuropathology practice I conduct an ongoing study of all available and existing medical literature related to the existence and diagnosis of CTE and I combine that knowledge with my training and extensive experience related to the study and diagnosis of CTE.

Christopher Mims died on October 15, 2008 at age 38.

Received from Eric J Wahoske, LA County Department of ME Coroner are 180 unstained tissue sections on glass slides labeled 08-7210-H LAC ME Coroner, US recuts (10 unstained slides from 8 tissue blocks).

H&E stained recuts are examined:

slide A  dura mater;
slide B  cerebral cortex
slide C       hippocampus
slide D  hippocampus
slide E  insular cortex, putamen, globus pallidus and thalamus
slide F       cerebral cortex
slide G  cerebellum cortex and dentate nucleus
slide H       medulla

PHF-1/tau immunostaining of slides G and H were negative for abnormally aggregated tau. PHF-1/tau immunostaining of slides B, C, D, E and F show numerous neocortical PHF-1/tau positive tangles in neurons, with staining of many neuronal processes (neuropil threads) as well as tau-positive glial cells, especially in the depths of the sulcus and focally around some blood vessels best seen in slide B. There are no neuritic plaques and the tangles are much more common in the neocortex than in the hippocampus. These findings are diagnostic of CTE.

Figure 1: neocortex with numerous tangles, neuropil threads, glial tau and perivascular location; on the right is a close up of the distinctive perivascular pathology of CTE.



Christopher Mims had CTE.

Signed:
/s/
Ronald L Hamilton, M.D.

Affiliated with the University of Pittsburgh School of Medicine

 **CONCUSSION SETTLEMENT**

*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

## NOTICE OF REQUEST FOR ADDITIONAL DOCUMENTS
### DATE OF NOTICE: February 20, 2019
### RESPONSE DEADLINE: June 20, 2019

### I. SETTLEMENT CLASS MEMBER INFORMATION

| Settlement Program ID | 950013395 | | | |
|---|---|---|---|---|
| **Name:** | First<br>Carleen | | M.I. | Last<br>Hastings |
| **Settlement Class Member Type** | Representative Claimant | | | |
| **Primary Counsel** | O'Hanlon, Demerath & Castillo | | | |
| **Asserted Qualifying Diagnosis** | Death with CTE (Chronic Traumatic Encephalopathy) | | **Date of Asserted Qualifying Diagnosis** | 10/15/08 |

### II. EXPLANATION OF REQUEST(S)

This Notice is an official communication from the Claims Administrator for the NFL Concussion Settlement Program. Your Claim Package is missing documents or information.

This Notice explains what is missing and what you may do to address the issue. We can help if you have questions. To cure the issues identified in this Notice, click the Respond to Request for Additional Documents button on your secure online portal and follow the instructions provided to upload the information identified below. If you already have provided us with the missing information, let us know because we may have received it after conducting the review that generated this notice.

The following requires attention before we can act further:

| | What is Missing | How to Address this Item |
|---|---|---|
| **1.** | You have not submitted any medical records reflecting the Qualifying Diagnosis. | Click the Respond button, go to Section 3 for Medical Records, click on the Upload Medical Records button and follow the instructions to upload medical records reflecting the Qualifying Diagnosis. |

### III. ADDITIONAL EXPLANATION OF WHAT IS MISSING

The medical records must show a post-mortem diagnosis of CTE made before April 22, 2015 (the Final Approval Date) by a board-certified neuropathologist for a Retired NFL Football Player who died before April 22, 2015. See Section 6.3 (f) of the Settlement Agreement and FAQ 109. Mr. Mims died on October 15, 2008, and the October 16, 2008 autopsy report signed by Louis A. Pena does not reference CTE and neither does the death certificate. You provided an undated letter from Dr. Ronald L. Hamilton who diagnosed Mr. Mims with CTE. You must establish that Dr. Hamilton reviewed Mr Mim's brain tissue and made a CTE diagnosis on or before April 22, 2015.

### IV. HOW TO RESPOND TO THIS NOTICE

You have 120 days to respond to this Notice and provide the missing information or documents. **We encourage you to gather the requested information or documents now and respond to this Notice promptly, rather than using the full 120 days allowed to answer.  The sooner you respond, the sooner your claim can move forward in the review process.**

By the Response Deadline stated above, send us the missing information or documents identified in Section II.  We will wait the full 120 days to re-review your claim, unless you click the Submit Claim Package for Review button to confirm that your response is complete and we may continue to review your claim.  If you do not respond in full on or before the Response Deadline, we will have to assess your claim based on the materials we have, which could lead to a lower Monetary Award or denial of your claim in its entirety.

Submit the requested information using your secure online portal to upload additional documents.

## V. How to Contact Us with Questions or for Help

If you are represented by a lawyer, consult with your lawyer if you have questions or need assistance. If you are unrepresented and have any questions about this Notice or need help, contact us at 1-855-887-3485 or send an email to ClaimsAdministrator@NFLConcussionSettlement.com.  If you are a lawyer, call or email your designated Firm Contact for assistance. For more information about the Settlement program, visit the official website at www.NFLConcussionSettlement.com to read the Frequently Asked Questions or download a copy of the complete Settlement Agreement.



# Exhibit 7



# NFL CONCUSSION SETTLEMENT

*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

## FILED APPEAL ALERT
### DATE OF NOTICE: September 4, 2019

### I. SETTLEMENT CLASS MEMBER INFORMATION

| | |
|---|---|
| **Settlement Program ID** | 950013395 |

| **Name:** | First<br>Carleen | M.I. | Last<br>Hastings |
|---|---|---|---|

| | |
|---|---|
| **Settlement Class Member Type** | Representative Claimant |
| **Lawyer** | O'Hanlon, Demerath & Castillo |

### II. APPEAL PROCESS EXPLANATION: ISSUE(S) APPEALED

This Notice is an official communication from the Claims Administrator for the NFL Concussion Settlement Program. The Settlement Class Member (the "Appellant") has filed a timely appeal of this claim. This Notice begins your process under the Rules Governing Appeals of Claim Determinations adopted by the Special Masters. The Appellant's reasons for the appeal are identified below.

| Date of Appeal | Reason for Appeal |
|---|---|
| 8/28/19 | Class Member Carleen Hastings, by and through counsel, files this written statement in support of this appeal and respectfully requests that the Claims Administrator's denial of this claim be reversed and remanded for a calculation of the Class Member's Monetary Award. The Claims Administrator erred in making two erroneous legal conclusions and one erroneous factual determination.<br><br>First, the Claims Administrator erred in concluding that the Amended Settlement Agreement required Class Member to submit proof that the board-certified neuropathologist who provided a post-mortem diagnosis of CTE made the diagnosis on or before 4/22/15.*<br><br>Second, the Claims Administrator erred in concluding that the Amended Settlement Agreement required the board-certified neuropathologist who provided the CTE diagnosis for this claim to also "confirm" his CTE diagnosis by examining the Player's brain tissue. The Amended Settlement Agreement requires a post-mortem diagnosis of CTE by a board-certified neuropathologist; it does not require any additional "confirmation" of the diagnosis by the board-certified neuropathologist.<br><br>Third, the Claims Administrator erred in concluding that there is no proof that Dr. Hamilton "personally performed the post-mortem exam on the Retired Player." Dr. Hamilton did personally review brain tissue from the Retired Player as he states in his letter.<br><br>_____<br>* If the Amended Settlement Agreement [ECF 6481] is construed to require a diagnosis on or before 4/22/15, Class Member reserves the right to seek relief from the Court pursuant to both Rule 60 and the Court's inherent authority to amend the judgment in this case in order to implement the settlement. |

## III. APPEAL SCHEDULE

Section 9.7(b) of the Settlement Agreement and the Rules permit the Appellee(s) to file a written opposition within 30 days of this Filed Appeal Alert. Under Section 9.7(c), Class Counsel may file a written statement in support of or opposition to the appeal within 15 days of the date of this Filed Appeal Alert or no later than 15 days after the NFL Parties post its written opposition to the appeal. These submissions must not exceed 10 double-spaced pages. The Settlement Class Member and the NFL may submit a reply no later than 15 days after Class Counsel posts its written statement, and the reply cannot exceed four double-spaced pages. The claim will then proceed to the Special Masters for a decision on this appeal.

| Appeal Document | Deadline to Submit |
|---|---|
| NFL Opposition Memorandum | 10/4/19 |
| Class Counsel Statement (optional) | 9/19/19 Or 15 days after the NFL Parties post the opposition memorandum |
| Reply to Class Counsel's Statement (optional) | 15 days after Class Counsel submits its statement |

You may use the NFL Settlement Portal to submit any appeal documents. If you do not use the Portal, you may submit documents in any of the following ways:

| | |
|---|---|
| **By Mail:** (must be postmarked on or before the appeal deadline date) | NFL Concussion Settlement Claims Administrator P.O. Box 25369 Richmond, VA 23260 |
| **By Overnight Delivery:** (must be placed with the carrier on or before the deadline date) | NFL Concussion Settlement c/o BrownGreer PLC 250 Rocketts Way Richmond, VA 23231 |
| **By Hand Delivery:** (must be delivered on or before the deadline date) | NFL Concussion Settlement c/o BrownGreer PLC 250 Rocketts Way Richmond, VA 23231 |

If you would like to receive and submit forms like this one electronically rather than on paper, go to www.NFLConcussionSettlement.com/Login.aspx, click the Create New User button and follow the instructions there to establish a secure online portal account with us, if you do not already have one.

## IV. HOW TO CONTACT US WITH QUESTIONS OR FOR HELP

If you are represented by a lawyer, consult with your lawyer if you have questions or need assistance. If you are unrepresented and have any questions about this Notice or need help, contact us at 1-855-887-3485 or send an email to ClaimsAdministrator@NFLConcussionSettlement.com. If you are a lawyer, call or email your designated Firm Contact for assistance. For more information about the Settlement Program, visit the official website at www.NFLConcussionSettlement.com, where you can read or download the Rules Governing Appeals of Claim Determinations, Frequently Asked Questions about the Settlement, the complete Settlement Agreement and other helpful materials.



# Exhibit 8

## NFL Parties' Opposition to Appeal of
## Claim Denial by Representative Claimant Carleen Hastings

Carleen Hastings, Representative Claimant for the late Christopher Mims, submitted a claim on February 5, 2019—the day before the deadline for pre-Effective Date claims—for a Qualifying Diagnosis of Death with CTE purportedly rendered by neuropathologist Dr. Ronald L. Hamilton. (*See* Claim Form; Diagnosing Physician Certification.) In support of her claim, Ms. Hastings submitted (1) a Diagnosing Physician Certification from Dr. Hamilton, reflecting a purported Qualifying Diagnosis of Death with CTE (Diagnosing Physician Certification at 6); (2) an undated letter from Dr. Hamilton, purporting to diagnose Mr. Mims with CTE (Hamilton Letter); (3) a death certificate indicating that Mr. Mims died on October 15, 2008 and listing Mr. Mims' primary cause of death as "DILATED CARDIOMYOPATHY" and contributing causes of death as "HEPATIC STEATOSIS" and "HISTORY OF HYPERTENSION" (Death Certificate at 2); and (4) an autopsy report completed by Dr. Louis A. Pena, indicating the same causes of death listed in Mr. Mims' death certificate (*see* Autopsy Report at 1).

On February 20, 2019, the Claims Administrator issued a Notice of Request for Additional Documents advising Ms. Hastings that her Claim Package was incomplete because Ms. Hastings did not submit any medical records reflecting the Qualifying Diagnosis. (*See* Notice of Request for Additional Documents.) In the section titled "Additional Explanation of What is Missing," the Claims Administrator explained that Ms. Hastings' Claim Package materials did not show that Dr. Hamilton administered a post-mortem examination in which he diagnosed Mr. Mims with CTE prior to the Settlement Final Approval Date of April 22, 2015, as required by the Settlement Agreement. (*See id.*) On July 30, 2019, the Claims Administrator denied Ms. Hastings' claim because she failed to submit any Claim Package materials to show that Dr. Hamilton actually performed a post-mortem examination and rendered a diagnosis of CTE prior to the Final Approval Date, as required by the Settlement Agreement. (*See* Notice of Denial of Monetary Award Claim ("Denial Notice") at 1.)

On appeal, Ms. Hastings does not contend that Dr. Hamilton diagnosed Mr. Mims with CTE based on a post-mortem examination prior to April 22, 2015. Instead, she argues that: (1) the still unspecified date that Dr. Hamilton actually diagnosed Mr. Mims does not matter, because the diagnosis date for any Retired NFL Football Player diagnosed with Death with CTE purportedly is the date of the player's death; (2) if the Claims Administrator determines that a diagnosing physician must render a diagnosis of Death with CTE prior to April 22, 2015, the amended Settlement Agreement purportedly violates Settlement Class Members' due process rights because it was a change to the original Settlement Agreement without proper notice; (3) the Settlement Agreement allegedly did not require Dr. Hamilton to examine Mr. Mims' brain tissue in a post-mortem examination to render a Death with CTE diagnosis; and (4) Dr. Hamilton did examine Mr. Mims' brain tissue. (*See* Written Statement in Support of Class Member's Appeal of the Claims Administrator's Notice of Denial of Monetary Award Claim ("Appeal").)[1]

---

[1]   With knowledge that Mr. Mims and other clients never received a diagnosis of CTE prior to the Final Approval Date, counsel for Ms. Hastings has engaged in a lengthy history of legal gamesmanship concerning the deadline for Qualifying Diagnoses of Death with CTE. On August 15, 2017, counsel for Ms. Hastings, on behalf of client Yvonne Sagapolutele, filed a Motion to Modify the Amended Final Order and Judgment, in which she alleged that the Settlement Agreement's deadline to obtain a Qualifying Diagnosis of Death with CTE was "imposed after the deadline to opt out and without notice to Class Members." (Mem. of Law in Supp. of Absent Class Member and Pl. Yvonne Sagapolutele's Mot. to Modify the Am. Final Order and J. at 18, 12-md-2323, ECF No. 8263-2

The NFL Parties respectfully oppose the Appeal because it is utterly unfounded, and there is no question this claim must be denied. The Settlement Agreement clearly requires that a board-certified neuropathologist render a Qualifying Diagnosis of Death with CTE prior to April 22, 2015, and Ms. Hastings has not provided—and undoubtedly cannot provide—any evidence that Dr. Hamilton rendered such a diagnosis prior to that date. In addition, the amended Settlement Agreement's requirement that a Qualifying Diagnosis of Death with CTE must be rendered prior to April 22, 2015 does not violate Settlement Class Members' due process rights; to the contrary, it expanded the deadline for Death with CTE diagnoses compared to the original Settlement Agreement to the benefit of Settlement Class Members. Finally, although this issue need not be reached on appeal, the Settlement Agreement requires that a board-certified neuropathologist personally examine a Retired NFL Football Player's brain tissue prior to rendering a timely Qualifying Diagnosis of Death with CTE.

For these reasons, and those set forth below, Ms. Hastings' appeal should be denied.

## I.    There Is No Evidence That Dr. Hamilton Rendered a Qualifying Diagnosis of Death With CTE Prior to April 22, 2015, as Required by the Settlement Agreement

For a Qualifying Diagnosis of Death with CTE, the Settlement Agreement explicitly requires that a diagnosing physician render the diagnosis prior to the Settlement's Final Approval Date of April 22, 2015. Specifically, Section 2.1(aa) of the Settlement Agreement provides that the Qualifying Diagnosis of "Death with CTE is defined in Exhibit 1," and Exhibit 1 states that the definition of Death with CTE is: "For Retired NFL Football Players who died prior to the Final Approval Date, *a post-mortem diagnosis of CTE made by a board-certified neuropathologist prior to the Final Approval Date*, provided that a Retired NFL Football Player who died between July 7, 2014 and the Final Approval Date shall have until 270 days from his date of death to obtain such a postmortem diagnosis." (Settlement Agreement, Ex. A-1 at 5 § 5 (emphasis added).) Section 6.3(f) of the Settlement Agreement reiterates that requirement, stating that "[a] Qualifying Diagnosis of Death with CTE shall be made only for Retired NFL Football Players who died prior to the Final Approval Date, through *a post-mortem diagnosis made by a board-certified neuropathologist prior to the Final Approval Date* . . . ." (*See id.* at 6.3(f) (emphasis added).)

In the Appeal, Ms. Hastings argues that a Diagnosing Physician is not required to actually render a Qualifying Diagnosis of Death with CTE prior to April 22, 2015 because "the only date that is relevant in determining the date of a Qualifying Diagnosis for Death with CTE is the date of the Player's death." (Appeal at 5.) As support for this argument, Ms. Hastings cites Settlement FAQ 99 (formerly Settlement FAQ 93), which states in part:

> *Death with CTE*: For these claims, the date of the Qualifying Diagnosis is the date of the Player's death, even though the diagnosis is not made until after the Player dies. The Monetary Award is based on the Player's age when he died.

---

(the "Motion to Modify the Amended Final Order and Judgment").) After the Parties fully briefed that motion, the Court denied the motion without prejudice to Ms. Sagapolutele's (or other similarly situated Settlement Class Members') ability to raise the issue at a later time if she filed a Death with CTE claim that would have been valid but for the deadline. (Order, 12-md-2323, ECF No. 8557.) Counsel then waited over 16 months to file Ms. Hastings' Death with CTE claim, which relies on an *undated* letter from Dr. Hamilton, with the clear intention of obfuscating the timing and nature of Dr. Hamilton's purported CTE diagnosis.

(Settlement FAQ 99.)

Ms. Hastings' argument rests on willful ignorance of the Settlement Agreement and a misinterpretation of Settlement FAQ 99. Specifically, the Settlement Agreement plainly requires that, "[f]or Retired NFL Football Players who died prior to the Final Approval Date, a ***post-mortem diagnosis***" of Death with CTE must be "made by a board-certified neuropathologist ***prior to the Final Approval Date***." (Settlement Agreement Ex. A-1 at 5 § 5 (emphasis added).) If, as Ms. Hastings argues, the Settlement Agreement required only that a Retired NFL Football Player died prior to the Final Approval Date in order for a diagnosis made at *any unlimited future date* to be timely, the Settlement Agreement would not include subsequent language providing that a player who died between July 7, 2014 and the Final Approval Date "shall have until 270 days from his date of death to obtain such a postmortem diagnosis." (*Id.*)

Moreover, Settlement FAQ 99 does not concern the date by which a Diagnosing Physician must have *actually made* a Death with CTE diagnosis, but instead concerns the date of diagnosis ***for compensation purposes***. The Parties to the Settlement Agreement did not wish to reduce the compensatory award of a decedent who otherwise would have aged between death and the neuropathological examination. The Death with CTE portion of Settlement FAQ 99 confirms this, as it clearly states that "[t]he ***Monetary Award*** is based on the Player's age when he died." (Settlement FAQ 99 (emphasis added).)

Ms. Hastings has not provided—and presumably cannot provide—any evidence that Dr. Hamilton rendered his purported Qualifying Diagnosis of Mr. Mims prior to the Final Approval Date of April 22, 2015. In fact, Dr. Hamilton's letter containing the purported diagnosis does not contain any dates whatsoever, and Dr. Hamilton's Diagnosing Physician Certification form only lists the date of Mr. Mims' death (October 15, 2008) as the date of diagnosis. (*See* Hamilton Letter; Diagnosing Physician Certification.) Accordingly, Ms. Hastings' appeal must be denied, and her claim denial upheld, for this fundamental reason alone.

## II. The Settlement Agreement Requirement That a Death With CTE Diagnosis Be Rendered Prior to April 22, 2015 Does Not Violate Settlement Class Members' Due Process Rights

Fully aware that her purported Death with CTE diagnosis is untimely because it was not rendered prior to the Final Approval Date of April 22, 2015, Ms. Hastings argues that such requirement somehow violates her right to due process. Specifically, Ms. Hastings argues that the Special Master should consider the arguments in Yvonne Sagapolutele's August 15, 2017 Motion to Modify the Amended Final Order and Judgment to remove the deadline to obtain the Qualifying Diagnosis, which Motion was denied without prejudice by Judge Brody with instruction that Ms. Sagapolutele "must first show that she would be entitled to recover but for the Death with CTE diagnosis deadline," and then may raise the due process argument in the claims appeal process. (Order, 12-md-2323, ECF No. 8557.) Ms. Hastings' argument that the amendments to the Settlement Agreement somehow violated her due process rights is meritless.

Relying on Ms. Sagapolutele's prior Motion to Modify the Amended Final Order and Judgment, Ms. Hastings alleges that the Settlement Agreement's deadline to obtain a Qualifying Diagnosis of Death with CTE was "surreptitiously added to the Amended Settlement Agreement" after the deadline to opt out and without notice to Settlement Class Members. (Appeal at 6.) Ms. Sagapolutele's prior motion argues that absent class members' due process rights were violated by the change, and that the Court should remedy the violation by modifying the Settlement Agreement

to remove the deadline for a Qualifying Diagnosis of Death with CTE. (*See* Motion to Modify the Amended Final Order and Judgment at 15-24.)

In response, the NFL Parties, too, incorporate all of the arguments set forth in their Opposition to that Motion, attached in full as Exhibit 1.[2] As the NFL Parties explained in their Opposition, far from injuring Settlement Class Members' rights by "imposing" a new deadline for a Qualifying Diagnosis of Death with CTE, the amendments to the Settlement Agreement *extended* the deadline to obtain the Qualifying Diagnosis from the Preliminary Approval Date to the Final Approval Date (*see id.* at 10-11), and provided a 270-day grace period in which Settlement Class Members who died between the Preliminary Approval Date and the Final Approval Date could obtain a Qualifying Diagnosis (*see id.* at 6, 10). Accordingly, the relevant changes solely benefited absent class members and in no way violated their due process rights. (*See id.* at 9-13.)

For these additional reasons, Ms. Hastings' appeal must be denied, and her claim denial must be upheld.

### III. The Settlement Agreement Requires a Diagnosing Physician to Examine a Retired NFL Football Player's Brain Tissue in Order to Render a Qualifying Diagnosis of Death with CTE

Ms. Hastings further argues that the Claims Administrator erred in stating that the Claim Package must contain evidence that the Diagnosing Physician "examined the Retired Player's brain tissue to confirm a CTE diagnosis" (Denial Notice at 1) because the Settlement Agreement purportedly does not require a Diagnosing Physician to examine brain tissue in order to render a Qualifying Diagnosis of Death with CTE. (*See* Appeal at 7.) Although this issue need not be reached on appeal because Ms. Hastings has not provided any evidence that Mr. Mims was rendered a Qualifying Diagnosis of Death with CTE prior to April 22, 2015, Ms. Hastings is simply wrong.

As previously discussed, a Qualifying Diagnosis of Death with CTE requires "a post-mortem diagnosis of CTE made by a board-certified neuropathologist prior to the Final Approval Date." (Settlement Agreement, Ex. A-1 at 5 § 5; *see also* Settlement Agreement §§ 2.1(aa), 6.3(f).) Post-mortem examination of brain tissue is the ***only*** way that CTE can be diagnosed, as Judge Brody made clear in the Court's Memorandum supporting Final Approval of the Settlement Agreement:

> Chronic Traumatic Encephalopathy is a neuropathological diagnosis that currently can only be made post mortem. This means no one can conclusively say that someone had CTE until a scientist looks at sections of that person's brain under a microscope to see if abnormally phosphorylated tau protein ("abnormal tau protein") is present, and if so whether it is present in a reportedly unique pattern.

*In re Nat. Football League Players' Concussion Injury Litig.*, 307 F.R.D. 351, 397 (E.D. Pa. 2015), *amended*, No. 2:12-MD-02323-AB, 2015 WL 12827803 (E.D. Pa. May 8, 2015), and *aff'd*, 821 F.3d 410 (3d Cir. 2016). Judge Brody further stated that "Retired Players cannot be compensated for CTE in life because no diagnostic or clinical profile of CTE exists, and the symptoms of the disease, if any, are unknown." (*Id.*)

---

[2]    (*See* Ex. 1, Mem. of Law of the National Football League and NFL Properties LLC in Opp. to Settlement Class Member Yvonne Sagapolutele's Mot. to Modify the Am. Final Order and J., 12-md-2323, ECF No. 8430.)

Thus, the Settlement Agreement and its implementing orders clearly require that a diagnosing physician personally examine a Retired NFL Football Player's brain tissue in order to render a Qualifying Diagnosis of Death with CTE. Here, Dr. Hamilton's letter indicated that he examined slides of Mr. Mims' brain tissue, but, as previously discussed, Ms. Hastings has not provided any evidence that he performed such a post-mortem examination and diagnosed Mr. Mims with CTE prior to April 22, 2015.

**Conclusion**

The denial of Ms. Hastings' claim was required under the judicially-approved terms of the Settlement Agreement. The Special Master has already denied 19 substantially similar appeals filed by Settlement Class Members represented by Ms. Hastings' counsel, and Ms. Hastings' appeal presents no additional evidence to warrant a different outcome.[3] Because Ms. Hastings does not present clear and convincing evidence that such determination was in error, the Special Master should affirm denial of the claim.

Dated:  October 3, 2019                  Respectfully submitted,

PAUL, WEISS, RIFKIND,
   WHARTON & GARRISON LLP

*/s/ Brad S. Karp*_____
Brad S. Karp
Bruce Birenboim
Claudia Hammerman
Lynn B. Bayard
Douglas M. Burns
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990
Email:  bkarp@paulweiss.com

*ATTORNEYS FOR THE*
*NATIONAL FOOTBALL LEAGUE*
*AND NFL PROPERTIES LLC*

---

[3] (*See, e.g.*, SPID 950012548, Doc. No. 214641.)

# EXHIBIT 1

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB <br><br> MDL No. 2323 <br><br> Hon. Anita B. Brody |
| Kevin Turner and Shawn Wooden, *on behalf of themselves and others similarly situated*, <br><br>                        Plaintiffs, <br><br>             v. <br><br> National Football League and NFL Properties, LLC, successor-in-interest to NFL Properties, Inc. <br>                     Defendants. | Civ. Action No.: 14-cv-00029-AB |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | Hon. Anita B. Brody |

## MEMORANDUM OF LAW OF THE NATIONAL FOOTBALL LEAGUE AND NFL PROPERTIES LLC IN OPPOSITION TO SETTLEMENT CLASS MEMBER YVONNE SAGAPOLUTELE'S MOTION TO MODIFY THE <u>AMENDED FINAL ORDER AND JUDGMENT</u>

**TABLE OF CONTENTS**

**Page**

Preliminary Statement ..................................................................................... 1

Background ......................................................................................................... 4

    A.    Parties ................................................................................................. 4

    B.    Procedural Background ...................................................................... 4

Argument ............................................................................................................ 8

I.    THE PARTIES WERE NOT REQUIRED TO NOTIFY THE SETTLEMENT CLASS ABOUT THE AMENDMENTS ........................... 8

    A.    The Amendments Did Not Require New Notice .................................. 9

    B.    The Original Settlement Notice Was Sufficient ................................. 11

II.    SAGAPOLUTELE IS NOT ENTITLED TO REWRITE THE SETTLEMENT AGREEMENT ............................................................. 13

Conclusion ......................................................................................................... 17

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Adelson* v. *Ocwen Fin. Corp.*,
    621 F. App'x 348 (7th Cir. 2015) ...........................................................14

*In re Baby Prods. Antitrust Litig.*,
    708 F.3d 163 (3d Cir. 2013)............................................................9, 11

*Blue Diamond Coal Co.* v. *Trustees of UMWA Combined Ben. Fund*,
    249 F.3d 519 (6th Cir. 2001) ...........................................................16

*In re Diet Drugs Prods. Liab. Litig.*,
    200 F. App'x 95 (3d Cir. 2006) ........................................................14

*In re Diet Drugs Prods. Liab. Litig.*,
    No. 99-cv-20593, 2010 WL 2735414 (E.D. Pa. July 2, 2010) ......................9, 11, 13

*F.A.C., Inc.* v. *Cooperativa de Seguros de Vida de Puerto Rico*,
    449 F.3d 185 (1st Cir. 2006)............................................................17

*Federman* v. *Artzt*,
    339 F. App'x 31 (2d Cir. 2009) .....................................................14, 15

*In re Four Seasons Sec. Laws Litig.*,
    525 F.2d 500 (10th Cir. 1975) .........................................................15

*Harris* v. *Graddick*,
    615 F. Supp. 239 (N.D. Ala. 1985)...................................................9, 11

*Hensley* v. *Alcon Labs., Inc.*,
    277 F.3d 535 (4th Cir. 2002) ..........................................................17

*Inmates of Suffolk Cty. Jail* v. *Rufo*,
    No. 71-cv-00162, 2015 WL 6958070 (D. Mass. Nov. 10, 2015) ...........................16

*Kokkonen* v. *Guardian Life Ins. Co. of Am.*,
    511 U.S. 375 (1994)..................................................................17

*In re Linerboard Antitrust Litig.*,
    223 F.R.D. 357 (E.D. Pa.), *amended*, 223 F.R.D. 370 (E.D. Pa. 2004)...................17

*Matthews, Wilson & Matthews, Inc.* v. *Capital City Bank*,
    614 F. App'x 969 (11th Cir. 2015) .....................................................15

**Page(s)**

*In re Nat'l Football League Players' Concussion Injury Litig.*,
  307 F.R.D. 351 (E.D. Pa. 2015), *amended*, No. 12-MD-02323, 2015 WL
  12827803 (E.D. Pa. May 8, 2015) ................................................................ passim

*In re Nat'l Football League Players Concussion Injury Litig.*,
  821 F.3d 410 (3d Cir. 2016), *amended* (May 2, 2016) ............................................7

*In re Nissan Motor Corp. Antitrust Litig.*,
  552 F.2d 1088 (5th Cir. 1977) ......................................................................11

*Orlando Residence, Ltd.* v. *Hilton Head Hotel Inv'rs*,
  No. 89-cv-0662, 2013 WL 1103027 (D.S.C. Mar. 15, 2013) ................................15

*In re PaineWebber Ltd. P'ships Litig.*,
  171 F.R.D. 104 (S.D.N.Y 1997) ....................................................................11

*Roman-Oliveras* v. *Puerto Rico Elec. Power Auth.*,
  797 F.3d 83 (1st Cir. 2015) ..........................................................................17

*Sawka* v. *Healtheast, Inc.*,
  989 F.2d 138 (3d Cir. 1993) ..........................................................................15

## OTHER AUTHORITIES

11 Fed. Prac. & Proc. Civ. § 2852 (3d ed.) ....................................................17

20 Fed. Prac. & Proc. Deskbook § 104 ..........................................................16

Fed. R. Civ. P. 23 ..................................................................................2, 9

Fed. R. Civ. P. 60 ......................................................................1, 3, 14, 15, 16

Newberg on Class Actions § 1:5 (5th ed.) ........................................................9

Newberg on Class Actions § 8:17 (5th ed.) ......................................................9

Newberg on Class Actions § 8:36 (5th ed.) ......................................................9

Newberg on Class Actions § 8:7 (5th ed.) ........................................................9

Newberg on Class Actions § 18:40 (5th ed.) ....................................................15

Defendants National Football League and NFL Properties LLC (collectively, the "NFL Parties") respectfully submit this memorandum of law in opposition to Settlement Class Member Yvonne Sagapolutele's ("Sagapolutele's") motion to modify the Amended Final Order and Judgment (the "Motion") (ECF No. 8263).

<u>**Preliminary Statement**</u>

Sagapolutele, an absent Settlement Class Member and representative of the estate of Retired NFL Football Player Pio Sagapolutele, brings this motion, ostensibly as a matter of due process, seeking significant revisions to the Final Order and Judgment that the Court entered more than two years ago approving the Class Action Settlement Agreement in this case.[1]  But no due process violation has occurred, and Sagapolutele has shown no justification for this Court to take the extraordinary step of rewriting a settlement agreement approved by both this Court and the Third Circuit that has been in place for years.  Sagapolutele's motion should therefore be denied.

The primary ground for Sagapolutele's motion is the amendments to the Settlement Agreement in February 2015, which expanded the definition of the Death with CTE Qualifying Diagnosis in response to the Court's directives.  Contrary to fact, Sagapolutele contends that the amendment imposed a deadline to obtain a Qualifying Diagnosis of Death with CTE, and "[b]ecause this change was made both without notice to absent class members and after the deadline to opt out of the settlement, [her] due process rights were violated."  (Pl. Mem. at 15.)  Sagapolutele asks this Court, pursuant to Rule 60 of the Federal Rules of Civil Procedure and the Court's inherent power, to amend the Final Order and Judgment to "remov[e] the deadline to obtain a Qualifying Diagnosis of Death with CTE."  (Pl. Mem. at 1.)

---

[1]  Unless otherwise defined, the capitalized terms used in this memorandum have the same meaning as those in the Settlement Agreement.

Sagapolutele's motion has no basis in fact or law for several reasons.

*First*, the amendments in question concerned an *expansion* of settlement benefits to the Settlement Class—namely, the expansion of the Qualifying Diagnosis of Death with CTE to include Retired NFL Football Players who died with CTE between Preliminary and Final Approval of the Settlement Agreement; the original agreement limited the Qualifying Diagnosis to those who died *prior* to Preliminary Approval.  It is well settled that additional notice to a class is necessary only when amendments to a settlement agreement are "materially adverse" to the class, not where, as here, they benefit the class.  Neither the Due Process Clause nor Rule 23 of the Federal Rules of Civil Procedure require notice in the event of beneficial, or even neutral, amendments.  As this Court correctly held in granting Final Approval of the Settlement Agreement over various objections to this very amendment (although on a different ground), no additional notice was required in this case for that very reason.

*Second*, contrary to Sagapolutele's contentions regarding lack of notice, the class notice in connection with the original settlement agreement was all that was necessary.  The Short- and Long-Form notices distributed to the Settlement Class Members made clear, as this Court and the Third Circuit held, that an award of Death with CTE would *not* be available to all Retired NFL Football Players diagnosed with CTE.  Rather, only particular cases of CTE meeting "certain" predetermined and agreed-to standards under the Settlement Agreement would be compensated—namely, cases where, prior to Preliminary Approval,[2] the Retired NFL Football Player received a post-mortem diagnosis of CTE made by a board-certified neuropathologist.  Further, the amendments in question were in fact made public; the NFL Parties and Class Counsel posted the amendments—including a redline comparison clearly

---

[2]     As noted above, the amendments to the Settlement Agreement extended this deadline to Final Approval.

reflecting the changes to the text of the Settlement Agreement—on the Court's publicly accessible PACER docket, where any member of the public, including the more than 5,000 Settlement Class Members with legal representation, could view it. In fact, over 40 Settlement Class Members objected to the amendments, including the very amendment that Sagapolutele complains of here.

*Finally*, even if Sagapolutele could show a due process violation, which she cannot, neither Rule 60 nor this Court's "inherent authority" allows Sagapolutele to rewrite the Settlement Agreement as she seeks. Rule 60(a) is limited to correction of "clerical mistakes" that do not affect the substantive rights of the parties. Yet her contention that the amendments were simply "clerical mistakes" is at odds with her characterization of those same amendments as impairing her rights under the settlement. Further, not only does Sagapolutele—as an absent class member—lack standing to move pursuant to Rule 60(b)(6), she also fails to establish that the "extraordinary remedy" of amendment pursuant to Rule 60(b)(6) is warranted here because she does not show that she will experience *any* hardship without the relief she seeks. For example, Sagapolutele has neither shown (nor even claimed) that the brain of her late husband, who died in 2009, has ever been examined by a board-certified neuropathologist for CTE, much less diagnosed as having CTE. Nor has she explained why any such examination—if such a belated diagnosis were even medically possible—did not occur prior to the Court's Final Approval Order on April 22, 2015 (as amended May 8, 2015). Finally, Sagapolutele has not shown that she is entitled to relief under the Court's "inherent authority" to amend the Final Order and Judgment because that authority is no more expansive than Rule 60.

Accordingly, Sagapolutele's motion should be denied.

## Background

### A.    Parties

The National Football League ("NFL") is an unincorporated association of 32 Clubs that promotes, organizes, and regulates the sport of professional football in the United States.  NFL Properties LLC ("NFLP") is a limited liability company organized under the laws of the State of Delaware and headquartered in New York.  Sagapolutele is a self-described absent Settlement Class Member and the representative of the estate of late Retired NFL Football Player Pio Sagapolutele.  (Pl. Mot. at 1.)

### B.    Procedural Background

The Judicial Panel on Multidistrict Litigation established this multidistrict litigation as MDL 2323 on January 31, 2012.  Since that time, over 300 additional cases, brought on behalf of approximately 5,000 former NFL players, have been included in the MDL.  *See In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. 351, 361 (E.D. Pa. 2015), *amended*, No. 12-MD-02323, 2015 WL 12827803 (E.D. Pa. May 8, 2015), *and aff'd*, 821 F.3d 410 (3d Cir. 2016), *amended* (May 2, 2016), *cert. denied*, 137 S. Ct. 591 (2016), and *cert. denied*, 137 S. Ct. 607 (2016).  Plaintiffs in these cases asserted fraud- and negligence-based claims against the NFL Parties based on, among other things, a purported duty to provide players with rules and information needed to protect them from the alleged effects of repetitive mild traumatic brain injuries sustained during NFL play, including CTE.  *Id*. at 361-62.

On June 25, 2014, the NFL Parties and Class Counsel[3] (collectively, the "Parties") filed a motion for preliminary class certification and preliminary approval of the Settlement Agreement, and on July 7, 2014, the Court approved the motion.  *See id.* at 363-65.

---

[3]    Class Counsel consists of attorneys whom this Court duly appointed as legal representatives for the Settlement Class, including Christopher A. Seeger, Sol Weiss, Steven C. Marks, Gene Locks, Arnold Levin, and Dianne M. Nast.  (Final Order & Judg. ¶ 6,  ECF No. 6510.)

The Settlement Agreement defined the Settlement Class as "'[a]ll living NFL Football Players who, prior to the date of Preliminary Approval . . . retired . . . from playing professional football with the NFL,'" as well as their Representative Claimants and Derivative Claimants.  *Id.* at 365 ("Representative Claimants are those duly authorized by law to assert the claims of deceased, legally incapacitated, or incompetent Retired Players.  Derivative Claimants are those, such as parents, spouses, or dependent children, who have some legal right to the income of Retired Players.").  The Settlement Agreement also provides funding for Retired NFL Football Players to receive a baseline assessment examination of their objective neurological functioning, for safety and educational initiatives, and for monetary awards for certain Qualifying Diagnoses, including, as relevant here, the Qualifying Diagnosis of Death with CTE.  *Id.* at 366-67.

Prior to the Fairness Hearing, the Parties distributed Court-approved Short- and Long-Form notices to the Settlement Class.  *See id.* at 382-86.  "Each was written in plain and straightforward language," and together, they disclosed the key components of the Settlement Agreement, making clear that "only 'certain' cases of CTE are covered."  *Id.* at 383-84.  As explained by the notice, under the original agreement, the Settlement's benefits included "[m]onetary awards for ***diagnoses*** of Death with CTE ***prior to July 7, 2014*** . . . ."  (*See* Long-Form Notice at 6, ECF No. 6086-1 (emphasis added); *see also* Class Action Settlement Agreement as of June 24, 2014 § 6.3(f), ECF No. 6087 (a "Qualifying Diagnosis of Death with CTE shall be made only for Retired NFL Football Players who died prior to the date of the Preliminary Approval and Class Certification Order, through a post-mortem diagnosis by a board-certified neuropathologist of CTE.").)

After the Fairness Hearing, the Parties—at this Court's request—agreed to several amendments to the Settlement Agreement, each of which made the Settlement Agreement more

beneficial to Settlement Class Members. *In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. at 386. For example, the amendments provided credit for Settlement Class Members who played in NFL Europe; ensured that all eligible Retired NFL Football Players who elected to receive a baseline assessment examination would receive one regardless of any funding limitations in the Settlement Agreement; included a hardship provision with respect to the appeal fee for Settlement Class Members; and allowed reasonable accommodation for Settlement Class Members who do not possess certain medical records. (Class Counsel and the NFL Parties' Joint Submission in Resp. to the Feb. 2, 2015 Order of the Ct., Feb. 13, 2015, ECF No. 6481.) In addition, as is relevant here, one amendment expanded the Qualifying Diagnosis of Death with CTE to cover not only Retired NFL Football Players who died prior to Preliminary Approval, but also Retired NFL Football Players who died between Preliminary Approval and Final Approval. (*Id*. at 4-5.) In addition, the Parties explained to the Court that "**consistent with the Parties' intent under the original Settlement Agreement**, and recognizing that obtaining such a [CTE] diagnosis **may take several months post-death**, the Parties have provided for a grace period of 270 days following any date of death between preliminary approval and the Final Approval Date to allow Claimants to obtain the necessary diagnosis." (*Id*. (emphasis added).)

Copies of the proposed amended Settlement Agreement, including a redline showing the exact changes made, were posted on the Court's publicly accessible PACER database in February 2015. (Class Counsel and the NFL Parties' Joint Submission in Resp. to the Feb. 2, 2015 Order of the Ct., Ex. A, Feb. 13, 2015, ECF No. 6481-1.) Between February and April 2015, more than 40 Settlement Class Members filed objections to the amendments, including objections to the amendment to the definition of Death with CTE at issue here. (*See*

Armstrong Objectors' Suppl. Obj. to the Am. Class Action Settlement, ECF No. 6503; Miller

Suppl. Obj. to Settlement, ECF No. 6484.) Sagapolutele did not file any objection.

After considering those objections, the Court issued its opinion approving the

Settlement Agreement and finding that "Class Members who opted out . . . received adequate

notice of these changes, ***and notification of Class Members is not required***." *In re Nat'l

Football League Players' Concussion Injury Litig.*, 307 F.R.D. at 386 (emphasis added). The

Court explained: "Because these changes improved the deal for Class Members without

providing any concessions to the NFL Parties, an additional round of notice for Class Members

is unnecessary." *Id*. On appeal, the Third Circuit affirmed this Court's Final Order and

Judgment in full. Regarding notice, the Third Circuit agreed with the District Court, finding

"that the content of the class notice . . . satisfied Rule 23 and due process." *In re Nat'l Football

League Players Concussion Injury Litig.*, 821 F.3d 410, 435-36 (3d Cir. 2016), *amended* (May 2,

2016), *cert. denied*, 137 S. Ct. 591 (2016), and *cert. denied*, 137 S. Ct. 607 (2016). Notably, the

Third Circuit also "conclude[d] that the settlement's treatment of CTE does not render the

agreement fundamentally unfair." *Id.* at 444.

On August 15, 2017, over two years after this Court granted final approval of the

Settlement, Sagapolutele filed this Motion challenging the Court's determination that the

amendments were beneficial to Settlement Class Members and therefore did not require

additional notice, and seeking "modification of the Final Order and Judgment by removal of the

deadline to obtain a Qualifying Diagnosis of Death with CTE."[4] (Pl. Mot. at 2.) Sagapolutele

contends that "[t]his deadline was added to the Settlement Agreement in February 2015 without

---

[4] Relatedly, Sagapolutele also seeks an "instruction to the settlement administrator to develop forms and procedures that allows Class Members to obtain a Qualifying Diagnosis of Death with CTE by obtaining a post-mortem diagnosis by a board-certified neuropathologist at any time during the 65-year term of the Monetary Award Fund." (Pl. Mot. at 2.)

notice to the class," and "effectively prevented Class Members . . . from obtaining a Qualifying Diagnosis of Death with CTE." (*Id.*) Despite Sagapolutele's claim that "this deadline materially prejudices" Settlement Class Members (*id.*), she offers no explanation, much less an evidentiary showing, of how her own rights were in any way impaired by the alleged lack of notice. She does not demonstrate—or even assert—that the brain of her late husband has been examined by a board-certified neuropathologist and determined to have CTE. Therefore, not only is Sagapolutele's injury entirely hypothetical, but she also does not establish that such an examination would even be viable, given her husband's death in 2009.[5]

The NFL Parties, through this memorandum of law, oppose the Motion.

## Argument

### I.

### THE PARTIES WERE NOT REQUIRED TO NOTIFY THE SETTLEMENT CLASS ABOUT THE AMENDMENTS

Sagapolutele argues that her due process rights were violated because she did not receive notice that the February 2015 amendment "impos[ed] a deadline to obtain a Qualifying Diagnosis of Death with CTE" when the original Settlement Agreement purportedly permitted "Class Members [to] obtain a Qualifying Diagnosis for Death with CTE anytime within the 65-year life of the Monetary Award Fund." (Pl. Mem. at 17.) Not so.

"[T]he Due Process Clause of the Fourteenth Amendment requires that notice [concerning a class action settlement] be 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" *In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. at

---

[5]   *See* Compl. ¶ 43, *Sagapolutele* v. *Nat'l Football League*, No. 17-cv-00348 (E.D. Pa. Jan. 25, 2017), ECF No. 1; *see also* Am. Stip. of Dismissal, *Sagapolutele* v. *Nat'l Football League*, No. 17-cv-00348 (E.D. Pa. May 3, 2017), ECF No. 4 (approving stipulation of dismissal without prejudice).

383 (quoting *Mullane* v. *Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)).[6] Parties

settling a class action litigation should therefore distribute notice that "'fairly apprises' class

members of the action and their rights." Newberg on Class Actions § 8:17 (5th ed.). Additional

notice is only required when the settling parties subsequently introduce amendments that "would

have a *material adverse* effect on the rights of class members." *In re Diet Drugs Prods. Liab.*

*Litig.*, No. 99-cv-20593, 2010 WL 2735414, at *6 (E.D. Pa. July 2, 2010) (emphasis added); *see*

*also In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 175 n.10, 182 (3d Cir. 2013) (supplemental

notice required only for "*material* alterations" (emphasis added)). Conversely, if the

amendments are neutral or beneficial to the settlement class, no additional notice is required. *See*

*Harris* v. *Graddick*, 615 F. Supp. 239, 244 (N.D. Ala. 1985) (holding that where "the

amendment is narrow and it is clearly apparent that the interests of the classes are not

*substantially impaired*, . . . the notice already given is adequate" (emphasis added)); *see also In*

*re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. at 383 (collecting cases,

including *Harris*). That is the case here.

###   A.     The Amendments Did Not Require New Notice

Sagapolutele's argument—that the Parties should have re-distributed notice

reflecting the February 2015 amendments to the Settlement Agreement—fundamentally

misunderstands the substance of the amendments. In Sagapolutele's telling, "in the midst of

otherwise beneficial amendments" to the Settlement Agreement, the Parties "impose[d] an

additional requirement that prevents Class Members from recovering settlement proceeds [for

CTE] unless they obtained a Qualifying Diagnosis before" Final Approval. (Pl. Mem. at 8.) But

---

[6]   Due process notice requirements mirror those of Rule 23 of the Federal Rules of Civil Procedure. *See* Newberg
on Class Actions § 1:5 (5th ed.) ("Rule 23 is constructed to ensure that the representative nature of class action
litigation safeguards these absent class members' due process rights."); *id.* § 8:7 (5th ed.) (the notice
requirements under Rule 23 "echo[] the constitutional test set forth by the Supreme Court"); *id.* § 8:36 (5th ed.)
("[A]s Rule 23's requirements are quite similar to the Constitution's, the distinction may be immaterial.").

the amendment only clarified what was always the case and extended the deadline for Death with CTE to Final Approval.

The original settlement agreement provided that an award for a Qualifying Diagnosis of Death with CTE would be available only to Retired NFL Football Players who died *and* received a CTE diagnosis prior to Preliminary Approval. The Long-Form Notice made this explicit, stating that the Settlement's benefits include "[m]onetary awards for ***diagnoses*** of Death with CTE ***prior to July 7, 2014*** . . . ." (*See* Long-Form Notice at 6, ECF No. 6086-1 (emphasis added); *see also* Decl. of Robert H. Klonoff Relating to the Proposed Class Settlement in the Nat'l Football League Players' Concussion Injury Litig. ¶ 85, Nov. 12, 2014, ECF No. 6423-9 ("[C]ontrary to the arguments advanced by various objectors, ***excluding CTE in cases diagnosed after July 7, 2014***, is not irrational." (emphasis added)).) Similarly, the Parties' publicly filed submission to the Court in support of the amendment stated specifically that the amendment's language providing only a grace period of time following death within which to obtain a neuropathological diagnosis of CTE was "*consistent with the Parties' intent under the original Settlement Agreement*." (*See* Class Counsel and the NFL Parties' Joint Submission in Resp. to the Feb. 2, 2015 Order of the Ct. at 4, ECF No. 6481 (emphasis added).)

Contrary to Sagapolutele's contentions, this amendment did not adversely affect the Settlement Class—much less materially so. In fact, the amendment *expanded* settlement benefits to encompass any additional Settlement Class Members who died after Preliminary Approval but before Final Approval, and provided 270 days to receive a CTE diagnosis for such players—thereby, increasing the time covered by the definition of Death with CTE by *nine* months. (*See id.* at 4-5.)

Accordingly, far from being materially adverse to Settlement Class Members, these amendments actually made the Settlement Agreement *more beneficial* by expanding the availability of an award for Death with CTE to a larger class of claimants. (*Id.*)  Thus, as this Court previously held, "[b]ecause these changes improved the deal for Class Members without providing any concessions to the NFL Parties, an additional round of notice for Class Members is unnecessary."  *In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. at 386; *see also In re Baby Prods. Antitrust Litig.*, 708 F.3d at 175 n.10, 182; *In re Diet Drugs Prods. Liab. Litig.*, 2010 WL 2735414, at *6; *Harris*, 615 F. Supp. at 244.

**B.    The Original Settlement Notice Was Sufficient**

Sagapolutele's due process argument fails for an additional reason.  The original notice, as this Court held, was clear that not all CTE diagnoses would be compensated under the Settlement Agreement, and the publicly available amendments sufficiently defined those CTE diagnoses eligible for compensation.

*First*, the Short- and Long-Form notices distributed to Settlement Class Members adequately protected their due process rights.  To comport with due process, settlement notice need only be adequate and summarize the terms of the Settlement; perfection and painstaking detail are not required.  *See In re Nat'l Football League Concussion Injury Litig.*, 307 F.R.D. at 382-83; *see also In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1104-05 (5th Cir. 1977) (explaining that notice need not "[be] perfectly correct in its form," and instead that "[t]he standard [] is that the notice . . . must contain information that a reasonable person would consider to be material in making an informed, intelligent decision" about whether to opt out); *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 124 (S.D.N.Y 1997) ("The notice need not be highly specific, and indeed 'numerous decisions, no doubt recognizing that notices to class members can practicably contain only a limited amount of information, have approved very

general descriptions of the proposed settlement.'" (quoting *Weinberger* v. *Kendrick*, 698 F.2d 61, 70 (2d Cir. 1982)).

As this Court previously held in overruling objections that "the Long-Form Notice is confusing because the term 'Death with CTE' appears several times without the accompanying cutoff date, . . . [b]oth the Summary Notice and the Long-Form Notice indicate that **only 'certain' cases of CTE are covered**."  *In re Nat'l Football League Concussion Injury Litig.*, 307 F.R.D. at 383-84 (emphasis added) (citing Summary Notice at 1, ECF No. 6086-2; Long-Form Notice at 1, ECF No. 6086-1).  Moreover, as stated above, the Long-Form Notice specifically stated that the Settlement's benefits include "[m]onetary awards for *diagnoses* of Death with CTE **prior to July 7, 2014** . . . ."  (*See* Long-Form Notice at 6, ECF No. 6086-1 (emphasis added).)  Both the Short- and Long-Form notice thus alerted Settlement Class Members that an award for CTE was not absolute or unconditional; rather, a Settlement Class Member would need to satisfy "certain" criteria before any award would be made.  That is the case here—under the original and amended Settlement Agreement, Sagapolutele must satisfy particular criteria before receiving an award of Death with CTE, including that she obtain her decedent's CTE diagnosis within a predetermined time period—and the original notice satisfied Sagapolutele's Due Process rights by alerting her to this fact.

*Second*, the Parties made the February 2015 amendments publicly available months prior to this Court's April 22, 2015 Final Approval Order (as amended May 8, 2015). Not only did the Parties post a copy of the amendments to this Court's publicly available PACER database as early as February 2015, but they also submitted a redline showing the exact changes to be made to the Settlement Agreement as a result of those proposed amendments.  (Class Counsel and the NFL Parties' Joint Submission in Resp. to the Feb. 2, 2015 Order of the Ct., Ex.

A, Feb. 13, 2015, ECF No. 6481-1.) This is especially significant in light of the widespread attention paid to the docket in this matter by, among others, the more than 5,000 Retired NFL Football Players who, at the time of settlement, were represented by counsel in MDL 2323. *See In re Nat'l Football League Concussion Injury Litig.*, 307 F.R.D. at 389; *see also In re Diet Drugs Prods. Liab. Litig.*, 2010 WL 2735414, at *4 (holding that no notice of settlement agreement amendments was required because, in part, "notice of the proposed Tenth Amendment, along with an opportunity to object, was supplied to representatives of all class members with active cases in MDL No. 1203.").

In fact, the Parties' efforts to publicize the amendments were successful, as evidenced by the fact that over 40 Settlement Class Members filed objections to the amendments, *including objections to the very Death with CTE provision about which Sagapolutele complains.* (*See* Armstrong Objectors' Suppl. Obj. to the Am. Class Action Settlement, ECF No. 6503; *see also* Miller Suppl. Obj. to Settlement, ECF No. 6484.) While these objectors raised somewhat different concerns than Sagapolutele raises here—they argued that the award of Death with CTE should be available to Retired NFL Football Players who die after Final Approval—they nonetheless sought, at least in part, the same relief that Sagapolutele appears to now seek: "modification of the Final Order and Judgment by removal of the deadline to obtain a Qualifying Diagnosis of Death with CTE." (Pl. Mot. at 2.) This Court properly rejected these objectors' requests, and similarly should reject Sagapolutele's efforts here.

## II.

### SAGAPOLUTELE IS NOT ENTITLED TO REWRITE THE SETTLEMENT AGREEMENT

Even if Sagapolutele had established that notice of the amendments should have been given—which she has not, as explained above—her Motion would fail. Sagapolutele first

argues that under Rule 60(a), the Court should rewrite the Settlement Agreement and amend the Final Order and Judgment because the Court made a "clerical error" when approving the amendments to the Settlement Agreement.  Second, Sagapolutele contends that amendment under Rule 60(b)(6) is justified by "extraordinary circumstances."  Finally, Sagapolutele argues that the Court's inherent authority permits it to amend the Final Order and Judgment here.  (Pl. Mem. at 18-24.)  These arguments lack merit.

  *First*, Sagapolutele has not made the necessary showing under Rule 60(a).  It is well settled that amendment of judgments pursuant to Rule 60(a) "is limited to the correction of 'clerical mistakes'; it encompasses only errors 'mechanical in nature, apparent on the record, and not involving an error of substantive judgment.'"  *In re Diet Drugs Prods. Liab. Litig.*, 200 F. App'x 95, 103 (3d Cir. 2006) (quoting *Pfizer Inc.* v. *Uprichard*, 422 F.3d 124, 129 (3d Cir. 2005)).  For Rule 60(a) to apply, the change to be corrected must not "affect[] the substantive rights of the parties."  *Id.* at 103-04 (quoting *Pfizer*, 422 F.3d at 130) (holding Rule 60(a) inapplicable because the "correction here goes beyond the correction of a 'mindless and mechanistic mistake'" (quotation omitted)).  Here, Sagapolutele has only ever alleged that the amendments in question were deliberate attempts by the Parties to modify the criteria for the Qualifying Diagnosis of Death with CTE.  She cannot simultaneously argue these amendments were mere "clerical mistakes."  As such, Rule 60(a) is inapplicable here.

  *Second*, Sagapolutele's attempts to seek relief under Rule 60(b)(6) fail, too.[7] Relief under Rule 60(b) is "not ordinarily . . . available to non-parties," *Federman* v. *Artzt*, 339 F. App'x 31, 33-34 (2d Cir. 2009), and "[a]bsent class members such as [movant] are treated, with limited exceptions inapplicable here, as non-parties to a class action."  *Adelson* v. *Ocwen*

---

[7] Although Sagapolutele broadly states she is moving for relief under Rule 60(b), her memorandum of law cites only to the Rule's catchall provision, which permits the modification of a final judgment based on "any other reason that justifies relief."  Fed. R. Civ. P. 60(b)(6).

*Fin. Corp.*, 621 F. App'x 348, 351 (7th Cir. 2015); *Federman*, 339 F. App'x at 33-34 (holding that absent class members who did not object to settlement were not "parties" for purposes of Rule 60(b) and declining "to expand the narrow exception to the general rule that non-parties cannot bring Rule 60(b) motions"); *In re Four Seasons Sec. Laws Litig.*, 525 F.2d 500, 504 (10th Cir. 1975) (absent class member "did not become a party for the purposes of Rule 60(b) to enable him to challenge the adequacy or nature of the settlement"); *see also* Fed. R. Civ. Proc. 60(b) ("the court may relieve *a party* . . . from a final judgment, order, or proceeding for the following reasons" (emphasis added)).  Sagapolutele did not object, intervene, or otherwise take steps to become a "party" to this action, so Rule 60(b) is not available to her here.  *See also* Newberg on Class Actions § 18:40 (5th ed.) ("[A]ll the circuits that have considered the issue have taken the position that absent class members are generally not authorized to file Rule 60 motions.").

Even if Sagapolutele were a "party," she has not met her burden to seek relief pursuant to Rule 60(b)(6) because such "[r]elief . . . may only be granted under extraordinary circumstances where, without such relief, an *extreme and unexpected hardship* would occur." *Sawka* v. *Healtheast, Inc.*, 989 F.2d 138, 140 (3d Cir. 1993) (emphasis added); *see also Matthews, Wilson & Matthews, Inc.* v. *Capital City Bank*, 614 F. App'x 969, 971 (11th Cir. 2015) (Rule 60(b)(6) "is an extraordinary remedy which may be invoked only upon a showing of exceptional circumstances, and the party seeking relief has the burden of showing that absent such relief, an extreme and unexpected hardship will result." (internal quotations omitted)); *Orlando Residence, Ltd.* v. *Hilton Head Hotel Inv'rs*, No. 89-cv-0662, 2013 WL 1103027, at *8 (D.S.C. Mar. 15, 2013), *aff'd sub nom. Orlando Residence, Ltd.* v. *Nelson*, 565 F. App'x 212 (4th Cir. 2014) ("Relief is rarely granted under . . . [Rule] 60(b)(6).").  The bar for relief under

Rule 60(b) is particularly high where the movant seeks to amend in "a class action [because] a too liberal application of Rule 60(b) would undermine the finality of judgments entered in such actions and would discourage their settlement." *Inmates of Suffolk Cty. Jail* v. *Rufo*, No. 71-cv-00162, 2015 WL 6958070, at *2 (D. Mass. Nov. 10, 2015); *see also Blue Diamond Coal Co.* v. *Trustees of UMWA Combined Ben. Fund*, 249 F.3d 519, 524 (6th Cir. 2001) ("[R]elief under Rule 60(b) is circumscribed by public policy favoring finality of judgments and termination of litigation.  This is especially true in an application of subsection (6) of Rule 60(b) . . . ." (internal quotations omitted)).

Sagapolutele has not made any showing whatsoever that the amendment will cause her any hardship, much less "extreme and unexpected hardship."  Tellingly, she has not shown—through supporting exhibits, affidavits, or even proffered facts in her brief—that the brain of her late husband, who passed away in 2009, has been examined by a board-certified neuropathologist and diagnosed with CTE at *any time*, much less that she would, but for the amendment, be entitled to an award.  She also has not established that a belated diagnosis years after death (indeed, her husband died approximately eight years ago) would even be possible given the deterioration of brain matter after death.  Nor does she seek to justify her apparent delay in seeking an examination.  Instead, Sagapolutele invites only speculation and offers only conclusory assertions as to how the purported change impacts her rights under the agreement, and she therefore fails to show that the exceptional remedy of Rule 60(b)(6) is warranted here.

*Finally*, Sagapolutele's invocation of the Court's "inherent authority" to amend a judgment does not salvage her claim because that authority is no broader than that provided by Rule 60, which, as explained above, does not permit Sagapolutele the relief she seeks.  *See* 20 Fed. Prac. & Proc. Deskbook § 104 (after 28 days from entry, "the judgment may be attacked,

other than by appeal, only as provided in Rule 60."); 11 Fed. Prac. & Proc. Civ. § 2852 (3d ed.)
(while "the power of a court to modify an interlocutory judgment or order at any time prior to
final judgment remains unchanged and is not limited by the provisions of Rule 60(b) . . . , [t]he
rule does apply, however, to all final judgments entered in civil actions."). Sagapolutele's cases
are not to the contrary; none holds that Courts have inherent authority to amend a final judgment
approving a settlement agreement. (*See* Pl. Mem. at 23-24.) Three of the five cited cases
concern only a court's authority to *enforce* a settlement agreement. *See Kokkonen* v. *Guardian
Life Ins. Co. of Am.*, 511 U.S. 375, 381 (1994) (holding that a district court has inherent authority
to *enforce* a settlement agreement under particular circumstances); *Roman-Oliveras* v. *Puerto
Rico Elec. Power Auth.*, 797 F.3d 83, 86-87 (1st Cir. 2015) (same); *Hensley* v. *Alcon Labs., Inc.*,
277 F.3d 535, 540-41 (4th Cir. 2002) (same). The fourth case, *In re Linerboard Antitrust Litig.*,
223 F.R.D. 357, 363 (E.D. Pa.), *amended*, 223 F.R.D. 370 (E.D. Pa. 2004) simply stands for the
proposition that a court overseeing an MDL has inherent power to control the discovery
process—an issue not relevant or in dispute here. Finally, while the fifth case involved an
*amendment* of an order entering a settlement agreement, the Court did not hold that the district
court had inherent authority to make the amendment; rather, it simply held that "the merits of
[the district court's] decision to amend are no longer open to review." *F.A.C., Inc.* v.
*Cooperativa de Seguros de Vida de Puerto Rico*, 449 F.3d 185, 190–91 (1st Cir. 2006).

In sum, Sagapolutele has not demonstrated (and cannot demonstrate) that she is
entitled to rewrite the Settlement Agreement.

## <u>Conclusion</u>

For the foregoing reasons, the NFL Parties respectfully request that the Court
deny the Motion in its entirety.

Dated:  September 28, 2017

Respectfully submitted,

/s/ Brad S. Karp

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
Brad S. Karp
Bruce Birenboim
Lynn B. Bayard
1285 Avenue of the Americas
New York, NY 10019-6064
Tel:   (212) 373-3000
bkarp@paulweiss.com

PEPPER HAMILTON LLP
Sean P. Fahey
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA 19103-2799
Tel:   (215) 981-4000

*Attorneys for Defendants the National Football
League and NFL Properties LLC*

## CERTIFICATE OF SERVICE

It is hereby certified that a true copy of the foregoing Memorandum of Law of the National Football League and NFL Properties LLC in Opposition to Settlement Class Member Yvonne Sagapolutele's Motion to Modify the Amended Final Order and Judgment was served electronically via the Court's electronic filing system on the 28th day of September, 2017, upon all counsel of record.

Dated:  September 28, 2017                       /s/Brad S. Karp
                                                                    Brad S. Karp

# Exhibit 9



# NFL CONCUSSION SETTLEMENT
*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

## POST-APPEAL NOTICE OF DENIAL OF MONETARY AWARD CLAIM
### DATE OF NOTICE: October 31, 2019

### I. SETTLEMENT CLASS MEMBER INFORMATION

| | |
|---|---|
| **Settlement Program ID** | 950013395 |

| **Name:** | First<br>Carleen | M.I. | Last<br>Hastings |
|---|---|---|---|

| | |
|---|---|
| **Settlement Class Member Type** | Representative Claimant |
| **Lawyer** | O'Hanlon, Demerath & Castillo |

| **Qualifying Diagnosis** | Death with CTE (Chronic Traumatic Encephalopathy) | **Date of Qualifying Diagnosis** | 10/15/08 |
|---|---|---|---|
| **Appellant** | Settlement Class Member | | |
| **Appellee** | NFL | | |

### II. EXPLANATION OF CLAIM DETERMINATION

This Notice is an official communication from the Claims Administrator for the NFL Concussion Settlement Program. The Special Master reviewed the appeal and determined the following, which is final and binding:

Appeal denied. Appellant did not show clear and convincing evidence of error in the Claims Administrator's decision. The Special Master's decision is a factual determination and is final and binding.

| 1. | Special Master ruled that the claim is denied |
|---|---|

### III. HOW TO CONTACT US WITH QUESTIONS OR FOR HELP

If you are represented by a lawyer, consult with your lawyer if you have questions or need assistance. If you are unrepresented and have any questions about this Notice or need help, contact us at 1-855-887-3485 or send an email to ClaimsAdministrator@NFLConcussionSettlement.com. If you are a lawyer, call or email your designated Firm Contact for assistance. For more information about the Settlement program, visit the official website at www.NFLConcussionSettlement.com to read the Frequently Asked Questions or download a copy of the complete Settlement Agreement.

# Exhibit 10

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| | § | |
| IN RE: NATIONAL FOOTBALL | § | No. 2:12-md-02323-AB |
| LEAGUE PLAYERS' CONCUSSION | § | |
| INJURY LITIGATION | § | MDL No. 2323 |
| | § | |
| | § | **Hon. Anita B. Brody** |
| THIS DOCUMENT RELATES TO: | § | |
| Settlement Class Member Carleen Hastings | § | |
| (SPID 950013395) | § | |

---

**SETTLMENT CLASS MEMBER'S OBJECTION TO THE SPECIAL**
**MASTER'S DECISION DENYING CLASS MEMBER'S APPEAL**

---

## TABLE OF CONTENTS

Table of Contents......................................................................................... i

Supporting Evidence.................................................................................. 4

Background.................................................................................................. 4

Standard of Review ................................................................................... 5

Argument .................................................................................................... 6

    I.    Class Member's claim was erroneously denied because the date of the Qualifying Diagnosis for Death with CTE is the date of the Player's death................................................. 6

    II.    Class Member's claim was erroneously denied because the Amended Settlement Agreement does not require a board-certified neuropathologist to personally examine brain tissue. ............................................................... 7

    III.    The Claims Administrator erred in stating that Dr. Hamilton did not examine the Player's brain tissue.................................... 8

Conclusion.................................................................................................. 9

i

TO THE HONORABLE DISTRICT COURT JUDGE:

Class Member Carleen Hastings ("Class Member") respectfully submits this objection to the Special Master's October 31, 2019 decision denying Class Member's appeal of the Denial of Monetary Award Claim. The Special Master erred in affirming the Claims Administrator's denial based on erroneous conclusions of law and by ignoring undisputed evidence that the diagnosing board-certified neuropathologist personally examined the deceased Retired Player's brain tissue.

This appeal presents the following three questions regarding these errors:

1) Is the date of a Qualifying Diagnosis for Death with CTE the date of the Player's death, as stated in the Posted Settlement Program FAQs?

2) Does a board-certified neuropathologist's diagnosis of Death with CTE satisfy the Amended Settlement Agreement's requirements without an additional "confirmation" of the diagnosis?

3) Did the Claims Administrator err in stating there was no post-mortem examination report that showed Dr. Hamilton has personally examined the Retired Player's brain tissue when there was a post-mortem examination report that showed Dr. Hamilton personally examined the Retired Player's brain tissue?

The answer to all three of these questions is "yes." The Court should overturn the Special Master's decision because the Special Master affirmed the Claims Administrator's denial despite the Claims Administrator's error by incorrectly answering "no" to these questions.

First, the Claims Administrator erroneously concluded that the date of diagnosis is not the date of the Player's death. But according to the Posted Settlement FAQs, which the NFL Parties approved, the date of the Qualifying Diagnosis for Death with CTE is "the date of the Player's death, even though the diagnosis is not made until

1

-4548-

after the Player dies."[1]

Second, the Claims Administrator erroneously concluded that the board-certified neuropathologist was required to confirm a CTE diagnosis by examining the Player's brain tissue. But that requirement can be found nowhere in the Amended Settlement Agreement. The settlement agreement simply requires a CTE diagnosis by a board-certified neuropathologist.

Third, the Claims Administrator stated there was no post-mortem examination report that showed Dr. Hamilton has personally examined the Retired Player's brain tissue, but there was, in fact, a post-mortem examination report that showed Dr. Hamilton personally examined the Retired Player's brain tissue.[2]

---

[1]    Posted Settlement FAQs (as of September 12, 2019), FAQ 99. In prior versions of the Posted Settlement FAQs, this language was included as part of FAQ 93.

[2]    The post-mortem examination report is the last page of Exhibit 2, Class Member's Claim Package, and it looks like this:



University of Pittsburgh
Physicians, Department
of Pathology

Division of Neuropathology

Clayton A. Wiley, MD, PhD
*Director*

Charleen T. Chu, MD, PhD
Robert H. Garman, DVM
Ronald Hamilton, MD
Julia Kofler, MD
Scott M. Kulich, MD, PhD
David Lacomis, MD
Geoffrey Murdoch, MD, PhD
Gutti R. Rao, MD

UPMC Presbyterian
Room S701 Scaife Hall
200 Lothrop Street
Pittsburgh, PA 15213
T 412-624-9415
F 412-624-5610

I have conducted a study of Cristopher Mims' brain tissue. Additionally, in my Neuropathology practice I conduct an ongoing study of all available and existing medical literature related to the existence and diagnosis of CTE and I combine that knowledge with my training and extensive experience related to the study and diagnosis of CTE.

Christopher Mims died on October 15, 2008 at age 38.

Received from Eric J Wahoske, LA County Department of ME Coroner are 180 unstained tissue sections on glass slides labeled 08-7210-H LAC ME Coroner, US recuts (10 unstained slides from 8 tissue blocks).

H&E stained recuts are examined:

      slide A  dura mater;
      slide B  cerebral cortex
      slide C        hippocampus
      slide D  hippocampus
      slide E  insular cortex, putamen, globus pallidus and thalamus
      slide F        cerebral cortex
      slide G  cerebellum cortex and dentate nucleus
      slide H        medulla

PHF-1/tau immunostaining of slides G and H were negative for abnormally aggregated tau. PHF-1/tau immunostaining of slides B, C, D, E and F show numerous neocortical PHF-1/tau positive tangles in neurons, with staining of many neuronal processes (neuropil threads) as well as tau-positive glial cells, especially in the depths of the sulcus and focally around some blood vessels best seen in slide B. There are no neuritic plaques and the tangles are much more common in the neocortex than in the hippocampus. These findings are diagnostic of CTE.

Figure 1: neocortex with numerous tangles, neuropil threads, glial tau and perivascular location; on the right is a close up of the distinctive perivascular pathology of CTE.



Christopher Mims had CTE.

Signed:
/s/
Ronald L Hamilton, M.D.

Affiliated with the University of Pittsburgh School of Medicine

3

## SUPPORTING EVIDENCE

Exhibit 1          Notice of Denial of Monetary Award Claim

Exhibit 2          Relevant Excerpts from Class Member's Claim Package

Exhibit 3          Notice of Request for Additional Documents

Exhibit 4          Class Member's Appeal

Exhibit 5          NFL Parties' Response

Exhibit 6          Post-Appeal Notice of Denial of Monetary Award Claim

## BACKGROUND

Class Member submitted a claim package that included a post-mortem diagnosis of Chronic Traumatic Encephalopathy ("CTE") made by a board-certified neuropathologist.[3]  Class Member's claim package also includes documentation showing that the Player died prior to April 22, 2015.[4]

Despite the documentation in the claim package, the Claims Administrator denied Class Member's Monetary Award Claim for the following reason:[5]

> Section 6.3(f) of the Settlement Agreement allows a CTE diagnosis if: (1) the Retired Player died before 4/22/15, and (2) there was a post-mortem diagnosis of CTE made by a board-certified neuropathologist prior to 4/22/15.  Although Dr. Hamilton is a board-certified neuropathologist and signed a Pre-Effective Date Diagnosing Physician Certification Form indicating a CTE diagnosis, we must have proof that he personally performed the post-mortem exam on the Retired Player and that it was done on or before 4/22/15.  There was no post-mortem examination report submitted to indicate that Dr. Hamilton examined the Retired Player's brain tissue to confirm a CTE diagnosis.  The two-page letter provided by Dr. Hamilton does not satisfy the requirements for a CTE diagnosis under this Settlement Program.  For these reasons, this claim is denied.

---

[3]   Exhibit 2.

[4]   *Id.*

[5]   Exhibit 1.

Contrary to the Claims Administrator's assertion that "[t]here was no post-mortem examination report submitted to indicate that Dr. Hamilton examined the Retired Player's brain tissue to confirm a CTE diagnosis," there was a post-mortem examination report that showed Dr. Hamilton has personally examined the Retired Player's brain tissue.[6]

Class Member timely filed an appeal of the Claims Administrator's Notice of Denial of Monetary Award Claim challenging the two conclusions of law in the Notice regarding the diagnosis date and the "confirmation" requirement and the failure to acknowledge that a post-mortem examination report showed that Dr. Hamilton did confirm his CTE diagnosis by examining the Retired Player's brain tissue.[7]

The Special Master denied the Class Member's appeal on October 31, 2019 without addressing the legal arguments raised in Class Member's Appeal or acknowledging that there is a post-mortem report showing that Dr. Hamilton personally examined the Retired Player's brain tissue.[8]

## STANDARD OF REVIEW

The Court reviews de novo Class Member's objections to conclusions of law from its Special Masters. *See* ECF No. 6871 at 4–5 (appointing the Special Masters and defining their roles). Class Member has challenged the Claims Administrator's conclusions of law, the facts are undisputed. The Court's decision regarding this objection is final and binding under both the original settlement agreement (of which Class Member received notice with an opportunity to opt out) and the amended settlement agreement (of which Class Member did not receive notice and which was entered after the opt-out deadline). *See* ECF No. 6073-2, Original Settlement Agreement § 9.8 *and* ECF No. 6481, Amended Settlement Agreement § 9.8. In the event this objection is not sustained, Class Member expressly reserves the right to re-urge the Motion to Modify [ECF 6479] this Court denied without prejudice on October 24, 2017 [ECF 8557].

---

[6]   The full post-mortem report is included as part of Exhibit 2 and shows that Dr. Hamilton personally examined the Retired Player's brain tissue.

[7]   Exhibit 4.

[8]   Exhibit 6.

## ARGUMENT

**I.  Class Member's claim was erroneously denied because the date of the Qualifying Diagnosis for Death with CTE is the date of the Player's death.**

The Claims Administrator's first reason for denying the claim package is legally flawed because the diagnosis date for Death with CTE is the date of the Player's death, even if the diagnosis occurs later.

The Claims Administrator published "Posted Program FAQs" on the Settlement Website with answers to frequently asked questions.  The content in the Posted Settlement Program FAQs was subject to advance approval by Counsel for the NFL Parties.[9]

According to the Posted Settlement Program FAQs, the diagnosis date for Death with CTE is the date of the Player's death, even though the diagnosis is not made until after the Player dies:[10]

> **How is the date of a Qualifying Diagnosis determined?**
>
> . . . .
>
> (a) *Death with CTE:* For these claims, the date of the Qualifying Diagnosis is the date of the Player's death, even though the diagnosis is not made until after the Player dies.

Based on the Claims Administrator's public, posted representations to class members that the date of the Qualifying Diagnosis for Death with CTE is the date of the Player's death, the only date that is relevant in determining the date of a Qualifying Diagnosis for Death with CTE is the date of the Player's death.  That is the date Class Member provided in the submitted claim package.  The Claims Administrator's insistence on proof that the diagnosis "was done on or before 4/22/15"

---

[9]  *See* Amended Settlement Agreement § 4.1(a).

[10]  This relevant language is from FAQ 99 in the Posted Settlement Program FAQs (as of September 12, 2019) and was also contained in prior versions of the Posted Settlement Program FAQs.  In some earlier versions of the Posted Settlement Program FAQs, this language was originally published in FAQ 93.

ignores these posted representations and erroneously concludes that evidence regarding the date of the Player's death does not establish the date of the Qualifying Diagnosis.

In reviewing other portions of this FAQ, the Court has noted that "by requiring the 'date of diagnosis,' the Settlement language implies that the 'date of diagnosis' is not necessarily the 'date of the examination.'"  ECF 10810, Settlement Implementation Determination, at 2.  The Court further recognized that FAQ 99 is a "sensible and reasonable interpretation of the Settlement," which "recognizes that there may be infrequent situations in which a Retired NFL Player's past symptoms were not recognized as a Qualifying Diagnosis at the time but now can be identified by a physician." *Id.* at 3.  The Court noted that in these circumstances, "the Retired NFL Player should not be penalized for their previous doctor's failure to identify a Qualifying Diagnosis" but "should be compensated based on the date their diagnosis actually began." *Id.*

The Court's reasoning applies with equal, if not greater, force to Death with CTE diagnoses.  Class Member's claim package establishes that the Player's death occurred before April 22, 2015.  Accordingly, the date of the Qualifying Diagnosis is before April 22, 2015, and the Claims Administrator erred, as a matter of law, in denying this claim.

## II. Class Member's claim was erroneously denied because the Amended Settlement Agreement does not require a board-certified neuropathologist to personally examine brain tissue.

The Claims Administrator also stated that the denial of this claim was based on the lack of evidence that "Dr. Hamilton examined the Retired Player's brain tissue to confirm a CTE diagnosis."  It is undisputed that there is no evidence that Dr. Hamilton reviewed the Player's brain tissue.  But, as a matter of law, there is no requirement in the Amended Settlement Agreement that a board-certified neuropathologist "confirm his diagnosis" by reviewing brain tissue.[11]  The Amended Settlement Agreement simply requires a diagnosis, which Dr. Hamilton provided.[12]

If the NFL Parties had intended to impose a requirement that a CTE diagnosis

---

[11]  *See* Amended Settlement Agreement [ECF 6481] § 6.4(f).

[12]  *See id.*

be confirmed by an examination of the Player's brain tissue, they should have included that requirement in the settlement agreement. But it's not there.

Regarding other diagnoses, the NFL Parties chose to require specific and detailed procedures for reviewing and confirming the diagnoses.[13] But for Death with CTE diagnoses, the Amended Settlement Agreement simply requires "a post-mortem diagnosis made by a board-certified neuropathologist."[14] It does not require an examination of the deceased Player's brain tissue.

Dr. Hamilton is one of only a handful of board-certified neuropathologists in the United States, and he has provided a post-mortem diagnosis that this Player "had CTE on his date of death."[15]

The Special Master erred by not correcting the Claims Administrator's erroneous conclusion of law that Class Member is required to compel Dr. Hamilton to confirm his diagnosis by examining the Player's brain tissue. There is no requirement in the Amended Settlement Agreement. Adding this arbitrary, after-the-fact requirement ignores the terms of the Amended Settlement Agreement and violates due process.

## III.    The Claims Administrator erred in stating that Dr. Hamilton did not examine the Player's brain tissue.

The Claims Administrator's denial of this claim is based on the purported lack of evidence that "Dr. Hamilton examined the Retired Player's brain tissue to confirm a CTE diagnosis" is also erroneous because Dr. Hamilton *did* examine the Retired Player's brain tissue to confirm the CTE diagnosis.

Dr. Hamilton's letter states: "I have conducted a study of Christopher Mims' brain tissue." Dr. Hamilton further states that he received "180 unstained tissue sections on glass slides" and examined stained recuts of brain tissue from the dura mater,

---

[13]    *See id.* §§ 5.1–5.14 (creating the Baseline Assessment Program and exempting Death with CTE from the program), § 6.3(a)–(e) (requiring that certain diagnoses, other than Death with CTE, be made by certain physicians on an approved list); *see also* Exhibit 2 to the Amended Settlement Agreement (providing standardized neuropsychological testing protocols for determining certain diagnoses).

[14]    *See* Amended Settlement Agreement [ECF 6481] § 6.4(f).

[15]    Exhibit 2.

8

cerebral cortex, hippocampus, insular cortex, putamen, globulus pallidus, thalamus, cerebellum cortex, dentate nucleus, and medulla.[16]  Based, in part, on his review of the brain tissue, Dr. Hamilton concluded that his "findings are diagnostic of CTE." [17]

The Claims Administrator erred in stating that there is no evidence that "Dr. Hamilton examined the Retired Player's brain tissue to confirm a CTE diagnosis." Dr. Hamilton's letter clearly establishes that he examined the Retired Player's brain tissue to confirm the CTE diagnosis.

<div align="center"><u>**CONCLUSION**</u></div>

For the foregoing reasons, Class Member respectfully requests the Court sustain this objection, reverse the Special Master's decision based on the errors in the Claims Administrator's Notice of Denial, and order the approval of Class Member's claim.

Dated:  November 20, 2019

Respectfully Submitted:

<u>/s/ Justin Demerath</u>

**Justin Demerath**
Texas State Bar No. 24034415
**David Campbell**
Texas State Bar No. 24057033
O'HANLON, DEMERATH & CASTILLO
808 West Avenue |  Austin, TX 78701
Tel: (512) 494-9949  |  Fax: (512) 494-9919
jdemerath@808west.com
dcampbell@808west.com

**Counsel for Class Member**

---

[16]  *See id.*

[17]  *See id.*

## <u>CERTIFICATE OF SERVICE</u>

It is hereby certified that a true copy of the foregoing document was submitted on the Court Portal on November 20, 2019.

<u>/s/ Justin B. Demerath</u>
Justin B. Demerath

 **CONCUSSION SETTLEMENT**

*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

## NOTICE OF DENIAL OF MONETARY AWARD CLAIM
### DATE OF NOTICE: **July 30, 2019**
### DEADLINE TO APPEAL: **August 29, 2019**

### I. SETTLEMENT CLASS MEMBER INFORMATION

| | |
|---|---|
| **Settlement Program ID** | 950013395 |

| **Name** | First<br>Carleen | M.I. | Last<br>Hastings |
|---|---|---|---|

| | |
|---|---|
| **Settlement Class Member Type** | Representative Claimant |
| **Lawyer** | O'Hanlon, Demerath & Castillo |

| **Asserted Qualifying Diagnosis** | Death with CTE (Chronic Traumatic Encephalopathy) | **Date** | 10/15/08 |
|---|---|---|---|

### II. EXPLANATION OF CLAIM DETERMINATION

This Notice is an official communication from the Claims Administrator for the NFL Concussion Settlement Program. We reviewed your Claim Package and determined that you are not entitled to a Monetary Award because:

1. Section 6.3(f) of the Settlement Agreement allows a CTE diagnosis if: (1) the Retired Player died before 4/22/15, and (2) there was a post-mortem diagnosis of CTE made by a board-certified neuropathologist prior to 4/22/15. Although Dr. Hamilton is a board-certified neuropathologist and signed a Pre-Effective Date Diagnosing Physician Certification Form indicating a CTE diagnosis, we must have proof that he personally performed the post-mortem exam on the Retired Player and that it was done on or before 4/22/15. There was no post-mortem examination report submitted to indicate that Dr. Hamilton examined the Retired Player's brain tissue to confirm a CTE diagnosis. The two-page letter provided by Dr. Hamilton does not satisfy the requirements for a CTE diagnosis under this Settlement Program. For these reasons, this claim is denied.

Section III below explains your right to appeal this denied claim, but living Retired Players may have the option to submit a new Claim Package under Section 9.1(c)(i) of the Settlement Agreement if they receive a new Qualifying Diagnosis. We will determine whether the new claim can be considered for a Monetary Award based on several factors, including whether the new claim shows materially changed circumstances from the earlier claim. These materially changed circumstances may include: (a) a different type of Qualifying Diagnosis than the one that was denied; or (b) the same type of Qualifying Diagnosis but with a different diagnosis date supported by additional medical records. If you submit a new claim within 365 days of the claim that is the subject of this denial notice, Section 10.3(d)(ii) of the Settlement Agreement requires us to audit that new claim if it is based on the same Qualifying Diagnosis as this denied claim, but the new diagnosis was made by a different physician.

### III. YOUR RIGHT TO APPEAL THIS DETERMINATION

If you have a good faith belief that the decision to deny your Monetary Award claim is incorrect, you may appeal this determination to the Court under Section 9.5 of the Settlement Agreement. To do so, click the Appeal Denied Claim button on your secure online portal and follow the instructions provided. You must submit supporting evidence to support your appeal. Any written statement may not be more than 10 double-spaced pages. You must do so on or before the Deadline to Appeal stated at the top of this Notice.

If you decide to appeal, the Settlement Agreement requires you to pay an Appeal Fee of $1,000, which you can do using the online PayPal option or by check made payable to the NFL Claims Administrator.  This fee will be refunded if your appeal is successful.  If you are unable to pay the $1,000 fee, you may make a hardship request to us to waive the fee and will have to submit financial information showing a sufficient hardship.

If paying the $1,000 Appeal Fee by check, mail the check to the address below.

> NFL Concussion Settlement
> Claims Administrator
> P.O. Box 25369
> Richmond, VA  23260

The Special Master appointed by the Court will decide your appeal based upon a showing by you of clear and convincing evidence.  The Special Master's factual determinations will be final and binding, but you or Class Counsel or the NFL Parties may object to any of the Special Master's conclusions of law, which will then be subject to de novo (*i.e.*, a new) review by the Court.

If an appeal is not submitted on or before the deadline stated at the top of this Notice, the determination in this Notice will become final.

## IV. CLASS COUNSEL'S RIGHT TO APPEAL THIS DETERMINATION

Section 9.5 of the Settlement Agreement also gives Class Counsel the right to challenge our decision to deny your Monetary Award claim.  If Class Counsel chooses to appeal, it must do so by the Deadline to Appeal stated at the top of this Notice and must provide a written copy of its Appeals Form and any supporting evidence to you, the NFL Parties, and us.

If an appeal is taken by you or Class Counsel, the NFL Parties may submit a written opposition (not to exceed 10 double-spaced pages) no later than 30 days after receipt of the Appeals Form.  The party taking the appeal is not permitted to submit a reply.

Class Counsel may also submit a written statement (not to exceed 10 double-spaced pages) in response to your appeal no later than 15 days after receipt of the Appeals Form, and you and the NFL Parties may each submit a reply to any such submission by Class Counsel.

## V. HOW TO CONTACT US WITH QUESTIONS OR FOR HELP

If you are represented by a lawyer, consult with your lawyer if you have questions or need assistance. If you are unrepresented and have any questions about this Notice or need help, contact us at 1-855-887-3485 or send an email to ClaimsAdministrator@NFLConcussionSettlement.com.  If you are a lawyer, call or email your designated Firm Contact for assistance. For more information about the Settlement program, visit the official website at www.NFLConcussionSettlement.com to read the Frequently Asked Questions or download a copy of the complete Settlement Agreement.





**University of Pittsburgh Physicians, Department of Pathology**

Division of Neuropathology

Clayton A. Wiley, MD, PhD
*Director*

Charleen T. Chu, MD, PhD
Robert H. Garman, DVM
Ronald Hamilton, MD
Julia Kofler, MD
Scott M. Kulich, MD, PhD
David Lacomis, MD
Geoffrey Murdoch, MD, PhD
Gutti R. Rao, MD

UPMC Presbyterian
Room 5701 Scaife Hall
200 Lothrop Street
Pittsburgh, PA 15213
T 412-624-9415
F 412-624-5610

I have conducted a study of Cristopher Mims' brain tissue. Additionally, in my Neuropathology practice I conduct an ongoing study of all available and existing medical literature related to the existence and diagnosis of CTE and I combine that knowledge with my training and extensive experience related to the study and diagnosis of CTE.

Christopher Mims died on October 15, 2008 at age 38.

Received from Eric J Wahoske, LA County Department of ME Coroner are 180 unstained tissue sections on glass slides labeled 08-7210-H LAC ME Coroner, US recuts (10 unstained slides from 8 tissue blocks).

H&E stained recuts are examined:

    slide A  dura mater;
    slide B  cerebral cortex
    slide C          hippocampus
    slide D  hippocampus
    slide E  insular cortex, putamen, globus pallidus and thalamus
    slide F          cerebral cortex
    slide G  cerebellum cortex and dentate nucleus
    slide H          medulla

PHF-1/tau immunostaining of slides G and H were negative for abnormally aggregated tau. PHF-1/tau immunostaining of slides B, C, D, E and F show numerous neocortical PHF-1/tau positive tangles in neurons, with staining of many neuronal processes (neuropil threads) as well as tau-positive glial cells, especially in the depths of the sulcus and focally around some blood vessels best seen in slide B. There are no neuritic plaques and the tangles are much more common in the neocortex than in the hippocampus. These findings are diagnostic of CTE.

Figure 1: neocortex with numerous tangles, neuropil threads, glial tau and perivascular location; on the right is a close up of the distinctive perivascular pathology of CTE.



Christopher Mims had CTE.

Signed:
/s/
Ronald L Hamilton, M.D.

 **CONCUSSION SETTLEMENT**

*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

## PRE-EFFECTIVE DATE DIAGNOSING PHYSICIAN CERTIFICATION FORM
### (for diagnoses made by physicians who are qualified to render Qualifying Diagnoses for purposes of Monetary Award claims before January 7, 2017)

This Pre-Effective Date Diagnosing Physician Certification Form is to be used only by physicians qualified to render Qualifying Diagnoses before January 7, 2017, in connection with the Class Action Settlement in <u>In re: National Football League Players' Concussion Injury Litigation</u> and who made a Qualifying Diagnosis before January 7, 2017. The Qualifying Diagnoses are found in Appendix A to this Pre-Effective Date Diagnosing Physician Certification Form.

Use this form to certify a Qualifying Diagnosis you made before January 7, 2017, based on your personal examination of the Retired NFL Football Player. **Do not sign this form unless you personally examined the player** or, in the case of a Qualifying Diagnosis of Death with CTE, you are the board-certified neuropathologist who made the post-mortem diagnosis of CTE. If you made a Qualifying Diagnosis as a Qualified MAF Physician on or after January 7, 2017, do not use this form; use the MAF Diagnosing Physician Certification Form instead. Also, if you are a Qualified BAP Provider certifying a diagnosis you made in the Baseline Assessment Program, do not use this form; use the BAP Diagnosing Physician Certification Form instead.

You must complete this form in its entirety, sign it under penalty of perjury, and return it to the patient along with copies of all supporting medical records that you created or received in connection with the Qualifying Diagnosis. In turn, the patient, or the patient's counsel, must submit this form and all supporting medical records referred to above to the Claims Administrator as part of a claim for compensation under the Class Action Settlement. The Claims Administrator will review the form, including your qualifications to provide the Qualifying Diagnosis, and the supporting medical records. All claims also are subject to audit. Any finding of fraudulent conduct by you will be subject to, without limitation, your referral to appropriate regulatory and disciplinary boards and agencies and/or federal authorities, and your disqualification from serving in any aspect of the Class Action Settlement.

You are required to preserve all supporting medical records that you created or received in connection with the Qualifying Diagnosis for the greater of: (a) 10 years after January 7, 2017; or (b) the period of time required under applicable state and federal laws.

If you have any questions, call the Claims Administrator toll free at 1-855-887-3485 or visit the Settlement Website at https://www.nflconcussionsettlement.com.

## PRE-EFFECTIVE DATE DIAGNOSING PHYSICIAN CERTIFICATION FORM
### (for diagnoses made by physicians who are qualified to render Qualifying Diagnoses for purposes of Monetary Award claims before January 7, 2017)

### I. PATIENT INFORMATION

| Settlement Program ID (if known) | | | 950013395 | | |
|---|---|---|---|---|---|
| **Name:** | First<br>Christopher | M.I. | Last<br>Mims | | Suffix |
| **Address:** | Address 1 ███████████ | | | | |
| | Address 2 | | | | |
| | City<br>Los Angeles | | | | |
| | State/Province<br>CA | | | | |
| | Postal Code<br>90047 | | Country<br>United States | | |
| **Telephone** | | | ⌐⌐⌐⌐ - ⌐⌐⌐⌐ - ⌐⌐⌐⌐⌐ | | |
| **Date of Birth** | | ██████████ / 1 9 7 0<br>(Month/Day/Year) | | | |
| **Date of Death** (if applicable) | | 1 0 / 1 5 / 2 0 0 8<br>(Month/Day/Year) | | | |

### II. DIAGNOSING PHYSICIAN INFORMATION

| National Provider Identifier (NPI) | | | 1013980978 | | |
|---|---|---|---|---|---|
| **Physician Name** | First<br>Ronald | M.I.<br>L. | Last<br>Hamilton | | Suffix |

**(a) Are you approved as a Qualified BAP Provider or a Qualified MAF Physician?**

☐ **YES.** If YES, you do not need to fill out the rest of this Section II or Sections III or IV. Instead, go to Section V.

☒ **NO.**

**(b)** If you answered No, have you previously completed this form for another Retired NFL Football Player, that you know was submitted to the Claims Administrator?

☐ **YES.** If YES, you do not need to fill out this Section II or Sections III or IV. Instead, go to Section V.

☒ **NO.**

If you answered No to both questions, fill out the rest of this Section II and then go to Section III.

## PRE-EFFECTIVE DATE DIAGNOSING PHYSICIAN CERTIFICATION FORM
### (for diagnoses made by physicians who are qualified to render Qualifying Diagnoses for purposes of Monetary Award claims before January 7, 2017)

| Office/Practice Name | University of Pittsburgh Medical Center | |
|---|---|---|
| **Address** | Address 1<br>A724.1 Scaife Hall | |
| | Address 2<br>200 Lothrop Street | |
| | City<br>Pittsburgh | |
| | State/Province<br>Pennsylvania | |
| | Postal Code<br>15213 | Country<br>USA |
| Telephone | 4 1 2 - 6 2 4 - 6 6 1 0 | |
| Fax | 4 1 2 - 6 2 4 - 5 4 8 8 | |
| Email Address | hamiltonrl@upmc.edu | |

### III.    BOARD CERTIFICATIONS

Check all board certifications that apply and list the board providing the certification and any identification number provided by the board (*e.g.*, American Board of Psychiatry and Neurology diplomate number). If you do not have any board certifications, summarize your relevant medical training and experience and then go to Section IV.

| Certification | Board | Board Identification Number | Effective Date | Expiration Date |
|---|---|---|---|---|
| [ ] Neurology | | | | |
| [ ] Neurosurgery | | | | |
| [X] Neuropathology | American Board of Pathology | | certified: 5/23/1996<br>recertified:1/1/2014 | |
| [ ] Neuropsychology | | | | |
| [ ] Other Neuro-specialty | | | | |
| [X] Other Board Certification | American Board of Pathology | | certified: 5/23/1996 | |

## PRE-EFFECTIVE DATE DIAGNOSING PHYSICIAN CERTIFICATION FORM
### (for diagnoses made by physicians who are qualified to render Qualifying Diagnoses for purposes of Monetary Award claims before January 7, 2017)

If you are not board-certified in a neuro-specialty area, summarize your relevant medical training and experience in the field of neurology and related fields that you believe qualifies you to make the diagnosis provided in Section V.

## IV.    OTHER QUALIFICATIONS

| | | Education Level | Institution | Degree/Area of Focus | Date Received |
|---|---|---|---|---|---|
| Educational Information | 1. | **Undergraduate Education** | University of Nebraska-Lincoln | B.S / Psychology | 1 9 8 5 (Month/Year) |
| | 2. | **Medical School** | University of Nebraska Medical Center | M.D. | 1 9 8 9 (Month/Year) |
| | 3. | **Internship** | Univ. of California, San Diego | Resident Anatomic Pathology | 1 9 9 1 (Month/Year) |
| | 4. | **Residency** | Univ. of California, San Diego | Resident Neuropathology | 1 9 9 3 (Month/Year) |
| | 5. | **Fellowship** | Univ. of Pittsburgh | Fellow Neuropathology | 1 9 9 4 (Month/Year) |
| | 6. | **Other (Graduate)** | Univ. of Pittsburgh | Fellow: NIMH Training Grant in Neuroscience | 1 9 9 5 (Month/Year) |

| States Where Licensed to Practice | | State | State License Number | Effective Date | Expiration Date |
|---|---|---|---|---|---|
| | 1. | **California** | **G69731** | **9/10/1990** | **Expired** |

**PRE-EFFECTIVE DATE DIAGNOSING PHYSICIAN CERTIFICATION FORM**
(for diagnoses made by physicians who are qualified to render Qualifying Diagnoses
for purposes of Monetary Award claims before January 7, 2017)

| | | | | | |
|---|---|---|---|---|---|
| | 2. | Pennsylvania | MD049717L | 5/12/1993 | 12/31/2018 |
| | 3. | Indiana | 01067332A | 9/29/2009 | 10/31/2019 |
| | 4. | | | | |
| | 5. | | | | |
| | 6. | | | | |

| Specialties | Check all specialties that apply. |
|---|---|
| | ☐ Neurology |
| | ☐ Neurosurgery |
| | ☒ Neuropathology |
| | ☐ Neuropsychology |
| | ☐ Other Neuro-specialty<br>(*e.g.*, brain injury medicine,<br>clinical neurophysiology, etc.) |
| | ☒ Other Specialty (list all)     **Anatomic Pathology** |

**PRE-EFFECTIVE DATE DIAGNOSING PHYSICIAN CERTIFICATION FORM**
**(for diagnoses made by physicians who are qualified to render Qualifying Diagnoses**
**for purposes of Monetary Award claims before January 7, 2017)**

## V. QUALIFYING DIAGNOSIS

Identify the patient's diagnosis and the date of such diagnosis. See **Appendix A** for the criteria for each diagnosis. Other than for Death with CTE, the identification of a condition, including through a blood test, genetic test, imaging technique, or otherwise, that has not yet resulted in actual cognitive impairment and/or actual neuromuscular impairment in the patient is **not** a Qualifying Diagnosis.

| Qualifying Diagnosis | Date of Diagnosis |
|---|---|
| ☐ Level 1.5 Neurocognitive Impairment | \|__\|__\|/\|__\|__\|/\|__\|__\|__\|__\| (Month/Day/Year) |
| ☐ Level 2 Neurocognitive Impairment* | \|__\|__\|/\|__\|__\|/\|__\|__\|__\|__\| (Month/Day/Year) |
| ☐ Alzheimer's Disease | \|__\|__\|/\|__\|__\|/\|__\|__\|__\|__\| (Month/Day/Year) |
| ☐ Parkinson's Disease | \|__\|__\|/\|__\|__\|/\|__\|__\|__\|__\| (Month/Day/Year) |
| ☐ ALS (amyotrophic lateral sclerosis) | \|__\|__\|/\|__\|__\|/\|__\|__\|__\|__\| (Month/Day/Year) |
| ☒ Death with CTE | \|_1_\|_0_\|/\|_1_\|_5_\|/\|_2_\|_0_\|_0_\|_8_\|* (Month/Day/Year) |

\* If you provided a diagnosis of Level 2 Neurocognitive Impairment, did you determine that certain testing was medically unnecessary because of the severity of the patient's dementia (*see* **Appendix A**)?

☐ YES     ☐ NO

If you answered Yes, provide the factual basis for that determination:

\*Pursuant to FAQ 93, Posted Settlement Program FAQs (as of November 7, 2018), for this claim, "the date of the Qualifying Diagnosis is the date of the Player's death, even though the diagnosis is not made until after the Player dies".

| PRE-EFFECTIVE DATE DIAGNOSING PHYSICIAN CERTIFICATION FORM |
|---|
| **(for diagnoses made by physicians who are qualified to render Qualifying Diagnoses for purposes of Monetary Award claims before January 7, 2017)** |

## VI. CERTIFICATION

By signing below, I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that all information provided in this form, and all related supporting medical records, are true and correct to the best of my knowledge, information and belief, and that I personally examined the Retired NFL Football Player named in Section I or, in the case of a Qualifying Diagnosis of Death with CTE, I am the board-certified neuropathologist who made the post-mortem diagnosis of CTE.

I acknowledge that any finding of fraudulent conduct may subject me to, without limitation, referral to appropriate regulatory and disciplinary boards and agencies and/or federal authorities, and disqualification from serving in any aspect of the Class Action Settlement.

| Signature of Diagnosing Physician | | Date of Signature | 0 2 / 0 1 / 2 0 1 9 (Month/Day/Year) |
|---|---|---|---|
| **Printed Name** | First Ronald | M.I. L. | Last Hamilton |

# APPENDIX A

Other than for Death with CTE, the identification of a condition, including through a blood test, genetic test, imaging technique, or otherwise, that has not yet resulted in actual cognitive impairment and/or actual neuromuscular impairment experienced by the patient does not qualify as a diagnosis.

## LEVEL 1.5 NEUROCOGNITIVE IMPAIRMENT

**The following diagnosis can only be made:**

> (1) prior to July 7, 2014, by a board-certified neurologist, board-certified neurosurgeon, other board-certified neuro-specialist physician, or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician, except as provided in (c), below;

> (2) from July 7, 2014 through January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified neurologist, board-certified neurosurgeon, or other board-certified neuro-specialist physician, except as provided in (c), below; or

> (3) for a patient who died prior to January 7, 2017 (the Effective Date of the Settlement Agreement), where the diagnosis occurred while the patient was living, by a board-certified or otherwise qualified neurologist, neurosurgeon, or other neuro-specialist physician, or by a physician with sufficient qualifications in the field of neurology or neurocognitive disorders to make a diagnosis of Level 1.5 Neurocognitive Impairment:

A diagnosis made outside of the Baseline Assessment Program (BAP) that a living patient suffers from Level 1.5 Neurocognitive Impairment, as set forth below, *i.e.*, early dementia, based on evaluation and evidence generally consistent with the diagnostic criteria set forth and provided below:

There is: (i) Concern of the patient, a knowledgeable informant, or the Qualified BAP Provider that there has been a severe decline in cognitive function; (ii) Evidence of a moderate to severe cognitive decline from a previous level of performance, as determined by and in accordance with the standardized neuropsychological testing protocol annexed in *Appendix B*, in two or more cognitive domains (complex attention, executive function, learning and memory, language, perceptual-spatial), provided one of the cognitive domains is (a) executive function, (b) learning and memory, or (c) complex attention; (iii) The patient exhibits functional impairment generally consistent with the criteria set forth in the National Alzheimer's Coordinating Center's Clinical Dementia Rating scale Category 1.0 (Mild) in the areas of Community Affairs, Home & Hobbies, and Personal Care—where such functional impairment is corroborated by documentary evidence (*e.g.*, medical records, employment records), the sufficiency of which will be determined by the physician making the diagnosis (and where no documentary evidence of functional impairment exists or is available, then (a) there must be evidence of moderate to severe cognitive decline from a previous level of performance, as determined by and in accordance with the standardized neuropsychological testing protocol annexed in *Appendix B*, in the executive function cognitive domain or the learning and memory cognitive domain, and at least one other cognitive domain; and (b) the patient's functional impairment, as described above, must be corroborated by a third-party sworn affidavit from a person familiar with the patient's condition (other than the player or his family members), the sufficiency of which will be determined by the diagnosing physician); and (iv) The cognitive deficits do not occur exclusively in the context of a delirium, acute substance abuse, or as a result of medication side effects.

**LEVEL 2 NEUROCOGNITIVE IMPAIRMENT**

**The following diagnosis can only be made:**

> **(1) prior to July 7, 2014, by a board-certified neurologist, board-certified neurosurgeon, other board-certified neuro-specialist physician, or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician, except as provided in (c), below;**

> **(2) from July 7, 2014 through January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified neurologist, board-certified neurosurgeon, or other board-certified neuro-specialist physician, except as provided in (c), below; or**

> **(3) for a patient who died prior to January 7, 2017 (the Effective Date of the Settlement Agreement), where the diagnosis occurred while the patient was living, by a board-certified or otherwise qualified neurologist, neurosurgeon, or other neuro-specialist physician, or by a physician with sufficient qualifications in the field of neurology or neurocognitive disorders to make a diagnosis of Level 2 Neurocognitive Impairment:**

A diagnosis made outside of the Baseline Assessment Program (BAP) that a living patient suffers from Level 2 Neurocognitive Impairment, as set forth below, *i.e.*, moderate dementia, based on evaluation and evidence generally consistent with the diagnostic criteria set forth and provided below, unless the diagnosing physician can certify in Section IV of the Diagnosing Physician Certification Form, above, that certain testing specified below for Level 2 Neurocognitive Impairment is medically unnecessary because the patient's dementia is so severe:

There is: (i) Concern of the patient, a knowledgeable informant, or the Qualified BAP Provider that there has been a severe decline in cognitive function; (ii) Evidence of a severe cognitive decline from a previous level of performance, as determined by and in accordance with the standardized neuropsychological testing protocol annexed in *Appendix B*, in two or more cognitive domains (complex attention, executive function, learning and memory, language, perceptual-spatial), provided one of the cognitive domains is (a) executive function, (b) learning and memory, or (c) complex attention; (iii) The patient exhibits functional impairment generally consistent with the criteria set forth in the National Alzheimer's Coordinating Center's Clinical Dementia Rating scale Category 2.0 (Moderate) in the areas of Community Affairs, Home & Hobbies, and Personal Care—where such functional impairment is corroborated by documentary evidence (*e.g.*, medical records, employment records), the sufficiency of which will be determined by the physician making the diagnosis (and where no documentary evidence of functional evidence exists or is available, then (a) there must be evidence of severe cognitive decline from a previous level of performance, as determined by and in accordance with the standardized neuropsychological testing protocol annexed in *Appendix B*, in the executive function cognitive domain or the learning and memory cognitive domain, and at least one other cognitive domain; and (b) the patient's functional impairment, as described above, must be corroborated by a third-party sworn affidavit from a person familiar with the patient's condition (other than the player or his family members), the sufficiency of which will be determined by the diagnosing physician); and (iv) The cognitive deficits do not occur exclusively in the context of a delirium, acute substance abuse, or as a result of medication side effects.

## ALZHEIMER'S DISEASE

(1) **The following diagnosis can only be made:**

**(a) prior to July 7, 2014, by a board-certified neurologist, board-certified neurosurgeon, other board-certified neuro-specialist physician, or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician; or**

**(b) from July 7, 2014 through January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified neurologist, board-certified neurosurgeon, or other board-certified neuro-specialist physician:**

A diagnosis in a living patient of the specific disease of Alzheimer's Disease as defined by the World Health Organization's International Classification of Diseases, 9th Edition (ICD-9), the World Health Organization's International Classification of Diseases, 10th Edition (ICD-10), or a diagnosis of Major Neurocognitive Disorder due to probable Alzheimer's Disease as defined in the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5).

(2) **The following diagnosis can only be made prior to January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician, or by a physician with sufficient qualifications in the field of neurology to make such a diagnosis, where the diagnosis was made while the patient was living but thereafter died prior to January 7, 2017 (the Effective Date of the Settlement Agreement):**

A diagnosis of Major Neurocognitive Disorder due to probable Alzheimer's Disease consistent with the definition in *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) or a diagnosis of Alzheimer's Disease.

## PARKINSON'S DISEASE

(1) **The following diagnosis can only be made:**

**(a) prior to July 7, 2014, by a board-certified neurologist, board-certified neurosurgeon, other board-certified neuro-specialist physician, or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician; or**

**(b) from July 7, 2014 through January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified neurologist, board-certified neurosurgeon, or other board-certified neuro-specialist physician:**

A diagnosis in a living patient of the specific disease of Parkinson's Disease as defined by the World Health Organization's International Classification of Diseases, 9th Edition (ICD-9), the World Health Organization's International Classification of Diseases, 10th Edition (ICD-10), or a diagnosis of Major Neurocognitive Disorder probably due to Parkinson's Disease as defined in the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5).

(2) **The following diagnosis can only be made prior to January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician, or by a physician with sufficient qualifications in the field of neurology to make such a diagnosis, where the diagnosis was made while the patient was living but thereafter died prior to January 7, 2017 (the Effective Date of the Settlement Agreement):**

A diagnosis of Parkinson's Disease.

ALS

(1) **The following diagnosis can only be made:**

(a) **prior to July 7, 2014, by a board-certified neurologist, board-certified neurosurgeon, other board-certified neuro-specialist physician, or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician; or**

(b) **from July 7, 2014 through January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified neurologist, board-certified neurosurgeon, or other board-certified neuro-specialist physician:**

A diagnosis in a living patient of the specific disease of Amyotrophic Lateral Sclerosis, also known as Lou Gehrig's Disease (ALS), as defined by the World Health Organization's International Classification of Diseases, 9th Edition (ICD-9) or the World Health Organization's International Classification of Diseases, 10th Edition (ICD-10).

(2) **The following diagnosis can only be made prior to January 7, 2017 (the Effective Date of the Settlement Agreement), by a board-certified or otherwise qualified neurologist, neurosurgeon or other neuro-specialist physician, or by a physician with sufficient qualifications in the field of neurology to make such a diagnosis, where the diagnosis was made while the patient was living but thereafter died prior to January 7, 2017 (the Effective Date of the Settlement Agreement):**

A diagnosis of the specific disease of Amyotrophic Lateral Sclerosis (ALS).

CTE

**The following diagnosis can only be made prior to April 22, 2015 by a board-certified neuropathologist, provided that a patient who died between July 7, 2014 and April 22, 2015 has until 270 days from the date of death to obtain such a post-mortem diagnosis:**

A post-mortem diagnosis of Chronic Traumatic Encephalopathy (CTE).

# APPENDIX B

## BASELINE NEUROPSYCHOLOGICAL TEST BATTERY AND SPECIFIC IMPAIRMENT CRITERIA FOR RETIRED NFL FOOTBALL PLAYERS

### Section 1: Test Battery

**Estimating Premorbid Intellectual Ability**

ACS Test of Premorbid Functioning (TOPF)

**Complex Attention/Processing Speed (6 scores)**

WAIS-IV Digit Span

WAIS-IV Arithmetic

WAIS-IV Letter Number Sequencing

WAIS-IV Coding

WAIS-IV Symbol Search

WAIS-IV Cancellation

**Executive Functioning (4 scores)**

Verbal Fluency (FAS)

Trails B

Booklet Category Test

WAIS-IV Similarities

**Effort/Performance Validity (8 scores)**

*ACS Effort Scores*

ACS-WAIS-IV Reliable Digit Span

ACS-WMS-IV Logical Memory Recognition

ACS-WMS-IV Verbal Paired Associates Recognition

ACS-WMS-IV Visual Reproduction Recognition

ACS-Word Choice

*Additional Effort Tests*

Test of Memory Malingering (TOMM)

Medical Symptom Validity Test (MSVT)

**Learning and Memory (6 scores)**

WMS-IV Logical Memory I

WMS-IV Logical Memory II

WMS-IV Verbal Paired Associates I

WMS-IV Verbal Paired Associates II

WMS-IV Visual Reproduction I

WMS-IV Visual Reproduction II

**Language (3 scores)**

Boston Naming Test

Category Fluency (Animal Naming)

BDAE Complex Ideational Material

**Spatial-Perceptual (3 scores)**

WAIS-IV Block Design

WAIS-IV Visual Puzzles

WAIS-IV Matrix Reasoning

**Mental Health**

MMPI-2RF

Mini International Neuropsychiatric Interview

### Section 2: Evaluate Performance Validity

Freestanding, embedded and regression based performance validity metrics will be administered to each Retired NFL Football Player during baseline and, if relevant, subsequent neuropsychological examinations. There will be at least seven performance validity metrics utilized during each assessment. The specific performance validity metrics utilized will not be released to the public in order to maintain the highest standards of assessment validity.  The performance

## APPENDIX B

validity metrics employed will be rotated at intervals determined by the Appeals Advisory Panel in consultation with Co-Lead Class Counsel and Counsel for the NFL Parties.

Each neuropsychological examiner must complete a checklist of validity criteria as set forth in *Slick et al.* 1999, and revised in 2013 (see below) for every Retired NFL Football Player examined in order to determine whether the Retired NFL Football Player's test data is a valid reflection of his optimal level of neurocognitive functioning.

1. Suboptimal scores on performance validity embedded indicators or tests. The cutoffs for each test should be established based on empirical findings.

2. A pattern of neuropsychological test performance that is markedly discrepant from currently accepted models of normal and abnormal central nervous system (CNS) function. The discrepancy must be consistent with an attempt to exaggerate or fabricate neuropsychological dysfunction (e.g., a patient performs in the severely impaired range on verbal attention measures but in the average range on memory testing; a patient misses items on recognition testing that were consistently provided on previous free recall trials, or misses many easy items when significantly harder items from the same test are passed).

3. Discrepancy between test data and observed behavior. Performance on two or more neuropsychological tests within a domain are discrepant with observed level of cognitive function in a way that suggests exaggeration or fabrication of dysfunction (e.g., a well-educated patient who presents with no significant visual-perceptual deficits or language disturbance in conversational speech performs in the severely impaired range on verbal fluency and confrontation naming tests).

4. Discrepancy between test data and reliable collateral reports. Performance on two or more neuropsychological tests within a domain are discrepant with day-to-day level of cognitive function described by at least one reliable collateral informant in a way that suggests exaggeration or fabrication of dysfunction (e.g., a patient handles all family finances but is unable to perform simple math problems in testing).

5. Discrepancy between test data and documented background history. Improbably poor performance on two or more standardized tests of cognitive function within a specific domain (e.g., memory) that is inconsistent with documented neurological or psychiatric history.

6. Self-reported history is discrepant with documented history. Reported history is markedly discrepant with documented medical or psychosocial history and suggests attempts to exaggerate deficits.

7. Self-reported symptoms are discrepant with known patterns of brain functioning. Reported or endorsed symptoms are improbable in number, pattern, or severity; or markedly inconsistent with expectations for the type or severity of documented medical problems.

8. Self-reported symptoms are discrepant with behavioral observations. Reported symptoms are markedly inconsistent with observed behavior (e.g., a patient complains of severe episodic memory deficits yet has little difficulty remembering names, events, or appointments; a patient complains of severe cognitive deficits yet has little difficulty driving independently and arrives on time for an appointment in an unfamiliar area; a patient complains of severely slowed mentation and concentration problems yet easily follows complex conversation).

9. Self-reported symptoms are discrepant with information obtained from collateral informants. Reported symptoms, history, or observed behavior is inconsistent with information obtained from other informants judged to be adequately reliable. The discrepancy must be consistent with an attempt to exaggerate deficits (e.g., a patient reports severe memory impairment and/or behaves as if severely memory-impaired, but his spouse reports that the patient has minimal memory dysfunction at home).

## APPENDIX B

Notwithstanding a practitioner's determination of sufficient effort in accordance with the foregoing factors, a Retired NFL Football Player's failure on two or more effort tests may result in the Retired NFL Football Player's test results being subjected to independent review, or result in a need for supplemental testing of the Retired NFL Football Player.

Note: Additional information relating to the evaluation of effort and performance validity will be provided in a clinician's interpretation guide.

### Section 3: Estimate Premorbid Intellectual Ability

| Test | Ability |
|---|---|
| Test of Premorbid Functioning (TOPF) | Reading<br>Reading + Demographic Variables |

The Test of Premorbid Functioning (TOPF) provides three models for predicting premorbid functioning: (a) demographics only, (b) TOPF only, and (c) combined demographics and TOPF prediction equations. For each model using demographic data, a simple and complex prediction equation can be selected. In the simple model, only sex, race/ethnicity, and education, are used in predicting premorbid ability. In the complex model, developmental, personal, and more specific demographic data is incorporated into the equations. The clinician should select a model based on the patient's background and his or her current level of reading or language impairment.

Note: It is necessary to estimate premorbid intellectual functioning in order to use the criteria for impairment set out in this document. Estimated premorbid intellectual ability will be assessed and classified as:

➢ Below Average (estimated IQ below 90);

➢ Average (estimated IQ between 90 and 109);

➢ Above Average (estimated IQ above 110).

### Section 4: Neuropsychological Test Score Criteria by Domain of Cognitive Functioning

There are 5 domains of cognitive functioning. In each domain, there are several tests that contribute 3, 4, or 6 demographically-adjusted test scores for consideration. Test selection in the domains was based on the availability of demographically-adjusted normative data for Caucasians and African Americans. These domains and scores are set out below.

The basic principle for defining impairment on testing is that there must be a pattern of performance that is approximately 1.5 standard deviations (for Level 1 Impairment), 1.7-1.8 standard deviations (for Level 1.5 Impairment) or 2 standard deviations (for Level 2 Impairment) below the person's expected level of premorbid functioning. Therefore, it is necessary to have more than one low test score in each domain. A user manual will be provided to neuropsychologists setting out the cutoff scores, criteria for identifying impairment in each cognitive domain, and statistical and normative data to support the impairment criteria.

## APPENDIX B

| Domain/Test | Ability |
|---|---|
| **Complex Attention/Speed of Processing (6 Scores)** | |
| Digit Span | Attention & Working Memory |
| Arithmetic | Mental Arithmetic |
| Letter Number Sequencing | Attention & Working Memory |
| Coding | Visual-Processing & Clerical Speed |
| Symbol Search | Visual-Scanning & Processing Speed |
| Cancellation | Visual-Scanning Speed |
| **Executive Functioning (4 scores)** | |
| Similarities | Verbal Reasoning |
| Verbal Fluency (FAS) | Phonemic Verbal Fluency |
| Trails B | Complex Sequencing |
| Booklet Category Test | Conceptual Reasoning |
| **Learning and Memory (6 scores)** | |
| Logical Memory I | Immediate Memory for Stories |
| Logical Memory II | Delayed Memory for Stories |
| Verbal Paired Associates I | Learning Word Pairs |
| Verbal Paired Associates II | Delayed Memory for Word Pairs |
| Visual Reproduction I | Immediate Memory for Designs |
| Visual Reproduction II | Delayed Memory for Designs |
| **Language** | |
| Boston Naming Test | Confrontation Naming |
| BDAE Complex Ideational Material | Language Comprehension |
| Category Fluency | Category (Semantic) Fluency |
| **Visual-Perceptual** | |
| Block Design | Spatial Skills & Problem Solving |
| Visual Puzzles | Visual Perceptual Reasoning |
| Matrix Reasoning | Visual Perceptual Reasoning |

**Impairment Criteria: *Below Average* Estimated Intellectual Functioning (A1 – E1)**

**A1. Complex Attention (6 test scores)**

1. Level 1 Impairment: 3 or more scores below a T score of 35

2. Level 1.5 Impairment: 4 or more scores below a T score of 35; or meet for Level 1 and 2 scores below a T score of 30

3. Level 2 Impairment: 3 or more scores below a T score of 30

**B1. Executive Function (4 test scores)**

1. Level 1 Impairment: 2 or more scores below a T score of 35

2. Level 1.5 Impairment: 3 or more scores below a T score of 35; or meet for Level 1 and 1 score below a T score of 30

# APPENDIX B

3. Level 2 Impairment: 2 or more scores below a T score of 30

### C1. Learning and Memory (6 test scores)

1. Level 1 Impairment: 3 or more scores below a T score of 35

2. Level 1.5 Impairment: 4 or more scores below a T score of 35; or meet for Level 1 and 2 scores below a T score of 30

3. Level 2 Impairment: 3 or more scores below a T score of 30

### D1. Language (3 test scores)

1. Level 1 Impairment: 3 or more scores below a T score of 37

2. Level 1.5 Impairment: meet for Level 1 and 2 scores below a T score of 35

3. Level 2 Impairment: 3 or more scores below a T score of 35

### E1. Visual-Perceptual (3 test scores)

1. Level 1 Impairment: 3 or more scores below a T score of 37

2. Level 1.5 Impairment: meet for Level 1 and 2 scores below a T score of 35

3. Level 2 Impairment: 3 or more scores below a T score of 35

## Impairment Criteria: *Average* Estimated Intellectual Functioning (A2 – E2)

### A2. Complex Attention (6 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 35

2. Level 1.5 Impairment: 3 or more scores below a T score of 35; or meet for Level 1 and 1 score below a T score of 30

3. Level 2 Impairment: 2 or more scores below a T score of 30

### B2. Executive Function (4 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 35

2. Level 1.5 Impairment: 3 or more scores below a T score of 35; or meet for Level 1 and 1 score below a T score of 30

3. Level 2 Impairment: 2 or more scores below a T score of 30

### C2. Learning and Memory (6 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 35

2. Level 1.5 Impairment: 3 or more scores below a T score of 35; or meet for Level 1 and 1 score below a T score of 30

3. Level 2 Impairment: 2 or more scores below a T score of 30

### D2. Language (3 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 37

2. Level 1.5 Impairment: 3 or more scores below a T score of 37; or meet for Level 1 and 1 score below a T score of 35

3. Level 2 Impairment: 2 or more scores below a T score of 35

### E2. Visual-Perceptual (3 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 37

2. Level 1.5 Impairment: 3 or more scores below a T score of 37; or meet for Level 1 and 1 score below a T score of 35

3. Level 2 Impairment: 2 or more scores below a T score of 35

| APPENDIX B |
|---|

**Impairment Criteria: *Below Average* Estimated Intellectual Functioning (A3 – E3)**

### A3. Complex Attention (6 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 35

2. Level 1.5 Impairment: meet for Level 1 and 3 or more scores below a T score of 37

3. Level 2 Impairment: 3 or more scores below a T score of 35

### B3. Executive Function (4 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 37

2. Level 1.5 Impairment: meet for Level 1 and 3 or more scores below a T score of 37; or meet for Level 1 and 1 score below a T score of 30

3. Level 2 Impairment: 2 or more scores below a T score of 30

### C3. Learning and Memory (6 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 35

2. Level 1.5 Impairment: meet for Level 1 and 3 or more scores below a T score of 37

3. Level 2 Impairment: 3 or more scores below a T score of 35

### D3. Language (3 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 40

2. Level 1.5 Impairment: 3 scores below at T score of 40; or meet for Level 1 and 1 score below a T score of 37

3. Level 2 Impairment: 2 or more scores below a T score of 37

### E3. Visual-Perceptual (3 test scores)

1. Level 1 Impairment: 2 or more scores below a T score of 40

2. Level 1.5 Impairment: 3 scores below at T score of 40; or meet for Level 1 and 1 score below a T score of 37

3. Level 2 Impairment: 2 or more scores below a T score of 37

| Section 5: Mental Health Assessment | | |
|---|---|---|
| **Test** | **Symptoms/Functioning** | **Assessment** |
| MMPI-2RF | Mental Health Assessment | Evaluation of Validity Scales and Configurations; T-Scores for Symptom Domains |
| Mini International Neuropsychiatric Interview (M.I.N.I. Version 5.0.0) | Semi-structured Psychiatric Interview | Scale Criteria for Various Psychiatric Diagnoses |

**Ronald L. Hamilton, M.D.**

1/2/2017

## CURRICULUM VITAE

## BIOGRAPHICAL

| | | | |
|---|---|---|---|
| **Name:** | Ronald Lee Hamilton | **Birth Date:** | ███████████ |
| **Home Address:** | ███████████<br>Pittsburgh, PA 15232 | **Birth Place:** | Omaha,<br>Nebraska |
| **Marital status:** | single | | |
| **Home Phone** | 412-310-9874 | **Citizenship:** | USA |
| **Business Address:** | Division of Neuropathology<br>A724.1 Scaife Hall<br>200 Lothrop Street<br>Pittsburgh, PA 15213 | | |
| **Business Phone:** | 412-624-6610 | | |
| **Business Fax:** | 412-624-5488 | | |
| **e-mail address** | hamiltonrl@upmc.edu | | |

## EDUCATION AND TRAINING

| | | | |
|---|---|---|---|
| 1977-1985 | University of Nebraska-Lincoln | B.S. | Psychology |
| 1985-1989 | University of Nebraska Medical Center | M.D. | |
| 1989-1991 | University of California, San Diego<br>Program Director, David Bailey | Resident Anatomic Pathology | |
| 1991-1993 | University of California, San Diego<br>Program Director, Henry C. Powell | Resident Neuropathology | |
| 1993-1994 | University of Pittsburgh<br>Program Director, Clayton A Wiley | Fellow Neuropathology | |
| 1994-1995 | University of Pittsburgh<br><br>Program Director, Michael Zigmond | Fellow: NIMH Training Grant<br>in Neuroscience | |

## APPOINTMENTS AND POSITIONS:

| | |
|---|---|
| 1995-2002 | University of Pittsburgh School of Medicine -Assistant Professor of Pathology |
| 2002-present | University of Pittsburgh School of Medicine -Associate Professor of Pathology |

## DISTRIBUTION OF % TIME

| | |
|---|---|
| Research | 20% |
| Other scholarly activity | 8% |
| Teaching | 10% |
| Clinical | 35% |
| Combined clinical and teaching | 20% |
| Service activities | 5% |
| Administrative activities. | 2% |
| | |
| TOTAL | 100% |

**Ronald L. Hamilton, M.D.**

## CERTIFICATION and LICENSURE

**SPECIALTY CERTIFICATION**

| | | |
|---|---|---|
| American Board of Pathology | Anatomic Pathology | 5/23/96 |
| American Board of Pathology | Neuropathology | 5/23/96 |
| American Board of Pathology – recertification | Neuropathology | 1/1/2014 |

**MEDICAL or OTHER PROFESSIONAL LICENSURE**

| | |
|---|---|
| 1990 | California Medical License (G69731) expired |
| 1993 | Pennsylvania Medical License (MD-049717-L) |
| 2009 | Indiana Medical License (01067332A) |

## MEMBERSHIPS IN PROFESSIONAL AND SCIENTIFIC SOCIETIES

| | |
|---|---|
| 1992 | American Association for the Advancement of Science |
| 1993 | American Association of Neuropathology |
| 1993 | International Society of Neuropathology |
| 1994 | College of American Pathologists (CAP) |
| 1995-97 | CAP Neuropathology Subcommittee |
| 1998 | Children's Cancer Group, Study Committee for CCGB975 |
| 1999 | Society for Neuroscience |

## HONORS

| | |
|---|---|
| Nominated "Teacher of the Year: Anatomic Pathology" | 1997 |
| Nominated "Teacher of the Year: Anatomic Pathology" | 1998 |
| Nominated "Teacher of the Year: Anatomic Pathology" | 1999 |
| Nominated "Teacher of the Year: Anatomic Pathology" | 2000 |
| Nominated "Teacher of the Year: Anatomic Pathology" | 2001 |
| Nominated "Teacher of the Year: Anatomic Pathology" | 2002 |
| UPMC ACES Award winner (ACES is an Award for | 2003 |

Clinical Excellence and Service and is given to about 10 physicians per year at UPMC)

| | |
|---|---|
| Letter of appreciation from Chief Residents | 1997-1998 |
| AP Pathology "TEACHER OF THE YEAR" | 2004-05 |

## PUBLICATIONS

**Refereed Articles**

1. Esch O, Spinosa JC, **Hamilton RL**, Crombie DL, Schteigart CO, Rondinone JF, D'Agostino HB,Lillienau J and Hofmann AF: Acute effects of topical methyl tert-butyl ether or ethyl propionate on gallbladder histology in animals: a comparison of two solvents for contact dissolution of cholesterol gallstones. Hepatology 16 (4):984-991, 1992.

2. Anders KH, Becker PS, Holden JK, Sharer LR, Cornford ME, Hansen LA, **Hamilton R,** Vinters, HV: Multifocal necrotizing leukoencephalopathy with pontine predilection in immunosuppressed patients: a clinicopathologic review of sixteen cases. Human Pathology 24:897-904, 1993.

3. **Hamilton RL**, Achim C, Grafe MR, Fremont JC, Miners D, Wiley CA: Herpes simplex virus brainstem encephalitis in an AIDS patient. Clinical Neuropathology, 14: 45-50, 1995.

**Ronald L. Hamilton, M.D.**

4. Rose J, Haskell WL, Gamble JG, **Hamilton RL**, Brown DA, Rinsky L: Muscle pathophysiology and clinical measures of disability in children with cerebral palsy. Journal of Orthopedic Research, 12(6): 758-768, 1994.

5. **Hamilton RL**, Grafe MR: Complete absence of the cerebellum: a report of two cases. Acta Neuropathologica 88 (3): 258-261, 1994.

6. **Hamilton RL**, Haas RH, Nyhan WL, Powell HC, Grafe MR: The neuropathology of propionic academia: a report of two additional cases.  Journal of Child Neurology 10(1): 25-30, 1995.

7. Haas RH, Marsden DL, Capistrano-Estrada S, **Hamilton RL**, Grafe MR, Wong W, Nyhan WL: Acute basal ganglia infarction in propionic acidemia.  Journal of Child Neurology 10(1) 18-22, 1995.

8. Kupperman BD, Quiceno JI, Wiley C, Hesselink J**, Hamilton R**, Keefe K, Garcia R, Freeman WR: Clinical and histopathologic study of varicella zoster virus retinitis in patients with the acquired immunodeficiency syndrome.  American Journal of Ophthalmology 118:589-600, 1994.

9. Adelson PD, Robichaurd P, **Hamilton RL**, Kochanek PM. A Model of Diffuse Traumatic Brain  Injury in the Immature Rat.  J Neurosurg 85:877-884, 1996.

10. Alper G, Crumrine PK, **Hamilton RL**, Albright L, Wald ER. An unusual case of inflammatory spinal epidural  mass (Castleman's syndrome) Pediatric Neurology  15: 60-2 , 1996

11. Adelson PD, Firlik KS, Firlik AD, **Hamilton RL**. A meningeal cyst of the thoracic spine presenting as prolonged paresis after ankle injury: case report. Neuropediatrics 27:207-210, 1996.

12. Cramer SC, Segal A, **Hamilton RL**, Schmahman J, Ma J. Leukoencephalitis Due to Varicella Zoster Virus:   Report of a Case and Review of Clinical Features.  Contemporary Neurology, 1, 1996 (electronic journal).

13. Mansfield RT, Schiding JK, **Hamilton R**, Kochanek PM: Effects of hypothermia on traumatic brain injury in immature rats. J Cerebral Blood Flow  Metabo 16(2): 244-252, 1996.

14. Pollack IF, Campbell JW, **Hamilton RL**, Martinez AJ, Bozik ME. Proliferation index as a predictor of prognosis in malignant gliomas of childhood. Cancer 79:849-856, 1996

15. Pollack IF, **Hamilton RL,** Finkelstein SD, Campbell JW, Martinez AJ, Sherwin RN, Bozik ME, Gollin SM. The relationship between tp53 mutations and overexpression of p53 and prognosis in malignant gliomas of childhood. Cancer Research 57:304-309, 1997.

16. Ikonomovic MD, Mizukami K, Davies P, **Hamilton R**, Sheffield R, Armstrong DM. The loss of GluR2(3) immunoreactivity preceded neurofibrillary tangle formation in the entorhinal cortex and hippocampus of Alzheimer brains. J Neuropath Exp Neurol 56:1018-1027, 1997.

17. Bredel M, Pollack IF, Campbell JW, **Hamilton RL**: Basic fibroblast growth factor as a predictor of prognosis in pediatric high-grade gliomas. Clinical Cancer Research 3:2157-2164, 1997

18. Blatt J, **Hamilton RL**: Neurodevelopmental anomalies in children with neuroblastoma. Cancer 82: 1603-8, 1998.

19. Fukui MB, Livstone BJ, Meltzer CC, **Hamilton RL**: Hemorrhagic presentation of untreated primary central nervous system lymphoma in the acquired immunodeficiency syndrome. Am J Roentgenol 170:1114-1115, 1998..

20. Bredel M, Pollack IF, **Hamilton RL**, James CD: Epidermal growth factor receptor (EGFR) and gene amplification in high-grade non-brainstem gliomas of childhood. Clin Can Res 5:1786-92, 1999

**Ronald L. Hamilton, M.D.**

21. Gerszten PC, Pollack IF, **Hamilton RL**. Primary parafalcine chondrosarcoma in a child. Acta Neuropathologica 95:111-4, 1998.

22. Pollack IF, **Hamilton RL**, Fitz C, Orenstein DM. An intrasylvian "fibroma" in a child with cystic fibrosis. Pediatric Neurosurgery 46:744-747 2000.

23. Liachenko S, Tang P, **Hamilton RL**, Xu Y: A reproducible model of circulatory arrest and remote resuscitation in rats for NMR investigation. Stroke 29:1229-1238, 1998

24. Meltzer CC, Liu AY, Perrone AM, **Hamilton RL** Meningioangiomatosis MR imaging with histopathologic correlation. AJR 170:804-5, 1998

25. Clark RSB, Kochanek PM, Chen M, Watkins SC, Marion DW, Chen J, **Hamilton RL**, Loeffert JE, Graham SH. Increases in Bcl-2 and cleavage of caspase-1 and caspase-3 in human brain after head injury. FASEB J, 13:813-821, 1999

26. Soontornniyomkij V, Wang G, Pittman CA, **Hamilton RL**, Wiley CA, Achim CL Absence of brain-derived neurotrophic factor and trkB receptor immunoreactivity in glia of Alzheimer's disease. Acta Neuropathologica 98:345-8, 1999.

27. Wang G, Achim CL, **Hamilton RL**, Wiley CA, Soontornniyomkij V  Tyramide signal amplification methods in multiple label immunofluorescence confocal microscopy. Methods 18(4):459-464, 1999

28. Firlik KS, Adelson PD, **Hamilton RL**: Coexistence of a ganglioglioma and Rasmussen's encephalitis: successful treatment in a four-year-old boy. Pediatr Neurosurg 30:278-282, 1999

29. Ikonomovic MD, Mizukami K, Warde D, Sheffield R, **Hamilton R**, Wenthold RJ, Armstrong DM Distribution of glutamate receptor subunit NMDAR1 in the hippocampus of normal elderly and patients with Alzheimer's disease. Exp Neurol 160(1):194-204, 1999.

30. Dallasta, LM, Wang G, Bodnar RJ, Draviam R, Wiley CA, Achim CA, **Hamilton RL**: Differential expression of intercellular adhesion molecules-1 (ICAM-1) and vascular adhesion cell molecule-1 (VCAM-1) in chronic murine retroviral encephalitis. Neuropathol Appl Neurobiol 26:332-341, 2000.

31.  Luabeya MK, Dallasta LM, Achim CL, Pauza CD, **Hamilton RL**: Blood-brain Barrier Disruption in Simian Immunodeficiency Virus Encephalitis. Neuropathol Appl Neurobiol 26:454-462, 2000.

32.  **Hamilton RL**. Lewy Bodies in Alzheimer's Disease: A Neuropathological Review of 145 Cases Using   -synuclein Immunohistochemistry. Brain Pathol 10: 378-384, 2000.

33.  Sweet, RA, **Hamilton RL**, Healy MT, Wisniewski SR, Henteleff R, Pollack BG, Lewis DA, DeKosky ST. Alterations of Striatal Dopamine Receptor Binding in Alzheimer's Disease Are Associated with Lewy Body Pathology and With Antemortem Psychosis. Arch Neurol 58:466-472, 2001.

34.  Styren S, **Hamilton RL**, Styren GC, Klunk WE X-34: a novel and intensely fluorescent stain for Alzheimer's disease pathology. J Histochem Cytochem 48:1223-1232, 2000.

35.  Lopez OL, **Hamilton RL**, Becker JT, Wisniewski S, Kaufer DI, DeKosky ST. Severity of cognitive impairment and the clinical diagnosis of AD with Lewy bodies. Neurology 54:1780-1787, 2000

36.  Lopez OL, Wisniewski S, **Hamilton RL**, Becker JT, Kaufer DI, DeKosky ST. Predictors of progression in patients with AD and Lewy bodies. Neurology 54:1774-1779, 2000.

**Ronald L. Hamilton, M.D.**

37.  Sweet RA, **Hamilton RL**, Lopez OL, Klunk WE, Wisnieski SR, Kaufer DI, Healy MT, Dekosky ST. Psychotic symptoms in Alzheimer's Disease are not associated with more severe neuropathologic features. Internat Psychogeriatr 12: 547-558, 2000.

38.  Lopez OL, Becker JT, Klunk W, Saxton J, **Hamilton RL**, Kaufer DI, Sweet RA, Meltzer CC, Wisniewski S, Kamboh MI, DeKosky ST. Research evaluation and diagnosis of probable Alzheimer's Disease over the last two decades. I. Neurology 55:1854-1862, 2000.

39.  Lopez OL, Becker JT, Klunk W, Saxton J, **Hamilton RL**, Kaufer DI, Sweet RA, Meltzer CC, Wisniewski S, Kamboh MI, DeKosky ST. Research evaluation and diagnosis of possible Alzheimer's Disease over the last two decades. II. Neurology 55:1863-1869, 2000.

40.  Pollack IF, **Hamilton RL**, Fitz C, Kassam A, Snyderman C. Congenital Reactive Myofibroblastic Tumor of the Petrous Bone: Case Report. Neurosurgery 48:430-435, 2001.

41.  Levy EI, Scarrow A, **Hamilton** RC (sic), Wollman MR, Fitz C. Pollack IF. Medical Management Of Eosinophilic Granuloma of the Cervical Spine. Pediatr Neurosurg 31:159-62, 1999.

42.  Pettegrew JW, Panchalingam K, **Hamilton RL**, and McClur RJ Brain Membrane Phospholipid Alterations in Alzheimer's Disease.  Neurochem Res 26:771-782, 2001

43.  Levy EI, Harris AE, Omalu BA, **Hamilton RL**, Branstetter BF, Pollack IF. Sudden Death from Fulminant Acute Cerebellitis.  Pediatr Neurosurg 35:24-28, 2001

44.  Lianchenko S, Tang P, **Hamilton RL**, Xu Y. Regional Dependence of Cerebral Reperfusion After Circulatory Arrest in Rats.  J Cerebr Blood Flow Met 21:1320-1329, 2001 .

45.  Pollack IF, Finkelstein SD, Burnham J, Holmes EJ, **Hamilton RL**, Yates AJ, Finlay J, Sposto R, and CCG. Age and TP53 Mutation Frequency in Childhood Malignant Gliomas: Results of a Multi-institutional Cohort. Cancer Res 61:7404-7407, 2001

46.  Adelson PD, Jenkins LW, **Hamilton RL**, Robichaud P, Tran MP, Kochanek PM. Histopathologic Response of the Immature Rat to Diffuse Traumatic Brain Injury.  J Neurotrauma 18 :967-976, 2001

47.  Pollack IF, Finkelstein SD, Woods J, Burnham J, Holmes EJ, **Hamilton RL**, Yates AJ, Boyett JM, Finlay J, Sposto R, and CCG. TP53 Mutations, Expression of p53 and Prognosis in Children with Malignant Gliomas.  New England Journal of Medicine 346:420-427, 2002

48.  Lopez OL, Becker JT, Kaufer DI, **Hamilton RL**, Sweet RA, Klunk W, DeKosky ST. Research Evaluation and Prospective Diagnosis of Dementia With Lewy Bodies.  Arch Neurol 59:43-46, 2002.

49.  Wang L, Yushmanov VE, Lianchenko SM, Tang P, **Hamilton RL**, Xu Y.  Late Reversal of Cerebral Perfusion and Water Diffusion After Transient Focal Ischemia in Rats.  J Cereb Blood Flow Metab 22:253-261, 2002.

50. Pollack IF, Biegal JA, Yates AJ, **Hamilton RL**, Finkelstein SD.Risk Assignment in Childhood Brain Tumors: The Emerging Role of Molecular and Biologic Classification. Current Oncology Reports 4:114-122, 2002.

51.  Pollack IF, **Hamilton RL**, Burnham J, Holmes EJ, Finkelstein SD, Sposto R, Yates AJ, Boyett JM, Finley JL. The impact of proliferation index on outcome in childhood malignant gliomas: results in a multi-institutional cohort. Neurosurgery 50:1238-1245, 2002.

**Ronald L. Hamilton, M.D.**

52. Sweet RA, Panchalingam K, Pettefrew JW, McClure RJ, **Hamilton RL**, Lopez OL, Kaufer DI, DeKosky ST, Klunk WE.  Psychosis in Alzheimer disease: postmortem magnetic resonance spectroscopy evidence of excess neuronal and membrane phospholipid pathology. Neurobiol Aging 23:547-53, 2002.

53.  Mazzola CA, Albright AL, Sutton LN, Tuite GF, **Hamilton RL**, Pollack IF.  Dermoid inclusion cysts and early spinal cord tethering after fetal surgery.  New Engl. J Med 347:256-9, 2002.

54.  Bredel M, Pollack IF, **Hamilton RL**, Birner P, Hainfellner JA, Zentner J.  DNA topoisomerase II-alpha predicts progression-free and overall survival in pediatric malignant non-brainstem gliomas.  Int J Cancer 99:817-20, 2002.

55.  Klunk WE, Wang Y, Huang G, Debnath ML, Holt DP, Shao L, **Hamilton RL**, Ikonomovic MD, DeKosky ST, Mathis CA.  The binding of BTA-1 to post-mortem brain homogenates is dominated by the amyloid component. J Neurosci 23:2086-2092, 2003.

56. Castellano-Sanchez, AA, Ohgaki H, Yokoo H, Scheithauer BW, Burger PC, **Hamilton RL**, Finkelstein SD, Brat, DJ.  Cerebral granular cell astrocytomas show a high frequency of allelic loss but lack a defining genotype. Brain Pathology 13: 62-78, 2003.

57.  Gilbertson RJ, Hill DA, Hernan R, Kocak M, Geyer R, Olson J, Gajjar A, Rush L, **Hamilton RL**, Finkelstein SD, Pollack IF.  ERBB1 is amplified and overexpressed in high-grade diffusely infiltrative pediatric brain stem glioma.  Clin Cancer Res 9:3620-3624, 2003.

58. Pollack IF, Finkelstein SD, Burnham J, **Hamilton RL**, Yates AJ, Holmes EJ, Boyett JM, Finlay JL. The association between chromosome 1p loss and outcome in pediatric malignant gliomas: results from the CCG-945 cohort. Pediatr Neurosurg 39:114-121, 2003.

59. Carter TL, Rissman RA, Mishizen-Eberz AJ, Wolfe BB, **Hamilton RL**, Gandy S, Armstrong DM. Differential Preservation of AMPA Receptor Subunits in the Hippocampi of Alzheimer's Disease Patients According to Braak Stage Experimental Neurology 187:299-309, 2004

60.  Finkelstein SD, Mohan D, **Hamilton RL**, Sasatomi E, Swalsky PA, Lieberman FS.  Microdissection-based genotyping assists discrimination of reactive gliosis versus glioma. Am J Clin Pathol 121:671-678, 2004

61.  **Hamilton RL**, Bowser B Alzheimer Disease Pathology in ALS Acta Neuropathologica107:515-522, 2004

62.  Mohan D, Couce ME, Wiley CA, **Hamilton RL**, Sasatomi E, Swalsky PA, Lieberman MD, Finkelstein SD.  Microdissection based genotyping of human gliomas: diagnostic and prognostic considerations Modern Pathology 17:1346-1358, 2004

63. Marshall GA, Kaufer DI, Lopez OL, Rao GR, **Hamilton RL**, DeKosky ST.  Right prosubiculum amyloid plaque density correlates with anosognosia in Alzheimer's Disease.  J Neurol Neurosurg Psychiatry 75:1396-4000, 2004.  **PMCID:  PMC1738763**

64.  Sweet RA, **Hamilton RL**, Butters ME, Mulsant BH, Pollock BG, Lewis DA, DeKosky ST, Reynolds CF.  Neuropathologic Correlates of Dementia in Late Life Major Depression Neuropsychopharmacology 29:2242-2250, 2004

65  Lee JYK, Finkelstein S, **Hamilton RL**, Rekha P, Pirris S, King Jr, JT, Omalu B.  Loss of heterozygosity Analysis of Benign, Atypical and Anaplastic Meningiomas.  Neurosurgery 55:1163-1173, 2004.

**Ronald L. Hamilton, M.D.**

66. Beckner ME, Sasatomi E, Swalsky PA, **Hamilton RL**, Pollack, IF, Finkelstein SD. Loss of heterozygosity reveals non-VHL Allelic loss in hemangioblastomas at 22q13. Human Pathology 35:1105-1111, 2004.

67. Tsuang D, Wilson R, Lopez OL, Luedecking-Zimmer EK, Leverenz JB, DeKosky ST, Kamboh MI, **Hamilton RL**. Genetic Association Between APOE*4 Allele and Lewy Bodies in Alzheimer's Disease Neurology, 64:509-513, 2005. **PMCID: PMC1487185**

68. Bredel C, Lassman S, Pollack IF, Knoth R, **Hamilton RL**, Werner M, Bredel M. DNA Topoisomerase II-alpha and Her-2/Neu Gene Dosages in Pediatric Malignant Gliomas. Int J Cancer 26:1188-92, 2005.

69. Witham TF, Okada H, Fellows W, **Hamilton RL**, Flickinger JC, Chambers WH, Pollack IF, Watkins SC, Kondziolka D. The characterization of tumor apoptosis after experimental radiosurgery. Stereotact Funct Neurosurg 83:17-24 2005.

70. McFadden K, **Hamilton RL**, Insalaco SJ, Lavine L, Al-Mateen M, Guoji Wang G, Wiley CA Neuronal intranuclear inclusion disease in a child without polyglutamine inclusions J Neuropathol Exper Neurol 64:545-552, 2005. **PMCID: PMC1402362**

71. Hatano M, Eguchi J, Tatsumi T, Kuwashima N, Dusak JE, Kinch MS, Pollack IF, **Hamilton RL**, Storkus WJ, Okada H. EphA2 as a glioma-associated antigen: a novel target for glioma-vaccines. Neoplasia 7:717-722, 2005. **PMCID: PMC1501889**

72. Jordan S, Ruoyan C, Koprivica V, **Hamilton RL**, Whitehead R, Tottori K, Kikuchi T. In vitro profile of the antidepressant candidate OPC-14523 at rat and human 5-HT$_{1A}$ receptors.Eur J Pharmacol, 517:165-173, 2005.

73. Omalu BI, Minster RL, Kamboh MI, **Hamilton RL**, Wecht CH, DeKosky ST. Chronic Traumatic Encephalopathy (CTE) in a National Football League (NFL) Player Neurosurgery, 57:128-134, 2005.

74. Judkins AR, Burger PC, **Hamilton RL**, Kleinschmidt-DeMasters B, Perry A, Pomeroy SL, Rosenblum MK, Yachnis AT, Zhou H, Rorke LB, Biegel JA. INI1 Protein Expression Distinguishes Atypical Teratoid/Rhabdopid Tumor from Choroid Plexus Carcinoma. J Neuropathol Exp Neurol 64:391-397, 2005.

75. Desai PP, Ikonomovic I, Abrahamson EE, **Hamilton RL,** Isanski BA, Hope CE, Klunk WE, Dekosky ST, Kamboh MI. Apolipoprotein D is a component of compact but not diffuse amyloid-beta plaques in Alzheimer's Disease temporal cortex. Neurobiol Dis May 22, 2005 (epub)

76. Carson-Walter EB, Hampton J, Geynisman D,Pillai PK, Sathanoori R, Madden SL, **Hamilton RL**, Walter KA. Plasmalemmal Vesicle associated protein-1 (PV-1) is a novel and critical marker of brain tumor angiogenesis. Clin Cancer Res 11:7643-7650, 2005.

77. Lopez OL, Becker JT, Sweet RA, Martin-Sanchez FJ, **Hamilton RL** Lewy bodies in the Amygdala increase risk for major depression in subjects with Alzheimer disease. Neurology 67:660-665, 2006.

78. Pollack IF, **Hamilton RL**, Sobol R, Burnham J, Yates AJ, Holmes EJ, Zhou T, Finlay J (for Children Oncology Group).O6-methylguanine-DNA methyltransferase strongly Correlates with Outcome in Childhood Malignant Gliomas: Results from the CCG-945 Cohort J Clin Oncol. Jul 20;24(21):3431-7, 2006.

**Ronald L. Hamilton, M.D.**

79. Mandal PK, Pettegrew JW, Masliah E, **Hamilton RL**, Mandal R. Interaction between Aβ Peptide and α Synuclein: Molecular Mechanisms in Overlapping Pathology of Alzheimer's and Parkinson's in Dementia with Lewy Body disease. Neurochemical Research, 2006 31, 1153-1162, 2006.

80. Omalu B, DeKosky ST, **Hamilton RL**, Minster RL, Kamboh MI, Shakir AM, Wecht Chronic Traumatic Encephalopathy in a National Football League Player: part II. Neurosurgery 59:1086-92, 2006

81. Ramsey CP, Glass CA, Koike MA, Montgomery MB, Ritson GP, Chia L, **Hamilton RL**, Chu CT, Jordan-Sciutto KL. Expression of Nrf2 in neurodegenerative diseases. J Neuropathol Exp Neurol 66:75-85, 2007. **PMCID: PMC2253896**

82. Boada FE, Tanase C, Davis D, Walter K, Torres-Trejo A, Couce M, **Hamilton R**, Kondziolka D, Bartinski W, Lieberman F. Non-invasive assessment of tumor proliferation using triple quantum filtered 23/Na MRI: technical challenges and solutions. Conf Proc IEEE Eng Med Biol Sci Soc. 2004; 7:5238-41

83. Pollack IF, **Hamilton RL**, James CD, Finkelstein SD, Burnham J, Yates AJ, Holmes EJ, Zhou T, Finlay J (for Children Oncology Group). Rarity of *PTEN* Deletions and *EGFR* Amplification in Malignant Gliomas of Childhood: Results from the Children's Cancer Group-945 Cohort J Neurosurg 105(5 Suppl):418-424, 2006.

84. Guzman A, Wood WL, Alpert E, Prasad MD, Miller RG, Rothstein JD, Bowser R, **Hamilton R**, Wood TD, Cleveland DW, Lingappa VR, Liu J. Common molecular signature in SOD1 for both sporadic and familial amyotrophic lateral sclerosis. Proc Nat Acad Sci 104:12524-12529, 2007. **PMCID: PMC2408940**

85. Beckner ME, Jane EP, Jankowitz B, Agostino NR, Walter KA, **Hamilton RL**, Pollack IF. Tumor cells from ultrasonic aspirations of glioblastomas migrate and from spheres with radial outgrowth. Cancer Letters 255:135-44, 2007. PMID 17543444, **PMCID: PMC2000342**

86. McIntyre JA, Chapman J, Shavit E, **Hamilton RL**, and DeKosky ST. Redox-Reactive Autoantibodies in Alzheimer's Patients' Cerebrospinal Fluids: Preliminary Studies. Autoimmunity, 40:390-396, 2007. PMID 17612901

87. Nakashima-Yasuda, Uryu, K, Robinson J, Xie S, Hurtig H, Duda J, Arnold S, Siderowf A, Grossman M, Leverenz J, Woltjer R, Lopez OL, **Hamilton R**, Tsuang DW, Galaska D, Masliah M, Kaye J, Clark C, Montine TJ, Lee VMY, Trojanowski J. Co-morbidity of TDP-43 Proteinopathy in Lewy Body Related Diseases. Acta Neuropathol 114:221-9, 2007. PMID 17653732

88. McIntyre JA, **Hamilton RL**, DeKosky ST. Redox-reactive autoantibodies in cerebrospinal fluids. Ann NY Acad Sci 1109:296-302, 2007. PMID 17785318

89. Okada H, Lieberman FS, Walter KA, Lunsford LD, Kondziolka DS, Bejjani GK, **Hamilton RL**, Torres-Trejo A, Kalinski P, Cai Q, Mabold JL, Edington HD, Butterfield LH, Whiteside TL, Potter DM, Schold SC Jr., Pollack IF Autologous glioma cell vaccine admixed with interleukin-4 gene transfected fibroblasts in the treatment of patients with malignant gliomas. J Transl Med 5:67, 2007. PMID 18093335. **PMCID: PMC2254376**

90. Beach TG, White CL, **Hamilton, RL**, Duda JE, Iwatsubo T, Dickson DW, Leverenz JB, Roncaroli F, Buttini M, Hladik CL, Sue LI, Noorigian JV, Adler CH. Evaluation of alpha-synuclein immunohistochemical methods used by invited experts. Acta Neuropathol 116:277-88, 2008. PMID 18626651. **PMCID: PMC2708176**

91. Ikonomovic MD, Klunk WE, Abrahamson EE, Mathis CA, Price JC, Tsopelas ND, Lopresti BJ, Ziolko S, Bi W, Paljug WR, Debnath ML, Hope CE, Isanski BA, **Hamilton RL**, DeKosky ST. Post-

**Ronald L. Hamilton, M.D.**

mortem correlates of in vivo PiB-PET amyloid imaging in a typical case of Alzheimers disease. Brain  131(Pt 6):1630-45, 2008.  PMID  18339640.  **PMCID:  PMC2408940**

92.  Leverenz JB, **Hamilton R**, Tsuang DW, Schantz A, Vavrek D, Larson EB, Kukall WA, Lopez O, Galasko D, Masliah E, Woltjer R, Clark C, Trojanowski JQ, Montine TJ. Empiric refinement of the pathologic assessment of Lewy-related pathology in the dementia patient.  Brain Pathol 18:220-224, 2008. PMID 18241249.  **PMCID:  PMC2689097  NIHMS29359**

93.  Raja AI, Yeaney GA, Jakacki RI, **Hamilton RL**, Pollack IF  Extraventricular neurocytoma in neurofibromatosis Type I: Case report.  J Neurosurg Pediatrics 2:63-67, 2008.PMID 18590398

94.  Okada H, Low KL, Kohanbash G, McDonald HA, **Hamilton RL**, Pollack IF.  Expression of glioma-associated antigens in pediatric brain stem and non-brain stem gliomas.  J Neurooncol 88:245-50, 2008. PMID 18324354.  **PMCID:  PMC2561297 NIHMS70086**

95.  Venneti S, Lopresti BJ, Wang G, **Hamilton RL**, Mathis CA, Klunk WE, Apte UM, Wiley CA. PK11195 labels activated microglia in Alzheimer's disease and in vivo in a mouse model using PET. Neurobiol Aging 2009, 30:1217-26. PMID 18178291

96.  Mullett SJ, **Hamilton RL**, Hinkle DA.  DJ-1 immunoreactivity in human brain astrocytes is dependent on infarct presence and infarct age.  Neurology 2009, 29:125-31. PMID 18647263

97.  Park DM, Yeaney GA, **Hamilton RL**, Mabold J, Urban N, Appleman L, Flickinger J, Lieberman F, Mintz A.  Identifying Muir-Torre syndrome in a patient with glioblastoma multiforme.  Neuro Oncol, 2009 11:452-5. PMID 19028998.  )

98.  Horbinski C, Bartynski WS, Carson-Walter E, **Hamilton RL**, Tan HP, Cheng S.  Reversible encephalopathy after cardiac transplantation:  Histologic evidence of endothelial activation, T-cell specific trafficking, and vascular endothelial growth factor expression.  Am J Neuroradiol 2008 30:588-90. PMID 18854444.

99.  Northcott P, Nakahara Y, Peacock J, Ellison D, Croul S, Feuk L, Ra YS, Kongham P, Zilerberg K, Mack S, McLeod J, Scherer S, Rao S, Grajkowska W, Gillespie Y, Lach B, Grundy R, Pollack IF, **Hamilton RL,** Van Meter T, Carlotti C, Boop R, Bigner D, Gilbertson R, Rutka J, Taylor MD. Multiple recurrent genetic events converge on control of histone lysine methylation in medulloblastoma.  Nat Genet 2009 41:465-72. PMID 19270706.

100. Ueda R, Kohanbash G, Sasaki K, Fujita M, Zhu X, Kastenhuber ER, McDonald HA, Potter DM, **Hamilton RL,** Lotze MT, Khan SA, Sobol RW, Okada H.  Dicer-regulated microRNAs 222 and 339 promote resistance of cancer cells to cytotoxic T-lymphocytes by down-regulation of ICAM-1. Proc Natl Acad Sci U S A. 2009 Jun 30;106(26):10746-51.  PMID: 19520829

101.  Maki RA, Tyurin VA, Lyon RC, **Hamilton RL**, DeKosky ST, Kagan VE, Reynolds WF.  Aberrant expression of myeloperoxidase in astrocytes promotes phospholipid oxidation and memory deficits in a mouse model of Alzheimer disease. J Biol Chem. 2009 Jan 30;284(5):3158-69. PMID: 19059911.

102.  Horbinski C, **Hamilton RL**, Lovell C, Burnham J, Pollack IF.  Impact of morphology, MIB-1, p53, and MGMT on Outcome in Pilocytic Astrocytomas.  Brain Pathology 2010; 20:581-8  e-pub Sept 21, 2009

103.  Armstrong RA, Ellis W, **Hamilton RL**, MacKenzie IR, Hedreen J, Gearing M, Montine T, Vonsattel JP, Head E, Lieberman AP, Cairns NJ.  Neuropathological heterogeneity in frontotemporal lobar degeneration with TDP-43 proteinopathy: a quantitative study of 94 cases using principle components analysis.  J Neural Transm 2010, 117:227-239.

**Ronald L. Hamilton, M.D.**

104. Horbinski C, **Hamilton RL**, Nikiforov Y, Pollack IF. Association of molecular alterations, including BRAF, with biology and outcome in pilocytic astrocytomas. Acta Neuropathol 2010 Jan 1, e-pub.

105. Van Deerlin VM, Sleiman PM, Martinez-Lage M, Chen-Plotkin A, Wang LS, Graff-Radford NR, Dickson DW, Rademakers R, Boeve BF, Grossman M, Arnold SE, Mann DM, Pickering-Brown SM, Seelaar H, Heutink P, van Swieten JC, Murrell JR, Ghetti B, Spina S, Grafman J, Hodges J, Spillantini MG, Gilman S, Lieberman AP, Kaye JA, Woltjer RL, Bigio EH, Mesulam M, Al-Sarraj S, Troakes C, Rosenberg RN, White CL 3rd, Ferrer I, Lladó A, Neumann M, Kretzschmar HA, Hulette CM, Welsh-Bohmer KA, Miller BL, Alzualde A, de Munain AL, McKee AC, Gearing M, Levey AI, Lah JJ, Hardy J, Rohrer JD, Lashley T, Mackenzie IR, Feldman HH, **Hamilton RL**, Dekosky ST, van der Zee J, Kumar-Singh S, Van Broeckhoven C, Mayeux R, Vonsattel JP, Troncoso JC, Kril JJ, Kwok JB, Halliday GM, Bird TD, Ince PG, Shaw PJ, Cairns NJ, Morris JC, McLean CA, DeCarli C, Ellis WG, Freeman SH, Frosch MP, Growdon JH, Perl DP, Sano M, Bennett DA, Schneider JA, Beach TG, Reiman EM, Woodruff BK, Cummings J, Vinters HV, Miller CA, Chui HC, Alafuzoff I, Hartikainen P, Seilhean D, Galasko D, Masliah E, Cotman CW, Tuñón MT, Martínez MC, Munoz DG, Carroll SL, Marson D, Riederer PF, Bogdanovic N, Schellenberg GD, Hakonarson H, Trojanowski JQ, Lee VM. Common variants at 7p21 are associated with frontotemporal lobar degeneration with TDP-43 inclusions. Nat Genet 2010 42:234-239.

106. Omalu BI, **Hamilton RL**, Kamboh MI, DeKosky ST, Bailes J. Chronic traumatic encephalopathy in a National Football League Player: Case report and emerging medicolegal practice questions. J Forensic Nurs, 2010, 6: 40-46.

107. Caltagarone J, **Hamilton RL**, Murdoch G, Jing Z, DeFranco DB, Bowser R. Paxillin and hydrogen peroxide-induced clone 5 expression and distribution in control and Alzheimer disease hippocampi. J Neuropathol Exp Neurol. 2010: 69:356-71.

108. Pollack IF, **Hamilton RL**, Sobol RW, Nikiforova MN, Lyons-Weiler MA, Laframboise WA, Burger PC, Brat DJ, Rosenblum MK, Holmes EJ, Zhou T, Jakacki RI; for the Children's Oncology Group. IDH1 mutations are common in malignant gliomas arising in adolescents: a report from the Children's Oncology Group. Childs Nerv Syst. 2010; 27:87-94

109. Jun G, Naj AC, Beecham GW, Wang LS, Buros J, Gallins PJ, Buxbaum JD, Ertekin-Taner N, Fallin MD, Friedland R, Inzelberg R, Kramer P, Rogaeva E, St George-Hyslop P, Arnold SE, Baldwin CT, Barber R, Beach T, Bigio EH, Bird TD, Boxer A, Burke JR, Cairns N, Carroll SL, Chui HC, Clark DG, Cotman CW, Cummings JL, Decarli C, Diaz-Arrastia R, Dick M, Dickson DW, Ellis WG, Fallon KB, Farlow MR, Ferris S, Frosch MP, Galasko DR, Gearing M, Geschwind DH, Ghetti B, Gilman S, Giordani B, Glass J, Graff-Radford NR, Green RC, Growdon JH, **Hamilton RL**, Harrell LE, Head E, Honig LS, Hulette CM, Hyman BT, Jicha GA, Jin LW, Johnson N, Karlawish J, Karydas A, Kaye JA, Kim R, Koo EH, Kowall NW, Lah JJ, Levey AI, Lieberman A, Lopez OL, Mack WJ, Markesbery W, Marson DC, Martiniuk F, Masliah E, McKee AC, Mesulam M, Miller JW, Miller BL, Miller CA, Parisi JE, Perl DP, Peskind E, Petersen RC, Poon W, Quinn JF, Raskind M, Reisberg B, Ringman JM, Roberson ED, Rosenberg RN, Sano M, Schneider JA, Schneider LS, Seeley W, Shelanski ML, Smith CD, Spina S, Stern RA, Tanzi RE, Trojanowski JQ, Troncoso JC, Van Deerlin VM, Vinters HV, Vonsattel JP, Weintraub S, Welsh-Bohmer KA, Woltjer RL, Younkin SG, Cantwell LB, Dombroski BA, Saykin AJ, Reiman EM, Bennett DA, Morris JC, Lunetta KL, Martin ER, Montine TJ, Goate AM, Blacker D, Tsuang DW, Beekly D, Cupples LA, Hakonarson H, Kukull W, Foroud TM, Haines J, Mayeux R, Farrer LA, Pericak-Vance MA, Schellenberg GD; Alzheimer's Disease Genetics Consortium, Arnold SE, Baldwin CT, Barber R, Beach T, Bigio EH, Bird TD, Boxer A, Burke JR, Cairns N, Carroll SL, Chui HC, Clark DG, Cotman CW, Cummings JL, Decarli C, Diaz-Arrastia R, Dick M, Dickson DW, Ellis WG, Fallon KB, Farlow MR, Ferris S, Frosch MP, Galasko DR, Gearing M, Geschwind DH, Ghetti B, Gilman S, Giordani B, Glass J, Graff-Radford NR, Green RC, Growdon JH, Hamilton RL, Harrell LE, Head E, Honig LS, Hulette CM, Hyman BT, Jicha GA, Jin LW, Johnson N, Karlawish J, Karydas A, Kaye JA, Kim R, Koo EH, Kowall NW, Lah JJ, Levey AI, Lieberman A, Lopez OL, Mack WJ, Markesbery W, Marson DC, Martiniuk F, Masliah E, McKee AC, Mesulam M, Miller JW, Miller BL, Miller CA, Parisi JE, Perl DP, Peskind E, Petersen RC, Poon W, Quinn JF, Raskind M, Reisberg B, Ringman JM, Roberson ED, Rosenberg RN, Sano M, Schneider JA, Schneider LS, Seeley W, Shelanski ML, Smith CD, Spina S, Stern RA, Tanzi RE, Trojanowski JQ, Troncoso JC, Van Deerlin VM, Vinters HV, Vonsattel JP, Weintraub S, Welsh-Bohmer KA, Woltjer RL, Younkin SG. Meta-analysis confirms CR1, CLU and PICALM as Alzheimer Disease Risk Loci and reveals interactions with APOE Genotypes. Arch Neurol, 2010, Sep 3 (epub ahead of print)

110. Pollack IF, **Hamilton RL**, Burger PC, Brat DJ, Rosenblum MK, Murdoch GH, Nikiforova MN, Holmes EJ, Zhou T, Cohen KJ, Jakacki RI; Children's Oncology Group. Akt activation is a common event in pediatric malignant gliomas and a potential adverse prognostic marker: a report from the Children's Oncology Group. J Neurooncol. 2010 Sep;99(2):155-63. Epub 2010 Jul 4

**Ronald L. Hamilton, M.D.**

111. Pollack IF, **Hamilton RL**, Sobol RW, Nikiforova MN, Nikiforov YE, Lyons-Weiler MA, Laframboise WA, Burger PC, Brat DJ, Rosenblum MK, Gilles FH, Yates AJ, Zhou T, Cohen KJ, Finlay JL, Jakacki RI; for the Children's Oncology Group. Mismatch repair deficiency is an uncommon mechanism of alkylator resistance in pediatric malignant gliomas: a report from the Children's Oncology Group. Pediatr Blood Cancer 2010 Jun 29 epub ahead of print

112. Bonneh-Barkay D, Wang G, Starkey A, **Hamilton RL**, Wiley CA. In vivo CHI3L1 (YKL-40) expression in astrocytes in acute and chronic neurological diseases. J Neuroinflammation 2010 Jun 11:7-34.

113. Hinkle DA, Mullett SJ, Gabris BE, **Hamilton RL**. DJ-1 expression in glioblastomas shows positive correlation with p53 expression and negative correlation with epidermal growth factor receptor amplification. Neuropathology 2010 May 19 (epub ahead of print)xx

114. Okada H, Kalinski P, Ueda R, Hoji A, Kohanbash G, Donegan TE, Mintz AH, Engh JA, Bartlett DL, Brown CK, Zeh H, Holtman MP, Reinhart TA, Whiteside TL,Butterfield LH, **Hamilton RL**, Potter DM, Pollack IF, Salazar AM, Lieberman FS. Induction of CD8+ T-cell responses against novel glioma-associated antigen peptides and clinical activity by vaccinations with {alpha}-type 1 polarized dendritic cells and polyinosinic-polycytidylic acid stabilized by lysine and carboxymethylcellulose In patients with recurrent malignant glioma. J Clin Oncol. 2011;29:330-6.PMID: 21149657

115. Kofler J, Bartynski WS, Reynolds TQ, Lieberman FS, Murdoch GH, **Hamilton RL**. Posterior reversible encephalopathy syndrome (PRES) with immune system activation, VEGF up-regulation, and cerebral amyloid angiopathy. J. Comput Assist Tomogr. 2011; 35:39-42. PMID: 21150450

116. Bonfield CM, Amin D, **Hamilton RL**, Gerszten PC. Extramedullary ependymoma near the conus medullaris with lumbar nerve root attachment: case report. Neurosurgery. 2011 Mar;68:E831-4. PMID:21311277

117. Fujita M, Kohanbash G, Fellows-Mayle W, **Hamilton RL**, Komohara Y, Decker SA, Ohlfest JR, Okada H.COX-2 blockade suppresses gliomagenesis by inhibiting myeloid-derived suppressor cells. Cancer Res. 2011 Apr 1;71:2664-74. Epub 2011 Feb 15. PMID: 21324923

118. Cohen KJ, Pollack IF, Zhou T, Buxton A, Holmes EF, Burger PC, Brat DJ, Rosenblum MK, **Hamilton RL**, Lavey RS, Heideman RL. Temozolomide in the treatment of high-grade gliomas in children: a report from the Children's Oncology Group. Neuro Oncol. 2011 Mar;13:317-23. PMID: 21339192

119. Omalu B, Bailes J, **Hamilton RL**, Kamboh MI, Hammers J, Case M, Fitzsimmons R. Emerging histomorphologic phenotypes of chronic traumatic encephalopathy in American athletes. Neurosurgery. 2011 Jul;69:173-83; discussion 183. PMID: 21358359

120. Tang JB, Svilar D, Trivedi RN, Wang XH, Goellner EM, Moore B, **Hamilton RL**, Banze LA, Brown AR, Sobol RW. N-methylpurine DNA glycosylase and DNA polymerase beta modulate BER inhibitor potentiation of glioma cell to temozolomide. Neurosurgery Oncol. 2011;13:471-86. PMID: 21377995

121. Liu KW, Feng H, Bachoo R, Kazlauskas A, Smith EM, Symes K, **Hamilton RL**, Nagane M, Nishikawa R, Hu, B, Cheng Sy. SHP-2/PTPN 11 mediates gliomagenesis driven by PDGFRA and INK4A/ARF aberrations in mice and humans. J. Clin Invest. 2011 Mar;121:905-17. PMID: 21393858

122. Naj AC, Jun G, Beecham GW, Wang LS, Vardarajan BN, Buros J, Gallins PJ, Buxbaum JD, Jarvidk GP, Crane PK, Larson EB, Bird TB, Boeve BF, Graff-Radford NR, De Jager PL, Evans D, Schneider JA, Carrasquillo MM, Ertekin-Taner N, Younkin SG, Cruchaga C, Kauwe JS, Nowotny P, Kramer P, Hardy J, Huentelman MJ, Myers AJ, Barmada MM, Demirci FY, Baldwin CT, Green RC, Rogaeva E, St. George-Hyslop P, Arnold SE, Barber R, Beach T, Bigio EH, Bowen JD, Boxer A, Burke JR, Cairns NJ, Carlson CS, Carney RM, Carroll SL, Chui HC, Clark DG, Corneveaux J, Cotman CW, Cummings JL, Decarli C, DeKosy ST, Diaz-Arrastia R, Dick M, Dickson DW, Ellis WG, Faber KM, Fallon KB, Farlow MR, Ferris S. Frosch MP, Galasko Dr, Ganguli M, Gearing M, Geschwind DH, Ghetti B, Gilbert JR, Gilman S, Giordani B, Glass JD, Growdon JH, **Hamilton RL**,R, Koo EH, Kowall NW, Lah JJ, Levey AI, Lieberman AP, Lopez OL, Mack WJ, Marson DC, Martiniuk F, Mash DC, Masliah E, McCormick WC, McCurry SM, McDavid AN, McKee AC, Mesulam M, Miller BL, Miller JW, Parisi JE, Perl DP, Peskind E,Petersen, RC, Poon, WV, Quinn JF, Rajbhandary RA, Raskind M, Reisberg B, Ringman JM, Roberson ED, Rosenberg RN,Sano M, Schneider LS, Seeley W, Shelanksi ML, Slifer MA, Smith CD, Sonnen JA, Spina S. Stern RA, Tanzi RE, Trojanowski JQ, Troncoso JC, Van Deerlin VM, Vinters HV, Vonsattel JP, Weintraub S, Welsh-Bohmer KA, Williamson

**Ronald L. Hamilton, M.D.**

J, Woltjer RL,Cantwell LB, Dombroski BA, Beekly D, Lunetta KL, Martin ER, Kamboh MI, Saykin AJ, Reiman EM, Bennett DA, Morris JC, Montine TJ, Goate AM, Iacker D, Tsuang DW, Hakonarson, H, Kukull WA, Foroud TM, Haines JL, Mayeux R, Pericak-Vance MA, Farrer LA, Schellenberg GD. Commons variants as MS4A4/MS4A6E, CD2AP, CD33 and EPHA1 are associated with late Onset Alzheimer's Disease. Nat Genet. 2011 May;43:436-41 Epub 2011 Apr 3. PMID: 21460841

123.    Chen-Plotkin AS, Martinez-Lage M,Sleiman PM, Hu W, Greene R, Wood  EM, Bing S, Grossman M, Schellenberg GD, Hatanpaa KJ, Weiner MF, White CL 3rd, Brooks WS, Halliday GM, Kril JJ, Gearing M, Beach TG, Graff-Radford NR, Dickson DW, Rademakers R, Boeve BF, Pickering-Brown SM, Snowden J, van Swieten JC, Heutink P, Seelaar H, Murrell AR, Ghetti B, Spina S, Grafman J, Kaye JA, Woltjer RL, Mesulam M, Bigio E, Llad'o A, Miller BL, Alzualde A, Moreno F,Rohrer JD, Mackenzie IR, Feldman HH, **Hamilton RL**, Cruts M, Engelborghs S, De Deyn PP, Van Broeckhoven C, Bird TD, Cairns NJ, Goate A, Frosch MP, Riederer PF, Bogdanovic N, Lee VM, Trojanowksi JQ, Van Deerlin VM. Genetic and clinical features of progranulin-associated frontotemporal lobar degeneration. Arch Neurol. 2011 Apr;68:488-97. PMID: 21482928

124.    Nikiforova MN, **Hamilton RL**. Molecular diagnostics of gliomas. Arch Pathol Lab Med. 2011 May;135:558-68. Review. PMID: 21526954

125.    Monaco EA 3rd, Armah HB, Nikiforova MN, **Hamilton RL**, Engh JA. Grade II Oligodendroglioma localized to the corpus callosum. Brain Tumor Pathol. 2011 Oct;28:305-9. Epub 2011 Jul 22. PMID: 21833577

126.    Horbinski C, Hobbs, J, Cieply K, Dacic S, **Hamilton RL**. EGFR expression stratifies oligodendroglioma behavior.Am J Pathol. 2011 Oct; 179:1638-44. Epub 2011 Aug 11. PMID: 21839716

127.    Omalu B, hammers, JL, bailes J**, Hamilton RL**. Kamboh MI, Webster G, Fitzsimmons RP. Chronic traumatic Encephalopathy  in an Iraqi war veteran with posttraumatic stress disorder who committed suicide. Neurosurg Focus. 2011 Nov; :E3. PMID: 22044102

128.    Liu Y, Komohara Y, Domenick N, Ohno M, Ikeura M, **Hamilton RL**, Horbinski C, Wang X, Ferrone S, Okada H. Expression of antigen processing molecules in brain metastasis of breast cancer. Cancer Immunol Immunother. 2011 Nov 8. (Epub ahead of print } PMID:22065046

129.    Feng H, Hu B, Liu KW, Li Y, Lu X, Cheng T, Yiin JJ, Lu S, Keezer S, Fenton T, Furnari FB, **Hamilton RL**, Vuori K, Sarkaria JN, Nagane M, Nishikawa R, Cavenee WK, Cheng SY. Activation of Rac 1 by src-dependent phosphorylation of Dock180(Y1811) mediates PDGFRa-stimulated glioma tumorigenesis in mice and humans. J Clin Invest. 2011 Dec; 121:4670-84. doi: 10.1172/JCI58559. Epub 2011 Nov 14. PMID: 22080864

130.    Horbinski C, Nikiforova MN, Hobbs J, Bortoluzzi S. Cieply K, Dacic S, **Hamilton RL**. The importance of 10q status in an outcomes-based comparison between 1p/19q fluorescence in situ hybridization and polymerase chain reaction-based microsatellite loss of heterozygosity analysis of oligodendrogliomas.  J. Neuropathol Exp Neurol. 2012 Jan;71:73-82. PMID: 22157622

131.    Ikonomovic MD, Abrahamson EE, Price JC, **Hamilton RL**, Mathis CA, Paljug WR, Cohen AD, Mizukami K, DeKosky ST, Lopez OL, Klunk WE. Early AD pathology in a {C-11} PiB-negative case: a PiB-amyloid imaging, biochemical, and  Immunohistochemical study. Acta Neuropathol. 2012 Mar;123:433-47. Epub 2012 Jan 24. PMID: 22271153

132.    Feng H, Hu B, Jarzynka MJ, Li Y, Keezer S, Johns TG, Tang CK, **Hamilton RL**, Vuuori K, Nishikawa R, Sarkaria JN, Fenton T, Cheng T, Furnari FB, Cavenee WK, Cheng SY. Phosphorylation of dedicator of cytokinesis 1(Dock 180) at tyrosine residue Y722 by Src family kinases mediates EGRFvIII-driven glioblastoma tumorigenesis. Proc Natl Acad Sci U S A. 2012 Feb 21;109:3018-23. Epub 2012 Feb 7. PMID: 22323579

133.    Wu Y, Lou H, Alerte TN, Stachowski EK, Chen J, Singleton AB, **Hamilton RL**, Perez RG. Neuroscience. 2012 Jan 25. {Epubahead a print} PMID: 22326202

134.    Murray PS, Kirkwood CM, Gray MC, Ikonomovic MD, Paljug WR, Abrahamson EE, Henteleff RA, **Hamilton RL**, Kofler JK, Klunk WE, Lopez OL, Penzes P, Sweet RA. β-Amyloid 42/40 ratio and kalirin expression in Alzheimer disease with psychosis. Neurobiol Aging. 2012 Mar 17. [Epub ahead of print] PMID:22429885

**Ronald L. Hamilton, M.D.**

135.    Choi SH, Olabarrieta M, Lopez OL, Maruca V, DeKosky ST, **Hamilton RL**, Becker JT. Gray Matter Atrophy Associated with Extrapyramidal Signs in the Lewy Body Variant of Alzheimer's Disease. J Alzheimers Dis. 2012 Aug 9. [Epub ahead of print] PMID:22886020

136.    Armstrong RA, **Hamilton RL**, Mackenzie IR, Hedreen J, Cairns NJ. Laminar Distribution of the Pathological Changes in Sporadic Frontotemporal Lobar Degeneration with TDP-43 Proteinopathy: A Quantitative Study Using Polynomial Curve Fitting. Neuropathol Appl Neurobiol. 2012 Jul 16. [Epub ahead of print] PMID:22804696

137.    Atkinson DM, **Hamilton RL** A 52-year-old male with visual changes. Brain Pathol. 2012 Jul;22(4):575-8. PMID:22697384

138.    Zou F, Chai HS, Younkin CS, Allen M, Crook J, Pankratz VS, Carrasquillo MM, Rowley CN, Nair AA, Middha S, Maharjan S, Nguyen T, Ma L, Malphrus KG, Palusak R, Lincoln S, Bisceglio G, Georgescu C, Kouri N, Kolbert CP, Jen J, Haines JL, Mayeux R, Pericak-Vance MA, Farrer LA, Schellenberg GD; Alzheimer's Disease Genetics Consortium, Petersen RC, Graff-Radford NR, Dickson DW, **Hamilton RL**, Younkin SG, Ertekin-Taner N. Brain expression genome-wide association study (eGWAS) identifies human disease-associated variants. PLoS Genet. 2012;8(6): e1002707. Epub 2012 Jun 7 PMID:22685416

139.    Horbinski C, Nikiforova MN, Hagenkord JM, **Hamilton RL**, Pollack IF. Interplay among BRAF, p16, p53, and MIB1 in pediatric low-grade gliomas. Neuro Oncol. 2012 Jun;14(6):777-89 (1012) PMID:22492957

140.    Hobbs J, Nikiforova MN, Fardo DW, Bortoluzzi S, Cieply K, **Hamilton RL**, Horbinski C. Paradoxical relationship between the degree of EGFR amplification and outcome in glioblastomas. Am J Surg Pathol. 2012 Aug;36(8):1186-93. PMID:22472960

141. Armstrong, R. A., **R. L. Hamilton**, I. R. Mackenzie, J. Hedreen and N. J. Cairns. "Laminar Distribution of the Pathological Changes in Sporadic Frontotemporal Lobar Degeneration with Transactive Response (Tar) DNA-Binding Protein of 43 Kda (Tdp-43) Proteinopathy: A Quantitative Study Using Polynomial Curve Fitting." *Neuropathol Appl Neurobiol* 39, no. 4 (2013): 335-47.

142. Clark, K. H., J. L. Villano, M. N. Nikiforova, **R. L. Hamilton** and C. Horbinski. "1p/19q Testing Has No Significance in the Workup of Glioblastomas." *Neuropathol Appl Neurobiol*, (2013).

143. Gheorghe, G., O. Radu, S. Milanovich, **R. L. Hamilton**, R. Jaffe, J. F. Southern and J. A. Ozolek. "Pathology of Central Nervous System Posttransplant Lymphoproliferative Disorders: Lessons from Pediatric Autopsies." *Pediatr Dev Pathol* 16, no. 2 (2013): 67-73.

1444. Holton, P., M. Ryten, M. Nalls, D. Trabzuni, M. E. Weale, D. Hernandez, H. Crehan, J. R. Gibbs, R. Mayeux, J. L. Haines, L. A. Farrer, M. A. Pericak-Vance, G. D. Schellenberg, M. Ramirez-Restrepo, A. Engel, A. J. Myers, J. J. Corneveaux, M. J. Huentelman, A. Dillman, M. R. Cookson, E. M. Reiman, A. Singleton, J. Hardy and R. Guerreiro. "Initial Assessment of the Pathogenic Mechanisms of the Recently Identified Alzheimer Risk Loci." *Ann Hum Genet* 77, no. 2 (2013): 85-105.

145. Miyashita, A., A. Koike, G. Jun, L. S. Wang, S. Takahashi, E. Matsubara, T. Kawarabayashi, M. Shoji, N. Tomita, H. Arai, T. Asada, Y. Harigaya, M. Ikeda, M. Amari, H. Hanyu, S. Higuchi, T. Ikeuchi, M. Nishizawa, M. Suga, Y. Kawase, H. Akatsu, K. Kosaka, T. Yamamoto, M. Imagawa, T. Hamaguchi, M. Yamada, T. Moriaha, M. Takeda, T. Takao, K. Nakata, Y. Fujisawa, K. Sasaki, K. Watanabe, K. Nakashima, K. Urakami, T. Ooya, M. Takahashi, T. Yuzuriha, K. Serikawa, S. Yoshimoto, R. Nakagawa, J. W. Kim, C. S. Ki, H. H. Won, D. L. Na, S. W. Seo, I. Mook-Jung, P. St George-Hyslop, R. Mayeux, J. L. Haines, M. A. Pericak-Vance, M. Yoshida, N. Nishida, K. Tokunaga, K. Yamamoto, S. Tsuji, I. Kanazawa, Y. Ihara, G. D. Schellenberg, L. A Farrer and R. Kuwano. "Sorl1 Is Genetically Associated with Late-Onset Alzheimer's Disease in Japanese, Koreans and Caucasians." *PLoS One* 8, no. 4 (2013): e58618.

146. Pang, B., M. B. Durso, **R. L. Hamilton** and M. N. Nikiforova. "A Novel Cold-Pcr/Fmca Assay Enhances the Detection of Low-Abundance Idh1 Mutations in Gliomas." *Diagn Mol Pathol* 22, no. 1 (2013): 28-34.

147. Reitz, C., G. Jun, A. Naj, R. Rajbhandary, B. N. Vardarajan, L. S. Wang, O. Valladares, C. F. Lin, E. B. Larson, N. R. Graff-Radford, D. Evans, P. L. De Jager, P. K. Crane, J. D. Buxbaum, J. R. Murrell, T. Raj, N. Ertekin-Taner, M. Logue, C. T. Baldwin, R. C. Green, L. L. Barnes, L. B. Cantwell, M. D. Fallin, R. C. Go, P. Griffith, T. O. Obisesan, J. J. Manly, K. L. Lunetta, M. I. Kamboh, O. L. Lopez, D. A. Bennett, H. Hendrie, K. S. Hall, A. M. Goate, G. S. Byrd, W. A. Kukull, T. M. Foroud, J. L. Haines, L. A. Farrer, M. A. Pericak-Vance, G. D. Schellenberg and R. Mayeux. "Variants

**Ronald L. Hamilton, M.D.**

in the Atp-Binding Cassette Transporter (Abca7), Apolipoprotein E 4,and the Risk of Late-Onset Alzheimer Disease in African Americans." *JAMA* 309, no. 14 (2013): 1483-92.

148. Schlegel, J., M. J. Sambade, S. Sather, S. J. Moschos, A. C. Tan, A. Winges, D. DeRyckere, C. C. Carson, D. G. Trembath, J. J. Tentler, S. G. Eckhardt, P. F. Kuan, **R. L. Hamilton**, L. M. Duncan, C. R. Miller, N. 9. Nikolaishvili-Feinberg, B. R. Midkiff, J. Liu, W. Zhang, C. Yang, X. Wang, S. V. Frye, H. S. Earp, J. M. Shields and D. K. Graham. "Mertk Receptor Tyrosine Kinase Is a Therapeutic Target in Melanoma." *J Clin Invest* 123, no. 5 (2013): 2257-67.

150. Spina, S., A. D. Van Laar, J. R. Murrell, **R. L. Hamilton**, J. K. Kofler, F. Epperson, M. R. Farlow, O. L. Lopez, J. Quinlan, S. T. DeKosky and B. Ghetti. "Phenotypic Variability in Three Families with Valosin-Containing Protein Mutation." *Eur J Neurol* 20, no. 2 (2013): 251-8.

151. Tsuang, D., J. B. Leverenz, O. L. Lopez, **R. L. Hamilton,** D. A. Bennett, J. A. Schneider, A. S. Buchman, E. B. Larson, P. K. Crane, J. A. Kaye, P. Kramer, R. Woltjer, J. Q. Trojanowski, D. Weintraub, A. S. Chen-Plotkin, D. J. Irwin, J. Rick, G. D. Schellenberg, G. S. Watson, W. Kukull, P. T. Nelson, G. A. Jicha, J. H. Neltner, D. Galasko, E. Masliah, J. F. Quinn, K. A. Chung, D. Yearout, I. F. Mata, J. Y. Wan, K. L. Edwards, T. J. Montine and C. P. Zabetian. "Apoe Epsilon4 Increases Risk for Dementia in Pure Synucleinopathies." *JAMA Neurol* 70, no. 2 (2013): 223-8.

152. Yeung, J. T., **R. L. Hamilton**, K. Ohnishi, M. Ikeura, D. M. Potter, M. N. Nikiforova, S. Ferrone, R. I. Jakacki, I. F. Pollack and H. Okada. "Loh in the Hla Class I Region at 6p21 Is Associated with Shorter Survival in Newly Diagnosed Adult Glioblastoma." *Clin Cancer Res* 19, no. 7 (2013): 1816-26.

153. Yeung, J. T., **R. L. Hamilton**, H. Okada, R. I. Jakacki and I. F. Pollack. "Increased Expression of Tumor-Associated Antigens in Pediatric and Adult Ependymomas: Implication for Vaccine Therapy." *J Neurooncol* 111, no. 2 (2013): 103-11.

154. **Hamilton R**, Krauze M, Romkes M, Omolo B, Konstantinopoulos P, Reinhart T, Harasymczuk M, Wang Y, Lin Y, Ferrone S, Whiteside T, Bortoluzzi S, Werley J, Nukui T, Fallert-Junecko B, Kondziolka D, Ibrahim J, Becker D, Kirkwood J, Moschos S. Pathologic and gene expression features of metastatic melanomas to the brain.Cancer. 2013 Aug 1;119(15):2737-46. doi: 10.1002/cncr.28029. Epub 2013 May 21.PMID:23695963 [PubMed - in process]

155. Lam S, Grandhi R, Wong R, **Hamilton R**, Greene S. Neuromuscular hamartoma of the sciatic nerve: Case report and review of the literature. Surg Neurol Int. 2013;4:8. doi: 10.4103/2152-7806.106266. Epub 2013 Jan 18.PMID:23493803[PubMed]

156. Reitz C, Mayeux R; Alzheimer's Disease Genetics Consortium. TREM2 and neurodegenerative disease. N Engl J Med. 2013 Oct 17;369(16):1564-5. doi: 10.1056/NEJMc1306509#SA1. PMID:24131184

157. Tempel ZJ, Johnson SA, Richard PS, Friedlander RM, Rothfus WE, **Hamilton RL**. Parasellar arachnoid cyst presenting with a nonpupil sparing third nerve palsy mimicking a posterior communicating artery aneurysm in an adult. Surg Neurol Int. 2013 Jul 9;4:87. doi: 10.4103/2152-7806.114799. eCollection 2013.PMID:23956930

158. Murray PS, Kirkwood CM, Gray MC, Fish KN, Ikonomovic MD, **Hamilton RL**, Kofler JK, Klunk WE, Lopez OL, Sweet RA. Hyperphosphorylated tau is elevated in Alzheimer's Disease with psychosis. J Alzheimers Dis, 2014 204;39:759-773. PMID:24270207

159. Oborski MJ, Laymon CM, Lieberman FS, Drappatz J, **Hamilton RL**, Mountz JM. First use of (18)F-labeled ML-10 PET to assess apoptosis change in a newly diagnosed glioblastoma multiforme patient before and early after therapy. Brain Behav 2014 4:312-315.  PMID:24683522

160  Shin SS, Murdoch G, Hamilton RL, Faraji AH, Kano H, Zwagerman NT, Gardner PA, Lunsford LD, Friedlander RM The Pathological Response of Cavernous Malformations Following Radiosurgery.  J Neurosurg (in press).

160.  Pollack IF, Jakacki RI, Butterfield LH, **Hamilton RL**, Panigrahy A, Potter DM, Connelly AK, Dibridge SA, Whiteside TL, Okada H. Antigen-specific immune responses and clinical outcome after vaccination with glioma-associated antigen peptides and polyinosinic-polycytidylic Acid stabilized by lysine and carboxymethylcellulose in children with newly diagnosed malignant brainstem and nonbrainstem gliomas. J Clin Oncol. 2014 Jul 1;32(19):2050-8. PMID:24888813

161.  Naj AC, Jun G, Reitz C, Kunkle BW, Perry W, Park YS, Beecham GW, Rajbhandary RA, Hamilton-Nelson KL, Wang LS, Kauwe JS, Huentelman MJ, Myers AJ, Bird TD, Boeve BF, Baldwin CT, Jarvik GP, Crane PK, Rogaeva E, Barmada MM, Demirci FY, Cruchaga C, Kramer PL, Ertekin-Taner N, Hardy J, Graff-Radford NR, Green RC, Larson

**Ronald L. Hamilton, M.D.**

EB, St George-Hyslop PH, Buxbaum JD, Evans DA, Schneider JA, Lunetta KL, Kamboh MI, Saykin AJ, Reiman EM, De Jager PL, Bennett DA, Morris JC, Montine TJ, Goate AM, Blacker D, Tsuang DW, Hakonarson H, Kukull WA, Foroud TM, Martin ER, Haines JL, Mayeux RP, Farrer LA, Schellenberg GD, Pericak-Vance MA; Alzheimer Disease Genetics Consortium, Albert MS, Albin RL, Apostolova LG, Arnold SE, Barber R, Barnes LL, Beach TG, Becker JT, Beekly D, Bigio EH, Bowen JD, Boxer A, Burke JR, Cairns NJ, Cantwell LB, Cao C, Carlson CS, Carney RM, Carrasquillo MM, Carroll SL, Chui HC, Clark DG, Corneveaux J, Cribbs DH, Crocco EA, DeCarli C, DeKosky ST, Dick M, Dickson DW, Duara R, Faber KM, Fallon KB, Farlow MR, Ferris S, Frosch MP, Galasko DR, Ganguli M, Gearing M, Geschwind DH, Ghetti B, Gilbert JR, Glass JD, Growdon JH, **Hamilton RL**, Harrell LE, Head E, Honig LS, Hulette CM, Hyman BT, Jicha GA, Jin LW, Karydas A, Kaye JA, Kim R, Koo EH, Kowall NW, Kramer JH, LaFerla FM, Lah JJ, Leverenz JB, Levey AI, Li G, Lieberman AP, Lin CF, Lopez OL, Lyketsos CG, Mack WJ, Martiniuk F, Mash DC, Masliah E, McCormick WC, McCurry SM, McDavid AN, McKee AC, Mesulam M, Miller BL, Miller CA, Miller JW, Murrell JR, Olichney JM, Pankratz VS, Parisi JE, Paulson HL, Peskind E, Petersen RC, Pierce A, Poon WW, Potter H, Quinn JF, Raj A, Raskind M, Reisberg B, Ringman JM, Roberson ED, Rosen HJ, Rosenberg RN, Sano M, Schneider LS, Seeley WW, Smith AG, Sonnen JA, Spina S, Stern RA, Tanzi RE, Thornton-Wells TA, Trojanowski JQ, Troncoso JC, Valladares O, Van Deerlin VM, Van Eldik LJ, Vardarajan BN, Vinters HV, Vonsattel JP, Weintraub S, Welsh-Bohmer KA, Williamson J, Wishnek S, Woltjer RL, Wright CB, Younkin SG, Yu CE, Yu L. .  Effects of multiple genetic Loci on age at onset in late-onset Alzheimer disease: a genome-wide association study.   JAMA Neurol. 2014 Nov 1;71(11):1394-404. doi: 10.1001/jamaneurol.2014.1491

162. Pollack IF, Jakacki RI, Butterfield LH, **Hamilton RL**, Panigrahy A, Potter DM, Connelly AK, Dibridge SA, Whiteside TL, Okada H.  Antigen-specific immune responses and clinical outcome after vaccination with glioma-associated antigen peptides and polyinosinic-polycytidylic acid stabilized by lysine and carboxymethylcellulose in children with newly diagnosed malignant brainstem and nonbrainstem gliomas.  J Clin Oncol. 2014 Jul 1;32(19):2050-8. doi: 10.1200/JCO.2013.54.0526. Epub 2014 Jun 2. PMID: 24888813

163.. Okada H, Butterfield LH, **Hamilton RL**, Hoji A, Sakaki M, Ahn BJ, Kohanbash G, Drappatz J, Engh J, Amankulor N, Lively MO, Chan MD, Salazar AM, Shaw EG, Potter DM, Lieberman FS.  Induction of robust type-1 CD8+ T-cell responses in WHO grade II low-grade glioma patients receiving peptide-based vaccines in combination with poly-ICLC Clin Cancer Res. 2014 Nov 25. pii: clincanres.1790.2014

164. Salloway S, Sperling R, Fox NC, Blennow K, Klunk W, Raskind M, Sabbagh M, Honig LS, Porsteinsson AP, Ferris S, Reichert M, Ketter N, Nejadnik B, Guenzler V, Miloslavsky M, Wang D, Lu Y, Lull J, Tudor IC, Liu E, Grundman M, Yuen E, Black R, Brashear HR; **Hamilton RL**,  Bapineuzumab 301 and 302 Clinical Trial Investigators.  Two phase 3 trials of bapineuzumab in mild-to-moderate Alzheimer's disease  N Engl J Med. 2014 Jan 23;370(4):322-33. doi: 10.1056/NEJMoa1304839.

165. Leone JP, Bhargava R, Theisen BK, **Hamilton RL**, Lee AV, Brufsky AM. Expression of high affinity folate receptor in breast cancer brain metastasis. Oncotarget. 2015 Jun 25. [Epub ahead of print] PMID: 24450891

166. Wang LS, Naj AC, Graham RR, Crane PK, Kunkle BW, Cruchaga C, Murcia JD, Cannon-Albright L, Baldwin CT, Zetterberg H, Blennow K, Kukull WA, Faber KM, Schupf N, Norton MC, Tschanz JT, Munger RG, Corcoran CD, Rogaeva E; Alzheimer's Disease Genetics Consortium, Lin CF, Dombroski BA, Cantwell LB, Partch A, Valladares O, Hakonarson H, St George-Hyslop P, Green RC, Goate AM, Foroud TM, Carney RM, Larson EB, Behrens TW, Kauwe JS, Haines JL, Farrer LA, Pericak-Vance MA, Mayeux R, Schellenberg GD; National Institute on Aging-Late-Onset Alzheimer's Disease (NIA-LOAD) Family Study, Albert MS, Albin RL, Apostolova LG, Arnold SE, Barber R, Barmada M, Barnes LL, Beach TG, Becker JT, Beecham GW, Beekly D, Bennett DA, Bigio EH, Bird TD, Blacker D, Boeve BF, Bowen JD, Boxer A, Burke JR, Buxbaum JD, Cairns NJ, Cao C, Carlson CS, Carroll SL, Chui HC, Clark DG, Cribbs DH, Crocco EA, DeCarli C, DeKosky ST, Demirci FY, Dick M, Dickson DW, Duara R, Ertekin-Taner N, Fallon KB, Farlow MR, Ferris S, Frosch MP, Galasko DR, Ganguli M, Gearing M, Geschwind DH, Ghetti B, Gilbert JR, Glass JD, Graff-Radford NR, Growdon JH, **Hamilton RL**, Hamilton-Nelson KL, Harrell LE, Head E, Honig LS, Hulette CM, Hyman BT, Jarvik GP, Jicha GA, Jin LW, Jun G, Jun G, Kamboh MI, Karydas A, Kaye JA, Kim R, Koo EH, Kowall NW, Kramer JH, LaFerla FM, Lah JJ, Leverenz JB, Levey AI, Li G, Lieberman AP, Lopez OL, Lunetta KL, Lyketsos CG, Mack WJ, Marson DC, Martin ER, Martiniuk F, Mash DC, Masliah E, McCormick WC, McCurry SM, McDavid AN, McKee AC, Mesulam WM, Miller BL, Miller CA, Miller JW, Montine TJ, Morris JC, Murrell JR, Olichney JM, Parisi JE, Perry W, Peskind E, Petersen RC, Pierce A, Poon WW, Potter H, Quinn JF, Raj A, Raskind M, Reiman EM, Reisberg B, Reitz C, Ringman JM, Roberson ED, Rosen HJ, Rosenberg RN, Sano M, Saykin AJ, Schneider JA, Schneider LS, Seeley WW, Smith AG, Sonnen JA, Spina S, Stern RA, Tanzi RE, Thornton-Wells TA, Trojanowski JQ, Troncoso JC, Tsuang DW, Van Deerlin VM, Van Eldik LJ, Vardarajan BN, Vinters HV, Vonsattel JP, Weintraub S, Welsh-Bohmer KA, Williamson J, Wishnek S, Woltjer RL, Wright CB, Younkin SG, Yu CE, Yu L.**Rarity of the Alzheimer disease-protective APP A673T variant in the United States.** JAMA Neurol. 2015 Feb;72(2):209-16. doi: 10.1001/jamaneurol.2014.2157.

**Ronald L. Hamilton, M.D.**

167. 2. Jun G, Ibrahim-Verbaas CA, Vronskaya M, Lambert JC, Chung J, Naj AC, Kunkle BW, Wang LS, Bis JC, Bellenguez C, Harold D, Lunetta KL, Destefano AL, Grenier-Boley B, Sims M, Beecham GW, Smith AV, Chouraki V, Hamilton-Nelson KL, Ikram MA, Fievet N, Denning N, Martin ER, Schmidt H, Kamatani Y, Dunstan ML, Valladares O, Laza AR, Zelenika D, Ramirez A, Foroud TM, Choi SH, Boland A, Becker T, Kukull WA, van der Lee SJ, Pasquier F, Cruchaga C, Beekly D, Fitzpatrick AL, Hanon O, Gill M, Barber R, Gudnason V, Campion D, Love S, Bennett DA, Amin N, Berr C, Tsolaki M, Buxbaum JD, Lopez OL, Deramecourt V, Fox NC, Cantwell LB, Tárraga L, Dufouil C, Hardy J, Crane PK, Eiriksdottir G, Hannequin D, Clarke R, Evans D, Mosley TH Jr, Letenneur L, Brayne C, Maier W, De Jager P, Emilsson V, Dartigues JF, Hampel H, Kamboh MI, de Bruijn RF, Tzourio C, Pastor P, Larson EB, Rotter JI, O'Donovan MC, Montine TJ, Nalls MA, Mead S, Reiman EM, Jonsson PV, Holmes C, St George-Hyslop PH, Boada M, Passmore P, Wendland JR, Schmidt R, Morgan K, Winslow AR, Powell JF, Carasquillo M, Younkin SG, Jakobsdóttir J, Kauwe JS, Wilhelmsen KC, Rujescu D, Nöthen MM, Hofman A, Jones L; IGAP Consortium, Haines JL, Psaty BM, Van Broeckhoven C, Holmans P, Launer LJ, Mayeux R, Lathrop M, Goate AM, Escott-Price V, Seshadri S, Pericak-Vance MA, Amouyel P, Williams J, van Duijn CM, Schellenberg GD, Farrer LA and . Collaborators (including **Hamilton RL**) (296)  **A novel Alzheimer disease locus located near the gene encoding tau protein**. Mol Psychiatry. 2015 Mar 17. doi: 10.1038/mp.2015.23.

168. . Østergaard SD, Mukherjee S, Sharp SJ, Proitsi P, Lotta LA, Day F, Perry JR, Boehme KL, Walter S, Kauwe JS, Gibbons LE; Alzheimer's Disease Genetics Consortium; GERAD1 Consortium; EPIC-InterAct Consortium, Larson EB, Powell JF, Langenberg C, Crane PK, Wareham NJ, Scott RA.
Collaborators (including **Hamilton RL**) (296)  Associations between Potentially Modifiable Risk Factors and Alzheimer Disease: A Mendelian Randomization Study. PLoS Med. 2015 Jun 16;12(6):e1001841; discussion e1001841. doi:

169. Wang P, Bahreini A, Gyanchandani R, Lucas PC, Hartmaier RJ, Watters RJ, Jonnalagadda AR, Trejo Bittar HE, Berg A, **Hamilton RL**, Kurland BF, Weiss KR, Mathew A, Leone JP, Davidson NE, Nikiforova MN, Brufsky AM, Ambros TF, Stern AM, Puhalla SL, Lee AV, Oesterreich S. Sensitive detection of mono- and polyclonal ESR1 mutations in primary tumors, metastatic lesions and cell free DNA of breast cancer patients. Clin Cancer Res. 2015 Oct 23. pii: 1534.2015. PMID: 26500237

170. Salgado CM, Basu D, Nikiforova M, **Hamilton RL**, Gehris R, Jakacki R, Panigrahy A, Yatsenko S, Reyes-Múgica M. Amplification of mutated NRAS leading to congenital melanoma in neurocutaneous melanocytosis. Melanoma Res. 2015 Oct;25(5):453-60.  PMID: 26266759

171. Shin SS, Murdoch G, Hamilton RL, Faraji AH, Kano H, Zwagerman NT, Gardner PA, Lunsford LD, Friedlander RM. Pathological response of cavernous malformations following radiosurgery. J Neurosurg. 2015 Oct;123(4):938-44. doi: 10.3171/2014.10.JNS14499. Epub 2015 Jun 19. PMID: 26090838

--------------------

172. Mukherjee S, Walter S, Kauwe JS, Saykin AJ, Bennett DA, Larson EB, Crane PK, Glymour MM; Adult Changes in Thought Study Investigators; Religious Orders Study/Memory and Aging Project Investigators; Alzheimer's Disease Genetics Consortium. Alzheimers Dement. Genetically predicted body mass index and Alzheimer's disease-related phenotypes in three large samples: Mendelian randomization analyses. 2015 Dec;11(12):1439-51. doi: 10.1016/j.jalz.2015.05.015. Epub 2015 Jun 12. PMID: 26079416

173. Ghani M, Reitz C, Cheng R, Vardarajan BN, Jun G, Sato C, Naj A, Rajbhandary R, Wang LS, Valladares O, Lin CF, Larson EB, Graff-Radford NR, Evans D, De Jager PL, Crane PK, Buxbaum JD, Murrell JR, Raj T, Ertekin-Taner N, Logue M, Baldwin CT, Green RC, Barnes LL, Cantwell LB, Fallin MD, Go RC, Griffith PA, Obisesan TO, Manly JJ, Lunetta KL, Kamboh MI, Lopez OL, Bennett DA, Hendrie H, Hall KS, Goate AM, Byrd GS, Kukull WA, Foroud TM, Haines JL, Farrer LA, Pericak-Vance MA, Lee JH, Schellenberg GD, St George-Hyslop P, Mayeux R, Rogaeva E; Alzheimer's Disease Genetics Consortium. Association of Long Runs of Homozygosity With Alzheimer Disease Among African American Individuals. JAMA Neurol. 2015 Nov;72(11):1313-23. doi: 10.1001/jamaneurol.2015.1700. PMID: 26366463

174. Nikiforova MN, Wald AI, Melan MA, Roy S, Zhong S, Hamilton RL, Lieberman FS, Drappatz J, Amankulor NM, Pollack IF, Nikiforov YE, Horbinski C.
Targeted next-generation sequencing panel (GlioSeq) provides comprehensive genetic profiling of central nervous system tumors. Neuro Oncol. 2016 Mar;18(3):379-87. doi: 10.1093/neuonc/nov289. Epub 2015 Dec 17. PMID: 2668176

175. Morrissy AS, Garzia L, Shih DJ, Zuyderduyn S, Huang X, Skowron P, Remke M, Cavalli FM, Ramaswamy V, Lindsay PE, Jelveh S, Donovan LK, Wang X, Luu B, Zayne K, Li Y, Mayoh C, Thiessen N, Mercier E, Mungall KL, Ma

**Ronald L. Hamilton, M.D.**

Y, Tse K, Zeng T, Shumansky K, Roth AJ, Shah S, Farooq H, Kijima N, Holgado BL, Lee JJ, Matan-Lithwick S, Liu J, Mack SC, Manno A, Michealraj KA, Nor C, Peacock J, Qin L, Reimand J, Rolider A, Thompson YY, Wu X, Pugh T, Ally A, Bilenky M, Butterfield YS, Carlsen R, Cheng Y, Chuah E, Corbett RD, Dhalla N, He A, Lee D, Li HI, Long W, Mayo M, Plettner P, Qian JQ, Schein JE, Tam A, Wong T, Birol I, Zhao Y, Faria CC, Pimentel J, Nunes S, Shalaby T, Grotzer M, Pollack IF, Hamilton RL, Li XN, Bendel AE, Fults DW, Walter AW, Kumabe T, Tominaga T, Collins VP, Cho YJ, Hoffman C, Lyden D, Wisoff JH, Garvin JH Jr, Stearns DS, Massimi L, Schüller U, Sterba J, Zitterbart K, Puget S, Ayrault O, Dunn SE, Tirapelli DP, Carlotti CG, Wheeler H, Hallahan AR, Ingram M, MacDonald TJ, Olson JJ, Van Meir EG, Lee JY, Wang KC, Kim SK, Cho BK, Pietsch T, Fleischhack G, Tippelt S, Ra YS, Bailey S, Lindsey JC, Clifford SC, Eberhart CG, Cooper MK, Packer RJ, Massimino M, Garre ML, Bartels U, Tabori U, Hawkins CE, Dirks P, Bouffet E, Rutka JT, Wechsler-Reya RJ, Weiss WA, Collier LS, Dupuy AJ, Korshunov A, Jones DT, Kool M, Northcott PA, Pfister SM, Largaespada DA, Mungall AJ, Moore RA, Jabado N, Bader GD, Jones SJ, Malkin D, Marra MA, Taylor MD. Divergent clonal selection dominates medulloblastoma at recurrence. Nature. 2016 Jan 21;529(7586):351-7. doi: 10.1038/nature16478. Epub 2016 Jan 13

176. Gandhoke GS, Yilmaz S, Grunwaldt L, Hamilton RL, Salvetti DJ, Greene S. A case of spinal epidural venous malformation with mediastinal extension: management with combined surgery and percutaneous sclerotherapy. J Neurosurg Pediatr. 2016 May;17(5):612-7. doi: 10.3171/2015.9.PEDS15341. Epub 2016 Jan 15.

177. Thompson EM, Hielscher T, Bouffet E, Remke M, Luu B, Gururangan S, McLendon RE, Bigner DD, Lipp ES, Perreault S, Cho YJ, Grant G, Kim SK, Lee JY, Rao AA, Giannini C, Li KK, Ng HK, Yao Y, Kumabe T, Tominaga T, Grajkowska WA, Perek-Polnik M, Low DC, Seow WT, Chang KT, Mora J, Pollack IF, Hamilton RL, Leary S, Moore AS, Ingram WJ, Hallahan AR, Jouvet A, Fèvre-Montange M, Vasiljevic A, Faure-Conter C, Shofuda T, Kagawa N, Hashimoto N, Jabado N, Weil AG, Gayden T, Wataya T, Shalaby T, Grotzer M, Zitterbart K, Sterba J, Kren L, Hortobágyi T, Klekner A, László B, Pócza T, Hauser P, Schüller U, Jung S, Jang WY, French PJ, Kros JM, van Veelen MC, Massimi L, Leonard JR, Rubin JB, Vibhakar R, Chambless LB, Cooper MK, Thompson RC, Faria CC, Carvalho A, Nunes S, Pimentel J, Fan X, Muraszko KM, López-Aguilar E, Lyden D, Garzia L, Shih DJ, Kijima N, Schneider C, Adamski J, Northcott PA, Kool M, Jones DT, Chan JA, Nikolic A, Garre ML, Van Meir EG, Osuka S, Olson JJ, Jahangiri A, Castro BA, Gupta N, Weiss WA, Moxon-Emre I, Mabbott DJ, Lassaletta A, Hawkins CE, Tabori U, Drake J, Kulkarni A, Dirks P, Rutka JT, Korshunov A, Pfister SM, Packer RJ, Ramaswamy V, Taylor MD. Prognostic value of medulloblastoma extent of resection after accounting for molecular subgroup: a retrospective integrated clinical and molecular analysis. Lancet Oncol. 2016 Mar 11. pii: S1470-2045(15)00581-1. doi: 10.1016/S1470-2045(15)00581-1. [Epub ahead of print]

178. Pollack IF, Jakacki RI, Butterfield LH, Hamilton RL, Panigrahy A, Normolle DP, Connelly AK, Dibridge S, Mason G, Whiteside TL, Okada H. Immune responses and outcome after vaccination with glioma-associated antigen peptides and poly-ICLC in a pilot study for pediatric recurrent low-grade gliomas†. Neuro Oncol. 2016 Mar 15. pii: now026. [Epub ahead of print]

179. Jakacki RI, Cohen KJ, Buxton A, Krailo MD, Burger PC, Rosenblum MK, Brat DJ, Hamilton RL, Eckel SP, Zhou T, Lavey RS, Pollack IF. Phase 2 study of concurrent radiotherapy and temozolomide followed by temozolomide and lomustine in the treatment of children with high-grade glioma: a report of the Children's Oncology Group ACNS0423 study. Neuro Oncol. 2016 Mar 22. pii: now038. [Epub ahead of print]

180. Ridge PG, Hoyt KB, Boehme K, Mukherjee S, Crane PK, Haines JL, Mayeux R, Farrer LA, Pericak-Vance MA, Schellenberg GD, Kauwe JS; Alzheimer's Disease Genetics Consortium (ADGC). Assessment of the genetic variance of late-onset Alzheimer's disease. Neurobiol Aging. 2016 May;41:200.e13-20. doi: 10.1016/j.neurobiolaging.2016.02.024. Epub 2016 Mar 3

181. Beckner ME, Pollack IF, Nordberg ML, Hamilton RL. Glioblastomas with copy number gains in EGFR and RNF139 show increased expressions of carbonic anhydrase genes transformed by ENO1. BBA Clin. 2015 Nov 10;5:1-15. doi: 10.1016/j.bbacli.2015.11.001. eCollection 2016 Jun. PMID: 27051584 Free PMC Article

182. Fernandes-Cabral DT, Zenonos GA, Hamilton RL, Panesar SS, Fernandez-Miranda JC. High-Definition Fiber Tractography in the Evaluation and Surgical Planning of Lhermitte-Duclos Disease: A Case Report. World Neurosurg. 2016 May 7. pii: S1878-8750(16)30257-1. doi: 10.1016/j.wneu.2016.04.128. [Epub ahead of print] PMID: 27168233

**Reviews, invited published papers, proceedings of conference and symposia, monographs, books and book chapters**

**Ronald L. Hamilton, M.D.**

1. **Hamilton RL**, Wiley CA. New developments in the neuropathology of AIDS. CAP Today, 10 (12): p 42, 1996.
2. **Hamilton RL**: Hydrocephalus in a 9 month-old infant. Brain Pathol 6:533-534, 1996
3. **Hamilton RL**: New onset hemiparesis. Brain Pathol 7: 715-716, 1997.
4. **Hamilton RL**: Precocious Puberty. Brain Pathol 7: 711-712, 1997
5. **Hamilton RL**: Frontal lobe tumor in 11 year-old girl. Brain Pathol 7: 713-714, 1997
6 **Hamilton RL**, Pollack, IF: The Molecular Biology of Ependymomas. Brain Pathology 7:807-822, 1997.
7. **Hamilton RL**: A 26 year old woman with new onset seizures. Brain Pathol 8: 239-240, 1997.
8. **Hamilton RL**, Wiley, CA, The Neuropathology of Viral Infections of the Nervous System. In: Textbook of Neuropathology; Davis RL, Robertson DM eds. Williams and Wilkins, 3rd edition,  Baltimore, MD. 1997.

9. **Hamilton RL**: Guidelines for the neuropathological diagnosis of Alzheimer's Disease and Dementia with Lewy Bodies. Revista de Neurologia 27 (S1): S67-S70, 1998
10. **Hamilton RL**: Experimental neuropathology of Alzheimer's Disease: animal models. Revista de Neurologia 27 (S1): S84-S86, 1998
11. Sanders VJ, Wiley CA, **Hamilton RL**: The mechanisms of neuronal damage in retroviral infections of the nervous system. in The Mechanisms of Neuronal Damage in Virus Infections of the Nervous System (Gosztonyi G, ed). Springer Verlag, Berlin, 2001.
12. **Hamilton RL**. [Recent Advances in the neuropathological evaluation of Alzheimer's Disease: the importance of synuclein] Rev Neurol 35:765-7, 2002 (Spanish).
13. Pollack IF, **Hamilton RL**, Finkelstein SD, Lieberman F.  Molecular abnormalities and correlations with tumor response and outcome in glioma patients.  Neuroimaging Clinics of North America: Advances in Brain Tumor Imaging and Therapy (Provenzale J, ed.) WB Saunders, Philadelphia,  2002.
14. **Hamilton RL**.  The other dementias: the neuropathology of the non-Alzheimer's Disease dementias. Rev Neurol 37:130-139, 2003 (Spanish).
15. Omalu BI, Wiley CA, **Hamilton RL**.  Case of the Month February 2003. Brain Pathology 13:419-420, 2003.
16. DeKosky ST, Ikonomovic MD, **Hamilton RL**, Bennett DA, Mufson EJ. Neuropathology of Mild Cognitive Impairment in the Elderly. In John Morris J, Scheltens P, and Cummings JL), (eds), *Alzheimer's Disease and Related Disorders:* London, Taylor & Francis, 1-16, 2006.
17. Crain BJ, Alston SR, Bruch LA, **Hamilton RL**, McLendon RE, Rhodes H, Tihan T, Weidenheim KM. Accreditation Council for Graduate Medical Education (ACGME) Competencies in Neuropathology Training.  J Neuropathol Exp Neurol 64:273-279, 2005.
18. McIntyre JA, **Hamilton RL**, Dekosky ST.  Redox-reactive autoantibodies in cerebrospinal fluids. Annals of NY Acad Sci 1109: 296-302, 2007.
19. DeKosky ST, Kaufer DI, **Hamilton R**, Wolk D, Lopez OL: Dementia. In: <u>Neurology in Clinical Practice: Principles of Diagnosis and Management,</u> 5th Edition. Editors: Bradley WG, Daroff RB, Fenichel GM & Jankovic J. Boston MA, Butterworth-Heinemann, 2007: 1855-1907.
20. Tyurin VA, Tyurina YY, Kochanek PM, **Hamilton R**, DeKosky ST, Greenberger JS, Bayir H, Kagan VE.  Chapter 19: Oxidative lipidomics of programmed cell death.  Methods Enzymol 442:375-93, 2008.
21. Yeaney GA, O'Conn SM, Jankowitz BT, **Hamilton RL**.  A 16 year-old male with cerebellar mass. Brain Pathol. 2009 19, 167-170. PMID 19076785
22. Horbinski, C, **Hamilton RL**.  Application of telepathology for neuropathologic intraoperative consultations. Brain Pathol 2009 19; 317-322. PMID 19290998

<u>**Abstracts**</u>

1. **Hamilton RL**, Sanger WG, and McComb RD: Characterization of cell lines derived from malignant tumors in patients with neurofibromatosis. Federation Proceedings 46: 433, 1987.
2. Esch O, Spinosa JC, **Hamilton RL**, Crombie DL, Schteigart CD, Hofmann AF: Reversible cytotoxicity to the gallbladder mucosa of contact dissolution solvents for cholesterol gallstones: a comparison of methyl tert-butyl ether (mtbe) and ethyl propionate (ep) in two animal models. Gastroenterology 100 (5, part 2): A135, 1991.

**Ronald L. Hamilton, M.D.**

3. Haas RH, Popovitch B, **Hamilton RL**: The utility of DNA dystrophin gene analysis in non-specific myopathy: presented at Child Neurology Society Annual Meeting, October, 1992: New Orleans, LA.

4. Haas RH, Mansden DL, Estrada S, **Hamilton RL**, Grafe MG, Nyhan WL: Acute basal ganglia infarction in propionic acidemia in spite of good metabolic control: presented at Child Neurology Society Annual Meeting, October, 1992: New Orleans, LA.

5. **Hamilton RL**, Haas RH, Nyhan W, Powell HP, Grafe MR:  The neuropathology of propionic acidemia: a report of two additional cases. American association of Neuropathology Annual Meeting, June 1993, Salt Lake City, UT; J Neuropathol Exp Neurol 52:299, 1993.

6. Mansfield RT, Schiding JK**, Hamilton R,** Kochanek PM: Hypothermia fails to reduce lesion volume after traumatic brain injury in immature rats.  Pediatric Research 35(4):55, 1994.

7. **Hamilton RL**, Bodnar RJ, Wang G, Wiley CA.  The effect of AZT on retroviral encephalitis: a murine model: presented at the Sixth Workshop on the Pathogenesis of Animal Retroviruses, Philadelphia, PA, Nov. 17-19, 1994.

8. Adelson PD, Robichaurd P, **Hamilton RL**, Kochanek PM. Brain edema and neuropathology after diffuse traumatic injury in immature rats.  Neurotrauma Society meeting, San Diego CA, Nov 10-11, 1995.

9. **Hamilton RL**, Bodnar RJ, Wang G, Klunk W, Wiley CA, Treatment of chronic retroviral encephalitis with zidovudine (AZT) in a murine model. Society for Neuroscience Meeting, San Diego, CA Nov 11-16 1995.

10. **Hamilton RL**, Bodnar RJ, Wang G, Klunk W, Wiley CA. The effect of zidovudine (AZT) on murine retroviral encephalitis. Amer. Assoc of Neuropathology, San Antonio, June, 1995. J Neuropathol Exp Neurol 54 (3): 438, 1995.

11. **Hamilton RL**, and Claassen D. Neonatal Methylmalonic Acidemia With Hemicerebellum: An Autopsy Report;  Society of Pediatric Pathology / Child Neurology Society (joint meeting), Baltimore, Oct 27-29, 1995.

12. **Hamilton RL**, Baldwin M, Wiley CA. Human Herpesviruses And Temporal Arteritis American Association of Neuropathology, Vancouver, BC, Canada, June 1996.

13. Mizukami K, Ikonomovic MD, Sheffield R, Rubin RT, Grayson D, **Hamilton R**, Warde D, Armstrong DM. Immunohistochemical Localization of GABA-A Receptor ß2/3 Subunits in the Hippocampal Formation in Aged Brain with Alzheimer-related Neuropathology. Society for Neuroscience meeting, Washington DC, Nov 1996.

14. Bodnar RJ and **Hamilton RL**. Effect of zidovudine (AZT) and saquinavir on retroviral infection of the central nervous system (CNS) Society for Neuroscience meeting, Nov 17-21, 1996 Washington D.C.

15. Bredel M, Pollack I, **Hamilton RL**, Finkelstein SD, Campbell JW, Martinez AJ, Sherwin R, Bozik ME, Gollin S. Overexpression of EGF receptor and p53 mutations in pediatric malignant gliomas. American Association of Neurological Surgeons, 1997 Annual meeting.

16. Xu Y, Liachennko S, Tang P, **Hamilton RL** Correlation of neuropathologic changes with cerebral metabolic and ADC abnormalities after prolonged asphyxial cardiac arrest. International Society of Magnetic Resonance in Medicine, annual meeting, 1997

17. Bredel M, Pollack IF, Campbell JW, **Hamilton RL**. Basic fibroblast growth factor as a prognostic indicator in pediatric high grade glioma patients. American Association of Neuropathology, Pittsburgh, PA, June 1997. J Neuropathol Exp Neurol 56 (5): 581, 1997

18. **Hamilton RL**, Bodnar RJ, Lackner AA, Lane JH, Wiley CA Neurotrophic factors in simian immunodeficiency virus encephalitis. American Association of Neuropathology, Pittsburgh, PA, June 1997. J Neuropathol Exp Neurol 56 (5): 618, 1997

19. Adelson, PD, Robichaud, P, **Hamilton, RL**, Kochanek, PM. Histologic analyses of severe diffuse traumatic brain injury in the immature rat . National Neurotrama Society, New Orleans Oct 24-25, 1997.

20. Dorsey RW, Achim CL, Wiley CA, **Hamilton RL**\*,  Soontornniyomkij V. Gene expression and cellular localization of neurotrophic factors in Alzheimer's disease. Society of Neuroscience meeting Nov, 1997, New Orleans.

21.  Klunk WE, **Hamilton RL**, Styren SD, Styren G, Debnath ML, Mathis CA, Mahood K, Hsiao KK. Staining of AD and Tg2576 mouse brain wirh X-34, a highly flourescent derivative of chrysamine

**Ronald L. Hamilton, M.D.**

G and A potential in vivo probe for sheet fibrils.  Siociety for Neuroscience meeting, New Orleans 1997.

22. Klunk WE, **Hamilton RL**, Styren SD, Styren G, Debnath ML.  Neuropathological study of AD brain with X-34, a new highly fluorescent derivative of congo red.  Society for  Neuroscience meeting. Los Angeles, CA 1998.

23. Halks-Miller M, Hesselgesser J, Horuk R, Soontornniyomkij V, **Hamilton R,** Achim C.  CCR1 immunoreactivity in Alzheimer's Disease brains.  Society for Neurosciences meeting. Los Angeles, CA 1998.

24.  Wang G, Soontornniyomkij V, Pittman CA, Achim CL, Wiley CA, **Hamilton RL**.  Glial expression of BDNF and TRK B receptor proteins in Alzheimer's Disease and HIV-1 encephalitis brains. Society for Neuroscience meeting. Los Angeles, CA 1998.

25. Ikonomovic MD, Mizukami K, Davies P, **Hamilton R**, Sheffield R, Armstrong DM.  Co-localization of interneurons and an ad-specific antibody in the hippocampal formation of Alzheimer brains. Society for Neurosciences. Los Angeles, CA 1998.

26. Mizukami K, Ikonomovic MD, Grayson DR, Rubin RT, Warde D, Sheffield R, **Hamilton RL,** Davies P, Armstrong DM.  Immunohistochemical study of GABA(A) receptor beta 2/3 subunits in the hippocampal formation of aged brains with Alzheimer-related neuropathologic changes. Experimental Neurology 147 2 333-45 (1997).

27. Bredel M, Pollack IF, **Hamilton RL**: Expression of the c-erbB1 Oncogene Product Epidermal Growth Factor Receptor (EGFR) and its Relevance for Outcome in Children with Supratentorial High-Grade Gliomas ; XVI Congress of the European Society for Pediatric Neurosurgery; November 11-15, 1998, Marseille, France

28. **Hamilton, RL** Numerous widespread alpha-synuclein positive thread-like processes characterize dementia with Lewy Bodies. Foundation IPSEN Conference, April 12, 1999, Paris France

29 **Hamilton RL** Numerous and widespread alpha-synuclein thread-like processes in dementia with Lewy bodies. American Assoc of Neuropathologist Annual Meeting, 1999, Portland, OR. J Neuropathol Exper Neurol 58:552, 1999.

30. Klunk WE, **Hamilton RL**, Styren SD, Head E: Evaluation of the aged canine as a screening system for the x-34 class of in vivo probes for amyloid deposition in AD. Soc. of Neuroscience, 1999

31. Kaufer, DL, **Hamilton RL**, Lopez OL, DeKosky ST MRI white matter hyperintensities and cerebral amyloid angiopathy in a case of dementia with Lewy bodies. Amer Neuropsychiatric Assoc, annual meeting, 2/2000, Ft. Myers, FLA.

32. **Hamilton RL**, Mash DC. Widespread Alpha-synucleinopathy in the Parkinson's Disease brain. 6th National Parkinson's Disease Foundation International Symposium on Parkinson's Disease Research, to be held in conjunction with the Society of Neuroscience meeting in Miami Beach, Oct 22-23[rd], 1999.

33. **Hamilton, RL**, Mash DC. Widespread alpha-synuclein-positive neuropil threads in the Parkinson's Disease brain. American Assoc of Neuropathology, Atlanta, GA, June 8-11, 2000.

34. Snyder JV, Gebel JM, Kassam A, **Hamilton RL**, Goldstein S, Watkins S, Yonas H, Chelluri L, Thulborn K. Guidance by MR Tissue Sodium Concentration of Infarct Resection in Massive Stroke. Neurology 54(7): A97-A98, Suppl. 3, 2000.

35. Chow TM, Kaufer DI, Lopez OL, **Hamilton RL**, Becker JT, DeKosky ST. Temporal Evolution of Lewy Body Phenotype in Autopsy Confirmed Cases of Alzheimer's Disease and Dementia With Lewy Bodies. Neurology 56(8): A300-A301, Suppl 3, 2001.

36.  Castellano-Sanchez A, Ohgaki HH, Yokoo, Finkelstein SD, Medina-Flores R, **Hamilton RL**, Scheithauer BW, Burger PC, Brat DJ.  Genetic Alterations in Granular Cell Astrocytomas. USCAP, 2002.

37.  Demidovich J, Pittman CA, Hamilton RL.  Altered calpain proteolysis of mutant alpha-synuclein. Honors Thesis presentation, Univ. Pitt, 2002

38.  Omalu BI, **Hamilton RL**, Swalsky PA, Finkelstein SD. Microdissection-based mutational profiling of malignant, atypical and benign meningiomas: the determination of meningioma grade by fractional mutational index.  AANP, Denver, 2002 (JNEN 61:491, 2002)

39.  Wilson, RK, Luedecking-Zimmer EK, Kamboh MI, DeKosky ST, **Hamilton RL**.  Association of the ApoE4 allele and Lewy bodies in Alzheimer's Disease.  AANP, Denver 2002 (JNEN 61: 455, 2002).

**Ronald L. Hamilton, M.D.**

40. Desai PP, Ikonomovic MD, **Hamilton RL**, DeKosky ST, Kamboh MI.  Apolipoprotein D in Alzheimer's Disease: implications for amyloid pathology.  Soc. for Neuroscience, Orlando, 2002.

41. Garb S, **Hamilton RL**.  Sequestration of soluble alpha-synuclein in Lewy body Variant of Alzheimer's Disease. Soc for Neuroscience, Orlando, 2002.

42. Marshall GA, Kaufer DI, Lopez OL, Rao GR, **Hamilton RL**, DeKosky ST.  A neuropathological correlate of anosognosia in Alzheimer's Disease.  American Association of Neurology, May 2003.

43. Sweet RA, Butters MA, **Hamilton RL**, Mulsant BH, Lopez OL, PollockBG, DeKosky ST, Reynolds CF Neuropathology Of Late Life Mood Disorders.  American College of Neuropsychopharmacology, 2003

44. Mohan D, Couce ME, Wiley CA, **Hamilton RL**, Sasatomi E, Swalsky PA, Lieberman MD, Finkelstein SD.  Microdissection based genotyping of human gliomas: diagnostic and prognostic considerations (USCAP, Vancouver 3/04)

45. Beckner ME, Sasatomi E, Swalsky PA, **Hamilton RL**, Pollack, IF, Finkelstein SD.  Loss of heterozygosity reveals non-VHL Allelic loss in hemangioblastomas at 22q13, (AANP Cleveland, June 24-27, 2004).

46. Judkins AR, Burger P, **Hamilton RL**, Kleinschmidt-DeMasters B, Perry A, Pomeroy S, Rosenblum MK, Yachnis AT, Rorke LB, Biegel JA. INI1 Expression Distinguishes Atypical Teratoid/Rhabdoid Tumor (ATR) from Choroid Plexus Carcinoma (CPC); (AANP Cleveland, June 24-27, 2004).

47. McFadden KA, **Hamilton RL**, Visvesvara GS, Gardner P, Couce ME.  Granulomatous Amebic Encephalitis in a Patient with Gardners Syndrome and Multi-organ Transplant (AANP Cleveland, June 24-27, 2004).

48. Yen, Amy, Lopez, OL, BeckerJ, **Hamilton RL.**  Mesial Temporal Sclerosis is associated with Lewy Bodies in Alzheimer's Disease. AANP Annual meeting June 9-12, 2005, Arlington, VA (platform). (J Neuropathol Exper Neurol 64:434, 2005.

49. Hinkle DA, Mullett SJ, **Hamilton RL** DJ-1 is over-expressed in human stroke reactive astrocytes. Society for Neuroscience Oct 2005.

50. Ramsey CP, Glass CA, Marshall MB, Morgan KL, Kioke MA, **Hamilton R**, Chu CT, Jordan-Sciutto KL.  Altered expression patterns of the antioxidant response transcriptional regulator NRF2, in Alzheimer's Disease and Parkinson's Disease. Society For Neuroscience, Nov. 2005, Washington DC.

51. Chu CT, Uchiyama Y, **Hamilton R**, Zhu J.  Extracellular signal regulated protein kinase acts upstream of both autophagy and cell death in MPP+ treated neurons.  Society For Neuroscience, Nov. 2005, Washington DC

52. Cieply K, Carol R. Sherer, Jennifer L. Hunt **Hamilton RL** Assessment of 1p and 19q Status in Pediatric Oligodendrogliomas by FISH, Association of Molecular Pathology,  Nov 10-13, 2005 Scottsdale AZ

53. Bencherif B, Lieberman FS, Wenzhu B, Price JC, Muthukrishnan A, Walter K, **Hamilton RL**, Lunsford LD, Mountz JM.  Increased F-18 Fluorothymidine Uptake is Seen in Non-Proliferating Recurrent/Residual Glioma Society for Nuclear Medicine, San Diego, 2006 June 3-7

54. **Hamilton, RL** Variations On A Theme: Lewy Bodies And Mesial Temporal Sclerosis In Alzheimer's Disease: A Review Of 278 Autopsy Cases. 10th International Conference on Alzheimer's Disease, Madrid, Spain, July-15-20, 2006.

55. DeKosky ST, Mathis CA, Price JC, Ikonomovic MD, **Hamilton RL**, Abrahamson EE, Paljug WR, Debnath ML, Hope CE, Isanski BA, Tsopelas ND, Lopresti BJ, Ziolko S, Bi W and Klunk WE.  Correlation of In Vivo PiB Retention and Post-Mortem A$\beta$ Levels: A Case Study. 10th International Conference on Alzheimer's Disease, Madrid, Spain, July-15-20, 2006.

56. Leverenz J, **Hamilton RL**, Larson E, Vavrek D, Lopez O, Galasko D, Masliah E, Kaye J, Nixon R, Clark C, Trojanowski J, Kukull W, Montine T, Tsuang D. Lewy-Related Pathology in Two Large Autopsied Dementia Samples: Application of Classification Criteria. 10th International Conference on Alzheimer's Disease, Madrid, Spain, July-15-20, 2006.

57. Venneti S, Lopresti BJ, Wang G, Mathis CA, Klunk WE, Shmookler AD, **Hamilton RL**, Apte UM, Wiley CA. PET imaging of microglia in a mouse model of Alzheimer's disease. 10th International Conference on Alzheimer's Disease, Madrid, Spain, July-15-20, 2006.

58. Kofler JK, Moore RA, **Hamilton RL**.  Concomitant Dementia with Lewy Bodies and Multiple System Atrophy in a Demented Patient.  International Congress of Neuropathology/American Association of Neuropathology Annual Meeting, San Francisco, CA, Sept 10-15, 2006.

**Ronald L. Hamilton, M.D.**

59. DeKosky ST, Mathis CA, Price JC, Ikonomovic MD, **Hamilton RL**, Abrahamson EE, Paljug WR, Debnath ML, Hope CE, Isanski BA, Tsopelas ND, Lopresti BJ, Ziolko S, Bi W, Klunk WE. Correlation of Regional in vivo Pittsburgh Compound B (PIB) Retention With in vitro PIB, A Levels, and Amyloid Plaque Density: Validation of PIB-PET in Postmortem Human Brain. Alzheimer's Association International Conference on Prevention of Dementia. June 9-12, 2007 Washington, D.C.

60. Kellermier HC, Nikiforova MN, Cieply K, **Hamilton RL**. Alterations of 1p in glioblastomas. ASIP/AANP Annual meeting, Washington DC April 2007.

61. Bliecher AG, Branstetter BF, Hamilton R, Murdoch G, Kellermeir HC. Clival Chordoma: Radiologic-Pathologic Correlations. American Society of Neuroradiology annual meeting, Chicago, IL. June 9-14, 2007.

62. Butters MA, Aizenstein HJ, Meltzer CC, **Hamilton RL,** Price JC, Mathis CA, Klunk WE, Becker JT, DeKosky ST, Reynolds CF. Cognition, cerebrovascular disease and Alzheimer's Disease in late-life depression. International Neuropsychological Society meeting, Bilbao Spain, July 2007.

63 Tyurin VA, Zhao Q, Mnuskin A, **Hamilton R**, DeKosky ST, Reynolds WF, Kagan VE. Phospholipid peroxidation biomarkers of Alzheimer's Disease in the Brain: Selective Oxidation of Phosphatidylserine. Society of Toxicology Meeting San Diego, CA. October 2, 2007.

64. Moschos SJ, D. Trembath D, Snavely A, Bradler E, Midkiff B, Nikolaishvilli-Feinberg N, Werley J, Krauze M, **Hamilton R**, Kirkwood JM. Prognostic Significance of PD-L1 Expression, Angiogenesis, and Hypoxia in Melanoma Brain Metastases (MBM); A Histopathologic Analysis. Annual meeting of the American Association of Clinical Oncology, Chicago Il, 5/29-6/2/2014.

65. Trembath DG, Moschos SJ, Snavely AC, Bradler E, Nikolaishvilli-Feinberg N, Bentley R. Midkiff BR, Jonette Werley J, Krauze MT, **Hamilton RL**. Analysis of select angiogenic markers in melanoma brain metastases. Annual meeting AANP, Portland OR. June 2014

66. Salgado CM, Basu D, Nikiforova M, Hamilton R, Gheris R, Jakacki R, Panigrahy A, Yatsenko S, Reyes-Mugica M. Congenital Melanoma: The full spectrum og p.Q61R mutation in NRAS. Accepted for the Annual Soc. Pediatric Pathology meeting, Birmingham AL, Sept 4-6, 2014.

67. Melan MA, Wald AI, Zhong S, **Hamilton R**, Horbinski C. Nikiforova MN. BrainSeq: Next-Generation Sequencing Panel for Detection of Genetic Alterations in Central Nervous System (CNS) Malignancies. National Harbor MD, Nov 12-15, 2014.

68. Hamilton RL. Chronic Traumatic Encephalopathy: Update on an Emerging Disease. Invited speaker: 18th International Congress of Neuropathology, July 12-16, 2014, Rio de Janeiro, Brazil

69. Hamilton RL. Cases of the Month: 16 Years of Unknowns. Invited speaker: 18th International Congress of Neuropathology, July 12-16, 2014, Rio de Janeiro, Brazil

70. Trembath DG, Moschos SJ, Snavely AC, Bradler E, Nikolaishvilli-Feinberg N, Midkiff BR, Werley J, **Krauze MT, Hamilton RL** Role of PD-L1, HIF-1a, and reactive gliosis in melanoma brain metastases. USCAP 2015, Boston, MA, March 21-27, 2015.

71. Nolan Priedigkeit, Ryan J. Hartmaier, Yijing Chen, Damir Vareslija, Ahmed Basudan, Roby Thomas, Jose P Leone, Peter C. Lucas, Rohit Bhargava, Ron L. Hamilton, Juliann Chmielecki, Nancy E. Davidson, Steffi Oesterreich, Adam M. Brufsky, Leonie Young, Adrian V. Lee Breast cancer brain metastases show limited intrinsic subtype switching, yet exhibit acquired ERBB2 amplifications and activating mutations. San Antonio Breast Cancer Symposium, 12/7/16

72. Steffi Oesterreich, Ahmed Basudan, Nolan Priedigkeit, Ryan Hartmaier, Amir Bahreini, Rekha Gyanchandani, Jose P Leone, Peter Lucas,, Rohit Bhargava, Ron Hamilton, Ryan Hartmaier, Adam Brufsky, Adrian V. LeePerivascular Inflammation in Temporal Artery Biopsies That Are Negative for Arteritis: Incidental or Harbinger American College of Rheumatology/ Association of Rheumatology Health Professionals (ACR/ARHP) Annual Meeting, Washington DC, 11/13/16

73. Expression of Carbonic Anhydrase Genes, CA3 and CA12, Transformed with ENO1, Relate to Copy Numbers of EGFR or RNF139 and XIAP, and Gender in Glioblastomas Using PCR Assays. Experimental Biology 2015 Annual Meeting

74. Evaluation of GlioSeq Targeted NGS Panel for Detection of O6-Methylguanine-DNA Methyltransferase (MGMT) mRNA Expression in Glioma Patients Alicia Hunt, Sarika Jain, Melissa A Melan, Abigail Wald, Ronald Hamilton, Marina N. Nikiforova Association For Molecular Pathology (AMP) Charlotte, NC. November 10-12, 2016.

## PROFESSIONAL ACTIVITIES

**Ronald L. Hamilton, M.D.**

**TEACHING**

University of California, San Diego, Dept of Neuroscience
      1991-93      lab assistant - graduate neuroanatomy course
University of California, San Diego, School of Medicine
      1991-93      Sophomore pathology course, neuropathology section (lab assistant)
University of California, San Diego, Dept of Pathology
      1991-93      Clinical Correlation Conference - Neuropath and Neurosurgery (monthly)
      1991-93      Neuropathology review for neurology residents (bi-monthly)
University of Pittsburgh, School of Medicine
      Freshman pathology course –
      PBL facilitator for musculoskeletal course 1994-1998
      Neuroscience Module – lecture M2 students full class: CNS tumors
            Annually since 1999.
                 April 29, 2014 1-3 pm
      Neuroscience Module   lecture MS1 students
            CNS tumors  March 2004
            CNS tumors  March 2005
            CNS tumors March 2006
            CNS Tumors    5/7/07
      Neuroscience rotation – small weekly lab, M3 students
            7/99-present
      Neuroscience rotation – small group M3 students
            6/18/2007 3-5pm
Weekly brain-cutting conference at Children's Hospital (2-5 medical (M3) students/week)
      Academic Advising: Kate McFadden 2/2000 to 6-2001
Other:
      High school - gifted science students of Mr. James Coll
            11/21/2002 , 11/14/ 2003, 10/28/2004, 11/18/2005, 11/3/2006


University of Pittsburgh, graduate students
      Cellular and Molecular Mechanisms of Neurodegeneration (MSCMP 3720)
                Organizers: Robert Bowser, Cristian Achim,
            1. Neuroanatomy and Neurohistology in neurodegeneration
                 1/13/98,  1/19/99
            2. Mitochondria and disease / Prion encephalopathies
                 3-24-98
            3. The role of alpha-synuclein in neurodegenerative diseases
                 10-11-00
      Molecular Pathobiology (organizers Frye and Achim) (MSCMP 2740)
            .Tumors of the Central Nervous System,  4-7-98,  4-20-99
            Alpha-synuclein and Neurodegeneration
                 4-2003, 1/8/04, 5/15/06
            Neuropathology of Neurodegeneration
                 1/6/04
            Alpha-synuclein and Tau in Neurodegeneration
                 1/5/07, 2/7/2008
            Pathologic diagnosis of the Lewy Body Disorders
                 2/12/09
University of Pittsburgh, Dept of Neuroscience - Combined Neuroscience Conference Wed 4-5
      10/3/95 *      Varicella Zoster Infections of the CNS in AIDS patients
      10/9/96 *      Lewy Bodies and Dementia
      2/19/97 *      The Neuropathology of Pediatric Seizures
      4/23/97 *      CNS manifestations of non-CNS tumors in children
      2/11/98          Case Presentation with Ian Pollack

**Ronald L. Hamilton, M.D.**

3/18/98 *        A 77 year old woman with Multiple sclerosis and dementia
11/4/98         *Pediatric meningiomas – two cases
1/20/99         Methanol Intoxication – with C. Foley
2/3/99          Gliomatosis cerebri with Dallasta
2/10/99         Amyloid angiopathy and leukomalacia – with D. Kaufer
3/17/99         Metachromatic Leukodystrophy – with D. Kaufer
9/18/02         Iatrogenic CJD*
* as primary presenter

University of Pittsburgh, Dept. of Pathology, Chief Resident's Fri noon slide conference
8/1/96 - Pediatric brain tumors
10/5/97 Pediatric brain tumors
1/9/98         NP REVIEW - Tumors I
1/16/98        NP REVIEW - Tumors II
1/23/98        NP REVIEW - Tumors III
1/30/98        NP REVIEW - Infections
2/6/98         NP REVIEW - Demyelinative diseases
2/13/98        NP REVIEW - Neurodegenerative diseases
2/20/98        NP Review - Cerebrovascular disease and developmental
5/24/02        Pediatric Neoplasms and Congenital Malformations
5/31/02        Degenerative Diseases

University of Pittsburgh, undergraduate
Independent Course and Honors Research Project –
Theodore Kaplan (1/97-6/97)
Emily Rogerson (1/99-5/99, 9/99-12/99, 1/00-4/00)
Kyle Hubbard (1/99 – 5/99, 9/99-12/99, 1/00-4/00)
Joe Demidovich – 2000-2002
Stan Garb (2001-2001)

Pathology Summer Undergraduate Research Program (SURP)
Kathleen Anderson 6/00-8/00
Kathleen Anderson 6/01-8-01

University of Pittsburgh, Dept. of Pathology,
Neuropathology of dementia conference - weekly (Fri 10-11)

University of Pittsburgh - ADRC Topics at Noon
X-34 and alpha-synuclein – New stains in Alzheimer's Disease 11/98
Lewy Body Pathology in Alzheimer's Disease, 11/01

Children's Hospital of Pittsburgh, Grand rounds
1996 - methyl malonic acidemia with hemi-cerebellum
2/13/97 - Pediatric AIDS with HIV encephalopathy
5/22/97 - 11 month-old boy with Hypotonia (Leigh's Disease)
3/18/98 - Becker's muscular dystrophy with severe cardiomyopathy
5/19/98 – Friedreich's Ataxia
10/15/98 – Spinal Muscular Atrophy Type I
2/2005 - Congenital Dystrophies – Pediatric Neurology

**Other Presentations**

Neurology Grand Rounds - 11-19-03 - CNS vasculitis
Pathology Noon Diagnostic Conference - 11-20-03 – "Some Bodies in the Brain"
AP Didactic Lecture – 11-25-03 - Neuropathology of Neurodegeneration
NP Didactic – 4-28-04 - ApoE4 and Lewy Bodies in AD

**Ronald L. Hamilton, M.D.**

NP Didactic -     3/31/2005 – AD Pathology in ALS and MTS and LB in AD
Pathology Noon Diagnostic Conference – 8-4-2006: Tauopathies
ADRC CPC 8-10-06
ADRC CPC 11-30-06
ADRC CPC 2-8-07
ADRC 20th Anniversary meeting, "Neuropathology of AD:"  9-28-06
ADRC Topics at Noon.  "Tauopathies"  11-16-06
ADRC CPC 8/16/2007
ADRC CPC 11/30/2007
Pediatric CPC 2/25/08
DJ-1 in glioblastomas (NP Didactic conference) – 3/10/2009 (1 hour)
Neuropathology review for Neurosurgery residents – 3/10/2010 (1 hour).
AP Chief Residents didactic conference.  2 hour conference.  Non-glial Tumors. Feb 25, 2014
CMU graduate class:  BioE 2630 – Methods in medical iamage analysis in neuropathology. April 4, 2014.
Anatomic Pathology Grand Rounds, July 10, 2014  Chronic Traumatic Encephalopathy: an Update.

**Clinical Conferences (recurring)**

| | | |
|---|---|---|
| ADRC Brain cutting | weekly | Tue 8-10 |
| ADRC Dementia signout - | weekly | Fri 10-11 |
| PUH – Neuropathology QA - | weekly | Wed 10-11 |
| CH  Brain cutting | weekly | Mon 10-11:00 |
| CH  Neuro-Oncology conf | weekly | Mon 11:30-12:30 |
| CH Gross autopsy conference | weekly | Tue 11-12 |
| CH Micro autopsy conf | weekly | Tue 1-2 |

University of Pittsburgh School of Medicine –
    2009 Brain Tumors – lecture to 1st year students
    2009 Klionsky summer research scholarship – Peter Kang (June-Aug 2009)
        Clinicopathologic correlations of chordomas
    2009 Monday 2 hour small group 3rd year  (5-12 students)
        4/6/2009, 7/27/2009, 9/10/2009, 10/12/2009, 12/7/2009, 1/25/2010, 2/15/2010

## <u>RESEARCH</u>

## <u>OTHER SUPPORT</u>

## <u>ACTIVE</u>

**HAMILTON, R.**
<u>ACTIVE</u>
**R01 NS037704**     (PI: Pollack)          9/1/98-1/31/17          0.7 calendar months
National Institutes of Health          $105,970
Role:  Co-Investigator
Title: Molecular Markers as Predictors of Outcome in Gliomas
The major goal of this project is to further characterize the molecular features of tumorigenesis
in pediatric malignant gliomas.

**1R01 CA174858-01**(PI: Pollack)          5/6/13-8/30/17          0.4 calendar
months
National Institutes of Health          $54,696
Role:  Co-Investigator
Title: Peptide Vaccine-Based Immunotherapy for Children with Recurrent Ependymomas
This project focuses on a pilot clinical trial of peptide-based immunotherapy for ependymomas,
among the most challenging childhood brain tumors.  The study will incorporate separate strata

**Ronald L. Hamilton, M.D.**

for posterior fossa and non-posterior fossa ependymomas.  We will treat a total of 12 patients in each of the two strata with subcutaneous TAA epitope vaccinations every 3 weeks for 8 courses combined with topical imiquimod. Participants will be evaluated for adverse events, regimen limiting toxicity (RLT), and treatment response by clinical and laboratory evaluations and MR imaging. We hypothesize that vaccine-based immunotherapy will not only prove safe for the treatment of pediatric ependymomas, but will also demonstrate activity as assessed by immunologic and clinical parameters.

(PI: Pollack)    5/8/14-6/1/17
Child Brain Tumor Foundation                    $10,487                              1.2
calendar months
**Children's Brain Tumor Tissue Consortium**
The CBTTC is a unique research platform in which tumor tissue is processed for comprehensive molecular (e.g., DNA, RNA, and protein) analysis using state-of-the-art methods and the data results of that analysis, together with new brain tumor models and relevant clinical information, are sent back to the participating institutions. In comparison to tissue banks, the CBTTC actively stimulates research by providing high-quality data that can be rapidly and efficiently analyzed by participating institutions.
PI: Pollack. 10% salary for Jonette Werley

<u>OVERLAP</u> No Overlap

**<u>Completed Research Support</u>**

National Institutes of Health                    3/1/02 – 2/28/05
P30 MH52247-10    (PI: Reynolds)        $23,305
Intervention Research Center for the Study of Late-Life Mood Disorders
a supplement to the above grant to establish a brain bank to investigate the neuropathological substrate of late life mood disorders.
Role:  Co-Investigator

R01 NS048595    (PI: Montine)                09/30/03 – 07/31/08
National Institutes of Health
Subcontract to the University of Washington on grant "Characterization of DLB: a Collaborative Study"
The major goal of this multi-institutional project is to investigate the role of ApoE4 alleles and other genetic polymorphisms in the Lewy Body Variant of Alzheimer's Disease.
Role:  Co-Investigator

Brain Tumor Society                    07/01/07-05/31/09
PI: Ian Pollack
JPA & Pediatric Low Grade Astrocytoma
The major goals of these two grants is to examine molecular markers of prognosis in pediatric gliomas.
Role:  Co-Investigator

U10 CA13539-27 (Reaman (subcontract 6172) (Pollack)                1/1/06-12/30/09
NIH/NCI
Children's Oncology Group Brain Tumor Resource Laboratory

**Ronald L. Hamilton, M.D.**


 This contract is providing infrastructure support for maintaining tissue processing and banking of high-grade gliomas.
Role:  Laboratory Director


R01 MH47346    (PI: Zubenko)                          12/1/04 – 11/30/09
National Institutes of Health
Morphologic/Neurochemical Correlates of Depression in AD
The major goal of this project is to better define the biological substrates of major depression in AD and to provide additional insight into the clinical biology of major depressive disorders affecting the elderly.
Role:  Co-Investigator


P50 AG05133    (PI: Lopez)              3/30/85 – 3/31/15          0 calendar months
National Institutes of Health              $71,764
Alzheimer Disease Research Center, Core C: Neuropathology
The three objectives of the Neuropathology Core are to (1) procure and bank brain from autopsies of ADRC patients and controls, (2) perform detailed neuropathologic analysis of all AD cases and (3) maintain well catalogued brain bank.
Role:  Core Advisor


Child Brain Tumor Fund (CBTF) (PI: Pollack)        5/8/13-5/7/14
0.3 cal months (2.5% support) `PITT subaccount #: 05.35206.xxxx.00000.709203.-----`


P01 NS040923    (PI: Pollack)              7/1/02-5/31/13          1.20 calendar months
National Institutes of Health              $22,074
Novel Strategies for Brain Tumor Therapy
The unifying hypothesis of this program project grant is that novel therapeutic approaches that take into account the unique features of central nervous system (CNS) tumors will have utility for preventing tumor growth and inducing tumor regression, and will potentiate the effects of conventional treatment approaches, particularly radiotherapy, for inducing glioma cell killing.
Role:  Co-Investigator


**Prior Grant Support**

| | |
|---|---|
| 1995-1997 | Murine Model of Retroviral Encephalitis |
| | Children's Hospital of Pittsburgh Research Fund ($50,000) |
| | 0% effort, 0% support |
| 1995-1998 | Blood Brain Barrier in HIV encephalitis (PI: Achim) |
| | Co PI. 10% effort and salary ($186,264) |
| 11/98 | PD Center Grant, Equipment $6000 |
| | for freezer for PD Brain Bank (one time equipment funding) |
| 7/1/98-6/30/99 | Neurotrophic Factors in SIV encephalitis |
| | Competitive Medical Research Fund (CMRF), $25,000, |
| | 0% effort, 0% support |
| 12/01/98-11/30/99 | Parkinson's Disease Brain Bank |
| | PI: Hamilton RL |
| | Parkinson's Disease Foundation ($24,899) 0% effort, 0% support |
| 7/1/98-6/30/00 | Molecular Markers of Prognosis in Pediatric Gliomas |

**Ronald L. Hamilton, M.D.**

                      PAR 95-063, NIH
                      PI: IF Pollack
                      10% effort and support ($263,311)

4/1/00-3/31/01:  Alpha-synuclein Aggregation in Dementia With Lewy Bodies
                  PI: RL Hamilton
                  Parkinson's Disease Foundation Seed Money Grant, $25,000 0% effort, 0% support

10/1/00-9/30/02   Millennium Agreement (Neuro Module)
                  PI: Rajiv Dhir
                  0% effort, 0% Support.
                  ($25,000 per year for supplies, plus support for 100% Level IV Res Tech)

1/1/99 – 12/31/03 COG Brain Tumor Resource Laboratory
        PI: Pollack, IF ($5800)  (subcontract 6172)
        Co-I – 5% effort and support
        NIH-U10 CA13539-27

3/01/02 - 2/28/07 - Supplemental Award to Establish a Late Life Mood Disorder Brain Bank
        PI: RA Sweet (for supplement)
              Supplement to 3 P30 MH52247-08S1 (PI: CF Reynolds)
              Co-I : 5% effort and support

7/1/98-6/30/05 Morphologic/Neurochemical Correlates of Depression in AD
        PI: G Zubenko
            2.5% effort and support ($20,000)

National Institutes of Health             09/30/03 – 07/31/08      5%
R01 NS048595     (PI: Montine)            $75,000

*Subcontract to the University of Washington on grant "Characterization of DLB: a Collaborative Study"*
The major goal of this multi-institutional project is to investigate the role of ApoE4 alleles and other genetic polymorphisms in the Lewy Body Variant of Alzheimer's Disease

R01 MH072947    (PI: Butters)        12/1/04 –11/30/11        0.36 calendar months
National Institutes of Health               $6,018
Pathways Linking Late Life Depression to Mild Cognitive Impairment and Dementia
The goal of this project is to investigate the relationships among late-life depression (LLD), cognitive impairment and progressive neurodegeneration.
Role:  Co-Investigator

R01 MH072947    (PI: Butters)        12/1/04 –11/30/11        0.36 calendar months
National Institutes of Health               $6,018
Pathways Linking Late Life Depression to Mild Cognitive Impairment and Dementia
The goal of this project is to investigate the relationships among late-life depression (LLD), cognitive impairment and progressive neurodegeneration.
Role:  Co-Investigator

**<u>Seminars and Invited Lectureships Related to Research</u>**

Presentation of an Unknown Case (Herpes simplex brainstem encephalitis) to American Association of Neuropathologists Annual Meeting, June 1992: St. Louis, MO.

**Ronald L. Hamilton, M.D.**

Presentation of an Unknown Case (Varicella zoster virus encephalitis in an AIDS patient) to XII International Congress of Neuropathology, Sept, 1994: Toronto, Ont, Canada.

Presentation of an Unknown Case (Atypical neurocytoma) to American Association of Neuropathologists Annual Meeting, June 2002: Denver (presenter: Rafael Medina-Flores).

## Other Research Related Activities

| | |
|---|---|
| 1995-2003 | Co-Director, Neuropathology Core ADRC |
| 2003-2012 | Director, Neuropathology Core ADRC. |
| 1995-2012- | Director, Neuropathology Brain Bank |
| 1997 - present - | Director of Neurohistology laboratory |
| 1997-present | Co-Director, Brain Tumor Resource Laboratory, Children's Cancer Group |
| 2001- 2009 | Director of Neuropathology Core of the Stephen Tuttle ALS Tissue Bank. |
| 2001-present | Co-Director, UP Brain Tumor Bank |

## CURRENT RESEARCH INTERESTS

1. Molecular Biology of Brain Tumors

## SERVICE

## University and Medical School

Residency Committee (Pathology) – 1997 to 2008
Institutional Review Board      3/02 – 5/2005
'Member of the UPSOM Interviewing Committee' jan 2010-present
Member, UPMC Professional Practice and Ethics Committee Jan 2014 - present

## OTHER

| | |
|---|---|
| 4/1996 - present | Case Editor - Brain Pathology, |
| | Case of the Month feature |
| | Case of the Month web site |
| | Increase to 2 cases per month 1/2007 |
| 10/99 | ad hoc reviewer, J Neuroscience |
| 1/2000 | ad hoc reviewer, J American Medical Association (JAMA) |
| 3/2000 | ad hoc reviewer, Neuropathology and Applied Neurobiology |
| 3/01 | ad hoc reviewer American Journal Pathology |
| 5/02 | ad hoc reviewer Neuroscience |
| 11/02 | ad hoc reviewer JNEN |
| 2004 | AANP Awards Committee, AANP, Cleveland |
| 2006 | AANP Awards committee, AANP-ISN San Fran |
| 10/2006 | ad hoc reviewer      Eur J Neurosci |
| 2/2007 | Ad hoc reviewer      Neuroscience |
| 2007 | Chairmen, Awards Committee, AANP Washington DC. (2 year term) |
| 7/29/2007 | ad hoc reviewer, Brain Pathology |
| 7/25/2007 | ad hoc reviewer Acta Neuropathologica |
| 10/19/2007 | ad hoc reviewer J Neuropathol Exp Neurol |
| 2008 | Chairman Awards Committee AANP, San Diego Annual Meeting |
| 2008 | ad hoc reviewer Brain Pathology |
| 2009 | ad hoc reviewer Pedi and Developmental Pathology |
| 2009 | ad hoc reviewer Amer. J. Pathol. |

**Ronald L. Hamilton, M.D.**

2014 – Featured in non-fiction book: League of Denial:  The NFL, Concussions and the Battle for the Truth (Crown Publishing, New York). Chapters 8 and 10 detail my role in the discovery of CTE in NFL football players.

January 2015 – Consulted with Sony Pictures about movie CONCUSSION based on the discovery of Chronic Traumatic Encephalopathy (CTE) in American NFL football players by my student, Bennet Omalu and me in July 2005.  I was also interviewed on the set by Sony documentary filmmakers for a bonus feature on the DVD:  The Making of "Concussion."  The movie is scheduled to be released Christmas Day, Dec 25, 2015.

January 2015 – interviewed by Jeane Marie Laskas (who wrote the 2009 GQ article the movie is based on) for a companion book to be released with the movie, December 2015.


**International Invitations**

1998 – Invited lecturer at Barcelona-Pittsburgh ADRC meeting, "Dementia Today," Barcelona, Spain (Oct 1998)

2000 – Invited lecturer at Barcelona-Pittsburgh ADRC meeting Dementia Today II", Barcelona, Spain (Oct 2000)

2001 - Invited symposia speaker at 10th Congress of the International Psychogeriatric Association (Nice, France, Sept 2001). "Pathological Diagnosis of Dementia With Lewy Bodies" (Symposia Organizer, Ian McKeith)

2002 – Invited lecturer at Barcelona-Pittsburgh ADRC meeting Dementia Today III", Barcelona, Spain (Oct 2002)

2003 – Symposium speaker "Dementia with Lewy Bodies" at International Psychogeriatric Associations meeting, Chicago, IL, USA, 08/19/03

2004  Invited lecturer at Barcelona-Pittsburgh ADRC meeting Dementia Today IV", Barcelona, Spain (Oct 2004)

2006  Invited lecturer at Barcelona-Pittsburgh ADRC meeting Dementia Today V", Barcelona, Spain (Oct 2006)

2008  Invited lecturer at Barcelona-Pittsburgh ADRC meeting Dementia Today VI", Barcelona, Spain (May 2008)

2014 – Invited lecturer AANP annual meeting June 2014.  What Every Neuropathologist Should Know: Molecular studies in metastatic brain tumors.

2014 - Invited as member of scientific committee International Congress of Neuropathology quadrennial meeting Sept 2014, Rio de Janeiro

2014 – Chair of Forensic Pathology Session, committee International Congress of Neuropathology quadrennial meeting Sept 2014, Rio de Janeiro

2014 – co-chair telepathology session with Dr. Wiley

2014 – Presentation – Chronic Traumatic Encephalopathy – update, International Congress of Neuropathology quadrennial meeting Sept 2014, Rio de Janeiro

2014 – presentation – Cases of the Month – 16 Years of Unknowns  International Congress of Neuropathology quadrennial meeting Sept 2014, Rio de Janeiro s

**CERTIFICATION OF VITAL RECORD**

## COUNTY OF LOS ANGELES • REGISTRAR–RECORDER/COUNTY CLERK

**CERTIFICATE OF DEATH**
STATE OF CALIFORNIA
USE BLACK INK ONLY / NO ERASURES, WHITEOUTS OR ALTERATIONS

3200819043413

STATE FILE NUMBER | LOCAL REGISTRATION NUMBER

### DECEDENT'S PERSONAL DATA

| 1 NAME OF DECEDENT — FIRST (Given) | 2 MIDDLE | 3 LAST (Family) |
|---|---|---|
| CHRISTOPHER | EDDIE | MIMS |

AKA ALSO KNOWN AS — Include full AKA (FIRST MIDDLE LAST)
- - -

| 4 DATE OF BIRTH mm/dd/yyyy | 5 AGE Yrs | IF UNDER ONE YEAR Months / Days | IF UNDER 24 HOURS Hours / Minutes | 6 SEX |
|---|---|---|---|---|
| 1970 | 38 | | | M |

| 9 BIRTH STATE/FOREIGN COUNTRY | 10 SOCIAL SECURITY NUMBER | 11 EVER IN U.S. ARMED FORCES? | 12 MARITAL STATUS (at Time of Death) | 7 DATE OF DEATH mm/dd/yyyy | 8 HOUR (24 Hours) |
|---|---|---|---|---|---|
| CALIFORNIA | -8828 | YES [X] NO UNK | DIVORCED | 10/15/2008 | 0935 |

| 14/15 EDUCATION | 14/15 WAS DECEDENT HISPANIC/LATINO(A)/SPANISH? | 16 DECEDENT'S RACE |
|---|---|---|
| SOME COLLEGE | [X] NO | AFRICAN AMERICAN |

| 17 USUAL OCCUPATION — Type of work for most of life. DO NOT USE RETIRED | 18 KIND OF BUSINESS OR INDUSTRY | 19 YEARS IN OCCUPATION |
|---|---|---|
| PROFESSIONAL ATHLETE | FOOTBALL ATHLETE | 8 |

### USUAL RESIDENCE

20 DECEDENT'S RESIDENCE (Street and number or location)

| 22 CITY | 22 COUNTY/PROVINCE | 23 ZIP CODE | 24 YEARS IN STATE | 25 STATE/FOREIGN COUNTRY |
|---|---|---|---|---|
| LOS ANGELES | LOS ANGELES | 90017 | 25 | CALIFORNIA |

### INFORMANT

26 INFORMANT'S NAME, RELATIONSHIP
MAREA BARSKY, FRIEND

### SPOUSE AND PARENT INFORMATION

| 28 NAME OF SURVIVING SPOUSE — FIRST | 29 MIDDLE | 30 LAST (Maiden Name) |
|---|---|---|
| - | - | - |

| 31 NAME OF FATHER — FIRST | 32 MIDDLE | 33 LAST | 34 BIRTH STATE |
|---|---|---|---|
| LORENZO | VICTOR | MIMS | CA |

| 35 NAME OF MOTHER — FIRST | 36 MIDDLE | 37 LAST (Maiden) | 38 BIRTH STATE |
|---|---|---|---|
| CARLEEN | | HASTINGS | TN |

1 of 2

### FUNERAL DIRECTOR / LOCAL REGISTRAR

| 39 DISPOSITION DATE mm/dd/yyyy | 40 PLACE OF FINAL DISPOSITION |
|---|---|
| 10/25/2008 | FOREST LAWN MEMORIAL PARK 6300 FOREST LAWN DR., LOS ANGELES, CA 90068 |

| 41 TYPE OF DISPOSITION(S) | 42 SIGNATURE OF EMBALMER | 43 LICENSE NUMBER |
|---|---|---|
| BU | JESSICA SOLIS | 9091 |

| 44 NAME OF FUNERAL ESTABLISHMENT | 45 LICENSE NUMBER | 46 SIGNATURE OF LOCAL REGISTRAR | 47 DATE mm/dd/yyyy |
|---|---|---|---|
| FOREST LAWN MEMR PRKS & MTYS | FD 904 | JONATHAN FIELDING, MD | 10/23/2008 |

### PLACE OF DEATH

| 101 PLACE OF DEATH | 122 IF HOSPITAL, SPECIFY ONE | 103 IF OTHER THAN HOSPITAL, SPECIFY ONE |
|---|---|---|
| RESIDENCE | IP ER/OP DOA | Hospice Nursing Home/LTC [X] Decedent's Home Other |

| 104 COUNTY | 105 FACILITY ADDRESS OR LOCATION WHERE FOUND (Street and number or location) | 106 CITY |
|---|---|---|
| LOS ANGELES | 612 SOUTH FLOWER STREET #409 | LOS ANGELES |

### CAUSE OF DEATH

| 107 CAUSE OF DEATH | | Time interval between Onset and Death | 108 DEATH REPORTED TO CORONER? |
|---|---|---|---|
| IMMEDIATE CAUSE (Final disease or condition resulting in death) (A) | DEFERRED | (AT) | [X] YES   NO |
| Sequentially list conditions, if any, leading to cause on Line A. Enter UNDERLYING CAUSE (disease or injury that initiated the events resulting in death) LAST (B) | | (BT) | REFERRAL NUMBER 2008-07210 |
| (C) | | (CT) | 109 BIOPSY PERFORMED?   YES [X] NO |
| (D) | | (DT) | 110 AUTOPSY PERFORMED? [X] YES   NO |
| | | | 111 USED IN DETERMINING CAUSE? [X] YES   NO |

| 112 OTHER SIGNIFICANT CONDITIONS CONTRIBUTING TO DEATH BUT NOT RESULTING IN THE UNDERLYING CAUSE GIVEN IN 107 |
|---|
| NONE |

| 113 WAS OPERATION PERFORMED FOR ANY CONDITION IN ITEM 107 OR 112? (if so, list type of operation and date) | 115A IF FEMALE, PREGNANT IN LAST YEAR? |
|---|---|
| NO | YES   NO   UNK |

### PHYSICIAN'S CERTIFICATION

| 114 I CERTIFY THAT TO THE BEST OF MY KNOWLEDGE DEATH OCCURRED AT THE HOUR, DATE AND PLACE STATED FROM THE CAUSES STATED | 115 SIGNATURE AND TITLE OF CERTIFIER | 116 LICENSE NUMBER | 117 DATE mm/dd/yyyy |
|---|---|---|---|
| Decedent Attended Since ___ mm/dd/yyyy   Decedent Last Seen Alive ___ mm/dd/yyyy | | | |

118 TYPE ATTENDING PHYSICIAN'S NAME, MAILING ADDRESS, ZIP CODE

### CORONER'S USE ONLY

| 119 I CERTIFY THAT IN MY OPINION DEATH OCCURRED AT THE HOUR, DATE AND PLACE STATED FROM THE CAUSES STATED | 120 INJURED AT WORK? | 121 INJURY DATE mm/dd/yyyy | 122 HOUR (24 Hours) |
|---|---|---|---|
| MANNER OF DEATH   Natural   Accident   Homicide   Suicide [X] Pending investigation   Could not be Determined | YES   NO   UNK | | |

123 PLACE OF INJURY (e.g. home, construction site, wooded area, etc.)

124 DESCRIBE HOW INJURY OCCURRED (Events which resulted in injury)

125 LOCATION OF INJURY (Street and number or location and city, and ZIP)

| 126 SIGNATURE OF CORONER / DEPUTY CORONER | 127 DATE mm/dd/yyyy | 128 TYPE NAME, TITLE OF CORONER / DEPUTY CORONER |
|---|---|---|
| EVONNE D REED | 10/20/2008 | EVONNE D REED, DEPUTY CORONER |

### STATE REGISTRAR

| A | B | C | D | E | FAX AUTH # | CENSUS TRACT |
|---|---|---|---|---|---|---|

*012008000916134*

This is to certify that this document is a true copy of the official record filed with the Registrar-Recorder/County Clerk.

SEP 0 4 2015

Dean C. Logan
DEAN C. LOGAN
Registrar-Recorder/County Clerk

*1 0 0 0 0 0 0 6 9 9 0 2 3 *

This copy not valid unless prepared on engraved border displaying the Seal and Signature of the Registrar-Recorder/County Clerk.   PBNCO (REV) 07/11

THE GREAT SEAL OF THE STATE CALIFORNIA EUREKA

REGISTRAR-RECORDER/COUNTY CLERK • COUNTY OF LOS ANGELES

ANY ALTERATION OR ERASURE VOIDS THIS CERTIFICATE

## CERTIFICATION OF VITAL RECORD

## COUNTY OF LOS ANGELES • REGISTRAR–RECORDER/COUNTY CLERK

### PHYSICIAN/CORONER'S AMENDMENT

3052008191127
STATE FILE NUMBER

NO ERASURES, WHITEOUTS, PHOTOCOPIES, OR ALTERATIONS

3200819043413
LOCAL REGISTRATION NUMBER

1.1

☐ BIRTH  ☒ DEATH  ☐ FETAL DEATH

TYPE OR PRINT CLEARLY IN BLACK INK ONLY – THIS AMENDMENT BECOMES AN ACTUAL PART OF THE OFFICIAL RECORD

### PART I  INFORMATION TO LOCATE RECORD

| INFORMATION AS IT APPEARS ON ORIGINAL RECORD | 1A. NAME—FIRST CHRISTOPHER | 1B. MIDDLE EDDIE | 1C. LAST MIMS | 2. SEX M |
|---|---|---|---|---|
| | 3. DATE OF EVENT—MM/DD/CCYY 10/15/2008 | 4. CITY OF EVENT LOS ANGELES | | 5. COUNTY OF EVENT LOS ANGELES |

### PART II  STATEMENT OF CORRECTIONS

2 of 2

| | 6. CERTIFICATE ITEM NUMBER | 7. INFORMATION AS IT APPEARS ON ORIGINAL RECORD | 9. INFORMATION AS IT SHOULD APPEAR |
|---|---|---|---|
| LIST ONE ITEM PER LINE | 107A | DEFERRED | DILATED CARDIOMYOPATHY |
| | 107AT | - | YEARS |
| | 112 | NONE | HEPATIC STEATOSIS, HISTORY OF HYPERTENSION |
| | 119 | PENDING INVESTIGATION | NATURAL |

| DECLARATION OF CERTIFYING PHYSICIAN OR CORONER | I HEREBY DECLARE UNDER PENALTY OF PERJURY THAT THE ABOVE INFORMATION IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE. | | |
|---|---|---|---|
| | 9. SIGNATURE OF CERTIFYING PHYSICIAN OR CORONER ► LOUIS A PENA MD | 10. DATE SIGNED—MM/DD/CCYY 12/12/2008 | 11. TYPED OR PRINTED NAME AND TITLE/DEGREE OF CERTIFIER DME |
| | 12. ADDRESS—STREET and NUMBER 1104 NORTH MISSION ROAD | 13. CITY LOS ANGELES | 14. STATE CA / 15. ZIP CODE 90033 |
| STATE/LOCAL REGISTRAR USE ONLY | 16. OFFICE OF VITAL RECORDS OR LOCAL REGISTRAR ► STATE REGISTRAR - OFFICE OF VITAL RECORDS | 17. DATE ACCEPTED FOR REGISTRATION—MM/DD/CCYY 12/15/2008 | |

STATE OF CALIFORNIA, DEPARTMENT OF PUBLIC HEALTH, OFFICE OF VITAL RECORDS

*022008000147349*

FORM VS 24Ae (REV. 1/08)

1.1

This is to certify that this document is a true copy of the official record filed with the Registrar-Recorder/County Clerk.

SEP 0 4 2015



DEAN C. LOGAN
Registrar-Recorder/County Clerk



*100000699024*

This copy not valid unless prepared on engraved border displaying the Seal and Signature of the Registrar-Recorder/County Clerk. PBNCO (REV) 07/11

ANY ALTERATION OR ERASURE VOIDS THIS CERTIFICATE

COUNTY OF LOS ANGELES                                          DEPARTMENT OF CORONER

# **12** **AUTOPSY REPORT**

No.

2008-07210

MIMS, CHRISTOPHER

I performed an autopsy on the body of

at _____ the DEPARTMENT OF CORONER

___Los Angeles, California___ on ___OCTOBER 16, 2008 @ 1525 HOURS___
                                      (Date)                              (Time)

From the anatomic findings and pertinent history I ascribe the death to:

(A)     DILATED CARDIOMYOPATHY

DUE TO, OR AS A CONSEQUENCE OF

(B)

DUE TO, OR AS A CONSEQUENCE OF

(C)

DUE TO, OR AS A CONSEQUENCE OF

(D)

OTHER CONDITIONS CONTRIBUTING BUT NOT RELATED TO THE IMMEDIATE CAUSE OF DEATH:

    HEPATIC STEATOSIS, HISTORY HYPERTENSION

*Anatomical Summary:*

    I.   Dilated cardiomyopathy, 1010 grams.

       A.   Pulmonary congestion and edema.

          1.   Secretions of bronchi and trachea.

       B.   Chronic hepatic congestion.

          1.   Hepatomegaly, 3200 grams.

          2.   Probable congestive heart failure.

             a.   Lower legs, dorsum of feet, with edema.

       C.   History of hypertension.

       D.   History of alcohol abuse.

          1.   Hepatic steatosis, moderate.

   II.   Other findings:

       A.   Morbid obesity.

       B.   No evidence of external or internal trauma.

       C.   No pulmonary emboli.

       D.   Bilateral knees with old surgical scars.

76A890M—Rev. 8/94

COUNTY OF LOS ANGELES

DEPARTMENT OF CORONER

# 12

## AUTOPSY REPORT

No.

2008-07210

MIMS, CHRISTOPHER

Page 2

E.  Upper torso, face with congestion and Tardieu spots consistent with prone position found.

F.  Skin, body creases of the axilla, legs and back with psoriatic-type lesions.

III.  See Toxicology Report.

IV.  See Microscopic Report.

V.  See Neuropathology Report.

CIRCUMSTANCES:

See the brief Investigator's Narrative Report.

This is a 38-year-old Black gentleman with a history of hypertension, sports-related knee injuries and alcohol abuse. On 10/15/08 at about 0900 hours, the decedent was found lying on the bathroom floor unresponsive. 911 was called, and the Los Angeles Fire Department responded to the scene and determined death on 10/15/08 at 0935 hours. The decedent apparently smoked tobacco heavily and used alcohol daily. The decedent had complained of labored breathing on 10/14/08. He was last seen alive by a friend on 10/14/08 at about 2230 hours.

EXTERNAL EXAMINATION:

The body is identified by toe tags and is that of an unembalmed, refrigerated adult Black male who appears about the reported age of 38 years. The body weighs 456 pounds, measures 80 inches, and is extremely obese.

The skin shows numerous psoriatic scaly-type skin lesions at the axilla, legs, dorsum of the feet and the torso. The skin is otherwise free of abrasions, lacerations, bruises and burns. There are scars over both knee regions: On the right knee, an old scar, 2 inches transversely oriented and on the left knee, an irregularly-shaped old scar, 1-1/2 inches. No old surgical scars are seen over the abdomen or torso regions.

75A79BP—Rev. 2/91

COUNTY OF LOS ANGELES                                                    DEPARTMENT OF CORONER

# **AUTOPSY REPORT**

**12**

Page ___3___

No.

2008-07210

MIMS, CHRISTOPHER

Tattoos are present and identified as follows:

1. Right anterior forearm, "Tough As" and below this, a tattoo of four nails vertically oriented, and below this, the word "Nails".

2. Left anterior forearm, the words "Balls of Steel" and in between is a brick wall with balls going through it.

3. Left upper lateral arm is a tattoo of four cards with the letter "A", diamond, spade, heart and clubs and the words "Fat Doctor", and below this a smiling man face that is green with dark hair. There are other designs around this tattoo.

4. Right upper lateral arm, multicolored tiger.

5. Right wrist, tribal-like band tattoo with a focal red color design.

Rigor has presumably been abolished. Livor mortis is slight red and fixed on the posterior upper back. Also, the face shows purple congestion and dependent purple fixed livor on the upper torso and neck regions with Tardieu spots present.

The head is otherwise normocephalic and covered by black hair. There is slight frontal receding of the hairline, and the hair can be described as short and curly. A mustache and beard are present. Examination of the eyes reveals irides that show corneal clouding and sclerae that are congested. There are no petechial hemorrhages of the conjunctivae of the lids or the sclerae. The oronasal passages are unobstructed. At autopsy, there is foam, red, frothy material from the mouth that is observed. Upper and lower teeth are present. The frenulum is intact. The neck is unremarkable. There is no chest deformity. There is no increased anterior-posterior diameter. The abdomen is obese. The genitalia are those of an adult male. The penis appears circumcised. The external genitalia are without trauma or lesions. The extremities show no edema, joint deformity, abnormal mobility, or needle tracks. The lower legs and dorsum of the feet are swollen.

76A798P—Rev. 2/91

COUNTY OF LOS ANGELES                                                    DEPARTMENT OF CORONER

# AUTOPSY REPORT

**12**

No.

2008-07210

MIMS, CHRISTOPHER

Page ___4___

EVIDENCE OF THERAPEUTIC INTERVENTION:

There is no evidence of any previous or recent hospitalization.

EVIDENCE OF EXTERNAL TRAUMATIC INJURIES:

None.

CLOTHING:

The body was not clothed, and I did not see the clothing.

INITIAL INCISION:

The body cavities are entered through the standard coronal and
Y-shaped incisions. No foreign material is present in the
mouth, upper airway, and trachea.

EVIDENCE OF INTERNAL INJURIES:

None.

NECK:

The neck organs are removed en bloc with the tongue. No lesions
are present, nor is trauma of the gingiva, lips, or oral mucosa
demonstrated. There is no edema of the larynx. Both hyoid bone
and larynx are intact and without fractures. No hemorrhage is
present in the adjacent throat organs, investing fascia, strap
muscles, thyroid, or visceral fascia. There are no prevertebral
fascial hemorrhages. The tongue when sectioned shows no trauma.

CHEST/ABDOMINAL CAVITY:

Both pleural cavities contain no fluid or adhesions. The
parietal pleurae are intact. The lungs are well-expanded. Soft
tissues of the thoracic and abdominal walls are well-preserved.
The subcutaneous fat of the abdominal wall measures 8.0 cm in
thickness, and the chest wall measures 6.0 cm. The breasts are

76A798P—Rev. 2/91

COUNTY OF LOS ANGELES

DEPARTMENT OF CORONER

# 12

## AUTOPSY REPORT

No.

2008-07210

MIMS, CHRISTOPHER

Page ___5___

examined and palpated in the usual manner and show no abnormalities. The organs of the abdominal cavity have a normal arrangement, and none are absent. There is no fluid collection. The peritoneal cavity is without evidence of peritonitis. There are no adhesions.

### SYSTEMIC AND ORGAN REVIEW

The following observations are limited to findings other than injuries, if described above.

MUSCULOSKELETAL SYSTEM:

No abnormalities of the bony framework or muscles are present.

CARDIOVASCULAR SYSTEM:

The aorta is elastic and of even caliber throughout, with vessels distributed normally from it. The abdominal and thoracic aorta have minimal atherosclerotic plaques. There is no tortuosity or widening of the thoracic segment. There is no dilatation of the lower abdominal segment. No aneurysm is present. The major branches of the aorta show no abnormality.

Within the pericardial sac, there is a minimal amount of serosanguineous fluid. The heart weighs 1010 grams. It is severely dilated with no significant ventricular hypertrophy. The right ventricle is 0.4 cm thick, and the left ventricle is 1.5 cm thick. The septal wall measures 2.0 cm. The chambers are normally developed and are without mural thrombosis. The valves are thin, leafy and competent but dilated. The circumferences of the valve rings are: Tricuspid valve 15.0 cm, pulmonic valve 10.0 cm, mitral valve 15.0 cm, and aortic valve 10.0 cm. There is mottled red and pale endocardial discoloration. There are no infarcts of the myocardium seen grossly. There is no abnormality of the apices of the papillary musculature. There are no defects of the septum. The great vessels enter and leave in a normal fashion. The ductus arteriosus is obliterated. The coronary ostia are widely patent. The right coronary artery is the dominant vessel. There is no coronary atherosclerosis. The blood within the heart and large blood vessels is liquid.

76A798P—Rev. 2/91

# AUTOPSY REPORT

**12**

Page 6

No.

2008-07210

MIMS, CHRISTOPHER

RESPIRATORY SYSTEM:

An extremely large amount of edema fluid is found in the upper respiratory and lower bronchial passages. The mucosa is intact and pale with secretions present. The lungs are subcrepitant, and there is dependent congestion. The left lung weighs 1030 grams. The right lung weighs 1050 grams. The visceral pleurae are smooth and intact. The parenchyma is congested and edematous. The pulmonary vasculature is without thrombo-embolism. Thromboemboli are not present in the distal tertiary branches.

GASTROINTESTINAL SYSTEM:

The esophagus is intact throughout. The stomach is not distended. It contains about 150 ml of green well-digested food and liquid present. The mucosa is smooth and green with no erosions or ulcerations. Portions of tablets and capsules cannot be discerned in the stomach. The small intestine and colon are examined by inspection, palpation and multiple incisions and show soft green stool in each region. The appendix is present. The pancreas occupies a normal position. There is no necrosis or trauma. The parenchyma is lobular and firm. The pancreatic ducts are not ectatic, and there is no parenchymal calcification.

HEPATOBILIARY SYSTEM:

The liver weighs 3200 grams, is enlarged, and is red-brown. The capsule is intact, and the consistency of the parenchyma is soft. The cut surface is smooth. There is chronic passive congestion. The gallbladder is present. The wall is thin and pliable. It contains a minimal amount of green liquid bile and no calculi. There is no obstruction or dilatation of the extra-hepatic ducts. The periportal lymph nodes are not enlarged.

COUNTY OF LOS ANGELES

DEPARTMENT OF CORONER

**AUTOPSY REPORT**

**12**

Page 7

No.

2008-07210

MIMS, CHRISTOPHER

URINARY SYSTEM:

The left kidney weighs 310 grams. The right kidney weighs 330 grams. The kidneys are normally situated, and the capsules strip easily revealing a surface that is focally pitted, light red and smooth. The corticomedullary demarcation is preserved. The pyramids are not remarkable. The peripelvic fat is not increased. The ureters are without dilatation or obstruction and pursue their normal course. The urinary bladder is contracted. It contains no urine.

GENITAL SYSTEM (MALE):

The prostate is without enlargement or nodularity. Both testes are in the scrotum and are unremarkable and without trauma.

HEMOLYMPHATIC SYSTEM:

The spleen weighs 220 grams and is slightly enlarged. The capsule is intact. The parenchyma is soft. There is no increased follicular pattern. Lymph nodes throughout the body are small and inconspicuous. There is focal enlargement of the lymph nodes observed in the peribronchial regions. The bone is not remarkable. The bone marrow of the rib is red, moist and unremarkable.

ENDOCRINE SYSTEM:

The thyroid gland is unremarkable. The parathyroid glands are not identified. The adrenal glands are unremarkable. The thymus gland is unremarkable. The pituitary gland is of normal size and is unremarkable.

SPECIAL SENSES:

The eyes are not dissected. The middle and inner ear are not dissected.

76A798P—Rev. 2/91

COUNTY OF LOS ANGELES

DEPARTMENT OF CORONER

# 12

## AUTOPSY REPORT

No.

2008-07210

MIMS, CHRISTOPHER

Page 8

HEAD AND CENTRAL NERVOUS SYSTEM:

There is no subcutaneous or subgaleal hemorrhage in the scalp.
The external periosteum and dura mater are stripped showing no
fractures of the calvarium or base of the skull. There are no
tears of the dura mater. There is no epidural, subdural or
subarachnoid hemorrhage. The fresh brain weighs 1440 grams.
The leptomeninges are thin and transparent. A normal
convolutional pattern is observed (see separate Neuropathology
Report to follow). Vessels at the base of the brain have a
normal pattern of distribution. There are no aneurysms. The
cranial nerves are intact, symmetrical and normal in size,
location and course. The cerebral arteries are without
arteriosclerosis.

See separate Neuropathology Report.

SPINAL CORD:

The entire cord is not dissected. The superior portion of the
cervical spinal cord is examined through the foramen magnum and
is unremarkable.

NEUROPATHOLOGY:

The brain is placed in formalin solution for further fixation
and later neuropathology consultation.

HISTOLOGIC SECTIONS:

Representative sections from various organs are preserved in one
storage jar in 10% formalin. Sections of heart, right and left
lungs, liver and spleen, kidneys, and dorsum of right foot skin
are submitted for slides. The slide key is #2008-07210: 1, 2,
3, 4, left ventricle of heart; 5, right ventricle of heart; 6,
right lung; 7, left lung; 8, liver and spleen; 9, right and left
kidneys; 10, dorsum of right foot and section of skin.

TOXICOLOGY:

Blood (heart and femoral), bile, liver tissue, stomach contents
and vitreous humor have been submitted to the laboratory. A
comprehensive screen is requested.

76A798P—Rev. 2/91

COUNTY OF LOS ANGELES

DEPARTMENT OF CORONER

**12**

# AUTOPSY REPORT

Page ___9___

No.

2008-07210

MIMS, CHRISTOPHER

PHOTOGRAPHY:

At-scene photos are available (34). Photographs have been taken during the course of the autopsy.

RADIOLOGY:

No x-rays are obtained.

WITNESSES:

None.

DIAGRAMS USED:

Diagram Form 20 was used during the performance of the autopsy. The diagram is not intended to be a facsimile.

OPINION:

This 38-year-old Black male died as a result of dilated cardiomyopathy. Hepatic steatosis and history of hypertension were contributory factors to his final demise.

Blood toxicology studies show a 0.11 g% alcohol femoral blood level. This is not a lethal level. The remainder of the toxicology studies show no drugs of abuse. A non-significant level of diphenhydramine is present. The vitreous fluid shows no evidence of diabetic ketoacidosis.

Alcohol abuse is strongly associated with the development of dilated cardiomyopathy, which may be a secondary nutritional disturbance or ethanol toxicity causing myocardial injury.

Based on the history and circumstances, as currently known, the manner of death is natural.

75A798P—Rev 2/91

COUNTY OF LOS ANGELES

DEPARTMENT OF CORONER

# 12
Page ___10___

# AUTOPSY REPORT

No.

2008-07210

MIMS, CHRISTOPHER

NOTE:

Dr. Christopher Rogers, Chief of Forensic Medicine Division,
reviewed the opinion and case and concurs.

_Louis A. Pena M.D._
LOUIS A. PENA, M.D.
DEPUTY MEDICAL EXAMINER

1-17-2009
DATE

LAP:am/jm:c
D-10/16/08-1900 hours
T-10/21/08

76A798P—Rev. 2/91

**-4619-**

COUNTY OF LOS ANGELES

DEPARTMENT OF CORONER



**20**

3:25pm

—Rigor

2008-07210
MINE, CHRISTOPHER
NAT  JP 10-16-08

341

eyes = corneal cloudin, congested

R

Teeth= own Frenulum Intact

Hair black short curly
slight frontal (receding) Hair line

L

Ear lobes pierced
Black mustache, Beard
Foam Red, Frothy mouth

No end of external trauma.

L                    R

purple fixed Livor + Tardieu Spots

Scaly psoriatic type skin lesions (arms)

Skin tags upper chest

Tattoo =
4 Cards A
Diamonds, spade,
Heart, clubes
Fat Doctor
men's face
green
Dark Hair
smiln
other Designs
ahead this)

Slight Red Fixed Livor

Tattoo
multicolored Tiger

Liver Temp Incision mark

Tardieu Balls of Steel (beaklian Leading Thigh)

O Rose Red.

Psoriasis type lesions on skin and fold arms

Tattoos:
Touch Als
4 Nails+III
Nails

Yellow Band matches CC# 2008-07210

Circumcised Penis testes ##

Nails short.
No trauma to hands, palms or Digits.

anus &

Tattoo
Tiger like Band Face and color

Numerous small old Scars, healed abrasions

Psoriatic type skin lesion scaly

Red scar 1½"

ELd Scars 2"

Scaly Hypopsoriatic skin
? psoriasis

Blue, white toe tags
matches Decedent's Name
& CC# 2008-07210

Legs/Dorsum feet swollen

10-16-2008

_____ M.D.
Deputy Medical Examiner

P5/93

COUNTY OF LOS ANGELES          **FORENSIC CONSULTANT'S REPORT**          DEPARTMENT OF CORONER

## 13

<u>NEUROPATHOLOGY</u>

2008-07210

MIMS, CHRISTOPHER E.

November 20, 2008

AGE:  38 years

DATE OF DEATH:  October 15, 2008

REFERRING DME:  Louis A. Pena, M.D.

CIRCUMSTANCES:

The following information is taken from the Investigator
Report and preliminary autopsy notes.  This 38-year-old man
reportedly had a past medical history of hypertension,
sports-related knee injuries, heavy smoking, and alcohol
abuse.  He was last known alive on 10/14/08 at 2230 hours,
reportedly complaining of labored breathing.  On 10/15/08, he
was found unresponsive on the bathroom floor by a friend.  He
was pronounced at the scene on 10/15/08 at 0935 hours by
responding paramedics.

At the time of postmortem examination on 10/16/08, the
findings included dilated cardiomyopathy (heart weight 1010
grams), pulmonary congestion and edema, hepatomegaly (3200
grams), marked obesity, and no evidence of acute trauma
including no scalp, skull or intracranial abnormality noted.
Brain weight at removal was 1440 grams.

GROSS DESCRIPTION:

Specimens available for examination are cranial dura mater
and brain.  Cranial dura mater submitted includes the dorsal
convexity regions with falx cerebri, posterior fossa with
tentorium cerebelli, and much of the right temporal fossa.
The external and internal surfaces of the dura mater are
smooth and shiny without evidence of hemorrhage,
discoloration or subdural neomembranes, the only exception
being a 0.8 x 0.5 x 0.4 cm light brown flattened nodule (0.4
cm in thickness) in the right anterolateral temporal fossa,
apparently within the dura.  It is sampled.  Dural venous
sinuses appear normal in pattern.

76FS89(Rev 8/93)

**13**

<u>NEUROPATHOLOGY</u>

2008-07210

MIMS, CHRISTOPHER E.

<u>Page 2</u>

Cerebral leptomeninges show mildly increased milky opacity
over the dorsolateral convexities, considered within normal
limits for age group. There is moderately severe
leptomeningeal vascular congestion. Cerebral hemispheres are
approximately symmetrical with a midline and closely apposed
interhemispheric fissure. There is no evidence of
significant brain swelling and no evidence of herniation at
the uncus, cerebellar tonsillar region, superior cerebellar
vermis or cingulate gyrus. There is some artifact present,
including partial avulsion of the inferomedial left
cerebellar hemisphere and deep incision into the right
anterior inferior cerebellar hemisphere. Convolutional
pattern is unremarkable. No recent or remote cerebral or
cerebellar cortical contusions are seen. No focal areas of
increased softening, firmness or discoloration are present.

Rectus-orbital and basitemporal areas are unremarkable.
Cranial nerves I through XII are intact except for avulsion
of olfactory bulbs bilaterally. Major basal arteries have a
normal pattern of distribution, discounting the absence of
the bilateral vertebral arteries, not included with the
specimen. The left posterior communicating artery is larger
than average, slightly exceeding the contribution to the left
posterior cerebral artery by basilar artery, thus consistent
with a fetal pattern. No aneurysms and no evidence of
occlusive vascular disease are apparent. Belly of the pons
is full and symmetrical, and medulla is remarkable only for
partial avulsion of the right medulla compared to the left.
Cerebellar hemispheres are approximately symmetrical with
normal-appearing folia. Basal cisterns are open.

The brain is sectioned in a coronal plane, and the brainstem
and cerebellum in a transverse plane.

76F389(Rev 8/93)

COUNTY OF LOS ANGELES      **FORENSIC CONSULTANT'S REPORT**      DEPARTMENT OF CORONER

**13**

<u>NEUROPATHOLOGY</u>

2008-07210

MIMS, CHRISTOPHER E.

December 3, 2008

MICROSCOPIC DESCRIPTION:

Sections of cranial dura mater and brain (8) stained by H&E
method include the right temporal fossa dural nodule (Slide
A), right frontal lobe (Slide B), left and right hippocampi
(Slides C and D, respectively), right basal ganglia (Slide
E), right parietal lobe (Slide F), cerebellum (Slide G), and
medulla (Slide H).

Slide A demonstrates native dura mater, with the expanded
zone composed of vascular channels and some ovoid pale
connective areas with a lace-like internal architecture. The
appearance is typical of a benign arachnoid villus. Some
leptomeningeal melanosis is incidentally noted in the brain
sections. In basal ganglia, some mild to moderate fine
granular calcification is noted in globus pallidus, primarily
in pericapillary areas and in the walls of some small blood
vessels. Mild autolysis is present in the sections.

There is no evidence of meningitis, encephalitis, abnormal
neuronal inclusions, developmental anomalies, hippocampal
sclerosis or neoplasia.

FINAL NEUROPATHOLOGIC DIAGNOSIS:

A.    Cerebrovascular congestion.

B.    Basal ganglia calcification, mild; incidental finding.


JOHN M. ANDREWS, M.D.                          DATE  12/9/08
DEPUTY MEDICAL EXAMINER
NEUROPATHOLOGY CONSULTANT

JMA:am/hg:c
T-12/04/08

76F389(Rev 8/93)

-4623-

COUNTY OF LOS ANGELES      **FORENSIC CONSULTANT'S REPORT**      DEPARTMENT OF CORONER

**13**

NEUROPATHOLOGY

2008-07210

MIMS, CHRISTOPHER E.

Page 3

Coronal sections reveal the cortical ribbon to be normal in thickness and color. Gray/white demarcation is distinct. Underlying white matter is homogeneous and clear. Corpus callosum is normal in thickness, color and symmetry. Lateral ventricles are normal in size and configuration with sharp superior angles. A cavum septi pellucidi is present anteriorly without fenestration of septum pellucidum. Third ventricle is midline and does not exceed 0.3 cm in maximum transverse diameter. Cerebral aqueduct and fourth ventricle are unremarkable. Choroid plexus is unremarkable bilaterally. Mammillary bodies and pineal body are grossly unremarkable. Substantia nigra is normally pigmented. Basal ganglia are normal in size, symmetry, contour and color. Amygdaloid complex of nuclei and hippocampi are grossly unremarkable.

Multiple transverse sections of the brainstem and cerebellum reveal no abnormality.

Selected areas are retained in storage. Representative sections are submitted for microscopic examination.

GROSS IMPRESSIONS:

A.   Adult cranial dura mater with small right middle fossa dural nodule.

B.   Cerebrovascular congestion.

C.   Otherwise, grossly unremarkable adult brain and coverings.


JOHN M. ANDREWS, M.D.                    12-3-08
DEPUTY MEDICAL EXAMINER                  DATE
NEUROPATHOLOGY CONSULTANT

JMA:am/hg:c
T-11/21/08

76F589(Rev 8/93)

-4624-

COUNTY OF LOS ANGELES   MICROSCOPIC REPORT   DEPARTMENT OF CORONER

**14**

I performed a microscopic examination on

DECEMBER 4, 2008 ➡

at   THE DEPARTMENT OF CORONER

Los Angeles, California

2008-07210

MIMS, CHRISTOPHER E.

## MICROSCOPIC DESCRIPTION

<u>Slides #1,2,3 and 4/10</u>: Sections of cardiac muscle show patchy areas of significant, severe interstitial fibrosis. There are focal areas of myocyte hypertrophy, myocyte attenuation, and myocyte fiber disarray. Slide #4 shows an adherent blood clot with fibrin, red cells and acute inflammation.

There is no acute or chronic myocarditis.

The trichrome stain confirms the abundant interstitial fibrosis, and one cross-section of the left anterior descending coronary artery shows minimal fibrointimal hyperplasia.

<u>Slide #5/10</u>: Section of unremarkable right ventricle.

<u>Slides #6 and #7/10</u>: Sections of lung show interstitial red blood cell congestion and pulmonary edema. Focal lung atelectasis is present. There are a few foreign body giant type cells and abundant alveolar macrophages. No pneumonia is observed. These sections are polarized and are unremarkable with some non- and refractile particles of nonspecific nature.

<u>Slide #8/10</u>: Section of liver with moderate steatosis. No cirrhosis is observed.

Section of autolyzed spleen with red blood cell congestion and numerous microvacuoles.

<u>Slide #9/10</u>: Sections of autolyzed kidney; otherwise, unremarkable.

76M350 (Rev. 1/93) P1/93

COUNTY OF LOS ANGELES                    MICROSCOPIC REPORT                    DEPARTMENT OF CORONER

# 14

2008-07210

MIMS, CHRISTOPHER E.

Page_____ 2

Slide #10/10:  Section of skin from the dorsum of the right foot with hyperkeratosis and subepidermal focal slight inflammation.

NOTE:  No sickled red blood cells are observed.


_____                    _____
LOUIS A. PENA, M.D.                                 DATE  1-17-2009
DEPUTY MEDICAL EXAMINER

LAP:am/brr:c/f
T-12/17/08

-4626-

COUNTY OF LOS ANGELES — AUTOPSY CHECK SHEET — DEPARTMENT OF CORONER

**16**

2008-07210    341
mims, christopher
LP 10-16-08

& Eunremark / none

**EXTERNAL EXAM**
Sex mle
Race black
Age 38 y. j.
Height 80"
Weight 456 pds
Hair b.curl
Eyes cornel cloudy
Sclera congested
Teeth own
Mouth
Tongue
Nose — septum Intact
Chest — Tardieu spots - positional
Breasts
Abdomen obese
Scar
Genitals circum ♂ testo ds
Edema — see diagram #20
Skin
Decubitus

**HEART** Wt. 1,0109
Dilated
Pericardium
Hypertrophy
Dilation
Muscle
Valves TV = 15cm, PV = 10cm, MV = 15cm, AV = 10cm
Coronaries
RV 0.4cm
LV 1.5cm
Septum 2.0cm
AORTA minimal Atherosclerosis
VESSELS — No pulmonary Embolo
LUNGS Wt.
R 10509
L 10309
Adhesions
Fluid
Atelectasis
Oedema — sev.
Congestion
Consolidation
Bronchi secretions
Nodes enlarged
PHARYNX
TRACHEA secretion
THYROID
THYMUS
LARYNX
HYOID
ABDOMINAL WALL FAT 8cm
CHEST WALL FAT 6cm

**PERITONEUM**
Fluid
Adhesions
LIVER Wt. 3200g chronic Hep.
Capsule Intact congestion
Lobules
Fibros
GB + minimal green Liquid Bile
Calculus
Bile ducts
SPLEEN Wt. 220 slight congestion
Color purple spleno megaly
Consistency soft
Capsule Intact
Malpigment
PANCREAS
ADRENALS
KIDNEYS Wt.
R 330g pitted, Pecalls
L 310g
Capsule Intact
Cortex
Vessels
Pelvis
Ureters
BLADDER contracted, No urine.
GENITALIA
Prostate
Testes & No trauma
Uterus ♂
Tubes
Ovaries
OESOPHAGUS
STOMACH — Contents 150ml green well-Dig foul, Liquid present
DUOD. & SM. INT. Soft green stool
APPENDIX +
LARGE INT. Soft green stool
ABDOM. NODES
SKELETON
Spine ext.
Marrow RB
Rib Cage
Long bones
Pelvis
No Fractures

SCALP
CALVARIUM
BRAIN Wt. 1440g
Dura
Fluid
Ventricles — see separate neuropath report
Vessels
Middle ears
Other
PITUITARY

SPINAL CORD
Sup. portion cervical
spinal cord

TOXICOLOGY SPECIMENS
blood - Heart, Fem -
Liver, Stomach, vitreous, Bile
SECTIONS FOR (10)
HISTOPATHOLOGY
1. 0 5. RV & Kidney
2. & R Lung 10. R. Dorsan Foot Skin
3. 7. Lung
& Liver, spleen ✓ Stock Jar
MICROBIOLOGY

DIAGRAMS #20
X-RAYS

OTHER PROCEDURES

GROSS IMPRESSIONS
See Adult Form #12
Dictated Report ①

| Date | Time | Deputy Medical Examiner |
|---|---|---|
| 10-16-2008 | 17:00 end | Louis A. Pena M.D. |

COUNTY OF LOS ANGELES        MEDICAL REPORT        DEPARTMENT OF CORONER

**15**

AUTOPSY CLASS: ☐ A ☒ B ☐ C    ☐ Examination Only D

Date 10-16-2008 Time 1525 Dr. Louis A. Peña

FINAL ON 12-11-2008 By Louis A. Peña
     print

APPROXI-
MATE
INTERVAL
BETWEEN
ONSET
AND
DEATH

2008-07210
MIMS, CHRISTOPHER

*H*
10-16-08

DEATH WAS CAUSED BY: (Enter only one cause per line for A, B, C, and D)
**IMMEDIATE CAUSE**

(A) Dilated Cardiomyopathy   ◀ yes

DUE TO, OR AS A CONSEQUENCE OF

(B)   ◀

DUE TO, OR AS A CONSEQUENCE OF

(C)   ◀

DUE TO, OR AS A CONSEQUENCE OF

(D)   ◀

Other conditions contributing but not related to the immediate cause of death:

Hepatic Steatosis, History of Hypertension

☒ **NATURAL**    ☐ **SUICIDE**    ☐ **HOMICIDE**

☐ **ACCIDENT**    ☐ **COULD NOT BE DETERMINED**

If other than natural causes
HOW DID INJURY OCCUR?

WAS OPERATION PERFORMED FOR ANY CONDITION STATED ABOVE: ☐YES ☒NO

TYPE SURGERY_____ DATE _____

☐ ORGAN PROCUREMENT    ☒ TECHNICIAN George Reid

☐ WITNESSES TO AUTOPSY    ☐ EVIDENCE RECOVERED AT AUTOPSY
     Item Description:

38 y.o. B.M H/o HTN.
Sports related knee Inj. ~ EtOH Abuse.
10-15-08 Fnd lying on BR floor unrespon.
at residence pronounced 0935am.
Appear a smoker, drank ~ 1 gal EtOH Vodka/day.
C/o Labored Breathing 10-14-08. LWA 10-14-08 2230.

Autopsy - Dilated "Cardiomyopathy" 1,010 grams
No CoR Art Disease. Hepatomeg S/w chronic Hep.
Cmg → CHF. In direct Myocard Dysfunct. HTN D Disorce
No P.E. No Evid. Ext/Int. Trauma. *(LP)*

10-16-2008
*Louis A. Peña*, M.D.

PRIOR EXAMINATION REVIEW BY DME
☒ BODY TAG *H*    ☐ CLOTHING
☐ X-RAY (No. 0 )    ☐ FLUORO
☐ SPECIAL    ☐ MED. RECORDS
PROCESSING TAG
☒ AT SCENE PHOTOS (No 34 *H*

TYPING BLOOD TAKEN BY_____
SOURCE _____

**TOXICOLOGY**

☐ NO BLOOD
   ☐ Embalmed
   ☐ >24 hr in hospital
   ☐ Decomposed
   ☐ Other _____
         Reason

**SPECIMENS**
Collected by Louis A. Peña
☒ HEART BLOOD    ☒ STOMACH CONT.
☒ FEMORAL BLOOD    ☐ BRAIN
☐ ____ BLOOD    ☐ SPLEEN
☐ ____ BLOOD    ☐ KIDNEY
☒ BILE    ☒ VITREOUS
☒ LIVER    ☐ ____
☒ URINE none    ☐ ____

**STORAGE JARS**
☒ Regular (No. 1 )    ☐ Oversize (No.___)
Histopath Cut: ☒ Autopsy ☐ Lab

☐ NO TOXICOLOGY REQUESTED

**TOXICOLOGICAL ANALYSES ORDERED**
SCREEN: ☒ C ☐ H ☐ T ☐ S
☐ ALCOHOL ONLY
☐ CARBON MONOXIDE
☐ NEOGEN SCREEN
☒ OTHER (specify drug and tissue)
Vitreous - glucose, Ketones *Thanks*
          *(LP)*

10 cassettes

**REQUESTED MATERIAL ON PENDING CASES**
☐ Police Report    ☐ Med History
☒ Tox    ☒ Histo
☐ Microbiology    ☐ Investigations
☐ Radiology Cons.    ☐ Eye Path. Cons
☐ Consult on
☒ Brain Submitted
☒ Neuro Consult ☐ DME to Cut
☐ Criminalistics
   ☐ GSR ☐ Sexual Assault ☐ Other

Resident _____    DME



Department of Coroner, County of Los Angeles

# FORENSIC SCIENCE LABORATORIES

**Laboratory Analysis Summary Report**



Friday, November 07, 2008

☑ PendingTox

**To:**  Dr. Pena

**Deputy Medical Examiner**

**Subject:**  **Coroner Case Number**  2008-07210   MIMS, CHRISTOPHER EDDIE

The following results have been technically and administratively reviewed and are the opinions and interpretations of the Analyst:

| SPECIMEN | SERVICE | DRUG | LEVEL | UNITS | ANALYST |
|---|---|---|---|---|---|
| **Blood, Femoral** | | | | | |
| | Alcohol | Ethanol | 0.11 | g% | M. Schuchardt |
| | Volatiles | Acetone | | ND | M. Schuchardt |
| **Blood, Heart** | | | | | |
| | Alcohol | Ethanol | 0.09 | g% | M. Schuchardt |
| | Barbiturate | Barbiturates | | ND | D. Kowal |
| | Bases | Diphenhydramine | < 0.50 | ug/ml | S. DeQuintana |
| | Cocaine | Cocaine and Metabolites | | ND | D. Kowal |
| | Fentanyl | Fentanyl | | ND | D. Kowal |
| | Methamphetamine | Methamphetamine | | ND | D. Kowal |
| | Opiates | Codeine | | ND | D. Kowal |
| | Opiates | Morphine | | ND | D. Kowal |
| | Phencyclidine | Phencyclidine | | ND | D. Kowal |
| | Volatiles | Acetone | | ND | M. Schuchardt |
| **Vitreous** | | | | | |
| | Alcohol | Ethanol | 0.14 | g% | M. Schuchardt |
| | Outside Test | Glucose | < 20 | mg/dl | NMS Labs, Inc. |
| | Volatiles | Acetone | | ND | M. Schuchardt |

Legend:

- - - - -

% Saturation

*

Done

| | |
|---|---|
| g | Grams |
| g% | Gram Percent |
| Inc. | Inconclusive |
| mEq/l | Milli equivalents |
| mg | Milligrams |
| mg/dl | Milligram per Deciliter |
| mg/l | Milligram per Liter |
| mmol/l | Millimoles per Liter |
| ND | Not Detected |
| Negative | |
| ng/gm | Nanograms per Gram |

| | |
|---|---|
| QNS | Quantity Not Sufficent |
| TNP | Test Not Performed |
| Trace | |
| ug | Micrograms |
| ug/g | Micrograms per Gram |
| ug/l | |
| ug/ml | Microgram per Milliliter |

dP
11-1306

Administratively reviewed by:  Daniel T. Anderson
**Supervising Criminalist II**
**FORENSIC LABORATORIES**

Page 1 of 2



Department of Coroner, County of Los Angeles
# FORENSIC SCIENCE LABORATORIES
**Laboratory Analysis Summary Report**



Friday, November 07, 2008

☑ PendingTox

**To:**     Dr. Pena
          **Deputy Medical Examiner**

**Subject:**   **Coroner Case Number**   2008-07210   MIMS, CHRISTOPHER EDDIE

The following results have been technically and administratively reviewed and are the opinions and interpretations of the Analyst:

| SPECIMEN | SERVICE | DRUG | LEVEL | UNITS | ANALYST |
|----------|---------|------|-------|-------|---------|

**Legend:**

- - - - -
% Saturation
*
Done

| | |
|---|---|
| g | Grams |
| g% | Gram Percent |
| Inc. | Inconclusive |
| mEq/l | Milli equivalents |
| mg | Milligrams |
| mg/dl | Milligram per Deciliter |
| mg/l | Milligram per Liter |
| mmol/l | Millimoles per Liter |
| ND | Not Detected |
| Negative | |
| ng/gm | Nanograms per Gram |

| | |
|---|---|
| QNS | Quantity Not Sufficent |
| TNP | Test Not Performed |
| Trace | |
| ug | Micrograms |
| ug/g | Micrograms per Gram |
| ug/l | |
| ug/ml | Microgram per Milliliter |

Administratively reviewed by:   Daniel T. Anderson
                               Supervising Criminalist II
                               FORENSIC LABORATORIES

Page 2 of 2

B Peña

COUNTY OF LOS ANGELES

**CASE REPORT** EDRS# 916134

DEPARTMENT OF CORONER

| | APPARENT MODE | NATURAL | | CASE NO. |
|---|---|---|---|---|
| **1** | | | | 2008-07210 |
| | SPECIAL CIRCUMSTANCES | | | CRYPT |
| | Media Interest | | | 341 |

| LAST, FIRST MIDDLE | | AKA | # |
|---|---|---|---|
| MIMS, CHRISTOPHER EDDIE | | | |

| ADDRESS | | | CITY | | | | | STATE | ZIP |
|---|---|---|---|---|---|---|---|---|---|
| | | | LOS ANGELES | | | | | CA | 90017 |

| SEX | RACE APPEARS | DOB | AGE | HGT | WGT | EYES | HAIR | TEETH | FACIAL HAIR | ID VIEW | CONDITION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| MALE | BLACK | 1970 | 38 | 80 in. | 456 lbs. | BROWN | BLACK | ALL NATURAL TEETH | BEARD AND MUSTACHE | Yes | FAIR |

| MARK TYPE | MARK LOCATION | MARK DESCRIPTION |
|---|---|---|
| TATTOO | LEFT ARM | "BALLS OF STEEL" |
| TATTOO | RIGHT ARM | "TOUGH AS NAILS" |
| SCAR , | BOTH KNEES | HEALED SCARS |
| TATTOO | LEFT ARM | "FAT DOCTOR" |

| NOK | | ADDRESS | | CITY | STATE | ZIP |
|---|---|---|---|---|---|---|
| | | | | | | |

| RELATIONSHIP | PHONE | NOTIFIED BY | DATE | TIME |
|---|---|---|---|---|
| SEE CASE NOTES | | | | 00:00 |

| SSN | DL ID | STATE CA | PENDING BY |
|---|---|---|---|

| ID METHOD |
|---|
| VISUALLY AT SCENE |

| LA # | MAIN # | CII # | FBI # | MILITARY # | POB |
|---|---|---|---|---|---|
| 2020867M | 04072535 | | | | |

| IDENTIFIED BY NAME (PRINT) | RELATIONSHIP | PHONE | DATE | TIME |
|---|---|---|---|---|
| LAHOMA GRIFFIN | EX-WIFE | (562) 313-3666 | 10/15/2008 | 13:06 |

| PLACE OF DEATH / PLACE FOUND | ADDRESS OR LOCATION | CITY | ZIP |
|---|---|---|---|
| RESIDENCE | | LOS ANGELES | 90017 |

| PLACE OF INJURY | AT WORK No | DATE | TIME | LOCATION OR ADDRESS | ZIP |
|---|---|---|---|---|---|

| DOD | TIME | FOUND OR PRONOUNCED BY |
|---|---|---|
| 10/15/2008 | 09:35 | LAPD # 3 |

| OTHER AGENCY INV. OFFICER | PHONE | REPORT NO. | NOTIFIED BY | NO |
|---|---|---|---|---|
| LAPD CENTRAL - SUVIATE/ MILLER | (213) 485-3294 | | | |

| TRANSPORTED BY | TO | DATE | TIME |
|---|---|---|---|
| RAMIRO GONZALEZ JR. | LOS ANGELES FSC | 10/15/2008 | 13:55 |

| FINGERPRINTS? | Yes | CLOTHING | Yes | PA RPT | No | MORTUARY | |
|---|---|---|---|---|---|---|---|
| MED. EV. | Yes | INVEST. PHOTO # | 34 | SEAL TYPE | CORONER SEAL | HOSP RPT | No |
| PHYS. EV. | No | EVIDENCE LOG | Yes | PROPERTY? | Yes | HOSP CHART | No |
| SUICIDE NOTE | No | GSR NO | | RCPT. NO. | 233635 | PF NO. | |

SYNOPSIS
ACCORDING TO THE REPORTED INFORMATION, THE DECEDENT WAS A 38 YEAR OLD BLACK MALE WITH A HISTORY OF HYPERTENSION, SPORTS RELATED KNEE INJURIES, AND ALCOHOL ABUSE. ON 10/15/08 AT 0900 HOURS, THE DECEDENT WAS FOUND LYING ON THE BATHROOM FLOOR, UNRESPONSIVE. 911 WAS CALLED AND LOS ANGELES FIRE DEPARTMENT #3 RESPONDED TO THE SCENE AND DETERMINED DEATH ON 10/15/08 AT 0935 HOURS. DECEDENT APPARENTLY SMOKED TOBACCO HEAVILY AND DRANK ABOUT 1 GALLON OF VODKA DAILY. DECEDENT COMPLAINED OF LABORED BREATHING ON 10/14/08, THE DECEDENT WAS LAST SEEN ALIVE ON 10/14/08 AT 2230 HOURS BY FRIEND. NO FOUL PLAY SUSPECTED.

| LYDIA GRANADO-MATA | | DATE | 10/15/2008 | REVIEWED BY | DATE | 10/15/08 |
|---|---|---|---|---|---|---|
| S16235 | L Granado mata | TIME | 17:05 | Yagerleuer | TIME | 2013 |
| | INVESTIGATOR | | | | | |

FORM #3 NARRATIVE TO FOLLOW? ☑



**County of Los Angeles, Department of Coroner**
**Investigator's Narrative**



Case Number: 2008-07210                    Decedent: MIMS, CHRISTOPHER EDDIE

## Information Sources:

1. LAPD Central Division, Officer Suviate #35743 & Miller #39293. 213-485-3294.

## Investigation:

On 10/15/08 at 1039 hours, Officer Miller of LAPD Central Division reported this apparent natural death. On 10/15/08 at 1107 hours, I was assigned this field call. I arrived on scene at 1158 hours and departed at 1326 hours. No foul play suspected. The apartment was secured with a coroner seal.

## Location:

The death occurred at a residence, ████████████████ Los Angeles, CA 90017.

## Informant/Witness Statements:

According to the information obtained from Officer Suviate and Miller, the decedent was last seen alive on 10/14/08 at 2230 hours and apparently complained of labored breathing. On 10/15/08 at about 0900 hours, the decedent was found unresponsive on the bathroom floor by a friend. 911 was dialed and Los Angeles Fire Department responded to the scene and determined death at 0935 hours. Per officers, the decedent abused alcohol, drinking about 1 gallon of vodka daily. The decedent reportedly drank to the point of passing out and when he would wake, would continue to drink. The decedent also smoked heavily, going through about 1 pack of cigarettes daily. The decedent's medical history included hypertension and a knee surgery about 7 months ago.

## Scene Description:

The scene was an apartment at the above listed location. The apartment appeared dirty, cluttered, and unkempt. Several medication bottles were located on the kitchen cabinet. Two large bottles of vodka were noted on top of the refrigerator and appeared empty. The decedent was located in the bathroom. The bathroom appeared dirty and contained several large duffle bags. The scene appeared to be void of any illicit drugs and drug paraphernalia.

## Evidence:

On 10/15/08 at 1221 hours, I collected several prescription medication bottles from the scene. I booked the items as evidence at the FSC.

## Body Examination:

The decedent appeared to be a 38 year old Black male. He was observed lying prone on wooden floor inside the bathroom. His arms were bent up at the elbow with his hands closed and resting near his head and his right leg straight with the left leg bent at the knee and turned out at the hip. A brown towel was noted under his head and appeared to be soiled with bloody, frothy purge. He appeared to be dressed in a blue shirt and blue underwear. He appeared to have black hair, brown eyes, beard and mustache and apparent natural teeth. The following tattoos were noted: right arm-"TOUGH AS NAILS", nails with the initials "C. MIMS", right arm- cougar, right wrist-tribal band, left arm-"FAT DOCTOR", "A" playing cards, male face, left arm- "BALLS OF STEEL." I observed healed scars to the knees, abdomen, back, and feet. No petechiea was noted. Lesions/ wounds were noted to the left calf, right shin, and lower right calf. No trauma was noted. On 10/15/08 at 1231 hours, rigor mortis was rated 3 throughout; and at 1234 hours, livor mortis appeared fixed and consistent with the position found. The ambient temperature on 10/15/08 at 1225 hours was 72.3 degrees F, and algor mortis was 101.2 degrees F at 0830 hours 1236 hours.

 

**County of Los Angeles, Department of Coroner
Investigator's Narrative**

Case Number: 2008-07210                    Decedent: MIMS, CHRISTOPHER EDDIE

### Identification:

On 10/15/08 at 1306 hours, ████████████ visually identified the decedent as Mims, Christopher Eddie.

### Next of Kin Notification:

Please see case notes.

### Tissue Donation:

At the completion of this report, family did not give permission for tissue donations.

### Autopsy Notification:

There is no request for autopsy notification regarding this particular case.

*L. Granado-Mata*                          *Kelly Yagerlener*

LYDIA GRANADO-MATA        516235        LARRY DIETZ

10/15/2008

_____

Date of Report

COUNTY OF LOS ANGELES     **PRELIMINARY EXAMINATION REPORT - FIELD**     DEPARTMENT OF CORONER

## 6

WAS ORIGINAL SCENE DISTURBED BY OTHERS? Y [ ]  N [X]
IF YES, NOTE CHANGES IN NARRATIVE FORM #3.
DATE _____ 10/15/2008 _____

| | | | |
|---|---|---|---|
| AMBIENT #1 | 72.3 F | TIME | 12:25 |
| AMBIENT #2 | F | TIME | |
| WATER | F | TIME | |
| LIVER TEMPERATURE #1 | 101.2 F | TIME | 12:36 |
| LIVER TEMPERATURE #2 | F | TIME | |

**2008-07210**

**MIMS, CHRISTOPHER EDDIE**
Nat
**DOD- 10/15/2008**

THERMOMETER #____ 07-17 ____

DATE & TIME FOUND ____ 10/15/2008 @ 9:00 ____     LAST KNOWN ALIVE ____ 10/14/2008 @ 22:30 ____

APPROX. AGE _38_ SEX _Male_ EST. HEIGHT _80_ EST. WEIGHT _456_ CLOTHED ? YES [X] NO [ ] IF YES, DESCRIBE:
Blue Shirt, Blue Underwear

DESCRIPTION AS TO WHERE REMAINS FOUND AND CONTACT MATERIAL TO BODY:
Prone on wood floor

SCENE TEMPERATURE REGULATED? YES [ ]   NO [X] IF YES, THERMOSTAT SET AT _____ DEGREES F.

LIVOR MORTIS: TIME OBSERVED _12:34_     RIGOR MORTIS: TIME OBSERVED ____ 12:31 ____

NECK FLEXION:

| | |
|---|---|
| ANTERIOR | 3 |
| POSTERIOR | 3 |
| RT. LATERAL | 3 |
| LT. LATERAL | 3 |

| | | | |
|---|---|---|---|
| JAW | 3 | HIP | 3 |
| SHOULDER | 3 | KNEE | 3 |
| ELBOW | 3 | ANKLE | 3 |
| WRIST | 3 | | |

SCALE
0 = ABSENT / NEGATIVE
1 +
2 +
3 +
4 = EXTREME DEGREE

USE SCALE TO DESCRIBE INTENSITY OF RIGOR

SHADE DIAGRAMS TO ILLUSTRATE THE LOCATION OF LIVOR MORTIS.

DESCRIBE INTENSITY OF COLORATION AND WHETHER LIVOR MORTIS IS PERMANENT OR BLANCHES UNDER PRESSURE

Appeared fixed and consistent with position found.

**L. Granado-Mata # 516235**

Investigator     REVIEWED BY:

NOTE: ALL DATA COLLECTED FOR THIS FORM MUST BE COLLECTED AT SCENE.

COUNTY OF LOS ANGELES

MEDICAL EVIDENCE

DEPARTMENT OF CORONER

**3A**

CASE # 2008-07210
DECEDENT'S NAME: MIMS, CHRISTOPHER EDDIE
DOD: 10/15/2008
INCOMING MODE:

Page 1 of 1

| Drug Name | Rx Number | Date of Issue | Number Issued | Number Remaining | Form | Dosage | Rx Directions | Physician | Pharmacy Phone/ Comments |
|---|---|---|---|---|---|---|---|---|---|
| ALLOPURINOL | 06383 01468 | 9/30/2008 | 30 | 19 | TABLET | 300 MG | 1 TAB DAILY | KALPARI, KAMRAN | RITE AID 213-494-1762 |
| ATENOLOL | 06383 01395 | 7/25/2008 | 90 | 14 | TABLET | 100 MG | 1 TAB DAILY | KALPARI, KAMRAN | RITE AID 213-494-1762 |
| BAYER ASPIRIN | | | 100 | 40 | TABLET | 325 MG | 1-2 TABS EVERY 4 HRS | | OTC MED |
| DIOVAN | | | 7 | 0 | TABLET | 320 MG/25 MG | | | SAMPLE BOTTLE |
| INDOMETHACIN | 05785 05748 | 2/1/2008 | 40 | 3 | CAPSULE | 50 MG | 1 CAP 4X DAILY | KALPARI, KAMRAN | RITE AID 213-494-1762 |
| LOTREL | 06383 01383 | 9/30/2008 | 14 | 0 | CAPSULE | 10-40 MG | 1 CAP DAILY | KALPARI, KAMRAN | RITE AID 213-494-1762 |
| NEXIUM | 063836 0144 | 10/6/2008 | 5 | 0 | CAPSULE | 40 MG | 1 CAP DAILY | KALPARI, KAMRAN | RITE AID 213-494-1762 |
| TYLENOL PM | | | 24 | 0 | TABLET | 500 MG/25 MG | 2 CAPLETS @ BEDTIME | | OTC MED |
| | | | | | | | | | |
| | | | | | | | | | |

**Paraphernalia Description**

(1) UNLABELED RX BOTTLE CONTAINING 53 CLEAR GEL CAPS; (2) CEPHALEXIN, 250 MG- ORANGE CAPSULES WITH "93 3147", (2) VALSARTAN, 320 MG- GRAY TEAR DROP SHAPED TABLET WITH "NVR" ON ONE SIDE & "DXL" ON OTHER SIDE.

Investigator: LYDIA GRANADO-MATA (516235

Date: 10/15/2008

-4635-



# NFL CONCUSSION SETTLEMENT

*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*

No. 2:12-md-02323 (E.D. Pa.)

## NOTICE OF REQUEST FOR ADDITIONAL DOCUMENTS

**DATE OF NOTICE: February 20, 2019**

**RESPONSE DEADLINE: June 20, 2019**

### I. SETTLEMENT CLASS MEMBER INFORMATION

| | |
|---|---|
| **Settlement Program ID** | 950013395 |

| **Name:** | First<br>Carleen | M.I. | Last<br>Hastings |
|---|---|---|---|

| | |
|---|---|
| **Settlement Class Member Type** | Representative Claimant |
| **Primary Counsel** | O'Hanlon, Demerath & Castillo |

| **Asserted Qualifying Diagnosis** | Death with CTE (Chronic Traumatic Encephalopathy) | **Date of Asserted Qualifying Diagnosis** | 10/15/08 |
|---|---|---|---|

### II. EXPLANATION OF REQUEST(S)

This Notice is an official communication from the Claims Administrator for the NFL Concussion Settlement Program. Your Claim Package is missing documents or information.

This Notice explains what is missing and what you may do to address the issue. We can help if you have questions. To cure the issues identified in this Notice, click the Respond to Request for Additional Documents button on your secure online portal and follow the instructions provided to upload the information identified below. If you already have provided us with the missing information, let us know because we may have received it after conducting the review that generated this notice.

The following requires attention before we can act further:

| | **What is Missing** | **How to Address this Item** |
|---|---|---|
| **1.** | You have not submitted any medical records reflecting the Qualifying Diagnosis. | Click the Respond button, go to Section 3 for Medical Records, click on the Upload Medical Records button and follow the instructions to upload medical records reflecting the Qualifying Diagnosis. |

### III. ADDITIONAL EXPLANATION OF WHAT IS MISSING

The medical records must show a post-mortem diagnosis of CTE made before April 22, 2015 (the Final Approval Date) by a board-certified neuropathologist for a Retired NFL Football Player who died before April 22, 2015. See Section 6.3 (f) of the Settlement Agreement and FAQ 109. Mr. Mims died on October 15, 2008, and the October 16, 2008 autopsy report signed by Louis A. Pena does not reference CTE and neither does the death certificate. You provided an undated letter from Dr. Ronald L. Hamilton who diagnosed Mr. Mims with CTE. You must establish that Dr. Hamilton reviewed Mr Mim's brain tissue and made a CTE diagnosis on or before April 22, 2015.

### IV. HOW TO RESPOND TO THIS NOTICE

You have 120 days to respond to this Notice and provide the missing information or documents. **We encourage you to gather the requested information or documents now and respond to this Notice promptly, rather than using the full 120 days allowed to answer. The sooner you respond, the sooner your claim can move forward in the review process.**

By the Response Deadline stated above, send us the missing information or documents identified in Section II. We will wait the full 120 days to re-review your claim, unless you click the Submit Claim Package for Review button to confirm that your response is complete and we may continue to review your claim. If you do not respond in full on or before the Response Deadline, we will have to assess your claim based on the materials we have, which could lead to a lower Monetary Award or denial of your claim in its entirety.

Submit the requested information using your secure online portal to upload additional documents.

## V. How to Contact Us with Questions or for Help

If you are represented by a lawyer, consult with your lawyer if you have questions or need assistance. If you are unrepresented and have any questions about this Notice or need help, contact us at 1-855-887-3485 or send an email to ClaimsAdministrator@NFLConcussionSettlement.com. If you are a lawyer, call or email your designated Firm Contact for assistance. For more information about the Settlement program, visit the official website at www.NFLConcussionSettlement.com to read the Frequently Asked Questions or download a copy of the complete Settlement Agreement.



**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| | § | |
| IN RE: NATIONAL FOOTBALL | § | No. 2:12-md-02323-AB |
| LEAGUE PLAYERS' CONCUSSION | § | |
| INJURY LITIGATION | § | MDL No. 2323 |
| | § | |
| | § | **Hon. Anita B. Brody** |
| THIS DOCUMENT RELATES TO: | § | |
| Settlement Class Member Carleen Hastings | § | |
| (SPID 950013395) | § | |

**WRITTEN STATEMENT IN SUPPORT OF CLASS MEMBER'S APPEAL
OF THE CLAIMS ADMINISTRATOR'S NOTICE OF DENIAL OF
MONETARY AWARD CLAIM**

Class Member Carleen Hastings, by and through counsel, files this written statement in support of this appeal and respectfully requests that the Claims Administrator's denial of this claim be reversed and remanded for a calculation of the Class Member's Monetary Award. The Claims Administrator erred in making two erroneous legal conclusions and one erroneous factual determination.

First, the Claims Administrator erred in concluding that the Amended Settlement Agreement required Class Member to submit proof that the board-certified neuropathologist who provided a post-mortem diagnosis of CTE made the diagnosis on or before 4/22/15.[1]

Second, the Claims Administrator erred in concluding that the Amended Settlement Agreement required the board-certified neuropathologist who provided the CTE diagnosis for this claim to also "confirm" his CTE diagnosis by examining the Player's brain tissue. The Amended

---

[1]    If the Amended Settlement Agreement [ECF 6481] is construed to require a diagnosis on or before 4/22/15, Class Member reserves the right to seek relief from the Court pursuant to both Rule 60 and the Court's inherent authority to amend the judgment in this case in order to implement the settlement.

Settlement Agreement requires a post-mortem diagnosis of CTE by a board-certified neuropathologist; it does not require any additional "confirmation" of the diagnosis by the board-certified neuropathologist.

Third, the Claims Administrator erred in concluding that there is no proof that Dr. Hamilton "personally performed the post-mortem exam on the Retired Player." Dr. Hamilton did personally review brain tissue from the Retired Player as he states in his letter.

### **SUPPORTING EVIDENCE**[2]

| Exhibit 1 | Notice of Denial of Monetary Award Claim |
|---|---|
| Exhibit 2 | Relevant Excerpts from Class Member's Claim Package |
| Exhibit 3 | Notice of Request for Additional Documents |

---

[2] Class Member also incorporates by reference the following documents that have been filed in this MDL or published on the Settlement Website:

(1) Original Settlement Agreement [ECF 6073-2];

(2) the Amended Settlement Agreement [ECF 6481];

(3) Absent Class Member and Plaintiff Yvonne Sagapolutele's Motion to Modify the Amended Final Order and Judgment [ECF 6534] by Conforming the Definition of "Death with CTE" to the Version Contemplated in the Fairness Hearing Order [ECF 6479] and Noticed to the Class in the Long Form Notice [ECF 6093-1] and Summary Notice [ECF 6093-2] Pursuant to Rule 60 and the Authority Retained in the Settlement Agreement [ECF 8263] ("Motion to Modify");

(4) Response in Opposition to the Motion to Modify [ECF 8430];

(5) Statement of Co-Lead Counsel in Opposition to the Motion to Modify [ECF 8431];

(6) Reply in Support of Motion to Modify [ECF 8442];

(7) Notice of Joinder [ECF 8443];

## BACKGROUND

Class Member submitted a claim package that included a post-mortem diagnosis of Chronic Traumatic Encephalopathy ("CTE") made by a board-certified neuropathologist after personally reviewing the Retired Player's brain tissue.[3]  Class Member's submitted claim package also includes documentation showing that the Player died prior to April 22, 2015.[4]

Despite the documentation in the claim package, the Claims Administrator denied Class Member's Monetary Award Claim for the following reason:[5]

> Section 6.3(f) of the Settlement Agreement allows a CTE diagnosis if: (1) the Retired Player died before 4/22/15, and (2) there was a post-mortem diagnosis of CTE made by a board-certified neuropathologist prior to 4/22/15.  Although Dr. Hamilton is a board-certified neuropathologist and signed a Pre-Effective Date Diagnosing Physician Certification Form indicating a CTE diagnosis, we must have proof that he personally performed the post-mortem exam on the Retired Player and that it was done on or before 4/22/15.  There was no post-mortem examination report submitted to indicate that Dr. Hamilton examined the Retired Player's brain tissue to confirm a CTE diagnosis.  The two-page letter provided by Dr. Hamilton does not satisfy the requirements for a CTE diagnosis under this Settlement Program.  For these reasons, this claim is denied.

Class Member has timely filed this appeal of the Claims Administrator's Notice of Denial of Monetary Award Claim.

---

(8) Order denying, without prejudice, the Motion to Modify [ECF 8557];

(9) Posted Settlement Program FAQs (as of February 19, 2019); and

(10) Posted Settlement Program FAQs (as of July 8, 2019).

[3]   Exhibit 2.

[4]   *Id.*

[5]   Exhibit 1.

**<u>ARGUMENTS</u>**

The Claims Administrator denied Class Member's claim for two reasons: (1) the claim package does not show that Dr. Hamilton (a board-certified neuropathologist) made the post-mortem diagnosis of CTE prior to 4/22/2015; and (2) Dr. Hamilton's report does not "indicate that [he] examined the Retired Player's brain tissue to confirm a CTE diagnosis." Neither reason merits denial of this claim as a matter of law. *And as a factual matter, Dr. Hamilton's report <u>does</u> indicate that he examined the Retired Player's brain tissue.*

## I.    The Claims Administrator erred in concluding that the CTE Diagnosis was not timely.

The Claims Administrator's first reason for denying the claim package is legally flawed in two respects. First, the diagnosis date for Death with CTE is the date of the Player's death, even if the diagnosis occurs later. Second, if the Amended Settlement Agreement [ECF 6481] does require that the diagnosis be made prior to 4/22/2015, this requirement violates Class Member's rights because it was not contained in the Original Settlement Agreement [ECF 6073-20] and was added (1) despite the Court's instructions that any changes to the Original Settlement Agreement should make it *more* favorable, not *less* favorable, to class members; (2) without notice to Class Member; and (3) after Class Member's opt-out deadline had already passed.

### A.  The diagnosis date for Death with CTE is the date of the Player's death.

The Claims Administrator has posted several versions of "Posted Settlement Program FAQs" on the Settlement Website with answers to frequently asked questions. All of the content in the Posted Settlement Program FAQs is subject to advance approval by Counsel for the NFL Parties.[6]

---

[6]    *See* Amended Settlement Agreement § 4.1(a).

According to FAQ 93 in these Posted Settlement Program FAQs, the diagnosis date for Death with CTE is the date of the Player's death, even though the diagnosis is not made until after the Player dies:[7]

> **93. How is the date of a Qualifying Diagnosis determined?**
>
> The physician making a Qualifying Diagnosis of a Retired NFL Football Player must determine and verify the date on which that Qualifying Diagnosis was made. This date is important under the Settlement Agreement. It affects the amount of a Monetary Award, because the younger a Player is at the time of the Qualifying Diagnosis, the larger the award.
>
> The diagnosing physician uses his or her professional medical judgment in deciding when the Player had the conditions amounting to a Qualifying Diagnosis under Exhibit 1 to the Settlement Agreement. There are some basic rules about this:
>
> > (a) *Death with CTE*: For these claims, the date of the Qualifying Diagnosis is the date of the Player's death, even though the diagnosis is not made until after the Player dies. The Monetary Award is based on the Player's age when he died.

Based on the Claims Administrator's representations to the class members that the date of the Qualifying Diagnosis for Death with CTE is the date of the Player's death, the only date that is relevant in determining the date of a Qualifying Diagnosis for Death with CTE is the date of the Player's death. The Claims Administrator's insistence on proof that the diagnosis "was done on or before 4/22/15" ignores these representations, which establish that the date of the Player's death is the date of the Qualifying Diagnosis.

Here, the claim package establishes that the Player's death occurred before April 22, 2015. Accordingly, the date of the Qualifying Diagnosis is before April 22, 2015, and the Claims Administrator erred in denying this claim.

---

[7]    This language is from the Posted Settlement Program FAQs (as of February 19, 2019). Since this claim package was submitted, a new version of the FAQs have been published on the Settlement Website in the Posted Settlement Program FAQs (as of July 8, 2019). The language in FAQ 93 is unchanged in the new version of Posted Settlement Program FAQs; it has merely been moved to FAQ 99.

**B. In the alternative, if this Denial is based on language that was surreptitiously added to the Settlement Agreement putatively imposing a deadline for a Qualifying Diagnosis for Death with CTE, the Denial must be reversed.**

The Court has previously considered a Motion to Modify the Amended Final Order and Judgment [ECF 8263] and denied the motion without prejudice to a consideration of the issues in that motion at a later time.[8]  In that motion, Class Member Yvonne Sagapolutele brought the Court's attention to the fact that although the Original Settlement Agreement contained no deadline for obtaining a Death with CTE Diagnosis, language appears to have been surreptitiously added to the Amended Settlement Agreement that could be read to have added a diagnosis deadline without notice to the Court or to the class members.[9]  The motion sought relief under both Rule 60 and the Court's inherent authority to implement the settlement by amending the Court's judgment.[10]

The Court denied the motion without prejudice and stated that before it would consider the "extraordinary action of modifying the Settlement Agreement," class members must first submit a claim to the Claims Administrator.[11]

If the Special Master concludes that the Amended Settlement Agreement does require Class Member to have obtained a CTE diagnosis prior to April 22, 2015 despite the contrary language in the Posted Settlement Program FAQs and in other notices, it does not appear that the Special

---

[8]    *See* Order [ECF 8557]

[9]    Motion to Modify [ECF 8263]

[10]    *Id.*

[11]    Order [ECF 8557]

Master would have the necessary authority to provide a remedy.[12]  To the extent the Special

Master may have the authority to provide a remedy, Class Member incorporates by reference the

arguments in the Motion to Modify [ECF 8263].  If the denial of this claim is not reversed, Class

Member expressly reserves the right to seek appropriate relief from the Court under Rule 60 and

under the Court's inherent authority to implement the settlement by amending the Court's

judgment.

## II.    The Claims Administrator erred in requiring that the board-certified neuropathologist "confirm" his CTE Diagnosis.

The Claims Administrator also states that the denial of this claim is based on the lack of

evidence that "Dr. Hamilton examined the Retired Player's brain tissue to confirm a CTE

diagnosis."  But there is no requirement in the Amended Settlement Agreement that a board-

certified neuropathologist "confirm his diagnosis."[13]  The Amended Settlement Agreement simply

requires a diagnosis.[14]

If the Parties to the settlement in this case had intended to impose a requirement that a CTE

diagnosis be confirmed by an examination of the Player's brain tissue, the parties could have

included that requirement in the settlement agreement.  Regarding other diagnoses, the Parties

agreed to specific and detailed procedures for reviewing and confirming the diagnoses.[15]  But for

---

[12]  *See* Order [ECF 6871] (providing Special Masters with the authority to faithfully oversee the implementation and administration of the Settlement Agreement); *see also* Motion to Modify [ECF 8263] (seeking relief under Rule 60).

[13]  *See* Amended Settlement Agreement [ECF 6481] § 6.4(f).

[14]  *See id.*

[15]  *See id.* §§ 5.1–5.14 (creating the Baseline Assessment Program and exempting Death with CTE from the program), § 6.3(a)–(e) (requiring that certain diagnoses, other than Death with CTE, be made by

Death with CTE diagnoses, the Amended Settlement Agreement simply requires "a post-mortem diagnosis made by a board-certified neuropathologist."[16]  Dr. Hamilton is one of only a handful of board-certified neuropathologists in the United States, and he has provided a post-mortem diagnosis that this Player "had CTE on his date of death."[17]

The Claims Administrator erred by imposing an arbitrary requirement that Dr. Hamilton confirm his diagnosis by examining the Player's brain tissue.  Adding this arbitrary requirement ignores the terms of the Amended Settlement Agreement and violates due process.

## III.    The Claims Administrator erred in stating that Dr. Hamilton did not examine the Player's brain tissue.

The Claims Administrator's denial of this claim is based on the purported lack of evidence that "Dr. Hamilton examined the Retired Player's brain tissue to confirm a CTE diagnosis" is also erroneous because Dr. Hamilton *did* examine the Retired Player's brain tissue to confirm the CTE diagnosis.

Dr. Hamilton's letter states: "I have conducted a study of Christopher Mims' brain tissue." Dr. Hamilton further states that he received "180 unstained tissue sections on glass slides" and examined stained recuts of brain tissue from the dura mater, cerebral cortex, hippocampus, insular cortex, putamen, globulus pallidus, thalamus, cerebellum cortex, dentate nucleus, and medulla.[18] Based, in part, on his review of the brain tissue, Dr. Hamilton concluded that his "findings are

---

certain physicians on an approved list), Exhibit 2 to the Amended Settlement Agreement (providing standardized neuropsychological testing protocols for determining certain diagnoses).

[16]    *See* Amended Settlement Agreement [ECF 6481] § 6.4(f).

[17]    Exhibit 2.

[18]    *See id.*

diagnostic of CTE." [19]

The Claims Administrator erred in stating that there is no evidence that "Dr. Hamilton examined the Retired Player's brain tissue to confirm a CTE diagnosis." Dr. Hamilton's letter clearly establishes that he examined the Retired Player's brain tissue to confirm the CTE diagnosis.

### CONCLUSION

For all of the foregoing reasons, Class Member respectfully requests that the Special Master reverse the Claims Administrator's denial of this Monetary Award Claim and remand to the Claims Administrator for a calculation of the Monetary Award.

Dated:  August 28, 2019

Respectfully Submitted:

/s/ Justin Demerath

**Justin Demerath**
Texas State Bar No. 24034415
**David Campbell**
Texas State Bar No. 24057033
O'HANLON, DEMERATH & CASTILLO
808 West Avenue | Austin, TX 78701
Tel: (512) 494-9949 | Fax: (512) 494-9919
jdemerath@808west.com
dcampbell@808west.com

**Counsel for Class Member**

---

[19]  *See id.*

## <u>CERTIFICATE OF SERVICE</u>

It is hereby certified that a true copy of the foregoing document was submitted on the Court Portal on the 28th day of August, 2019.

<div align="right">

<u>/s/ Justin B. Demerath</u>
Justin B. Demerath

</div>

## NFL Parties' Opposition to Appeal of
## Claim Denial by Representative Claimant Carleen Hastings

Carleen Hastings, Representative Claimant for the late Christopher Mims, submitted a claim on February 5, 2019—the day before the deadline for pre-Effective Date claims—for a Qualifying Diagnosis of Death with CTE purportedly rendered by neuropathologist Dr. Ronald L. Hamilton.  (*See* Claim Form; Diagnosing Physician Certification.)  In support of her claim, Ms. Hastings submitted (1) a Diagnosing Physician Certification from Dr. Hamilton, reflecting a purported Qualifying Diagnosis of Death with CTE (Diagnosing Physician Certification at 6); (2) an undated letter from Dr. Hamilton, purporting to diagnose Mr. Mims with CTE (Hamilton Letter); (3) a death certificate indicating that Mr. Mims died on October 15, 2008 and listing Mr. Mims' primary cause of death as "DILATED CARDIOMYOPATHY" and contributing causes of death as "HEPATIC STEATOSIS" and "HISTORY OF HYPERTENSION" (Death Certificate at 2); and (4) an autopsy report completed by Dr. Louis A. Pena, indicating the same causes of death listed in Mr. Mims' death certificate (*see* Autopsy Report at 1).

On February 20, 2019, the Claims Administrator issued a Notice of Request for Additional Documents advising Ms. Hastings that her Claim Package was incomplete because Ms. Hastings did not submit any medical records reflecting the Qualifying Diagnosis.  (*See* Notice of Request for Additional Documents.)  In the section titled "Additional Explanation of What is Missing," the Claims Administrator explained that Ms. Hastings' Claim Package materials did not show that Dr. Hamilton administered a post-mortem examination in which he diagnosed Mr. Mims with CTE prior to the Settlement Final Approval Date of April 22, 2015, as required by the Settlement Agreement.  (*See id.*)  On July 30, 2019, the Claims Administrator denied Ms. Hastings' claim because she failed to submit any Claim Package materials to show that Dr. Hamilton actually performed a post-mortem examination and rendered a diagnosis of CTE prior to the Final Approval Date, as required by the Settlement Agreement.  (*See* Notice of Denial of Monetary Award Claim ("Denial Notice") at 1.)

On appeal, Ms. Hastings does not contend that Dr. Hamilton diagnosed Mr. Mims with CTE based on a post-mortem examination prior to April 22, 2015.  Instead, she argues that: (1) the still unspecified date that Dr. Hamilton actually diagnosed Mr. Mims does not matter, because the diagnosis date for any Retired NFL Football Player diagnosed with Death with CTE purportedly is the date of the player's death; (2) if the Claims Administrator determines that a diagnosing physician must render a diagnosis of Death with CTE prior to April 22, 2015, the amended Settlement Agreement purportedly violates Settlement Class Members' due process rights because it was a change to the original Settlement Agreement without proper notice; (3) the Settlement Agreement allegedly did not require Dr. Hamilton to examine Mr. Mims' brain tissue in a post-mortem examination to render a Death with CTE diagnosis; and (4) Dr. Hamilton did examine Mr. Mims' brain tissue.  (*See* Written Statement in Support of Class Member's Appeal of the Claims Administrator's Notice of Denial of Monetary Award Claim ("Appeal").)[1]

---

[1]    With knowledge that Mr. Mims and other clients never received a diagnosis of CTE prior to the Final Approval Date, counsel for Ms. Hastings has engaged in a lengthy history of legal gamesmanship concerning the deadline for Qualifying Diagnoses of Death with CTE.  On August 15, 2017, counsel for Ms. Hastings, on behalf of client Yvonne Sagapolutele, filed a Motion to Modify the Amended Final Order and Judgment, in which she alleged that the Settlement Agreement's deadline to obtain a Qualifying Diagnosis of Death with CTE was "imposed after the deadline to opt out and without notice to Class Members."  (Mem. of Law in Supp. of Absent Class Member and Pl. Yvonne Sagapolutele's Mot. to Modify the Am. Final Order and J. at 18, 12-md-2323, ECF No. 8263-2

The NFL Parties respectfully oppose the Appeal because it is utterly unfounded, and there is no question this claim must be denied. The Settlement Agreement clearly requires that a board-certified neuropathologist render a Qualifying Diagnosis of Death with CTE prior to April 22, 2015, and Ms. Hastings has not provided—and undoubtedly cannot provide—any evidence that Dr. Hamilton rendered such a diagnosis prior to that date. In addition, the amended Settlement Agreement's requirement that a Qualifying Diagnosis of Death with CTE must be rendered prior to April 22, 2015 does not violate Settlement Class Members' due process rights; to the contrary, it expanded the deadline for Death with CTE diagnoses compared to the original Settlement Agreement to the benefit of Settlement Class Members. Finally, although this issue need not be reached on appeal, the Settlement Agreement requires that a board-certified neuropathologist personally examine a Retired NFL Football Player's brain tissue prior to rendering a timely Qualifying Diagnosis of Death with CTE.

For these reasons, and those set forth below, Ms. Hastings' appeal should be denied.

## I. There Is No Evidence That Dr. Hamilton Rendered a Qualifying Diagnosis of Death With CTE Prior to April 22, 2015, as Required by the Settlement Agreement

For a Qualifying Diagnosis of Death with CTE, the Settlement Agreement explicitly requires that a diagnosing physician render the diagnosis prior to the Settlement's Final Approval Date of April 22, 2015. Specifically, Section 2.1(aa) of the Settlement Agreement provides that the Qualifying Diagnosis of "Death with CTE is defined in Exhibit 1," and Exhibit 1 states that the definition of Death with CTE is: "For Retired NFL Football Players who died prior to the Final Approval Date, *a post-mortem diagnosis of CTE made by a board-certified neuropathologist prior to the Final Approval Date*, provided that a Retired NFL Football Player who died between July 7, 2014 and the Final Approval Date shall have until 270 days from his date of death to obtain such a postmortem diagnosis." (Settlement Agreement, Ex. A-1 at 5 § 5 (emphasis added).) Section 6.3(f) of the Settlement Agreement reiterates that requirement, stating that "[a] Qualifying Diagnosis of Death with CTE shall be made only for Retired NFL Football Players who died prior to the Final Approval Date, through *a post-mortem diagnosis made by a board-certified neuropathologist prior to the Final Approval Date* . . . ." (*See id.* at 6.3(f) (emphasis added).)

In the Appeal, Ms. Hastings argues that a Diagnosing Physician is not required to actually render a Qualifying Diagnosis of Death with CTE prior to April 22, 2015 because "the only date that is relevant in determining the date of a Qualifying Diagnosis for Death with CTE is the date of the Player's death." (Appeal at 5.) As support for this argument, Ms. Hastings cites Settlement FAQ 99 (formerly Settlement FAQ 93), which states in part:

> *Death with CTE*: For these claims, the date of the Qualifying Diagnosis is the date of the Player's death, even though the diagnosis is not made until after the Player dies. The Monetary Award is based on the Player's age when he died.

---

(the "Motion to Modify the Amended Final Order and Judgment").) After the Parties fully briefed that motion, the Court denied the motion without prejudice to Ms. Sagapolutele's (or other similarly situated Settlement Class Members') ability to raise the issue at a later time if she filed a Death with CTE claim that would have been valid but for the deadline. (Order, 12-md-2323, ECF No. 8557.) Counsel then waited over 16 months to file Ms. Hastings' Death with CTE claim, which relies on an *undated* letter from Dr. Hamilton, with the clear intention of obfuscating the timing and nature of Dr. Hamilton's purported CTE diagnosis.

(Settlement FAQ 99.)

Ms. Hastings' argument rests on willful ignorance of the Settlement Agreement and a misinterpretation of Settlement FAQ 99. Specifically, the Settlement Agreement plainly requires that, "[f]or Retired NFL Football Players who died prior to the Final Approval Date, a ***post-mortem diagnosis***" of Death with CTE must be "made by a board-certified neuropathologist ***prior to the Final Approval Date***." (Settlement Agreement Ex. A-1 at 5 § 5 (emphasis added).) If, as Ms. Hastings argues, the Settlement Agreement required only that a Retired NFL Football Player died prior to the Final Approval Date in order for a diagnosis made at *any unlimited future date* to be timely, the Settlement Agreement would not include subsequent language providing that a player who died between July 7, 2014 and the Final Approval Date "shall have until 270 days from his date of death to obtain such a postmortem diagnosis." (*Id.*)

Moreover, Settlement FAQ 99 does not concern the date by which a Diagnosing Physician must have *actually made* a Death with CTE diagnosis, but instead concerns the date of diagnosis ***for compensation purposes***. The Parties to the Settlement Agreement did not wish to reduce the compensatory award of a decedent who otherwise would have aged between death and the neuropathological examination. The Death with CTE portion of Settlement FAQ 99 confirms this, as it clearly states that "[t]he ***Monetary Award*** is based on the Player's age when he died." (Settlement FAQ 99 (emphasis added).)

Ms. Hastings has not provided—and presumably cannot provide—any evidence that Dr. Hamilton rendered his purported Qualifying Diagnosis of Mr. Mims prior to the Final Approval Date of April 22, 2015. In fact, Dr. Hamilton's letter containing the purported diagnosis does not contain any dates whatsoever, and Dr. Hamilton's Diagnosing Physician Certification form only lists the date of Mr. Mims' death (October 15, 2008) as the date of diagnosis. (*See* Hamilton Letter; Diagnosing Physician Certification.) Accordingly, Ms. Hastings' appeal must be denied, and her claim denial upheld, for this fundamental reason alone.

## II. The Settlement Agreement Requirement That a Death With CTE Diagnosis Be Rendered Prior to April 22, 2015 Does Not Violate Settlement Class Members' Due Process Rights

Fully aware that her purported Death with CTE diagnosis is untimely because it was not rendered prior to the Final Approval Date of April 22, 2015, Ms. Hastings argues that such requirement somehow violates her right to due process. Specifically, Ms. Hastings argues that the Special Master should consider the arguments in Yvonne Sagapolutele's August 15, 2017 Motion to Modify the Amended Final Order and Judgment to remove the deadline to obtain the Qualifying Diagnosis, which Motion was denied without prejudice by Judge Brody with instruction that Ms. Sagapolutele "must first show that she would be entitled to recover but for the Death with CTE diagnosis deadline," and then may raise the due process argument in the claims appeal process. (Order, 12-md-2323, ECF No. 8557.) Ms. Hastings' argument that the amendments to the Settlement Agreement somehow violated her due process rights is meritless.

Relying on Ms. Sagapolutele's prior Motion to Modify the Amended Final Order and Judgment, Ms. Hastings alleges that the Settlement Agreement's deadline to obtain a Qualifying Diagnosis of Death with CTE was "surreptitiously added to the Amended Settlement Agreement" after the deadline to opt out and without notice to Settlement Class Members. (Appeal at 6.) Ms. Sagapolutele's prior motion argues that absent class members' due process rights were violated by the change, and that the Court should remedy the violation by modifying the Settlement Agreement

to remove the deadline for a Qualifying Diagnosis of Death with CTE. (*See* Motion to Modify the Amended Final Order and Judgment at 15-24.)

In response, the NFL Parties, too, incorporate all of the arguments set forth in their Opposition to that Motion, attached in full as Exhibit 1.[2] As the NFL Parties explained in their Opposition, far from injuring Settlement Class Members' rights by "imposing" a new deadline for a Qualifying Diagnosis of Death with CTE, the amendments to the Settlement Agreement *extended* the deadline to obtain the Qualifying Diagnosis from the Preliminary Approval Date to the Final Approval Date (*see id.* at 10-11), and provided a 270-day grace period in which Settlement Class Members who died between the Preliminary Approval Date and the Final Approval Date could obtain a Qualifying Diagnosis (*see id.* at 6, 10). Accordingly, the relevant changes solely benefited absent class members and in no way violated their due process rights. (*See id.* at 9-13.)

For these additional reasons, Ms. Hastings' appeal must be denied, and her claim denial must be upheld.

### III. The Settlement Agreement Requires a Diagnosing Physician to Examine a Retired NFL Football Player's Brain Tissue in Order to Render a Qualifying Diagnosis of Death with CTE

Ms. Hastings further argues that the Claims Administrator erred in stating that the Claim Package must contain evidence that the Diagnosing Physician "examined the Retired Player's brain tissue to confirm a CTE diagnosis" (Denial Notice at 1) because the Settlement Agreement purportedly does not require a Diagnosing Physician to examine brain tissue in order to render a Qualifying Diagnosis of Death with CTE. (*See* Appeal at 7.) Although this issue need not be reached on appeal because Ms. Hastings has not provided any evidence that Mr. Mims was rendered a Qualifying Diagnosis of Death with CTE prior to April 22, 2015, Ms. Hastings is simply wrong.

As previously discussed, a Qualifying Diagnosis of Death with CTE requires "a post-mortem diagnosis of CTE made by a board-certified neuropathologist prior to the Final Approval Date." (Settlement Agreement, Ex. A-1 at 5 § 5; *see also* Settlement Agreement §§ 2.1(aa), 6.3(f).) Post-mortem examination of brain tissue is the ***only*** way that CTE can be diagnosed, as Judge Brody made clear in the Court's Memorandum supporting Final Approval of the Settlement Agreement:

> Chronic Traumatic Encephalopathy is a neuropathological diagnosis that currently can only be made post mortem. This means no one can conclusively say that someone had CTE until a scientist looks at sections of that person's brain under a microscope to see if abnormally phosphorylated tau protein ("abnormal tau protein") is present, and if so whether it is present in a reportedly unique pattern.

*In re Nat. Football League Players' Concussion Injury Litig.*, 307 F.R.D. 351, 397 (E.D. Pa. 2015), *amended*, No. 2:12-MD-02323-AB, 2015 WL 12827803 (E.D. Pa. May 8, 2015), and *aff'd*, 821 F.3d 410 (3d Cir. 2016). Judge Brody further stated that "Retired Players cannot be compensated for CTE in life because no diagnostic or clinical profile of CTE exists, and the symptoms of the disease, if any, are unknown." (*Id.*)

---

[2]    (*See* Ex. 1, Mem. of Law of the National Football League and NFL Properties LLC in Opp. to Settlement Class Member Yvonne Sagapolutele's Mot. to Modify the Am. Final Order and J., 12-md-2323, ECF No. 8430.)

Thus, the Settlement Agreement and its implementing orders clearly require that a diagnosing physician personally examine a Retired NFL Football Player's brain tissue in order to render a Qualifying Diagnosis of Death with CTE. Here, Dr. Hamilton's letter indicated that he examined slides of Mr. Mims' brain tissue, but, as previously discussed, Ms. Hastings has not provided any evidence that he performed such a post-mortem examination and diagnosed Mr. Mims with CTE prior to April 22, 2015.

### Conclusion

The denial of Ms. Hastings' claim was required under the judicially-approved terms of the Settlement Agreement. The Special Master has already denied 19 substantially similar appeals filed by Settlement Class Members represented by Ms. Hastings' counsel, and Ms. Hastings' appeal presents no additional evidence to warrant a different outcome.[3] Because Ms. Hastings does not present clear and convincing evidence that such determination was in error, the Special Master should affirm denial of the claim.

Dated: October 3, 2019

Respectfully submitted,

PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP

*/s/ Brad S. Karp*
Brad S. Karp
Bruce Birenboim
Claudia Hammerman
Lynn B. Bayard
Douglas M. Burns
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
Email: bkarp@paulweiss.com

*ATTORNEYS FOR THE
NATIONAL FOOTBALL LEAGUE
AND NFL PROPERTIES LLC*

---

[3] (*See, e.g.*, SPID 950012548, Doc. No. 214641.)

# EXHIBIT 1

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br><br>MDL No. 2323<br><br>Hon. Anita B. Brody |
| Kevin Turner and Shawn Wooden, *on behalf of themselves and others similarly situated*,<br><br>                              Plaintiffs,<br><br>                    v.<br><br>National Football League and NFL Properties, LLC, successor-in-interest to NFL Properties, Inc.<br>                              Defendants. | Civ. Action No.: 14-cv-00029-AB |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | Hon. Anita B. Brody |

**MEMORANDUM OF LAW OF THE NATIONAL FOOTBALL LEAGUE AND NFL PROPERTIES LLC IN OPPOSITION TO SETTLEMENT CLASS MEMBER YVONNE SAGAPOLUTELE'S MOTION TO MODIFY THE <u>AMENDED FINAL ORDER AND JUDGMENT</u>**

# TABLE OF CONTENTS

**Page**

Preliminary Statement ............................................................................................. 1

Background ............................................................................................................... 4

      A.    Parties .................................................................................................... 4

      B.    Procedural Background ......................................................................... 4

Argument .................................................................................................................. 8

I.     THE PARTIES WERE NOT REQUIRED TO NOTIFY THE SETTLEMENT CLASS ABOUT THE AMENDMENTS ........................................................... 8

      A.    The Amendments Did Not Require New Notice .................................... 9

      B.    The Original Settlement Notice Was Sufficient ................................. 11

II.    SAGAPOLUTELE IS NOT ENTITLED TO REWRITE THE SETTLEMENT AGREEMENT .................................................................................................. 13

Conclusion .............................................................................................................. 17

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Adelson* v. *Ocwen Fin. Corp.,*
    621 F. App'x 348 (7th Cir. 2015) ...............................................................................14

*In re Baby Prods. Antitrust Litig.,*
    708 F.3d 163 (3d Cir. 2013)..................................................................................9, 11

*Blue Diamond Coal Co.* v. *Trustees of UMWA Combined Ben. Fund,*
    249 F.3d 519 (6th Cir. 2001) ...............................................................................16

*In re Diet Drugs Prods. Liab. Litig.,*
    200 F. App'x 95 (3d Cir. 2006) ...............................................................................14

*In re Diet Drugs Prods. Liab. Litig.,*
    No. 99-cv-20593, 2010 WL 2735414 (E.D. Pa. July 2, 2010) ......................9, 11, 13

*F.A.C., Inc.* v. *Cooperativa de Seguros de Vida de Puerto Rico,*
    449 F.3d 185 (1st Cir. 2006)...............................................................................17

*Federman* v. *Artzt,*
    339 F. App'x 31 (2d Cir. 2009) .........................................................................14, 15

*In re Four Seasons Sec. Laws Litig.,*
    525 F.2d 500 (10th Cir. 1975) ...............................................................................15

*Harris* v. *Graddick,*
    615 F. Supp. 239 (N.D. Ala. 1985)......................................................................9, 11

*Hensley* v. *Alcon Labs., Inc.,*
    277 F.3d 535 (4th Cir. 2002) ...............................................................................17

*Inmates of Suffolk Cty. Jail* v. *Rufo,*
    No. 71-cv-00162, 2015 WL 6958070 (D. Mass. Nov. 10, 2015) ...........................16

*Kokkonen* v. *Guardian Life Ins. Co. of Am.,*
    511 U.S. 375 (1994)...............................................................................................17

*In re Linerboard Antitrust Litig.,*
    223 F.R.D. 357 (E.D. Pa.), *amended*, 223 F.R.D. 370 (E.D. Pa. 2004)..................17

*Matthews, Wilson & Matthews, Inc.* v. *Capital City Bank,*
    614 F. App'x 969 (11th Cir. 2015) ........................................................................15

**Page(s)**

*In re Nat'l Football League Players' Concussion Injury Litig.*,
307 F.R.D. 351 (E.D. Pa. 2015), *amended*, No. 12-MD-02323, 2015 WL
12827803 (E.D. Pa. May 8, 2015) ............................................................. passim

*In re Nat'l Football League Players Concussion Injury Litig.*,
821 F.3d 410 (3d Cir. 2016), *amended* (May 2, 2016) ..........................................7

*In re Nissan Motor Corp. Antitrust Litig.*,
552 F.2d 1088 (5th Cir. 1977) ............................................................11

*Orlando Residence, Ltd.* v. *Hilton Head Hotel Inv'rs*,
No. 89-cv-0662, 2013 WL 1103027 (D.S.C. Mar. 15, 2013) ................................15

*In re PaineWebber Ltd. P'ships Litig.*,
171 F.R.D. 104 (S.D.N.Y 1997) ............................................................11

*Roman-Oliveras* v. *Puerto Rico Elec. Power Auth.*,
797 F.3d 83 (1st Cir. 2015) ............................................................17

*Sawka* v. *Healtheast, Inc.*,
989 F.2d 138 (3d Cir. 1993) ............................................................15

**OTHER AUTHORITIES**

11 Fed. Prac. & Proc. Civ. § 2852 (3d ed.) ................................................17

20 Fed. Prac. & Proc. Deskbook § 104 ....................................................16

Fed. R. Civ. P. 23 ............................................................2, 9

Fed. R. Civ. P. 60 ............................................................1, 3, 14, 15, 16

Newberg on Class Actions § 1:5 (5th ed.) ................................................9

Newberg on Class Actions § 8:17 (5th ed.) ................................................9

Newberg on Class Actions § 8:36 (5th ed.) ................................................9

Newberg on Class Actions § 8:7 (5th ed.) ................................................9

Newberg on Class Actions § 18:40 (5th ed.) ................................................15

Defendants National Football League and NFL Properties LLC (collectively, the "NFL Parties") respectfully submit this memorandum of law in opposition to Settlement Class Member Yvonne Sagapolutele's ("Sagapolutele's") motion to modify the Amended Final Order and Judgment (the "Motion") (ECF No. 8263).

### Preliminary Statement

Sagapolutele, an absent Settlement Class Member and representative of the estate of Retired NFL Football Player Pio Sagapolutele, brings this motion, ostensibly as a matter of due process, seeking significant revisions to the Final Order and Judgment that the Court entered more than two years ago approving the Class Action Settlement Agreement in this case.[1]  But no due process violation has occurred, and Sagapolutele has shown no justification for this Court to take the extraordinary step of rewriting a settlement agreement approved by both this Court and the Third Circuit that has been in place for years.  Sagapolutele's motion should therefore be denied.

The primary ground for Sagapolutele's motion is the amendments to the Settlement Agreement in February 2015, which expanded the definition of the Death with CTE Qualifying Diagnosis in response to the Court's directives.  Contrary to fact, Sagapolutele contends that the amendment imposed a deadline to obtain a Qualifying Diagnosis of Death with CTE, and "[b]ecause this change was made both without notice to absent class members and after the deadline to opt out of the settlement, [her] due process rights were violated."  (Pl. Mem. at 15.)  Sagapolutele asks this Court, pursuant to Rule 60 of the Federal Rules of Civil Procedure and the Court's inherent power, to amend the Final Order and Judgment to "remov[e] the deadline to obtain a Qualifying Diagnosis of Death with CTE."  (Pl. Mem. at 1.)

---

[1]    Unless otherwise defined, the capitalized terms used in this memorandum have the same meaning as those in the Settlement Agreement.

Sagapolutele's motion has no basis in fact or law for several reasons.

*First*, the amendments in question concerned an *expansion* of settlement benefits to the Settlement Class—namely, the expansion of the Qualifying Diagnosis of Death with CTE to include Retired NFL Football Players who died with CTE between Preliminary and Final Approval of the Settlement Agreement; the original agreement limited the Qualifying Diagnosis to those who died *prior* to Preliminary Approval. It is well settled that additional notice to a class is necessary only when amendments to a settlement agreement are "materially adverse" to the class, not where, as here, they benefit the class. Neither the Due Process Clause nor Rule 23 of the Federal Rules of Civil Procedure require notice in the event of beneficial, or even neutral, amendments. As this Court correctly held in granting Final Approval of the Settlement Agreement over various objections to this very amendment (although on a different ground), no additional notice was required in this case for that very reason.

*Second*, contrary to Sagapolutele's contentions regarding lack of notice, the class notice in connection with the original settlement agreement was all that was necessary. The Short- and Long-Form notices distributed to the Settlement Class Members made clear, as this Court and the Third Circuit held, that an award of Death with CTE would *not* be available to all Retired NFL Football Players diagnosed with CTE. Rather, only particular cases of CTE meeting "certain" predetermined and agreed-to standards under the Settlement Agreement would be compensated—namely, cases where, prior to Preliminary Approval,[2] the Retired NFL Football Player received a post-mortem diagnosis of CTE made by a board-certified neuropathologist. Further, the amendments in question were in fact made public; the NFL Parties and Class Counsel posted the amendments—including a redline comparison clearly

---

[2]    As noted above, the amendments to the Settlement Agreement extended this deadline to Final Approval.

reflecting the changes to the text of the Settlement Agreement—on the Court's publicly accessible PACER docket, where any member of the public, including the more than 5,000 Settlement Class Members with legal representation, could view it.  In fact, over 40 Settlement Class Members objected to the amendments, including the very amendment that Sagapolutele complains of here.

  *Finally*, even if Sagapolutele could show a due process violation, which she cannot, neither Rule 60 nor this Court's "inherent authority" allows Sagapolutele to rewrite the Settlement Agreement as she seeks.  Rule 60(a) is limited to correction of "clerical mistakes" that do not affect the substantive rights of the parties.  Yet her contention that the amendments were simply "clerical mistakes" is at odds with her characterization of those same amendments as impairing her rights under the settlement.  Further, not only does Sagapolutele—as an absent class member—lack standing to move pursuant to Rule 60(b)(6), she also fails to establish that the "extraordinary remedy" of amendment pursuant to Rule 60(b)(6) is warranted here because she does not show that she will experience *any* hardship without the relief she seeks.  For example, Sagapolutele has neither shown (nor even claimed) that the brain of her late husband, who died in 2009, has ever been examined by a board-certified neuropathologist for CTE, much less diagnosed as having CTE.  Nor has she explained why any such examination—if such a belated diagnosis were even medically possible—did not occur prior to the Court's Final Approval Order on April 22, 2015 (as amended May 8, 2015).  Finally, Sagapolutele has not shown that she is entitled to relief under the Court's "inherent authority" to amend the Final Order and Judgment because that authority is no more expansive than Rule 60.

  Accordingly, Sagapolutele's motion should be denied.

## Background

### A.    Parties

The National Football League ("NFL") is an unincorporated association of 32 Clubs that promotes, organizes, and regulates the sport of professional football in the United States.  NFL Properties LLC ("NFLP") is a limited liability company organized under the laws of the State of Delaware and headquartered in New York.  Sagapolutele is a self-described absent Settlement Class Member and the representative of the estate of late Retired NFL Football Player Pio Sagapolutele.  (Pl. Mot. at 1.)

### B.    Procedural Background

The Judicial Panel on Multidistrict Litigation established this multidistrict litigation as MDL 2323 on January 31, 2012.  Since that time, over 300 additional cases, brought on behalf of approximately 5,000 former NFL players, have been included in the MDL.  *See In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. 351, 361 (E.D. Pa. 2015), *amended*, No. 12-MD-02323, 2015 WL 12827803 (E.D. Pa. May 8, 2015), *and aff'd*, 821 F.3d 410 (3d Cir. 2016), *amended* (May 2, 2016), *cert. denied*, 137 S. Ct. 591 (2016), and *cert. denied*, 137 S. Ct. 607 (2016).  Plaintiffs in these cases asserted fraud- and negligence-based claims against the NFL Parties based on, among other things, a purported duty to provide players with rules and information needed to protect them from the alleged effects of repetitive mild traumatic brain injuries sustained during NFL play, including CTE.  *Id*. at 361-62.

On June 25, 2014, the NFL Parties and Class Counsel[3] (collectively, the "Parties") filed a motion for preliminary class certification and preliminary approval of the Settlement Agreement, and on July 7, 2014, the Court approved the motion.  *See id.* at 363-65.

---

[3]    Class Counsel consists of attorneys whom this Court duly appointed as legal representatives for the Settlement Class, including Christopher A. Seeger, Sol Weiss, Steven C. Marks, Gene Locks, Arnold Levin, and Dianne M. Nast.  (Final Order & Judg. ¶ 6,  ECF No. 6510.)

The Settlement Agreement defined the Settlement Class as "'[a]ll living NFL Football Players who, prior to the date of Preliminary Approval . . . retired . . . from playing professional football with the NFL,'" as well as their Representative Claimants and Derivative Claimants.  *Id.* at 365 ("Representative Claimants are those duly authorized by law to assert the claims of deceased, legally incapacitated, or incompetent Retired Players.  Derivative Claimants are those, such as parents, spouses, or dependent children, who have some legal right to the income of Retired Players.").  The Settlement Agreement also provides funding for Retired NFL Football Players to receive a baseline assessment examination of their objective neurological functioning, for safety and educational initiatives, and for monetary awards for certain Qualifying Diagnoses, including, as relevant here, the Qualifying Diagnosis of Death with CTE.  *Id.* at 366-67.

Prior to the Fairness Hearing, the Parties distributed Court-approved Short- and Long-Form notices to the Settlement Class.  *See id.* at 382-86.  "Each was written in plain and straightforward language," and together, they disclosed the key components of the Settlement Agreement, making clear that "only 'certain' cases of CTE are covered."  *Id.* at 383-84.  As explained by the notice, under the original agreement, the Settlement's benefits included "[m]onetary awards for ***diagnoses*** of Death with CTE ***prior to July 7, 2014*** . . . ."  (*See* Long-Form Notice at 6, ECF No. 6086-1 (emphasis added); *see also* Class Action Settlement Agreement as of June 24, 2014 § 6.3(f), ECF No. 6087 (a "Qualifying Diagnosis of Death with CTE shall be made only for Retired NFL Football Players who died prior to the date of the Preliminary Approval and Class Certification Order, through a post-mortem diagnosis by a board-certified neuropathologist of CTE.").)

After the Fairness Hearing, the Parties—at this Court's request—agreed to several amendments to the Settlement Agreement, each of which made the Settlement Agreement more

beneficial to Settlement Class Members.  *In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. at 386.  For example, the amendments provided credit for Settlement Class Members who played in NFL Europe; ensured that all eligible Retired NFL Football Players who elected to receive a baseline assessment examination would receive one regardless of any funding limitations in the Settlement Agreement; included a hardship provision with respect to the appeal fee for Settlement Class Members; and allowed reasonable accommodation for Settlement Class Members who do not possess certain medical records.  (Class Counsel and the NFL Parties' Joint Submission in Resp. to the Feb. 2, 2015 Order of the Ct., Feb. 13, 2015, ECF No. 6481.)  In addition, as is relevant here, one amendment expanded the Qualifying Diagnosis of Death with CTE to cover not only Retired NFL Football Players who died prior to Preliminary Approval, but also Retired NFL Football Players who died between Preliminary Approval and Final Approval.  (*Id.* at 4-5.)  In addition, the Parties explained to the Court that "**consistent with the Parties' intent under the original Settlement Agreement**, and recognizing that obtaining such a [CTE] diagnosis **may take several months post-death**, the Parties have provided for a grace period of 270 days following any date of death between preliminary approval and the Final Approval Date to allow Claimants to obtain the necessary diagnosis." (*Id.* (emphasis added).)

Copies of the proposed amended Settlement Agreement, including a redline showing the exact changes made, were posted on the Court's publicly accessible PACER database in February 2015.  (Class Counsel and the NFL Parties' Joint Submission in Resp. to the Feb. 2, 2015 Order of the Ct., Ex. A, Feb. 13, 2015, ECF No. 6481-1.)  Between February and April 2015, more than 40 Settlement Class Members filed objections to the amendments, including objections to the amendment to the definition of Death with CTE at issue here.  (*See*

Armstrong Objectors' Suppl. Obj. to the Am. Class Action Settlement, ECF No. 6503; Miller Suppl. Obj. to Settlement, ECF No. 6484.)  Sagapolutele did not file any objection.

After considering those objections, the Court issued its opinion approving the Settlement Agreement and finding that "Class Members who opted out . . . received adequate notice of these changes, **and notification of Class Members is not required**."  *In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. at 386 (emphasis added).  The Court explained:  "Because these changes improved the deal for Class Members without providing any concessions to the NFL Parties, an additional round of notice for Class Members is unnecessary."  *Id*.  On appeal, the Third Circuit affirmed this Court's Final Order and Judgment in full.  Regarding notice, the Third Circuit agreed with the District Court, finding "that the content of the class notice . . . satisfied Rule 23 and due process."  *In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 435-36 (3d Cir. 2016), *amended* (May 2, 2016), *cert. denied*, 137 S. Ct. 591 (2016), and *cert. denied*, 137 S. Ct. 607 (2016).  Notably, the Third Circuit also "conclude[d] that the settlement's treatment of CTE does not render the agreement fundamentally unfair."  *Id.* at 444.

On August 15, 2017, over two years after this Court granted final approval of the Settlement, Sagapolutele filed this Motion challenging the Court's determination that the amendments were beneficial to Settlement Class Members and therefore did not require additional notice, and seeking "modification of the Final Order and Judgment by removal of the deadline to obtain a Qualifying Diagnosis of Death with CTE."[4]  (Pl. Mot. at 2.)  Sagapolutele contends that "[t]his deadline was added to the Settlement Agreement in February 2015 without

---

[4]    Relatedly, Sagapolutele also seeks an "instruction to the settlement administrator to develop forms and procedures that allows Class Members to obtain a Qualifying Diagnosis of Death with CTE by obtaining a post-mortem diagnosis by a board-certified neuropathologist at any time during the 65-year term of the Monetary Award Fund."  (Pl. Mot. at 2.)

notice to the class," and "effectively prevented Class Members . . . from obtaining a Qualifying Diagnosis of Death with CTE." (*Id.*) Despite Sagapolutele's claim that "this deadline materially prejudices" Settlement Class Members (*id.*), she offers no explanation, much less an evidentiary showing, of how her own rights were in any way impaired by the alleged lack of notice. She does not demonstrate—or even assert—that the brain of her late husband has been examined by a board-certified neuropathologist and determined to have CTE. Therefore, not only is Sagapolutele's injury entirely hypothetical, but she also does not establish that such an examination would even be viable, given her husband's death in 2009.[5]

The NFL Parties, through this memorandum of law, oppose the Motion.

## Argument

### I.

### THE PARTIES WERE NOT REQUIRED TO NOTIFY THE SETTLEMENT CLASS ABOUT THE AMENDMENTS

Sagapolutele argues that her due process rights were violated because she did not receive notice that the February 2015 amendment "impos[ed] a deadline to obtain a Qualifying Diagnosis of Death with CTE" when the original Settlement Agreement purportedly permitted "Class Members [to] obtain a Qualifying Diagnosis for Death with CTE anytime within the 65-year life of the Monetary Award Fund." (Pl. Mem. at 17.) Not so.

"[T]he Due Process Clause of the Fourteenth Amendment requires that notice [concerning a class action settlement] be 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" *In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. at

---

[5] *See* Compl. ¶ 43, *Sagapolutele* v. *Nat'l Football League*, No. 17-cv-00348 (E.D. Pa. Jan. 25, 2017), ECF No. 1; *see also* Am. Stip. of Dismissal, *Sagapolutele* v. *Nat'l Football League*, No. 17-cv-00348 (E.D. Pa. May 3, 2017), ECF No. 4 (approving stipulation of dismissal without prejudice).

383 (quoting *Mullane* v. *Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)).[6]  Parties

settling a class action litigation should therefore distribute notice that "'fairly apprises' class

members of the action and their rights."  Newberg on Class Actions § 8:17 (5th ed.).  Additional

notice is only required when the settling parties subsequently introduce amendments that "would

have a *material adverse* effect on the rights of class members."  *In re Diet Drugs Prods. Liab.*

*Litig.*, No. 99-cv-20593, 2010 WL 2735414, at *6 (E.D. Pa. July 2, 2010) (emphasis added); *see*

*also In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 175 n.10, 182 (3d Cir. 2013) (supplemental

notice required only for "*material* alterations" (emphasis added)).  Conversely, if the

amendments are neutral or beneficial to the settlement class, no additional notice is required.  *See*

*Harris* v. *Graddick*, 615 F. Supp. 239, 244 (N.D. Ala. 1985) (holding that where "the

amendment is narrow and it is clearly apparent that the interests of the classes are not

*substantially impaired*, . . . the notice already given is adequate" (emphasis added)); *see also In*

*re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. at 383 (collecting cases,

including *Harris*).  That is the case here.

A.    **The Amendments Did Not Require New Notice**

Sagapolutele's argument—that the Parties should have re-distributed notice

reflecting the February 2015 amendments to the Settlement Agreement—fundamentally

misunderstands the substance of the amendments.  In Sagapolutele's telling, "in the midst of

otherwise beneficial amendments" to the Settlement Agreement, the Parties "impose[d] an

additional requirement that prevents Class Members from recovering settlement proceeds [for

CTE] unless they obtained a Qualifying Diagnosis before" Final Approval.  (Pl. Mem. at 8.)  But

---

[6]    Due process notice requirements mirror those of Rule 23 of the Federal Rules of Civil Procedure.  *See* Newberg
on Class Actions § 1:5 (5th ed.) ("Rule 23 is constructed to ensure that the representative nature of class action
litigation safeguards these absent class members' due process rights."); *id.* § 8:7 (5th ed.) (the notice
requirements under Rule 23 "echo[] the constitutional test set forth by the Supreme Court"); *id.* § 8:36 (5th ed.)
("[A]s Rule 23's requirements are quite similar to the Constitution's, the distinction may be immaterial.").

the amendment only clarified what was always the case and extended the deadline for Death with CTE to Final Approval.

The original settlement agreement provided that an award for a Qualifying Diagnosis of Death with CTE would be available only to Retired NFL Football Players who died *and* received a CTE diagnosis prior to Preliminary Approval. The Long-Form Notice made this explicit, stating that the Settlement's benefits include "[m]onetary awards for ***diagnoses*** of Death with CTE ***prior to July 7, 2014*** . . . ." (*See* Long-Form Notice at 6, ECF No. 6086-1 (emphasis added); *see also* Decl. of Robert H. Klonoff Relating to the Proposed Class Settlement in the Nat'l Football League Players' Concussion Injury Litig. ¶ 85, Nov. 12, 2014, ECF No. 6423-9 ("[C]ontrary to the arguments advanced by various objectors, ***excluding CTE in cases diagnosed after July 7, 2014***, is not irrational." (emphasis added)).) Similarly, the Parties' publicly filed submission to the Court in support of the amendment stated specifically that the amendment's language providing only a grace period of time following death within which to obtain a neuropathological diagnosis of CTE was "*consistent with the Parties' intent under the original Settlement Agreement*." (*See* Class Counsel and the NFL Parties' Joint Submission in Resp. to the Feb. 2, 2015 Order of the Ct. at 4, ECF No. 6481 (emphasis added).)

Contrary to Sagapolutele's contentions, this amendment did not adversely affect the Settlement Class—much less materially so. In fact, the amendment *expanded* settlement benefits to encompass any additional Settlement Class Members who died after Preliminary Approval but before Final Approval, and provided 270 days to receive a CTE diagnosis for such players—thereby, increasing the time covered by the definition of Death with CTE by *nine* months. (*See id.* at 4-5.)

Accordingly, far from being materially adverse to Settlement Class Members, these amendments actually made the Settlement Agreement *more beneficial* by expanding the availability of an award for Death with CTE to a larger class of claimants. (*Id.*) Thus, as this Court previously held, "[b]ecause these changes improved the deal for Class Members without providing any concessions to the NFL Parties, an additional round of notice for Class Members is unnecessary." *In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. at 386; *see also In re Baby Prods. Antitrust Litig.*, 708 F.3d at 175 n.10, 182; *In re Diet Drugs Prods. Liab. Litig.*, 2010 WL 2735414, at \*6; *Harris*, 615 F. Supp. at 244.

**B.    The Original Settlement Notice Was Sufficient**

Sagapolutele's due process argument fails for an additional reason.  The original notice, as this Court held, was clear that not all CTE diagnoses would be compensated under the Settlement Agreement, and the publicly available amendments sufficiently defined those CTE diagnoses eligible for compensation.

*First*, the Short- and Long-Form notices distributed to Settlement Class Members adequately protected their due process rights.  To comport with due process, settlement notice need only be adequate and summarize the terms of the Settlement; perfection and painstaking detail are not required.  *See In re Nat'l Football League Concussion Injury Litig.*, 307 F.R.D. at 382-83; *see also In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1104-05 (5th Cir. 1977) (explaining that notice need not "[be] perfectly correct in its form," and instead that "[t]he standard [] is that the notice . . . must contain information that a reasonable person would consider to be material in making an informed, intelligent decision" about whether to opt out); *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 124 (S.D.N.Y 1997) ("The notice need not be highly specific, and indeed 'numerous decisions, no doubt recognizing that notices to class members can practicably contain only a limited amount of information, have approved very

general descriptions of the proposed settlement.'" (quoting *Weinberger* v. *Kendrick*, 698 F.2d 61, 70 (2d Cir. 1982)).

As this Court previously held in overruling objections that "the Long-Form Notice is confusing because the term 'Death with CTE' appears several times without the accompanying cutoff date, . . . [b]oth the Summary Notice and the Long-Form Notice indicate that **only 'certain' cases of CTE are covered**." *In re Nat'l Football League Concussion Injury Litig.*, 307 F.R.D. at 383-84 (emphasis added) (citing Summary Notice at 1, ECF No. 6086-2; Long-Form Notice at 1, ECF No. 6086-1). Moreover, as stated above, the Long-Form Notice specifically stated that the Settlement's benefits include "[m]onetary awards for **diagnoses** of Death with CTE **prior to July 7, 2014** . . . ." (*See* Long-Form Notice at 6, ECF No. 6086-1 (emphasis added).) Both the Short- and Long-Form notice thus alerted Settlement Class Members that an award for CTE was not absolute or unconditional; rather, a Settlement Class Member would need to satisfy "certain" criteria before any award would be made. That is the case here—under the original and amended Settlement Agreement, Sagapolutele must satisfy particular criteria before receiving an award of Death with CTE, including that she obtain her decedent's CTE diagnosis within a predetermined time period—and the original notice satisfied Sagapolutele's Due Process rights by alerting her to this fact.

*Second*, the Parties made the February 2015 amendments publicly available months prior to this Court's April 22, 2015 Final Approval Order (as amended May 8, 2015). Not only did the Parties post a copy of the amendments to this Court's publicly available PACER database as early as February 2015, but they also submitted a redline showing the exact changes to be made to the Settlement Agreement as a result of those proposed amendments. (Class Counsel and the NFL Parties' Joint Submission in Resp. to the Feb. 2, 2015 Order of the Ct., Ex.

A, Feb. 13, 2015, ECF No. 6481-1.)  This is especially significant in light of the widespread attention paid to the docket in this matter by, among others, the more than 5,000 Retired NFL Football Players who, at the time of settlement, were represented by counsel in MDL 2323.  *See In re Nat'l Football League Concussion Injury Litig.*, 307 F.R.D. at 389; *see also In re Diet Drugs Prods. Liab. Litig.*, 2010 WL 2735414, at *4  (holding that no notice of settlement agreement amendments was required because, in part, "notice of the proposed Tenth Amendment, along with an opportunity to object, was supplied to representatives of all class members with active cases in MDL No. 1203.").

In fact, the Parties' efforts to publicize the amendments were successful, as evidenced by the fact that over 40 Settlement Class Members filed objections to the amendments, *including objections to the very Death with CTE provision about which Sagapolutele complains*.  (*See* Armstrong Objectors' Suppl. Obj. to the Am. Class Action Settlement, ECF No. 6503; *see also* Miller Suppl. Obj. to Settlement, ECF No. 6484.)  While these objectors raised somewhat different concerns than Sagapolutele raises here—they argued that the award of Death with CTE should be available to Retired NFL Football Players who die after Final Approval—they nonetheless sought, at least in part, the same relief that Sagapolutele appears to now seek: "modification of the Final Order and Judgment by removal of the deadline to obtain a Qualifying Diagnosis of Death with CTE."  (Pl. Mot. at 2.)  This Court properly rejected these objectors' requests, and similarly should reject Sagapolutele's efforts here.

## II.

## SAGAPOLUTELE IS NOT ENTITLED TO REWRITE
## THE SETTLEMENT AGREEMENT

Even if Sagapolutele had established that notice of the amendments should have been given—which she has not, as explained above—her Motion would fail.  Sagapolutele first

argues that under Rule 60(a), the Court should rewrite the Settlement Agreement and amend the Final Order and Judgment because the Court made a "clerical error" when approving the amendments to the Settlement Agreement. Second, Sagapolutele contends that amendment under Rule 60(b)(6) is justified by "extraordinary circumstances." Finally, Sagapolutele argues that the Court's inherent authority permits it to amend the Final Order and Judgment here. (Pl. Mem. at 18-24.) These arguments lack merit.

*First*, Sagapolutele has not made the necessary showing under Rule 60(a). It is well settled that amendment of judgments pursuant to Rule 60(a) "is limited to the correction of 'clerical mistakes'; it encompasses only errors 'mechanical in nature, apparent on the record, and not involving an error of substantive judgment.'" *In re Diet Drugs Prods. Liab. Litig.*, 200 F. App'x 95, 103 (3d Cir. 2006) (quoting *Pfizer Inc.* v. *Uprichard*, 422 F.3d 124, 129 (3d Cir. 2005)). For Rule 60(a) to apply, the change to be corrected must not "affect[] the substantive rights of the parties." *Id.* at 103-04 (quoting *Pfizer*, 422 F.3d at 130) (holding Rule 60(a) inapplicable because the "correction here goes beyond the correction of a 'mindless and mechanistic mistake'" (quotation omitted)). Here, Sagapolutele has only ever alleged that the amendments in question were deliberate attempts by the Parties to modify the criteria for the Qualifying Diagnosis of Death with CTE. She cannot simultaneously argue these amendments were mere "clerical mistakes." As such, Rule 60(a) is inapplicable here.

*Second*, Sagapolutele's attempts to seek relief under Rule 60(b)(6) fail, too.[7] Relief under Rule 60(b) is "not ordinarily . . . available to non-parties," *Federman* v. *Artzt*, 339 F. App'x 31, 33-34 (2d Cir. 2009), and "[a]bsent class members such as [movant] are treated, with limited exceptions inapplicable here, as non-parties to a class action." *Adelson* v. *Ocwen*

---

[7] Although Sagapolutele broadly states she is moving for relief under Rule 60(b), her memorandum of law cites only to the Rule's catchall provision, which permits the modification of a final judgment based on "any other reason that justifies relief." Fed. R. Civ. P. 60(b)(6).

*Fin. Corp.*, 621 F. App'x 348, 351 (7th Cir. 2015); *Federman*, 339 F. App'x at 33-34 (holding

that absent class members who did not object to settlement were not "parties" for purposes of

Rule 60(b) and declining "to expand the narrow exception to the general rule that non-parties

cannot bring Rule 60(b) motions"); *In re Four Seasons Sec. Laws Litig.*, 525 F.2d 500, 504 (10th

Cir. 1975) (absent class member "did not become a party for the purposes of Rule 60(b) to

enable him to challenge the adequacy or nature of the settlement"); *see also* Fed. R. Civ. Proc.

60(b) ("the court may relieve *a party* . . . from a final judgment, order, or proceeding for the

following reasons" (emphasis added)).  Sagapolutele did not object, intervene, or otherwise take

steps to become a "party" to this action, so Rule 60(b) is not available to her here.  *See also*

Newberg on Class Actions § 18:40 (5th ed.) ("[A]ll the circuits that have considered the issue

have taken the position that absent class members are generally not authorized to file Rule 60

motions.").

        Even if Sagapolutele were a "party," she has not met her burden to seek relief

pursuant to Rule 60(b)(6) because such "[r]elief . . . may only be granted under extraordinary

circumstances where, without such relief, an *extreme and unexpected hardship* would occur."

*Sawka* v. *Healtheast, Inc.*, 989 F.2d 138, 140 (3d Cir. 1993) (emphasis added); *see also*

*Matthews, Wilson & Matthews, Inc.* v. *Capital City Bank*, 614 F. App'x 969, 971 (11th Cir.

2015) (Rule 60(b)(6) "is an extraordinary remedy which may be invoked only upon a showing of

exceptional circumstances, and the party seeking relief has the burden of showing that absent

such relief, an extreme and unexpected hardship will result." (internal quotations omitted));

*Orlando Residence, Ltd.* v. *Hilton Head Hotel Inv'rs*, No. 89-cv-0662, 2013 WL 1103027, at *8

(D.S.C. Mar. 15, 2013), *aff'd sub nom. Orlando Residence, Ltd.* v. *Nelson,* 565 F. App'x 212

(4th Cir. 2014) ("Relief is rarely granted under . . . [Rule] 60(b)(6).").  The bar for relief under

Rule 60(b) is particularly high where the movant seeks to amend in "a class action [because] a too liberal application of Rule 60(b) would undermine the finality of judgments entered in such actions and would discourage their settlement." *Inmates of Suffolk Cty. Jail* v. *Rufo*, No. 71-cv-00162, 2015 WL 6958070, at *2 (D. Mass. Nov. 10, 2015); *see also Blue Diamond Coal Co.* v. *Trustees of UMWA Combined Ben. Fund*, 249 F.3d 519, 524 (6th Cir. 2001) ("[R]elief under Rule 60(b) is circumscribed by public policy favoring finality of judgments and termination of litigation.  This is especially true in an application of subsection (6) of Rule 60(b) . . . ." (internal quotations omitted)).

Sagapolutele has not made any showing whatsoever that the amendment will cause her any hardship, much less "extreme and unexpected hardship."  Tellingly, she has not shown—through supporting exhibits, affidavits, or even proffered facts in her brief—that the brain of her late husband, who passed away in 2009, has been examined by a board-certified neuropathologist and diagnosed with CTE at *any time*, much less that she would, but for the amendment, be entitled to an award.  She also has not established that a belated diagnosis years after death (indeed, her husband died approximately eight years ago) would even be possible given the deterioration of brain matter after death.  Nor does she seek to justify her apparent delay in seeking an examination.  Instead, Sagapolutele invites only speculation and offers only conclusory assertions as to how the purported change impacts her rights under the agreement, and she therefore fails to show that the exceptional remedy of Rule 60(b)(6) is warranted here.

*Finally*, Sagapolutele's invocation of the Court's "inherent authority" to amend a judgment does not salvage her claim because that authority is no broader than that provided by Rule 60, which, as explained above, does not permit Sagapolutele the relief she seeks.  *See* 20 Fed. Prac. & Proc. Deskbook § 104 (after 28 days from entry, "the judgment may be attacked,

other than by appeal, only as provided in Rule 60."); 11 Fed. Prac. & Proc. Civ. § 2852 (3d ed.) (while "the power of a court to modify an interlocutory judgment or order at any time prior to final judgment remains unchanged and is not limited by the provisions of Rule 60(b) . . . , [t]he rule does apply, however, to all final judgments entered in civil actions."). Sagapolutele's cases are not to the contrary; none holds that Courts have inherent authority to amend a final judgment approving a settlement agreement. (*See* Pl. Mem. at 23-24.) Three of the five cited cases concern only a court's authority to *enforce* a settlement agreement. *See Kokkonen* v. *Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 381 (1994) (holding that a district court has inherent authority to *enforce* a settlement agreement under particular circumstances); *Roman-Oliveras* v. *Puerto Rico Elec. Power Auth.*, 797 F.3d 83, 86-87 (1st Cir. 2015) (same); *Hensley* v. *Alcon Labs., Inc.*, 277 F.3d 535, 540-41 (4th Cir. 2002) (same). The fourth case, *In re Linerboard Antitrust Litig.*, 223 F.R.D. 357, 363 (E.D. Pa.), *amended*, 223 F.R.D. 370 (E.D. Pa. 2004) simply stands for the proposition that a court overseeing an MDL has inherent power to control the discovery process—an issue not relevant or in dispute here. Finally, while the fifth case involved an *amendment* of an order entering a settlement agreement, the Court did not hold that the district court had inherent authority to make the amendment; rather, it simply held that "the merits of [the district court's] decision to amend are no longer open to review." *F.A.C., Inc.* v. *Cooperativa de Seguros de Vida de Puerto Rico*, 449 F.3d 185, 190–91 (1st Cir. 2006).

In sum, Sagapolutele has not demonstrated (and cannot demonstrate) that she is entitled to rewrite the Settlement Agreement.

## <u>Conclusion</u>

For the foregoing reasons, the NFL Parties respectfully request that the Court deny the Motion in its entirety.

Dated:  September 28, 2017

Respectfully submitted,

/s/ Brad S. Karp
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
Brad S. Karp
Bruce Birenboim
Lynn B. Bayard
1285 Avenue of the Americas
New York, NY 10019-6064
Tel:   (212) 373-3000
bkarp@paulweiss.com

PEPPER HAMILTON LLP
Sean P. Fahey
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA 19103-2799
Tel:   (215) 981-4000

*Attorneys for Defendants the National Football
League and NFL Properties LLC*

## CERTIFICATE OF SERVICE

It is hereby certified that a true copy of the foregoing Memorandum of Law of the

National Football League and NFL Properties LLC in Opposition to Settlement Class Member

Yvonne Sagapolutele's Motion to Modify the Amended Final Order and Judgment was served

electronically via the Court's electronic filing system on the 28th day of September, 2017, upon

all counsel of record.


Dated:  September 28, 2017                        /s/Brad S. Karp
                                                 Brad S. Karp



# NFL CONCUSSION SETTLEMENT
*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

## POST-APPEAL NOTICE OF DENIAL OF MONETARY AWARD CLAIM
### DATE OF NOTICE: October 31, 2019

### I. SETTLEMENT CLASS MEMBER INFORMATION

| | |
|---|---|
| **Settlement Program ID** | 950013395 |

| **Name:** | First: Carleen | M.I. | Last: Hastings |
|---|---|---|---|

| | |
|---|---|
| **Settlement Class Member Type** | Representative Claimant |
| **Lawyer** | O'Hanlon, Demerath & Castillo |

| **Qualifying Diagnosis** | Death with CTE (Chronic Traumatic Encephalopathy) | **Date of Qualifying Diagnosis** | 10/15/08 |
|---|---|---|---|
| **Appellant** | Settlement Class Member | | |
| **Appellee** | NFL | | |

### II. EXPLANATION OF CLAIM DETERMINATION

This Notice is an official communication from the Claims Administrator for the NFL Concussion Settlement Program. The Special Master reviewed the appeal and determined the following, which is final and binding:

Appeal denied. Appellant did not show clear and convincing evidence of error in the Claims Administrator's decision. The Special Master's decision is a factual determination and is final and binding.

| 1. | Special Master ruled that the claim is denied |
|---|---|

### III. HOW TO CONTACT US WITH QUESTIONS OR FOR HELP

If you are represented by a lawyer, consult with your lawyer if you have questions or need assistance. If you are unrepresented and have any questions about this Notice or need help, contact us at 1-855-887-3485 or send an email to ClaimsAdministrator@NFLConcussionSettlement.com.  If you are a lawyer, call or email your designated Firm Contact for assistance. For more information about the Settlement program, visit the official website at www.NFLConcussionSettlement.com to read the Frequently Asked Questions or download a copy of the complete Settlement Agreement.



# Exhibit 11

**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br><br>MDL No. 2323<br><br>Hon. Anita B. Brody |
| Kevin Turner and Shawn Wooden, *on behalf of themselves and others similarly situated*,<br><br>                    Plaintiffs,<br><br>               v.<br><br>National Football League and NFL Properties, LLC, successor-in-interest to NFL Properties, Inc.<br>                    Defendants. | Civ. Action No.: 14-cv-00029-AB |
| THIS DOCUMENT RELATES TO:<br>Settlement Class Member Carleen Hastings (SPID 950013395) | Hon. Anita B. Brody |

**RESPONSE OF THE NATIONAL FOOTBALL LEAGUE AND
NFL PROPERTIES LLC IN OPPOSITION TO CARLEEN HASTINGS'
OBJECTION TO POST-APPEAL NOTICE OF DENIAL OF
<u>MONETARY AWARD CLAIM</u>**

## **TABLE OF CONTENTS**

TABLE OF CONTENTS ............................................................................................ i

PRELIMINARY STATEMENT ............................................................................. 1

BACKGROUND ...................................................................................................... 3

ARGUMENT ............................................................................................................ 4

      A.    Qualifying Diagnoses of Death with CTE Must Be Rendered Prior to the Deadline Set Forth in the Settlement Agreement .................................... 4

      B.    Diagnosing Physicians Must Examine Brain Tissue to Render a Qualifying Diagnosis of Death with CTE ............................................ 7

Conclusion ............................................................................................................... 8

The National Football League and NFL Properties LLC (collectively, the "NFL Parties") respectfully submit this response in opposition to Carleen Hastings' Objection to Post-Appeal Notice of Denial of Monetary Award Claim (the "Objection"). In the Objection, Ms. Hastings seeks reversal of the Special Master's decision denying her appeal of a Qualifying Diagnosis of Death with CTE based on purported legal error. For the reasons set forth below, Ms. Hastings' arguments are without merit, and the Objection should be denied.

## PRELIMINARY STATEMENT

On July 30, 2019, the Claims Administrator denied Ms. Hastings' claim for a Qualifying Diagnosis of Death with CTE on behalf of the late Christopher Mims.[1] The Claims Administrator explained that Ms. Hastings' claim was insufficient to satisfy the Settlement criteria for the alleged Qualifying Diagnosis because it did not provide any evidence that the diagnosing physician, Dr. Ronald Hamilton, personally performed a post-mortem examination of Mr. Mims' brain before the deadline set forth in the Settlement Agreement (here, April 22, 2015 given that Mr. Mims died prior to Preliminary Approval of the Settlement). Ms. Hastings then appealed her claim determination to the Special Masters, arguing that (1) the date on which Dr. Hamilton actually diagnosed Mr. Mims does not matter, because FAQ 99 allegedly establishes that the "diagnosis date" for Death with CTE is the date of the player's death, regardless of when the actual diagnosis later occurs; (2) if the Claims Administrator determines that a diagnosing physician must render a diagnosis of Death with CTE prior to a deadline set forth in the operative Settlement Agreement, then the Settlement Agreement violates Settlement Class Members' due process rights because it purportedly reflects an adverse change to the original Settlement Agreement without proper notice;

---

[1] Mr. Mims' death certificate indicates that he died on October 15, 2008 as a result of dilated cardiomyopathy, with contributing causes of hepatic steatosis and hypertension. (*See* Death Certificate, Doc. No. 142714 at 2.)

(3) the Settlement Agreement allegedly did not require Dr. Hamilton to examine Mr. Mims' brain tissue to render a post-mortem diagnosis; and (4) Dr. Hamilton did examine Mr. Mims' brain tissue.  Upon considering these arguments, the Special Master denied the appeal and concurred with the Claims Administrator's determination that Ms. Hastings' claim did not satisfy the Settlement criteria for a Qualifying Diagnosis of Death with CTE.  Ms. Hastings now asks the Court to overturn the Special Master's determination on legal grounds.

In the Objection, Ms. Hastings advances nearly identical versions of three of the four arguments set forth in her prior appeal: (1) Dr. Hamilton's alleged diagnosis of Mr. Mims was timely pursuant to Settlement FAQ 99 because the "diagnosis date" purportedly is the date of the player's death as opposed to when the diagnosis actually occurred; (2) the Settlement Agreement's Injury Definition for Death with CTE allegedly did not require Dr. Hamilton to examine Mr. Mims' brain tissue to render the diagnosis; and (3) the Claims Administrator allegedly erred in stating that Dr. Hamilton did not examine Mr. Mims' brain tissue.  There is no merit to these arguments.

In fact, the Injury Definition for Death with CTE set forth in the Settlement Agreement expressly requires that a board-certified neuropathologist render the diagnosis prior to the Final Approval Date (April 22, 2015) or within 270 days after the player's death when the player died between Preliminary and Final Approval.  The Objection willfully ignores the express language of the Settlement Agreement while attempting to twist the meaning of FAQ 99 to displace the Settlement Agreement's unambiguous requirements.  Here, Ms. Hastings did not provide—and undoubtedly cannot provide—any evidence that Dr. Hamilton rendered the diagnosis prior to the April 22, 2015 deadline, and that factual record is final and binding for this Objection.

In addition, as this Court made clear in approving the Settlement Agreement, a proper Qualifying Diagnosis of Death with CTE necessarily requires that a board-certified neuropathologist personally examine a Retired NFL Football Player's brain tissue prior to the deadline set forth in the Settlement Agreement.  Moreover, even though Dr. Hamilton indicated that he examined slides of Mr. Mims' brain tissue, neither Dr. Hamilton nor Ms. Hastings have provided any evidence that Dr. Hamilton personally examined Mr. Mims' brain tissue prior to the deadline set forth in the Settlement Agreement.

For these reasons, and those set forth herein and in the NFL Parties' opposition to Ms. Hastings' appeal, the Objection should be denied.

## BACKGROUND

This Objection is one of a series of 20 separate objections filed by the law firm of O'Hanlon, Demerath & Castillo ("O'Hanlon") on behalf of claimants whose Claim Packages relied on undated letters from neuropathologist Dr. Ronald Hamilton purporting to render Qualifying Diagnoses of Death with CTE.  For each of these claims, neither Dr. Hamilton's undated letter nor the remaining Claim Package materials provide any evidence that Dr. Hamilton actually rendered a Qualifying Diagnosis of Death with CTE prior to Final Approval of the Settlement (or within 270 days of death when the Retired Player died between Preliminary and Final Approval).  In addition, for all but one of these claims, Dr. Hamilton's letter fails to provide any evidence that Dr. Hamilton examined the deceased player's brain tissue in order to render the diagnosis.

With knowledge that Mr. Mims and its other clients never received a diagnosis of Death with CTE prior to the deadline set forth in the Settlement Agreement, O'Hanlon has engaged in a lengthy campaign to evade the deadline plainly established for Qualifying Diagnoses of Death with CTE.  On August 15, 2017, O'Hanlon, on behalf of client Yvonne Sagapolutele, filed a

Motion to Modify the Amended Final Order and Judgment, alleging that the Settlement Agreement's deadline to obtain a Qualifying Diagnosis of Death with CTE was "imposed after the deadline to opt out and without notice to Class Members." (Mem. of Law in Supp. of Absent Class Member and Pl. Yvonne Sagapolutele's Mot. to Modify the Am. Final Order and J. at 18, 12-md-2323, ECF No. 8263-2 (the "Motion to Modify the Amended Final Order and Judgment").) After full briefing, the Court denied the motion without prejudice to Ms. Sagapolutele's (or other similarly situated Settlement Class Members') ability to raise the issue at a later time if she filed a Death with CTE claim that would have been valid but for the deadline. (Order, 12-md-2323, ECF No. 8557.) O'Hanlon then waited over 16 months to file any Death with CTE claims—ultimately filing 20 separate claims on February 5, 2019 (the day before the deadline for pre-Effective Date claims)—and relying on undated letters from Dr. Hamilton with the clear intention of obfuscating the timing and nature of the purported Death with CTE diagnoses. O'Hanlon is now back before the Court advancing meritless arguments with respect to Qualifying Diagnoses of Death with CTE that the Court should summarily reject.

## ARGUMENT

In the Objection, Ms. Hastings argues that Dr. Hamilton's alleged diagnosis was timely because the "diagnosis date" for a Death with CTE claim purportedly is the date of the player's death, and that, although Dr. Hamilton allegedly did examine slides of Mr. Mims' brain tissue, the Settlement Agreement did not require Dr. Hamilton to examine Mr. Mims' brain tissue to render the diagnosis. Both arguments are wholly without merit.

### A. Qualifying Diagnoses of Death with CTE Must Be Rendered Prior to the Deadline Set Forth in the Settlement Agreement

*First*, Ms. Hastings argues that the Special Master erred in denying her appeal because a diagnosing physician need not render a Qualifying Diagnosis of Death with CTE prior to *any*

deadline so long as the retired player decedent passed away before the Settlement's Final Approval Date. (*See* Objection at 6-7.) That argument, however, is contradicted by the clear terms of the Settlement Agreement.

For a Qualifying Diagnosis of Death with CTE, the Settlement Agreement explicitly requires that a diagnosing physician render the diagnosis prior to a specified deadline set by the Settlement Agreement. Specifically, Section 2.1(aa) of the Settlement Agreement provides that the Qualifying Diagnosis of "Death with CTE is defined in Exhibit 1," and Exhibit 1 states that the definition of Death with CTE is: "For Retired NFL Football Players who died prior to the Final Approval Date, *a post-mortem diagnosis of CTE made by a board-certified neuropathologist prior to the Final Approval Date, provided that a Retired NFL Football Player who died between July 7, 2014 and the Final Approval Date shall have until 270 days from his date of death to obtain such a postmortem diagnosis*." (Settlement Agreement, Ex. A-1 at 5 § 5 (emphasis added).) Section 6.3(f) of the Settlement Agreement reiterates that requirement.

In the Objection, as in her prior appeal, Ms. Hastings argues that, where a player died before the Final Approval Date, *no deadline applies* to when a physician must render a Qualifying Diagnosis of Death with CTE because "the diagnosis date for Death with CTE is the date of the Player's death, even if the diagnosis occurs later." (Objection at 6; *see also* Written Statement in Support of Class Member's Appeal of the Claims Administrator's Notice of Denial of Monetary Award Claim, Objection Ex. 4 at 5 (arguing that "the only date that is relevant in determining the date of a Qualifying Diagnosis for Death with CTE is the date of the Player's death").) As support for this argument, Ms. Hastings cites Settlement FAQ 99 (formerly Settlement FAQ 93), which states in part:

> *Death with CTE*: For these claims, the date of the Qualifying Diagnosis is the date of the Player's death, even though the

> diagnosis is not made until after the Player dies. The Monetary Award is based on the Player's age when he died.

(Settlement FAQ 99.)

Ms. Hastings' argument rests on willful ignorance of the Settlement Agreement and a misinterpretation of Settlement FAQ 99. Specifically, as outlined above, the Settlement Agreement plainly requires that, "[f]or Retired NFL Football Players who died prior to the Final Approval Date, a post-mortem diagnosis" of Death with CTE must be "made by a board-certified neuropathologist *prior to the Final Approval Date* . . . ." (Settlement Agreement Ex. A-1 at 5 § 5 (emphasis added).) Moreover, if, as Ms. Hastings argues, the Settlement Agreement required only that a Retired NFL Football Player died prior to the Final Approval Date in order for a diagnosis made at *any unlimited future date* to be timely, the Settlement Agreement would not include subsequent language providing that a player who died between July 7, 2014 and April 22, 2015 "*shall have until 270 days from his date of death to obtain such a postmortem diagnosis*." (*Id.*)

Moreover, Settlement FAQ 99 does not—and cannot—alter the Settlement Agreement's Injury Definition setting forth the date by which a Diagnosing Physician must have *actually made* a Death with CTE diagnosis. Instead, FAQ 99 concerns the date of diagnosis used *for calculating compensation*. The Parties to the Settlement Agreement did not wish to reduce the compensatory award of a decedent by calculating the award value from the date of the neuropathological examination and diagnosis because, unlike living claimants, the decedent would not have aged between death and the relevant examination. Thus, the Death with CTE discussion in Settlement FAQ 99 clearly states that "[t]he *Monetary Award* is based on the Player's age when he died."

(Settlement FAQ 99 (emphasis added).)  Ms. Hastings' counsel shamelessly excluded that clarifying language from the FAQ quotation included in the Objection.  (*See* Objection at 6.)

For these reasons, Ms. Hastings' first legal argument lacks any merit whatsoever.

**B.    Diagnosing Physicians Must Examine Brain Tissue to Render a Qualifying Diagnosis of Death with CTE**

*Second*, Ms. Hastings argues that the Special Master erred in denying her appeal because the Settlement Agreement purportedly does not require a diagnosing physician to examine brain tissue to render a Qualifying Diagnosis of Death with CTE.  (*See* Objection at 7-8.)  Ms. Hastings is simply wrong.

As previously discussed, a Qualifying Diagnosis of Death with CTE requires "a post-mortem diagnosis of CTE made by a board-certified neuropathologist prior to the Final Approval Date . . . ."  (Settlement Agreement, Ex. A-1 at 5 § 5; *see also* Settlement Agreement §§ 2.1(aa), 6.3(f).)  As this Court made clear in the Court's Memorandum supporting Final Approval of the Settlement Agreement, post-mortem examination of brain tissue is the ***only*** way that CTE can be diagnosed at present:

> Chronic Traumatic Encephalopathy is a neuropathological diagnosis that currently can only be made post mortem. This means no one can conclusively say that someone had CTE until a scientist looks at sections of that person's brain under a microscope to see if abnormally phosphorylated tau protein ("abnormal tau protein") is present, and if so whether it is present in a reportedly unique pattern.

*In re Nat. Football League Players' Concussion Injury Litig.*, 307 F.R.D. 351, 397 (E.D. Pa. 2015), *amended*, No. 2:12-MD-02323-AB, 2015 WL 12827803 (E.D. Pa. May 8, 2015), and *aff'd*, 821 F.3d 410 (3d Cir. 2016).  This Court further explained that "Retired Players cannot be compensated for CTE in life because no diagnostic or clinical profile of CTE exists, and the symptoms of the disease, if any, are unknown."  (*Id.*)  CTE researchers continue to support this holding with respect

to the diagnosis of CTE today. *See, e.g.*, Jesse Mez et al., *Duration of American Football Play and Chronic Traumatic Encephalopathy*, Annals of Neurology (forthcoming, first published Oct. 7, 2019), https://onlinelibrary.wiley.com/doi/abs/10.1002/ana.25611 (explaining that "CTE only can be definitively diagnosed by postmortem neuropathologic examination," and that "validated *in vivo* diagnostic criteria do not currently exist").

Thus, the Settlement Agreement and its implementing orders clearly require that a diagnosing physician personally examine a Retired NFL Football Player's brain tissue in order to render a Qualifying Diagnosis of Death with CTE. Here, Dr. Hamilton submitted an undated letter indicating that he examined slides of Mr. Mims' brain tissue in order to render the diagnosis (*see* Hamilton Letter, Objection at 3), but, as previously discussed, neither Dr. Hamilton nor Ms. Hastings have provided *any* evidence that Dr. Hamilton performed such a post-mortem examination and diagnosed Mr. Mims with CTE prior to April 22, 2015. For these reasons, even if Dr. Hamilton's evaluation of the slides were considered a sufficient post-mortem examination of Mr. Mims' brain tissue to render a valid diagnosis, Ms. Hastings' claim was still unsupported.

## Conclusion

For the foregoing reasons, the NFL Parties respectfully request that the Court deny Ms. Hastings' Objection and affirm the Special Master's decision.

Dated: December 12, 2019                    Respectfully submitted,

/s/ Brad S. Karp
PAUL, WEISS, RIFKIND, WHARTON
  & GARRISON LLP
Brad S. Karp
Bruce Birenboim
Claudia Hammerman
Lynn B. Bayard
Douglas M. Burns
1285 Avenue of the Americas
New York, NY 10019-6064
Tel: (212) 373-3000
bkarp@paulweiss.com

*Attorneys for the National Football League and
NFL Properties LLC*

# Exhibit 12

## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br><br>MDL No. 2323 |
| THIS DOCUMENT RELATES TO:<br><br>ALL CLAIMS LISTED BELOW. | **Hon. Anita B. Brody** |

## SETTLEMENT IMPLEMENTATION ORDER

**AND NOW,** this 16th day of June, 2020, it is **ORDERED** that the following claim

appeals are **REMANDED** to the Special Master for further explanation[1]:



1. SPID
2. SPID
3. SPID
4. SPID
5. SPID

---

[1] In each of these cases, the Settlement Class Member submitted a claim for a diagnosis of Death With CTE. In each, the Claims Administrator denied the claim for two reasons: (1) failure to comply with the deadline for obtaining a Death With CTE Diagnosis; and (2) failure to provide proof that a physician examined the deceased's brain-tissue. In each case, the Special Master affirmed the denial, stating that the Appellant did not point to clear and convincing evidence of error in the Claims Administrator's decision. But the Special Master did not specify whether this conclusion applied to *both* of the Claims Administrator's reasons or only *one* of those reasons.

For at least two claims—SPID Nos. 950013395 and [redacted]—there is evidence in the record that a doctor personally examined slides with brain tissue of the deceased player. But the Claims Administrator appears to have denied these claims for both reasons above: that (1) the claim packages did not satisfy the diagnosis deadline for Death with CTE claims, and (2) the claims packages did not establish that a doctor reviewed the deceased player's brain tissue. The Special Master affirmed the Claims Administrator's decisions, but never specified the grounds of the affirmance. For these claims, as well as every other claim listed in this Order, the Special Master must specify whether clear and convincing evidence of error exists as to each independent basis given by the Claims Administrator for the denials.

1

6. SPID █████████

7. SPID █████████

8. SPID █████████

9. SPID █████████

10. SPID █████████

11. SPID █████████

12. SPID █████████

13. SPID █████████

14. SPID █████████

15. SPID 950013395

16. SPID █████████

17. SPID █████████

18. SPID █████████

19. SPID █████████

20. SPID █████████

June 16, 2020

s/ANITA B. BRODY, J. _____
ANITA B. BRODY, J.

# Exhibit 13

**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | : : : : | No. 2:12-md-02323-AB MDL No. 2323 |
| | : : | **Hon. Anita B. Brody** |
| THIS DOCUMENT RELATES TO: APPEAL OF SETTLEMENT CLASS MEMBER CARLEEN HASTINGS REGARDING DENIAL OF MONETARY AWARD | : : : : : : | |
| | : | SPID No. 950013395 |

## INTRODUCTION

On February 5, 2019, Representative Claimant Carleen Hastings filed a claim for benefits under the Amended Settlement Agreement on behalf of her late son, Christopher E. Mims, a Retired NFL Football Player. Mr. Mims passed away on October 15, 2008, and later received a post-mortem diagnosis of Chronic Traumatic Encephalopathy. The Claims Administrator denied the claim for two reasons: (1) failure to meet the diagnosis deadline for Death with CTE claims, and (2) failure to establish that a doctor reviewed Mr. Mims' brain tissue.

Ms. Hastings timely appealed. Special Master Pritchett affirmed the denial, and Ms. Hastings subsequently appealed to the District Court. Following review of Ms. Hastings' objection, the Court has remanded this claim to the Special Master to clarify whether the affirmance applies to one or both of the reasons for denial provided by the Claims Administrator.[1]

While there is no clear and convincing evidence that a diagnosis was made before the appropriate deadline, I do find there is clear and convincing evidence that the diagnosing neuropathologist personally examined Mr. Mims' brain tissue. I therefore re-affirm the Claims Administrator's denial of Ms. Hastings' claim on the first basis only.

## FACTUAL AND PROCEDURAL BACKGROUND

On the morning of October 15, 2008, Christopher Mims was found unresponsive on his bathroom floor by a friend, who called the paramedics. Doc. 199440. Mr. Mims was pronounced at the scene, and a post-mortem autopsy was performed the following day. *Id.* His cause of death was determined to be dilated cardiomyopathy. *Id.*

---

[1] Settlement Implementation Order, Doc. 225731 (June 16, 2020).

On February 5, 2019, Ms. Hastings filed a claim for relief under the Settlement on behalf of her late son. Doc. 198425. Dr. Ronald Hamilton, a board-certified neuropathologist, provided a letter stating that he conducted an examination of the late Mr. Mims' brain tissue based upon "10 unstained slides from 8 tissue blocks" received from the Los Angeles County Medical Coroner. Doc. 199435. Dr. Hamilton concluded that the "findings are diagnostic of CTE," and that "Christopher Mims had CTE." *Id.* The letter is undated.

On June 17, 2019, the Claims Administrator denied the claim, writing:

> Although Dr. Hamilton is a board-certified neuropathologist and signed a Pre-Effective Date Diagnosing Physician Certification Form indicating a CTE diagnosis, we must have proof that he personally performed the post-mortem exam on the Retired Player and that it was done on or before 4/22/15. There was no post-mortem examination report submitted to indicate that Dr. Hamilton examined the Retired Player's brain tissue to confirm a CTE diagnosis. The two-page letter provided by Dr. Hamilton does not satisfy the requirements for a CTE diagnosis under this Settlement Program. For these reasons, this claim is denied.

Doc. 211985. Ms. Hastings timely appealed. Doc. 213485.

On October 31, 2019, Special Master Pritchett denied the Appeal, stating that "Appellant did not show clear and convincing evidence of error in the Claims Administrator's decision." Doc. 214492.

Ms. Hastings appealed the Special Master's decision to the Federal District Court, asserting that the Special Master erred in affirming the Claims Administrator's denial. Doc. 217476. Judge Brody remanded the claim for clarification, noting that the Special Master's decision "did not specify whether . . . [it] applied to both of the Claims Administrator's reasons or only one of [the] reasons" for denial of Ms. Hastings' claim. Doc. 225731.

## DISCUSSION

There are two criteria that must be satisfied under the Settlement Agreement to support a Qualifying Diagnosis of Death with CTE:[2]

(1) a post-mortem diagnosis made by a board-certified neuropathologist based on examination of the deceased Player's brain tissue,[3] *and*

---

[2] *See* Settlement Agreement, Exhibit A-1(5).

[3] As the Court wrote in the Final Order and Judgment approving the Settlement, "no one can conclusively say that someone had CTE until a scientist looks at sections of that person's brain under a microscope to see if abnormally phosphorylated tau protein ('abnormal tau protein') is present, and if so whether it is present in a reportedly unique pattern." *See* In re Nat'l Football League Players' Concussion Injury Litig., 307 F.R.D. 351, 391 (E.D. Pa. 2015). To conclusively diagnose CTE, the diagnosing neuropathologist must therefore examine the Player's brain tissue.

(2) compliance with the deadline for obtaining the post-mortem diagnosis.[4]

The Claims Administrator determined that Ms. Hastings' claim failed to satisfy either of the two requirements. By order of Judge Brody, I now review this matter to provide additional clarification following Special Master Pritchett's affirmance. Specifically, I will address "whether clear and convincing evidence of error exists as to each independent basis given by the Claims Administrator" for denial of Ms. Hastings' claim. Doc. 225731.

The Settlement explicitly provides that "[a] Qualifying Diagnosis of Death with CTE shall be made only for Retired NFL Football Players who died prior to the Final Approval Date [of April 22, 2015], through a post-mortem diagnosis made by a board-certified neuropathologist prior to the Final Approval Date . . . ." Thus, there are *two* aspects to complying with the deadline for obtaining a Qualifying Diagnosis of Death with CTE: both the date of the Qualifying Diagnosis *and* the date of the neuropathologist's post-mortem examination must be prior to April 22, 2015.

Mr. Mims tragically passed away at the age of 38 on October 15, 2008 due to heart complications. Doc. 199440. A post-mortem autopsy was conducted, which included a neuropathology examination. *Id.* The final neuropathologic diagnosis, reported by neuropathology consultant Dr. John Andrews, did not include CTE; notably, despite several minor abnormalities,[5] Dr. Andrews concluded with the following impression: "[o]therwise, grossly unremarkable adult brain and coverings." *Id.*

The present claim, based upon a diagnosis of Death with CTE, is supported by a conspicuously undated letter from Dr. Hamilton discussing his analysis of Mr. Mims' brain tissue.[6] Doc. 199435. The letter was filed on February 6, 2019. Although the date of the Qualifying Diagnosis (that is, the date of Mr. Mims' passing) is well before the Final Approval Date of April 22, 2015, no proof has been offered to suggest that Dr. Hamilton's examination was timely.

Counsel for Ms. Hastings repeatedly asserts that "the Claims Administrator erroneously concluded that the date of diagnosis is not the date of the Player's death." Doc. 217476. This incorrect assertion misrepresents the deficiency in Ms. Hastings' claim. The problem with this claim—as stated by the Claims Administrator—is not the date of the Qualifying Diagnosis; rather, at issue it is what date the diagnosis was ***actually made***.

Ms. Hastings continues to provide no proof of when Dr. Hamilton examined the late Mr. Mims' brain tissue to make his diagnosis. Thus, there is no clear and convincing evidence of error in the Claims Administrator's decision that the April 22, 2015 deadline for obtaining a diagnosis was not met.

---

[4] *See* Settlement Agreement, Section 6.3(f) ("A Qualifying Diagnosis of Death with CTE shall be made . . . through a post-mortem diagnosis made . . . prior to the Final Approval Date, provided that a Retired NFL Football Player who died between July 7, 2014 and the Final Approval Date shall have until 270 days from his date of death to obtain such a post-mortem diagnosis.") The Final Approval Date was April 22, 2015. *See* Settlement Portal, *Frequently Asked Questions*, FAQ # 98 (f).

[5] Specifically, Dr. Andrews noted the following impressions about Mr. Mims' brain: "adult cranial dura mater with small right middle fossa dural nodule," as well as "cerebrovasular congestion." Neither relates to CTE.

[6] Although it appears that Dr. Hamilton did personally examine slides of Mr. Mims' brain tissue, it is surprising that he does not discuss—or even acknowledge—the findings of Dr. Andrews' neuropathological examination.

## CONCLUSION

The Claims Administrator denied Ms. Hastings' claim for two independent reasons. First, the claim was denied based upon a lack of proof that the diagnosis was timely. I find that there is no evidence that the diagnosis of Death with CTE was obtained before the appropriate deadline. Second, the claim was denied for failure of the diagnosing physician to personally examine the Player's brain tissue. However, the evidence suggests that Dr. Hamilton did examine the late Mr. Mims' brain tissue as is necessary to diagnose Death with CTE.

The Claims Administrator correctly concluded that Ms. Hastings failed to show that the diagnosis was obtained before the appropriate deadline. I thus affirm the denial solely on the first basis.


Date: July 15, 2020

_____

David Hoffman, Special Master

# Exhibit 14



# NFL CONCUSSION SETTLEMENT
*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

## POST-APPEAL NOTICE OF DENIAL OF MONETARY AWARD CLAIM
### DATE OF NOTICE: July 17, 2020

### I. SETTLEMENT CLASS MEMBER INFORMATION

| | | | | |
|---|---|---|---|---|
| **Settlement Program ID** | 950013395 | | | |
| **Name:** | First<br>Carleen | M.I. | Last<br>Hastings | |
| **Settlement Class Member Type** | Representative Claimant | | | |
| **Lawyer** | O'Hanlon, Demerath & Castillo | | | |
| **Qualifying Diagnosis** | Death with CTE (Chronic Traumatic Encephalopathy) | **Date of Qualifying Diagnosis** | | 10/15/08 |
| **Appellant** | Settlement Class Member | | | |
| **Appellee** | NFL | | | |

### II. EXPLANATION OF CLAIM DETERMINATION

This Notice is an official communication from the Claims Administrator for the NFL Concussion Settlement Program. The Special Master reviewed the appeal and determined the following:

Please see attached.

| | |
|---|---|
| **1.** | Special Master ruled that the claim is denied |

### III. HOW TO CONTACT US WITH QUESTIONS OR FOR HELP

If you are represented by a lawyer, consult with your lawyer if you have questions or need assistance. If you are unrepresented and have any questions about this Notice or need help, contact us at 1-855-887-3485 or send an email to ClaimsAdministrator@NFLConcussionSettlement.com. If you are a lawyer, call or email your designated Firm Contact for assistance. For more information about the Settlement program, visit the official website at www.NFLConcussionSettlement.com to read the Frequently Asked Questions or download a copy of the complete Settlement Agreement.



# Exhibit 15

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE: NATIONAL FOOTBALL | § | No. 2:12-md-02323-AB |
| LEAGUE PLAYERS' CONCUSSION | § | |
| INJURY LITIGATION | § | MDL No. 2323 |
| | § | |
| | § | **Hon. Anita B. Brody** |
| THIS DOCUMENT RELATES TO: | § | |
| ALL CLAIMS FOR CLASS MEMBERS | § | |
| LISTED BELOW[1] | § | |

---

**SUPPLEMENT TO SETTLEMENT CLASS MEMBERS' OBJECTIONS
TO THE SPECIAL MASTER'S DECISIONS**

---

TO THE HONORABLE JUDGE BRODY:

For the reasons previously provided to the Court in their Objections, Class Members respectfully request the Court sustain their objections to the Special Master's decisions and order approval of their claims.

After Class Members filed their Objections, the Court requested that the Special Master provide further explanation regarding the standard of review he used in affirming the denial of the Class Members' claims.[2]  The Special Master has now

---

[1]   "Class Members" refers to the 20 class members identified in the Court's Settlement Implementation Order dated June 16, 2020, who are identified as SPID Nos. █████████████████████████████ 950013395, █████████████████████████████████████.

[2]   In its June 16, 2020 order, the Court noted that the claims administrator had denied Class Members' claims for two reasons: (1) failure to comply with the deadline for obtaining a Death with CTE Diagnosis; and (2) failure to provide proof that a physician examined the deceased's brain tissue.  The Court asked the Special Master to specify whether he applied a clear and convincing evidence of error standard of review to both of these reasons.

Regarding two claims — SPID Nos. 950013395 and █████████ — the Court asked the Special Master to explain whether his affirmance was based on both of the above two reasons, or only the former reason.

1

clarified the standard of review he used.[3]

Accordingly, unless the Court requires additional briefing or a hearing on Class Members' Objections, Class Members respectfully request the Court sustain their previously-filed objections, reverse the Special Master's decisions, and order approval of Class Members' claims.

Dated:  August 14, 2020

Respectfully Submitted:

/s/ Justin Demerath

**Justin Demerath**
Texas State Bar No. 24034415
**David Campbell**
Texas State Bar No. 24057033
O'HANLON, DEMERATH & CASTILLO
808 West Avenue  |  Austin, TX 78701
Tel: (512) 494-9949  |  Fax: (512) 494-9919
jdemerath@808west.com
dcampbell@808west.com

**Counsel for Class Members**

---

[3]   In response to the Court's request, the Special Master has explained that he applied that standard of review to both reasons.

The Special Master also clarified that for the two claims — SPID Nos. 950013395 and ▮▮▮▮▮ — in which there was evidence that the board-certified neuropathologist examined brain tissue, the affirmance was based only on the first reason given for denial.

Regarding the other 18 claims, the Special Master asserts that without examining a deceased person's brain tissue, the CTE diagnosis cannot be "conclusively" established.  But there is no medical or legal requirement cited by the Special Master that a board-certified neuropathologist's CTE diagnosis be "conclusive" as opposed to medically reasonable.  Moreover, the Amended Settlement Agreement provides no basis for second-guessing the diagnosis of a board-certified neuropathologist — it simply requires a "post-mortem diagnosis by a board-certified neuropathologist of CTE."  See Amended Settlement Agreement [ECF 64810], § 6.3(f).  It is undisputed that Class Members have each received a post-mortem diagnosis by a board-certified neuropathologist of CTE. As a matter of law, that diagnosis is sufficient under the terms of the settlement agreement.

2

## <u>CERTIFICATE OF SERVICE</u>

It is hereby certified that a true copy of the foregoing document was submitted

on the Court Portal on August 14, 2020.

<div align="right">

<u>/s/ Justin B. Demerath</u>
Justin B. Demerath

</div>

# Exhibit 16

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br><br>MDL No. 2323<br><br>Hon. Anita B. Brody |
| Kevin Turner and Shawn Wooden, *on behalf of themselves and others similarly situated*,<br><br>                              Plaintiffs,<br><br>                    v.<br><br>National Football League and NFL Properties, LLC, successor-in-interest to NFL Properties, Inc.<br>                              Defendants. | Civ. Action No.: 14-cv-00029-AB |
| THIS DOCUMENT RELATES TO:<br>Settlement Class Members SPIDs ███████████████████████ 950013395, ███ and █████. | Hon. Anita B. Brody |

**RESPONSE OF THE NATIONAL FOOTBALL LEAGUE AND NFL PROPERTIES LLC IN OPPOSITION TO SUPPLEMENT TO SETTLEMENT CLASS MEMBERS' OBJECTIONS TO THE SPECIAL MASTER'S DECISION**

The National Football League and NFL Properties LLC (collectively, the "NFL Parties") respectfully submit this response in opposition to the Supplement filed by twenty Settlement Class Members (the "Demerath Claimants") to their Objections to the Special Master's Decisions affirming denial of their facially deficient Death with CTE claims.

Although the NFL Parties' underlying opposition briefs submitted in connection with each Settlement Class Member's Objection conclusively demonstrate why each should be swiftly denied, the NFL Parties feel compelled to respond briefly to the Supplement's new and audacious argument that Dr. Ronald Hamilton's failure to examine brain tissue of eighteen of the deceased players should somehow be excused because the Settlement Agreement purportedly does not permit any "second-guessing" of a CTE diagnosis by a board-certified neuropathologist and because it nowhere states that such diagnoses must be "conclusive as opposed to medically reasonable." (Supplement at 2 n.3.) That argument is frivolous.

According to the very university with which Dr. Hamilton is affiliated, neuropathologists are medical doctors who specialize in the diagnosis of brain and nervous system disease through microscopic examination of brain and nerve tissue in conjunction with radiologic studies.[1] The suggestion that the Settlement Agreement's requirement for a "post-mortem diagnosis of CTE made by a board-certified neuropathologist" requires anything less than an actual examination of brain tissue is meritless, particularly given this Court's prior statements in its Final Approval Order (*see* NFL Objections at 7 (quoting the Court's Final Approval Order as stating "Chronic Traumatic Encephalopathy is a neuropathological diagnosis that currently can only be made post mortem. This means no one can conclusively say that someone had CTE until a scientist looks at sections

---

[1] *See* "Role of the Neuropathologist," UPMC, Neuropathology, available at https://www.upmc.com/services/pathology/diagnostic-services/anatomic/neuropathology.

of that person's brain under a microscope to see if abnormally phosphorylated tau protein ("abnormal tau protein") is present, and if so whether it is present in a reportedly unique pattern.").)

The denial of the eighteen claims does not amount to "second guessing" a reasonable diagnosis, but instead is the *only* supportable result. In fact, the only "guessing" here was done by Dr. Ronald Hamilton, who lent his name to "virtually identical, undated, form letter[s]" that essentially posit "it is more likely than not" that these players had CTE at the time of their passing based on the fact they played football." (*See* July 15, 2020 Special Master Decision at 2 (for SPID 950013154).) Here, it is entirely irrelevant whether the applicable diagnostic standard is "conclusive" or "medically reasonable" because Dr. Hamilton's actions—providing purported "diagnoses" without any examination of brain tissue—clearly satisfy neither. Indeed, they fail *any* conceivable medical standard in the field of neuropathology and plainly do not comply with the terms of the Settlement Agreement.

For the foregoing reasons, and those set forth in the Objection responses, the NFL Parties respectfully request that the Court deny these Objections, condemn such frivolous arguments, and affirm the Special Master's decisions.

Dated: December 28, 2020                    Respectfully submitted,

/s/ Brad S. Karp

PAUL, WEISS, RIFKIND, WHARTON
  & GARRISON LLP
Brad S. Karp
Bruce Birenboim
Lynn B. Bayard
Claudia Hammerman
Douglas M. Burns
1285 Avenue of the Americas
New York, NY 10019-6064
Tel: (212) 373-3000
bkarp@paulweiss.com

*Attorneys for the National Football League and
NFL Properties LLC*

# Exhibit 17

**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB <br> MDL No. 2323 |
| THIS DOCUMENT RELATES TO: <br> ALL CLAIMS LISTED BELOW. | **Hon. Anita B. Brody** |

<u>**ORDER**</u>

**AND NOW**, this 24th day of February, 2023, it is **ORDERED** that the Objections of the

following Class Members are **DENIED** because the claims packages are insufficient:

1. SPID ███████
2. SPID ███████
3. SPID ███████
4. SPID ███████
5. SPID ███████
6. SPID ███████
7. SPID ███████
8. SPID ███████
9. SPID ███████
10. SPID ███████
11. SPID ███████
12. SPID ███████
13. SPID ███████

14. SPID ████████

15. SPID ████████

16. SPID ████████

17. SPID ████████

18. SPID ████████

It is further **ORDERED** that the Objections of the following Class Members are

**REMANDED** to the Special Master. The Special Master is instructed to return the claims to the

Claims Administrator to further determine the sufficiency of the claims packages:

1. SPID 950013395

2. SPID ████████

BY THE COURT:


 _____ s/ANITA B. BRODY, J.
ANITA B. BRODY, J.

2

# Exhibit 18

 **CONCUSSION SETTLEMENT**

*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

## NOTICE OF REMAND OF APPEAL FOR RE-REVIEW
### DATE OF NOTICE: **March 3, 2023**

### I. SETTLEMENT CLASS MEMBER INFORMATION

| | |
|---|---|
| **Settlement Program ID** | 950013395 |

| **Name** | First<br>Carleen | | M.I. | Last<br>Hastings |
|---|---|---|---|---|

| **Settlement Class Member Type** | Representative Claimant |
|---|---|
| **Lawyer** | O'Hanlon, Demerath & Castillo |

### II. CLAIM REMANDED FOR RE-REVIEW

This Notice is an official communication from the Claims Administrator for the NFL Concussion Settlement Program. The Special Master has remanded this claim to the Claims Administrator under Appeal Rule 23(c) for re-review for the issues raised in the appeal. In a re-review, an award may go up or down in amount, or the claim may be denied. We will send you a new determination notice on the outcome of the re-review, which will have a new time for the Settlement Class Member, Co-Lead Class Counsel or the NFL Parties to appeal that result.

### III. HOW TO CONTACT US WITH QUESTIONS OR FOR HELP

If you have any questions about this Notice or need help, call us at 1-855-887-3485 or email ClaimsAdministrator@NFLConcussionSettlement.com.



# Exhibit 19



# NFL CONCUSSION SETTLEMENT
*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

## NOTICE OF DENIAL OF MONETARY AWARD CLAIM
### DATE OF NOTICE: May 16, 2023
### DEADLINE TO APPEAL: June 15, 2023

### I. SETTLEMENT CLASS MEMBER INFORMATION

| | |
|---|---|
| **Settlement Program ID** | 950013395 |

| **Name** | First<br>Carleen | M.I. | Last<br>Hastings |
|---|---|---|---|

| | |
|---|---|
| **Settlement Class Member Type** | Representative Claimant |
| **Lawyer** | O'Hanlon, Demerath & Castillo |

| **Asserted Qualifying Diagnosis** | Death with CTE (Chronic Traumatic Encephalopathy) | **Date** | 10/15/08 |
|---|---|---|---|
| **Claim Type** | Pre-Effective Date | **Name of Diagnosing Physician** | Hamilton, Ronald L. |

### II. EXPLANATION OF CLAIM DETERMINATION

This Notice is an official communication from the Claims Administrator for the NFL Concussion Settlement Program. We reviewed your Claim Package and determined that you are not entitled to a Monetary Award because:



| | |
|---|---|
| 1. | In an Order dated 2/24/2023, Hon. Anita B. Brody ordered the Objection of Class Member Carleen Hastings (SPID 950013395) remanded to the Special Master and instructed the Special Master to return the claim to the Claims Administrator "to further determine the sufficiency of" the Claim Package. The Special Master remanded the claim to the Claims Administrator on 3/3/2023.

A "Claim Package" is defined in Section 2.1(n) of the Amended Class Action Settlement Agreement as "the Claim Form and other documentation, as set forth in Section 8.2(a)."  Section 8.2(a) states that the content of Claim Packages will include, without limitation:
(i) A Claim Form with the Personal Signature of the Retired NFL Football Player (or Representative Claimant) either on the Claim Form or on an acknowledgement form verifying the contents of the Claim Form;
(ii) A Diagnosing Physician Certification;
(iii) Medical records reflecting the Qualifying Diagnosis;
(iv) A HIPAA-compliant authorization form; and
(v) Records in the possession, custody or control of the Settlement Class Member demonstrating employment and participation in NFL Football.

All of these Claim Package content requirements have been met except for Section 8.2(a)(iii), medical records reflecting the Qualifying Diagnosis.

Section 6.3(f) of and Exhibit A-1 to the Settlement Agreement state that, for Retired NFL Football Players who died before the 4/22/2015 Final Approval Date, a Qualifying Diagnosis of Death with CTE shall be made only if the Player was diagnosed through a post-mortem diagnosis of CTE made by a board-certified neuropathologist prior to the 4/22/2015 Final Approval Date. Thus, there are three criteria that must be fulfilled to meet the Settlement's requirements for a Qualifying Diagnosis of Death with CTE:

1. The Retired NFL Football Player Died Before the Final Approval Date:  The Player died in 2008, well before the 4/22/2015 Final Approval Date. This criterion is fulfilled.

2. The Post-Mortem Diagnosis of CTE Was Made by a Board-Certified Neuropathologist:  The diagnosis of CTE was made by Dr. Ronald Hamilton, a board-certified neuropathologist.  An AAP member reviewed the Claim Package to determine whether the diagnosis of CTE was medically supported. The AAP member determined that the claim meets the Settlement Agreement's requirement of "a post-mortem diagnosis of CTE made by a board-certified neuropathologist" based on examination of the brain tissue. This criterion is fulfilled.

3. The Post-Mortem Diagnosis of CTE Was Made Prior to the Final Approval Date:  We have been unable to confirm whether the diagnosis was made prior to the 4/22/2015 Final Approval Date in order to meet the Settlement's requirements for a Qualifying Diagnosis of Death with CTE. The one-page letter provided by Dr. Hamilton is undated and does not indicate whether the diagnosis was made prior to 4/22/2015, as required by the Settlement's Injury Definition for the Qualifying Diagnosis of Death with CTE. The date of Dr. Hamilton's diagnosis has not been provided. Therefore, this criterion is not fulfilled.

Because the diagnosis in this case does not fulfill the Settlement's requirements for a Qualifying Diagnosis of Death with CTE, the medical records included in the Claim Packages do not reflect a Qualifying Diagnosis, and therefore the Claim Package is not sufficient under Section 8.2(a) of the Settlement Agreement. |

Section III below explains your right to appeal this denied claim, but living Retired Players may have the option to submit a new Claim Package under Section 9.1(c)(i) of the Settlement Agreement if they receive a new Qualifying Diagnosis. We will determine whether the new claim can be considered for a Monetary Award based on several factors, including whether the new claim shows materially changed circumstances from the earlier claim.  These materially changed circumstances may include: (a) a different type of Qualifying Diagnosis than the one that was denied; or (b) the same type of Qualifying Diagnosis but with a different diagnosis date supported by additional medical records.  If you submit a new claim within 365 days of the claim that is the subject of this denial notice, Section 10.3(d)(ii) of the Settlement Agreement requires us to audit that new claim if it is based on the same Qualifying Diagnosis as this denied claim, but the new diagnosis was made by a different physician.

## III. YOUR RIGHT TO APPEAL THIS DETERMINATION

If you have a good faith belief that the decision to deny your Monetary Award claim is incorrect, you may appeal this determination to the Court under Section 9.5 of the Settlement Agreement. To do so, click the Appeal Denied Claim button on your secure online portal and follow the instructions provided. You must submit supporting evidence to support your appeal. Any written statement may not be more than 10 double-spaced pages. You must do so on or before the Deadline to Appeal stated at the top of this Notice.

If you decide to appeal, the Settlement Agreement requires you to pay an Appeal Fee of $1,000, which you can do using the online PayPal option or by check made payable to the NFL Claims Administrator. This fee will be refunded if your appeal is successful. If you are unable to pay the $1,000 fee, you may make a hardship request to us to waive the fee and will have to submit financial information showing a sufficient hardship.

If paying the $1,000 Appeal Fee by check, mail the check to the address below.

NFL Concussion Settlement
Claims Administrator
P.O. Box 25369
Richmond, VA 23260

The Special Master appointed by the Court will decide your appeal based upon a showing by you of clear and convincing evidence. The Special Master's factual determinations will be final and binding, but you or Class Counsel or the NFL Parties may object to any of the Special Master's conclusions of law, which will then be subject to de novo (*i.e.*, a new) review by the Court.

If an appeal is not submitted on or before the deadline stated at the top of this Notice, the determination in this Notice will become final.

## IV. CLASS COUNSEL'S RIGHT TO APPEAL THIS DETERMINATION

Section 9.5 of the Settlement Agreement also gives Class Counsel the right to challenge our decision to deny your Monetary Award claim. If Class Counsel chooses to appeal, it must do so by the Deadline to Appeal stated at the top of this Notice and must provide a written copy of its Appeals Form and any supporting evidence to you, the NFL Parties, and us.

If an appeal is taken by you or Class Counsel, the NFL Parties may submit a written opposition (not to exceed 10 double-spaced pages) no later than 30 days after receipt of the Appeals Form. The party taking the appeal is not permitted to submit a reply.

Class Counsel may also submit a written statement (not to exceed 10 double-spaced pages) in response to your appeal no later than 15 days after receipt of the Appeals Form, and you and the NFL Parties may each submit a reply to any such submission by Class Counsel.

## V. HOW TO CONTACT US WITH QUESTIONS OR FOR HELP

If you have any questions about this Notice or need help, call us at 1-855-887-3485 or email ClaimsAdministrator@NFLConcussionSettlement.com.




# NFL CONCUSSION SETTLEMENT
*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

## APPEALS FORM FOR MONETARY AWARD OR DERIVATIVE CLAIMANT AWARD CLAIM DETERMINATION
### DATE OF NOTICE: **May 16, 2023**
### DEADLINE TO APPEAL: **June 15, 2023**

### I. SETTLEMENT CLASS MEMBER INFORMATION

| | |
|---|---|
| **Settlement Program ID** | 950013395 |

| **Name:** | First<br>Carleen | M.I. | Last<br>Hastings |
|---|---|---|---|

| | |
|---|---|
| **Settlement Class Member Type** | Representative Claimant |
| **Primary Counsel** | O'Hanlon, Demerath & Castillo |

### II. REASON FOR THIS APPEAL

Here is a short statement explaining the reason(s) for my appeal.  Raise all issues you wish to appeal.  Issues not raised at this time will not be addressed by the Court.

The Special Master should reverse the Claims Administrator's latest denial of Class Member Carleen Hastings's claim because the Claims Administrator's latest Notice denies the claim for the same reason that was already considered and rejected by the Court in its February 24, 2023 Order.

### III. HOW TO SUBMIT THIS FORM

You may submit this Appeals Form and any accompanying documents using one of these methods:

| | |
|---|---|
| **By Mail:**<br>(must be postmarked on or before the appeal deadline date) | NFL Concussion Settlement<br>Claims Administrator<br>P.O. Box 25369<br>Richmond, VA 23260 |
| **By Overnight Delivery:**<br>(must be placed with the overnight carrier on or before the appeal deadline date) | NFL Concussion Settlement<br>c/o BrownGreer PLC<br>250 Rocketts Way<br>Richmond, VA 23231 |
| **By Hand Delivery:**<br>(must delivered on or before the appeal deadline date) | NFL Concussion Settlement<br>c/o BrownGreer PLC<br>250 Rocketts Way<br>Richmond, VA 23231 |

### IV. HOW TO CONTACT US WITH QUESTIONS OR FOR HELP

If you are represented by a lawyer, consult with your lawyer if you have questions or need assistance. If you are unrepresented and have any questions about this Form or need help, contact us at 1-855-887-3485 or send an email to ClaimsAdministrator@NFLConcussionSettlement.com.  If you are a lawyer, call or email your designated Firm Contact for assistance. For more information about the Settlement Program, visit the official website at www.NFLConcussionSettlement.com, where you can read or download the Rules Governing Appeals of Claim Determinations, Frequently Asked Questions about the Settlement, the complete Settlement Agreement and other helpful materials.

 **CONCUSSION SETTLEMENT**

*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*

No. 2:12-md-02323 (E.D. Pa.)

## APPEALS FORM FOR MONETARY AWARD OR DERIVATIVE CLAIMANT AWARD CLAIM DETERMINATION

**DATE OF NOTICE: May 16, 2023**

**DEADLINE TO APPEAL: June 15, 2023**

### I. SETTLEMENT CLASS MEMBER INFORMATION

| | |
|---|---|
| **Settlement Program ID** | 950013395 |

| **Name:** | First<br>Carleen | M.I. | Last<br>Hastings |
|---|---|---|---|

| | |
|---|---|
| **Settlement Class Member Type** | Representative Claimant |
| **Primary Counsel** | O'Hanlon, Demerath & Castillo |

### II. REASON FOR THIS APPEAL

Here is a short statement explaining the reason(s) for my appeal. Raise all issues you wish to appeal. Issues not raised at this time will not be addressed by the Court.

The Special Master should reverse the Claims Administrator's latest denial of Class Member Carleen Hastings's claim because the Claims Administrator's latest Notice denies the claim for the same reason that was already considered and rejected by the Court in its February 24, 2023 Order.

### III. HOW TO SUBMIT THIS FORM

You may submit this Appeals Form and any accompanying documents using one of these methods:

| **By Mail:**<br>(must be postmarked on or before the appeal deadline date) | NFL Concussion Settlement<br>Claims Administrator<br>P.O. Box 25369<br>Richmond, VA 23260 |
|---|---|
| **By Overnight Delivery:**<br>(must be placed with the overnight carrier on or before the appeal deadline date) | NFL Concussion Settlement<br>c/o BrownGreer PLC<br>250 Rocketts Way<br>Richmond, VA 23231 |
| **By Hand Delivery:**<br>(must delivered on or before the appeal deadline date) | NFL Concussion Settlement<br>c/o BrownGreer PLC<br>250 Rocketts Way<br>Richmond, VA 23231 |

### IV. HOW TO CONTACT US WITH QUESTIONS OR FOR HELP

If you are represented by a lawyer, consult with your lawyer if you have questions or need assistance. If you are unrepresented and have any questions about this Form or need help, contact us at 1-855-887-3485 or send an email to ClaimsAdministrator@NFLConcussionSettlement.com.  If you are a lawyer, call or email your designated Firm Contact for assistance. For more information about the Settlement Program, visit the official website at www.NFLConcussionSettlement.com, where you can read or download the Rules Governing Appeals of Claim Determinations, Frequently Asked Questions about the Settlement, the complete Settlement Agreement and other helpful materials.



# NFL CONCUSSION SETTLEMENT

*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*

No. 2:12-md-02323 (E.D. Pa.)

## FILED APPEAL ALERT
### DATE OF NOTICE: **June 22, 2023**

## I. SETTLEMENT CLASS MEMBER INFORMATION

| Settlement Program ID | 950012548 | | |
|---|---|---|---|
| **Name:** | First<br>Robin | M.I.<br>B | Last<br>Cornish |
| **Settlement Class Member Type** | Representative Claimant | | |
| **Lawyer** | O'Hanlon, Demerath & Castillo | | |

## II. APPEAL PROCESS EXPLANATION: ISSUE(S) APPEALED

This Notice is an official communication from the Claims Administrator for the NFL Concussion Settlement Program. The Settlement Class Member (the "Appellant") has filed a timely appeal of this claim. This Notice begins your process under the Rules Governing Appeals of Claim Determinations adopted by the Special Masters. The Appellant's reasons for the appeal are identified below.

| Date of Appeal | Reason for Appeal |
|---|---|
| 6/15/23 | The Special Master should reverse the Claims Administrator's latest denial of Class Member Robin B. Cornish's claim because the Claims Administrator's latest Notice denies the claim for the same reason that was already considered and rejected by the Court in its February 24, 2023 Order. |

## III. APPEAL SCHEDULE

Section 9.7(b) of the Settlement Agreement and the Rules permit the Appellee(s) to file a written opposition within 30 days of this Filed Appeal Alert. Under Section 9.7(c), Class Counsel may file a written statement in support of or opposition to the appeal within 15 days of the date of this Filed Appeal Alert or no later than 15 days after the NFL Parties post its written opposition to the appeal. These submissions must not exceed 10 double-spaced pages. The Settlement Class Member and the NFL may submit a reply no later than 15 days after Class Counsel posts its written statement, and the reply cannot exceed four double-spaced pages. The claim will then proceed to the Special Masters for a decision on this appeal.

| Appeal Document | Deadline to Submit |
|---|---|
| NFL Opposition Memorandum | 7/24/23 |
| Class Counsel Statement (optional) | 7/7/23<br>Or<br>15 days after the NFL Parties post the opposition memorandum |
| Reply to Class Counsel's Statement (optional) | 15 days after Class Counsel submits its statement |

You may use the NFL Settlement Portal to submit any appeal documents. If you do not use the Portal, you may submit documents in any of the following ways:

| **By Mail:**<br>(must be postmarked on or before the appeal deadline date) | NFL Concussion Settlement<br>Claims Administrator<br>P.O. Box 25369<br>Richmond, VA 23260 |
|---|---|

| **By Overnight Delivery:** (must be placed with the carrier on or before the deadline date) | NFL Concussion Settlement c/o BrownGreer PLC 250 Rocketts Way Richmond, VA 23231 |
|---|---|
| **By Hand Delivery:** (must be delivered on or before the deadline date) | NFL Concussion Settlement c/o BrownGreer PLC 250 Rocketts Way Richmond, VA 23231 |

If you would like to receive and submit forms like this one electronically online rather than on paper, go to www.NFLConcussionSettlement.com/Login.aspx, click the Create New User button and follow the instructions there to establish a secure online portal account with us, if you do not already have one.

## IV. HOW TO CONTACT US WITH QUESTIONS OR FOR HELP

If you have any questions about this Notice or need help, call us at 1-855-887-3485 or email ClaimsAdministrator@NFLConcussionSettlement.com.





# NFL CONCUSSION SETTLEMENT
IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION
No. 2:12-md-02323 (E.D. Pa.)

## FILED APPEAL ALERT
### DATE OF NOTICE: **June 22, 2023**

### I. SETTLEMENT CLASS MEMBER INFORMATION

| Settlement Program ID | 950013395 | | |
|---|---|---|---|
| **Name:** | First<br>Carleen | M.I. | Last<br>Hastings |
| **Settlement Class Member Type** | Representative Claimant | | |
| **Lawyer** | O'Hanlon, Demerath & Castillo | | |

### II. APPEAL PROCESS EXPLANATION: ISSUE(S) APPEALED

This Notice is an official communication from the Claims Administrator for the NFL Concussion Settlement Program. The Settlement Class Member (the "Appellant") has filed a timely appeal of this claim. This Notice begins your process under the Rules Governing Appeals of Claim Determinations adopted by the Special Masters. The Appellant's reasons for the appeal are identified below.

| Date of Appeal | Reason for Appeal |
|---|---|
| 6/15/23 | The Special Master should reverse the Claims Administrator's latest denial of Class Member Carleen Hastings's claim because the Claims Administrator's latest Notice denies the claim for the same reason that was already considered and rejected by the Court in its February 24, 2023 Order. |

### III. APPEAL SCHEDULE

Section 9.7(b) of the Settlement Agreement and the Rules permit the Appellee(s) to file a written opposition within 30 days of this Filed Appeal Alert. Under Section 9.7(c), Class Counsel may file a written statement in support of or opposition to the appeal within 15 days of the date of this Filed Appeal Alert or no later than 15 days after the NFL Parties post its written opposition to the appeal. These submissions must not exceed 10 double-spaced pages. The Settlement Class Member and the NFL may submit a reply no later than 15 days after Class Counsel posts its written statement, and the reply cannot exceed four double-spaced pages. The claim will then proceed to the Special Masters for a decision on this appeal.

| Appeal Document | Deadline to Submit |
|---|---|
| NFL Opposition Memorandum | 7/24/23 |
| Class Counsel Statement (optional) | 7/7/23<br>Or<br>15 days after the NFL Parties post the opposition memorandum |
| Reply to Class Counsel's Statement (optional) | 15 days after Class Counsel submits its statement |

You may use the NFL Settlement Portal to submit any appeal documents. If you do not use the Portal, you may submit documents in any of the following ways:

| **By Mail:**<br>(must be postmarked on or before the appeal deadline date) | NFL Concussion Settlement<br>Claims Administrator<br>P.O. Box 25369<br>Richmond, VA 23260 |
|---|---|

| **By Overnight Delivery:**<br>(must be placed with the carrier on or before the deadline date) | NFL Concussion Settlement<br>c/o BrownGreer PLC<br>250 Rocketts Way<br>Richmond, VA 23231 |
|---|---|
| **By Hand Delivery:**<br>(must be delivered on or before the deadline date) | NFL Concussion Settlement<br>c/o BrownGreer PLC<br>250 Rocketts Way<br>Richmond, VA 23231 |

If you would like to receive and submit forms like this one electronically online rather than on paper, go to www.NFLConcussionSettlement.com/Login.aspx, click the Create New User button and follow the instructions there to establish a secure online portal account with us, if you do not already have one.

## IV.  How to Contact Us with Questions or for Help

If you have any questions about this Notice or need help, call us at 1-855-887-3485 or email ClaimsAdministrator@NFLConcussionSettlement.com.



## <u>NFL Parties' Opposition to Appeal of Claim Denial by Carleen Hastings</u>

Carleen Hastings, Representative Claimant for the late Christopher Mims, submitted a claim on February 5, 2019—the day before the deadline for pre-Effective Date claims—for a Qualifying Diagnosis of Death with CTE purportedly rendered by neuropathologist Dr. Ronald L. Hamilton. In support of her claim, Ms. Hastings submitted an undated letter from Dr. Hamilton claiming to diagnose Mr. Mims with CTE. The Claims Administrator and Special Master previously determined that the undated letter fails to satisfy Claimant's burden of demonstrating that the diagnosis was made prior to the Settlement Agreement's April 22, 2015 deadline for a Death with CTE diagnosis.[1] In this Appeal, Ms. Hastings now **concedes**, for the first time, that "Dr. Hamilton's CTE diagnosis was not made before April 22, 2015." (Appeal at 8.) That acknowledgement establishes that Ms. Hastings' claim is untimely under the clear terms of the Settlement Agreement.

The Appeal nevertheless argues that the claim denial should be reversed because enforcement of the Settlement Agreement's Death with CTE diagnosis deadline somehow violates Ms. Hastings' due process rights. In making this argument, Ms. Hastings expressly incorporates the similar argument made in Yvonne Sagapolutele's August 15, 2017 Motion to Modify the Amended Final Order and Judgment (the "Motion to Modify"), which sought to remove the deadline to obtain a diagnosis for Death with CTE. Like Ms. Sagapolutele, Ms. Hastings argues that enforcement of the Settlement Agreement's April 22, 2015 deadline for a Death with CTE diagnosis purportedly violates Settlement Class Members' due process rights because the deadline was a change to the original Settlement Agreement without proper notice. (*See* Appeal at 8–9.) In denying the Motion to Modify without prejudice, Judge Brody instructed that "[b]efore Plaintiff can attempt the extraordinary action of modifying the Settlement Agreement, she must first show that she would be entitled to recover but for the Death with CTE diagnosis deadline," and noted that Ms. Sagapolutele may raise the due process argument in the claims appeal process. (Order, ECF No. 8557.)

The Special Master has never before addressed this due process argument. While the argument was urged in Ms. Sagapolutele's claim review process (among others), her claim's Death with CTE diagnosis was denied for reasons other than untimeliness—specifically, the purported diagnosis was not based on an examination of the Retired Player's brain tissue. In this Appeal, the due process argument is now ripe for determination by the Special Master and it should be summarily rejected.[2]

The relevant amendments to the Settlement Agreement (which were made without supplemental notice to the Settlement Class) raise no conceivable due process violation because they **expanded** benefits to the Settlement Class—specifically, the amendments **expanded** the deadline for a Death with CTE diagnosis to include Retired Players who died between Preliminary

---

[1]    (*See* Settlement Agreement, Ex. A-1 at 5 § 5.) Where a Retired Player died between the July 14, 2014 Preliminary Approval Date and the April 22, 2015 Final Approval Date, the Settlement Agreement provides 270 days from a Retired Player's date of death to receive a Death with CTE diagnosis. This grace period, potentially extending the deadline beyond April 22, 2015 in a limited set of circumstances, is wholly inapplicable to Mr. Mims, who died in 2008. (*Id.*)

[2]    The same due process argument is ripe for decision in the appeal of Settlement Class Member SPID 950012548, which has a similar history and raises identical arguments. The NFL Parties are submitting Oppositions to both appeals on the same day.

and Final Approval of the Settlement Agreement.[3]  It is well-settled that additional notice to a class is only necessary where amendments to a settlement agreement are materially adverse to the class, not where they benefit the class, as here.[4]  Indeed, the Court found (and the Third Circuit affirmed) that "[b]ecause these changes improved the deal for Class Members without providing any concessions to the NFL Parties, an additional round of notice for Class Members is unnecessary." *In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. 351, 386 (E.D. Pa. 2015), *amended*, No. 2:12-MD-02323-AB, 2015 WL 12827803 (E.D. Pa. May 8, 2015), and *aff'd*, 821 F.3d 410 (3d Cir. 2016) (the "Final Approval Order").

For these reasons, and those set forth below, Ms. Hastings' Appeal should be denied.  The NFL Parties respectfully request that the Special Master (1) reaffirm that Ms. Hastings' claim fails because it is untimely under the Settlement Agreement's clear deadline for a Death with CTE diagnosis; and (2) hold (consistent with the Court's Final Approval Order, affirmed by the Third Circuit) that the original notice of the Settlement Agreement and its later-expanded deadline for a Death with CTE diagnosis satisfy due process.

## I.     As Ms. Hastings Concedes, Her Claim Fails to Satisfy the Settlement's Unambiguous April 22, 2015 Death with CTE Diagnosis Deadline

Ms. Hastings' claim has a long and tortured history, but at no point has she offered evidence that her claim is timely.

On July 30, 2019, the Claims Administrator denied Ms. Hastings' claim, finding that the undated letter from Dr. Hamilton failed to substantiate that the Death with CTE diagnosis was made before the April 22, 2015 diagnosis deadline or that Dr. Hamilton conducted a post-mortem examination of the Retired Player's brain tissue to confirm a CTE diagnosis, as required by the Settlement Agreement.[5]  (July 30, 2019 Denial Notice.)  The Special Master affirmed the denial because Ms. Hastings "did not show clear and convincing evidence of error in the Claims Administrator's decision."  (October 31, 2019 Post-Appeal Notice of Denial.)

Ms. Hastings filed an Objection to the Special Master's decision.  Judge Brody remanded the claim to the Special Master for "further explanation" of the grounds for denial.  (*See* June 16, 2020 Settlement Implementation Order.)  In a written opinion, the Special Master held that "the

---

[3]  The original agreement limited the Qualifying Diagnosis to those who died *prior* to Preliminary Approval.  *See* Long-Form Notice at 6, ECF No. 6086-1 (the Settlement's benefits include "[m]onetary awards for *diagnoses* of Death with CTE *prior to July 7, 2014* . . . ") (emphasis added.).

[4]  *See* Ex. 1 at 8–9 (collecting cases), NFL Parties' Opp. to Mot. to Modify, ECF No. 8430.

[5]  Section 2.1(aa) of the Settlement Agreement provides that the Qualifying Diagnosis of "Death with CTE is defined in Exhibit 1," and Exhibit 1 states that the definition of Death with CTE is: "For Retired NFL Football Players who died prior to the Final Approval Date, *a post-mortem diagnosis of CTE made by a board-certified neuropathologist prior to the Final Approval Date*, provided that a Retired NFL Football Player who died between July 7, 2014 and the Final Approval Date shall have until 270 days from his date of death to obtain such a postmortem diagnosis."  (Settlement Agreement, Ex. A-1 at 5 § 5 (emphasis added).)  Section 6.3(f) of the Settlement Agreement reiterates that "[a] Qualifying Diagnosis of Death with CTE shall be made only for Retired NFL Football Players who died prior to the Final Approval Date, through *a post-mortem diagnosis made by a board-certified neuropathologist prior to the Final Approval Date* . . . "  (*See id.* at 6.3(f) (emphasis added).)  As the Court has made clear in its Final Approval Order, post-mortem examination of brain tissue is the *only* way that CTE can be diagnosed, as "no one can conclusively say that someone had CTE until a scientist looks at sections of that person's brain under a microscope . . ."  (Final Approval Order at 397.)

evidence suggests that Dr. Hamilton did examine the late Mr. Mims' brain tissue," but that the claim was properly denied for untimeliness because "there is no evidence that the diagnosis of Death with CTE was obtained before the appropriate deadline." (July 15, 2020 Special Master Decision.) Ms. Hastings thereafter renewed her objections. (Appeal, Ex. 15).

On February 24, 2023, the Court issued a brief order (the "Order") remanding Ms. Hastings' claim to the Special Master, with instruction to return the claim to the Claims Administrator "to further determine the sufficiency of" claim package. (Order.) The Court made no statement whatsoever about the timeliness of Ms. Hastings' claim or the merits of her objections. The present Appeal mischaracterizes the Court's Order as "agree[ing]" that "the diagnosis was not untimely," even though the Order did not address the merits of Ms. Hastings' claim in any respect. (Appeal at 1.)[6]

In the four years since the original denial of her claim, Ms. Hastings has offered no evidence that Dr. Hamilton made a timely diagnosis and thus, upon further review, the Claims Administrator again denied Ms. Hastings' claim. Specifically, the Claims Administrator stated that it was "unable to confirm whether the diagnosis was made prior to the 4/22/2015 Final Approval Date in order to meet the Settlement's requirements for a Qualifying Diagnosis of Death with CTE. The one-page letter provided by Dr. Hamilton is undated and does not indicate whether the diagnosis was made prior to 4/22/2015, as required by the Settlement's Injury Definition for the Qualifying Diagnosis of Death with CTE. The date of Dr. Hamilton's diagnosis has not been provided." (May 16, 2023 Denial Notice.)

Ms. Hastings' Appeal similarly offers no evidence that Dr. Hamilton diagnosed Mr. Mims with CTE prior to April 22, 2015, as the Settlement Agreement requires. Rather, the Appeal **concedes**, for the first time, that "Dr. Hamilton's CTE diagnosis was not made before April 22, 2015." (Appeal at 8.) This concession plainly establishes that Mr. Mims' CTE diagnosis was untimely under the clear terms of the Settlement Agreement.[7]

---

[6]   Notably, the Court's Order disposed of 20 Death with CTE claims. The Order found that 18 claims, all of which lacked evidence of any post-mortem examination of brain tissue, were "insufficient" and the objection was denied with respect to these claims. The remaining two claims (including Ms. Hastings'), which contained evidence of post-mortem examination of brain tissue, were remanded so the claims review process could start anew. Ms. Hastings' suggestion that the Court's mere remand of these two claims, without any discussion or explanation, constituted a substantive ruling by the Court that the claims were not untimely is simply not credible. To construe the Order in this way would require the Special Master to assume either (i) that the Court rejected, without any discussion or explanation, the Settlement Agreement's clear deadline and the reasoned conclusions of the Special Master and Claims Administrator on the question; or (ii) that the Court found, without any discussion or explanation, a due process violation in enforcing that deadline, even though the Special Master had never addressed the due process argument and the Court had previously rejected such an argument in connection with Settlement approval. Nothing in the history of the Court's administration of the Settlement Agreement would support an assumption that the Court made critical substantive rulings *sub silentio*.

[7]   In her Appeal, Ms. Hastings also rehashes old, rejected arguments that a Diagnosing Physician is not required to render a Qualifying Diagnosis of Death with CTE prior to April 22, 2015—notwithstanding the plain language in the Settlement Agreement—because "the date of the Qualifying Diagnosis is the date of the Player's death, even though the diagnosis is not made until after the Player Dies." (Appeal at 8 (quoting former Settlement FAQ 99, now FAQ 100).) This argument fails for the reasons set forth in the NFL Parties' Opposition to Ms. Hastings' prior appeal, which are expressly incorporated herein by reference. (*See* Oct. 3, 2019 NFL Parties' Opposition.)

## II.    The Settlement Agreement's Death With CTE Diagnosis Deadline Does Not Violate Due Process

Ms. Hastings' Appeal argues that, if the Claims Administrator determines that a diagnosing physician must render a diagnosis of Death with CTE prior to April 22, 2015 (as the Claims Administrator determined here), the amended Settlement Agreement "would violate [her] due process rights" because the deadline constituted a change to the original Settlement Agreement without proper notice. (*See* Appeal at 8–9.) This argument, which is now ripe for decision, is entirely meritless.

As Ms. Hastings notes, her arguments mirror those made in the Motion to Modify. (Appeal at 3 n.3 (incorporating Motion to Modify).) These arguments accordingly fail for the same reasons discussed in the NFL Parties' Opposition to the Motion to Modify, which the NFL Parties specifically incorporate here. (*See* Ex. 1.) Far from injuring Settlement Class Members' rights by "impos[ing] a new deadline" for a Qualifying Diagnosis of Death with CTE (Appeal at 9), the February 2015 amendments to the Settlement Agreement ***extended*** the deadline to obtain the Qualifying Diagnosis from the Preliminary Approval Date to the Final Approval Date (*see* Ex. 1 at 10–11), and provided a 270-day grace period in which Settlement Class Members who died between the Preliminary Approval Date and the Final Approval Date could obtain a Qualifying Diagnosis (*see id.* at 6, 10). Thus, the amendments *increased* the time for certain Class Members to receive a diagnosis of Death with CTE by *nine months*. Because the relevant changes only benefitted the class, the failure to provide supplemental notice could not have violated class members' due process rights. (*See id.* at 8–13.) Additional notice is necessary only when amendments to a settlement agreement are materially adverse to the class. (*See id.* at 8–9 (collecting cases).) Neither the Due Process Clause nor Rule 23 of the Federal Rules of Civil Procedure require notice in the event of beneficial, or even neutral, amendments.

Contrary to Ms. Hastings' contentions, the class notice in connection with the original settlement agreement was all that was necessary. The Short- and Long-Form notices distributed to Settlement Class Members made clear, as the Court and the Third Circuit held, that an award of Death with CTE would *not* be available to all Retired Players diagnosed with CTE. Rather, only particular cases of CTE meeting "certain" predetermined and agreed-to standards under the Settlement Agreement would be compensated—*i.e.*, cases where, prior to Preliminary Approval,[8] the Retired Player received a post-mortem diagnosis of CTE made by a board-certified neuropathologist. (*See* Ex. 1 at 11–12; Long-Form Notice at 6, ECF No. 6086-1 (the Settlement's benefits include "[m]onetary awards for ***diagnoses*** of Death with CTE ***prior to July 7, 2014*** . . . ") (emphasis added).)

Moreover, any argument that the amendments were added "surreptitiously" (Appeal, Ex. 6 at 6), is wholly unfounded. The amendments in question were made public: the NFL Parties and Class Counsel posted the amendments—including a redline comparison clearly reflecting the changes to the text of the Settlement Agreement—on the Court's publicly accessible PACER docket, where any member of the public, including the more than 5,000 Settlement Class Members with legal representation, could view it. (Joint Submission, ECF No. 6481.) In fact, over 40 Settlement Class Members objected to the amendments, including the very amendment that Ms. Hastings complains of here. (*See* Armstrong Objectors' Suppl. Obj. to the Am. Class Action

---

[8]    As noted above, the amendments to the Settlement Agreement extended this deadline to Final Approval.

Settlement, ECF No. 6503; Miller Suppl. Obj. to Settlement, ECF No. 6484.)

After considering those objections, the Court issued its opinion approving the Settlement Agreement and finding that "Class Members who opted out . . . received adequate notice of these changes, ***and notification of Class Members is not required***."  (Final Approval Order at 386 (emphasis added).)  The Court explained: "Because these changes improved the deal for Class Members without providing any concessions to the NFL Parties, an additional round of notice for Class Members is unnecessary."  *Id*.  On appeal, the Third Circuit affirmed the Court's Final Order and Judgment in full.  Regarding notice, the Third Circuit agreed with the District Court's finding "that the content of the class notice . . . satisfied Rule 23 and due process."  *In re Nat'l Football League Players' Concussion Injury Litig.*, 821 F.3d 410, 435–36 (3d Cir. 2016), *amended* (May 2, 2016), *cert. denied*, 137 S. Ct. 591 (2016), and *cert. denied*, 137 S. Ct. 607 (2016).[9]  Notably, the Third Circuit also "conclude[d] that the settlement's treatment of CTE does not render the agreement fundamentally unfair."  *Id.* at 444.

The Appeal presents no justification for the Special Master or Court to take the extraordinary step of rewriting a settlement agreement approved by both the Court and the Third Circuit that has been in place for years.  Ms. Hastings is simply wrong in asserting that the "Court has already considered [her] arguments and agreed" (Appeal at 9); the Court merely remanded the claim "to further determine the sufficiency of" her claim package.  (Order.)  As the Claims Administrator correctly determined (and the Special Master has previously concluded), Ms. Hastings' claim is untimely under the clear terms of Settlement Agreement and, contrary to Ms. Hastings' argument, those terms—and specifically the diagnosis deadline for Qualifying Diagnoses of Death with CTE—present no due process concerns.

### Conclusion

Because Ms. Hastings does not present clear and convincing evidence that the Claims Administrator's Denial Notice was in error, the Special Master should again affirm denial of her claim.  The denial of Ms. Hastings' claim is required under the judicially-approved terms of the Settlement Agreement and those terms raise no due process concerns.

---

[9]    Indeed, to comport with due process, settlement notice need only be adequate and summarize the terms of the Settlement; perfection and painstaking detail are not required.  *See* Final Approval Order at 382–83*; see also In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1104–05 (5th Cir. 1977) (explaining that notice need not "[be] perfectly correct in its form," and instead that "[t]he standard [] is that the notice . . . must contain information that a reasonable person would consider to be material in making an informed, intelligent decision" about whether to opt out); *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 124 (S.D.N.Y 1997) ("The notice need not be highly specific, and indeed numerous decisions, no doubt recognizing that notices to class members can practicably contain only a limited amount of information, have approved very general descriptions of the proposed settlement.") (internal quotation omitted).

Dated:  August 7, 2023

Respectfully submitted,

PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP

*/s/ Brad S. Karp*
Brad S. Karp
Bruce Birenboim
Claudia Hammerman
Lynn B. Bayard
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990
Email:  bkarp@paulweiss.com

*ATTORNEYS FOR THE*
*NATIONAL FOOTBALL LEAGUE*
*AND NFL PROPERTIES LLC*

# Exhibit 1

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br><br>MDL No. 2323<br><br>Hon. Anita B. Brody |
| Kevin Turner and Shawn Wooden, *on behalf of themselves and others similarly situated*,<br><br>                    Plaintiffs,<br><br>                    v.<br><br>National Football League and NFL Properties, LLC, successor-in-interest to NFL Properties, Inc.<br>                    Defendants. | Civ. Action No.: 14-cv-00029-AB |
| THIS DOCUMENT RELATES TO:<br>ALL ACTIONS | Hon. Anita B. Brody |

# MEMORANDUM OF LAW OF THE NATIONAL FOOTBALL LEAGUE AND NFL PROPERTIES LLC IN OPPOSITION TO SETTLEMENT CLASS MEMBER YVONNE SAGAPOLUTELE'S MOTION TO MODIFY THE AMENDED FINAL ORDER AND JUDGMENT

# TABLE OF CONTENTS

**Page**

Preliminary Statement ........................................................................................... 1

Background .......................................................................................................... 4

    A.    Parties ..................................................................................... 4

    B.    Procedural Background ......................................................... 4

Argument ............................................................................................................. 8

I.     THE PARTIES WERE NOT REQUIRED TO NOTIFY THE SETTLEMENT CLASS ABOUT THE AMENDMENTS ........................................................... 8

    A.    The Amendments Did Not Require New Notice ................... 9

    B.    The Original Settlement Notice Was Sufficient ................. 11

II.    SAGAPOLUTELE IS NOT ENTITLED TO REWRITE THE SETTLEMENT AGREEMENT ....................................................................................... 13

Conclusion .......................................................................................................... 17

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Adelson* v. *Ocwen Fin. Corp.*,
 621 F. App'x 348 (7th Cir. 2015) ...............................................................14

*In re Baby Prods. Antitrust Litig.*,
 708 F.3d 163 (3d Cir. 2013).................................................................9, 11

*Blue Diamond Coal Co.* v. *Trustees of UMWA Combined Ben. Fund*,
 249 F.3d 519 (6th Cir. 2001) ....................................................................16

*In re Diet Drugs Prods. Liab. Litig.*,
 200 F. App'x 95 (3d Cir. 2006) ................................................................14

*In re Diet Drugs Prods. Liab. Litig.*,
 No. 99-cv-20593, 2010 WL 2735414 (E.D. Pa. July 2, 2010) ....................9, 11, 13

*F.A.C., Inc.* v. *Cooperativa de Seguros de Vida de Puerto Rico*,
 449 F.3d 185 (1st Cir. 2006).....................................................................17

*Federman* v. *Artzt*,
 339 F. App'x 31 (2d Cir. 2009) ...............................................................14, 15

*In re Four Seasons Sec. Laws Litig.*,
 525 F.2d 500 (10th Cir. 1975) ..................................................................15

*Harris* v. *Graddick*,
 615 F. Supp. 239 (N.D. Ala. 1985)..........................................................9, 11

*Hensley* v. *Alcon Labs., Inc.*,
 277 F.3d 535 (4th Cir. 2002) ....................................................................17

*Inmates of Suffolk Cty. Jail* v. *Rufo*,
 No. 71-cv-00162, 2015 WL 6958070 (D. Mass. Nov. 10, 2015) ...........................16

*Kokkonen* v. *Guardian Life Ins. Co. of Am.*,
 511 U.S. 375 (1994)..................................................................................17

*In re Linerboard Antitrust Litig.*,
 223 F.R.D. 357 (E.D. Pa.), *amended*, 223 F.R.D. 370 (E.D. Pa. 2004)...................17

*Matthews, Wilson & Matthews, Inc.* v. *Capital City Bank*,
 614 F. App'x 969 (11th Cir. 2015) ............................................................15

**Page(s)**

*In re Nat'l Football League Players' Concussion Injury Litig.*,
    307 F.R.D. 351 (E.D. Pa. 2015), *amended*, No. 12-MD-02323, 2015 WL
    12827803 (E.D. Pa. May 8, 2015) ................................................................ passim

*In re Nat'l Football League Players Concussion Injury Litig.*,
    821 F.3d 410 (3d Cir. 2016), *amended* (May 2, 2016) ............................................7

*In re Nissan Motor Corp. Antitrust Litig.*,
    552 F.2d 1088 (5th Cir. 1977) ............................................................................11

*Orlando Residence, Ltd.* v. *Hilton Head Hotel Inv'rs*,
    No. 89-cv-0662, 2013 WL 1103027 (D.S.C. Mar. 15, 2013) ...............................15

*In re PaineWebber Ltd. P'ships Litig.*,
    171 F.R.D. 104 (S.D.N.Y 1997) .........................................................................11

*Roman-Oliveras* v. *Puerto Rico Elec. Power Auth.*,
    797 F.3d 83 (1st Cir. 2015) ................................................................................17

*Sawka* v. *Healtheast, Inc.*,
    989 F.2d 138 (3d Cir. 1993) ...............................................................................15

## OTHER AUTHORITIES

11 Fed. Prac. & Proc. Civ. § 2852 (3d ed.) .......................................................................17

20 Fed. Prac. & Proc. Deskbook § 104 ...........................................................................16

Fed. R. Civ. P. 23 .......................................................................................................2, 9

Fed. R. Civ. P. 60 ...............................................................................1, 3, 14, 15, 16

Newberg on Class Actions § 1:5 (5th ed.) .........................................................................9

Newberg on Class Actions § 8:17 (5th ed.) .......................................................................9

Newberg on Class Actions § 8:36 (5th ed.) .......................................................................9

Newberg on Class Actions § 8:7 (5th ed.) .........................................................................9

Newberg on Class Actions § 18:40 (5th ed.) ....................................................................15

Defendants National Football League and NFL Properties LLC (collectively, the "NFL Parties") respectfully submit this memorandum of law in opposition to Settlement Class Member Yvonne Sagapolutele's ("Sagapolutele's") motion to modify the Amended Final Order and Judgment (the "Motion") (ECF No. 8263).

### Preliminary Statement

Sagapolutele, an absent Settlement Class Member and representative of the estate of Retired NFL Football Player Pio Sagapolutele, brings this motion, ostensibly as a matter of due process, seeking significant revisions to the Final Order and Judgment that the Court entered more than two years ago approving the Class Action Settlement Agreement in this case.[1] But no due process violation has occurred, and Sagapolutele has shown no justification for this Court to take the extraordinary step of rewriting a settlement agreement approved by both this Court and the Third Circuit that has been in place for years. Sagapolutele's motion should therefore be denied.

The primary ground for Sagapolutele's motion is the amendments to the Settlement Agreement in February 2015, which expanded the definition of the Death with CTE Qualifying Diagnosis in response to the Court's directives. Contrary to fact, Sagapolutele contends that the amendment imposed a deadline to obtain a Qualifying Diagnosis of Death with CTE, and "[b]ecause this change was made both without notice to absent class members and after the deadline to opt out of the settlement, [her] due process rights were violated." (Pl. Mem. at 15.) Sagapolutele asks this Court, pursuant to Rule 60 of the Federal Rules of Civil Procedure and the Court's inherent power, to amend the Final Order and Judgment to "remov[e] the deadline to obtain a Qualifying Diagnosis of Death with CTE." (Pl. Mem. at 1.)

---

[1] Unless otherwise defined, the capitalized terms used in this memorandum have the same meaning as those in the Settlement Agreement.

Sagapolutele's motion has no basis in fact or law for several reasons.

*First*, the amendments in question concerned an *expansion* of settlement benefits to the Settlement Class—namely, the expansion of the Qualifying Diagnosis of Death with CTE to include Retired NFL Football Players who died with CTE between Preliminary and Final Approval of the Settlement Agreement; the original agreement limited the Qualifying Diagnosis to those who died *prior* to Preliminary Approval. It is well settled that additional notice to a class is necessary only when amendments to a settlement agreement are "materially adverse" to the class, not where, as here, they benefit the class. Neither the Due Process Clause nor Rule 23 of the Federal Rules of Civil Procedure require notice in the event of beneficial, or even neutral, amendments. As this Court correctly held in granting Final Approval of the Settlement Agreement over various objections to this very amendment (although on a different ground), no additional notice was required in this case for that very reason.

*Second*, contrary to Sagapolutele's contentions regarding lack of notice, the class notice in connection with the original settlement agreement was all that was necessary. The Short- and Long-Form notices distributed to the Settlement Class Members made clear, as this Court and the Third Circuit held, that an award of Death with CTE would *not* be available to all Retired NFL Football Players diagnosed with CTE. Rather, only particular cases of CTE meeting "certain" predetermined and agreed-to standards under the Settlement Agreement would be compensated—namely, cases where, prior to Preliminary Approval,[2] the Retired NFL Football Player received a post-mortem diagnosis of CTE made by a board-certified neuropathologist. Further, the amendments in question were in fact made public; the NFL Parties and Class Counsel posted the amendments—including a redline comparison clearly

---

[2]    As noted above, the amendments to the Settlement Agreement extended this deadline to Final Approval.

reflecting the changes to the text of the Settlement Agreement—on the Court's publicly accessible PACER docket, where any member of the public, including the more than 5,000 Settlement Class Members with legal representation, could view it. In fact, over 40 Settlement Class Members objected to the amendments, including the very amendment that Sagapolutele complains of here.

*Finally*, even if Sagapolutele could show a due process violation, which she cannot, neither Rule 60 nor this Court's "inherent authority" allows Sagapolutele to rewrite the Settlement Agreement as she seeks. Rule 60(a) is limited to correction of "clerical mistakes" that do not affect the substantive rights of the parties. Yet her contention that the amendments were simply "clerical mistakes" is at odds with her characterization of those same amendments as impairing her rights under the settlement. Further, not only does Sagapolutele—as an absent class member—lack standing to move pursuant to Rule 60(b)(6), she also fails to establish that the "extraordinary remedy" of amendment pursuant to Rule 60(b)(6) is warranted here because she does not show that she will experience *any* hardship without the relief she seeks. For example, Sagapolutele has neither shown (nor even claimed) that the brain of her late husband, who died in 2009, has ever been examined by a board-certified neuropathologist for CTE, much less diagnosed as having CTE. Nor has she explained why any such examination—if such a belated diagnosis were even medically possible—did not occur prior to the Court's Final Approval Order on April 22, 2015 (as amended May 8, 2015). Finally, Sagapolutele has not shown that she is entitled to relief under the Court's "inherent authority" to amend the Final Order and Judgment because that authority is no more expansive than Rule 60.

Accordingly, Sagapolutele's motion should be denied.

## Background

### A.    Parties

The National Football League ("NFL") is an unincorporated association of 32 Clubs that promotes, organizes, and regulates the sport of professional football in the United States.  NFL Properties LLC ("NFLP") is a limited liability company organized under the laws of the State of Delaware and headquartered in New York.  Sagapolutele is a self-described absent Settlement Class Member and the representative of the estate of late Retired NFL Football Player Pio Sagapolutele.  (Pl. Mot. at 1.)

### B.    Procedural Background

The Judicial Panel on Multidistrict Litigation established this multidistrict litigation as MDL 2323 on January 31, 2012.  Since that time, over 300 additional cases, brought on behalf of approximately 5,000 former NFL players, have been included in the MDL.  *See In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. 351, 361 (E.D. Pa. 2015), *amended*, No. 12-MD-02323, 2015 WL 12827803 (E.D. Pa. May 8, 2015), *and aff'd*, 821 F.3d 410 (3d Cir. 2016), *amended* (May 2, 2016), *cert. denied*, 137 S. Ct. 591 (2016), and *cert. denied*, 137 S. Ct. 607 (2016).  Plaintiffs in these cases asserted fraud- and negligence-based claims against the NFL Parties based on, among other things, a purported duty to provide players with rules and information needed to protect them from the alleged effects of repetitive mild traumatic brain injuries sustained during NFL play, including CTE.  *Id*. at 361-62.

On June 25, 2014, the NFL Parties and Class Counsel[3] (collectively, the "Parties") filed a motion for preliminary class certification and preliminary approval of the Settlement Agreement, and on July 7, 2014, the Court approved the motion.  *See id.* at 363-65.

---

[3]    Class Counsel consists of attorneys whom this Court duly appointed as legal representatives for the Settlement Class, including Christopher A. Seeger, Sol Weiss, Steven C. Marks, Gene Locks, Arnold Levin, and Dianne M. Nast.  (Final Order & Judg. ¶ 6,  ECF No. 6510.)

The Settlement Agreement defined the Settlement Class as "'[a]ll living NFL Football Players who, prior to the date of Preliminary Approval . . . retired . . . from playing professional football with the NFL,'" as well as their Representative Claimants and Derivative Claimants. *Id.* at 365 ("Representative Claimants are those duly authorized by law to assert the claims of deceased, legally incapacitated, or incompetent Retired Players. Derivative Claimants are those, such as parents, spouses, or dependent children, who have some legal right to the income of Retired Players."). The Settlement Agreement also provides funding for Retired NFL Football Players to receive a baseline assessment examination of their objective neurological functioning, for safety and educational initiatives, and for monetary awards for certain Qualifying Diagnoses, including, as relevant here, the Qualifying Diagnosis of Death with CTE. *Id.* at 366-67.

Prior to the Fairness Hearing, the Parties distributed Court-approved Short- and Long-Form notices to the Settlement Class. *See id.* at 382-86. "Each was written in plain and straightforward language," and together, they disclosed the key components of the Settlement Agreement, making clear that "only 'certain' cases of CTE are covered." *Id.* at 383-84. As explained by the notice, under the original agreement, the Settlement's benefits included "[m]onetary awards for *diagnoses* of Death with CTE *prior to July 7, 2014* . . . ." (*See* Long-Form Notice at 6, ECF No. 6086-1 (emphasis added); *see also* Class Action Settlement Agreement as of June 24, 2014 § 6.3(f), ECF No. 6087 (a "Qualifying Diagnosis of Death with CTE shall be made only for Retired NFL Football Players who died prior to the date of the Preliminary Approval and Class Certification Order, through a post-mortem diagnosis by a board-certified neuropathologist of CTE.").)

After the Fairness Hearing, the Parties—at this Court's request—agreed to several amendments to the Settlement Agreement, each of which made the Settlement Agreement more

beneficial to Settlement Class Members. *In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. at 386. For example, the amendments provided credit for Settlement Class Members who played in NFL Europe; ensured that all eligible Retired NFL Football Players who elected to receive a baseline assessment examination would receive one regardless of any funding limitations in the Settlement Agreement; included a hardship provision with respect to the appeal fee for Settlement Class Members; and allowed reasonable accommodation for Settlement Class Members who do not possess certain medical records. (Class Counsel and the NFL Parties' Joint Submission in Resp. to the Feb. 2, 2015 Order of the Ct., Feb. 13, 2015, ECF No. 6481.) In addition, as is relevant here, one amendment expanded the Qualifying Diagnosis of Death with CTE to cover not only Retired NFL Football Players who died prior to Preliminary Approval, but also Retired NFL Football Players who died between Preliminary Approval and Final Approval. (*Id.* at 4-5.) In addition, the Parties explained to the Court that "**consistent with the Parties' intent under the original Settlement Agreement**, and recognizing that obtaining such a [CTE] diagnosis **may take several months post-death**, the Parties have provided for a grace period of 270 days following any date of death between preliminary approval and the Final Approval Date to allow Claimants to obtain the necessary diagnosis." (*Id.* (emphasis added).)

Copies of the proposed amended Settlement Agreement, including a redline showing the exact changes made, were posted on the Court's publicly accessible PACER database in February 2015. (Class Counsel and the NFL Parties' Joint Submission in Resp. to the Feb. 2, 2015 Order of the Ct., Ex. A, Feb. 13, 2015, ECF No. 6481-1.) Between February and April 2015, more than 40 Settlement Class Members filed objections to the amendments, including objections to the amendment to the definition of Death with CTE at issue here. (*See*

Armstrong Objectors' Suppl. Obj. to the Am. Class Action Settlement, ECF No. 6503; Miller Suppl. Obj. to Settlement, ECF No. 6484.) Sagapolutele did not file any objection.

After considering those objections, the Court issued its opinion approving the Settlement Agreement and finding that "Class Members who opted out . . . received adequate notice of these changes, ***and notification of Class Members is not required***." *In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. at 386 (emphasis added). The Court explained: "Because these changes improved the deal for Class Members without providing any concessions to the NFL Parties, an additional round of notice for Class Members is unnecessary." *Id*. On appeal, the Third Circuit affirmed this Court's Final Order and Judgment in full. Regarding notice, the Third Circuit agreed with the District Court, finding "that the content of the class notice . . . satisfied Rule 23 and due process." *In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 435-36 (3d Cir. 2016), *amended* (May 2, 2016), *cert. denied*, 137 S. Ct. 591 (2016), and *cert. denied*, 137 S. Ct. 607 (2016). Notably, the Third Circuit also "conclude[d] that the settlement's treatment of CTE does not render the agreement fundamentally unfair." *Id.* at 444.

On August 15, 2017, over two years after this Court granted final approval of the Settlement, Sagapolutele filed this Motion challenging the Court's determination that the amendments were beneficial to Settlement Class Members and therefore did not require additional notice, and seeking "modification of the Final Order and Judgment by removal of the deadline to obtain a Qualifying Diagnosis of Death with CTE."[4] (Pl. Mot. at 2.) Sagapolutele contends that "[t]his deadline was added to the Settlement Agreement in February 2015 without

---

[4]    Relatedly, Sagapolutele also seeks an "instruction to the settlement administrator to develop forms and procedures that allows Class Members to obtain a Qualifying Diagnosis of Death with CTE by obtaining a post-mortem diagnosis by a board-certified neuropathologist at any time during the 65-year term of the Monetary Award Fund." (Pl. Mot. at 2.)

notice to the class," and "effectively prevented Class Members . . . from obtaining a Qualifying Diagnosis of Death with CTE." (*Id.*) Despite Sagapolutele's claim that "this deadline materially prejudices" Settlement Class Members (*id.*), she offers no explanation, much less an evidentiary showing, of how her own rights were in any way impaired by the alleged lack of notice. She does not demonstrate—or even assert—that the brain of her late husband has been examined by a board-certified neuropathologist and determined to have CTE. Therefore, not only is Sagapolutele's injury entirely hypothetical, but she also does not establish that such an examination would even be viable, given her husband's death in 2009.[5]

The NFL Parties, through this memorandum of law, oppose the Motion.

### Argument

### I.

### THE PARTIES WERE NOT REQUIRED TO NOTIFY THE SETTLEMENT CLASS ABOUT THE AMENDMENTS

Sagapolutele argues that her due process rights were violated because she did not receive notice that the February 2015 amendment "impos[ed] a deadline to obtain a Qualifying Diagnosis of Death with CTE" when the original Settlement Agreement purportedly permitted "Class Members [to] obtain a Qualifying Diagnosis for Death with CTE anytime within the 65-year life of the Monetary Award Fund." (Pl. Mem. at 17.) Not so.

"[T]he Due Process Clause of the Fourteenth Amendment requires that notice [concerning a class action settlement] be 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" *In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. at

---

[5]    *See* Compl. ¶ 43, *Sagapolutele* v. *Nat'l Football League*, No. 17-cv-00348 (E.D. Pa. Jan. 25, 2017), ECF No. 1; *see also* Am. Stip. of Dismissal, *Sagapolutele* v. *Nat'l Football League*, No. 17-cv-00348 (E.D. Pa. May 3, 2017), ECF No. 4 (approving stipulation of dismissal without prejudice).

383 (quoting *Mullane* v. *Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)).[6]  Parties settling a class action litigation should therefore distribute notice that "'fairly apprises' class members of the action and their rights."  Newberg on Class Actions § 8:17 (5th ed.).  Additional notice is only required when the settling parties subsequently introduce amendments that "would have a *material adverse* effect on the rights of class members."  *In re Diet Drugs Prods. Liab. Litig.*, No. 99-cv-20593, 2010 WL 2735414, at *6 (E.D. Pa. July 2, 2010) (emphasis added); *see also In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 175 n.10, 182 (3d Cir. 2013) (supplemental notice required only for "*material* alterations" (emphasis added)).  Conversely, if the amendments are neutral or beneficial to the settlement class, no additional notice is required.  *See Harris* v. *Graddick*, 615 F. Supp. 239, 244 (N.D. Ala. 1985) (holding that where "the amendment is narrow and it is clearly apparent that the interests of the classes are not *substantially impaired*, . . . the notice already given is adequate" (emphasis added)); *see also In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. at 383 (collecting cases, including *Harris*).  That is the case here.

### A.      The Amendments Did Not Require New Notice

Sagapolutele's argument—that the Parties should have re-distributed notice reflecting the February 2015 amendments to the Settlement Agreement—fundamentally misunderstands the substance of the amendments.  In Sagapolutele's telling, "in the midst of otherwise beneficial amendments" to the Settlement Agreement, the Parties "impose[d] an additional requirement that prevents Class Members from recovering settlement proceeds [for CTE] unless they obtained a Qualifying Diagnosis before" Final Approval.  (Pl. Mem. at 8.)  But

---

[6]  Due process notice requirements mirror those of Rule 23 of the Federal Rules of Civil Procedure.  *See* Newberg on Class Actions § 1:5 (5th ed.) ("Rule 23 is constructed to ensure that the representative nature of class action litigation safeguards these absent class members' due process rights."); *id.* § 8:7 (5th ed.) (the notice requirements under Rule 23 "echo[] the constitutional test set forth by the Supreme Court"); *id.* § 8:36 (5th ed.) ("[A]s Rule 23's requirements are quite similar to the Constitution's, the distinction may be immaterial.").

the amendment only clarified what was always the case and extended the deadline for Death with CTE to Final Approval.

The original settlement agreement provided that an award for a Qualifying Diagnosis of Death with CTE would be available only to Retired NFL Football Players who died *and* received a CTE diagnosis prior to Preliminary Approval. The Long-Form Notice made this explicit, stating that the Settlement's benefits include "[m]onetary awards for ***diagnoses*** of Death with CTE ***prior to July 7, 2014* . . . .**" (*See* Long-Form Notice at 6, ECF No. 6086-1 (emphasis added); *see also* Decl. of Robert H. Klonoff Relating to the Proposed Class Settlement in the Nat'l Football League Players' Concussion Injury Litig. ¶ 85, Nov. 12, 2014, ECF No. 6423-9 ("[C]ontrary to the arguments advanced by various objectors, ***excluding CTE in cases diagnosed after July 7, 2014*, is not irrational.**" (emphasis added)).) Similarly, the Parties' publicly filed submission to the Court in support of the amendment stated specifically that the amendment's language providing only a grace period of time following death within which to obtain a neuropathological diagnosis of CTE was "*consistent with the Parties' intent under the original Settlement Agreement*." (*See* Class Counsel and the NFL Parties' Joint Submission in Resp. to the Feb. 2, 2015 Order of the Ct. at 4, ECF No. 6481 (emphasis added).)

Contrary to Sagapolutele's contentions, this amendment did not adversely affect the Settlement Class—much less materially so. In fact, the amendment *expanded* settlement benefits to encompass any additional Settlement Class Members who died after Preliminary Approval but before Final Approval, and provided 270 days to receive a CTE diagnosis for such players—thereby, increasing the time covered by the definition of Death with CTE by *nine* months. (*See id.* at 4-5.)

Accordingly, far from being materially adverse to Settlement Class Members, these amendments actually made the Settlement Agreement *more beneficial* by expanding the availability of an award for Death with CTE to a larger class of claimants. (*Id.*) Thus, as this Court previously held, "[b]ecause these changes improved the deal for Class Members without providing any concessions to the NFL Parties, an additional round of notice for Class Members is unnecessary." *In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. at 386; *see also In re Baby Prods. Antitrust Litig.*, 708 F.3d at 175 n.10, 182; *In re Diet Drugs Prods. Liab. Litig.*, 2010 WL 2735414, at *6; *Harris*, 615 F. Supp. at 244.

**B.  The Original Settlement Notice Was Sufficient**

Sagapolutele's due process argument fails for an additional reason.  The original notice, as this Court held, was clear that not all CTE diagnoses would be compensated under the Settlement Agreement, and the publicly available amendments sufficiently defined those CTE diagnoses eligible for compensation.

*First*, the Short- and Long-Form notices distributed to Settlement Class Members adequately protected their due process rights.  To comport with due process, settlement notice need only be adequate and summarize the terms of the Settlement; perfection and painstaking detail are not required.  *See In re Nat'l Football League Concussion Injury Litig.*, 307 F.R.D. at 382-83; *see also In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1104-05 (5th Cir. 1977) (explaining that notice need not "[be] perfectly correct in its form," and instead that "[t]he standard [] is that the notice . . . must contain information that a reasonable person would consider to be material in making an informed, intelligent decision" about whether to opt out); *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 124 (S.D.N.Y 1997) ("The notice need not be highly specific, and indeed 'numerous decisions, no doubt recognizing that notices to class members can practicably contain only a limited amount of information, have approved very

11

general descriptions of the proposed settlement.'" (quoting *Weinberger* v. *Kendrick*, 698 F.2d 61, 70 (2d Cir. 1982)).

As this Court previously held in overruling objections that "the Long-Form Notice is confusing because the term 'Death with CTE' appears several times without the accompanying cutoff date, . . . [b]oth the Summary Notice and the Long-Form Notice indicate that **only 'certain' cases of CTE are covered**." *In re Nat'l Football League Concussion Injury Litig.*, 307 F.R.D. at 383-84 (emphasis added) (citing Summary Notice at 1, ECF No. 6086-2; Long-Form Notice at 1, ECF No. 6086-1). Moreover, as stated above, the Long-Form Notice specifically stated that the Settlement's benefits include "[m]onetary awards for **diagnoses** of Death with CTE **prior to July 7, 2014** . . . ." (*See* Long-Form Notice at 6, ECF No. 6086-1 (emphasis added).) Both the Short- and Long-Form notice thus alerted Settlement Class Members that an award for CTE was not absolute or unconditional; rather, a Settlement Class Member would need to satisfy "certain" criteria before any award would be made. That is the case here—under the original and amended Settlement Agreement, Sagapolutele must satisfy particular criteria before receiving an award of Death with CTE, including that she obtain her decedent's CTE diagnosis within a predetermined time period—and the original notice satisfied Sagapolutele's Due Process rights by alerting her to this fact.

*Second*, the Parties made the February 2015 amendments publicly available months prior to this Court's April 22, 2015 Final Approval Order (as amended May 8, 2015). Not only did the Parties post a copy of the amendments to this Court's publicly available PACER database as early as February 2015, but they also submitted a redline showing the exact changes to be made to the Settlement Agreement as a result of those proposed amendments. (Class Counsel and the NFL Parties' Joint Submission in Resp. to the Feb. 2, 2015 Order of the Ct., Ex.

A, Feb. 13, 2015, ECF No. 6481-1.)  This is especially significant in light of the widespread attention paid to the docket in this matter by, among others, the more than 5,000 Retired NFL Football Players who, at the time of settlement, were represented by counsel in MDL 2323.  *See In re Nat'l Football League Concussion Injury Litig.*, 307 F.R.D. at 389; *see also In re Diet Drugs Prods. Liab. Litig.*, 2010 WL 2735414, at *4  (holding that no notice of settlement agreement amendments was required because, in part, "notice of the proposed Tenth Amendment, along with an opportunity to object, was supplied to representatives of all class members with active cases in MDL No. 1203.").

In fact, the Parties' efforts to publicize the amendments were successful, as evidenced by the fact that over 40 Settlement Class Members filed objections to the amendments, *including objections to the very Death with CTE provision about which Sagapolutele complains*.  (*See* Armstrong Objectors' Suppl. Obj. to the Am. Class Action Settlement, ECF No. 6503; *see also* Miller Suppl. Obj. to Settlement, ECF No. 6484.)  While these objectors raised somewhat different concerns than Sagapolutele raises here—they argued that the award of Death with CTE should be available to Retired NFL Football Players who die after Final Approval—they nonetheless sought, at least in part, the same relief that Sagapolutele appears to now seek: "modification of the Final Order and Judgment by removal of the deadline to obtain a Qualifying Diagnosis of Death with CTE."  (Pl. Mot. at 2.)  This Court properly rejected these objectors' requests, and similarly should reject Sagapolutele's efforts here.

## II.

### SAGAPOLUTELE IS NOT ENTITLED TO REWRITE THE SETTLEMENT AGREEMENT

Even if Sagapolutele had established that notice of the amendments should have been given—which she has not, as explained above—her Motion would fail.  Sagapolutele first

argues that under Rule 60(a), the Court should rewrite the Settlement Agreement and amend the Final Order and Judgment because the Court made a "clerical error" when approving the amendments to the Settlement Agreement. Second, Sagapolutele contends that amendment under Rule 60(b)(6) is justified by "extraordinary circumstances." Finally, Sagapolutele argues that the Court's inherent authority permits it to amend the Final Order and Judgment here. (Pl. Mem. at 18-24.) These arguments lack merit.

*First*, Sagapolutele has not made the necessary showing under Rule 60(a). It is well settled that amendment of judgments pursuant to Rule 60(a) "is limited to the correction of 'clerical mistakes'; it encompasses only errors 'mechanical in nature, apparent on the record, and not involving an error of substantive judgment.'" *In re Diet Drugs Prods. Liab. Litig.*, 200 F. App'x 95, 103 (3d Cir. 2006) (quoting *Pfizer Inc.* v. *Uprichard*, 422 F.3d 124, 129 (3d Cir. 2005)). For Rule 60(a) to apply, the change to be corrected must not "affect[] the substantive rights of the parties." *Id.* at 103-04 (quoting *Pfizer*, 422 F.3d at 130) (holding Rule 60(a) inapplicable because the "correction here goes beyond the correction of a 'mindless and mechanistic mistake'" (quotation omitted)). Here, Sagapolutele has only ever alleged that the amendments in question were deliberate attempts by the Parties to modify the criteria for the Qualifying Diagnosis of Death with CTE. She cannot simultaneously argue these amendments were mere "clerical mistakes." As such, Rule 60(a) is inapplicable here.

*Second*, Sagapolutele's attempts to seek relief under Rule 60(b)(6) fail, too.[7] Relief under Rule 60(b) is "not ordinarily . . . available to non-parties," *Federman* v. *Artzt*, 339 F. App'x 31, 33-34 (2d Cir. 2009), and "[a]bsent class members such as [movant] are treated, with limited exceptions inapplicable here, as non-parties to a class action." *Adelson* v. *Ocwen*

---

[7] Although Sagapolutele broadly states she is moving for relief under Rule 60(b), her memorandum of law cites only to the Rule's catchall provision, which permits the modification of a final judgment based on "any other reason that justifies relief." Fed. R. Civ. P. 60(b)(6).

*Fin. Corp.*, 621 F. App'x 348, 351 (7th Cir. 2015); *Federman*, 339 F. App'x at 33-34 (holding that absent class members who did not object to settlement were not "parties" for purposes of Rule 60(b) and declining "to expand the narrow exception to the general rule that non-parties cannot bring Rule 60(b) motions"); *In re Four Seasons Sec. Laws Litig.*, 525 F.2d 500, 504 (10th Cir. 1975) (absent class member "did not become a party for the purposes of Rule 60(b) to enable him to challenge the adequacy or nature of the settlement"); *see also* Fed. R. Civ. Proc. 60(b) ("the court may relieve *a party* . . . from a final judgment, order, or proceeding for the following reasons" (emphasis added)). Sagapolutele did not object, intervene, or otherwise take steps to become a "party" to this action, so Rule 60(b) is not available to her here. *See also* Newberg on Class Actions § 18:40 (5th ed.) ("[A]ll the circuits that have considered the issue have taken the position that absent class members are generally not authorized to file Rule 60 motions.").

Even if Sagapolutele were a "party," she has not met her burden to seek relief pursuant to Rule 60(b)(6) because such "[r]elief . . . may only be granted under extraordinary circumstances where, without such relief, an *extreme and unexpected hardship* would occur." *Sawka* v. *Healtheast, Inc.*, 989 F.2d 138, 140 (3d Cir. 1993) (emphasis added); *see also Matthews, Wilson & Matthews, Inc.* v. *Capital City Bank*, 614 F. App'x 969, 971 (11th Cir. 2015) (Rule 60(b)(6) "is an extraordinary remedy which may be invoked only upon a showing of exceptional circumstances, and the party seeking relief has the burden of showing that absent such relief, an extreme and unexpected hardship will result." (internal quotations omitted)); *Orlando Residence, Ltd.* v. *Hilton Head Hotel Inv'rs*, No. 89-cv-0662, 2013 WL 1103027, at *8 (D.S.C. Mar. 15, 2013), *aff'd sub nom. Orlando Residence, Ltd.* v. *Nelson*, 565 F. App'x 212 (4th Cir. 2014) ("Relief is rarely granted under . . . [Rule] 60(b)(6)."). The bar for relief under

Rule 60(b) is particularly high where the movant seeks to amend in "a class action [because] a too liberal application of Rule 60(b) would undermine the finality of judgments entered in such actions and would discourage their settlement." *Inmates of Suffolk Cty. Jail* v. *Rufo*, No. 71-cv-00162, 2015 WL 6958070, at *2 (D. Mass. Nov. 10, 2015); *see also Blue Diamond Coal Co.* v. *Trustees of UMWA Combined Ben. Fund*, 249 F.3d 519, 524 (6th Cir. 2001) ("[R]elief under Rule 60(b) is circumscribed by public policy favoring finality of judgments and termination of litigation. This is especially true in an application of subsection (6) of Rule 60(b) . . . ." (internal quotations omitted)).

Sagapolutele has not made any showing whatsoever that the amendment will cause her any hardship, much less "extreme and unexpected hardship." Tellingly, she has not shown—through supporting exhibits, affidavits, or even proffered facts in her brief—that the brain of her late husband, who passed away in 2009, has been examined by a board-certified neuropathologist and diagnosed with CTE at *any time*, much less that she would, but for the amendment, be entitled to an award. She also has not established that a belated diagnosis years after death (indeed, her husband died approximately eight years ago) would even be possible given the deterioration of brain matter after death. Nor does she seek to justify her apparent delay in seeking an examination. Instead, Sagapolutele invites only speculation and offers only conclusory assertions as to how the purported change impacts her rights under the agreement, and she therefore fails to show that the exceptional remedy of Rule 60(b)(6) is warranted here.

*Finally*, Sagapolutele's invocation of the Court's "inherent authority" to amend a judgment does not salvage her claim because that authority is no broader than that provided by Rule 60, which, as explained above, does not permit Sagapolutele the relief she seeks. *See* 20 Fed. Prac. & Proc. Deskbook § 104 (after 28 days from entry, "the judgment may be attacked,

other than by appeal, only as provided in Rule 60."); 11 Fed. Prac. & Proc. Civ. § 2852 (3d ed.) (while "the power of a court to modify an interlocutory judgment or order at any time prior to final judgment remains unchanged and is not limited by the provisions of Rule 60(b) . . . , [t]he rule does apply, however, to all final judgments entered in civil actions."). Sagapolutele's cases are not to the contrary; none holds that Courts have inherent authority to amend a final judgment approving a settlement agreement. (*See* Pl. Mem. at 23-24.) Three of the five cited cases concern only a court's authority to *enforce* a settlement agreement. *See Kokkonen* v. *Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 381 (1994) (holding that a district court has inherent authority to *enforce* a settlement agreement under particular circumstances); *Roman-Oliveras* v. *Puerto Rico Elec. Power Auth.*, 797 F.3d 83, 86-87 (1st Cir. 2015) (same); *Hensley* v. *Alcon Labs., Inc.*, 277 F.3d 535, 540-41 (4th Cir. 2002) (same). The fourth case, *In re Linerboard Antitrust Litig.*, 223 F.R.D. 357, 363 (E.D. Pa.), *amended*, 223 F.R.D. 370 (E.D. Pa. 2004) simply stands for the proposition that a court overseeing an MDL has inherent power to control the discovery process—an issue not relevant or in dispute here. Finally, while the fifth case involved an *amendment* of an order entering a settlement agreement, the Court did not hold that the district court had inherent authority to make the amendment; rather, it simply held that "the merits of [the district court's] decision to amend are no longer open to review." *F.A.C., Inc.* v. *Cooperativa de Seguros de Vida de Puerto Rico*, 449 F.3d 185, 190–91 (1st Cir. 2006).

In sum, Sagapolutele has not demonstrated (and cannot demonstrate) that she is entitled to rewrite the Settlement Agreement.

## Conclusion

For the foregoing reasons, the NFL Parties respectfully request that the Court deny the Motion in its entirety.

Dated: September 28, 2017

<div style="margin-left:40%">

Respectfully submitted,

/s/ Brad S. Karp
_____
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
Brad S. Karp
Bruce Birenboim
Lynn B. Bayard
1285 Avenue of the Americas
New York, NY 10019-6064
Tel:   (212) 373-3000
bkarp@paulweiss.com

PEPPER HAMILTON LLP
Sean P. Fahey
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA 19103-2799
Tel:   (215) 981-4000

*Attorneys for Defendants the National Football
League and NFL Properties LLC*

</div>

**<u>CERTIFICATE OF SERVICE</u>**

It is hereby certified that a true copy of the foregoing Memorandum of Law of the National Football League and NFL Properties LLC in Opposition to Settlement Class Member Yvonne Sagapolutele's Motion to Modify the Amended Final Order and Judgment was served electronically via the Court's electronic filing system on the 28th day of September, 2017, upon all counsel of record.


Dated:  September 28, 2017                    /s/Brad S. Karp
                                             Brad S. Karp

## NFL Parties' Opposition to Appeal of Claim Denial by Robin Cornish

Robin Cornish, Representative Claimant for the late Frank Cornish, submitted a claim on February 5, 2019—the day before the deadline for pre-Effective Date claims—for a Qualifying Diagnosis of Death with CTE purportedly rendered by neuropathologist Dr. Ronald L. Hamilton. In support of her claim, Ms. Cornish submitted an undated letter from Dr. Hamilton claiming to diagnose Mr. Cornish with CTE. The Claims Administrator and Special Master previously determined that the undated letter fails to satisfy Claimant's burden of demonstrating that the diagnosis was made prior to the Settlement Agreement's April 22, 2015 deadline for a Death with CTE diagnosis.[1] In this Appeal, Ms. Cornish now **concedes**, for the first time, that "Dr. Hamilton's CTE diagnosis was not made before April 22, 2015." (Appeal at 8.) That acknowledgement establishes that Ms. Cornish's claim is untimely under the clear terms of the Settlement Agreement.

The Appeal nevertheless argues that the claim denial should be reversed because enforcement of the Settlement Agreement's Death with CTE diagnosis deadline somehow violates Ms. Cornish's due process rights. In making this argument, Ms. Cornish expressly incorporates the similar argument made in Yvonne Sagapolutele's August 15, 2017 Motion to Modify the Amended Final Order and Judgment (the "Motion to Modify"), which sought to remove the deadline to obtain a diagnosis for Death with CTE. Like Ms. Sagapolutele, Ms. Cornish argues that enforcement of the Settlement Agreement's April 22, 2015 deadline for a Death with CTE diagnosis purportedly violates Settlement Class Members' due process rights because the deadline was a change to the original Settlement Agreement without proper notice. (*See* Appeal at 8–9.) In denying the Motion to Modify without prejudice, Judge Brody instructed that "[b]efore Plaintiff can attempt the extraordinary action of modifying the Settlement Agreement, she must first show that she would be entitled to recover but for the Death with CTE diagnosis deadline," and noted that Ms. Sagapolutele may raise the due process argument in the claims appeal process. (Order, ECF No. 8557.)

The Special Master has never before addressed this due process argument. While the argument was urged in Ms. Sagapolutele's claim review process (among others), her claim's Death with CTE diagnosis was denied for reasons other than untimeliness—specifically, the purported diagnosis was not based on an examination of the Retired Player's brain tissue. In this Appeal, the due process argument is now ripe for determination by the Special Master and it should be summarily rejected.[2]

The relevant amendments to the Settlement Agreement (which were made without supplemental notice to the Settlement Class) raise no conceivable due process violation because they **expanded** benefits to the Settlement Class—specifically, the amendments **expanded** the deadline for a Death with CTE diagnosis to include Retired Players who died between Preliminary

---

[1]  (*See* Settlement Agreement, Ex. A-1 at 5 § 5.) Where a Retired Player died between the July 14, 2014 Preliminary Approval Date and the April 22, 2015 Final Approval Date, the Settlement Agreement provides 270 days from a Retired Player's date of death to receive a Death with CTE diagnosis. This grace period, potentially extending the deadline beyond April 22, 2015 in a limited set of circumstances, is wholly inapplicable to Mr. Cornish, who died in 2008. (*Id.*)

[2]  The same due process argument is ripe for decision in the appeal of Settlement Class Member SPID 950013395, which has a similar history and raises identical arguments. The NFL Parties are submitting Oppositions to both appeals on the same day.

and Final Approval of the Settlement Agreement.[3]  It is well-settled that additional notice to a class is only necessary where amendments to a settlement agreement are materially adverse to the class, not where they benefit the class, as here.[4]  Indeed, the Court found (and the Third Circuit affirmed) that "[b]ecause these changes improved the deal for Class Members without providing any concessions to the NFL Parties, an additional round of notice for Class Members is unnecessary." *In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. 351, 386 (E.D. Pa. 2015), *amended*, No. 2:12-MD-02323-AB, 2015 WL 12827803 (E.D. Pa. May 8, 2015), and *aff'd*, 821 F.3d 410 (3d Cir. 2016) (the "Final Approval Order").

For these reasons, and those set forth below, Ms. Cornish's Appeal should be denied.  The NFL Parties respectfully request that the Special Master (1) reaffirm that Ms. Cornish's claim fails because it is untimely under the Settlement Agreement's clear deadline for a Death with CTE diagnosis; and (2) hold (consistent with the Court's Final Approval Order, affirmed by the Third Circuit) that the original notice of the Settlement Agreement and its later-expanded deadline for a Death with CTE diagnosis satisfy due process.

## I.    As Ms. Cornish Concedes, Her Claim Fails to Satisfy the Settlement's Unambiguous April 22, 2015 Death with CTE Diagnosis Deadline

Ms. Cornish's claim has a long and tortured history, but at no point has she offered evidence that her claim is timely.

On February 20, 2019, the Claims Administrator requested additional documents from Ms. Cornish because the undated letter from Dr. Hamilton failed to substantiate that the Death with CTE diagnosis was made before the April 22, 2015 diagnosis deadline or that Dr. Hamilton conducted a post-mortem examination of the Retired Player's brain tissue to confirm a CTE diagnosis, as required by the Settlement Agreement.[5]  (February 20, 2019 Notice of Request for Additional Documents).  In response, counsel for Ms. Cornish sent a letter to the Claims Administrator asserting that no additional documents were required because the Settlement Program FAQs provide that the date of Mr. Cornish's Qualifying Diagnosis is the date of his death. (See May 6, 2019 email from David J. Campbell to the Claims Administrator at 1–2.)  On June

---

3    The original agreement limited the Qualifying Diagnosis to those who died *prior* to Preliminary Approval.  *See* Long-Form Notice at 6, ECF No. 6086-1 (the Settlement's benefits include "[m]onetary awards for ***diagnoses*** of Death with CTE ***prior to July 7, 2014*** . . . ") (emphasis added).

4    *See* Ex. 1 at 8–9 (collecting cases), NFL Parties' Opp. to Mot. to Modify, ECF No. 8430.

5    Section 2.1(aa) of the Settlement Agreement provides that the Qualifying Diagnosis of "Death with CTE is defined in Exhibit 1," and Exhibit 1 states that the definition of Death with CTE is: "For Retired NFL Football Players who died prior to the Final Approval Date, ***a post-mortem diagnosis of CTE made by a board-certified neuropathologist prior to the Final Approval Date,*** provided that a Retired NFL Football Player who died between July 7, 2014 and the Final Approval Date shall have until 270 days from his date of death to obtain such a postmortem diagnosis."  (Settlement Agreement, Ex. A-1 at 5 § 5 (emphasis added).)  Section 6.3(f) of the Settlement Agreement reiterates that "[a] Qualifying Diagnosis of Death with CTE shall be made only for Retired NFL Football Players who died prior to the Final Approval Date, through ***a post-mortem diagnosis made by a board-certified neuropathologist prior to the Final Approval Date*** . . . "  (*See id.* at 6.3(f) (emphasis added).)  As the Court has made clear in its Memorandum supporting Final Approval of the Settlement Agreement, post-mortem examination of brain tissue is the *only* way that CTE can be diagnosed, as "no one can conclusively say that someone had CTE until a scientist looks at sections of that person's brain under a microscope . . ." (Final Approval Order at 397.)

25, 2019, the Claims Administrator denied Ms. Cornish's claim for failure to submit adequate documentation. (June 25, 2019 Denial Notice.) The Special Master affirmed the denial because Ms. Cornish "did not show clear and convincing evidence of error in the Claims Administrator's decision." (September 26, 2019 Post-Appeal Notice of Denial.)

Ms. Cornish filed an Objection to the Special Master's decision. Judge Brody remanded the claim to the Special Master for "further explanation" of the grounds for denial. (*See* June 16, 2020 Settlement Implementation Order.) In a written opinion, the Special Master held that "the evidence suggests that Dr. Hamilton did examine the late Mr. Cornish's brain tissue," but that the claim was properly denied for untimeliness because "there is no evidence that the diagnosis of Death with CTE was obtained before the appropriate deadline." (July 15, 2020 Special Master Decision.) Ms. Cornish thereafter renewed her objections. (Appeal, Ex. 15).

On February 24, 2023, the Court issued a brief order (the "Order") remanding Ms. Cornish's claim to the Special Master, with instruction to return the claim to the Claims Administrator "to further determine the sufficiency of the" claim package. (Order.) The Court made no statement whatsoever about the timeliness of Ms. Cornish's claim or the merits of her objections. The present Appeal mischaracterizes the Court's Order as "agree[ing]" that "the diagnosis was not untimely," even though the Order did not address the merits of Ms. Cornish's claim in any respect. (Appeal at 1.)[6]

In the four years since the original denial of her claim, Ms. Cornish has offered no evidence that Dr. Hamilton made a timely diagnosis and thus, upon further review, the Claims Administrator again denied Ms. Cornish's claim. Specifically, the Claims Administrator stated that it was "unable to confirm whether the diagnosis was made prior to the 4/22/2015 Final Approval Date in order to meet the Settlement's requirements for a Qualifying Diagnosis of Death with CTE. The one-page letter provided by Dr. Hamilton is undated and does not indicate whether the diagnosis was made prior to 4/22/2015, as required by the Settlement's Injury Definition for the Qualifying Diagnosis of Death with CTE. The date of Dr. Hamilton's diagnosis has not been provided." (May 16, 2023 Denial Notice.)

Ms. Cornish's Appeal similarly offers no evidence that Dr. Hamilton diagnosed Mr. Cornish with CTE prior to April 22, 2015, as the Settlement Agreement requires. Rather, the Appeal ***concedes***, for the first time, that "Dr. Hamilton's CTE diagnosis was not made before April

---

[6]   Notably, the Court's Order disposed of 20 Death with CTE claims. The Order found that 18 claims, all of which lacked evidence of any post-mortem examination of brain tissue, were "insufficient" and the objection was denied with respect to these claims. The remaining two claims (including Ms. Cornish's), which contained evidence of post-mortem examination of brain tissue, were remanded so the claims review process could start anew. Ms. Cornish's suggestion that the Court's mere remand of these two claims, without any discussion or explanation, constituted a substantive ruling by the Court that the claims were not untimely is simply not credible. To construe the Order in this way would require the Special Master to assume either (i) that the Court rejected, without any discussion or explanation, the Settlement Agreement's clear deadline and the reasoned conclusions of the Special Master and Claims Administrator on the question; or (ii) that the Court found, without any discussion or explanation, a due process violation in enforcing that deadline, even though the Special Master had never addressed the due process argument and the Court had previously rejected such an argument in connection with Settlement approval. Nothing in the history of the Court's administration of the Settlement Agreement would support an assumption that the Court made critical substantive rulings *sub silentio*.

22, 2015." (Appeal at 8.) This concession plainly establishes that Mr. Cornish's CTE diagnosis was untimely under the clear terms of the Settlement Agreement.[7]

## II.    The Settlement Agreement's Death With CTE Diagnosis Deadline Does Not Violate Due Process

Ms. Cornish's Appeal argues that, if the Claims Administrator determines that a diagnosing physician must render a diagnosis of Death with CTE prior to April 22, 2015 (as the Claims Administrator determined here), the amended Settlement Agreement "would violate [her] due process rights" because the deadline constituted a change to the original Settlement Agreement without proper notice. (*See* Appeal at 8–9.) This argument, which is now ripe for decision, is entirely meritless.

As Ms. Cornish notes, her arguments mirror those made in the Motion to Modify. (Appeal at 3 n.3 (incorporating Motion to Modify).) These arguments accordingly fail for the same reasons discussed in the NFL Parties' Opposition to the Motion to Modify, which the NFL Parties specifically incorporate here. (*See* Ex. 1.) Far from injuring Settlement Class Members' rights by "impos[ing] a new deadline" for a Qualifying Diagnosis of Death with CTE (Appeal at 9), the February 2015 amendments to the Settlement Agreement *extended* the deadline to obtain the Qualifying Diagnosis from the Preliminary Approval Date to the Final Approval Date (*see* Ex. 1 at 10–11), and provided a 270-day grace period in which Settlement Class Members who died between the Preliminary Approval Date and the Final Approval Date could obtain a Qualifying Diagnosis (*see id.* at 6, 10). Thus, the amendments *increased* the time for certain Class Members to receive a diagnosis of Death with CTE by *nine months*. Because the relevant changes only benefitted the class, the failure to provide supplemental notice could not have violated class members' due process rights. (*See id.* at 8–13.) Additional notice is necessary only when amendments to a settlement agreement are materially adverse to the class. (*See id.* at 8–9 (collecting cases).) Neither the Due Process Clause nor Rule 23 of the Federal Rules of Civil Procedure require notice in the event of beneficial, or even neutral, amendments.

Contrary to Ms. Cornish's contentions, the class notice in connection with the original settlement agreement was all that was necessary. The Short- and Long-Form notices distributed to Settlement Class Members made clear, as the Court and the Third Circuit held, that an award of Death with CTE would *not* be available to all Retired Players diagnosed with CTE. Rather, only particular cases of CTE meeting "certain" predetermined and agreed-to standards under the Settlement Agreement would be compensated—*i.e.*, cases where, prior to Preliminary Approval,[8] the Retired Player received a post-mortem diagnosis of CTE made by a board-certified neuropathologist. (*See* Ex. 1 at 11–12; Long-Form Notice at 6, ECF No. 6086-1 (the Settlement's benefits include "[m]onetary awards for *diagnoses* of Death with CTE *prior to July 7, 2014* . . . ") (emphasis added).)

Moreover, any argument that the amendments were added "surreptitiously" (Appeal, Ex. 6

---

[7]    In her Appeal, Ms. Cornish also rehashes old, rejected arguments that a Diagnosing Physician is not required to render a Qualifying Diagnosis of Death with CTE prior to April 22, 2015—notwithstanding the plain language in the Settlement Agreement—because "the date of the Qualifying Diagnosis is the date of the Player's death, even though the diagnosis is not made until after the Player Dies." (Appeal at 8 (quoting former Settlement FAQ 99, now FAQ 100).) This argument fails for the reasons set forth in the NFL Parties' Opposition to Ms. Cornish's prior appeal, which are expressly incorporated herein by reference. (*See* Oct. 3, 2019 NFL Parties' Opposition.)

[8]    As noted above, the amendments to the Settlement Agreement extended this deadline to Final Approval.

at 6), is wholly unfounded. The amendments in question were made public: the NFL Parties and Class Counsel posted the amendments—including a redline comparison clearly reflecting the changes to the text of the Settlement Agreement—on the Court's publicly accessible PACER docket, where any member of the public, including the more than 5,000 Settlement Class Members with legal representation, could view it. (Joint Submission, ECF No. 6481.) In fact, over 40 Settlement Class Members objected to the amendments, including the very amendment that Ms. Cornish complains of here. (*See* Armstrong Objectors' Suppl. Obj. to the Am. Class Action Settlement, ECF No. 6503; Miller Suppl. Obj. to Settlement, ECF No. 6484.)

After considering those objections, the Court issued its opinion approving the Settlement Agreement and finding that "Class Members who opted out . . . received adequate notice of these changes, ***and notification of Class Members is not required***." (Final Approval Order at 386 (emphasis added).) The Court explained: "Because these changes improved the deal for Class Members without providing any concessions to the NFL Parties, an additional round of notice for Class Members is unnecessary." *Id.* On appeal, the Third Circuit affirmed the Court's Final Order and Judgment in full. Regarding notice, the Third Circuit agreed with the District Court's finding "that the content of the class notice . . . satisfied Rule 23 and due process." *In re Nat'l Football League Players' Concussion Injury Litig.*, 821 F.3d 410, 435–36 (3d Cir. 2016), *amended* (May 2, 2016), *cert. denied*, 137 S. Ct. 591 (2016), and *cert. denied*, 137 S. Ct. 607 (2016).[9] Notably, the Third Circuit also "conclude[d] that the settlement's treatment of CTE does not render the agreement fundamentally unfair." *Id.* at 444.

The Appeal presents no justification for the Special Master or Court to take the extraordinary step of rewriting a settlement agreement approved by both the Court and the Third Circuit that has been in place for years. Ms. Cornish is simply wrong in asserting that the "Court has already considered [her] arguments and agreed" (Appeal at 9); the Court merely remanded the claim "to further determine the sufficiency of the" claim package. (Order.) As the Claims Administrator correctly determined (and the Special Master has previously concluded), Ms. Cornish's claim is untimely under the clear terms of Settlement Agreement and, contrary to Ms. Cornish's argument, those terms—and specifically the diagnosis deadline for Qualifying Diagnoses of Death with CTE—present no due process concerns.

### Conclusion

Because Ms. Cornish does not present clear and convincing evidence that the Claims Administrator's Denial Notice was in error, the Special Master should again affirm denial of her claim. The denial of Ms. Cornish's claim is required under the judicially-approved terms of the Settlement Agreement and those terms raise no due process concerns.

---

[9]    Indeed, to comport with due process, settlement notice need only be adequate and summarize the terms of the Settlement; perfection and painstaking detail are not required. *See* Final Approval Order at 382–83*; see also In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1104–05 (5th Cir. 1977) (explaining that notice need not "[be] perfectly correct in its form," and instead that "[t]he standard [] is that the notice . . . must contain information that a reasonable person would consider to be material in making an informed, intelligent decision" about whether to opt out); *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 124 (S.D.N.Y 1997) ("The notice need not be highly specific, and indeed numerous decisions, no doubt recognizing that notices to class members can practicably contain only a limited amount of information, have approved very general descriptions of the proposed settlement.") (internal quotation omitted).

Dated:  August 7, 2023

Respectfully submitted,

PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP

*/s/ Brad S. Karp*_____
Brad S. Karp
Bruce Birenboim
Claudia Hammerman
Lynn B. Bayard
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990
Email:  bkarp@paulweiss.com

*ATTORNEYS FOR THE*
*NATIONAL FOOTBALL LEAGUE*
*AND NFL PROPERTIES LLC*

# Exhibit 1

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br><br>MDL No. 2323<br><br>Hon. Anita B. Brody |
| Kevin Turner and Shawn Wooden, *on behalf of themselves and others similarly situated*,<br><br>                    Plaintiffs,<br><br>            v.<br><br>National Football League and NFL Properties, LLC, successor-in-interest to NFL Properties, Inc.<br>                    Defendants. | Civ. Action No.: 14-cv-00029-AB |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | Hon. Anita B. Brody |

# MEMORANDUM OF LAW OF THE NATIONAL FOOTBALL LEAGUE AND NFL PROPERTIES LLC IN OPPOSITION TO SETTLEMENT CLASS MEMBER YVONNE SAGAPOLUTELE'S MOTION TO MODIFY THE AMENDED FINAL ORDER AND JUDGMENT

# TABLE OF CONTENTS

**Page**

Preliminary Statement ................................................................................................ 1

Background .................................................................................................................. 4

    A.    Parties ........................................................................................................ 4

    B.    Procedural Background ............................................................................ 4

Argument .................................................................................................................... 8

I.    THE PARTIES WERE NOT REQUIRED TO NOTIFY THE SETTLEMENT CLASS ABOUT THE AMENDMENTS .......................................................... 8

    A.    The Amendments Did Not Require New Notice .................................... 9

    B.    The Original Settlement Notice Was Sufficient ................................... 11

II.    SAGAPOLUTELE IS NOT ENTITLED TO REWRITE THE SETTLEMENT AGREEMENT ........................................................................................... 13

Conclusion ............................................................................................................... 17

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Adelson* v. *Ocwen Fin. Corp.*,
  621 F. App'x 348 (7th Cir. 2015) ......................................................14

*In re Baby Prods. Antitrust Litig.*,
  708 F.3d 163 (3d Cir. 2013)...........................................................9, 11

*Blue Diamond Coal Co.* v. *Trustees of UMWA Combined Ben. Fund*,
  249 F.3d 519 (6th Cir. 2001) ..............................................................16

*In re Diet Drugs Prods. Liab. Litig.*,
  200 F. App'x 95 (3d Cir. 2006) ...........................................................14

*In re Diet Drugs Prods. Liab. Litig.*,
  No. 99-cv-20593, 2010 WL 2735414 (E.D. Pa. July 2, 2010) ...................9, 11, 13

*F.A.C., Inc.* v. *Cooperativa de Seguros de Vida de Puerto Rico*,
  449 F.3d 185 (1st Cir. 2006)...............................................................17

*Federman* v. *Artzt*,
  339 F. App'x 31 (2d Cir. 2009) ........................................................14, 15

*In re Four Seasons Sec. Laws Litig.*,
  525 F.2d 500 (10th Cir. 1975) ............................................................15

*Harris* v. *Graddick*,
  615 F. Supp. 239 (N.D. Ala. 1985)....................................................9, 11

*Hensley* v. *Alcon Labs., Inc.*,
  277 F.3d 535 (4th Cir. 2002) ...............................................................17

*Inmates of Suffolk Cty. Jail* v. *Rufo*,
  No. 71-cv-00162, 2015 WL 6958070 (D. Mass. Nov. 10, 2015) ...........................16

*Kokkonen* v. *Guardian Life Ins. Co. of Am.*,
  511 U.S. 375 (1994)...........................................................................17

*In re Linerboard Antitrust Litig.*,
  223 F.R.D. 357 (E.D. Pa.), *amended*, 223 F.R.D. 370 (E.D. Pa. 2004).................17

*Matthews, Wilson & Matthews, Inc.* v. *Capital City Bank*,
  614 F. App'x 969 (11th Cir. 2015) .......................................................15

**Page(s)**

*In re Nat'l Football League Players' Concussion Injury Litig.*,
307 F.R.D. 351 (E.D. Pa. 2015), *amended*, No. 12-MD-02323, 2015 WL
12827803 (E.D. Pa. May 8, 2015) ................................................................... passim

*In re Nat'l Football League Players Concussion Injury Litig.*,
821 F.3d 410 (3d Cir. 2016), *amended* (May 2, 2016) ............................................7

*In re Nissan Motor Corp. Antitrust Litig.*,
552 F.2d 1088 (5th Cir. 1977) ..............................................................................11

*Orlando Residence, Ltd.* v. *Hilton Head Hotel Inv'rs*,
No. 89-cv-0662, 2013 WL 1103027 (D.S.C. Mar. 15, 2013) ................................15

*In re PaineWebber Ltd. P'ships Litig.*,
171 F.R.D. 104 (S.D.N.Y 1997) ............................................................................11

*Roman-Oliveras* v. *Puerto Rico Elec. Power Auth.*,
797 F.3d 83 (1st Cir. 2015) ...................................................................................17

*Sawka* v. *Healtheast, Inc.*,
989 F.2d 138 (3d Cir. 1993) ..................................................................................15

## OTHER AUTHORITIES

11 Fed. Prac. & Proc. Civ. § 2852 (3d ed.) ...............................................................17

20 Fed. Prac. & Proc. Deskbook § 104 ......................................................................16

Fed. R. Civ. P. 23 ...................................................................................................2, 9

Fed. R. Civ. P. 60 ................................................................................1, 3, 14, 15, 16

Newberg on Class Actions § 1:5 (5th ed.) ...................................................................9

Newberg on Class Actions § 8:17 (5th ed.) .................................................................9

Newberg on Class Actions § 8:36 (5th ed.) .................................................................9

Newberg on Class Actions § 8:7 (5th ed.) ...................................................................9

Newberg on Class Actions § 18:40 (5th ed.) .............................................................15

Defendants National Football League and NFL Properties LLC (collectively, the "NFL Parties") respectfully submit this memorandum of law in opposition to Settlement Class Member Yvonne Sagapolutele's ("Sagapolutele's") motion to modify the Amended Final Order and Judgment (the "Motion") (ECF No. 8263).

## Preliminary Statement

Sagapolutele, an absent Settlement Class Member and representative of the estate of Retired NFL Football Player Pio Sagapolutele, brings this motion, ostensibly as a matter of due process, seeking significant revisions to the Final Order and Judgment that the Court entered more than two years ago approving the Class Action Settlement Agreement in this case.[1]  But no due process violation has occurred, and Sagapolutele has shown no justification for this Court to take the extraordinary step of rewriting a settlement agreement approved by both this Court and the Third Circuit that has been in place for years.  Sagapolutele's motion should therefore be denied.

The primary ground for Sagapolutele's motion is the amendments to the Settlement Agreement in February 2015, which expanded the definition of the Death with CTE Qualifying Diagnosis in response to the Court's directives.  Contrary to fact, Sagapolutele contends that the amendment imposed a deadline to obtain a Qualifying Diagnosis of Death with CTE, and "[b]ecause this change was made both without notice to absent class members and after the deadline to opt out of the settlement, [her] due process rights were violated."  (Pl. Mem. at 15.)  Sagapolutele asks this Court, pursuant to Rule 60 of the Federal Rules of Civil Procedure and the Court's inherent power, to amend the Final Order and Judgment to "remov[e] the deadline to obtain a Qualifying Diagnosis of Death with CTE."  (Pl. Mem. at 1.)

---

[1]    Unless otherwise defined, the capitalized terms used in this memorandum have the same meaning as those in the Settlement Agreement.

Sagapolutele's motion has no basis in fact or law for several reasons.

*First*, the amendments in question concerned an *expansion* of settlement benefits to the Settlement Class—namely, the expansion of the Qualifying Diagnosis of Death with CTE to include Retired NFL Football Players who died with CTE between Preliminary and Final Approval of the Settlement Agreement; the original agreement limited the Qualifying Diagnosis to those who died *prior* to Preliminary Approval. It is well settled that additional notice to a class is necessary only when amendments to a settlement agreement are "materially adverse" to the class, not where, as here, they benefit the class. Neither the Due Process Clause nor Rule 23 of the Federal Rules of Civil Procedure require notice in the event of beneficial, or even neutral, amendments. As this Court correctly held in granting Final Approval of the Settlement Agreement over various objections to this very amendment (although on a different ground), no additional notice was required in this case for that very reason.

*Second*, contrary to Sagapolutele's contentions regarding lack of notice, the class notice in connection with the original settlement agreement was all that was necessary. The Short- and Long-Form notices distributed to the Settlement Class Members made clear, as this Court and the Third Circuit held, that an award of Death with CTE would *not* be available to all Retired NFL Football Players diagnosed with CTE. Rather, only particular cases of CTE meeting "certain" predetermined and agreed-to standards under the Settlement Agreement would be compensated—namely, cases where, prior to Preliminary Approval,[2] the Retired NFL Football Player received a post-mortem diagnosis of CTE made by a board-certified neuropathologist. Further, the amendments in question were in fact made public; the NFL Parties and Class Counsel posted the amendments—including a redline comparison clearly

---

[2] As noted above, the amendments to the Settlement Agreement extended this deadline to Final Approval.

reflecting the changes to the text of the Settlement Agreement—on the Court's publicly accessible PACER docket, where any member of the public, including the more than 5,000 Settlement Class Members with legal representation, could view it. In fact, over 40 Settlement Class Members objected to the amendments, including the very amendment that Sagapolutele complains of here.

*Finally*, even if Sagapolutele could show a due process violation, which she cannot, neither Rule 60 nor this Court's "inherent authority" allows Sagapolutele to rewrite the Settlement Agreement as she seeks. Rule 60(a) is limited to correction of "clerical mistakes" that do not affect the substantive rights of the parties. Yet her contention that the amendments were simply "clerical mistakes" is at odds with her characterization of those same amendments as impairing her rights under the settlement. Further, not only does Sagapolutele—as an absent class member—lack standing to move pursuant to Rule 60(b)(6), she also fails to establish that the "extraordinary remedy" of amendment pursuant to Rule 60(b)(6) is warranted here because she does not show that she will experience *any* hardship without the relief she seeks. For example, Sagapolutele has neither shown (nor even claimed) that the brain of her late husband, who died in 2009, has ever been examined by a board-certified neuropathologist for CTE, much less diagnosed as having CTE. Nor has she explained why any such examination—if such a belated diagnosis were even medically possible—did not occur prior to the Court's Final Approval Order on April 22, 2015 (as amended May 8, 2015). Finally, Sagapolutele has not shown that she is entitled to relief under the Court's "inherent authority" to amend the Final Order and Judgment because that authority is no more expansive than Rule 60.

Accordingly, Sagapolutele's motion should be denied.

## Background

### A.     Parties

The National Football League ("NFL") is an unincorporated association of 32 Clubs that promotes, organizes, and regulates the sport of professional football in the United States.  NFL Properties LLC ("NFLP") is a limited liability company organized under the laws of the State of Delaware and headquartered in New York.  Sagapolutele is a self-described absent Settlement Class Member and the representative of the estate of late Retired NFL Football Player Pio Sagapolutele.  (Pl. Mot. at 1.)

### B.     Procedural Background

The Judicial Panel on Multidistrict Litigation established this multidistrict litigation as MDL 2323 on January 31, 2012.  Since that time, over 300 additional cases, brought on behalf of approximately 5,000 former NFL players, have been included in the MDL.  *See In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. 351, 361 (E.D. Pa. 2015), *amended*, No. 12-MD-02323, 2015 WL 12827803 (E.D. Pa. May 8, 2015), *and aff'd*, 821 F.3d 410 (3d Cir. 2016), *amended* (May 2, 2016), *cert. denied*, 137 S. Ct. 591 (2016), and *cert. denied*, 137 S. Ct. 607 (2016).  Plaintiffs in these cases asserted fraud- and negligence-based claims against the NFL Parties based on, among other things, a purported duty to provide players with rules and information needed to protect them from the alleged effects of repetitive mild traumatic brain injuries sustained during NFL play, including CTE.  *Id.* at 361-62.

On June 25, 2014, the NFL Parties and Class Counsel[3] (collectively, the "Parties") filed a motion for preliminary class certification and preliminary approval of the Settlement Agreement, and on July 7, 2014, the Court approved the motion.  *See id.* at 363-65.

---

[3]     Class Counsel consists of attorneys whom this Court duly appointed as legal representatives for the Settlement Class, including Christopher A. Seeger, Sol Weiss, Steven C. Marks, Gene Locks, Arnold Levin, and Dianne M. Nast.  (Final Order & Judg. ¶ 6,  ECF No. 6510.)

The Settlement Agreement defined the Settlement Class as "'[a]ll living NFL Football Players who, prior to the date of Preliminary Approval . . . retired . . . from playing professional football with the NFL,'" as well as their Representative Claimants and Derivative Claimants. *Id.* at 365 ("Representative Claimants are those duly authorized by law to assert the claims of deceased, legally incapacitated, or incompetent Retired Players. Derivative Claimants are those, such as parents, spouses, or dependent children, who have some legal right to the income of Retired Players."). The Settlement Agreement also provides funding for Retired NFL Football Players to receive a baseline assessment examination of their objective neurological functioning, for safety and educational initiatives, and for monetary awards for certain Qualifying Diagnoses, including, as relevant here, the Qualifying Diagnosis of Death with CTE. *Id.* at 366-67.

Prior to the Fairness Hearing, the Parties distributed Court-approved Short- and Long-Form notices to the Settlement Class. *See id.* at 382-86. "Each was written in plain and straightforward language," and together, they disclosed the key components of the Settlement Agreement, making clear that "only 'certain' cases of CTE are covered." *Id.* at 383-84. As explained by the notice, under the original agreement, the Settlement's benefits included "[m]onetary awards for **diagnoses** of Death with CTE **prior to July 7, 2014** . . . ." (*See* Long-Form Notice at 6, ECF No. 6086-1 (emphasis added); *see also* Class Action Settlement Agreement as of June 24, 2014 § 6.3(f), ECF No. 6087 (a "Qualifying Diagnosis of Death with CTE shall be made only for Retired NFL Football Players who died prior to the date of the Preliminary Approval and Class Certification Order, through a post-mortem diagnosis by a board-certified neuropathologist of CTE.").)

After the Fairness Hearing, the Parties—at this Court's request—agreed to several amendments to the Settlement Agreement, each of which made the Settlement Agreement more

beneficial to Settlement Class Members. *In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. at 386. For example, the amendments provided credit for Settlement Class Members who played in NFL Europe; ensured that all eligible Retired NFL Football Players who elected to receive a baseline assessment examination would receive one regardless of any funding limitations in the Settlement Agreement; included a hardship provision with respect to the appeal fee for Settlement Class Members; and allowed reasonable accommodation for Settlement Class Members who do not possess certain medical records. (Class Counsel and the NFL Parties' Joint Submission in Resp. to the Feb. 2, 2015 Order of the Ct., Feb. 13, 2015, ECF No. 6481.) In addition, as is relevant here, one amendment expanded the Qualifying Diagnosis of Death with CTE to cover not only Retired NFL Football Players who died prior to Preliminary Approval, but also Retired NFL Football Players who died between Preliminary Approval and Final Approval. (*Id.* at 4-5.) In addition, the Parties explained to the Court that "**consistent with the Parties' intent under the original Settlement Agreement**, and recognizing that obtaining such a [CTE] diagnosis **may take several months post-death**, the Parties have provided for a grace period of 270 days following any date of death between preliminary approval and the Final Approval Date to allow Claimants to obtain the necessary diagnosis." (*Id.* (emphasis added).)

Copies of the proposed amended Settlement Agreement, including a redline showing the exact changes made, were posted on the Court's publicly accessible PACER database in February 2015. (Class Counsel and the NFL Parties' Joint Submission in Resp. to the Feb. 2, 2015 Order of the Ct., Ex. A, Feb. 13, 2015, ECF No. 6481-1.) Between February and April 2015, more than 40 Settlement Class Members filed objections to the amendments, including objections to the amendment to the definition of Death with CTE at issue here. (*See*

Armstrong Objectors' Suppl. Obj. to the Am. Class Action Settlement, ECF No. 6503; Miller Suppl. Obj. to Settlement, ECF No. 6484.) Sagapolutele did not file any objection.

After considering those objections, the Court issued its opinion approving the Settlement Agreement and finding that "Class Members who opted out . . . received adequate notice of these changes, ***and notification of Class Members is not required***." *In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. at 386 (emphasis added). The Court explained: "Because these changes improved the deal for Class Members without providing any concessions to the NFL Parties, an additional round of notice for Class Members is unnecessary." *Id*. On appeal, the Third Circuit affirmed this Court's Final Order and Judgment in full. Regarding notice, the Third Circuit agreed with the District Court, finding "that the content of the class notice . . . satisfied Rule 23 and due process." *In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 435-36 (3d Cir. 2016), *amended* (May 2, 2016), *cert. denied*, 137 S. Ct. 591 (2016), and *cert. denied*, 137 S. Ct. 607 (2016). Notably, the Third Circuit also "conclude[d] that the settlement's treatment of CTE does not render the agreement fundamentally unfair." *Id.* at 444.

On August 15, 2017, over two years after this Court granted final approval of the Settlement, Sagapolutele filed this Motion challenging the Court's determination that the amendments were beneficial to Settlement Class Members and therefore did not require additional notice, and seeking "modification of the Final Order and Judgment by removal of the deadline to obtain a Qualifying Diagnosis of Death with CTE."[4] (Pl. Mot. at 2.) Sagapolutele contends that "[t]his deadline was added to the Settlement Agreement in February 2015 without

---

[4] Relatedly, Sagapolutele also seeks an "instruction to the settlement administrator to develop forms and procedures that allows Class Members to obtain a Qualifying Diagnosis of Death with CTE by obtaining a post-mortem diagnosis by a board-certified neuropathologist at any time during the 65-year term of the Monetary Award Fund." (Pl. Mot. at 2.)

notice to the class," and "effectively prevented Class Members . . . from obtaining a Qualifying Diagnosis of Death with CTE." (*Id.*) Despite Sagapolutele's claim that "this deadline materially prejudices" Settlement Class Members (*id.*), she offers no explanation, much less an evidentiary showing, of how her own rights were in any way impaired by the alleged lack of notice. She does not demonstrate—or even assert—that the brain of her late husband has been examined by a board-certified neuropathologist and determined to have CTE. Therefore, not only is Sagapolutele's injury entirely hypothetical, but she also does not establish that such an examination would even be viable, given her husband's death in 2009.[5]

The NFL Parties, through this memorandum of law, oppose the Motion.

<div align="center">

**Argument**

**I.**

**THE PARTIES WERE NOT REQUIRED TO NOTIFY
THE SETTLEMENT CLASS ABOUT THE AMENDMENTS**

</div>

Sagapolutele argues that her due process rights were violated because she did not receive notice that the February 2015 amendment "impos[ed] a deadline to obtain a Qualifying Diagnosis of Death with CTE" when the original Settlement Agreement purportedly permitted "Class Members [to] obtain a Qualifying Diagnosis for Death with CTE anytime within the 65-year life of the Monetary Award Fund." (Pl. Mem. at 17.) Not so.

"[T]he Due Process Clause of the Fourteenth Amendment requires that notice [concerning a class action settlement] be 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" *In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. at

---

[5]    *See* Compl. ¶ 43, *Sagapolutele* v. *Nat'l Football League*, No. 17-cv-00348 (E.D. Pa. Jan. 25, 2017), ECF No. 1; *see also* Am. Stip. of Dismissal, *Sagapolutele* v. *Nat'l Football League*, No. 17-cv-00348 (E.D. Pa. May 3, 2017), ECF No. 4 (approving stipulation of dismissal without prejudice).

<div align="center">

8

</div>

383 (quoting *Mullane* v. *Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)).[6] Parties settling a class action litigation should therefore distribute notice that "'fairly apprises' class members of the action and their rights." Newberg on Class Actions § 8:17 (5th ed.). Additional notice is only required when the settling parties subsequently introduce amendments that "would have a *material adverse* effect on the rights of class members." *In re Diet Drugs Prods. Liab. Litig.*, No. 99-cv-20593, 2010 WL 2735414, at *6 (E.D. Pa. July 2, 2010) (emphasis added); *see also In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 175 n.10, 182 (3d Cir. 2013) (supplemental notice required only for "*material* alterations" (emphasis added)). Conversely, if the amendments are neutral or beneficial to the settlement class, no additional notice is required. *See Harris* v. *Graddick*, 615 F. Supp. 239, 244 (N.D. Ala. 1985) (holding that where "the amendment is narrow and it is clearly apparent that the interests of the classes are not *substantially impaired*, . . . the notice already given is adequate" (emphasis added)); *see also In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. at 383 (collecting cases, including *Harris*). That is the case here.

A.   **The Amendments Did Not Require New Notice**

Sagapolutele's argument—that the Parties should have re-distributed notice reflecting the February 2015 amendments to the Settlement Agreement—fundamentally misunderstands the substance of the amendments. In Sagapolutele's telling, "in the midst of otherwise beneficial amendments" to the Settlement Agreement, the Parties "impose[d] an additional requirement that prevents Class Members from recovering settlement proceeds [for CTE] unless they obtained a Qualifying Diagnosis before" Final Approval. (Pl. Mem. at 8.) But

---

[6] Due process notice requirements mirror those of Rule 23 of the Federal Rules of Civil Procedure. *See* Newberg on Class Actions § 1:5 (5th ed.) ("Rule 23 is constructed to ensure that the representative nature of class action litigation safeguards these absent class members' due process rights."); *id.* § 8:7 (5th ed.) (the notice requirements under Rule 23 "echo[] the constitutional test set forth by the Supreme Court"); *id.* § 8:36 (5th ed.) ("[A]s Rule 23's requirements are quite similar to the Constitution's, the distinction may be immaterial.").

the amendment only clarified what was always the case and extended the deadline for Death with CTE to Final Approval.

The original settlement agreement provided that an award for a Qualifying Diagnosis of Death with CTE would be available only to Retired NFL Football Players who died *and* received a CTE diagnosis prior to Preliminary Approval.  The Long-Form Notice made this explicit, stating that the Settlement's benefits include "[m]onetary awards for **diagnoses** of Death with CTE **prior to July 7, 2014** . . . ."  (*See* Long-Form Notice at 6, ECF No. 6086-1 (emphasis added); *see also* Decl. of Robert H. Klonoff Relating to the Proposed Class Settlement in the Nat'l Football League Players' Concussion Injury Litig. ¶ 85, Nov. 12, 2014, ECF No. 6423-9 ("[C]ontrary to the arguments advanced by various objectors, **excluding CTE in cases diagnosed after July 7, 2014**, is not irrational." (emphasis added)).)  Similarly, the Parties' publicly filed submission to the Court in support of the amendment stated specifically that the amendment's language providing only a grace period of time following death within which to obtain a neuropathological diagnosis of CTE was "*consistent with the Parties' intent under the original Settlement Agreement*."  (*See* Class Counsel and the NFL Parties' Joint Submission in Resp. to the Feb. 2, 2015 Order of the Ct. at 4, ECF No. 6481 (emphasis added).)

Contrary to Sagapolutele's contentions, this amendment did not adversely affect the Settlement Class—much less materially so.  In fact, the amendment *expanded* settlement benefits to encompass any additional Settlement Class Members who died after Preliminary Approval but before Final Approval, and provided 270 days to receive a CTE diagnosis for such players—thereby, increasing the time covered by the definition of Death with CTE by *nine* months.  (*See id.* at 4-5.)

Accordingly, far from being materially adverse to Settlement Class Members, these amendments actually made the Settlement Agreement *more beneficial* by expanding the availability of an award for Death with CTE to a larger class of claimants. (*Id*.) Thus, as this Court previously held, "[b]ecause these changes improved the deal for Class Members without providing any concessions to the NFL Parties, an additional round of notice for Class Members is unnecessary." *In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. at 386; *see also In re Baby Prods. Antitrust Litig.*, 708 F.3d at 175 n.10, 182; *In re Diet Drugs Prods. Liab. Litig.*, 2010 WL 2735414, at *6; *Harris*, 615 F. Supp. at 244.

### B.      The Original Settlement Notice Was Sufficient

Sagapolutele's due process argument fails for an additional reason. The original notice, as this Court held, was clear that not all CTE diagnoses would be compensated under the Settlement Agreement, and the publicly available amendments sufficiently defined those CTE diagnoses eligible for compensation.

*First*, the Short- and Long-Form notices distributed to Settlement Class Members adequately protected their due process rights. To comport with due process, settlement notice need only be adequate and summarize the terms of the Settlement; perfection and painstaking detail are not required. *See In re Nat'l Football League Concussion Injury Litig.*, 307 F.R.D. at 382-83; *see also In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1104-05 (5th Cir. 1977) (explaining that notice need not "[be] perfectly correct in its form," and instead that "[t]he standard [] is that the notice . . . must contain information that a reasonable person would consider to be material in making an informed, intelligent decision" about whether to opt out); *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 124 (S.D.N.Y 1997) ("The notice need not be highly specific, and indeed 'numerous decisions, no doubt recognizing that notices to class members can practicably contain only a limited amount of information, have approved very

general descriptions of the proposed settlement.'" (quoting *Weinberger* v. *Kendrick*, 698 F.2d 61, 70 (2d Cir. 1982)).

As this Court previously held in overruling objections that "the Long-Form Notice is confusing because the term 'Death with CTE' appears several times without the accompanying cutoff date, . . . [b]oth the Summary Notice and the Long-Form Notice indicate that ***only 'certain' cases of CTE are covered***." *In re Nat'l Football League Concussion Injury Litig.*, 307 F.R.D. at 383-84 (emphasis added) (citing Summary Notice at 1, ECF No. 6086-2; Long-Form Notice at 1, ECF No. 6086-1). Moreover, as stated above, the Long-Form Notice specifically stated that the Settlement's benefits include "[m]onetary awards for ***diagnoses*** of Death with CTE ***prior to July 7, 2014*** . . . ." (*See* Long-Form Notice at 6, ECF No. 6086-1 (emphasis added).) Both the Short- and Long-Form notice thus alerted Settlement Class Members that an award for CTE was not absolute or unconditional; rather, a Settlement Class Member would need to satisfy "certain" criteria before any award would be made. That is the case here—under the original and amended Settlement Agreement, Sagapolutele must satisfy particular criteria before receiving an award of Death with CTE, including that she obtain her decedent's CTE diagnosis within a predetermined time period—and the original notice satisfied Sagapolutele's Due Process rights by alerting her to this fact.

*Second*, the Parties made the February 2015 amendments publicly available months prior to this Court's April 22, 2015 Final Approval Order (as amended May 8, 2015). Not only did the Parties post a copy of the amendments to this Court's publicly available PACER database as early as February 2015, but they also submitted a redline showing the exact changes to be made to the Settlement Agreement as a result of those proposed amendments. (Class Counsel and the NFL Parties' Joint Submission in Resp. to the Feb. 2, 2015 Order of the Ct., Ex.

A, Feb. 13, 2015, ECF No. 6481-1.)  This is especially significant in light of the widespread attention paid to the docket in this matter by, among others, the more than 5,000 Retired NFL Football Players who, at the time of settlement, were represented by counsel in MDL 2323.  *See In re Nat'l Football League Concussion Injury Litig.*, 307 F.R.D. at 389; *see also In re Diet Drugs Prods. Liab. Litig.*, 2010 WL 2735414, at *4  (holding that no notice of settlement agreement amendments was required because, in part, "notice of the proposed Tenth Amendment, along with an opportunity to object, was supplied to representatives of all class members with active cases in MDL No. 1203.").

In fact, the Parties' efforts to publicize the amendments were successful, as evidenced by the fact that over 40 Settlement Class Members filed objections to the amendments, *including objections to the very Death with CTE provision about which Sagapolutele complains*.  (*See* Armstrong Objectors' Suppl. Obj. to the Am. Class Action Settlement, ECF No. 6503; *see also* Miller Suppl. Obj. to Settlement, ECF No. 6484.)  While these objectors raised somewhat different concerns than Sagapolutele raises here—they argued that the award of Death with CTE should be available to Retired NFL Football Players who die after Final Approval—they nonetheless sought, at least in part, the same relief that Sagapolutele appears to now seek: "modification of the Final Order and Judgment by removal of the deadline to obtain a Qualifying Diagnosis of Death with CTE."  (Pl. Mot. at 2.)  This Court properly rejected these objectors' requests, and similarly should reject Sagapolutele's efforts here.

## II.

### SAGAPOLUTELE IS NOT ENTITLED TO REWRITE THE SETTLEMENT AGREEMENT

Even if Sagapolutele had established that notice of the amendments should have been given—which she has not, as explained above—her Motion would fail.  Sagapolutele first

argues that under Rule 60(a), the Court should rewrite the Settlement Agreement and amend the Final Order and Judgment because the Court made a "clerical error" when approving the amendments to the Settlement Agreement.  Second, Sagapolutele contends that amendment under Rule 60(b)(6) is justified by "extraordinary circumstances."  Finally, Sagapolutele argues that the Court's inherent authority permits it to amend the Final Order and Judgment here.  (Pl. Mem. at 18-24.)  These arguments lack merit.

  *First*, Sagapolutele has not made the necessary showing under Rule 60(a).  It is well settled that amendment of judgments pursuant to Rule 60(a) "is limited to the correction of 'clerical mistakes'; it encompasses only errors 'mechanical in nature, apparent on the record, and not involving an error of substantive judgment.'"  *In re Diet Drugs Prods. Liab. Litig.*, 200 F. App'x 95, 103 (3d Cir. 2006) (quoting *Pfizer Inc.* v. *Uprichard*, 422 F.3d 124, 129 (3d Cir. 2005)).  For Rule 60(a) to apply, the change to be corrected must not "affect[] the substantive rights of the parties."  *Id.* at 103-04 (quoting *Pfizer*, 422 F.3d at 130) (holding Rule 60(a) inapplicable because the "correction here goes beyond the correction of a 'mindless and mechanistic mistake'" (quotation omitted)).  Here, Sagapolutele has only ever alleged that the amendments in question were deliberate attempts by the Parties to modify the criteria for the Qualifying Diagnosis of Death with CTE.  She cannot simultaneously argue these amendments were mere "clerical mistakes."  As such, Rule 60(a) is inapplicable here.

  *Second*, Sagapolutele's attempts to seek relief under Rule 60(b)(6) fail, too.[7] Relief under Rule 60(b) is "not ordinarily . . . available to non-parties," *Federman* v. *Artzt*, 339 F. App'x 31, 33-34 (2d Cir. 2009), and "[a]bsent class members such as [movant] are treated, with limited exceptions inapplicable here, as non-parties to a class action."  *Adelson* v. *Ocwen*

---

[7] Although Sagapolutele broadly states she is moving for relief under Rule 60(b), her memorandum of law cites only to the Rule's catchall provision, which permits the modification of a final judgment based on "any other reason that justifies relief."  Fed. R. Civ. P. 60(b)(6).

*Fin. Corp.*, 621 F. App'x 348, 351 (7th Cir. 2015); *Federman*, 339 F. App'x at 33-34 (holding that absent class members who did not object to settlement were not "parties" for purposes of Rule 60(b) and declining "to expand the narrow exception to the general rule that non-parties cannot bring Rule 60(b) motions"); *In re Four Seasons Sec. Laws Litig.*, 525 F.2d 500, 504 (10th Cir. 1975) (absent class member "did not become a party for the purposes of Rule 60(b) to enable him to challenge the adequacy or nature of the settlement"); *see also* Fed. R. Civ. Proc. 60(b) ("the court may relieve *a party* . . . from a final judgment, order, or proceeding for the following reasons" (emphasis added)).  Sagapolutele did not object, intervene, or otherwise take steps to become a "party" to this action, so Rule 60(b) is not available to her here.  *See also* Newberg on Class Actions § 18:40 (5th ed.) ("[A]ll the circuits that have considered the issue have taken the position that absent class members are generally not authorized to file Rule 60 motions.").

Even if Sagapolutele were a "party," she has not met her burden to seek relief pursuant to Rule 60(b)(6) because such "[r]elief . . . may only be granted under extraordinary circumstances where, without such relief, an *extreme and unexpected hardship* would occur." *Sawka* v. *Healtheast, Inc.*, 989 F.2d 138, 140 (3d Cir. 1993) (emphasis added); *see also Matthews, Wilson & Matthews, Inc.* v. *Capital City Bank*, 614 F. App'x 969, 971 (11th Cir. 2015) (Rule 60(b)(6) "is an extraordinary remedy which may be invoked only upon a showing of exceptional circumstances, and the party seeking relief has the burden of showing that absent such relief, an extreme and unexpected hardship will result." (internal quotations omitted)); *Orlando Residence, Ltd.* v. *Hilton Head Hotel Inv'rs*, No. 89-cv-0662, 2013 WL 1103027, at *8 (D.S.C. Mar. 15, 2013), *aff'd sub nom. Orlando Residence, Ltd.* v. *Nelson*, 565 F. App'x 212 (4th Cir. 2014) ("Relief is rarely granted under . . . [Rule] 60(b)(6).").  The bar for relief under

Rule 60(b) is particularly high where the movant seeks to amend in "a class action [because] a too liberal application of Rule 60(b) would undermine the finality of judgments entered in such actions and would discourage their settlement." *Inmates of Suffolk Cty. Jail* v. *Rufo*, No. 71-cv-00162, 2015 WL 6958070, at *2 (D. Mass. Nov. 10, 2015); *see also Blue Diamond Coal Co.* v. *Trustees of UMWA Combined Ben. Fund*, 249 F.3d 519, 524 (6th Cir. 2001) ("[R]elief under Rule 60(b) is circumscribed by public policy favoring finality of judgments and termination of litigation. This is especially true in an application of subsection (6) of Rule 60(b) . . . ." (internal quotations omitted)).

Sagapolutele has not made any showing whatsoever that the amendment will cause her any hardship, much less "extreme and unexpected hardship." Tellingly, she has not shown—through supporting exhibits, affidavits, or even proffered facts in her brief—that the brain of her late husband, who passed away in 2009, has been examined by a board-certified neuropathologist and diagnosed with CTE at *any time*, much less that she would, but for the amendment, be entitled to an award. She also has not established that a belated diagnosis years after death (indeed, her husband died approximately eight years ago) would even be possible given the deterioration of brain matter after death. Nor does she seek to justify her apparent delay in seeking an examination. Instead, Sagapolutele invites only speculation and offers only conclusory assertions as to how the purported change impacts her rights under the agreement, and she therefore fails to show that the exceptional remedy of Rule 60(b)(6) is warranted here.

*Finally*, Sagapolutele's invocation of the Court's "inherent authority" to amend a judgment does not salvage her claim because that authority is no broader than that provided by Rule 60, which, as explained above, does not permit Sagapolutele the relief she seeks. *See* 20 Fed. Prac. & Proc. Deskbook § 104 (after 28 days from entry, "the judgment may be attacked,

other than by appeal, only as provided in Rule 60."); 11 Fed. Prac. & Proc. Civ. § 2852 (3d ed.) (while "the power of a court to modify an interlocutory judgment or order at any time prior to final judgment remains unchanged and is not limited by the provisions of Rule 60(b) . . . , [t]he rule does apply, however, to all final judgments entered in civil actions."). Sagapolutele's cases are not to the contrary; none holds that Courts have inherent authority to amend a final judgment approving a settlement agreement. (*See* Pl. Mem. at 23-24.) Three of the five cited cases concern only a court's authority to *enforce* a settlement agreement. *See Kokkonen* v. *Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 381 (1994) (holding that a district court has inherent authority to *enforce* a settlement agreement under particular circumstances); *Roman-Oliveras* v. *Puerto Rico Elec. Power Auth.*, 797 F.3d 83, 86-87 (1st Cir. 2015) (same); *Hensley* v. *Alcon Labs., Inc.*, 277 F.3d 535, 540-41 (4th Cir. 2002) (same). The fourth case, *In re Linerboard Antitrust Litig.*, 223 F.R.D. 357, 363 (E.D. Pa.), *amended*, 223 F.R.D. 370 (E.D. Pa. 2004) simply stands for the proposition that a court overseeing an MDL has inherent power to control the discovery process—an issue not relevant or in dispute here. Finally, while the fifth case involved an *amendment* of an order entering a settlement agreement, the Court did not hold that the district court had inherent authority to make the amendment; rather, it simply held that "the merits of [the district court's] decision to amend are no longer open to review." *F.A.C., Inc.* v. *Cooperativa de Seguros de Vida de Puerto Rico*, 449 F.3d 185, 190–91 (1st Cir. 2006).

In sum, Sagapolutele has not demonstrated (and cannot demonstrate) that she is entitled to rewrite the Settlement Agreement.

## <u>Conclusion</u>

For the foregoing reasons, the NFL Parties respectfully request that the Court deny the Motion in its entirety.

Dated:  September 28, 2017

Respectfully submitted,

/s/ Brad S. Karp
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
Brad S. Karp
Bruce Birenboim
Lynn B. Bayard
1285 Avenue of the Americas
New York, NY 10019-6064
Tel:   (212) 373-3000
bkarp@paulweiss.com

PEPPER HAMILTON LLP
Sean P. Fahey
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA 19103-2799
Tel:   (215) 981-4000

*Attorneys for Defendants the National Football
League and NFL Properties LLC*

## CERTIFICATE OF SERVICE

It is hereby certified that a true copy of the foregoing Memorandum of Law of the National Football League and NFL Properties LLC in Opposition to Settlement Class Member Yvonne Sagapolutele's Motion to Modify the Amended Final Order and Judgment was served electronically via the Court's electronic filing system on the 28th day of September, 2017, upon all counsel of record.

Dated:  September 28, 2017

   /s/Brad S. Karp
    Brad S. Karp

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE: NATIONAL FOOTBALL | § | No. 2:12-md-02323-AB |
| LEAGUE PLAYERS' CONCUSSION | § | |
| INJURY LITIGATION | § | MDL No. 2323 |
| | § | |
| | § | **Hon. Anita B. Brody** |
| THIS DOCUMENT RELATES TO: | § | |
| Settlement Class Member Robin B. Cornish | § | |
| (SPID 950012548) | § | |

**SUPPLEMENT IN SUPPORT OF CLASS MEMBER'S APPEAL OF THE
CLAIMS ADMINISTRATOR'S NOTICE OF DENIAL OF MONETARY
AWARD CLAIM**

In response to the Special Master's invitation to submit a supplemental response on whether other evidence is relevant to the interpretation of the June 25, 2014 (Unamended) Settlement Agreement (which was prepared before the fairness hearing), Class Member Robin B. Cornish provides the following:

**I.    Because the date of the "Qualifying Diagnosis" is the date the Player died, the Special Master can decide this appeal without considering any additional evidence.**

If the Special Master decides this appeal based on the first issue (i.e., the date of the "Qualifying Diagnosis") then other evidence about the June 25, 2014 (Unamended) Settlement Agreement is irrelevant — and need not be considered by the Special Master — because there would be no need to consider the language in that original settlement. That other evidence would be unnecessary and irrelevant because the first issue is based on the language in the amended settlement agreement. As that language was interpreted and explained by the NFL, the date of Class Member's "Qualifying Diagnosis" is the date of the Player's death.

For this Class Member, the date of the Qualifying Diagnosis would be August 23, 2008, the date when Frank Cornish died.

No additional evidence would be relevant to this first issue.

**A. The date of the "Qualifying Diagnosis" is the "date of the Player's death."**

The Amended Settlement Agreement added language to the settlement in Section 6.3(f), and this new language stated that the date of a "Qualifying Diagnosis" for "Death with CTE" must be "prior to the Final Approval Date." *See* ECF 6481-1. But the Amended Settlement Agreement did not explain how to calculate the date of the "Qualifying Diagnosis", so the FAQs that were approved by the NFL provided that explanation. Pursuant to Section 4.1(a) of the Amended Settlement Agreement, the NFL approved the FAQs that have expressly and repeatedly stated that "the date of the Qualifying Diagnosis is the date of the Player's death, even though the diagnosis is not made until after the Player dies."[1]

The NFL's arguments largely ignore the language in the FAQs. In footnote 5 of their response, the NFL cites Section 6.3(f) but does not discuss the date of the "Qualifying Diagnosis" anywhere in the body of its argument. Similarly, in footnote 7, the NFL mentions the relevant FAQ, but does not discuss the relevant language and instead merely references its prior briefing about the FAQ. However, the NFL's prior briefing says next to nothing about the language in the FAQ.

In its prior briefing, the NFL asserted that there are actually two different diagnosis dates — one diagnosis date for "compensation purposes"[2] and a different diagnosis date for other purposes.

---

[1]    This language was originally posted on February 19, 2019 as FAQ 93, and then after Class Member's claim was submitted, the same language was posted on July 8, 2019 under FAQ 99 and is now included in FAQ 100.

[2]    Specifically, the NFL previously stated that the parties "did not wish to reduce the compensatory award of a decedent who otherwise would have aged between death and the neuropathological examination." It's not clear how a decedent could age when decedents (by definition) do not age because they are dead. Regardless, a different sentence in the FAQ makes it clear that the Monetary Award for a Death with CTE claim is based on the "Player's

But the NFL has never provided any argument in support of this assertion.  In its prior briefing, the NFL noted that the FAQ also states that "[t]he Monetary Award is based on the Player's age when he died," but the NFL has never explained how that sentence (which says nothing about the Qualifying Diagnosis date) could change the clear language of the preceding sentence, which expressly states that the date of the Qualifying Diagnosis "is the date of the Player's death, even though the diagnosis is not made until after the Player dies."

The language in the FAQ is clear, and it establishes that "the date of the Qualifying Diagnosis is the date of the Player's death, even though the diagnosis is not made until after the Player dies." In this case, the date of the Player's death is clearly before the Preliminary Approval date.

**B.  No additional documents are relevant to the Special Master's analysis of this issue.**

No additional documents would seem to be relevant if the Special Master sustains this appeal based on the date of the "Qualifying Diagnosis" based on the language in the FAQs and the settlement agreement.  The FAQs and the Amended Settlement Agreement create only one date for the "Qualifying Diagnosis" in Death with CTE claims — the date of the Player's death.

Section 6.3(f) of the Amended Settlement Agreement simply states that the date of the "Qualifying Diagnosis" must be "prior to the Final Approval Date," and the FAQs clearly provide that "the date of the Qualifying Diagnosis is the date of the Player's death, even though the diagnosis is not made until after the Player dies."  Thus, if the Special Master sustains this appeal based on that clear language, the Special Master does not need to consider any evidence about the June 25, 2014 (Unamended) Settlement Agreement.

\*    \*    \*

---

age when he died."  But the first sentence of the FAQ does something different; it makes it clear that the date for a Qualifying Diagnosis for Death with CTE is the date of the Player's death even if the diagnosis occurs later.

If the Special Master sustains this appeal on the first issue (because the date of the Qualifying Diagnosis is "the date of the Player's death"), then the Special Master would not need to consider the language in the June 25, 2014 (Unamended) Settlement Agreement.

If, however, the Special Master does not decide this appeal based on the first issue, then the Special Master would reach the second issue, which could require consideration of other documents that may be relevant (though not dispositive) to the interpretation of the June 25, 2014 (Unamended) Settlement Agreement.

## II.    If the Special Master decides this appeal based on Class Member's due process arguments, additional evidence may be relevant but is not dispositive.

If the Special Master decides this case based on the second issue (i.e., the due process arguments Class Member has raised), the Special Master already has the dispositive evidence discussed in the parties' briefing, and Class Member is not aware of additional evidence that would be dispositive or directly relevant to this issue. However, there is other evidence that may be somewhat relevant to the fundamental question of whether the Original Settlement Agreement required a CTE diagnosis before July 7, 2014 or merely required that the Player have died prior to July 7, 2014.

### A.  The language in the settlement agreements and notices is dispositive.

Class Member believes the dispositive evidence has been discussed in the prior briefing. Although the NFL seems to contend that the original settlement agreement contained a diagnosis deadline for Death with CTE claims, the Special Master need only look at the language of the settlement agreements and accompanying notices from the Settlement website to see that is not true. The plain language of the Original Settlement Agreement shows that it contained no

diagnosis deadline,[3] and all notices sent to class members expressly told them that for Death with CTE claims, as long as the Player died before the relevant date, they only needed to obtain the post-mortem diagnosis in time to submit their claim.[4]

The NFL concedes the amendments to the June 25, 2014 (Unamended) Settlement Agreement "were made without supplemental notice to the Settlement Class," which means that this change would necessarily violate due process if it would have impacted Class Member's ability to make an informed decision regarding whether to opt out. *See, e.g.*, *In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 180 (3d Cir. 2013). The NFL contends that no notice was necessary because the changes "improved the deal" for some class members, but the NFL ignores that if its argument regarding the first issue is correct (i.e., that Class Member can recover nothing under the amended settlement agreement unless a diagnosis was performed before the Final Approval Date), that change to the settlement agreement (while it may have benefited a few individuals) would have clearly prejudiced Class Member by making it impossible for Class Member to recover any settlement funds — a fact that would have been important to know in order to decide whether to opt out of the settlement.

To determine whether the June 25, 2014 (Unamended) Settlement Agreement, at Section 6.3(f) or otherwise, required that diagnoses of CTE, as well as death with that condition, occur

---

3    Original Settlement Agreement, ECF 6073-2 ("For Retired NFL Football Players who died prior to the date of the Preliminary Approval and Class Certification Order, a post-mortem diagnosis of CTE made by a board-certified neuropathologist.").

4    Summary Notice, ECF No. 6093-2 (explaining that Class Members merely needed to obtain a post-mortem diagnosis); Long-Form Notice, ECF 6093-1 (explicitly stating that a Qualifying Diagnosis could occur "at any time until the end of the 65-year term of the Monetary Award Fund" as long as the death occurred prior to July 7, 2014).

prior to the Preliminary Approval Date, the Special Master need look no further than the plain language of that original settlement agreement.  That plain language states that Class Member a Qualifying Diagnosis of Death with CTE requires a Player "who died prior to the date of the Preliminary Approval and Class Certification Order, through a post-mortem diagnosis by a board-certified neuropathologist of CTE."  The NFL has never explained how a diagnosis deadline can be crammed into the plain language of the original settlement agreement.

Although no additional evidence is necessary, some additional evidence may be relevant.

**B. The objections that have been filed are not dispositive but may be somewhat relevant.**

Though not dispositive, the objections that have been filed may be somewhat relevant in that the objections are all based on complaints that it was unfair for the settlement to impose an arbitrary deadline for Death with CTE claims *based on the date of a Player's death*.  Class Member is not aware of any complaints about any diagnosis deadline because no diagnosis deadline existed in the original settlement agreement.  It is significant that none of the objections complain about any diagnosis deadline for such claims, but it should not be surprising because no such deadline existed.

The Morey Objections [ECF 6082, 6201], for example, only underscore Class Member's argument that the original settlement agreement imposed a deadline based on the date of death, not diagnosis.  When these objections were filed, the relevant language in the settlement agreement stated that a Death with CTE claim required a post-mortem diagnosis of CTE by a board-certified neuropathologist without imposing any kind of diagnosis deadline:

> A Qualifying Diagnosis of Death with CTE shall be made only for Retired NFL Football Players who died prior to the date of the Preliminary Approval and Class Certification Order, a post-mortem diagnosis of CTE made by a board-certified neuropathologist.

Original Settlement Agreement, ECF 6073-2.

The Morey Objection complained that this language created a problem because the deadline based on the date of death is arbitrary and allows a monetary award for "'a post-mortem diagnosis of CTE' *only* '[f]or Retired NFL Football Players who died prior to the date of the Preliminary Approval and Class Certification Order.'" ECF 6201, at 25. Nothing in this objection indicated that anyone believed class members had to obtain a CTE diagnosis before the date of the Preliminary Approval. In fact, a hypothetical in the Morey Objection shows just the opposite.

The Morey Objection provided a hypothetical situation to explain why imposing the deadline based on the date of death was arbitrary: "[W]hile CTE found in a retired player who died on the eve of preliminary approval allows a $4 million payment, that same condition goes uncompensated if the player dies one day later, after preliminary approval." ECF 6201, at 25. This hypothetical implicitly illustrates that no one believed there was also a diagnosis deadline because if there were such a deadline, the hypothetical wouldn't work. The hypothetical player who "died on the eve of preliminary approval" would *not* be able to get any payment unless — on the day of the Player's death — the player's family rushed to find a board certified neuropathologist to provide a post-mortem diagnosis before midnight on the date the player died.[5] The hypothetical only works if we assume the post-mortem diagnosis can be obtained later.

Moreover, this hypothetical from the Morey Objection further illustrates why it makes no sense to interpret the original settlement agreement to require that the death *and diagnosis* must both occur before the July 7, 2014 deadline. If that were the case, it would be impossible for any

---

[5]  Additionally, for class members whose family member died years ago, the process to get a CTE diagnosis is not simple as it requires finding a board-certified neuropathologist, gathering all relevant records to review, and possibly exhuming the family member's body.

hypothetical player who died shortly before the preliminary approval date to obtain a post-mortem diagnosis in time.

### C. The District Court's analysis of the objections is not dispositive but is relevant.

The District Court's order addressing the Morey Objection (and other objections) is also somewhat relevant because it also implicitly recognizes that the settlement agreement is intended to impose a deadline based on the date of death, not the date of the diagnosis. *In re NFL Players' Concussion Injury Litigation*, 307 F.R.D. 351, 383–84 (E.D. Penn. Apr. 22, 2015).

In addressing whether the notices complied with Rule 23, the District Court explained that the various notices appropriately informed "Class Members that there is no compensation for Death with CTE for Retired Players *who died after the Preliminary Approval Date*." *Id.* at 383 (emphasis added). The Court says nothing about any purported additional diagnosis deadline requirement. *See id.*

The Court further explained that the Long-Form Notice was not misleading because it does disclose that "those who die after [July 7, 2014] will not be compensated." *Id.* at 384. Relevantly, the Long-Form Notice does not anywhere disclose that those who do not obtain a *diagnosis* by July 7, 2014 will not be compensated. *See id.* The District Court said the opposite — that a diagnosis may be obtained at any time so long as the Player died before July 7, 2014.

Nowhere in the District Court's analysis of the objections does the Court indicate that anyone intended that the deadline for Death with CTE claims be based on anything other than the date of the Player's death. Moreover, although there were discussions in the Fairness Hearing and post-fairness hearing about expanding the settlement by allowing additional class members to submit claims if a Player died after the Preliminary Approval Date but before the Final Approval Date, there was no discussion about prejudicing current class members by adding a diagnosis deadline

that was not in the original settlement agreement and directly conflicted with the information in the notices that had been provided to class members.

**D. The Third Circuit's review of the settlement agreement provides no reason to doubt Class Member's interpretation.**

The Third Circuit has reviewed issues related to this case in various opinions, but none has squarely addressed the issue presented. Nevertheless, it is notable that in one of its opinions, the Third Circuit recognized that under the settlement, a class member is entitled to a monetary award for "Death with CTE provided the player died before final approval of the settlement on April 22, 2015." *In re NFL Players' Concussion Injury Litigation*, 821 F.3d 410, 423–24 (3rd Cir. 2016). The Third Circuit's review of the settlement agreement also led it to believe that the deadline applied based on the date of the Player's death, not on a diagnosis date. *Id.*

The Third Circuit noted that in order to collect from the settlement fund, a class member must register with the fund and submit a claims package "no later than two years after the date of the Qualifying Diagnosis or within two years after the supplemental notice is posted on the settlement website, whichever is later." *Id.* This is, perhaps, an important point because it shows that the settlement agreement created a natural — and reasonable — deadline for class members to submit a Qualifying Diagnosis for Death with CTE that does not require any violation of class members' due process rights.

**III. To the extent the Special Master finds any ambiguity it would only support Class Member's claims in this appeal.**

Class Member does not believe the Special Master will need to consult New York contract law regarding ambiguity in a contract because Class Member does not believe the settlement agreements are ambiguous. However, if the Special Master determines that either of the settlement agreements is ambiguous, that ambiguity would only support Class Member's appeal.

Under New York law, an ambiguity in a contract allows for consideration of extrinsic evidence to resolve the ambiguity. *Coliseum Towers Associates v. Cnty. of Nassau*, 2 A.D.3d 562, 564 (2d Dep't 2003).

For the amended settlement agreement, it is not clear that there would be any extrinsic evidence relevant to the first issue because the NFL does not dispute that the language in the FAQs governs how the settlement agreement should be interpreted. And it is also undisputed that the NFL approved the FAQs that expressly state that "the date of the Qualifying Diagnosis is the date of the Player's death, even though the diagnosis is not made until after the Player dies." However, if the NFL had claimed the FAQs could not be considered, it would create an ambiguity in the amended settlement agreement that would allow the FAQs to be considered as extrinsic evidence.

For the original settlement agreement, the relevant extrinsic evidence would be the same documents the Special Master would consult to determine if notice were provided as required by due process, i.e., the notices sent to absent class members. That extrinsic evidence all establishes there was no diagnosis deadline in the original settlement agreement.

The Summary Notice contained no diagnosis deadline. ECF No. 6093-2. It merely stated that class members could obtain monetary awards for "certain cases" of CTE "diagnosed after death." ECF No. 6093-2.

Similarly, the Long-Form Notice also contained no diagnosis deadline. But more importantly, this notice clearly stated that the deadline applied to the date of the Player's death, not the diagnosis date. *See* ECF No. 6093-1. The Long-Form Notice stated that class members in subclass 2 included any representative of a Player who "died prior to **July 7, 2014** and received a diagnosis of Death with CTE." *Id.* at 8. It put no deadline on the diagnosis.

The Long-Form Notice further stated: "Monetary awards are available for the diagnosis of

ALS, Parkinson's Disease, Alzheimer's Disease, [Neurocognitive Impairment,] or Death with CTE (the 'Qualifying Diagnoses')" and that a "Qualifying Diagnosis may occur at any time until the end of the 65-year term of the Monetary Award Fund." *Id.* at 10. This clearly indicated to class members that the July 7, 2014 deadline did not apply to a diagnosis of Death with CTE. *Id.*

Additionally, if the Special Master finds an ambiguity, the ambiguity must be construed against the NFL and in favor of Class Member because, under New York law, ambiguities in a contract will be construed against the party who prepared or presented it. *Coliseum Towers Associates*, 2 A.D.3d at 565. Here, Class Member was an absent class member who was not involved in preparing the settlement agreements.

Class Member does not believe that it will be necessary for the Special Master to utilize New York law in this case because the language in the settlement agreements and the accompanying notices is clear. But to the extent there is an ambiguity, it would need to be construed against the NFL.

## CONCLUSION

Class Member respectfully requests that the Special Master reverse the Claims Administrator's denial of this Monetary Award Claim and remand to the Claims Administrator for a calculation of the Monetary Award.

Dated: September 18, 2023

Respectfully Submitted:

*/s/ Justin Demerath*

**Justin Demerath**
Texas State Bar No. 24034415
**David Campbell**
Texas State Bar No. 24057033

O'HANLON, DEMERATH & CASTILLO
808 West Avenue | Austin, TX 78701
Tel: (512) 494-9949 | Fax: (512) 494-9919
jdemerath@808west.com
dcampbell@808west.com

**Counsel for Class Member**

## CERTIFICATE OF SERVICE

It is hereby certified that a true copy of the foregoing document was submitted on the Court

Portal on the 18th day of September, 2023.

*/s/ Justin B. Demerath*_____
Justin B. Demerath

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | § § § § § | No. 2:12-md-02323-AB MDL No. 2323 |
| THIS DOCUMENT RELATES TO: Settlement Class Member Carleen Hastings (SPID 950013395) | § § § § | **Hon. Anita B. Brody** |

**SUPPLEMENT IN SUPPORT OF CLASS MEMBER'S APPEAL OF THE CLAIMS ADMINISTRATOR'S NOTICE OF DENIAL OF MONETARY AWARD CLAIM**

In response to the Special Master's invitation to submit a supplemental response on whether other evidence is relevant to the interpretation of the June 25, 2014 (Unamended) Settlement Agreement (which was prepared before the fairness hearing), Class Member Carleen Hastings provides the following:

## I. Because the date of the "Qualifying Diagnosis" is the date the Player died, the Special Master can decide this appeal without considering any additional evidence.

If the Special Master decides this appeal based on the first issue (i.e., the date of the "Qualifying Diagnosis") then other evidence about the June 25, 2014 (Unamended) Settlement Agreement is irrelevant — and need not be considered by the Special Master — because there would be no need to consider the language in that original settlement. That other evidence would be unnecessary and irrelevant because the first issue is based on the language in the amended settlement agreement. As that language was interpreted and explained by the NFL, the date of Class Member's "Qualifying Diagnosis" is the date of the Player's death.

For this Class Member, the date of the Qualifying Diagnosis would be October 15, 2008, the date when Christopher Mims died.

No additional evidence would be relevant to this first issue.

### A.  The date of the "Qualifying Diagnosis" is the "date of the Player's death."

The Amended Settlement Agreement added language to the settlement in Section 6.3(f), and this new language stated that the date of a "Qualifying Diagnosis" for "Death with CTE" must be "prior to the Final Approval Date."  *See* ECF 6481-1.  But the Amended Settlement Agreement did not explain how to calculate the date of the "Qualifying Diagnosis", so the FAQs that were approved by the NFL provided that explanation.  Pursuant to Section 4.1(a) of the Amended Settlement Agreement, the NFL approved the FAQs that have expressly and repeatedly stated that "the date of the Qualifying Diagnosis is the date of the Player's death, even though the diagnosis is not made until after the Player dies."[1]

The NFL's arguments largely ignore the language in the FAQs.  In footnote 5 of their response, the NFL cites Section 6.3(f) but does not discuss the date of the "Qualifying Diagnosis" anywhere in the body of its argument.  Similarly, in footnote 7, the NFL mentions the relevant FAQ, but does not discuss the relevant language and instead merely references its prior briefing about the FAQ.  However, the NFL's prior briefing says next to nothing about the language in the FAQ.

In its prior briefing, the NFL asserted that there are actually two different diagnosis dates — one diagnosis date for "compensation purposes"[2] and a different diagnosis date for other

---

[1]    This language was originally posted on February 19, 2019 as FAQ 93, and then after Class Member's claim was submitted, the same language was posted on July 8, 2019 under FAQ 99 and is now included in FAQ 100.

[2]    Specifically, the NFL previously stated that the parties "did not wish to reduce the compensatory award of a decedent who otherwise would have aged between death and the neuropathological examination."  It's not clear

purposes. But the NFL has never provided any argument in support of this assertion. In its prior briefing, the NFL noted that the FAQ also states that "[t]he Monetary Award is based on the Player's age when he died," but the NFL has never explained how that sentence (which says nothing about the Qualifying Diagnosis date) could change the clear language of the preceding sentence, which expressly states that the date of the Qualifying Diagnosis "is the date of the Player's death, even though the diagnosis is not made until after the Player dies."

The language in the FAQ is clear, and it establishes that "the date of the Qualifying Diagnosis is the date of the Player's death, even though the diagnosis is not made until after the Player dies." In this case, the date of the Player's death is clearly before the Preliminary Approval date.

**B. No additional documents are relevant to the Special Master's analysis of this issue.**

No additional documents would seem to be relevant if the Special Master sustains this appeal based on the date of the "Qualifying Diagnosis" based on the language in the FAQs and the settlement agreement. The FAQs and the Amended Settlement Agreement create only one date for the "Qualifying Diagnosis" in Death with CTE claims — the date of the Player's death.

Section 6.3(f) of the Amended Settlement Agreement simply states that the date of the "Qualifying Diagnosis" must be "prior to the Final Approval Date," and the FAQs clearly provide that "the date of the Qualifying Diagnosis is the date of the Player's death, even though the diagnosis is not made until after the Player dies." Thus, if the Special Master sustains this

---

how a decedent could age when decedents (by definition) do not age because they are dead. Regardless, a different sentence in the FAQ makes it clear that the Monetary Award for a Death with CTE claim is based on the "Player's age when he died." But the first sentence of the FAQ does something different; it makes it clear that the date for a Qualifying Diagnosis for Death with CTE is the date of the Player's death even if the diagnosis occurs later.

appeal based on that clear language, the Special Master does not need to consider any evidence about the June 25, 2014 (Unamended) Settlement Agreement.

<p style="text-align:center">*   *   *</p>

If the Special Master sustains this appeal on the first issue (because the date of the Qualifying Diagnosis is "the date of the Player's death"), then the Special Master would not need to consider the language in the June 25, 2014 (Unamended) Settlement Agreement.

If, however, the Special Master does not decide this appeal based on the first issue, then the Special Master would reach the second issue, which could require consideration of other documents that may be relevant (though not dispositive) to the interpretation of the June 25, 2014 (Unamended) Settlement Agreement.

## II.    If the Special Master decides this appeal based on Class Member's due process arguments, additional evidence may be relevant but is not dispositive.

If the Special Master decides this case based on the second issue (i.e., the due process arguments Class Member has raised), the Special Master already has the dispositive evidence discussed in the parties' briefing, and Class Member is not aware of additional evidence that would be dispositive or directly relevant to this issue.  However, there is other evidence that may be somewhat relevant to the fundamental question of whether the Original Settlement Agreement required a CTE diagnosis before July 7, 2014 or merely required that the Player have died prior to July 7, 2014.

### A.   The language in the settlement agreements and notices is dispositive.

Class Member believes the dispositive evidence has been discussed in the prior briefing. Although the NFL seems to contend that the original settlement agreement contained a diagnosis deadline for Death with CTE claims, the Special Master need only look at the language of the

settlement agreements and accompanying notices from the Settlement website to see that is not true. The plain language of the Original Settlement Agreement shows that it contained no diagnosis deadline,[3] and all notices sent to class members expressly told them that for Death with CTE claims, as long as the Player died before the relevant date, they only needed to obtain the post-mortem diagnosis in time to submit their claim.[4]

The NFL concedes the amendments to the June 25, 2014 (Unamended) Settlement Agreement "were made without supplemental notice to the Settlement Class," which means that this change would necessarily violate due process if it would have impacted Class Member's ability to make an informed decision regarding whether to opt out. *See, e.g.*, *In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 180 (3d Cir. 2013). The NFL contends that no notice was necessary because the changes "improved the deal" for some class members, but the NFL ignores that if its argument regarding the first issue is correct (i.e., that Class Member can recover nothing under the amended settlement agreement unless a diagnosis was performed before the Final Approval Date), that change to the settlement agreement (while it may have benefited a few individuals) would have clearly prejudiced Class Member by making it impossible for Class Member to recover any settlement funds — a fact that would have been important to know in order to decide whether to opt out of the settlement.

---

[3]   Original Settlement Agreement, ECF 6073-2 ("For Retired NFL Football Players who died prior to the date of the Preliminary Approval and Class Certification Order, a post-mortem diagnosis of CTE made by a board-certified neuropathologist.").

[4]   Summary Notice, ECF No. 6093-2 (explaining that Class Members merely needed to obtain a post-mortem diagnosis); Long-Form Notice, ECF 6093-1 (explicitly stating that a Qualifying Diagnosis could occur "at any time until the end of the 65-year term of the Monetary Award Fund" as long as the death occurred prior to July 7, 2014).

To determine whether the June 25, 2014 (Unamended) Settlement Agreement, at Section 6.3(f) or otherwise, required that diagnoses of CTE, as well as death with that condition, occur prior to the Preliminary Approval Date, the Special Master need look no further than the plain language of that original settlement agreement. That plain language states that Class Member a Qualifying Diagnosis of Death with CTE requires a Player "who died prior to the date of the Preliminary Approval and Class Certification Order, through a post-mortem diagnosis by a board-certified neuropathologist of CTE." The NFL has never explained how a diagnosis deadline can be crammed into the plain language of the original settlement agreement.

Although no additional evidence is necessary, some additional evidence may be relevant.

### B. The objections that have been filed are not dispositive but may be somewhat relevant.

Though not dispositive, the objections that have been filed may be somewhat relevant in that the objections are all based on complaints that it was unfair for the settlement to impose an arbitrary deadline for Death with CTE claims *based on the date of a Player's death*. Class Member is not aware of any complaints about any diagnosis deadline because no diagnosis deadline existed in the original settlement agreement. It is significant that none of the objections complain about any diagnosis deadline for such claims, but it should not be surprising because no such deadline existed.

The Morey Objections [ECF 6082, 6201], for example, only underscore Class Member's argument that the original settlement agreement imposed a deadline based on the date of death, not diagnosis. When these objections were filed, the relevant language in the settlement agreement stated that a Death with CTE claim required a post-mortem diagnosis of CTE by a board-certified neuropathologist without imposing any kind of diagnosis deadline:

A Qualifying Diagnosis of Death with CTE shall be made only for Retired NFL

Football Players who died prior to the date of the Preliminary Approval and Class Certification Order, a post-mortem diagnosis of CTE made by a board-certified neuropathologist.

Original Settlement Agreement, ECF 6073-2.

The Morey Objection complained that this language created a problem because the deadline based on the date of death is arbitrary and allows a monetary award for "'a post-mortem diagnosis of CTE' *only* '[f]or Retired NFL Football Players who died prior to the date of the Preliminary Approval and Class Certification Order.'"  ECF 6201, at 25.  Nothing in this objection indicated that anyone believed class members had to obtain a CTE diagnosis before the date of the Preliminary Approval. In fact, a hypothetical in the Morey Objection shows just the opposite.

The Morey Objection provided a hypothetical situation to explain why imposing the deadline based on the date of death was arbitrary: "[W]hile CTE found in a retired player who died on the eve of preliminary approval allows a $4 million payment, that same condition goes uncompensated if the player dies one day later, after preliminary approval."  ECF 6201, at 25. This hypothetical implicitly illustrates that no one believed there was also a diagnosis deadline because if there were such a deadline, the hypothetical wouldn't work.  The hypothetical player who "died on the eve of preliminary approval" would *not* be able to get any payment unless — on the day of the Player's death — the player's family rushed to find a board certified neuropathologist to provide a post-mortem diagnosis before midnight on the date the player died.[5]  The hypothetical only works if we assume the post-mortem diagnosis can be obtained

---

[5]    Additionally, for class members whose family member died years ago, the process to get a CTE diagnosis is not simple as it requires finding a board-certified neuropathologist, gathering all relevant records to review, and possibly exhuming the family member's body.

later.

Moreover, this hypothetical from the Morey Objection further illustrates why it makes no sense to interpret the original settlement agreement to require that the death *and diagnosis* must both occur before the July 7, 2014 deadline. If that were the case, it would be impossible for any hypothetical player who died shortly before the preliminary approval date to obtain a post-mortem diagnosis in time.

### C. The District Court's analysis of the objections is not dispositive but is relevant.

The District Court's order addressing the Morey Objection (and other objections) is also somewhat relevant because it also implicitly recognizes that the settlement agreement is intended to impose a deadline based on the date of death, not the date of the diagnosis. *In re NFL Players' Concussion Injury Litigation*, 307 F.R.D. 351, 383–84 (E.D. Penn. Apr. 22, 2015).

In addressing whether the notices complied with Rule 23, the District Court explained that the various notices appropriately informed "Class Members that there is no compensation for Death with CTE for Retired Players *who died after the Preliminary Approval Date*." *Id.* at 383 (emphasis added). The Court says nothing about any purported additional diagnosis deadline requirement. *See id.*

The Court further explained that the Long-Form Notice was not misleading because it does disclose that "those who die after [July 7, 2014] will not be compensated." *Id.* at 384. Relevantly, the Long-Form Notice does not anywhere disclose that those who do not obtain a *diagnosis* by July 7, 2014 will not be compensated. *See id.* The District Court said the opposite — that a diagnosis may be obtained at any time so long as the Player died before July 7, 2014.

Nowhere in the District Court's analysis of the objections does the Court indicate that

Case: 25-2271    Document: 20-3    Page: 1690    Date Filed: 10/08/2025

anyone intended that the deadline for Death with CTE claims be based on anything other than the date of the Player's death.  Moreover, although there were discussions in the Fairness Hearing and post-fairness hearing about expanding the settlement by allowing additional class members to submit claims if a Player died after the Preliminary Approval Date but before the Final Approval Date, there was no discussion about prejudicing current class members by adding a diagnosis deadline that was not in the original settlement agreement and directly conflicted with the information in the notices that had been provided to class members.

**D. The Third Circuit's review of the settlement agreement provides no reason to doubt Class Member's interpretation.**

The Third Circuit has reviewed issues related to this case in various opinions, but none has squarely addressed the issue presented.  Nevertheless, it is notable that in one of its opinions, the Third Circuit recognized that under the settlement, a class member is entitled to a monetary award for "Death with CTE provided the player died before final approval of the settlement on April 22, 2015."  *In re NFL Players' Concussion Injury Litigation*, 821 F.3d 410, 423–24 (3rd Cir. 2016).  The Third Circuit's review of the settlement agreement also led it to believe that the deadline applied based on the date of the Player's death, not on a diagnosis date.  *Id.*

The Third Circuit noted that in order to collect from the settlement fund, a class member must register with the fund and submit a claims package "no later than two years after the date of the Qualifying Diagnosis or within two years after the supplemental notice is posted on the settlement website, whichever is later."  *Id.*  This is, perhaps, an important point because it shows that the settlement agreement created a natural — and reasonable — deadline for class members to submit a Qualifying Diagnosis for Death with CTE that does not require any violation of class members' due process rights.

9
**-4806-**

### III.   To the extent the Special Master finds any ambiguity it would only support Class Member's claims in this appeal.

Class Member does not believe the Special Master will need to consult New York contract law regarding ambiguity in a contract because Class Member does not believe the settlement agreements are ambiguous.  However, if the Special Master determines that either of the settlement agreements is ambiguous, that ambiguity would only support Class Member's appeal.

Under New York law, an ambiguity in a contract allows for consideration of extrinsic evidence to resolve the ambiguity.  *Coliseum Towers Associates v. Cnty. of Nassau*, 2 A.D.3d 562, 564 (2d Dep't 2003).

For the amended settlement agreement, it is not clear that there would be any extrinsic evidence relevant to the first issue because the NFL does not dispute that the language in the FAQs governs how the settlement agreement should be interpreted.  And it is also undisputed that the NFL approved the FAQs that expressly state that "the date of the Qualifying Diagnosis is the date of the Player's death, even though the diagnosis is not made until after the Player dies."  However, if the NFL had claimed the FAQs could not be considered, it would create an ambiguity in the amended settlement agreement that would allow the FAQs to be considered as extrinsic evidence.

For the original settlement agreement, the relevant extrinsic evidence would be the same documents the Special Master would consult to determine if notice were provided as required by due process, i.e., the notices sent to absent class members.  That extrinsic evidence all establishes there was no diagnosis deadline in the original settlement agreement.

The Summary Notice contained no diagnosis deadline.  ECF No. 6093-2.  It merely stated that class members could obtain monetary awards for "certain cases" of CTE "diagnosed after

death." ECF No. 6093-2.

Similarly, the Long-Form Notice also contained no diagnosis deadline. But more importantly, this notice clearly stated that the deadline applied to the date of the Player's death, not the diagnosis date. *See* ECF No. 6093-1. The Long-Form Notice stated that class members in subclass 2 included any representative of a Player who "died prior to **July 7, 2014** and received a diagnosis of Death with CTE." *Id.* at 8. It put no deadline on the diagnosis.

The Long-Form Notice further stated: "Monetary awards are available for the diagnosis of ALS, Parkinson's Disease, Alzheimer's Disease, [Neurocognitive Impairment,] or Death with CTE (the 'Qualifying Diagnoses')" and that a "Qualifying Diagnosis may occur at any time until the end of the 65-year term of the Monetary Award Fund." *Id.* at 10. This clearly indicated to class members that the July 7, 2014 deadline did not apply to a diagnosis of Death with CTE. *Id.*

Additionally, if the Special Master finds an ambiguity, the ambiguity must be construed against the NFL and in favor of Class Member because, under New York law, ambiguities in a contract will be construed against the party who prepared or presented it. *Coliseum Towers Associates*, 2 A.D.3d at 565. Here, Class Member was an absent class member who was not involved in preparing the settlement agreements.

Class Member does not believe that it will be necessary for the Special Master to utilize New York law in this case because the language in the settlement agreements and the accompanying notices is clear. But to the extent there is an ambiguity, it would need to be construed against the NFL.

## CONCLUSION

Class Member respectfully requests that the Special Master reverse the Claims

Administrator's denial of this Monetary Award Claim and remand to the Claims Administrator for a calculation of the Monetary Award.

Dated:  September 18, 2023

Respectfully Submitted:

*/s/ Justin Demerath*

**Justin Demerath**
Texas State Bar No. 24034415
**David Campbell**
Texas State Bar No. 24057033
O'HANLON, DEMERATH & CASTILLO
808 West Avenue | Austin, TX 78701
Tel: (512) 494-9949 | Fax: (512) 494-9919
jdemerath@808west.com
dcampbell@808west.com

**Counsel for Class Member**

## CERTIFICATE OF SERVICE

It is hereby certified that a true copy of the foregoing document was submitted on the Court Portal on the 18th day of September, 2023.

*/s/ Justin B. Demerath*
Justin B. Demerath

Justin B. Demerath

## NFL Parties' Supplemental Brief in Opposition to
## Appeal of Claim Denial by Carleen Hastings

On August 7, 2023, the NFL Parties submitted an Opposition to the Appeal of Claim Denial filed by Carleen Hastings, Representative Claimant for the late Christopher Mims. Mr. Mims died in 2008 and his CTE diagnosis "was not made before April 22, 2015," *i.e.*, the Final Approval date, as Ms. Hastings concedes. (Appeal at 8.) On August 28, 2023, the Special Master requested supplemental briefing addressing the question of whether, under New York principles of law, the June 25, 2014 (Unamended) Settlement Agreement (the "Unamended Settlement"), at Section 6.3(f) or otherwise, should be read to contain a diagnosis deadline of prior to July 7, 2014 (the date of Preliminary Approval) for Qualifying Diagnoses of Death with CTE. [1]

The Unamended Settlement clearly sets forth such a diagnosis deadline by its plain terms. At Section 6.3(f), the Unamended Settlement provides that, "A Qualifying Diagnosis of Death with CTE shall be made only for Retired NFL Football Players who died prior to the date of the Preliminary Approval and Class Certification Order, through a post-mortem diagnosis by a board-certified neuropathologist of CTE." (Unamended Settlement § 6.3(f).) The draft notice to Class Members, attached as Exhibit B-5 and expressly incorporated into the Unamended Settlement, makes clear that this ***deadline*** applied to any ***diagnosis*** of Death with CTE (and not simply to a Player's date of death). Specifically the draft notice provides that, under the proposed settlement, the NFL would fund "[m]onetary awards for ***diagnoses of . . . Death with CTE prior to [Date of Preliminary Approval Order]***." (Unamended Settlement, Ex. B-5 at 6 (emphasis added).) Because the Unamended Settlement unambiguously sets forth a diagnosis deadline for Death with CTE, there is no basis to consult parol evidence on the issue.

---

[1] In this supplemental brief, the NFL Parties address only the specific question posed by the Special Master and do not repeat (but incorporate by reference) the factual and procedural background and the other legal arguments set forth in the Opposition.

But *even if* an ambiguity were found (and none exists), the parol evidence overwhelmingly demonstrates that Class Members, the parties, and the Court all understood that the Unamended Settlement included a diagnosis deadline for Death with CTE. This universal understanding is established by numerous documents and filings, including (i) the approved Long-Form Notice actually sent to Ms. Hastings and other Class Members in July 2014; (ii) objections filed by Class Members who disagreed with the Unamended Settlement's treatment of CTE; (iii) statements made at the November 19, 2014 fairness hearing; (iv) the February 2015 amendments to the Settlement extending the diagnosis deadline and corresponding objections; and (v) the Court's holding (approved by the Third Circuit) that no new notice was required based on the February 2015 amendments. Accordingly, there is simply no question that the Unamended Settlement contains a deadline for the diagnosis of Death with CTE. This longstanding, bargained-for element of the Settlement must be affirmed to honor the parties' agreement.

## I.    The Unamended Settlement Agreement Unambiguously Established A Diagnosis Deadline For Death With CTE

Under New York law, "[t]he fundamental rule of contract interpretation is that agreements are construed in accord with the parties' intent, and '[t]he best evidence of what parties to a written agreement intend is what they say in their writing.' Thus, a written agreement that is clear and unambiguous on its face must be enforced according to the plain meaning of its terms, and extrinsic evidence of the parties' intent may be considered only if the agreement is ambiguous." *Banco Espirito Santo, S.A.* v. *Concessionaria Do Rodoanel Oeste S.A.*, 100 A.D.3d 100, 106 (N.Y. App. Div. 2012) (citations omitted). When determining if there is an ambiguity, "[t]he entire contract must be reviewed and '[p]articular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby. Form should not prevail over substance and a sensible meaning of words should be sought.'"

*Riverside S. Plan. Corp.* v. *CRP/Extell Riverside, L.P.*, 13 N.Y.3d 398, 404 (2009) (citation omitted). Thus, courts interpret contracts to give all provisions effect, and avoid rendering any superfluous or meaningless. *Burlington Ins. Co.* v. *NYC Transit Auth.*, 29 N.Y.3d 313, 322 (2017).

Reading the Unamended Settlement as a whole—as New York law requires—there can be no question that the parties adopted a diagnosis deadline for Death with CTE. *See Banco Espirito Santo, S.A.*, 100 A.D.3d at 106. At Section 6.3(f), the Unamended Settlement provides that, "A Qualifying Diagnosis of Death with CTE shall be made only for Retired NFL Football Players who died prior to the date of the Preliminary Approval and Class Certification Order, through a post-mortem diagnosis by a board-certified neuropathologist of CTE." (Unamended Settlement § 6.3(f).) The draft notice to Class Members, attached as Exhibit B-5 to the Unamended Settlement, makes clear that this ***deadline*** applies to any ***diagnosis*** of Death with CTE (and not simply to the Player's date of death). Importantly, the Unamended Settlement specifically provides that "its exhibits, attachments, and appendices will constitute the entire agreement and understanding among the parties" and that "[a]ll of the exhibits attached hereto are hereby incorporated by references as though fully set forth herein." (Unamended Settlement §§ 30.3, 30.5.)[2] Accordingly, the draft notice to Class Members attached as Exhibit B-5 is essential to discerning the parties' intent. *See Riverside S. Plan. Corp.*, 13 N.Y.3d at 404 (in discerning the parties' intent, the Court should review the agreement as a whole and give effect to all provisions).

The plain, unambiguous language of the draft notice confirms the parties' intent to include a diagnosis deadline for Death with CTE in the Unamended Settlement. The draft notice begins with a summary that sets Death with CTE apart from other potential diagnoses, noting that the

---

[2] *See also* Unamended Settlement § 2.1 ("references to this Settlement Agreement will include all exhibits, schedules, and annexes hereto."); *id.* § 2.1(hhhh) (defining "Settlement Agreement" as "this Settlement Agreement and all accompanying exhibits, including any subsequent amendments thereto and any exhibits to such amendments.").

Unamended Settlement "will provide eligible retired players" with "*[m]onetary awards for diagnoses* of ALS (Lou Gehrig's disease), Parkinson's Disease, Alzheimer's Disease, early and moderate Dementia and *certain cases of chronic traumatic encephalopathy (CTE) (a neuropathological finding) diagnosed after death*." (Unamended Settlement, Ex. B-5 at 1 (emphasis added).) This language clearly alerts readers that some, but not all post-mortem diagnoses would be compensated. More specifically, the draft notice contains a Q&A that unambiguously reflects a deadline for any diagnosis of Death with CTE. In answer to the question, "What are the benefits of the Settlement?," the draft notice states that "the NFL Parties will pay to fund . . . Monetary awards for *diagnoses of* ALS, Parkinson's Disease, Alzheimer's Disease, Level 2 Neurocognitive Impairment (*i.e.* moderate Dementia), Level 1.5 Neurocognitive Impairment (*i.e.* early Dementia) and *Death with CTE prior to [Date of Preliminary Approval Order]*." (*Id.* at 6 (emphasis added).) This language is determinative, as the only reasonable interpretation is that—unlike all other qualifying diagnoses—there is a diagnosis deadline for Death with CTE tied to the date of preliminary approval. *Cf. Banco Espirito Santo, S.A.*, 100 A.D.3d at 108 ("Ambiguity . . . only exists if there is more than one reasonable interpretation of the language at issue").

Accordingly, the draft notice establishes the parties' clear intent that the Unamended Settlement contain a diagnosis deadline for Death with CTE. The draft notice, which reflects the parties' effort to communicate in plain language the benefits of the Unamended Settlement to Class Members, clearly states that eligible retired players would receive monetary awards based on "diagnoses," and that for Death with CTE only "certain cases" would be compensated, specifically "diagnoses of . . . Death with CTE prior to [Date of Preliminary Approval Order]." (Unamended Settlement, Ex. B-5 at 1, 6.) The parties' unambiguous intent to include a diagnosis deadline for Death with CTE, as evidenced in the Unamended Settlement, must control.

## II.    Substantial Evidence Confirms That The Parties And Class Members Understood The Death With CTE Diagnosis Deadline

*Even if* the Unamended Settlement were ambiguous (and it is not), numerous filings and documents demonstrate that the parties, Court, and Class Members all understood that it contained a diagnosis deadline for a Qualifying Diagnosis of Death with CTE. The Settlement's treatment of CTE was extensively litigated over the course of the Settlement's approval. While much of the debate centered on the inclusion of the date of death deadline, the parties, Class Members, and Court appreciated (and none contested) that there was also a diagnosis deadline. Indeed, many Class Members specifically objected to the diagnosis deadline, which the parties defended in their briefing and the Court approved. These contemporaneous objections, the approved notice sent to Class Members in July 2014, the November 19, 2014 fairness hearing, the February 2015 amendments, and the Court's Final Approval Order (affirmed by the Third Circuit) all confirm that the Unamended Settlement contains a diagnosis deadline. These extensive contemporaneous sources dispel any possible doubt about the diagnosis deadline.

*First*, like the draft notice in the Unamended Settlement, the approved Long-Form Notice that was actually sent to Ms. Hastings and the other Class Members in July 2014 unambiguously stated that the Settlement's benefits include "[m]onetary awards for ***diagnoses*** of Death with CTE ***prior to July 7, 2014*** . . . ," the date of the Preliminary Approval Order. (Long-Form Notice at 6, ECF No. 6086-1 (emphasis added).) The Notice and link to the widely used settlement website—which contained the same language—were sent directly to Ms. Hastings. (*See* ECF No. 6423-12 ¶ 45 (as of October 14, 2014—prior to the amendments—over 62,989 unique visitors accessed the settlement website and 4,544 individuals called the toll-free number with 2,302 speaking with a live operator).)

*Second*, objections from Class Members who disagreed with the Unamended Settlement's

5

treatment of CTE recognized the existence of the diagnosis deadline.  For example, Class Members

filed objections to the Unamended Settlement arguing that:

- "[Objectors] object to the [Unamended Settlement] because ***a 'Death with CTE' qualifying diagnosis requires, as noted above, retirees to have died and been diagnosed with CTE prior to July 7, 2014***.  (*See* [Unamended Settlement], §6.3(f))."  (ECF No. 6237 at 6 (emphasis added).)

- The initial settlement (filed January 6, 2014) was problematic because "[p]layers suffering from CTE who ***would be diagnosed*** or who died after [Preliminary Approval] were to receive nothing."  (ECF No. 6082 at 13 (emphasis added).)  "[Intervenors'] interests were not adequately represented during the negotiation of the initial settlement, in part, because that settlement arbitrarily denied compensation to individuals whose CTE went ***undetected*** until after preliminary approval."  (*Id.* at 14 (emphasis added).)  "If a player is ***diagnosed with CTE after the preliminary approval stage***, he is entitled to ***nothing forever*** – regardless of the Monetary Award Fund's duration."  (*Id.* at 30–31 (emphasis added).)

- "Under the proposed Settlement, the receipt of a Monetary Award is premised on a retired NFL Player being ***diagnosed*** with a neurocognitive disorder. However, the proposed Settlement limits the qualifying neurocognitive disorders to Alzheimer's, Parkinson's, ALS, ***Death with CTE (prior to July 7, 2014)***, and Levels 1.5 and 2.0 Neurocognitive Disorders."  (ECF No. 6220 at 2 (emphasis added).)

- "[T]here is no reason why a ***CTE diagnosis before preliminary approval*** should be sufficient to demonstrate entitlement to a multi-million dollar award while a ***future*** diagnosis entitles a class member to nothing.  (ECF No. 6201 at 28 (emphasis added).)

- "Players who have already died with a ***diagnosis of CTE before July 7, 2014*** are eligible to receive up to $4 million. Players who will die after July 7, 2014 with the exact same diagnosis will receive *nothing*, while releasing all of their claims."  (ECF No. 6213 at 3 (emphasis added).)

- "The settlement proposal currently before this Court seeks ***estoppel of any CTE claim, from July 7, 2014 forward***, against the NFL."  (ECF No. 6241 at 1–2 (emphasis added).)

- "[Objectors] believe that it is unfair for class members who are not ***diagnosed*** prior to the certification of the class to receive nothing."  (ECF No. 6439 at 3 (emphasis added).)

Moreover, like Ms. Hastings, some Class Members vigorously argued that the Notice was

insufficiently clear about the diagnosis deadline for Death with CTE.  (*See* ECF Nos. 6082, 6201.)

These arguments were made publicly, responded to by the parties, considered by the Court, and

ultimately rejected.  The several objections to the diagnosis deadline and the Notice's treatment of

it demonstrate that, at the time of preliminary approval and the fairness hearing, it was well

understood that a Qualifying Diagnosis of Death with CTE had a diagnosis deadline.

*Third*, the November 19, 2014 fairness hearing further demonstrates the parties' intent to include a Death with CTE diagnosis deadline and the Court's full consideration of the issue. At the fairness hearing, which occurred prior to the February 2015 amendments, the Court heard extensive debate over the Unamended Settlement's treatment of CTE. Among other things, the Court heard argument regarding an objection—almost identical to Ms. Hastings'—that class notice failed clearly to convey the Death with CTE diagnosis deadline. Objectors' counsel argued that "a player reading the long-form notice would be misled" by one part of the notice that said "[a] qualifying diagnosis may occur at any time until the end of a 65-year term of the monetary award fund," which counsel characterized as "certainly not true if in fact death with CTE before July 7th of 2014 is what gets you an award." (Fairness Hearing Tr. at 95:3–9.)[3] Both Class Counsel and the Court dismissed the concern. Class Counsel emphasized that "under the section entitled 'What are the benefits of the settlement?' . . . it says monetary awards for diagnosis of death with CTE prior to July 7, 2014. I think if you're reading the notice, the section if you want to know what your benefits are, you're probably going to go to the section that says, what are the benefits of the settlement? The notice does that." (*Id.* at 199:3–13.) Judge Brody agreed: "I read them and I thought that this one was very specific. I mean if anyone wants to review them, they ought to review all the others." (*Id.* at 200:12–15.)

*Fourth*, the February 2015 amendments extending the diagnosis deadline for Death with CTE conclusively demonstrate that such a deadline also existed in the Unamended Settlement. In response to a February 2, 2015 Court Order (ECF No. 6479), the parties amended the deadline to obtain a Qualifying Diagnosis of Death with CTE from the Preliminary Approval Date to the Final

---

[3] Ms. Hastings similarly contends that "in all notices that were provided regarding the settlement agreement, [Ms. Hastings] and other absent class members were told they could obtain a CTE diagnosis at any time within the 65-year life of the Monetary Award Fund." (Appeal at 8.) Unlike objector's counsel at the Fairness Hearing, Ms. Hastings simply ignores the clear language in the notice describing the diagnosis deadline for death with CTE.

Approval Date, and provided a 270-day grace period in which Settlement Class Members who died between the Preliminary Approval Date and the Final Approval Date could obtain a Qualifying Diagnosis. The 270-day grace period would be wholly superfluous if there were no diagnosis deadline in the Unamended Settlement, as moving the date of death deadline to Final Approval would have been sufficient to expand the benefit. If, as Ms. Hastings argues, the Unamended Settlement required only that a Retired Player died prior to the deadline in order for a diagnosis made at *any unlimited future date* to be timely, the February 2015 amendments would not have added language providing that a Retired Player who died between July 7, 2014 and April 22, 2015 "*shall have until 270 days from his date of death to obtain such a post-mortem diagnosis.*" (Settlement Agreement Ex. A-1 § 5 (emphasis added).) Indeed, the parties specifically explained to the Court that "***consistent with the Parties' intent under the original Settlement Agreement***, and recognizing that obtaining such a [CTE] *diagnosis may take several months post-death*, the Parties have provided for a grace period of 270 days following any date of death between preliminary approval and the Final Approval Date to allow Claimants to obtain the necessary diagnosis." (Joint Submission at 4–5, ECF No. 6481 (emphasis added).) The parties' Joint Proposed Findings of Fact and Conclusions of Law in Support of Final Approval also repeatedly states the original intent to set a diagnosis deadline, which was then extended along with a 270-day grace period. (*See* ECF No. 6497 ¶¶ 62, 78, 178, 358, 380, 496, 502.)

Following the February 2015 amendments and prior to Final Approval, Class Members were informed of the extended deadline for Death with CTE diagnoses by FAQ 41 on the Settlement website, which stated, "The Representative Claimant of a player who died before the Final Approval Date may establish Death with CTE by submitting medical records showing a *diagnosis* of Death with CTE made by a board-certified neuropathologist *after the player's death*

*and before the Final Approval Date*.  If the player died between July 7, 2014 and the Final

Approval Date, his Representative Claimant has until 270 days after the player's death to obtain

the post-mortem diagnosis.  Players who died on or after the Final Approval Date (which has not

yet occurred) are not eligible for benefits for Death with CTE."  (Ex. 1, Settlement FAQs (Apr. 1,

2016) (emphasis added); *see also* ECF No. 6423-12 ¶¶ 39–47.)

The objections following the February 2015 amendments recognized that the Unamended

Agreement contained a diagnosis deadline for Death with CTE that the amendments extended.

Specifically, objectors argued that "[w]hile expanding the covered deaths to those occurring

between the preliminary approval and final approval dates, *and extending the deadline to secure*

*the necessary post-mortem diagnosis* until 270 days after the date of death, are steps in the right

direction, in truth, there should be no deadline for Death with CTE benefits since death is one of

the elements of the claim."  (ECF No. 6503 at 2 (emphasis added).)  This objection, like the

numerous objections to the Unamended Settlement noting the diagnosis deadline, confirms the

universal understanding that a CTE diagnosis deadline existed before and after the amendments.

*Fifth*, in its Final Approval Order, the Court squarely rejected Ms. Hastings due process

argument that the February 2015 amendments inserted a "new" diagnosis deadline for Death with

CTE "after the opt out deadline without notice to [Ms. Hastings] and other absent class members."

(Appeal at 8; *see id*. at 9.)  As the Court explained and Third Circuit affirmed, "[b]ecause these

changes [in the 2015 Amendments] improved the deal for Class Members without providing any

concessions to the NFL Parties, an additional round of notice for Class Members is unnecessary."

*In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. 351, 386 (E.D. Pa.

2015), *amended*, No. 2:12-MD-02323-AB, 2015 WL 12827803 (E.D. Pa. May 8, 2015), and *aff'd*,

821 F.3d 410 (3d Cir. 2016).  If the February 2015 amendments newly inserted a diagnosis

deadline when none had previously existed, that clearly would have been a "concession" to the NFL Parties which the Court determined had not occurred.

In sum, voluminous parol evidence confirms that the Unamended Agreement contains a diagnosis deadline for Death with CTE.

### III.    Interpretation Of The Unamended Settlement Agreement Is Unnecessary To Resolve Ms. Hastings' Appeal

In any event, the NFL Parties respectfully submit that the interpretative question about the Unamended Settlement agreement does not control the outcome of Ms. Hastings' Appeal because her due process argument rests on the Notice that she *actually received*, not the terms of the Unamended Settlement.  Ms. Hastings asserts that "in all notices that were provided regarding the settlement agreement, [Ms. Hastings] and other absent class members were told they could obtain a CTE diagnosis at any time within the 65-year life of the Monetary Award Fund" and that any addition of a diagnosis deadline occurred after the time to opt out had elapsed.  (Appeal at 8.)  But this is simply untrue because the notice sent to Class Members explains that Settlement benefits include "[m]onetary awards for ***diagnoses*** of Death with CTE ***prior to July 7, 2014*** . . . ."  (Long-Form Notice at 6, ECF No. 6086-1 (emphasis added).)  Because the Notice sent to Class Members (including Ms. Hastings) contained a diagnosis deadline for Death with CTE and the February 2015 amendments beneficially extended the deadline, the Notice was sufficient, as the Court found (and the Third Circuit affirmed).  Like other Class Members who objected to the contents of that Notice, Ms. Hastings had a full and fair opportunity to litigate these arguments before the Court during the settlement approval process or to opt out.  That is all due process and Rule 23 require.

### Conclusion

The denial of Ms. Hastings' claim is required under the judicially-approved terms of the Settlement Agreement and those terms raise no due process concerns.

Dated:  September 18, 2023

Respectfully submitted,

PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP

*/s/ Brad S. Karp*_____
Brad S. Karp
Bruce Birenboim
Claudia Hammerman
Lynn B. Bayard
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990
Email:  bkarp@paulweiss.com

*ATTORNEYS FOR THE*
*NATIONAL FOOTBALL LEAGUE*
*AND NFL PROPERTIES LLC*

## NFL Parties' Supplemental Brief in Opposition to
## Appeal of Claim Denial by Robin Cornish

On August 7, 2023, the NFL Parties submitted an Opposition to the Appeal of Claim Denial filed by Robin Cornish, Representative Claimant for the late Frank Cornish.  Mr. Cornish died in 2008 and his CTE diagnosis "was not made before April 22, 2015," *i.e.*, the Final Approval date, as Ms. Cornish concedes.  (Appeal at 8.)  On August 28, 2023, the Special Master requested supplemental briefing addressing the question of whether, under New York principles of law, the June 25, 2014 (Unamended) Settlement Agreement (the "Unamended Settlement"), at Section 6.3(f) or otherwise, should be read to contain a diagnosis deadline of prior to July 7, 2014 (the date of Preliminary Approval) for Qualifying Diagnoses of Death with CTE. [1]

The Unamended Settlement clearly sets forth such a diagnosis deadline by its plain terms.  At Section 6.3(f), the Unamended Settlement provides that, "A Qualifying Diagnosis of Death with CTE shall be made only for Retired NFL Football Players who died prior to the date of the Preliminary Approval and Class Certification Order, through a post-mortem diagnosis by a board-certified neuropathologist of CTE."  (Unamended Settlement § 6.3(f).)  The draft notice to Class Members, attached as Exhibit B-5 and expressly incorporated into the Unamended Settlement, makes clear that this ***deadline*** applied to any ***diagnosis*** of Death with CTE (and not simply to a Player's date of death).  Specifically the draft notice provides that, under the proposed settlement, the NFL would fund "[m]onetary awards for ***diagnoses of . . . Death with CTE prior to [Date of Preliminary Approval Order]***."  (Unamended Settlement, Ex. B-5 at 6 (emphasis added).)  Because the Unamended Settlement unambiguously sets forth a diagnosis deadline for Death with CTE, there is no basis to consult parol evidence on the issue.

---

[1] In this supplemental brief, the NFL Parties address only the specific question posed by the Special Master and do not repeat (but incorporate by reference) the factual and procedural background and the other legal arguments set forth in the Opposition.

But *even if* an ambiguity were found (and none exists), the parol evidence overwhelmingly demonstrates that Class Members, the parties, and the Court all understood that the Unamended Settlement included a diagnosis deadline for Death with CTE. This universal understanding is established by numerous documents and filings, including (i) the approved Long-Form Notice actually sent to Ms. Cornish and other Class Members in July 2014; (ii) objections filed by Class Members who disagreed with the Unamended Settlement's treatment of CTE; (iii) statements made at the November 19, 2014 fairness hearing; (iv) the February 2015 amendments to the Settlement extending the diagnosis deadline and corresponding objections; and (v) the Court's holding (approved by the Third Circuit) that no new notice was required based on the February 2015 amendments. Accordingly, there is simply no question that the Unamended Settlement contains a deadline for the diagnosis of Death with CTE. This longstanding, bargained-for element of the Settlement must be affirmed to honor the parties' agreement.

## I.    The Unamended Settlement Agreement Unambiguously Established A Diagnosis Deadline For Death With CTE

Under New York law, "[t]he fundamental rule of contract interpretation is that agreements are construed in accord with the parties' intent, and '[t]he best evidence of what parties to a written agreement intend is what they say in their writing.' Thus, a written agreement that is clear and unambiguous on its face must be enforced according to the plain meaning of its terms, and extrinsic evidence of the parties' intent may be considered only if the agreement is ambiguous." *Banco Espirito Santo, S.A.* v. *Concessionaria Do Rodoanel Oeste S.A.*, 100 A.D.3d 100, 106 (N.Y. App. Div. 2012) (citations omitted). When determining if there is an ambiguity, "[t]he entire contract must be reviewed and '[p]articular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby. Form should not prevail over substance and a sensible meaning of words should be sought.'"

*Riverside S. Plan. Corp.* v. *CRP/Extell Riverside, L.P.*, 13 N.Y.3d 398, 404 (2009) (citation omitted). Thus, courts interpret contracts to give all provisions effect, and avoid rendering any superfluous or meaningless. *Burlington Ins. Co.* v. *NYC Transit Auth.*, 29 N.Y.3d 313, 322 (2017).

Reading the Unamended Settlement as a whole—as New York law requires—there can be no question that the parties adopted a diagnosis deadline for Death with CTE. *See Banco Espirito Santo, S.A.*, 100 A.D.3d at 106. At Section 6.3(f), the Unamended Settlement provides that, "A Qualifying Diagnosis of Death with CTE shall be made only for Retired NFL Football Players who died prior to the date of the Preliminary Approval and Class Certification Order, through a post-mortem diagnosis by a board-certified neuropathologist of CTE." (Unamended Settlement § 6.3(f).) The draft notice to Class Members, attached as Exhibit B-5 to the Unamended Settlement, makes clear that this ***deadline*** applies to any ***diagnosis*** of Death with CTE (and not simply to the Player's date of death). Importantly, the Unamended Settlement specifically provides that "its exhibits, attachments, and appendices will constitute the entire agreement and understanding among the parties" and that "[a]ll of the exhibits attached hereto are hereby incorporated by references as though fully set forth herein." (Unamended Settlement §§ 30.3, 30.5.)[2] Accordingly, the draft notice to Class Members attached as Exhibit B-5 is essential to discerning the parties' intent. *See Riverside S. Plan. Corp.*, 13 N.Y.3d at 404 (in discerning the parties' intent, the Court should review the agreement as a whole and give effect to all provisions).

The plain, unambiguous language of the draft notice confirms the parties' intent to include a diagnosis deadline for Death with CTE in the Unamended Settlement. The draft notice begins with a summary that sets Death with CTE apart from other potential diagnoses, noting that the

---

[2] *See also* Unamended Settlement § 2.1 ("references to this Settlement Agreement will include all exhibits, schedules, and annexes hereto."); *id.* § 2.1(hhhh) (defining "Settlement Agreement" as "this Settlement Agreement and all accompanying exhibits, including any subsequent amendments thereto and any exhibits to such amendments.").

Unamended Settlement "will provide eligible retired players" with "*[m]onetary awards for diagnoses* of ALS (Lou Gehrig's disease), Parkinson's Disease, Alzheimer's Disease, early and moderate Dementia and *certain cases of chronic traumatic encephalopathy (CTE) (a neuropathological finding) diagnosed after death*." (Unamended Settlement, Ex. B-5 at 1 (emphasis added).) This language clearly alerts readers that some, but not all post-mortem diagnoses would be compensated. More specifically, the draft notice contains a Q&A that unambiguously reflects a deadline for any diagnosis of Death with CTE. In answer to the question, "What are the benefits of the Settlement?," the draft notice states that "the NFL Parties will pay to fund . . . Monetary awards for *diagnoses of* ALS, Parkinson's Disease, Alzheimer's Disease, Level 2 Neurocognitive Impairment (*i.e.* moderate Dementia), Level 1.5 Neurocognitive Impairment (*i.e.* early Dementia) and *Death with CTE prior to [Date of Preliminary Approval Order]*." (*Id.* at 6 (emphasis added).) This language is determinative, as the only reasonable interpretation is that— unlike all other qualifying diagnoses—there is a diagnosis deadline for Death with CTE tied to the date of preliminary approval. *Cf. Banco Espirito Santo, S.A.*, 100 A.D.3d at 108 ("Ambiguity . . . only exists if there is more than one reasonable interpretation of the language at issue").

Accordingly, the draft notice establishes the parties' clear intent that the Unamended Settlement contain a diagnosis deadline for Death with CTE. The draft notice, which reflects the parties' effort to communicate in plain language the benefits of the Unamended Settlement to Class Members, clearly states that eligible retired players would receive monetary awards based on "diagnoses," and that for Death with CTE only "certain cases" would be compensated, specifically "diagnoses of . . . Death with CTE prior to [Date of Preliminary Approval Order]." (Unamended Settlement, Ex. B-5 at 1, 6.) The parties' unambiguous intent to include a diagnosis deadline for Death with CTE, as evidenced in the Unamended Settlement, must control.

## II.  Substantial Evidence Confirms That The Parties And Class Members Understood The Death With CTE Diagnosis Deadline

*Even if* the Unamended Settlement were ambiguous (and it is not), numerous filings and documents demonstrate that the parties, Court, and Class Members all understood that it contained a diagnosis deadline for a Qualifying Diagnosis of Death with CTE.  The Settlement's treatment of CTE was extensively litigated over the course of the Settlement's approval.  While much of the debate centered on the inclusion of the date of death deadline, the parties, Class Members, and Court appreciated (and none contested) that there was also a diagnosis deadline.  Indeed, many Class Members specifically objected to the diagnosis deadline, which the parties defended in their briefing and the Court approved.  These contemporaneous objections, the approved notice sent to Class Members in July 2014, the November 19, 2014 fairness hearing, the February 2015 amendments, and the Court's Final Approval Order (affirmed by the Third Circuit) all confirm that the Unamended Settlement contains a diagnosis deadline.  These extensive contemporaneous sources dispel any possible doubt about the diagnosis deadline.

*First*, like the draft notice in the Unamended Settlement, the approved Long-Form Notice that was actually sent to Ms. Cornish and the other Class Members in July 2014 unambiguously stated that the Settlement's benefits include "[m]onetary awards for ***diagnoses*** of Death with CTE ***prior to July 7, 2014*** . . . ," the date of the Preliminary Approval Order.  (Long-Form Notice at 6, ECF No. 6086-1 (emphasis added).)  The Notice and link to the widely used settlement website—which contained the same language—were sent directly to Ms. Cornish.  (*See* ECF No. 6423-12 ¶ 45 (as of October 14, 2014—prior to the amendments—over 62,989 unique visitors accessed the settlement website and 4,544 individuals called the toll-free number with 2,302 speaking with a live operator).)

*Second*, objections from Class Members who disagreed with the Unamended Settlement's

treatment of CTE recognized the existence of the diagnosis deadline.  For example, Class Members

filed objections to the Unamended Settlement arguing that:

- "[Objectors] object to the [Unamended Settlement] because *a 'Death with CTE' qualifying diagnosis requires, as noted above, retirees to have died and been diagnosed with CTE prior to July 7, 2014*.  (*See* [Unamended Settlement], §6.3(f))."  (ECF No. 6237 at 6 (emphasis added).)

- The initial settlement (filed January 6, 2014) was problematic because "[p]layers suffering from CTE who *would be diagnosed* or who died after [Preliminary Approval] were to receive nothing." (ECF No. 6082 at 13 (emphasis added).)  "[Intervenors'] interests were not adequately represented during the negotiation of the initial settlement, in part, because that settlement arbitrarily denied compensation to individuals whose CTE went *undetected* until after preliminary approval." (*Id.* at 14 (emphasis added).)  "If a player is *diagnosed with CTE after the preliminary approval stage*, he is entitled to *nothing forever* – regardless of the Monetary Award Fund's duration." (*Id.* at 30–31 (emphasis added).)

- "Under the proposed Settlement, the receipt of a Monetary Award is premised on a retired NFL Player being *diagnosed* with a neurocognitive disorder. However, the proposed Settlement limits the qualifying neurocognitive disorders to Alzheimer's, Parkinson's, ALS, *Death with CTE (prior to July 7, 2014)*, and Levels 1.5 and 2.0 Neurocognitive Disorders." (ECF No. 6220 at 2 (emphasis added).)

- "[T]here is no reason why a *CTE diagnosis before preliminary approval* should be sufficient to demonstrate entitlement to a multi-million dollar award while a *future* diagnosis entitles a class member to nothing. (ECF No. 6201 at 28 (emphasis added).)

- "Players who have already died with a *diagnosis of CTE before July 7, 2014* are eligible to receive up to $4 million. Players who will die after July 7, 2014 with the exact same diagnosis will receive *nothing*, while releasing all of their claims." (ECF No. 6213 at 3 (emphasis added).)

- "The settlement proposal currently before this Court seeks *estoppel of any CTE claim, from July 7, 2014 forward*, against the NFL." (ECF No. 6241 at 1–2 (emphasis added).)

- "[Objectors] believe that it is unfair for class members who are not *diagnosed* prior to the certification of the class to receive nothing." (ECF No. 6439 at 3 (emphasis added).)

Moreover, like Ms. Cornish, some Class Members vigorously argued that the Notice was

insufficiently clear about the diagnosis deadline for Death with CTE.  (*See* ECF Nos. 6082, 6201.)

These arguments were made publicly, responded to by the parties, considered by the Court, and

ultimately rejected.  The several objections to the diagnosis deadline and the Notice's treatment of

it demonstrate that, at the time of preliminary approval and the fairness hearing, it was well

understood that a Qualifying Diagnosis of Death with CTE had a diagnosis deadline.

*Third*, the November 19, 2014 fairness hearing further demonstrates the parties' intent to include a Death with CTE diagnosis deadline and the Court's full consideration of the issue. At the fairness hearing, which occurred prior to the February 2015 amendments, the Court heard extensive debate over the Unamended Settlement's treatment of CTE. Among other things, the Court heard argument regarding an objection—almost identical to Ms. Cornish's—that class notice failed clearly to convey the Death with CTE diagnosis deadline. Objectors' counsel argued that "a player reading the long-form notice would be misled" by one part of the notice that said "[a] qualifying diagnosis may occur at any time until the end of a 65-year term of the monetary award fund," which counsel characterized as "certainly not true if in fact death with CTE before July 7th of 2014 is what gets you an award." (Fairness Hearing Tr. at 95:3–9.)[3] Both Class Counsel and the Court dismissed the concern. Class Counsel emphasized that "under the section entitled 'What are the benefits of the settlement?' . . . it says monetary awards for diagnosis of death with CTE prior to July 7, 2014. I think if you're reading the notice, the section if you want to know what your benefits are, you're probably going to go to the section that says, what are the benefits of the settlement? The notice does that." (*Id.* at 199:3–13.) Judge Brody agreed: "I read them and I thought that this one was very specific. I mean if anyone wants to review them, they ought to review all the others." (*Id.* at 200:12–15.)

*Fourth*, the February 2015 amendments extending the diagnosis deadline for Death with CTE conclusively demonstrate that such a deadline also existed in the Unamended Settlement. In response to a February 2, 2015 Court Order (ECF No. 6479), the parties amended the deadline to obtain a Qualifying Diagnosis of Death with CTE from the Preliminary Approval Date to the Final

---

[3] Ms. Cornish similarly contends that "in all notices that were provided regarding the settlement agreement, [Ms. Cornish] and other absent class members were told they could obtain a CTE diagnosis at any time within the 65-year life of the Monetary Award Fund." (Appeal at 8.) Unlike objector's counsel at the Fairness Hearing, Ms. Cornish simply ignores the clear language in the notice describing the diagnosis deadline for death with CTE.

Approval Date, and provided a 270-day grace period in which Settlement Class Members who died between the Preliminary Approval Date and the Final Approval Date could obtain a Qualifying Diagnosis.  The 270-day grace period would be wholly superfluous if there were no diagnosis deadline in the Unamended Settlement, as moving the date of death deadline to Final Approval would have been sufficient to expand the benefit.  If, as Ms. Cornish argues, the Unamended Settlement required only that a Retired Player died prior to the deadline in order for a diagnosis made at *any unlimited future date* to be timely, the February 2015 amendments would not have added language providing that a Retired Player who died between July 7, 2014 and April 22, 2015 "*shall have until 270 days from his date of death to obtain such a post-mortem diagnosis.*" (Settlement Agreement Ex. A-1 § 5 (emphasis added).)  Indeed, the parties specifically explained to the Court that "***consistent with the Parties' intent under the original Settlement Agreement***, and recognizing that obtaining such a [CTE] ***diagnosis may take several months post-death***, the Parties have provided for a grace period of 270 days following any date of death between preliminary approval and the Final Approval Date to allow Claimants to obtain the necessary diagnosis."  (Joint Submission at 4–5, ECF No. 6481 (emphasis added).)  The parties' Joint Proposed Findings of Fact and Conclusions of Law in Support of Final Approval also repeatedly states the original intent to set a diagnosis deadline, which was then extended along with a 270-day grace period.  (*See* ECF No. 6497 ¶¶ 62, 78, 178, 358, 380, 496, 502.)

Following the February 2015 amendments and prior to Final Approval, Class Members were informed of the extended deadline for Death with CTE diagnoses by FAQ 41 on the Settlement website, which stated, "The Representative Claimant of a player who died before the Final Approval Date may establish Death with CTE by submitting medical records showing a ***diagnosis*** of Death with CTE made by a board-certified neuropathologist ***after the player's death***

*and before the Final Approval Date*.  If the player died between July 7, 2014 and the Final

Approval Date, his Representative Claimant has until 270 days after the player's death to obtain

the post-mortem diagnosis.  Players who died on or after the Final Approval Date (which has not

yet occurred) are not eligible for benefits for Death with CTE."  (Ex. 1, Settlement FAQs (Apr. 1,

2016) (emphasis added); *see also* ECF No. 6423-12 ¶¶ 39–47.)

  The objections following the February 2015 amendments recognized that the Unamended

Agreement contained a diagnosis deadline for Death with CTE that the amendments extended.

Specifically, objectors argued that "[w]hile expanding the covered deaths to those occurring

between the preliminary approval and final approval dates, ***and extending the deadline to secure***

***the necessary post-mortem diagnosis*** until 270 days after the date of death, are steps in the right

direction, in truth, there should be no deadline for Death with CTE benefits since death is one of

the elements of the claim."  (ECF No. 6503 at 2 (emphasis added).)  This objection, like the

numerous objections to the Unamended Settlement noting the diagnosis deadline, confirms the

universal understanding that a CTE diagnosis deadline existed before and after the amendments.

  *Fifth*, in its Final Approval Order, the Court squarely rejected Ms. Cornish due process

argument that the February 2015 amendments inserted a "new" diagnosis deadline for Death with

CTE "after the opt out deadline without notice to [Ms. Cornish] and other absent class members."

(Appeal at 8; *see id*. at 9.)  As the Court explained and Third Circuit affirmed, "[b]ecause these

changes [in the 2015 Amendments] improved the deal for Class Members without providing any

concessions to the NFL Parties, an additional round of notice for Class Members is unnecessary."

*In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. 351, 386 (E.D. Pa.

2015), *amended*, No. 2:12-MD-02323-AB, 2015 WL 12827803 (E.D. Pa. May 8, 2015), and *aff'd*,

821 F.3d 410 (3d Cir. 2016).  If the February 2015 amendments newly inserted a diagnosis

deadline when none had previously existed, that clearly would have been a "concession" to the NFL Parties which the Court determined had not occurred.

In sum, voluminous parol evidence confirms that the Unamended Agreement contains a diagnosis deadline for Death with CTE.

### III.    Interpretation Of The Unamended Settlement Agreement Is Unnecessary To Resolve Ms. Cornish's Appeal

In any event, the NFL Parties respectfully submit that the interpretative question about the Unamended Settlement agreement does not control the outcome of Ms. Cornish's Appeal because her due process argument rests on the Notice that she *actually received*, not the terms of the Unamended Settlement.  Ms. Cornish asserts that "in all notices that were provided regarding the settlement agreement, [Ms. Cornish] and other absent class members were told they could obtain a CTE diagnosis at any time within the 65-year life of the Monetary Award Fund" and that any addition of a diagnosis deadline occurred after the time to opt out had elapsed.  (Appeal at 8.)  But this is simply untrue because the notice sent to Class Members explains that Settlement benefits include "[m]onetary awards for *diagnoses* of Death with CTE *prior to July 7, 2014* . . . ."  (Long-Form Notice at 6, ECF No. 6086-1 (emphasis added).)  Because the Notice sent to Class Members (including Ms. Cornish) contained a diagnosis deadline for Death with CTE and the February 2015 amendments beneficially extended the deadline, the Notice was sufficient, as the Court found (and the Third Circuit affirmed).  Like other Class Members who objected to the contents of that Notice, Ms. Cornish had a full and fair opportunity to litigate these arguments before the Court during the settlement approval process or to opt out.  That is all due process and Rule 23 require.

### Conclusion

The denial of Ms. Cornish's claim is required under the judicially-approved terms of the Settlement Agreement and those terms raise no due process concerns.

Dated: September 18, 2023

Respectfully submitted,

PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP

*/s/ Brad S. Karp*_____
Brad S. Karp
Bruce Birenboim
Claudia Hammerman
Lynn B. Bayard
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
Email: bkarp@paulweiss.com

*ATTORNEYS FOR THE*
*NATIONAL FOOTBALL LEAGUE*
*AND NFL PROPERTIES LLC*

# Exhibit 1

The Wayback Machine - https://web.archive.org/web/20160401042214/https://www.nflconcussionsettlement.com/FAQ.aspx



| HOME | | NOTICE MATERIALS | | COURT DOCUMENTS | | FAQs | SIGN UP FOR FUTURE INFORMATION |

## Frequently Asked Questions

**BASIC INFORMATION**

**WHO IS PART OF THE SETTLEMENT?**

**THE BASELINE ASSESSMENT PROGRAM**

**MONETARY AWARDS**

**EDUCATION FUND**

**REMAINING IN THE SETTLEMENT**

**HOW TO GET BENEFITS**

**EXCLUDING YOURSELF (OPTING OUT) FROM THE SETTLEMENT**

**THE LAWYERS REPRESENTING YOU**

**OBJECTING TO THE SETTLEMENT**

**THE COURT'S FAIRNESS HEARING**

**GETTING MORE INFORMATION**

**QUESTIONS IN ADDITION TO THOSE IN THE LONG FORM NOTICE**

### BASIC INFORMATION

**1. Why is this Notice being provided?**

The Court in charge of this case authorized this Notice because you have a right to know about the proposed Settlement of this lawsuit and about all of your options before the Court decides whether to give final approval to the Settlement. This Notice summarizes the Settlement and explains your legal rights and options.

This case is being heard in the U.S. District Court for the Eastern District of Pennsylvania. The case is known as *In re: National Football League Players' Concussion Injury Litigation,* No. 2:12-md-02323. The people who sued are called the "Plaintiffs." The National Football League and NFL Properties, LLC are called the "NFL Defendants."

The Settlement may affect your rights if you are: (a) a retired player of the NFL, American Football League ("AFL"), World League of American Football, NFL Europe League or NFL Europa League, (b) an authorized representative of a deceased, legally incapacitated or incompetent retired player of those leagues, or (c) an individual with a close legal relationship with a retired player of those leagues, such as a spouse, parent or child.

Back To Top

**2. What is the litigation about?**

The Plaintiffs claim that retired players experienced head trauma during their NFL football playing careers that resulted in brain injuries, which have caused or may cause them long-term neurological problems. The Plaintiffs accuse the NFL Parties of being aware of the evidence and the risks associated with repetitive traumatic brain injuries but failing to warn and protect the players against the long-term risks, and ignoring and concealing this information from the players. The NFL Parties deny the claims in the litigation.

Back To Top

**3. What is a class action?**

In a class action, one or more people, the named plaintiffs (who are also called proposed "class representatives") sue on behalf of themselves and other people with similar claims. All of these people together are the proposed "class" or "class members." When a class action is settled, one

**-4833-**

court resolves the issues for all class members (in the settlement context, "settlement class members"), except for those who exclude themselves (opt out) from the settlement. In this case, the proposed class representatives are Kevin Turner and Shawn Wooden. Excluding yourself (opting out) means that you will not receive any benefits from the Settlement. The process for excluding yourself (opting out) is described here.

Back To Top

**4. Why is there a Settlement?**

After extensive settlement negotiations mediated by retired United States District Court Judge Layn Phillips, and further settlement negotiations under the supervision of the Court-appointed Special Master, Perry Golkin, the Plaintiffs and the NFL Parties agreed to the Settlement.

A settlement is an agreement between a plaintiff and a defendant to resolve a lawsuit. Settlements conclude litigation without the court or a jury ruling in favor of the plaintiff or the defendant. A settlement allows the parties to avoid the cost and risk of a trial, as well as the delays of litigation.

If the Court approves this Settlement, the litigation between the Settlement Class Members and the NFL Parties is over. Only Settlement Class Members are eligible for the benefits summarized on this website. The NFL Parties will no longer be legally responsible to defend against the claims by Settlement Class Members made in this litigation.

The Court has not and will not decide in favor of the retired players or the NFL Parties. By reviewing this Settlement, the Court is not making and will not make any findings that any law was broken or that the NFL Parties did anything wrong.

The proposed Class Representatives and their lawyers ("Co-Lead Class Counsel," "Class Counsel," and "Subclass Counsel") believe that the proposed Settlement is best for everyone who is affected. The factors that Co-Lead Class Counsel, Class Counsel and Subclass Counsel considered included the uncertainty and delay associated with continued litigation, a trial and appeals and the uncertainty of particular legal issues that are yet to be determined by the Court. Co-Lead Class Counsel, Class Counsel and Subclass Counsel balanced these and other substantial risks in determining that the Settlement is fair, reasonable and adequate in light of all circumstances and in the best interests of the Settlement Class Members.

The Settlement Agreement is available here. The Settlement Agreement is also on file with the Clerk of the Court for the U.S. District Court for the Eastern District of Pennsylvania. You can also get this information by calling 1-855-887-3485.

Back To Top

**5. What are the benefits of the Settlement?**

Under the Settlement, the NFL Parties will pay to fund:

- Baseline neuropsychological and neurological examinations for eligible retired players, and additional medical testing, counseling and/or treatment if they are diagnosed with moderate cognitive impairment during the baseline examinations (up to $75 million, though every qualified Retired NFL Football Player will be eligible to receive one baseline examination during the term of the program), (the "Baseline Assessment Program");

- Monetary awards for diagnoses of Death with CTE prior to the Final Approval Date, ALS, Parkinson's Disease, Alzheimer's Disease, Level 2 Neurocognitive Impairment (i.e., moderate Dementia) and Level 1.5 Neurocognitive Impairment (i.e., early Dementia) (see Questions 14-21 and Injury Definitions). All valid claims under the Settlement, without limitation, will be paid in full throughout the 65-year life of the Settlement (the "Monetary Award Fund"); and

- Education programs promoting safety and injury prevention with respect to football players, including safety-related initiatives in youth football, the education of retired players regarding the NFL's medical and disability programs and other educational programs and initiatives ($10 million).

In addition, the NFL Parties will pay the cost of notifying the Settlement Class. Administrative costs and expenses will be paid out of the Monetary Award Fund. The Baseline Assessment Program costs and expenses will be paid out of the Baseline Assessment Program Fund.

The details of the Settlement benefits are in the Settlement Agreement, which is available here. The Settlement Agreement is also on file with the Clerk of the Court for the U.S. District Court for the Eastern District of Pennsylvania. You can also get this information by calling 1-855-887-3485.

Note: The Baseline Assessment Program and Monetary Award Fund will be administered independently of the NFL Parties and any benefit programs that have been created between the NFL and the NFL Players Association. The NFL Parties are not involved in determining the validity of claims under the Settlement.

Back To Top

**-4834-**

## WHO IS PART OF THE SETTLEMENT?

**6. Who is included in the Settlement Class?**

This Settlement Class includes three types of people:

Retired NFL Football Players: All living NFL Football players who, prior to July 7, 2014, (1) have retired, formally or informally, from playing professional football with the NFL or any Member Club, including AFL, World League of American Football, NFL Europe League and NFL Europa League players, or (2) were formerly on any roster, including preseason, regular season, or postseason, of any such Member Club or league and no longer are under contract to a Member Club and are not seeking active employment as a player with any Member Club, whether signed to a roster or signed to any practice squad, developmental squad, or taxi squad of a Member Club.

Representative Claimants: Authorized representatives, ordered by a court or other official of competent jurisdiction under applicable state law, of deceased, legally incapacitated or incompetent Retired NFL Football Players.

Derivative Claimants: Spouses, parents, dependent children, or any other persons who properly under applicable state law assert the right to sue independently or derivatively by reason of their relationship with a living or deceased Retired NFL Football Player. (For example, a spouse asserting the right to sue due to the injury of a husband who is a Retired NFL Football Player.)

The Settlement recognizes two separate groups ("Subclasses") of Settlement Class Members based on the Retired NFL Football Player's injury status prior to July 7, 2014:

- Subclass 1 includes: Retired NFL Football Players who were not diagnosed with ALS, Parkinson's Disease, Alzheimer's Disease, Level 2 Neurocognitive Impairment (i.e., moderate Dementia), Level 1.5 Neurocognitive Impairment (i.e., early Dementia) or Death with CTE prior to July 7, 2014, and their Representative Claimants and Derivative Claimants.

- Subclass 2 includes:

  - Retired NFL Football Players who were diagnosed with ALS, Parkinson's Disease, Alzheimer's Disease, Level 2 Neurocognitive Impairment (i.e., moderate Dementia), or Level 1.5 Neurocognitive Impairment (i.e., early Dementia) prior to July 7, 2014, and their Representative Claimants and Derivative Claimants; and

  - Representative Claimants of deceased Retired NFL Football Players who were diagnosed with ALS, Parkinson's Disease, Alzheimer's Disease, Level 2 Neurocognitive Impairment (i.e., moderate Dementia), or Level 1.5 Neurocognitive Impairment (i.e., early Dementia) prior to death or who died prior to July 7, 2014 and received a diagnosis of Death with CTE.

Back To Top

**7. What players are not included in the Settlement Class?**

The Settlement Class does not include current NFL players. The Settlement Class also does not include people who tried out for but did not make it onto preseason, regular season or postseason rosters or practice, developmental or taxi squads of the NFL or any Member Clubs.

Back To Top

**8. What if I am not sure whether I am included in the Settlement Class?**

If you are not sure whether you are included in the Settlement Class, you may call 1-855-887-3485 with questions. You may also write with questions to NFL Concussion Settlement, P.O. Box 25369, Richmond, VA 23260. You may also consult with your own attorney.

Back To Top

**9. What are the different levels of neurocognitive impairment?**

In addition to ALS, Parkinson's Disease and Alzheimer's Disease, various levels of neurocognitive impairment are covered by this Settlement. More details can be found in the Injury Definitions, which are available here or by calling 1-855-887-3485.

The level of neurocognitive impairment will be established in part with evidence of decline in performance in at least two areas subject to clinical evaluative testing, provided one of the areas is executive function, learning and memory, or complex attention, and related functional impairment as follows:

| LEVEL OF NEUROCOGNITIVE IMPAIRMENT | TYPE OF IMPAIRMENT | DEGREE OF DECLINE |
|---|---|---|
| Level 1 | Moderate cognitive impairment | Moderate cognitive decline |

**-4835-**

| Level 1.5 | Early Dementia | Moderate to severe cognitive decline |
| Level 2 | Moderate Dementia | Severe cognitive decline |

If neurocognitive impairment is temporary and only occurs in delirium, or as a result of substance abuse or medicinal side effects, it is not covered by the Settlement.

Back To Top

**10. Must a retired player be vested under the NFL Retirement Plan to receive Settlement benefits?**

No. A retired player can be a Settlement Class Member regardless of whether he is vested due to credited seasons or total and permanent disability under the Bert Bell/Pete Rozelle NFL Player Retirement Plan.

Back To Top

### THE BASELINE ASSESSMENT PROGRAM

**11. What is the Baseline Assessment Program ("BAP")?**

All living retired players who have earned at least one-half of an Eligible Season, who do not exclude themselves (opt out) from the Settlement, and who timely register to participate in the Settlement may participate in the Baseline Assessment Program ("BAP"). Registration for benefits will not be available until after the date the Settlement is finally approved and any appeals are fully resolved ("Final Settlement Approval"). A retired player may provide his name and contact information now here or by calling 1-855-887-3485. This ensures that the retired player will receive additional notice about the registration process and deadlines when it becomes available.

The BAP will provide baseline neuropsychological and neurological assessment examinations to determine whether retired players are currently suffering from cognitive impairment. Retired players will have from two to ten years, depending on their age as of Final Settlement Approval, to have a baseline examination conducted through a nationwide network of qualified and independent medical providers.

- Retired players 43 or older as of the date of Final Settlement Approval will need to have a baseline examination within two years of the start of the BAP.

- Retired players under the age of 43 as of the date of Final Settlement Approval will need to have a baseline examination within 10 years of the start of the BAP, or before they turn 45, whichever comes sooner.

Retired players who are diagnosed with Level 1 Neurocognitive Impairment (i.e., moderate cognitive impairment) are eligible to receive further medical testing and/or treatment (including counseling and pharmaceuticals) for that condition during the ten-year term of the BAP or within five years from diagnosis, whichever is later.

Retired players who participate in the BAP will be encouraged to provide their confidential medical records for use in research into cognitive impairment and safety and injury prevention with respect to football players.

Although all retired players are encouraged to take advantage of the BAP and receive a baseline examination, they do not need to participate in the BAP to receive a monetary award. Any award to a retired player may be reduced by 10% if the retired player does not participate in the BAP, as explained in more detail here.

Back To Top

**12. Why should a retired player get a BAP baseline examination?**

Getting a BAP baseline examination will be beneficial. It will determine whether the retired player has any cognitive impairment. If he is diagnosed with Level 1 Neurocognitive Impairment (i.e., moderate cognitive impairment), he will be eligible to receive further medical testing and/or treatment for that condition. In addition, regardless of any cognitive impairment today, the results of the BAP baseline examination can be used as a comparison to measure any subsequent deterioration of cognitive condition over the course of his life. Participants also will be examined by at least two experts during the BAP baseline examinations, a neuropsychologist and a neurologist,

**-4836-**

and the retired player and/or his family members will have the opportunity to ask questions relating to any cognitive impairment during those examinations.

Participation in the BAP does not prevent the retired player from filing a claim for a monetary award. For the next 65 years, retired players will be eligible for compensation paid from the Monetary Award Fund if the player develops a Qualifying Diagnosis. Participation in the BAP also will help ensure that, to the extent the retired player receives a Qualifying Diagnosis in the future, he will receive the maximum monetary award to which he is entitled.

Back To Top

**13. How does a retired player schedule a baseline assessment examination and where will it be done?**

Retired players need to register for Settlement benefits before they can get a baseline assessment examination. Registration for benefits will not be available until after Final Settlement Approval. **A retired player may provide his name and contact information now here or by calling 1-855-887-3485. This ensures that the retired player will receive additional notice about the registration process and deadlines when it becomes available.**

The BAP Administrator will send notice to those retired players determined during registration to be eligible for the BAP, explaining how to arrange for an initial baseline assessment examination. The BAP will use a nationwide network of qualified and independent medical providers who will provide both the initial baseline assessment as well as any further testing and/or treatment. The BAP Administrator, which will be appointed by the Court, will establish the network of medical providers.

Back To Top

## MONETARY AWARDS

**14. What diagnoses qualify for monetary awards?**

Monetary awards are available for the diagnosis of ALS, Parkinson's Disease, Alzheimer's Disease, Level 2 Neurocognitive Impairment (i.e., moderate Dementia), Level 1.5 Neurocognitive Impairment (i.e., early Dementia) or Death with CTE (the "Qualifying Diagnoses"). A Qualifying Diagnosis may occur at any time until the end of the 65-year term of the Monetary Award Fund.

If a retired player receives a monetary award based on a Qualifying Diagnosis, and later is diagnosed with a different Qualifying Diagnosis that entitles him to a larger monetary award than his previous award, he will be eligible for an increase in compensation. This would also apply to Derivative Claimants.

Qualifying Diagnoses must be made by approved qualified specialists. Any time prior to Final Settlement Approval, only board-certified neurologists, board-certified neurosurgeons or board-certified neuro-specialist physicians or similarly qualified specialists can make Qualifying Diagnoses. Following Final Settlement Approval, only qualified specialists approved by the Claims Administrator will be able to make Qualifying Diagnoses with the exception of Qualifying Diagnoses made through the BAP.

Back To Top

**15. Do I need to prove that playing professional football caused the retired player's Qualifying Diagnosis?**

No. No proof is necessary that a retired player's Qualifying Diagnosis was caused by playing football or that he experienced head injuries in the NFL, AFL, World League of American Football, NFL Europe League or NFL Europa League in order to receive a monetary award. The fact that a retired player receives a Qualifying Diagnosis is sufficient to be eligible for a monetary award.

You also do not need to exclude the possibility that the Qualifying Diagnosis was caused or contributed to by amateur football or other professional football league injuries or by various risk factors linked to the Qualifying Diagnosis.

Back To Top

**16. How much money will I receive?**

The amount of money you will receive depends on the retired player's:

- Specific Qualifying Diagnosis,

- Age at the time of diagnosis,

- Number of seasons played in the NFL, the AFL, the World League of American Football, NFL Europe, or NFL Europa,

- Diagnosis of a prior stroke or traumatic brain injury, and

**-4837-**

- Participation in a baseline assessment exam.

The amount of money you will receive also depends on:

- Any legally enforceable liens on the award,

- Any retainer agreement with an attorney, and

- Any further assessments ordered by the Court.

Certain costs and expenses related to resolving any liens for Settlement Class Members will be paid out of such Settlement Class Members' monetary awards or derivative claimant awards.

The table below lists the maximum amount of money available for each Qualifying Diagnosis before any adjustments are made.

| QUALIFYING DIAGNOSIS | MAXIMUM AWARD AVAILABLE |
|---|---|
| Amyotrophic lateral sclerosis (ALS) | $5 million |
| Death with CTE (diagnosed after death) | $4 million |
| Parkinson's Disease | $3.5 million |
| Alzheimer's Disease | $3.5 million |
| Level 2 Neurocognitive Impairment (i.e., moderate Dementia) | $3 million |
| Level 1.5 Neurocognitive Impairment(i.e., early Dementia) | $1.5 million |

Monetary awards may be increased up to 2.5% per year during the 65-year Monetary Award Fund term for inflation.

To receive the maximum amount outlined in the table, a retired player must have played for at least five Eligible Seasons and have been diagnosed when younger than 45 years old.

Derivative Claimants are eligible to be compensated from the monetary award of the retired player with whom they have a close relationship in an amount of 1% of that award. If there are multiple Derivative Claimants for the same retired player, the 1% award will be divided among the Derivative Claimants according to the law where the retired player (or his Representative Claimant, if any) resides.

Back To Top

**17. How does the age of the retired player at the time of first diagnosis affect a monetary award?**

Awards are reduced for retired players who were 45 or older when diagnosed. The younger a retired player is at the time of diagnosis, the greater the award he will receive. Setting aside the other downward adjustments to monetary awards, the table below provides:

- The average award within each age range for people diagnosed between the ages of 45-79; and

- The amount of the award for those under age 45 and over 79.

The actual amount will be determined based on each retired player's actual age at the time of diagnosis and on other potential adjustments.

| AGE AT DIAGNOSIS | ALS | DEATH W/CTE | PARKINSON'S | ALZHEIMER'S | LEVEL 2 | LEVEL 1.5 |
|---|---|---|---|---|---|---|
| Under 45 | $5,000,000 | $4,000,000 | $3,500,000 | $3,500,000 | $3,000,000 | $1,500,000 |
| 45 - 49 | $4,500,000 | $3,200,000 | $2,470,000 | $2,300,000 | $1,900,000 | $950,000 |
| 50 - 54 | $4,000,000 | $2,300,000 | $1,900,000 | $1,600,000 | $1,200,000 | $600,000 |

-4838-

| | | | | | |
|---|---|---|---|---|---|
| 55 - 59 | $3,500,000 | $1,400,000 | $1,300,000 | $1,150,000 | $950,000 | $475,000 |
| 60 - 64 | $3,000,000 | $1,200,000 | $1,000,000 | $950,000 | $580,000 | $290,000 |
| 65 - 69 | $2,500,000 | $980,000 | $760,000 | $620,000 | $380,000 | $190,000 |
| 70 - 74 | $1,750,000 | $600,000 | $475,000 | $380,000 | $210,000 | $105,000 |
| 75 - 79 | $1,000,000 | $160,000 | $145,000 | $130,000 | $80,000 | $40,000 |
| 80+ | $300,000 | $50,000 | $50,000 | $50,000 | $50,000 | $25,000 |

**Note:** The age of the retired player at diagnosis (not the age when applying for a monetary award) is used to determine the monetary amount awarded.

Back To Top

### 18. How does the number of seasons a retired player played affect a monetary award?

Awards are reduced for retired players who played less than five "Eligible Seasons." The Settlement uses the term "Eligible Season" to count the seasons in which a retired player played or practiced in the NFL, the AFL, the World League of American Football, NFL Europe, or NFL Europa. A retired player earns an Eligible Season for:

- Each season where he was on an NFL or AFL Member Club's "Active List" for either three or more regular season or postseason games, or

- Where he was on an Active List for one or more regular or postseason games and then spent two regular or postseason games on an injured reserve list or inactive list due to a concussion or head injury.

A retired player also earns one-half of an Eligible Season for:

- Each season where he was on an NFL or AFL Member Club's practice, developmental or taxi squad for at least eight games, but did not otherwise earn an Eligible Season, or

- Where he was on a World League of American Football, NFL Europe League, or NFL Europa League team's active roster for three or more regular or postseason games, or

- Where he was on a World League of American Football, NFL Europe League, or NFL Europa League team's active roster for one or more regular or postseason games and then spent at least two regular or postseason games on the World League of American Football, NFL Europe League, or NFL Europa League injured reserve list or team inactive list due to a concussion or head injury.

A Retired NFL Football Player may not receive credit for more than one Eligible Season per year.

The "Active List" means the list of all players physically present, eligible and under contract to play for an NFL or AFL Member Club on a particular game day within any applicable roster or squad limits in the applicable NFL or AFL Constitution and Bylaws.

The table below lists the reductions to a retired player's (or his Representative Claimant's) monetary award if the retired player has less than five Eligible Seasons. To determine the total number of Eligible Seasons credited to a retired player, add together all of the earned Eligible Seasons and half Eligible Seasons. For example, if a retired player earned two Eligible Seasons and three half Eligible Seasons, he will be credited with 3.5 Eligible Seasons.

| NUMBER OF ELIGIBLE SEASONS | PERCENTAGE OF REDUCTION |
|---|---|
| 4.5 | 10% |
| 4 | 20% |
| 3.5 | 30% |
| 3 | 40% |
| 2.5 | 50% |
| 2 | 60% |

**-4839-**

| 1.5 | 70% |
|-----|-----|
| 1 | 80% |
| .5 | 90% |
| 0 | 97.5% |

Back To Top

**19. How do prior strokes or traumatic brain injuries of a retired player affect a monetary award?**

It depends. A retired player's monetary award (or his Representative Claimant monetary award) will be reduced by 75% if he experienced: (1) a medically diagnosed stroke that occurred before or after the time the retired player played NFL football, but before he received a Qualifying Diagnosis; or (2) a severe traumatic brain injury unrelated to NFL football that occurred during or after the time the retired player played NFL football, but before he received a Qualifying Diagnosis.

The award will not be reduced if the retired player (or his Representative Claimant) can show by clear and convincing evidence that the stroke or traumatic brain injury is not related to the Qualifying Diagnosis.

Back To Top

**20. How is a retired player's monetary award affected if he does not participate in the BAP program?**

It depends on when the retired player receives his Qualifying Diagnosis and the nature of the diagnosis. There is a 10% reduction to the monetary award only if the retired player:

- Did not receive a Qualifying Diagnosis prior to July 7, 2014, and

- Does not participate in the BAP, and

- Receives a Qualifying Diagnosis (other than ALS) after his deadline to receive a BAP baseline assessment examination.

Back To Top

**21. Can I receive a monetary award even though the retired player is dead?**

Yes. Representative Claimants for deceased retired players with Qualifying Diagnoses will be eligible to receive monetary awards. If the deceased retired player died before January 1, 2006, however, the Representative Claimant will only receive a monetary award if the Court determines that a wrongful death or survival claim is allowed under applicable state law.

Derivative Claimants also will be eligible for a total award of 1% of the monetary award that the Representative Claimant for the deceased retired player receives.

Representative and Derivative Claimants will also need to register for Settlement benefits. Registration for benefits will not be available until after Final Settlement Approval. Representative and Derivative Claimants can provide their name and contact information now here or by calling 1-855-887-3485. This ensures that they will receive additional notice about the registration process and deadlines when it becomes available.

Back To Top

**22. Will this Settlement affect a retired player's participation in NFL or NFLPA related benefits programs?**

No. The Settlement benefits are completely independent of any benefits programs that have been created by or between the NFL and the NFL Players Association. This includes the 88 Plan (Article 58 of the 2011 Collective Bargaining Agreement) and the Neuro-Cognitive Disability Benefit (Article 65 of the 2011 Collective Bargaining Agreement).

**Note**: The Settlement ensures that a retired player who has signed, or will sign, a release as part of his Neuro-Cognitive Disability Benefit application, will not be denied Settlement benefits.

Back To Top

**-4840-**

**23. Will this Settlement prevent retired players from bringing workers' compensation claims?**

No. Claims for workers' compensation will not be released by this Settlement.

Back To Top

## EDUCATION FUND

**24. What types of education programs are supported by the Settlement?**

The Settlement will provide $10 million in funding to support education programs promoting safety and injury prevention with respect to football players, including safety-related initiatives in youth football, the education of retired players regarding the NFL's medical and disability programs and other educational programs and initiatives.

Retired players will be able to actively participate in such initiatives if they desire.

Back To Top

## REMAINING IN THE SETTLEMENT

**25. What am I giving up to stay in the Settlement Class?**

Unless you exclude yourself (opt out) from the Settlement, you cannot sue the NFL Parties, the Member Clubs, or related individuals and entities, or be part of any other lawsuit against the NFL Parties about the issues in this case. This means you give up your right to continue to litigate any claims related to this Settlement, or file new claims, in any court or in any proceeding at any time. However, the Settlement does not release any claims for workers' compensation or claims alleging entitlement to NFL medical and disability benefits available under the Collective Bargaining Agreement.

Please note that certain Plaintiffs also sued the football helmet manufacturer Riddell and certain related entities (specifically, Riddell, Inc., Riddell Sports Group Inc., All American Sports Corporation, Easton-Bell Sports, Inc., EB Sports Corp., Easton-Bell Sports, LLC and RBG Holdings Corp.). They are not parties to this Settlement and claims against them are not released by this Settlement.

Article XVIII of the Settlement Agreement contains the complete text and details of what Settlement Class Members give up unless they exclude themselves (opt out) from the Settlement, so please read it carefully. The Settlement Agreement is available here. The Settlement Agreement is also on file with the Clerk of the Court for the U.S. District Court for the Eastern District of Pennsylvania. You can also get this information by calling 1-855-887-3485. If you have any questions you can talk to the law firms listed here for free or you can talk to your own lawyer if you have questions about what this means.

Back To Top

## HOW TO GET BENEFITS

**26. How do I get Settlement benefits?**

To get benefits, you will need to register. This is true for all Settlement Class Members, including Representative and Derivative Claimants. Registration for benefits will not begin until after Final Settlement Approval. If and when that occurs, further notice will be provided about the registration process and deadlines. However, you may provide your name and contact information now here or by calling 1-855-887-3485. This ensures that you will receive additional notice about the registration process and deadlines when that becomes available. To receive any Settlement benefits, you must register on or before 180 days from the date that further notice about the registration process and deadlines is posted here. Information about the registration deadline will also be available by calling 1-855-887-3485.

Back To Top

**27. Is there a time limit for Retired NFL Football Players and Representative Claimants to file claims for monetary awards?**

Yes. Retired NFL Football Players and Representative Claimants for retired players who are diagnosed by the date of Final Settlement Approval must submit claims for monetary awards within two years of the date that further notice about the registration process and deadlines is posted here. Retired NFL Football Players and Representative Claimants for retired players who are diagnosed after the date of Final Settlement Approval have two years from the date of diagnosis to file claims. This deadline may be extended up to an additional two years upon a showing of substantial hardship.

**-4841-**

Derivative Claimants must submit claims no later than 30 days after a Retired NFL Football Player or a Representative Claimant receives notice of an entitlement to a monetary award. All claims must be submitted by the end of the 65-year term of the Monetary Award Fund.

Back To Top

**28. Can I re-apply for compensation if my claim is denied?**

Yes. A Settlement Class Member who submits a claim for a monetary award that is denied can re-apply in the future should the Retired NFL Football Player's medical condition change.

Back To Top

**29. Can I appeal the determination of my monetary award claim?**

Yes. The Settlement establishes an independent process for a Settlement Class Member to appeal the denial of a monetary award claim or the amount of the monetary award.

Back To Top

## EXCLUDING YOURSELF (OPTING OUT) FROM THE SETTLEMENT

If you want to retain the right to sue the NFL Parties about the legal issues in this case, then you must take steps to remove yourself from the Settlement. You may do this by asking to be excluded from opting out of the Settlement Class. If you exclude yourself (opt out), you cannot receive benefits from this Settlement.

**30. How do I get out of the Settlement?**

On or before October 14, 2014, you must mail a letter or other written document to the Claims Administrator requesting exclusion from the Settlement Class. Your request must include:

- Your name, address, telephone number, and date of birth;

- A copy of your driver's license or other government issued identification;

- A statement that "I wish to exclude myself from the Settlement Class in *In re: National Football League Players' Concussion Injury Litigation*, No. 2:12-md-02323" (or substantially similar clear and unambiguous language); and

- Your signature by hand, and the date on which you signed it (even if represented by an attorney).

You must mail your exclusion (opt out) request, postmarked on or before October 14, 2014, to:

NFL Concussion Settlement
P.O. Box 25369
Richmond, VA 23260

Your request to exclude yourself (opt out) is not effective unless and until the District Court grants Final Approval.

Back To Top

**31. If I do not exclude myself (opt out), can I sue the NFL Parties for the same thing later?**

No. Unless you exclude yourself (opt out), you give up the right to sue the NFL Parties for all of the claims that this Settlement resolves. If you want to maintain your own lawsuit relating to the claims released by the Settlement, then you must exclude yourself (opt out) on or before October 14, 2014.

Back To Top

**32. If I exclude myself (opt out), can I still get benefits from this Settlement?**

No. If you exclude yourself (opt out) from the Settlement you will not get any Settlement benefits. You will not be eligible to receive a monetary award or participate in the Baseline Assessment Program.

Back To Top

## THE LAWYERS REPRESENTING YOU

**33. Do I have a lawyer in the case?**

The Court has appointed a number of lawyers to represent all Settlement Class Members as "Co-Lead Class Counsel," "Class Counsel" and "Subclass Counsel." They are:

| | |
|---|---|
| Christopher A. Seeger<br>Co-Lead Class Counsel<br>SEEGER WEISS LLP | Sol Weiss<br>Co-Lead Class Counsel<br>ANAPOL SCHWARTZ |

**-4842-**

| 77 Water Street<br>New York, NY 10005 | 1710 Spruce Street<br>Philadelphia, PA 19103 |
|---|---|
| Steven C. Marks<br>Class Counsel<br>PODHURST ORSECK P.A.<br>City National Bank Building<br>25 W. Flagler Street, Suite 800<br>Miami, FL 33130-1780 | Gene Locks<br>Class Counsel<br>LOCKS LAW FIRM<br>The Curtis Center, Suite 720 East<br>601 Walnut Street<br>Philadelphia, PA 19106 |
| Arnold Levin<br>Counsel - Subclass 1<br>LEVIN FISHBEIN SEDRAN & BERMAN<br>510 Walnut Street, Suite 500<br>Philadelphia, PA 19106 | Dianne M. Nast<br>Counsel - Subclass 2<br>NAST LAW LLC<br>1101 Market Street, Suite 2801<br>Philadelphia, Pennsylvania 19107 |

You will not be charged for contacting these lawyers. If you are represented by your own attorney, you should contact that attorney to discuss the proposed Settlement. You do not have to hire your own attorney to participate in the Settlement program, but the administrators of the Settlement cannot provide you with any legal advice or answer questions that depend upon your individual factual circumstances. If you do not already have your own attorney, you may hire one at your own expense.

Back To Top

**34. How will the lawyers be paid?**

At a later date to be determined by the Court, Co-Lead Class Counsel, Class Counsel and Subclass Counsel will ask the Court for an award of attorneys' fees and reasonable costs. The NFL Parties have agreed not to oppose or object to the request for attorneys' fees and reasonable incurred costs if the request does not exceed $112.5 million. These fees and incurred costs will be paid separately by the NFL Parties and not from the Baseline Assessment Program Fund, Education Fund or Monetary Award Fund. Settlement Class Members will have an opportunity to comment on and/or object to this request at an appropriate time. Ultimately, the award of attorneys' fees and reasonable costs to be paid by the NFL Parties is subject to the approval of the Court.

After Final Settlement Approval, Co-Lead Class Counsel may ask the Court to set aside up to five percent of each monetary award and derivative claimant award to facilitate the Settlement program and related efforts of Co-Lead Class Counsel, Class Counsel and Subclass Counsel. If approved, this money would be held in a separate fund overseen by the Court. Any future request for a set-aside will describe: (1) the proposed amount; (2) how the money will be used; and (3) any other relevant information. This "set-aside" would come out of the claimant's attorney's fee if represented by individual counsel or, if not represented, out of the monetary award and derivative claimant award itself. No money will be held back or set aside from any award without a Court order. The set-aside is a matter between Class Counsel and individual counsel for Settlement Class Members. The NFL Parties do not take a position on the proposal.

Back To Top

<div align="center">

## OBJECTING TO THE SETTLEMENT

</div>

**35. How do I tell the Court if I do not like the Settlement?**

If you have not excluded yourself (opted out), you may object to the Settlement or any part of it. The Court will consider your views. To object to the Settlement, you or your attorney must submit your written objection to the Court. The objection must include the following:

- The name of the case and multidistrict litigation, In re: *National Football League Players' Concussion Injury Litigation*, No. 2:12-md-02323;

- Your name, address, telephone number, and date of birth;

- If you are a Representative Claimant or Derivative Claimant, the name of the Retired NFL Football Player to whom you are related;

- Written statement or evidence establishing how you are a Settlement Class Member;

- A detailed statement of your objections, and the specific reasons for each such objection, including any facts or law you wish to bring to the Court's attention;

- Any other supporting papers, materials or briefs that you want the Court to consider in support of your objection; and

- Your signature by hand, and the date on which you signed it (even if represented by an attorney).

Attorneys filing objections on behalf of Settlement Class Members must follow the requirements in Section 14.3(b) of the Settlement Agreement.

You must mail your objection, postmarked on or before October 14, 2014, to:

| Court |
|---|
| Clerk of the District Court/NFL Concussion Settlement |
| U.S. District Court for the Eastern District of Pennsylvania |
| United States Courthouse |
| 601 Market Street |
| Philadelphia, PA 19106-1797 |

Back To Top

**36. What is the difference between objecting to the Settlement and excluding myself?**

Objecting is simply telling the Court that you do not like something about the Settlement or want it to say something different. You can object only if you do not exclude yourself (opt out) from the Settlement Class. Excluding yourself (opting out) is telling the Court that you do not want to be part of the Settlement Class and you do not want to receive any Settlement benefits. If you exclude yourself (opt out), you have no basis to object because the case no longer affects you.

Back To Top

## THE COURT'S FAIRNESS HEARING

The Court will hold a hearing to decide whether to approve the Settlement. You may attend and you may ask to speak, but you do not have to. The Court will determine if you are allowed to speak if you request to do so.

**37. When and where will the Court hold a Fairness Hearing concerning the Settlement?**

The Court will hold the Fairness Hearing on Wednesday, November 19, 2014 at 10:00 a.m. at the United States Courthouse, 601 Market Street, Philadelphia, Pennsylvania 19106 in Courtroom 7B. The hearing may be moved to a different date or time without additional notice, so it is a good idea to check www.NFLConcussionSettlement.com or call 1-855-887-3485. At this hearing, the Court will hear evidence about whether the Settlement is fair, reasonable, and adequate. If there are objections, the Court will consider them and may elect to listen to people who have asked to speak at the hearing. After the hearing, the Court will decide whether to approve the Settlement. We do not know how long the decision will take.

After the Fairness Hearing, the Court will consider the request for attorneys' fees and reasonable costs by Co-Lead Class Counsel, Class Counsel and Subclass Counsel.

Back To Top

**38. Do I have to attend the hearing?**

No. Co-Lead Class Counsel, Class Counsel and Subclass Counsel will answer questions the Court may have. But you are welcome to attend at your own expense. If you timely file an objection, you do not have to come to Court to talk about it. As long as you filed your written objection on time, the Court will consider it. You may also have your own lawyer attend at your expense, but it is not necessary.

Back To Top

**39. May I speak at the hearing?**

On or before November 3, 2014, you may ask the Court for permission to speak at the Fairness Hearing. The Court will determine whether to grant you permission to speak. To make such a request, you must send written notice to the Court stating your intention to speak at the *In re: National Football League Players' Concussion Injury Litigation*, No. 2:12-md-02323 Fairness Hearing. Be sure to include your name, address, telephone number, and your signature. Your request to speak must be sent to the Court at this address.

Back To Top

## GETTING MORE INFORMATION

**40. How do I get more information?**

This Notice summarizes the proposed Settlement. More details are in the Settlement Agreement. You can get a copy of the Settlement Agreement here. The Settlement Agreement is also on file with the Clerk of the Court for the U.S. District for the Eastern District of Pennsylvania. You also may write with questions to NFL Concussion Settlement, P.O. Box 25369, Richmond, VA 23260 or call 1-855-887-3485.

PLEASE DO NOT WRITE OR TELEPHONE THE COURT OR THE NFL PARTIES FOR INFORMATION

-4844-

ABOUT THE SETTLEMENT OR THIS LITIGATION.

| IMPORTANT DATES AND CONTACT INFORMATION | |
|---|---|
| Exclusion (Opt Out) Deadline | October 14, 2014 |
| Objection Deadline | October 14, 2014 |
| Deadline to Request to Speak at the Fairness Hearing | November 3, 2014 |
| Fairness Hearing | November 19, 2014 |
| Start of Registration Period | The date the announcement of the registration process is posted on the Settlement Website. (This will occur following Final Settlement Approval after all appeals.) |
| Registration Deadline | 180 days after the start of the registration period |
| Deadline to Receive a BAP | • For retired players age 43 or older: Within two years of Final Settlement Approval<br>• For retired players under age 43: Within ten years of Final Approval or before age 45, whichever comes sooner |
| Deadline to Submit a Claim | • For retired players (and their Representative Claimants) diagnosed by the date of Final Settlement Approval: Within two years from the start of the Registration Period<br>• For retired players (and their Representative Claimants) diagnosed after the date of Final Settlement Approval: Within two years from the date of diagnosis |
| Claims Administrator | NFL Concussion Settlement<br>P.O. Box 25369<br>Richmond, VA 23260<br>Tel: 1-855-887-3485 |
| Court | Clerk of the District Court/NFL Concussion Settlement<br>U.S. District Court for the Eastern District of Pennsylvania<br>United States Courthouse<br>601 Market Street<br>Philadelphia, PA 19106-1797 |
| Class Counsel | Christopher A. Seeger<br>Co-Lead Class Counsel<br>SEEGER WEISS LLP<br>77 Water Street<br>New York, NY 10005 | Sol Weiss<br>Co-Lead Class Counsel<br>ANAPOL SCHWARTZ<br>1710 Spruce Street<br>Philadelphia, PA 19103 |
| | Steven C. Marks<br>Class Counsel<br>PODHURST ORSECK P.A.<br>City National Bank Building<br>25 W. Flagler Street, Suite 800<br>Miami, FL 33130-1780 | Gene Locks<br>Class Counsel<br>LOCKS LAW FIRM<br>The Curtis Center, Suite 720 East<br>601 Walnut Street<br>Philadelphia, PA 19106 |
| | Arnold Levin<br>Counsel - Subclass 1<br>LEVIN FISHBEIN SEDRAN & BERMAN<br>510 Walnut Street, Suite 500<br>Philadelphia, PA 19106 | Dianne M. Nast<br>Counsel - Subclass 2<br>NAST LAW LLC<br>1101 Market Street, Suite 2801<br>Philadelphia, Pennsylvania 19107 |

Back To Top

QUESTIONS IN ADDITION TO THOSE IN THE LONG FORM NOTICE

**41. If a player is deceased, how does a Representative Claimant prove that the player suffered from a Qualifying Diagnosis at the time of or before his death?**

The proof a Representative Claimant must submit to show that a deceased player received a Qualifying Diagnosis depends on the date of the player's death and the type of injury.

If the player dies before the Effective Date of the Settlement Agreement, the Representative Claimant may establish Level 1.5 Neurocognitive Impairment, Level 2 Neurocognitive Impairment, Alzheimer's Disease, Parkinson's Disease, or ALS by submitting medical records showing a diagnosis of such condition made before the player died. The diagnosis must have been made by properly credentialed physicians, as described in Section 6.3(e) of the Settlement Agreement.

The Representative Claimant of a player who died before the Final Approval Date may establish Death with CTE by submitting medical records showing a diagnosis of Death with CTE made by a board-certified neuropathologist after the player's death and before the Final Approval Date. If the player died between July 7, 2014 and the Final Approval Date, his Representative Claimant has until 270 days after the player's death to obtain the post-mortem diagnosis. Players who died on or after the Final Approval Date (which has not yet occurred) are not eligible for benefits for Death with CTE.

All claimants, including Representative Claimants of deceased players, also must submit a Diagnosing Physician Certification signed by the physician who made the Qualifying Diagnosis, except that Representative Claimants of players who die before the Effective Date do not have to submit a Diagnosing Physician Certification if the physician who made the Qualifying Diagnosis also died before the Effective Date, or was deemed legally incapacitated or incompetent prior to that date, but they do have to submit evidence of the physician's death, incapacity or incompetence, and of his or her qualifications.

A Representative Claimant of a player who died before January 1, 2006 also must establish that the claim is not time-barred.

Back To Top

**-4846-**

# Exhibit 1



## Frequently Asked Questions

BASIC INFORMATION

WHO IS PART OF THE SETTLEMENT?

THE BASELINE ASSESSMENT PROGRAM

MONETARY AWARDS

EDUCATION FUND

REMAINING IN THE SETTLEMENT

HOW TO GET BENEFITS

EXCLUDING YOURSELF (OPTING OUT) FROM THE SETTLEMENT

THE LAWYERS REPRESENTING YOU

OBJECTING TO THE SETTLEMENT

THE COURT'S FAIRNESS HEARING

GETTING MORE INFORMATION

QUESTIONS IN ADDITION TO THOSE IN THE LONG FORM NOTICE

### BASIC INFORMATION

**1. Why is this Notice being provided?**

The Court in charge of this case authorized this Notice because you have a right to know about the proposed Settlement of this lawsuit and about all of your options before the Court decides whether to give final approval to the Settlement. This Notice summarizes the Settlement and explains your legal rights and options.

This case is being heard in the U.S. District Court for the Eastern District of Pennsylvania. The case is known as *In re: National Football League Players' Concussion Injury Litigation*, No. 2:12-md-02323. The people who sued are called the "Plaintiffs." The National Football League and NFL Properties, LLC are called the "NFL Defendants."

The Settlement may affect your rights if you are: (a) a retired player of the NFL, American Football League ("AFL"), World League of American Football, NFL Europe League or NFL Europa League, (b) an authorized representative of a deceased, legally incapacitated or incompetent retired player of those leagues, or (c) an individual with a close legal relationship with a retired player of those leagues, such as a spouse, parent or child.
Back To Top

**2. What is the litigation about?**

The Plaintiffs claim that retired players experienced head trauma during their NFL football playing careers that resulted in brain injuries, which have caused or may cause them long-term neurological problems. The Plaintiffs accuse the NFL Parties of being aware of the evidence and the risks associated with repetitive traumatic brain injuries but failing to warn and protect the players against the long-term risks, and ignoring and concealing this information from the players. The NFL Parties deny the claims in the litigation.
Back To Top

**3. What is a class action?**

In a class action, one or more people, the named plaintiffs (who are also called proposed "class representatives") sue on behalf of themselves and other people with similar claims. All of these people together are the proposed "class" or "class members." When a class action is settled, one

**-4848-**

court resolves the issues for all class members (in the settlement context, "settlement class members"), except for those who exclude themselves (opt out) from the settlement. In this case, the proposed class representatives are Kevin Turner and Shawn Wooden. Excluding yourself (opting out) means that you will not receive any benefits from the Settlement. The process for excluding yourself (opting out) is described here.

Back To Top

#### 4. Why is there a Settlement?

After extensive settlement negotiations mediated by retired United States District Court Judge Layn Phillips, and further settlement negotiations under the supervision of the Court-appointed Special Master, Perry Golkin, the Plaintiffs and the NFL Parties agreed to the Settlement.

A settlement is an agreement between a plaintiff and a defendant to resolve a lawsuit. Settlements conclude litigation without the court or a jury ruling in favor of the plaintiff or the defendant. A settlement allows the parties to avoid the cost and risk of a trial, as well as the delays of litigation.

If the Court approves this Settlement, the litigation between the Settlement Class Members and the NFL Parties is over. Only Settlement Class Members are eligible for the benefits summarized on this website. The NFL Parties will no longer be legally responsible to defend against the claims by Settlement Class Members made in this litigation.

The Court has not and will not decide in favor of the retired players or the NFL Parties. By reviewing this Settlement, the Court is not making and will not make any findings that any law was broken or that the NFL Parties did anything wrong.

The proposed Class Representatives and their lawyers ("Co-Lead Class Counsel," "Class Counsel," and "Subclass Counsel") believe that the proposed Settlement is best for everyone who is affected. The factors that Co-Lead Class Counsel, Class Counsel and Subclass Counsel considered included the uncertainty and delay associated with continued litigation, a trial and appeals and the uncertainty of particular legal issues that are yet to be determined by the Court. Co-Lead Class Counsel, Class Counsel and Subclass Counsel balanced these and other substantial risks in determining that the Settlement is fair, reasonable and adequate in light of all circumstances and in the best interests of the Settlement Class Members.

The Settlement Agreement is available here. The Settlement Agreement is also on file with the Clerk of the Court for the U.S. District Court for the Eastern District of Pennsylvania. You can also get this information by calling 1-855-887-3485.

Back To Top

#### 5. What are the benefits of the Settlement?

Under the Settlement, the NFL Parties will pay to fund:

- Baseline neuropsychological and neurological examinations for eligible retired players, and additional medical testing, counseling and/or treatment if they are diagnosed with moderate cognitive impairment during the baseline examinations (up to $75 million, though every qualified Retired NFL Football Player will be eligible to receive one baseline examination during the term of the program), (the "Baseline Assessment Program");

- Monetary awards for diagnoses of Death with CTE prior to the Final Approval Date, ALS, Parkinson's Disease, Alzheimer's Disease, Level 2 Neurocognitive Impairment (i.e., moderate Dementia) and Level 1.5 Neurocognitive Impairment (i.e., early Dementia) (see Questions 14-21 and Injury Definitions). All valid claims under the Settlement, without limitation, will be paid in full throughout the 65-year life of the Settlement (the "Monetary Award Fund"); and

- Education programs promoting safety and injury prevention with respect to football players, including safety-related initiatives in youth football, the education of retired players regarding the NFL's medical and disability programs and other educational programs and initiatives ($10 million).

In addition, the NFL Parties will pay the cost of notifying the Settlement Class. Administrative costs and expenses will be paid out of the Monetary Award Fund. The Baseline Assessment Program costs and expenses will be paid out of the Baseline Assessment Program Fund.

The details of the Settlement benefits are in the Settlement Agreement, which is available here. The Settlement Agreement is also on file with the Clerk of the Court for the U.S. District Court for the Eastern District of Pennsylvania. You can also get this information by calling 1-855-887-3485.

Note: The Baseline Assessment Program and Monetary Award Fund will be administered independently of the NFL Parties and any benefit programs that have been created between the NFL and the NFL Players Association. The NFL Parties are not involved in determining the validity of claims under the Settlement.

Back To Top

**-4849-**

# WHO IS PART OF THE SETTLEMENT?

**6. Who is included in the Settlement Class?**

This Settlement Class includes three types of people:

<u>Retired NFL Football Players:</u> All living NFL Football players who, prior to July 7, 2014, (1) have retired, formally or informally, from playing professional football with the NFL or any Member Club, including AFL, World League of American Football, NFL Europe League and NFL Europa League players, or (2) were formerly on any roster, including preseason, regular season, or postseason, of any such Member Club or league and no longer are under contract to a Member Club and are not seeking active employment as a player with any Member Club, whether signed to a roster or signed to any practice squad, developmental squad, or taxi squad of a Member Club.

<u>Representative Claimants:</u> Authorized representatives, ordered by a court or other official of competent jurisdiction under applicable state law, of deceased, legally incapacitated or incompetent Retired NFL Football Players.

<u>Derivative Claimants:</u> Spouses, parents, dependent children, or any other persons who properly under applicable state law assert the right to sue independently or derivatively by reason of their relationship with a living or deceased Retired NFL Football Player. (For example, a spouse asserting the right to sue due to the injury of a husband who is a Retired NFL Football Player.)

The Settlement recognizes two separate groups ("Subclasses") of Settlement Class Members based on the Retired NFL Football Player's injury status prior to July 7, 2014:

- <u>Subclass 1</u> includes: Retired NFL Football Players who were <u>not</u> diagnosed with ALS, Parkinson's Disease, Alzheimer's Disease, Level 2 Neurocognitive Impairment (i.e., moderate Dementia), Level 1.5 Neurocognitive Impairment (i.e., early Dementia) or Death with CTE prior to July 7, 2014, and their Representative Claimants and Derivative Claimants.

- <u>Subclass 2</u> includes:

   - Retired NFL Football Players who <u>were</u> diagnosed with ALS, Parkinson's Disease, Alzheimer's Disease, Level 2 Neurocognitive Impairment (i.e., moderate Dementia), or Level 1.5 Neurocognitive Impairment (i.e., early Dementia) prior to July 7, 2014, and their Representative Claimants and Derivative Claimants; and

   - Representative Claimants of deceased Retired NFL Football Players who were diagnosed with ALS, Parkinson's Disease, Alzheimer's Disease, Level 2 Neurocognitive Impairment (i.e., moderate Dementia), or Level 1.5 Neurocognitive Impairment (i.e., early Dementia) prior to death or who died prior to July 7, 2014 and received a diagnosis of Death with CTE.

Back To Top

**7. What players are not included in the Settlement Class?**

The Settlement Class does not include current NFL players. The Settlement Class also does not include people who tried out for but did not make it onto preseason, regular season or postseason rosters or practice, developmental or taxi squads of the NFL or any Member Clubs.

Back To Top

**8. What if I am not sure whether I am included in the Settlement Class?**

If you are not sure whether you are included in the Settlement Class, you may call 1-855-887-3485 with questions. You may also write with questions to NFL Concussion Settlement, P.O. Box 25369, Richmond, VA 23260. You may also consult with your own attorney.

Back To Top

**9. What are the different levels of neurocognitive impairment?**

In addition to ALS, Parkinson's Disease and Alzheimer's Disease, various levels of neurocognitive impairment are covered by this Settlement. More details can be found in the Injury Definitions, which are available here or by calling 1-855-887-3485.

The level of neurocognitive impairment will be established in part with evidence of decline in performance in at least two areas subject to clinical evaluative testing, provided one of the areas is executive function, learning and memory, or complex attention, and related functional impairment as follows:

| LEVEL OF NEUROCOGNITIVE IMPAIRMENT | TYPE OF IMPAIRMENT | DEGREE OF DECLINE |
|---|---|---|
| Level 1 | Moderate cognitive impairment | Moderate cognitive decline |

| Level 1.5 | Early Dementia | Moderate to severe cognitive decline |
| Level 2 | Moderate Dementia | Severe cognitive decline |

If neurocognitive impairment is temporary and only occurs in delirium, or as a result of substance abuse or medicinal side effects, it is not covered by the Settlement.

Back To Top

**10. Must a retired player be vested under the NFL Retirement Plan to receive Settlement benefits?**

No. A retired player can be a Settlement Class Member regardless of whether he is vested due to credited seasons or total and permanent disability under the Bert Bell/Pete Rozelle NFL Player Retirement Plan.

Back To Top

### THE BASELINE ASSESSMENT PROGRAM

**11. What is the Baseline Assessment Program ("BAP")?**

All living retired players who have earned at least one-half of an Eligible Season, who do not exclude themselves (opt out) from the Settlement, and who timely register to participate in the Settlement may participate in the Baseline Assessment Program ("BAP"). Registration for benefits will not be available until after the date the Settlement is finally approved and any appeals are fully resolved ("Final Settlement Approval"). A retired player may provide his name and contact information now here or by calling 1-855-887-3485. This ensures that the retired player will receive additional notice about the registration process and deadlines when it becomes available.

The BAP will provide baseline neuropsychological and neurological assessment examinations to determine whether retired players are currently suffering from cognitive impairment. Retired players will have from two to ten years, depending on their age as of Final Settlement Approval, to have a baseline examination conducted through a nationwide network of qualified and independent medical providers.

- Retired players 43 or older as of the date of Final Settlement Approval will need to have a baseline examination within two years of the start of the BAP.

- Retired players under the age of 43 as of the date of Final Settlement Approval will need to have a baseline examination within 10 years of the start of the BAP, or before they turn 45, whichever comes sooner.

Retired players who are diagnosed with Level 1 Neurocognitive Impairment (i.e., moderate cognitive impairment) are eligible to receive further medical testing and/or treatment (including counseling and pharmaceuticals) for that condition during the ten-year term of the BAP or within five years from diagnosis, whichever is later.

Retired players who participate in the BAP will be encouraged to provide their confidential medical records for use in research into cognitive impairment and safety and injury prevention with respect to football players.

Although all retired players are encouraged to take advantage of the BAP and receive a baseline examination, they do not need to participate in the BAP to receive a monetary award. Any award to a retired player may be reduced by 10% if the retired player does not participate in the BAP, as explained in more detail here.

Back To Top

**12. Why should a retired player get a BAP baseline examination?**

Getting a BAP baseline examination will be beneficial. It will determine whether the retired player has any cognitive impairment. If he is diagnosed with Level 1 Neurocognitive Impairment (i.e., moderate cognitive impairment), he will be eligible to receive further medical testing and/or treatment for that condition. In addition, regardless of any cognitive impairment today, the results of the BAP baseline examination can be used as a comparison to measure any subsequent deterioration of cognitive condition over the course of his life. Participants also will be examined by at least two experts during the BAP baseline examinations, a neuropsychologist and a neurologist,

**-4851-**

and the retired player and/or his family members will have the opportunity to ask questions relating to any cognitive impairment during those examinations.

Participation in the BAP does not prevent the retired player from filing a claim for a monetary award. For the next 65 years, retired players will be eligible for compensation paid from the Monetary Award Fund if the player develops a Qualifying Diagnosis. Participation in the BAP also will help ensure that, to the extent the retired player receives a Qualifying Diagnosis in the future, he will receive the maximum monetary award to which he is entitled.
Back To Top

**13. How does a retired player schedule a baseline assessment examination and where will it be done?**
Retired players need to register for Settlement benefits before they can get a baseline assessment examination. Registration for benefits will not be available until after Final Settlement Approval. **A retired player may provide his name and contact information now here or by calling 1-855-887-3485. This ensures that the retired player will receive additional notice about the registration process and deadlines when it becomes available.**

The BAP Administrator will send notice to those retired players determined during registration to be eligible for the BAP, explaining how to arrange for an initial baseline assessment examination. The BAP will use a nationwide network of qualified and independent medical providers who will provide both the initial baseline assessment as well as any further testing and/or treatment. The BAP Administrator, which will be appointed by the Court, will establish the network of medical providers.
Back To Top

### MONETARY AWARDS

**14. What diagnoses qualify for monetary awards?**
Monetary awards are available for the diagnosis of ALS, Parkinson's Disease, Alzheimer's Disease, Level 2 Neurocognitive Impairment (i.e., moderate Dementia), Level 1.5 Neurocognitive Impairment (i.e., early Dementia) or Death with CTE (the "Qualifying Diagnoses"). A Qualifying Diagnosis may occur at any time until the end of the 65-year term of the Monetary Award Fund.

If a retired player receives a monetary award based on a Qualifying Diagnosis, and later is diagnosed with a different Qualifying Diagnosis that entitles him to a larger monetary award than his previous award, he will be eligible for an increase in compensation. This would also apply to Derivative Claimants.

Qualifying Diagnoses must be made by approved qualified specialists. Any time prior to Final Settlement Approval, only board-certified neurologists, board-certified neurosurgeons or board-certified neuro-specialist physicians or similarly qualified specialists can make Qualifying Diagnoses. Following Final Settlement Approval, only qualified specialists approved by the Claims Administrator will be able to make Qualifying Diagnoses with the exception of Qualifying Diagnoses made through the BAP.
Back To Top

**15. Do I need to prove that playing professional football caused the retired player's Qualifying Diagnosis?**
No. No proof is necessary that a retired player's Qualifying Diagnosis was caused by playing football or that he experienced head injuries in the NFL, AFL, World League of American Football, NFL Europe League or NFL Europa League in order to receive a monetary award. The fact that a retired player receives a Qualifying Diagnosis is sufficient to be eligible for a monetary award.

You also do not need to exclude the possibility that the Qualifying Diagnosis was caused or contributed to by amateur football or other professional football league injuries or by various risk factors linked to the Qualifying Diagnosis.
Back To Top

**16. How much money will I receive?**
The amount of money you will receive depends on the retired player's:

- Specific Qualifying Diagnosis,

- Age at the time of diagnosis,

- Number of seasons played in the NFL, the AFL, the World League of American Football, NFL Europe, or NFL Europa,

- Diagnosis of a prior stroke or traumatic brain injury, and

<center>-4852-</center>

- Participation in a baseline assessment exam.

The amount of money you will receive also depends on:

- Any legally enforceable liens on the award,

- Any retainer agreement with an attorney, and

- Any further assessments ordered by the Court.

Certain costs and expenses related to resolving any liens for Settlement Class Members will be paid out of such Settlement Class Members' monetary awards or derivative claimant awards.

The table below lists the maximum amount of money available for each Qualifying Diagnosis before any adjustments are made.

| QUALIFYING DIAGNOSIS | MAXIMUM AWARD AVAILABLE |
|---|---|
| Amyotrophic lateral sclerosis (ALS) | $5 million |
| Death with CTE (diagnosed after death) | $4 million |
| Parkinson's Disease | $3.5 million |
| Alzheimer's Disease | $3.5 million |
| Level 2 Neurocognitive Impairment (i.e., moderate Dementia) | $3 million |
| Level 1.5 Neurocognitive Impairment(i.e., early Dementia) | $1.5 million |

Monetary awards may be increased up to 2.5% per year during the 65-year Monetary Award Fund term for inflation.

To receive the maximum amount outlined in the table, a retired player must have played for at least five Eligible Seasons and have been diagnosed when younger than 45 years old.

Derivative Claimants are eligible to be compensated from the monetary award of the retired player with whom they have a close relationship in an amount of 1% of that award. If there are multiple Derivative Claimants for the same retired player, the 1% award will be divided among the Derivative Claimants according to the law where the retired player (or his Representative Claimant, if any) resides.

Back To Top

**17. How does the age of the retired player at the time of first diagnosis affect a monetary award?**

Awards are reduced for retired players who were 45 or older when diagnosed. The younger a retired player is at the time of diagnosis, the greater the award he will receive. Setting aside the other downward adjustments to monetary awards, the table below provides:

- The average award within each age range for people diagnosed between the ages of 45-79; and

- The amount of the award for those under age 45 and over 79.

The actual amount will be determined based on each retired player's actual age at the time of diagnosis and on other potential adjustments.

| AGE AT DIAGNOSIS | ALS | DEATH W/CTE | PARKINSON'S | ALZHEIMER'S | LEVEL 2 | LEVEL 1.5 |
|---|---|---|---|---|---|---|
| Under 45 | $5,000,000 | $4,000,000 | $3,500,000 | $3,500,000 | $3,000,000 | $1,500,000 |
| 45 - 49 | $4,500,000 | $3,200,000 | $2,470,000 | $2,300,000 | $1,900,000 | $950,000 |
| 50 - 54 | $4,000,000 | $2,300,000 | $1,900,000 | $1,600,000 | $1,200,000 | $600,000 |

**-4853-**

| 55 - 59 | $3,500,000 | $1,400,000 | $1,300,000 | $1,150,000 | $950,000 | $475,000 |
| 60 - 64 | $3,000,000 | $1,200,000 | $1,000,000 | $950,000 | $580,000 | $290,000 |
| 65 - 69 | $2,500,000 | $980,000 | $760,000 | $620,000 | $380,000 | $190,000 |
| 70 - 74 | $1,750,000 | $600,000 | $475,000 | $380,000 | $210,000 | $105,000 |
| 75 - 79 | $1,000,000 | $160,000 | $145,000 | $130,000 | $80,000 | $40,000 |
| 80+ | $300,000 | $50,000 | $50,000 | $50,000 | $50,000 | $25,000 |

**Note:** The age of the retired player at diagnosis (not the age when applying for a monetary award) is used to determine the monetary amount awarded.

Back To Top

**18. How does the number of seasons a retired player played affect a monetary award?**

Awards are reduced for retired players who played less than five "Eligible Seasons." The Settlement uses the term "Eligible Season" to count the seasons in which a retired player played or practiced in the NFL, the AFL, the World League of American Football, NFL Europe, or NFL Europa. A retired player earns an Eligible Season for:

- Each season where he was on an NFL or AFL Member Club's "Active List" for either three or more regular season or postseason games, or

- Where he was on an Active List for one or more regular or postseason games and then spent two regular or postseason games on an injured reserve list or inactive list due to a concussion or head injury.

A retired player also earns one-half of an Eligible Season for:

- Each season where he was on an NFL or AFL Member Club's practice, developmental or taxi squad for at least eight games, but did not otherwise earn an Eligible Season, or

- Where he was on a World League of American Football, NFL Europe League, or NFL Europa League team's active roster for three or more regular or postseason games, or

- Where he was on a World League of American Football, NFL Europe League, or NFL Europa League team's active roster for one or more regular or postseason games and then spent at least two regular or postseason games on the World League of American Football, NFL Europe League, or NFL Europa League injured reserve list or team inactive list due to a concussion or head injury.

A Retired NFL Football Player may not receive credit for more than one Eligible Season per year.

The "Active List" means the list of all players physically present, eligible and under contract to play for an NFL or AFL Member Club on a particular game day within any applicable roster or squad limits in the applicable NFL or AFL Constitution and Bylaws.

The table below lists the reductions to a retired player's (or his Representative Claimant's) monetary award if the retired player has less than five Eligible Seasons. To determine the total number of Eligible Seasons credited to a retired player, add together all of the earned Eligible Seasons and half Eligible Seasons. For example, if a retired player earned two Eligible Seasons and three half Eligible Seasons, he will be credited with 3.5 Eligible Seasons.

| NUMBER OF ELIGIBLE SEASONS | PERCENTAGE OF REDUCTION |
|---|---|
| 4.5 | 10% |
| 4 | 20% |
| 3.5 | 30% |
| 3 | 40% |
| 2.5 | 50% |
| 2 | 60% |

| 1.5 | 70% |
| 1 | 80% |
| .5 | 90% |
| 0 | 97.5% |

Back To Top

**19. How do prior strokes or traumatic brain injuries of a retired player affect a monetary award?**

It depends. A retired player's monetary award (or his Representative Claimant monetary award) will be reduced by 75% if he experienced: (1) a medically diagnosed stroke that occurred before or after the time the retired player played NFL football, but before he received a Qualifying Diagnosis; or (2) a severe traumatic brain injury unrelated to NFL football that occurred during or after the time the retired player played NFL football, but before he received a Qualifying Diagnosis.

The award will not be reduced if the retired player (or his Representative Claimant) can show by clear and convincing evidence that the stroke or traumatic brain injury is not related to the Qualifying Diagnosis.

Back To Top

**20. How is a retired player's monetary award affected if he does not participate in the BAP program?**

It depends on when the retired player receives his Qualifying Diagnosis and the nature of the diagnosis. There is a 10% reduction to the monetary award only if the retired player:

- Did not receive a Qualifying Diagnosis prior to July 7, 2014, and

- Does not participate in the BAP, and

- Receives a Qualifying Diagnosis (other than ALS) after his deadline to receive a BAP baseline assessment examination.

Back To Top

**21. Can I receive a monetary award even though the retired player is dead?**

Yes. Representative Claimants for deceased retired players with Qualifying Diagnoses will be eligible to receive monetary awards. If the deceased retired player died before January 1, 2006, however, the Representative Claimant will only receive a monetary award if the Court determines that a wrongful death or survival claim is allowed under applicable state law.

Derivative Claimants also will be eligible for a total award of 1% of the monetary award that the Representative Claimant for the deceased retired player receives.

Representative and Derivative Claimants will also need to register for Settlement benefits. Registration for benefits will not be available until after Final Settlement Approval. Representative and Derivative Claimants can provide their name and contact information now here or by calling 1-855-887-3485. This ensures that they will receive additional notice about the registration process and deadlines when it becomes available.

Back To Top

**22. Will this Settlement affect a retired player's participation in NFL or NFLPA related benefits programs?**

No. The Settlement benefits are completely independent of any benefits programs that have been created by or between the NFL and the NFL Players Association. This includes the 88 Plan (Article 58 of the 2011 Collective Bargaining Agreement) and the Neuro-Cognitive Disability Benefit (Article 65 of the 2011 Collective Bargaining Agreement).

**Note**: The Settlement ensures that a retired player who has signed, or will sign, a release as part of his Neuro-Cognitive Disability Benefit application, will not be denied Settlement benefits.

Back To Top

**-4855-**

**23. Will this Settlement prevent retired players from bringing workers' compensation claims?**

No. Claims for workers' compensation will not be released by this Settlement.

Back To Top

## EDUCATION FUND

**24. What types of education programs are supported by the Settlement?**

The Settlement will provide $10 million in funding to support education programs promoting safety and injury prevention with respect to football players, including safety-related initiatives in youth football, the education of retired players regarding the NFL's medical and disability programs and other educational programs and initiatives.

Retired players will be able to actively participate in such initiatives if they desire.

Back To Top

## REMAINING IN THE SETTLEMENT

**25. What am I giving up to stay in the Settlement Class?**

Unless you exclude yourself (opt out) from the Settlement, you cannot sue the NFL Parties, the Member Clubs, or related individuals and entities, or be part of any other lawsuit against the NFL Parties about the issues in this case. This means you give up your right to continue to litigate any claims related to this Settlement, or file new claims, in any court or in any proceeding at any time. However, the Settlement does not release any claims for workers' compensation or claims alleging entitlement to NFL medical and disability benefits available under the Collective Bargaining Agreement.

Please note that certain Plaintiffs also sued the football helmet manufacturer Riddell and certain related entities (specifically, Riddell, Inc., Riddell Sports Group Inc., All American Sports Corporation, Easton-Bell Sports, Inc., EB Sports Corp., Easton-Bell Sports, LLC and RBG Holdings Corp.). They are not parties to this Settlement and claims against them are not released by this Settlement.

Article XVIII of the Settlement Agreement contains the complete text and details of what Settlement Class Members give up unless they exclude themselves (opt out) from the Settlement, so please read it carefully. The Settlement Agreement is available here. The Settlement Agreement is also on file with the Clerk of the Court for the U.S. District Court for the Eastern District of Pennsylvania. You can also get this information by calling 1-855-887-3485. If you have any questions you can talk to the law firms listed here for free or you can talk to your own lawyer if you have questions about what this means.

Back To Top

## HOW TO GET BENEFITS

**26. How do I get Settlement benefits?**

To get benefits, you will need to register. This is true for all Settlement Class Members, including Representative and Derivative Claimants. Registration for benefits will not begin until after Final Settlement Approval. If and when that occurs, further notice will be provided about the registration process and deadlines. However, you may provide your name and contact information now here or by calling 1-855-887-3485. This ensures that you will receive additional notice about the registration process and deadlines when that becomes available. To receive any Settlement benefits, you must register on or before 180 days from the date that further notice about the registration process and deadlines is posted here. Information about the registration deadline will also be available by calling 1-855-887-3485.

Back To Top

**27. Is there a time limit for Retired NFL Football Players and Representative Claimants to file claims for monetary awards?**

Yes. Retired NFL Football Players and Representative Claimants for retired players who are diagnosed by the date of Final Settlement Approval must submit claims for monetary awards within two years of the date that further notice about the registration process and deadlines is posted here. Retired NFL Football Players and Representative Claimants for retired players who are diagnosed after the date of Final Settlement Approval have two years from the date of diagnosis to file claims. This deadline may be extended up to an additional two years upon a showing of substantial hardship.

**-4856-**

Derivative Claimants must submit claims no later than 30 days after a Retired NFL Football Player or a Representative Claimant receives notice of an entitlement to a monetary award. All claims must be submitted by the end of the 65-year term of the Monetary Award Fund.

*Back To Top*

**28. Can I re-apply for compensation if my claim is denied?**

Yes. A Settlement Class Member who submits a claim for a monetary award that is denied can re-apply in the future should the Retired NFL Football Player's medical condition change.

*Back To Top*

**29. Can I appeal the determination of my monetary award claim?**

Yes. The Settlement establishes an independent process for a Settlement Class Member to appeal the denial of a monetary award claim or the amount of the monetary award.

*Back To Top*

## EXCLUDING YOURSELF (OPTING OUT) FROM THE SETTLEMENT

If you want to retain the right to sue the NFL Parties about the legal issues in this case, then you must take steps to remove yourself from the Settlement. You may do this by asking to be excluded from-opting out of-the Settlement Class. If you exclude yourself (opt out), you cannot receive benefits from this Settlement.

**30. How do I get out of the Settlement?**

On or before October 14, 2014, you must mail a letter or other written document to the Claims Administrator requesting exclusion from the Settlement Class. Your request must include:

- Your name, address, telephone number, and date of birth;

- A copy of your driver's license or other government issued identification;

- A statement that "I wish to exclude myself from the Settlement Class *in In re: National Football League Players' Concussion Injury Litigation*, No. 2:12-md-02323" (or substantially similar clear and unambiguous language); and

- Your signature by hand, and the date on which you signed it (even if represented by an attorney).

You must mail your exclusion (opt out) request, postmarked on or before October 14, 2014, to:

<div align="center">

NFL Concussion Settlement
P.O. Box 25369
Richmond, VA 23260

</div>

Your request to exclude yourself (opt out) is not effective unless and until the District Court grants Final Approval.

*Back To Top*

**31. If I do not exclude myself (opt out), can I sue the NFL Parties for the same thing later?**

No. Unless you exclude yourself (opt out), you give up the right to sue the NFL Parties for all of the claims that this Settlement resolves. If you want to maintain your own lawsuit relating to the claims released by the Settlement, then you must exclude yourself (opt out) on or before October 14, 2014.

*Back To Top*

**32. If I exclude myself (opt out), can I still get benefits from this Settlement?**

No. If you exclude yourself (opt out) from the Settlement you will not get any Settlement benefits. You will not be eligible to receive a monetary award or participate in the Baseline Assessment Program.

*Back To Top*

## THE LAWYERS REPRESENTING YOU

**33. Do I have a lawyer in the case?**

The Court has appointed a number of lawyers to represent all Settlement Class Members as "Co-Lead Class Counsel," "Class Counsel" and "Subclass Counsel." They are:

| | |
|---|---|
| Christopher A. Seeger<br>Co-Lead Class Counsel<br>SEEGER WEISS LLP | Sol Weiss<br>Co-Lead Class Counsel<br>ANAPOL SCHWARTZ |

<div align="center">

**-4857-**

</div>

| | |
|---|---|
| 77 Water Street<br>New York, NY 10005 | 1710 Spruce Street<br>Philadelphia, PA 19103 |
| Steven C. Marks<br>Class Counsel<br>PODHURST ORSECK P.A.<br>City National Bank Building<br>25 W. Flagler Street, Suite 800<br>Miami, FL 33130-1780 | Gene Locks<br>Class Counsel<br>LOCKS LAW FIRM<br>The Curtis Center, Suite 720 East<br>601 Walnut Street<br>Philadelphia, PA 19106 |
| Arnold Levin<br>Counsel - Subclass 1<br>LEVIN FISHBEIN SEDRAN & BERMAN<br>510 Walnut Street, Suite 500<br>Philadelphia, PA 19106 | Dianne M. Nast<br>Counsel - Subclass 2<br>NAST LAW LLC<br>1101 Market Street, Suite 2801<br>Philadelphia, Pennsylvania 19107 |

You will not be charged for contacting these lawyers. If you are represented by your own attorney, you should contact that attorney to discuss the proposed Settlement. You do not have to hire your own attorney to participate in the Settlement program, but the administrators of the Settlement cannot provide you with any legal advice or answer questions that depend upon your individual factual circumstances. If you do not already have your own attorney, you may hire one at your own expense.

Back To Top

**34. How will the lawyers be paid?**

At a later date to be determined by the Court, Co-Lead Class Counsel, Class Counsel and Subclass Counsel will ask the Court for an award of attorneys' fees and reasonable costs. The NFL Parties have agreed not to oppose or object to the request for attorneys' fees and reasonable incurred costs if the request does not exceed $112.5 million. These fees and incurred costs will be paid separately by the NFL Parties and not from the Baseline Assessment Program Fund, Education Fund or Monetary Award Fund. Settlement Class Members will have an opportunity to comment on and/or object to this request at an appropriate time. Ultimately, the award of attorneys' fees and reasonable costs to be paid by the NFL Parties is subject to the approval of the Court.

After Final Settlement Approval, Co-Lead Class Counsel may ask the Court to set aside up to five percent of each monetary award and derivative claimant award to facilitate the Settlement program and related efforts of Co-Lead Class Counsel, Class Counsel and Subclass Counsel. If approved, this money would be held in a separate fund overseen by the Court. Any future request for a set-aside will describe: (1) the proposed amount; (2) how the money will be used; and (3) any other relevant information. This "set-aside" would come out of the claimant's attorney's fee if represented by individual counsel or, if not represented, out of the monetary award and derivative claimant award itself. No money will be held back or set aside from any award without a Court order. The set-aside is a matter between Class Counsel and individual counsel for Settlement Class Members. The NFL Parties do not take a position on the proposal.

Back To Top

## OBJECTING TO THE SETTLEMENT

**35. How do I tell the Court if I do not like the Settlement?**

If you have not excluded yourself (opted out), you may object to the Settlement or any part of it. The Court will consider your views. To object to the Settlement, you or your attorney must submit your written objection to the Court. The objection must include the following:

- The name of the case and multidistrict litigation, In re: *National Football League Players' Concussion Injury Litigation*, No. 2:12-md-02323;

- Your name, address, telephone number, and date of birth;

- If you are a Representative Claimant or Derivative Claimant, the name of the Retired NFL Football Player to whom you are related;

- Written statement or evidence establishing how you are a Settlement Class Member;

- A detailed statement of your objections, and the specific reasons for each such objection, including any facts or law you wish to bring to the Court's attention;

- Any other supporting papers, materials or briefs that you want the Court to consider in support of your objection; and

- Your signature by hand, and the date on which you signed it (even if represented by an attorney).

Attorneys filing objections on behalf of Settlement Class Members must follow the requirements in Section 14.3(b) of the Settlement Agreement.

You must mail your objection, postmarked on or before October 14, 2014, to:

| Court |
| --- |
| Clerk of the District Court/NFL Concussion Settlement |
| U.S. District Court for the Eastern District of Pennsylvania |
| United States Courthouse |
| 601 Market Street |
| Philadelphia, PA 19106-1797 |

Back To Top

**36. What is the difference between objecting to the Settlement and excluding myself?**

Objecting is simply telling the Court that you do not like something about the Settlement or want it to say something different. You can object only if you do not exclude yourself (opt out) from the Settlement Class. Excluding yourself (opting out) is telling the Court that you do not want to be part of the Settlement Class and you do not want to receive any Settlement benefits. If you exclude yourself (opt out), you have no basis to object because the case no longer affects you.

Back To Top

## THE COURT'S FAIRNESS HEARING

The Court will hold a hearing to decide whether to approve the Settlement. You may attend and you may ask to speak, but you do not have to. The Court will determine if you are allowed to speak if you request to do so.

**37. When and where will the Court hold a Fairness Hearing concerning the Settlement?**

The Court will hold the Fairness Hearing on Wednesday, November 19, 2014 at 10:00 a.m. at the United States Courthouse, 601 Market Street, Philadelphia, Pennsylvania 19106 in Courtroom 7B. The hearing may be moved to a different date or time without additional notice, so it is a good idea to check www.NFLConcussionSettlement.com or call 1-855-887-3485. At this hearing, the Court will hear evidence about whether the Settlement is fair, reasonable, and adequate. If there are objections, the Court will consider them and may elect to listen to people who have asked to speak at the hearing. After the hearing, the Court will decide whether to approve the Settlement. We do not know how long the decision will take.

After the Fairness Hearing, the Court will consider the request for attorneys' fees and reasonable costs by Co-Lead Class Counsel, Class Counsel and Subclass Counsel.

Back To Top

**38. Do I have to attend the hearing?**

No. Co-Lead Class Counsel, Class Counsel and Subclass Counsel will answer questions the Court may have. But you are welcome to attend at your own expense. If you timely file an objection, you do not have to come to Court to talk about it. As long as you filed your written objection on time, the Court will consider it. You may also have your own lawyer attend at your expense, but it is not necessary.

Back To Top

**39. May I speak at the hearing?**

On or before November 3, 2014, you may ask the Court for permission to speak at the Fairness Hearing. The Court will determine whether to grant you permission to speak. To make such a request, you must send written notice to the Court stating your intention to speak at the *In re: National Football League Players' Concussion Injury Litigation*, No. 2:12-md-02323 Fairness Hearing. Be sure to include your name, address, telephone number, and your signature. Your request to speak must be sent to the Court at this address.

Back To Top

## GETTING MORE INFORMATION

**40. How do I get more information?**

This Notice summarizes the proposed Settlement. More details are in the Settlement Agreement. You can get a copy of the Settlement Agreement here. The Settlement Agreement is also on file with the Clerk of the Court for the U.S. District for the Eastern District of Pennsylvania. You also may write with questions to NFL Concussion Settlement, P.O. Box 25369, Richmond, VA 23260 or call 1-855-887-3485.

PLEASE DO NOT WRITE OR TELEPHONE THE COURT OR THE NFL PARTIES FOR INFORMATION

**-4859-**

ABOUT THE SETTLEMENT OR THIS LITIGATION.

| IMPORTANT DATES AND CONTACT INFORMATION | |
|---|---|
| Exclusion (Opt Out) Deadline | October 14, 2014 |
| Objection Deadline | October 14, 2014 |
| Deadline to Request to Speak at the Fairness Hearing | November 3, 2014 |
| Fairness Hearing | November 19, 2014 |
| Start of Registration Period | The date the announcement of the registration process is posted on the Settlement Website. (This will occur following Final Settlement Approval after all appeals.) |
| Registration Deadline | 180 days after the start of the registration period |
| Deadline to Receive a BAP | • For retired players age 43 or older: Within two years of Final Settlement Approval<br>• For retired players under age 43: Within ten years of Final Approval or before age 45, whichever comes sooner |
| Deadline to Submit a Claim | • For retired players (and their Representative Claimants) diagnosed by the date of Final Settlement Approval: Within two years from the start of the Registration Period<br>• For retired players (and their Representative Claimants) diagnosed after the date of Final Settlement Approval: Within two years from the date of diagnosis |
| Claims Administrator | NFL Concussion Settlement<br>P.O. Box 25369<br>Richmond, VA 23260<br>Tel: 1-855-887-3485 |
| Court | Clerk of the District Court/NFL Concussion Settlement<br>U.S. District Court for the Eastern District of Pennsylvania<br>United States Courthouse<br>601 Market Street<br>Philadelphia, PA 19106-1797 |
| Class Counsel | Christopher A. Seeger<br>Co-Lead Class Counsel<br>SEEGER WEISS LLP<br>77 Water Street<br>New York, NY 10005 | Sol Weiss<br>Co-Lead Class Counsel<br>ANAPOL SCHWARTZ<br>1710 Spruce Street<br>Philadelphia, PA 19103 |
| | Steven C. Marks<br>Class Counsel<br>PODHURST ORSECK P.A.<br>City National Bank Building<br>25 W. Flagler Street, Suite 800<br>Miami, FL 33130-1780 | Gene Locks<br>Class Counsel<br>LOCKS LAW FIRM<br>The Curtis Center, Suite 720 East<br>601 Walnut Street<br>Philadelphia, PA 19106 |
| | Arnold Levin<br>Counsel - Subclass 1<br>LEVIN FISHBEIN SEDRAN & BERMAN<br>510 Walnut Street, Suite 500<br>Philadelphia, PA 19106 | Dianne M. Nast<br>Counsel - Subclass 2<br>NAST LAW LLC<br>1101 Market Street, Suite 2801<br>Philadelphia, Pennsylvania 19107 |

Back To Top

**-4860-**

QUESTIONS IN ADDITION TO THOSE IN THE LONG FORM NOTICE

**41. If a player is deceased, how does a Representative Claimant prove that the player suffered from a Qualifying Diagnosis at the time of or before his death?**

The proof a Representative Claimant must submit to show that a deceased player received a Qualifying Diagnosis depends on the date of the player's death and the type of injury.

If the player dies before the Effective Date of the Settlement Agreement, the Representative Claimant may establish Level 1.5 Neurocognitive Impairment, Level 2 Neurocognitive Impairment, Alzheimer's Disease, Parkinson's Disease, or ALS by submitting medical records showing a diagnosis of such condition made before the player died. The diagnosis must have been made by properly credentialed physicians, as described in Section 6.3(e) of the Settlement Agreement.

The Representative Claimant of a player who died before the Final Approval Date may establish Death with CTE by submitting medical records showing a diagnosis of Death with CTE made by a board-certified neuropathologist after the player's death and before the Final Approval Date. If the player died between July 7, 2014 and the Final Approval Date, his Representative Claimant has until 270 days after the player's death to obtain the post-mortem diagnosis. Players who died on or after the Final Approval Date (which has not yet occurred) are not eligible for benefits for Death with CTE.

All claimants, including Representative Claimants of deceased players, also must submit a Diagnosing Physician Certification signed by the physician who made the Qualifying Diagnosis, except that Representative Claimants of players who die before the Effective Date do not have to submit a Diagnosing Physician Certification if the physician who made the Qualifying Diagnosis also died before the Effective Date, or was deemed legally incapacitated or incompetent prior to that date, but they do have to submit evidence of the physician's death, incapacity or incompetence, and of his or her qualifications.

A Representative Claimant of a player who died before January 1, 2006 also must establish that the claim is not time-barred.

Back To Top

**-4861-**

# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| | : | |
| IN RE: NATIONAL FOOTBALL LEAGUE | : | No. 2:12-md-02323-AB |
| PLAYERS' CONCUSSION INJURY | : | |
| LITIGATION | : | MDL No. 2323 |
| | : | |
| | : | **Hon. Anita B. Brody** |
| THIS DOCUMENT RELATES TO: | : | |
| APPEALS OF REPRESENTATIVE | : | |
| CLAIMANTS ROBIN CORNISH AND | : | |
| CARLEEN HASTINGS REGARDING | : | |
| DENIALS OF MONETARY AWARDS | : | |
| | : | |
| | : | |

## INTRODUCTION

I consolidate two Representative Claims for decision: one by Robin Cornish, and the other by Carleen Hastings. Both act for players who died in 2008. Years later—at some time after April 2015—both players were posthumously diagnosed with Chronic Traumatic Encephalopathy (CTE) after a neuropathologist examined slides containing their brain tissue.

After various procedural detours, the Claims Administrator denied both Claims solely because they were untimely under Section 6.3(f) of the Amended Class Action Settlement Agreement.[1] Ms. Cornish and Ms. Hastings have appealed, raising two core arguments.[2]

First, they assert that they have satisfied the diagnostic deadline for a Qualifying Diagnosis of Death with CTE, because a "diagnosis" occurs at death. Relying on the plain text of the Amended Settlement Agreement, I disagree and find that a Diagnosis of Death with CTE occurs when the neuropathologist conducts his or her medical examination and reaches a judgment.

---

[1] *See* Amended Settlement Agreement, Section 6.3(f) ("A Qualifying Diagnosis of Death with CTE shall be made only for Retired NFL Football Players who died prior to the Final Approval Date, through a post-mortem diagnosis made by a board-certified neuropathologist prior to the Final Approval Date, provided that a Retired NFL Football Player who died between July 7, 2014 and the Final Approval Date shall have until 270 days from his date of death to obtain such a post-mortem diagnosis."). The Final Approval Date was April 22, 2015.

[2] In this round of briefing, Claimants make a third argument: that Judge Brody has already determined their claims to be timely, having somehow "agreed" with their earlier objection. Cornish Doc. 284510 at 1; Hastings Doc. 284543 at 1. This did not happen; Counsel has misread the Court's remand Order. To avoid more delay, I have resolved their arguments on the merits, after having given all parties a chance to file supplemental briefing on the interpretative issues at the heart of the Appeal. I also re-read Claimants' previous briefing, which made the nature of their contentions crystal clear.

Second, even if the Amended Settlement Agreement's deadline has passed, Claimants maintain that the unamended Settlement Agreement contained no such rule. The absence of an original deadline would mean (they argue) that it violated due process to amend the Agreement without distributing new class notice and permitting objections. After extensive review, I conclude that the unamended Settlement Agreement would also have imposed a CTE diagnosis deadline.

I therefore deny the Appeals.

## FACTUAL AND PROCEDURAL BACKGROUND

Claimants' paths to today's consolidated decision are similar. Ms. Cornish acts on behalf of her late husband, Frank Cornish, a Retired NFL Football Player, who died at age 40 on August 23, 2008. Cornish Doc. 199406.[3] On August 24, 2008, an autopsy confirmed that Mr. Cornish's cause of death was "sudden adult death with evidence of hypertensive heart disease." Cornish Doc. 199407. Ms. Hastings, meanwhile, stands in for her late son, Christopher E. Mims, also a Retired NFL Football Player, who died on October 15, 2008 at age 38. Hastings Doc. 199437. An autopsy, performed the next day, determined the cause of death to be dilated cardiomyopathy. Hastings Doc. 199440.

Years passed, and eventually the Court approved the Amended Class Action Settlement Agreement and this claim appeal process. Unpacking Ms. Cornish's and Ms. Hastings' arguments on appeal requires a short detour into the Settlement's procedural history, specifically around the deadline for a Qualifying Diagnosis of Death with CTE.

### 1. Relevant Settlement History

The parties initially moved for approval of a Settlement in January 2014.[4] The Court denied that motion without prejudice,[5] and the parties negotiated toward a revised agreement over several months.[6] They then sought preliminary approval for a (first) Revised Settlement Agreement, dated June 24, 2014 (the "June Agreement"). The June Agreement provided, at Section 6.3(f), that a "Qualifying Diagnosis of Death with CTE shall be made only for Retired NFL Football Players who died prior to the date of the Preliminary Approval and Class Certification Order [i.e., July 7, 2014], through a post-mortem diagnosis by a board-certified neuropathologist of CTE."[7]

---

[3] For clarity, I have identified documents by which Claimant's portal they come from.

[4] ECF No. 5634, Motion of Proposed Class Counsel for an Order: (1) Granting Preliminary Approval of the Class Action Settlement Agreement, etc. (Jan. 6, 2014); ECF No. 5634-2, Proposed Class Action Settlement (Jan. 6, 2014).

[5] ECF No. 5658, Order Denying Plaintiffs' Motion for Preliminary Approval and Class Certification Without Prejudice (Jan. 14, 2014).

[6] ECF No. 6509, Memorandum Accompanying Order Granting Final Approval of the Class Action Settlement (Apr. 22, 2015), at 11 (explaining that after the denial of preliminary approval in January 2014, "[f]ive more months of arm's-length, hard fought negotiations followed").

[7] ECF No. 6087, Class Action Settlement as of June 25, 2014 (Jul. 7, 2014), at 32.

The Injury Definition for Death with CTE provided: "For Retired NFL Football Players who died prior to the date of the Preliminary Approval and Class Certification Order, a post-mortem diagnosis of CTE made by a board-certified Neuropathologist."[8]

Because a Qualifying Diagnosis for CTE under the June Agreement could only come post-mortem, the only Claimants would be Representative ones, belonging to "Subclass 2": "Representative Claimants of deceased Retired NFL Football Players who were diagnosed with a Qualifying Diagnosis prior to death or who died prior to the date of the Preliminary Approval and Class Certification Order and who received a post-mortem diagnosis of CTE."[9]

On June 25, 2014, moving for approval of this Agreement, proposed Class Counsel wrote twice that "Death with CTE" required a "post-mortem diagnosis prior to the date of the Preliminary Approval and Class Certification Order."[10]

Additionally, proposed Class Counsel moved for approval of the draft Long- and Short-Form Notices,[11] which were expressly incorporated into the June Agreement.[12] The draft Short-Form Notice provided that Monetary Awards were available for "diagnoses of ALS (Lou Gehrig's disease), Alzheimer's Disease, Parkinson's Disease, Dementia and *certain cases of chronic traumatic encephalopathy or CTE (a neuropathological finding) diagnosed after death*."[13]

In the draft Long-Form Notice, the section entitled "What are the benefits of the Settlement?" included the following description:

> Monetary awards for diagnoses of ALS, Parkinson's Disease, Alzheimer's Disease, Level 2 Neurocognitive Impairment (*i.e.*, moderate Dementia), Level 1.5 Neurocognitive Impairment (*i.e.*, early Dementia) and Death with CTE prior to [Date of Preliminary Approval Order].[14]

At the same time, the draft Long-Form Notice later noted:

> Monetary awards are available for the diagnosis of ALS, Parkinson's Disease, Alzheimer's Disease, Level 2 Neurocognitive Impairment (*i.e.*, moderate Dementia), Level 1.5 Neurocognitive Impairment (*i.e.*, early Dementia) or Death

---

[8] *Id.* at 110.

[9] *Id.* at 126. Subclass 1, for Claimants who had not been diagnosed as of the date of the preliminary approval, did not mention CTE at all. *Id.* at 125.

[10] ECF No. 6073-5, Memorandum of Law in Support of Motion of Proposed Class Counsel for an Order: (1) Granting Preliminary Approval of the Class Action Settlement Agreement, etc. (Jun. 25, 2014), at 14, 25.

[11] ECF No. 6073, Motion of Proposed Class Counsel for an Order . . . Approving the Dissemination of Class Notice.

[12] *See* ECF No. 6073-2, at 129 ("This Order and Judgment incorporates and makes a part hereof: (a) the Settlement Agreement and exhibits filed with the Court on June 25, 2014, including definitions of the terms used therein and (b) the Settlement Class Notice Plan and the Summary Notice, both of which were filed with the Court on June 25, 2014.").

[13] ECF No. 6073-3, at 86 (emphasis added).

[14] ECF No. 6073-2, at 147 (emphasis in original).

with CTE (the "Qualifying Diagnoses"). A Qualifying Diagnosis *may occur at any time until the end of the 65-year term of the Monetary Award Fund*.[15]

The motion for preliminary approval and the draft Notices were contested. The Morey respondents' July 2, 2014 objection focused on the fact that "while ***past*** diagnosed cases of CTE are covered if a class member dies before preliminary approval, ***no future cases of CTE post-preliminary approval are covered***."[16] They argued that the proposed Long- and Short-Form Notices did not clearly explain that "if a player is diagnosed with CTE after the preliminary approval stage, he is entitled to ***nothing forever***."[17]

On July 7, 2014, the District Court granted preliminary approval of the June Agreement.[18] On July 8, 2014, Class Counsel moved for approval of the final Long- and Short-Form Notices.[19] On July 9, 2014, the Court approved these completed versions.[20] In addition to approving the "dissemination of notice," the Court found that the "form and content of the proposed Long-Form and Summary Notice also satisfy the requirements of Rule 23 and the Due Process clause."[21]

The final Short-Form Notice was identical to the draft with respect to Death with CTE.[22] But the final Long-Form Notice, under "What are the benefits of the Settlement?" read differently. It tightened the draft language in which "diagnoses" was spatially—if not grammatically—separated from "Death with CTE" and the relevant cutoff date. Now, it read:

> Monetary awards for diagnoses of Death with CTE prior to **July 7, 2014**, ALS, Parkinson's Disease, Alzheimer's Disease, Level 2 Neurocognitive Impairment

---

[15] *Id.* at 151 (emphasis added).

[16] ECF No. 6082, Objection to June 25, 2014 Class Action Settlement and Opposition to Motion for Preliminary Approval of Sean Morey, Alan Faneca, Ben Hamilton, Robert Royal, Roderick Cartwright, Jeff Rohrer, and Sean Considine, (July 2, 2014), at 40 (emphasis in original).

[17] *Id.* at 40–41 (emphasis in original).

[18] ECF No. 6084, Order Granting Preliminary Approval of the Proposed Class Action Settlement Agreement (July 7, 2014).

[19] ECF No. 6086, Motion for Approval of Completed Versions of Long-Form Notice and Summary Notice (July 8, 2014).

[20] ECF No. 6093, Order Approving the Completed Versions of the Long-Form Notice and the Summary Notice (July 9, 2014), at 7. The NFL Parties argue that for Ms. Cornish and Ms. Hastings, respectively, "her due process argument rests on the Notice that she *actually received*, not the terms of the Unamended Settlement." Cornish Doc. 289333 at 10 (emphasis in original); Hastings Doc. 289332 at 10 (emphasis in original). I discuss the draft notices here not to obscure the fact that Ms. Cornish and Ms. Hastings received the final notices, not the drafts, but rather to illuminate parties' efforts to make the diagnosis deadline more explicit between the draft and final versions. And the terms of the Unamended Settlement do matter to Ms. Cornish and Ms. Hastings' arguments, because the question is whether the Notices they *actually received* adequately communicated the contents of the Unamended Settlement. Clarity about the contents of the Unamended Settlement is central to that inquiry.

[21] ECF No. 6083, Memorandum Accompanying the Order Granting Preliminary Approval of the Proposed Class Action Settlement Agreement (July 7, 2014), at 18–19.

[22] *See* ECF No. 6093-2, Order Approving the Completed Versions of the Long-Form Notice and the Summary Notice [ECF No. 6086] (July 9, 2014).

(*i.e.*, moderate Dementia) and Level 1.5 Neurocognitive Impairment (*i.e.*, early Dementia).[23]

Like the draft Long-Form Notice, the final Long-Form Notice later noted:

Monetary awards are available for the diagnosis of ALS, Parkinson's Disease, Alzheimer's Disease, Level 2 Neurocognitive Impairment (*i.e.*, moderate Dementia), Level 1.5 Neurocognitive Impairment (*i.e.*, early Dementia) or Death with CTE (the "Qualifying Diagnoses"). A Qualifying Diagnosis *may occur at any time until the end of the 65-year term of the Monetary Award Fund.*[24]

Multiple parties objected to the Settlement.[25] The Morey objectors' October 6, 2014 filing was again notable.[26] Central to that document was the understanding that CTE diagnoses were cut off at the date of preliminary approval.[27] It was wrong, they argued, that "a CTE diagnosis *before* preliminary approval should be sufficient to demonstrate entitlement to a multi-million dollar award while a *future* diagnosis entitles a class member to nothing."[28]

Other objectors agreed that under the June Agreement, CTE diagnoses must occur before July 2014 (and that this was unfair).[29] One group objected because "a 'Death with CTE' qualifying diagnosis requires retirees to have died *and been diagnosed with CTE prior to July 7, 2014.*"[30] Another claimed that the Settlement was "flawed" in excluding "CTE victims diagnosed *after* the settlement while including CTE victims diagnosed *before* the settlement."[31]

---

[23] ECF No. 6093-1, Order Approving the Completed Versions of the Long-Form Notice and the Summary Notice [ECF No. 6086] (July 9, 2014), at 7 (emphasis in original).

[24] *Id.* at 11 (emphasis added).

[25] *See, e.g.*, ECF 6109, Reply in Further Support of Motion to Intervene by Sean Morey, Alan Faneca, Ben Hamilton, Robert Royal, Roderick Cartwright, Jeff Rohrer, and Sean Considine (July 29, 2014), at 6 (opposing the fact that "none" of the Monetary Award Fund would be "available to assist retired players. . . should they be diagnosed with CTE post-settlement.").

[26] ECF No. 6201, Objection of Sean Morey, Alan Faneca, Ben Hamilton, Robert Royal, Roderick "Rock" Cartwright, Jeff Rohrer, and Sean Considine to Class Action Settlement (Oct. 6, 2014).

[27] *See id.* at 27 (arguing that the January 2014 proposed Settlement "arbitrarily denied compensation to individuals whose CTE went undetected until after preliminary approval"); *id.* at 35 (arguing that as in the January 2014 proposed Settlement, in the June 2014 proposed Settlement "[c]lass members whose CTE is discovered in the future receive nothing").

[28] *Id.* at 28. (emphasis in original).

[29] *See* ECF 6213, at 2 (Miller Objection, Oct. 14, 2014) ("The settlement favors currently injured class members at the expense of those who will die or be diagnosed with CTE in the future."); ECF 6235, at 3-4 (Jones Objection, Oct. 14, 2014) (arguing that it is arbitrary not to compensate CTE diagnosed after the approval date); ECF 6400, at 2 (McFarland Objection, Nov. 3, 2014) ("Future Cases of CTE are apparently not included as a qualifying diagnosis."); ECF 6409, at 4 (Carrington Objection, Nov. 3, 2014) ("There is no additional monetary compensation for athletes who die after the preliminary approval order or who are diagnosed with CTE after the preliminary approval hearing."); ECF 6412, at 2 (Werner Objection, Nov. 3, 2014) ("If it's monetary acceptable for those who suffered before July 7th 2014 but not for those diagnosed after this date? . . . What is the NFL saying here???").

[30] ECF No. 6233, at 18 (Armstrong Objection, Oct. 14, 2014) (emphasis added).

[31] ECF No. 6242, at 2 (Chelsey Objection, Oct. 14, 2014) (emphasis in original).

Objectors also raised concerns about the class notice.[32] The Morey objectors, for example, argued that the Long-Form Notice "states that '[a] Qualifying Diagnosis may occur at any time until the end of the 65-year term of the Monetary Award Fund,' which is false as applied to *every* future diagnosis of 'Death with CTE.'"[33]

The objectors were not alone in the view that the June Agreement provided no recovery for every future diagnosis of Death with CTE. Class Counsel and the NFL Parties expressed this understanding throughout 2014. For instance, economic reports generated by experts on both sides in February 2014 reveal that the parties explicitly assumed the preliminary approval date was a cutoff for CTE *diagnoses*, not just deaths. Class Counsel's expert report read, "In the case of Death with CTE, this analysis assumes that only those cases that had a confirmed diagnosis pre-settlement will be compensated. Therefore, the model does not forecast any future cases of CTE."[34] Similarly, the NFL Parties' expert wrote, "Because the Settlement will not provide monetary awards for CTE for players diagnosed with CTE after the date of Preliminary Approval, the model assumes that no other players will be diagnosed with CTE."[35] Both of these reports were filed on the docket on September 12, 2014.

In October 2014, proposed Class Counsel defended the CTE cutoff date as follows:

> However, as retired players deceased before preliminary approval would not have recognized the need to seek or obtain a medical diagnosis to confirm their rights and entitlements under the Settlement, the proposed Settlement affords an opportunity for compensation to their families *in the event the retired player received a post-mortem neuropathological diagnosis of CTE*.[36]

The past tense language—"received"—reinforces the June and July motion practice in indicating that the June Agreement would only compensate Death with CTE diagnoses already made by the cutoff date. Similarly, the NFL Parties acknowledged that "the settlement fails to

---

[32] One particularly colorful objection dramatized a living room scene in a fictional Retired NFL Player's household, imagining a conversation between the Retired NFL Player and his wife and son upon receiving the Long-Form Notice. *See* ECF No. 6241, at 33-35 (Duerson Objection, Oct. 14, 2014). The fictional family did not understand the cutoff date for CTE, and the objector urged the Court to "save them from the empty promises" by sending out supplemental notice to inform readers "point blank, that NO CTE CLAIMS WILL BE PAID FOR A DEATH OCCURRING AFTER JULY 7, 2014"). *Id.* at 35.

[33] ECF No. 6201, Objection of Sean Morey, Alan Faneca, Ben Hamilton, Robert Royal, Roderick "Rock" Cartwright, Jeff Rohrer, and Sean Considine to Class Action Settlement (Oct. 6, 2014), at 57 (emphasis in original).

[34] ECF No. 6167, NFL Concussion Liability Forecast, Prepared by Thomas Vasquez Ph.D. on February 10, 2014 (Sept. 12, 2014), at 23.

[35] ECF No. 6168, Report of the Segal Group to Special Master Perry Golkin (Sept. 12, 2014), at 28, n. 18.

[36] ECF No. 6183, Co-Lead Class Counsel's Memorandum of Law in Response to Motion of Sean Morey, Alan Faneca, Ben Hamilton, Robert Royal, Roderick Cartwright, Jeffrey Rohrer, and Sean Considine for Leave to Conduct Limited Discovery (Oct. 2, 2014), at 4, n. 3 (emphasis added).

compensate CTE *diagnosed* after July 7, 2014."[37] Class Counsel and the NFL Parties also defended the notice against objectors' due process arguments.[38]

In November 2014, the NFL Parties again highlighted the diagnosis deadline: "[T]he Agreement does not (for good reason) compensate a post-mortem pathological diagnosis of CTE after preliminary approval."[39] Class Counsel similarly addressed the timing issue.[40] Reiterating that the June Agreement required "Death with CTE (post-mortem diagnosis prior to July 7, 2014),"[41] Class Counsel defended that deadline as the result of a bargained-for process: the NFL Parties drew a line in the sand on CTE, but made concessions in other areas, such as uncapping the Monetary Award Fund.[42]

On November 19, 2014, the Court conducted a Fairness Hearing.[43] Objectors again contended that the Settlement was unfair in limiting compensation for Death with CTE to diagnoses prior to preliminary approval,[44] and again the Parties defended this limit.[45] At the Hearing, objectors emphasized that the Long-Form Notice was misleading:

> When you look to the long-form notice at Section 14. . . it says that "Monetary awards are available for the diagnosis of ALS, Parkinson's Alzheimer, Level 1 neurocognitive impairment, early dementia, or death with CTE." And then they take death with CTE, along with those others, and they give it a defined term, they call it a qualifying diagnosis. And then it says, "A qualifying diagnosis may occur at any time until the end of a 65-year term of the monetary award fund." Well that's

---

[37] ECF No. 6185, Response of the NFL Parties in Opposition to Motion for Leave to Conduct Limited Discovery (Oct. 2, 2014), at 7 (emphasis added).

[38] *See* ECF No. 6184, Co-Lead Counsel's Omnibus Response to Motions (Oct. 2, 2014), at 6 ("The class notice makes clear that only claims for diagnoses of Death with CTE prior to July 7, 2014 will be paid."); ECF No. 6186, Response of the NFL Parties in Opposition to Emergency Motions (Oct. 2, 2014), at 10 ("The Settlement Class Notice also objectively and neutrally appraises all Settlement Class Members of the nature of the action and the Settlement Class claims and issues, including, as relevant here . . . that the Qualifying Diagnosis of Death with CTE includes only 'diagnoses of death with CTE prior to July 7, 2014.'").

[39] ECF No. 6422, Memorandum of Law in Support of Final Approval of the Class Action Settlement Agreement and in Response to Objections (Nov. 12, 2014), at 78-79.

[40] ECF No. 6423-1, Memorandum of Law in Support of Class Plaintiffs' Motion for an Order Granting Final Approval of Settlement and Certification of Class and Subclasses (Nov. 12, 2014), at 17 ("Subclass 2 is defined as . . . the Representative Claimants of deceased Retired NFL Football Players who were diagnosed with a Qualifying Diagnosis prior to death, or who died prior to July 7, 2014 and who received a post-mortem diagnosis of CTE.").

[41] *Id.*

[42] *See id.* at 69 ("During the negotiations, however, Class Counsel determined which conditions the NFL Parties were willing to resolve on a global basis and which they were not. In short, Class Counsel determined where the NFL Parties would draw the ultimate line and refuse to settle.").

[43] ECF No. 6449, Transcript of Fairness Hearing (held on Nov. 19, 2014, entered Nov. 28, 2014).

[44] *See id.* at 123:2-6 ("At the settlement table in this case no class representative was there to advocate for the people who died with CTE. No one. No one was advocating that post-July 7th CTE needs to be compensated.").

[45] *See id.* at 192:5-13 ("The settlement covers death with CTE prepreliminary approval precisely because obviously by definition players who have deceased prior to prepreliminary approval cannot get a qualifying diagnosis and be covered. So the coverage for death with CTE prepreliminary approval was an expansion of the settlement so those players who had CTE and were deceased were covered.").

certainly not true if in fact death with CTE before July 7th of 2014 is what gets you an award. So again, a player reading the long-form notice would be misled.[46]

In response, Class Counsel drew the Court's attention to "the section entitled 'What are the benefits of the settlement?'" and explained:

> That's the section. Right under there it says monetary awards for diagnosis of death with CTE prior to July 7, 2014. I think if you're reading this notice, the section if you want to know what your benefits are, you're probably going to go to the section that says, what are the benefits of the settlement? The notice does that.[47]

After the Fairness Hearing, objectors reiterated concerns about the Long-Form Notice[48] and the cutoff date for CTE.[49] And Class Counsel again underscored the prevailing understanding that the cutoff date for CTE Awards meant cutoff for date of Diagnosis, as well as date of death: "Class Counsel fought to secure recovery for the families of those who died and whose brains revealed a pathological finding of CTE before this Settlement came to fruition."[50]

On February 2, 2015, the Court suggested that the parties propose changes to the Revised Agreement.[51] The only suggestion touching CTE was that the "Qualifying Diagnosis of Death with CTE should include Retired NFL Football Players who die between preliminary approval and final approval of the Settlement."[52]

The parties offered amendments on February 13, 2015.[53] The amendments added to 6.3(f) the now controlling language that "a post-mortem diagnosis made by a board-certified neuropathologist" must be "prior to the Final Approval Date, provided that a Retired NFL Football Player who died between July 7, 2014 and the Final Approval Date shall have until 270 days from his date of death to obtain such a post-mortem diagnosis."[54] The parties jointly wrote:

> The Settlement Agreement currently provides for a Death with CTE Qualifying Diagnosis for Retired NFL Football Players who died prior to the date of the Preliminary Approval and Class Certification Order and who had a post-mortem diagnosis of CTE made by a board-certified neuropathologist.

---

[46] *Id.* at 94:15-25; 95:1-9.

[47] *Id.* at 199:5-13.

[48] The Morey Objectors, for example, contended that the settling parties' Fairness Hearing argument that "a different part of the notice clarifies that the Settlement provides recovery for 'Death with CTE *prior to July 7, 2014*'" was insufficient and that the Notice was "defective as a matter of law" for containing "both false and technically true statements." ECF No. 6455, Post-Fairness Hearing Supplemental Briefing of Objectors Sean Morey, Alan Faneca, Ben Hamilton, Robert Royal, Roderick Cartwright, Jeff Rohrer, and Sean Considine (Dec. 2, 2014), at 31.

[49] *See, e.g.*, ECF No. 6456 (Duerson Suppl. Obj., Dec. 2, 2014), at 4 ("If final approval is granted, CTE will forever disappear from the NFL's lexicon, as no player's family will ever qualify for a death benefit after July 7, 2014.").

[50] ECF No. 6467, Class Counsel's Omnibus Response to Post-Fairness Hearing Submissions (Dec. 12, 2014), at 34.

[51] ECF No. 6479, Order Proposing Changes to the Proposed Settlement Agreement (Feb. 2, 2015).

[52] *Id.* at 2.

[53] ECF No. 6481, Joint Submission in Response to the Feb. 2, 2015 Order (Feb. 13, 2015).

[54] ECF No. 6481-1, at 37.

(Settlement Agreement, Ex. 1.) The Settlement Agreement, as amended, extends this deadline from the date of preliminary approval to the Final Approval Date, which is defined as the date that the Court enters the Final Order and Judgment. (Settlement Agreement, as amended, §§2.1(mm), 6.3(f), Ex. 1.).

In addition, consistent with the Parties' intent under the original Settlement Agreement, and recognizing that obtaining such a diagnosis may take several months post-death, the Parties have provided for a grace period of 270 days following any date of death between preliminary approval and the Final Approval Date to allow Claimants to obtain the necessary diagnosis.[55]

Several objections followed on the ground that the amendments did not cure purported defects related to CTE.[56] None that I have found suggested that it was a novel requirement that the Diagnosis of Death with CTE, like the death itself, pre-date the Approval Date. And at least one filed objection strongly suggested to the contrary.[57]

The prevailing understanding of the diagnosis rule reappeared in a joint submission—filed by the NFL Parties and joined by Class Counsel—of proposed findings of fact and conclusions of law: "Post Final Approval, a post-mortem diagnosis of CTE is not compensated," with the one exception of Players who died between Preliminary and Final Approval.[58] Likewise, Class Counsel's letter notifying opt outs of the amendments stated that to receive an Award for Death with CTE, Retired Players needed to have "received a post-mortem diagnosis by the date of the Final Approval (or 270 days following any death between Preliminary Approval and Final Approval to allow time for the necessary diagnosis)."[59]

On April 22, 2015, Judge Brody, approving the amendments, found that because "these changes improved the deal for Class Members without providing any concessions to the NFL Parties, an additional round of notice for Class Members is unnecessary."[60] She stated that the relevant change to the CTE benefit was that it (now) "compensates Death with CTE up until the Final Approval Date, instead of the Preliminary Approval Date."[61]

Judge Brody also considered objections to the Long-Form and Summary Notices:

The Summary Notice states that only "certain cases of chronic traumatic encephalopathy" receive Monetary Awards. Summary Notice at 1 (emphasis

---

[55] ECF No. 6481 at 4-5 (cleaned up).
[56] *See, e.g.*, ECF No. 6503 (Armstrong Suppl. Obj., Apr. 13, 2015); ECF No. 6484 (Miller Suppl. Obj., Feb. 27, 2015).
[57] *Cf.* ECF No. 6484 (suggesting that the amendment created a perverse change which could motivate player suicide by making a deadline for benefits in the future, the final approval date, and not in the past).
[58] ECF No. 6497, Class Counsel and the NFL Parties' Joint Proposed Findings of Fact and Conclusions of Law in Support of Final Approval of the Class Action Settlement (Mar. 12, 2015), at 38.
[59] ECF No. 6500-1, Notice to Opt-Outs (Mar. 31, 2015), at 2.
[60] ECF No. 6509, Memorandum Regarding Final Approval of the Settlement (Apr. 22, 2015), at 56.
[61] *Id.* at 78.

added). In context, this is more than adequate: none of the other Qualifying Diagnoses listed contain any type of limiting language . . .

Objectors unsuccessfully argue that the Long-Form Notice is also misleading. Objectors concede that that the Long-Form Notice states that compensation is limited to "diagnoses of Death with CTE prior to July 7, 2014." Yet they maintain that this statement is misleading because it "does not outright disclose" that those who die after that date will not be compensated. This is not enough to confuse a careful reader . . . Objectors further argue that the Long-Form Notice is confusing because the term "Death with CTE" appears several times without the accompanying cutoff date. See Morey Obj. at 43- 44. Both the Summary Notice and the Long-Form Notice indicate that only "certain" cases of CTE are covered. See Summary Notice at 1; Long-Form Notice at 1.

Even if the Long-Form Notice were unclear, it repeatedly instructs readers to sources that can answer their questions. Like the Summary Notice, the Long-Form Notice contains a banner at the bottom of each page directing those with "Questions?" to call a toll-free support number or visit the Settlement Website. Warnings that the Long-Form Notice is only a summary and that readers should look to the Settlement for specific details appear five times in the Long-Form Notice. . .[62]

Finally, Judge Brody wrote that the "Parties provided compensation for Death with CTE until the Final Approval Date because they recognized that Retired Players who died prior to final approval did not have sufficient notice that they had to obtain Qualifying Diagnoses."[63]

The Third Circuit, approving the Settlement, held "that the content of the class notice . . . satisfied Rule 23 and due process."[64] It also found "that the settlement's treatment of CTE does not render the agreement fundamentally unfair."[65]

Almost a year after final denial of certiorari, on August 15, 2017, Settlement Class Member Yvonne Sagapolutele moved to "Modify the Amended Final Order and Judgment."[66] That motion argued that the Amended Settlement Agreement's diagnosis deadline was neither contemplated

---

[62] *Id*. at 51-52 (internal citations omitted) (paragraph breaks added).

[63] *Id*. at 81.

[64] In re Nat'l Football League Players Concussion Injury Litig., 821 F.3d 410, 435-36 (3d Cir. 2016), amended (May 2, 2016), cert. denied, 137 S. Ct. 591 (2016), and cert. denied, 137 S. Ct. 607 (2016). The Third Circuit, in the context of another class action settlement, refused to revisit its earlier ruling on the adequacy of notice. *See* In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Prod. Liab. Litig., 385 F.3d 386, 396 (3d Cir. 2004) ("Moreover, this Court has already addressed the notice and adequacy of representation with respect to the original Settlement Agreement and we found the requirements of due process satisfied . . . Due process does not require this Court to entertain challenges to adequacy of notice and representation every time any case related to a class action judgment comes up on appeal.").

[65] *In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d, at 444.

[66] ECF No. 8263, Motion to Modify the Amended Final Order and Judgment (Aug. 15, 2017).

by the June Agreement, nor fairly presented in the Notices.[67] As far as I have been able to tell, this was the first time that *anyone* articulated a reading of the June Agreement which would permit post-Approval Date diagnoses so long as a Player's death preceded it.[68]

Judge Brody denied that motion without prejudice on October 26, 2017, stating that "[b]efore Plaintiff can attempt the extraordinary action of modifying the Settlement Agreement, she must first show that she would be entitled to recover but for the Death with CTE diagnosis deadline," and noting that the due process argument could be raised in the claim appeal process.[69]

## 2.  Procedural History of Today's Claims

I now turn back to today's Claims. Ms. Cornish and Ms. Hastings filed their respective Claims on February 6, 2019. Cornish Doc. 199403; Hastings Doc. 198425. Dr. Ronald Hamilton, a board-certified neuropathologist, provided an undated letter stating that he examined the late Mr. Cornish's brain tissue using "three H&E stained slides" received from the Tarrant County Medical Examiner. Cornish Doc. 199405. Dr. Hamilton concluded that the "histopathologic findings are diagnostic of CTE" and that "Frank Cornish had CTE." *Id.* Dr. Hamilton provided a similarly undated letter stating that he examined the late Mr. Mims' brain tissue using "10 unstained slides from 8 tissue blocks" received from the Los Angeles County Department of Medical Examiner-Coroner. Hastings Doc. 199435. He concluded that his "findings are diagnostic of CTE" and that "Christopher Mims had CTE." *Id.*

As counsel has now confirmed, Dr. Hamilton's undated examination and diagnoses of both Mr. Cornish and Mr. Mims in fact post-dated April 22, 2015. Cornish Doc. 284510 at 8; Hastings Doc. 284543 at 8.

The Claims Administrator denied Ms. Cornish's Claim on June 25, 2019, and Ms. Hastings' Claim on July 30, 2019. Cornish Doc. 209824; Hasting Doc. 211985. Both Claimants appealed. Cornish Doc. 210928; Hastings Doc. 213485. On September 26, 2019 (for Ms. Cornish) and October 31, 2019 (for Ms. Hastings), Special Master Pritchett denied the Appeals, stating for each that "Appellant did not show clear and convincing evidence of error in the Claims Administrator's decision." Cornish Doc. 215686; Hastings Doc. 217483.

---

[67] *Id.*

[68] Some class members erroneously believed that the June Agreement would permit post-Approval Date diagnoses of post-Approval Date deaths. *See* ECF No. 6345, at 3 (Williams Objection, Nov. 3, 2014) ("Players diagnosed with CTE (living) today, have to kill themselves or die for their family to ever benefit."); ECF No. 6347, at 1 (Flint Objection; Nov. 3, 2014) ("It seems an injustice not to consider CTE in a living player because we cannot enjoy the benefits dead. I love my family and would like for them to be compensated if that condition is found but as a player I would rather my family and I could enjoy the benefits together while I'm alive."). And a few objectors argued that Representative Claimants of Retired NFL Players who died before January 1, 2006, should be able to prove Death with CTE by alternative means other than a post-mortem diagnosis by a board-certified neuropathologist. *See* ECF No. 6222 (Komlo Objection, Oct. 14, 2014); ECF No. 6362 (O'Hanley Objection, Nov. 3, 2014). But none of these objections raise the situation at issue here: that a Retired NFL Player might die between January 1, 2006, and the Approval Date and receive a diagnosis of Death with CTE by a board-certified neuropathologist after the Approval Date.

[69] ECF No. 8557, Order Denying Motion to Modify the Amended Final Order and Judgment (Oct. 26, 2017), at 1.

Judge Brody remanded both Claims for further explanation, noting that the Special Master's decision "did not specify whether . . . [it] applied to *both* of the Claims Administrator's reasons or only *one* of those reasons" for denial. Cornish Doc. 225723 at 1; Hastings Doc. 225731 at 1. On July 15, 2020, I denied Ms. Cornish's Claim after remand, writing:

> The Claims Administrator denied Ms. Cornish's claim for two independent reasons.
>
> First, the claim was denied based upon a lack of proof that the diagnosis was timely. I find that there is no evidence that the diagnosis of Death with CTE was obtained before the appropriate deadline.
>
> Second, the claim was denied for failure of the diagnosing physician to personally examine the Player's brain tissue. However, the evidence suggests that Dr. Hamilton did examine the late Mr. Cornish's brain tissue as is necessary to diagnose Death with CTE.
>
> The Claims Administrator correctly concluded that Ms. Cornish failed to show that the diagnosis was obtained before the appropriate deadline. I thus affirm the denial solely on the first basis.

Cornish Doc. 226586 at 4.

I similarly denied Ms. Hastings' Claim, writing:

> The Claims Administrator denied Ms. Hastings' claim for two independent reasons. First, the claim was denied based upon a lack of proof that the diagnosis was timely. I find that there is no evidence that the diagnosis of Death with CTE was obtained before the appropriate deadline. Second, the claim was denied for failure of the diagnosing physician to personally examine the Player's brain tissue. However, the evidence suggests that Dr. Hamilton did examine the late Mr. Mims' brain tissue as is necessary to diagnose Death with CTE.
>
> The Claims Administrator correctly concluded that Ms. Hastings failed to show that the diagnosis was obtained before the appropriate deadline. I thus affirm the denial solely on the first basis.

Hastings Doc. 226585 at 4.

On February 24, 2023, Judge Brody remanded both Claims for a second time, instructing the Special Masters to return them to the Claims Administrator "to further determine the sufficiency of the claims packages." Cornish Doc. 278160 at 2; Hastings Doc. 278167 at 2. This Order required the Claims Administrator to ensure that Dr. Hamilton's examination of the

decedents' tissue substantively and sufficiently supported a Diagnosis of Death with CTE in each Claim. It did not conclude that the Claims were timely.

The Claims Administrator, after assigning the files to a member of the Appeals Advisory Panel (AAP), assured itself that Dr. Hamilton's analysis substantively and sufficiently supported a Diagnosis for both Claims. Cornish Doc. 282802; Hastings Doc. 282803. The Claims Administrator then denied both Claims on the sole basis that the relevant Diagnoses were untimely. Cornish Doc. 282802; Hastings Doc. 282803.

Both Representative Claimants appealed. Cornish Doc. 284510; Hastings Doc. 284543.

## DISCUSSION

I make the following factual findings.

(1) Dr. Hamilton is a board-certified neuropathologist;
(2) Dr. Hamilton examined slides containing Mr. Mims' and Mr. Cornish's brain tissue and diagnosed them both posthumously with CTE;
(3) Dr. Hamilton's examinations post-dated April 22, 2015;[70]
(4) But for their timing, those examinations sufficiently supported an Award of Death with CTE under Section 6.3(f) of the Amended Settlement Agreement.

These factual findings clarify what remains to be decided. Both Claimants satisfy the Settlement's requirement that a board-certified neuropathologist diagnosed the Retired NFL Players with CTE after posthumous examination of brain tissue.[71] However, both Diagnoses post-date April 22, 2015, and are therefore untimely under Section 6.3(f) of the Amended Settlement Agreement. Claimants offer two reasons why the untimeliness of Dr. Hamilton's examinations and diagnoses should not preclude their recovery.

### 1. Claimants' Diagnosis Deadline Argument

*First*, Claimants state that the "claims package is not insufficient based on the purported untimeliness of the diagnosis because the date of the Qualifying Diagnosis is the date of the Player's

---

[70] I cannot make a finding as to the precise day on which the examinations and the diagnoses occurred because the relevant letter is undated and counsel has not disclosed the date. Counsel concedes only that the examination occurred after April 22, 2015. *See* Cornish Doc. 284510 at 8 ("The Claims Administrator has again denied Class Member's claim because Dr. Hamilton's CTE diagnosis was not made before April 22, 2015, which is the Final Approval Date for the Amended Settlement."); Hastings Doc. 284543 at 8 (same).

[71] As the Court wrote in the Final Order and Judgment approving the Settlement, "no one can conclusively say that someone had CTE until a scientist looks at sections of that person's brain under a microscope to see if abnormally phosphorylated tau protein ('abnormal tau protein') is present, and if so whether it is present in a reportedly unique pattern." In re Nat'l Football League Players' Concussion Injury Litig., 307 F.R.D. 351, 391 (E.D. Pa. 2015). To conclusively diagnose CTE, therefore, the diagnosing neuropathologist must examine the deceased Player's brain tissue.

death, even though the diagnosis is not made until after the Player Dies." Cornish Doc. 284510 at 8; Hastings Doc. 284543 at 8. Claimants rely on FAQ #99 (from 2019), now restyled as FAQ #100:

> The physician making a Qualifying Diagnosis of a Retired NFL Football Player must determine and verify the date on which that Qualifying Diagnosis was made. This date is important under the Settlement Agreement. It affects the amount of a Monetary Award, because the younger a Player is at the time of the Qualifying Diagnosis, the larger the award. The diagnosing physician uses his or her professional medical judgment in deciding when the Player had the conditions amounting to a Qualifying Diagnosis under Exhibit 1 to the Settlement Agreement. There are some basic rules about this: … (a) *Death with CTE*: For these claims, the date of the Qualifying Diagnosis is the date of the Player's death, even though the diagnosis is not made until after the Player dies. The Monetary Award is based on the Player's age when he died. [72]

The FAQ is awkwardly phrased. But contrary to Claimants' supplemental briefing, the FAQ is not part of "the language in the amended settlement agreement." Cornish Doc. 289319 at 1; Hastings Doc. 289320 at 1.

Given the Amended Settlement's text at 6.3(f), which controls, and the FAQ's preamble language, the FAQ must set the date from which *payment* for the Diagnosis is calculated for the Program's payment grid, not the moment at which the Diagnosis occurs. Any other result would run afoul of the text of the Amended Settlement.[73]

That's because Section 6.3(f) creates two conditions for recovery: the date of the Qualifying Diagnosis *and* the date of the neuropathologist's post-mortem examination must be prior to April 22, 2015. Claimants would collapse these two into one, writing the second out of the Agreement entirely. And since the Diagnosis must be "made by" a neuropathologist, it cannot occur automatically at the time of death. Relying on this text, I conclude that a Diagnosis for the purposes of 6.3(f) of the Amended Settlement Agreement occurs when a board-certified neuropathologist personally examines the decedent's brain tissue and concludes that it is marked by CTE.

### 2. Claimants' Due Process Argument

In the alternative, Claimants argue:

> [T]he language the Claims Administrator relies on could not have added a diagnosis-date requirement because it was added to the settlement agreement after

---

[72] *Frequently Asked Questions: FAQ #100* (How is the date of a Qualifying Diagnosis determined?), NFL CONCUSSION SETTLEMENT, https://www.nflconcussionsettlement.com.

[73] *See* Special Master Ruling on Untimely Claim Package, at 3 (Oct. 10, 2022), https://www.nflconcussionsettlement.com/Docs/untimely_claim_package_SM.pdf ("FAQs cannot create rights the Settlement disclaims."). The Claims Administrator should revise FAQ #100 to make it even more clear.

the opt out deadline without notice to Class Member and other absent class members. In all notices that were provided regarding the settlement agreement, Class Member and other absent class members were told they could obtain a CTE diagnosis at any time within the 65-year life of the Monetary Award Fund.

Cornish Doc. 284510 at 8; Hastings Doc. 284543 at 8.

Having considered the record with care, I am convinced that this argument is without factual or legal merit.[74] Analytically, the first step in proving that the Amended Settlement Agreement unfairly curtailed Claimants' rights would be to show that the June Agreement *lacked* a cutoff for Diagnoses of Death with CTE. If the June Agreement had such a rule, and was so-understood at the time, amending it to add more words to the same effect could not violate due process.

The question then is how to best interpret the June Agreement. It, like the Amended Settlement Agreement, was a (proposed) contract governed by New York law.[75] The Third Circuit interprets settlement agreements as contracts,[76] including when applying New York law.[77] And yet, because of the unique way in which "a court retains special responsibility to see to the administration of justice" in a class action settlement, exclusive reliance on "black-letter contract law is unavailing."[78] In addition to ascertaining the parties' intent using ordinary contract law

---

[74] I gave the parties to this Appeal an opportunity to file supplementary submissions. Ms. Cornish, Ms. Hastings, and the NFL Parties did so. Cornish Docs. 289333; 289319; Hastings Docs. 289332; 289320. Class Counsel did not.

[75] ECF No. 6087, at 93 ("Notwithstanding any contrary law applicable to the underlying claims, this Settlement Agreement and the Releases hereunder will be interpreted and enforced in accordance with the laws of the State of New York, without regard to conflict of law principles.").

[76] *See* Sullivan v. DB Investments, Inc., 667 F.3d 273, 312 (3d Cir. 2011) ("It is well established that 'settlement agreements are creatures of private contract law.'") (quoting Bauer v. Trans. Sch. Dist. of City of St. Louis, 255 F.3d 478, 482 (8th Cir. 2001); Ehreart v. Verizon Wireless, 609 F.3d 590, 594 (3d Cir. 2010) ("We have no doubt that the settlement agreement reached in this case is a binding and enforceable contract under general principles of contract interpretation."). Like the settlement agreement in *Ehreart*, here the Settlement "was negotiated through and executed by experienced counsel on both sides, following mediation with a well-respected and experienced mediator." *Id.*

[77] *See* In re Cendant Corp. Prides Litig., 233 F.3d 188, 193 n.6 (3d Cir. 2000) (applying "New York contract law, which governs this case" to interpreting provisions in a settlement agreement). New York law interprets settlements as it does contracts. Brad H. v. City of New York, 951 N.E.2d 743, 746 (N.Y. 2011) ("The settlement agreement is a contract and its meaning must be discerned under several cardinal principles of contractual interpretation. A written agreement that is clear, complete and subject to only one reasonable interpretation must be enforced according to the plain meaning of the language chosen by the contracting parties."); Cordero v. Transamerica Annuity Service Corp., 211 N.E.3d 663, 670 (N.Y. 2023) (looking to "what the parties would have expected under the contract" to interpret a structured settlement agreement).

[78] *Id.* at 194. Some have argued for a "distinctive interpretive regime" to adjudicate disputes about contractual meaning in Settlements. *See* Howard M. Erichson & Ethan J. Leib, *Class Action Settlements as Contracts?*, 102 N. C. L. REV. 1, 6 (forthcoming 2023) ("Our argument is that structural facts about class action settlements—both the nature of their binding effect and the dynamics of their negotiation—militate in favor of an interpretive approach that brings skepticism to the idea that the judge's role in these contexts is merely to promote the 'intent of the parties.'"). I am governed by the Third Circuit's approach, as *Cendant* lays out.

principles, the Court also retains responsibility "for the protection of class members" until the settlement fund has been distributed.[79]

Under New York law, the "fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent."[80] The best evidence of parties' intent comes from "a written agreement that is complete, clear and unambiguous on its face."[81] Only if the agreement is ambiguous, i.e., not "reasonably susceptible of only one meaning," may a court consider extrinsic evidence of parties' intent.[82]

I start with the June Agreement's text.

### a. The Settlement's Plain Meaning

Paragraph 6.3(f) of the June Agreement creates a cutoff for the date of Death with CTE. Whether it does so for the date of Diagnosis is less clear. This is the key text:

> Qualifying Diagnosis of Death with CTE shall be made only for Retired NFL Football Players who died prior to the date of the Preliminary Approval and Class Certification Order [i.e., July 7, 2014], through a post-mortem diagnosis by a board-certified neuropathologist of CTE.[83]

Claimants assert that this language creates no deadline for diagnoses of Death with CTE at all. But that is not a plausible interpretation.

*First*, the text connects the Player's death to a post-mortem diagnosis using the function word "through," while offering only one date by which those events can occur. Since most post-mortem diagnoses are proximate to death,[84] the most natural reading is that the drafters intended that diagnoses and death would be subject to the same cutoff date. Given that intuitive connection, had the parties intended there to be no deadline for diagnoses, it would be reasonable to expect that 6.3(f) would have stated such a surprising outcome expressly.

*Second*, other parts of the June Agreement indicate that CTE diagnoses would be proximate to death. Namely, the Subclass 2 definition paragraph, which gives 6.3(f) its scope, encompasses those who died prior to the Approval Date "and" who "received" a post-mortem diagnosis of

---

[79] Cendant Corp. Prides, 233 F.3d at 194.

[80] Greenfield v. Phillies Records, Inc., 780 N.E.2d 166, 170 (N.Y. 2002).

[81] *Id.*

[82] *Id.*

[83] ECF No. 6087, at 32.

[84] New York looks to Black's Law Dictionary to aid in ascertaining the plain meaning of contested terms. *See, e.g.*, De La Cruz v. Caddell Dry Dock & Repair Co., Inc., 997 N.E.2d 1223, 1227-1228 (N.Y. 2013). The 10th edition of Black's Law Dictionary—contemporaneous with the June Agreement—refers readers looking for "postmortem examination" to "autopsy," and defines "autopsy" in turn as a "medical examination of a corpse to determine the cause of death, esp. in a criminal investigation." *Black's Law Dictionary* (10th ed. 2014). The inclusion of "corpse" implies that the examination occurs close in time to the death.

CTE.[85] The conjunctive word strongly implies that the diagnosis and the death must both happen prior to the same event. Additionally, the past tense of "received" is evidence that the diagnosis needed to have happened already—before the Preliminary Approval Date. Again, had the parties intended an open-ended diagnosis deadline, with all the long-tail risk that such a deadline would create, they would have phrased this as those who died prior to the Approval Date and who "receive" a post-mortem diagnosis of CTE.

*Third*, the June Agreement's exhibits offer still more textual evidence. The June Agreement provides that "its exhibits, attachments, and appendices will constitute the entire agreement and understanding among the parties" and that "[a]ll of the exhibits attached hereto are hereby incorporated by references as though fully set forth herein."[86] As I have already indicated, the draft Long-Form Notice explicitly cut-off CTE awards in time: "diagnoses of . . . Death with CTE prior to [Date of Preliminary Approval Order]."[87] This fits with the other textual evidence to form a coherent picture.

But the following Q&A then seemingly muddied the waters:

Monetary awards are available for the diagnosis of ALS, Parkinson's Disease, Alzheimer's Disease, Level 2 Neurocognitive Impairment (*i.e.*, moderate Dementia), Level 1.5 Neurocognitive Impairment (*i.e.*, early Dementia) or Death with CTE (the "Qualifying Diagnoses"). A Qualifying Diagnosis *may occur at any time until the end of the 65-year term of the Monetary Award Fund*.[88]

This language is confounding, but needs to be harmonized with the rest of the text.[89] Given the plain text of 6.3(f), the Subclass 2 definition, and the notice limiting "Monetary awards for diagnoses of . . . Death with CTE prior to [Date of Preliminary Approval Order],"[90] the overall effect is reasonably clear. The specific and explicit CTE deadline controls the more general Q&A's "at any time" statement, under the *noscitur a sociis* principle, and following the text's injunction to have the exhibits give way to the main text.[91] New York courts read contracts as a whole, making

---

[85] ECF No. 6087, at 126.

[86] ECF No. 6073-2, at 96 §§ 30.3, 30.5. The notices do not determine the Class's rights; the Settlement Agreement itself does. I include them here as interpretative evidence. As the NFL Parties point out, Ms. Cornish and Ms. Hastings received the final notice, which is clearer than the draft notice with respect to the diagnosis deadline for Death with CTE.

[87] ECF No. 6073-2, at 147.

[88] *Id.* at 151 (emphasis added).

[89] Indeed, it must be, as the June Agreement provides that "Notwithstanding the foregoing, any inconsistency between this Settlement Agreement and any attachments, exhibits, or appendices hereto will be resolved in favor of this Settlement Agreement." ECF No. 6073-2, at 96, § 30.3.

[90] ECF No. 6073-2, at 147.

[91] *See supra* note 89; *see also* Ethan J. Leib, *The Textual Canons in Contract Cases: A Preliminary Study*, 5 Wis. L. Rev. 1109, 1118 (2022) ("This canon holds that courts should know words by their associates and interpret more comprehensive words in a series to be limited by the more specific and less comprehensive enumerated items.").

each provision fit with others to the extent possible.[92] Simply put, it makes no sense in context for the drafters to have created a deadline for Death with CTE but not its diagnosis without making that concession explicit. The most natural plain reading is that a Diagnosis must occur by the Date of the Preliminary Approval Order.

True, the June Agreement's 6.3(f) text is not as clear as it could have been—nor as explicit as the same paragraph in the Amended Settlement Agreement became. But a "contract's silence on an issue" does not, by itself, create an ambiguity that can be resolved by extrinsic evidence.[93] Rather, an ambiguity only arises out of "what was written so blindly and imperfectly that its meaning is doubtful."[94] I have just explained why I do not think it likely that a New York court would find that 6.3(f)'s apparent silence on the diagnosis deadline creates such an ambiguity. But I concede that some might identify in 6.3(f) a gap—and thus a latent ambiguity—to be filled.

### b. Contemporaneous Extrinsic Evidence

I predict that if a New York court were to find the June Agreement ambiguous about whether it contains a diagnostic deadline, that ambiguity would be conclusively resolved by contemporaneous extrinsic evidence of the parties' publicly expressed intent.[95]

"There is no surer way to find out what parties meant, than to see what they have done."[96] The Settlement's procedural history between June 2014 and February 2015 offers just this—a kind of practical construction.[97] I reviewed that evidence extensively above. Since it was pre-dispute, public, intended to probe June Agreement's function, and subject to contestation, it provides highly reliable evidence of meaning.[98] I predict a New York court would find it invaluable in

---

[92] *See* Ellington v. EMI Music, Inc., 21 N.E.3d 1000, 1003 (N.Y. 2014) ("Where the terms of a contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract, giving a practical interpretation to the language employed and reading the contract as a whole.").

[93] Donohue v. Cuomo, 184 N.E.3d 860, 866 (N.Y. 2022).

[94] *Id.* at 867 (quoting Trustees of Southampton v. Jessup, 173 N.Y. 84, 90 (1903)).

[95] *Cf.* Evans v. Famous Music Corp., 807 N.E.2d 869, 873 (N.Y. 2004) (turning first to, and relying on, extrinsic evidence of how parties behaved under a set of royalty contracts "for guidance as to which interpretation should prevail" with respect to an "ambiguity" in those contracts).

[96] Brooklyn Life Ins. Co. of New York v. Dutcher, 95 U.S. 269, 273 (1877) (*quoted with approval in* Town of Pelham v. City of Mount Vernon, 304 N.Y. 15, 23 (1952). Indeed, the "best evidence of the intent of the parties to a contract is their conduct after the contract is formed." Waverly Corp. v. City of New York, 851 N.Y.S.2d 176, 179 (1st Dept. 2008).

[97] Admittedly, it is somewhat unclear how to characterize the extrinsic evidence here. The June Agreement was not the parties' final word, and they never performed under the original 6.3(f). It is thus not classically "course of performance" evidence. But it is not course of negotiation or course of dealing either, and, like other kinds of practical construction, it demonstrates what the parties thought about the relevant contract language before they had incentives to behave strategically.

[98] Overall, "the parties' practical construction of the provision at issue during the course of performance. . . is given the greatest weight" relative to other types of extrinsic evidence, such as course of dealings and custom and usage. 28 GLEN BANKS, N.Y. PRAC., CONTRACT LAW § 9:28 (2023).

resolving ambiguity. In so concluding, I follow courts interpreting settlement agreements that relied on contemporaneous motion practice to determine meaning.[99]

Starting with the Proposed Class Counsel Memorandum of June 25, 2014, which introduced the June Agreement, the drafting parties themselves made crystal clear that they intended the dual deadline. In that document, proposed Class Counsel stated twice that for Death with CTE, a "post-mortem diagnosis prior to the date of the Preliminary Approval and Class Certification Order" was required.[100] Proposed Class Counsel's Motion for Approval of Completed Versions of Long-Form Notice and Summary Notice of July 8, 2014 included the Long-Form Notice, which explained that the June Agreement established "[m]onetary awards for diagnoses of Death with CTE prior to [the Date of the Preliminary Approval Order, i.e.,] **July 7, 2014**."[101] This language resulted from edits to the Notice from its draft to completed versions in early July, 2014, sharpening the dual deadline.[102] And the NFL Parties' response to multiple objections in the Fall reinforces the point: the drafting parties all believed that the June Agreement cut off CTE diagnoses as of July 7, 2014.[103]

Claimants point to one phrase in the *distributed* Long-Form Notice, stating that Qualifying Diagnoses may occur at any time. But as I've just referenced, both the distributed and draft Notice even more specifically state that "diagnoses" of CTE must occur prior to July 7, 2014, and followed a memorandum making that deadline explicit. As Class Counsel argued in the Fairness Hearing, a reasonable reader of the Notice and the June Agreement could not have concluded that the deadline to obtain a Diagnosis was open-ended.

Further resolving any doubts, the Long-Form Notice directed the reader to multiple other resources which reinforced the dual deadline.[104] At the bottom of every page of the Long-Form Notice was a banner which directed readers to call a toll-free number or visit the Settlement website for more information.[105] On the Settlement website, Class Members could find the Settlement Agreement itself, the Court's preliminary order and opinion, Class Counsel's motions in support of preliminary approval, and Frequently Asked Questions which provided—once again—the toll-free hotline Class Members could use to get their questions answered.[106] The written sources, at the very least, would have reinforced the diagnostic deadline.

---

[99] *See, e.g.,* Boston Exec. Helicopters, LLC v. Maguire, 45 F.4th 506, 511, 519 (1st Cir. 2022) (relying in part on parties' "motion practice regarding the terms of the settlement" to hold that the "lead-up to the signing of the settlement agreement resolves any relevant ambiguity about the meaning of the term 'standard form, non-exclusive lease' as intended by the parties"); Jensen v. Minnesota Department of Human Services, 897 F.3d 908, 915 (8th Cir. 2018) (relying in part on parties' court-filed letters, reports, responses, motions, and memoranda throughout a relevant time period to resolve an ambiguity in a class action settlement).

[100] ECF No. 6073-5, at 14, 25.

[101] ECF No. 6086-1, at 7 (emphasis in original).

[102] *Compare* ECF No. 6073-2, at 147 (draft version) *with* ECF No. 6086-1, at 7 (completed version).

[103] *See supra* at the record described in notes 34 through 39.

[104] *See* ECF No. 6422, at 177 (listing the various resources class members could access in addition to the Long-Form Notice on the Settlement website).

[105] Long-Form Notice, NFL CONCUSSION SETTLEMENT, https://www.nflconcussionsettlement.com/Docs/Long-Form%20Notice.pdf.

[106] ECF No. 6422, at 177.

That all said, the Third Circuit has stated that contract interpretation of a class action settlement must attend to the class's interests, not just the parties' expressed intent. I take that to mean that the class's reasonable expectations—the received meaning of the language—should bear some interpretative weight. To that end, I have searched the record in vain to find any examples of *anyone* reading the June Agreement as the Claimants did before 2017. Rather, multiple objectors to the June Agreement contemporaneously stated it meant that the deadline applied to Diagnoses *and* deaths. Their arguments—that this deadline was arbitrary and not clearly communicated in the Long-Form Notice—reinforce the prevailing understanding that the CTE *Diagnosis* deadline was real, controversial, and distinct from other parts of the Agreement.[107]

The Morey objectors' July 2, 2014 filing is illustrative.[108] After arguing that it was unfair that "the settlement would compensate only those few cases of CTE detected before preliminary approval of the settlement, to the exclusion of all future cases,"[109] the document goes on to argue that in an attempt to "***sell*** the settlement to players," neither Notice "explains—or so much as indicates—that while ***past*** diagnosed cases of CTE are covered if a class member dies before preliminary approval, ***no future cases of CTE post-preliminary approval are covered***."[110] These parties, and many others, were clear that the June Agreement created a binding dual deadline.[111]

In their supplemental briefing, Claimants point to a hypothetical raised in the Morey objection from October of 2014: "Thus, while CTE found in a retired player who died on the eve of preliminary approval allows a $4 million payment, that same condition goes uncompensated if the player dies one day later, after preliminary approval."[112] Claimants argue that this hypothetical proves that the June Agreement had no diagnosis deadline because "[i]f that were the case, it would be impossible for any hypothetical player who died shortly before the preliminary approval date to obtain a post-mortem diagnosis in time." Cornish Doc. 289319 at 8; Hastings Doc. 289320 at 8.

But this hypothetical cuts against Claimants' preferred interpretation. It was the unfairness of just such a scenario—a death that could not be immediately diagnosed—that led the District Court to suggest, and the parties to adopt, an amendment to allow time to obtain a diagnosis. As the NFL Parties explain in their supplemental briefs:

---

[107] *See generally supra* at pages 5 though 9.

[108] ECF No. 6082.

[109] *Id.* at 22.

[110] *Id.* at 39-40 (emphasis in original).

[111] Judge Brody's memorandum approving the Amended Settlement appears to confirm that understanding. As she wrote: the "*Parties provided compensation for Death with CTE until the Final Approval Date* because they recognized that Retired Players who died prior to final approval did not have sufficient notice that they had to obtain Qualifying Diagnoses." ECF No. 6509, at 81 (emphasis added). In approving that result, as well as the relevant notices against due process challenges, Judge Brody specifically denied that the Notice was unlawfully confusing or obscure. *Id.* at 52 ("Even if the Long-Form Notice were unclear, it repeatedly instructs readers to sources that can answer their questions.").

[112] ECF No. 6201, at 40.

The 270-day grace period would be wholly superfluous if there were no diagnosis deadline in the [June Agreement], as moving the date of death deadline to Final Approval would have been sufficient to expand that benefit. If, as [Claimants argue], the [June Agreement] required only that a Retired Player died prior to the deadline in order for a diagnosis made at *any unlimited future date* to be timely, the February 2015 amendments would not have added language providing that a Retired Player who died between July 7, 2014 and April 15, 2015 "*shall have until 270 days from his date of death to obtain such a post-mortem diagnosis.*"

Cornish Doc. 289333 at 8; Hastings Doc. 289332 at 8.

I conclude that the June Agreement would have denied recovery for a Death with CTE that preceded July 7, 2014, but which was diagnosed by examination of brain tissue after that date. I reach that view by focusing on the plain text of the June Agreement itself. My interpretation finds further support in (i) the papers that moved the June Agreement to the Court's attention; (ii) the explicit statement of a timing rule for CTE diagnoses in the distributed Long-Form Notice; and (iii) the subsequent months of reactions to those developments, which affirmed that the diagnostic cutoff matched that for Death with CTE.

Given this interpretation of what the June Agreement would have compelled had *it* been the operative document in this Settlement, I cannot agree that the proposed February Amendments, later approved in April 2015, cut back on Claimants' rights by making 6.3(f) more explicit. Those amendments, as Judge Brody already held, improved the deal without taking rights away. Claimants' Appeal must fail at its first step: they cannot show that they were harmed by the 2015 amendments.

I will go no further. I agree with Claimants that if the June Agreement contained no diagnostic deadline, the due process consequences would be complex. Claimants argue that new notices should have been required, and that they should be able to amend the Agreement now in their favor. The NFL Parties deny that result, defending the accuracy and completeness of the Long-Form Notice that Claimants received. Both parties appear to ask me to resolve this aspect of Claimants' due process challenge.

But my limited charge is "to take all steps necessary to faithfully oversee the implementation and administration of the Settlement Agreement."[113] The relevant Notices and Agreement have been approved by the District Court and the Third Circuit: it goes well-beyond my writ to opine on their legality. I will leave further due process questions to the District Court, should it see the need to reach them.

I merely interpret the (operative) April 2015 Amended Class Action Settlement and the proposed June 2014 Agreement to contain the same basic requirement for an Award of Death with

---

[113] Settlement Agreement, Section 10.1(a)(ii).

CTE: that the post-mortem Diagnosis, by a board-certified neuropathologist, occur by the relevant Approval Date.[114]

<div align="center">

CONCLUSION

</div>

Ms. Hastings and Ms. Cornish are Representative Claimants for Retired Players who died in 2008 and suffered from CTE. For the purposes of the Amended Settlement Agreement, both sufficiently demonstrated the latter fact through a post-mortem diagnosis by a neuropathologist. But both diagnoses occurred after April 22, 2015.

As such, their diagnoses came too late under the Amended Settlement Agreement, Section 6.3(f). The Claims Administrator correctly applied the Amended Settlement Agreement's clear textual command.

At the urging of the parties to these Appeals, I have analyzed whether this outcome would have arisen under the proposed Agreement of June 25, 2014. I conclude that the requirement that death and diagnosis both occur prior to the final approval date was not novel to the Amended Agreement but was present in the June Agreement as well.

Both Claimants argue that application of Section 6.3(f) raises due process issues. They can renew those arguments, as well as any objections to my analysis of the June Agreement, in the District Court.[115] The Appeals are denied.

Date: October 7, 2023

_David A. Hoffman_
David Hoffman, Special Master

---

[114] They are not precisely the same for those Claimants dying between June 2014 and April 2015, who receive in the Amended Agreement the right to recover for Diagnoses occurring up to 270 days from death.

[115] I certify that my contract interpretation discussion is reviewable *de novo* under FRCP 53(f)4 and the Rule 31 of the Rules Governing Appeals of Claim Determinations. Only my factual conclusions, on page 13, are final.

# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | : : : : | No. 2:12-md-02323-AB<br><br>MDL No. 2323 |
| | : | **Hon. Anita B. Brody** |
| THIS DOCUMENT RELATES TO: APPEALS OF REPRESENTATIVE CLAIMANTS ROBIN CORNISH AND CARLEEN HASTINGS REGARDING DENIALS OF MONETARY AWARDS | : : : : : : : | |

## INTRODUCTION

I consolidate two Representative Claims for decision: one by Robin Cornish, and the other by Carleen Hastings. Both act for players who died in 2008. Years later—at some time after April 2015—both players were posthumously diagnosed with Chronic Traumatic Encephalopathy (CTE) after a neuropathologist examined slides containing their brain tissue.

After various procedural detours, the Claims Administrator denied both Claims solely because they were untimely under Section 6.3(f) of the Amended Class Action Settlement Agreement.[1] Ms. Cornish and Ms. Hastings have appealed, raising two core arguments.[2]

First, they assert that they have satisfied the diagnostic deadline for a Qualifying Diagnosis of Death with CTE, because a "diagnosis" occurs at death. Relying on the plain text of the Amended Settlement Agreement, I disagree and find that a Diagnosis of Death with CTE occurs when the neuropathologist conducts his or her medical examination and reaches a judgment.

---

[1] *See* Amended Settlement Agreement, Section 6.3(f) ("A Qualifying Diagnosis of Death with CTE shall be made only for Retired NFL Football Players who died prior to the Final Approval Date, through a post-mortem diagnosis made by a board-certified neuropathologist prior to the Final Approval Date, provided that a Retired NFL Football Player who died between July 7, 2014 and the Final Approval Date shall have until 270 days from his date of death to obtain such a post-mortem diagnosis."). The Final Approval Date was April 22, 2015.

[2] In this round of briefing, Claimants make a third argument: that Judge Brody has already determined their claims to be timely, having somehow "agreed" with their earlier objection. Cornish Doc. 284510 at 1; Hastings Doc. 284543 at 1. This did not happen; Counsel has misread the Court's remand Order. To avoid more delay, I have resolved their arguments on the merits, after having given all parties a chance to file supplemental briefing on the interpretative issues at the heart of the Appeal. I also re-read Claimants' previous briefing, which made the nature of their contentions crystal clear.

Second, even if the Amended Settlement Agreement's deadline has passed, Claimants maintain that the unamended Settlement Agreement contained no such rule. The absence of an original deadline would mean (they argue) that it violated due process to amend the Agreement without distributing new class notice and permitting objections. After extensive review, I conclude that the unamended Settlement Agreement would also have imposed a CTE diagnosis deadline.

I therefore deny the Appeals.

## FACTUAL AND PROCEDURAL BACKGROUND

Claimants' paths to today's consolidated decision are similar. Ms. Cornish acts on behalf of her late husband, Frank Cornish, a Retired NFL Football Player, who died at age 40 on August 23, 2008. Cornish Doc. 199406.[3] On August 24, 2008, an autopsy confirmed that Mr. Cornish's cause of death was "sudden adult death with evidence of hypertensive heart disease." Cornish Doc. 199407. Ms. Hastings, meanwhile, stands in for her late son, Christopher E. Mims, also a Retired NFL Football Player, who died on October 15, 2008 at age 38. Hastings Doc. 199437. An autopsy, performed the next day, determined the cause of death to be dilated cardiomyopathy. Hastings Doc. 199440.

Years passed, and eventually the Court approved the Amended Class Action Settlement Agreement and this claim appeal process. Unpacking Ms. Cornish's and Ms. Hastings' arguments on appeal requires a short detour into the Settlement's procedural history, specifically around the deadline for a Qualifying Diagnosis of Death with CTE.

### 1. Relevant Settlement History

The parties initially moved for approval of a Settlement in January 2014.[4] The Court denied that motion without prejudice,[5] and the parties negotiated toward a revised agreement over several months.[6] They then sought preliminary approval for a (first) Revised Settlement Agreement, dated June 24, 2014 (the "June Agreement"). The June Agreement provided, at Section 6.3(f), that a "Qualifying Diagnosis of Death with CTE shall be made only for Retired NFL Football Players who died prior to the date of the Preliminary Approval and Class Certification Order [i.e., July 7, 2014], through a post-mortem diagnosis by a board-certified neuropathologist of CTE."[7]

---

[3] For clarity, I have identified documents by which Claimant's portal they come from.

[4] ECF No. 5634, Motion of Proposed Class Counsel for an Order: (1) Granting Preliminary Approval of the Class Action Settlement Agreement, etc. (Jan. 6, 2014); ECF No. 5634-2, Proposed Class Action Settlement (Jan. 6, 2014).

[5] ECF No. 5658, Order Denying Plaintiffs' Motion for Preliminary Approval and Class Certification Without Prejudice (Jan. 14, 2014).

[6] ECF No. 6509, Memorandum Accompanying Order Granting Final Approval of the Class Action Settlement (Apr. 22, 2015), at 11 (explaining that after the denial of preliminary approval in January 2014, "[f]ive more months of arm's-length, hard fought negotiations followed").

[7] ECF No. 6087, Class Action Settlement as of June 25, 2014 (Jul. 7, 2014), at 32.

The Injury Definition for Death with CTE provided: "For Retired NFL Football Players who died prior to the date of the Preliminary Approval and Class Certification Order, a post-mortem diagnosis of CTE made by a board-certified Neuropathologist."[8]

Because a Qualifying Diagnosis for CTE under the June Agreement could only come post-mortem, the only Claimants would be Representative ones, belonging to "Subclass 2": "Representative Claimants of deceased Retired NFL Football Players who were diagnosed with a Qualifying Diagnosis prior to death or who died prior to the date of the Preliminary Approval and Class Certification Order and who received a post-mortem diagnosis of CTE."[9]

On June 25, 2014, moving for approval of this Agreement, proposed Class Counsel wrote twice that "Death with CTE" required a "post-mortem diagnosis prior to the date of the Preliminary Approval and Class Certification Order."[10]

Additionally, proposed Class Counsel moved for approval of the draft Long- and Short-Form Notices,[11] which were expressly incorporated into the June Agreement.[12] The draft Short-Form Notice provided that Monetary Awards were available for "diagnoses of ALS (Lou Gehrig's disease), Alzheimer's Disease, Parkinson's Disease, Dementia and *certain cases of chronic traumatic encephalopathy or CTE (a neuropathological finding) diagnosed after death*."[13]

In the draft Long-Form Notice, the section entitled "What are the benefits of the Settlement?" included the following description:

> Monetary awards for diagnoses of ALS, Parkinson's Disease, Alzheimer's Disease, Level 2 Neurocognitive Impairment (*i.e.*, moderate Dementia), Level 1.5 Neurocognitive Impairment (*i.e.*, early Dementia) and Death with CTE prior to [Date of Preliminary Approval Order].[14]

At the same time, the draft Long-Form Notice later noted:

> Monetary awards are available for the diagnosis of ALS, Parkinson's Disease, Alzheimer's Disease, Level 2 Neurocognitive Impairment (*i.e.*, moderate Dementia), Level 1.5 Neurocognitive Impairment (*i.e.*, early Dementia) or Death

---

[8] *Id*. at 110.

[9] *Id*. at 126. Subclass 1, for Claimants who had not been diagnosed as of the date of the preliminary approval, did not mention CTE at all. *Id.* at 125.

[10] ECF No. 6073-5, Memorandum of Law in Support of Motion of Proposed Class Counsel for an Order: (1) Granting Preliminary Approval of the Class Action Settlement Agreement, etc. (Jun. 25, 2014), at 14, 25.

[11] ECF No. 6073, Motion of Proposed Class Counsel for an Order . . . Approving the Dissemination of Class Notice.

[12] *See* ECF No. 6073-2, at 129 ("This Order and Judgment incorporates and makes a part hereof: (a) the Settlement Agreement and exhibits filed with the Court on June 25, 2014, including definitions of the terms used therein and (b) the Settlement Class Notice Plan and the Summary Notice, both of which were filed with the Court on June 25, 2014.").

[13] ECF No. 6073-3, at 86 (emphasis added).

[14] ECF No. 6073-2, at 147 (emphasis in original).

with CTE (the "Qualifying Diagnoses"). A Qualifying Diagnosis *may occur at any time until the end of the 65-year term of the Monetary Award Fund*.[15]

The motion for preliminary approval and the draft Notices were contested. The Morey respondents' July 2, 2014 objection focused on the fact that "while ***past*** diagnosed cases of CTE are covered if a class member dies before preliminary approval, ***no future cases of CTE post-preliminary approval are covered***."[16] They argued that the proposed Long- and Short-Form Notices did not clearly explain that "if a player is diagnosed with CTE after the preliminary approval stage, he is entitled to ***nothing forever***."[17]

On July 7, 2014, the District Court granted preliminary approval of the June Agreement.[18] On July 8, 2014, Class Counsel moved for approval of the final Long- and Short-Form Notices.[19] On July 9, 2014, the Court approved these completed versions.[20] In addition to approving the "dissemination of notice," the Court found that the "form and content of the proposed Long-Form and Summary Notice also satisfy the requirements of Rule 23 and the Due Process clause."[21]

The final Short-Form Notice was identical to the draft with respect to Death with CTE.[22] But the final Long-Form Notice, under "What are the benefits of the Settlement?" read differently. It tightened the draft language in which "diagnoses" was spatially—if not grammatically—separated from "Death with CTE" and the relevant cutoff date. Now, it read:

Monetary awards for diagnoses of Death with CTE prior to **July 7, 2014**, ALS, Parkinson's Disease, Alzheimer's Disease, Level 2 Neurocognitive Impairment

---

[15] *Id.* at 151 (emphasis added).

[16] ECF No. 6082, Objection to June 25, 2014 Class Action Settlement and Opposition to Motion for Preliminary Approval of Sean Morey, Alan Faneca, Ben Hamilton, Robert Royal, Roderick Cartwright, Jeff Rohrer, and Sean Considine, (July 2, 2014), at 40 (emphasis in original).

[17] *Id.* at 40–41 (emphasis in original).

[18] ECF No. 6084, Order Granting Preliminary Approval of the Proposed Class Action Settlement Agreement (July 7, 2014).

[19] ECF No. 6086, Motion for Approval of Completed Versions of Long-Form Notice and Summary Notice (July 8, 2014).

[20] ECF No. 6093, Order Approving the Completed Versions of the Long-Form Notice and the Summary Notice (July 9, 2014), at 7. The NFL Parties argue that for Ms. Cornish and Ms. Hastings, respectively, "her due process argument rests on the Notice that she *actually received*, not the terms of the Unamended Settlement." Cornish Doc. 289333 at 10 (emphasis in original); Hastings Doc. 289332 at 10 (emphasis in original). I discuss the draft notices here not to obscure the fact that Ms. Cornish and Ms. Hastings received the final notices, not the drafts, but rather to illuminate parties' efforts to make the diagnosis deadline more explicit between the draft and final versions. And the terms of the Unamended Settlement do matter to Ms. Cornish and Ms. Hastings' arguments, because the question is whether the Notices they *actually received* adequately communicated the contents of the Unamended Settlement. Clarity about the contents of the Unamended Settlement is central to that inquiry.

[21] ECF No. 6083, Memorandum Accompanying the Order Granting Preliminary Approval of the Proposed Class Action Settlement Agreement (July 7, 2014), at 18–19.

[22] *See* ECF No. 6093-2, Order Approving the Completed Versions of the Long-Form Notice and the Summary Notice [ECF No. 6086] (July 9, 2014).

(*i.e.*, moderate Dementia) and Level 1.5 Neurocognitive Impairment (*i.e.*, early Dementia).[23]

Like the draft Long-Form Notice, the final Long-Form Notice later noted:

> Monetary awards are available for the diagnosis of ALS, Parkinson's Disease, Alzheimer's Disease, Level 2 Neurocognitive Impairment (*i.e.*, moderate Dementia), Level 1.5 Neurocognitive Impairment (*i.e.*, early Dementia) or Death with CTE (the "Qualifying Diagnoses"). A Qualifying Diagnosis *may occur at any time until the end of the 65-year term of the Monetary Award Fund.*[24]

Multiple parties objected to the Settlement.[25] The Morey objectors' October 6, 2014 filing was again notable.[26] Central to that document was the understanding that CTE diagnoses were cut off at the date of preliminary approval.[27] It was wrong, they argued, that "a CTE diagnosis *before* preliminary approval should be sufficient to demonstrate entitlement to a multi-million dollar award while a *future* diagnosis entitles a class member to nothing."[28]

Other objectors agreed that under the June Agreement, CTE diagnoses must occur before July 2014 (and that this was unfair).[29] One group objected because "a 'Death with CTE' qualifying diagnosis requires retirees to have died *and been diagnosed with CTE prior to July 7, 2014.*"[30] Another claimed that the Settlement was "flawed" in excluding "CTE victims diagnosed *after* the settlement while including CTE victims diagnosed *before* the settlement."[31]

---

[23] ECF No. 6093-1, Order Approving the Completed Versions of the Long-Form Notice and the Summary Notice [ECF No. 6086] (July 9, 2014), at 7 (emphasis in original).

[24] *Id.* at 11 (emphasis added).

[25] *See, e.g.*, ECF 6109, Reply in Further Support of Motion to Intervene by Sean Morey, Alan Faneca, Ben Hamilton, Robert Royal, Roderick Cartwright, Jeff Rohrer, and Sean Considine (July 29, 2014), at 6 (opposing the fact that "none" of the Monetary Award Fund would be "available to assist retired players. . . should they be diagnosed with CTE post-settlement.").

[26] ECF No. 6201, Objection of Sean Morey, Alan Faneca, Ben Hamilton, Robert Royal, Roderick "Rock" Cartwright, Jeff Rohrer, and Sean Considine to Class Action Settlement (Oct. 6, 2014).

[27] *See id.* at 27 (arguing that the January 2014 proposed Settlement "arbitrarily denied compensation to individuals whose CTE went undetected until after preliminary approval"); *id.* at 35 (arguing that as in the January 2014 proposed Settlement, in the June 2014 proposed Settlement "[c]lass members whose CTE is discovered in the future receive nothing").

[28] *Id.* at 28. (emphasis in original).

[29] *See* ECF 6213, at 2 (Miller Objection, Oct. 14, 2014) ("The settlement favors currently injured class members at the expense of those who will die or be diagnosed with CTE in the future."); ECF 6235, at 3-4 (Jones Objection, Oct. 14, 2014) (arguing that it is arbitrary not to compensate CTE diagnosed after the approval date); ECF 6400, at 2 (McFarland Objection, Nov. 3, 2014) ("Future Cases of CTE are apparently not included as a qualifying diagnosis."); ECF 6409, at 4 (Carrington Objection, Nov. 3, 2014) ("There is no additional monetary compensation for athletes who die after the preliminary approval order or who are diagnosed with CTE after the preliminary approval hearing."); ECF 6412, at 2 (Werner Objection, Nov. 3, 2014) ("If it's monetary acceptable for those who suffered before July 7th 2014 but not for those diagnosed after this date? . . . What is the NFL saying here???").

[30] ECF No. 6233, at 18 (Armstrong Objection, Oct. 14, 2014) (emphasis added).

[31] ECF No. 6242, at 2 (Chelsey Objection, Oct. 14, 2014) (emphasis in original).

Objectors also raised concerns about the class notice.[32] The Morey objectors, for example, argued that the Long-Form Notice "states that '[a] Qualifying Diagnosis may occur at any time until the end of the 65-year term of the Monetary Award Fund,' which is false as applied to *every* future diagnosis of 'Death with CTE.'"[33]

The objectors were not alone in the view that the June Agreement provided no recovery for every future diagnosis of Death with CTE. Class Counsel and the NFL Parties expressed this understanding throughout 2014. For instance, economic reports generated by experts on both sides in February 2014 reveal that the parties explicitly assumed the preliminary approval date was a cutoff for CTE *diagnoses*, not just deaths. Class Counsel's expert report read, "In the case of Death with CTE, this analysis assumes that only those cases that had a confirmed diagnosis pre-settlement will be compensated. Therefore, the model does not forecast any future cases of CTE."[34] Similarly, the NFL Parties' expert wrote, "Because the Settlement will not provide monetary awards for CTE for players diagnosed with CTE after the date of Preliminary Approval, the model assumes that no other players will be diagnosed with CTE."[35] Both of these reports were filed on the docket on September 12, 2014.

In October 2014, proposed Class Counsel defended the CTE cutoff date as follows:

However, as retired players deceased before preliminary approval would not have recognized the need to seek or obtain a medical diagnosis to confirm their rights and entitlements under the Settlement, the proposed Settlement affords an opportunity for compensation to their families *in the event the retired player received a post-mortem neuropathological diagnosis of CTE*.[36]

The past tense language—"received"—reinforces the June and July motion practice in indicating that the June Agreement would only compensate Death with CTE diagnoses already made by the cutoff date. Similarly, the NFL Parties acknowledged that "the settlement fails to

---

[32] One particularly colorful objection dramatized a living room scene in a fictional Retired NFL Player's household, imagining a conversation between the Retired NFL Player and his wife and son upon receiving the Long-Form Notice. *See* ECF No. 6241, at 33-35 (Duerson Objection, Oct. 14, 2014). The fictional family did not understand the cutoff date for CTE, and the objector urged the Court to "save them from the empty promises" by sending out supplemental notice to inform readers "point blank, that NO CTE CLAIMS WILL BE PAID FOR A DEATH OCCURRING AFTER JULY 7, 2014"). *Id.* at 35.

[33] ECF No. 6201, Objection of Sean Morey, Alan Faneca, Ben Hamilton, Robert Royal, Roderick "Rock" Cartwright, Jeff Rohrer, and Sean Considine to Class Action Settlement (Oct. 6, 2014), at 57 (emphasis in original).

[34] ECF No. 6167, NFL Concussion Liability Forecast, Prepared by Thomas Vasquez Ph.D. on February 10, 2014 (Sept. 12, 2014), at 23.

[35] ECF No. 6168, Report of the Segal Group to Special Master Perry Golkin (Sept. 12, 2014), at 28, n. 18.

[36] ECF No. 6183, Co-Lead Class Counsel's Memorandum of Law in Response to Motion of Sean Morey, Alan Faneca, Ben Hamilton, Robert Royal, Roderick Cartwright, Jeffrey Rohrer, and Sean Considine for Leave to Conduct Limited Discovery (Oct. 2, 2014), at 4, n. 3 (emphasis added).

compensate CTE *diagnosed* after July 7, 2014."[37] Class Counsel and the NFL Parties also defended the notice against objectors' due process arguments.[38]

In November 2014, the NFL Parties again highlighted the diagnosis deadline: "[T]he Agreement does not (for good reason) compensate a post-mortem pathological diagnosis of CTE after preliminary approval."[39] Class Counsel similarly addressed the timing issue.[40] Reiterating that the June Agreement required "Death with CTE (post-mortem diagnosis prior to July 7, 2014),"[41] Class Counsel defended that deadline as the result of a bargained-for process: the NFL Parties drew a line in the sand on CTE, but made concessions in other areas, such as uncapping the Monetary Award Fund.[42]

On November 19, 2014, the Court conducted a Fairness Hearing.[43] Objectors again contended that the Settlement was unfair in limiting compensation for Death with CTE to diagnoses prior to preliminary approval,[44] and again the Parties defended this limit.[45] At the Hearing, objectors emphasized that the Long-Form Notice was misleading:

> When you look to the long-form notice at Section 14. . . it says that "Monetary awards are available for the diagnosis of ALS, Parkinson's Alzheimer, Level 1 neurocognitive impairment, early dementia, or death with CTE." And then they take death with CTE, along with those others, and they give it a defined term, they call it a qualifying diagnosis. And then it says, "A qualifying diagnosis may occur at any time until the end of a 65-year term of the monetary award fund." Well that's

---

[37] ECF No. 6185, Response of the NFL Parties in Opposition to Motion for Leave to Conduct Limited Discovery (Oct. 2, 2014), at 7 (emphasis added).

[38] *See* ECF No. 6184, Co-Lead Counsel's Omnibus Response to Motions (Oct. 2, 2014), at 6 ("The class notice makes clear that only claims for diagnoses of Death with CTE prior to July 7, 2014 will be paid."); ECF No. 6186, Response of the NFL Parties in Opposition to Emergency Motions (Oct. 2, 2014), at 10 ("The Settlement Class Notice also objectively and neutrally appraises all Settlement Class Members of the nature of the action and the Settlement Class claims and issues, including, as relevant here . . . that the Qualifying Diagnosis of Death with CTE includes only 'diagnoses of death with CTE prior to July 7, 2014.'").

[39] ECF No. 6422, Memorandum of Law in Support of Final Approval of the Class Action Settlement Agreement and in Response to Objections (Nov. 12, 2014), at 78-79.

[40] ECF No. 6423-1, Memorandum of Law in Support of Class Plaintiffs' Motion for an Order Granting Final Approval of Settlement and Certification of Class and Subclasses (Nov. 12, 2014), at 17 ("Subclass 2 is defined as . . . the Representative Claimants of deceased Retired NFL Football Players who were diagnosed with a Qualifying Diagnosis prior to death, or who died prior to July 7, 2014 and who received a post-mortem diagnosis of CTE.").

[41] *Id.*

[42] *See id.* at 69 ("During the negotiations, however, Class Counsel determined which conditions the NFL Parties were willing to resolve on a global basis and which they were not. In short, Class Counsel determined where the NFL Parties would draw the ultimate line and refuse to settle.").

[43] ECF No. 6449, Transcript of Fairness Hearing (held on Nov. 19, 2014, entered Nov. 28, 2014).

[44] *See id.* at 123:2-6 ("At the settlement table in this case no class representative was there to advocate for the people who died with CTE. No one. No one was advocating that post-July 7th CTE needs to be compensated.").

[45] *See id.* at 192:5-13 ("The settlement covers death with CTE preliminary approval precisely because obviously by definition players who have deceased prior to preliminary approval cannot get a qualifying diagnosis and be covered. So the coverage for death with CTE preliminary approval was an expansion of the settlement so those players who had CTE and were deceased were covered.").

certainly not true if in fact death with CTE before July 7th of 2014 is what gets you an award. So again, a player reading the long-form notice would be misled.[46]

In response, Class Counsel drew the Court's attention to "the section entitled 'What are the benefits of the settlement?'" and explained:

> That's the section. Right under there it says monetary awards for diagnosis of death with CTE prior to July 7, 2014. I think if you're reading this notice, the section if you want to know what your benefits are, you're probably going to go to the section that says, what are the benefits of the settlement? The notice does that.[47]

After the Fairness Hearing, objectors reiterated concerns about the Long-Form Notice[48] and the cutoff date for CTE.[49] And Class Counsel again underscored the prevailing understanding that the cutoff date for CTE Awards meant cutoff for date of Diagnosis, as well as date of death: "Class Counsel fought to secure recovery for the families of those who died and whose brains revealed a pathological finding of CTE before this Settlement came to fruition."[50]

On February 2, 2015, the Court suggested that the parties propose changes to the Revised Agreement.[51] The only suggestion touching CTE was that the "Qualifying Diagnosis of Death with CTE should include Retired NFL Football Players who die between preliminary approval and final approval of the Settlement."[52]

The parties offered amendments on February 13, 2015.[53] The amendments added to 6.3(f) the now controlling language that "a post-mortem diagnosis made by a board-certified neuropathologist" must be "prior to the Final Approval Date, provided that a Retired NFL Football Player who died between July 7, 2014 and the Final Approval Date shall have until 270 days from his date of death to obtain such a post-mortem diagnosis."[54] The parties jointly wrote:

> The Settlement Agreement currently provides for a Death with CTE Qualifying Diagnosis for Retired NFL Football Players who died prior to the date of the Preliminary Approval and Class Certification Order and who had a post-mortem diagnosis of CTE made by a board-certified neuropathologist.

---

[46] *Id.* at 94:15-25; 95:1-9.

[47] *Id.* at 199:5-13.

[48] The Morey Objectors, for example, contended that the settling parties' Fairness Hearing argument that "a different part of the notice clarifies that the Settlement provides recovery for 'Death with CTE *prior to July 7, 2014*'" was insufficient and that the Notice was "defective as a matter of law" for containing "both false and technically true statements." ECF No. 6455, Post-Fairness Hearing Supplemental Briefing of Objectors Sean Morey, Alan Faneca, Ben Hamilton, Robert Royal, Roderick Cartwright, Jeff Rohrer, and Sean Considine (Dec. 2, 2014), at 31.

[49] *See, e.g.*, ECF No. 6456 (Duerson Suppl. Obj., Dec. 2, 2014), at 4 ("If final approval is granted, CTE will forever disappear from the NFL's lexicon, as no player's family will ever qualify for a death benefit after July 7, 2014.").

[50] ECF No. 6467, Class Counsel's Omnibus Response to Post-Fairness Hearing Submissions (Dec. 12, 2014), at 34.

[51] ECF No. 6479, Order Proposing Changes to the Proposed Settlement Agreement (Feb. 2, 2015).

[52] *Id.* at 2.

[53] ECF No. 6481, Joint Submission in Response to the Feb. 2, 2015 Order (Feb. 13, 2015).

[54] ECF No. 6481-1, at 37.

(Settlement Agreement, Ex. 1.) The Settlement Agreement, as amended, extends this deadline from the date of preliminary approval to the Final Approval Date, which is defined as the date that the Court enters the Final Order and Judgment. (Settlement Agreement, as amended, §§2.1(mm), 6.3(f), Ex. 1.).

In addition, consistent with the Parties' intent under the original Settlement Agreement, and recognizing that obtaining such a diagnosis may take several months post-death, the Parties have provided for a grace period of 270 days following any date of death between preliminary approval and the Final Approval Date to allow Claimants to obtain the necessary diagnosis.[55]

Several objections followed on the ground that the amendments did not cure purported defects related to CTE.[56] None that I have found suggested that it was a novel requirement that the Diagnosis of Death with CTE, like the death itself, pre-date the Approval Date. And at least one filed objection strongly suggested to the contrary.[57]

The prevailing understanding of the diagnosis rule reappeared in a joint submission—filed by the NFL Parties and joined by Class Counsel—of proposed findings of fact and conclusions of law: "Post Final Approval, a post-mortem diagnosis of CTE is not compensated," with the one exception of Players who died between Preliminary and Final Approval.[58] Likewise, Class Counsel's letter notifying opt outs of the amendments stated that to receive an Award for Death with CTE, Retired Players needed to have "received a post-mortem diagnosis by the date of the Final Approval (or 270 days following any death between Preliminary Approval and Final Approval to allow time for the necessary diagnosis)."[59]

On April 22, 2015, Judge Brody, approving the amendments, found that because "these changes improved the deal for Class Members without providing any concessions to the NFL Parties, an additional round of notice for Class Members is unnecessary."[60] She stated that the relevant change to the CTE benefit was that it (now) "compensates Death with CTE up until the Final Approval Date, instead of the Preliminary Approval Date."[61]

Judge Brody also considered objections to the Long-Form and Summary Notices:

The Summary Notice states that only "certain cases of chronic traumatic encephalopathy" receive Monetary Awards. Summary Notice at 1 (emphasis

---

[55] ECF No. 6481 at 4-5 (cleaned up).
[56] *See, e.g.*, ECF No. 6503 (Armstrong Suppl. Obj., Apr. 13, 2015); ECF No. 6484 (Miller Suppl. Obj., Feb. 27, 2015).
[57] *Cf.* ECF No. 6484 (suggesting that the amendment created a perverse change which could motivate player suicide by making a deadline for benefits in the future, the final approval date, and not in the past).
[58] ECF No. 6497, Class Counsel and the NFL Parties' Joint Proposed Findings of Fact and Conclusions of Law in Support of Final Approval of the Class Action Settlement (Mar. 12, 2015), at 38.
[59] ECF No. 6500-1, Notice to Opt-Outs (Mar. 31, 2015), at 2.
[60] ECF No. 6509, Memorandum Regarding Final Approval of the Settlement (Apr. 22, 2015), at 56.
[61] *Id.* at 78.

added). In context, this is more than adequate: none of the other Qualifying Diagnoses listed contain any type of limiting language . . .

Objectors unsuccessfully argue that the Long-Form Notice is also misleading. Objectors concede that that the Long-Form Notice states that compensation is limited to "diagnoses of Death with CTE prior to July 7, 2014." Yet they maintain that this statement is misleading because it "does not outright disclose" that those who die after that date will not be compensated. This is not enough to confuse a careful reader . . . Objectors further argue that the Long-Form Notice is confusing because the term "Death with CTE" appears several times without the accompanying cutoff date. See Morey Obj. at 43- 44. Both the Summary Notice and the Long-Form Notice indicate that only "certain" cases of CTE are covered. See Summary Notice at 1; Long-Form Notice at 1.

Even if the Long-Form Notice were unclear, it repeatedly instructs readers to sources that can answer their questions. Like the Summary Notice, the Long-Form Notice contains a banner at the bottom of each page directing those with "Questions?" to call a toll-free support number or visit the Settlement Website. Warnings that the Long-Form Notice is only a summary and that readers should look to the Settlement for specific details appear five times in the Long-Form Notice. . .[62]

Finally, Judge Brody wrote that the "Parties provided compensation for Death with CTE until the Final Approval Date because they recognized that Retired Players who died prior to final approval did not have sufficient notice that they had to obtain Qualifying Diagnoses."[63]

The Third Circuit, approving the Settlement, held "that the content of the class notice . . . satisfied Rule 23 and due process."[64] It also found "that the settlement's treatment of CTE does not render the agreement fundamentally unfair."[65]

Almost a year after final denial of certiorari, on August 15, 2017, Settlement Class Member Yvonne Sagapolutele moved to "Modify the Amended Final Order and Judgment."[66] That motion argued that the Amended Settlement Agreement's diagnosis deadline was neither contemplated

---

[62] *Id*. at 51-52 (internal citations omitted) (paragraph breaks added).

[63] *Id*. at 81.

[64] In re Nat'l Football League Players Concussion Injury Litig., 821 F.3d 410, 435-36 (3d Cir. 2016), amended (May 2, 2016), cert. denied, 137 S. Ct. 591 (2016), and cert. denied, 137 S. Ct. 607 (2016). The Third Circuit, in the context of another class action settlement, refused to revisit its earlier ruling on the adequacy of notice. *See* In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Prod. Liab. Litig., 385 F.3d 386, 396 (3d Cir. 2004) ("Moreover, this Court has already addressed the notice and adequacy of representation with respect to the original Settlement Agreement and we found the requirements of due process satisfied . . . Due process does not require this Court to entertain challenges to adequacy of notice and representation every time any case related to a class action judgment comes up on appeal.").

[65] *In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d, at 444.

[66] ECF No. 8263, Motion to Modify the Amended Final Order and Judgment (Aug. 15, 2017).

by the June Agreement, nor fairly presented in the Notices.[67] As far as I have been able to tell, this was the first time that *anyone* articulated a reading of the June Agreement which would permit post-Approval Date diagnoses so long as a Player's death preceded it.[68]

Judge Brody denied that motion without prejudice on October 26, 2017, stating that "[b]efore Plaintiff can attempt the extraordinary action of modifying the Settlement Agreement, she must first show that she would be entitled to recover but for the Death with CTE diagnosis deadline," and noting that the due process argument could be raised in the claim appeal process.[69]

## 2. **Procedural History of Today's Claims**

I now turn back to today's Claims. Ms. Cornish and Ms. Hastings filed their respective Claims on February 6, 2019. Cornish Doc. 199403; Hastings Doc. 198425. Dr. Ronald Hamilton, a board-certified neuropathologist, provided an undated letter stating that he examined the late Mr. Cornish's brain tissue using "three H&E stained slides" received from the Tarrant County Medical Examiner. Cornish Doc. 199405. Dr. Hamilton concluded that the "histopathologic findings are diagnostic of CTE" and that "Frank Cornish had CTE." *Id.* Dr. Hamilton provided a similarly undated letter stating that he examined the late Mr. Mims' brain tissue using "10 unstained slides from 8 tissue blocks" received from the Los Angeles County Department of Medical Examiner-Coroner. Hastings Doc. 199435. He concluded that his "findings are diagnostic of CTE" and that "Christopher Mims had CTE." *Id.*

As counsel has now confirmed, Dr. Hamilton's undated examination and diagnoses of both Mr. Cornish and Mr. Mims in fact post-dated April 22, 2015. Cornish Doc. 284510 at 8; Hastings Doc. 284543 at 8.

The Claims Administrator denied Ms. Cornish's Claim on June 25, 2019, and Ms. Hastings' Claim on July 30, 2019. Cornish Doc. 209824; Hasting Doc. 211985. Both Claimants appealed. Cornish Doc. 210928; Hastings Doc. 213485. On September 26, 2019 (for Ms. Cornish) and October 31, 2019 (for Ms. Hastings), Special Master Pritchett denied the Appeals, stating for each that "Appellant did not show clear and convincing evidence of error in the Claims Administrator's decision." Cornish Doc. 215686; Hastings Doc. 217483.

---

[67] *Id.*

[68] Some class members erroneously believed that the June Agreement would permit post-Approval Date diagnoses of post-Approval Date deaths. *See* ECF No. 6345, at 3 (Williams Objection, Nov. 3, 2014) ("Players diagnosed with CTE (living) today, have to kill themselves or die for their family to ever benefit."); ECF No. 6347, at 1 (Flint Objection; Nov. 3, 2014) ("It seems an injustice not to consider CTE in a living player because we cannot enjoy the benefits dead. I love my family and would like for them to be compensated if that condition is found but as a player I would rather my family and I could enjoy the benefits together while I'm alive."). And a few objectors argued that Representative Claimants of Retired NFL Players who died before January 1, 2006, should be able to prove Death with CTE by alternative means other than a post-mortem diagnosis by a board-certified neuropathologist. *See* ECF No. 6222 (Komlo Objection, Oct. 14, 2014); ECF No. 6362 (O'Hanley Objection, Nov. 3, 2014). But none of these objections raise the situation at issue here: that a Retired NFL Player might die between January 1, 2006, and the Approval Date and receive a diagnosis of Death with CTE by a board-certified neuropathologist after the Approval Date.

[69] ECF No. 8557, Order Denying Motion to Modify the Amended Final Order and Judgment (Oct. 26, 2017), at 1.

Judge Brody remanded both Claims for further explanation, noting that the Special Master's decision "did not specify whether . . . [it] applied to *both* of the Claims Administrator's reasons or only *one* of those reasons" for denial. Cornish Doc. 225723 at 1; Hastings Doc. 225731 at 1. On July 15, 2020, I denied Ms. Cornish's Claim after remand, writing:

> The Claims Administrator denied Ms. Cornish's claim for two independent reasons.
>
> First, the claim was denied based upon a lack of proof that the diagnosis was timely. I find that there is no evidence that the diagnosis of Death with CTE was obtained before the appropriate deadline.
>
> Second, the claim was denied for failure of the diagnosing physician to personally examine the Player's brain tissue. However, the evidence suggests that Dr. Hamilton did examine the late Mr. Cornish's brain tissue as is necessary to diagnose Death with CTE.
>
> The Claims Administrator correctly concluded that Ms. Cornish failed to show that the diagnosis was obtained before the appropriate deadline. I thus affirm the denial solely on the first basis.

Cornish Doc. 226586 at 4.

I similarly denied Ms. Hastings' Claim, writing:

> The Claims Administrator denied Ms. Hastings' claim for two independent reasons. First, the claim was denied based upon a lack of proof that the diagnosis was timely. I find that there is no evidence that the diagnosis of Death with CTE was obtained before the appropriate deadline. Second, the claim was denied for failure of the diagnosing physician to personally examine the Player's brain tissue. However, the evidence suggests that Dr. Hamilton did examine the late Mr. Mims' brain tissue as is necessary to diagnose Death with CTE.
>
> The Claims Administrator correctly concluded that Ms. Hastings failed to show that the diagnosis was obtained before the appropriate deadline. I thus affirm the denial solely on the first basis.

Hastings Doc. 226585 at 4.

On February 24, 2023, Judge Brody remanded both Claims for a second time, instructing the Special Masters to return them to the Claims Administrator "to further determine the sufficiency of the claims packages." Cornish Doc. 278160 at 2; Hastings Doc. 278167 at 2. This Order required the Claims Administrator to ensure that Dr. Hamilton's examination of the

decedents' tissue substantively and sufficiently supported a Diagnosis of Death with CTE in each Claim. It did not conclude that the Claims were timely.

The Claims Administrator, after assigning the files to a member of the Appeals Advisory Panel (AAP), assured itself that Dr. Hamilton's analysis substantively and sufficiently supported a Diagnosis for both Claims. Cornish Doc. 282802; Hastings Doc. 282803. The Claims Administrator then denied both Claims on the sole basis that the relevant Diagnoses were untimely. Cornish Doc. 282802; Hastings Doc. 282803.

Both Representative Claimants appealed. Cornish Doc. 284510; Hastings Doc. 284543.

<div align="center">

### DISCUSSION

</div>

I make the following factual findings.

(1) Dr. Hamilton is a board-certified neuropathologist;
(2) Dr. Hamilton examined slides containing Mr. Mims' and Mr. Cornish's brain tissue and diagnosed them both posthumously with CTE;
(3) Dr. Hamilton's examinations post-dated April 22, 2015;[70]
(4) But for their timing, those examinations sufficiently supported an Award of Death with CTE under Section 6.3(f) of the Amended Settlement Agreement.

These factual findings clarify what remains to be decided. Both Claimants satisfy the Settlement's requirement that a board-certified neuropathologist diagnosed the Retired NFL Players with CTE after posthumous examination of brain tissue.[71] However, both Diagnoses post-date April 22, 2015, and are therefore untimely under Section 6.3(f) of the Amended Settlement Agreement. Claimants offer two reasons why the untimeliness of Dr. Hamilton's examinations and diagnoses should not preclude their recovery.

### 1. Claimants' Diagnosis Deadline Argument

*First*, Claimants state that the "claims package is not insufficient based on the purported untimeliness of the diagnosis because the date of the Qualifying Diagnosis is the date of the Player's

---

[70] I cannot make a finding as to the precise day on which the examinations and the diagnoses occurred because the relevant letter is undated and counsel has not disclosed the date. Counsel concedes only that the examination occurred after April 22, 2015. *See* Cornish Doc. 284510 at 8 ("The Claims Administrator has again denied Class Member's claim because Dr. Hamilton's CTE diagnosis was not made before April 22, 2015, which is the Final Approval Date for the Amended Settlement."); Hastings Doc. 284543 at 8 (same).

[71] As the Court wrote in the Final Order and Judgment approving the Settlement, "no one can conclusively say that someone had CTE until a scientist looks at sections of that person's brain under a microscope to see if abnormally phosphorylated tau protein ('abnormal tau protein') is present, and if so whether it is present in a reportedly unique pattern." In re Nat'l Football League Players' Concussion Injury Litig., 307 F.R.D. 351, 391 (E.D. Pa. 2015). To conclusively diagnose CTE, therefore, the diagnosing neuropathologist must examine the deceased Player's brain tissue.

death, even though the diagnosis is not made until after the Player Dies." Cornish Doc. 284510 at 8; Hastings Doc. 284543 at 8. Claimants rely on FAQ #99 (from 2019), now restyled as FAQ #100:

> The physician making a Qualifying Diagnosis of a Retired NFL Football Player must determine and verify the date on which that Qualifying Diagnosis was made. This date is important under the Settlement Agreement. It affects the amount of a Monetary Award, because the younger a Player is at the time of the Qualifying Diagnosis, the larger the award. The diagnosing physician uses his or her professional medical judgment in deciding when the Player had the conditions amounting to a Qualifying Diagnosis under Exhibit 1 to the Settlement Agreement. There are some basic rules about this: … (a) *Death with CTE*: For these claims, the date of the Qualifying Diagnosis is the date of the Player's death, even though the diagnosis is not made until after the Player dies. The Monetary Award is based on the Player's age when he died. [72]

The FAQ is awkwardly phrased. But contrary to Claimants' supplemental briefing, the FAQ is not part of "the language in the amended settlement agreement." Cornish Doc. 289319 at 1; Hastings Doc. 289320 at 1.

Given the Amended Settlement's text at 6.3(f), which controls, and the FAQ's preamble language, the FAQ must set the date from which *payment* for the Diagnosis is calculated for the Program's payment grid, not the moment at which the Diagnosis occurs. Any other result would run afoul of the text of the Amended Settlement.[73]

That's because Section 6.3(f) creates two conditions for recovery: the date of the Qualifying Diagnosis *and* the date of the neuropathologist's post-mortem examination must be prior to April 22, 2015. Claimants would collapse these two into one, writing the second out of the Agreement entirely. And since the Diagnosis must be "made by" a neuropathologist, it cannot occur automatically at the time of death. Relying on this text, I conclude that a Diagnosis for the purposes of 6.3(f) of the Amended Settlement Agreement occurs when a board-certified neuropathologist personally examines the decedent's brain tissue and concludes that it is marked by CTE.

## 2. **Claimants' Due Process Argument**

In the alternative, Claimants argue:

> [T]he language the Claims Administrator relies on could not have added a diagnosis-date requirement because it was added to the settlement agreement after

---

[72] *Frequently Asked Questions: FAQ #100* (How is the date of a Qualifying Diagnosis determined?), NFL CONCUSSION SETTLEMENT, https://www.nflconcussionsettlement.com.

[73] *See* Special Master Ruling on Untimely Claim Package, at 3 (Oct. 10, 2022), https://www.nflconcussionsettlement.com/Docs/untimely_claim_package_SM.pdf ("FAQs cannot create rights the Settlement disclaims."). The Claims Administrator should revise FAQ #100 to make it even more clear.

the opt out deadline without notice to Class Member and other absent class members. In all notices that were provided regarding the settlement agreement, Class Member and other absent class members were told they could obtain a CTE diagnosis at any time within the 65-year life of the Monetary Award Fund.

Cornish Doc. 284510 at 8; Hastings Doc. 284543 at 8.

Having considered the record with care, I am convinced that this argument is without factual or legal merit.[74] Analytically, the first step in proving that the Amended Settlement Agreement unfairly curtailed Claimants' rights would be to show that the June Agreement *lacked* a cutoff for Diagnoses of Death with CTE. If the June Agreement had such a rule, and was so-understood at the time, amending it to add more words to the same effect could not violate due process.

The question then is how to best interpret the June Agreement. It, like the Amended Settlement Agreement, was a (proposed) contract governed by New York law.[75] The Third Circuit interprets settlement agreements as contracts,[76] including when applying New York law.[77] And yet, because of the unique way in which "a court retains special responsibility to see to the administration of justice" in a class action settlement, exclusive reliance on "black-letter contract law is unavailing."[78] In addition to ascertaining the parties' intent using ordinary contract law

---

[74] I gave the parties to this Appeal an opportunity to file supplementary submissions. Ms. Cornish, Ms. Hastings, and the NFL Parties did so. Cornish Docs. 289333; 289319; Hastings Docs. 289332; 289320. Class Counsel did not.

[75] ECF No. 6087, at 93 ("Notwithstanding any contrary law applicable to the underlying claims, this Settlement Agreement and the Releases hereunder will be interpreted and enforced in accordance with the laws of the State of New York, without regard to conflict of law principles.").

[76] *See* Sullivan v. DB Investments, Inc., 667 F.3d 273, 312 (3d Cir. 2011) ("It is well established that 'settlement agreements are creatures of private contract law.'") (quoting Bauer v. Trans. Sch. Dist. of City of St. Louis, 255 F.3d 478, 482 (8th Cir. 2001); Ehreart v. Verizon Wireless, 609 F.3d 590, 594 (3d Cir. 2010) ("We have no doubt that the settlement agreement reached in this case is a binding and enforceable contract under general principles of contract interpretation."). Like the settlement agreement in *Ehreart*, here the Settlement "was negotiated through and executed by experienced counsel on both sides, following mediation with a well-respected and experienced mediator." *Id.*

[77] *See* In re Cendant Corp. Prides Litig., 233 F.3d 188, 193 n.6 (3d Cir. 2000) (applying "New York contract law, which governs this case" to interpreting provisions in a settlement agreement). New York law interprets settlements as it does contracts. Brad H. v. City of New York, 951 N.E.2d 743, 746 (N.Y. 2011) ("The settlement agreement is a contract and its meaning must be discerned under several cardinal principles of contractual interpretation. A written agreement that is clear, complete and subject to only one reasonable interpretation must be enforced according to the plain meaning of the language chosen by the contracting parties."); Cordero v. Transamerica Annuity Service Corp., 211 N.E.3d 663, 670 (N.Y. 2023) (looking to "what the parties would have expected under the contract" to interpret a structured settlement agreement).

[78] *Id.* at 194. Some have argued for a "distinctive interpretive regime" to adjudicate disputes about contractual meaning in Settlements. *See* Howard M. Erichson & Ethan J. Leib, *Class Action Settlements as Contracts?*, 102 N. C. L. Rev. 1, 6 (forthcoming 2023) ("Our argument is that structural facts about class action settlements—both the nature of their binding effect and the dynamics of their negotiation—militate in favor of an interpretive approach that brings skepticism to the idea that the judge's role in these contexts is merely to promote the 'intent of the parties.'"). I am governed by the Third Circuit's approach, as *Cendant* lays out.

principles, the Court also retains responsibility "for the protection of class members" until the settlement fund has been distributed.[79]

Under New York law, the "fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent."[80] The best evidence of parties' intent comes from "a written agreement that is complete, clear and unambiguous on its face."[81] Only if the agreement is ambiguous, i.e., not "reasonably susceptible of only one meaning," may a court consider extrinsic evidence of parties' intent.[82]

I start with the June Agreement's text.

### a. The Settlement's Plain Meaning

Paragraph 6.3(f) of the June Agreement creates a cutoff for the date of Death with CTE. Whether it does so for the date of Diagnosis is less clear. This is the key text:

> Qualifying Diagnosis of Death with CTE shall be made only for Retired NFL Football Players who died prior to the date of the Preliminary Approval and Class Certification Order [i.e., July 7, 2014], through a post-mortem diagnosis by a board-certified neuropathologist of CTE.[83]

Claimants assert that this language creates no deadline for diagnoses of Death with CTE at all. But that is not a plausible interpretation.

*First*, the text connects the Player's death to a post-mortem diagnosis using the function word "through," while offering only one date by which those events can occur. Since most post-mortem diagnoses are proximate to death,[84] the most natural reading is that the drafters intended that diagnoses and death would be subject to the same cutoff date. Given that intuitive connection, had the parties intended there to be no deadline for diagnoses, it would be reasonable to expect that 6.3(f) would have stated such a surprising outcome expressly.

*Second*, other parts of the June Agreement indicate that CTE diagnoses would be proximate to death. Namely, the Subclass 2 definition paragraph, which gives 6.3(f) its scope, encompasses those who died prior to the Approval Date "and" who "received" a post-mortem diagnosis of

---

[79] Cendant Corp. Prides, 233 F.3d at 194.
[80] Greenfield v. Phillies Records, Inc., 780 N.E.2d 166, 170 (N.Y. 2002).
[81] *Id.*
[82] *Id.*
[83] ECF No. 6087, at 32.
[84] New York looks to Black's Law Dictionary to aid in ascertaining the plain meaning of contested terms. *See, e.g.*, De La Cruz v. Caddell Dry Dock & Repair Co., Inc., 997 N.E.2d 1223, 1227-1228 (N.Y. 2013). The 10th edition of Black's Law Dictionary—contemporaneous with the June Agreement—refers readers looking for "postmortem examination" to "autopsy," and defines "autopsy" in turn as a "medical examination of a corpse to determine the cause of death, esp. in a criminal investigation." *Black's Law Dictionary* (10th ed. 2014). The inclusion of "corpse" implies that the examination occurs close in time to the death.

CTE.[85] The conjunctive word strongly implies that the diagnosis and the death must both happen prior to the same event. Additionally, the past tense of "received" is evidence that the diagnosis needed to have happened already—before the Preliminary Approval Date. Again, had the parties intended an open-ended diagnosis deadline, with all the long-tail risk that such a deadline would create, they would have phrased this as those who died prior to the Approval Date and who "receive" a post-mortem diagnosis of CTE.

*Third*, the June Agreement's exhibits offer still more textual evidence. The June Agreement provides that "its exhibits, attachments, and appendices will constitute the entire agreement and understanding among the parties" and that "[a]ll of the exhibits attached hereto are hereby incorporated by references as though fully set forth herein."[86] As I have already indicated, the draft Long-Form Notice explicitly cut-off CTE awards in time: "diagnoses of . . . Death with CTE prior to [Date of Preliminary Approval Order]."[87] This fits with the other textual evidence to form a coherent picture.

But the following Q&A then seemingly muddied the waters:

> Monetary awards are available for the diagnosis of ALS, Parkinson's Disease, Alzheimer's Disease, Level 2 Neurocognitive Impairment (*i.e.*, moderate Dementia), Level 1.5 Neurocognitive Impairment (*i.e.*, early Dementia) or Death with CTE (the "Qualifying Diagnoses"). A Qualifying Diagnosis *may occur at any time until the end of the 65-year term of the Monetary Award Fund.*[88]

This language is confounding, but needs to be harmonized with the rest of the text.[89] Given the plain text of 6.3(f), the Subclass 2 definition, and the notice limiting "Monetary awards for diagnoses of . . . Death with CTE prior to [Date of Preliminary Approval Order],"[90] the overall effect is reasonably clear. The specific and explicit CTE deadline controls the more general Q&A's "at any time" statement, under the *noscitur a sociis* principle, and following the text's injunction to have the exhibits give way to the main text.[91] New York courts read contracts as a whole, making

---

[85] ECF No. 6087, at 126.

[86] ECF No. 6073-2, at 96 §§ 30.3, 30.5. The notices do not determine the Class's rights; the Settlement Agreement itself does. I include them here as interpretive evidence. As the NFL Parties point out, Ms. Cornish and Ms. Hastings received the final notice, which is clearer than the draft notice with respect to the diagnosis deadline for Death with CTE.

[87] ECF No. 6073-2, at 147.

[88] *Id.* at 151 (emphasis added).

[89] Indeed, it must be, as the June Agreement provides that "Notwithstanding the foregoing, any inconsistency between this Settlement Agreement and any attachments, exhibits, or appendices hereto will be resolved in favor of this Settlement Agreement." ECF No. 6073-2, at 96, § 30.3.

[90] ECF No. 6073-2, at 147.

[91] *See supra* note 89; *see also* Ethan J. Leib, *The Textual Canons in Contract Cases: A Preliminary Study*, 5 Wis. L. Rev. 1109, 1118 (2022) ("This canon holds that courts should know words by their associates and interpret more comprehensive words in a series to be limited by the more specific and less comprehensive enumerated items.").

each provision fit with others to the extent possible.[92] Simply put, it makes no sense in context for the drafters to have created a deadline for Death with CTE but not its diagnosis without making that concession explicit. The most natural plain reading is that a Diagnosis must occur by the Date of the Preliminary Approval Order.

True, the June Agreement's 6.3(f) text is not as clear as it could have been—nor as explicit as the same paragraph in the Amended Settlement Agreement became. But a "contract's silence on an issue" does not, by itself, create an ambiguity that can be resolved by extrinsic evidence.[93] Rather, an ambiguity only arises out of "what was written so blindly and imperfectly that its meaning is doubtful."[94] I have just explained why I do not think it likely that a New York court would find that 6.3(f)'s apparent silence on the diagnosis deadline creates such an ambiguity. But I concede that some might identify in 6.3(f) a gap—and thus a latent ambiguity—to be filled.

### b. Contemporaneous Extrinsic Evidence

I predict that if a New York court were to find the June Agreement ambiguous about whether it contains a diagnostic deadline, that ambiguity would be conclusively resolved by contemporaneous extrinsic evidence of the parties' publicly expressed intent.[95]

"There is no surer way to find out what parties meant, than to see what they have done."[96] The Settlement's procedural history between June 2014 and February 2015 offers just this—a kind of practical construction.[97] I reviewed that evidence extensively above. Since it was pre-dispute, public, intended to probe June Agreement's function, and subject to contestation, it provides highly reliable evidence of meaning.[98] I predict a New York court would find it invaluable in

---

[92] *See* Ellington v. EMI Music, Inc., 21 N.E.3d 1000, 1003 (N.Y. 2014) ("Where the terms of a contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract, giving a practical interpretation to the language employed and reading the contract as a whole.").

[93] Donohue v. Cuomo, 184 N.E.3d 860, 866 (N.Y. 2022).

[94] *Id.* at 867 (quoting Trustees of Southampton v. Jessup, 173 N.Y. 84, 90 (1903)).

[95] *Cf.* Evans v. Famous Music Corp., 807 N.E.2d 869, 873 (N.Y. 2004) (turning first to, and relying on, extrinsic evidence of how parties behaved under a set of royalty contracts "for guidance as to which interpretation should prevail" with respect to an "ambiguity" in those contracts).

[96] Brooklyn Life Ins. Co. of New York v. Dutcher, 95 U.S. 269, 273 (1877) (*quoted with approval in* Town of Pelham v. City of Mount Vernon, 304 N.Y. 15, 23 (1952). Indeed, the "best evidence of the intent of the parties to a contract is their conduct after the contract is formed." Waverly Corp. v. City of New York, 851 N.Y.S.2d 176, 179 (1st Dept. 2008).

[97] Admittedly, it is somewhat unclear how to characterize the extrinsic evidence here. The June Agreement was not the parties' final word, and they never performed under the original 6.3(f). It is thus not classically "course of performance" evidence. But it is not course of negotiation or course of dealing either, and, like other kinds of practical construction, it demonstrates what the parties thought about the relevant contract language before they had incentives to behave strategically.

[98] Overall, "the parties' practical construction of the provision at issue during the course of performance . . . is given the greatest weight" relative to other types of extrinsic evidence, such as course of dealings and custom and usage. 28 GLEN BANKS, N.Y. PRAC., CONTRACT LAW § 9:28 (2023).

resolving ambiguity. In so concluding, I follow courts interpreting settlement agreements that relied on contemporaneous motion practice to determine meaning.[99]

Starting with the Proposed Class Counsel Memorandum of June 25, 2014, which introduced the June Agreement, the drafting parties themselves made crystal clear that they intended the dual deadline. In that document, proposed Class Counsel stated twice that for Death with CTE, a "post-mortem diagnosis prior to the date of the Preliminary Approval and Class Certification Order" was required.[100] Proposed Class Counsel's Motion for Approval of Completed Versions of Long-Form Notice and Summary Notice of July 8, 2014 included the Long-Form Notice, which explained that the June Agreement established "[m]onetary awards for diagnoses of Death with CTE prior to [the Date of the Preliminary Approval Order, i.e.,] **July 7, 2014**."[101] This language resulted from edits to the Notice from its draft to completed versions in early July, 2014, sharpening the dual deadline.[102] And the NFL Parties' response to multiple objections in the Fall reinforces the point: the drafting parties all believed that the June Agreement cut off CTE diagnoses as of July 7, 2014.[103]

Claimants point to one phrase in the *distributed* Long-Form Notice, stating that Qualifying Diagnoses may occur at any time. But as I've just referenced, both the distributed and draft Notice even more specifically state that "diagnoses" of CTE must occur prior to July 7, 2014, and followed a memorandum making that deadline explicit. As Class Counsel argued in the Fairness Hearing, a reasonable reader of the Notice and the June Agreement could not have concluded that the deadline to obtain a Diagnosis was open-ended.

Further resolving any doubts, the Long-Form Notice directed the reader to multiple other resources which reinforced the dual deadline.[104] At the bottom of every page of the Long-Form Notice was a banner which directed readers to call a toll-free number or visit the Settlement website for more information.[105] On the Settlement website, Class Members could find the Settlement Agreement itself, the Court's preliminary order and opinion, Class Counsel's motions in support of preliminary approval, and Frequently Asked Questions which provided—once again—the toll-free hotline Class Members could use to get their questions answered.[106] The written sources, at the very least, would have reinforced the diagnostic deadline.

---

[99] *See, e.g.,* Boston Exec. Helicopters, LLC v. Maguire, 45 F.4th 506, 511, 519 (1st Cir. 2022) (relying in part on parties' "motion practice regarding the terms of the settlement" to hold that the "lead-up to the signing of the settlement agreement resolves any relevant ambiguity about the meaning of the term 'standard form, non-exclusive lease' as intended by the parties"); Jensen v. Minnesota Department of Human Services, 897 F.3d 908, 915 (8th Cir. 2018) (relying in part on parties' court-filed letters, reports, responses, motions, and memoranda throughout a relevant time period to resolve an ambiguity in a class action settlement).

[100] ECF No. 6073-5, at 14, 25.

[101] ECF No. 6086-1, at 7 (emphasis in original).

[102] *Compare* ECF No. 6073-2, at 147 (draft version) *with* ECF No. 6086-1, at 7 (completed version).

[103] *See supra* at the record described in notes 34 through 39.

[104] *See* ECF No. 6422, at 177 (listing the various resources class members could access in addition to the Long-Form Notice on the Settlement website).

[105] Long-Form Notice, NFL CONCUSSION SETTLEMENT, https://www.nflconcussionsettlement.com/Docs/Long-Form%20Notice.pdf.

[106] ECF No. 6422, at 177.

That all said, the Third Circuit has stated that contract interpretation of a class action settlement must attend to the class's interests, not just the parties' expressed intent. I take that to mean that the class's reasonable expectations—the received meaning of the language—should bear some interpretative weight. To that end, I have searched the record in vain to find any examples of *anyone* reading the June Agreement as the Claimants did before 2017. Rather, multiple objectors to the June Agreement contemporaneously stated it meant that the deadline applied to Diagnoses *and* deaths. Their arguments—that this deadline was arbitrary and not clearly communicated in the Long-Form Notice—reinforce the prevailing understanding that the CTE *Diagnosis* deadline was real, controversial, and distinct from other parts of the Agreement.[107]

The Morey objectors' July 2, 2014 filing is illustrative.[108] After arguing that it was unfair that "the settlement would compensate only those few cases of CTE detected before preliminary approval of the settlement, to the exclusion of all future cases,"[109] the document goes on to argue that in an attempt to "***sell*** the settlement to players," neither Notice "explains—or so much as indicates—that while ***past*** diagnosed cases of CTE are covered if a class member dies before preliminary approval, ***no future cases of CTE post-preliminary approval are covered***."[110] These parties, and many others, were clear that the June Agreement created a binding dual deadline.[111]

In their supplemental briefing, Claimants point to a hypothetical raised in the Morey objection from October of 2014: "Thus, while CTE found in a retired player who died on the eve of preliminary approval allows a $4 million payment, that same condition goes uncompensated if the player dies one day later, after preliminary approval."[112] Claimants argue that this hypothetical proves that the June Agreement had no diagnosis deadline because "[i]f that were the case, it would be impossible for any hypothetical player who died shortly before the preliminary approval date to obtain a post-mortem diagnosis in time." Cornish Doc. 289319 at 8; Hastings Doc. 289320 at 8.

But this hypothetical cuts against Claimants' preferred interpretation. It was the unfairness of just such a scenario—a death that could not be immediately diagnosed—that led the District Court to suggest, and the parties to adopt, an amendment to allow time to obtain a diagnosis. As the NFL Parties explain in their supplemental briefs:

---

[107] *See generally supra* at pages 5 though 9.

[108] ECF No. 6082.

[109] *Id.* at 22.

[110] *Id.* at 39-40 (emphasis in original).

[111] Judge Brody's memorandum approving the Amended Settlement appears to confirm that understanding. As she wrote: the "*Parties provided compensation for Death with CTE until the Final Approval Date* because they recognized that Retired Players who died prior to final approval did not have sufficient notice that they had to obtain Qualifying Diagnoses." ECF No. 6509, at 81 (emphasis added). In approving that result, as well as the relevant notices against due process challenges, Judge Brody specifically denied that the Notice was unlawfully confusing or obscure. *Id.* at 52 ("Even if the Long-Form Notice were unclear, it repeatedly instructs readers to sources that can answer their questions.").

[112] ECF No. 6201, at 40.

The 270-day grace period would be wholly superfluous if there were no diagnosis deadline in the [June Agreement], as moving the date of death deadline to Final Approval would have been sufficient to expand that benefit. If, as [Claimants argue], the [June Agreement] required only that a Retired Player died prior to the deadline in order for a diagnosis made at *any unlimited future date* to be timely, the February 2015 amendments would not have added language providing that a Retired Player who died between July 7, 2014 and April 15, 2015 "*shall have until 270 days from his date of death to obtain such a post-mortem diagnosis.*"

Cornish Doc. 289333 at 8; Hastings Doc. 289332 at 8.

I conclude that the June Agreement would have denied recovery for a Death with CTE that preceded July 7, 2014, but which was diagnosed by examination of brain tissue after that date. I reach that view by focusing on the plain text of the June Agreement itself. My interpretation finds further support in (i) the papers that moved the June Agreement to the Court's attention; (ii) the explicit statement of a timing rule for CTE diagnoses in the distributed Long-Form Notice; and (iii) the subsequent months of reactions to those developments, which affirmed that the diagnostic cutoff matched that for Death with CTE.

Given this interpretation of what the June Agreement would have compelled had *it* been the operative document in this Settlement, I cannot agree that the proposed February Amendments, later approved in April 2015, cut back on Claimants' rights by making 6.3(f) more explicit. Those amendments, as Judge Brody already held, improved the deal without taking rights away. Claimants' Appeal must fail at its first step: they cannot show that they were harmed by the 2015 amendments.

I will go no further. I agree with Claimants that if the June Agreement contained no diagnostic deadline, the due process consequences would be complex. Claimants argue that new notices should have been required, and that they should be able to amend the Agreement now in their favor. The NFL Parties deny that result, defending the accuracy and completeness of the Long-Form Notice that Claimants received. Both parties appear to ask me to resolve this aspect of Claimants' due process challenge.

But my limited charge is "to take all steps necessary to faithfully oversee the implementation and administration of the Settlement Agreement."[113] The relevant Notices and Agreement have been approved by the District Court and the Third Circuit: it goes well-beyond my writ to opine on their legality. I will leave further due process questions to the District Court, should it see the need to reach them.

I merely interpret the (operative) April 2015 Amended Class Action Settlement and the proposed June 2014 Agreement to contain the same basic requirement for an Award of Death with

---

[113] Settlement Agreement, Section 10.1(a)(ii).

CTE: that the post-mortem Diagnosis, by a board-certified neuropathologist, occur by the relevant Approval Date.[114]

<div align="center">

## CONCLUSION

</div>

Ms. Hastings and Ms. Cornish are Representative Claimants for Retired Players who died in 2008 and suffered from CTE. For the purposes of the Amended Settlement Agreement, both sufficiently demonstrated the latter fact through a post-mortem diagnosis by a neuropathologist. But both diagnoses occurred after April 22, 2015.

As such, their diagnoses came too late under the Amended Settlement Agreement, Section 6.3(f). The Claims Administrator correctly applied the Amended Settlement Agreement's clear textual command.

At the urging of the parties to these Appeals, I have analyzed whether this outcome would have arisen under the proposed Agreement of June 25, 2014. I conclude that the requirement that death and diagnosis both occur prior to the final approval date was not novel to the Amended Agreement but was present in the June Agreement as well.

Both Claimants argue that application of Section 6.3(f) raises due process issues. They can renew those arguments, as well as any objections to my analysis of the June Agreement, in the District Court.[115] The Appeals are denied.


Date: October 7, 2023

David Hoffman, Special Master


---

[114] They are not precisely the same for those Claimants dying between June 2014 and April 2015, who receive in the Amended Agreement the right to recover for Diagnoses occurring up to 270 days from death.

[115] I certify that my contract interpretation discussion is reviewable *de novo* under FRCP 53(f)4 and the Rule 31 of the Rules Governing Appeals of Claim Determinations. Only my factual conclusions, on page 13, are final.



# NFL CONCUSSION SETTLEMENT
*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

## POST-APPEAL NOTICE OF DENIAL OF MONETARY AWARD CLAIM
### DATE OF NOTICE: October 13, 2023
### DEADLINE TO SUBMIT OBJECTION TO SPECIAL MASTER'S DECISION: November 2, 2023

### I. SETTLEMENT CLASS MEMBER INFORMATION

| | | | | |
|---|---|---|---|---|
| **Settlement Program ID** | 950012548 | | | |
| **Name:** | First<br>Robin | | M.I.<br>B | Last<br>Cornish |
| **Settlement Class Member Type** | Representative Claimant | | | |
| **Lawyer** | O'Hanlon, Demerath & Castillo | | | |
| **Qualifying Diagnosis** | Death with CTE (Chronic Traumatic Encephalopathy) | | **Date of Qualifying Diagnosis** | 8/23/08 |
| **Appellant** | Settlement Class Member | | | |
| **Appellee** | NFL | | | |

### II. EXPLANATION OF CLAIM DETERMINATION

This Notice is an official communication from the Claims Administrator for the NFL Concussion Settlement Program. The Special Master reviewed the appeal and determined the following:

Please find an opinion denying the appeal, attached.

| 1. | Special Master ruled that the claim is denied |
|---|---|

### III. HOW TO OBJECT TO THIS DECISION

If you disagree with the Special Master's decision, you may submit an Objection to the Court by clicking the Object to Special Master Determination button on your secure online portal and following the instructions provided, **but you must do so on or before the deadline stated at the top of this Notice.**

The Court will review your Objection de novo (*i.e.*, anew), and we will inform you of the outcome.

### IV. HOW TO CONTACT US WITH QUESTIONS OR FOR HELP

If you have any questions about this Notice or need help, call us at 1-855-887-3485 or email ClaimsAdministrator@NFLConcussionSettlement.com.



# NFL CONCUSSION SETTLEMENT
*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

## POST-APPEAL NOTICE OF DENIAL OF MONETARY AWARD CLAIM
### DATE OF NOTICE: October 13, 2023
### DEADLINE TO SUBMIT OBJECTION TO SPECIAL MASTER'S DECISION: November 2, 2023

### I. SETTLEMENT CLASS MEMBER INFORMATION

| | |
|---|---|
| **Settlement Program ID** | 950013395 |

| **Name:** | First<br>Carleen | | M.I. | Last<br>Hastings |
|---|---|---|---|---|

| | |
|---|---|
| **Settlement Class Member Type** | Representative Claimant |
| **Lawyer** | O'Hanlon, Demerath & Castillo |

| **Qualifying Diagnosis** | Death with CTE (Chronic Traumatic Encephalopathy) | **Date of Qualifying Diagnosis** | 10/15/08 |
|---|---|---|---|
| **Appellant** | Settlement Class Member | | |
| **Appellee** | NFL | | |

### II. EXPLANATION OF CLAIM DETERMINATION

This Notice is an official communication from the Claims Administrator for the NFL Concussion Settlement Program. The Special Master reviewed the appeal and determined the following:

Please find an opinion denying the appeal, attached.

| 1. | Special Master ruled that the claim is denied |
|---|---|

### III. HOW TO OBJECT TO THIS DECISION

If you disagree with the Special Master's decision, you may submit an Objection to the Court by clicking the Object to Special Master Determination button on your secure online portal and following the instructions provided, **but you must do so on or before the deadline stated at the top of this Notice.**

The Court will review your Objection de novo (*i.e.*, anew), and we will inform you of the outcome.

### IV. HOW TO CONTACT US WITH QUESTIONS OR FOR HELP

If you have any questions about this Notice or need help, call us at 1-855-887-3485 or email ClaimsAdministrator@NFLConcussionSettlement.com.

---

**SETTLMENT CLASS MEMBER'S OBJECTION TO THE SPECIAL MASTER'S DECISION DENYING CLASS MEMBER'S APPEAL**

---

TO THE HONORABLE DISTRICT COURT JUDGE:

Class Member Carleen Hastings (SPID 950013395) ("Class Member") respectfully submits this objection to the Special Master's Decision (which was provided to Class Member on October 13, 2023) denying Class Member's appeal of the Denial of Monetary Award Claim. The Special Master erred in again affirming the Claims Administrator's denial of this claim based on the timeliness of the post-mortem CTE diagnosis. This objection presents the following two issues.

First, Class Member previously objected to the Special Master's denial based on timeliness because the date of a Qualifying Diagnosis for Death with CTE is the date of the Player's death (as stated in the Posted Settlement Program FAQs). Based on that timeliness objection, this Court reversed and remanded to "*further determine* the sufficiency of the claims packages."[1] Instead of further determining the sufficiency of the claims package, the Claims Administrator denied the claim for the same reason (timeliness of diagnosis) even though this Court has already reversed and remanded the denial based on timeliness. The Special Master erred in not reversing the Claims Administrator's second claim denial based on this previously-litigated issue.

Second, in the alternative, the Special Master also erred in opining that the original Settlement Agreement imposed a diagnosis deadline when the relevant language simply stated that a "Qualifying Diagnosis of Death with CTE shall be made only for Retired NFL Football Players who died prior to [the Approval Date], through a post-mortem diagnosis by a board-certified neuropathologist of CTE."[2] Consistent with that language the notices to class members further confirmed that a CTE diagnosis could "occur at any time until the end of the 65-year term of the Monetary Award Fund."[3]

The Court has already reversed a denial of this claim based on purported untimeliness of the diagnosis. (If the Court had believed the Claims Administrator did not err in concluding the diagnosis was untimely, the Court would not have remanded this matter.) The Court should again reverse the denial based on untimeliness. Moreover, based on the Special Master's finding that Class Member's claim package is otherwise sufficient,

---

[1]   ECF 12001 (emphasis added).

[2]   ECF 6087 at 32.

[3]   ECF 6086-1 at 11.

---

*Objection from Class Member Carleen Hastings (SPID 950013395)*

1

the Court should order the Claims Administrator to pay Class Member the Monetary Award that is owed.

The Court need not reach the second issue in the Special Master's latest decision if the Court reverses based on the timeliness issue. However, if the Court reaches the second issue, the Court should address that issue in the context of the due process arguments described in the Motion to Modify [ECF 6479] previously filed with this Court.

## **BACKGROUND**

In 2019, Class Member submitted a claim package that included a post-mortem diagnosis of Chronic Traumatic Encephalopathy ("CTE") made by Dr. Hamilton, a board-certified neuropathologist, along with documentation showing that the Player died prior to April 22, 2015. The claim package includes an autopsy report, death certificate, and letter from Dr. Hamilton describing his diagnosis of CTE based on his post mortem examination of the brain tissue of Class Member.

The Claims Administrator initially requested additional documents, stating: "You have not submitted any medical records reflecting the Qualifying Diagnosis." The Claims Administrator further explained the following:

> The medical records must show a post-mortem diagnosis of CTE made before April 22, 2015 (the Final Approval Date) by a board-certified neuropathologist for a Retired NFL Football Player who died before April 22, 2015. See Section 6.3(f) of the Settlement Agreement and FAQ 109. Mr. Mims died on October 15, 2008, and the October 16, 2008 autopsy report signed by Louis A. Pena does not reference CTE and neither does the death certificate. You provided an undated letter from Dr. Ronald L. Hamilton who diagnosed Mr. Mims with CTE. You must establish that Dr. Hamilton reviewed Mr. Mim's brain tissue and made a CTE diagnosis on or before April 22, 2015.

In a correspondence dated May 6, 2019, Class Member's counsel explained that pursuant to FAQ 109 and FAQ 93, the diagnosis date for a Death with CTE diagnosis is "the date of the Player's death, even though the diagnosis is not made until after the Player dies."

Despite this response, the Claims Administrator denied Class Member's Monetary Award Claim. Class Member timely filed an appeal of the Claims Administrator's Notice of Denial of Monetary Award Claim and the Special Master denied the Class Member's appeal on October 31, 2019. On November 20, 2019, Class Member filed an Objection to the Special Master's Decision Denying Class Member's Appeal with this Court.

*Objection from Class Member Carleen Hastings (SPID 950013395)*

In response to the Special Master's Decision, the Court issued a Settlement Implementation Order on June 16, 2020 requesting that the Special Master provide further explanation regarding whether the claim was being denied for two reasons, or only for the purported untimeliness of the diagnosis.[4]

On July 15, 2020, Special Master David Hoffman clarified that Class Member's claim was being *denied only on the basis of the purported untimeliness of the diagnosis*:

> The Claims Administrator denied Ms. Hastings' claim for two independent reasons. First, the claim was denied based upon a lack of proof that the diagnosis was timely. I find that there is no evidence that the diagnosis of Death with CTE was obtained before the appropriate deadline. Second, the claim was denied for failure of the diagnosing physician to personally examine the Player's brain tissue. However, the evidence suggests that Dr. Hamilton did examine the late Mr. Mims' brain tissue as is necessary to diagnose Death with CTE.

> The Claims Administrator correctly concluded that Ms. Hastings failed to show that the diagnosis was obtained before the appropriate deadline. I thus affirm the denial solely on the first basis.

Following this decision, Class Member filed a Supplement to Settlement Class Members' Objections to the Special Master's Decisions Class Members requesting the Court remand the claim because the CTE diagnosis was not untimely.

On February 24, 2023, after considering the sole issue before the Court related to this Class Member's claim (i.e., whether the diagnosis was untimely), the Court remanded this claim and instructed the Special Master to return the claims to the Claims Administrator to *further determine* the sufficiency of the claim package.[5]

The Claims Administrator then issued a new Notice of Denial of Monetary Award Claim dated May 16, 2023 on the exact same issue that had already been considered and rejected by the Court in its February 24, 2023 Order. The Claims Administrator stated that the claims package is sufficient in all respects except for the alleged untimeliness of the diagnosis:

---

[4]   ECF 12001.

[5]   ECF 12001.

*Objection from Class Member Carleen Hastings (SPID 950013395)*

3

The Post-Mortem Diagnosis of CTE Was Made Prior to the Final Approval Date: We have been unable to confirm whether the diagnosis was made prior to the 4/22/2015 Final Approval Date in order to meet the Settlement's requirements for a Qualifying Diagnosis of Death with CTE. The one-page letter provided by Dr. Hamilton is undated and does not indicate whether the diagnosis was made prior to 4/22/2015, as required by the Settlement's Injury Definition for the Qualifying Diagnosis of Death with CTE. The date of Dr. Hamilton's diagnosis has not been provided. Therefore, this criterion is not fulfilled.

Because the diagnosis does not fulfill the Settlement's requirements for a Qualifying Diagnosis of Death with CTE, the medical records included in the Claim Package do not reflect a Qualifying Diagnosis, and therefore the Claim Package is not sufficient under Section 8.2(a) of the Settlement Agreement.[6]

Class Member timely appealed that decision, and although Special Master David Hoffman denied the appeal, he made findings of fact that other than the timeliness issue, Class Member's claims packages were sufficient. Class Member now files this objection.

## <u>STANDARD OF REVIEW</u>

The Court reviews de novo Class Member's objections to conclusions of law from its Special Masters. *See* ECF No. 6871 at 4–5 (appointing the Special Masters and defining their roles). Class Member has challenged the Claims Administrator's conclusions of law, the facts are undisputed. The Court's decision regarding this objection is final and binding under both the original settlement agreement (of which Class Member received notice with an opportunity to opt out) and the amended settlement agreement (of which Class Member did not receive notice and which was entered after the opt-out deadline). *See* ECF No. 6073-2, Original Settlement Agreement § 9.8 *and* ECF No. 6481, Amended Settlement Agreement § 9.8. In the event this objection is not sustained, Class Member expressly reserves the right to re-urge the Motion to Modify [ECF 6479] this Court denied without prejudice on October 24, 2017 [ECF 8557].

---

[6]    Exhibit 19.

*Objection from Class Member Carleen Hastings (SPID 950013395)*

4

## ARGUMENT

**I.    Class Member's claim was erroneously denied based on the purported untimeliness of the diagnosis.  (Indeed, the Court has already reversed the previous denial of this claim on this same issue.)**

Prior to the opt-out deadline, absent class members were consistently told they could obtain a diagnosis for Death with CTE "***any time until the end of the 65-year term of the Monetary Award Fund***."[7]  Consistent with that notice, the FAQs, which were approved by the NFL, said that the date of the Qualifying Diagnosis for Death with CTE is "the date of the Player's death, even though the diagnosis is not made until after the Player dies."  Unsurprisingly, Class Member reasonably believed she had time to obtain that qualifying diagnosis, which in this case was achieved by 1) obtaining brain tissue from the deceased Player, (2) finding a board-certified neuropathologist to review the brain tissue, and (3) sending the brain tissue to the neuropathologist for a CTE diagnosis.  But now for the second time, the Claims Administrator has denied this claim based on when Class Member obtained the CTE diagnosis.

The first time this claim was appealed, Class Member explained why the diagnosis was timely.  Based on that briefing, the Court reversed and ordered that the Claims Administrator "*further determine* the sufficiency of the claims package."[8]  Instead of further determining whether the claims package was sufficient, the Claims Administrator again denied the claims package for the same, erroneous reason related to the timeliness of the diagnosis.  However, as Class Member showed in the previous appeal, the diagnosis was timely and the claims package is otherwise sufficient.  Moreover, the Special Master's findings confirm that the claims package is otherwise sufficient.

Although the Special Master found the claims package to be otherwise sufficient, the Special Master again affirmed the denial based on timeliness without analyzing the impact of this Court's order reversing and remanding.  Notably, the Special Master does not explain why the Court would have reversed and remanded this claim if the Court believed the Claims Administrator did not err by denying the claim on timeliness grounds.

This time around, the Special Master implicitly recognizes that the FAQ's language supports Class Member's argument.  Nevertheless, the Special Master ignores the language because it is not in the amended settlement agreement.  But that misses the point.  The language in the FAQ was approved by the NFL, and explains how the

---

[7]    ECF 6087 at 150 (emphasis added).

[8]    ECF 12001 (emphasis added).

settlement agreement should be interpreted. According to that language, which has remained in the FAQs for years, the date of the Qualifying Diagnosis for Death with CTE is "the date of the Player's death, even though the diagnosis is not made until after the Player dies."

The Court previously reversed the denial of Class Member's claim based on untimeliness and remanded for a consideration of whether the claim package is otherwise sufficient. Based on the Special Master's decision, it is. Accordingly, the Court should again reverse because the Claims Administrator erred by again denying this claim as untimely. Moreover, because the Special Master recognized that the claim is otherwise sufficient, the Court should order that on remand the Claims Administrator provide Class Member with the appropriate Monetary Award.

## II.    In the alternative, the Court should address Class Member's due process arguments.

Class Member has previously provided the Court with briefing on its due process arguments based on the fact that the original settlement requirement contains no diagnosis deadline.[9] Indeed, the original settlement agreement clearly demonstrates there is no diagnosis deadline:

> A Qualifying Diagnosis of Death with CTE shall be made only for Retired NFL Football Players who died prior to the date of the Preliminary Approval and Class Certification Order, through a post-mortem diagnosis by a board-certified neuropathologist of CTE.[10]

The Special Master recognizes that this is the key text, but interprets this text in a way that ignores the plain language of the text read in context.

First, the Special Master asserts that text provides only one date by which "events can occur." But the text does not say that the date refers to "events" — it refers to a single event, i.e., the death of the Player. By assuming that the text must include some deadline for the post-mortem CTE diagnosis, the Special Master put the cart before the horse and assumes the very thing that is in dispute, the existence of a deadline for the CTE diagnosis.

The Special Master goes on to say that the word "through" connects the "Player's death to a post-mortem diagnosis", but that is also wrong. The word "through"

---

[9]    *See* Motion to Modify [ECF 8263]

[10]    ECF No. 6087 at 32.

*Objection from Class Member Carleen Hastings (SPID 950013395)*

6

introduces a second condition to the Qualifying Diagnosis of Death with CTE. The primary clause of the sentence imposes the first condition (i.e., that the Player "died prior to the date of the Preliminary Approval and Class Certification Order) and the secondary clause imposes a second condition (i.e., that the Qualifying Diagnosis must be provided "through" a post-mortem diagnosis by a board-certified neuropathologist). The word through does not change the plain meaning of the text.

The Special Master goes on to improperly opine that it is natural to assume that the diagnosis and death would be subject to same cutoff date because post-mortem diagnoses are usually proximate to death. But this is wrong for a slew of reasons:

- Post-mortem means *after* death, not around the same time as the death. If the settlement had intended for the diagnosis to occur "at or around the time of death," the settlement could have said that; or it could have requireda "perimortem diagnosis";[11] or it could have required a post-mortem diagnosis within *x* days of the Player's death. The original settlement agreement did none of these things. Instead, the settlement agreement simply required a post-mortem diagnosis by a board-certified neuropathologist with no deadline, and the corresponding notice to absent class members clearly stated they could obtain a diagnosis for Death with CTE "***any time until the end of the 65-year term of the Monetary Award Fund***." And the corresponding FAQ logically informed absent class members that the date of Death with CTE diagnosis was the date of the players death.

- The Special Master is not a medical expert and has no basis to make that diagnosis deadline assumption regarding post-mortem diagnoses of CTE. The truth is that post-mortem diagnoses based on brain tissue typically occur months, years, or even decades after the death and autopsy.[12] Moreover, in the context of this settlement, it should be no surprise that a post-mortem diagnosis would occur long after an autopsy (if there was one) because the required diagnosis cannot be made as part of a routine medical examination in an autopsy — the diagnosis has to be made by a board-certified neuropathologist, and there are only a few hundred very busy doctors which

---

[11] "Perimortem" — not post-mortem — means "taking place at or around the time of death". Merriam-Webster Online Dictionary, https://www.merriam-webster.com/medical/perimortem (last visited Nov. 1, 2023).

[12] *See, e.g.*, Arenn Faye Carlose, et al., *From brain collections to modern brain banks: A historical perspective*, ALZHEIMER'S & DEMENTIAL: TRANSLATIONAL RESEARCH & CLINICAL INTERVENTIONS 5, 52, 52–59 (2019) (describing the development of modern brain banks where brain tissue is stored for decades to allow for later testing of brain tissue for purposes of post-mortem diagnoses of neurological disorders).

possess this qualification in the country.  If a diagnosis is obtained by brain tissue analysis, that is typically done by examination of brain tissue by board-certified neuropathologist months, or years after it was harvested from the subject during an autopsy.

- Even if, as the Special Master says, some post-mortem diagnoses are made proximate death, that does not mean that post-mortem diagnoses *must* be made proximate to death.  Indeed, the word post-mortem diagnosis itself simply means a diagnosis made after death.  Unlike perimortem, which means at or *around the time of death*, "post-mortem" simply means *after death*.  The phrase naturally includes any event that occurs after death, even if that event occurs months or years later. [13]

- Finally, the Special Master states that if the parties had intended for there to be no deadline for Death with CTE diagnoses, it would be reasonable to expect the parties to state "such a surprising outcome expressly."  But it is not clear why the Special Master believes that would be a surprising outcome.  Typically, if parties do not want to create a deadline, they express that intent by not creating a deadline.  They don't include language announcing that they are not creating a deadline.  Moreover, to the extent the Special Master wanted to see this express language, he only needed to look to the long-form notice, which expressly recognizes that a CTE diagnosis "may occur at any time until the end of the 65-year term of the Monetary Award Fund."

Second, the Special Master claims that the settlement agreement's definition of "Subclass 2" further indicates that the CTE diagnosis must occur prior to the Approval Date because the words "and" and "received".  But the Special Master misreads this provision by failing to faithfully read the text and context.

By using the word "and", the text of this provision simply recognizes that there are two conditions to a Death with CTE Qualifying Diagnosis, the Player must be a player "[1] who died prior to the date of the Preliminary Approval and Class Certification Order *and* [2] who received a post-mortem diagnosis of CTE."[14]  The word "and" does not indicate, in any way, that the date provides a deadlines for both the player's death and the post-mortem diagnosis.  To the contrary, the text of this provision indicates that the date clearly applies only to the date of the player's death.

---

[13]  This is consistent with the long-form notice, which states that a Death with CTE diagnosis "may occur at any time until the end of the 65-year term of the Monetary Award Fund."

[14]  ECF 6087 at 7.

*Objection from Class Member Carleen Hastings (SPID 950013395)*

8

Next, the Special Master focuses on the word "received" and says that shows that the diagnosis must have occurred in the past. But in context, it is clear this does not mean that a CTE diagnosis must have occurred in the past because Death with CTE class members are not necessarily in Subclass 2 — they can be in Subclass 1. The notice attached to the settlement agreement makes that clear — it states that Death With CTE Class Members are in both Subclass 1 and Subclass 2: the latter are those who have "received a diagnosis of Death with CTE" and the former are those Players "and their Representative Claimants and Derivative Claimants" who had not yet received a diagnosis of "Death with CTE prior to [Date of Preliminary Approval Order]."[15]

Third, the Special Master's Decision recognizes the above exhibits to the settlement agreement were made part of the settlement agreement, which creates a problem for the Special Master's interpretation because the long-form notice states: "A Qualifying Diagnosis may occur at any time until the end of the 65-year term of the Monetary Award Fund."[16] In fact, the Special Master recognizes that this notice directly conflicts with his interpretation of the settlement agreement and chooses to disregard the conflict citing a *noscitur a sociis* principle. However, there would be no conflict and the Special Master would not have found this language "confounding" if he had simply interpreted the original settlement agreement, which imposes no deadline for the post-mortem CTE diagnosis. The language the Special Master finds "confounding" is actually entirely consistent with the language in the settlement, which contains no deadline for a post-mortem diagnosis of CTE.

Finally, the Special Master claims that if the agreement were found to be ambiguous, a court would need to look at extrinsic evidence of the parties' publicly expressed intent and after discussing that extrinsic evidence concludes it supports his interpretation. But there are two problems with the Special Master's ambiguity analysis.

First, extrinsic evidence would not be relevant to Class Member's claims because Class Member was an absent class member when the settlement agreement was negotiated and thus, was not involved in negotiating the settlement agreement. Therefore, any ambiguity has to be construed against the NFL and in favor of Class member. *Coliseum Towers Associates v. Cnty. of Nassau*, 2 A.D.3d 562, 564 (2d Dep't 2003).

Second, assuming extrinsic evidence could be considered, the extrinsic evidence that would be relevant is extrinsic evidence of the *parties'* publicly expressly intent. The Special Master cites no extrinsic evidence regarding Class Member's publicly expressed

---

[15] ECF No. 6087 at 147–48. The same is true of the amended settlement agreement. ECF 6481-1 at 147–48.

[16] ECF 6087 at 151.

intent, which is not surprising given that Class Member was an absent class member during the time that the settlement agreement and amended settlement agreement were approved.   And the evidence from the NFL does not support the Special Master's interpretation and in the case of the long-form notice, undermines the Special Master's interpretation.   The Special Master's Decision points to language in some of the notices that the settlement agreement provided "[m]onetary awards for diagnoses of Death with CTE prior to [the date of the Approval Order]", but it is not clear that this requires a diagnosis before that date as opposed to a death before that date.[17]   Moreover, read in context, no reasonable reader would believe the date referred to the diagnosis because that phrase then referred readers to "Questions 14-21."   And Question 14 explains: "A Qualifying Diagnosis may occur at any time until the end of the 65-year term of the Monetary Fund."[18]

## CONCLUSION

The Special Master recognized that if the amended settlement agreement "cut back on Claimants' rights" by imposing a diagnosis deadline, "the due process consequences would be complex."   Although the Special Master opines that the amended settlement agreement did not do that, the Special Master's opinion is wrong for the reasons described above and in the Motion to Modify [ECF 6479] that this Court previously considered.  However, the Court need not delve into those due process issues if the Court sustains this Class Member's objection based on the first issue regarding the timeliness of the diagnosis.

Class Member respectfully requests the Court sustain this objection, reverse the Special Master's decision based on the errors in the Claims Administrator's Notice of Denial, and remand with an order that the Claims Administrator pay the appropriate Monetary Award to Class Member.

Dated:  November 2, 2023

Respectfully Submitted:

/s/ Justin Demerath

**Justin Demerath**
Texas State Bar No. 24034415

---

[17]   *See* 6086-1 at 7.

[18]   *Id.* at 11.

*Objection from Class Member Carleen Hastings (SPID 950013395)*

10

**David Campbell**

Texas State Bar No. 24057033

O'HANLON, DEMERATH & CASTILLO

808 West Avenue | Austin, TX 78701

Tel: (512) 494-9949 | Fax: (512) 494-9919

jdemerath@808west.com

dcampbell@808west.com

**Counsel for Class Member**

## CERTIFICATE OF SERVICE

It is hereby certified that a true copy of the foregoing document was submitted on the Court Portal on November 2, 2023.

/s/ Justin B. Demerath

Justin B. Demerath

---

**SETTLMENT CLASS MEMBER'S OBJECTION TO THE SPECIAL
MASTER'S DECISION DENYING CLASS MEMBER'S APPEAL**

---

TO THE HONORABLE DISTRICT COURT JUDGE:

Class Member Robin Cornish (SPID 950012548) ("Class Member") respectfully submits this objection to the Special Master's Decision (which was provided to Class Member on October 13, 2023) denying Class Member's appeal of the Denial of Monetary Award Claim. The Special Master erred in again affirming the Claims Administrator's denial of this claim based on the timeliness of the post-mortem CTE diagnosis. This objection presents the following two issues.

First, Class Member previously objected to the Special Master's denial based on timeliness because the date of a Qualifying Diagnosis for Death with CTE is the date of the Player's death (as stated in the Posted Settlement Program FAQs). Based on that timeliness objection, this Court reversed and remanded to "further determine the sufficiency of the claims packages."[1] Instead of further determining the sufficiency of the claims package, the Claims Administrator denied the claim for the same reason (timeliness of diagnosis) even though this Court has already reversed and remanded the denial based on timeliness. The Special Master erred in not reversing the Claims Administrator's second claim denial based on this previously-litigated issue.

Second, in the alternative, the Special Master also erred in opining that the original Settlement Agreement imposed a diagnosis deadline when the relevant language simply stated that a "Qualifying Diagnosis of Death with CTE shall be made only for Retired NFL Football Players who died prior to [the Approval Date], through a post-mortem diagnosis by a board-certified neuropathologist of CTE."[2] Consistent with that language the notices to class members further confirmed that a CTE diagnosis could "occur at any time until the end of the 65-year term of the Monetary Award Fund."[3]

The Court has already reversed a denial of this claim based on purported untimeliness of the diagnosis. (If the Court had believed the Claims Administrator did not err in concluding the diagnosis was untimely, the Court would not have remanded this matter.) The Court should again reverse the denial based on untimeliness. Moreover, based on the Special Master's finding that Class Member's claim package is otherwise sufficient,

---

[1] ECF 12001 (emphasis added).

[2] ECF 6087 at 32.

[3] ECF 6086-1 at 11.

the Court should order the Claims Administrator to pay Class Member the Monetary Award that is owed.

The Court need not reach the second issue in the Special Master's latest decision if the Court reverses based on the timeliness issue. However, if the Court reaches the second issue, the Court should address that issue in the context of the due process arguments described in the Motion to Modify [ECF 6479] previously filed with this Court.

## **BACKGROUND**

In 2019, Class Member submitted a claim package that included a post-mortem diagnosis of Chronic Traumatic Encephalopathy ("CTE") made by Dr. Hamilton, a board-certified neuropathologist, along with documentation showing that the Player died prior to April 22, 2015. The claim package includes an autopsy report, death certificate, and letter from Dr. Hamilton describing his diagnosis of CTE based on his post mortem examination of the brain tissue of Class Member.

The Claims Administrator initially requested additional documents, stating: "You have not submitted any medical records reflecting the Qualifying Diagnosis." The Claims Administrator further explained the following:

> The medical records must show a post-mortem diagnosis of CTE made before April 22, 2015 (the Final Approval Date) by a board-certified neuropathologist for a Retired NFL Football Player who died before April 22, 2015. See Section 6.3(f) of the Settlement Agreement and FAQ 109. Mr. Cornish died on August 23, 2008, and the August 24, 2008 autopsy report signed by Marc A. Krouse does not reference CTE and neither does the death certificate. You provided an undated letter from Dr. Ronald L. Hamilton who diagnosed Mr. Cornish with CTE. You must establish that Dr. Hamilton reviewed Mr. Cornish's brain tissue and made a CTE diagnosis on or before April 22, 2015.

In a correspondence dated May 6, 2019, Class Member's counsel explained that pursuant to FAQ 109 and FAQ 93, the diagnosis date for a Death with CTE diagnosis is "the date of the Player's death, even though the diagnosis is not made until after the Player dies."

Despite this response, the Claims Administrator denied Class Member's Monetary Award Claim. Class Member timely filed an appeal of the Claims Administrator's Notice of Denial of Monetary Award Claim and the Special Master denied the Class Member's appeal on October 31, 2019. On November 20, 2019, Class Member filed an Objection to

the Special Master's Decision Denying Class Member's Appeal with this Court.

In response to the Special Master's Decision, the Court issued a Settlement Implementation Order on June 16, 2020 requesting that the Special Master provide further explanation regarding whether the claim was being denied for two reasons, or only for the purported untimeliness of the diagnosis.[4]

On July 15, 2020, Special Master David Hoffman clarified that Class Member's claim was being denied only on the basis of the purported untimeliness of the diagnosis:

> The Claims Administrator denied Ms. Cornish's claim for two independent reasons. First, the claim was denied based upon a lack of proof that the diagnosis was timely. I find that there is no evidence that the diagnosis of Death with CTE was obtained before the appropriate deadline. Second, the claim was denied for failure of the diagnosing physician to personally examine the Player's brain tissue. However, the evidence suggests that Dr. Hamilton did examine the late Mr. Cornish's brain tissue as is necessary to diagnose Death with CTE.
>
> The Claims Administrator correctly concluded that Ms. Cornish failed to show that the diagnosis was obtained before the appropriate deadline. I thus affirm the denial solely on the first basis.

Following this decision, Class Member filed a Supplement to Settlement Class Members' Objections to the Special Master's Decisions Class Members requesting the Court remand the claim because the CTE diagnosis was not untimely.

On February 24, 2023, after considering the sole issue before the Court related to this Class Member's claim (i.e., whether the diagnosis was untimely), the Court remanded this claim and instructed the Special Master to return the claims to the Claims Administrator to further determine the sufficiency of the claim package.[5]

The Claims Administrator then issued a new Notice of Denial of Monetary Award Claim dated May 16, 2023 on the exact same issue that had already been considered and rejected by the Court in its February 24, 2023 Order. The Claims Administrator stated that the claims package is sufficient in all respects except for the alleged untimeliness of the diagnosis:

---

[4]   ECF 12001.

[5]   ECF 12001.

Objection from Class Member Robin Cornish (SPID 950012548)

3

The Post-Mortem Diagnosis of CTE Was Made Prior to the Final Approval Date: We have been unable to confirm whether the diagnosis was made prior to the 4/22/2015 Final Approval Date in order to meet the Settlement's requirements for a Qualifying Diagnosis of Death with CTE. The one-page letter provided by Dr. Hamilton is undated and does not indicate whether the diagnosis was made prior to 4/22/2015, as required by the Settlement's Injury Definition for the Qualifying Diagnosis of Death with CTE. The date of Dr. Hamilton's diagnosis has not been provided. Therefore, this criterion is not fulfilled.

Because the diagnosis does not fulfill the Settlement's requirements for a Qualifying Diagnosis of Death with CTE, the medical records included in the Claim Package do not reflect a Qualifying Diagnosis, and therefore the Claim Package is not sufficient under Section 8.2(a) of the Settlement Agreement.[6]

Class Member timely appealed that decision, and although Special Master David Hoffman denied the appeal, he made findings of fact that other than the timeliness issue, Class Member's claims packages were sufficient. Class Member now files this objection.

## STANDARD OF REVIEW

The Court reviews de novo Class Member's objections to conclusions of law from its Special Masters. See ECF No. 6871 at 4–5 (appointing the Special Masters and defining their roles). Class Member has challenged the Claims Administrator's conclusions of law, the facts are undisputed. The Court's decision regarding this objection is final and binding under both the original settlement agreement (of which Class Member received notice with an opportunity to opt out) and the amended settlement agreement (of which Class Member did not receive notice and which was entered after the opt-out deadline). See ECF No. 6073-2, Original Settlement Agreement § 9.8 and ECF No. 6481, Amended Settlement Agreement § 9.8. In the event this objection is not sustained, Class Member expressly reserves the right to re-urge the Motion to Modify [ECF 6479] this Court denied without prejudice on October 24, 2017 [ECF 8557].

---

[6]    Exhibit 19.

Objection from Class Member Robin Cornish (SPID 950012548)

4

## ARGUMENT

**I.    Class Member's claim was erroneously denied based on the purported untimeliness of the diagnosis.  (Indeed, the Court has already reversed the previous denial of this claim on this same issue.)**

Prior to the opt-out deadline, absent class members were consistently told they could obtain a diagnosis for Death with CTE "any time until the end of the 65-year term of the Monetary Award Fund."[7]  Consistent with that notice, the FAQs, which were approved by the NFL, said that the date of the Qualifying Diagnosis for Death with CTE is "the date of the Player's death, even though the diagnosis is not made until after the Player dies."  Unsurprisingly, Class Member reasonably believed she had time to obtain that qualifying diagnosis, which in this case was achieved by 1) obtaining brain tissue from the deceased Player, (2) finding a board-certified neuropathologist to review the brain tissue, and (3) sending the brain tissue to the neuropathologist for a CTE diagnosis.  But now for the second time, the Claims Administrator has denied this claim based on when Class Member obtained the CTE diagnosis.

The first time this claim was appealed, Class Member explained why the diagnosis was timely.  Based on that briefing, the Court reversed and ordered that the Claims Administrator "further determine the sufficiency of the claims package."[8]  Instead of further determining whether the claims package was sufficient, the Claims Administrator again denied the claims package for the same, erroneous reason related to the timeliness of the diagnosis.  However, as Class Member showed in the previous appeal, the diagnosis was timely and the claims package is otherwise sufficient.  Moreover, the Special Master's findings confirm that the claims package is otherwise sufficient.

Although the Special Master found the claims package to be otherwise sufficient, the Special Master again affirmed the denial based on timeliness without analyzing the impact of this Court's order reversing and remanding.  Notably, the Special Master does not explain why the Court would have reversed and remanded this claim if the Court believed the Claims Administrator did not err by denying the claim on timeliness grounds.

This time around, the Special Master implicitly recognizes that the FAQ's language supports Class Member's argument.  Nevertheless, the Special Master ignores the language because it is not in the amended settlement agreement.  But that misses the point.  The language in the FAQ was approved by the NFL, and explains how the

---

[7]    ECF 6087 at 150 (emphasis added).

[8]    ECF 12001 (emphasis added).

Objection from Class Member Robin Cornish (SPID 950012548)

settlement agreement should be interpreted.  According to that language, which has remained in the FAQs for years, the date of the Qualifying Diagnosis for Death with CTE is "the date of the Player's death, even though the diagnosis is not made until after the Player dies."

The Court previously reversed the denial of Class Member's claim based on untimeliness and remanded for a consideration of whether the claim package is otherwise sufficient.  Based on the Special Master's decision, it is.  Accordingly, the Court should again reverse because the Claims Administrator erred by again denying this claim as untimely.  Moreover, because the Special Master recognized that the claim is otherwise sufficient, the Court should order that on remand the Claims Administrator provide Class Member with the appropriate Monetary Award.

## II.    In the alternative, the Court should address Class Member's due process arguments.

Class Member has previously provided the Court with briefing on its due process arguments based on the fact that the original settlement requirement contains no diagnosis deadline.[9]  Indeed, the original settlement agreement clearly demonstrates there is no diagnosis deadline:

> A Qualifying Diagnosis of Death with CTE shall be made only for Retired NFL Football Players who died prior to the date of the Preliminary Approval and Class Certification Order, through a post-mortem diagnosis by a board-certified neuropathologist of CTE.[10]

The Special Master recognizes that this is the key text, but interprets this text in a way that ignores the plain language of the text read in context.

First, the Special Master asserts that text provides only one date by which "events can occur."  But the text does not say that the date refers to "events" — it refers to a single event, i.e., the death of the Player.  By assuming that the text must include some deadline for the post-mortem CTE diagnosis, the Special Master put the cart before the horse and assumes the very thing that is in dispute, the existence of a deadline for the CTE diagnosis.

The Special Master goes on to say that the word "through" connects the "Player's death to a post-mortem diagnosis", but that is also wrong.  The word "through"

---

[9]    See Motion to Modify [ECF 8263]

[10]    ECF No. 6087 at 32.

Objection from Class Member Robin Cornish (SPID 950012548)

6

introduces a second condition to the Qualifying Diagnosis of Death with CTE. The primary clause of the sentence imposes the first condition (i.e., that the Player "died prior to the date of the Preliminary Approval and Class Certification Order) and the secondary clause imposes a second condition (i.e., that the Qualifying Diagnosis must be provided "through" a post-mortem diagnosis by a board-certified neuropathologist). The word through does not change the plain meaning of the text.

The Special Master goes on to improperly opine that it is natural to assume that the diagnosis and death would be subject to same cutoff date because post-mortem diagnoses are usually proximate to death. But this is wrong for a slew of reasons:

- Post-mortem means after death, not around the same time as the death. If the settlement had intended for the diagnosis to occur "at or around the time of death," the settlement could have said that; or it could have required a "perimortem diagnosis";[11] or it could have required a post-mortem diagnosis within x days of the Player's death. The original settlement agreement did none of these things. Instead, the settlement agreement simply required a post-mortem diagnosis by a board-certified neuropathologist with no deadline, and the corresponding notice to absent class members clearly stated they could obtain a diagnosis for Death with CTE "any time until the end of the 65-year term of the Monetary Award Fund." And the corresponding FAQ logically informed absent class members that the date of Death with CTE diagnosis was the date of the players death.

- The Special Master is not a medical expert and has no basis to make that diagnosis deadline assumption regarding post-mortem diagnoses of CTE. The truth is that post-mortem diagnoses based on brain tissue typically occur months, years, or even decades after the death and autopsy.[12] Moreover, in the context of this settlement, it should be no surprise that a post-mortem diagnosis would occur long after an autopsy (if there was one) because the required diagnosis cannot be made as part of a routine medical examination in an autopsy — the diagnosis has to be made by a board-certified neuropathologist, and there are only a few hundred very busy doctors which

---

[11] "Perimortem" — not post-mortem — means "taking place at or around the time of death". Merriam-Webster Online Dictionary, https://www.merriam-webster.com/medical/perimortem (last visited Nov. 1, 2023).

[12] See, e.g., Arenn Faye Carlose, et al., From brain collections to modern brain banks: A historical perspective, ALZHEIMER'S & DEMENTIAL: TRANSLATIONAL RESEARCH & CLINICAL INTERVENTIONS 5, 52, 52–59 (2019) (describing the development of modern brain banks where brain tissue is stored for decades to allow for later testing of brain tissue for purposes of post-mortem diagnoses of neurological disorders).

Objection from Class Member Robin Cornish (SPID 950012548)

7

possess this qualification in the country. If a diagnosis is obtained by brain tissue analysis, that is typically done by examination of brain tissue by board-certified neuropathologist months, or years after it was harvested from the subject during an autopsy.

- Even if, as the Special Master says, some post-mortem diagnoses are made proximate death, that does not mean that post-mortem diagnoses must be made proximate to death. Indeed, the word post-mortem diagnosis itself simply means a diagnosis made after death. Unlike perimortem, which means at or around the time of death, "post-mortem" simply means after death. The phrase naturally includes any event that occurs after death, even if that event occurs months or years later. [13]

- Finally, the Special Master states that if the parties had intended for there to be no deadline for Death with CTE diagnoses, it would be reasonable to expect the parties to state "such a surprising outcome expressly." But it is not clear why the Special Master believes that would be a surprising outcome. Typically, if parties do not want to create a deadline, they express that intent by not creating a deadline. They don't include language announcing that they are not creating a deadline. Moreover, to the extent the Special Master wanted to see this express language, he only needed to look to the long-form notice, which expressly recognizes that a CTE diagnosis "may occur at any time until the end of the 65-year term of the Monetary Award Fund."

Second, the Special Master claims that the settlement agreement's definition of "Subclass 2" further indicates that the CTE diagnosis must occur prior to the Approval Date because the words "and" and "received". But the Special Master misreads this provision by failing to faithfully read the text and context.

By using the word "and", the text of this provision simply recognizes that there are two conditions to a Death with CTE Qualifying Diagnosis, the Player must be a player "[1] who died prior to the date of the Preliminary Approval and Class Certification Order and [2] who received a post-mortem diagnosis of CTE."[14] The word "and" does not indicate, in any way, that the date provides a deadlines for both the player's death and the post-mortem diagnosis. To the contrary, the text of this provision indicates that the date clearly applies only to the date of the player's death.

---

[13] This is consistent with the long-form notice, which states that a Death with CTE diagnosis "may occur at any time until the end of the 65-year term of the Monetary Award Fund."

[14] ECF 6087 at 7.

Objection from Class Member Robin Cornish (SPID 950012548)

Next, the Special Master focuses on the word "received" and says that shows that the diagnosis must have occurred in the past.  But in context, it is clear this does not mean that a CTE diagnosis must have occurred in the past because Death with CTE class members are not necessarily in Subclass 2 — they can be in Subclass 1.  The notice attached to the settlement agreement makes that clear — it states that Death With CTE Class Members are in both Subclass 1 and Subclass 2: the latter are those who have "received a diagnosis of Death with CTE" and the former are those Players "and their Representative Claimants and Derivative Claimants" who had not yet received a diagnosis of "Death with CTE prior to [Date of Preliminary Approval Order]."[15]

Third, the Special Master's Decision recognizes the above exhibits to the settlement agreement were made part of the settlement agreement, which creates a problem for the Special Master's interpretation because the long-form notice states: "A Qualifying Diagnosis may occur at any time until the end of the 65-year term of the Monetary Award Fund."[16]  In fact, the Special Master recognizes that this notice directly conflicts with his interpretation of the settlement agreement and chooses to disregard the conflict citing a noscitur a sociis principle.  However, there would be no conflict and the Special Master would not have found this language "confounding" if he had simply interpreted the original settlement agreement, which imposes no deadline for the post-mortem CTE diagnosis.  The language the Special Master finds "confounding" is actually entirely consistent with the language in the settlement, which contains no deadline for a post-mortem diagnosis of CTE.

Finally, the Special Master claims that if the agreement were found to be ambiguous, a court would need to look at extrinsic evidence of the parties' publicly expressed intent and after discussing that extrinsic evidence concludes it supports his interpretation.  But there are two problems with the Special Master's ambiguity analysis.

First, extrinsic evidence would not be relevant to Class Member's claims because Class Member was an absent class member when the settlement agreement was negotiated and thus, was not involved in negotiating the settlement agreement.  Therefore, any ambiguity has to be construed against the NFL and in favor of Class member.  Coliseum Towers Associates v. Cnty. of Nassau, 2 A.D.3d 562, 564 (2d Dep't 2003).

Second, assuming extrinsic evidence could be considered, the extrinsic evidence that would be relevant is extrinsic evidence of the parties' publicly expressly intent.  The Special Master cites no extrinsic evidence regarding Class Member's publicly expressed

---

[15]  ECF No. 6087 at 147–48.  The same is true of the amended settlement agreement.  ECF 6481-1 at 147–48.

[16]  ECF 6087 at 151.

Objection from Class Member Robin Cornish (SPID 950012548)

9

intent, which is not surprising given that Class Member was an absent class member during the time that the settlement agreement and amended settlement agreement were approved.   And the evidence from the NFL does not support the Special Master's interpretation and in the case of the long-form notice, undermines the Special Master's interpretation.   The Special Master's Decision points to language in some of the notices that the settlement agreement provided "[m]onetary awards for diagnoses of Death with CTE prior to [the date of the Approval Order]", but it is not clear that this requires a diagnosis before that date as opposed to a death before that date.[17]   Moreover, read in context, no reasonable reader would believe the date referred to the diagnosis because that phrase then referred readers to "Questions 14-21."   And Question 14 explains: "A Qualifying Diagnosis may occur at any time until the end of the 65-year term of the Monetary Fund."[18]

## **CONCLUSION**

The Special Master recognized that if the amended settlement agreement "cut back on Claimants' rights" by imposing a diagnosis deadline, "the due process consequences would be complex."   Although the Special Master opines that the amended settlement agreement did not do that, the Special Master's opinion is wrong for the reasons described above and in the Motion to Modify [ECF 6479] that this Court previously considered.   However, the Court need not delve into those due process issues if the Court sustains this Class Member's objection based on the first issue regarding the timeliness of the diagnosis.

Class Member respectfully requests the Court sustain this objection, reverse the Special Master's decision based on the errors in the Claims Administrator's Notice of Denial, and remand with an order that the Claims Administrator pay the appropriate Monetary Award to Class Member.

Dated:  November 2, 2023

Respectfully Submitted:

/s/ Justin Demerath

**Justin Demerath**
Texas State Bar No. 24034415

---

[17]   See 6086-1 at 7.

[18]   Id. at 11.

Objection from Class Member Robin Cornish (SPID 950012548)

10

**David Campbell**

Texas State Bar No. 24057033

O'HANLON, DEMERATH & CASTILLO

808 West Avenue | Austin, TX 78701

Tel: (512) 494-9949 | Fax: (512) 494-9919

jdemerath@808west.com

dcampbell@808west.com

**Counsel for Class Member**

<u>**CERTIFICATE OF SERVICE**</u>

It is hereby certified that a true copy of the foregoing document was submitted on the Court Portal on November 2, 2023.

/s/ Justin B. Demerath

Justin B. Demerath

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br><br>MDL No. 2323<br><br>Hon. Anita B. Brody |
| Kevin Turner and Shawn Wooden, *on behalf of themselves and others similarly situated*,<br><br>Plaintiffs,<br><br>v.<br><br>National Football League and NFL Properties LLC, successor-in-interest to NFL Properties, Inc.<br><br>Defendants. | Civ. Action No.: 14-cv-00029-AB |
| THIS DOCUMENT RELATES TO:<br>Settlement Class Member<br>Carleen Hastings (SPID 950013395) | Hon. Anita B. Brody |

**RESPONSE OF THE NATIONAL FOOTBALL LEAGUE AND NFL PROPERTIES LLC IN OPPOSITION TO SETTLEMENT CLASS MEMBER CARLEEN HASTINGS' OBJECTION TO THE SPECIAL MASTER'S OCTOBER 7, 2023 RULING**

# <u>TABLE OF CONTENTS</u>

<div align="right"><u>Page</u></div>

PRELIMINARY STATEMENT ...................................................................................1

BACKGROUND ........................................................................................................4

ARGUMENT.............................................................................................................7

I.     Ms. Hastings' Claim Was Correctly Ruled Untimely Because the Diagnosis Occurred After the Settlement's April 22, 2015 Deadline ....................................7

II.    The Special Master Correctly Ruled that the Unamended Settlement Agreement Included a Diagnosis Deadline for Death with CTE ...........................................9

      A.    The Plain Text of the Unamended Settlement, Read as a Whole, Unambiguously Established the Diagnosis Deadline ...........................................10

      B.    Substantial Contemporaneous Extrinsic Evidence Confirms that the Parties and Class Members Recognized the Death with CTE Diagnosis Deadline .....................................................................................................13

Conclusion ..............................................................................................................19

The National Football League and NFL Properties LLC (collectively, the "NFL Parties") respectfully submit this response in opposition to Settlement Class Member Carleen Hastings' Objection to the Special Master's October 7, 2023 decision (the "Decision") denying her appeal of her Death with CTE claim denial (the "Objection"). For the reasons set forth below, the Special Master's Decision was correct and should be affirmed.[1]

## PRELIMINARY STATEMENT

Carleen Hastings, Representative Claimant for the late Christopher Mims, submitted a claim on February 5, 2019—the day before the deadline for pre-Effective Date claims—for a Qualifying Diagnosis of Death with CTE purportedly rendered by neuropathologist Dr. Ronald L. Hamilton. In support of her claim, Ms. Hastings submitted an undated letter from Dr. Hamilton claiming to diagnose Mr. Mims with CTE. In her recent Appeal, Ms. Hastings **conceded**, for the first time, that "Dr. Hamilton's CTE diagnosis was not made before April 22, 2015." (Appeal at 8.) The Special Master thus made the binding factual finding that "Dr. Hamilton's examinations post-dated April 22, 2015," and concluded that the Death with CTE diagnosis was "too late" under the plain terms of Section 6.3(f) of the Settlement Agreement, requiring that "[a] Qualifying Diagnosis of Death with CTE shall be made only for Retired NFL Football Players who died prior to the Final Approval Date [April 22, 2015], through a post-mortem diagnosis made by a board-certified neuropathologist prior to the Final Approval Date." (Decision at 13, 22; Settlement Agreement § 6.3(f).) Accordingly, the Decision found that, in denying Ms. Hastings' claim, "[t]he

---

[1] Ms. Hastings' Objection exceeds—indeed, is approximately double—the applicable page limit. (*See* Rules Governing Appeals of Claim Determinations 5(f), 32(a)). Accordingly, Ms. Hastings' counsel and Class Counsel consented to a page limit extension of up to 10 single spaced pages or 20 double spaced pages, which the Claims Administrator approved by email correspondence on December 11, 2023.

Claims Administrator correctly applied the Amended Settlement Agreement's clear textual command." (Decision at 22.)

Ms. Hastings' Objection, however, argues that the Special Master erred in finding her Death with CTE diagnosis untimely under the Settlement Agreement. Relying on a Settlement FAQ, Ms. Hastings argues that the diagnosis date for Death with CTE is "the date of the Player's death, even though the diagnosis is not made until after the Player dies." (Objection at 6 (quoting Settlement FAQ 100).) However, as the Special Master correctly concluded, this FAQ—which is not part of the Settlement Agreement and cannot vary its clear terms—describes how Monetary Awards are to be computed. The FAQ thus defines the date "from which *payment* for the Diagnosis is calculated . . . not the moment at which the diagnosis occurs." (Decision at 14.) The Special Master correctly held that "a Diagnosis of Death with CTE occurs when the neuropathologist conducts his or her medical examination and reaches a judgment." (Decision at 1.) Because, as Ms. Hastings concedes, that examination and diagnosis occurred after April 22, 2015—the diagnosis deadline clearly set forth in Section 6.3(f) of the Settlement Agreement—her claim was properly rejected as untimely.

In the alternative, Ms. Hastings argues that the Special Master erred in rejecting her argument that enforcement of the Settlement Agreement's April 22, 2015 diagnosis deadline for Death with CTE purportedly violates Settlement Class Members' due process rights because the diagnosis deadline was a change to the preliminary Unamended Settlement Agreement without proper notice. (Objection at 2.) But, as the Special Master correctly concluded upon a searching analysis of both the Unamended Settlement's plain language and contemporaneous extrinsic evidence, "this argument is without factual or legal merit" and "fail[s] at its first step" because the Unamended Settlement Agreement "would also have imposed a CTE diagnosis deadline."

(Decision at 2, 15, 21.)     Indeed, as the Decision describes, several objectors to the Unamended Settlement—in addition to the Final Settlement—specifically challenged the adequacy of notice and the deadlines for a Qualifying Diagnosis of Death with CTE, making the same arguments that Ms. Hastings offers.[2]     Yet, in its Final Approval Order, the Court held that "[t]he content of the Long-Form Notice and Summary Notice satisfy the requirements of Rule 23 and due process," and specifically found that the notices' description of the deadlines concerning Death with CTE was "more than adequate" and "not enough to confuse a careful reader."  *In re Nat. Football League Players' Concussion Inj. Litig.*, 307 F.R.D. 351, 383–84 (E.D. Pa. 2015), *amended*, No. 2:12-MD-02323-AB, 2015 WL 12827803 (E.D. Pa. May 8, 2015), and *aff'd*, 821 F.3d 410 (3d Cir. 2016) (hereinafter "Final Approval Order").  The Third Circuit agreed with the Court that "the content of the class notice . . . satisfied Rule 23 and due process" and concluded that "the settlement's treatment of CTE does not render the agreement fundamentally unfair."  821 F.3d at 435, 444.

The relevant amendments to the Settlement Agreement (which were made without supplemental notice to the Settlement Class) raise no conceivable due process violation because they ***expanded*** benefits to the Settlement Class—specifically, the amendments ***expanded*** the deadline for a Death with CTE diagnosis to include Retired Players who died between Preliminary and Final Approval of the Settlement Agreement.[3]  It is well-settled that additional notice to a class is only necessary where amendments to a settlement agreement are materially adverse to the class,

---

[2]  (*See* ECF No. 6082; ECF No. 6237 at 6, 30–31; ECF No. 6220 at 2; ECF No. 6201 at 28; ECF No. 6213 at 3; ECF No. 6241 at 1–2; ECF No. 6439 at 3; ECF No. 6503 at 2.)

[3]  The original agreement limited the Qualifying Diagnosis to those who died and were diagnosed *prior* to Preliminary Approval.  (*See* Long-Form Notice at 6, ECF No. 6086-1 (the Settlement's benefits include "[m]onetary awards for ***diagnoses*** of Death with CTE ***prior to July 7, 2014*** . . . ") (emphasis added).)  The amendments expanded Death with CTE benefits to permit that "a Retired NFL Football Player who died between July 7, 2014 and the Final Approval Date shall have until 270 days from his date of death to obtain such a post-mortem diagnosis."  (Settlement Agreement § 6.3(f).)

not where they benefit the class, as here.[4]  Thus, this Court held and the Third Circuit affirmed, "Because these changes improved the deal for Class Members without providing any concessions to the NFL Parties, an additional round of notice for Class Members is unnecessary." (*Id.* at 386.) The Special Master relied on these opinions, finding that the "amendments, as Judge Brody already held, improved the deal without taking rights away. [Ms. Hastings'] Appeal must fail at its first step: [she] cannot show that [she was] harmed by the 2015 amendments." (Decision at 21.)

For these reasons, and those set forth below, Ms. Hastings' Objection should be denied.[5] The NFL Parties respectfully request that the Court (1) affirm that Ms. Hastings' claim fails because it is untimely under the Settlement Agreement's clear deadline for a Death with CTE diagnosis; and (2) hold (consistent with the Court's Final Approval Order, unanimously affirmed by the Third Circuit) that the original notice of the Settlement Agreement and its later-expanded deadline for a Death with CTE diagnosis satisfy due process.

## **BACKGROUND**

Ms. Hastings' claim has a long and tortured history, but she has never offered any evidence that her claim is timely under the Settlement Agreement.

---

[4]   (*See* NFL Parties' Opp. to Mot. to Modify, ECF No. 8430 at 8–9 (collecting cases)).

[5]   The Objection purports to reserve Ms. Hastings' right, if the Objection is denied, "to re-urge the Motion to Modify [ECF 6479] this Court denied without prejudice on October 24, 2017 [ECF 8557]." (*See* Objection at 4.)  This makes no sense.  The Court's denial of the Motion to Modify directed plaintiff to raise any due process arguments with respect to notice through the appeals process.  ECF No. 8557 ("Plaintiff . . . can go through the appeals process and raise any issues as to why she is entitled to relief—including, but not limited to, the notice issue raised in her motion to modify.")  That is exactly what Ms. Hastings has done here.  Indeed, Ms. Hastings' Objection specifically asks the Court to address this alternative argument "in the context of the due process arguments described in the Motion to Modify," noting that "Class Member has previously provided the Court with briefing on its due process arguments based on the fact that the original settlement requirement contains no diagnosis deadline." (*See* Objection at 2, 6.)  If, as we urge, the Court affirms the Decision's legal conclusion that the Unamended Settlement Agreement contained a diagnosis deadline as well as this Court's prior ruling (affirmed by the Third Circuit) that notice satisfied due process, including specifically with respect to death with CTE, Ms. Hastings would be estopped from raising the same argument through a renewed Motion to Modify.

On July 30, 2019, the Claims Administrator denied Ms. Hastings' claim, finding that the undated letter from Dr. Hamilton failed to substantiate that the Death with CTE diagnosis was made before the April 22, 2015 diagnosis deadline or that Dr. Hamilton conducted a post-mortem examination of the Retired Player's brain tissue to confirm a CTE diagnosis, as required by the Settlement Agreement.[6]  (July 30, 2019 Denial Notice.)  The Special Master affirmed the denial because Ms. Hastings "did not show clear and convincing evidence of error in the Claims Administrator's decision."  (October 31, 2019 Post-Appeal Notice of Denial.)

Ms. Hastings filed an Objection to the Special Master's decision.  The Court remanded the claim to the Special Master for "further explanation" of the grounds for denial.  (*See* June 16, 2020 Settlement Implementation Order.)  In a written opinion, the Special Master held that "the evidence suggests that Dr. Hamilton did examine the late Mr. Mims' brain tissue," but that the claim was properly denied for untimeliness because "there is no evidence that the diagnosis of Death with CTE was obtained before the appropriate deadline."  (July 15, 2020 Special Master Decision.)  Ms. Hastings thereafter renewed her objections.

On February 24, 2023, the Court issued a brief order (the "Order") remanding Ms. Hastings' claim to the Special Master, with instruction to return the claim to the Claims Administrator "to further determine the sufficiency of the" claim package.  (Order.)  The Court made no statement whatsoever about the timeliness of Ms. Hastings' claim or the merits of her objections.  The present Objection mischaracterizes the Court's Order as "revers[ing] a denial of this claim based on purported untimeliness of the diagnosis," even though the Order only "remanded" the claim and did not address the merits in any respect.  (Objection at 1; Order.)  As

---

[6]    As the Court made clear in its Final Approval Order, post-mortem examination of brain tissue is the *only* way that CTE can be diagnosed, as "no one can conclusively say that someone had CTE until a scientist looks at sections of that person's brain under a microscope . . ."  (Final Approval Order at 397.)

the Special Master squarely found, the Order "did not conclude that the Claims were timely."[7] (Decision at 13.)

In the four years since the original denial of her claim, Ms. Hastings has offered no evidence that Dr. Hamilton made a timely diagnosis and thus, upon further review, the Claims Administrator again denied Ms. Hastings' claim. Specifically, the Claims Administrator stated that it was "unable to confirm whether the diagnosis was made prior to the 4/22/2015 Final Approval Date in order to meet the Settlement's requirements for a Qualifying Diagnosis of Death with CTE. The one-page letter provided by Dr. Hamilton is undated and does not indicate whether the diagnosis was made prior to 4/22/2015, as required by the Settlement's Injury Definition for the Qualifying Diagnosis of Death with CTE. The date of Dr. Hamilton's diagnosis has not been provided." (May 16, 2023 Denial Notice.)

Ms. Hastings again appealed the Claims Administrator's determination, arguing that "the language the Claims Administrator relies on could not have added a diagnosis-date requirement because it was added to the settlement agreement after the opt out deadline without notice to Class Member and other absent class members." (Appeal at 8.) The Appeal, like this Objection, similarly offered no evidence that Dr. Hamilton diagnosed Mr. Mims with CTE prior to April 22, 2015, as the Settlement Agreement requires. Rather, the Appeal **conceded**, for the first time, that

---

[7]    Notably, the Court's Order disposed of 20 Death with CTE claims. The Order found that 18 claims, all of which lacked evidence of any post-mortem examination of brain tissue, were "insufficient" and the objection was denied with respect to these claims. The remaining two claims (including Ms. Hastings'), which contained evidence of post-mortem examination of brain tissue, were remanded so the claims review process could start anew. Ms. Hastings' suggestion that the Court's mere remand of these two claims, without any discussion or explanation, constituted a substantive ruling by the Court that the claims were not untimely is simply not credible. To construe the Order in this way would require (i) that the Court rejected, without any discussion or explanation, the Settlement Agreement's clear deadline and the reasoned conclusions of the Special Master and Claims Administrator on the question; or (ii) that the Court found, without any discussion or explanation, a due process violation in enforcing that deadline, even though the Court had previously rejected such an argument in connection with Settlement approval. Nothing in the history of the Court's administration of the Settlement Agreement would support an assumption that the Court made critical substantive rulings *sub silentio*.

"Dr. Hamilton's CTE diagnosis was not made before April 22, 2015." (Appeal at 8.)  As the Special Master found, this concession plainly establishes that Mr. Mims' CTE diagnosis was untimely under the clear terms of the Settlement Agreement.  (Decision at 13, 22.)  The Special Master made a binding factual finding that Dr. Hamilton's examination occurred after April, 22, 2015, rendering Ms. Hastings' claim untimely.  (Decision at 13.)

To address Ms. Hastings' due process arguments, the Special Master requested supplemental briefing on whether the Unamended Settlement contained a diagnosis deadline (in addition to a deadline for the Player's death).  After considering both parties' submissions, the Special Master concluded that the Unamended Settlement "would have denied recovery for a death with CTE that preceded [preliminary settlement approval], but which was diagnosed by examination of brain tissue after that date."  (Decision at 21.)  Thus, the February 2015 amendments extending the diagnosis deadline did not "cut back on Claimants' rights"  (Decision at 21.)  "[T]he requirement that death and diagnosis both occur prior to the final approval date was not novel to the Amended Agreement but was present in the [Unamended] Agreement as well." (Decision at 22.)  Accordingly, the Special Master concluded that Ms. Hastings' argument that the diagnosis deadline in the Amended Settlement Agreement unfairly curtailed Ms. Hastings' rights is "without factual or legal merit."  (Decision at 15.)

## ARGUMENT

### I.     Ms. Hastings' Claim Was Correctly Ruled Untimely Because the Diagnosis Occurred After the Settlement's April 22, 2015 Deadline

The Special Master's Decision was correct in finding that Ms. Hastings' Death with CTE claim was untimely under the Settlement Agreement because the diagnosis occurred after the Final Approval Date of April 22, 2015.  As the Decision observed, the plain language of the Settlement

Agreement contains deadlines for two independent events—the date of death and the date of diagnosis—both of which must occur prior to the Final Approval Date:

> "A Qualifying Diagnosis of Death with CTE shall be made only for Retired NFL Football Players who died prior to the Final Approval Date, through a post-mortem diagnosis made by a board-certified neuropathologist prior to the Final Approval Date, provided that a Retired NFL Football Player who died between July 7, 2014 and the Final Approval Date shall have until 270 days from his date of death to obtain such a post-mortem diagnosis. (Settlement Agreement § 6.3(f).)

If, as Ms. Hastings contends, the date of diagnosis for Death with CTE is simply the date of death, the Settlement Agreement would not have twice stated a deadline of "prior to the Final Approval Date" for two separate events: (i) death and (ii) post-mortem diagnosis by a board-certified neuropathologist. (*See id.*) Moreover, it would have made no sense for the Settlement Agreement to provide a Retired Player who died between Preliminary Approval and Final Approval 270 days from the date of death to obtain a post-mortem diagnosis if there was no independent diagnosis deadline and the date of death was treated as the date of diagnosis. As the Decision correctly concluded, "a Diagnosis of Death with CTE occurs when the neuropathologist conducts his or her medical examination and reaches a judgment." (Decision at 1.)

The Settlement Agreement plainly sets forth the dual deadlines recognized by the Special Master, and Ms. Hastings' contorted reading of FAQ 100 cannot vary the terms of that agreement. As the Special Master held: "Given the Amended Settlement's text at 6.3(f), which controls, and the FAQ's preamble language, the FAQ must set the date from which *payment* for the Diagnosis is calculated for the Program's payment grid, not the moment at which the Diagnosis occurs. Any other result would run afoul of the text of the Amended Settlement." (Decision at 14.)

## II.    The Special Master Correctly Ruled that the Unamended Settlement Agreement Included a Diagnosis Deadline for Death with CTE

Special Master Hoffman, one of the most widely cited scholars on contract law,[8] correctly read the plain text of the Unamended Settlement to include a diagnosis deadline for claims of Death with CTE.  The Unamended Settlement, like the final Agreement, is governed by New York law.  (*See* Unamended Settlement § 27.1(a).)  As the Special Master noted, under New York law the "fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent."  *Greenfield* v. *Philles Recs., Inc.*, 98 N.Y.2d 562, 569 (2002).  "'The best evidence of what parties to a written agreement intend is what they say in their writing.'  Thus, a written agreement that is clear and unambiguous on its face must be enforced according to the plain meaning of its terms, and extrinsic evidence of the parties' intent may be considered only if the agreement is ambiguous."  *Banco Espirito Santo, S.A.* v. *Concessionaria Do Rodoanel Oeste S.A.*, 100 A.D.3d 100, 106 (N.Y. App. Div. 2012) (citation omitted).  When determining if there is an ambiguity, "[t]he entire contract must be reviewed and '[p]articular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby.  Form should not prevail over substance and a sensible meaning of words should be sought.'"  *Riverside S. Plan. Corp.* v. *CRP/Extell Riverside, L.P.*, 13 N.Y.3d 398, 404 (2009) (citation omitted).  Thus, courts interpret contracts to give all provisions effect, and avoid rendering any superfluous or meaningless.  *Burlington Ins. Co.* v. *NYC Transit Auth.*, 29 N.Y.3d 313, 322 (2017).

---

[8]    *See* Brian Leiter, *10 Most-Cited Commercial Law Scholars in the U.S., 2016-2020* (Aug. 30, 2021), https://leiterlawschool.typepad.com/leiter/2021/08/10-most-cited-commercial-law-scholars-in-the-us-2016-2020.html.

### A.     The Plain Text of the Unamended Settlement, Read as a Whole, Unambiguously Established the Diagnosis Deadline

The Special Master faithfully applied New York law's command to interpret the Unamended Settlement in accord with the parties' intent. *See Greenfield*, 98 N.Y.2d at 569. The Objection argues in conclusory fashion that the Special Master's textual interpretation of Section 6.3(f) is "wrong" (Objection at 6), but reading the Unamended Settlement as a whole—as New York law requires—there can be no question that the parties adopted a diagnosis deadline for Death with CTE. *See Riverside S. Plan. Corp.* v. *CRP/Extell Riverside, L.P.*, 13 N.Y.3d 398, 404 (2009).

At Section 6.3(f), the Unamended Settlement provides that, "A Qualifying Diagnosis of Death with CTE shall be made only for Retired NFL Football Players who died prior to the date of the Preliminary Approval and Class Certification Order, through a post-mortem diagnosis by a board-certified neuropathologist of CTE." (Unamended Settlement § 6.3(f).) The Special Master explained that the word "through" "connects the Player's death to a post-mortem diagnosis . . . while offering only one date by which those events can occur." (Decision at 16.) Because "most post-mortem diagnoses are proximate to death, the most natural reading is that the drafters intended that diagnoses and death would be subject to the same cutoff date" expressed in the text of Section 6.3(f).[9] (Decision at 16.) The Special Master further reasoned that other parts of the Unamended Settlement indicate that CTE diagnoses must be obtained before the cutoff date; specifically, the Subclass 2 definition includes "Retired NFL Football Players . . . who died prior to the date of the

---

[9]     Ms. Hastings asserts, without evidence, that "post-mortem diagnoses based on brain tissue typically occur months, years, or even decades after death and autopsy." (Objection at 7.) The lone study she cites "present[s] a recount of the history of neuroscience and brain archiving," including a discussion of modern brain banks, but it says nothing about the typical timing of post-mortem diagnoses based on brain tissue. *See* Arenn Faye Carlos, et al., *From brain collections to modern brain banks: A historical perspective*, ALZHEIMER'S & DEMENTIA: TRANSLATIONAL RESEARCH & CLINICAL INTERVENTIONS 5, 52 (2019). The study, published about four years after Final Approval, certainly has no bearing on the parties' intent about the meaning of Section 6.3(f) of the Unamended Settlement.

Preliminary Approval and Class Certification Order and who ***received*** a post-mortem diagnosis of CTE." (Decision at 16–17; Unamended Settlement § 1.2(b) (emphasis added).)  As the Special Master reasonably found, the conjunctive "and" and past-tense "received" strongly imply that diagnosis and death must both happen prior to Preliminary Approval.  If the parties had intended to allow an open-ended diagnosis deadline after the Preliminary Approval, the agreement would have referred to those who "receive" a diagnosis rather than using the past tense "received." (Decision at 17.)[10]

Moreover, the Special Master's interpretation relied on substantial textual evidence in the exhibits to the Unamended Settlement.  (Decision at 17–18.)  The draft notice to Class Members, attached as Exhibit B-5 to the Unamended Settlement, makes clear that the Section 6.3(f) ***deadline*** applies to any ***diagnosis*** of Death with CTE (and not simply to the Player's date of death).  Importantly, the Unamended Settlement specifically provides that "its exhibits, attachments, and appendices will constitute the entire agreement and understanding among the parties" and that "[a]ll of the exhibits attached hereto are hereby incorporated by references as though fully set forth herein." (Unamended Settlement §§ 30.3, 30.5.)[11]  Accordingly, the draft notice to Class Members attached as Exhibit B-5 is essential to discerning the parties' intent.  *See Riverside S. Plan. Corp.*,

---

[10]  Ms. Hastings' observation that Subclass 1 includes Retired Players who were not diagnosed with Death with CTE prior to preliminary approval is irrelevant to the existence of the diagnosis deadline; the subclasses were intended to "prevent conflicts of interest between Class Members" during litigation.  (Final Approval Order at 376.)  The existence of Subclass 1 cuts against Ms. Hastings' preferred interpretation of the Unamended Settlement because the Subclass 1 representative, who had not been diagnosed with CTE but alleged that he was at risk of developing CTE, participated through counsel in the vigorous negotiation of the settlement with "an incentive to negotiate for varied and generous future awards in light of the current uncertainty in his diagnosis."  (Final Approval Order at 377.)  Accordingly, the Third Circuit recognized that the Settlement's treatment of CTE "was the bargain struck by the parties" and "does not render the agreement fundamentally unfair."  821 F.2d at 444.

[11]  *See also* Unamended Settlement § 2.1 ("references to this Settlement Agreement will include all exhibits, schedules, and annexes hereto."); *id.* § 2.1(hhhh) (defining "Settlement Agreement" as "this Settlement Agreement and all accompanying exhibits, including any subsequent amendments thereto and any exhibits to such amendments.").

13 N.Y.3d at 404 (in discerning the parties' intent, the Court should review the agreement as a whole and give effect to all provisions).

As the Special Master reasoned, the plain, unambiguous language of the draft notice confirms the parties' intent to include a diagnosis deadline for Death with CTE in the Unamended Settlement.  The draft notice begins with a summary that sets Death with CTE apart from other potential diagnoses, noting that the Unamended Settlement "will provide eligible retired players" with "*[m]onetary awards for diagnoses* of ALS (Lou Gehrig's disease), Parkinson's Disease, Alzheimer's Disease, early and moderate Dementia and *certain cases of chronic traumatic encephalopathy (CTE) (a neuropathological finding) diagnosed after death*."  (Unamended Settlement, Ex. B-5 at 1 (emphasis added).)  This language clearly alerts readers that some, but not all post-mortem diagnoses would be compensated.  More specifically, the draft notice contains a Q&A that unambiguously reflects a deadline for any diagnosis of Death with CTE.  In answer to the question, "What are the benefits of the Settlement?," the draft notice states that "the NFL Parties will pay to fund . . . Monetary awards for *diagnoses of* ALS, Parkinson's Disease, Alzheimer's Disease, Level 2 Neurocognitive Impairment (*i.e.* moderate Dementia), Level 1.5 Neurocognitive Impairment (*i.e.* early Dementia) and *Death with CTE prior to [Date of Preliminary Approval Order]*."  (*Id.* at 6 (emphasis added).)  This language is determinative, as the only reasonable interpretation is that—unlike all other qualifying diagnoses—there is a diagnosis deadline for Death with CTE tied to the date of preliminary approval.  *Cf. Banco Espirito Santo, S.A.*, 100 A.D.3d at 108 ("Ambiguity . . . only exists if there is more than one reasonable interpretation of the language at issue").  Accordingly, the Special Master noted that this clause "explicitly cut-off CTE awards in time."  (Decision at 17.)

The Special Master specifically addressed the more general Q&A in the draft notice that Ms. Hastings repeatedly and selectively quotes in her Objection, finding that it can "be harmonized with the rest of the text," and noting that the Unamended Settlement provides that "any inconsistency . . . will be resolved in favor of this Settlement Agreement." (Decision at 17; *id.* n.89.) That Q&A, which explains that "[a] Qualifying diagnosis may occur at any time until the end of the 65-year term of the Monetary Award Fund," is making a general statement with respect to the Settlement and the many Qualifying Diagnoses available under it; but this generalized statement is controlled, under the *noscitur a sociis* principle, by the "specific and explicit CTE [diagnosis] deadline" repeated elsewhere in the draft notice. (Decision at 17.)

Accordingly, the draft notice establishes the parties' clear intent that the Unamended Settlement contains a diagnosis deadline for Death with CTE. The draft notice, which reflects the parties' effort to communicate in plain language the benefits of the Unamended Settlement to Class Members, clearly states that eligible retired players would receive monetary awards based on "diagnoses," and that for Death with CTE only "certain cases" would be compensated, specifically "diagnoses of . . . Death with CTE prior to [Date of Preliminary Approval Order]." (Unamended Settlement, Ex. B-5 at 1, 6.) The parties' unambiguous intent to include a diagnosis deadline for Death with CTE, as evidenced in the Unamended Settlement, must control.

### B.    Substantial Contemporaneous Extrinsic Evidence Confirms that the Parties and Class Members Recognized the Death with CTE Diagnosis Deadline

Moreover, as the Special Master correctly concluded, *even if* the Unamended Settlement were ambiguous (and it is not), numerous contemporaneous filings and documents demonstrate that the parties, Court, and Class Members all understood that it contained a diagnosis deadline for a Qualifying Diagnosis of Death with CTE. The Settlement's treatment of CTE was extensively litigated over the course of the Settlement's approval. While much of the debate centered on the

inclusion of the date of death deadline, the parties, Class Members, and Court appreciated (and none contested) that there was also a diagnosis deadline.  Indeed, many Class Members specifically objected to the diagnosis deadline, which the parties defended in their briefing and the Court approved.  (*See* Decision at 5–6.)  These contemporaneous objections, the approved notice sent to Class Members in July 2014, the November 19, 2014 fairness hearing, the February 2015 amendments, and the Court's Final Approval Order (affirmed by the Third Circuit) all dispel any possible doubt about the Unamended Settlement's diagnosis deadline.  Indeed, the Special Master underscored that the "best evidence of the intent of the parties to a contract is their conduct after the contract is formed."[12]  (Decision at 18 n.96 (quoting *Waverly Corp.* v. *City of New York*, 48 A.D.3d 261, 265 (N.Y. App. Div. 2008)).)

*First*, like the draft notice in the Unamended Settlement, the approved Long-Form Notice that was actually sent to Ms. Hastings and the other Class Members in July 2014 unambiguously stated that the Settlement's benefits include "[m]onetary awards for ***diagnoses*** of Death with CTE ***prior to July 7, 2014*** . . . ," the date of the Preliminary Approval Order.  (Long-Form Notice at 6, ECF No. 6086-1 (emphasis added).)  The Special Master noted that the parties revised the language

---

[12]    Ms. Hastings argues that "extrinsic evidence would not be relevant to Class Member's claims because Class Member was an absent class member when the settlement agreement was negotiated and, thus, was not involved in negotiating the settlement agreement."  (Objection at 9.)  However, the guiding principle of contract interpretation is to focus on the *parties'* intent, and the "Settlement Agreement will be deemed to have been mutually prepared by the Parties and will not be construed against any of them by reason of authorship." (Unamended Settlement § 30.7.)  The fact that Ms. Hastings did not directly participate is irrelevant; the Court found that the Class Counsel and Class Representatives adequately represented absent class members' interests. (Final Approval Order at 373–79.)

Moreover, multiple absent class members participated in the settlement approval process and objected to the CTE diagnosis deadline.  *See infra* at 15–16.  Like these absent class members, Ms. Hastings had a full and fair opportunity to raise her criticism of the Death with CTE diagnosis deadline during settlement approval.  That is all Rule 23 and due process require.  The case Ms. Hastings cites to argue that ambiguities must be construed against the Settlement, in fact, *undermines* her argument and aligns with the Special Master's interpretive approach.  *See Coliseum Towers Assocs.* v. *Cnty. of Nassau*, 2 A.D.3d 562, 564 (N.Y. App. Div. 2003) ("the practical interpretation of a contract by the parties to it for any considerable period of time before it comes to be the subject of controversy is deemed of great, if not controlling, influence") (citation omitted).

from the draft notice, "sharpening the dual deadline." (Decision at 19.)  The Notice and link to the widely used settlement website—which contained the same language—were sent directly to Ms. Hastings.  The Special Master noted that the "written sources, at the very least, would have reinforced the diagnostic deadline." (Decision at 19.)[13]

*Second*, as the Special Master found, objections from Class Members who disagreed with the Unamended Settlement's treatment of CTE recognized the existence of the diagnosis deadline. Indeed, the Special Master "searched the record in vain to find any examples of *anyone* reading the [Unamended Settlement] as [Ms. Hastings] did before 2017," when the Motion to Modify (ECF 8263) was filed.  (Decision at 20.)  For example, the Special Master noted an objection that "the settlement would compensate only those few cases of CTE ***detected before preliminary approval*** of the settlement, to the exclusion of all future cases," and that the notice did not explain "that while ***past diagnosed cases of CTE are covered*** if a class member dies before preliminary approval, no future cases of CTE post-preliminary approval are covered." (Decision at 20 (quoting ECF No. 6082 at 22, 39–40 (emphasis revised)).)  Additional Class Members raised the same objection to the Unamended Settlement, criticizing the CTE diagnosis deadline.  Among other examples, Class Members argued:

- "[Objectors] object to the [Unamended Settlement] because ***a 'Death with CTE' qualifying diagnosis requires, as noted above, retirees to have died and been diagnosed with CTE prior to July 7, 2014***.  (*See* [Unamended Settlement], §6.3(f))." (ECF No. 6237 at 6 (emphasis added).)

- The initial settlement (filed January 6, 2014) was problematic because "[p]layers suffering from CTE who ***would be diagnosed*** or who died after [Preliminary Approval] were to receive nothing." (ECF No. 6082 at 13 (emphasis added).)  "[Intervenors'] interests were not adequately represented during the negotiation of the initial settlement, in part, because

---

[13]  Every page of the Long-Form Notice had a bolded footer that read "Questions?  Call 1-855-887-3485 or Visit www.NFLConcussionSettlement.com."  (*See* ECF No. 6086-1; *see also* ECF No. 6423-12 ¶ 45 (as of October 14, 2014—prior to the opt-out deadline, objection deadline, and 2015 amendments—over 62,989 unique visitors accessed the settlement website and 4,544 individuals called the toll-free number with 2,302 speaking with a live operator).)

that settlement arbitrarily denied compensation to individuals whose CTE went ***undetected*** until after preliminary approval." (*Id.* at 14 (emphasis added).) "If a player is ***diagnosed with CTE after the preliminary approval stage***, he is entitled to ***nothing forever*** – regardless of the Monetary Award Fund's duration." (*Id.* at 30–31 (emphasis added).)

- "[T]here is no reason why a ***CTE diagnosis before preliminary approval*** should be sufficient to demonstrate entitlement to a multi-million dollar award while a ***future diagnosis*** entitles a class member to nothing. (ECF No. 6201 at 28 (emphasis added).)

- "[Objectors] believe that it is unfair for class members who are not ***diagnosed*** prior to the certification of the class to receive nothing." (ECF No. 6439 at 3 (emphasis added).)

Indeed, like Ms. Hastings, some Class Members vigorously argued that the Notice was insufficiently clear about the diagnosis deadline for Death with CTE. (*See* ECF Nos. 6082, 6201.) These arguments were made publicly, responded to by the parties, considered by the Court, and ultimately rejected. The several objections to the diagnosis deadline and the Notice's treatment of it demonstrate that, at the time of preliminary approval and the fairness hearing, it was well understood that a Qualifying Diagnosis of Death with CTE had a diagnosis deadline. Thus, the Special Master reasonably concluded that these objectors' arguments "reinforce the prevailing understanding that the CTE *Diagnosis* deadline was real, controversial, and distinct from other parts of the Agreement." (Decision at 20.)

*Third*, the November 19, 2014 fairness hearing further demonstrates the parties' intent to include a Death with CTE diagnosis deadline and the Court's full consideration of the issue. At the fairness hearing, which occurred prior to the February 2015 amendments, the Court heard extensive debate over the Unamended Settlement's treatment of CTE. The Court heard argument regarding an objection—almost identical to Ms. Hastings'—that class notice failed clearly to convey the Death with CTE diagnosis deadline. Objectors' counsel argued that "a player reading the long-form notice would be misled" by one part of the notice that said "[a] qualifying diagnosis may occur at any time until the end of a 65-year term of the monetary award fund," which counsel

characterized as "certainly not true if in fact death with CTE before July 7th of 2014 is what gets you an award." (ECF No. 6463, Fairness Hearing Tr. at 95:3–9.)[14] Class Counsel responded that "under the section entitled 'What are the benefits of the settlement?' . . . it says monetary awards for diagnosis of death with CTE prior to July 7, 2014. I think if you're reading the notice, the section if you want to know what your benefits are, you're probably going to go to the section that says, what are the benefits of the settlement? The notice does that." (*Id.* at 199:3–13.) The Court agreed: "I read them and I thought that this one was very specific. I mean if anyone wants to review them, they ought to review all the others." (*Id.* at 200:12–15.)

*Fourth*, the February 2015 amendments extending the diagnosis deadline for Death with CTE conclusively demonstrate that such a deadline also existed in the Unamended Settlement. In response to a February 2, 2015 Court Order (ECF No. 6479), the parties amended the deadline to obtain a Qualifying Diagnosis of Death with CTE from the Preliminary Approval Date to the Final Approval Date, and provided a 270-day grace period in which Settlement Class Members who died between the Preliminary Approval Date and the Final Approval Date could obtain a Qualifying Diagnosis. The Special Master correctly determined that the extension "cuts against [Ms. Hastings'] preferred interpretation" because the Court recommended the extension to prevent the unfairness of a Retired Player lacking sufficient notice to obtain a Qualifying Diagnosis. (Decision at 20; Final Approval Order at 397 ("The Parties provided compensation for Death with CTE until the Final Approval Date because they recognized that Retired Players who died prior to final approval did not have sufficient notice that they had to obtain Qualifying Diagnoses.").) The 270-day grace period would be wholly superfluous if there were no diagnosis deadline in the

---

[14] Ms. Hastings similarly contends that "absent class members were consistently told they could obtain a diagnosis for Death with CTE at 'any time until the end of the 65-year term of the Monetary Award Fund.'" (Objection at 5.) Unlike objector's counsel at the Fairness Hearing, Ms. Hastings simply ignores the clear language in the notice describing the diagnosis deadline for Death with CTE.

Unamended Settlement, as moving the date of death deadline to Final Approval would have been sufficient to expand the benefit.  If, as Ms. Hastings argues, the Unamended Settlement required only that a Retired Player died prior to the deadline in order for a diagnosis made at *any unlimited future date* to be timely, the February 2015 amendments would not have added language providing that a Retired Player who died between July 7, 2014 and April 22, 2015 "*shall have until 270 days from his date of death to obtain such a post-mortem diagnosis.*"  (Settlement Agreement Ex. A-1 § 5 (emphasis added).)  Indeed, the parties specifically explained to the Court that "***consistent with the Parties' intent under the original Settlement Agreement***, and recognizing that obtaining such a [CTE] ***diagnosis may take several months post-death***, the Parties have provided for a grace period of 270 days following any date of death between preliminary approval and the Final Approval Date to allow Claimants to obtain the necessary diagnosis."  (Joint Submission at 4–5, ECF No. 6481 (emphasis added).)  The parties' Joint Proposed Findings of Fact and Conclusions of Law in Support of Final Approval also repeatedly states the original intent to set a diagnosis deadline, which was then extended along with a 270-day grace period.  (*See* ECF No. 6497 ¶¶ 62, 78, 178, 358, 380, 496, 502.)

Following the February 2015 amendments and prior to Final Approval, Class Members were informed of the extended deadline for Death with CTE diagnoses by FAQ 41 on the Settlement website, which stated, "The Representative Claimant of a player who died before the Final Approval Date may establish Death with CTE by submitting medical records showing a ***diagnosis*** of Death with CTE made by a board-certified neuropathologist ***after the player's death and before the Final Approval Date***.  If the player died between July 7, 2014 and the Final Approval Date, his Representative Claimant has until 270 days after the player's death to obtain the post-mortem diagnosis.  Players who died on or after the Final Approval Date (which has not

yet occurred) are not eligible for benefits for Death with CTE." (Ex. 1, Settlement FAQs (Apr. 1, 2016) (emphasis added); *see also* ECF No. 6423-12 ¶¶ 39–47.)

The objections following the February 2015 amendments recognized that the Unamended Agreement contained a diagnosis deadline for Death with CTE that the amendments extended. Specifically, objectors argued that "[w]hile expanding the covered deaths to those occurring between the preliminary approval and final approval dates, ***and extending the deadline to secure the necessary post-mortem diagnosis*** until 270 days after the date of death, are steps in the right direction, in truth, there should be no deadline for Death with CTE benefits since death is one of the elements of the claim." (ECF No. 6503 at 2 (emphasis added).)

*Fifth*, in its Final Approval Order, the Court squarely rejected Ms. Hastings' due process argument that the February 2015 amendments inserted a "new" diagnosis deadline for Death with CTE that did not exist in the Unamended Settlement. As the Court explained and Third Circuit affirmed, "[b]ecause these changes [in the 2015 Amendments] improved the deal for Class Members without providing any concessions to the NFL Parties, an additional round of notice for Class Members is unnecessary." *In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. 351, 386 (E.D. Pa. 2015), *amended*, No. 2:12-MD-02323-AB, 2015 WL 12827803 (E.D. Pa. May 8, 2015), and *aff'd*, 821 F.3d 410 (3d Cir. 2016). If the February 2015 amendments newly inserted a diagnosis deadline when none had previously existed, that clearly would have been a "concession" to the NFL Parties which the Court determined had not occurred.

In sum, even if the plain text of the Unamended Settlement Agreement were ambiguous (and it is not), voluminous parol evidence confirms that the Unamended Agreement contains a diagnosis deadline for Death with CTE.

**Conclusion**

Simply put, the denial of Ms. Hastings' claim is required under the judicially approved terms of the Settlement Agreement and those terms raise no due process concerns. The Objection should be denied.

Dated:  December 13, 2023

Respectfully submitted,

PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP

*/s/ Brad S. Karp*_____
Brad S. Karp
Bruce Birenboim
Claudia Hammerman
Lynn B. Bayard
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990
Email:  bkarp@paulweiss.com

*ATTORNEYS FOR THE
NATIONAL FOOTBALL LEAGUE
AND NFL PROPERTIES LLC*

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br><br>MDL No. 2323<br><br>Hon. Anita B. Brody |
| Kevin Turner and Shawn Wooden, *on behalf of themselves and others similarly situated*,<br><br>                    Plaintiffs,<br><br>            v.<br><br>National Football League and NFL Properties LLC, successor-in-interest to NFL Properties, Inc.<br>                    Defendants. | Civ. Action No.: 14-cv-00029-AB |
| THIS DOCUMENT RELATES TO:<br>Settlement Class Member<br>Robin Cornish (SPID 950012548) | Hon. Anita B. Brody |

**RESPONSE OF THE NATIONAL FOOTBALL LEAGUE AND NFL PROPERTIES LLC IN OPPOSITION TO SETTLEMENT CLASS MEMBER ROBIN CORNISH'S OBJECTION TO <u>THE SPECIAL MASTER'S OCTOBER 7, 2023 RULING</u>**

# <u>TABLE OF CONTENTS</u>

<div align="right"><u>Page</u></div>

PRELIMINARY STATEMENT ................................................................................1

BACKGROUND ................................................................................................4

ARGUMENT ...................................................................................................7

I.    Ms. Cornish's Claim Was Correctly Ruled Untimely Because the Diagnosis Occurred After the Settlement's April 22, 2015 Deadline ...................................7

II.    The Special Master Correctly Ruled that the Unamended Settlement Agreement Included a Diagnosis Deadline for Death with CTE ..........................................9

    A.    The Plain Text of the Unamended Settlement, Read as a Whole, Unambiguously Established the Diagnosis Deadline ............................................10

    B.    Substantial Contemporaneous Extrinsic Evidence Confirms that the Parties and Class Members Recognized the Death with CTE Diagnosis Deadline ....................................................................................13

Conclusion ...................................................................................................19

The National Football League and NFL Properties LLC (collectively, the "NFL Parties") respectfully submit this response in opposition to Settlement Class Member Robin Cornish's Objection to the Special Master's October 7, 2023 decision (the "Decision") denying her appeal of her Death with CTE claim denial (the "Objection"). For the reasons set forth below, the Special Master's Decision was correct and should be affirmed.[1]

## PRELIMINARY STATEMENT

Robin Cornish, Representative Claimant for the late Frank Cornish, submitted a claim on February 5, 2019—the day before the deadline for pre-Effective Date claims—for a Qualifying Diagnosis of Death with CTE purportedly rendered by neuropathologist Dr. Ronald L. Hamilton. In support of her claim, Ms. Cornish submitted an undated letter from Dr. Hamilton claiming to diagnose Mr. Cornish with CTE. In her recent Appeal, Ms. Cornish **conceded**, for the first time, that "Dr. Hamilton's CTE diagnosis was not made before April 22, 2015." (Appeal at 8.) The Special Master thus made the binding factual finding that "Dr. Hamilton's examinations post-dated April 22, 2015," and concluded that the Death with CTE diagnosis was "too late" under the plain terms of Section 6.3(f) of the Settlement Agreement, requiring that "[a] Qualifying Diagnosis of Death with CTE shall be made only for Retired NFL Football Players who died prior to the Final Approval Date [April 22, 2015], through a post-mortem diagnosis made by a board-certified neuropathologist prior to the Final Approval Date." (Decision at 13, 22; Settlement Agreement § 6.3(f).) Accordingly, the Decision found that, in denying Ms. Cornish's claim, "[t]he

---

[1]  Ms. Cornish's Objection exceeds—indeed, is approximately double—the applicable page limit. (*See* Rules Governing Appeals of Claim Determinations 5(f), 32(a)). Accordingly, Ms. Cornish's counsel and Class Counsel consented to a page limit extension of up to 10 single spaced pages or 20 double spaced pages, which the Claims Administrator approved by email correspondence on December 11, 2023.

Claims Administrator correctly applied the Amended Settlement Agreement's clear textual command." (Decision at 22.)

Ms. Cornish's Objection, however, argues that the Special Master erred in finding her Death with CTE diagnosis untimely under the Settlement Agreement. Relying on a Settlement FAQ, Ms. Cornish argues that the diagnosis date for Death with CTE is "the date of the Player's death, even though the diagnosis is not made until after the Player dies." (Objection at 6 (quoting Settlement FAQ 100).) However, as the Special Master correctly concluded, this FAQ—which is not part of the Settlement Agreement and cannot vary its clear terms—describes how Monetary Awards are to be computed. The FAQ thus defines the date "from which *payment* for the Diagnosis is calculated . . . not the moment at which the diagnosis occurs." (Decision at 14.) The Special Master correctly held that "a Diagnosis of Death with CTE occurs when the neuropathologist conducts his or her medical examination and reaches a judgment." (Decision at 1.) Because, as Ms. Cornish concedes, that examination and diagnosis occurred after April 22, 2015—the diagnosis deadline clearly set forth in Section 6.3(f) of the Settlement Agreement—her claim was properly rejected as untimely.

In the alternative, Ms. Cornish argues that the Special Master erred in rejecting her argument that enforcement of the Settlement Agreement's April 22, 2015 diagnosis deadline for Death with CTE purportedly violates Settlement Class Members' due process rights because the diagnosis deadline was a change to the preliminary Unamended Settlement Agreement without proper notice. (Objection at 2.) But, as the Special Master correctly concluded upon a searching analysis of both the Unamended Settlement's plain language and contemporaneous extrinsic evidence, "this argument is without factual or legal merit" and "fail[s] at its first step" because the Unamended Settlement Agreement "would also have imposed a CTE diagnosis deadline."

(Decision at 2, 15, 21.)    Indeed, as the Decision describes, several objectors to the Unamended Settlement—in addition to the Final Settlement—specifically challenged the adequacy of notice and the deadlines for a Qualifying Diagnosis of Death with CTE, making the same arguments that Ms. Cornish offers.[2]   Yet, in its Final Approval Order, the Court held that "[t]he content of the Long-Form Notice and Summary Notice satisfy the requirements of Rule 23 and due process," and specifically found that the notices' description of the deadlines concerning Death with CTE was "more than adequate" and "not enough to confuse a careful reader."  *In re Nat. Football League Players' Concussion Inj. Litig.*, 307 F.R.D. 351, 383–84 (E.D. Pa. 2015), *amended*, No. 2:12-MD-02323-AB, 2015 WL 12827803 (E.D. Pa. May 8, 2015), and *aff'd*, 821 F.3d 410 (3d Cir. 2016) (hereinafter "Final Approval Order").  The Third Circuit agreed with the Court that "the content of the class notice . . . satisfied Rule 23 and due process" and concluded that "the settlement's treatment of CTE does not render the agreement fundamentally unfair."  821 F.3d at 435, 444.

The relevant amendments to the Settlement Agreement (which were made without supplemental notice to the Settlement Class) raise no conceivable due process violation because they ***expanded*** benefits to the Settlement Class—specifically, the amendments ***expanded*** the deadline for a Death with CTE diagnosis to include Retired Players who died between Preliminary and Final Approval of the Settlement Agreement.[3]  It is well-settled that additional notice to a class is only necessary where amendments to a settlement agreement are materially adverse to the class,

---

[2]   (*See* ECF No. 6082; ECF No. 6237 at 6, 30–31; ECF No. 6220 at 2; ECF No. 6201 at 28; ECF No. 6213 at 3; ECF No. 6241 at 1–2; ECF No. 6439 at 3; ECF No. 6503 at 2.)

[3]   The original agreement limited the Qualifying Diagnosis to those who died and were diagnosed *prior* to Preliminary Approval.  (*See* Long-Form Notice at 6, ECF No. 6086-1 (the Settlement's benefits include "[m]onetary awards for ***diagnoses*** of Death with CTE ***prior to July 7, 2014*** . . . ") (emphasis added).)  The amendments expanded Death with CTE benefits to permit that "a Retired NFL Football Player who died between July 7, 2014 and the Final Approval Date shall have until 270 days from his date of death to obtain such a post-mortem diagnosis."  (Settlement Agreement § 6.3(f).)

not where they benefit the class, as here.[4]  Thus, this Court held and the Third Circuit affirmed, "Because these changes improved the deal for Class Members without providing any concessions to the NFL Parties, an additional round of notice for Class Members is unnecessary."  (*Id.* at 386.)  The Special Master relied on these opinions, finding that the "amendments, as Judge Brody already held, improved the deal without taking rights away.  [Ms. Cornish's] Appeal must fail at its first step: [she] cannot show that [she was] harmed by the 2015 amendments."  (Decision at 21.)

For these reasons, and those set forth below, Ms. Cornish's Objection should be denied.[5]  The NFL Parties respectfully request that the Court (1) affirm that Ms. Cornish's claim fails because it is untimely under the Settlement Agreement's clear deadline for a Death with CTE diagnosis; and (2) hold (consistent with the Court's Final Approval Order, unanimously affirmed by the Third Circuit) that the original notice of the Settlement Agreement and its later-expanded deadline for a Death with CTE diagnosis satisfy due process.

## **BACKGROUND**

Ms. Cornish's claim has a long and tortured history, but she has never offered any evidence that her claim is timely under the Settlement Agreement.

---

[4]  (*See* NFL Parties' Opp. to Mot. to Modify, ECF No. 8430 at 8–9 (collecting cases)).

[5]  The Objection purports to reserve Ms. Cornish's right, if the Objection is denied, "to re-urge the Motion to Modify [ECF 6479] this Court denied without prejudice on October 24, 2017 [ECF 8557]."  (*See* Objection at 4.)  This makes no sense.  The Court's denial of the Motion to Modify directed plaintiff to raise any due process arguments with respect to notice through the appeals process.  ECF No. 8557 ("Plaintiff . . . can go through the appeals process and raise any issues as to why she is entitled to relief—including, but not limited to, the notice issue raised in her motion to modify.")  That is exactly what Ms. Cornish has done here.  Indeed, Ms. Cornish's Objection specifically asks the Court to address this alternative argument "in the context of the due process arguments described in the Motion to Modify," noting that "Class Member has previously provided the Court with briefing on its due process arguments based on the fact that the original settlement requirement contains no diagnosis deadline."  (*See* Objection at 2, 6.)  If, as we urge, the Court affirms the Decision's legal conclusion that the Unamended Settlement Agreement contained a diagnosis deadline as well as this Court's prior ruling (affirmed by the Third Circuit) that notice satisfied due process, including specifically with respect to death with CTE, Ms. Cornish would be estopped from raising the same argument through a renewed Motion to Modify.

On July 30, 2019, the Claims Administrator denied Ms. Cornish's claim, finding that the undated letter from Dr. Hamilton failed to substantiate that the Death with CTE diagnosis was made before the April 22, 2015 diagnosis deadline or that Dr. Hamilton conducted a post-mortem examination of the Retired Player's brain tissue to confirm a CTE diagnosis, as required by the Settlement Agreement.[6]  (July 30, 2019 Denial Notice.)  The Special Master affirmed the denial because Ms. Cornish "did not show clear and convincing evidence of error in the Claims Administrator's decision."  (October 31, 2019 Post-Appeal Notice of Denial.)

Ms. Cornish filed an Objection to the Special Master's decision.  The Court remanded the claim to the Special Master for "further explanation" of the grounds for denial.  (*See* June 16, 2020 Settlement Implementation Order.)  In a written opinion, the Special Master held that "the evidence suggests that Dr. Hamilton did examine the late Mr. Cornish's brain tissue," but that the claim was properly denied for untimeliness because "there is no evidence that the diagnosis of Death with CTE was obtained before the appropriate deadline."  (July 15, 2020 Special Master Decision.)  Ms. Cornish thereafter renewed her objections.

On February 24, 2023, the Court issued a brief order (the "Order") remanding Ms. Cornish's claim to the Special Master, with instruction to return the claim to the Claims Administrator "to further determine the sufficiency of the" claim package.  (Order.)  The Court made no statement whatsoever about the timeliness of Ms. Cornish's claim or the merits of her objections.  The present Objection mischaracterizes the Court's Order as "revers[ing] a denial  of this claim based on purported untimeliness of the diagnosis," even though the Order only "remanded" the claim and did not address the merits in any respect.  (Objection at 1; Order.)  As

---

[6]    As the Court made clear in its Final Approval Order, post-mortem examination of brain tissue is the *only* way that CTE can be diagnosed, as "no one can conclusively say that someone had CTE until a scientist looks at sections of that person's brain under a microscope . . ."  (Final Approval Order at 397.)

the Special Master squarely found, the Order "did not conclude that the Claims were timely."[7] (Decision at 13.)

In the four years since the original denial of her claim, Ms. Cornish has offered no evidence that Dr. Hamilton made a timely diagnosis and thus, upon further review, the Claims Administrator again denied Ms. Cornish's claim.  Specifically, the Claims Administrator stated that it was "unable to confirm whether the diagnosis was made prior to the 4/22/2015 Final Approval Date in order to meet the Settlement's requirements for a Qualifying Diagnosis of Death with CTE.  The one-page letter provided by Dr. Hamilton is undated and does not indicate whether the diagnosis was made prior to 4/22/2015, as required by the Settlement's Injury Definition for the Qualifying Diagnosis of Death with CTE.  The date of Dr. Hamilton's diagnosis has not been provided."  (May 16, 2023 Denial Notice.)

Ms. Cornish again appealed the Claims Administrator's determination, arguing that "the language the Claims Administrator relies on could not have added a diagnosis-date requirement because it was added to the settlement agreement after the opt out deadline without notice to Class Member and other absent class members."  (Appeal at 8.)  The Appeal, like this Objection, similarly offered no evidence that Dr. Hamilton diagnosed Mr. Cornish with CTE prior to April 22, 2015, as the Settlement Agreement requires.  Rather, the Appeal ***conceded***, for the first time,

---

[7]    Notably, the Court's Order disposed of 20 Death with CTE claims.  The Order found that 18 claims, all of which lacked evidence of any post-mortem examination of brain tissue, were "insufficient" and the objection was denied with respect to these claims.  The remaining two claims (including Ms. Cornish's), which contained evidence of post-mortem examination of brain tissue, were remanded so the claims review process could start anew. Ms. Cornish's suggestion that the Court's mere remand of these two claims, without any discussion or explanation, constituted a substantive ruling by the Court that the claims were not untimely is simply not credible. To construe the Order in this way would require (i) that the Court rejected, without any discussion or explanation, the Settlement Agreement's clear deadline and the reasoned conclusions of the Special Master and Claims Administrator on the question; or (ii) that the Court found, without any discussion or explanation, a due process violation in enforcing that deadline, even though the Court had previously rejected such an argument in connection with Settlement approval.  Nothing in the history of the Court's administration of the Settlement Agreement would support an assumption that the Court made critical substantive rulings *sub silentio*.

that "Dr. Hamilton's CTE diagnosis was not made before April 22, 2015." (Appeal at 8.) As the Special Master found, this concession plainly establishes that Mr. Cornish's CTE diagnosis was untimely under the clear terms of the Settlement Agreement. (Decision at 13, 22.) The Special Master made a binding factual finding that Dr. Hamilton's examination occurred after April, 22, 2015, rendering Ms. Cornish's claim untimely. (Decision at 13.)

To address Ms. Cornish's due process arguments, the Special Master requested supplemental briefing on whether the Unamended Settlement contained a diagnosis deadline (in addition to a deadline for the Player's death). After considering both parties' submissions, the Special Master concluded that the Unamended Settlement "would have denied recovery for a death with CTE that preceded [preliminary settlement approval], but which was diagnosed by examination of brain tissue after that date." (Decision at 21.) Thus, the February 2015 amendments extending the diagnosis deadline did not "cut back on Claimants' rights" (Decision at 21.) "[T]he requirement that death and diagnosis both occur prior to the final approval date was not novel to the Amended Agreement but was present in the [Unamended] Agreement as well." (Decision at 22.) Accordingly, the Special Master concluded that Ms. Cornish's argument that the diagnosis deadline in the Amended Settlement Agreement unfairly curtailed Ms. Cornish's rights is "without factual or legal merit." (Decision at 15.)

## ARGUMENT

### I. Ms. Cornish's Claim Was Correctly Ruled Untimely Because the Diagnosis Occurred After the Settlement's April 22, 2015 Deadline

The Special Master's Decision was correct in finding that Ms. Cornish's Death with CTE claim was untimely under the Settlement Agreement because the diagnosis occurred after the Final Approval Date of April 22, 2015. As the Decision observed, the plain language of the Settlement

Agreement contains deadlines for two independent events—the date of death and the date of diagnosis—both of which must occur prior to the Final Approval Date:

> "A Qualifying Diagnosis of Death with CTE shall be made only for Retired NFL Football Players who died prior to the Final Approval Date, through a post-mortem diagnosis made by a board-certified neuropathologist prior to the Final Approval Date, provided that a Retired NFL Football Player who died between July 7, 2014 and the Final Approval Date shall have until 270 days from his date of death to obtain such a post-mortem diagnosis. (Settlement Agreement § 6.3(f).)

If, as Ms. Cornish contends, the date of diagnosis for Death with CTE is simply the date of death, the Settlement Agreement would not have twice stated a deadline of "prior to the Final Approval Date" for two separate events: (i) death and (ii) post-mortem diagnosis by a board-certified neuropathologist. (*See id.*)  Moreover, it would have made no sense for the Settlement Agreement to provide a Retired Player who died between Preliminary Approval and Final Approval 270 days from the date of death to obtain a post-mortem diagnosis if there was no independent diagnosis deadline and the date of death was treated as the date of diagnosis.  As the Decision correctly concluded, "a Diagnosis of Death with CTE occurs when the neuropathologist conducts his or her medical examination and reaches a judgment." (Decision at 1.)

The Settlement Agreement plainly sets forth the dual deadlines recognized by the Special Master, and Ms. Cornish's contorted reading of FAQ 100 cannot vary the terms of that agreement. As the Special Master held: "Given the Amended Settlement's text at 6.3(f), which controls, and the FAQ's preamble language, the FAQ must set the date from which *payment* for the Diagnosis is calculated for the Program's payment grid, not the moment at which the Diagnosis occurs.  Any other result would run afoul of the text of the Amended Settlement." (Decision at 14.)

## II.    The Special Master Correctly Ruled that the Unamended Settlement Agreement Included a Diagnosis Deadline for Death with CTE

Special Master Hoffman, one of the most widely cited scholars on contract law,[8] correctly read the plain text of the Unamended Settlement to include a diagnosis deadline for claims of Death with CTE.  The Unamended Settlement, like the final Agreement, is governed by New York law.  (*See* Unamended Settlement § 27.1(a).)  As the Special Master noted, under New York law the "fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent."  *Greenfield* v. *Philles Recs., Inc.*, 98 N.Y.2d 562, 569 (2002).  "'The best evidence of what parties to a written agreement intend is what they say in their writing.'  Thus, a written agreement that is clear and unambiguous on its face must be enforced according to the plain meaning of its terms, and extrinsic evidence of the parties' intent may be considered only if the agreement is ambiguous."  *Banco Espirito Santo, S.A.* v. *Concessionaria Do Rodoanel Oeste S.A.*, 100 A.D.3d 100, 106 (N.Y. App. Div. 2012) (citation omitted).  When determining if there is an ambiguity, "[t]he entire contract must be reviewed and '[p]articular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby.  Form should not prevail over substance and a sensible meaning of words should be sought.'"  *Riverside S. Plan. Corp.* v. *CRP/Extell Riverside, L.P.*, 13 N.Y.3d 398, 404 (2009) (citation omitted).  Thus, courts interpret contracts to give all provisions effect, and avoid rendering any superfluous or meaningless.  *Burlington Ins. Co.* v. *NYC Transit Auth.*, 29 N.Y.3d 313, 322 (2017).

---

[8]    *See* Brian Leiter, *10 Most-Cited Commercial Law Scholars in the U.S., 2016-2020* (Aug. 30, 2021), https://leiterlawschool.typepad.com/leiter/2021/08/10-most-cited-commercial-law-scholars-in-the-us-2016-2020.html.

### A. The Plain Text of the Unamended Settlement, Read as a Whole, Unambiguously Established the Diagnosis Deadline

The Special Master faithfully applied New York law's command to interpret the Unamended Settlement in accord with the parties' intent. *See Greenfield*, 98 N.Y.2d at 569. The Objection argues in conclusory fashion that the Special Master's textual interpretation of Section 6.3(f) is "wrong" (Objection at 6), but reading the Unamended Settlement as a whole—as New York law requires—there can be no question that the parties adopted a diagnosis deadline for Death with CTE. *See Riverside S. Plan. Corp.* v. *CRP/Extell Riverside, L.P.*, 13 N.Y.3d 398, 404 (2009).

At Section 6.3(f), the Unamended Settlement provides that, "A Qualifying Diagnosis of Death with CTE shall be made only for Retired NFL Football Players who died prior to the date of the Preliminary Approval and Class Certification Order, through a post-mortem diagnosis by a board-certified neuropathologist of CTE." (Unamended Settlement § 6.3(f).) The Special Master explained that the word "through" "connects the Player's death to a post-mortem diagnosis . . . while offering only one date by which those events can occur." (Decision at 16.) Because "most post-mortem diagnoses are proximate to death, the most natural reading is that the drafters intended that diagnoses and death would be subject to the same cutoff date" expressed in the text of Section 6.3(f).[9] (Decision at 16.) The Special Master further reasoned that other parts of the Unamended Settlement indicate that CTE diagnoses must be obtained before the cutoff date; specifically, the Subclass 2 definition includes "Retired NFL Football Players . . . who died prior to the date of the

---

[9]     Ms. Cornish asserts, without evidence, that "post-mortem diagnoses based on brain tissue typically occur months, years, or even decades after death and autopsy." (Objection at 7.) The lone study she cites "present[s] a recount of the history of neuroscience and brain archiving," including a discussion of modern brain banks, but it says nothing about the typical timing of post-mortem diagnoses based on brain tissue. *See* Arenn Faye Carlos, et al., *From brain collections to modern brain banks: A historical perspective*, ALZHEIMER'S & DEMENTIA: TRANSLATIONAL RESEARCH & CLINICAL INTERVENTIONS 5, 52 (2019). The study, published about four years after Final Approval, certainly has no bearing on the parties' intent about the meaning of Section 6.3(f) of the Unamended Settlement.

Preliminary Approval and Class Certification Order and who ***received*** a post-mortem diagnosis of CTE." (Decision at 16–17; Unamended Settlement § 1.2(b) (emphasis added).) As the Special Master reasonably found, the conjunctive "and" and past-tense "received" strongly imply that diagnosis and death must both happen prior to Preliminary Approval. If the parties had intended to allow an open-ended diagnosis deadline after the Preliminary Approval, the agreement would have referred to those who "receive" a diagnosis rather than using the past tense "received." (Decision at 17.)[10]

Moreover, the Special Master's interpretation relied on substantial textual evidence in the exhibits to the Unamended Settlement. (Decision at 17–18.) The draft notice to Class Members, attached as Exhibit B-5 to the Unamended Settlement, makes clear that the Section 6.3(f) ***deadline*** applies to any ***diagnosis*** of Death with CTE (and not simply to the Player's date of death). Importantly, the Unamended Settlement specifically provides that "its exhibits, attachments, and appendices will constitute the entire agreement and understanding among the parties" and that "[a]ll of the exhibits attached hereto are hereby incorporated by references as though fully set forth herein." (Unamended Settlement §§ 30.3, 30.5.)[11] Accordingly, the draft notice to Class Members attached as Exhibit B-5 is essential to discerning the parties' intent. *See Riverside S. Plan. Corp.*,

---

[10]   Ms. Cornish's observation that Subclass 1 includes Retired Players who were not diagnosed with Death with CTE prior to preliminary approval is irrelevant to the existence of the diagnosis deadline; the subclasses were intended to "prevent conflicts of interest between Class Members" during litigation. (Final Approval Order at 376.) The existence of Subclass 1 cuts against Ms. Cornish's preferred interpretation of the Unamended Settlement because the Subclass 1 representative, who had not been diagnosed with CTE but alleged that he was at risk of developing CTE, participated through counsel in the vigorous negotiation of the settlement with "an incentive to negotiate for varied and generous future awards in light of the current uncertainty in his diagnosis." (Final Approval Order at 377.) Accordingly, the Third Circuit recognized that the Settlement's treatment of CTE "was the bargain struck by the parties" and "does not render the agreement fundamentally unfair." 821 F.2d at 444.

[11]   *See also* Unamended Settlement § 2.1 ("references to this Settlement Agreement will include all exhibits, schedules, and annexes hereto."); *id.* § 2.1(hhhh) (defining "Settlement Agreement" as "this Settlement Agreement and all accompanying exhibits, including any subsequent amendments thereto and any exhibits to such amendments.").

13 N.Y.3d at 404 (in discerning the parties' intent, the Court should review the agreement as a whole and give effect to all provisions).

As the Special Master reasoned, the plain, unambiguous language of the draft notice confirms the parties' intent to include a diagnosis deadline for Death with CTE in the Unamended Settlement.  The draft notice begins with a summary that sets Death with CTE apart from other potential diagnoses, noting that the Unamended Settlement "will provide eligible retired players" with "*[m]onetary awards for diagnoses* of ALS (Lou Gehrig's disease), Parkinson's Disease, Alzheimer's Disease, early and moderate Dementia and *certain cases of chronic traumatic encephalopathy (CTE) (a neuropathological finding) diagnosed after death*."  (Unamended Settlement, Ex. B-5 at 1 (emphasis added).)  This language clearly alerts readers that some, but not all post-mortem diagnoses would be compensated.  More specifically, the draft notice contains a Q&A that unambiguously reflects a deadline for any diagnosis of Death with CTE.  In answer to the question, "What are the benefits of the Settlement?," the draft notice states that "the NFL Parties will pay to fund . . . Monetary awards for *diagnoses of* ALS, Parkinson's Disease, Alzheimer's Disease, Level 2 Neurocognitive Impairment (*i.e.* moderate Dementia), Level 1.5 Neurocognitive Impairment (*i.e.* early Dementia) and *Death with CTE prior to [Date of Preliminary Approval Order]*."  (*Id.* at 6 (emphasis added).)  This language is determinative, as the only reasonable interpretation is that—unlike all other qualifying diagnoses—there is a diagnosis deadline for Death with CTE tied to the date of preliminary approval.  *Cf. Banco Espirito Santo, S.A.*, 100 A.D.3d at 108 ("Ambiguity . . . only exists if there is more than one reasonable interpretation of the language at issue").  Accordingly, the Special Master noted that this clause "explicitly cut-off CTE awards in time."  (Decision at 17.)

12

The Special Master specifically addressed the more general Q&A in the draft notice that Ms. Cornish repeatedly and selectively quotes in her Objection, finding that it can "be harmonized with the rest of the text," and noting that the Unamended Settlement provides that "any inconsistency . . . will be resolved in favor of this Settlement Agreement." (Decision at 17; *id.* n.89.) That Q&A, which explains that "[a] Qualifying diagnosis may occur at any time until the end of the 65-year term of the Monetary Award Fund," is making a general statement with respect to the Settlement and the many Qualifying Diagnoses available under it; but this generalized statement is controlled, under the *noscitur a sociis* principle, by the "specific and explicit CTE [diagnosis] deadline" repeated elsewhere in the draft notice. (Decision at 17.)

Accordingly, the draft notice establishes the parties' clear intent that the Unamended Settlement contains a diagnosis deadline for Death with CTE. The draft notice, which reflects the parties' effort to communicate in plain language the benefits of the Unamended Settlement to Class Members, clearly states that eligible retired players would receive monetary awards based on "diagnoses," and that for Death with CTE only "certain cases" would be compensated, specifically "diagnoses of . . . Death with CTE prior to [Date of Preliminary Approval Order]." (Unamended Settlement, Ex. B-5 at 1, 6.) The parties' unambiguous intent to include a diagnosis deadline for Death with CTE, as evidenced in the Unamended Settlement, must control.

**B.      Substantial Contemporaneous Extrinsic Evidence Confirms that the Parties and Class Members Recognized the Death with CTE Diagnosis Deadline**

Moreover, as the Special Master correctly concluded, *even if* the Unamended Settlement were ambiguous (and it is not), numerous contemporaneous filings and documents demonstrate that the parties, Court, and Class Members all understood that it contained a diagnosis deadline for a Qualifying Diagnosis of Death with CTE. The Settlement's treatment of CTE was extensively litigated over the course of the Settlement's approval. While much of the debate centered on the

inclusion of the date of death deadline, the parties, Class Members, and Court appreciated (and none contested) that there was also a diagnosis deadline. Indeed, many Class Members specifically objected to the diagnosis deadline, which the parties defended in their briefing and the Court approved. (*See* Decision at 5–6.) These contemporaneous objections, the approved notice sent to Class Members in July 2014, the November 19, 2014 fairness hearing, the February 2015 amendments, and the Court's Final Approval Order (affirmed by the Third Circuit) all dispel any possible doubt about the Unamended Settlement's diagnosis deadline. Indeed, the Special Master underscored that the "best evidence of the intent of the parties to a contract is their conduct after the contract is formed."[12] (Decision at 18 n.96 (quoting *Waverly Corp.* v. *City of New York*, 48 A.D.3d 261, 265 (N.Y. App. Div. 2008)).)

*First*, like the draft notice in the Unamended Settlement, the approved Long-Form Notice that was actually sent to Ms. Cornish and the other Class Members in July 2014 unambiguously stated that the Settlement's benefits include "[m]onetary awards for ***diagnoses*** of Death with CTE ***prior to July 7, 2014*** . . . ," the date of the Preliminary Approval Order. (Long-Form Notice at 6, ECF No. 6086-1 (emphasis added).) The Special Master noted that the parties revised the language

---

[12]   Ms. Cornish argues that "extrinsic evidence would not be relevant to Class Member's claims because Class Member was an absent class member when the settlement agreement was negotiated and, thus, was not involved in negotiating the settlement agreement." (Objection at 9.) However, the guiding principle of contract interpretation is to focus on the *parties'* intent, and the "Settlement Agreement will be deemed to have been mutually prepared by the Parties and will not be construed against any of them by reason of authorship." (Unamended Settlement § 30.7.) The fact that Ms. Cornish did not directly participate is irrelevant; the Court found that the Class Counsel and Class Representatives adequately represented absent class members' interests. (Final Approval Order at 373–79.)

Moreover, multiple absent class members participated in the settlement approval process and objected to the CTE diagnosis deadline. *See infra* at 15–16. Like these absent class members, Ms. Cornish had a full and fair opportunity to raise her criticism of the Death with CTE diagnosis deadline during settlement approval. That is all Rule 23 and due process require. The case Ms. Cornish cites to argue that ambiguities must be construed against the Settlement, in fact, *undermines* her argument and aligns with the Special Master's interpretive approach. *See Coliseum Towers Assocs.* v. *Cnty. of Nassau*, 2 A.D.3d 562, 564 (N.Y. App. Div. 2003) ("the practical interpretation of a contract by the parties to it for any considerable period of time before it comes to be the subject of controversy is deemed of great, if not controlling, influence") (citation omitted).

from the draft notice, "sharpening the dual deadline." (Decision at 19.)  The Notice and link to

the widely used settlement website—which contained the same language—were sent directly to

Ms. Cornish.  The Special Master noted that the "written sources, at the very least, would have

reinforced the diagnostic deadline." (Decision at 19.)[13]

*Second*, as the Special Master found, objections from Class Members who disagreed with

the Unamended Settlement's treatment of CTE recognized the existence of the diagnosis deadline.

Indeed, the Special Master "searched the record in vain to find any examples of *anyone* reading

the [Unamended Settlement] as [Ms. Cornish] did before 2017," when the Motion to Modify (ECF

8263) was filed.  (Decision at 20.)  For example, the Special Master noted an objection that "the

settlement would compensate only those few cases of CTE ***detected before preliminary approval***

of the settlement, to the exclusion of all future cases," and that the notice did not explain "that

while ***past diagnosed cases of CTE are covered*** if a class member dies before preliminary

approval, no future cases of CTE post-preliminary approval are covered." (Decision at 20 (quoting

ECF No. 6082 at 22, 39–40 (emphasis revised)).)  Additional Class Members raised the same

objection to the Unamended Settlement, criticizing the CTE diagnosis deadline.  Among other

examples, Class Members argued:

- "[Objectors] object to the [Unamended Settlement] because ***a 'Death with CTE' qualifying diagnosis requires, as noted above, retirees to have died and been diagnosed with CTE prior to July 7, 2014***. (*See* [Unamended Settlement], §6.3(f))." (ECF No. 6237 at 6 (emphasis added).)

- The initial settlement (filed January 6, 2014) was problematic because "[p]layers suffering from CTE who ***would be diagnosed*** or who died after [Preliminary Approval] were to receive nothing." (ECF No. 6082 at 13 (emphasis added).)  "[Intervenors'] interests were not adequately represented during the negotiation of the initial settlement, in part, because

---

[13] Every page of the Long-Form Notice had a bolded footer that read "Questions?  Call 1-855-887-3485 or Visit www.NFLConcussionSettlement.com."  (*See* ECF No. 6086-1; *see also* ECF No. 6423-12 ¶ 45 (as of October 14, 2014—prior to the opt-out deadline, objection deadline, and 2015 amendments—over 62,989 unique visitors accessed the settlement website and 4,544 individuals called the toll-free number with 2,302 speaking with a live operator).)

that settlement arbitrarily denied compensation to individuals whose CTE went ***undetected*** until after preliminary approval." (*Id.* at 14 (emphasis added).) "If a player is ***diagnosed with CTE after the preliminary approval stage***, he is entitled to ***nothing forever*** – regardless of the Monetary Award Fund's duration." (*Id.* at 30–31 (emphasis added).)

- "[T]here is no reason why a ***CTE diagnosis before preliminary approval*** should be sufficient to demonstrate entitlement to a multi-million dollar award while a ***future diagnosis*** entitles a class member to nothing. (ECF No. 6201 at 28 (emphasis added).)

- "[Objectors] believe that it is unfair for class members who are not ***diagnosed*** prior to the certification of the class to receive nothing." (ECF No. 6439 at 3 (emphasis added).)

Indeed, like Ms. Cornish, some Class Members vigorously argued that the Notice was insufficiently clear about the diagnosis deadline for Death with CTE. (*See* ECF Nos. 6082, 6201.) These arguments were made publicly, responded to by the parties, considered by the Court, and ultimately rejected. The several objections to the diagnosis deadline and the Notice's treatment of it demonstrate that, at the time of preliminary approval and the fairness hearing, it was well understood that a Qualifying Diagnosis of Death with CTE had a diagnosis deadline. Thus, the Special Master reasonably concluded that these objectors' arguments "reinforce the prevailing understanding that the CTE *Diagnosis* deadline was real, controversial, and distinct from other parts of the Agreement." (Decision at 20.)

*Third*, the November 19, 2014 fairness hearing further demonstrates the parties' intent to include a Death with CTE diagnosis deadline and the Court's full consideration of the issue. At the fairness hearing, which occurred prior to the February 2015 amendments, the Court heard extensive debate over the Unamended Settlement's treatment of CTE. The Court heard argument regarding an objection—almost identical to Ms. Cornish's—that class notice failed clearly to convey the Death with CTE diagnosis deadline. Objectors' counsel argued that "a player reading the long-form notice would be misled" by one part of the notice that said "[a] qualifying diagnosis may occur at any time until the end of a 65-year term of the monetary award fund," which counsel

characterized as "certainly not true if in fact death with CTE before July 7th of 2014 is what gets you an award." (ECF No. 6463, Fairness Hearing Tr. at 95:3–9.)[14] Class Counsel responded that "under the section entitled 'What are the benefits of the settlement?' . . . it says monetary awards for diagnosis of death with CTE prior to July 7, 2014. I think if you're reading the notice, the section if you want to know what your benefits are, you're probably going to go to the section that says, what are the benefits of the settlement? The notice does that." (*Id.* at 199:3–13.) The Court agreed: "I read them and I thought that this one was very specific. I mean if anyone wants to review them, they ought to review all the others." (*Id.* at 200:12–15.)

*Fourth*, the February 2015 amendments extending the diagnosis deadline for Death with CTE conclusively demonstrate that such a deadline also existed in the Unamended Settlement. In response to a February 2, 2015 Court Order (ECF No. 6479), the parties amended the deadline to obtain a Qualifying Diagnosis of Death with CTE from the Preliminary Approval Date to the Final Approval Date, and provided a 270-day grace period in which Settlement Class Members who died between the Preliminary Approval Date and the Final Approval Date could obtain a Qualifying Diagnosis. The Special Master correctly determined that the extension "cuts against [Ms. Cornish's] preferred interpretation" because the Court recommended the extension to prevent the unfairness of a Retired Player lacking sufficient notice to obtain a Qualifying Diagnosis. (Decision at 20; Final Approval Order at 397 ("The Parties provided compensation for Death with CTE until the Final Approval Date because they recognized that Retired Players who died prior to final approval did not have sufficient notice that they had to obtain Qualifying Diagnoses.").) The 270-day grace period would be wholly superfluous if there were no diagnosis deadline in the

---

[14]  Ms. Cornish similarly contends that "absent class members were consistently told they could obtain a diagnosis for Death with CTE at 'any time until the end of the 65-year term of the Monetary Award Fund.'" (Objection at 5.) Unlike objector's counsel at the Fairness Hearing, Ms. Cornish simply ignores the clear language in the notice describing the diagnosis deadline for Death with CTE.

Unamended Settlement, as moving the date of death deadline to Final Approval would have been sufficient to expand the benefit. If, as Ms. Cornish argues, the Unamended Settlement required only that a Retired Player died prior to the deadline in order for a diagnosis made at *any unlimited future date* to be timely, the February 2015 amendments would not have added language providing that a Retired Player who died between July 7, 2014 and April 22, 2015 "*shall have until 270 days from his date of death to obtain such a post-mortem diagnosis.*" (Settlement Agreement Ex. A-1 § 5 (emphasis added).) Indeed, the parties specifically explained to the Court that "**consistent with the Parties' intent under the original Settlement Agreement**, and recognizing that obtaining such a [CTE] **diagnosis may take several months post-death**, the Parties have provided for a grace period of 270 days following any date of death between preliminary approval and the Final Approval Date to allow Claimants to obtain the necessary diagnosis." (Joint Submission at 4–5, ECF No. 6481 (emphasis added).) The parties' Joint Proposed Findings of Fact and Conclusions of Law in Support of Final Approval also repeatedly states the original intent to set a diagnosis deadline, which was then extended along with a 270-day grace period. (*See* ECF No. 6497 ¶¶ 62, 78, 178, 358, 380, 496, 502.)

Following the February 2015 amendments and prior to Final Approval, Class Members were informed of the extended deadline for Death with CTE diagnoses by FAQ 41 on the Settlement website, which stated, "The Representative Claimant of a player who died before the Final Approval Date may establish Death with CTE by submitting medical records showing a *diagnosis* of Death with CTE made by a board-certified neuropathologist *after the player's death and before the Final Approval Date*. If the player died between July 7, 2014 and the Final Approval Date, his Representative Claimant has until 270 days after the player's death to obtain the post-mortem diagnosis. Players who died on or after the Final Approval Date (which has not

yet occurred) are not eligible for benefits for Death with CTE." (Ex. 1, Settlement FAQs (Apr. 1, 2016) (emphasis added); *see also* ECF No. 6423-12 ¶¶ 39–47.)

The objections following the February 2015 amendments recognized that the Unamended Agreement contained a diagnosis deadline for Death with CTE that the amendments extended. Specifically, objectors argued that "[w]hile expanding the covered deaths to those occurring between the preliminary approval and final approval dates, ***and extending the deadline to secure the necessary post-mortem diagnosis*** until 270 days after the date of death, are steps in the right direction, in truth, there should be no deadline for Death with CTE benefits since death is one of the elements of the claim." (ECF No. 6503 at 2 (emphasis added).)

*Fifth*, in its Final Approval Order, the Court squarely rejected Ms. Cornish's due process argument that the February 2015 amendments inserted a "new" diagnosis deadline for Death with CTE that did not exist in the Unamended Settlement. As the Court explained and Third Circuit affirmed, "[b]ecause these changes [in the 2015 Amendments] improved the deal for Class Members without providing any concessions to the NFL Parties, an additional round of notice for Class Members is unnecessary." *In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. 351, 386 (E.D. Pa. 2015), *amended*, No. 2:12-MD-02323-AB, 2015 WL 12827803 (E.D. Pa. May 8, 2015), and *aff'd*, 821 F.3d 410 (3d Cir. 2016). If the February 2015 amendments newly inserted a diagnosis deadline when none had previously existed, that clearly would have been a "concession" to the NFL Parties which the Court determined had not occurred.

In sum, even if the plain text of the Unamended Settlement Agreement were ambiguous (and it is not), voluminous parol evidence confirms that the Unamended Agreement contains a diagnosis deadline for Death with CTE.

## Conclusion

Simply put, the denial of Ms. Cornish's claim is required under the judicially approved terms of the Settlement Agreement and those terms raise no due process concerns.  The Objection should be denied.

Dated:  December 13, 2023

Respectfully submitted,

PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP

*/s/ Brad S. Karp*_____
Brad S. Karp
Bruce Birenboim
Claudia Hammerman
Lynn B. Bayard
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990
Email:  bkarp@paulweiss.com

*ATTORNEYS FOR THE*
*NATIONAL FOOTBALL LEAGUE*
*AND NFL PROPERTIES LLC*

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

———————————————————— :
:
IN RE: NATIONAL FOOTBALL : No. 2:12-md-02323-AB
LEAGUE PLAYERS' CONCUSSION :
INJURY LITIGATION : MDL No. 2323
———————————————————— :
: **Hon. Anita B. Brody**
THIS DOCUMENT RELATES TO: :
:
SPID No. 950012548 (R.C.) :
SPID No. 950013395 (C.H.) :
———————————————————— :

## SETTLEMENT IMPLEMENTATION DETERMINATION

R.C. and C.H. each sought a sought monetary award from this

class action settlement as a Representative Claimant of a deceased

Retired NFL Football Player. The Claims Administrator denied their

claims because of untimely diagnoses. The Special Master affirmed

those determinations in a consolidated opinion issued on October 7,

2023, which I attach here.

R.C. and C.H. each objected to the Special Master's determination.

I have reviewed the Special Master's legal conclusions *de novo* and find

that they fully resolve the questions presented in the claimants'

objections.  I adopt the Special Master's thorough and well-reasoned decision denying the claimants' appeal.

**AND NOW**, this 9th day of June, 2025, it is **ORDERED** that the Objections to the Special Master's Decision (Doc. ID Nos. 291993 & 291995) are **OVERRULED** and that the Special Master's consolidated decision dated October 7, 2023 upholding the determinations of the Claims Administrator is **AFFIRMED**.

s/ANITA B. BRODY, J.
ANITA B. BRODY

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| _____ | : | |
| IN RE: NATIONAL FOOTBALL | : | No. 2:12-md-02323-AB |
| LEAGUE PLAYERS' CONCUSSION | : | |
| INJURY LITIGATION | : | MDL No. 2323 |
| _____ | : | |
| | : | **Hon. Anita B. Brody** |
| THIS DOCUMENT RELATES TO: | : | |
| | : | |
| SPID No. 950012548 (R.C.) | : | |
| SPID No. 950013395 (C.H.) | : | |
| _____ | : | |

## <u>SETTLEMENT IMPLEMENTATION DETERMINATION</u>

R.C. and C.H. each sought a sought monetary award from this
class action settlement as a Representative Claimant of a deceased
Retired NFL Football Player. The Claims Administrator denied their
claims because of untimely diagnoses. The Special Master affirmed
those determinations in a consolidated opinion issued on October 7,
2023, which I attach here.

R.C. and C.H. each objected to the Special Master's determination.
I have reviewed the Special Master's legal conclusions *de novo* and find
that they fully resolve the questions presented in the claimants'

objections.  I adopt the Special Master's thorough and well-reasoned decision denying the claimants' appeal.

**AND NOW**, this 9th day of June, 2025, it is **ORDERED** that the Objections to the Special Master's Decision (Doc. ID Nos. 291993 & 291995) are **OVERRULED** and that the Special Master's consolidated decision dated October 7, 2023 upholding the determinations of the Claims Administrator is **AFFIRMED**.

s/ANITA B. BRODY, J.
ANITA B. BRODY